# EXHIBIT 2

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

     MASIMO CORPORATION,

 4                                        :      CIVIL ACTION
                 Plaintiff,               :

 5   v                                    :
                                          :
 6   PHILIPS ELECTRONICS NORTH AMERICA    :
     CORPORATION and PHILIPS MEDIZIN      :
 7   SYSTEME BOBLINGEN GMBH,              :
                                          :      NO. 09-80-LPS
 8               Defendants.              :
     ------------------------------------
 9   AND RELATED COUNTERCLAIMS.           :
     ------------------------------------
10
                              Wilmington, Delaware
11                      Thursday, February 12, 2015
                            Bench Trial - Volume B
12
                              - - -
13
     BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge
14
                              - - -
15
     APPEARANCES:
16

17           MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
             BY:  JULIA HEANEY, ESQ.
18
                  and
19
             KNOBBE, MARTENS, OLSON & BEAR, LLP
20           BY:  JOSEPH R. RE, ESQ.,
                  JON W. GURKA, ESQ., and
21                STEPHEN LARSON, ESQ.
                  (Irvine, California)
22
                  and
23

24

25   Kevin Maurer                    Brian P. Gaffigan
     Official Court Reporter         Official Court Reporter
```

```
 1    APPEARANCES:   (Continued)

 2
                KNOBBE, MARTENS, OLSON & BEAR, LLP
 3              BY:   KAREN VOGEL WEIL, ESQ.
                      (Los Angeles, California)
 4
                           Counsel for Masimo Corporation
 5

 6              POTTER, ANDERSON & CORROON, LLP
                BY:   RICHARD L. HORWITZ, ESQ.
 7
                      and
 8
                MAYER BROWN, LLP
 9              BY:   BRIAN A. ROSENTHAL, ESQ.,
                      ALAN M. GRIMALDI, ESQ., and
10                    BRIAN K. ANDREA, ESQ.
                      (Washington, District of Columbia)
11
                      and
12
                GIBSON DUNN & CRUTCHER, LLP
13              BY:   WILLIAM C. ROOKLIDGE, ESQ.
                      (Irvine, California)
14
                      and
15
                JONES DAY, LLP
16              BY:   SASHA MAYERGOYZ, ESQ.
                      (Chicago, Illinois)
17
                           Counsel for Philips Electronics North
18                         America Corporation and Philips
                           Medizin Systeme Boiblingen GmbH
19

20

21

22

23

24

25
```

Kesler - cross

1    prosecution or litigation, and so she was the right fit.  We

2    would ask -- any one of us on the prosecution team for any

3    of the reexams, we would go ask her to go pull documents

4    from the litigators.  She would go do that, prepare the

5    IDS's, and we would file them in any case where any of those

6    documents were even remotely relevant.

7    Q.      So if I understand your testimony, who prompted a

8    request for documents in this process that was set up?

9    A.      The prosecutors.

10   Q.      And how would you decide when to issue a prompt for

11   litigation documents?

12   A.      So any time we were preparing a response to an

13   Office Action or any other action that was coming up in a

14   reexamination or any case at all, we would ask Kendall to go

15   find those.  And that was true for any of us, so if any of

16   us asked, or she would go prepare it for all of them.

17             I would also, when I ran into litigators in

18   the hallway, for example, I would generally ask, how is the

19   litigation going?  And if they sounded like there were some

20   documents that needed to be pulled, I would go make sure

21   that Kendall -- I would go ask Kendall, hey, it sounds like

22   there is something going on in litigation.  Why don't you go

23   out and find if there are any documents we need to submit.

24   Q.      So would you ever be the one to ask, for example,

25   Steve Jensen:  Hey, Steve.  Do you have any documents to

Kesler - cross

1 give me?

2 A.      No, absolutely not.  He is such a busy guy, and I

3 have such a hard time catching him that that is just not a

4 good process.  That is why we have Kendall to go ask the

5 lower level litigators what is going on?  Pull the

6 documents, bring them to us.

7 Q.      I have to ask you in that regard, Mr. Kesler,

8 yesterday you talked about a five point plan referring to

9 Mr. Jensen.  What were you referring to?

10 A.      Okay.  So I initially start by trying to call his

11 office or walk down to it.

12          If he is not there, I ask his assistant to let

13 me know where he is and let me know when he comes into the

14 office.

15          If it doesn't sound like he is going to be in

16 any time soon, then I'll send him an e-mail, I'll give him a

17 call on his phone, I'll call him on his cellphone, I'll

18 leave a message on both of those.

19          And then I will text him if I really need to get

20 ahold of him.

21 Q.      And how long would it typically take for litigation

22 documents to be submitted once with the litigation document

23 is created or issued, entered?  How long would it typically

24 take for these litigation documents to be submitted to the

25 Patent Office?

360

Jensen - cross

1   possible to do so.

2   Q.     Mr. Jensen, you're the client confidant.  You are Mr.

3   Kiani's contact.  As he described, you are brothers from

4   different mothers.  You advised Masimo on all important

5   strategic decisions in this litigation where your client is

6   seeking hundreds of millions of dollars on two patents, one

7   of which is the '984 patent.  You learned that the sole

8   argument advanced through the PTO for patentability had been

9   rejected.  You had been stung before for failing to disclose

10  litigation to the PTO, yet Judge Stark's March 31st Order

11  comes in and it stops you with you in that conversation with

12  Mr. Grover and Mr. Kesler so that the Order never gets to

13  the PTO.  And your explanation, Mr. Jensen, is that it was

14  not your job?

15  A.     No.

16              MR. ROOKLIDGE:  No further questions.

17              THE COURT:  Okay.  Round two.

18                     CROSS-EXAMINATION

19  BY MS. WEIL:

20  Q.     Good afternoon, Mr. Jensen.

21  A.     Good afternoon, Ms. Weil.

22  Q.     Can you explain why you said no to that last

23  question?

24  A.     Well, there was a lot of things built into it that I

25  found objectionable.  And so in saying "no" to that, the

Jensen - cross

1   that you were the only lawyer with complete knowledge of all

2   the enforcement efforts of Masimo's patents?

3   A.     With knowledge, yeah.  What time period?

4   Q.     2013-2014.

5   A.     2013, no.  That's what I said in my prior testimony.

6   This was 2010.  Very, very, very different time periods in

7   terms of what I was doing.

8   Q.     You can put that away.

9          All right.  I want to talk about the '984

10  reexam.  Actually, the reexams in general.  So you know that

11  there were 23 reexams filed against Masimo's patents?

12  A.     I was informed, again, at a very high level, I think

13  it was about three years into the case, that there had been

14  23, a couple dozen reexams filed.  Many of those by Philips.

15  Some by, many additional ones by Masimo's competitor

16  Nellcor.  And by some who we don't know.

17  Q.     Do you supervise any of those reexams?

18  A.     I don't supervise them at all, no.

19  Q.     Do you oversee or coordinate any of them?

20  A.     No.  That doesn't even come with my coordination, as

21  the chart shows, that is not even one that I coordinate.

22  That I leave to the prosecution team, to coordinate and

23  figure out how to staff those and trust that they will do

24  it.

25  Q.     Do you control any of them in any way?

Jensen - cross

1    A.     No, I do not control them.

2    Q.     Do you have day-to-day or even regular knowledge of

3    the details of what has been going on in those reexams?

4    A.     No.  It's actually pretty rare that I get even a

5    general update on that.  I trust the team.

6    Q.     So we have already heard some testimony from you

7    regarding the procedures that you instigated for the

8    disclosure of litigation documents to the Patent and

9    Trademark Office in connection with the reexams and other

10   pending patent prosecution.  I want to turn to that a little

11   bit.

12          Could you tell us what impact, if any, the

13   determination in the Nellcor case that you had committed

14   inequitable conduct had on that procedure?

15   A.     It had an enormous effect.  That was a very upsetting

16   time for me, a very stressful period.  I think, as Mr. Re

17   said in opening, it gets somebody's attention.  It's a

18   patent lawyer's worst nightmare.  I think it was for me.  It

19   was very, very upsetting for me.

20          And so it really caused an entire shift, not

21   only in my practice, in the way that I interacted with

22   Masimo and the way my practice was formulated, I think it

23   actually made changes throughout the firm.

24          I almost quit the practice of law at that point

25   in time.  But it made very, very, very significant changes

Jensen - cross

1   in the way my practice was formed and what I was going to do

2   going forward to make sure it never happened again.

3   Q.      And was that one of the reasons for this procedure

4   that you instigated for the reexams with the go-between of

5   Ms. Loebakka that we've heard testimony about?

6   A.      It was clearly the primary reason that I asked that.

7   I mean these documents that are coming in in the litigation,

8   the prosecutors wouldn't even know about them on a normal

9   basis.  And I wanted to make sure that everything just got

10  sent in because, otherwise, somebody would forget something.

11  It was document by document, relying on someone to just

12  remember:  Oh, I need to send this over to the prosecutors.

13  I knew from experience there is no way that would work.  And

14  so I wanted to have a process in place.

15          There were two teams.  They didn't really know

16  what was going on on a day-to-day basis.  They didn't have

17  the details.  They were separated.  There was actually a

18  Protective Order in this case by Philips' design that made

19  it so they weren't connected.  You couldn't have the

20  prosecution team rummaging through litigation materials and

21  happen across something that was under the Protective Order.

22          So we had to come up with something where

23  they would somehow go to the litigation teams, and there

24  were multiple of them, and there are hundreds of patent

25  applications, and they would know what was going on in those

Jensen - cross

1    patent applications rather than some litigator having to keep

2    track, which would have been impossible, and trigger them

3    providing materials from, get the litigation teams to provide

4    them materials that related to any patent that was involved in

5    litigation.  They could communicate that easier.  Let's find

6    out what was going on in the prosecution, get that information

7    and send it in, just send it all in to the Patent Office.  And

8    that's the prior finding, was the single most significant

9    reason in asking that that be done.

10   Q.      I bet you have never want that again.

11   A.      I never want that again.

12   Q.      And how did that Court determination affect the kind

13   of work that you did for Masimo going forward?

14   A.      It took me out of the prosecution, out of -- if

15   you remember that case, I was actually supervising the

16   prosecution at the time, and not necessarily doing all of it

17   but that's the way I was supervising it.  And I was actually

18   litigating the case as one of the lead lawyers in the case.

19           That completely changed and stopped and

20   separated from that point forward.  And I stepped out of

21   supervising, directing, controlling, doing, providing the

22   oversight or even coordinating the prosecution from that

23   point forward.

24           And like I said, I'd get consulted.  I went on

25   an interview.  That is something I get pulled into and it's

Jensen - cross

1  a quick in and out.  But I stepped out of it.

2  Q.      And just a few things that I want to zero in on with

3  respect to this process for the disclosure.  At any time

4  during the reexam of the '984 patent, have you been part of

5  the review or decision process of what to submit to the PTO?

6  A.      No, I am not part of that process.  The process

7  happens without any of my involvement.

8  Q.      And at any time during the '984 reexam, have you been

9  part of the process of getting litigation materials to the

10  prosecution teams?

11  A.      No, the group that was set up there did not involve,

12  did not include me.  It excluded me.

13  Q.      All right.  Now, I would like to talk about the

14  interview in the reexam.

15  A.      Okay.

16  Q.      I believe that you testified earlier that that

17  interview involved both the '222 and the '984; is that

18  right?

19  A.      Correct.

20  Q.      What was the status of the '222 patent at the time of

21  the interview?

22  A.      It was an expired patent.  It was actually very

23  important, but it was expired, as was the '984.

24  Q.      The '984 was expired as well?

25  A.      The '984 was expired as well.