# EXHIBIT A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

---

## FORM 10-K

---

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended January 1, 2022**
**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**
**Commission File Number 001-33642**

**♥MASIMO**

# MASIMO CORPORATION

**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| DE | 33-0368882 |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification Number)** |
| 52 Discovery    Irvine,    CA | 92618 |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(949)  297-7000**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class:** | **Trading symbol:** | **Name of each exchange on which registered:** |
|---|---|---|
| Common Stock, par value $0.001 | MASI | The Nasdaq Stock Market, LLC |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    ☒ Yes   ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    ☐ Yes   ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    ☒ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    ☒ Yes   ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.    ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.)    ☐ Yes   ☒ No

The aggregate market value of the voting stock held by non-affiliates of the registrant, based upon the closing sale price of the common stock on July 3, 2021, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $10.9 billion. Shares of stock held by officers, directors and 5 percent or more stockholders have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes. At January 29, 2022, the registrant had 55,364,690 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Items 10, 11, 12, 13 and 14 of Part III of this Annual Report on Form 10-K incorporate information by reference from the registrant's proxy statement for the registrant's 2022 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission within 120 days after the close of the fiscal year covered by this annual report on Form 10-K.

**MASIMO CORPORATION**
**FISCAL YEAR 2021 FORM 10-K ANNUAL REPORT**
**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| | **PART I** | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 36 |
| Item 1B | Unresolved Staff Comments | 64 |
| Item 2 | Properties | 65 |
| Item 3 | Legal Proceedings | 65 |
| Item 4 | Mine Safety Disclosures | 65 |
| | **PART II** | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 66 |
| Item 6 | Reserved | 68 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 69 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 78 |
| Item 8 | Financial Statements and Supplementary Data | 79 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 79 |
| Item 9A | Controls and Procedures | 79 |
| Item 9B | Other Information | 79 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 80 |
| | **PART III** | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 80 |
| Item 11 | Executive Compensation | 80 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 80 |
| Item 13 | Certain Relationships and Related Transactions and Director Independence | 80 |
| Item 14 | Principal Accounting Fees and Services | 80 |
| | **PART IV** | |
| Item 15 | Exhibits and Financial Statement Schedules | 81 |
| Item 16 | Form 10-K Summary | 84 |
| Signatures | | 85 |

**FORWARD-LOOKING STATEMENTS**

*This Annual Report on Form 10-K contains "forward-looking statements" that involve risks and uncertainties, as well as assumptions that, if they never materialize or prove incorrect, could cause our results to differ materially and adversely from those expressed or implied by such forward-looking statements. The forward-looking statements are contained principally in Item 1—"Business," Item 1A—"Risk Factors" and Item 7—"Management's Discussion and Analysis of Financial Condition and Results of Operations" but appear throughout this Annual Report on Form 10-K. Examples of forward-looking statements include, but are not limited to, any projection or expectation of earnings, revenue or other financial items; the plans, strategies and objectives of management for future operations; factors that may affect our operating results, including accounting and tax estimates; our success in pending litigation; new products or services; the demand for our products; our ability to consummate acquisitions and successfully integrate them into our operations; future capital expenditures; effects of current or future economic conditions or performance; industry trends and other matters that do not relate strictly to historical facts or statements of assumptions underlying any of the foregoing. These statements are often identified by the use of words such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "ongoing," "opportunity," "plan," "potential," "predicts," "seek," "should," "will," or "would," and similar expressions and variations or negatives of these words. These forward-looking statements are based on the expectations, estimates, projections, beliefs and assumptions of our management based on information currently available to management, all of which is subject to change. Such forward-looking statements are subject to risks, uncertainties and other factors that are difficult to predict and could cause our actual results and the timing of certain events to differ materially and adversely from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those identified below, and those discussed under Item 1A—"Risk Factors" in this Annual Report on Form 10-K. Furthermore, such forward-looking statements speak only as of the date of this Annual Report on Form 10-K. We undertake no obligation to update or revise publicly any forward-looking statements to reflect events or circumstances after the date of such statements for any reason, except as otherwise required by law.*

**PART I**

**ITEM 1.    BUSINESS**

*Overview*

We are a global medical technology company that develops, manufactures and markets a variety of noninvasive monitoring technologies and hospital automation™ solutions. Our mission is to improve patient outcomes and reduce the cost of patient care. Our patient monitoring solutions generally incorporate a monitor or circuit board, proprietary single-patient use or reusable sensors, software and/or cables. We provide our products to hospitals, emergency medical service (EMS) providers, home care providers, long-term care facilities, physician offices, veterinarians and consumers through our direct sales force, distributors and original equipment manufacturers (OEM) partners. We were incorporated in California in May 1989 and reincorporated in Delaware in May 1996.

Our core business is Measure-through Motion and Low Perfusion™ pulse oximetry, known as Masimo Signal Extraction Technology® (SET®) pulse oximetry. Our product offerings have expanded significantly over the years to also include noninvasive monitoring of blood constituents with an optical signature, optical regional oximetry monitoring, electrical brain function monitoring, acoustic respiration monitoring, exhaled gas monitoring, nasal high flow ventilation, minimally invasive neuromodulation technology for pain and addiction reduction, hospital automation™ and connectivity solutions and home wellness and monitoring.

These technologies are incorporated into a variety of product platforms designed to meet our customers' needs. In addition, we provide our technologies to OEMs in a form factor that is easy to integrate into their patient monitors, defibrillators, infant incubators and other devices.

Our technology is supported by a substantial intellectual property portfolio that we have built through internal development and, to a lesser extent, acquisitions and license agreements. We have also exclusively licensed from Cercacor Laboratories, Inc. (Cercacor) the right to certain OEM rainbow™ technologies and to incorporate certain rainbow™ technology into our products intended to be used by professional caregivers, including, but not limited to, hospital caregivers and alternate care facility caregivers.

***Core Business***

*Conventional Pulse Oximetry*

Pulse oximetry enables the noninvasive measurement of the oxygen saturation level of arterial blood ($SpO_2$), which delivers oxygen to the body's tissues. Pulse oximetry also measures pulse rate (PR), which, when measured by electrocardiogram (ECG), is called heart rate. Pulse oximeters use sensors attached to an extremity, typically the fingertip or certain core body sites. These sensors contain two light-emitting diodes that transmit red and infrared light from one side of the extremity through the tissue to a photodetector on the other side of the extremity. The photodetector in the sensor measures the amount of red and infrared light absorbed by the tissue. A microprocessor then analyzes the changes in light absorption to provide a continuous, real-time measurement of the amount of oxygen in the patient's arterial blood. Pulse oximeters typically give audio and visual alerts, or alarms, when the patient's arterial blood oxygen saturation level or pulse rate falls outside of a user-designated range. As a result, clinicians have the opportunity to assess patients who may need immediate treatment to prevent the serious clinical consequences of hypoxemia, or low arterial blood oxygen saturation levels, and hyperoxemia, or high arterial blood oxygen levels.

As one of the most common technologies used in and out of hospitals around the world, pulse oximetry has gained widespread clinical acceptance as a standard patient vital sign measurement because it can give clinicians a warning of possible hypoxemia or hyperoxemia. $SpO_2$ monitoring of oxygen saturation is critical because hypoxemia can lead to a lack of oxygen in the body's tissues, which can be toxic and result in organ damage or death. Pulse oximeters are used in a variety of critical care settings, including surgery, recovery rooms, intensive care units (ICUs), emergency departments and general care floors, as well as alternative care settings, such as long-term care facilities, physician offices and the home monitoring of patients with chronic conditions.

Clinicians also use pulse oximeters to monitor oxygen saturation in premature babies to ensure that appropriate oxygen saturation levels are maintained. In premature babies, oxygen saturation levels above clinically acceptable limits may lead to a condition known as retinopathy of prematurity (ROP), which, if left untreated, can lead to permanent eye damage or blindness. By ensuring that oxygen saturation levels in babies remain within clinically acceptable limits, clinicians believe they can lower the incidence of ROP.

Conventional pulse oximetry has limitations that can reduce its effectiveness and the quality of patient care. In particular, when using conventional pulse oximetry, oxygen saturation measurements can be distorted by motion artifact, or patient movement, and low perfusion, or low arterial blood flow at the measurement site. Motion artifact can cause conventional pulse oximeters to inaccurately measure the arterial blood oxygen saturation level, due mainly to the effect of movement-induced pulsations of venous blood, which is at a lower oxygen saturation than arterial blood. Low perfusion can also cause conventional pulse oximeters to report inaccurate measurements or, in some cases, no measurement at all. In addition, conventional pulse oximeters cannot distinguish oxygenated hemoglobin from dyshemoglobin, including the most prevalent forms of dyshemoglobins, carboxyhemoglobin and methemoglobin. As a result, conventional pulse oximeters may report falsely high oxygen levels when these dyshemoglobins are present in the blood. Furthermore, conventional pulse oximetry readings can also be impacted by bright light and electrical interference caused by the presence of electrical surgical equipment.

Independent research has shown that over 70% of oxygen saturation alarms outside the operating room are false when conventional pulse oximetry is used. In the operating room, conventional pulse oximeters can fail to give accurate measurements due to weak physiological signals or low perfusion. Manufacturers of pulse oximeters have attempted to address some of these limitations with varying degrees of success. Some competing devices have attempted to minimize the observed effects of motion artifact by repeating/freezing the last measurement before motion artifact was detected until a new, clean signal is detected and a new measurement can be displayed. Other competing devices increase the averaging time during motion, known as long averaging, in an attempt to reduce the observed effect of motion on their measurements. Still other competing devices extend the audible alarm notification delay, which reduces awareness of inaccurate measurements. These competing "motion tolerant" or "alarm management" techniques mask the limitations of conventional pulse oximetry. Several published studies have demonstrated that these also contribute to increased occurrences of undetected true alarms, or events where hypoxemia occurs but is not detected by the pulse oximeter.

Lastly, because conventional pulse oximetry cannot consistently measure $SpO_2$ and pulse rate in the presence of motion artifact or low perfusion, its use is limited in lower acuity settings in the hospital, such as in general care areas, where a hospital's staff-to-patient ratio is significantly lower and the staff have less tolerance for false alarms. In addition, two-wavelength pulse oximeters cannot distinguish oxygenated hemoglobin from dyshemoglobin, including the most prevalent forms of carboxyhemoglobin and methemoglobin. As a result of these dyshemoglobins, pulse oximeters will report falsely high oxygen levels when they are present in the blood.

Table of Contents

*Masimo Difference*

*Masimo SET® Pulse Oximetry*

Masimo SET® was designed to overcome the primary limitations of conventional pulse oximetry by maintaining accuracy in the presence of motion artifact, low perfusion and weak signal-to-noise situations. Our Masimo SET® platform, which became available to U.S. hospitals in 1998, is the basis of our pulse oximetry products, and we believe represented the first significant technological advancement in pulse oximetry since its introduction in the early 1980s. Masimo SET® utilizes five signal processing algorithms, four of which are proprietary, in parallel to deliver high sensitivity and specificity in the measurement of arterial blood oxygen saturation levels. Sensitivity is the ability to detect true alarms and specificity is the ability to avoid false alarms. One of our proprietary processing algorithms, Discrete Saturation Transform, separates the signal from noise in real time through the use of adaptive filtering and an iterative sampling technique that tests each possible saturation value for validity. Masimo SET® signal processing can therefore identify the venous blood and other "noise", isolate them and extract the arterial signal.

The performance of Masimo SET® pulse oximetry has been evaluated in more than 100 independent studies and thousands of clinical evaluations. We believe that Masimo SET® is trusted by clinicians to safely monitor in excess of approximately 200 million patients each year and has been chosen as the primary pulse oximeter technology used by nine of the top ten hospitals according to the 2021-2022 *U.S. News & World Report* Best Hospitals Honor Roll. Compared to conventional pulse oximeters, during patient motion and low perfusion, Masimo SET® provides measurements when other pulse oximeters cannot, significantly reduces false alarms (improved specificity), and accurately detects true alarms (improved sensitivity). Clinical studies have shown that the use of Masimo SET® pulse oximetry, in conjunction with modified clinical protocols, has helped clinicians reduce ROP in neonates and improve screening for newborns with critical congenital heart disease (CCHD). Clinical studies have also shown a reduction in rapid response activations and ICU transfers when Masimo SET® is used to continuously monitor patients on general wards. Additionally, researchers have found that the use of Masimo SET® is associated with reduced ventilator weaning time and arterial blood gas measurements in the ICU.

Our pulse oximetry technology is contained on a circuit board which can be placed inside a standalone pulse oximetry monitor, placed inside OEM multiparameter monitors, or included as part of an external "Board-in-Cable" solution that is plugged into a port on an OEM or other device. All of these solutions use our proprietary single-patient-use or reusable sensors and cables. We sell our products to end-users through our direct sales force and through certain distributors, as well as to our OEM partners, for incorporation into their products. In 2013, we also began selling our pulse oximetry products in the consumer market.

To complement our Masimo SET® platform, we have developed a wide range of proprietary single-patient-use (disposable) and multi-patient-use (reusable) sensors, cables and other accessories designed specifically to work with Masimo SET® software and hardware. Our single-patient-use sensors offer several advantages over reusable sensors, including improved performance, cleanliness, increased comfort and greater reliability. In addition, our neonatal adhesive sensors have been designed to exhibit greater durability compared to competitive sensors. Although our technology platforms operate solely with our proprietary sensor lines, our sensors have the capability to work with certain competitive pulse oximetry monitors through the use of adapter cables.

Adhesive sensors are single-patient-use items, but the U.S. Food and Drug Administration (FDA) allows third parties to reprocess pulse oximetry sensors. In response to some hospitals' requests to implement environmentally friendly or "green" products, we offer sensor reprocessing as well as sensor recycling programs.

*Masimo rainbow SET® Platform*

Since introducing Masimo SET®, we have continued to innovate by introducing noninvasive measurements that go beyond arterial blood oxygen saturation and pulse rate. Our Masimo rainbow SET® platform leverages our Masimo SET® technology and incorporates licensed rainbow® technology to enable real-time monitoring of additional noninvasive measurements. Our rainbow SET® platform includes our rainbow SET® Pulse CO-Oximetry products, which we believe are the first devices cleared by the FDA to noninvasively and continuously monitor additional hemoglobin species that were previously only measurable using intermittent invasive procedures using multiple wavelengths of light.

In addition to $SpO_2$, PR, perfusion index (Pi), Pleth Variability Index (PVi®) and respiration rate from the pleth (RRp®), rainbow® Pulse CO-Oximetry has the unique ability to measure and distinguish oxygenated hemoglobins from the dyshemoglobins that are incapable of transporting oxygen, carboxyhemoglobin (SpCO®) and methemoglobin (SpMet®). Besides the ability to measure SpCO® and SpMet®, the Masimo rainbow SET® platform also allows for the noninvasive and continuous monitoring of total hemoglobin concentration (SpHb®) as well as the monitoring of arterial oxygen saturation, in the presence of carboxyhemoglobin and methemoglobin, known as fractional arterial oxygen saturation ($SpfO_2$™). Additionally, the rainbow SET® platform also allows for the calculation of Oxygen Content (SpOC™) and Oxygen Reserve Index™ (ORi™). $SpfO_2$™ and ORi™ have received CE Marking, but are not currently available for sale in the U.S.

3

We believe that Masimo rainbow® Pulse CO-Oximetry products will become widely adopted for the noninvasive monitoring of these measurements in the future. We also believe that the addition of acoustic respiration rate (RRa®), using our rainbow Acoustic Monitoring® technology, will strengthen the clinical demand for noninvasive and continuous monitoring using our rainbow® platform, especially in the growing general floor market.

Products with our MX circuit board contain our Masimo SET® pulse oximetry technology as well as circuitry to support rainbow® measurements. At the time of purchase, or at any time in the future, our customers and our OEMs' customers have the option of purchasing additional rainbow® software measurements, which allow such customers to incrementally expand their patient monitoring systems with a cost-effective solution. To date, over forty companies have released rainbow SET®equipped products or announced rainbow® integration plans.

*Measurements*

*SpHb®*

Hemoglobin is the oxygen-carrying component of red blood cells (RBCs). Hemoglobin measurement is one of the most frequent invasive laboratory measurements in the world, and is often measured as part of a complete blood count (CBC), which measures multiple other blood components. A low hemoglobin status is a condition called anemia. As a chronic disorder, anemia can be treated by iron supplements, diet changes or drugs that increase the production of RBCs. As an acute disorder resulting from bleeding, anemia requires either stoppage of the bleeding or a blood transfusion in order to sustain organ function and life.

SpHb® is available as a continuous or a spot-check measurement. Continuous SpHb® monitoring provides real-time visibility into hemoglobin levels and the changes, or lack of changes, in hemoglobin levels, which can otherwise only be measured through intermittent, invasive blood testing. SpHb® monitoring is not intended to be used as the sole basis for making diagnosis or treatment decisions, but continuous SpHb® monitoring may help clinicians to trend hemoglobin in real time between invasive blood samples.

*SpOC™*

The oxygen content of blood is a function of both oxygen saturation and hemoglobin levels. SpOC™ provides a more complete picture of a patient's oxygenation status by combining noninvasive and continuous measurements of both hemoglobin and oxygen saturation levels into a single calculation.

*SpCO®*

Carbon monoxide (CO) is a colorless, odorless and tasteless gas that is undetectable by humans and is often unknowingly inhaled from combustion fumes, or during fires by victims and first responders. CO poisoning is the leading cause of accidental poisoning death in the U.S. and is responsible for up to 50,000 emergency department visits and 500 unintentional deaths annually. CO, when bound to hemoglobin cells, prevents those cells from carrying oxygen. Elevated CO levels may cause severe neurological damage, permanent heart damage or death. Screening for elevated CO levels in the emergency department is critical, as symptoms of CO poisoning in patients may be misdiagnosed because such symptoms are similar to the flu.

CO levels in the blood can be measured using a laboratory CO-Oximeter, which requires a patient or a patient's blood sample to be transported to a hospital with laboratory CO-Oximetry capability. Additional delays occur if a patient needs hyperbaric oxygen therapy, which often requires transfer to yet another medical center with hyperbaric capability. Outside the hospital, laboratory measurements of carboxyhemoglobin are not considered feasible. Historically, this meant that CO levels in the blood could not be assessed in environments in which such assessment would be very useful, such as in the home or as part of the medical evaluation of first responders potentially exposed to CO at the scene of a fire.

While SpCO® is not intended to replace invasive carboxyhemoglobin tests, when used with other clinical variables, SpCO® may help clinicians identify elevated CO levels and help determine additional test and treatment options. Multiple leading emergency first responder associations, including the National Association of Emergency Medical Technicians, the National Association of EMS Educators, the International Association of Fire Fighters and the International Association of Fire Chiefs, have educated their members on the benefits of noninvasive CO measurement when exposure is suspected or when an individual presents symptoms that could indicate elevated CO levels.

*SpMet*

Methemoglobin in the blood leads to a dangerous condition known as methemoglobinemia, which occurs as a reaction to some common drugs used in hospitals and outpatient procedures. Methemoglobinemia reduces the amount of oxygen bound to hemoglobin for delivery to tissues and forces normal hemoglobin to bind more tightly to oxygen, releasing less oxygen to the tissues. Methemoglobinemia may go unrecognized or be subject to delayed diagnosis, increasing risk to the patient. Commonly prescribed drugs can introduce methemoglobin into the blood and cause methemoglobinemia. Some of the 30 drugs that are known to cause methemoglobinemia include benzocaine, a local anesthetic routinely used in procedures ranging from endoscopy to surgery; inhaled nitric oxide, routinely used in the Neonatal Intensive Care Unit; nitroglycerin, used to treat cardiac patients; and dapsone, used to treat infections for immune-deficient patients such as Human Immunodeficiency Virus (HIV) patients. Warnings, cautions and alerts regarding the clinical significance and prevalence of methemoglobinemia have been generated by the FDA, the Veterans Administration, the Institute for Safe Medication Practices and the National Academy of Clinical Biochemistry. The American Academy of Pediatrics recommends monitoring methemoglobin levels in infants who receive nitric oxide therapy. While SpMet® is not intended to replace invasive methemoglobin tests, when used with other clinical variables, SpMet® may help clinicians identify elevated methemoglobin levels and help determine additional test and treatment options.

*PVi*

PVi® is a measure of the dynamic changes in the Perfusion Index (Pi) that occur during the respiratory cycle. The calculation is accomplished by measuring changes in Pi over a time interval where one or more complete respiratory cycles have occurred. PVi® may show changes that reflect physiologic factors such as vascular tone, circulating blood volume and intrathoracic pressure excursions. When used with other clinical variables, PVi® may help clinicians assess fluid responsiveness in surgical and intensive care patients who are mechanically ventilated and help determine other treatment options. PVi® has received FDA 510(k) clearance as a continuous, noninvasive, dynamic indicator of fluid responsiveness in select populations of mechanically ventilated adult patients.

*RPVi*

Rainbow® Pleth Variability Index (RPVi™) is a multi-wavelength version of PVi® that is designed to provide enhanced specificity to changes in fluid volume compared to PVi®. Similar to PVi®, RPVi™ is displayed as a percentage and is calculated by measuring changes in Pi over a time interval where one or more complete respiratory cycles have occurred. The lower the number, the less variability there is in Pi over a respiratory cycle, which indicates more fluid in the body. RPVi™ has received the CE Mark, but is not currently available for sale in the U.S.

*RRp*

Respiration rate is defined as the number of breaths per minute. Changes in respiration rate provide an early warning sign of deterioration in patient condition. A low respiration rate is indicative of respiratory depression and high respiration rate is indicative of patient distress. Current methods of monitoring respiration rate include end tidal carbon dioxide (EtCO$_2$) monitoring, which requires a nasal cannula be inserted in the patient's nose or a mask to be worn, and therefore has low patient compliance; and impedance monitoring, which is considered unreliable and requires the placement of ECG electrodes on the chest. RRp® allows clinicians to noninvasively and continuously measure and monitor respiration rate using a standard Masimo SET® pulse oximetry sensor or rainbow® Pulse CO-Oximetry sensor. RRp® is determined by the variations in the plethysmograph waveform due to respiration, although the measurement is not possible in all patients or conditions and may not immediately indicate changes in respiration rate. RRp® has received the CE Mark, as well as FDA 510(k) clearance when used in healthcare settings with the MightySat® Rx fingertip SET® pulse oximeter. RRp® is also available in the U.S. for use by consumers for general health and wellness purposes as part of our MightySat® fingertip pulse oximeter. RRp® has received FDA 510(k) clearance for continuous RRp® monitoring of adult and pediatric patients with Rad-97®, Radical-7® and Radius-7® Pulse Co-Oximeters®. With this clearance, both continuous and spot-check RRp® are now available in the U.S. and supported in a variety of pulse oximetry sensors and configurations, including a non-cabled, tetherless, wearable Radius PPG™.

*RRa®*

Our sound-based monitoring technology, rainbow Acoustic Monitoring® (RAM®), enables RRa® and provides continuous and noninvasive monitoring of respiration rate. For patients requiring accurate and sensitive respiration rate monitoring, we believe that RRa® better detects pauses in breathing than respiration rate measurements from other technologies such as EtCO₂ monitoring and RRp®. RRa® also provides an important visual indication of breathing through a displayed acoustic waveform. Multiple clinical studies have shown that the noninvasive measurement of acoustic respiration rate provides as good or better respiration rate monitoring accuracy as EtCO₂ monitoring, and can reliably detect episodes of respiratory pause, defined as the cessation of breathing for 30 seconds or more. When used with other clinical variables, RRa® may help clinicians assess respiratory depression and respiratory distress earlier and more often to help determine treatment options and potentially enable earlier interventions.

*SpfO2®*

Prior to our debut of SpfO2™, pulse oximeters could only measure and display functional SpO₂ oxygen saturation. Therefore, when patients had elevated carboxyhemoglobin and/or elevated methemoglobin, the displayed *functional* SpO₂ oxygen saturation overestimated the actual oxygen saturation value. SpfO2™, or *fractional* oxygen saturation, allows more precise arterial oxygenation assessment in patients with elevated dyshemoglobins, common throughout the hospital and pre-hospital setting, compared to functional oxygen saturation, and may also allow earlier interventions and more timely therapeutic decisions. SpfO2™ has received the CE Mark, but is not currently available for sale in the U.S.

*ORi™*

ORi™ provides real-time visibility to oxygenation status in moderate hyperoxic range, which we define as a patient's oxygen "reserve". ORi™ can be trended and has optional alarms to notify clinicians of changes in a patient's oxygen reserve. When this technology is used with SpO₂ monitoring, ORi™ may extend the continuous and noninvasive visibility of a patient's oxygen status into ranges previously unmonitored in this fashion. ORi™ may also be of value in patients receiving supplemental oxygen, such as those in surgery, under conscious sedation or in the ICU, as ORi™ is represented as an "index" parameter with a unit-less scale between 0.00 and 1.00. Furthermore, ORi™ may provide an advance warning of an impending hypoxic state, or an indication of an unintended hyperoxic state, when evaluated in conjunction with the partial pressure of oxygen (PaO₂). In this way, ORi™ may assist in determining the need for proactive interventions to avoid hypoxia or unintended hyperoxia. ORi™ has received the CE Mark, but is not currently available for sale in the U.S.

### *Other Noninvasive Measurements*

Following the introduction of our rainbow SET® platform, we have continued to expand our technology offerings by introducing additional noninvasive measurements and technologies to create new market opportunities in both hospital and non-hospital care settings.

*SedLine® Brain Function Monitoring*

Brain function monitoring is most commonly used during surgery to help clinicians avoid over-titration and under-titration of anesthesia and sedation. SedLine® brain function monitoring technology measures the brain's electrical activity by detecting EEG signals. In contrast to whole-scalp EEG monitoring, which is used for diagnostic purposes, this form of EEG monitoring is often referred to as processed EEG monitoring or brain function monitoring. Brain function monitors display the patient's EEG waveforms, but these may be difficult for clinicians to interpret. With SedLine® technology, EEG signals are processed and displayed as a single number called the Patient State Index (PSi), which gives a continuous quantitative indication of the patient's depth of anesthesia and sedation. SedLine® brain function monitoring technology also displays raw EEG waveforms, the PSi trend and a Density Spectral Array view, which allows clinicians to compare EEG power in both sides of the brain over time to facilitate the detection of asymmetrical activity and agent-specific effects on the EEG signal.

SedLine® brain function monitoring technology is available on Root® through the use of a Masimo Open Connect® (MOC-9®) connectivity port. The Root® patient monitoring and connectivity platform integrates rainbow® and SET® measurements with measurement technologies, such as SedLine®.

*NomoLine® Capnography and Gas Monitoring*

We offer a portfolio of capnography and gas monitoring products ranging from external "plug-in-and-measure" capnography and gas analyzers, integrated modules, handheld capnograph and capnometer devices and capnography sampling lines. Our NomoLine® capnography sampling lines are available in more than 40 configurations of airway adapter sets and cannulas for use in a variety of clinical scenarios on both intubated and non-intubated adult, pediatric, infant and neonatal patients, in both low and high humidity configurations, facilitating easy to use sidestream capnography and gas monitoring.

Table of Contents

These products have the ability to measure multiple expired gases, such as carbon dioxide ($CO_2$), nitrous oxide ($N_2O$), oxygen ($O_2$) and other anesthetic agents. In addition, respiration rate is calculated from the $CO_2$ waveform. These measurements are possible through either mainstream monitoring, which samples gases from a ventilated patient's breathing circuit, or sidestream monitoring, which samples gases from a breathing circuit in mechanically ventilated patients or through a cannula or mask in spontaneously breathing patients. These capnography and gas measurements are standard-of-care in many hospital environments, such as operating rooms and ICUs, during procedural sedation. NomoLine+ capnography sampling lines have received FDA 510(k) clearance.

*O3+ Organ Oximetry*

O3+ organ or Regional Oximetry, also known as tissue or cerebral oximetry, uses near-infrared spectroscopy (NIRS) to provide continuous measurement of tissue oxygen saturation (rSO$_2$) to help detect regional hypoxemia, or oxygen deficits in specific tissues such as the brain, that pulse oximetry alone cannot detect under certain conditions. In addition, O3+ sensors, in conjunction with our Root+ monitor, can automate the differential analysis of regional to central oxygen saturation derived from SET+ pulse oximeters. O3+ monitoring involves applying O3+ Regional Oximetry sensors to the forehead and connecting the O3+ MOC-9+ module to a Root+ monitor through one of its three MOC-9+ ports. O3+ Regional Oximetry has received the CE Mark and FDA 510(k) clearance for use in adult and pediatric patients, including use of O3+ in infant and neonatal patients, as well as expanded use in monitoring somatic tissue oxygenation saturation in all patient populations and monitoring relative changes in hemoglobin, oxyhemoglobin and deoxyhemoglobin in adult brains.

*Advanced Hemodynamic Monitoring Solutions*

In January 2021, we acquired LiDCO Group, PLC, which specializes in advanced hemodynamic monitoring solutions. With the completion of this acquisition, we will be able to provide clinicians with access to patients' cardiac output (CO), stroke volume (SV), systemic vascular resistance (SVR), oxygen delivery (DO$_2$), stroke volume variation (SVV) and pulse pressure variation (PPV), which are used to assess preload and afterload, to help determine the current state of a patient's hemodynamic stability and whether any interventions are needed to optimize the delivery of oxygen to the tissues. Hemodynamic monitoring solutions are also used to monitor the response to therapies such as vasopressors, inotropes and fluids.

**The Masimo Hospital Automation™ Platform**

*Patient SafetyNet™*[(1)]

Patient SafetyNet+, our patient surveillance, remote monitoring and clinician notification solution, works in concert with our bedside and ambulatory monitoring devices to facilitate the supplemental monitoring of the oxygen saturation, pulse rate, perfusion index, hemoglobin, methemoglobin and respiration rate of up to 200 patients simultaneously from a single server. Patient SafetyNet+ offers an intuitive and powerful user interface with trending, real-time waveform capability at a central station, as well as remote clinician notification via pager, voice-over-IP phone or smart-phones. Patient SafetyNet+ also features an Adaptive Connectivity Engine™ (ACE™) that enables two-way, HL-7 based connectivity to clinical/hospital information systems. The ACE™ significantly reduces the time and complexity to integrate and validate custom HL-7 implementations, and demonstrates our commitment to innovation that automates patient care with open, scalable and standards-based connectivity architecture.

Patient SafetyNet™ Series 5000, along with Hospital Automation™ Connectivity, Iris+ Gateway, Kite+, UniView™, UniView : 60™ and MyView+ through the Root+ patient monitoring and connectivity platform, offers a new level of interoperability designed to enhance clinician workflows and reduce the cost of care in a variety of hospital settings, including operating rooms and the general care floors. Patient SafetyNet™ Series 5000 with Iris+ ports enables Root+ to assimilate data from all devices connected to the patient, thereby acting as a comprehensive in-room patient monitor and connectivity hub. Alarms and alerts for all devices are seamlessly forwarded to the patient's clinician and device data can be transferred to the patient's electronic medical record (EMR). The patient-centric user interface of the Patient SafetyNet™ Series 5000 displays near real-time data from all devices with Kite+, providing a single unified dashboard of patient information. To simplify documentation of patient data, Root+ enables clinicians to easily verify and send patient vitals and Early Warning Scores (EWS), as well as all connected medical device information data, to the EMR directly from Root+.

An interface between the Patient SafetyNet™ Series 5000 and the hospital admission, discharge and transfer (ADT) system allows clinicians to receive ADT information on Root+ for positive patient identification at the bedside. Clinicians can also manually enter additional data on the Root+ device, including temperature, blood pressure, level of consciousness, pain score and urine output.

—————————————

[(1)] The use of the trademark Patient SafetyNet™ is under license from the University HealthSystem Consortium.

Table of Contents

In a series of studies published between 2010 and 2020 by Dartmouth-Hitchcock Medical Center, clinicians using Masimo SET® and Patient SafetyNet™ identified patient distress earlier, which decreased rapid response team activations, ICU transfers and ICU days. Per these studies, over ten years, there were zero preventable deaths or brain damage due to opioid-induced respiratory depression in monitored patients. In addition, we believe these studies demonstrated that the use of Masimo SET® and Patient SafetyNet™ can result in significant cost savings. Hospitals and other care centers may determine that they can reduce their costs by moving less critically ill patients from the ICU to the general care floors where they can be continuously and accurately monitored in a more cost-effective manner. We believe that the advanced performance of the Masimo SET® platform coupled with reliable, cost-effective and easy-to-use wireless remote monitoring will allow hospitals to create continuous surveillance solutions on general care floors where patients are at risk of avoidable adverse events and where direct patient observation by skilled clinicians is considered cost prohibitive.

### Kite®

Kite® provides a supplemental display of data from a Masimo device on a compatible smart television and allows clinicians to configure the display differently than that of the connected Masimo device. Kite® integrates into existing hospital infrastructures where a supplementary display may be beneficial, such as the operating room.

### UniView™

UniView™, an integrated display of real-time data and alarms from multiple Masimo and third-party devices, designed to reduce clinician cognitive overload and improve patient safety. UniView™ promotes data sharing and team coordination among multiple clinicians. UniView™ brings together data from a variety of sources – such as patient monitors, ventilators, anesthesia gas machines, and IV pumps – and provides a supplementary display for them, clearly organized, on one or more large, central monitors, so that all clinicians can simultaneously view and act upon the same, comprehensive real-time patient status and historical trends.

### UniView : 60™

UniView : 60™ uses the Masimo Hospital Automation™ platform to aggregate and display pertinent patient information on a digital display just outside each patient's room, allowing clinicians to familiarize themselves with the most relevant details of each patient's case at the door in 60 seconds or less before they see the patient.

### Replica™

Replica™, working in conjunction with Patient SafetyNet™, is a mobile application for smart phones and tablets that provides for supplemental remote monitoring and clinician notification. Replica™ was developed to allow clinicians to view continuous monitoring data for multiple patients, as well as view and respond to alarms and alerts, all from their smart phones, regardless of location.

### MyView®

MyView® is a wireless, presence-detection system that enables the display of customized clinical profiles on Masimo devices, such as Root®, Radical-7® and the Patient SafetyNet™ View Station. When a clinician approaches the device, a clinician-worn MyView® badge signals the device to display a preselected set of parameters and waveforms tailored to the individual clinician's preferences. MyView® gives clinicians the ability to receive and review medical device information in a manner that is most conducive to optimizing their workflow, while the presence mapping data collected by all the Masimo devices can provide insight into how clinicians spend time with patients. This provides nursing leadership and management the opportunity to examine analytical data on patient-clinician interactions and optimize workflows across the unit, hospital and hospital system.

### Patient SafetyNet™ Surveillance

Patient SafetyNet™ Surveillance is a software option that provides real-time video images of a patient's room, including the patient and connected monitoring devices, adding existing communication technology to central monitoring. Two-way audio is available to allow the caregiver to listen to and communicate with the patient. The system utilizes the existing hospital information technology network, precluding the installation of additional infrastructure.

Table of Contents

***Connectivity***

Despite medical technology advances, the lack of device communication and integration creates risks to patient safety in hospitals around the world. Without device interoperability, critical patient information can go unnoticed, leaving clinicians unaware and patients at risk. Existing approaches for device interoperability require separate hardware, software and/or network infrastructure, which can clutter the patient room, increase complexity, burden IT management and increase costs. To address these challenges, we introduced Iris⁺ connectivity in our Root⁺ patient monitoring and connectivity platform. Iris⁺ connectivity enables multiple standalone third-party devices such as intravenous pumps (IV), ventilators, hospital beds and other patient monitors to connect through Root⁺, enabling display, notification and documentation to the EMR through Masimo Patient SafetyNet™.

The addition of Iris⁺ connectivity to Root⁺ and Patient SafetyNet™ provides multiple advantages to hospitals, such as allowing standalone device information to be remotely viewed at a Patient SafetyNet™ view station, transmitted through notification systems to clinicians regardless of location or sent to electronic health record systems. This may enhance patient assessment, clinical workflows and decision support. In addition, bringing data from disparate devices together facilitates more integrated patient care and provides a flexible and cost-effective platform, while avoiding installation of separate costly systems and potentially reducing costs by leveraging existing network infrastructure.

***Nasal High-Flow Ventilation***

The Masimo softFlow™ technology provides respiratory support by generating a precisely regulated, stable and high flow of room air or a mix of room air and oxygen through the nose of the patient by means of thin nasal prongs. Controlled oxygen supply ensures oxygenation while, at the same time, the respiratory airways are humidified. A stable air flow is essential for treating hypoxemic and hypercapnic respiratory failure. Together with the softflow™ nasal applicator, the softflow™ generator provides a constant air flow and in doing so, it is completely independent of external pneumatic systems. Due to this, the Masimo softFlow™ technology is able to treat respiratory insufficiency and allows therapy at home in a manner that is as reliable and efficient as in the hospital.

***Neuromodulation Solution***

Bridge™ is the first FDA-cleared, drug-free, non-surgical device to use neuromodulation to aid in the reduction of symptoms associated with opioid withdrawal. Bridge™ can be used for patients experiencing opioid withdrawal symptoms, while undergoing treatment for opioid use disorder when initiating treatment, transitioning to naltrexone or tapering off medication-assisted treatment. In addition, we believe Bridge™ may reduce pain and addiction-related side-effects. Bridge™ is a small electrical nerve stimulator device that contains a battery-powered chip and wires that are applied percutaneously around a patient's ear. It requires a prescription and is offered to qualified healthcare professionals with training. Bridge™ has been granted a FDA 510(k) de novo classification.

***Coronavirus-2019 (COVID-19) Response and Telehealth Solutions***

*Masimo SafetyNet™*

In an effort to help clinicians and public health officials combat the COVID-19 pandemic, we developed the Masimo SafetyNet™ solution. The Masimo SafetyNet™ solution provides continuous tetherless pulse oximetry and respiration rate monitoring coupled with a patient surveillance platform. Masimo SafetyNet™ solution is available worldwide. In partnership with Samsung Electronics America (Samsung), the Masimo SafetyNet™ Patient App is available on select Samsung smartphones, pre-installed and pre-configured.

*Masimo SafetyNet-OPEN™*

As the COVID-19 pandemic continues, companies and organizations worldwide struggle to find the appropriate balance between reopening and keeping people safe by reducing the risk of infection. Masimo SafetyNet-OPEN™ was designed to help businesses, governments and schools more responsibly manage employee and student health and safety during the COVID-19 pandemic. Masimo SafetyNet-OPEN™ helps address certain challenges of reopening responsibly and safely with a comprehensive, flexible, and easy-to-deploy continuous monitoring solution that, in conjunction with clinical guidance from partner hospitals, helps manage prevention, early identification, and recovery monitoring. As a global leader in noninvasive patient monitoring technologies and advanced connectivity and automation solutions, we believe we are uniquely positioned to provide organizations with tools to assist them in reopening safely.

Table of Contents

### Recent Developments

On February 15, 2022, we announced our entry into a definitive merger agreement to acquire Viper Holdings Corporation, which owns Sound United ("Sound United"), a consumer technology company that owns a portfolio of premium brands, including Bowers & Wilkins, Denon, Polk Audio and Marantz. Pursuant to the merger agreement, we will pay approximately $1.025 billion, subject to adjustments, for the acquisition. The transaction is subject to customary closing conditions and is expected to close in the middle of 2022.

### Our Strategy

Our mission is to develop technologies that improve patient outcomes and reduce the cost of patient care. We intend to continue to grow our impact on patient care by not only providing patient-centered solutions to healthcare providers, but by also expanding outside of the hospital arena with our technologies that are improving lives in the hospitals. We believe that people and infrastructures are ready for actionable patient care outside of the hospital. Some of our tactics are explained below:

- *Continue to Expand our Market Share in Pulse Oximetry.* We grew our product revenue to $1,239.2 million in 2021 from $829.9 million in 2018, representing a three-year compound annual growth rate of 14.3%. This growth can be attributed to continued expansion of our core SET® pulse oximeter customer base, higher revenues from rainbow® Pulse CO-Oximetry, NomoLine® capnography and other new technologies, and our expanding list of OEM partners. We supplement our direct sales to hospitals and other low-acuity healthcare facilities through various U.S. and international distributors. Combined sales through our direct and distributor sales channels increased to $1,099.1 million, or 88.7% of product revenue in 2021, from $718.6 million, or 86.6% of product revenue, in 2018. As the healthcare industry shifts toward hospitals, physicians and providers being rewarded by payers based on the quality and value of the services (as opposed to the volume of fee-for-service transactions), we expect to see more hospitals gravitate towards technologies like Masimo SET® that have a proven track record of improving patient care.

- *Expand the Pulse Oximetry Market to Other Patient Care Settings.* Many patients die due to unintended opioid overdoses after surgery while on general care floors. We believe the ability to continuously and accurately monitor patients outside of critical care settings, including the general, medical and surgical floors of the hospital, is currently an unmet medical need that has the potential to significantly improve patient care and increase the size of the pulse oximetry market. In addition, we believe the ability of Masimo SET® to accurately monitor and address the limitations of conventional pulse oximetry has enabled us, and will continue to enable us, to expand into non-critical care settings, and therefore, significantly expand the market for our products. To further support our expansion into the general care areas, we market Patient SafetyNet™, which enables continuous monitoring of up to 200 patients' SpO₂, PR, RRp® and with rainbow SET®, noninvasive monitoring of hemoglobin and other advanced measurements. We believe that Patient SafetyNet™, when combined with Masimo SET® pulse oximetry and RAM® or capnography, offers a clinically proven and cost-effective approach to continuous post-operative monitoring. Outside of the hospital setting, patients could die due to unintentional opioid overdose, even when opioids are being taken for short duration, such as after surgery, and as prescribed by a physician.

- *Expand the Use of rainbow® Technology in Hospital Settings.* We believe the noninvasive measurements of rainbow® Pulse CO-Oximetry (SpHb®, SpCO®, SpMet®, PVi®, SpfO₂™, SpOC™ and ORi™), RAM® and Halo Ion®, as well as future measurements, provide an excellent opportunity to help our customers improve patient care while reducing their overall cost of care.

- *Expand the Use of rainbow® Technology in Non-Hospital Settings.* We believe the noninvasive measurement of hemoglobin, SpHb®, creates a significant opportunity in markets such as physician offices, emergency departments and blood donation centers; and the noninvasive measurement of carboxyhemoglobin, SpCO®, creates a significant opportunity in the fire/alternate care market.

- *Expand the Use of Root® in Hospital Settings.* We believe Root® represents a powerful paradigm in patient monitoring because it enhances our rainbow® and SET® measurements with multiple specialty parameters, including SedLine® brain function monitoring, O3® Regional Oximetry, and NomoLine® capnography and gas monitoring, and enables open-architecture connectivity in an integrated, clinician-centric hub. Our Hospital Automation™ integration platform for Root® provides a conduit to the patient's EMR for a range of clinical devices that may otherwise remain disconnected, and therefore, unable to communicate their information. Hospital Automation™, in conjunction with the Iris® ports found on Root®, offers clinical utility and flexibility by collecting device information from multiple sources and making it available to clinicians in one networked place, akin to an airplane cockpit. Complementary innovations like the Radius-7® wearable, wireless monitor foster an environment of safety without sacrificing patient mobility or comfort. Radius-7® provides patients in medical-surgical units with mobility, allowing them to visit common areas and labs, all while being continuously monitored around the clock. Root® is acuity-adaptable, meaning it can be configured for any care area, and is competitively priced.

- *Expand Hospital Automation™ and Connectivity in Hospital Settings.* We believe we can improve and automate the continuum of care through our connectivity platform by reducing complexity by integrating data from multiple disparate monitors and therapeutic devices through Root® and Iris® Gateway; by deploying decision support algorithms like Halo

Table of Contents

ION™; by saving time through semi-automated and automated bedside vital signs measurement and documentation with Patient SafetyNet™; by keeping patients connected with their care providers through Masimo SafetyNet™ and Rad 97® when they are discharged from hospitals; by improving data interpretation through adaptable and intuitive displays like UniView™, UniView : 60™ and MyView™; and through remote monitoring via Patient SafetyNet™ and Replica™.

- *Utilize our Customer Base and OEM Relationships to Market Masimo rainbow SET®, O3®, SedLine® and Capnography Products Incorporating Licensed rainbow® Technology.* We currently sell rainbow SET® products through our direct sales force and distributors. We include our MX circuit boards in our pulse oximeters and also sell them to our OEM partners. Our MX circuit boards are equipped with circuitry to support rainbow® Pulse CO-Oximetry measurements that can be activated at time of sale or through a subsequent software upgrade. We believe that, over time, the clinical need for these measurements, along with our installed customer base, will help drive the adoption of our rainbow® Pulse CO-Oximetry products.

- *Continue to Innovate and Maintain Our Technology Leadership Position.* We invented and pioneered the first pulse oximeter to accurately measure arterial blood oxygen saturation level and pulse rate in the presence of motion artifact and low perfusion. In addition, we launched our rainbow SET® platform that enabled what we believe is the first noninvasive monitoring of carboxyhemoglobin, methemoglobin and hemoglobin, as well as PVi®, all of which were previously only available with invasive and/or complicated testing. Furthermore, we believe that our introduction of RRa® with RAM® technology represented the first platform to enable noninvasive and continuous respiration monitoring through an easy-to-use single-patient adhesive acoustic sensor. Finally, we believe that our recent introduction of ORi™ may provide advance warning of an impending hypoxic state, or an indication of an unintended hyperoxic state.

- *Expand Masimo technology into the personal health consumer and home market.* Our first general wellness and personal health consumer and home market application was the MightySat®, a fingertip pulse oximeter with five important health and breathing measurements that was targeted at sports, fitness and relaxation. These values include: O₂, PR, RRp®, PI and PVi®. In the past two years, we launched six additional products for the consumer and home market. We released the Radius T°™, a means to monitor a loved one's fever in a hassle-free continuous manner; Masimo Sleep™, a means to help you understand what is going on in your body that may be impacting your sleep; Bridge™, the first FDA-cleared, drug-free, non-surgical device to use neuromodulation to aid in the reduction of symptoms associated with opioid withdrawal; Masimo Doctella, a secure, cloud-based platform that allows providers to customize interactive digital CarePrograms™ for their patients from the hospital to the home by helping them view patient inputs and compliance with treatment plans, interpret physiological data, and collect population health data; SafetyNet-OPEN™, a remote patient management solution for tracking key vital signs at the organizational level; and finally, SafetyNet-Alert™, a remote patient management solution for tracking key vital signs at home. We believe that in the home setting, accurate monitoring with Masimo SET® and Masimo SafetyNet Alert™ may help reduce the risk of opioid overdose by alerting family members and others when opioids have slowed a patient's breathing and caused a significant drop in oxygen saturation.

- *Expand the Masimo product portfolio through strategic investments and acquisitions.* In 2020 and 2021, we successfully completed three strategic acquisitions and an exclusive license agreement, all of which are currently being integrated into our product portfolio. In addition, on February 15, 2022, we announced our entry into a definitive merger agreement to acquire Sound United, a consumer technology company that owns a portfolio of premium brands. We continually evaluate new and exciting opportunities to expand our product portfolio. We pursue the opportunities that we believe will add stockholder value, can be successfully integrated within our business and show positive potential to achieve our business and financial objectives.

We plan to continue to innovate and develop new technologies and products, internally and through our collaboration with Cercacor, from whom we currently license certain rainbow® technologies.

Our future growth strategy is also closely tied to our focus on international expansion opportunities. Since 2007, we have continued to expand our sales and marketing presence in Europe, Asia, Asia Pacific, Middle East, Canada and Latin America. We have accomplished this by both additional staffing and adding or expanding sales offices in many of these territories. By centralizing a portion of our international operations, including sales management, marketing, customer support, planning, logistics and administrative functions, in Neuchâtel, Switzerland, we believe we have developed a more efficient and scalable international organization that is capable of being even more responsive to the business needs of our international customers under this centralized management structure.

### *Our Products and Markets*

We develop, manufacture and market patient monitoring technologies that incorporate a monitor or circuit board and sensors, including proprietary single-patient-use and reusable sensors and patient cables. In addition, we offer remote alarm/monitoring solutions, software and connectivity solutions.

The following chart summarizes our principal product components and principal markets and methods of distribution:

Table of Contents

Patient Monitoring Solutions:

*Description:*

*Use:*

*Distribution Channel:*

*Circuit Boards and Modules*
*(e.g., MX-5, MX-7, MSX (shown below), MS-2011, MS-2013, MS-2040, uSpO2®, SedLine®, ISA™ and IRMA™)*

• Signal processing apparatus for all Masimo technology platforms

• Mainstream and sidestream capnography and gas monitoring

• Incorporated and sold to OEM partners who incorporate our circuit boards into their patient monitoring systems







*Monitors and Devices*
*(e.g., Radical-7®, Rad-97® (both shown below), Rad-67®, Rad-57®, Root®, Rad-8®, Rad-5®, Radius-7®, Rad-G™ and TIR-1™)*

• Bedside, handheld and wireless monitoring devices that incorporate Masimo SET® with and without licensed Masimo rainbow SET® technology, noninvasive blood pressure and capnography.

• Sold directly to end-users and through distributors and in some cases to our OEM partners who sell to end-users







12

| | | |
|---|---|---|
| *Patient Monitoring and Connectivity Platform* *(e.g., Root®, Radius-7® and Root® with NIBP (shown below))* | *Description:* | *Use:* | *Distribution Channel:* |

*Patient Monitoring and Connectivity Platform*
*(e.g., Root®, Radius-7® and Root® with NIBP (shown below))*




*Description:*

*Use:*

• Displays measurements from Masimo's Radical-7® (connected or hand carried) or Radius-7® (patient-worn)

• Provides additional specialty measurements from Masimo or third-party-developed applications through Masimo Open Connect® (MOC-9®)

• Integrates noninvasive blood pressure (NIBP) and temperature

• Connects third-party devices such as IV pumps, ventilators, beds and other patient monitors to automate data transfer to the EMR

*Distribution Channel:*

• Sold directly to end-users and through distributors



*Sensors*
*(e.g., SET®, rainbow® Pulse CO-Oximetry, rainbow Acoustic Monitoring® Sensors, RD SedLine™, TFA-1®, RD SET®, RD rainbow SET®, O3® Pediatric, RD rainbow Lite SET®, rainbow® DCI®-Mini, Centroid™ and Radius PPG™ (last six shown below))*






• Extensive line of both single-patient, reusable and rainbow® sensors

• Patient cables, as well as adapter cables that enable the use of our sensors on certain competitors' monitors

• Sold directly to end-users and through distributors and to OEM partners who sell to end-users

13

Table of Contents

| *Description:* | *Use:* | *Distribution Channel:* |
|---|---|---|

*Sensors (Continued)*

 

*Line Filters and Mainstream Adapters for Capnography and Gas Monitoring*
  *(e.g., NomoLine® Cannula with Radius PCG™ Capnograph with disposable adapter, IRMA CO2, IRMA AX+ and EMMA® (shown below))*



 

• Line of disposables to measure gas parameters using mainstream and sidestream capnography

• Sold directly to end-users and through distributors and to OEM partners who sell to end-users

*Proprietary Measurements*
  *(e.g., SpHb®, SpCO®, SpMet®, PVi®, RRa®, RRp®, ORi™, 3D Alarms® and Adaptive Threshold Alarm)*



    

• rainbow® measurements and other proprietary features

• Sold directly to end-users and through OEM partners who sell to new and existing end-users

Table of Contents

| *Description:* | *Use:* | *Distribution Channel:* |
|---|---|---|

*Hospital Automation™ and Connectivity Suite*
  *(e.g., Iris® Connectivity, Iris® Gateway, iSirona™, Patient SafetyNet™, UniView™, and UniView : 60™, Replica™, Iris® Analytics, and Halo ION® (shown below))*

• Software and hardware enabling third-party devices to connect through Patient SafetyNet™ and to document data in the EMR

• Sold directly to end-users









*Description:*                                                                                                                          *Use:*                                                                                          *Distribution Channel:*

*Hospital Automation™ and Connectivity Suite (Continued)*



- Network-linked, wired or wireless, multiple patient floor monitoring solutions

- Standalone wireless alarm notification solutions

- Sold directly to end-users

- Home-based patient engagement and remote data capture platform

- Sold directly to end-users and through distributors

- Connectivity hub for the aggregation and transmission of patient data to the EMR

- Sold directly to end-users

*Nasal High Flow Ventilation*
*(e.g., TNI softFlow® 50 and TNI softFlow® junior (shown below))*



- Intensive care and inpatient care in clinics as well as home care

- Sold directly to end-users and through distributors

| *Description:* | *Use:* | *Distribution Channel:* |
|---|---|---|

*Nasal High Flow Ventilation (Continued)*



*Advanced Hemodynamic Monitoring Solutions*
*(e.g., Masimo LiDCO Hemodynamic Monitoring system, Double Channel Pressure Transducer and Stimpod NMS450X Peripheral Nerve Stimulator (shown below))*

• High-acuity care areas such as the operating room

• Sold directly to end-users and through distributors







*Home Wellness and Monitoring*
*(e.g., Radius T™, Masimo Sleep™, MightySat® with PVi® and RRp® and iSpO₂®)*

• Disposable thermometers, disposable fingertip sensors for sleep monitoring, fingertip pulse oximeter, or pulse oximeter cable and sensor for use with an iPhone, iPad, iPod touch and select Android smart phones

• Sold directly to consumers through the Masimo Personal Health website and through consumer retailers





*Description:*
*Home Wellness and Monitoring (Continued)*                    *Use:*                    *Distribution Channel:*







*Circuit Boards*

*Masimo SET® MS Circuit Boards.* Our Masimo SET® MS circuit boards perform all signal processing and other pulse oximetry functions incorporating the Masimo SET® platform. Our MS circuit boards are included in our proprietary monitors or sold to our OEM partners for incorporation into their monitors. Once incorporated into a pulse oximeter, the MS circuit boards perform all data acquisition processing and report the pulse oximetry measurements to the host monitor. The circuit boards and related software interface directly with our proprietary sensors to calculate $SpO_2$, PR and Pi. Our latest MSX family of circuit boards provide Masimo SET® $SpO_2$, PR, and Pi in a variety of small form factors with a typical power consumption of only 45 milliwatts.

*uSpO₂® Cable/Board.* Our SET® technology-in-a-cable contains the low power (MS-2040) technology in a reduced size, allowing it to be embedded into patient cables as part of the sensor connector. This allows the $uSpO_2$® cable/board to interface with monitoring devices externally via an existing communications port in instances where internal integration of a traditional Masimo SET® technology board is not feasible. The $uSpO_2$® cable/board provides the same Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry found in our other products, with a typical power consumption of less than 45 milliwatts.

*Masimo rainbow SET® MX Circuit Boards.* Our circuit board is the foundation for our Masimo rainbow® Pulse CO-Oximetry and rainbow Acoustic Monitoring® platform, utilizing certain technology that is licensed from Cercacor. The MX circuit boards offer the full functionality of our rainbow® technology, which includes noninvasive measurements for SpHb®, SpOC™, SpCO®, SpMet®, PVi® and RRa®, in addition to providing Measure-through Motion and Low Perfusion™ SET® pulse oximetry measurements $SpO_2$, PR and Pi measurement capabilities of Masimo SET® pulse oximetry. Customers can choose to purchase additional measurements beyond $SpO_2$, PR and Pi at the time of sale or at any time in the future through a field-installed software upgrade.

Our MX-5™ OEM circuit board deploys a technology platform that utilizes approximately half the power of previously available rainbow® circuit boards to deliver rainbow® Pulse CO-Oximetry noninvasive measurement performance. In addition to its lower power demands, the MX-5 adds dynamic power utilization to scale the MX-5's power draw based upon the combination of parameters being monitored to permit even longer battery run-times.

18

Our MX-7™ OEM circuit board is our latest and most advanced rainbow SET® board. The MX-7™ board builds on the current MSX™ low-power SET® board and MX-5™ rainbow® board technologies by offering more efficient power utilization, scaling its power draw based upon the combination of rainbow SET® parameters being monitored to permit even longer battery run times. Designed for integration into the more than 200 multi-parameter monitors available from our more than 90 OEM partners, the MX-7™ has the ability to support all 13 of Masimo's SET® pulse oximetry and rainbow™ Pulse CO-Oximetry measurements in an advanced module re-engineered to reduce power needs.

*Monitors / Devices*

*Root*. Root® is a powerful patient monitoring and connectivity platform that integrates our rainbow® and SET® measurements with multiple additional specialty measurements through MOC-9® open architecture technology in an integrated, clinician-centric platform. The first MOC-9® technologies developed by Masimo were SedLine® brain function monitoring, NomoLine® capnography and gas monitoring and O3® Regional Oximetry. Root® with NomoLine® capnography, SedLine® brain function monitoring, wireless communication and Iris® connectivity for third-party medical devices has received FDA 510(k) clearance. O3® Regional Oximetry has received the CE Mark and FDA 510(k) clearance.

Early Warning Signs (EWS) for Root® aggregates information from multiple vital signs and clinical observations to generate a score that represents the potential degree of patient deterioration. There are several EWS protocols, such as the Pediatric Early Warning Score (PEWS), Modified Early Warning Score (MEWS) and National Early Warning Score (NEWS). These various scores require vital signs contributors such as oxygen saturation, pulse rate, respiration rate, body temperature and systolic blood pressure along with contributors input by clinicians, such as level of consciousness, use of supplemental oxygen and urine output. The weighting and number of contributors differ depending upon which EWS protocol is used. Root® can be customized for various predefined EWS protocols, or hospitals can configure their own set of required contributors, and their relative weights, to create an EWS unique to their care environment.

Our MOC-9® partnerships enable third parties to utilize Root®'s open architecture and built-in connectivity to independently develop, obtain regulatory approvals, and commercialize their own external MOC-9® module. Alternatively, third parties can develop Masimo Open Connect Control™ (MOC-C™) applications for Root® using the MOC-9® software development kit (SDK). While we support the development efforts of our MOC³ partners as needed, and help increase awareness of the availability of non-Masimo MOC-9® modules and MOC-C™ applications, our MOC-9® partners use their existing distribution channels to sell their MOC-9® modules or MOC-C™ applications to customers.

Pathway™, a newborn oxygenation visualization mode for Root®, provides clinicians with a way to visualize a hospital's recommended resuscitation protocol for a newborn's oxygen saturation while continuously monitoring $SpO_2$ and PR during the first ten minutes after birth. Use of Pathway™ is intended to help streamline clinician workflow and improve protocol adherence during this critical period.

*Radical-7*. The Radical-7® Pulse CO-Oximeter® is a wireless touchscreen device that incorporates our MX circuit board to allow upgradeable rainbow SET® measurements and offers three-in-one capability. The Radical-7® can be used as:

- a standalone device for bedside monitoring;

- a detachable, battery-operated handheld unit for easy portable monitoring;

- an integrated device as part of the Root® patient monitoring and connectivity platform; and

- a monitor interface via SatShare®, a proprietary technology allowing our products to work with certain competitor products, to upgrade existing conventional multiparameter patient monitors to Masimo SET® while displaying rainbow® measurements on the Radical-7® itself.

With its wide-ranging flexibility, Radical-7® can continuously monitor a patient from the ambulance, to the emergency room, to the operating room, to the general floor and beyond, until the patient is discharged. Radical-7® delivers the accuracy and reliability of Masimo rainbow SET® with multi-functionality, ease of use and the availability of measurement upgrades for existing monitors.

*Radius-7*. Radius-7® for the Root® patient monitoring and connectivity platform is the first and only wearable, wireless monitor with rainbow SET® technology, enabling continuous monitoring and early identification of clinical deterioration while still allowing patients the freedom of movement. With Bluetooth® and Wi-Fi wireless connectivity, Radius-7® with Root® can alert clinicians at the bedside or remotely, through Masimo Patient SafetyNet™, of critical changes in a patient's $SpO_2$ and PR, even during states of motion and low perfusion, as well as RRa® and additional rainbow SET® measurements. Radius-7® with Root® has received both the CE Mark and FDA 510(k) clearance.

*Radius PPG™.* Radius PPG™ is a tetherless sensor solution powered by Masimo SET® that represents a significant breakthrough in patient monitoring. Radius PPG™ eliminates the need for a cabled connection to a pulse oximetry monitor, allowing patients to move freely and comfortably while still being continuously monitored reliably and accurately. Via wireless connection, measurements are displayed on Masimo host devices or third-party multi-parameter monitors with integrated Masimo technology. Coupled with the proven benefits of Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry, Radius PPG™ is ideally suited for use anywhere patients can benefit from mobility. Radius PPG™ is also available as part of the Masimo SafetyNet™ remote patient management solution designed for at home use.

*Radius VSM™.* Radius VSM™ is a wearable, tetherless vital signs monitor that provides the ability to monitor a wide variety of physiological measurements, including continuous SET® Pulse Oximetry, noninvasive blood pressure, body temperature, respiration rate and ECG. Designed on a wearable, modular platform, Radius VSM™ features can be scaled to accommodate surges in patient volume and for use across the continuum of patient care, based upon each patient's needs and level of acuity. For additional versatility, Radius VSM™ can operate as a self-contained device or be used wirelessly with Masimo bedside monitors and patient surveillance systems, automating the integration of expanded monitoring and the transfer of continuous monitoring data to EMRs. Radius VSM™ has received the CE Mark, and has been released in limited European markets.

*Radius PCG™.* Radius PCG™ is a portable-real-time capnograph with wireless Bluetooth® connectivity. Radius PCG™ connects with Root® to provide seamless, tetherless mainstream capnography for patients of all ages. Radius PCG™ has received the CE Mark and FDA 510(k) clearance.

*Rad-97®.* Rad-97® is a versatile standalone Pulse CO-Oximeter® that features a 1080p HD color display with user-friendly multi-touch navigation and Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology that can be used to measure SpO₂, PR, PVi® and Pi rainbow SET® measurements such as SpHb®, SpOC™, SpCO®, SpMet® and RRa® can also be enabled. Rad-97® is the smallest Masimo bedside device currently capable of monitoring the full rainbow SET® platform. An optional integrated camera allows remote clinicians to interact with patients at home over live audio and video. With its built-in enterprise Wi-Fi capability, Rad-97® has the ability to connect wirelessly from the home to supplemental patient monitoring systems, including Patient SafetyNet™, facilitating automatic data transfer to hospital EMR systems. Rad-97® has received the CE Mark and FDA 510(k) clearance, including an additional Rad-97® configuration with integrated NomoLine® capnography. Rad-97® has also received FDA 501(k) clearance for home use, bringing hospital-grade technology to the home in a single integrated device that is a monitoring, connectivity and telecommunications hub.

*Rad-97® NIBP.* Rad-97® NIBP includes an integrated port that allows clinicians to connect a blood pressure cuff inflation hose directly to the device. Designed for reliability and patient comfort, Rad-97® NIBP is compatible with both disposable and reusable cuffs for a variety of patient types. Rad-97® NIBP enables clinicians to measure arterial blood pressure for adult, pediatric and neonatal patients, with three measurement modes: spot-check, automatic interval (which measures blood pressure routinely, at a desired interval) and stat interval (which continually measures blood pressure for a desired duration).

*Rad-67®.* Rad-67®, our handheld Pulse CO-Oximeter®, is a compact, portable spot-check device that offers Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology with SpO₂, PR and Pi measurements and upgradeable rainbow® noninvasive monitoring technology for SpHb®. With the universal reusable rainbow® DCI®-mini sensor, Rad-67® features Next Generation SpHb® technology. The Rad-67® with next generation SpHb® technology has received the CE Mark and FDA 510(k) clearance.

*Rad-57®.* Rad-57® is a fully featured handheld Pulse CO-Oximeter® that provides continuous, noninvasive measurement of SpO₂, PR, PVi® and Pi with the ability to upgrade to SpHb®, SpCO®, SpMet® and SpOC™. Its rugged and lightweight design makes it applicable for use in hospital and field settings, specifically for fire departments and emergency medical service units.

*Rad-8®.* Rad-8® is a bedside pulse oximeter featuring Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology with SpO₂, PR and Pi measurement, but without the ability to update to rainbow® technology. Rad-8® is an affordable, low-cost design with a streamlined feature set.

*Rad-5® & Rad-5v®.* Rad-5® and Rad-5v® were Masimo's first dedicated lightweight, user-configurable, handheld pulse oximeters to provide Masimo SET® Measure-through Motion and Low Perfusion™ technology with SpO₂, PR and Pi measurements, but without the ability to upgrade to rainbow® technology.

*Rad-G™.* Rad-G™ is a low-cost, rugged, handheld pulse oximetry device with a rechargeable battery and LCD display. It uses Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology to measure SpO₂, PR, Pi, PVi® and RRp®. Rad-G™ was designed primarily for use in pneumonia screening, spot-checking, and continuous measurement of SpO₂ and RRp® in low-resource settings. Rad-G™ has received the CE Mark and FDA 510(k) clearance.

*Rad-G™ with Temperature.* The Rad-G™ with Temperature provides all the important parameters of the Rad-G™, but with the added functionality of clinical-grade, real-time forehead non-contact infrared thermometry. The Rad-G™ with Temperature makes it easier for clinicians to quickly assess patients and make informed care decisions anywhere pulse oximetry or vital signs checking is needed in a compact, portable form factor. Rad-G™ with Temperature has received the CE Mark, but is not currently available for sale in the U.S.

*Pronto*.ᵃ Prontoᵃ is a handheld noninvasive multiparameter testing device that uses Masimo rainbow SET® technology to provide spot-check measurement of SpO₂, PR, Pi and SpHb® in both hospitals (i.e., emergency departments) and remote settings such as physician offices.

*SatShare*ᵃ. Our SatShareᵃ technology enables a conventional monitor to receive continuous measurement updates using Masimo SET® through a simple cable connection from the back of Radical-7ᵃ to the sensor input port on the conventional monitor. No software upgrades or new modules are necessary for the upgrade, which can be completed in minutes. SatShareᵃ allows hospitals to standardize the technology and sensors used throughout the hospital while allowing them to gain the more accurate monitoring capabilities using Masimo SET®, as well as other additional functionality, in a cost-effective manner. SatShareᵃ technology has facilitated many hospital-wide conversions of previously installed competitor monitors to Masimo SET®. In addition, Masimo rainbow SET® measurements such as SpHb® are available to clinicians on the Radical-7ᵃ itself while the device is being used in SatShareᵃ mode.

*MightySat*ᵃ *Rx.* MightySatᵃ Rx is a fingertip pulse oximeter that incorporates Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology, which measures and displays SpO₂, PR and Pi with the option to add PVi® and RRpᵃ. The MightySatᵃ Rx has received the CE Mark and FDA 510(k) clearance. The RRpᵃ measurement on the MightySatᵃ Rx fingertip pulse oximeter has received the CE Mark. MightySatᵃ Rx also received FDA 510(k) clearance of spot-check RRpᵃ measurement.

*iSpO₂*ᵃ *Rx.* The iSpO₂ᵃ Rx pulse oximeter combines a fingertip sensor, cable and pulse oximeter in a lightweight, portable device that connects directly to a smart device for displaying measurements. iSpO₂ᵃ Rx uses Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology to measure SpO₂, PR and Pi. The Masimo Professional Health app, available for both iOSᵃ and Androidᵃ devices, allows clinicians to track, trend and download patient data. iSpO₂ᵃ Rx has received the CE Mark, but is not currently available for sale in the U.S.

*SedLine*ᵃ *MOC-9*ᵃ *Module.* Our SedLineᵃ MOC-9ᵃ module for Rootᵃ is an EEG-based continuous brain function monitor that provides information about a patient's response to anesthesia. Our Next Generation SedLineᵃ enhances PSi to make it less susceptible to EMG interference and to improve performance in low-power EEG cases.

*O3*ᵃ *MOC-9*ᵃ *Module.* Our O3ᵃ MOC-9ᵃ module for Rootᵃ uses NIRS to detect regional hypoxemia by continuously measuring tissue oxygen saturation (rSO₂), automating the differential analysis of regional to central oxygen saturation.

*NomoLine*ᵃ *Capnography and Gas Monitoring.* Our gas analyzers, IRMA™ and ISA™, are available through Rootᵃ MOC-9ᵃ modules via OEM integration or through an emergency capnometer (EMMA®). These analyzers enable our customers to benefit from CO₂, N₂O, O₂ and anesthetic agent monitoring in many hospital environments.

*TIR-1*™. Our non-contact clinical-grade infrared thermometer with Bluetoothᵃ connectivity provides forehead temperature measurement across all patient populations. The non-contact module reduces the risk for patient cross-contamination while also reducing costs and waste by eliminating the need for probe covers and other disposables. The Bluetoothᵃ technology automates data transfer to a connected Masimo device, such as Rootᵃ, enabling streamlined integration into the bedside device and EMR.

### Sensors

*Sensors and Cables.* We have developed some of the broadest lines of single-patient-use (disposable), reusable and rainbowᵃ sensors and cables. In total, we have over 150 different types of sensors designed to meet virtually every clinical need. Masimo SET® sensors are uniquely designed to reduce interference from physiological and non-physiological noise. Our proprietary technology platforms operate only with our proprietary sensor lines. However, through the use of adapter cables, our sensors can be connected to certain competitor pulse oximetry monitors. We sell our sensors and cables to end-users directly or through our distributors and OEM partners.

Our single-patient-use sensors offer several advantages over reusable sensors, including improved performance, cleanliness, increased comfort and greater reliability. Our reusable sensors are primarily used for short-term, spot-check monitoring.

*RD SET*ᵃ, *RD rainbow SET*ᵃ, *and RD rainbow Lite SET*ᵃ. Our RD family of sensors is designed to maximize patient comfort, optimize clinician workflow and reduce material waste. RD sensors are lightweight with no moving parts and a flat, soft cable with smooth edges. RD sensors are available in fold-over and wrap-around styles for a variety of patient types and clinical scenarios.

Table of Contents

*SofTouch™ Sensors.* SofTouch™ sensors are designed with less or no adhesive for patients with compromised skin conditions. SofTouch™ sensors are available as single-patient sensors for newborns and multi-site reusable sensors for pediatrics and adults.

*Trauma and Newborn Sensors.* We have developed two specialty sensor lines, for trauma and resuscitation situations, as well as for newborns. These sensors contain an identifier that automatically sets the pulse oximeter to its maximum sensitivity and fastest settings, and allow for quick application, even in wet and slippery environments. Additionally, we introduced low-profile sensors LNCS® and M-LNCS® Neo, NeoPt and Inf sensors to monitor oxygen saturation in newborns. These sensors are smaller and thinner, making them significantly more comfortable for patients and easier for clinicians to apply.

*Blue® Sensors.* We believe our Blue® Sensors are the first FDA-cleared sensors to accurately monitor arterial blood oxygen saturation levels in cyanotic infants and children with abnormally low oxygen saturation levels.

*E1® Ear Sensor.* We believe that our E1® Ear Sensor is the first single-patient-use ear sensor that can be placed securely in the ear conchae, allowing clinicians to combine Masimo SET® performance and central monitoring to provide quick access and responsive assessment of oxygenation. The E1® Ear Sensor is designed for field emergency medical services utilization.

*TFA-1® Adhesive Forehead Sensor.* We designed our TFA-1® forehead sensor for hospitals desiring forehead monitoring using a disposable sensor. TFA-1® combines Masimo SET® performance with quick access and responsive oxygenation assessment.

*rainbow® Sensors.* We developed these proprietary, multi-wavelength sensors for use with our rainbow® Pulse CO-Oximetry products. In contrast to traditional sensors that only have the capability to monitor SpO₂ and PR, our rainbow® sensors can also monitor SpCO®, SpMet® and SpHb®. Our licensed rainbow SET® sensors are the only sensors that are compatible with our licensed rainbow SET® products. Rainbow® sensors are available in single-patient-use, and reusable spot-check sensor types.

The rainbow® DCI®-mini is the first noninvasive hemoglobin spot-check sensor for infants and small children (weight 3 to 30 kg). Paired with our handheld Pronto® or Rad-67™ devices, the rainbow® DCI®-mini sensors are designed to help clinicians quickly and easily spot-check hemoglobin levels in infants and small children, which may facilitate the identification of anemia. When paired with Rad-67™, the rainbow® DCI®-mini enables Next Generation SpHb® measurements. The rainbow® DCI®-mini has received the CE Mark in Europe and Ministry of Health, Labour and Welfare (MHLW) approval in Japan, but is not currently available for sale in the U.S. The rainbow® Super DCI®-mini sensor allows for the ability to measure SpHb®, SpCO®, SpMet® and SpO₂ on the same noninvasive reusable sensor. The rainbow® Super DCI®-mini has received the CE Mark in Europe and MHLW approval in Japan, but is not currently available for sale in the U.S.

*rainbow Acoustic® Sensors.* We believe we were the first to market a continuous respiration rate monitoring technology based on an acoustic sensor placed on the patient's neck. Our rainbow Acoustic® sensors detect the sounds associated with breathing and convert the sounds into continuous respiration rate using proprietary signal processing that is based on Masimo SET®. RAS-45, our single-use acoustic respiration sensor for RAM®, is designed to facilitate placement on and improve attachment to the neck. RAS-45 operates with Masimo MX circuit boards to measure RRa® and display an acoustic respiration wave form. Like the RAS-125c sensor, RAS-45 operates with Masimo MX technology boards to measure RRa®, display the acoustic respiration wave form and optionally allow clinicians to listen to the sound of breathing. Both the RAS-45 and RAS-125c are available in CE Marked countries and the U.S. for adult and pediatric patients who weigh more than 10 kg. RAS-45 has received the CE Mark and FDA 510(k) clearance.

*SedLine® Sensor.* Used with the SedLine® MOC-9® module for the Root® patient monitoring and connectivity platform, the SedLine® sensor is a disposable sensor that collects EEG data for our SedLine® monitor. RD SedLine™ sensors feature a repositioned, color-coded sensor-cable connection that lies comfortably on the patient's head and soft foam pads to reduce discomfort upon application to the head.

*O3® Sensors.* Used with the O3® MOC-9® module for the Root® patient monitor, each O3® sensor contains four light-emitting diodes and two detectors to continuously measure rSO₂. Our pediatric application of O3® regional oximetry with the O3® pediatric sensor for both adult and pediatric patients weighing more than 5 kg (11 lbs) and less than 40 kg (88 lbs) has received FDA 510(k) clearance. O3® sensor for use with infants and neonatal patients has also received FDA 510(k) clearance.

*Centroid®.* Centroid® is a wearable wireless patient orientation, activity and respiration rate sensor. Centroid® helps clinicians monitor a patient's position to avoid preventable pressure ulcers and can alert clinicians to sudden movements such as fall-like events. In addition, Centroid® detects chest movements to continuously provide respiration rate, providing clinicians with additional data that may inform care decisions. Centroid® pairs with the Root® platform using Bluetooth® to track a patient's posture, orientation and activity. The data transmitted by Centroid® can be displayed in various formats on Root®, giving clinicians multiple ways to assess adherence to protocols regarding tissue stress and to tailor care to the specific needs of each patient.

Table of Contents

*Proprietary Measurements and Features*

All of our monitors shipped since January 2006, including Radical-7® and certain future OEM products, that incorporate the MX circuit board will allow purchases of software for rainbow® measurements, as well as other future measurements. Our current rainbow® measurements include SpHb®, SpCO®, SpMet®, SpOC™ ORi™, Pi, PR, PVi®, RPVi™, RRp® SpfO₂™ and RRa®.

*Eve™.* Eve™ is our newborn screening software application for our Radical-7® Pulse CO-Oximeter®, is designed to help clinicians more effectively and efficiently screen newborns for CCHD. In the Radical-7® Pulse CO-Oximeter®, Eve™ automates the screening steps with animated instruction, including sensor application, measurement selection and screening result determination. Eve™ is intended to provide consistent application of the screening protocol to reduce method-and operator-induced variability and improve efficiency by automating the data capture and comparison between readings. Eve™ has received the CE Mark, but is currently not available for sale in the U.S.

*X-Cal®*

Sensor and cable failures can prevent pulse oximeters from providing the patient safety advantages that continuous pulse oximetry monitoring is intended to provide. Our X-Cal® technology enhances patient safety and improves clinician efficiency by preserving system quality, performance and reliability and reducing the chances of bad or inferior sensors and cables being used on patients. X-Cal® technology enhances the benefits of Masimo's pulse oximetry by incorporating the means to track the expected monitoring life of our sensors and cables and provides appropriate user messaging on the host monitor.

X-Cal® addresses three common problems experienced by clinicians using an integrated Masimo system, including:

- Patient safety may be compromised by using counterfeit Masimo sensors and cables because they are not produced with comparable components, do not provide proper shielding from ambient interferences, create electrostatic noise caused by motion, do not have our quality and performance controls, and are not tested or warranted to work within a Masimo system;

- We design our sensors and cables to last well beyond their warranty period and customer feedback indicates our sensors and cables last significantly longer than competing products, but cable and sensor reliability may still be compromised when used beyond their intended life, affecting patient care and causing clinicians and biomedical engineers to spend time troubleshooting intermittent cable and sensor issues; and

- We believe that third-party reprocessed pulse oximetry sensors introduce challenges in the clinical environment due to potential quality issues. In fact, we believe that most third-party reprocessed sensors do not indicate that they are capable of performing in the same conditions as Masimo Measure-through Motion and Low Perfusion® sensors or in neonatal applications, key performance requirements available with Masimo SET® sensors. To the best of our knowledge, no third-party company has attempted to reprocess rainbow SET® sensors.

*The Masimo Hospital Automation™ Platform and Iris® Connectivity*

*Masimo Patient SafetyNet™.* Patient SafetyNet™ is a supplemental remote monitoring and clinician notification system that routes bedside-generated alarms through a server to a qualified clinician's handheld paging device in real-time. Each system can support up to 200 bedside monitors and can either be integrated into a hospital's existing IT infrastructure or operate as a stand-alone wireless network.

*Iris®.* Iris® connectivity ports on Root® allows third-party devices, such as intravenous pumps and ventilators, to connect to Root® enabling display of measurements and notification on the Root® monitor, with the ability to document results in the EMR through Masimo Patient SafetyNet™.

*Iris® Gateway.* Iris® Gateway bridges the gap between device data generated at the patient bedside and documentation in patient data management systems by automatically transferring data from medical devices to EMRs, improving productivity and reducing the likelihood of transcription errors.

*Iris® Device Management System (Iris® DMS).* Iris® DMS is an automation and connectivity solution designed to streamline management of Masimo devices used throughout a hospital system. Iris® DMS is designed to address the challenges of maintaining many patient monitors in a complex hospital environment. Iris® DMS securely connects over a hospital's existing network to all connected Masimo devices to provide an easy-to-use dashboard that allows biomedical engineers and IT professionals to view detailed diagnostic information about connected Masimo devices at a glance, without the need to physically interact with each device. Iris® DMS supports remote software upgrades to ensure all devices stay up to date, easily and efficiently.

Table of Contents

*iSirona™*. iSirona™ is a compact, versatile connectivity hub designed to maximize interoperability across the continuum of care. The iSirona™ hub offers an efficient way to physically connect up to six medical devices at the bedside and automatically route the data to the Masimo Hospital Automation™ platform for EMR integration, surveillance monitoring, alarm management, mobile notifications, smart displays and analytics.

### Analytics and Reporting

*Trace™*. Trace™ is the first data visualization and reporting software compatible with the full capabilities of the Root™ patient monitoring and connectivity platform, including Radical-7® and Radius-7® Pulse CO-Oximeters®, Root® with integrated noninvasive blood pressure and temperature, and connected MOC-9® modules such as SedLine® brain function monitoring, ISA™ OR® capnography, and O3® Regional Oximetry. Trace™ can create insightful, easy-to-read patient reports that include parameter trends, histograms, event annotations, and key statistics. Trace™ can communicate with Masimo devices via high-speed wired or wireless connections, with the ability to transfer up to 96 hours of patient data.

*Iris® Analytics*. Iris® Analytics is a supplemental tool that works in conjunction with the Masimo Hospital Automation™ platform to generate customizable alarm analytics, individual patient reports, and even hospital-wide reports across the continuum of care.

*Halo ION®*. Halo ION® is a comprehensive, scalable and customizable continuous early warning score. Halo ION® allows clinicians to aggregate trend data from as few as three physiological parameters (for example, $SpO_2$, PR and PI), and as many as are available, including data from EMRs, into a single continuous early warning score. Each patient's Halo ION® score is displayed on the Masimo Patient SafetyNet™ Supplemental Remote Monitoring and Clinician Notification System as a number ranging from zero to 100, helping to streamline clinicians' patient assessment workflow.

### Hospital-to-Home and Wellness

*Masimo SafetyNet™*. Masimo SafetyNet™ is a home-based patient engagement and remote care automation platform, which provides a complete end-to-end home care solution, allowing clinicians to create and manage treatment plans, patient schedules and patient data flow using automated, customizable CarePrograms™, home device data aggregation, and a web-based provider dashboard. CarePrograms™ are delivered to patients' smartphones via an app (available for both iOS® and Android® devices) and dynamically update based on patient input, including both self-reported data and physiological data collected by connected monitoring devices. Masimo SafetyNet™ was developed in the wake of the COVID-19 pandemic to assist with hospital surge capacity and provide clinicians a secure cloud-based platform to remotely manage a patient's health. Powered by Masimo SET® Measure-through Motion and Low Perfusion™ technology, the tetherless single-patient-use sensor (Radius PPG™) provides continuous respiration rate and oxygen saturation monitoring, with a second tetherless sensor, Radius T™, for continuous temperature measurements. Patient data is sent securely via Bluetooth to the Masimo SafetyNet™ mobile application.

*Masimo SafetyNet Alert™*. Masimo SafetyNet Alert™ is an arterial blood oxygen saturation monitoring and alert system designed for use at home. Masimo SafetyNet Alert™ features Masimo SET® technologies in a wearable fingertip pulse oximetry sensor that communicates wirelessly to an accompanying home medical hub and smartphone app. Masimo SafetyNet Alert™ monitors blood oxygen saturation ($SpO_2$) and pulse rate (PR) using clinically proven Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry and perfusion index (Pi). The system provides escalating alerts when drops in oxygen levels are detected, designed to wake up the person suffering from opioid overdose and if they do not, to send alerts to others when help may be needed. Masimo SafetyNet™ Alert has received the CE Mark, but is not available for sale in the United States.

*Radius T™ Continuous Thermometer*. The Radius T™ Continuous Thermometer is a wearable wireless thermometer that continuously and seamlessly measures temperatures using a small, inconspicuous, wearable sensor that can be easily applied to anyone from children to elderly adults with no action needed after initial application to the skin. Radius T™ eliminates manual measurements, for users five years or older, that approximate oral temperature, not just external skin temperature, with laboratory accuracy within ±0.1°C, whereas other thermometry solutions typically have laboratory accuracy within ±0.2°C. Radius T™ has received FDA 510(k) clearance for both prescription and over-the-counter (OTC) use on patients and consumers five years and older.

*Masimo Sleep™*. Masimo Sleep™ is designed to help consumers better understand the quality of their sleep, Masimo Sleep™ is fueled by the same expertise in signal processing and sensor development that drives our hospital products used by leading institutions to monitor millions of patients a year.

*MightySat®*. MightySat® is our fingertip pulse oximeter for personal use that provides $SpO_2$, PR and Pi measurements for health and wellness applications. MightySat®, which is also available with RRp® and PVi®, provides measurements in a compact, battery-powered design with a large color screen that can be rotated for real-time display of the measurements. Bluetooth® wireless functionality enables measurement display via a free, downloadable Masimo Personal Health application on iOS® and Android® mobile devices, as well as the ability to trend and communicate measurements, including the Apple Health Kit.

24

Table of Contents

MightySat⁺ is available through consumer retailers and directly from Masimo, and is intended for general health and wellness use only. MightySat⁺ is not intended for medical use.

*iSpO₂⁺. iSpO₂⁺* is a personal use pulse oximeter that combines a fingertip sensor, cable and pulse oximeter in a lightweight, portable device that connects directly to a smart device for displaying measurements. iSpO₂⁺ uses Measure-through Motion and Low Perfusion™ SET⁺ technology to measure SpO₂, PR and Pi. The Masimo Personal Health app, available for both iOS⁺ and Android⁺ devices, allows users to track, trend and download their data, as well as share it with the Apple Health app. iSpO₂⁺ is available through consumer retailers and directly from Masimo and is intended for general health and wellness use only. iSpO₂⁺ is not intended for medical use.

*Cercacor Laboratories, Inc.*

Cercacor is an independent entity spun-off from us to our stockholders in 1998. Joe Kiani, our Chairman and Chief Executive Officer, is also the Chairman and Chief Executive Officer of Cercacor. We are a party to a cross-licensing agreement with Cercacor, which was amended and restated effective January 1, 2007 (the Cross-Licensing Agreement), which governs each party's rights to certain intellectual property held by the two companies.

The following table outlines our rights under the Cross-Licensing Agreement relating to specific end-user markets and the related technology applications of specific measurements.

| | End-User Markets | |
| --- | --- | --- |
| Measurements | Professional Caregiver and Alternate Care Market | Patient and Pharmacist |
| Vital Signs⁽¹⁾ | Masimo (owns) | Cercacor (non-exclusive license) |
| Non-Vital Signs⁽²⁾ | Masimo (exclusive license) | Cercacor (owns or exclusive license) |

___

(1)  Vital signs measurements include, but are not limited to, SpO₂, peripheral venous oxygen saturation, mixed venous oxygen saturation, fetal oximetry, sudden infant death syndrome, ECG, blood pressure (noninvasive blood pressure, invasive blood pressure and continuous noninvasive blood pressure), temperature, respiration rate, CO₂, pulse rate, cardiac output, EEG, perfusion index, depth of anesthesia, cerebral oximetry, tissue oximetry and/or EMG, and associated features derived from these measurements, such as 3D alarm⁺, PVi⁺ and other features.

(2)  Non-vital signs measurements include the body fluid constituents other than vital signs measurements and include, but are not limited to, carbon monoxide, methemoglobin, blood glucose, hemoglobin and bilirubin.

*Our License to Cercacor.* We granted Cercacor an exclusive, perpetual and worldwide license, with sublicense rights, to use our Masimo SET⁺ technology, including all improvements, for the monitoring of non-vital signs measurements and to develop and sell devices incorporating Masimo SET⁺ for monitoring non-vital signs measurements in the "Cercacor Market". The Cercacor Market consists of any product market in which a product is intended to be used by a patient or pharmacist rather than a professional medical caregiver regardless of the particular location of the sale, including sales to doctors, hospitals, alternate care market professionals or otherwise, provided the product is intended to be recommended, or resold, for use by the patient or pharmacist. We also granted Cercacor a non-exclusive, perpetual and worldwide license, with sublicense rights, to use Masimo SET⁺ for the measurement of vital signs in the Cercacor Market. In exchange, Cercacor pays us a 10% royalty on the amount of vital signs sensors and accessories sold by Cercacor.

*Cercacor's License to us.* We exclusively license from Cercacor the right to make and distribute products in the "Masimo Market" that utilize rainbow⁺ technology for the measurement of carbon monoxide, methemoglobin, fractional arterial oxygen saturation, and hemoglobin, which includes hematocrit. The Masimo Market consists of any product market where the product is intended to be used by a professional medical caregiver, including hospital caregivers, surgicenter caregivers, paramedic vehicle caregivers, doctors' offices caregivers, alternate care facility caregivers and vehicles where alternative care services are provided. We also have the option to obtain exclusive licenses to make and distribute products in the Masimo Market that utilize rainbow⁺ technology for the monitoring of other non-vital signs measurements, including blood glucose. We have 180 days after proof of feasibility to exercise the above-referenced option to obtain a license for the measurement of blood glucose for an additional $2.5 million and licenses for other non-vital signs measurements for an additional $0.5 million each. The licenses are exclusive until the later of 20 years from the grant of the applicable license or the expiration of the last patent included in the rainbow⁺ technology related to the applicable measurements. To date, we have developed and commercially released devices that measure carbon monoxide, methemoglobin and hemoglobin using licensed rainbow⁺ technology. We also make and distribute products that monitor respiration rate via rainbow Acoustic Monitoring⁺, which is a Masimo-developed rainbow⁺ technology and, therefore, is not required to be licensed from Cercacor.

Table of Contents

Our license to use rainbow® technology for these measurements in these markets is exclusive on the condition that we continue to pay Cercacor royalties on our products incorporating rainbow® technology, subject to certain minimum aggregate royalty thresholds, and that we use commercially reasonable efforts to develop or market products incorporating the licensed rainbow® technology. The royalty is up to 10% of the rainbow® royalty base, which includes handhelds, tabletop and multiparameter devices. Handheld products incorporating rainbow® technology carry a 10% royalty rate. For other products, only the proportional amount attributable to that portion of our devices used to monitor non-vital signs measurements, rather than to monitor vital signs measurements, and sensors and accessories for measuring only non-vital sign parameters are included in the 10% rainbow® royalty base. For multiparameter devices, the rainbow® royalty base includes the percentage of the revenue based on the number of rainbow®-enabled measurements.

For hospital contracts where we place equipment and enter into a sensor contract, we pay a royalty to Cercacor on the total sensor contract revenue based on the ratio of rainbow®-enabled devices to total devices. Pursuant to the terms of the license, we are subject to certain specific annual minimum aggregate royalty payment obligations of $5.0 million per year.

*Change in Control.* The Cross-Licensing Agreement provides that, upon a change in control:

- if the surviving or acquiring entity ceases to use "Masimo" as a company name and trademark, all rights to the "Masimo" trademark will be assigned to Cercacor;

- the option to license technology developed by Cercacor for use in blood glucose monitoring will be deemed automatically exercised and a $2.5 million license fee for this technology will become immediately payable to Cercacor; and

- the minimum aggregate annual royalties payable to Cercacor for carbon monoxide, methemoglobin, fractional arterial oxygen saturation, hemoglobin and/or glucose will increase to $15.0 million per year until the exclusivity period of the agreement ends, plus up to $2.0 million for each additional measurement with no maximum ceiling for non-vital sign measurements.

For purposes of the Cross-Licensing Agreement, a change in control includes any of the following with respect to us or Cercacor:

- the sale of all or substantially all of either company's assets to a non-affiliated third-party;

- the acquisition by a non-affiliated third-party of 50% or more of the voting power of either company;

- Joe Kiani, our Chief Executive Officer and the Chief Executive Officer of Cercacor, resigns or is terminated from his position with either company; or

- the merger or consolidation of either company with a non-affiliated third-party.

*Ownership of Improvements.* Any improvements to Masimo SET® or rainbow® technology made by Cercacor, by us, or jointly by Cercacor with us or with any third-party that relates to non-vital signs monitoring, and any new technology acquired by Cercacor, is and will be owned by Cercacor. Any improvements to the Masimo SET® platform or rainbow® technology made by Cercacor, by us, or jointly by Cercacor with us or with any third-party that relates to vital signs monitoring, and any new technology acquired by us, is and will be owned by us. However, for both non-vital signs and vital signs monitoring, any improvements to the technology, excluding acquired technology, will be assigned to the other party and will be subject to the terms of the licenses granted under the Cross-Licensing Agreement. Any new non-vital signs monitoring technology utilizing Masimo SET® that we develop will be owned by Cercacor and will be subject to the same license and option fees as if it had been developed by Cercacor. Also, we will not be reimbursed by Cercacor for our expenses relating to the development of any such technology.

*Other Agreements with Cercacor.* We have also entered into various other agreements with Cercacor, including an Administrative Services Agreement, a Consulting Services Agreement and a Sublease Agreement. See Note 3 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information on these agreements and other transactions with Cercacor.

### Government Regulation

As a global medical technology company, we are subject to significant government regulation, compliance requirements, fees and costs, both in the U.S. and abroad. These regulatory requirements subject our products and our business to numerous risks that are specifically discussed within "Risks Related to Our Regulatory Environment" under Part I, Item 1A—"Risk Factors" within this Annual Report on Form 10-K. A summary of certain critical aspects of our regulatory environment is included below.

*Product Clearance and Approval Requirements*

Table of Contents

Many of our products are regulated by numerous government agencies, the most significant of which are the U.S. FDA, the national authorities in the European Union (EU) and the United Kingdom (UK), and MHLW in Japan. In addition, there are government agencies that regulate our products in other countries, whose requirements vary substantially from country to country. These agencies require us to comply with laws that regulate the design, development, clinical trials, testing, manufacture, packaging, labeling, storage, distribution, import, export and promotion of many of our products.

In the U.S., unless an exemption applies, each medical device that we wish to market in the U.S. must, generally, first receive from the FDA either clearance of a 510(k) premarket notification or approval of a premarket application (PMA). In some cases, the device may be authorized by FDA through the *de novo* classification process. The FDA's 510(k) clearance process requires us to show that our new medical device is substantially equivalent to a legally marketed "predicate" medical device and usually takes from four to nine months, but it may take longer. The PMA process requires us to demonstrate through valid scientific evidence that there is reasonable assurance of safety and effectiveness of the device for its intended use. The PMA process is much more costly, lengthy and uncertain than the process of obtaining 510(k) clearance. Both 510(k) and PMA submissions are subject to user fees. The FDA determines the appropriate process based on the risk classification of the medical device. There are three classifications, from Class I to Class III. The majority of our current regulated products have been deemed Class II devices, requiring 510(k) clearance, while some have been deemed Class I devices.

Most of our OEM partners are required to obtain clearance or approval of their devices that incorporate Masimo's technologies, like Masimo SET® technology, Masimo rainbow SET® technology, Masimo Board-in-Cable technology, or are used with Masimo's sensors. We generally grant our OEM partners a right to cross-reference the 510(k) submission files from our cleared Masimo SET® circuit boards, sensors, cables and notification systems.

In the EU, medical devices are currently subject to the Medical Devices Directive 93/42/EEC (MDD). Under the MDD, a medical device may only be placed on the market within the EU if it conforms to certain "essential requirements". Key requirements include that a medical device achieves its intended performance and does not compromise the clinical condition or safety of patients or the safety and health of users and others, and bears the CE Mark. A medical device that conforms to such essential requirements can bear a CE Mark, which allows the device to be placed on the market throughout the EU. Each medical device that we wish to market in the EU must conform to these requirements.

Conformity is determined through an assessment procedure, which depends upon the risk classification of the device. For our EU medical devices, conformity assessment generally involves a notified body. Notified bodies are often private entities that are authorized or licensed by government authorities to perform, or otherwise have oversight over, such assessments. Notified bodies may also review a manufacturer's quality systems. If the conformity assessment is successfully completed, the manufacturer may apply a CE Mark to the product. This allows the general commercializing of a product in the EU. However, the product can also be subject to local registration requirements depending on the country.

On May 26, 2021, the existing MDD was repealed and replaced by the Medical Devices Regulation (EU) 2017/745 (MDR). The MDR is similar to the MDD, though it includes significantly more stringent requirements, notably stronger conformity assessment procedures, greater control over notified bodies and their standards, increased transparency, and more robust device vigilance requirements. The MDR applies to the medical devices we commercialize in the EU after May 26, 2021. However, the MDR is subject to certain transitional periods that enable certain notified body certificates to remain valid beyond 2021. For some of our devices, this could be as late as May 2024.

The UK exited the EU on December 31, 2020 (Brexit). The UK does not intend to implement the MDR into the laws of Great Britain (England, Scotland and Wales). Northern Ireland is an exception where the MDR will continue to apply. Great Britain instead introduced a new, standalone medical devices framework. Currently, this aligns closely to the MDD. Instead of a CE Mark, medical devices marketed in Great Britain must bear a UKCA Mark. However, EU CE Marks will continue to be recognized in Great Britain until June 30, 2023, as will certificates issued by EU-recognized notified bodies. This arrangement is not reciprocated in the EU. Each medical device that we wish to market in the UK must comply with the national laws in the UK, which going forward may differ from the laws in the EU.

*Continuing FDA Regulation*

Clinical trials involving medical devices are subject to FDA regulation. Among other requirements, clinical trial sponsors must comply with requirements related to informed consent, Institutional Review Board (IRB) approval, monitoring, reporting, record-keeping, labeling and promotion. If the study involves a significant risk device, the sponsor must obtain FDA approval of an investigational device exemption in addition to IRB approval prior to beginning the study. Information regarding certain device clinical trials must also be submitted to a public database maintained by the National Institutes of Health.

After a device is approved and placed on the market, numerous regulatory requirements continue to apply. These regulatory requirements include, but are not limited to, the following: product listing and establishment registration; adherence to the Quality System Regulation (QSR) which requires stringent testing, control, documentation and other quality assurance

27

procedures for the design, manufacture, storage and handling of devices; labeling requirements and FDA prohibitions against the promotion of off-label uses or indications; adverse event and device malfunction reporting; post-approval restrictions or conditions, including post-approval clinical trials or other required testing; post-market surveillance requirements; the FDA's recall authority, whereby it can ask for, or require, the recall of products from the market; and requirements relating to voluntary corrections or removals. Device manufacturers are subject to announced and unannounced inspections by the FDA to evaluate compliance with these requirements.

*Advertising and Promotion*

Advertising and promotion of medical devices, in addition to being regulated by the FDA, are also regulated by the Federal Trade Commission (FTC) and by federal and state regulatory and enforcement authorities, including the Department of Justice, the Office of Inspector General of the Department of Health and Human Services, and various state attorneys general. Although physicians are permitted to use their medical judgment to use medical devices for indications other than those cleared or approved by the FDA, we may not promote our products for such "off-label" uses and can only market our products for cleared or approved uses. Other companies' promotional activities for their FDA-regulated products have been the subject of FTC enforcement actions brought under healthcare reimbursement laws and consumer protection statutes. FTC enforcement actions often result in consent decrees that constrain future actions. In addition, under the federal Lanham Act and similar state laws, competitors and others can initiate litigation relating to advertising claims.

*Import and Export Requirements*

To import a device, the importer must file an entry notice and bond with the United States Bureau of Customs and Border Protection (CBP). All devices are subject to FDA examination before release from CBP. Any article that appears to be in violation of the Federal Food, Drug and Cosmetics Act (FDCA) may be refused admission and a notice of detention and hearing may be issued. If the FDA ultimately refuses admission, the CBP may issue a notice for redelivery and, if a company fails to redeliver the goods or otherwise satisfy CBP and the FDA with respect to their disposition, may assess liquidated damages for up to three times the value of the lot. The CBP also imposes its own regulatory requirements on the import of our products, including inspection and possible sanctions for noncompliance.

Products exported from the United States are subject to foreign countries' import requirements and the exporting requirements of the FDA or European regulating bodies, as applicable. In particular, international sales of medical devices manufactured in the United States that are not approved or cleared by the FDA for use in the United States, or are banned or deviate from lawful performance standards, are subject to FDA export requirements.

Foreign countries often require, among other things, a Certificate of Foreign Government (CFG) for export. To obtain a CFG, the device manufacturer must apply to the FDA. The FDA certifies that the product has been granted clearance or approval in the United States and that the manufacturing facilities were in compliance with the FDA's QSR regulations at the time of the last FDA inspection.

*Conflict Minerals and Supply Chain*

We are subject to certain SEC rules adopted pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act concerning "conflict minerals" (generally tin, tantalum, tungsten and gold), From January 1, 2021, similar rules are in force in the EU. Certain of these conflict minerals are used in the manufacture of our products. Although the U.S. rules are being challenged in court, in their present form they require us to investigate the source of any conflict minerals necessary to the production or functionality of our products. If any such conflict minerals originated in the Democratic Republic of the Congo or adjoining countries (the DRC region), we must undertake comprehensive due diligence to determine whether such minerals financed or benefited armed groups in the DRC region. Since our supply chain is complex, our ongoing compliance with these rules could affect the pricing, sourcing and availability of conflict minerals used in the manufacture of our products.

We are also subject to disclosure requirements regarding abusive labor practices in portions of our supply chain under the California Transparency in Supply Chains Act.

Table of Contents

*Environmental*

Our manufacturing processes involve the use, generation and disposal of solid wastes, hazardous materials and hazardous wastes, including silicone adhesives, solder and solder paste, sealants, epoxies and various solvents such as methyl ethyl ketone, acetone and isopropyl alcohol. As such, we are subject to stringent federal, state and local laws relating to the protection of the environment, including those governing the use, handling and disposal of hazardous materials and wastes. Products that we sell in Europe are subject to regulation in EU markets under the Restriction of Hazardous Substances Directive (RoHS). RoHS prohibits companies from selling products which contain certain hazardous materials, including lead, mercury, cadmium, chromium, polybrominated biphenyls and polybrominated diphenyl ethers, in EU member states. In addition, the EU's Regulation-Registration, Evaluation, Authorization, and Restriction of Chemicals Directive also restricts substances of very high concern in products.

Future environmental laws may require us to alter our manufacturing processes, thereby increasing our manufacturing costs. We believe that our products and manufacturing processes at our facilities comply in all material respects with applicable environmental laws and worker health and safety laws; however, the risk of environmental liabilities cannot be completely eliminated.

*Health Care Fraud and Abuse*

In the U.S., there are federal and state anti-kickback laws that generally prohibit the payment or receipt of kickbacks, bribes or other remuneration in exchange for the referral of patients or other health-related business. For example, the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) prohibits anyone from, among other things, knowingly and willfully offering, paying, soliciting or receiving any bribe, kickback or other remuneration intended to induce the referral of patients for, or the purchase, order or recommendation of, health care products and services reimbursed by a federal health care program, including Medicare and Medicaid. Recognizing that the federal anti-kickback law is broad and potentially applicable to many commonplace arrangements, Congress and the Office of Inspector General (OIG) within the Department of Health and Human Services have created statutory "exceptions" and regulatory "safe harbors". Exceptions and safe harbors exist for a number of arrangements relevant to our business, including, among other things, payments to bona fide employees, certain discount and rebate arrangements, and certain payment arrangements involving Group Purchasing Organizations (GPOs).

Although an arrangement that fits into one or more of these exceptions or safe harbors is immune from prosecution, arrangements that do not fit squarely within an exception or safe harbor do not necessarily violate the law, but the OIG or other government enforcement authorities may examine the practice to determine whether it involves the sorts of abuses that the statute was designed to combat. Violations of this federal law can result in significant penalties, including imprisonment, monetary fines and assessments, and exclusion from Medicare, Medicaid and other federal health care programs. Exclusion of a manufacturer, like us, would preclude any federal health care program from paying for its products. In addition to the federal anti-kickback law, many states have their own laws that are analogous to the federal anti-kickback law, but may apply regardless of whether any federal or state health care program business is involved. Federal and state anti-kickback laws may affect our sales, marketing and promotional activities, educational programs, pricing and discount practices and policies, and relationships with health care providers by limiting the kinds of arrangements we may have with hospitals, alternate care market providers, GPOs, physicians, payers and others in a position to purchase or recommend our products.

Federal and state false claims laws prohibit anyone from presenting, or causing to be presented, claims for payment to third-party payers that are false or fraudulent. For example, the Federal Civil False Claims Act (31 U.S.C. § 3729 et seq.) imposes liability on any person or entity who, among other things, knowingly and willfully presents, or causes to be presented, a false or fraudulent claim for payment by a federal health care program, including Medicaid and Medicare. Some suits filed under the False Claims Act, known as "qui tam" actions, can be brought by a "whistleblower" or "relator" on behalf of the government and such individuals may share in any amounts paid by the entity to the government in fines or settlement. Manufacturers, like us, can be held liable under false claims laws, even if they do not submit claims to the government, where they are found to have caused submission of false claims by, among other things, providing incorrect coding or billing advice about their products to customers that file claims, or by engaging in kickback arrangements or off-label promotion with customers that file claims. A number of states also have false claims laws, and some of these laws may apply to claims for items or services reimbursed under Medicaid and/or commercial insurance. Sanctions under these federal and state fraud and abuse laws may include civil monetary penalties and criminal fines, exclusion from government health care programs and imprisonment.

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) created new federal crimes, including health care fraud and false statements related to health care matters. The health care fraud statute prohibits, among other things, knowingly and willfully executing a scheme to defraud any health care benefit program, including those offered by private payers. The false statements statute prohibits, among other things, knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for health care benefits, items or services. A violation of either statute is a felony and may result in fines, imprisonment and other significant penalties.

Table of Contents

The Physician Payment Sunshine Act (Sunshine Act), which was enacted by Congress as part of the ACA, requires medical device companies to track and publicly report, with limited exceptions, all payments and transfers of value to physicians and teaching hospitals in the U.S. Companies are required to track payments made and to report such payments to the government by March 31 of each year. Several states have similar requirements. Beginning in 2022, the reporting requirement also applies to advance practice nurses and physician assistants.

The Foreign Corrupt Practices Act of 1977 and similar worldwide anti-bribery laws in non-U.S. jurisdictions generally prohibit companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business.

Due to the breadth of some of these laws, it is possible that some of our current or future practices might be challenged under one or more of these laws. In addition, there can be no assurance that we would not be required to alter one or more of our practices to be in compliance with these laws. Evolving interpretations of current laws or the adoption of new federal or state laws or regulations could adversely affect many of the arrangements we have with customers and physicians. Therefore, our risk of being found in violation of these laws is increased by the fact that some of these laws are broad and open to interpretation.

*Data Privacy and Protection of Health and Other Personal Information*

Data protection legislation is becoming increasingly common in the United States at both the federal and state level. For example, the California Consumer Privacy Act of 2018 (CCPA), which became effective on January 1, 2020, requires us to make disclosures to consumers about our data collection, use and sharing practices, allows consumers to opt out of certain data sharing with third parties, and provides a cause of action for data breaches. The CCPA, together with the Consumer Privacy Rights Act, which will be effective beginning January 1, 2023, is the most comprehensive data privacy law in the United States, and could be the precursor to other similar legislation in other states or at the federal level. Internationally, the General Data Protection Regulation (GDPR) took effect in May 2018 within the European Economic Area (EEA) and many EEA jurisdictions. Other jurisdictions outside of the EEA have also adopted their own data privacy and protection laws. We have implemented, and continue to implement, procedures and processes to comply with these regulations and, as international data privacy and protection laws continue to evolve, and as new regulations, interpretive guidance and enforcement information become available, we may incur incremental costs to modify our business practices to comply with these requirements. In addition, our internal control policies and procedures may not always protect us from reckless or criminal acts committed by our employees or agents.

In addition, numerous federal, state and international laws and regulations, including HIPAA and GDPR, govern the collection, use and disclosure of patient-identifiable, protected health information (PHI) and other personal information. In the U.S., HIPAA applies to covered entities, which include most healthcare facilities that purchase and use our products, and their business associates. The HIPAA Privacy Rule restricts the use and disclosure of PHI, and requires covered entities and their business associates to safeguard that information and to provide certain rights to individuals with respect to that information. The HIPAA Security Rule establishes detailed requirements for safeguarding PHI transmitted or stored electronically.

Although we are not a covered entity, we are sometimes deemed by our customers to be a business associate of covered entities due to activities that we perform for or on behalf of covered entities, such as training customers on the use of our products or investigating product performance. As business associates, we are subject to many of the requirements of HIPAA and could be directly subject to HIPAA civil and criminal enforcement and the associated penalties for violation of the Privacy, Security and Breach Notification Rules.

The HIPAA standards also apply to the use and disclosure of PHI for research and generally require the covered entity performing the research to obtain the written authorization of the research subject (or an appropriate waiver) before providing that subject's PHI to sponsors like us for purposes related to the research. These covered entities also typically impose contractual limitations on our use and disclosure of the PHI they disclose to us. We may be required to make costly system modifications to comply with the privacy and security requirements that will be imposed on us and our failure to comply may result in liability and adversely affect our business. Other countries also have, or are developing, laws governing the collection, use and transmission of health information, and these laws could create liability for us or increase our cost of doing business.

*Third-Party Reimbursement*

Health care providers, including hospitals, that purchase our products generally rely on third-party payers, including the Medicare and Medicaid programs and private payers, including indemnity insurers and managed care plans, to cover and reimburse all or part of the cost of the products and the procedures in which they are used. As a result, demand for our products is dependent in part on the coverage and reimbursement policies of these payers. No uniform coverage or reimbursement policy for medical technology exists among all third-party payers, and coverage and reimbursement can differ significantly from payer to payer.

Table of Contents

The Centers for Medicare & Medicaid Services (CMS) is the federal agency responsible for administering the Medicare program. Along with its contractors, CMS establishes the coverage and reimbursement policies for the Medicare program. Because a large percentage of our products are used in the treatment of elderly or disabled individuals who are Medicare beneficiaries, Medicare's coverage and reimbursement policies are particularly significant to our business. In addition, private payers often follow the coverage and reimbursement policies of Medicare.

In general, Medicare will cover a medical product or procedure when the product or procedure is included within a statutory benefit category and is reasonable and necessary for the diagnosis or treatment of an illness or injury, or to improve the functioning of a malformed body part. Even if the medical product or procedure is considered medically necessary and coverage is available, Medicare may place restrictions on the circumstances where it provides coverage. For example, several Medicare local contractors have issued policies that restrict coverage for pulse oximetry in hospital inpatient and outpatient settings to a limited number of conditions, including limiting coverage to patients who (i) exhibit signs of acute respiratory dysfunction, (ii) have chronic lung disease, severe cardiopulmonary disease or neuromuscular disease involving the muscles of respiration, (iii) are under treatment with a medication with known pulmonary toxicity, or (iv) have sustained multiple trauma or complaints of acute chest pain.

Reimbursement for our products may vary not only by the type of payer involved but also based upon the setting in which the product is furnished and utilized. For example, Medicare payment may be made, in appropriate cases, for patient stays in the hospital inpatient and in outpatient settings involving the use of our products. Medicare generally reimburses hospitals based upon prospectively determined amounts. For hospital inpatient stays, the prospective payment generally is determined by the patient's condition and other patient data and procedures performed during the inpatient stay, using a classification system known as Medicare Severity Diagnosis-Related Groups (MS-DRGs). Prospective rates are adjusted for, among other things, regional differences, co-morbidity and complications. Hospitals generally do not receive separate Medicare reimbursement for the specific costs of purchasing our products for use in the inpatient setting. Rather, Medicare reimbursement for these costs is deemed to be included within the prospective payments made to hospitals for the inpatient services in which the products are utilized.

In contrast, some differences may be seen in the reimbursement for use of our products in hospital outpatient departments. In this setting, Medicare payments also are generally made under a prospective payment system based on the ambulatory payment classifications (APCs) under which individual items and procedures are categorized. Hospitals receive the applicable APC payment rate for the procedure regardless of the actual cost for such treatment. Some outpatient services such as oximetry services do not receive separate reimbursement. Rather, their reimbursement is deemed packaged into the APC for an associated procedure and the payment for that APC does not vary whether or not the packaged procedure is performed. Some procedures also are paid through composite APCs, which are APCs that establish a payment rate that applies when a specific combination of services is provided.

Reimbursement for certain pulse oximetry monitoring services, including those using our products, may be separately payable when they are the only service provided to the patient on that day, packaged if provided with certain critical care services, or reimbursed through a composite APC when provided in connection with certain other services.

Because payments through the Prospective Payment System in both the hospital inpatient and outpatient settings are based on predetermined rates and may be less than a hospital's actual costs in furnishing care, hospitals have incentives to lower their operating costs by utilizing products that will reduce the length of inpatient stays, decrease labor or otherwise lower their costs. If hospitals cannot obtain adequate coverage and reimbursement for our products, or the procedures in which they are used, we cannot be certain that they will purchase our products, despite the clinical benefits and opportunity for cost savings that we believe can be derived from their use.

Our success with rainbow SET® technologies in U.S. settings of care with reimbursable monitoring procedures, such as hospital emergency departments, hospital procedure labs, and physician offices may largely depend on the ability of providers to receive reimbursement for such procedures. While private insurance payers often follow Medicare coverage and payment, we cannot be certain of this and, in many cases, cannot control the coverage or payment rates that private insurance payers put in place. In addition, the potential amendment, repeal or judicial invalidation of the ACA, and/or the enactment of other legislation or regulations, could affect future payment for services involving the use of our products.

Our success in non-U.S. markets depends largely upon the availability of coverage and reimbursement from the third-party payers through which health care providers are paid in those markets. Health care payment systems in non-U.S. markets vary significantly by country, and include single-payer government managed systems, as well as systems in which private payers and government managed systems exist side-by-side. Our ability to achieve market acceptance or significant sales volume in international markets we enter will be dependent in large part on the availability of reimbursement for procedures performed using our products under health care payment systems in such markets.

*Other U.S. and Foreign Regulation*

We and our OEM partners also must comply with numerous federal, state and local laws, as well as laws in other jurisdictions, relating to matters such as safe working conditions, manufacturing practices, environmental protection, fire hazard control and hazardous substance disposal. We cannot be sure that we will not be required to incur significant costs to comply with these laws and regulations in the future or that these laws or regulations will not hurt our business, financial condition and results of operations. Unanticipated changes in existing regulatory requirements or adoption of new requirements could hurt our business, financial condition and results of operations.

### *Markets*

*Competitive Conditions*

The medical device industry is highly competitive and many of our competitors have substantially greater financial, technical, marketing and other resources than we do. While we regard any company that sells pulse oximeters as a potential customer, we also recognize that the companies selling pulse oximeters on an OEM basis and/or pulse oximetry sensors are also potential competitors. Our primary competitor, Medtronic plc (Medtronic, formerly Covidien Ltd.), currently holds a substantial share of the pulse oximetry market. In addition, large technology companies that have not historically operated in the healthcare or medical device space, such as Alphabet Inc., Amazon.com, Inc., Apple Inc., Samsung Electronics Co., Ltd. and others, have developed or may develop products and technologies that may compete with our current or future products and technologies in the consumer and clinical marketplaces.

Medtronic sells its own brand of Nellcor pulse oximeters to end-users, sells pulse oximetry modules to other monitoring companies on an OEM basis, and licenses to certain OEMs the right to make their pulse oximetry platforms compatible with their sensors. We also face substantial competition from larger medical device companies, including companies that develop products that compete with our proprietary Masimo SET® and our OEM partners. We believe that a number of companies have announced products that claim to offer motion-tolerant accuracy. In addition, some of our patents have expired and others will expire over time in accordance with the laws of the jurisdiction in which they were issued.

We believe that the principal competitive factors in the market for pulse oximetry products include:

- accurate monitoring during both patient motion and low perfusion;
- ability to introduce other clinically beneficial measurements related to oxygenation and respiration, such as noninvasive and continuous oxygen reserve index and hemoglobin;
- competitive pricing;
- brand recognition and perception of innovation abilities;
- sales and marketing capability;
- access to hospitals which are members of GPOs;
- access to integrated delivery networks;
- access to OEM partners; and
- patent protection.

*Market Demand*

We currently sell all of our medical products both directly to hospitals and the alternate care market via our sales force and various distributors in the U.S. and around the world, including Europe, the Middle East, Asia, Latin America, Canada and Australia. We sell our non-medical/consumer products through e-commerce Internet sites such as www.masimopersonalhealth.com and www.amazon.com.

Our sales and marketing strategy for pulse oximetry has been, and will continue to be, focused on building end-user awareness of the clinical and cost-saving benefits of our technologies. Our sales representatives' primary focus is to facilitate the conversion of competitor accounts to our Masimo SET® pulse oximetry and rainbow SET® Pulse CO-Oximetry® products, to expand the use of Masimo SET® and Patient SafetyNet™ on the general floor and to create and expand the use of rainbow® measurements in both critical care and non-critical care areas. In addition to sales representatives, we employ clinical specialists to work with our sales representatives to educate end-users on the benefits of Masimo SET® and assist with the introduction and implementation of our technology and products to their sites.

For the year ended January 1, 2022, two just-in-time distributors, Medline Industries and Cardinal Health, represented approximately 14.6% and 10.2%, respectively, of our total revenue. These were the only two customers that represented 10% or more of our revenue for the year ended January 2, 2021. Importantly, these two distributors take and fulfill orders from our

direct customers, many of which have signed long-term sensor purchase agreements with us. If a specific just-in-time distributor is unable to fulfill these orders, the orders would be redirected to other distributors or fulfilled directly by us.

Additionally, we sell certain of our products through our OEM partners who incorporate our technologies into their monitors and sometimes resell our sensors to their installed base. Our OEM agreements allow us to expand the availability of our technologies through the sales and distribution channels of each OEM partner. To facilitate clinician awareness of Masimo technologies, our OEM partners have generally agreed to place the applicable Masimo trademark prominently on their instruments.

In order to facilitate our U.S. direct sales to hospitals, we have signed contracts with what we believe to be the five largest national GPOs in the U.S., based on the total volume of negotiated purchases. In return for the GPOs putting our products on contract, we have agreed to pay the GPOs a percentage of our revenue from their member hospitals. In 2021 and 2020, revenue from the sale of our pulse oximetry products to hospitals that are associated with GPOs amounted to $643.1 million and $564.0 million, respectively.

### Resources

#### Intellectual Property

We believe that in order to maintain a competitive advantage in the marketplace, we must develop and maintain protection of the proprietary aspects of our technology. We rely on a combination of patent, trademark, trade secret, copyright and other intellectual property rights and measures to protect our intellectual property.

We have developed a patent portfolio internally, and, to a lesser extent, through acquisitions and licensing, that covers many aspects of our product offerings. As of January 1, 2022, we had approximately 800 issued patents and approximately 500 pending applications in the U.S., Europe, Japan, Australia, Canada and other countries throughout the world. Our patents expire in accordance with the laws of the particular jurisdiction in which they were issued, which sometimes change. Additionally, as of January 1, 2022, we owned approximately 100 U.S. registered trademarks and approximately 500 foreign registered trademarks, as well as trade names that we use in conjunction with the sale of our products. Our trademarks are perpetually renewable. We have full proprietary ownership, including ownership of all patents, copyrights and trade secrets, of all technology related to the noninvasive monitoring of vital signs measurements, and Cercacor will have proprietary ownership of all technology related to the noninvasive monitoring of non-vital signs measurements. We also rely upon trade secrets, continuing technological innovations and licensing opportunities to develop and maintain our competitive position.

We seek to protect our trade secrets and proprietary know-how, in part, with confidentiality agreements with consultants, vendors and employees, although we cannot be certain that the agreements will not be breached or that we will have adequate remedies for any breach.

There are risks related to our intellectual property rights. For further detail on these risks, see "Risks Related to Our Intellectual Property" under Item 1A—"Risk Factors" in this Annual Report on Form 10-K.

#### Research and Product Development

We believe that ongoing research and development efforts are essential to our success. Our research and development efforts focus primarily on continuing to enhance our technical expertise in pulse oximetry, expanding our noninvasive monitoring of other measurements and developing remote alarm and monitoring solutions.

Although we and Cercacor each have separate research and development projects, we collaborate with Cercacor on multiple research and development activities related to rainbow® technology and other technologies. Under the Cross-Licensing Agreement, the parties have agreed to allocate proprietary ownership of technology developed by either party based on the functionality of the technology. We will have proprietary rights to all technology related to the noninvasive measurement of vital signs measurements, and Cercacor will have proprietary ownership of all technology related to the noninvasive monitoring of non-vital signs measurements.

#### Manufacturing

Our strategy is to manufacture products in-house when it is efficient and cost-effective for us to do so. We currently manufacture our bedside and handheld pulse oximeters, our full line of disposable and reusable sensors and most of our patient cables in-house or through captive contract maquiladora operations. We maintain an approximate 70,700 square foot manufacturing facility in Irvine, California, and two separate manufacturing facilities in Mexicali and San Luis Rio Colorado,

Mexico that have combined square footage of approximately 333,400 square feet. All three of these facilities are International Organization for Standardization (ISO) 13485:2016 certified. We also maintain an approximate 86,500 square foot facility in Hudson, New Hampshire, a portion of which is used to manufacture advanced light emitting diodes and other advanced component-level technologies.

We will continue to utilize third-party contract manufacturers for products and subassemblies that can be more efficiently manufactured by these parties, such as our circuit boards. We monitor our third-party manufacturers and perform inspections and product tests at various steps in the manufacturing cycle to ensure compliance with our specifications. We also do full functional testing of our circuit boards.

For raw materials, we and our contract manufacturers rely on sole source suppliers for some components, including digital signal processor chips and analog-to-digital converter chips. We and our contract manufacturers have taken steps to minimize the impact of a shortage or stoppage of shipments of digital signal processor chips or analog to digital converter chips, including maintaining a safety stock of inventory and designing software that may be easily ported to another digital signal processor chip. We have agreements with certain major suppliers and each agreement provides for varying terms with respect to contract expiration, termination and pricing. Most of these agreements allow for termination upon specified notice, ranging from four to twelve months, to the non-terminating party. Certain of these agreements with our major suppliers allow for pricing adjustments, each agreement provides for annual pricing negotiation, and one agreement also guarantees us the most favorable pricing offered by the supplier to any of its other customers.

### Sustainability

As a global manufacturer of patient monitoring technology, our mission is to improve patient outcomes and reduce the cost of care. We understand the materials we use and the products we manufacture can have an impact on the environment. We are continuously evaluating ways to reduce our overall environmental footprint. We have implemented measures to promote greater environmental responsibility, conserve resources and reduce waste in an effort to help combat climate change.

We are committed to operating in an environmentally responsible manner and support the internationally recognized environmental principles set forth in the United Nations Global Compact. We strive to identify new opportunities to improve the sustainability of our business and encourage our employees to join in our efforts. In furtherance of these commitments, we reinforce the following sustainability principles:

- **Environmental.** We undertake initiatives to promote greater environmental responsibility and incorporate energy efficiency measures in all areas of our business. We comply with applicable environmental protection laws in all areas of our business.
- **Social.** We train and encourage our employees to conduct their activities in an environmentally responsible and sustainable manner.
- **Economic.** We continuously take steps to minimize material waste and energy inefficiencies in our products and manufacturing processes.

### Human Capital Resources

Core to our long-term strategy for human capital is attracting, developing and retaining the best talent globally with the right skills to drive our future success. We consider our employees to be our greatest assets and the greatest strength behind our innovation and success. We seek to attract and retain highly-talented, experienced and well-educated individuals to support our long-term growth and profitability goals.

Our success and future growth is largely dependent on our ability to retract, retain and develop a diverse workforce at all levels of the organization. To succeed, we have developed key recruitment and retention strategies that we focus on as part of our overall management of our business. These include:

- **Compensation.** Our compensation programs are designed to align the compensation of our employees with their performance and to provide the proper incentives to attract and retain employees while motivating them to achieve superior results. The structure of our compensation programs balance incentive earnings for both short-term and long-term performance.
  - Our executive compensation is aligned with stockholder interests by aligning pay-for-performance metrics.
  - We utilize nationally-recognized compensation consultants to evaluate our executive compensation benefit programs and provide benchmarking against our peer groups.
  - We provide employee wages that are competitive and consistent with employee positions, experience, skills, knowledge and geography.
  - Our annual increases and cash incentives are based on market and awarded based on merit.

- We offer a wide variety of benefits, including health insurance, paid time off, retirement plans, and voluntary benefits such as financial and personal wellness benefits, etc.

- **Health and Safety.** We are committed to the safety and well-being of our employees. In response to the COVID-19 pandemic, we implemented changes to our business in an effort to protect our employees and customers. We instituted safety protocols and procedures for our essential employees who continue to work on site, including: daily temperature checks upon entering all facilities, implementation of Masimo SafetyNet-Open™ to pre-clear employees entering our main campus facilities, installation of plexiglass partitions between work stations at our primary manufacturing and assembly facilities, increased distancing and implementation of extensive cleaning and sanitation procedures for our manufacturing and assembly facilities as well as our general administration and sales facilities.

- **Developing Leaders of Tomorrow/Succession Planning.** We are committed to identifying and developing the talents of our next generation of leaders. Our executive management team conducts organization and leadership reviews of all business leaders, focusing on our high-performing and high potential talent, diversity, and the succession planning for critical roles.

- **Employee Feedback and Retention.** In 2020 and 2021, we were certified as a Great Place to Work®. In addition, for 2021, we were recognized on Fortune Best Workplaces in Manufacturing & Production™. To assess and improve employee retention and engagement, we survey employees and take actions to address areas of employee concerns. The average tenure of our employee is approximately 5.1 years and more than 17% of our employees have been employed by us for more than ten years.

- **Inclusion and Diversity.** In fiscal 2021, our full-time employees increased from approximately 2,000 as of January 2, 2021 to 2,200 as of January 1, 2022 and our dedicated contract personnel worldwide decreased from approximately 4,200 as of January 2, 2021 to approximately 4,000 as of January 1, 2022. Of our full-time employees, approximately 66% were male and approximately 34% were female, and women represented approximately 27% of our management/leadership roles. Minorities represented approximately 48% of our U.S. workforce, and approximately 40% of our management/leadership roles.

*Available Information*

Our annual reports on Form 10-K, quarterly reports on Form 10-Q, proxy statements, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, are available free of charge at our website, www.masimo.com, as soon as reasonably practicable after electronically filing such reports with the SEC. Any information contained on, or that can be accessed through, our website is not incorporated by reference into, nor is it in any way a part of, this Annual Report on Form 10-K.

**ITEM 1A.   RISK FACTORS**

*The following risk factors and other information included in this Annual Report on Form 10-K should be carefully considered. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties not presently known to us or that we presently deem less significant may also impair our business operations. If any of the following risks come to fruition, our business, financial condition, results of operations and future growth prospects would likely be materially and adversely affected. In these circumstances, the market price of our common stock could decline, and you could lose all or part of your investment.*

**Summary of Material Risk Factors**

Below is a summary of the principal factors that make an investment in our securities speculative or risky. This summary does not address all of the risks that we face. Additional discussion of the risks summarized in this summary, and other risks that we face, can be found following this summary and should be carefully considered together with all of the other information appearing in this Annual Report on Form 10-K.

- We currently derive the majority of our revenue from our Masimo SET® platform, Masimo rainbow SET® platform and related products. If these technologies and related products do not continue to achieve market acceptance, our business, financial condition and results of operations would be adversely affected.

- Some of our products are in development or have been recently introduced into the market and may not achieve market acceptance, which could limit our growth and adversely affect our business, financial condition and results of operations.

- Our ability to commercialize new products, new or improved technologies and additional applications for Masimo SET® and our licensed rainbow® technology is limited to certain markets by our Cross-Licensing Agreement with Cercacor Laboratories, Inc. (Cercacor), which may impair our growth and adversely affect our business, financial condition and results of operations.

  - We face competition from other companies, many of which have substantially greater resources than we do. If we do not successfully develop and commercialize enhanced or new products that remain competitive with products or alternative technologies developed by others, we could lose revenue opportunities and customers, and our ability to grow our business would be impaired, adversely affecting our financial condition and results of operations.

- We depend on our domestic and international OEM partners for a portion of our revenue. If they do not devote sufficient resources to the promotion of products that use our technologies, our business would be harmed.

- If we fail to maintain or develop relationships with GPOs, sales of our products would decline.

- Inadequate levels of coverage or reimbursement from governmental or other third-party payers for our products, or for procedures using our products, may cause our revenue to decline or prevent us from realizing revenues from future products.

- Consolidation in the healthcare industry could lead to demands for price concessions or to the exclusion of existing market participants from certain markets, which could have an adverse effect on our business, results of operations or financial condition.

- Our customers may reduce, delay or cancel purchases due to a variety of factors, such as lower hospital census levels or third-party guidelines, which could adversely affect our business, financial condition and results of operations.

- The loss of any large customer or distributor, or any cancellation or delay of a significant purchase by a large customer, could reduce our net sales and harm our operating results.

- Counterfeit Masimo sensors and third-party reprocessed single-patient-use Masimo sensors may harm our reputation. Also, these counterfeit and third-party reprocessed sensors, as well as genuine Masimo reprocessed sensors, are sold at lower prices than new Masimo sensors and could cause our revenue to decline, which may adversely affect our business, financial condition and results of operations.

- If the patents we own or license, or our other intellectual property rights, do not adequately protect our technologies, we may lose market share to our competitors and be unable to operate our business profitably.

- If third parties claim that we infringe their intellectual property rights, we may incur liabilities and costs and may have to redesign or discontinue selling certain products.

- We believe competitors may currently be violating and may in the future violate our intellectual property rights. As a result, we may initiate litigation to protect and enforce our intellectual property rights, which may result in substantial expense and may divert management's attention from implementing our business strategy.

- The laws of foreign countries may not adequately protect our intellectual property rights.

- Our failure to obtain and maintain FDA clearances or approvals on a timely basis, or at all, would prevent us from commercializing our current, upgraded or new products in the U.S., which could severely harm our business.

- The failure of our OEM partners to obtain required FDA clearances or approvals for products that incorporate our technologies could have a negative impact on our revenue.

- If we or our suppliers fail to comply with ongoing regulatory requirements, or if we experience unanticipated problems with our products, these products could be subject to restrictions or withdrawal from the market.

- Failure to obtain regulatory authorizations in foreign jurisdictions may prevent us from marketing our products abroad.

- Modifications to our marketed devices may require new regulatory clearances or premarket approvals, or may require us to cease marketing or to recall the modified devices until clearances or approvals are obtained.

- Regulatory reforms may impact our ability to develop and commercialize our products and technologies.

- If our products cause or contribute to a death or serious injury, or malfunction in a way that would likely cause or contribute to a death or serious injury, we will be subject to medical device reporting regulations, and may need to initiate voluntary corrective actions or in certain circumstances be required to take corrective actions, such as the recall of our products.

- Promotion of our products using claims that are off-label, unsubstantiated, false or misleading could subject us to substantial penalties.

- The regulatory environment governing information, cybersecurity and privacy is increasingly demanding and continues to evolve.

- We may be subject to or otherwise affected by federal and state healthcare laws, including fraud and abuse laws, and could face substantial penalties if we are unable to fully comply with these laws.

- Legislative and regulatory changes in the healthcare industry could have a negative impact on our financial performance. Furthermore, our business, financial condition, results of operations and cash flows could be significantly and adversely affected by healthcare reform legislation in the U.S. or in our key international markets.

- Our business, financial condition and results of operations may be adversely affected by the COVID-19 pandemic.

- If our employees become ill or otherwise incapacitated, our operations may be adversely impacted.

- We may experience conflicts of interest with Cercacor with respect to business opportunities and other matters.

- We will be required to assign to Cercacor and pay Cercacor for the right to use certain products and technologies we develop that relate to the monitoring of non-vital sign parameters, including improvements to Masimo SET®.

- In the event that the Cross-Licensing Agreement is terminated for any reason, or Cercacor grants a license to rainbow® technology to a third-party, our business would be adversely affected.

- We may not be able to commercialize our products incorporating licensed rainbow® technology cost-effectively or successfully.

- Rights provided to Cercacor in the Cross-Licensing Agreement may impede a change in control of our company.

- If we are unable to obtain key materials and components from sole or limited source suppliers, we will not be able to deliver our products to customers.

- Future strategic initiatives, including acquisitions of businesses and strategic investments, could negatively affect our business, financial condition and results of operations if we fail to integrate the acquired businesses successfully into our existing operations or achieve the desired results of our investment.

- Our new products and changes to existing products as a result of our proposed acquisition of Sound United could fail to attract or retain users or generate revenue and profits. Further, we may not be successful in our personal consumer strategy and investments, which could adversely affect our business, reputation or financial results.

- Our credit agreement contains certain covenants and restrictions that may limit our flexibility in operating our business.

- Our proposed new debt facility, which will be used to partially fund our pending acquisition of Sound United, may restrict our future operations, including our ability to respond to changes or to take certain actions. If we fail to comply with the covenants and other obligations under the proposed credit facility, the lender may be able to accelerate amounts owed under the facility.

- Concentration of ownership of our stock among our existing directors, executive officers and principal stockholders may prevent new investors from influencing significant corporate decisions.

- Our corporate documents and Delaware law contain provisions that could discourage, delay or prevent a change in control of our company, prevent attempts to replace or remove current management and reduce the market price of our stock.

- Our bylaws provide that the state or federal courts located within the State of Delaware are the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.

Table of Contents

**Risks Related to Our Revenues**

**We currently derive the majority of our revenue from our Masimo SET® platform, Masimo rainbow SET® platform and related products. If these technologies and related products do not continue to achieve market acceptance, our business, financial condition and results of operations would be adversely affected.**

We are highly dependent upon the continued success and market acceptance of our proprietary Masimo SET® and Masimo rainbow SET® technologies that serve as the basis of our primary product offerings. Continued market acceptance of products incorporating these technologies will depend upon us continuing to provide evidence to the medical community that our products are cost-effective and offer significantly improved performance compared to conventional pulse oximeters. Healthcare providers that currently have significant investments in competitive pulse oximetry products may be reluctant to purchase our products. If hospitals and other healthcare providers do not believe our Masimo SET® and Masimo rainbow SET® platforms are cost-effective, safe or more accurate or reliable than competitive pulse oximetry products, they may not buy our products in sufficient quantities to enable us to generate revenue growth from the sale of these products. In addition, allegations regarding the safety and effectiveness of our products, whether or not substantiated, may impair or impede the acceptance of our products.

**Some of our products are in development or have been recently introduced into the market and may not achieve market acceptance, which could limit our growth and adversely affect our business, financial condition and results of operations.**

Many of our noninvasive measurement technologies are considered disruptive. These technologies have performance levels that we believe are acceptable for many clinical environments but may be insufficient in others. In addition, these technologies may perform better in some patients and settings than others. Over time, we hope to continue to improve the performance of these technologies and educate the clinical community on how to properly evaluate them. If we are successful in these endeavors, we expect these technologies will become more useful in more environments and will become more widely adopted. Our product portfolio continues to expand, and we are investing significant resources to enter into, and in some cases create, new markets for these products. We are continuing to invest in sales and marketing resources to achieve market acceptance of these products, but are unable to guarantee that our technologies will achieve general market acceptance.

The degree of market acceptance of these products will depend on a number of factors, including but not limited to:

- perceived clinical benefits from our products;
- perceived cost effectiveness of our products;
- perceived safety and effectiveness of our products;
- reimbursement available through government and private healthcare programs for using some of our products; and
- introduction and acceptance of competing products or technologies.

If our products do not gain market acceptance or if our customers prefer our competitors' products, our potential revenue growth would be limited, which would adversely affect our business, financial condition and results of operations.

**Our ability to commercialize new products, new or improved technologies and additional applications for Masimo SET® and our licensed rainbow® technology is limited to certain markets by our Cross-Licensing Agreement with Cercacor Laboratories, Inc. (Cercacor), which may impair our growth and adversely affect our business, financial condition and results of operations.**

Since 1998, we have been a party to a cross-licensing agreement with Cercacor, (as amended, the Cross-Licensing Agreement), under which we granted Cercacor:

- an exclusive, perpetual and worldwide license, with sublicense rights, to use all Masimo SET® technology owned by us, including all improvements to this technology, for the monitoring of non-vital signs parameters and to develop and sell devices incorporating Masimo SET® for monitoring non-vital signs parameters in any product market in which a product is intended to be used by a patient or pharmacist rather than by a professional medical caregiver, which we refer to as the "Cercacor Market"; and
- a non-exclusive, perpetual and worldwide license, with sublicense rights, to use all Masimo SET® technology owned by us for measurement of vital signs in the "Cercacor Market".

Non-vital signs measurements consist of body fluid constituents other than vital signs measurements, including, but not limited to, carbon monoxide, methemoglobin, blood glucose, hemoglobin and bilirubin. Under the Cross-Licensing Agreement, we are only permitted to sell devices utilizing Masimo SET® for the monitoring of non-vital signs parameters in markets where the product is intended to be used by a professional medical caregiver, including, but not limited to, hospital caregivers and alternate care facility caregivers, rather than by a patient or pharmacist, which we refer to as the "Masimo Market".

Accordingly, our ability to commercialize new products, new or improved technologies and additional applications for Masimo SET® is limited. In particular, our inability to expand beyond the "Masimo Market" may limit our ability to maintain or increase our revenue and impair our growth.

Pursuant to the Cross-Licensing Agreement, we have licensed from Cercacor the right to make and distribute products in the "Masimo Market" that utilize rainbow® technology for certain noninvasive measurements. As a result, the opportunity to expand the market for our products incorporating rainbow® technology is also limited, which could limit our ability to maintain or increase our revenue and impair our growth.

**We face competition from other companies, many of which have substantially greater resources than we do. If we do not successfully develop and commercialize enhanced or new products that remain competitive with products or alternative technologies developed by others, we could lose revenue opportunities and customers, and our ability to grow our business would be impaired, adversely affecting our financial condition and results of operations.**

The medical device industry is intensely competitive and is significantly affected by new product introductions and other market activities of industry participants. A number of our competitors have substantially greater capital resources, larger product portfolios, larger customer bases, larger sales forces and greater geographic presence, have established stronger reputations with specific customers, and have built relationships with Group Purchasing Organizations and other hospital purchasing groups (collectively, GPOs) that may be more effective than ours. Our Masimo SET® platform faces additional competition from companies developing products for use with third-party monitoring systems, as well as from companies that currently market their own pulse oximetry monitors. In addition, competitors with larger product portfolios than ours are engaging in bundling practices, whereby they offer increased discounts to hospitals that purchase their requirements for a variety of different products from the competitor, including products that we do not offer, effectively pricing their competing products at a loss.

Continuing technological advances and new product introductions within the medical device industry place our products at risk of obsolescence. Our long-term success depends upon the development and successful commercialization of new products, new or improved technologies and additional applications for our existing technologies. The research and development process is time-consuming and costly and may not result in products or applications that we can successfully commercialize. In particular, we may not be able to successfully commercialize our products for applications other than arterial blood oxygen saturation and pulse rate monitoring, such as for respiration rate, hemoglobin, carboxyhemoglobin and methemoglobin monitoring. In addition, we may not be able to develop and successfully commercialize new products and technologies that we acquire.

If we do not successfully adapt our products and applications both within and outside these measurements, we could lose revenue opportunities and customers. Furthermore, one or more of our competitors may develop products that are substantially equivalent to those of our products that are cleared or approved for use, or those of our original equipment manufacturer (OEM) partners, in which case a competitor of ours may use our products or those of our OEM partners as predicate devices to more quickly obtain regulatory clearance or approval of their competing products. Competition could result in pressure from our customers to reduce the price of our products and could cause them to place fewer orders for our products, which could, in turn, cause a reduction in our revenues and product gross margins, thereby adversely impacting our business, financial condition and results of operations.

Some of the world's largest technology companies that have not historically operated in the healthcare or medical device space, such as Alphabet Inc., Amazon.com, Inc., Apple Inc., Samsung Electronics Co., Ltd. and others, have developed or may develop products and technologies that may compete with our current or future products and technologies. For example, in September 2020, Apple, Inc. announced that its Apple Watch Series 6 includes a pulse oximetry monitoring feature, which may compete with certain of our existing products and products in development, including the consumer versions of our iSpO2® and MightySat® pulse oximeters. In addition, in September 2021, Apple, Inc. announced that its Apple Watch Series 7 includes a blood oxygen level monitoring feature and a sleep tracking function, both of which compete with our existing products. These companies have substantially greater capital, research and development, and sales resources than we have. To effectively compete, we may need to expand our product offerings and distribution channels, which in the interim could increase our research and development costs and decrease our operating margins, thereby adversely impacting our business, financial condition and results of operations.

**We depend on our domestic and international OEM partners for a portion of our revenue. If they do not devote sufficient resources to the promotion of products that use our technologies, our business would be harmed.**

We are, and will continue to be, dependent upon our domestic and international OEM partners for a portion of our revenue through their marketing, selling and distribution of certain of their products that incorporate our technologies. Although we expect that our OEM partners will accept and actively market, sell and distribute products that incorporate our technologies, they may not do so. Because products that incorporate our technologies may represent a relatively small percentage of business for some of our OEM partners, they may have less incentive to promote these products over other products that do not incorporate these technologies.

In addition, some of our OEM partners offer products that compete with ours and also may be involved in intellectual property disputes with us. Therefore, we cannot guarantee that our OEM partners, or any company that may acquire any of our OEM partners, will vigorously promote products incorporating our technologies. The failure of our OEM partners to successfully market, sell or distribute products incorporating our technologies, the termination of OEM agreements, the loss of OEM partners or the inability to enter into future OEM partnership agreements would have a material adverse effect on our business, financial condition and results of operations.

**If we fail to maintain or develop relationships with GPOs, sales of our products would decline.**

Our ability to sell our products to hospitals depends, in part, on our relationships with GPOs. Many existing and potential customers for our products are members of GPOs. GPOs negotiate pricing arrangements and contracts with medical supply manufacturers and distributors that may include provisions for sole sourcing and bundling, which generally reduce the choices available to member hospitals.

These negotiated prices are made available to a GPO's members. If we are not one of the providers selected by a GPO, the GPO's members may be less likely or unlikely to purchase our products. If a GPO has negotiated a strict sole source, market share compliance or bundling contract for another manufacturer's products, we may be prohibited from making sales to members of such GPO for the duration of such contractual arrangement. Shipments of our pulse oximetry products to customers that are members of GPOs represent approximately 90% of our U.S. product sales. Our failure to renew our contracts with GPOs may cause us to lose market share and could have a material adverse effect on our business, financial condition and results of operations. In addition, if we are unable to develop new relationships with GPOs, our competitive position would likely suffer and our opportunities to grow our revenues and business would be harmed.

**Inadequate levels of coverage or reimbursement from governmental or other third-party payers for our products, or for procedures using our products, may cause our revenue to decline or prevent us from realizing revenues from future products.**

Sales of our products depend in part on the reimbursement and coverage policies of governmental and private healthcare payers. The lack of adequate coverage and reimbursement for our products or the procedures in which our products are used may deter customers from purchasing our products.

We cannot guarantee that governmental or third-party payers will reimburse or begin reimbursing a customer for the cost of our products or the procedures in which our products are used. For example, some insurance carriers have issued policies denying coverage for transcutaneous hemoglobin measurement on the grounds that the technology is investigational in the outpatient setting. Other payers are continuing to investigate our products to determine if they will provide reimbursement for the use of such products.

These trends could lead to pressure to reduce prices for our current and future products, hinder our ability to obtain market adoption, cause a decrease in the size of the market or potentially increase competition, any of which could have a material adverse effect on our business, financial condition and results of operations.

We do not control payer decision-making with respect to coverage and payment levels for our products. Additionally, we expect many payers to continue to explore cost-containment strategies (e.g., comparative and cost-effectiveness analyses, so-called "pay-for-performance" programs implemented by various public government healthcare programs and private third-party payers, and expansion of payment bundling initiatives, and other such methods that shift medical cost risk to providers) that may potentially impact coverage and/or payment levels for our current products or products we develop in the future.

Outside of the U.S., reimbursement systems vary by country. These systems are often subject to the same pressures to curb rising healthcare costs and control healthcare expenditures as those in the U.S. In addition, as economies of emerging markets develop, these countries may implement changes in their healthcare delivery and payment systems. If adequate levels of reimbursement from third-party payers outside of the U.S. are not obtained, sales of our products outside of the U.S. may be adversely affected.

**Consolidation in the healthcare industry could lead to demands for price concessions or to the exclusion of existing market participants from certain markets, which could have an adverse effect on our business, results of operations or financial condition.**

Because healthcare costs have risen significantly over the past decade, numerous initiatives and reforms initiated by legislators, regulators and third-party payers to curb these costs have resulted in a consolidation trend in the healthcare industry to aggregate purchasing power. As the healthcare industry consolidates, competition to provide products and services to industry participants has become, and will continue to become, more intense. This has resulted in, and will likely continue to result in, greater pricing pressures and the exclusion of certain existing market participants from important market segments as GPOs, independent delivery networks and large single accounts continue to use their market power to consolidate purchasing decisions for hospitals.

We expect that market demand, government regulation, third-party coverage and reimbursement policies and societal pressures will continue to impact the worldwide healthcare industry, resulting in further business consolidations and alliances among our customers, which may reduce competition, exert further downward pressure on the prices of our products and adversely impact our business, financial condition and results of operations.

**Our customers may reduce, delay or cancel purchases due to a variety of factors, such as lower hospital census levels or third-party guidelines, which could adversely affect our business, financial condition and results of operations.**

Our customers are facing growing levels of uncertainties, including variations in overall hospital census for paying patients and the impact of such census variations on hospital budgets. As a result, many hospitals are reevaluating their entire cost structure, including the amount of capital they allocate to medical device technologies and products. In addition, certain of our census measurements, including our rainbow® measurements such as carbon monoxide, methemoglobin and hemoglobin, that are sold with upfront license fees and more complex and expensive sensors, could also be impacted by hospital budget reductions. Any reductions in capital spending budgets by hospitals could have a significant negative impact on our OEM customers who, due to their traditionally larger capital equipment sales model, could see declines in purchases from their hospital customers. This, in turn, could reduce our board sales to our OEM customers.

From time to time, states and other local regulatory authorities may issue guidelines regarding the appropriate scope and use of our products. For example, some of our noninvasive monitoring devices may be subject to authorization by individual states as part of the Emergency Medical Services (EMS) scope of practice procedures. A lack of inclusion into scope of practice procedures may limit adoption of our products.

Additionally, increases in demand resulting from global medical crises such as the COVID-19 pandemic may be short lived. If the increased demand results in a stockpiling of our products by, or excess inventory at, our customers, future orders may be delayed or canceled until such on-hand inventory is consumed.

**The loss of any large customer or distributor, or any cancellation or delay of a significant purchase by a large customer, could reduce our net sales and harm our operating results.**

We have a concentration of OEM, distributor and direct customers. For example, sales to two just-in-time distributors each represented 10% or more of our product sales for the year ended January 1, 2022. We cannot provide any assurances that we will retain our current customers, groups of customers or distributors, or that we will be able to attract and retain additional customers in the future. If for any reason we were to lose our ability to sell to a specific group or class of customers or through a distributor, we could experience a significant reduction in revenue, which would adversely impact our operating results.

Our sales could also be negatively affected by any rebates, discounts or fees that are required by, or offered to, GPOs and customers, including wholesalers or distributors. Additionally, some of our just-in-time distributors have been demanding higher fees, which we may be obligated to pay in order to continue to offer products to our customers through these distributors or which may obligate us to distribute our products directly to our customers. The loss of any large customer or distributor, an increase in distributor fees, or the risks associated with selling directly to our customers could have a material adverse effect on our business, financial condition and results of operations.

**Counterfeit Masimo sensors and third-party reprocessed single-patient-use Masimo sensors may harm our reputation. Also, these counterfeit and third-party reprocessed sensors, as well as genuine Masimo reprocessed sensors, are sold at lower prices than new Masimo sensors and could cause our revenue to decline, which may adversely affect our business, financial condition and results of operations.**

We believe that other entities are manufacturing and selling counterfeit Masimo sensors. In addition, certain medical device reprocessors have been collecting our used single-patient-use sensors from hospitals and then reprocessing, repackaging and reselling those sensors to hospitals. These counterfeit and third-party reprocessed sensors are sold at lower prices than new Masimo sensors. Our experience with both these counterfeit sensors and third-party reprocessed sensors is that they provide inferior performance, increased sensor consumption, reduced comfort and a number of monitoring problems. Notwithstanding these limitations, some of our customers have indicated a willingness to purchase some of their sensor requirements from these counterfeit manufacturers and third-party reprocessors in an effort to reduce their sensor costs.

These counterfeit and reprocessed sensors have led and may continue to lead to confusion with our genuine Masimo products, have reduced and may continue to reduce our revenue, and, in some cases, have harmed and may continue to harm our reputation if customers conclude incorrectly that these counterfeit or reprocessed sensors are original Masimo sensors.

In addition, we have expended a significant amount of time and expense investigating issues caused by counterfeit and reprocessed sensors, troubleshooting problems stemming from such sensors, educating customers about why counterfeit and reprocessed sensors do not perform to their expectations, enforcing our proprietary rights against the counterfeit manufacturers and reprocessors, and enforcing our contractual rights.

In response to these counterfeit sensors and third-party reprocessors, we have incorporated X-Cal² technology into certain products to ensure our customers get the performance they expect by using genuine Masimo sensors and that such sensors do not continue to be used beyond their useful life. However, some customers may object to the X-Cal² technology, potentially resulting in the loss of customers and revenues.

We also offer our own Masimo reprocessed sensors, which meet the same performance specifications as our new Masimo sensors, to our customers. Reprocessed sensors sold by us are also offered at a lower price and, therefore, may reduce certain customer demand for our new sensors. As a result, increased sales of our own Masimo reprocessed sensors may result in lower revenues, which could negatively impact our business, financial condition and results of operations.

## Risks Related to Our Intellectual Property

**If the patents we own or license, or our other intellectual property rights, do not adequately protect our technologies, we may lose market share to our competitors and be unable to operate our business profitably.**

Our success depends significantly on our ability to protect our rights to the technologies used in our products. Our utilization of patent protection, trade secrets and a combination of copyright and trademark laws, as well as nondisclosure, confidentiality and other contractual arrangements, to protect our intellectual property afford us only limited protection and may not adequately protect our rights or permit us to gain or maintain any competitive advantage.

Certain of our patents related to our technologies have begun to expire. Upon the expiration of our issued or licensed patents, we generally lose some of our rights to exclude competitors from making, using, selling or importing products using the technology based on the expired patents.

Furthermore, in recent years, the U.S. Supreme Court has ruled on several patent cases and several laws have been enacted that, in certain situations, potentially narrow the scope of patent protection available and weaken the rights of patent owners. As a result, we believe large technology companies may be pursuing an "efficient infringement" strategy, having concluded that it is cheaper to infringe third party intellectual property rights than to acquire, license or otherwise respect them. There can be no assurance that we will be successful in securing additional patents on commercially desirable improvements, that such additional patents will adequately protect our innovations or offset the effect of expiring patents, or that competitors will not be able to design around our patents.

In addition, third parties have challenged, and may continue to challenge, our issued patents through procedures such as Inter-Partes Review (IPR). In many IPR challenges, the U.S. Patent and Trademark Office (PTO) cancels or significantly narrows issued patent claims. IPR challenges could increase the uncertainties and costs associated with the maintenance, enforcement and defense of our issued and future patents and could have a material adverse effect on our business, financial condition and results of operations.

We also utilize unpatented proprietary technology and know-how and often rely on confidentiality agreements and intellectual property assignment agreements with our employees, OEM partners, independent distributors and consultants to protect such unpatented proprietary technology and know-how. However, such agreements may not be enforceable or may not provide meaningful protection for our proprietary information in the event of unauthorized use or disclosure or other breaches of the agreements, or in the event that our competitors discover or independently develop similar or identical designs or other proprietary information.

We rely on the use of registered and common law trademarks with respect to the brand names of some of our products. Common law trademarks provide less protection than registered trademarks. Loss of rights in our trademarks could adversely affect our business, financial condition and results of operations.

**If third parties claim that we infringe their intellectual property rights, we may incur liabilities and costs and may have to redesign or discontinue selling certain products.**

Searching for existing intellectual property rights may not reveal important intellectual property and our competitors may also have filed for patent protection, which may not be publicly-available information, or claimed trademark rights that have not been revealed through our searches. In addition, some of our employees were previously employed at other medical device companies. We may be subject to claims that our employees have disclosed, or that we have used, trade secrets or other proprietary information of our employees' former employers. Our efforts to identify and avoid infringing on third parties' intellectual property rights may not always be successful. Any claims of patent or other intellectual property infringement against us, even those without merit, could:

- be expensive and time-consuming to defend and result in payment of significant damages to third parties;
- force us to stop making or selling products that incorporate the intellectual property;
- require us to redesign, reengineer or rebrand our products, product candidates and technologies;
- require us to enter into royalty agreements that would increase the costs of our products;
- require us to indemnify third parties pursuant to contracts in which we have agreed to provide indemnification for intellectual property infringement claims;
- divert the attention of our management and other key employees; and

43

Table of Contents

• result in our customers or potential customers deferring or limiting their purchase or use of the affected products impacted by the claims until the claims are resolved;

any of which could have a material adverse effect on our business, financial condition and results of operations. In addition, new patents obtained by our competitors could threaten the continued commercialization of our products in the market even after they have already been introduced.

**We believe competitors may currently be violating and may in the future violate our intellectual property rights. As a result, we may initiate litigation to protect and enforce our intellectual property rights, which may result in substantial expense and may divert management's attention from implementing our business strategy.**

We believe that the success of our business depends, in part, on obtaining patent protection for our products and technologies, defending our patents and preserving our trade secrets. We were previously involved in significant litigation to protect our patent positions related to some of our pulse oximetry signal processing patents that resulted in various settlements. We believe some of the new market entrants in the healthcare and monitoring space, including some of the world's largest technology companies, may be infringing our intellectual property, and we may be required to engage in additional litigation to protect our intellectual property in the future. In addition, we believe that certain individuals who previously held high level technical and clinical positions with us misappropriated our intellectual property for the benefit of themselves and other companies. For example, on January 9, 2020, we initiated litigation against Apple Inc. for infringement of a number of patents, for trade secret misappropriation and for ownership and correction of inventorship of a number of Apple Inc. patents that list one of our former employees as an inventor. Our ongoing and future litigation could result in significant additional costs and further divert the attention of our management and key personnel from our business operations and the implementation of our business strategy and may not be successful or adequate to protect our intellectual property rights.

**The laws of foreign countries may not adequately protect our intellectual property rights.**

Intellectual property protection laws in foreign countries differ substantially from those in the U.S. If we fail to apply for intellectual property protection in foreign countries, or if we cannot adequately protect our intellectual property rights in these foreign countries, our competitors may be able to compete more effectively against us, which could adversely affect our competitive position, as well as our business, financial condition and results of operations.

**Risks Related to Our Regulatory Environment**

**Our failure to obtain and maintain FDA clearances or approvals on a timely basis, or at all, would prevent us from commercializing our current, upgraded or new products in the U.S., which could severely harm our business.**

Unless an exemption applies, each medical device that we market in the U.S. must first undergo premarket review pursuant to the Federal Food, Drug, and Cosmetic Act (FDCA) by receiving clearance of a 510(k) premarket notification, receiving clearance through the *de novo* classification review process or obtaining approval of a premarket approval (PMA) application. Even if regulatory clearance or approval of a product is granted, the U.S. Food and Drug Administration (FDA) may clear or approve our products only for limited indications for use. Additionally, the FDA may not grant 510(k) clearance on a timely basis, if at all, for new products or new uses that we propose for Masimo SET® or licensed rainbow® technology.

The traditional FDA 510(k) clearance process for our products has generally taken between four to nine months. However, our more recent experience and interactions with the FDA, along with information we have received from other medical device manufacturers, suggests that, in some cases, the FDA is requiring applicants to provide additional or different information and data for 510(k) clearance than it had previously required, and that the FDA may not rely on approaches that it had previously accepted to support 510(k) clearance. As a result, FDA 510(k) clearance can be delayed for our products in some cases.

To support our product applications to the FDA, we frequently are required to conduct clinical testing of our products. Such clinical testing must be conducted in compliance with FDA requirements pertaining to human research. Among other requirements, we must obtain informed consent from study subjects and approval by institutional review boards before such studies may begin. We must also comply with other FDA requirements such as monitoring, record-keeping, reporting and the submission of information regarding certain clinical trials to a public database maintained by the National Institutes of Health. In addition, if the study involves a significant risk device, we are required to obtain the FDA's approval of the study under an Investigational Device Exemption (IDE). Compliance with these requirements can require significant time and resources. In addition, public health emergencies and other extraordinary circumstances may disrupt the conduct of our clinical trials. If the FDA determines that we have not complied with such requirements, the FDA may refuse to consider the data to support our applications or may initiate enforcement actions.

Even though 510(k) clearances have been obtained, if safety or effectiveness problems are identified with our products, we may need to initiate a recall of such products. Furthermore, our new products or significantly modified marketed products could be

Table of Contents

denied 510(k) clearance and be required to undergo the more burdensome PMA or *de novo* classification review processes. The process of obtaining a *de novo* classification or PMA approval is much more costly, lengthy and uncertain than the process for obtaining 510(k) clearance.

*De novo* classification review generally takes six months to one year from the time of submission of the *de novo* request, although it can take longer. Approval of a PMA generally takes one year from the time of submission of the PMA, but may be longer.

We sell consumer versions of our iSpO₂® and MightySat® pulse oximeters that are not intended for medical use. Some of our products or product features may not be subject to the 510(k) process and/or other regulatory requirements in accordance with specific FDA guidance and policies, such as the FDA guidance related to mobile medical applications. In addition, some of our products or product features may not be subject to device regulation pursuant to Section 520(o) of the FDCA, which excludes certain software functions from the statutory definition of a device. In addition, we may market certain products pursuant to enforcement discretion policies the FDA previously announced to address the need for these products as a result of the COVID-19 pandemic. Such policies only remain in effect during the public health emergency, such that we will need to seek clearance or approval of such products to continue marketing these products at the end of the COVID-19 pandemic. If the FDA changes its policies or concludes that our marketing of these products is not in accordance with its current policies and/or Section 520(o) of the FDCA, we may be required to seek clearance or approval of these devices through the 510(k), *de novo* classification review or PMA processes.

**The failure of our OEM partners to obtain required FDA clearances or approvals for products that incorporate our technologies could have a negative impact on our revenue.**

Our OEM partners are required to obtain their own FDA clearances in the U.S. for most products incorporating Masimo technologies. The FDA clearances we have obtained may not make it easier for our OEM partners to obtain clearances of products incorporating these technologies, or the FDA may not grant clearances on a timely basis, if at all, for any future products incorporating Masimo technologies that our OEM partners propose to market.

**If we or our suppliers fail to comply with ongoing regulatory requirements, or if we experience unanticipated problems with our products, these products could be subject to restrictions or withdrawal from the market.**

Our products, along with the manufacturing processes, labeling and promotional activities for our products, are subject to continual review and periodic inspections by the FDA and other regulatory bodies. Among other requirements, we and certain of our suppliers are required to comply with the FDA's Quality System Regulation (QSR), which governs the methods and documentation of the design, control testing, production, component suppliers control, quality assurance, complaint handling, labeling control, packaging, storage and shipping of our products. The FDA enforces the QSR through announced and unannounced inspections. We are also subject to similar state requirements and licenses.

In addition to the FDA, from time to time we are subject to inspections by the California Food and Drug Branch, international regulatory authorities and other similar governmental agencies. The standards used by these regulatory authorities are complex and may differ from those used by the FDA.

Failure by us or one of our suppliers to comply with statutes and regulations administered by the FDA and other regulatory bodies or failure to adequately respond to any FDA Form 483 observations, any California Food and Drug Branch notices of violation or any similar reports could result in, among other things, any of the following:

- warning letters or untitled letters issued by the FDA;
- fines, civil penalties, in rem forfeiture proceedings, injunctions, consent decrees and criminal prosecution;
- import alerts;
- unanticipated expenditures to address or defend such actions;
- delays in clearing or approving, or refusal to clear or approve, our products;
- withdrawals or suspensions of clearance or approval of our products or those of our third-party suppliers by the FDA or other regulatory bodies;
- product recalls or seizures;
- orders for physician notification or device repair, replacement or refund;
- interruptions of production or inability to export to certain foreign countries; and
- operating restrictions.

Table of Contents

If any of these events were to occur, it would harm our reputation and adversely affect our business, financial condition and results of operations.

**Failure to obtain regulatory authorizations in foreign jurisdictions may prevent us from marketing our products abroad.**

We currently market and intend to continue to market our products internationally. Outside of the U.S., we can generally market a product only if we receive a marketing authorization (and/or meet certain pre-marketing requirements) and, in some cases, pricing approval, from the appropriate regulatory authorities. The regulatory registration/licensing process varies among international jurisdictions and may require additional or different product testing than required to obtain FDA clearance. FDA clearance does not ensure new product registration/licensing by foreign regulatory authorities, and we may be unable to obtain foreign regulatory registration/licensing on a timely basis, if at all.

In addition, clearance by one foreign regulatory authority does not ensure clearance by any other foreign regulatory authority or by the FDA. If we fail to receive necessary approvals to commercialize our products in foreign jurisdictions on a timely basis, or at all, our business, financial condition and results of operations could be adversely affected.

Furthermore, foreign regulatory requirements may change from time to time, which could adversely affect our ability to market new products, and/or continue to market existing products, internationally. Certain significant changes in the international regulatory landscape have recently taken place or will take place in the near future. These include the new EU Medical Devices Regulation (EU) 2017/745 (MDR), which came into effect on May 26, 2021 and a new regulatory regime in the UK effective since January 1, 2021 as a result of the UK's exit from the EU and the expiry of the transitional periods.

**Modifications to our marketed devices may require new regulatory clearances or premarket approvals, or may require us to cease marketing or to recall the modified devices until clearances or approvals are obtained.**

We have made modifications to our devices in the past and we may make additional modifications in the future. Any modification to a device that is cleared by the FDA that could significantly affect its safety or effectiveness or that could constitute a major change in its intended use would require a new clearance or approval and certain modifications to devices cleared or approved by foreign regulatory authorities may also require a new clearance or approval.

We may not be able to obtain such clearances or approvals in a timely fashion, or at all. Delays in obtaining future clearances would adversely affect our ability to introduce new or enhanced products in a timely manner, which in turn would have an adverse effect on our business, financial condition and results of operations.

For device modifications that we conclude do not require a new regulatory clearance or approval, we may be required to recall and to stop marketing the modified devices if the government agency disagrees with our conclusion and requires new clearances or approvals for the modifications. This could have an adverse effect on our business, financial condition and results of operations.

During the COVID-19 pandemic, the FDA has issued enforcement policies under which the agency has said it will not require clearance of a new 510(k) for certain modifications to 510(k)-cleared non-invasive vital-sign patient monitoring devices. However, these policies remain in effect only during the COVID-19 pandemic. Manufacturers that make modifications pursuant to these policies will need to stop marketing the modifications at the end of the COVID-19 pandemic unless the manufacturer receives 510(k) clearance for the modifications.

**Regulatory reforms may impact our ability to develop and commercialize our products and technologies.**

From time to time, legislation is drafted and introduced by governments that could significantly change the statutory provisions governing the clearance or approval, manufacture and marketing of medical devices. For example, in August 2017, Congress enacted the FDA Reauthorization Act of 2017 (FDARA). FDARA reauthorized the FDA to collect device user fees, including a new user fee for *de novo* classification requests, and contained substantive amendments to the device provisions of the FDCA. Among other changes, FDARA required that the FDA update and revise its processes for scheduling inspections of device establishments, communicating about those inspections with manufacturers and providing feedback on the manufacturer's responses to Form 483s. The statute also required that the FDA study the impact of device servicing, including third-party services, and created a new process for device sponsors to request classification of accessory devices as part of the PMA application for the parent device or to request a separate classification of accessory devices.

In addition, regulations and guidance are often revised or reinterpreted by the government agency in ways that may significantly affect our business or products. Future regulatory changes could make it more difficult for us to obtain or maintain approval to develop and commercialize our products and technologies. Public health emergencies may also prompt temporary or permanent regulatory reforms that could change the processes governing the clearance or approval, manufacture and marketing of medical devices.

In the EU, for example, the new MDR became applicable to our medical devices on May 26, 2021. The MDR requires medical devices and their manufacturers to comply with more stringent standards than before. The MDR also imposes new and enhanced obligations on importers and distributors of medical devices in the EU. Although the MDR is subject to certain transitional periods, both we and others involved in the distribution and commercialization of our medical devices in the EU will need to comply with more stringent EU rules.

Due to Brexit, from January 1, 2021, a new regulatory framework applies to medical devices commercialized in Great Britain (England, Scotland and Wales). This is now separate from the regime in the EU. Although certain transition periods apply until June 30, 2023, the medical devices we intend to commercialize in Great Britain will need to conform to different requirements than the requirements in the EU. These factors are likely to add more complexity to our regulatory compliance obligations in Europe and our ability to commercialize medical devices in European markets.

**If our products cause or contribute to a death or serious injury, or malfunction in a way that would likely cause or contribute to a death or serious injury, we will be subject to medical device reporting regulations, and may need to initiate voluntary corrective actions or in certain circumstances be required to take corrective actions, such as the recall of our products.**

Regulatory agencies in many countries require us to report anytime our products cause or contribute to a death or serious injury, or malfunction in a way that would likely cause or contribute to a death or serious injury. For example, under the FDA medical device reporting regulations, we are required to report to the FDA any incident in which a product of ours may have caused or contributed to a death or serious injury or in which a product of ours malfunctioned and, if the malfunction were to recur, would be likely to cause or contribute to death or serious injury. In addition, all manufacturers placing medical devices on the market in the EU are legally required to report any serious or potentially serious incidents involving devices produced or sold by the manufacturer to the relevant authority in those jurisdictions where any such incident occurred.

The FDA and similar foreign regulatory authorities have the authority to require the recall of our commercialized products in the event of material deficiencies or defects in, for example, design, labeling or manufacture. The FDA must find that there is a reasonable probability that the device would cause serious adverse health consequences or death in order to require a recall. The standard for recalling deficient products may be different in foreign jurisdictions. Manufacturers may, under their own initiative, recall a product if any material deficiency is found in a device or they become aware of a safety issue involving a marketed product. A government-mandated or voluntary recall by us or by one of our distributors could occur as a result of component failures, manufacturing errors, design or labeling defects or other deficiencies and issues.

We may initiate certain field actions, such as a product correction or removal of our products in the future. In addition, third parties that commercialize products incorporating our technologies may initiate similar actions or product corrections. Any correction or removal initiated by us to reduce a health risk posed by our device, or to remedy a violation of the FDCA or other regulations caused by the device that may present a risk to health, must be reported to the FDA. If the FDA subsequently determines that a report was required for a correction or removal of our products that we did not believe required a report, we could be subject to enforcement actions.

Any recalls or corrections of our products or third party products that incorporate our technologies, or enforcement actions would divert managerial and financial resources and could have an adverse effect on our financial condition and results of operations. In addition, given our dependence upon patient and physician perceptions, any negative publicity associated with any recalls could materially and adversely affect our business, financial condition, results of operations and growth prospects.

**Promotion of our products using claims that are off-label, unsubstantiated, false or misleading could subject us to substantial penalties.**

Obtaining 510(k) clearance permits us to promote our products for the uses cleared by the FDA. Use of a device outside its cleared or approved indications is known as "off-label" use or promotion, respectively. Physicians may use our products off-label because the FDA does not restrict or regulate a physician's choice of treatment within the practice of medicine, but we may not promote our products "off-label". While we may request additional cleared indications for our current products, the FDA may deny those requests, require additional expensive clinical data to support any additional indications or impose limitations on the intended use of any cleared product as a condition of clearance. If the FDA determines that our products were promoted for off-label use or that false, misleading or inadequately substantiated promotional claims have been made by us or our OEM partners, it could request that we or our OEM partners modify those promotional materials or it could take regulatory or enforcement actions, including the issuance of an untitled letter, warning letter, injunction, seizure, civil fine and criminal penalties. While certain U.S. courts have held that truthful, non-misleading, off-label information is protected under the First Amendment under certain circumstances, the FDA continues to take the position that off-label promotion is subject to enforcement action.

It is also possible that other federal, state or foreign enforcement authorities may take action if they consider our communications, including promotional or training materials, to constitute promotion of an uncleared or unapproved use. If not successfully defended, enforcement actions related to off-label promotion could result in significant fines or penalties under other statutory authorities, such as laws prohibiting false claims for reimbursement. In any such event, our reputation could be damaged, adoption of our products could be impaired and we could be subject to extensive fines and penalties.

Additionally, we must have adequate substantiation for the claims we make for our products. If any of our claims are determined to be false, misleading or deceptive, our products could be considered misbranded under the FDCA or in violation of the Federal Trade Commission Act. We could also face lawsuits from our competitors under the Lanham Act alleging that our marketing materials are false or misleading.

**The regulatory environment governing information, cybersecurity and privacy is increasingly demanding and continues to evolve.**

Personal privacy and data security have become significant issues in the U.S., Europe and many other jurisdictions where we offer our products. The regulatory framework for privacy and security issues worldwide is rapidly evolving and is likely to remain uncertain for the foreseeable future.

Certain U.S. and foreign laws, such as the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA), govern the transmission, security and privacy of individually identifiable information and sensitive health and other personal information that we may obtain or have access to in connection with the operation of our business, including the conduct of clinical research trials or other research studies that may provide us with access to this information. We may be required to make costly system modifications to comply with these data privacy and security requirements. In addition, if we do not properly comply with applicable laws and regulations related to the protection of this information, we could be subject to criminal or civil penalties and sanctions. The California Consumer Privacy Act of 2018 (CCPA), which became effective on January 1, 2020, requires us to make new disclosures to consumers about our data collection, use and sharing practices. The CCPA also allows consumers to opt out of certain data sales to third parties, affords new consumer rights, and provides a new cause of action for data breaches with the possibility of significant statutory damage awards as well as injunctive or declaratory relief if there has been unauthorized access, theft or disclosure of specified personal information due to failure to implement reasonable security procedures. The California Privacy Rights Act (CPRA), which will go into effect on January 1, 2023, with a twelve month look-back period for enforcement purposes, will effectively replace the CCPA. Among other changes, the CPRA expands consumers' rights and has enhanced enforcement mechanisms such as the creation of a new California privacy agency that will investigate and enforce the CPRA and its promulgating regulations. In addition to the CCPA and the CPRA, all 50 U.S. states have data breach notification laws that, if violated, could result in penalties, fines and litigation. In addition, many states have implemented or are in the process of implementing related legislation, including state-specific biometric privacy laws that have resulted in class-action lawsuits against businesses. The full impact of these laws on our business is yet to be determined, but it could result in increased operating expenses as well as additional exposure to the risk of litigation by or on behalf of consumers.

Internationally, the General Data Protection Regulation (GDPR) took effect in May 2018 within the European Economic Area (EEA), and many EEA jurisdictions have also adopted their own data privacy and protection laws in addition to the GDPR. Furthermore, other international jurisdictions, including Singapore, South Korea, China, Brazil, Mexico and Australia, have also implemented laws relating to data privacy and protection. Although we believe that we are complying with the GDPR and similar laws, these laws are still relatively new. Therefore, as international data privacy and protection laws continue to evolve, and as new regulations, interpretive guidance and enforcement information become available, we may incur incremental costs to modify our business practices to comply with these requirements. In addition, our internal control policies and procedures may not always protect us from reckless, intentional or criminal acts committed by our employees or agents.

In addition, our pending acquisition of Sound United, a consumer technology company, may subject us to additional privacy regulations.

Violations of these laws, or allegations of such violations, could subject us to monetary and non-monetary penalties for noncompliance, disrupt our operations, involve significant management distraction, subject us to class action lawsuits and result in a material adverse effect on our business, financial condition and results of operations.

**We may be subject to or otherwise affected by federal and state healthcare laws, including fraud and abuse laws, and could face substantial penalties if we are unable to fully comply with these laws.**

Healthcare fraud and abuse laws potentially applicable to our operations include, but are not limited to:

Table of Contents

- the federal Anti-Kickback Statute, which prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving any bribe, kickback or other remuneration intended to induce the purchase, order or recommendation of an item or service reimbursable under a federal healthcare program (such as the Medicare or Medicaid programs);

- the federal False Claims Act and other federal laws which prohibit, among other things, knowingly and willfully presenting, or causing to be presented, claims for payment from Medicare, Medicaid, other government payers or other third-party payers that are false or fraudulent;

- the Physician Payments Sunshine Act, which requires medical device companies to track and publicly report, with limited exceptions, all payments and transfers of value to physicians and teaching hospitals in the U.S.; and

- state laws analogous to each of the above federal laws, such as state anti-kickback and false claims laws that may apply to items or services reimbursed by governmental programs and non-governmental third-party payers, including commercial insurers.

If we are found to have violated any such laws or other similar governmental regulations, including their foreign counterparts, that are directly or indirectly applicable to us, we may be subject to penalties, including civil and criminal penalties, damages, fines, exclusion of our products from reimbursement under Medicare, Medicaid and other federal healthcare programs, and the curtailment or restructuring of our operations. Any penalties could adversely affect our ability to operate our business and our financial results. Any action against us for violation of these laws, even if we successfully defend against such action, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business.

**Legislative and regulatory changes in the healthcare industry could have a negative impact on our financial performance. Furthermore, our business, financial condition, results of operations and cash flows could be significantly and adversely affected by healthcare reform legislation in the U.S. or in our key international markets.**

Changes in the healthcare industry in the U.S. and abroad could adversely affect the demand for our products and the way in which we conduct our business. For example, the Patient Protection and Affordable Care Act (the ACA), enacted in 2010, required most individuals to have health insurance, established new regulations on health plans, created insurance-pooling mechanisms and reduced Medicare spending on services provided by hospitals and other providers. The long-term viability of the ACA, and its impact on our business and results of operations, remains uncertain. There have also been recent U.S. Congressional actions to repeal and replace the ACA, and future actions are expected. For example, the Tax Cuts and Jobs Act of 2017 (TCJA), among other things, eliminated the individual mandate requiring most Americans (other than those who qualify for a hardship exemption) to carry a minimum level of health coverage effective January 1, 2019.

In December 2018, a federal district court judge in Texas found the ACA's individual mandate to be unconstitutional; and therefore, the entire law to be invalid. In December 2019, the Fifth Circuit affirmed the ruling regarding the individual mandate but remanded the case to the district court for additional analysis of the question of severability and whether portions of the law remain valid. In June 2021, the U.S. Supreme Court held that the states and individuals that brought the lawsuit do not have standing to challenge the law, effectively ending the case without ruling on the constitutionality of the individual mandate. Although we cannot predict the ultimate content or timing of any healthcare reform legislation or other court challenges to the ACA, potential changes resulting from any amendment, repeal, replacement or invalidation of these programs, including any reduction in the future availability of healthcare insurance benefits, may decrease the number of people who are insured, which could adversely affect our business and future results of operations.

Our medical devices and business activities are subject to rigorous regulation by the FDA and other federal, state and international governmental authorities. These authorities and members of Congress have been increasing their scrutiny over the medical device industry. In recent years, Congress, the Department of Justice, the Office of Inspector General of the Department of Health and Human Services and the Department of Defense have issued subpoenas and other requests for information to medical device manufacturers, primarily related to financial arrangements with healthcare providers, regulatory compliance and marketing and product promotional practices. Furthermore, certain state governments have enacted legislation to limit and/or increase transparency of interactions with healthcare providers, pursuant to which we are required by law to disclose payments and other transfers of value to healthcare providers licensed by certain states.

We anticipate that the government will continue to scrutinize our industry closely, and any new regulations or statutory provisions could result in delays or increased costs during the periods of product development, clinical trials and regulatory review and approval, as well as increased costs to assure compliance.

49

**Risks Related to Our Business and Operations**

**Our business, financial condition and results of operations may be adversely affected by the COVID-19 pandemic.**

In December 2019, COVID-19 was reported to have surfaced in Wuhan, China and has since spread to many other countries, including the United States, where we have our principal executive offices and principal operations, Switzerland, where we have our international headquarters, and Mexico, where we have significant manufacturing operations. Government-imposed travel restrictions have resulted, and may continue to result, in direct operational and administrative disruptions to our domestic and foreign facilities. In addition, quarantines, shelter-in-place and similar orders by local governments have impacted and could further impact the productivity of our manufacturing, engineering, sales and administrative staff and facilities in the United States and other countries. Our operations would be disrupted if any of our employees or employees of our business partners were suspected of having contracted COVID-19, which could require quarantine of some or all such employees or closure of our facilities for disinfection.

If the current pace of the COVID-19 pandemic continues to accelerate due to variants such as the omicron variant and the spread of the virus is not contained in the U.S. and other jurisdictions where we operate, our business operations could be further delayed or interrupted. Further, any resurgence in infections in the U.S. or other countries where government restrictions have been fully or partially lifted could result in a re-imposition of such restrictions, causing renewed disruptions to our business. In the event that government and health authorities may announce new or extend existing restrictions, which could include vaccine or testing mandates, we may be required to make further adjustments to our operations in order to comply with any such restrictions. For example, on September 9, 2021, the President of the United States issued Executive Order (EO) 14042, requiring that employees of federal contractors and subcontractors be fully vaccinated against COVID-19, and Masimo is a federal contractor. However, the EO has faced legal challenges in federal courts and there is currently a nationwide injunction on EO 14042. The President of the United States also directed the Federal Occupational Safety and Health Administration (Fed-OSHA) to issue Emergency Temporary Standards (ETS) that will direct large employers (those with 100+ employees) to mandate COVID-19 vaccinations for their employees; however, on January 13, 2022, the U.S. Supreme Court blocked these regulations from going into effect. Though it is difficult to predict whether the injunction on the EO mandate will be lifted, if we are ultimately required to mandate vaccines for our employees, we may experience workforce constraints due to shortages of vaccinated personnel, strains on the labor market, limitations on hiring new employees and difficulty retaining and securing employees who are vaccinated. In addition, our suppliers who are subject to similar vaccination mandates or regulations may experience similar constraints, thereby affecting their ability to provide to us with sufficient inventory or material to meet our demands and needs in a timely manner. All of these factors could negatively affect our business and operations.

Furthermore, global supply chains and the timely availability of raw materials, component parts and products may be materially disrupted by the COVID-19 pandemic and measures taken to combat COVID-19, such as quarantines, government mandates surrounding vaccinations, factory slowdowns or shutdowns, border closings and travel restrictions. In addition, our suppliers have experienced, and may continue to experience, difficulties in delivering raw materials, components and products to us as transportation networks and distribution facilities have been disrupted, resulting in delays at ports of arrival. Furthermore, the availability of shipping containers has decreased and there have been global changes in the types of goods being shipped, all of which have resulted in increased shipping costs, which may affect the availability of raw materials, component parts and products to meet our sales demand. For example, we utilize semiconductor chips in certain products that we manufacture. Semiconductor chips have been subject to an ongoing global supply shortage and our ability to source semiconductor chips or the components that use semiconductor chips may be adversely affected in the future. Component delivery lead times have increased and are expected to continue to increase, which may cause delays in our production of products and increase the cost to obtain semiconductor chips and components that use semiconductor chips. If this semiconductor chip shortage or shortages of other component parts continues, we may experience delays, production interruptions, increased costs and an inability to fulfill engineering design changes or customer demand, each of which could adversely affect our business and financial performance.

The COVID-19 pandemic has also led to extreme volatility in capital markets and a decline in interest rates, and has adversely affected, and may continue to adversely affect, the market price of our common stock. While the potential economic impact brought by, and the duration of, the COVID-19 pandemic may be difficult to assess or predict, a continued or widespread pandemic could result in significant disruption of global financial markets, reducing our ability to access capital, which could negatively affect our liquidity in the future. The extent to which COVID-19 impacts our business and financial results continues to depend on numerous evolving factors that we may not be able to accurately predict.

**If our employees become ill or otherwise incapacitated, our operations may be adversely impacted.**

At the outset of the COVID-19 pandemic, we implemented telework policies wherever possible for appropriate categories of employees in response to various stay at home/shelter in place orders (Stay at Home Orders) implemented by state and local governments. In response to the lifting or partial lifting of the Stay at Home Orders, we have reopened our facilities to both "nonessential" and "essential" employees. We have implemented a number of safety measures for our facilities, including limiting facility access, social distancing, face covering, temperature checking and increased sanitation standards. While we have developed and implemented, and continue to develop and implement, health and safety guidelines in an effort to try to mitigate the negative impact of COVID-19, there can be no assurances that our measures will be sufficient to protect our employees in our workplace or that our employees will not otherwise be exposed to COVID-19 outside of our workplace. If a number of our employees become ill, incapacitated or are otherwise unable to continue working during the current or any future pandemic or epidemic, our operations may be adversely impacted.

**We may experience conflicts of interest with Cercacor with respect to business opportunities and other matters.**

Prior to our initial public offering in August 2007, our stockholders owned 99% of the outstanding shares of capital stock of Cercacor, and we believe that a number of our stockholders, including certain of our directors and executive officers, continue to own shares of Cercacor stock. Joe Kiani, our Chairman and Chief Executive Officer (CEO), is also the Chairman and CEO of Cercacor.

Due to the interrelated nature of Cercacor with us, conflicts of interest may arise with respect to transactions involving business dealings between us and Cercacor, potential acquisitions of businesses or products, the development and ownership of technologies and products, the sale of products, markets and other matters in which our best interests and the best interests of our stockholders may conflict with the best interests of the stockholders of Cercacor. In addition, we and Cercacor may disagree regarding the interpretation of certain terms in the Cross-Licensing Agreement. We cannot guarantee that any conflict of interest will be resolved in our favor, or that, with respect to our transactions with Cercacor, we will negotiate terms that are as favorable to us as if such transactions were with another third-party.

**We will be required to assign to Cercacor and pay Cercacor for the right to use certain products and technologies we develop that relate to the monitoring of non-vital sign parameters, including improvements to Masimo SET®.**

Under the Cross-Licensing Agreement, if we develop certain products or technologies that relate to the noninvasive monitoring of non-vital sign parameters, including improvements to Masimo SET® for the noninvasive monitoring of non-vital sign parameters, we would be required to assign these developments to Cercacor and then license the technology back from Cercacor in consideration for upfront payments and royalty obligations to Cercacor. Therefore, these products and technologies would be deemed to have been developed or improved exclusively by Cercacor.

In addition, we will not be reimbursed by Cercacor for our expenses relating to the development or improvement of any such products or technologies, which expenses may be significant. As a result of these terms, we may not generate any revenue from the further development of certain products and technologies for the monitoring of non-vital sign parameters, including improvements to Masimo SET®, which could adversely affect our business, financial condition and results of operations.

**In the event that the Cross-Licensing Agreement is terminated for any reason, or Cercacor grants a license to rainbow® technology to a third-party, our business would be adversely affected.**

Cercacor owns all of the proprietary rights to certain rainbow® technology developed with our proprietary Masimo SET® for products intended to be used in the "Cercacor Market", and all rights to any non-vital signs measurement for which we do not exercise an option pursuant to the Cross-Licensing Agreement. In addition, Cercacor has the right to terminate the Cross-Licensing Agreement or grant licenses covering rainbow® technology to third parties if we breach certain terms of the agreement, including any failure to meet our minimum royalty payment obligations or failure to use commercially reasonable efforts to develop or market products incorporating licensed rainbow® technology. If we lose our exclusive license to rainbow® technology, we would lose the ability to prevent others from making, using, selling or importing products using rainbow® technology in our market. As a result, we would likely be subject to increased competition within our market, and Cercacor or competitors who obtain a license to rainbow® technology from Cercacor would be able to offer related products.

**We may not be able to commercialize our products incorporating licensed rainbow® technology cost-effectively or successfully.**

As a result of the royalties that we must pay to Cercacor, it is generally more expensive for us to make products that incorporate licensed rainbow® technology than products that do not include licensed rainbow® technology.

As a result, we may not be able to sell products incorporating licensed rainbow® technology at a price the market is willing to accept. If we cannot commercialize our products incorporating licensed rainbow® technology successfully, we may not be able to generate sufficient product revenue from these products to be profitable, which could adversely affect our business, financial condition and results of operations.

Table of Contents

**Rights provided to Cercacor in the Cross-Licensing Agreement may impede a change in control of our company.**

Under the Cross-Licensing Agreement, a change in control includes the resignation or termination of Joe Kiani from his position as CEO of either Masimo or Cercacor. A change in control also includes other customary events, such as the sale or merger of Masimo or Cercacor to a non-affiliated third-party or the acquisition of 50% or more of the voting power of Masimo or Cercacor by a non-affiliated third-party. In the event we undergo a change in control, we are required to immediately pay a $2.5 million fee to exercise an option to license technology developed by Cercacor for use in blood glucose monitoring.

Additionally, our per product royalties payable to Cercacor will become subject to specified minimums, and the minimum aggregate annual royalties for licensed rainbow® measurements payable to Cercacor related to carbon monoxide, methemoglobin, fractional arterial oxygen saturation, hemoglobin and blood glucose will increase to $15.0 million, plus up to $2.0 million for other rainbow® measurements. Also, if the surviving or acquiring entity ceases to use "Masimo" as a company name and trademark following a change in control, all rights to the "Masimo" trademark will automatically be assigned to Cercacor. This could delay or discourage transactions involving an actual or potential change in control of us, including transactions in which our stockholders might otherwise receive a premium for their shares over our then-current trading price. In addition, our requirement to assign all future improvements for non-vital signs to Cercacor could impede a change in control of our company.

**If we are unable to obtain key materials and components from sole or limited source suppliers, we will not be able to deliver our products to customers.**

We depend on certain sole or limited source suppliers for certain key materials and components, including digital signal processor chips and analog-to-digital converter chips, for our noninvasive patient monitoring solutions. These suppliers are located around the world, and the production and shipment of such materials and components may be constrained globally due to the COVID-19 pandemic. We may experience manufacturing problems related to these suppliers and other outside sources if such suppliers fail to develop, manufacture or ship products and components to us on a timely basis, or provide us with products and components that do not meet our quality standards and required quantities. We have experienced supply constraints with regard to certain digital signal processor chips and other components during the pandemic, but have so far been able to mitigate these constraints. In addition, from time to time there have been industry-wide shortages of certain components that we use in our noninvasive blood constituent patient monitoring solutions. We may also experience price increases for materials or components, with no guarantee that such increases can be passed along to our customers, which could adversely impact our gross margins.

If any of these problems occur, we may be unable to obtain substitute sources for these products and components on a timely basis or on terms acceptable to us, which could harm our ability to manufacture our own products and components profitably or on time.

**Future strategic initiatives, including acquisitions of businesses and strategic investments, could negatively affect our business, financial condition and results of operations if we fail to integrate the acquired businesses successfully into our existing operations or achieve the desired results of our investment.**

We have acquired several businesses since our inception and we may acquire additional businesses in the future. For example, on February 15, 2022, we entered into a definitive merger agreement to acquire Sound United. Future acquisitions may require debt or equity financing, which could be dilutive to our existing stockholders or reduce our earnings per share or other financial metrics. In connection with the pending acquisition of Sound United, we received a debt commitment letter for a credit facility in the amount of $800 million and expect to secure this credit facility in the event the proposed acquisition closes. Even if we complete acquisitions, there are many factors that could affect whether such acquisition will be beneficial to our business, including, without limitation:

- payment of above-market prices for acquisitions and higher than anticipated acquisition costs;

- issuance of common stock as part of the acquisition price or a need to issue stock options or other equity to newly-hired employees of target companies, resulting in dilution of ownership to our existing stockholders;

- reduced profitability if an acquisition is not accretive to our business over either the short-term or the long-term;

- difficulties in integrating any acquired companies, personnel, products and other assets into our existing business;

- delays in realizing the benefits of the acquired company, products or other assets;

- regulatory challenges and becoming subject to additional regulatory requirements;

- cybersecurity and compliance-related issues;

- diversion of our management's time and attention from other business concerns;

- limited or no direct prior experience in new markets or countries we may enter;

- unanticipated issues dealing with unfamiliar suppliers, service providers or other collaborators of the acquired company;
- higher costs of integration than we anticipated;
- write-downs or impairments of goodwill or other intangible assets associated with the acquired company;
- difficulties in retaining key employees of the acquired business who are necessary to manage these acquisitions;
- negative impacts on our relationships with our employees, clients or collaborators;
- intellectual property and other litigation, other claims or liabilities in connection with the acquisition; and
- changes in the overall financial model as certain acquired companies may have a different revenue, gross profit margin or operating expense profile.

Further, our ability to benefit from future acquisitions and/or external strategic investments depends on our ability to successfully conduct due diligence, negotiate acceptable terms, evaluate prospective opportunities and bring acquired technologies and/or products to market at acceptable margins and operating expense levels. For example, we acquired TNI medical AG° (TNI) and added softFlow° technology to our product portfolio during 2020. In addition, we acquired LiDCO Group, Plc, which specializes in hemodynamic monitoring solutions. As these are our first therapeutic and hemodynamic monitoring solutions, the integration of these technologies may require substantial management time and attention and may divert attention and resources from other important areas, including our existing business and product lines, and we may not be able to sell softFlow° technology and hemodynamic monitoring solutions at acceptable margins and operating expense levels. Our failure in any of these tasks could result in unforeseen liabilities associated with an acquired company, acquiring a company on unfavorable terms or selecting and eventually acquiring a suboptimal acquisition target.

We may also discover deficiencies in internal controls, data adequacy and integrity, product quality, regulatory compliance, product liabilities or other undisclosed liabilities that we did not uncover prior to our acquisition or investment, which could result in us becoming subject to penalties, other liabilities or asset impairments. In addition, if we do not achieve the anticipated benefits of an acquisition or other external investment as rapidly as expected, or at all, investors or analysts may downgrade our stock.

We also expect to continue to carry out internal strategic initiatives that we believe are necessary to grow our revenues and expand our business, both in the U.S. and abroad. For example, we have continued to invest in international expansion programs designed to increase our worldwide presence and take advantage of market expansion opportunities around the world. Although we believe our investments in these initiatives continue to be in the long-term best interests of Masimo and our stockholders, there are no assurances that such initiatives will yield favorable results for us. Accordingly, if these initiatives are not successful, our business, financial condition and results of operations could be adversely affected.

If these risks materialize, our stock price could be materially adversely affected. Any difficulties in the integration of acquired businesses or unexpected penalties, liabilities or asset impairments in connection with such acquisitions or investments could have a material adverse effect on our business, financial condition and results of operations.

**Our new products and changes to existing products as a result of our proposed acquisition of Sound United could fail to attract or retain users or generate revenue and profits. Further, we may not be successful in our personal consumer strategy and investments, which could adversely affect our business, reputation and results.**

In connection with our proposed acquisition of Sound United, we announced an expansion in our business and product strategy to additionally focus on personal consumer products to integrate with our successful medical technology businesses. Further, we may introduce certain changes to our existing products or introduce new and unproven products. We do not have significant experience with consumer hardware products, which may adversely affect our ability to successfully develop and market these products and technologies and integrate them with our existing products and platforms. We expect this will be a complex, evolving, and long-term strategic initiative that will involve the development of new and emerging technologies, continued investment in medical technology and consumer hardware products, and collaboration with other companies, developers, partners and other participants. However, our personal consumer business may not develop in accordance with our vision and expectations, and market acceptance of features, products or services we build for the personal consumer business may be uncertain. We may be unsuccessful in our research and product development efforts, including if we are unable to develop relationships with key participants in the personal consumer business. Our new strategic efforts may also divert resources and management attention from other areas of our business. In addition, as our personal consumer business continues to evolve, we may be subject to a variety of laws and regulations in the United States and international jurisdictions, which we were not previously affected by, including in the areas of privacy, which may delay or impede the development of our products and services, increase our operating costs, require significant management time and attention, or otherwise harm our business. As a result of these or other factors, our personal consumer strategy and investments may not be successful in the foreseeable future, or at all, which could adversely affect our business, reputation, or financial results.

**Our credit agreement contains certain covenants and restrictions that may limit our flexibility in operating our business.**

Our credit agreement dated December 17, 2018 (Credit Facility) with JPMorgan Chase Bank, N.A., as Administrative Agent and as a lender, and Bank of the West, as a lender (together, Lenders), contains various affirmative covenants and restrictions that limit our ability to engage in specified types of transactions, including:

- incurring specified types of additional indebtedness, there can be no assurance that we will be able to obtain any additional debt or equity financing at the time needed or that such financing will be available on terms that are favorable or acceptable to us (including guarantees or other contingent obligations);

- paying dividends on, repurchasing or making distributions in respect of our common stock or making other restricted payments, subject to specified exceptions;

- making specified investments (including loans and advances);

- selling or transferring certain assets;

- creating certain liens;

- consolidating, merging, selling or otherwise disposing of all or substantially all of our assets; and

- entering into certain transactions with any of our affiliates.

In addition, under our Credit Facility, we are required to satisfy and maintain specified financial ratios and other affirmative covenants. Our ability to meet those financial ratios and affirmative covenants could be affected by events beyond our control and, therefore, we cannot be assured that we will be able to continue to satisfy these requirements. A breach of any of these ratios or covenants could result in a default under our Credit Facility. Upon the occurrence of an event of default, the Lenders could elect to declare all amounts outstanding under our Credit Facility immediately due and payable, terminate all commitments to extend further credit and pursue legal remedies for recovery, all of which could adversely affect our business and financial condition. See Note 15 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information on our Credit Facility.

**Our proposed new debt facility, which will be used to partially fund our pending acquisition of Sound United, may restrict our future operations, including our ability to respond to changes or to take certain actions. If we fail to comply with the covenants and other obligations under the proposed credit facility, the lender may be able to accelerate amounts owed under the facility.**

In connection with the pending acquisition of Sound United, we recently received a commitment letter for a credit facility in the amount of $800 million and expect to secure this credit facility in the event the pending acquisition closes (the "New Debt Facility"). The New Debt Facility may contain a number of restrictive covenants that impose significant operating and financial restrictions on us and may, unless waived by the lender, limit our ability to engage in acts that may be in our long-term best interests, including restrictions on our ability to:

- Incur additional indebtedness;
- Incur liens;
- Merge, dissolve, liquidate, amalgamate, consolidate or sell all or substantially all of our assets;
- Declare or pay certain dividends, payments or distribution or repurchase or redeem certain capital stock; and
- Make certain investments.

These restrictions could limit, potentially significantly, our operational flexibility and affect our ability to finance our future operations or capital needs or to execute our business strategy.

Further, if we do not achieve the anticipated benefits from the pending acquisition of Sound United, our ability to service our indebtedness may be adversely impacted. Even if we achieve the anticipated benefits from the pending acquisition, we may be required to raise substantial additional financing to fund working capital, capital expenditures, acquisitions, or other general corporate purposes. Our ability to arrange additional financing and make payments of principal and interest on our indebtedness will depend on our future performance, which will be subject to general economic, financial, and business conditions as well as other factors affecting our operations, many of which are beyond our control.

**Risks Related to Our Stock**

**Concentration of ownership of our stock among our existing directors, executive officers and principal stockholders may prevent new investors from influencing significant corporate decisions.**

As of January 1, 2022, our current directors and executive officers and their affiliates, in the aggregate, beneficially owned approximately 9.5% of our outstanding stock. Subject to any fiduciary duties owed to our other stockholders under Delaware law, these stockholders may be able to exercise significant influence over matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, and will have some control over our management and policies in their roles as stockholders. Some of these persons or entities may have interests that are different from yours. For example, these stockholders may support proposals and actions with which you may disagree or which are not in your best interests.

The concentration of ownership could delay or prevent a change in control of us, or otherwise discourage a potential acquirer from attempting to obtain control of us, which in turn could reduce the price of our stock.

In addition, these stockholders could use their voting influence to maintain our existing management and directors in office or support or reject other management and Board proposals that are subject to stockholder approval, such as amendments to our employee stock plans and approvals of significant financing transactions.

**Our corporate documents and Delaware law contain provisions that could discourage, delay or prevent a change in control of our company, prevent attempts to replace or remove current management and reduce the market price of our stock.**

Provisions in our certificate of incorporation and bylaws may discourage, delay or prevent a merger or acquisition involving us that our stockholders may consider favorable. For example, our certificate of incorporation authorizes our Board to issue up to 5.0 million shares of "blank check" preferred stock. As a result, without further stockholder approval, our Board has the authority to attach special rights, including voting and dividend rights, to this preferred stock, including pursuant to a stockholder rights plan. With these rights, preferred stockholders could make it more difficult for a third-party to acquire us. In addition, our certificate of incorporation provides for a staggered Board, whereby directors serve for three-year terms, with one-third of the directors coming up for reelection each year. A staggered Board will make it more difficult for a third-party to obtain control of our Board through a proxy contest, which may be a necessary step in an acquisition of us that is not favored by our Board.

We are also subject to anti-takeover provisions under the General Corporation Law of the State of Delaware. Under these provisions, if anyone becomes an "interested stockholder," we may not enter into a "business combination" with that person for three years without special approval, which could discourage a third-party from making a takeover offer and could delay or prevent a change in control of us. For purposes of these provisions, an "interested stockholder" generally means someone owning 15% or more of our outstanding voting stock or an affiliate of ours that owned 15% or more of our outstanding voting stock during the past three years, subject to certain exceptions as described in the General Corporation Law of the State of Delaware.

**Our bylaws provide that the state or federal courts located within the State of Delaware are the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.**

Our bylaws provide that the state or federal courts located within the State of Delaware are the sole and exclusive forum for: (i) any derivative action or proceeding brought on our behalf, (ii) any action asserting a claim of breach of fiduciary duty owed by any of our directors, officers or other employees or stockholders to our stockholders, (iii) any action asserting a claim against us arising pursuant to the General Corporation Law of the State of Delaware, our certificate of incorporation or our bylaws or as to which the General Corporation Law of the State of Delaware confers jurisdiction on the Court of Chancery of the State of Delaware, or (iv) any action asserting a claim governed by the internal affairs doctrine. However, this choice of forum provision does not apply to (a) actions in which the Court of Chancery in the State of Delaware concludes that an indispensable party is not subject to the jurisdiction of Delaware courts, or (b) actions in which a federal court has assumed exclusive jurisdiction to a proceeding. This choice of forum provision is not intended to apply to any actions brought under the Securities Act of 1933, as amended (the Securities Act), or the Securities Exchange Act of 1934, as amended (the Exchange Act). Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. As a result, the exclusive forum provision will not apply to suits brought to enforce any duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds

favorable for disputes with us or our directors, officers or other employees or stockholders, which may discourage such lawsuits against us and our directors, officers and other employees or stockholders.

Furthermore, the enforceability of similar choice of forum provisions in other companies' certificates of incorporation has been challenged in legal proceedings, and it is possible that a court could find these types of provisions to be inapplicable or unenforceable. If a court were to find the choice of forum provision in our bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our business, financial condition and results of operations.

### General Risk Factors

**We may experience significant fluctuations in our periodic financial results and may not maintain our current levels of profitability in the future.**

Our operating results have fluctuated in the past and are likely to fluctuate in the future. Many of the countries in which we operate, including the U.S. and several of the members of the EU, have experienced and continue to experience uncertain economic conditions resulting from global as well as local factors. In addition, continuing uncertainty in the U.S. economy may result in continued inflationary pressures globally and in the U.S. in particular, which may contribute to future interest rate volatility.

Our business or financial results may be adversely impacted by these uncertain economic conditions, including: adverse changes in interest rates, foreign currency exchange rates, tax laws or tax rates; inflation; contraction in the availability of credit in the marketplace due to legislation or other economic conditions, which may potentially impair our ability to access the capital markets on terms acceptable to us or at all; and the effects of government initiatives to manage economic conditions.

We are also unable to predict how changing global economic conditions or potential global health concerns such as the COVID-19 pandemic will affect our critical customers, suppliers and distributors. Any negative impact of such matters on our critical customers, suppliers or distributors may also have an adverse impact on our results of operations or financial condition. Our expense levels are based, in part, on our expectations regarding future revenue levels and are relatively fixed in the short term. As a result, if our revenue for a particular period was below our expectations, we would not be able to proportionately reduce our operating expenses for that period. Any revenue shortfall would have a disproportionately negative effect on our operating results for the period.

In addition, the methods, estimates and judgments that we use in applying our accounting policies are, by their nature, subject to substantial risks, uncertainties and assumptions. Factors may arise over time that lead us to change our methods, estimates and judgments, the impact of which could significantly affect our results of operations. See "Critical Accounting Policies and Estimates" contained in Part I, Item 2 of this Annual Report on Form 10-K.

Recent accounting changes related to our embedded leases within certain deferred equipment agreements have also resulted in the acceleration of the timing related to our recognition of revenue and expenses associated with certain equipment provided to customers at no up-front charge. Since we cannot control the timing of when our customers will request us to deliver such equipment, our revenue and costs with respect to leased equipment could vary substantially in any given quarter or year, which could further increase quarterly or annual fluctuations within our financial results.

Due to these and other factors, you should not rely on our results for any one quarter as an indication of our future performance. If our operating results fail to meet or exceed the expectations of securities analysts or investors, our stock price could drop suddenly and significantly.

**Future changes in accounting pronouncements and tax laws, or the interpretation thereof, could have a significant impact on our reported results, and may affect our historical reporting of previous transactions.**

New accounting pronouncements or taxation rules, and evolving interpretations thereof, have occurred and are likely to occur in the future. Future changes made by new accounting standards may apply prospectively or retrospectively, depending on the method of adoption, and may recast previously reported results. For additional information related to the impact of new accounting pronouncements, please see Note 2 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

In addition, future changes to the U.S. tax code and its regulations could have a material impact on our effective tax rate and the implementation of these changes could require us to make substantial changes to our business practices, allocate resources, and increase our costs, which could negatively affect our business, results of operations and financial condition.

Table of Contents

**If we lose the services of our key personnel, or if we are unable to attract and retain other key personnel, we may not be able to manage our operations or meet our growth objectives.**

We are highly dependent on our senior management, especially Joe Kiani, our CEO, and other key officers. We are also heavily dependent on our engineers and field sales team, including sales representatives and clinical specialists. We believe certain of our competitors with greater financial resources than us have targeted our key personnel for recruitment and will likely continue to do so in the future. In addition, we may experience employee turnover as a result of the ongoing "great resignation" occurring throughout the U.S. economy, which has impacted job market dynamics. New hires require training and take time before they achieve full productivity. New employees may not become as productive as we expect, and we may be unable to hire or retain sufficient numbers of qualified individuals. The loss of the services of members of our key personnel, including as a result of the COVID-19 pandemic, or the inability to attract and retain qualified personnel in the future could prevent the implementation and completion of our objectives, including the development and introduction of our products. In general, our key personnel may terminate their employment at any time and for any reason without notice, unless the individual is a participant in our 2007 Severance Protection Plan, in which case the individual has agreed to provide us with six months' notice if such individual decides to voluntarily resign. We do not maintain any "key person" life insurance policies with respect to any of our key personnel.

**We are involved, and may become involved in the future, in disputes and other legal or regulatory proceedings that, if adversely decided or settled, could materially and adversely affect our business, financial condition and results of operations.**

We are, and may in the future become, party to litigation, regulatory proceedings or other disputes. In general, claims made by or against us in disputes and other legal or regulatory proceedings can be expensive and time-consuming to bring or defend against, requiring us to expend significant resources and divert the efforts and attention of our management and other personnel from our business operations. These potential claims may include but are not limited to personal injury and class action lawsuits, intellectual property claims and regulatory investigations relating to the advertising and promotional claims about our products and employee claims against us based on, among other things, discrimination, harassment or wrongful termination. Any one of these claims, even those without merit, may divert our financial and management resources that would otherwise be used to benefit the future performance of our operations. Any adverse determination against us in these proceedings, or even the allegations contained in the claims, regardless of whether they are ultimately found to be without merit, may also result in settlements, injunctions or damages that could have a material adverse effect on our business, financial condition and results of operations.

**Changes to government immigration regulations may materially affect our workforce and limit our supply of qualified professionals, or increase our cost of securing workers.**

We recruit professionals on a global basis and must comply with the immigration laws in the countries in which we operate, including the U.S. Some of our employees are working under Masimo-sponsored temporary work visas, including H1-B visas. Statutory law limits the number of new H1-B temporary work permit petitions that may be approved in a fiscal year. Furthermore, there is a possibility that the current U.S. immigration visa program may be significantly overhauled, and the number of H1-B visas available, as well as the process to obtain them, may be subject to significant change. Any resulting changes to this visa program could impact our ability to recruit, hire and retain qualified skilled personnel. If we are unable to obtain work visas in sufficient quantities or at a sufficient rate for a significant period of time, our business, operating results and financial condition could be adversely affected.

**The risks inherent in operating internationally, including the purchase, sale and shipment of our components and products across international borders, may adversely impact our business, financial condition and results of operations.**

We currently derive approximately 33% of our net sales from international operations. In addition, we purchase a portion of our raw materials and components from international sources. The sale and shipment of our products across international borders, as well as the purchase of materials and components from international sources, subject us to extensive U.S. and foreign governmental trade regulations, including those related to duties, tariffs and conflict minerals. Compliance with such regulations is costly and we could be exposed to potentially significant penalties, fines and interest if we are found not to be in compliance with such regulations. Any failure to comply with applicable legal and regulatory obligations could impact us in a variety of ways that include, but are not limited to, significant criminal, civil and administrative penalties, including imprisonment of individuals, fines and penalties, denial of export privileges, seizure of shipments, restrictions on certain business activities, and exclusion or debarment from government contracting. We have historically engaged in transactions with entities related to or located in countries subject to U.S. export restrictions. For example, we have had sales of medical products destined for Iran.

Table of Contents

In addition, changes in policy in the U.S. and other countries regarding international trade, including import and export regulation and international trade agreements, could negatively impact our business. In recent years, the U.S. has imposed tariffs on goods imported from China and certain other countries, which has resulted in retaliatory tariffs by China and other countries. Changes or uncertainty in tariffs or further retaliatory trade measures taken by China or other countries in response could affect the demand for our products and services, impact the competitive position of our products, prevent us from being able to sell products in certain countries or otherwise adversely impact our results of operations. The implementation of more restrictive trade policies, such as more detailed inspections, higher tariffs or new barriers to entry, could negatively impact our business, results of operations and financial condition.

Although these activities have not been financially material to our business, financial condition or results of operations, and were undertaken in accordance with general licenses authorizing such activities issued by the U.S. Treasury Department's Office of Foreign Assets Control, we may not be successful in ensuring compliance with limitations or restrictions on business in Iran or any other countries subject to economic sanctions and embargoes imposed by the United States. Also, the failure to comply with applicable legal and regulatory obligations could result in the disruption of our shipping, manufacturing and sales activities. Any material decrease in our international sales would adversely affect our business, financial condition and results of operations.

In addition, our international operations expose us and our representatives, agents and distributors to risks inherent in operating in foreign jurisdictions. These risks include, but are not limited to:

- the imposition of additional U.S. and foreign governmental controls or regulations;
- the imposition of costly and lengthy new export licensing requirements;
- a shortage of high-quality sales people and distributors;
- the loss of any key personnel who possess proprietary knowledge, or who are otherwise important to our success in certain international markets;
- changes in duties and tariffs, license obligations and other non-tariff barriers to trade;
- the imposition of new trade restrictions;
- the imposition of restrictions on the activities of foreign agents, representatives and distributors;
- compliance with foreign tax laws, regulations and requirements;
- pricing pressure;
- changes in foreign currency exchange rates;
- laws and business practices favoring local companies;
- political instability and actual or anticipated military or political conflicts;
- financial and civil unrest worldwide;
- outbreaks of illnesses, pandemics or other local or global health issues;
- the inability to collect amounts paid by foreign government customers to our appointed foreign agents;
- longer payment cycles, increased credit risk and different collection remedies with respect to receivables; and
- difficulties in enforcing or defending intellectual property rights.

The U.S. government initiated substantial changes in U.S. trade policy and U.S. trade agreements, including tariffs on certain foreign goods. In response to these tariffs, certain foreign governments instituted or are considering imposing tariffs on certain U.S. goods. In addition, the U.S. has negotiated new trade agreements that could impact us, including the United States-Mexico-Canada Agreement (USMCA), which went into force on July 1, 2020 and replaced the North American Free Trade Agreement. A trade war, trade barriers or other governmental actions related to tariffs, international trade agreements, import or export restrictions or other trade policies could adversely impact demand for our products, our costs, customers, suppliers and/or the U.S. economy or certain sectors thereof and, therefore, adversely affect our business, financial condition and results of operations.

The U.S. Foreign Corrupt Practices Act and similar worldwide anti-bribery laws in non-U.S. jurisdictions generally prohibit companies and their intermediaries from promising or making improper payments to foreign officials for the purpose of obtaining an advantage to secure or retain business. Because of the predominance of government-sponsored healthcare systems around the world, many of our customer relationships outside of the U.S. are with governmental entities and are therefore subject to such anti-bribery laws. We have adopted policies and practices that help us ensure compliance with these anti-bribery laws. However, such policies and practice may require us to invest in additional monitoring resources or forgo certain business opportunities in order to ensure global compliance with these laws.

**Our operations may be adversely impacted by our exposure to risks related to foreign currency exchange rates.**

We market our products in certain foreign markets through our subsidiaries and other international distributors. As a result, events that result in global economic uncertainty could significantly affect our results of operations in the form of gains and losses on foreign currency transactions and potential devaluation of the local currencies of our customers relative to the U.S. Dollar.

While a majority of our sales are transacted in U.S. Dollars, some of our sales agreements with foreign customers provide for payment in currencies other than the U.S. Dollar. These foreign currency revenues, when converted into U.S. Dollars, can vary depending on the approximation of the exchange rates applied during a respective period. Similarly, certain of our foreign subsidiaries transact business in their respective country's local currency, which is also their functional currency. In addition, certain production costs related to our manufacturing operations in Mexico are denominated in Mexican Pesos. As a result, expenses of these foreign subsidiaries and certain production costs, when converted into U.S. Dollars, can vary depending on average monthly exchange rates during a respective period.

We are also exposed to foreign currency gains or losses on outstanding foreign currency denominated receivables and payables, as well as cash deposits. When converted to U.S. Dollars, these receivables, payables and cash deposits can vary depending on the monthly exchange rates at the end of the period. In addition, certain intercompany transactions may give rise to realized and unrealized foreign currency gains or losses based on the currency underlying such intercompany transactions. Accordingly, our operating results are subject to fluctuations in foreign currency exchange rates.

The balance sheets of our foreign subsidiaries whose functional currency is not the U.S. Dollar are translated into U.S. Dollars at the rate of exchange at the balance sheet date and the statements of operations and cash flows are translated into U.S. Dollars using an approximation of the average monthly exchange rates applicable during the period. Any foreign currency exchange gain or loss as a result of translating the balance sheets of our foreign subsidiaries whose functional currency is not the U.S. Dollar is included in equity as a component of accumulated other comprehensive income (loss).

We currently do not hedge our foreign currency exchange rate risk. As a result, changes in foreign exchange rates could have a material adverse effect on our business, financial condition and results of operations. For additional information related to our foreign currency exchange rate risk, please see Quantitative and Qualitative Disclosures about Market Risks in Part I, Item 3 of this Annual Report on Form 10-K.

**We currently manufacture our products at a limited number of locations and any disruption to, expansion of, or changes in trade programs related to such manufacturing operations could adversely affect our business, financial condition and results of operations.**

We rely on manufacturing facilities in California, New Hampshire and Mexico that may be affected by natural or man-made disasters. Earthquakes are of particular significance since some of our facilities are located in earthquake-prone areas. We are also vulnerable to damage from other types of disasters, including power loss, attacks from extremist or terrorist organizations, epidemics, communication failures, fire, floods and similar events. Our facilities and the manufacturing equipment we use to produce our products would be difficult to replace and could require substantial time to repair if significant damage were to result from any of these occurrences.

If one of our manufacturing facilities was affected by a natural or man-made disaster, we would be forced to rely on third-party manufacturers if we could not shift production to our other manufacturing facilities. Furthermore, our insurance for damage to our property and the disruption of our business from casualties may not be sufficient to cover all of our potential losses and may not continue to be available to us on acceptable terms, or at all. If the lease for any of our leased facilities is terminated, we are unable to renew any of our leases or we are otherwise forced to seek alternative facilities, or if we voluntarily expand one or more of our manufacturing operations to new locations, we may incur additional transition costs and experience a disruption in the supply of our products until the new facilities are available and operating. Additionally, we have occasionally experienced seasonality among our manufacturing workforce, and if we continue to experience such seasonality or other workforce shortages or otherwise have issues retaining employees or contractors at our manufacturing facilities, we may not be able to meet our customers' demands.

Our global manufacturing and distribution are dependent upon our manufacturing facilities in Mexico, and the expedient importation of raw materials and exportation of finished goods between the U.S. and Mexico. Undue delays and/or closures of the proximal cross-border transit facilities, or any restrictions by the U.S. federal administration related to the movement of goods across the U.S. and Mexico border, may adversely affect our ability to fulfill orders and supply our healthcare provider customers with essential replenishment supplies, as well as adversely impact our business, operating results and financial condition.

In addition, our manufacturing facilities in Mexico are authorized to operate under the Mexican Maquiladora (IMMEX) program. The IMMEX program allows us to import certain items from the U.S. into Mexico duty-free, provided that such items, after processing, are exported from Mexico within a stipulated timeframe. Maquiladora status, which is renewed periodically, is subject to various restrictions and requirements, including compliance with the terms of the IMMEX program and other local regulations. Failure to comply with the IMMEX program regulations, including any changes thereto, could increase our manufacturing costs and adversely affect our business, operating results and financial condition.

**If we do not accurately forecast customer demand, we may hold suboptimal inventory levels that could adversely affect our business, financial condition and results of operations.**

If we are unable to meet the demand of our customers, our customers may cancel orders or purchase products from our competitors, which could reduce our revenue and gross profit margin. Conversely, if product demand decreases, we may be unable to timely adjust our manufacturing cost structure, resulting in excess capacity, which would lower gross product margins. Similarly, if we are unable to forecast demand accurately, we could be required to record charges related to excess or obsolete inventory, which would also lower our gross margin.

**If we fail to comply with the reporting obligations of the Exchange Act or if we fail to maintain adequate internal control over financial reporting, our business, results of operations and financial condition and investors' confidence in us could be adversely affected.**

We are required to prepare and disclose certain information under the Exchange Act as amended, in a timely manner and meet our reporting obligations in their entirety, and our failure to do so could subject us to penalties under federal securities laws and regulations of The Nasdaq Stock Market LLC, expose us to lawsuits and restrict our ability to access financing on favorable terms, or at all.

If we fail to maintain adequate internal controls over financial reporting, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with the Sarbanes-Oxley Act. Moreover, any material weakness in our internal control environment could result in the loss of investor confidence in the reliability of our financial statements, which in turn could harm our business, negatively impact the trading price of our stock, and adversely affect investors' confidence in our company and our ability to access capital markets for financing.

**Changing laws and increasingly complex corporate governance and public disclosure requirements could have an adverse effect on our business and operating results.**

Changing laws, regulations and standards relating to corporate governance and public disclosure, including the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), the California Transparency in Supply Chains Act, the UK Modern Slavery Act and new regulations issued by the SEC and The Nasdaq Stock Market LLC, have created, and will create, additional compliance requirements for us. For example, the Dodd-Frank Act includes provisions regarding, among other things, advisory votes on named executive officer compensation and "conflict minerals" reporting. Complying with these rules and regulations has increased and will increase our legal and financial compliance costs, make some activities more difficult, time-consuming or costly and increase demand on our systems and resources. As a result, management's attention may be diverted from other business concerns, which could adversely affect our business, financial condition and results of operations.

We may also need to hire additional employees or engage outside consultants to comply with these requirements, which will increase our costs and expenses. To maintain high standards of corporate governance and public disclosure, we have invested in, and intend to continue to invest in, reasonably necessary resources to comply with evolving standards.

In addition, stockholder litigation surrounding executive compensation and disclosure of executive compensation has increased with the passage of the Dodd-Frank Act. Furthermore, our stockholders may not continue to approve our advisory vote on named executive officer compensation that is being voted on by our stockholders annually pursuant to the Dodd-Frank Act. If we are involved in a lawsuit related to compensation matters or any other matters not covered by our directors' and officers' liability insurance, we may incur significant expenses in defending against such lawsuits, or be subject to significant fines or required to take significant remedial actions, each of which could adversely affect our business, financial condition and results of operations.

Table of Contents

**If product liability claims are brought against us, we could face substantial liability and costs.**

Our products are predominantly used in patient care and expose us to product liability claims and product recalls, including, but not limited to, those that may arise from unauthorized off-label use, malfunctions, design flaws or manufacturing defects related to our products or the use of our products with incompatible components or systems. In addition, as we continue to expand our product portfolio, we may enter or create new markets, including consumer markets, that may expose us to additional product liability risks. For example, with the acquisition of TNI® in March 2020, we added softFlow® technology to our product portfolio. While this technology provides efficient, quiet and comfortable respiratory support to patients, it may present increased risk of infection to caregivers.

We cannot be certain that our product liability insurance will be sufficient to cover any or all damages for product liability claims that may be brought against us in the future. Furthermore, we may not be able to obtain or maintain insurance in the future at satisfactory rates or in adequate amounts to protect us against any product liability claims.

Additionally, the laws and regulations regarding product liability are constantly evolving, both through the passage of new legislation at the state and federal levels and through new interpretations of existing legislation. For example, in February 2017, the Washington Supreme Court determined that, under the Washington Product Liability Act, medical device manufacturers have a duty to warn hospitals of any potential risks posed by their products. As the legal and regulatory landscape surrounding product liability change, we may become exposed to greater liability than currently anticipated.

Any losses that we may suffer from product liability claims, and the effect that any product liability litigation may have upon the reputation and marketability of our technology and products, together with the corresponding diversion of the attention of our key employees, may subject us to significant damages and could adversely affect our business, financial condition and results of operations.

**We may incur environmental and personal injury liabilities related to certain hazardous materials used in our operations.**

Certain manufacturing processes for our products may involve the storage, use, generation and disposal of certain hazardous materials and wastes, including silicone adhesives, solder and solder paste, sealants, epoxies and various solvents such as methyl ethyl ketone, acetone and isopropyl alcohol. As a result, we are subject to certain environmental laws, as well as certain other laws and regulations, that restrict the materials that can be used in our products or in our manufacturing processes. For example, products that we sell in Europe are subject to regulation in the EU markets under the Restriction of the Use of Hazardous Substances Directive (RoHS). RoHS prohibits companies from selling products that contain certain hazardous materials in EU member states. In addition, the EU's Registration, Evaluation, Authorization, and Restriction of Chemicals Directive also restricts substances of very high concern in products. Compliance with such regulations may be costly and, therefore, we may incur significant costs to comply with these laws and regulations.

In addition, new environmental laws may further affect how we manufacture our products, how we use, generate or dispose of hazardous materials and waste, or further affect what materials can be used in our products. Any required changes to our operations or products may increase our manufacturing costs, detrimentally impact the performance of our products, add greater testing lead-times for product introductions or have other similar effects.

In connection with our research and manufacturing activities, we use, and our employees may be exposed to, materials that are hazardous to human health, safety or the environment. The risk of accidental injury to our employees or contamination from these materials cannot be eliminated, and we could be held liable for any resulting damages, the related liability for which could exceed our reserves. We do not specifically insure against environmental liabilities. If an enforcement action were to occur, our reputation and our business and financial condition may be harmed, even if we were to prevail or settle the action on terms favorable to us.

**We rely significantly on information technology and any failure, inadequacy, interruption or security lapse of that technology, including any cybersecurity incidents, could harm our ability to operate our business effectively.**

Increased global cybersecurity vulnerabilities, cybersecurity threats and sophisticated and targeted cybersecurity attacks pose a risk to the security of our systems and networks, including the confidentiality, availability and integrity of any underlying information and data, and those of our customers, partners, suppliers and third-party service providers. Our ability to effectively manage and maintain our internal business information, and to ship products to customers and invoice them on a timely basis, depends significantly on our enterprise resource planning system and other information systems.

Portions of our information technology systems may experience interruptions, delays or cessations of service or produce errors in connection with ongoing systems implementation work. In addition, interfaces between our products and our customers' computer networks could provide additional opportunities for cybersecurity attacks on us and our customers. The techniques used to attack computer systems are sophisticated, change frequently and may originate from less regulated and remote areas of the world. Cybersecurity attacks in particular are evolving and include, but are not limited to: threats, malicious software, ransomware, attempts to gain unauthorized access to data and other electronic security breaches that could lead to disruptions in systems, misappropriation of confidential or otherwise protected information and corruption of data. As a result, there can be no assurance that our protective measures will prevent or detect security breaches that could have a significant impact on our business, reputation, financial condition and results of operations.

The failure of these systems to operate or integrate effectively with other internal, customer, supplier or third-party service provider systems and to protect the underlying information technology system and data integrity, including from cyber-attacks, intrusions or other breaches or unauthorized access of these systems, or any failure by us to remediate any such attacks or breaches, may also result in damage to our reputation or competitiveness, delays in product fulfillment and reduced efficiency of our operations, and could require significant capital investments to remediate any such failure, problem or breach, all of which could adversely affect our business, financial condition and results of operations.

**Discontinuation, reform or replacement of LIBOR and other benchmark rates, or uncertainty related to the potential for any of the foregoing, may adversely affect our business.**

The U.K. Financial Conduct Authority announced in 2017 that it intends to phase out the London Inter-Bank Offered Rate (LIBOR) by the end of 2023. In addition, other regulators have suggested reforming or replacing other benchmark rates. The discontinuation, reform or replacement of LIBOR or any other benchmark rates may have an unpredictable impact on contractual mechanics in the credit markets or cause disruption to the broader financial markets. Uncertainty as to the nature of such potential discontinuation, reform or replacement may also negatively impact interest expense related to borrowings under our Credit Facility. Borrowings under our Credit Facility bear interest, at our election, either at the Alternate Base Rate (as defined in the Credit Facility), or at the Adjusted LIBO Rate (as defined in the Credit Facility), which is derived from LIBOR. We may in the future pursue amendments to our Credit Facility to provide for a transition mechanism or other reference rate in anticipation of LIBOR's discontinuation, but we may not be able to reach agreement with our Lenders on any such amendments. As a result, additional financing to replace any then-outstanding LIBOR-based debt may be unavailable, more expensive or restricted by the terms of such outstanding indebtedness.

**Our stock price may be volatile, and your investment in our stock could suffer a decline in value.**

There has been and could continue to be significant volatility in the market price and trading volume of equity securities. For example, our closing stock price ranged from $208.49 to $303.29 per share from January 3, 2021 to January 1, 2022. Factors contributing to our stock price volatility may include our financial performance, as well as broader economic, political and market factors, including the COVID-19 pandemic. In addition to the other risk factors previously discussed in this Annual Report on Form 10-K, there are many other factors that we may not be able to control that could have a significant effect on our stock price. These include, but are not limited to:

• actual or anticipated fluctuations in our operating results or future prospects;

• our announcements or our competitors' announcements of new products;

• the public's reaction to our press releases, or other public announcements and our filings with the SEC;

• strategic actions by us or our competitors, such as acquisitions or restructurings;

• new laws or regulations or new interpretations of existing laws or regulations applicable to our business;

• changes in accounting standards, policies, guidance, interpretations or principles;

• changes in our growth rates or our competitors' growth rates;

• developments regarding our patents or proprietary rights or those of our competitors;

• ongoing legal proceedings;

• our inability to raise additional capital as needed;

• concerns or allegations as to the safety or efficacy of our products;

• changes in financial markets or general economic conditions, including the effects of recession or slow economic growth in the U.S. and abroad;

• effects of public health crises, epidemics and pandemics, such as the COVID-19 pandemic;

• sales of stock by us or members of our management team, our Board or certain institutional stockholders; and

- changes in stock market analyst recommendations or earnings estimates regarding our stock, other comparable companies or our industry generally.

Therefore, you may not be able to resell your shares at or above the price you paid for them.

**Our investors could experience substantial dilution of their investments as a result of subsequent exercises of our outstanding options, vesting of outstanding restricted stock units (RSUs) and performance stock units (PSUs), or the grant of future equity awards by us.**

As of January 1, 2022, approximately 10.6 million shares of our common stock were reserved for issuance under our equity incentive plans, of which approximately 3.0 million shares were subject to options outstanding at such date at a weighted-average exercise price of $81.38 per share, approximately 2.9 million shares were subject to outstanding RSUs, approximately 0.3 million shares were subject to outstanding PSUs and approximately 4.4 million shares were available for future awards under our 2017 Equity Incentive Plan. Over the past 36 months, we have experienced higher rates of stock option exercises compared to many earlier periods, and this trend may continue. To the extent outstanding options are exercised or outstanding RSUs or PSUs vest, our existing stockholders may incur dilution.

We rely on equity awards to motivate current employees and to attract new employees. The grant of future equity awards by us to our employees and other service providers may further dilute our stockholders.

**Future resales of our stock, including those by our insiders and a few investment funds, may cause our stock price to decline.**

A significant portion of our outstanding shares are held by our directors, our executive officers and a few investment funds. Resales by these stockholders of a substantial number of such shares, announcements of any proposed resale of substantial amounts of our stock or the perception that substantial resales may be made, could significantly reduce the market price of our stock. Some of our directors and executive officers have entered into Rule 10b5-1 trading plans pursuant to which they have arranged to sell shares of our stock from time to time in the future. Generally, these sales require public filings. Actual or potential sales by these insiders, including those under a pre-arranged Rule 10b5-1 trading plan, could be interpreted by the market as an indication that the insider has lost confidence in our stock and reduce the market price of our stock.

We have registered and expect to continue to register shares reserved under our equity plans pursuant to Registration Statements on Form S-8. All shares issued pursuant to a Registration Statement on Form S-8 can be freely sold in the public market upon issuance, subject to restrictions on our affiliates under Rule 144. If a large number of these shares are sold in the public market, the sales could reduce the trading price of our stock.

**We may elect not to declare cash dividends on our stock, may elect to only pay dividends on an infrequent or irregular basis, or may elect not to make any additional stock repurchases. As a result, any return on your investment may be limited to the value of our stock. In addition, the payment of any future dividends or the repurchase of our stock might limit our ability to pursue other growth opportunities.**

Our Board may from time to time declare, and we may pay, dividends on our outstanding shares in the manner and upon the terms and conditions permitted under applicable law. However, we may elect to retain all future earnings for the operation and expansion of our business, rather than paying cash dividends on our stock. In addition, under certain circumstances, our Credit Facility may limit our ability to pay cash dividends, repurchase our common stock or make other distributions to stockholders. Any payment of cash dividends on our stock will be at the discretion of our Board and will depend upon our results of operations, earnings, capital requirements, financial condition, business prospects, contractual restrictions and other factors deemed relevant by our Board. In addition, our ability to pay dividends may be limited or subject to the lender's consent under our New Debt Facility. In the event our Board declares any dividends, there is no assurance with respect to the amount, timing or frequency of any such dividends.

Any repurchase of our common stock under the stock repurchase plan authorized by our Board in October 2021 (2021 Repurchase Program) will be at the discretion of a committee comprised of our CEO and Chief Financial Officer, and will depend on several factors, including, but not limited to, results of operations, capital requirements, financial conditions, available capital from operations or other sources and the market price of our common stock. Therefore, there is no assurance with respect to the amount, price or timing of any such repurchases. We may elect to retain all future earnings for the operation and expansion of our business, rather than repurchasing additional outstanding shares. For additional information related to our 2021 Repurchase Program, please see Note 17 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

In the event we pay dividends, or make any stock repurchases in the future, our ability to finance any material expansion of our business, including through acquisitions, investments or increased capital spending, or to fund our operations, may be limited. In addition, any repurchases we may make in the future may not prove to be at optimal prices. Our Board may modify or amend the 2021 Repurchase Program, or adopt a new stock repurchase program, at any time at its discretion without stockholder approval.

**Environmental, social and corporate governance (ESG) regulations, global climate change, corporate citizenship and related matters/provisions may make our supply chain more complex, and our reporting of such matters and may adversely affect our business.**

There is an increasing focus on the governance of environmental and social risks. Our customers and distributors have adopted, or may adopt, procurement policies that include ESG provisions that their suppliers or manufacturers must comply with, or they may seek to include such provisions in their terms and conditions. An increasing number of participants in the medical device industry are also joining voluntary ESG groups or organizations. These ESG provisions and initiatives are subject to change, can be unpredictable, and may be difficult and expensive for us to comply with, given the complexity of our supply chain and the outsourced manufacturing of certain components of our products. If we are unable to comply, or are unable to cause our suppliers to comply, with such policies or provisions, a customer may cease purchasing products from us, and may take legal action against us, which could harm our reputation, revenue and results of operations.

Further, increased public awareness and concern regarding global climate change may result in new or enhanced legal requirements. There continues to be a lack of consistent climate legislation, which creates economic and regulatory uncertainty. Such uncertainty may have an impact on our business, from the demand for our customers' products to our costs of compliance in the manufacturing and servicing of our customers' products, all of which may impact our results of operations. In addition, climate change initiatives and legislation could also disrupt our operations by impacting the availability and cost of materials within our supply chain, and could also increase insurance and other operating costs.

Investors, stockholders, customers, suppliers and other third parties are increasingly focusing on ESG and corporate social responsibility endeavors and reporting and transparency. Certain institutional investors, investment funds, other influential investors, customers, suppliers and other third parties are also increasingly focused on ESG practices. Companies that do not adapt to or comply with the evolving investor or stakeholder expectations and standards, or which are perceived to have not responded appropriately, may suffer from reputational damage and result in the business, financial condition and/or stock price of a company being materially and adversely affected. Further, this increased focus on ESG issues may result in new regulations and/or third-party requirements that could adversely impact our business, or certain shareholders reducing or eliminating their holdings of our stock. Additionally, an allegation or perception that we have not taken sufficient action in these areas could negatively harm our reputation.

**We are subject to recently enacted state laws in California that require gender and diversity quotas for boards of directors of public companies headquartered in California.**

In September 2018, California enacted Senator Bill 826 (SB 826), which generally requires public companies with principal executive offices in California to have at least two female directors on its board of directors if the company has at least five directors, and at least three female directors on its board of directors if the company has at least six directors.

Additionally, on September 30, 2020, California enacted Assembly Bill 979 (AB 979), which generally requires public companies with principal executive offices in California to include specified numbers of directors from "underrepresented communities". A director from an "underrepresented community" means a director who self-identifies as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, Alaska Native, gay, lesbian, bisexual or transgender. By December 31, 2021, each public company with principal executive offices in California was required to have at least one director from an underrepresented community. By December 31, 2022, a public company with more than four but fewer than nine directors will be required to have a minimum of two directors from underrepresented communities, and a public company with nine or more directors will need to have a minimum of three directors from underrepresented communities.

We cannot assure that we can recruit, attract and/or retain qualified members of the board and meet gender and diversity quotas as required by SB 826 or AB 979, and our board of directors does not currently satisfy the quota required under SB 826. A failure to comply with either SB 826 or AB 979 could result in fines from the California Secretary of State, with a $100,000 fine for the first violation and a $300,000 fine for each subsequent violation of either law, and our reputation may be adversely affected.

**ITEM 1B.    UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2.   PROPERTIES**

We own two facilities in Irvine, California with combined square footage of approximately 314,400 that house our corporate headquarters and the majority of our U.S. research and development activities. We also own approximately 86,500 square feet of property in Hudson, New Hampshire, which is used to develop and manufacture advanced light emitting diodes and other advanced component-level technologies, as well as warehousing and administrative operations. Additionally, we own approximately 79,300 square feet of property in Neuchatel, Switzerland, that houses our international headquarters.

We continue to lease and occupy various other buildings in California and other locations in the U.S. approximating a total of 168,800 square feet for product manufacturing, warehousing, distribution and sales support operations. These leases expire from February 2022 through March 2031. We also operate multiple facilities in Mexicali and San Luis Rio Colorado, Mexico with combined square footage of approximately 333,400 square feet, which are used for manufacturing and warehousing our products under a shelter labor agreement with Industrial Vallera de Mexicali, S.A. de C.V. (IVEMSA). IVEMSA leases these manufacturing facilities directly from the owners of the properties under separate agreements that are guaranteed by us. These leases expire in August 2024.

We also lease and occupy various other facilities throughout the world to operate our business. We believe that our existing facilities are adequate to meet our needs and that existing needs and future growth can be accommodated by purchasing or leasing alternative or additional space.

**ITEM 3.   LEGAL PROCEEDINGS**

The information set forth in Note 21 to our accompanying consolidated financial statements under the caption "Litigation" included in Part IV, Item 15(a) of this Annual Report on Form 10-K is incorporated herein by reference.

**ITEM 4.   MINE SAFETY DISCLOSURES**

Not applicable.

**PART II**

**ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

*Market Information*

Our stock is traded on the Nasdaq Global Select Market under the symbol "MASI". As of February 8, 2022, the closing price of our stock was $224.52 per share, and the number of stockholders of record, excluding persons whose stock is in nominee or "street name" accounts through brokers, was 17.

*Dividend Policy*

We have historically not paid dividends to our stockholders. Any determination to declare and pay dividends will be made by our Board and will depend upon our results of operations, earnings, capital requirements, financial condition, business prospects, contractual restrictions and other factors deemed relevant by our Board. In addition, under certain circumstances, our Credit Facility may limit our ability to pay cash dividends. In the event a dividend is declared, there is no assurance with respect to the amount, timing or frequency of any such dividends. The dividend declared in 2012 was deemed to be a special dividend and there is no assurance that special dividends will be declared again during the expected term.

*Stock Performance Graph*

The following stock performance graph and related information shall not be deemed "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act or Exchange Act, except to the extent that we specifically incorporate it by reference into such filing.

The following stock performance graph compares total stockholder returns for our common stock from January 1, 2017 through January 1, 2022 against the Nasdaq Market Composite Index and Nasdaq Medical Equipment Index, assuming a $100 investment made on January 1, 2017. Each of the two comparative measures of cumulative total return assumes reinvestment of dividends. The stock performance shown on the graph below is not necessarily indicative of future price performance.

**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN\***

Among Masimo Corporation, the Nasdaq Market Composite Index, and

the Nasdaq Medical Equipment Index



\*$100 invested on 1/1/2017 in stock or in index, including reinvestment of dividends. Indexes calculated on month-end basis.

*Repurchases and Withholdings of Issuer Securities*

In July 2018, our Board of Directors (Board) approved a new stock repurchase program, authorizing us to purchase up to 5.0 million additional shares of its common stock over a period of up to three years (2018 Repurchase Program). The 2018 Repurchase Program became effective in September 2018.

In October 2021, the Board approved a new stock repurchase program, authorizing the Company to purchase up to 3.0 million shares of its common stock over a period of up to three years (2021 Repurchase Program). The 2021 Repurchase Program became effective in October 2021 upon the expiration of the 2018 Repurchase Program.

We expect to fund the 2021 Repurchase Program through our available cash, cash expected to be generated from future operations and other potential sources of capital. The 2021 Repurchase Program can be carried out at the discretion of a committee comprised of our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) through open market purchases, one or more Rule 10b5-1 trading plans, block trades and privately negotiated transactions. Any repurchases under the 2021 Repurchase Program are subject to the availability of stock, general market conditions, the trading price of the stock, available capital, alternative uses for capital and our financial performance. During the year ended January 1, 2022, we repurchased approximately 0.5 million shares under the 2018 Repurchase Program at an average cost of 235.88 per share, totaling approximately $128.9 million. No shares were repurchased under the 2021 Repurchase Program during the year ended January 1, 2022.

*Issuer Repurchases and Withholdings of Equity Securities*

During the quarter ended January 1, 2022, we did not effect any repurchases of shares of our common stock or withhold any shares of our common stock to satisfy tax withholding obligations.

During the year ended January 1, 2022, we satisfied certain U.S. federal and state tax withholding obligations due upon the vesting of equity grants by withholding shares of our common stock, with an aggregate fair market value on the date of vesting equal to the tax withholding obligations, from the shares of our common stock actually issued in connection with such award. Shares withheld to satisfy tax withholding obligations for the years ended January 1, 2022 and January 2, 2021 were as follows (in thousands, except per share amounts):

| | Three Months Ended | | Year Ended | |
| --- | --- | --- | --- | --- |
| | January 1, 2022[1] | January 2, 2021 | January 1, 2022[1] | January 2, 2021 |
| Shares withheld | 18 | 8,464 | 67,704 | 18,750 [1] |
| Average cost per share | $ 276.97 | $ 252.72 | $ 247.10 | $ 203.01 |
| Value of shares withheld | $ 5 | $ 2,139 | $ 16,728 | $ 3,807 |

[1]   Also included here is the option cost due upon the exercise of stock options that was paid by delivering the shares previously owned by the participant.

**ITEM 6.    RESERVED.**

**ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read this discussion together with the financial statements, related notes and other financial information included in this Annual Report on Form 10-K. The following discussion may contain predictions, estimates and other forward-looking statements that involve a number of risks and uncertainties, including those discussed under Item 1A—"Risk Factors" and elsewhere in this Annual Report on Form 10-K. These risks could cause our actual results to differ materially from any future performance suggested below.*

### Executive Overview

We are a global medical technology company that develops, manufactures and markets a variety of noninvasive monitoring technologies and hospital automation™ solutions. Our mission is to improve patient outcomes and reduce the cost of patient care. Our patient monitoring solutions generally incorporate a monitor or circuit board, proprietary single-patient use or reusable sensors, software and/or cables. We provide our products to hospitals, emergency medical service (EMS) providers, home care providers, long-term care facilities, physician offices, veterinarians and consumers through our direct sales force, distributors and original equipment manufacturers (OEM) partners. We were incorporated in California in May 1989 and reincorporated in Delaware in May 1996.

Our core business is Measure-through Motion and Low Perfusion™ pulse oximetry, known as Masimo Signal Extraction Technology® (SET®) pulse oximetry. Our product offerings have expanded significantly over the years to also include noninvasive monitoring of blood constituents with an optical signature, optical regional oximetry monitoring, electrical brain function monitoring, acoustic respiration monitoring and exhaled gas monitoring. In addition, we have developed the Root® patient monitoring and connectivity platform, the Radical-7® and Rad-97® bedside and portable patient monitors and the Radius-7® wearable wireless patient monitor. We have also developed hospital automation™ and connectivity solutions, such as the Masimo Patient SafetyNet™ supplemental remote patient surveillance and monitoring system, which currently allows up to 200 patients to be monitored and viewed simultaneously and remotely through a PC-based monitor or by care providers through their pagers, voice-over-IP phones or smartphones; Iris® and Iris® Gateway, which allow the transfer of data from Masimo and third-party devices to hospital electronic medical records; and UniView™, which provides an integrated display of real-time data from Masimo and third-party devices. Please see Part I, Item 1 of this Annual Report on Form 10-K for additional information related to our business, products and technologies.

### COVID-19 Pandemic

The COVID-19 pandemic has created significant uncertainty in the U.S. and around the globe, resulting in both challenges and opportunities for our business. We are committed to being as transparent as possible with our investors, employees, customers, suppliers and business partners as we collectively work to respond to this crisis. In response to this situation, we have implemented a number of precautionary measures at our facilities, including requiring certain personnel to work remotely from home and enacting social distancing, requiring face masks and mandatory screening for symptoms associated with COVID-19 for critical personnel that are required to report to our facilities to work. We have introduced new products, such as Masimo SafetyNet™, Masimo SafetyNet-Open™ and Masimo SafetyNet Alert™, to help combat the COVID-19 pandemic, and continue to make charitable pledges to various global health organizations to support global COVID-19 relief efforts.

Given the uncertainties related to the COVID-19 pandemic, we cannot predict the extent to which the fluctuations in product demand we have experienced will continue or any resulting changes in our product mix, as well as the associated gross margin impact from those fluctuations in boards and instruments sales. In addition, the fluctuations in demand could result in potential reductions in future demand if our customers have over purchased our products and need to consume their excess inventory before purchasing additional products. Furthermore, we continue to be exposed to potential disruptions to our manufacturing operations, disruptions in the manufacturing supply chain of critical components and in our workforce as circumstances surrounding the global impact of the COVID-19 pandemic continue to change. Please see *"Risks Related to Our Revenues"* and *"Risks Related to our Business and Operations"* in Part I, Item 1A of this Annual Report on Form 10-K for additional information on potential negative impacts to us resulting from the COVID-19 pandemic.

### Stock Repurchase Program

In October 2021, our Board approved a stock repurchase program, authorizing us to purchase up to 3.0 million shares of our common stock over a period of up to three years (2021 Repurchase Program). The 2021 Repurchase Program may be carried out at the discretion of a committee comprised of our CEO and CFO through open market purchases, one or more Rule 10b5-1 trading plans, block trades and in privately negotiated transactions. For additional information regarding our current and prior stock repurchase programs, see Part II, Item 5 and Note 17 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

*Cercacor*

Cercacor Laboratories, Inc. (Cercacor) is an independent entity spun off from us to our stockholders in 1998. Joe Kiani, our Chairman and Chief Executive Officer (CEO), is also the Chairman and CEO of Cercacor. We are a party to a cross-licensing agreement with Cercacor, which was amended and restated effective January 1, 2007 (the Cross-Licensing Agreement), which governs each party's rights to certain intellectual property held by the two companies. See Note 3 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information related to Cercacor.

*Results of Operations*

The following table sets forth, for the periods indicated, our results of operations expressed as U.S. Dollar amounts and as a percentage of revenue (dollars in thousands).

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | |
| --- | --- | --- | --- | --- |
| | Amount | % of Revenue | Amount | % of Revenue |
| Product revenue | $ 1,239,153 | 100.0 % | $ 1,143,744 | 100.0 % |
| Cost of goods sold | 430,806 | 34.8 | 400,679 | 35.0 |
| Gross profit | 808,347 | 65.2 | 743,065 | 65.0 |
| Operating expenses: | | | | |
| Selling, general and administrative | 395,291 | 31.9 | 369,057 | 32.3 |
| Research and development | 137,234 | 11.1 | 118,659 | 10.4 |
| Litigation awards, settlements/or defense costs | — | — | (474) | — |
| Total operating expenses | 532,525 | 43.0 | 487,242 | 42.6 |
| Operating income | 275,822 | 22.3 | 255,823 | 22.4 |
| Non-operating (loss) income | (1,442) | (0.1) | 7,913 | 0.7 |
| Income before provision for income taxes | 274,380 | 22.1 | 263,736 | 23.1 |
| Provision for income taxes | 44,733 | 3.6 | 23,454 | 2.1 |
| Net income | $ 229,647 | 18.5 % | $ 240,282 | 21.0 % |

*Comparison of the Year ended January 1, 2022 to the Year ended January 2, 2021*

*Revenue.* Product revenue increased $95.4 million, or 8.3%, to $1,239.2 million for the year ended January 1, 2022, from $1,143.7 million for the year ended January 2, 2021. The following table details our total product revenues by the geographic area to which the products were shipped for the years ended January 1, 2022 and January 2, 2021 (dollars in thousands):

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | | Increase/ (Decrease) | Percentage Change |
| --- | --- | --- | --- | --- | --- | --- |
| United States (U.S.) | $ 822,410 | 66.4 % | $ 763,069 | 66.7 % | $ 59,341 | 7.8 % |
| Europe, Middle East and Africa | 251,839 | 20.3 | 238,681 | 20.9 | 13,158 | 5.5 |
| Asia and Australia | 123,595 | 10.0 | 103,756 | 9.1 | 19,839 | 19.1 |
| North and South America (excluding U.S.) | 41,309 | 3.3 | 38,238 | 3.3 | 3,071 | 8.0 |
| Product revenue | $ 1,239,153 | 100.0 % | $ 1,143,744 | 100.0 % | $ 95,409 | 8.3 % |

This increase was primarily due to higher revenue from consumables, parameters and services, as well as the impact of approximately $8.2 million of favorable foreign exchange rate movements from the prior year that increased the U.S. Dollar translation of foreign sales that were denominated in various foreign currencies. During the year ended January 1, 2022, we shipped approximately 289,000 noninvasive technology boards and monitors.

Product revenue generated through our direct and distribution sales channels increased $140.3 million, or 14.6%, to $1,099.1 million for the year ended January 1, 2022, compared to $958.8 million for the year ended January 2, 2021. Revenues from our OEM channel decreased $44.9 million, or 24.3%, to $140.1 million for the year ended January 1, 2022 as compared to $185.0 million for the year ended January 2, 2021.

Table of Contents

*Gross Profit.* Gross profit consists of product revenue less cost of goods sold. Our gross profit for the years ended January 1, 2022 and January 2, 2021 were as follows (dollars in thousands):

| Gross Profit | | | | | |
|---|---|---|---|---|---|
| Year Ended January 1, 2022 | Percentage of Revenues | Year Ended January 2, 2021 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $808,347 | 65.2% | $743,065 | 65.0% | $65,282 | 8.8% |

Cost of goods sold includes labor, material, overhead and other similar costs related to the production, supply, distribution and support of our products. Cost of goods sold increased $30.1 million to $430.8 million for the year ended January 1, 2022, from $400.7 million for the year ended January 2, 2021, primarily due to higher material, manufacturing and distribution costs associated with the mix of products sold.

Gross profit as a percentage of revenues increased to 65.2% for the year ended January 1, 2022 from 65.0% for the year ended January 2, 2021, primarily due to an increase in product revenue and favorable revenue mix.

*Selling, General and Administrative.* Selling, general and administrative expenses consist primarily of salaries, stock-based compensation and related expenses for sales, marketing and administrative personnel, sales commissions, advertising and promotion costs, professional fees related to legal, accounting and other outside services, public company costs and other corporate expenses. Selling, general and administrative expenses for the years ended January 1, 2022 and January 2, 2021 were as follows (dollars in thousands):

| Selling, General and Administrative | | | | | |
|---|---|---|---|---|---|
| Year Ended January 1, 2022 | Percentage of Revenues | Year Ended January 2, 2021 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $395,291 | 31.9% | $369,057 | 32.3% | $26,234 | 7.1% |

Selling, general and administrative expenses increased $26.2 million, or 7.1%, to $395.3 million for the year ended January 1, 2022 from $369.1 million for the year ended January 2, 2021. This increase was primarily attributable to higher compensation and other employee-related costs of approximately $20.4 million, higher legal and professional fees of approximately $16.7 million, higher occupancy and other office-related costs of approximately $5.2 million and higher travel costs of approximately $2.1 million, which were partially offset by a reduction in advertising and marketing-related expenses of approximately $19.2 million, and a reduction in contributions of approximately $0.9 million.

*Research and Development.* Research and development expenses consist primarily of salaries, stock-based compensation and related expenses for engineers and other personnel engaged in the design and development of our products. These expenses also include third-party fees paid to consultants, prototype and engineering supply expenses and the costs of clinical trials. Research and development expenses for the years ended January 1, 2022 and January 2, 2021 were as follows (dollars in thousands):

| Research and Development | | | | | |
|---|---|---|---|---|---|
| Year Ended January 1, 2022 | Percentage of Revenues | Year Ended January 2, 2021 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $137,234 | 11.1% | $118,659 | 10.4% | $18,575 | 15.7% |

Research and development expenses increased $18.6 million, or 15.7%, to $137.2 million for the year ended January 1, 2022 from $118.7 million for the year ended January 2, 2021, primarily due to higher compensation-related costs of approximately $12.3 million, higher engineering project costs of approximately $3.9 million and higher occupancy and office fees of $2.6 million, which were partially offset by lower professional fees of approximately $0.7 million.

*Non-operating (Loss) Income.* Non-operating (loss) income consists primarily of interest income, interest expense and foreign exchange gains and losses. Non-operating (loss) income for the years ended January 1, 2022 and January 2, 2021 were as follows (dollars in thousands):

| Non-operating (Loss) Income | | | | | |
|---|---|---|---|---|---|
| Year Ended January 1, 2022 | Percentage of Revenues | Year Ended January 2, 2021 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $(1,442) | (0.1)% | $7,913 | 0.7% | $(9,355) | (118.2)% |

Non-operating (loss) was $1.4 million for the year ended January 1, 2022, as compared to $7.9 million of non-operating income for the year ended January 2, 2021. This net decrease of approximately $9.4 million was primarily due to approximately

$4.6 million in lower interest income and approximately $4.5 million of net realized and unrealized loss on foreign currency denominated transactions during the year ended January 1, 2022.

*Provision for Income Taxes.* Our provision for income taxes for the years ended January 1, 2022 and January 2, 2021 were as follows (dollars in thousands):

| Provision for Income Taxes | | | | | |
|---|---|---|---|---|---|
| Year Ended January 1, 2022 | Percentage of Revenues | Year Ended January 2, 2021 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $44,733 | 3.6% | $23,454 | 2.1% | $21,279 | 90.7% |

Our provision for income taxes was $44.7 million for the year ended January 1, 2022 compared to $23.5 million for the year ended January 2, 2021. Our effective tax rate was 16.3% for the year ended January 1, 2022 compared to 8.9% for the year ended January 2, 2021. This increase in our effective tax rate for the year ended January 1, 2022 resulted primarily from an decrease in the amount of excess tax benefits realized from stock-based compensation pursuant to Accounting Standards Update (ASU) No. 2016-09, *Compensation—Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting* (ASU 2016-09), of approximately $13.7 million compared to the year ended January 2, 2021.

We have made no provision for U.S. income taxes or foreign withholding taxes on approximately $180.6 million in accumulated earnings from our foreign subsidiaries as we expect that such amounts will continue to be indefinitely reinvested in operations outside the U.S. Our effective tax rate was lower than the U.S. federal statutory rate primarily due to a portion of our earnings being generated from countries other than the U.S., where such earnings are generally subject to lower tax rates than the U.S., excess tax benefits from U.S. stock-based compensation and research and development tax credits. While we expect our worldwide consolidated effective tax rate will continue to be lower than the U.S. federal statutory rate, our actual future effective income tax rate will depend on various factors, including the geographic composition of our pre-tax income, the amount of excess tax benefits realized from U.S. stock-based compensation, the amount of our research and development tax credits, the deductibility of executive compensation, changes in tax laws, changes in deferred tax asset valuation allowances and the recognition and derecognition of tax benefits associated with uncertain tax positions.

### Comparison of the Year ended January 2, 2021 to the Year ended December 28, 2019

For a discussion regarding our financial condition and results of operations for the year ended January 2, 2021 as compared to the year ended December 28, 2019, refer to the discussion under the heading "Comparison of the Year ended January 2, 2021 to the Year ended December 28, 2019" in Item 7, which should be read in conjunction with Item 6, in each case, of our Annual Report on Form 10-K for the year ended January 2, 2021, filed with the Securities and Exchange Commission on February 23, 2021.

### Liquidity and Capital Resources

*Sources of Cash.* Our principal sources of liquidity consist of our existing cash and cash equivalent balances, future funds expected to be generated from operations and available borrowing capacity under our Credit Facility. As of January 1, 2022, we had approximately $970.7 million in working capital, of which approximately $745.3 million was cash and cash equivalents. In addition to net working capital, we had approximately $148.3 million of available borrowing capacity (net of outstanding letters of credit) under our Credit Facility as compared to approximately $867.3 million in working capital and approximately $641.4 million in cash and cash equivalents at January 2, 2021.

We currently maintain a Credit Facility with JPMorgan Chase Bank, N.A. (as Administrative Agent and a Lender, and Bank of the West, as a Lender, collectively, the Initial Lenders). The Credit Facility provides for up to $150.0 million of unsecured borrowings, with an option, subject to certain conditions, for us to increase the aggregate borrowing capacity to up to $550.0 million in the future with the Initial Lenders and additional Lenders, as required. The Credit Facility also provides for a sublimit of up to $25.0 million for the issuance of letters of credit and a sublimit of $75.0 million for borrowings in specified foreign currencies. Proceeds from the Credit Facility are expected to be used for general corporate, capital investment and expenditures and working capital needs. For additional information regarding the Credit Facility, see Note 15 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

In managing our day-to-day liquidity and capital structure, we generally do not rely on foreign earnings as a source of funds. As of January 1, 2022, we had cash totaling $102.6 million held outside the U.S., of which approximately $59.8 million was accessible without additional tax cost and approximately $42.8 million was accessible at an incremental estimated tax cost of up to $0.4 million. We currently have sufficient funds on-hand and cash held outside the U.S. that is available without additional tax cost to fund our global operations. In the event funds that are treated as permanently reinvested are repatriated, we may be required to accrue and pay additional U.S. taxes to repatriate these funds.

*Uses of Cash.* Our cash requirements depend on numerous factors, including but not limited to market acceptance of our technologies, our continued ability to commercialize new products and to create or improve our technologies and applications, expansion of our global footprint through acquisitions and/or strategic investments in technologies or technology companies, investments in property and equipment, the renewal of our Credit Facility, the impact of disruptions to the manufacturing industry supply chain for key components resulting from the COVID-19 pandemic, inflation, repurchases of our stock under our authorized stock repurchase program, costs related to our domestic and international regulatory requirements and other long-term commitment and contingencies. For further details regarding our commitment and contingencies, see Note 21 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

Despite these investment requirements and potential expenditures, we anticipate that our existing cash and cash equivalents, amounts available under our Credit Facility and cash provided by operations will be sufficient to meet our working capital requirements, capital expenditures and other operational funding needs for the next 12 months and beyond.

In connection with the proposed acquisition of Sound United announced on February 15, 2022, we received a debt commitment letter in the amount of $800 million and we expect to secure this financing in the event the proposed acquisition closes. We intend to fund this acquisition through a combination of cash on hand and borrowings under a new credit facility. The acquisition is expected to close in the middle of 2022.

*Cash Flows*

The following table summarizes our cash flows (in thousands):

| | Year Ended | | |
| --- | --- | --- | --- |
| | January 1, 2022 | | January 2, 2021 |
| Net cash provided by (used in): | | | |
| Operating activities | $ | 264,754 | $ | 210,963 |
| Investing activities | | (37,529) | | (82,787) |
| Financing activities | | (122,404) | | (54,307) |
| Effect of foreign currency exchange rates on cash | | (1,448) | | 3,060 |
| Increase in cash, cash equivalents, and restricted cash | $ | 103,373 | $ | 76,929 |

*Operating Activities.* Cash provided by operating activities for the year ended January 1, 2022 was $264.8 million and was primarily driven by net income of $229.6 million. This was increased by non-cash activities, including stock-based compensation of $44.6 million, and depreciation and amortization of $35.6 million, partially offset by a deferred income tax benefit of $15.1 million. Additional increases in operating cash resulted from decreases in inventory, accounts payable, accrued liabilities, deferred revenue and other contract-related liabilities, other current assets and income tax payable of $13.5 million, $11.0 million, $7.8 million, $7.1 million, $6.9 million and $6.4 million, respectively, primarily due to the timing of payments. Additional increases to net income were changes in operating assets, including an increase in accounts receivable, lease receivables, and deferred cost and other contract assets of $60.8 million, $16.1 million and $6.9 million, respectively.

Cash provided by operating activities for the year ended January 2, 2021 was $211.0 million and was primarily driven by net income of $240.3 million. This was increased by non-cash activities, including stock-based compensation of $42.2 million and depreciation and amortization of $29.3 million, partially offset by a deferred income tax benefit of $5.0 million. Additional increases in operating cash resulted from increases in accrued compensation, deferred revenue and other contract-related liabilities, accrued liabilities and accounts payable of $15.5 million, $10.9 million, $9.4 million and $7.6 million, respectively, primarily due to the timing of payments. Partially offsetting this was $94.4 million of purchases of inventory to both increase finished goods days on hand as well as secure raw material supply to ensure we are able to support higher customer demand during the COVID-19 pandemic, and to support product launches. Additional reductions to net income including were changes in operating assets, including an increase in other current assets of $30.0 million, primarily due to the timing of various tax payments and refunds, and an increase in lease receivables of $7.7 million.

*Investing Activities.* Cash used in investing activities for the year ended January 1, 2022 was $37.5 million, consisting primarily of $25.5 million for purchases of property and equipment, $9.4 million for intangible assets related to capitalized patent and trademark costs and $2.6 million related to the acquisition of a strategic investment.

Cash used in investing activities for the year ended January 2, 2021 was $82.8 million, consisting primarily of $120.0 million for maturities of short-term investments, $112.7 million of business combinations, $72.5 million for purchases of property and

equipment, of which $16.4 million related to the purchase of a building, $7.4 million for intangible assets related to capitalized patent and trademark costs and $6.8 million related to the acquisition of a strategic investment.

*Financing Activities.* Cash used in financing activities for the year ended January 1, 2022 was $122.4 million, resulting primarily from cash paid for common stock repurchase transactions that settled during the year of $128.9 million, which were partially offset by proceeds from the issuance of common stock (upon exercise of options) of $23.2 million.

Cash used in financing activities for the year ended January 2, 2021 was $54.3 million, resulting primarily from cash paid for common stock repurchase transactions that settled during the year of $110.5 million, which were partially offset by proceeds from the issuance of common stock (upon exercise of options) of $58.4 million.

### *Critical Accounting Estimates*

Our financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires management to make estimates and judgements that affect the reported amounts of net revenues, expenses, assets and liabilities. These estimates and judgements are based on historical experience and on various other factors that are believed to be reasonable under the circumstances, and form the basis for making management's most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effects of matters that are inherently uncertain. Although we regularly evaluate these estimates and assumptions, changes in judgments and uncertainties relating to these estimates could potentially result in materially different results under different assumptions and conditions. If these estimates differ significantly from actual results, the impact to the consolidated financial statements may be material. We believe that the critical accounting policies that are the most significant for purposes of fully understanding and evaluating our reported financial results include the following:

#### *Revenue Recognition, Deferred Revenue and Other Contract Liabilities*

We derive the majority of our product revenue from four primary sources: (i) direct sales under deferred equipment agreements with end-user hospitals where we provide up-front monitoring equipment at no up-front charge in exchange for a multi-year sensor purchase commitment; (ii) other direct sales of noninvasive monitoring solutions to end-user hospitals, emergency medical response organizations and other direct customers; (iii) sales of noninvasive monitoring solutions to distributors who then typically resell to end-user hospitals, emergency medical response organizations and other customers; and (iv) sales of integrated circuit boards to OEM customers who incorporate our embedded software technology into their multiparameter monitoring devices. Subject to customer credit considerations, the majority of such sales are made on open account using industry standard payment terms based on the geography within which the specific customer is located.

We generally recognize revenue following a single, principles-based five-step model to be applied to all contracts with customers and generally provide for the recognition of revenue in an amount that reflects the consideration to which we expect to be entitled, net of allowances for estimated returns, discounts or sales incentives, as well as taxes collected from customers that are remitted to government authorities, when control over the promised goods or services are transferred to the customer. Revenue related to equipment supplied under sales-type lease arrangements is recognized once control over the equipment is transferred to the customer, while revenue related to equipment supplied under operating-type lease arrangements is generally recognized on a straight-line basis over the term of the lease.

While the majority of our sales transactions contain standard business terms and conditions, there are some transactions that contain non-standard business terms and conditions. As a result, contract interpretation and analysis is required to determine the appropriate accounting, including: (i) the amount of the total consideration, including variable consideration, (ii) whether the arrangement contains an embedded lease, and if so, whether such embedded lease is a sales-type lease or an operating lease, (iii) the identification of the distinct performance obligations contained within the arrangement, (iv) how the arrangement consideration should be allocated to each performance obligation when multiple performance obligations exist, including the determination of standalone selling price, and (v) when to recognize revenue on the performance obligations. Changes in judgments on these assumptions and estimates could materially impact the timing of revenue recognition.

We enter into agreements to sell our monitoring solutions and services, sometimes as part of arrangements with multiple performance obligations that include various combinations of distinct product sales, equipment leases and services. In the case of contracts with multiple performance obligations, the authoritative guidance provides that the total consideration be allocated to each performance obligation on the basis of relative standalone selling prices. When a standalone selling price is not readily observable, we estimate the standalone selling price by considering multiple factors including, but not limited to, features and functionality of the product, geographies, type of customer, contractual prices pursuant to Group Purchasing Organization (GPO) contracts, our pricing and discount practices, and other market conditions.

Table of Contents

Sales under deferred equipment agreements are generally structured such that we agree to provide certain monitoring-related equipment, software, installation, training and/or warranty support at no up-front charge in exchange for the customer's commitment to purchase sensors over the term of the agreement, which generally ranges from three to six years. We allocate contract consideration under deferred equipment agreements containing fixed annual sensor purchase commitments to the underlying lease and non-lease components at contract inception. In determining whether any underlying lease components are related to a sales-type lease or an operating lease, we evaluate the customer's rights and ability to control the use of the underlying equipment throughout the contract term, including any equipment substitution rights retained by us, as well as our expectations surrounding potential contract/lease extensions or renewals and the customer's likelihood to exercise any purchase options. Revenue allocable to non-lease components is generally recognized as such non-lease components are satisfied. Revenue allocable to lease components under sales-type lease arrangements is generally recognized when control of the equipment is transferred to the customer. Revenue allocable to lease components under operating lease arrangements is generally recognized over the term of the operating lease. We generally do not expect to derive any significant value in excess of such asset's unamortized book value from equipment underlying our operating leases arrangements.

Revenue from direct sales of our products to end-user hospitals, emergency medical response organizations, other direct customers, distributors and OEM customers is generally recognized by us when control of such products transfer to the customer based upon the terms of the contract or underlying purchase order. Revenue related to OEM rainbow® parameter software licenses is recognized by us upon the OEM's shipment of its product to its customer, as reported to us by the OEM.
We provide certain customers with various sales incentives that may take the form of discounts or rebates. We estimate and provide allowances for these programs as a reduction to revenue at the time of sale. In general, customers do not have a right of return for credit or refund. However, we allow returns under certain circumstances. At the end of each period, we estimate and accrue for these returns as a reduction to revenue. We estimate the revenue constraints related to these forms of variable consideration based on various factors, including expected purchasing volumes, prior sales and returns history, and specific contractual terms and limitations.

*Inventory*

Inventories are stated at the lower of cost or net realizable value. Cost is determined using a standard cost method, which approximates FIFO (first-in, first-out). Inventory valuation reserves are recorded for materials that have become obsolete or are no longer used in current production and for inventory that has a net realizable value less than the carrying value in inventory. We generally purchase raw materials in quantities that we anticipate will be fully used within one year. However, changes in operating strategy and customer demand, and frequent unpredictable fluctuations in market values for such materials, can limit our ability to effectively utilize all of the raw materials purchased and sold through resulting finished goods to customers for a profit. We regularly monitor potential inventory excess, obsolescence and lower market values compared to standard costs and, when necessary, reduce the carrying amount of our inventory to its market value.

We determine any required inventory valuation adjustments based on an evaluation of the expected future use of our inventory on an item by item basis. We apply historical obsolescence rates to estimate the loss on inventory expected to have a recovery value below cost. Our historical obsolescence rates are developed from our company specific experience for major categories of inventory, which are then applied to excess inventory on an item by item basis. We also record other specific inventory valuation adjustments when we become aware of other unique events that result in a known recovery value below cost. For inventory items that have been written down, the reduced value becomes the new cost basis. If our assumptions, judgements or estimates on various factors, including expected purchasing volumes, prove to be too low, our future earnings will be affected when any related additional inventory losses are recorded.

*Stock-Based Compensation*

Our stock-based compensation awards are currently comprised of stock options, restricted stock units (RSUs) and performance share units (PSUs), all of which are equity-classified awards. For equity-classified awards granted on or after January 1, 2006, we estimate the fair value of the award on the date of grant and expense stock-based compensation over the requisite service period. In the case of PSUs, the amount of expense recognized is also dependent upon the expected achievement level for the specified performance criteria. The fair value of RSU and PSU awards is the closing price of our common stock on the grant date. To calculate the fair value of stock option awards, we use the Black-Scholes option pricing model, which, in addition to the closing price of our stock on the grant date and the option strike price, requires the input of subjective assumptions. These assumptions include the estimated length of time employees will retain their stock options before exercising them (the expected term), the estimated volatility of our stock price over the expected term and the dividend yield on our common stock. We estimate expected term based on both our specific historical option exercise experience, as well as expected term information available from a peer group of companies with similar vesting schedules. The estimated volatility is based on both the historical and implied volatilities of our share price.

Changes in the types and quantity of equity awards, as well as the fair market value of our stock may impact the cost of future stock option grants. In general, to the extent that the fair market value of our stock increases, the overall cost of granting these options will also increase. Any changes in the assumptions, judgments and estimates mentioned above could cause our actual stock-based compensation expense to vary, resulting in changes to future earnings. For further details regarding our stock-based compensation see Note 18 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

*Accounting for Income Taxes*

We account for income taxes using the asset and liability method, under which we recognize deferred tax assets and liabilities for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and for net operating loss and tax credit carryforwards. A tax position that meets a more-likely-than-not recognition threshold is recognized in the first reporting period that it becomes more-likely-than-not such tax position will be sustained upon examination. A tax position that meets this more-likely-than-not recognition threshold is recorded at the largest amount of tax benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. Previously recognized income tax positions that fail to meet the recognition threshold in a subsequent period are derecognized in that period. Differences between actual results and our assumptions, or changes in our assumptions in future periods, are recorded in the period they become known. We record potential accrued interest and penalties related to unrecognized tax benefits in income tax expense.

As a multinational corporation, we are subject to complex tax laws and regulations in various jurisdictions. The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws themselves are subject to change as a result of changes in fiscal policy, changes in legislation, evolution of regulations and court rulings. We have concluded all U.S. federal income tax matters for years through 2017 and all material state, local and foreign income tax matters for years through 2014. Given the foregoing, our actual liability for U.S. or foreign taxes may be materially different from our estimates, which could result in the need to record additional liabilities or potentially to reverse previously recorded tax liabilities.

Deferred tax assets (DTA) and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. A valuation allowance is recorded against any deferred tax assets when, in the judgment of management, it is more likely than not that all or part of a deferred tax asset will not be realized. In assessing the need for a valuation allowance, we consider all positive and negative evidence, including recent financial performance, scheduled reversals of temporary differences, projected future taxable income, availability of taxable income in carryback periods and tax planning strategies.

Income taxes are highly susceptible to changes from period to period, requiring management to make assumptions about our future income over the lives of our DTAs and the impact of changes in valuation allowances. Any difference in the assumptions, judgments and estimates mentioned above could results in changes to our results of operations.

*Litigation Costs and Contingencies*

We record a charge equal to at least the minimum estimated liability for a loss contingency or litigation settlement when both of the following conditions are met: (i) information available prior to issuance of the financial statements indicates that it is probable that a liability had been incurred at the date of the financial statements and (ii) the range of loss can be reasonably estimated. The determination of whether a loss contingency or litigation settlement is probable or reasonably possible involves a significant amount of management judgment, as does the estimation of the range of loss given the nature of contingencies. Liabilities related to litigation settlements with multiple elements are recorded based on the fair value of each element. Legal and other litigation related expenses are recognized as the services are provided. We record insurance and other indemnity recoveries for litigation expenses when both of the following conditions are met: (i) the recovery is probable and (ii) collectability is reasonably assured. The insurance recoveries recorded are only to the extent the litigation costs have been incurred and recognized in the financial statements; however, it is reasonably possible that the actual recovery may be significantly different from our estimates. There are many uncertainties associated with any litigation, and we cannot provide assurance that any actions or other third-party claims against us will be resolved without costly litigation or substantial settlement charges. If any of those events were to occur, our business, financial condition and results of operations could be materially and adversely affected.

*Business Combinations*

We account for business combinations using the acquisition method of accounting, which requires that once control is obtained, all the assets acquired, liabilities assumed and noncontrolling interest in the acquired entity, if applicable, are recorded at their respective fair values at the date of acquisition. The determination of fair values of identifiable assets and liabilities requires estimates and the use of valuation techniques when market value is not readily available. For intangible assets acquired in a business combination, we typically use the income method. Significant estimates in valuing certain intangible assets include, but are not limited to, the amount and timing of future cash flows, growth rates, discount rates and useful lives. The excess of the purchase price over fair values of identifiable assets, liabilities, and noncontrolling interest in the acquired entity, if applicable, is recorded as goodwill. Should any of the assumptions, judgements or estimates associated with the valuation components change, the fair value of the assets acquired could vary.

***Recent Accounting Pronouncements***

For details regarding any recently adopted and recently issued accounting standards, see Note 2 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

**ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to various market risks that may arise from adverse changes in market rates and prices, such as interest rates, foreign exchange fluctuations and inflation. We do not enter into derivatives or other financial instruments for trading or speculative purposes.

*Interest Rate Risk*

Our exposure to market risk for changes in interest rates relates to the increase or decrease in the amount of interest income we can earn on our cash and cash equivalents and on the increase or decrease in the amount of interest expense we must pay with respect to our various outstanding debt instruments. We do not believe our cash equivalents are subject to significant interest rate risk due to their short terms to maturity. As of January 1, 2022, the carrying value of our cash equivalents approximated fair value. We currently do not have any significant risks associated with interest rates fluctuations related to interest expense. Under our current policies, we do not use interest rate derivative instruments to manage exposure to interest rate changes. Therefore, declines in interest rates over time will reduce our interest income while increases in interest rates will increase our interest income. A hypothetical 100 basis point change in interest rates along the entire interest rate yield curve would increase or decrease our interest income yields on our investments and interest income of approximately $0.1 million for each $10.0 million in interest-bearing investments.

*Foreign Currency Exchange Rate Risk*

A majority of our assets and liabilities are maintained in the United States in U.S. Dollars and a majority of our sales and expenditures are transacted in U.S. Dollars. However, we also transact with foreign customers in currencies other than the U.S. Dollar. These foreign currency revenues, when converted into U.S. Dollars, can vary depending on average exchange rates during a respective period. In addition, certain of our foreign subsidiaries transact in their respective country's local currency, which is also their functional currency. As a result, expenses of these foreign subsidiaries when converted into U.S. Dollars can also vary depending on average monthly exchange rates during a respective period.

We are exposed to foreign currency gains or losses on outstanding foreign currency denominated receivables and payables, as well as our foreign currency denominated cash balances and certain intercompany transactions. In addition, other transactions between us or our subsidiaries and a third-party, denominated in a currency different from the functional currency, are foreign currency transactions. Realized and unrealized foreign currency gains or losses on these transactions are also included in our statements of operations as incurred.

The balance sheets of each of our foreign subsidiaries whose functional currency is not the U.S. Dollar are translated into U.S. Dollars at the rate of exchange at the balance sheet date and the statements of comprehensive income and cash flows are translated into U.S. Dollars using an approximation of the average monthly exchange rates applicable during the period. Any foreign exchange gain or loss as a result of translating the balance sheets of our foreign subsidiaries whose functional currency is not the U.S. Dollar is included in equity as a component of accumulated other comprehensive income.

Our primary foreign currency exchange rate exposures are with the Canadian Dollar, Euro, Japanese Yen, Swedish Krona, the British Pound, Mexico Peso, Turkish Lira and Australian Dollar. Foreign currency exchange rates may experience significant volatility from one period to the next. Specifically, during the year ended January 1, 2022, we estimate that fluctuations in the exchange rates between the U.S. Dollar and other foreign currencies, including the Canadian Dollar, the Euro, the British Pound, the Australian Dollar and the South Korean Won, favorably impacted our revenues by $8.2 million. We currently do not enter into forward exchange contracts to hedge exposures denominated in foreign currencies and do not use derivative financial instruments for trading or speculative purposes. The effect of additional changes in foreign currency exchange rates could have a material effect on our future operating results or cash flows, depending on which foreign currency exchange rates change and depending on the directional change (either a strengthening or weakening against the U.S. Dollar). We estimate that the potential impact of a hypothetical 10% adverse change in all applicable foreign currency exchange rates from the rates in effect as of January 1, 2022 would have resulted in an estimated reduction of $15.3 million in reported pre-tax income for the year ended January 1, 2022. As our foreign operations continue to grow, our exposure to foreign currency exchange rate risk may become more significant.

*Inflation Risk*

We continuously monitor the effects of inflationary factors, such as increases in our cost of goods sold and selling and operating expenses, which may adversely affect our results of operations. We do not believe that inflation has had a material effect on our business, financial condition or results of operations during the periods presented. If our costs were to become subject to significant inflationary pressures, we may strategically adjust product pricing to mitigate such inflation risks. However, we may not be able to fully offset the impact of persistent inflation. Our inability or failure to do so could have a material adverse effect on our business, financial condition and results of operations.

**ITEM 8.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

Our consolidated financial statements and supplementary data required by this item are set forth at the pages indicated in Part IV, Item 15(a)(1) and 15(a)(2), respectively, of this Annual Report on Form 10-K.

**ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A.   CONTROLS AND PROCEDURES**

*Evaluation of Disclosure Controls and Procedures*

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Exchange Act, as of the end of the period covered by this Annual Report on Form 10-K. We recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K.

*Management's Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) promulgated by the SEC under the Exchange Act. All internal control systems, no matter how well designed, have inherent limitations and may not prevent or detect all misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on criteria established in the 2013 *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of January 1, 2022.

Grant Thornton LLP, an independent registered public accounting firm, has audited the effectiveness of our internal control over financial reporting as of January 1, 2022. Their attestation report, which expresses an unqualified opinion on the effectiveness of our internal control over financial reporting as of January 1, 2022 is included in Part IV, Item 15(a)(1) of this Annual Report on Form 10-K.

*Changes in Internal Control Over Financial Reporting*

During the quarter ended January 1, 2022, there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B.   OTHER INFORMATION**

On February 14, 2022, our wholly owned subsidiary, Masimo Canada ULC, entered into a Purchase and Sale Agreement (Purchase Agreement) with Keltic (Prior) Development Limited Partnership (Vendor) for the purchase of land and a building to be constructed in Vancouver, British Columbia, Canada (Premises) for a purchase price of CAD $123.0 million (plus GST) (Purchase Price), subject to customary adjustments. We have deposited CAD $1.0 million in escrow as an initial deposit (Initial Deposit). Subject to satisfactory completion of our due diligence, we will pay an additional CAD $20.0 million to the Vendor as a further deposit (together with the Initial Deposit, Deposits) thirty (30) days following the execution of the Purchase Agreement. As security for the release of the Deposits to the Vendor, the Vendor will grant a mortgage on the Premises in the principal amount of CAD $21.0 million (Mortgage), with no payments due under the Mortgage unless there is an event of default by the Vendor. The Mortgage will be fully subordinate to the Vendor's site specific construction financing and any mezzanine financing related to the development of the Premises, up to a maximum of CAD $85.0 million. The balance of the Purchase Price will be due and payable upon the closing of the transaction (Closing), which is currently expected to occur during the second half of 2024. Further, following the Vendor's receipt of the first stage of a staged building permit for

construction of the building at the Premises, in the event of an uncured material default of the terms of the Purchase Agreement by the Vendor prior to the Closing, we will have the option to purchase the Premises at its then fair market value.

The Purchase Agreement contains customary representations, warranties and covenants of the parties. The Closing is subject to certain customary conditions, including, without limitation: (i) receipt of satisfactory environmental and geotechnical reports with respect to the land; (ii) the Vendor entering into a contract with a general contractor for the construction of the Premises on terms acceptable to us and the Vendor; (iii) receipt of certain regulatory clearances; and (iv) the Vendor's compliance with all of its obligations under the Purchase Agreement, including delivering the Premises to us in accordance with mutually agreed upon plans and specifications.

We may terminate the Purchase Agreement under certain circumstances, including in the event of material delays in construction or if the Closing does not occur by July 31, 2025, subject to certain exceptions.

The representations, warranties and covenants contained in the Purchase Agreement were made solely for the benefit of the parties to the Purchase Agreement, and may be subject to limitations agreed upon by the contracting parties. Accordingly, the Purchase Agreement is incorporated herein by reference only to provide investors with information regarding the terms of the Purchase Agreement and not to provide investors with any other factual information regarding us or our business, and should be read in conjunction with the disclosures in this Annual Report on Form 10-K and our other filings with the SEC.

The foregoing description of the Purchase Agreement is a summary of certain terms of the Purchase Agreement, does not purport to be complete, and is qualified in its entirety by reference to the full text of the Purchase Agreement, which is filed as Exhibit 10.37 to this Annual Report on Form 10-K and incorporated herein by reference.

**ITEM 9C.   DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

**PART III**

**ITEM 10.   DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by this item is incorporated by reference from the information contained in our Definitive Proxy Statement to be filed with the SEC in connection with the Annual Meeting of Stockholders to be held in 2022 (2022 Proxy Statement).

**ITEM 11.   EXECUTIVE COMPENSATION**

The information required by this item is incorporated by reference from the information contained in the 2022 Proxy Statement.

**ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by this item is incorporated by reference from the information contained in the 2022 Proxy Statement.

**ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE**

The information required by this item is incorporated by reference from the information contained in the 2022 Proxy Statement.

**ITEM 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES**

The information required by this item is incorporated by reference from the information contained in the 2022 Proxy Statement.

PART IV

**ITEM 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

*(a)(1) Financial Statements*

The Consolidated Financial Statements of Masimo Corporation and Reports of Grant Thornton LLP, Independent Registered Public Accounting Firm (PCAOB ID 248), are included in a separate section of this Annual Report on Form 10-K beginning on page F-1.

*(a)(2) Financial Statement Schedules*

The financial statement schedule is included in a separate section of this Annual Report on Form 10-K beginning on page F-1.

*(a)(3) Exhibits*

| Exhibit Number | Description of Document |
|---|---|
| 2.1^ | Agreement and Plan of Merger, dated February 15, 2022, by and among Masimo Corporation, Sonic Boom Acquisition Corp., Viper Holdings Corporation, and, solely in its capacity as the Seller Representative, Viper Holdings, LLC (Sound United Series). |
| 3.1(1) | Amended and Restated Certificate of Incorporation (Exhibit 3.2) |
| 3.2(2) | Second Amended and Restated Bylaws adopted on October 24, 2019 (Exhibit 3.1) |
| 4.1* | Amended Form of Common Stock Certificate |
| 4.2(4)# | Masimo Retirement Savings Plan (Exhibit 4.7) |
| 4.3(20)* | Description of Securities of Masimo Corporation (Exhibit 4.3) |
| 10.1(1)# | Form of Indemnity Agreement between the Registrant and its officers and directors (Exhibit 10.1) |
| 10.2(5)# | Amended and Restated Employment Agreement, dated November 4, 2015, between Joe Kiani and the Registrant (Exhibit 10.1) |
| 10.3(13)# | First Amendment to November 4, 2015 Amended and Restated Employment Agreement, dated July 27, 2017, by and between Masimo Corporation and Joe Kiani (Exhibit 10.1) |
| 10.4 (19) | Second Amendment to November 4, 2015 Amended and Restated Employment Agreement, dated January 14, 2022, by and between Masimo Corporation and Joe Kiani (Exhibit 10.1) |
| 10.5(18)# | Offer Letter, dated March 31, 2011 between Tom McClenahan and the Registrant (Exhibit 10.7) |
| 10.6(14)# | Offer Letter, dated September 22, 2017, between the Company and Micah Young (Exhibit 10.1) |
| 10.7(5)# | Restricted Share Unit Award Agreement, dated November 4, 2015, by and between Joe Kiani and the Registrant (Exhibit 10.2) |
| 10.8(5)# | Equity-Holder Non-Competition and Confidentiality Agreement, dated November 4, 2015, by and between Joe Kiani and the Registrant (Exhibit 10.3) |
| 10.9(7)# | Amended and Restated 2007 Severance Protection Plan and Summary Plan Description, effective December 31, 2008 (Exhibit 10.11) |
| 10.10(3)# | Amended and Restated 2007 Severance Protection Plan Agreement, dated November 3, 2014, by and between the Registrant and Tom McClenahan (Exhibit 10.21) |
| 10.11(16)# | Amended and Restated 2007 Severance Protection Plan, Limited Participation Agreement, dated December 12, 2017, by and between the Registrant and Micah Young (Exhibit 10.16) |
| 10.12(1)# | 2007 Stock Incentive Plan of the Registrant, and forms of agreements related thereto (Exhibit 10.33) |
| 10.13*# | Masimo Corporation 2017 Equity Incentive Plan (Exhibit 10) |
| 10.14(15)# | Masimo Corporation Executive Bonus Incentive Plan (Appendix D) |
| 10.15(6)+ | Manufacturing and Purchase Agreement, dated October 2, 2008, by and between Analog Devices, Inc. and the Registrant (Exhibit 10.21) |
| 10.16(1)+ | Purchase Agreement, dated July 26, 2001, between Jabil Circuit, Inc. and the Registrant (Exhibit 10.15) |

81

| Exhibit Number | Description of Document |
|---|---|
| 10.17(1)+ | Shelter Labor Services Agreement, dated December 27, 2000, between Industrial Vallera de Mexicali, S.A. de C.V. and the Registrant (Exhibit 10.11) |
| 10.18(21)† | Lease Agreement effective as of September 1, 2007, by and among Industrias Asociadas Maquiladoras, S.A. de C.V., Industrial Vallera de Mexicali, S.A. de C.V. and the Registrant, as guarantor (Exhibit 10.23) |
| 10.19(21)† | First Amendment, Lease Agreement effective as of December 17, 2013, by and among Industrias Asociadas Maquiladoras, S.A. de C.V., Industrial Vallera de Mexicali, S.A. de C.V. and the Registrant, as guarantor (Exhibit 10.24) |
| 10.20(1) | Settlement Agreement and Release of Claims, dated January 17, 2006, between Cercacor Laboratories, Inc., Nellcor Puritan Bennett, Inc., Mallinckrodt, Inc., Tyco Healthcare Group LP, Tyco International Ltd., Tyco International (US) Inc. and the Registrant (Exhibit 10.30) |
| 10.21(8) | Second Amendment to the January 17, 2006 Settlement Agreement and Release of Claims, as amended pursuant to the January 24, 2006 Amendment to Settlement Agreement and Release of Claims, dated January 28, 2011, by and among Masimo Corporation, Masimo Laboratories, Inc., Nellcor Puritan Bennett LLC, Mallinckrodt Inc., Tyco Healthcare Group LP and Covidien Inc. (Exhibit 10.1) |
| 10.22(1) | Amended and Restated Cross-Licensing Agreement, effective January 1, 2007, between Cercacor Laboratories, Inc. and the Registrant (Exhibit 10.34) |
| 10.23(1) | Services Agreement, effective January 1, 2007, between Cercacor Laboratories, Inc. and the Registrant (Exhibit 10.35) |
| 10.24(21)†* | Settlement and Covenant Not to Sue Agreement, entered into as of the Effective Date of November 16, 2015, between Masimo Corporation, Masimo Technologies SARL, and Masimo International SARL and Mindray Medical International, Limited, Shenzhen Mindray Biomedical Electronics Co., Ltd and Mindray DS USA, Inc. (Exhibit 10.29) |
| 10.25(9) | Lease Agreement, dated July 15, 2012, related to the premises at 9600 Jeronimo, between the Registrant and The Irvine Company, LLC (Exhibit 10.45) |
| 10.26(9) | First Amendment to June 22, 2012 Lease Agreement, relating to the premises at 9600 Jeronimo, between the Registrant and Irvine Company, LLC (Exhibit 10.46) |
| 10.27(3) | Second Amendment to June 22, 2012 Lease Agreement, relating to the premises at 9600 Jeronimo, between the Registrant and Irvine Company, LLC (Exhibit 10.34) |
| 10.28(9) | Third Amendment to June 22, 2012 Lease Agreement, relating to the premises at 9600 Jeronimo, between the Registrant and Irvine Company, LLC (Exhibit 10.48) |
| 10.29(10) | Single-Tenant Lease, relating to the premises at 9600 Jeronimo, dated as of July 13, 2016, by and between Masimo Corporation and The Irvine Company LLC (Exhibit 10.1) |
| 10.30(11) | Third Amendment to Settlement Agreement and Release of Claims, dated as of September 1, 2016, by and among Masimo Corporation and Cercacor Laboratories, Inc., and Medtronic Plc., Covidien LP, Nellcor Puritan Bennett LLC and Covidien Holdings Inc. (Exhibit 10.1) |
| 10.31(12)+ | Settlement Agreement, dated November 5, 2016, by and between Masimo Corporation, Masimo International Technologies SARL and Masimo International SARL and Koninklijke Philips N.V. (Exhibit 10.1) |
| 10.32(18) | Credit Agreement dated as of December 17, 2018, among Masimo Corporation, the Lenders party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent (Exhibit 10.42) |
| 10.33(17)# | Offer Letter, dated April 17, 2002, between the Company and Bilal Muhsin (Exhibit 10.1) |
| 10.34(17)# | Offer Letter, dated December 15, 2017, between the Company and Tao Levy (Exhibit 10.2) |
| 10.35(17)# | 2007 Severance Protection Plan Participation Agreement, dated March 26, 2018, by and between the Company and Bilal Muhsin (Exhibit 10.3) |
| 10.36(17)# | 2007 Severance Protection Plan Participation Agreement, dated March 16, 2018, by and between the Company and Tao Levy (Exhibit 10.4) |
| 10.37†* | Purchase and Sale Agreement, dated February 14, 2022, by and between Masimo Canada, ULC and Keltic (Prior) Development Limited Partnership |
| 21.1* | List of Registrant's Subsidiaries |

| Exhibit Number | | Description of Document |
|---|---|---|
| 23.1* | Consent of Independent Registered Public Accounting Firm | |
| 31.1* | Certification of Joe Kiani, Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | |
| 31.2* | Certification of Micah Young, Chief Financial Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | |
| 32.1* | Certification of Joe Kiani, Chief Executive Officer, and Micah Young, Chief Financial Officer, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | |
| 101.INS* | Inline XBRL Instance Document | |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document | |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document | |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document | |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document | |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document | |

---

Attached as Exhibit 101 to this report are the following formatted in iXBRL (Inline eXtensible Business Reporting Language): (i) Consolidated Balance Sheets as of January 1, 2022 and January 2, 2021, (ii) Consolidated Statements of Operations for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, (iii) Consolidated Statements of Comprehensive Income for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, (iv) Consolidated Statements of Stockholders' Equity for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, (v) Consolidated Statements of Cash Flows for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, and (vi) Notes to Consolidated Financial Statements.

---

(1)    Incorporated by reference to the exhibits to the Registrant's Registration Statement on Form S-1 (No. 333-142171), originally filed on April 17, 2007. The number given in parentheses indicates the corresponding exhibit number in such Form S-1, as amended.

(2)    Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on October 30, 2019. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(3)    Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K, filed on February 17, 2015. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

(4)    Incorporated by reference to the exhibit to the Registrant's Registration Statement on Form S-8, filed on February 11, 2008. The number given in parentheses indicates the corresponding exhibit number in such Form S-8.

(5)    Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on November 5, 2015 at 4:45 p.m. Eastern Time. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(6)    Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K, filed on March 4, 2009. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

(7)    Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K, filed on February 15, 2013. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

(8)    Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on January 31, 2011. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(9)    Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K, filed on February 24, 2016. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(10)    Incorporated by reference to the exhibit to the Registrant's Quarterly Report on Form 10-Q, filed on August 3, 2016. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(11)    Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on September 2, 2016. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(12)    Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on November 7, 2016. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(13)    Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on August 2, 2017. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(14)    Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K filed on September 25, 2017. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(15)    Incorporated by reference to Appendix D to the Registrant's Definitive Proxy Statement on Schedule 14A (File No. 001-33642) filed on April 16, 2020.

(16)    Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K filed on February 28, 2018. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

(17)    Incorporated by reference to the exhibit to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2018. The number given in parentheses indicates the corresponding exhibit number in such Form 10-Q.

(18)    Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K filed on February 26, 2019. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

(19) Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K filed on January 14, 2022. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(20) Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K filed on February 19, 2020. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

(21) Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K filed on February 23, 2021. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

\*     Filed herewith.

#     Indicates management contract or compensatory plan.

+     The SEC has granted confidential treatment with respect to Item 601(b)(10) of Regulation S-K because such information is both (i) not material and (ii) of the type that the Registrant customarily and actually treats as private or confidential The Registrant hereby undertakes to furnish supplemental copies of the unredacted exhibit upon request by the SEC.

‡     Non-material schedules and exhibits have been omitted pursuant to Item 601(a)(5) of Regulation S-K. The Registrant hereby undertakes to furnish supplementally copies of any of the omitted schedules and exhibits upon request by the SEC.

^     Schedules have been omitted from this filing pursuant to Item 601(b)(2) of Regulation S-K. The Registrant agrees to            furnish supplementally a copy of any omitted schedule to the SEC upon its request; provided, however, that the Registrant may request confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended for any schedule so furnished.

     ***(b) Exhibits***

See Item 15(a)(3) above.

     ***(c) Financial Statement Schedules***

See Item 15(a)(2) above.

**ITEM 16.    FORM 10-K SUMMARY**

None.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:   February 15, 2022                                          By:    _____
                                                                                    /s/ JOE KIANI
                                                                               Joe Kiani
                                                                               Chairman of the Board & Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| SIGNATURE | TITLE(S) | DATE |
|---|---|---|
| _____<br>/s/ JOE KIANI<br>Joe Kiani | Chairman of the Board & Chief Executive Officer<br>(*Principal Executive Officer*) | February 15, 2022 |
| _____<br>/s/ MICAH YOUNG<br>Micah Young | Executive Vice President, Chief Financial Officer<br>(*Principal Financial Officer and Principal Accounting Officer*) | February 15, 2022 |
| _____<br>/s/ H MICHAEL COHEN<br>H Michael Cohen | Director | February 15, 2022 |
| _____<br>/s/ ADAM MIKKELSON<br>Adam Mikkelson | Director | February 15, 2022 |
| _____<br>/s/ CRAIG REYNOLDS<br>Craig Reynolds | Director | February 15, 2022 |
| _____<br>/s/ JULIE A. SHIMER, PH.D.<br>Julie A. Shimer, Ph.D. | Director | February 15, 2022 |

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS AND SCHEDULE**

**MASIMO CORPORATION**

**Consolidated Financial Statements**

Reports of Independent Registered Public Accounting Firm ..... F-2

Consolidated Balance Sheets as of January 1, 2022 and January 2, 2021 ..... F-5

Consolidated Statements of Operations for the years ended January 1, 2022, January 2, 2021 and December 28, 2019 ..... F-6

Consolidated Statements of Comprehensive Income for the years ended January 1, 2022, January 2, 2021 and December 28, 2019 ..... F-7

Consolidated Statements of Stockholders' Equity for the years ended January 1, 2022, January 2, 2021 and December 28, 2019 ..... F-8

Consolidated Statements of Cash Flows for the years ended January 1, 2022, January 2, 2021 and December 28, 2019 ..... F-9

Notes to Consolidated Financial Statements ..... F-10

**Schedule**

Schedule II - Valuation and Qualifying Accounts ..... F-44

F-1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Stockholders
Masimo Corporation

**Opinion on the financial statements**

We have audited the accompanying consolidated balance sheets of Masimo Corporation (a Delaware corporation) and subsidiaries (the "Company") as of January 1, 2022 and January 2, 2021, the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended January 1, 2022, and the related notes and financial statement schedule included under Item 15(a) (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of January 1, 2022 and January 2, 2021, and the results of its operations and its cash flows for each of the three years in the period ended January 1, 2022, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of January 1, 2022, based on criteria established in the 2013 *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated February 15, 2022 expressed an unqualified opinion.

**Basis for opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical audit matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Accounting for Deferred Equipment Agreements*

As described in Note 2 to the financial statements, the Company derives a portion of its product revenue from direct sales under deferred equipment agreements with end-user hospitals. Contract consideration under such agreements containing fixed annual sensor purchase commitments is allocated to the identified performance obligations, including lease components, on the basis of relative standalone selling prices.

We identified the accounting for deferred equipment agreements as a critical audit matter. The principal consideration for our determination that the accounting for deferred equipment agreements is a critical audit matter is that the identification and evaluation of performance obligations requires management judgment and interpretation of contract terms. Therefore, subjective and complex auditor judgment is necessary to evaluate the reasonableness of management's judgments and assumptions in this area.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. Our audit procedures related to deferred equipment agreements included the following, among others.

- Inspecting a sample of deferred equipment agreements with fixed sensor commitments and evaluating the reasonableness of performance obligations, including lease components, identified by management in accordance with the relevant authoritative guidance.

- Testing the design and operating effectiveness of internal controls related to the accounting for deferred equipment agreements, including controls over the identification of performance obligations.

/s/ GRANT THORNTON LLP
We have served as the Company's auditor since 2006.

Newport Beach, California
February 15, 2022

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Stockholders
Masimo Corporation

**Opinion on internal control over financial reporting**
We have audited the internal control over financial reporting of Masimo Corporation (a Delaware corporation) and subsidiaries (the "Company") as of January 1, 2022, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of January 1, 2022, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by COSO.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended January 1, 2022, and our report dated February 15, 2022 expressed an unqualified opinion on those financial statements.

**Basis for opinion**
The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and limitations of internal control over financial reporting**
A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ GRANT THORNTON LLP

Newport Beach, California
February 15, 2022

Table of Contents

**MASIMO CORPORATION**
**CONSOLIDATED BALANCE SHEETS**
(in thousands, except par value)

| | January 1, 2022 | January 2, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 745,250 | $ 641,447 |
| Trade accounts receivable, net of allowance for credit losses of $2,182 and $1,603 at January 1, 2022 and January 2, 2021, respectively | 200,765 | 141,350 |
| Inventories | 201,370 | 215,952 |
| Other current assets | 91,027 | 102,416 |
| Total current assets | 1,238,412 | 1,101,165 |
| Lease receivable, non-current | 73,688 | 57,666 |
| Deferred costs and other contract assets | 28,093 | 20,076 |
| Property and equipment, net | 272,793 | 272,511 |
| Intangible assets, net | 72,502 | 73,923 |
| Goodwill | 100,334 | 103,206 |
| Deferred tax assets | 52,607 | 39,363 |
| Other non-current assets | 48,581 | 44,642 |
| Total assets | $ 1,887,010 | $ 1,712,552 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities | | |
| Accounts payable | $ 75,627 | $ 64,061 |
| Accrued compensation | 70,835 | 71,601 |
| Deferred revenue and other contract-related liabilities, current | 50,877 | 44,935 |
| Other current liabilities | 70,397 | 53,239 |
| Total current liabilities | 267,736 | 233,836 |
| Other non-current liabilities | 69,029 | 71,076 |
| Total liabilities | 336,765 | 304,912 |
| Commitments and contingencies (Note 21) | | |
| Stockholders' equity | | |
| Preferred stock, $0.001 par value; 5,000 shares authorized; 0 shares issued and outstanding | — | — |
| Common stock, $0.001 par value; 100,000 shares authorized; 55,335 and 55,251 shares issued and outstanding at January 1, 2022 and January 2, 2021, respectively | 55 | 55 |
| Treasury stock, 16,539 and 15,993 shares at January 1, 2022 and January 2, 2021, respectively | (767,655) | (638,736) |
| Additional paid-in capital | 752,513 | 703,693 |
| Accumulated other comprehensive (loss) income | (5,530) | 1,413 |
| Retained earnings | 1,570,862 | 1,341,215 |
| Total stockholders' equity | 1,550,245 | 1,407,640 |
| Total liabilities and stockholders' equity | $ 1,887,010 | $ 1,712,552 |

The accompanying notes are an integral part of these consolidated financial statements.

**MASIMO CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except per share information)**

| | Year Ended January 1, 2022 | Year Ended January 2, 2021 | Year Ended December 28, 2019 |
|---|---|---|---|
| Revenue: | | | |
| Product | $ 1,239,153 | $ 1,143,744 | $ 936,408 |
| Royalty and other revenue | — | — | 1,429 |
| Total revenue | 1,239,153 | 1,143,744 | 937,837 |
| Cost of goods sold | 430,806 | 400,679 | 308,665 |
| Gross profit | 808,347 | 743,065 | 629,172 |
| Operating expenses: | | | |
| Selling, general and administrative | 395,291 | 369,057 | 314,661 |
| Research and development | 137,234 | 118,659 | 93,295 |
| Litigation awards, settlements/or defense costs | — | (474) | — |
| Total operating expenses | 532,525 | 487,242 | 407,956 |
| Operating income | 275,822 | 255,823 | 221,216 |
| Non-operating (loss) income | (1,442) | 7,913 | 12,950 |
| Income before provision for income taxes | 274,380 | 263,736 | 234,166 |
| Provision for income taxes | 44,733 | 23,454 | 37,950 |
| Net income | $ 229,647 | $ 240,282 | $ 196,216 |
| | | | |
| Net income per share: | | | |
| Basic | $ 4.16 | $ 4.39 | $ 3.67 |
| Diluted | $ 3.98 | $ 4.14 | $ 3.44 |
| | | | |
| Weighted-average shares used in per share calculations: | | | |
| Basic | 55,166 | 54,700 | 53,434 |
| Diluted | 57,682 | 58,037 | 57,100 |

The accompanying notes are an integral part of these consolidated financial statements.

**MASIMO CORPORATION**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(in thousands)**

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | |
|---|---|---|---|---|---|---|
| Net income | $ | 229,647 | $ | 240,282 | $ | 196,216 |
| Other comprehensive (loss) gain, net of tax: | | | | | | |
| Foreign currency translation (losses) gains | | (6,943) | | 8,131 | | (519) |
| Total comprehensive income | $ | 222,704 | $ | 248,413 | $ | 195,697 |

The accompanying notes are an integral part of these consolidated financial statements.

**MASIMO CORPORATION**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

(in thousands)

| | Common Stock | | Treasury Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive (Loss) Income | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance at December 29, 2018** | 53,085 | $ 53 | 15,255 | $ (489,026) | $ 533,164 | $ (6,199) | $ 931,073 | $ 969,065 |
| Stock options exercised | 851 | 1 | — | — | 28,348 | — | — | 28,349 |
| Restricted/Performance stock units vested | 36 | — | — | — | — | — | — | — |
| Shares paid for tax withholding | (1) | — | — | — | (123) | — | — | (123) |
| Stock-based compensation | — | — | — | — | 39,235 | — | — | 39,235 |
| Net income | — | — | — | — | — | — | 196,216 | 196,216 |
| Repurchases of common stock | (275) | — | 275 | (37,554) | — | — | — | (37,554) |
| Adoption of ASU 2016-02 | — | — | — | — | — | — | (26,795) | (26,795) |
| Foreign currency translation adjustment | — | — | — | — | — | (519) | — | (519) |
| **Balance at December 28, 2019** | 53,696 | 54 | 15,530 | (526,580) | 600,624 | (6,718) | 1,100,494 | 1,167,874 |
| Stock options exercised | 1,945 | 1 | — | — | 63,035 | — | — | 63,036 |
| Restricted/Performance stock units vested | 85 | — | — | — | — | — | — | — |
| Shares paid for tax withholding | (19) | — | 7 | (1,616) | (2,191) | — | — | (3,807) |
| Stock-based compensation | — | — | — | — | 42,225 | — | — | 42,225 |
| Repurchases of common stock | (456) | — | 456 | (110,540) | — | — | — | (110,540) |
| Net income | — | — | — | — | — | — | 240,282 | 240,282 |
| Adoption of ASU 2016-13 | — | — | — | — | — | — | 439 | 439 |
| Foreign currency translation adjustment | — | — | — | — | — | 8,131 | — | 8,131 |
| **Balance at January 2, 2021** | 55,251 | 55 | 15,993 | (638,736) | 703,693 | 1,413 | 1,341,215 | 1,407,640 |
| Stock options exercised | 391 | — | — | — | 20,924 | — | — | 20,924 |
| Restricted/Performance stock units vested | 307 | — | — | — | — | — | — | — |
| Shares paid for tax withholding | (68) | — | — | — | (16,728) | — | — | (16,728) |
| Stock-based compensation | — | — | — | — | 44,624 | — | — | 44,624 |
| Repurchases of common stock | (546) | — | 546 | (128,919) | — | — | — | (128,919) |
| Net income | — | — | — | — | — | — | 229,647 | 229,647 |
| Foreign currency translation adjustment | — | — | — | — | — | (6,943) | — | (6,943) |
| **Balance at January 1, 2022** | 55,335 | $ 55 | 16,539 | $ (767,655) | $ 752,513 | $ (5,530) | $ 1,570,862 | $ 1,550,245 |

The accompanying notes are an integral part of these consolidated financial statements.

**MASIMO CORPORATION**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(in thousands)**

| | Year Ended January 1, 2022 | Year Ended January 2, 2021 | Year Ended December 28, 2019 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income | $ 229,647 | $ 240,282 | $ 196,216 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 35,620 | 29,300 | 23,487 |
| Stock-based compensation | 44,624 | 42,225 | 39,235 |
| Loss on disposal of equipment, intangibles and other assets | 479 | 554 | 357 |
| Provision for credit losses | 815 | 82 | 687 |
| Benefit from deferred income taxes | (15,086) | (4,964) | (5,965) |
| Changes in operating assets and liabilities: | | | |
| Increase in trade accounts receivable | (60,799) | (2,229) | (23,580) |
| Decrease (increase) in inventories | 13,493 | (94,434) | (21,257) |
| Decrease (increase) in other current assets | 6,884 | (29,984) | (8,536) |
| Increase in lease receivable, net | (16,061) | (7,749) | (11,958) |
| (Increase) decrease in deferred costs and other contract assets | (8,053) | (2,806) | 3,308 |
| Decrease (increase) in other non-current assets | 57 | (1,320) | (226) |
| Increase in accounts payable | 10,988 | 7,637 | 9,934 |
| Increase in accrued compensation | 47 | 15,544 | 5,338 |
| Increase in deferred revenue and other contract-related liabilities | 7,110 | 10,871 | 7,739 |
| Increase (decrease) in income taxes payable | 6,409 | (1,301) | 4,079 |
| Increase in accrued liabilities | 7,793 | 9,391 | 746 |
| Increase (decrease) in other non-current liabilities | 787 | (136) | 2,038 |
| **Net cash provided by operating activities** | 264,754 | 210,963 | 221,642 |
| **Cash flows from investing activities:** | | | |
| Maturities of short-term investments | — | 120,000 | 160,000 |
| Purchases of short-term investments | — | — | (280,000) |
| Purchases of property and equipment, net | (25,503) | (72,549) | (68,375) |
| Increase in intangible assets | (9,426) | (7,408) | (4,117) |
| Business combinations, net of cash acquired | — | (112,706) | — |
| Deposit to acquire noncontrolling interest | — | (3,374) | — |
| Other strategic investing activities | (2,600) | (6,750) | (5,189) |
| **Net cash used in investing activities** | (37,529) | (82,787) | (197,681) |
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of common stock | 23,241 | 58,424 | 28,339 |
| Repurchases of common stock | (128,917) | (110,540) | (37,555) |
| Payroll tax withholdings on behalf of employees for stock options | (16,728) | (2,391) | (123) |
| **Net cash used in financing activities** | (122,404) | (54,307) | (9,339) |
| Effect of foreign currency exchange rates on cash | (1,448) | 3,060 | 812 |
| Net increase in cash, cash equivalents and restricted cash | 103,373 | 76,929 | 15,434 |
| Cash, cash equivalents and restricted cash at beginning of period | 645,004 | 568,075 | 552,641 |
| Cash, cash equivalents and restricted cash at end of period | $ 748,377 | $ 645,004 | $ 568,075 |

The accompanying notes are an integral part of these consolidated financial statements.

F-9

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Description of the Company**

Masimo Corporation (the Company) is a global medical technology company that develops, manufactures and markets a wide array of patient monitoring technologies, as well as automation and connectivity solutions. The Company's mission is to improve patient outcomes and reduce the cost of patient care. The Company's patient monitoring solutions generally incorporate a monitor or circuit board, proprietary single-patient use or reusable sensors, software and/or cables. The Company primarily sells its products to hospitals, emergency medical service providers, home care providers, physician offices, veterinarians, long-term care facilities and consumers through its direct sales force, distributors and original equipment manufacturer (OEM) partners.

The Company invented Masimo Signal Extraction Technology® (SET®), which provides the capabilities of Measure-through Motion and Low Perfusion™ pulse oximetry to address the primary limitations of conventional pulse oximetry. Over the years, the Company's product offerings have expanded significantly to also include rainbow® Pulse CO-Oximetry, with its ability to monitor carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), total hemoglobin concentration (SpHb®), fractional arterial oxygen saturation (SpfO₂™), Oxygen Content (SpOC™), Pleth Variability Index (PVi®), rainbow® Pleth Variability Index (RPVi™), respiration rate from the pleth (RRp®) and Oxygen Reserve Index (ORi™); as well as acoustic respiration monitoring (RRa®), SedLine® brain function monitoring, NomoLine® capnography and gas monitoring and O3® Regional Oximetry. These technologies are based upon Masimo SET®, rainbow® and other proprietary algorithms and are incorporated into a variety of product platforms depending on customers' specifications. The Company's current technology offerings also include remote patient monitoring, connectivity, and hospital automation™ solutions, including Masimo Patient SafetyNet™[1], Masimo Patient SafetyNet™ Surveillance[1], Masimo SafetyNet™, Masimo SafetyNet-Open™, Replica™, Iris®, MyView™, UniView™, Uniview : 60™, Trace™, Masimo Sleep™, Centroid™, and Bridge™. The Company's technologies are supported by a substantial intellectual property portfolio that the Company has built through internal development and, to a lesser extent, acquisitions and license agreements.

*Basis of Presentation*

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America (GAAP), and include the accounts of the Company and its wholly-owned or controlled subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

*Fiscal Periods*

The Company follows a conventional 52/53 week fiscal year. Under a conventional 52/53 week fiscal year, a 52 week fiscal year includes four quarters of 13 weeks while a 53 week fiscal year includes three 13 week fiscal quarters and one 14 week fiscal quarter. The Company's last 53 week fiscal year was fiscal year 2020. Fiscal year 2021 was a 52 week fiscal year ended January 1, 2022, with the fourth quarter having 13 weeks. All references to years in these notes to consolidated financial statements are references to fiscal years unless otherwise noted.

*Use of Estimates*

The Company prepares its financial statements in conformity with GAAP, which requires the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Significant estimates include the determination of standalone selling prices, variable consideration, total consideration allocated to each performance obligation within a contract, inventory valuation, valuation of the Company's equity awards, valuation of identifiable assets and liabilities connected with business combinations, deferred taxes and any associated valuation allowances, deferred revenue, uncertain income tax positions, and litigation costs and related accruals. Actual results could differ from such estimates.

**2. Summary of Significant Accounting Policies**

---

[1]    The use of the trademark Patient SafetyNet™ is under license from the University HealthSystem Consortium.

Table of Contents

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Business Combinations*

The Company accounts for business combinations using the acquisition method of accounting, which requires that once control is obtained, all the assets acquired, liabilities assumed and noncontrolling interests in the acquired entity, if applicable, are recorded at their respective fair values at the date of acquisition. The excess of the purchase price over fair values of identifiable assets, liabilities and noncontrolling interests in the acquired entity, if applicable, is recorded as goodwill.

*Fair Value Measurements*

Authoritative guidance describes a fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value:

- Level 1 - Quoted prices in active markets for *identical* assets or liabilities.

- Level 2 - Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for *similar* assets or liabilities, quoted prices in markets that are not active or other inputs that can be corroborated by observable market data for substantially the full term of the assets or liabilities.

- Level 3 - Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

Pursuant to current authoritative guidance, entities are allowed an irrevocable option to elect the fair value for the initial and subsequent measurement for specified financial assets and liabilities on a contract-by-contract basis. The Company did not elect to apply the fair value option under this guidance to specific assets or liabilities on a contract-by contract basis. The Company did not carry financial assets measured under the fair value hierarchy based on any of the three levels of inputs (Level 1, 2 and 3) other than cash and cash equivalents for the years ended January 1, 2022 and January 2, 2021. The Company carries cash and cash equivalents at cost, which approximates fair value, and are Level 1 under the fair value hierarchy.

For certain other financial assets and liabilities, including restricted cash, accounts receivable, accounts payable and other current assets and liabilities, the carrying amounts approximate their fair value primarily due to the relatively short maturity of these balances. The Company also measures certain non-financial assets at fair value on a non-recurring basis, primarily goodwill, intangible assets and operating lease right-of-use assets, in connection with periodic evaluations for potential impairment.

*Cash and Cash Equivalents*

The Company considers all highly liquid investments with an original maturity from date of purchase of three months or less, or highly liquid investments that are readily convertible into known amounts of cash, to be cash equivalents.

*Accounts Receivable and Allowance for Credit Losses*

Accounts receivable consist of trade receivables recorded at the time of invoicing of product sales, reduced by reserves for estimated bad debts and returns. Trade accounts receivable are recorded at the invoiced amount and do not bear interest. Credit is extended based on an evaluation of the customer's financial condition. Collateral is generally not required. The Company records an allowance for credit losses that it does not expect to collect based on relevant information, including historical experience, current conditions, and reasonable and supportable forecasts. Accounts are charged off against the allowance when the Company believes they are uncollectible. The allowance for credit losses is measured on a collective (pool) basis when similar risk characteristics exist. The Company has identified receivables for U.S. customers and receivables from international customers as a portfolio segment, and measures expected credit losses on such receivables using an aging methodology.

*Inventory*

Inventories are stated at the lower of cost or net realizable value. Cost is determined using a standard cost method, which approximates the first in, first out method, and includes material, labor and overhead costs. Inventory valuation adjustments are recorded for inventory items that have become excess or obsolete or are no longer used in current production and for inventory items that have a market price less than carrying value in inventory. The Company generally determines inventory valuation adjustments based on an evaluation of the expected future use of its inventory on an item by item basis and applies historical obsolescence rates to estimate the loss on inventory expected to have a recovery value below cost. The Company also records other specific inventory valuation adjustments when it becomes aware of unique events or circumstances that result in an expected recovery value below cost. For inventory items that have been written down, the reduced value becomes the new cost basis.

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Property and Equipment*

Property and equipment are stated at cost. Depreciation is calculated using the straight-line method over estimated useful lives as follows:

|  | Useful Lives |
|---|---|
| Buildings and building improvements | 7 to 39 years |
| Computer equipment and software | 2 to 12 years |
| Demonstration units | 3 years |
| Furniture and office equipment | 2 to 6 years |
| Leasehold improvements | Lesser of useful life or term of lease |
| Machinery, equipment and tooling | 3 to 10 years |
| Transportation, vehicles and other | 4 to 20 years |

Land is not depreciated and construction-in-progress is not depreciated until placed in service. Normal repair and maintenance costs are expensed as incurred, whereas significant improvements that materially increase values or extend useful lives are capitalized and depreciated over the remaining estimated useful lives of the related assets. Upon sale or retirement of depreciable assets, the related cost and accumulated depreciation or amortization are removed from the accounts and any gain or loss on the sale or retirement is recognized in income.

*Lessee Right-of-Use (ROU) Assets and Lease Liabilities*

The Company determines if an arrangement contains a lease at inception. ROU assets represent the Company's right to use an asset underlying an operating lease for the lease term and lease liabilities represent the Company's obligation to make lease payments arising from an operating lease. ROU assets and lease liabilities are recognized at the commencement date based on the present value of lease payments over the lease term. The Company generally estimates the applicable discount rate used to determine the net present value of lease payments based on available information at the lease commencement date. Many of the Company's lessee agreements include options to extend the lease, which the Company does not include in its lease terms unless they are reasonably certain to be exercised. The Company utilizes a portfolio approach to account for the ROU assets and liabilities associated with certain equipment leases.

The Company has also made an accounting policy election not to separate lease and non-lease components for its real estate leases and to exclude short-term leases with a term of twelve months or less from its ROU assets and lease liabilities. Rental expense for lease payments related to operating leases is recognized on a straight-line basis over the lease term.

*Intangible Assets*

Intangible assets consist primarily of patents, trademarks, software development costs, customer relationships and acquired technology. Costs related to patents and trademarks, which include legal and application fees, are capitalized and amortized over the estimated useful lives using the straight-line method. Patent and trademark amortization commences once final approval of the patent or trademark has been obtained. Patent costs are amortized over the lesser of 10 years or the patent's remaining legal life, which assumes renewals, and trademark costs are amortized over 17 years, and their associated amortization cost is included in selling, general and administrative expense in the accompanying consolidated statements of operations. For intangibles purchased in an asset acquisition or business combination, which mainly include patents, trademarks, customer relationships and acquired technologies, the useful life is determined largely by valuation estimates of remaining economic life.

The Company's policy is to renew its patents and trademarks. Costs to renew patents and trademarks are capitalized and amortized over the remaining useful life of the intangible asset. The Company periodically evaluates the amortization period and carrying basis of patents and trademarks to determine whether any events or circumstances warrant a revised estimated useful life or reduction in value. Capitalized application costs are charged to operations when it is determined that the patent or trademark will not be obtained or is abandoned.

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Impairment of Goodwill, Intangible Assets and Other Long-Lived Assets*

Goodwill is recorded as the difference, if any, between the aggregate consideration paid for an acquisition and the fair value of the acquired net tangible and intangible assets. Goodwill is not amortized, but instead is tested annually for impairment, or more frequently when events or changes in circumstances indicate that goodwill might be impaired. In assessing goodwill impairment, the Company has the option to first assess the qualitative factors to determine whether the existence of events or circumstances leads to a determination that it is more likely than not that the fair value of a reporting unit is less than its carrying amount. The Company's qualitative assessment of the recoverability of goodwill considers various macroeconomic, industry-specific and Company-specific factors, including: (i) severe adverse industry or economic trends; (ii) significant Company-specific actions; (iii) current, historical or projected deterioration of the Company's financial performance; or (iv) a sustained decrease in the Company's market capitalization below its net book value. If, after assessing the totality of events or circumstances, the Company determines it is unlikely that the fair value of a reporting unit is less than its carrying amount, then a quantitative analysis is unnecessary. However, if the Company concludes otherwise, or if the Company elects to bypass the qualitative analysis, then the Company must perform a quantitative analysis that compares the fair value of the reporting unit with its carrying amount, including goodwill. If the fair value of the reporting unit exceeds its carrying amount, goodwill is not considered impaired; otherwise, a goodwill impairment loss is recognized for the lesser of: (a) the amount that the carrying amount of a reporting unit exceeds its fair value; or (b) the amount of the goodwill allocated to that reporting unit. The annual impairment test is performed during the fourth fiscal quarter.

The Company reviews long-lived assets and identifiable intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flows expected to be generated by the asset. If such asset is considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

*Income Taxes*

The Company accounts for income taxes using the asset and liability method, under which the Company recognizes deferred tax assets and liabilities for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and for net operating loss and tax credit carryforwards. Tax positions that meet a more-likely-than-not recognition threshold are recognized in the first reporting period that it becomes more-likely-than-not such tax position will be sustained upon examination. A tax position that meets this more-likely-than-not recognition threshold is recorded at the largest amount of tax benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. Previously recognized income tax positions that fail to meet the recognition threshold in a subsequent period are derecognized in that period. Differences between actual results and the Company's assumptions, or changes in the Company's assumptions in future periods, are recorded in the period they become known. The Company records potential accrued interest and penalties related to unrecognized tax benefits in income tax expense.

As a multinational corporation, the Company is subject to complex tax laws and regulations in various jurisdictions. The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws themselves are subject to change as a result of changes in fiscal policy, changes in legislation, evolution of regulations and court rulings. Therefore, the actual liability for U.S. or foreign taxes may be materially different from the Company's estimates, which could result in the need to record additional liabilities or potentially to reverse previously recorded tax liabilities.

Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. A valuation allowance is recorded against any deferred tax assets when, in the judgment of management, it is more likely than not that all or part of a deferred tax asset will not be realized. In assessing the need for a valuation allowance, the Company considers all positive and negative evidence, including recent financial performance, scheduled reversals of temporary differences, projected future taxable income, availability of taxable income in carryback periods and tax planning strategies.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Revenue Recognition, Deferred Revenue and Other Contract Liabilities*

The Company derives the majority of its product revenue from four primary sources: (i) direct sales under deferred equipment agreements with end-user hospitals where the Company provides up-front monitoring equipment at no up-front charge in exchange for a multi-year sensor purchase commitment; (ii) other direct sales of noninvasive monitoring solutions to end-user hospitals, emergency medical response organizations and other direct customers; (iii) sales of noninvasive monitoring solutions to distributors who then typically resell to end-user hospitals, emergency medical response organizations and other customers; and (iv) sales of integrated circuit boards to OEM customers who incorporate the Company's embedded software technology into their multiparameter monitoring devices. Subject to customer credit considerations, the majority of such sales are made on open account using industry standard payment terms based on the geography within which the specific customer is located.

The Company generally recognizes revenue following a single, principles-based five-step model to be applied to all contracts with customers and generally provides for the recognition of revenue in an amount that reflects the consideration to which the Company expects to be entitled, net of allowances for estimated returns, discounts or sales incentives, as well as taxes collected from customers that are remitted to government authorities, when control over the promised goods or services are transferred to the customer. Revenue related to equipment supplied under sales-type lease arrangements is recognized once control over the equipment is transferred to the customer, while revenue related to equipment supplied under operating-type lease arrangements is generally recognized on a straight-line basis over the term of the lease.

While the majority of the Company's revenue contracts and transactions contain standard business terms and conditions, there are some transactions that contain non-standard business terms and conditions. As a result, contract interpretation, judgment and analysis is required to determine the appropriate accounting, including: (i) the amount of the total consideration, as well as variable consideration, (ii) whether the arrangement contains an embedded lease, and if so, whether such embedded lease is a sales-type lease or an operating lease, (iii) the identification of the distinct performance obligations contained within the arrangement, (iv) how the arrangement consideration should be allocated to each performance obligation when multiple performance obligations exist, including the determination of standalone selling price, and (v) when to recognize revenue on the performance obligations. Changes in judgments on these assumptions and estimates could materially impact the timing of revenue recognition.

The Company enters into agreements to sell its monitoring solutions and services, sometimes as a part of arrangements with multiple performance obligations that include various combinations of product sales, equipment leases and services. In the case of contracts with multiple performance obligations, the authoritative guidance provides that the total consideration be allocated to each performance obligation on the basis of relative standalone selling prices. When a standalone selling price is not readily observable, the Company estimates the standalone selling price by considering multiple factors including, but not limited to, features and functionality of the product, geographies, type of customer, contractual prices pursuant to Group Purchasing Organization (GPO) contracts, the Company's pricing and discount practices, and other market conditions.

Sales under deferred equipment agreements are generally structured such that the Company agrees to provide certain monitoring-related equipment, software, installation, training and/or warranty support at no up-front charge in exchange for the customer's commitment to purchase sensors over the term of the agreement, which generally ranges from three years to six years. The Company allocates contract consideration under deferred equipment agreements containing fixed annual sensor purchase commitments to the underlying lease and non-lease components at contract inception.

In determining whether any underlying lease components are related to a sales-type lease or an operating lease, the Company evaluates the customer's rights and ability to control the use of the underlying equipment throughout the contract term, including any equipment substitution rights retained by the Company, as well as the Company's expectations surrounding potential contract/lease extensions or renewals and the customer's likelihood to exercise any purchase options. Revenue allocable to non-lease performance obligations is generally recognized as such non-lease performance obligations are satisfied. Revenue allocable to lease components under sales-type lease arrangements is generally recognized when control over the equipment is transferred to the customer. Revenue allocable to lease components under operating lease arrangements is generally recognized over the term of the operating lease. The Company generally does not expect to derive any significant value in excess of such asset's unamortized book value from equipment underlying its operating lease arrangements after the end of the agreement.

Revenue from the sale of products to end-user hospitals, emergency medical response organizations, other direct customers, distributors and OEM customers, is recognized by the Company when control of such products transfer to the customer based upon the terms of the contract or underlying purchase order. Revenue related to OEM rainbow® parameter software licenses is recognized by the Company upon the OEM's shipment of its product to its customer, as reported to the Company by the OEM.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company provides certain customers with various sales incentives that may take the form of discounts or rebates. The Company records estimates related to these programs as a reduction to revenue at the time of sale. In general, customers do not have a right of return for credit or refund. However, the Company allows returns under certain circumstances. At the end of each period, the Company estimates and accrues for these returns as a reduction to revenue. The Company estimates the revenue constraints related to these forms of variable consideration based on various factors, including expected purchasing volumes, prior sales and returns history, and specific contractual terms and limitations.

The majority of the Company's royalty and other revenue arose from one agreement that was due and payable quarterly in arrears. An estimate of these royalty revenues was recorded in the period earned based on historical results, adjusted for any new information or trends known to management at the time of estimation. This estimated revenue was adjusted prospectively when the Company received the underlying royalty report, approximately sixty days after the end of the previous quarter. The Company received its final royalty payment from this agreement during the three months ended March 30, 2019. The Company recognized no royalty revenue for the years ended January 1, 2022 and January 2, 2021. For the year ended December 28, 2019, the Company recognized royalty revenue pursuant to this agreement of approximately $0.7 million.

### Shipping and Handling Costs and Fees

All shipping and handling costs are expensed as incurred and are recorded as a component of cost of goods sold in the accompanying consolidated statements of operations. Charges for shipping and handling billed to customers are included as a component of product revenue.

### Taxes Collected From Customers and Remitted to Governmental Authorities

The Company's policy is to present revenue net of taxes collected from customers and remitted to governmental authorities.

### Deferred Costs and Other Contract Assets

The costs of monitoring-related equipment provided to customers under operating lease arrangements within the Company's deferred equipment agreements are generally deferred and amortized to cost of goods sold over the life of the underlying contracts. Some of the Company's deferred equipment agreements also contain provisions for certain allowances to be made directly to the end-user hospital customer at the inception of the arrangement. These allowances are generally allocated to the lease and non-lease components and recognized as a reduction to revenue as the underlying performance obligations are satisfied.

The Company generally invoices its customers under deferred equipment agreements as sensors are provided to the customer. However, the Company may recognize revenue for certain non-lease performance obligations under deferred equipment agreements with fixed annual commitments at the time such performance obligations are satisfied and prior to the customer being invoiced. When this occurs, the Company records an unbilled contract receivable related to such revenue until the customer has been invoiced pursuant to the terms of the underlying deferred equipment agreement.

The incremental costs of obtaining a contract with a customer are capitalized and deferred if the Company expects such costs to be recoverable over the life of the contract and the contract term is greater than one year. Such deferred costs generally relate to certain incentive sales commissions earned by the Company's internal sales team in connection with the execution of deferred equipment agreements and are amortized to expense over the expected term of the underlying contract.

### Product Warranty

The Company provides a warranty against defects in material and workmanship for a period ranging from six months to forty-eight months, depending on the product type. In traditional sales activities, including direct and OEM sales, the Company establishes an accrued liability for the estimated warranty costs at the time of revenue recognition, with a corresponding provision to cost of goods sold. Customers may also purchase extended warranty coverage or service level upgrades separately or as part of a deferred equipment agreement. Revenue related to extended warranty coverage and service level upgrades is generally recognized over the life of the contract, which reasonably approximates the period over which such services will be provided. The related extended warranty and service level upgrade costs are expensed as incurred.

Changes in the product warranty accrual were as follows (in thousands):

Table of Contents

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | Year Ended | | |
|---|---|---|---|
| | January 1, 2022 | January 2, 2021 | December 28, 2019 |
| Warranty accrual, beginning of period | $ 2,740 | $ 3,395 | $ 1,910 |
| Accrual for warranties issued | 2,219 | 832 | 1,715 |
| Changes in pre-existing warranties (including changes in estimates) | (1,439) | 196 | 1,130 |
| Settlements made | (1,033) | (1,683) | (1,360) |
| Warranty accrual, end of period | $ 2,487 | $ 2,740 | $ 3,395 |

*Advertising Costs*

Advertising costs are expensed as incurred. These costs are included in selling, general and administrative expense in the accompanying consolidated statements of operations. Advertising costs for the years ended January 1, 2022, January 2, 2021 and December 28, 2019 were $9.0 million, $30.8 million and $14.0 million, respectively.

*Research and Development*

Costs related to research and development activities are expensed as incurred. These costs include personnel costs, materials, depreciation and amortization on associated tangible and intangible assets and an allocation of facility costs, all of which are directly related to research and development activities.

*Litigation Costs and Contingencies*

The Company records a charge equal to at least the minimum estimated liability for a loss contingency or litigation settlement when both of the following conditions are met: (i) information available prior to issuance of the financial statements indicates that it is probable that a liability had been incurred at the date of the financial statements, and (ii) the range of loss can be reasonably estimated. The determination of whether a loss contingency or litigation settlement is probable or reasonably possible involves a significant amount of management judgment, as does the estimation of the range of loss given the nature of contingencies. Liabilities related to litigation settlements with multiple elements are recorded based on the fair value of each element. Legal and other litigation related expenses are recognized as the services are provided. The Company records insurance and other indemnity recoveries for litigation expenses when both of the following conditions are met: (a) the recovery is probable, and (b) collectability is reasonably assured. Insurance recoveries are only recorded to the extent the litigation costs to which they relate have been incurred and recognized in the financial statements.

*Foreign Currency Translation*

The Company's international headquarters is in Switzerland, and its functional currency is the U.S. Dollar. The Company has many other foreign subsidiaries, and the largest transactions in foreign currency translations occur in Japanese Yen and the European Euro.

The Company records certain revenues and expenses in foreign currencies. These revenues and expenses are translated into U.S. Dollars based on the average exchange rate for the reporting period. Assets and liabilities denominated in foreign currencies are translated into U.S. Dollars at the exchange rate in effect as of the balance sheet date. Translation gains and losses related to foreign currency assets and liabilities of a subsidiary that are denominated in the functional currency of such subsidiary are included as a component of accumulated other comprehensive income (loss) within the accompanying consolidated balance sheets. Realized and unrealized foreign currency gains and losses related to foreign currency assets and liabilities of the Company or a subsidiary that are not denominated in the underlying functional currency are included as a component of non-operating (income) expense within the accompanying consolidated statements of operations.

*Comprehensive Income*

Comprehensive income includes foreign currency translation adjustments and any related tax benefits that have been excluded from net income and reflected in equity.

F-16

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Net Income Per Share*

A computation of basic and diluted net income per share is as follows (in thousands, except per share data):

| | Year Ended | | |
|---|---|---|---|
| | January 1, 2022 | January 2, 2021 | December 28, 2019 |
| **Net income:** | $ 229,647 | $ 240,282 | $ 196,216 |
| **Basic net income per share:** | | | |
| Weighted-average shares outstanding - basic | 55,166 | 54,700 | 53,434 |
| Net income per basic share | $ 4.16 | $ 4.39 | $ 3.67 |
| **Diluted net income per share:** | | | |
| Weighted-average shares outstanding - basic | 55,166 | 54,700 | 53,434 |
| Diluted share equivalents: stock options, RSUs and PSUs | 2,516 | 3,337 | 3,666 |
| Weighted-average shares outstanding - diluted | 57,682 | 58,037 | 57,100 |
| Net income per diluted share | $ 3.98 | $ 4.14 | $ 3.44 |

Basic net income per share is computed by dividing net income by the weighted-average number of shares outstanding during the period. Net income per diluted share is computed by dividing the net income by the weighted-average number of shares and potential shares outstanding during the period, if the effect of potential shares is dilutive. Potential shares include incremental shares of stock issuable upon the exercise of stock options and the vesting of both restricted share units (RSUs) and performance stock units (PSUs). For the years ended January 1, 2022, January 2, 2021 and December 28, 2019, weighted options to purchase 0.2 million, 0.4 million and 0.4 million shares of common stock, respectively, were outstanding but not included in the computation of diluted net income per share because the effect of including such shares would have been antidilutive in the applicable period. For each of the years ended January 1, 2022, January 2, 2021 and December 28, 2019, certain RSUs were considered contingently issuable shares as their vesting is contingent upon the occurrence of certain future events. Since such events had not occurred and were not considered probable of occurring as of January 1, 2022, January 2, 2021 and December 28, 2019, 2.7 million of weighted average shares related to such RSUs have been excluded from the calculation of potential shares. For additional information with respect to these RSUs, please see "*Employment and Severance Agreements*" in Note 21 to these consolidated financial statements.

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Supplemental Cash Flow Information*

Supplemental cash flow information includes the following (in thousands):

| | | Year Ended | | | | |
|---|---|---|---|---|---|---|
| | | January 1, 2022 | | January 2, 2021 | | December 28, 2019 |
| Cash paid during the year for: | | | | | | |
| Interest expense | $ | 285 | $ | 270 | $ | 211 |
| Income taxes | | 43,947 | | 39,491 | | 42,270 |
| Operating lease liabilities | | 7,306 | | 6,276 | | 6,676 |
| Non-cash operating activities: | | | | | | |
| ROU assets obtained in exchange for lease liabilities[(1)] | $ | 6,042 | $ | 15,387 | $ | 26,484 |
| Non-cash investing activities: | | | | | | |
| Unpaid purchases of property and equipment | $ | — | $ | 2,053 | $ | 6,686 |
| Settlement of promissory note receivable in connection with business combination | | — | | 5,100 | | — |
| Non-cash financing activities: | | | | | | |
| Unsettled common stock proceeds from option exercises | $ | 694 | $ | 3,011 | $ | 14 |
| Fair value of common stock received for payment of stock option exercise price | | — | | 1,616 | | — |
| Reconciliation of cash, cash equivalents and restricted cash: | | | | | | |
| Cash and cash equivalents | $ | 745,250 | $ | 641,447 | $ | 567,687 |
| Restricted cash | | 3,127 | | 3,557 | | 388 |
| Total cash, cash equivalents and restricted cash shown in the statement of cash flows | $ | 748,377 | $ | 645,004 | $ | 568,075 |

*Segment Information*

The Company uses the "management approach" in determining reportable business segments. The management approach designates the internal organization used by management for making operating decisions and assessing performance as the source for determining the Company's reportable segments. Based on this assessment, management has determined it operates in one reportable business segment, which is comprised of patient monitoring and related products.

*Recently Adopted Accounting Pronouncements*

In June 2016, the (FASB) issued Accounting Standards Update (ASU) No. 2016-13, *Financial Instruments–Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments (ASU 2016-13)*. Subsequent to the issuance of ASU 2016-13, the FASB clarified the guidance through several ASUs. The collective new guidance (Accounting Standards Codification (ASC) 326) generally requires entities to use a current expected credit loss model, which is a new impairment model based on expected losses rather than incurred losses. Under this model, an entity recognizes an impairment allowance equal to its current estimate of all contractual cash flows that the entity does not expect to collect. The entity's estimate considers relevant information about past events, current conditions, and reasonable and supportable forecasts. The Company's adoption of this standard, effective December 29, 2019, did not have a material impact on its consolidated financial statements.

F-18

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

In July 2019, the FASB issued ASU No. 2019-07, *Codification Updates to SEC Sections–Amendments to SEC Paragraphs Pursuant to SEC Final Rule Releases No. 33-10532, Disclosure Update and Simplification, and Nos. 33-10231 and 33-10442, Investment Company Reporting Modernization, and Miscellaneous Updates* (ASU 2019-07). The new standard aligns the guidance in various sections of the codification with the requirements of certain already effective Securities and Exchange Commission final rules. ASU 2019-07 is effective immediately and was adopted upon issuance. The Company's adoption of this standard did not have a material impact on its consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-15, *Intangibles–Goodwill and Other–Internal–Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* (ASU 2018-15). The new standard aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). ASU 2018-15 is effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2019. Early adoption is permitted, including adoption in an interim period. The Company early adopted this standard during the three months ended September 28, 2019, and such adoption did not have a material impact on its consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework–Changes to the Disclosure Requirements for Fair Value Measurement* (ASU 2018-13). The new standard adds and modifies certain disclosure requirements for fair value measurements including when entities will no longer be required to disclose the amount of and reasons for transfers between Level 1 and Level 2 of the fair value hierarchy, but will need to disclose the range and weighted average used to develop significant unobservable inputs for Level 3 fair value measurements. ASU 2018-13 is effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2019. Early adoption is permitted, including adoption in an interim period. The Company early adopted this standard during the three months ended September 28, 2019, and such adoption did not have a material impact on its consolidated financial statements.

In July 2018, the FASB issued ASU No. 2018-09, *Codification Improvements* (ASU 2018-09). This new standard amends, clarifies, corrects errors in and makes minor improvements to the ASC. The transition and effective date guidance is based on the facts and circumstances of each amendment. Some of the amendments of ASU 2018-09 do not require transition guidance and are effective upon issuance. The Company completed its adoption of all applicable items contained in ASU 2018-09 as of September 28, 2019, and such adoption did not have a material impact on its consolidated financial statements.

In February 2018, the FASB issued ASU No. 2018-02, *Income Statement–Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income* (ASU 2018-02). The new standard allows a reclassification for certain stranded tax effects from accumulated other comprehensive income to retained earnings, and requires certain disclosures about stranded tax effects. ASU 2018-02 is effective for annual and interim periods beginning after December 15, 2018. The Company adopted this standard during the three months ended March 30, 2019, and such adoption did not have a material impact on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* (ASU 2016-02). Subsequent to the issuance of ASU 2016-02, the FASB clarified the guidance through several ASUs. The collective guidance was codified by the FASB in ASC 842, which, among other things (i) requires the Company to recognize an ROU asset and a lease liability for all operating leases for which the Company is the lessee; (ii) changes the classification of certain embedded leases within the Company's deferred equipment agreements with its customers from operating to sales-type leases, resulting in the acceleration of revenue under certain contracts, as well as the immediate expensing of certain costs that were previously deferred and expensed over the term of the lease; and (iii) requires disclosures by the Company as a lessor and lessee about the amount, timing and uncertainty of cash flows arising from its leases.

On December 30, 2018, the Company adopted ASC 842 using the modified retrospective method for all lease arrangements at the beginning of the period of adoption. Results for reporting periods beginning December 30, 2018 are presented under ASC 842, while prior period amounts were not adjusted and continue to be reported in accordance with the Company's historic accounting under ASC 840, *Leases*. Adoption of this new accounting standard had a material impact on the Company's consolidated balance sheet upon adoption, but did not have a significant impact on the Company's consolidated net earnings and cash flows for the year ended December 28, 2019. For leases that commenced before the effective date of ASC 842, the Company did not elect any of the permitted practical expedients. However, the Company utilized a portfolio approach for purposes of determining the discount rate associated with certain equipment leases and made certain accounting policy elections not to separate lease and non-lease components for its real estate leases and to exclude short-term leases with a term of twelve months or less from its application of ASC 842.

Table of Contents

**MASIMO CORPORATION**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

In connection with its adoption of ASC 842, the Company recorded lessee operating lease ROU assets and lessee operating lease liabilities of $22.5 million as of December 30, 2018, primarily related to real estate and equipment leases, based on the present value of the future lease payments on such date. As a lessor, the Company also recorded customer lease receivables of $62.0 million, a reduction to equipment leased to customers (formerly titled deferred cost of goods sold) of $103.5 million, an increase to deferred tax assets of $8.6 million, a decrease to deferred revenue and contract-related liabilities of $9.1 million, an increase in other current liabilities of $3.0 million and a cumulative net decrease to retained earnings of $26.8 million, all related to the reclassification of certain embedded leases in existing deferred equipment agreements from operating to sales-type leases as December 30, 2018. See Notes 6, 7 and 11 to these consolidated financial statements for additional disclosures required by ASC 842.

In December 2019, the FASB issued ASU No. 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes* (ASU 2019-12). The standard simplifies the accounting for income taxes by removing exceptions to the incremental approach for intraperiod tax allocation when there is a loss from continuing operations and income or a gain from other items, to the requirement to recognize a deferred tax liability for equity method investments when a foreign subsidiary becomes an equity method investment, to the ability not to recognize a deferred tax liability for a foreign subsidiary when a foreign equity method investment becomes a subsidiary, and to the general methodology for calculating income taxes in an interim period when a year-to-date loss exceeds the anticipated loss for the year. In addition, the standard requires that an entity recognize a franchise tax that is partially based on income as an income-based tax and account for any incremental amount incurred as a non-income-based tax, evaluate when a step up in the tax basis of goodwill should be considered part of the business combination in which the book goodwill was originally recognized and when it should be considered a separate transaction and reflect the effect of an enacted change in tax laws or rates in the annual effective tax rate computation in the interim period that includes the enactment date, and specifies that an entity is not required to allocate the consolidated amount of current and deferred tax expense to a legal entity that is not subject to tax in its separate financial statements; however, an entity may elect to do so (on an entity-by-entity basis) for a legal entity that is both not subject to tax and disregarded by the taxing authority. The Company's adoption of this standard, effective as of January 3, 2021, did not have a material impact on its consolidated financial statements.

In October 2020, the FASB issued ASU No. 2020-10, *Codification Improvements*. The standard provides updates for technical corrections, clarifications to guidance, simplifications to wording or structure of guidance, and other minor improvements across various areas of accounting within GAAP. ASU No. 2020-10 is effective after December 15, 2020 on a retrospective basis. Early adoption is permitted. The Company's adoption of this standard, effective as of January 3, 2021, did not have a material impact on its consolidated financial statements.

In November 2021, the FASB issued ASU No. 2021-08, *Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers (ASU 2021-08)*. The standard requires companies to apply ASC 606 to recognize and measure contract assets and contract liabilities from contracts with customers acquired in a business combination. This creates an exception to the general recognition and measurement principle in ASC 805. ASU 2021-08 is effective for annual reporting periods beginning after December 15, 2022, and for interim periods within those years, and should be adopted prospectively. Early adoption is permitted. The Company's early adoption of this standard, effective January 3, 2021, did not have a material impact on its consolidated financial statements.

### Recently Issued Accounting Pronouncements

In March 2020, the FASB issued ASU No. 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting (ASU 2020-04)*. The standard provides temporary optional expedients and exceptions to the guidance in GAAP on contract modifications and hedge accounting to ease the financial reporting burdens related to the expected market transition from the London Interbank Offered Rate (LIBOR) and other interbank offered rates to alternative reference rates, such as the Secured Overnight Financing Rate (SOFR). Entities can make a one-time election to sell and/or reclassify held-to-maturity debt securities that reference an interest rate affected by reference rate reform. ASU 2020-04 is effective beginning on March 12, 2020, and the Company may elect to apply this standard prospectively through December 31, 2022. The relief is temporary and generally cannot be applied to contract modifications that occur after December 31, 2022 or hedging relationships entered into or evaluated after that date. However, certain optional expedients can be applied to hedging relationships evaluated in periods after December 31, 2022. The Company is currently evaluating the expected impact of this standard, but does not expect it to have a material impact on its consolidated financial statements upon adoption.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

In January 2021, the FASB issued ASU No. 2021-01, *Reference Rate Reform (Topic 848): Scope (ASU 2021-01)*. The standard clarified the scope and application of the original guidance. ASU No. 2021-01 is effective as of March 12, 2020 through December 31, 2022 and may be applied to contract modifications and hedging relationships from the beginning of an interim period that includes or is subsequent to March 12, 2020. The Company is currently evaluating the expected impact of this standard, but does not expect it to have a material impact on its consolidated financial statements upon adoption.

In July 2021, the FASB issued ASU No. 2021-05, *Leases (Topic 842), Lessors-Certain Leases with Variable Lease Payments (ASU 2021-05)*. This standard amends the original ASU No. 2016-02 lease standard by requiring lessors to classify leases as operating leases if they have variable lease payments that do not depend on an index or rate and would have selling losses at lease commencement if they were classified as sales-type. ASU 2021-05 is effective for annual reporting periods beginning after December 15, 2021, and for interim periods within those years, and may be adopted either prospectively or on a retrospective basis for leases that commenced or were modified after the date of initial adoption of ASC 842. Early adoption is permitted.

The Company is adopting this standard prospectively, and is currently evaluating the expected impact of this standard on its consolidated financial statements. Upon adoption, the Company anticipates that, among other things, the classification of certain new leases for which the Company is the lessor will change from sales-type leases to operating leases when evaluated at the time of lease commencement. As a result, the equipment costs associated with such new operating leases will initially be deferred and subsequently amortized to expense over the term of the lease, rather than being immediately recognized upon lease commencement. Similarly, revenue associated with such new operating leases will be recognized over the term of the lease, rather than being immediately recognized on the date of the lease commencement. The Company currently expects to complete its assessment of the full financial impact of this new standard during the next three months.

**3. Related Party Transactions**

Cercacor Laboratories, Inc. (Cercacor) is an independent entity that was spun off from the Company to its stockholders in 1998. Joe Kiani, the Company's Chairman and Chief Executive Officer (CEO), is also the Chairman and CEO of Cercacor. Effective as of January 3, 2016, in connection with changes in the capital structure of Cercacor, the Company determined that Cercacor was no longer required to be consolidated. Although the Company believes that Cercacor continues to be considered a variable interest entity, the Company has determined that it is no longer the primary beneficiary of Cercacor as it does not have the power to direct the activities of Cercacor that most significantly impact Cercacor's economic performance and has no obligation to absorb Cercacor's losses.

The Company is a party to the following agreements with Cercacor:

- *Cross-Licensing Agreement* - The Company and Cercacor are parties to a cross-licensing agreement (Cross-Licensing Agreement), which governs each party's rights to certain intellectual property held by the two companies. The Company is subject to certain annual minimum aggregate royalty obligations for use of the rainbow® licensed technology. The current annual minimum royalty obligation is $5.0 million. Aggregate liabilities payable to Cercacor arising under the Cross-Licensing Agreement were $13.5 million, $13.3 million and $12.1 million for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, respectively. The Company had sales to Cercacor in the amount of $0.1 million, less than $0.1 million and less than $0.1 million for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, respectively.

- *Administrative Services Agreement* - The Company is a party to an administrative services agreement with Cercacor (G&A Services Agreement), which governs certain general and administrative services that the Company provides to Cercacor. Amounts charged by the Company pursuant to the G&A Services Agreement were $0.3 million, $0.3 million and $0.2 million for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, respectively.

- *Lease and Sublease Agreements* - Effective December 14, 2019, the Company entered into a new lease agreement with Cercacor for approximately 34,000 of square feet of office, research and development space at one of the Company's owned facilities in Irvine (Cercacor Lease). The term of the Cercacor Lease expires on December 31, 2024. In March 2016, the Company entered into a sublease agreement with Cercacor for approximately 16,830 square feet of excess office and laboratory space located at 40 Parker, Irvine, California (Cercacor Sublease). The Cercacor Sublease began on May 1, 2016 and expired on December 15, 2019. The Company recognized approximately $1.2 million, $1.1 million and $0.4 million of combined lease and sublease income for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, respectively.

Net amounts due to Cercacor were approximately $3.5 million and $3.6 million as of January 1, 2022 and January 2, 2021, respectively.

F-21

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company's CEO is also the Chairman of the Masimo Foundation for Ethics, Innovation and Competition in Healthcare (Masimo Foundation), a non-profit organization that was founded in 2010 to provide a platform for encouraging ethics, innovation and competition in healthcare. In addition, the Company's Executive Vice President (EVP), Chief Financial Officer (CFO) serves as the Treasurer of the Masimo Foundation and the Company's EVP, General Counsel and Corporate Secretary serves as the Secretary for the Masimo Foundation. For the fiscal years ended January 1, 2022, January 2, 2021 and December 28, 2019, the Company made cash contributions of approximately $0.0 million, $1.5 million and $1.0 million, respectively, to the Masimo Foundation. In addition, for each of the years ended January 1, 2022, January 2, 2021 and December 28, 2019, the Company made various in-kind contributions to the Masimo Foundation, mainly in the form of donated administrative services.

The Company's CEO is also a co-founder and a member of the board of directors of Like Minded Media Ventures (LMMV), a team of storytellers that create content focused in the areas of true stories, social causes and science. LMMV creates stories with a multi-platform strategy, bridging the gap between film, television, digital and social media. The Company entered into a marketing service agreement with LMMV for audiovisual production services promoting brand awareness, including television commercials and digital advertising, during 2020. During the fiscal years ended January 1, 2022 and January 2, 2021, the Company incurred less than $0.1 million and approximately $3.5 million in marketing expenses to LMMV under the marketing service agreement, respectively. At January 1, 2022 and January 2, 2021, there were no amounts due to LMMV for services rendered.

The Company entered into a software license and professional services agreement with Like Minded Labs (LML), a subsidiary of LMMV, during the second quarter of 2021. Pursuant to the software license agreement, LML granted the Company a perpetual, non-exclusive and fully paid-up right and license to integrate LML's software into the Company's products in exchange for a $3.0 million one-time license fee. Pursuant to the professional services agreement, LML will provide professional services to the Company, including the development of custom software intended to support the integration of the licensed software into the Company's products, as well as future support services upon the Company's acceptance of deliverables.

In July 2021, the Company entered into a patent purchase and option agreement with Vantrix Corporation (Vantrix), an acquiree of LML, for certain patents for $0.5 million, and the right to purchase two pools of additional patents from Vantrix for an exercise fee of up to $1.1 million. The agreements with LML and Vantrix include sublicensing provisions whereby the software and patents are licensed back to LML or Vantrix, respectively, for further advancement of the technologies.

The Company maintains an aircraft time share agreement, pursuant to which the Company has agreed from time to time to make its aircraft available to the Company's CEO for lease on a time-sharing basis. The Company charges the Company's CEO for personal use based on agreed upon reimbursement rates. During the fiscal years ended January 1, 2022, January 2, 2021 and December 28, 2019, the Company charged the Company's CEO less than $0.1 million, less than $0.1 million and $0.1 million, respectively, related to such reimbursements.

**4. Inventories**

Inventories consist of the following (in thousands):

| | January 1, 2022 | | January 2, 2021 |
|---|---|---|---|
| Raw materials | $ 128,319 | $ | 133,098 |
| Work-in-process | 17,140 | | 15,985 |
| Finished goods | 55,911 | | 66,869 |
| Total Inventories | $ 201,370 | $ | 215,952 |

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**5. Other Current Assets**

Other current assets consist of the following (in thousands):

| | January 1, 2022 | January 2, 2021 |
|---|---|---|
| Prepaid expenses | $ 30,879 | $ 30,235 |
| Lease receivable, current | 28,666 | 23,206 |
| Indirect taxes receivable | 12,847 | 14,545 |
| Prepaid income taxes | 7,009 | 14,782 |
| Restricted cash[1] | 3,041 | 3,397 |
| Prepaid rebates and royalties | 2,785 | 3,081 |
| Customer notes receivable | 2,410 | 2,283 |
| Deposits to acquire noncontrolling interest[2] | — | 3,374 |
| Other current assets | 3,390 | 7,513 |
| Total other current assets | $ 91,027 | $ 102,416 |

_____

[1]    Restricted cash includes funds received from the Bill and Melinda Gates Foundation. As the Company incurs costs associated with research and development related to this project, on a quarterly basis, the Company reclasses amounts from the grant to offset costs incurred.

[2]    During the fourth quarter of 2020, the Company obtained a controlling interest in a provider of advanced hemodynamic monitoring solutions. During the first quarter of 2021, the Company acquired the remaining noncontrolling interest. The impact of the noncontrolling interest is immaterial in all periods presented.

**6. Lease Receivable**

Upon the Company's adoption of ASC 842, the Company recognizes revenue and costs, as well as a lease receivable, at the time the lease commences pursuant to deferred equipment agreements containing embedded sales-type leases. Lease revenue related to both operating-type and sales-type leases for the years ended January 1, 2022 and January 2, 2021 was approximately $59.4 million and $42.6 million, respectively, and is included within product revenue in the accompanying consolidated statements of operations. Costs related to embedded leases within the Company's deferred equipment agreements are included in cost of goods sold. See "Recently Adopted Accounting Pronouncements" in Note 2 to these consolidated financial statements for additional information related to the Company's adoption of ASC 842.

Lease receivable consists of the following (in thousands):

| | January 1, 2022 | January 2, 2021 |
|---|---|---|
| Lease receivable | $ 102,609 | $ 81,074 |
| Allowance for credit loss | (255) | (202) |
| Lease receivable, net | 102,354 | 80,872 |
| Less: current portion of lease receivable | (28,666) | (23,206) |
| Lease receivable, noncurrent | $ 73,688 | $ 57,666 |

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

As of January 1, 2022, estimated future maturities of customer sales-type lease receivables for each of the following fiscal years are as follows (in thousands):

| Fiscal year | | Amount |
|---|---|---|
| 2022 | $ | 28,666 |
| 2023 | | 24,297 |
| 2024 | | 20,552 |
| 2025 | | 14,428 |
| 2026 | | 7,993 |
| Thereafter | | 6,418 |
| Total | $ | 102,354 |

Estimated future operating lease payments expected to be received from customers under deferred equipment agreements are not material as of January 1, 2022.

**7. Deferred Costs and Other Contract Assets**

Deferred costs and other contract assets consist of the following (in thousands):

| | January 1, 2022 | | January 2, 2021 | |
|---|---|---|---|---|
| Deferred commissions | $ | 11,878 | $ | 7,477 |
| Prepaid contract allowances | | 8,598 | | 7,336 |
| Unbilled contract receivables | | 4,970 | | 3,925 |
| Equipment leased to customers, net | | 2,647 | | 1,338 |
| Deferred costs and other contract assets | $ | 28,093 | $ | 20,076 |

For the years ended January 1, 2022, January 2, 2021 and December 28, 2019, $0.5 million, $0.4 million and $1.0 million, respectively, of equipment leased to customers was amortized to cost of goods sold. As of January 1, 2022 and January 2, 2021, accumulated amortization of equipment leased to customers was $0.5 million and $0.9 million, respectively.

**8. Property and Equipment, net**

Property and equipment, net, consists of the following (in thousands):

| | January 1, 2022 | | January 2, 2021 | |
|---|---|---|---|---|
| Building and building improvements | $ | 142,132 | $ | 122,310 |
| Machinery, equipment and tooling | | 103,451 | | 90,843 |
| Land | | 57,027 | | 57,151 |
| Transportation, vehicles and other | | 33,082 | | 33,175 |
| Computer equipment and software | | 32,450 | | 24,693 |
| Leasehold improvements | | 21,894 | | 19,295 |
| Furniture and office equipment | | 14,200 | | 13,567 |
| Demonstration units | | 949 | | 1,024 |
| Construction-in-progress (CIP) | | 25,109 | | 44,589 |
| Total property and equipment | | 430,294 | | 406,647 |
| Accumulated depreciation | | (157,501) | | (134,136) |
| Property and equipment, net | $ | 272,793 | $ | 272,511 |

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The balance in CIP at January 1, 2022 relates primarily to the capitalized implementation costs related to a new enterprise resource planning software system and costs related to equipment and other facility improvements, the underlying assets for which have not been completed or placed into service. The decrease in CIP balance from January 2, 2021 primarily relates to the Company's European headquarters building in Switzerland being placed into service along with a phase of the new enterprise resource planning software system for certain subsidiaries being placed into service.

The balance in CIP at January 2, 2021 related primarily to acquisition and improvement costs for a portion of a purchased building in Switzerland, capitalized implementation costs related to a new enterprise resource planning software system and costs related to manufacturing equipment and other facility improvements globally, the underlying assets for which have not been completed or placed into service.

For the years ended January 1, 2022, January 2, 2021 and December 28, 2019, depreciation expense of property and equipment was $25.3 million, $21.8 million and $19.1 million, respectively.

On February 14, 2022, our wholly owned subsidiary, Masimo Canada ULC, entered into a Purchase and Sale Agreement (Purchase Agreement) with Keltic (Prior) Development Limited Partnership for the purchase of a property in Vancouver, British Columbia, Canada for a purchase price of CAD 123.0 million (plus GST), (Purchase Price) subject to certain adjustments. We have deposited CAD 1.0 million in escrow as an initial deposit. Subject to satisfactory completion of our due diligence, we will pay an additional CAD 20.0 million to the Vendor as an additional deposit, collectively the deposits, thirty (30) days following the execution of the Purchase Agreement. The balance of the Purchase Price will be due and payable upon the closing of the transaction, which is currently expected to occur during the second half of 2024.

**9. Intangible Assets, net**

Intangible assets, net, consist of the following (in thousands):

|  | January 1, 2022 | January 2, 2021 |
|---|---|---|
| **Gross carrying amount** | | |
| Patents | $ 31,513 | $ 26,875 |
| Acquired technologies | 28,371 | 29,039 |
| Customer relationships | 24,624 | 24,666 |
| Trademarks | 12,210 | 11,708 |
| Licenses | 8,108 | 5,108 |
| Licenses-related party | 7,500 | 7,500 |
| Other | 6,203 | 5,693 |
| Total gross carrying amount | $ 118,529 | $ 110,589 |
| **Accumulated amortization** | | |
| Patents | $ (13,222) | $ (10,763) |
| Acquired technologies | (7,668) | (5,259) |
| Customer relationships | (7,381) | (6,486) |
| Trademarks | (6,127) | (3,999) |
| Licenses-related party | (5,969) | (5,594) |
| Licenses | (1,975) | (1,247) |
| Other | (3,685) | (3,318) |
| Total accumulated amortization | (46,027) | (36,666) |
| Net carrying amount | $ 72,502 | $ 73,923 |

Intangible assets have a weighted-average amortization period of twelve years. For the years ended January 1, 2022, January 2, 2021 and December 28, 2019, amortization of intangible assets was $10.3 million, $7.5 million and $4.4 million, respectively.

As of January 1, 2022 and January 2, 2021, the total costs of patents not yet amortizing was $9.0 million and $8.2 million, respectively. As of January 1, 2022 and January 2, 2021, the total costs of trademarks not yet amortizing was $1.0 million and $0.9 million, respectively.

For the years ended January 1, 2022 and January 2, 2021, total renewal costs capitalized for patents and trademarks was $1.5 million and $1.3 million, respectively. As of January 1, 2022, the weighted-average number of years until the next renewal was two years for patents and three years for trademarks.

During the first quarter of 2020, the Company completed an immaterial business combination. Based on the Company's purchase price allocation, approximately $15.5 million, $2.6 million and $1.7 million of the purchase price was assigned to customer relationships, acquired technologies and trademarks, respectively.

During the second quarter of 2020, the Company completed another immaterial business combination. Based on the Company's purchase price allocation, approximately $6.3 million, $2.4 million, $0.4 million and $0.3 million of the purchase price was assigned to acquired technologies, trademarks, customer relationships and other intangibles, respectively.

During the fourth quarter of 2020, the Company obtained a controlling interest in a provider of advanced hemodynamic monitoring solutions. Based on the Company's purchase price allocation, approximately $14.0 million, $2.3 million, $1.0 million and $1.0 million of the purchase price was assigned to acquired technologies, trademarks, customer relationships and other intangibles, respectively. Subsequently, during the first quarter of 2021, the Company acquired the remaining minority interest. See Note 14 to these consolidated financial statements for further details.

Estimated amortization expense for each of the next fiscal years is as follows (in thousands):

| Fiscal year | | Amount |
|---|---|---|
| 2022 | $ | 8,242 |
| 2023 | | 8,138 |
| 2024 | | 7,674 |
| 2025 | | 6,864 |
| 2026 | | 5,930 |
| Thereafter | | 35,654 |
| Total | $ | 72,502 |

### 10. Goodwill

Changes in goodwill were as follows (in thousands):

| | | January 1, 2022 | | January 2, 2021 |
|---|---|---|---|---|
| Goodwill, beginning of period | $ | 103,206 | $ | 22,350 |
| Increase from business combinations | | — | | 79,862 |
| Foreign currency translation and other adjustments | | (2,872) | | 994 |
| Goodwill, end of period | $ | 100,334 | $ | 103,206 |

During the first quarter of 2020, the Company completed an immaterial business combination. Based on the Company's purchase price allocation for this transaction, approximately $31.4 million of the purchase price was assigned to goodwill.

During the second quarter of 2020, the Company completed another immaterial business combination. Based on the Company's purchase price allocation for this transaction, approximately $26.7 million of the purchase price was assigned to goodwill.

During the fourth quarter of 2020, the Company obtained a controlling interest in a provider of advanced hemodynamic monitoring solutions. Based on the Company's purchase price allocation, approximately $21.8 million of the purchase price was assigned to goodwill. During the first quarter of fiscal 2021, the Company acquired the remaining minority interest. See Note 14 to these consolidated financial statements for further details.

### 11. Lessee ROU Assets and Lease Liabilities

The Company leases certain facilities in North and South America, Europe, the Middle East and Asia-Pacific regions under operating lease agreements expiring at various dates through January 2032. In addition, the Company leases equipment in the U.S. and Europe pursuant to leases that are classified as operating leases and expire at various dates through August 2026. The majority of these leases are non-cancellable and generally do not contain any material restrictive covenants, material residual value guarantees or other material guarantees. The Company recognizes lease costs under these agreements using a straight-line

method based on total lease payments. Certain facility leases contain predetermined price escalations and in some cases renewal options, the longest of which is for five years.

The Company generally estimates the applicable discount rate used to determine the net present value of lease payments based on available information at the lease commencement date. As of January 1, 2022, the weighted average discount rate used by the Company for all operating leases was approximately 2.6%.

The balance sheet classifications for amounts related to the Company's operating leases for which it is the lessee are as follows (in thousands):

| | Balance sheet classification | | January 1, 2022 | | January 2, 2021 |
|---|---|---|---|---|---|
| Lessee ROU assets, net | Other non-current assets | $ | 30,486 | $ | 32,324 |
| Lessee current lease liabilities | Other current liabilities | | 6,371 | | 5,975 |
| Lessee non-current lease liabilities | Other non-current liabilities | | 26,290 | | 28,373 |
| Total operating lease liabilities | | $ | 32,661 | $ | 34,348 |

For the years ended January 1, 2022 and January 2, 2021, accumulated amortization for lessee ROU assets was $15.2 million and $9.2 million, respectively. The weighted average remaining lease term for the Company's operating leases was 6.4 years as of January 1, 2022.

As of January 1, 2022, estimated future operating lease payments for each of the following fiscal years were as follows (in thousands):

| Fiscal year | | Amount |
|---|---|---|
| 2022 | $ | 7,411 |
| 2023 | | 6,685 |
| 2024 | | 5,235 |
| 2025 | | 3,991 |
| 2026 | | 2,804 |
| Thereafter[1] | | 9,442 |
| Total | | 35,568 |
| Imputed interest | | (2,907) |
| Present value | $ | 32,661 |

[1]   Includes optional renewal period for certain leases.

For the years ended January 1, 2022, January 2, 2021 and December 28, 2019, the Company's operating lease costs were approximately $8.2 million, $6.9 million and $6.8 million, respectively.

**12. Other Non-Current Assets**

Other assets, long-term consist of the following (in thousands):

| | | January 1, 2022 | | January 2, 2021 |
|---|---|---|---|---|
| Lessee ROU assets, net | $ | 30,486 | $ | 32,324 |
| Strategic investments | | 13,830 | | 8,002 |
| Prepaid deposits | | 3,863 | | 3,816 |
| Other non-current assets | | 402 | | 500 |
| Total non-current assets | $ | 48,581 | $ | 44,642 |

**13. Deferred Revenue and Other Contract Liabilities**

Deferred revenue and other contract liabilities consist of the following (in thousands):

| | January 1, 2022 | | January 2, 2021 |
|---|---|---|---|
| Deferred revenue | $ | 35,127 | $ | 33,221 |
| Accrued rebates and allowances | | 13,628 | | 12,127 |
| Accrued customer reimbursements | | 7,424 | | 3,829 |
| Total deferred revenue and other contract liabilities | | 56,179 | | 49,177 |
| Less: Non-current portion of deferred revenue | | (5,302) | | (4,242) |
| Deferred revenue and other contract liabilities - current | $ | 50,877 | $ | 44,935 |

Deferred revenue relates to contracted amounts that have been invoiced to customers for which remaining performance obligations must be completed before the Company can recognize the revenue. These amounts primarily relate to undelivered equipment, sensors and services under deferred equipment agreements, extended warranty agreements and maintenance agreements.

Changes in deferred revenue for the year ended January 1, 2022 were as follows:

| | Amount |
|---|---|
| Deferred revenue, beginning of the period | $ 33,221 |
| Revenue deferred during the period | 31,133 |
| Recognition of revenue deferred in prior periods | (29,227) |
| Deferred revenue, end of the period | $ 35,127 |

Expected revenue from remaining contractual performance obligations (Unrecognized Contract Revenue) includes deferred revenue, as well as other amounts that will be invoiced and recognized as revenue in future periods when the Company completes its performance obligations. While Unrecognized Contract Revenue is similar in concept to backlog, Unrecognized Contract Revenue excludes revenue allocable to monitoring-related equipment that is effectively leased to customers under deferred equipment agreements and other contractual obligations for which neither party has performed.

As of January 1, 2022, the Company had approximately $1,165.1 million of Unrecognized Contract Revenue related to executed contracts with an original duration of one year or more. The Company expects to recognize approximately $318.0 million of this amount as revenue within the next twelve months and the remaining balance thereafter.

The estimated timing of this revenue is based, in part, on management's estimates and assumptions about when its performance obligations will be completed. As a result, the actual timing of this revenue in future periods may vary, possibly materially.

**14. Other Current Liabilities**

Other current liabilities consist of the following (in thousands):

| | | January 1, 2022 | | January 2, 2021 |
|---|---|---|---|---|
| Accrued indirect taxes payable | $ | 16,302 | $ | 14,365 |
| Accrued expenses | | 12,061 | | 6,794 |
| Income tax payable | | 11,996 | | 5,910 |
| Accrued legal fees | | 7,136 | | 4,058 |
| Lessee lease liabilities, current | | 6,371 | | 5,975 |
| Related party payables | | 5,618 | | 3,655 |
| Accrued warranty | | 2,487 | | 2,740 |
| Accrued property taxes | | 1,989 | | 1,682 |
| Accrued donations | | 1,707 | | 495 |
| Noncontrolling interest⁽¹⁾ | | — | | 3,469 |
| Other current liabilities | | 4,730 | | 4,096 |
| Total other current liabilities | $ | 70,397 | $ | 53,239 |

---

[1]   During the fourth quarter of 2020, the Company obtained a controlling interest in a provider of advanced hemodynamic monitoring solutions. The noncontrolling interest of the acquiree was recorded within other current liabilities as of January 2, 2021, as the noncontrolling interest shares were mandatorily redeemable. During the first quarter of 2021, the Company acquired the remaining noncontrolling interest. The impact of the noncontrolling interest is immaterial in all periods presented.

**15. Credit Facilities**

The Company currently maintains a credit agreement (Credit Facility) with JPMorgan Chase Bank, N.A., as Administrative Agent and a Lender, and Bank of the West, a Lender (collectively, the Lenders). The Credit Facility provides for up to $150.0 million of unsecured borrowings, with an option, subject to certain conditions, for the Company to increase the aggregate borrowing capacity up to $550.0 million in the future with the Lenders and additional lenders, as required. The Credit Facility also provides for a sublimit of up to $25.0 million for the issuance of letters of credit and a sublimit of $75.0 million for borrowings in specified foreign currencies. All unpaid principal under the Credit Facility will become due and payable on December 17, 2023. Proceeds from the Credit Facility are expected to be used for general corporate, capital investment and working capital needs.

Borrowings under the Credit Facility will be deemed, at the Company's election, either: (a) an Alternate Base Rate (ABR) Loan, which bears interest at the ABR, plus a spread of 0.125% to 1.000% based upon a Company leverage ratio, or (b) a Eurocurrency Loan, which bears interest at the Adjusted LIBO Rate (as defined below), plus a spread of 1.125% to 2.000% based upon a Company net leverage ratio. Subject to certain conditions, the Company may also request swingline loans from time to time that bear interest similar to an ABR Loan. Pursuant to the terms of the Credit Facility, the ABR is equal to the greatest of (i) the prime rate, (ii) the Federal Reserve Bank of New York effective rate plus 0.50%, and (iii) the one-month Adjusted LIBO Rate plus 1.0%. The Adjusted LIBO Rate is equal to the Eurocurrency Rate (as defined within the 2018 Credit Facility) for the applicable interest period multiplied by the statutory reserve rate for such period, rounded upward, if necessary, to the next 1/16 of 1%. The Company is also obligated under the Credit Facility to pay an unused fee ranging from 0.150% to 0.275% per annum, based upon a Company leverage ratio, with respect to any unutilized portion of the Credit Facility.

Pursuant to the terms of the Credit Facility, the Company is subject to certain covenants, including financial covenants related to a net leverage ratio and an interest charge coverage ratio, and other customary negative covenants. The Credit Facility also includes customary events of default which, upon the occurrence of any such event of default, provide the Lenders with the right to take either or both of the following actions: (a) immediately terminate the commitments, and (b) declare the loans then outstanding immediately due and payable in full. As of January 1, 2022 and January 2, 2021, the Credit Facility had no outstanding draws and as of January 1, 2022, the Credit Facility had $1.7 million of outstanding letters of credit. The Company was in compliance with all covenants under the Credit Facility as of January 1, 2022.

The Company incurred total combined interest expense of $0.3 million, $0.3 million and $0.3 million for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, respectively, under its current and previous credit facilities.

**16. Other Non-Current Liabilities**

Other non-current liabilities consist of the following (in thousands):

| | January 1, 2022 | | January 2, 2021 |
|---|---|---|---|
| Lessee non-current lease liabilities | $ | 26,290 | $ 28,373 |
| Income tax payable, non-current | | 16,980 | 19,245 |
| Unrecognized tax benefits | | 14,864 | 11,777 |
| Deferred tax liabilities | | 5,112 | 6,247 |
| Other non-current liabilities | | 5,783 | 5,434 |
| Total other non-current liabilities | $ | 69,029 | $ 71,076 |

Unrecognized tax benefits relate to the Company's long-term portion of tax liability associated with uncertain tax positions. Authoritative guidance prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. See Note 20 to these consolidated financial statements for further details.

**17. Stock Repurchase Program**

In July 2018, the Company's Board of Directors (Board) approved a stock repurchase program, authorizing the Company to purchase up to 5.0 million additional shares of its common stock over a period of up to three years (2018 Repurchase Program). A total of 1.3 million shares were purchased by the Company pursuant to the 2018 Repurchase Program prior to its expiration in September 2021.

In October 2021, the Board approved a new stock repurchase program, authorizing the Company to purchase up to 3.0 million shares of its common stock over a period of up to three years (2021 Repurchase Program). The 2021 Repurchase Program became effective in October 2021 upon the expiration of the 2018 Repurchase Program. The Company expects to fund the 2021 Repurchase Program through its available cash, cash expected to be generated from future operations, the Credit Facility and other potential sources of capital. The 2021 Repurchase Program can be carried out at the discretion of a committee comprised of the Company's CEO and CFO through open market purchases, one or more Rule 10b5-1 trading plans, block trades and privately negotiated transactions. As of January 1, 2022, 3.0 million shares remained available for repurchase pursuant the 2021 Repurchase Program.

The following table provides a summary of the Company's stock repurchase activities during the years ended January 1, 2022, January 2, 2021 and December 28, 2019 (in thousands, except per share amounts):

| | Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | | December 28, 2019 | |
| Shares repurchased | | 546 [1] | | 456 [1] | | 275 |
| Average cost per share | $ | 235.88 | $ | 242.40 | $ | 136.61 |
| Value of shares repurchased | | 128,919 | $ | 110,540 | $ | 37,554 |

_____

[1]   Excludes shares withheld from the shares of its common stock actually issued in connection with the vesting of PSU or RSU awards to satisfy certain U.S. federal and state tax withholding obligations.

**18. Stock-Based Compensation**

Total stock-based compensation expense for the years ended January 1, 2022, January 2, 2021 and December 28, 2019 was $44.6 million, $42.2 million and $39.2 million, respectively. As of January 1, 2022, an aggregate of 10.6 million shares of common stock were reserved for future issuance under the Company's equity plans, of which 4.4 million shares were available for future grant under the Masimo Corporation 2017 Equity Incentive Plan (2017 Equity Plan). Additional information related to the Company's current equity incentive plans, stock-based award activity and valuation of stock-based awards is included below.

***Equity Incentive Plans***

***2007 Stock Incentive Plan***

Effective June 1, 2017, upon the approval and ratification of the 2017 Equity Plan, the Company's 2007 Stock Incentive Plan (2007 Equity Plan) terminated, provided that awards outstanding under the 2007 Equity Plan will continue to be governed by the terms of that plan. In addition, upon the effectiveness of the 2017 Equity Plan, an aggregate of 5.0 million shares of the Company's common stock registered under prior registration statements for issuance pursuant to the 2007 Equity Plan were deregistered and concurrently registered under the 2017 Equity Plan.

***2017 Equity Incentive Plan***

The 2017 Equity Plan permits the grant of stock options, restricted stock, RSUs, stock appreciation rights, PSUs, performance shares, performance bonus awards and other stock or cash awards to employees, directors and consultants of the Company and employees and consultants of any parent or subsidiary of the Company. Upon effectiveness, an aggregate of 5.0 million shares were available for issuance under the 2017 Equity Plan. In May 2020, the Company's stockholders approved an increase of 2.5 million shares to the 2017 Equity Plan. The aggregate number of shares that may be awarded under the 2017 Equity Plan is 7.5 million shares. The 2017 Equity Plan provides that at least 95% of the equity awards issued under the 2017 Equity Plan must vest over a period of not less than one year following the date of grant. The exercise price per share of each option granted under the 2017 Equity Plan may not be less than the fair market value of a share of the Company's common stock on the date of grant, which is generally equal to the closing price of the Company's common stock on the Nasdaq Global Select Market on the grant date.

***Stock-Based Award Activity***

***Stock Options***

The number and weighted-average exercise price of options issued and outstanding under all of the Company's equity plans are as follows (in thousands, except for weighted-average exercise prices):

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | |
|---|---|---|---|---|---|---|
| | Shares | Average Exercise Price | Shares | Average Exercise Price | Shares | Average Exercise Price |
| Options outstanding, beginning of period | 3,448 | $ 77.44 | 5,212 | $ 54.23 | 5,676 | $ 43.61 |
| Granted | 85 | 250.15 | 400 | 187.83 | 545 | 140.56 |
| Cancelled/Forfeited | (171) | 149.11 | (219) | 126.98 | (158) | 83.14 |
| Exercised | (391) | 53.55 | (1,945) | 32.41 | (851) | 33.32 |
| Options outstanding, end of period | 2,971 | $ 81.38 | 3,448 | $ 77.44 | 5,212 | $ 54.23 |
| Options exercisable, end of period | 2,175 | $ 57.09 | 2,026 | $ 47.31 | 3,311 | $ 33.80 |

Total stock option expense for the years ended January 1, 2022, January 2, 2021 and December 28, 2019 was $13.0 million, $16.1 million, and $14.8 million, respectively. As of January 1, 2022, the Company had $27.0 million of unrecognized compensation cost related to non-vested stock options that are expected to vest over a weighted average period of approximately 5.1 years.

The number and weighted-average exercise price of outstanding and exercisable stock options segregated by exercise price ranges (in thousands, except range of exercise prices and remaining contractual life) were as follows:

| | Year Ended January 1, 2022 | | | Year Ended January 2, 2021 | | |
|---|---|---|---|---|---|---|
| | Options Outstanding | | Options Exercisable | Options Outstanding | | Options Exercisable |
| Range of Exercise Prices | Number of Options | Average Remaining Contractual Life | Number of Options | Number of Options | Average Remaining Contractual Life | Number of Options |
| $15.00 to $50.00 | 1,426 | 3.33 | 1,426 | 1,696 | 4.14 | 1,518 |
| $50.01 to $80.00 | 31 | 4.75 | 29 | 42 | 5.80 | 26 |
| $80.01 to $120.00 | 805 | 5.81 | 544 | 910 | 6.83 | 408 |
| $120.01 to $160.00 | 356 | 7.36 | 124 | 476 | 8.41 | 74 |
| $160.01 to $200.00 | 226 | 8.18 | 41 | 255 | 9.17 | — |
| $200.01 to $230.00 | 29 | 8.54 | 5 | 37 | 9.50 | — |
| $230.01 to $280.00 | 98 | 8.97 | 6 | 32 | 9.53 | — |
| Total | 2,971 | 5.11 | 2,175 | 3,448 | 5.90 | 2,026 |

As of January 1, 2022 and January 2, 2021, the weighted-average remaining contractual term of options outstanding was 5.1 years and 5.9 years, respectively. As of January 1, 2022 and January 2, 2021, the weighted average remaining contractual term of options exercisable with an exercise price less than the closing price of the Company's common stock was 4.3 years and 4.7 years, respectively.

*RSUs*

The number of RSUs issued and outstanding under all of the Company's equity plans are as follows (in thousands, except for weighted average grant date fair value amounts):

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | |
|---|---|---|---|---|---|---|
| | Units | Weighted Average Grant Date Fair Value | Units | Weighted Average Grant Date Fair Value | Units | Weighted Average Grant Date Fair Value |
| RSUs outstanding, beginning of period | 2,862 | $ 99.66 | 2,797 | $ 96.85 | 2,707 | $ 95.54 |
| Granted | 112 | 257.43 | 98 | 193.77 | 100 | 133.57 |
| Canceled/Forfeited | (23) | 204.33 | (6) | 165.03 | (3) | 133.50 |
| Vested | (35) | 163.71 | (27) | 134.78 | (7) | 99.05 |
| RSUs outstanding, end of period | 2,916 | $ 104.13 | 2,862 | $ 99.66 | 2,797 | $ 96.85 |

Total RSU expense for the years ended January 1, 2022, January 2, 2021 and December 28, 2019 was $9.0 million, $5.7 million and $2.8 million, respectively. As of January 1, 2022, the Company had $26.6 million of unrecognized compensation cost related to non-vested RSU awards expected to be recognized and vest over a weighted-average period of approximately 3.5 years, excluding any contingent compensation expense related to certain RSUs that were granted to the Company's Chairman and CEO in connection with the amendment and restatement of his employment agreement. See "Employment and Severance Agreements" in Note 21 to these consolidated financial statements for further details on the CEO's employment agreement.

*PSUs*

The number of PSUs outstanding under all of the Company's equity plans are as follows (in thousands, except for weighted average grant date fair value amounts):

| | Year Ended January 1, 2022 | | | Year Ended January 2, 2021 | | | Year Ended December 28, 2019 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Units | | Weighted Average Grant Date Fair Value | Units | | Weighted Average Grant Date Fair Value | Units | | Weighted Average Grant Date Fair Value |
| PSUs outstanding, beginning of period | 444 | $ | 120.28 | 412 | $ | 102.22 | 313 | $ | 88.34 |
| Granted | 148 | (1) | 250.73 | 97 | | 179.42 | 128 | | 133.50 |
| Canceled/Forfeited | (17) | | 166.84 | (7) | | 122.13 | — | | — |
| Vested | (272) | | 86.95 | (58) | | 90.69 | (29) | | 90.69 |
| PSUs outstanding, end of period | 303 | $ | 168.68 | 444 | $ | 120.28 | 412 | $ | 102.22 |

(1) On February 22, 2021, the Audit Committee approved the weighted payout percentage for the 2018 PSU awards (three-year performance period), which were based upon the Company's actual fiscal year 2020 performance against pre-established performance objectives. Included in the granted amount are those additional PSUs earned based on actual performance achieved. These PSUs were originally awarded at target.

During the year ended December 28, 2019, the Company awarded 128,000 PSUs that will vest three years from the award date based on the achievement of certain fiscal year 2021 performance criteria approved by the Compensation Committee of the Board (Compensation Committee). If earned, the PSUs granted will vest at the time achievement level of the performance criteria is determined by the Compensation Committee. The number of shares that may be earned can range from 0% to 200% of the target amount; therefore, the maximum number of shares that can be issued under these awards is twice the original award of 128,000 PSUs or 256,000 shares. On February 14, 2022, the Audit Committee determined that the performance criteria were achieved within the range.

During the year ended January 2, 2021, the Company awarded 97,000 PSUs that will vest three years from the award date, based on the achievement of certain fiscal year 2022 performance criteria approved by the Compensation Committee. If earned, the PSUs granted will vest upon achievement of the performance criteria after the year in which the performance achievement level has been determined. The number of shares that may be earned can range from 0% to 200% of the target amount; therefore, the maximum number of shares that can be issued under these awards is twice the original award of 97,000 PSUs or 194,000 shares.

During the year ended January 1, 2022, the Company awarded 69,000 PSUs that will vest three years from the award date, based on the achievement of certain fiscal year 2023 performance criteria approved by the Compensation Committee. If earned, the PSUs granted will vest upon achievement of the performance criteria after the year in which the performance achievement level has been determined. The number of shares that may be earned can range from 0% to 200% of the target amount; therefore, the maximum number of shares that can be issued under these awards is twice the original award of 69,000 PSUs or 138,000 shares.

Based on management's estimate of the number of units expected to vest, total PSU expense for the years ended January 1, 2022, January 2, 2021 and December 28, 2019 was $22.6 million, $20.4 million and $21.6 million, respectively. As of January 1, 2022, the Company had $33.5 million of unrecognized compensation cost related to non-vested PSU awards expected to be recognized and vest over a weighted-average period of approximately 0.8 years.

*Valuation of Stock-Based Award Activity*

The fair value of each RSU and PSU is determined based on the closing price of the Company's common stock on the grant date.

The Black-Scholes option pricing model is used to estimate the fair value of options granted under the Company's stock-based compensation plans. The range of assumptions used and the resulting weighted-average fair value of options granted at the date of grant were as follows:

| | Year Ended January 1, 2022 | Year Ended January 2, 2021 | Year Ended December 28, 2019 |
|---|---|---|---|
| Risk-free interest rate | 0.3% to 0.9% | 0.2% to 1.7% | 1.4% to 2.6% |
| Expected term | 5.1 years to 5.6 years | 5.1 years to 5.1 years | 5.1 years to 5.2 years |
| Estimated volatility | 30.9% to 34.7% | 26.9% to 35.5% | 28.2% to 30.0% |
| Expected dividends | 0% | 0% | 0% |
| Weighted-average fair value of options granted | $75.72 per share | $51.10 per share | $42.29 per share |

*Risk-free interest rate.* The risk-free interest rate is based on the implied yield available on U.S. Treasury zero-coupon issues with a remaining term approximately equal to the expected term of the Company's stock options.

*Expected term.* The expected term represents the average period that the Company's stock options are expected to be outstanding. The expected term is based on both the Company's specific historical option exercise experience, as well as expected term information available from a peer group of companies with a similar vesting schedule.

*Estimated volatility.* The estimated volatility is the amount by which the Company's share price is expected to fluctuate during a period. The Company's estimated volatilities for fiscal years 2021, 2020 and 2019 are based on historical and implied volatilities of the Company's share price over the expected term of the option.

*Expected dividends.* The Board may from time to time declare, and the Company may pay, dividends on its outstanding shares in the manner and upon the terms and conditions provided by law. Any determination to declare and pay dividends will be made by the Board and will depend upon the Company's results of operations, earnings, capital requirements, financial condition, business prospects, contractual restrictions and other factors deemed relevant by the Board. In the event a dividend is declared, there is no assurance with respect to the amount, timing or frequency of any such dividends. The dividend declared in 2012 was deemed to be a special dividend and there is no assurance that special dividends will be declared again during the expected term. Based on this uncertainty and unknown frequency, for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, no dividend rate was used in the assumptions to calculate the stock-based compensation expense.

The Company has elected to recognize stock-based compensation expense on a straight-line basis over the requisite service period for the entire award, net of forfeitures. Forfeitures of stock-based awards are recognized as they occur. The total fair value of all options that vested during fiscal years 2021, 2020 and 2019 was $15.2 million, $15.1 million and $14.2 million, respectively.

The aggregate intrinsic value of options is calculated as the positive difference, if any, between the market value of the Company's common stock on the date of exercise or the respective period end, as appropriate, and the exercise price of the options. The aggregate intrinsic value of options outstanding, with an exercise price less than the closing price of the Company's common stock, as of January 1, 2022 was $628.1 million. The aggregate intrinsic value of options exercisable, with an exercise price less than the closing price of the Company's common stock, as of January 1, 2022 was $512.5 million. The aggregate intrinsic value of options exercised during the years ended January 1, 2022, January 2, 2021 and December 28, 2019 was $84.7 million, $355.3 million and $93.9 million, respectively.

The total income tax benefit recognized in the consolidated statements of operations for stock-based compensation expense was $16.4 million, $30.4 million and $15.7 million for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, respectively.

The following table presents the total stock-based compensation expense that is included in each functional line item of the consolidated statements of operations (in thousands):

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | |
|---|---|---|---|---|---|---|
| Cost of goods sold | $ | 839 | $ | 714 | $ | 445 |
| Selling, general and administrative | | 31,315 | | 31,462 | | 30,450 |
| Research and development | | 12,470 | | 10,049 | | 8,340 |
| Total | $ | 44,624 | $ | 42,225 | $ | 39,235 |

**19. Non-operating (Loss) Income**

Non-operating income consists of the following (in thousands):

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | |
|---|---|---|---|---|---|---|
| Interest income | $ | 936 | $ | 5,534 | $ | 13,917 |
| Realized and unrealized foreign currency (loss) gain | | (1,863) | | 2,631 | | (627) |
| Interest expense | | (355) | | (338) | | (328) |
| Other | | (160) | | 86 | | (12) |
| Total non-operating (loss) income | $ | (1,442) | $ | 7,913 | $ | 12,950 |

**20. Income Taxes**

The components of income before provision for income taxes are as follows (in thousands):

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | |
|---|---|---|---|---|---|---|
| United States | $ | 221,225 | $ | 214,816 | $ | 181,664 |
| Foreign | | 53,155 | | 48,920 | | 52,502 |
| Total | $ | 274,380 | $ | 263,736 | $ | 234,166 |

The following table presents the current and deferred provision (benefit) for income taxes (in thousands):

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | |
|---|---|---|---|---|---|---|
| **Current:** | | | | | | |
| Federal | $ | 38,166 | $ | 13,901 | $ | 30,218 |
| State | | 7,069 | | 6,444 | | 5,273 |
| Foreign | | 14,584 | | 8,073 | | 8,424 |
| Subtotal | $ | 59,819 | $ | 28,418 | $ | 43,915 |
| **Deferred:** | | | | | | |
| Federal | $ | (4,884) | $ | 1,354 | $ | (3,732) |
| State | | (6,054) | | (6,191) | | (1,985) |
| Foreign | | (4,148) | | (127) | | (248) |
| Subtotal | | (15,086) | | (4,964) | | (5,965) |
| Total | $ | 44,733 | $ | 23,454 | $ | 37,950 |

Included in the fiscal year 2021, 2020 and 2019 tax provisions are increases of $3.6 million, $0.2 million and $1.8 million, respectively, for tax and accrued interest related to uncertain tax positions for each fiscal year.

The reconciliation of the U.S. federal statutory tax rate to the Company's effective tax rate is as follows:

| | Year Ended January 1, 2022 | Year Ended January 2, 2021 | Year Ended December 28, 2019 |
|---|---|---|---|
| Statutory regular federal income tax rate | 21.0 % | 21.0 % | 21.0 % |
| State provision, net of federal benefit | 0.3 | 0.1 | 1.1 |
| Nondeductible executive compensation | 2.1 | 1.8 | 2.1 |
| Research and development tax credits | (1.8) | (2.2) | (1.1) |
| Foreign income taxed at different rates | (0.3) | (1.0) | (1.7) |
| U.S. tax on foreign income, net | 0.9 | 1.0 | 0.1 |
| Excess stock-based compensation | (5.5) | (10.4) | (6.0) |
| Derecognition of uncertain tax position | (1.0) | (2.2) | — |
| Other | 0.6 | 0.8 | 0.7 |
| Total | 16.3 % | 8.9 % | 16.2 % |

During the year ended December 28, 2019, the Company completed its analysis of the income tax effects of the Tax Cuts and Jobs Act of 2017 (2017 Tax Act) and, pursuant to Staff Accounting Bulletin No. 118, recorded an adjustment of approximately $0.9 million to reduce its previously estimated accrual based on additional information and guidance that became available with respect to the application of certain provisions of the 2017 Tax Act. The U.S. Treasury Department, the Internal Revenue Service, and other standard-setting bodies will continue to interpret or issue guidance on how provisions of the 2017 Tax Act will be applied or otherwise administered. As future guidance is issued, the Company may make adjustments to amounts that it has previously recorded that may materially impact its provision for income taxes in the period in which such adjustments are made.

As of January 1, 2022, the Company has accumulated undistributed earnings generated by its foreign subsidiaries of approximately $267.1 million. Because such earnings have previously been subject to U.S. tax, any additional taxes due with respect to such earnings or the excess of the amount for financial reporting over the tax basis of its foreign investments would generally be limited to foreign withholding and state taxes. The Company considers $86.5 million of these accumulated undistributed earnings as no longer permanently reinvested and has accrued foreign withholding and state taxes, net of estimated foreign tax credits, of $1.6 million. The Company intends, however, to indefinitely reinvest the remaining $180.6 million of earnings. If the Company decides to distribute such permanently reinvested earnings, the Company would accrue estimated additional income tax expense of up to approximately $8.6 million.

The components of the deferred tax assets are as follows (in thousands):

| | January 1, 2022 | | January 2, 2021 |
|---|---|---|---|
| **Deferred tax assets:** | | | |
| Deferred revenue | $ | 26,139 | $ 19,769 |
| Net operating losses | | 9,494 | 19,140 |
| Accrued liabilities | | 19,165 | 16,534 |
| Tax credits | | 13,079 | 9,398 |
| Stock-based compensation | | 8,919 | 8,385 |
| Operating lease assets | | 5,696 | 5,782 |
| Other | | — | — |
| Total | | 82,492 | 79,008 |
| Valuation allowance | | (6,524) | (15,660) |
| Total deferred tax assets | $ | 75,968 | $ 63,348 |
| | | | |
| **Deferred tax liabilities:** | | | |
| Property and equipment | $ | (12,966) | $ (12,818) |
| Acquired intangibles | | (2,649) | (5,465) |
| Operating lease liabilities | | (5,436) | (5,429) |
| Withholding taxes on undistributed foreign earnings | | (2,829) | (3,108) |
| State taxes and other | | (4,265) | (2,302) |
| Other | | (440) | (1,110) |
| Total deferred tax liabilities | | (28,585) | (30,232) |
| Net deferred tax assets | $ | 47,383 | $ 33,116 |

As of January 1, 2022, the Company has $1.6 million and $2.9 million of net operating losses from federal and various state jurisdictions, which will begin to expire in 2036 and 2039, respectively. Additionally, the Company has $29.2 million of net operating losses from foreign jurisdictions which will carryover indefinitely. The Company also has state research and development tax credits of $19.2 million that will carry forward indefinitely and $0.3 million of Canadian investment tax credits on research and development expenditures that will begin to expire in 2033. In assessing the realizability of deferred tax assets, the Company considers whether it is more likely than not that all or some portion of the deferred tax assets will not be realized. In making this determination, the Company considered all available positive and negative evidence, including scheduled reversals of liabilities, projected future taxable income, tax planning strategies and recent financial performance.

During the year ended January 2, 2021, the Company established a valuation allowance to reduce the deferred tax assets relating to certain acquired operating losses in certain foreign jurisdictions that the Company believes are not likely to be realized. During the year ended January 1, 2022, there was a decrease in the valuation allowance of $9.1 million primarily due to the loss of certain acquired operating losses as a result of an internal reorganization.

As a result of certain business and employment actions undertaken by the Company, income earned in a certain European country is subject to a reduced tax rate through 2022, which, upon meeting certain requirements, can be extended through 2026. For the year ended January 1, 2022 and January 2, 2021, the estimated income tax benefit related to such business arrangement was $1.0 million and $0.9 million, respectively, and favorably impacted net income per diluted share by $0.02 for each year.

The following is a tabular reconciliation of the total amounts of unrecognized tax benefits (in thousands):

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 |
|---|---|---|---|
| Unrecognized tax benefits (gross), beginning of period | $ | 18,005 | $ 17,009 |
| Increase from tax positions in prior period | | 543 | 471 |
| Decrease from tax position in prior period | | (850) | — |
| Increase from tax positions in current period | | 7,019 | 6,565 |
| Lapse of statute of limitations | | (3,069) | (6,040) |
| Unrecognized tax benefits (gross), end of period | $ | 21,648 | $ 18,005 |

The amount of unrecognized benefits which, if ultimately recognized, could favorably affect the tax rate in a future period was $19.8 million and $16.3 million as of January 1, 2022 and January 2, 2021, respectively. It is reasonably possible that the amount of unrecognized tax benefits in various jurisdictions may change in the next 12 months due to the expiration of statutes of limitation and audit settlements. However, due to the uncertainty surrounding the timing of these events, an estimate of the change within the next 12 months cannot be made at this time.

For the years ended January 1, 2022 and December 28, 2019, the Company recorded an expense of $0.1 million and $0.8 million for interest and penalties related to unrecognized tax benefits as part of income tax expense, respectively. For the year ended January 2, 2021, the Company recorded a benefit of $0.5 million for interest and penalties related to unrecognized tax benefits as part of income tax expense.

Total accrued interest and penalties related to unrecognized tax benefits as of January 1, 2022 and January 2, 2021 were $0.8 million and $0.7 million, respectively.

The Company conducts business in multiple jurisdictions, and as a result, one or more of the Company's subsidiaries files income tax returns in the U.S. federal, various state, local and foreign jurisdictions. The Company has concluded all U.S. federal income tax matters for years through 2017. All material state, local and foreign income tax matters have been concluded for years through 2014.

In March 2020, the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act) was enacted and signed into law in response to the market volatility and instability resulting from the COVID-19 pandemic. It includes a significant number of tax provisions and lifts certain deduction limitations originally imposed by the 2017 Tax Act. The changes are primarily related to: (1) the business interest expense disallowance rules for 2019 and 2020; (2) net operating loss rules; (3) charitable contribution limitations; (4) employee retention credit; and (5) the realization of corporate alternative minimum tax credits.

The Company has reviewed the tax provision in the CARES Act and did not identify any material impact to the Company's consolidated financial statements.

## 21. Commitments and Contingencies

### *Employee Retirement Savings Plan*

The Company sponsors a qualified defined contribution plan or 401(k) plan, the Masimo Retirement Savings Plan (MRSP), covering the Company's full-time U.S. employees who meet certain eligibility requirements. In general, the Company matches an employee's contribution up to 3% of the employee's compensation, subject to a maximum amount. The Company may also contribute to the MRSP on a discretionary basis. The Company contributed $3.4 million, $3.2 million and $2.5 million to the MSRP for the years ended January 1, 2022, January 2, 2021 and December 28, 2019, respectively, all in the form of matching contributions. In addition, the Company sponsors various defined contribution plans in certain locations outside of the United States, the contributions to which were not material for any period.

*Employment and Severance Agreements*

In July 2017, the Company entered into the First Amendment to the certain Amended and Restated Employment Agreement entered into between the Company and Mr. Kiani on November 4, 2015 (as amended, the Amended Employment Agreement). Pursuant to the terms of the Amended Employment Agreement, upon a "Qualifying Termination" (as defined in the Amended Employment Agreement), Mr. Kiani will be entitled to receive a cash severance benefit equal to two times the sum of his then-current base salary and the average annual bonus paid to Mr. Kiani during the immediately preceding three years, the full amount of the "Award Shares" (as defined in the Amended Employment Agreement) and the full amount of the "Cash Payment" (as defined in the Amended Employment Agreement). In addition, in the event of a "Change in Control" (as defined in the Amended Employment Agreement) prior to a Qualifying Termination, on each of the first and second anniversaries of the Change in Control, 50% of the Cash Payment and 50% of the Award Shares will vest, subject in each case to Mr. Kiani's continuous employment through each such anniversary date; however, in the event of a Qualifying Termination or a termination of Mr. Kiani's employment due to death or disability prior to either of such anniversaries, any unvested amount of the Cash Payment and all of the unvested Award Shares shall vest and be paid in full. Additionally, in the event of a Change in Control prior to a Qualifying Termination, Mr. Kiani's stock options and any other equity awards will vest in accordance with their terms, but in no event later than in two equal installments on each of the one year and two year anniversaries of the Change in Control, subject in each case to Mr. Kiani's continuous employment through each such anniversary date.

As of January 1, 2022, the expense related to the Award Shares and Cash Payment that would be recognized in the Company's consolidated financial statements upon the occurrence of a Qualifying Termination under the Restated Employment Agreement was approximately $292.9 million.

On January 14, 2022, the Company entered into the Second Amendment to the Amended Employment Agreement (the "Second Amendment") with Mr. Kiani. The Second Amendment provides that the RSUs granted to Mr. Kiani pursuant to the Amended Employment Agreement will vest in full upon the termination of Mr. Kiani's employment with the Company pursuant to Mr. Kiani's death or disability. As of January 14, 2022, the expense related to the Award Shares and Cash Payment that would be recognized in the Company's consolidated financial statements upon the occurrence of a Qualifying Termination under the Restated Employment Agreement was approximately $664.3 million.

As of January 1, 2022, the Company had severance plan participation agreements with five executive officers. The participation agreements (the Agreements) are governed by the terms and conditions of the Company's 2007 Severance Protection Plan, which became effective on July 19, 2007 and which was amended effective December 31, 2008.

Under each of the Agreements, the applicable executive officer may be entitled to receive certain salary, equity, medical and life insurance benefits if he is terminated by the Company without cause or if he terminates his employment for good reason under certain circumstances. Each executive officer is also required to give the Company six months advance notice of his resignation under certain circumstances.

*Cercacor Cross-Licensing Agreement Provisions*

The Company's Cross-Licensing Agreement with Cercacor contains annual minimum aggregate royalty obligations for use of the rainbow® licensed technology. The current annual minimum royalty obligation is $5.0 million. Upon a change in control (as defined in the Cross-Licensing Agreement) of the Company or Cercacor: (i) all rights to the "Masimo" trademark will be assigned to Cercacor if the surviving or acquiring entity ceases to use "Masimo" as a company name and trademark; (ii) the option to license technology developed by Cercacor for use in blood glucose monitoring will be deemed automatically exercised and a $2.5 million license fee for this technology will become immediately payable to Cercacor; and (iii) the minimum aggregate annual royalties payable to Cercacor for carbon monoxide, methemoglobin, fractional arterial oxygen saturation, hemoglobin and/or glucose measurements will increase to $15.0 million per year until the exclusivity period of the agreement ends, plus up to $2.0 million for each additional vital sign measurement with no maximum ceiling for non-vital sign measurements.

*Purchase Commitments*

Pursuant to contractual obligations with vendors, the Company had $170.2 million of purchase commitments as of January 1, 2022, that are expected to be purchased within one year. These purchase commitments have been made for certain inventory items in order to secure sufficient levels of those items, other critical inventory and manufacturing supplies and to achieve better pricing.

*Other Contractual Commitments*

In the normal course of business, the Company may provide bank guarantees to support government hospital tenders in certain foreign jurisdictions. As of January 1, 2022, the Company had approximately $3.5 million in outstanding unsecured bank guarantees.

In certain circumstances, the Company also provides limited indemnification within in various customer contracts whereby the Company indemnifies the parties to whom it sells its products with respect to potential infringement of intellectual property, and against bodily injury caused by a defective Company product. It is not possible to predict the maximum potential amount of future payments under these or similar agreements, due to the conditional nature of the Company's obligations and the unique facts and circumstances involved. As of January 1, 2022, the Company had not incurred any significant costs related to contractual indemnification of its customers.

On February 15, 2022, we announced our entry into a definitive merger agreement to acquire Viper Holdings Corporation, which owns Sound United ("Sound United"), a consumer technology company that owns a portfolio of premium brands, including Bowers & Wilkins, Denon, Polk Audio and Marantz. Pursuant to the merger agreement, the Company will pay approximately $1.025 billion, subject to adjustments. The transaction is subject to customary closing conditions, including receipt of certain regulatory approvals, and is anticipated to close in the middle of 2022. The Company expects to finance the acquisition through a combination of cash on hand and new credit facility. The Company received a debt commitment letter for a credit facility in the amount of $800 million and expects to secure this financing in the event the pending acquisition closes.*Concentrations of Risk*

The Company is exposed to credit loss for the amount of its cash deposits with financial institutions in excess of federally insured limits. The Company invests a portion of its excess cash in time deposits with major financial institutions. As of January 1, 2022, the company had $745.3 million of bank balances of which $5.1 million was covered by either the U.S. Federal Deposit Insurance Corporation limit or foreign countries' deposit insurance organizations.

The Company's ability to sell its products to U.S. hospitals depends in part on its relationships with GPOs. Many existing and potential customers for the Company's products become members of GPOs. GPOs negotiate pricing arrangements and contracts, sometimes exclusively, with medical supply manufacturers and distributors, and these negotiated prices are made available to a GPO's affiliated hospitals and other members. During the years ended January 1, 2022, January 2, 2021 and December 28, 2019, revenue from the sale of the Company's products to customers that are members of GPOs approximated 51.9%, 49.3% and 55.3% of total product revenue, respectively.

For the years ended January 1, 2022, January 2, 2021 and December 28, 2019, the Company had sales through two just-in-time distributors that represented 14.6% and 9.6%, 11.5% and 10.1%, and 11.1% and 13.0% of total product revenue, respectively. As of January 1, 2022 and January 2, 2021, one just-in-time distributor represented 7.4% and 6.7% of the Company's accounts receivable balance, respectively.

As of January 1, 2022 and January 2, 2021, one customer represented 15.7% and 9.1%, respectively, of the Company's accounts receivable balance. The receivable balance related to such customer is fully secured by letters of credit.

The majority of the Company's historical royalty revenue arose from one agreement with Medtronic plc (Medtronic). For the years ended January 1, 2022 and January 2, 2021, the Company recognized no royalty revenue pursuant to this agreement. For the year ended December 28, 2019, the Company recognized royalty revenue pursuant to this agreement of $0.7 million. Pursuant to the agreement, Medtronic is not obligated to pay royalties to the Company for its sales occurring after October 6, 2018.

*Litigation*

During the third quarter of fiscal year 2017, the Company became aware that certain amounts had been paid by a foreign government customer to the Company's former appointed foreign agent in connection with a foreign government tender, but had not been remitted by such agent to the Company in accordance with the agency agreement. On December 28, 2017, the Company initiated arbitration proceedings against this foreign agent after unsuccessful attempts to recover such remittances. As a result, the Company recorded a net charge of approximately $10.5 million during the fourth quarter of fiscal year 2017 in connection with this dispute, of which $2.0 million was recovered during the year ended December 28, 2019. An arbitration hearing was held on February 11, 2019. On July 8, 2019, the arbitrator awarded the Company $10.5 million in damages, fees and costs. On January 12, 2020, the Company received notice that bankruptcy restructuring proceedings had been initiated for the foreign agent. The Company filed its claim with the bankruptcy trustee on January 16, 2020. In July 2020, the Company was notified that a bankruptcy reorganization proposal had been submitted for voting by creditors in August 2020. The reorganization proposal was rejected by a vote of the creditors on August 26, 2020. On October 22, 2020, the Company filed a

petition seeking to enforce the arbitration award. Although the Company intends to vigorously pursue the collection of the arbitration award, there is no guarantee that the Company will be successful in these efforts.

On January 2, 2014, a putative class action complaint was filed against the Company in the U.S. District Court for the Central District of California (District Court) by Physicians Healthsource, Inc. The complaint alleges that the Company sent unsolicited facsimile advertisements in violation of the Junk Fax Protection Act of 2005 and related regulations. The complaint seeks $500 for each alleged violation, treble damages if the District Court finds the alleged violations to be knowing, plus interest, costs and injunctive relief. On March 26, 2019, an amended complaint was filed adding Radha Geismann, M.D. PC as an additional named plaintiff. On June 17, 2019, the plaintiffs filed their motion for class certification. On September 10, 2019, the parties filed motions for summary judgment. On September 30, 2019, the Company filed its opposition to the motion for class certification, and the plaintiffs filed their reply on October 7, 2019. On November 21, 2019, the District Court issued an order denying the plaintiffs' motion for class certification and granting in part and denying in part the Company's motion for summary judgment, and deferring ruling on the plaintiffs' motion for summary judgment. On December 5, 2019, the plaintiffs filed a petition for permission to appeal the order denying class certification, which was denied on January 24, 2020. Trial of the individual plaintiffs' claims was scheduled for June 2, 2020, but on April 1, 2020, the District Court vacated the trial date and directed the parties to conduct an in-person mediation. The mediation has not occurred and no new trial date has been set. On July 13, 2020, the District Court issued an order granting in part and denying in part the plaintiffs' motion for summary judgment.

The Company believes it has good and substantial defenses to the claims, but there is no guarantee that the Company will prevail. The Company is unable to determine whether any loss will ultimately occur or to estimate the range of such loss; therefore, no amount of loss has been accrued by the Company in the accompanying consolidated financial statements.

On January 9, 2020, the Company filed a complaint against Apple Inc. (Apple) in the District Court for infringement of a number of patents, for trade secret misappropriation, and for ownership and correction of inventorship of a number of Apple patents listing one of its former employees as an inventor. Apple filed petitions for Inter Partes review of the asserted patents in the U.S. Patent and Trademark Office (PTO). The PTO has instituted Inter Partes review of the asserted patents. On October 13, 2020, the District Court stayed the patent infringement claims pending completion of the Inter Partes review proceedings. On February 5, 2021, the Company filed a fourth amended complaint. On February 26, 2021, Apple filed a partial motion to dismiss the trade secrets claim in the fourth amended complaint. On April 21, 2021, the District Court issued an order granting in part and denying in part the motion to dismiss. On May 5, 2021, Apple filed its answer to the fourth amended complaint. On December 7, 2021, Apple filed a motion for partial summary judgment on the trade secrets claim, which is currently pending. The Company is seeking damages, injunctive relief, and declaratory judgment regarding ownership of the Apple patents.

On June 30, 2021, the Company filed a complaint with the U.S. International Trade Commission (ITC) against Apple for infringement of a number of other patents. The Company filed an amended complaint on July 12, 2021. On August 13, 2021, the ITC issued a Notice of Institution of Investigation on the asserted patents. An evidentiary hearing is scheduled for June 6-10, 2022, and the target date for completion of the ITC investigation is January 16, 2023. The Company is seeking an exclusion order and a permanent cease and desist order. Although the Company intends to vigorously pursue all of its legal remedies, there is no guarantee that the Company will be successful in these efforts.

From time to time, the Company may be involved in other litigation and investigations relating to claims and matters arising out of its operations in the normal course of business. The Company believes that it currently is not a party to any other legal proceedings which, individually or in the aggregate, would have a material adverse effect on its consolidated financial position, results of operations or cash flows.

## 22. Segment Information and Enterprise Reporting

The Company operates in one segment based upon the Company's organizational structure and the way in which the Company's chief operating decision maker, the CEO, reviews financial information, including gross profit, operating expenses, operating income, and net income presented on a consolidated basis, accompanied by disaggregated information about revenues by geographic region for purposes of making operating decisions and assessing financial performance. In addition, the Company's assets are primarily located in the U.S. The Company does not produce reports for, or measure the performance of, its geographic regions on any asset-based metrics. Therefore, geographic information is presented only for revenues and long-lived assets.

The following schedule presents an analysis of the Company's product revenues based upon the geographic area to which the product was shipped (in thousands, except percentages):

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | |
|---|---|---|---|---|---|---|
| **Geographic area by destination:** | | | | | | |
| United States (U.S.) | $ 822,410 | 66.4 % | $ 763,069 | 66.7 % | $ 636,371 | 68.0 % |
| Europe, Middle East and Africa | 251,839 | 20.3 | 238,681 | 20.9 | 183,363 | 19.6 |
| Asia and Australia | 123,595 | 10.0 | 103,756 | 9.1 | 87,961 | 9.4 |
| North and South America (excluding U.S.) | 41,309 | 3.3 | 38,238 | 3.3 | 28,713 | 3.0 |
| Total product revenue | $ 1,239,153 | 100.0 % | $ 1,143,744 | 100.0 % | $ 936,408 | 100.0 % |

The Company's consolidated long-lived assets (tangible non-current assets) by geographic area are (in thousands, except percentages):

| | Year Ended January 1, 2022 | | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | |
|---|---|---|---|---|---|---|
| **Long-lived assets by geographic area:** | | | | | | |
| United States | $ 239,394 | 86.9 % | $ 238,094 | 86.9 % | $ 216,650 | 98.5 % |
| International | 36,046 | 13.1 | 35,755 | 13.1 | 3,276 | 1.5 |
| Total | $ 275,440 | 100.0 % | $ 273,849 | 100.0 % | $ 219,926 | 100.0 % |

**MASIMO CORPORATION**
**VALUATION AND QUALIFYING ACCOUNTS**
**Years ended January 1, 2022, January 2, 2021 and December 28, 2019**
**(in thousands)**

| Description | Balance at Beginning of Period | Additions Charged to Expense and Other Accounts | Amounts Charged Against Reserve | Balance at End of Period |
|---|---|---|---|---|
| Year ended January 1, 2022 | | | | |
| Allowance for credit losses | $ 1,805 | $ 728 [1] | $ (96) | $ 2,437 |
| Allowance for sales returns and allowances | 1,222 | (953) [1] | (104) | 165 |
| Year ended January 2, 2021 | | | | |
| Allowance for credit losses | 2,206 | 128 [1] | (529) | 1,805 |
| Allowance for sales returns and allowances | 700 | 814 [1] | (292) | 1,222 |
| Year ended December 28, 2019 | | | | |
| Allowance for credit losses | 1,535 | 1,021 | (350) | 2,206 |
| Allowance for sales returns and allowances | 432 | 1,696 | (1,428) | 700 |

---

[1]    Additions charged to expense and other accounts include amounts from immaterial business combinations.

F-43



**MASIMO CORPORATION**

The following abbreviations, when used in the inscription on the face of this certificate shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM – as tenants in common
TEN ENT – as tenants by the entireties
JT TEN   – as joint tenants with right of
                survivorship and not as tenants
                in common

UNIF GIFT MIN ACT ...................Custodian......................
                                          (Cust)                      (Minor)
                        under Uniform Gifts to Minors
                        Act.................................................
                                                        (State)
UNIF TRAN MIN ACT....................Custodian.................
                                          (Cust)                      (Minor)
                        under Uniforms Transfers to Minors
                        Act.................................................
                                                        (State)

*Additional abbreviations may also be used though not in the above list*

For Value Received, _____ hereby sell, assign and transfer unto

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

_____

(PLEASE PRINT OR TYPE NAME AND ADDRESS, INCLUDING ZIP CODE OF ASSIGNEE)

_____

_____

_____Shares

of the stock represented by the within Certificate, and do hereby irrevocably constitute and appoint

_____Attorney

to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.

DATED_____

X_____

**NOTICE**: THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

**Signature(s) Guaranteed**

By_____

The Signature(s) must be guaranteed by an eligible guarantor institution (Bank, Stockbrokers, Savings and Loan Associations or Credit Unions with membership in an approved Signature Guarantee Medallion Program), pursuant to SEC Rule 17Ad-15.

***Certain identified information has been omitted from this exhibit because it is both (i) not material and (ii) would likely cause competitive harm to the Registrant if publicly disclosed. Such omitted information is indicated by brackets ("[…***…]") in this exhibit. ***

**PURCHASE AND SALE AGREEMENT**
**220 Prior Street, Vancouver**

THIS AGREEMENT is made the 11th day of February, 2022.

BETWEEN:

**MASIMO CANADA ULC**

    (the "**Purchaser**")

AND:

**KELTIC (PRIOR) DEVELOPMENT LIMITED PARTNERSHIP**

    (the "**Vendor**")

1.    **Basic Terms**

    The basic terms of this Purchase and Sale Agreement (this "**Agreement**") are:

| | | |
|---|---|---|
| 1.1 | **Address of Purchaser:** | 1021 West Hastings Street, Suite 500<br>Vancouver, British Columbia V6E 0C3<br>Attention: […***…]<br>E-mail:  […***…] |
| 1.2 | **Address of Vendor:** | 2338 – 666 Burrard Street<br>Vancouver, British Columbia V6C 2X8<br><br>Attention: […***…]<br>E-mail: […***…] |
| 1.3 | **Purchaser's Solicitors:** | Stirling LLP |
| | **Address of Purchaser's Solicitors:** | Stirling LLP<br>1460 – 701 West Georgia Street<br>Vancouver, BC V7Y 1E4<br><br>Attention: […***…]<br>E-mail: […***…] |

| | | |
|---|---|---|
| 1.4 | **Vendor's Solicitors:** | Koffman Kalef LLP |
| | **Address of Vendor's Solicitors:** | 1900 - 885 West Georgia Street<br>Vancouver, BC V6C 3H4 |
| | | Attention: […***…]<br>E-mail: […***…] |
| 1.5 | **Lands:** | |
| | **Municipal Address:** | 220 Prior Street, Vancouver, British Columbia |
| | **Legal Description:** | PID: 010-813-357, Lot A (Reference Plan 2883) of Lot 20 District Lots 181, 196 and 2037 Plan 6780 |
| 1.6 | **Purchase Price:** | $123,000,000.00 Canadian Dollars plus GST |
| 1.7 | **Deposit:** | |
| | **Initial Deposit:** | $1,000,000.00 |
| | **Second Deposit:** | $20,000,000.00 |
| | | (the Initial Deposit and the Second Deposit are together referred to as the "**Deposit**") |
| | **Deposit To Be Paid In Trust To:** | Subject to Sections 4.1 and 5.1, Koffman Kalef LLP (the "**Deposit Holder**") |
| 1.8 | **Acceptance Date:** | The date on which this Agreement is fully executed and delivered |
| 1.9 | **Subject Removal Date:** | 30 days following the Acceptance Date |
| 1.10 | **Completion Date:** | The date which is the first Business Day that is the latter of sixty (60) days after: (a) completion of construction of the Building, (as defined in Section 22.2 below); or (b) a certificate of completion being issued to the Contractor with respect to the Construction Contract. |

The foregoing basic terms are approved by the parties. Any reference in this Agreement to a basic term will be construed to include the provision set forth above as well as any additional terms and conditions of this Agreement where the basic term is more fully set forth.

2

2.   **Additional Definitions**

2.1   "**Amount**" has the meaning ascribed to such term in Section 27.3;

2.2   "**ARC**" means an advance ruling certificate issued under section 102 of the Competition Act;

2.3   "**Board Approval Condition**" has the meaning ascribed to such term in Section 10.1;

2.4   "**Board Approval Condition Date**" has the meaning ascribed to such term in Section 10.1;

2.5   "**Building**" means all buildings, structures and improvements constructed and developed on or under the Lands prior to the time of Closing;

2.6   "**Building Permit**" has the meaning ascribed to such term in Section 11.3;

2.7   "**Building Permit Condition Date**" has the meaning ascribed to such term in Section 11.3;

2.8   "**Building Permit Mutual Condition**" has the meaning ascribed to such term in Section 11.3;

2.9   "**Business Day**" means any day excluding Saturdays, Sundays and statutory holidays in British Columbia and any day in which the Land Title Office is closed for business;

2.10   "**CRA**" has the meaning ascribed to such term in Section 20.1;

2.11   "**City**" means the City of Vancouver;

2.12   "**Closing**" means the completion of the transaction contemplated in this Agreement;

2.13   "**Commissioner**" means the Commissioner of Competition appointed under the Competition Act and includes a person duly authorized to exercise the powers and to perform the duties of the Commissioner and includes his or her staff at the Competition Bureau;

2.14   "**Competition Act**" means the Competition Act (Canada), as amended from time to time, and includes the regulations thereunder;

2.15   "**Competition Act Approval**" means any one of the following: (i) the Commissioner shall have issued an ARC in respect of the transaction contemplated by this Agreement; or (ii) the Commissioner shall have issued a letter to the parties indicating that he or she does not, at that time, intend to make an application under section 92 of the Competition Act in respect of the Transaction and either the relevant waiting period under section 123 of the Competition Act shall have expired or been terminated or the obligation to provide pre-merger notification in accordance with Part IX of the Competition Act shall have been waived pursuant to paragraph 113(c) of the Competition Act;

2.16   "**Construction Contract**" means the fixed price head construction contract to be entered into between the Vendor and the Contractor and approved by the Purchaser, such approval not to be unreasonably withheld, conditioned or delayed, providing, among other things, for the construction by the Contractor of the Building on the Lands in accordance with the Contract Plans and Specifications;

2.17   "**Contractor**" means Syncra Construction Corp. or another level 1 contractor mutually agreed upon between the Vendor and Purchaser;

2.18   "**Contract Plans and Specifications**" means the plans and specifications that are approved in writing by the Vendor and the Purchaser (the approval of the Purchaser not to be unreasonably withheld, conditioned or delayed), and which are attached to and form part of the Construction Contract, which plans and specifications will be based primarily on the building plans attached hereto as Schedule "B";

2.19    "**Contracts**" means such written service, operation, management, maintenance, or other contracts or equipment leases and other agreements related thereto, pertaining to the operation of the Property;

2.20    "**Deficiency Holdback Amount**" has the meaning ascribed to such term in Section 19.2;

2.21    "**Deficiency List**" has the meaning ascribed to such term in Section 19.1;

2.22    "**Delivery Date**" has the meaning ascribed to such term in Section 13.1;

2.23    "**Deposit**" has the meaning ascribed to such term in Section 1.7;

2.24    "**Deposit Holder**" has the meaning ascribed to such term in Section 1.7;

2.25    "**Development Rights**" means all permits and approvals, municipal rezoning and development applications and development rights relating to or in connection with the development and construction of the Lands and the Building;

2.26    "**Due Diligence Documents**" has the meaning ascribed to it in Section 13.1;

2.27    "**Equipment**" means all chattels, tools, equipment, furniture and other personal property owned by the Vendor, located on the Lands at the time of Closing and used solely or primarily in connection with the operation of the Lands and the Building;

2.28    "**GST**" has the meaning ascribed to such term in Section 20.1;

2.29    "**Inspections**" has the meaning ascribed to such term in Section 13.4;

2.30    "**Lands**" has the meaning ascribed to such term in Section 1.5;

2.31    "**MOE**" means the Ministry of Environment and Climate Change Strategy;

2.32    "**Mutual Conditions**" has the meaning ascribed to such term in Section 11.1;

2.33    "**Mutual Conditions Date**" means six (6) months after the Acceptance Date;

2.34    "**Nominee**" means Keltic (Prior) GP Ltd.

2.35    "**Option to Purchase**" has the meaning ascribed to such term in Section 6.1;

2.36    "**Outside Completion Date**" means July 31, 2025;

2.37    "**Permits**" means all licences and permits obtained by the Vendor, if any, for the development, construction, and operation of the Building and the Lands;

2.38    "**Permitted Encumbrances**" has the meaning ascribed to such term in Section 3.1;

2.39    "**Property**" has the meaning ascribed to such term in Section 3.1;

2.40    "**Purchaser's Condition**" has the meaning ascribed to such term in Section 9.1;

2.41    "**Purchaser's Mortgage**" has the meaning ascribed to such term in Section 7.1;

2.42    "**Serviced**" means in respect of the Lands, any public road access, water, storm sewer, sanitary sewer, natural gas, electrical, fibre optic and telecommunications service, installed or constructed generally in accordance with the Contract Plans and Specifications;

2.43    "Subject Removal Date" has the meaning given to such term in Section 1.9;

4

2.44    "**Shares**" has the meaning given to such term in Section 3.3;

2.45    "**Transfer**" has the meaning ascribed to such term in Section 26.1(a);

2.46    "**Vendor's Works**" has the meaning ascribed to such term in Section 16.1(i).

3.    **Purchase and Sale and Option to Acquire Shares of Nominee**

3.1    The Purchaser agrees to purchase, and the Vendor agrees to sell, all of the Vendor's right, title and interest in and to:

    (a)    the Lands;

    (b)    the Building;

    (c)    the shares of the Nominee, if elected to be purchased by the Purchaser pursuant to Section 3.3;

    (d)    the Contracts, subject to Section 17;

    (e)    the Equipment;

    (f)    the Permits, subject to Section 17;

    (g)    the Development Rights; and

    (h)    Contract Plans and Specifications owned by the Vendor and which are in the possession or control of the Vendor,

(collectively, the "**Property")**,

free and clear of all liens, charges, encumbrances, save and except for the charges and encumbrances listed in Schedule A attached to this Agreement (the "**Permitted Encumbrances**", for the Purchase Price and upon the terms and conditions set forth in this Agreement.

3.2    The Purchaser will have the sole right to name the Building, to determine the location and specifications of any post-Closing signage attached to the Building or on the Lands, subject to compliance with applicable laws, and, if applicable, to select the civic address of the Building if permitted by the City provided that the Purchaser provides the Vendor with all information regarding its intended post-Closing signage needs so that the location can be factored into design and permit applications to ensure that power and mounting points are in the correct locations. The cost of any changes to that initially proposed by the Purchaser and included in the approved Contract Plans and Specifications shall be borne by the Purchaser. Notwithstanding the foregoing, the Purchaser shall have no right to use of the name "Keltic", "Keltic Prior", "Keltic Canada," or any variation thereof.

3.3    The Purchaser shall have the option, in its sole discretion, to purchase all of the issued and outstanding shares (the "**Shares**") of the Nominee, upon written notice by the Purchaser to the Vendor's Solicitor, received not later than thirty (30) days before the Completion Date, and the following terms and conditions shall apply:

5

(a)   the Purchase Price shall be the purchase price for all of the Purchased Assets and the Shares. The amount of One Dollar ($1.00), represents the purchase price of the Shares and the remainder will be allocated to the Lands and Building; and

(b)   the share purchase terms and conditions relating to the sale and purchase of the Shares set forth in Schedule C attached hereto will apply and will be binding upon the Vendor and the Purchaser.

3.4   If the Purchaser exercises the option to acquire the Shares, on Closing, the Vendor will receive a credit on the vendor's statement of adjustments equal to fifty percent (50%) of the amount the Purchaser would have paid in property transfer tax if the Shares were not acquired.

4.   **Purchase Price**

4.1   The Purchase Price for the Property will be paid by the Purchaser to the Vendor as follows:

(a)   by payment of the Initial Deposit by the Purchaser to the Deposit Holder within five (5) Business Days after the execution and delivery by the Vendor and the Purchaser of this Agreement, to be deposited and, subject to Section 4.1(b), held by the Deposit Holder, in trust in an interest-bearing account which interest shall accrue to the benefit of the Purchaser;

(b)   by payment of the Second Deposit by the Purchaser directly to the Vendor within five (5) Business Days after the Subject Removal Date, at which time the Deposit Holder shall be irrevocably authorized and directed to release the Initial Deposit to the Vendor; and

(c)   by payment of the balance of the Purchase Price, subject to adjustment as provided in Section 23, by the Purchaser to the Vendor on the Completion Date in accordance with the provisions of this Agreement.

4.2   It is a condition of the release of the Deposit to the Vendor that the Deposit shall be used by the Vendor solely for the servicing, development and construction costs related to development of the Lands and construction of the Building, and the Deposit shall not be used to fund other projects being developed by the Vendor or its related entities. At the written request of the Purchaser, the Vendor will provide evidence, satisfactory to the Purchaser, acting reasonably, confirming that the Deposit has been deployed in accordance with the requirements of this section, and after the commencement of construction of the Building, the Vendor will provide, at the written request of the Purchaser, not more frequently than on a quarterly basis, a written report to the Purchaser summarizing the amount of the Deposit used by the Vendor to fund construction costs related to the development of the Lands and construction of the Building until the Deposit has been fully deployed to the project.

4.3   The Vendor shall not be required to pay interest on the Deposit to the Purchaser unless the Vendor is in default under the terms of this Agreement, in which case the Vendor shall pay interest on the Deposit at a rate of five percent (5%), compounded annually, from the time the Deposit was released to the Purchaser until the Deposit funds are repaid in full to the Purchaser.

5.    **Deposit**

5.1    The Vendor and Purchaser agree that any interest accruing on the Deposit for so long as it is held by the Deposit Holder, will be for the account of the Purchaser, unless otherwise stated herein, and that the Deposit will be paid as follows:

(a)    the Initial Deposit and the Deposit, if applicable, together with any interest earned, will be returned to the Purchaser if the Purchaser's Condition, the Board Approval Condition, the Mutual Conditions and/or the Building Permit Mutual Condition (as the Board Approval Condition, the Mutual Conditions and the Building Permit Mutual Condition relates to the Purchaser's obligations) are not satisfied or waived by the Purchaser by the Subject Removal Date, the Board Approval Condition Date, the Mutual Conditions Date or the Building Permit Condition Date, as applicable;

(b)    the Initial Deposit and the Deposit, if applicable, together with any interest earned, will be returned to the Purchaser if the Board Approval Condition, the Mutual Conditions and/or the Building Permit Mutual Condition (as the Board Approval Condition, the Mutual Conditions and Building Permit Mutual Condition relates to the Vendor' obligations) are not satisfied or waived by the Vendor by the Board Approval Condition Date, the Mutual Conditions Date or the Building Permit Condition Date, as applicable;

(c)    the Deposit, together with any interest earned, will be forfeited to the Vendor, if the Purchaser's Condition, the Board Approval Condition, the Mutual Conditions, the Building Permit Mutual Condition and the Competition Condition are all satisfied or waived, as the case may be, and the Purchaser fails to complete the purchase in accordance with this Agreement or if the Purchaser repudiates this Agreement, without prejudice to any other rights the Vendor may have in respect of such failure or repudiation by the Purchaser;

(d)    the Deposit, together with any interest earned, will be returned by the Vendor to the Purchaser if the Competition Condition is not satisfied; and

(e)    the Deposit, together with any interest earned, will be refunded to the Purchaser upon demand, if the Vendor fails to complete the transaction in accordance with this Agreement or if the Vendor repudiates this Agreement, without prejudice to any other rights the Purchaser may have in respect of such failure or repudiation by the Vendor.

The Vendor acknowledges receipt of the sum of $10.00 from the Purchaser, in consideration of the Vendor allowing the Purchaser the benefit of the Purchaser's Condition and will not revoke this Agreement while the Purchaser's Condition remains outstanding. Such non-refundable sum is not refundable in any circumstances but will be applied to the Purchase Price on the Completion Date.

6.    **Option to Purchase**

6.1    The Vendor will grant the Purchaser an option to purchase within five (5) Business Days after the satisfaction of the Building Permit Mutual Condition, as evidence of the Purchaser's right to acquire the Property from the Vendor pursuant to the terms of this Agreement, and the option to purchase will include the following terms:

(a)    the Purchaser will only be permitted to exercise the option to purchase if the Vendor is in material default of the terms and conditions of this Agreement and fails to remedy the material default within one hundred and eighty (180) days of receiving written notice of the default from the Purchaser provided, however, that such one hundred and eighty (180)

day period may be extended by an additional ninety (90) days if reasonably necessary and the Vendor is diligently and continuously working to rectify the default;

(b)    if the Vendor is in material default of this Agreement and the Purchaser exercises the option to purchase, the purchase price under the option to purchase will be the fair market value of the Lands and the improvements on the Lands at the time the option to purchase is exercised without any prejudice to any claims either party may have against the other for breach of this Agreement;

(c)    if the parties cannot mutually agree on the fair market value of the Lands and improvements on the Lands within thirty (30) days of the Purchaser exercising the option to purchase, each party will have thirty (30) days to obtain a professional third party appraisal of the Lands and improvements and will simultaneously exchange the professional third party appraisal reports. If the difference between the two appraisals is within fifteen percent (15%) of the value of the higher appraisal, the purchase price under the option to purchase will be the average of the two appraisals. If the difference between the appraisals is greater than fifteen percent (15%) of the higher appraisal, the parties will mutually approve an independent professional appraiser with more than twenty (20) years' experience to prepare a third appraisal report and whichever of the first two appraisals is closer to the third appraisal report will be the purchase price under the option to purchase. Each party will be responsible for the costs of the appraisal they obtain in the first instance and the fees of the appraiser who prepares the third appraisal report, if necessary, will be shared equally between the parties;

(d)    the Deposit paid by the Purchaser will be credited to the Purchaser towards the payment of the purchase price under the option to purchase;

(e)    the option to purchase will expire on the earlier of:

　　(i)    the transfer of the Property pursuant to the terms of this Agreement;

　　(ii)    the lawful termination of this Agreement by the Vendor; or

　　(iii)    the termination of this Agreement by the Purchaser;

(f)    the option to purchase will be fully subordinate and postponed to the Vendor's construction financing and any mezzanine financing obtained by the Vendor to finance the development of the Lands and construction of the Building provided the principal amount of such site specific financing without any right of consolidation with other loans, collectively, does not exceed $85,000,000 and the Purchaser will promptly sign subordination, standstill and postponement agreements on commercially reasonable terms required by the Vendor's construction lender and mezzanine lender, if any;

(g)    the Purchaser will promptly sign priority agreements in registrable form in favour of the City and all utility and telecommunication providers with respect to non-financial covenants registered on title to the Lands with respect to the development of the Lands and the construction of the Building; and

(h)    the Purchaser will sign and register a discharge of the option to purchase from title to the Lands promptly after the expiry of the option to purchase,

(the "**Option to Purchase**"). The form of the Option to Purchase will be settled by the parties on or before the Mutual Conditions Date. The Vendor will sign the Option to Purchase in a form that the Land Title Office will accept for registration and acknowledges the Purchaser will register the Option to Purchase on title to the Lands.

7.  **Purchaser's Mortgage**

7.1   Concurrently with payment of the Second Deposit by the Purchaser directly to the Vendor, the Vendor will grant the Purchaser a mortgage, as security for the release of the Deposit to the Vendor, the interest accrued on the Deposit (subject to Section 4.3), and the Vendor's performance of its obligations under this Agreement. The mortgage will include the following terms:

(a)   principal amount of twenty one million dollars ($21,000,000);

(b)   no payments will be due under the mortgage unless there is an event of default;

(c)   the mortgage will be fully subordinate and postponed to the Vendor's site specific construction financing and any mezzanine financing obtained by the Vendor to finance the development of the Lands and construction of the Building and the Purchaser will promptly sign upon request subordination, standstill and postponement agreements on commercially reasonable terms required by the Vendor's construction lender and mezzanine lender, if any;

(d)   the principal amount of the prior ranking construction financing and mezzanine financing, collectively, will not exceed $85,000,000 without the prior written consent of the Purchaser, such consent not to be unreasonably withheld, and the construction lender and mezzanine lender will have no right to consolidate its loan with any other loan owed by the Vendor to such lenders;

(e)   the Purchaser will promptly sign priority agreements in registrable form in favour of the City and all utility and telecommunication providers with respect to non-financial covenants registered on title to the Lands with respect to the development of the Lands and the construction of the Building; and

(f)   the Purchaser will sign and register a discharge of the mortgage if the Vendor lawfully terminates this Agreement or the Property is transferred to the Purchaser in accordance with the terms of this Agreement and, in such instance, no amount or compensation will be payable by the Vendor to the Purchaser in connection with the discharge of the mortgage,

(the "**Purchaser's Mortgage**").

The form of the Purchaser's Mortgage, which will include a beneficial mortgage from the Vendor, will be settled by the parties, acting reasonably, on or before the Subject Removal Date. The Vendor will cause the Nominee to sign the Purchaser's Mortgage in a form that the Land Title Office will accept for registration and acknowledges the Purchaser will register the Purchaser's Mortgage on title to the Lands.

9

8.  **Allocation of Purchase Price**

8.1  The parties will use reasonable efforts to agree upon an allocation of the Purchase Price between the Lands, the Building and the other components of the Property prior to the Completion Date, but failure to agree upon the same will not affect the enforceability of this Agreement or affect or impair any of the rights or obligations of the parties under this Agreement. If, despite their reasonable efforts, the parties do not agree upon an allocation, each of the parties will be entitled to allocate the amount of the Purchase Price among the categories of the Property in such manner as each party deems appropriate in the circumstances.

9.  **Purchaser's Conditions Precedent**

9.1  The obligation of the Purchaser to complete the purchase of the Property on the Completion Date is subject to and conditional upon the condition precedent in this Section 9.1 (the "**Purchaser's Condition**") being satisfied or waived not later than 5:00 p.m. on the Subject Removal Date, namely the Purchaser being satisfied in its sole discretion with the result of its investigations, inspections and reviews in respect of the Property and any other due diligence, investigations, inspections or inquiries of the Property, the Nominee and/or the Vendor that the Purchaser deems necessary or desirable.

9.2  The Purchaser's Condition is for the sole benefit of the Purchaser and may be unilaterally waived in writing in whole or in part by the Purchaser at any time up to and including the time specified above. If the Purchaser fails to notify the Vendor in writing of the satisfaction or waiver of the Purchaser's Condition by the time specified above, this Agreement will automatically terminate. In such event, the Deposit Holder is hereby irrevocably directed by the Vendor and the Purchaser to repay the Initial Deposit and accrued interest, in full, to the Purchaser without deduction save for the sum of $10.00 (which will be retained by the Vendor in any event as consideration for the Vendor agreeing to not revoke or withdraw this Agreement prior to the Subject Removal Date, except as may be permitted pursuant to any other provision included in this Agreement), and thereafter neither party will have any further obligations to the other under this Agreement, except for the obligation of the Purchaser to maintain the confidentiality of all disclosed documents and instruments delivered to it, to return all copies of such documents and instruments.

10.  **Board Approval of the Agreement**

10.1  The obligations of the Purchaser and the Vendor to complete the purchase and sale of the Property are subject to and conditional upon, on or before seven (7) days from the Acceptance Date ("**Board Approval Condition Date**"):

(a)  the Vendor obtaining approval from the directors of the general partner of the Vendor as to the terms and conditions set out in this Agreement; and

(b)  the Purchaser obtaining approval from its parent company's board of directors as to the terms and conditions set out in this Agreement;

(the "**Board Approval Condition**")

10.2  The Board Approval Condition is for the benefit of both the Vendor and the Purchaser and cannot be unilaterally waived. If the Board Approval Condition is not satisfied by the Board Approval Condition Date then this Agreement shall automatically terminate. In such event, the Deposit Holder is hereby irrevocably directed by the Vendor and the Purchaser to repay the Initial Deposit and accrued interest, in full, to the Purchaser without deduction save for the sum of $10.00 (which will be retained by the Vendor in any event as consideration for the Vendor agreeing to not revoke or withdraw this Agreement prior to the Subject Removal Date, except as may be permitted pursuant to any other provision included in this Agreement),

and thereafter neither party will have any further obligations to the other under this Agreement, except for the obligation of the Purchaser to maintain the confidentiality of all disclosed documents and instruments delivered to it, to return all copies of such documents and instruments.

11.    **Mutual Conditions, Building Permit Mutual Condition and Competition Condition**

11.1    The obligations of the Purchaser and the Vendor to complete the purchase and sale of the Property are subject to, on or before the Mutual Conditions Date:

(a)    the Vendor and Purchaser receive a satisfactory environmental report prepared by a duly qualified and reputable environmental consultant with respect to the environmental condition of the Lands and the existence of any environmental contamination, and the parties being satisfied with the environmental condition of the Lands;

(b)    the Vendor and Purchaser receive a satisfactory geotechnical report with respect to the condition of the Lands and the development of the planned Building on the Lands in accordance with the Contract Plans and Specifications;

(c)    the Vendor and Purchaser approve the Contract Plans and Specifications, which will include the design of a building with a gross building area of not less than one hundred thousand (100,000) square feet and will be based on the Plans and Specifications, with such alterations as the Vendor and Purchaser mutually approve; and

(d)    the Vendor signing a Construction Contract with the Contractor on terms acceptable to both the Vendor and the Purchaser, each acting reasonably. The Vendor shall use commercially reasonable efforts to negotiate and settle the form of Construction Contract on or before the Mutual Conditions Date, and such Construction Contract will incorporate and be consistent with the Contract Plans and Specifications and allow for the Contract to be assigned by the Vendor, without approval by the Contractor, and assumed by the Purchaser or an entity controlled by the Purchaser in certain permitted circumstances, provided such assignment is acceptable to the Vendor's lender(s);

(together, the "**Mutual Conditions**").

11.2    The Mutual Conditions are for the benefit of both the Vendor and the Purchaser and cannot be unilaterally waived. If the Mutual Conditions are not satisfied by the Mutual Conditions Date then this Agreement shall automatically terminate. In such event, the Deposit Holder is hereby irrevocably directed by the Vendor and the Purchaser to repay the Initial Deposit and accrued interest, in full, to the Purchaser without deduction save for the sum of $10.00 (which will be retained by the Vendor in any event as consideration for the Vendor agreeing to not revoke or withdraw this Agreement prior to the Subject Removal Date, except as may be permitted pursuant to any other provision included in this Agreement), and thereafter neither party will have any further obligations to the other under this Agreement, except for the obligation of the Purchaser to maintain the confidentiality of all disclosed documents and instruments delivered to it, to return all copies of such documents and instruments.

11.3    The obligations of the Purchaser and the Vendor to complete the purchase and sale of the Property are subject to, on or before ninety (90) days after the satisfaction of the Mutual Conditions (the "**Building Permit Condition Date**"), the Vendor obtaining the first stage of a staged building permit for construction of the Building on the Lands (the "**Building Permit**") consistent with the terms of the Contract Plans and Specifications (the "**Building Permit Mutual Condition**"), provided that if the MOE has not provided an approval in principle for the Lands on or before May 1, 2022 thereby allowing the City of Vancouver to issue a first stage building permit within the time contemplated for the Building Permit Condition Date, then the Building Permit Condition

11

Date will be deemed to be extended for a period equal to the delay, provided that this extension right shall apply only as a result of delays caused by or contributed to by the MOE or the City, and which are not caused or contributed by the Vendor.

11.4    The Building Permit Mutual Condition is for the benefit of both the Vendor and the Purchaser and cannot be unilaterally waived. If the Building Permit Mutual Condition is not satisfied by the Building Permit Condition Date, then this Agreement shall automatically terminate. In such event, the Vendor will repay the Initial Deposit and accrued interest, in full, to the Purchaser without deduction save for the sum of $10.00 (which will be retained by the Vendor in any event as consideration for the Vendor agreeing to not revoke or withdraw this Agreement prior to the Subject Removal Date, except as may be permitted pursuant to any other provision included in this Agreement), and thereafter neither party will have any further obligations to the other under this Agreement, except for the obligation of the Purchaser to maintain the confidentiality of all disclosed documents and instruments delivered to it, to return all copies of such documents and instruments.

11.5    Furthermore, the obligation of the parties to complete the transaction shall be subject to the closing condition (the "**Competition Condition**") that Competition Act Approval, shall have been obtained on or before 5:00 p.m. (Vancouver time) on the date that is six (6) months after the Mutual Conditions Date.

11.6    Notwithstanding any other provision of this Agreement, it is agreed:

(a)    The Purchaser will engage legal counsel within thirty (3o) days of the Acceptance Date to advise with respect to an application for Competition Approval Act for this transaction;

(b)    On or before the Mutual Conditions Date, the Purchaser will provide a written report to the Vendor as to legal counsel's advice with respect to the application for Competition Act Approval, which will include an assessment of the probability of receiving Competition Act Approval and an estimated timeline to obtain Competition Act Approval;

(c)    The parties shall consult and cooperate with each other in connection with the effort to make, or cause to be made, all filings and submissions, and submit all documentation and information to obtain Competition Act Approval. If practical and permissible under the Competition Act, the parties will make diligent commercial efforts to obtain Competition Act Approval not later than six (6) months after the Mutual Conditions Date. Without limiting the generality of the foregoing:

(i)    the parties shall furnish to each other or their respective legal counsel information that may be reasonably requested by each party in connection with the preparation of such filings and submissions, provided that if a party is asked to provide information that it deems to be competitively sensitive, the disclosing party may restrict the provision of such information to the Commissioner on a confidential basis, provided further that nothing in this Agreement obligates a party to share with the other party or its external legal counsel any information related to the valuation of the transaction or any other transaction;

(ii)    each party and its legal counsel shall be given a reasonable opportunity to review and comment on any proposed submissions and/or filings, subject to the right of each party to redact any confidential information from such submissions and/or filings prior to such review;

12

(iii)    each party shall promptly notify the other party of any substantive communication from the Commissioner and shall permit the other party or its legal counsel, as appropriate, to review and comment in advance of any proposed written substantive communication with the Commissioner, subject to the right of each party to redact any confidential information from such submissions and/or filings prior to such review;

(iv)    neither party shall participate in any meeting or substantive discussion with the Commissioner in connection with the review of the transaction unless it consults with the other tarty in advance; and

(v)    neither party will take any action that would have the effect of delaying, impairing or impeding the receipt of Competition Act Approval, except with the approval of the other party.

(d)    The Purchaser shall keep the Vendor and the Vendor's Solicitors informed of the status of the proceedings related to obtaining Competition Act Approval and shall use commercially reasonable efforts to obtain Competition Act Approval.

(e)    The Purchaser shall be responsible for all filing fees incurred in connection with the Competition Act Approval. Each of the Purchaser and the Vendor shall be responsible for its own solicitors' fees.

(f)    The Competition Condition is for the benefit of both the Vendor and the Purchaser and cannot be unilaterally waived. If the Competition Condition is not satisfied within the time required herein, then this Agreement shall automatically terminate. In such event, the Vendor is hereby irrevocably directed by to repay the Deposit and accrued interest, in full, to the Purchaser without deduction save for the sum of $10.00 (which will be retained by the Vendor in any event as consideration for the Vendor agreeing to not revoke or withdraw this Agreement prior to the Subject Removal Date, except as may be permitted pursuant to any other provision included in this Agreement), and thereafter neither party will have any further obligations to the other under this Agreement, except for the obligation of the Purchaser to maintain the confidentiality of all disclosed documents and instruments delivered to it, to return all copies of such documents and instruments.

12.    **Purchaser's Closing Conditions**

12.1    The Purchaser's obligation to complete the transactions contemplated by this Agreement is subject to the covenants and agreements of the Vendor to be performed on or before the Completion Date pursuant to this Agreement will have been duly performed in all material respects (the "**Closing Conditions**"), which Closing Conditions are for the sole benefit of the Purchaser. If the Closing Conditions are not satisfied on or as of the Completion Date, the Purchaser may by notice in writing to the Vendor waive satisfaction thereof, in whole or in part, without prejudice to any of its other rights under this Agreement and complete the purchase of the Property, or elect not to complete. If the Closing Conditions are not satisfied and the Purchaser elects to complete the Purchase of the Property, the Purchaser's election to purchase the Property will be without prejudice to any claim the Purchaser may have against the Vendor under this Agreement or at law or in equity. If the Closing Conditions are not satisfied on or as of the Completion Date and the Purchaser does not waive the unsatisfied Closing Conditions, the Deposit, together with interest earned, will be returned to the Purchaser without deduction save for the sum of $10.00 (which will be retained by the Vendor in any event as consideration for the Vendor agreeing to not revoke or withdraw this Agreement prior to the Subject Removal Date, except as may be permitted pursuant to any other provision included in this Agreement) and the return of the Deposit will be without

prejudice to any claim the Purchaser may have against the Vendor under this Agreement or at law or in equity.

13.  **Purchaser's Due Diligence**

13.1   The Vendor will, within 5 Business Days after the execution and delivery of this Agreement by the Purchaser and the Vendor (the "**Delivery Date**"), deliver to the Purchaser the following, in each case to the extent within the possession or control of the Vendor:

    (a)   list of all major consultants and related contract particulars;

    (b)   copies of all Permits;

    (c)   copies of Contract Plans and Specifications in hand as of the Acceptance Date;

    (d)   any surveys, building plans, development plans, site plans, floor plans, building condition reports, expense budgets, hazardous materials assessments and environmental reports relating to the Property and in the possession or control of the Vendor,

    (collectively, the "**Due Diligence Documents**").

13.2   The Vendor will further provide such documents and information relating to the Property in the possession or control of the Vendor and that are reasonably requested by the Purchaser, within 5 days of such request, or whenever, before the Completion Date, the Vendor is in control or possession of new Due Diligence Documents that have not been previously provided to the Purchaser.

13.3   The Purchaser agrees to maintain the confidentiality, in accordance with Section 47, of all such Due Diligence Documents so delivered, and to destroy or return all copies of the same to the Vendor forthwith, upon demand, if the Purchaser's Condition is not satisfied or waived within the time or times provided therein or if the Purchaser fails to complete its purchase of the Property.

13.4   From time to time after the date of this Agreement, upon reasonable advance notice to the Vendor (being not less than two (2) Business Days), and, if requested by the Vendor, in the presence of the Vendor or its designated representative, the Purchaser and their respective agents, employees and consultants will be entitled to enter onto and into the Lands to carry out inspections (the "**Inspections**"), provided that the Inspections will be carried out during normal business hours, will not unduly interfere with construction, development or operation on Lands and will not injure the Lands. The Purchaser will be responsible for and will indemnify the Vendor for all damages, costs, expenses and other adverse consequences of the Purchaser's actions in conducting the Inspections. The Purchaser will not materially disturb or materially interfere with the activities of the Vendor or any other permitted user of any portion of the Lands.

13.5   The Purchaser hereby waives any requirement for the Vendor to provide to the Purchaser a "site disclosure statement" for the Property under the *Environmental Management Act* (British Columbia) or any regulation in respect thereto.

13.6   The Vendor will execute, or cause to be executed, and return to the Purchaser or the Purchaser's Solicitors within five (5) Business Days of the Purchaser's written request, all consents or letters of authority which may be necessary for the Vendor to execute in order for the Purchaser to conduct such due diligence searches or cause inspections or tests to be made with respect to the purchase of the Property as the Purchaser determines to be necessary, acting reasonably. The Purchaser will copy the Vendor on any and all inquiries made to the City.

13.7     The Purchaser may, with prior written notice to the Vendor, discuss the Property and any reports rendered in respect thereof, with such of the Vendor's consultants as the Purchaser may reasonably request from time to time, and the Vendor will use commercially reasonable efforts to assist the Purchaser in arranging meetings between such consultants and the Purchaser.

**14.    Vendor's Representations and Warranties**

14.1     The Vendor represents and warrants to the Purchaser as representations and warranties that are true as of the date hereof and will be true at the time of Closing as follows:

(a)      The Vendor is a limited partnership validly existing under the laws of British Columbia and has and will have the power, authority and capacity to enter into this Agreement, to perform its obligations hereunder and to carry out the transaction contemplated by this Agreement.

(b)      The Vendor is not a non-resident of Canada within the meaning of the *Income Tax Act*.

(c)      There are no claims pending, commenced, or to the best of the Vendor's knowledge, threatened with respect to the Property or the Vendor's title to the Property.

(d)      The Vendor is, and on the Completion Date will be, the sole beneficial owner of the Property, free and clear of all liens, claims, judgments, charges, caveats and encumbrances whatsoever except the Permitted Encumbrances (subject to the provisions of this Agreement related to clearing title of the Vendor's financial encumbrances), and the Vendor has the full right and authority to sell the Property and to transfer and assign valid title to the Lands, the Building and the Equipment to the Purchaser.

(e)      The Vendor is not in breach of the Permitted Encumbrances and has not received written notice of any breach or alleged breach of any of the Permitted Encumbrances.

(f)      The zoning of the Lands permits the development of the Lands and the construction of the Building as contemplated by the Contract Plans and Specifications;

(g)      The Contracts delivered by the Vendor to the Purchaser constitute all of the service, development, operation, management, or other contracts and other agreements related thereto, pertaining to the ownership of the Lands and operation of the Property as at the date of this Agreement.

(h)      On the Completion Date there will be no leases, tenancy agreements, offers to lease, tenancy or rights of occupation affecting the Lands that will survive the Completion Date.

(i)      The Permits delivered by the Vendor to the Purchaser constitute all of the licences and permits obtained by the Vendor as at the date of this Agreement for the operation, development and construction of or in connection with the Building and the Lands.

(j)      All of the Contract Plans and Specifications delivered by the Vendor to the Purchaser are complete, true and accurate copies of such documents.

(k)      The building systems in the Building, including electrical, mechanical, heating, HVAC, emergency and fire safety systems, and security systems will be in good working order on the Completion Date.

(l)      The Building will be constructed entirely within the boundaries of the Lands.

(m)     The Vendor has not received any notice and does not have any knowledge of any encroachment of any structure, improvements or infrastructure onto the Lands.

(n)     The Vendor has not received any written notice and does not have any knowledge that the Lands are subject to any outstanding work order, bylaw infraction or notice or defect of non-compliance from any federal, provincial, municipal or government authority.

(o)     The Vendor has not received any notice and does not have any knowledge of any intention of the applicable municipality to alter its zoning by-law, official community plan or land use plan, if any, so as to affect or potentially affect the development of the Lands, construction of the Building, or the future operation thereof.

(p)     Except as disclosed to the Purchaser in writing, the Vendor has not received any notice and does not have any of knowledge of any lien or claim of builder's lien having being filed against the Lands, whether arising from the Construction Contract or otherwise.

(q)     All municipal taxes, local improvement taxes, rates, levies and assessments of every nature and kind with respect to the Lands and Building for the current and all preceding calendar years have been paid in full (or will otherwise be adjusted for on Closing pursuant to Section 23).

(r)     Except as disclosed to the Purchaser, the Vendor has not received any notice and does not have any knowledge of any environmental contamination of the Lands or requirement or order to remediate environmental contamination or hazardous materials from the Lands, including, but not limited to, the presence of any underground fuel storage tanks located on the Lands.

(s)     Except as disclosed to the Purchaser, the Vendor has not received any notice and does not have any knowledge of environmental contamination or hazardous materials migrating from the Lands onto adjacent neighbouring lands or into any underground water system, or environmental contamination or hazardous materials migrating from neighbouring lands or underground water system onto the Lands.

The Vendor acknowledges that the Purchaser is relying on the foregoing representations and warranties in connection with the purchase by the Purchaser of the Property.

15.     **Purchaser's Representations and Warranties**

15.1    The Purchaser represents and warrants to the Vendor as representations and warranties that are true as of the date hereof and will be true at the time of Closing as follows:

(a)     The Purchaser is and will be a company duly incorporated and in good standing under the laws of Nova Scotia and extra-provincially registered and in good standing under the laws of British Columbia and registered to carry on business in British Columbia.

(b)     The Purchaser has and will have the power, authority and capacity to enter into this Agreement, to perform its obligations hereunder and to carry out the transaction contemplated by this Agreement.

(c)     The execution and delivery of this Agreement and the completion of the transactions contemplated by this Agreement will have been by the Completion Date, duly authorized by all necessary action on the part of the Purchaser.

(d)     The Purchaser is not a non-resident of Canada within the meaning of the *Income Tax Act*.

16

16.   **Vendor's Covenants**

16.1   The Vendor will:

(a)   Obtain the following insurance:

(i)   "All Risks" Course of Construction (Builder's Risk)

(A)   The policy will cover loss or damage to the Building and all property located on Lands and to be used in the construction of the project, excluding equipment owned or leased by the Contractor, any consultant, sub-consultants, project manager or subcontractor;

(B)   The policy will be written on a "replacement cost" basis and for not less than the full insurable value of the Building, being $50,000,000, including products that are specified to be provided by the Vendor, subject to sub limits applicable.

(C)   The All Loss Policy Deductible will be no more than $50,000 except with the Water Damage / Flood Damage, Sewer back up/Flood Damage deductible being no more than $100,000 and Earthquake deductible being 10% of the replacement cost of the Building ($100,000 minimum).

(ii)   Commercial General "Wrap-up Liability"

(A)   The policy will have a limit of liability of not less than $25,000,000 per occurrence and, with respect to the products and completed operations hazards, $25,000,000 annually in the aggregate. The policy will cover third party bodily injury and property damage claims, arising out of an accident or occurrence caused by an "Insured" and arising from activities relating directly to the project.

(B)   The insurance will be maintained with an insurer(s) that is acceptable to the Purchaser, acting reasonably, and the insurer will provide the Purchaser with not less than thirty (30) days' written notice of cancellation, material alteration or non-renewal of the insurance. When requested by the Purchaser, the Vendor will provide a detailed written certificate of insurance as to the insurance obtained by the Vendor for the project. The insurance coverage will

(i) contain a cross liability clause naming the Purchaser and its directors, employees, consultants and agents as additional insureds;

(ii) include blanket contractual liability coverage covering liability arising directly or indirectly out of the operations and all activities of the Vendor on the Lands; and

(iii) be primary insurance in respect of the Purchaser and all activities on the Lands and any insurance maintained by the Purchaser will be in excess of the Vendor's insurance and will not contribute to it;

17

(b)    terminate at its expense all Contracts and Permits other than the Contracts and Permits that the Purchaser notifies the Vendor that the Purchaser will assume pursuant to Section 17, provided that the Purchase shall assume all liability for any manufacturer, mechanical, elevator maintenance, equipment or construction warranties that may be voided in the event that required maintenance contracts are not kept in place and assumed by the Purchaser after the Completion Date;

(c)    observe and perform all obligations of the Vendor under the Contracts, the Permits and the Permitted Encumbrances as would a prudent owner;

(d)    take or cause to be taken all proper steps and actions and corporate proceedings on its part to enable the Vendor to vest a good and marketable title to the Property in the Purchaser free and clear of all liens, encumbrances, defects in title, equities or claims of every nature and kind except for Permitted Encumbrances and to enable the Vendor to carry out the sale of the Property and to execute and deliver this Agreement as valid and binding obligations of the Vendor;

(e)    deliver vacant possession of the Lands and Building to the Purchaser;

(f)    cause the Contractor to construct the Building on or before the Outside Completion Date in accordance with the terms of the Construction Contract in a good and workmanlike manner;

(g)    from and after the Mutual Conditions Date, not materially amend or modify the Construction Contract or the Contract Plans and Specifications without the prior written consent of the Purchaser, which consent for material alteration is at the sole discretion of the Purchaser; provided that the Purchaser covenants and agrees to reply to a request for consent in a timely manner so as not to cause delay to the project and further provided that the Vendor shall have discretion to address and approve non-material change orders, requests for information and provide supplemental instructions to the Contractor provided they do not materially impact the Construction Contract, the Contract Plans and Specifications, the Purchase Price or the estimated Completion Date;

(h)    promptly notify the Purchaser if the Vendor becomes aware that after the date hereof any of the representations or warranties of the Vendor become untrue or incorrect in any material respect;

(i)    ensure that on or before the Completion Date:

    (i)    the Lands will be Serviced and the Vendor shall have otherwise complied with all terms and conditions of the "prior-to permit issuance letter" issued by the City and dated December 22, 2020; and

    (ii)    all necessary approvals, permits and certificates shall be obtained prior to the Completion Date in order for the Purchaser to occupy and utilize the Building as required immediately following Closing, subject to any improvement work to be carried out by the Purchaser,

    (the "**Vendor's Works**"); and

18

(j)    subject to Section 11.3, the Vendor will complete, or cause the Contractor to complete, with no increase to the Purchase Price, unless the resulting change to the Purchase Price was as a result of a request or change order initiated by the Purchaser, the Vendor's Works on or before the Outside Completion Date in a good and workmanlike manner, post all security as required by the City or any approving authority or utility provider in connection with the Vendor's Works, including, arrange for the City or relevant approving authorities and utility providers to certify as complete the Vendor's Works and, if required by the City and/or by approving authorities or by utility providers, provide security and/or maintenance bonds as required to cover any maintenance periods during which the Vendor or any successor on in title to the Lands is required to maintain such Vendor's Works.

17.    **Assignment and Assumption of Contracts and Permits**

17.1    The Vendor will deliver to the Purchaser a written list of all Contracts and Permits then in existence or which will be entered into by the Vendor prior to the Completion Date and copies or drafts of the same one hundred and twenty (120) days before the estimated Completion Date.

17.2    The Purchaser will deliver to the Vendor written notice of the Contracts and Permits that the Purchaser wishes to assume as of the Completion Date and the Purchaser will deliver such written notice ninety (90) days before the estimated Completion Date.

17.3    Subject to Section 16.1(b), the Purchaser will not be responsible for any obligations or liabilities under the Contracts and Permits that the Purchaser elects not to assume. The Vendor will remain responsible for all obligations and liabilities under the Contracts and Permits that the Purchaser elects not to assume, including any costs to terminate the Contracts and Permits.

17.4    The Vendor and Purchaser will act in a prudent, diligent and commercially reasonable manner to facilitate the assignment and assumption of the Contracts and Permits that the Purchaser elects to assume, including obtaining the written approval or consent of any required third party or government authority to the assignment of the Contract or Permit to the Purchaser and the release of the Vendor from all obligations and liabilities under the Contract or Permit that arise after the Completion Date.

17.5    In regards to Contracts and Permits that the Purchaser elects to assume and which do not contain any restrictions on assignment, the Purchaser will assume such Contracts and Permits as of the Completion Date and will indemnify the Vendor with respect to any obligations or liabilities that arise under the assumed Contracts and Permits after the Completion Date. The Vendor will remain responsible for all obligations and liabilities under the Contracts and Permits that arose prior to the Completion Date and will indemnify the Purchaser with respect to any obligations or liabilities that arose under the Contracts and Permits prior to the Completion Date.

17.6    To the extent there is any restriction or prohibition against the assignment of a Contract or Permit to the Purchaser which the Purchaser wishes to assume, the Vendor will hold its rights, benefits, and advantages under those Contracts and Permits in trust, for the benefit of the Purchaser, and will, if requested by the Purchaser, do such acts and sign such documents as the Purchaser reasonably requests so that the Purchaser may receive the benefits and advantages of the Contracts and Permits, including, if necessary, allowing the Purchaser to bring an action in the Vendor's name. The Purchaser will reimburse and indemnify the Vendor for all costs and expenses that the Vendor incurs, including legal costs and disbursements on a full indemnity basis, in order for the Purchase to enforce and receive the rights, benefits and advantages under any Contract or Permit held by the Vendor in trust for the Purchaser.

19

18. **Purchaser's Improvements and Fixtures**

18.1     The Vendor consents to the Purchaser engaging the Contractor or a different contractor to complete the Purchaser's fixturing and improvements to the Building. The Vendor and Purchaser will cooperate and act in a commercial reasonable matter to coordinate the Contractor and the Purchaser's selected contractor having joint access to the Building prior to the Completion Date in order to complete the construction of the Building and the Purchaser's fixturing and improvement works in the most cost and time effective manner as is practical in the circumstances. Notwithstanding the foregoing, priority shall be provided to the Contractor and any subcontractors engaged to carry out the base building construction in order for the Building to be delivered to the Purchaser within the time frames contemplated in this Agreement. The Vendor shall not be responsible for any delays to the construction schedule or delivery of the Building due to the Purchaser's contractors taking possession and carrying out work concurrently with the Contractor and its sub trades.

19. **Completion of Construction – Holdback Matters**

19.1     In the event that the parties estimate, at the time of transfer of the Building to the Purchaser, any work required to be performed will not be completed or work will be completed but contain deficiencies, the Vendor and the Purchaser, acting reasonably, will prepare a punch list of such deficiencies (which will include the estimated cost and time to complete each deficiency) which deficiency list (the "**Deficiency List**") will be executed by both the Vendor and the Purchaser. The parties will use commercially reasonable efforts to complete the Deficiency List within twenty (20) days of the completion of construction of the Building. If the Vendor and the Purchaser fail to reach agreement on the Deficiency List within thirty (30) days after completion of construction of the Building, a British Columbia qualified architect mutually approved by the Vendor and Purchaser will, acting impartially, resolve any disagreement on any aspect of the Deficiency List at least five (5) Business Days before the Completion Date.

19.2     A portion of the Purchase Price equal to 150% of the estimated cost to complete the deficiencies set out in the Deficiency List (the "**Deficiency Holdback Amount**") will be held in trust by the Vendor's Solicitors in an interest-bearing account with interest accruing to the benefit of the Vendor. The Vendor's Solicitors are hereby authorized and directed to release to the Vendor upon the completion of each deficiency item the estimated cost thereof plus 50%. If any of the work described in the Deficiency List has not been completed within twice the time allotted therefor, then the Purchaser will have the right, but not the obligation, at its sole option, to complete such work described in the Deficiency List as remains outstanding at such time, and to receive reimbursement from the Deficiency Holdback Amount the allotted estimated cost for such work on the Deficiency List plus 50%. Notwithstanding the foregoing, provided the Vendor is diligently and continuously working to rectify the Deficiency List, if the Vendor is delayed in completing the work due to supply chain or delivery delays, the period of time allocated for completion of such work shall be extended by the period of delay, provided the Vendor takes commercially reasonable steps to mitigate the delay.

19.3     If the reasonable costs of the Purchaser or persons engaged by the Purchaser to complete work on the Deficiency List in accordance with the Contract Plans and Specifications exceeds the reimbursement amount of the Deficiency Holdback Amount received by the Purchaser pursuant to section 19.2 above, the Vendor will reimburse the Purchaser for the excess amount to complete such deficiency work.

20.  **Goods and Services Tax**

20.1  The Vendor and the Purchaser, by their acceptance of this Agreement, hereby represent and warrant that each of them is and will at the Completion Date not be a non-resident of Canada for the purposes of the *Income Tax Act* (Canada) and the Vendor and the Purchaser confirm that they will be registered with the Canada Revenue Agency or any successor thereto (**"CRA"**) in compliance with Part IX of the *Excise Tax Act* (Canada) relating to the goods and services tax (**"GST"**) on the Completion Date. The Purchase Price does not include GST and the Purchaser confirms that it will be responsible for any GST payable with respect to the subject transaction, account directly to CRA with respect thereto and confirm its GST registration number to the Vendor on the Completion Date by providing a signed GST certificate to the Vendor.

21.  **Termination Rights**

21.1  The Purchaser will have the right to terminate this Agreement and receive full return of its Deposit plus accrued interest if:

(a)  the construction lender's quantity surveyor advises:

(i)  progress on the construction of the Building is more than twelve (12) months behind the construction schedule originally approved by the construction lender, subject to delays caused by Force Majeure, or by the acts or omissions of the Purchaser or those for whom the Purchaser is responsible for at law; or

(ii)  the Building will not be completed on or before the Outside Completion Date; or

(b)  the construction of the Building and the Vendor's Works in accordance with the terms of this Agreement and the Contract Plans and Specifications has not been completed on or before the Outside Completion Date; or

(c)  after the commencement of construction of the Building, construction progress is stopped and discontinued for twelve (12) consecutive months; or

(d)  the Vendor is declared bankrupt, become insolvent or take advantage of any debtor protector legislation, including but not limited to the *Bankruptcy and Insolvency Act* or the *Companies' Creditors Arrangement Act*; or

(e)  the Construction Contract is terminated by the Vendor or the Contractor and the Vendor fails to:

(i)  enter into a new construction contract within sixty (60) days of such termination with a contractor of equal or higher reputation and covenant to the Contractor; and

(ii)  cause the Contract Plans and Specifications to be adopted as the plans and specifications in the new construction contract; or

(f)  the Construction Contract is assigned by the Contractor to a new contractor without the prior written consent of the Purchaser, such consent not to be unreasonably withheld or delayed, provided the assignee is of similar or exceeding reputation to the Contractor;

21

and termination of the Agreement by the Purchaser pursuant to this Section 21 will be without prejudice to any claim the Purchaser may have against the Vendor under this Agreement or at law or in equity.

22.    **Completion Date**

22.1    The sale and purchase of the Property will be completed on the Completion Date by electronic exchange of documents between the Purchaser's Solicitors and the Vendor's Solicitors, in accordance with Section 27.

22.2    "completion of construction of the Building" as noted in Section 1.10(a) means that date at which the occupancy permit in relation to the base building construction for the Building is issued by the City, whether such occupancy permit is provisional or final, but shall not be dependent on an occupancy permit being issued for any Purchaser's improvement work.

23.    **Closing Adjustments**

23.1    All usual adjustments of taxes, rates, local improvement assessments and other charges and all other costs normally adjusted for on a sale of property similar to the Property in British Columbia will be made as of 12:00 a.m. on the Completion Date. The Vendor will receive the benefit of all income and will be responsible for all expenses incurred in operating and maintaining the Property incurred for and attributable up to 11:59 p.m. on the day preceding the Completion Date and the Purchaser will receive the benefit of all income and be responsible for all expenses from and including the Completion Date. The adjustments will include the adjustment referred to in Section 3.4.

23.2    In respect to change orders and the Construction Contract, the parties agree the Purchase Price will be adjusted as follows:

(a)    the Purchase Price will be increased for any change order requested by the Purchaser that amends or modifies the Contract Plans and Specifications and increases the cost to construct the project, and the increase will be equal to the amount the cost to construct the project is directly increased as a result of the change order, without any markup by the Vendor;

(b)    the Purchase Price will be decreased for any change order requested by the Purchaser that amends or modifies the Contract Plans and Specifications and decreases the cost to construct the project, and the decrease will be equal to the amount the cost to construct the project is directly decreased as a result of the change order;

(c)    the Purchase Price will not be increased or decreased with respect to any change order requested by the Purchaser that is with respect to a change to accommodate the City, any Permits, applicable laws or should reasonably have been addressed by the Vendor and the Contractor in the Contract Plans and Specifications; and

(d)    the Purchase Price will not be increased or decreased with respect to any permitted change order requested by the Vendor regardless of whether the permitted change order requested by the Vendor directly increases or decreases the cost to construct the project.

23.3    Any adjustments which are not capable of being calculated on the Completion Date will be adjusted between the parties as soon as possible after the Completion Date, and, at Closing, the parties will execute and deliver to each other an undertaking to re-adjust for the purposes thereof.

24.   **Risk**

24.1   The Property will be and remain at the Vendor's risk until the Transfer (as defined in Section 26.1(a)) is filed for registration in the applicable Land Title Office or the solicitors for the Vendor and Purchaser confirm in writing that the transaction has completed as contemplated in Section 3.3.

25.   **Possession**

25.1   The Purchaser will have vacant possession of the Lands and Building free and clear of all charges, liens and encumbrances save for the Permitted Encumbrances immediately upon the Closing.

26.   **Delivery of Closing Documents**

26.1   Two (2) Business Days prior to the Completion Date, the Vendor will cause the Vendor's Solicitors to deliver to the Purchaser's Solicitors the following items, duly executed by the Vendor and in registrable form whenever appropriate, to be dealt with in accordance with Section 27:

(a)   a Form A – Freehold Transfer from the Nominee, conveying legal title of the Lands to the Purchaser (the "**Transfer**"). For the purposes of delivering the required registrable freehold transfer, the Purchaser acknowledges that title to the Lands will be held by the Nominee as registered owner and as nominee and bare trustee for the Vendor. The Purchaser hereby agrees to accept such registrable freehold transfer from the party which is registered owner on the Completion Date in fulfillment of the Vendor's obligations under the *Property Law Act* (British Columbia);

(b)   a transfer of beneficial interest from the Vendor;

(c)   an assignment and assumption agreement in respect of all Contracts and Permits being assigned to and assumed by the Purchaser which shall include a covenant by the Vendor in favour of the Purchaser to perform and observe all obligations thereunder prior to the Completion Date and to indemnify and save the Purchaser harmless in respect of the Vendor's failure to do so, and a covenant by the Purchaser in favour of the Vendor to perform and observe all obligations thereunder from and after the Completion Date and to indemnify and save the Vendor harmless in respect of the Purchaser's failure to do so;

(d)   an assignment of the Vendor's interest in any guarantees, warranties or indemnities with respect to the Property, including the building systems within the Building, to the extent assignable;

(e)   assignment of the Vendor's warranty rights under the Construction Contract;

(f)   as-built drawings for the Building;

(g)   all operation manuals and warranties, including but not limited to operation manuals and warranties for all building systems within the Building;

(h)   a statutory declaration from the Contractor addressed to the Vendor and the Purchaser that includes:

23

(i)    the date the Building was substantially completed or the date the payment certifier for the project issued a certificate of completion for the Construction Contract;

(ii)    the Contractor has been paid in full by the Vendor all amounts owing under the Construction Contract and in respect of all change orders for the construction of the completed Building and the Vendor's Works, or the outstanding amount which remains owing to the Contractor;

(iii)    the Contractor has paid in full all subcontractors and suppliers with respect to the construction of the Building and the Vendor's Works, including in respect of all change orders, or the outstanding amount owing or claimed to be owing to any unpaid subcontractor or supplier; and

(iv)    if the Contractor has any knowledge of a subcontractor or supplier that intends to file a claim of builder's lien against the Lands and, to the best of the Contractor's knowledge, the estimated amount of the potential lien claim; and

(i)    a bill of sale with respect to the Equipment, if any;

(j)    a vendor's statement of adjustments;

(k)    a mutual undertaking to re-adjust pursuant to Section 23.3;

(l)    a certificate of the Vendor, dated as of the Completion Date, that certifies that each of the representations and warranties of the Vendor set out in this Agreement and any document to be delivered under this Agreement is true and accurate as of the Completion Date and that the Vendor has performed all of its covenants and obligations to be performed under this Agreement on or before the Completion Date;

(m)    a statutory declaration of a director or officer of each party comprising the Vendor declaring that the Vendor is not a non-resident for the purposes of section 116 of the *Income Tax Act* (Canada);

(n)    either:

(i)    registrable discharges of any mortgages, liens, charges and encumbrances against all or any part of the Property other than Permitted Encumbrances; or

(ii)    provided that an encumbrance other than a Permitted Encumbrance is in favour of a Canadian Schedule I chartered bank or other recognized financial institution, credit union or insurance company, solicitor's undertakings in favour of and satisfactory to the Purchaser's Solicitors providing for delivery and registration of discharges of any such encumbrance after Closing; and

(o)    such further deeds, acts, things, certificates and assurances as may be requisite in the reasonable opinion of the Purchaser's Solicitors for more perfectly and absolutely assigning, transferring, conveying and assuring to and vesting in the Purchaser, title to the Property free and clear of any lien, charge, encumbrance or legal notation other than the Permitted Encumbrances as contemplated herein.

26.2    Two (2) Business Days prior to the Completion Date, the Purchaser will cause the Purchaser's Solicitors to deliver to the Vendor's Solicitors the following items, duly executed by the Purchaser and in registrable form whenever appropriate, to be dealt with in accordance with Section 27:

(a)    an assumption agreement with respect to the Permitted Encumbrances affecting the Lands and, if required pursuant to the terms of the Permitted Encumbrances, a direct covenant by the Purchaser with the other parties to such Permitted Encumbrances;

(b)    a certificate satisfactory to the Vendor's Solicitors sufficient to relieve the Vendor of any obligation to collect and remit any GST, sales taxes or value add taxes, with respect to the sale of the Property to the Purchaser and an indemnity of the Vendor in respect thereof;

(c)    a certificate of the Purchaser, dated as of the Completion Date, that certifies that each of the representations and warranties of the Purchaser set out in this Agreement and any document to be delivered under this Agreement is true and accurate as of the Completion Date and that the Purchaser has performed all of its obligations and covenants to be performed under this Agreement on or before the Completion Date;

(d)    discharge of the Purchaser's Mortgage;

(e)    such further documents as the Vendor's Solicitors may reasonably require.

26.3    All documents referred to in Section 26.1 and Section 26.2 will be prepared by the Purchaser's Solicitors to the extent that preparation is required, in a form reasonably satisfactory to the Purchaser's Solicitors and the Vendor's Solicitors and, where applicable, in a form suitable for registration in the appropriate offices of public record. The Vendor and the Purchaser will each deliver to or cause to be delivered to the other all such further documents and assurances as may be reasonably required to give full effect to the intent and meaning hereof.

26.4    On or before Closing, the Vendor will deliver to the Purchaser the following (to the extent that such items have not previously been delivered to the Purchaser):

(a)    originally executed copies of the Contracts and Permits assigned to and assumed by the Purchaser, to the extent within the control of the Vendor; and

(b)    all keys, passwords, and like devices for the Lands and the Building which are in the possession or control of the Vendor including, without limitation, master keys to all rentable space located within the Building and the Lands.

27.    **Closing Procedure**

27.1    On or before the Completion Date, the Purchaser will pay to the Purchaser's Solicitors in trust the amount provided for in Section 4.1(c), less the amount to be advanced to the Purchaser on the Completion Date under any mortgage financing arranged by the Purchaser.

27.2    Forthwith following receipt by the Purchaser's Solicitors of the payment pursuant to Section 27.1 and the documents and items referred to in Section 26.1, the Purchaser will cause the Purchaser's Solicitors to file the Transfer in the appropriate Land Title Office on the Completion Date concurrently with any security documents applicable to any mortgage financing arranged by the Purchaser in connection with the purchase of the Property.

27.3    Forthwith following the filing referred to in Section 27.2 and upon the Purchaser's Solicitors being satisfied as to the Purchaser's pending title to the Lands after conducting a post-filing check of the property index disclosing only the following:

(a)    the existing title number(s) to the Lands;

(b)    the Permitted Encumbrances;

(c)     the pending number assigned to the Transfer;

(d)     pending numbers assigned to any charges granted by the Purchaser including any security documents applicable to any mortgage financing arranged by the Purchaser in connection with the purchase of the Property; and

(e)     any charges with respect to which the Vendor's Solicitors have extended undertakings satisfactory to the Purchaser and the Purchaser's Solicitors regarding the discharge and release of the same,

the Purchaser will cause the Purchaser's Solicitors, forthwith upon receipt by them of the proceeds of any financing arranged by the Purchaser in connection with the sale and purchase of the Property, to deliver to the Vendor's Solicitors on the Completion Date any document referred to in Section 26.1 or Section 26.2 not previously provided to the Vendor and any other documents reasonably required by the Vendor or the Vendor's Solicitors pursuant to Section 26.2, in each case in a form executed by the Purchaser, and a wire transfer for the balance due to the Vendor pursuant to Section 4.1(c), and to release the Deposit, to the extent held by the Purchaser's Solicitors, to the Vendor's Solicitors. Notwithstanding any provision of this Agreement, the parties agree that, with respect to payment of the amount payable to the Vendor's Solicitors pursuant to the agreed upon Vendor's statement of adjustments (the "**Amount**"), if the Purchaser is:

(f)     relying on mortgage financing to assist with the purchase of the Property, and if the Purchaser's Solicitors have: (i) received the net mortgage proceeds from the mortgage lender or its solicitors and continue to hold the Amount in their trust account but are unable to deposit the net mortgage proceeds to the Vendor's Solicitors trust account because their financial institution's hours of operation do not permit the same; or (ii) received written confirmation from the Purchaser's mortgage lender that it is holding the net mortgage proceeds and the same are unconditionally available to the Purchaser; or

(g)     paying the Amount by way of wire transfer, and if the Purchaser and the Purchaser's Solicitors have: (i) used commercially reasonable efforts to ensure that the Vendor's Solicitors will receive the Amount on or before 5:00 p.m. on the Completion Date and provided evidence that such wire transfer was initiated prior to such time to the Vendor's Solicitors, but for any reason outside of the Purchaser's control (excluding any event which is a default by the Purchaser under this Agreement) the Vendor's Solicitors do not receive the Amount by such time,

then the time and date on which the Amount must be received by the Vendor's Solicitors will be extended to 1:00 p.m. on the next Business Day following the Completion Date, so long as, in addition to the Amount, the Purchaser also pays to the Vendor or the Vendor's Solicitors on such next Business Day following the Completion Date interest on the Amount at a rate equal to the Prime Rate plus two percent (2%) per annum for each day from and including the Completion Date to but not including the day such payment is made. In this paragraph, "Prime Rate" means that variable annual rate of interest quoted by the main branch of Royal Bank of Canada, Vancouver, British Columbia, from time to time as the rate of interest used by it as a reference rate for setting rates of interest on Canadian dollar loans in Canada repayable on demand and commonly referred to by such bank as its "prime rate".

27.4     All requirements of Sections 27.1 through 27.3 are concurrent requirements and it is specifically agreed that nothing will be completed on the Completion Date until everything that is required to be paid, executed and delivered in connection with the closing of the purchase and sale of the Property pursuant to this Agreement has been so paid, executed and delivered and until the Purchaser's Solicitors have satisfied themselves as to title pursuant to Section 27.3.

28.    **Discharge of Vendor's Encumbrances**

28.1    The Purchaser acknowledges and agrees that if the Vendor's title to the Property is subject to any financial encumbrance which the Vendor is required to discharge pursuant to this Agreement, the Vendor will not be required to clear title prior to the receipt of the net sales proceeds but will be obligated to do so within a reasonable time following Closing and the Purchaser will pay, or cause the Purchaser's Solicitors to make payment in accordance with Section 27.3 to the Vendor's Solicitors in trust on their undertaking to discharge any such financial encumbrance and obtain and register a discharge thereof in accordance with Section 27.3(e).

29.    **Assignment**

29.1    The Purchaser shall have no right to assign all or any of its right, title or interest in this Agreement without the prior written consent of the Vendor, which consent shall not be unreasonably withheld, except that the Purchaser may assign all of its rights and obligations under this Agreement or direct that the Vendor transfer title to the Lands to an "affiliate" (as such term is defined in the *Business Corporations Act* (British Columbia)) of the Purchaser, without consent of the Vendor, but upon providing written notice of such assignment or direction to the Vendor and provided the Purchaser pays the Vendor an assignment fee equal to 0.5% of the Purchase Price (such assignment fee to be waived if the assignment is to an "affiliate"). Notwithstanding any such assignment or direction, and whether or not the consent of the Vendor is required, the Purchaser will remain liable for, and will not be released from, the obligations of the Purchaser under this Agreement. Any profit or consideration relating to any assignment by the Purchaser shall be shared equally by the Vendor and the Purchaser.

30.    **Fees and Expenses**

30.1    The Purchaser will be responsible for all costs of the Purchaser's Solicitors to prepare and register all documents as are necessary to complete the sale and purchase of the Property (excepting for this Agreement and any documents incidental thereto). All documents required to clear title to the Property of any liens, charges or encumbrances that are not Permitted Encumbrances will be prepared and registered by and at the expense of the Vendor. The Purchaser will pay the expense of registering the Transfer and any property transfer tax due in respect of the transfer of the Property to the Purchaser.

31.    **Agency Disclosure**

31.1    To the extent that either party has dealt with or engaged any broker, representative or other person in connection with this transaction, that such party shall be solely responsible for any and all commissions, fees or payments claimed by such person and such engaging party shall indemnify and hold the other party harmless on account of any loss, damage, liability or expense, including reasonable legal fees and expenses, incurred with respect to the engagement or payment to such broker, representative or other person.

31.2    Notwithstanding the foregoing, the Vendor and the Purchaser acknowledge the following:

(a)    The Vendor has an agency relationship with Michael Buchan, John Lecky, Jake Luft and Mitch Knoepfel who are licensed with Avison Young Commercial Real Estate Services, LP (Avison Young). Avison Young will receive commissions as stipulated by way of separate agreement.

(b)    The Purchaser has an agency relationship with Mark Sager acting in his own capacity as representative and agent. Mark Sager will receive a commission of one percent (1%) of the Purchase Price for arranging the transaction, which will paid by the Vendor.

27

32.   **Delivery**

    32.1   Any delivery of notices, requests, demands, documents or money pursuant to this Agreement may be made upon the solicitor acting for the party for whom delivery is intended.

33.   **No Solicitation**

    33.1   The Vendor agrees that unless this Agreement is terminated, the Vendor will not (and will not authorize or permit any of the Vendor's employees or agents to) directly or indirectly solicit any offer or accept any possible proposal from any other third party with respect to the Property.

34.   **No Merger**

    34.1   The Vendor agrees that the execution and delivery of the closing documents according to Section 26 is not intended to and will not in any way merge or otherwise restrict the terms, covenants, conditions, representations, warranties or provisions made or to be performed or observed by the Vendor contained in this Agreement other than the Vendor's obligation to deliver the said closing documents.

35.   **Entire Agreement**

    35.1   This Agreement (including the schedules attached hereto) constitutes the entire agreement between the parties in respect of the subject matter of this Agreement, and the parties understand and agree that there are no representations, warranties, guarantees or promises affecting this Agreement except for those contained in this Agreement. The parties further understand and agree that there are no covenants, agreements, collateral agreements or conditions affecting the subject matter of this Agreement other than as expressed in writing in this Agreement.

36.   **No Waiver**

    36.1   No failure or delay on the part of a party in exercising any right, power or privilege under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. Except as may be limited herein, a party may, in its sole discretion, exercise any and all rights, powers, remedies and recourses available to it under this Agreement or any other remedy available to it and such rights, powers, remedies and recourses may be exercised concurrently or individually without the necessity of making any election.

37.   **Amendment and Waiver**

    37.1   No amendment to this Agreement is binding unless set forth in writing and duly executed by the parties. No waiver of any provision of this Agreement is binding unless it is executed in writing by each party to be bound.

38.   **Time**

    38.1   Time shall be of the essence of this Agreement.

39.   **Interpretation**

39.1   In this Agreement, words signifying gender include all genders, words in the singular include the plural and vice versa, and every use of the word "including" or "includes" is to be construed as meaning "including, without limitation" or "includes, without limitation", respectively. The headings used herein are for convenience only and are not to affect the interpretation of this Agreement.

40.   **Interpretation of Time**

40.1   All references to time in this Agreement are to Vancouver time.

41.   **Business Day**

41.1   Unless otherwise specified in this Agreement, time periods within which or following which any calculation or payment is to be made, or action is to be taken, will be calculated by excluding the day on which the period begins and including the day on which the period ends. If the last day of a time period is not a Business Day, the time period will end on the next Business Day.

42.   **Notices**

42.1   Any notices, requests or demands which may or are required to be given or made hereunder will be in writing and served personally or emailed and addressed:

(a)   if to the Purchaser, to the address or email address and person set out in Section 1.1 with a copy to the Purchaser's Solicitors to the address or email address set out in Section 1.3; and

(b)   and if to the Vendor, to the address or email address and person set out in Section 1.2 with a copy to the Vendor's Solicitors to the address or email address set out in Section 1.4,

provided that either party may change its address or email address by written notice to the other and in such event this section will be deemed to be amended accordingly. Any notice, request or demand given or made hereunder by personal delivery or email will be conclusively deemed to have been given or made on the day it is actually delivered or emailed unless it is delivered or emailed after 5:00 p.m. or on a day other than a Business Day, in which case it will be deemed to have been given or made on the next Business Day.

43.   **Governing Law**

43.1   This Agreement and the agreement resulting therefrom will be construed according to and governed by the laws of the Province of British Columbia and the laws of Canada applicable therein, without regard to conflicts of laws. Any and all disputes arising under this Agreement, whether as to interpretation, performance or otherwise, shall be subject to the non-exclusive jurisdiction of the courts of the Province of British Columbia and each of the parties hereto hereby irrevocably attorns to the jurisdiction of the courts of such province.

44.   **Survival**

44.1   The representations and warranties of the Vendor and the Purchaser under the Agreement will survive the Completion Date for a period of 12 months following the Completion Date and will not merge on Closing.

45.   **Binding Effect**

45.1   This Agreement will enure to the benefit of and be binding upon the Vendor and the Purchaser and their respective administrators, successors and permitted assigns.

46.   **Further Assurances**

46.1   Each of the parties will execute and deliver all such further documents and do such further acts and things as may be reasonably required from time to time to give effect to the intent of the parties in this Agreement.

47.   **Confidentiality**

47.1   The parties agree that this Agreement and the transaction of purchase and sale referred to herein and any information provided by either party to the other with respect to such transaction or the Property will be kept strictly confidential, except that this duty of confidentiality will not apply to any information that becomes generally available to the public, except where made available in violation of this Section, or must otherwise be disclosed by operation of law or by order of a court of competent jurisdiction. The parties may give any such confidential information on a confidential basis to their advisors, consultants, current or prospective lenders, tenants and investors for the purposes of assisting with such transaction. The Vendor and the Purchaser will not make any public announcements in respect of such transaction without prior written consent of the other party. Notwithstanding the foregoing, nothing herein contained shall restrict or prohibit any disclosure which the Purchaser is required to make in obtaining the approvals under the Competition Act.

48.   **Force Majeure**

48.1   If the Vendor is delayed in doing anything the Vendor is required to do pursuant to this Agreement, and the delay is caused by any condition or cause beyond the reasonable control of the Vendor including, without limitations, acts or omissions by third parties not related to the Vendor (but not including the Contractor, project architect or any project subcontractor), strike, lockout, pandemic (the present COVID-19 pandemic is a known condition, but any government health orders issued after the Acceptance Date with respect to COVID-19 and which adversely impact the ability of the Vendor to perform its obligations under this Agreement are not a known condition), epidemic, labour dispute, unforeseen geotechnical conditions, exceptional climatic condition (100 year event), act of God, change in laws, ordinances, rules, regulations or orders of governmental authorities enacted after the Building Permit Condition Date, enemy or hostile action, civil commotion, fire or other casualty (a "**Force Majeure**"), the time for the Vendor doing anything the Vendor is required to do pursuant to this Agreement shall be extended by the time equivalent to the period of such delay, plus one ninety (90) days, provided the Vendor provides prompt written notice of the event of Force Majeure to the Purchaser and takes commercially reasonable steps to mitigate the effects of the Force Majeure. Lack of funds or financing cannot be an event of Force Majeure under this Agreement. An event of Force Majeure will not change or have any impact on the Outside Completion Date.

*[Balance of Page Left Intentionally Blank]*

49.     **Execution in Counterparts**

49.1    This Agreement may be executed by electronic means (including via DocuSign) and in counterparts and all counterparts so executed (including those executed and delivered by electronic means) will constitute one agreement binding on the parties.

The Purchaser and the Vendor have executed this Agreement as of the date first set out above.


**Purchaser:**

**MASIMO CANADA ULC**, by its authorized signatory


Per:            /s/ JOE KIANI
                Name: Joe Kiani
                Title: CEO



**Vendor:**

**KELTIC (PRIOR) DEVELOPMENT LIMITED PARTNERSHIP,** by its general partner, **KELTIC (PRIOR) GP LTD.,** by its authorized signatory


Per:            /s/ RUI WANG
                Name: Rui Wang
                Title: Director


Per:            /s/ RACHEL LI LEI
                Name: Rachel Li Lei
                Title: CEO


31

**SCHEDULE A**

[...***...]

SCHEDULE B

[...***...]

SCHEDULE C

[...***...]

Exhibit 21.1

**Subsidiaries of the Registrant - 2021**

The following are wholly-owned subsidiaries of the registrant, Masimo Corporation, a Delaware corporation:

| Name of Subsidiary | State or Jurisdiction of Incorporation or Organization |
| --- | --- |
| Masimo Americas, Inc. | Delaware |
| Masimo de Mexico Holdings I LLC | Delaware |
| Masimo de Mexico Holdings II LLC | Delaware |
| Masimo Holdings LLC | Delaware |
| SpO2.com, Inc. | Delaware |
| SEDLine, Inc. | Delaware |
| Masimo Australia Pty Ltd | Australia |
| Masimo Österreich GmbH | Austria |
| Masimo Importacao e Distribuicao de Produtos Medicos Ltda | Brazil |
| Masimo Holdings LP | Cayman |
| Masimo (China) Medical Technology Co., Ltd. | China |
| Masimo Europe Ltd. | England and Wales |
| Masimo Hong Kong Limited | Hong Kong |
| Masimo Medical Technologies India Private Limited | India |
| Masimo Japan Kabushiki Kaisha | Japan |
| Masimo Mexico, S. de R.L. de C.V. | Mexico |
| Masimo Canada ULC | Nova Scotia |
| Masimo Peru Srl | Peru |
| Masimo Asia Pacific PTE. Ltd. | Singapore |
| Masimo International SARL | Switzerland |
| Masimo International Technologies SARL | Switzerland |
| Masimo Medikal Ürünler Ticaret Limited Şirketi | Turkey |
| Masimo Semiconductor, Inc. | Delaware |
| Masimo Sweden AB | Sweden |
| 52 Discovery, LLC | California |
| Masimo 25 Sagamore, LLC | New Hampshire |
| Masimo Korea, LLC | South Korea |
| Masimo Polska sp. Z.o.o. | Poland |
| Masimo 17, LLC | California |
| Masimo (Shanghai) Industrial Co., Ltd. | China |
| Patient Doctor Technologies, Inc. | Delaware |

Exhibit 21.1

| Name of Subsidiary | State or Jurisdiction of Incorporation or Organization |
|---|---|
| Alton Office Property, LLC | Delaware |
| Alton Office Holdings, LLC | Delaware |
| OC Property Ventures LLC | Delaware |
| OC Property Shelter LLC | Delaware |
| Masimo Saudi Arabia for Trading, LLC | Saudi Arabia |
| VCCB Holdings, Inc. | Delaware |
| TNI medical AG | Germany |
| Masimo Technology Café LLC | California |
| Masimo LHC, Limited | United Kingdom |
| LiDCO Group Limited, Plc | United Kingdom |
| LiDCO Limited | United Kingdom |
| Cassette Analytical Systems Limited | United Kingdom |
| LiDCO Netherlands B.V. | Netherlands |
| Masimo Medikal Ürünler Ticaret Limited Şirketi İstanbul Şubesi | Turkey |

Exhibit 23.1

**CONSENT OF INDEPENDENT REGISTERED PUBLIC**
**ACCOUNTING FIRM**

We have issued our reports dated February 15, 2022, with respect to the consolidated financial statements, financial statement schedule, and internal control over financial reporting included in the Annual Report of Masimo Corporation on Form 10-K for the year ended January 1, 2022. We consent to the incorporation by reference of said reports in the Registration Statements of Masimo Corporation on Forms S-8 (File No. 333-148149, effective December 19, 2007; File No. 333-157673, effective March 4, 2009; File No. 333-168534, effective August 4, 2010; File No. 333-179557, effective February 17, 2012; File No. 333-186692, effective February 15, 2013; File No. 333-194089, effective February 24, 2014; File No. 333-219207, effective July 10, 2017; File No. 333-234386, effective October 30, 2019, and File No. 333-240152, effective July 28, 2020) and Form S-3 (File No. 333-229892, effective February 26, 2019).

/s/ GRANT THORNTON LLP

Newport Beach, California
February 15, 2022

Exhibit 31.1

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**Pursuant to Rule 13a-14(a) adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Joe Kiani, certify that:

1. I have reviewed this annual report on Form 10-K of Masimo Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 15, 2022

/s/ JOE KIANI
Joe Kiani
Chairman of the Board and Chief Executive Officer
*(Principal Executive Officer)*

Exhibit 31.2

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**Pursuant to Rule 13a-14(a) adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Micah Young, certify that:

1. I have reviewed this annual report on Form 10-K of Masimo Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 15, 2022

/s/ MICAH YOUNG

Micah Young
Executive Vice President, Chief Financial Officer
*(Principal Financial Officer)*

**Exhibit 32.1**

**CERTIFICATIONS OF**
**CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Joe Kiani, Chief Executive Officer of Masimo Corporation (the "Company"), certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that to my knowledge:

1. The Annual Report on Form 10-K of the Company for the period ended January 1, 2022 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 15, 2022

/s/ JOE KIANI

Joe Kiani
Chairman of the Board and Chief Executive Officer
*(Principal Executive Officer)*

I, Micah Young, Executive Vice President and Chief Financial Officer of Masimo Corporation (the "Company"), certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that to my knowledge:

1. The Annual Report on Form 10-K of the Company for the period ended January 1, 2022 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 15, 2022

/s/ MICAH YOUNG

Micah Young
Executive Vice President, Chief Financial Officer
*(Principal Financial Officer)*

A signed original of these certifications has been provided to Masimo Corporation and will be retained by Masimo Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

These certifications are being furnished solely to accompany this Annual Report on Form 10-K pursuant to 18 U.S.C. Section 1350, and shall not be deemed filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and are not to be incorporated by reference into any filing of Masimo Corporation, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

# EXHIBIT B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended January 2, 2021**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number 001-33642**

# MASIMO CORPORATION

### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| DE | 33-0368882 |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification Number)** |
| 52 Discovery    Irvine   , CA | 92618 |
| **(Address of principal executive offices)** | **(Zip Code)** |

(949)   297-7000

**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class: | Trading symbol: | Name of each exchange on which registered: |
|---|---|---|
| Common Stock, par value $0.001 | MASI | The Nasdaq Stock Market, LLC |

**Securities registered pursuant to Section 12(g) of the Act:**          None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.          ☒ Yes ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.          ☐ Yes ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.          ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).          ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.          ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.          ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.)          ☐ Yes ☒ No

The aggregate market value of the voting stock held by non-affiliates of the registrant, based upon the closing sale price of the common stock on June 27, 2020, the last business day of the registrant's most recently completed second fiscal quarter, as reported on the Nasdaq Global Select Market, was approximately $9.2 billion. Shares of stock held by officers, directors and 5 percent or more stockholders have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes. At January 30, 2021, the registrant had 55,266,559 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Items 10, 11, 12, 13 and 14 of Part III of this Annual Report on Form 10-K incorporate information by reference from the registrant's proxy statement for the registrant's 2021 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission within 120 days after the close of the fiscal year covered by this annual report on Form 10-K.

**MASIMO CORPORATION**
**FISCAL YEAR 2020 FORM 10-K ANNUAL REPORT**
**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 35 |
| Item 1B | Unresolved Staff Comments | 62 |
| Item 2 | Properties | 62 |
| Item 3 | Legal Proceedings | 62 |
| Item 4 | Mine Safety Disclosures | 62 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 63 |
| Item 6 | Selected Financial Data | 66 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 68 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 79 |
| Item 8 | Financial Statements and Supplementary Data | 79 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 80 |
| Item 9A | Controls and Procedures | 80 |
| Item 9B | Other Information | 80 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 81 |
| Item 11 | Executive Compensation | 81 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 81 |
| Item 13 | Certain Relationships and Related Transactions and Director Independence | 81 |
| Item 14 | Principal Accounting Fees and Services | 81 |
| **PART IV** | | |
| Item 15 | Exhibits and Financial Statement Schedules | 82 |
| Item 16 | Form 10-K Summary | 85 |
| Signatures | | 86 |

**FORWARD-LOOKING STATEMENTS**

*This Annual Report on Form 10-K contains "forward-looking statements" that involve risks and uncertainties, as well as assumptions that, if they never materialize or prove incorrect, could cause our results to differ materially and adversely from those expressed or implied by such forward-looking statements. The forward-looking statements are contained principally in Item 1—"Business," Item 1A—"Risk Factors" and Item 7—"Management's Discussion and Analysis of Financial Condition and Results of Operations" but appear throughout this Annual Report on Form 10-K. Examples of forward-looking statements include, but are not limited to, any projection or expectation of earnings, revenue or other financial items; the plans, strategies and objectives of management for future operations; factors that may affect our operating results, including accounting and tax estimates; our success in pending litigation; new products or services; the demand for our products; our ability to consummate acquisitions and successfully integrate them into our operations; future capital expenditures; effects of current or future economic conditions or performance; industry trends and other matters that do not relate strictly to historical facts or statements of assumptions underlying any of the foregoing. These statements are often identified by the use of words such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "ongoing," "opportunity," "plan," "potential," "predicts," "seek," "should," "will," or "would," and similar expressions and variations or negatives of these words. These forward-looking statements are based on the expectations, estimates, projections, beliefs and assumptions of our management based on information currently available to management, all of which is subject to change. Such forward-looking statements are subject to risks, uncertainties and other factors that are difficult to predict and could cause our actual results and the timing of certain events to differ materially and adversely from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those identified below, and those discussed under Item 1A—"Risk Factors" in this Annual Report on Form 10-K. Furthermore, such forward-looking statements speak only as of the date of this Annual Report on Form 10-K. We undertake no obligation to update or revise publicly any forward-looking statements to reflect events or circumstances after the date of such statements for any reason, except as otherwise required by law.*

**PART I**

**ITEM 1.   BUSINESS**

*Overview*

We are a global medical technology company that develops, manufactures and markets a variety of noninvasive monitoring technologies and hospital automation solutions. Our mission is to improve patient outcomes and reduce the cost of patient care. Our patient monitoring solutions generally incorporate a monitor or circuit board, proprietary single-patient use or reusable sensors, software and/or cables. We provide our products to hospitals, emergency medical service (EMS) providers, home care providers, long-term care facilities, physician offices, veterinarians and consumers through our direct sales force, distributors and original equipment manufacturers (OEM) partners. We were incorporated in California in May 1989 and reincorporated in Delaware in May 1996.

Our core business is Measure-through Motion and Low Perfusion™ pulse oximetry, known as Masimo Signal Extraction Technology® (SET®) pulse oximetry. Our product offerings have expanded significantly over the years to also include noninvasive monitoring of blood constituents with an optical signature, optical regional oximetry monitoring, electrical brain function monitoring, acoustic respiration monitoring, exhaled gas monitoring, nasal high flow ventilation, minimally invasive neuromodulation technology for pain and addiction reduction, hospital automation and connectivity solutions and home wellness and monitoring.

These technologies are incorporated into a variety of product platforms designed to meet our customers' needs. In addition, we provide our technologies to OEMs in a form factor that is easy to integrate into their patient monitors, defibrillators, infant incubators and other devices.

Our technology is supported by a substantial intellectual property portfolio that we have built through internal development and, to a lesser extent, acquisitions and license agreements. We have also exclusively licensed from Cercacor Laboratories, Inc. (Cercacor) the right to certain OEM rainbow® technologies and to incorporate certain rainbow® technology into our products intended to be used by professional caregivers, including, but not limited to, hospital caregivers and alternate care facility caregivers.

1

Table of Contents

*Core Business*

*Conventional Pulse Oximetry*

Pulse oximetry enables the noninvasive measurement of the oxygen saturation level of arterial blood ($SpO_2$), which delivers oxygen to the body's tissues. Pulse oximetry also measures pulse rate (PR), which, when measured by electrocardiogram (ECG), is called heart rate. Pulse oximeters use sensors attached to an extremity, typically the fingertip or certain core body sites. These sensors contain two light-emitting diodes that transmit red and infrared light from one side of the extremity through the tissue to a photodetector on the other side of the extremity. The photodetector in the sensor measures the amount of red and infrared light absorbed by the tissue. A microprocessor then analyzes the changes in light absorption to provide a continuous, real-time measurement of the amount of oxygen in the patient's arterial blood. Pulse oximeters typically give audio and visual alerts, or alarms, when the patient's arterial blood oxygen saturation level or pulse rate falls outside of a user-designated range. As a result, clinicians have the opportunity to assess patients who may need immediate treatment to prevent the serious clinical consequences of hypoxemia, or low arterial blood oxygen saturation levels, and hyperoxemia, or high arterial blood oxygen levels.

As one of the most common technologies used in and out of hospitals around the world, pulse oximetry has gained widespread clinical acceptance as a standard patient vital sign measurement because it can give clinicians a warning of possible hypoxemia or hyperoxemia. $SpO_2$ monitoring of oxygen saturation is critical because hypoxemia can lead to a lack of oxygen in the body's tissues, which can be toxic and result in organ damage or death. Pulse oximeters are used in a variety of critical care settings, including surgery, recovery rooms, intensive care units (ICUs), emergency departments and general care floors, as well as alternative care settings, such as long-term care facilities, physician offices and the home monitoring of patients with chronic conditions.

Clinicians also use pulse oximeters to monitor oxygen saturation in premature babies to ensure that appropriate oxygen saturation levels are maintained. In premature babies, oxygen saturation levels above clinically acceptable limits may lead to a condition known as retinopathy of prematurity (ROP), which, if left untreated, can lead to permanent eye damage or blindness. By ensuring that oxygen saturation levels in babies remain within clinically acceptable limits, clinicians believe they can lower the incidence of ROP.

Conventional pulse oximetry has limitations that can reduce its effectiveness and the quality of patient care. In particular, when using conventional pulse oximetry, oxygen saturation measurements can be distorted by motion artifact, or patient movement, and low perfusion, or low arterial blood flow at the measurement site. Motion artifact can cause conventional pulse oximeters to inaccurately measure the arterial blood oxygen saturation level, due mainly to the effect of movement-induced pulsations of venous blood, which is at a lower oxygen saturation than arterial blood. Low perfusion can also cause conventional pulse oximeters to report inaccurate measurements or, in some cases, no measurement at all. In addition, conventional pulse oximeters cannot distinguish oxygenated hemoglobin from dyshemoglobin, including the most prevalent forms of dyshemoglobins, carboxyhemoglobin and methemoglobin. As a result, conventional pulse oximeters may report falsely high oxygen levels when these dyshemoglobins are present in the blood. Furthermore, conventional pulse oximetry readings can also be impacted by bright light and electrical interference caused by the presence of electrical surgical equipment.

Independent research has shown that over 70% of oxygen saturation alarms outside the operating room are false when conventional pulse oximetry is used. In the operating room, conventional pulse oximeters can fail to give accurate measurements due to weak physiological signals or low perfusion. Manufacturers of pulse oximeters have attempted to address some of these limitations with varying degrees of success. Some competing devices have attempted to minimize the observed effects of motion artifact by repeating/freezing the last measurement before motion artifact was detected until a new, clean signal is detected and a new measurement can be displayed. Other competing devices increase the averaging time during motion, known as long averaging, in an attempt to reduce the observed effect of motion on their measurements. Still other competing devices extend the audible alarm notification delay, which reduces awareness of inaccurate measurements. These competing "motion tolerant" or "alarm management" techniques mask the limitations of conventional pulse oximetry. Several published studies have demonstrated that these also contribute to increased occurrences of undetected true alarms, or events where hypoxemia occurs but is not detected by the pulse oximeter.

Lastly, because conventional pulse oximetry cannot consistently measure $SpO_2$ and pulse rate in the presence of motion artifact or low perfusion, its use is limited in lower acuity settings in the hospital, such as in general care areas, where a hospital's staff-to-patient ratio is significantly lower and the staff have less tolerance for false alarms. In addition, two-wavelength pulse oximeters cannot distinguish oxygenated hemoglobin from dyshemoglobin, including the most prevalent forms of carboxyhemoglobin and methemoglobin. As a result of these dyshemoglobins, pulse oximeters will report falsely high oxygen levels when they are present in the blood.

Table of Contents

*Masimo Difference*

*Masimo SET® Pulse Oximetry*

Masimo SET® was designed to overcome the primary limitations of conventional pulse oximetry by maintaining accuracy in the presence of motion artifact, low perfusion and weak signal-to-noise situations. Our Masimo SET® platform, which became available to U.S. hospitals in 1998, is the basis of our pulse oximetry products, and we believe represented the first significant technological advancement in pulse oximetry since its introduction in the early 1980s. Masimo SET® utilizes five signal processing algorithms, four of which are proprietary, in parallel to deliver high sensitivity and specificity in the measurement of arterial blood oxygen saturation levels. Sensitivity is the ability to detect true alarms and specificity is the ability to avoid false alarms. One of our proprietary processing algorithms, Discrete Saturation Transform®, separates the signal from noise in real time through the use of adaptive filtering and an iterative sampling technique that tests each possible saturation value for validity. Masimo SET® signal processing can therefore identify the venous blood and other "noise", isolate them and extract the arterial signal.

The performance of Masimo SET® pulse oximetry has been evaluated in more than 100 independent studies and thousands of clinical evaluations. We believe that Masimo SET® is trusted by clinicians to safely monitor in excess of approximately 200 million patients each year and has been chosen as the primary pulse oximeter technology used by nine of the top ten hospitals according to the 2020-2021 *U.S. News & World Report* Best Hospitals Honor Roll. Compared to conventional pulse oximeters, during patient motion and low perfusion, Masimo SET® provides measurements when other pulse oximeters cannot, significantly reduces false alarms (improved specificity), and accurately detects true alarms (improved sensitivity). Clinical studies have shown that the use of Masimo SET® pulse oximetry, in conjunction with modified clinical protocols, has helped clinicians reduce ROP in neonates and improve screening for newborns with critical congenital heart disease (CCHD). Clinical studies have also shown a reduction in rapid response activations and ICU transfers when Masimo SET® is used to continuously monitor patients on general wards. Additionally, researchers have found that the use of Masimo SET® is associated with reduced ventilator weaning time and arterial blood gas measurements in the ICU.

Our pulse oximetry technology is contained on a circuit board which can be placed inside a standalone pulse oximetry monitor, placed inside OEM multiparameter monitors, or included as part of an external "Board-in-Cable" solution that is plugged into a port on an OEM or other device. All of these solutions use our proprietary single-patient-use or reusable sensors and cables. We sell our products to end-users through our direct sales force and through certain distributors, as well as to our OEM partners, for incorporation into their products. In 2013, we also began selling our pulse oximetry products in the consumer market.

To complement our Masimo SET® platform, we have developed a wide range of proprietary single-patient-use (disposable) and multi-patient-use (reusable) sensors, cables and other accessories designed specifically to work with Masimo SET® software and hardware. Our single-patient-use sensors offer several advantages over reusable sensors, including improved performance, cleanliness, increased comfort and greater reliability. In addition, our neonatal adhesive sensors have been designed to exhibit greater durability compared to competitive sensors. Although our technology platforms operate solely with our proprietary sensor lines, our sensors have the capability to work with certain competitive pulse oximetry monitors through the use of adapter cables.

Adhesive sensors are single-patient-use items, but the U.S. Food and Drug Administration (FDA) allows third parties to reprocess pulse oximetry sensors. In response to some hospitals' requests to implement environmentally friendly or "green" products, we offer sensor reprocessing as well as sensor recycling programs.

*Masimo rainbow SET® Platform*

Since introducing Masimo SET®, we have continued to innovate by introducing noninvasive measurements that go beyond arterial blood oxygen saturation and pulse rate. Our Masimo rainbow SET® platform leverages our Masimo SET® technology and incorporates licensed rainbow® technology to enable real-time monitoring of additional noninvasive measurements. Our rainbow SET® platform includes our rainbow® Pulse CO-Oximetry products, which we believe are the first devices cleared by the FDA to noninvasively and continuously monitor additional hemoglobin species that were previously only measurable using intermittent invasive procedures using multiple wavelengths of light.

In addition to $SpO_2$, PR, perfusion index (Pi), Pleth Variability Index ($PVi®$) and respiration rate from the pleth ($RRp®$), rainbow® Pulse CO-Oximetry has the unique ability to measure and distinguish oxygenated hemoglobins from the dyshemoglobins that are incapable of transporting oxygen, carboxyhemoglobin ($SpCO®$) and methemoglobin ($SpMet®$). Besides the ability to measure $SpCO®$ and $SpMet®$, the Masimo rainbow SET® platform also allows for the noninvasive and continuous monitoring of total hemoglobin concentration ($SpHb®$) as well as the monitoring of arterial oxygen saturation, in the presence of carboxyhemoglobin and methemoglobin, known as fractional arterial oxygen saturation ($SpfO_2™$). Additionally, the rainbow SET® platform also allows for the calculation of Oxygen Content ($SpOC™$) and Oxygen Reserve Index™ ($ORi™$). $SpfO_2™$ and $ORi™$ have received CE Marking, but are not currently available for sale in the U.S.

3

We believe that Masimo rainbow® Pulse CO-Oximetry products will become widely adopted for the noninvasive monitoring of these measurements in the future. We also believe that the addition of acoustic respiration rate (RRa®), using our rainbow Acoustic Monitoring® technology, will strengthen the clinical demand for noninvasive and continuous monitoring using our rainbow® platform, especially in the growing general floor market.

Products with our MX circuit board contain our Masimo SET® pulse oximetry technology as well as circuitry to support rainbow® measurements. At the time of purchase, or at any time in the future, our customers and our OEMs' customers have the option of purchasing additional rainbow® software measurements, which allow such customers to incrementally expand their patient monitoring systems with a cost-effective solution. To date, over thirty-eight companies have released rainbow SET® equipped products or announced rainbow® integration plans.

*Measurements*

*SpHb®*

Hemoglobin is the oxygen-carrying component of red blood cells (RBCs). Hemoglobin measurement is one of the most frequent invasive laboratory measurements in the world, and is often measured as part of a complete blood count (CBC), which measures multiple other blood components. A low hemoglobin status is a condition called anemia. As a chronic disorder, anemia can be treated by iron supplements, diet changes or drugs that increase the production of RBCs. As an acute disorder resulting from bleeding, anemia requires either stoppage of the bleeding or a blood transfusion in order to sustain organ function and life.

SpHb® is available as a continuous or a spot-check measurement. Continuous SpHb® monitoring provides real-time visibility into hemoglobin levels and the changes, or lack of changes, in hemoglobin levels, which can otherwise only be measured through intermittent, invasive blood testing. SpHb® monitoring is not intended to be used as the sole basis for making diagnosis or treatment decisions, but continuous SpHb® monitoring may help clinicians to trend hemoglobin in real time between invasive blood samples.

*SpOC™*

The oxygen content of blood is a function of both oxygen saturation and hemoglobin levels. SpOC™ provides a more complete picture of a patient's oxygenation status by combining noninvasive and continuous measurements of both hemoglobin and oxygen saturation levels into a single calculation.

*SpCO®*

Carbon monoxide (CO) is a colorless, odorless and tasteless gas that is undetectable by humans and is often unknowingly inhaled from combustion fumes, or during fires by victims and first responders. CO poisoning is the leading cause of accidental poisoning death in the U.S. and is responsible for up to 50,000 emergency department visits and 500 unintentional deaths annually. CO, when bound to hemoglobin cells, prevents those cells from carrying oxygen. Elevated CO levels may cause severe neurological damage, permanent heart damage or death. Screening for elevated CO levels in the emergency department is critical, as symptoms of CO poisoning in patients may be misdiagnosed because such symptoms are similar to the flu.

CO levels in the blood can be measured using a laboratory CO-Oximeter, which requires a patient or a patient's blood sample to be transported to a hospital with laboratory CO-Oximetry capability. Additional delays occur if a patient needs hyperbaric oxygen therapy, which often requires transfer to yet another medical center with hyperbaric capability. Outside the hospital, laboratory measurements of carboxyhemoglobin are not considered feasible. Historically, this meant that CO levels in the blood could not be assessed in environments in which such assessment would be very useful, such as in the home or as part of the medical evaluation of first responders potentially exposed to CO at the scene of a fire.

While SpCO® is not intended to replace invasive carboxyhemoglobin tests, when used with other clinical variables, SpCO® may help clinicians identify elevated CO levels and help determine additional test and treatment options. Multiple leading emergency first responder associations, including the National Association of Emergency Medical Technicians, the National Association of EMS Educators, the International Association of Fire Fighters and the International Association of Fire Chiefs, have educated their members on the benefits of noninvasive CO measurement when exposure is suspected or when an individual presents symptoms that could indicate elevated CO levels.

4

Table of Contents

*SpMet®*

Methemoglobin in the blood leads to a dangerous condition known as methemoglobinemia, which occurs as a reaction to some common drugs used in hospitals and outpatient procedures. Methemoglobinemia reduces the amount of oxygen bound to hemoglobin for delivery to tissues and forces normal hemoglobin to bind more tightly to oxygen, releasing less oxygen to the tissues. Methemoglobinemia may go unrecognized or be subject to delayed diagnosis, increasing risk to the patient. Commonly prescribed drugs can introduce methemoglobin into the blood and cause methemoglobinemia. Some of the 30 drugs that are known to cause methemoglobinemia include benzocaine, a local anesthetic routinely used in procedures ranging from endoscopy to surgery; inhaled nitric oxide, routinely used in the Neonatal Intensive Care Unit; nitroglycerin, used to treat cardiac patients; and dapsone, used to treat infections for immune-deficient patients such as Human Immunodeficiency Virus (HIV) patients. Warnings, cautions and alerts regarding the clinical significance and prevalence of methemoglobinemia have been generated by the FDA, the Veterans Administration, the Institute for Safe Medication Practices and the National Academy of Clinical Biochemistry. The American Academy of Pediatrics recommends monitoring methemoglobin levels in infants who receive nitric oxide therapy. While SpMet® is not intended to replace invasive methemoglobin tests, when used with other clinical variables, SpMet® may help clinicians identify elevated methemoglobin levels and help determine additional test and treatment options.

*PVi®*

PVi® is a measure of the dynamic changes in the Perfusion Index (Pi) that occur during the respiratory cycle. The calculation is accomplished by measuring changes in Pi over a time interval where one or more complete respiratory cycles have occurred. PVi® is displayed as a percentage. The lower the number, the less variability there is in Pi over a respiratory cycle. PVi® may show changes that reflect physiologic factors such as vascular tone, circulating blood volume and intrathoracic pressure excursions. When used with other clinical variables, PVi® may help clinicians assess fluid responsiveness in surgical and intensive care patients who are mechanically ventilated and help determine other treatment options. In August 2020, PVi® received FDA 510(k) clearance as a continuous, noninvasive, dynamic indicator of fluid responsiveness in select populations of mechanically ventilated adult patients.

*RPVi™*

Rainbow® Pleth Variability Index (RPVi™) is a multi-wavelength version of PVi® that is designed to provide enhanced specificity to changes in fluid volume compared to PVi®. Similar to PVi®, RPVi™ is displayed as a percentage and is calculated by measuring changes in Pi over a time interval where one or more complete respiratory cycles have occurred. The lower the number, the less variability there is in Pi over a respiratory cycle, which indicates more fluid in the body. RPVi™ has received the CE Mark, but is not currently available for sale in the U.S.

*RRp®*

Respiration rate is defined as the number of breaths per minute. Changes in respiration rate provide an early warning sign of deterioration in patient condition. A low respiration rate is indicative of respiratory depression and high respiration rate is indicative of patient distress. Current methods of monitoring respiration rate include end tidal carbon dioxide (EtCO₂) monitoring, which requires a nasal cannula be inserted in the patient's nose or a mask to be worn, and therefore has low patient compliance; and impedance monitoring, which is considered unreliable and requires the placement of ECG electrodes on the chest. RRp® allows clinicians to noninvasively and continuously measure and monitor respiration rate using a standard Masimo SET® pulse oximetry sensor or rainbow® Pulse CO-Oximetry sensor. RRp® is determined by the variations in the plethysmograph waveform due to respiration, although the measurement is not possible in all patients or conditions and may not immediately indicate changes in respiration rate. RRp® has received the CE Mark, as well as FDA 510(k) clearance when used in healthcare settings with the MightySat® Rx fingertip SET® pulse oximeter. RRp® is also available in the U.S. for use by consumers for general health and wellness purposes as part of our MightySat® fingertip pulse oximeter. In March 2020, RRp® received FDA 510(k) clearance for continuous RRp® monitoring of adult and pediatric patients with Rad-97®, Radical-7® and Radius-7® Pulse Co-Oximeters®. With this clearance, both continuous and spot-check RRp® are now available in the U.S. and supported in a variety of pulse oximetry sensors and configurations, including a non-cabled, tetherless, wearable Radius PPG™.

Table of Contents

*RRa®*

Our sound-based monitoring technology, rainbow Acoustic Monitoring® (RAM®), enables RRa® and provides continuous and noninvasive monitoring of respiration rate. For patients requiring accurate and sensitive respiration rate monitoring, we believe that RRa® better detects pauses in breathing than respiration rate measurements from other technologies such as EtCO$_2$ monitoring and RRp®. RRa® also provides an important visual indication of breathing through a displayed acoustic waveform.

Multiple clinical studies have shown that the noninvasive measurement of acoustic respiration rate provides as good or better respiration rate monitoring accuracy as EtCO$_2$ monitoring, and can reliably detect episodes of respiratory pause, defined as the cessation of breathing for 30 seconds or more. When used with other clinical variables, RRa® may help clinicians assess respiratory depression and respiratory distress earlier and more often to help determine treatment options and potentially enable earlier interventions.

*SpfO2™*

Prior to our debut of SpfO$_2$™, pulse oximeters could only measure and display functional SpO$_2$ oxygen saturation. Therefore, when patients had elevated carboxyhemoglobin and/or elevated methemoglobin, the displayed *functional* SpO$_2$ oxygen saturation overestimated the actual oxygen saturation value. SpfO$_2$™, or *fractional* oxygen saturation, allows more precise arterial oxygenation assessment in patients with elevated dyshemoglobins, common throughout the hospital and pre-hospital setting, compared to functional oxygen saturation, and may also allow earlier interventions and more timely therapeutic decisions. SpfO$_2$™ has received the CE Mark, but is not currently available for sale in the U.S.

*ORi™*

ORi™ provides real-time visibility to oxygenation status in moderate hyperoxic range, which we define as a patient's oxygen "reserve". ORi™ can be trended and has optional alarms to notify clinicians of changes in a patient's oxygen reserve. When this technology is used with SpO$_2$ monitoring, ORi™ may extend the continuous and noninvasive visibility of a patient's oxygen status into ranges previously unmonitored in this fashion. ORi™ may also be of value in patients receiving supplemental oxygen, such as those in surgery, under conscious sedation or in the ICU, as ORi™ is represented as an "index" parameter with a unit-less scale between 0.00 and 1.00. Furthermore, ORi™ may provide an advance warning of an impending hypoxic state, or an indication of an unintended hyperoxic state, when evaluated in conjunction with the partial pressure of oxygen (PaO$_2$). In this way, ORi™ may assist in determining the need for proactive interventions to avoid hypoxia or unintended hyperoxia. ORi™ has received the CE Mark, but is not currently available for sale in the U.S.

### Other Noninvasive Measurements

Following the introduction of our rainbow SET® platform, we have continued to expand our technology offerings by introducing additional noninvasive measurements and technologies to create new market opportunities in both hospital and non-hospital care settings.

*SedLine® Brain Function Monitoring*

Brain function monitoring is most commonly used during surgery to help clinicians avoid over-titration and under-titration of anesthesia and sedation. SedLine® brain function monitoring technology measures the brain's electrical activity by detecting EEG signals. In contrast to whole-scalp EEG monitoring, which is used for diagnostic purposes, this form of EEG monitoring is often referred to as processed EEG monitoring or brain function monitoring. Brain function monitors display the patient's EEG waveforms, but these may be difficult for clinicians to interpret. With SedLine® technology, EEG signals are processed and displayed as a single number called the Patient State Index (PSi), which gives a continuous quantitative indication of the patient's depth of anesthesia and sedation. SedLine® brain function monitoring technology also displays raw EEG waveforms, the PSi trend and a Density Spectral Array view, which allows clinicians to compare EEG power in both sides of the brain over time to facilitate the detection of asymmetrical activity and agent-specific effects on the EEG signal.

SedLine® brain function monitoring technology is available on Root® through the use of a Masimo Open Connect® (MOC-9®) connectivity port. The Root® patient monitoring and connectivity platform integrates rainbow® and SET® measurements with measurement technologies, such as SedLine®.

*NomoLine® Capnography and Gas Monitoring*

We offer a portfolio of capnography and gas monitoring products ranging from external "plug-in-and-measure" capnography and gas analyzers, integrated modules, handheld capnograph and capnometer devices and capnography sampling lines. Our NomoLine® capnography sampling lines are available in more than 40 configurations of airway adapter sets and cannulas for use in a variety of clinical scenarios on both intubated and non-intubated adult, pediatric, infant and neonatal patients, in both low and high humidity configurations, facilitating easy to use sidestream capnography and gas monitoring.

Table of Contents

These products have the ability to measure multiple expired gases, such as carbon dioxide ($CO_2$), nitrous oxide ($N_2O$), oxygen ($O_2$) and other anesthetic agents. In addition, respiration rate is calculated from the $CO_2$ waveform. These measurements are possible through either mainstream monitoring, which samples gases from a ventilated patient's breathing circuit, or sidestream monitoring, which samples gases from a breathing circuit in mechanically ventilated patients or through a cannula or mask in spontaneously breathing patients. These capnography and gas measurements are standard-of-care in many hospital environments, such as operating rooms and ICUs, during procedural sedation. NomoLine® capnography sampling lines have received FDA 510(k) clearance.

*O3® Organ Oximetry*

O3® organ or Regional Oximetry, also known as tissue or cerebral oximetry, uses near-infrared spectroscopy (NIRS) to provide continuous measurement of tissue oxygen saturation (rSO₂) to help detect regional hypoxemia, or oxygen deficits in specific tissues such as the brain, that pulse oximetry alone cannot detect under certain conditions. In addition, O3® sensors, in conjunction with our Root® monitor, can automate the differential analysis of regional to central oxygen saturation derived from SET® pulse oximeters. O3® monitoring involves applying O3® Regional Oximetry sensors to the forehead and connecting the O3® MOC-9® module to a Root® monitor through one of its three MOC-9® ports. O3® Regional Oximetry has received the CE Mark and FDA 510(k) clearance for use in adult and pediatric patients. In June 2019, we announced FDA 510(k) clearance for use of O3® in infant and neonatal patients. In August 2020, O3® Regional Oximetry received 510(k) clearance for expanded use in monitoring somatic tissue oxygenation saturation in all patient populations and monitoring relative changes in hemoglobin, oxyhemoglobin and deoxyhemoglobin in adult brains. With this FDA 510(k) clearance, O3® Regional Oximetry is now indicated for use in both cerebral and somatic applications, both in the U.S. and in CE Mark countries, for all patient populations.

*Advanced Hemodynamic Monitoring Solutions*

In December 2020, we acquired a majority ownership stake of LiDCO Group, PLC, which specializes in hemodynamic monitoring solutions. With this acquisition, we will be able to provide clinicians with access to patients' cardiac output, stroke volume and systemic vascular resistance, which are used to assess preload and afterload, to help determine the current state of a patient's hemodynamic stability and whether any interventions are needed to optimize the delivery of oxygen to the tissues. Hemodynamic monitoring solutions is also used to monitor the response to therapies such as vasopressors, inotropes and fluids.

**The Masimo Hospital Automation™ Platform**

*Patient SafetyNet™(1)*

Patient SafetyNet™, our patient surveillance, remote monitoring and clinician notification solution, works in concert with our bedside and ambulatory monitoring devices to facilitate the supplemental monitoring of the oxygen saturation, pulse rate, perfusion index, hemoglobin, methemoglobin and respiration rate of up to 200 patients simultaneously from a single server. Patient SafetyNet™ offers an intuitive and powerful user interface with trending, real-time waveform capability at a central station, as well as remote clinician notification via pager, voice-over-IP phone or smart-phones. Patient SafetyNet™ also features an Adaptive Connectivity Engine™(ACE™) that enables two-way, HL-7 based connectivity to clinical/hospital information systems. The ACE™ significantly reduces the time and complexity to integrate and validate custom HL-7 implementations, and demonstrates our commitment to innovation that automates patient care with open, scalable and standards-based connectivity architecture.

Patient SafetyNet™ Series 5000, along with Hospital Automation™ Connectivity, Iris® Gateway, Kite®, UniView™, UniView : 60™ and MyView® through the Root® patient monitoring and connectivity platform, offers a new level of interoperability designed to enhance clinician workflows and reduce the cost of care in a variety of hospital settings, including operating rooms and the general care floors. Patient SafetyNet™ Series 5000 with Iris® ports enables Root® to assimilate data from all devices connected to the patient, thereby acting as a comprehensive in-room patient monitor and connectivity hub. Alarms and alerts for all devices are seamlessly forwarded to the patient's clinician and device data can be transferred to the patient's electronic medical record (EMR). The patient-centric user interface of the Patient SafetyNet™ Series 5000 displays near real-time data from all devices with Kite®, providing a single unified dashboard of patient information. To simplify documentation of patient data, Root® enables clinicians to easily verify and send patient vitals and Early Warning Scores (EWS), as well as all connected medical device information data, to the EMR directly from Root®.

An interface between the Patient SafetyNet™ Series 5000 and the hospital admission, discharge and transfer (ADT) system allows clinicians to receive ADT information on Root® for positive patient identification at the bedside. Clinicians can also manually enter additional data on the Root® device, including temperature, blood pressure, level of consciousness, pain score and urine output.

---

(1) The use of the trademark Patient SafetyNet™ is under license from the University HealthSystem Consortium.

Table of Contents

In a series of studies published between 2010 and 2020 by Dartmouth-Hitchcock Medical Center, clinicians using Masimo SET® and Patient SafetyNet™ identified patient distress earlier, which decreased rapid response team activations, ICU transfers and ICU days. Per these studies, over ten years, there were zero preventable deaths or brain damage due to opioid-induced respiratory depression in monitored patients. In addition, we believe these studies demonstrated that the use of Masimo SET® and Patient SafetyNet™ can result in significant cost savings. Hospitals and other care centers may determine that they can reduce their costs by moving less critically ill patients from the ICU to the general care floors where they can be continuously and accurately monitored in a more cost-effective manner. We believe that the advanced performance of the Masimo SET® platform coupled with reliable, cost-effective and easy-to-use wireless remote monitoring will allow hospitals to create continuous surveillance solutions on general care floors where patients are at risk of avoidable adverse events and where direct patient observation by skilled clinicians is considered cost prohibitive.

*Kite®*

Kite® provides a supplemental display of data from a Masimo device on a compatible smart television and allows clinicians to configure the display differently than that of the connected Masimo device. Kite® integrates into existing hospital infrastructures where a supplementary display may be beneficial, such as the operating room.

*UniView™*

UniView™, an integrated display of real-time data and alarms from multiple Masimo and third-party devices, designed to reduce clinician cognitive overload and improve patient safety. UniView™ promotes data sharing and team coordination among multiple clinicians. UniView™ brings together data from a variety of sources – such as patient monitors, ventilators, anesthesia gas machines, and IV pumps – and provides a supplementary display for them, clearly organized, on one or more large, central monitors, so that all clinicians can simultaneously view and act upon the same, comprehensive real-time patient status and historical trends.

*UniView : 60™*

UniView : 60™ uses the Masimo Hospital Automation™ platform to aggregate and display pertinent patient information on a digital display just outside each patient's room, allowing clinicians to familiarize themselves with the most relevant details of each patient's case at the door in 60 seconds or less before they see the patient.

*Replica™*

Replica™, working in conjunction with Patient SafetyNet™, is a mobile application for smart phones and tablets that provides for supplemental remote monitoring and clinician notification. Replica™ was developed to allow clinicians to view continuous monitoring data for multiple patients, as well as view and respond to alarms and alerts, all from their smart phones, regardless of location.

*MyView®*

MyView® is a wireless, presence-detection system that enables the display of customized clinical profiles on Masimo devices, such as Root®, Radical-7® and the Patient SafetyNet™ View Station. When a clinician approaches the device, a clinician-worn MyView® badge signals the device to display a preselected set of parameters and waveforms tailored to the individual clinician's preferences. MyView® gives clinicians the ability to receive and review medical device information in a manner that is most conducive to optimizing their workflow, while the presence mapping data collected by all the Masimo devices can provide insight into how clinicians spend time with patients. This provides nursing leadership and management the opportunity to examine analytical data on patient-clinician interactions and optimize workflows across the unit, hospital and hospital system.

*Patient SafetyNet™ Surveillance*

Patient SafetyNet™ Surveillance is a software option that provides real-time video images of a patient's room, including the patient and connected monitoring devices, adding existing communication technology to central monitoring. Two-way audio is available to allow the caregiver to listen to and communicate with the patient. The system utilizes the existing hospital information technology network, precluding the installation of additional infrastructure.

### Connectivity

Despite medical technology advances, the lack of device communication and integration creates risks to patient safety in hospitals around the world. Without device interoperability, critical patient information can go unnoticed, leaving clinicians unaware and patients at risk. Existing approaches for device interoperability require separate hardware, software and/or network infrastructure, which can clutter the patient room, increase complexity, burden IT management and increase costs. To address these challenges, we introduced Iris® connectivity in our Root® patient monitoring and connectivity platform. Iris® connectivity enables multiple standalone third-party devices such as intravenous pumps (IV), ventilators, hospital beds and other patient monitors to connect through Root®, enabling display, notification and documentation to the EMR through Masimo Patient SafetyNet™.

The addition of Iris® connectivity to Root® and Patient SafetyNet™ provides multiple advantages to hospitals, such as allowing standalone device information to be remotely viewed at a Patient SafetyNet™ view station, transmitted through notification systems to clinicians regardless of location or sent to electronic health record systems. This may enhance patient assessment, clinical workflows and decision support. In addition, bringing data from disparate devices together facilitates more integrated patient care and provides a flexible and cost-effective platform, while avoiding installation of separate costly systems and potentially reducing costs by leveraging existing network infrastructure.

### Nasal High Flow Ventilation

With the acquisition of TNI medical AG (TNI®) in March 2020, we added TNI softFlow® technology to our product portfolio. The TNI softFlow® technology provides respiratory support by generating a precisely regulated, stable high flow of room air or a mix of room air and oxygen through the nose of the patient by means of thin nasal prongs. Controlled oxygen supply ensures oxygenation while, at the same time, the respiratory airways are humidified. A stable air flow is essential for treating hypoxemic and hypercapnic respiratory failure. Together with the TNI applicator, the TNI Flow generator provides a constant air flow and in doing so, it is completely independent of external pneumatic systems. Due to this, the TNI softFlow® technology is able to treat respiratory insufficiency and allows therapy at home in a manner that is as reliable and efficient as in the hospital.

### Neuromodulation Solution

Bridge™ is the first FDA-cleared, drug-free, non-surgical device to use neuromodulation to aid in the reduction of symptoms associated with opioid withdrawal. Bridge™ can be used for patients experiencing opioid withdrawal symptoms, while undergoing treatment for opioid use disorder when initiating treatment, transitioning to naltrexone or tapering off medication-assisted treatment. In addition, we believe Bridge™ may reduce pain and addiction-related side-effects. Bridge™ is a small electrical nerve stimulator device that contains a battery-powered chip and wires that are applied percutaneously around a patient's ear. It requires a prescription and is offered to qualified healthcare professionals with training. Bridge™ has been granted a FDA 510(k) de novo classification.

### Coronavirus-2019 (COVID-19) Response and Telehealth Solutions

#### Masimo SafetyNet™

In an effort to help clinicians and public health officials combat the COVID-19 pandemic, we developed the Masimo SafetyNet™ solution. The Masimo SafetyNet™ solution provides continuous tetherless pulse oximetry and respiration rate monitoring coupled with a patient surveillance platform. We announced the full market release of the Masimo SafetyNet™ solution in April 2020, and it is available worldwide. In addition, we announced a partnership with Samsung Electronics America (Samsung) to make the Masimo SafetyNet™ Patient App available on select Samsung smartphones, pre-installed and pre-configured.

#### Masimo SafetyNet-OPEN™

As the COVID-19 pandemic continues, companies and organizations worldwide struggle to find the appropriate balance between reopening and keeping people safe by reducing the risk of infection. Masimo SafetyNet-OPEN™ was designed to help businesses, governments and schools more responsibly manage employee and student health and safety during the COVID-19 pandemic. Masimo SafetyNet-OPEN™ helps address certain challenges of reopening responsibly and safely with a comprehensive, flexible, and easy-to-deploy continuous monitoring solution that, in conjunction with clinical guidance from partner hospitals, helps manage prevention, early identification, and recovery monitoring. As a global leader in noninvasive patient monitoring technologies and advanced connectivity and automation solutions, we believe we are uniquely positioned to provide organizations with tools to assist them in reopening safely.

Table of Contents

### Our Strategy

Our mission is to develop technologies that improve patient outcomes and reduce the cost of patient care. We intend to continue to grow our business and improve our market position by pursuing the following strategies:

- *Continue to Expand our Market Share in Pulse Oximetry.* We grew our product revenue to $1,143.7 million in 2020 from $738.2 million in 2017, representing a three-year compound annual growth rate of 15.7%. This growth can be attributed to continued expansion of our core SET® pulse oximeter customer base, higher revenues from rainbow® Pulse CO-Oximetry, NomoLine® capnography and other new technologies, and our expanding list of OEM partners. We supplement our direct sales to hospitals and other low-acuity healthcare facilities through various U.S. and international distributors. Combined sales through our direct and distributor sales channels increased to $958.8 million, or 83.8% of product revenue in 2020, from $644.7 million, or 87.3% of product revenue, in 2017. As the healthcare industry shifts toward hospitals, physicians and providers being rewarded by payers based on the quality and value of the services (as opposed to the volume of fee-for-service transactions), we expect to see more hospitals gravitate towards technologies like Masimo SET® that have a proven track record of improving patient care.

- *Expand the Pulse Oximetry Market to Other Patient Care Settings.* Many patients die due to unintended opioid overdoses after surgery while on general care floors. We believe the ability to continuously and accurately monitor patients outside of critical care settings, including the general, medical and surgical floors of the hospital, is currently an unmet medical need that has the potential to significantly improve patient care and increase the size of the pulse oximetry market. In addition, we believe the ability of Masimo SET® to accurately monitor and address the limitations of conventional pulse oximetry has enabled us, and will continue to enable us, to expand into non-critical care settings, and therefore, significantly expand the market for our products. To further support our expansion into the general care areas, we market Patient SafetyNet™, which enables continuous monitoring of up to 200 patients' $SpO_2$, PR, RRp® and with rainbow SET®, noninvasive monitoring of hemoglobin and other advanced measurements. We believe that Patient SafetyNet™, when combined with Masimo SET® pulse oximetry and RAM® or capnography, offers a clinically proven and cost-effective approach to continuous post-operative monitoring. Outside of the hospital setting, patients could die due to unintentional opioid overdose, even when opioids are being taken for short duration, such as after surgery, and as prescribed by a physician. We believe that in the home setting, accurate monitoring with Masimo SET® may help reduce the risk of opioid overdose by alerting family members and others when opioids have slowed a patient's breathing and caused a significant drop in oxygen saturation.

- *Expand the Use of rainbow® Technology in Hospital Settings.* We believe the noninvasive measurements of rainbow® Pulse CO-Oximetry (SpHb®, SpCO®, SpMet®, PVi®, $SpO_2$™, SpOC™ and ORi™), RAM® and Halo Ion®, as well as future measurements, provide an excellent opportunity to help our customers improve patient care while reducing their overall cost of care.

- *Expand the Use of rainbow® Technology in Non-Hospital Settings.* We believe the noninvasive measurement of hemoglobin, SpHb®, creates a significant opportunity in markets such as physician offices, emergency departments and blood donation centers; and the noninvasive measurement of carboxyhemoglobin, SpCO®, creates a significant opportunity in the fire/alternate care market.

- *Expand the Use of Root® in Hospital Settings.* We believe Root® represents a powerful new paradigm in patient monitoring because it enhances our rainbow® and SET® measurements with multiple specialty parameters, including SedLine® brain function monitoring, O3® Regional Oximetry, and NomoLine® capnography and gas monitoring, and enables open-architecture connectivity in an integrated, clinician-centric hub. Our Hospital Automation™ integration platform for Root® provides a conduit to the patient's EMR for a range of clinical devices that may otherwise remain disconnected, and therefore, unable to communicate their information. Hospital Automation™, in conjunction with the Iris® ports found on Root®, offers clinical utility and flexibility by collecting device information from multiple sources and making it available to clinicians in one networked place, akin to an airplane cockpit. Complementary innovations like the Radius-7® wearable, wireless monitor foster an environment of safety without sacrificing patient mobility or comfort. Radius-7® provides patients in medical-surgical units with mobility, allowing them to visit common areas and labs, all while being continuously monitored around the clock. Root® is acuity-adaptable, meaning it can be configured for any care area, and is competitively priced.

- *Expand Hospital Automation and Connectivity in Hospital Settings.* We believe we can improve and automate the continuum of care through our connectivity platform by reducing complexity by integrating data from multiple disparate monitors and therapeutic devices through Root® and Iris® Gateway; by deploying decision support algorithms like Halo ION®; by saving time through semi-automated and automated bedside vital signs measurement and documentation with Patient SafetyNet™; by keeping patients connected with their care providers through Masimo SafetyNet™ and Rad 97® when they are discharged from hospitals; by improving data interpretation through adaptable and intuitive displays like UniView™, UniView : 60™ and MyView®; and through remote monitoring via Patient SafetyNet™ and Replica™.

10

Table of Contents

- *Utilize our Customer Base and OEM Relationships to Market Masimo rainbow SET®, O3®, SedLine® and Capnography Products Incorporating Licensed rainbow® Technology.* We currently sell rainbow SET® products through our direct sales force and distributors. We include our MX circuit boards in our pulse oximeters and also sell them to our OEM partners. Our MX circuit boards are equipped with circuitry to support rainbow® Pulse CO-Oximetry measurements that can be activated at time of sale or through a subsequent software upgrade. We believe that, over time, the clinical need for these measurements, along with our installed customer base, will help drive the adoption of our rainbow® Pulse CO-Oximetry products.

- *Continue to Innovate and Maintain Our Technology Leadership Position.* We invented and pioneered the first pulse oximeter to accurately measure arterial blood oxygen saturation level and pulse rate in the presence of motion artifact and low perfusion. In addition, we launched our rainbow SET® platform that enabled what we believe is the first noninvasive monitoring of carboxyhemoglobin, methemoglobin and hemoglobin, as well as PVi®, all of which were previously only available with invasive and/or complicated testing. Furthermore, we believe that our introduction of RRa® with RAM® technology represented the first platform to enable noninvasive and continuous respiration monitoring through an easy-to-use single-patient adhesive acoustic sensor. Finally, we believe that our recent introduction of ORi™ may provide advance warning of an impending hypoxic state, or an indication of an unintended hyperoxic state.

- *Expand Masimo technology into the personal health consumer market.* Our first general wellness and personal health consumer market application was the MightySat®, a fingertip pulse oximeter with five important health and breathing measurements that was targeted at sports, fitness and relaxation. These values include: $O_2$, PR, RRp®, PI and PVI®. In 2020, we launched four additional products for the consumer market. We released the Radius T°™, a means to monitor a loved one's fever in a hassle-free continuous manner; Masimo Sleep™, a means to help you understand what is going on in your body that may be impacting your sleep; Bridge™, the first FDA-cleared, drug-free, non-surgical device to use neuromodulation to aid in the reduction of symptoms associated with opioid withdrawal; and finally, SafetyNet-OPEN™, a remote patient management solution for tracking key vital signs at the organizational level.

- *Expand the Masimo product portfolio through strategic investments and acquisitions.* In 2020, we successfully completed three strategic acquisitions and an exclusive license agreement, all of which are currently being integrated into our product portfolio. We continually evaluate new and exciting opportunities to expand our product portfolio. After we have applied both our strategic and financial filters, we pursue the opportunities that we believe will add stockholder value, can be successfully integrated within our business and show positive potential to achieve our short and long-term financial forecasts.

We plan to continue to innovate and develop new technologies and products, internally and through our collaboration with Cercacor, from whom we currently license certain rainbow® technologies.

Our future growth strategy is also closely tied to our focus on international expansion opportunities. Since 2007, we have continued to expand our sales and marketing presence in Europe, Asia, Asia Pacific, Middle East, Canada and Latin America. We have accomplished this by both additional staffing and adding or expanding sales offices in many of these territories. By centralizing a portion of our international operations, including sales management, marketing, customer support, planning, logistics and administrative functions, in Neuchâtel, Switzerland, we believe we have developed a more efficient and scalable international organization that is capable of being even more responsive to the business needs of our international customers under this centralized management structure.

### Our Products and Markets

We develop, manufacture and market patient monitoring technologies that incorporate a monitor or circuit board and sensors, including proprietary single-patient-use and reusable sensors and patient cables. In addition, we offer remote alarm/monitoring solutions, software and connectivity solutions.

The following chart summarizes our principal product components and principal markets and methods of distribution:

Table of Contents

Patient Monitoring Solutions:

|  | *Description:* | *Use:* | *Distribution Channel:* |
|---|---|---|---|

*Circuit Boards and Modules*
*(e.g., MX-5, MSX (shown below), MS-2011, MS-2013, MS-2040, uSpO2®, SedLine®, ISA™ and IRMA™)*





- Signal processing apparatus for all Masimo technology platforms

- Mainstream and sidestream capnography and gas monitoring

- Incorporated and sold to OEM partners who incorporate our circuit boards into their patient monitoring systems

*Monitors and Devices*
*(e.g., Radical-7®, Rad-97® (both shown below), Rad-67®, Rad-57®, Root®, Rad-8®, Rad-5®, Radius-7®, Rad-G™, TIR-1™)*



- Bedside, handheld and wireless monitoring devices that incorporate Masimo SET® with and without licensed Masimo rainbow SET® technology, noninvasive blood pressure and capnography.

- Sold directly to end-users and through distributors and in some cases to our OEM partners who sell to end-users



| Description: | Use: | Distribution Channel: |
| --- | --- | --- |

*Patient Monitoring and Connectivity Platform*
*(e.g., Root®, Radius-7® and Root® with NIBP* (shown below)*)*






- Displays measurements from Masimo's Radical-7® (connected or hand carried) or Radius-7® (patient-worn)

- Provides additional specialty measurements from Masimo or third-party-developed applications through Masimo Open Connect® (MOC-9®)

- Integrates noninvasive blood pressure (NIBP) and temperature

- Connects third-party devices such as IV pumps, ventilators, beds and other patient monitors to automate data transfer to the EMR

- Sold directly to end-users and through distributors

*Sensors*
*(e.g., SET®, rainbow® Pulse CO-Oximetry, rainbow Acoustic Monitoring® Sensors, RD SedLine™,*
*TFA-1®, RD SET®, RD rainbow SET®, O3® Pediatric, RD rainbow Lite SET®, rainbow® DCI®-*
*Mini, Centroid™, Radius PPG™ (last six shown below))*









- Extensive line of both single-patient, reusable and rainbow® sensors

- Patient cables, as well as adapter cables that enable the use of our sensors on certain competitors' monitors

- Sold directly to end-users and through distributors and to OEM partners who sell to end-users

Table of Contents

*Description:*                          *Use:*              *Distribution Channel:*

*Sensors (Continued)*




*Line Filters and Mainstream Adapters for Capnography and Gas Monitoring*
*(e.g., NomoLine® Cannula with Radius PCG™ Capnograph with disposable adapter, IRMA CO2,*
*IRMA AX+, and EMMA® (shown below))*



• Line of disposables to measure gas parameters using mainstream and sidestream capnography

• Sold directly to end-users and through distributors and to OEM partners who sell to end-users



*Proprietary Measurements*
*(e.g., SpHb®, SpCO®, SpMet®, PVi®, RRa®, RRp®, ORi™, 3D Alarms® and Adaptive Threshold*
*Alarm)*






• rainbow® measurements and other proprietary features

• Sold directly to end-users and through OEM partners who sell to new and existing end-users

14

Table of Contents

| *Description:* | *Use:* | *Distribution Channel:* |
|---|---|---|

*Hospital Automation™ and Connectivity Suite*
*(e.g., Iris® Connectivity, Iris® Gateway, Patient SafetyNet™, UniView™, and UniView : 60™,*
*Replica™, Iris® Analytics, and Halo ION® (shown below))*




• Software and hardware enabling third-party devices to connect through Patient SafetyNet™ and to document data in the EMR

• Sold directly to end-users





Table of Contents

*Description:*
*Hospital Automation and Connectivity Suite (Continued)*

*Use:*

*Distribution Channel:*



- Network-linked, wired or wireless, multiple patient floor monitoring solutions

- Standalone wireless alarm notification solutions

- Sold directly to end-users



- Home-based patient engagement and remote data capture platform

- Sold directly to end-users and through distributors

*Nasal High Flow Ventilation*
*(e.g. TNI softFlow® 50 and TNI softFlow® junior(shown below))*





- Intensive care and inpatient care in clinics as well as home care

- Sold directly to end-users and through distributors

16

Table of Contents

|  | *Description:* | *Use:* | *Distribution Channel:* |
|---|---|---|---|

*Home Wellness and Monitoring*
*(e.g. Radius T℠, Masimo Sleep™, MightySat® with PVi® and RRp®, and iSpO2®)*







• Disposable thermometers, disposable fingertip sensors for sleep monitoring, fingertip pulse oximeter, or pulse oximeter cable and sensor for use with an iPhone, iPad, iPod touch and select Android smart phones

• Sold directly to consumers through the Masimo Personal Health website and through consumer retailers

*Circuit Boards*

*Masimo SET® MS Circuit Boards.* Our Masimo SET® MS circuit boards perform all signal processing and other pulse oximetry functions incorporating the Masimo SET® platform. Our MS circuit boards are included in our proprietary monitors or sold to our OEM partners for incorporation into their monitors. Once incorporated into a pulse oximeter, the MS circuit boards perform all data acquisition processing and report the pulse oximetry measurements to the host monitor. The circuit boards and related software interface directly with our proprietary sensors to calculate $SpO_2$, PR and Pi. Our latest MSX family of circuit boards provide Masimo SET® $SpO_2$, PR, and Pi in a variety of small form factors with a typical power consumption of only 45 milliwatts.

*uSpO₂® Cable/Board.* Our SET® technology-in-a-cable contains the low power (MS-2040) technology in a reduced size, allowing it to be embedded into patient cables as part of the sensor connector. This allows the uSpO₂® cable/board to interface with monitoring devices externally via an existing communications port in instances where internal integration of a traditional Masimo SET® technology board is not feasible. The uSpO₂® cable/board provides the same Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry found in our other products, with a typical power consumption of less than 45 milliwatts.

*Masimo rainbow SET® MX Circuit Boards.* Our circuit board is the foundation for our Masimo rainbow® Pulse CO-Oximetry and rainbow Acoustic Monitoring® platform, utilizing certain technology that is licensed from Cercacor. The MX circuit boards offer the full functionality of our rainbow® technology, which includes noninvasive measurements for SpHb®, SpOC™, SpCO™, SpMet®, PVi® and RRa®, in addition to providing Measure-through Motion and Low Perfusion™ SET® pulse oximetry measurements $SpO_2$, PR and Pi measurement capabilities of Masimo SET® pulse oximetry. Customers can choose to purchase additional measurements beyond $SpO_2$, PR and Pi at the time of sale or at any time in the future through a field-installed software upgrade.

Our MX-5 OEM circuit board deploys a technology platform that utilizes approximately half the power of previously available rainbow® circuit boards to deliver rainbow® Pulse CO-Oximetry noninvasive measurement performance. In addition to its lower power demands, the MX-5 adds dynamic power utilization to scale the MX-5's power draw based upon the combination of parameters being monitored to permit even longer battery run-times.

Table of Contents

*Monitors / Devices*

*Root®*. Root® is a powerful patient monitoring and connectivity platform that integrates our rainbow® and SET® measurements with multiple additional specialty measurements through MOC-9® open architecture technology in an integrated, clinician-centric platform. The first MOC-9® technologies developed by Masimo were SedLine® brain function monitoring, NomoLine® capnography and gas monitoring and O3® Regional Oximetry. Root® with NomoLine® capnography, SedLine® brain function monitoring, wireless communication and Iris® connectivity for third-party medical devices has received FDA 510(k) clearance. O3® Regional Oximetry has received the CE Mark and FDA 510(k) clearance.

Early Warning Signs (EWS) for Root® aggregates information from multiple vital signs and clinical observations to generate a score that represents the potential degree of patient deterioration. There are several EWS protocols, such as the Pediatric Early Warning Score (PEWS), Modified Early Warning Score (MEWS) and National Early Warning Score (NEWS). These various scores require vital signs contributors such as oxygen saturation, pulse rate, respiration rate, body temperature and systolic blood pressure along with contributors input by clinicians, such as level of consciousness, use of supplemental oxygen and urine output. The weighting and number of contributors differ depending upon which EWS protocol is used. Root® can be customized for various predefined EWS protocols, or hospitals can configure their own set of required contributors, and their relative weights, to create an EWS unique to their care environment.

Our MOC-9® partnerships enable third parties to utilize Root®'s open architecture and built-in connectivity to independently develop, obtain regulatory approvals, and commercialize their own external MOC-9® module. Alternatively, third parties can develop Masimo Open Connect Control™ (MOC-C™) applications for Root® using the MOC-9® software development kit (SDK). While we support the development efforts of our MOC® partners as needed, and help increase awareness of the availability of non-Masimo MOC-9® modules and MOC-C™ applications, our MOC-9® partners use their existing distribution channels to sell their MOC-9® modules or MOC-C™ applications to customers.

Pathway™, a newborn oxygenation visualization mode for Root®, provides clinicians with a way to visualize a hospital's recommended resuscitation protocol for a newborn's oxygen saturation while continuously monitoring $SpO_2$ and PR during the first ten minutes after birth. Use of Pathway™ is intended to help streamline clinician workflow and improve protocol adherence during this critical period.

*Radical-7®*. The Radical-7® Pulse CO-Oximeter® is a wireless touchscreen device that incorporates our MX circuit board to allow upgradeable rainbow SET® measurements and offers three-in-one capability. The Radical-7® can be used as:

- a standalone device for bedside monitoring;

- a detachable, battery-operated handheld unit for easy portable monitoring;

- an integrated device as part of the Root® patient monitoring and connectivity platform; and

- a monitor interface via SatShare®, a proprietary technology allowing our products to work with certain competitor products, to upgrade existing conventional multiparameter patient monitors to Masimo SET® while displaying rainbow® measurements on the Radical-7® itself.

With its wide-ranging flexibility, Radical-7® can continuously monitor a patient from the ambulance, to the emergency room, to the operating room, to the general floor and beyond, until the patient is discharged. Radical-7® delivers the accuracy and reliability of Masimo rainbow SET® with multi-functionality, ease of use and the availability of measurement upgrades for existing monitors.

*Radius-7®*. Radius-7® for the Root® patient monitoring and connectivity platform is the first and only wearable, wireless monitor with rainbow SET® technology, enabling continuous monitoring and early identification of clinical deterioration while still allowing patients the freedom of movement. With Bluetooth® and Wi-Fi wireless connectivity, Radius-7® with Root® can alert clinicians at the bedside or remotely, through Masimo Patient SafetyNet™, of critical changes in a patient's $SpO_2$ and PR, even during states of motion and low perfusion, as well as RRa® and additional rainbow SET® measurements. Radius-7® with Root® has received both CE Mark and FDA 510(k) clearance.

*Radius PPG™*. Radius PPG™ is a tetherless sensor solution powered by Masimo SET® that represents a significant breakthrough in patient monitoring. Radius PPG™ eliminates the need for a cabled connection to a pulse oximetry monitor, allowing patients to move freely and comfortably while still being continuously monitored reliably and accurately. Via wireless connection, measurements are displayed on Masimo host devices or third-party multi-parameter monitors with integrated Masimo technology. Coupled with the proven benefits of Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry, Radius PPG™ is ideally suited for use anywhere patients can benefit from mobility. Radius PPG™ is also available as part of the Masimo SafetyNet™ remote patient management solution designed for at home use.

*Radius VSM™*. Radius VSM™ is a wearable, tetherless vital signs monitor that provides the ability to monitor a wide variety of physiological measurements, including continuous SET® Pulse Oximetry, noninvasive blood pressure, body temperature, respiration rate and ECG. Designed on a wearable, modular platform, Radius VSM™ features can be scaled to accommodate surges in patient volume and for use across the continuum of patient care, based upon each patient's needs and level of acuity. For additional versatility, Radius VSM™ can operate as a self-contained device or be used wirelessly with Masimo bedside monitors and patient surveillance systems, automating the integration of expanded monitoring and the transfer of continuous monitoring data to EMRs. Radius VSM™ has received the CE Mark, and has been released in limited European markets.

*Radius PCG™*. Radius PCG™ is a portable-real-time capnograph with wireless Bluetooth® connectivity. Radius PCG™ connects with Root® to provide seamless, tetherless mainstream capnography for patients of all ages. Radius PCG™ has received the CE Mark.

*Rad-97®*. Rad-97® is a versatile standalone Pulse CO-Oximeter® that features a 1080p HD color display with user-friendly multi-touch navigation and Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology that can be used to measure SpO₂, PR, PVi® and Pi rainbow SET® measurements such as SpHb®, SpOC™, SpCO®, SpMet® and RRa® can also be enabled. Rad-97® is the smallest Masimo bedside device currently capable of monitoring the full rainbow SET® platform. An optional integrated camera allows remote clinicians to interact with patients at home over live audio and video. With its built-in enterprise Wi-Fi capability, Rad-97® has the ability to connect wirelessly from the home to supplemental patient monitoring systems, including Patient SafetyNet™, facilitating automatic data transfer to hospital EMR systems. Rad-97® has received the CE Mark and FDA 510(k) clearance, including an additional Rad-97® configuration with integrated NomoLine® capnography. Rad-97® has also received FDA 501(k) clearance for home use, bringing hospital-grade technology to the home in a single integrated device that is a monitoring, connectivity and telecommunications hub.

*Rad-97® NIBP*. Rad-97® NIBP includes an integrated port that allows clinicians to connect a blood pressure cuff inflation hose directly to the device. Designed for reliability and patient comfort, Rad-97® NIBP is compatible with both disposable and reusable cuffs for a variety of patient types. Rad-97® NIBP enables clinicians to measure arterial blood pressure for adult, pediatric and neonatal patients, with three measurement modes: spot-check, automatic interval (which measures blood pressure routinely, at a desired interval) and stat interval (which continually measures blood pressure for a desired duration).

*Rad-67®*. Rad-67®, our handheld Pulse CO-Oximeter®, is a compact, portable spot-check device that offers Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology with SpO₂, PR and Pi measurements and upgradeable rainbow® noninvasive monitoring technology for SpHb®. With the universal reusable rainbow® DCI®-mini sensor, Rad-67® features Next Generation SpHb® technology. The Rad-67® with next generation SpHb® technology has received the CE Mark and FDA 510(k) clearance.

*Rad-57®*. Rad-57® is a fully featured handheld Pulse CO-Oximeter® that provides continuous, noninvasive measurement of SpO₂, PR, PVi® and Pi with the ability to upgrade to SpHb®, SpOC®, SpMet® and SpOC™. Its rugged and lightweight design makes it applicable for use in hospital and field settings, specifically for fire departments and emergency medical service units.

*Rad-8®*. Rad-8® is a bedside pulse oximeter featuring Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology with SpO₂, PR and Pi measurement, but without the ability to update to rainbow® technology. Rad-8® is an affordable, low-cost design with a streamlined feature set.

*Rad-5® & Rad-5v®*. Rad-5 and Rad-5v were Masimo's first dedicated lightweight, user-configurable, handheld pulse oximeters to provide Masimo SET® Measure-through Motion and Low Perfusion™ technology with SpO₂, PR and Pi measurements, but without the ability to upgrade to rainbow® technology.

*Rad-G™*. Rad-G™ is a low-cost, rugged, handheld pulse oximetry device with a rechargeable battery and LCD display. It uses Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology to measure SpO₂, PR, Pi, PVi® and RRp®. Rad-G™ was designed primarily for use in pneumonia screening, spot-checking, and continuous measurement of SpO₂ and RRp® in low-resource settings. Rad-G™ has received FDA 510(k) clearance.

*Pronto®*. Pronto® is a handheld noninvasive multiparameter testing device that uses Masimo rainbow SET® technology to provide spot-check measurement of SpO₂, PR, Pi and SpHb® in both hospitals (i.e., emergency departments) and remote settings such as physician offices.

19

Table of Contents

*SatShare®.* Our SatShare® technology enables a conventional monitor to receive continuous measurement updates using Masimo SET® through a simple cable connection from the back of Radical-7® to the sensor input port on the conventional monitor. No software upgrades or new modules are necessary for the upgrade, which can be completed in minutes. SatShare allows hospitals to standardize the technology and sensors used throughout the hospital while allowing them to gain the more accurate monitoring capabilities using Masimo SET®, as well as other additional functionality, in a cost-effective manner. SatShare® technology has facilitated many hospital-wide conversions of previously installed competitor monitors to Masimo SET®. In addition, Masimo rainbow SET® measurements such as SpHb® are available to clinicians on the Radical-7® itself while the device is being used in SatShare® mode.

*MightySat® Rx.* MightySat® Rx is a fingertip pulse oximeter that incorporates Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology, which measures and displays SpO₂, PR and Pi with the option to add PVi® and RRp®. The MightySat® Rx has received the CE Mark and FDA 510(k) clearance. The RRp® measurement on the MightySat® Rx fingertip pulse oximeter has received the CE Mark. MightySat® Rx also received FDA 510(k) clearance of spot-check RRp® measurement.

*iSpO₂® Rx.* The iSpO₂® Rx pulse oximeter combines a fingertip sensor, cable and pulse oximeter in a lightweight, portable device that connects directly to a smart device for displaying measurements. iSpO₂® Rx uses Masimo SET® Measure-through Motion and Low Perfusion™ pulse oximetry technology to measure SpO₂, PR and Pi. The Masimo Professional Health app, available for both iOS and Android® devices, allows clinicians to track, trend and download patient data. iSpO₂® Rx has received the CE Mark, but is not currently available for sale in the U.S.

*SedLine® MOC-9® Module.* Our SedLine® MOC-9® module for Root® is an EEG-based continuous brain function monitor that provides information about a patient's response to anesthesia. Our Next Generation SedLine® enhances PSi to make it less susceptible to EMG interference and to improve performance in low-power EEG cases.

*O3® MOC-9® Module.* Our O3® MOC-9® module for Root® uses NIRS to detect regional hypoxemia by continuously measuring tissue oxygen saturation (rSO₂), automating the differential analysis of regional to central oxygen saturation.

*NomoLine® Capnography and Gas Monitoring.* Our gas analyzers, IRMA™ and ISA™, are available through Root® MOC-9® modules via OEM integration or through an emergency capnometer (EMMA®). These analyzers enable our customers to benefit from CO₂, N₂O, O₂ and anesthetic agent monitoring in many hospital environments.

*TIR-1™.* Our non-contact clinical-grade infrared thermometer with Bluetooth® connectivity provides forehead temperature measurement across all patient populations. The non-contact module reduces the risk for patient cross-contamination while also reducing costs and waste by eliminating the need for probe covers and other disposables. The Bluetooth® technology automates data transfer to a connected Masimo device, such as Root®, enabling streamlined integration into the bedside device and EMR.

### Sensors

*Sensors and Cables.* We have developed one of the broadest lines of single-patient-use (disposable), reusable and rainbow® sensors and cables. In total, we have over 150 different types of sensors designed to meet virtually every clinical need. Masimo SET® sensors are uniquely designed to reduce interference from physiological and non-physiological noise. Our proprietary technology platforms operate only with our proprietary sensor lines. However, through the use of adapter cables, our sensors can be connected to certain competitor pulse oximetry monitors. We sell our sensors and cables to end-users directly or through our distributors and OEM partners.

Our single-patient-use sensors offer several advantages over reusable sensors, including improved performance, cleanliness, increased comfort and greater reliability. Our reusable sensors are primarily used for short-term, spot-check monitoring.

*RD SET®, RD rainbow SET®, and RD rainbow Lite SET®.* Our RD family of sensors is designed to maximize patient comfort, optimize clinician workflow and reduce material waste. RD sensors are lightweight with no moving parts and a flat, soft cable with smooth edges. RD sensors are available in fold-over and wrap-around styles for a variety of patient types and clinical scenarios.

*SofTouch™ Sensors.* SofTouch™ sensors are designed with less or no adhesive for patients with compromised skin conditions. SofTouch™ sensors are available as single-patient sensors for newborns and multi-site reusable sensors for pediatrics and adults.

*Trauma and Newborn Sensors.* We have developed two specialty sensor lines, for trauma and resuscitation situations, as well as for newborns. These sensors contain an identifier that automatically sets the pulse oximeter to its maximum sensitivity and fastest settings, and allow for quick application, even in wet and slippery environments. Additionally, we introduced low-profile sensors LNCS® and M-LNCS® Neo, NeoPt and Inf sensors to monitor oxygen saturation in newborns. These sensors are smaller and thinner, making them significantly more comfortable for patients and easier for clinicians to apply.

Table of Contents

*Blue® Sensors.* We believe our Blue® Sensors are the first FDA-cleared sensors to accurately monitor arterial blood oxygen saturation levels in cyanotic infants and children with abnormally low oxygen saturation levels.

*E1® Ear Sensor.* We believe that our E1® Ear Sensor is the first single-patient-use ear sensor that can be placed securely in the ear conchae, allowing clinicians to combine Masimo SET® performance and central monitoring to provide quick access and responsive assessment of oxygenation. The E1® Ear Sensor is designed for field emergency medical services utilization.

*TFA-1® Adhesive Forehead Sensor.* We designed our TFA-1® forehead sensor for hospitals desiring forehead monitoring using a disposable sensor. TFA-1® combines Masimo SET® performance with quick access and responsive oxygenation assessment.

*rainbow® Sensors.* We developed these proprietary, multi-wavelength sensors for use with our rainbow® Pulse CO-Oximetry products. In contrast to traditional sensors that only have the capability to monitor $SpO_2$, and PR, our rainbow® sensors can also monitor SpCO®, SpMet® and SpHb®. Our licensed rainbow SET® sensors are the only sensors that are compatible with our licensed rainbow SET® products. Rainbow® sensors are available in single-patient-use, and reusable spot-check sensor types.

The rainbow® DCI®-mini is the first noninvasive hemoglobin spot-check sensor for infants and small children (weight 3 to 30 kg). Paired with our handheld Pronto® or Rad-67® devices, the rainbow® DCI®-mini sensors are designed to help clinicians quickly and easily spot-check hemoglobin levels in infants and small children, which may facilitate the identification of anemia. When paired with Rad-67®, the rainbow® DCI®-mini enables Next Generation SpHb® measurements. The rainbow® DCI®-mini has received the CE Mark in Japan and Europe, but is not currently available for sale in the U.S. The rainbow® Super DCI®-mini sensor allows for the ability to measure SpHb®, SpCO®, SpMet® and $SpO_2$ on the same noninvasive reusable sensor. The rainbow® Super DCI®-mini has received the CE Mark in Europe and Ministry of Health, Labour and Welfare (MHLW) approval in Japan, but is not currently available for sale in the U.S.

*rainbow Acoustic® Sensors.* We believe we were the first to market a continuous respiration rate monitoring technology based on an acoustic sensor placed on the patient's neck. Our rainbow Acoustic® sensors detect the sounds associated with breathing and convert the sounds into continuous respiration rate using proprietary signal processing that is based on Masimo SET®. RAS-45, our single-use acoustic respiration sensor for RAM®, is designed to facilitate placement on and improve attachment to the neck. RAS-45 operates with Masimo MX circuit boards to measure RRa® and display an acoustic respiration wave form. Like the RAS-125c sensor, RAS-45 operates with Masimo MX technology boards to measure RRa®, display the acoustic respiration wave form and optionally allow clinicians to listen to the sound of breathing. Both the RAS-45 and RAS-125c are available in CE marked countries and the U.S. for adult and pediatric patients who weigh more than 10 kg. RAS-45 has received FDA 510(k) clearance and the CE Mark.

*SedLine® Sensor.* Used with the SedLine® MOC-9® module for the Root® patient monitoring and connectivity platform, the SedLine® sensor is a disposable sensor that collects EEG data for our SedLine® monitor. RD SedLine™ sensors feature a repositioned, color-coded sensor-cable connection that lies comfortably on the patient's head and soft foam pads to reduce discomfort upon application to the patient.

*O3® Sensors.* Used with the O3® MOC-9® module for the Root® patient monitor, each O3® sensor contains four light-emitting diodes and two detectors to continuously measure rSO₂. Our pediatric application of O3® regional oximetry with the O3®pediatric sensor for both adult patients and pediatric patients weighing more than 5 kg (11 lbs) and less than 40 kg (88 lbs) has received FDA 510(k) clearance. O3® sensors for use with infants and neonatal patients has also received FDA 510(k) clearance.

*Centroid™.* Centroid™ is a wearable wireless patient orientation, activity and respiration rate sensor. Centroid™ helps clinicians monitor a patient's position to avoid preventable pressure ulcers and can alert clinicians to sudden movements such as fall-like events. In addition, Centroid™ detects chest movements to continuously provide respiration rate, providing clinicians with additional data that may inform care decisions. Centroid™ pairs with the Root® platform using Bluetooth® to track a patient's posture, orientation and activity. The data transmitted by Centroid™ can be displayed in various formats on Root®, giving clinicians multiple ways to assess adherence to protocols regarding tissue stress and to tailor care to the specific needs of each patient.

### Proprietary Measurements and Features

All of our monitors shipped since January 2006, including Radical-7® and certain future OEM products, that incorporate the MX circuit board will allow purchases of software for rainbow® measurements, as well as other future measurements. Our current rainbow® measurements include SpHb®, SpCO®, SpMet®, SpOC™ ORi™, Pi, PR, PVi®, RPVi™, RRp® SpfO₂™ and RRa®.

Table of Contents

*Eve™.* Eve™ is our newborn screening software application for our Radical-7® Pulse CO-Oximeter®, is designed to help clinicians more effectively and efficiently screen newborns for CCHD. In the Radical-7® Pulse CO-Oximeter®, Eve™ automates the screening steps with animated instruction, including sensor application, measurement selection and screening result determination. Eve™ is intended to provide consistent application of the screening protocol to reduce method-and operator-induced variability and improve efficiency by automating the data capture and comparison between readings. Eve™ has received CE Marking, but is currently not available for sale in the U.S.

### X-Cal®

Sensor and cable failures can prevent pulse oximeters from providing the patient safety advantages that continuous pulse oximetry monitoring is intended to provide. Our X-Cal® technology enhances patient safety and improves clinician efficiency by preserving system quality, performance and reliability and reducing the chances of bad or inferior sensors and cables being used on patients. X-Cal® technology enhances the benefits of Masimo's pulse oximetry by incorporating the means to track the expected monitoring life of our sensors and cables and provides appropriate user messaging on the host monitor.

X-Cal® addresses three common problems experienced by clinicians using an integrated Masimo system, including:

- Patient safety may be compromised by using counterfeit Masimo sensors and cables because they are not produced with comparable components, do not provide proper shielding from ambient interferences, create electrostatic noise caused by motion, do not have our quality and performance controls, and are not tested or warranted to work within a Masimo system;

- We design our sensors and cables to last well beyond their warranty period and customer feedback indicates our sensors and cables last significantly longer than competing products, but cable and sensor reliability may still be compromised when used beyond their intended life, affecting patient care and causing clinicians and biomedical engineers to spend time troubleshooting intermittent cable and sensor issues; and

- We believe that third-party reprocessed pulse oximetry sensors introduce challenges in the clinical environment due to potential quality issues. In fact, we believe that most third-party reprocessed sensors do not indicate that they are capable of performing in the same conditions as Masimo Measure-through Motion and Low Perfusion™ sensors or in neonatal applications, key performance requirements available with Masimo SET® sensors. To the best of our knowledge, no third-party company has attempted to reprocess rainbow SET® sensors.

### The Masimo Hospital Automation Platform and Iris® Connectivity

*Masimo Patient SafetyNet™.* Patient SafetyNet™ is a supplemental remote monitoring and clinician notification system that routes bedside-generated alarms through a server to a qualified clinician's handheld paging device in real-time. Each system can support up to 200 bedside monitors and can either be integrated into a hospital's existing IT infrastructure or operate as a stand-alone wireless network.

*Iris®.* Iris® connectivity ports on Root® allows third-party devices, such as intravenous pumps and ventilators, to connect to Root® enabling display of measurements and notification on the Root® monitor, with the ability to document results in the EMR through Masimo Patient SafetyNet™.

*Iris® Gateway.* Iris® Gateway bridges the gap between device data generated at the patient bedside and documentation in patient data management systems by automatically transferring data from medical devices to EMRs, improving productivity and reducing the likelihood of transcription errors.

*Iris® Device Management System (Iris® DMS).* Iris® DMS is an automation and connectivity solution designed to streamline management of Masimo devices used throughout a hospital system. Iris® DMS is designed to address the challenges of maintaining many patient monitors in a complex hospital environment. Iris® DMS securely connects over a hospital's existing network to all connected Masimo devices to provide an easy-to-use dashboard that allows biomedical engineers and IT professionals to view detailed diagnostic information about connected Masimo devices at a glance, without the need to physically interact with each device. Iris® DMS supports remote software upgrades to ensure all devices stay up to date, easily and efficiently.

*Analytics and Reporting*

*Trace™* is the first data visualization and reporting software compatible with the full capabilities of the Root® patient monitoring and connectivity platform, including Radical-7® and Radius-7® Pulse CO-Oximeters®, Root® with integrated noninvasive blood pressure and temperature, and connected MOC-9® modules such as SedLine® brain function monitoring, ISA™ and ISA™ OR+capnography, and O3® Regional Oximetry. Trace™ can create insightful, easy-to-read patient reports that include parameter trends, histograms, event annotations, and key statistics. Trace™ can communicate with Masimo devices via high-speed wired or wireless connections, with the ability to transfer up to 96 hours of patient data.

Iris® Analytics is a supplemental tool that works in conjunction with the Masimo Hospital Automation™ platform to generate customizable alarm analytics, individual patient reports, and even hospital-wide reports across the continuum of care.

*Halo ION®.* Halo ION® is a comprehensive, scalable and customizable continuous early warning score. Halo ION® allows clinicians to aggregate trend data from as few as three physiological parameters (for example, SpO₂, PR and PI), and as many as are available, including data from EMRs, into a single continuous early warning score. Each patient's Halo ION® score is displayed on the Masimo Patient SafetyNet™ Supplemental Remote Monitoring and Clinician Notification System as a number ranging from zero to 100, helping to streamline clinicians' patient assessment workflow.

*Hospital-to-Home and Wellness*

*Masimo SafetyNet™* is a home-based patient engagement and remote care automation platform. Originally named Doctella™, Masimo SafetyNet™ provides a complete end-to-end home care solution, allowing clinicians to create and manage treatment plans, patient schedules and patient data flow using automated, customizable CarePrograms™, home device data aggregation, and a web-based provider dashboard. CarePrograms™ are delivered to patients' smartphones via an app (available for both iOS® and Android® devices) and dynamically update based on patient input, including both self-reported data and physiological data collected by connected monitoring devices. Masimo SafetyNet™ was developed in the wake of the COVID-19 pandemic to assist with hospital surge capacity and provide clinicians a secure cloud-based platform to remotely manage a patient's health. Powered by Masimo SET® Measure-through Motion and Low Perfusion™ technology, the tetherless single-patient-use sensor (Radius PPG™) provides continuous respiration rate and oxygen saturation monitoring, with a second tetherless sensor, Radius T°™, for continuous temperature measurements. Patient data is sent securely via Bluetooth to the Masimo SafetyNet™ mobile application.

*Radius T°™ Continuous Thermometer* is a wearable wireless thermometer that continuously and seamlessly measures temperatures using a small, inconspicuous, wearable sensor that can be easily applied to anyone from children to elderly adults with no action needed after initial application to the skin. Radius T°™ eliminates manual measurements while providing continuous insight into changes in the user's temperature and helps users understand which way their temperature is trending. In addition, Radius T°™ uses proprietary algorithms to provide body temperature measurements, for users five years or older, that approximate oral temperature, not just external skin temperature, with laboratory accuracy within ±0.1°C, whereas other thermometry solutions typically have laboratory accuracy within ±0.2°C.

*Masimo Sleep™* was designed to help consumers better understand the quality of their sleep. Masimo Sleep™ is fueled by the same expertise in signal processing and sensor development that drives our hospital products used by leading institutions to monitor millions of patients a year.

*MightySat®,* our fingertip pulse oximeter for personal use provides SpO₂, PR and Pi measurements for health and wellness applications. MightySat®, which is also available with RRp® and PVi®, provides measurements in a compact, battery-powered design with a large color screen that can be rotated for real-time display of the measurements. Bluetooth® wireless functionality enables measurement display via a free, downloadable Masimo Personal Health application on iOS® and Android® mobile devices, as well as the ability to trend and communicate measurements, including the Apple Health Kit. MightySat® is available through consumer retailers and directly from Masimo, and is intended for general health and wellness use only. MightySat® is not intended for medical use.

*iSpO₂®* is a personal use pulse oximeter that combines a fingertip sensor, cable and pulse oximeter in a lightweight, portable device that connects directly to a smart device for displaying measurements. iSpO₂® uses Measure-through Motion and Low Perfusion™ SET® technology to measure SpO₂, PR and Pi. The Masimo Personal Health app, available for both iOS® and Android® devices, allows users to track, trend and download their data, as well as share it with the Apple Health app. iSpO₂® is available through consumer retailers and directly from Masimo and is intended for general health and wellness use only. iSpO₂® is not intended for medical use.

23

Table of Contents

*Cercacor Laboratories, Inc.*

Cercacor is an independent entity spun-off from us to our stockholders in 1998. Joe Kiani, our Chairman and Chief Executive Officer, is also the Chairman and Chief Executive Officer of Cercacor. We are a party to a cross-licensing agreement with Cercacor, which was amended and restated effective January 1, 2007 (the Cross-Licensing Agreement), which governs each party's rights to certain intellectual property held by the two companies.

The following table outlines our rights under the Cross-Licensing Agreement relating to specific end-user markets and the related technology applications of specific measurements.

| Measurements | End-User Markets | |
| --- | --- | --- |
| | Professional Caregiver and Alternate Care Market | Patient and Pharmacist |
| Vital Signs[1] | Masimo (owns) | Cercacor (non-exclusive license) |
| Non-Vital Signs[2] | Masimo (exclusive license) | Cercacor (owns or exclusive license) |

[1] Vital signs measurements include, but are not limited to, $SpO_2$, peripheral venous oxygen saturation, mixed venous oxygen saturation, fetal oximetry, sudden infant death syndrome, ECG, blood pressure (noninvasive blood pressure, invasive blood pressure and continuous noninvasive blood pressure), temperature, respiration rate, $CO_2$, pulse rate, cardiac output, EEG, perfusion index, depth of anesthesia, cerebral oximetry, tissue oximetry and/or EMG, and associated features derived from these measurements, such as 3D alarm®, PVi® and other features.

[2] Non-vital signs measurements include the body fluid constituents other than vital signs measurements and include, but are not limited to, carbon monoxide, methemoglobin, blood glucose, hemoglobin and bilirubin.

*Our License to Cercacor.* We granted Cercacor an exclusive, perpetual and worldwide license, with sublicense rights, to use our Masimo SET® technology, including all improvements, for the monitoring of non-vital signs measurements and to develop and sell devices incorporating Masimo SET® for monitoring non-vital signs measurements in the "Cercacor Market". The Cercacor Market consists of any product market in which a product is intended to be used by a patient or pharmacist rather than a professional medical caregiver regardless of the particular location of the sale, including sales to doctors, hospitals, alternate care market professionals or otherwise, provided the product is intended to be recommended, or resold, for use by the patient or pharmacist. We also granted Cercacor a non-exclusive, perpetual and worldwide license, with sublicense rights, to use Masimo SET® for the measurement of vital signs in the Cercacor Market. In exchange, Cercacor pays us a 10% royalty on the amount of vital signs sensors and accessories sold by Cercacor.

*Cercacor's License to us.* We exclusively license from Cercacor the right to make and distribute products in the "Masimo Market" that utilize rainbow® technology for the measurement of carbon monoxide, methemoglobin, fractional arterial oxygen saturation, and hemoglobin, which includes hematocrit. The Masimo Market consists of any product market where the product is intended to be used by a professional medical caregiver, including hospital caregivers, surgicenter caregivers, paramedic vehicle caregivers, doctors' offices caregivers, alternate care facility caregivers and vehicles where alternative care services are provided. We also have the option to obtain exclusive licenses to make and distribute products in the Masimo Market that utilize rainbow® technology for the monitoring of other non-vital signs measurements, including blood glucose. We have 180 days after proof of feasibility to exercise the above-referenced option to obtain a license for the measurement of blood glucose for an additional $2.5 million and licenses for other non-vital signs measurements for an additional $0.5 million each. The licenses are exclusive until the later of 20 years from the grant of the applicable license or the expiration of the last patent included in the rainbow® technology related to the applicable measurements. To date, we have developed and commercially released devices that measure carbon monoxide, methemoglobin and hemoglobin using licensed rainbow® technology. We also make and distribute products that monitor respiration rate via rainbow Acoustic Monitoring®, which is a Masimo-developed rainbow® technology and, therefore, is not required to be licensed from Cercacor.

Our license to use rainbow® technology for these measurements in these markets is exclusive on the condition that we continue to pay Cercacor royalties on our products incorporating rainbow® technology, subject to certain minimum aggregate royalty thresholds, and that we use commercially reasonable efforts to develop or market products incorporating the licensed rainbow® technology. The royalty is up to 10% of the rainbow® royalty base, which includes handhelds, tabletop and multiparameter devices. Handheld products incorporating rainbow® technology carry a 10% royalty rate. For other products, only the proportional amount attributable to that portion of our devices used to monitor non-vital signs measurements, rather than to monitor vital signs measurements, and sensors and accessories for measuring only non-vital sign parameters are included in the 10% rainbow® royalty base. For multiparameter devices, the rainbow® royalty base includes the percentage of the revenue based on the number of rainbow®-enabled measurements.

Table of Contents

For hospital contracts where we place equipment and enter into a sensor contract, we pay a royalty to Cercacor on the total sensor contract revenue based on the ratio of rainbow®-enabled devices to total devices. Pursuant to the terms of the license, we are subject to certain specific annual minimum aggregate royalty payment obligations of $5.0 million per year.

*Change in Control.* The Cross-Licensing Agreement provides that, upon a change in control:

- if the surviving or acquiring entity ceases to use "Masimo" as a company name and trademark, all rights to the "Masimo" trademark will be assigned to Cercacor;

- the option to license technology developed by Cercacor for use in blood glucose monitoring will be deemed automatically exercised and a $2.5 million license fee for this technology will become immediately payable to Cercacor; and

- the minimum aggregate annual royalties payable to Cercacor for carbon monoxide, methemoglobin, fractional arterial oxygen saturation, hemoglobin and/or glucose will increase to $15.0 million per year until the exclusivity period of the agreement ends, plus up to $2.0 million for each additional measurement with no maximum ceiling for non-vital sign measurements.

For purposes of the Cross-Licensing Agreement, a change in control includes any of the following with respect to us or Cercacor:

- the sale of all or substantially all of either company's assets to a non-affiliated third-party;

- the acquisition by a non-affiliated third-party of 50% or more of the voting power of either company;

- Joe Kiani, our Chief Executive Officer and the Chief Executive Officer of Cercacor, resigns or is terminated from his position with either company; or

- the merger or consolidation of either company with a non-affiliated third-party.

*Ownership of Improvements.* Any improvements to Masimo SET® or rainbow® technology made by Cercacor, by us, or jointly by Cercacor with us or with any third-party that relates to non-vital signs monitoring, and any new technology acquired by Cercacor, is and will be owned by Cercacor. Any improvements to the Masimo SET® platform or rainbow® technology made by Cercacor, by us, or jointly by Cercacor with us or with any third-party that relates to vital signs monitoring, and any new technology acquired by us, is and will be owned by us. However, for both non-vital signs and vital signs monitoring, any improvements to the technology, excluding acquired technology, will be assigned to the other party and will be subject to the terms of the licenses granted under the Cross-Licensing Agreement. Any new non-vital signs monitoring technology utilizing Masimo SET® that we develop will be owned by Cercacor and will be subject to the same license and option fees as if it had been developed by Cercacor. Also, we will not be reimbursed by Cercacor for our expenses relating to the development of any such technology.

*Other Agreements with Cercacor.* We have also entered into various other agreements with Cercacor, including an Administrative Services Agreement, a Consulting Services Agreement and a Sublease Agreement. See Note 3 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information on these agreements and other transactions with Cercacor.

### Government Regulation

As a global medical technology company, we are subject to significant government regulation, compliance requirements, fees and costs, both in the U.S. and abroad. These regulatory requirements subject our products and our business to numerous risks that are specifically discussed within "Risks Related to Our Regulatory Environment" under Part I, Item 1A—"Risk Factors" within this Annual Report on Form 10-K. A summary of certain critical aspects of our regulatory environment is included below.

#### Product Clearance and Approval Requirements

Many of our products are regulated by numerous government agencies, the most significant of which are the U.S. FDA, the national authorities in the European Union (EU) and the United Kingdom (UK), and MHLW in Japan. In addition, there are government agencies that regulate our products in other countries, whose requirements vary substantially from country to country. These agencies require us to comply with laws that regulate the design, development, clinical trials, testing, manufacture, packaging, labeling, storage, distribution, import, export and promotion of many of our products.

Table of Contents

In the U.S., unless an exemption applies, each medical device that we wish to market in the U.S. must, generally, first receive from the FDA either clearance of a 510(k) premarket notification or approval of a premarket application (PMA). In some cases, the device may be authorized by FDA through the *de novo* classification process. The FDA's 510(k) clearance process requires us to show that our new medical device is substantially equivalent to a legally marketed "predicate" medical device and usually takes from four to nine months, but it may take longer. The PMA process requires us to demonstrate through valid scientific evidence that there is reasonable assurance of safety and effectiveness of the device for its intended use. The PMA process is much more costly, lengthy and uncertain than the process of obtaining 510(k) clearance. Both 510(k) and PMA submissions are subject to user fees. The FDA determines the appropriate process based on the risk classification of the medical device. There are three classifications, from Class I to Class III. The majority of our current regulated products have been deemed Class II devices, requiring 510(k) clearance, while some have been deemed Class I devices.

Most of our OEM partners are required to obtain clearance or approval of their devices that incorporate Masimo's technologies, like Masimo SET® technology, Masimo rainbow SET® technology, Masimo Board-in-Cable technology, or are used with Masimo's sensors. We generally grant our OEM partners a right to cross-reference the 510(k) submission files from our cleared Masimo SET® circuit boards, sensors, cables and notification systems.

In the EU, medical devices are currently subject to the Medical Devices Directive 93/42/EEC (MDD). Under the MDD, a medical device may only be placed on the market within the EU if it conforms to certain "essential requirements". Key requirements include that a medical device achieves its intended performance and does not compromise the clinical condition or safety of patients or the safety and health of users and others, and bears the CE Mark. A medical device that conforms to such essential requirements can bear a CE Mark, which allows the device to be placed on the market throughout the EU. Each medical device that we wish to market in the EU must conform to these requirements.

Conformity is determined through an assessment procedure, which depends upon the risk classification of the device. For our EU medical devices, conformity assessment generally involves a notified body. Notified bodies are often private entities that are authorized or licensed by government authorities to perform, or otherwise have oversight over, such assessments. Notified bodies may also review a manufacturer's quality systems. If the conformity assessment is successfully completed, the manufacturer may apply a CE Mark to the product. This allows the general commercializing of a product in the EU. However, the product can also be subject to local registration requirements depending on the country.

On May 26, 2021, the existing MDD will be repealed and replaced by the Medical Devices Regulation (EU) 2017/745 (MDR). The MDR is similar to the MDD, though it includes significantly more stringent requirements, notably stronger conformity assessment procedures, greater control over notified bodies and their standards, increased transparency, and more robust device vigilance requirements. The MDR will apply to the medical devices we commercialize in the EU after May 26, 2021. However, the MDR is subject to certain transitional periods that enable certain notified body certificates to remain valid beyond 2021. For some of our devices, this could be as late as May 2024.

The UK exited the EU on December 31, 2020 (Brexit). The UK does not intend to implement the MDR into the laws of Great Britain (England, Scotland and Wales). Northern Ireland is an exception where the MDR will continue to apply. Great Britain instead introduced a new, standalone medical devices framework. Currently, this aligns closely to the MDD. Instead of a CE mark, medical devices marketed in Great Britain must bear a UKCA mark. However, EU CE marks will continue to be recognized in Great Britain until June 30, 2023, as will certificates issued by EU-recognized notified bodies. This arrangement is not reciprocated in the EU. Each medical device that we wish to market in the UK must comply with the national laws in the UK, which going forward may differ from the laws in the EU.

*Continuing FDA Regulation*

Clinical trials involving medical devices are subject to FDA regulation. Among other requirements, clinical trial sponsors must comply with requirements related to informed consent, Institutional Review Board (IRB) approval, monitoring, reporting, record-keeping, labeling and promotion. If the study involves a significant risk device, the sponsor must obtain FDA approval of an investigational device exemption in addition to IRB approval prior to beginning the study. Information regarding certain device clinical trials must also be submitted to a public database maintained by the National Institutes of Health.

After a device is approved and placed on the market, numerous regulatory requirements continue to apply. These regulatory requirements include, but are not limited to, the following: product listing and establishment registration; adherence to the Quality System Regulation (QSR) which requires stringent testing, control, documentation and other quality assurance procedures for the design, manufacture, storage and handling of devices; labeling requirements and FDA prohibitions against the promotion of off-label uses or indications; adverse event and device malfunction reporting; post-approval restrictions or conditions, including post-approval clinical trials or other required testing; post-market surveillance requirements; the FDA's recall authority, whereby it can ask for, or require, the recall of products from the market; and requirements relating to voluntary corrections or removals. Device manufacturers are subject to announced and unannounced inspections by the FDA to evaluate compliance with these requirements.

*Advertising and Promotion*

Advertising and promotion of medical devices, in addition to being regulated by the FDA, are also regulated by the Federal Trade Commission (FTC) and by federal and state regulatory and enforcement authorities, including the Department of Justice, the Office of Inspector General of the Department of Health and Human Services, and various state attorneys general. Although physicians are permitted to use their medical judgment to use medical devices for indications other than those cleared or approved by the FDA, we may not promote our products for such "off-label" uses and can only market our products for cleared or approved uses. Other companies' promotional activities for their FDA-regulated products have been the subject of FTC enforcement actions brought under healthcare reimbursement laws and consumer protection statutes. FTC enforcement actions often result in consent decrees that constrain future actions. In addition, under the federal Lanham Act and similar state laws, competitors and others can initiate litigation relating to advertising claims.

*Import and Export Requirements*

To import a device, the importer must file an entry notice and bond with the United States Bureau of Customs and Border Protection (CBP). All devices are subject to FDA examination before release from CBP. Any article that appears to be in violation of the Federal Food, Drug and Cosmetics Act (FDCA) may be refused admission and a notice of detention and hearing may be issued. If the FDA ultimately refuses admission, the CBP may issue a notice for redelivery and, if a company fails to redeliver the goods or otherwise satisfy CBP and the FDA with respect to their disposition, may assess liquidated damages for up to three times the value of the lot. The CBP also imposes its own regulatory requirements on the import of our products, including inspection and possible sanctions for noncompliance.

Products exported from the United States are subject to foreign countries' import requirements and the exporting requirements of the FDA or European regulating bodies, as applicable. In particular, international sales of medical devices manufactured in the United States that are not approved or cleared by the FDA for use in the United States, or are banned or deviate from lawful performance standards, are subject to FDA export requirements.

Foreign countries often require, among other things, a Certificate of Foreign Government (CFG) for export. To obtain a CFG, the device manufacturer must apply to the FDA. The FDA certifies that the product has been granted clearance or approval in the United States and that the manufacturing facilities were in compliance with the FDA's QSR regulations at the time of the last FDA inspection.

*Conflict Minerals and Supply Chain*

We are subject to certain SEC rules adopted pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act concerning "conflict minerals" (generally tin, tantalum, tungsten and gold), From January 1, 2021, similar rules are in force in the EU. Certain of these conflict minerals are used in the manufacture of our products. Although the U.S. rules are being challenged in court, in their present form they require us to investigate the source of any conflict minerals necessary to the production or functionality of our products. If any such conflict minerals originated in the Democratic Republic of the Congo or adjoining countries (the DRC region), we must undertake comprehensive due diligence to determine whether such minerals financed or benefited armed groups in the DRC region. Since our supply chain is complex, our ongoing compliance with these rules could affect the pricing, sourcing and availability of conflict minerals used in the manufacture of our products.

We are also subject to disclosure requirements regarding abusive labor practices in portions of our supply chain under the California Transparency in Supply Chains Act.

*Environmental*

Our manufacturing processes involve the use, generation and disposal of solid wastes, hazardous materials and hazardous wastes, including silicone adhesives, solder and solder paste, sealants, epoxies and various solvents such as methyl ethyl ketone, acetone and isopropyl alcohol. As such, we are subject to stringent federal, state and local laws relating to the protection of the environment, including those governing the use, handling and disposal of hazardous materials and wastes. Products that we sell in Europe are subject to regulation in EU markets under the Restriction of Hazardous Substances Directive (RoHS). RoHS prohibits companies from selling products which contain certain hazardous materials, including lead, mercury, cadmium, chromium, polybrominated biphenyls and polybrominated diphenyl ethers, in EU member states. In addition, the EU's Regulation-Registration, Evaluation, Authorization, and Restriction of Chemicals Directive also restricts substances of very high concern in products.

Future environmental laws may require us to alter our manufacturing processes, thereby increasing our manufacturing costs. We believe that our products and manufacturing processes at our facilities comply in all material respects with applicable environmental laws and worker health and safety laws; however, the risk of environmental liabilities cannot be completely eliminated.

Table of Contents

*Health Care Fraud and Abuse*

In the U.S., there are federal and state anti-kickback laws that generally prohibit the payment or receipt of kickbacks, bribes or other remuneration in exchange for the referral of patients or other health-related business. For example, the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) prohibits anyone from, among other things, knowingly and willfully offering, paying, soliciting or receiving any bribe, kickback or other remuneration intended to induce the referral of patients for, or the purchase, order or recommendation of, health care products and services reimbursed by a federal health care program, including Medicare and Medicaid. Recognizing that the federal anti-kickback law is broad and potentially applicable to many commonplace arrangements, Congress and the Office of Inspector General (OIG) within the Department of Health and Human Services have created statutory "exceptions" and regulatory "safe harbors". Exceptions and safe harbors exist for a number of arrangements relevant to our business, including, among other things, payments to bona fide employees, certain discount and rebate arrangements, and certain payment arrangements involving Group Purchasing Organizations (GPOs).

Although an arrangement that fits into one or more of these exceptions or safe harbors is immune from prosecution, arrangements that do not fit squarely within an exception or safe harbor do not necessarily violate the law, but the OIG or other government enforcement authorities may examine the practice to determine whether it involves the sorts of abuses that the statute was designed to combat. Violations of this federal law can result in significant penalties, including imprisonment, monetary fines and assessments, and exclusion from Medicare, Medicaid and other federal health care programs. Exclusion of a manufacturer, like us, would preclude any federal health care program from paying for its products. In addition to the federal anti-kickback law, many states have their own laws that are analogous to the federal anti-kickback law, but may apply regardless of whether any federal or state health care program business is involved. Federal and state anti-kickback laws may affect our sales, marketing and promotional activities, educational programs, pricing and discount practices and policies, and relationships with health care providers by limiting the kinds of arrangements we may have with hospitals, alternate care market providers, GPOs, physicians, payers and others in a position to purchase or recommend our products.

Federal and state false claims laws prohibit anyone from presenting, or causing to be presented, claims for payment to third-party payers that are false or fraudulent. For example, the Federal Civil False Claims Act (31 U.S.C. § 3729 et seq.) imposes liability on any person or entity who, among other things, knowingly and willfully presents, or causes to be presented, a false or fraudulent claim for payment by a federal health care program, including Medicaid and Medicare. Some suits filed under the False Claims Act, known as "qui tam" actions, can be brought by a "whistleblower" or "relator" on behalf of the government and such individuals may share in any amounts paid by the entity to the government in fines or settlement. Manufacturers, like us, can be held liable under false claims laws, even if they do not submit claims to the government, where they are found to have caused submission of false claims by, among other things, providing incorrect coding or billing advice about their products to customers that file claims, or by engaging in kickback arrangements or off-label promotion with customers that file claims. A number of states also have false claims laws, and some of these laws may apply to claims for items or services reimbursed under Medicaid and/or commercial insurance. Sanctions under these federal and state fraud and abuse laws may include civil monetary penalties and criminal fines, exclusion from government health care programs and imprisonment.

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) created new federal crimes, including health care fraud and false statements related to health care matters. The health care fraud statute prohibits, among other things, knowingly and willfully executing a scheme to defraud any health care benefit program, including those offered by private payers. The false statements statute prohibits, among other things, knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for health care benefits, items or services. A violation of either statute is a felony and may result in fines, imprisonment and other significant penalties.

The Physician Payment Sunshine Act (Sunshine Act), which was enacted by Congress as part of the ACA, requires medical device companies to track and publicly report, with limited exceptions, all payments and transfers of value to physicians and teaching hospitals in the U.S. Companies are required to track payments made and to report such payments to the government by March 31 of each year. Several states have similar requirements. Beginning in 2022, the reporting requirement will also apply to advance practice nurses and physician assistants.

The Foreign Corrupt Practices Act of 1977 and similar worldwide anti-bribery laws in non-U.S. jurisdictions generally prohibit companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business.

Table of Contents

Due to the breadth of some of these laws, it is possible that some of our current or future practices might be challenged under one or more of these laws. In addition, there can be no assurance that we would not be required to alter one or more of our practices to be in compliance with these laws. Evolving interpretations of current laws or the adoption of new federal or state laws or regulations could adversely affect many of the arrangements we have with customers and physicians. Therefore, our risk of being found in violation of these laws is increased by the fact that some of these laws are broad and open to interpretation.

### Data Privacy and Protection of Health and Other Personal Information

Data protection legislation is becoming increasingly common in the United States at both the federal and state level. For example, the California Consumer Privacy Act of 2018 (CCPA), which became effective on January 1, 2020, requires us to make disclosures to consumers about our data collection, use and sharing practices, allows consumers to opt out of certain data sharing with third parties, and provides a cause of action for data breaches. The CCPA, together with the newly passed Consumer Privacy Rights Act, which is effective beginning January 1, 2023, is the most comprehensive data privacy law in the United States, and could be the precursor to other similar legislation in other states or at the federal level. Internationally, the General Data Protection Regulation (GDPR) took effect in May 2018 within the European Economic Area (EEA) and many EEA jurisdictions. Other jurisdictions outside of the EEA have also adopted their own data privacy and protection laws. We have implemented, and continue to implement, procedures and processes to comply with these regulations and, as international data privacy and protection laws continue to evolve, and as new regulations, interpretive guidance and enforcement information become available, we may incur incremental costs to modify our business practices to comply with these requirements. In addition, our internal control policies and procedures may not always protect us from reckless or criminal acts committed by our employees or agents.

In addition, numerous federal, state and international laws and regulations, including HIPAA and GDPR, govern the collection, use and disclosure of patient-identifiable, protected health information (PHI) and other personal information. In the U.S., HIPAA applies to covered entities, which include most healthcare facilities that purchase and use our products, and their business associates. The HIPAA Privacy Rule restricts the use and disclosure of PHI, and requires covered entities and their business associates to safeguard that information and to provide certain rights to individuals with respect to that information. The HIPAA Security Rule establishes detailed requirements for safeguarding PHI transmitted or stored electronically.

Although we are not a covered entity, we are sometimes deemed by our customers to be a business associate of covered entities due to activities that we perform for or on behalf of covered entities, such as training customers on the use of our products or investigating product performance. As business associates, we are subject to many of the requirements of HIPAA and could be directly subject to HIPAA civil and criminal enforcement and the associated penalties for violation of the Privacy, Security and Breach Notification Rules.

The HIPAA standards also apply to the use and disclosure of PHI for research and generally require the covered entity performing the research to obtain the written authorization of the research subject (or an appropriate waiver) before providing that subject's PHI to sponsors like us for purposes related to the research. These covered entities also typically impose contractual limitations on our use and disclosure of the PHI they disclose to us. We may be required to make costly system modifications to comply with the privacy and security requirements that will be imposed on us and our failure to comply may result in liability and adversely affect our business. Other countries also have, or are developing, laws governing the collection, use and transmission of health information, and these laws could create liability for us or increase our cost of doing business.

### Third-Party Reimbursement

Health care providers, including hospitals, that purchase our products generally rely on third-party payers, including the Medicare and Medicaid programs and private payers, including indemnity insurers and managed care plans, to cover and reimburse all or part of the cost of the products and the procedures in which they are used. As a result, demand for our products is dependent in part on the coverage and reimbursement policies of these payers. No uniform coverage or reimbursement policy for medical technology exists among all third-party payers, and coverage and reimbursement can differ significantly from payer to payer.

The Centers for Medicare & Medicaid Services (CMS) is the federal agency responsible for administering the Medicare program. Along with its contractors, CMS establishes the coverage and reimbursement policies for the Medicare program. Because a large percentage of our products are used in the treatment of elderly or disabled individuals who are Medicare beneficiaries, Medicare's coverage and reimbursement policies are particularly significant to our business. In addition, private payers often follow the coverage and reimbursement policies of Medicare.

Table of Contents

In general, Medicare will cover a medical product or procedure when the product or procedure is included within a statutory benefit category and is reasonable and necessary for the diagnosis or treatment of an illness or injury, or to improve the functioning of a malformed body part. Even if the medical product or procedure is considered medically necessary and coverage is available, Medicare may place restrictions on the circumstances where it provides coverage. For example, several Medicare local contractors have issued policies that restrict coverage for pulse oximetry in hospital inpatient and outpatient settings to a limited number of conditions, including limiting coverage to patients who (i) exhibit signs of acute respiratory dysfunction, (ii) have chronic lung disease, severe cardiopulmonary disease or neuromuscular disease involving the muscles of respiration, (iii) are under treatment with a medication with known pulmonary toxicity, or (iv) have sustained multiple trauma or complaints of acute chest pain.

Reimbursement for our products may vary not only by the type of payer involved but also based upon the setting in which the product is furnished and utilized. For example, Medicare payment may be made, in appropriate cases, for patient stays in the hospital inpatient and in outpatient settings involving the use of our products. Medicare generally reimburses hospitals based upon prospectively determined amounts. For hospital inpatient stays, the prospective payment generally is determined by the patient's condition and other patient data and procedures performed during the inpatient stay, using a classification system known as Medicare Severity Diagnosis-Related Groups (MS-DRGs). Prospective rates are adjusted for, among other things, regional differences, co-morbidity and complications. Hospitals generally do not receive separate Medicare reimbursement for the specific costs of purchasing our products for use in the inpatient setting. Rather, Medicare reimbursement for these costs is deemed to be included within the prospective payments made to hospitals for the inpatient services in which the products are utilized.

In contrast, some differences may be seen in the reimbursement for use of our products in hospital outpatient departments. In this setting, Medicare payments also are generally made under a prospective payment system based on the ambulatory payment classifications (APCs) under which individual items and procedures are categorized. Hospitals receive the applicable APC payment rate for the procedure regardless of the actual cost for such treatment. Some outpatient services such as oximetry services do not receive separate reimbursement. Rather, their reimbursement is deemed packaged into the APC for an associated procedure and the payment for that APC does not vary whether or not the packaged procedure is performed. Some procedures also are paid through composite APCs, which are APCs that establish a payment rate that applies when a specific combination of services is provided.

Reimbursement for certain pulse oximetry monitoring services, including those using our products, may be separately payable when they are the only service provided to the patient on that day, packaged if provided with certain critical care services, or reimbursed through a composite APC when provided in connection with certain other services.

Because payments through the Prospective Payment System in both the hospital inpatient and outpatient settings are based on predetermined rates and may be less than a hospital's actual costs in furnishing care, hospitals have incentives to lower their operating costs by utilizing products that will reduce the length of inpatient stays, decrease labor or otherwise lower their costs. If hospitals cannot obtain adequate coverage and reimbursement for our products, or the procedures in which they are used, we cannot be certain that they will purchase our products, despite the clinical benefits and opportunity for cost savings that we believe can be derived from their use.

Our success with rainbow SET® technologies in U.S. settings of care with reimbursable monitoring procedures, such as hospital emergency departments, hospital procedure labs, and physician offices may largely depend on the ability of providers to receive reimbursement for such procedures. While private insurance payers often follow Medicare coverage and payment, we cannot be certain of this and, in many cases, cannot control the coverage or payment rates that private insurance payers put in place. In addition, the potential amendment, repeal or judicial invalidation of the ACA, and/or the enactment of other legislation or regulations, could affect future payment for services involving the use of our products.

Our success in non-U.S. markets depends largely upon the availability of coverage and reimbursement from the third-party payers through which health care providers are paid in those markets. Health care payment systems in non-U.S. markets vary significantly by country, and include single-payer government managed systems, as well as systems in which private payers and government managed systems exist side-by-side. Our ability to achieve market acceptance or significant sales volume in international markets we enter will be dependent in large part on the availability of reimbursement for procedures performed using our products under health care payment systems in such markets.

Table of Contents

*Other U.S. and Foreign Regulation*

We and our OEM partners also must comply with numerous federal, state and local laws, as well as laws in other jurisdictions, relating to matters such as safe working conditions, manufacturing practices, environmental protection, fire hazard control and hazardous substance disposal. We cannot be sure that we will not be required to incur significant costs to comply with these laws and regulations in the future or that these laws or regulations will not hurt our business, financial condition and results of operations. Unanticipated changes in existing regulatory requirements or adoption of new requirements could hurt our business, financial condition and results of operations.

### *Markets*

*Competitive Conditions*

The medical device industry is highly competitive and many of our competitors have substantially greater financial, technical, marketing and other resources than we do. While we regard any company that sells pulse oximeters as a potential customer, we also recognize that the companies selling pulse oximeters on an OEM basis and/or pulse oximetry sensors are also potential competitors. Our primary competitor, Medtronic plc (Medtronic, formerly Covidien Ltd.), currently holds a substantial share of the pulse oximetry market. In addition, large technology companies that have not historically operated in the healthcare or medical device space, such as Alphabet, Apple, Samsung and others, have developed or may develop products and technologies that may compete with our current or future products and technologies in the consumer and clinical marketplaces.

Medtronic sells its own brand of Nellcor pulse oximeters to end-users, sells pulse oximetry modules to other monitoring companies on an OEM basis, and licenses to certain OEMs the right to make their pulse oximetry platforms compatible with their sensors. We also face substantial competition from larger medical device companies, including companies that develop products that compete with our proprietary Masimo SET® and our OEM partners. We believe that a number of companies have announced products that claim to offer motion-tolerant accuracy. In addition, some of our patents have expired and others will expire over time in accordance with the laws of the jurisdiction in which they were issued.

We believe that the principal competitive factors in the market for pulse oximetry products include:

- accurate monitoring during both patient motion and low perfusion;
- ability to introduce other clinically beneficial measurements related to oxygenation and respiration, such as noninvasive and continuous oxygen reserve index and hemoglobin;
- competitive pricing;
- brand recognition and perception of innovation abilities;
- sales and marketing capability;
- access to hospitals which are members of GPOs;
- access to integrated delivery networks;
- access to OEM partners; and
- patent protection.

*Market Demand*

We currently sell all of our medical products both directly to hospitals and the alternate care market via our sales force and various distributors in the U.S. and around the world, including Europe, the Middle East, Asia, Latin America, Canada and Australia. We sell our non-medical/consumer products through e-commerce Internet sites such as www.masimopersonalhealth.com and www.amazon.com.

Our sales and marketing strategy for pulse oximetry has been, and will continue to be, focused on building end-user awareness of the clinical and cost-saving benefits of our technologies. Our sales representatives' primary focus is to facilitate the conversion of competitor accounts to our Masimo SET® pulse oximetry and rainbow SET® Pulse CO-Oximetry® products, to expand the use of Masimo SET® and Patient SafetyNet™ on the general floor and to create and expand the use of rainbow® measurements in both critical care and non-critical care areas. In addition to sales representatives, we employ clinical specialists to work with our sales representatives to educate end-users on the benefits of Masimo SET® and assist with the introduction and implementation of our technology and products to their sites.

Table of Contents

For the year ended January 2, 2021, two just-in-time distributors, Medline Industries and Cardinal Health, represented approximately 11.5% and 10.1%, respectively, of our total revenue. These were the only two customers that represented 10% or more of our revenue for the year ended December 28, 2019. Importantly, these two distributors take and fulfill orders from our direct customers, many of which have signed long-term sensor purchase agreements with us. If a specific just-in-time distributor is unable to fulfill these orders, the orders would be redirected to other distributors or fulfilled directly by us.

Additionally, we sell certain of our products through our OEM partners who incorporate our technologies into their monitors and sometimes resell our sensors to their installed base. Our OEM agreements allow us to expand the availability of our technologies through the sales and distribution channels of each OEM partner. To facilitate clinician awareness of Masimo technologies, our OEM partners have generally agreed to place the applicable Masimo trademark prominently on their instruments.

In order to facilitate our U.S. direct sales to hospitals, we have signed contracts with what we believe to be the five largest national GPOs in the U.S., based on the total volume of negotiated purchases. In return for the GPOs putting our products on contract, we have agreed to pay the GPOs a percentage of our revenue from their member hospitals. In 2020 and 2019, revenue from the sale of our pulse oximetry products to hospitals that are associated with GPOs amounted to $564.0 million and $517.6 million, respectively.

### Resources

#### Intellectual Property

We believe that in order to maintain a competitive advantage in the marketplace, we must develop and maintain protection of the proprietary aspects of our technology. We rely on a combination of patent, trademark, trade secret, copyright and other intellectual property rights and measures to protect our intellectual property.

We have developed a patent portfolio internally, and, to a lesser extent, through acquisitions and licensing, that covers many aspects of our product offerings. As of January 2, 2021, we had approximately 800 issued patents and approximately 500 pending applications in the U.S., Europe, Japan, Australia, Canada and other countries throughout the world. Our patents expire in accordance with the laws of the particular jurisdiction in which they were issued, which sometimes change. Additionally, as of January 2, 2021, we owned approximately 90 U.S. registered trademarks and approximately 300 foreign registered trademarks, as well as trade names that we use in conjunction with the sale of our products. Our trademarks are perpetually renewable.

Under the Cross-Licensing Agreement, we and Cercacor have agreed to allocate proprietary ownership of technology developed based on the functionality of the technology. We will have proprietary ownership, including ownership of all patents, copyrights and trade secrets, of all technology related to the noninvasive monitoring of vital signs measurements, and Cercacor will have proprietary ownership of all technology related to the noninvasive monitoring of non-vital signs measurements. We also rely upon trade secrets, continuing technological innovations and licensing opportunities to develop and maintain our competitive position.

We seek to protect our trade secrets and proprietary know-how, in part, with confidentiality agreements with consultants, vendors and employees, although we cannot be certain that the agreements will not be breached or that we will have adequate remedies for any breach.

There are risks related to our intellectual property rights. For further detail on these risks, see "Risks Related to Our Intellectual Property" under Item 1A—"Risk Factors" in this Annual Report on Form 10-K.

#### Research and Product Development

We believe that ongoing research and development efforts are essential to our success. Our research and development efforts focus primarily on continuing to enhance our technical expertise in pulse oximetry, expanding our noninvasive monitoring of other measurements and developing remote alarm and monitoring solutions.

Although we and Cercacor each have separate research and development projects, we collaborate with Cercacor on multiple research and development activities related to rainbow® technology and other technologies. Under the Cross-Licensing Agreement, the parties have agreed to allocate proprietary ownership of technology developed by either party based on the functionality of the technology. We will have proprietary rights to all technology related to the noninvasive measurement of vital signs measurements, and Cercacor will have proprietary ownership of all technology related to the noninvasive monitoring of non-vital signs measurements.

*Manufacturing*

Our strategy is to manufacture products in-house when it is efficient and cost-effective for us to do so. We currently manufacture our bedside and handheld pulse oximeters, our full line of disposable and reusable sensors and most of our patient cables in-house or through captive contract maquiladora operations. We maintain an approximate 70,700 square foot manufacturing facility in Irvine, California, and two separate manufacturing facilities in Mexicali and San Luis Rio Colorado, Mexico that have combined square footage of approximately 333,400 square feet. All three of these facilities are International Organization for Standardization (ISO) 13485:2016 certified. We also maintain an approximate 86,500 square foot facility in Hudson, New Hampshire, a portion of which is used to manufacture advanced light emitting diodes and other advanced component-level technologies.

We will continue to utilize third-party contract manufacturers for products and subassemblies that can be more efficiently manufactured by these parties, such as our circuit boards. We monitor our third-party manufacturers and perform inspections and product tests at various steps in the manufacturing cycle to ensure compliance with our specifications. We also do full functional testing of our circuit boards.

For raw materials, we and our contract manufacturers rely on sole source suppliers for some components, including digital signal processor chips and analog-to-digital converter chips. We and our contract manufacturers have taken steps to minimize the impact of a shortage or stoppage of shipments of digital signal processor chips or analog to digital converter chips, including maintaining a safety stock of inventory and designing software that may be easily ported to another digital signal processor chip. We believe that our sources of supply for components and raw materials are adequate. In the event of a delay or disruption in the supply of sole source components, we believe that we and our contract manufacturers will be able to locate additional sources of these sole source components on commercially reasonable terms and without experiencing material disruption in our business or operations. We have agreements with certain major suppliers and each agreement provides for varying terms with respect to contract expiration, termination and pricing. Most of these agreements allow for termination upon specified notice, ranging from four to twelve months, to the non-terminating party. Certain of these agreements with our major suppliers allow for pricing adjustments, each agreement provides for annual pricing negotiation, and one agreement also guarantees us the most favorable pricing offered by the supplier to any of its other customers.

*Human Capital Resources*

Core to our long-term strategy for human capital is attracting, developing and retaining the best talent globally with the right skills to drive our future success. We consider our employees to be our greatest assets and the greatest strength behind our innovation and success. We seek to attract and retain highly-talented, experienced and well-educated individuals to support our long-term growth and profitability goals.

Our success and future growth is largely dependent on our ability to retract, retain and develop a diverse workforce at all levels of the organization. To succeed, we have developed key recruitment and retention strategies that we focus on as part of our overall management of our business. These include:

- **Compensation.** Our compensation programs are designed to align the compensation of our employees with their performance and to provide the proper incentives to attract and retain employees while motivating them to achieve superior results. The structure of our compensation programs balance incentive earnings for both short-term and long-term performance.

  - Our executive compensation is aligned with stockholder interests by aligning pay-for-performance metrics.

  - We utilize nationally-recognized compensation consultants to evaluate our executive compensation benefit programs and provide benchmarking against our peer groups.

  - We provide employee wages that are competitive and consistent with employee positions, experience, skills, knowledge and geography.

  - Our annual increases and cash incentives are based on market and awarded based on merit.

  - We offer a wide variety of benefits, including health insurance, paid time off, retirement plans, and voluntary benefits such as financial and personal wellness benefits, etc.

- **Health and Safety.** We are committed to the safety and well-being of our employees. In response to the COVID-19 pandemic, we implemented changes to our business in an effort to protect our employees and customers and in support of the health and safety protocols. A large majority of our workforce has been working remotely since March 2020, and we instituted safety protocols and procedures for our essential employees who continue to work on site. We installed plexiglass partitions for our manufacturing/assemblies facilities and implemented extensive cleaning sanitation procedures for our both manufacturing/assembly facilities and our general administration and sales facilities.

33

Table of Contents

- **Developing Leaders of Tomorrow/Succession Planning.** We are committed to identifying and developing the talents of our next generation of leaders. Our executive management team conducts an annual organization and leadership review of all business leaders, focusing on our high-performing and high potential talent, diversity, and the succession planning for critical roles.

- **Employee Feedback and Retention.** In November 2020, we were certified as a Great Place to Work®, earning a positive response of 84%, proving that we have created an amazing employee experience. To assess and improve employee retention and engagement, we survey employees with the assistance of third-party consultants, and take actions to address areas of employee concerns. The average tenure of our employee is approximately 5.5 years and more than 20% of our employees have been employed by us for more than ten years.

- **Diversity.** In fiscal 2020, our workforce grew at a faster pace than past years, increasing from approximately 1,600 full-time employees and approximately 3,700 dedicated contract personnel worldwide as of December 28, 2019 to 2,000 full-time employees and approximately 4,200 dedicated contract personnel worldwide as of January 2, 2021. Of our full-time employees, approximately 65% were male and approximately 35% were female, and women represented approximately 27% of our management/leadership roles. Minorities represented approximately 49% of our U.S. workforce, of which minorities accounted for approximately 39% of the employees in our management/leadership roles.

*Available Information*

Our annual reports on Form 10-K, quarterly reports on Form 10-Q, proxy statements, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, are available free of charge at our website, www.masimo.com, as soon as reasonably practicable after electronically filing such reports with the SEC. Any information contained on, or that can be accessed through, our website is not incorporated by reference into, nor is it in any way a part of, this Annual Report on Form 10-K.

34

Table of Contents

## ITEM 1A.    RISK FACTORS

*The following risk factors and other information included in this Annual Report on Form 10-K should be carefully considered. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties not presently known to us or that we presently deem less significant may also impair our business operations. If any of the following risks come to fruition, our business, financial condition, results of operations and future growth prospects would likely be materially and adversely affected. In these circumstances, the market price of our common stock could decline, and you could lose all or part of your investment.*

### Summary of Material Risk Factors

Below is a summary of the principal factors that make an investment in our securities speculative or risky. This summary does not address all of the risks that we face. Additional discussion of the risks summarized in this summary, and other risks that we face, can be found following this summary and should be carefully considered together with all of the other information appearing in this Annual Report on Form 10-K.

- We currently derive the majority of our revenue from our Masimo SET® platform, Masimo rainbow SET® platform and related products. If these technologies and related products do not continue to achieve market acceptance, our business, financial condition and results of operations would be adversely affected.

- Some of our products are in development or have been recently introduced into the market and may not achieve market acceptance, which could limit our growth and adversely affect our business, financial condition and results of operations.

- Our ability to commercialize new products, new or improved technologies and additional applications for Masimo SET® and our licensed rainbow® technology is limited to certain markets by our Cross-Licensing Agreement with Cercacor Laboratories, Inc. (Cercacor), which may impair our growth and adversely affect our business, financial condition and results of operations.

- We face competition from other companies, many of which have substantially greater resources than we do. If we do not successfully develop and commercialize enhanced or new products that remain competitive with products or alternative technologies developed by others, we could lose revenue opportunities and customers, and our ability to grow our business would be impaired, adversely affecting our financial condition and results of operations.

- We depend on our domestic and international OEM partners for a portion of our revenue. If they do not devote sufficient resources to the promotion of products that use our technologies, our business would be harmed.

- If we fail to maintain or develop relationships with GPOs, sales of our products would decline.

- Inadequate levels of coverage or reimbursement from governmental or other third-party payers for our products, or for procedures using our products, may cause our revenue to decline or prevent us from realizing revenues from future products.

- Consolidation in the healthcare industry could lead to demands for price concessions or to the exclusion of existing market participants from certain markets, which could have an adverse effect on our business, results of operations or financial condition.

- Our customers may reduce, delay or cancel purchases due to a variety of factors, such as lower hospital census levels or third-party guidelines, which could adversely affect our business, financial condition and results of operations.

- The loss of any large customer or distributor, or any cancellation or delay of a significant purchase by a large customer, could reduce our net sales and harm our operating results.

- Counterfeit Masimo sensors and third-party medical device reprocessors that reprocess our single-patient-use sensors may harm our reputation. Also, these counterfeit and third-party reprocessed sensors, as well as genuine Masimo reprocessed sensors, are sold at lower prices than new Masimo sensors and could cause our revenue to decline, which may adversely affect our business, financial condition and results of operations.

- If the patents we own or license, or our other intellectual property rights, do not adequately protect our technologies, we may lose market share to our competitors and be unable to operate our business profitably.

- If third parties claim that we infringe their intellectual property rights, we may incur liabilities and costs and may have to redesign or discontinue selling certain products.

- We believe competitors may currently be violating and may in the future violate our intellectual property rights. As a result, we may initiate litigation to protect and enforce our intellectual property rights, which may result in substantial expense and may divert management's attention from implementing our business strategy.

- Our failure to obtain and maintain FDA clearances or approvals on a timely basis, or at all, would prevent us from commercializing our current, upgraded, or new products in the U.S., which could severely harm our business.

Table of Contents

- We may be subject to or otherwise affected by federal and state healthcare laws, including fraud and abuse laws, and could face substantial penalties if we are unable to fully comply with these laws.

- Legislative and regulatory changes in the healthcare industry could have a negative impact on our financial performance. Furthermore, our business, financial condition, results of operations and cash flows could be significantly and adversely affected by healthcare reform legislation in the U.S. or in our key international markets.

- The failure of our OEM partners to obtain required FDA clearances or approvals for products that incorporate our technologies could have a negative impact on our revenue.

- If we or our suppliers fail to comply with ongoing regulatory requirements, or if we experience unanticipated problems with our products, these products could be subject to restrictions or withdrawal from the market.

- Failure to obtain regulatory authorizations in foreign jurisdictions may prevent us from marketing our products abroad.

- Modifications to our marketed devices may require new regulatory clearances or premarket approvals, or may require us to cease marketing or to recall the modified devices until clearances or approvals are obtained.

- Regulatory reforms may impact our ability to develop and commercialize our products and technologies.

- If our products cause or contribute to a death or serious injury, or malfunction in a way that would likely cause or contribute to a death or serious injury, we will be subject to medical device reporting regulations, and may need to initiate voluntary corrective actions such as the recall of our products.

- Promotion of our products using claims that are off-label, unsubstantiated, false or misleading could subject us to substantial penalties.

- The regulatory environment governing information, cybersecurity and privacy laws is increasingly demanding and continues to evolve.

- Our business, financial condition and results of operations may be adversely affected by the COVID-19 pandemic.

- If we are unable to obtain key materials and components from sole or limited source suppliers, we will not be able to deliver our products to customers.

- If our essential employees who are unable to telework become ill or otherwise incapacitated, our operations may be adversely impacted.

- Future strategic initiatives, including acquisitions of businesses and strategic investments, could negatively affect our business, financial condition and results of operations if we fail to integrate the acquired businesses successfully into our existing operations or achieve the desired results of our investment.

- Our credit agreement contains certain covenants and restrictions that may limit our flexibility in operating our business.

- We may experience conflicts of interest with Cercacor with respect to business opportunities and other matters.

- We will be required to assign to Cercacor and pay Cercacor for the right to use certain products and technologies we develop that relate to the monitoring of non-vital sign parameters, including improvements to Masimo SET®.

- In the event that the Cross-Licensing Agreement is terminated for any reason, or Cercacor grants a license to rainbow® technology to a third-party, our business would be adversely affected.

- We may not be able to commercialize our products incorporating licensed rainbow® technology cost-effectively or successfully.

- Rights provided to Cercacor in the Cross-Licensing Agreement may impede a change in control of our company.

- Concentration of ownership of our stock among our existing directors, executive officers and principal stockholders may prevent new investors from influencing significant corporate decisions.

- Our corporate documents and Delaware law contain provisions that could discourage, delay or prevent a change in control of our company, prevent attempts to replace or remove current management and reduce the market price of our stock.

- Our bylaws provide that the state or federal courts located within the State of Delaware are the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.

Table of Contents

**Risks Related to Our Revenues**

**We currently derive the majority of our revenue from our Masimo SET\* platform, Masimo rainbow SET\* platform and related products. If these technologies and related products do not continue to achieve market acceptance, our business, financial condition and results of operations would be adversely affected.**

We are highly dependent upon the continued success and market acceptance of our proprietary Masimo SET\* and Masimo rainbow SET\* technologies that serve as the basis of our primary product offerings. Continued market acceptance of products incorporating these technologies will depend upon us continuing to provide evidence to the medical community that our products are cost-effective and offer significantly improved performance compared to conventional pulse oximeters. Healthcare providers that currently have significant investments in competitive pulse oximetry products may be reluctant to purchase our products. If hospitals and other healthcare providers do not believe our Masimo SET\* and Masimo rainbow SET\* platforms are cost-effective, safe or more accurate or reliable than competitive pulse oximetry products, they may not buy our products in sufficient quantities to enable us to generate revenue growth from the sale of these products. In addition, allegations regarding the safety and effectiveness of our products, whether or not substantiated, may impair or impede the acceptance of our products.

**Some of our products are in development or have been recently introduced into the market and may not achieve market acceptance, which could limit our growth and adversely affect our business, financial condition and results of operations.**

Many of our noninvasive measurement technologies are considered disruptive. These technologies have performance levels that we believe are acceptable for many clinical environments but may be insufficient in others. In addition, these technologies may perform better in some patients and settings than others. Over time, we hope to continue to improve the performance of these technologies and educate the clinical community on how to properly evaluate them. If we are successful in these endeavors, we expect these technologies will become more useful in more environments and will become more widely adopted. Our product portfolio continues to expand, and we are investing significant resources to enter into, and in some cases create, new markets for these products. We are continuing to invest in sales and marketing resources to achieve market acceptance of these products, but are unable to guarantee that our technologies will achieve general market acceptance.

The degree of market acceptance of these products will depend on a number of factors, including:

- perceived clinical benefits from our products;

- perceived cost effectiveness of our products;

- perceived safety and effectiveness of our products;

- reimbursement available through government and private healthcare programs for using some of our products; and

- introduction and acceptance of competing products or technologies.

If our products do not gain market acceptance or if our customers prefer our competitors' products, our potential revenue growth would be limited, which would adversely affect our business, financial condition and results of operations.

On March 30, 2020, we acquired TNI medical AG (TNI\*) and added TNI softFlow\* technology to our product portfolio. The TNI softFlow\* technology provides respiratory support by generating a precisely regulated, stable high flow of room air or a mix of room air and oxygen. The TNI softFlow\* technology is our first therapeutic product. We may not be able to achieve market acceptance of the TNI softFlow\* technology, and any potential revenue from the TNI softFlow\* technology could be limited, which would adversely affect our business, financial condition and results of operations.

In December 2020, we acquired a majority ownership of LiDCO Group, PLC, and added hemodynamic monitoring solutions to our product portfolio. The hemodynamic monitoring solutions provide clinicians with access to patients' cardiac output, stroke volume and systemic vascular resistance. We may not be able to achieve market acceptance of the hemodynamic monitoring solutions, and any potential revenue from it could be limited, which would adversely affect our business, financial condition and result of operations.

Table of Contents

**Our ability to commercialize new products, new or improved technologies and additional applications for Masimo SET® and our licensed rainbow® technology is limited to certain markets by our Cross-Licensing Agreement with Cercacor Laboratories, Inc. (Cercacor), which may impair our growth and adversely affect our business, financial condition and results of operations.**

Since 1998, we have been a party to a cross-licensing agreement with Cercacor, (as amended, the Cross-Licensing Agreement), under which we granted Cercacor:

- an exclusive, perpetual and worldwide license, with sublicense rights, to use all Masimo SET® technology owned by us, including all improvements to this technology, for the monitoring of non-vital signs parameters and to develop and sell devices incorporating Masimo SET® for monitoring non-vital signs parameters in any product market in which a product is intended to be used by a patient or pharmacist rather than a professional medical caregiver, which we refer to as the Cercacor Market; and

- a non-exclusive, perpetual and worldwide license, with sublicense rights, to use all Masimo SET® technology owned by us for measurement of vital signs in the Cercacor Market.

Non-vital signs measurements consist of body fluid constituents other than vital signs measurements, including, but not limited to, carbon monoxide, methemoglobin, blood glucose, hemoglobin and bilirubin. Under the Cross-Licensing Agreement, we are only permitted to sell devices utilizing Masimo SET® for the monitoring of non-vital signs parameters in markets where the product is intended to be used by a professional medical caregiver, including, but not limited to, hospital caregivers and alternate care facility caregivers, rather than by a patient or pharmacist, which we refer to as the Masimo Market. Accordingly, our ability to commercialize new products, new or improved technologies and additional applications for Masimo SET® is limited. In particular, our inability to expand beyond the Masimo Market may limit our ability to maintain or increase our revenue and impair our growth.

Pursuant to the Cross-Licensing Agreement, we have licensed from Cercacor the right to make and distribute products in the Masimo Market that utilize rainbow® technology for certain noninvasive measurements. As a result, the opportunity to expand the market for our products incorporating rainbow® technology is also limited, which could limit our ability to maintain or increase our revenue and impair our growth.

**We face competition from other companies, many of which have substantially greater resources than we do. If we do not successfully develop and commercialize enhanced or new products that remain competitive with products or alternative technologies developed by others, we could lose revenue opportunities and customers, and our ability to grow our business would be impaired, adversely affecting our financial condition and results of operations.**

The medical device industry is intensely competitive and is significantly affected by new product introductions and other market activities of industry participants. A number of our competitors have substantially greater capital resources, larger product portfolios, larger customer bases, larger sales forces and greater geographic presence, have established stronger reputations with specific customers, and have built relationships with Group Purchasing Organizations and other hospital purchasing groups (collectively, GPOs) that may be more effective than ours. Our Masimo SET® platform faces additional competition from companies developing products for use with third-party monitoring systems, as well as from companies that currently market their own pulse oximetry monitors. In addition, competitors with larger product portfolios than ours are engaging in bundling practices, whereby they offer increased discounts to hospitals that purchase their requirements for a variety of different products from the competitor, including products that we do not offer, effectively pricing their competing products at a loss.

Continuing technological advances and new product introductions within the medical device industry place our products at risk of obsolescence. For example, in September 2020, Apple, Inc. announced that its Apple Watch Series 6 includes a pulse oximetry monitoring feature, which may compete with certain of our existing products and products in development, including the consumer versions of our iSpO2® and MightySat® pulse oximeters. Our long-term success depends upon the development and successful commercialization of new products, new or improved technologies and additional applications for our existing technologies. The research and development process is time-consuming and costly and may not result in products or applications that we can successfully commercialize. In particular, we may not be able to successfully commercialize our products for applications other than arterial blood oxygen saturation and pulse rate monitoring, such as for respiration rate, hemoglobin, carboxyhemoglobin and methemoglobin monitoring. In addition, we may not be able to develop and successfully commercialize new products and technologies that we acquire. For example, in March 2020, we acquired TNI® and added TNI softFlow® technology to our product portfolio. As this is our first therapeutic product, we may not be able to successfully commercialize the TNI softFlow® technology for respiratory support applications. Also, in December 2020, we acquired majority ownership of LiDCO Group, PLC, and added hemodynamic monitoring solutions to our product portfolio. As these are our first therapeutic and hemodynamic monitoring solutions, we may not be able to successfully commercialize or obtain market acceptance of these products.

Table of Contents

If we do not successfully adapt our products and applications both within and outside these measurements, we could lose revenue opportunities and customers. Furthermore, one or more of our competitors may develop products that are substantially equivalent to those of our products that are cleared or approved for use, or those of our original equipment manufacturer (OEM) partners, in which case a competitor of ours may use our products or those of our OEM partners as predicate devices to more quickly obtain regulatory clearance or approval of their competing products. Competition could result in pressure from our customers to reduce the price of our products and could cause them to place fewer orders for our products, which could, in turn, cause a reduction in our revenues and product gross margins, thereby adversely impacting our business, financial condition and results of operations.

Some of the world's largest technology companies that have not historically operated in the healthcare or medical device space, such as Alphabet Inc., Apple Inc., Samsung Electronics Co., Ltd. and others, have developed or may develop products and technologies that may compete with our current or future products and technologies. These companies have substantially greater capital, research and development, and sales resources than we have. If we are unable to successfully compete against them, our financial performance could decline.

**We depend on our domestic and international OEM partners for a portion of our revenue. If they do not devote sufficient resources to the promotion of products that use our technologies, our business would be harmed.**

We are, and will continue to be, dependent upon our domestic and international OEM partners for a portion of our revenue through their marketing, selling and distribution of certain of their products that incorporate our technologies. Although we expect that our OEM partners will accept and actively market, sell and distribute products that incorporate our technologies, they may not do so. Because products that incorporate our technologies may represent a relatively small percentage of business for some of our OEM partners, they may have less incentive to promote these products over other products that do not incorporate these technologies.

In addition, some of our OEM partners offer products that compete with ours and also may be involved in intellectual property disputes with us. Therefore, we cannot guarantee that our OEM partners, or any company that may acquire any of our OEM partners, will vigorously promote products incorporating our technologies. The failure of our OEM partners to successfully market, sell or distribute products incorporating our technologies, the termination of OEM agreements, the loss of OEM partners or the inability to enter into future OEM partnership agreements would have a material adverse effect on our business, financial condition and results of operations.

**If we fail to maintain or develop relationships with GPOs, sales of our products would decline.**

Our ability to sell our products to hospitals depends, in part, on our relationships with GPOs. Many existing and potential customers for our products are members of GPOs. GPOs negotiate pricing arrangements and contracts with medical supply manufacturers and distributors that may include provisions for sole sourcing and bundling, which generally reduce the choices available to the hospitals.

These negotiated prices are made available to a GPO's members. If we are not one of the providers selected by a GPO, the GPO's members may be less likely or unlikely to purchase our products. If a GPO has negotiated a strict sole source, market share compliance or bundling contract for another manufacturer's products, we may be prohibited from making sales to members of such GPO for the duration of such contractual arrangement. Shipments of our pulse oximetry products to customers that are members of GPOs represent approximately 75% of our U.S. product sales. Our failure to renew our contracts with GPOs may cause us to lose market share and could have a material adverse effect on our business, financial condition and results of operations. In addition, if we are unable to develop new relationships with GPOs, our competitive position would likely suffer and our opportunities to grow our revenues and business would be harmed.

**Inadequate levels of coverage or reimbursement from governmental or other third-party payers for our products, or for procedures using our products, may cause our revenue to decline or prevent us from realizing revenues from future products.**

Sales of our products depend in part on the reimbursement and coverage policies of governmental and private healthcare payers. The lack of adequate coverage and reimbursement for our products or the procedures in which our products are used may deter customers from purchasing our products.

We cannot guarantee that governmental or third-party payers will reimburse or begin reimbursing a customer for the cost of our products or the procedures in which our products are used. For example, some insurance carriers have issued policies denying coverage for transcutaneous hemoglobin measurement on the grounds that the technology is investigational in the outpatient setting. Other payers are continuing to investigate our products to determine if they will provide reimbursement for the use of such products.

Table of Contents

These trends could lead to pressure to reduce prices for our current and future products, hinder our ability to obtain market adoption, cause a decrease in the size of the market or potentially increase competition, any of which could have a material adverse effect on our business, financial condition and results of operations.

We do not control payer decision-making with respect to coverage and payment levels for our products. Additionally, we expect many payers to continue to explore cost-containment strategies (e.g., comparative and cost-effectiveness analyses, so-called "pay-for-performance" programs implemented by various public government healthcare programs and private third-party payers, and expansion of payment bundling initiatives, and other such methods that shift medical cost risk to providers) that may potentially impact coverage and/or payment levels for our current products or products we develop in the future.

Outside of the U.S., reimbursement systems vary by country. These systems are often subject to the same pressures to curb rising healthcare costs and control healthcare expenditures as those in the U.S. In addition, as economies of emerging markets develop, these countries may implement changes in their healthcare delivery and payment systems. If adequate levels of reimbursement from third-party payers outside of the U.S. are not obtained, sales of our products outside of the U.S. may be adversely affected.

**Consolidation in the healthcare industry could lead to demands for price concessions or to the exclusion of existing market participants from certain markets, which could have an adverse effect on our business, results of operations or financial condition.**

Because healthcare costs have risen significantly over the past decade, numerous initiatives and reforms initiated by legislators, regulators and third-party payers to curb these costs have resulted in a consolidation trend in the healthcare industry to aggregate purchasing power. As the healthcare industry consolidates, competition to provide products and services to industry participants has become, and will continue to become, more intense. This has resulted in, and will likely continue to result in, greater pricing pressures and the exclusion of certain existing market participants from important market segments as GPOs, independent delivery networks and large single accounts continue to use their market power to consolidate purchasing decisions for hospitals.

We expect that market demand, government regulation, third-party coverage and reimbursement policies and societal pressures will continue to impact the worldwide healthcare industry, resulting in further business consolidations and alliances among our customers, which may reduce competition, exert further downward pressure on the prices of our products and adversely impact our business, financial condition and results of operations.

**Our customers may reduce, delay or cancel purchases due to a variety of factors, such as lower hospital census levels or third-party guidelines, which could adversely affect our business, financial condition and results of operations.**

Our customers are facing growing levels of uncertainties, including variations in overall hospital census for paying patients and the impact of such census variations on hospital budgets. As a result, many hospitals are reevaluating their entire cost structure, including the amount of capital they allocate to medical device technologies and products. In addition, certain of our products, including our rainbow® measurements such as carbon monoxide, methemoglobin and hemoglobin, that are sold with upfront license fees and more complex and expensive sensors, could also be impacted by hospital budget reductions. Any reductions in capital spending budgets by hospitals could have a significant negative impact on our OEM customers who, due to their traditionally larger capital equipment sales model, could see declines in purchases from their hospital customers. This, in turn, could reduce our board sales to our OEM customers.

From time to time, states and other local regulatory authorities may issue guidelines regarding the appropriate scope and use of our products. For example, some of our noninvasive monitoring devices may be subject to authorization by individual states as part of the Emergency Medical Services (EMS) scope of practice procedures. A lack of inclusion into scope of practice procedures may limit adoption of our products.

Additionally, increases in demand resulting from global medical crises such as the COVID-19 pandemic may be short lived. If the increased demand results in a stockpiling of our products by, or excess inventory at, our customers, future orders may be delayed or canceled until such on-hand inventory is consumed.

Table of Contents

**The loss of any large customer or distributor, or any cancellation or delay of a significant purchase by a large customer, could reduce our net sales and harm our operating results.**

We have a concentration of OEM, distribution and direct customers. For example, sales to two just-in-time distributors each represented 10% or more of our product sales for the fiscal year ended January 2, 2021. We cannot provide any assurances that we will retain our current customers, groups of customers or distributors, or that we will be able to attract and retain additional customers in the future. If for any reason we were to lose our ability to sell to a specific group or class of customers or through a distributor, we could experience a significant reduction in revenue, which would adversely impact our operating results.

Our sales could also be negatively affected by any rebates, discounts or fees that are required by, or offered to, GPOs and customers, including wholesalers or distributors. Additionally, some of our just-in-time distributors have been demanding higher fees, which we may be forced to pay in order to continue to offer products to our customers or which may force us to distribute our products directly to our customers. The loss of any large customer or distributor, or an increase in distributor fees, could have a material adverse effect on our business, financial condition and results of operations.

Our royalty and other revenue has historically consisted primarily of royalties received from Medtronic plc (Medtronic) related to its U.S. sales, and more recently, revenue from non-recurring engineering (NRE) services for a certain OEM customer. However, Medtronic is no longer required to pay us royalties and we have completed the majority of our contracted NRE services. We have not replaced this royalty and NRE services revenue with similar revenues, and such loss of revenue had an adverse effect on our results of operations for the fiscal year ended January 2, 2021.

**Counterfeit Masimo sensors and third-party medical device reprocessors that reprocess our single-patient-use sensors may harm our reputation. Also, these counterfeit and third-party reprocessed sensors, as well as genuine Masimo reprocessed sensors, are sold at lower prices than new Masimo sensors and could cause our revenue to decline, which may adversely affect our business, financial condition and results of operations.**

We believe that other entities are manufacturing and selling counterfeit Masimo sensors. In addition, certain medical device reprocessors have been collecting our used single-patient-use sensors from hospitals and then reprocessing, repackaging and reselling those sensors to hospitals. These counterfeit and third-party reprocessed sensors are sold at lower prices than new Masimo sensors. Our experience with both these counterfeit sensors and third-party reprocessed sensors is that they provide inferior performance, increased sensor consumption, reduced comfort and a number of monitoring problems. Notwithstanding these limitations, some of our customers have indicated a willingness to purchase some of their sensor requirements from these counterfeit manufacturers and third-party reprocessors in an effort to reduce their sensor costs.

These counterfeit and reprocessed sensors have led and may continue to lead to confusion with our genuine Masimo products, have reduced and may continue to reduce our revenue, and, in some cases, have harmed and may continue to harm our reputation if customers conclude incorrectly that these counterfeit or reprocessed sensors are original Masimo sensors.

In addition, we have expended a significant amount of time and expense investigating issues caused by counterfeit and reprocessed sensors, troubleshooting problems stemming from such sensors, educating customers about why counterfeit and reprocessed sensors do not perform to their expectations, enforcing our proprietary rights against the counterfeit manufacturers and reprocessors, and enforcing our contractual rights under our contracts.

In response to these counterfeit sensors and third-party reprocessors, we have incorporated X-Cal® technology into certain products to ensure our customers get the performance they expect by using genuine Masimo sensors and that such sensors do not continue to be used beyond their useful life. However, some customers may object to the X-Cal® technology, potentially resulting in the loss of customers and revenues.

We also offer our own Masimo reprocessed sensors, which meet the same performance specifications as our new Masimo sensors, to our customers. Reprocessed sensors sold by us are also offered at a lower price and, therefore, may reduce certain customer demand for our new sensors. As a result, increased sales of our own Masimo reprocessed sensors may result in lower revenues, which could negatively impact our business, financial condition and results of operations.

**Risks Related to Our Intellectual Property**

**If the patents we own or license, or our other intellectual property rights, do not adequately protect our technologies, we may lose market share to our competitors and be unable to operate our business profitably.**

Our success depends significantly on our ability to protect our rights to the technologies used in our products. Our utilization of patent protection, trade secrets and a combination of copyright and trademark laws, as well as nondisclosure, confidentiality and other contractual arrangements, to protect our intellectual property afford us only limited protection and may not adequately protect our rights or permit us to gain or maintain any competitive advantage.

Certain of our patents related to our technologies have begun to expire. Upon the expiration of our issued or licensed patents, we generally lose some of our rights to exclude competitors from making, using, selling or importing products using the technology based on the expired patents. Furthermore, in recent years, the U.S. Supreme Court has ruled on several patent cases and several laws have been enacted that, in certain situations, potentially narrow the scope of patent protection available and weaken the rights of patent owners. There can be no assurance that we will be successful in securing additional patents on commercially desirable improvements, that such additional patents will adequately protect our innovations or offset the effect of expiring patents, or that competitors will not be able to design around our patents.

In addition, third parties may challenge our issued patents through procedures such as Inter-Partes Review (IPR). In many IPR challenges, the U.S. Patent and Trademark Office (PTO) cancels or significantly narrows issued patent claims. IPR challenges could increase the uncertainties and costs associated with the maintenance, enforcement and defense of our issued and future patents and could have a material adverse effect on our business, financial condition and results of operations.

We also utilize unpatented proprietary technology and know-how and often rely on confidentiality agreements and intellectual property assignment agreements with our employees, OEM partners, independent distributors and consultants to protect such unpatented proprietary technology and know-how. However, such agreements may not be enforceable or may not provide meaningful protection for our proprietary information in the event of unauthorized use or disclosure or other breaches of the agreements, or in the event that our competitors discover or independently develop similar or identical designs or other proprietary information.

We rely on the use of registered and common law trademarks with respect to the brand names of some of our products. Common law trademarks provide less protection than registered trademarks. Loss of rights in our trademarks could adversely affect our business, financial condition and results of operations.

**If third parties claim that we infringe their intellectual property rights, we may incur liabilities and costs and may have to redesign or discontinue selling certain products.**

Searching for existing intellectual property rights may not reveal important intellectual property and our competitors may also have filed for patent protection, which may not be publicly-available information, or claimed trademark rights that have not been revealed through our searches. In addition, some of our employees were previously employed at other medical device companies. We may be subject to claims that our employees have disclosed, or that we have used, trade secrets or other proprietary information of our employees' former employers. Our efforts to identify and avoid infringing on third parties' intellectual property rights may not always be successful. Any claims of patent or other intellectual property infringement against us, even those without merit, could:

- be expensive and time-consuming to defend and result in payment of significant damages to third parties;
- force us to stop making or selling products that incorporate the intellectual property;
- require us to redesign, reengineer or rebrand our products, product candidates and technologies;
- require us to enter into royalty agreements that would increase the costs of our products;
- require us to indemnify third parties pursuant to contracts in which we have agreed to provide indemnification for intellectual property infringement claims;
- divert the attention of our management and other key employees; and
- result in our customers or potential customers deferring or limiting their purchase or use of the affected products impacted by the claims until the claims are resolved;

any of which could have a material adverse effect on our business, financial condition and results of operations. In addition, new patents obtained by our competitors could threaten the continued commercialization of our products in the market even after they have already been introduced.

42

Table of Contents

**We believe competitors may currently be violating and may in the future violate our intellectual property rights. As a result, we may initiate litigation to protect and enforce our intellectual property rights, which may result in substantial expense and may divert management's attention from implementing our business strategy.**

We believe that the success of our business depends, in part, on obtaining patent protection for our products and technologies, defending our patents and preserving our trade secrets. We were previously involved in significant litigation to protect our patent positions related to some of our pulse oximetry signal processing patents that resulted in various settlements. We believe some of the new market entrants in the healthcare and monitoring space, including some of the world's largest technology companies, may be infringing our intellectual property, and we may be required to engage in additional litigation to protect our intellectual property in the future. In addition, we believe that certain individuals who previously held high level technical and clinical positions with us misappropriated our intellectual property for the benefit of themselves and other companies. For example, on January 9, 2020, we initiated litigation against Apple Inc. for infringement of a number of patents, for trade secret misappropriation and for ownership and correction of inventorship of a number of Apple Inc. patents that list one of our former employees as an inventor. Our ongoing and future litigation could result in significant additional costs and further divert the attention of our management and key personnel from our business operations and the implementation of our business strategy and may not be successful or adequate to protect our intellectual property rights.

### Risks Related to Our Regulatory Environment

**Our failure to obtain and maintain FDA clearances or approvals on a timely basis, or at all, would prevent us from commercializing our current, upgraded or new products in the U.S., which could severely harm our business.**

Unless an exemption applies, each medical device that we market in the U.S. must first undergo premarket review pursuant to the Federal Food, Drug, and Cosmetic Act (FDCA) by receiving clearance of a 510(k) premarket notification, receiving clearance through the *de novo* classification review process or obtaining approval of a premarket approval (PMA) application. Even if regulatory clearance or approval of a product is granted, the U.S. Food and Drug Administration (FDA) may clear or approve our products only for limited indications for use. Additionally, the FDA may not grant 510(k) clearance on a timely basis, if at all, for new products or new uses that we propose for Masimo SET* or licensed rainbow* technology.

The traditional FDA 510(k) clearance process for our products has generally taken between four to nine months. However, our more recent experience and interactions with the FDA, along with information we have received from other medical device manufacturers, suggests that, in some cases, the FDA is requiring applicants to provide additional or different information and data for 510(k) clearance than it had previously required, and that the FDA may not rely on approaches that it had previously accepted to support 510(k) clearance. As a result, FDA 510(k) clearance can be delayed for our products in some cases.

To support our product applications to the FDA, we frequently are required to conduct clinical testing of our products. Such clinical testing must be conducted in compliance with FDA requirements pertaining to human research. Among other requirements, we must obtain informed consent from study subjects and approval by institutional review boards before such studies may begin. We must also comply with other FDA requirements such as monitoring, record-keeping, reporting and the submission of information regarding certain clinical trials to a public database maintained by the National Institutes of Health. In addition, if the study involves a significant risk device, we are required to obtain the FDA's approval of the study under an Investigational Device Exemption (IDE). Compliance with these requirements can require significant time and resources. In addition, public health emergencies and other extraordinary circumstances may disrupt the conduct of our clinical trials. If the FDA determines that we have not complied with such requirements, the FDA may refuse to consider the data to support our applications or may initiate enforcement actions.

Even though 510(k) clearances have been obtained, if safety or effectiveness problems are identified with our pulse oximeters incorporating Masimo SET* and licensed rainbow* technology, patient monitor devices, sensors, cables and other products, we may need to initiate a recall of such devices. Furthermore, our new products or significantly modified marketed products could be denied 510(k) clearance and be required to undergo the more burdensome PMA or *de novo* classification review processes. The process of obtaining a *de novo* classification or PMA approval is much more costly, lengthy and uncertain than the process for obtaining 510(k) clearance.

*De novo* classification review generally takes six months to one year from the time of submission of the *de novo* request, although it can take longer. Approval of a PMA generally takes one year from the time of submission of the PMA, but may be longer.

43

Table of Contents

We sell consumer versions of our iSpO$_2$® and MightySat® pulse oximeters that are not intended for medical use. Some of our products or product features may not be subject to the 510(k) process and/or other regulatory requirements in accordance with specific FDA guidance and policies, such as the FDA guidance related to mobile medical applications. In addition, some of our products or product features may not be subject to device regulation pursuant to Section 520(o) of the FDCA, which excludes certain software functions from the statutory definition of a device. In addition, we may market certain products pursuant to enforcement discretion policies the FDA has recently announced to address the need for these products as a result of the COVID-19 pandemic. Such policies only remain in effect during the public health emergency, such that we will need to seek clearance or approval of such products to continue marketing these products at the end of the COVID-19 pandemic. If the FDA changes its policies or concludes that our marketing of these products is not in accordance with its current policies and/or Section 520(o) of the FDCA, we may be required to seek clearance or approval of these devices through the 510(k), *de novo* classification review or PMA processes.

**The failure of our OEM partners to obtain required FDA clearances or approvals for products that incorporate our technologies could have a negative impact on our revenue.**

Our OEM partners are required to obtain their own FDA clearances in the U.S. for most products incorporating Masimo technologies. The FDA clearances we have obtained may not make it easier for our OEM partners to obtain clearances of products incorporating these technologies, or the FDA may not grant clearances on a timely basis, if at all, for any future products incorporating Masimo technologies that our OEM partners propose to market.

**If we or our suppliers fail to comply with ongoing regulatory requirements, or if we experience unanticipated problems with our products, these products could be subject to restrictions or withdrawal from the market.**

Our products, along with the manufacturing processes, labeling and promotional activities for our products, are subject to continual review and periodic inspections by the FDA and other regulatory bodies. Among other requirements, we and certain of our suppliers are required to comply with the FDA's Quality System Regulation (QSR), which governs the methods and documentation of the design, control testing, production, component suppliers control, quality assurance, complaint handling, labeling control, packaging, storage and shipping of our products. The FDA enforces the QSR through announced and unannounced inspections. We are also subject to similar state requirements and licenses.

In addition to the FDA, from time to time we are subject to inspections by the California Food and Drug Branch, international regulatory authorities and other similar governmental agencies. The standards used by these regulatory authorities are complex and may differ from those used by the FDA.

Failure by us or one of our suppliers to comply with statutes and regulations administered by the FDA and other regulatory bodies or failure to adequately respond to any FDA Form 483 observations, any California Food and Drug Branch notices of violation or any similar reports could result in, among other things, any of the following:

- warning letters or untitled letters issued by the FDA;
- fines, civil penalties, in rem forfeiture proceedings, injunctions, consent decrees and criminal prosecution;
- import alerts;
- unanticipated expenditures to address or defend such actions;
- delays in clearing or approving, or refusal to clear or approve, our products;
- withdrawals or suspensions of clearance or approval of our products or those of our third-party suppliers by the FDA or other regulatory bodies;
- product recalls or seizures;
- orders for physician notification or device repair, replacement or refund;
- interruptions of production or inability to export to certain foreign countries; and
- operating restrictions.

If any of these items were to occur, it would harm our reputation and adversely affect our business, financial condition and results of operations.

Table of Contents

**Failure to obtain regulatory authorizations in foreign jurisdictions may prevent us from marketing our products abroad.**

We currently market and intend to continue to market our products internationally. Outside of the U.S., we can generally market a product only if we receive a marketing authorization (and/or meet certain pre-marketing requirements) and, in some cases, pricing approval, from the appropriate regulatory authorities. The regulatory registration/licensing process varies among international jurisdictions and may require additional or different product testing than required to obtain FDA clearance. FDA clearance does not ensure new product registration/licensing by foreign regulatory authorities, and we may be unable to obtain foreign regulatory registration/licensing on a timely basis, if at all.

In addition, clearance by one foreign regulatory authority does not ensure clearance by any other foreign regulatory authority or by the FDA. If we fail to receive necessary approvals to commercialize our products in foreign jurisdictions on a timely basis, or at all, our business, financial condition and results of operations could be adversely affected.

Furthermore, foreign regulatory requirements may change from time to time, which could adversely affect our ability to market new products, and/or continue to market existing products, internationally. Certain significant changes in the international regulatory landscape have recently taken place or will take place in the near future. These include the new EU Medical Devices Regulation (EU) 2017/745 (MDR) coming into effect from May 26, 2021 and a new regulatory regime applying in the UK from January 1, 2021 as a result of the UK's exit from the EU on December 31, 2020 (Brexit).

**Modifications to our marketed devices may require new regulatory clearances or premarket approvals, or may require us to cease marketing or to recall the modified devices until clearances or approvals are obtained.**

We have made modifications to our devices in the past and we may make additional modifications in the future. Any modification to a device that is cleared by the FDA that could significantly affect its safety or effectiveness or that could constitute a major change in its intended use would require a new clearance or approval and certain modifications to devices cleared or approved by foreign regulatory authorities may also require a new clearance or approval.

We may not be able to obtain such clearances or approvals in a timely fashion, or at all. Delays in obtaining future clearances would adversely affect our ability to introduce new or enhanced products in a timely manner, which in turn would have an adverse effect on our business, financial condition and results of operations.

For device modifications that we conclude do not require a new regulatory clearance or approval, we may be required to recall and to stop marketing the modified devices if the government agency disagrees with our conclusion and requires new clearances or approvals for the modifications. This could have an adverse effect on our business, financial condition and results of operations.

During the COVID-19 pandemic, the FDA has issued enforcement policies under which the agency has said it will not require clearance of a new 510(k) for certain modifications to 510(k)-cleared non-invasive vital-sign patient monitoring devices. However, these policies remain in effect only during the COVID-19 pandemic. Manufacturers that make modifications pursuant to these policies will need to stop marketing the modifications at the end of the COVID-19 pandemic unless the manufacturer receives 510(k) clearance for the modifications.

**Regulatory reforms may impact our ability to develop and commercialize our products and technologies.**

From time to time, legislation is drafted and introduced by governments that could significantly change the statutory provisions governing the clearance or approval, manufacture and marketing of medical devices. For example, in August 2017, Congress enacted the FDA Reauthorization Act of 2017 (FDARA). FDARA reauthorized the FDA to collect device user fees, including a new user fee for *de novo* classification requests, and contained substantive amendments to the device provisions of the FDCA. Among other changes, FDARA required that the FDA update and revise its processes for scheduling inspections of device establishments, communicating about those inspections with manufacturers and providing feedback on the manufacturer's responses to Form 483s. The statute also required that the FDA study the impact of device servicing, including third-party services, and created a new process for device sponsors to request classification of accessory devices as part of the PMA application for the parent device or to request a separate classification of accessory devices.

In addition, regulations and guidance are often revised or reinterpreted by the government agency in ways that may significantly affect our business or products. Future regulatory changes could make it more difficult for us to obtain or maintain approval to develop and commercialize our products and technologies. Public health emergencies may also prompt temporary or permanent regulatory reforms that could change the processes governing the clearance or approval, manufacture and marketing of medical devices.

Table of Contents

In the EU, for example, the new Medical Devices Regulation (EU) 2017/745 (MDR) will apply to our medical devices from May 26, 2021. The MDR will require medical devices and their manufacturers to comply with more stringent standards than before. The MDR also imposes new and enhanced obligations on importers and distributors of medical devices in the EU. Although the MDR is subject to certain transitional periods, both we and others involved in the distribution and commercialization of our medical devices in the EU will need to comply with more stringent EU rules.

Due to Brexit, from January 1, 2021, a new regulatory framework applies to medical devices commercialized in Great Britain (England, Scotland and Wales). This is now separate to the regime in the EU. Although certain transition periods apply until June 30, 2023, the medical devices we intend to commercialize in Great Britain will need to conform to different requirements than the requirements in the EU. These factors are likely to add more complexity to our regulatory compliance obligations in Europe and our ability to commercialize medical devices in European markets.

**If our products cause or contribute to a death or serious injury, or malfunction in a way that would likely cause or contribute to a death or serious injury, we will be subject to medical device reporting regulations, and may need to initiate voluntary corrective actions such as the recall of our products.**

Regulatory agencies in many countries require us to report anytime our products cause or contribute to a death or serious injury, or malfunction in a way that would likely cause or contribute to a death or serious injury. For example, under the FDA medical device reporting regulations, we are required to report to the FDA any incident in which a product of ours may have caused or contributed to a death or serious injury or in which a product of ours malfunctioned and, if the malfunction were to recur, would be likely to cause or contribute to death or serious injury. In addition, all manufacturers placing medical devices on the market in the European Union (EU) are legally required to report any serious or potentially serious incidents involving devices produced or sold by the manufacturer to the relevant authority in those jurisdictions where any such incident occurred.

The FDA and similar foreign regulatory authorities have the authority to require the recall of our commercialized products in the event of material deficiencies or defects in, for example, design, labeling or manufacture. The FDA must find that there is a reasonable probability that the device would cause serious adverse health consequences or death in order to require a recall. The standard for recalling deficient products may be different in foreign jurisdictions. Manufacturers may, under their own initiative, recall a product if any material deficiency in a device is found or they become aware of a safety issue involving a marketed product. A government-mandated or voluntary recall by us or by one of our distributors could occur as a result of component failures, manufacturing errors, design or labeling defects or other deficiencies and issues.

We may initiate certain field actions, such as a correction or removal of our products in the future. Any correction or removal initiated by us to reduce a health risk posed by our device, or to remedy a violation of the FDCA or other regulations caused by the device that may present a risk to health, must be reported to the FDA. If the FDA subsequently determines that a report was required for a correction or removal of our products that we did not believe required a report, we could be subject to enforcement actions.

Any recalls of our products or enforcement actions would divert managerial and financial resources and could have an adverse effect on our financial condition and results of operations. In addition, given our dependence upon patient and physician perceptions, any negative publicity associated with any recalls could materially and adversely affect our business, financial condition, results of operations and growth prospects.

**Promotion of our products using claims that are off-label, unsubstantiated, false or misleading could subject us to substantial penalties.**

Obtaining 510(k) clearance permits us to promote our products for the uses cleared by the FDA. Use of a device outside its cleared or approved indications is known as "off-label" use. Physicians may use our products off-label because the FDA does not restrict or regulate a physician's choice of treatment within the practice of medicine. While we may request additional cleared indications for our current products, the FDA may deny those requests, require additional expensive clinical data to support any additional indications or impose limitations on the intended use of any cleared product as a condition of clearance. If the FDA determines that our products were promoted for off-label use or that false, misleading or inadequately substantiated promotional claims have been made by us or our OEM partners, it could request that we or our OEM partners modify those promotional materials or take regulatory or enforcement actions, including the issuance of an untitled letter, warning letter, injunction, seizure, civil fine and criminal penalties. While certain U.S. courts have held that truthful, non-misleading, off-label information is protected under the First Amendment under certain circumstances, the FDA continues to take the position that off-label promotion is subject to enforcement action.

Table of Contents

It is also possible that other federal, state or foreign enforcement authorities may take action if they consider our communications, including promotional or training materials, to constitute promotion of an uncleared or unapproved use. If not successfully defended, enforcement actions related to off-label promotion could result in significant fines or penalties under other statutory authorities, such as laws prohibiting false claims for reimbursement. In any such event, our reputation could be damaged, adoption of our products could be impaired and we could be subject to extensive fines and penalties.

Additionally, we must have adequate substantiation for the claims we make for our products. If any of our claims are determined to be false, misleading or deceptive, our products could be considered misbranded under the FDCA or in violation of the Federal Trade Commission Act. We could also face lawsuits from our competitors under the Lanham Act alleging that our marketing materials are false or misleading.

**The regulatory environment governing information, cybersecurity and privacy laws is increasingly demanding and continues to evolve.**

Personal privacy and data security have become significant issues in the U.S., Europe and many other jurisdictions where we offer our products. The regulatory framework for privacy and security issues worldwide is rapidly evolving and is likely to remain uncertain for the foreseeable future.

Certain U.S. laws, such as the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA), govern the transmission, security and privacy of individually identifiable information that we may obtain or have access to in connection with the operation of our business, including the conduct of clinical research trials or other research studies that may provide us with access to sensitive health and other personal information. We may be required to make costly system modifications to comply with these data privacy and security requirements. In addition, if we do not properly comply with applicable laws and regulations related to the protection of this information, we could be subject to criminal or civil sanctions. The California Consumer Privacy Act of 2018 (CCPA), which became effective on January 1, 2020, requires us to make new disclosures to consumers about our data collection, use and sharing practices. The CCPA also allows consumers to opt out of certain data sharing with third parties, and provides a new cause of action for data breaches with the possibility of significant statutory damage awards as well as injunctive or declaratory relief if there has been unauthorized access, theft or disclosure of personal information due to failure to implement reasonable security procedures. The impact of the CCPA on our business is yet to be determined, but it could result in increased operating expenses as well additional exposure to the risk of litigation by or on behalf of consumers.

The CCPA is the most comprehensive data privacy regulation to date in the United States, and could be the precursor to similar legislation in other states or at the federal level. Internationally, the General Data Protection Regulation (GDPR) took effect in May 2018 within the European Economic Area (EEA) and many EEA jurisdictions have also adopted their own data privacy and protection laws in addition to the GDPR. Furthermore, other international jurisdictions, including Singapore, South Korea, China, Brazil, Mexico and Australia, have also implemented laws relating to data privacy and protection. Although we believe that we are complying with the GDPR and similar laws, these laws are still relatively new. Therefore, as international data privacy and protection laws continue to evolve, and as new regulations, interpretive guidance and enforcement information become available, we may incur incremental costs to modify our business practices to comply with these requirements. In addition, our internal control policies and procedures may not always protect us from reckless or criminal acts committed by our employees or agents.

Violations of these laws, or allegations of such violations, could subject us to monetary and non-monetary penalties for noncompliance, disrupt our operations, involve significant management distraction, subject us to class action lawsuits and result in a material adverse effect on our business, financial condition and results of operations.

**We may be subject to or otherwise affected by federal and state healthcare laws, including fraud and abuse laws, and could face substantial penalties if we are unable to fully comply with these laws.**

Healthcare fraud and abuse laws potentially applicable to our operations include, but are not limited to:

- the federal Anti-Kickback Statute, which prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving any bribe, kickback or other remuneration intended to induce the purchase, order or recommendation of an item or service reimbursable under a federal healthcare program (such as the Medicare or Medicaid programs);

- the federal False Claims Act and other federal laws which prohibit, among other things, knowingly and willfully presenting, or causing to be presented, claims for payment from Medicare, Medicaid, other government payers or other third-party payers that are false or fraudulent;

- the Physician Payments Sunshine Act, which requires medical device companies to track and publicly report, with limited exceptions, all payments and transfers of value to physicians and teaching hospitals in the U.S.; and

47

Table of Contents

- state laws analogous to each of the above federal laws, such as state anti-kickback and false claims laws that may apply to items or services reimbursed by governmental programs and non-governmental third-party payers, including commercial insurers.

If we are found to have violated any such laws or other similar governmental regulations, including their foreign counterparts, that are directly or indirectly applicable to us, we may be subject to penalties, including civil and criminal penalties, damages, fines, exclusion of our products from reimbursement under Medicare, Medicaid and other federal healthcare programs, and the curtailment or restructuring of our operations. Any penalties could adversely affect our ability to operate our business and our financial results. Any action against us for violation of these laws, even if we successfully defend against such action, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business.

**Legislative and regulatory changes in the healthcare industry could have a negative impact on our financial performance. Furthermore, our business, financial condition, results of operations and cash flows could be significantly and adversely affected by healthcare reform legislation in the U.S. or in our key international markets.**

Changes in the healthcare industry in the U.S. and abroad could adversely affect the demand for our products and the way in which we conduct our business. For example, the Patient Protection and Affordable Care Act (the ACA), enacted in 2010, required most individuals to have health insurance, established new regulations on health plans, created insurance-pooling mechanisms and reduced Medicare spending on services provided by hospitals and other providers. The long-term viability of the ACA, and its impact on our business and results of operations, remains uncertain. There have also been recent U.S. Congressional actions to repeal and replace the ACA, and future actions are expected. For example, the Tax Cuts and Jobs Act of 2017 (TCJA), among other things, eliminated the individual mandate requiring most Americans (other than those who qualify for a hardship exemption) to carry a minimum level of health coverage effective January 1, 2019.

In December 2018, a federal district court judge in Texas found the ACA's individual mandate to be unconstitutional; and therefore, the entire law to be invalid. In December 2019, the Fifth Circuit affirmed the ruling regarding the individual mandate but remanded the case to the district court for additional analysis of the question of severability and whether portions of the law remain valid. In November 2020, the U.S. Supreme Court heard the case and is expected to issue an opinion by June 2021. Although we cannot predict the ultimate content or timing of any healthcare reform legislation or court challenges to the ACA, potential changes resulting from any amendment, repeal, replacement or invalidation of these programs, including any reduction in the future availability of healthcare insurance benefits, may decrease the number of people who are insured, which could adversely affect our business and future results of operations.

Our medical devices and business activities are subject to rigorous regulation by the FDA and other federal, state and international governmental authorities. These authorities and members of Congress have been increasing their scrutiny over the medical device industry. In recent years, Congress, the Department of Justice, the Office of Inspector General of the Department of Health and Human Services and the Department of Defense have issued subpoenas and other requests for information to medical device manufacturers, primarily related to financial arrangements with healthcare providers, regulatory compliance and marketing and product promotional practices. Furthermore, certain state governments have enacted legislation to limit and/or increase transparency of interactions with healthcare providers, pursuant to which we are required by law to disclose payments and other transfers of value to healthcare providers licensed by certain states.

We anticipate that the government will continue to scrutinize our industry closely, and any new regulations or statutory provisions could result in delays or increased costs during the periods of product development, clinical trials and regulatory review and approval, as well as increased costs to assure compliance.

### Risks Related to Our Business and Operations

**Our business, financial condition and results of operations may be adversely affected by the COVID-19 pandemic.**

In December 2019, COVID-19 was reported to have surfaced in Wuhan, China and has since spread to many other countries, including the United States, where we have our principal executive offices and principal operations, Switzerland, where we have our international headquarters, and Mexico, where we have significant manufacturing operations. Government-imposed travel restrictions have resulted, and may continue to result, in direct operational and administrative disruptions to our domestic and foreign facilities. In addition, quarantines, shelter-in-place and similar orders by local governments have impacted and could further impact the productivity of our manufacturing, engineering, sales and administrative staff and facilities in the United States and other countries. Our operations would be disrupted if any of our employees or employees of our business partners were suspected of having contracted COVID-19, which could require quarantine of some or all such employees or closure of our facilities for disinfection.

Table of Contents

If the current pace of the COVID-19 pandemic cannot be slowed and the spread of the virus is not contained, our business operations could be further delayed or interrupted. We expect that government and health authorities may announce new or extend existing restrictions, which could require us to make further adjustments to our operations in order to comply with any such restrictions. We may also experience limitations in employee resources. In addition, global supply chains and the timely availability of raw materials and products may be materially disrupted by quarantines, factory slowdowns or shutdowns, border closings and travel restrictions resulting from the COVID-19 pandemic.

The adverse effects of the COVID-19 pandemic on our business could be material in future periods, particularly if there are significant and prolonged economic slowdowns in regions where we derive a significant amount of our revenue or profit, or where our suppliers are located, or if we are forced to close facilities and limit or cease manufacturing operations for extended periods of time. Although we are currently experiencing an increase in the demand for our products, we could experience delays in receipt of customer payments. In addition, our ability to fulfill orders placed with us within the order's specified time line and for the cost we estimated when we accepted the order may be negatively affected. Furthermore, we are unable to determine if the increase we are experiencing in the demand for our products is being driven by increased usage of our products or the stockpiling of our products by our customers, the latter of which could result in the delay or cancellation of future orders until such on-hand inventory is consumed. These factors could lead to a reduction in revenues, unfavorable gross margin impact due to product mix, and/or a delay in cash flows in future periods and have a material adverse effect on our business, financial condition and results of operations.

The COVID-19 pandemic has also led to extreme volatility in capital markets and a decline in interest rates, and has adversely affected, and may continue to adversely affect, the market price of our common stock. While the potential economic impact brought by, and the duration of, the COVID-19 pandemic may be difficult to assess or predict, a continued or widespread pandemic could result in significant disruption of global financial markets, reducing our ability to access capital, which could in the future negatively affect our liquidity. The extent to which COVID-19 impacts our business and financial results continues to depend on numerous evolving factors that we are not able to accurately predict.

**If our essential employees who are unable to telework become ill or otherwise incapacitated, our operations may be adversely impacted.**

As a medical device manufacturer, we believe we fall within a "critical essential infrastructure" sector, specifically the "Healthcare/Public Health" sector, and we are considered exempt under various stay at home/shelter in place orders (Stay at Home Orders), including the Blueprint for a Safer Economy first implemented in August 2020 and the Stay Home Order in effect since March 2020, each of which places certain restrictions on persons and businesses in California. Accordingly, our employees in California and other locations may continue to work because of the importance of our operations to the health and well-being of citizens in the states in which we operate. Consistent with these Stay at Home Orders, we have implemented telework policies wherever possible for appropriate categories of "nonessential" employees. "Essential" employees that are unable to telework continue to work at our facilities. We have implemented a number of safety measures for our facilities, including social distancing, face covering, temperature checking and increased sanitation standards. We are following guidance from the Center for Disease Control and the Occupational Safety and Health Administration regarding suspension of nonessential travel, self-isolation recommendations for employees returning from certain geographic areas, confirmed reports of any COVID-19 diagnosis among our employees and the return of such employees to our workplace. Pursuant to updated guidance from the Equal Employment Opportunity Commission, we are engaging in limited and appropriate inquiries of employees regarding potential COVID-19 exposure, based on the direct threat that such exposure may present to our workforce. While we have developed and implemented, and continue to develop and implement, health and safety guidelines in an effort to try to mitigate the negative impact of COVID-19, there can be no assurances that our measures will be sufficient to protect our employees in our workplace or that our employees will not otherwise be exposed to COVID-19 outside of our workplace. If a number of our essential employees become ill, incapacitated or are otherwise unable to continue working during the current or any future epidemic, our operations may be adversely impacted.

**We may experience conflicts of interest with Cercacor with respect to business opportunities and other matters.**

Prior to our initial public offering in August 2007, our stockholders owned 99% of the outstanding shares of capital stock of Cercacor, and we believe that a number of our stockholders, including certain of our directors and executive officers, continue to own shares of Cercacor stock. Joe Kiani, our Chairman and Chief Executive Officer (CEO), is also the Chairman and CEO of Cercacor.

Table of Contents

Due to the interrelated nature of Cercacor with us, conflicts of interest may arise with respect to transactions involving business dealings between us and Cercacor, potential acquisitions of businesses or products, the development and ownership of technologies and products, the sale of products, markets and other matters in which our best interests and the best interests of our stockholders may conflict with the best interests of the stockholders of Cercacor. In addition, we and Cercacor may disagree regarding the interpretation of certain terms in the Cross-Licensing Agreement. We cannot guarantee that any conflict of interest will be resolved in our favor, or that, with respect to our transactions with Cercacor, we will negotiate terms that are as favorable to us as if such transactions were with another third-party.

**We will be required to assign to Cercacor and pay Cercacor for the right to use certain products and technologies we develop that relate to the monitoring of non-vital sign parameters, including improvements to Masimo SET®.**

Under the Cross-Licensing Agreement, if we develop certain products or technologies that relate to the noninvasive monitoring of non-vital sign parameters, including improvements to Masimo SET® for the noninvasive monitoring of non-vital sign parameters, we would be required to assign these developments to Cercacor and then license the technology back from Cercacor in consideration for upfront payments and royalty obligations to Cercacor. Therefore, these products and technologies would be deemed to have been developed or improved exclusively by Cercacor.

In addition, we will not be reimbursed by Cercacor for our expenses relating to the development or improvement of any such products or technologies, which expenses may be significant. As a result of these terms, we may not generate any revenue from the further development of certain products and technologies for the monitoring of non-vital sign parameters, including improvements to Masimo SET®, which could adversely affect our business, financial condition and results of operations.

**In the event that the Cross-Licensing Agreement is terminated for any reason, or Cercacor grants a license to rainbow® technology to a third-party, our business would be adversely affected.**

Cercacor owns all of the proprietary rights to certain rainbow® technology developed with our proprietary Masimo SET® for products intended to be used in the Cercacor Market, and all rights to any non-vital signs measurement for which we do not exercise an option pursuant to the Cross-Licensing Agreement. In addition, Cercacor has the right to terminate the Cross-Licensing Agreement or grant licenses covering rainbow® technology to third parties if we breach certain terms of the agreement, including any failure to meet our minimum royalty payment obligations or failure to use commercially reasonable efforts to develop or market products incorporating licensed rainbow® technology. If we lose our exclusive license to rainbow® technology, we would lose the ability to prevent others from making, using, selling or importing products using rainbow® technology in our market. As a result, we would likely be subject to increased competition within our market, and Cercacor or competitors who obtain a license to rainbow® technology from Cercacor would be able to offer related products.

**We may not be able to commercialize our products incorporating licensed rainbow® technology cost-effectively or successfully.**

As a result of the royalties that we must pay to Cercacor, it is generally more expensive for us to make products that incorporate licensed rainbow® technology than products that do not include licensed rainbow® technology.

We cannot assure you that we will be able to sell products incorporating licensed rainbow® technology at a price the market is willing to accept. If we cannot commercialize our products incorporating licensed rainbow® technology successfully, we may not be able to generate sufficient product revenue from these products to be profitable, which could adversely affect our business, financial condition and results of operations.

**Rights provided to Cercacor in the Cross-Licensing Agreement may impede a change in control of our company.**

Under the Cross-Licensing Agreement, a change in control includes the resignation or termination of Joe Kiani from his position as CEO of either Masimo or Cercacor. A change in control also includes other customary events, such as the sale or merger of Masimo or Cercacor to a non-affiliated third-party or the acquisition of 50% or more of the voting power of Masimo or Cercacor by a non-affiliated third-party. In the event we undergo a change in control, we are required to immediately pay a $2.5 million fee to exercise an option to license technology developed by Cercacor for use in blood glucose monitoring.

Additionally, our per product royalties payable to Cercacor will become subject to specified minimums, and the minimum aggregate annual royalties for licensed rainbow® measurements payable to Cercacor related to carbon monoxide, methemoglobin, fractional arterial oxygen saturation, hemoglobin and blood glucose will increase to $15.0 million, plus up to $2.0 million for other rainbow® measurements. Also, if the surviving or acquiring entity ceases to use "Masimo" as a company name and trademark following a change in control, all rights to the "Masimo" trademark will automatically be assigned to Cercacor. This could delay or discourage transactions involving an actual or potential change in control of us, including transactions in which our stockholders might otherwise receive a premium for their shares over our then-current trading price. In addition, our requirement to assign all future improvements for non-vital signs to Cercacor could impede a change in control of our company.

Table of Contents

**If we are unable to obtain key materials and components from sole or limited source suppliers, we will not be able to deliver our products to customers.**

We depend on certain sole or limited source suppliers for certain key materials and components, including digital signal processor chips and analog-to-digital converter chips, for our noninvasive patient monitoring solutions. These suppliers are located around the world, and the production and shipment of such materials and components may be constrained globally due to the COVID-19 pandemic. We may experience manufacturing problems related to these suppliers and other outside sources if such suppliers fail to develop, manufacture or ship products and components to us on a timely basis, or provide us with products and components that do not meet our quality standards and required quantities. In addition, from time to time there have been industry-wide shortages of certain components that we use in our noninvasive blood constituent patient monitoring solutions. We may also experience price increases for materials or components, with no guarantee that such increases can be passed along to our customers, which could adversely impact our gross margins.

If any of these problems occur, we may be unable to obtain substitute sources for these products and components on a timely basis or on terms acceptable to us, which could harm our ability to manufacture our own products and components profitably or on time.

**Future strategic initiatives, including acquisitions of businesses and strategic investments, could negatively affect our business, financial condition and results of operations if we fail to integrate the acquired businesses successfully into our existing operations or achieve the desired results of our investment.**

We have acquired several businesses since our inception and we may acquire additional businesses in the future. Future acquisitions may require debt or equity financing, which could be dilutive to our existing stockholders or reduce our earnings per share. Even if we complete acquisitions, there are many factors that could affect whether such acquisition will be beneficial to our business, including, without limitation:

- payment of above-market prices for acquisitions and higher than anticipated acquisition costs;

- issuance of common stock as part of the acquisition price or a need to issue stock options or other equity to newly-hired employees of target companies, resulting in dilution of ownership to our existing stockholders;

- reduced profitability if an acquisition is not accretive to our business over either the short-term or the long-term;

- difficulties in integrating any acquired companies, personnel, products and other assets into our existing business;

- delays in realizing the benefits of the acquired company, products or other assets;

- regulatory challenges;

- cybersecurity and compliance-related issues;

- diversion of our management's time and attention from other business concerns;

- limited or no direct prior experience in new markets or countries we may enter;

- unanticipated issues dealing with unfamiliar suppliers, service providers or other collaborators of the acquired company;

- higher costs of integration than we anticipated;

- write-downs or impairments of goodwill or other intangible assets associated with the acquired company;

- difficulties in retaining key employees of the acquired business who are necessary to manage these acquisitions;

- negative impacts on our relationships with our employees, clients or collaborators;

- litigation or other claims in connection with the acquisition; and

- changes in the overall financial model as certain acquired companies may have a different revenue, gross profit margin or operating expense profile.

Further, our ability to benefit from future acquisitions and/or external strategic investments depends on our ability to successfully conduct due diligence, negotiate acceptable terms, evaluate prospective opportunities and bring acquired technologies and/or products to market at acceptable margins and operating expense levels. For example, in March 2020, we acquired TNI* and added TNI softFlow* technology to our product portfolio. In addition, in December 2020, we acquired a majority of ownership of LiDCO Group, PLC, which specializes in hemodynamic monitoring solutions. As these are our first therapeutic and hemodynamic monitoring solutions, the integration of these technologies may require substantial management time and attention and may divert attention and resources from other important areas, including our existing business and product lines, and we may not be able to sell the TNI softFlow* technology and hemodynamic monitoring solutions at acceptable margins and operating expense levels. Our failure in any of these tasks could result in unforeseen liabilities associated with an acquired company, acquiring a company on unfavorable terms or selecting and eventually acquiring a suboptimal acquisition target.

We may also discover deficiencies in internal controls, data adequacy and integrity, product quality, regulatory compliance, product liabilities or other undisclosed liabilities that we did not uncover prior to our acquisition or investment, which could result in us becoming subject to penalties, other liabilities or asset impairments. In addition, if we do not achieve the anticipated benefits of an acquisition or other external investment as rapidly as expected, or at all, investors or analysts may downgrade our stock.

We also expect to continue to carry out internal strategic initiatives that we believe are necessary to grow our revenues and expand our business, both in the U.S. and abroad. For example, we have continued to invest in international expansion programs designed to increase our worldwide presence and take advantage of market expansion opportunities around the world. Although we believe our investments in these initiatives continue to be in the long-term best interests of Masimo and our stockholders, there are no assurances that such initiatives will yield favorable results for us. Accordingly, if these initiatives are not successful, our business, financial condition and results of operations could be adversely affected.

If these risks materialize, our stock price could be materially adversely affected. Any difficulties in the integration of acquired businesses or unexpected penalties, liabilities or asset impairments in connection with such acquisitions or investments could have a material adverse effect on our business, financial condition and results of operations.

**Our credit agreement contains certain covenants and restrictions that may limit our flexibility in operating our business.**

Our credit agreement dated December 17, 2018 (Credit Facility) with JPMorgan Chase Bank, N.A., as Administrative Agent and a Lender, and Bank of the West, a Lender, contains various affirmative covenants and restrictions that limit our ability to engage in specified types of transactions, including:

- incurring specified types of additional indebtedness (including guarantees or other contingent obligations);

- paying dividends on, repurchasing or making distributions in respect of our common stock or making other restricted payments, subject to specified exceptions;

- making specified investments (including loans and advances);

- selling or transferring certain assets;

- creating certain liens;

- consolidating, merging, selling or otherwise disposing of all or substantially all of our assets; and

- entering into certain transactions with any of our affiliates.

In addition, under our Credit Facility, we are required to satisfy and maintain specified financial ratios and other affirmative covenants. Our ability to meet those financial ratios and affirmative covenants could be affected by events beyond our control and, therefore, we cannot be assured that we will be able to continue to satisfy these requirements. A breach of any of these ratios or covenants could result in a default under our Credit Facility. Upon the occurrence of an event of default, the Lenders could elect to declare all amounts outstanding under the Credit Facility immediately due and payable, terminate all commitments to extend further credit and pursue legal remedies for recovery, all of which could adversely affect our business and financial condition. See Note 15 to our accompanying condensed consolidated financial statements included in Part I, Item 1 of this Annual Report on Form 10-K for additional information on our Credit Facility.

**Risks Related to Our Stock**

**Concentration of ownership of our stock among our existing directors, executive officers and principal stockholders may prevent new investors from influencing significant corporate decisions.**

As of January 2, 2021, our current directors and executive officers and their affiliates, in the aggregate, beneficially owned approximately 9.4% of our outstanding stock. Subject to any fiduciary duties owed to our other stockholders under Delaware law, these stockholders may be able to exercise significant influence over matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, and will have some control over our management and policies. Some of these persons or entities may have interests that are different from yours. For example, these stockholders may support proposals and actions with which you may disagree or which are not in your best interests.

The concentration of ownership could delay or prevent a change in control of us, or otherwise discourage a potential acquirer from attempting to obtain control of us, which in turn could reduce the price of our stock.

In addition, these stockholders could use their voting influence to maintain our existing management and directors in office or support or reject other management and Board proposals that are subject to stockholder approval, such as amendments to our employee stock plans and approvals of significant financing transactions.

**Our corporate documents and Delaware law contain provisions that could discourage, delay or prevent a change in control of our company, prevent attempts to replace or remove current management and reduce the market price of our stock.**

Provisions in our certificate of incorporation and bylaws may discourage, delay or prevent a merger or acquisition involving us that our stockholders may consider favorable. For example, our certificate of incorporation authorizes our Board to issue up to 5.0 million shares of "blank check" preferred stock. As a result, without further stockholder approval, our Board has the authority to attach special rights, including voting and dividend rights, to this preferred stock, including pursuant to a stockholder rights plan. With these rights, preferred stockholders could make it more difficult for a third-party to acquire us. In addition, our certificate of incorporation provides for a staggered Board, whereby directors serve for three-year terms, with one-third of the directors coming up for reelection each year. A staggered Board will make it more difficult for a third-party to obtain control of our Board through a proxy contest, which may be a necessary step in an acquisition of us that is not favored by our Board.

We are also subject to anti-takeover provisions under the General Corporation Law of the State of Delaware. Under these provisions, if anyone becomes an "interested stockholder," we may not enter into a "business combination" with that person for three years without special approval, which could discourage a third-party from making a takeover offer and could delay or prevent a change in control of us. For purposes of these provisions, an "interested stockholder" generally means someone owning 15% or more of our outstanding voting stock or an affiliate of ours that owned 15% or more of our outstanding voting stock during the past three years, subject to certain exceptions as described in the General Corporation Law of the State of Delaware.

**Our bylaws provide that the state or federal courts located within the State of Delaware are the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.**

Our bylaws provide that the state or federal courts located within the State of Delaware are the sole and exclusive forum for: (i) any derivative action or proceeding brought on our behalf, (ii) any action asserting a claim of breach of fiduciary duty owed by any of our directors, officers or other employees or stockholders to our stockholders, (iii) any action asserting a claim against us arising pursuant to the General Corporation Law of the State of Delaware, our certificate of incorporation or our bylaws or as to which the General Corporation Law of the State of Delaware confers jurisdiction on the Court of Chancery of the State of Delaware, or (iv) any action asserting a claim governed by the internal affairs doctrine. However, this choice of forum provision does not apply to (a) actions in which the Court of Chancery in the State of Delaware concludes that an indispensable party is not subject to the jurisdiction of Delaware courts, or (b) actions in which a federal court has assumed exclusive jurisdiction to a proceeding. This choice of forum provision is not intended to apply to any actions brought under the Securities Act of 1933, as amended (the Securities Act), or the Securities Exchange Act of 1934, as amended (the Exchange Act). Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. As a result, the exclusive forum provision will not apply to suits brought to enforce any duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees or stockholders, which may discourage such lawsuits against us and our directors, officers and other employees or stockholders.

Table of Contents

Furthermore, the enforceability of similar choice of forum provisions in other companies' certificates of incorporation has been challenged in legal proceedings, and it is possible that a court could find these types of provisions to be inapplicable or unenforceable. If a court were to find the choice of forum provision in our bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our business, financial condition and results of operations.

<strong>General Risk Factors</strong>

**The laws of foreign countries may not adequately protect our intellectual property rights.**

Intellectual property protection laws in foreign countries differ substantially from those in the U.S. If we fail to apply for intellectual property protection in foreign countries, or if we cannot adequately protect our intellectual property rights in these foreign countries, our competitors may be able to compete more effectively against us, which could adversely affect our competitive position, as well as our business, financial condition and results of operations.

**We may experience significant fluctuations in our periodic financial results and may not maintain our current levels of profitability in the future.**

Our operating results have fluctuated in the past and are likely to fluctuate in the future. Many of the countries in which we operate, including the U.S. and several of the members of the EU, have experienced and continue to experience uncertain economic conditions resulting from global as well as local factors. In addition, continuing strength and growth in the U.S. economy may raise the probability of inflationary pressures and contribute to future interest rate volatility.

Our business or financial results may be adversely impacted by these uncertain economic conditions, including: adverse changes in interest rates, foreign currency exchange rates, tax laws or tax rates; inflation; contraction in the availability of credit in the marketplace due to legislation or other economic conditions, which may potentially impair our ability to access the capital markets on terms acceptable to us or at all; and the effects of government initiatives to manage economic conditions.

We are also unable to predict how changing global economic conditions or potential global health concerns such as the COVID-19 pandemic will affect our critical customers, suppliers and distributors. Any negative impact of such matters on our critical customers, suppliers or distributors may also have an adverse impact on our results of operations or financial condition. Our expense levels are based, in part, on our expectations regarding future revenue levels and are relatively fixed in the short term. As a result, if our revenue for a particular period was below our expectations, we would not be able to proportionately reduce our operating expenses for that period. Any revenue shortfall would have a disproportionately negative effect on our operating results for the period.

In addition, the methods, estimates and judgments that we use in applying our accounting policies are, by their nature, are subject to substantial risks, uncertainties and assumptions. Factors may arise over time that lead us to change our methods, estimates and judgments, the impact of which could significantly affect our results of operations. See "Critical Accounting Estimates" contained in Part I, Item 2 of this Annual Report on Form 10-K.

Recent accounting changes related to our embedded leases within certain deferred equipment agreements have also resulted in the acceleration of the timing related to our recognition of revenue and expenses associated with certain equipment provided to customers at no up-front charge. Since we cannot control the timing of when our customers will request us to deliver such equipment, our revenue and costs with respect to leased equipment could vary substantially in any given quarter or year, which could further increase quarterly or annual fluctuations within our financial results.

Due to these and other factors, you should not rely on our results for any one quarter as an indication of our future performance. If our operating results fail to meet or exceed the expectations of securities analysts or investors, our stock price could drop suddenly and significantly.

54

**Future changes in accounting pronouncements and tax laws, or the interpretation thereof, could have a significant impact on our reported results, and may affect our historical reporting of previous transactions.**

New accounting pronouncements or taxation rules, and evolving interpretations thereof, have occurred and are likely to occur in the future. For example, in recent years, the Financial Accounting Standards Board issued new accounting standards that impact our reporting of revenue and expenses, including Accounting Standards Codification (ASC) Topic 606, *Revenue from Contracts with Customers* and ASC Topic 842, *Leases.* Changes made by these new accounting standards not only apply prospectively, but depending on the method of adoption, may also recast previously reported results. For additional information related to the impact of new accounting pronouncements, please see Note 2 to our accompanying condensed consolidated financial statements included in Part I, Item 1 of this Annual Report on Form 10-K.

In addition, the TCJA, which went into effect in December 2017, made changes to the corporate tax rate, business-related deductions and taxation of foreign earnings, among others, U.S. federal and state regulatory and standard-setting bodies continue to issue guidance and regulations related to the TCJA that could have a material financial statement impact on our effective tax rate in future periods. The implementation by us of new practices and processes designed to comply with, and benefit from, the TCJA and its rules and regulations could require us to make substantial changes to our business practices, allocate additional resources, and increase our costs, which could negatively affect our business, results of operations and financial condition.

**If we lose the services of our key personnel, or if we are unable to attract and retain other key personnel, we may not be able to manage our operations or meet our growth objectives.**

We are highly dependent on our senior management, especially Joe Kiani, our CEO, and other key officers. We are also heavily dependent on our engineers and field sales team, including sales representatives and clinical specialists. The loss of the services of members of our key personnel, including as a result of the COVID-19 pandemic, or the inability to attract and retain qualified personnel in the future could prevent the implementation and completion of our objectives, including the development and introduction of our products. In general, our key personnel may terminate their employment at any time and for any reason without notice, unless the individual is a participant in our 2007 Severance Protection Plan, in which case the individual has agreed to provide us with six months' notice if such individual decides to voluntarily resign. We do not maintain any "key person" life insurance policies with respect to any of our key personnel.

**We are involved, and may become involved in the future, in disputes and other legal or regulatory proceedings that, if adversely decided or settled, could materially and adversely affect our business, financial condition and results of operations.**

We are, and may in the future become, party to litigation, regulatory proceedings or other disputes. In general, claims made by or against us in disputes and other legal or regulatory proceedings can be expensive and time-consuming to bring or defend against, requiring us to expend significant resources and divert the efforts and attention of our management and other personnel from our business operations. These potential claims may include but are not limited to personal injury and class action lawsuits, intellectual property claims and regulatory investigations relating to the advertising and promotional claims about our products and employee claims against us based on, among other things, discrimination, harassment or wrongful termination. Any one of these claims, even those without merit, may divert our financial and management resources that would otherwise be used to benefit the future performance of our operations. Any adverse determination against us in these proceedings, or even the allegations contained in the claims, regardless of whether they are ultimately found to be without merit, may also result in settlements, injunctions or damages that could have a material adverse effect on our business, financial condition and results of operations.

**Changes to government immigration regulations may materially affect our workforce and limit our supply of qualified professionals, or increase our cost of securing workers.**

We recruit professionals on a global basis and must comply with the immigration laws in the countries in which we operate, including the U.S. Some of our employees are working under Masimo-sponsored temporary work visas, including H1-B visas. Statutory law limits the number of new H1-B temporary work permit petitions that may be approved in a fiscal year. Furthermore, there is a possibility that the current U.S. immigration visa program may be significantly overhauled, and the number of H1-B visas available, as well as the process to obtain them, may be subject to significant change. Any resulting changes to this visa program could impact our ability to recruit, hire and retain qualified skilled personnel. If we are unable to obtain work visas in sufficient quantities or at a sufficient rate for a significant period of time, our business, operating results and financial condition could be adversely affected. On June 22, 2020, President Trump signed an executive order temporarily halting certain work visa programs, including the H1-B visa program. The executive order took effect on June 24, 2020 and was extended in December 2020 to remain in effect until March 31, 2021. While the executive order does not impact current employees that are working under Masimo-sponsored temporary work visas, including H1-B visas, the executive order could impact our ability to recruit and hire qualified skilled personnel.

Table of Contents

**The risks inherent in operating internationally, including the purchase, sale and shipment of our components and products across international borders, may adversely impact our business, financial condition and results of operations.**

We currently derive approximately 33% of our net sales from international operations. In addition, we purchase a portion of our raw materials and components from international sources. The sale and shipment of our products across international borders, as well as the purchase of materials and components from international sources, subject us to extensive U.S. and foreign governmental trade regulations, including those related to conflict minerals. Compliance with such regulations is costly and we could be exposed to potentially significant penalties if we are found not to be in compliance with such regulations. Any failure to comply with applicable legal and regulatory obligations could impact us in a variety of ways that include, but are not limited to, significant criminal, civil and administrative penalties, including imprisonment of individuals, fines and penalties, denial of export privileges, seizure of shipments, restrictions on certain business activities, and exclusion or debarment from government contracting. For example, we have had sales of medical products destined for Iran.

Although these activities have not been financially material to our business, financial condition or results of operations, and were undertaken in accordance with general licenses authorizing such activities issued by the U.S. Treasury Department's Office of Foreign Assets Control, we may not be successful in ensuring compliance with limitation or restrictions on business in Iran or any other countries subject to economic sanctions and embargoes imposed by the United States. Also, the failure to comply with applicable legal and regulatory obligations could result in the disruption of our shipping, manufacturing and sales activities. Any material decrease in our international sales would adversely affect our business, financial condition and results of operations.

In June 2016, the United Kingdom (UK) held a referendum pursuant to which voters elected to leave the EU, commonly referred to as Brexit. The UK formally left the EU on January 31, 2020 and began a transition period that ended on December 31, 2020. Although the long-term effects of Brexit have yet to be seen, and the UK is in the process of negotiating trade deals with other countries, Brexit has created additional uncertainties that may ultimately result in new regulatory costs and challenges for medical device companies and increased restrictions on imports and exports throughout Europe, which could adversely affect our ability to conduct and expand our operations in Europe and which may have an adverse effect on our business, financial condition and results of operations. Additionally, Brexit may increase the possibility that other countries may decide to leave the EU in the future.

In addition, our international operations expose us and our representatives, agents and distributors to risks inherent in operating in foreign jurisdictions. These risks include, but are not limited to:

- the imposition of additional U.S. and foreign governmental controls or regulations;

- the imposition of costly and lengthy new export licensing requirements;

- a shortage of high-quality sales people and distributors;

- the loss of any key personnel that possess proprietary knowledge, or who are otherwise important to our success in certain international markets;

- changes in duties and tariffs, license obligations and other non-tariff barriers to trade;

- the imposition of new trade restrictions;

- the imposition of restrictions on the activities of foreign agents, representatives and distributors;

- compliance with foreign tax laws, regulations and requirements;

- pricing pressure;

- changes in foreign currency exchange rates;

- laws and business practices favoring local companies;

- political instability and actual or anticipated military or political conflicts;

- financial and civil unrest worldwide;

- outbreaks of illnesses, pandemics or other local or global health issues;

- the inability to collect amounts paid by foreign government customers to our appointed foreign agents;

- longer payment cycles, increased credit risk and different collection remedies with respect to receivables; and

- difficulties in enforcing or defending intellectual property rights.

Table of Contents

The U.S. government has recently initiated substantial changes in U.S. trade policy and U.S. trade agreements, including the initiation of tariffs on certain foreign goods. In response to these tariffs, certain foreign governments instituted or are considering imposing tariffs on certain U.S. goods. In addition, the U.S. has recently negotiated new trade agreements that could impact us, including the United States-Mexico-Canada Agreement (USMCA), which went into force on July 1, 2020 and replaced the North American Free Trade Agreement. A trade war, trade barriers or other governmental actions related to tariffs, international trade agreements, import or export restrictions or other trade policies could adversely impact demand for our products, our costs, customers, suppliers and/or the U.S. economy or certain sectors thereof and, therefore, adversely affect our business, financial condition and results of operations.

The U.S. Foreign Corrupt Practices Act and similar worldwide anti-bribery laws in non-U.S. jurisdictions generally prohibit companies and their intermediaries from promising or making improper payments to non-U.S. officials for the purpose of obtaining an advantage to secure or retain business. Because of the predominance of government-sponsored healthcare systems around the world, many of our customer relationships outside of the U.S. are with governmental entities and are therefore subject to such anti-bribery laws. We have adopted policies and practices that help us ensure compliance with these anti-bribery laws. However, such policies and practice may require us to invest in additional monitoring resources or forgo certain business opportunities in order to ensure global compliance with these laws.

**Our operations may be adversely impacted by our exposure to risks related to foreign currency exchange rates.**

We market our products in certain foreign markets through our subsidiaries and other international distributors. As a result, events that result in global economic uncertainty could significantly affect our results of operations in the form of gains and losses on foreign currency transactions and potential devaluation of the local currencies of our customers relative to the U.S. Dollar.

While a majority of our sales are transacted in U.S. Dollars, some of our sales agreements with foreign customers provide for payment in currencies other than the U.S. Dollar. These foreign currency revenues, when converted into U.S. Dollars, can vary depending on the approximation of the exchange rates applied during a respective period. Similarly, certain of our foreign subsidiaries transact business in their respective country's local currency, which is also their functional currency. In addition, certain production costs related to our manufacturing operations in Mexico are denominated in Mexican Pesos. As a result, expenses of these foreign subsidiaries and certain production costs, when converted into U.S. Dollars, can vary depending on average monthly exchange rates during a respective period.

We are also exposed to foreign currency gains or losses on outstanding foreign currency denominated receivables and payables, as well as cash deposits. When converted to U.S. Dollars, these receivables, payables and cash deposits can vary depending on the monthly exchange rates at the end of the period. In addition, certain intercompany transactions may give rise to realized and unrealized foreign currency gains or losses based on the currency underlying such intercompany transactions. Accordingly, our operating results are subject to fluctuations in foreign currency exchange rates.

The balance sheets of our foreign subsidiaries whose functional currency is not the U.S. Dollar are translated into U.S. Dollars at the rate of exchange at the balance sheet date and the statements of operations and cash flows are translated into U.S. Dollars using an approximation of the average monthly exchange rates applicable during the period. Any foreign currency exchange gain or loss as a result of translating the balance sheets of our foreign subsidiaries whose functional currency is not the U.S. Dollar is included in equity as a component of accumulated other comprehensive income (loss).

We currently do not hedge our foreign currency exchange rate risk. As a result, changes in foreign exchange rates could have a material adverse effect on our business, financial condition and results of operations. For additional information related to our foreign currency exchange rate risk, please see Quantitative and Qualitative Disclosures about Market Risk in Part I, Item 3 of this Annual Report on Form 10-K.

**We currently manufacture our products at a limited number of locations and any disruption to, expansion of, or changes in trade programs related to such manufacturing operations could adversely affect our business, financial condition and results of operations.**

We rely on manufacturing facilities in California, New Hampshire and Mexico that may be affected by natural or man-made disasters. Earthquakes are of particular significance since some of our facilities are located in earthquake-prone areas. We are also vulnerable to damage from other types of disasters, including power loss, attacks from extremist or terrorist organizations, epidemics, communication failures, fire, floods and similar events. Our facilities and the manufacturing equipment we use to produce our products would be difficult to replace and could require substantial time to repair if significant damage were to result from any of these occurrences.

If one of our manufacturing facilities was affected by a natural or man-made disaster, we would be forced to rely on third-party manufacturers if we could not shift production to our other manufacturing facilities. Furthermore, our insurance for damage to our property and the disruption of our business from casualties may not be sufficient to cover all of our potential losses and may not continue to be available to us on acceptable terms, or at all. If the lease for any of our leased facilities is terminated, we are unable to renew any of our leases or we are otherwise forced to seek alternative facilities, or if we voluntarily expand one or more of our manufacturing operations to new locations, we may incur additional transition costs and experience a disruption in the supply of our products until the new facilities are available and operating. Additionally, we have occasionally experienced seasonality among our manufacturing workforce, and if we continue to experience such seasonality or other workforce shortages or otherwise have issues retaining employees at our manufacturing facilities, we may not be able to meet our customers' demands.

Our global manufacturing and distribution are dependent upon our manufacturing facilities in Mexico, and the expedient importation of raw materials and exportation of finished goods between the U.S. and Mexico. Undue delays and/or closures of the proximal cross-border transit facilities, or any restrictions by the U.S. federal administration related to the movement of goods across the U.S. and Mexico border, may adversely affect our ability to fulfill orders and supply our healthcare provider customers with essential replenishment supplies, as well as adversely impact our business, operating results and financial condition.

In addition, our manufacturing facilities in Mexico are authorized to operate under the Mexican Maquiladora (IMMEX) program. The IMMEX program allows us to import certain items from the U.S. into Mexico duty-free, provided that such items, after processing, are exported from Mexico within a stipulated timeframe. Maquiladora status, which is renewed periodically, is subject to various restrictions and requirements, including compliance with the terms of the IMMEX program and other local regulations. Failure to comply with the IMMEX program regulations, including any changes thereto, could increase our manufacturing costs and adversely affect our business, operating results and financial condition.

**If we do not accurately forecast customer demand, we may hold suboptimal inventory levels that could adversely affect our business, financial condition and results of operations.**

If we are unable to meet the demand of our customers, our customers may cancel orders or purchase products from our competitors, which could reduce our revenue and gross profit margin. Conversely, if product demand decreases, we may be unable to timely adjust our manufacturing cost structure, resulting in excess capacity, which would lower gross product margins. Similarly, if we are unable to forecast demand accurately, we could be required to record charges related to excess or obsolete inventory, which would also lower our gross margin.

**If we fail to comply with the reporting obligations of the Securities Exchange Act of 1934, as amended, or if we fail to maintain adequate internal control over financial reporting, our business, results of operations and financial condition and investors' confidence in us could be adversely affected.**

We are required to prepare and disclose certain information under the Securities Exchange Act of 1934, as amended, in a timely manner and meet our reporting obligations in their entirety, and our failure to do so could subject us to penalties under federal securities laws and regulations of The Nasdaq Stock Market LLC, expose us to lawsuits and restrict our ability to access financing on favorable terms, or at all.

If we fail to maintain adequate internal controls over financial reporting, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with the Sarbanes-Oxley Act. Moreover, any material weakness in our internal control environment could result in the loss of investor confidence in the reliability of our financial statements, which in turn could harm our business, negatively impact the trading price of our stock, and adversely affect investors' confidence in our company and our ability to access capital markets for financing.

**Changing laws and increasingly complex corporate governance and public disclosure requirements could have an adverse effect on our business and operating results.**

Changing laws, regulations and standards relating to corporate governance and public disclosure, including the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), the California Transparency in Supply Chains Act, the UK Modern Slavery Act and new regulations issued by the SEC and The Nasdaq Stock Market LLC, have created, and will create, additional compliance requirements for us. For example, the Dodd-Frank Act includes provisions regarding, among other things, advisory votes on named executive officer compensation and "conflict minerals" reporting. Complying with these rules and regulations has increased and will increase our legal and financial compliance costs, make some activities more difficult, time-consuming or costly and increase demand on our systems and resources. As a result, management's attention may be diverted from other business concerns, which could adversely affect our business, financial condition and results of operations.

58

Table of Contents

We may also need to hire additional employees or engage outside consultants to comply with these requirements, which will increase our costs and expenses. To maintain high standards of corporate governance and public disclosure, we have invested in, and intend to continue to invest in, reasonably necessary resources to comply with evolving standards.

In addition, stockholder litigation surrounding executive compensation and disclosure of executive compensation has increased with the passage of the Dodd-Frank Act. Furthermore, our stockholders may not continue to approve our advisory vote on named executive officer compensation that is being voted on by our stockholders annually pursuant to the Dodd-Frank Act. If we are involved in a lawsuit related to compensation matters or any other matters not covered by our directors' and officers' liability insurance, we may incur significant expenses in defending against such lawsuits, or be subject to significant fines or required to take significant remedial actions, each of which could adversely affect our business, financial condition and results of operations.

**If product liability claims are brought against us, we could face substantial liability and costs.**

Our products are predominantly used in patient care and expose us to product liability claims and product recalls, including, but not limited to, those that may arise from unauthorized off-label use, malfunctions, design flaws or manufacturing defects related to our products or the use of our products with incompatible components or systems. In addition, as we continue to expand our product portfolio, we may enter or create new markets, including consumer markets, that may expose us to additional product liability risks. For example, with the acquisition of TNI® in March 2020, we added TNI softFlow® technology to our product portfolio. While this technology provides efficient, quiet and comfortable respiratory support to patients, it may present increased risk of infection to caregivers.

We cannot be certain that our product liability insurance will be sufficient to cover any or all damages for product liability claims that may be brought against us in the future. Furthermore, we may not be able to obtain or maintain insurance in the future at satisfactory rates or in adequate amounts to protect us against any product liability claims.

Additionally, the laws and regulations regarding product liability are constantly evolving, both through the passage of new legislation at the state and federal levels and through new interpretations of existing legislation. For example, in February 2017, the Washington Supreme Court determined that, under the Washington Product Liability Act, medical device manufacturers have a duty to warn hospitals of any potential risks posed by their products. As the legal and regulatory landscape surrounding product liability change, we may become exposed to greater liability than currently anticipated.

Any losses that we may suffer from product liability claims, and the effect that any product liability litigation may have upon the reputation and marketability of our technology and products, together with the corresponding diversion of the attention of our key employees, may subject us to significant damages and could adversely affect our business, financial condition and results of operations.

**We may incur environmental and personal injury liabilities related to certain hazardous materials used in our operations.**

Certain manufacturing processes for our products may involve the storage, use, generation and disposal of certain hazardous materials and wastes, including silicone adhesives, solder and solder paste, sealants, epoxies and various solvents such as methyl ethyl ketone, acetone and isopropyl alcohol. As a result, we are subject to certain environmental laws, as well as certain other laws and regulations, that restrict the materials that can be used in our products or in our manufacturing processes. For example, products that we sell in Europe are subject to regulation in the EU markets under the Restriction of the Use of Hazardous Substances Directive (RoHS). RoHS prohibits companies from selling products that contain certain hazardous materials in EU member states. In addition, the EU's Registration, Evaluation, Authorization, and Restriction of Chemicals Directive also restricts substances of very high concern in products. Compliance with such regulations may be costly and, therefore, we may incur significant costs to comply with these laws and regulations.

In addition, new environmental laws may further affect how we manufacture our products, how we use, generate or dispose of hazardous materials and waste, or further affect what materials can be used in our products. Any required changes to our operations may increase our manufacturing costs, detrimentally impact the performance of our products, add greater testing lead-times for product introductions or have other similar effects.

In connection with our research and manufacturing activities, we use, and our employees may be exposed to, materials that are hazardous to human health, safety or the environment. The risk of accidental injury to our employees or contamination from these materials cannot be eliminated, and we could be held liable for any resulting damages, the related liability for which could exceed our reserves. We do not specifically insure against environmental liabilities. If an enforcement action were to occur, our reputation and our business and financial condition may be harmed, even if we were to prevail or settle the action on terms favorable to us.

Table of Contents

**We rely significantly on information technology and any failure, inadequacy, interruption or security lapse of that technology, including any cybersecurity incidents, could harm our ability to operate our business effectively.**

Increased global cybersecurity vulnerabilities, cybersecurity threats and sophisticated and targeted cybersecurity attacks pose a risk to the security of Masimo's systems and networks, including the confidentiality, availability and integrity of any underlying information and data, and those of our customers, partners, suppliers and third-party service providers. Our ability to effectively manage and maintain our internal business information, and to ship products to customers and invoice them on a timely basis, depends significantly on our enterprise resource planning system and other information systems.

Portions of our information technology systems may experience interruptions, delays or cessations of service or produce errors in connection with ongoing systems implementation work. In addition, interfaces between our products and our customers' computer networks could provide additional opportunities for cybersecurity attacks on us and our customers. The techniques used to attack computer systems are sophisticated, change frequently and may originate from less regulated and remote areas of the world. Cybersecurity attacks in particular are evolving and include, but are not limited to, threats, malicious software, ransom ware, attempts to gain unauthorized access to data and other electronic security breaches that could lead to disruptions in systems, misappropriation of confidential or otherwise protected information and corruption of data. As a result, there can be no assurance that our protective measures will prevent or detect security breaches that could have a significant impact on our business, reputation, financial condition and results of operations.

The failure of these systems to operate or integrate effectively with other internal, customer, supplier or third-party service provider systems and to protect the underlying information technology system and data integrity, including from cyber-attacks, intrusions or other breaches or unauthorized access of these systems, or any failure by us to remediate any such attacks or breaches, may also result in damage to our reputation or competitiveness, delays in product fulfillment and reduced efficiency of our operations, and could require significant capital investments to remediate any such failure, problem or breach, all of which could adversely affect our business, financial condition and results of operations.

**Discontinuation, reform or replacement of LIBOR and other benchmark rates, or uncertainty related to the potential for any of the foregoing, may adversely affect our business.**

The U.K. Financial Conduct Authority announced in 2017 that it intends to phase out the London Inter-Bank Offered Rate (LIBOR) by the end of 2021. In addition, other regulators have suggested reforming or replacing other benchmark rates. The discontinuation, reform or replacement of LIBOR or any other benchmark rates may have an unpredictable impact on contractual mechanics in the credit markets or cause disruption to the broader financial markets. Uncertainty as to the nature of such potential discontinuation, reform or replacement may also negatively impact interest expense related to borrowings under our Credit Facility. Borrowings under our Credit Facility bear interest, at our election, either at the Alternate Base Rate (as defined in the Credit Facility), or at the Adjusted LIBO Rate (as defined in the Credit Facility), which is derived from LIBOR. We may in the future pursue amendments to our Credit Facility to provide for a transition mechanism or other reference rate in anticipation of LIBOR's discontinuation, but we may not be able to reach agreement with our lenders on any such amendments. As a result, additional financing to replace any then-outstanding LIBOR-based debt may be unavailable, more expensive or restricted by the terms of such outstanding indebtedness.

**Our stock price may be volatile, and your investment in our stock could suffer a decline in value.**

There has been and could continue to be significant volatility in the market price and trading volume of equity securities. For example, our closing stock price ranged from $148.38 to $271.35 per share from December 29, 2019 to January 2, 2021. Factors contributing to our stock price volatility may include our financial performance, as well as broader economic, political and market factors, including the COVID-19 pandemic. In addition to the other risk factors previously discussed in this Annual Report on Form 10-K, there are many other factors that we may not be able to control that could have a significant effect on our stock price. These include, but are not limited to:

•    actual or anticipated fluctuations in our operating results or future prospects;

•    our announcements or our competitors' announcements of new products;

•    the public's reaction to our press releases, our other public announcements and our filings with the SEC;

•    strategic actions by us or our competitors, such as acquisitions or restructurings;

•    new laws or regulations or new interpretations of existing laws or regulations applicable to our business;

•    changes in accounting standards, policies, guidance, interpretations or principles;

•    changes in our growth rates or our competitors' growth rates;

•    developments regarding our patents or proprietary rights or those of our competitors;

•    ongoing legal proceedings;

•    our inability to raise additional capital as needed;

60

- concerns or allegations as to the safety or efficacy of our products;

- changes in financial markets or general economic conditions, including the effects of recession or slow economic growth in the U.S. and abroad;

- effects of public health crises, epidemics and pandemics, such as the COVID-19 pandemic;

- sales of stock by us or members of our management team, our Board of Directors (Board) or certain institutional stockholders; and

- changes in stock market analyst recommendations or earnings estimates regarding our stock, other comparable companies or our industry generally.

Therefore, you may not be able to resell your shares at or above the price you paid for them.

**Our investors could experience substantial dilution of their investments as a result of subsequent exercises of our outstanding options, vesting of outstanding restricted stock units (RSUs) and performance stock units (PSUs), or the grant of future equity awards by us.**

As of January 2, 2021, approximately 11.1 million shares of our common stock were reserved for issuance under our equity incentive plans, of which approximately 3.4 million shares were subject to options outstanding at such date at a weighted-average exercise price of $77.44 per share, approximately 2.9 million shares were subject to outstanding RSUs, approximately 0.4 million shares were subject to outstanding PSUs and approximately 4.4 million shares were available for future awards under our 2017 Equity Incentive Plan. Over the past 36 months, we have experienced higher rates of stock option exercises compared to many earlier periods, and this trend may continue. To the extent outstanding options are exercised or outstanding RSUs or PSUs vest, our existing stockholders may incur dilution.

We rely on equity awards to motivate current employees and to attract new employees. The grant of future equity awards by us to our employees and other service providers may further dilute our stockholders.

**Future resales of our stock, including those by our insiders and a few investment funds, may cause our stock price to decline.**

A significant portion of our outstanding shares are held by our directors, our executive officers and a few investment funds. Resales by these stockholders of a substantial number of such shares, announcements of any proposed resale of substantial amounts of our stock or the perception that substantial resales may be made, could significantly reduce the market price of our stock. Some of our directors and executive officers have entered into Rule 10b5-1 trading plans pursuant to which they have arranged to sell shares of our stock from time to time in the future. Generally, these sales require public filings. Actual or potential sales by these insiders, including those under a pre-arranged Rule 10b5-1 trading plan, could be interpreted by the market as an indication that the insider has lost confidence in our stock and reduce the market price of our stock.

We have registered and expect to continue to register shares reserved under our equity plans pursuant to Registration Statements on Form S-8. All shares issued pursuant to a Registration Statement on Form S-8 can be freely sold in the public market upon issuance, subject to restrictions on our affiliates under Rule 144. If a large number of these shares are sold in the public market, the sales could reduce the trading price of our stock.

**We may elect not to declare cash dividends on our stock, may elect to only pay dividends on an infrequent or irregular basis, or may elect not to make any additional stock repurchases. As a result, any return on your investment may be limited to the value of our stock. In addition, the payment of any future dividends or the repurchase of our stock might limit our ability to pursue other growth opportunities**.

Our Board may from time to time declare, and we may pay, dividends on our outstanding shares in the manner and upon the terms and conditions provided by law. However, we may elect to retain all future earnings for the operation and expansion of our business, rather than paying cash dividends on our stock. In addition, under certain circumstances, our Credit Facility may limit our ability to pay cash dividends, repurchase our common stock or make other distributions to stockholders. Any payment of cash dividends on our stock will be at the discretion of our Board and will depend upon our results of operations, earnings, capital requirements, financial condition, business prospects, contractual restrictions and other factors deemed relevant by our Board. In the event our Board declares any dividends, there is no assurance with respect to the amount, timing or frequency of any such dividends.

Table of Contents

Any repurchase of our common stock under the stock repurchase plan authorized by our Board in July 2018 (2018 Repurchase Program) will be at the discretion of a committee comprised of our CEO and Chief Financial Officer, and will depend on several factors, including, but not limited to, results of operations, capital requirements, financial conditions, available capital from operations or other sources and the market price of our common stock. Therefore, there is no assurance with respect to the amount, price or timing of any such repurchases. We may elect to retain all future earnings for the operation and expansion of our business, rather than repurchasing additional outstanding shares. For additional information related to our 2018 Repurchase Program, please see Note 17 to our accompanying condensed consolidated financial statements included in Part I, Item 1 of this Annual Report on Form 10-K.

In the event we pay dividends, or make any stock repurchases in the future, our ability to finance any material expansion of our business, including through acquisitions, investments or increased capital spending, or to fund our operations, may be limited. In addition, any repurchases we may make in the future may not prove to be at optimal prices. Our Board may modify or amend the 2018 Repurchase Program, or adopt a new stock repurchase program, at any time at its discretion without stockholder approval.

## ITEM 1B.   UNRESOLVED STAFF COMMENTS

None.

## ITEM 2.   PROPERTIES

We own two facilities in Irvine, California with combined square footage of approximately 314,400 that house our corporate headquarters and the majority of our U.S. research and development activities. We also own approximately 86,500 square feet of property in Hudson, New Hampshire, which is used to develop and manufacture advanced light emitting diodes and other advanced component-level technologies, as well as warehousing and administrative operations. Additionally, we own approximately 79,300 square feet of property in Neuchatel, Switzerland, that houses our international headquarters.

We continue to lease and occupy various other buildings in California and other locations in the U.S. approximating a total of 168,800 square feet for product manufacturing, warehousing, distribution and sales support operations. These leases expire from February 2022 through September 2030. We also operate multiple facilities in Mexicali and San Luis Rio Colorado, Mexico with combined square footage of approximately 333,400 square feet, which are used for manufacturing and warehousing our products under a shelter labor agreement with Industrial Vallera de Mexicali, S.A. de C.V. (IVEMSA). IVEMSA leases these manufacturing facilities directly from the owners of the properties under separate agreements that are guaranteed by us. These leases expire in August 2024.

We also lease and occupy various other facilities throughout the world to operate our business. We believe that our existing facilities are adequate to meet our needs and that existing needs and future growth can be accommodated by purchasing or leasing alternative or additional space.

## ITEM 3.   LEGAL PROCEEDINGS

The information set forth in Note 21 to our accompanying consolidated financial statements under the caption "Litigation" included in Part IV, Item 15(a) of this Annual Report on Form 10-K is incorporated herein by reference.

## ITEM 4.   MINE SAFETY DISCLOSURES

Not applicable.

**PART II**

**ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

*Market Information*

Our stock is traded on the Nasdaq Global Select Market under the symbol "MASI". As of February 16, 2021, the closing price of our stock was $273.52 per share, and the number of stockholders of record, excluding persons whose stock is in nominee or "street name" accounts through brokers, was 18.

*Dividend Policy*

We have historically not paid dividends to our stockholders. Any determination to declare and pay dividends will be made by our Board and will depend upon our results of operations, earnings, capital requirements, financial condition, business prospects, contractual restrictions and other factors deemed relevant by our Board. In addition, under certain circumstances, our Credit Facility may limit our ability to pay cash dividends. In the event a dividend is declared, there is no assurance with respect to the amount, timing or frequency of any such dividends. The dividend declared in 2012 was deemed to be a special dividend and there is no assurance that special dividends will be declared again during the expected term.

*Stock Performance Graph*

The following stock performance graph and related information shall not be deemed "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act or Exchange Act, except to the extent that we specifically incorporate it by reference into such filing.

The following stock performance graph compares total stockholder returns for our common stock from January 2, 2016 through January 2, 2021 against the Nasdaq Market Composite Index and Nasdaq Medical Equipment Index, assuming a $100 investment made on January 2, 2016. Each of the two comparative measures of cumulative total return assumes reinvestment of dividends. The stock performance shown on the graph below is not necessarily indicative of future price performance.

63

Table of Contents

**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN***

Among Masimo Corporation, the Nasdaq Market Composite Index, and

the Nasdaq Medical Equipment Index



*$100 invested on 1/2/2016 in stock or in index, including reinvestment of dividends. Indexes calculated on month-end basis.

*Repurchases and Withholdings of Issuer Securities*

In July 2018, our Board of Directors (Board) approved a new stock repurchase program, authorizing us to purchase up to 5.0 million additional shares of its common stock over a period of up to three years (Repurchase Program). The Repurchase Program became effective in September 2018. We expect to fund the Repurchase Program through its available cash, cash expected to be generated from future operations and other potential sources of capital. The Repurchase Program can be carried out at the discretion of a committee comprised of our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) through open market purchases, one or more Rule 10b5-1 trading plans, block trades and privately negotiated transactions. Any repurchases under the Repurchase Plan are subject to the availability of stock, general market conditions, the trading price of the stock, available capital, alternative uses for capital and our financial performance. During the year ended January 2, 2021, we repurchased approximately 0.5 million shares under the Repurchase Program at an average cost of $242.40 per share, totaling approximately $110.5 million. The total remaining shares authorized for repurchase under the Repurchase Program approximated 4.3 million shares as of January 2, 2021.

64

*Issuer Repurchases and Withholdings of Equity Securities*

During the three months ended January 2, 2021, we effected stock repurchases pursuant to the Repurchase Program. Shares repurchased by us or withheld to satisfy tax withholding obligations during each fiscal month of the quarter ended January 2, 2021 were as follows:

| Period | Total Number of Shares Purchased | | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs[1] |
|---|---|---|---|---|---|
| September 27, 2020 to October 24, 2020 | — | $ | — | — | 4,722,518 |
| October 25, 2020 to November 21, 2020 | 317,950 | | 242.35 | — | 4,404,568 |
| November 22, 2020 to January 2, 2021 | 135,512 | | 244.37 | — | 4,269,056 |
| Total | 453,462 | $ | 242.95 | — | 4,269,056 |

[1]  In July 2018, our board of directors authorized the Repurchase Program, whereby we may repurchase up to 5.0 million shares of our common stock. The Repurchase Program can be carried out at the discretion of a committee comprised of our CEO and CFO through open market purchases, one or more Rule 10b5-1 trading plans, block trades and privately negotiated transactions.

During the year ended January 2, 2021, we satisfied certain U.S. federal and state tax withholding obligations due upon the vesting of equity grants by withholding shares of our common stock, with an aggregate fair market value on the date of vesting equal to the tax withholding obligations, from the shares of our common stock actually issued in connection with such award. Shares withheld to satisfy tax withholding obligations for the year ended January 2, 2021 and December 28, 2019 were as follows (in thousands, except per share amounts):

| | Three Months Ended | | | | Year Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | January 2, 2021[1] | | December 28, 2019 | | January 2, 2021[1] | | December 28, 2019 | |
| Shares withheld | 8,464 | | — | | 18,750 [1] | | 1 | |
| Average cost per share | $ | 252.72 | $ | — | $ | 203.01 | $ | 105.52 |
| Value of shares withheld | $ | 2,139 | $ | — | $ | 3,807 | $ | 123 |

[1]  Also included here is the option cost due upon the exercise of stock options that was paid by delivering the shares previously owned by the participant.

Table of Contents

**ITEM 6.   SELECTED FINANCIAL DATA**

The following tables reflect selected financial data derived from our consolidated financial statements for each of the last five years. The consolidated statement of operations data for the years ended January 2, 2021, December 28, 2019 and December 29, 2018 and the consolidated balance sheet data as of January 2, 2021 and December 28, 2019 were derived from our audited consolidated financial statements included in this Annual Report on Form 10-K. The consolidated statement of operations data for the years ended December 30, 2017 and December 31, 2016, and the consolidated balance sheet data as of December 29, 2018, December 30, 2017 and December 31, 2016 were derived from our audited consolidated financial statements that are not included in this Annual Report on Form 10-K. Historical results are not necessarily indicative of future results.

We adopted Accounting Standards Codification (ASC) Topic 842, *Leases* (ASC 842), effective December 30, 2018, using the modified retrospective approach and applying the current-period adjustment method of adoption. Pursuant to such adoption method, all periods beginning on or after December 30, 2018 are presented under ASC 842 with a cumulative effect adjustment to the opening balance sheet as of the first day of fiscal year 2019, and all prior period amounts are not adjusted and continue to be reported in accordance with the legacy accounting requirements under ASC Topic 840, *Leases*. See Note 2 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information related to our adoption of this new accounting standard.

The selected financial data set forth below should be read in conjunction with our consolidated financial statements, the related notes and Item 7 - "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this Annual Report on Form 10-K.

| | Year Ended January 2, 2021 | Year Ended December 28, 2019 | Year Ended December 29, 2018 | Year Ended December 30, 2017[1] | Year Ended December 31, 2016[1] |
|---|---|---|---|---|---|
| | | | (in thousands, except per share amounts) | | |
| **Statement of Operations:** | | | | | |
| Revenue: | | | | | |
| Product | $ 1,143,744 | $ 936,408 | $ 829,874 | $ 738,242 | $ 673,962 |
| Royalty and other revenue | — | 1,429 | 28,415 | 52,006 | 38,936 |
| Total revenue | 1,143,744 | 937,837 | 858,289 | 790,248 | 712,898 |
| Cost of goods sold | 400,679 | 308,665 | 283,397 | 268,216 | 234,560 |
| Gross profit | 743,065 | 629,172 | 574,892 | 522,032 | 478,338 |
| Operating expenses: | | | | | |
| Selling, general and administrative | 369,057 | 314,661 | 285,417 | 273,011 | 254,707 |
| Research and development | 118,659 | 93,295 | 81,006 | 65,234 | 57,686 |
| Litigation settlement, award and/or defense costs | (474) | — | 425 | — | (270,000) |
| Total operating expenses | 487,242 | 407,956 | 366,848 | 338,245 | 42,393 |
| Operating income | 255,823 | 221,216 | 208,044 | 183,787 | 435,945 |
| Non-operating income (expense) | 7,913 | 12,950 | 5,732 | 2,013 | (2,429) |
| Income before provision for income taxes | 263,736 | 234,166 | 213,776 | 185,800 | 433,516 |
| Provision for income taxes | 23,454 | 37,950 | 20,233 | 61,011 | 122,419 |
| Net income including noncontrolling interest | 240,282 | 196,216 | 193,543 | 124,789 | 311,097 |
| Net loss attributable to noncontrolling interest | 20 | — | — | — | — |
| Net income attributable to Masimo Corporation stockholders | $ 240,302 | $ 196,216 | $ 193,543 | $ 124,789 | $ 311,097 |
| | | | | | |
| Net income per share attributable to Masimo Corporation stockholders: | | | | | |
| Basic | $ 4.39 | $ 3.67 | $ 3.70 | $ 2.42 | $ 6.28 |
| Diluted | $ 4.14 | $ 3.44 | $ 3.45 | $ 2.23 | $ 5.85 |
| Weighted-average number of common shares: | | | | | |
| Basic | 54,700 | 53,434 | 52,296 | 51,516 | 49,530 |
| Diluted | 58,037 | 57,100 | 56,039 | 55,874 | 53,195 |

Table of Contents

| | January 2, 2021 | | December 28, 2019 | | December 29, 2018 | | December 30, 2017[1] | | December 31, 2016[1] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in thousands) | | | | |
| **Balance Sheet Data:** | | | | | | | | | |
| Cash, cash equivalents and short-term investments | $ | 641,447 | $ | 687,687 | $ | 552,490 | $ | 315,302 | $ | 305,970 |
| Working capital | | 867,329 | | 823,843 | | 642,722 | | 430,041 | | 289,830 |
| Total assets | | 1,712,552 | | 1,396,128 | | 1,154,818 | | 905,436 | | 814,352 |
| Total debt | | — | | — | | — | | — | | 71 |
| Total equity | | 1,407,640 | | 1,167,874 | | 969,065 | | 724,025 | | 584,177 |

---

[1]  Certain information presented as of and for the periods ended December 30, 2017 and December 31, 2016 have been previously restated to reflect the full retrospective application of Accounting Standards Update (ASU) No. 2014-09, *Revenue (Topic 606): Revenue from Contracts with Customers (ASU 2014-09),* as of December 31, 2017. Information presented as of and for the period ended January 2, 2016 has not been restated and continues to reflect the prior revenue recognition guidance pursuant to ASC Topic 605, *Revenue Recognition.*

Table of Contents

**ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read this discussion together with the financial statements, related notes and other financial information included in this Annual Report on Form 10-K. The following discussion may contain predictions, estimates and other forward-looking statements that involve a number of risks and uncertainties, including those discussed under Item 1A—"Risk Factors" and elsewhere in this Annual Report on Form 10-K. These risks could cause our actual results to differ materially from any future performance suggested below.*

### Executive Overview

We are a global medical technology company that develops, manufactures and markets a variety of noninvasive monitoring technologies and hospital automation solutions. Our mission is to improve patient outcomes and reduce the cost of patient care. Our patient monitoring solutions generally incorporate a monitor or circuit board, proprietary single-patient use or reusable sensors, software and/or cables. We provide our products to hospitals, emergency medical service (EMS) providers, home care providers, long-term care facilities, physician offices, veterinarians and consumers through our direct sales force, distributors and original equipment manufacturers (OEM) partners. We were incorporated in California in May 1989 and reincorporated in Delaware in May 1996.

Our core business is Measure-through Motion and Low Perfusion™ pulse oximetry, known as Masimo Signal Extraction Technology® (SET®) pulse oximetry. Our product offerings have expanded significantly over the years to also include noninvasive monitoring of blood constituents with an optical signature, optical regional oximetry monitoring, electrical brain function monitoring, acoustic respiration monitoring and exhaled gas monitoring. In addition, we have developed the Root® patient monitoring and connectivity platform, the Radical-7® and Rad-97® bedside and portable patient monitors and the Radius-7® wearable wireless patient monitor. We have also developed hospital automation and connectivity solutions, such as the Masimo Patient SafetyNet™ supplemental remote patient surveillance and monitoring system, which currently allows up to 200 patients to be monitored and viewed simultaneously and remotely through a PC-based monitor or by care providers through their pagers, voice-over-IP phones or smartphones; Iris® and Iris® Gateway, which allow the transfer of data from Masimo and third-party devices to hospital electronic medical records; and UniView™, which provides an integrated display of real-time data from Masimo and third-party devices. Please see Part I, Item 1 of this Annual Report on Form 10-K for additional information related to our business, products and technologies.

### COVID-19 Pandemic

The COVID-19 pandemic has created significant uncertainty in the U.S. and around the globe, resulting in both challenges and opportunities for our business. We are committed to being as transparent as possible with our investors, employees, customers, suppliers and business partners as we collectively work to respond to this crisis. In response to this situation, we have implemented a number of precautionary measures at our facilities, including requiring certain personnel to work remotely from home and enacting social distancing, requiring face masks and mandatory screening for symptoms associated with COVID-19 for critical personnel that are required to report to our facilities to work. We have recently introduced new products, such as Masimo SafetyNet™ and Masimo SafetyNet-Open™, to help combat the COVID-19 pandemic, and have made charitable pledges to various global health organizations to support global COVID-19 relief efforts. In response to the increased product demand that we are seeing from our customers as they respond to and prepare for COVID-19 patient volumes, we have continued to increase our manufacturing capacity. We currently believe that our existing liquidity position will be sufficient to fund these initiatives and our response efforts.

Given the uncertainties related to the COVID-19 pandemic, we cannot predict how long the increased product demand we have experienced or any resulting changes in our product mix, as well as the associated gross margin impact from increased boards/instruments sales, will continue. In addition, this increase in current demand could result in potential reductions in future demand if our customers have over purchased our products and need to consume their excess inventory before purchasing additional products. Furthermore, we continue to be exposed to potential disruptions to our manufacturing operations, disruptions in the supply of critical manufacturing components and in our workforce as circumstances surrounding the global impact of the COVID-19 pandemic continue to change. Please see "*Risks Related to Our Revenues*" and "*Risks Related to our Business and Operations*" in Part I, Item 1A of this Annual Report on Form 10-K for additional information on potential negative impacts to us resulting from the COVID-19 pandemic.

Table of Contents

*Adoption of Lease Accounting Standard*

Effective December 30, 2018, we adopted ASC Topic 842, *Leases* (ASC 842). Our adoption of ASC 842 generally resulted in (a) the recognition of lessee right-of-use (ROU) assets for the right to use assets subject to operating leases; (b) the recognition of lessee lease liabilities for our obligation to make payments under operating leases; and (c) the acceleration of when we recognize certain revenue and costs as a lessor of equipment provided to end-user hospitals at no up-front charge under deferred equipment agreements with fixed multi-year sensor purchase commitments. See "*Critical Accounting Policies and Estimates*" below and Note 2 to our accompanying consolidated financial statements included in Part I, Item 1 of this Annual Report on Form 10-K for additional information related to our adoption of this accounting standard.

*Stock Repurchase Program*

In July 2018, our Board approved a stock repurchase program authorizing us to purchase up to 5.0 million shares of our common stock over a period of up to three years (2018 Repurchase Program). The 2018 Repurchase Program may be carried out at the discretion of a committee comprised of our CEO and CFO through open market purchases, one or more Rule 10b5-1 trading plans, block trades and in privately negotiated transactions. For additional information regarding our current and prior stock repurchase programs, see Part II, Item 5 and Note 17 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

*Cercacor*

Cercacor Laboratories, Inc. (Cercacor) is an independent entity spun off from us to our stockholders in 1998. Joe Kiani, our Chairman and Chief Executive Officer (CEO), is also the Chairman and CEO of Cercacor. We are a party to a cross-licensing agreement with Cercacor, which was amended and restated effective January 1, 2007 (the Cross-Licensing Agreement), which governs each party's rights to certain intellectual property held by the two companies. See Note 3 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information related to Cercacor.

### Results of Operations

The following table sets forth, for the periods indicated, our results of operations expressed as U.S. Dollar amounts and as a percentage of revenue (dollars in thousands).

| | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | | Year Ended December 29, 2018 | |
|---|---|---|---|---|---|---|
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % of Revenue |
| | (dollars in thousands) | | | | | |
| **Revenue:** | | | | | | |
| Product | $ 1,143,744 | 100.0 % | $ 936,408 | 99.8 % | $ 829,874 | 96.7 % |
| Royalty and other revenue | — | — | 1,429 | 0.2 | 28,415 | 3.3 |
| Total revenue | 1,143,744 | 100.0 | 937,837 | 100.0 | 858,289 | 100.0 |
| Cost of goods sold | 400,679 | 35.0 | 308,665 | 32.9 | 283,397 | 33.0 |
| Gross profit | 743,065 | 65.0 | 629,172 | 67.1 | 574,892 | 67.0 |
| **Operating expenses:** | | | | | | |
| Selling, general and administrative | 369,057 | 32.3 | 314,661 | 33.6 | 285,417 | 33.3 |
| Research and development | 118,659 | 10.4 | 93,295 | 9.9 | 81,006 | 9.4 |
| Litigation awards, settlements/or defense costs | (474) | — | — | — | 425 | — |
| Total operating expenses | 487,242 | 42.6 | 407,956 | 43.5 | 366,848 | 42.7 |
| Operating income | 255,823 | 22.4 | 221,216 | 23.6 | 208,044 | 24.2 |
| Non-operating income | 7,913 | 0.7 | 12,950 | 1.4 | 5,732 | 0.7 |
| Income before provision for income taxes | 263,736 | 23.1 | 234,166 | 25.0 | 213,776 | 24.9 |
| Provision for income taxes | 23,454 | 2.1 | 37,950 | 4.0 | 20,233 | 2.4 |
| Net income including noncontrolling interest | 240,282 | 21.0 | 196,216 | 20.9 | 193,543 | 22.5 |
| Net loss attributable to noncontrolling interest | 20 | — | — | — | — | — |
| Net income attributable to Masimo Corporation stockholders | $ 240,262 | 21.0 % | $ 196,216 | 20.9 % | $ 193,543 | 22.5 % |

### Comparison of the Year ended January 2, 2021 to the Year ended December 28, 2019

*Revenue.* Total revenue increased $205.9 million, or 22.0%, to $1,143.7 million for the year ended January 2, 2021, from $937.8 million for the year ended December 28, 2019. The following table details our total product revenues by the geographic area to which the products were shipped for fiscal years 2020 and 2019 (dollars in thousands):

| | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | | Increase/ (Decrease) | Percentage Change |
|---|---|---|---|---|---|---|
| United States (U.S.) | $ 763,069 | 66.7 % | $ 636,371 | 68.0 % | $ 126,698 | 19.9 % |
| Europe, Middle East and Africa | 238,681 | 20.9 | 183,363 | 19.6 | 55,318 | 30.2 |
| Asia and Australia | 103,756 | 9.1 | 87,961 | 9.4 | 15,795 | 18.0 |
| North and South America (excluding U.S.) | 38,238 | 3.3 | 28,713 | 3.0 | 9,525 | 33.2 |
| Total product revenue | $ 1,143,744 | 100.0 % | $ 936,408 | 100.0 % | $ 207,336 | 22.1 % |
| Royalty and other revenue | — | | 1,429 | | (1,429) | (100.0)% |
| Total revenue | $ 1,143,744 | | $ 937,837 | | $ 205,907 | |

Product revenues increased $207.3 million, or 22.1%, to $1,143.7 million for the year ended January 2, 2021 from $936.4 million for the year ended December 28, 2019. This increase was primarily due to higher revenue from monitors, consumables, boards and services, a portion of which we believe is related to a continued overall demand for our products due to the global COVID-19 pandemic, as well as the impact of approximately $0.5 million of favorable foreign exchange rate movements from the prior year that increased the U.S. Dollar translation of foreign sales that were denominated in various foreign currencies. During the year ended January 2, 2021, we shipped approximately 472,300 noninvasive technology boards and monitors, an increase of approximately 226,100 units, or 91.8%, from approximately 246,200 units shipped during the year ended December 28, 2019.

Table of Contents

Product revenue generated through our direct and distribution sales channels increased $142.0 million, or 17.4%, to $958.8 million for the year ended January 2, 2021, compared to $816.8 million for the year ended December 28, 2019. Revenues from our OEM channel increased $65.4 million, or 54.7%, to $185.0 million for the year ended January 2, 2021 as compared to $119.6 million for the year ended December 28, 2019.

Royalty and other revenue historically consisted primarily of royalties received from Medtronic plc (Medtronic) and revenue from non-recurring engineering services for a certain OEM customer. For the year ended January 2, 2021, there was no royalty and other revenue compared to $1.4 million of royalty and other revenue reported for the year ended December 28, 2019, primarily due to a reduction in royalties from Medtronic as a result of the expiration of its obligation to pay us sales-based royalties after October 6, 2018. We received our final royalty payment from Medtronic during the three months ended March 30, 2019. We currently do not expect any significant royalty or other revenue in the future.

*Gross Profit.* Gross profit consists of total revenue less cost of goods sold. Our gross profit for fiscal years 2020 and 2019 was as follows (dollars in thousands):

| | Gross Profit | | | | | | |
|---|---|---|---|---|---|---|---|
| | Year Ended January 2, 2021 | Percentage of Revenues | Year Ended December 28, 2019 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| Product gross profit | $ 743,065 | 65.0 % | $ 627,911 | 67.1 % | $ 115,154 | 18.3 % |
| Royalty and other revenue gross profit | — | — | 1,261 | 88.2 | (1,261) | (100.0) |
| Total gross profit | $ 743,065 | 65.0 % | $ 629,172 | 67.1 % | $ 113,893 | 18.1 % |

Cost of goods sold includes labor, material, overhead and other similar costs related to the production, supply, distribution and support of our products and the rendering of non-recurring engineering (NRE) services. Cost of goods sold increased $92.0 million to $400.7 million for the year ended January 2, 2021, from $308.7 million for the year ended December 28, 2019, primarily due to higher material, manufacturing and distribution costs associated with the increase in product sales volumes, product mix, and increased manufacturing complexity associated with the impact of COVID-19.

Product gross margins decreased to 65.0% for the year ended January 2, 2021 from 67.1% for the year ended December 28, 2019, primarily due to unfavorable product mix associated with the increase in board and monitor sales, increased manufacturing complexity associated with the impact of COVID-19, and higher distribution costs. Royalty and other revenue gross profit decreased by $1.3 million for the year ended January 2, 2021 compared to the year ended December 28, 2019 due to lower royalties from Medtronic as a result of the expiration of its obligation to pay us royalties after October 6, 2018.

*Selling, General and Administrative.* Selling, general and administrative expenses consist primarily of salaries, stock-based compensation and related expenses for sales, marketing and administrative personnel, sales commissions, advertising and promotion costs, professional fees related to legal, accounting and other outside services, public company costs and other corporate expenses. Selling, general and administrative expenses for fiscal years 2020 and 2019 were as follows (dollars in thousands):

| Selling, General and Administrative | | | | | |
|---|---|---|---|---|---|
| Year Ended January 2, 2021 | Percentage of Revenues | Year Ended December 28, 2019 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $369,057 | 32.3% | $314,661 | 33.6% | $54,396 | 17.3% |

Selling, general and administrative expenses increased $54.4 million, or 17.3%, to $369.1 million for the year ended January 2, 2021 from $314.7 million for the year ended December 28, 2019. This increase was primarily attributable to higher compensation and other employee-related costs of approximately $28.3 million, higher advertising and marketing related expenses of approximately $16.7 million, higher legal and professional fees of approximately $12.5 million and higher contributions of approximately $3.7 million, which were partially offset by a reduction in travel costs of approximately $10.3 million.

Table of Contents

*Research and Development.* Research and development expenses consist primarily of salaries, stock-based compensation and related expenses for engineers and other personnel engaged in the design and development of our products. These expenses also include third-party fees paid to consultants, prototype and engineering supply expenses and the costs of clinical trials. Research and development expenses for fiscal years 2020 and 2019 were as follows (dollars in thousands):

| Research and Development | | | | | |
|---|---|---|---|---|---|
| Year Ended January 2, 2021 | Percentage of Revenues | Year Ended December 28, 2019 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $118,659 | 10.4% | $93,295 | 9.9% | $25,364 | 27.2% |

Research and development expenses increased $25.4 million, or 27.2%, to $118.7 million for the year ended January 2, 2021 from $93.3 million for the year ended December 28, 2019, primarily due to higher compensation-related costs of approximately $19.8 million, higher professional fees of approximately $1.5 million, higher office equipment-related expenses of approximately $1.3 million and higher occupancy and facilities-related expense of approximately $1.0 million.

*Non-operating Income.* Non-operating income consists primarily of interest income, interest expense and foreign exchange losses. Non-operating income for fiscal years 2020 and 2019 was as follows (dollars in thousands):

| Non-operating Income | | | | | |
|---|---|---|---|---|---|
| Year Ended January 2, 2021 | Percentage of Revenues | Year Ended December 28, 2019 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $7,913 | 0.7% | $12,950 | 1.4% | $(5,037) | (38.9)% |

Non-operating income was $7.9 million for the year ended January 2, 2021, as compared to $13.0 million of non-operating income for the year ended December 28, 2019. This net decrease of approximately $5.0 million was primarily due to approximately $8.4 million in lower interest income, which was offset by approximately $3.3 million of net realized and unrealized gains on foreign currency denominated transactions during the year ended January 2, 2021.

*Provision for Income Taxes.* Our provision for income taxes for fiscal years 2020 and 2019 was as follows (dollars in thousands):

| Provision for Income Taxes | | | | | |
|---|---|---|---|---|---|
| Year Ended January 2, 2021 | Percentage of Revenues | Year Ended December 28, 2019 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $23,454 | 2.1% | $37,950 | 4.0% | $(14,496) | (38.2)% |

Our provision for income taxes was $23.5 million for the year ended January 2, 2021 compared to $38.0 million for the year ended December 28, 2019. Our effective tax rate was 8.9% for the year ended January 2, 2021 compared to 16.2% for the year ended December 28, 2019. This decrease in our effective tax rate for the year ended January 2, 2021 resulted primarily from an increase in the amount of excess tax benefits realized from stock-based compensation pursuant to ASU No. 2016-09, *Compensation—Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting* (ASU 2016-09) of approximately $14.5 million compared to the year ended December 28, 2019, an increase in R&D tax credits, and a decrease in nondeductible compensation related expenses.

We have made no provision for U.S. income taxes or foreign withholding taxes on approximately $142.8 million in accumulated earnings from our foreign subsidiaries as we expect that such amounts will continue to be indefinitely reinvested in operations outside the U.S. Our effective tax rate was lower than the U.S. federal statutory rate primarily due to a portion of our earnings being generated from countries other than the U.S., where such earnings are generally subject to lower tax rates than the U.S., excess tax benefits from U.S. stock-based compensation and research and development tax credits. While we expect our worldwide consolidated effective tax rate will continue to be lower than the U.S. federal statutory rate, our actual future effective income tax rate will depend on various factors, including the geographic composition of our pre-tax income, the amount of excess tax benefits realized from U.S. stock-based compensation, the amount of our research and development tax credits, the deductibility of executive compensation, changes in tax laws, changes in deferred tax asset valuation allowances and the recognition and derecognition of tax benefits associated with uncertain tax positions.

*Comparison of the Year ended December 28, 2019 to the Year ended December 29, 2018*

For a discussion regarding our financial condition and results of operations for the year ended December 28, 2019 as compared to the year ended December 29, 2018, please refer to the discussion under the heading "Comparison of the Year ended December 28, 2019 to the Year ended December 29, 2018" in Item 7 of our Annual Report on Form 10-K for the fiscal year ended December 28, 2019, filed with the Securities and Exchange Commission on February 19, 2020.

*Liquidity*

Our principal sources of liquidity consist of our existing cash and cash equivalent balances, future funds expected to be generated from operations and available borrowing capacity under our credit facility. As of January 2, 2021, we had approximately $867.3 million in working capital, of which approximately $641.4 million was cash and cash equivalents. In addition to net working capital, we had approximately $148.3 million of available borrowing capacity (net of outstanding letters of credit) under our Credit Agreement (Credit Facility) as compared to approximately $823.8 million in working capital, approximately $567.7 million in cash and cash equivalents and $120.0 million in short-term investments at December 28, 2019.

In managing our day-to-day liquidity and capital structure, we generally do not rely on foreign earnings as a source of funds. As of January 2, 2021, we had cash totaling $71.7 million held outside of the U.S., of which approximately $32.8 million was accessible without additional tax cost and approximately $38.9 million was accessible at an incremental estimated tax cost of up to $0.4 million. We currently have sufficient funds on-hand and cash held outside the U.S. that is available without additional tax cost to fund our global operations. In the event funds that are treated as permanently reinvested are repatriated, we may be required to accrue and pay additional U.S. taxes to repatriate these funds.

*Cash Flows*

The following table summarizes our cash flows (in thousands):

| | Year Ended | |
|---|---|---|
| | January 2, 2021 | December 28, 2019 |
| Net cash provided by (used in): | | |
| Operating activities | $ 210,963 | $ 221,640 |
| Investing activities | (82,787) | (197,681) |
| Financing activities | (54,307) | (9,339) |
| Effect of foreign currency exchange rates on cash | 3,060 | 814 |
| Increase in cash, cash equivalents, and restricted cash | $ 76,929 | $ 15,434 |

*Operating Activities*. Cash provided by operating activities for the year ended January 2, 2021 was $211.0 million and was primarily driven by net income including noncontrolling interests of $240.3 million. This was increased by non-cash activities including stock-based compensation of $42.2 million, depreciation and amortization of $29.3 million and a deferred income tax benefit of $5.0 million. Additional increases in operating cash resulted from increases in accrued compensation, deferred revenue and other contract-related liabilities, accrued liabilities and accounts payable of $15.5 million, $10.9 million, $9.4 million and $7.6 million, respectively, primarily due to the timing of payments. Partially offsetting this was $94.4 million of purchases of inventory to both increase finished goods days on hand as well as secure raw material supply to ensure we are able to support higher customer demand during the COVID-19 pandemic, and to support product launches. Additional reductions to net income including noncontrolling interests were changes in operating assets, including an increase in other current assets of $30.0 million, primarily due to the timing of various tax payments and refunds, and an increase in lease receivables of $7.7 million.

Cash provided by operating activities for the year ended December 28, 2019 was $221.6 million and was driven primarily by net income of $196.2 million. Non-cash activity included stock-based compensation of $39.2 million, depreciation and amortization of $23.5 million and a deferred income tax benefit of $6.0 million. Additional sources of cash related to changes in operating assets and liabilities included increases in accounts payable, deferred revenue and other contract-related liabilities, and accrued compensation of $9.9 million, $7.7 million and $5.3 million, respectively, primarily due to the timing of payments. These sources of cash were partially offset by other changes in operating assets and liabilities related to increases in accounts receivable and lease receivable of $23.6 million and $12.0 million, respectively, primarily due to the timing of cash receipts, an increase in inventory of $21.3 million, primarily due to the growth in our business and the timing of shipments, and an increase in other current assets of $8.5 million, primarily due to the timing of various tax payments and refunds.

Table of Contents

*Investing Activities*. Cash used in investing activities for the fiscal year ended January 2, 2021 was $82.8 million, consisting primarily of $120.0 million for maturities of short-term investments, $112.71 million of business combinations, $72.5 million for purchases of property and equipment of which $16.4 million related to the purchase of a building, $6.8 million related to the acquisition of a strategic investment and $7.4 million for intangible assets related to capitalized patent and trademark costs.

Cash used in investing activities for the fiscal year ended December 28, 2019 was $197.7 million, consisting primarily of $280.0 million for purchases of short-term investments, $68.4 million for purchases of property and equipment of which $35.6 million related to the purchase of two buildings, $5.2 million related to the acquisition of a strategic investment and $4.1 million for intangible assets related to capitalized patent and trademark costs, which were offset by $160.0 million of maturities of short-term investments.

*Financing Activities*. Cash used in financing activities for the fiscal year ended January 2, 2021 was $54.3 million, resulting primarily from cash paid for common stock repurchase transactions that settled during the year of $110.5 million, which were partially offset by proceeds from the issuance of common stock (upon exercise of options) of $58.4 million.

Cash used in financing activities for the fiscal year ended December 28, 2019 was $9.3 million, resulting primarily from cash paid for common stock repurchase transactions that settled during the year of $37.6 million, which were partially offset by proceeds from the issuance of common stock (upon exercise of options) of $28.3 million.

### Capital Resources and Prospective Capital Requirements

We currently maintain a Credit Agreement (Credit Facility) with JPMorgan Chase Bank, N.A., as Administrative Agent and a Lender, and Bank of the West, as a Lender (collectively, the Initial Lenders). The Credit Facility provides for up to $150.0 million of unsecured borrowings, with an option, subject to certain conditions, for us to increase the aggregate borrowing capacity to up to $550.0 million in the future with the Initial Lenders and additional Lenders, as required. The Credit Facility also provides for a sublimit of up to $25.0 million for the issuance of letters of credit and a sublimit of $75.0 million for borrowings in specified foreign currencies. All unpaid principal under the Credit Facility will become due and payable on December 17, 2023. Proceeds from the Credit Facility are expected to be used for general corporate, capital investment and working capital needs. For additional information regarding the Credit Facility, see Note 15 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

In July 2018, our Board approved the 2018 Repurchase Program, authorizing us to purchase up to 5.0 million additional shares of its common stock over a period of up to three years. The 2018 Repurchase Program became effective in September 2018 upon the expiration of our previous repurchase program. For additional information regarding our stock repurchase programs, see Note 17 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

We expect to fund our future operating, investing and financing activities through our available cash, future cash from operations, our Credit Facility and other potential sources of capital. In addition to funding our working capital requirements, we anticipate additional capital expenditures primarily related to investments in infrastructure growth. Possible additional uses of cash may include the acquisitions and/or strategic investments in technologies or technology companies, investments in property and equipment as well as repurchases of stock under our authorized stock repurchase program. However, any repurchases of common stock will be subject to numerous factors, including the availability of our stock, general market conditions, the trading price of our stock, available capital, alternative uses for capital and our financial performance. In addition, the amount and timing of our actual investing activities will vary significantly depending on numerous factors, including the timing and amount of capital expenditures, costs of product development efforts, our timetable for infrastructure expansion, stock repurchase activity and costs related to our domestic and international regulatory requirements. Despite these investment requirements and potential expenditures, we anticipate that our existing cash and cash equivalents and amounts available under our new Credit Facility will be sufficient to meet our working capital requirements, capital expenditures and other operational funding needs for at least the next 12 months.

### Off-Balance Sheet Arrangements

We do not currently have, nor have we ever had, any relationships with unconsolidated entities or financial partnerships, such as entities referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or for other contractually narrow or limited purposes. In addition, we do not engage in trading activities involving non-exchange traded contracts. As a result, we are not materially exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in these relationships.

Table of Contents

### Contractual Obligations and Commercial Commitments

The following table summarizes our outstanding contractual obligations and commercial commitments as of January 2, 2021 and the effect those obligations are expected to have on our cash liquidity and cash flow in future periods (in thousands). The estimated payments reflected in this table are based on management's estimates and assumptions about these obligations. As a result, the actual cash outflows in future periods will vary, possibly materially, from those reflected in this table.

|  | Payments Due By Period | | | | |
|  | Less than 1 Year | Between 1-3 Years | Between 3-5 Years | More than 5 Years | Total |
|---|---|---|---|---|---|
| Operating leases[1] | $ 6,610 | $ 11,810 | $ 8,116 | $ 11,055 [3] | $ 37,591 |
| Purchase commitments[2] | 123,000 | — | — | — | 123,000 |
| Total contractual obligations | $ 129,610 | $ 11,810 | $ 8,116 | $ 11,055 | $ 160,591 |

―――――――

[1]   Undiscounted lease payments for operating leases.
[2]   Certain inventory items under non-cancellable purchase orders.
[3]   Includes optional renewal periods for certain leases.

*Other obligations.* As of January 2, 2021, our estimated liabilities related to uncertain tax positions, including interest, were $11.8 million. Due to the high degree of uncertainty regarding the timing of potential cash flows associated with these liabilities, we are unable to make a reasonably reliable estimate of the amounts and periods in which these liabilities might be made.

In addition, we had the following annual minimum royalty commitments to Cercacor, as of January 2, 2021 (in thousands):

|  | Payments Due By Period | | | |
|  | Less than 1 Year | Between 1-3 Years | Between 3-5 Years | More than 5 Years |
|---|---|---|---|---|
| Minimum royalty commitment to Cercacor[1] | $ 5,000 | $ 10,000 | $ 10,000 | [1] |

―――――――

[1]   Subsequent to 2025, the royalty arrangement requires a $5.0 million minimum annual royalty payment unless the agreement is amended, restated or terminated.

See Note 3 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information related to Cercacor.

### Critical Accounting Estimates

Our financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires management to make estimates and judgements that affect the reported amounts of net revenues, expenses, assets and liabilities. These estimates and judgements are based on historical experience and on various other factors that are believed to be reasonable under the circumstances, and form the basis for making management's most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effects of matters that are inherently uncertain. Although we regularly evaluate these estimates and assumptions, changes in judgments and uncertainties relating to these estimates could potentially result in materially different results under different assumptions and conditions. If these estimates differ significantly from actual results, the impact to the consolidated financial statements may be material. We believe that the critical accounting policies that are the most significant for purposes of fully understanding and evaluating our reported financial results include the following:

#### Revenue Recognition, Deferred Revenue and Other Contract Liabilities

We derive the majority of our product revenue from four primary sources: (i) direct sales under deferred equipment agreements with end-user hospitals where we provide up-front monitoring equipment at no up-front charge in exchange for a multi-year sensor purchase commitment; (ii) other direct sales of noninvasive monitoring solutions to end-user hospitals, emergency medical response organizations and other direct customers; (iii) sales of noninvasive monitoring solutions to distributors who then typically resell to end-user hospitals, emergency medical response organizations and other customers; and (iv) sales of integrated circuit boards to OEM customers who incorporate our embedded software technology into their multiparameter monitoring devices. Subject to customer credit considerations, the majority of such sales are made on open account using industry standard payment terms based on the geography within which the specific customer is located.

Table of Contents

We generally recognize revenue following a single, principles-based five-step model to be applied to all contracts with customers and generally provide for the recognition of revenue in an amount that reflects the consideration to which we expect to be entitled, net of allowances for estimated returns, discounts or sales incentives, as well as taxes collected from customers that are remitted to government authorities, when control over the promised goods or services are transferred to the customer. Revenue related to equipment supplied under sales-type lease arrangements is recognized once control over the equipment is transferred to the customer, while revenue related to equipment supplied under operating-type lease arrangements is generally recognized on a straight-line basis over the term of the lease.

While the majority of our sales transactions contain standard business terms and conditions, there are some transactions that contain non-standard business terms and conditions. As a result, contract interpretation and analysis is required to determine the appropriate accounting, including: (i) the amount of the total consideration, including variable consideration, (ii) whether the arrangement contains an embedded lease, and if so, whether such embedded lease is a sales-type lease or an operating lease, (iii) the identification of the distinct performance obligations contained within the arrangement, (iv) how the arrangement consideration should be allocated to each performance obligation when multiple performance obligations exist, including the determination of standalone selling price, and (v) when to recognize revenue on the performance obligations. Changes in judgments on these assumptions and estimates could materially impact the timing of revenue recognition.

We enter into agreements to sell our monitoring solutions and services, sometimes as part of arrangements with multiple performance obligations that include various combinations of distinct product sales, equipment leases and services. In the case of contracts with multiple performance obligations, the authoritative guidance provides that the total consideration be allocated to each performance obligation on the basis of relative standalone selling prices. When a standalone selling price is not readily observable, we estimate the standalone selling price by considering multiple factors including, but not limited to, features and functionality of the product, geographies, type of customer, contractual prices pursuant to Group Purchasing Organization (GPO) contracts, our pricing and discount practices, and other market conditions.

Sales under deferred equipment agreements are generally structured such that we agree to provide certain monitoring-related equipment, software, installation, training and/or warranty support at no up-front charge in exchange for the customer's commitment to purchase sensors over the term of the agreement, which generally ranges from three to six years. We allocate contract consideration under deferred equipment agreements containing fixed annual sensor purchase commitments to the underlying lease and non-lease components at contract inception. In determining whether any underlying lease components are related to a sales-type lease or an operating lease, we evaluate the customer's rights and ability to control the use of the underlying equipment throughout the contract term, including any equipment substitution rights retained by us, as well as our expectations surrounding potential contract/lease extensions or renewals and the customer's likelihood to exercise any purchase options. Revenue allocable to non-lease components is generally recognized as such non-lease components are satisfied. Revenue allocable to lease components under sales-type lease arrangements is generally recognized when control over the equipment is transferred to the customer. Revenue allocable to lease components under operating lease arrangements is generally recognized over the term of the operating lease. We generally do not expect to derive any significant value in excess of such asset's unamortized book value from equipment underlying our operating leases arrangements.

Revenue from direct sales of our products to end-user hospitals, emergency medical response organizations, other direct customers, distributors and OEM customers is generally recognized by us when control of such products transfer to the customer based upon the terms of the contract or underlying purchase order. Revenue related to OEM rainbow® parameter software licenses is recognized by us upon the OEM's shipment of its product to its customer, as reported to us by the OEM.
We provide certain customers with various sales incentives that may take the form of discounts or rebates. We estimate and provide allowances for these programs as a reduction to revenue at the time of sale. In general, customers do not have a right of return for credit or refund. However, we allow returns under certain circumstances. At the end of each period, we estimate and accrue for these returns as a reduction to revenue. We estimate the revenue constraints related to these forms of variable consideration based on various factors, including expected purchasing volumes, prior sales and returns history, and specific contractual terms and limitations.

*Inventory*

Inventories are stated at the lower of cost or net realizable value. Cost is determined using a standard cost method, which approximates FIFO (first-in, first-out). Inventory valuation reserves are recorded for materials that have become obsolete or are no longer used in current production and for inventory that has a net realizable value less than the carrying value in inventory. We generally purchase raw materials in quantities that we anticipate will be fully used within one year. However, changes in operating strategy and customer demand, and frequent unpredictable fluctuations in market values for such materials, can limit our ability to effectively utilize all of the raw materials purchased and sold through resulting finished goods to customers for a profit. We regularly monitor potential inventory excess, obsolescence and lower market values compared to standard costs and, when necessary, reduce the carrying amount of our inventory to its market value.

Table of Contents

We determine any required inventory valuation adjustments based on an evaluation of the expected future use of our inventory on an item by item basis. We apply historical obsolescence rates to estimate the loss on inventory expected to have a recovery value below cost. Our historical obsolescence rates are developed from our company specific experience for major categories of inventory, which are then applied to excess inventory on an item by item basis. We also record other specific inventory valuation adjustments when we become aware of other unique events that result in a known recovery value below cost. For inventory items that have been written down, the reduced value becomes the new cost basis. If our estimates for potential inventory losses prove to be too low, our future earnings will be affected when any related additional inventory losses are recorded.

### Lessee ROU Assets and Lease Liabilities

We determine if an arrangement contains a lease at inception. ROU assets represent our right to use an asset underlying an operating lease for the lease term and lease liabilities represent our obligation to make lease payments arising from an operating lease. ROU assets and lease liabilities are recognized at the commencement date based on the present value of lease payments over the lease term. We generally estimate the applicable discount rate used to determine the net present value of lease payments based on available information at the lease commencement date. Many of our lessee agreements include options to extend the lease, which we do not include in our lease terms unless they are reasonably certain to be exercised. We utilize a portfolio approach to account for the ROU assets and liabilities associated with certain equipment leases. We have also made a policy election not to separate lease and non-lease components for our real estate leases and to exclude short-term leases with a term of twelve months or less from our ROU assets and lease liabilities. Rental expense for lease payments related to operating leases is recognized on a straight-line basis over the lease term.

### Stock-Based Compensation

Our stock-based compensation awards are currently comprised of stock options, restricted stock units (RSUs) and performance share units (PSUs), all of which are equity-classified awards. For equity-classified awards granted on or after January 1, 2006, we estimate the fair value of the award on the date of grant and expense stock-based compensation over the requisite service period. In the case of PSUs, the amount of expense recognized is also dependent upon the expected achievement level for the specified performance criteria. The fair value of RSU and PSU awards is the closing price of our common stock on the grant date. To calculate the fair value of stock option awards, we use the Black-Scholes option pricing model, which, in addition to the closing price of our stock on the grant date and the option strike price, requires the input of subjective assumptions. These assumptions include the estimated length of time employees will retain their stock options before exercising them (the expected term), the estimated volatility of our stock price over the expected term and the dividend yield on our common stock. We estimate expected term based on both our specific historical option exercise experience, as well as expected term information available from a peer group of companies with similar vesting schedules. The estimated volatility is based on both the historical and implied volatilities of our share price.

Changes in the types and quantity of equity awards, as well as the fair market value of our stock may impact the cost of future stock option grants. In general, to the extent that the fair market value of our stock increases, the overall cost of granting these options will also increase. For further details regarding our stock-based compensation see Note 18 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

### Accounting for Income Taxes

We account for income taxes using the asset and liability method, under which we recognize deferred tax assets and liabilities for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and for net operating loss and tax credit carryforwards. A tax position that meets a more-likely-than-not recognition threshold is recognized in the first reporting period that it becomes more-likely-than-not such position will be sustained upon examination. A tax position that meets this more-likely-than-not recognition threshold is recorded at the largest amount of tax benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. Previously recognized income tax positions that fail to meet the recognition threshold in a subsequent period are derecognized in that period. Differences between actual results and our assumptions, or changes in our assumptions in future periods, are recorded in the period they become known. We record potential accrued interest and penalties related to unrecognized tax benefits in income tax expense.

Table of Contents

As a multinational corporation, we are subject to complex tax laws and regulations in various jurisdictions. The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws themselves are subject to change as a result of changes in fiscal policy, changes in legislation, evolution of regulations and court rulings. We have concluded all U.S. federal income tax matters for years through 2016 and all material state, local and foreign income tax matters for years through 2013. Given the foregoing, our actual liability for U.S. or foreign taxes may be materially different from our estimates, which could result in the need to record additional liabilities or potentially to reverse previously recorded tax liabilities.

Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. A valuation allowance is recorded against any deferred tax assets when, in the judgment of management, it is more likely than not that all or part of a deferred tax asset will not be realized. In assessing the need for a valuation allowance, we consider all positive and negative evidence, including recent financial performance, scheduled reversals of temporary differences, projected future taxable income, availability of taxable income in carryback periods and tax planning strategies.

### Litigation Costs and Contingencies

We record a charge equal to at least the minimum estimated liability for a loss contingency or litigation settlement when both of the following conditions are met: (i) information available prior to issuance of the financial statements indicates that it is probable that a liability had been incurred at the date of the financial statements and (ii) the range of loss can be reasonably estimated. The determination of whether a loss contingency or litigation settlement is probable or reasonably possible involves a significant amount of management judgment, as does the estimation of the range of loss given the nature of contingencies. Liabilities related to litigation settlements with multiple elements are recorded based on the fair value of each element. Legal and other litigation related expenses are recognized as the services are provided. We record insurance and other indemnity recoveries for litigation expenses when both of the following conditions are met: (i) the recovery is probable and (ii) collectability is reasonably assured. The insurance recoveries recorded are only to the extent the litigation costs have been incurred and recognized in the financial statements; however, it is reasonably possible that the actual recovery may be significantly different from our estimates. There are many uncertainties associated with any litigation, and we cannot provide assurance that any actions or other third-party claims against us will be resolved without costly litigation or substantial settlement charges. If any of those events were to occur, our business, financial condition and results of operations could be materially and adversely affected.

### Business Combinations

We account for business combinations using the acquisition method of accounting, which requires that once control is obtained, all the assets acquired, liabilities assumed and noncontrolling interest in the acquired entity, if applicable, are recorded at their respective fair values at the date of acquisition. The determination of fair values of identifiable assets and liabilities requires estimates and the use of valuation techniques when market value is not readily available. For intangible assets acquired in a business combination, we typically use the income method. Significant estimates in valuing certain intangible assets include, but are not limited to, the amount and timing of future cash flows, growth rates, discount rates and useful lives. The excess of the purchase price over fair values of identifiable assets, liabilities, and noncontrolling interest in the acquired entity, if applicable, is recorded as goodwill.

### Recent Accounting Pronouncements

For details regarding any recently adopted and recently issued accounting standards, see Note 2 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

**ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to various market risks that may arise from adverse changes in market rates and prices, such as interest rates, foreign exchange fluctuations and inflation. We do not enter into derivatives or other financial instruments for trading or speculative purposes.

### Interest Rate Risk

Our exposure to market risk for changes in interest rates relates to the increase or decrease in the amount of interest income we can earn on our cash and cash equivalents and on the increase or decrease in the amount of interest expense we must pay with respect to our various outstanding debt instruments. We do not believe our cash equivalents are subject to significant interest rate risk due to their short terms to maturity. As of January 2, 2021, the carrying value of our cash equivalents approximated fair value. We currently do not have any significant risks associated with interest rates fluctuations related to interest expense. Under our current policies, we do not use interest rate derivative instruments to manage exposure to interest rate changes. Therefore, declines in interest rates over time will reduce our interest income while increases in interest rates will increase our interest income. A hypothetical 100 basis point change in interest rates along the entire interest rate yield curve would increase or decrease our interest rate yields on our investments and interest income approximately $0.1 million for each $10.0 million in interest-bearing investments.

### Foreign Currency Exchange Rate Risk

A majority of our assets and liabilities are maintained in the United States in U.S. Dollars and a majority of our sales and expenditures are transacted in U.S. Dollars. However, we also transact with foreign customers in currencies other than the U.S. Dollar. These foreign currency revenues, when converted into U.S. Dollars, can vary depending on average exchange rates during a respective period. In addition, certain of our foreign subsidiaries transact in their respective country's local currency, which is also their functional currency. As a result, expenses of these foreign subsidiaries when converted into U.S. Dollars can also vary depending on average monthly exchange rates during a respective period.

We are exposed to foreign currency gains or losses on outstanding foreign currency denominated receivables and payables, as well as our foreign currency denominated cash balances and certain intercompany transactions. In addition, other transactions between us or our subsidiaries and a third-party, denominated in a currency different from the functional currency, are foreign currency transactions. Realized and unrealized foreign currency gains or losses on these transactions are also included in our statements of operations as incurred.

The balance sheets of each of our foreign subsidiaries whose functional currency is not the U.S. Dollar are translated into U.S. Dollars at the rate of exchange at the balance sheet date and the statements of comprehensive income and cash flows are translated into U.S. Dollars using an approximation of the average monthly exchange rates applicable during the period. Any foreign exchange gain or loss as a result of translating the balance sheets of our foreign subsidiaries whose functional currency is not the U.S. Dollar is included in equity as a component of accumulated other comprehensive income.

Our primary foreign currency exchange rate exposures are with the Canadian Dollar, Euro, Japanese Yen, Swedish Krona, the British Pound, Mexico Peso, Turkish Lira and Australian Dollar. Foreign currency exchange rates may experience significant volatility from one period to the next. Specifically, during the fiscal year ended January 2, 2021, we estimate that fluctuations in the exchange rates between the U.S. Dollar and other foreign currencies, including the Turkish Lira, Canadian Dollar and the Australian Dollar, favorably impacted our revenues by $0.5 million. We currently do not enter into forward exchange contracts to hedge exposures denominated in foreign currencies and do not use derivative financial instruments for trading or speculative purposes. The effect of additional changes in foreign currency exchange rates could have a material effect on our future operating results or cash flows, depending on which foreign currency exchange rates change and depending on the directional change (either a strengthening or weakening against the U.S. Dollar). We estimate that the potential impact of a hypothetical 10% adverse change in all applicable foreign currency exchange rates from the rates in effect as of January 2, 2021 would have resulted in an estimated reduction of $23.4 million in reported pre-tax income for the year ended January 2, 2021. As our foreign operations continue to grow, our exposure to foreign currency exchange rate risk may become more significant.

### Inflation Risk

We do not believe that inflation has had a material effect on our business, financial condition or results of operations during the periods presented. If our costs were to become subject to significant inflationary pressures, we may not be able to fully offset such higher costs through price increases. Our inability or failure to do so could have a material adverse effect on our business, financial condition and results of operations.

Table of Contents

**ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

Our consolidated financial statements and supplementary data required by this item are set forth at the pages indicated in Part IV, Item 15(a)(1) and 15(a)(2), respectively, of this Annual Report on Form 10-K.

**ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A.    CONTROLS AND PROCEDURES**

### *Evaluation of Disclosure Controls and Procedures*

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Exchange Act, as of the end of the period covered by this Annual Report on Form 10-K. We recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K.

### *Management's Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) promulgated by the SEC under the Exchange Act. All internal control systems, no matter how well designed, have inherent limitations and may not prevent or detect all misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on criteria established in the 2013 *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of January 2, 2021.

Grant Thornton LLP, an independent registered public accounting firm, has audited the effectiveness of our internal control over financial reporting as of January 2, 2021. Their attestation report, which expresses an unqualified opinion on the effectiveness of our internal control over financial reporting as of January 2, 2021, is included in Part IV, Item 15(a)(1) of this Annual Report on Form 10-K.

### *Changes in Internal Control Over Financial Reporting*

During the quarter ended January 2, 2021 there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B.    OTHER INFORMATION**

Not applicable.

**PART III**

**ITEM 10.**   **DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by this item is incorporated by reference from the information contained in our Definitive Proxy Statement to be filed with the SEC in connection with the Annual Meeting of Stockholders to be held in 2021 (2021 Proxy Statement).

**ITEM 11.**   **EXECUTIVE COMPENSATION**

The information required by this item is incorporated by reference from the information contained in the 2021 Proxy Statement.

**ITEM 12.**   **SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by this item is incorporated by reference from the information contained in the 2021 Proxy Statement.

**ITEM 13.**   **CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE**

The information required by this item is incorporated by reference from the information contained in the 2021 Proxy Statement.

**ITEM 14.**   **PRINCIPAL ACCOUNTING FEES AND SERVICES**

The information required by this item is incorporated by reference from the information contained in the 2021 Proxy Statement.

## PART IV

**ITEM 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

*(a)(1) Financial Statements*

The Consolidated Financial Statements of Masimo Corporation and Reports of Grant Thornton LLP, Independent Registered Public Accounting Firm, are included in a separate section of this Annual Report on Form 10-K beginning on page F-1.

*(a)(2) Financial Statement Schedules*

The financial statement schedule is included in a separate section of this Annual Report on Form 10-K beginning on page F-1.

*(a)(3) Exhibits*

| Exhibit Number | Description of Document |
|---|---|
| 3.1(1) | Amended and Restated Certificate of Incorporation (Exhibit 3.2) |
| 3.2(2) | Second Amended and Restated Bylaws adopted on October 24, 2019 (Exhibit 3.1) |
| 4.1(1) | Form of Common Stock Certificate (Exhibit 4.1) |
| 4.2(4)# | Masimo Retirement Savings Plan (Exhibit 4.7) |
| 4.3* | Description of Securities of Masimo Corporation |
| 10.1(1)# | Form of Indemnity Agreement between the Registrant and its officers and directors (Exhibit 10.1) |
| 10.2(5)# | Amended and Restated Employment Agreement, dated November 4, 2015, between Joe Kiani and the Registrant (Exhibit 10.1) |
| 10.3(13) | First Amendment to November 4, 2015 Amended and Restated Employment Agreement, dated July 27, 2017, by and between Masimo Corporation and Joe Kiani (Exhibit 10.1) |
| 10.4(1)# | Offer Letter, dated February 15, 1996, between Yongsam Lee and the Registrant (Exhibit 10.7) |
| 10.5(2)# | Offer Letter, dated March 30, 2007, between Anand Sampath and the Registrant (Exhibit 10.8) |
| 10.6(6)# | Offer Letter, dated July 23, 2008, between Jon Coleman and the Registrant (Exhibit 10.9) |
| 10.7(19)# | Offer Letter, dated March 31, 2011 between Tom McClenahan and the Registrant (Exhibit 10.7) |
| 10.8(14)# | Offer Letter, dated September 22, 2017, between the Company and Micah Young (Exhibit 10.1) |
| 10.9(5)# | Restricted Share Unit Award Agreement, dated November 4, 2015, by and between Joe Kiani and the Registrant (Exhibit 10.2) |
| 10.10(5)# | Equity-Holder Non-Competition and Confidentiality Agreement, dated November 4, 2015, by and between Joe Kiani and the Registrant (Exhibit 10.3) |
| 10.11(7)# | Amended and Restated 2007 Severance Protection Plan and Summary Plan Description, effective December 31, 2008 (Exhibit 10.11) |
| 10.12(9)# | 2007 Severance Protection Plan Participation Agreement, dated January 11, 2008, by and between the Registrant and Yongsam Lee (Exhibit 10.3) |
| 10.13(19)# | Amended and Restated 2007 Severance Protection Plan Agreement, dated November 12, 2013, by and between the Registrant and Jon Coleman (Exhibit 10.13) |
| 10.14(19)# | Amended and Restated 2007 Severance Protection Plan Agreement, dated December 9, 2013, by and between the Registrant and Anand Sampath |
| 10.15(3)# | Amended and Restated 2007 Severance Protection Plan Agreement, dated November 3, 2014, by and between the Registrant and Tom McClenahan (Exhibit 10.21) |
| 10.16(17)# | Amended and Restated 2007 Severance Protection Plan, Limited Participation Agreement, dated December 12, 2017, by and between the Registrant and Micah Young (Exhibit 10.16) |

| Exhibit Number | Description of Document |
| --- | --- |
| 10.17(1)# | 2007 Stock Incentive Plan of the Registrant, and forms of agreements related thereto (Exhibit 10.33) |
| 10.18(15)# | Masimo Corporation 2017 Equity Incentive Plan (Exhibit 10) |
| 10.19(16)# | Masimo Corporation Executive Bonus Incentive Plan (Appendix D) |
| 10.20(6)+ | Manufacturing and Purchase Agreement, dated October 2, 2008, by and between Analog Devices, Inc. and the Registrant (Exhibit 10.21) |
| 10.21(1)+ | Purchase Agreement, dated July 26, 2001, between Jabil Circuit, Inc. and the Registrant (Exhibit 10.15) |
| 10.22(1)+ | Shelter Labor Services Agreement, dated December 27, 2000, between Industrial Vallera de Mexicali, S.A. de C.V. and the Registrant (Exhibit 10.11) |
| 10.23†* | Lease Agreement effective as of September 1, 2007, by and among Industrias Asociadas Maquiladoras, S.A. de C.V., Industrial Vallera de Mexicali, S.A. de C.V. and the Registrant, as guarantor |
| 10.24†* | First Amendment, Lease Agreement effective as of December 17, 2013, by and among Industrias Asociadas Maquiladoras, S.A. de C.V., Industrial Vallera de Mexicali, S.A. de C.V. and the Registrant, as guarantor |
| 10.25(1) | Settlement Agreement and Release of Claims, dated January 17, 2006, between Cercacor Laboratories, Inc., Nellcor Puritan Bennett, Inc., Mallinckrodt, Inc., Tyco Healthcare Group LP, Tyco International Ltd., Tyco International (US) Inc. and the Registrant (Exhibit 10.30) |
| 10.26(8) | Second Amendment to the January 17, 2006 Settlement Agreement and Release of Claims, as amended pursuant to the January 24, 2006 Amendment to Settlement Agreement and Release of Claims, dated January 28, 2011, by and among Masimo Corporation, Masimo Laboratories, Inc., Nellcor Puritan Bennett LLC, Mallinckrodt Inc., Tyco Healthcare Group LP and Covidien Inc. (Exhibit 10.1) |
| 10.27(1) | Amended and Restated Cross-Licensing Agreement, effective January 1, 2007, between Cercacor Laboratories, Inc. and the Registrant (Exhibit 10.34) |
| 10.28(1) | Services Agreement, effective January 1, 2007, between Cercacor Laboratories, Inc. and the Registrant (Exhibit 10.35) |
| 10.29†* | Settlement and Covenant Not to Sue Agreement, entered into as of the Effective Date of November 16, 2015, between Masimo Corporation, Masimo Technologies SARL, and Masimo International SARL and Mindray Medical International, Limited, Shenzhen Mindray Biomedical Electronics Co., Ltd and Mindray DS USA, Inc. |
| 10.30(10) | Lease Agreement, dated July 15, 2012, related to the premises at 9600 Jeronimo, between the Registrant and The Irvine Company, LLC (Exhibit 10.45) |
| 10.31(10) | First Amendment to June 22, 2012 Lease Agreement, relating to the premises at 9600 Jeronimo, between the Registrant and Irvine Company, LLC (Exhibit 10.46) |
| 10.32(3) | Second Amendment to June 22, 2012 Lease Agreement, relating to the premises at 9600 Jeronimo, between the Registrant and Irvine Company, LLC (Exhibit 10.34) |
| 10.33(10) | Third Amendment to June 22, 2012 Lease Agreement, relating to the premises at 9600 Jeronimo, between the Registrant and Irvine Company, LLC (Exhibit 10.48) |
| 10.34(11) | Single-Tenant Lease, relating to the premises at 9600 Jeronimo, dated as of July 13, 2016, by and between Masimo Corporation and The Irvine Company LLC (Exhibit 10.1) |
| 10.35(12) | Third Amendment to Settlement Agreement and Release of Claims, dated as of September 1, 2016, by and among Masimo Corporation and Cercacor Laboratories, Inc., and Medtronic Plc., Covidien LP, Nellcor Puritan Bennett LLC and Covidien Holdings Inc. (Exhibit 10.1) |
| 10.36(12)+ | Settlement Agreement, dated November 5, 2016, by and between Masimo Corporation, Masimo International Technologies SARL and Masimo International SARL and Koninklijke Philips N.V. (Exhibit 10.1) |
| 10.37(19) | Credit Agreement dated as of December 17, 2018, among Masimo Corporation, the Lenders party thereto and JPMorgan Chase Bank, N.A. as Administrative Agent (Exhibit 10.42) |
| 10.38(18)# | Offer Letter, dated April 17, 2002, between the Company and Bilal Muhsin (Exhibit 10.1) |
| 10.39(18)# | Offer Letter, dated December 15, 2017, between the Company and Tao Levy (Exhibit 10.2) |

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 10.40(18)# | 2007 Severance Protection Plan Participation Agreement, dated March 26, 2018, by and between the Company and Bilal Muhsin (Exhibit 10.3) |
| 10.41(18)# | 2007 Severance Protection Plan Participation Agreement, dated March 16, 2018, by and between the Company and Tao Levy (Exhibit 10.4) |
| 21.1* | List of Registrant's Subsidiaries |
| 23.1* | Consent of Independent Registered Public Accounting Firm |
| 31.1* | Certification of Joe Kiani, Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Micah Young, Chief Financial Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Joe Kiani, Chief Executive Officer, and Micah Young, Chief Financial Officer, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

_____

Attached as Exhibit 101 to this report are the following formatted in iXBRL (Inline eXtensible Business Reporting Language): (i) Consolidated Balance Sheets as of January 2, 2021 and December 28, 2019, (ii) Consolidated Statements of Operations for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, (iii) Consolidated Statements of Comprehensive Income for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, (iv) Consolidated Statements of Equity for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, (v) Consolidated Statements of Cash Flows for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, and (vi) Notes to Consolidated Financial Statements.

_____

(1)   Incorporated by reference to the exhibits to the Registrant's Registration Statement on Form S-1 (No. 333-142171), originally filed on April 17, 2007. The number given in parentheses indicates the corresponding exhibit number in such Form S-1, as amended.

(2)   Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on October 30, 2019. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(3)   Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K, filed on February 17, 2015. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

(4)   Incorporated by reference to the exhibit to the Registrant's Registration Statement on Form S-8, filed on February 11, 2008. The number given in parentheses indicates the corresponding exhibit number in such Form S-8.

(5)   Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on November 5, 2015 at 4:45 p.m. Eastern Time. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(6)   Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K, filed on March 4, 2009. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

(7)   Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K, filed on February 15, 2013. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

(8)   Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on January 31, 2011. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(9)   Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on January 17, 2008. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(10)   Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K, filed on February 24, 2016. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(11)   Incorporated by reference to the exhibit to the Registrant's Quarterly Report on Form 10-Q, filed on August 3, 2016. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(12)   Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K, filed on September 2, 2016. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(13)   Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K filed on August 2, 2017. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(14)   Incorporated by reference to the exhibit to the Registrant's Current Report on Form 8-K filed on September 25, 2017. The number given in parentheses indicates the corresponding exhibit number in such Form 8-K.

(15)   Incorporated by reference to the Registrant's Quarterly Report on Form 10-Q filed on July 28, 2020. The number given in parentheses indicates the corresponding exhibit number in such Form 10-Q.

(16)   Incorporated by reference to Appendix D to the Registrant's Definitive Proxy Statement on Schedule 14A (File No. 001-33642) filed on April 16, 2020.

(17)   Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K filed February 28, 2018. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

(18)   Incorporated by reference to the exhibit to the Registrant's Quarterly Report on Form 10-Q filed May 7, 2018. The number given in parentheses indicates the corresponding exhibit number in such Form 10-Q.

(19)   Incorporated by reference to the exhibit to the Registrant's Annual Report on Form 10-K filed February 26, 2019. The number given in parentheses indicates the corresponding exhibit number in such Form 10-K.

\*   Filed herewith.

\#   Indicates management contract or compensatory plan.

\+   The SEC has granted confidential treatment with respect to certain portions of this exhibit. Omitted portions have been filed separately with the SEC.

†   Certain identified information has been omitted pursuant to Item 601(b)(10) of Regulation S-K because such information is both (i) not material and (ii) would likely cause competitive harm to the Registrant if publicly disclosed. The Registrant hereby undertakes to furnish supplemental copies of the unredacted exhibit upon request by the SEC.

### (b) Exhibits

See Item 15(a)(3) above.

### (c) Financial Statement Schedules

See Item 15(a)(2) above.

## ITEM 16.   FORM 10-K SUMMARY

None.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

| | | |
|---|---|---|
| Date: | February 23, 2021 | By: _____ /s/ JOE KIANI _____ |
| | | Joe Kiani |
| | | Chairman of the Board & Chief Executive Officer |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| SIGNATURE | TITLE(S) | DATE |
|---|---|---|
| /s/ JOE KIANI | Chairman of the Board & Chief Executive Officer (*Principal Executive Officer*) | February 23, 2021 |
| Joe Kiani | | |
| /s/ MICAH YOUNG | Executive Vice President, Chief Financial Officer (*Principal Financial Officer*) | February 23, 2021 |
| Micah Young | | |
| /s/ J. TODD KONING | Senior Vice President, Chief Accounting Officer (*Principal Accounting Officer*) | February 23, 2021 |
| J. Todd Koning | | |
| /s/ H MICHAEL COHEN | Director | February 23, 2021 |
| H Michael Cohen | | |
| /s/ THOMAS HARKIN | Director | February 23, 2021 |
| Thomas Harkin | | |
| /s/ ADAM MIKKELSON | Director | February 23, 2021 |
| Adam Mikkelson | | |
| /s/ CRAIG REYNOLDS | Director | February 23, 2021 |
| Craig Reynolds | | |
| /s/ JULIE A. SHIMER, PH.D. | Director | February 23, 2021 |
| Julie A. Shimer, Ph.D. | | |

86

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS AND SCHEDULE**

**MASIMO CORPORATION**

**Consolidated Financial Statements**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of January 2, 2021 and December 28, 2019 | F-5 |
| Consolidated Statements of Operations for the years ended January 2, 2021, December 28, 2019 and December 29, 2018 | F-6 |
| Consolidated Statements of Comprehensive Income for the years ended January 2, 2021, December 28, 2019 and December 29, 2018 | F-7 |
| Consolidated Statements of Equity for the years ended January 2, 2021, December 28, 2019 and December 29, 2018 | F-8 |
| Consolidated Statements of Cash Flows for the years ended January 2, 2021, December 28, 2019 and December 29, 2018 | F-9 |
| Notes to Consolidated Financial Statements | F-10 |

**Schedule**

| | |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | F-44 |

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Stockholders
Masimo Corporation

**Opinion on the financial statements**

We have audited the accompanying consolidated balance sheets of Masimo Corporation (a Delaware corporation) and subsidiaries (the "Company") as of January 2, 2021 and December 28, 2019, the related consolidated statements of operations, comprehensive income, equity, and cash flows for each of the three years in the period ended January 2, 2021, and the related notes and financial statement schedule included under Item 15(a) (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of January 2, 2021 and December 28, 2019, and the results of its operations and its cash flows for each of the three years in the period ended January 2, 2021, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of January 2, 2021, based on criteria established in the 2013 *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated February 23, 2021 expressed an unqualified opinion.

**Change in accounting principle**

As described in Note 2 to the financial statements, the Company has changed its method of accounting for leases in fiscal year 2019 due to the adoption of the new leasing standard. The Company adopted the new leasing standard using the modified retrospective approach.

**Basis for opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical audit matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Accounting for Deferred Equipment Agreements*

As described in Note 2 to the financial statements, the Company derives a portion of its product revenue from direct sales under deferred equipment agreements with end-user hospitals. Contract consideration under such agreements containing fixed annual sensor purchase commitments is allocated to the identified performance obligations, including lease components, on the basis of relative standalone selling prices.

Table of Contents

We identified the accounting for deferred equipment agreements as a critical audit matter. The principal consideration for our determination that the accounting for deferred equipment agreements is a critical audit matter is that the identification and evaluation of performance obligations requires management judgment and interpretation of contract terms. Therefore, subjective and complex auditor judgment is necessary to evaluate the reasonableness of management's judgments and assumptions in this area.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. Our audit procedures related to deferred equipment agreements included the following, among others.

- Inspecting a sample of deferred equipment agreements with fixed sensor commitments and evaluating the reasonableness of performance obligations, including lease components, identified by management in accordance with the relevant authoritative guidance.

- Testing the design and operating effectiveness of internal controls related to the accounting for deferred equipment agreements, including controls over the identification of performance obligations.

/s/ GRANT THORNTON LLP

We have served as the Company's auditor since 2006.

Newport Beach, California
February 23, 2021

F-3

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Stockholders
Masimo Corporation

**Opinion on internal control over financial reporting**
We have audited the internal control over financial reporting of Masimo Corporation (a Delaware corporation) and subsidiaries (the "Company") as of January 2, 2021, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of January 2, 2021, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by COSO.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended January 2, 2021, and our report dated February 23, 2021 expressed an unqualified opinion on those financial statements.

**Basis for opinion**
The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and limitations of internal control over financial reporting**
A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ GRANT THORNTON LLP

Newport Beach, California
February 23, 2021

F-4

**MASIMO CORPORATION**

**CONSOLIDATED BALANCE SHEETS**

**(in thousands, except par value)**

| | January 2, 2021 | December 28, 2019 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 641,447 | $ 567,687 |
| Short-term investments | — | 120,000 |
| Trade accounts receivable, net of allowance for doubtful accounts of $1,603 and $1,803 at January 2, 2021 and December 28, 2019, respectively | 141,350 | 132,433 |
| Inventories | 215,952 | 115,871 |
| Other current assets | 102,416 | 60,071 |
| Total current assets | 1,101,165 | 996,062 |
| Lease receivable, noncurrent | 57,666 | 49,936 |
| Deferred costs and other contract assets | 20,076 | 16,214 |
| Property and equipment, net | 272,511 | 219,552 |
| Intangible assets, net | 73,923 | 27,251 |
| Goodwill | 103,206 | 22,350 |
| Deferred tax assets | 39,363 | 35,972 |
| Other non-current assets | 44,642 | 28,791 |
| Total assets | $ 1,712,552 | $ 1,396,128 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities | | |
| Accounts payable | $ 64,061 | $ 54,548 |
| Accrued compensation | 71,601 | 54,705 |
| Deferred revenue and other contract-related liabilities, current | 44,935 | 25,939 |
| Other current liabilities | 53,239 | 37,027 |
| Total current liabilities | 233,836 | 172,219 |
| Other non-current liabilities | 71,076 | 56,035 |
| Total liabilities | 304,912 | 228,254 |
| Commitments and contingencies (Note 21) | | |
| Masimo Corporation Stockholders' equity | | |
| Preferred stock, $0.001 par value; 5,000 shares authorized; 0 shares issued and outstanding | — | — |
| Common stock, $0.001 par value; 100,000 shares authorized; 55,251 and 53,696 shares issued and outstanding at January 2, 2021 and December 28, 2019, respectively | 55 | 54 |
| Treasury stock, 15,993 and 15,530 shares at January 2, 2021 and December 28, 2019, respectively | (638,736) | (526,580) |
| Additional paid-in capital | 703,693 | 600,624 |
| Accumulated other comprehensive income (loss) | 1,413 | (6,718) |
| Retained earnings | 1,341,235 | 1,100,494 |
| Total Masimo Corporation stockholders' equity | 1,407,660 | 1,167,874 |
| Noncontrolling interest | (20) | — |
| Total equity | 1,407,640 | 1,167,874 |
| Total liabilities and equity | $ 1,712,552 | $ 1,396,128 |

The accompanying notes are an integral part of these consolidated financial statements.

**MASIMO CORPORATION**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

**(in thousands, except per share information)**

| | Year Ended January 2, 2021 | Year Ended December 28, 2019 | Year Ended December 29, 2018 |
|---|---|---|---|
| Revenue: | | | |
|     Product | $ 1,143,744 | $ 936,408 | $ 829,874 |
|     Royalty and other revenue | — | 1,429 | 28,415 |
| Total revenue | 1,143,744 | 937,837 | 858,289 |
| Cost of goods sold | 400,679 | 308,665 | 283,397 |
| Gross profit | 743,065 | 629,172 | 574,892 |
| Operating expenses: | | | |
|     Selling, general and administrative | 369,057 | 314,661 | 285,417 |
|     Research and development | 118,659 | 93,295 | 81,006 |
|     Litigation awards, settlements/or defense costs | (474) | — | 425 |
| Total operating expenses | 487,242 | 407,956 | 366,848 |
| Operating income | 255,823 | 221,216 | 208,044 |
| Non-operating income | 7,913 | 12,950 | 5,732 |
| Income before provision for income taxes | 263,736 | 234,166 | 213,776 |
| Provision for income taxes | 23,454 | 37,950 | 20,233 |
| Net income including noncontrolling interest | 240,282 | 196,216 | 193,543 |
| Net loss attributable to noncontrolling interest | 20 | — | — |
| Net income attributable to Masimo Corporation stockholders | $ 240,302 | $ 196,216 | $ 193,543 |
| Net income per share attributable to Masimo Corporation stockholders: | | | |
|     Basic | $ 4.39 | $ 3.67 | $ 3.70 |
|     Diluted | $ 4.14 | $ 3.44 | $ 3.45 |
| Weighted-average shares used in per share calculations: | | | |
|     Basic | 54,700 | 53,434 | 52,296 |
|     Diluted | 58,037 | 57,100 | 56,039 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

**MASIMO CORPORATION**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(in thousands)**

| | Year Ended January 2, 2021 | Year Ended December 28, 2019 | Year Ended December 29, 2018 |
|---|---|---|---|
| Net income including noncontrolling interest | $ 240,282 | $ 196,216 | $ 193,543 |
| Other comprehensive gain (loss), net of tax: | | | |
|    Foreign currency translation gains (losses) | 8,131 | (519) | (3,258) |
| Total comprehensive income | 248,413 | 195,697 | 190,285 |
|    Comprehensive loss attributable to noncontrolling interest | 20 | — | — |
| Comprehensive income attributable to Masimo Corporation stockholders | $ 248,433 | $ 195,697 | $ 190,285 |

The accompanying notes are an integral part of these consolidated financial statements.

F-7

**MASIMO CORPORATION**

**CONSOLIDATED STATEMENTS OF EQUITY**

**(in thousands)**

| | Masimo Corporation Stockholders | | | | | | | | |
| | Common Stock | | Treasury Stock | | | | | | |
| | Shares | Amount | Shares | Amount | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Retained Earnings | Noncontrolling Interest | Total Equity |
|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 30, 2017** | 51,636 | $ 52 | 15,059 | $ (472,536) | $461,494 | $ (2,941) | $ 737,956 | $ — | $ 724,025 |
| Stock options exercised | 1,608 | 1 | — | — | 44,421 | — | — | — | 44,422 |
| Restricted/Performance stock units vested | 39 | — | — | — | — | — | — | — | — |
| Shares paid for tax withholding | (2) | — | — | — | (168) | — | — | — | (168) |
| Stock-based compensation | — | — | — | — | 27,417 | — | — | — | 27,417 |
| Repurchases of common stock | (196) | — | 196 | (16,490) | — | — | — | — | (16,490) |
| Net income | — | — | — | — | — | — | 193,543 | — | 193,543 |
| Adoption of ASU 2016-16 | — | — | — | — | — | — | (426) | — | (426) |
| Foreign currency translation adjustment | — | — | — | — | — | (3,258) | — | — | (3,258) |
| **Balance at December 29, 2018** | 53,085 | 53 | 15,255 | (489,026) | 533,164 | (6,199) | 931,073 | — | 969,065 |
| Stock options exercised | 851 | 1 | — | — | 28,348 | — | — | — | 28,349 |
| Restricted/Performance stock units vested | 36 | — | — | — | — | — | — | — | — |
| Shares paid for tax withholding | (1) | — | — | — | (123) | — | — | — | (123) |
| Stock-based compensation | — | — | — | — | 39,235 | — | — | — | 39,235 |
| Repurchases of common stock | (275) | — | 275 | (37,554) | — | — | — | — | (37,554) |
| Net income | — | — | — | — | — | — | 196,216 | — | 196,216 |
| Adoption of ASU 2016-02 | — | — | — | — | — | — | (26,795) | — | (26,795) |
| Foreign currency translation adjustment | — | — | — | — | — | (519) | — | — | (519) |
| **Balance at December 28, 2019** | 53,696 | 54 | 15,530 | (526,580) | 600,624 | (6,718) | 1,100,494 | — | 1,167,874 |
| Stock options exercised | 1,945 | 1 | — | — | 63,035 | — | — | — | 63,036 |
| Restricted/Performance stock units vested | 85 | — | — | — | — | — | — | — | — |
| Shares paid for tax withholding | (19) | — | 7 | (1,616) | (2,191) | — | — | — | (3,807) |
| Stock-based compensation | — | — | — | — | 42,225 | — | — | — | 42,225 |
| Repurchases of common stock | (456) | — | 456 | (110,540) | — | — | — | — | (110,540) |
| Net income (loss) | — | — | — | — | — | — | 240,302 | (20) | 240,282 |
| Adoption of ASU 2016-13 | — | — | — | — | — | — | 439 | — | 439 |
| Foreign currency translation adjustment | — | — | — | — | — | 8,131 | — | — | 8,131 |
| **Balance at January 2, 2021** | 55,251 | $ 55 | 15,993 | $ (638,736) | $703,693 | $ 1,413 | $1,341,235 | $ (20) | $1,407,640 |

The accompanying notes are an integral part of these consolidated financial statements.

F-8

**MASIMO CORPORATION**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Year Ended January 2, 2021 | Year Ended December 28, 2019 | Year Ended December 29, 2018 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income including noncontrolling interest | $ 240,282 | $ 196,216 | $ 193,543 |
| Adjustments to reconcile net income including noncontrolling interest to net cash provided by operating activities: | | | |
| Depreciation and amortization | 29,300 | 23,487 | 21,127 |
| Stock-based compensation | 42,225 | 39,233 | 27,417 |
| Loss on disposal of equipment, intangibles and other assets | 554 | 357 | 949 |
| Benefit (provision) for doubtful accounts | 82 | 687 | (439) |
| (Benefit) for amount due from former foreign agent | — | — | (2,016) |
| (Benefit) from deferred income taxes | (4,964) | (5,965) | (8,274) |
| Changes in operating assets and liabilities: | | | |
| (Increase) decrease in trade accounts receivable | (2,229) | (23,580) | 10,826 |
| (Increase) in inventories | (94,434) | (21,257) | (1,885) |
| (Increase) decrease in other current assets | (29,984) | (8,536) | 3,843 |
| (Increase) in lease receivable, net | (7,749) | (11,958) | — |
| (Increase) decrease in deferred costs and other contract assets | (2,806) | 3,308 | (17,935) |
| (Increase) decrease in other non-current assets | (1,320) | (226) | 407 |
| Increase in accounts payable | 7,637 | 9,934 | 5,211 |
| Increase in accrued compensation | 15,544 | 5,338 | 10,195 |
| Increase in deferred revenue and other contract-related liabilities | 10,871 | 7,739 | 1,420 |
| (Decrease) increase in income taxes payable | (1,301) | 4,079 | (1,208) |
| Increase in accrued liabilities | 9,391 | 746 | 3,923 |
| (Decrease) increase in other non-current liabilities | (136) | 2,038 | (7,577) |
| **Net cash provided by operating activities** | 210,963 | 221,640 | 239,527 |
| **Cash flows from investing activities:** | | | |
| Maturities of short-term investments | 120,000 | 160,000 | — |
| Purchases of short-term investments | — | (280,000) | — |
| Purchases of property and equipment, net | (72,549) | (68,375) | (17,126) |
| Increase in intangible assets | (7,408) | (4,117) | (5,557) |
| Business combinations, net of cash acquired | (112,706) | — | (3,922) |
| Deposit to acquire noncontrolling interest | (3,374) | — | — |
| Other strategic investing activities | (6,750) | (5,189) | 453 |
| **Net cash (used in) investing activities** | (82,787) | (197,681) | (26,152) |
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of common stock | 58,424 | 28,339 | 44,748 |
| Repurchases of common stock | (110,540) | (37,555) | (18,478) |
| Payroll tax withholdings on behalf of employees for stock options | (2,191) | (123) | (168) |
| Debt issuance costs | — | — | (322) |
| **Net cash (used in) provided by financing activities** | (54,307) | (9,339) | 25,780 |
| Effect of foreign currency exchange rates on cash | 3,060 | 814 | (1,997) |
| Net increase in cash, cash equivalents and restricted cash | 76,929 | 15,434 | 237,158 |
| Cash, cash equivalents and restricted cash at beginning of period | 568,075 | 552,641 | 315,483 |
| Cash, cash equivalents and restricted cash at end of period | $ 645,004 | $ 568,075 | $ 552,641 |

The accompanying notes are an integral part of these consolidated financial statements.

F-9

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Description of the Company**

Masimo Corporation (the Company) is a global medical technology company that develops, manufactures and markets a wide array of patient monitoring technologies, as well as automation and connectivity solutions. The Company's mission is to improve patient outcomes and reduce the cost of patient care. The Company's patient monitoring solutions generally incorporate a monitor or circuit board, proprietary single-patient use or reusable sensors, software and/or cables. The Company primarily sells its products to hospitals, emergency medical service providers, home care providers, physician offices, veterinarians, long-term care facilities and consumers through its direct sales force, distributors and original equipment manufacturer (OEM) partners.

The Company invented Masimo Signal Extraction Technology® (SET®), which provides the capabilities of Measure-through Motion and Low Perfusion™ pulse oximetry to address the primary limitations of conventional pulse oximetry. Over the years, the Company's product offerings have expanded significantly to also include rainbow® Pulse CO-Oximetry, with its ability to monitor carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), total hemoglobin concentration (SpHb®), fractional arterial oxygen saturation (SpfO₂™), Oxygen Content (SpOC™), Pleth Variability Index (PVi®), rainbow® Pleth Variability Index (RPVi™), respiration rate from the pleth (RRp®) and Oxygen Reserve Index (ORi™); as well as acoustic respiration monitoring (RRa®), SedLine® brain function monitoring, NomoLine® capnography and gas monitoring and O3® Regional Oximetry. These technologies are based upon Masimo SET®, rainbow® and other proprietary algorithms and are incorporated into a variety of product platforms depending on customers' specifications. The Company's current technology offerings also include remote patient monitoring, connectivity, and hospital automation solutions, including Masimo Patient SafetyNet™[1], Masimo Patient SafetyNet™ Surveillance[1], Masimo SafetyNet™, Masimo SafetyNet-Open™, Replica™, Iris®, MyView®, UniView™, Uniview : 60™, Trace™, Masimo Sleep™, Centroid™, and Bridge™. The Company's technologies are supported by a substantial intellectual property portfolio that the Company has built through internal development and, to a lesser extent, acquisitions and license agreements.

**2. Summary of Significant Accounting Policies**

*Basis of Presentation*

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America (GAAP), and include the accounts of the Company and its wholly-owned or controlled subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation.

As further discussed below within this Note 2 to these consolidated financial statements, the Company adopted Financial Accounting Standards Board (FASB) Accounting Standards Update (ASU) No. 2016-02, *Leases (Topic 842)* (ASU 2016-02) effective December 30, 2018.

*Fiscal Periods*

The Company follows a conventional 52/53 week fiscal year. Under a conventional 52/53 week fiscal year, a 52 week fiscal year includes four quarters of 13 weeks while a 53 week fiscal year includes three 13 week fiscal quarters and one 14 week fiscal quarter. The Company's last 53 week fiscal year was fiscal year 2014. Fiscal year 2020 is a 53 week fiscal year ending January 2, 2021, with the fourth quarter having 14 weeks. All references to years in these notes to consolidated financial statements are fiscal years unless otherwise noted.

*Reclassifications*

Certain amounts in the accompanying consolidated financial statements have been reclassified to conform to the current period presentation, including previously reported selling, general and administrative expenses that have been reclassified as research and development expenses within the consolidated financial statements for the year ended December 29, 2018. Included in the consolidated financial statements were certain reclassifications of the short-term investments for the years ended January 2, 2021 and December 28, 2019.

---

[1]   The use of the trademark Patient SafetyNet™ is under license from the University HealthSystem Consortium.

F-10

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

### Use of Estimates

The Company prepares its financial statements in conformity with GAAP, which requires the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Significant estimates include the determination of standalone selling prices, variable consideration, total consideration allocated to each performance obligation within a contract, inventory valuation, valuation of the Company's equity awards, valuation of identifiable assets and liabilities connected with business combinations, deferred taxes and any associated valuation allowances, deferred revenue, uncertain income tax positions, and litigation costs and related accruals. Actual results could differ from such estimates.

### Business Combinations

The Company accounts for business combinations using the acquisition method of accounting, which requires that once control is obtained, all the assets acquired, liabilities assumed and noncontrolling interests in the acquired entity, if applicable, are recorded at their respective fair values at the date of acquisition. The excess of the purchase price over fair values of identifiable assets, liabilities and noncontrolling interests in the acquired entity, if applicable, is recorded as goodwill.

### Fair Value Measurements

Authoritative guidance describes a fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value:

- Level 1 - Quoted prices in active markets for *identical* assets or liabilities.

- Level 2 - Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for *similar* assets or liabilities, quoted prices in markets that are not active or other inputs that can be corroborated by observable market data for substantially the full term of the assets or liabilities.

- Level 3 - Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

Pursuant to current authoritative guidance, entities are allowed an irrevocable option to elect the fair value for the initial and subsequent measurement for specified financial assets and liabilities on a contract-by-contract basis. The Company did not elect to apply the fair value option under this guidance to specific assets or liabilities on a contract-by contract basis. There were no transfers between Level 1, Level 2 and Level 3 inputs during the years ended January 2, 2021 or December 28, 2019. The Company carries cash and cash equivalents, as well as certificates of deposit with maturities of one year or less, at cost, which approximates fair value.

The following table represents the Company's financial assets (in thousands), measured at fair value on a recurring basis as of January 2, 2021:

| | Adjusted Basis Cost | Gross Unrealized Gains | Gross Unrealized (Losses) | Estimated Fair Value | Reported as Cash and Cash Equivalents | Short-Term Investments |
|---|---|---|---|---|---|---|
| Cash | $ 641,447 | $ — | $ — | $ 641,447 | $ 641,447 | $ — |
| Level 1: | | | | | | |
| None | — | — | — | — | — | — |
| Level 2: | | | | | | |
| None | — | — | — | — | — | — |
| Level 3: | | | | | | |
| None | — | — | — | — | — | — |
| Total assets measured at fair value | $ 641,447 | $ — | $ — | $ 641,447 | $ 641,447 | $ — |

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table represents the Company's financial assets (in thousands), measured at fair value on a recurring basis as of December 28, 2019.

| | Adjusted Basis Cost | Gross Unrealized Gains | Gross Unrealized (Losses) | Estimated Fair Value | Reported as | |
| | | | | | Cash and Cash Equivalents | Short-Term Investments |
|---|---|---|---|---|---|---|
| Cash | $    567,687 | $    — | $    — | $    567,687 | $    567,687 | $    — |
| Level 1: | | | | | | |
|    Certificates of deposit | 120,000 | — | — | 120,000 | — | 120,000 |
|    Subtotal | 120,000 | — | — | 120,000 | — | 120,000 |
| Level 2: | | | | | | |
|    None | — | — | — | — | | — |
| Level 3: | | | | | | |
|    None | — | — | — | — | | — |
| Total assets measured at fair value | $    687,687 | $    — | $    — | $    687,687 | $    567,687 | $    120,000 |

For certain other financial assets and liabilities, including restricted cash, accounts receivable, accounts payable and other current assets and liabilities, the carrying amounts approximate their fair value primarily due to the relatively short maturity of these balances. The Company also measures certain non-financial assets at fair value on a non-recurring basis, primarily goodwill, intangible assets and operating lease right-of-use assets, in connection with periodic evaluations for potential impairment.

### *Cash and Cash Equivalents*

The Company considers all highly liquid investments with an original maturity from date of purchase of three months or less, or highly liquid investments that are readily convertible into known amounts of cash, to be cash equivalents.

### *Short-Term Investments*

The Company classifies its investments in certificates of deposits maturing in greater than three months but less than one year on the date of the original investment as short-term investments. The carrying value of such investments approximates fair value and is accessible without any significant restrictions, taxes, or penalties. As of January 2, 2021, the Company had no investments in certificates of deposit.

### *Accounts Receivable and Allowance for Doubtful Accounts*

Accounts receivable consist of trade receivables recorded at the time of invoicing of product sales, reduced by reserves for estimated bad debts and returns. Trade accounts receivable are recorded at the invoiced amount and do not bear interest. Credit is extended based on an evaluation of the customer's financial condition. Collateral is generally not required. The Company records an allowance for doubtful accounts that it does not expect to collect based on relevant information, including historical experience, current conditions, and reasonable and supportable forecasts. Accounts are charged off against the allowance when the Company believes they are uncollectible.

### *Inventory*

Inventories are stated at the lower of cost or net realizable value. Cost is determined using a standard cost method, which approximates the first in, first out method, and includes material, labor and overhead costs. Inventory valuation adjustments are recorded for inventory items that have become excess or obsolete or are no longer used in current production and for inventory items that have a market price less than carrying value in inventory. The Company generally determines inventory valuation adjustments based on an evaluation of the expected future use of its inventory on an item by item basis and applies historical obsolescence rates to estimate the loss on inventory expected to have a recovery value below cost. The Company also records other specific inventory valuation adjustments when it becomes aware of unique events or circumstances that result in an expected recovery value below cost. For inventory items that have been written down, the reduced value becomes the new cost basis.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

### *Property and Equipment*

Property and equipment are stated at cost. Depreciation is calculated using the straight-line method over estimated useful lives as follows:

|  | Useful Lives |
|---|---|
| Aircraft and components | 4 to 20 years |
| Buildings | 39 years |
| Building improvements | 7 to 15 years |
| Computer equipment and software | 2 to 12 years |
| Demonstration units | 3 years |
| Furniture and office equipment | 2 to 6 years |
| Leasehold improvements | Lesser of useful life or term of lease |
| Machinery and equipment | 5 to 10 years |
| Tooling | 3 years |
| Vehicles | 5 years |

Land is not depreciated and construction-in-progress is not depreciated until placed in service. Normal repair and maintenance costs are expensed as incurred, whereas significant improvements that materially increase values or extend useful lives are capitalized and depreciated over the remaining estimated useful lives of the related assets. Upon sale or retirement of depreciable assets, the related cost and accumulated depreciation or amortization are removed from the accounts and any gain or loss on the sale or retirement is recognized in income.

### *Lessee Right-of-Use (ROU) Assets and Lease Liabilities*

As further discussed below within this Note 2 to these consolidated financial statements, the Company adopted ASC 842 effective December 30, 2018. The Company determines if an arrangement contains a lease at inception. ROU assets represent the Company's right to use an asset underlying an operating lease for the lease term and lease liabilities represent the Company's obligation to make lease payments arising from an operating lease. ROU assets and lease liabilities are recognized at the commencement date based on the present value of lease payments over the lease term. The Company generally estimates the applicable discount rate used to determine the net present value of lease payments based on available information at the lease commencement date. Many of the Company's lessee agreements include options to extend the lease, which the Company does not include in its lease terms unless they are reasonably certain to be exercised. The Company utilizes a portfolio approach to account for the ROU assets and liabilities associated with certain equipment leases.

The Company has also made an accounting policy election not to separate lease and non-lease components for its real estate leases and to exclude short-term leases with a term of twelve months or less from its ROU assets and lease liabilities. Rental expense for lease payments related to operating leases is recognized on a straight-line basis over the lease term.

### *Intangible Assets*

Intangible assets consist primarily of patents, trademarks, software development costs, customer relationships and acquired technology. Costs related to patents and trademarks, which include legal and application fees, are capitalized and amortized over the estimated useful lives using the straight-line method. Patent and trademark amortization commences once final approval of the patent or trademark has been obtained. Patent costs are amortized over the lesser of 10 years or the patent's remaining legal life, which assumes renewals, and trademark costs are amortized over 17 years, and their associated amortization cost is included in selling, general and administrative expense in the accompanying consolidated statements of operations. For intangibles purchased in an asset acquisition or business combination, which mainly include patents, trademarks, customer relationships and acquired technologies, the useful life is determined largely by valuation estimates of remaining economic life.

The Company's policy is to renew its patents and trademarks. Costs to renew patents and trademarks are capitalized and amortized over the remaining useful life of the intangible asset. The Company periodically evaluates the amortization period and carrying basis of patents and trademarks to determine whether any events or circumstances warrant a revised estimated useful life or reduction in value. Capitalized application costs are charged to operations when it is determined that the patent or trademark will not be obtained or is abandoned.

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Impairment of Goodwill, Intangible Assets and Other Long-Lived Assets*

Goodwill is recorded as the difference, if any, between the aggregate consideration paid for an acquisition and the fair value of the acquired net tangible and intangible assets. Goodwill is not amortized, but instead is tested annually for impairment, or more frequently when events or changes in circumstances indicate that goodwill might be impaired. In assessing goodwill impairment, the Company has the option to first assess the qualitative factors to determine whether the existence of events or circumstances leads to a determination that it is more likely than not that the fair value of a reporting unit is less than its carrying amount. The Company's qualitative assessment of the recoverability of goodwill considers various macroeconomic, industry-specific and Company-specific factors, including: (i) severe adverse industry or economic trends; (ii) significant Company-specific actions; (iii) current, historical or projected deterioration of the Company's financial performance; or (iv) a sustained decrease in the Company's market capitalization below its net book value. If, after assessing the totality of events or circumstances, the Company determines it is unlikely that the fair value of a reporting unit is less than its carrying amount, then a quantitative analysis is unnecessary. However, if the Company concludes otherwise, or if the Company elects to bypass the qualitative analysis, then the Company must perform a quantitative analysis that compares the fair value of the reporting unit with its carrying amount, including goodwill. If the fair value of the reporting unit exceeds its carrying amount, goodwill is not considered impaired; otherwise, a goodwill impairment loss is recognized for the lesser of: (a) the amount that the carrying amount of a reporting unit exceeds its fair value; or (b) the amount of the goodwill allocated to that reporting unit. The annual impairment test is performed during the fourth fiscal quarter.

The Company reviews long-lived assets and identifiable intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flows expected to be generated by the asset. If such asset is considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

*Income Taxes*

The Company accounts for income taxes using the asset and liability method, under which the Company recognizes deferred tax assets and liabilities for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and for net operating loss and tax credit carryforwards. Tax positions that meet a more-likely-than-not recognition threshold are recognized in the first reporting period that it becomes more-likely-than-not such tax position will be sustained upon examination. A tax position that meets this more-likely-than-not recognition threshold is recorded at the largest amount of tax benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. Previously recognized income tax positions that fail to meet the recognition threshold in a subsequent period are derecognized in that period. Differences between actual results and the Company's assumptions, or changes in the Company's assumptions in future periods, are recorded in the period they become known. The Company records potential accrued interest and penalties related to unrecognized tax benefits in income tax expense.

As a multinational corporation, the Company is subject to complex tax laws and regulations in various jurisdictions. The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws themselves are subject to change as a result of changes in fiscal policy, changes in legislation, evolution of regulations and court rulings. Therefore, the actual liability for U.S. or foreign taxes may be materially different from the Company's estimates, which could result in the need to record additional liabilities or potentially to reverse previously recorded tax liabilities.

Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. A valuation allowance is recorded against any deferred tax assets when, in the judgment of management, it is more likely than not that all or part of a deferred tax asset will not be realized. In assessing the need for a valuation allowance, the Company considers all positive and negative evidence, including recent financial performance, scheduled reversals of temporary differences, projected future taxable income, availability of taxable income in carryback periods and tax planning strategies.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Revenue Recognition, Deferred Revenue and Other Contract Liabilities*

The Company derives the majority of its product revenue from four primary sources: (i) direct sales under deferred equipment agreements with end-user hospitals where the Company provides up-front monitoring equipment at no up-front charge in exchange for a multi-year sensor purchase commitment; (ii) other direct sales of noninvasive monitoring solutions to end-user hospitals, emergency medical response organizations and other direct customers; (iii) sales of noninvasive monitoring solutions to distributors who then typically resell to end-user hospitals, emergency medical response organizations and other customers; and (iv) sales of integrated circuit boards to OEM customers who incorporate the Company's embedded software technology into their multiparameter monitoring devices. Subject to customer credit considerations, the majority of such sales are made on open account using industry standard payment terms based on the geography within which the specific customer is located.

The Company generally recognizes revenue following a single, principles-based five-step model to be applied to all contracts with customers and generally provides for the recognition of revenue in an amount that reflects the consideration to which the Company expects to be entitled, net of allowances for estimated returns, discounts or sales incentives, as well as taxes collected from customers that are remitted to government authorities, when control over the promised goods or services are transferred to the customer. Revenue related to equipment supplied under sales-type lease arrangements is recognized once control over the equipment is transferred to the customer, while revenue related to equipment supplied under operating-type lease arrangements is generally recognized on a straight-line basis over the term of the lease.

While the majority of the Company's revenue contracts and transactions contain standard business terms and conditions, there are some transactions that contain non-standard business terms and conditions. As a result, contract interpretation, judgment and analysis is required to determine the appropriate accounting, including: (i) the amount of the total consideration, as well as variable consideration, (ii) whether the arrangement contains an embedded lease, and if so, whether such embedded lease is a sales-type lease or an operating lease, (iii) the identification of the distinct performance obligations contained within the arrangement, (iv) how the arrangement consideration should be allocated to each performance obligation when multiple performance obligations exist, including the determination of standalone selling price, and (v) when to recognize revenue on the performance obligations. Changes in judgments on these assumptions and estimates could materially impact the timing of revenue recognition.

The Company enters into agreements to sell its monitoring solutions and services, sometimes as a part of arrangements with multiple performance obligations that include various combinations of product sales, equipment leases and services. In the case of contracts with multiple performance obligations, the authoritative guidance provides that the total consideration be allocated to each performance obligation on the basis of relative standalone selling prices. When a standalone selling price is not readily observable, the Company estimates the standalone selling price by considering multiple factors including, but not limited to, features and functionality of the product, geographies, type of customer, contractual prices pursuant to Group Purchasing Organization (GPO) contracts, the Company's pricing and discount practices, and other market conditions.

Sales under deferred equipment agreements are generally structured such that the Company agrees to provide certain monitoring-related equipment, software, installation, training and/or warranty support at no up-front charge in exchange for the customer's commitment to purchase sensors over the term of the agreement, which generally ranges from three years to six years. The Company allocates contract consideration under deferred equipment agreements containing fixed annual sensor purchase commitments to the underlying lease and non-lease components at contract inception.

In determining whether any underlying lease components are related to a sales-type lease or an operating lease, the Company evaluates the customer's rights and ability to control the use of the underlying equipment throughout the contract term, including any equipment substitution rights retained by the Company, as well as the Company's expectations surrounding potential contract/lease extensions or renewals and the customer's likelihood to exercise any purchase options. Revenue allocable to non-lease performance obligations is generally recognized as such non-lease performance obligations are satisfied. Revenue allocable to lease components under sales-type lease arrangements is generally recognized when control over the equipment is transferred to the customer. Revenue allocable to lease components under operating lease arrangements is generally recognized over the term of the operating lease. The Company generally does not expect to derive any significant value in excess of such asset's unamortized book value from equipment underlying its operating lease arrangements after the end of the agreement.

Revenue from the sale of products to end-user hospitals, emergency medical response organizations, other direct customers, distributors and OEM customers, is recognized by the Company when control of such products transfer to the customer based upon the terms of the contract or underlying purchase order. Revenue related to OEM rainbow® parameter software licenses is recognized by the Company upon the OEM's shipment of its product to its customer, as reported to the Company by the OEM.

F-15

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company provides certain customers with various sales incentives that may take the form of discounts or rebates. The Company records estimates related to these programs as a reduction to revenue at the time of sale. In general, customers do not have a right of return for credit or refund. However, the Company allows returns under certain circumstances. At the end of each period, the Company estimates and accrues for these returns as a reduction to revenue. The Company estimates the revenue constraints related to these forms of variable consideration based on various factors, including expected purchasing volumes, prior sales and returns history, and specific contractual terms and limitations.

The majority of the Company's royalty and other revenue arose from one agreement that was due and payable quarterly in arrears. An estimate of these royalty revenues was recorded in the period earned based on historical results, adjusted for any new information or trends known to management at the time of estimation. This estimated revenue was adjusted prospectively when the Company received the underlying royalty report, approximately sixty days after the end of the previous quarter. The Company received its final royalty payment from this agreement during the three months ended March 30, 2019. For the years ended January 2, 2021, December 28, 2019 and December 29, 2018, the Company recognized royalty revenue pursuant to this agreement of approximately $0.0 million, $0.7 million and $26.4 million, respectively.

### Shipping and Handling Costs and Fees

All shipping and handling costs are expensed as incurred and are recorded as a component of cost of goods sold in the accompanying consolidated statements of operations. Charges for shipping and handling billed to customers are included as a component of product revenue.

### Taxes Collected From Customers and Remitted to Governmental Authorities

The Company's policy is to present revenue net of taxes collected from customers and remitted to governmental authorities.

### Deferred Costs and Other Contract Assets

The costs of monitoring-related equipment provided to customers under operating lease arrangements within the Company's deferred equipment agreements are generally deferred and amortized to cost of goods sold over the life of the underlying contracts. Some of the Company's deferred equipment agreements also contain provisions for certain allowances to be made directly to the end-user hospital customer at the inception of the arrangement. These allowances are generally allocated to the lease and non-lease components and recognized as a reduction to revenue as the underlying performance obligations are satisfied.

The Company generally invoices its customers under deferred equipment agreements as sensors are provided to the customer. However, the Company may recognize revenue for certain non-lease performance obligations under deferred equipment agreements with fixed annual commitments at the time such performance obligations are satisfied and prior to the customer being invoiced. When this occurs, the Company records an unbilled contract receivable related to such revenue until the customer has been invoiced pursuant to the terms of the underlying deferred equipment agreement.

The incremental costs of obtaining a contract with a customer are capitalized and deferred if the Company expects such costs to be recoverable over the life of the contract and the contract term is greater than one year. Such deferred costs generally relate to certain incentive sales commissions earned by the Company's internal sales team in connection with the execution of deferred equipment agreements and are amortized to expense over the expected term of the underlying contract.

### Product Warranty

The Company generally provides a warranty against defects in material and workmanship for a period ranging from three months to forty-eight months, depending on the product type. In traditional sales activities, including direct and OEM sales, the Company establishes an accrued liability for the estimated warranty costs at the time of revenue recognition, with a corresponding provision to cost of goods sold. Customers may also purchase extended warranty coverage or service level upgrades separately or as part of a deferred equipment agreement. Revenue related to extended warranty coverage and service level upgrades is generally recognized over the life of the contract, which reasonably approximates the period over which such services will be provided. The related extended warranty and service level upgrade costs are expensed as incurred.

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Changes in the product warranty accrual were as follows (in thousands):

| | Year Ended | | |
| --- | --- | --- | --- |
| | January 2, 2021 | December 28, 2019 | December 29, 2018 |
| Warranty accrual, beginning of period | $ 3,395 | $ 1,910 | $ 1,149 |
| Accrual for warranties issued | 832 | 1,715 | 1,549 |
| Changes in pre-existing warranties (including changes in estimates)[1] | 196 | 1,130 | 551 |
| Settlements made | (1,683) | (1,360) | (1,339) |
| Warranty accrual, end of period | $ 2,740 | $ 3,395 | $ 1,910 |

_____

[1]   In connection with its adoption of ASC 842 on December 30, 2018, the Company recorded an adjustment to pre-existing warranties of $2.5 million related to equipment previously capitalized under its deferred equipment agreements where the embedded leases were treated as operating leases under prior guidance. See "Recently Adopted Accounting Pronouncements" in Note 2 to these consolidated financial statements for additional information related to the Company's adoption of ASC 842.

### Advertising Costs

Advertising costs are expensed as incurred. These costs are included in selling, general and administrative expense in the accompanying consolidated statements of operations. Advertising costs for the years ended January 2, 2021, December 28, 2019 and December 29, 2018 were $30.8 million, $14.0 million and $17.9 million, respectively.

### Research and Development

Costs related to research and development activities are expensed as incurred. These costs include personnel costs, materials, depreciation and amortization on associated tangible and intangible assets and an allocation of facility costs, all of which are directly related to research and development activities.

### Litigation Costs and Contingencies

The Company records a charge equal to at least the minimum estimated liability for a loss contingency or litigation settlement when both of the following conditions are met: (i) information available prior to issuance of the financial statements indicates that it is probable that a liability had been incurred at the date of the financial statements, and (ii) the range of loss can be reasonably estimated. The determination of whether a loss contingency or litigation settlement is probable or reasonably possible involves a significant amount of management judgment, as does the estimation of the range of loss given the nature of contingencies. Liabilities related to litigation settlements with multiple elements are recorded based on the fair value of each element. Legal and other litigation related expenses are recognized as the services are provided. The Company records insurance and other indemnity recoveries for litigation expenses when both of the following conditions are met: (a) the recovery is probable, and (b) collectability is reasonably assured. Insurance recoveries are only recorded to the extent the litigation costs to which they relate have been incurred and recognized in the financial statements.

### Foreign Currency Translation

The Company's international headquarters is in Switzerland, and its functional currency is the U.S. Dollar. The Company has many other foreign subsidiaries, and the largest transactions in foreign currency translations occur in Japanese Yen and the European Euro.

The Company records certain revenues and expenses in foreign currencies. These revenues and expenses are translated into U.S. Dollars based on the average exchange rate for the reporting period. Assets and liabilities denominated in foreign currencies are translated into U.S. Dollars at the exchange rate in effect as of the balance sheet date. Translation gains and losses related to foreign currency assets and liabilities of a subsidiary that are denominated in the functional currency of such subsidiary are included as a component of accumulated other comprehensive income (loss) within the accompanying consolidated balance sheets. Realized and unrealized foreign currency gains and losses related to foreign currency assets and liabilities of the Company or a subsidiary that are not denominated in the underlying functional currency are included as a component of non-operating (income) expense within the accompanying consolidated statements of operations.

### Comprehensive Income

Comprehensive income includes foreign currency translation adjustments and any related tax benefits that have been excluded from net income including noncontrolling interest and reflected in equity.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Net Income Per Share*

A computation of basic and diluted net income per share is as follows (in thousands, except per share data):

| | Year Ended | | |
|---|---|---|---|
| | January 2, 2021 | December 28, 2019 | December 29, 2018 |
| **Net income attributable to Masimo Corporation stockholders:** | $ 240,282 | $ 196,216 | $ 193,543 |
| Net loss attributable to noncontrolling interest | 20 | — | — |
| Net income attributable to Masimo Corporation stockholders | $ 240,302 | $ 196,216 | $ 193,543 |
| **Basic net income per share attributable to Masimo Corporation stockholders:** | | | |
| Net income attributable to Masimo Corporation stockholders | $ 240,302 | $ 196,216 | $ 193,543 |
| Weighted-average shares outstanding - basic | 54,700 | 53,434 | 52,296 |
| Net income per basic share attributable to Masimo Corporation stockholders | $ 4.39 | $ 3.67 | $ 3.70 |
| **Diluted net income per share attributable to Masimo Corporation stockholders:** | | | |
| Weighted-average shares outstanding - basic | 54,700 | 53,434 | 52,296 |
| Diluted share equivalents: stock options, RSUs and PSUs | 3,337 | 3,666 | 3,743 |
| Weighted-average shares outstanding - diluted | 58,037 | 57,100 | 56,039 |
| Net income per diluted share attributable to Masimo Corporation stockholders | $ 4.14 | $ 3.44 | $ 3.45 |

Basic net income per share is computed by dividing net income by the weighted-average number of shares outstanding during the period. Net income per diluted share is computed by dividing the net income by the weighted-average number of shares and potential shares outstanding during the period, if the effect of potential shares is dilutive. Potential shares include incremental shares of stock issuable upon the exercise of stock options and the vesting of both restricted share units (RSUs) and performance stock units (PSUs). For the years ended January 2, 2021, December 28, 2019 and December 29, 2018, weighted options to purchase 0.4 million, 0.4 million and 1.1 million shares of common stock, respectively, were outstanding, but not included in the computation of diluted net income per share because the effect of including such shares would have been antidilutive in the applicable period. For each of the years ended January 2, 2021, December 28, 2019 and December 29, 2018, certain RSUs were considered contingently issuable shares as their vesting is contingent upon the occurrence of certain future events. Since such events had not occurred and were not considered probable of occurring as of January 2, 2021, December 28, 2019 and December 29, 2018, 2.7 million of weighted average shares related to such RSUs have been excluded from the calculation of potential shares. For additional information with respect to these RSUs, please see "*Employment and Severance Agreements*" in Note 21 to these consolidated financial statements.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Supplemental Cash Flow Information*

Supplemental cash flow information includes the following (in thousands):

| | Year Ended | | |
|---|---|---|---|
| | January 2, 2021 | December 28, 2019 | December 29, 2018 |
| Cash paid during the year for: | | | |
| Interest expense | $ 270 | $ 211 | $ 193 |
| Income taxes | 39,491 | 42,270 | 36,589 |
| Operating lease liabilities | 6,276 | 6,676 | — |
| | | | |
| Non-cash operating activities: | | | |
| ROU assets obtained in exchange for lease liabilities[1] | $ 15,387 | $ 26,484 | $ — |
| | | | |
| Non-cash investing activities: | | | |
| Unpaid purchases of property and equipment | $ 2,053 | $ 6,686 | $ 2,391 |
| Settlement of promissory note receivable in connection with business combination | 5,100 | — | — |
| | | | |
| Non-cash financing activities: | | | |
| Unsettled common stock proceeds from option exercises | $ 3,011 | $ 14 | $ 4 |
| Fair value of common stock received for payment of stock option exercise price | 1,616 | — | — |
| | | | |
| Reconciliation of cash, cash equivalents and restricted cash: | | | |
| Cash and cash equivalents | $ 641,447 | $ 567,687 | $ 552,490 |
| Restricted cash | 3,557 | 388 | 151 |
| Total cash, cash equivalents and restricted cash shown in the statement of cash flows | $ 645,004 | $ 568,075 | $ 552,641 |

_____

[1]  In connection with its adoption of ASC 842 on December 30, 2018, the Company recorded a lessee operating lease ROU asset of $22.5 million. See "Recently Adopted Accounting Pronouncements" in Note 2 to these consolidated financial statements for additional information related to the Company's adoption of ASC 842.

*Segment Information*

The Company uses the "management approach" in determining reportable business segments. The management approach designates the internal organization used by management for making operating decisions and assessing performance as the source for determining the Company's reportable segments. Based on this assessment, management has determined it operates in one reportable business segment, which is comprised of patient monitoring and related products.

*Recently Adopted Accounting Pronouncements*

In June 2016, the (FASB) issued Accounting Standards Update (ASU) No. 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments (ASU 2016-13)*. Subsequent to the issuance of ASU 2016-13, the FASB clarified the guidance through several ASUs. The collective new guidance (ASC 326) generally requires entities to use a current expected credit loss model, which is a new impairment model based on expected losses rather than incurred losses. Under this model, an entity recognizes an impairment allowance equal to its current estimate of all contractual cash flows that the entity does not expect to collect. The entity's estimate considers relevant information about past events, current conditions, and reasonable and supportable forecasts. The Company's adoption of this standard, effective December 29, 2019, did not have a material impact on its consolidated financial statements.

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

In July 2019, the FASB issued ASU No. 2019-07, *Codification Updates to SEC Sections - Amendments to SEC Paragraphs Pursuant to SEC Final Rule Releases No. 33-10532, Disclosure Update and Simplification, and Nos. 33-10231 and 33-10442, Investment Company Reporting Modernization, and Miscellaneous Updates* (ASU 2019-07). The new standard aligns the guidance in various sections of the codification with the requirements of certain already effective SEC final rules. ASU 2019-07 is effective immediately and was adopted upon issuance. The Company's adoption of this standard did not have a material impact on its consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-15, *Intangibles–Goodwill and Other–Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* (ASU 2018-15). The new standard aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). ASU 2018-15 is effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2019. Early adoption is permitted, including adoption in an interim period. The Company early adopted this standard during the three months ended September 28, 2019, and such adoption did not have a material impact on its consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework - Changes to the Disclosure Requirements for Fair Value Measurement* (ASU 2018-13). The new standard adds and modifies certain disclosure requirements for fair value measurements including when entities will no longer be required to disclose the amount of and reasons for transfers between Level 1 and Level 2 of the fair value hierarchy, but will need to disclose the range and weighted average used to develop significant unobservable inputs for Level 3 fair value measurements. ASU 2018-13 is effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2019. Early adoption is permitted, including adoption in an interim period. The Company early adopted this standard during the three months ended September 28, 2019, and such adoption did not have a material impact on its consolidated financial statements.

In July 2018, the FASB issued ASU No. 2018-09, *Codification Improvements* (ASU 2018-09). This new standard amends, clarifies, corrects errors in and makes minor improvements to the ASC. The transition and effective date guidance is based on the facts and circumstances of each amendment. Some of the amendments of ASU 2018-09 do not require transition guidance and are effective upon issuance. The Company completed its adoption of all applicable items contained in ASU 2018-09 as of September 28, 2019, and such adoption did not have a material impact on its consolidated financial statements.

In February 2018, the FASB issued ASU No. 2018-02, *Income Statement - Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income* (ASU 2018-02). The new standard allows a reclassification for certain stranded tax effects from accumulated other comprehensive income to retained earnings, and requires certain disclosures about stranded tax effects. ASU 2018-02 is effective for annual and interim periods beginning after December 15, 2018. The Company adopted this standard during the three months ended March 30, 2019, and such adoption did not have a material impact on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* (ASU 2016-02). Subsequent to the issuance of ASU 2016-02, the FASB clarified the guidance through several ASUs. The collective guidance was codified by the FASB in ASC 842, which, among other things (i) requires the Company to recognize an ROU asset and a lease liability for all operating leases for which the Company is the lessee; (ii) changes the classification of certain embedded leases within the Company's deferred equipment agreements with its customers from operating to sales-type leases, resulting in the acceleration of revenue under certain contracts, as well as the immediate expensing of certain costs that were previously deferred and expensed over the term of the lease; and (iii) requires disclosures by the Company as a lessor and lessee about the amount, timing and uncertainty of cash flows arising from its leases.

On December 30, 2018, the Company adopted ASC 842 using the modified retrospective method for all lease arrangements at the beginning of the period of adoption. Results for reporting periods beginning December 30, 2018 are presented under ASC 842, while prior period amounts were not adjusted and continue to be reported in accordance with the Company's historic accounting under ASC 840, *Leases*. Adoption of this new accounting standard had a material impact on the Company's consolidated balance sheet upon adoption, but did not have a significant impact on the Company's consolidated net earnings and cash flows for the year ended December 28, 2019. For leases that commenced before the effective date of ASC 842, the Company did not elect any of the permitted practical expedients. However, the Company utilized a portfolio approach for purposes of determining the discount rate associated with certain equipment leases and made certain accounting policy elections not to separate lease and non-lease components for its real estate leases and to exclude short-term leases with a term of twelve months or less from its application of ASC 842.

Table of Contents

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

In connection with its adoption of ASC 842, the Company recorded lessee operating lease ROU assets and lessee operating lease liabilities of $22.5 million as of December 30, 2018, primarily related to real estate and equipment leases, based on the present value of the future lease payments on such date. As a lessor, the Company also recorded customer lease receivables of $62.0 million, a reduction to equipment leased to customers (formerly titled deferred cost of goods sold) of $103.5 million, an increase to deferred tax assets of $8.6 million, a decrease to deferred revenue and contract-related liabilities of $9.1 million, an increase in other current liabilities of $3.0 million and a cumulative net decrease to retained earnings of $26.8 million, all related to the reclassification of certain embedded leases in existing deferred equipment agreements from operating to sales-type leases as of December 30, 2018. See Notes 6, 7 and 11 to these consolidated financial statements for additional disclosures required by ASC 842.

### *Recently Issued Accounting Pronouncements*

In March 2020, the FASB issued ASU No. 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting (ASU 2020-04)*. The new guidance provides temporary optional expedients and exceptions to the guidance in GAAP on contract modifications and hedge accounting to ease the financial reporting burdens related to the expected market transition from the London Interbank Offered Rate (LIBOR) and other interbank offered rates to alternative reference rates, such as the Secured Overnight Financing Rate (SOFR). Entities can make a one-time election to sell and/or reclassify held-to-maturity debt securities that reference an interest rate affected by reference rate reform. ASU 2020-04 is effective beginning on March 12, 2020, and the Company may elect to apply this guidance prospectively through December 31, 2022. The relief is temporary and generally cannot be applied to contract modifications that occur after December 31, 2022 or hedging relationships entered into or evaluated after that date. However, certain optional expedients can be applied to hedging relationships evaluated in periods after December 31, 2022. The Company is currently evaluating the expected impact of this standard, but does not expect it to have a material impact on its consolidated financial statements upon adoption.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes* (ASU 2019-12). The new standard simplifies the accounting for income taxes by removing exceptions to the incremental approach for intraperiod tax allocation when there is a loss from continuing operations and income or a gain from other items, to the requirement to recognize a deferred tax liability for equity method investments when a foreign subsidiary becomes an equity method investment, to the ability not to recognize a deferred tax liability for a foreign subsidiary when a foreign equity method investment becomes a subsidiary, and to the general methodology for calculating income taxes in an interim period when a year-to-date loss exceeds the anticipated loss for the year. In addition, the standard requires that an entity recognize a franchise tax that is partially based on income as an income-based tax and account for any incremental amount incurred as a non-income-based tax, evaluate when a step up in the tax basis of goodwill should be considered part of the business combination in which the book goodwill was originally recognized and when it should be considered a separate transaction, reflect the effect of an enacted change in tax laws or rates in the annual effective tax rate computation in the interim period that includes the enactment date, and specifying that an entity is not required to allocate the consolidated amount of current and deferred tax expense to a legal entity that is not subject to tax in its separate financial statements, however, an entity may elect to do so (on an entity-by-entity basis) for a legal entity that is both not subject to tax and disregarded by the taxing authority. ASU 2019-12 is effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2020. Early adoption is permitted, including adoption in an interim period. The Company is currently evaluating the expected impact of this standard, but does not expect it to have a material impact on its consolidated financial statements upon adoption.

### 3. Related Party Transactions

Cercacor Laboratories, Inc. (Cercacor) is an independent entity that was spun off from the Company to its stockholders in 1998. Joe Kiani, the Company's Chairman and Chief Executive Officer (CEO), is also the Chairman and CEO of Cercacor. Effective as of January 3, 2016, in connection with changes in the capital structure of Cercacor, the Company determined that Cercacor was no longer required to be consolidated. Although the Company believes that Cercacor continues to be considered a variable interest entity, the Company has determined that it is no longer the primary beneficiary of Cercacor as it does not have the power to direct the activities of Cercacor that most significantly impact Cercacor's economic performance and has no obligation to absorb Cercacor's losses.

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company is a party to the following agreements with Cercacor:

- *Cross-Licensing Agreement* - The Company and Cercacor are parties to a cross-licensing agreement (Cross-Licensing Agreement), which governs each party's rights to certain intellectual property held by the two companies. The Company is subject to certain annual minimum aggregate royalty obligations for use of the rainbow® licensed technology. The current annual minimum royalty obligation is $5.0 million. Aggregate liabilities payable to Cercacor arising under the Cross-Licensing Agreement were $13.3 million, $12.1 million and $10.9 million for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, respectively. The Company had sales to Cercacor in the amount of less than $0.1 million, $0.1 million, and less than $0.1 million for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, respectively.

- *Administrative Services Agreement* - The Company is a party to an administrative services agreement with Cercacor (G&A Services Agreement), which governs certain general and administrative services that the Company provides to Cercacor. Amounts charged by the Company pursuant to the G&A Services Agreement were $0.3 million, $0.2 million and $0.2 million for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, respectively.

- *Patent Transfer and Licensing Agreement.* The Company entered into a patent transfer and licensing agreement with Cercacor (the Patent Agreement) effective July 2015, pursuant to which, among other things, it purchased certain patents from Cercacor (the Purchased Patents) for an aggregate purchase price of $2.4 million. Pursuant to the Patent Agreement, the Company granted Cercacor an irrevocable, non-exclusive, worldwide license with respect to the products and services covered by the Purchased Patents.

- *Lease and Sublease Agreements* - Effective December 14, 2019, the Company entered into a new lease agreement with Cercacor for approximately 34,000 of square feet of office, research and development space at one of the Company's owned facilities in Irvine (Cercacor Lease). The term of the Cercacor Lease expires on December 31, 2024. In March 2016, the Company entered into a sublease agreement with Cercacor for approximately 16,830 square feet of excess office and laboratory space located at 40 Parker, Irvine, California (Cercacor Sublease). The Cercacor Sublease began on May 1, 2016 and expired on December 15, 2019. The Company recognized approximately $1.1 million, $0.4 million and $0.4 million of combined lease and sublease income for the years ended January 2, 2021, December 28, 2019, and December 29, 2018, respectively.

Net amounts due to Cercacor were approximately $3.6 million and $2.9 million as of January 2, 2021 and December 28, 2019, respectively.

The Company's CEO is also the Chairman of the Masimo Foundation for Ethics, Innovation and Competition in Healthcare (Masimo Foundation), a non-profit organization that was founded in 2010 to provide a platform for encouraging ethics, innovation and competition in healthcare. In addition, the Company's Executive Vice President (EVP), Chief Financial Officer (CFO) serves as the Treasurer of the Masimo Foundation and the Company's EVP, General Counsel and Corporate Secretary serves as the Secretary for the Masimo Foundation. For the fiscal years ended January 2, 2021, December 28, 2019 and December 29, 2018, the Company made cash contributions of approximately $1.5 million, $1.0 million and $2.0 million, respectively, to the Masimo Foundation. In addition, for each of the years ended January 2, 2021, December 28, 2019 and December 29, 2018, the Company made various in-kind contributions to the Masimo Foundation, mainly in the form of donated administrative services.

The Company's CEO is also a co-founder and a member of the board of directors of Like Minded Media Ventures (LMMV), a team of storytellers that create content focused in the areas of true stories, social causes and science**.** LMMV creates stories with a multi-platform strategy, bridging the gap between film, television, digital and social media. The Company entered into a marketing service agreement with LMMV for audiovisual production services promoting brand awareness, including television commercials and digital advertising, during the second quarter of 2020. During the fiscal year ended January 2, 2021, the Company incurred approximately $3.5 million in marketing expenses to LMMV under the marketing service agreement. At January 2, 2021, there was no amount due to LMMV for services rendered.

The Company maintains an aircraft time share agreement, pursuant to which the Company has agreed from time to time to make its aircraft available to the Company's CEO for lease on a time-sharing basis. The Company charges the Company's CEO for personal use based on agreed upon reimbursement rates. During the fiscal years ended January 2, 2021, December 28, 2019 and December 29, 2018, the Company charged the Company's CEO less than $0.1 million, $0.1 million and $0.2 million, respectively, related to such reimbursements.

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**4. Inventories**

Inventories consist of the following (in thousands):

|  | January 2, 2021 | December 28, 2019 |
|---|---|---|
| Raw materials | $ 133,098 | $ 55,920 |
| Work-in-process | 15,985 | 10,966 |
| Finished goods | 66,869 | 48,985 |
| Total Inventories | $ 215,952 | $ 115,871 |

**5. Other Current Assets**

Other current assets consist of the following (in thousands):

|  | January 2, 2021 | December 28, 2019 |
|---|---|---|
| Prepaid expenses | $ 30,235 | $ 11,746 |
| Lease receivable, current | 23,206 | 20,250 |
| Prepaid income taxes | 14,782 | 7,330 |
| Indirect taxes receivable | 14,545 | 9,311 |
| Deposits to acquire noncontrolling interest[1] | 3,374 | — |
| Prepaid rebates and royalties | 3,081 | 1,801 |
| Restricted cash[2] | 3,397 | 230 |
| Customer notes receivable | 2,283 | 4,847 |
| Other current assets | 7,513 | 4,556 |
| Total other current assets | $ 102,416 | $ 60,071 |

_____

[1]   During the fourth quarter of fiscal 2020, the Company obtained a controlling interest in a provider of advanced hemodynamic monitoring solutions. The Company made a deposit to acquire the noncontrolling interest of the acquirer.

[2]   Restricted cash includes funds received from the Bill and Melinda Gates Foundation. As the Company incurs costs associated with research and development related to this project, on a quarterly basis, the Company reclasses amounts from the grant to offset costs incurred.

**6. Lease Receivable**

Effective December 30, 2018, the Company adopted ASC 842, which resulted in changes to the classification of certain embedded leases within its deferred equipment agreements from operating-type leases to sales-type leases. As a result, the Company now recognizes revenue and costs, as well as a lease receivable, at the time the lease commences pursuant to deferred equipment agreements containing embedded sales-type leases. Lease revenue related to both operating-type and sales-type leases for the year ended January 2, 2021 and December 28, 2019 was approximately $42.6 million and $44.0 million, respectively, and is included within product revenue in the accompanying consolidated statements of operations. Costs related to embedded leases within the Company's deferred equipment agreements are included in cost of goods sold. See "Recently Adopted Accounting Pronouncements" in Note 2 to these consolidated financial statements for additional information related to the Company's adoption of ASC 842.

Lease receivable consists of the following (in thousands):

|  | January 2, 2021 | December 28, 2019 |
|---|---|---|
| Lease receivable | $ 81,074 | $ 70,589 |
| Allowance for credit loss | (202) | (403) |
| Lease receivable, net | 80,872 | 70,186 |
| Less: current portion of lease receivable | (23,206) | (20,250) |
| Lease receivable, noncurrent | $ 57,666 | $ 49,936 |

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

As of January 2, 2021, estimated future maturities of customer sales-type lease receivables for each of the following fiscal years are as follows (in thousands):

| Fiscal year | Amount |
|---|---|
| 2021 | $ 23,206 |
| 2022 | 19,992 |
| 2023 | 15,493 |
| 2024 | 11,469 |
| 2025 | 6,238 |
| Thereafter | 4,474 |
| Total | $ 80,872 |

Estimated future operating lease payments expected to be received from customers under deferred equipment agreements are not material as of January 2, 2021.

**7. Deferred Costs and Other Contract Assets**

Deferred costs and other contract assets consist of the following (in thousands):

| | January 2, 2021 | December 28, 2019 |
|---|---|---|
| Deferred commissions | $ 7,477 | $ 5,260 |
| Prepaid contract allowances | 7,336 | 8,098 |
| Unbilled contract receivables | 3,925 | 2,482 |
| Equipment leased to customers, net[1] | 1,338 | 374 |
| Deferred costs and other contract assets | $ 20,076 | $ 16,214 |

---

[1] Formerly titled "Deferred cost of goods sold". In connection with its adoption of ASC 842 on December 30, 2018, the Company recorded a reduction to equipment leased to customers, net, of $103.5 million as a result of the reclassification of certain embedded leases within the Company's deferred equipment agreements with its customers from operating to sales-type leases. See "Recently Adopted Accounting Pronouncements" under Note 2 to these consolidated financial statements for additional information related to the Company's adoption of ASC 842.

For the years ended January 2, 2021, December 28, 2019, and December 29, 2018, $0.4 million, $1.0 million and $30.0 million, respectively, of equipment leased to customers was amortized to cost of goods sold. As of January 2, 2021 and December 28, 2019, accumulated amortization of equipment leased to customers was $0.9 million and $0.7 million, respectively.

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**8. Property and Equipment, net**

Property and equipment, net, consists of the following (in thousands):

| | January 2, 2021 | December 28, 2019 |
|---|---|---|
| Building and building improvements | $ 122,310 | $ 101,731 |
| Machinery and equipment | 72,610 | 58,864 |
| Land | 57,151 | 40,216 |
| Aircraft and vehicles | 33,175 | 29,934 |
| Computer equipment and software | 24,693 | 19,650 |
| Leasehold improvements | 19,295 | 15,921 |
| Tooling | 18,233 | 15,346 |
| Furniture and office equipment | 13,567 | 11,049 |
| Demonstration units | 1,024 | 836 |
| Construction-in-progress (CIP) | 44,589 | 39,107 |
| Total property and equipment | 406,647 | 332,654 |
| Accumulated depreciation | (134,136) | (113,102) |
| Property and equipment, net | $ 272,511 | $ 219,552 |

In March 2020, the Company purchased a facility in Switzerland for its international headquarters for a purchase price of $16.4 million, as well as land in Mexicali, Mexico for a purchase price of $7.7 million to be used for the construction of a new manufacturing and distribution facility.

The balance in CIP at January 2, 2021 relates primarily to acquisition and improvement costs for a portion of a recently purchased building in Switzerland, capitalized implementation costs related to a new enterprise resource planning software system and costs related to manufacturing equipment and other facility improvements, the underlying assets for which have not been completed or placed into service. The balance in CIP at December 28, 2019 related primarily to acquisition and improvement costs for a portion of a recently purchased building in California, capitalized and implementation costs related to an enterprise resource planning software system and costs related to manufacturing equipment and other facility improvements, the underlying assets for which have not been placed into service.

For the years ended January 2, 2021, December 28, 2019 and December 29, 2018, depreciation expense of property and equipment was $21.8 million, $19.1 million and $16.3 million, respectively.

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**9. Intangible Assets, net**

Intangible assets, net, consist of the following (in thousands):

| | | January 2, 2021 | | December 28, 2019 |
|---|---|---|---|---|
| **Gross carrying amount** | | | | |
| Acquired technologies | $ | 29,039 | $ | 5,580 |
| Patents | | 26,875 | | 23,242 |
| Customer relationships | | 24,666 | | 7,669 |
| Trademarks | | 11,708 | | 4,614 |
| Licenses-related party | | 7,500 | | 7,500 |
| Capitalized software development costs | | 3,710 | | 3,328 |
| Other | | 7,091 | | 5,466 |
| Total gross carrying amount | $ | 110,589 | $ | 57,399 |
| **Accumulated amortization** | | | | |
| Patents | $ | (10,763) | $ | (9,251) |
| Licenses-related party | | (6,841) | | (5,984) |
| Customer relationships | | (6,486) | | (5,688) |
| Acquired technologies | | (5,259) | | (4,182) |
| Trademarks | | (3,999) | | (2,195) |
| Capitalized software development costs | | (2,319) | | (2,137) |
| Other | | (999) | | (711) |
| Total accumulated amortization | | (36,666) | | (30,148) |
| Net carrying amount | $ | 73,923 | $ | 27,251 |

Intangible assets have a weighted-average amortization period of twelve years. For the years ended January 2, 2021, December 28, 2019 and December 29, 2018, amortization of intangible assets was $7.5 million, $4.4 million and $4.8 million, respectively. As of January 2, 2021 and December 28, 2019, the total costs of patents not yet amortizing was $8.2 million and $6.1 million, respectively. As of January 2, 2021 and December 28, 2019, the total costs of trademarks not yet amortizing was $0.9 million and $0.7 million, respectively.

For the years ended January 2, 2021 and December 28, 2019, total renewal costs capitalized for patents and trademarks was $1.3 million and $1.3 million, respectively. As of January 2, 2021, the weighted-average number of years until the next renewal was one year for patents and six years for trademarks.

During the first quarter of fiscal 2020, the Company completed an immaterial business combination. Based on the Company's preliminary purchase price allocation, approximately $15.5 million, $2.6 million and $1.7 million of the purchase price was assigned to customer relationships, acquired technologies and trademarks, respectively.

During the second quarter of fiscal 2020, the Company completed another immaterial business combination. Based on the Company's preliminary purchase price allocation, approximately $6.3 million, $2.4 million, $0.4 million and $0.3 million of the purchase price was assigned to acquired technologies, trademarks, customer relationships and other intangibles, respectively.

During the fourth quarter of fiscal 2020, the Company obtained a controlling interest in a provider of advanced hemodynamic monitoring solutions. Based on the Company's preliminary purchase price allocation, approximately $14.0 million, $2.3 million, $1.0 million and $1.0 million of the purchase price was assigned to acquired technologies, trademarks, customer relationships and other intangibles, respectively. Subsequently, during the first quarter of fiscal 2021, the Company acquired the remaining minority interest. See Note 14 to these consolidated financial statements for further details.

The Company is still gathering additional information to finalize these preliminary estimates with respect to tax contingency matters and expects to finalize the purchase price allocations as soon as practicable, but no later than one year from the acquisition dates.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Estimated amortization expense for each of the next fiscal years is as follows (in thousands):

| Fiscal year | | Amount |
|---|---|---|
| 2021 | $ | 8,761 |
| 2022 | | 8,385 |
| 2023 | | 7,334 |
| 2024 | | 6,985 |
| 2025 | | 5,974 |
| Thereafter | | 36,484 |
| Total | $ | 73,923 |

## 10. Goodwill

Changes in goodwill were as follows (in thousands):

| | January 2, 2021 | | December 28, 2019 |
|---|---|---|---|
| Goodwill, beginning of period | $ 22,350 | $ | 23,297 |
| Increase from business combinations | 79,862 | | — |
| Foreign currency translation and other adjustments | 994 | | (947) |
| Goodwill, end of period | $ 103,206 | $ | 22,350 |

During the first quarter of fiscal 2020, the Company completed an immaterial business combination. Based on the Company's preliminary purchase price allocation for this transaction, approximately $31.4 million of the purchase price was assigned to goodwill.

During the second quarter of fiscal 2020, the Company completed another immaterial business combination. Based on the Company's preliminary purchase price allocation for this transaction, approximately $26.7 million of the purchase price was assigned to goodwill.

During the fourth quarter of fiscal 2020, the Company obtained a controlling interest in a provider of advanced hemodynamic monitoring solutions. Based on the Company's preliminary purchase price allocation, approximately $21.8 million of the purchase price was assigned to goodwill. Subsequently, during the first quarter of fiscal 2021, the Company acquired the remaining minority interest. See Note 14 to these consolidated financial statements for further details.

The Company is still gathering additional information to finalize these preliminary estimates with respect to tax contingency matters and expects to finalize the purchase price allocations as soon as practicable, but no later than one year from the acquisition dates.

## 11. Lessee ROU Assets and Lease Liabilities

Effective December 30, 2018, the Company adopted ASC 842. See "Recently Adopted Accounting Pronouncements" in Note 2 to these consolidated financial statements for additional information.

The Company leases certain facilities in North and South America, Europe, the Middle East and Asia-Pacific regions under operating lease agreements expiring at various dates through February 2031. In addition, the Company leases equipment in the U.S. and Europe that are classified as operating leases and expire at various dates through April 2024. The majority of these leases are non-cancellable and generally do not contain any material restrictive covenants, material residual value guarantees or other material guarantees. The Company recognizes lease costs under these agreements using a straight-line method based on total lease payments. Certain facility leases contain predetermined price escalations and in some cases renewal options, the longest of which is for five years.

The Company generally estimates the applicable discount rate used to determine the net present value of lease payments based on available information at the lease commencement date. As of January 2, 2021, the weighted average discount rate used by the Company for all operating leases was approximately 2.5%.

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The balance sheet classifications for amounts related to the Company's operating leases for which it is the lessee are as follows (in thousands):

|  | Balance sheet classification | January 2, 2021 | December 28, 2019 |
|---|---|---|---|
| Lessee ROU assets, net | Other non-current assets | $ 32,324 | $ 19,137 |
| Lessee current lease liabilities | Other current liabilities | 5,975 | 4,653 |
| Lessee non-current lease liabilities | Other non-current liabilities | 28,373 | 15,834 |
| Total operating lease liabilities |  | $ 34,348 | $ 20,487 |

For the years ended January 2, 2021 and December 28, 2019, accumulated amortization for lessee ROU assets was $9.2 million and $4.7 million, respectively. The weighted average remaining lease term for the Company's operating leases was 7.1 years as of January 2, 2021.

As of January 2, 2021, estimated future operating lease payments for each of the following fiscal years were as follows (in thousands):

| Fiscal year | Amount |
|---|---|
| 2021 | $ 6,610 |
| 2022 | 6,048 |
| 2023 | 5,762 |
| 2024 | 4,540 |
| 2025 | 3,576 |
| Thereafter[1] | 11,055 |
| Total | 37,591 |
| Imputed interest | (3,243) |
| Present value[2] | $ 34,348 |

_____

[1]   Includes optional renewal period for certain leases.

[2]   During fiscal 2020, the Company entered into lease agreements for two properties which have not commenced as of January 2, 2021. The future obligations for such leases are $3.1 million in the aggregate and are not included in the estimated future operating lease payments.

Lease costs consist of the following (in thousands):

|  | January 2, 2021 | December 28, 2019 |
|---|---|---|
| Operating lease costs | $ 6,945 | $ 6,790 |
| Short-term lease costs | 1 | 12 |
| Sublease income | — | (232) |
| Total lease cost | $ 6,946 | $ 6,570 |

For the year ended December 29, 2018, rental expense related to operating leases was $6.9 million.

F-28

## 12. Other Non-Current Assets

Other assets, long-term consist of the following (in thousands):

| | January 2, 2021 | December 28, 2019 |
|---|---|---|
| Lessee ROU assets, net | $ 32,324 | $ 19,137 |
| Strategic investments | 8,002 | 6,475 |
| Prepaid deposits | 3,816 | 3,022 |
| Other non-current assets | 500 | 157 |
| Total non-current assets | $ 44,642 | $ 28,791 |

## 13. Deferred Revenue and Other Contract Liabilities

Deferred revenue and other contract liabilities consist of the following (in thousands):

| | January 2, 2021 | December 28, 2019 |
|---|---|---|
| Deferred revenue[1] | $ 33,221 | $ 13,998 |
| Accrued rebates and allowances | 12,127 | 8,436 |
| Accrued customer reimbursements[2] | 3,829 | 5,739 |
| Total deferred revenue and other contract liabilities | 49,177 | 28,173 |
| Less: Non-current portion of deferred revenue | (4,242) | (2,234) |
| Deferred revenue and other contract liabilities - current | $ 44,935 | $ 25,939 |

---

[1]   In connection with its adoption of ASC 842 on December 30, 2018, the Company recorded a reduction to deferred revenue of approximately $1.1 million due to the acceleration of revenue as a result of the reclassification of certain embedded leases within the Company's deferred equipment agreements with its customers from operating to sales-type leases. See "Recently Adopted Accounting Pronouncements" in Note 2 to these consolidated financial statements for additional information related to the Company's adoption of ASC 842.

[2]   In connection with its adoption of ASC 842 on December 30, 2018, the Company recorded a reduction to accrued customer reimbursements of approximately $12.3 million related to the derecognition of liabilities and leased equipment assets for certain OEM equipment reimbursements. See "Recently Adopted Accounting Pronouncements" in Note 2 to these consolidated financial statements for additional information related to the Company's adoption of ASC 842.

Deferred revenue relates to contracted amounts that have been invoiced to customers for which remaining performance obligations must be completed before the Company can recognize the revenue. These amounts primarily relate to undelivered equipment, sensors and services under deferred equipment agreements, extended warranty agreements and maintenance agreements.

Changes in deferred revenue for the year ended January 2, 2021 were as follows:

| | Amount |
|---|---|
| Deferred revenue, beginning of the period | $ 13,998 |
| Increase from business combinations | 9,778 |
| Revenue deferred during the period | 27,385 |
| Recognition of revenue deferred in prior periods | (17,940) |
| Deferred revenue, end of the period | $ 33,221 |

During the first quarter of fiscal 2020, the Company completed an immaterial business combination. Based on the Company's preliminary purchase price allocation for this transaction, approximately $7.4 million of the purchase price was assigned to deferred revenue.

During the second quarter of fiscal 2020, the Company completed another immaterial business combination. Based on the Company's preliminary purchase price allocation for this transaction, approximately $1.3 million of the purchase price was assigned to deferred revenue.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

During the fourth quarter of fiscal 2020, the Company obtained a controlling interest in a provider of advanced hemodynamic monitoring solutions. Based on the Company's preliminary purchase price allocation, approximately $1.1 million of the purchase price was assigned to deferred revenue. Subsequently, during the first quarter of fiscal 2021, the Company acquired the remaining minority interest. See Note 14 to these consolidated financial statements for further details.

The Company is still gathering additional information to finalize these preliminary estimates with respect to tax contingency matters and expects to finalize the purchase price allocations as soon as practicable, but no later than one year from the acquisition dates.

Expected revenue from remaining contractual performance obligations (Unrecognized Contract Revenue) includes deferred revenue, as well as other amounts that will be invoiced and recognized as revenue in future periods when the Company completes its performance obligations. While Unrecognized Contract Revenue is similar in concept to backlog, Unrecognized Contract Revenue excludes revenue allocable to monitoring-related equipment that is effectively leased to customers under deferred equipment agreements and other contractual obligations for which neither party has performed.

The following table summarizes the Company's estimated Unrecognized Contract Revenue as of January 2, 2021 and the future periods within which the Company expects to recognize such revenue.

| | Expected Future Revenue By Period (in thousands) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Less than 1 Year | | Between 1-3 Years | | Between 3-5 Years | | More than 5 Years | | Total |
| Unrecognized contract revenue | $ | 231,982 | $ | 370,779 | $ | 176,835 | $ | 44,862 | $ | 824,458 |

The estimated timing of this revenue is based, in part, on management's estimates and assumptions about when its performance obligations will be completed. As a result, the actual timing of this revenue in future periods may vary, possibly materially, from those reflected in this table.

## 14. Other Current Liabilities

Other current liabilities consist of the following (in thousands):

| | January 2, 2021 | | December 28, 2019 | |
|---|---|---|---|---|
| Accrued indirect taxes payable | $ | 14,365 | $ | 7,545 |
| Accrued expenses | | 6,794 | | 6,115 |
| Lessee lease liabilities, current | | 5,975 | | 4,653 |
| Income tax payable | | 5,910 | | 7,142 |
| Accrued legal fees | | 4,058 | | 1,839 |
| Related party payables | | 3,655 | | 3,024 |
| Minority interest[1] | | 3,469 | | — |
| Accrued warranty | | 2,740 | | 3,395 |
| Accrued property taxes | | 1,682 | | 1,629 |
| Other current liabilities | | 4,591 | | 1,685 |
| Total other current liabilities | $ | 53,239 | $ | 37,027 |

---

[1] During the fourth quarter of fiscal 2020, the Company obtained a controlling interest in a provider of advanced hemodynamic monitoring solutions. The noncontrolling interest of the acquiree was recorded within other current liabilities as of January 2, 2021, as the minority interest shares are mandatorily redeemable. During the first quarter of fiscal 2021, the Company acquired the remaining minority interest.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**15. Credit Facilities**

The Company currently maintains a credit agreement (Credit Facility) with JPMorgan Chase Bank, N.A., as Administrative Agent and a Lender, and Bank of the West, a Lender (collectively, the Lenders). The Credit Facility provides for up to $150.0 million of unsecured borrowings, with an option, subject to certain conditions, for the Company to increase the aggregate borrowing capacity up to $550.0 million in the future with the Lenders and additional lenders, as required. The Credit Facility also provides for a sublimit of up to $25.0 million for the issuance of letters of credit and a sublimit of $75.0 million for borrowings in specified foreign currencies. All unpaid principal under the Credit Facility will become due and payable on December 17, 2023. Proceeds from the Credit Facility are expected to be used for general corporate, capital investment and working capital needs.

Borrowings under the Credit Facility will be deemed, at the Company's election, either: (a) an Alternate Base Rate (ABR) Loan, which bears interest at the ABR, plus a spread of 0.125% to 1.000% based upon a Company leverage ratio, or (b) a Eurocurrency Loan, which bears interest at the Adjusted LIBO Rate (as defined below), plus a spread of 1.125% to 2.000% based upon a Company net leverage ratio. Subject to certain conditions, the Company may also request swingline loans from time to time that bear interest similar to an ABR Loan. Pursuant to the terms of the Credit Facility, the ABR is equal to the greatest of (i) the prime rate, (ii) the Federal Reserve Bank of New York effective rate plus 0.50%, and (iii) the one-month Adjusted LIBO Rate plus 1.0%. The Adjusted LIBO Rate is equal to the Eurocurrency Rate (as defined within the 2018 Credit Facility) for the applicable interest period multiplied by the statutory reserve rate for such period, rounded upward, if necessary, to the next 1/16 of 1%. The Company is also obligated under the Credit Facility to pay an unused fee ranging from 0.150% to 0.275% per annum, based upon a Company leverage ratio, with respect to any unutilized portion of the Credit Facility.

Pursuant to the terms of the Credit Facility, the Company is subject to certain covenants, including financial covenants related to a net leverage ratio and an interest charge coverage ratio, and other customary negative covenants. The Credit Facility also includes customary events of default which, upon the occurrence of any such event of default, provide the Lenders with the right to take either or both of the following actions: (a) immediately terminate the commitments, and (b) declare the loans then outstanding immediately due and payable in full. As of January 2, 2021 and December 28, 2019, the Credit Facility had no outstanding draws and as of January 2, 2021, the Credit Facility had $1.7 million of outstanding letters of credit. The Company was in compliance with all covenants under the Credit Facility as of January 2, 2021.

The Company incurred total combined interest expense of $0.3 million, $0.3 million and $0.6 million for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, respectively, under its current and previous credit facilities.

**16. Other Non-Current Liabilities**

Other non-current liabilities consist of the following (in thousands):

|  | January 2, 2021 | December 28, 2019 |
|---|---|---|
| Lessee non-current lease liabilities | $ 28,373 | $ 15,834 |
| Income tax payable, non-current | 19,245 | 21,509 |
| Unrecognized tax benefits | 11,777 | 13,184 |
| Deferred tax liabilities | 6,247 | 3,052 |
| Other non-current liabilities | 5,434 | 2,456 |
| Total other non-current liabilities | $ 71,076 | $ 56,035 |

Unrecognized tax benefits relate to the Company's long-term portion of tax liability associated with uncertain tax positions. Authoritative guidance prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. See Note 20 to these consolidated financial statements for further details.

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**17. Stock Repurchase Program**

In September 2015, the Company's Board of Directors (Board) authorized a stock repurchase program, whereby the Company could purchase up to 5.0 million shares of its common stock over a period of up to three years (2015 Repurchase Program). A total of 3.1 million shares were purchased by the Company pursuant to the 2015 Repurchase Program prior to its expiration in September 2018.

In July 2018, the Board approved a new stock repurchase program, authorizing the Company to purchase up to 5.0 million additional shares of its common stock over a period of up to three years (2018 Repurchase Program). The 2018 Repurchase Program became effective in September 2018 upon the expiration of the 2015 Repurchase Program. The Company expects to fund the 2018 Repurchase Program through its available cash, cash expected to be generated from future operations, the Credit Facility and other potential sources of capital. The 2018 Repurchase Program can be carried out at the discretion of a committee comprised of the Company's CEO and CFO through open market purchases, one or more Rule 10b5-1 trading plans, block trades and privately negotiated transactions. As of January 2, 2021, 4.3 million shares remained available for repurchase pursuant the 2018 Repurchase Program.

The following table provides a summary of the Company's stock repurchase activities during the years ended January 2, 2021, December 28, 2019 and December 29, 2018 (in thousands, except per share amounts):

| | | | Years Ended | | | | |
|---|---|---|---|---|---|---|---|
| | | January 2, 2021 | | December 28, 2019 | | | December 29, 2018 |
| Shares repurchased | | 456 (1) | | 275 (1) | | | 198 |
| Average cost per share | $ | 242.40 | $ | 136.61 | $ | | 84.12 |
| Value of shares repurchased | $ | 110,540 | $ | 37,554 | $ | | 16,490 |

_____
(1)   Excludes shares withheld from the shares of its common stock actually issued in connection with the vesting of PSU or RSU awards to satisfy certain U.S. federal and state tax withholding obligations.

**18. Stock-Based Compensation**

Total stock-based compensation expense for the years ended January 2, 2021, December 28, 2019 and December 29, 2018 was $42.2 million, $39.2 million and $27.4 million, respectively. As of January 2, 2021, an aggregate of 11.1 million shares of common stock were reserved for future issuance under the Company's equity plans, of which 4.4 million shares were available for future grant under the Masimo Corporation 2017 Equity Incentive Plan (2017 Equity Plan). Additional information related to the Company's current equity incentive plans, stock-based award activity and valuation of stock-based awards is included below.

*Equity Incentive Plans*

*2007 Stock Incentive Plan*

Effective June 1, 2017, upon the approval and ratification of the 2017 Equity Plan, the Company's 2007 Stock Incentive Plan (2007 Equity Plan) terminated, provided that awards outstanding under the 2007 Equity Plan will continue to be governed by the terms of that plan. In addition, upon the effectiveness of the 2017 Equity Plan, an aggregate of 5.0 million shares of the Company's common stock registered under prior registration statements for issuance pursuant to the 2007 Equity Plan were deregistered and concurrently registered under the 2017 Equity Plan.

*2017 Equity Incentive Plan*

The 2017 Equity Plan permits the grant of stock options, restricted stock, RSUs, stock appreciation rights, PSUs, performance shares, performance bonus awards and other stock or cash awards to employees, directors and consultants of the Company and employees and consultants of any parent or subsidiary of the Company. Upon effectiveness, an aggregate of 5.0 million shares were available for issuance under the 2017 Equity Plan. In May 2020, the Company's stockholders approved an increase of 2.5 million shares to the 2017 Equity Plan. The aggregate number of shares that may be awarded under the 2017 Equity Plan is 7.5 million shares.

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The 2017 Equity Plan provides that at least 95% of the equity awards issued under the 2017 Equity Plan must vest over a period of not less than one year following the date of grant. The exercise price per share of each option granted under the 2017 Equity Plan may not be less than the fair market value of a share of the Company's common stock on the date of grant, which is generally equal to the closing price of the Company's common stock on the Nasdaq Global Select Market on the grant date.

*Stock-Based Award Activity*

*Stock Options*

The number and weighted-average exercise price of options issued and outstanding under all of the Company's equity plans are as follows (in thousands, except for weighted-average exercise prices):

| | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | | Year Ended December 29, 2018 | |
|---|---|---|---|---|---|---|
| | Shares | Average Exercise Price | Shares | Average Exercise Price | Shares | Average Exercise Price |
| Options outstanding, beginning of period | 5,212 | $ 54.23 | 5,676 | $ 43.61 | 6,953 | $ 36.26 |
| Granted | 400 | 187.83 | 545 | 140.56 | 564 | 98.47 |
| Canceled/Forfeited | (219) | 126.98 | (158) | 83.14 | (233) | 67.45 |
| Exercised | (1,945) | 32.41 | (851) | 33.32 | (1,608) | 27.62 |
| Options outstanding, end of period | 3,448 | $ 77.44 | 5,212 | $ 54.23 | 5,676 | $ 43.61 |
| Options exercisable, end of period | 2,026 | $ 47.31 | 3,311 | $ 33.80 | 3,273 | $ 29.63 |

Total stock option expense for the years ended January 2, 2021, December 28, 2019 and December 29, 2018 was $16.1 million, $14.8 million, and $13.8 million, respectively. As of January 2, 2021, the Company had $40.8 million of unrecognized compensation cost related to non-vested stock options that are expected to vest over a weighted average period of approximately 5.9 years.

The number and weighted-average exercise price of outstanding and exercisable stock options segregated by exercise price ranges (in thousands, except range of exercise prices and remaining contractual life) were as follows:

| | Year Ended January 2, 2021 | | | Year Ended December 28, 2019 | | |
|---|---|---|---|---|---|---|
| | Options Outstanding | | Options Exercisable | Options Outstanding | | Options Exercisable |
| Range of Exercise Prices | Number of Options | Average Remaining Contractual Life | Number of Options | Number of Options | Average Remaining Contractual Life | Number of Options |
| $15.00 to $50.00 | 1,696 | 4.14 | 1,518 | 3,464 | 4.14 | 2,958 |
| $50.01 to $80.00 | 42 | 5.80 | 26 | 68 | 5.56 | 30 |
| $80.01 to $120.00 | 910 | 6.83 | 408 | 1,148 | 6.98 | 320 |
| $120.01 to $160.00 | 476 | 8.41 | 74 | 532 | 8.46 | 3 |
| $160.01 to $200.00 | 255 | 9.17 | — | — | 0.00 | — |
| $200.01 to $230.00 | 37 | 9.50 | — | — | 0.00 | — |
| $230.01 to $275.00 | 32 | 9.53 | — | — | 0.00 | — |
| Total | 3,448 | 5.90 | 2,026 | 5,212 | 5.60 | 3,311 |

As of January 2, 2021 and December 28, 2019, the weighted-average remaining contractual term of options outstanding was 5.9 years and 5.6 years, respectively. As of January 2, 2021 and December 28, 2019, the weighted average remaining contractual term of options exercisable with an exercise price less than the closing price of the Company's common stock was 4.7 years and 4.3 years, respectively.

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*RSUs*

The number of RSUs issued and outstanding under all of the Company's equity plans are as follows (in thousands, except for weighted average grant date fair value amounts):

| | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | | Year Ended December 29, 2018 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Units | Weighted Average Grant Date Fair Value | Units | Weighted Average Grant Date Fair Value | Units | Weighted Average Grant Date Fair Value |
| RSUs outstanding, beginning of period | 2,797 | $ 96.85 | 2,707 | $ 95.54 | 2,708 | $ 95.51 |
| Granted | 98 | 193.77 | 100 | 133.57 | 7 | 99.05 |
| Canceled/Forfeited | (6) | 165.03 | (3) | 133.50 | — | — |
| Vested | (27) | 134.78 | (7) | 99.05 | (8) | 88.40 |
| RSUs outstanding, end of period | 2,862 | $ 99.66 | 2,797 | $ 96.85 | 2,707 | $ 95.54 |

Total RSU expense for the years ended January 2, 2021, December 28, 2019 and December 29, 2018 was $5.7 million, $2.8 million and $0.7 million, respectively. As of January 2, 2021, the Company had $22.6 million of unrecognized compensation cost related to non-vested RSU awards expected to be recognized and vest over a weighted-average period of approximately 3.8 years, excluding any contingent compensation expense related to certain RSUs that were granted to the Company's Chairman and CEO in connection with the amendment and restatement of his employment agreement. See "Employment and Severance Agreements" in Note 21 to these consolidated financial statements for further details on the CEO's employment agreement.

*PSUs*

The number of PSUs outstanding under all of the Company's equity plans are as follows (in thousands, except for weighted average grant date fair value amounts):

| | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | | Year Ended December 29, 2018 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Units | Weighted Average Grant Date Fair Value | Units | Weighted Average Grant Date Fair Value | Units | Weighted Average Grant Date Fair Value |
| PSUs outstanding, beginning of period | 412 | $ 102.22 | 313 | $ 88.34 | 233 | $ 90.70 |
| Granted | 97 | 179.42 | 128 | 133.50 | 197 | 86.95 |
| Canceled/Forfeited | (7) | 122.13 | — | — | (86) | 90.71 |
| Vested | (58) | 90.69 | (29) | 90.69 | (31) | 90.70 |
| PSUs outstanding, end of period | 444 | $ 120.28 | 412 | $ 102.22 | 313 | $ 88.34 |

During the year ended December 29, 2018, the Company awarded 197,000 PSUs that will vest three years from the award date based on the achievement of certain 2020 performance criteria approved by the Compensation Committee. If earned, the PSUs granted will vest at the time the achievement level of the performance criteria is determined by the Compensation Committee. The number of shares that may be earned can range from 0% to 200% of the target amount; therefore, the maximum number of shares that can be issued under these awards is twice the original award of 197,000 PSUs or 394,000 shares. On February 22, 2021, the Compensation Committee determined that the performance criteria was achieved within the range.

During the year ended December 28, 2019, the Company awarded 128,000 PSUs that will vest three years from the award date, based on the achievement of certain 2021 performance criteria approved by the Board. If earned, the PSUs granted will vest upon achievement of the performance criteria after the year in which the performance achievement level has been determined. The number of shares that may be earned can range from 0% to 200% of the target amount; therefore, the maximum number of shares that can be issued under these awards is twice the original award of 128,000 PSUs or 256,000 shares.

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

During the year ended January 2, 2021, the Company awarded 97,000 PSUs that will vest three years from the award date, based on the achievement of certain 2023 performance criteria approved by the Board. If earned, the PSUs granted will vest upon achievement of the performance criteria after the year in which the performance achievement level has been determined. The number of shares that may be earned can range from 0% to 200% of the target amount; therefore, the maximum number of shares that can be issued under these awards is twice the original award of 97,000 PSUs or 194,000 shares.

Based on management's estimate of the number of units expected to vest, total PSU expense for the years ended January 2, 2021, December 28, 2019 and December 29, 2018 was $20.4 million, $21.6 million and $12.9 million, respectively. As of January 2, 2021, the Company had $31.6 million of unrecognized compensation cost related to non-vested PSU awards expected to be recognized and vest over a weighted-average period of approximately 0.9 years.

### *Valuation of Stock-Based Award Activity*

The fair value of each RSU and PSU is determined based on the closing price of the Company's common stock on the grant date.

The Black-Scholes option pricing model is used to estimate the fair value of options granted under the Company's stock-based compensation plans. The range of assumptions used and the resulting weighted-average fair value of options granted at the date of grant were as follows:

| | Year Ended January 2, 2021 | Year Ended December 28, 2019 | Year Ended December 29, 2018 |
|---|---|---|---|
| Risk-free interest rate | 0.2% to 1.7% | 1.4% to 2.6% | 2.3% to 3.1% |
| Expected term | 5.1 years to 5.1 years | 5.1 years to 5.2 years | 5.2 years to 5.6 years |
| Estimated volatility | 26.9% to 35.5% | 28.2% to 30.0% | 26.8% to 32.0% |
| Expected dividends | 0% | 0% | 0% |
| Weighted-average fair value of options granted | $51.10 per share | $42.29 per share | $31.85 per share |

*Risk-free interest rate.* The risk-free interest rate is based on the implied yield available on U.S. Treasury zero-coupon issues with a remaining term approximately equal to the expected term of the Company's stock options.

*Expected term.* The expected term represents the average period that the Company's stock options are expected to be outstanding. The expected term is based on both the Company's specific historical option exercise experience, as well as expected term information available from a peer group of companies with a similar vesting schedule.

*Estimated volatility.* The estimated volatility is the amount by which the Company's share price is expected to fluctuate during a period. The Company's estimated volatilities for fiscal years 2020, 2019 and 2018 are based on historical and implied volatilities of the Company's share price over the expected term of the option.

*Expected dividends.* The Board may from time to time declare, and the Company may pay, dividends on its outstanding shares in the manner and upon the terms and conditions provided by law. Any determination to declare and pay dividends will be made by the Board and will depend upon the Company's results of operations, earnings, capital requirements, financial condition, business prospects, contractual restrictions and other factors deemed relevant by the Board. In the event a dividend is declared, there is no assurance with respect to the amount, timing or frequency of any such dividends. The dividend declared in 2012 was deemed to be a special dividend and there is no assurance that special dividends will be declared again during the expected term. Based on this uncertainty and unknown frequency, for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, no dividend rate was used in the assumptions to calculate the stock-based compensation expense.

The Company has elected to recognize stock-based compensation expense on a straight-line basis over the requisite service period for the entire award. The total fair value of all options that vested during fiscal years 2020, 2019 and 2018 was $15.1 million, $14.2 million and $13.7 million, respectively.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The aggregate intrinsic value of options is calculated as the positive difference, if any, between the market value of the Company's common stock on the date of exercise or the respective period end, as appropriate, and the exercise price of the options. The aggregate intrinsic value of options outstanding, with an exercise price less than the closing price of the Company's common stock, as of January 2, 2021 was $658.5 million. The aggregate intrinsic value of options exercisable, with an exercise price less than the closing price of the Company's common stock, as of January 2, 2021 was $447.8 million. The aggregate intrinsic value of options exercised during the years ended January 2, 2021, December 28, 2019 and December 29, 2018 was $355.3 million, $93.9 million and $127.1 million, respectively.

The total income tax benefit recognized in the consolidated statements of operations for stock-based compensation expense was $30.4 million, $15.7 million and $22.0 million for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, respectively.

The following table presents the total stock-based compensation expense that is included in each functional line item of the consolidated statements of operations (in thousands):

| | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | | Year Ended December 29, 2018 |
|---|---|---|---|---|---|
| Cost of goods sold | $ | 714 | $ | 445 | $ | 334 |
| Selling, general and administrative | | 31,462 | | 30,450 | | 21,391 |
| Research and development | | 10,049 | | 8,340 | | 5,692 |
| Total | $ | 42,225 | $ | 39,235 | $ | 27,417 |

The increase in total stock-based compensation expense during the year ended January 2, 2021 was due to both the composition of the equity awards granted and a significant increase in the fair market value of the Company's stock from the prior year, which increased the value of the equity awards granted during such year.

## 19. Non-operating Income

Non-operating income consists of the following (in thousands):

| | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | | Year Ended December 29, 2018 |
|---|---|---|---|---|---|
| Interest income | $ | 5,534 | $ | 13,917 | $ | 8,178 |
| Realized and unrealized foreign currency gain (loss) | | 2,631 | | (627) | | (2,027) |
| Interest expense | | (338) | | (328) | | (706) |
| Other | | 86 | | (12) | | 287 |
| Total non-operating income | $ | 7,913 | $ | 12,950 | $ | 5,732 |

## 20. Income Taxes

The components of income before provision for income taxes are as follows (in thousands):

| | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | | Year Ended December 29, 2018 |
|---|---|---|---|---|---|
| United States | $ | 214,816 | $ | 181,664 | $ | 173,848 |
| Foreign | | 48,920 | | 52,502 | | 39,928 |
| Total | $ | 263,736 | $ | 234,166 | $ | 213,776 |

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table presents the current and deferred provision (benefit) for income taxes (in thousands):

|  | Year Ended January 2, 2021 | Year Ended December 28, 2019 | Year Ended December 29, 2018 |
|---|---|---|---|
| **Current:** | | | |
| Federal | $ 13,901 | $ 30,218 | $ 20,418 |
| State | 6,444 | 5,273 | 3,075 |
| Foreign | 8,073 | 8,424 | 5,014 |
| Subtotal | $ 28,418 | $ 43,915 | $ 28,507 |
| **Deferred:** | | | |
| Federal | $ 1,354 | $ (3,732) | $ (6,678) |
| State | (6,191) | (1,985) | (1,258) |
| Foreign | (127) | (248) | (338) |
| Subtotal | (4,964) | (5,965) | (8,274) |
| Total | $ 23,454 | $ 37,950 | $ 20,233 |

Included in the fiscal year 2020 and 2019 tax provisions are increases of $0.2 million and $1.8 million, respectively, for tax and accrued interest related to uncertain tax positions for each fiscal year. Fiscal year 2018 included a tax benefit of $1.6 million for tax and accrued interest related to uncertain tax positions.

The reconciliation of the U.S. federal statutory tax rate to the Company's effective tax rate is as follows:

|  | Year Ended January 2, 2021 | Year Ended December 28, 2019 | Year Ended December 29, 2018 |
|---|---|---|---|
| Statutory regular federal income tax rate | 21.0 % | 21.0 % | 21.0 % |
| State provision, net of federal benefit | 0.1 | 1.1 | 0.7 |
| Nondeductible executive compensation | 1.8 | 2.1 | 1.9 |
| Research and development tax credits | (2.2) | (1.1) | (1.4) |
| Foreign income taxed at different rates | (1.0) | (1.7) | (2.0) |
| U.S. tax on foreign income, net | 1.0 | 0.1 | 0.7 |
| Impact of 2017 Tax Act | — | — | 0.1 |
| Withholding taxes on undistributed foreign earnings, net | — | — | (0.6) |
| Excess stock-based compensation | (10.4) | (6.0) | (9.4) |
| Derecognition of uncertain tax position | (2.2) | — | (1.5) |
| Other | 0.8 | 0.7 | — |
| Total | 8.9 % | 16.2 % | 9.5 % |

During the year ended December 29, 2018, the Company completed its analysis of the income tax effects of the Tax Cuts and Jobs Act of 2017 (2017 Tax Act) and, pursuant to Staff Accounting Bulletin No. 118, recorded an adjustment of approximately $0.9 million to reduce its previously estimated accrual based on additional information and guidance that became available with respect to the application of certain provisions of the 2017 Tax Act. The U.S. Treasury Department, the Internal Revenue Service, and other standard-setting bodies will continue to interpret or issue guidance on how provisions of the 2017 Tax Act will be applied or otherwise administered. As future guidance is issued, the Company may make adjustments to amounts that it has previously recorded that may materially impact its provision for income taxes in the period in which such adjustments are made.

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

As of January 2, 2021, the Company has accumulated undistributed earnings generated by its foreign subsidiaries of approximately $229.3 million. Because such earnings have previously been subject to U.S. tax, any additional taxes due with respect to such earnings or the excess of the amount for financial reporting over the tax basis of its foreign investments would generally be limited to foreign withholding and state taxes. The Company considers $86.5 million of these accumulated undistributed earnings as no longer permanently reinvested and has accrued foreign withholding and state taxes, net of estimated foreign tax credits, of $1.6 million. The Company intends, however, to indefinitely reinvest the remaining $142.8 million of earnings. If the Company decides to distribute such permanently reinvested earnings, the Company would accrue estimated additional income tax expense of up to approximately $6.8 million.

The components of the deferred tax assets are as follows (in thousands):

|  | January 2, 2021 | December 28, 2019 |
|---|---|---|
| **Deferred tax assets:** | | |
| Deferred revenue | $ 19,769 | $ 13,948 |
| Net operating losses | 19,140 | 724 |
| Accrued liabilities | 16,534 | 13,273 |
| Tax credits | 9,398 | 6,438 |
| Stock-based compensation | 8,385 | 7,926 |
| Operating lease assets | 5,782 | 4,174 |
| Other | — | 867 |
| Total | 79,008 | 47,350 |
| Valuation allowance | (15,660) | — |
| Total deferred tax assets | $ 63,348 | $ 47,350 |
| **Deferred tax liabilities:** | | |
| Property and equipment | $ (12,818) | $ (6,604) |
| Acquired intangibles | (5,465) | — |
| Operating lease liabilities | (5,429) | (3,845) |
| Withholding taxes on undistributed foreign earnings | (3,108) | (2,829) |
| State taxes and other | (2,302) | (1,152) |
| Other | (1,110) | — |
| Total deferred tax liabilities | (30,232) | (14,430) |
| Net deferred tax assets | $ 33,116 | $ 32,920 |

As of January 2, 2021, the Company has $1.9 million and $2.9 million of net operating losses from federal and various state jurisdictions, which will begin to expire in 2036 and 2039, respectively. Additionally, the Company has $76.8 million of net operating losses from foreign jurisdictions which will carryover indefinitely. The Company also has state research and development tax credits of $14.9 million that will carry forward indefinitely and $0.3 million of Canadian investment tax credits on research and development expenditures that will begin to expire in 2033. In assessing the realizability of deferred tax assets, the Company considers whether it is more likely than not that all or some portion of the deferred tax assets will not be realized. In making this determination, the Company considered all available positive and negative evidence, including scheduled reversals of liabilities, projected future taxable income, tax planning strategies and recent financial performance. During the year ended January 2, 2021, the Company established a valuation allowance to reduce the deferred tax assets relating to certain acquired operating losses in certain foreign jurisdictions that the Company believes are not likely to be realized.

As a result of certain business and employment actions undertaken by the Company, income earned in a certain European country is subject to a reduced tax rate through 2022, which, upon meeting certain requirements, can be extended through 2026. For the year ended January 2, 2021 and December 29, 2018, the estimated income tax benefit related to such business arrangement was $0.9 million and $1.7 million, respectively, and favorably impacted net income per diluted share by $0.02 for each year.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following is a tabular reconciliation of the total amounts of unrecognized tax benefits (in thousands):

| | Year Ended January 2, 2021 | Year Ended December 28, 2019 |
|---|---|---|
| Unrecognized tax benefits (gross), beginning of period | $ 17,009 | $ 15,412 |
| Increase from tax positions in prior period | 471 | 81 |
| Increase from tax positions in current period | 6,565 | 2,636 |
| Lapse of statute of limitations | (6,040) | (1,120) |
| Unrecognized tax benefits (gross), end of period | $ 18,005 | $ 17,009 |

The amount of unrecognized benefits which, if ultimately recognized, could favorably affect the tax rate in a future period was $16.3 million and $15.7 million as of January 2, 2021 and December 28, 2019, respectively. It is reasonably possible that the amount of unrecognized tax benefits in various jurisdictions may change in the next 12 months due to the expiration of statutes of limitation and audit settlements. However, due to the uncertainty surrounding the timing of these events, an estimate of the change within the next 12 months cannot be made at this time.

For the years ended January 2, 2021 and December 29, 2018, the Company recorded a benefit of $0.5 million and $0.8 million, respectively, for interest and penalties related to unrecognized tax benefits as part of income tax expense. For the year ended December 28, 2019, the Company recorded an expense of $0.5 million for interest and penalties related to unrecognized tax benefits as part of income tax expense.

Total accrued interest and penalties related to unrecognized tax benefits as of January 2, 2021 and December 28, 2019 were $0.7 million and $1.3 million, respectively.

The Company conducts business in multiple jurisdictions, and as a result, one or more of the Company's subsidiaries files income tax returns in the U.S. federal, various state, local and foreign jurisdictions. The Company has concluded all U.S. federal income tax matters for years through 2016. All material state, local and foreign income tax matters have been concluded for years through 2013.

In March 2020, the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act) was enacted and signed into law in response to the market volatility and instability resulting from the COVID-19 pandemic. It includes a significant number of tax provisions and lifts certain deduction limitations originally imposed by the 2017 Tax Act. The changes are primarily related to: (1) the business interest expense disallowance rules for 2019 and 2020; (2) net operating loss rules; (3) charitable contribution limitations; (4) employee retention credit; and (5) the realization of corporate alternative minimum tax credits.

The Company has reviewed the tax provision in the CARES Act and did not identify any material impact to the Company's consolidated financial statements.

**21. Commitments and Contingencies**

*Employee Retirement Savings Plan*

The Company sponsors a qualified defined contribution plan or 401(k) plan, the Masimo Retirement Savings Plan (MRSP), covering the Company's full-time U.S. employees who meet certain eligibility requirements. In general, the Company matches an employee's contribution up to 3% of the employee's compensation, subject to a maximum amount. The Company may also contribute to the MRSP on a discretionary basis. The Company contributed $3.2 million, $2.5 million and $2.3 million to the MSRP for the years ended January 2, 2021, December 28, 2019 and December 29, 2018, respectively, all in the form of matching contributions. In addition, the Company sponsors various defined contribution plans in certain locations outside of the United States, the contributions to which were not material for any period.

Table of Contents

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Employment and Severance Agreements*

In July 2017, the Company entered into the First Amendment to the certain Amended and Restated Employment Agreement entered into between the Company and Mr. Kiani on November 4, 2015 (as amended, the Amended Employment Agreement). Pursuant to the terms of the Amended Employment Agreement, upon a "Qualifying Termination" (as defined in the Amended Employment Agreement), Mr. Kiani will be entitled to receive a cash severance benefit equal to two times the sum of his then-current base salary and the average annual bonus paid to Mr. Kiani during the immediately preceding three years, the full amount of the "Award Shares" (as defined in the Amended Employment Agreement) and the full amount of the "Cash Payment" (as defined in the Amended Employment Agreement). In addition, in the event of a "Change in Control" (as defined in the Amended Employment Agreement) prior to a Qualifying Termination, on each of the first and second anniversaries of the Change in Control, 50% of the Cash Payment and 50% of the Award Shares will vest, subject in each case to Mr. Kiani's continuous employment through each such anniversary date; however, in the event of a Qualifying Termination or a termination of Mr. Kiani's employment due to death or disability prior to either of such anniversaries, any unvested amount of the Cash Payment and all of the unvested Award Shares shall vest and be paid in full. Additionally, in the event of a Change in Control prior to a Qualifying Termination, Mr. Kiani's stock options and any other equity awards will vest in accordance with their terms, but in no event later than in two equal installments on each of the one year and two year anniversaries of the Change in Control, subject in each case to Mr. Kiani's continuous employment through each such anniversary date.

As of January 2, 2021, the expense related to the Award Shares and Cash Payment that would be recognized in the Company's consolidated financial statements upon the occurrence of a Qualifying Termination under the Restated Employment Agreement was approximately $292.9 million.

As of January 2, 2021, the Company had severance plan participation agreements with eight executive officers. The participation agreements (the Agreements) are governed by the terms and conditions of the Company's 2007 Severance Protection Plan, which became effective on July 19, 2007 and which was amended effective December 31, 2008.

Under each of the Agreements, the applicable executive officer may be entitled to receive certain salary, equity, medical and life insurance benefits if he is terminated by the Company without cause or if he terminates his employment for good reason under certain circumstances. Each executive officer is also required to give the Company six months advance notice of his resignation under certain circumstances.

*Cercacor Cross-Licensing Agreement Provisions*

The Company's Cross-Licensing Agreement with Cercacor contains annual minimum aggregate royalty obligations for use of the rainbow® licensed technology. The current annual minimum royalty obligation is $5.0 million. Upon a change in control (as defined in the Cross-Licensing Agreement) of the Company or Cercacor: (i) all rights to the "Masimo" trademark will be assigned to Cercacor if the surviving or acquiring entity ceases to use "Masimo" as a company name and trademark; (ii) the option to license technology developed by Cercacor for use in blood glucose monitoring will be deemed automatically exercised and a $2.5 million license fee for this technology will become immediately payable to Cercacor; and (iii) the minimum aggregate annual royalties payable to Cercacor for carbon monoxide, methemoglobin, fractional arterial oxygen saturation, hemoglobin and/or glucose measurements will increase to $15.0 million per year until the exclusivity period of the agreement ends, plus up to $2.0 million for each additional vital sign measurement with no maximum ceiling for non-vital sign measurements.

*Purchase Commitments*

Pursuant to contractual obligations with vendors, the Company had $123.0 million of purchase commitments as of January 2, 2021, that are expected to be purchased within one year. These purchase commitments have been made for certain inventory items in order to secure sufficient levels of those items, other critical inventory and manufacturing supplies and to achieve better pricing.

*Other Contractual Commitments*

In the normal course of business, the Company may provide bank guarantees to support government hospital tenders in certain foreign jurisdictions. As of January 2, 2021, the Company had approximately $2.5 million in outstanding unsecured bank guarantees.

MASIMO CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

In certain circumstances, the Company also provides limited indemnification within its various customer contracts whereby the Company indemnifies the parties to whom it sells its products with respect to potential infringement of intellectual property, and against bodily injury caused by a defective Company product. It is not possible to predict the maximum potential amount of future payments under these or similar agreements, due to the conditional nature of the Company's obligations and the unique facts and circumstances involved. As of January 2, 2021, the Company had not incurred any significant costs related to contractual indemnification of its customers.

### Concentrations of Risk

The Company is exposed to credit loss for the amount of its cash deposits with financial institutions in excess of federally insured limits. The Company invests a portion of its excess cash in time deposits with major financial institutions. As of January 2, 2021, the Company had $641.4 million of bank balances of which $4.8 million was covered by either the U.S. Federal Deposit Insurance Corporation limit or foreign countries' deposit insurance organizations.

The Company's ability to sell its products to U.S. hospitals depends in part on its relationships with GPOs. Many existing and potential customers for the Company's products become members of GPOs. GPOs negotiate pricing arrangements and contracts, sometimes exclusively, with medical supply manufacturers and distributors, and these negotiated prices are made available to a GPO's affiliated hospitals and other members. During the years ended January 2, 2021, December 28, 2019 and December 29, 2018, revenue from the sale of the Company's products to customers that are members of GPOs approximated 49.3%, 55.3% and 56.7% of total product revenue, retrospectively.

For the years ended January 2, 2021, December 28, 2019 and December 29, 2018, the Company had sales through two just-in-time distributors that represented 11.5% and 10.1%, 11.1% and 13.0%, and 10.4% and 12.9% of total product revenue, respectively. As of January 2, 2021 and December 28, 2019, one just-in-time distributor represented 6.7% and 6.2% of the Company's accounts receivable balance, respectively.

As of January 2, 2021 and December 28, 2019, one customer represented 9.1% and 19.0%, respectively, of the Company's accounts receivable balance. The receivable balance related to such customer is fully secured by letters of credit.

The majority of the Company's historical royalty revenue arose from one agreement with Medtronic plc (Medtronic). For the year ended January 2, 2021, the Company recognized no royalty revenue pursuant to this agreement. For the years ended December 28, 2019 and December 29, 2018, the Company recognized royalty revenue pursuant to this agreement of $0.7 million and $26.4 million, respectively. Pursuant to the agreement, Medtronic is not obligated to pay royalties to the Company for its sales occurring after October 6, 2018.

### Litigation

During the third quarter of fiscal year 2017, the Company became aware that certain amounts had been paid by a foreign government customer to the Company's former appointed foreign agent in connection with a foreign government tender, but had not been remitted by such agent to the Company in accordance with the agency agreement. On December 28, 2017, the Company initiated arbitration proceedings against this foreign agent after unsuccessful attempts to recover such remittances. As a result, the Company recorded a net charge of approximately $10.5 million during the fourth quarter of fiscal year 2017 in connection with this dispute, of which $2.0 million was recovered during the year ended December 28, 2019. An arbitration hearing was held on February 11, 2019. On July 8, 2019, the arbitrator awarded the Company $10.5 million in damages, fees and costs. On January 12, 2020, the Company received notice that bankruptcy restructuring proceedings had been initiated for the foreign agent. The Company filed its claim with the bankruptcy trustee on January 16, 2020. In July 2020, the Company was notified that a bankruptcy reorganization proposal had been submitted for voting by creditors in August 2020. The reorganization proposal was rejected by a vote of the creditors on August 26, 2020. On October 22, 2020, the Company filed a petition seeking to enforce the arbitration award. Although the Company intends to vigorously pursue the collection of the arbitration award, there is no guarantee that the Company will be successful in these efforts.

On January 2, 2014, a putative class action complaint was filed against the Company in the U.S. District Court for the Central District of California (District Court) by Physicians Healthsource, Inc. The complaint alleges that the Company sent unsolicited facsimile advertisements in violation of the Junk Fax Protection Act of 2005 and related regulations. The complaint seeks $500 for each alleged violation, treble damages if the District Court finds the alleged violations to be knowing, plus interest, costs and injunctive relief. On March 26, 2019, an amended complaint was filed adding Radha Geismann, M.D. PC as an additional named plaintiff. On June 17, 2019, the plaintiffs filed their motion for class certification. On September 10, 2019, the parties filed motions for summary judgment. On September 30, 2019, the Company filed its opposition to the motion for class certification, and the plaintiffs filed their reply on October 7, 2019.

MASIMO CORPORATION

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

On November 21, 2019, the District Court issued an order denying the plaintiffs' motion for class certification, and granting in part and denying in part the Company's motion for summary judgment, and deferring ruling on the plaintiffs' motion for summary judgment. On December 5, 2019, the plaintiffs filed a petition for permission to appeal the order denying class certification, which was denied on January 24, 2020. Trial of the individual plaintiffs' claims was scheduled for June 2, 2020, but on April 1, 2020, the District Court vacated the trial date and directed the parties to conduct an in-person mediation. The mediation has not occurred and no new trial date has been set. On July 13, 2020, the District Court issued an order granting in part and denying in part the plaintiffs' motion for summary judgment. The Company believes it has good and substantial defenses to the claims, but there is no guarantee that the Company will prevail. The Company is unable to determine whether any loss will ultimately occur or to estimate the range of such loss; therefore, no amount of loss has been accrued by the Company in the accompanying consolidated financial statements.

On January 9, 2020, the Company filed a complaint against Apple Inc. (Apple) in the District Court for infringement of a number of patents, for trade secret misappropriation, and for ownership and correction of inventorship of a number of Apple patents listing one of its former employees as an inventor. Apple filed petitions for Inter Partes Review of the asserted patents in the U.S. Patent and Trademark Office (PTO). The PTO has not yet acted on the petitions. On October 14, 2020, the District Court stayed the patent infringement claims pending completion of the Inter Partes review proceedings. On November 13, 2020, the Company filed a third amended complaint. On December 1, 2020, Apple filed a partial motion to dismiss the trade secrets claim in the third amended complaint. On January 6, 2021, the District Court granted the motion in part and denied it in part, with leave to amend within 30 days. On February 3, 2021, Apple filed its answer to the third amended complaint. The Company is seeking damages, injunctive relief, and declaratory judgment regarding ownership of the Apple patents. Although the Company intends to vigorously pursue all of its legal remedies, there is no guarantee that the Company will be successful in these efforts.

From time to time, the Company may be involved in other litigation and investigations relating to claims and matters arising out of its operations in the normal course of business. The Company believes that it currently is not a party to any other legal proceedings which, individually or in the aggregate, would have a material adverse effect on its consolidated financial position, results of operations or cash flows.

**22. Segment Information and Enterprise Reporting**

The Company operates in one segment based upon the Company's organizational structure and the way in which the Company's chief operating decision maker, the CEO, reviews financial information, including gross profit, operating expenses, operating income, and net income including noncontrolling interests presented on a consolidated basis, accompanied by disaggregated information about revenues by geographic region for purposes of making operating decisions and assessing financial performance. In addition, the Company's assets are primarily located in the U.S. The Company does not produce reports for, or measure the performance of, its geographic regions on any asset-based metrics. Therefore, geographic information is presented only for revenues and long-lived assets.

The following schedule presents an analysis of the Company's product revenues based upon the geographic area to which the product was shipped (in thousands, except percentages):

| | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | | Year Ended December 29, 2018 | |
|---|---|---|---|---|---|---|
| **Geographic area by destination:** | | | | | | |
| United States (U.S.) | $ 763,069 | 66.7 % | $ 636,371 | 68.0 % | $ 566,816 | 68.3 % |
| Europe, Middle East and Africa | 238,681 | 20.9 | 183,363 | 19.6 | 160,910 | 19.4 |
| Asia and Australia | 103,756 | 9.1 | 87,961 | 9.4 | 75,534 | 9.1 |
| North and South America (excluding U.S.) | 38,238 | 3.3 | 28,713 | 3.0 | 26,614 | 3.2 |
| Total product revenue | $ 1,143,744 | 100.0 % | $ 936,408 | 100.0 % | $ 829,874 | 100.0 % |

**MASIMO CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company's consolidated long-lived assets (tangible non-current assets) by geographic area are (in thousands, except percentages):

| | Year Ended January 2, 2021 | | Year Ended December 28, 2019 | | Year Ended December 29, 2018 | |
|---|---|---|---|---|---|---|
| **Long-lived assets by geographic area:** | | | | | | |
| United States | $ 238,094 | 86.9 % | $ 216,650 | 98.5 % | $ 262,373 | 95.6 % |
| International | 35,755 | 13.1 | 3,276 | 1.5 | 12,016 | 4.4 |
| Total | $ 273,849 | 100.0 % | $ 219,926 | 100.0 % | $ 274,389 | 100.0 % |

## 23. Quarterly Financial Data

The following tables contain selected unaudited consolidated statements of operations data for each quarter of 2020 and 2019 (in thousands, except per share data):

| | Quarters Ended | | | |
|---|---|---|---|---|
| **Fiscal 2020** | **March 28, 2020** | **June 27, 2020** | **September 26, 2020** | **January 2, 2021** |
| Total revenue | $ 269,625 | $ 300,953 | $ 278,112 | $ 295,054 |
| Gross profit | 185,629 | 191,584 | 178,926 | 186,926 |
| Operating income | 69,010 | 62,220 | 59,698 | 64,895 |
| Net income | 64,456 | 55,772 | 49,405 | 70,669 |
| Net income per share | | | | |
| Basic[1] | $ 1.20 | $ 1.02 | $ 0.90 | $ 1.28 |
| Diluted[1] | $ 1.12 | $ 0.96 | $ 0.85 | $ 1.21 |

| | Quarters Ended | | | |
|---|---|---|---|---|
| **Fiscal 2019** | **March 30, 2019** | **June 29, 2019** | **September 28, 2019** | **December 28, 2019** |
| Total revenue | $ 231,664 | $ 229,652 | $ 229,011 | $ 247,510 |
| Gross profit | 151,642 | 154,339 | 156,268 | 166,923 |
| Operating income | 56,023 | 52,004 | 51,632 | 61,557 |
| Net income | 49,322 | 44,888 | 49,085 | 52,921 |
| Net income per share | | | | |
| Basic[1] | $ 0.93 | $ 0.84 | $ 0.92 | $ 0.99 |
| Diluted[1] | $ 0.87 | $ 0.79 | $ 0.86 | $ 0.92 |

_____

[1] The sum of the basic and diluted earnings per share numbers for each quarter may not equal the basic and diluted earnings per share number for the entire year due to quarterly rounding.

Table of Contents

Schedule II

**MASIMO CORPORATION**
**VALUATION AND QUALIFYING ACCOUNTS**
**Years ended January 2, 2021, December 28, 2019 and December 29, 2018**
**(in thousands)**

| Description | Balance at Beginning of Period | Additions Charged to Expense and Other Accounts | Amounts Charged Against Reserve | Balance at End of Period |
|---|---|---|---|---|
| **Year ended January 2, 2021** | | | | |
| Allowance for doubtful accounts | $ 2,206 | $ 128 (1) | $ (529) | $ 1,805 |
| Allowance for sales returns and allowances | 700 | 814 (1) | (292) | 1,222 |
| **Year ended December 28, 2019** | | | | |
| Allowance for doubtful accounts(2) | 1,535 | 1,021 | (350) | 2,206 |
| Allowance for sales returns and allowances | 432 | 1,696 | (1,428) | 700 |
| **Year ended December 29, 2018** | | | | |
| Allowance for doubtful accounts | 2,116 | (486) | (95) | 1,535 |
| Allowance for sales returns and allowances | 424 | 1,416 | (1,408) | 432 |

---

(1)   Additions charged to expense and other accounts include amounts from immaterial business combinations.

(2)   In connection with its adoption of ASC 842 on December 30, 2018, the Company recorded allowance for credit loss for lease receivable, which is included in the allowance for doubtful accounts for the year ended December 28, 2019. See "Recently Adopted Accounting Pronouncements" in Note 2 to these consolidated financial statements for additional information related to the Company's adoption of ASC 842.

F-44

Exhibit 10.23

**\*\*\*Certain identified information has been omitted from this exhibit because it is both (i) not material and (ii) would likely cause competitive harm to the Registrant if publicly disclosed. Such omitted information is indicated by brackets ("[...\*\*\*...]") in this exhibit. \*\*\***

LEASE AGREEMENT entered into as of September 1, 2007 by and between **INDUSTRIAS ASOCIADAS MAQUILADORAS, S. A. de C. V.** (hereinafter referred to as IAMSA), herein represented by Mr. Eduardo Mendoza Larios, and **INDUSTRIAL VALLERA DE MEXICALI, S.A DE C.V,** (hereinafter referred to as COMPANY), herein represented by Mr. Sergio Tagliapietra Nassri, Legal Representative, pursuant to the following RECITALS and CLAUSES.

### R E C I T A L S

I.- IAMSA declares that:

A.- It is a Company organized and existing under Mexican General Corporation Law, as per Public Instrument No. 13,602, Volume 268, executed before Attorney Macedonio E. Gutiérrez, then Notary Public No. One of Mexicali, Baja California, dated August 8, 1955, amended to change its denomination to INDUSTRIAS ASOCIADAS MAQUILADORAS, S. A. DE. C. V, as per Public Instrument No. 229,855, Volume 8.945, executed before Attorney Francisco Lozano Noriega, Notary Public No. Ten of the Federal District, Mexico, recorded under number 6077, pages 365-375, and 396, on September 30, 1987 of the Public Registry of Property and Commerce in this City of Mexicali, Baja California, having as its corporate object the development and operation of an Industrial Park in the City of Mexicali, Baja California, Mexico, including that known as Las Californias Industrial Park.

B.- Mr. Eduardo Mensoza Larios is its Legal Representative, as it appears in Public Instrument No. 113,204, Volume 2,799, dated the 5 of Julio of 2007, executed before Attorney Luis Alfonso Vidales Moreno, Notary Public No. 5 of the City of Méxicali, Baja California, recorded under number 5436993 the 19 of July of 2007, Commerce Section, at the Public Registry of Property and Commerce in this City of Mexicali, Baja California.

C.- IAMSA´S registration number at the Federal Registry of Tax Payers is IAM-870622-MF4.
The address at which it has its principal place of business is Km. 10.5 on Highway to San Luis, Rio Colorado, Sonora, Mexicali, Baja California, Mexico

D.- IAMSA has established the "Palaco Industrial Park", hereinafter referred to as the Industrial Park, and more specifically shown described on **Exhibit "A"**, which is attached hereto and made a part hereof.

F.- The parties desire to enter into a lease regarding lot 5, block 3 & 6 East, with a total land area of 20,892.22 square meters square meters and a portion of the building located at Calzada del Oro #2001, int. 5 Palaco Industrial Park, Mexicali Baja California Zip Code 21600. The building which is subject of this Lease Agreement is constructed as a basic shell with a warehouse area of approximately 8,882.18 square meters (95,607.00 square feet), as the same is depicted in **Exhibit "B"** attached hereto. The property subject matter of this lease and the improvements, together, shall hereinafter be referred to as the Leased Property (refer to Exhibits A, B & C).

G.- IAMSA has previously applied for and obtained financial loans through Mexican and Foreign Banking and Lending Institutions, with which funds, buildings and improvements located in the Industrial Park, are being constructed.

II. COMPANY declares that:

A.- It is organized under the Mexican General Corporation Law as per Public Instrument Number 22,079, Volume 349, executed on June 30, 1982, before Attorney Fernando Diaz Ceballos, Notary Public Number Four of the City of Mexicali, Baja California, properly registered in the Public Registry of Property and Commerce of this City of Mexicali, under number 2,039, on August 30, 1982. Such document was amended by means of Public Instrument Number 26,551, volume 511, dates January 8, 1987, before Attorney Eduardo Illades Villafaña, Notary Public Number Six of the City of Tijuana, Baja California, duly registered in the Public registry of Property and Commerce of this City of Mexicali, Baja California, under number 5,339, pages 457, of volume XIII, First Book, Commerce section, that contains the change of denomination to INDUSTRIAL VALLERA DE MEXICALI, S.A. DE C.V.

B. Mr. Sergio Tagliapietra Nassri verifies his capacity as attorney-in-fact of COMPANY as per Public Instrument Number 28,902, Volume 552, executed on November 27,1987, before Attorney J. Eduardo Illades Moreno, Notary Public Number 6 of the City of Tijuana, Baja California, properly in the Public Registry of Property and Commerce.

C. Company's registration number at the Federal Registry of Taxpayers is IVM-861027-KH1.

D. The address at which his principal has its principal place of business is precisely the Leased Property subject matter of this Agreement.

**C L A U S E S:**

**I.- SCOPE OF LEASE AGREEMENT.**

On the express terms and conditions set forth hereinafter, the scope of this Lease Agreement is as follows: IAMSA hereby leases to COMPANY, and COMPANY hereby leases from IAMSA, the building in the Industrial Park as precisely described in **Exhibit "B"**, referred to above, which is attached hereto and made a part hereof, and the improvements as more specifically described in **"Exhibit C"** (collectively, the "Improvements"). It is expressly understood that COMPANY enters this agreement with IAMSA, with the intention of performing industrial and warehouse activities involving disposable medical products and other uses ancillary thereto.

**II.- CONSTRUCTION BY IAMSA.**

A.- All improvements to the Leased Property (including the Improvements) have been constructed in accordance with specifications approved by IAMSA and COMPANY.

B.- IAMSA shall perform all future improvements in accordance with all laws, ordinances, regulations, and orders of governmental authorities, and the Industrial Park Regulations which are attached hereto as **Exhibit "D"**.

C.- (deleted).

D.- COMPANY shall have the right to require changes in the Specifications during the course of construction provided that such changes do not unreasonably delay completion of the Improvements and provided that COMPANY reimburses IAMSA upon demand for any additional costs incurred by IAMSA by reason of changes required by COMPANY. COMPANY hereby waives the right to object to any delay in completion caused by said changes in Specifications.

E.- The Leased Property shall be considered ready for occupancy when IAMSA has completed all of the Improvements in accordance with the Specifications and COMPANY is able to use the Leased Property for those purposes permitted under this Lease Agreement. The parties presently anticipate that the Leased Property will be ready for such occupancy by COMPANY on September 1, 2007 ("**Target Occupancy Date**"). IAMSA will use commercially reasonable, diligent efforts to cause the Improvements and the Leased Property to be ready for COMPANY's beneficial use and occupancy on the Target Occupancy Date.

IAMSA shall diligently complete or repair, as soon as possible, any items or corrections not completed when the Leased Property is ready for occupancy.

F.- Upon prior written consent of IAMSA, COMPANY may, at any time prior to the commencement of the term hereof, at its sole risk, enter upon and install such trade fixtures and equipment in the Leased Property as it may elect.

G.- IAMSA hereby acknowledges that any and all construction improvements to be completed by IAMSA hereunder either during the pre-lease term or afterwards, either with IAMSA's employees or by third parties contracted by IAMSA, will be the sole responsibility of IAMSA, and therefore guarantees and warrants to COMPANY that such employees and third parties will be in full compliance with all pertinent construction and social security, tax, labor and other applicable Mexican laws and regulations.

## III.- INSTALLATIONS BY COMPANY.

A.- COMPANY may, at its expense, install on the Leased Property, such trade fixtures, equipment and furniture as it may deem necessary; provided that such items are installed and are removable without material damage to the structural integrity of the Building and Improvements. Said trade fixtures, equipment and furniture shall remain COMPANY's property and, unless COMPANY is in default hereunder (after the giving of notice by IAMSA and the expiration of the applicable cure period), shall be removed by COMPANY upon expiration of the term hereof, or earlier termination of this Lease as specified hereunder. COMPANY also may install temporary improvements in the interior of the Building, provided that such improvements are installed and are removed without material damage to the structure of the Improvements. Such improvements shall remain the property of COMPANY and, unless COMPANY is in default hereunder (after the giving of notice by IAMSA and the expiration of the applicable cure period), shall be removed by COMPANY upon expiration of the term hereof or earlier termination of this Lease as specified hereunder. COMPANY shall repair, at its sole expense, all damage caused by such installation or removal of trade fixtures, equipment, furniture or temporary improvements.

B.- COMPANY shall perform all installations in accordance with all laws, ordinances, regulations, orders of government authorities, and the Industrial Park's Regulations which was attached hereto as **Exhibit "D"**.

**IV.- LEASE TERM, AND COMMENCEMENT DATE.**

A.- Lease Agreement. This Lease Agreement shall be effective upon its execution and delivery by IAMSA and COMPANY.

B.- Term. The term of this Lease shall commence on the later of (i) September 1, 2007 and (ii) the date on which IAMSA delivers possession of the Leased Property to COMPANY with all Improvements completed in accordance with the Specifications. Such date shall be referred to herein as the "**Commencement Date**." The term of this Lease shall terminate upon the conclusion of the seventh (7th) Lease Year (defined below).

C.- Lease Year. The term "Lease Year" as used herein, shall mean a period of twelve (12) consecutive full calendar months. The first Lease Year shall begin on the Commencement Date if the Commencement Date occurs on the first day of a calendar month; if not, then the first Lease Year shall commence upon the first day of the calendar month next following the date of commencement of the term hereof. The rent for any partial month shall be prorated.

D.- Renewal of Lease Agreement. It is understood and agreed upon that COMPANY shall have the right to extend the term of the Lease Agreement after the termination of the original lease term, for one (1) additional term of five (5) years. It is understood that COMPANY shall notify IAMSA in writing, at least 180 days prior to the termination of the initial lease term or its extensions, regarding its intention to exercise this option. If no written notice is received prior to such period, it is understood that the COMPANY has no intention to renew the lease and consequently shall immediately proceed to vacate the premises as stated hereunder at the expiration of the lease term. It is also agreed that the payment of rent during the first year of the extension period, will be the same as was in force during the last year of the original lease term, reflecting only the annual increases as established in Clause V, paragraph A of this Lease Agreement.

E.- Early Termination of Lease Agreement. In the event that IAMSA and COMPANY enter into a new lease for additional premises in any IAMSA development (the "**Additional Premises**"), COMPANY shall have the right to terminate this Lease Agreement upon the delivery of written notice to IAMSA. COMPANY's termination right under this paragraph may be exercised at any time after COMPANY's commencement of beneficial occupancy of the Additional Premises and shall be effective upon delivery to IAMSA, at which time this Lease Agreement shall terminate.

F.- Prior Lease Agreements Superseded. Effective as of the Commencement Date, this Lease Agreement supersedes all prior lease agreements between IAMSA and COMPANY for space in the building that is Leased Property under this Lease Agreement, including (1) the Lease Agreement for 17,000 sq. ft. having a commencement date of February 1, 2001 (as amended), (2) the Lease Agreement for 15,500 sq. ft. having a commencement date of July 1, 2003 (as amended), and (3) the Lease Agreement for 20,667 sq. ft. dated December 26, 2006.

**V.- RENT.**

A.- Lease. As rent for the lease of the Land and Improvements during the lease term hereof, COMPANY shall pay to IAMSA base rent in the amount of […***…] in the lawful currency of the United States of America) per month, plus value added tax, (corresponding to […***…] per square feet of constructed area per month payable in advance to IAMSA at the address of IAMSA, on the first day of each month concurrently with the payment of such base rent). Upon the commencement of the second (and each successive) Lease Year, such base rent shall be increased by two percent (2%).

B.- Maintenance Fee. The COMPANY shall pay a monthly maintenance fee for the building, at the rate of […***…] per sq. ft. plus value added tax, payable jointly with the monthly rent. Upon the commencement of the second (and each successive) Lease Year, such monthly maintenance fee shall be increased by two percent (2%).

If such rent and maintenance fee is not paid within five (5) days after the first day of any given month, it shall become delinquent and a five percent (5%) late payment fee will be applied per month.

IAMSA and COMPANY hereby agree that maintenance of specific equipment such as A/C units, compressors, electrical transformers, will be Company's sole responsibility. For such purpose, COMPANY will enter into a periodic maintenance contract with a third party covering said specific equipment that is the property of IAMSA, and COMPANY shall assume all liabilities concerning its own equipment. COMPANY shall provide a copy of such maintenance contract to IAMSA within twenty (20) days after the Commencement Date. Further, COMPANY shall obtain a insurance on such equipment and improvements property of IAMSA, in accordance with the Clause VII, Paragraph A of this Lease Agreement.

C.- Notwithstanding the above statements, COMPANY will pay the rent provided for in the above, at the address of IAMSA as set forth in this Agreement, or at the address of the banking financial institution or to any assignee of IAMSA as IAMSA may direct, under the terms of Clause XIII of this Lease Agreement.

D.- Prorate. The rent for any partial month shall be prorated.

E.- Liquidated Damages. Any termination by IAMSA of this Lease Agreement due to a default of COMPANY, prior to or during the first six (6) months of the Lease Term, or termination of this Lease Agreement by COMPANY without cause, entitles IAMSA to apply as liquidated damages all sums paid or deposited by COMPANY, as prepaid rent or as a security deposit, in addition to any other rights of IAMSA provided for herein.

F. Setoff. The payment of any rent due under this Lease, shall not be withheld or reduced for any reason whatsoever, and COMPANY agrees to assert any claim, demand, or other right against IAMSA only by way of an independent proceeding.

**VI. USE.**

The Leased Property shall be used and occupied for any lawful industrial purpose not in violation of the Industrial Park Regulations that was attached hereto as **Exhibit "D"**, COMPANY shall promptly and adequately comply with all laws, ordinances and orders of all governmental authorities affecting the Leased Property, particularly with all regulations related to environmental controls. COMPANY shall not perform or omit any acts that may damage the Leased Property, or be a menace to other occupants of the Industrial Park.

**VII. INSURANCE.**

A.- Fire and Other Insurance. IAMSA will obtain and invoice COMPANY for the necessary insurance covering the building, building improvements property of IAMSA, and third party damages, in an amount sufficient to provide for their replacement, naming IAMSA as beneficiary. IAMSA will deliver to COMPANY a copy of the insurance policies together with the receipt of payment of the premiums or the invoice issued to COMPANY for reimbursement to IAMSA of such expenses. COMPANY accepts and promises to pay such expenses immediately upon demand by IAMSA.

B.- Form and Delivery of Policies. Each insurance policy referred to in the preceding paragraphs shall be in form approved by the Department of Finance and Public Credit and written with one or more companies licensed to do insurance in Mexicali, Baja California, Mexico, and it shall provide that it shall not be subject to cancellation or exchange, except after at least 30 days prior written to IAMSA.

C.- Guaranty. It is clearly understood that IAMSA has been induced to enter into this Lease with COMPANY due to the guaranties to be submitted by COMPANY. Consequently, COMPANY shall assure that a Guarantee under the form of **Exhibit "E"** attached hereto, is given by MASIMO Corporation, a Delaware corporation ("GUARANTOR"), to insure the adherence by COMPANY of all of the conditions, covenants, obligations, including those concerning the application of mechanisms of restoration in the event of an environmental damage and contamination of the Leased Property, liabilities and agreements set forth in this Lease Agreement.

**VIII.- TAXES AND ASSESSMENTS.**

With the exception of the income tax and fixed asset tax on IAMSA, which shall be borne by IAMSA, COMPANY shall pay all taxes and assessments of every kind, including property tax, which are or may be at any time during the leased term levied against the Leased Property, the Lease Agreement or COMPANY. All such taxes and assessments shall be paid by COMPANY, and receipt showing their payment shall be delivered to IAMSA by COMPANY before such taxes and assessments become delinquent.

**IX.- REPAIRS, ALTERATIONS AND IMPROVEMENTS.**

A.  IAMSA

1.- After receipt of written notice from COMPANY, IAMSA at its expense shall with minimum interference to COMPANY 's normal use of the Leased Property, diligently proceed to repair any structural defects in the roof or exterior bearing walls of the building of IAMSA, excepting normal use, wear and damage. IAMSA shall not be liable for any damages, and shall not be obligated to make any repairs, caused by any negligent act or omissions of COMPANY, its employees, agents, invitees, or contractors. IAMSA shall have no other obligation to maintain or repair any other portion of the Leased Property, except for the repair of any Improvements constructed by IAMSA for COMPANY for a period of one year after their completion. IAMSA shall not be liable to COMPANY for any damage resulting from IAMSA's failure to make repairs, unless COMPANY has notified IAMSA of the need for such repairs, and IAMSA has failed to commence such repairs within seven (7) calendar days after said notice has been given, or has failed to complete the same in a diligent manner in the case of emergency. Any leaks in the roof will be repaired by IAMSA unless the same are caused by any actions of COMPANY in connection with installations made by COMPANY in the facility. However, it is understood that any damages caused by any such leaks either to the materials or equipment or any property of COMPANY shall not be the responsibility of IAMSA, and COMPANY shall bear the risk of such loss to property.

2.- If IAMSA fails to make the repairs described in Clause IX, "A", COMPANY may, but shall not be required to, make or cause such repairs, to be made without the prior authorization for the cost of repairs by IAMSA and IAMSA shall, on demand, immediately pay to COMPANY the actual cost of the repairs.

B. COMPANY

1.- COMPANY, at its expense, shall keep and maintain in good order and repair, except for normal use and wear, all of the Leased Property, including but not limited to improvements (but excluding those obligations of IAMSA stated in paragraph "A", 1, of this clause above), plumbing, sewage and other utility facilities that are within the Leased Property, as well as fixtures, partitions, walls (interior and exterior, including painting as often as necessary), floors, ceilings, signs, doors, windows, plate glass and all other repairs to the Leased Property. COMPANY at its expense shall repair all leaks except those caused by construction and structural defects and the negligence of IAMSA and its agents, employees, contractors and representatives (which shall be repaired by IAMSA at its sole cost and expense). The plumbing facilities shall not be used for any other purpose than that for which they were constructed. The expense of any breakage, stoppage or damage resulting from a violation of this provision, shall be borne by COMPANY. COMPANY shall store all trash only temporarily within Leased Property (see Park Rules and Regulations, **Exhibit "D"**), and shall arrange for the regular pick-up of trash at COMPANY's expense. COMPANY shall not burn any trash of any kind in or about the Leased Property or the Industrial Park. COMPANY must maintain all parts of the Leased Property and those areas adjoining the Leased Property in a neat, clean and orderly condition, free of garbage, debris and illegal obstruction.

2.- COMPANY shall obtain IAMSA's written consent before making any alterations, improvements or additions to the exterior walls and roof of the Leased Property with a cost exceeding US $5,000.00 (FIVE THOUSAND DOLLARS 00/100 CURRENCY OF THE UNITED STATES OD AMERICA) per alteration, improvement or addition. COMPANY shall not materially damage any floors, walls, ceilings, partitions, or any wood, stone, or ironwork on or about the Leased Property in connection with the construction of any such alterations or improvements.

3.- COMPANY shall keep the Leased Property free and clear of all encumbrances and liens arising out of acts or omissions of COMPANY, including those arising out of acts or construction done or ordered by COMPANY. However, if by reason of any work performed, materials furnished or obligations incurred by COMPANY with any third party, or any other act or omission by COMPANY, IAMSA is made liable or involved in litigation, COMPANY shall hold harmless and indemnify IAMSA, including any costs and expenses, and attorney's fee incurred as a result of such third party suit. Should COMPANY fail to fully discharge any such encumbrances or liens within thirty (30) days after the date the same appears of record or fail to provide a bond acceptable to IAMSA in case of litigation, IAMSA, at its option, may pay all or any part thereof. If IAMSA pays any such lien or encumbrances or any part thereof, COMPANY shall, on demand, immediately pay IAMSA the amount so paid, together with interest at the rate of thirty percent (30%) per annum from the date of payment. No lien or encumbrance of any character whatsoever created by an act or omission by COMPANY shall in any way affect the rights of IAMSA regarding clear title to the Leased Property. Although, if COMPANY by any reason of any work performed, materials furnished or obligations incurred by IAMSA with any third party, or any other act or omission by IAMSA, COMPANY is made liable or involved in any litigation, IAMSA shall defend, hold harmless and indemnify COMPANY from and against any and all actions, costs and expenses (including attorneys' fees and litigation costs), liabilities and proceedings in connection with such work performed, materials furnished or obligations incurred by IAMSA. Should IAMSA fail fully to discharge any such encumbrances or liens within thirty (30) days after the date the same appears or record or fail to provide a bond acceptable to COMPANY in case of litigation, COMPANY its option, may pay all or any part thereof. If COMPANY pays any such lien or encumbrances or any part thereof, IAMSA shall, on demand, immediately pay COMPANY the amount so paid together with inters at the rate of thirty percent (30%) per annum from the date of payment.

4.- As stated in this Lease Agreement, COMPANY, at its expense, shall have active all the time a maintenance policy covering IAMSA's equipment in the Facilities. IAMSA guarantees that all plumbing, sewage and other utility facilities that are within the Leased property and all the items referred on the above paragraph are duly working upon the Commencement Date.

**X.- UTILITY SERVICES.**

During the term of this Lease Agreement, COMPANY shall promptly pay for any and all public and other utilities and related services furnished to the Leased Property, including but not limited to, water, gas, electricity, telephone and trash pick up charges, and hook up services. IAMSA will assist COMPANY in obtaining all such utility services if such becomes necessary. All contracts necessary for the installation of any services to the Leased Property, water, drainage and telephone hook-up fees if any, as well as any KVA installation charge by the Mexican Federal Electric Commission and its electricity hook-up fees usage charge will be covered by in full by COMPANY.

**XI.- RIGHT-OF-WAY; TRANSFORMER.**

IAMSA is hereby granted a right-of-way upon, across, and under the Leased Property to enter, exit, make installations, replacements, repair and maintain all utilities, including but not limited to water, gas, telephone, all electricity and any television or radio antenna system serving the Leased Property. By virtue of this right-of-way it shall be expressly permissible for the electrical and/or telephone companies to erect and maintain the necessary poles and other necessary equipment on the Leased Property; provided, that in exercising any right COMPANY may have under this Clause, IAMSA agrees to cause only minimal interference with COMPANY's use and possession of the Leased Property.

Notwithstanding the foregoing, IAMSA shall procure at its cost a 1,000 KVA transformer for use at the Leased Property for the benefit of the premises leased by COMPANY hereunder. The installation and connection of the transformer shall be performed by COMPANY at its sole cost and expense and shall comply with the Specifications and all applicable legal requirements.

**XII.- ASSIGNMENT AND SUBLETTING.**

A.- COMPANY shall have the right, upon prior written consent from IAMSA, which consent shall not be unreasonably withheld, conditioned or delayed, to assign or transfer this Lease Agreement or any interest therein or to permit the use of the Leased Property, provided, however, that COMPANY is not in default (after the giving of notice and the expiration of the cure period hereunder) in the payment of rents or other obligations under this Lease Agreement. Notwithstanding the foregoing, COMPANY shall not be required to obtain the prior written consent of IAMSA in the event that this Lease Agreement is assigned, subleased or transferred to, or the Leased Property is occupied by, a person or entity controlled by, controlling or under common control with Masimo Corporation, a Delaware corporation. In the event of any assignment, transfer or sublease, COMPANY shall remain liable for all its obligations under this Lease Agreement. The assignment, transfer or sublease of this Lease Agreement by COMPANY will produce no extra charge to COMPANY, and shall be done under the same covenants herein agreed.

B.- IAMSA shall have the right to assign and reassign, from time to time, any or all of the rights and obligations of IAMSA in this Lease Agreement or any interest therein, subject to COMPANY's consent, provided that no such assignment or reassignment shall impair any of the rights of COMPANY herein, and provided further, that IAMSA shall remain liable for all of its obligations under this Lease Agreement. In the event of such assignment or reassignment, COMPANY shall not diminish or withhold any of the rents payable hereunder by asserting against such assignee any defense, setoff, or counterclaims which COMPANY may have against IAMSA or any other person. However, COMPANY hereby specifically waives, with respect to withholding of rent, any preventive measures to guarantee payment of a claim, as provided by the Code of Civil Procedures.

**XIII.- SUBORDINATION.**

During the term of this Lease Agreement, IAMSA shall have the right to encumber its interest in the Leased Property or in this Lease Agreement for any purpose it deems convenient and COMPANY shall and hereby does subordinate its interest in this Lease Agreement and in the Leased Property to such encumbrances. However, in the event such encumbrances are foreclosed upon or judicially enforced, the one who holds the encumbrance shall agree to respect this Lease Agreement and accept the performance by COMPANY of its obligations hereunder. COMPANY shall execute any agreement in commercially reasonable form which may be required by IAMSA in confirmation with such subordination and submit whatever public finance data may be reasonably requested of COMPANY by any trust insurance company, bank or other recognized lending institution providing financing to IAMSA that is secured by IAMSA's interest in the Leased Property or this Lease Agreement.

Once IAMSA shall have notified COMPANY in writing that the former has assigned its interest in this Lease Agreement to any lending institution as security for a debt or other obligation of IAMSA, IAMSA shall not have the power to amend this Lease Agreements so as to reduce the rent, decrease the term or modify or negate any substantial obligation without the written consent of such lending institution. Such obligation shall continue until the lending institution has notified COMPANY in writing that such assignment has been terminated, in the understanding that if IAMSA fails to obtain such lending institution's approval to carry out the foregoing, the amendment of the terms above mentioned shall have no effect whatsoever as against such lending institution. In addition, if the lending institution shall notify COMPANY in writing requiring the payment of rents hereunder directly to such lending institution or its representative, then COMPANY shall be obligated to pay such lending institution or its representative each subsequent rental that may become due under this Lease Agreement (together with any unpaid rent then past due), until the date on which such lending institution notifies COMPANY authorizing payment of rent to IAMSA or other party entitled thereto. COMPANY understands and agrees that except for the advanced rental payments provided for in this Lease Agreement, at the request of IAMSA, COMPANY shall provide a statement within twenty (20) days after IAMSA's request therefor that no such advanced payment has been made; such document shall be binding upon COMPANY as against the lending institution to which this Lease Agreement may be assigned. In addition, the lending institution shall not be bound to recognize those payments made to IAMSA after the COMPANY has received notice requiring payments to be made to such lending institutions, and IAMSA hereby (i) authorizes COMPANY to conclusively rely on any statement from such lending institution or other lender regarding where additional payments under this Lease Agreement must be delivered and (ii) releases COMPANY from any and all claims, costs, expenses and liability from COMPANY's compliance with the direction of such lending institution or lender.

**XIV.- ACCESS TO LEASED PROPERTY.**

Without undue interference to COMPANY's operation, IAMSA or its authorized representatives shall have the right to enter the Leased Property during all COMPANY business hours, and in emergencies at all times, to inspect the Leased Property and to make repairs, and if approved by COMPANY, additions or alterations to the Leased Property. For a period of ninety (90) days prior to the termination of this Lease Agreement, IAMSA shall have access to the Leased Property for the purpose of exhibiting it to prospective tenants and may post usual "For Sale" or "For Lease" signs upon the Leased Property. Except in case of emergency (in which case as much oral or written notice as is practicable shall be given), IAMSA shall give prior written notice to COMPANY before entering the Leased Property.

**XV. DAMAGE OR DESTRUCTION.**

A.- Total. In the event that the whole or a substantial part of the Leased Property is damaged or destroyed by fire, act of nature, or any other cause, so as to make COMPANY unable to continue the operation of its business, IAMSA shall, within fifteen (15) days from such destruction, determine whether the Leased Property can be restored within six (6) months. If IAMSA determines that the Leased Property cannot be restored within six (6) months, either IAMSA or COMPANY shall have the right and option to immediately terminate this Lease Agreement, by advising the other thereof by written notice. If this Lease Agreement is not terminated as provided in the preceding sentence, IAMSA shall proceed diligently to reconstruct the Leased Property, in that event the IAMSA will accept in lieu of the rent during this period the rental insurance or bond acquired by the COMPANY. During the period of reconstruction the COMPANY will not be obliged to pay the rent. In the event that the Leased Property is not reconstructed within six months after the date of destruction, then IAMSA will have a cure period of thirty days to finish the restoration of the Improvements of IAMSA, such cure period beginning on the last day of such six month period. Upon IAMSA's failure to deliver the restored premises and Improvements prior to the expiration of such thirty (30) day cure period, COMPANY will have the right to terminate this Lease Agreement by the delivery of written notice to IAMSA, or COMPANY may elect to accept one day of free rent for each day of delay of the delivery of the Leased Property from and after the end of the sixth month (in addition to the abatement of rent during the period of restoration by IAMSA as provided above). Company's right to terminate this Agreement will be subject to the COMPANY forwarding to IAMSA any insurance proceeds paid to COMPANY for the loss of Improvements constructed by the LESSOR, in accordance with the Insurance that the COMPANY is obliged to acquire under Section VII of this Agreement. In the event total damage occurs and the reconstruction of the premises commences, IAMSA will exercise its best efforts to re-locate COMPANY to another IAMSA property that is acceptable to COMPANY and suitable for COMPANY's operations, subject to availability, only for the reconstruction period, in order to help COMPANY with its continuing operations at no charge during such reconstruction.

B.- Partial. In the event the said damages caused to the Leased Property does not prevent COMPANY from continuing the normal operation of its business on the Leased Property, IAMSA and COMPANY shall repair said damage, each party reconstructing that portion of the improvements that it initially installed; provided that during the period required for such repair work, the rent payable hereunder by COMPANY shall be equitably abated for the interference with COMPANY's use and possession of the Leased Property caused by such damage and repairs. Further, COMPANY shall not be required to pay IAMSA any rent or other charges due under this Lease Agreement that are funded by proceeds from rental loss insurance carried by COMPANY, provided that such rental loss proceeds are paid to IAMSA.

**XVI.- LIMITATION OF LIABILITY.**

Except for intentional or negligent acts or omissions of IAMSA, its agents or employees, IAMSA shall not be liable to COMPANY or to any other person whatsoever for any loss or damage of any kind or nature caused by the intentional or negligent acts or omissions of COMPANY or other occupants of the Industrial Park or of adjacent property, or the public, or the causes beyond the control of IAMSA, including but not limited to any, failure to furnish or any interruption of any utility or other services in or about the Leased Property. COMPANY recognizes that additions, replacements and repairs to the Industrial Park will be made from time to time, provided that the same shall not substantially interfere with COMPANY's use and enjoyment of the Leased Property.

**XVII.- INDEMNIFICATION.**

COMPANY agrees to indemnify and save IAMSA harmless from third-party claims, costs, expenses, liabilities, damages, actions and proceedings of any kind or nature whatsoever (collectively, "Claims") arising from (i) any negligent acts or omissions of COMPANY, or its contractors, licensees, agents, invitees or employees, or (ii) any accident, injury or damage whatsoever caused to any person or property occurring in the Leased Property, or the areas adjoining the Leased Property that are exclusively controlled by COMPANY, and from and against all costs and expenses, including attorney's fees, incurred thereby.

IAMSA will indemnify and will hold COMPANY harmless from any and all third-party Claims against COMPANY arising from any negligent acts or omissions of IAMSA, or its contractors, agents, employees or representatives, and from and against all costs, and expenses, including attorney's fees, incurred thereby.

**XVIII.- NOTICES.**

All notices under this Lease Agreement shall be forwarded to the address mentioned in the Recitals above or such other addresses as may from time to time be furnished by the parties hereto. Said notices shall be in writing and sent registered mail, by fax, or hand-delivered when possible, and shall be deemed given fourteen (14) days after the date of mailing thereof, or hand-delivered. Duplicate notices shall be sent by certified airmail, postage prepaid, to such additional addresses as may from time to time be requested in writing by the parties hereto.

**XIX.- COMPANY's DEFAULT.**

A.- Each of the following shall be an "Event of Default" of COMPANY:

1.- Vacating or abandonment of the Leased Property; IAMSA shall consider the building vacated or abandoned when COMPANY closes its operation, terminates all employees and stops making payment of rent for one or more months. Under such circumstances IAMSA may proceed to take over the building after notifying COMPANY under the terms hereunder provided, and no answer is received for a period of fifteen (15) days following such notice. For such purpose, IAMSA is hereby expressly authorized by COMPANY to request the competent Court under a voluntary jurisdiction procedure to be given possession of the building using any legal means provided by law, and expressly waiving COMPANY's right to be notified due to prior notice of abandonment. This procedure shall be observed independently of any other remedies of IAMSA as provided hereunder. Consequently, COMPANY hereby expressly consents and submits to such action, waiving expressly and action to file any claim against IAMSA and/or its representatives for any such taking over.

2.- Failure to pay any installment of rent due and payable hereunder upon the date when said payment is due, as provided for in clause "V", paragraph "A" hereunder, following fourteen days after COMPANY receives written notice.

3.- Default in the performance of any of covenants, agreements or obligations hereunder, said default, except for default in the payment of rents, continuing for fifteen (15) days after written notice thereof is given by IAMSA to COMPANY (or for any additional reasonable period necessary for COMPANY to cure said default) given by IAMSA;

4.- A general assignment by COMPANY for the benefit of creditors;

5.- The filing of a voluntary petition in bankruptcy by COMPANY or the filing of an involuntary petition by COMPANY's creditors, said petition remaining undischarged for a period of ninety (90) days;

6.- The appointment of a Receiver to take possession of substantially all of COMPANY's assets or of this leasehold, said receivership remaining undissolved or unstayed for a period of thirty (30) days after the levy thereof; or

7.- After receipt of written notice and the expiration of a reasonable period of time to cure (as defined by the applicable Government Office), the failure by COMPANY to comply with any and all applicable laws and regulations of any Environmental Agency of the Government of Mexico as determined by the corresponding Environmental Authorities, in connection with the performance of their activities or the use or operation of any equipment by COMPANY that may be considered as contaminating by such Governmental Office, and failure to comply with any and all recommendations consistent with applicable legal requirements so given by said Governmental Office in connection therewith.

8.- Upon the occurrence of any Event of Default by COMPANY, IAMSA shall have the right, at its option, and in addition to other rights or remedies granted by law, including the right to claim damage, to immediately rescind this Lease Agreement and evict COMPANY from the Leased Property, without affecting the rights of IAMSA under the terms of paragraph A), 1) of this Clause.

## XX.- RIGHT TO CURE DEFAULTS.

In the event of COMPANY's breach of any term or provision herein, (except payment of rents and maintenance fee), IAMSA may, without any obligation to do so at any time after the giving of written notice and the expiration of a thirty (30) days period without cure of such default by COMPANY, cure such breach or default including the application of mechanisms of restoration in the event of contamination or make repairs to the Leased Property, for the account and at the expense of COMPANY. If IAMSA, by reason of such breach or default, pays any money in accordance with the preceding sentence, the sums so paid or incurred with interest accruing from the date of payment, shall be paid by COMPANY to IAMSA on the first day of the month after incurring such expenses.

If any installment of rent or any other payment is not paid promptly when due, it shall bear interest of *five (5%)* percent per month from the date on which it becomes delinquent until paid. This provision is not intended to relieve COMPANY from any default in the making of any payment at the time and in the manner herein specified. The foregoing interests, expenses and damages shall be recoverable from COMPANY by exercise of IAMSA's right to recover damages under this Clause. Nothing in this Clause affects the right of IAMSA to indemnification by COMPANY for liability arising prior to the termination of this Lease for personal injuries or property damage in accordance with Clause XVII of this Lease Agreement.

## XXI.- WAIVER.

In the event IAMSA or COMPANY does not compel the other to comply with any of the obligations hereunder, such action or omission shall not be construed as a waiver of a subsequent breach of the same or any other provision. Any consent or approval shall not be deemed to waive or render unnecessary the consent or approval of any subsequent or similar act by COMPANY or IAMSA.

## XXII.- CERTIFICATES.

COMPANY shall, within twenty (20) days of receipt of a written request made by IAMSA, deliver to IAMSA a statement in writing certifying that this Lease Agreement is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified); the dates to which the rent and any other charges have been paid in advance, and that IAMSA's Improvements have been satisfactorily completed. It is intended that any such statement may be relied upon by any person, prospective purchaser or lending institution interested in the Leased Property. Within twenty (20) days after COMPANY's request therefor, IAMSA shall issue a statement certifying those facts with respect to this Lease Agreement as may reasonably be requested by COMPANY, which statement may be relied upon by COMPANY and its actual and prospective investors, lenders, assignees, sublessees and transferees.

## XXIII.- HOLDING OVER.

If COMPANY should remain in possession of the Leased Property, due to COMPANY's omission or negligence, after the expiration of this agreement, COMPANY shall pay to IAMSA, in addition to base rent and other charges due and payable under this Lease Agreement, a monthly penalty equal to one hundred percent (100%) percent of the amount of the monthly base rent, as of the expiration date of the Lease Agreement, and provided that IAMSA gives thirty (30) days prior written notice before any such monthly penalty is effective, until COMPANY has delivered to IAMSA possession of the Leased Property or executed an agreement extending the term of COMPANY's lease of the Leased Property. This provision shall not be construed as granting any right to COMPANY to remain in possession of the Leased Property after the expiration of the Lease term. COMPANY shall indemnify IAMSA against any third party claims for loss or liability resulting from the delay by COMPANY in surrendering the Leased Property, at the expiration of this Lease Agreement, waving any right granted by law.

## XXIV.- SURRENDER.

On the last day of the term of this Lease Agreement, or the sooner termination thereof pursuant to other provisions hereof, COMPANY shall quit and surrender the Leased Property, broom clean, in good condition together with all alterations, additions and improvements that may have been made to the same, except furniture, machinery and equipment owned by COMPANY. Upon the termination of this Lease Agreement, COMPANY shall immediately remove all of its property, with the exception noted above, and all property not removed shall be deemed abandoned by COMPANY. COMPANY shall immediately repair any and all damage caused to the Leased Property by the removal of COMPANY's property.

## XXV.- QUIET ENJOYMENT.

IAMSA agrees that COMPANY, upon paying the rent and all other charges provided for herein and upon complying with all of the terms and provisions of the Lease Agreement, shall lawfully and quietly occupy and enjoy the Leased Property during the Lease Term.

**XXVI.- MISCELLANEOUS.**

A.- This document contains all of the agreements and conditions made between the parties, and may not be modified orally or in any manner other than by a written agreement signed by the authorized representatives of the parties.

B.- If any term, covenant, condition or provision of this Lease, or the application thereof to any person or circumstances, shall to any extent be held by a court of competent jurisdiction, to be invalid, void or unenforceable, the remaining terms, covenants, conditions or provisions of this Lease or the application thereof to any person or circumstances, shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

C.- In the event that either party should bring an action against the other party for the possession of the Leased Property or for the recovery of any sum due hereunder, or because of the breach of default of any covenant in this Lease Agreement, the prevailing party shall have the right to collect from the other party its relevant costs and expenses, including attorney's fees.

D.- Every payment and performance required by this Lease Agreement, shall be paid and performed on the date specified for such payment or performance and except for the specific grace periods herein, no delay or extension thereof shall be permitted.

E.- The titles and subtitles to the Clauses of this document shall have no effect on the interpretation of the terms and provisions contained in this Lease Agreement.

F.- IAMSA hereby acknowledges having received from COMPANY the amount of […***…], currency of the United States of America plus the Value Added Tax, to be applied to the three (3) months of the rent as deposit in guaranty for compliance of the obligations assumed hereunder by COMPANY, including but not limited to payment of rents, environmental damage or contamination of the Leased Property, and shall be reimbursed to COMPANY by IAMSA upon termination of the Lease Agreement after either (i) COMPANY has performed all of its obligations under this Lease Agreement or (ii) if IAMSA disputes COMPANY's claim that it has performed its obligations hereunder, IAMSA shall offset against such deposit the damages allegedly caused by COMPANY's failure to perform within thirty (30) days of the termination or expiration of this Lease Agreement, and the remaining balance shall be refunded to COMPANY. COMPANY reserves the right to proceed against IAMSA for any portion of the security deposit that COMPANY alleges has been wrongfully withheld by IAMSA.

G.- The parties agree that this Lease Agreement shall be governed by the Laws of the State of Baja California. For everything pertaining to the interpretation and compliance of this Lease Agreement, the parties thereby expressly submit to the jurisdiction of the Civil Courts of the City of Mexicali, State of Baja California, expressly waiving any other jurisdiction which might be applicable by reason of their present or future domiciles or otherwise.

H.- Whenever the prior consent of either party, written or otherwise, is required as a condition for any act by the other party under this Lease Agreement, such party agrees not arbitrarily to withhold such consent.

I.- Each party shall execute such further documents as shall be requested by the other party, but only to the extent that the effect of said documents is to give legal effect to rights set forth in this Lease Agreement.

J.- Submission of this instrument for examination or signature by COMPANY does not constitute a reservation of or option to lease, and it is not effective as a lease or otherwise until execution and delivery by both IAMSA and COMPANY.

K.- This Lease Agreement and each of its covenants and conditions shall be binding upon and shall inure to the benefit of the parties hereto and their respective assignees, subject to the provisions hereof. Whenever in this Lease a reference is made to IAMSA, such reference shall be deemed to refer to the person in whom the interest of the lessor hereunder shall be vested. Any successor or assignee of COMPANY who accepts an assignment of the benefit of this Lease and enters into possession of enjoyment hereunder shall thereby assume and agree to perform and be bound by, the covenants and conditions hereof.

L.- This Agreement and each and all of its stipulations as drafted, are for the sole and exclusive use by IAMSA with its lessees. Its contents shall not be disclosed to or used by other parties, for any other purpose whatsoever, except for disclosures to a party's attorneys or accountants, or for disclosure required under applicable laws (including without limitation securities laws).

M.- All Exhibits mentioned hereunder shall be signed by all parties involved, and shall be enforceable together with Lease Agreement.

N.- This Agreement will be executed in the English and Spanish versions. In the event any inconsistency arises regarding its interpretation, then the English version shall prevail.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties have executed this Lease Agreement in the city of Mexicali, Baja California, Mexico, on the 1st day of September, two thousand seven.

**INDUSTRIAS ASOCIADAS**          **INDUSTRIAL VALLERA DE MEXICALI**
**MAQUILADORAS S.A. DE C.V.**          **S.A. DE C.V.**

/s/ Eduardo Mendoza Larios              /s/ Sergio Tagliapietra Nassri
**Eduardo Mendoza Larios**             **Sergio Tagliapietra Nassri**
Legal Representative                 Legal Representative

**GUARANTOR:**
MASIMO CORPORATION

/s/ Gary Waite 8/27/07
**Gary Waite**
**Vice President of Manufacturing**

**W I T N E S S E S**

_____    _____

EXHIBIT "A"

PALACO INDUSTRIAL PARK LAYOUT

**[To Be Attached]**



EXHIBIT "B"

BUILDING LAYOUT AND DESCRIPTION


**[To Be Attached]**



## Exhibit B

"BUILDING SPECIFICATIONS"

**Module 1 (15,500.00 sq. ft.)**
  **Office Area (1,574.00 sq. ft.)**
    Two (2) restrooms.
    Ceramic tile floors.
    Two (2) office cubicles.
    Low Ceiling.
    Lighting.
    One 5 ton A/C unit.
  **Production Area (13,926.00 sq. ft.)**
    Two (2) loading docks.
    One (1) level access ramp.

**Module 2 (17,00.00 sq. ft.)**
  **Office Area (1,574.00 sq. ft. /1,574.00 sq. ft. mezzanine)**
    Two (2) restrooms.
    Ceramic tile floors.
    Two (2) office cubicles.
    Low Ceiling.
    Lighting.
    One 5 ton A/C unit.
  **Production Area (13,852.00 sq. ft.)**
    Two (2) loading docks.
    One (1) level access ramp.
    Restrooms.

**Module 3 (20,666.00 sq. ft.)**
  **Office Area (787.00 sq. ft.)**
    Two (2) restrooms.
    Ceramic tile floors.
    Three office cubicles.
    Low Ceiling.
    Lighting.
    One 5 ton A/C unit.
  **Production Area (19,879.67 sq. ft.)**
    Four (4) loading docks.
    One (1) level access ramp.

**Module 4 (42,441.00 sq. ft.)**
  **Office Area (3,321.00 sq. ft.):**
  - Includes tile floors, carpet in private cubicles, low ceiling, lighting, 18 tons of A/C and restrooms.
  **Production Area (39,119.34 sq. ft.):**
  - 4 in-pit loading docks with levelers and 1 level access ramp.
  - Production area restrooms.

X ℓ ghW 8/27/07

EXHIBIT "C"

DESCRIPTION OF IMPROVEMENTS

**[To Be Attached]**

## Exhibit C

"DESCRIPTION OF IMPROVEMENTS"

1) **Site drawing with additional fence and parking (in blue font).**



2) **Items to be improved and included.**

- Additional Parking with 18 stalls.
- Landscaping around additional parking lot.
- Fence continuation as shown in attached layout. Fence will consist of block and steel (same construction type as fence located in front of the building).
- 1,000 KVA transformer.
- Building entrance specified in the following item #3.

ghw 8/27/07

3) Improved entrance options and materials.



ghhv 8/27/07





EXHIBIT "D"

INDUSTRIAL PARK REGULATIONS


**[To Be Attached]**





## EXHIBIT D

AUGUST 2007

**INDUSTRIAL PARK REGULATIONS**
**INDUSTRIAS ASOCIADAS MAQUILADORAS S.A. DE C.V.**
**PALACO INDUSTRIAL PARK**
**MEXICALI, BAJA CALIFORNIA, MEXICO**

2

## I. OBJECTIVE.

This document has been prepared to assure proper development and use of the land at PALACO INDUSTRIAL PARK, which is operated by INDUSTRIAS ASOCIADAS MAQUILADORAS, S. A. DE C. V. (refer as to IAMSA), as such shall be identified hereinafter.   It is intended to defend the benefits offered to companies that arrive to form a part of the community of our Park.   The information as presented does not interfere and shall be incorporated to the rules and regulations established by Governmental Authorities that rule regulate the development and services in the City of Mexicali, Baja California, Mexico.

All designs for amendments concerning remodeling or adaptations of new elements to the building, offices, signs and symbols, landscaping, parking spaces, pavements, subdivisions, location and relocation of equipment, loading and unloading zones, exterior illumination, etc., must be submitted for review before such changes are made, to the Park Administrator for approval and if such be necessary, for the approval of the corresponding governmental office.

These Regulations will be applicable to companies owners or lessees on land neighboring with IAMSA, only in those cases that due to their activity, employees, supplier, clients and other visitors of the same, they use as means of access to their industrial installations, the corridor and avenues of IAMSA, understanding that upon the occurrence of any such event, the industrial building as stated will be considered part of the industrial urban complex of IAMSA, forming a part of the same unit that are formed by the companies located therein, and necessary will derive in the application and consequent submission to the common norms and rules for all of the tenants, as well as the present Regulations.

## II.    CRITERIA FOR USE OF LAND.

A. Acceptable Uses.-

1.   Light industry (research and development) or warehousing subject to the following restrictions:

3

    a.   Use or operation must be performed or executed within the occupied building.

2.  If dealing with industries that due to their nature, it has to perform activities in spaces on open air different to those of logistics, traffic, and transportation of goods and products, it shall be subject to the restrictions that are stated. No user or operations, or uses that produce or cause the following effects will be allowed:

    a) Intense noise, sounds or vibration.
    b) Unpleasant or repulsive odors.
    c) Dust, dirt, ashes, smoke or any other source of environmental contamination.
    d) Unusual fire or hazardous explosives; it is prohibited any activity or use that implies the involvement of hazardous materials.
    e) Electromagnetic interference
    f) Residual contaminated water or hard to recycle that violates the limits established by applicable Federal and State regulations.
    g) Contamination of land.
    h) Inadequate handling and warehousing of hazardous materials and residues.

B. Special uses.- The following uses are a support to the Industrial   Park and shall be submitted to our Group to be approved if such are justified:

a) Office Buildings related with, or as support to the activities generated within the Industrial Park.

    b) Places designed for the consumption and retail sale of food to the general public.

C. Prohibited Uses of land.-  The following uses are not permitted:
    a) Residential
    b)  Haul yards for mobile houses and recreational vehicles.

4

c) Bus Terminals

d) Deposit yards for dismantling of vehicles or machinery or business for automobile used parts, etc.

e) Commercial excavating for extraction of construction materials.

f) Drilling for extraction of carbohydrate substances (Petroleum, gas, etc.)..

g) Raising of Livestock or other animals

h) Activities related to the reproduction, incubation, storage and sacrifice of animals as well as processing of fat, bones, meat or remains of this same activity.

i) Refining of petroleum and its derivatives.

j) Auctions or sales to the public in general, except prior approval from IAMSA in writing in the Agreement.

k) Production or manufacture of cement, lime, asphalt, gypsum, fireworks, natural and artificial resins, etc.

l) Processing of sugar and its derivatives

m) Cemeteries

n) Activities that only consist of handling and warehousing hazardous materials and residues.

D)    IAMSA will establish the means to regulate unpleasant odors, noses, smoke, residues, residual water, remains, and in general waste materials, and other problems that may affect the operation of the Park, its image or property.

## III.    SPACE ALLOCATION AND DIMENSIONAL STANDARDS

A. Lot sizes.- The size of the lots was determined by IAMSA and shall not be subdivided under any circumstances without approval.

B. Construction Factors.- The ratio of the areas constructed as to the site is as follows:

1. Maximum area constructed          60%

2. Minimum open area                 40%

3. Parking: one parking space per 1,000 square feet of constructed area.

5

C. Heights.- Maximum height of any structure is 12 meters (approximately = 40 feet)

D. Limits.- The following measures are minimal and are originated at the limit of the property.

    1. The front yard is established in 6 meters approximately (approximately 20 feet). This space is for landscaping, decorative fence (optional), sidewalks, driveway and company logos.

    2. Side yard: 6.0 meters

    3. Back yard: 6.0 meters

E. Loading Areas and Outdoor Storage

    1. Loading areas: Each building has been allotted sufficient space for truck parking within each lot. The streets may be used only for maneuvering.

    2. Outdoor storage.- Must be approved by IAMSA and if so authorized, must preferably be located in the back yard. This area must be protected with a visual screen approved by IAMSA.

    3. Wastes and trash.- There may not be visible accumulation of trash and waste materials. The areas designated to store, accumulate and pick up trash shall be behind a visual screen, as well as in areas in which it is not visible from the streets.

    4. Rest areas.- Each occupant shall provide an open green are for their employees.

    5. Non-specified areas.- Any area without any specific use will be allowed as green are or covered with gravel.

F.    Parking areas.- No parking will be allowed in the street, consequently each construction project shall provide with adequate space for parking outside the street for specific need of each user.

The user has the obligation to mark visitors and employees parking spaces. The parking areas shall have adjacent space for landscaping and screens to minimize its visual impact.

G. Design Characteristics.- Design characteristics shall be considered as an environmental element. All characteristics of design including installations for

6

outside lighting must be approved by IAMSA. Designs include benches, shades, canopies, signs, posts, fountains, sculptures, etc.

**IV.   BUILDING DESIGN**

A. Concept of Site Plan

A wide variety of architectural designs and materials are permitted, provided that there is harmony with the exterior design of the building, excluding all constructions that disrupt the environmental harmony.

B.   Facades

The colors, materials, exterior finishing, and forms used in the building shall be in the same height levels. The exterior walls may be concrete block without finishing, smooth concrete finishing, "pre-cast" concrete or a similar approved material. Corrugated or metal sheets, asbestos, or similar materials will be restricted for walls, except with the approval of IAMSA.

Architectural designs, particularly the main facades shall maintain a language formed by Mexican colonial style, modern colonial, using materials representative of such zone.

Materials such as red brick, burned red brick, brick or stock or ball stone (or the like) applied in accesses to the building and/or finishing in the corners when the main entrances are on the extreme sides.

The arches in any of its variations shall be permitted provided that they maintain harmony as a whole and are incorporated in adequate proportion to the building design.

All design proposal and/or remodeling shall be submitted for the corresponding authorization to the Design Committee of IAMSA who shall at all times reserve the right to approve the facades and styles, issuing the corresponding recommendations to improve the proposals so submitted by the interested party.

7

C.    Mechanic Equipment

All mechanic equipment such as ducts, ventilators, extractors and air conditioning units, including those on the roof, shall be hidden with screen that forms a part of the architectural design to minimize visibility.

D.    Non-decorative Fences, block and brick walls.

These may only be used in the limits with adjacent and/or rear lots. May be used only if necessary in restricted green areas. The use of tin, wood, smooth concrete, chain link wire, etc. is restricted. It is required to use materials with architectural criteria similar to the existing buildings. It is permitted to use chain link fences only in side and rear limits.

E.    Signs

The installation or alteration of exterior signs including traffic sign, shall be submitted and approved by IAMSA. Under no circumstances or purpose will be authorized the placing of advertising or canvas signs in the exterior of the building, on the fence or in any manner that alter the image of the building or its surroundings. For such purpose, the occupant, owner or lessee of the building, shall at all times, request authorization from IAMSA prior to the execution of such actions.

F.    Exterior Installation of the Name of the Company

It is the obligation of each lessee, to install for its own account the name of the Company in the area designated for such purpose. Such shall be of individuals acrylic letters, with the following measures: 32 inches height, and width proportional to the letter. Thickness, 2 inches.

G.    Warehouses for hazardous materials and residues.

The warehouses for hazardous materials or residues of each user can be located within users lots but shall comply with applicable Federal regulations regarding it's location and construction. The previous obligates the user to present to the Federal Environment Authority the required construction permits with the intention of receiving the required authorization.

8

## V.   MAINTENANCE, SECURITY AND ENVIRONMENT PROTECTION.

A.      Fees.- A maintenance fee will be charged to all occupants of the Park per square feet of construction in accordance with the lease, sublease, sales agreements, or any other type of agreement. The total cost will include maintenance of the streets, landscaping, access control and public lighting.

In the case of land sold such fee shall be in American dollars per square meter of land per month.

Such amounts will be updated every year in accordance with the CPI (Consumer Price Index) Los Angeles-Riverside-Orange County.

B.      Under no circumstances authorization will be given to use the parking area, public streets, loading docks or trash containers area, as safekeeping or warehousing of goods or hazardous residues.

C.      Washing of any type of vehicles is forbidden in any place of the Industrial Park, except when the occupant designates an specific area that shall be approved by IAMSA. The area shall be protected by a barrier to avoid visibility from the streets and shall contain sewers and oil filters as required for such activity.

D.      In the event of water installations located in green areas, such will be used only for irrigation exclusively of such areas.

E.      It shall be the obligation of each lessee to pay water bills corresponding to the its building green areas.

F.      Any damage caused due to any circumstance to any installation in the Industrial Park by the company client, shall be repaired by the same as soon as possible, on the contrary the management of the Industrial Park will take the resolutions as considered necessary and will execute the same on the cost of the company client.

G.      Under no circumstances loading and unloading maneuvering in parking areas for automobiles, domestic units and avenues of the Industrial park.

9

H.    it is strictly forbidden to take alcoholic beverages in public streets of the industrial park, in the parking areas of the companies; exceptionally this shall be allowed when there are special events and corporate festivities, which may take place in the parking areas, provided such is notified in advance to the Administration of the Industrial park for consideration and authorization.

I.    In the event of need of the performance of safety drills of any nature, it shall be notified 48 hours in advance to the security area of the Administration of the Industrial park, and follow the procedures indicated for this purpose.

J.    the company shall inform its employees any measures and procedures for safety that rule the Industrial Park, as well as the new measures that are taken in this area, which shall be notified by the Administration of the Industrial Park.

K.    It is prohibited to discharge residual water into the storm drain that does not comply with the limits established by the applicable Federal and State Environmental Regulations.

L. The industrial park administration reserves the right to make periodic inspections to the users with the sole intention to assure that environmental and security aspects are being complied with.

## VI.    VIGILANCE COMMITTEE

IAMSA has organized a Vigilance Committee consisting of three members, one an OCCUPANT of the Park and two representatives of IAMSA, with all vigilance faculties regarding compliance with these Regulations, and to assure that the installations of their establishments do not represent a nuisance to occupants, or that cause deterioration to such property and to the Park installations.

10

The Vigilance Committee will have the following functions and faculties:

a) Supervise the exact compliance of the obligations established in these Regulations.

b) The Committee shall notify IAMSA of any deficiencies and violations to the stipulations of these Regulations so as to allow IAMSA to take any measures as necessary to impose any sanctions stipulated in Chapter VII and in such case to make effective such sanctions.

c) The faculties of the Committee will be exercised by any two members of the Committee whoever they are.

d) The Committee will notify the occupant with a copy to IAMSA any violations to the Regulations or non compliance with the rules established in this Regulations or in the lease Agreement executed between the parties. In the same document, the occupant will be required to remedy any violation or non compliance, in a period not less than three days or more than thirty, which term will be defined by the committee taking in consideration the nature of the violation and the measures that may be necessary to adopt to correct the same.

## VII. SANCTIONS FOR VIOLATION TO THE OBLIGATIONS IN THESE REGULATIONS.

For the imposition of the sanctions the following procedure will be observed:

1. If the occupant does not remedy the violation under the terms indicated in the prior Chapter, it shall be notified to IAMSA, so that the latter imposes and executes the sanctions that are applicable in accordance with the following stipulations.

2. The penalties or sanctions will vary depending on the nature of the action or the omission of the occupant, as follows:

   a) For establishing without prior authorization from IAMSA, office buildings related with or as support for activities

II

generated in the Industrial Park and/or spaces for the consumption and sale of food to the public, 30 minimum wages

b)      For prohibited uses of the building, as established in Chapter II, C, of these Park Regulations, 50 minimum wages;

c)      For outdoor storage, garbage and trash, and allow street parking of automobiles, as provided for in Chapter III, Section E, fractions 3, 4 and 7 of these Park Regulations, allowing the parking of automobiles in the street, and not obeying the stipulations established for the security area of the Industrial Park, 50 minimum wages;

d)      For any non-compliance with the stipulations of Clause II of these Regulations, with no specific sanction, 90 minimum wages.

e)      For non-compliance with the stipulations of Clause III of these Regulations, with no specific sanction, 90 minimum wages.

f)      For non-compliance with the stipulations of Clause IV of these Regulations, with no specific sanction, 90 minimum wages.

3.   In the event that the occupant notwithstanding requirement made and sanctions and penalties imposed, does not remedy such non-compliance nor pays the amount imposed for sanctions of any nature, with the term so given, IAMSA is authorized to:

i.      Remedy the situation omitted by occupant, and charge the cost caused to remedy the situation, as well as to impose a penalty for non complying, equal to 100 minimum wages independently of the sanction imposed prior to this.

ii.      Execute any actions that may legally proceed to obtain reimbursement of expenses that IAMSA may have incurred, as well as the amounts for penalties

12

due to noncompliance, including attorney's expenses
and fees due to such actions.

4.   In the event of recurrence by occupant, the latter will abide
the preceding clauses and shall be applied am additional
sanction of 180 minimum wages.   Independently of the
above, if the penalized occupant does not act as required,
IAMSA shall reasonably proceed to remedy the non
compliance and to make effective the penalty imposed, in
addition to any expenses incurred in such repair.   In the
event of not covering the amounts due, IAMSA shall proceed
to demand such responsibility, if necessary, through judicial
procedures, in which case occupant will be obligated to pay
attorney's fees and any other expenses generated.

5.   the penalties, sanctions fines and expenses incurred to
remedy or repair all those acts omitted or not taken care of
by any occupant in default shall be charged to the same
through an invoice or fee invoice, as may be the case, and it
shall be the obligation of occupant to pay IAMSA within a
period of five calendar days following the date in which such
notice for payment was made.

## VIII.   AMENDMENTS

This document will be amended eventually by the management of IAMSA
together with the Committee, in order to keep it updated, due to changes that
with time may become necessary.

The amendments will be delivered to occupants and he expressly agrees to
submit and act under the terms of these Regulations and its amendments, and to
submit to the determinations of the Committee for the benefit of its property, its
security and that of its employees and neighbors. Further, the occupant agrees to

13

perform in accordance with such rules in order to improve its installations and maintain the value of its property.

INDUSTRIAS ASOCIADAS MAQUILADORAS, S. A. DE C. V.

By: Eudardo Mendoza Larios

APPROVED AND EXPRESSLY
ACCEPTED:

By: Sergio Taglapietra Nassri
Industrial Vallera de Mexicalo,  S.A. de C.V.

EXHIBIT "E"

GUARANTEE

**[To Be Attached]**

## EXHIBIT E

### GUARANTY

The undersigned **MASIMO Corporation**, a Delaware corporation (hereinafter referred to as "Guarantor"), in consideration for the lease of the premises described in that certain lease (hereinafter referred to as "Lease") with a commencement date beginning _Sept. 1, 2007_  between **Industrias Asociadas Maquiladoras S.A. DE C.V.**, a Mexican corporation, whose address is Km. 10.5 Carretera a San Luis R.C., Mexicali, B.C., México, as Landlord (hereinafter referred to as "Landlord"), and **Industrial Vallera de Mexicali S.A. DE C.V.** , a Mexican corporation, as Tenant (hereinafter referred to as "Tenant"), does hereby convenant and agree as follows:

A) **MASIMO Corporation** hereby unconditionally guarantees the full, faithful and timely payment and performance by Tenant of all payments, covenants and other obligations of Tenant under the terms of the Lease, including the payment of any rent, or any other costs or charges (including those concerning the cost of restoration in the event of any environmental damage or contamination of the leased property), or in the performance of any other covenant and obligation of Tenant under the Lease. On written demand of Landlord, the Guarantor shall fully and promptly pay all rent, sums, costs and charges to be paid by Tenant under or pursuant to the Lease, as well as any other obligation to be performed by Tenant under or pursuant to the Lease. In addition, Guarantor shall on Landlord's written demand pay to Landlord any and all sums due to Landlord pursuant to the Lease including all interest and late charges on past rent and past due obligations of Tenant, reasonable costs advanced by Landlord, and all damages and expenses (including reasonable attorneys' fees and litigation costs) that may arise in consequence of Tenant's default.

B) The obligations of Guarantor hereunder are independent of the obligations of Tenant. A separate action or actions may, at Landlord's option, be brought and prosecuted against the Guarantor, whether or not any action is first or subsequently brought against Tenant, or whether or not Tenant is joined in any such action. Guarantor may be joined in any action or proceeding commenced by Landlord against Tenant arising out of, in connection with or based upon the Lease. Guarantor waives any right to require Landlord to proceed against Tenant or pursue any other remedy in Landlord's power whatsoever, any right to complain of delay in the enforcement of Landlord and/or prior action by Landlord of any nature whatsoever against Tenant, or otherwise. Guarantor hereby expressly waives all defenses which might constitute a legal or equitable discharge of a surety or obligor, and acknowledges that its obligations under this guaranty are not subject to any reduction, limitation, impairment, discharge or termination for any reason (other than indefeasible payment and performance in full of all rents and other payments due and payable by the Lessee under the Lease).

C) This Guaranty shall remain and continue in full force and effect and shall not be discharged in whole or in part notwithstanding (whether prior or subsequent to the execution hereof) any alteration, renewal, extension, modification, amendment or assignment of or subletting permitted under the Lease. The undersigned hereby waives notices of any of the foregoing, and agrees that the liability of the undersigned hereunder shall be based upon the obligations of Tenant set forth in the Lease as the same may be altered, renewed, extended, modified, amended or assigned. For the purpose of this Guaranty and the obligations and liabilities of the undersigned hereunder, "Tenant" shall be deemed to include any and all assignees, subtenants, permittees or others directly or indirectly operating or conducting a business in or from the Premises, as fully as if any of the same were the named Tenant under the Lease.

D) The undersigned's obligations hereunder shall remain fully binding although Landlord may have waived one or more defaults by Tenant, extended the time of performance by Tenant

or released, returned or misapplied other collateral at any time given as security for Tenant's obligations.

E) This Guaranty shall remain in full force and effect notwithstanding the institution by or against Tenant of bankruptcy, reorganization, readjustment, receivership, or insolvency proceedings of any nature, or the disaffirmance of the Lease in any such proceedings or otherwise.

F) Neuter should also refer, where applicable, to the feminine gender and the masculine gender; and the singular reference shall also include the plural of any word id the context so requires.

G) This Guaranty shall be applicable to, binding upon and inure to the benefit of the heirs, executors, administrators, representatives, successors and assigns of Landlord and the undersigned. Landlord may, without notice, assign this Guaranty in whole or in part in connection with Landlord's assignment of its interest under the Lease.

H) In the event that Landlord should institute any suit against the undersigned for violation of or to enforce any the covenants or conditions of this Guaranty or to enforce any right of Landlord hereunder, or should the undersigned institute any suit against Landlord arising out of or in connection with this Guaranty, or should either party institute a suit against the other for a declaration of rights hereunder, or should either party intervene in any suit in which the other is a party to enforce or protect its interest or rights hereunder, the prevailing party in any such suit shall be entitled to the fees of its attorney (s) in the reasonable amount thereof, to be determined by the court and taxed as a part of the costs therein.

I) The execution of this Guaranty prior to execution of the Lease shall not invalidate this Guaranty or lessen the obligations of Guarantor (s) hereunder.

J) This Guaranty is made pursuant to, and shall be interpreted and applied in accordance with, the Laws of the State of California, and Guarantor stipulates to submit any and all disputes which may arise under the Lease to the jurisdiction of California courts.

IN THE WITNESS WHEREOF, the undersigned hereby signs and authorizes this Guaranty this _____ day of August 2007.     *Sept. 2007*     gMW

Guarantor.

_____   8/27/07
Mr. Gary Waite
Vice President
**MASIMO Corporation**

WITNESSES

_____

**EXHIBIT 10.24**

**\*\*\*Certain dentified information has been omitted from this exhibit because it is both (i) not material and (ii) would likely cause competitive harm to the Registrant if publicly disclosed. Such omitted information is indicated by brackets ("[...\*\*\*...]") in this exhibit. \*\*\***

**FIRST ADDENDUM** entered into by and between **INDUSTRIAS ASOCIADAS MAQUILADORAS, S.A DE C.V**., herein represented by Mr. Eduardo Mendoza Larios, hereinafter referred to as "LESSOR", and **INDUSTRIAL VALLERA DE MEXICALI S.A. DE C.V.** hereinafter to as "LESSEE", represented by its legal representative, Sr. Sergio Tagliapietra Nassri, and with acknowledge of **MASIMO CORPORATION**, hereinafter referred to as "GUARANTOR", represented in this act by Yongsam Lee, pursuant to the following RECITALS and CLAUSES:

**R E C I T A L S**

Both parties declare:

I.     That LESSOR and the LESSEE have entered into a Lease Agreement dated on September 1st, 2007 (herein after referred to as the "Lease Agreement") whereby LESSOR leased certain property to LESSEE located at "Palaco Industrial Park", in the City of Mexicali, Baja California, with a total constructed area of 8,882.18 square meters (eight thousand eight hundred and eighty two point eighteen square meters), equivalent to 95,607.00 square feet (ninety five thousand six hundred and seven square feet).

II.     That it's their intention to execute this First Addendum to expand the Leased Property with 53,797 (fifty three thousand seven hundred and ninety seven) additional square feet of constructed area to have a total of 149,404 square feet (one hundred forty nine thousand four hundred and four) of constructed leased area; with the location, dimensions, boundaries and adjoining properties detailed in the plot plan attached hereto as "**Exhibit A**"; and to extend the Lease Term by a new term of seven (7) years commencing on December 17, 2013 and ending on December 16, 2020.

III.     That the powers of attorney under which they represented LESSOR and LESSEE are still in effect, and that such have not been revoked or limited in any manner, and consequently they mutually acknowledge their representation and capacity for all legal purposes;

Pursuant to the above the parties agree as follows:

**CLAUSES**

**EXPANSION OF THE LEASED PROPERTY AND RIGHT OF FIRST REFUSAL.**

LESSOR and LESSEE expressly agree and accept to expand the Leased Property with 53.797 (fifty three thousand seven hundred and ninety seven) additional square feet of constructed area by an expansion of the Building to have a total of 149,404 square feet (one hundred forty nine thousand four hundred and four) of constructed area, and the improvements thereon required by LESSEE and to be provided by LESSOR, all described in "**Exhibit A1**" attached to this Addendum. LESSOR will execute the expansion of 53,797 additional square feet and additional parking space in a period of 5 months commencing on July 17, 2013 and the formal delivery to LESSEE shall be on December 17, 2013.

LESSEE shall have an additional parking space parking spaces, described in "**Exhibit A**" for the exclusive use and control of LESSEE, same that shall be guarded with LESSEE'S security personnel during the Lease Term.

The parties further expressly agree that during the Lease Term, LESSOR grants LESSEE an irrevocable right of first refusal for renting the building planned to be built in the industrial park adjoining to Venustiano Carranza Boulevard. Once LESSOR has received an offer from a third party, it will immediately notify LESSEE, who will enjoy of a period of 15 (fifteen) calendar days in order to exercise its right of first refusal to lease such new building.

### SECOND EXTENSION OF THE LEASE TERM AND OPTION TO EXTEND.

**A.**     LESSOR and LESSEE agree to extend the Term of the Lease Agreement for a new term of seven (7) years mandatory for the parties, therefore the new Term will commence on December 17, 2013 and will end on December 16, 2020.

**B.**     **Option to Extend.** LESSEE shall have the right to request the extension of the Term herein agreed upon the terms, conditions and rents set forth herein, for one (1) additional period of seven (7) years, by giving written notice to LESSOR not less than one hundred and eighty (180) calendar days prior to the expiration of the Lease Term, provided that LESSEE is not then in default in payment of rent or of any other obligation. The parties hereby agree that lack of timely and formal notice by LESSEE to exercise the Extended Term herein referred, shall be understood that LESSEE does not intent to extend the Lease Term.

### THIRD RENT AND MAINTENANCE FEE.

**A.**     As from December 17, 2013, as total rent of the "Leased Property" of 149,404 square feet (one hundred forty nine thousand four hundred and four) of constructed area, LESSEE shall pay LESSOR the amount of […***…], Legal Currency of the United States of America) per square foot, equivalents to […***…], Legal Currency of the United States of America; plus […***…] of Value Added Tax (IVA by its Spanish acronym) or the corresponding at the moment of payment, payable in advance to LESSOR in LESSOR'S address.

If such rent is no paid within the first five (5) days of each month, it shall become delinquent and late penalty fees will be applied at the rate of five per cent (5%) per month, payable precisely in United States Currency.

**B.**     **Maintenance Fee**: Also as from December 17, 2013, LESSEE shall pay to LESSOR a monthly maintenance fee at the rate of […***…], Legal Currency of the United States of America) per square foot equivalent to […***…], Legal Currency of the United States of America) monthly; plus […***…] of Value Added Tax (IVA by its Spanish acronym) or the corresponding at the moment of payment, which shall be payable jointly with the monthly rent.

If such maintenance fee is no paid within the first five (5) days of each month, it shall become delinquent and late penalty fees will be applied at the rate of five per cent (5%) per month, payable precisely in United States Currency.

**C.     Increase**. Both Rent and maintenance fee herein established will be increased annually in the terms described on the Lease Agreement as from the first lease year herein extended.

**FOURTH SECURITY DEPOSIT**.

LESSEE hereby delivers the amount of [...***...], Legal Currency of the United States of America) to complete the requirement of a security deposit of 3 months of rent, as deposit in guaranty for compliance of the obligations assumed in the lease agreement and hereunder by LESSEE, including but not limited to payment of rents, environmental damage or contamination of the Leased Property and shall be reimbursed to LESSEE by LESSOR upon termination of the Lease Agreement in the terms therein described.

**FIFTH GUARANTY**.

GUARANTOR hereby acknowledges and accepts the agree by LESSEE under this addendum, and also that the Guaranty granted in relation to the Lease Agreement is in full force and effect and still applies to the Lease Agreement as amended by this First Addendum.

**SIXTH.** All other terms and conditions of the Lease Agreement, including the ones relative to the Guaranty and Insurance and all stipulations contained therein will remain and continue in full force and effect as contained in such Lease Agreement, therefore this addendum does not cause novation. The Lease Agreement previously executed by the parties on September 1st, 2007 shall govern any matter related to the Lease, which is not specifically addressed herein, including the original and additional leased properties described above.

**SEVENTH.** This document is referred to all of the AMENDMENTS made to the Lease Agreement, and forms a part of the same as one whole document; both contain the conditions and promises made between the parties, and may not be modified orally or in any manner other than by a written agreement signed by the authorized representatives of the parties.

**EIGHTH.** The parties hereunder agree that everything to the interpretation and compliance of this First Addendum and the Lease Agreement, they expressly submit to the jurisdiction of the Civil Courts of the City of Mexicali, State of Baja California, expressly waiving any other jurisdiction which might be applicable by reason of their present or future domiciles or otherwise.

IN WITNESS WHEREOF, the parties have executed this First Addendum to the Lease Agreement in the city of Mexicali, Baja California, Mexico, on the 15th day of July of 2013.

**LESSOR:**
**Industrias Asociadas Maquiladoras,**
**S.A. de C.V.**

/s/ Eduardo Mendoza Larios
**Eduardo Mendoza Larios**
**Legal Representative**

**LESSEE:**
**INDUSTRIAL VALLERA DE MEXICALI S.A. DE C.V.**

/s/ Sergio Tagliapietra Nassri
**Sergio Tagliapietra Nassri**
**Legal Representative**

**WITNESSES:**
/s/ Lope Palomino
Lope Palomino

/s/ [Illegible]

**Guarantor Acknowledges and accepts the terms set forth in this Addendum as described in the Fourth Clause.**
**GUARANTOR:**
**MASIMO CORPORATION.**

/s/ Yongsam Lee
**Yongsam Lee**
**Legal Representative**

**EXHIBIT 10.29**

**\*\*\*Certain identified information has been omitted from this exhibit because it is both (i) not material and (ii) would likely cause competitive harm to the Registrant if publicly disclosed.**
**Such omitted information is indicated by brackets ("[...\*\*\*...]") in this exhibit. \*\*\***

## SETTLEMENT AND COVENANT NOT TO SUE AGREEMENT

This **SETTLEMENT AND COVENANT NOT TO SUE AGREEMENT** (this "Agreement") is entered into as of the Effective Date (as that term is defined below) between Masimo Corporation ("Masimo"), Masimo Technologies SARL ("Masimo Tech") and Masimo International SARL ("Masimo SARL") and their respective Affiliates ("collectively, "MASIMO") and Mindray Medical International, Limited ("MMIL"), Shenzhen Mindray Biomedical Electronics Co., Ltd. ("Shenzhen Mindray"), Mindray DS USA, Inc. ("Mindray DS") and their respective Affiliates (collectively, "MINDRAY"), who are referred to in this Agreement collectively as the "Parties" and individually as a "Party."

**WHEREAS,** Masimo and Masimo SARL filed suit against Shenzhen Mindray in the United States District Court for the Central District of California for patent infringement and breach of a certain 2002 Agreement between Masimo and Shenzhen Mindray, as amended, in Civil Action No. SACV12-02206 CJC (DFMx) (the "California Litigation"), in which Shenzhen Mindray has asserted counterclaims for patent infringement and antitrust violations; and

**WHEREAS**, Masimo filed suit against Mindray DS, MMIL and Shenzhen Mindray for patent infringement and breach of a certain Restated Purchasing and License Agreement, dated effective as of August 19, 1997, between Masimo and Datascope Corporation (and its current successor(s) and assign(s)), as amended (the "Datascope Agreement"), in Civil Action L-9601- 13, Superior Court of New Jersey, Law Division, Bergen County, currently removed to the United States District Court for the District of New Jersey, as Civil Action No. 2:15-cv-06900 (SDW)(SCM) (the "New Jersey Litigation"), in which Mindray DS and Shenzhen Mindray have asserted counterclaims for declarations of non-infringement, patent infringement and antitrust violations; and

**WHEREAS**, as a result of a remand decision in Civil Action No. 2:15-cv-00457 (SDW)(SCM), Mindray DS filed an appeal with the United States Court of Appeals for the Federal Circuit, docketed as Case No. 15-2058 (the "Federal Circuit Appeal"); and

**WHEREAS**, Shenzhen Mindray filed suits against Masimo for anticompetitive conduct in connection with the 2002 Agreement between Masimo Corporation and Shenzhen Mindray and for patent infringement against Masimo and Shenzhen Comen Medical Instruments Co. Ltd., in Shenzhen Intermediate People's Court in the Republic of China, in Action No. (2015) 深中 法知民 初字第 796　号，(2015) 深中法知民初字第554号，(2015)深中法知民初字第555　号；Masimo has instituted an invalidity proceeding against Shenzhen Mindray's China Patent No. 2007103050619 at the State Intellectual Property Office (SIPO) (the "Chinese Litigations"); and

**WHEREAS**, as Masimo has petitioned the United States Patent and Trademark Office for the institution of Inter Partes Review of U.S. Patent No. 5,987,343 (the "Kinast IPR"); and

**WHEREAS**, the Parties desire to resolve all aspects of the California Litigation, the New Jersey Litigation, the Chinese Litigations, the Federal Circuit Appeal and the Kinast IPR (collectively, the "Litigations"), without investment of further time, expense or other legal action; and

**WHEREAS**, MINDRAY desires a dependable supply of high performance pulse oximetry technology for the United States and Canada and wishes to secure its future supply of pulse oximetry technology from MASIMO so that it can plan its own long-term business operations with assurance of this dependable supply;

**NOW**, **THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, MASIMO and MINDRAY, intending to be legally bound, agree as follows:

1.    **DEFINITIONS**. The definitions of capitalized terms set forth in the recitals above are hereby incorporated into and made a part of this Agreement. Furthermore, as used in this Agreement:

1.1    "**Affiliate**" shall mean, with respect to any referenced Person, any other Person who directly or indirectly, by itself or through one or more intermediaries, controls, is controlled by, or is under direct or indirect common control with, such Person. A Person shall be regarded as in control of another Person if it owns, or directly or indirectly controls, at least fifty percent (50%) of the voting stock or other ownership interests of such Person, or if it directly or indirectly possesses the power to direct or cause the direction of the management and policies of such Person by any means whatsoever; provided, however, in those jurisdictions where majority ownership of equity interests is prohibited to foreign owners, an Affiliate shall be a Person in which the referenced Person directly or indirectly owns the maximum permitted percentage of equity interests in such other Person as is permitted by local law.

1.2    "**Claims**" means any and all claims, counterclaims, third party claims, contribution claims, indemnity claims, demands, actions, causes of action, and all other claims of every kind and nature in law or equity, whether arising under state, federal, international or other law, which were asserted in or which arise from the same transactions or occurrences as those claims asserted in the Litigations, whether such claims are absolute or contingent, direct or indirect, known or unknown.

1.3    "**Masimo Covered Products**" means MASIMO products commercially available from MASIMO as of the Effective Date and MASIMO products commercially available from MASIMO as of the date MASIMO receives the entire Settlement Payment, as listed on Exhibit A, and products Essentially Unchanged therefrom. For the sake of clarity, Masimo Covered Products refers only to products commercially available from MASIMO, and the covenants in this Agreement that refer to Masimo Covered Products do not encompass third party customer products that incorporate Masimo Covered Products apart from the Masimo Covered Products themselves. MASIMO will deliver Exhibit A to MINDRAY within ten (10) days of the Effective Date.

1.4    "**Mindray Covered Technology**" means MINDRAY's pulse oximetry technology and gas monitoring technology (i.e., $CO_2$, $O_2$, and anesthesia gases) as included in products commercially available from MINDRAY as of the Effective Date, as listed on Exhibit B, and pulse oximetry technology and gas monitoring technology Essentially Unchanged therefrom. For the sake of clarity, Mindray Covered Technology refers only to MINDRAY's pulse oximetry technology and gas monitoring technology,

and the covenants in this Agreement that refer to Mindray Covered Technology do not encompass the products that incorporate Mindray Covered Technology apart from the Mindray Covered Technology itself. MINDRAY will deliver Exhibit B to MASIMO within ten (10) days of the Effective Date.

1.5   **"Effective Date"** means the earliest date upon which all Parties have signed this Agreement or identical counterparts thereof.

1.6   A new or updated product is **"Essentially Unchanged"** from an existing product if the differences between the new or updated product and the existing product do not create a new or different basis for a claim of infringement of the Pertinent Patents, provided, however, that any functionality added after the Effective Date that would create a new or different basis for a claim of infringement of the Pertinent Patents will not be considered part of a Masimo Covered Product or any Mindray Covered Technology.

1.7   **"Person"** means any individual or firm, association, organization, joint venture, trust, partnership, corporation, or other collective organization or entity.

1.8   **"Pertinent Patents"** means all patents and patent applications in all jurisdictions worldwide, assigned to, owned by, controlled by, or licensed to with right to sublicense, either Party, and specifically includes the patents asserted by any party in the Litigations and any continuations, continuations-in-part, divisionals, reexaminations and reissues of such patents.

**2.   COVENANT NOT TO SUE**. Subject to the terms and conditions of this Agreement, each Party hereby agrees, promises and covenants to the other Party, for their benefit and for the benefit of their predecessors, successors, heirs and assigns, with effect throughout the world, not to claim or assert any cause of action or bring or instigate any proceeding, before any tribunal, whether judicial or administrative, seeking a determination that the making, having made, using, offering for sale, selling, importing, exporting, commercialization or other exploitation, of the Masimo Covered Products or Mindray Covered Technology infringes or infringed the other Party's Pertinent Patents; provided, however, that MASIMO's covenant to MINDRAY shall become effective only upon MASIMO's receipt of the entire Settlement Payment. Without in any way limiting the foregoing, and for the avoidance of doubt, each of MASIMO and MINDRAY acknowledges that the covenant not to sue granted herein applies to each and every Masimo Covered Product and Mindray Covered Technology within or outside the United States and that this covenant extends to every customer, distributor, reseller and end-user of such Masimo Covered Product or Mindray Covered Technology, whether located anywhere in the world.

**3.   MINDRAY SpO2 SALES**.

3.1   **Supply of SpO2 for Delivery in the United States and Canada**. Until December 31, 2027, MINDRAY agrees to purchase from MASIMO, and MASIMO agrees to sell to MINDRAY (pursuant to the Datascope Agreement), all of MINDRAY's requirements for pulse oximetry for use in any MINDRAY products that are to be sold, offered for sale or otherwise distributed in the United States and Canada, except that MINDRAY may integrate pulse oximetry in MINDRAY multi-parameter monitors from another third party brand not Affiliated with MINDRAY for customers that request

patient monitors from MINDRAY equipped with such other third party pulse oximetry brand. At any time after MINDRAY provides notice of its intention to import, sell, offer for sale, or distribute Mindray SpO2 in the United States and Canada after December 31, 2027, either Party will have the right to terminate the Datascope Agreement on twelve (12) months prior written notice to the other Party. After the Effective Date, the territorial scope of the Datascope Agreement will be limited to the United States and Canada only. For clarity, between the Effective Dale and December 31, 2027, the Datascope Agreement shall not prohibit the importation, sale, offer for sale, and distribution of Mindray SpO2 outside of the United States and Canada, and after December 31, 2027, the Datascope Agreement shall not prohibit the importation, sale, offer for sale, and distribution of Mindray SpO2 inside the United States and Canada. All other terms of the Datascope Agreement will remain unchanged. In the event of breach of this Section 3.1 by MINDRAY, MASIMO will provide written notice to MINDRAY. If MINDRAY fails to cure the breach within ninety (90) days, then the covenant provided by MASIMO in Section 2 will terminate, and MASIMO may immediately terminate the Datascope Agreement and/or stop shipping to MINDRAY, in addition to any other rights and remedies MASIMO may have. In the event of breach of this Section 3.1 by MASIMO, MINDRAY will provide written notice to MASIMO. If MASIMO fails to cure the breach within ninety (90) days, then MINDRAY may fulfill its SpO2 requirements in the United States and Canada with Mindray SpO2 or another third party SpO2 brand, in addition to any other rights and remedies MINDRAY may have. In the event of alleged breach by either party, the parties shall engage in good-faith discussions to attempt to resolve such alleged breach within the ninety (90) day cure period, including discussion between top management from both Parties.

## 4. PAYMENT.

**4.1   Amount of Payment**. MINDRAY shall pay MASIMO the amount of twenty five million US dollars (US$25,000,000) ("the Settlement Payment") in two installments. The first installment of seven million US dollars (US$7,000,000) shall be paid no later than November 16, 2015. The second installment of eighteen million US dollars (US$18,000,000) shall be paid no later than sixty (60) days after the Effective Date. Mindray desires that the Settlement Payment be borne by the respective MINDRAY group companies as follows:

| Legal Entity Name | Amount (US$) |
|---|---|
| Shenzhen Mindray Bio-Medical Electronics Co., Ltd. | 18,000,000 |
| Mindray DS USA, INC. | 7,000,000 |

**4.2   Method of Payment**. The Settlement Payment will be made by wire transfer in U.S. dollars and in immediately available funds. The wire transfer payment shall be sent to the following bank:

| | |
|---|---|
| Bank Name: | […***…] |
| | […***…] |
| | […***…] |
| ABA/Routing No.: | […***…] |
| Account Name: | Masimo Corporation |
| Account No.: | […***…] |

**4.3   Taxes**. All taxes shall be the financial responsibility of the Party obligated to pay such taxes as determined by the applicable law and neither Party is or shall be liable at any time for any of the other Party's taxes incurred in connection with or related to amounts paid under this Agreement.

**5.   PURCHASE AGREEMENT**.

**5.1   Negotiation of Purchasing and Licensing Agreement**. The Parties agree to negotiate in good faith in an attempt to reach mutually agreeable terms for a purchasing and licensing agreement that enables Shenzhen Mindray to license Masimo SET® pulse oximetry circuit boards for integration in Mindray pulse oximetry-equipped devices to be sold in regional markets outside the United States and Canada for which the parties are able to agree upon minimum annual sales volumes over the term of the agreement.

**6.   RELEASES AND DISMISSAL.**

**6.1   MASIMO Releases to MINDRAY**. Except with respect to the obligations created by or arising out of this Agreement, effective upon MASIMO's receipt of the entire Settlement Payment from MINDRAY, MASIMO and their respective predecessors, successors, heirs and assigns, release and absolutely discharge MINDRAY, and each of their current and former customers, distributors, suppliers, manufacturers, employees, representatives, agents, officers, and directors, past and present, of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs, expenses, liens, attorneys' fees, actions and causes of action of every kind and nature whatever, (i) arising out of or in connection with the Litigations or infringement of MASIMO's Pertinent Patents, including without limitation all Claims, and (ii) based in whole or in part on acts or omissions of MINDRAY prior to the Effective Date.

**6.2   MINDRAY Releases to MASIMO**. Except with respect to the obligations created by or arising out of this Agreement, effective as of the Effective Date, MINDRAY and their respective predecessors, successors, heirs and assigns, release and absolutely discharge MASIMO and each of their current and former customers, distributors, suppliers, manufacturers, employees, representatives, agents, officers, and directors, past and present, of and from any and all claims, demands, damages, debts,

liabilities, accounts, reckonings, obligations, costs, expenses, liens, attorneys, fees, actions and causes of action of every kind and nature whatever, (i) arising out of or in connection with the Litigations or infringement of MINDRAY's Pertinent Patents, including without limitation all Claims, and (ii) based in whole or in part on acts or omissions of MASIMO prior to the Effective Date.

**6.3    Unknown Claims**. MASIMO and MINDRAY expressly acknowledge and agree that this Agreement, as of the respective dates indicated in Sections 6.1 and 6.2, fully and finally releases and forever resolves the Litigations, including those Claims involving the Masimo Covered Products and Mindray Covered Technology that are unknown or known, unanticipated or unsuspected or that may hereafter arise as a result of the discovery of new and/or additional facts. The Parties acknowledge and understand the significance and potential consequences of its release of unknown claims. The Parties intend that the claims released under this Agreement be construed as broadly as possible and agree to waive and relinquish all rights and benefits each may have under Section 1542 of the Civil Code of the State of California, or any similar statute or law of any other jurisdiction. Section 1542 reads as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

**6.4    Denial of Liability**. The Parties acknowledge that they are entering into this Agreement to resolve disputed claims, that nothing herein shall be construed to be an admission of liability, and that MASIMO on the one hand, and MINDRAY on the other, expressly deny any liability to the other Party. Nothing in this Agreement shall be an admission by MASIMO or MINDRAY that the Pertinent Patents are valid and enforceable. Each Party shall bear its own costs and attorney's fees incurred in the Litigations.

**6.5    Dismissal of the Litigations**. Within five (5) days of the Effective Date, MINDRAY shall direct its attorneys to file a stipulation of dismissal with prejudice of all of MINDRAY's claims and counterclaims in each of the Litigations, with each Party to bear its own costs and attorneys' fees. Within five (5) days of receiving the entire Settlement Payment, MASIMO shall direct its attorneys to file a stipulation of dismissal with prejudice of all of MASIMO's claims and counterclaims in each of the California Litigation and the New Jersey Litigation, with each Party to bear its own costs and attorneys' fees. The Parties agree to submit to the court, within five (5) days of the Effective Date, appropriate stipulations and proposed orders for extensions of time for all due dates in the Litigations so that neither Party is required to incur unnecessary expenses in the Litigations between the Effective Date and the date the Litigations are dismissed. All such stipulations and proposed orders will provide that the court in which the action is currently pending will retain jurisdiction over any action involving this Agreement that relates to the respective action. In the event the Court denies the Parties' request to extend the trial date in the California Litigation, MASIMO shall also dismiss its claims and counterclaims in the California Litigation and the New Jersey Litigation with prejudice, provided that MINDRAY first delivers to MASIMO a bank guarantee (Exhibit

D) in the amount of the unpaid portion of the Settlement Payment from a bank in Hong Kong acceptable to MASIMO guaranteeing payment to MASIMO of the unpaid portion of the Settlement Payment within the time period agreed in Section 4.1. MASIMO shall dismiss its claims and counterclaims in the California Litigation and the New Jersey Litigation with prejudice within five (5) days after receipt of said bank guarantee. Upon receipt of the entire Settlement Payment, Masimo shall provide Mindray with a letter of confirmation for such Payment within five (5) days of said receipt. The bank guarantee is voided upon Masimo receipt of the entire Settlement Payment. In addition, within ten (10) days of the Effective Date, the Parties shall file a joint request to dismiss the Kinast IPR and MASIMO shall file a request to dismiss the invalidity proceeding instituted at SIPO.

     **6.6**　　**Rule 408**. The Parties acknowledge and agree that this Agreement, the terms in this Agreement, and the discussions and negotiations leading up to this Agreement are subject to Federal Rule of Evidence 408 and were made in an effort to amicably resolve the Litigations.

## 7.   TERM AND TERMINATION OF COVENANT.

     **7.1**　　**Term**. The covenants not to sue entered into under this Agreement are effective as set forth in Section 2 and continue until the last sale of a Masimo Covered Product or product including Mindray Covered Technology anywhere in the world, unless terminated pursuant to Section 3.1.

     **7.2**　　**Termination**. MASIMO will have the right to terminate this Agreement in whole or in part, effective immediately upon written notice to MINDRAY, if MINDRAY does not make the Settlement Payment required under Section 4.1; either Party will have the right to terminate this Agreement in whole or in part, effective immediately upon written notice, if the other Party does not fulfill its obligations to request dismissal of the Litigations as required by Section 6.5 of this Agreement.

     **7.3**　**Effects of Termination by MASIMO or MINDRAY**. If either Party terminates this Agreement in whole or in part pursuant to Section 7.2 above, the covenant not to sue delivered to the other Party will terminate.

     **7.4**　**Survival**. Section 10.2 will survive the termination of this Agreement.

## 8.   SETTLEMENT. One purpose of this Agreement, which is a material inducement to each settling Party, is to establish a resolution of their disputes and claims so that the Parties can put to rest their respective claims and challenges. Therefore, the Parties agree not to challenge, or assist others in challenging, either directly or through their attorneys or other agents, the validity or enforceability of the patents asserted by the other Party in any of the Litigations, and any patents or patent applications claiming priority from such patents, except in defense of litigation asserting such patents against the other Party. In addition, no Party, either directly or through their attorneys or other agents, will seek to revive or re-litigate any of the claims, defenses, affirmative defenses, counterclaims, and other legal challenges made in this case by voluntarily participating in or assisting any other Person to assert or litigate any such matter in

any forum under any law, provided, however, that nothing herein shall prohibit a Party from providing information, documents or testimony as required by law or legal process and it shall not be a breach of this Section 8 for a Party to do so. Further, no use by any other Person in any legal proceeding of information, documents or testimony provided pursuant to law or legal process by a Party, nor any determination in any legal proceeding that is based in whole or in part on information, documents or testimony provided pursuant to law or legal process by a Party, shall constitute a breach of this Section 8, nor will any party intentionally seek to circumvent this provision, such as by indirectly pursuing through third parties the activities prohibited by this provision.

**9.     ASSIGNMENT OF CERTAIN MINDRAY PATENTS TO MASIMO**. MINDRAY agrees to assign, pursuant to the Assignment Agreement attached as Exhibit C, all right, title and interest in and to US Patent Nos. 6308089 and 7048687 and 5987343 and China Patent No. 100353917 ("Transferred Patents") to MASIMO, including the right to sue for and recover damages for infringement by any third party, including such infringements whether occurring prior to and/or after the Effective Date. MINDRAY's assignment of the Transferred Patents to MASIMO is "as is", including without any warranty as to their validity or enforceability. From the Effective Date on, MASIMO shall be responsible for payment of any and all fees required to keep the Transferred Patents in force if MASIMO so desires. Notwithstanding this assignment, MASIMO hereby grants MINDRAY an irrevocable, worldwide, non-exclusive, fully paid-up, royalty-free right and license under the Transferred Patents to undertake any act that may be alleged as direct or indirect infringement under the Transferred Patents. MINDRAY further agrees to train its sales force on the patient safety benefits of MASIMO's X-Cal technology, which MINDRAY alleged infringed the Transferred Patents, by distributing to its sales force an X-Cal brochure (Exhibit E) to be prepared and provided by MASIMO.

**10.    GENERAL PROVISION**.

    **10.1    Irreparable Harm Arising from Breach**. The Parties agree that violation of the provisions contained in Sections 2 and 10.2 shall cause a Party to suffer immediate and irreparable harm for which there is no adequate remedy at law. Therefore, the Parties further agree that in the event of a breach of Sections 2 or 10.2, the non-breaching Party shall be entitled to preliminary and permanent injunctive relief, in addition to all other remedies available to it at law or equity.

    **10.2    Confidentiality**. Except to the extent necessary to facilitate the actions contemplated in Section 6.5, each Party will hold the terms of this Agreement in confidence and shall not publicize or disclose it in any manner whatsoever. Notwithstanding the foregoing, the Parties may disclose this Agreement as required by applicable law, including, without limitation, applicable securities laws; in confidence to a Court (or otherwise as directed by law); to the Parties' respective attorneys, accountants, auditors, tax preparers, financial advisors and other agents who have a need to know the content of this Agreement; and to acquirers or prospective acquirers of the business of each party or part thereof to which the Agreement pertains. Each Party may disclose the scope of the covenant not to sue granted in Section 2, and the releases granted in Section 6.1 and Section 6.2, to a third party to the extent that such Party reasonably believes necessary to respond to an inquiry from such third party as to

whether products are authorized and/or released and therefore not subject to a claim of infringement.

**10.3    Governing Law, Jurisdiction and Venue**. This Agreement shall be governed by, interpreted and construed in accordance with the laws of California, without reference to conflicts of laws principles. Any legal action or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement must be brought or otherwise commenced in a federal or state court in California. Each Party expressly and irrevocably consents and submits to the jurisdiction of such state and federal courts in connection with any such legal proceeding and to accept service of process by mail to the address provided in this Agreement.

**10.4    Warranties; Disclaimers; Limitations**.

**(a)** Each Party represents and warrants that it is the owner with all right, title and interest in and to its Pertinent Patents and the right to enforce its Pertinent Patents, and that each Party has all rights necessary to grant any and all rights granted under this Agreement including without limitation the covenants granted in Section 2, and the releases granted in Section 6.1 and Section 6.2.

**(b)** Each Party agrees to defend and indemnify the other Party for any third party claims arising out of any breach of Section 10.4(a).

**(c)** Subject to Section 10.4(a), neither Party shall have any obligation to file, prosecute or maintain any patents or patent applications, to enforce the Pertinent Patents against third parties or to provide know-how or support relating thereto.

**10.5    Duly Existing**. Each of the Parties represents and warrants that it is duly existing, and each Party hereto represents and warrants that it has the full power and authority to enter into this Agreement, and that there are no other Persons whose consent to this Agreement or whose joinder herein is necessary to make fully effective the provisions of this Agreement.

**10.6    Entire Agreement**. This is an enforceable Agreement. This Agreement, including the attached Exhibit A, Exhibit B, Exhibit C, Exhibit D, and Exhibit E, which are incorporated by reference herein, constitute the entire agreement between the Parties and supersede all previous communications, representations, agreements or understandings, either oral or written, between the Parties with respect to the subject matter hereof. For clarity, except as set forth in Section 3.1, this Agreement does not supersede the Datascope Agreement, which remains in effect. This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each Party hereto, which specifically refers to this Agreement.

**10.7    Waiver**. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any

provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving Party.

**10.8    Notices**. Any notice required or permitted by this Agreement shall be in writing and shall be sent by a reliable overnight courier service; by prepaid registered or certified mail, return receipt requested; or by facsimile to the other Party at the address below or to such other address for which such Party shall give notice hereunder. Such notice shall be deemed to have been given three (3) days after the date of sending if by overnight courier service, or five (5) days after the date of sending by registered or certified mail, or upon confirmed receipt if delivered by facsimile, excepted that notice of change of address shall be effective only upon receipt.

To MASIMO:

> Mr. Joe Kiani
> Chairman & CEO
> Masimo
> 52 Discovery
> Irvine, CA 92618

w/copy to (which will not constitute notice):

> Mr. Tom McClenahan
> EVP & General Counsel
> Masimo
> 52 Discovery
> Irvine, CA 92618

To MINDRAY:

> Mr. Minghe Cheng
> Co-CEO & Chief Strategic Officer
> Mindray Medical International Limited
> Mindray Building, Keji 12th Road South, High-tech Industrial Park
> Shenzhen 518057
> P. R. China

w/copy to (which will not constitute notice):

> Ms. Fannie Lin Fan
> Group General Counsel
> Mindray Medical International Limited
> Mindray Building, Keji 12th Road South, High-tech Industrial Park
> Shenzhen 518057
> P. R. China

**10.9    Severability**. If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable under any controlling body of law, that provision shall be reformed, construed and enforced to the maximum extent permissible; and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**10.10    Section Headings**. The section headings used in this Agreement and the attached Exhibit shall be intended for convenience only and shall not be deemed to supersede or modify any provisions.

**10.11    Counterparts**. This Agreement may be signed in counterparts, each of which shall be deemed an original hereof, but all of which together shall constitute one and the same instrument. A faxed or e-mailed copy of the signature page shall be considered an original for purposes of this Agreement.

**10.12    Duty to Effectuate**. The Parties agree to perform any lawful additional acts, including the execution of additional agreements, as are reasonably necessary to effectuate the purpose of this Agreement.

IN WITNESS WHEREOF, the Parties do hereby execute this Settlement and Covenant Not to Sue Agreement by duly authorized officials as of the Effective Date:

**MINDRAY MEDICAL INTL. LTD.**

By: /s/ Minghe Cheng

Name: Minghe Cheng

Title: Co-CEO & Chief Strategic Office

Date: Nov. 16, 2015

**MASIMO CORPORATION**

By: /s/ Joe Kiani

Name: Joe Kiani

Title: Chairman and CEO

Date: 11-15-15

**SHENZHEN MINDRAY BIOMEDICAL ELECTRONICS CO., LTD.**

By: /s/ Minghe Cheng

Name: Minghe Cheng

Title: Director

Date: Nov. 16, 2015

**MASIMO INTERNATIONAL SARL**

By: /s/ Mark P. de Raad

Name: Mark P. de Raad

Title: Manager

Date: 11-15-15

**MINDRAY DS, USA, INC.**

By: /s/ Minghe Cheng

Name: Minghe Cheng

Title: Director

Date: Nov. 16, 2015

**MASIMO TECHNOLOGIES SARL**

By: /s/ Mark P. de Raad

Name: Mark P. de Raad

Title: Manager

Date: 11-15-15

**EXHIBIT A**

[…***…]

[…***…]

[…***…]

[…***…]

[...***...]

[…***…]

[…***…]

[…***…]

[…***…]

[…***…]

[…***…]

[…***…]

[…***…]

[…***…]

[…\*\*\*…]

[…***…]

[…***…]

[...***...]

[…***…]

[…***…]

EXHIBIT B

[…***…]

[…***…]

[…***…]

[…***…]

[…***…]

[…***…]

[…***…]

[...***...]

[…***…]

[…***…]

[…***…]

**EXHIBIT C**

ASSIGNMENT

Shenzhen Mindray Biomedical Electronics Co., Ltd. and Mindray DS USA, Inc. (collectively, "ASSIGNOR"), represents and warrants that it is the sole owner of the entire right, title, and interest to the following issued letters patents and applications for letters patents (hereinafter "the Patents and Patent Applications"):

| Patent | Issue/Pub. Date | Title |
|---|---|---|
| U.S. Pat. No. 6,308,089 | October 23, 2001 | Limited Use Medical Probe |
| U.S. Pat. No. 7,048,687 | May 23, 2006 | Limited Use Medical Probe |
| U.S. Pat. No. 5,987,343 | November 7, 1997 | Method for Storing Pulse Oximeter Characteristics |
| China Pat. No. CN100353917 | December 12, 2007 | Limited Use Medical Probe |

| Application No. | Filing Date | Title |
|---|---|---|
| 10/045,475 | 10-22-2001 | Limited Use Medical Probe |
| 11/366,617 | 03-02-2006 | Limited Use Medical Probe |

ASSIGNOR hereby acknowledges that it has sold, assigned, and transferred, and by these presents does hereby sell, assign, and transfer, unto Masimo Corporation (hereinafter "ASSIGNEE"), its successors, legal representatives, and assigns, the entire right, title, and interest in, to, and under the Patents and Patent Applications and all U.S. and China patents that may be granted thereon, and all provisional applications relating thereto and all U.S. and China divisions, continuations, reissues, reexaminations, renewals, and extensions thereof, and all rights of priority under International Conventions and applications for letters patent that may hereafter be filed for the Patents and Patent Applications in the U.S. and China; and ASSIGNOR hereby authorizes and requests the Commissioner of Patents of the United States and the Director of State Intellectual Property Office to issue all letters patents resulting from the Patents and Patent Applications and applications in the U.S. and China to ASSIGNEE, its successors, legal representatives, and assigns, in accordance with the terms of this Assignment.

ASSIGNOR does hereby sell, assign, transfer, and convey to ASSIGNEE, its successors, legal representatives, and assigns all claims for damages and all remedies arising out of any violation of the rights assigned hereby that may have accrued prior to the date of assignment to ASSIGNEE, or may accrue hereafter, including, but not limited to, the right to sue for, collect, and retain damages for past infringements of the Patents and Patent Applications before or after issuance;

ASSIGNOR hereby covenants and agrees that it will communicate to ASSIGNEE, its successors, legal representatives, and assigns any facts known to ASSIGNOR respecting the Patents and Patent Applications immediately upon becoming aware of those facts, and that it will sign necessary lawful papers, make necessary rightful oaths, and will generally do everything necessary to aid ASSIGNEE, its successors, legal representatives, and assigns to obtain and enforce the Patents and Patent Applications in the U.S. and China.

In testimony whereof, I hereunto set my hand and seal this <u>16th</u> day of November, 2015.

**Assignor (Conveying Party)**                         **Assignee (Receiving Party)**

SHENZHEN MINDRAY BIOMEDICAL ELECTRONICS
CO., LTD.                                             MASIMO

By:<u> /s/ Jianguang Du</u>                           By:<u> /s/ Tom McClenahan</u>

Name:<u> Jianguang Du</u>                             Name:<u> Tom McClenahan</u>

Title:<u> Group IP Director</u>                       Title:<u> General Counsel</u>

Date:<u> November 16, 2015</u>                        Date:<u> November 15, 2015</u>

MINDRAY DS USA

By:<u> /s/ Jianguang Du</u>

Name:<u> Jianguang Du</u>

Title:<u> Group IP Director</u>

Date:<u> November 16, 2015</u>

**EXHIBIT D**

**Letter of Guarantee**

[…***…]

[…***…]

[…***…]

EXHIBIT E

# X-Cal™ Technology for Enhanced Patient Safety and Improved Clinician Efficiency

**SUMMARY**

Masimo provides the most reliable pulse oximetry products available. Masimo's pulse oximetry boards, cables, and sensors are designed to work together as an integrated system to provide accurate and reliable measurements even under challenging conditions, including motion and low perfusion. When one of the elements in the system is not a genuine Masimo product, performance degrades and sometimes to clinically dangerous levels. Also, when cables and sensors are used beyond their expected life, certain intermittent failures may occur during patient monitoring. Intermittent failures can and have caused the monitor to display falsely "normal" saturation values when a patient's actual saturation level may be too low. In fact, the search for the best solution to this problem was the genesis of X-Cal sensor life monitoring technology. If clinicians don't use other information to assess their patients, intermittent cable and sensor failures can lead to delays in necessary clinical intervention since these failures can prevent pulse oximeters from reliably alarming the clinicians.

Masimo's X-Cal technology is designed to enhance patient safety by addressing three issues that can compromise measurement reliability and patient safety: (1) the use of imitation cables and sensors; (2) the use of compromised third party reprocessed cables and sensors; and (3) the use of cables and sensors beyond their expected life. Monitors equipped with X-Cal-enabled pulse oximetry circuit boards can detect and preclude operation with non-genuine cables and sensors. In addition, X-Cal-enabled pulse oximetry boards can measure the aggregate utilization of genuine and compromised reprocessed cables and sensors, and in turn, require the replacement of genuine and compromised cables and sensors when they have been used beyond their expected monitoring life. X-Cal cannot guarantee that compromised sensors cannot be used with Masimo pulse oximeters, nor can it guarantee that with Masimo's X-Cal, you will never have a situation where the measurements are inaccurate. However, it minimizes the possibility of it.

## THE TECHNICAL BENEFIT OF X-CAL IS BASED ON MASIMO COMPONENTS WORKING AS AN INTEGRATED SYSTEM

Masimo SET Measure-through Motion and Low Perfusion pulse oximetry has three system components:



1. The sensor that connects to the patient
2. The patient cable that connects the sensor to the Masimo circuit board in the monitor
3. The Masimo circuit board (SET® SpO2 or rainbow® Pulse CO-Oximetry) installed in a multiparameter patient monitor or Masimo pulse oximeter

All Masimo components work together as an integrated system to measure through challenging conditions including motion and low perfusion. When all components are fully functioning, the system works as intended. In contrast, when any of these system components is compromised, erroneous measurements can occur.

## PROBLEM #1 ADDRESSED BY X-CAL: POOR QUALITY AND PERFORMANCE OF IMITATION MASIMO SENSORS AND CABLES

Multiple third-party manufacturers have attempted to copy Masimo sensors and cables. Imitation cables and sensors (also known as "knockoffs," "copy-cat," "pirated" products, etc) use components without the same design, manufacturing process, or quality controls as Masimo and as such, do not meet Masimo quality or performance specifications. This becomes particularly problematic in challenging conditions.

**SOLUTION:** When an imitation sensor or cable connects to an X-Cal enabled monitor, a message is displayed to replace the sensor or cable.

## PROBLEM #2 ADDRESSED BY X-CAL: RELIABILITY RISKS ASSOCIATED WITH CABLES AND SENSORS WHEN USED BEYOND THEIR EXPECTED LIFE

Eventually, all cables and sensors wear out or become damaged due to daily use. Safety recommendations include removing damaged sensors and cables from service for Biomedical Engineering evaluation.[1] Damaged components that lead to intermittent performance issues can cause care inefficiencies and frustration, such as repeated returns of the patient cable with intermittent faults to Biomedical Engineering or repeated, inconclusive biomedical testing and investigation. Given the intermittent nature of the interruption and because the clinical use scenario is not easily replicated, biomedical engineers may find no obvious issue with the cable or sensor and return them to clinical use. This contributes to alarm fatigue for clinicians, which ECRI Institute has rated as the biggest technology issue facing hospitals.[2]

A recent independent study of reusable sensors taken from active use in several hospitals highlights the risk of sensors being used beyond their expected life. The study used a spectrometer to examine 847 pulse oximeter sensors from 29 hospitals. A total of 89 sensors (10.5%) had a functional error of the electrical components that would cause an error in SpO2 measurement accuracy. The study authors stated: "When undetected, these cable faults frequently cause the monitor to display SpO2 readings in the low 80s regardless of the patient's true SpO2 value. These types of cable faults are not identified by the monitor, simulators or standard electrical tests."[3]

Customer feedback indicates that Masimo reusable sensors, cables, and single-patient-use sensors last significantly longer without performance degradation than non-Masimo products. Durability testing and experience through the application of millions of sensors per year demonstrate that Masimo single-patient-use sensors function for about seven days of continuous clinical use, which is much longer than the average patient stay and well beyond the typical length of monitoring during a patient stay.

**SOLUTION:** X-Cal provides an automatic method to detect when cables and sensors have been used far beyond their expected life, allowing the aging inventory to be replaced. With X-Cal, biomedical engineers are expected to spend less time troubleshooting faulty/nuisance alarms and even less time investigating, testing, and replacing faulty patient cables.

## PROBLEM #3 ADDRESSED BY X-CAL: POOR QUALITY AND PERFORMANCE OF THIRD- PARTY REPROCESSED PULSE OXIMETRY SENSORS

The FDA has stated: "It is essential that users understand that the performance of reprocessed sensors might be different from that of the original sensor."[4] Masimo has found that customers do not always understand how sensors are reprocessed. Customers often assume third-party reprocessed sensors function to the same specification as Masimo sensors. This is not the case. To the best of our knowledge, none of the known third-party reprocessors of Masimo sensors (including Stryker Sustainability/Ascent, SterilMed, ReNu, Hygia, and Midwestern Reprocessing Center) have received an FDA 510(k) indication for use during motion or low perfusion. In addition, none have received FDA 510(k) clearance for or have demonstrated compatibility with the non-Masimo pulse oximeters of Nellcor and Philips Fast. Furthermore, Masimo testing of third-party reprocessed sensors identified a variety of performance issues including biological debris, functional defects, risk of component failure, and adhesive properties that are likely to cause discomfort with infants and neonates.

Third-party reprocessing alters single-patient-use sensors from their original form and function, which may have an adverse effect on the consistency and accuracy of oxygen saturation and pulse rate measurements. Third-party reprocessed sensors often have damage to both optical and electrical components.

**SOLUTION:** X-Cal does not prevent the use of reprocessed sensors but does provide an automatic method to detect when reprocessed sensors have been used far beyond their expected life.

### HOW X-CAL WORKS

X-Cal is seamlessly integrated into Masimo sensors, cables, and circuit boards and is provided at no additional cost to end users. X-Cal can detect imitation cables and sensors and measures the active patient monitoring time of each cable and sensor. Monitors equipped with X-Cal-enabled circuit boards will not function with imitation cables and sensors and will display a message to replace cables and sensors that have been used beyond their useful life.

Furthermore, the indication to change a sensor or cable only occurs outside of active patient monitoring to avoid disruption to clinical practice. For example, if the end of a single-patient-use sensor's expected life is reached while actively monitoring a patient, the sensor will continue to operate until monitoring with that sensor is stopped. At the next re-application of the same sensor, the monitor will display a message advising the clinician to replace the sensor.

For sensors and patient cables, the active monitoring time limit depends on the sensor or cable, as shown in the table below. For each sensor or cable category, the table below shows the expected life of the sensor or cable, based upon active patient monitoring of 24, 12, or 8 hours per day.

| Sensor or Cable | Active Patient Monitoring Limit | Duration if Monitoring 24 Hours Per Day | Duration if Monitoring 12 Hours Per Day | Duration if Monitoring 8 Hours Per Day |
|---|---|---|---|---|
| Single-patient-use SpO2 Sensors with Replaceable tape | 336 hours | 14 days | 28 days | 42 days |
| Single-patient-use SpO2 Sensors without Replaceable tape | 168 hours | 7 days | 14 days | 21 days |
| Reusable SpO2 Sensors (DCI, DCIP, Yl, TC-I, TF-I, and DB | 8,760 hours | 12 months | 2 years | 3 years |
| Patient Cables | 17,520 hours | 24 months | 4 years | 6 years |

## MASIMO OFFERS MULTIPLE OPTIONS TO MAINTAIN SENSOR PERFORMANCE WHILE MAXIMIZING SUSTAINABILITY AND COST-EFFECTIVENESS

Masimo sensor solutions include:

Single-patient-use sensors – Offering performance and convenience, includes a selection of sensors with a replaceable tape option for extended single-patient use.

ReSposable™ – A revolutionary sensor system that offers the performance and comfort of a single-patient-use disposable sensor with unprecedented reduction of carbon footprint and waste. ReSposable offers the green advantages of a reusable sensor and a similar sensor price per-patient as using a combination of reprocessed and new single-patient-use sensors.

Masimo reprocessing program for single-patient-use sensors – For customers who wish to use single-patient-use sensors and reduce costs by reprocessing these sensors without the performance issues of third-party reprocessed sensors,

## CONCLUSION

In summary, X-Cal helps address three reasons pulse oximeters fail to deliver reliable measurements. Along with its breakthrough ability to monitor during low to signal to noise situations, Masimo SET provides the most reliable pulse oximetry in the world.

## QUESTIONS

If you have any questions on X-Cal, please call 877-932-XCAL or email MasimoTech@masimo.com.

## REFERENCES

1 Pennsylvania Patient Safety Advisory. 2(2): 2005:26-29.
2 ECRI Institute. Top Ten Health Technology Hazards for 2012.
3 Milner QJ, Mathews GR. An assessment of the accuracy of pulse oximeters. Anaesthesia. 2012
4 Weininger S. Effective standards and regulatory tools for respiratory gas monitors and pulse oximeters: The role of the engineer and clinician. Anesth Analg.

Exhibit 21.1

**Subsidiaries of the Registrant - 2020**

The following are wholly-owned subsidiaries of the registrant, Masimo Corporation, a Delaware corporation:

| <u>Name of Subsidiary</u> | <u>State or Jurisdiction of Incorporation or Organization</u> |
| --- | --- |
| Masimo Americas, Inc. | Delaware |
| Masimo de Mexico Holdings I LLC | Delaware |
| Masimo de Mexico Holdings II LLC | Delaware |
| Masimo Holdings LLC | Delaware |
| SpO2.com, Inc. | Delaware |
| SEDLine, Inc. | Delaware |
| Masimo Australia Pty Ltd | Australia |
| Masimo Öesterreich GmbH | Austria |
| Masimo Importacao e Distribuicao de Produtos Medicos Ltda | Brazil |
| Masimo Holdings LP | Cayman |
| Masimo China Medical Technology Co., Ltd. | China |
| Masimo Europe Ltd. | England and Wales |
| Masimo Hong Kong Limited | Hong Kong |
| Masimo Medical Technologies India Private Limited | India |
| Masimo Japan Kabushiki Kaisha | Japan |
| Masimo Mexico, S. de R.L. de C.V. | Mexico |
| Masimo Canada ULC | Nova Scotia |
| Masimo Peru Srl | Peru |
| Masimo Asia Pacific PTE. Ltd. | Singapore |
| Masimo International SARL | Switzerland |
| Masimo International Technologies SARL | Switzerland |
| Masimo Medikal Ürünler Ticaret Limited Şirketi | Turkey |
| Masimo Semiconductor, Inc. | Delaware |
| Masimo Sweden AB | Sweden |
| 52 Discovery, LLC | California |
| Masimo 25 Sagamore, LLC | New Hampshire |
| Masimo Korea, LLC | South Korea |
| Masimo Polska sp. Z.o.o. | Poland |
| Masimo 17, LLC | California |
| Masimo (Shanghai) Industrial Co., Ltd. | China |
| Patient Doctor Technologies, Inc. | Delaware |

**Exhibit 21.1**

| Name of Subsidiary | State or Jurisdiction of Incorporation or Organization |
|---|---|
| Alton Office Property, LLC | Delaware |
| Alton Office Holdings, LLC | Delaware |
| OC Property Ventures LLC | Delaware |
| OC Property Shelter LLC | Delaware |
| Masimo Saudi Arabia for Trading, LLC | Saudi Arabia |
| VCCB Holdings, Inc. | Delaware |
| TNI medical AG | Germany |
| Masimo Technology Café LLC | California |
| Masimo LHC, Limited | United Kingdom |
| LiDCO Group, Plc | United Kingdom |
| LiDCO Limited | United Kingdom |
| Cassette Analytical Systems Limited | United Kingdom |
| LiDCO Netherlands B.V. | Netherlands |

**Exhibit 23.1**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC
### ACCOUNTING FIRM

We have issued our reports dated February 23, 2021, with respect to the consolidated financial statements, financial statement schedule, and internal control over financial reporting included in the Annual Report of Masimo Corporation on Form 10-K for the year ended January 2, 2021. We consent to the incorporation by reference of said reports in the Registration Statements of Masimo Corporation on Forms S-8 (File No. 333-148149, effective December 19, 2007; File No. 333-157673, effective March 4, 2009; File No. 333-168534, effective August 4, 2010; File No. 333-179557, effective February 17, 2012; File No. 333-186692, effective February 15, 2013; File No. 333-194089, effective February 24, 2014; File No. 333-219207, effective July 10, 2017; File No. 333-234386, effective October 30, 2019, and File No. 333-240152, effective July 28, 2020) and Form S-3 (File No. 333-229892, effective February 26, 2019).

/s/ GRANT THORNTON LLP

Newport Beach, California
February 23, 2021

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**Pursuant to Rule 13a-14(a) adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Joe Kiani, certify that:

1. I have reviewed this annual report on Form 10-K of Masimo Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 23, 2021

/s/ JOE KIANI
_____
Joe Kiani
Chairman of the Board and Chief Executive Officer
*(Principal Executive Officer)*

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**Pursuant to Rule 13a-14(a) adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Micah Young, certify that:

1. I have reviewed this annual report on Form 10-K of Masimo Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 23, 2021

/s/ MICAH YOUNG
Micah Young
Executive Vice President, Chief Financial Officer
*(Principal Financial Officer)*

**Exhibit 32.1**

**CERTIFICATIONS OF**
**CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Joe Kiani, Chief Executive Officer of Masimo Corporation (the "Company"), certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that to my knowledge:

1. The Annual Report on Form 10-K of the Company for the period ended January 2, 2021 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 23, 2021

/s/ JOE KIANI
Joe Kiani
Chairman of the Board and Chief Executive Officer
*(Principal Executive Officer)*


I, Micah Young, Executive Vice President and Chief Financial Officer of Masimo Corporation (the "Company"), certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that to my knowledge:

1. The Annual Report on Form 10-K of the Company for the period ended January 2, 2021 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 23, 2021

/s/ MICAH YOUNG
Micah Young
Executive Vice President, Chief Financial Officer
*(Principal Financial Officer)*


A signed original of these certifications has been provided to Masimo Corporation and will be retained by Masimo Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

These certifications are being furnished solely to accompany this Annual Report on Form 10-K pursuant to 18 U.S.C. Section 1350, and shall not be deemed filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and are not to be incorporated by reference into any filing of Masimo Corporation, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

# EXHIBIT C

**FREE ARTICLE** Join Over 1 Million Premium Members And Get More In-Depth Stock Guidance and Research

# Masimo (MASI) Q4 2021 Earnings Call Transcript

By Motley Fool Transcribing – Feb 15, 2022 at 10:00PM

You're reading a free article with opinions that may differ from The Motley Fool's Premium Investing Services. Become a Motley Fool member today to **get instant access to our top analyst recommendations, in-depth research, investing resources**, and more. **Learn More**

# MASI earnings call for the period ending December 31, 2021.

**Masimo (MASI 0.67%)**

Q4 2021 Earnings Call

Feb 15, 2022, *4:30 p.m. ET*

# Contents:

- Prepared Remarks

- Questions and Answers

- Call Participants



IMAGE SOURCE: THE MOTLEY FOOL.

# Prepared Remarks:

**Operator**

Good afternoon, ladies and gentlemen, and welcome to Masimo's fourth quarter and fiscal year 2021 earnings conference call. The company's press release is available at www.masimo.com. [Operator instructions] And now I'm pleased to introduce Mr. Eli Kammerman, Masimo's vice president of business development and investor relations.

Please go ahead, sir.

**Eli Kammerman** -- *Vice President of Business Development and Investor Relations*

**MOTLEY FOOL RETURNS**



Thank you, and hello, everybody. Joining me today are Chairman and CEO Joe Kiani; and Executive Vice President and Chief Financial Officer Micah Young. This call will contain forward-looking statements, which reflect management's current judgment, including certain of our expectations regarding fiscal year 2022 financial performa

However, they are subject to risks and uncertainties that could cause actual results to differ materially.

Risk factors that could cause our actual results to differ materially from our projections and forecasts are discussed in detail in our periodic filings with the SEC. You will find these in the Investor Relations section of our website. Also, this call will include a discussion of certain financial measures that are not calculated in accordance with generally accepted accounting principles or GAAP. We generally refer to these as non-GAAP financial measures.

**INVEST SMARTER WITH THE MOTLEY FOOL**

### Join Over 1 Million Premium Members Receiving… 

- New Stock Picks Each Month
- Detailed Analysis of Companies
- Model Portfolios
- Live Streaming During Market Hours
- And Much More

Get Started Now

**10 stocks we like better than Masimo**

When our award-winning analyst team has a stock tip, it can pay to listen. After all, the newsletter they have run for over a decade, *Motley Fool Stock Advisor*, has tripled the market.*

They just revealed what they believe are the **ten best stocks** for investors to buy right now… and Masimo wasn't one of them! That's right -- they think these 10 stocks *a*

even better buys.

See the 10 stocks

*Stock Advisor returns as of September 30, 2022*

In addition to GAAP results, these non-GAAP financial measures are intended to provide additional information to enable investors to assess the company's operating results in the same way management assesses such results. Management uses non-GAAP measures to budget, evaluate and measure the company's performance and sees these results as an indicator of the company's ongoing business performance. The company believes that these non-GAAP financial measures increase transparency and better reflect the underlying financial performance of the business. Reconciliation of these measures to the most directly comparable GAAP financial measures are included within the earnings release and supplementary financial information on our website.

Investors should consider all of our statements today, together with our reports filed with the SEC, including our most recent Form 10-K and 10-Q in order to make informed investment decisions. In addition to the earnings release issued today, we have posted a quarterly earnings presentation within the Investor Relations section of our website to supplement the content we will be covering this afternoon. I'll now pass the call to Joe Kiani.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you, Eli. Good afternoon, and thank you for joining us for Masimo's fourth quarter and 2021 year-end earnings call. While 2021 was a very challenging year in global healthcare and for millions of patients. We were able to help ease the burden on

hospitals their caregivers and patients by providing them with our breakthrough technologies.

As some hospitals were overwhelmed with COVID patient admissions, our monitoring products made a real difference in patient care. Our team demonstrated our commitment to our mission and guiding principles by putting our customers' and patients' priorities first. The long duration of the COVID pandemic drove demand for monitoring equipment and tools to enhance the productivity of overburdened healthcare workers. We manufactured and installed record numbers of our innovative products last year despite supply chain challenges, building on our reputation for responsiveness and dedication to our customers.

As a result, our installed base grew by 7%, while our revenues for fiscal year 2021 grew by 8% against the 22% revenue growth in the prior year. We achieved revenues of $1.239 billion in 2021 as more customers than ever used and switched to Masimo products, acknowledging our clinically superior performance and value for optimizing care and improving outcomes. During 2021, we expanded our portfolio of products with a combination of internally developed and acquired technologies that enable caregivers to rapidly capture the most accurate patient data regardless of the setting. We broadened sales and marketing efforts for the softFlow non-invasive ventilation system for patients with respiratory distress and extended the reach of the LiDCO cardiac output and hemodynamic monitoring products used in surgery.

Our 2021 results exceeded expectations and have positioned us for a year of double-digit constant currency revenue growth in 2022. I'll discuss more later in the call, including further details on our pending acquisition, which we announced with our earnings press release. Now I'll ask Micah to review our fourth quarter and full-year results in more detail and provide you with an overview of our 2022 financial guidance.

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Thank you, Joe, and good afternoon, everyone. Our fourth-quarter results were well above expectations as we once again shipped a record volume of single-patient use sensors while our driver shipments once again exceeded our pre-COVID run rate by more than 20%. Increased demand for patient monitoring in hospitals has been durable as these results demonstrate. We had a record-breaking fourth quarter of securing new customer contracts, resulting in another record contracting year for Masimo.

In fact, we converted a major U.S. hospital system to Masimo technologies in the fourth quarter. During the quarter, we shipped 76,000 technology boards and instruments, which was the highest quarterly figure for 2021 and points to continued demand for our technology. We have shipped approximately 2.3 million technology boards and instruments over the last 10 years.

And as of the end of the fourth quarter, we estimate that our installed base has grown 7% versus our installed base at the end of the fourth quarter of 2020. This is a notable increase considering the surge in our installed base a year ago. In fact, we estimate that our installed base has grown 25% over the past two years from the fourth quarter of 2019 to the fourth quarter of 2021. For the fourth quarter of 2021, we reported product revenue of $328 million, representing growth of 11% on a reported basis and 11.5% on a constant currency basis.

If you recall, our fourth quarter 2020 results included one additional week of revenue, which added roughly three percentage points to our growth rate for the prior-year period. Regardless of the extra week in the fourth quarter of 2020, our revenue has increased 32% over the past two years from the fourth quarter of 2019 to the fourth quarter of 2021. Our worldwide sales of single-patient use sensors were up 15% versus the prior-year period, driven by strong demand for our set sensors. In line with typical seasonality, our sensor revenues increased by 4% sequentially versus the third quarter of 2021.

For the fourth quarter of 2021, our worldwide sales of technology boards and instruments were down 3% versus the prior-year period due to the COVID-related spike in purchases in 2020. However, our worldwide sales of technology boards and instruments increased 5% sequentially versus the third quarter of 2021. Moving down the P&L. Our non-GAAP gross margin for the fourth quarter increased 240 basis points to 65.9%, compared to 63.5% in the prior-year period.

If you recall, in the fourth quarter of 2020, we experienced significant COVID-related inefficiencies, which suppressed our gross margin. Our non-GAAP selling, general and administrative expenses as a percentage of revenue increased 30 basis points to 30%, compared to 29.7% in the prior-year quarter. And our non-GAAP research and development expenses as a percentage of revenue decreased 50 basis points to 10.2%, compared to 10.7% in the same quarter last year. For the fourth quarter, our non-GAAP operating profit was $84.2 million or an operating margin of 25.7%.

In comparison, fourth quarter 2020 non-GAAP operating profit was $68.1 million or an operating margin of 23.1%. This reflects non-GAAP operating profit dollar growth of 24% over the prior-year period, driven by strong revenue performance and operating margin expansion of 260 basis points over the prior-year quarter. Moving further down the P&L. Our non-GAAP tax rate was 16.9%, which came in below the 22% tax rate that was implied in our last guidance.

This was primarily due to higher-than-usual R&D tax credits in combination with a favorable geographic mix. And our weighted average shares outstanding for the quarter was $57.8 million. For the fourth quarter, our non-GAAP net income was $70.1 million or $1.21 per diluted share. In comparison, fourth quarter 2020 non-GAAP net income was $57.3 million or $0.98 per diluted share.

This reflects non-GAAP EPS growth of 23% over the prior-year quarter. Turning to our GAAP results. GAAP net income for the fourth quarter of 2021 was $68.3 million or

$1.18 per diluted share. In comparison, Fourth quarter 2020 GAAP net income was $70.7 million or $1.21 per diluted share.

Included in our GAAP earnings for the quarter was $4.4 million of excess tax benefits from stock-based compensation, compared to $10 million of excess tax benefits in the prior-year period. Overall, for the fourth quarter, we delivered strong performance across the business that exceeded expectations with double-digit revenue growth operating profit dollar growth of 24%, and EPS growth of 23%. And our driver shipments once again exceeded our pre-overrun rate by more than 20% even after the large surge in driver shipments we experienced in 2020. Looking back, 2021 was another record year for Masimo in terms of winning new customers.

Despite the difficult year-over-year comparisons, we delivered revenue growth of 8%, operating profit dollar growth of 12%, and EPS growth of 11% on a non-GAAP basis. Over the past two years, from fiscal year 2019 to fiscal year 2021, we have increased our revenues by 32%, operating profit dollars by 31%, and EPS by 24% on a non-GAAP basis. Over the same two-year period, our installed base of technology boards and instruments has increased by 25%. The number of connected beds via Patient SafetyNet and Iris Gateway has grown by more than 50%, and our installed base for our Root connectivity platform has more than doubled.

Now I'd like to go into more detail on the full year 2022 financial guidance that we outlined in our press release last month. It is important to note that this guidance does not reflect the impact of our pending acquisition which Joe will discuss in more detail later in the call. For 2022, we are projecting product revenues of $1.350 billion which reflects year-over-year growth of approximately 9% on a reported basis and 10% on a constant currency basis. Included in our product revenue guidance is $7 million of year-over-year currency headwinds.

Our non-GAAP gross margin guidance is 66.5%, which represents a 70-basis-point increase over our 2021 results. And our non-GAAP operating expense guidance is

41.7% of revenue, which reflects a 30 basis point decrease over the prior-year period. Our guidance for non-GAAP operating profit margin is 24.8%, which reflects a 100-basis-point improvement over the prior-year period. Based on these assumptions, our non-GAAP operating profit dollars are expected to grow 14% to reach $335 million in 2022, which reflects strong operating leverage and profit dollar growth that is one and a half times our revenue growth rate.

Moving further down the P&L. Our non-GAAP non-operating income, which is primarily comprised of interest income, is expected to be a very nominal amount in 2022. We are also projecting a non-GAAP tax rate of 24% and weighted average shares outstanding of $58.8 million. Based on these assumptions, we are projecting non-GAAP EPS of $4.34.

And from a GAAP perspective, we are projecting a GAAP tax rate of 19.4% and GAAP earnings per share of $4.27 for the year. For additional details on our full year 2022 financial guidance for GAAP and non-GAAP earnings per share, please refer to today's earnings release and supplemental financial information within the Investor Relations section of our website at masimo.com. To conclude, our performance last year has built a strong foundation for 2022 and beyond. We delivered another record year in terms of -- in 2021 in terms of winning new customers, which has expanded our potential for future business across our entire portfolio and sets the foundation for a strong recurring revenue stream in the years ahead.

As we introduce products into new markets this year and beyond, we can play an important role in improving patient outcomes and reducing the cost of care. We are entering 2022 with a positive outlook for revenue growth and profitability. Our guidance reflects our confidence for driving double-digit organic growth for both revenue and operating profit operating profits as we remain steadfast in our commitment to delivering on our long-range financial goals. With that, I will turn the call back to Joe.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you, Micah. There's no question that 2021 provided us with an opportunity to shine by contributing to solutions for the multiple challenges related to the pandemic. As the press from COVID now start to diminish, we're all well-positioned to build on the progress we achieved in the last two years from winning the trust of more customers. This has led to a record amount of new customer businesses including Providence, a 50-plus hospital system with 25,000 physicians, a total of 120,000 caregivers serving 25 million patient visits a year.

This is due to increase our ability to make even a bigger positive difference. We feel that the end of the pandemic is in sight. Our observations in the field reveal that hospitals are becoming more optimistic about a return to normal conditions. We should benefit from the rebound in surgical procedures because our solutions include a variety of products used in the surgery that are positioned for growth in 2022 and beyond.

These products include rainbow, SedLine, O3, NomoLine, and LiDCO. Our ability to accurately measure hemoglobin levels with rainbow and cardiac output with LiDCO in combination with SET Pulse Oximetry and O3 organ Oximetry provides clinicians with a valuable means of assessing oxygen delivery to vital organs. Knowing oxygen delivery levels in real time can optimize intraoperative blood transfusions and help improve outcomes. Masimo has evolving from a company with breakthrough noninvasive monitoring technologies for hospitals into a company that can provide breakthrough monitoring capabilities in any setting, fulfilling our mission of taking noninvasive monitoring to new sites and applications.

From the launch of iSpO2 over a decade ago, we have implemented a major strategic initiative to leverage our clinically superior technologies into wearable devices for deployment in the home setting. Our home strategy is coming to fruition with significant new products and features that will contribute to our success in this emerging field, including the recent announcement of telehealth features with Masimo SafetyNet and the Masimo Watch. Last week, we announced a significant expansi

Case 1:22-cv-01377-MN-JLH Document 181-1 Filed 10/20/23 Page 427 of 481 PageID #: 1404

the capabilities of Masimo SafetyNet to include secure video conferencing to enable a comprehensive telehealth solution. With this new capability, we can provide patients with a better hospital at home experience, as well as virtual doctor visits from their homes.

Masimo station now allows clinicians and hospitals to schedule and conduct multiway audio and video-based virtual appointments with at-home patients through the Masimo SafetyNet smartphone app while being able to view continuous and spot-check vital signs and other physiological data. We see telehealth and telemonitoring as areas where we can deploy our differentiated clinically superior technologies to obtain the most accurate patient data to drive optimal outcomes in patient management. Complementing these technologies with software and hardware that facilitates easy interactions between patients and healthcare professionals is critical. Data is useful only when it's true and readily available to experts that can interpret it.

Masimo SafetyNet can become a premier telehealth solution by integrating reliable telemonitoring with telehealth to provide superior patient experience that is fast, reliable, and easy to use. We've developed a full suite of products for enabling effective telemedicine the Masimo SafetyNet app is the easiest way for patients to connect with their doctors and care team without having to download additional apps or send in their physiological measurements separately. Our devices from home, monitoring today include the Tetherless Radius PPG and Radius T sensors, which can collect oxygen saturation, pulse rate, respiration rate, temperature, and other data. Our newest offering in our telehealth product suite is the Masimo Watch.

The W1 wearable monitor, which we recently debuted at the ERIC Health Conference and is expected to be released worldwide in the second quarter this year. The W1 is a versatile product that uses Masimo SET technology to obtain oxygen saturation, pulse rate, and respiration rate on the risk on appreciably. In addition, we have added capabilities for measuring steps, detecting falls, and capturing ECG signals and arrhythmias. Today, we announced our intent to acquire Sound United.

A company with a premium consumer technology platform and iconic universally recognized brands like Bowers & Wilkins, Denon, Marantz, and Polk Audio, as well as an integrated wireless software platform, HEOS, connecting devices and networks in the home. As important, Sound United has an excellent team of leaders, engineers, manufacturing and supply chain experts, and highest ability consumer electronics. The transaction is expected to close near midyear and is subject to customary closing conditions. We expect this acquisition to be immediately accretive and to support our long-range revenue growth target of 8% to 10%.

The Sound United transaction aligns with Masimo's priorities, objective, and vision by advancing our strategy of enabling connected monitoring across both the hospital and home. We see significant opportunities to cross leverage technologies, bringing Masimo's clinically superior solutions into the home and on the go as well as bringing Sound United's premium technologies into hospitals to advance our hospital automation connectivity and cloud-based technologies. The technology and expertise with Sound United will serve us well as we aim to augment our telehealth and telemedicine strategy. Their well-established reputation and presence in the home can be leveraged by Masimo to accelerate our success in gaining adoption of integrated home-based telemedicine solutions, first with the Masimo Watch W1.

In addition, Sound United unlocks access to large, well-established consumer channels of offering us immediate scale with leading retail establishments like Best Buy in the U.S. and Euronics in Europe. Our portfolio of products for consumer health and wellness is expanding as we launch more wearable technologies into the market. We intend to build on the success of products such as Masimo Sleep, Radius T, and MightySat with forthcoming introduction of some exciting new technologies.

Our go-to-market strategy is highly differentiated and bringing clinically superior technologies to consumers using our clinical and signal processing expertise to enable better health and wellness decisions at home and on the go. The potential for Masimo technologies to be integrated into wearables and connected consumer

devices is a key driver of our announcement today. The strategic expansion of Masimo in the hospital and into the home has been underway for years, as we develop many innovations that broaden the use cases and addressable markets for our technology. We've added hospital automation and connectivity solutions, and we're now introducing exciting new products for telehealth, telemonitoring, and consumer health and wellness.

These new opportunities outside the hospital represent very large and growing addressable markets that far exceed the size of the traditional market that we serve today. We hope to succeed in these new markets by delivering superior technologies that have proven success in the hospital setting. In closing, Masimo is well-positioned for growth in 2022 and beyond with a steadily increasing installed base and a team focused on improving patient care. We're looking forward to a post-COVID normalization that will facilitate broader use of our products across multiple settings.

This year should be a very productive one for Masimo as our customer interactions intensify, and we expand our addressable markets. We remain committed to our mission to improve patient outcomes and reduce the cost of care and taking noninvasive monitoring to new sites and applications. With that, we'll open the call for questions. Operator?

# Questions & Answers:

**Operator**

Thank you very much, Mr. Kiani. [Operator instructions] With that, we'll take our first question this afternoon from Matt Taylor with UBS.

**Matt Taylor** -- *UBS -- Analyst*

Case 8:22-cv-01377-MN-JLH    Document 18-1    Filed 10/20/22    Page 430 of 481    PageID #: 1407

Good afternoon. Thanks for taking the question. So I'd love to hear more about the opportunity here for Masimo with the acquisition. Maybe you could give us a sense for some of your vision about how you'll integrate Masimo technology with these brands and how quickly that could evolve to take more of your hospital technology into the home.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Sure. Thank you. I'm going to give you, I think, a fraction of what we're planning because of competitive reasons. But I think you'll see even the fraction of what we're discussing is going to be significant.

First of all, I want to tell you, since I was a kid, I've been an enthusiast of audio file equipment and the engineering that is done to create these incredible products that can not only replicate recorded music but do it in a way without distortion with incredible fidelity. And the companies that are part of Sound United are the best of the best. And what a fantastic thing, and we're going to hopefully do things to help them become even better, even though Denon is a 100-year brand, Marantz a 50-year brand, and so forth, Bowers & Wilkins and Polk an English and a U.S. company with the first two Japanese companies that have just done a remarkable job.

But they've got things like HEOS, which we really like in the connectivity side. We also see their incredible team and the way they develop the channels in the past 15 years, led by Kevin Duffy as a big relief maybe and an opportunity that we see for the launch of W1 and other products that are coming. We have expanded significant resources for many years to get to this place from a technological perspective. And we believe this team will help us maximize the potential for W1 and other products that are going to follow.

Secondly, maybe as I'm getting older, my hearing is getting worse, but there's an opportunity with the Air Buds and the new regulations in the United States regardir

Case 1:22-cv-01377-MN-JLH   Document 181   Filed 10/20/22   Page 431 of 481 PageID #: 1408

hearing aids to really do some cool things in both listening to music and having communication to improving the hearing and experiences of many, many people. And we see that as another large opportunity that we will now better be able to serve. These are projects we've been working on internally. But now with Sound United, we can hopefully accelerate them and reach a broader audience more rapidly.

**Matt Taylor** -- *UBS -- Analyst*

And maybe I could just ask a follow-up on the financials that you gave on here. I guess, could you just talk about how is immediately accretive? And any longer-term history that you can give us with the growth rate, why you're confident in this high single-digit growth longer term?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

I'm going to Micah.

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Yes. Absolutely. Yes. So, Matt, Sound United grew double digits in 2021, and that exceeded historical growth rates.

Going forward, we expect a long-term growth rate of high single digits. And we'll provide more update on the 2022 outlook and on into next year as we think about going forward, once we close the deal and hopefully, we'll have an Investor Day around that time that we closed the deal to really talk about the markets in a bigger way and what we're doing to bring them into the hospital and what we're doing to bring us more into the home with their efforts as well. So I think there's a lot of synergies with this deal. And we're excited what we can do with our clinically superior solutions as we go into the home and even on the go with Sound United.

And also just their premium technologies are very valuable for things that we want to do in the hospital and as we look to advance our hospital automation connectivity and cloud-based technology.

**Matt Taylor** -- *UBS -- Analyst*

Thank you, Micah.

**Operator**

Thank you. We go next now to Rick Wise with Stifel.

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

Good afternoon, everybody. Joe, one question for you to start. Look, I'm not a consumer analyst. I've had many products in my home with these brand names, so I know it well.

But I'm just -- and I guess I'm very confident, highly confident that you wouldn't have done this transaction unless you had truly visionary ideas and thoughts about how it's going to contribute to Masimo over time. Maybe because I'm not as smart, maybe you can help me better understand how do we think about this translating into revenue not in five or 10 years, but in the next couple of years, how is this all going to unfold that we're going to see what it -- I mean, a series of products that combine Masimo technology and this Sound United technology. Is that going to start kicking in once the deal is closed quickly or it's going to take several years to put all this together? I'm just not sure how I'm going to explain to somebody exactly what this means to sales growth and margins and the outlook for Masimo for the next few years.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you, Rick. First of all, you're one of the smartest guys I know. But we're going to stretch our mind and we're going to stretch yours. I think we're going to put you not just in healthcare but consumer healthcare.

At the Analyst Day that we intend to have post-closing, we're going to lay out some of the immediate product lines and the revenues we anticipate. What I can tell you is that this strategy has been percolating for several years of requiring something like Sound United to help us with the strategy they've been working on for over a decade. So look, I am really excited about this. And I wish I could share with you our vision of where we're going with this.

But as you can imagine, our competitors like to know that too. And I don't want to mess up the future by talking about at the head of time. And I always criticize the tech talkers -- we're doers, we're not tech talkers. So why don't you let us deliver and then you'll see it, but it won't take 10 years.

You're going to see some of the benefits pretty quickly after the merger is complete. And again, Micah will keep you guys abreast of the best day, but we're going to have an Analyst Day, and I hope you can come out and meet some of the folks from Sound United to see some of the things we're planning to do together.

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

OK. I total – I get it. I equally await that moment. Turning to a couple of more mundane things.

Micah, gosh, I have to say I'm impressed with the gross margin guidance, the operating margin guidance. And I might have feared in my heart of hearts that given supply chain challenges, chip shortages, and whatnot, that the outlook might be more challenged. Help us think through that and how are you doing it?

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Yes. Great question, Rick. Just like any company right now, I mean, everybody is facing supply chain challenges. The team has done a great job of navigating through those, not to say they don't still exist and that we will navigate through some more in the future.

But our operations team has done a great job. We've continued to see some pressure from some pricing pressure. We've had some higher freight costs that have come through the numbers this past year. And like I mentioned before, a lot of those costs really were magnified during the pandemic and probably set us back a couple of years on our gross margins initially.

And we said that we're assuming those in our guidance as we're looking forward. So we've incorporated that to the best of our ability as we move forward, and we feel very good as we move into this year and that's why we're reconfirming our guidance and expectations and outlook, and it's a very strong outlook going forward. And we're coming off another record-breaking fourth quarter in terms of winning new customers, which has really kind of fueled that confidence for us as we're thinking about the outlook going forward. So that's how I look at it right now, Rick.

And we're going to do everything we can to continue to navigate some of those choppy waters that every company is facing right now.

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

Great. And just one last one, if I could ask one more. You talked, I think, Micah, about the post-COVID recovery should be positive, should be positive for Masimo. Your field check is positive.

That all sounds great. Help us understand Part A, what you dialed in, in terms of recovery assumptions into your guidance. And two, how specifically, how do we think about that return to more normal or normal active? How do we think about the potential impact on top-line growth? Thanks so much.

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Yes. Absolutely. Rick, I mean, you know me by now working with me in several years now. So I'm very thoughtful, prudent about how we guide.

We want to be confident in our guidance. And we are kind of modeling out a steady return again through the next few months. And then we believe that we'll start to see a pickup in volumes as we move throughout the year. So we still believe volumes were probably down.

Census volumes are probably still around 80% to 90% range as we move throughout the fourth quarter and still suppressed. So we're feeling like things are going to start to open back up more, and we've incorporated some of that in our guidance.

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

Thank you very much.

**Operator**

Thank you. And next, we'll go to Mr. Mike Matson with Needham & Company.

**Mike Matson** -- *Needham and Company -- Analyst*

Thanks for taking my question. Yes. I guess just a few on the acquisitions. Can you maybe tell us what Sound United's gross margin and operating margins are roughly? It looks like the EBITDA margin is up 14%, I think.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yes, Mike. So if you look at it, yes, you're right. We'll update you more on the margin profile, but you're right on the EBITDA margin. So if you look at our EBITDA dollars.

So it's about $125 million of EBITDA. And of course, top line is around $900 million in terms of revenue. So you're doing the math right. Its right around 14% is what they delivered based on our estimates for 2021 calendar year.

But we'll disclose more as we get closer to the close. And of course, as we get closer to Investor Day and really demonstrate, how it's all come together in terms of the combined company.

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

And I will one of them to bring the revenue with promise of the acquisition what brings out the revenues in the product of both businesses.

**Mike Matson** -- *Needham and Company -- Analyst*

OK. But, I mean, is it safe to assume that at least the gross margin is lower than Masimo, I mean, just given the nature of the consumer products.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yes. Yes. Absolutely. I think if you went out there and looked at some of the peers to the company, I mean, you would see it probably closer, maybe a little – slightly lower than even our capital sales margin.

So you're probably in the ballpark, but I'd say you look at some of the peer companies that are out there.

**Mike Matson** -- *Needham and Company -- Analyst*

OK. And then is there any way you can give us any sense of cost synergies you're expecting with this deal.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Sorry. I didn't --

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

No. We aren't expecting any cost synergies. We want that entire team. We hope we can keep the entire team.

So no. Not that.

**Mike Matson** -- *Needham and Company -- Analyst*

OK. And then just finally, from a manufacturing perspective, can you maybe talk about any opportunities there to leverage your purchasing and manufacturing facilities and things like that, certainly since all electronic products.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yes. I think you know that's a really mature and well-run area, and we do hope from their manufacturing supply chain team, there will be things we can learn, there will be things we can add. And the great thing is go add few more R&D centers as well as at least two or three more manufacturing sites for us, which will allow us to have a more global reach into the best people, we can hopefully get.

**Mike Matson** -- *Needham and Company -- Analyst*

OK. Got it.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you.

**Operator**

[Operator instructions] And next, we'll go next now to Mr. Jason Bednar with Piper Sandler.

**Jason Bednar** -- *Piper Sandler -- Analyst*

Thanks. Good afternoon. Thanks for taking my questions. Guys, a lot of different things I am going to ask here.

So I will try and transact you in here. On Sound United, I think just help me out with the few items in this deal. Which is a big deal for you, you're putting your stack in the ground and bringing in in-house to consumer technology company, maybe what made Sound United the right asset for Masimo to acquire versus the others targets out there? And your partnerships that you maybe not able to form with other technology companies? How right ownership here with the right approach, there seems like the main joint technology here is the connectivity on your reference maybe why not simply license that part of the technology from Sound United?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Well, we did look at many different consumer technology companies. We like Sound United the most for several reasons. One, it's management team. Two, the distribution channel, that is essential to what we are doing as an important product for us which is the Masimo Watch.

Three, it's the brand and the quality of those brands and the durability of those brands. So this is not a company -- a product that are here today going tomorrow. So not critical, but great. That their management team are based on callback.

So they are just 30-minutes, 40-minutes from here. So that has made them an ideal company for us to get to the finish line. And then a quick short on partnership, I would tell you we really want to control the strategy. We will go on the things we have in mind to get leaked up there and we need the undivided attention of this team.

When we are developing the rainbow, there were two companies that has the semiconductor, LED, and imported detectors that we needed for rainbow. And we looked hard to get exactly what we needed. So we acquired a company called, Spire Semiconductor they are now called Masimo Semiconductor. And it is one of the best things we did, because not only we were able to focus them on our challenges, but we were getting much better products at much lower cost and even helped our set business, because of what they can fabricate for us.

So I think, we were totally open to partnership. We have many of them, we started as OEM company where we reached partnerships with about 100 companies, this is a strategic area where we felt we are having all in-house under one bandwidth.

**Jason Bednar** -- *Piper Sandler -- Analyst*

OK. So I guess maybe following up on that point, because to be fair, there's a lot of really good consumer technology brands out there that you maybe could acquire. So I guess is the overriding value here, just that you're acquiring channel relationships while bringing on some pretty decent EBITDA in the process? I guess what I'm struggling with is like, what's unique about this asset as far as integrating with Masimo's technology down the road?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yeah. I think the channel is obvious with the management team and but there's more. There's technologies that they have, that we have that together, I think will do a lot more for people, so again, I can't get into that stuff right now, but they will -- I mean, I could not think of a better company for us to acquire given how we envision the future.

**Jason Bednar** -- *Piper Sandler -- Analyst*

OK. And just one more for me then, I'll hop back into the queue. I guess, is there any concern, or can you talk about where we are with respect to revenue and EBITDA c

the last 12 months that you referenced there being bolstered by kind of demand during the pandemic? Just maybe how you see this growth that the business looking when we move kind of post-COVID and maybe get beyond some of this what was potentially some kind of demand or do you not see it that way?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

You're talking about the Sound United or Masimo?

**Jason Bednar** -- *Piper Sandler -- Analyst*

Sorry. Just with Sound United.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yeah. Well, you have to assume that there is some COVID bump, that's really the way we went into it and still the way we felt comfortable with it. But if you speak to the management team, it doesn't seem to be a slowing down. And I think it's because of not only some of the new products they've gone into, but some of the new products that they're going to be introducing.

So even on their own they're bullish that this is not going to end, however, we're being more conservative and we acquire them assuming high single digit, long-term growth, but maybe a little slow down right after COVID.

**Jason Bednar** -- *Piper Sandler -- Analyst*

OK. All right. Thanks, gentlemen. Very helpful.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you. Thank you so much. And look, I wish I could share with you all the things we're thinking and wanting to do. I know it's a little frustrating, but it's, we are more

likely to accomplish the end goal if we can keep some of that to ourselves until the products come to market.

**Operator**

Thank you. And we'll go next now to Jayson Bedford with Raymond James.

**Jayson Bedford** -- *Raymond James -- Analyst*

Hi. Good afternoon. Thanks for taking the questions. Just a couple here.

And I hope this isn't a naive question, but where do you see the bigger cross-sell opportunities here? Is it Sound United product into the hospital or Masimo products into the home?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Now I move forward to the home. We see some opportunity for future products that we're going to be creating for hospitals that come from integration of Sound United and Masimo technologies. But immediately, we think they're going to be beneficial to our push into consumer healthcare.

**Jayson Bedford** -- *Raymond James -- Analyst*

OK. And just on that, the W1 offering, what needs to happen before you launch, I think you said 2Q, what needs to happen before you launch, is there a regulatory requirement. And then talk about the channels that you use to sell that product?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Well, we go through a process called the premarket release, a limited market release, and then the full market release and we do that even when we think the product is done, but we do that to ensure by the time we call the full market release, hopefully

have a perfect product. So we're right now in a premarket release mode. As you saw, we debuted it as our health. We have customers in the Middle East that are using it or about to use it and as far as -- I think when you mentioned kind of the timing of the actual full market releases, it depends how smoothly the premarket release stage and the limited market release stage goes.

Sometimes, they're done in a couple of weeks to -- sometimes they've done in several months. And then as far as your regulatory question, we can market this thing without regulatory clearance but we plan to submit for FDA clearance because we believe this will be used by many people as a health product as not just the wellness product. So we might have two versions of it, like we do today, the Rx version and the consumer version.

**Jayson Bedford** -- *Raymond James -- Analyst*

OK. That's helpful. And then maybe just last one Sound United it obviously looks attractive from a valuation standpoint by Medtech standards. But can you just, Joe, maybe highlight some of the risks involved in this deal that you see?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yes. Yes. Of course, the risks involved if we don't keep the management team if we lose some of the key people that we want to keep. The risk involved.

I told you about a decade ago where we launched iSpO2, this new market could be a mirage for a narrative. We're seeing it more as a narrative. And it looks like COVID helped cement that vision instead of it being a mirage, so we feel wrong about that. But one thing I can tell you, regardless of where we hope to take this to the home.

We think everything we're going to do with Sound United will make us a better company for hospitals and professional caregivers. So whether it becomes a home run or a second base, it's going to help us be a better company to our current custome

**Jayson Bedford** -- *Raymond James -- Analyst*

OK. Thank you.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you.

**Operator**

And, gentlemen, it appears that is all the questions we have for this afternoon. Mr. Kiani, I'll turn things back to you for any closing comments.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Well, I want to thank everyone for joining us today. I'm looking forward to our Analyst Day, where post-closing we can share with you more. By then, hopefully, you'll also be able to play with the Masimo watch yourself. And maybe buy some of it yourself.

But bottom line, this is an exciting time for us. And this is the first major acquisition we've done post roughly seven smaller tuck-ins that we've done which every one of them has been successful. But this is a wonderful opportunity for all the possibilities we've been hoping for. So have a wonderful day and rest of your evening and we'll see you shortly.

Thank you.

**Operator**

[Operator signoff]

**Duration: 52 minutes**

# Call participants:

**Eli Kammerman** -- *Vice President of Business Development and Investor Relations*

**Joe Kiani** -- *Chairman and Chief Executive Officer*

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

**Matt Taylor** -- *UBS -- Analyst*

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

**Mike Matson** -- *Needham and Company -- Analyst*

**Jason Bednar** -- *Piper Sandler -- Analyst*

**Jayson Bedford** -- *Raymond James -- Analyst*

[More MASI analysis](#)

[All earnings call transcripts](#)

*This article is a transcript of this conference call produced for The Motley Fool. While we strive for our Foolish Best, there may be errors, omissions, or inaccuracies in this transcript. As with all our articles, The Motley Fool does not assume any responsibility for your use of this content, and we strongly encourage you to do your own research, including listening to the call yourself and reading the company's SEC filings. Please see our [Terms and Conditions](#) for additional details, including our Obligatory Capitalized Disclaimers of Liability.*

*The Motley Fool recommends Masimo. The Motley Fool has a [disclosure policy](#).*

***STOCKS MENTIONED***



**Masimo**
MASI
$134.53 (0.67%) $0.90



**Motley Fool Stock Advisor's Latest Pick?**
**314% Avg Return***
Get Access

*Average returns of all recommendations since inception. Cost basis and return based on previous market day close.*

**RELATED ARTICLES**



Masimo (MASI) Q2 2022 Earnings Call Transcript



Masimo (MASI) Q1 2022 Earnings Call Transcript



1 Green Flag and 1 Red Flag for Masimo



Why Masimo Stock Is Tanking Today



Masimo (MASI) Q3 2021 Earnings Call Transcript

---

# Our Most Popular Articles







It's Official: Here's Your Social Security Raise for 2023

1 Stock-Split Stock to Buy Hand Over Fist and 1 to Avoid Like the Plague

Why Mer Tod

# Premium Investing Services

Invest better with The Motley Fool. Get stock recommendations, portfolio guidance, and more from The Motley Fool's premium services.

View Premium Services

# EXHIBIT D

FREE ARTICLE    Join Over 1 Million Premium Members And Get More In-Depth Stock Guidance and Research

# Masimo (MASI) Q3 2021 Earnings Call Transcript

By Motley Fool Transcribing – Oct 27, 2021 at 12:01AM

You're reading a free article with opinions that may differ from The Motley Fool's Premium Investing Services. Become a Motley Fool member today to **get instant access to our top analyst recommendations, in-depth research, investing resources**, and more. **Learn More**

# MASI earnings call for the period ending September 30, 2021.

**Masimo (MASI 0.98%)**

Q3 2021 Earnings Call

Oct 26, 2021, *4:30 p.m. ET*

# Contents:

- Prepared Remarks

- Questions and Answers

- Call Participants



IMAGE SOURCE: THE MOTLEY FOOL.

# Prepared Remarks:

**Operator**

Good afternoon, ladies and gentlemen, and welcome to Masimo's third-quarter 2021 earnings conference call. The company's press release is available at www.masimo.com. At this time, all lines have been placed on mute to prevent any background noise. After the speakers' remarks, there will be question-and-answer session.

I am pleased to introduce Mr. Eli Kammerman, Masimo's vice president of business development and investor relations. Sir, the floor is yours.

**Eli Kammerman** -- *Vice President of Business Development and Investor Relations*

**MOTLEY FOOL RETURNS**



Market-beating stocks from our award-winning analyst team.

|   STOCK ADVISOR RETURNS   |   S&P 500 RETURNS   |
|---|---|
| **314%** | **102%** |

*Calculated by average return of all stock recommendations since inception of the Stock Advisor service in February of 2002. Returns as of 10/13/2022.*

*Discounted offers are only available to new members. Stock Advisor list price is $199 per year.*

Join Stock Advisor

Thank you, and hello, everybody. Joining me today are Chairman and CEO Joe Kiani, and Executive Vice President and Chief Financial Officer Micah Young. This call wi'

contain forward-looking statements, which reflect management's current judgment, including certain of our expectations regarding fiscal year 2021 financial performance. However, they are subject to risks and uncertainties that could cause actual results to differ materially.

Risk factors that could cause our actual results to differ materially from our projections and forecasts are discussed in detail in our periodic filings with the SEC. You will find these in the investor relations section of our website. Also, this call will include a discussion of certain financial measures that are not calculated in accordance with generally accepted accounting principles or GAAP. We generally refer to these as non-GAAP financial measures.

**INVEST SMARTER WITH THE MOTLEY FOOL**

### Join Over 1 Million Premium Members Receiving… 

- New Stock Picks Each Month
- Detailed Analysis of Companies
- Model Portfolios
- Live Streaming During Market Hours
- And Much More

Get Started Now

### 10 stocks we like better than Masimo

When our award-winning analyst team has a stock tip, it can pay to listen. After all, the newsletter they have run for over a decade, *Motley Fool Stock Advisor*, has tripled the market.*

They just revealed what they believe are the **ten best stocks** for investors to buy right now... and Masimo wasn't one of them! That's right -- they think these 10 stocks are even better buys.

See the 10 stocks

*Stock Advisor returns as of September 30, 2022*

In addition to GAAP results, these non-GAAP financial measures are intended to provide additional information to enable investors to assess the company's operating results in the same way management assesses such results. Management uses non-GAAP measures to budget, evaluate and measure the company's performance and sees these results as an indicator of the company's ongoing business performance. The company believes that these non-GAAP financial measures increase transparency and better reflect the underlying financial performance of the business. Reconciliation of these measures to the most directly comparable GAAP financial measures are included within the earnings release and supplementary financial information on our website.

Investors should consider all of our statements today, together with our reports filed with the SEC, including our most recent Form 10-K and 10-Q in order to make informed investment decisions. In addition to the earnings release issued today, we have posted a quarterly earnings presentation within the Investor Relations section of our website to supplement the content we will be covering this afternoon. I'll now pass the call to Joe Kiani.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you, Eli. Good afternoon, everyone, and thank you for joining us for Masimo's third-quarter 2021 earnings call. While COVID last year brought us record-breaking

growth, we are happy to see COVID-related hospitalizations received and hospitals return to traditional practices. Our revenues increased by 10% due to many factors, including a 27% increase in single-patient-use sensor volume.

In addition, our shipments of technology boards and monitors were very strong as we saw strong demand from hospitals for our monitors, especially our SET pulse oximeters and rainbow Pulse CO-Oximeters. I'm also happy to report that third quarter's double-digit revenue growth helped us achieve an 18% increase in our non-GAAP earnings per share. Now, I'll ask Micah to review our third-quarter results in more detail and provide you with an update on our 2021 financial guidance.

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Thank you, Joe, and good afternoon, everyone. Our third-quarter results came in above expectations as we shipped a record-breaking volume of single-patient-use sensors and our driver shipments significantly exceeded our pre-COVID run rate by more than 20%. These results demonstrate the high regard for our differentiated technologies and the consistent demand from hospitals to expand patient monitoring into additional care areas. These new monitors going into lower acuity settings are driving increased sensor volumes that contributed to our strong revenue performance this quarter.

During the quarter, we shipped 74,600 technology boards and instruments, which exceeded expectations. As a result, we have now shipped approximately 2.3 million technology boards and instruments over the last 10 years. As of the end of the third quarter, we estimate that our installed base has grown 7% over our installed base at the end of the third quarter of 2020, which is a notable increase considering the surge in our installed base a year ago. For the third quarter of 2021, we reported product revenue of $307 million, representing growth of 10.5% on a reported basis and 10.1% growth on a constant currency basis.

You may recall from our earnings call last July that we delivered 21.5% product revenue growth in the third quarter of 2020 due to higher-than-usual demand for our technology boards and instruments, as hospitals address the potential shortage of monitored beds for COVID patients. Despite this very tough year-over-year comparison, we delivered double-digit revenue growth that exceeded expectations. For the third quarter of 2021, our worldwide sales of technology boards and instruments were higher than in normal years, but down 17% versus the prior-year period due to COVID-related purchases in 2020 that I just mentioned. Fortunately, this decline was more than offset by a strong rebound in sensor sales.

In fact, our worldwide sales of single-patient-use sensors were up 27% versus the prior-year period driven by strong demand for our sensors. Most encouragingly, our sensor revenues increased by 2% sequentially versus the second quarter of 2021 in contrast to the typical seasonal decline we've experienced for the same sequential periods and prior years. This represents another sign of a rebound in sensor volumes associated with the ongoing recovery in hospital sensors in combination with increased sensor utilization coming from our large and growing installed base. Moving down the P&L.

Our non-GAAP gross margin for the third quarter increased 200 basis points to 66.5%, compared to 64.5% in the prior-year period. The year-over-year improvement was primarily driven by a more favorable revenue mix as we delivered strong revenue performance from our higher margin sensors in combination with the anticipated decline in sales for our lower margin technology boards and instruments. Our non-GAAP selling, general and administrative expenses as a percentage of revenue decreased 20 basis points to 32%, compared to 32.2% in the prior-year quarter. And our non-GAAP research and development expenses as a percentage of revenue increased 110 basis points to 11.5%, compared to 10.4% in the same quarter last year.

As a result, our non-GAAP operating margin improved 110 basis points to 23%, compared to 21.9% in the prior-year period. Moving further down the P&L. Our non-GAAP tax rate was 23.5%, and our weighted average shares outstanding for the

quarter was 57.7 million. For the third quarter, our non-GAAP net income was $54.3 million or $0.94 per diluted share.

In comparison, third-quarter 2020 non-GAAP net income was $46.8 million or $0.80 per diluted share. This reflects non-GAAP EPS growth of 18% over the prior-year quarter. Turning to our GAAP results. GAAP net income for the third quarter of 2021 was $57.8 million or $1 per diluted share.

In comparison, third-quarter 2020 GAAP net income was $49.4 million or $0.85 per diluted share. To summarize the third quarter, we delivered strong performance across the business that exceeded expectations with double-digit revenue growth, operating margin expansion of 110 basis points, and EPS growth of 18%. And our driver shipments exceeded our pre-COVID run rate by 20% even after the large surge in driver shipments we experienced last year. Most importantly, our recurring revenue stream of single-patient-use sensors has increased significantly over the last two years as a result of record new customer wins, increased utilization across our installed base, and the expansion of patient monitoring in hospitals.

To provide some perspective on the increased driver utilization, we estimate that our installed base has grown by 25% over the past two years from the third quarter of 2019 to the third quarter of 2021, while our single-patient-use sensor revenues have increased by 35% over the same two-year period. As a result, our sensor growth has outpaced our installed base growth, leading to higher revenues per driver. And related to the expansion of patient monitoring in hospitals, the adhesive sensor growth rate for our top 30 U.S. customers who have the highest number of monitor installations last year has continued to outpace the adhesive growth rate for our overall customer base over the last two years.

It's clear that we are realizing higher utilization across our installed base as monitoring practices have expanded within hospitals. We're realizing success with our hospital automation business as well. Our solutions for increasing productivity and

Case 1:22-cv-01377-MN-JLH    Document 181    Filed 10/20/23    Page 455 of 481 PageID #: 1432

streamlining workflows have been well received by hospitals with overextended staff, especially where there are shortages of available nurses. In fact, our hospital automation revenues contributed 0.5 percentage points to our revenue growth this quarter.

I'm also happy to report that the number of beds connected via Patient SafetyNet and Iris Gateway has grown by 50% over the past two years from the third quarter of 2019 to the third quarter of 2021. And our installed base growth for our Root connectivity platform has more than doubled over the same two-year period. Now, I'd like to provide an update on our full-year 2021 financial guidance. As a result of our strong performance in the third quarter, we are increasing our revenue guidance to $1.230 billion, which reflects year-over-year growth of 7.5% on a reported basis and 6.8% on a constant currency basis.

This represents an increase of $14 million above our prior guidance which is comprised of a $15 million increase due to stronger sales performance, partially offset by a $1 million reduction in foreign exchange benefits. It is also important to note that our revenue guidance implies a growth rate of 8% in the fourth quarter of 2021. If you recall from last year, our fourth-quarter 2020 results included an extra week of revenue, which added roughly 3 percentage points to our growth rate for that period. Therefore, if you exclude the extra week from last year, our guidance implies a double-digit revenue growth rate in the fourth quarter of 2021.

Further, we are now projecting to ship at least 280,000 technology boards and instruments this year. Our non-GAAP gross margin guidance remains unchanged at 66%. And our non-GAAP operating margin guidance remains unchanged at 23.8%. Moving further down the P&L.

For the full year, our non-GAAP non-operating income is expected to be negligible. Our non-GAAP tax rate remains unchanged at 23.4%, and our weighted average shares outstanding is unchanged at 57.7 million. Based on all of these assumptions, we a

increasing our non-GAAP EPS guidance to $3.88, which represents an increase of $0.03 above our prior guidance of $3.85. And from a GAAP perspective, we are projecting a GAAP tax rate of 18% and GAAP earnings per share of $3.88 for the year, which represents an increase of $0.05 above our prior guidance of $3.83.

For additional details on our full-year 2021 financial guidance for GAAP and non-GAAP earnings per share, please refer to today's earnings release and supplemental financial information within the Investor Relations section of our website at masimo.com. With that, I will turn the call back to Joe.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thanks, Micah. Thank you. An important topic on many people's mind is the ongoing impact of the COVID pandemic on businesses in general and for Masimo from disruptions in the supply chain to hospital admissions and our sensor volumes. Our team has done a superb job mitigating supply chain disruptions and the recent hospitalization due to COVID have been geographically concentrated and therefore, have had a smaller effect on our sensor volumes than what we experienced in 2020.

In addition, the temporary reduction of sensor volumes due to postponed surgeries in certain geographies has been offset by increased utilization in other geographies. You can see this in our results for the third quarter, our performance exceeded expectations. After securing record new contracts for any first half year period in our history, we won sizable new contracts this quarter and also secured contract renewals from many of our existing customers nearly setting new records and for the first nine months setting new records. Another noteworthy milestone for us in the third quarter was the commercial release in Europe of our rainbow super sensor, which incorporates 12 light-emitting diodes to simultaneously monitor all blood constituent parameters noninvasively: SpO2, SpHb, SpCO, SpMet, ORi, PVi, RPVi, PR, RRp, Pi, Spf02, and SpOC.

Previously, our customers could have either SpCO or SpMet in our rainbow sensors. By making SpMet, SpCO, and SpO2 available on the same sensor, we are able to measure fractional oxygen saturation known as SpfO2. SpfO2 provides a more complete picture of arterial blood oxygenation in the presence of these hemoglobins. When these hemoglobin levels are elevated due to carbon monoxide poisoning or methemoglobinemia, fractional oxygen saturation is more representative of the total oxygen-carrying capacity of hemoglobin than standard functional SpO2.

Masimo is the only company in the world that offers fractional oxygen saturation as well as 11 other parameters on one sensor. In the current pandemic environment, methemoglobinemia poisoning is more prevalent due to some of the drugs that are being given to treat COVID, such as inhaled nitric oxide therapy. Without SpfO2 and SpMet, this deadly poisoning may go unnoticed. Also by having SpHb and SpfO2, we can now provide clinicians with a view of not just saturation of oxygen in the blood but the amount of oxygen in the blood, SpOC, or oxygen content.

Oxygen content, SpOC, and fractional occupancy saturation, SpfO2, can help identify the source of diminished oxygen delivery whether it's due to dyshemoglobins that can result from methemoglobinemia or carbon monoxide poisoning or low hemoglobin that can result from blood loss or anemia. The rainbow super sensor has not received FDA clearance but is now available in CE countries such as France, U.K., Germany, Italy, Switzerland, Sweden, and Spain. With CE clearance, we also launched Masimo SafetyNet Alert for opioid overdose and COVID monitoring at home in eight countries in Europe. France, U.K., Germany, Italy, Switzerland, Sweden, Netherlands, and Spain.

Here in the U.S., we submitted the FDA de novo application for Masimo SafetyNet for opioid and it is currently under review at the FDA. From the studies we conducted on post-op patients on opioids and on people who were taking opioids illicitly, we expect Masimo SafetyNet Alert to be a life-saving system for those experiencing an opioid overdose. Also in the third quarter, we announced the release of the MX-7 board, our latest and most advanced rainbow SET board, designed for integration into the mc

than 200 multiparameter monitors available from our more than 90 OEM partners. MX-7 has the ability to support all 12 of rainbow super sensor parameters and additionally, Rainbow Acoustic Monitoring and an advanced module reengineered to reduce power needs.

Our new product pipeline is strong. our engineering and clinical development teams have been very productive despite the challenges presented by the pandemic, and we are excited about the future. I'd like to take this opportunity to thank our entire team at Masimo. Our team has been working passionately to ensure that we deliver our life-saving products to our customers and patients despite supply chain interruption and delays.

In closing, we expect a strong finish to 2021 as the pandemic-related hospitalizations subside and hospitals provide more elective surgeries. We are committed to our mission of improving patient outcomes, reducing the cost of care, and taking noninvasive monitoring to new sites and applications. With that, we'll open the call to questions. Operator?

# Questions & Answers:

**Operator**

Thank you, sir. [Operator instructions] We'll pause for just a moment to compile the Q&A. Our first question comes from the line of Rick Wise from Stifel. Your line is open.

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

Hi, good afternoon, Joe. Good afternoon, everybody. Thank you for another excellent quarter. Great to see it.

And I'd like to start off a little bit on a big picture perspective with -- given some of the themes, Joe, that you talked about, that Micah highlighted about the expanding customer installed base renewals, greater utilization, the flow of technology, the larger installed base, the expansion of monitoring, it's hard for me to -- as you're listening to you also talk about sort of the COVID pressures may be easing or stabilizing or improving, it's hard for me not to think about 2022. I'm hoping maybe just at a high level, not that you'll guide us, but that you'll help us set us up -- level set us to think about '22, some of the key drivers, key themes. It's still early, but can we expect continued low double-digit top line, continued gross and operating margin expansion, driven by all these factors you're talking about? Sorry for the long question.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Well, no, not at all, Rick. And thank you. It's good to have you on the call. We believe 2022 will be another strong year.

We believe it will be driven by not only our core business set, we think it will be driven by also our work in hospital automation and home telehealth monitoring, telemonitoring and also some of the new products that are coming out. Given that we've been having record contract year, both in TI, what we call true incremental and renewals, we're feeling pretty good about next year. I think some of the unknowns that may make things maybe even better would be if we get Masimo SafetyNet for opioid cleared by the FDA before end of the year, which we don't know. And I think some of the potential headwinds could come on our earnings as we want to get more consumers to become aware of Masimo SafetyNet Alert.

So on the revenue side, everything looks great. On the earnings side, we have to see because we've got to kind of decide how much we want to put in and getting the message out for this new missionary sell we have in the never done before opioid safety monitoring at home.

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

Right. So, you're saying the continued low double-digit top line, but maybe you might invest more in some of these to support some of these potential opportunities if I'm hearing you correctly.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Correct. The good news is a lot of our business is driven by the hospitals even outside to home. But at the same time, the only way to reach consumers is through advertisement. You know, we have a wonderful sales force for hospitals, but there is no such thing for consumers.

So that's where we're going to look at our investment plans and we're going to watch it. But yes, top line, we feel really good about it. And on the bottom line, we haven't done the numbers yet, so I can't tell you. But the only difference you're going to see probably next year than what we normally spend is on advertisement.

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

Gotcha. Micah, on gross margins, they certainly came in better than expected, but so did revenues, and it sounds like mix was positive. Help us think through the go-forward implications? So is this where we sort of stay and again, thinking about next year continue from here?

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Yeah. I think that's the way to think about it, Rick. If you look at our guidance for the year, even at 66% for the full year, we had some compressed gross margins in the first half, especially Q2 where we had a high-record installations under contract of our equipment and that put pressure on our margins in the second quarter. But if you look

at our guidance for the full year, it implies that our 66.5% gross margin in the third quarter, we're going to be somewhere in line with that for the fourth quarter.

It's not going to be significant -- it shouldn't be significantly off that number based on our guidance. So in fact, it implies about 66.5% for the fourth quarter. So I think that's how you should think about it. We continue to have some -- the COVID-related headwinds that we've experienced over the last 18 months with -- as you know, with some of the higher freight costs and those types of things that are already incorporated into our guidance for this year.

So we're already thinking those through. And that's why, you know, we're guiding to 66% for this year. So --

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

Yeah. And just last for me. Joe, you obviously highlighted some of the compelling innovation on the sensor side. Last quarter, I just was -- as I reread the transcript, you emphasized, I think your words were exactly, you can expect some exciting innovation in the next 12 months.

You highlighted a little bit. It's three months later, what are we going to see and when we're going to see it? Thank you very much.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you. Thank you, Rick. We are indeed excited about the products we're going to announce in the next several months. But if you don't mind, I prefer not to talk about our product pipeline.

We have competitors listening as well.

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

But still excited, I think.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Very excited, very excited. Thank you.

**Operator**

Our next question comes from the line of Jason Bednar from Piper Sandler. Your line is open.

**Jason Bednar** -- *Piper Sandler -- Analyst*

Hey, good afternoon. Congrats, another solid quarter here, guys. Thanks for all the details here. A few questions from our end.

You know, first, Micah, I wanted to ask on guidance. You know, when I look at the typical sequential progression for your business for, you know, looking third-quarter to fourth-quarter revenue typically rises at about an upper single-digit pace, but it looks like your guidance implies something closer to low single-digit growth over third-quarter levels. So, you know, is there anything, I guess, we should consider is like holding you back in the fourth quarter from seeing this normal sequential progression?

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

No. I mean, Jason, if you look at the fourth quarter, and I mentioned in my prepared remarks, I mean if you look at the growth rate year over year, and you strip out that extra week last year, you know, our growth rate implies double digits, actually about 10.5% in the fourth quarter. If you adjust for that extra week last year. So we're still -- you know, we still have confidence in the business.

We're seeing good, you know, good trends in terms of sensor volumes. We expect those trends to continue, and we've implied, you know, a double-digit growth rate in

Case 8:22-cv-01377-MN-JLH    Document 81    Filed 10/20/22    Page 468 of 481 PageID #: 1440

fourth quarter. So, as you know, we want to provide guidance that we're confident in that not only we can achieve, but we can exceed.

**Jason Bednar** -- *Piper Sandler -- Analyst*

Yeah. Yeah. And I totally appreciate the year-over-year numbers and everything. I was -- I guess I was asking more like quarter to quarter, third quarter to fourth quarter.

Just understanding there's like, you know, some variability here in the middle of the pandemic. When I look, you know, historically, third quarter to fourth quarter, just the progression looks a little bigger in past year. So, you know, maybe it's just conservatism. But I guess, maybe bigger picture and following up on Rick's question there regarding some of that elevated ad spending as we look forward to next year.

I mean Joe, Micah, are you willing to say today that you're willing to stay within the LRP for next year at the earnings line?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Look, I was giving a high-level view of things. We have not looked at our numbers for 2022. I think Micah was cringing as I was speaking. So please, let's not continue this dialogue.

We'll give you our guidance for 2022 in February.

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Yeah, Jason, we'll -- we've got a lot of work to do, and we'll -- you'll hear more from us at the end of the year.

**Jason Bednar** -- *Piper Sandler -- Analyst*

OK. Appreciate that. Got it. All right.

Case 1:22-cv-01377-MN-JLH   Document 81   Filed 10/20/22   Page 464 of 481 PageID #: 1441

Maybe just one last one here. Just I guess curious just because it's been a topical here this year and maybe even late in 2020. Just wondering if you could maybe expand in a bit more detail on what we can expect from these contracting wins? I mean, I guess, what does this mean for the business from a growth perspective needs are obviously all really good things longer term, definitely playing into the strategy here. But when do you think we see the full benefits from all these contracting wins that we've seen for Masimo here over the past year?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yeah, that's a good question because, of course, you know that our revenues really are separated from our contracts because typically, our contracts take another six to 12 months for installation and recognition. So the strong contract here we've been having this year so far will help us a lot in 2022. So, yes. So I think that's when you should expect to see the results in 2022.

**Jason Bednar** -- *Piper Sandler -- Analyst*

All right. Very helpful. Thanks so much, guys.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you.

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Thanks, Jason.

**Operator**

Our next question comes from the line of Ravi Misra from Berenberg Capital. Your line is open.

**Ravi Misra** -- *Berenberg Capital Markets -- Analyst*

Hi, good afternoon. Thank you for taking the questions. Just wanted to kind of prod a little bit on the installed base commentary and driver shipment commentary. You know, Joe, Micah, as you get into these lower acuity settings, I was hoping you can maybe help frame the opportunity here for us.

You know, where are we in terms of the penetration of the, you know, the new kind of bed opportunity or new monitor opportunity, both from a, you know, what's available out there? And kind of what's your estimate of where you're kind of monitor partners are in those arenas? And then maybe secondly, you know, you talked about the sensor growth outpacing the installed base growth. And to me, I kind of think about, OK, well, a lot of the commentary is focused on the SET kind of pull-through there. But are we also seeing a similar dynamic in rainbow? Or maybe you can help qualify how much of that 35% growth is rainbow versus SET?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yeah. I -- the dust haven't quite cleared yet, but if I was going to make an educated estimate, I would say, the postsurgical ward has probably gone from 10% penetration to maybe 30% to 40% penetration in the U.S. now. And that increase happened basically last year as people turn pretty much every bed into a monitoring bed.

As far as our SET and rainbow consumers, consumables, they're walking pretty much hand-in-hand the growth rate. And we're seeing more and more hospitals understand the benefit of continuous monitoring in the postsurgical awards. You may have seen in the press release we did a few weeks ago about our partnership with Ohio health system, where they basically have now put -- made every bed into a monitored bed and not only because of the safety of the patient, which they made a video of, I think it's on YouTube, but also because it reduced the workload on the nurses, they no longer had to go short. They all happen automatically.

In fact, one of the things that was happening some of those nurses at UH were leaving UH to go to neighboring hospitals that have our system in for the postsurgical wards. So we're beginning -- I think what happened last year, it really helped the wall fall and people began seeing the -- finally, the realization of reliable monitoring without all the false alarms in postsurgical ward with Masimo SET.

**Ravi Misra** -- *Berenberg Capital Markets -- Analyst*

And then just -- I mean, just naturally, I start thinking about automation as you're kind of getting deeper into these postsurgical floors. I mean, is that also leading to a similar level of pull-through of the automation portfolio. I got to assume that's got to be the case.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Not one for one, but absolutely, it is pulling in more hospital automation. But at this point, it's not for every safety -- in that patient safety system we put out, does it turn into hospital automation customer, but it is happening.

**Ravi Misra** -- *Berenberg Capital Markets -- Analyst*

Great. And then maybe just one last one. On the sup -- the rainbow super sensor, that's Europe only? Or is that Europe and the U.S.?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Europe only. We're going to be submitting to the FDA for FDA approval or FDA clearance, the super sensor in the U.S. soon.

**Ravi Misra** -- *Berenberg Capital Markets -- Analyst*

Thank you very much.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you.

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Thanks, Ravi.

**Operator**

Our next question comes from the line of Mike Polark from Baird. Your line is open.

**Mike Polark** -- *Baird -- Analyst*

Hey, good evening. Thank you. Two or three for me. Big picture, Joe, curious for your reaction to Baxter Hill-Rom transaction to those companies not really direct competitors, but Hill-Rom especially doing interesting things on monitoring and connectivity and automation.

So I'd just be curious to get your, you know, first, second, and third gut feel or gut thoughts on that combination.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Well, I think it's -- I think that combination seems like a good thing for both companies. We don't really see ourselves competing yet with that entity. Hill-Rom is one of our OEM customers. And Baxter, we have a relationship with where their infusion pumps are compatible with our hospital automation.

So yes, we may have a little bit of a coopetition, but we'll fully focus on the cooperation more.

**Mike Polark** -- *Baird -- Analyst*

LiDCO, can you remind me on the timing or plans for the U.S. launch? I haven't heard anything about it yet on today's call.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

LiDCO has launched in the U.S. already. We are planning a more streamlined version of LiDCO that goes hand-in-hand with Root, hopefully, before end of the year. But LiDCO is available in the U.S.

It has received incredibly strong support from the customer base, and, you know, we're really happy we brought that team on board.

**Mike Polark** -- *Baird -- Analyst*

All right. Do they have -- remind me, did they have their own -- I didn't think they had much of a commercial infrastructure in the U.S. Is it the Masimo sales reps are now selling LiDCO? Or how does the sales structure look for LiDCO in the U.S.?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

You're right. They did not have much of a sales force in the U.S. But more importantly, LiDCO was a superior technology without a backing of a company like Masimo. So I think one of the things that happened is besides us having a strong clinical support team out there is the fact that Masimo's behind Masimo now has really put the wind in the sales of LiDCO.

And the cool thing about LiDCO, I mentioned in my comments about the oxygen levels in the blood through SpOC oxygen content. By knowing the cardiac output, we can now even get into oxygen delivery, which is really something that anesthesiologists care greatly about.

**Mike Polark** -- *Baird -- Analyst*

OK. That's it for me. Thank you.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you.

**Operator**

Your next question comes from the line of Marie Thibault from BTIG. Your line is open.

**Marie Thibault** -- *BTIG -- Analyst*

Hi, great. Thank you. And thank you for taking the question this evening. I wanted to ask a question on the strong driver demand you saw this quarter.

And maybe if you could parse it out for us, how much of that was driven sort of by the underlying tailwind of expanded monitoring and wanting to have more monitored beds? And how much of it was coming from, I guess, immediate demand around the COVID spike during the quarter?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

It was the first. COVID has not been a big driver this year. I think what we didn't expect is additional funding available to hospitals this year to continue purchasing products that they need post last year's more than double our normal rate of driver shipments. This -- so far this year, we have out shipped our normal run rate that we'd left in 2019 with, which is incredible, given how many drivers we sold last year.

So, yeah, I think it's just -- I don't think it's COVID-related anymore. I think this is really just hospitals expanding in the general floors, hospitals moving to Masimo. I think last year was a great year for Masimo to stand out when SpO2 mattered the most. Not only ours is the most accurate, most reliable, but with availability for Masimo SafetyNet `

COVID, where we are helping hundreds of hospitals manage their patients remotely, some of them weren't even our customers before.

I think that has helped us gain new customers, gain new ground. So it's -- I think it's really been a remarkable year on top of a year that we couldn't have anticipated last.

**Marie Thibault** -- *BTIG -- Analyst*

That's very helpful. Thank you for that color. OK. And then maybe I can ask a two-part sort of on new products.

I was intrigued by the rainbow super sensor release you had the other day and then some of your detail you gave, Joe, on the call. I have to admit that I don't have anywhere near your level of expertise on some of this. So if you could just sort of explain for us who this -- you know, who the target customer would be for rainbow super sensor, which of your current installed base would sort of say, "Hey, we want to add this on?" Who is it most ideal for?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

We believe it's ideal for the OR, for the ICU, and emergency departments. I think you may have seen the announcement the society of advancement of blood management after reviewing 10 years of research on hemoglobin came out in support of continuous hemoglobin monitoring and said it should help improve outcomes. So there's a bigger demand now for hemoglobin, but now that we can deliver hemoglobin without people deciding, OK, what's more important, carbon monoxide monitoring or detection or methemoglobin monitoring or detection, now that they can have all of it in one sensor, I think it reduces the dilemma. It allows hospitals at least down in Europe to have the same products from the emergency department to the OR, to the ICU, and step down.

So I think really, this is great. We've seen customers who have been using different parts of it, like methemoglobin with hemoglobin and everything, discover patients

had methemoglobin poisoning 40 drugs that are given in hospitals caused methemoglobinemia including all the nitrates as well as all the immune deficiency drugs and hydroxychloroquine that was being used for a while. And then, of course, CO is usually what people come in with from poisoning from imperfect combustion from either their heaters at home or generators or even their cars. So I think we -- this has been a passionate pursuit of ours.

And that's why I want to spell out every parameter. I remember when I first started Masimo with the idea that one day on one sensor, we could measure 12 parameters noninvasively, was a vision, was a dream we had and to finally make it available in the commercial volumes which, by the way, is thanks to the acquisition we made years ago in New Hampshire when we bought Spire Semiconductor, which is now Masimo Semiconductor, that allowed us to make all the specialty light-emitting diodes we needed at a price point and mission and all the good stuff that allows us to make this product and make it available at a price that people can afford.

**Marie Thibault** -- *BTIG -- Analyst*

Oh, that's wonderful. Congrats on achieving that dream, Joe. Wonderful. One last one, if I can, topic is your supply chain.

How are things going on that front? I know that we've heard some, you know, commentary around kind of electronic componentry and things like that. So, would love to hear how MASI is positioned there. And thanks, again, for the questions.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yeah. We had the same problems everybody else does, but we have been able to work around it, I think, in a way that not every company has been able to, again, thanks and kudos to our team, our entire team, engineering, manufacturing, distribution, everyone who really have pitched in to not let our customers feel any of it. So far, knock on wood.

**Marie Thibault** -- *BTIG -- Analyst*

Thank you.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you.

**Operator**

Your next question comes from the line of Michael Matson from Needham and Company. Your line is open.

**Michael Matson** -- *Needham & Company -- Analyst*

Yeah, and good afternoon. Thanks for taking my questions. You know, I wanted to ask a couple on SafetyNet or I guess, sorry, Opioid SafetyNet. So, just want to get your thoughts now that it looks like Medicare is trying to repeal this MSET rule and maybe that's why you're seemingly hitting at the need to do some DTC advertising there when you do launch it.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yeah, yeah. Yes, yes, yes. Yeah, unfortunately, that's regrettable. I thought that was a really good policy to allow breakthrough products that, by definition, are expected by the FDA to save lives, to get reimbursement right away, and then analyze it a few years later to decide if it should continue, decrease or increase.

So seeing that fall on the waste side is disappointing. I know they're talking about maybe resurrecting it, I'm not optimistic. But yes, that's unfortunate. And yes, that's why we are going to probably have a heavier lift with that until we get reimbursement, which normally takes a few years post product availability.

**Michael Matson** -- *Needham & Company -- Analyst*

OK. And in terms of, you know, assuming you do end up getting the product approved and you launch some sort of DTC effort. You know, what I've seen with other companies is typically there's some sort of like a pilot, you know, where it's rolled out in kind of limited geographies to evaluate how it's performing and then scale it up over time. I mean, is that kind of how it would work with you guys? Or -- you know, because it sounds like you were almost calling out a fairly material impact to your margins from those, assuming that you go forward with it.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

No, I was not calling a material impact to our margins. I was trying to be truthful on the positive and a negative when Rick asked me, how do I see 2022. We have not yet analyzed this impact on our margins or profit about the level of advertising we have to do. So I just want to be clear with that.

But of course, it is a new expense that we haven't really had before. We did it a little bit of it. If you remember during COVID where we did that, the two commercials, Together at Hospital, Together at Home, we feel like we got to do more of that and not just on TV, but social media. But, yeah, to kind of go back, we see that we will need to prove the value, not just clinically but economically of Masimo SafetyNet opioid.

In just the studies we've done, to submit to the FDA, we've already been seeing it. Now we need to document all of it. Of course, there was that large study from Dartmouth that showed in hospitals, they saved $7 million a year and had no more debt in bed with the group that was being monitored with our technology. We have to repeat those.

I don't think it will take 10 years. I think we should be able to get those types of results, hopefully, much, much sooner than that.

**Michael Matson** -- *Needham & Company -- Analyst*

Case 8:22-cv-01377-MN-JLH   Document 185-1   Filed 10/20/23   Page 474 of 481   PageID #: 1451

OK. Thanks for clarifying that margin impact. So, then in terms of a couple more on the super sensor as well. I know that's kind of a hot topic here.

But is this intended to kind of go be a higher end sensor above like the regular rainbow sensor? I assume that's the case. Or would it replace the regular kind of rainbow sensor?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Yeah. We -- actually, that's another good question. We do anticipate eventually having only the super sensor. We'll have to see about that.

We're evaluating it. As I mentioned, our costs have come down dramatically since we even made the eight LED version of rainbow sensors versus a 12. So we're going to pass that savings to our customers and eventually maybe just have one sensor for all the rainbow users.

**Michael Matson** -- *Needham & Company -- Analyst*

OK. And so, I guess, that leads to my question just on pricing. I mean, is this something that would have a price premium over your other rainbow sensor? Or is it -- it sounds like what you're saying is it will eventually be sort of priced at parity and just replace the old one, but --

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Well, we have right now, I think just maybe for reference, we have our two LED sensors. We have the four LED rainbow light sensor. We have -- we've had the eight LED, and now we have the 12 LED. So what I think could -- what I kind of foresee and we haven't yet finalized all this is we'll continue with the two LED, four LED and maybe just have the 12 LED.

And as far as pricing is concerned, we believe we can market the 12 LED around where we would market normally the eight LED. And as volumes allow us to make more of it and make it for less, then we can see a day where we even charge less than what we charge today, even for the eight LED.

**Michael Matson** -- *Needham & Company -- Analyst*

OK, great. Thank you.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you.

**Operator**

Your next question comes from the line of Jayson Bedford from Raymond James. You may ask your question.

**Jayson Bedford** -- *Raymond James -- Analyst*

Good afternoon. And as much as I'd like to dig deeper on the two, four, eight, and 12 LEDs in terms of the installed base, I feel like my head would be a little busy. So I'll keep it simple here. I think I heard you mention 280,000 boards for the year.

Does that imply a bit of a step down in the fourth quarter? I'm curious as to why. And if I misheard you on the 280,000 let me know.

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Yeah. No, Jason, we're still confident in the year. We look at -- our last guidance was about 270,000. We came in about 10,000 above on the driver shipment number for the third quarter, and we just kind of passed that through.

We expect to be at least 280,000 for the year. So we're not seeing anything slowing down at all. The demand is strong for all of our technology boards and instruments, and we expect that to be kind of the floor for the year.

**Jayson Bedford** -- *Raymond James -- Analyst*

OK. But I guess, Micah, just based on an earlier comment, it sounds like there was no real bolus due to COVID in the third quarter in terms of boards, which would suggest to me that, you know, fourth quarter probably shouldn't go down 10,000 boards is kind of the thought or 8,000?

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

Well, it's -- it implies 68,000 for the fourth quarter. We came in at 74,000. So, it's only 6,000 above, and we expect to at least be at that 280,000 for the year. So, you know, we're not seeing anything out of the ordinary as far as demand in the quarter.

As Joe mentioned, it's continued expansion in hospitals that we're seeing. And we're kind of getting back to normal business patterns. So, we expect that to be the floor and we would expect to do better than that number for the year.

**Jayson Bedford** -- *Raymond James -- Analyst*

OK. OK. And I apologize if I missed this, but did you give a U.S. and international breakout in terms of revenue?

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

No, but I was about -- so, for this quarter, two-thirds was U.S., so about 67% and 33% was OUS.

**Jayson Bedford** -- *Raymond James -- Analyst*

OK. And then I think just lastly, SafetyNet Alert for opioids. Just wondering if you can give us some of the initial feedback in Europe, and I realize it's early, but maybe some commentary on, say, early learnings about the launch and what you would do differently or improve on going forward?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Certainly. Overall, the launch, in my opinion, has been underwhelming. We didn't make Masimo SafetyNet Alert for Europe. We really made it for the U.S.

because of the epidemic that's recognized here. But we know Europe has about the same amount of problems as we do. So we would have expected more. I think if anything, it shows reimbursement might be more of an issue than we thought.

As far as the positives, we've seen people didn't ask us for it is for COVID monitoring people at home because they like consumers to be able to buy it for COVID at home. We've also seen people being interested in it for apnea monitoring, at home apnea monitoring. So I think it's been a good experience as we hopefully prepare to launch in the U.S. I hope the U.S.

will be more robust as we launch. I think some of the settlements with the opioid companies in the U.S. may help bolster that even before reimbursement, but we'll have to see.

**Jayson Bedford** -- *Raymond James -- Analyst*

So, Joe, is it more just kind of sticker shock in pricing? Or is it just an awareness issue that's probably a little lower in Europe than it is in the U.S.?

**Joe Kiani** -- *Chairman and Chief Executive Officer*

I believe it's an awareness issue. I believe there's this mindset in Europe that if they prescribe it, it means they're doing something dangerous to the patient. So they're afraid of it. But we're also going to test the pricing.

We're going to offer some discounts to see if pricing makes a difference. We, in our testing, our surveys that we did, which I don't know how much to believe those, but in the surveys we did, pricing did not seem to be an issue, at least at the prices we launched it at. But -- so I would say if I had to make a guess right now, I think it's lack of awareness and just some fear about recognizing that if it's going to tell a patient, they have to be monitored, you're telling them that they're in danger that I think they might fear over there.

**Jayson Bedford** -- *Raymond James -- Analyst*

OK. That's helpful. Thank you.

**Joe Kiani** -- *Chairman and Chief Executive Officer*

Thank you so much, everyone, for joining us today. I hope that was treat in the trick and treat season that we're in. Wish you all a Happy Halloween, and we'll talk next year.

**Operator**

[Operator signoff]

**Duration: 54 minutes**

# Call participants:

**Eli Kammerman** -- *Vice President of Business Development and Investor Relations*

**Joe Kiani** -- *Chairman and Chief Executive Officer*

**Micah Young** -- *Executive Vice President and Chief Financial Officer*

**Rick Wise** -- *Stifel Financial Corp. -- Analyst*

**Jason Bednar** -- *Piper Sandler -- Analyst*

**Ravi Misra** -- *Berenberg Capital Markets -- Analyst*

**Mike Polark** -- *Baird -- Analyst*

**Marie Thibault** -- *BTIG -- Analyst*

**Michael Matson** -- *Needham & Company -- Analyst*

**Jayson Bedford** -- *Raymond James -- Analyst*

More MASI analysis

All earnings call transcripts

*This article is a transcript of this conference call produced for The Motley Fool. While we strive for our Foolish Best, there may be errors, omissions, or inaccuracies in this transcript. As with all our articles, The Motley Fool does not assume any responsibility for your use of this content, and we strongly encourage you to do your own research, including listening to the call yourself and reading the company's SEC filings. Please see our* Terms and Conditions *for additional details, including our Obligatory Capitalized Disclaimers of Liability.*

*The Motley Fool recommends Masimo. The Motley Fool has a* disclosure policy.

**5 Stocks Under $49**

We hear it over and over from investors, "I wish I had bought Amazon or Netflix when they were first recommended by the Motley Fool. I'd be sitting on a gold mine!" And it's true.

And while Amazon and Netflix have had a good run, we think these 5 **other** stocks are screaming buys. And you can buy them now for less than $49 a share!

**You can grab a copy of "5 Growth Stocks Under $49" for FREE for a limited time only.**

Click here to learn more.

Learn more

**STOCKS MENTIONED**



### Masimo
MASI
$134.94 (0.98%) $1.31



### Motley Fool Stock Advisor's Latest Pick?
Get Access
**314% Avg Return***

*Average returns of all recommendations since inception. Cost basis and return based on previous market day close.*

**RELATED ARTICLES**

 Masimo (MASI) Q2 2022 Earnings Call Transcript

 Masimo (MASI) Q1 2022 Earnings Call Transcript

 1 Green Flag and 1 Red Flag for Masimo

 Why Masimo Stock Is Tanking Today

 Masimo (MASI) Q4 2021 Earnings Call Transcript

## Our Most Popular Articles



**It's Official: Here's Your Social Security Raise for 2023**



**1 Stock-Split Stock to Buy Hand Over Fist and 1 to Avoid Like the Plague**



**Soci Get Here Kno**

## Premium Investing Services

Invest better with The Motley Fool. Get stock recommendations, portfolio guidance, and more from The Motley Fool's premium services.

**View Premium Services**