# EXHIBIT J

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
stephen.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404
Facsimile: (949)-760-9502

Attorneys for Plaintiff,
**Masimo Corporation**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., a California corporation,<br><br>Defendant. | ) Case No. 8:20-cv-00048<br>)<br>) **COMPLAINT FOR**<br>) **(1) PATENT INFRINGEMENT**<br>) **(2) TRADE SECRET**<br>) **MISAPPROPRIATION AND**<br>) **(3) OWNERSHIP OF PATENTS**<br>)<br>) **AND DEMAND FOR JURY TRIAL**<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiffs MASIMO CORPORATION ("Masimo") and CERCACOR LABORATIES, INC. ("Cercacor") hereby complain of Defendant APPLE INC. ("Apple"), and allege as follows:

## I. THE PARTIES

1.     Plaintiff Masimo is a Delaware corporation having its principal place of business at 52 Discovery, Irvine, California 92618.

2.     Plaintiff Cercacor is a Delaware corporation having its principal place of business at 15750 Alton Pkwy, Irvine, California 92618.

3.     Upon information and belief, Defendant Apple is a California corporation having a principal place of business at One Apple Park Way, Cupertino, California, 95014.

## II. JURISDICTION AND VENUE

4.     This civil action includes claims for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq*., more particularly, 35 U.S.C. §§ 271 and 281. This Complaint further alleges trade secret misappropriation and seeks a declaration of ownership of certain patents and patent applications, and, pursuant to 35 U.S.C. § 256, correction of inventorship of certain patents.

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367(a).

6.     Apple has its principal place of business in California. Apple is subject to personal jurisdiction in California and has committed the acts complained of in this Judicial District.

7.     Venue is proper in the Southern Division of the Central District of California pursuant to 28 U.S.C. § 1400(b) with respect to patent infringement because Defendant has a regular and established place of business in the County of Orange within the Central District of California and has committed acts of infringement in this Judicial District. Defendant also has committed acts of

misappropriation in this Judicial District. Thus, venue is proper pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District.

### III. STATEMENT OF THE CASE

8. This action seeks relief for the theft of Plaintiffs' highly confidential information and trade secrets, and infringement of Masimo's patents by Defendant, and ownership of patents assigned to or filed by Apple on subject matter that belongs to Masimo.

### IV. STATEMENT OF FACTS

9. Masimo is a medical technology company that revolutionized non-invasive monitoring of physiological parameters, such as pulse rate, arterial oxygen saturation and many others.

10. Most of these parameters are measured using light that is transmitted through the body tissue. The received light, that has been attenuated by the various components of the body tissue, including the blood, is known in the industry as a photoplethysmograph or "PPG." The transmission and receipt of these light signals is typically accomplished through a sensor that is applied to a body part such as a finger, arm, toe, forehead or ear.

11. Before Masimo, these non-invasive measurements from the PPG were plagued by unreliability, often when the measurement was needed most, due to the person moving or having low peripheral blood flow (known as "low perfusion"). The industry had essentially given up on solving these problems, concluding they were largely unsolvable. In the medical context, clinicians had to live with the results – patient monitors gave excessive false alarms, froze their measurements for prolonged periods of time despite potential changes in the physiological parameter (e.g., oxygen saturation or pulse rate), delayed notification of alarms due to long averaging times of sensor data, produced inaccurate measurements, or were unable to obtain data on the most critical

patients and babies who cannot be instructed to stay still. Masimo's pioneering technology, known as Masimo Signal Extraction Technology ("Masimo SET"), solved this problem and dramatically improved the reliability of monitoring and reporting physiological signals derived from the PPG.

12.     Following its initial success with Masimo SET, Masimo invested heavily in developing additional breakthrough measurement technologies, such as non-invasively measuring total hemoglobin, carboxyhemoglobin, and methemoglobin. Masimo has continued to innovate, succeeding where others have consistently failed. Masimo was the first, and remains the only, company delivering these game-changing technologies to hospitals in the United States. Use of Masimo's technology in the clinical setting has been proven to reduce blindness in premature infants, detect congenital heart disease in infants, save lives on the general care floor and post-surgery, and improve transfusion management, while saving money.

13.     From its inception, Masimo has continuously developed cutting-edge noninvasive patient monitoring technologies. Masimo sought and received numerous U.S. patents for many of its inventions. Masimo's revolutionary technology was a key to its gaining significant market praise and penetration. After introduction into the market, many competitors, much larger than Masimo, used Masimo's technology without a license, resulting in patent infringement lawsuits that ultimately confirmed the validity of Masimo's innovations. But, Masimo maintains some technology as trade secrets. Masimo also closely guards its future product and market plans. Only select employees have knowledge of and access to these guarded secrets.

14.     Masimo's innovations also include important advances in sensor technologies that work together as part of Masimo's system and algorithms. Masimo's sensors are integral to the success of the revolutionary technologies Masimo has developed.

15.   In 1998, Masimo spun certain technologies off into a new company, Masimo Laboratories, Inc. or "Masimo Labs," to further research and develop the technologies. The name of the company was later changed to "Cercacor."  Cercacor and Masimo have a cross-license agreement to facilitate confidential collaboration between the companies.  Cercacor is not owned by Masimo.

16.   Like Masimo, Cercacor is an innovator of non-invasive monitoring technologies.  Cercacor is on the frontline of understanding how measuring, tracking, and analyzing physiological parameters can impact pre-diabetic and diabetic patients, sports training and performance and overall health and wellness principally in the consumer market.  Cercacor continued the development that started at Masimo on non-invasive total hemoglobin (SpHb), methemoglobin (SpMet), and carboxyhemoglobin (SpCO®) and other non-invasive physiological parameters.

17.   Leading hospitals around the world use Cercacor technology licensed to Masimo and sold under the name Masimo rainbow SET.  Like Masimo, Cercacor also maintains some technology as trade secrets, and Cercacor closely guards its future product and market plans.  Only select employees have knowledge of and access to these guarded secrets.

18.   Masimo and Cercacor carefully guard the secrecy of their confidential information and documents.  For example, Masimo and Cercacor have policies regarding labeling confidential information and documents as "CONFIDENTIAL AND PROPRIETARY."   They also restrict these documents and information from disclosure to third parties and employees on a need-to-know basis.  Masimo and Cercacor also have policies in place regarding the use of computers and related equipment that govern how their computer systems may be used.  Those policies also govern the protection of Masimo's and Cercacor's confidential information.  Both Masimo and Cercacor have

document management systems that restrict access to confidential documents to only those employees with proper security credentials and a need for access. Masimo and Cercacor also require employees to sign agreements precluding the employees from disclosing or making use of any confidential information except as authorized by Masimo and Cercacor and as necessary for the performance of the employees' duties. Masimo and Cercacor also require third parties, including customers, to execute confidential non-disclosure agreements. Masimo and Cercacor implemented such policies and procedures to maintain the confidentiality of sensitive information. These policies remain in place today.

19. In 2013, Apple contacted Masimo and asked to meet regarding a potential collaboration. Apple told Masimo that Apple would like to understand more about Masimo's technology to potentially integrate that technology into Apple's products. Apple and Masimo later entered into a confidentiality agreement, and Masimo's management met with Apple. The meetings included confidential discussions of Masimo's technology. After what seemed to Masimo to have been productive meetings, Apple quickly began trying to hire Masimo employees, including engineers and key management.

20. Masimo employed Michael O'Reilly as its Chief Medical Officer and Executive Vice President for Medical Affairs beginning in January 2008. As part of the Masimo executive team, O'Reilly was privy to extremely sensitive information, including information about mobile medical products and applications, wellness applications, clinical data gathering and analytics, and other technology of Masimo. Upon information and belief, Apple employed O'Reilly in July 2013, shortly after the meetings with Masimo, to assist in wellness and mobile applications that include non-invasive measurement of physiological parameters. Not long after, by December of 2013, O'Reilly was already meeting with the FDA on behalf of Apple to discuss medical

applications and discuss medical products that non-invasively measures blood constituents.

21.    Apple systematically recruited other key Masimo personnel, such as Marcelo Lamego, who was the former Chief Technical Officer of Cercacor and a former Research Scientist at Masimo.  Lamego had unfettered access to Plaintiffs' highly confidential technical information.  He was trained and mentored at Masimo by the most skilled engineers and scientists, and was taught about the keys to effective non-invasive monitoring, something he was not involved in prior to Masimo.  He was also exposed to guarded secrets regarding mobile medical products, including key technology and advance plans for future products.

22.    Given what appeared to be a targeted effort to obtain information and expertise from Masimo and Cercacor, Masimo and Cercacor warned Apple about respecting their rights.

23.    Shortly after joining Apple in January 2014, Lamego pursued on behalf of Apple numerous patent applications on technologies he was intimately involved in at Plaintiffs Cercacor and Masimo, and with which he had no prior experience or knowledge.

24.    For example, Lamego is named as an inventor on U.S. Provisional Patent Application No. 62/043,294, filed Aug. 28, 2014 and titled "Reflective Surface Treatments for Optical Sensors."  Related applications that also name Lamego as an inventor include U.S Patent Application Nos. 14/740,196 and 16/114,003, which issued as U.S. Patent Nos. 10,078,052 and 10,247,670.

25.    As another example, Lamego is named as an inventor on U.S. Provisional Patent Application No. 62/047,818, filed Sep. 9, 2014, entitled "Modulation and Demodulation Techniques for a Health Monitoring System." A related application that names Lamego as the sole inventor includes U.S Patent Application No. 14/621,268, which issued as U.S. Patent No. 10,219,754.

26. As another example, Lamego is named as an inventor on U.S. Provisional Patent Application No. 62/056,299, filed on Sep. 26, 2014, and entitled "Electronic Device that Computes Health Data." Related applications that also name Lamego as the sole inventor include U.S Patent Application Nos. 14/617,422, 15/667,832, and 16/700,710. The '422 Application issued as U.S. Patent No. 9,723,997 and the '832 Application issued as U.S. Patent No. 10,524,671.

27. As another example, Lamego is named as an inventor on U.S. Provisional Patent Application No. 62/057,089, filed on Sep. 29, 2014, and entitled "Methods and Systems for Modulation and Demodulation of Optical Signals." Related applications that also name Lamego as an inventor include U.S Patent Application Nos. 14/618,664 and 15/960,507. The '664 Application issued as U.S. Patent Nos. 9,952,095.

28. Upon information and belief, Apple announced the first version of its watch in September 2014, and began shipping its watch in April 2015. The Apple Watch Series 3 was released on September 22, 2017, and upon information and belief had significant performance issues with the non-invasive physiological measurements. Apple announced The Apple Watch Series 4 on September 12, 2018, and upon information and belief, that watch includes technology that tracks Masimo's technology to solve some of the performance issues, including technology to which Lamego was exposed at Masimo and also technology for which he was an inventor while at Cercacor. The Apple Watch Series 5 was announced on September 10, 2019 and released on September 20, 2019. Upon information and belief, the Apple Watch Series 5 also includes Masimo's technology to solve some of the prior performance issues, including technology as to which Lamego was an inventor while at Cercacor.

/ / /

/ / /

-7-

## V.  <u>THE PATENTS-IN-SUIT</u>

29.     Masimo is the owner by assignment of U.S. Patent No. 10,258,265 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '265 patent"), which the United States Patent and Trademark Office lawfully and duly issued on April 16, 2019.  A true and correct copy of the '265 patent is attached hereto as Exhibit 1.

30.     Masimo is the owner by assignment of U.S. Patent No. 10,258,266 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '266 patent"), which the United States Patent and Trademark Office lawfully and duly issued on April 16, 2019.  A true and correct copy of the '266 patent is attached hereto as Exhibit 2.

31.     Masimo is the owner by assignment of U.S. Patent No. 10,292,628 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '628 patent"), which the United States Patent and Trademark Office lawfully and duly issued on May 21, 2019.  A true and correct copy of the '628 patent is attached hereto as Exhibit 3.

32.     Masimo is the owner by assignment of U.S. Patent No. 10,299,708 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '708 patent"), which the United States Patent and Trademark Office lawfully and duly issued on May 21, 2019.  A true and correct copy of the '708 patent is attached hereto as Exhibit 4.

33.     Masimo is the owner by assignment of U.S. Patent No. 10,376,190 entitled "Multi-stream data collection system for noninvasive measurement of blood constituents" ("the '190 patent"), which the United States Patent and Trademark Office lawfully and duly issued on August 13, 2019.  A true and correct copy of the '190 patent is attached hereto as Exhibit 5.

34.     Masimo is the owner by assignment of U.S. Patent No. 10,376,191 entitled "Multi-stream data collection system for noninvasive measurement of

blood constituents" ("the '191 patent"), which the United States Patent and Trademark Office lawfully and duly issued on August 13, 2019. A true and correct copy of the '191 patent is attached hereto as Exhibit 6.

35. Masimo is the owner by assignment of U.S. Patent No. 10,470,695 entitled "Advanced pulse oximetry sensor" ("the '695 patent"), which the United States Patent and Trademark Office lawfully and duly issued on November 12, 2019. A true and correct copy of the '695 patent is attached hereto as Exhibit 7.

36. Masimo is the owner by assignment of U.S. Patent No. 6,771,994 entitled "Pulse oximeter probe-off detection system" ("the '994 patent"), which the United States Patent and Trademark Office lawfully and duly issued on August 3, 2004. A true and correct copy of the '994 patent is attached hereto as Exhibit 8.

37. Masimo is the owner by assignment of U.S. Patent No. 8,457,703 entitled "Low power pulse oximeter" ("the '703 patent"), which the United States Patent and Trademark Office lawfully and duly issued on June 4, 2013. A true and correct copy of the '703 patent is attached hereto as Exhibit 9.

38. Masimo is the owner by assignment of U.S. Patent No. 10,433,776 entitled "Low power pulse oximeter" ("the '776 patent"), which the United States Patent and Trademark Office lawfully and duly issued on October 8, 2019. A true and correct copy of the '776 patent is attached hereto as Exhibit 10.

## VI. FIRST CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 10,258,265)

39. Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 38.

40. Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and 5 devices, infringe at least Claims 1-3, 6-11,

13, 17, and 17-25 of the '265 patent under at least 35 U.S.C. § 271(a), (b), and (c).

41.     Upon information and belief, Defendant has directly infringed one or more claims of the '265 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and 5 devices.

42.     For example, upon information and belief, in operation, the Apple Watch Series 4 and 5 devices include all of the limitations of Claim 1 of the '265 patent.  The Apple Watch Series 4 and 5 devices are adapted to be worn by a wearer and provide an indication of a physiological parameter (for example, heart rate) of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



43.     The Apple Watch Series 4 and 5 devices include a plurality of emitters of different wavelengths (for example, green and infrared LEDs) and at least four detectors (for example, photodiode sensors) spaced apart from each other as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:

/ / /

/ / /

-10-

44.     The detectors output signals responsive to light from the light emitters attenuated by body tissue.  Upon information and belief, the signals are indicative of a physiological parameter (for example, heart rate) of the wearer.

45.     Upon information and belief, at least some of the technology in the Apple Watch Series 4 and 5 devices is described in Apple's U.S. Patent Application Publication 2019/0072912 (the '912 publication).  A copy of the publication is attached as Exhibit 11.  Analysis of the Apple Watch Series 4 and 5 devices show that the devices include a housing having a surface and a circular wall protruding from the surface, and a light permeable cover arranged above a portion of the housing and covering the detectors as described, for example, in Fig. 4C and the corresponding text of the '912 publication:

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIG. 4C

46.     Upon information and belief, Defendant has knowledge of Masimo's patents, including the '265 patent, at least based on O'Reilly and Lamego's former positions with Masimo and Cercacor.   Masimo filed provisional patent applications that led to the '265 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.   Lamego is a named inventor of the '265 patent.   Defendant had knowledge of the '265 patent no later than the filing of this Complaint.

47.     Upon information and belief, Defendant has actively induced others to infringe the '265 patent by marketing and selling the above Apple Watch Series 4 and 5 devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '265 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and 5 devices be used to infringe the

'265 patent.  Defendant's acts constitute infringement of the '265 patent in violation of 35 U.S.C. § 271(b).

48.    Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '265 patent.  By way of example only, upon information and belief, Defendant actively induces direct infringement of the '265 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and 5 devices, including use with Apple iPhones.  Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

49.    Upon information and belief, Defendant's acts constitute contributory infringement of the '265 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and 5 devices and Apple iPhones that constitute material parts of the invention of the asserted claims of the '265 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendant to be especially made or especially adapted for use in an infringement of the '265 patent.

50.    Defendant's infringement of the '265 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '265 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

51.    Because of Defendant's infringement of the '265 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

/ / /

52.     Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## VII.  SECOND CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,258,266)

53.     Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 52.

54.     Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and 5 devices, infringe at least Claims 1-19 of the '266 patent under at least 35 U.S.C. § 271(a), (b), and (c).

55.     Upon information and belief, Defendant has directly infringed one or more claims of the '266 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and 5 devices.

56.     For example, upon information and belief, in operation, the Apple Watch Series 4 and 5 devices 4 and 5 devices include all of the limitations of Claim 1 of the '266 patent.  The Apple Watch Series 4 and 5 devices provides an indication of a physiological parameter (for example, heart rate) of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:

/ / /

/ / /

/ / /

-14-



57.     The Apple Watch Series 4 and 5 devices a plurality of emitters that emit light into tissue of a user and a plurality of detectors (for example, photodiode sensors) that detect light that has been attenuated by tissue of the user as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:

58.     Analysis of the Apple Watch Series 4 and 5 devices show that the devices include a housing configured to house the detectors and a lens located between the tissue of the user and the detectors as described, for example, in Fig. 4C and the corresponding text of the '912 publication:



FIG. 4C

59.     Upon information and belief, the lens has a single outwardly protruding convex surface configured to cause tissue of the user to conform to the protruding convex surface during operation of the noninvasive optical physiological sensor.

60.     Upon information and belief, Defendant has knowledge of Masimo's patents, including the '266 patent, at least based on O'Reilly and Lamego's former positions with Masimo and Cercacor.    Masimo filed provisional patent applications that led to the '266 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Lamego is a named inventor of the '266 patent.  Defendant had knowledge of the '266 patent no later than the filing of this Complaint.

/ / /

61.     Upon information and belief, Defendant has actively induced others to infringe the '266 patent by marketing and selling the above Apple Watch Series 4 and 5 devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '266 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and 5 devices be used to infringe the '266 patent.  Defendant's acts constitute infringement of the '266 patent in violation of 35 U.S.C. § 271(b).

62.     Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '266 patent.  By way of example only, upon information and belief, Defendant actively induces direct infringement of the '266 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and 5 devices.  Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

63.     Upon information and belief, Defendant's acts constitute contributory infringement of the '266 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and 5 devices that constitute material parts of the invention of the asserted claims of the '266 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendant to be especially made or especially adapted for use in an infringement of the '266 patent.

64.     Defendant's infringement of the '266 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of

the '266 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

65.     Because of Defendant's infringement of the '266 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

66.     Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

### VIII.  THIRD CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 10,292,628)

67.     Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 66.

68.     Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and 5 devices, infringe at least Claim 1 of the '628 patent under at least 35 U.S.C. § 271(a), (b), and (c).

69.     Upon information and belief, Defendant has directly infringed one or more claims of the '628 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and 5 devices.

70.     For example, upon information and belief, in operation, the Apple Watch Series 4 and 5 devices include all of the limitations of Claim 1 of the '628 patent.

71.     Analysis of the Apple Watch Series 4 and 5 devices show that the devices include a housing configured to house a plurality of detectors as described, for example, in Fig. 4C and the corresponding text of the '912 publication:

/ / /

-18-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIG. 4C

72.     The Apple Watch Series 4 and 5 devices include a plurality of emitters that emit light into tissue of a user and a plurality of detectors that detect light that has been attenuated by tissue of the user as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:

/ / /

/ / /

/ / /

73.     Analysis of the Apple Watch Series 4 and 5 devices shows that the devices include a light permeable cover configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the plurality of detectors are configured to receive light passed through the outwardly protruding convex surface after attenuation by tissue of the user, as described, for example, in Fig. 4C and the corresponding text of the '912 publication:

/ / /

/ / /

/ / /



74.

FIG. 4C

75.    Upon information and belief, Defendant has knowledge of Masimo's patents, including the '628 patent, at least based on O'Reilly and Lamego's former positions with Masimo and Cercacor.   Masimo filed provisional patent applications that led to the '628 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.   Lamego is a named inventor of the '628 patent.   Defendant had knowledge of the '628 patent no later than the filing of this Complaint.

76.    Upon information and belief, Defendant has actively induced others to infringe the '628 patent by marketing and selling the above Apple Watch Series 4 and 5 devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '628 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and 5 devices be used to infringe the

'628 patent. Defendant's acts constitute infringement of the '628 patent in violation of 35 U.S.C. § 271(b).

77. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '628 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '628 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and 5 devices, including use with Apple iPhones. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

78. Upon information and belief, Defendant's acts constitute contributory infringement of the '628 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and 5 devices and Apple iPhones that constitute material parts of the invention of the asserted claims of the '628 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '628 patent.

79. Defendant's infringement of the '628 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '628 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

80. Because of Defendant's infringement of the '628 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

/ / /

81.     Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## IX.  FOURTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,299,708)

82.     Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 81.

83.     Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and 5 devices, infringe at least Claim 1 of the '708 patent under at least 35 U.S.C. § 271(a), (b), and (c).

84.     Upon information and belief, Defendant has directly infringed one or more claims of the '708 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and 5 devices.

85.     For example, upon information and belief, in operation, the Apple Watch Series 4 and 5 devices include all of the limitations of Claim 1 of the '708 patent.  The Apple Watch Series 4 and 5 devices are adapted to be worn by a wearer and provide an indication of a physiological parameter (for example, heart rate) of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:

/ / /

/ / /

/ / /

-23-



86.    Analysis of the Apple Watch Series 4 and 5 devices show that the devices include a platform including a planar surface, a housing including a raised edge portion extending from and enclosing at least a portion of the planar surface, and the housing including a protruding light permeable cover as described, for example, in Fig. 4C and the corresponding text of the '912 publication:

/ / /

/ / /

/ / /



87.

FIG. 4C

88.    Upon information and belief, the Apple Watch Series 4 and 5 devices include at least four detectors (for example, photodiode sensors) arranged on the planar surface of the platform and within the housing, wherein the at least four detectors are arranged in a grid pattern such that a first detector and a second detector are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector are arranged across from each other on opposite sides of the central point along a second axis which is perpendicular to the first axis as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:

/ / /

/ / /

/ / /



89.    Upon information and belief, Defendant has knowledge of Masimo's patents, including the '708 patent, at least based on O'Reilly and Lamego's former positions with Masimo and Cercacor.    Masimo filed provisional patent applications that led to the '708 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.    Lamego is a named inventor of the '708 patent.    Defendant had knowledge of the '708 patent no later than the filing of this Complaint.

90.    Upon information and belief, Defendant has actively induced others to infringe the '708 patent by marketing and selling the above Apple Watch Series 4 and 5 devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '708 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and 5 devices be used to infringe the '708 patent.    Defendant's acts constitute infringement of the '708 patent in violation of 35 U.S.C. § 271(b).

91.    Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '708 patent.    By way of example only, upon information and belief, Defendant actively induces direct

infringement of the '708 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and 5 devices, including use with Apple iPhones. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

92. Upon information and belief, Defendant's acts constitute contributory infringement of the '708 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and 5 devices and Apple iPhones that constitute material parts of the invention of the asserted claims of the '708 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '708 patent.

93. Defendant's infringement of the '708 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '708 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

94. Because of Defendant's infringement of the '708 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

95. Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

/ / /

/ / /

# X. FIFTH CAUSE OF ACTION

## (INFRINGEMENT OF U.S. PATENT NO. 10,376,190)

96.     Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 95.

97.     Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and 5 devices, infringe at least Claim 1 of the '190 patent under at least 35 U.S.C. § 271(a), (b), and (c).

98.     Upon information and belief, Defendant has directly infringed one or more claims of the '190 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and 5 devices.

99.     For example, upon information and belief, in operation, the Apple Watch Series 4 and 5 devices include all of the limitations of Claim 1 of the '190 patent.  The Apple Watch Series 4 and 5 devices are noninvasive optical physiological measurement devices adapted to be worn by a wearer, the noninvasive optical physiological measurement device providing an indication of a physiological parameter (for example, heart rate) of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



100. Upon information and belief, the Apple Watch Series 4 and 5 devices include light emitters and at least four detectors spaced apart from each other and configured to output one or more signals responsive to light from the one or more light emitters attenuated by body tissue, the one or more signals indicative of a physiological parameter of the wearer as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



101. Analysis of the Apple Watch Series 4 and 5 devices show that the devices include a housing having a surface and a circular raised edge extending from the surface, and a light permeable cover arranged above at least a portion of the housing, the light permeable cover comprising a protrusion arranged to cover the at least four detectors as described, for example, in Fig. 4C and the corresponding text of the '912 publication:

/ / /

/ / /

/ / /



FIG. 4C

102.   Upon information and belief, Defendant has knowledge of Masimo's patents, including the '190 patent, at least based on O'Reilly and Lamego's former positions with Masimo and Cercacor.   Masimo filed provisional patent applications that led to the '190 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Lamego is a named inventor of the '190 patent.  Defendant had knowledge of the '190 patent no later than the filing of this Complaint.

103.   Upon information and belief, Defendant has actively induced others to infringe the '190 patent by marketing and selling the above Apple Watch Series 4 and 5 devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '190 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and 5 devices be used to infringe the

'190 patent.  Defendant's acts constitute infringement of the '190 patent in violation of 35 U.S.C. § 271(b).

104.  Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '190 patent.  By way of example only, upon information and belief, Defendant actively induces direct infringement of the '190 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and 5 devices, including use with Apple iPhones.  Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

105.  Upon information and belief, Defendant's acts constitute contributory infringement of the '190 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and 5 devices and Apple iPhones that constitute material parts of the invention of the asserted claims of the '190 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '190 patent.

106.  Defendant's infringement of the '190 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '190 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

107.  Because of Defendant's infringement of the '190 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

/ / /

-31-

108.  Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XI.  SIXTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,376,191)

109.  Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 108.

110.  Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and 5 devices, infringe at least Claim 1 of the '191 patent under at least 35 U.S.C. § 271(a), (b), and (c).

111.  Upon information and belief, Defendant has directly infringed one or more claims of the '191 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and 5 devices.

112.  For example, upon information and belief, in operation, the Apple Watch Series 4 and 5 devices include all of the limitations of Claim 1 of the '191 patent.  The Apple Watch Series 4 and 5 devices are a noninvasive optical physiological sensor as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:

/ / /

/ / /

/ / /

-32-

1
2
3
4
5
6
7
8
9



10    113.    The Apple Watch Series 4 and 5 devices include a plurality of
11  emitters configured to emit light into tissue of a user and a plurality of detectors
12  configured to detect light that has been attenuated by tissue of the user, wherein
13  the plurality of detectors comprise at least four detectors as shown in the image
14  below  found  on  the  Apple  website  at  https://support.apple.com/en-
15  us/HT204666:
16
17
18
19
20
21
22
23
24
25

26    114.    Analysis of the Apple Watch Series 4 and 5 devices show that the
27  devices include a housing configured to house at least the plurality of detectors
28  in a circular portion of the housing, and a lens configured to be located between

tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the lens comprises a single outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the single outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor as described, for example, in Fig. 4C and the corresponding text of the '912 publication:



FIG. 4C

115.  Upon information and belief, Defendant has knowledge of Masimo's patents, including the '191 patent, at least based on O'Reilly and Lamego's former positions with Masimo and Cercacor.  Masimo filed provisional patent applications that led to the '191 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Lamego is a named

inventor of the '191 patent. Defendant had knowledge of the '191 patent no later than the filing of this Complaint.

116. Upon information and belief, Defendant has actively induced others to infringe the '191 patent by marketing and selling the above Apple Watch Series 4 and 5 devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '191 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and 5 devices be used to infringe the '191 patent. Defendant's acts constitute infringement of the '191 patent in violation of 35 U.S.C. § 271(b).

117. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '191 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '191 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and 5 devices. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

118. Upon information and belief, Defendant's acts constitute contributory infringement of the '191 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and 5 devices that constitute material parts of the invention of the asserted claims of the '191 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '191 patent.

119.   Defendant's infringement of the '191 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '191 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

120.   Because of Defendant's infringement of the '191 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

121.   Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XII.  SEVENTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 10,470,695)

122.   Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 121.

123.   Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and 5 devices, infringe at least Claim 1 of the '695 patent under at least 35 U.S.C. § 271(a), (b), and (c).

124.   Upon information and belief, Defendant has directly infringed one or more claims of the '695 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and 5 devices.

125.   For example, upon information and belief, in operation, the Apple Watch Series 4 and 5 devices include all of the limitations of Claim 1 of the '695 patent.   The Apple Watch Series 4 and 5 devices are a wrist-worn physiological monitoring device configured for placement on a user at a tissue measurement site as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



126.   The Apple Watch Series 4 and 5 devices include a light emission source comprising a plurality of emitters configured to irradiate the tissue measurement site by emitting light towards the tissue measurement site, the tissue measurement site being located on a wrist of the user, the plurality of emitters configured to emit one or more wavelengths and a plurality of detectors configured to detect the light emitted by the plurality of emitters after attenuation by a circular portion of the tissue measurement site, the plurality of detectors further configured to output at least one signal responsive to the detected light as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



127.  Analysis of the Apple Watch Series 4 and 5 devices show that the devices include a processor configured to receive the at least one signal responsive to the output and determine a physiological parameter of the user and a light block forming an enclosing wall between the light emission source and the plurality of detectors, the light block defining the circular portion of the tissue measurement site, the light emission source arranged proximate a first side of the enclosing wall and the plurality of detectors arranged proximate a second side of the enclosing wall, the first side being different than the second side, wherein the enclosing wall prevents at least a portion of light emitted from the light emission source from being detected by the plurality of detectors without attenuation by the tissue, and wherein the plurality of detectors are arranged in an array having a spatial configuration corresponding to the portion of the tissue measurement site as described, for example, in Fig. 4C and the corresponding text of the '912 publication:



FIG. 4C

-38-

128.   Upon information and belief, Defendant has knowledge of Masimo's patents, including the '695 patent, at least based on O'Reilly and Lamego's former positions with Masimo and Cercacor.   Masimo filed provisional patent applications that led to the '695 patent in August 2008, while O'Reilly and Lamego were with Masimo and/or Cercacor.  Lamego is a named inventor of the '695 patent.  Defendant had knowledge of the '695 patent no later than the filing of this Complaint.

129.   Upon information and belief, Defendant has actively induced others to infringe the '695 patent by marketing and selling the above Apple Watch Series 4 and 5 devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '695 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and 5 devices be used to infringe the '695 patent.   Defendant's acts constitute infringement of the '695 patent in violation of 35 U.S.C. § 271(b).

130.   Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '695 patent.  By way of example only, upon information and belief, Defendant actively induces direct infringement of the '695 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and 5 devices.  Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

131.   Upon information and belief, Defendant's acts constitute contributory infringement of the '695 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4

-39-

and 5 devices that constitute material parts of the invention of the asserted claims of the '695 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '695 patent.

132.   Defendant's infringement of the '695 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '695 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

133.   Because of Defendant's infringement of the '695 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

134.   Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XIII.  EIGHTH CAUSE OF ACTION
## (INFRINGEMENT OF U.S. PATENT NO. 6,771,994)

135.   Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 134.

136.   Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and 5 devices, infringe at least Claim 15 of the '994 patent under at least 35 U.S.C. § 271(a), (b), and (c).

137.   Upon information and belief, Defendant has directly infringed one or more claims of the '994 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and 5 devices.

/ / /

138.   For example, upon information and belief, in operation, the Apple Watch Series 4 and 5 devices include all of the limitations of Claim 15 of the '994 patent.   Upon information and belief, the Apple Watch Series 4 and 5 devices detects light transmitted through body tissue carrying pulsing blood to determine heart rate as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



139.   The Apple Watch Series 4 and 5 devices include at least one light emission device and a light sensitive detector as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



140. The detectors output signals responsive to light from the light emitters attenuated by body tissue. Upon information and belief, the signals are indicative of a physiological parameter (for example, heart rate) of the wearer.

141. Upon information and belief, at least some of the technology in the Apple Watch Series 4 and 5 devices is described in U.S. Patent Application Publication 2019/0090806 (the '806 publication). A copy of the publication is attached as Exhibit 12. Analysis of the Apple Watch Series 4 and 5 devices show that the devices include a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient. Upon information and belief, this technology is described, for example, in Fig. 7 and the corresponding text of the '806 publication:



FIG. 7

142. Upon information and belief, Defendant has knowledge of Masimo's patents, including the '994 patent, at least based on O'Reilly and Lamego's former positions with Masimo and Cercacor. Masimo filed a patent application that led to the '994 patent on June 16, 2000. The '994 patent issued on August 3, 2004, and Masimo has maintained the patent while O'Reilly and Lamego were with Masimo and/or Cercacor. Defendant had knowledge of the '994 patent no later than the filing of this Complaint.

143. Upon information and belief, Defendant has actively induced others to infringe the '994 patent by marketing and selling the above Apple Watch Series 4 and 5 devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '994 patent.

To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and 5 devices be used to infringe the '994 patent. Defendant's acts constitute infringement of the '994 patent in violation of 35 U.S.C. § 271(b).

144. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '994 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '994 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and 5 devices. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

145. Upon information and belief, Defendant's acts constitute contributory infringement of the '994 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and 5 devices that constitute material parts of the invention of the asserted claims of the '994 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '994 patent.

146. Defendant's infringement of the '994 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '994 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

/ / /

/ / /

147.   Because of Defendant's infringement of the '994 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

148.   Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

### XIV.   NINTH CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 8,457,703)

149.   Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 148.

150.   Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and 5 devices, infringe at least Claim 1 of the '703 patent under at least 35 U.S.C. § 271(a), (b), and (c).

151.   Upon information and belief, Defendant has directly infringed one or more claims of the '703 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and 5 devices.

152.   For example, upon information and belief, in operation, the Apple Watch Series 4 and 5 devices include all of the limitations of Claim 1 of the '703 patent.  The Apple Watch Series 4 and 5 devices provide an indication of a physiological parameter (for example, heart rate) of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:

/ / /

/ / /

/ / /

-44-



153.   The Apple Watch Series 4 and 5 devices drive one or more light sources configured to emit light into tissue and receives one or more signals from one or more detectors configured to detect light after attenuation by tissue as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:

154.   The detectors output signals responsive to light from the light emitters attenuated by body tissue.  Upon information and belief, the signals are indicative of a physiological parameter (for example, heart rate) of the wearer.

/ / /

155. Upon information and belief, the Apple Watch Series 4 and 5 devices continuously operate at a lower power consumption level to determine measurement values for heart rate, as described at https://support.apple.com/en-us/HT204666:

> The optical heart sensor in Apple Watch uses what is known as photoplethysmography. This technology, while difficult to pronounce, is based on a very simple fact: Blood is red because it reflects red light and absorbs green light. Apple Watch uses green LED lights paired with light-sensitive photodiodes to detect the amount of blood flowing through your wrist at any given moment. When your heart beats, the blood flow in your wrist — and the green light absorption — is greater. Between beats, it's less. By flashing its LED lights hundreds of times per second, Apple Watch can calculate the number of times the heart beats each minute — your heart rate. The optical heart sensor supports a range of 30–210 beats per minute. In addition, the optical heart sensor is designed to compensate for low signal levels by increasing both LED brightness and sampling rate.

156. Upon information and belief, the Apple Watch Series 4 and 5 devices as described above compare processing characteristics to a predetermined threshold, and when the processing characteristics pass the threshold, the Apple Watch Series 4 and 5 devices transition to continuously operating at a higher power consumption level, wherein the continuously operating at the lower power consumption level comprises reducing activation of an attached sensor, the sensor positioning the light sources and the detectors proximate to the tissue.

157. Masimo filed a provisional patent application that led to the '703 patent on July 2, 2001, The '703 patent issued on June 4, 2013, while

while O'Reilly and Lamego were with Masimo and/or Cercacor. Defendant had knowledge of the '703 patent no later than the filing of this Complaint.

158. Upon information and belief, Defendant has actively induced others to infringe the '703 patent by marketing and selling the above Apple Watch Series 4 and 5 devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '703 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and 5 devices be used to infringe the '703 patent. Defendant's acts constitute infringement of the '703 patent in violation of 35 U.S.C. § 271(b).

159. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '703 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '703 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and 5 devices. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

160. Upon information and belief, Defendant's acts constitute contributory infringement of the '703 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and 5 devices that constitute material parts of the invention of the asserted claims of the '703 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '703 patent.

161.   Defendant's infringement of the '703 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '703 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

162.   Because of Defendant's infringement of the '703 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

163.   Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XV.  TENTH CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 10,433,776)

164.   Plaintiff Masimo hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 163.

165.   Upon information and belief, Defendant's products, including at least the Apple Watch Series 4 and 5 devices, infringe at least Claim 1 of the '776 patent under at least 35 U.S.C. § 271(a), (b), and (c).

166.   Upon information and belief, Defendant has directly infringed one or more claims of the '776 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of physiological monitors, including the Apple Watch Series 4 and 5 devices.

167.   For example, upon information and belief, in operation, the Apple Watch Series 4 and 5 devices include all of the limitations of Claim 1 of the '776 patent.  The Apple Watch Series 4 and 5 devices are configured to monitor at least a pulse rate of a patient by processing signals responsive to light

/ / /

-48-

168. attenuated by body tissue of the wearer as shown in the image below found on the Apple website at https://www.apple.com/apple-watch-series-4/health/:



169. The Apple Watch Series 4 and 5 devices drive one or more light sources configured to emit light into tissue and receives one or more signals from one or more detectors configured to detect light after attenuation by tissue as shown in the image below found on the Apple website at https://support.apple.com/en-us/HT204666:



170. Upon information and belief, the Apple Watch Series 4 and 5 devices operate according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of a plurality of light sources, and when operating according to the first control protocol, calculating, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor as explained, for example, on the Apple website at https://support.apple.com/en-us/HT204666. That webpage explains the optical heart sensor uses photoplethysmography. "Apple Watch uses green LED lights paired with light-sensitive photodiodes to detect the amount of blood flowing through your wrist at any given moment. When your heart beats, the blood flow in your wrist — and the green light absorption — is greater. Between beats, it's less. By flashing its LED lights hundreds of times per second, Apple Watch can calculate the number of times the heart beats each minute — your heart rate. The optical heart sensor supports a range of 30–210 beats per minute. In addition, the optical heart sensor is designed to compensate for low signal levels by increasing both LED brightness and sampling rate." That webpage further explains that the "optical heart sensor can also use infrared light. This mode is what Apple Watch uses when it measures your heart rate in the background, and for heart rate notifications. Apple Watch uses green LED lights to measure your heart rate during workouts and Breathe sessions, and to calculate walking average and Heart Rate Variability (HRV)."

171. Upon information and belief, the Apple Watch Series 4 and 5 devices operate generate a trigger signal, wherein generating said trigger signal is responsive to at least one of: a comparison of processing characteristics to a

predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector, and in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of the plurality of light sources, and when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor, wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

172. Upon information and belief, Defendant has knowledge of Masimo's patents, including the '776 patent, at least based on O'Reilly and Lamego's former positions with Masimo and Cercacor. Masimo filed a provisional patent application that led to the '776 patent on July 2, 2001, The '776 patent issued on June 4, 2013, while while O'Reilly and Lamego were with Masimo and/or Cercacor. Defendant had knowledge of the '776 patent no later than the filing of this Complaint.

173. Upon information and belief, Defendant has actively induced others to infringe the '776 patent by marketing and selling the above Apple Watch Series 4 and 5 devices, knowing and intending that such systems would

be used by customers and end users in a manner that infringes the '776 patent. To that end, Defendant provides instructions and teachings to its customers and end users that such Apple Watch Series 4 and 5 devices be used to infringe the '776 patent. Defendant's acts constitute infringement of the '776 patent in violation of 35 U.S.C. § 271(b).

174. Upon information and belief, Defendant actively induces users to directly infringe the asserted claims of the '776 patent. By way of example only, upon information and belief, Defendant actively induces direct infringement of the '776 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Apple Watch Series 4 and 5 devices. Upon information and belief, Defendant knew or should have known that these activities would cause direct infringement.

175. Upon information and belief, Defendant's acts constitute contributory infringement of the '776 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, Defendant contributorily infringes because, among other things, Defendant offers to sell and/or sells within the United States, and/or imports into the United States, components of the Apple Watch Series 4 and 5 devices that constitute material parts of the invention of the asserted claims of the '776 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Defendant to be especially made or especially adapted for use in an infringement of the '776 patent.

176. Defendant's infringement of the '776 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '776 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

/ / /

177. Because of Defendant's infringement of the '776 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

178. Upon information and belief, unless enjoined, Defendant, and/or others acting on behalf of Defendant, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XVI. ELEVENTH CAUSE OF ACTION
## (TRADE SECRET MISAPPROPRIATION UNDER
## CALIFORNIA'S UNIFORM TRADE SECRET ACT)

179. Plaintiffs Masimo and Cercacor hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 177.

180. This is a cause of action for Misappropriation of Trade Secrets under California's Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426 *et seq*., based upon Defendant's wrongful and improper use and disclosure of confidential and proprietary trade secret information of Plaintiffs.

181. Plaintiffs own trade secrets including, but not limited to, Plaintiffs' business plans, know-how, technical information, technical data, designs, manufacturing techniques and other business information ("Confidential Information").

182. Plaintiffs' Confidential Information is currently or was, at least at the time of Defendant's misappropriation, not generally known. All individuals with access to Plaintiffs' Confidential Information were instructed to keep it confidential, and they were subject to obligations to keep Plaintiffs' Confidential Information secret. Additionally, Plaintiffs' Confidential Information is, or at least was at the time of Defendant's misappropriation, not generally known to the public or to other persons who can obtain economic value from its disclosure or use.

183. Plaintiffs' Confidential Information has actual and potential independent economic value because it is, or was, not generally known. The actual and potential independent economic value of Plaintiffs' Confidential Information is derived from not being generally known because it gives or gave Plaintiffs an actual and potential business advantage over others who do not know the information and who could obtain economic value from its disclosure or use.

184. Plaintiffs made reasonable efforts under the circumstances to keep Plaintiffs' Confidential Information from becoming generally known. For example, Plaintiffs' efforts included marking documents confidential, instructing those individuals with access to the information to treat it as confidential, restricting access to the information, and requiring individuals and companies to enter into confidentiality agreements with Masimo in order to receive Masimo Confidential Information.

185. Plaintiffs are informed and believe, and thereon allege, that Defendant misappropriated Plaintiffs' Confidential Information by acquisition, disclosure and/or use. Upon information and belief, Defendant acquired, used and disclosed Plaintiffs' Confidential Information at least by filing patent applications containing Masimo's Confidential Information, without Plaintiffs' express or implied consent.

186. Upon information and belief, Lamego disclosed Plaintiffs' Confidential Information at least by September 2014, without Plaintiffs' consent, to Defendant. Additionally, at the time of disclosure, Lamego knew or had reason to know that his knowledge of Plaintiffs' Confidential Information was acquired by an employer-employee relationship, fiduciary relationship, and Lamego's employment agreements, which created a duty for Lamego to keep Plaintiffs' Confidential Information secret.

187. Upon information and belief, Defendant disclosed Plaintiffs' Confidential Information, without Plaintiffs' consent, in published patent filings.

Defendant knew or had reason to know that the knowledge of Plaintiffs' Confidential Information came from Plaintiffs, and that Lamego had previously acquired Plaintiffs' Confidential Information by virtue of an employer-employee and fiduciary relationship and the Lamego employment agreements, all of which created a duty for Lamego to keep Plaintiffs' Confidential Information secret.

188. Plaintiffs were harmed by Defendant's acquisition, use, and disclosure of Plaintiffs' Confidential Information, and Defendant's actions were substantial factors in causing Plaintiffs' harm. As a direct and proximate result of Defendant's willful, improper, and unlawful acquisition, use, and disclosure of Plaintiffs' trade secrets, Plaintiffs have suffered, and will continue to suffer, great harm and damage. Plaintiffs will continue to be irreparably damaged unless Defendant is enjoined from further use and disclosure of Plaintiffs' Confidential Information.

189. Defendant was unjustly enriched by Defendant's acquisition, use, and disclosure of Plaintiffs' Confidential Information, and Defendant's actions were substantial factors in causing Defendant to be unjustly enriched. Defendant was unjustly enriched because its misappropriation of Plaintiffs' Confidential Information caused Defendant to receive a benefit that it otherwise would not have achieved.

190. If neither damages nor unjust enrichment caused by Defendant's misappropriation of Plaintiffs' Confidential Information is provable at trial, Plaintiffs are entitled to a reasonable royalty for the period of time that Defendant's use of Plaintiffs' Confidential Information could have been prohibited.

191. The aforementioned acts of Defendant in wrongfully misappropriating Plaintiffs' trade secrets were, and continue to be, willful and malicious, warranting an award of reasonable attorneys' fees, as provided by

Cal. Civ. Code § 3426.4, and exemplary damages, as provided by Cal. Civ. Code §§ 3294 and 3426.3(c).

## XVII.  TWELTH CAUSE OF ACTION
## (CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 10,078,052)

192.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 190.

193.  Lamego is a named inventor of U.S. Patent 10,078,052 presently recorded as owned by Apple.  A true and correct copy of the '052 patent is attached hereto as Exhibit 13.

194.  The '052 Patent claims subject matter that Lamego obtained from discussions with Masimo or Cercacor employees Ammar Al-Ali, Mohamed Diab, and Walter Weber.  Al-Ali, Diab, and Weber are joint inventors of the claimed subject matter, regardless of patentability.  Accordingly, Al-Ali, Diab, and Weber should have been named inventors on the '052 Patent.

195.  Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Plaintiffs seek an order directing the U.S. Patent and Trademark Office to correct the inventorship of the '052 Patent by adding inventors Al-Ali, Diab, and Weber as named inventors.

## XVIII.  THIRTEENTH CAUSE OF ACTION
## (CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 10,247,670)

196.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 194.

197.  Lamego is a named inventor of U.S. Patent 10,247,670 presently recorded as owned by Apple.  A true and correct copy of the '670 patent is attached hereto as Exhibit 14.

198.  The '670 Patent claims subject matter that Lamego obtained from discussions with Masimo or Cercacor employees Al-Ali, Diab, and Weber.  Al-Ali, Diab, and Weber are joint inventors of the claimed subject matter,

regardless of patentability. Accordingly, Al-Ali, Diab, and Weber should have been named inventors on the '670 Patent.

199. Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Plaintiffs seek an order directing the U.S. Patent and Trademark Office to correct the inventorship of the '670 Patent by adding inventors Al-Ali, Diab, and Weber as named inventors.

## XIX.  FOURTEENTH CAUSE OF ACTION
## (CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 9,952,095)

200. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 198.

201. Lamego is a named inventor of U.S. Patent 9,952,095 presently recorded as owned by Apple. A true and correct copy of the '095 patent is attached hereto as Exhibit 15.

202. The '095 Patent claims subject matter that Lamego obtained from discussions with Masimo or Cercacor employees Al-Ali, Diab, and Weber. Al-Ali, Diab, and Weber are joint inventors of the claimed subject matter, regardless of patentability. Accordingly, Al-Ali, Diab, and Weber should have been named inventors on the '095 Patent.

203. Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Plaintiffs seek an order directing the U.S. Patent and Trademark Office to correct the inventorship of the '095 Patent by adding inventors Al-Ali, Diab, and Weber as named inventors.

## XX.  FIFTEENTH CAUSE OF ACTION
## (CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 10,219,754)

204. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 202.

/ / /

/ / /

205. Lamego is a named inventor of U.S. Patent 10,219,754 presently recorded as owned by Apple. A true and correct copy of the '754 patent is attached hereto as Exhibit 16.

206. The '754 Patent claims subject matter that Lamego obtained from discussions with Masimo or Cercacor employees Al-Ali, Diab, and Weber. Al-Ali, Diab, and Weber are joint inventors of the claimed subject matter, regardless of patentability. Accordingly, Al-Ali, Diab, and Weber should have been named inventors on the '754 Patent.

207. Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Plaintiffs seek an order directing the U.S. Patent and Trademark Office to correct the inventorship of the '754 Patent by adding inventors Al-Ali, Diab, and Weber as named inventors.

## XXI.  SIXTEENTH CAUSE OF ACTION
## (CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 10,524,671)

208. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 206.

209. Lamego is a named inventor of U.S. Patent 10,524,671 presently recorded as owned by Apple. A true and correct copy of the '671 patent is attached hereto as Exhibit 17.

210. The '671 Patent claims subject matter that Lamego obtained from discussions with Masimo or Cercacor employees Al-Ali, Diab, and Weber. Al-Ali, Diab, and Weber are joint inventors of the claimed subject matter, regardless of patentability. Accordingly, Al-Ali, Diab, and Weber should have been named inventors on the '671 Patent.

211. Pursuant to 28 U.S.C. § 2201 and 35 U.S.C. § 256, Plaintiffs seek an order directing the U.S. Patent and Trademark Office to correct the inventorship of the '671 Patent by adding inventors Al-Ali, Diab, and Weber as named inventors.

# XXII. SEVENTEENTH CAUSE OF ACTION

## (DECLARATORY JUDGMENT OF OWNERSHIP OF PATENTS AND PATENT APPLICATIONS)

212. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 210.

213. U.S. Patents 10,078,052, 10,219,754, 10,247,670, 9,952,095, and 10,524,671 are recorded as owned by Apple (the "Lamego Patents"). U.S. Patent Applications 15/667,832 and 15/960,507 are also recorded as owned by Apple (the "Lamego Applications").

214. Lamego developed the claimed subject matter in both the Lamego Patents and the Lamego Applications with employees of Masimo and Cercacor while he was employed at those companies. Lamego, as well as all of the other employees/inventors, had an obligation to assign said subject matter, patents, and patent applications to their employer, Masimo and Cercacor.

215. As evidenced by the allegations set forth above, Plaintiffs Masimo and Cercacor are exclusive owners, or at least joint owners, of all patents and patent applications that are based on Apple's claiming subject matter developed at Masimo and Cercacor while Lamego and the joint inventors (e.g., Al-Ali, Diab, and/or Weber) were employed at Masimo or Cercacor. Those patents and patent applications include, at a minimum, the Lamego Patents and Lamego Applications and all original applications, continuations, divisionals, and applications or patents that claim priority to any of these patents and patent applications, including foreign counterparts.

216. Based on the forgoing, Plaintiffs seek declaratory relief that they are the exclusive owners, or at least joint owners, of those patents and patent applications. Thus, Plaintiffs seeks an order from the Court ordering Apple to change the title to the patents and patent applications in favor of Masimo and Cercacor.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment in their favor against Defendant for the following relief:

A.     Pursuant to 35 U.S.C. § 271, a determination that Defendant and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them have infringed each of the '265, '266, '628, '708, '190, '191, '994, '695, '703, and '776 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271;

B.     Pursuant to 35 U.S.C. § 283, an injunction enjoining Defendant and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them from infringing the '265, '266, '628, '708, '190, '191, '994, '695, '703, and '776 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271, including preliminary and permanent injunctive relief;

C.     Pursuant to 35 U.S.C. § 284, an award compensating Masimo for Defendant's infringement of the '265, '266, '628, '708, '190, '191, '994, '695, '703, and '776 patents through payment of not less than a reasonable royalty on Defendant's sales of infringing products;

D.     Pursuant to 35 U.S.C. § 284, an award increasing damages up to three times the amount found or assessed by the jury for Defendant's infringement of each of the '265, '266, '628, '708, '190, '191, '994, '695, '703, and '776 patents in view of the willful and deliberate nature of the infringement;

E.     Pursuant to 35 U.S.C. § 285, a finding that this is an exceptional case, and an award of reasonable attorneys' fees and non-taxable costs;

F.     An assessment of prejudgment and post-judgment interest and costs against Defendant, together with an award of such interest and costs,

pursuant to 35 U.S.C. § 284;

G.     That Defendant be adjudged to have misappropriated Plaintiffs' trade secrets in violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*, and that Defendant's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

H.     That Defendant be adjudged to have been unjustly enriched;

I.     That Plaintiffs be awarded damages for actual losses, unjust enrichment, and/or a reasonable royalty pursuant to 18 U.S.C. § 1836(b)(3)(B) and Cal. Civ. Code § 3426.3.

J.     That Defendant, its agents, servants, employees, and attorneys, and all those persons in active concert or participation with each of them, be forthwith temporarily, preliminarily, and thereafter permanently required to return all of Plaintiffs' trade secrets and confidential information and enjoined from further using and disclosing to any third parties any of Plaintiffs' trade secrets and confidential information;

K.     That Defendant, its agents, servants, employees, and attorneys, and all those persons in active concert or participation with Defendant, be forthwith temporarily, preliminarily, and thereafter permanently required to return all of Plaintiffs' trade secrets and enjoined from further using and disclosing to any third parties any of Plaintiffs' trade secrets;

L.     That Defendant be enjoined from selling or offering to sell any product, including Defendant's Apple Watch Series 4 and 5 devices, that includes or uses any of Plaintiffs' trade secrets;

M.     That Defendant be directed to file with this Court and to serve on Plaintiffs within thirty (30) days after the service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Defendant has complied with the injunction;

/ / /

N.     That Defendant be required to account to Plaintiffs for any and all gains, profits, and advantages derived by it, and all damages sustained by Plaintiffs, by reason of Defendant's acts complained herein;

O.     That Plaintiffs be awarded exemplary damages and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D), and Cal. Civ. Code § 3426.3(c) and 3426.4;

P.     That the U.S. Patent and Trademark Office be directed to correct the inventorship of the Lamego Patents to add the correct inventors;

Q.     An order imposing a constructive trust for the benefit of Plaintiffs over: (1) any trade secrets Defendants obtained from Plaintiffs; (2) any profits, revenues, or other benefits obtained by Defendants as a result of any disclosure or use of trade secrets obtained from Plaintiffs; and (3) the Lamego Patents and the Lamego Patent Applications;

R.     That Plaintiffs be declared exclusive owners, or at least joint owners, of the patents and patent applications that are based on Plaintiffs' developments, including the Lamego Patents and Lamego Patent Applications;

S.     An award of taxable costs; and

T.     That this Court award such other and further relief as this Court may deem just.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  January 9, 2020     By: */s/ Perry D. Oldham*
                            Joseph R. Re
                            Stephen C. Jensen
                            Perry D. Oldham
                            Stephen W. Larson

                            Attorneys for Plaintiff,
                            Masimo Corporation

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Masimo Corporation hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  January 9, 2020 By: */s/ Perry D. Oldham*

Joseph R. Re
Stephen C. Jensen
Perry D. Oldham
Stephen W. Larson

Attorneys for Plaintiff,
Masimo Corporation

# EXHIBIT K

JOSHUA H. LERNER, SBN 220755
  jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
  mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
  bburoker@gibsondunn.com
BRIAN K. ANDREA, *pro hac vice*
  bandrea@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel.: 202.955.8500 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
  brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

*Attorneys for Defendant Apple Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

| | |
|---|---|
| MASIMO CORPORATION,<br>a Delaware corporation; and<br>CERCACOR LABORATORIES, INC.,<br>a Delaware corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>APPLE INC.,<br>a California corporation,<br><br>        Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx)<br><br>**DECLARATION OF BRIAN A. ROSENTHAL IN SUPPORT OF APPLE'S MOTION TO STAY THE PATENT INFRINGEMENT CASE PENDING *INTER PARTES* REVIEW PROCEEDINGS**<br><br>**Hearing:**<br>Date:    October 19, 2020<br>Time:    1:30 p.m.<br>Place:   Courtroom 10C<br>Judge:  Hon. James V. Selna |

I, Brian Rosenthal, declare and state as follows:

1.      I am an attorney permitted to practice law before this Court *pro hac vice* and am licensed to practice law in New York and the District of Columbia. I am a partner with the law firm of Gibson, Dunn & Crutcher LLP and counsel of record for Defendant Apple Inc. ("Apple") in the above-captioned action.

2.      I have personal, firsthand knowledge of the facts stated herein and, if called upon to do so, could and would competently testify thereto.

3.      I make this Declaration in support of Apple's Motion to Stay the Patent Infringement Case Pending *Inter Partes* Review Proceedings ("Motion").

4.      Apple and Plaintiffs held a meet and confer regarding Apple's Motion on September 4, 2020. Counsel for Plaintiffs stated that they will oppose the motion.

5.      No depositions have yet been noticed or scheduled in this action.

6.      On June 15, 2020, Apple produced to Plaintiffs publicly available core technical documents.

7.      On July 10, 2020, the Court held a hearing in which it stated that notwithstanding Plaintiffs' failure to provide a trade secret disclosure, Apple should produce confidential core technical documents that relate to the patent case. The transcript of that hearing is attached hereto as **Exhibit A**.

8.      On July 16, 2020, Apple produced additional highly confidential core technical documents sufficient to show the structure and operation of the accused features of the accused products, as set forth in Plaintiffs' First Amended Complaint.

9.      On August 3, 2020, Apple made available for inspection the source code for the accused features of the accused products, based on the allegations in the First Amended Complaint.

10.      Plaintiffs served their preliminary infringement contentions on July 27, 2020, which for the first time identified the claims Plaintiffs intend to assert against Apple. The document did not provide any infringement contentions with respect to U.S.

1   Patent No. 10,433,776 ("the '776 patent") asserted against Apple.  After Apple pointed

2   out this omission, Plaintiffs informed Apple that contentions for that patent would be

3   forthcoming in its supplemental infringement contentions, but that Plaintiffs were

4   asserting all claims of the '776 patent against Apple.  Plaintiffs have identified "at least"

5   245 claims across the twelve Asserted Patents that they allege Apple infringes, all of

6   which still remain asserted in this action.   Plaintiffs' July 27, 2020 preliminary

7   infringement contentions are attached hereto as **Exhibit B**.

8            11.    On September 8, 2020, Apple served its invalidity contentions for U.S.

9   Patent Nos. 10,258,265 ("the '265 patent"), 10,292,628 ("the '628 patent"), 6,771,994

10  ("the '994 patent"), 8,457,703 ("the '703 patent"), 10,433,776 ("the '776 patent"),

11  10,588,553 ("the '553 patent"), and 10,588,554 ("the '554 patent"), which Plaintiffs

12  asserted against Apple in the original Complaint and/or the First Amended Complaint

13  (these contentions were initially due on September 7, 2020, but because that day fell on

14  a Court holiday (Labor Day), the parties agreed that Apple may serve these contentions

15  the following day).

16           12.    Apple has already filed or will file before the hearing on this Motion *Inter*

17  *Partes* Review ("IPR") petitions challenging at least all asserted claims of all twelve of

18  the Asserted Patents.

19           13.    Specifically, on August 31, 2020, Apple filed IPR petitions challenging all

20  asserted claims of the '265 patent (IPR2020-01520), the '776 patent (IPR2020-01524),

21  the '994 patent (IPR2020-01526), and the '553 patent (IPR2020-01536 and IPR2020-

22  01537).  These petitions are attached hereto as **Exhibits C-G**, respectively.

23           14.    On September 2, 2020, Apple filed IPR petitions challenging all claims of

24  the '554 patent (IPR2020-01538 and IPR2020-01539) and all claims of the '628 patent

25  (IPR2020-01521).  These petitions are attached hereto as **Exhibits H-J**, respectively.

26

27

28

15. On September 9, 2020, Apple filed an IPR petition challenging all asserted claims of the '703 patent (IPR2020-01523). This petition is attached hereto as **Exhibit K**.

16. With respect to the five patents newly asserted in Plaintiffs' Second Amended Complaint (U.S. Patent Nos. 10,624,564 ("the '564 patent"), 10,631,765 ("the '765 patent"), 10,702,194 ("the '194 patent"), 10,702,195 ("the '195 patent"), and 10,709,366 ("the '366 patent")), Apple expects to file IPR petitions challenging at least all asserted claims of those patents by the noticed hearing for its Motion.

17. Before filing each IPR petition, Apple stipulated to Plaintiffs that in the event the Patent Trial and Appeal Board ("PTAB") institutes on any ground raised in its IPR petitions, Apple will not assert in this litigation that same ground against the corresponding claims. Those stipulations are attached hereto as **Exhibits L-R**, respectively. Apple will make a similar stipulation before filing IPR petitions challenging the five patents newly asserted in the Second Amended Complaint.

18. On September 9, 2020, at the urging of Judge Early, the parties held a meet and confer and reached a compromise with respect to two pending disputes between the parties—the sufficiency of Apple's core technical production and Plaintiffs' failure to provide a trade secret disclosure pursuant to California Code of Civil Procedure Section 2019.210. By the terms of that compromise, the parties agreed that by October 9, 2020, Plaintiffs would provide a Section 2019.210 trade secret disclosure and Apple would produce additional technical documents. The parties agreed that Plaintiffs would provide preliminary infringement contentions by November 13, 2020. Other terms of the compromise are reflected in the transcript of the parties' discussion.

19. Attached hereto as **Exhibit S** is a true and correct copy of the United States Patent Office's ("USPTO") Patent Trial and Appeal Board Trial Statistics, which contains data valid as of July 31, 2020. This document was retrieved from the USPTO's website

(https://www.uspto.gov/sites/default/files/documents/trial_statistics_20200731.pdf) on September 11, 2020.

20. Attached hereto as **Exhibit T** is a true and correct copy of Lex Machina's Patent Trial and Appeal Board statistics for trials listing Apple Inc. as the Petitioner, which contains data valid as of September 10, 2020. This document was retrieved from Lex Machina's website (https://lexmachina.com/) on September 11, 2020.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of September, 2020, in Larchmont, NY.


By: /s/ *Brian A. Rosenthal*
Brian A. Rosenthal

# EXHIBIT L

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404; Facsimile: (949)-760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
12790 El Camino Real
San Diego, CA 92130
Telephone: (858) 707-4000; Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

*Counsel for Defendants listed on next page.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation <br><br> Defendant. | Case No. 8:20-cv-00048-JVS-JDE <br><br> **JOINT STIPULATION REGARDING PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER** <br><br> [Discovery Document: Referred to Magistrate Judge John D. Early] <br><br> Date: July 23, 2020 <br> Time: 10:00 a.m. <br> Ctrm: 6A <br><br> Discovery Cut-Off: 7/5/2021 <br> Pre-Trial Conference: 3/21/2022 <br> Trial: 4/5/2022 <br><br> Hon. James V. Selna <br> Magistrate Judge John D. Early |

JOSHUA H. LERNER, SBN 220755
    jlerner@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.:  415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
    mlyon@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.:  650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
    bburoker@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel.: 202.955.8541 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
    brosenthal@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ILISSA SAMPLIN, SBN 314018
    isamplin@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
    akaounis@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

Attorneys for Defendant Apple Inc.

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTORY STATEMENTS ................................................. 1

    A.  Plaintiffs' Introductory Statement ................................. 1

    B.  Defendant's Introductory Statement ............................. 4

II.   DISPUTES REGARDING PROTECTIVE ORDER ......................... 7

    A.  Section 3 – Filings Under Seal .................................. 7

        1.  Plaintiffs' Position ..................................... 8

        2.  Defendant's Position .................................. 8

    B.  Sections 5.5 and 6 – Use of Protected Material at Trial .......... 11

        1.  Plaintiffs' Position .................................... 12

        2.  Defendant's Position ................................. 13

    C.  Section 9.1 – Export Regulations ............................ 15

        1.  Plaintiffs' Position .................................... 15

        2.  Defendant's Position ................................. 16

    D.  Section 9.2(b) and (j)– Disclosure of Confidential
        Information ........................................... 19

        1.  Plaintiffs' Position .................................... 20

        2.  Defendant's Position ................................. 21

    E.  Section 9.2(f) – Disclosure of Confidential Information .......... 23

        1.  Plaintiffs' Position .................................... 24

        2.  Defendant's Position ................................. 26

    F.  Section 9.3 – Use of Highly Confidential Information ........... 29

        1.  Plaintiffs' Position .................................... 30

            a.  The Court Should Reject Apple's
                "Relationship" Restriction ..................... 30

# TABLE OF CONTENTS
## (*Cont'd*)

Page No.

   i. Apple Cannot Show Jensen Will Inadvertently Disclose Protected Material ........................ 32

   ii. Apple Cannot Show It Will Suffer Harm ........................................................ 33

   iii. Apple's Restriction Would Prejudice Plaintiffs ............................................... 34

  b. The Court Should Reject Apple's Attempt to Provide Plaintiffs' Trade Secrets To Its In-House Counsel .......................................... 35

 2. Defendant's Position ........................................ 36

  a. This Court Should Bar Those Who are Either Competitive Decision-Makers Or Are Present Board Members Or Were Board Members Within The Last Two Years From Accessing Confidential Materials ...................... 37

   i. The Relationship Between Mr. Jensen And Plaintiffs Presents An Unacceptable Risk Of Inadvertent Disclosure Of Confidential Information In This Case ......................... 39

   ii. The Nature of Mr. Jensen's Service on Cercacor's Board of Directors Conflicts With The Obligation To Remain Silent Under A Protective Order .......................................... 41

   iii. The Risk Of Inadvertent Disclosure of Apple's Confidential Information Outweighs Harm To Plaintiffs, If Any ...... 45

  b. Apple's Provision Providing Trade Secrets to its In-House Counsel ........................................ 47

G. Section 10 – Prosecution Bar ................................ 49

 1. Plaintiffs' Position .......................................... 52

1

**TABLE OF CONTENTS**
*(Cont'd)*

2

3

**Page No.**

4       2.    Defendant's Position.......................................................54

5           a.    The Prosecution Bar Should Prohibit Those

6               Who Receive Apple's Confidential
             Information From Participating in *Inter*

7               *Partes* Review Unless The Patent Owner
             Does Not Attempt to Amend Its Claims .............55

8

9           b.    The Significant Risk Of Inadvertent
             Disclosure Justifies The Inclusion Of An

10               Acquisition Bar In The Protective Order .............59

11  H.    Sections 4.5 and 11 – Source Code...........................................63

12       1.    Plaintiffs' Position ...........................................................66

13           a.    Section 4.5 ......................................................67

14           b.    Section 11(f) ...................................................68

15           c.    Section 11(h) ...................................................69

16           d.    Section 11(i) ....................................................70

17           e.    Section 11(j) ....................................................71

18           f.    Section 11(k) ...................................................72

19           g.    Section 11(l) ....................................................73

20       2.    Defendant's Position.......................................................73

21           a.    Section 4.5 ......................................................73

22           b.    Section 11(f) ...................................................74

23

24               i.    Generating Source Code as PDF
             Copies..........................................74

25               ii.    Printing More Than 200 Pages ...............75

26

27               iii.    Printing Directory Paths Information ........76

28           c.    Section 11(h) ...................................................77

**TABLE OF CONTENTS**
*(Cont'd)*

Page No.

d.  Section 11(i) ......................................................77

e.  Section 11(j) .....................................................79

    i.  Increasing the Number of Reviewers.........79

    ii.  Restrictions on how source code may be transported ...............................................80

f.  Section 11(k) ...................................................81

    i.  Bringing Source Code to the Deposition ...................................................81

    ii.  Maintaining Marked Deposition Exhibits ......................................................81

g.  Section 11(l) ....................................................82

I.  Section 17 – Disposition After Trial.......................................82

  1.  Plaintiffs' Position .........................................................83

  2.  Defendant's Position.......................................................83

Plaintiffs MASIMO CORPORATION ("Masimo") and CERCACOR LABORATIES, INC. ("Cercacor") and Defendant APPLE INC. ("Apple") hereby submit this Joint Stipulation Regarding Plaintiffs' Motion for a Protective Order, pursuant to Fed. R. Civ. P. 26(c) and L.R. 37-1 *et seq.*

## I.  INTRODUCTORY STATEMENTS

Pursuant to Judge Selna's June 23, 2020 Order (ECF No. 59), the parties have appended to Adam Powell's Declaration as Exhibit 4 a redlined version of the protective order that shows the parties' competing proposals on the disputed provisions addressed herein.  The redline changes reflect Apple's proposals that differ from Plaintiffs' proposals.  In addition, a clean version of Plaintiffs' full proposed protective order is appended to Adam Powell's Declaration as Exhibit 2, and a clean version of Apple's full proposed protective order is appended to Ilissa Samplin's Declaration as Exhibit A.

### A.  **Plaintiffs' Introductory Statement**

Plaintiffs understand the Court expects customized protective orders to be based on its Model Protective Order (the "Model Order"), which is attached as Powell Decl., Ex. 1.  Thus, Plaintiffs offered to prepare a draft based on the Model Order.  Powell Decl. ¶ 6.  Apple refused and insisted on preparing the initial draft.  *Id.*  Plaintiffs agreed, but only on the condition that Apple would base its draft on the Model Order.  *Id.*  Unfortunately, Apple provided a draft several weeks later that bore no relationship to the Model Order.  *See id.*, Ex. 5 at 11-41.  Plaintiffs again asked Apple to provide a draft based on the Model Order, but Apple refused.  *Id.*, Ex. 6 at 2.  Thus, Plaintiffs prepared a draft based on the Model Order.  *Id.*, Ex. 6 at 1, 15-37.  Since then, the parties engaged in numerous meet-and-confers and exchanged numerous drafts to narrow their disputes.  *Id.* ¶¶ 9-10 and Exs. 7-8.  The parties were unable to resolve all issues and now present competing proposals.

Plaintiffs' proposal tracks the Court's Model Order as closely as possible.

For issues not addressed by the Model Order, Plaintiffs proposed using the language this Court recently adopted in *Masimo v. True Wearables*, No. 8:18-cv-02001-JVS-JDE ("*True Wearables*"). The provisions this Court adopted in *True Wearables* make sense here because Apple argued the two cases were related and involve "nearly identical" allegations. *See* Powell Decl., Ex. 24 (Apple's Notice of Related Cases) at 3. Instead of using this Court's Model Order, or the *True Wearables* Order, Apple primarily relies on provisions from something it calls "Apple's standard protective order." Apple's proposals are inappropriate for many reasons.

First, many of Apple's proposals conflict with the Court's Model Order, Local Rules, and Ninth Circuit precedent. For example, Apple proposes changing the Model Order by: (1) providing that the mere designation of information as "Highly Confidential" or "Source Code" constitutes good cause for sealing the information (Section II.A, *infra*), (2) eliminating this Court's provisions concerning how information is used at trial (Section II.B, *infra*), (3) improperly limiting the individuals who can access "Confidential" information (Section II.D, *infra*), and (4) modifying the process of returning or destroying designated information after Final Disposition (Section II.J, *infra*). Apple fails to justify these changes to the Court's Model Order.

Second, the parties agreed to add a "Highly Confidential" tier to the Model Order, but Apple inappropriately narrows who may access such information. *See* Section II.F, *infra*. Apple proposes language that would deprive Plaintiffs of their chosen counsel, Stephen Jensen, who has been representing Plaintiffs in litigation against Plaintiffs' competitors for decades. This Court rejected nearly identical language in *True Wearables*. Powell Decl., Ex. 13 at 8. This Court then affirmed Jensen is not a "competitive decision-maker" and may access Highly Confidential information. *Id.*, Ex. 14 at 5-6.

Apple identifies no reason why this Court should reach a contrary conclusion in this case.

Third, the parties agreed to add a "Source Code" tier to the Model Order, but Apple defines "source code" to include technical documents that are not source code and imposes unreasonable restrictions on reviewing "source code." Section II.H, *infra*. As a result, Apple's proposal significantly hinders Plaintiffs' ability to review anything Apple designates as source code. Apple also includes numerous provisions seeking Plaintiffs' work product, including a provision requiring advanced notice of the specific source code printouts Plaintiffs will use at depositions. Apple's counsel also insists they may review any work product inadvertently left behind by Plaintiffs in the source code review room, which is contrary to their ethical duties.

Fourth, Apple asserts that a consultant that worked for Plaintiffs in *True Wearables* may serve as Apple's e-discovery consultant in this case, despite Apple asserting the two cases are "nearly identical." *See* Section II.E, *infra*. Apple takes that position even though the consultant obtained access to Plaintiffs' highly confidential and ***privileged*** information in *True Wearables*. The consultant also obtained privileged information while serving as Plaintiffs' expert witness in another matter that Apple asserted is relevant to this case. Apple does not explain why it cannot use one of the dozens of other available consultants who have not worked for Plaintiffs on related matters.

Fifth, the parties agreed to add a patent prosecution bar to the Model Order, but Apple proposes unworkable terms. *See* Section II.G, *infra*. For example, Apple proposes that Plaintiffs' outside counsel may participate in *inter partes* review, but ***only if*** Plaintiffs waive their right to amend the claims. That is one-sided and forces Plaintiffs to choose between using its preferred counsel and waiving its right to amend the claims. The Court should adopt Plaintiffs'

proposal, which properly allows outside counsel to participate so long as they are not involved in amending the claims.

Finally, Apple insists that Protected Material may not be taken outside the U.S. or provided to any foreign national. *See* Section II.C, *infra*. Apple attempts to justify its proposal on U.S. export regulations, but its proposal is more onerous than U.S. export regulations. For example, Apple's proposal bars Plaintiffs from using foreign nationals as expert witnesses or conducting depositions outside the U.S., even if doing so does not violate export regulations. The Court should adopt Plaintiffs' proposal, which places the burden on the Receiving Party to comply with applicable export regulations.

Accordingly, Plaintiffs respectfully request the Court enter their proposed protective order, which is attached to the Powell Declaration as Exhibit 2.

**B.    Defendant's Introductory Statement**

Plaintiffs have approached the protective order negotiations from the premise that this Court's model protective order—what Plaintiffs term the "Model Order"—governs in the event of any disputes between the parties. Apple respectfully disagrees with Plaintiffs' position, and further notes that Plaintiffs have been more than willing to take a contrary stance when it suits their interests (e.g., advocating for an unprecedented provision that would restrict Apple from using the e-discovery vendor of its choosing). This Court's instructions state merely that "[a] model protective order is attached below." The Court's rules do not instruct parties to adopt all provisions in the Model Order, do not provide that the Model Order controls in the event of any disputes, and do not even require parties to submit a redline between their protective order proposals and the Model Order. Plaintiffs' suggestion that their proposed protective order is more appropriate because it purportedly "tracks the Court's Model Order as closely as possible" therefore is not persuasive. Nor is it true. Plaintiffs are proposing many provisions that do not appear in the Model Order

at all, proving *Apple's* point—which is that this case involving patent, trade secret, and highly sensitive information requires different protections against the use and disclosure of confidential information than a run-of-the mill litigation.

Equally unpersuasive is Plaintiffs' argument that any departures from the Court's Model Order should track the language in the protective order entered in the *True Wearables* case. While it is true that Apple filed a notice of related cases given certain allegations common to this lawsuit and *True Wearables*, Apple is differently situated from True Wearables, including in ways that bear directly on the protective order disputes here. Apple is one of the largest technology companies in the world and the accused products in this case, the Apple Watch Series 4 and 5, are extremely valuable products already in the wearables space. True Wearables, Inc., by contrast, is a six-year old medical device start-up. Moreover, Apple is not a party in *True Wearables* and therefore was not involved in the negotiations regarding the protective order in that case or the briefing leading up to entry of that protective order. Plaintiffs' suggestion that Apple should be automatically or presumptively bound by the *True Wearables* protective order or any other rulings entered in that case therefore is not sensible or fair. This lawsuit is a separate action involving different parties, considerations, and confidential information. These protective order disputes should be decided with those facts in mind; the protective order and decisions in *True Wearables* should not be treated as presumptively valid or binding here.

Notably, Plaintiffs have resisted—and fail to mention at all—the Model Order the Northern District of California has adopted for cases "involving patents, highly sensitive confidential information and/or trade secrets," in recognition of the heightened protections necessary for, and sensitivities involving, information of the type at issue in this action. *See* Samplin Decl. Ex. D. Apple proposed provisions from the Northern District's Model. Plaintiffs dismissed them on the mere basis that they are not in this Court's Model Order.

But Plaintiffs have recognized the value in adopting provisions from the Northern District's Model for like cases proceeding in this District. *See, e.g.*, Joint Stip. at 9, *Masimo Corp. v. Mindray DS USA Inc*, 2014 WL 12597116 (C.D. Cal. Feb. 13, 2014), ECF No. 111 ("*Masimo's* proposal is modeled after the Northern District of California's Model Protective Order . . . which was the basis for nearly every other aspect of the parties' Proposed Stipulated Protective Order.") (emphasis added). Judge Selna likewise has looked to Northern District rules in cases like this one. *See* Samplin Decl. Ex. C, at 52.

Apple has agreed to the majority of the provisions contained in this Court's Model Order. Apple respectfully submits, however, that in this case involving patent, trade secret, and source code information—some of the most sensitive information in Apple's *and* Plaintiffs' possession—certain heightened protections are necessary, including those proposed by Apple here, for example:

- precluding a party's competitive decision-makers and Board members form accessing Apple's highly confidential information given the inherent risk for the inadvertent disclosure of confidential information;
- extending the agreed-upon prosecution bar to those who receive access to confidential information from participating in the acquisition of new patents given the risk that litigation counsel will use their acquired knowledge to advise a client on which patents to acquire;
- barring counsel who receive access to highly confidential materials from participating in IPR proceedings that involve claim amendments given the likelihood that counsel's knowledge will be used to guide co-counsel toward or away from making amendments;
- access by a limited number of Apple's in-house counsel to Plaintiffs' highly confidential information, including their alleged trade secrets,

which is fairly standard in high stakes trade secret cases like this one;[1]

- prohibitions on the export of confidential materials—in this case that does not involve parties, experts, or evidence located abroad—given the heightened risk of misuse and unauthorized access; and

- automatic return or destruction of the parties' confidential material—including their highly sensitive source code and trade secret-related information—60 days following the final disposition of this action.

Apple is advocating for standard and reasonable protections for its sensitive Apple Watch-related information, and respectfully requests that the Court enter its proposed protective order attached to the Samplin Declaration as Exhibit A.

## II. DISPUTES REGARDING PROTECTIVE ORDER

The parties have reached an impasse on the following issues.

### A. Section 3 – Filings Under Seal

The Parties' dispute on Section 3 is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

3. ACNOWLEDGMENT OF UNDER SEAL FILING PROCEDURE

. . . The parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL does not—without the submission of competent evidence by declaration, establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable—constitute good cause. But designation of information as HIGHLY CONFIDENTIAL –

---

[1] On June 25, 2020, the Court dismissed Plaintiffs' trade secret claim. ECF No. 60. However, the Court granted Plaintiffs 30 days to amend. Apple is cognizant of, and objects to, any protective order provisions that will hinder its ability to defend against a future trade secret misappropriation claim.

> SOURCE CODE or HIGHLY CONFIDENTIAL – ATTORNEYS'
> EYES ONLY shall be presumptively deemed to present good
> cause for filing under seal. Nothing in this section shall in any way
> limit or detract from this Protective Order's requirements as to
> Source Code.

### 1. **Plaintiffs' Position**

Plaintiffs propose adopting the language from this Court's Model Order. *Compare* Powell Decl., Ex. 1 (Model Order) at 3 *with* Ex. 2 (Plaintiffs' proposal) at 2. Plaintiffs' proposal (and the Model Order) are consistent with the Local Rules, which state that merely designating information "confidential pursuant to a protective order is ***not*** sufficient justification for filing under seal; a person seeking to file such documents under seal must comply with L.R. 79-5.2.2(b)." L.R. 79-5.2.2(a)(i) (emphasis added). Apple's proposal deviates from the Model Order and Local Rules by including a provision that the designation of information as highly confidential or source code is "presumptively deemed to present good cause for filing under seal." *See* Powell Decl., Ex. 4 at 2-3. Plaintiffs' objection was based solely on the Court's Model Order and Local Rules.

### 2. **Defendant's Position**

Apple's proposal does not alleviate the parties' obligations to follow the procedures set forth in Local Civil Rule 79-5 relating to "CONFIDENTIAL" information. Apple's proposal merely recognizes that because this case will involve the production of source code, highly confidential competitive information, and potentially trade secrets, elevated designations for such material necessarily raise a presumption of good cause for filing under seal. Throughout the course of the parties' negotiations, Plaintiffs' counsel stated that while they would not advocate for Apple's proposed language, they would indicate to the Court that they do not object to it. *See, e.g.*, Samplin Decl. Ex.

G, at 153 [June 3, 2020 Email from A. Powell] (stating, with respect to Section 3 of the protective order, that Plaintiffs "will not include Apple's edits in our draft, but we will indicate that we do not oppose the changes if the Court deems them acceptable"). Apple therefore was surprised when Plaintiffs failed to indicate their non-opposition in this submission.

The public's right of access is important, and clearly upheld in Apple's proposed protective order (Samplin Decl. Ex. A [Apple's proposed protective order]; *see also* Powell Decl. Ex. 4 [parties' combined proposed protective orders]), but such a right "is not absolute and can be overridden given sufficiently compelling reasons for doing so." *Foltz v. State Farm Mut. Auto Ins. Comp*., 331 F.3d 1122, 1135 (9th Cir. 2003). Compelling reasons include to protect "sources of business information that might harm a litigant's competitive standing" (*Ctr. For Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016), *cert. denied sub nom. FCA U.S. LLC v. Ctr. for Auto Safety*, 137 S. Ct. 38 (2016) (citing *Nixon v. Warner Commc'ns, Inc*., 435 U.S. 589, 597 (1978)), and "to prevent disclosure of materials . . . including, *but not limited to*, trade secrets or other confidential research, development, or commercial information" (*Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002) (emphasis in original)). The parties' agreed definitions of the elevated designations of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" *presumptively* fall into those categories worthy of protection:

- "'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY': extremely confidential and/or sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party."

- "'HIGHLY CONFIDENTIAL – SOURCE CODE': extremely

sensitive "Confidential Information or Items" representing computer code, scripts, assembly, binaries, object code, source code listings (e.g., file names and path structure), descriptions of source code (e.g., descriptions of declarations, functions, and parameters), object code listings, and Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip, disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party . . . ."

Compelling reasons are fairly certain to justify the filing under seal of any materials marked with these elevated designations in *this* case—where highly confidential information, source code, competitive information, and potentially trade secrets are at issue. Put differently, Plaintiffs have no cognizable argument that materials satisfying the above definitions should be available to the public. In this case where Plaintiffs have asserted that Apple has misappropriated *Plaintiffs'* purported trade secrets (and may continue to attempt to assert their misappropriation claim even though it has thus far been dismissed), Plaintiffs should be equally interested in a presumption preventing disclosure of their highly confidential and source code information. That is why Apple's proposed language—which would have bilateral effect—makes sense. And if a situation arises in which the presumption is too broad for a particular application, the presumption can be rebutted.

Further, this presumption will relieve administrative burden for both the parties and the Court, as it will curtail numerous submissions seeking to justify highly confidential and source code redactions where the parties are in agreement about those redactions. Apple's proposal would limit the need for briefing on this topic to those situations where the designations actually are disputed. Apple's proposed approach makes practical and efficient sense in a

case where the parties already know that information designated highly confidential will feature source code and potentially trade secrets that should be redacted in Court submissions.

**B.     Sections 5.5 and 6 – Use of Protected Material at Trial**

The Parties' dispute on Sections 5.6 and 6 is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

5.     SCOPE

. . .

5.6     Any use of Protected Material at trial shall be governed by ~~the orders of the trial judge and other applicable authorities~~ <u>a separate agreement or order</u>. This Order does not govern the use of Protected Material at trial.

6.     DURATION

Even after Final Disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing, a court order otherwise directs, or the information was made public during trial. For purposes of this Order, "Final Disposition" occurs after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals. ~~Once a case proceeds to trial, information that was designated or maintained pursuant to this protective order used or introduced as an exhibit at trial becomes public and will be presumptively available to all members of the public, including the press, unless compelling reasons supported by specific factual findings to proceed otherwise are made to the trial judge. *See Kamakana*, 447 F.3d at 1180-81 (distinguishing "good cause" showing for sealing documents~~

produced in discovery from "compelling reasons" standard when merits-related documents are part of court record).Pursuant to Paragraph 5.6 above, any use of Protected Material at trial shall be governed by a separate agreement or order.

**1.** **Plaintiffs' Position**

Plaintiffs again propose adopting this Court's Model Order on these provisions. *Compare* Powell Decl., Ex. 1 (Model Order) at 6 *with* Ex. 2 (Plaintiffs' proposal) at 7.[2] Plaintiffs' proposal (and the Court's Model Order) properly recognize that a separate order from the trial Court will govern the use of Protected Material at trial and that Ninth Circuit precedent imposes a higher burden to seal information introduced at trial. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1180-81 (9th Cir. 2006). This language is commonly included in protective orders. *See, e.g.*, *Glaukos Corp. v. Ivantis, Inc.*, No. 8:18-cv-00620-JVS-JDE, Dkt. No. 36 (C.D. Cal. Aug. 3, 2018) (Powell Decl., Ex. 21) at 3.

Apple proposes modifying these provisions to improperly provide that the treatment of protected material at trial may be governed by a separate "agreement" without the Court's input. Powell Decl., Ex. 4 at 7. Apple also removes the Court's recitation of the Ninth Circuit standard for sealing material at trial. *See Kamakana*, 447 F.3d at 1180-81; *Oliner v. Kontrabecki*, 745 F.3d 1024, 1025–26 (9th Cir. 2014) ("In keeping with the strong public policy favoring access to court records, most judicial records may be sealed only if the court finds 'compelling reasons.'"). Apple provides no justification for

---

[2] The parties agreed to minor changes to the Model Order to make clear that information designated pursuant to the Protective Order but ***not*** introduced at trial remains protected by the Protective Order. *Compare* Powell Decl., Ex. 1 (Model Order) at 6 *with* Ex. 2 (Plaintiffs' proposal) at 7.

removing this Court's correct recitation of the law. The Court should adopt its standard language and reject Apple's unsupported modifications.

### 2. **Defendant's Position**

Apple does not take issue with the Ninth Circuit law cited in this Court's Model Order, or with the uncontroverted fact that there is a strong public policy favoring access to court records, including at trial. Apple's simple position is that the parties are far off from any trial in this action—having yet to even produce a single confidential document in this case—and therefore the Court should defer entering orders about how the parties' highly sensitive information, including source code and potentially trade secrets, will be treated at a trial. Indeed, this Court's instructions to parties about protective orders states that "no proposed discovery protective order should purport to control the handing of materials at trial," and is precisely what Apple seeks to avoid.

Notably, the Northern District's Model Order for cases "involving patents, highly sensitive confidential information and/or trade secrets" provides that "[a]ny use of Protected Material at trial shall be governed by a separate agreement or order"—which is the exact language Apple is proposing here. Samplin Decl. Ex. D, at 59 [Northern District of California's Model Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets ("N.D. Cal. Model Order") § 3]; *see also id.* Ex. A, at 12 [Apple's proposed protective order provision for this case]. While Apple recognizes that the Central District of California has not published its own distinct Model Order for cases "involving patents, highly sensitive confidential information and/or trade secrets" (this case involves all three), courts within the Central District routinely follow the Northern District's model.[3] *See, e.g.*, *Masimo Corp. v. Mindray DS USA Inc*, No. 12-02206-CJC

---

[3] The Northern District also uses a default Patent Local Rule 2-2 Interim

(JPRx), 2014 WL 12597116 (C.D. Cal. Apr. 15, 2014) (affirming the magistrate judge's protective order, which was based on the Northern District of California's model protective order and provided for a two-year prosecution bar); *see also* Order at 2, *Freed Designs, Inc. v. Sig Sauer, Inc.*, No. 13-9570-ODW (AGRx) (C.D. Cal. July 9, 2014), ECF No. 28 ("The Court is agreeable to the entry of a protective order that tracks the language of the Northern District of California's Patent Local Rule 2-2 Model Protective Order."); Order at 3, *Black Hills Media, LLC v. Pioneer Corp.*, No. 13-05980-SJO (PJWx) (C.D. Cal. Sep. 24, 2013), ECF No. 59 ("If the parties are unable to agree on a protective order, the Court will enter the Northern District of California's Patent Local Rule 2-2 Interim Model Protective Order."). The Northern District's position on this issue is sensible given the type of Protected Material that will be involved in, and the current posture of, this case. Indeed, Plaintiff Masimo has previously agreed in this District to the Northern District language that Apple is proposing for this case. *See* Joint Stip. at 9, *Masimo Corp. v. Mindray DS USA Inc*, 2014 WL 12597116 (C.D. Cal. Feb. 13, 2014), ECF No. 111.

To be clear, Apple does not dispute that this Court will need to be involved in any decision about how Protected Material will be treated at trial, should a trial occur in this action. Apple therefore is confused by Plaintiffs' suggestion that Apple has recommended that the parties reach agreements about trial procedure without this Court's involvement. To the contrary, Apple fully expects the Court to be instrumental in deciding this issue—with final say about

---

Model Protective Order, which courts within the Central District routinely follow as well. *See* N.D. Cal., Patent Local Rule 2-2 Interim Model Protective Order, https://www.cand.uscourts.gov/wp-content/uploads/forms/model-protective-orders/Interim-Patent-Protective-Order-Rule-2-2.docx (last visited June 24, 2020). The two Northern District model orders are identical in relevant respects.

how the parties' Protected Material will be treated at trial. Apple simply proposes that the Court adopt the Northern District's proffered method for handling the treatment at trial of Protected Material in cases like this one—that is, deferring the issue until the case gets closer to trial, as most litigations resolve before that point, thereby mooting this issue completely.

**C.     Section 9.1 – Export Regulations**

The Parties' dispute on Section 9.1 is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

9.1     Basic Principles.

. . .

Protected Material must be stored and maintained by a Receiving Party <u>at a location in the United States and</u> in a secure manner that ensures that access is limited to the persons authorized under this Order. ~~The Receiving Party will take any reasonably necessary precautions to comply with applicable United States Export Administration Regulations.~~ <u>To ensure compliance with applicable United States Export Administration Regulation, Protected Material may not be exported outside the United States or released to any foreign national (even if within the United States).</u>

**1.     Plaintiffs' Position**

Plaintiffs again proposed adopting the Court's Model Order, which does not discuss export regulations. Apple insists that no Protected Material may be taken to *any* foreign country or provided to *any* foreign national (even within the United States). Powell Decl., Ex. 4 at 12. Apple attempted to justify those provisions by referencing U.S. export regulations. But Apple's proposal goes far beyond what is required by U.S. export regulations. For example, Apple's proposal would prevent a Canadian citizen who is a U.S. permanent resident

-15-

from serving as outside counsel or as an expert witness. Apple's proposal would also prevent the parties from taking depositions in *any* other country. Additionally, Apple's proposal could be interpreted as requiring outside counsel to discriminate based on national origin.

During the conference of counsel, Apple argued the parties could consider deviating from Apple's draconian language on a case-by-case basis. For example, Apple suggests Plaintiffs could ask Apple's permission to designate a foreign national as an expert, or to take Apple's materials outside the country for depositions. Apple thereby proposes giving itself improper leverage to deny Plaintiffs their choice of expert witness and prevent depositions that Apple deems undesirable.

The Court should adopt Plaintiffs' proposal, which would accomplish Apple's stated goals without providing Apple undue leverage. Plaintiffs propose requiring the Receiving Party to take whatever procedures may be reasonably necessary to comply with applicable export regulations. Such language is common when one or more parties alleges protected material may be subject to export regulations. Indeed, Apple has recently *stipulated* to similar language. *Pinn, Inc. v. Apple Inc.*, Case No. 8:19-cv-01805-DOC-JDE, Dkt. No. 60 (C.D. Cal. March 13, 2020) (Powell Decl., Ex. 17) at 16 ("Each party receiving Protected Material shall comply with all applicable export control statutes and regulations").

## 2. Defendant's Position

Apple's proposal regarding export control is not controversial. It provides that Protected Material should not be exported outside the United States or to any foreign national in order to comply with federal regulation and protect the parties' sensitive information. This provision should not impose *any* burden on Plaintiffs, given that all of Plaintiffs' counsel are located in the United States and discovery regarding the claims and defenses in this case

should not involve sending sensitive information abroad.[4]  By the opposite token, it should be clear why these provisions are critical—given the heightened risk of misuse and unauthorized access of information in countries outside the United States, differing views of business sensitivity and privacy, and Apple's inability to obtain justice, enforce the protective order, or reverse or prevent ongoing harm should its Protected Material be compromised outside the United States.

Plaintiffs' quote from one of Apple's "recently *stipulated*" protective orders does not support their position on this issue.  While Plaintiffs are correct that the protective order they reference from an entirely different case says that the parties "shall" comply with export rules, Plaintiffs omit the lengthy remainder of the paragraph, which is key:  "No party receiving Protected Material may allow it to leave the territorial boundaries of the United States of America or to be made available to any foreign national who is not (i) lawfully admitted for permanent residence in the United States or (ii) identified as a protected individual under the Immigration and Naturalization Act (8 U.S.C. 1324b(a)(3))."  The protective order further provided an exception from export prohibitions where non-source code Protected Material is reasonably necessary for use in a deposition in a foreign country.  Apple offered in this case to consider reasonable carve outs to address Plaintiffs' concerns, but Plaintiffs did not propose a workable solution.

Instead, Plaintiffs took the position that they should have the right to export Apple material outside the United States at will—but that they would

---

[4] If the case eventually requires depositions or experts located outside the United States, the parties can revisit the issue at that time, and attempt to reach agreement about the export of specific materials to the extent necessary.  Thus far, Plaintiffs have not expressed that they anticipate any need to hire experts or conduct depositions abroad.

agree to a provision requiring them to give notice to Apple before doing so, and then Apple would have the burden of proving that Plaintiffs should be prevented from exporting. Plaintiffs' proposal was unworkable, because it would have imposed on Apple the burden to prevent transfer of Apple materials abroad, when the burden should be on *Plaintiffs* to justify any such transfer in the first place. Notably, in proposing this notice provision, Plaintiffs at least recognized that Apple could be harmed by unfettered disclosure of its confidential material abroad. Yet, once the parties failed to reach agreement on this export provision, Plaintiffs reverted to their original proposal (sans any notice of export), which leaves Apple's confidential material *without any protections* in this regard.

It is not clear to Apple why Plaintiffs are insisting on a provision to permit export of Apple's data outside the United States—particularly given that when Apple asked Plaintiffs if they have export plans, Plaintiffs responded in the negative. Apple has yet to hear a compelling justification for this dispute, and therefore continues to seek sensible and definitive protections against the export of its sensitive materials abroad, particularly given the information that will be at issue in this case.[5]

---

[5] The theft of intellectual property by foreign companies and nationals is an indisputable issue for American companies, including Apple; in fact, it is considered one of the greatest threats to American businesses and the U.S. economy. The United States has responded in kind, including with the White House Annual Intellectual Property Report from 2019 discussing the country's focus on combatting the theft of trade secrets by international actors (https://www.whitehouse.gov/wp-content/uploads/2020/04/IPEC-2019-Annual-Intellectual-Property-Report.pdf), the Department of Justice Task Force on Intellectual Property, which "confront[s] the growing number of domestic and international intellectual property (IP) crimes" (https://www.justice.gov/iptf), and a trade deal with China entered earlier this year to, among other things, protect trade secrets, increase the scope of liability for trade secret misappropriation, and prohibit unauthorized disclosure by government personnel or third parties in proceedings (Economic and Trade Agreement

**D.      Section 9.2(b) and (j)– Disclosure of Confidential Information**

The Parties' dispute on Sections 9.2(b) and (j) is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

9.2      Disclosure of "CONFIDENTIAL" Information or Items.

. . .

(b) ~~the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action~~ Not more than three (3) representatives of the Receiving Party who are officers or employees (including House Counsel) to whom disclosure is reasonably necessary for this Action, provided that:  (a) each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; and (b) no unresolved objections to such disclosure exist after proper Pre-Access Disclosure Requirements are provided to all Parties and all objections have been resolved under the Objections Process under 9.2(c) below;

. . .

~~(j) during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the form attached as Exhibit A hereto; and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A),~~

---

Between the United States of America and the People's Republic of China: Phase 1 (January 15, 2020)).  In this context, Apple's proposal to limit export of its extremely sensitive materials is not only reasonable, but critical.

unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

### 1. **Plaintiffs' Position**

Plaintiffs again propose adopting the Court's Model Order. *Compare* Powell Decl., Ex. 1 (Model Order) at 10-11 *with* Ex. 2 (Plaintiffs' proposal) at 13, 16. Courts in this district routinely include similar provisions in protective orders. *See, e.g.*, *Uniloc 2017 LLC v. Netflix, Inc.*, No. 8:18-cv-02055-GW-DFM, Dkt. No. 80 (C.D. Cal. Aug. 5, 2019) (Powell Decl., Ex. 19) at 3-4 (permitting disclosure of confidential material to "[t]he officers, directors, and employees of the receiving party to whom disclosure is reasonably necessary, and who have signed the Agreement to Be Bound (Exhibit A)" and "During their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the Agreement to be Bound (Exhibit A)"); *XR Comms., LLC v. D-Link Systems, Inc.*, No. 8:17-cv-00596-JVS-JCG, Dkt. No. 113 (C.D. Cal. Mar. 6, 2018) (Powell Decl., Ex. 20) at 4 (same).

Apple proposes limiting Section 9.2(b) to only three individuals who must be disclosed *and* approved by the opposing party. Powell Decl., Ex. 4 at 13. Apple completely strikes Section 9.2(j). *Id.*, Ex. 4 at 16. During the conference of counsel, Apple provided no justification for its proposals. Instead, it asserted its proposal on 9.2(b) was a "standard" Apple provision and that it has not agreed to a provision similar to Section 9.2(j) in other cases. Apple's asserted preference is not sufficient justification for departing from the Court's Model Order.

Plaintiffs' proposal (and the Model Order) are reasonable. Section 9.2(b) allows the parties to show "Confidential" information to party employees if it is

reasonably necessary. For example, litigants routinely designate non-public communications between the parties as "Confidential" because they need not be kept confidential from employees of the opposing party, but should not be made public. Section 9.2(j) allows the parties to show "Confidential" information to witnesses during their depositions if it is "reasonably necessary" and the individual agrees to be bound by the Protective Order. These provisions are entirely appropriate because they apply only to the lowest tier of "Confidential" information. *See* Section 9.3 and 11, *infra*. More sensitive information, like trade secrets, may be designated "Highly Confidential – Attorneys' Eyes Only" or "Highly Confidential – Source Code" and may not be viewed by individuals authorized under Sections 9.2(b) and (h). That is one important purpose of a multi-tier Protective Order. The Court should adopt Plaintiffs' proposal.

### 2. **Defendant's Position**

The parties dispute how many and which types of individuals should have access to Protected Material on behalf of the Receiving Party. Plaintiffs' proposal seeks an unlimited grant of access to all of their officers, directors, and employees under the ambiguous cover of "reasonably necessary" without any advanced designation. Under this proposal, Apple would have no way of knowing, for example, how many people at Masimo have been shown Apple's confidential information or any basis to discern how Masimo concluded that disclosure to those people was "reasonably necessary." Apple should not be forced to provide that type of discretion to an adversary.

Apple's proposal provides an appropriate safeguard against Plaintiffs applying the vague "reasonably necessary" language in a way that would unnecessarily expose Apple's confidential information to Plaintiffs' employees. In addition, a restriction on the number of employees that may view confidential materials is appropriate to further limit the risk of misuse. Plaintiffs' proposal does not afford Apple either protection and such protections are absolutely

-21-

necessarily.  For example, if Plaintiffs have a team of engineers currently working on the development of a potentially competing product (e.g., a competing smartwatch), Apple should have the right to oppose disclosure *before* Plaintiffs determine that disclosure of Apple's confidential information to that team of engineers is reasonably necessary.  Under Plaintiffs' proposal, Plaintiffs could provide this sensitive information to a team of four or more such engineers if Plaintiffs deemed it reasonably necessary.  Under Plaintiffs' proposal, Apple would not have a right to oppose this disclosure, nor would it even know that the disclosure occurred.

Plaintiffs have submitted provisions from protective orders in other cases that do not limit the number of people with access to confidential information and that do not provide a right of objection, but those provisions are inapposite here.  In contrast to the parties in the cited cases, Apple is one of the largest technology companies in the world, whose value lies in the protection and security of its proprietary and confidential information.  The need to limit the exposure and dissemination of its confidential information is apparent and should be observed.  In expanding the number of Plaintiffs' recipients of Apple's confidential information, Plaintiffs' proposal unnecessarily extends the vulnerability and exposure of Apple's confidential information beyond any level necessary to the prosecution of this case.

Moreover, to support their proposal, Plaintiffs identify a practice that some litigants "routinely designate non-public communications between the parties as 'Confidential' . . . because they should not be made public."  In so doing, Plaintiffs disregard the purpose of confidentiality designations as protections against the improper access to private information.  Plaintiffs' argument also neglects the fact that a majority of documents that receive the "confidential" designation receive do so not merely because they should be kept private, but also because they should be kept confidential from employees of the

-22-

opposing party—particularly where those employees may be working on a future competitive product or are involved in some other work that would provide the Producing Party with a basis to object.

Plaintiffs' Section 9(j) proposal is objectionable for many of the same reasons as their proposal in 9(b). Like 9(b), Plaintiffs' proposal in Section 9(j) would enable disclosure of confidential information to a deposition witness without any prior ability for Apple to object. Section 9(j) permits Plaintiffs to transmit Apple's "confidential" information to *any* individual who signs an acknowledgement form, even one signed on the spot during a deposition. Denying Apple the ability to raise any objections to that person seeing Apple's confidential information would create an end-run around the provisions needed in 9(b) for Plaintiffs' employees and is even more important if Plaintiffs seek to depose Apple's competitors, business partners, or others who should not be permitted to review Apple confidential information at all. Plaintiffs' proposed Section 9(j) would enable *anyone* that Plaintiffs call for deposition in this case to view Apple's non-public information. That is not how the process is supposed to work—and it risks improper disclosure of Apple's highly sensitive information and gamesmanship on the part of Plaintiffs in noticing depositions in this case. The Court should reject Plaintiffs' proposed Section 9(j) in its entirety.

**E.**    **<u>Section 9.2(f) – Disclosure of Confidential Information</u>**

The Parties' dispute on Section 9.2(f) is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

(f) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgement and Agreement to Be Bound" (Exhibit A)~~, provided that the name of~~

any e-discovery vendors must be disclosed at least fourteen (14) ~~days before providing the e-discovery vendor with Protected Material so that the Producing Party has an opportunity to object pursuant to the objection procedure set forth in subparagraph (c) above;~~

### 1. **Plaintiffs' Position**

Plaintiffs propose the parties provide advance disclosure of e-discovery consultants and an opportunity to object. This provision is not present in the Model Order, but is necessary in this case to prevent a specific risk associated with Apple using Consilio LLC as an e-discovery consultant. Consilio working for Apple in this case is highly problematic because Consilio worked for Plaintiffs in matters that Apple considers directly relevant to this case. Consilio thereby obtained access to Plaintiffs' highly confidential and privileged information *relevant to this case*.

In particular, Plaintiffs retained Consilio in *True Wearables*, which Apple asserts is a related case that involves issues "nearly identical" to this case. Powell Decl. ¶ 11 and Ex. 24 (Apple's Notice of Related Cases) at 3. Apple has already pursued discovery concerning *True Wearables*, including requesting "All documents produced by Masimo and Cercacor in [*True Wearables*]." Powell Decl. ¶ 13. In its role as Plaintiffs' e-discovery consultant in that "nearly identical" case, Consilio collected Plaintiffs' highly confidential and privileged information. *Id.* ¶ 11. Consilio hosted Plaintiffs' documents in a database, including non-produced documents that were not responsive and/or privileged. *Id.* While Plaintiffs have since terminated Consilio's involvement in *True Wearables*, Consilio still had access to those files around the time Plaintiffs filed this lawsuit. *Id.*

Consilio was also Plaintiffs' forensic expert in *Masimo Corp. v. Sotera Wireless Inc.*, No. 30-2013-00649172-CU-IP-CJC (Cal. Sup. Ct.) ("*Sotera*").

-24-

*Id.* ¶ 12. In *Sotera*, Consilio analyzed forensic images of devices used by former Masimo employees who left to work for Sotera. *Id.* One of those employees was a Masimo executive involved in both Masimo's engineering and marketing departments. *Id.* Consilio even **testified** for Masimo at trial in that matter. *Id.* Two individual forensic consultants who worked for Plaintiffs in *Sotera* are presently Consilio's "Senior Director – Digital Forensics & Expert Services" and "Senior Manager in Digital Forensics and Expert Services (DFES group)." *Id.*, Ex. 9. *Sotera* is currently stayed and Consilio retains access to Plaintiffs' information because the matter has not yet been dismissed. *Id.* ¶ 12.

Similar to *True Wearables*, Apple initially asserted *Sotera* was relevant to this case by seeking production of "All Documents and Communications relating to the trade secrets which You alleged were misappropriated by the defendants in [*Sotera*]." *Id.* ¶ 13. Apple claims it no longer asserts *Sotera* is relevant because Plaintiffs indicated they are not aware of overlapping trade secrets in the two cases. *Id.* ¶ 14. However, Apple expressly reserved the right to pursue discovery regarding *Sotera*. *Id.* Additionally, Apple cannot deny that Consilio obtained privileged information in *Sotera* regarding other related issues, including Masimo's strategies for litigating trade secret cases.

During the conference of counsel, Plaintiffs told Apple this provision was necessary only to prevent Consilio from working for Apple on this case. *Id.* Plaintiffs told Apple they would agree to remove this provision if Apple agreed not to use Consilio. *Id.* Doing so would both protect Plaintiffs' information **and** reduce the risk of Apple's counsel being disqualified if Consilio intentionally or inadvertently conveyed to them Plaintiffs' privileged information. Apple refused, but never explained why Apple must use Consilio instead of the dozens of other available e-discovery consultants. *Id.* Apple's insistence on using Consilio is troubling. Consilio apparently has no concern about working for Plaintiffs in *True Wearables* and working for Apple in this

-25-

case. Consilio presents an unacceptably high risk of improperly disclosing Plaintiffs' confidential and privileged information to Apple, even inadvertently, as well as unquestionably presenting an appearance of impropriety and conflicted loyalty.

Disqualification is appropriate where both (1) a confidential relationship exists and (2) confidential information was disclosed to the consultant. *Broadcom Corp. v. Emulex Corp.*, 2010 WL 11465478, at \*1 (C.D. Cal. Apr. 5, 2010) (J. Selna). The Court should "also consider prejudice to both parties and whether disqualification would promote the integrity of the legal process." *Id.* (granting motion for disqualification). As discussed above, Consilio had a confidential relationship with Plaintiffs and received confidential and privileged information from Plaintiffs in cases that Apple asserts are relevant to this matter. While the prejudice to Plaintiffs of improper disclosure would be severe (and the appearance of impropriety is already highly concerning), Apple will suffer no prejudice from simply using a different e-discovery consultant. *See id.* (finding no prejudice because the defendant could find a new expert). Requiring Apple to use a different consultant would promote the integrity of the legal process by avoiding actual and apparent conflicts of interest.

Accordingly, the Court should bar Apple from using Consilio in this case, or at least adopt Plaintiffs' proposal so that Plaintiffs have an opportunity to object if Apple attempts to retain Consilio in connection with this case.

## 2. **Defendant's Position**

Plaintiffs' efforts to disqualify Apple's discovery vendor Consilio through a proposed protective order provision is unprecedented and inappropriate. If Plaintiffs have concerns about Apple's use of Consilio in this case, they should attempt to satisfy their burden of disqualifying Apple's discovery vendor through a properly noticed motion on the issue. A proposed protective order provision is not the appropriate vehicle.

Indeed, Apple suspects that Plaintiffs are attempting to backdoor this issue in through a proposed protective order provision precisely because the case law does not support a request for a discovery vendor's disqualification under the circumstances present here. In *Gordon v. Kaleida Health*, for example, a discovery vendor (D4) provided services to both the plaintiffs and the defendants *in the same matter*, and the court determined there was "no need to protect Defendants from the risk of possible prejudicial disclosure of Defendants' confidential information as a result of D4's providing ESI consulting services to Plaintiffs." 2013 WL 2250506, at *10 (W.D.N.Y. May 21, 2013). Here, Consilio did not provide any discovery services to Plaintiffs in connection with the present lawsuit—and, therefore, this is even more of a clear-cut case than the *Gordon* case involving services provided to both the plaintiffs and the defendants in the *same* matter. Consilio's services for Plaintiffs on the related *True Wearables* lawsuit were minimal and short-lived. And Consilio's services for Plaintiffs in the *Sotera* lawsuit were for a matter that Plaintiffs have steadfastly represented has nothing to do with this case.

With respect to the *True Wearables* case, to which Apple is not a party, approximately a year and a half ago, Plaintiffs' counsel sent Consilio a comparatively small amount of data. Consilio processed and hosted that data from Plaintiffs *but never reviewed* the data. After a few months of no activity, Plaintiffs' counsel asked Consilio to return the data—because Plaintiffs had decided to host the data through their outside counsel—and Consilio complied. Consilio later informed Plaintiffs' counsel that it would work with Apple, not Plaintiffs, on any matters involving Masimo where Apple is a defendant (including this case). Consilio no longer has possession of any of Plaintiffs' data from *True Wearables*, did not review any of the small amount of *True Wearables*-related data that it previously received from Plaintiffs, and has not performed any work for Plaintiffs in connection with the present case.

1     Plaintiffs' reference to the *Sotera* matter is even more perplexing. As
2  Apple explained to Plaintiffs during multiple meet and confers, the *only* reason
3  Apple propounded a discovery request in this case that mentioned the *Sotera*
4  matter is because *Sotera* involved allegations of trade secret misappropriation
5  by Plaintiff Masimo. Given the vague nature of Plaintiffs' allegations of their
6  purported trade secrets in this case, Apple had no basis to rule out the potential
7  relevance of any other claim of trade secret misappropriation brought by either
8  Plaintiff, including by Plaintiff Masimo in the *Sotera* case. As soon as Plaintiffs
9  represented to Apple that they *did not believe* that any of the trade secrets
10 alleged in *Sotera* overlap with the purported trade secrets alleged in this case,
11 Apple agreed not to further pursue the request—but reserved all rights because
12 Plaintiffs' representation was not a conclusive or definitive one. In any event,
13 Plaintiffs' repeated position has been that *Sotera* is not relevant to this lawsuit,
14 and Apple has not pressed the issue (and has no plans to do so, particularly now
15 that the trade secret claim has been dismissed). Plaintiffs' reference to *Sotera* in
16 this submission therefore is surprising, to say the least—as is Plaintiffs'
17 suggestion that Apple would agree or concede that Consilio has obtained
18 "privileged information" about "Masimo's strategies for litigating trade secret
19 cases" that would preclude Consilio from serving as a discovery vendor for
20 Apple in this case. Apple *disagrees* with that assertion, and believes the case
21 law is clear that the facts at issue here do not create a conflict that warrants
22 Consilio's exclusion, let alone an unprecedented protective order provision with
23 the same effect.

24     Plaintiffs' efforts to disqualify Apple's discovery vendor through a
25 proposed protective order provision are meritless. If Plaintiffs have non-
26 frivolous concerns about Apple's use of Consilio in this case, they can file a
27 properly noticed motion. That will give Apple a full and fair opportunity to
28 respond—including with citations to all of the case law that refutes Plaintiffs'

argument, with a response to Plaintiffs' bald assertion that Apple "will suffer no prejudice from simply using a different e-discovery consultant," which is false, and with a declaration from Consilio that, among other things, refutes Plaintiffs' suggestion that Consilio has reviewed or continues to have possession of Plaintiffs' privileged information.[6]  A disqualification ruling does not belong in a protective order provision.[7]

**F.**     **Section 9.3 – Use of Highly Confidential Information**

The Parties' dispute on Section 9.3 is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

9.3.     Disclosure     of     "HIGHLY     CONFIDENTIAL     – ATTORNEYS'  EYES  ONLY"  Information  or  Items.     Unless otherwise  ordered  by  the  court  or  permitted  in  writing  by  the Designating  Party,  a  Receiving  Party  may  disclose  any  information or  item  designated  "HIGHLY  CONFIDENTIAL  –  ATTORNEYS' EYES  ONLY"  only  to  the  individuals  identified  in  Paragraphs  9.2 (a),  (c)-(i),  ~~who  are  not  competitive  decision  makers  of  a  Party.~~ provided  that  such  Outside  Counsel  under  Paragraph  9.2(a)  is  not involved  in  competitive  decision-making,  as  defined  by  U.S.  Steel v.  United  States,  730  F.2d  1465,  1468  n.3  (Fed.  Cir.  1984),  on

---

[6] Apple  has  not  submitted  a  declaration  from  Consilio  with  this  Joint Stipulation  given  its  position  that  this  dispute  is  not  ripe  for  adjudication  in connection  with  protective  order  briefing.   Apple  certainly  will  be  prepared  with such  a  declaration  if  and  when  the  Court  considers  this  issue,  and  therefore respectfully  requests  an  opportunity  to  submit  such  a  declaration  at  the appropriate time—before the Court decides this issue.

[7] Adding  a  "notice  and  objection"  provision  like  the  one  alternatively proposed  by  Plaintiffs  will  serve  only  to  kick  the  can  down  the  road  on  the  same (meritless) issue, and therefore should be rejected.

behalf of a Party or a competitor of a Party and such proposed
Outside Counsel did not, at the time the lawsuit was filed or within
the previous two (2) years from the date the lawsuit was filed, have
a business or ownership interest in a Party (i.e., was not a Board
member, Director, officer, employee, or hold a title with a Party).
Additionally, whether Plaintiffs' trade secret disclosure under
California Code of Civil Procedure Section 2019.210 is designated
"CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS'
EYES ONLY," access to said disclosure shall be permitted for
three (3) Apple House Counsel.

### 1. Plaintiffs' Position

Plaintiffs again propose language similar to the language this Court
adopted in *True Wearables*. *Compare* Powell Decl., Ex. 2 (Plaintiffs' proposal)
at 16 *with* Ex. 13 (*True Wearables*) at 8. Apple replaced that language with a
proposal that (a) seeks to prevent certain of Plaintiffs' ***outside*** counsel from
accessing "Highly Confidential" information, yet (b) seeks to allow three of
Apple's ***in-house*** counsel access to Plaintiffs' "Highly Confidential" trade secret
information in Plaintiffs' Section 2019.210 statement. *Id.*, Ex. 4 at 17. The
Court should adopt Plaintiffs' proposal on both issues.

### a. The Court Should Reject Apple's "Relationship" Restriction

Apple proposes language that is nearly identical to the language this
Court previously rejected in *True Wearables*. In that case, the defendant asked
this Court to allow access only to individuals who, within two years prior to
filing suit, did "not have a business or ownership interest in a Party (*i.e.*, not
competitive decision makers, Board members, Directors, employees, owners,
shareholders, or affiliates of a Party)." Powell Decl., Ex. 12 at 9. The
defendants were trying to prevent Stephen Jensen from participating in the case.

After extensive briefing, this Court rejected the defendants' proposal and adopted language similar to the language Plaintiffs propose in this case, which bars only "competitive decisionmakers." *Id.*, Ex. 13 at 8. This Court then rejected the defendants' direct challenge to Jensen and concluded he was ***not*** a "competitive decisionmaker." *Id.*, Ex. 14 at 5-6.

Here, Apple proposes language that is nearly identical to the language this Court previously rejected. In particular, Apple seeks to allow access only to individuals who, within two years prior to filing suit, did not "have a business or ownership interest in a Party (i.e., was not a Board member, Director, officer, employee, or hold a title with a Party)." Powell Decl., Ex. 4 at 17. Apple has not explained why this provision is necessary or provided any factual or legal basis, whatsoever, for this provision. Indeed, Apple recently stipulated to a protective order without such language. *See Pinn* (Powell Decl., Ex. 17) at 8. It appears Apple is proposing this unusual language to exclude Jensen because Apple added the language to its proposal as the parties in *True Wearables* were litigating the same issue. Moreover, it does not appear that any of Plaintiffs' other outside counsel could be impacted by this provision. Thus, while Plaintiffs are in the dark as to Apple's reason or basis for this provision, Plaintiffs will direct their arguments towards Jensen in particular.

To restrict access to highly confidential information, Apple has the burden of showing an unacceptably high risk of inadvertent disclosure. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992). Apple also bears "the burden of showing that specific prejudice or harm will result from the disclosure of each document (or item of information) that it seeks to protect." *Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*, 242 F.R.D. 552, 554 (C.D. Cal. 2007) (citing *Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1130 (9th Cir. 2003)). The district court must balance the risk of the disclosure against the risk to the receiving party that the denial of access would

impair prosecution of its claims. *Brown Bag*, 960 F.2d at 1470; *see also In re Deutsche Bank,* 605 F.3d 1373, 1380 (Fed Cir. 2010). Apple cannot satisfy any of those requirements here.

### i.     **Apple Cannot Show Jensen Will Inadvertently Disclose Protected Material**

To evaluate the risk of inadvertent disclosure, the Court should examine "the factual circumstances surrounding [Jensen's] activities, association, and relationship with a party." *U.S. Steel*, 730 F.2d at 1468. A "crucial factor" is whether Jensen is "involved in 'competitive decisionmaking'; that is advising on pricing or design 'made in light of similar or corresponding information about a competitor.'" *Brown Bag*, 960 F.2d at 1470 (quoting *U.S. Steel*, 730 F.2d at 1468 n.3). Here, this Court recently determined Jensen is not involved in "competitive decisionmaking" for Plaintiffs. Powell Decl., Ex. 14 at 5-6; *see also* Jensen Decl. ¶ 10; Kiani Decl. ¶ 6.

A protective order also mitigates risk because courts presume attorneys will abide by protective orders and not expose themselves to contempt sanctions. *Coventry First LLC v. 21st Servs.*, No. 05CV2179-IEG (NLS), 2005 WL 8173350, at *5 (S.D. Cal. Dec. 22, 2005) ("[I]n the absence of any actual evidence of bad faith, the Court declines to presume [the attorneys] will disclose [the] confidential information, thereby breaching the protective order and exposing themselves to contempt sanctions.") (*citing Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1211 (Fed. Cir. 1987)). Not only have the parties agreed to a protective order, they even agree on barring Jensen and the rest of Plaintiffs' litigation team from engaging in patent prosecution.

At most, Apple may show Jensen is in contact with corporate officers who make competitive decisions. But that is not enough. *See Matsushita Elec. Indus. Co. v. United States*, 929 F.2d 1577, 1580 (Fed. Cir. 1991) (finding "largely irrelevant" regular contact with corporate officials who make policy or

competitive decisions).  Rather, "the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party . . . must govern any concern for inadvertent or accidental disclosure."  *U.S. Steel*, 730 F.2d at 1468 ("Whether an unacceptable opportunity for inadvertent disclosure exists, however, must be determined, as above indicated, by the facts on a counsel-by-counsel basis").

Interaction with decision makers is insufficient because the issue does not turn on the functions of the people a lawyer meets with, but on the functions of the lawyer.  As the Federal Circuit observed, "the standard is not 'regular contact' with other corporate officials who make 'policy,' or even competitive decisions, but 'advice and participation' in 'competitive decisionmaking.'"  *Id.* at 1580.  Lead litigation lawyers regularly report to boards and corporate officers about ongoing litigation, despite the lawyers having access to highly confidential information and the boards and officers engaging in competitive decision-making.  The point is that the people who have access to the highly confidential information are not the people making the competitive decisions.  If the standard were physical proximity to, or regular interaction with, competitive decision makers, no lead litigation counsel would ever see confidential information.

Apple cannot meet its burden of showing Jensen, or any other lawyer at Knobbe Martens, poses an unacceptably high risk of inadvertent disclosure.

### ii.    **Apple Cannot Show It Will Suffer Harm**

Apple also has not even attempted to meet its "burden of showing that specific prejudice or harm will result from the disclosure of each document (or item of information) that it seeks to protect."  *Nutratech*, 242 F.R.D. at 554.  Apple's proposed language does not specify any particular information Jensen should be excluded from viewing.  Apple also failed to explain any particular harm that Apple would suffer from Jensen viewing such information.

### iii. **Apple's Restriction Would Prejudice Plaintiffs**

Exclusion of Jensen would also prejudice Plaintiffs. *See In re Deutsche Bank,* 605 F.3d 1373, 1380 (Fed. Cir. 2010) ("[T]he district court must balance [the risk of disclosure] against the potential harm to the opposing party from restrictions on that party's right to have the benefit of counsel of its choice"). Jensen has served as Masimo's outside counsel for over twenty-five years. *See* Kiani Decl. ¶ 4; Jensen Decl. ¶ 2. During that time, Jensen has represented Plaintiffs in numerous cases involving Masimo's direct competitors and the exchange of highly confidential information. Jensen Decl. ¶ 3. Plaintiffs rely heavily on Jensen to evaluate and manage all of their intellectual property litigation and other litigation concerning the companies' technologies. *Id.* ¶¶ 6-7; Kiani Decl. ¶¶ 4-5. Over the years, Jensen has gained extensive knowledge of Plaintiffs' technology. This has given him a unique ability to readily discern when others are using that technology, assuming, of course, he can see the relevant evidence. No other lawyer has Jensen's breadth of understanding of Plaintiffs' technology and trade secrets. Kiani Decl. ¶¶ 5, 9; Jensen Decl. ¶ 5-6, 9-10.

Although numerous opponents have tried to deprive Masimo of Jensen's leadership in litigation, they have never succeeded. Every court to address this issue has allowed Jensen access to highly confidential materials or information. Jensen Decl. ¶ 4. Indeed, this Court twice rejected the *True Wearables* defendants' attempts to bar Jensen from accessing highly confidential information. Powell Decl., Exs. 22 and 23. Additionally, Apple's outside counsel in this case unsuccessfully attempted to exclude Jensen on behalf of another client in another case. *Id.*, Ex. 18 at 24-25. This recurrence suggests that Plaintiffs' adversaries, including Apple, are well aware that depriving Plaintiffs of their experienced choice of counsel would severely prejudice Plaintiffs.

Jensen is accustomed to abiding by protective orders, appropriately handling and maintaining designated materials, and ensuring that he never reveals those materials, or the confidential information they contain, to his clients.  Jensen Decl. ¶¶ 5 and 9; Kiani Decl. ¶ 10.  Moreover, when appropriate, Jensen uses the best safeguard possible—he refrains from engaging in any discussion that could arguably implicate any information revealed to him under a protective order—as should any other outside lawyer.  Jensen Decl. ¶ 5; Kiani Decl. ¶ 10.  Because the actual prejudice to Plaintiffs outweighs any alleged—although unexplained—harm to Apple, this Court should reject Apple's proposed restriction.

### b.  **The Court Should Reject Apple's Attempt to Provide Plaintiffs' Trade Secrets To Its In-House Counsel**

Apple argued Plaintiffs' Section 2019.210 disclosure must be detailed and that this particular case requires a "more exacting level of particularity" than standard trade secret cases.  Powell Decl., Ex. 25 at 21 n.1.  Despite advocating for such a high standard, Apple insists that three of its ***in-house*** lawyers should have access to the highly confidential trade secrets set forth in Plaintiffs' Section 2019.210 disclosure.  *Id.*, Ex. 4 at 17.  Apple provides no support or justification for requiring Plaintiffs to disclose ***trade secrets*** to Apple employees.   Apple's proposal thus creates a significant risk of further misappropriation of Plaintiffs' trade secrets.

"Requiring a party to rely on its competent outside counsel does not create an 'undue and unnecessary burden'" *See Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 529 (N.D. Cal. 2000) (rejecting Intel's request to allow its in-house counsel access to highly confidential material because Intel was represented by competent outside counsel); *see also CytoSport, Inc. v. Vital Pharm., Inc.*, 2010 WL 1904840, at *2 (E.D. Cal. May 10, 2010) (rejecting request for outside counsel to view confidential material because forcing

defendant to "rely on competent outside counsel does not create an 'undue and unnecessary burden,' sufficient to demonstrate actual prejudice"). Here, Apple is represented by Gibson Dunn, which claims it has 20 offices, 1300+ lawyers, and "129 years of excellence." *See* https://www.gibsondunn.com (accessed June 19, 2020). Apple will suffer no prejudice from denying Apple's in-house counsel access to Plaintiffs' trade secrets.

Apple's proposal also highlights its continued lopsided approach to litigating this case. Apple is simultaneously seeking to prevent one of Plaintiffs' ***outside*** counsel from accessing all highly confidential information while providing three of Apple's ***in-house*** counsel access to Plaintiffs ***trade secrets***. *See* Powell Decl., Ex. 4 at 17. Nothing supports such a one-sided and inequitable proposal. The Court should adopt Plaintiffs' proposal.

### 2. <u>Defendant's Position</u>

The parties have two disputes over which individuals should receive access to another party's highly confidential information. *First*, Apple seeks entry of a protective order that denies access of its highly confidential and sensitive "attorneys' eyes only" documents to a party's outside counsel who are competitive decision-makers or have served on a party's Board of Directors within the last two years. This request is a reasonable and necessary measure to protect Apple's valuable technical information from inadvertent disclosure or misuse. *Second*, to the extent Plaintiffs replead their trade secret claim, Apple seeks to have a limited number of its in-house counsel receive access to Plaintiffs' alleged trade secrets, given the integral role in-house counsel is playing in the defense of this matter.

a. **This Court Should Bar Those Who are Either Competitive Decision-Makers Or Are Present Board Members Or Were Board Members Within The Last Two Years From Accessing Confidential Materials**

The parties agree that this action will involve disclosure of trade secret and other confidential and proprietary information; the parties disagree as to whether outside counsel who are competitive decision-makers or serve on a party's Board of Directors should be permitted access to highly confidential documents designated by Apple as "Attorneys' Eyes Only." In support of their argument that such persons should have access, Plaintiffs rely on their briefing in the *True Wearables* case. However, Apple was not a party to that briefing and Plaintiffs' attempts to liken this case to *True Wearables* fails in any event. In *True Wearables*, Plaintiffs asserted trade secret and infringement claims against the six-year old medical device start-up True Wearables, Inc. This is an inapposite comparison to the present case with Apple, one of the largest technology companies in the world. The accused products in this case, the Apple Watch Series 4 and 5, are extremely successful and valuable products already in the wearables space—far different than the fledgling startup in *True Wearables*.

Ninth Circuit precedent is clear that district courts may preclude access to a party's confidential and proprietary information from those involved in an opposing party's competitive decision-making. *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992). The Federal Circuit has defined what "competitive decision-making" means,[8] and, to avoid any doubt as

---

[8] Competitive decision-making is "[s]horthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions . . . made in light of similar or corresponding information about a competitor." *See U.S. Steel*

to its meaning, Apple's proposal explicitly incorporates that definition. Mr. Jensen, is a long-time contributor to Plaintiffs' competitive decision-making. Mr. Jensen's extensive participation in Plaintiffs' business enterprises creates an untenable risk that his access to Apple's confidential information will lead to the inadvertent disclosure to those most capable of misusing Apple's information. But excluding competitive decision makers alone is not enough to resolve the dispute, because Plaintiffs argue that one of their outside counsel, Mr. Jensen, should not meet the Court's definition of a competitive decision maker, a position that Apple strongly disputes. Rather than defer that issue to a later discovery dispute, Apple's proposed protective order also explicitly excludes current Board Members and those that have served in that role within the last two years, which would exclude Mr. Jensen since he is a current member of the Board of Directors of Plaintiff Cercacor. Restricting access from Board members has been consistently upheld in cases in which courts have been asked to impose those restrictions because participation at Board meetings "present[s] an unacceptable opportunity for the inadvertent disclosure of confidential information" because of the conflicting duty of disclosure inherent in Board service and an individual's consent to abide by a protective order. *See, e.g.*, *Meridian Enters. Corp. v. Bank of Am. Corp*., 2008 WL 474326, at \*4 (E.D. Mo. Feb. 15, 2008); *Norbrook Labs., Ltd. v. G.C. Hanford Mfg. Co*., 2003 WL 1956214 (N.D.N.Y. April 24, 2003).

Here, good cause exists for granting Apple's protective order. *First*, the nature and pervasive scope of Mr. Jensen's involvement with Plaintiffs' business enterprises cannot be adequately separated from his concurrent role in Plaintiffs' wider litigation licensing business in a way that will otherwise ensure the confidentiality of Apple's information. *Second*, Mr. Jensen's service on

---

*Corp. v. United States*, 730 F.2d 1465, 1468 & n.3 (Fed. Cir. 1984).

Plaintiff Cercacor's Board of Directors and its attendant fiduciary duty to that Board evince the conflict of interests inherent in allowing him access to Apple's confidential trade secret information. *Third*, the balance of hardships clearly favors Mr. Jensen's exclusion in this case. The harm to Apple of inadvertent disclosure of its most confidential information to Plaintiffs is substantial, given that this information is its "crown jewel," disclosure to other companies of which would create substantial harm to Apple. *See* Corp. Couns. Gd. To Software Trans. § 8:2; *see also, e.g.*, *buySAFE, Inc. v. Google, Inc*., No. 3:13-CV-781, 2014 WL 2468553, at *2 (E.D. Va. June 2, 2014). By contrast, Mr. Jensen's exclusion would pose little harm to Plaintiffs, who employ a variety of highly competent counsel (over fifteen partners and associates have appeared on filings and meet and confers in this case) to represent them in this and other cases. Accordingly, an order preventing Mr. Jensen and others similarly situated from viewing Apple's confidential information will not meaningfully impair Plaintiffs' ability to conduct this litigation; it will simply prevent the inadvertent misuse or disclosure in other existing or potential litigation of confidential information obtained from this litigation.

### i. The Relationship Between Mr. Jensen And Plaintiffs Presents An Unacceptable Risk Of Inadvertent Disclosure Of Confidential Information In This Case

The decision to exclude counsel from discovery requires an assessment in each case of "the risk of inadvertent disclosure." *In re Matsushita Electric Industrial Co. v. United States*, 929 F.2d 1577, 1579 (Fed. Cir. 1994) (quoting *U.S. Steel Corp.*, 730 F.2d at 1468). That risk, in turn, "must be determined . . . by the facts on a counsel-by-counsel basis." *Id*. Although the Federal Circuit has stated that the key inquiry in evaluating that risk involves determining whether the lawyer is involved in his client's "competitive decision making," it

has also made clear that that term is simply "shorthand" for broader considerations relevant to assessing the risk of inadvertent disclosure, such as "a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions." *U.S. Steel Corp*. 730 F.2d at 1468 n.3. As one court has noted, "involvement in competitive decisionmaking, while an important consideration [under *U.S. Steel Corp*.], is not necessarily the exclusive one," and proper analysis under *U.S. Steel* involves a "careful and comprehensive inquiry" into the lawyer's "role in the affairs of [his client's] company, his association and relationship with those in the corporate hierarchy who are competitive decisionmakers, and any other factor that enhances the risk of inadvertent disclosure." *Autotech Techs. Ltd. P'ship v. AutomationDirect.com, Inc*., 237 F.R.D. 405, 408 (N.D. Ill. 2006).

Therefore, the determination of whether Mr. Jensen may be excluded from access to confidential information involves a factual inquiry into whether his "activities, association, and relationship" with Plaintiffs "are such as to involve counsel's advice and participation in any or all" of Plaintiffs' decisions in operating their licensing business. *U.S. Steel Corp.*, 730 F.2d at 1468 n.3.

Over the course of Mr. Jensen's longstanding representation of Plaintiffs, Mr. Jensen has served as both a day-to-day and long-term strategy advisor. He has evaluated the companies' intellectual property portfolios and overseen legal due diligence, and he also served as Masimo's acting Senior Vice President of OEM Business, Business Development and General Counsel. *See* Biography of Steve Jensen, *accessible at* https://www.knobbe.com/attorneys/steve-jensen. It was in this capacity that Mr. Jensen made business decisions relating to the manufacture of Masimo's equipment and components.

In a 2020 declaration describing Mr. Jensen's role as Plaintiffs' attorney, the former Chief Technology Officer at Masimo Corporation stated Mr. Jensen "would advise Masimo about when to file patent applications, where to file

patent applications, whether to pursue continuations, and other decisions related to creating patent portfolio value." *Masimo Corp. v. True Wearables*, No. 3:18-CV-02001-JVS-JDE, Dkt. 82-6, Ex. 6 at ¶ 4 (Mar. 16, 2020). Indeed, Mr. Jensen is listed as an attorney of record before the USPTO on each of the patents-in-suit and thus, may become a witness in this litigation, as the prosecuting patent attorney may sometimes be deposed regarding the statements made to the Patent and Trademark Office.

Taken together, these facts create a situation in which Mr. Jensen's experience as a business decision-maker is impossible to separate from his role as Plaintiffs' outside counsel. Given the depth of his involvement and investment in Plaintiffs' business, Mr. Jensen should not be permitted to access Apple's highly confidential information.

### ii. The Nature of Mr. Jensen's Service on Cercacor's Board of Directors Conflicts With The Obligation To Remain Silent Under A Protective Order

Directors are fiduciaries of a corporation and, as such, occupy positions of trust and confidence on which corporate officials must rely. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 180 (3d Cir. 1992). A significant part of a director's duty of loyalty is to disclose to other decision-makers all information in his possession germane to a transaction at issue. *Id.*

A Board member's duty of disclosure arises from a director's general duties of care, good faith, and loyalty to the corporation, and the duty of disclosure requires that directors "disclose fully and fairly all material information within the board's control." *Skeen v. Jo-Ann Stores*, 750 A.2d 1170 (Del. 2000). The American Bar Association's Corporate Director's Guidebook states that corporate directors have the following duty of disclosure:

> As fiduciaries, directors have an obligation to take reasonable steps to ensure that shareholders are

> furnished with all relevant material information known to the directors … . Likewise, directors also have the duty to information their fellow directors and management about information known to the director that is relevant to corporate decisions.

ABA Section of Business Law, Corporate Director's Guidebook Fifth Edition, § 3(C)(4) (2007) (Exhibit A).

Apple's proposal seeks to exclude outside counsel with service on a Party's or a competitor of a Party's Board of Directors. The reason for this is because such counsel bear fiduciary duties of disclosure to their Board of Directors, yet must also abide by their ethical obligations as attorneys to the protective order. To permit these oft-conflicting commitments unnecessarily jeopardizes the security of Apple's most sensitive information.

Plaintiffs seek to invite these very risks by requesting that Mr. Jensen, member of both Cercacor's Board of Directors and Masimo's Board of Directors of the Masimo Foundation for Ethics, Innovation and Competition in Healthcare, receive access to Apple's highly confidential information. Plaintiffs' contentions that Mr. Jensen does not make business decisions would mean that he does not fulfill his obligations to either Board as a director and thus, cannot mean what they said. Directors are required to make decisions related to the business of the corporation in order to fulfill their fiduciary obligations. Mr. Jensen's duties of disclosure inherent in his service on the Boards of both Plaintiffs directly fan the flames of the risks created in granting Mr. Jensen access to Apple's protected information. The confidential technical information about Apple's business which Mr. Jensen learns through an "attorneys' eyes only" disclosure constitutes information that would be relevant to a variety of Plaintiffs' corporate decisions. As such, Mr. Jensen's fiduciary duty to disclose such information would obligate Mr. Jensen to inform the other directors of Cercacor about any confidential "attorneys' eyes only" information

-42-

of Apple's that was also relevant to Cercacor's corporate decisions. Accordingly, Courts have recognized that there is direct conflict between outside counsel's obligations to abide by a protective order and his simultaneous fiduciary duty to the corporation as a Board member and have uniformly refused to allow access by individuals such as Mr. Jensen to the highly confidential/trade secret information of another party. *See Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co*. 2003 WL1956214, at *5 (N.D.N.Y. Apr. 24, 2003) ("While the court does not doubt [outside counsel and Board member] Mr. Heath's assurances that he will abide by the protective order, it cannot endorse a situation that places Mr. Heath's ethical obligations as an attorney in direct competition with his fiduciary duty to Hanford); *see also Meridian Enters. Corp. v. Bank of Am. Corp*., 2008 WL474326, at *3 (E.D. Mo. Feb. 15, 2008) (finding "that the risk of inadvertent disclosure is great because Mr. McMullin is both a shareholder of [Plaintiff] and a member of its Board of Directors, and therefore has a fiduciary duty to [Plaintiff] to disclose all information in his possession germane to issues discussed").

To the extent Plaintiffs may argue that they have no interest in Apple's underlying technology, that is false. Plaintiffs' contention is belied by the fact that Cercacor sells a device that "measures hemoglobin" and "are synced via Bluetooth to an app which can display trends over time." *See Medgadget @ CES 2016: Cercacor's Ember Non-Invasive Hemoglobin Sensor*, Scott Jung, Medgadget (Jan. 8, 2016), https://www.medgadget.com/2016/01/medgadget-ces-2016-cercacors-ember-non-invasive-hemoglobin-sensor.html; *see also Athletes can know their hemoglobin instantly with Ember* (Jan. 18, 2016), https://www.sportswearable.net/athletes-can-know-their-hemoglobin-instantly-with-ember/ ("Cercacor has produced a wearable which will provide you with real-time data."). Plaintiffs' product is designed to interact with Apple's iPhone and the accused Apple Watch also interacts with the iPhone. The likelihood of

-43-

future overlap between the technology that the accused products practice and those of the products that Plaintiffs sell is increasing. Indeed, Cercacor's product and the Apple Watch are both wearables and are targeted to the consumer market. The wearable market is growing, especially as it relates to health-related applications. It is incredibly unfair and prejudicial for Cercacor to have a member of its Board of Directors with a fiduciary duty to steer that company in the right direction to have had access to Apple's highly confidential technical, financial, and source code information.

Assume, for example, that Cercacor is considering introducing a new feature that technical documentation from Apple shows to have been rejected as unsuccessful. By virtue of his access to Apple's highly confidential financial, technical, and source code information, Mr. Jensen knows that Apple has already rejected that feature as being unworkable. As a result, Mr. Jensen, sitting in the Board meeting considering the issue, knows that Cercacor will be wasting million dollars if it proceeds. Does he tell the Board and the shareholders? Mr. Jensen has a fiduciary duty to advise the company and at the same time, a prohibition from disclosing that information under the protective order in this case. That is why the concern is so acute for Board members. As explained in *Norbrook Labs*, Board members and those with competitive decision-making should be denied access to Apple's "attorneys' eyes only" highly confidential technical, financial, and source code information. 2003 WL1956214, at *5.

And where source code is involved, the risk is even greater. Indeed, Plaintiffs cite no cases in this court or the Federal Circuit where Board members of a reviewing party are subsequently allowed to view a competitor's guarded technical information.

### iii. The Risk Of Inadvertent Disclosure of Apple's Confidential Information Outweighs Harm To Plaintiffs, If Any

This litigation involves sensitive and highly confidential technology present in the Accused Products (the Apple Watch Series 4 and 5). Thus, the confidential technical documents at issue is information that Apple must be careful not to allow to fall into the hands of those that may be interested in developing products that may compete with or otherwise exploit the technology in the Accused Products or drafting patent claims to read on those products. Any disclosure or improper use of Apple's confidential information by Mr. Jensen or any outside counsel, even if inadvertent, would severely harm Apple by revealing its proprietary technology. Indeed, Apple could lose the entire competitive advantage offered by its proprietary features if its source code were disclosed.

We emphasize, of course, that our concern is inadvertent disclosure. We do not question Mr. Jensen's integrity as an officer of the court. But as the Federal Circuit has stated, "[i]nadvertence, like the thief-in-the-night, is no respecter of its victims." *U.S. Steel Corp.*, 730 F.2d at 1468. Where counsel is, like Mr. Jensen, an integral part of his client's litigation licensing enterprise, and is exposed to confidential information that may aid in advancing that enterprise, "compartmentalization of protected information is . . . 'a feat beyond the compass of ordinary minds.'" *Autotech*, 237 F.R.D. at 408 (quoting *Shepard v. United States*, 290 U.S. 96 (1933)). Or, to put it more bluntly: "once knowledge has been gained, a person cannot perform a prefrontal lobotomy on himself." *Id.* at 408 n.3.

The issue of inadvertent disclosure can take on additional significance in cases involving patents and trade secrets when the firm representing a party in litigation matters also represents the party in patent prosecution and other

intellectual property matters related to patent prosecution. *See In re Deutsche Bank Tr. Co. Ams.*, 605 F.3d 1373 (Fed. Cir. 2010). While Mr. Jensen says that he no longer is involved in patent prosecution for Plaintiffs, his partners and associates are. He works regularly with those colleagues in patent litigation matters and the risk of inadvertent disclosure within his firm is thus a significant concern. For attorneys involved in "making strategic decisions on the type and scope of patent protection that might be available or worth pursuing, . . . competitive decisionmaking may be a regular party of their representation." *Id.* at 1380. In such instances, "the risk of inadvertent disclosure of competitive information learned during litigation is therefore much greater." Even where an attorney is not directly involved in patent prosecution, these attorneys may have "the opportunity to influence the direction of prosecution," and the risk of inadvertent disclosure may nonetheless arise. *Id.*

In short, granting Mr. Jensen unrestricted access to confidential information about Apple's methods and systems would expose Apple to endless litigation, even if Mr. Jensen conducts himself entirely in good faith.

By contrast, denying Mr. Jensen access to confidential information would impose no significant harm on Plaintiffs. Plaintiffs retain highly competent outside counsel to conduct their litigation, and have more than adequate resources to retain additional counsel if they deem it necessary. Plaintiffs have other highly competent counsel that have been involved in this case since its beginning (and even in previous cases). Indeed, Mr. Jensen is not designated as lead counsel—that is the role of Mr. Joseph Re. The availability of competent outside counsel is typically sufficient to defeat any claim that exclusion of in-house counsel would unduly prejudice the nonmoving party. *See, e.g., A. Hirsch Inc. v. United States*, 657 F. Supp. 1297, 1305 (Ct. Int'l Trade 1987) ("in view of retained counsel's competence, it is not clear how plaintiffs' position will be prejudiced by excluding [in-house] counsel from access"); *Brown Bag*

*Software*, 960 F.2d at 1471 (finding no prejudice where outside counsel had sufficient time and resources to review confidential materials and was competent). The balance of hardships, therefore, strongly favors denying Mr. Jensen access to Apple's confidential information.

### b. **Apple's Provision Providing Trade Secrets to its In-House Counsel**

Plaintiffs argue that Apple's proposal would result in a one-sided approach whereby its in-house counsel would receive access to Plaintiffs' alleged trade secrets and Plaintiffs' in-house counsel would not receive the same. But by nature of their trade secret misappropriation claim, Plaintiffs have alleged that Apple already has possession of their trade secrets.[9] If Plaintiffs' trade secret information is already in Apple's possession, as Plaintiffs contend, then Plaintiffs should have no qualms about sharing that information with the persons at Apple directly involved in the defense of this lawsuit. And as Apple has explained repeatedly, a very limited number of Apple's in-house counsel need access to this information in a case where Plaintiffs have asserted a serious, high exposure claim of trade secret misappropriation against the company. Contrary to Plaintiffs' assertions, the competence of Apple's outside counsel does not absolve in-house counsel's need for access to this information.

Apple's in-house counsel is integrally involved in the defense of this lawsuit. They need to know the purported trade secrets that Plaintiffs contend were misappropriated (to the extent Plaintiffs replead that any purported trade secrets were in fact misappropriated by Apple) in order to advise on strategy—and, more importantly, to guide document collection and production, which

---

[9] Of course, Apple recognizes that the trade secret claim has been dismissed from this case. However, because the claim was dismissed with leave to replead, Apple wants to make sure that this protective order adequately serves its interests and needs in the event the claim is repleaded.

depends on the purported trade secrets actually at issue, if any. In-house counsel is overseeing document discovery, and therefore needs to know the identity of the purported trade secrets so that it can manage the search for responsive documents, and also prevent disclosure of *Apple's* trade secrets.

Moreover, Apple genuinely does not believe that it possesses any of Plaintiffs' trade secrets—nor does Apple want any of Plaintiffs' trade secrets. In-house counsel needs to know what information Plaintiffs claim Apple misappropriated, if any, so that it can address the allegations internally and excise any alleged trade secrets from Apple products as soon as possible. In-house counsel cannot do so without any information about the particular, alleged trade secrets at issue in this case—thereby hindering Apple's ability to mitigate damages to the extent Plaintiffs have a valid misappropriation claim, as is Apple's duty under the law. For these reasons, it is incredibly common for parties in trade secret cases to agree that a limited number of in-house counsel will have access to attorneys' eyes only information, including the plaintiffs' Section 2019.210 disclosure. *See, e.g.*, Transcript of Case Management Proceedings, *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA (N.D. Cal. March 16, 2017), ECF. No. 63 (permitting disclosure of highly confidential materials to one in-house counsel upon his or her agreement to be bound by the protective order); Order at 10, *Bladeroom Grp. Ltd., et al., v. Facebook, Inc.*, No. CV-15-01370-EJD (N.D. Cal. Aug. 3, 2015) ECF No. 54 (permitting disclosure of attorneys' eyes only material to two designated in-house counsel who have no involvement in competitive decision-making, to whom disclosure is reasonably necessary for the litigation, and who have agreed to be bound by the protective order); *MMCA Grp., Ltd. v. Hewlett-Packard Co.*, 2009 WL 595537, at *1 (N.D. Cal. Mar. 5, 2009) (granting two of defendants' in-house attorneys access to attorneys' eyes only material given small risk of disclosure where the "attorneys who would be given access to AEO materials would be

litigation attorneys with no involvement" in defendants' business affairs); *see also, e.g.*, Order at 10, *Mastronardi Int'l Ltd. v. SunSelect*, 18-cv-00737-AWI-JLT, 2019 WL 3996608, at *9 (E.D. Cal. Aug. 23, 2019) ECF No. 60 (permitting disclosure of attorneys' eyes only material to any number of designated in-house counsel who are not involved competitive decision-making, to whom disclosure is reasonably necessary for the litigation, and who have agreed to be bound by the protective order).

## G.  Section 10 – Prosecution Bar

The Parties' proposals regarding the patent prosecution bar in Section 10 are not amenable to convenient redlining and are presented separately below.

**Plaintiffs' proposal:**

After the adoption of this provision by the parties, Outside Counsel of Record and any person associated with a Party who receive a Producing Party's material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order who accesses or otherwise learns of, in whole or in part, said material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order shall not prepare, prosecute, supervise, advise, counsel, or assist in the preparation or prosecution of any patent application seeking a patent on behalf of the Receiving Party or its acquirer, successor, or predecessor in the field of non-invasive monitoring during the pendency of this Action and for two years after final termination of this action.  To avoid any doubt, "prosecution" as used in this paragraph does not include representing or advising a Party before a domestic or foreign agency in connection with a reissue, ex parte

reexamination, covered business method review, *inter partes* review, opposition, cancelation, or similar proceeding; though in connection with any such agency proceeding involving the patents-in-suit, Outside Counsel of Record for a Receiving Party shall not: (i) participate in the preparation, prosecution, supervision, advice, counsel, or assistance of any amended claims; (ii) reveal a Producing Party's Protected Material to any prosecuting reexamination counsel or agent; or (iii) use a producing Party's Protected Material for any purpose not permitted by Section 5. The applicability of this provision is to be determined on an individual-by-individual basis such that an individual attorney who has not received Protected Material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" is not restricted from undertaking any activities by virtue of this provision even if said individual attorney is employed by or works for the same firm or organization as an individual who has received such Protected Material.

**Apple's proposal:**

Plaintiffs' Language: Absent written consent from the Producing Party, any individual who receives access to "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information shall not be involved, directly or indirectly, in the (i) prosecution of patents or patent applications relating to non-invasive physiological monitoring, including without limitation the patents at issue in this action and any patent or application claiming priority to or otherwise related to the patents at issue in this action,

before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office") or (ii) the acquisition of patents (including patent applications), or the rights to any such patents or patent applications with the right to sublicense, relating to the functionality, operation, and design of non-invasive physiological monitoring technologies. For purposes of this Paragraph, "prosecution" means advising on, consulting on, preparing, prosecuting, drafting, editing, and/or amending of patent applications, specifications, claims, and/or responses to office actions, or otherwise affecting the scope of claims in patents or patent applications relating to the functionality, operation, and design of non-invasive physiological monitoring technologies (generally or as described in any patent in suit), before any foreign or domestic agency, including the United States Patent and Trademark Office;. To avoid any doubt, "prosecution" as used in this Paragraph does not include providing patent prosecution counsel with public information to submit to the Patent Office. "Prosecution" as used in this Paragraph also does not include representing a party before a domestic or foreign agency in a patent challenge (including, but not limited to, a reissue protest, *ex parte* reexamination, *inter partes* reexamination, *inter partes* review, covered business method review, post-grant review or other patent office proceedings in the United States or elsewhere on behalf of a patentee but only if no amendments to the claims are made to the patent or patent application by anyone during that process. If an individual that has had access to "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL –

SOURCE CODE" information and participates in a reissue protest, *ex parte* reexamination, *inter partes* reexamination, *inter partes* review, covered business method review, post-grant review, or other patent office proceedings in the United States or elsewhere on behalf of a patentee, the claims of the patent involved in such proceedings may not be amended by anyone without violating this protective order. These prohibitions are not intended to and shall not preclude counsel from participating directly or indirectly in proceedings on behalf of a Party challenging the validity of any patent. This Prosecution Bar shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information is first received by the affected individual and shall end two (2) years after final resolution of this action, including all appeals.

### 1. **Plaintiffs' Position**

The parties agree to add a prosecution bar to the Court's Model Order.[10] Plaintiffs propose the Court adopt a prosecution bar based on the language from *True Wearables*. *Compare* Powell Decl., Ex. 2 (Plaintiffs' proposal) at 17-18 *with* Ex. 13 (*True Wearables*) at 18-19. The *True Wearables* prosecution bar is straightforward and properly allows both sides' outside counsel to participate in post-grant patent proceedings before the Patent Office, but bars outside counsel from participating in amending the claims. Thus, Plaintiffs' proposal prevents the inadvertent use of highly confidential information to amend claims without substantively prejudicing the patentee.

---

[10] Apple's proposal incorrectly and confusingly begins with the phrase "Plaintiffs' Language." That appears to be a typographical error.

1    Apple has previously **stipulated** to similar language in other cases. *Pinn*
2    (Powell Decl., Ex. 17) at 15 (permitting "participation in inter partes review
3    except to amend claims"). This Court also routinely includes similar language.
4    *See Netflix* (Powell Decl., Ex. 19) at 13 (permitting participation in *inter partes*
5    *review* proceedings, "but counsel may not participate in the drafting of any new
6    or amended claims in any such proceeding"); *XR Comms.* (Powell Decl., Ex. 20)
7    at 13 (same); *Uniloc 2017 LLC v. Microsoft Corp.*, No. 8:18-cv-02224-AG-
8    JDE, Dkt. No. 30 (C.D. Cal. May 2, 2019) (Powell Decl., Ex. 23) at 10 (same).
9    Indeed, other courts have rejected this same proposal by Apple in other cases,
10   and adopted restrictions similar to Plaintiffs' proposal. *LBT IP I LLC v. Apple*
11   *Inc.*, No. 1-19-cv-01245, Dkt. No. 28 (D. Del. April 27, 2020) (Powell Decl.,
12   Ex. 15) at 1 (rejecting Apple's proposal and allowing outside counsel to
13   participate in Patent Office proceedings as long as they are not involved in
14   "direct or indirect claim drafting or claim amendment activity"); *Achates*
15   *Reference Publishing, Inc. v. Symantec et al.*, No. 2:11-cv-294-JRG-RSP, Dkt.
16   No. 447 (E.D. Tex. August 20, 2013) (Powell Decl., Ex. 16) at 1-2 (same).

17   Nevertheless, Apple proposes a one-sided and problematic prosecution
18   bar. *See* Powell Decl., Ex. 4 at 18-20. Apple proposes that its outside counsel
19   can always participate in all aspects of challenging Plaintiffs' patents, but
20   Plaintiffs' outside counsel can be involved in such proceedings "***only if*** no
21   amendments to the claims are made to the patent or patent application by
22   anyone during this process." *Id.* at 19 (emphasis added). Apple also proposes
23   that, if Plaintiffs' outside counsel is involved in post-grant proceedings, "the
24   claims of the patent involved in such proceedings may not be amended ***by***
25   ***anyone*** without violating this protective order." *Id.* (emphasis added). Apple's
26   proposal unfairly forces Plaintiffs to choose between preserving their right to
27   amend their claims during post-grant proceedings or using their preferred
28   counsel.

Plaintiffs proposal also makes clear that the prosecution bar applies "on an individual-by-individual basis," such that only individual attorneys who actually receive access to Highly Confidential information are barred from patent prosecution. *Id.*, Ex. 2 at 17-18. Other individuals at the same firm who have not received highly confidential information should not be restricted because such individuals present no risk of inadvertent use or disclosure. This language should be included to avoid any later argument that access by individual attorneys disqualifies the entire firm. The Court should adopt Plaintiffs' proposal.

## 2.  **Defendant's Position**

The parties agree that a prosecution bar is appropriate for this matter because individuals granted access to confidential information, especially source code and other technical information, should not be permitted to use that information to prosecute patents. *See generally In re Deutsche Bank Tr. Co. Ams.*, 605 F.3d 1373, 1381 (Fed. Cir. 2010). The parties disagree, however, as to two issues. *First*, Apple proposes that the prosecution bar provisions should preclude attorneys and others that have seen Protected Material from participating in any Patent Trial Appeal Board ("PTAB") proceedings such as *inter partes* review ("IPR") proceedings that will involve claim amendments to avoid the risk of inadvertent disclosure of that confidential information during the process of amending the claims. *Second*, Apple's position is that the prosecution bar should extend to the acquisition of patents because just as patent prosecution involves the risk that an attorney might inadvertently use another party's confidential information to procure patent rights in new and pending applications based on that other party's confidential information, so too can that attorney assist in buying patents that relate to the other party's confidential information. Plaintiffs did not address this issue in their portion of the joint stipulation, but had previously rejected it during the meet and confer process.

a. **The Prosecution Bar Should Prohibit Those Who Receive Apple's Confidential Information From Participating in *Inter Partes* Review Unless The Patent Owner Does Not Attempt to Amend Its Claims**

The parties dispute the extent to which the protective order should bar outside counsel who access another party's highly confidential materials from participating in IPR proceedings that involve claim amendments. Plaintiffs contend that such counsel should have full ability to participate in all non-amendment aspects of such proceedings. Apple does not object to Plaintiffs' counsel's participation in IPR proceedings that will not involve claim amendments. In that type of proceeding, the claims cannot be narrowed or modified in a way that improperly uses the other party's confidential information. But Apple does object to an attorney that receives confidential, highly confidential and source code material from an opponent from then being an attorney in an IPR where the claims of the patent the attorney is representing will be amended. For purposes of discussion, we will discuss this in the context of Apple's highly confidential information and Plaintiffs' counsel seeking to participate in representing Plaintiffs in IPRs that involve amendments. In that context, Apple's objections to allowing Plaintiffs' counsel that view its confidential, highly confidential, and source code information from participating in any IPR proceeding where the claims of the patent are amended is grounded in the same concern as barring the same counsel from actually amending the claims—the risk of inadvertent disclosure of information.

Plaintiffs' reliance on previous protective orders where Apple has stipulated not to include this additional protection misses the point. Prior experience has demonstrated to Apple the need for this additional level of protection due to the appearance of impropriety that arises in litigation counsel who are barred from working on claim amendments being co-counsel with

amendment counsel in the IPR and both sets of counsel signing onto the
pleadings with the PTAB. The concern is particularly acute here because
Plaintiffs are highly litigious companies that that have shown time and again
that they are willing to sue companies they view as a threat to their business.
Knobbe Martens, Plaintiffs' law firm in this litigation (and virtually all of
Masimo's intellectual property cases), also handles all of Plaintiffs' patent
prosecution and is intimately involved in their corporate strategy and decision-
making. The need for heightened protection of Apple's Protected Material is
particularly important here.

This issue has arisen in many cases, and courts frequently fashion
protective orders that prohibit the participation by litigation counsel in any post-
grant review proceedings, in any capacity.[11] Apple's proposal is much less
restrictive, as it would permit Plaintiffs' litigation counsel who have had access
to Protected Material to participate in post-grant review proceedings that do not
involve claim amendments. To be clear, counsel that have seen Protected
Material have to make a choice at the time an IPR or other PTAB proceeding is
filed. That counsel can choose to appear as counsel for a patent owner in an IPR

---

[11] *See, e.g., Boston Sci. Corp. v. Cook Grp. Inc.*, No. 15-980, 2017 WL
547903, at *2 (D. Del. Feb. 10, 2017); *Telebuyer, LLC v. Amazon.com, Inc.*, No.
13-CV-1677, 2014 WL 5804334, at 5-*7 (W.D. Wash. July 7, 2014); *buySAFE,
Inc. v. Google, Inc.*, No. 3:13-CV-781, 2014 WL 2468553, at *2 (E.D. Va. June
2, 2014); *Bear Creek Technologies Inc. v. Verizon Services Corp.*, No. 12-CV-
600, 2012 WL 3190762, at *2 n.6 (D. Del. July 25, 2012); *Pragmatus AV, LLC
v. Facebook, Inc*, No. 5:11-CV-2168, 2012 WL 12355858, at *1 (N.D. Cal. July
5, 2012); *55 Brake, LLC v. Audi of Am.*, No. 1:CV 08-177-BLW, 2011 WL
2747523, at *1–*2 (D. Idaho July 13, 2011); *Edwards Lifesciences AG v.
CoreValve, Inc.*, No. 08-91-GMS, 2011 WL 10565589, at *1 (D. Del. Feb. 23,
2011); *Methode Electronics, Inc. v. Delphi Automotive Systems LLC*, No. 09-
CV-13078, 2009 WL 3875980, at *4 (E.D. Mich. 2009), *affirming and
modifying in part magistrate's order*, 679 F. Supp. 2d 828, 835–36 (E.D. Mich.
Jan. 19, 2010).

with the understanding that the claims of that patent will not be able to be amended even by other counsel involved in the IPR. If Plaintiffs believe that an amendment is going to be made, then it can hire other counsel that have not seen Apple's confidential, highly confidential, and source code information to handle the IPR and make the amendments.

The protections Apple seeks are especially warranted in cases where, as here, the case concerns the disclosure of a company's source code—valuable information that Apple considers the "crown jewels" of its intellectual property portfolio. *Unwired Planet LLC v. Apple Inc*., No. 3:12-CV-00505-RCJ, 2013 WL 1501489, at *5 (D. Nev. Apr. 11, 2013). Such cases "may require the bar to extend to post-issuance proceedings because they involve highly confidential information, such as source code, which, if disclosed, could compromise the value of the disclosing party's products." *Mirror Worlds Techs., LLC v. Facebook, Inc*., No. 17-CV-3473 (JGK), 2017 WL 5969334, at *2 (S.D.N.Y. Nov. 20, 2017) (quotations omitted); *cf. Drone Techs., Inc., v. Parrot S.A*., 838 F.3d 1283, 1300 n.13 (Fed, Cir. 2016) ("[S]ource code requires additional protections to prevent improper disclosure because it is often a company's most sensitive and most valuable property. As a result, district courts regularly provide for additional restrictions on discovery to account for the unique characteristics of source code.") (citation omitted).

Courts have recognized the risks in allowing litigation counsel to participate in post-grant proceedings where claims may be amended. *See, e.g.*, *Mirror Worlds Techs., LLC* 2017 WL 5969334, at *3 (citing *Telebuyer*, 2014 WL 5804334, at *6) ("When a[n] attorney gains access to highly confidential information in an infringement case, there is a risk that the attorney will be able to use that information to . . . amend . . . the scope of [the patent] claims to sustain them against a challenge in a post-issuance proceeding."). Plaintiffs argue that their attorneys who obtain access to Apple's confidential materials

should be allowed to participate in any IPR proceeding up until the patents are amended. If Plaintiffs decide to move to amend the challenged patent in the IPR, it is only at that point, Plaintiffs argue, that those attorneys who have viewed Apple's confidential materials could continue as counsel in the IPR and they would simply have co-counsel join the IPR to be the ones to work on the amendments. However, Plaintiffs' proposal misses the point of these protections. Those who have viewed Apple's confidential, highly confidential, and source code information are at risk for inadvertently disclosing the information to amendment counsel. Plaintiffs' counsel with that knowledge would be co-counseling with amendment counsel. In that environment, the risk of inadvertent disclosure is extremely high—that is, that the litigation counsel with knowledge of Apple's highly confidential information could guide amendment counsel to make amendments that would cover Apple products or steer amendment counsel away from making amendments that would exclude features in Apple's products. It is difficult "for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so." *In re Deutsche Bank Tr. Co. Ams.*, 605 F.3d 1373, 1378 (Fed. Cir. 2010).

Plaintiffs further argue that this provision is a matter of fairness. They call Apple's proposal "one-sided" in that it would permit its outside counsel to participate in all aspects of challenging Plaintiffs' patents. Again, Plaintiffs fail to appreciate the purpose of this protection. Plaintiffs' outside counsel are receiving access to Apple's most valuable and protected confidential information. The need for minimizing the risk of inadvertent disclosure is clear. Even if Apple's litigation counsel reviewed Plaintiffs' highly confidential and source code information, there is no risk of misusing that information in attacking Plaintiffs' patents.

Plaintiffs' last paragraph in their statement on this section attempts to characterize the parties as disputing whether the application of the prosecution bar applies on an individual-by-individual basis. Apple has never taken the position that a prosecution bar should apply to all individuals at the law firm receiving highly confidential information. Indeed, no reading of its proposal could support such an interpretation. It is clear from its proposal that the prosecution bar shall apply to those in receipt of highly confidential information on an individual basis.

Apple's proposal strikes an appropriate balance between the parties' interests. It would permit Plaintiffs' trial counsel to represent Plaintiffs in post-grant review proceedings involving asserted patents that are not to be amended during those proceedings—thereby minimizing any burden or hardship on Plaintiffs. But that decision would need to be made in advance of entering an appearance in that post-grant proceeding. If amendments are to be made, then Plaintiffs would need to engage other counsel that have not reviewed Apple's confidential, highly confidential, or source code information to represent it in the post-grant proceedings on that patent from the outset of the proceeding. Plaintiffs' proposal, in contrast, would allow Plaintiffs' trial counsel to (consciously or subconsciously) use their knowledge of Apple's highly sensitive documents in such proceedings to strategically narrow Plaintiffs' patent claims in an effort to avoid the prior art while still covering aspects of Apple's products. The provision that Apple proposes is needed to protect against this exact risk, and should be included in the protective order entered in this case.

> **b.** **The Significant Risk Of Inadvertent Disclosure Justifies The Inclusion Of An Acquisition Bar In The Protective Order**

Both parties agree that a patent prosecution bar should be put in place. The fundamental rationale behind such bars is that a person involved in writing

patent claims in a pending patent application may choose to write the claim to cover technology he or she saw in the confidential files of the opposing party or to avoid amending or adding claims in pending patent applications that would not cover the confidential technology of the other party. That fundamental principle is equally applicable when an attorney is advising clients on whether to purchase new patents for its portfolio. In both situations, the attorney is being asked to provide advice to the client that could result in the client having new patent claims that can be asserted against the adversary.

Thus, to prevent counsel's inadvertent reliance on confidential information, a patent acquisition bar provision should be ordered to prohibit any of Plaintiffs' counsel who actually review Apple's sensitive technical material from participating in patent acquisitions relating to that material's subject matter until two year after the case ends.

A patent acquisition bar is a reasonable compromise on a necessary protection. Courts regularly find it appropriate to restrict individuals who receive another party's confidential technical information from later assisting in the acquisition of patents covering the disclosed technology.[12] The rationale for

_____

[12] See, e.g., Order at 5, Realtime Adaptive Streaming LLC v. Google LLC, No. 18-CV-03629 (C.D. Cal. July 18, 2019), ECF No. 80; Intellectual Ventures I, LLC v. Lenovo Group Ltd., 2019 WL 343242, at *4 (D. Mass. Jan. 25, 2019); Order at 3, Uniloc USA, Inc. v. Apple Inc., No. 18-CV-00572 (N.D. Cal. July 2, 2018), ECF No. 107; Order at 10, Univ. of Va. Patent Found. v. Gen. Elec. Co., No. 14-CV-00051 (W.D. Va. June 11, 2015), ECF No. 61; Telebuyer, 2014 WL 5804334, at *7; Inventor Holdings, LLC v. Google, Inc., 2014 WL 4369504, at *2 (D. Del. Aug. 27, 2014); Catch A Wave Techs., Inc. v. Sirius XM Radio, Inc., No. 12-CV-05791, 2013 WL 9868422, at *1 (N.D. Cal. Aug. 6, 2013); EPL Holdings, LLC v. Apple Inc., No. C-12-04306, 2013 WL 2181584, at *5 (N.D. Cal. May 20, 2013); Unwired Planet LLC v. Apple Inc., No. 12-CV-00505, 2013 WL 1501489, at *7 (D. Nev. Apr. 11, 2013); Transcript at 29:20–30:4, Intellectual Ventures I LLC v. Altera Corp., No. 10-CV-00065 (D. Del. Aug. 1, 2012), ECF No. 145; E-Contact Techs., LLC v. Apple, Inc., No. 11-CV-00426,

such restrictions is well-established:  "It is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so."  *In re Deutsche Bank Tr. Co. Ams.*, 605 F.3d 1373, 1378 (Fed. Cir. 2010) (alteration omitted) (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980)).  Notwithstanding general provisions "specifying that designated confidential information may be used only for purposes of the current litigation," and notwithstanding the good faith of all individuals involved, courts recognize that "there may be circumstances in which even the most rigorous efforts . . . to preserve confidentiality . . . may not prevent inadvertent compromise."  *Id.*; *see also Catch A Wave Techs., Inc. v. Sirius XM Radio, Inc.*, No. 12-CV-05791, 2013 WL 9868422, at *1 (N.D. Cal. Aug. 6, 2013) ("The patent acquisition bar . . . adds an additional layer of protection by prohibiting not just disclosure and use, but also advising.").

Plaintiffs recognized and endorsed these settled principles when they agreed to a prosecution bar nearly identical in scope to the proposed acquisition bar.  The justification underlying these two provisions is identical—it will be difficult, if not impossible, for an individual who has seen Apple's confidential information to segregate that information mentally when later advising on patent prosecution or acquisition related to that information.  The risks of inadvertent disclosure and competitive misuse are the same with respect to both prosecution and acquisition:

> Counsel for Plaintiff has acquiesced to the imposition of a patent prosecution bar, and, therefore, apparently agrees that there could possibly be a risk of

2012 WL 11924448, at *2 (E.D. Tex. June 19, 2012); *cf. Blackbird Tech LCC v. Serv. Lighting & Elec. Supplies, Inc.*, No. 15-CV-00053, 2016 WL 2904592, at *6 (D. Del. May 18, 2016) (requiring covenant not to sue on patents acquired during duration of protective order).

> inadvertent disclosure of Defendants' confidential
> information in the course of representing their client
> before the PTO. Therefore, it is hard to conceive that
> there would be little or no risk of inadvertent
> disclosure when these same attorneys advise their
> client in matters regarding acquisitions of patents.

*E-Contact Techs., LLC v. Apple, Inc*., No. 11-CV-00426, 2012 WL 11924448, at *2 (E.D. Tex. June 19, 2012); *see also EPL Holdings, LLC v. Apple Inc.*, No. C-12-04306, 2013 WL 2181584, at *4 (N.D. Cal. May 20, 2013) (explaining that patent acquisition and prosecution create the same risk of inadvertent use because "litigation counsel may consciously or subconsciously use their knowledge . . . to advise a client on which patents to acquire"). And the concern is further heightened here because Plaintiffs seek Apple's valuable source code and other technical documentation. The disclosure of this confidential technology carries significant risks of inadvertent disclosure and competitive misuse. *See Telebuyer, LLC v. Amazon.com, Inc.*, No. 13-CV-01677, 2014 WL 5804334, at *2 (W.D. Wash. July 7, 2014) (describing source code as "highly confidential, technical information" that poses a "heightened risk of inadvertent disclosure") (citation omitted); *Applied Signal Technology, Inc. v. Emerging Markets Commc'ns, Inc.*, 2011 WL 197811 at *2 (N.D. Cal. Jan. 20, 2011) ("confidential technical documents, including source code . . . may pose a heightened risk of inadvertent disclosure").

In sum, Apple should not be forced to incur the risk that Plaintiffs' counsel will inadvertently rely on Apple's highly sensitive technical information to make competitive decisions regarding the acquisition of patents or patent rights related to the technology at issue. In light of the foregoing, this Court should enter Apple's proposed acquisition bar.

**H.**     **Sections 4.5 and 11 – Source Code**

The Parties' disputes on Sections 4.5 and 11 are shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

4.5 "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code, scripts, assembly, binaries, object code, source code listings (e.g., file names and path structure), descriptions of source code ~~comments,~~ (e.g., descriptions of declarations, functions, and parameters), object code listings, and Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip, disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party. Other documents that quote source code may be designated pursuant to this Paragraph, provided that the Producing Party also produces a redacted version designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY," which removes the quoted source code. Native Computer Aided Design (CAD) files may be designated pursuant to this Paragraph, provided that any printouts of CAD files shall be designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY" and will not be included in the page limits discussed in Section 11 below.

11.     SOURCE CODE

. . .

(f)     The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in Paragraph (c) in the first instance. ~~The Receiving Party may generate PDF copies of limited portions of source code on the source code computer for purposes of asking the Producing Party to produce paper copies.~~ Any printed portion that consists of more than fifteen (15) pages of a continuous block of Source Code ~~or more than two hundred (200) pages total~~ shall be presumed to be excessive, and the burden shall be on the Receiving Party to demonstrate the need for such a printed copy. <u>The Receiving Party may print out no more than two hundred (200) pages total.</u> Within ten (10) days, the Producing Party shall either (i) provide one copy set of such pages to the Receiving Party or (ii) inform the Requesting Party that it objects that the printed portions are excessive and/or not done for a permitted purpose. The Parties will cooperate in good faith if a different timeframe for production is required.  If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party shall be entitled to seek a Court resolution of whether the printed Source Code in question is narrowly tailored and was printed for a permitted purpose.  The burden shall be on the Receiving Party to demonstrate that such printed portions are no more than is reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere.  The printed pages shall constitute

1  part of the Source Code produced by the Producing Party in this
2  action. ~~Printing of directory paths or structures and file names~~
3  ~~shall not count toward the consecutive or aggregate page count~~
4  ~~listed in this section.~~

5  . . .

6  (h)   . . . The Producing Party shall not be responsible for any
7  items left in the room following each inspection session, and the
8  Receiving Party shall have no expectation of confidentiality for
9  any items left in the room following each inspection session
10  without a prior agreement to that effect.   ~~However, if the~~
11  ~~Producing Party locates any material that appears to contain the~~
12  ~~work product of the Receiving Party, the Producing Party shall not~~
13  ~~review the material and shall contact the Receiving Party in~~
14  ~~accordance with their ethical duties.~~  . . .

15  (i)    . . . Upon ~~three (3) days'~~ one (1) day's advance notice to the
16  Receiving Party by the Producing Party, the Receiving Party shall
17  provide a copy of this log to the Producing Party.

18  (j)   . . . ~~Absent agreement of the Parties or order of this Court,~~
19  ~~no~~No more than a total of fifteen (15) individuals identified by the
20  Receiving Party shall have access to the printed portions of the
21  Source Code (except insofar as such code appears in any court
22  filing or expert report). ~~The Parties agree to cooperate in good~~
23  ~~faith if it becomes necessary for more than fifteen (15) individuals~~
24  ~~to have access to the printed portions of the Source Code.   A~~
25  ~~Producing Party's source code material may only be transported by~~
26  ~~the Receiving Party at the direction of a person authorized under~~
27  ~~these provisions to another person authorized under these~~

28

provisions, on paper via hand carry, Federal Express, or other similarly reliable courier.

(k)     For depositions, the Receiving Party shall not bring copies of any printed Source Code.  Rather, at least ten (10) days before the date of the deposition, the Receiving Party shall notify the Producing Party about the specific portions of Source Code it wishes to use Source Code at the deposition, and the Producing Party shall bring printed copies of the Source Code those portions to the deposition for use by the Receiving Party.  Copies of Source Code that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers.  The Producing Party shall maintain the marked deposition exhibits during the pendency of this case.  All other All paper copies of Source Code brought to the deposition by the Producing Party shall remain with the Producing Counsel's outside counsel for secure destruction in a timely manner following the deposition.

(l)     . . . If a Party reasonably believes that it needs to submit a portion of Source Code as part of a filing with the Court, the Parties shall meet and confer as to how to make such a filing while protecting the confidentiality of the Source Code and such Source Code will not be filed absent agreement from the Producing Party that the confidentiality protections will be adequate or order of this Court. . . .

**1.     Plaintiffs' Position**

The Court's Model Order does not address source code.  Thus, Plaintiffs proposed the Court adopt language that corresponds to the source code

-66-

provisions from *True Wearables*. *See* Ex. 13 (*True Wearables*) at 8-12. Apple replaced Plaintiffs' proposal in its entirety and refused to compromise. In an effort to narrow the disputes, Plaintiffs agreed to work from Apple's proposal. Apple adopted some of Plaintiffs' changes but largely maintained its refusal to compromise. Apple initially refused to even *explain* its objections. *See* Powell Decl., Ex. 8 at 9, 11. Apple first provided some explanation of its position a few days before Plaintiffs provided their portion of this joint stipulation. *Id.*, Ex. 8 at 4-8. Plaintiffs address the disputes in turn below.

### a. Section 4.5

Plaintiffs proposed including the *True Wearables* definition of "source code." *See* Ex. 13 at 7 ("To the extent such Protected Material includes computer source code and/or live data (that is, data as it exists residing in a database or databases) (i.e., 'Source Code Material'), the producing party may designate such Protected Material as 'RESTRICTED CONFIDENTIAL SOURCE CODE.'"). That is a standard and commonly used definition of "source code" that includes actual source code and live data. *See also Intellectual Pixels Ltd. v. Sony Interactive Entertainment LLC*, No. 8:19-cv-01432-JVS-KES, Dkt. No. 49 (C.D. Cal. Nov. 15, 2019) (Powell Decl., Ex. 22) at 6 (providing the same definition for "source code"). Nevertheless, Apple rejected Plaintiffs' proposal.

In an effort to compromise, Plaintiffs agreed to much of Apple's definition. However, Plaintiffs could not agree to Apple's insistence that mere "descriptions" of source code can be designated as "source code." *See* Powell Decl., Ex. 4 at 4. That term is far too vague and would invite disputes as to whether a technical document describing product functions performed by source code constitutes a "description" of source code. Apple's proposal will impermissibly sweep in many technical documents that are not source code. Apple's overly broad definition of what constitutes "source code," combined

-67-

with Apple's overly restrictive procedures for reviewing source code discussed below, would significantly hinder Plaintiffs' ability to review Apple's technical documents.

### b. Section 11(f)

The parties have several disputes regarding Section 11(f). First, Plaintiffs propose that "[t]he Receiving Party may generate PDF copies of limited portions of source code on the source code computer for purposes of asking the Producing Party to produce paper copies." Powell Decl., Ex. 4 at 21-22. Generating an electronic PDF copy on the source code computer is the most efficient way for a Receiving Party to tell the Producing Party what portion of the source code it would like printed. This approach also avoids disputes over whether the Producing Party printed source code in an illegible format, or in a format that uses more of a Receiving Party's allocated pages than necessary.

Apple argues the producing party should create paper copies only when they are "not objectionable or any objections are resolved." *Id.*, Ex. 8 at 6. That makes no sense because this provision does **not** involve printing paper copies. It merely allows the Receiving Party to create—**on the source code computer**—an electronic copy that the Producing Party can print **if** any objections have been resolved. Plaintiffs' proposal does not allow the Receiving Party to create paper copies of anything.

Second, Plaintiffs propose that the Receiving Party may move the Court for permission to print more than 200 pages total. *Id.*, Ex. 4 at 22. Apple argues this provision is unnecessary and could be "misconstrued as Apple agreeing that printing more than 200 pages may be necessary in this case." *Id.*, Ex. 8 at 6. Plaintiffs recognize Apple does not agree that printing more 200 pages may be necessary. All Plaintiffs seek is the ability to **ask the Court** to increase that page limit. *See Microsoft* (Powell Decl., Ex. 23) at 7 (permitting party to ask to print additional pages beyond page limit)

In contrast, Apple proposes language that arguably prohibits the Receiving Party from even *asking* this Court to increase the 200-page total limit. Powell Decl., Ex. 4 at 22. Apple's proposal specifically mentions a procedure allowing parties to increase the 15-consecutive-page limit but *not* the 200-page total limit. *Id.* That language could easily be misconstrued as the parties agreeing the 200-page limit can *never* be increased, particularly in light of Apple' refusal to agree to Plaintiffs' proposal providing that a party may ask the Court for leave to print more than 200 pages.

Third, Plaintiffs propose that printing directory paths or structures and filenames do not count towards the consecutive or aggregate page limits described. *Id.* This is appropriate because paths and filenames are not source code; they are analogous to a table of contents. The metadata included in directory listings also establish when a file was last modified and can also be used to show whether a file was modified from a prior version. A printed copy of the paths and filenames makes review of the actual source code far more efficient.

Apple claims Masimo intends to use directory printouts to "facilitate some of its review of the code (which includes the structure of how files are grouped into file paths) outside of the source code review room." Powell Decl., Ex. 8 at 5. That again makes no sense. While paths and filenames can be designated and protected under the source code provisions, they are *not* actual source code. Maintaining a copy of paths and filenames is important to easily track a parties' review of the *actual* source code in the source code review room.

c. **Section 11(h)**

The parties agree that the Receiving Party should not store notes or other material in the source code review room beyond the time when the party is reviewing code in the room. However, Plaintiffs believe counsel should abide

by their ethical duties not to review any work product that may be inadvertently left behind. Powell Decl., Ex. 4 at 23. This is consistent with counsel's ethical duty to "refrain from examining" another attorney's work product and "promptly notify the sender." California Professional Rule of Conduct 4.4; *see also Rico v. Mitsubishi Motors Corp.*, 42 Cal. 4th 807, 808 (2007). Plaintiffs' proposal is also consistent with the Federal Rules of Civil Procedure and Federal Rules of Evidence, which reject automatic waiver of privilege based on inadvertent disclosure. *See* Fed. R. Civ. P. 26(b)(5)(B); Fed. R. Evid. 502(b).

Apple argues Plaintiffs' proposal is "contrary" to prior provisions stating reviewers have no "expectation of confidentiality for materials left behind in the source code review room" and should "clean up." Powell Decl., Ex. 8 at 6. That is why Plaintiffs included this provision: to clarify that if a party *accidentally* leaves work product behind, it should not be reviewed or used. Apple's refusal to agree to this simple provision is troubling and reinforces the need for Plaintiffs' proposal.

### d. Section 11(i)

The parties agree on this section except Apple demands a *one-day* response to any requests for a log of individuals who review paper copies of source code. Powell Decl., Ex. 4 at 23. That is unreasonable. For example, one party may request a log on Christmas Eve and assert a violation occurred if the opposing party does not respond on Christmas Day. Plaintiffs provide a reasonable three-day notice period, which balances prompt disclosure with avoiding unduly harassing opposing counsel on weekends and holidays. Apple previously stipulated to protective orders that included a similar log, but did not include a one-day response time. *See Pinn* (Powell Decl., Ex. 17) at 14. This Court has also adopted orders requiring similar logs be provided on *seven* days' notice. *Microsoft* (Powell Decl., Ex. 23) at 8.

### e. Section 11(j)

The parties have two disputes regarding Section 11(j). First, Plaintiffs propose that the number of individuals authorized to access printed Source Code can be increased beyond 15 individuals, but only by agreement of the parties or order of this Court. Powell Decl., Ex. 4 at 24. This could become necessary if, for example, individuals authorized to access source code need to be replaced because they withdraw from this case. Apple argued that, in other "extremely large cases, the parties have been able to manage within the 10 person limit and thus, Apple cannot imagine a situation in which more than 15 people will become necessary." *Id.*, Ex. 8 at 10. Whether this provision was necessary in other cases has nothing to do with whether it might become necessary in this case. There is no valid reason to preclude a party from even *asking* Apple or the Court to increase the limit. *See CBS Interactive, Inc. v. Etilize, Inc.*, 257 F.R.D. 195, 201 (N.D. Cal. 2009) ("[D]istrict courts have inherent authority to grant a motion to modify a protective order where 'good cause' is shown.'").

Second, Plaintiffs propose printed source code may be transported to and from individuals authorized to view the source code via hand carry, Federal Express, or other similarly reliable carrier. Powell Decl., Ex. 4 at 24. Apple rejected that proposal entirely. *Id.* Without this language, counsel may be required to personally fly source code printouts to their experts for use in preparing expert reports. That would be unduly restrictive. Indeed, this Court routinely includes language similar to Plaintiffs' proposal. *See Intellectual Pixels* (Powell Decl., Ex. 22) at 10 (permitting parties to transfer printed source code by "hand carry, via Federal Express, or via other similarly reliable courier with tracking capabilities"); *Microsoft* (Powell Decl., Ex. 23) at 8 (permitting parties to transport printed source code pages by "reliable hand carry" and "Federal Express"). Indeed, Apple previously stipulated to the inclusion of similar language. *See Pinn* (Powell Decl., Ex. 17) at 13 (allowing transportation

"via hand carry, Federal Express or other similarly reliable courier").

### f.    Section 11(k)

The parties have two disputes regarding Section 11(k). First, Plaintiffs propose that the Producing Party bring all printed source code to depositions upon request. Powell Decl., Ex. 4 at 24. This is reasonable and not unduly burdensome because the parties have agreed to a presumptive limit that no more than 200 pages that will be printed.

In contrast, Apple requires ten days' advanced notice of the *specific* portions of printed code that will be addressed at a deposition. *Id.* Apple's proposal is highly problematic because it seeks disclosure of work product regarding the specific portions of the code about which the questioning attorney will ask, and would give the Producing Party an unfair advantage by knowing exactly what material will be addressed at a given deposition. Further, deposition preparation often continues up to the day of the deposition, and relevant code is likely to be identified by the witness during the deposition. A 10-day advance notice that requires identification of only specific portions of code is not workable. The Court should follow the standard rule that does not require advanced notice of exhibits that will be used at a deposition. *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985) ("[T]he selection and compilation of documents by counsel in this case in preparation for pretrial discovery falls within the highly-protected category of opinion work product."); *Stevens v. Corelogic, Inc*, 2016 WL 397936, at *9 (S.D. Cal. Feb. 2, 2016) ("[C]ourts in this Circuit have viewed *Sporck* favorably.").

Second, Plaintiffs propose that the Producing Party maintain marked deposition exhibits during the pendency of this case. Powell Decl., Ex. 4 at 24. Apple struck this provision and proposes that the Producing Party destroy all deposition exhibits containing source code. *Id.* at 24-25. There is no potential harm from the ***Producing Party's*** outside counsel maintaining a copy of the

exhibit. Moreover, Apple's proposal could create evidentiary issues if the parties later dispute the content of an exhibit that was introduced at a deposition.

### g. Section 11(l)

Plaintiffs proposal merely confirms that this Court has the authority to order a party to file source code over the objection of the Producing Party. Powell Decl., Ex. 4 at 25. That is necessarily part of this Court's inherent authority to manage its docket. Apple struck Plaintiffs' proposed language and refused to explain its objection even after Plaintiffs repeatedly asked Apple to do so. *See Id.*, Ex. 8 at 8.

Accordingly, the Court should adopt Plaintiffs' proposed source code provisions.

### 2. Defendant's Position

Over the course of three months, Apple has diligently negotiated with plaintiffs the terms of a protective order, despite Plaintiffs' repeated efforts to delay that process. Plaintiffs' accusations that Apple has refused to compromise or explain its objections are demonstrably false. Plaintiffs raised new disputes each time the parties exchanged proposed protective order provisions, making it impossible for the parties to focus on the specific issues in dispute and drawing the negotiation process out indefinitely.

### a. Section 4.5

The parties dispute whether descriptions of source code should receive a "Highly Confidential – Source Code" designation in order to protect Apple's sensitive technical information. As Apple explained to Plaintiffs numerous times during this process, Apple's source code is extremely sensitive and every other business in its industry seeks to review its contents. The designation of descriptions of source code as "highly confidential" and thus requiring the same protections afforded source code is necessary to preserve Apple's valuable technical information from improper disclosure or use. Apple goes to great

lengths to limit the use and review of its source code by any individuals, including its own employees and counsel. These protections extend to descriptions of the source code. Descriptions of source code in internal documents and emails can and often do reveal important details about how the source code operates and thus deserve the same level of protection as the source code itself. Indeed, some descriptions are even more revealing of the operation of the products than the source code itself because the descriptions use simple and clear terms to explain how the source code works rather than source code terminology that can be complex to understand, particularly if one function calls a second function, which in turn calls a third, for example. Having a higher level description of what is happening is extremely valuable. Thus, limiting the provision to only source code comments is not sufficient. Apple's proposal to bestow the same protections accorded to source code unto descriptions of source code is a reasonable and necessary protection of its valuable and sensitive asset.

Moreover, Plaintiffs incorrectly claim that Apple's proposal is "overly broad." Apple's proposal cabins the types of technical documents to which this provision applies by proposing the few types of documents that should receive this designation: "(e.g., descriptions of declarations, functions, and parameters)." Powell Decl. Ex. 3, at 57.

This Court should adopt Apple's proposal.

### b. **Section 11(f)**

#### i. **Generating Source Code as PDF Copies**

Plaintiffs propose generating electronic PDF copies of source code on the source code computer for the purpose of "asking the Producing Party to produce paper copies." Plaintiffs' proposal is an unreasonable request that does not justify exposing Apple's confidential source code to impermissible disclosure or use by converting it to an electronic PDF copy. There are far more common and less risky means of telling the Producing Party what portion of the source code

the Receiving Party would like printed—for instance, indicating the starting and ending points of desired portions of source code. This is how typical litigation discovery and review of confidential, valuable information occurs. Notably, such language is not present in the provisions of the Protective Order entered in *True Wearables*. Powell Decl., Ex. 13. Yet at the last minute, Plaintiffs requested this unnecessary and inefficient provision. It should be rejected.

Plaintiffs' claim that this provision is "the most efficient" neglects the aims of a protective order—to minimize the unnecessary risk of improper disclosure and use of a party's most sensitive and confidential information. Permitting the printing of Apple's valuable source code to an electronic PDF copy contravenes these aims and this Court therefore should reject Plaintiffs' proposal.

### ii. <u>Printing More Than 200 Pages</u>

In the beginning of this negotiation, Apple proposed a one-hundred page limit of any printed portion of source code, because, as it explained to Plaintiffs numerous times and still maintains, such a limit is more than necessary to allow Plaintiffs to sufficiently review any such portion of Apple's information at issue in this case. In the interests of compromise, Apple agreed to compromise on a two-hundred page limit of any printed portion of source code. Now, however, Plaintiffs drags the dispute on further. Plaintiff seeks to add language explicitly permitting a reviewing party to demonstrate the need for any printed portion of source code beyond two hundred pages. This provision should be rejected for two reasons. *First*, Plaintiffs' provision is unwarranted in light of the already-agreed provision in the protective order that the Protective Order may be modified by the Court. *See* Samplin Decl. Ex. A, at 32 ("Protective Order") ("Modification by Court. This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order sua sponte in the interests of justice. All disputes between the Parties

concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the Central District of California."). *Second*, a two hundred page limit is more than adequate for Plaintiffs to view any printed portion of the source code and, therefore, Apple does not agree to include language that might be interpreted by the Court as suggesting that modification of that limit was contemplated by the parties.

### iii.     Printing Directory Paths Information

This is another provision that Plaintiffs inserted late in the parties' negotiations over Section 11, which delayed bringing this protective order dispute to the Court.  As a further attempt to expand the number of pages it can print, Plaintiffs asked for source code directory paths, structures, and file names to be excluded.  But those pieces of information *are* source code—they are absolutely necessary to enable a computer to compile the source code into executable instructions and are used universally across computing systems and languages.  Source code directory paths provide detailed information about the source code and are thus just as sensitive as the source code instructions. Source code directory paths and file structures should count toward the page limits described.  Moreover, it was with this understanding that source code directory paths, structures, and file names would be included in the page count that Apple, in the interest of compromise, agreed to a two-hundred-page limit of any printed portion source code, a limit more than adequate for review of any printed portion of the source code.

Permitting Plaintiffs to sidestep limits on source code printing takes away the incentive for Plaintiffs to be careful and deliberate in choosing portions of code to print, and encourages Plaintiffs to print out larger portions of code than truly necessary and review them at their leisure in their office or at home (i.e., outside of the secure environment).  Plaintiffs' preferences and convenience

plainly do not outweigh the need to protect Apple's valuable and vulnerable source code. As Apple explained during meet-and-confer discussions with Plaintiffs, the entire purpose of having a source code review room, in which the source code is made available for review (and the existence of which the parties agree is necessary), is for the review to occur in the secure environment. Plaintiffs' "preference and convenience should not trump the need to protect the source code for what Apple considers to be its crown jewels—the products at issue in this case." *Unwired Planet LLC v. Apple Inc*., No. 3:12-CV-00505-RCJ, 2013 WL 1501489, at *5 (D. Nev. Apr. 11, 2013).

### c. Section 11(h)

The parties dispute who must bear the burden of locating any material left in the source code review room. Plaintiffs seek to require the Producing Party to review any confidential material left in the review room and to contact the Receiving Party regarding the identification of such material.

Plaintiffs request an unnecessary imposition on the Producing Party to contact the Receiving Party and to make judgments about whether something the Producing Party leaves behind is work product or not. To streamline the process of the review, Apple requests that Plaintiffs be responsible for all materials, potential work product or otherwise, left in the review room. If anything is left behind, the Receiving Party should bear the burden of notifying the Producing Party.

### d. Section 11(i)

Apple seeks one-day advance notice for the Receiving Party to provide the Producing Party with a log of the reviewers and recipients of paper copies of the source code. As Apple has explained to Plaintiffs in the parties' meet-and-confers, if one party determines that its source code has been disclosed or used contrary to the provisions of the Protective Order, that party needs every tool at its disposal to stop the further dissemination of the source code. These

provisions are necessary because past experience demonstrates that misuse can occur and, in fact, in at least one instance, the absence of more urgent measures like this provision impaired Apple's ability to act as quickly as it would have liked to prevent further risk of misuse. In *Valencell Inc. v. Apple Inc.*, the plaintiffs sent a shipment consisting almost entirely of Apple's documents marked "Highly Confidential – Attorneys' Eyes Only" to be used by the plaintiffs' counsel at the deposition of an Apple witness. Order at 2, *Valencell Inc. v. Apple Inc.* (E.D.N.C. Aug. 28, 2017) ECF No. 216. Instead of being sent to the hotel where Plaintiffs' counsel was staying, the shipment was misdirected to a third party who then alerted Apple of his receipt of its materials. Despite being aware of the non-delivery, the plaintiffs delayed in disclosing to Apple the disruptions in the shipment. *Id.* at 3. Only when Apple contacted the plaintiffs and requested the source code log did the plaintiffs subsequently notify Apple of this disruption and of a second unrelated missing shipment "consisting of almost 1,000 pages of Apple's source code" that been intended to be sent to one of the plaintiffs' experts but instead was reported by FedEx as never having left its distribution center and was not received by the expert. *Id.* If Apple's source code is sent to the wrong individual or left at a FedEx distribution center, both of which occurred in *Valencell*, Apple would need to know immediately every person that had access to the source code to identify the potential source of that leak. In such a situation, three days would be completely inadequate. Turning Plaintiffs' example around, if Apple source code was leaked on the Internet on Christmas Eve, then Apple would indeed expect to have a list of the people who had access to it on Christmas Day. This provision hopefully will never be necessary. But, if it is necessary to request a log, the requesting party deserves a response within one day. Plaintiffs' "preference and convenience should not trump the need to protect the source code for what Apple considers to be its crown jewels—the products at issue in this case." *Unwired Planet LLC v. Apple*

*Inc.*, No. 3:12-CV-00505-RCJ, 2013 WL 1501489, at *5 (D. Nev. Apr. 11, 2013).

### e.   Section 11(j)

The parties dispute (1) language concerning how many individuals may review and receive the Producing Party's source code on behalf of the Receiving Party; and (2) the transportation of source code by the Receiving Party.

### i.   Increasing the Number of Reviewers

Much like the dispute over number of pages of source code that can be printed, here, Apple originally proposed a limit of ten people to access source code, but agreed to a compromise of fifteen people on behalf of a Receiving Party.   A limit on the number of reviewers of a party's source code is a necessary protection against the risk of inadvertent disclosure.   Plaintiffs' attempt to permit the increase the limit of the number of reviewers beyond fifteen should fail for the same reason that the Court should reject similar language in the page limit provision above.  Plaintiffs' provision is unwarranted in light of the already-agreed provision that the protective order may be modified.  *See* Samplin Decl. Ex. A, at 32 ("Modification by Court.  This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order sua sponte in the interests of justice.   All disputes between the Parties concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the Central District of California.").   Further, Apple opposes inclusion of any provision in this protective order suggesting that it agrees that adding more people to that limit was contemplated.  Apple does not contemplate either party needing more than fifteen individuals to review the other side's source code.

## ii. Restrictions on how source code may be transported

This is another example of Plaintiffs' many attempts to indefinitely draw out the negotiation of the protective order. Each time the parties exchanged protective order provisions, Plaintiffs inserted new clauses into agreed-upon sections and manufactured new disputes. This provision was added in the latest version Plaintiffs sent despite months of negotiation over the protective order without any suggestion by Plaintiffs that a transportation provision was needed.

Plaintiffs propose unnecessary language outlining who may transport printed source code to and from individuals authorized to view the source code. The protective order already provides provisions on how many copies can be made and where they are to be stored and by whom. *See* Powell Decl. Ex. 3, at 74 ("The Receiving Party's outside counsel of record and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents duplication of or unauthorized access to the Source Code."). Plaintiffs argue that the absence of this language suggests that a party may be "required to personally fly source code printouts to their experts for use in preparing expert reports." That may be the case. Apple's source code is extremely sensitive and Apple should not have to take the risk that it will be lost in the mail, FedEx, or any other courier service. *See Valencell* at 2 (shipment consisting "almost entirely of Apple documents" marked "Attorneys' Eyes Only" "were intended to be sent to the hotel where [the plaintiffs'] counsel would be staying, but were misdirected by an unknown man to a third party"); *id.* at 2 ("The other shipment . . . [consisting] of almost 1,000 pages of Apple's source code . . . was to be sent to [the plaintiffs'] expert, but he did not receive the shipment and it is reported by FedEx as never having left its Fort Worth Distribution Center.").

Source code is going to be produced in a single location for review.

Thus, the experts will be traveling to the source code review room to complete the review. It is not too much of a burden to require that they obtain printed copies in a similar fashion.

### f.     <u>Section 11(k)</u>

#### i.     <u>Bringing Source Code to the Deposition</u>

The parties dispute whether the Producing Party shall bring all printed source code to depositions upon request or whether the Producing Party shall receive ten days' notice to bring specific portions of source code to be addressed at a deposition.

Plaintiffs request the Producing Party bear the burden of bringing *all* of the printed source code to the deposition. Apple does not agree. Instead, Apple's proposal requires Plaintiffs to identify only the portions of the source code they need and avoid needlessly exposing Apple's source code to inadvertent or improper disclosure. It also forces Plaintiffs to be careful and deliberate in choosing portions of code to print, discouraging Plaintiffs from requesting the printing of larger portions of code than truly necessary. Apple's provision ensures the adequate protection of its confidential information. This Court should accept Apple's proposal.

#### ii.     <u>Maintaining Marked Deposition Exhibits</u>

The parties dispute whether the Producing Party must maintain marked deposition exhibits during the pendency of this case. Plaintiffs argue that there is no potential harm in requiring Apple to maintain paper copies of its confidential source code. Not so. Plaintiffs' proposal unnecessarily preserves Apple's confidential technical information in a medium that allows it to be easily misused. By contrast, there is no risk, as Plaintiffs argue, that Apple's proposal could create the evidentiary issue that the parties might dispute the content of an exhibit introduced at a deposition. The exhibit is clearly identified by the court reporter and the deposition transcript and Apple cannot foresee any

scenario that results in the outcome Plaintiffs describe.

### g.  Section 11(l)

The parties dispute whether the protective order requires confirmation that the Court has the authority to order a party to file source code over the objection of the Producing Party.  Plaintiffs' provision is redundant and unwarranted in light of the already-agreed provision in the protective order that the Protective Order may be modified.  *See* Samplin Decl. Ex. A, at 32 ("Modification by Court.  This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order sua sponte in the interests of justice.  All disputes between the Parties concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the Central District of California.").

As Plaintiffs admit, their proposal merely restates the Court's inherent authority—something that Apple has never disagreed with.  This is another example of Plaintiffs' many attempts to indefinitely draw out the negotiation process of the protective order.  Each time the parties exchanged protective order provisions, Plaintiffs inserted new clauses into agreed-upon sections, manufacturing new disputes and making it impossible for the parties to identify the issues actually in dispute.  This is one such example.

In light of the foregoing, this Court should reject Plaintiffs' language.

## I.  Section 17 – Disposition After Trial

The Parties' dispute on Section 17 is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

17.  FINAL DISPOSITION

~~After~~Not later than sixty (60) days after the Final Disposition of this Action, as defined in Paragraph 6, ~~within 60 days of a written~~

request by the Designating Party, each Receiving Party shall return all Protected Material to the Producing Party or destroy such material. . . .

### 1.    **Plaintiffs' Position**

Plaintiffs again propose following the Court's Model Order. *Compare* Powell Decl., Ex. 1 (Model Order) at 14-15 *with* Ex. 2 (Plaintiffs' proposal) at 28-29. The Court's Model Order provides that information should be deleted or returned at the end of the case within 60 days of receiving a request from the opposing party. This provision makes sense, as it helps prevent inadvertent failures to delete or return information and avoids any dispute as to the precise date of "Final Disposition." This language is commonly included in protective orders. *See, e.g., Glaukos* (Powell Decl., Ex. 21) at 16.

Apple proposes that the obligation to return or destroy be automatically triggered by "Final Disposition." Powell Decl., Ex. 4 at 30. Apple provides no justification for departing from the Court's Model Order other than suggesting Apple used automatic provisions in other cases. Plaintiffs believe the Court's standard language reflects the better practice. Plaintiffs also do not believe that Apple's prior practice in other cases is a sufficient reason to depart from this Court's Model Order. Moreover, it makes practical sense to place the burden on the Producing Party to remember to ask for the return or destruction of its confidential information. The Court should adopt Plaintiffs' proposal.

### 2.    **Defendant's Position**

The parties are in agreement about every aspect of this provision, besides Plaintiffs' request for a requirement of written notice to trigger return or destruction of Protected Material following Final Disposition. This case will involve production of highly confidential technical information, including source code. Apple therefore already is certain that it wants Plaintiffs to return or destroy all such material that they receive from Apple following the

resolution of this action, and Apple assumes that Plaintiffs want the same from Apple with respect to their sensitive information and source code. The parties should not be required to provide formal, written notice to effectuate that result.

Plaintiffs' argument that written notice is necessary to ascertain the timing of "Final Disposition" is wrong. Apple has reached agreement with opposing parties in scores of other litigations on the language it proposes here (i.e., return or destruction of Protected Material following Final Disposition of the action, without written notice), and has never in those cases encountered an unsolvable issue with respect to the meaning of "Final Disposition." Final disposition is not a nebulous concept. It will be very clear to Plaintiffs when they should return or destroy Apple's Protected Material—and on the off chance it is not, Plaintiffs can simply send Apple's counsel an email seeking guidance.

Likewise unpersuasive is Plaintiffs' statement that it "makes practical sense to place the burden on the Producing Party to remember to ask for the return or destruction of its confidential information." In fact, the statement is concerning, as it underscores Plaintiffs' belief that if Apple inadvertently fails to satisfy the formality of written notice, Plaintiffs get to hold onto Apple's highly confidential information, including source code and potentially trade secrets, indefinitely. That is certainly not how these protective order provisions are meant to work. Indeed, it would defeat the very purpose of a protective order— which is meant to govern the receipt, possession, and use of other parties' confidential information during the pendency of the lawsuit for which the confidential information was produced in the first place.

Finally, as is clear from the text, Apple is not requesting a unilateral provision. Apple's proposal is bilateral—and would relieve Apple *and* Plaintiffs from the formality of written notice to compel destruction or return of materials that they already know they do not want circulating outside of their respective companies following Final Disposition of this action. Frankly, Apple

is surprised that the parties were unable to resolve this issue without court intervention, as Apple's proposal seems to be in the best interests of all parties—preventing a "gotcha" where a party simply forgets that the protective order requires the formality of written notice to effectuate return or destruction.

Apple recognizes that this Court's general Model Order includes the "written request" language Plaintiffs seek. Apple nonetheless respectfully submits that written requests should not be required to compel return or destruction of the Protected Material that will be involved in this case—which has the potential to include some of the most sensitive information at Apple. Apple notes that the Northern District's Model Order does not require written notice for the return or destruction of Protected Material following Final Disposition of the action. *See* Samplin Decl. Ex. D, at 74. While Apple recognizes that this District has not published its own distinct Model Order for cases "involving patents, highly sensitive confidential information and/or trade secrets," Apple submits that the Northern District's language on this dispute, for this particular type of case, is instructive.

Simply put, short of pointing to this Court's Model Order, Plaintiffs have provided no practical or legal reason to oppose Apple's sensible and customary proposal. Apple respectfully requests that the Court so order Apple's proposed version of this protective order provision accordingly.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 26, 2020    By: */s/ Adam B. Powell*
                                     Joseph R. Re
                                     Stephen C. Jensen
                                     Perry D. Oldham
                                     Stephen W. Larson
                                     Adam B. Powell

                                     Attorneys for Plaintiffs
                                     Masimo Corporation and
                                     Cercacor Laboratories

GIBSON, DUNN & CRUTCHER LLP

Dated:  June 26, 2020

By: */s/ Ilissa Samplin (with permission)*
Joshua H. Lerner
H. Mark Lyon
Brian M. Buroker
Brian A. Rosenthal
Ilissa Samplin
Angelique Kaounis

Attorneys for Defendant Apple Inc.

# EXHIBIT M

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION,<br>a Delaware corporation; and<br>CERCACOR LABORATORIES, INC.,<br>a Delaware corporation,<br><br>           Plaintiffs,<br><br>     v.<br><br>APPLE INC.,<br>a California corporation,<br><br>           Defendant. | CASE NO. 8:20-cv-00048-JVS (JDEx)<br><br>PROTECTIVE ORDER |

Based on Plaintiffs' Motion for Protective Order (Dkt. 61, "Motion"), the Joint Stipulation of the parties (Dkt. 61-1), the evidence submitted in support of and in opposition to the Motion (Dkt. 61-2 to 61-5), including the parties' respective proposed protective orders (Dkt. 61-2, Exh. 2, and Dkt. 61-5, Exh. A), and the June 23, 2020 Order by the Honorable Judge James V. Selna, United States District Judge (Dkt. 59), and good cause appearing therefor, the Motion is granted, in part, and the Court finds and orders as follows.

1.   PURPOSES AND LIMITATIONS

Discovery in this action is likely to involve production of confidential, proprietary or private information for which special protection from public disclosure and from use for any purpose other than pursuing this litigation may be warranted. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery, including disclosures under Rule 26, and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

2.   GOOD CAUSE STATEMENT

This action is likely to involve trade secrets, customer and pricing lists and other valuable research, development, commercial, financial, technical and/or proprietary information for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of, among other things, confidential business or financial information, information regarding confidential business practices, or other confidential research, development, or commercial information (including information implicating privacy rights of third parties), information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law. Accordingly, to expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in preparation for and in the conduct of trial, to address their handling at the end of the litigation, and serve the ends of justice, a protective order for such

information is justified in this matter, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure or any other applicable authority. It is the intent of the parties that information will not be designated as confidential for tactical reasons and that nothing be so designated without a good faith belief that it has been maintained in a confidential, non-public manner, and there is good cause why it should not be part of the public record of this case.

       3.     ACKNOWLEDGMENT OF UNDER SEAL FILING PROCEDURE

The parties further acknowledge, as set forth in Section 14.3, below, that this Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal. There is a strong presumption that the public has a right of access to judicial proceedings and records in civil cases. In connection with non-dispositive motions, good cause must be shown to support a filing under seal. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006), *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002), *Makar-Welbon v. Sony Electrics, Inc.*, 187 F.R.D. 576, 577 (E.D. Wis. 1999) (even stipulated protective orders require good cause showing), and a specific showing of good cause with proper evidentiary support and legal justification, must be made with respect to Protected Material that a party seeks to file under seal. The parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL does not—without the submission of competent evidence by declaration, establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable— constitute good cause.

Further, if a party requests sealing related to a dispositive motion or trial, then compelling reasons, not only good cause, for the sealing must be shown, and the relief sought shall be narrowly tailored to serve the specific interest to be protected. *See Pintos v. Pacific Creditors Ass'n.*, 605 F.3d 665, 677-79 (9th Cir. 2010). For each item or type of information, document, or thing sought to be filed or introduced under seal in connection with a dispositive motion or trial, the party seeking protection must articulate compelling reasons, supported by specific facts and legal justification, for the requested sealing order. Again, competent evidence supporting the application to file documents under seal must be provided by declaration.

Any document that is not confidential, privileged, or otherwise protectable in its entirety will not be filed under seal if the confidential portions can be redacted. If documents can be redacted, then a redacted version for public viewing, omitting only the confidential, privileged, or otherwise protectable portions of the document, shall be filed. Any application that seeks to file documents under seal in their entirety should include an explanation of why redaction is not feasible.

4. <u>DEFINITIONS</u>

4.1 Action: this pending federal lawsuit.

4.2 Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

4.3 "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26, and as specified above in the Good Cause Statement.

4.4 "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely confidential and/or sensitive "Confidential

-3-

Information or Items," disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party.

4.5 "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code, scripts, assembly, binaries, object code, source code listings (e.g., file names and path structure), source code comments, object code listings, and Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip, disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party. Other documents that quote source code or internal documents that contain specific descriptions of source code (e.g. descriptions of declarations, functions, and parameters) that describe how the source code operates, to be narrowly applied, may be designated pursuant to this Paragraph, provided that the Producing Party also produces a redacted version designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY," which removes the quoted source code or specific descriptions of source code. Native Computer Aided Design (CAD) files may be designated pursuant to this Paragraph, provided that any printouts of CAD files shall be designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY" and will not be included in the page limits discussed in Section 11 below.

4.6 Counsel: Outside Counsel of Record and House Counsel (as well as their support staff).

4.7 Designating Party or Producing Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL," HIGHLY CONFIDENTIAL –

-4-

ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

4.8 Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery.

4.9 Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this Action.

4.10 House Counsel: attorneys who are employees of a party to this Action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

4.11 Non-Party: any natural person, partnership, corporation, association or other legal entity not named as a Party to this action.

4.12 Outside Counsel of Record: attorneys who are not employees of a party to this Action but are retained to represent a party to this Action and have appeared in this Action on behalf of that party or are affiliated with a law firm that has appeared on behalf of that party, and includes support staff.

4.13 Party: any party to this Action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

4.14 Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

4.15 Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

4.16 Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." Protected Material shall not include: (i) advertising materials that have been actually published or publicly disseminated; and (ii) materials that show on their face they have been disseminated to the public.

4.17 Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

5. SCOPE

5.1 All Protected Material shall be used solely for this case or any related appellate proceeding, and not for any other purpose whatsoever, including without limitation any other litigation, patent prosecution or acquisition, patent reexamination or reissue proceedings, or any business or competitive purpose or function. Protected Material shall not be distributed, disclosed or made available to anyone except as expressly provided in this Order.

5.2 The protections conferred by this Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel in court or in other settings that might reveal Protected Material.

5.3 Nothing in this Protective Order shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material to any person for any purpose.

5.4     This Order does not preclude any Party or Non-Party from using Protected Material with the consent of the Producing Party or by order of the Court.

5.5     This Order does not preclude any Party or Non-Party from moving the Court for additional protection of any Discovery Material or modification of this Order, including, without limitation, moving for an order that certain matter not be produced at all.

5.6     Any use of Protected Material at trial shall be governed by the orders of the trial judge and other applicable authorities. This Order does not govern the use of Protected Material at trial.

6.     <u>DURATION</u>

Even after Final Disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing, a court order otherwise directs, or the information was made public during trial. For purposes of this Order, "Final Disposition" occurs after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals.

7.     <u>DESIGNATING PROTECTED MATERIAL</u>

7.1     <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.

Mass, indiscriminate or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber the case development process or to impose unnecessary expenses and burdens on other parties) may expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the inapplicable designation.

7.2    <u>Manner and Timing of Designations</u>. Except as otherwise provided in this Order, or as otherwise stipulated or ordered, Disclosure of Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix at a minimum, the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" (hereinafter "Confidentiality legend"), to each page that contains protected material. If only a portion of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).  For digital files being produced, the Producing Party may mark each viewable page or image with the appropriate designation, and mark the medium, container, and/or communication in which the digital files were contained.

A Party or Non-Party that makes original documents available for inspection need not designate them for protection until after the inspecting Party has indicated which documents it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants

-8-

copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate Confidentiality legend to each page that contains Protected Material. If only a portion of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b) for testimony given in depositions that the Designating Party identifies the Disclosure or Discovery Material on the record at the time the testimony is given or by sending written notice of which portions of the transcript of the testimony are designated within 30 days of receipt of the transcript of the testimony. During the 30-day period, the entire transcript will be treated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony dealing with such Protected Material. In such cases the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order. In the event the deposition is recorded (by video or otherwise), the original and all copies of the recording shall be designated pursuant to the terms of this Protective Order. Counsel for any Producing Party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter and videographer (if any), any person who is not authorized by this Protective Order to receive or access Protected Material based on the designation of such Protected Material. Such right of exclusion shall be applicable only during periods of examination or testimony regarding such Protected Material.

-9-

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information is stored the appropriate Confidentiality legend. If only a portion or portions of the information warrants protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

(d) When electronic files or documents are printed for use at deposition, in a court proceeding, or for provision in printed form to an expert or consultant pre-approved pursuant to Paragraph 9.2(c), the party printing the electronic files or documents shall affix a legend to the printed document corresponding to the designation of the Designating Party and including the production number and designation associated with the native file. The parties reserve the right to object to the use of any image format version of a document produced in native file format to the extent any information has been altered.

7.3     Inadvertent Failures to Designate. An inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material, provided that the Producing Party notifies all Receiving Parties that such Discovery Material is protected under one of the categories of this Order within fourteen (14) days of the Producing Party learning of the inadvertent failure to designate. Upon such timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order. The Producing Party shall reproduce the Protected Material with the correct confidentiality designation within seven (7) days upon its notification to the Receiving Parties. Upon receiving the Protected Material with the correct confidentiality designation, the Receiving

Parties shall return or securely destroy all Discovery Material that was not designated properly.

A Receiving Party shall not be in breach of this Order for any use of such Discovery Material before the Receiving Party receives such notice that such Discovery Material is protected under one of the categories of this Order, unless an objectively reasonable person would have realized that the Discovery Material should have been appropriately designated with a confidentiality designation under this Order. Once a Receiving Party has received notification of the correct confidentiality designation for the Protected Material with the correct confidentiality designation, the Receiving Party shall treat such Discovery Material (subject to the exception in the following Paragraph below) at the appropriately designated level pursuant to the terms of this Order.

A subsequent designation of "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" shall apply on a going forward basis and shall not disqualify anyone who reviewed "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" materials while the materials were not marked "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" from engaging in the activities set forth in Paragraph 10.

## 8      CHALLENGING CONFIDENTIALITY DESIGNATIONS

8.1.   <u>Timing and Form of Challenges</u>. Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.   Any challenge to a designation of Discovery Material under this Order shall comply with the procedures set forth in Local Rule 37-1.

-11-

8.2     Meet and Confer. It shall be the responsibility of the Challenging Party to initiate the dispute resolution process under Local Rule 37-1 et seq.

8.3     Joint Stipulation. Any challenge submitted to the Court shall be via a joint stipulation pursuant to Local Rule 37-2.

8.4     The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived or withdrawn the confidentiality designation, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

9       ACCESS TO AND USE OF PROTECTED MATERIAL

9.1     Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in accordance with Section 5.  Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the Action has been terminated, a Receiving Party must comply with the provisions of section 17 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party in a secure manner at a location in the United States that ensures that access is limited to the persons authorized under this Order. For any Protected Material that is subject to export control, such material shall be so marked or designated by the Designating Party and the Receiving Party shall upon receipt be responsible for complying with all applicable United States Export Administration Regulations and shall take all reasonable steps to so comply,

-12-

including taking steps to ensure such material is not exported outside the United States or provided to foreign nationals to whom such assess is restricted.

Nothing in this Protective Order shall be construed to prevent counsel from advising their clients with respect to this case based in whole or in part upon Protected Materials, provided counsel does not disclose the Protected Material itself except as provided in this Order.

Nothing in this Protective Order shall preclude a party from using material obtained lawfully from a source other than the Producing Party, even if the Producing Party also designated the material pursuant to this Protective Order.

9.2    Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action, including the expert's support staff, provided that: (1) such consultants or experts are not presently an officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party and (2) such expert or consultant is not

-13-

involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party. At least fourteen (14) days before access to the Protected Material is to be given to a consultant or expert, the consultant or expert shall complete the "Acknowledgment and Agreement to Be Bound" (Exhibit A) and the same shall be served upon the producing Party along with the following "Pre-Access Disclosure Requirements":

(i)     a current curriculum vitae of the consultant or expert;

(ii)    identification of the consultant or expert's present employer and job title;

(iii)   identification of all of the person's past and current employment and consulting relationships in the past five years, including direct relationships and relationships through entities owned or controlled by the person, including but not limited to, an identification of any individual or entity with or for whom the person is employed or to whom the person provides consulting services relating to the design, development, operation, or patenting of non-invasive physiological monitoring technologies, or relating to the acquisition of intellectual property assets relating to non-invasive physiological monitoring;

(iv)    identification (by application number, title, and filing date) of all pending patent applications on which the person is named as an inventor, in which the person has any ownership interest, or as to which the person has had or anticipates in the future any involvement in advising on, consulting on, preparing, prosecuting, drafting, editing, amending, or otherwise affecting the scope of the claims; and

-14-

(v)  a listing (by name and number of the case, filing date, and location of court) of any litigation in connection with which the person has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.

The Party seeking to disclose Protected Material shall provide such other information regarding the person's professional activities reasonably requested by the Producing Party for it to evaluate whether good cause exists to object to the disclosure of Protected Material to the outside expert or consultant. Objection Process: The producing party may object to and notify the receiving Party in writing that it objects to disclosure of Protected Material to the consultant or expert.  In the absence of an objection within fourteen (14) days of the date on which the Producing Party receives notice that a consultant or expert will be given access to Protected Material, the person shall be deemed approved under this Protective Order.  There shall be no disclosure of Protected Material to the person prior to expiration of this fourteen (14) day period.  If an objection is received within that fourteen (14) day period, the Parties agree to meet and confer within seven (7) days following the objection and to use good faith to resolve any such objection.  If the Parties are unable to resolve any objection, the objecting Party shall serve on the other Party a Joint Stipulation pursuant to Local Rule 37-2.1 within seven (7) days of the meet and confer.  The objecting Party shall have the burden of proving the need for a protective order.  No disclosure shall occur until all such objections are resolved by agreement or Court order;

(d) the court and its personnel;

(e) court reporters, videographers, and their staff;

-15-

(f) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) the author, recipient, or custodian of a document containing the information, or any other individual who appears to have had access to the specific information at issue based on the face of the document, the document's metadata, other documents, or sworn witness testimony;

(h) any mediators or settlement officers and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions;

(i) any other person with the prior written consent of the Producing Party; and

(j) during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the form attached as Exhibit A hereto; and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Protective Order. If a Designating Party believes a party is not acting in good faith in seeking to show Protected Material to a witness during a deposition, the Designating Party may seek a further protective order under Local Rule 37 to prevent the showing of Protected Material to the witness, with the Designating Party bearing the burden

-16-

of proof to show that the party seeking to show Protected Material to a witness during a deposition is not acting in good faith.

9.3. <u>Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to the individuals identified in Paragraphs 9.2 (a), (c)-(i), who are not competitive decision-makers of a Party as defined by applicable authorities.

10. <u>PROSECUTION BAR</u>

After the adoption of this provision by the parties, Outside Counsel of Record and any person associated with a Party who receive a Producing Party's material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order who accesses or otherwise learns of, in whole or in part, said material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order shall not prepare, prosecute, supervise, advise, counsel, or assist in the preparation or prosecution of any patent application seeking a patent on behalf of the Receiving Party or its acquirer, successor, or predecessor in the field of non-invasive monitoring during the pendency of this Action and for two years after final termination of this action. To avoid any doubt, "prosecution" as used in this paragraph does not include representing or advising a Party before a domestic or foreign agency in connection with a reissue, ex parte reexamination, covered business method review, *inter partes* review, opposition, cancelation, or similar proceeding; though in connection with any such agency proceeding involving the patents-in-suit, Outside Counsel

-17-

of Record for a Receiving Party shall not: (i) participate in the preparation, prosecution, supervision, advice, counsel, or assistance of any amended claims; (ii) reveal a Producing Party's Protected Material to any prosecuting reexamination counsel or agent; or (iii) use a producing Party's Protected Material for any purpose not permitted by Section 5. The applicability of this provision is to be determined on an individual-by-individual basis such that an individual attorney who has not received Protected Material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" is not restricted from undertaking any activities by virtue of this provision even if said individual attorney is employed by or works for the same firm or organization as an individual who has received such Protected Material.

11. SOURCE CODE

(a) To the extent production of source code becomes necessary in this case, a Producing Party may designate source code as "HIGHLY CONFIDENTIAL - SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code. Nothing in this Order shall be construed as a representation or admission that Source Code is properly discoverable in this action, or to obligate any Party to produce any Source Code.

(b) Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information including the Prosecution Bar set forth in Paragraph 10, and may be disclosed only to the individuals identified in Paragraphs 9.2(a), (c), (d), (e), (g), and (j), subject to the restrictions set forth in Paragraph 9.3.

(c) Any source code produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and

-18-

searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel in the Central District of California or another mutually agreed upon location. The source code shall be made available for inspection on a secured computer in a secured room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device. No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the Source Code Review Room. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code.

(d)     The Producing Party shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, if such tools exist and are presently used in the ordinary course of the Producing Party's business. The Receiving Party's outside counsel and/or experts may request that commercially available software tools for viewing and searching Source Code be installed on the secured computer, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the Producing Party approves such software tools; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with all of the protections herein. The Receiving Party must provide the Producing Party with the CD or DVD containing such licensed software tool(s) at least fourteen (14) days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for

-19-

use on the Source Code Computer.    The Parties agree to cooperate in good faith if additional software becomes necessary on an expedited basis.

(e)    The Receiving Party's outside counsel and/or experts shall be entitled to take notes relating to the Source Code but may not copy the Source Code into the notes and may not take such notes electronically on the Source Code Computer itself or any other computer.

(f)    The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in Paragraph (c) in the first instance.  Any printed portion that consists of more than fifteen (15) pages of a continuous block of Source Code or more than two hundred (200) pages total shall be presumed to be excessive, and the burden shall be on the Receiving Party to demonstrate the need for such a printed copy.   Within ten (10) days, the Producing Party shall either (i) provide one copy set of such pages to the Receiving Party or (ii) inform the Requesting Party that it objects that the printed portions are excessive and/or not done for a permitted purpose.   The Parties will cooperate in good faith if a different timeframe for production is required.   If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party shall be entitled to seek a Court resolution of whether the printed Source Code in question is narrowly tailored and was printed for a permitted purpose.   The burden shall be on the Receiving Party to demonstrate that such printed portions are no more than is reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere.   The printed pages

shall constitute part of the Source Code produced by the Producing Party in this action.

(g)     All persons who will review a Producing Party's Source Code on behalf of a Receiving Party, including members of a Receiving Party's outside law firm, shall be identified in writing to the Producing Party at least five (5) days in advance of the first time that such person reviews such Source Code.  Such identification shall be in addition to any other disclosure required under this Order.  All persons viewing Source Code on the source code computer shall sign on each day they view Source Code a log that will include the names of persons who enter the locked room to view the Source Code and when they enter and depart.  The log shall be kept by the Producing Party.

(h)     Unless otherwise agreed in advance by the Parties in writing, following each day on which inspection is done under this Order, the Receiving Party's outside counsel and/or experts shall remove all notes, documents, and all other materials from the Source Code Review Room; failure to do so could be deemed a waiver of confidentiality to any materials left behind.  The Producing Party is not responsible for any items left in the room following each inspection session. But all counsel remain bound by their ethical duties regarding the handling and possible return of work product inadvertently left behind by a representative of an opposing party. Proper identification of all authorized persons shall be provided prior to any access to the secure room or the computer containing Source Code.  Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the secure room or the Source Code Computer may be denied, at the discretion of the supplier, to any individual who fails to provide proper identification.

-21-

(i)     The Receiving Party's outside counsel of record may make no more than three (3) additional paper copies of any portions of the Source Code received from a Producing Party pursuant to Paragraph 11(f), not including copies attached to court filings or used at depositions, and shall maintain a log of all paper copies of the Source Code.  The log shall include the names of the reviewers and/or recipients of paper copies and locations where the paper copies are stored.  Upon request from the Producing Party, the Receiving Party shall provide a copy of this log to the Producing Party as soon reasonably practicable and in no event more than three (3) days after receipt of such request.

(j)     The Receiving Party's outside counsel of record and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents duplication of or unauthorized access to the Source Code, including, without limitation, storing the Source Code in a locked room or cabinet at all times when it is not in use.  Absent agreement of the Parties or order of this Court, no more than a total of fifteen (15) individuals identified by the Receiving Party shall have access to the printed portions of the Source Code (except insofar as such code appears in any court filing or expert report).  The Parties agree to cooperate in good faith if it becomes necessary for more than fifteen (15) individuals to have access to the printed portions of the Source Code. Nothing in this paragraph reflects an agreement by any Party in advance that access by more than fifteen individuals is warranted.

(k)     For depositions, the Receiving Party shall not bring copies of any printed Source Code.  Rather, at least ten (10) days before the date of the deposition, the Receiving Party shall notify the Producing Party it wishes to use Source Code at the deposition, and the Producing Party shall bring printed

-22-

copies of the Source Code to the deposition for use by the Receiving Party. Copies of Source Code that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers. The Producing Party shall maintain the marked deposition exhibits during the pendency of this case. All other paper copies of Source Code brought to the deposition by the Producing Party shall remain with the Producing Counsel's outside counsel for secure destruction in a timely manner following the deposition.

(l)     Except as provided in this sub-paragraph, absent express written permission from the Producing Party, the Receiving Party may not create electronic images, or any other images, or make electronic copies, of the Source Code from any paper copy of Source Code for use in any manner (including by way of example only, the Receiving Party may not scan the Source Code to a PDF or photograph the code). Images or copies of Source Code shall not be included in correspondence between the Parties (references to production numbers shall be used instead), and shall be omitted from pleadings and other papers whenever possible. If a Party reasonably believes that it needs to submit a portion of Source Code as part of a filing with the Court, the Parties shall meet and confer as to how to make such a filing while protecting the confidentiality of the Source Code and such Source Code will not be filed absent agreement from the Producing Party that the confidentiality protections will be adequate or order of this Court. If a Producing Party agrees to produce an electronic copy of all or any portion of its Source Code or provide written permission to the Receiving Party that an electronic or any other copy needs to be made for a Court filing, access to the Receiving Party's submission, communication, and/or disclosure of electronic files or other materials

-23-

containing any portion of Source Code (paper or electronic) shall at all times be limited solely to individuals who are expressly authorized to view Source Code under the provisions of this Order. Where the Producing Party has provided the express written permission required under this provision for a Receiving Party to create electronic copies of Source Code, the Receiving Party shall maintain a log of all such electronic copies of any portion of Source Code in its possession or in the possession of its retained consultants, including the names of the reviewers and/or recipients of any such electronic copies, and the locations and manner in which the electronic copies are stored. Additionally, any such electronic copies must be labeled "HIGHLY CONFIDENTIAL - SOURCE CODE" as provided for in this Order.

12. <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION</u>

If a Party is served with a subpoena, including one issued by any court, arbitral, administrative or legislative body or a court order issued in other litigation, that requests or compels disclosure of any Protected Material, that Party must:

(a) promptly notify in writing each Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected. If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this

-24-

action as "CONFIDENTIAL," HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

13.  A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a) The terms of this Order are applicable to information produced by a Non-Party in this Action and designated as Protected Material. Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

-25-

(3) make the information requested available for inspection by the Non-Party, if requested.

(c) If the Non-Party fails to seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

14.   UNAUTHORIZED DISCLOSURE OF PROTECTED
        MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order and (d) request such person or persons to execute the "Acknowledgment an Agreement to Be Bound" attached hereto as Exhibit A.  Unauthorized or inadvertent disclosure does not change the status of Discovery Material or waive a Producing Party's right to maintain the disclosed document or information as Protected Material.

15.   INADVERTENT PRODUCTION OF PRIVILEGED OR
OTHERWISE PROTECTED MATERIAL

(a) The inadvertent production by a Party of Discovery Material subject to the attorney-client privilege, work-product protection, or any other applicable privilege or protection, despite the Producing Party's reasonable efforts to prescreen such Discovery Material prior to production, will not waive the applicable privilege and/or protection if a request for return of such inadvertently produced Discovery Material is made promptly after the Producing Party learns of its inadvertent production.

(b) Upon a request from any Producing Party who has inadvertently produced Discovery Material that it believes is privileged and/or protected, each Receiving Party shall immediately return such Protected Material or Discovery Material and all copies to the Producing Party, except for any pages containing privileged markings by the Receiving Party which shall instead be destroyed and certified as such by the Receiving Party to the Producing Party.

(c) Nothing herein shall prevent the Receiving Party from preparing a record for its own use containing the date, author, addresses, and topic of the inadvertently produced Discovery Material and such other information as is reasonably necessary to identify the Discovery Material and describe its nature to the Court in any motion to compel production of the Discovery Material.

16.   MISCELLANEOUS

16.1   Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

16.2   Right to Assert Other Objections. By agreeing to the entry of this Protective Order, no Party waives any right it otherwise would have to object to

-27-

disclosing or producing any information or item on any ground not addressed in this Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

16.3    Filing Protected Material. A Party that seeks to file under seal any Protected Material must comply with Local Civil Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material. If a Party's request to file Protected Material under seal is denied by the court, then the Receiving Party may file the information in the public record unless otherwise instructed by the court.

16.4    Termination of Matter and Retention of Jurisdiction.  The Parties agree that the terms of this Protective Order shall survive and remain in effect after the Final Disposition of the above-captioned matter.  The Court shall retain jurisdiction after Final Determination of this matter to hear and resolve any disputes arising out of this Protective Order.

16.5    Successors.  This Order shall be binding upon the Parties hereto, their successors, and anyone who obtains access to Protected Material.

16.6    Modification by Court.  This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order sua sponte in the interests of justice.  All disputes between the Parties concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the Central District of California.

16.7    Computation of Time.  The computation of any period of time prescribed or allowed by this Order shall be governed by the provisions for computing time set forth in Federal Rules of Civil Procedure 6.

## 17.   FINAL DISPOSITION

After the Final Disposition of this Action, as defined in Paragraph 6, within 60 days of a written request by the Designating Party, each Receiving Party shall return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material, but must return or destroy any pleadings, correspondence, and consultant or expert work product that contain information designated "HIGHLY CONFIDENTIAL – SOURCE CODE." Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Paragraph 6 (DURATION).

/ / /

/ / /

/ / /

/ / /

18.    <u>VIOLATION</u>

Any violation of this Order may be punished by appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

**IT IS SO ORDERED.**

Dated:  June 30, 2020

_____
JOHN D. EARLY
United States Magistrate Judge

-30-

## **EXHIBIT A**

I, _____, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *Masimo Corp., et al. v. Apple Inc.*, United States District Court, Central District of California, Southern Division, Civil Action No. 8:20-cv-00048-JVS (JDEx).  Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order.

Name of individual: _____

Present occupation/job description: _____

_____

_____

Name of Company or Firm: _____

Address: _____

Dated: _____

_____

[Signature]

-31-

# EXHIBIT N

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

1717 Pennsylvania Ave. N.W., Ste. 900, Washington D.C. 20006
**T** (202) 640-6400

Jonathan E. Bachand
Jonathan.Bachand@knobbe.com

June 29, 2021
*Via EDIS*

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Re:    *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*
ITC Inv. No. 337-TA-_____

Dear Secretary Barton:

Enclosed for filing, please find documents in support of a request by Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Complainants") that the U.S. International Trade Commission ("Commission") institute an investigation pursuant to the provisions of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 concerning certain light-based physiological measurement devices and components thereof. Please note that the Complaint, Complainants' Statement on the Public Interest, and certain Confidential Exhibits 11, 15-28, and 30 contain Confidential Business Information and, pursuant to the Commission's Rules of Practice and Procedure, a separate letter requesting confidential treatment of the information accompanies this filing.

On March 16, 2020, the Commission provided "notice that it is temporarily waiving and amending certain of the Commission's rules that required the filing of paper copies, CD-ROMS, and other physical media in section 337 investigations to address concerns about COVID-19." International Trade Commission, Temporary Changes to Filing Procedures, Federal Register Vol. 85, No. 54 (March 19, 2020). Specifically, the Commission approved the temporary amendment of various rules "to permit parties to file section 337 complaints, exhibits, attachments, and appendices, electronically." *Id.* Accordingly, Complainants' filing only contains electronic documents. Complainants' submission via EDIS includes the following documents:

1. One (1) electronic copy of Complainants' Verified Complaint, pursuant to Commission Rule 210,8(a)(1)(i);

2. A statement on the Public Interest Regarding the remedial orders sought by Complainants in the Verified Complaint, pursuant to Commission Rule 210(8(b);

3. One (1) electronic copy of the public exhibits to the Verified Complaint pursuant to Commission Rules 210.8(a)(1) and 210.12(a)(9);

4. One (1) electronic copy of the confidential exhibits to the Verified Complaint, pursuant to Commission Rules 201(6)(c) and 210.8(a)(1)(ii);

5.  One (1) electronic certified copy of each of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and 7,761,127 listed as Exhibits 1-5 in the Complaint, pursuant to Commission Rules 210.8(a)(1)(i) and 210.12(a)(9)(i);

6.  One (1) electronic certified copy of each assignment for each of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and 7,761,127 listed as Exhibits 6-10 in the Complaint, pursuant to Commission Rules 210.8(a)(1)(i) and 210.12(a)(9)(ii);

7.  A certified copy of each of the prosecution histories for U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and 7,761,127, listed as Appendices A, C, D, E, and G in the Complaint, pursuant to 19 C.F.R. 210.12(c)(1); [1]

8.  A copy of each currently available cited technical reference identified in the prosecution histories of the Asserted Patents, identified as Appendices B, F, and H to the Complaint, pursuant to 19 C.F.R. 210.12(c)(2);[2] and

9.  A letter of certification pursuant to 19 C.F.R. 201.6(b) and 210.5(d) requesting confidential treatment of information appearing in the Complaint, Complainants' Statement on the Public Interest, and Confidential Exhibits 11, 15-28, and 30.

Thank you for your attention to this filing.  Please contact the undersigned if you have any questions.

Respectfully submitted,

/s/ *Jonathan E. Bachand*
Jonathan E. Bachand

---

[1]    Due to USPTO errors, Complainants submitted certificates of correction to correct typographical errors in U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648 as originally issued. Although these certificates of correction have been approved, and certificates of correction have been issued for both U.S. Patent Nos. 10,912,501 and 10,945,648, the certificate of correction for U.S. Patent No. 10,912,502 has not yet issued.  Additionally, Complainants have not yet received certified copies of the prosecution histories, which contain the information related to the certificates of correction for U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648.  Accordingly, Complainants are submitting uncertified copies of the prosecution histories of U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648, and will submit certified copies once received.  Once the certificate of correction issues for U.S. Patent No. 10,912,502, Complainants will seek leave to amend the complaint to add the certificate of correction.

[2]    Because U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648 are related, there is a substantial overlap of the patents and applicable pages of each technical reference mentioned in the prosecution histories, and the copies are provided together in Appendix B.

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

1717 Pennsylvania Ave. N.W., Ste. 900, Washington D.C. 20006
**T** (202) 640-6400

Jonathan E. Bachand
Jonathan.Bachand@knobbe.com

June 29, 2021
*Via EDIS*

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Re:  *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*
ITC Inv. No. 337-TA-_____

Dear Secretary Barton:

In accordance with 19 C.F.R. §§ 201.6 and 210.5, Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Complainants") request confidential treatment for the Confidential Business Information contained in Confidential Exhibits 11, 15-28, and 30 to Complainants' Verified Complaint, confidential treatment for the Confidential Business Information in the Verified Complaint itself, and confidential treatment for Complainants' Statement on the Public Interest.

The information for which confidential treatment is sought is proprietary commercial information not otherwise publicly available and consists of the following:

- Business proprietary information regarding technical specifications and designs for the products on which Complainants' claim of domestic industry is based (Confidential Exhibits 20-27);

- Business proprietary information regarding Complainants' purchase of an infringing article (Confidential Exhibit 30);

- Business proprietary information regarding the license agreement between Masimo Corporation and Cercacor Laboratories, Inc. (Confidential Exhibit 11);

- Business proprietary information regarding the investments and products on which Complainants' claim of domestic industry is based (Confidential Exhibit 28, the Verified Complaint, and the Statement of the Public Interest); and

- Business proprietary information relating to evaluations of the infringing article (Confidential Exhibits 15-19).

The information described above qualifies as Confidential Business Information pursuant to Rule 201.6(a) because:

1.    It is not publicly available;

2.    Unauthorized disclosure of such information could cause substantial harm to the competitive position of Complainants; and

# Knobbe Martens

3.    The disclosure of such information could impair the Commission's ability to obtain information necessary to perform its statutory function.

I certify under penalty of perjury that to the best of my knowledge, information and belief, founded after a reasonable inquiry, that substantially identical information is not available to the public.

Please contact me at 202-640-6406 if you have any questions about this request, or if this request is not granted in full.

Respectfully submitted,

/s/ *Jonathan E. Bachand*
Jonathan E. Bachand

34793297

knobbe.com

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof** | Investigation No. 337-TA-_____ |

## COMPLAINANTS' STATEMENT ON THE PUBLIC INTEREST

Pursuant to Commission Rule § 210.8(b), Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo" or "Complainants") submit this Statement on the Public Interest for the remedial orders sought against Respondent Apple, Inc. ("Apple" or "Respondent").

Through years of innovation in the United States, Masimo revolutionized pulse oximetry technology for monitoring patients. In particular, Masimo discovered how to reliably measure arterial oxygen saturation, even in the presence of motion and low blood flow, without drawing blood. This was a major breakthrough in the field of pulse oximetry. Masimo manufactures and sells pulse oximeters with this technology that caregivers use to monitor over 200 million patients a year. By developing various consumer products, Masimo has now made its hospital-grade technology directly available to everyone. Masimo protected its innovations through numerous patents.

In 2013, Apple met with Masimo about integrating Masimo's technology into the Apple Watch. Soon thereafter, Apple began hiring Masimo employees, starting with Masimo's Chief Medical Officer. In the Fall of 2020, Apple introduced the Series 6, manufactured in Asia. Apple claims the Series 6 watch can measure arterial oxygen saturation. The importation and sale of that

1

product infringes multiple Masimo patents (as well as incorporates Masimo's trade secrets, a claim the parties are litigating in California).

Masimo seeks an order excluding from entry into the United States the Series 6 watch and components thereof, and any other wearable electronic devices with light-based pulse oximetry functionality and components thereof, imported by Apple that infringe one or more claims of U.S. Patent Nos. 10,912,502, 10,912,501, 10,945,648, 10,687,745, and 7,761,127, (collectively, "the Asserted Patents").  Masimo also seeks permanent cease and desist orders prohibiting Apple from engaging in the importation, sale for importation, marketing and/or advertising, distribution, offering for sale, sale, testing, use after importation, sale after importation, or other transfer within the United States of those devices and components.  These remedies will not have an adverse effect on the public health or welfare, competitive conditions in the United States economy, production of like or directly competitive articles in the United States, or United States consumers.

**A.    Explanation of how the articles potentially subject to the requested remedial orders are used in the United States.**

The Series 6 is just one of several Apple smartwatches, which function like a smartphone on the wrist.  The Series 6 is the only currently available Apple Watch that claims to measure blood oxygen.  Apple heavily markets that feature of the Series 6 to give the watch the appearance of a medical device.  Yet, hidden from the millions of purchasers of the Series 6, Apple warns in the fine print that the blood oxygen measurements should not be relied upon for medical purposes. *See* https://www.apple.com/apple-watch-series-6.   Thus, despite all the marketing about the significance of the addition of this measurement, the Apple Series 6 watch is not for medical use.

**B.    Identification of any public health, safety, or welfare concerns relating to the requested remedial orders.**

Masimo's requested remedial orders would not raise public health, safety, or welfare concerns for many reasons.  First, Masimo offers pulse oximetry devices with reliable medical-

grade measurements, directly to consumers.  Indeed, Masimo is the recognized leader in reliable medical-grade pulse oximetry in the United States.  Numerous other companies also sell pulse oximeters, including wearable pulse oximeters, directly to consumers.

Second, the pulse oximetry functionality in Apple's infringing Series 6 watches is not essential to the public health or welfare.  The COVID-19 pandemic heightened the public's awareness of the importance of blood oxygen measurements.  Apple capitalized on this awareness by introducing the Apple Series 6 watch with a very heavy marketing focus on the addition of blood oxygen measurement.  But, as noted above, Apple warns users in the fine print they actually should not rely on the blood oxygen measurements.  Some have even observed that the inaccurate physiological measurements of the Series 6 watch endanger public health.  *See, e.g.*, Fowler, Geoffrey, "The new Apple Watch says my lungs may be sick.  Or perfect.  It can't decide." *Washington Post*, September 23, 2020.  The Series 6 watches provide no unique service or feature related to public health, safety, or welfare that would warrant a denial of Masimo's requested relief.

Third, the strong public interest in protecting Masimo's intellectual property rights justifies exclusion.  *See, e.g.*, *Certain Baseband Processor Chips and Chipsets, Transmitter and Receiver (Radio) Chip, Power Control Chips, and Products Containing Same, Including Cellular Telephone Handsets*, Inv. No. 337-TA-543, Comm'n Op. at 136-37 (June 19, 2007); *see also Certain Wearable Monitoring Devices, Systems, and Components Thereof*, 85 Fed. Red. 2440 (Jan. 15, 2020) (instituting investigation into health monitoring devices without requiring ALJ to make a determination on the public interest).  That public interest is particularly acute here, because Masimo has spent decades researching and developing its revolutionary technology to the benefit of the public.  Its patents reflect Masimo's innovations.  Masimo's technology is used by 9 of the top 10 hospitals in the United States.  It is also directly available to consumers.

3

Apple, with its market dominance in the consumer market, should not be allowed to infringe Masimo's patents, yet escape exclusion under the guise of public health. The Commission has found public interest considerations to outweigh the need to protect intellectual property rights only where "inadequate supply within the United States—by both the patentee and domestic licensees—meant that an exclusion would deprive the public of products necessary for some important health or welfare need[.]" *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1360 (Fed. Cir. 2010). No such inadequate supply exists, as explained below.

**C.**  **Identification of like or directly competitive articles that Complainants and/or third parties make which could replace the subject articles if they were excluded.**

Even if smartwatches were necessary for some important public interest function, Apple and other third parties can provide an adequate supply of alternatives to consumers. *See Certain Personal Data & Mobile Commc'n Devices & Related Software*, Inv. No. 337-TA-710, Comm'n Op. at 74 (Dec. 29, 2011) ("That 'mobile phones' may play a critical role in public health and safety does not mean that [the infringing phones] play a critical role in public health and safety that other smartphones cannot.").

Apple sells other smartwatches, including the Apple Watch Series 3 and Apple Watch SE. Neither of those watches include blood oxygen measurement, so they would not be impacted by any remedial order. Moreover, multiple significant companies supply smartwatches in the United States, including, Fitbit, Fossil, Garmin, Samsung and many others, ensuring numerous options for consumers. The breadth of available options ensures manufacturers could quickly and fully replace the infringing products in the event of an exclusion order without escalating prices.

For consumers looking for reliable pulse oximetry, the Series 6 watch does not provide it as Apple admits in the fine print.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████   This will be well before any exclusion order could take effect.

**D.     Identification of whether Complainants and/or third parties have the capacity to replace the volume of articles subject to the requested remedial orders in a commercially reasonable time in the United States.**

No public interest concerns exist when the market contains an adequate supply of substitute products for those subject to a remedial order.  *Certain Lens-Fitted Film Packages*, Inv. No. 337-TA-406, Comm'n. Op. at 18 (June 28, 1999).  Apple and the many large and reputable companies identified above have the capacity to replace the volume of articles subject to the requested remedial orders, and such replacement would entail no delay in reaching consumers given current manufacturing and distribution levels.

**E.     Statement regarding how the requested remedial orders would impact consumers.**

A remedial order would benefit consumers.  Excluding Apple's Series 6 watch would prevent consumers from unwittingly relying on its blood oxygen saturation number as medically relevant.  More importantly, the remedial order would foster new innovations that would benefit the consumer.  Apple cannot claim that a consumer choice justifies continued importation.  "[T]he mere constriction of choice cannot be a sufficient basis" for denying relief.  *See Certain Personal Data & Mobile Commc'n Devices & Related Software*, Inv. No. 337-TA-710, Comm'n Op. at 69 (Dec. 29, 2011).

Thus, no public interest concerns exist with the remedies sought by Masimo.

Respectfully submitted,

Dated:  June 29, 2021                   By: /s/ *Jonathan E. Bachand*
                                        Jonathan E. Bachand
                                        KNOBBE, MARTENS, OLSON & BEAR, LLP
                                        1717 Pennsylvania Ave NW STE 900
                                        Washington, DC 20006

Telephone: 202-640-6400
Facsimile: 949-760-9502

Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**In the Matter of Certain Light-Based**
**Physiological Measurement Devices and**
**Components Thereof**

Investigation No. 337-TA-_____

**COMPLAINT UNDER SECTION 337 OF**
**THE TARIFF ACT OF 1930, AS AMENDED**

Complainants:

Masimo Corporation
52 Discovery
Irvine, CA 92618
Telephone: 949-297-7000

Cercacor Laboratories, Inc.
15750 Alton Pkwy
Irvine, CA 92618
Telephone: 800-610-8522

Respondent:

Apple Inc.
One Apple Park Way
Cupertino, CA 95014
Telephone:  408-996-1010

Counsel for Complainants:

Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
Telephone:  (949) 760-0404

Jonathan E. Bachand
KNOBBE MARTENS OLSON & BEAR, LLP
1717 Pennsylvania Ave NW, Suite 900
Washington DC, 20006
Telephone: (202) 640-6400

## <u>TABLE OF CONTENTS</u>

**Page No.**

I. INTRODUCTION .................................................................................................................. 1

II. COMPLAINANTS ............................................................................................................... 3

III. PROPOSED RESPONDENT ............................................................................................. 7

IV. PRODUCTS AND TECHNOLOGY AT ISSUE ............................................................... 8

      A.    <u>Complainants' Technology</u> ...................................................................... 8

      B.    <u>Apple's Copying of Complainants' Technology</u> .................................... 11

      C.    <u>The Accused Products</u> ......................................................................... 13

V. THE ASSERTED PATENTS ............................................................................................ 14

      A.    <u>U.S. Patent No. 10,912,501</u> ................................................................ 14

            1.    Identification of the Patent and Ownership by Masimo Corporation ....... 14

            2.    Foreign Counterparts to the '501 Patent .................................... 17

            3.    Non-Technical Description of the '501 Patent ......................... 17

      B.    <u>U.S. Patent No. 10,912,502</u> ................................................................ 18

            1.    Identification of the Patent and Ownership by Masimo Corporation ....... 18

            2.    Foreign Counterparts to the '502 Patent .................................... 20

            3.    Non-Technical Description of the '502 Patent ......................... 20

      C.    <u>U.S. Patent No. 10,945,648</u> ................................................................ 21

            1.    Identification of the Patent and Ownership by Masimo Corporation ....... 21

            2.    Foreign Counterparts to the '648 Patent .................................... 24

            3.    Non-Technical Description of the '648 Patent ......................... 24

      D.    <u>U.S. Patent No. 10,687,745</u> ................................................................ 25

            1.    Identification of the Patent and Ownership by Masimo Corporation ....... 25

2.      Foreign Counterparts to the '745 Patent ................................................... 26

3.      Non-Technical Description of the '745 Patent ......................................... 26

E.      U.S. Patent No. 7,761,127 ................................................................................... 27

1.      Identification of the Patent and Ownership by Cercacor .......................... 27

2.      Foreign Counterparts to the '127 Patent ................................................... 28

3.      Non-Technical Description of the '127 Patent ......................................... 28

F.      Licensees ............................................................................................................. 29

VI. UNLAWFUL AND UNFAIR ACTS OF PROPOSED RESPONDENT ............................. 29

VII. THE DOMESTIC INDUSTRY Related to Asserted Patents ................................. 37

A.      Technical Prong ................................................................................................. 38

B.      Economic Prong ................................................................................................. 39

VIII. SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE .............................. 40

IX. CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED
       TARIFF SCHEDULE OF THE UNITED STATES ......................................................... 41

X. RELATED LITIGATION .................................................................................................. 41

XI. REQUESTED RELIEF ..................................................................................................... 42

**LIST OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1 | Certified Copy of U.S. Patent No. 10,912,501 |
| 2 | Certified Copy of U.S. Patent No. 10,912,502 |
| 3 | Certified Copy of U.S. Patent No. 10,945,648 |
| 4 | Certified Copy of U.S. Patent No. 10,687,745 |
| 5 | Certified Copy of U.S. Patent No. 7,761,127 |
| 6 | Certified Assignment Documents for U.S. Patent No. 10,912,501 |
| 7 | Certified Assignment Documents for U.S. Patent No. 10,912,502 |
| 8 | Certified Assignment Documents for U.S. Patent No. 10,945,648 |
| 9 | Certified Assignment Documents for U.S. Patent No. 10,687,745 |
| 10 | Certified Assignment Documents for U.S. Patent No. 7,761,127 |
| 11 | CONFIDENTIAL EXHIBIT: Amended and Restated Cross-Licensing Agreement between Masimo Laboratories and Masimo Corporation Effective January 1, 2007 |
| 12 | Listing of All Foreign Patents and All Foreign Patent Applications Corresponding to Asserted Patents |
| 13 | Representative Photos of Representative Apple Watch Series 6 (Model No. 109.627 shown) |
| 14 | Product Literature Regarding the Apple Watch Series 6 |
| 15 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Claims of the '501 Patent to an Apple Watch Series 6 |
| 16 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '502 Patent to an Apple Watch Series 6 |
| 17 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '648 Patent to an Apple Watch Series 6 |
| 18 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '745 Patent to an Apple Watch Series 6 |
| 19 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '127 Patent to an Apple Watch Series 6 |
| 20 | CONFIDENTIAL EXHIBIT Drawings, Photographs, or Other Visual Representations of Masimo's rainbow® Sensors |
| 21 | CONFIDENTIAL EXHIBIT:  Drawings, Photographs, or Other Visual Representations of Masimo's Confidential Domestic Industry Product |
| 22 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '501 Patent to Masimo's Domestic Industry Product |
| 23 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '502 Patent to Masimo's Domestic Industry Product |
| 24 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '648 Patent to Masimo's Domestic Industry Product |

| Exhibit No. | Description |
|---|---|
| 25 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '745 Patent to Masimo's Domestic Industry Product |
| 26 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '127 Patent to Masimo's Domestic Industry Products |
| 27 | CONFIDENTIAL EXHIBIT:  Confidential Declaration of Bilal Muhsin |
| 28 | CONFIDENTIAL EXHIBIT: Confidential Declaration of Micah Young |
| 29 | September 15, 2020 Press Release |
| 30 | CONFIDENTIAL EXHIBIT: Invoice dated April 19, 2021 |
| 31 | Photographs of Product Packaging of the Apple Watch Series 6 |
| 32 | January 28, 2021 Apple 10K Filing with SEC |
| 33 | Fowler, Geoffrey, "The new Apple Watch says my lungs may be sick. Or perfect.  It can't decide." *Washington Post*, September 23, 2020. |
| 34 | Masimo Form 10-K, dated February 23, 2021 |
| 35 | "The Apple Watch's blood oxygen sensor is less accurate than you think" |
| 36 | "Can the Apple Watch Series 6 Keep the Doctor Away?" |
| 37 | "Apple Watch Series 6 review – Minute Improvements" |
| 38 | "The New Apple Watch 6 May Have a Problem.  Oddly Enough, That's OK" |
| 39 | "Apple Watch Series 6 and SE Review – Watch Out for the Upsell" |
| 40 | Provisional Application No. 60/367,428 |

## LIST OF APPENDICES

| Appendix | Description |
|---|---|
| A | File History for U.S. Patent No. 10,912,501 |
| B | Relevant Technical References Cited in File History for U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648 |
| C | File History for U.S. Patent No. 10,912,502 |
| D | File History for U.S. Patent No. 10,945,648 |
| E | Certified File History for U.S. Patent No. 10,687,745 |
| F | Relevant Technical References Cited in File History for U.S. Patent No. 10,687,745 |
| G | Certified File History for U.S. Patent No. 7,761,127 |
| H | Relevant Technical References Cited in File History for U.S. Patent No. 7,761,127 |

## I.  **INTRODUCTION**

1.      Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo" or "Complainants") request that the United States International Trade Commission ("Commission") institute an investigation into violations of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337") committed by Respondent Apple Inc. ("Apple") ("Apple" or "Respondent").

2.      This Complaint is based on Respondent's unlawful and unauthorized importation into the United States, sale for importation, and/or sale within the United States after importation of certain light-based physiological measurement devices and components thereof. Respondent's products, including, but not limited to, the "Apple Watch Series 6," or "Series 6" ("Accused Products") infringe at least one claim of U.S. Patent No. 10,912,501, titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," ("the '501 Patent"), U.S. Patent No. 10,912,502, titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," ("the '502 Patent"), U.S. Patent No. 10,945,648, titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," ("the '648 Patent"), U.S. Patent No. 10,687,745, titled "Physiological Measurement Devices, Systems, and Methods," ("the '745 Patent"), and U.S. Patent No. 7,761,127, titled "Multiple Wavelength Sensor Substrate," ("the '127 Patent") (collectively, "the Asserted Patents"), either literally or under the doctrine of equivalents.

3.     The Accused Products directly infringe and/or induce the infringement of, literally or under the doctrine of equivalents, at least the following claims (collectively, "the Asserted Claims") of the Asserted Patents:

| U.S. Patent | Asserted Claims[1] |
|---|---|
| '501 Patent | **1**-9, 11-18, **19**-25 and **26**-30 |
| '502 Patent | **1**-2, 4-6, 8-12, 14-18, **19**-22, 24-26, and **28**-30 |
| '648 Patent | **1**-5, **6**-17, 19, and **20**-30 |
| '745 Patent | **1**-6, 8-9, 11, 14, **20**-24, and 26-27 |
| '127 Patent | **7**-9 |

Further discovery may reveal that Respondent infringes additional claims.

4.     Certified copies of the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent are attached hereto as **Exhibits 1, 2, 3, 4, and 5**, respectively.  Masimo Corp. owns by assignment the entire right, title, and interest in and to the '501 Patent, '502 Patent, '648 Patent, and '745 Patent (collectively, "the Masimo Patents").  Certified copies of the recorded assignments of the Masimo Patents are attached hereto as **Exhibits 6, 7, 8, and 9**, respectively. Masimo Corp. exclusively licenses certain rights to the Masimo Patents to Cercacor.  A copy of the Amended and Re-Stated Cross-Licensing Agreement between Masimo Corp. and Cercacor (formerly known as Masimo Laboratories) granting the license to Cercacor is attached hereto as **Confidential Exhibit 11**.  Cercacor owns by assignment the entire right, title, and interest in and to the '127 Patent ("the Cercacor Patent").  Certified copies of the recorded assignment of the Cercacor Patent are attached hereto as **Exhibit 9**.  Masimo is a licensee of certain exclusive rights to the Cercacor Patents, as reflected in **Confidential Exhibit 11.**

5.     Respondent's activities with respect to the importation into the United States, the

---

[1]      Independent claims are noted in **BOLD**.

sale for importation into the United Sates, and/or the sale within the United States after importation of certain light-based physiological measurement devices and components thereof, described more fully *infra*, are unlawful under 19 U.S.C. § 1337(a)(1)(B)(i) in that they constitute infringement of the valid and enforceable Asserted Patents.

6.      As required by Section 337(a)(2) and defined by Section 337(a)(3), industries exist in the United States relating to articles covered by the Asserted Patents or alternatively such industries relating to articles protected by the Asserted Patents are in the process of being established.

7.      Complainants seek relief from the Commission in the form of a permanent limited exclusion order, pursuant to Section 337(d), excluding from entry into the United States the Accused Products that infringe one or more claims of the Asserted Patents.  Complainants also seek a permanent cease and desist order, pursuant to Section 337(f), directing Respondent to immediately cease and desist from importing, marketing, advertising, demonstrating, warehousing inventory for distribution, distributing, offering for sale, selling, or using in the United States the certain light-based physiological measurement devices and components thereof that infringe one or more claims of the Asserted Patents.

8.      Complainants further seek as relief a bond, for the 60-day Presidential review period pursuant to Section 337(j), for the importation of the certain light-based physiological measurement devices and components thereof that infringe one or more claims of the Asserted Patents.

## II.  <u>COMPLAINANTS</u>

9.      Complainant Masimo Corporation is a Delaware corporation having its principal place of business at 52 Discovery, Irvine, California 92618.  Masimo owns the Masimo Patents and has certain exclusive rights to the Cercacor Patent.  (*See* **Exhibits 1-4, 6-9, Confidential**

**Exhibit 11**).  Complainant Cercacor is a Delaware corporation having its principal place of business at 15750 Alton Pkwy, Irvine, CA 92618.  Cercacor is the owner of the Cercacor Patent and has certain exclusive rights to the Masimo Patents.  (*See* **Exhibits 5 and 10, Confidential Exhibit 11**).

10.     Masimo is a global medical technology company that has revolutionized non-invasive monitoring of physiological parameters, such as pulse rate, arterial oxygen saturation and many others.  These innovations have been repeatedly recognized by Federal courts.  *See Mallinckrodt, Inc. v. Masimo Corp.*, Case No. 2:00-CV-06506 (C.D. Cal. Apr. 5, 2004), ECF No. 588; *Mallinckrodt, Inc. v. Masimo Corp.*, Case No. 2:00-CV-06506 (C.D. Cal. July 12, 2004), ECF No. 622; *Mallinckrodt, Inc. v. Masimo Corp.*, Case No. 2:00-CV-06506 (C.D. Cal. Aug. 4, 2004), ECF No. 632, *aff'd in part and rev'd in part*, 147 F. App'x 158 (Fed. Cir. 2005); *Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x 158 (Fed. Cir. 2005); *Masimo Corp. v. Philips Elec. N. Am. Corp.*, Case No. 1:09-CV-00080 (D. Del. Oct. 17, 2014), ECF No. 919; *Masimo Corp. v. Philips Elec. N. Am. Corp.*, Case No. 1:09-CV-00080 (D. Del. May 18, 2015), ECF No. 997; *Masimo Corp. v. Philips Elec. N. Am. Corp.*, Case No. 1:09-CV-00080 (D. Del. May 18, 2015), ECF No. 998.

11.     Masimo develops, manufactures, and markets a variety of noninvasive patient monitoring technologies and hospital automation solutions as part of its mission to improve patient outcomes and reduce the cost of patient care.  Masimo's patient monitoring solutions are systems that generally incorporate a monitor or circuit board, proprietary single-patient use or reusable sensors, software and/or cables.  Masimo primarily sells its products to professional caregivers, such as hospitals, emergency medical service providers, home care providers,

physician offices, veterinarians, long term care facilities and also to consumers, through its direct sales force, online, distributors, and original equipment manufacturer (OEM) partners.

12.     Masimo has rapidly expanded its workforce despite the COVID-19 Pandemic.  As of December 28, 2019, Masimo had approximately 1,600 full-time employees and approximately 3,700 dedicated contract personnel worldwide.  **Exhibit 34** (Masimo Form 10k) at 34.  By January 2, 2021, Masimo had grown to 2,000 full-time employees and approximately 4,200 dedicated contract personnel worldwide.

13.     Masimo's core business is referred to as Masimo SET® pulse oximetry.  Pulse oximetry allows for the noninvasive measurement of the oxygen saturation level of arterial blood, which delivers oxygen to the body's tissues.  Pulse oximetry also allows for the measurement of pulse rate.  "SET" refers to Masimo's Signal Extraction Technology, a technology invented by Masimo that, for the first time, allowed pulse oximeters to provide accurate measurements of oxygen saturation even during patient motion and low perfusion (i.e., decreased arterial blood flow) conditions.

14.     Over the years, Masimo's product offerings have expanded significantly to also include rainbow® Pulse CO-Oximetry, with its unique ability to allow for real-time non-invasive monitoring of additional physiological measurements, including  carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), total hemoglobin concentration (SpHb®) and fractional arterial oxygen saturation (SpfO2™).  Rainbow® Pulse CO-oximetry also has the ability to measure pulse rate, perfusion index (Pi), Pleth Variability Index (PVi®) and respiration rate from the pleth (RRp®).  The rainbow SET® platform also allows for the calculation of Oxygen Content (SpOC™) and Oxygen Reserve Index (ORi™).

15.     Masimo's current technology offerings also include remote patient monitoring, connectivity, and hospital automation solutions, including Masimo Patient SafetyNet™, Masimo Patient SafetyNet™ Surveillance, Replica™, Iris®, MyView®, UniView™ and Trace™. Masimo's technologies are supported by a substantial intellectual property portfolio.

16.     Masimo invests significantly in its research and development efforts, and currently spends about 10% of its sales revenue on research and development activities.  For the year ending January 2, 2021, Masimo spent approximately $118,689,000 for research and development activities.  **Exhibit 34** (Masimo Form 10k) at 66.  The majority of these activities take place in the United States.  **Exhibit 34** (Masimo Form 10k) at 62.  As a result of these efforts, Masimo has been awarded numerous patents in the United States and around the world. As of January 2, 2021, Masimo had approximately 800 issued patents and approximately 500 pending applications in the U.S., Europe, Japan, Australia, Canada and other countries throughout the world.  **Exhibit 34** (Masimo Form 10k) at 32.

17.     Masimo owns two facilities in Irvine, California, with combined square footage of approximately 314,400, housing its corporate headquarters and the majority of its U.S. research and development activities.  Masimo also owns approximately 86,500 square feet of property in Hudson, New Hampshire, which is used to develop and manufacture advanced light emitting diodes and other advanced component-level technologies, as well as warehousing and administrative operations.

18.     Masimo also leases and occupies approximately 105,800 square feet of additional building space in Irvine, California for product manufacturing and warehousing.  Masimo also leases or owns an additional 61,000 square feet at various locations throughout the United States, that provide centers for distribution of Masimo's products directly to its customers, and is in the

████████████████████████████████████████████

process of establishing distribution centers throughout the United States, ████████████████

████████████████████████████████████████████

19.     Complainant Cercacor is a health and wellness innovator based in Irvine, California.   In 1998, Masimo spun certain technology off into a new company, Masimo Laboratories, Inc. or "Masimo Labs," to further research and develop the technologies.   The name of the company was later changed to "Cercacor."   Cercacor and Masimo have a license agreement between them to facilitate collaboration between the companies.

20.     Like Masimo, Cercacor is an innovator of non-invasive monitoring technologies. Cercacor is on the frontline of understanding how measuring, tracking, and analyzing physiological parameters can impact pre-diabetic and diabetic patients, endurance sports training and performance, and overall health and wellness.   Cercacor continued the development that started at Masimo on numerous non-invasive parameters.   Leading hospitals around the world use Cercacor technology licensed to Masimo and sold under the name Masimo rainbow SET®. This technology was the first, and remains the only, noninvasive monitoring technology that can measure carbon monoxide, methemoglobin, and total hemoglobin in the blood.

### III.   PROPOSED RESPONDENT

21.     Respondent Apple Inc. ("Apple") is a California corporation having a principal place of business at One Apple Park Way, Cupertino, California 95014.   Apple unlawfully sells for importation, imports, and/or sells after importation into the United States certain light-based physiological measurement devices and components thereof, including the Apple Watch Series 6, that infringe the '501 Patent, the '502 Patent, the '648 Patent, the '745 Patent, and the '127 Patent, either literally or under the doctrine of equivalents.

22.     Apple is in the business of designing, manufacturing, and marketing smartphones, personal computers, tablets, wearables, and accessories, and sells a variety of related services.

Apple's wearables include certain light-based physiological measurement devices and components thereof, including the Apple Watch Series 6.

## IV.  PRODUCTS AND TECHNOLOGY AT ISSUE

### A.  Complainants' Technology

23.    Products that practice one or more claims of the Asserted Patents—including the Accused Products and Masimo's Domestic Industry products—are light-based physiological measurement devices and components thereof.   These physiological measurement devices typically rely on light that is transmitted through the body tissue.  The received light, that has been attenuated by the various components of the body tissue, including the pulsing arterial blood, is known in the industry as a photoplethysmography or "PPG."   The transmission and receipt of this light is typically accomplished through a sensor that is applied to a body part such as a finger, arm, toes, forehead or ear.

24.    Before Masimo, non-invasive measurements from the PPG were plagued by unreliability, often when the measurement was needed most, due to the person moving or having low peripheral blood flow (known as "low perfusion").  The industry had essentially given up on solving these problems, concluding they were largely unsolvable.   In the medical context, clinicians had to live with the results—patient monitors gave excessive false alarms, froze their measurements for prolonged periods of time despite potential changes in the physiological parameter (e.g., oxygen saturation or pulse rate), delayed notification of alarms due to long averaging times of sensor data, produced inaccurate measurements, or were unable to obtain data on the most critical patients and babies who cannot be instructed to stay still.   Masimo's pioneering Masimo SET® technology, solves this problem and dramatically improved the reliability of monitoring and reporting physiological signals derived from the PPG.

████████████████████████████████████████

25.     Following its initial success with Masimo SET® technology, Masimo invested heavily in developing additional breakthrough measurement technologies, such as non-invasively measuring total hemoglobin, carboxyhemoglobin, and methemoglobin.  Masimo has continued to innovate, succeeding where others have consistently failed.  Masimo was the first, and remains the only, company delivering these game-changing technologies to hospitals in the United States.  Use of Masimo's technology in the clinical setting has been proven to reduce blindness in premature infants, detect congenital heart disease in infants, save lives on the general care floor and post-surgery, and improve transfusion management, while also saving substantial money for the hospitals providing care.

26.     Masimo's investment in its technology and research and development has included significant investments in wrist-worn devices for measurements of physiological parameters.  Masimo's patent filings as early as 2002 disclose wrist-worn devices for measuring physiological parameters that wirelessly connected to monitors.  *See* **Exhibit 40** (Provisional Application No. 60/367,428 filed on March 25, 2002).

27.     One of Masimo's commercially marketed wrist-worn device for measuring physiological parameters, the Radius PPG, was cleared by the FDA in May of 2019.  The Radius PPG eliminated the need for a cabled connection to a pulse oximetry monitor, allowing patients to move freely and comfortably while still being continuously monitored reliably and accurately. The device communicated with monitors via a wireless connection allowing patients to benefit from mobility.

28.     ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

29.     Given its success selling medical-grade devices for non-invasively measuring physiological parameters, Complainants decided to leverage these clinical grade products for sale directly to consumers where allowable.  Masimo noticed that there has been many devices sold to consumers purporting to provide physiological measurements, but could identify none that provided clinical grade measurement.  The devices available to consumers were more like toys. In 2013, Masimo first began selling its pulse oximetry products to the consumer market.  After Masimo began selling directly to consumers, it also increased its investment in direct-to-consumer advertising, including being a premium sponsor of the BNP Paribas Open Tennis Tournament in Palm Springs, CA.

30.     Notably, despite the acute awareness of pulse oximetry created by the COVID-19 pandemic, the large multitude of so-called pulse oximeters offered to consumers are prohibited for medical purposes.  Unfortunately, the consumers do not recognize this, which puts their health at risk.

31.     The Asserted Patents claim devices and/or components of devices used in the non-invasive measurement of physiological parameters such as oxygen saturation.  For example, the four Masimo Patents claim devices containing multiple optical sources that emit light at different wavelengths and numerous light detectors.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  The devices are configured in specific ways which improve the successful detection of the signal while minimizing the effects of light-piping.  The Cercacor Patent also claims novel technologies assisting in the non-invasive measurement of physiological parameters.  The '127

10

Patent claims a sensor using a thermal mass within a substrate to measure and account for effects on measurements from temperature changes.

**B.**   **Apple's Copying of Complainants' Technology**

32.   In 2013, Apple contacted Masimo and asked to meet regarding a potential collaboration.  Apple told Masimo that Apple would like to understand more about Masimo's technology to potentially integrate that technology into Apple's products.  Apple and Masimo later entered into a confidentiality agreement, and Masimo's management met with Apple.  The meetings included confidential discussions of Masimo's technology.  After what seemed to Masimo to have been productive meetings, Apple quickly began hiring Masimo's employees, including engineers and key management.

33.   Masimo employed Michael O'Reilly as its Chief Medical Officer and Executive Vice President for Medical Affairs beginning in January 2008.  As part of the Masimo executive team, O'Reilly was privy to extremely sensitive information, including information about mobile medical products and applications, wellness applications, clinical data gathering and analytics, and other technology of Masimo.  Upon information and belief, Apple employed O'Reilly in July 2013, shortly after the meetings with Masimo, to assist in wellness and mobile applications that include non-invasive measurement of physiological parameters.  Not long after, by December of 2013, O'Reilly was already meeting with the FDA on behalf of Apple to discuss medical applications and discuss medical products that non-invasively measures blood constituents.

34.   Apple systematically recruited other key Masimo personnel, such as Marcelo Lamego (a named inventor on many of the Asserted Patents), who was the former Chief Technical Officer of Cercacor and a former Research Scientist at Masimo.  Lamego was a

Masimo employee during 2000-2001 and 2003-2006, and the Cercacor Chief Technical Officer during 2006-2014.

35.     Lamego had unfettered access to Complainants' technical information.  He was trained and mentored at Masimo by the most skilled engineers and scientists, and was taught about the keys to effective non-invasive monitoring, something he was not involved in prior to Masimo.  Masimo engineers and scientists including, among others, Ammar Al-Ali, Mohamed Diab, and Walter Weber, exposed Lamego to all of Masimo's technology on non-invasive monitoring.  The Masimo engineers, including Al-Ali, Diab, and Weber, were Masimo employees at all relevant times.  Lamego also had access to and learned guarded secrets regarding Complainants' mobile medical products, including key technology and advance plans for future products.

36.     When Lamego left Cercacor, he assured Complainants that he would not violate his agreements with Complainants and volunteered that he would not work on technology similar to Complainants' technology.  On January 24, 2014, Complainants sent a letter to Apple explaining that Lamego possessed Complainants' confidential proprietary information and warning Apple to respect Complainants' rights in such information.  The letter stated, "we trust that Apple will employ Mr. Lamego in an area that does not involved healthcare technology, including mobile health applications and the measurement of physiological information."  The letter also asked that "Apple refrain from inducing Mr. Lamego to take actions that would violate the Agreement while he performs services for Apple" and asked Apple to "direct Mr. Lamego to honor his obligations to all of his prior employers."  Based on Complainants' conversations with Lamego, Complainants' letter to Apple, and Complainants' confidentiality agreement with Apple, Complainants' reasonably believed that Lamego would not use or disclose Complainants'

confidential information and that Apple would not induce Lamego to do so or itself use Complainants' confidential information.

37.     Unbeknownst to Complainants at the time, it now appears that, shortly after joining Apple in January 2014, Lamego began pursuing on behalf of Apple numerous patent applications directed toward technologies he worked on at Complainants, and with which he had no prior experience or knowledge.

38.     Apple announced the first version of its watch in September 2014 and began shipping its watch in April 2015.   On information and belief, Apple began incorporating Masimo's technology in later versions of its watch.   Ultimately with the launch of the Apple Watch Series 6 in September 2020, Apple for the first time purported to have incorporated the ability to measure blood oxygen saturation (pulse oximetry) into its watches—technology, which as described in more detail below, infringes the Asserted Claims.   Unfortunately for U.S. consumers, the Apple Watch Series 6 differs from Masimo's medical grade technology in that Apple's Accused Products do not reliably measure blood oxygen concentrations, as described in **Exhibits 33 and 35-39**.

### C.     The Accused Products

39.     Pursuant to 19 C.F.R. § 210.12(a)(12), the category of the Accused Products may be plainly described as wearable electronic devices with light-based pulse oximetry functionality, including various devices made by Apple, including, but not limited to, various models of the Apple Watch Series 6.   The Apple Watch Series 6 is an electronic smartwatch, which purportedly includes pulse oximetry functionality.   Relevant here, the Accused Products contain LEDs, photodiodes, and other features within the scope of the Masimo Patents to measure the oxygen saturation of the user.   The Accused Products also contain the thermal mass technology

claimed in the '127 Patent.  The infringing products—including their associated systems, and components thereof—are further described in **Exhibits 15, 16, 17, 18, and 19**, which include claim charts comparing the Asserted Claims to the Apple Watch Series 6.  The Apple Watch Series 6 either infringes these claims upon importation or Apple induces consumers to infringe these claims through its sale of the Apple Watch Series 6 and its recommendation, encouragement, and/or instruction to users to use the Apple Watch Series 6 in connection with an iPhone.

40.     The Apple Watch Series 6 is imported into and sold within the United States by or on behalf of Apple.  On information and belief, commercially significant volumes of infringing products are maintained in inventory by Apple in the United States.

41.     The identification of exemplary Accused Products is intended purely for illustration and is not intended to limit the scope of the investigation.  Any remedy should extend to all present and future infringing products of Apple, regardless of model number, name, or type of product.

## V.   THE ASSERTED PATENTS

### A.   U.S. Patent No. 10,912,501

#### 1.     Identification of the Patent and Ownership by Masimo Corporation

42.     Masimo Corporation owns by assignment the entire right, title, and interest in the '501 Patent, entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," which issued on February 9, 2021.  **Exhibit 1**.  The '501 Patent issued from U.S. Patent Application Serial No. 17/031,356, filed on September 24, 2020.  The '501 Patent is a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a

continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a continuation of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.   U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August

25, 2008.  U.S. Patent Application No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.  A certificate of correction issued on the '501 Patent on April 6, 2021.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '501 Patent is August 25, 2028.

43.    The inventors of the '501 Patent, Jeroen Poeze, Marcelo Lamego, Sean Merritt, Cristiano Dalvi, Hung Vo, Johannes Bruinsma, Ferdyan Lesmana, Massi Joe E. Kiani, and Greg Olsen, assigned to Masimo Laboratories, Inc. the entire right, title, and interest throughout the world in, to and under said improvements in the invention described and claimed in U.S. Patent Application No. 12/534,827 and all divisions and continuations thereof, which includes the '501 Patent.  **Exhibit 9**.  On August 2, 2010, Masimo Laboratories Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 9**.  On July 29, 2019, Cercacor assigned to Masimo Corporation, the entire right, title and interest to U.S. Application No. 16/212537 and all continuations thereof, which includes the '501 Patent.  **Exhibit 9**.  Cercacor is the licensee of certain exclusive rights to the '501 Patent.  **Confidential Exhibit 17**.  The '501 Patent is valid, enforceable, and is currently in full force and effect.

44.    Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the prosecution history of the '501 Patent[2]; and 2) an electronic copy of each patent and applicable pages of each technical reference

---

[2]    Due to USPTO errors, Complainants submitted certificates of correction to correct typographical errors in U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648 as originally issued.  Although these certificates of correction have been approved, and certificates of correction have been issued for both U.S. Patent Nos. 10,912,501 and 10,945,648, the certificate of correction for U.S. Patent No. 10,912,502 has not yet issued.  Additionally, Complainants have not yet received certified copies of the prosecution histories which contain the information related to the certificates of correction for U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648.  Accordingly, Complainants are submitting uncertified copies of the

mentioned in the prosecution history.  These materials are included in Appendices A and B, respectively.

### 2.  Foreign Counterparts to the '501 Patent

45.    Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '501 Patent.  **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '501 Patent are known to Masimo Corporation.

### 3.  Non-Technical Description of the '501 Patent

46.    The '501 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors. The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '501 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '501 Patent also includes limitations to novel arrangements of light sources and photodetectors.  The '501 Patent also contains limitations to processors, network devices, and user interfaces, allowing the device to be easily used by consumers.

---

prosecution histories of U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648, and will submit certified copies once received.

███████████████████████████████████████████████

47.     In sum, the invention of the '501 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters. ███████████████████████ ████████████████████████████████████████████.

48.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '501 Patent.

B.     <u>U.S. Patent No. 10,912,502</u>

1.     <u>Identification of the Patent and Ownership by Masimo Corporation</u>

49.     Masimo Corporation owns by assignment the entire right, title, and interest in the '502 Patent, entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," which issued on February 9, 2021. **Exhibit 2**. The '502 Patent issued from U.S. Patent Application Serial No. 17/031,407, filed on September 24, 2020. The '502 Patent is a continuation of a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a continuation of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application

Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.   U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.  On May 25, 2021, the PTO approved a certification of correction for the '502 patent, which has not yet issued. Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '502 Patent is August 25, 2028.

50.     The inventors of the '502 Patent, Jeroen Poeze, Marcelo Lamego, Sean Merritt, Cristiano Dalvi, Hung Vo, Johannes Bruinsma, Ferdyan Lesmana, Massi Joe E. Kiani, and Greg

Olsen, assigned to Masimo Laboratories, Inc. the entire right, title, and interest throughout the world in, to and under said improvements in the invention described and claimed in U.S. Patent Application No. 12/534,827 and all divisions and continuations thereof, which includes the '502 Patent.  **Exhibit 7**.  On August 2, 2010, Masimo Laboratories Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 7**.  On July 29, 2019, Cercacor assigned to Masimo Corporation, the entire right, title and interest to U.S. Application No. 16/212537 and all continuations thereof, which includes the '502 Patent.  **Exhibit 7**.  Cercacor is the licensee of certain exclusive rights to the '502 Patent.  **Confidential Exhibit 11**.  The '502 Patent is valid, enforceable, and is currently in full force and effect.

51.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the prosecution history of the '502 Patent; and 2) a electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices C and B, respectively.  Because the '501 Patent, '502 Patent, and '648 Patent are related, there is a substantial overlap of the patents and applicable pages of each technical reference mentioned in the prosecution histories and the copies are provided together in Appendix B.

### 2.     Foreign Counterparts to the '502 Patent

52.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '502 Patent.  **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '502 Patent are known to Masimo Corporation.

### 3.     Non-Technical Description of the '502 Patent

53.     Like the '501 Patent, the '502 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate. The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors. The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection. This data is then processed by a processing device which outputs a measurement of the physiological parameter. The '502 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements. The '502 Patent also includes limitations to novel arrangements of light sources and photodetectors. The '502 Patent also contains limitations to processors, network devices, and user interfaces, allowing the device to be easily used by consumers.

54.     In sum, the invention of the '502 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters. ███████████████████ ████████████████████████████████████████.

55.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '502 Patent.

C.      **U.S. Patent No. 10,945,648**

1.      **Identification of the Patent and Ownership by Masimo Corporation**

56.     Masimo Corporation owns by assignment the entire right, title, and interest in the '648 Patent, entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," which issued on March 16, 2021. (*See* **Exhibit 3**). The '648 Patent issued

21

from U.S. Patent Application Serial No. 17/031,316, filed on September 24, 2020.  The '648 Patent is a continuation of is a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a continuation of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, and 61/091,732 filed August 25, 2008. U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008. U.S. Patent Application No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008. U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of

the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.  A certificate of correction issued on the '648 Patent on April 20, 2021.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '648 Patent is August 25, 2028.

57.    The inventors of the '648 Patent, Jeroen Poeze, Marcelo Lamego, Sean Merritt, Cristiano Dalvi, Hung Vo, Johannes Bruinsma, Ferdyan Lesmana, Massi Joe E. Kiani, and Greg Olsen, assigned to Masimo Laboratories, Inc. the entire right, title, and interest throughout the world in, to and under said improvements in the invention described and claimed in U.S. Patent Application No. 12/534,827 and all divisions and continuations thereof, which includes the '648 Patent.  **Exhibit 8**.  On August 2, 2010, Masimo Laboratories Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 8**.  On July 29, 2019, Cercacor assigned to Masimo Corporation, the entire right, title and interest to U.S. Application No. 16/212537 and all continuations thereof, which includes the '648 Patent.  **Exhibit 8**.  Cercacor is the licensee of certain exclusive rights to the '648 Patent.  **Confidential Exhibit 11**.  The '648 Patent is valid, enforceable, and is currently in full force and effect.

58.    Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the prosecution history of the '648 Patent; and 2) a electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices D and B,

respectively.   Because the '501 Patent, '502 Patent, and '648 Patent are related, there is a substantial overlap of the patents and applicable pages of each technical reference mentioned in the prosecution histories and the copies are provided together in Appendix B.

## 2.      Foreign Counterparts to the '648 Patent

59.      Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '648 Patent.  **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '648 Patent are known to Masimo Corporation.

## 3.      Non-Technical Description of the '648 Patent

60.      Like the '501 and '502 Patents, the '648 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '648 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '648 Patent also includes limitations to novel arrangements of light sources and photodetectors.  The '648 Patent also contains limitations to processors, network devices, and user interfaces, allowing the device to be easily used by consumers.

61.      In sum, the invention of the '648 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters.                    .

62.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '648 Patent.

    **D.**     <u>**U.S. Patent No. 10,687,745**</u>

          **1.**     <u>**Identification of the Patent and Ownership by Masimo Corporation**</u>

63.     Masimo Corporation owns by assignment the entire right, title, and interest in the '745 Patent, entitled "Physiological Monitoring Devices, Systems, and Methods," which issued on June 23, 2020.  (*See* **Exhibit 4**).  The '745 Patent issued from U.S. Patent Application Serial No. 16/835,772, filed on March 31, 2020.  The '745 Patent is a continuation of U.S. Patent Application No. 16/791,963, filed February 14, 2020, which is a continuation of U.S. Patent Application No. 16/532,065 filed August 5, 2019, which is a continuation of U.S. Patent Application No. 16/226,249 filed December 19, 2018, which is a continuation of U.S. Patent Application No. 15/195,199 filed June 28, 2016, which claims priority benefit under 35 U.S.C. § 119(e) from U.S. Provisional Application No. 62/188,430, filed July 2, 2015.  A certificate of correction issued on the '745 Patent on September 22, 2020.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '745 Patent is June 28, 2029.

64.     The inventor of the '745 Patent, Ammar Al-Ali, assigned to Masimo Corporation the entire right, title, and interest in in U.S. Patent Application No. 15/195199, and all divisions and continuations thereof, which includes the '745 Patent.  **Exhibit 9**.  Cercacor is the licensee of certain exclusive rights to the '745 Patent.  **Confidential Exhibit 11**.  The '745 Patent is valid, enforceable, and is currently in full force and effect.

65.    Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the certified prosecution history of the '745 Patent; and 2) an electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices E and F, respectively.

### 2.    Foreign Counterparts to the '745 Patent

66.    Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '745 Patent.  *See* **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '745 Patent are known to Masimo Corporation.

### 3.    Non-Technical Description of the '745 Patent

67.    The '745 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors. The devices also include optical transmission materials configured to change the shape of the emitted light or diffusers to spread the light.  The devices also contain light blocks to inhibit light from the optical sources from reaching the detectors before being attenuated by the user's skin. The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '745 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '745 Patent also includes limitations to novel arrangements of light sources and photodetectors.

68.     In sum, the invention of the '745 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters. ███████████ █████████████████████████████████████████████████████████████.

69.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '745 Patent.

### E.     U.S. Patent No. 7,761,127

#### 1.     Identification of the Patent and Ownership by Cercacor

70.     Cercacor owns by assignment the entire right, title, and interest in the '127 Patent, entitled "Multiple Wavelength Sensor Substrate," which issued on July 20, 2010.  **Exhibit 5**. The '127 Patent issued from U.S. Patent Application Serial No. 11/366,209, filed on March 1, 2006.  The '127 Patent claims priority to Provisional Application No. 60/657,596, filed on March 1, 2005, Provisional Application No. 60/657,281, filed on March 1, 2005, Provisional Application No. 60/657,268, filed on March 1, 2005, and Provisional Application No. 60/657,759, filed on March 1, 2005.  Certificates of correction issued on the '127 Patent on January 4, 2011 and February 1, 2011.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '127 Patent is April 28, 2029.

71.     The inventors of the '127 Patent, Ammar Al-Ali, Mohamed Diab, Marcelo Lamego, James Coffin, and Yassir Abdul-Hafiz, assigned to Masimo Laboratories, Inc. the entire right, title, and interest in U.S. Patent Application No. 11/366,209, and all patents granted thereof, which includes the '127 Patent.  **Exhibit 10**.  On August 2, 2010, Masimo Laboratories, Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 10**.  Masimo is a licensee of

certain exclusive rights to the '127 Patent.  **Confidential Exhibit 11**.  The '127 Patent is valid, enforceable, and is currently in full force and effect.

72.　　Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the certified prosecution history of the '127 Patent; and 2) an electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices G and H, respectively.

### 2.　　Foreign Counterparts to the '127 Patent

73.　　Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '127 Patent.  **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '127 Patent are known to Masimo Corporation.

### 3.　　Non-Technical Description of the '127 Patent

74.　　The '127 Patent discloses and involves a physiological sensor for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The sensor includes a thermal mass, a plurality of light emitting sources operating at a plurality of wavelengths thermally coupled to the thermal mass, a temperature sensor to determine the bulk temperature of the thermal mass, and a detector capable of detecting light emitted from the light emitting sources after attenuation by the user's skin.  Based on the bulk temperature of the thermal mass, the sensor is able to compensate for shifts in the LED wavelengths due to temperature.

75.    In sum, the '127 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters.  Confidential samples of rainbow® sensors that embody the claims of the '127 Patent are available upon request.

76.    The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '127 Patent.

**F.    Licensees**

77.    Masimo has licensed certain exclusive rights to the Masimo Patents to Cercacor. **Confidential Exhibit 11**.  Cercacor has licensed certain exclusive rights to the Cercacor Patent to Masimo.  **Confidential Exhibit 11**.  There are no other licensees to the Asserted Patents.

**VI.    UNLAWFUL AND UNFAIR ACTS OF PROPOSED RESPONDENT**

78.    Respondent manufactures, markets, sells for importation, imports and/or sells after importation into the United States products that directly infringe the '501 Patent, the '502 Patent, the '648 Patent, the '745 Patent, and the '127 Patent, either literally or under the doctrine of equivalents.  Apple also induces the infringement of claims 20-24 and 26-27 of the '745 Patent by recommending, encouraging, and/or suggesting that consumers use their Apple Watch Series 6 with the consumer's iPhone in an infringing manner.  On information and belief, Apple has knowledge of the '745 Patent because it monitors Masimo's patent filings.  Apple will also have knowledge of the '745 Patent before the issuance of any requested relief in this Investigation, from the filing of this lawsuit itself and service of this complaint.

79.    Respondent's Apple Watch Series 6 are sold under the below model names and numbers.

| Model Name | Model Number |
|---|---|
| Apple Watch Series 6 (GPS) 40 mm case | A2291 |
| Apple Watch Series 6 (GPS) 44 mm case | A2292 |
| Apple Watch Nike (GPS) 40 mm case | A2291 |
| Apple Watch Nike (GPS) 44 mm case | A2292 |
| Apple Watch Series 6 (GPS + Cellular) Aluminum 40 mm case | A2293 |
| Apple Watch Series 6 (GPS + Cellular) Aluminum 44 mm case | A2294 |
| Apple Watch Nike (GPS + Cellular) 40 mm case | A2293 |
| Apple Watch Nike (GPS + Cellular) 44 mm case | A2294 |
| Apple Watch Series 6 (GPS + Cellular) Stainless Steel 44 mm case | A2293 |
| Apple Watch Series 6 (GPS + Cellular) Stainless Steel 44 mm case | A2294 |
| Apple Watch Hermes (GPS + Cellular) 40 mm case | A2293 |
| Apple Watch Hermes (GPS + Cellular) 44 mm case | A2294 |
| Apple Watch Edition (GPS + Cellular) Titanium 40 mm case | A2293 |
| Apple Watch Edition (GPS + Cellular) Titanium 44 mm case | A2294 |

80.     Photographs of a representative Apple Watch Series 6 (specifically Model No. 2291) are attached to this Complaint as **Exhibit 13**.  A copy of information regarding the Apple Watch Series 6 from Apple's website is attached hereto as **Exhibit 14**.  Samples of the Apple Watch Series 6 can be made available upon request.

81.     On information and belief, Respondent and others on its behalf manufacture the Accused Products at least in China, and then import them into the United States, sell them for importation into the United States, and/or sell them within the United States after importation.

82.     These acts of Respondent constitute infringement of the Asserted Patents.

83.     Claim charts demonstrating how a representative Apple Watch Series 6 infringes the '501 Patent, the '502 Patent, the '648 Patent,'745 Patent, and the '127 Patent are attached as **Confidential Exhibits 15, 16, 17, 18, and 19**, respectively.  While a representative Apple Watch Series 6 is shown in the claim charts in **Confidential Exhibits 15, 16, 17, 18, and 19**, Respondent does not distinguish in any relevant manner between other model numbers of the Apple Watch Series 6 in their marketing or promotional materials, and Masimo alleges that all of Respondent's Apple Watch Series 6 identified in ¶79 above infringe at least one Asserted Claim of the Asserted Patents.

84.     Masimo has not licensed or otherwise authorized Respondent to make, use, sell, offer to sell, or import the Accused Products.

85.     Respondent has sought to capitalize on Masimo's extensive research and development efforts.

### VII.   THE DOMESTIC INDUSTRY RELATED TO ASSERTED PATENTS

86.     A domestic industry exists or is in the process of being established as defined by 19 U.S.C. §§ 1337(a)(2)–(3) relating to Masimo's significant investment in plant and equipment; significant employment of labor or capital; research and development activities; and substantial investment in exploitation of the patents, including engineering with respect to Masimo's physiological measurement devices and monitors.  With respect to the '501 Patent, the '502 Patent, the '648 Patent, and the '745 Patent, Masimo's activities in the United States with respect to ██████████████████████████████████████—constitute a domestic industry for purposes of Section 337.  To the extent it is determined that a domestic industry does not currently exist with respect to the '501 Patent, the '502 Patent, the '648 Patent, and/or the '745 Patent, Masimo is in the process of establishing a domestic industry ████████████████

██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ is protected by one or more claims of each of the '501 Patent, the '502 Patent, the '648 Patent, and the '745 Patent.

87.     With respect to the '127 Patent, Masimo's activities in the United States with respect to at least its rainbow® sensor technology constitute a domestic industry for purposes of Section 337.   Masimo's rainbow® sensors—including the, RD rainbow® Set-2, rainbow® R1, rainbow® R25, rainbow® R20, rainbow® DCI SC 200, rainbow® DCI SC 400, rainbow® DCI SC 1000, rainbow® DCI mini SC-200, rainbow® DCI mini SC-400, rainbow® DCI mini SC-1000, rainbow® Super DCI mini SC-200, rainbow® Super DCI mini SC-400, rainbow® Super DCI mini-SC-1000, rainbow® DCI, rainbow® DCI-dc, RD rainbow® 8 λ SpCO Adhesive Sensor, LNCS-II™ rainbow® DCI® 8λ SpHb, LNCS-II™ rainbow® DCIP® 8λ SpHb, LNCS-II™ rainbow® DCI® 8λ SpCO, and LNCS-II™ rainbow® DCIP® 8λ SpCO—are protected by at least one claim of the '127 Patent.

A.      **Technical Prong**

88.     Masimo has designed and developed its domestic industry products through its extensive research and development efforts based almost entirely in the United States. Moreover, Masimo ██████████████████████████████ in the United States and manufactures a material amount of the components of its rainbow® sensors in the United States.   As set forth in more detail herein, Masimo's domestic industry products incorporate the inventions claimed in one or more claims of the Asserted Patents.

89.     Drawings, photographs, or other visual representations of representative Masimo domestic industry products (specifically, ███████████ and certain rainbow® sensors) are

attached hereto as **Confidential Exhibit 20 and Confidential Exhibit 21**.  Claim charts showing how a representative Masimo domestic industry product practices exemplary claims of the '501 Patent, the '502 Patent, the '648 Patent, the '745 Patent, and the '127 Patent are attached hereto as **Confidential Exhibits 15, 16, 17, 18 and 19**, respectively.  Additional information regarding the domestic industry products is found in the Declaration of Bilal Muhsin, attached hereto as **Confidential Exhibit 27**.

        **B.**      **Economic Prong**

90.     The domestic industry in this case is based on significant investments Masimo has made and/or plans to make and activities Masimo has undertaken and/or plans to undertake in the United States relating to products protected by one or more claims of the Asserted Patents. These investments and activities include research and development, manufacturing, testing, and engineering for the Masimo domestic industry products.  Specific, non-limiting examples of Masimo's substantial investments and activities related to the Asserted Patents are set forth in the confidential declaration of Micah Young, attached to this complaint as **Confidential Exhibit 28**.

91.     Masimo employs a significant number of employees in its U.S facilities in Irvine, California.  These employees devote substantial personnel-hours toward the research and development, testing and engineering for the Masimo domestic industry products.  The confidential declaration of Micah Young sets forth details regarding the investments it has made in these U.S. employees.

92.     Masimo also invests capital toward manufacturing and research and development for products protected by the Asserted Patents.  The confidential declaration of Micah Young provides additional details regarding Masimo's capital investments.

93.     In addition, Masimo has made substantial investments in plant and equipment in the United States.  Masimo's facilities in Irvine, California, houses activities for research and development, manufacturing, testing and engineering for the Masimo domestic industry products.  Masimo also owns a facility in New Hampshire where manufacturing activities for its rainbow® sensors take place.  The confidential declaration of Micah Young includes further non-limiting examples of Masimo's investments in this category.

94.     To the extent it is determined that a domestic industry does not currently exist, Masimo is in the process of establishing a domestic industry with respect to the Masimo Patents because it is actively engaged in the steps leading to the exploitation of its intellectual property rights, and there is a significant likelihood that an industry will be established in the United States in the future ████████████████████████████████

████████████████████████████████████████████████

████████████████████████.  Further, non limiting examples regarding the active steps taken by Masimo to establish a domestic industry are included in the confidential declaration of Micah Young filed herewith as **Confidential Exhibit 28**.

## VIII.  <u>SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE</u>

95.     Respondent, and/or others on its behalf, manufactures the Accused Products at least in China, and then imports them into the United States, sells them for importation into the United States, and/or sells them after importation into the United States.  Respondent sells and offers for sale the Accused Products directly to customers in the United States.  Respondent stated in a press release dated September 15, 2020, that it was introducing the Series 6 in the United States for sale starting on September 18, 2020.  **Exhibit 29**

96.     Prior to filing this Complaint, a representative Apple Watch Series 6 product was purchased on April 19, 2021, in the United States.  A copy of the invoice of this purchase is

attached hereto as **Confidential Exhibit 30**.  The packaging of this Accused Product indicates that it was made outside the United States.  Photographs of the product packaging for this Apple Watch product, showing that it was made in China, are attached hereto as **Exhibit 31**.

97.     In addition, Apple's 10K filed with the SEC on January 28, 2021 states that "[s]ubstantially all of the Company's hardware products are manufactured by outsourcing partners that are located primarily in Asia, with some Mac computers manufactured in the U.S. and Ireland."  **Exhibit 32**.

## IX.  CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

98.     Upon information and belief, the Accused Products may be classified under at least the following heading of the Harmonized Tariff Schedules of the United States: 8517.62.0090.  This HTS identification is illustrative and not exhaustive.  The identification is not intended to limit the scope of the Investigation, nor is it intended to restrict the scope of any exclusion order or other remedy ordered by the Commission.

## X.  RELATED LITIGATION

99.     On January 9, 2020, Masimo Corp. and Cercacor filed suit in the United States District Court for the Central District of California, Case No. 8:20-cv-00048.  In that case, Complainants assert that Respondent Apple has, *inter alia*, engaged in trade secret misappropriation and has infringed patents not asserted in this complaint by the sale of the certain products, including the Apple Watch Series 6.  Complainants also seek a declaration of ownership of several patents and applications filed by Apple.  That case is currently pending before the district court, but Complainants' patent infringement claims are stayed pending resolution of the below referenced *inter partes* review proceedings.

100.     Respondent has filed numerous petitions for *inter partes* review of the patents involved in Case No. 8:20-cv-0048, none of which are asserted in this complaint:  IPR2020-01520 (Instituted March 2, 2021); IPR2021-00208 (Instituted June 3, 2021); IPR2020-01521 (Instituted April 14, 2021); IPR2021-00193 (Instituted June 3, 2021); IPR2021-00195 (Instituted June 3, 2021); IPR2021-00209 (Instituted June 3, 2021); IPR2020-01524 (Instituted April 16, 2021); IPR2020-01722 (Instituted May 12, 2021); IPR2020-01723 (Institution denied May 12, 2021); IPR2020-01536 (Instituted March 2, 2021); IPR2020-01537 (Instituted March 2, 2021); IPR2020-01538 (Instituted March 2, 2021); IPR2020-01539 (Instituted March 2, 2021); IPR2020-01526 (Instituted April 16, 2021); and IPR2020-01523 (Instituted April 14, 2021).

101.     There have been no other foreign or domestic court or agency litigations involving any of the Asserted Patents.

## XI.   <u>REQUESTED RELIEF</u>

102.     WHEREFORE, by reason of the foregoing, Complainants request that the United States International Trade Commission:

    a)  institute an immediate investigation pursuant to 19 U.S.C. § 1337 into the violations of that section based on Respondent's unlawful importation into the United States, sale for importation into the United States, and/or sale in the United States after importation of certain light-based physiological measurement devices and components thereof that infringe one or more claims of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and/or 7,761,127;

    b)  schedule and conduct a hearing pursuant to Section 337(c), for the purposes of receiving evidence and hearing argument concerning whether there has been a violation of Section 337;

c) determine that there has been a violation of Section 337 by Respondent;

d) issue a permanent exclusion order, pursuant to 19 U.S.C. § 1337(d), excluding from entry into the United States all of Respondent's light-based physiological measurement devices and components thereof, including Apple Watch Series 6, that infringe one or more claims of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and/or 7,761,127;

e) issue a permanent cease and desist order, pursuant to 19 U.S.C. § 1337(f), directing Respondent to cease and desist from importing, marketing, advertising, demonstrating, warehousing of inventory for distribution, sale, or use of certain light-based physiological measurement devices and components thereof that infringe one or more claims of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and/or 7,761,127;

f) impose a bond upon Respondent should Respondent continue to import infringing articles during the 60-day Presidential Review period pursuant to 19 U.S.C. § 1337(j); and

g) grant such other and further relief as the Commission deems appropriate and just under the law, based on the facts complained of herein and determined by the investigation.

Respectfully submitted,

Dated:  June 29, 2021                 By: /s/ *Jonathan E. Bachand*
                                      Jonathan E. Bachand
                                      KNOBBE, MARTENS, OLSON & BEAR, LLP
                                      1717 Pennsylvania Ave NW STE 900
                                      Washington, DC 20006
                                      Telephone: 202-640-6400

Facsimile: 949-760-9502

Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

## <u>VERIFICATION OF COMPLAINT</u>

I, Jonathan E. Bachand, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.12(a), under penalty of perjury, that the following statements are true:

1.     I am Counsel for Complainants Masimo Corporation and Cercacor Laboratories, Inc. and I am duly authorized to sign the Complaint on behalf of Complainants;

2.     I have read the foregoing Complaint;

3.     To the best of my knowledge, information, and belief, based upon reasonable inquiry, the foregoing Complaint is well-founded in fact and is warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law, or the establishment of new law;

4.     The allegations and other factual contentions have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

5.     The foregoing Complaint is not being filed for an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation.

Executed this 29th day of June, 2021.

/s/ *Jonathan E. Bachand*
Jonathan E. Bachand
Counsel for Complainants
Masimo Corporation and Cercacor
Laboratories, Inc.

44

# EXHIBIT O

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

```
-------------------------------x
In the Matter of                   Investigation No.

CERTAIN LIGHT-BASED PHYSIOLOGICAL   337-TA-1276

MEASUREMENT DEVICES AND COMPONENTS

THEREOF

-------------------------------x
```

**OPEN SESSIONS**

```
Pages:    862 through 1167 (with excerpts)

Place:    Washington, D.C.

Date:     June 9, 2022
```

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

```
 1              UNITED STATES INTERNATIONAL TRADE COMMISSION

 2                        Washington, D.C.

 3            Before the Honorable Monica Bhattacharyya

 4                     Administrative Law Judge

 5

 6     -------------------------------x

 7     In the Matter of                    Investigation No.

 8

 9     CERTAIN LIGHT-BASED PHYSIOLOGICAL    337-TA-1276

10     MEASUREMENT DEVICES AND COMPONENTS

11     THEREOF

12     -------------------------------x

13

14

15                     EVIDENTIARY HEARING

16                   Thursday, June 9, 2022

17                        Volume IV

18

19

20          The parties met via remote videoconferencing

21     pursuant to notice of the Administrative Law Judge at 9:30

22     a.m. Eastern.

23

24

25     Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR
```

1    A P P E A R A N C E S:

2    [All parties appeared via remote videoconferencing and/or

3    telephonically.]

4

5    Counsel for Complainants Masimo Corporation and Cercacor

6    Laboratories, Inc.:

7              KNOBBE, MARTENS, OLSON & BEAR, LLP

8              2040 Main Street, Fourteenth Floor

9              Irvine, California 92614

10             (949) 760-0404

11                  Stephen C. Jensen, Esq.

12                  Joseph R. Re, Esq.

13                  Sheila N. Swaroop, Esq.

14                  Ted M. Cannon, Esq.

15                  Kendall M. Loebbaka, Esq.

16                  Douglas B. Wentzel, Esq.

17                  Irfan A. Lateef, Esq.

18                  Brian C. Claassen, Esq.

19                  Daniel C. Kiang, Esq.

20                  Douglas B. Wentzel, Esq.

21

22

23

24

25    CONTINUED ON FOLLOWING PAGE

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Complainants Masimo Corporation and Cercacor

 4   Laboratories, Inc.:

 5           KNOBBE, MARTENS, OLSON & BEAR, LLP

 6           1717 Pennsylvania Avenue, NW, Suite 900

 7           Washington, DC 20006

 8           (202) 640-6400

 9               Jonathan E. Bachand, Esq.

10

11           KNOBBE, MARTENS, OLSON & BEAR, LLP

12           925 4th Avenue, Suite 2500

13           Seattle, Washington 98104

14           (206) 405-2000

15               Carol Pitzel Cruz, Esq.

16

17

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Respondent Apple Inc.:

 4           WILMER CUTLER PICKERING HALE AND DORR LLP

 5           1875 Pennsylvania Avenue, NW

 6           Washington, DC 20006

 7           (202) 663-6000

 8               Michael D. Esch, Esq.

 9               David L. Cavanaugh, Esq.

10

11           WILMER CUTLER PICKERING HALE AND DORR LLP

12           2600 El Camino Real, Suite 400

13           Palo Alto, California 94306

14           (650) 858-6000

15               Mark D. Selwyn, Esq.

16

17

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Respondent Apple Inc.:

 4           WILMER CUTLER PICKERING HALE AND DORR LLP

 5           60 State Street

 6           Boston, Massachusetts 02109

 7           (617) 526-6000

 8                   Joseph J. Mueller, Esq.

 9                   Richard Goldenberg, Esq.

10                   Sarah R. Frazier, Esq.

11                   Jonathan A. Cox, Esq.

12                   Nina Garcia, Esq.

13                   Cynthia D. Vreeland, Esq.

14

15

16           WILMER CUTLER PICKERING HALE AND DORR LLP

17           1225 17th Street, Suite 2600

18           Denver, Colorado 80202

19           (720) 598-3459

20                   Ravi S. Deol, Esq.

21

22

23

24

25       CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Respondent Apple Inc.:

 4            WILMER CUTLER PICKERING HALE AND DORR LLP

 5            350 South Grand Avenue, Suite 2400

 6            Los Angeles, California 90071

 7            (213) 443-5300

 8                  Derek Gosma, Esq.

 9

10

11

12

13

14

15

16

17            *** Index appears at end of transcript ***

18

19

20

21

22

23

24

25
```

```
 1                    O P E N   S E S S I O N

 2

 3                    AFTERNOON SESSION

 4                 (In session at 2:00 p.m.)

 5           JUDGE BHATTACHARYYA:  We're on the public record.

 6           MR. MUELLER:  Thank you, Your Honor.  We would

 7    like to call as our next witness Scott Cromar.

 8           Hello, Mr. Cromar.

 9           THE WITNESS:  Good morning or good afternoon.

10    Can you hear me and see me okay?

11           JUDGE BHATTACHARYYA:  I can.

12           THE WITNESS:  Okay.  Great.

13           JUDGE BHATTACHARYYA:  Do you understand that

14    you're under an obligation to tell the truth here today?

15           THE WITNESS:  Yes.

16                      SCOTT CROMAR,

17            having been first duly sworn and/or affirmed

18    on his oath, was thereafter examined and testified as

19    follows:

20           JUDGE BHATTACHARYYA:  Proceed, counsel.

21                    DIRECT EXAMINATION

22    BY MR. MUELLER:

23       Q.   Good afternoon, Mr. Cromar.  My name is Joe

24    Mueller, and I'd like to ask you a few questions, if I

25    could.
```

```
 1        A.    Okay.

 2        Q.    Mr. Cromar, you are an attorney, correct?

 3        A.    Yes, that's correct.

 4        Q.    And you prosecute patents, right, sir?

 5        A.    Yes.

 6        Q.    You've prosecuted in the range of a hundred or so

 7   patents for Masimo or Cercacor, correct?

 8        A.    I don't know what the specific number is.  That

 9   might be right.  Something like that, quite a few.

10        Q.    Now, sir, you're a partner at Knobbe Martens,

11   right?

12        A.    Yes, that's right.

13        Q.    That's the same firm as Mr. Re and Ms. Swaroop

14   and their colleagues, correct?

15        A.    Yes.

16        Q.    Now you, sir, were the prosecutor and helped

17   primary responsibility for the prosecution of three of the

18   patents in this investigation; is that fair?

19        A.    Yes, that's right.

20        Q.    The '501, '502, and '648, correct?

21        A.    Correct.

22        Q.    Now the original priority application for those

23   patents was filed in 2008, right?

24        A.    Are you referring to the provisionals that the

25   patents-in-suit claim priority to?
```

 1        Q.    That's correct, sir.

 2        A.    I believe there were multiple provisionals, so

 3   they were -- I think they were filed in 2008 in different

 4   times in 2008.

 5        Q.    Now the '501, '502, and '648 were filed on

 6   September 24th of the year 2000, right?  I'm sorry.  2020.

 7   I misspoke.  2020.  Is that right, sir?

 8        A.    That's consistent with my recollection at the

 9   moment.  I would have to look at the files just to confirm

10   that that date is correct, but I believe that's correct.

11        Q.    Just to make this a little easier, if we could go

12   to tab 1 in the binder that you should have in front of you.

13   This is your deposition from this case.  You were deposed,

14   right, sir?

15        A.    Yes, I was deposed.  I don't know for sure which

16   binder you're referring to.  I have a binder that says

17   Cromar direct on it and there's also a sealed envelope.

18        Q.    You can open the sealed envelope right now, sir.

19        A.    Okay.  Let me grab that.  I was told that I

20   should open this on camera; is that correct?

21        Q.    Go right ahead.

22        A.    All right.  So I think, is this the binder that

23   you're referring to?

24        Q.    Yes, tab 1, please, sir.  Page 108, lines 14-17.

25   We can put these up on the screen too.

1          Question.  Okay.  So you filed the applications

2    for the '501, '502, and '648 patents on the same day, that

3    was September 24th, 2020, correct?

4          Answer.  I believe that's correct.

5          Does that refresh your memory, sir?

6     A.   Sorry.  You got a little ahead of me.  I was

7    trying to open to the correct page.  So you said it's page

8    108?

9     Q.   No -- that's right -- 108, lines 14-17, please,

10    sir.

11    A.   Okay.  I'm there now.

12    Q.   And you see here, you were asked whether you

13    filed these three patents on the same day, September 24th,

14    2020, correct?

15    A.   Correct.  I believe that's the correct date, but

16    I would have to go verify that by looking at the file

17    histories.

18    Q.   Now that's 12 years after 2008, right?

19    A.   Yes.  You're asking for the difference between

20    the year 2008 and the year 2020, correct?

21    Q.   Twelve years, right?

22    A.   That would be 12 years, that's right.

23    Q.   Now you couldn't identify at your deposition any

24    reason why, for example, the application for the '501 patent

25    could not have been filed earlier than September of 2020,

1   correct?

2        A.   I don't know that that's correct.  Can I refresh

3   my recollection, or do you have something that can remind

4   me?

5        Q.   Absolutely.  Let's go to page 90 in your

6   deposition, lines 2-11.

7             Question.  Sitting here today, you cannot

8   identify any reason why the application for the '501 patent

9   could not have been filed earlier than September 2020,

10  correct?

11            Yeah.  Again, I -- I haven't formed an opinion on

12  that, and I don't feel comfortable doing so as we sit here.

13            Were you asked that question and did you give

14  that answer?

15       A.   Yes, that's correct.  I believe my answer to the

16  question was that I haven't formed an opinion on it, and,

17  you know, at the time I hadn't formed an opinion on it.

18       Q.   Let's pull up CX-1287.  This is a press release

19  for the release of the Apple Watch Series 6.  Let me just

20  focus you on the date.

21            Do you see September 15th, 2020?

22       A.   Yeah, I see that on the screen.

23       Q.   That's nine days before you filed the

24  applications that led to the '501, '502, and '648 patents,

25  correct?

1    A.   Just to confirm, I understand the question

2  correctly, you're asking for the difference between

3  September 15th, 2020, and September 24th, 2020?

4    Q.   Nine days, right?

5    A.   Yes, there's -- that would be nine days, that's

6  right.

7    Q.   Now over the course of the prosecution of these

8  three patents, the '501, '502, and '648, you had access to

9  confidential teardowns of the Apple Series 6 watch, correct?

10   A.   I am not sure -- the question sounds kind of like

11 it's potentially getting into privileged information, and

12 I'm not sure if I can answer.

13   Q.   Let me take you to your deposition, at page 245,

14 lines 12-18.

15        Question.  Did you see those nonpublic teardowns

16 of the Apple Watch Series 6 during prosecution of the '501,

17 '502, and '648 patents?

18        The Witness:  Yes, I think so.

19        Were you asked that question and did you give

20 that answer?

21   A.   I'm getting to that page.  I see that, yes, I

22 believe that's correct.

23   Q.   Now at your deposition you did not answer because

24 you said you could not answer without revealing privileged

25 information the following question:

1    You drafted the claims of the '501 patent

2    application to cover Apple Watch products.

3    At your deposition you were unable to answer that

4    question without revealing privileged information, true?

5    MR. RE:  Objection, Your Honor, again, seeing an

6    adverse inference from the assertion of the privilege which

7    is wholly improper and unethical.

8    MR. MUELLER:  It's neither improper nor

9    unethical, Your Honor.  Right now I'm not asking for any

10   adverse inference; I'm asking for the facts.

11   MR. RE:  No, the privilege has been asserted.  I

12   don't see why you're asking questions where you know the

13   privilege has been asserted.

14   MR. MUELLER:  Your Honor, what I asked was, you

15   couldn't answer the question on the grounds that it would

16   reveal privileged information.  This is precisely the same

17   question we asked an earlier witness in the hearing,

18   Your Honor.

19   MR. RE:  Sounds like we're in agreement.

20   MR. MUELLER:  That was not a sustained objection.

21   The question was permitted.  I'm asking the exact same form

22   of the question now.

23   JUDGE BHATTACHARYYA:  I'll allow the question.

24   Mr. Re, to the extent you want to argue, there

25   shouldn't be any adverse inference.

```
 1                   C E R T I F I C A T E

 2    TITLE: CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES

 3    AND COMPONENTS THEREOF

 4    INVESTIGATION NO.:  337-TA-1276

 5    HEARING DATE:  June 9, 2022

 6    LOCATION:  Washington, D.C. - Remote

 7    NATURE OF HEARING:  Evidentiary Hearing

 8         I hereby certify that the foregoing/attached
      transcript is a true, correct and complete record of the
 9    above-referenced proceedings of the U.S. International Trade
      Commission.
10    Date:   June 9, 2022
      Signed:
11    ss//

12    Signature of the Contractor or the Authorized Contractor's
      Representative
13
           I hereby certify that I am not the court reporter
14    and that I have proofread the above-referenced transcript of
      the proceedings of the U.S. International Trade Commission
15    against the aforementioned court reporter's notes and
      recordings for accuracy in transcription in the spelling,
16    hyphenation, punctuation and speaker identification and did
      not make any changes of a substantive nature.  The
17    foregoing/attached transcript is a true, correct and
      complete transcription of the proceedings.
18    Signed:

19    ss//       Raymond G. Brynteson

20
           I hereby certify that I reported the
21    above-referenced proceedings of the U.S. International Trade
      Commission and caused to be prepared from my record media
22    and notes of the proceedings a true, correct and complete
      verbatim recording of the proceedings.
23    Signed:

24    ss//       Linda Kinkade

25
```

# EXHIBIT P



OPINION · ACTIVIST SPOTLIGHT

# How activist Politan Capital may find an opportunity to trim costs, build value at Masimo

PUBLISHED SAT, AUG 20 2022·8:42 AM EDT

 **Kenneth Squire**
@13DMONITOR

SHARE   f   🐦   in   ✉

**In this article**

MASI  +1.37 (+1.03%)  ⊞

 Follow your favorite stocks
**CREATE FREE ACCOUNT**


📺 TV
**Fast Money
Halftime Report**   WATCH LIVE ▶
UP NEXT | The Exchange  01:00 pm ET    Listen


Dobrila Vignjevic / E+ | Getty Images

## Company: Masimo (MASI)

**Business:** Masimo ⊞ is a global medical technology company that develops, manufactures and markets a variety of noninvasive monitoring technologies and hospital automation solutions. Their core business is measure-through-motion and low perfusion pulse oximetry. They sell highly technical pulse oximeter devices to hospitals and operate in a duopoly with 60% market share. Nellcor controls the other 40% market share.

**Stock Market Value:** about $8.2B ($155.72 per share)

## Activist: Politan Capital Management

**Percentage Ownership:** 8.4%

**Average Cost:** $143.73

**Activist Commentary:** Politan Capital Management was founded by Quentin Koffey. Most recently, Koffey led the activism strategy at Senator Investment Group. Prior to that, he led the activist practice at D.E. Shaw and before that he was at Elliott Management. Koffey is operating Politan more like a private equity fund than a traditional long-short equity hedge fund, as it can draw down locked up capital to give it enough time to accomplish its goals through active engagement with

### TRENDING NOW

 **Dow rallies 600 points in huge market turnaround following hot inflation data**

 **Kamikaze drones and missiles hit north and south Ukraine; Kremlin denies Putin discussed war 'settlement'**

 **New York AG asks judge to bar Trump from moving assets to new company he formed amid fraud suit**

 **Social Security cost-of-living adjustment will be 8.7% in 2023, highest increase in 40 years**

 **Albertsons merger with Kroger could be announced this week**

boards and management teams to improve governance, operations or strategic direction. Politan looks for (i) high quality businesses that underperform their peers or potential, (ii) where there is a clear fix and (iii) a clear pathway to implement that fix.

## What's Happening?

Politan Capital Management has reported an 8.4% interest in MASI for investment purposes.

## Behind the Scenes:

Masimo has a solid core pulse oximetry business for hospitals. This is a high technology business that uses decades of studies to convince hospitals that their devices get more accurate readings and healthier outcomes. As a result, it is a very sticky business with high barriers to entry. This is a razor/razor blade business model with the devices using single-use sensors pursuant to five-year contracts resulting in 80% recurring revenue for Masimo. While Covid temporarily helped them in 2020, by the end of 2021 the bump had subsided. They now have secular tailwinds in a trend to use devices like pulse oximeters instead of nurses as the nursing population is declining. Further, more demand for pulse oximeters in hospitals is anticipated as they open up for more elective surgeries after Covid.

Masimo was founded in 1989 by chairman and CEO Joe Kiani (who owns 8.5% of the company's stock). He built a solid business and kept a small circle with a five-person board. However, Masimo has become a public company run like private company by a visionary founder. This worked fine for a while as he successfully built the pulse oximetry business, but now the milk is starting to spoil as Kiani pursues pet/science projects. While some of these projects like hospital automation businesses and brain function monitoring could be reasonable extensions of their core business, it has become obvious that the company needs a more objective board to oversee the discipline of R&D spending.

For example, after meeting with Masimo about integrating its technology into the Apple Watch, Apple began hiring Masimo employees, including its chief medical officer. In the fall of 2020, Apple introduced the Series 6 watch, which can measure arterial oxygen saturation. Masimo sued Apple for allegedly stealing trade secrets and using Masimo's inventions, which isn't unreasonable. But, now Masimo has launched its own W1 watch to compete with Apple. This feels more personal than fiduciary.

Moreover, on Feb. 15, it was announced that the company entered into an agreement to acquire Sound United LLC, a consumer speaker business, for $1 billion. At eight times EBITDA, reasonable minds can differ whether they overpaid for this acquisition or not by a couple of hundred million dollars, but news of the acquisition sent the stock into a nosedive from $228 per share on Feb. 15 to $144 per share the following day. That is a loss of $4.6 billion in market cap for a $1 billion acquisition. Clearly, the market was concerned with the lack of strategic discipline at a company being run by its founder.

This is a story as old as activism itself – a founder/CEO making a

great product and using the cash flow to fund pet projects. Kiani seems capable of running the core business, but he has an empire-building mentality that needs to be reined in by the board. With a refreshed board that institutes discipline, operating margins should be in excess of 40%, and the stock could double in three years' time.

This is a company in desperate need of shareholder representation on the board. But don't expect to see any public fight letters from Politan — that is not their style. They will work quietly and behind the scenes with the Masimo to try to get one or two seats on the board. With only five directors, Masimo could easily add two Politan directors and still have a very manageable board of seven.

As board members, Politan could be very helpful to both management and shareholders in pursuing strategic projects. They will listen to management with an open mind, and if they agree with a project their support would give management cover with other shareholders to pursue it. However, at the end of the day they are economic animals and will do what is best for shareholders — if management cannot justify a project, Politan will be there to protect shareholder value.

If Masimo does not settle, Politan would not be able to nominate directors until January and then could only nominate two directors to the staggered board. But that is OK with Politan – they are patient investors with money locked up for more than four years. They will even go through multiple years and multiple proxy fights if that is what is necessary. Quentin Koffey won five of 14 board seats at Centene, as well as three of nine board seats at CoreLogic when he was at Senator. He also had various activist campaigns at D.E. Shaw and Elliott. Moreover, there is some evidence of shareholder discontent at Masimo. At the 2022 annual meeting, incumbent directors Adam Mikkelson and Craig Reynolds received 20.3% and 30.3% votes against them, respectively. But maybe the biggest thing in Politan's favor is that Joe Kiani is up for election in 2024. If the firm wins a proxy fight in 2023, it would be like the Sword of Damocles for him. Clearly, it would be better for everyone to resolve this amicably.

*Ken Squire is the founder and president of 13D Monitor, an institutional research service on shareholder activism, and he is the founder and portfolio manager of the 13D Activist Fund, a mutual fund that invests in a portfolio of activist 13D investments. Squire is also the creator of the AESG™ investment category, an activist investment style focused on improving ESG practices of portfolio companies.*

---

**Fast Money Halftime Report**

UP NEXT | **The Exchange** 01:00 pm ET



---

**MORE FROM CNBC**

**FDA declares several popular cereals are not 'healthy' breakfast foods**

**Controversy over colonoscopies after new study suggest benefits might be overestimated**

**FROM THE WEB**                    Taboola Feed



**BlackRock CEO Predicts Next Wave of Market Winners**

Altimetry

30-year fixed rate mortgage hits the highest level in 20 years

Harris was involved in a motorcade accident this week initially described as a 'mechanical failure'

Apple's next iPhone could have a completely new charging system

Taiwan's clock is ticking once China's Xi enters third term, says Vivek Ramaswamy



"Move your money in 2022," Wall St. legend warns

Chaikin Analytics



Virginia Gov Will Cover The Cost To Install Solar If You Own A Home In These Zip Codes

EnergyBillCruncher

by Taboola

# MORE FROM CNBC



Harris was involved in a motorcade accident this week initially described as a 'mechanical failure'

By Kelly O'Donnell, Kristen Welker and Zoë Richards



Federal agents think they have enough evidence to charge Hunter Biden wi...

Dan Mangan



U.S. delivers angry rebuke of massive OPEC+ production cut —...

Sam Meredith,Natasha Turak



Sweden says investigation into Russian pipeline leaks strengthen...

Sam Meredith



Europe is quietly launching a new political club — with hopes Brexi...

Holly Ellyatt

FROM THE WEB                                    by Taboola



Revealed: Amazon Left Scrambling As Shoppers Find Out About Secret Deals



Get Your Money Out of U.S. Banks Immediately

Sponsored · Online Shopping Tools

Sponsored · Chaikin Analytics







**Nailable Solar Shingles Sweep The Nation**

Sponsored  gosolarshingle.com



**Wall Street Legend Warns: "Move Your Money By Late Fall"**

Sponsored  VisionaryProfit



**Amazon Has Millions of Prime Subscribers — But Few Know...**

Sponsored  Capital One Shopping

**FROM THE WEB**



by Taboola ▷



**Before You Renew Amazon Prime, Read This**

Sponsored  Capital One Shopping

**Here Are 29 of the Coolest Gifts for This 2022**

29 Insanely Cool Gadgets You'll Regret Not Getting Before They Sell Out

Sponsored · Trending Gifts



**Killer Hybrids And EVs Are Finally Here: See 2022's Thrilling New...**

Sponsored  StuffAnswered



**Gronk's Favorite "Dressy" Shoes Feel Like Walking On Clouds**

Guys, Say Hello to Your New Favorite Casual Dress Shoe—Perfect for the Office

Sponsored · Wolf & Shepherd



**Big Change in Virginia Leaves Drivers Furious**

If you drive a car and pay for insurance in 2022 you need to see this.

Sponsored  Expert in Money

## MORE FROM CNBC



**Federal agents think they have enough evidence to charge Hunter Biden with tax and gun-buy crimes, report says**

Dan Mangan



**U.S. delivers angry rebuke of massive OPEC+ production cut — and it...**

Sam Meredith,Natasha Turak







'This is serious': JPMorgan's Jamie Dimon warns U.S. likely to tip into...

Sam Meredith

Europe is quietly launching a new political club — with hopes Brexit...

Holly Ellyatt

Social Security's cost-of-living increase for 2023 would be...

Lorie Konish

**FROM THE WEB**                                            by Taboola



**Wall Street Legend Serious Warning: "Move Your Money Out of Cash"**

Sponsored · VisionaryProfit



**Here Are 23 of the Coolest Gifts for This 2022**

23 Insanely Cool Gadgets You'll Regret Not Getting Before They Sell Out

Sponsored · CoolGifts



**5 Best Laundry Detergents Revealed**

According to Experts

Sponsored · Tru Earth



**2022's Top Family SUVs. 3 Rows Of Seating, Tons Of Tech & More**

Sponsored · Family SUVs



**How Much Money Do You Really Get from a Reverse Mortgage?**

Sponsored · NewRetirement

**FROM THE WEB**                                            by Taboola





**Toxic drinking water at Camp Lejeune poisoned Marines for more than three decades.**

Sponsored · Camp Lejeune Justice



**How Much Do You Really Get From a Reverse Mortgage?**

Sponsored · NewRetirement



**Big Change Leaves Virginia Drivers Fuming**

If you drive a car and pay for insurance in 2022

**The Prices On The New Honda CR-V Might Surprise You**

Sponsored · The New Honda CR-V

**Say Hello to the Next Generation of Outdoor Cooking Technology.**

Meet Ooni's Most Advanced Pizza Oven

...you need to see this.

Sponsored : Expert In Money

Sponsored : Ooni Pizza Ovens

## MORE FROM CNBC



### Sweden says investigation into Russian pipeline leaks strengthens suspicion of 'gross sabotage'

Sam Meredith



### Jim Cramer says economic data can't capture one huge driver...

Krystal Hur



It's bad enough mortgage rates are over 7% — now it's harder to qualif...

Diana Olick



Polestar confirms it will deliver 50,000 electric vehicles in 2022

John Rosevear



Russia unleashes its anger on Ukraine with brutal strikes — bu...

Holly Ellyatt

FROM THE WEB                                           by Taboola



Camp Lejeune victims to receive $21 billion

Sponsored : Camp Lejeune Claims



Medicare Recipients Are Getting A Big Surprise Thursday

Sponsored : Medicare | SmartDailyDigest



Tommy Chong: The Horrendous Truth About CBD

Sponsored : Tommy Chong's CBD



Toxic drinking water at Camp Lejeune poisoned Marines for mor...

Time is running out to file a claim.

Sponsored : Trulaw Attorneys



This Might Just Be The Creepiest Gadget Ever

Just Clip the Starscope on Your Phone

Sponsored : StarScope

FROM THE WEB                                           by Taboola



**The Permanent Solution To Clogged Gutters Is Found!**



**Empty Las Vegas Suites That Overlook The Strip**

# EXHIBIT Q


(https://www.macrotrends.net)

Search over 200,000 charts...

Stock Screener        Stock Research        Market Indexes        Precious Metals        (/stocks/stock-screener) (/stocks/research) (/
                                                                    Energy        (/charts/precious-metals) (/charts/
                                                                                    Commodities        Exchange Rates

Interest Rates        Economy        Global Metrics        rates) (/charts/interest-rates) (/charts/economy) (/countries/topic-overview)

### Sponsored Business Content


Curious about cryptocurrencies? Read our advisor's guide.
Fidelity Investments


Reputation matters. Yours and ours. Apply today.
Fidelity Investments


Finance with confidence. Lock in your rate.
Chase Multifamily Lending


Megatrends: Cybersecurity Opportunities
Morgan Stanley


Bitcoin FAQs
Charles Schwab

# Masimo Market Cap 2010-2022 | MASI

Prices (https://www.macrotrends.net/stocks/charts/MASI/masimo/stock-price-history)

Financials (https://www.macrotrends.net/stocks/charts/MASI/masimo/financial-statements)

Revenue & Profit (https://www.macrotrends.net/stocks/charts/MASI/masimo/revenue)

Assets & Liabilities (https://www.macrotrends.net/stocks/charts/MASI/masimo/total-assets)

Margins (https://www.macrotrends.net/stocks/charts/MASI/masimo/profit-margins)

Price Ratios (https://www.macrotrends.net/stocks/charts/MASI/masimo/pe-ratio)

Other Ratios (https://www.macrotrends.net/stocks/charts/MASI/masimo/current-ratio)

Other Metrics (https://www.macrotrends.net/stocks/charts/MASI/masimo/dividend-yield-history)

Stock Price History (https://www.macrotrends.net/stocks/charts/MASI/masimo/stock-price-history)

Stock Splits (https://www.macrotrends.net/stocks/charts/MASI/masimo/stock-splits)

Market Cap (https://www.macrotrends.net/stocks/charts/MASI/masimo/market-cap)

Masimo market cap history and chart from 2010 to 2022. Market capitalization (or market value) is the most commonly used method of measuring the size of a publicly traded company and is calculated by multiplying the current stock price by the number of shares outstanding. Masimo market cap as of October 12, 2022 is **$6.81B.**

Search for ticker or company name...        📊 Compare MASI With Other Stocks





**AD**

Save on travel with member prices

Book now →

Available on selected hotels only. Terms apply, subject to availability. See site for details.



**Sponsored Business Content**                                    Dianomi ▷

- Megatrends: Cybersecurity Opportunities
  (Morgan Stanley)

- 5 Tips for Talking to Aging Parents About Money
  (Charles Schwab)

- Tired of playing it safe in business? (Elixirr)

- Join our in-person insurance event on November
  16th (S&P Global Market Intelligence)

- When Opportunity Strikes, Take Action
  (CME Group)

- Earn up to $2,000 with a new Citigold account
  and required activities. (CITIGOLD® OFFER)

- Become the kind of emotionally intelligent
  leader you'd want to follow (NYU Stern Executive MBA)

- Commission-Free Trades on Stocks, ETFs &
  Options Trades. Learn more. (TradeStation)

Sponsored Video by:    charles SCHWAB    Learn M[...]

| Sector | Industry | Market Cap | Revenue |
|---|---|---|---|
| Medical (https://www.macrotrends.net/stocks/sector/4/medical) | Medical Instruments Manufacturing (https://www.macrotrends.net/stocks/industry/103/) | $6.810B | $1.239B |

Masimo Corporation develops, manufactures and markets a family of non-invasive monitoring systems. The Company has two segments: Product Revenues, Royalty & Other revenues. Within Product revenues, the company's flagship - Signal Extraction Tecgnology (SET) Pulse Oximetry - is used to monitor blood oxygen saturation levels and protect against hypoxemia and hyperoxemia. The device also measures pulse rate. Apart from blood monitoring, the company has also ventured into non-invasive blood constituent, brain and breathe monitoring. The company's rainbow Pulse CO-Oximetry measures blood constituents that include total hemoglobin (SpHb), oxygen content (SpOC), carboxyhemoglobin (SpCO), methemoglobin (SpMet) and SET measurements of oxygen saturation (SpO2), pulse rate (PR), perfusion index (PI), and pleth variability index (PVi). Rainbow Acoustic Monitoring measures respiration rate (RRa) non-invasively and on a continuous basis. SedLine monitors brain functioning of patients under anesthesia or sedation.

| Stock Name | Country | Market Cap | PE Ratio |
|---|---|---|---|
| Thermo Fisher Scientific (TMO) (/stocks/charts/TMO/thermo-fisher-scientific/market-cap) | United States | $196.212B | 19.98 |
| Edwards Lifesciences (EW) (/stocks/charts/EW/edwards-lifesciences/market-cap) | United States | $50.928B | 36.03 |
| Alcon (ALC) (/stocks/charts/ALC/alcon/market-cap) | Switzerland | $27.989B | 23.70 |
| STERIS (STE) (/stocks/charts/STE/steris/market-cap) | Ireland | $16.868B | 20.95 |
| Teleflex (TFX) (/stocks/charts/TFX/teleflex/market-cap) | United States | $8.960B | 14.28 |
| Fresenius Medical Care AG KGaA (FMS) (/stocks/charts/FMS/fresenius-medical-care-ag-kgaa/market-cap) | Germany | $7.695B | 7.10 |
| Penumbra (PEN) (/stocks/charts/PEN/penumbra/market-cap) | United States | $6.815B | 817.64 |
| Globus Medical (GMED) (/stocks/charts/GMED/globus-medical/market-cap) | United States | $5.930B | 30.25 |
| Glaukos (GKOS) (/stocks/charts/GKOS/glaukos/market-cap) | United States | $2.492B | 0.00 |
| Integer Holdings (ITGR) (/stocks/charts/ITGR/integer-holdings/market-cap) | United States | $1.722B | 13.47 |
| Nevro (NVRO) (/stocks/charts/NVRO/nevro/market-cap) | United States | $1.321B | 0.00 |
| Paragon 28 (FNA) (/stocks/charts/FNA/paragon-28/market-cap) | United States | $1.292B | 0.00 |
| AVANOS MEDICAL, INC (AVNS) (/stocks/charts/AVNS/avanos-medical,-inc/market-cap) | United States | $0.980B | 15.00 |
| Artivion (AORT) (/stocks/charts/AORT/artivion/market-cap) | United States | $0.420B | 40.04 |

SPONSORED BUSINESS CONTE

When Opportunity Strikes, Tak Action (CME Group)

Download the Practitioner's Gu to Volatility Products (Mini VIX Futures Now Trading)

Our exclusive guide has steps start and build a thriving RIA. (Fidelity Investments)

Megatrends: Cybersecurity Opportunities (Morgan Stanley)

For a limited time, earn up to $2,000 cash with required activities. (Citigold® Offer)

Schwab's Weekly Market Revi (Charles Schwab)

© 2010-2022 Macrotrends LLC  |  Terms of Service (/terms)  |  Privacy Policy (/privacy)  |  Contact Us (mailto:%69n%66o@%6Dac%72otrends%2En%65t)  |  Do Not Sell My Personal Information (/ccpa)
Fundamental data from Zacks Investment Research, Inc. (https://www.zacksdata.com)