# EXHIBIT 14

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

---

```
--------------------------------x
In the Matter of                   Investigation No.

CERTAIN LIGHT-BASED PHYSIOLOGICAL   337-TA-1276

MEASUREMENT DEVICES AND COMPONENTS

THEREOF

--------------------------------x
```

**REVISED AND CORRECTED TRANSCRIPT**

**OPEN SESSIONS**

```
Pages:    1 through 282 (with excerpts)
Place:    Washington, D.C.
Date:     June 6, 2022
```

---

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

1

1      UNITED STATES INTERNATIONAL TRADE COMMISSION

2                    Washington, D.C.

3        Before the Honorable Monica Bhattacharyya

4                 Administrative Law Judge

5

6    -------------------------------x

7    In the Matter of                    Investigation No.

8

9    CERTAIN LIGHT-BASED PHYSIOLOGICAL    337-TA-1276

10   MEASUREMENT DEVICES AND COMPONENTS

11   THEREOF

12   -------------------------------x

13

14

15                   EVIDENTIARY HEARING

16                  Monday, June 6, 2022

17                       Volume I

18

19

20        The parties met via remote videoconferencing

21   pursuant to notice of the Administrative Law Judge at 9:30

22   a.m. Eastern.

23

24

25   Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

```
 1   A P P E A R A N C E S:

 2   [All parties appeared via remote videoconferencing and/or

 3   telephonically.]

 4

 5   Counsel for Complainants Masimo Corporation and Cercacor

 6   Laboratories, Inc.:

 7           KNOBBE, MARTENS, OLSON & BEAR, LLP

 8           2040 Main Street, Fourteenth Floor

 9           Irvine, California 92614

10           (949) 760-0404

11               Stephen C. Jensen, Esq.

12               Joseph R. Re, Esq.

13               Sheila N. Swaroop, Esq.

14               Irfan Lateef, Esq.

15

16           KNOBBE, MARTENS, OLSON & BEAR, LLP

17           1717 Pennsylvania Avenue, NW, Suite 900

18           Washington, DC 20006

19           (202) 640-6400

20               Jonathan E. Bachand, Esq.

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Complainants Masimo Corporation and Cercacor

 4   Laboratories, Inc.:

 5           KNOBBE, MARTENS, OLSON & BEAR, LLP

 6           925 4th Avenue, Suite 2500

 7           Seattle, Washington 98104

 8           (206) 405-2000

 9               Carol Pitzel Cruz, Esq.

10

11

12   Counsel for Respondent Apple Inc.:

13           WILMER CUTLER PICKERING HALE AND DORR LLP

14           1875 Pennsylvania Avenue, NW

15           Washington, DC 20006

16           (202) 663-6000

17               Michael D. Esch, Esq.

18               David L. Cavanaugh, Esq.

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

1   A P P E A R A N C E S (continued):

2

3   Counsel for Respondent Apple Inc.:

4           WILMER CUTLER PICKERING HALE AND DORR LLP

5           2600 El Camino Real, Suite 400

6           Palo Alto, California 94306

7           (650) 858-6000

8               Mark D. Selwyn, Esq.

9

10          WILMER CUTLER PICKERING HALE AND DORR LLP

11          60 State Street

12          Boston, Massachusetts 02109

13          (617) 526-6000

14              Joseph J. Mueller, Esq.

15              Sarah R. Frazier, Esq.

16

17          WILMER CUTLER PICKERING HALE AND DORR LLP

18          1225 17th Street, Suite 2600

19          Denver, Colorado 80202

20          (720) 598-3459

21              Ravi S. Deol, Esq.

22

23

24          *** Index appears at end of transcript ***

25

```
 1                    P R O C E E D I N G S
 2                (In session at 9:30 a.m.)
 3           JUDGE BHATTACHARYYA:  Good morning everyone.
 4   This is Monica Bhattacharyya, Presiding ALJ.  We're here for
 5   the evidentiary hearing in certain light-based physiological
 6   measurement devices and components thereof, Investigation
 7   No. 337-TA-1276.  With me is my Attorney Advisor Ted Jou.
 8           Could counsel please enter their appearances.
 9           MS. SWAROOP:  Good morning, Your Honor.  Sheila
10   Swaroop, counsel for Complainants Masimo and Cercacor.
11           JUDGE BHATTACHARYYA:  Good morning.  I believe
12   you're on mute.
13           MR. MUELLER:  I'm sorry, Your Honor.  Good
14   morning.  Joe Mueller on behalf of Respondent Apple.
15           JUDGE BHATTACHARYYA:  Good morning.  We're
16   starting out on the public record.
17           As we discussed last week, there should be a
18   designated person for both Complainants and Respondent who
19   can confirm when we're ready to go on the confidential
20   record at certain points during the hearing.
21           Ms. Swaroop, who is the designated representative
22   for Masimo?
23           MS. SWAROOP:  Yes, Your Honor, I can make those
24   representations today.
25           JUDGE BHATTACHARYYA:  Thank you.  Mr. Mueller,
```

1    for Apple?

2           MR. MUELLER:  Yes, Your Honor.  Sarah Frazier

3    will be our designated representative on that issue.

4           JUDGE BHATTACHARYYA:  Thank you.  We do have some

5    members of the public here, including, there's a Call In

6    User 1.  I'd ask call in User 1 to mute their line, if it's

7    not muted already, and also at some point when they call in

8    to identify themselves as a member of the public.

9           There's also a person on the line, Arjun

10   Jaikumar.  I'd ask that that person also indicate if they

11   are a member of the public or affiliated with Respondent or

12   Complainants.  We don't have to hold up the hearing for

13   that.  At the moment I'll just assume that both those people

14   are members of the public.

15          (Clarification by reporter.)

16          JUDGE BHATTACHARYYA:  All right.  Thank you.  I

17   wanted to follow up on a couple of items from our

18   pre-hearing conference last week.  There was a question

19   about deposition designations.  As I believe you received an

20   email last week from my attorney advisor, I'm not going to

21   require that all deposition designations that have been

22   discussed be admitted into evidence.  Each party should move

23   to admit their deposition designations by the close of their

24   case, whether it's their case-in-chief or...

25          Any questions about that?

1          MR. MUELLER:  No, Your Honor.  Thank you.

2          MS. SWAROOP:  Thank you, Your Honor.

3          JUDGE BHATTACHARYYA:  The other item that was

4    discussed last week had to do with sequestration.  As I also

5    believe you heard from my Attorney Advisor, each party will

6    be permitted a corporate representative designated by that

7    party to not be sequestered.  Are there any questions about

8    that fact?

9          MR. MUELLER:  Does the sequestration apply before

10   opening statements or after opening statements?  There was

11   some email correspondence on this.  We'll, of course, do

12   whatever Your Honor directs.

13         We have had in most of our cases actually the

14   sequestration kicks in before the witnesses begin to testify

15   as opposed to the opening statements, but whatever

16   Your Honor's preference is, of course we'll strictly adhere

17   to that.

18         JUDGE BHATTACHARYYA:  Ms. Swaroop, do you have a

19   preference?

20         MS. SWAROOP:  Yes, Your Honor.  Masimo would

21   prefer that the sequestration begin with opening statements,

22   and I think, as we had provided to Your Honor's Attorney

23   Advisor with some authority, suggesting that if witness

24   testimony is going to be referred to in the opening, that

25   the sequestration should go into effect at that time.  And I

1   plan to refer to witness testimony in my opening, and I

2   understand from Apple's slides that they intend to as well.

3          JUDGE BHATTACHARYYA:  Mr. Mueller, is that

4   correct, does Apple intend to refer to the anticipated

5   content of witness testimony?

6          MR. MUELLER:  At a very high level, Your Honor.

7   We're not going to get into any of the details of what any

8   particular witness will say.

9          JUDGE BHATTACHARYYA:  The sequestration will go

10  into effect for the opening statements as well.

11         MR. MUELLER:  Your Honor, I would just note for

12  the record that our corporate designee from the fact witness

13  group is Dr. Paul Mannheimer.

14         JUDGE BHATTACHARYYA:  Thank you.

15         And Ms. Swaroop, I assume it's Mr. Kiani, as you

16  indicated last week?

17         MS. SWAROOP:  Yes, it is, Your Honor.

18         JUDGE BHATTACHARYYA:  Is there anything further

19  before we proceed with opening statements?

20         MR. MUELLER:  Yes, Your Honor, two quick things.

21  To the extent that Masimo does attempt to introduce certain

22  deposition designations today, we do have some outstanding

23  objections.  We can take those up later if it more

24  convenient for Your Honor.

25         Also, on the witness list for today, although I

1    suspect we won't reach him, is Mr. Scruggs.  We have some

2    pretty significant objections to the anticipated testimony

3    from Mr. Scruggs.

4            Again, it may be easier just to take those up

5    later today, particularly in light of the fact that we may

6    not reach him today, but we're happy to discuss it now if

7    Your Honor would prefer.

8            JUDGE BHATTACHARYYA:  I would appreciate a

9    preview of the issues that are going to come up, but rather

10   than take away time from the hearing, if you could send an

11   email copying Masimo's counsel just summarizing what you

12   believe at a high level the disputes are going to be, that

13   would be helpful.

14           MR. MUELLER:  Will do.  Thank you, Your Honor.

15           JUDGE BHATTACHARYYA:  Thank you.  Shall we

16   proceed with opening statements?

17           MS. SWAROOP:  Your Honor, Complainants are ready

18   to begin.

19           JUDGE BHATTACHARYYA:  Okay.  You may proceed.

20                 OPENING STATEMENT BY COMPLAINANTS

21           MS. SWAROOP:  Good morning, Your Honor.  Masimo

22   and our team here in California are happy to be here to

23   begin this evidentiary hearing.  We're looking forward to

24   presenting our case to you and to having you hear from our

25   witnesses and consider our evidence.

1         This ITC investigation and the five patents at

2    issue mean a lot to Masimo.  These patents resulted from the

3    ingenuity of many Masimo and Cercacor engineers, some of

4    whom you will hear from.

5         These inventions relate to three areas of

6    physiological monitoring.  The first is a sensor design for

7    light-based measurements that was not only unique but went

8    against conventional thinking about how to obtain reliable

9    measurements.  You'll hear that this design actually

10   resulted in improved measurements.

11        The second is a novel sensor design with features

12   to project light into tissue to allow more of the tissue to

13   be irradiated which increases the relevant information in

14   the detected signals.

15        Your Honor, I apologize.  There appears to be

16   some sound or some background.  If the person could mute,

17   that would be appreciated.  Thank you.

18        And the third invention is a novel accuracy

19   enhancement system that introduces a thermal mass that

20   stabilizes and normalizes temperature to allow a single

21   thermistor to be used to correlate to the temperature of

22   multiple LEDs.

23        This is done to compensate for measurement errors

24   resulting from subtle changes to the LED operating

25   characteristics.

1          Now one of the parameters we will discuss

2     throughout the hearing is a noninvasive measurement of

3     oxygen saturation of a person's blood.  The evidence will

4     show the challenges of obtaining reliable oxygen saturation

5     measurements from a person's wrist.

6          This investigation presents very important issues

7     affecting Masimo's domestic industry, and we appreciate your

8     efforts to carefully consider the issues here.

9          I'd like to start first with introducing you to

10    Masimo.  The evidence will show that Masimo is a pioneer in

11    the area of noninvasive monitoring of physiological

12    parameters.  You'll hear from our first witness, Joe Kiani,

13    about Masimo's history of innovation.

14         Mr. Kiani will explain how he started Masimo in

15    1989 to solve a bane of pulse oximeter measurements,

16    measuring through motion and low blood flow.  You will hear

17    how the innovations developed at Masimo revolutionized

18    noninvasive monitoring.

19         And if we could go to our first slide here, which

20    is on the screen.

21         The evidence will show that Masimo developed and

22    introduced many innovative products in the professional care

23    settings and that Masimo consumer presence began to grow

24    many years ago.

25         The timeline here identifies various

1    medical-grade, consumer products that Masimo has introduced

2    throughout the years.  You will hear about Masimo's iSpO2,

3    the first consumer pulse oximeter for the Apple iPhone that

4    Apple itself carried in the 2012 time period.

5              You will hear about Masimo's other consumer

6    products including the Masimo W1 Watch that was released in

7    2021.

8              In addition to being Masimo's founder and CEO,

9    Mr. Kiani is also an inventor on three of the five patents

10   at issue in this investigation.

11             If we could go to our next slide.

12             We refer to these as the Multi-Detector Patents

13   and they are part of the '501, '502, and '648 patent group.

14   You will hear from Mr. Kiani about this invention.

15             The evidence will show that the claimed sensor

16   design, which has a convex protrusion that covers all of the

17   detectors and deforms the skin, was completely

18   counterintuitive.  These patents also claim specific

19   structures of the sensor that minimize the amount of light

20   that goes directly from the LEDs to the detectors without

21   interacting with the tissue.

22             Our next slide here, we have a figure from the

23   Multi-Detector Patents.  This is Fig. 3C that Mr. Kiani will

24   talk about.  And you can see here we have a sensor, and

25   there's a protrusion that's labeled as element 305, and you

1    can see a series of four windows or openings that are

2    labeled as 320, 321, 322, and 323.

3         The photodetectors are below those openings and

4    receive light from the emitters.  The patent also explains

5    that these windows can include shielding to reduce noise

6    from ambient light.

7         You will hear that this invention came about when

8    Masimo was researching how to obtain better light-based

9    signals for very difficult and more sensitive noninvasive

10   physiological parameters, such as total hemoglobin, carbon

11   monoxide, and even glucose.

12        In addition to giving better measurements for

13   more difficult parameters, you will hear that this patented

14   sensor design also improved light-based measurements in more

15   difficult sites.

16        The next patent in this investigation is the '745

17   patent, which you'll hear referred to as the light-shaping

18   patent.  You'll hear from Ammar Al-Ali, who is the inventor

19   on this patent, and Mr. Al-Ali will explain his invention.

20        If we go to our next figure.

21        What we see here is Fig. 7A from the '745 patent,

22   which shows one embodiment of the invention.  And you can

23   see here we have an LED that's shaded in red at the top

24   there, and then there's a light diffuser that spreads out

25   and can also shape the light so that more tissue is

1   irradiated before it reaches the photodetector.  The

2   photodetector is shown there in blue as element 710.

3          There's also light block that's shown as item 706

4   in green that's between the LEDs and the photodetector.

5          The evidence will show the -- this improved the

6   measurement particularly on more difficult sites.

7          The third inventor you'll hear from is Mohamed

8   Diab.  He joined Mr. Kiani to start Masimo.  Mr. Diab is an

9   inventor on the '127 patent, which we refer to as the

10  temperature patent.

11         Mr. Diab will explain how this patent allowed for

12  the measurement of parameters that no other company has been

13  able to measure.  This patent introduced using a thermal

14  mass for the LED package and the sensor that stabilizes and

15  normalizes temperature, so that a thermistor can be used to

16  correlate to the temperature of multiple LEDs and, in turn,

17  correlate to the changes in wavelength of emitted light.

18         The basics of this are shown in our next slide,

19  which include Figs. 12 and 14 from the '127 patent.

20         What we see here on Fig. 12 on the left is a

21  diagram of the emitter substrate, and it shows a thermal

22  mass in the middle with multiple LEDs thermally coupled to

23  that mass.  A temperature sensor, you see that on the right,

24  is also shown thermally coupled to the thermal mass.

25         The temperature sensor measures the temperature

1  of the thermal mass and uses that to estimate all of the

2  operating wavelengths of the LEDs.

3           Fig. 14, which is on the right, from this patent,

4  illustrates one example of a PC board that includes

5  metallized layers that act as a thermal mass so that the

6  measurement by the temperature sensors can provide

7  meaningful information about the operating wavelengths of

8  the LED.

9           The evidence will show that this feature results

10  in increased accuracy, because the measurement of

11  physiological parameters depends on the particular

12  wavelength of the LEDs.

13           The inventors pursued this to help them measure

14  new physiological parameters that are difficult to obtain.

15  This technology is used in Masimo's rainbow« sensors, which

16  measure a variety of parameters with light-based

17  measurements.

18           You'll also hear from several witnesses

19  about Masimo's extensive activities in the United States to

20  use these three patent groups in its products.  For the

21  Multi-Detector Patents and the light-shaping patent, the

22  evidence will show Masimo's efforts in the United States to

23  design, develop, and manufacture the Masimo Watch.

24           You will hear from Mr. Kiani, Mr. Al-Ali and

25  Bilal Muhsin, the CEO, about Masimo's activities in

1   developing and launching the Masimo Watch that is

2   commercially called W1.

3            You'll hear about the details in the Masimo Watch

4   project from Stephen Scruggs, an engineer at Masimo who,

5   along with others, designed and developed the watches we are

6   presenting for the technical prong requirement.

7            The evidence will show that this has been an

8   ongoing project for years.  Masimo's design and development

9   activities have taken place in the United States, so that

10  Masimo could develop a medical-grade product that delivers

11  reliable measurements.  This is in contrast with other pulse

12  oximeters that are not reliable.

13           Now my next slide is going to include Masimo

14  confidential business information.  So I just want to make

15  that clear so that we can have the appropriate people leave

16  the Webex meeting, and that would include Apple's corporate

17  representative.

18           I apologize.  Yes, that would include Apple's

19  corporate representative as well.

20           (Whereupon, the hearing proceeded in confidential

21  session.)

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3           JUDGE BHATTACHARYYA:  Moving back to the public

 4      record.

 5           MS. SWAROOP:  I'd now like to discuss patent

 6      validity with respect to the Multi-Detector Patents.

 7           Now we don't know exactly what Apple's validity

 8      defense will be and what exactly Apple will present to you,

 9      and that's because Apple's pre-hearing brief for the five

10      claims in this group includes dozens of references for

11      background and for motivation to combine, and Apple's

12      invalidity grounds uses a combination of numerous

13      references.

14           So we will see the reveal along with you when

15      Apple decides to finally unveil what the bases are for its

16      invalidity defense.

17           The best we can discern is that Apple now appears

18      to be relying on two primary references in its combinations.

19      One, based on a patent that we refer to as Lumidigm, and one

20      based on foam sensor heads from a student project at Kansas

21      State.

22           So let's talk about Lumidigm first.  The evidence

23      will show that Lumidigm's focus was obtaining a spectral

24      signature across a band of wavelengths to identify the

25      wearer.  Lumidigm then provides a wish list of wide-ranging
```

1    use cases that range from fruit ripeness, identifying

2    counterfeit documents, oxygenation, a mood meter, a lie

3    detector, used as a TV remote, a barcode scanner, a smoke

4    detector, a guitar tuner, an alcohol monitor, and more

5    unrelated wishes.

6         For Kansas State, the evidence will show that an

7    undergraduate student following conventional wisdom designed

8    a basic sensor for a summer project.  The foam sensor head

9    lacked the unrecognized benefit of the convex protrusion

10   that we talked about earlier.  It merely conformed to and

11   did not disturb the tissue.  Also, it was never

12   commercialized or developed beyond an undergraduate

13   student's summer project.

14        When Apple does unveil its invalidity combinations

15   based on Lumidigm or the Kansas State student project.  You

16   will hear from our expert why the references they choose to

17   present to you are missing fundamental features of the

18   claims and why the combinations would not have been obvious

19   and would still be missing claimed features.

20        Apple's own evidence will also support the

21   nonobviousness of the claimed sensor configuration.

22        Another defense you may hear from Apple on is an

23   assertion that Masimo's patents are somehow unenforceable

24   due to prosecution laches.  The publicly available

25   prosecution history of this patent family refutes that

1    defense and shows the activity Masimo took to move its

2    patents toward issuance.  You will hear no expert from Apple

3    testify that the record of prosecution showed any kind of

4    unreasonable delay by Masimo.

5          Apple's pre-hearing brief also does not identify

6    any Apple witnesses who will speak about any prejudice that

7    Apple has suffered as a result of any alleged delay.

8          Apple's opening slides include a timeline

9    labeling various time periods as a delay, but that simply

10   ignores the public record of the prosecution history that

11   actually was taking place during that time period.

12         And now I'd like to turn to the light-shaping

13   patent and the evidence there.  As that patent, as I had

14   previewed earlier, this patent changes the shape of light

15   from the detector so that it irradiates more of the tissue

16   and improves overlap in the area being measured.

17         The evidence will show that Apple implemented

18   this feature in the infringing Series 6 and later watches

19   with its MLA lens.

20         Masimo will present tests of the infringing

21   watches that show that light entering the Apple MLA lens is

22   a different shape from the light that exits the MLA lens.

23         We can go to our next --

24         MR. MUELLER:  If we could go on the confidential

25   record, please.

 1          MS. SWAROOP:  Your Honor, this is not --

 2          MR. MUELLER:  I apologize for interrupting.  I

 3   just want to be careful about going on the Apple

 4   confidential record for any discussion of the technical

 5   details of the Apple products.

 6          MS. SWAROOP:  Your Honor, I plan to discuss

 7   testing that was conducted by Masimo.  This is not Apple

 8   confidential information and was not identified as

 9   containing Apple confidential information in our discussion

10   over these slides.

11          MR. MUELLER:  I'll take Ms. Swaroop's word for

12   it, but to the extent there's oral discussion that's going

13   to move into the details of the products, we would ask that

14   we go on the Apple confidential record, and I believe there

15   is a slide coming up soon that will also require we go on

16   that record.

17          JUDGE BHATTACHARYYA:  Ms. Swaroop, do you know

18   what Mr. Mueller is referring to?

19          MS. SWAROOP:  I do, Your Honor.  It's related to

20   the '127 patent, and I plan to go on the confidential record

21   for that portion.

22          This particular portion is information that is

23   not confidential to Apple, and I plan to discuss the test

24   results on our slide, which Apple has not identified as

25   containing any Apple confidential information.

1              MR. MUELLER:  Just that, Your Honor, we have no

2    objection.  I just want to be careful that, if it goes

3    beyond that, we move on the confidential record.

4              JUDGE BHATTACHARYYA:  You may proceed,

5    Ms. Swaroop.

6              MS. SWAROOP:  Thank you, Your Honor.

7              If we could go to our slide here.

8              This slide shows light-shaping testing of the

9    Apple Watch that was done in this investigation.  And you

10   can see here that there were three different LEDs that were

11   tested: the red, the green, and the infrared in the third

12   row.

13             And so in these tests Masimo obtained images of

14   the light as it exited the LED, images when the light

15   entered the MLA lens, and that's what we see in the second

16   column as the light -- as it enters the MLA lens, and then

17   the third column we see what the light looks like after it

18   has exited the MLA lens.  And so that's the third column.

19             And the evidence will show, if you look at the

20   second column and the third column, that there's a change in

21   shape, when we go to the second column, before the light

22   enters the MLA, and the third column, after the light has

23   exited the MLA.  And so this change in shape, we believe,

24   confirms Apple's infringement.

25             An the issue of validity, Apple has said it will

1    present an invalidity defense based upon its original watch,

2    the Series 0.  But Apple's evidence of this watch is not

3    corroborated.  Apple's opening slides will show you dates

4    and images of the Series 0 watch that appear nowhere in the

5    exhibits identified for those slides.

6              Apple's expert also relies on documents that do

7    not corroborate the prior art status or structure of that

8    watch.  But, regardless, the evidence will show this watch

9    lacked the ability to measure oxygen saturation.

10             The evidence will also show that Apple's other

11   references for validity, such as Iwamiya, did not disclose

12   use for measuring oxygen saturation.

13             And Sarantos, the evidence will show that that

14   reference is discussing a configuration for use with

15   irrelevant wavelengths of light that are not used for

16   measuring oxygen saturation.

17             Similar to the Multi-Detector Patents, Apple has

18   claimed it will present a defense of prosecution laches,

19   and, again, the publicly available prosecution history of

20   this patent family refutes that defense and shows the

21   activities Masimo took to move its patents towards issuance.

22             Again, Apple has identified no expert on this

23   issue, and no witness that will speak to any prejudice Apple

24   has faced.

25             I now will be addressing Apple confidential

1   business information in addressing the '127 patent, so,

2   Mr. Kiani will need to leave the room.

3         JUDGE BHATTACHARYYA:  We're moving on to the

4   Apple confidential record.

5         (Whereupon, the hearing proceeded in confidential

6   session.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   O P E N   S E S S I O N

2

3          JUDGE BHATTACHARYYA:  We're moving back to the

4    public record.  You may proceed.

5          MS. SWAROOP:  Thank you, Your Honor.

6                Apple's validity defense for the '127 temperature

7    patent is based on obviousness, but the evidence will show

8    that no combination of prior art shows a thermal mass

9    thermally coupled to the LEDs and the thermistors so that

10   the thermistor's temperature measurement can meaningfully

11   estimate operating wavelengths of the LEDs.

12               Now you're going to see in Apple's slides a

13   mention of a Scarlett reference in connection with the

14   thermal mass claim language for the '127 patent.  But

15   Scarlett is not one of the references Apple is relying upon

16   for its obviousness grounds.  It's merely one of the many

17   state-of-the-art references that appear throughout Apple's

18   pre-hearing brief.

19               You will also hear evidence of commercial

20   success, awards for Masimo's rainbow« technology, and

21   teaching away in the prior art, all of which support

22   nonobviousness of this invention.

23               The last point I'd like to address is the remedy

24   Masimo is seeking for Apple's activities.  Masimo is seeking

25   both a limited exclusion order and a cease and desist order

1    against the Apple Watch Series 6, Series 7, and any Next

2    Generation Apple Watch that includes these same light-based

3    physiological monitoring features that infringe Masimo's

4    patents.

5           However, what is very important to note here is

6    that Masimo is not seeking exclusion of every Apple Watch.

7    As we will show, Apple has sold other watches with different

8    back surfaces before it introduced the sensor design and the

9    blood oxygen feature that began with Series 6.  We're not

10   seeking any remedy in this investigation regarding those

11   other watches.

12          Apple has sold tens of millions of those other

13   watches, and the remedies we are seeking here would not

14   impact Apple's ability to import and sell those watches.

15          Our ask is not a prohibition on Apple's ability

16   to import tens of millions of watches from its factories in

17   Asia if it chooses to do so.  Rather, Apple should not be

18   allowed to import and distribute watches with the pulse

19   oximetry sensor of the Series 6, Series 7, and future

20   watches, because those watches infringe the Masimo and

21   Cercacor patents that protect our domestic industry, and

22   that is a violation of Section 337.

23          We welcome the opportunity to present our

24   evidence to you.  Thank you, Your Honor.

25          JUDGE BHATTACHARYYA:  Thank you.

1           Mr. Mueller, you may proceed.

2               OPENING STATEMENT BY RESPONDENT

3           MR. MUELLER:  Thank you very much, Your Honor.

4   Good morning, and thank you again for your time and

5   consideration at this hearing.

6           Let me begin by noting some of the folks who will

7   also be presenting witnesses over the course of this

8   hearing.  They include my colleagues Jonathan Cox, Sarah

9   Frazier, Nina Garcia, Derek Gosma, Mark Selwyn, and Cindy

10  Vreeland.

11          On behalf of all of them and also the folks who

12  are helping us behind the scenes here, and, most

13  importantly, on behalf of our client, Apple, we do want to

14  thank you for your time and your consideration.  Apple

15  respects this agency and this process, and we're going to do

16  our best over the course of the hearing to present the best

17  possible evidence on the issues before Your Honor.

18          Let me also show you some pictures right now of

19  the Apple engineers who will testify live over the course of

20  this hearing.

21          Mr. Brian Land is the head.  He is the Chief of

22  the Health Sensing Hardware Group within Apple.  He has been

23  working at Apple for over 15 years, and, as I mentioned, he

24  bears lead responsibility for developing the health sensing

25  hardware within the Apple Watch.

1          Along with Mr. Land we have five of his

2     colleagues.  Dr. Paul Mannheimer, who, as I noted, will be

3     our corporate designee at this hearing.  Dr. Vivek

4     Venugopal, Dr. Saahil Mehra, Dr. Steve Waydo, and Dr. Ueyn

5     Block, five Ph.D.s, and the gentleman who runs the group,

6     Mr. Land.

7          Why have we brought these six engineers to

8     testify before Your Honor?  Well, the first reason, of

9     course, is that Apple does respect this agency and this

10    process, and the second reason is Apple firmly believes that

11    the facts in this case are decidedly on its side and wants

12    to provide Your Honor with the best possible evidence of all

13    the issues Your Honor needs to decide in this investigation.

14         Now let me take down their pictures for just a

15    moment and turn a little bit to the issues at the heart of

16    this case.

17         As Ms. Swaroop mentioned, Masimo and Cercacor,

18    who I'll refer to for simplicity as Masimo, are requesting

19    an import ban on the Series 6 and Series 7 watches.  Now

20    Ms. Swaroop just suggested that it may not be that big of an

21    impingement on Apple because there are other watch models.

22    In fact, these are the two leading and most advanced models

23    of Apple Watch, and Masimo is trying to sever the supply

24    chain of those devices to the United States.

25         Now the agency has the power to effect that

1   supply chain cut, but the question is, is there a proper

2   basis for doing so in this case.  And we believe the

3   evidence will conclusively show there is no proper basis for

4   an import ban of any type, let alone against these

5   particular devices.

6          In fact, this case is being used at Masimo for an

7   improper legal purpose and an improper business purpose.

8   And let me explain what I mean.

9          Back in 2020 Masimo filed a District Court action

10  in the Central District of California against Apple alleging

11  trade secret misappropriation and patent infringement.  That

12  case is proceeding today.

13         Now there's very significant problems with the

14  claims in that case.  I'm not going into the details now,

15  but we believe there are profound problems with the trade

16  secret allegations, the patent claims have been stayed

17  pending IPR proceedings where literally dozens of claims

18  have been invalidated by the Patent Office during the IPR

19  proceedings.

20         Those merits issues for another day for another

21  court, but I note that, because of the relevance to this

22  particular investigation, is that it was initiated

23  explicitly because of Masimo's dissatisfaction with the pace

24  of the District Court case.

25         And, Your Honor, respectfully, we believe that

1    initiating an investigation on those grounds is not a proper

2    purpose, and, moreover, it led to Masimo prematurely filing

3    this case, its complaint in this case, long before any

4    mature domestic industry existed for at least four of the

5    five patents-in-suit, and for all five of them we believe

6    there's no domestic industry meriting an exclusion order in

7    this case.

8         Now from a business perspective, there too we

9    find that the case that's being brought for what we believe

10   to be an improper purpose.  For four of the five patents in

11   this case the alleged domestic industry product is the

12   so-called Masimo Watch, which has recently been given by

13   Masimo the name W1.

14        That watch cannot be purchased, cannot be

15   purchased, in any store in the U.S. today, let alone at the

16   time when the complaint was filed.

17        Now as Your Honor knows from earlier briefing in

18   this case, we believe the law is clear that, in the absence

19   of special circumstance, the relevant time for assessing

20   whether there's a sufficient domestic industry is the date

21   of filing of the complaint.  And we believe the evidence

22   will show beyond a shadow of a doubt there was no legitimate

23   domestic industry as of that date, nor is there one today,

24   with respect to the Masimo Watch.

25        And what we believe is happening is Masimo is

1    trying to clear a path for a hoped-for aspirational product,

2    clear a path by banning the import to the U.S. of the

3    leading Apple Watch models.

4          Now, again, there's just no proper basis for

5    doing that.  And you can see, as you get into the substance

6    of the patent issues, what we believe the evidence will show

7    to Your Honor is that, with all of the patents-in-suit,

8    Masimo has been trying to stretch disclosures and written

9    descriptions that were directed to clinical products of the

10   type that Masimo has focused on historically.  They have had

11   some consumer products, but far limited offerings as

12   compared to their clinical products.

13         These patent disclosures were drafted in the

14   context of their historical focus on clinical products, and

15   they have tried to stretch them by drafting claims to cover

16   consumer products like the Apple Watch.

17         Now the reason why that's significant is the

18   clinical setting is quite different than the consumer

19   wearable setting.  In the consumer wearable setting, as you

20   will hear from the six Apple engineers who will testify to

21   Your Honor, there are very special engineering challenges

22   that are associated with consumer devices.

23         Apple engineers are forced to engineer their

24   sensors within the context of a very small form factor, a

25   small device, that needs to coexist with a huge array of

1   other components within those devices, many of which have

2   nothing to do with the health senors, but can interact with

3   those sensors through electromagnetic interference or

4   vibrations or other forms of effect.

5           It is a tremendous engineering challenge to have

6   to design health-sensing hardware in the context of these

7   multipurpose devices, which reside in a beautiful,

8   attractive design, industrial design, that Apple has placed

9   a special focus on.

10          These patents don't teach anything about how to

11  achieve the engineering challenges that Apple has faced, yet

12  Masimo is trying to assert claims that were drafted to

13  stretch and stretch, to cover these types of consumer

14  products, and, as Your Honor, we believe, will find, based

15  on the evidence, we believe the evidence will show,

16  Your Honor, the stretch is, A, not far enough to establish

17  actual infringement, and, B runs headlong into prior art.

18          The basic problem they face, Your Honor, is that

19  by stretching these claims they have drafted them to cover

20  the lowest common denominator technology that can be common

21  to both clinical and consumer products, but that type of

22  technology has been known long before these patents were

23  filed, indeed, in some cases, decades before these patents

24  were filed.

25          And also, as I said, they didn't stretch quite

1    far enough.  There are distinctions between each of the

2    asserted claims and the Apple Watch.  So we believe the

3    claims are both invalid and not infringed.

4           And, to boot, as I mentioned earlier, the

5    domestic industry contentions in this case, I think

6    Ms. Swaroop suggested at one point that there's a burden on

7    Masimo from having to put in evidence on undisputed issues.

8           Let me be clear.  Domestic industry issues are

9    hotly contested.  We think for four of the five

10   patents-in-suit, there's nothing remotely close to domestic

11   industry as of the time of the complaint nor even today, and

12   for the fifth product there are severe problems in the

13   economic reporting data.  And also for that product there's

14   no competition whatsoever between the Apple Watch and the

15   rainbow« sensors.  So there is, indeed, a dispute on those

16   issues as well.

17          In short, to justify this sort of supply chain

18   cut, they would need to establish a proper factual basis on

19   all of these different issues, and we think the evidence

20   will show, again and again, they cannot meet their burden.

21          So, with that, Your Honor, I'll turn to the

22   evidence, some more specific evidence, which I'll try to

23   preview and contextualize.  I'll start with just a few words

24   about Apple.

25          Apple, of course, has been around for decades.

1    It was started in the 1970s in California by Steve Jobs and

2    Steve Wozniak working out of a garage initially.  The

3    company has grown over the years, and today employs over

4    100,000 employees across the U.S. and overseas as well.

5        But the research and development is headquartered

6    in California, including at the headquarters building that

7    you see right here.  And it is, by any definition, an

8    American business success story.

9        Over the years Apple has focused on industrial

10   design, and I say that not just as a history lesson, but

11   because this has particular salience and relevance to this

12   investigation, Your Honor.  Over the years Apple has gone to

13   great lengths to create products that look attractive, in

14   some cases they believe beautiful, and are very easy to use.

15   But at the same time, at the same time, have immense

16   computing capabilities within them, hugely powerful devices,

17   but in these attractive, easy-to-use packages.

18       And achieving all those goals takes the talent of

19   thousands of engineers, including the six who Your Honor

20   will hear from.  They helped design the Apple Watch or

21   different parts of the Apple Watch.

22       The original Apple Watch, the Series 0, was

23   released in 2015.  Mr. Land, the head of the Health Sensing

24   Hardware Group, was at the company at the time, and he will

25   explain to you some of the work that he personally did in

1    connection with the Series 0 watch.

2            The Series 0 watch had a wide array of software

3    capabilities.  It allowed for users to customize the apps

4    that they could use on the watch, as just one example.

5    Music can be downloaded to use the watch, the original

6    watch, as, effectively, a wrist-worn iPod.

7            It also also some health functionality, including

8    calorie tracking, standing and exercise apps, and it had a

9    heart rate sensor that Mr. Land himself worked on.

10           It also had LEDs and photodiodes for various

11   purposes, including heart rate sensing, and it had a curved

12   back crystal.  Your Honor is going to hear a fair amount

13   about the back of the Apple Watch, including the accused

14   Series 6 and Series 7 models.  But Your Honor will hear that

15   the shape, a dome shape of the watch, has been constant

16   since the Series 0.

17           And the reason for that domed, curved shape,

18   there are multiple reasons, one of which has to do with

19   charging.  Your Honor may have seen that the Apple Watch can

20   be placed in a charging cradle.  The dome fits snugly in the

21   cradle and is designed to align the watch with the charging

22   hardware components so that the charging can occur in an

23   efficient way.  There was a very practical reason for that

24   dome shape.  Again, that was part of the original Apple

25   Watch.

1          Over the years the Apple engineers have made

2    various improvements to the Apple Watch, the Series 1 and 2,

3    Series 3, Series 4, 5, and then we arrive at the Series 6

4    and 7, the accused products in this investigation,

5    achievements over the years by various Apple engineers to

6    move the ball forward.

7          Now I'm just going to note here, those

8    achievements owe absolutely nothing to Masimo trade secrets,

9    Masimo proprietary information.  Any suggestion that the

10   Apple engineers took Masimo information to put in the

11   hardware or software of the Apple Watch is false.

12   Your Honor will hear that firsthand from six different Apple

13   engineers.

14          The Series 6, among the improved features and

15   functions, included a processor and altimeter, a new and

16   better display, a new operating system.  It also supported

17   some features used in the earlier models.

18          It included a blood oxygen sensor.  This was the

19   first Apple Watch to include a blood oxygen sensor.

20   Your Honor will hear precisely how that sensor was

21   developed.  It took years of hard work, including by the

22   folks who have come here to testify before Your Honor.

23          It also, the Series 6, supported features

24   available in some earlier models, including health

25   functionality.

1           Series 7, another advance in the display, some

2    improved durability and environmental sealing.  As

3    Your Honor will hear, the watch is a waterproof device

4    designed for swimming and other activities that could expose

5    the device to water or moisture, other contaminants.

6           It is designed explicitly not to have holes in

7    it, which would allow water or other contaminants to enter

8    into the structure.  It is a sealed structure.  It always

9    has been.  It has no openings.

10          The Series 7 also has the WatchOS 8 operating

11   system, a new advance in the operating system, and it

12   retained the blood oxygen sensor and other features like the

13   heart rate monitor from the Series 6.

14          Now, if we look at the full range of Apple

15   models, they represent years upon years of hard work by

16   many, many, many engineers within Apple.  And there are, of

17   course, far more features in these devices than just the

18   health-sensing hardware.  There's a whole panoplea of

19   features and functions available to Apple Watch users.  Even

20   within the context of the health-sensing hardware there's

21   far more than just the blood oxygen sensor.

22          So what is occurring in this case is Masimo is

23   targeting a sliver of the function in the overall watch and

24   arguing that sliver justifies an import ban on the entire

25   Series 6 and the entire Series 7.  And we believe the

1   evidence will show no such thing.

2           Now if we shift to Masimo, the evidence will show

3   that Masimo has focused over the years to clinical products

4   for doctors' offices and hospitals and home settings under

5   the care of a clinician.  Now let me be clear.  They have

6   released certain consumer products over the years, not every

7   one of their products was purely for a clinical setting, but

8   the majority of their business has been in the clinical

9   setting, a substantial majority.

10          And even their consumer products, we believe you

11  will see, are far different from the consumer wearables like

12  the Apple Watch.

13          Here's some examples of Masimo products.  Credit

14  where credit is due.  We think Masimo has made some valuable

15  contributions to the clinical setting, and we respect the

16  work that they have done in connection with public health in

17  that setting.

18          But it's a different setting than the consumer

19  wearables marketplace.  The engineering challenges are

20  different.  The technological solutions to those challenges

21  are different.  And there's a fundamental disconnect between

22  patent applications drafted in the context of products like

23  the ones you see here and the Apple Watch.  And they can't

24  bridge that gap, we believe, without running headlong into

25  the prior art, and, even if they do, they haven't stretched

1    far enough in terms of how they have drafted the claims to

2    capture the Apple Watch.  There is no infringement.

3            So let me turn to the patents, the '127, '745,

4    and the collection of related patents, the '501, '502, and

5    '648, which we call the Poeze patents, after one of the

6    named inventors, and we believe that for all of these

7    patents you will see the same pattern, this pattern of

8    trying to stretch disclosures, drafting claims directed to

9    lowest common denominator technology that was known years

10   before these patents were filed or the parent applications.

11           And even despite that, even despite the stretch,

12   failing to stretch far enough to actually establish

13   infringement of the Apple products.  In all five of these

14   patents, we also believe that there's not going to be a

15   showing of a sufficient domestic industry to carry Masimo's

16   burden on that important issue.

17           So let me, for an example, the timeline of the

18   prosecution of these patents, the timeline for the '745

19   patent.

20           We believe that the timeline tells the tale for

21   this patent and for others as well.  If you look at the

22   chronology, Your Honor, the Apple Series 0 watch, the very

23   first Apple Watch model, was released on April 24th, 2015.

24   The provisional application that Masimo filed for the '745

25   patent was not filed until July 2nd of 2015.  And then the

1    application that actually issued as the asserted '745 patent

2    was filed in March of 2020, years after various Apple Watch

3    models had been introduced.

4            If we look at the timeline for the Poeze patents,

5    the '501, the '502, and the '648, again, the pattern is

6    perhaps even more pronounced.  Here we have the original

7    provisional application filed in 2008.  I'll try to

8    highlight that, if I can, with a laser pointer.  Then

9    there's a variety of applications filed in the intervening

10   period before the three applications that issued as the

11   '501, '502, and '648.

12           But if Your Honor looks at the dates, the dates

13   for each of those applications in that interim period

14   occurred shortly after an Apple Watch release.  Apple Watch

15   Series 0, April 2015, next application, December of that

16   same year.  Apple Watch Series 4, released September 2018,

17   four more applications filed by Masimo starting in December

18   of 2018.  Apple Watch Series 5 released, September of 2019,

19   two more applications filed starting in December of 2019.

20   And then three more applications filed in 2020 shortly after

21   the Series 6 watch was released in September of 2020.

22           Masimo may claim this is a coincidence.  We

23   believe the evidence will show it was not a coincidence at

24   all.

25           The '127 patent, claim 9, is a good first example

1    of how Masimo has had to draft claims directed to lowest

2    common denominator technology in an effort to bridge the gap

3    between clinical products and consumer wearables like the

4    Apple Watch.

5           If you look at the claim limitations, they claim

6    basic components, like a plurality of light-emitting

7    sources, temperature sensor, a detector capable of detecting

8    light.  These are all old as the hills.

9           And what the claimed innovation here is to use

10   something they call a thermal mass along with a temperature

11   sensor thermally coupled to the thermal mass and capable of

12   determining a bulk temperature for the thermal mass.

13          So the purported innovation here is to regulate

14   the bulk temperature using this thermal mass as a regulation

15   component.

16          Now from the joint technology tutorial presented

17   to Your Honor, and this is the joint tutorial, it is known,

18   has been known for long, a long, long time, that by

19   adjusting the temperature -- the temperature of an LED

20   device can effect the wavelength of the light, the

21   temperature and the wavelength of the light have a

22   relationship, and there can be variation of that wavelength

23   based on temperature.  That was known.

24          Webster is just one example of a well-known

25   treatise from 1997 that teaches that same idea, variation of

54

1   wavelength based on temperature.  So that's clearly not a

2   patentable concept.

3          Now the claims use this term, a thermal mass, a

4   thermal mass, and that particular phrase, a thermal mass, is

5   an unusual combination of words that they are accusing --

6   may shed some light on what they mean by it -- what they are

7   accusing are copper substrate portions within the Apple

8   Watch on which certain components reside.

9          But Your Honor will see evidence that the

10  substrate technology used in sensor devices, again, has been

11  known for decades.  One example is Mendelson from 1991,

12  which was a blood oxygen sensor which had a substrate, and

13  if a substrate qualifies as a thermal mass, Mendelson had

14  it.

15         Scarlett is another example.  This one shows

16  copper lines through the substrate, copper pathways, like

17  the copper pathways that are accused in the Apple Watch.

18  Again, these types of basic structures have been known for

19  years and years, decades and decades.

20         So even the purported innovation of that patent,

21  we believe the evidence will show that, if a thermal mass to

22  regulate bulk temperature can be satisfied by mere PCB or

23  other forms of substrates, there's no possible way that they

24  can survive scrutiny in light of the prior art, the claims

25  are invalid.

1            If we turn to the '745, again, we see a similar

2    pattern, claims that recite lowest common denominator

3    technology in an effort to bridge the gap from the clinical

4    setting to the consumer wearables setting.

5            This is the patent which Ms. Swaroop referred to,

6    which changes the shape of light, according to the

7    disclosure.  It involves components like a plurality of

8    light-emitting diodes, a plurality of photodiodes, light

9    block processor.  These are basic old components.

10           But the key purported innovation here is to take

11   light from a light-emitting diode, which is emitted in a,

12   quote, first shape, to put that light through a material

13   configured in a particular way, according to the claims, to

14   change the light from a first shape into a second shape.

15           So the purported innovation here literally is

16   running light through a component to change the shape of the

17   light.  That's the purported innovation.

18           And that is no innovation at all.  Just one

19   example is the Iwamiya patent filed by Casio Computer.  This

20   was filed back in 2010, twelve years ago.

21           Here you can see, Your Honor, in red are

22   light-emitting units.  The light in these units passes

23   through various structures, including this annular light

24   guide.  That's that ring-shaped component in yellow below.

25   The light that comes out the other side is in a new shape, a

1   ring.  That's exactly one of the shapes that is claimed as

2   inventive in the '745 patent.

3          So Iwamiya teaches this basic idea of passing

4   light through a structure such that it arrives out the other

5   side in a different shape.

6          Again, there's many examples of this.  This is

7   simply one.

8          Another example is the Fresnel lens in the

9   original Series 0.  In the Fresnel lens, there was a grooved

10  Fresnel lens.  It was a grooved lens that was used in the

11  Series 0.  And for one of the light-emitting diodes or LEDs,

12  the one in red that you can see in the top left-hand corner,

13  the light would pass through some of the grooved sections of

14  the lens, and it would come out the other side in a crescent

15  shape.

16         So, again, if that's the purported innovation

17  here, changing light from one shape to another by running it

18  through a structure, the Fresnel lens in the Series 0 is

19  certainly an example of that.

20         Ms. Swaroop suggested there was some dispute as

21  to the date.  There will be no dispute.  The Series 0 watch

22  was released to great public fanfare in 2015.  The Apple

23  witnesses will testify to exactly that.  This is not a fact

24  that can be reasonably contested.  It was a public,

25  commercial release to the world, and we'll certainly put in

1  evidence on that point, but the Fresnel lens in that device

2  did change the shape of certain light emitted by light

3  diodes.

4        Again, we would never claim that's a patentable

5  invention, but, if that's the contention, the Fresnel lens

6  invalidates.

7        Now if we turn to the Poeze patents, '501, '502,

8  and '648, once again, we see the same pattern.  These are

9  the so-called Multi-Detector Patents according to Masimo.

10  And these claims are long, but if you look at any portion of

11  them, this is just old technology.

12        LEDs, photodiodes, a convex surface are just some

13  examples, storage device, a strap.  The length of the claims

14  should not be taken as any indication of their innovation.

15  Again, every single part of these claims was old as the

16  hills.

17        Here's what they submitted as patent, prior art

18  to the Patent Office, page after page of prior art

19  references, which speaks to how crowded this field was,

20  speaks to some of the rudimentary features they were trying

21  to claim as patentable.

22        Even though they submitted all this prior art,

23  they didn't submit enough.  We will show Your Honor many

24  prior art references that were not before the Patent Office.

25  Those include the ones you see here.  These are all

1   physiological sensors, including some blood oxygen sensors,

2   and they all include multiple detectors.

3          The purple components that we colorized here,

4   Your Honor, are all photodiodes.  As you can see, every one

5   of these devices has multiple detectors for detecting light,

6   multiple photodiodes, and it goes on.  Here's another slide

7   of additional photodetectors from over the years.

8          If you look at the dates, Your Honor, you can see

9   some are from the 1970s, 1978, into the '90s, into the

10  2000s, and, again, it continues.

11         So multi-detectors, there's nothing patentable

12  about multiple detectors.  Reference after reference after

13  reference speaks to that.

14         Ms. Swaroop said we have disclosed dozens of

15  patents and other publications as state of the art evidence.

16  She is exactly right.  We certainly have.  And there's a

17  good reason for that.  These patents are directed to

18  technology that was taught many times over in decades that

19  preceded these patent applications.

20         To the extent that the contention here is that

21  the convex surface requirement is somehow a patentable

22  advance, it's not.  Again, you can see it over and over

23  again, including the Smart reference from 1971, the Cramer

24  reference from 1978, on and on and on.

25         And if we -- even if we focus on particular

1    combinations of these old components, Your Honor will see
2    that we have evidence of that too.  One example is the
3    Lumidigm patent.

4            You will hear live testimony from Dr. Robert
5    Rowe, a former engineer at Lumidigm.  He is one of the named
6    inventors on the Lumidigm prior art reference that you see
7    here, which is directed to an electro-optical sensor.

8            Now, Ms. Swaroop mentioned that there's a lot of
9    different use cases disclosed in the Lumidigm patent, and
10   she is correct about that.  One of the use cases is blood
11   oxygen sensing, and you can see the highlighted text here,
12   blood oxygen sensing using light detectors with multiple
13   diodes.

14           You can see here the multiple photodiodes and the
15   multiple emitters on the right, the emitters in red, the
16   diodes in purple, and there's an explicit disclosure of
17   using these types of configurations and structures within a
18   watch.  Fig. 8B shows using the multiple detector sensor
19   taught by Lumidigm in a watch.

20           To the extent there's some critique by Masimo of
21   the sufficiency of the disclosure of Lumidigm's teaching
22   with respect to a watch, well, if they argue that, they are
23   going to have a big problem with the Poeze patents, which
24   have a threadbare disclosure of actually using their sense
25   technology within a watch.  The Lumidigm disclosure is at

1    least as much if not more than what's in Poeze.

2           But what is clearly in Lumidigm are multiple

3    detectors, multiple photodiodes, and a convex protrusion.

4    It teaches a compound curvature on the optical surface.

5           So even if one looks at the combination of all

6    these old elements recited in these long claims, Lumidigm

7    taught it.

8           Moreover, Professor Steven Warren from Kansas

9    State University, who is one of our two independent

10   technical experts in this case, he will explain to

11   Your Honor, not only all the prior art references that we've

12   looked at from third-party publications and patents and so

13   on, but also that one of his undergraduate students created

14   a blood oxygen sensor using multiple detectors.

15          So, again, the shorthand that Ms. Swaroop used to

16   refer to the Poeze patents was the multiple detector

17   patents.  Here is an undergraduate student project that had

18   multiple detectors used for blood oxygen sensing.  That too

19   is prior art to the Poeze patents.

20          Now if we look at the Asserted Patents, not only

21   is there prior art problems, there's also section 112

22   problems.  For several of the claims that are asserted in

23   this case, the stretch that's been executed by Masimo during

24   the drafting of those claims has gone so far as to

25   disconnect the claims from the written descriptions within

1    the patents.

2            There is an insufficient written description to

3    demonstrate possession of the claimed invention and

4    enablement of those inventions and section 112 problems.

5    We'll get into the details of those over the course of the

6    case.

7            Now as I said, for each of these patents we see

8    this pattern of stretching and covering -- drafting claims

9    directed at lowest common denominator technology in an

10   effort to bridge the gap from clinical to consumer

11   wearables, but the stretch was not far enough.

12           There is no infringement with respect to the

13   Apple Watch because distinctions remain as to each of the

14   patents in the case.

15           For the '127 patent, there's a requirement of a

16   thermal mass -- I talked about that earlier -- a temperature

17   sensor thermally coupled to the thermal mass and capable of

18   determining a bulk temperature for the thermal mass.

19           Now at this point, Your Honor, I'm going to go on

20   the confidential Apple record before I discuss the next

21   slide, so I would ask that Masimo and the public be excused.

22           (Whereupon, the hearing proceeded in confidential

23   session.)

24

25

```
 1                O P E N   S E S S I O N

 2

 3          JUDGE BHATTACHARYYA:  We're moving back to the

 4   public record.

 5          MR. MUELLER:  May I proceed?

 6          JUDGE BHATTACHARYYA:  Yes, you may.

 7          MR. MUELLER:  Thank you, Your Honor.

 8          The domestic industry requirement, of course,

 9   Your Honor is well familiar that it requires there be a

10   domestic industry that exists or is in the process of being

11   established.  And we believe these requirements are not met

12   for the asserted domestic industry products in this

13   investigation.

14          Now, I won't belabor this, because Your Honor has

15   received extensive briefing on the issue, but we do believe

16   the law is clear that the relevant time for assessing the

17   satisfactoriness of a domestic industry is at the time of

18   the filing date of the complaint.

19          Among the cases that set out that point is a

20   Certain Thermal Plastic Encapsulated Electric Motors case,

21   which says, ordinarily, the relevant date at which to

22   determine if the domestic industry requirement is satisfied

23   is the filing date of the complaint.

24          And as this case proceeds to explain, the

25   Commission has explained that it will consider
```

1   post-complaint evidence regarding domestic industry only in

2   very specific circumstances, i.e., when a significant and

3   unusual development has occurred after the complaint has

4   been filed.

5        No such event has occurred here.  In fact,

6   there's not even an allegation of a significant and unusual

7   development occurring after the complaint.  So we believe

8   the relevant time for assessing the domestic industry is the

9   date of the complaint.

10        But at whatever point Your Honor assesses it,

11   even today, there is no proper domestic industry for these

12   patents.

13        To take the Masimo Watch, which is the asserted

14   domestic industry product for four of the five patents, the

15   evidence will show it's a bit of a moving target for us to

16   even figure out when the so-called project started.  Witness

17   testimony has varied.  And the details of the research and

18   development period really remain opaque to us in important

19   respects.  What exactly happened in the years before the

20   amended complaint was filed in July of 2021 is a bit of a

21   mystery.

22        I'm sure we're going to hear testimony on this

23   subject from the Masimo witnesses, but, as Your Honor is

24   aware, we have been fighting furiously to get information on

25   this subject for months and months and months and months,

1    and it's been a continual moving target in terms of what the

2    physical product or products are that evidence this

3    development and the details about how those products work or

4    don't work, who developed them, or didn't develop them.

5    It's a question mark.

6           Even if we look at the period for after the

7    complaint was filed in July of 2021, it's clear that R&D

8    continued.  There was no finished Masimo Watch when that

9    complaint was filed -- not even close.

10          Even as of today you cannot buy this Masimo W1

11   watch in any store in the U.S.  It is not on the open

12   marketplace.  It's not a commercial product in competition

13   with the Apple Watch even today, even today, and certainly

14   not as of the time of the complaint.

15          Your Honor, at this point I am going to go into

16   Masimo confidential information, so I would ask to go on the

17   Masimo confidential record.

18          (Whereupon, the hearing proceeded in confidential

19   session.)

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3          JUDGE BHATTACHARYYA:  Why don't we take our

 4   morning break at this time.  We're on break for 15 minutes.

 5               (Whereupon, the proceedings recessed at 11:06

 6   a.m.)

 7               (In session at 11:22 a.m.)

 8          JUDGE BHATTACHARYYA:  We're back on the record.

 9   We're on the public record.

10               Is Apple's counsel ready to proceed as well?  I

11   believe you're muted still.

12          MS. SWAROOP:  Still can't hear you.

13          MR. MUELLER:  Thank you.  We're ready to proceed,

14   Your Honor.

15          JUDGE BHATTACHARYYA:  Ms. Swaroop, are you ready

16   to call your first witness?

17          MS. SWAROOP:  I am, Your Honor.  Before we do

18   that, we do have evidence that is being received without a

19   sponsoring witness.  So we would like to move that in now

20   before we begin our examination of our first witness.  We

21   did provide a list to Apple's counsel yesterday based on

22   Your Honor's rulings.  I do think we have agreement with

23   regard to the list.

24          JUDGE BHATTACHARYYA:  The procedure we normally

25   follow is that you send it to the Bhattacharyya337 email
```

1    address so that I can have a copy to look at it, and then
2    I'll confirm on the record if there's no opposition and let
3    the evidence in.
4         Do you want to do that now or we can do it --
5    it's up to you.
6         MS. SWAROOP:  Yes, Your Honor.  We do have a list
7    electronically.
8         MR. MUELLER:  Your Honor, I would just need to
9    confer with some folks to cross-check those numbers, so the
10   email procedure would be helpful to us.
11        MS. SWAROOP:  Understood, Your Honor.  We will
12   send the email and take care of this later.  So I guess we
13   are ready to begin with our first witness.  Mr. Joseph Re
14   will be conducting the examination.
15        For our first witness Complainants call Joe
16   Kiani.
17        JUDGE BHATTACHARYYA:  I just wanted to make sure
18   the court reporter is still with us.  Great.  Thank you.
19        MR. RE:  Good morning, Your Honor.  Pleasure to
20   be here.  If my voice sounds a little funny, I am a COVID
21   survivor.  It's only my second day back in the office.
22        JUDGE BHATTACHARYYA:  I'm glad to have you back.
23        MR. RE:  Before I begin with Mr. Kiani, there
24   were some outstanding objections.  I believe we are to deal
25   with those at the time I am going to introduce them rather

1    than argue about their admissibility in advance.

2              JUDGE BHATTACHARYYA:  That's fine, if that's the

3    procedure -- that's fine.

4              MR. RE:  Yes.  There are four objected to

5    exhibits that I do want to introduce despite the objection,

6    and I'm ready to respond if argument is required.

7              JUDGE BHATTACHARYYA:  Okay.

8              MR. RE:  Thank you.

9              JUDGE BHATTACHARYYA:  Welcome, Mr. Kiani.  Do you

10   understand that you're under an obligation to tell the truth

11   here today?

12             THE WITNESS:  Yes, Your Honor.

13                        JOSEPH KIANI,

14             having been first duly sworn and/or affirmed

15   on his oath, was thereafter examined and testified as

16   follows:

17                     DIRECT EXAMINATION

18   BY MR. RE:

19       Q.   Good morning, Mr. Kiani.  For the record, could

20   you please give your full name and spell your name?

21       A.   Yes.  My name is Massi Joseph E. Kiani,

22   M-A-S-S-I, Joseph, E, and K-I-A-N-I.

23       Q.   What are your current positions?

24       A.   I am chairman and CEO of Masimo and Cercacor.

25       Q.   For how long have you been the CEO of Masimo?

1      A.    Since inception.  Since 1989 where I started

2   Masimo in my garage.

3      Q.    Could you briefly tell us about your formal

4   education?

5      A.    Yes.  I have my bachelor's and master's from San

6   Diego State University in electrical engineering.

7      Q.    And the master's, what was your master's degree

8   on at San Diego State?

9      A.    Advanced signal processing, adaptive filters, AI.

10     Q.    When you said you started Masimo in 1989, what

11  was your main purpose in starting Masimo?

12     A.    I wanted to solve the motion artifact problem

13  with pulse oximeter.

14     Q.    What exactly, briefly, is pulse oximetry?

15     A.    Pulse oximetry is the noninvasive measurement of

16  arterial oxygen saturation and pulse rate using two

17  wavelengths of light passing through a tissue and looking at

18  the pulsatile information and normalizing that from the bulk

19  or the DC information.

20     Q.    Now you mentioned this motion problem.  Explain

21  to me what exactly is the motion problem.

22     A.    Well, the assumption pulse oximetry makes, the

23  invention of pulse oximetry back in '72 with Dr. Aoyagi, is

24  that whatever pulsates is what we're interested in.

25            During motion the venous blood starts pulsating

 1    at your frequency of motion.  Venous blood is typically less

 2    than 10 millimeter mercury or your arterial is probably 100,

 3    120.  So it's a Jell-O pool of blood.

 4         So when you start moving, the venous information

 5    starts getting in the signal, and it confused a conventional

 6    pulse oximeter to give a normalized average of arterial and

 7    venous saturation.

 8         Q.   And in addition to motion, what other major

 9    problem did you learn about in tackling this motion problem?

10         A.   Low perfusion.  Low perfusion is when there's low

11    blood flow to the extremity.  When your hands are cold, you

12    have low perfusion.  I usually have cold hands, and that's

13    why I noticed the problem early on as an engineer with the

14    motion and low perfusion.

15         It's not just a low signal-to-noise problem.

16    When you have low perfusion, because your hand typically is

17    your radiator trying to keep you cool, when you have cold

18    hands, you're not getting enough really -- you're not

19    getting a lot of arterial blood supply.

20         So the venous saturation becomes really low, like

21    50 percent, versus when you're hot, it could be 97.

22         So when you move, when you have low perfusion, it

23    really shows the problem of motion with pulse oximetry.

24         Q.   Mr. Kiani, you can stare at the camera.  It looks

25    like you're probably looking at a screen of me.

1       A.   Yeah.  I'm looking at you.  Sorry.

2       Q.   Look at the camera.  That's much better.

3            And who else was part -- why was this motion

4   problem significant in the hospitals?

5       A.   Well, when the patients were first monitored for

6   pulse oximetry it was in the operating room where patients

7   are sedated and not moving, but when patients started going

8   outside the OR and being monitored in the ICU, intensive

9   care unit, or neonatal unit, or recovery room, they don't

10  stay still.

11           So when they began moving, they realized 70 to 90

12  percent of the alarms were false alarms due to motion

13  artifact and low perfusion.

14      Q.   And what other were some of the effects of these

15  caused by motion problems in patients?

16      A.   Well, crying wolf made clinicians ignore the

17  alarm.  They were finding a lot of patients dead in bed,

18  literally, because they ignored the alarm.

19           And the neonatal intensive care unit where you're

20  not just worried about too little oxygen, but you're worried

21  about too much oxygen, because the baby's eyes aren't

22  developed yet, a lot of babies were getting severe eye

23  damage.  Two thousand a year were becoming blind.  In fact,

24  Stevie Wonder is blind from ROP, retinopathy of prematurity,

25  in the neonatal ICU.

1      Q.   Can you say that word, ROP, more slowly for the

2   court reporter?  What does it stand for?

3      A.   Sure.  Retinopathy of prematurity, so eye damage

4   due to prematurity, but it's really due to gyrations in the

5   oxygen in the neonatal ICU because they didn't have a

6   trustworthy pulse oximeter.

7      Q.   And who joined you in this endeavor to begin

8   tackling the motion and low perfusion problems?

9      A.   Mohamed Diab.  Six months after I started Masimo,

10  Mohamed joined me, and he -- I started Masimo with a $40,000

11  loan on my condo, and I wanted Mohamed to join, but he said

12  until you raise money from third parties, I'm not sure I'm

13  going to give up my job to join you, because I had raised by

14  then $80,000 from other people, and Mohamed joined me.

15     Q.   What did Mr. Diab do when he joined Masimo?

16     A.   He developed the circuit and wrote the software.

17  Eventually he became our chief technical officer.

18     Q.   And what techniques did you begin to use to

19  tackle this motion problem with pulse oximetry?

20     A.   Well, I had studied, my master's work, area of

21  adaptive filters, which had been used in antisubmarine

22  warfare and satellite communication, and adaptive filters

23  were incredibly a useful tool because they could adapt to

24  the noise.

25          So when they saw noise coming at a certain

1    frequency versus another frequency, it would adapt its

2    coefficients to cancel.  Because the problem -- canceled the

3    noise frequency.  The problem is motion is happening in the

4    same window that we're looking for a signal, which is from

5    30 beats per minute to 300 beats per minute.

6         So adaptive filters, which I thought would work,

7    ended up working along with things we call parallel engines

8    and improved sensor design and hardware design to actually

9    get rid of the motion artifact problem and the low perfusion

10   problem.

11   Q.   I'd like to delve in quickly to some of your

12   early products.  If you could -- there's a book in there --

13   you can look at the book if you need to see the original.

14        We'll put it on the screen to try to save some

15   time, but, in particular, I'd like to direct your attention

16   to Complainants' or CX Exhibit 1370.  If you can just tell

17   me what that is.

18   A.   That is our 25th year anniversary annual report

19   from our incorporation.

20   Q.   And I'd like to take you to page 4 of that

21   report, which begins a multipage timeline.

22        Do you see that?

23   A.   I do.

24   Q.   I wonder if you could briefly describe some of

25   your early products that are represented by this timeline.

1       A.   Yes.  So after our founding in '89, we show here

2   in 1995, for the first time we showed Masimo pulse oximetry

3   at the Society of Technology and Anesthesia and introduced

4   an OEM board called the MS-1 that we wanted companies that

5   made patient monitors to incorporate to have Masimo SET

6   level pulse oximetry.

7       Q.   And how were your products initially received

8   bought these boards?

9       A.   Well, everyone was blown away at what we could

10  do.  The industry had tried for years to deal with the

11  motion artifact problem and had concluded that it was

12  impossible to solve.  It was just inherent limitation of

13  pulse oximetry.

14          So when we showed people we could actually

15  measure-through-motion and low perfusion, everyone was just

16  blown away, and it was highly regarded.

17      Q.   And then after 1995 I see some entries for

18  some -- your own products.

19          Do you see those?  In 1998, '96, do you see

20  those?

21      A.   Yes.

22      Q.   What did you begin to do with your boards after

23  you introduced the MS1?

24      A.   Well, first of all, by 1996 is when the first

25  time the product shipped to consumers, when this case being

1    the clinical consumers, and through an OEM we called Contron

2    from England, but you see the LNOP sensor, which is our low

3    noise optical probe sensor that was introduced then, later

4    we created or own standalone device with the help of a

5    company called Ivy Biomedical where we could show standalone

6    pulse oximeter with our technology rather than a

7    multiparameter patient monitor.  And then NEC created the

8    standalone as well.

9        Q.   I'd like you to take a look at what is page 35 of

10   this annual report, particularly the right side.

11            If you could briefly explain, what is this chart

12   shown in your annual report?

13       A.   Well, by now numerous clinical studies had come

14   out showing the advantages of Masimo SET.  This was the most

15   comprehensive done by Dr. Steven Barker.  I think it was in

16   2002 that this came out.

17            And he compared Masimo SET to all of the

18   available commercial pulse oximeters at the time.  And he

19   looked at their sensitivity versus their specificity, and

20   this is what is known as a ROC curve, a receiver operating

21   characteristic curve, which plots on the y-axis the

22   sensitivity, on the x-axis one minus the specificity.  An

23   ideal product should go straight up.  You can see we're

24   pretty close to that.  That red is Masimo SET.

25            For example, at a 95 percent sensitivity, we have

 1    about a 3 percent false alarm rate, where, if you just keep

 2    going right, they get a lot worse, 30, 40, 50 percent false

 3    alarm, and some of them are worse than the flip of a coin.

 4    These are random number generators.

 5        Q.   For the record, I need you to define what's the

 6    difference between the sensitivity of a device and the

 7    specificity of a device.

 8        A.   Yes.  Sensitivity is the ability to pick up true

 9    alarm, a true event.  Specificity is the ability to reject

10    false events.  So you would like to have a product that's

11    100 percent sensitive and 100 percent specific.

12        Q.   I'd like you to take a look at what has been

13    marked as Complainants' Exhibit 0777.

14             If you could just identify this document for the

15    record.

16        A.   Yes.  This is what we referred to as

17    bibliography.  It summarizes some of the studies on SET,

18    Masimo SET pulse oximetry, and rainbow« pulse, which is this

19    multiwavelength blood constituent sensor that you put on

20    your site to measure 12 parameters.

21        Q.   And tell me how many articles and studies have

22    confirmed the superiority of Masimo SET technology?

23        A.   Over a hundred.  Over a hundred.  And what's

24    really unique here is in clinical world usually, whatever

25    you create, a third of the studies say they're better, a

88

1    third say they're worse, a third is neutral.  In our case,

2    over a hundred said it was positive and a couple neutral.

3         Q.   Now you mentioned the LNOP, the low noise optical

4    probe.

5              If we can go back to that, 1370, page 4, and blow

6    up that 1996 entry.

7         A.   Yes.

8         Q.   Is this -- tell me more about this sensor.  Is

9    this a single patient use?  What kind of sensor are we

10   talking about here.

11        A.   If you zoom out of the picture --

12        Q.   1996.

13        A.   Go back to 1996 LNOP, if you go look at that,

14   just go -- so what you see is it's an adhesive, single

15   patient use sensor, and that white bump you see there,

16   that's actually the invention there.  That's a cavity that

17   the digit can sit on to minimize the impact of motion.

18        Q.   How did you market this as assisting with your

19   Masimo SET performance?

20        A.   Well, it was part of the system.  We were trying

21   to solve this problem of motion artifact, as I mentioned,

22   and what we figured out that, if you put the soft tissue

23   into this cavity, you minimize the optical perturbation of

24   the site.

25        Q.   And so it's the subject of a patent, I

1   understand?

2        A.   Yes.  In fact, the name of the sensor is the

3   title of the patent, low noise optical probe.

4        Q.   For the record, it's Complainants' Exhibit 1586.

5   If we can call that up.

6             Is this the patent on that sensor?

7        A.   Yes, it is.

8        Q.   And if we can go to Fig. 4, I'd like you to

9   describe for the record what's shown in Fig. 4 of this '818

10  patent.

11       A.   Yeah.  Basically, the dashed lines is the body of

12  the sensor, where you see the flesh, the 128 is sitting on,

13  130 is the LED that's shining through the tissue going to

14  the photodetector 126.  And you see the photodetector is

15  recessed, and it's actually in a cavity where the tissue can

16  sit on underneath where you have these protective dashed

17  line barriers to make sure you don't get light piping but

18  you get the light from the LED to the photodetector.

19       Q.   And 128, is that the finger or tissue?

20       A.   Yes.

21       Q.   Okay.  And the detector is 126 in the bottom of

22  the well, is that what you're saying?

23       A.   Yes.

24       Q.   Okay.  And what did other sensors at that time

25  do, which made this a patentable invention, in your mind?

1      A.   Well, everybody else in the industry would bring

2   the detector right up to the 128, the patient finger in this

3   case, and have -- try to be as planar and flat as they could

4   with the sensors, the detector and the LED.

5      Q.   How did the medical device industry react to

6   Masimo's entry into the pulse oximetry market?

7           MR. MUELLER:  I'll object for lack of foundation

8   as to what other folks may have reacted to.  Mr. Kiani can

9   talk about his own reactions, but I would object on lack of

10  foundation grounds and hearsay grounds to the perspective of

11  third parties.

12          JUDGE BHATTACHARYYA:  Mr. Re, did you want to

13  respond?

14          MR. RE:  I'll rephrase.

15     Q.   What did you personally experience when you

16  introduced your products in the medical device industry?

17     A.   Well, after our patent was published, everybody

18  became all of a sudden quite smart.  What they couldn't do

19  for over a decade before in solving the motion problem,

20  everyone all of a sudden seemed to have a solution.

21          So several companies violated our patents.  We

22  ended up suing Nellcor, which is the market leader, about 90

23  percent market share at the time, and once we won that

24  litigation, everybody else except for two, a Chinese company

25  called Mindray and a European company called Philips, we had

1    to sue them.  They wouldn't stop.  And ultimately Mindray

2    settled right before trial, and Phillips went to trial, and

3    we won that litigation, both with the jury and the judge.

4         Q.   I just want to go back to the Nellcor case.

5              What was the outcome of the Nellcor patent

6    infringement case?

7         A.   Yeah, the Nellcor case, the court ordered that

8    040505 CI, which was the technology generations for Nellcor,

9    had infringed our IP, and the Federal Circuit court ordered

10   their injunction of those products.

11             MR. MUELLER:  I'm sorry.  I'm just going to move

12   to strike testimony about court decisions from other cases

13   involving patents not asserted in this case.  I object and

14   move to strike Mr. Kiani's testimony characterizing

15   decisions from other bodies on a patent not in this suit.

16             JUDGE BHATTACHARYYA:  Mr. Re?

17             MR. RE:  The court can take judicial notice.

18   This is all public information in court filings, at the

19   Federal Circuit, in the Central District of California,

20   everything Mr. Kiani mentioned is all of public record.

21             JUDGE BHATTACHARYYA:  The objection is overruled

22   as to weight, not admissibility.

23        Q.   Does Masimo or you have an estimation of how many

24   patients a year are monitored with Masimo technology?

25        A.   Yeah, over 200 million patients are monitored

1    with Masimo pulse oximetry now.

2         Q.   And as CEO of Masimo, can you tell me how your

3    products made a difference in health care today?

4         A.   Yes.  Dramatic.  We have helped reduce blindness

5    in the neonatal ICUs.  These are all documented by clinical

6    studies, the outcome studies.  We have helped save lives on

7    postsurgical patients that were on opioids.

8              And recently, even with COVID, when patients

9    couldn't be admitted to the hospital because there were too

10   many patients in the hospital with COVID, they used our

11   technology to send the COVID patients home, and a study had

12   just come out showing 70 percent reduction in mortality.

13             No other pulse oximeter has ever shown outcome

14   improvement except Masimo's.

15        Q.   And has Masimo received awards for its technical

16   achievements?

17        A.   Yes.  Numerous awards.  Over 50 awards.

18        Q.   In fact, if you can just, for the record, tell me

19   what is Exhibit 1378, if we can call that up.

20        A.   Yeah, this is some of the awards we've received

21   for our inventions, the latest one being FDA granting us,

22   basically, as one of eight companies that could help the

23   epidemic, the opioid epidemic.

24        Q.   And since you solved this motion and low

25   perfusion problems, has Masimo continued to invest in

1    research and development in other areas?

2        A.   Yes.  Absolutely.  Masimo's founding was all

3    about innovation.  I was 24 when I started Masimo.  So we

4    had to prove ourselves.  So we have continued to, not only

5    advance pulse oximetry, even though we made it 30 times

6    better than what was out there before, but we had then taken

7    the two-LED pulse oximeter to multi-LED we call rainbow« to

8    measure 12 parameters noninvasively for the first time,

9    including noninvasive hemoglobin, noninvasive carbon

10   monoxide, methemoglobin, that have all been shown to save

11   lives dramatically in hospitals.

12       Q.   I wonder if you can just briefly describe, who is

13   Cercacor, your other company?

14       A.   Yes.  In 1998, at the behest of shareholders and

15   our board, we spun off a company called Masimo Laboratories

16   at the time that we named Cercacor, which means closer to

17   the heart.  And Cercacor or Masimo Labs was to go work on

18   nonvital signs measurements, like rainbow«, like measuring

19   hemoglobin and hopefully noninvasive blood glucose, and

20   that's what Cercacor is.

21       Q.   And what's the -- is there a legal or technical

22   relationship between Masimo and Cercacor?

23       A.   Yes.  At the time of the spinoff and later

24   updated, we have a cross-licensing agreement between the two

25   companies.  So, basically, the two R&D organizations, Masimo

1    and Cercacor, can collaborate, because whatever they invent

2    it's shared amongst each other for the various projects.

3        Q.   And for the record could you identify

4    Complainants' Exhibit 1612?

5        A.   Yes, that is the latest cross-license agreement

6    between Masimo Laboratories or Cercacor and Masimo

7    Corporation.

8        Q.   So tell me, today, or since the relevant periods

9    in this case, what are the projects that Cercacor works on

10   relating to this case?

11       A.   Well, Cercacor is who developed rainbow«.

12   rainbow« platform was supposed to be the platform that

13   helped us to get to noninvasive glucose, but along the way

14   we checked for measurements that were maybe slightly easier

15   but a lot harder than pulse oximetry, like carbon monoxide,

16   like hemoglobin.  And we delivered.  Those things worked and

17   they have been in the market for over 15 years some of them.

18       Q.   Well, let's call up that exhibit, the timeline,

19   Complainants' Exhibit 1370, and let's take a look at pages 6

20   and 7 of the timeline, because it does go many pages.

21            Can you show us from looking at the timeline in

22   Exhibit 1370 what are some of the parameters and products

23   introduced through the rainbow« research platform?

24       A.   Yes.  Beginning 2005, with SpCO, that's the

25   noninvasive way of measuring carbon monoxide.  Nothing else

1   is like it out there still.  And it helps firefighters and

2   people that may have been in a situation where they could

3   have inhaled smoke and carbon monoxide to detect when their

4   CO has gotten dangerous.

5        Q.   Are you aware of any other companies that offer

6   products in competition with these parameters shown in this

7   timeline dealing with SpCO and methemoglobin and hemoglobin?

8   Are you aware of any other competing commercial products?

9        A.   No.  No.  Over the years we've seen announcements

10  from a few companies, but nothing in the market.  We are

11  still the only company with these parameters.  And, like I

12  said, noninvasive hemoglobin has been proven to now reduce

13  mortality by 30 percent in hospitals.

14       Q.   Why is it called rainbow«?

15       A.   Because we went from a two wavelengths of light

16  to more than seven, like the colors of the rainbow, so we

17  call it rainbow«.

18       Q.   And did you patent some of the research that came

19  out of the rainbow« research and development?

20       A.   Yes.  Absolutely.

21       Q.   I just need you to identify for the record joint

22  Exhibit 1, if we can call that up.

23            Can you identify that for the record?

24       A.   Yeah, that is actually the '501 patent that's in

25  this case that describes some of the inventions that we did

1    with rainbow«.

2         Q.   And you're a named inventor on here?

3         A.   Yes, I am.

4         Q.   Can you identify for the record Joint Exhibit 2?

5         A.   Yes.

6              MR. MUELLER:  I'm sorry.  I apologize for

7    interrupting here.  I do want to make an objection based on

8    that last answer.

9              The alleged domestic industry products in this

10   case for these patents are not the rainbow« sensors.  So I'm

11   going to object to testimony in which Mr. Kiani is trying to

12   link these patents and suggest that the rainbow« sensors

13   practice them.

14             The alleged products for these patents are the

15   Masimo Watch, the alleged product I should say, for domestic

16   industry.  There's no contention in this case linking the

17   Poeze patents to the rainbow« sensors, and it's far too late

18   to make that now.  So I object.

19             JUDGE BHATTACHARYYA:  Mr. Re?

20             MR. RE:  I'm doing no such thing.  I'm just

21   laying out basic facts.  I haven't gone anywhere near the

22   subtleties that Mr. Mueller is alluding to.  I'm just

23   setting forth facts.  I'm not making any argument.

24             JUDGE BHATTACHARYYA:  Is Masimo making a

25   contention that the '501 patent covers the rainbow« sensor

1    products?

2         MR. RE:  No.  It's the research of the rainbow«

3    that led to where we're going later in time.  Correct.  This

4    is way earlier.  I'm just introducing -- these are the

5    patents that are in the investigation.  Mr. Kiani is an

6    inventor.  I was just trying to make them of record.  I

7    wasn't trying to do anything further yet.

8         MR. MUELLER:  Your Honor, so long as there's no

9    contention by Masimo that the Poeze patents, the '501, '502,

10   '648, practice the rainbow« sensor products or that those

11   products are the domestic industry, then we can keep going.

12        JUDGE BHATTACHARYYA:  Mr. Re, as I understood it,

13   you would agree with that --

14        MR. RE:  Yes, I do.

15        JUDGE BHATTACHARYYA:  -- statement?  All right.

16   Then we can proceed.

17   Q.   So the third patent is the -- can we identify for

18   the record Joint Exhibit 3, which is the '648 patent, and

19   call that up.

20        This is the third, as Mr. Mueller calls it, the

21   Poeze patents?

22   A.   Yes.

23   Q.   And you're an inventor on all three of these,

24   right?

25   A.   Yes.  Yes, I am.

1      Q.   And who are these other gentlemen that are

2   co-inventors with you?

3      A.   Well, these were, some of them, my former

4   colleagues, but my colleagues from Cercacor.  You'll see,

5   for example, Marcelo Lamego, who went to Apple in Cupertino;

6   Sean Merritt, Cristiano Dalvi, who have now gone to Rockley,

7   who is Apple-funded.  But, yeah, these are my colleagues at

8   the time at Cercacor.

9      Q.   Could you just briefly explain how the ideas, the

10   research that's embodied and disclosed in these patents,

11   tell me, what was it you were doing that led to the

12   disclosures of these three patents?

13      A.   Yeah.  We were trying to measure noninvasively

14   hemoglobin and glucose, which are much more difficult

15   measurements than oxygen.  Just getting to the signal is

16   really challenging.  And we had come up with this idea of

17   the active pulse.

18         Instead of your natural pulse, that can be very

19   small from point 1 percent of the signal to maybe 4 or 5

20   percent, we wanted to create an active pulse, so we created

21   our own pulsation to create maybe 5 to 10 percent signal, AC

22   signal.

23         Well, during that experimentation, one time the

24   active pulse detector hammer had been left in, and when it

25   pushed up against the digit we noticed the signal got

1    stronger, which was a surprise to us.

2            And that led us to this idea that, hey, maybe we

3    should use actually a protrusion instead of the opposite,

4    which we always had done, which was the cavity.  And then,

5    of course, along with that came problems of protrusion.

6    There was now light piping issues, and so we had to account

7    for it.  But, yes, that's how this idea came about.

8        Q.   Why were you surprised by the strengthening of

9    the signal when applying an active pulse?

10        A.   Well, because usually if you press against your

11    digit you see it become white, the capillary blood bed

12    pushes out of the way.  So we thought that's going to cause

13    the signal to go away, where actually at the right level it

14    actually increases it.  You can go too far and do what I

15    just said or too little where it won't impact it.  But at

16    the right height you actually get a bigger signal.

17        Q.   I'd like you to look at Fig. 3C of the Poeze

18    patents, what we call multidetector patents, whatever.

19            Could you just tell me what you mean by the

20    protrusion by looking at Fig. 3C?

21        A.   Yeah, the protrusion is the 305, and you can see

22    how it kind of comes up, it's got those four windows, 320,

23    322, and 21, and 3, where the four detectors are underneath

24    it where the light would go through from the top portion

25    where the LED would shine through the digit if your finger

1   were inside this alligator clip.  And that's where we

2   protected the light from piping as well with those windows

3   and the recession.  Again, that, 305, is the protrusion.

4        Q.   And you said that when you use the protrusion it

5   caused problems with light piping, is that what I

6   understood?

7        A.   Yeah.  It made it worse.  So we had to take extra

8   care to make sure that the light that you see by the

9   detector has gone through the tissue, and that's where we

10  basically created, again, this well, this time, you know,

11  with obviously a cover, as a reasonable product, and we made

12  sure that only the light that went through the tissue went

13  to the photodetector.

14       Q.   I understand you prepared a demonstrative to

15  explain the ill effects of light piping; is that right?

16       A.   Yes.

17       Q.   If you can call up that demonstrative.

18       A.   Yeah.  So what you see here, on the left side,

19  this is a reflectance mode.  You see the light emitter

20  diodes on the left, and the detector on the right.  What you

21  want is the light to go down to the tissue and come back up

22  to the detector.  But if you don't design this properly, you

23  get light that goes from the LED directly to the

24  photodetector, without going through the tissue.

25            And the same phenomenon exists also with the

1    transmissions.  This is adhesive transmission sensor around

2    the finger, and you can see how the light, instead of going

3    right to the detector, some of it, if you're not careful,

4    will go around and get to the detector without going through

5    the tissue, which causes inaccuracies in the measurement.

6        Q.    And if we go back to Fig. 3C, did I hear you or

7    understand you, did the hole or the well, did that go all

8    the way to the tissue in Fig. 3C?

9        A.    It did.  It did.  And then down to the floor of

10    the detector, with optical barriers in that well, the walls,

11    to make sure only the light through the tissue gets to that

12    photodetector that's sitting at the bottom of that hole.

13        Q.    And did you have a reason or understanding why

14    you know the industry did not understand the ill effects of

15    light piping?

16        A.    Yes.  Yes.  During the '90s, early '90s, we were

17    developing the measured pulse oximeter, our main competitor,

18    Nellcor, came with the first time a new improved sensor, and

19    they had built it so it reduces the problem of emissions,

20    electromagnetic radiation that by putting a Faraday shield

21    around the detector, but because they weren't aware of the

22    light piping, that bump created the cavity, like a fiber, so

23    more light went from the LEDs to the detector and was

24    causing all kinds of errors out there, but they didn't

25    understand it.  And so their improved product actually made

1   things worse.

2        Q.   Okay.  I'd like to change subjects now and talk

3   about your consumer products.

4             What was Masimo's first consumer-focused product?

5        A.   The iSpO2.

6        Q.   And what is the iSpO2?

7        A.   I think as the name maybe suggests it's a product

8   that the pulse oximeter that connects to the smartphones,

9   like an iPhone or tablet or iPad, and we have it in two

10  versions, one with the finger sensor clip attached to the

11  cable, that goes right to the phones, and one with a

12  connector that allows you to plug in 50 different sensors we

13  make from neonate to adult, from ear to forehead and finger

14  to it.

15       Q.   And did that technology that you incorporated

16  with the iPhone, did that have your medical-grade technology

17  in it?

18       A.   Oh, yeah.  I will not market any pulse oximeter

19  that doesn't have our Masimo SET performance or very close

20  to it, because I've seen the outcome difference.  That's why

21  for years we would not enter into this consumer stuff,

22  because it would be toys, it wouldn't work.  So, yeah, once

23  we got the power consumption down, remember, the MS1 board I

24  showed in '95, that consumed 4,500 milliwatts, so that could

25  not be made into a wearable or a consumer product.  So it

1    was down to -- when we got the power down to about 20

2    milliwatts, we began to make these consumer products and

3    products that were wearable.

4         Q.   I'd like you to look at Complainants' Exhibit

5    1511.

6         A.   Yes.

7         Q.   Would you identify for the record what is Exhibit

8    CX-1511?

9         A.   This is a press release, an announcement, that we

10   also sent through what we call Livewire, which is an

11   electronic email database of our customers, where we

12   announced the availability of iSpO2, a debut of it, at the

13   Consumer Electronics Show in January of 2013.

14        Q.   And when you say Consumer Electronics Show, you

15   showed this product at that show that year?

16        A.   Yes.

17        Q.   Prior to going to the Consumer Electronics Show,

18   what other shows did you go to before then?

19        A.   Only the clinical ones, like the anesthesiologist

20   conference or critical care conference or nursing

21   conference.  This was our first time going to kind of a

22   public consumer type of a marketplace.

23        Q.   And did the iSpO2 device with the iPhone, did

24   that attract some media coverage at CES?

25        A.   That was a big hit.  There was numerous, like 15,

1    20 different articles written about it, and put on the news

2    about the availability of a medical-grade Masimo SET pulse

3    oximeter for the first time available on these kinds of

4    devices.

5         Q.   And if I could show you Complainants' Exhibit

6    1512, could you explain for the record what is this exhibit

7    showing?

8         A.   Yeah, I think this is just some of the -- kind of

9    like the cutouts of some of these articles that had come

10   out, 21 articles that had come out as of January 10th, 2013.

11        Q.   And did Apple take notice of the notoriety you

12   were receiving with your consumer product for use with the

13   iPhone?

14        A.   Yes.  Within two to three months they contacted

15   us, and they said you guys are the platinum of noninvasive

16   monitoring, we want you to come down to Cupertino, we want

17   to learn more, we'll sign your NDA, we want to work with you

18   to integrate your technology into our products.

19        Q.   Did you have such a meeting?

20        A.   Yes, we did.  I was personally there.

21        Q.   And did Apple send you an agenda for the meeting?

22        A.   Yes, they did.

23        Q.   I'd like to show you an exhibit, which Apple has

24   objected to, so I'm alerting Mr. Mueller, it's Exhibit 1539.

25             Could you --

1          MR. MUELLER:  Actually, before we put it up, we

2     might want to go on the Apple confidential record here to

3     discuss the details of this, the Apple/Masimo confidential

4     record for both parties.

5          JUDGE BHATTACHARYYA:  Let's move on to the

6     confidential record for both Apple and Masimo.

7          (Whereupon, the hearing proceeded in confidential

8     session.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    O P E N   S E S S I O N

2    BY MR. RE:

3        Q.   When did you become interested in a

4    wrist-wearable pulse oximeter?

5        A.   Actually from the very beginning.  When I started

6    Masimo, I hoped to one day build a wrist-worn pulse

7    oximeter, because I hoped to one day take the product out of

8    the hospital into home for sleep analysis, for detecting

9    babies that are about to die from sudden infant death

10   syndrome, to even taking it to the gym, take it to people

11   who are exercising.  So that's been something since

12   practically 1990, 1991 that I was --

13       Q.   And why weren't you able to do it back then and

14   just go on to the wrist?

15       A.   As I mentioned, the power.  Our technology, we do

16   so much signal processing with the adaptive filter, it used

17   to take a very sophisticated sharp chip from analog devices

18   that consumed about 3,000 milliwatts.  Fortunately over time

19   these chips have gotten better and smaller and more power.

20            So, look, if I wanted to do conventional pulse

21   oximeter, I could have made a wrist-worn device 30 years

22   ago, but to make something that works accurately, reliably,

23   continuously, it needed to be Masimo SET or very close, and

24   that's what we were waiting for.  And eventually we did get

25   the power down to do that.

 1        Q.   When did you start getting -- submitting --
 2   spending serious resources towards pursuing a wrist pulse
 3   oximeter?
 4        A.   Right around the time we had the low power pulse
 5   oximeter, so around 2013, 2014, I remember 2014 we began
 6   actually a project at Cercacor to develop a wrist-worn pulse
 7   oximeter.
 8        Q.   And let's take a look at a document numbered
 9   CX-1482, if we can call that up.
10        Would you identify this document?
11        A.   Yes.  This is a Cercacor presentation on what we
12   called the wrist-worn pulse oximeter or wearable rainbow«.
13        Q.   If we can go to the picture, just the picture, on
14   page 114, could you identify that physical?
15        A.   Yes, mind you, this is a prototype, so it was
16   okay to have all these cables dangling out, because this is
17   for data collection.  But the sensor is where that black
18   part is on the wrist where it shines the LED, multiple LEDs,
19   multiple detectors, to pick up, not just SpO2, but hopefully
20   hemoglobin and CO and other measurements.
21        Q.   What's the year of this presentation?
22        A.   This presentation is 2016, I believe.
23        Q.   And I'd like you to look at a physical exhibit
24   that's in your room.  If you look over at the table to your
25   right, if you can call up and hold Complainants' physical

1    Exhibit 139 and let me know if you recognize that device.

2    Do you see it?  Do you see the table next to you?  To your

3    right.

4         A.   Oh.

5         Q.   To your right.  There we go.

6         A.   I see, yes.  This.

7         Q.   Yes.  What is CPX-139?

8         A.   This is the actual physical representation of

9    what's in that picture.

10        Q.   And this is 2016, the presentation, if I

11   remember, you said?

12        A.   That is correct.

13        Q.   Okay.  I'd like you to go to the next exhibit,

14   CX-1483.

15             Do you see this document?

16        A.   Yes.

17        Q.   I'd like you to go to the picture on page 2

18   ending in 120.

19             Could you tell me what that is?

20        A.   Yeah.  This is -- we were trying to see how the

21   measurement would work if it actually transmitted the signal

22   straight from one end of the wrist to the other side.  This

23   is a transmission wearable wrist pulse oximeter, the giant

24   black thing there is the photodetector, and the little

25   circuitry someone is holding with their finger are the LEDs

1    on the other side.

2         Q.   And what year is this watch prototype?

3         A.   2017.

4         Q.   And can you look to your right, there's a

5    physical, CPX-140, can you call that up, show it on the

6    screen?

7              What is that physical?

8         A.   Yeah, this is the actual, I guess, hardware

9    manifestation of that image that you just saw.

10        Q.   For the record, that picture on CPX-140 was

11   ending in 120, the picture of this physical.

12             I'd now like you to look at CX-1520.  If you

13   could identify this document for the record.

14        A.   Yeah, this is, I think, a presentation at

15   Cercacor called the Hummingbird Project.

16        Q.   And if you look at the picture on the page 15,

17   ending in 086, could you describe that for the record?

18        A.   Yes, that's just another update to what the

19   wrist-worn pulse oximeter prototype looked like.

20        Q.   And what was the point of this prototype?

21        A.   It's to test the accuracy of it, not just in room

22   air, but under the saturation, where we brought in

23   volunteers, and by having them read a mixture of nitrogen

24   and oxygen, we dropped them from room air of 100 percent to

25   70 percent.

1        Q.   I'd like -- what's the benefit of using a watch

2   versus a product like the PPG we talked about in Exhibit

3   691?

4        A.   Well, we wanted something unobtrusive, because,

5   as I mentioned earlier, in one of the biggest, I think,

6   cases where this kind of product could be useful is for

7   detecting opioid overdose.  But of the hundred thousand

8   people that died from opioid overdose last year, 80,000 were

9   illicit users.  In talking to some of those people, they

10   were not going to wear a finger sensor that told everyone --

11   signaled that they were potentially addicts.

12            So a watch could be something that's unobtrusive,

13   it looks like something anyone would wear, and yet, if in

14   the middle of the night opioid overdose stopped them from

15   breathing, an alarm could go to wake them and eventually

16   maybe to an ambulance to come rescue them.

17        Q.   Exhibit 1493, do you recognize that document?

18        A.   Yes, that's a Team Meeting presentation in

19   December 2018.

20        Q.   And I'd like you to go to page 10 of this

21   presentation of 2018, at the very top, can we just blow up

22   the first few lines on the Engineering Goals da Vinci.

23        A.   Yes.

24        Q.   And next to develop wrist-based hardware

25   solution, what is designated in this presentation?

1      A.   That it's been 100 percent completed, that we

2   have validated that we can measure SpO2 accurately with our

3   wrist-worn pulse oximeter.

4      Q.   And was there also research going on on this

5   subject at Masimo concurrently with Cercacor?

6      A.   Yes.  Yes, there was a friendly rivalry, a

7   cooperation, but, yes, Masimo was working on their own

8   version as well.

9      Q.   And where does all this research and development

10   occur with Masimo and Cercacor?

11      A.   Masimo and Cercacor are literally two blocks from

12   each other in Irvine, California.

13      Q.   Okay.  How involved were you with regard to the

14   Masimo Watch project, you personally?

15      A.   Well, as I said, from almost the beginning I

16   wanted to have it.  Towards the end, meaning the last

17   several years, I became personally really involved, because

18   I wanted to now see it come to market.

19           We were going after this opioid epidemic problem,

20   and I really thought this watch could be a lifesaver.

21      Q.   I'd like you to -- we're going to go on the CBI

22   portion.  This is Masimo confidential information.

23           (Whereupon, the hearing proceeded in confidential

24   session.)

25

```
 1                    O P E N   S E S S I O N

 2

 3              JUDGE BHATTACHARYYA:  Moving to the public

 4    record.

 5              MR. MUELLER:  May I proceed, Your Honor?

 6              JUDGE BHATTACHARYYA:  Yes, you may.

 7    BY MR. MUELLER:

 8         Q.   Mr. Kiani, over the life of the company, fair to

 9    say that Masimo has focused, not exclusively, but has

10    focused on the clinical setting?

11         A.   Yes, that is correct.

12         Q.   And, fair to say, the vast majority of the Masimo

13    revenues over the years have been in that clinical setting?

14         A.   Yes.

15         Q.   Now you identified for Her Honor in your

16    testimony earlier several products that you described as

17    consumer products, right?

18         A.   Yes.

19         Q.   I think there's the SpO2 monitor, right?

20         A.   iSpO2, yes.

21         Q.   The MightySet; is that correct?

22         A.   That is correct.

23         Q.   And another one you mentioned was the Radius PPG,

24    correct?

25         A.   Yes, that is correct.
```

          1        Q.   Now, to be clear, all of these products that you

          2   described involve fingertip sensors, correct?

          3        A.   Correct.

          4        Q.   So let me just show you an example.  This is the

          5   Radius PPG.  If you could turn to, in your binder, sir, this

          6   is CX-0691.  I believe it's at tab 2 in your binder.

          7        A.   In my direct binder?

          8        Q.   There should be another binder titled

          9   "Cross-examination."

         10        A.   I have not opened it yet.

         11        Q.   You can go ahead and open it, sir.

         12        A.   Okay.

         13             MR. RE:  I also get a copy, I assume?  There's

         14   two sets.

         15             MR. MUELLER:  Yes.

         16             MR. RE:  Can you give us just one moment?

         17             MR. MUELLER:  Sure.

         18             MR. RE:  The witness is down the hall.  We did

         19   not open the box, and it's being opened now in the witness

         20   room.

         21             MR. MUELLER:  Thank you.

         22             THE WITNESS:  This reminds me when my daughter

         23   took the LSAT remotely.

         24             I have opened it.

         25        Q.   Take your time, and if you could, please, turn to

1    tab 2 in the binder, which is CX-0691.

2         A.   Yes, I see that.

3         Q.   This is a brochure for the Radius PPG, correct?

4         A.   Yes, sir.

5         Q.   And that's one of the consumer products that you

6    identified for Her Honor, right?

7         A.   Yes.

8         Q.   And you see in this brochure, on the cover here,

9    we have a woman wearing a hospital gown with the Radius PPG

10   on her wrist, correct?

11        A.   Yes.

12        Q.   Now if you could please, sir, turn to the very

13   next page, we see the full setup for the Radius PPG,

14   correct?

15        A.   "The full setup," what do you -- oh, yeah, I see

16   that, on the left page showing it working with Root.

17        Q.   Let's just make sure we understand.  The

18   Radius PPG sensor is actually located on the fingertip,

19   correct?

20        A.   Yes, where it says Masimo right there at that

21   end, yes.

22        Q.   And then it's connected by a cable to a device

23   strapped to the wrist, correct?

24        A.   Correct.

25        Q.   And that is transmitting to this host device we

1    see here on the right; is that right, sir?

2        A.   Yes, that is correct.

3        Q.   Now, again, this is a consumer product, meaning

4    it doesn't need to be prescribed by a doctor, correct?

5        A.   That is correct, but in this particular case

6    we're showing it's being used in a hospital.

7        Q.   Fair enough.  And you would agree, sir, and I'm

8    not criticizing the product, but you would agree this is not

9    something that a user could wear walking down the street or

10   jogging.

11       A.   That's not true.  People do use it in that

12   fashion today.

13       Q.   Okay.  So your position is this product right

14   here could be used in the way that a consumer wearable

15   product could be used for jogging or exercising; is that

16   your position?

17       A.   Yes.  In fact, on the next page you see this

18   woman laying down at home, not in a hospital.  In fact,

19   that's from our commercial with Morgan Freeman using it at

20   home.

21       Q.   Sir, I didn't say at home.  I referred to

22   jogging.

23       A.   Yeah, yeah, but it's the same.  In fact, you made

24   the distinction that the Apple Watch doesn't work for

25   motion.  This works through motion and low perfusion.  So,

1  yes, people do wear it.  They jog with it.  We have athletes

2  who exercise with it and can tell the power of their

3  exercise by when their oxygen drops during their exercise.

4         So, yeah, this is worn.  It lasts about four or

5  five days, with that single puck, with that battery.  And

6  people can wear it continuously.  They can take a shower

7  with it.

8         This is meant for untethered, wearable device for

9  both home and hospital, and, I guess, jogging, as you make

10  it sound --

11     Q.   Understood.  Just as a technical matter, at all

12  times in the use cases you're describing, the user would

13  have a finger clip sensor attached to a cable running down

14  their hand attached to that device strapped to their wrist,

15  correct?

16     A.   That's not a finger clip sensor.  That's an

17  adhesive wearable sensor.  I don't want -- I'm not arguing

18  with you.  I'm just trying to make sure you clarify.  The

19  fingertip is that alligator-style clip.

20     Q.   It's a finger sensor, finger adhesive sensor,

21  attached to a cable running down their hand attached to a

22  device strapped to their wrist, correct?

23     A.   That's correct.

24     Q.   Okay.  Now let me ask you to focus now on the

25  three patents on which you are a named inventor which are

1    asserted in this case.  I'm going to refer to them by their

2    last three digits, '501, '502, and '648.

3              Do you have those in mind, sir?

4         A.   I do.

5         Q.   And if I call those -- I believe the gentleman's

6    name is Poeze.  Is that the correct pronunciation?

7         A.   Yeah, he was the first named inventor, Jeroen

8    Poeze.

9         Q.   So if I refer to these as the Poeze patents,

10   you'll know what I mean?

11        A.   Yes, although you mispronounced his last name,

12   I'll know what you mean.

13        Q.   What's the correct pronunciation?

14        A.   Poeze.

15        Q.   Got it.  Okay.  Let's look at Fig. 3 in these

16   patents.  This is a figure that you looked at with Mr. Re, I

17   believe.

18             Just so the record is clear, one of these three

19   is JX-1.

20        A.   Do you want me to look at my binder or your

21   binder you gave me?

22        Q.   You can look at the Cross-Examination Binder.

23   There's a hard copy of JX-1.  I believe it's at tab 3.

24        A.   Yes, I found it.

25        Q.   You can also look at the screen.  We'll pull it

1    up in a moment here.  If you could turn in the binder while

2    we're pulling it up here to Fig. 3.

3         A.   Fig. 3, yes.  C, D, E, which one?

4         Q.   This one right here, Fig. 3C --

5         A.   Perfect.  That's the one Mr. Re showed me.

6         Q.   That's right.  Now this is showing a finger clip

7    sensor, correct, sir?

8         A.   Yes, this is a finger clip sensor.

9         Q.   And so the way this would work is a user would

10   insert their finger into this device and then close it down,

11   right?

12        A.   Yes.

13        Q.   And that region at the bottom center of the

14   screen where it's labeled 322, 323, 320 and 305, you talked

15   about that earlier with Mr. Re, correct?

16        A.   Yes.

17        Q.   And you told us about how the tissue would be on

18   top of that sensor, correct?

19        A.   Correct.

20        Q.   And there's the holes that go all the way down to

21   where the photodetectors reside, correct?

22        A.   Correct.

23        Q.   And readings are taken from those, correct?

24        A.   Yes.  You either accumulate or you parse, but,

25   yes, you take those detector signals and measure what you

 1    need to measure, in this case oxygen or hemoglobin or

 2    glucose.

 3        Q.   Now you would agree with me that nowhere in these

 4    patents is there a similar description, similar level of

 5    detail, for a watch, correct?

 6        A.   No, not for a watch.  Although there is a

 7    wristband device, but there is a lot of description about

 8    this being used in different parts of the body, like the

 9    forehead, the ear, and the like.  Different sizes of

10    patients, from neonates to adults.

11        Q.   Sir, stay with my question.  Not a watch, right?

12        A.   Well, there's a wrist-worn device, but because

13    this would connect to a wrist-worn device, I assume that is

14    not considered a watch, but, yes, there is a wrist-worn

15    device shown.

16        Q.   Sir, stay with my question.  Not a watch.

17        A.   Yes, not a watch.  It doesn't have the clock.

18        Q.   In fact, sir, as you told us earlier, Masimo, and

19    apparently Cercacor, did work on watches in the mid 2010s,

20    correct?

21        A.   Well, once we reduced the power consumption of

22    our algorithm, our set board, yes, we began trying to make

23    wearables and consumer products.

24        Q.   And the reduced power consumption that you're

25    describing occurred in the mid 2010s, right?

1        A.    That is correct.  To the best of my memory,

2   that's when it happened.

3        Q.    And because you developed it in the mid 2010s, of

4   course you didn't have possession of those particular ideas

5   back at the time of the Poeze patents when they were filed,

6   correct, sir?

7        A.    That's not true.  Back even in '91 I had this

8   idea of making a watch out of our technology.

9        Q.    Well, sir, I understand you had the idea.  You

10  had the aspiration.  You hadn't actually pulled it off and

11  come up with the engineering solution until much later,

12  correct?

13       A.    Well, the engineering solution included power

14  reduction and size reduction of our pulse oximeter

15  technology.  So we were working towards that.  Hospitals

16  don't need the power or size reduction because those devices

17  get plugged to the wall by the bedside.

18             So the reason we were pushing and pushing to

19  reduce the size, reduce the power, so we can make it

20  portable, wearable consumer version.

21       Q.    I understand that was your goal, sir, but you

22  just told me a couple minutes ago that you solved the power

23  consumption problem in the 2010s, correct?

24       A.    Yeah.  I don't have the exact date in my mind,

25  but, yeah, right kind of before we began working on iSpO2,

1    and then MightySet on the watch we had gotten the power down

2    to a level where it could be wearable and battery-operated.

3         Q.   In the 2010s, correct?

4         A.   Yes, sir, to the best of my memory, yes.

5         Q.   Now because you came up with that in the 2010s,

6    you were not in possession with that in 2008, correct?

7         A.   I'm sorry.  What are you -- oh, when we -- well,

8    they're related.  If you actually read the patent, it talks

9    about putting the sensor anywhere on the body.

10             You're focusing on the watch.  We focus on pulse

11   oximetry, where in the body you could put it.  And what this

12   invention showed is that in difficult situations -- in this

13   case hemoglobin or glucose where the signals are tiny -- or

14   are or on the finger or maybe in situations where maybe on

15   the forehead or wrist where the pulse ox is strong but that

16   site is bad, this invention comes in handy to make the

17   measurement.

18        Q.   Sir --

19        A.   We were in possession of it, yes.

20        Q.   Sir --

21        A.   With the power -- sorry.

22        Q.   I didn't mean to interrupt you.  Did you finish

23   your answer?

24        A.   No.  I would say we were in possession of one

25   piece, but we needed the other piece, the power consumption

1    to come down, to then put it together to make things like

2    iSpO2 and eventually the watch.

3        Q.   Sir, you were not in possession as of 2008 of the

4    engineering solution to putting a pulse oximeter in a watch,

5    correct?

6        A.   Well, not all of the -- not all the components of

7    it, but some of it, yeah, that's what this patent shows.

8        Q.   Sir, you could not build a watch with a pulse

9    oximeter in it; you did not have possession of that idea in

10   2008, correct?

11       A.   We did not have feasibility until maybe 2016,

12   2017.

13       Q.   Now the patent was filed, the original patent in

14   the Poeze patent family, was filed in 2008, correct?

15       A.   The provisional was filed in 2008, that's

16   correct.

17       Q.   And, in fact, it was filed on September 20 -- I'm

18   sorry.  I'll retract that.

19            It was filed in 2008, but the three patents that

20   are asserted in this case in that same family were filed

21   about 12 years later in September of 2020, correct?

22       A.   I know that's -- I think when they fished.  I

23   don't know when they were filed.  You'd have to talk to our

24   lawyers.  Obviously the disclosure is identical, all that

25   changes are the claims, and I don't know when those claims

1    were first sought after.

2         Q.   Well, let's pull up the Joint Exhibit that we

3    were just looking at a moment ago, and let's look at the

4    cover.

5         So we have here the '501 patent.  This is one of

6    the three asserted in this case, correct?

7         A.   Yes.

8         Q.   And let's go down to the filing date, which is in

9    the left-hand side, midway down.  And do you see, sir, it

10   was filed on September 24th of 2020?

11        A.   Yes, I see that.  That's when those claims were

12   filed.

13        Q.   And let's take a look at JX-2, the '502 patent.

14   We'll take you to the filing date for this one.  September

15   24th, 2020.  Do you see that, sir?

16        A.   Yes, I do.

17        Q.   Very same day, right?

18        A.   Yes.

19        Q.   And let's go to JX-3, the '648 patent, and do you

20   see, sir, that was filed on the very same day as well?

21        A.   Yes.

22        Q.   So you'd agree that the three patents in this

23   family that are asserted in this case were filed on

24   September 24th, 2020, right?

25        A.   Yes.

1      Q.   Now that's 12 years after the original

2    provisional application, correct?

3      A.   Yes.

4      Q.   If we go back to the release dates of the Apple

5    Watches, do you see the Series 6 was released on September

6    18th, 2020?

7      A.   Yes, I do see that.

8      Q.   Very shortly before these applications were

9    filed, correct?

10     A.   Yes, correct.

11     Q.   And, in fact, if we go to RX-0333, which is tab

12   14 in your binder, sir.

13     A.   Yes, I see the press release from Apple

14   announcing the watch, Series 6.

15     Q.   On September 15th of 2020, correct?

16     A.   Yes.

17     Q.   That's nine days before these three patent

18   applications were filed, right?

19     A.   Yes.

20     Q.   And it's fair to say, sir, you know of no reason

21   that these three patents could not have been filed earlier

22   than September 24th, 2020, right?

23     A.   Well, I think there were reasons it was filed

24   then.  I have a vague understanding of some of the reasons,

25   but you should ask the lawyers who did it to why they did it

153

1    when they did it.

2        Q.   Well, let me take you to your deposition.  This

3    is RX-1204.  Let me take you to your deposition transcript

4    at page 175, lines 14-17.

5            MR. RE:  Objection.  One moment.  Mr. Kiani, do

6    you have a copy of your deposition with you?  It should be

7    in one of your notebooks.

8            THE WITNESS:  Well, yeah.  Which tab am I looking

9    at?

10       Q.   Tab 1 in your Cross-Examination Binder.  Take

11   your time.  Let me know when you're on page 175.

12       A.   Yes.

13       Q.   Are you there, sir?

14       A.   I am.

15       Q.   Line 14.

16           Question.  And is there any reason that you know

17   of that these three patents could not have been filed

18   earlier than September 24th, 2020?

19           Answer.  No.

20           Were you asked that question and did you give

21   that answer, sir?

22       A.   Yes, that is correct.  That is my understanding

23   at the time.  I did not know.

24       Q.   All right.  Thank you, sir.  You can put your

25   deposition transcript aside for the moment.

1           Let me ask you about whether what was known in

2   your view and what was not known with respect to the --

3   these three patents on which you're a named co-inventor.

4           LEDs, light-emitting diodes, with multiple

5   wavelengths had been used in physiological measuring devices

6   before 2008, correct?

7       A.   Yes.

8       Q.   Before 2008 there had been physiological

9   measuring devices with multiple LEDs emitting different

10  wavelengths of light, correct?

11      A.   That was Masimo's invention, rainbow«.

12      Q.   Before 2008, correct?

13      A.   That is correct.

14      Q.   And those were in public sale before 2008,

15  correct?

16      A.   Correct.

17      Q.   And there was also physiological devices with

18  multiple photodiodes before 2008, correct?

19      A.   Correct.

20      Q.   So, in fact, there were multiple detector

21  physiological devices before 2008, correct?

22      A.   That's correct.

23      Q.   Now you weren't the first to invent photodiodes

24  configured to receive light attenuated by the tissue of a

25  user, right?

```
 1       A.   That is correct.

 2       Q.   In fact, that was an old idea?

 3       A.   Yes, absolutely.  Sorry.

 4       Q.   I'm sorry.  I didn't mean to interrupt.

 5       A.   I apologize.  I was just saying that concept, of

 6  course, dates back to even the oximeters before pulse

 7  oximeters, before Aoyagi invention, yes.

 8       Q.   You'd agree with me, sir, that Masimo wasn't the

 9  first to invent a user-worn device that could take

10  physiological measurements from photodiodes, right?

11       A.   That is correct.

12       Q.   Nor the first to invent a user-worn device that

13  could transmit measurements wirelessly, right?

14       A.   Yes, I believe -- I believe that's correct, yes.

15       Q.   Nor the first to invent a user-worn device with a

16  touchscreen, correct?

17       A.   Yeah, I think so.  I think you're right.  We were

18  the first, but I don't believe this patent was first to

19  disclose that.

20       Q.   It came before this patent; is that right, sir?

21       A.   Yes, the way you asked it, yeah.

22       Q.   And, of course, wrist straps for various types of

23  devices have been around forever, right?

24       A.   Yes, they have.

25       Q.   Now let's talk a little bit about light piping, a
```

1  subject you discussed at some length with Mr. Re.

2            Light piping is another problem that you have con

3  fronted over the course of your time at Masimo, correct?

4       A.   That is correct.

5       Q.   And you and your colleagues viewed that as a

6  substantial challenge to overcome, right?

7       A.   Yes.  Trying to measure either during motion or

8  very low perfusion situations light piping becomes a

9  problem.

10      Q.   If I understood your testimony earlier, you had

11 achieved mechanisms and techniques for dealing with the

12 light piping problem by the early to mid-'90s, correct?

13      A.   That is correct.

14      Q.   And, in fact, you were offering for sale

15 products -- if you could remind me -- was it LPN sensors?

16      A.   LNOP.

17      Q.   Got it.  You were offering those as of 1994, I

18 think you said?

19      A.   1996.

20      Q.   I'm sorry, 1996.  So the light piping techniques

21 that you had developed were in public sale as of 1996,

22 correct?

23      A.   Not all of them, the particular design that we

24 had at the time dealt with light piping, but that design

25 wouldn't have worked for what we were doing later, which is

1    in this patent.

2        Q.   Now I want to ask you a very specific question.

3    In your direct testimony with Mr. Re earlier today, you did

4    not show Her Honor any portions of the '501, '502, or '648

5    patent specifications that describe techniques for dealing

6    with light piping, correct?

7        A.   Yes.  I wasn't asked that, but it's in here, and

8    there's a lot of discussions about it.

9        Q.   Protrusion, I believe you touched on that subject

10   also, right, sir?

11       A.   Yes, I did.

12       Q.   You would agree that convex protrusions were

13   known long before these three patents, the '501, '502, and

14   '648 were filed for, correct?

15       A.   No.  I believe, to my understanding, we were the

16   first to actually do this convex protrusion when we actually

17   made these products that are the subject of the 2008 filing.

18       Q.   When you say made these products, you understand

19   the only domestic industry product being alleged for these

20   patents in this case is the Masimo Watch, do you understand

21   that, sir?

22       A.   I do.  It surprises me because we do use these in

23   other domestic industry products, but, yes, I've learned

24   that this morning.

25       Q.   And you're not trying to change the position now,

1  are you?

2      A.   I don't know if we can, but I don't think it's

3  true.

4      Q.   Okay.  In any event, the Masimo Watch was not in

5  existence in 2008, correct?

6      A.   No, it was not.

7      Q.   Masimo hasn't licensed these three patents to any

8  other companies, correct?

9      A.   That is correct.

10     Q.   And these three patents have not been recognized,

11  these patents themselves, '501, '502, '648, have not been

12  recognized in any industry journals or publications,

13  correct?

14     A.   Yes.  Other than discussing them for our case,

15  I've not seen anything.

16     Q.   All right.  I want to talk a little bit without

17  getting into the details, you have also, your company, I

18  should say, has also filed a lawsuit against Apple in the

19  Central District of California, correct?

20     A.   That is correct.

21     Q.   And we won't get into the details today, that's

22  for another court, but you have made trade secret

23  allegations and patent allegations in that case, correct?

24     A.   That is correct.

25     Q.   Now the patent allegations were stayed or paused

1    pending review of those patents in the Patent Office through
2    what are known as IPR proceedings, correct?
3         A.   Yes, I believe Apple filed 20 plus IPRs
4    against -- I think ten patents we filed in that case.
5         Q.   And you were dissatisfied with the fact that the
6    case was stayed, correct?
7         A.   Yes.  Obviously, as any plaintiff, I'd like the
8    case to move forward.
9         Q.   And that was one of the reasons why you filed the
10   complaint that led to this investigation, right, sir?
11        A.   Yes, it is.  It is.  As I said earlier,
12   unfortunately, District Court patent cases I've learned take
13   several years.
14        Q.   Now some of the patents in the District Court
15   case that were subjected or became the subject of IPR
16   proceedings are related to the '501, '502, and '648 patents
17   in this case, correct?
18        A.   Correct.
19        Q.   And you understand the Patent Office has made
20   some determinations about those patents in the IPR
21   proceedings, right?
22             MR. RE:  Objection, Your Honor.  This is an
23   argument that was not made in the pre-hearing briefing.  I
24   see no relevance.  And very confusing to untangle if
25   Mr. Mueller is suggesting that somehow these IPRs bolster

1    his case with regard to the patents that are in this case

2    where all the IPR information was, in fact, submitted to the

3    Patent Office.  I don't see the connection in how this

4    argument was previously made in the pre-hearing brief.

5               MR. MUELLER:  I'd say two things, Your Honor.

6    One, Mr. Re referred to other litigation this morning that

7    has absolutely nothing to do with this case.  I objected.

8    Your Honor overruled my objection with respect to the

9    Nellcor case, for example.

10              In distinction with those cases, which have

11   nothing to do with this case, these IPR proceedings are

12   directly connected to the same family members of these three

13   patents.  In fact, 383 of the 384 claims that have been

14   reviewed by the PTAB in the IPR proceedings have been

15   invalidated, 383 out of 384.

16              So, yes, we do think that bolsters our case on

17   invalidity, that 383 out of the 384 claims that have been

18   reviewed by the IPR proceedings that relate to the patents

19   in this case have been invalidated.

20              So I would say that, Your Honor.  But I would

21   also say, what I would also say is, to the extent -- same

22   limitations -- I've just been given a note by Ms. Frazier

23   making the point that these also include claims with some of

24   the same limitations at issue in this case.

25              It also goes to the motive for Masimo filing this

1    case, namely, the stay for some of these same patents.

2            So I actually think there's a direct connection,

3    a direct nexus, between these IPR proceedings and the

4    results of those IPR proceedings in this case.

5            The last point I would make, Your Honor, is the

6    only patents -- or the patents in this particular case have

7    not yet gone into IPR proceedings.  So you will be the first

8    to assess the invalidity of these particular claims, but of

9    the 384 related claims, 383 have been invalidated.

10           MR. RE:  Your Honor, my objection was it wasn't

11   in the brief.  I objected.  Where is that -- how is that

12   responsive to the fact that this argument has never been

13   made.

14           Ms. Frazier, on Friday, her sole reason for

15   participating on Friday was to hold us to the briefing and

16   the disclosures.  Where was there any argument about the

17   relevance of these IPRs with regard to the claims at issue

18   in this case.  I saw nothing about that.  And I think it's

19   complete -- I think she used the word sandbag -- when you

20   make a very complicated argument like this as if this

21   bolsters your invalidity case.

22           And the reason why I discussed Masimo's

23   leadership in the field of pulse oximetry is because Apple

24   sought our help.  And they're making a nonobviousness

25   argument.

1          So there's a big difference.  And what I heard

2    Mr. Mueller just say, since I got overruled on something I

3    think was irrelevant, let me do something that's irrelevant

4    too.  That is not proper advocacy.  Where in your brief did

5    you make any argument about this connection between the IPRs

6    and the claims at issue, that's what I -- this is why it's a

7    new argument to measure, as I sit here.

8          MR. MUELLER:  I would just say -- I'm sorry.

9          JUDGE BHATTACHARYYA:  Go ahead.

10         MR. MUELLER:  Very, very briefly.  Number one,

11    I'm not making the same objection.  The Nellcor case, for

12    example, has utterly nothing to do with this case, whereas

13    these IPR proceedings involve related patents in the same

14    family.  Point one.

15         Point two, I don't have a pincite for Your Honor

16    right now on the pre-hearing brief, but I believe this has

17    been part of the expert reports.  The expert reports of our

18    technical experts have cited these IPR proceedings, so this

19    is a preserved position.

20         But, in any event, Your Honor, we can take it up

21    later on, if it would make things easier right now.  But I

22    do want to say, quite clearly, this is not the same thing as

23    citing to Nellcor.  These are the same patents in the same

24    family, and they have been invalidated far over 99 percent

25    of the time.

 1          JUDGE BHATTACHARYYA:  Let's take a short recess.

 2     One minute.

 3          (Brief interruption.)

 4          JUDGE BHATTACHARYYA:  We can go back on the

 5     record.  I'll wait for Mr. Mueller.

 6          I am overruling the objection.  The question can

 7     be asked.

 8          Mr. Kiani, to the extent you have knowledge, you

 9     should answer.

10     A.   Yes, Your Honor.  My understanding is that the

11     patents in the District Court case are broader, and what

12     I've learned is that, when we filed these patents, we

13     included some of the prior art that Apple had found along

14     with the IPR filings.  So the Patent Office could view these

15     new claims we were asking in view of all of it.

16          So I don't understand Mr. Mueller's comments

17     about what's happened on the IPR side as it relates to this,

18     because these are narrower claims.

19     Q.   Mr. Kiani, the record will speak for itself, but

20     you do not contest my suggestion that 383 of the 384

21     reviewed claims in this family have been invalidated by the

22     Patent Office, correct?

23     A.   Well, I never knew the numbers, sir, but I also

24     know it's on appeal with the Federal Circuit Court of

25     Appeals.  So I don't think it's complete.  Besides, that

1    prior art on those patents that were broader have been given

2    to the Patent Office when they issued these with narrower

3    claims.

4        Q.    Again, the record will speak for itself.

5            You would agree with me, Mr. Kiani, that there

6    are no IPR proceedings yet involving the three patents in

7    this family in this investigation, correct?

8        A.    Yes.  I don't get to ask the questions, but I

9    don't know why Apple didn't file them.

10       Q.    Well, sir, you understand Her Honor will be the

11   first to assess the invalidity of those claims, right?

12       A.    I am happy that she will.

13       Q.    And I understand that you will be appealing the

14   earlier decisions, but you are not contesting my recitation

15   of the fact that 383 of the 384 claims have been invalidated

16   to date, correct?

17       A.    I don't know, sir, but I will take your word for

18   it.

19       Q.    Okay.  Now, the '501, '502, and '648 patents are

20   not directed to, for example, a method for transmitting

21   email from a user-worn device, correct?

22       A.    Correct.

23       Q.    They are not for text messaging, credit?

24       A.    Correct.

25       Q.    They are not for sending or receiving text

1     messages or emails from a wrist-worn device, correct?

2          A.   Correct.

3          Q.   They are not for electronic payments?

4          A.   No, they are not.

5          Q.   Not for GPS?

6          A.   No.

7          Q.   Not for music or podcasts?

8          A.   No.

9          Q.   Not for an altimeter?

10         A.   No.

11         Q.   Not for a compass?

12         A.   No.

13         Q.   Not for magnetic charging, sir?

14         A.   No.

15         Q.   Not for microphones or speakers?

16         A.   No.

17         Q.   Not for Wi-Fi -- I'm sorry.

18         A.   The product does have speakers and I think a

19    microphone, but, no, no, the patents are not about that.

20         Q.   And the patents are not for Wi-Fi or cellular

21    conductivity, correct, sir?

22         A.   Not the claims in this case, no.

23         Q.   Now these three paints, the '501, '502, and '648,

24    are also not directed at an industrial design for a watch,

25    correct?

1          A.    That's correct.

2          Q.    And you understand what an industrial design is,

3     right?

4          A.    Yes.

5          Q.    And you understand that for consumer products

6     industrial design can create significant engineering

7     challenges, fair?

8          A.    Fair.

9          Q.    And this patent does not teach ways to overcome

10    the industrial design related engineering challenges in a

11    watch, correct?

12         A.    Not -- not the look of the product, no.

13         Q.    Now the Masimo Watch, we're going to talk about

14    some of the confidential information about that product

15    shortly, but your position is the Masimo Watch is now ready

16    for at least a limited release; is that right, sir?

17         A.    It is in limited release, yes.

18         Q.    Well, to be clear, you can't buy it in a store

19    yet, correct?

20         A.    That's the definition of a limited market

21    release, yes.

22         Q.    Just so the record is clear, you cannot buy it in

23    the store yet, right?

24         A.    Oh.  No, you can't.  You can get on our website

25    and order one provided you agree to give us feedback on the

167

1    product, and if we make any substantial changes that you'll

2    let us take it back if we want to give you a new one.

3    That's the agreement.

4        Q.   Now you just held up what I believe you're

5    contending is one of those watches; is that right, sir?

6        A.   That is correct.

7        Q.   Now I took your deposition a while back.  Is that

8    the same watch you were wearing that day?

9        A.   Yes, it is.

10       Q.   All right.  And you would agree with me that that

11   watch looks an awful lot like the Apple Watch.

12       A.   It looks similar.  It's got that same ugly Casio

13   square shape, but it is what it is.

14       Q.   It looks a lot like the industrial design of the

15   Apple Watch, correct?

16       A.   Correct, from afar.

17       Q.   Now that watch, the Masimo Watch watch that

18   you're wearing, even this limited release that you just

19   described -- we're going to come back to that -- has only

20   occurred very recently, right?

21       A.   What has occurred very recently?

22       Q.   This limited release that you just described.

23       A.   Yes, May 2nd is when we did it, yes.

24       Q.   May 2nd, do I have that right?

25       A.   Yes, sir.

1      Q.   So that's a little over a month ago.

2      A.   That's correct.

3      Q.   Now, the Apple Watch, the original Apple Watch,

4  was released in 2015, correct?

5      A.   Yes.  You're welcome to sell all you want of

6  that.

7      Q.   And the Series 6 and the Series 7 for which

8  you're seeking an import ban were released in 2020 and 2021,

9  right?

10      A.   Yes, that's correct.  I think September of each

11  year.

12      Q.   And, of course, those dates are before the May

13  limited release date that you just gave us, correct?

14      A.   Yes.

15      Q.   And we can agree on this, sir.  Apple could not

16  have copied the look of the Masimo Watch, because when Apple

17  created the Apple Watch models at issue in this case the

18  watch didn't exist, correct?

19      A.   Correct.

20           MR. MUELLER:  At this point, Your Honor, I'm

21  going to ask to go on the Masimo confidential record.

22           (Whereupon, the hearing proceeded in confidential

23  session.)

24

25

```
 1                 O P E N   S E S S I O N

 2

 3              MR. RE:  Thank you, Your Honor.

 4    BY MR. RE:

 5         Q.   Mr. Mueller showed you where the Radius PPG was

 6    connected or next to Root.  Do you remember that discussion?

 7         A.   Yes, I do.

 8         Q.   And then you directed him to the next page where

 9    there was a woman sitting at home with the Radius PPG on it,

10    right?

11         A.   Yes.

12         Q.   Now can you explain what I think you were trying

13    to explain during your cross-examination on whether the

14    Root, is that a home device or is that for the hospital?

15         A.   The Root is for the hospital.  At home you use a

16    phone, a smartphone to see the information.

17         Q.   So the consumer doesn't buy that larger item

18    shown on page 2.

19         A.   No, I don't believe they would.  That's overkill

20    for them.

21         Q.   Right.  And so in the picture with the person at

22    home, they could use Radius PPG with the iPhone?

23         A.   That's correct.

24              MR. MUELLER:  I'm going to object to the leading,

25    Your Honor.
```

```
 1   BY MR. RE:

 2        Q.   Okay.  Does the Radius PPG require Root?

 3        A.   No, it does not.  It can work with any Bluetooth

 4   device.

 5        Q.   And what are Bluetooth devices that work with

 6   Radius PPG?

 7        A.   Well, a whole host of them, from the iOS phones,

 8   to the Android phones, to the tablets that you can buy.  So,

 9   yeah, any of them.

10        Q.   Okay.  One other thing.  You had early in your

11   testimony, I think it might have been before the lunch

12   break, you and Mr. Mueller were having a debate about

13   evidence of whether, you know, Apple could have gotten ideas

14   from Masimo.  Do you remember that?

15        A.   I do.

16        Q.   And you kept saying I don't have any direct

17   evidence, it's only circumstantial, right?

18        A.   Yes.

19        Q.   What did you mean by that?

20        A.   Well, no other company except the one that took

21   30 of our engineers, including or CTO, who was an inventor

22   of the three patents in this case came up with a

23   convex-shaped sensor for monitoring pulse ox.

24             So that's one of the evidence as I think leads me

25   to believe that they took it from us.  And also other
```

1    companies that do copy Apple, of course they are going to

2    copy Apple, and we're going to have more people with these

3    convex-based sensors.  Before then, nobody else had it.

4         Q.   And Mr. Mueller also asked you about that meeting

5    that occurred in May 3rd, 2013.  Do you remember that?

6         A.   Yes.

7         Q.   And --

8              MR. MUELLER:  I'm sorry to interrupt.  If we're

9    going to get into that, if we could go on the Apple-Masimo

10   confidential record.

11             MR. RE:  I won't get into the content of the

12   meeting.  I didn't intend to.  I just want to ask one

13   question.

14        Q.   Was there any agreement signed prior to the

15   meeting at Apple in May of 2013?

16        A.   Yes.  Apple asked us to tell them confidential

17   information, a product roadmap, how and why it worked, so we

18   insisted on an NDA, and we had a nondisclosure agreement

19   between us for that meeting.

20        Q.   And was confidential information exchanged

21   pursuant to that signed NDA?

22        A.   Yes.

23             MR. RE:  I have no further questions, Your Honor.

24             MR. MUELLER:  Just briefly, Your Honor.

25             MR. RE:  Oh, is there two rounds for every

1    witness?

2         JUDGE BHATTACHARYYA:  If you brought up something

3    in redirect that Mr. Mueller wants to respond to, then

4    that's acceptable.

5         MR. RE:  Okay.  Thank you.

6                   RECROSS-EXAMINATION

7    BY MR. MUELLER:

8    Q.   I'll keep this brief.

9         Mr. Kiani, you just heard a reference to this

10   meeting you had with Apple, correct?

11   A.   Correct.

12   Q.   And some information that was provided, right?

13   A.   Yes.

14   Q.   Now you were at that meeting, correct?

15   A.   I was.

16   Q.   And, sir, as you said earlier, you have no direct

17   evidence whatsoever of copying by Apple of the features at

18   issue in this case, correct?

19   A.   Correct.

20   Q.   Now you were at the meeting, so, presumably, if

21   there had been such information at the meeting, you would

22   have told us about it earlier, correct?

23   A.   No one has asked what we discussed at the

24   meeting.  I'm happy to answer your questions on that.

25   Q.   My question is simply, you have no direct

1   evidence whatsoever of any copying of the features at issue

2   in this case, correct?

3        A.   That's correct.

4        Q.   Now last question.  You mentioned this convex or

5   a convex sensor was an indication of something improper by

6   you, right, or by Apple?

7        A.   By Apple, yeah.

8        Q.   Do you understand, sir --

9        A.   If I may say, I wasn't getting into the

10  legalities of it.  You asked about circumstantial.  I guess

11  Mr. Re asked about what's circumstantial on copying, and the

12  convex was one of them.

13       Q.   Sir, you understand the convex shape on the back

14  of the watch was in the Series 0 in 2015.  Do you understand

15  that?

16       A.   Marcelo started January 2014 at Apple.

17       Q.   Sir, you understand the Series 0 is not accused

18  of infringement in this case, correct?

19       A.   Correct.

20       Q.   You understand there's no contention by Masimo,

21  not one, that the Series 0 infringes any of the five patents

22  in this case, correct?

23       A.   Correct, nothing until Series 6 and 7 in this

24  case.

25       Q.   And the Series 0 had a curved rear of the watch,

1    correct?

2         A.    Not exactly like Series 6 and 7, but yes.

3         Q.    And it had sensor technology within it, correct?

4         A.    Not for pulse oximetry.

5         Q.    It had curved sensor, a curved back surface and

6    sensors within it in the Series 0, correct?

7         A.    It is different, and that's why we're not

8    alleging those including Series 4 and 5 in this particular

9    case.

10         Q.    Sir, please --

11         A.    I'm agreeing with you, but I'm just clarifying

12    that they're different.  Sorry.

13         Q.    Please, sir, stay with my question.  The rear of

14    the Series 0 was a domed back crystal, correct?

15         A.    Yes.

16         Q.    And there were physiological sensors in that

17    device, correct?

18         A.    Not -- yes, but not pulse oximetry, yes.

19         Q.    And it's not accused of infringement in this

20    case, right?

21              MR. MUELLER:  Thank you, sir.  No further

22    questions.

23              (Clarification by reporter.)

24              THE WITNESS:  I believe I said they're not in

25    this case, ma'am.

```
 1              THE REPORTER:  Thank you.

 2              JUDGE BHATTACHARYYA:  Mr. Kiani, thank you so

 3    much for your testimony.

 4              THE WITNESS:  Thank you, Your Honor.  Thank you

 5    for your time.

 6              MR. RE:  Thank you, Your Honor.

 7              MR. MUELLER:  Your Honor, while we're switching

 8    to the next witness, Mr. Selwyn will do the

 9    cross-examination of the next witness.

10              JUDGE BHATTACHARYYA:  Thank you.

11              MS. SWAROOP:  Your Honor, I think during the

12    course of the morning session we did send Your Honor a list

13    of the exhibits that we would like to have moved in without

14    a sponsoring witness.  We're happy to do that now or to move

15    to our next witness.

16              JUDGE BHATTACHARYYA:  If it's all right with you,

17    why don't we move to our next witness and do that at the end

18    of the day.  Is that all right?

19              MS. SWAROOP:  That's fine, Your Honor.

20              For our next witness, Complainants call Mohamed

21    Diab, and Mr. Lateef will be conducting the examination of

22    Mr. Diab.

23              MR. LATEEF:  Just waiting for the witness,

24    Your Honor, to get to the witness room.

25              JUDGE BHATTACHARYYA:  Mr. Diab, are you ready to
```

1   proceed?

2           THE WITNESS:  I am.  Sorry.  I had to take off my

3   jacket.

4           JUDGE BHATTACHARYYA:  Do you understand that you

5   have an obligation to tell the truth here today?

6           THE WITNESS:  I do.

7                   MOHAMED DIAB,

8           having been first duly sworn and/or affirmed

9   on his oath, was thereafter examined and testified as

10  follows:

11          JUDGE BHATTACHARYYA:  You may proceed.

12                  DIRECT EXAMINATION

13  BY MR. LATEEF:

14      Q.  What do you do, Mr. Diab?

15      A.  I am an engineer at Masimo.

16      Q.  And what is your current position at Masimo?

17      A.  I'm a fellow scientist.

18      Q.  What year did you start working at Masimo?

19      A.  1989.

20      Q.  And how long have you been working at Masimo?

21      A.  Ever since.

22      Q.  Okay.  Where did you attend college?

23      A.  Cal State Fullerton.

24      Q.  And what degree did you earn there?

25      A.  Bachelor in electrical engineering with emphasis

1    on computer engineering.

2        Q.    What year did you graduate?

3        A.    1986.

4        Q.    Briefly could you tell us the kind of work that

5    you did at Masimo in the 1990s?

6        A.    Sure.  At that time we were working on our first

7    pulse oximeter, and I was involved in the hardware design,

8    the sensor designs and the algorithm designs.  The algorithm

9    is what takes the signal from the sensor, calculates pulse

10   rate, saturation and other parameters.

11       Q.    Great.  Did you work on measuring

12   carboxyhemoglobin when you were at Masimo?

13       A.    Yes.  We have started a project at Masimo to work

14   on the carboxyhemoglobin and other parameters that are

15   considered, they call them hemoglobin species, oxygen is one

16   of them, carboxy is another when it binds with hemoglobin,

17   methemoglobin, and total hemoglobin as well.

18       Q.    Can you explain the importance of measuring

19   carboxyhemoglobin --

20       A.    Yes.

21       Q.    -- noninvasively?

22       A.    Carboxyhemoglobin, carbon monoxide, when it binds

23   with oxygen, with hemoglobin, it has the affinity of 200

24   times what oxygen does.  In other words, it displaces the

25   oxygen.  It won't let the oxygen bind with the hemoglobin.

1          So it turns the hemoglobin into a dysfunctional

2    hemoglobin, and, hence, the carbon monoxide poisoning that

3    we hear.  And it's very hard to diagnose because it looks

4    like a flu.  People with a high carbon monoxide poisoning,

5    they go to the hospital, they look bright red and they look

6    like they have a flu.

7          Firefighters suffer because of that.  And many

8    times when you have to buy appliances, like you buy a

9    furnace that doesn't have good combustion, people get carbon

10   monoxide poisoning.

11   Q.   What research did you do with respect to

12   carboxyhemoglobin?

13   A.   We looked into, first of all, how it interacts

14   with tissue, and I spent quite a bit of time looking into

15   the theory behind it.  Then we moved into a computer

16   simulation trying to understand can we build a device that

17   will measure carboxy noninvasively, carboxyhemoglobin in the

18   tissue noninvasively, with reasonable accuracy that is

19   relevant to the field.

20         And the result of those simulations, which took

21   about a year, is that, yes, we could, and we also figured

22   out that we can measure the other parameters, the

23   methemoglobin and total hemoglobin as well.

24   Q.   With respect to carboxyhemoglobin, who else

25   worked with you on developing that technology?

1      A.   We hired Mr. Marcelo Lamego after two years of my

2   work on that one, and after that eventually we created a

3   team, we called it the rainbow« team, and the name rainbow«

4   came from the number of wavelengths or number of LEDs that

5   were needed in the sensor.

6           Typically, if you look at our oxygen sensor, it

7   has two of them, it looks red, this one has many of them, so

8   we called it rainbow«.

9      Q.   We're going to start a section that discusses

10  Masimo CBI.

11          Could we please go on the Masimo CBI record?

12          (Whereupon, the hearing proceeded in confidential

13  session.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    O P E N   S E S S I O N

2

3            JUDGE BHATTACHARYYA:  Moving back to the public

4    record.

5    BY MR. LATEEF:

6        Q.   Okay.  Could you take a look at Joint Exhibit

7    007?

8        A.   Okay.

9        Q.   Can you tell me what this is?

10       A.   Yeah.  So this is a United States Patent No.

11   7,761,127.  I am an inventor on this patent.

12       Q.   Okay.  And who owns this patent?

13       A.   I believe initially it was Masimo Laboratories.

14   That's the company we spun off in 1988.  But today's

15   Cercacor, it was renamed to Cercacor.

16       Q.   Okay.  And does this patent relate to your work

17   on measuring carboxyhemoglobin?

18       A.   Yes.

19       Q.   Okay.  Can you explain at a very high level how?

20       A.   Okay.  So this is a patent that describes a

21   sensor that can take 16 LEDs with many novel features, and

22   the part that I just explained about how we can predict the

23   wavelengths using the thermistor and the thermal mass is

24   described in this patent.

25       Q.   Okay.  Let's take a look at Fig. 2A.  And can you

1   describe what is shown here?

2       A.   This is something you may have seen in a

3   hospital.  It's called a clip sensor.  This is a sensor that

4   goes and clips on the digit, and it has LEDs in it.  It may

5   be a measure -- oxygen saturation or other parameters for

6   rainbow«.

7       Q.   Let's move to Fig. 4.  Can you explain what we're

8   looking at here?

9       A.   So this is an expanded view of that particular

10  sensor.  So if you were to break it up and open it up and

11  look inside of it, this is what you're going to see.  On the

12  left there is a cable.  On the top and the bottom there are

13  those shelves, the top and the bottom shelves.  Then in the

14  middle there is -- there are a couple of pads, very flexible

15  pad.

16          And if you look at 600, that's where the assembly

17  is, and this is what we were talking about before.

18      Q.   Okay.  And 600 is now on the screen.  Do you see

19  that?

20      A.   Yeah.  This is like a 4x8 millimeter.  This is

21  our first revision of it, just to give you have a sense of

22  the size, 4x8 millimeter.

23      Q.   Let's go to Fig. 6.  And can you explain what

24  we're looking at here?

25      A.   So this is the same sensor assembly but zoomed

1    in.  And what you see on the right side, you see the LEDs.

2    Those are little, look like sugar cubes.  Those are the

3    LEDs.  Our sensor design can accommodate 16 of them.

4        Q.    Okay.  Let's go to Fig. 12.  Could you explain

5    this figure to us?

6        A.    Sure.  This is a block diagram of that

7    thermistor.  So you see -- not thermistor -- of the

8    assembly.  This is the block diagram, top-level block

9    diagram.

10            You see the LED on the left, the light emitter.

11   In the middle you have the thermal mass, which is really the

12   substrate, described here as a substrate.  The emitters pump

13   the heat into the thermal mass, and when we described that

14   energy right here with two arrows.  And on the right side

15   you have this temperature sensor, which in our case, as an

16   example of one embodiment, was a thermistor, and it is

17   attached to the other side of the substrate.

18       Q.    Can you explain what a thermistor is?

19       A.    A thermistor is a device that it changed its

20   resistance with temperature.  So if you measure the

21   resistance, you can look up what the temperature is, and

22   it's really accurate.

23       Q.    Thank you.  Can we turn to Fig. 14 in the patent?

24            Can you explain what we're looking at here on

25   Fig. 14?

1      A.    Sure.  So this is really a cross-section across

2    that emitter assembly, and it shows the composition of the

3    board itself.

4          So the board typically is made of material called

5    FR-4.  It's some kind of a material that is used in all of

6    the computer boards.  If you have a computer at home and you

7    look and you open it up and you look at the board, it will

8    be probably an FR-4 board.  It's used widely in the computer

9    industry in electronics.

10          You could see sandwiched in between -- first of

11   all, the top layer, we call it the component layer, that's

12   where the LED goes, and this is a metallized layer,

13   conductive, probably copper.

14          Then there are layers 2, 3, 4, and 5.  These are

15   inner layers.  Also they are made out of, typically, copper.

16   They are metallized layers.  And there is a bottom layer

17   where we attach the thermistor.

18      Q.    Okay.  And are these layers connected in any way?

19      A.    Absolutely.  You have to connect them; otherwise,

20   the heat will not flow because the FR-4 is a very good

21   insulator.  It is made out of fiberglass.

22          So we have via, we call via or through holes that

23   connect each one of those layers to the next.  So the heat

24   will be generated on the top where the LEDs are, and it

25   flows down through all of the layers.

209

1          Q.   Is --

2          A.   Through those conductive holes.

3          Q.   Yes.  Does this structure keep the temperature of

4     this thermal mass constant?

5          A.   No.  No.  As actually you've seen it before in

6     the simulation, the temperature is not constant.  It

7     actually follows the temperature of the LED in sync, and

8     that actually is the main trick.

9          Q.   And maybe you can explain again how, despite the

10    changes in the temperature, the thermistor is related to the

11    wavelength of the LEDs.

12         A.   Well, what happened right here is that, I'm going

13    to use an example to help us analogy -- to help us in this,

14    we have attached those LEDs thermally to the thermal mass.

15              And I'm going to use an example of people in an

16    elevator and you want to know the height of the people.

17    Actually what you want to do is how high their hair or their

18    head, their scalp, from the base floor.

19              So how do you do it?  We first ask them to take

20    off their shoes, stand, normalize them, have them stand

21    barefoot on the elevator.  And then we find out what is the

22    level of the elevator, the tenth floor.  So the floor of the

23    elevator is akin to the thermistor in a thermal mass

24    temperature.  That's where things are standing.

25              And then every person has their own different

1    height, just like those LEDs, each one has its own junction

2    temperature.  But once you do that, you calculate the height

3    of each one of those, and you can say, okay, well, the

4    height of this person from the first floor is their height

5    from the floor of the elevator plus where the elevator is.

6           So that's pretty much what we do with our

7    invention.  We find out that we can measure the temperature

8    of the thermal mass and then calibrate each LED

9    independently to figure out what is the wavelength of each

10   one of them, and we validated our results two ways, one,

11   with a spectrophotometer, and two, with the results of the

12   studies that we have done.

13   Q.    Thank you.  Let's now talk about the Masimo

14   products.  Are there Masimo products that use this

15   wavelength correction?

16   A.    Yes.  All of rainbow« sensors use wavelength

17   correction except for a couple of them.  One is an acoustic

18   sensor, and the other one, it's called Light Set 1, but the

19   rest of them all use temperature correction.

20   Q.    Okay.  Let's talk about the rest of them.  These

21   rainbow« sensors, what kind of products do they connect to?

22   A.    They connect to the board, rainbow« device

23   essentially, and those they have what we call MX board, and

24   there are many revisions of those MX boards, 1, 3, 5.  I

25   don't know where we are right now, but the temperature of

1    each one of them as well as the wavelength as well as the

2    signal coming from each LED is taken inside the board,

3    processed, corrected, based on what the wavelength is, and

4    then some kind of a calculation is done to come up with

5    saturation, carboxyhemoglobin, methemoglobin, pulse rate, or

6    what other parameter we have.

7        Q.   Okay.  Can you tell me the name of some of the

8    rainbow« products?

9        A.   Well, the very first one that we have released is

10   RAD-57.  I'm very proud of that one.  That was the very

11   first device that were able to measure noninvasively

12   carboxyhemoglobin in the human body.

13       Q.   Okay.  Going back to the sensors, do all rainbow«

14   sensors besides the two that you mentioned have some common

15   features?

16       A.   Yes.

17       Q.   Okay.  Let's talk about those common features.

18   Let's talk about the LEDs.  Do all rainbow« sensors have --

19       A.   Yeah, they all have LEDs.  That's really common.

20   Typically pulse oximeter sensor that you see in the

21   hospital, the one with the red color, they have two, one

22   red, that you see.  These all have more than two.  Typically

23   eight or more.

24       Q.   Okay.  And do these sensors all have thermistors?

25       A.   Yes, they all do have thermistors with a thermal

1    mass.

2        Q.   And do all of these have detectors as well?

3        A.   Yes, they have at least one or more detector.

4        Q.   Okay.  And what do the devices like the RAD-57 do

5    with the signals from the sensor?

6        A.   Could you repeat?  I'm sorry.  I couldn't hear

7    you.

8        Q.   Oh, I'm sorry.  What do the rainbow« devices such

9    as the RAD-57 do with the signals from these rainbow«

10   sensors?

11       A.   Okay.  So, basically, we isolate what we call a

12   photoplethysmograph signal.  It's really the heart -- that's

13   how we can isolate it from the rest of the signals.

14            We isolate that, and it's really not trivial to

15   get a reliable one.  We have -- let's say you have an LED.

16   You're going to have eight of those signals.  We have a

17   temperature coming in.  We do the correction for the

18   wavelengths, and these get adjusted.  And at the end we have

19   a calculation that is done based on that.  And then there is

20   a display that shows up.

21       Q.   You mentioned some calculations that are done.

22   Did you write any code for this wavelength correction?

23       A.   I wrote actually the original code for all of

24   rainbow« including the wavelength correction.

25       Q.   Okay.  And is there code in the production

 1   releases of the Masimo devices?

 2       A.   Well, the software folks took my code and

 3   obviously they said, okay, we need to modify, restructure

 4   it.  And so my code on its own is not there, it's the

 5   modified version of it is there, and obviously there were

 6   more additions over the years.

 7       Q.   And does the --

 8            JUDGE BHATTACHARYYA:  I'm sorry to interrupt.

 9   It's time -- it's about time for our afternoon break.  If

10   you just have a few more questions for the witness, then we

11   can finish that first, but, otherwise, we should take the

12   break now.

13            MR. LATEEF:  We can take the break now.

14            JUDGE BHATTACHARYYA:  All right.  Then we're in

15   recess for 15 minutes.

16            (Whereupon, the proceedings recessed at 3:21

17   p.m.)

18            (In session at 3:35 p.m.)

19            JUDGE BHATTACHARYYA:  We are on the public

20   record.

21            Mr. Lateef, you may continue.

22   BY MR. LATEEF:

23       Q.   Okay.  Mr. Diab, you have a binder in front of

24   you, and I'd like you to take a look at what should be in

25   your first tab, CPX-125.  Sorry.  152.

1      A.   Okay.

2      Q.   Do you recognize this?

3      A.   This is part of the software that does the

4   wavelength correction in the rainbow« product.

5      Q.   Okay.  You can put that away.

6           Could you next take a look at CX-678?  It's also

7   on the screen in front of you.

8      A.   678, okay.

9      Q.   Yes, it's also on the screen.  Okay.

10          Do you recognize what this is?

11     A.   Yes.  This is the RAD-57 Operator Manual, that's

12   the device we introduced in 2005.

13     Q.   And do you know the date of this Operator's

14   Manual?

15     A.   Probably a later date than 2005.  It should be

16   very similar.

17     Q.   If we can move forward a couple pages.

18     A.   I think 2018, something like that.  But the

19   original one was very similar to this.

20     Q.   Okay.  And let's go back to talking about the

21   sensors again, the rainbow« sensors that we were discussing.

22          Where are the emitters placed in a rainbow«

23   sensor?

24     A.   Well, the emitters are placed on what we call an

25   emitter assembly, which we discussed this a little while

215

1    ago.  Those are -- have been placed on a flex circuit, which

2    then in this case has the emitter assemblies as well as the

3    photodiode.

4            And in the picture, the expanded picture that we

5    have shown originally -- or not originally -- earlier of

6    that clip sensor, you could see that flex circuit, and then

7    the hierarchy will go higher and higher and higher until you

8    have the whole sensor.

9            MR. LATEEF:  We're now going to go back on some

10   Masimo CBI information.  Could we go back on the Masimo CBI?

11           (Whereupon, the hearing proceeded in confidential

12   session.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  O P E N   S E S S I O N

 2

 3          JUDGE BHATTACHARYYA:  Let's move to the public

 4   record.

 5                      CROSS-EXAMINATION

 6   BY MR. SELWYN:

 7          Q.   Good afternoon, Mr. Diab.

 8          A.   Good afternoon.

 9          Q.   You are one of the cofounders of Masimo, correct?

10          A.   Correct.

11          Q.   And at Masimo you've been chief technology

12   officer, chief scientist, and fellow scientist, correct?

13          A.   Correct.

14          Q.   You're not aware of any evidence that Apple ever

15   copied the '127 patent, correct?

16          A.   I have not looked at any evidence myself.

17          Q.   You're not aware of a shred of evidence that

18   Apple copied the '127 patent, correct?

19          A.   I said I did not look into that, so I cannot form

20   an opinion about it.

21          Q.   You're a named inventor of the '127 patent,

22   correct?

23          A.   Correct.

24          Q.   But you're not here to suggest that Apple Watch

25   uses or practices the '127 patent, correct?
```

 1      A.   I have not looked at any piece that has to do
 2  with the Apple Watch to make or form any opinion.
 3      Q.   So you have not compared the claims of the '127
 4  patent on the one hand with any Apple product on the other,
 5  correct?
 6      A.   No, I have not.
 7      Q.   And you're also not here to suggest that Masimo
 8  practices or uses the '127 patent, correct?
 9      A.   I'm sorry.  Could you repeat that question?
10      Q.   Sure.  You're not here to suggest that Masimo is
11  using or practicing the '127 patent, correct?
12      A.   That is incorrect.  We are using and practicing
13  the '127 patent in all of our rainbow« sensors.
14      Q.   Well, sir, you have not compared the claims of
15  the '127 patent to any Masimo product; isn't that true?
16      A.   I think I did.  I think Masimo uses all of those
17  in the patent.  Actually all the aspects that we described,
18  all the embodiments, nearly all of them that we described in
19  the patent uses them.  So how could we not practicing the
20  patent?
21      Q.   Mr. Diab, do you remember giving a deposition in
22  this case?
23      A.   Yes.
24      Q.   Can we have on the screen, please, Mr. Diab's
25  deposition at page 77, lines 9-14?

1          MR. LATEEF:  Should we now open the cross binder

2    or materials that you gave him?

3          MR. SELWYN:  Certainly.  Feel free.

4          MR. LATEEF:  Mr. Diab, there should be an

5    envelope near you with the materials.

6     Q.   Mr. Diab, if you open the binder, tab 11, your

7    deposition, and I'd like to direct your attention to page

8    77, lines 9-14, which are on the screen.

9          We asked this question and did you give this

10   answer:

11         Question.  Have you ever compared any Masimo

12   product against any claim in the '127 patent to see if that

13   product practices each element of the claim?

14         Answer.  No, I did not.

15         Were you asked that question and did you give

16   that answer?

17    A.   I think I did, but that's for the claims.  I was

18   talking about the patent.  The patent itself, the text of

19   the patent, which I helped wrote, and I know that we have

20   worked on all of those, do practice the patent.  I don't

21   think I looked at the claim in details.  But for the

22   patents, absolutely.

23    Q.   Mr. Diab, you testified today about some

24   mechanical aspects of Masimo's products, like adhesives,

25   correct?

1        A.   Yes.

2        Q.   You're not familiar with the mechanical aspects

3   of the '127 patent, correct?

4        A.   No.  My work was more on to related to the

5   wavelength correction and light piping issue, the mechanical

6   aspect of it.  I understand how the adhesive works.  I

7   understand how the die attached work.  I understand that

8   there is a cure that they use in the oven.  I understood all

9   of that obviously because of my interaction, but I'm not an

10  expert or somebody who is, you know, really familiar with

11  the process itself.

12       Q.   Sir, the first time that you read the '127 patent

13  since it issued was the week before your deposition in this

14  case, correct?

15       A.   Since it was issued, yes.

16       Q.   And you did not review any prior art patents or

17  publications before you applied for the '127 patent,

18  correct?

19       A.   I myself did not review, no.  I wrote a

20  disclosure, and we sent it to our lawyers.

21       Q.   You're not aware of anyone at Masimo

22  investigating whether there were any products on the market

23  already that could estimate wavelength shifts before you

24  applied for the '127 patent; isn't that true?

25       A.   I don't know if -- you're asking me about if

1   somebody at Masimo was aware 15, 17 years ago?  I do not

2   remember that.  I have no idea to remember it.

3        Q.   But you do know that the concept of wavelength

4   shift was well-established before the '127 patent, correct?

5        A.   Yes.

6             MR. SELWYN:  Your Honor, I think at this point we

7   need to go on to the confidential Masimo business record.

8             JUDGE BHATTACHARYYA:  Moving on to the Masimo

9   confidential record.

10             (Whereupon, the hearing proceeded in confidential

11   session.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     O P E N   S E S S I O N

 2

 3           JUDGE BHATTACHARYYA:  We're moving back to the

 4     public record.

 5                     REDIRECT EXAMINATION

 6     BY MR. LATEEF:

 7        Q.   Mr. Diab, did you ever investigate whether a

 8     board with one metallic layer could provide a thermal mass?

 9        A.   Yes.

10           MR. SELWYN:  Objection, Your Honor.

11           JUDGE BHATTACHARYYA:  I'm sorry.  I didn't hear

12     the objection.

13           MR. SELWYN:  It's beyond the scope.

14           JUDGE BHATTACHARYYA:  Mr. Lateef, can you

15     respond?

16           MR. LATEEF:  He asked the witness about the

17     number of layers that are in the Masimo sensor and about the

18     dimensions of that regarding a thermal mass, implying that a

19     smaller thermal mass would not provide the benefit of the

20     '127 patent.  I'm merely responding to that.

21           JUDGE BHATTACHARYYA:  Mr. Selwyn, anything

22     further?

23           MR. SELWYN:  I asked no question to which that

24     question that was just posed would be relevant to.

25           JUDGE BHATTACHARYYA:  I agree.  The question is
```

246

1  outside the scope of the cross.  So that portion of the

2  testimony is stricken.

3  BY MR. LATEEF:

4       Q.   Mr. Diab, you mentioned test stations earlier.

5  Do you remember that?

6       A.   Yes.

7       Q.   Are there test stations that check the

8  characterization of the current Masimo sensors?

9       A.   Yes.  We have that on every single sensor.  It's

10  tested before it's shipped.  The -- and it's the same

11  technique that was used on the old version of the sensor and

12  the new version of the sensor.  There is no sensor that

13  leaves Masimo production without being characterized, and

14  the characterization validates whether the equation is

15  working or not.  If it doesn't, it gets thrown out.

16           So that is our validation of whether it's ceramic

17  or not.  Every single sensor gets characterized and

18  validated that the wavelengths that comes out correspond to

19  the equation that we put inside the sensor.

20           MR. LATEEF:  I have no further questions,

21  Your Honor.

22           MR. SELWYN:  No questions, Your Honor.

23           JUDGE BHATTACHARYYA:  Thank you.  Mr. Diab, thank

24  you so much for being with us.

25           THE WITNESS:  Thank you, Your Honor.

1          MS. SWAROOP:  Your Honor, Complainants' next

2    witness will be Mr. Ammar Al-Ali, and Mr. Jensen will be

3    conducting that examination.

4          MR. MUELLER:  Your Honor, Sarah Frazier will be

5    conducting the cross-examination.

6          JUDGE BHATTACHARYYA:  Thank you.

7          MR. JENSEN:  Good afternoon, Your Honor.  This is

8    Steve Jensen.

9          Mr. Al-Ali, are you comfortable and do you have

10   your book?

11         THE WITNESS:  Yes.  Good afternoon.

12         MR. JENSEN:  May we begin, Your Honor?

13         JUDGE BHATTACHARYYA:  I'll swear in the witness

14   first before we proceed further.

15         Mr. Al-Ali, did I pronounce it right?

16         THE WITNESS:  That's correct.

17         JUDGE BHATTACHARYYA:  Welcome.  Thank you for

18   coming.  Do you understand you're under an obligation to

19   tell the truth here today?

20         THE WITNESS:  I do.

21                   AMMAR AL-ALI,

22         having been first duly sworn and/or affirmed

23   on his oath, was thereafter examined and testified as

24   follows:

25         JUDGE BHATTACHARYYA:  Thank you.

1                   DIRECT EXAMINATION

2     BY MR. JENSEN:

3         Q.   Mr. Al-Ali, could you please state and spell your

4     name for the record?

5         A.   Ammar Al-Ali, A-M-M-A-R, A-L hyphen A-L-I.

6         Q.   And who is your current employer?

7         A.   Masimo Corporation.

8         Q.   When did you start at Masimo?

9         A.   I started April 1995.

10        Q.   Could you just briefly explain your job history

11    at Masimo since you started?

12        A.   Yes.  I started at Masimo in '95 as a software

13    engineer, and then moved from that to manage the engineering

14    department.  I worked in the early days of '95 to about 2000

15    on the Masimo saturation algorithm.

16             And then after that our RAD system, which is a

17    medical device, and then after that I worked on the rainbow«

18    system, and lately I've been working on wearable

19    technologies.

20        Q.   And what are your current responsibilities at

21    Masimo?

22        A.   Right now I oversee the technology development of

23    the company.

24        Q.   Okay.  And you mentioned wearables in your

25    previous answer.  Did there come a point in time when from

1    your technology perspective the Masimo wrist pulse oximeter

2    project became more formal?

3         A.    Yes.  I started looking into measuring the wrist

4    somewhere around 2014, 2015.  Did some feasibility work

5    there.  And then started again in 2017 to 2018.  And in 2019

6    we actually put a complete team to go after it, expanded the

7    team so we have enough support from all disciplines of the

8    engineering department.

9         Q.    And did you file any patents back with that early

10   work that you did?

11        A.    Yes.  I did file a patent on 2015 based on that

12   initial work.

13        Q.    And can you find in your book Complainants'

14   Exhibit 4?  Or we'll also pull it up on the screen.  And let

15   us know if you recognize that patent.

16        A.    Yes, I do recognize that patent.

17        Q.    And is this one of the patents that you were

18   referring to that stemmed from the work you mentioned in

19   2014 and 2015?

20        A.    That's correct.  This was from the 2015 time,

21   yes.

22        Q.    And you're an inventor on this patent, right?

23        A.    Yes, I am.

24        Q.    What was your involvement in this patent?

25        A.    I am the designer for the and the inventor for

1    the subject matter.  I gave disclosure to the attorneys to

2    actually file the patent.

3         Q.   Okay.  And then you said that things started

4    from -- I think you said working more with a team happened a

5    little later.

6              What started happening then when you picked it

7    back up, I think you said?

8         A.   Oh, in 2019 we put a complete team behind this

9    technology.  We hired mechanical engineers, electronic

10   engineers, and software.  So we actually started making the

11   sensor and trying to optimize its performance.

12        Q.   And when did Masimo have its own wrist pulse

13   oximeter devices with sensing on the wrist?

14        A.   This would be late 2019.

15        Q.   And could you please on the -- it's on the stand

16   that's behind you -- or someone might have put it next to

17   you, please find Complainants' physical exhibit 22.  It's

18   either there or it's on the cart.

19        A.   Oh, it's on the cart.

20        Q.   Number 22.

21        A.   I found it.

22        Q.   Okay.  Do you recognize Complainants' Exhibit 22?

23        A.   Yes.  It's one of our early sensors.

24        Q.   Can you show us just on your camera there, not on

25   the ELMO, but just on the camera what you're holding?

1          A.    (Complying.)

2          Q.    And do you recognize that sensor?

3          A.    Yes, I do.

4          Q.    And when was it made?

5          A.    This sensor was made in October 2019.

6          Q.    How can you tell when it was made?

7          A.    I do remember that, but also it has the labels on

8    it.

9          Q.    And maybe you could put it on the ELMO so that we

10   can see that, what you're looking at.  There we go.

11               So you were looking -- you were mentioning some

12   labels.  Are those the labels down there?

13         A.    Yes, these are the labels, and 10-23-19, this is

14   when it was actually used for a Desat study.

15         Q.    When you say "Desat study," what do you mean by

16   that?

17         A.    This is a study that we do to evaluate the

18   accuracy of the product.  We bring in volunteers and we

19   attach the sensor to their wrist and make them breathe a

20   different mixture of oxygen and nitrogen to change the SpO2

21   in their blood.  So typically that study we take a person

22   from about 100 percent, which is normal, down to about 70

23   percent.

24         Q.    On the back of the sensor head of that watch, is

25   there a label?

1          MR. JENSEN:  Actually, Your Honor, I should have

2    said earlier we were on the confidential record as soon as I

3    started pulling up these samples.  I would like to be on the

4    confidential CBI for Masimo at this point.

5          (Whereupon, the hearing proceeded in confidential

6    session.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   C O N T E N T S

 2                  INDEX OF WITNESSES

 3
                                         RE-    RE-
     WITNESS                 DIRECT CROSS DIRECTCROSS

 5   JOSEPH KIANI................79    131   181   186

 6   MOHAMED DIAB...............190    228   245

 7   AMMAR AL-ALI...............248

 8

 9

10

11   AFTERNOON SESSION                      136

12

13

14   CONFIDENTIAL SESSIONS   17-27          194-204

15                           35-36          216-227

16                           62-68          233-244

17                           72-76          253-end

18                           106-113

19                           120-139

20                           169-182

21

22

23

24

25
```

```
 1               C E R T I F I C A T E

 2   TITLE: CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES

 3   AND COMPONENTS THEREOF

 4   INVESTIGATION NO.:  337-TA-1276

 5   HEARING DATE:  June 6, 2022

 6   LOCATION:  Washington, D.C. - Remote

 7   NATURE OF HEARING:  Evidentiary Hearing

 8         I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
 9   above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:    June 29, 2022
     Signed:
11   ss//

12   Signature of the Contractor or the Authorized Contractor's
     Representative
13
           I hereby certify that I am not the court reporter
14   and that I have proofread the above-referenced transcript of
     the proceedings of the U.S. International Trade Commission
15   against the aforementioned court reporter's notes and
     recordings for accuracy in transcription in the spelling,
16   hyphenation, punctuation and speaker identification and did
     not make any changes of a substantive nature.  The
17   foregoing/attached transcript is a true, correct and
     complete transcription of the proceedings.
18   Signed:

19   ss//      Raymond G. Brynteson

20
           I hereby certify that I reported the
21   above-referenced proceedings of the U.S. International Trade
     Commission and caused to be prepared from my record media
22   and notes of the proceedings a true, correct and complete
     verbatim recording of the proceedings.
23   Signed:

24   ss//      Linda Kinkade

25
```

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

```
-------------------------------x
In the Matter of                 Investigation No.

CERTAIN LIGHT-BASED PHYSIOLOGICAL   337-TA-1276

MEASUREMENT DEVICES AND COMPONENTS

THEREOF

-------------------------------x
```

**OPEN SESSIONS**

```
Pages:    283 through 596 (with excerpts)

Place:    Washington, D.C.

Date:     June 7, 2022
```

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

283

1          UNITED STATES INTERNATIONAL TRADE COMMISSION

2                       Washington, D.C.

3          Before the Honorable Monica Bhattacharyya

4                     Administrative Law Judge

5

6    -------------------------------x

7    In the Matter of                  Investigation No.

8

9    CERTAIN LIGHT-BASED PHYSIOLOGICAL   337-TA-1276

10   MEASUREMENT DEVICES AND COMPONENTS

11   THEREOF

12   -------------------------------x

13

14

15                    EVIDENTIARY HEARING

16                  Tuesday, June 7, 2022

17                       Volume II

18

19

20        The parties met via remote videoconferencing

21   pursuant to notice of the Administrative Law Judge at 9:30

22   a.m. Eastern.

23

24

25   Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

1   A P P E A R A N C E S:

2   [All parties appeared via remote videoconferencing and/or

3   telephonically.]

4

5   Counsel for Complainants Masimo Corporation and Cercacor

6   Laboratories, Inc.:

7           KNOBBE, MARTENS, OLSON & BEAR, LLP

8           2040 Main Street, Fourteenth Floor

9           Irvine, California 92614

10          (949) 760-0404

11              Stephen C. Jensen, Esq.

12              Joseph R. Re, Esq.

13              Sheila N. Swaroop, Esq.

14              Ted M. Cannon, Esq.

15              Kendall M. Loebbaka, Esq.

16              Douglas B. Wentzel, Esq.

17              Irfan Lateef, Esq.

18              Alan G. Laquer, Esq.

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE

1    A P P E A R A N C E S (continued):

2

3    Counsel for Complainants Masimo Corporation and Cercacor

4    Laboratories, Inc.:

5            KNOBBE, MARTENS, OLSON & BEAR, LLP

6            1717 Pennsylvania Avenue, NW, Suite 900

7            Washington, DC 20006

8            (202) 640-6400

9                    Jonathan E. Bachand, Esq.

10

11           KNOBBE, MARTENS, OLSON & BEAR, LLP

12           925 4th Avenue, Suite 2500

13           Seattle, Washington 98104

14           (206) 405-2000

15                   Carol Pitzel Cruz, Esq.

16

17

18

19

20

21

22

23

24

25    CONTINUED ON FOLLOWING PAGE

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Respondent Apple Inc.:

 4           WILMER CUTLER PICKERING HALE AND DORR LLP

 5           1875 Pennsylvania Avenue, NW

 6           Washington, DC 20006

 7           (202) 663-6000

 8               Michael D. Esch, Esq.

 9               David L. Cavanaugh, Esq.

10

11           WILMER CUTLER PICKERING HALE AND DORR LLP

12           2600 El Camino Real, Suite 400

13           Palo Alto, California 94306

14           (650) 858-6000

15               Mark D. Selwyn, Esq.

16

17

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

1    A P P E A R A N C E S (continued):

2

3    Counsel for Respondent Apple Inc.:

4         WILMER CUTLER PICKERING HALE AND DORR LLP

5         60 State Street

6         Boston, Massachusetts 02109

7         (617) 526-6000

8              Joseph J. Mueller, Esq.

9              Richard Goldenberg, Esq.

10             Sarah R. Frazier, Esq.

11             Jonathan A. Cox, Esq.

12             Nina Garcia, Esq.

13             Cynthia D. Vreeland, Esq.

14

15

16        WILMER CUTLER PICKERING HALE AND DORR LLP

17        1225 17th Street, Suite 2600

18        Denver, Colorado 80202

19        (720) 598-3459

20             Ravi S. Deol, Esq.

21

22

23

24

25        CONTINUED ON FOLLOWING PAGE

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Respondent Apple Inc.:

 4           WILMER CUTLER PICKERING HALE AND DORR LLP

 5           350 South Grand Avenue, Suite 2400

 6           Los Angeles, California 90071

 7           (213) 443-5300

 8               Derek Gosma, Esq.

 9

10

11

12           *** Index appears at end of transcript ***

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1              P R O C E E D I N G S

 2              (In session at 9:30 a.m.)

 3         JUDGE BHATTACHARYYA:  Let's begin.  We're on the

 4    record.  Let's start on the public record.

 5              For today's activities, who is going to be the

 6    designated attorney regarding CBI for each side?

 7         MS. SWAROOP:  I will be for Complainants,

 8    Your Honor.

 9         JUDGE BHATTACHARYYA:  Thank you.

10         MR. MUELLER:  Ms. Frazier has kindly agreed,

11    Your Honor, to do the same for us.

12         JUDGE BHATTACHARYYA:  Okay.  Wonderful.  We have

13    some exhibits that I understand are ready or almost ready

14    for admission.  I have a list entitled Table of Exhibits

15    Entered Into Evidence Without Sponsoring Witness.  The PDF

16    is entitled -- is dated 6-6-2022.

17              Are there any objections to admission of any of

18    these exhibits?

19         MR. MUELLER:  No, Your Honor.  With respect to

20    the two tables of exhibits that the Complainants submitted,

21    one for the evidentiary hearing yesterday and one for the

22    evidence without a sponsoring witness, we have no objection

23    to the table for the evidence without a sponsoring witness.

24              For the admitted exhibits that were used

25    yesterday, we have no further objections and nothing to
</pre>

1    raise at this time.  I would just note, Your Honor, there

2    were a couple points where we made some standing objections,

3    for example, to post-complaint evidence, which Your Honor

4    has already ruled on, and I just wanted to make clear that

5    we're not abandoning our legal position on that issue.  We

6    have no further objections for Your Honor to resolve at this

7    time.

8            JUDGE BHATTACHARYYA:  All right.  So starting

9    with the Table of Exhibits Entered Into Evidence Without a

10   Sponsoring Witness, I understand no objections, those

11   exhibits are admitted into evidence.  Please send a copy of

12   that list to the court reporter.

13           (Whereupon, the exhibits as recited by counsel

14   and reflected in the attached index were submitted and

15   received in evidence.)

16           JUDGE BHATTACHARYYA:  The second list I have is

17   Table of Admitted Exhibits With the Evidentiary Hearing on

18   June 6, 2022.  And I understand there are no objections to

19   that list either; is that right, Mr. Mueller?

20           MR. MUELLER:  No further objections, Your Honor,

21   nothing that we need to raise beyond what you've heard in

22   the past.

23           We have taken positions, again, the example I'd

24   use is on post-complaint evidence, but we understand

25   Your Honor's guidance and there's nothing further we would

1    ask Your Honor to do at this time.

2            JUDGE BHATTACHARYYA:  Understood.  Those exhibits

3    are admitted into evidence.

4            (Whereupon, the exhibits as recited by counsel

5    and reflected in the attached index were submitted and

6    received in evidence.)

7            JUDGE BHATTACHARYYA:  Please send a copy to the

8    court reporter.

9            MS. SWAROOP:  Your Honor, just so it's clear,

10   this table contains exhibits that are now part of the

11   evidentiary record.  I just want to make sure there's no

12   ambiguity with regard to that.  Mr. Mueller indicated some

13   standing objections, but I just want to make the record very

14   clear that there are no objections to these exhibits coming

15   in.

16           JUDGE BHATTACHARYYA:  My understanding is they

17   are admitted.  If Mr. Mueller wants to preserve his right to

18   potentially petition for review of that ruling, but under

19   the current rulings, those exhibits are admitted.

20           MR. MUELLER:  That's correct, Your Honor.  Thank

21   you.

22           JUDGE BHATTACHARYYA:  Okay.  I also have a list

23   6-7-2022, Complainants' Deposition Designations and Exhibits

24   to Move Into Evidence.  Are those ready to be moved in at

25   this time?

1          MS. SWAROOP:  Yes, Your Honor.  We had prepared a
2    list.  I believe Apple had raised one objection.  I don't
3    know if Apple is maintaining that objection, but we have
4    prepared a list with the designations and the exhibits
5    accompanying those to move into evidence.
6          JUDGE BHATTACHARYYA:  All right.  Mr. Mueller,
7    are there objections to these designations and associated
8    exhibits?
9          MR. MUELLER:  Your Honor, there's been 13 sets of
10    designations.  For 12 of them we have no objections.  We do
11    have objections to David Amor.  If Your Honor would like to
12    hear those objections now, the bases for them, I'm happy to
13    do so.  Ms. Frazier can provide the details.
14          JUDGE BHATTACHARYYA:  Yes, let's do that now.
15          MS. SWAROOP:  Your Honor, just so it's clear, we
16    had submitted written communications to Your Honor setting
17    forth our positions.  We believe Apple provided an email to
18    Your Honor yesterday with regard to its position on
19    Mr. Amor, and we had provided our response this morning in
20    writing.
21          So that is in writing, if Your Honor would prefer
22    to review that, or if you'd like to have argument now, we
23    can do that.
24          JUDGE BHATTACHARYYA:  I appreciate the parties
25    giving me a heads-up on their positions.  I would like to

1    have the argument on the record.

2              MS. SWAROOP:  I understand.  Mr. Bachand will be

3    making that argument for Complainants.

4              MS. FRAZIER:  Good morning, Your Honor.

5              JUDGE BHATTACHARYYA:  Good morning.

6              MS. FRAZIER:  As Mr. Mueller noted, we have

7    significantly narrowed.  We do have objections outstanding

8    with respect to the designations and three exhibits

9    Complainants seek to introduce through David Amor.

10             Mr. Amor was the designee with respect to --

11   actually, Your Honor, if we could please go on the Apple

12   confidential record for this portion.

13             JUDGE BHATTACHARYYA:  All right.

14             (Whereupon, the hearing proceeded in confidential

15   session.)

16

17

18

19

20

21

22

23

24

25

301

```
 1                  O P E N   S E S S I O N

 2

 3          JUDGE BHATTACHARYYA:  And now we're moving on to

 4     the Masimo confidential record.

 5              (Whereupon, the hearing proceeded in confidential

 6     session.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1                 O P E N   S E S S I O N

 2

 3           JUDGE BHATTACHARYYA:  Moving back to the public

 4      record.

 5                      CROSS-EXAMINATION

 6      BY MS. FRAZIER:

 7           Q.   Now, Mr. Al-Ali, you've testified for about 60

 8      minutes between yesterday and today, correct?

 9           A.   Yes.

10           Q.   And Mr. Jensen didn't ask you any questions about

11      the '127 patent, correct?

12           A.   I don't remember, no.

13           Q.   You are an inventor on the '127 patent, sir?

14           A.   I believe so.

15           Q.   And the '127 patent was designed to measure

16      carboxyhemoglobin and methemoglobin, correct?

17           A.   I believe so.

18           Q.   The '127 patent does not have anything to do with

19      SpO2, right?

20           A.   The patent itself, no.

21           Q.   And you are unaware of Masimo ever using the

22      techniques described in the '127 patent for measuring SpO2,

23      right?

24           A.   No, some of those techniques actually applied for

25      SpO2.

1       Q.   But you don't have any product that uses the

2  techniques described and claimed in the '127 patent for

3  measuring SpO2, right?

4       A.   Not on the market, yes, but we are working.

5       Q.   Let's turn, sir, please, to your deposition.  Do

6  you recall being deposed in this investigation?

7       A.   Yes.

8            MR. JENSEN:  Ammar, there should be an envelope

9  that has been unopened somewhere in the room with you there.

10           THE WITNESS:  Yeah, I see it.

11           MR. JENSEN:  And our deposition should be in

12  there.

13           THE WITNESS:  Okay.

14      Q.   Mr. Al-Ali, it will be at tab 1 of the binder,

15  and we will also put it up on the screen for you.

16      A.   Yes, I see that.

17      Q.   Okay.  And, again, sir, you yourself don't have a

18  product, Masimo does not have a product out with the

19  techniques described and claimed in the '127 patent for

20  measuring SpO2, correct?

21      A.   We don't have a product that we sell.

22      Q.   Now you don't remember how the solution for the

23  '745 patent came to mind, correct?

24      A.   When you say how it came to mind, like the moment

25  that I remember how I would go do that?

 1      Q.   Well, you don't remember how you came up with the

 2   idea described in the '745 patent.

 3      A.   Of course, I mean, I remember thinking about the

 4   problem and trying to find a solution.

 5      Q.   But you don't remember how the solution came to

 6   your mind, right?

 7      A.   I'm not sure I understand that.  I'm thinking

 8   about a solution for a problem.  So are you saying like my

 9   thoughts, how I got there?

10      Q.   So let's see what you said at your deposition,

11   sir.  It's at tab 1 of your binder.

12      A.   Mm-hmm.

13      Q.   If we could put it up on the screen.  Page 44,

14   beginning at line 16.

15      A.   Yep.

16      Q.   Do you see there:

17           Question.  How did you come up with the idea

18   described in the '745 patent?

19           Answer.  I don't remember how the idea came to my

20   mind, but it's a problem that we were facing and we tried to

21   find a solution.  And this is like many years ago, so it's

22   not -- I don't remember how the solution came to my mind.

23           Were you asked that question and did you give

24   that answer?

25      A.   Yeah.  And this is what I just gave you seconds

1    ago.

2         Q.    And, sir, you don't remember because it was many

3    years ago, correct?

4         A.    Yeah, I don't remember how it came to my mind,

5    but I remember it's a problem we were going after.

6         Q.    And fair to say you don't know one way or the

7    other why the '745 patent was not filed until March of 2020,

8    correct?

9         A.    The '745 patent?

10        Q.    Correct.

11        A.    That -- I think that was filed in 2015.

12        Q.    You think you had the original idea in 2015; is

13   that right?

14        A.    I think it was filed in 2015.

15        Q.    Well, let's bring it up.  I believe it's Exhibit

16   4.  This is the '745 patent, sir, correct?

17        A.    Yes.

18        Q.    And do you see on the left-hand column where it

19   says, filed, March 31st, 2020?

20        A.    Yeah, I see that, but that's the continuation.

21   The original file, the disclosure, was done in 2015, I

22   believe.

23        Q.    Correct.  And you, sir, don't know one way or

24   another why the application for the '745 patent was not

25   filed until March of 2020, correct?

334

1      A.   No, the application was filed in 2015.  I know

2   that very well because right after that actually I had major

3   heart surgery, so I know exactly when it was filed because

4   it's in my mind.

5      Q.   And that's the original provisional you're

6   talking about, correct?

7      A.   That's the original, but it's in the same

8   disclosure.

9      Q.   Now, sir, you consider shaping the light to be

10  the thing that was new about the '745 patent, correct?

11     A.   Yes.

12     Q.   And it changes from a first shape to a second

13  shape, correct?

14     A.   Correct.

15     Q.   And as the sole inventor of the '745 patent, you

16  do not know what the first shape of light emitted by the

17  LEDs is, correct?

18     A.   So it's not important to know what the first

19  shape is.  What's important is the final shape that we need.

20  So LEDs, as their nature, they come out with different

21  shapes, and usually the emission out of the LEDs comes out

22  almost like a cone with a hollow inside.  So it is not

23  appropriate to what we're trying to do.  So it doesn't

24  matter how it is shaped as it comes out of the emitter,

25  because we had a diffuser on top that actually uniforms the

1    light, and then it allows us to shape it any way we want

2    when it comes out.  So what's important --

3         Q.    Sir, if you could just stay with my question.

4              As the sole inventor of the '745 patent, you

5    don't know what the shape of light emitted by the LEDs is,

6    correct?

7         A.    Yeah, but I'm trying to explain.

8         Q.    Well, let's see what you said at your deposition,

9    sir.  It's in tab 1 of your binder.  We'll put it up on the

10   screen.  Page 72, lines 5-14.

11             Question.  In the '745 patent, what shape is the

12   first shape of light emitted by the LEDs?

13             And what shape is that?

14             Answer.  I don't know what shape.

15             Were you asked that question and did you give

16   that answer?

17        A.    That's correct.  I don't care what the shape --

18   the first shape is.  I care what comes out is important.

19        Q.    And the '745 patent describes what comes out as

20   the second shape as a ring or a doughnut.  That's what you

21   were showing Mr. Jensen?

22        A.    That's one configuration of it, yes.

23        Q.    And that's what you invented, right?

24        A.    Reshaping the light, yes.

25        Q.    Now I heard you mention prior art in your

1    discussion with Mr. Jensen.  You personally did not

2    investigate whether any prior art to the '745 patent

3    describes shaping of light, correct?

4         A.   I did not myself.

5         Q.   And you have never compared the claims of the

6    '745 patent to any prior art, correct?

7         A.   I'm not qualified to do that.

8         Q.   Now, sir --

9              MS. FRAZIER:  Your Honor, at this point we should

10   go on the Masimo confidential record, please.

11             (Whereupon, the hearing proceeded in confidential

12   session.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2             MS. SWAROOP:  Your Honor, for our next witness,

 3   Complainants call Bilal Muhsin.  We're just getting him set

 4   up in the witness room.

 5             JUDGE BHATTACHARYYA:  Okay.

 6             MR. MUELLER:  Your Honor, I'll be conducting this

 7   cross-examination.

 8             JUDGE BHATTACHARYYA:  Thank you.

 9             MR. MUELLER:  Are we back on the public record,

10   Your Honor?

11             JUDGE BHATTACHARYYA:  Yes, we are.

12             MR. MUELLER:  Okay.  Thank you, Your Honor.

13             MS. SWAROOP:  Our witness is ready.

14             Good morning, Mr. Muhsin.

15             JUDGE BHATTACHARYYA:  Good morning.  Could you

16   help me pronounce your name again?

17             THE WITNESS:  Bilal.

18             JUDGE BHATTACHARYYA:  And the last name?

19             THE WITNESS:  Muhsin.

20             JUDGE BHATTACHARYYA:  Okay.  Mr. Muhsin, thank

21   you for coming here today.  Do you understand you're under

22   an obligation to tell the truth in your testimony?

23             THE WITNESS:  I do.

24                        BILAL MUHSIN,

25             having been first duly sworn and/or affirmed
```

1    on his oath, was thereafter examined and testified as

2    follows:

3                          DIRECT EXAMINATION

4    BY MS. SWAROOP:

5         Q.   Good morning, Mr. Muhsin.

6         A.   Good morning.

7         Q.   Could you please describe your current

8    employment?

9         A.   I'm the Chief Operating Officer at Masimo.

10        Q.   How long have you held that position?

11        A.   Since 2019.

12        Q.   What are your responsibilities as the Chief

13   Operating Officer at Masimo?

14        A.   I oversee R&D, regulatory, quality, operations,

15   and commercial for Masimo, and clinical affairs as well.

16        Q.   Mr. Muhsin, what is the Masimo Watch project?

17        A.   It is a project that formally started in 2019.

18   It's about a design of a wrist sensor that's able to

19   calculate pulse oximetry, the SpO2 reading, and has other

20   functionalities that a watch would have.

21        Q.   What is your role in the Masimo Watch project?

22        A.   I'm no longer a hands-on engineer, but I do

23   oversee the entire R&D development, the operation side, and

24   the commercialization side of the product.

25        Q.   You mentioned that the Masimo Watch project

343

1    formally started in 2019.  What did you mean by that?

2        A.    It started in 2019 because, formally I said,

3    which is a W1 project, we had many iterations of wrist

4    sensors that we worked on prior, between us and our sister

5    company Cercacor.  So, technically, we had a lot of work

6    done prior to 2019 on the project, but that's when it

7    formally started for the W1.

8            MS. SWAROOP:  And I'm going to be going into some

9    confidential material, so I would like to go on the CBI

10   record for Masimo.

11           JUDGE BHATTACHARYYA:  Moving on to the Masimo

12   confidential record.

13           (Whereupon, the hearing proceeded in confidential

14   session.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                  O P E N   S E S S I O N

 2

 3          JUDGE BHATTACHARYYA:  All right.  Let's move on

 4   to the public record.

 5   BY MS. SWAROOP:

 6      Q.   Mr. Muhsin -- do we need to --

 7           Can I continue, Your Honor?

 8           JUDGE BHATTACHARYYA:  Yes, you may.

 9           MS. SWAROOP:  Okay.

10   BY MS. SWAROOP:

11      Q.   So, Mr. Muhsin, we were discussing CX-789, page

12   39.  Can you tell us what this is showing here?

13      A.   This is the model that would sit in the bed at

14   Arab Health.  We had kind of a mockup of a home setting, so

15   the model would sit in the bed.  This is the watch on the

16   model's hand reading the SpO2 or the O2 calculation, the

17   oxygenation.  That's the 99 percent up there, and the heart

18   rate, which is at 89 beats per minute, and then the step

19   counter and the time.  So this is being demonstrated at Arab

20   Health on the model.

21      Q.   Okay.  Thank you, Mr. Muhsin.

22           I would like to ask you about Masimo's

23   manufacturing activities in the United States in connection

24   with the W1.

25           Does Masimo have a video made that illustrates
```

1    and shows the production of the Masimo W1 at its Irvine,

2    California facility?

3         A.   Yes.

4         Q.   Did you have any involvement in coordinating that

5    video?

6         A.   I did walk the manufacturing floor and asked them

7    to focus on certain parts of the line in terms of that

8    video, yes.

9         Q.   Okay.  Do you know when that video was made?

10        A.   Last year, end of last year.

11             MS. SWAROOP:  I'm going to show the video and I

12    would like to go on the Masimo CBI record for that.

13             (Whereupon, the hearing proceeded in confidential

14    session.)

15

16

17

18

19

20

21

22

23

24

25

362

```
 1                    O P E N   S E S S I O N

 2

 3            MR. MUELLER:  Thank you, Your Honor.  May I

 4   proceed?

 5            JUDGE BHATTACHARYYA:  Yes.

 6                    CROSS-EXAMINATION

 7   BY MR. MUELLER:

 8       Q.   Good afternoon, or good morning I should say,

 9   Mr. Muhsin.  Nice to see you.

10       A.   Good morning.

11       Q.   If we could please pull up CPX-0146.

12       A.   I have a box here.  Am I supposed to open it?

13       Q.   If you could, that would be great actually.  I'm

14   not going to refer to it quite yet, but if you could open it

15   up to have it handy, that would be terrific.

16            MS. SWAROOP:  Are we on the public record right

17   now?

18            JUDGE BHATTACHARYYA:  Yes, we're on the public

19   record.

20            MS. SWAROOP:  Your Honor, our position is that

21   the image of the W1 is fine for the public record, but any

22   details with regard to its features and its operation we do

23   consider to be Masimo CBI.

24            MR. MUELLER:  Well, Your Honor, I think it would

25   depend on the question of what's CBI and what's not.  I
```

1    think some of the basic features and functionality should

2    not be CBI, if that's what they are relying on is the

3    domestic industry product and they are taking the position

4    it's been released.

5            MS. SWAROOP:  That's fine.  I would just note,

6    with regard to the release, again, as we've heard,

7    individuals who access the watch do have to agree to certain

8    contractual restrictions, including a restriction that they

9    do not copy any features of the watch, and so that is our

10   concern here.

11           JUDGE BHATTACHARYYA:  Ms. Swaroop, let's take

12   this on a case-by-case basis.  If Mr. Mueller asks a

13   question that you believe is seeking confidential

14   information, then please speak up and we'll move onto the

15   Masimo record at that time.

16           MS. SWAROOP:  Thank you, Your Honor.  I'll do

17   that.

18   BY MR. MUELLER:

19       Q.   Mr. Muhsin, let me ask you a few questions about

20   what we're looking at here.

21           This is an image of a physical device that you

22   say is the Masimo W1 watch, correct?

23       A.   Yes.

24       Q.   And if we pull up CPX-0155AC, this is another

25   image of the Masimo W1 device, correct, sir?

1       A.   Yes.

2       Q.   And if we pull up CPX-156AC, this is another

3   image of the Masimo W1 watch, correct?

4       A.   Yes.

5       Q.   And this is the watch that you've stated on the

6   public record is being manufactured in Irvine, California,

7   correct?

8       A.   Yes, in our Laguna Canyon Road facility.

9       Q.   Now, you have testified that this watch is

10  currently in a phase called the limited market release,

11  correct?

12      A.   Yes.

13      Q.   And that phase began after the premarket release

14  phase or PMR, correct?

15      A.   Well, they sometimes overlap, but, yes.

16      Q.   Now just to be clear, before you answer the

17  question I'm about to ask you, I'm not asking you for any

18  detail in terms of pricing or contract materials or any

19  confidential information in my next question.

20           The PMR phase only involved one customer,

21  correct?

22      A.   Correct.

23      Q.   The Prince Sultan Cardiac Center, correct?

24      A.   Yes.

25      Q.   And the sale for that premarket release phase was

1   made at the end of 2021, correct?

2        A.   Yes.

3        Q.   You showed Her Honor a Purchase and Sales

4   Agreement dated December 16th, 2021.  Again, I don't want

5   you to get into any details.  It was dated December 16th,

6   2021, right?

7        A.   Yes.

8        Q.   Now the devices were not actually shipped on that

9   date, right?

10        A.   They were shipped soon after.

11        Q.   They were shipped at some point in 2022, correct?

12        A.   No, I believe we shipped in December.

13        Q.   You did not ship them to the Cardiac Center in

14   December, did you, sir?

15        A.   We shipped them to the distributor.  It went to

16   Saudi Arabia.  I don't know when it got to the Cardiac

17   Center.  If it got there in December or early January, I'm

18   not sure.

19        Q.   Well, sir, the Cardiac Center did not have use of

20   those devices even as of your deposition in February; isn't

21   that true?

22        A.   Use is a little bit different.  It doesn't mean

23   they did not receive them.

24        Q.   Well, they didn't have them in their hands to be

25   able to use until some point after your deposition in

1    February, correct?

2         A.   No.  No, they had them in their hands, not

3    necessarily using them, I believe, at that time.  That's

4    what I recall.

5         Q.   Well, let me take you to your deposition.

6         A.   Yes.

7         Q.   If you look in your binder, sir, the

8    Cross-Examination Binder, it should be tab 1.

9         A.   I'm sorry?

10        Q.   It should be tab 1 in your binder.  Let me know

11   when you have tab 1.

12        A.   Yes.

13        Q.   Sir, if you could please turn to page 70 --

14        A.   May I grab my glasses real quick, do you mind?

15        Q.   Take your time.

16        A.   I have them.

17        MR. MUELLER:  Ms. Swaroop, it might be you.

18   We're hearing echoes from that room.

19        MS. SWAROOP:  Well, Mr. Mueller, I was hearing

20   some echoes from you as well so...

21        MR. MUELLER:  I'll try to go slowly here and see

22   if we can get it sorted out.

23        Q.   Mr. Muhsin, do you have your glasses?

24        A.   I do.  Thank you.

25        Q.   If you can please turn to your deposition at page

1   70, lines 9-11.  In context, your deposition was taken in

2   February, correct, sir?

3       A.   Yes, the second one was in February.  I had an

4   earlier one as well.

5       Q.   And if we look at lines 9-11.

6            Question.  Has the Prince Sultan Cardiac Center

7   used the Masimo Watch with any patients yet?

8            Answer.  No.

9            Were you asked that question and did you give

10  that answer?

11      A.   That's correct.

12           MS. SWAROOP:  I apologize, Mr. Muhsin.  I'd like

13  to object, because there is a further follow-up question

14  that Mr. Mueller is not showing the witness.

15           JUDGE BHATTACHARYYA:  Okay.

16           MR. MUELLER:  If Ms. Swaroop wants to take it up

17  on redirect --

18           JUDGE BHATTACHARYYA:  Ms. Swaroop, you can

19  provide any additional context during redirect.

20           MS. SWAROOP:  Thank you, Your Honor.

21           JUDGE BHATTACHARYYA:  I am hearing a considerable

22  amount of echo.

23           MR. MUELLER:  Your Honor, perhaps we can take the

24  morning break and we can try to sort it out.  Would that

25  make sense?

1            JUDGE BHATTACHARYYA:  Yes, that sounds like a

2    great idea.  Let's take the morning break.  We're on recess

3    for 15 minutes.

4            (Whereupon, the proceedings recessed at 11:10

5    a.m.)

6            (In session at 11:25 a.m.)

7            JUDGE BHATTACHARYYA:  We're back on the record.

8    We're on the public record.

9            MR. MUELLER:  May I proceed, Your Honor?

10           JUDGE BHATTACHARYYA:  Yes, please.

11   BY MR. MUELLER:

12       Q.   Mr. Muhsin, let me put on the screen the three

13   images we looked at.  Those are CPX-146, CPX-155, CPX-156.

14   And they each have the suffix AC.

15           Now these are the three images of the Masimo W1

16   watch, correct?

17       A.   Yes.

18       Q.   Now you would agree, sir, from an industrial

19   design perspective, this device looks a lot like the Apple

20   Watch, right?

21       A.   No, I wouldn't agree.

22       Q.   You wouldn't agree.

23       A.   No.

24       Q.   Is that right?

25       A.   I mean, from my perspective, maybe I know it a

1    little bit too intimately, but I would not agree.

2         Q.   You would not agree.  Now you understand, sir,

3    that the Masimo engineering team actually gave consideration

4    to the Apple Watch while designing what we're looking at

5    right here, correct?

6         A.   I don't know.

7         Q.   You don't know one way or the other?

8         A.   No.  I wasn't part of the process.

9         Q.   Well, you testified on direct that you are the

10   head of the operations team, correct?

11        A.   The head of the operations, yes, head of

12   operations team, correct.

13        Q.   Research and development reports to you, right?

14        A.   Yes, they do.

15        Q.   And, in fact, you testified on direct that they

16   reported to you regularly about progress on the Masimo W1

17   watch, correct?

18        A.   That is correct.

19        Q.   A project that, according to you, began in 2019,

20   right?

21        A.   Yes.

22        Q.   Continues through today, correct?

23        A.   Correct.

24        Q.   And you don't know one way or the other if the

25   engineering team gave consideration to the Apple Watch while

1    designing the Masimo Watch; is that right?

2         A.   That is correct.

3         Q.   Now you will agree with me that the Apple Watch

4    was released, the original model, was released years before

5    the work even began in 2019 on the W1, credit?

6         A.   So I explained this, I think, in the beginning.

7    Our work also began a lot earlier, but, yes, there was a

8    version of the Apple Watch that was released before the

9    release of the W1.

10        Q.   In fact, multiple versions.  The original version

11   was 2015, that's the Apple Watch, correct?

12        A.   Yes.

13        Q.   And there were a series of models released each

14   year thereafter, correct?

15        A.   Yes.

16        Q.   Now, the Masimo W1 watch has followed a research

17   and development schedule at a high level that is similar to

18   other Masimo projects, correct?

19        A.   In some ways, yes, in some ways, no, but, yes.

20        Q.   Your normal process involves premarket release,

21   correct?

22        A.   Yes.

23        Q.   Limited market release, right?

24        A.   Yes.

25        Q.   And then, finally, release to the open commercial

 1    marketplace, correct?

 2         A.    Final market release.

 3         Q.    And that's called final market release, right,

 4    sir?

 5         A.    Yes.

 6         Q.    And you followed that normal process with respect

 7    to the W1 watch project, correct?

 8         A.    Yes.

 9         Q.    And you followed that normal process in the years

10    2019 to today, correct?

11         A.    For the W1 again specifically?

12         Q.    That's right, the W1.

13         A.    Yes, we did.

14         Q.    Is that right, sir?

15         A.    Yes.

16         Q.    Now the PMR or premarket release phase you

17    testified is now complete, correct?

18         A.    Yes.

19         Q.    It consisted of sales to one customer, right?

20         A.    Correct.

21         Q.    And that's the Cardiac Center in Saudi Arabia,

22    correct?

23         A.    Yes.  That wasn't the only use.  That was the

24    only sale.

25         Q.    And they provided some feedback; is that right,

1    sir?

2         A.   Yes.

3         Q.   And you've now moved, you've testified, to the

4    limited market release, correct?

5         A.   Yes.

6         Q.   This involves the use of non-disclosure

7    agreements and certain terms that folks who want to acquire

8    these devices have to agree to before they are given them,

9    right?

10        A.   Correct.

11        Q.   And one of the things that you're seeking is

12   further feedback, correct?

13        A.   If there is feedback, yes, but really the

14   stability of the manufacturing process, meaning when we go

15   to high volume, can we make -- can we keep it consistent

16   throughout.  That's the main purpose right now of the

17   limited market release.

18        Q.   Well, sir, you would agree with me that research

19   and development continues on the W1 even as of today,

20   correct?

21        A.   It's on the operational side now, so it's no

22   longer with the engineers on the development side.  It has

23   now moved on to the manufacturing side, and we're in the

24   manufacturing stability process of the product.

25        Q.   Sir, are you testifying that no engineering work

1    is occurring on the software or hardware of the W1?

2         A.   Software continues to always be improved,

3    correct.

4         Q.   Right.  So the truth is, there is software

5    development ongoing even as of today, correct?

6         A.   Software will always be ongoing, so it never

7    stops.  Whether it's through these phases or after release,

8    just like our phone or the Apple Watch, they continuously

9    give upgrades and every year, every six months, you'll

10   receive an upgrade, and that will improve the product.

11        Q.   Well, sir, you don't yet have the final software

12   for the final market release of the W1, correct?

13        A.   At any point when manufacturing stability is

14   complete, we have what we call our minimum set requirements

15   for the software.  So we can release with any -- or it can

16   be pushed out with the current version of software.

17        Q.   Right, but you're not at the point of market

18   release stage, right?

19        A.   That's because of the manufacturing stability,

20   making sure the manufacturing stability is there, not

21   because of anything else.

22        Q.   And as of today, you are not in the manufacturing

23   for the final market release phase, correct?

24        A.   We are.  We are in the manufacturing process of

25   the -- for the limited market release, and we're producing

1    watches right now that at any point can be part of the final

2    market.

3            So just because we have them on the shelf, once

4    we say we're ready to go, those same watches that we built

5    through those same manufacturing processes can be used for

6    final market release.

7    Q.   Let's put it this way.  No customer anywhere in

8    the world can walk into a store and buy a Masimo Watch today

9    being correct?

10   A.   So today you can buy it on -- through -- you can

11   sign up for the limited market release and through the

12   e-commerce we will send you one today, but it's not open to

13   market.

14   Q.   And if you could just stay with my question,

15   please, sir.

16           There is no ability for a consumer to buy the

17   Masimo Watch in any store anywhere in the world, correct?

18   A.   So there's virtual stores.  So today you can sign

19   up for the limited market release and you can gain one

20   through that, but it's not available in a store, no.

21   Q.   It's not available in a store, correct, sir?

22   A.   That is correct.

23   Q.   Okay.  Now you, Masimo, I should say, and

24   Cercacor filed an amended complaint last July in 2021,

25   correct?

1        A.   Yes.

2        Q.   And the physical devices that we looked at images

3   of just a little while ago did not exist on the date that

4   complaint was filed, correct?

5        A.   I testified that the physical that was shown to

6   me in the presentation was there, and I walked you through

7   it, I think, in my deposition.  It was on the table when I

8   walked you through the version that was there.

9        Q.   Well, sir, I want to be very careful here.  I'm

10  distinguishing between earlier prototypes, and we may come

11  back to those, including on the confidential record.

12            On the public record for right now I'm focused on

13  the Masimo W1 watch that is in this limited market release?

14            Do you have that device in mind, sir?

15       A.   Yes.

16       Q.   And we just looked at those three images.  If we

17  can pull them up again.

18            What we are looking at right here did not exist

19  in July of 2021, correct?

20       A.   Correct.  These specific ones did not, but

21  versions of the Masimo Watch did.

22       Q.   Sir, you have to stay with my question.  These

23  particular watches did not exist in July of 2021, correct?

24       A.   Correct.

25       Q.   And, in fact, these particular watches in this

1    industrial design were not manufactured until December of

2    2021, correct?

3         A.   November, December time frame.

4         Q.   Now we can take those images down.

5              The complaint actually included a declaration

6    from you; is that right, sir?

7         A.   Yes, it did.

8         Q.   And because we're on the public record I'm not

9    going to pull up the actual content of the declaration, but

10   that declaration included some computer-assisted design

11   drawings, right, sir?

12        A.   It included some drawings, yes, CAD drawings.

13        Q.   And those are called CAD drawings,

14   computer-assisted design, correct?

15        A.   Yes.

16        Q.   And you don't know when those were created,

17   right?

18        A.   Meaning?

19        Q.   You don't know when the CAD drawings were

20   created, correct?

21        A.   Prior to me submitting that, yes, they were.  I

22   mean, they were created prior to my submission, yes.

23        Q.   But you don't know exactly when.

24        A.   No.

25        Q.   And those CAD drawings did not correspond to an

1   actual physical device that existed at that time, correct?

2       A.   A design did correspond to a physical.

3       Q.   Sir, you did not put in in your complaint a

4   photograph of an actual physical device in existence at that

5   time, did you.

6       A.   That is correct.  I did not put in a photograph.

7       Q.   Now if a device actually existed at that time

8   that matched the CAD drawing, nothing would have stopped you

9   from taking a photograph of it, right?

10      A.   I testified to this in my deposition that I wore

11  that same device on my wrist prior to me putting that

12  declaration together with that same design.

13      Q.   And, sir, if you wore it on your wrist, surely

14  someone could have taken a photograph of it and attached it

15  to the complaint, correct?

16      A.   It wasn't -- it wasn't -- I didn't make the call

17  whether it was a photograph or something else.

18      Q.   Well, whoever made the call, what was attached to

19  the complaint was not what you are testifying to now; it was

20  a computer-assisted design drawing, correct?

21      A.   In the complaint it was.  And when we walked

22  through the samples during my deposition, I walked you

23  through --

24      Q.   Sir, please, just stay with my question.

25  Ms. Swaroop will have a chance to ask you questions later

1    and you can expand on whatever you like.

2              But my question was simply, you attached

3    computer-assisted design drawings only to the complaint,

4    correct, sir?

5         A.   No, there were also photographs, but for that

6    portion, yes.

7         Q.   The photographs you're referring to were a

8    photograph of a strap, an actual physical strap.

9         A.   I believe so, yes.

10        Q.   Okay.  There was no photograph of an actual watch

11   device, a full watch device, attached to the complaint,

12   correct?

13        A.   Correct.

14        Q.   Now, in fact, you weren't aware as of your

15   December deposition of a Masimo Watch that existed on the

16   date of the complaint that matched the description of the

17   Masimo Watch in your declaration attached to the complaint,

18   correct?

19        A.   No.  I could tell you which vintage and which

20   ones based on what was displayed at the table, but I

21   couldn't pick if it was the exact same one or not.

22        Q.   Well, let's pull up your deposition.  This is

23   your first deposition from December at page 127, line 22, to

24   page 128, line 5.

25             Take your time, sir.  I believe it's tab 1 in

 1    that binder, the Cross-Examination Binder.

 2             MS. SWAROOP:  Apologize.  Are we in the December

 3    deposition or the February deposition?

 4             MR. MUELLER:  December, which is tab 1 in the

 5    cross binder.

 6             MS. SWAROOP:  Thank you.

 7        Q.   Are you there, sir?

 8        A.   Yes.

 9        Q.   Okay.  So we can put this up on the screen.  This

10    is page 127, line 22, to 128, line 5.

11             Question.  Maybe you do, but do you have either

12    on your person today sitting here right now or at your

13    office or at your home, do you have in your possession

14    somewhere a Masimo Watch that existed on the date of the

15    complaint that matches the description on pages 1 through 7?

16             Answer.  I do not.

17             Question.  You do not?

18             Answer.  Correct.

19             Were you asked those questions and did you give

20    those answers, sir?

21        A.   Yes, but I remember, if we go up and down

22    throughout this question and answer, you were asking for the

23    specific watch when we were doing that, and I was telling

24    you I don't have a specific watch, and I did walk you

25    through a series of watches on the table.  There was

380

1  probably over 50 of them.  And I did point out at which
2  point I believed the complaint was filed and which watches
3  were produced at that time.

4      Q.   Sir, were you asked those questions and did you
5  give those answers?

6      A.   Yeah.  Let me just look through here again.

7      Q.   We're going to keep going, sir.  You can come
8  back to this with Ms. Swaroop, if you would like.

9      A.   You asked me if I had it in my possession.

10     Q.   Sir, you have to stay with my question.

11     A.   I understand, but I had it in my possession, not
12 whether it existed.

13     Q.   I understand, but you have to stay with my
14 questions, and Ms. Swaroop will have a chance to do redirect
15 with you after I'm done.

16          You're also unaware of any documents that showed
17 the exact state of the Masimo Watch project as of July 2021,
18 correct?

19     A.   Any what?  I'm sorry.

20     Q.   You are unaware of any documents, you're not sure
21 whether they exist, documents that showed the exact state of
22 the Masimo Watch project as of July 2021, correct?

23     A.   Yeah.  When you say "the exact state," that's, I
24 think, what I answered to.

25     Q.   Let's take a look at your deposition.  This is

1    page 37, lines 12-15.

2         A.    37?

3         Q.    Page 37, sir.

4               Question.  Are there any documents that show the

5    exact state of the Masimo Watch project as of July 2021?

6               Answer.  I'm not sure.

7               Were you asked that question and did you give

8    that answer?

9         A.    I'm sorry.  That's not -- I don't have that in

10   front of me.  I see on line 12 of the first deposition, it

11   says this is the first time --

12        Q.    I apologize, sir.  It was my mistake there.  This

13   is tab 2.  This is actually your February deposition.  I

14   apologize for the confusion.  If you go to tab 2 in your

15   binder --

16              MS. SWAROOP:  Your Honor, I'll note that the clip

17   was cut off here.  His complete answer is not being shown.

18        Q.    We can scroll down.  That's fine.

19        A.    Page 37; is that correct?

20        Q.    That's right, page 37, lines 12-15.

21        A.    Okay.

22        Q.    Question.  Are there any documents that show the

23   exact state of the Masimo Watch project as of July 2021?

24              Answer.  I'm not sure.  I'm sure there's

25   engineering documents.

1            Were you asked that question and did you give

2     those answers -- that answer?

3            A.    That is correct.

4            Q.    And you did not identify any specific documents

5     at that time, correct?

6            A.    Not my job to have the specific documents for my

7     engineering team, but there are specific documents that are

8     generated by the engineering team.

9            Q.    Now, sir, you didn't go back and check the

10    inventory that existed on the date the complaint was filed,

11    correct?

12           A.    Inventory of what?

13           Q.    Inventory of the Masimo W1 watch.  Correct?

14           A.    I'm sorry.  I wasn't asked to check the

15    inventory.

16           Q.    Sir, you did not check the inventory that existed

17    on the date the complaint was filed, correct?

18           A.    Yeah, I don't think I checked the inventory at

19    that date, no.

20           Q.    You did not attempt to investigate the date for

21    any particular physical product like the ones on the table

22    at your deposition, you did not investigate the date for any

23    particular product, correct?

24           A.    So there was 50 samples of products that you were

25    showing me, and I recall which one happened on which date.

383

1   In my role that's too specific for what I do.

2        Q.   In fact, sir, you didn't attempt to investigate

3   the date for any of them, correct?

4        A.   Correct, for those samples, you're right.

5        Q.   Now you're aware that Masimo first provided a

6   Masimo Watch to Apple during your December deposition,

7   correct?

8        A.   Correct.

9        Q.   But that particular device could not turn on,

10  right?

11       A.   I don't know.

12       Q.   Well, we tried to turn it on at the deposition

13  and it didn't turn on; isn't that right?

14       A.   That is correct.  We were going through whether

15  it was charged or not, and then later my lawyer said that

16  maybe it didn't have software on it at that time.  I'm not

17  sure.

18       Q.   Now the limited market release phase that the

19  Masimo Watch is now in, you provided no details during your

20  direct testimony about customers who have purchased during

21  the limited market release phase, correct?

22       A.   I'm sorry.  Can you repeat the question?

23       Q.   Sure.  With Ms. Swaroop you did not provide any

24  information about the customers that have purchased in that

25  phase, correct?

384

1      A.   Yeah, she didn't ask me about it.

2      Q.   And no information about the number of sales,

3  correct?

4      A.   She did not ask me.

5           MR. MUELLER:  At this point, Your Honor, I am

6  going to go on the Masimo confidential business record, if I

7  could.

8           (Whereupon, the hearing proceeded in confidential

9  session.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3            MS. SWAROOP:  Are we on the public record now?

 4            JUDGE BHATTACHARYYA:  Yes, we are.

 5            MS. SWAROOP:  Thank you, Your Honor.

 6            Mr. Scruggs, do you have a binder with you there

 7    in the room?

 8            THE WITNESS:  Yes, I have a binder.

 9            MS. SWAROOP:  We are ready to proceed.  Before we

10    begin, you're a little soft-spoken, so I would just ask that

11    you try and speak as close to the mic as you can.

12            THE WITNESS:  Sounds good.

13            JUDGE BHATTACHARYYA:  Welcome, Mr. Scruggs.  Do

14    you understand that you are under an obligation to tell the

15    truth here today?

16            THE WITNESS:  Yes, I do.

17                    STEPHEN SCRUGGS,

18            having been first duly sworn and/or affirmed

19    on his oath, was thereafter examined and testified as

20    follows:

21            JUDGE BHATTACHARYYA:  You may proceed, counsel.

22                    DIRECT EXAMINATION

23    BY MS. SWAROOP:

24      Q.   Good morning, Mr. Scruggs.  Could you please

25    state and spell your last name for the record?
```

```
 1        A.   My name is Stephen Scruggs, and my last name is
 2   spelled S-C-R-U-G-G-S.
 3        Q.   Where do you work?
 4        A.   I work at Masimo Corporation.
 5        Q.   How long have you worked there?
 6        A.   I've worked there for almost ten years now.  My
 7   ten-year anniversary will be in July.
 8        Q.   What is your current position at Masimo?
 9        A.   I'm the Director of Sensor Design.
10        Q.   How long have you had that position?
11        A.   I have had that position for a little over a year
12   now.
13             MS. SWAROOP:  I am going to go on the Masimo CBI
14   record for essentially all of Mr. Scruggs' testimony, so I
15   would like to designate the record accordingly.
16             JUDGE BHATTACHARYYA:  Moving to the Masimo
17   confidential record.
18             (Whereupon, the hearing proceeded in confidential
19   session.)
20
21
22
23
24
25
```

1                  O P E N   S E S S I O N

2

3          JUDGE BHATTACHARYYA:  Moving back to the public

4     record.

5                     CROSS-EXAMINATION

6     BY MR. MUELLER:

7          Q.   Good afternoon, Mr. Scruggs.  Nice to meet you.

8     My name is Joe Mueller.  I'd like to ask you a few

9     questions, if I could.

10         A.   Yes, please.

11              MS. SWAROOP:  Mr. Mueller, before we begin, we do

12    have the sealed box.  Would you like Mr. Scruggs to open

13    that?

14         Q.   Yes, please, if you could, sir.

15              MS. SWAROOP:  We'll do the same here.

16         A.   All right.  I have two binders.

17         Q.   Thank you.  Mr. Scruggs, you said you first

18    started working on the Masimo Watch project in 2019,

19    correct?

20         A.   Yes, that's correct.

21         Q.   And by that point there were several years worth

22    of Apple watch models on the market, right, sir?

23         A.   I'm not familiar with when the Apple Watches were

24    put on the market.

25         Q.   Well, you know they were put on the market before

1    2019, correct?

2         A.   I -- yes, I knew that.

3         Q.   And, in fact, sir, you and the engineering team

4    that worked on the Masimo Watch considered the Apple Watch

5    inspect designing the Masimo Watch, correct?

6         A.   Yes, that's correct.

7         Q.   Now at your deposition you were unable to answer

8    questions because of instructions from your lawyers, and I

9    want to just confirm that you were not able to answer

10   certain questions for those reasons.

11        You were not able to answer the question about

12   whether Masimo's counsel in this investigation contributed

13   to any of the ideas in the design of the Masimo Watch,

14   correct?

15        A.   Are you reading from my transcript?

16        Q.   I actually am.  You are not able to answer any

17   question -- you were not able to answer the question whether

18   Masimo's counsel in this investigation contributed ideas to

19   the design of the Apple Watch, correct?

20        MS. SWAROOP:  Mr. Mueller, in view of the judge's

21   ruling, we're not maintaining that instruction, and

22   Mr. Scruggs can answer.

23        MR. MUELLER:  Your Honor, I certainly object to

24   disclosure of what -- if they are now going to permit him to

25   answer a question they instructed him not to answer in fact

439

1  discovery, I object.  I was just trying to make clear that
2  he was not able to answer that question because of a
3  privilege instruction at his deposition.  He certainly
4  shouldn't be now offering an answer he didn't offer then.
5      JUDGE BHATTACHARYYA:  Are you objecting to the
6  question?  I'm not quite sure what you're asking.
7      MS. SWAROOP:  Yes, Your Honor.
8      JUDGE BHATTACHARYYA:  It was an improper
9  question?
10      MS. SWAROOP:  Well, there was an instruction not
11  to answer on grounds of privilege with regard to the
12  evidence that came out at Mr. Scruggs' deposition.
13  Your Honor made a ruling on that.
14      I had instructed Mr. Scruggs not to answer at his
15  deposition on the basis of that privilege issue with regard
16  to that particular testing.
17      Your Honor has ruled that there's no privilege
18  with respect to that.  So if they are going to ask him that
19  question, in view of Your Honor's ruling, we're not
20  maintaining that instruction on privilege.
21      MR. MUELLER:  Well, Your Honor, if I might
22  respond.
23      MS. SWAROOP:  I'm not objecting to the question.
24  I'm just pointing out that he can answer the question.
25      MR. MUELLER:  If I might respond.

440

1          JUDGE BHATTACHARYYA:  Mr. Mueller, I don't think

2     there's a problem with your question, if you want to ask it.

3     The objection is overruled to the extent the objection is to

4     the question Mr. Mueller asked.

5          MR. MUELLER:  To be clear, Your Honor, I'm not

6     going to ask the question if he is now going to offer

7     answers that he didn't offer at his deposition.

8          The motion before Your Honor was to claw back

9     testimony, lots and lots and lots of testimony, that he gave

10    at his deposition, much of which he offered answers to

11    questions that we put to him at his deposition.  That is

12    not -- not what I'm asking him about now.

13         I am asking him a question that he was unable to

14    answer because of a privilege instruction.  And it's too

15    late to waive the privilege now to provide us with

16    information that was not provided during discovery.

17         JUDGE BHATTACHARYYA:  Okay.  You are free to ask

18    him if he was unable at his deposition to answer a question

19    because of a privilege instruction.

20         MR. MUELLER:  That's all I want to do,

21    Your Honor.

22         JUDGE BHATTACHARYYA:  Okay.

23    Q.   Mr. Scruggs, at your deposition you were unable

24    to answer the following question because of an instruction

25    from counsel, and the question was:

```
 1              Did Masimo's counsel in this investigation
 2      contribute to any of the ideas in the design of the Masimo
 3      Watch?
 4              You were unable to answer that question at your
 5      deposition, correct, sir?
 6          A.   If you're referencing my transcript, could I
 7      follow along in my binder?
 8          Q.   You certainly can, sir.  It's tab 1 in your
 9      binder.
10          A.   Okay.
11          Q.   It's page 148, sir, starting at line 4,
12      continuing to line 9.
13              MS. SWAROOP:  Your Honor, the basis for my
14      comment was that --
15              MR. MUELLER:  I apologize.  It's tab 2.
16              THE WITNESS:  Tab 2?
17              MS. SWAROOP:  Mr. Mueller is attempting to draw
18      an adverse inference from the instruction.  I want to make
19      it clear that no counsel in this investigation was involved
20      in the design and development.  So I just would like the
21      record to be clear on that.
22          A.   I'm on tab 2, page 148.  Could you please repeat
23      the line number?
24          Q.   Yes, I can.  Lines 4-9.  And we can put it up on
25      the screen.
```

442

 1          Question.  Did Masimo's counsel in this

 2    investigation contribute to any of the ideas in the design

 3    of the Masimo Watch?

 4          Ms. Swaroop:  I'm going to instruct the witness

 5    not to answer.

 6          The Witness:  I'm not able to answer.

 7          Were you asked that question and did you give

 8    that answer?

 9     A.   Yes, I asked that question and I gave that

10    answer.

11     Q.   And the same was true with respect to the

12    question:  Did Masimo take any steps to ensure its

13    litigation counsel in this investigation would not

14    contribute ideas or influence the design of the Masimo

15    Watch?

16          At your deposition you were not able to answer

17    for the very same reason, correct?

18     A.   Yes, that's correct.

19     Q.   Thank you, sir.  You can put that aside.

20     A.   Okay.

21     Q.   Now you spent, by my count, over an hour of

22    direct testimony going through various materials and images

23    of products, correct, sir?

24     A.   Yes, that's correct.

25     Q.   And you understand, Mr. Scruggs, none of those

1    materials, none of those images, were attached to the

2    amended complaint in this case last July, right?

3         A.    I'm not aware of what was attached.

4         Q.    To the best of your knowledge, sir, none of the

5    devices referred to in your testimony today were referred to

6    in the amended complaint last July, correct?

7         A.    I don't know what was attached to the amended

8    complaint.  I know that those devices have been around.  I

9    know the devices.  I don't know what was attached to the

10   complaint.

11        Q.    In fact, sir, according to your own testimony

12   today, not all of them were around.  Some of them were

13   created after last July, correct?

14        A.    Yes.

15        Q.    Okay.  Now you said that you demonstrated these

16   devices to the technical experts in this case, including

17   Apple's experts and also Dr. Madisetti.  Do I have that

18   right, sir?

19        A.    Yes, that's correct.

20        Q.    Let me show you a demonstrative, RDX-11.2.

21             Before I show it to you, before I put it up, for

22   my next couple of questions, I'm not going to show you any

23   images of these products.  I'm not asking you about the

24   internal workings of them.  In fact, I'm not asking about

25   anything in terms of how they measure blood oxygen readings

444

 1    or measure heart rate.  Okay?  Do you have that in mind?  I
 2    want to stay on the public record here, so I want you to be
 3    careful not to reveal any confidential information.  Okay,
 4    sir?
 5            MS. SWAROOP:  Mr. Mueller, did you provide a copy
 6    of those demonstratives to Complainants or to Mr. Scruggs?
 7    I don't believe I see them in the cross binder that was
 8    given to counsel.
 9            MR. MUELLER:  There's no requirement for cross
10    binders to be given to counsel, sir -- Ms. Swaroop.
11            MS. SWAROOP:  I have a binder with cross exhibits
12    because we actually do have an agreement that two copies
13    would be provided to our team.  I have my cross binder.
14    Mr. Scruggs has his cross binder.
15            My point is, the demonstratives exhibits that
16    you're referring to now do not appear to be in the cross
17    binder.  So I'd like to know if I could have a copy.
18            MR. MUELLER:  We can certainly get you a copy.
19    It was our understanding that demonstratives were not part
20    of the cross binders, the exhibits were, but not the
21    demonstratives, Ms. Swaroop.  We're happy to get you a copy
22    of it too.  It's a single page, and I can put it up right
23    now.  It's RDX-11.2.
24       Q.   Now, again, as I said, Mr. Scruggs, if you could,
25    please, sir, be careful not to talk about any confidential

1    information, because we're on the public record.

2            These are readings taken of the Masimo Watch

3    articles or physicals that you showed to our technical

4    experts, Professors Warren and Sarrafzadeh, during the March

5    14th, 2022 demonstrations.

6            Do you recall that demonstration that day, sir?

7    A.    Yes, I do.

8    Q.    Okay.  And various physicals, as Masimo refers to

9    them, were presented that day by you, right?

10   A.    Yes, that's correct.

11   Q.    Now you handled them yourself, correct?

12   A.    Yes.

13   Q.    You did not permit Apple's experts to themselves

14   operate the devices, take readings on their own bodies,

15   correct?

16   A.    Yes, that's correct.

17   Q.    That is to say, you took the readings and you

18   only let the experts watch once you were satisfied that a

19   reading had been taken, correct?

20   A.    The experts were in the room the whole time

21   during the demonstration, so they could see the entire

22   demonstration.

23   Q.    But, sir, stay with my question.  You only let

24   the experts read the numbers on the devices when you were

25   satisfied with the readings, correct?

446

1      A.   They were able to see the readings the entire

2 time that I was doing the demonstration.

3      Q.   Now they asked you for permission to also use a

4 finger clip sensor as a reference device; isn't that true?

5      A.   I don't recall that.

6      Q.   You didn't permit them to, did you.

7      A.   We did not use a reference device.

8      Q.   By the way, using reference devices, you know

9 what that means, right?

10      A.   Yes, I do.

11      Q.   Using reference devices is using a device to

12 compare the accuracy of one device against another, correct?

13      A.   Yes, that's correct.

14      Q.   It's a very common thing in the industry in which

15 you work, right, sir?

16      A.   I don't know that it's common, but I know that

17 that's done.

18      Q.   And you've done it yourself.

19      A.   I don't know that I've used a reference device on

20 myself.  I know that during clinical studies we'll sometimes

21 use reference devices.

22      Q.   And by "we" you mean Masimo?

23      A.   Yes, that's correct.

24      Q.   Okay.  Now if we look at the data here, we have

25 blood oxygen on the left and pulse rate on the right.  Do

447

1    you see that, sir?

2        A.   Yes.

3        Q.   And there are various numbers, which I will

4    represent to you were recorded by our experts.  You have no

5    reason to quarrel with those numbers, do you?

6        A.   I would think that, if your experts recorded

7    them, that it is likely they were displayed.

8        Q.   And do you see there's lists, CPX numbers, that

9    correspond to various devices, including the ones you

10   testified about earlier?

11       A.   Yes, I see those.

12       Q.   Now these demonstrations were taken where you

13   were sitting at a table, correct?

14       A.   Yes, I was sitting.

15       Q.   And you were there for about 75 minutes.  Do I

16   have that right, sir?

17       A.   I don't remember the specific time, but that

18   sounds about right.

19       Q.   And you were sitting the entire time, correct?

20       A.   Yes, I was sitting during the demonstrations.

21       Q.   And I really don't mean to be flip in my next

22   question.  You didn't go out for a jog midway through, did

23   you.

24       A.   No, I did not go for a jog.

25       Q.   All right.  You remained sitting, correct?

1          A.   Yes.

2          Q.   So let's look at these readings.  On the left we

3     have blood oxygen, and do you see in the top row, the

4     variation was between 95 percent and 99 percent?  Do you see

5     that?

6          A.   Yes, I see those three numbers reported.

7          Q.   Now on the next row down we have a variation of

8     97 to 81.  Do you see that?

9          A.   Mm-hmm.

10         Q.   Now a reading of 81 percent can be cause for

11    concern, correct?

12         A.   I'm not a medical professional, so I don't know

13    what would be cause for concern.

14         Q.   Well, sir, you're one of the leaders of the

15    sensor group at Masimo, aren't you?

16         A.   Yes, of the mechanical design group.

17         Q.   And you understand, sir, that a reading at 81 is

18    a cause for concern of a user of these types of devices,

19    correct?

20         A.   I think I'd want to talk to one of our clinicians

21    or a doctor.

22         Q.   So you don't know one way or the other?

23         A.   I don't know what value would be cause for

24    concern.

25         Q.   Well, you'd agree with me that the difference

 1   between an 81 reading and a 97 reading on the same subject

 2   sitting at the same table is a very significant variation,

 3   isn't it?

 4        A.   I definitely see that that's a variation of 16

 5   percent SpO2.

 6        Q.   That's a poorly functioning blood oxygen sensor,

 7   isn't it.

 8        A.   I don't know that variation of 16 personnel means

 9   that it was poorly performing, but I do see variation.

10        Q.   Do you consider that good performance?

11        A.   I don't think there's enough data here to

12   quantify whether or not it's good or bad performance.

13        Q.   Let's go to the next row.  The next device

14   measured your blood oxygen level at 100 percent, correct?

15        A.   Yes, I see that.

16        Q.   With no variation at all, right?

17        A.   I see that.

18        Q.   Now, in fact, these devices had a cap at 100

19   percent, didn't they.

20        A.   I don't believe the devices display values over

21   100.

22        Q.   So if there was some sort of reading that hit the

23   top of the charts, it's going to be listed as 100 no matter

24   what the particulars, correct?

25        A.   Yes, that's how all pulse oximeters report

450

1   values.

2        Q.   And the next row down has 100, 100, 100, 100,

3   100, right?

4        A.   I see that, yes.

5        Q.   Same with the one below that, correct?

6        A.   Mm-hmm.

7        Q.   And then below that we have 99.4, 100, 100.  Do

8   you see that?

9        A.   Yes, I do.

10       Q.   And then three 98s, right?

11       A.   Yes.

12       Q.   So we have a variation from device to device from

13   81 to 100, correct?

14       A.   Yes.  The reported values here, I see 81 and I

15   CDX-100.

16       Q.   Same person, sitting at the same table, in the

17   same session, there is variation from 81 to 100, correct?

18       A.   Yes, I see that.

19       Q.   Pulse rate, right-hand side of the screen, let's

20   take a look at the readings.

21            First device, 125, 113, 94, correct?

22       A.   Yes.

23       Q.   Now 125 is a pretty high pulse rate, isn't it?

24       A.   Yes.

25       Q.   It would indicate that you might be, in fact,

1    running, at least at a very, very brisk walk, correct?

2         A.   Or stressed, yes.

3         Q.   Or very stressed.  That could be another reason

4    why the heart rate is extremely high, correct?

5         A.   Yes.

6         Q.   Now the next row down we have in the 90s and then

7    as low as 82, correct?

8         A.   Yes, I see that.

9         Q.   And, again, this is you being measured, right?

10        A.   Mm-hmm.

11        Q.   Same person, right, sir?

12        A.   Yes.

13        Q.   Same table, same session.

14        A.   Correct.

15        Q.   The next row down, the device measured your pulse

16   rate at 140 and then 52.  Do you see that?

17        A.   Mm-hmm.  I see that.

18        Q.   140 is a very high pulse rate, correct?

19        A.   Yes.

20        Q.   52 is extremely low.  That's indicative of

21   somebody who might be sleeping or very not stressed,

22   correct?

23        A.   Yes, 52 is lower than 140.

24        Q.   And the device, same device, CPX-052C, measured

25   the same person's pulse rate as 140 and then 52, correct?

1        A.    Yes, at different points in time.

2        Q.    Now there's other numbers listed below for the

3    other devices, correct?

4        A.    I see that.

5        Q.    But, again, if we look at the sum total of these

6    we have variation of 52 to 140 as well as numbers in the

7    90's, 80's, and 100's, correct?

8        A.    I see that variation, yes.

9        Q.    And this variation, again, was the same subject,

10    same session, right?

11        A.    Yes, these values were taken on me during the

12    same session.

13        Q.    And you never once got up, correct?

14        A.    I did not get up.

15            MR. MUELLER:  At this point, Your Honor, we need

16    to go on the Masimo confidential record.

17            (Whereupon, the hearing proceeded in confidential

18    session.)

19

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3              MR. LAQUER:  Good afternoon.

 4              JUDGE BHATTACHARYYA:  Good afternoon.  I see

 5    Mr. Young is before us here.

 6              THE WITNESS:  Good afternoon, Your Honor.

 7              JUDGE BHATTACHARYYA:  Good afternoon.  Do you

 8    understand that the testimony -- that you are under an

 9    obligation to tell the truth in your testimony today?

10              THE WITNESS:  Yes, I do.

11                         MICAH YOUNG,

12              having been first duly sworn and/or affirmed

13    on his oath, was thereafter examined and testified as

14    follows:

15                      DIRECT EXAMINATION

16    BY MR. LAQUER:

17         Q.   Can you please state your name?

18         A.   Micah Young.

19         Q.   What is your job title?

20         A.   I'm Masimo's CFO and Executive Vice President.

21         Q.   When did you join Masimo?

22         A.   In October of 2017.

23         Q.   What's your educational background?

24         A.   I have a Bachelor of Science in accounting as

25    well as Criminal Justice, and that's from Indiana Wesleyan
```

482

1  University, and I earned my CPA shortly thereafter, although

2  I'm currently inactive.

3      Q.   What are your responsibilities as Masimo's CFO

4  and Executive VP?

5      A.   I'm responsible for all aspects of financing,

6  including accounting, financial planning and analysis, tax

7  and investor relations.

8      Q.   How many people does Masimo employ in its

9  financial department?

10      A.   We have just over a hundred employees in the

11  finance department.

12      Q.   And who do you report to?

13      A.   I report directly to Joe Kiani.

14      Q.   Let's look at Complainants' Exhibit 1637, if you

15  could tell me whether you recognize this.

16      A.   Yes, that's our latest Earnings Report for fiscal

17  year 2021.

18      Q.   Let's turn to page 17 of the exhibit.  Could you

19  tell me why did Masimo include the Masimo W1 watch in its

20  2021 Earnings Report here?

21      A.   Well, the Masimo W1 watch is a top priority for

22  the company, and we've invested significant dollars over the

23  years to develop the watch and other wrist-worn devices, and

24  we wanted to also show investors that this is going to

25  become a larger part of our revenue earnings going forward.

1          Q.   Please turn to page 19 of the exhibit.  Can you

2     describe what is shown here?

3          A.   Yes.  This slide shows our Sound United

4     acquisition.  We paid just over a billion dollars for Sound

5     United.  That acquisition closed in April of this year.

6               Sound United is a premium consumer technology

7     leader with premium audio brands like Denon, Marantz, Bowers

8     & Wilkins, as well as Polk Audio, and they have over 20,000

9     points of retail distribution.

10         Q.   And why did Masimo pay over one billion dollars

11    for Sound United?

12         A.   If you look at the next slide, you'll see it's a

13    strategic priority for the company, and if you look

14    underneath cross-leveraging our core competencies and

15    capabilities, you'll see where this acquisition is strategic

16    for us and it helps us bring Masimo W1 watch to consumers

17    and bring it from our technologies from the hospital into

18    the home.

19         Q.   Let's take a look next at Complainants' Exhibit

20    CX-1630.  Let me know whether you recognize this.

21         A.   Yes.  That's our form 10-K for fiscal year 2020,

22    which is ending January 2nd, 2021.

23         Q.   Please turn to page 40 of the exhibit.  The last

24    paragraph there begins with:

25               Continuing technological advances and new product

1    introductions within the medical device industry place our

2    products at risk of obsolescence.  For example, in September

3    2020 Apple Inc. announced that its Apple Watch Series 6

4    includes a pulse oximetry monitoring feature, which may

5    compete with certain of our existing products and products

6    in development, including the consumer versions of our iSpO2

7    and MightySat pulse oximeters.

8            Why did Masimo include that statement in its

9    10-K?

10       A.   Well, at that time Apple just launched the Watch

11   6 Series, and we were concerned that the public would rely

12   on it for pulse oximetry rather than our other pulse

13   oximetry devices we have launched over the years, in

14   addition to the W1 watch that we were -- that we -- had been

15   in development during that time.  So we disclosed it in the

16   10-K as a risk factor at that time.

17           MR. LAQUER:  Your Honor, at this point I'd like

18   to go on Masimo's confidential record in order to discuss

19   CBI.

20           (Whereupon, the hearing proceeded in confidential

21   session.)

22

23

24

25

```
 1                  O P E N   S E S S I O N

 2

 3                      CROSS-EXAMINATION

 4    BY MR. MUELLER:

 5        Q.   Good afternoon, sir.  It's nice to meet you.  My

 6    name is Joe Mueller, and I'd like to ask you a few

 7    questions, if I could.

 8        A.   Yes.  Thank you.

 9        Q.   Let's pull up CX-1630, which was an exhibit that

10    you were asked about during your direct testimony.

11             This is a form 10-K, right, sir?

12        A.   Yes, that's correct.

13        Q.   And let's take a look at page 40, which I think

14    was the same page you were asked about.  And I want to focus

15    in on the same section that you were asked about, about

16    potential competition with MightySat --

17        A.   Okay.

18        Q.   -- and iSpO2.  Do you recall that, sir?

19        A.   Yes.

20        Q.   In particular, there's a reference to the Apple

21    Watch Series 6 potentially competing with those products.

22    Do you see that?

23        A.   Yes, I see that.

24        Q.   Now you understand neither iSpO2 nor the

25    MightySat is a domestic industry product in this case?
```

1        A.    Okay.  Yes.

2        Q.    And there's no reference here to the rainbow«

3   sensors, correct?

4        A.    Not in that line.

5        Q.    Right.  There's no reference to the rainbow«

6   sensors competing with the Apple Watch, correct?

7        A.    There's no reference in that document, no.

8        Q.    And, in fact, there is no competition between the

9   rainbow« sensors and the Apple Watch, correct?

10        A.    I can't answer that.

11        Q.    Now the Masimo Watch right now is in something

12   called the limited market release phase, correct?

13        A.    Yes, correct.

14        Q.    It's not on the open commercial marketplace yet,

15   correct?

16        A.    Yes.

17        Q.    There's no competition between Apple and Masimo

18   with respect to the Apple Watch and the Masimo Watch in the

19   open commercial marketplace today, correct?

20        A.    We've limited released it in the Middle East.

21        Q.    Right.  Not to the open commercial marketplace in

22   the U.S. or anywhere else in the world, correct?

23        A.    Correct.

24        Q.    Now today, as of today, in this limited market

25   release phase, what are the total revenues to Masimo for the

514

1    Masimo Watch?

2        A.   I don't have that number.  You'd have to get that

3    from Bilal Muhsin or his team.

4        Q.   Well, sir, you're the Chief Financial Officer,

5    correct?

6        A.   Correct.

7        Q.   You just spent over a half hour giving us various

8    numbers, correct?

9        A.   Correct.

10       Q.   And you don't know the revenues of the Masimo

11   Watch as of today; is that right?

12       A.   We're in a limited release, and at this point

13   it's not material to overall numbers.

14       Q.   Less than a thousand dollars?

15       A.   I can't give you a number on that.

16       Q.   You don't know one way or the other if the total

17   revenues for the Masimo Watch as of today are less than a

18   thousand dollars, correct?

19       A.   I don't know that at this time.

20            MR. MUELLER:  At this point, Your Honor, we'll go

21   on the confidential Masimo record, if we could.

22            (Whereupon, the hearing proceeded in confidential

23   session.)

24

25

```
 1                    O P E N   S E S S I O N

 2

 3              JUDGE BHATTACHARYYA:  Good afternoon,

 4   Mr. Hammarth.

 5              THE WITNESS:  Good afternoon.

 6              JUDGE BHATTACHARYYA:  Do you understand that

 7   you're under an obligation to tell the truth in your

 8   testimony here today?

 9              THE WITNESS:  Yes, I do.

10                    JEROEN HAMMARTH,

11              having been first duly sworn and/or affirmed

12   on his oath, was thereafter examined and testified as

13   follows:

14              JUDGE BHATTACHARYYA:  Thank you.

15                    DIRECT EXAMINATION

16   BY MR. LAQUER:

17         Q.   Could you please state your name?

18         A.   My name is Jeroen Hammarth.

19         Q.   What is your job title?

20         A.   I'm the CFO of Cercacor Labs.

21         Q.   How long have you been Cercacor's CFO?

22         A.   Since January of 2013.

23              MR. LAQUER:  Your Honor, I'd like to go on to

24   Complainants' confidential record in order to discuss CBI.

25              (Whereupon, the hearing proceeded in confidential
```

1    session.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  O P E N   S E S S I O N

 2

 3            JUDGE BHATTACHARYYA:  Moving back to the public

 4   record.

 5            MR. COX:  I'm sorry.  Let's take down the

 6   exhibit.  Thank you.

 7   BY MR. COX:

 8       Q.   You'll agree with me, Mr. Hammarth, that

 9   Cercacor's R&D includes R&D for clinical products, like

10   rainbow« sensors, correct?

11       A.   Yes.

12       Q.   And you'll agree that rainbow« sensors are kinds

13   of sensors used with external monitoring devices, right?

14       A.   Sure.  Yes.

15       Q.   And those clinical products are used in places

16   like hospitals and doctors' offices, correct?

17       A.   Masimo products do, yes.

18       Q.   That's right.  And those clinical products, like

19   rainbow«, are not the same as consumer wearable products,

20   correct?

21       A.   Well, that's really not for me to make a

22   determination, right.  Quite a lot in the market, we're

23   seeing a convergence between consumer products and medical

24   products, so I'm not sure that I can really answer that

25   question.
```

531

1     Q.   Okay.  So it's your understanding that a rainbow«

2     sensor used in an external monitoring device would be

3     considered a consumer wearable product; is that your

4     testimony?

5     A.   No.  What I'm saying is that I don't know if I'm

6     qualified to say what the difference is between a wearable

7     clinical product and a consumer wearable product.

8     Q.   Okay.  But you wouldn't go jogging while wearing

9     a rainbow« sensor with an external monitor, right?

10    A.   Well, if I was wearing a continuous glucose

11    monitor, I could go jogging with that on, and that is a

12    clinical product that's wearable.

13    Q.   You wouldn't go for a swim while wearing a

14    rainbow« sensor with an external monitor; is that right?

15    A.    Well, if it was waterproof -- I don't know.  See,

16    you're asking me for an opinion on the difference between a

17    clinical product and a consumer product, and, like I said,

18    I'm not sure that the market is going in that direction

19    where there's going to be such a clear delineation.  I'm

20    probably not the right person to ask that question to.

21    Q.   Very well.  Thank you very much, Mr. Hammarth.

22         MR. COX:  No further questions.

23         MR. LAQUER:  Very briefly.

24

25

```
 1                    REDIRECT EXAMINATION

 2   BY MR. LAQUER:

 3       Q.   Apple's counsel just asked you about product

 4   categories and uses.

 5            Are you familiar with the Ember« product?

 6       A.   Yes.

 7       Q.   Can you explain very briefly what that is?

 8       A.   Yeah.  Ember is our product, which incorporates

 9   our technologies for hemoglobin measurement, carbon monoxide

10   measurement, and some others, that's marketed to

11   individuals, consumers, who are mainly elite athletes to

12   measure their physiological parameters to help them with

13   their training.

14            MR. LAQUER:  I have no further questions.

15            MR. COX:  Just a brief recross, Your Honor, on

16   the questions that were just asked.

17                    RECROSS-EXAMINATION

18   BY MR. COX:

19       Q.   You just mentioned Cercacor's Ember« products; is

20   that right?

21       A.   Yes.

22       Q.   Those are -- those Ember« products are Cercacor's

23   one and only product, correct?

24       A.   That is our current one and only product that we

25   sell today, yes.
```

1      Q.   You'll agree that the Ember« is a small, niche

2  product, right?

3      A.   It is.  It is marketed to elite athletes, who do

4  things like marathons, Tour de France type of stuff, Ironman

5  Triathlons, those kinds of things, yes.

6      Q.   Approximately how many Ember« units does Cercacor

7  sell every year?

8      A.   Oh, in a given year, between 30 and 50.

9      Q.   That's 30 and 50, not 30 and 50,000, right?

10      A.   I'm talking about units, yes.

11      Q.   Okay, 30 and 50 units.

12           MR. COX:  No further questions.  Thank you.

13           MR. LAQUER:  I have no further questions.

14           JUDGE BHATTACHARYYA:  Thank you, Mr. Hammarth.

15           THE WITNESS:  Thank you.

16           MR. LAQUER:  Complainants next call Daniel

17  McGavock.

18           JUDGE BHATTACHARYYA:  Good afternoon,

19  Mr. McGavock.

20           THE WITNESS:  Good afternoon.

21           JUDGE BHATTACHARYYA:  Do you understand you're

22  under an obligation to tell the truth in your testimony here

23  today?

24           THE WITNESS:  Yes, I am.

25                    DANIEL M. MCGAVOCK,

534

```
 1              having been first duly sworn and/or affirmed
 2   on his oath, was thereafter examined and testified as
 3   follows:
 4              JUDGE BHATTACHARYYA:  Thank you.
 5                      DIRECT EXAMINATION
 6   BY MR. LAQUER:
 7        Q.   Could you state your name?
 8        A.   Daniel M. McGavock.
 9        Q.   What do you do professionally?
10        A.   I'm a vice president at Charles River Associates,
11   and I'm the practice leader of the intellectual property
12   practice, and I specialize in financial and economic
13   consulting, primarily focused on intellectual property
14   matters, both in litigation context as well as outside of
15   litigation for strategy and transactional purposes.
16        Q.   Could you briefly describe your educational
17   background?
18        A.   Yes.  I earned a Bachelor of Science degree in
19   accounting from Indiana University in 1984, and I'm also a
20   certified public accountant.  I've been a CPA since 1985.
21        Q.   Do you have prior experience in ITC
22   investigations?
23        A.   Yes, I do.  I've worked on several investigations
24   on behalf of both Complainants and Respondents.
25              MR. LAQUER:  Your Honor, Complainants proffer
```

1    Mr. McGavock as an expert on financial matters, including

2    economic, domestic industry, bond, and commercial success.

3            MR. MUELLER:  No objection, Your Honor.

4            JUDGE BHATTACHARYYA:  At this time Mr. McGavock

5    is admitted as an expert in financial matters, including

6    economic, domestic industry, bond, and commercial success.

7        Q.   Mr. McGavock, do you have an opinion regarding

8    the economic prong of domestic industry requirement in this

9    investigation?

10       A.   Yes.  It's my opinion that Masimo's domestic

11   investments in plant and equipment as well as labor or

12   capital are both quantitatively and qualitatively

13   significant in accordance with the requirements of section

14   337.

15       Q.   What work did you do in preparing your opinion?

16       A.   Well, I first -- I gained an understanding of the

17   patents and the products at issue, and then I also gained a

18   thorough understanding of the appendices that Mr. Young went

19   through in detail, and the sources of the information, how

20   the information was compiled, and I also did some

21   independent research.

22       Q.   Did you consider Mr. Hammarth's appendix also?

23       A.   Yes, I did.

24       Q.   All right.  And can you describe your independent

25   research?

1        A.   Yes.  Well, one of the, I think, most important

2   elements of my work was to actually visit the domestic

3   facilities where the research and development activities are

4   taking place in Irvine, not only research and development,

5   but manufacturing activities as well.

6            (Whereupon, the hearing proceeded in confidential

7   session.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

582

```
 1                    C O N T E N T S

 2                  INDEX OF WITNESSES

 3
                                     RE-    RE-
    WITNESS               DIRECT CROSS DIRECTCROSS

 5  AMMAR AL-ALI,...............313,   330

 6                        313

 7  BILAL MUHSIN,...............342    362

 8  STEPHEN SCRUGGS,...........390     437   472   478

 9  MICAH YOUNG,................481    512

10  JEROEN HAMMARTH,............521    526   532   532

11  DANIEL M. MCGAVOCK,.........534    552   573   576

12

13

14

15  AFTERNOON SESSION                        428

16

17

18  CONFIDENTIAL SESSIONS    294-300    385-389    523-529

19                          302-329    392-436    537-582

20                          337-340    453-480

21                          344-355    485-511

22                          358-361    515-520

23

24

25
```

583

```
 1    COMPLAINANTS' TABLE OF ADMITTED EXHIBITS FOR THE EVIDENTIARY

 2    HEARING ON JUNE 6, 2022

 3             JOE KIANI

 4             CX-0364C

 5             CX-0612C

 6             CX-0691

 7             CX-0777

 8             CX-0783C

 9             CX-1370

10             CX-1371

11             CX-1378

12             CX-1482C

13             CX-1483C

14             CX-1493C

15             CX-1511C

16             CX-1512C

17             CX-1520C

18             CX-1539C

19             CX-1586

20             CX-1612C

21             CX-1615C

22             CPX-0139aC

23             CPX-0139C

24             CPX-0140aC

25             CPX-0140C
```

| 1  | CPX-0161     |
|----|--------------|
| 2  | CPX-0161a    |
| 3  | JX-001       |
| 4  | JX-002       |
| 5  | JX-003       |
| 6  | RX-1467      |
| 7  | RX-0333      |
| 8  | MOHAMED DIAB |
| 9  | JX-007       |
| 10 | CPX-0152C    |
| 11 | CX-0342C     |
| 12 | CX-0388C     |
| 13 | CX-0397C     |
| 14 | CX-0426C     |
| 15 | CX-0427C     |
| 16 | CX-0430C     |
| 17 | CX-0440C     |
| 18 | CX-0454C     |
| 19 | CX-0584C     |
| 20 | CX-0588C     |
| 21 | CX-0589C     |
| 22 | CX-0590C     |
| 23 | CX-0596C     |
| 24 | CX-0678      |
| 25 | CX-0782C     |

```
 1          CX-0797C

 2          CX-0816C

 3          CX-0818C

 4          CX-1635C

 5          AMMAR AL-ALI

 6          CX-0004

 7          CX-0352C

 8          CX-0355C

 9          CX-0356C

10          CX-0357C

11          CX-0370C

12          CX-0375C

13          CX-0378C

14          CX-0433C

15          CPX-0022C

16          CPX-0022aC

17          CPX-0052aC

18          CPX-0052C

19          CPX-0054aC

20          CPX-0054C

21          CPX-0056C

22          CPX-0056aC

23          COMPLAINANTS' DEPOSITION DESIGNATIONS AND

24           EXHIBITS

25          David Amor - CX-0273C
```

| 1  | CX-0266C                   |
|----|----------------------------|
| 2  | CX-0267C                   |
| 3  | CX-0269C                   |
| 4  | Ueyn Block - CX-0281C      |
| 5  | CX-0057C                   |
| 6  | CX-0058C                   |
| 7  | CX-0059C                   |
| 8  | CX-0060C                   |
| 9  | CX-0007C                   |
| 10 | CX-0067                    |
| 11 | CX-0061C                   |
| 12 | CX-0103                    |
| 13 | CX-0062C                   |
| 14 | CX-0063C                   |
| 15 | CX-0064C                   |
| 16 | CX-0068C                   |
| 17 | CX-0069C                   |
| 18 | CX-0070C                   |
| 19 | CX-0071C                   |
| 20 | CX-0072C                   |
| 21 | CX-0073C                   |
| 22 | CX-0104C                   |
| 23 | CX-0106C                   |
| 24 | CX-0011C                   |
| 25 | CX-0109C                   |

587

```
 1          CX-0110C

 2          CX-0111C

 3          CX-0112C

 4          CX-0114C

 5          CX-0103

 6          CX-0118

 7          Diedre Caldbeck - CX-0275C

 8          CX-0240C

 9          CX-0241C

10          CX-0242

11          CX-0244

12          CX-0245C

13          Mathieu Charbonneua-Lefort - CX-0283C

14          CX-0100C

15          CX-0022C

16          CX-0023C

17          CX-0024C

18          CX-0025C

19          CX-0026C

20          CX-0011C

21          CX-0027C

22          CX-0028C

23          CX-0031C

24          CX-0032C

25          CX-0033C
```

```
 1          CX-0035C

 2          CX-0037C

 3          CX-0038C

 4          CX-0039C

 5          Aditya Dua - CX-0285C

 6          CX-0092C

 7          CX-0094C

 8          CX-0096C

 9          CX-0098C

10          CX-0100C

11          Brian Land - CX-0287C

12          CX-0175C

13          CX-0006C

14          Paul Mannheimer - CX-0289C

15          CX-0007C

16          CX-0010

17          CX-0011C

18          CX-0012C

19          Saahil Mehra - CX-0291C

20          CX-0189C

21          CX-0190C

22          CX-0191C

23          CX-0192C

24          CX-0068C

25          CX-0069C
```

| | |
|---|---|
| 1 | CX-0070C |
| 2 | CX-0071C |
| 3 | CX-0072C |
| 4 | CX-0073C |
| 5 | CX-0105C |
| 6 | CX-0193C |
| 7 | CX-0106C |
| 8 | CX-0194C |
| 9 | CX-0107C |
| 10 | CX-0195C |
| 11 | CX-0100C |
| 12 | CX-0196C |
| 13 | CX-0197C |
| 14 | CX-0011C |
| 15 | CX-0111C |
| 16 | CX-0198C |
| 17 | RX-0294C (Dep. Ex. 108) |
| 18 | CX-0199C |
| 19 | CX-0201C |
| 20 | CX-0202C |
| 21 | CX-0203C |
| 22 | CX-0110C |
| 23 | CX-0205C |
| 24 | CX-0206C |
| 25 | CX-0207C |

```
 1          CX-0208C

 2          CX-0209C

 3          CX-0210C

 4          CX-0211C

 5          CX-0212C

 6          CX-0213C

 7          CX-0214C

 8          CX-0215C

 9          Mark Rollins - CX-0293C

10          CX-0051C

11          CX-0128C

12          CX-0129C

13          CX-130C

14          RX-0928C (Depo. Ex. 131)

15          CX-0132C

16          CX-0133C

17          CX-0134C

18          CX-0135C

19          CX-1216C (Depo. Ex. 136C)

20          CX-0137

21          Robert Rowe - CX-0279C

22          Tao Shui - CX-0295C

23          CX-0013C

24          CX-0014C

25          CX-0015C
```

```
 1          CX-0016C

 2          CX-0017C

 3          Vivek Venugopal - CX-0297C

 4          CX-0051C

 5          CX-0052C

 6          CX-0053C

 7          CX-0054C

 8          CX-0055C

 9          CX-0056C

10          CX-0057C

11          CX-0059C

12          CX-0061C

13          CX-0062C

14          CX-0063C

15          CX-0067C

16          CX-0068C

17          CX-0069C

18          CX-0074C

19          Stephen Waydo - CX-0299C

20          CX-0100C

21          RX-0678C (Depo. Ex. 120)

22          CX-0123C

23          CX-0051C

24          CX-0125C

25          CX-0126C
```

```
 1          CX-0127C
 2          Asserted Patents, File Histories, and Assignments
 3          (Category A)
 4          JX-001
 5          JX-002
 6          JX-003
 7          JX-004
 8          JX-005
 9          JX-006
10          JX-007
11          JX-008
12          JX-009
13          JX-010
14          CX-1266
15          CX-1267
16          CX-1268
17          CX-1269
18          CX-1270
19          Related Patent File Histories (Category B)
20          CX-1422
21          CX-1425
22          CX-1429
23          CX-1456
24          CX-1459
25          CX-1621
```

```
 1          CX-1622

 2          CX-1623

 3          CX-1760

 4          Stipulations (Category C)

 5          CX-0128C

 6          CX-1259C

 7          EDIS Dkt. No. 770692

 8          Apple's Interrogatories and Admissions

 9          (Category D)

10          CX-1254C

11          CX-1228C

12          CX-1216C

13          CX-1248C

14          CX-1221C

15          CX-1200C

16          CX-1231C

17          CX-1226C

18          CX-1230C

19          CX-1204C

20          CX-1225C

21          CX-1250C

22          CX-1229C

23          CX-1217C

24          CX-1228C

25          CX-1227C
```

```
 1          CX-1257C

 2          CX-1256C

 3          Physicals of the Apple Watch Series 6 and

 4          Series 7 and Components Thereof (Category G)

 5          CPX-0160

 6          CPX-0160a

 7          CPX-0161

 8          CPX-0161a

 9          CPX-0162

10          CPX-0162a

11          CPX-0163

12          CPX-0163a

13          CPX-0166

14          CPX-0166a

15          CPX-0167

16          CPX-0167a

17          CPX-0168C

18          CPX-0168aC

19          CPX-0169C

20          CPX-0169aC

21          CPX-0170C

22          CPX-0170aC

23          CPX-0171C

24          CPX-0171aC

25          CPX-0172C
```

```
 1          CPX-0172aC

 2          CPX-0173C

 3          CPX-0173aC

 4          CPX-0174C

 5          CPX-0174aC

 6          CPX-0175C

 7          CPX-0175aC

 8          CPX-0176C

 9          CPX-0176aC

10          CPX-0177C

11          CPX-0177aC

12          CPX-0178C

13          CPX-0178aC

14          CPX-0179C

15          CPX-0179aC

16          CPX-0180C

17          CPX-0180aC

18          CPX-0181C

19          CPX-0181aC

20

21

22

23

24

25
```

596

```
 1                    C E R T I F I C A T E

 2   TITLE: CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES

 3   AND COMPONENTS THEREOF

 4   INVESTIGATION NO.:  337-TA-1276

 5   HEARING DATE:  June 7, 2022

 6   LOCATION:  Washington, D.C. - Remote

 7   NATURE OF HEARING:  Evidentiary Hearing

 8           I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
 9   above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:    June 7, 2022
     Signed:
11   ss//

12   Signature of the Contractor or the Authorized Contractor's
     Representative
13
             I hereby certify that I am not the court reporter
14   and that I have proofread the above-referenced transcript of
     the proceedings of the U.S. International Trade Commission
15   against the aforementioned court reporter's notes and
     recordings for accuracy in transcription in the spelling,
16   hyphenation, punctuation and speaker identification and did
     not make any changes of a substantive nature.  The
17   foregoing/attached transcript is a true, correct and
     complete transcription of the proceedings.
18   Signed:

19   ss//      Raymond G. Brynteson

20
             I hereby certify that I reported the
21   above-referenced proceedings of the U.S. International Trade
     Commission and caused to be prepared from my record media
22   and notes of the proceedings a true, correct and complete
     verbatim recording of the proceedings.
23   Signed:

24   ss//      Linda Kinkade

25
```

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

---

```
-------------------------------x
In the Matter of                 Investigation No.

CERTAIN LIGHT-BASED PHYSIOLOGICAL   337-TA-1276

MEASUREMENT DEVICES AND COMPONENTS

THEREOF

-------------------------------x
```

**REVISED AND CORRECTED TRANSCRIPT**

**OPEN SESSIONS**

```
Pages:    597 through 861 (with excerpts)y

Place:    Washington, D.C.

Date:     June 8, 2022
```

---

## HERITAGE REPORTING CORPORATION

*Official Reporters*

1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

597

1          UNITED STATES INTERNATIONAL TRADE COMMISSION

2                         Washington, D.C.

3             Before the Honorable Monica Bhattacharyya

4                      Administrative Law Judge

5

6     -------------------------------x

7     In the Matter of                    Investigation No.

8

9     CERTAIN LIGHT-BASED PHYSIOLOGICAL    337-TA-1276

10    MEASUREMENT DEVICES AND COMPONENTS

11    THEREOF

12    -------------------------------x

13

14

15                      EVIDENTIARY HEARING

16                   Wednesday, June 8, 2022

17                         Volume III

18

19

20         The parties met via remote videoconferencing

21    pursuant to notice of the Administrative Law Judge at 9:30

22    a.m. Eastern.

23

24

25    Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

```
 1   A P P E A R A N C E S:
 2   [All parties appeared via remote videoconferencing and/or
 3   telephonically.]
 4
 5   Counsel for Complainants Masimo Corporation and Cercacor
 6   Laboratories, Inc.:
 7            KNOBBE, MARTENS, OLSON & BEAR, LLP
 8            2040 Main Street, Fourteenth Floor
 9            Irvine, California 92614
10            (949) 760-0404
11                Stephen C. Jensen, Esq.
12                Joseph R. Re, Esq.
13                Sheila N. Swaroop, Esq.
14                Ted M. Cannon, Esq.
15                Kendall M. Loebbaka, Esq.
16                Douglas B. Wentzel, Esq.
17                Irfan A. Lateef, Esq.
18                Brian C. Claassen, Esq.
19                Daniel C. Kiang, Esq.
20                Douglas B. Wentzel, Esq.
21
22
23
24
25   CONTINUED ON FOLLOWING PAGE
```

```
 1    A P P E A R A N C E S (continued):

 2

 3    Counsel for Complainants Masimo Corporation and Cercacor

 4    Laboratories, Inc.:

 5            KNOBBE, MARTENS, OLSON & BEAR, LLP

 6            1717 Pennsylvania Avenue, NW, Suite 900

 7            Washington, DC 20006

 8            (202) 640-6400

 9                  Jonathan E. Bachand, Esq.

10

11            KNOBBE, MARTENS, OLSON & BEAR, LLP

12            925 4th Avenue, Suite 2500

13            Seattle, Washington 98104

14            (206) 405-2000

15                  Carol Pitzel Cruz, Esq.

16

17

18

19

20

21

22

23

24

25    CONTINUED ON FOLLOWING PAGE
```

```
 1    A P P E A R A N C E S (continued):

 2

 3    Counsel for Respondent Apple Inc.:

 4            WILMER CUTLER PICKERING HALE AND DORR LLP

 5            1875 Pennsylvania Avenue, NW

 6            Washington, DC 20006

 7            (202) 663-6000

 8                    Michael D. Esch, Esq.

 9                    David L. Cavanaugh, Esq.

10

11            WILMER CUTLER PICKERING HALE AND DORR LLP

12            2600 El Camino Real, Suite 400

13            Palo Alto, California 94306

14            (650) 858-6000

15                    Mark D. Selwyn, Esq.

16

17

18

19

20

21

22

23

24

25    CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Respondent Apple Inc.:

 4           WILMER CUTLER PICKERING HALE AND DORR LLP

 5           60 State Street

 6           Boston, Massachusetts 02109

 7           (617) 526-6000

 8                   Joseph J. Mueller, Esq.

 9                   Richard Goldenberg, Esq.

10                   Sarah R. Frazier, Esq.

11                   Jonathan A. Cox, Esq.

12                   Nina Garcia, Esq.

13                   Cynthia D. Vreeland, Esq.

14

15

16           WILMER CUTLER PICKERING HALE AND DORR LLP

17           1225 17th Street, Suite 2600

18           Denver, Colorado 80202

19           (720) 598-3459

20                   Ravi S. Deol, Esq.

21

22

23

24

25       CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Respondent Apple Inc.:

 4           WILMER CUTLER PICKERING HALE AND DORR LLP

 5           350 South Grand Avenue, Suite 2400

 6           Los Angeles, California 90071

 7           (213) 443-5300

 8                Derek Gosma, Esq.

 9

10

11

12

13

14

15

16

17           *** Index appears at end of transcript ***

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S
 2              (In session at 9:30 a.m.)
 3           JUDGE BHATTACHARYYA:  Good morning.  We're back
 4    on the record.  Let's start on the public record.  Is there
 5    any housekeeping to take care of before we begin?
 6           MS. SWAROOP:  Your Honor, we do have a table of
 7    admitted exhibits.  I think we're just waiting on Apple to
 8    confirm some of the final descriptions and then that should
 9    be ready to go.  Apart from that Complainants have no
10    further housekeeping and we're ready to begin with the
11    examination of Mr. Goldberg, which will be conducted by
12    Mr. Lateef.
13           MR. MUELLER:  Good morning, Your Honor.  Joe
14    Mueller on behalf of Apple.  Just a couple of quick things.
15              We have two objections to some Goldberg testimony
16    and exhibits.  Mr. Selwyn could address those briefly now,
17    Your Honor, if Your Honor pleases, or we can wait until the
18    testimony, whatever your preference is.
19           JUDGE BHATTACHARYYA:  Why don't we do that
20    argument now.  It could be that I would defer ruling until
21    the testimony, but I would like to hear argument.
22           MR. MUELLER:  Thank you, Your Honor.  Mr. Selwyn
23    will do this.
24           MR. SELWYN:  Good morning, Your Honor.
25           JUDGE BHATTACHARYYA:  Good morning.
```

```
 1        MR. SELWYN:  We have two objections with respect
 2   to Mr. Goldberg's anticipated testimony, which I'll briefly
 3   state.
 4        First, it appears that Masimo intends to admit
 5   Mr. Diab's deposition testimony through Mr. Goldberg.  We
 6   object to that.  Mr. Diab was present for the hearing and
 7   Masimo could have elicited any relevant testimony during his
 8   examination.  The rules don't permit a party to use a
 9   deposition of its own witness in support of itself where the
10   witness was available.
11        And, second, it appears that Masimo intends to
12   offer more than 20 exhibits through Mr. Goldberg for which
13   he was never identified as a sponsoring witness.  If it were
14   just a couple of exhibits, we could overlook that, but it's
15   more than 20.  We didn't have the notice that the ground
16   rules require and we object.
17        JUDGE BHATTACHARYYA:  Mr. Lateef, is it?
18        MR. LATEEF:  Yes, that's correct.
19        JUDGE BHATTACHARYYA:  Okay.
20        MR. LATEEF:  Thank you, Your Honor.  Last night
21   we had emailed Mr. Selwyn's team and said that Masimo does
22   not seek to admit the Diab deposition into testimony, so I'm
23   not sure why he is maintaining that objection.
24        MR. SELWYN:  I'm making that objection because
25   the note indicated that Masimo intended to rely upon his
```

1    deposition testimony.  So it was not at all evident how that

2    was going to be used.

3            If Mr. Goldberg will just say I considered it as

4    part of all the deposition testimony in the case, we have no

5    problem with that, but if the intent is to use Mr. Goldberg

6    in order to offer deposition designations from Mr. Diab,

7    then we object.

8            MR. LATEEF:  I think our position was clear that

9    we're not admitting it into evidence, so I think this

10   objection should be overruled.

11           JUDGE BHATTACHARYYA:  Mr. Lateef, could you

12   describe how you intend to -- what the witness is going to

13   say in terms of Mr. Diab's testimony?

14           MR. LATEEF:  I considered --

15           JUDGE BHATTACHARYYA:  Deposition testimony.

16           MR. LATEEF:  I considered Mr. Diab's deposition

17   testimony.

18           JUDGE BHATTACHARYYA:  Is he going to describe

19   Mr. Diab's deposition testimony?

20           MR. LATEEF:  No.

21           JUDGE BHATTACHARYYA:  Based on that

22   representation, the objection is overruled at this time.

23           With respect to the exhibits?

24           MR. LATEEF:  I don't know what exhibits he is

25   talking about.  They were not -- there was no objection when

1    we gave him the list of exhibits two days ago.

2          MR. SELWYN:  I don't think that's right,

3    Your Honor.  We did object to exhibits for which

4    Mr. Goldberg is apparently going to be the sponsor for which

5    there was never an indication that he would be the

6    sponsoring witness.  As I say, there are more than 20 in

7    that category.

8          JUDGE BHATTACHARYYA:  Can you tell me the

9    timeline of what happened?  When were the --

10         Mr. Lateef, do you agree that Mr. Goldberg wasn't

11   listed as a sponsoring witness for these exhibits?

12         MR. LATEEF:  I don't know what exhibits he is

13   talking about.

14         JUDGE BHATTACHARYYA:  The parties need to meet

15   and confer about this.  The parties were supposed to meet

16   and confer on these kinds of issues --

17         MR. LATEEF:  We've had about three exchanges of

18   emails about Goldberg's slides, and I don't recall there

19   being mention of any exhibits being objected to.  There was

20   a meet-and-confer on Monday evening about exhibits, and I

21   did not see further correspondence about that.

22         MR. SELWYN:  Your Honor, we did object at that

23   time, and it was not cured.  They were not removed from the

24   list.  I can lead the list, if Your Honor pleases.

25         JUDGE BHATTACHARYYA:  When did you tell

1    Mr. Lateef's team that you were objecting to those exhibits?

2              MR. SELWYN:  It would have been Monday evening.

3              MR. LATEEF:  All of the documents have already

4    been admitted as far as I can tell through the depositions

5    of Apple's witnesses that were admitted yesterday.

6              MR. SELWYN:  We checked that, Your Honor, and

7    that's true as to some, but there's still more than 20 that

8    were not.

9              MR. LATEEF:  I'd like to see that list of 20 that

10   he is maintaining are objected to.

11             MR. SELWYN:  I'll read it Your Honor.  CX-11C,

12   CX-12C, 15C, 25C, 57C, 59C, 100C, 105C, 111C, 193C, 195C,

13   198C, 199C, 206C, 211C, 215C, 280C, 282C, 290C and 298C.

14             JUDGE BHATTACHARYYA:  Mr. Selwyn, do you have a

15   copy of the email where you provided notice of your

16   objections to these exhibits?

17             MR. SELWYN:  We're locating it, Your Honor.

18             JUDGE BHATTACHARYYA:  Thank you.

19             MR. SELWYN:  I thing we're going to try to

20   display it on the screen, Your Honor.

21             JUDGE BHATTACHARYYA:  Okay.  I guess a further

22   question I have for the parties is, to the extent -- are

23   these major documents such that we need to rule on this

24   right now, or could this be addressed later?

25             MR. SELWYN:  Your Honor, we don't know how

1    they're going to be used in the examination.

2         So here was the email that we sent.  If we scroll

3    up, I believe we will see the first objection.

4         At the time, Your Honor, nearly all of his

5    exhibits were not admitted and he was not listed as a

6    sponsoring witness.  As Mr. Lateef points out, some have

7    since been admitted but more than 20 have not and he was not

8    listed as a sponsor.

9         MR. LATEEF:  I don't see a list of 20 here.  I

10   don't see a list of any exhibits here.  I've gone through at

11   least the first three exhibits that Mr. Selwyn mentioned.

12   They are all in the record as of yesterday morning.

13        For example, Exhibit 11 came in through the

14   deposition testimony of Dr. Mehra yesterday.  Exhibit 57

15   came in through the deposition testimony of Dr. Venugopal

16   Gopal.  100 came in through the deposition testimony of

17   Dr. Mehra.  Exhibit 111 came in through the deposition

18   testimony of Dr. Mehra.  Exhibits 12, 15, and 25 have also

19   come in through the deposition testimony of various Apple

20   witnesses.  Exhibit 59 came in through the deposition

21   testimony of Ueyn Block.  Exhibit 59 came in through the

22   deposition testimony of Ueyn Block.  Exhibit 3 -- Exhibit

23   211 came in through the deposition testimony of Dr. Mehra.

24        MR. SELWYN:  Your Honor, just to short-circuit

25   it, we obviously have a discrepancy.  If we could go offline

1    to resolve it.

2            MR. LATEEF:  No, you brought this up, and I

3    clearly indicated that they are in the record.

4            JUDGE BHATTACHARYYA:  Do you want to continue

5    with your -- complete your list, Mr. Lateef, and then I

6    think we should take a break and the parties can discuss

7    what they want to do.

8            Mr. Lateef, did you have further --

9            MR. LATEEF:  I haven't seen this list of 20

10   exhibits, and I would -- I'd like to proceed with the

11   witness at this time.

12           JUDGE BHATTACHARYYA:  All right.  But I have not

13   ruled on the objections.  Mr. Lateef, if I don't rule on

14   them now, if we defer this to a later point, it could be

15   that some of the testimony will be subject to motion to

16   strike.  Is that okay with you?

17           MR. LATEEF:  Okay.  Let's take the break.

18           Are those all your objections, Mr. Selwyn?

19           MR. SELWYN:  Yes, that would complete our

20   objections to anticipated testimony.

21           MR. LATEEF:  And are you removing your objections

22   to 11, 57, 100, 111?

23           MR. SELWYN:  As I say, that's or objections to

24   the anticipated testimony.

25           MR. LATEEF:  No, are you removing your objections

1    to 11, 57, 100, and 111 that I just identified that came in

2    through the deposition testimony?

3         JUDGE BHATTACHARYYA:  Counsel, let's take a break

4    for five minutes.

5         MR. LATEEF:  I deserve a response to that

6    question.

7         MR. SELWYN:  Your Honor, I'll respond if you

8    would like me to.

9         JUDGE BHATTACHARYYA:  No, I would like you to

10   meet and confer offline and come back and let me know your

11   respective positions.

12        MR. SELWYN:  Certainly.  Thank you.

13        MR. LATEEF:  Thank you, Your Honor.

14        (Whereupon, the proceedings recessed at 9:44

15   a.m.)

16        (In session at 9:49 a.m.)

17        JUDGE BHATTACHARYYA:  We're back on the record.

18        Did counsel have a chance to address this issue?

19        MR. SELWYN:  Yes, Your Honor.  We've looked at

20   the list.  It does appear that some of the exhibits were

21   admitted yesterday.  We haven't had time to confirm that

22   all.  But in the interest of time we'll withdraw the

23   objection so we can move forward.

24        JUDGE BHATTACHARYYA:  Very well.

25        MR. LATEEF:  Your Honor, I'd like the record to

1    reflect that this time goes to Apple.

2              JUDGE BHATTACHARYYA:  Are you asking me for a

3    ruling on that?

4              MR. LATEEF:  Yes, I am.

5              JUDGE BHATTACHARYYA:  According to what I

6    understand about the parties' agreement, that seems

7    appropriate.

8              MR. LATEEF:  Thank you, Your Honor.

9              MR. MUELLER:  Your Honor, we have no further --

10             MR. LATEEF:  We would like to call Dr. Goldberg

11   to the stand please.  Thank you.

12             JUDGE BHATTACHARYYA:  I'm sorry.  Mr. Mueller,

13   did you --

14             MR. MUELLER:  I was just saying, Your Honor, we

15   have no further issues this morning, and Mr. Selwyn will do

16   the cross-examination of Dr. Goldberg.  Thank you,

17   Your Honor.

18             JUDGE BHATTACHARYYA:  Okay.  Thank you.  Welcome,

19   Dr. Goldberg.

20             THE WITNESS:  Good morning, Your Honor.

21             JUDGE BHATTACHARYYA:  Do you understand that

22   you're under an obligation to tell the truth in your

23   testimony today?

24             THE WITNESS:  Yes, I understand that.

25

1   //

2                         JACK GOLDBERG,

3              having been first duly sworn and/or affirmed

4   on his oath, was thereafter examined and testified as

5   follows:

6              JUDGE BHATTACHARYYA:  Thank you.

7                     DIRECT EXAMINATION

8   BY MR. LATEEF:

9       Q.   Good morning, Mr. Goldberg.  Could you please

10  state your name for the record?

11      A.   My name is Jack Goldberg.

12      Q.   Did you provide or prepare demonstrative slides

13  to assist you in today's testimony?

14      A.   Yes, I did.

15      Q.   Okay.  Let's pull up the cover to the

16  demonstratives.

17              Does this look like your demonstratives that you

18  prepared for today's testimony?

19      A.   Yes.

20      Q.   Let's go to the next slide.  Could you please

21  tell us the scope of your analysis in this case?

22      A.   Yes.  My analysis was limited to issues involving

23  the '127 patent, specifically infringement of claim 9 by the

24  Apple Watch Series 6 and 7 products and the Next Generation

25  Apple Watch, the domestic industry technical prong of claim

1    9, which includes Masimo's current and early rainbow«

2    sensors, and the validity of the '127 patent, which will be

3    covered in my rebuttal testimony.

4        Q.    What are your opinions that you're going to state

5    today?

6        A.    That the Apple products infringe claim 9 of the

7    '127, that the domestic industry products practice the

8    claims of the '127 patent, and that the '127 patent -- well,

9    I'm not going to address that today, that's for later,

10   regarding validity.

11       Q.    Great.  Let's go to the next slide.  Could you

12   please tell us about your qualifications in this case?

13       A.    Yes.  I have a bachelor's, master's degree, both

14   from MIT, in electrical engineering and computer science.

15   During the years '73 to '84 I had varied industry

16   experience, but in '84 through '95 I worked for

17   IVAC Corporation, a medical device company that offered

18   products, including infusion pumps, blood pressure machines,

19   and clinical thermometers.

20          My experience at IVAC involved lots of work with

21   sensors, heat flow, thermal management, fluid flow

22   management, and projects including the noninvasive

23   measurement of cardiac output, the processing of optical and

24   radio frequency signals and other.

25          From 1995 until the present I've been working at

1    Metrionix, which is my own company, as a consultant and

2    expert in various fields, including medical sensors.

3         MR. LATEEF:  Your Honor, at this time Masimo

4    moves to have Mr. Goldberg moved as a technical expert in

5    the field of physiological monitoring technologies.

6         JUDGE BHATTACHARYYA:  Any objection?

7         MR. SELWYN:  We have no objection.  We do intend

8    to cross him on the extent of his expertise, however.

9         JUDGE BHATTACHARYYA:  At this time Dr. Goldberg

10   is admitted as an expert in the field of physiological

11   technologies.

12        Q.   Okay.  Let's go to the next slide.  Could you

13   please explain what you're providing here on this slide is

14   this?

15        A.   Yes.  This slide was shown earlier during others'

16   testimony.  This is Fig. 12 from the '127 patent.  It shows

17   light emitters and the temperature sensors, both coupled to

18   the thermal mass.

19        Quoting from the patent, the substrate shown

20   here, substrate 1200, quote, is also configured with a

21   relatively significant thermal mass, which stabilizes and

22   normalizes the bulk temperature so that the thermistor

23   measurement of bulk temperature is meaningful.

24        The patent also -- and that occurs at column 10,

25   lines 67, through column 11, line 4.

1            The patent also expresses the fact that the

2    thermistor measures a bulk temperature of the thermal mass,

3    which is used to estimate the operating wavelengths of all

4    the LEDs, and that occurs at column 10, 22-48.

5         Q.   Okay.  Let's go to the next slide, and can you

6    explain the identifiers you're going to use for your

7    analysis?

8         A.   Yes.  This slide documents all of the elements

9    and the shorthand reference to those elements ranging from

10   the preamble to 7A through 7H of claim 7, and the verbiage

11   of claim 9.

12        Q.   Okay.  Let's go to the next slide.

13            Did you review any stipulations relevant to your

14   analysis?

15        A.   I did.  I reviewed document 770692, there are

16   three stipulations there which basically explain that,

17   regarding the hardware components of the blood oxygen

18   feature, it's stipulated that there are no differences

19   between the various models of the Apple Watch Series 6, no

20   differences between the various models of the Apple Watch 7,

21   and that for the purposes here those hardware components of

22   the Apple Watch 6 are representative of the hardware

23   components of the Apple Watch 7 and vice versa.

24            I also saw the stipulation, Complainants' Exhibit

25   1259, which in paragraph 7 states that a determination

616

1    regarding the Apple Watch Series 7 regarding infringement of
2    any claim would apply equally to the currently planned
3    design of Apple's Next Generation watches.
4         Q.   Great.  Let's go to the next slide.
5              Could you please explain your analysis for the
6    preamble?
7         A.   Yes.  The accused products satisfy the preamble.
8    This is undisputed.  The preamble requires a sensor capable
9    of emitting light into the tissue, and this evidence from an
10   Apple Watch consumer support page points out that the blood
11   oxygen application includes photodiodes, light emitting --
12   photodiodes-type detectors for detecting the amount of light
13   reflected back from the light emitters, which include red
14   and green, and infrared light emitters, and that advanced
15   algorithms are used to evaluate the color of the blood and,
16   thereby, determine the oxygen level.
17             MR. LATEEF:  I think for the next part of the
18   testimony we need to go on the Apple CBI transcript,
19   Your Honor.
20             (Whereupon, the hearing proceeded in confidential
21   session.)
22
23
24
25

```
 1                  O P E N   S E S S I O N

 2

 3                     CROSS-EXAMINATION

 4    BY MR. SELWYN:

 5         Q.   Good morning, Mr. Goldberg.

 6         A.   Good morning.

 7         Q.   You were engaged by Masimo's law firm, Knobbe

 8    Martens, to serve as an expert to testify on behalf of

 9    Masimo in this matter, correct?

10         A.   That is correct.

11         Q.   And much of your consulting practice is tied to

12    the Knobbe firm, correct?

13         A.   Currently, yes.

14         Q.   This is not your only ongoing case for which you

15    are engaged by the Knobbe firm, correct?

16         A.   Yes.

17         Q.   And, in fact, there are currently five different

18    ongoing matters for which you have been hired by Knobbe,

19    correct?

20         A.   I don't think there's five.

21         Q.   Well, let's see what you said in your deposition.

22              Can we have, please, page 14, lines 8-11?  We'll

23    put it on the screen.

24              MR. LATEEF:  Should the witness now open the

25    cross box?
```

1          MR. SELWYN:  That would be fine.

2     A.   I have it.

3     Q.   Do you remember being asked this question and

4  giving this answer:

5          Question.  Five of the matters for which you are

6  currently engaged by Knobbe Martens are listed on your CV as

7  ongoing, correct?

8          Answer.  That's correct.

9          Were you asked that question and did you give

10 that answer?

11    A.   At that time I gave that answer, yes.

12    Q.   And you've been retained by Knobbe for 10 or 11

13 different matters in recent years, correct?

14    A.   I would say so.

15    Q.   Now, sir, you don't hold yourself as an expert in

16 the design of medical sensors broadly or generally, correct?

17    A.   I have -- I'm not sure I can answer that.

18    Q.   Let's see what you said at your deposition.

19         Can we have page 43, lines 1-6.

20         Do you remember being asked this question and

21 giving this answer:

22         Do you hold yourself out to be an expert in the

23 design of medical sensors?

24         Answer.  Again, medical sensors cover a very

25 broad range of technologies.  I've never held myself out to

638

1    be an expert in the design of medical sensors broadly or

2    generally.

3            Were you asked that question and did you give

4    that answer?

5        A.   I did.

6        Q.   You've never designed a pulse oximeter, have you,

7    sir?

8        A.   That is correct.

9        Q.   You've never done any research and development

10   for a pulse oximeter, correct?

11       A.   I was engaged in investigation of the current

12   state of the art involving pulse oximeters while I was

13   working for IVAC Corporation.  I'm not sure that --

14       Q.   Sir, you've never done any research and

15   development in the laboratory for a pulse oximeter, correct?

16       A.   That is correct.

17       Q.   And you've never published any books, papers or

18   articles regarding pulse oximetry or pulse oximeters,

19   correct?

20       A.   Correct.

21           MR. SELWYN:  Your Honor, I think we now have to

22   go on to the Apple confidential record.

23           (Whereupon, the hearing proceeded in confidential

24   session.)

25

1               O P E N   S E S S I O N

2

3          JUDGE BHATTACHARYYA:  Let's move to the public

4    record.

5          MR. LATEEF:  Are we ready to proceed?

6          JUDGE BHATTACHARYYA:  Yes.

7    BY MR. LATEEF:

8       Q.   Mr. Goldberg, could you please explain your

9    experience with temperature measurement or sensing?

10      A.   Yes.  While at IVAC I did a lot of work involving

11   temperature measurement.  I worked on an infrared

12   thermometer.  I worked on various aspects of other clinical

13   thermometers that involved thermistors.  I have done a lot

14   of projects that involved the measurement of heat.  I worked

15   on the equipment used in manufacturing thermometers, that

16   involved temperature measurement.

17      Q.   Great.  Does the '127 patent anywhere describe

18   testing the average temperature of the LEDs?

19      A.   No, it does not.

20      Q.   Does the thermistor in the '127 patent measure

21   temperature in the same manner as the Apple Watch?

22      A.   They both employ thermistors, and thermistors are

23   located on the circuit board.

24      Q.   That's a sufficient answer.

25           Can we now move to the Apple CBI confidential

1    record?

2                  (Whereupon, the hearing proceeded in confidential

3    session.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   O P E N   S E S S I O N

 2

 3          MR. CLAASSEN:  Good morning, Your Honor.  This is

 4   Brian Claassen on behalf of Masimo.  For the next witness

 5   Masimo calls Dr. Vijay Madisetti.

 6          THE WITNESS:  Good morning, Your Honor.

 7          JUDGE BHATTACHARYYA:  Good morning,

 8   Dr. Madisetti.  Do you understand you're under an obligation

 9   to testify truthfully today?

10          THE WITNESS:  I do.

11                   VIJAY MADISETTI,

12          having been first duly sworn and/or affirmed

13   on his oath, was thereafter examined and testified as

14   follows:

15                   DIRECT EXAMINATION

16   BY MR. CLAASSEN:

17       Q.   Good morning, Dr. Madisetti.

18       A.   Good morning, sir.

19       Q.   Please introduce yourself and spell your last

20   name for the court reporter.

21       A.   My name is Vijay Madisetti.  My last name is

22   spelled M-A-D-I-S-E-T-T-I.

23       Q.   Did you prepare demonstrative slides regarding

24   your analysis in this case?

25       A.   Yes, I did.
```

1     Q.  Let's pull up CDX-11, please.

2        Turning to the next slide, slide 2,

3  Dr. Madisetti, will you explain your background?

4     A.  Yes.  I'm a full professor at Georgia Tech in the

5  Colleges of Engineering and Computer Science.  I have a

6  Ph.D. from the University of California at Berkeley in

7  electrical engineering and computer science, and my CV is

8  shown attached as Exhibit 329.

9     Q.  Dr. Madisetti, is your CV Exhibit 329 current?

10    A.  Yes.

11    Q.  Turning to the next slide, Dr. Madisetti, could

12  you tell me your assignment in this case?  Excuse me.  Let's

13  go to slide 4, please.

14       Dr. Madisetti, can you explain your background

15  with respect to -- with respect to publications and books

16  that you've written?

17    A.  Yes.  In the area of this investigation I've been

18  working, teaching, researching, and consulting in the area

19  of signal processing, chip design, software design, for over

20  30 years.

21       These are some of the books that I've written,

22  starting back in the '90s until last year, I've been focused

23  on the areas of signal crossing, chip design, and software,

24  and along the way I've also taught many courses and done

25  research in these areas.

 1      Q.   Turning to the next slide, Dr. Madisetti, can you

 2  describe for the ALJ what technical articles you've written

 3  relating to biological signal processing?

 4      A.   Yes.  Over the past 30 years I've authored many

 5  papers in technologies such as filters, cancellers,

 6  noise-reduction techniques, adaptive digital filters, and

 7  also, for example, on the right, pulse signals, pulse

 8  oximetry is a special case of this particular general

 9  problem.  I've also designed a pulse oximeter.

10      MR. CLAASSEN:  Your Honor, at this time Masimo

11  moves to admit Dr. Madisetti as a technical expert in the

12  field of physiological monitoring technologies.

13      JUDGE BHATTACHARYYA:  Any objection?

14      MS. FRAZIER:  There is, Your Honor.  No objection

15  to Dr. Madisetti being admitted as an expert, but we would

16  request that it be in the areas of expertise he recited --

17  signal processing, chip design, and software.

18      MR. CLAASSEN:  Your Honor --

19      JUDGE BHATTACHARYYA:  Mr. Claassen, is that

20  acceptable to you?

21      MR. CLAASSEN:  Your Honor, Dr. Madisetti has

22  rendered opinions regarding physiological monitoring

23  technologies.  He has explained his technical articles

24  related to this area and his design of pulse oximeters.

25      Masimo would like to have him admitted in the

1    field of physiological monitoring technologies.

2              JUDGE BHATTACHARYYA:  I understand that, but

3    you're objecting to that designation.

4              MS. FRAZIER:  We are, Your Honor, but happy to

5    take it up on cross-examination.

6              MR. CLAASSEN:  Your Honor, I'd ask if he is

7    admitted, they either raise their objection now or -- so

8    that I know how to address it.

9              JUDGE BHATTACHARYYA:  Ms. Frazier, are you --

10             MR. CLAASSEN:  I'm requesting that they voir dire

11   the witness now if they have a question as to his

12   qualifications.

13             MS. FRAZIER:  Again, Your Honor, no objection to

14   Dr. Madisetti being admitted as an expert consistent with

15   description of his background related to signal processing.

16             We do object as to his expertise regarding

17   physiological monitoring devices.

18             JUDGE BHATTACHARYYA:  In that case, I believe we

19   have to resolve that.  Should we resolve that at this time?

20             MS. FRAZIER:  May I voir dire the witness,

21   Your Honor?

22             JUDGE BHATTACHARYYA:  Yes, you may.

23                     VOIR DIRE EXAMINATION

24   BY MS. FRAZIER:

25        Q.   Dr. Madisetti, good morning.

668

1          A.   Good morning.

2          Q.   You said that you designed one pulse oximeter,

3    correct?

4          A.   Yes, I designed a pulse oximeter.

5          Q.   And that work was led by Professor John Scharf

6    and his colleagues at Emory University, correct?

7          A.   I collaborated with Professor John Scharf.

8          Q.   And you have never written any books about that

9    research, correct?

10         A.   It was entered in a prototype, and I did not

11   write -- I don't believe I wrote a book on that topic.

12         Q.   And you have never written any papers about that

13   research, correct?

14         A.   There were some reports, I believe, but no

15   published papers.

16         Q.   And let's see what you said at your deposition,

17   Dr. Madisetti.

18              Mr. Lee, if we could bring up Dr. Madisetti's

19   deposition transcript at page 185, line 11.

20              Question.  Did you ever write any books, papers,

21   or articles about that research?

22              Answer.  I did not.

23              Dr. Madisetti, were you asked those questions and

24   did you give that answer?

25         A.   Yes, that is what I said today.  There was a

1    prototype and there were some internal reports.

2         Q.   And you have never spoken publicly on that

3    research, correct?

4         A.   I made presentations to reviewers.

5         Q.   And --

6              MR. CLAASSEN:  Your Honor, I'm going to ask if

7    this voir dire is going to contain any sort of reference to

8    his deposition transcript that he be given the entire

9    transcript to review.

10             JUDGE BHATTACHARYYA:  He can look at his whole

11   transcript, and you'll also have the opportunity to respond.

12             MR. CLAASSEN:  I understand.  I'm asking that

13   counsel give him his entire transcript, which they have not

14   done yet.

15             MS. FRAZIER:  Your Honor, the transcript is in

16   possession of Masimo's counsel at their offices.  We sent

17   them over this morning.  I'm happy for the binder to be

18   given to Dr. Madisetti now, if it's in the room.

19             MR. CLAASSEN:  Go ahead and open your

20   cross-examination binder, Dr. Madisetti.

21             THE WITNESS:  I will.

22             MS. FRAZIER:  Your Honor, just a point of

23   clarification.  We are on the public record, correct?

24             (Clarification by reporter.)

25             THE WITNESS:  I have the binder, counsel.

1    Q.   Dr. Madisetti, we'll put up on the screen.  It's
2    also at tab 1 of volume 1 of your binders, page 185 of your
3    transcript, lines 14 through 19.
4         Question.  Did you speak about that research
5    publicly?
6         Answer.  I am not.
7         Were you asked that question, did you give that
8    answer?
9    A.   Yes, I did, and I confirmed that today.  It was
10   an internal review.
11   Q.   And, Dr. Madisetti, the slide you showed a few
12   moments ago of four papers you had written with respect to
13   biological signal monitoring, do you recall those?
14   A.   Yes.
15   Q.   And if I search those papers, I will not find a
16   reference to pulse oximetry in those, correct?
17   A.   I don't know.  I would have to look through them,
18   but they deal with biological signals.  They deal with
19   different types of signal extraction techniques, noise
20   cancellation, and associated formulation technologies that
21   are applicable to pulse oximetry.
22   Q.   And they deal with biological signal extraction,
23   correct?
24   A.   Yes.  They deal with various kinds of biological
25   signals as well as physical signals.

1        Q.    Thank you.

2              MS. FRAZIER:  Your Honor, no further questions

3    for Dr. Madisetti.  We do maintain our objection.  We

4    believe his expertise should be consistent with what he has

5    described, which is expertise in the biological signal

6    monitoring, not physiological monitoring devices.

7              MR. CLAASSEN:  Your Honor, I'd like to respond,

8    moving back to slide 4 of Exhibit CDX-11C.

9    By MR. CLAASSEN:

10       Q.    Dr. Madisetti, the books that you mentioned on

11   the left side of Exhibit 11 -- CDX-11C, are those all

12   related to signal processing?

13       A.    Yes.

14       Q.    Are there any books on hardware design?

15       A.    Yes, the ones on the bottom left.

16       Q.    Can you explain your experience in hardware

17   design to us?

18       A.    Yes.  I was one of the authors of the Standard

19   Language for Hardware Design, which is called VHDL.  This is

20   a IEEE standard.  I authored books in the area of chip

21   design, software design, system-on-chip design.

22              I designed several products.  The software that

23   I've designed on cell phones is present in millions of

24   phones worldwide.  And I have extensive experience in the

25   design of -- and design, research, and teaching of software

1    and hardware --

2        Q.   Do you have experience --

3        A.   -- signal processing, monitoring, and sensor

4    design.

5        Q.   To be clear, you also have experience designing

6    hardware for pulse oximeters; is that correct?

7        A.   Yes.  I designed using PVDs and in collaboration

8    with Professor Jim Scharf.

9            MR. CLAASSEN:  Your Honor, Masimo proffers

10   Dr. Madisetti as an expert in the field of physiological

11   monitoring technologies.

12           JUDGE BHATTACHARYYA:  Mr. Claassen, could you

13   just summarize for me your position regarding his experience

14   in physiological monitoring versus biological signal

15   monitoring?

16           MR. CLAASSEN:  Yes, Your Honor.  If you'd like to

17   focus on pulse oximetry in particular with respect to

18   physiological signal monitoring, we would accept that as an

19   acceptable field for Dr. Madisetti.

20           JUDGE BHATTACHARYYA:  Okay.  Could you just

21   summarize for me what we've just heard about his experience

22   in pulse oximetry?

23           MR. CLAASSEN:  Yes, Your Honor.  He has years of

24   experience developing a pulse oximeter and both the hardware

25   and software for that pulse oximeter.  Dr. Madisetti is also

1    a well-regarded author with respect to the design of ASIC,

2    which are hardware, so it's hardware and software.  He is a

3    signal processing expert.  Without question, Apple is not

4    questioning that.

5            So the issue here really is the definition of the

6    field, and I believe it's fair to say that Dr. Madisetti is

7    an expert with respect to physiological monitoring

8    technologies in pulse oximetry in particular.

9            JUDGE BHATTACHARYYA:  Ms. Frazier, did you want

10   to respond to Mr. Claassen's argument?

11           MS. FRAZIER:  Yes, Your Honor.  Again, no

12   objection to admission in the areas that Dr. Madisetti

13   offered himself, including chip design and signal

14   processing, but we do maintain his only pulse oximetry

15   experience that he testified to was that one effort in

16   collaboration with another professor that he never wrote

17   about, never talked about, never published on.

18           So, Your Honor, he has no publications specific

19   to the field of pulse oximetry, so I actually think that the

20   narrower definition here would be even more objectionable to

21   Apple.

22           JUDGE BHATTACHARYYA:  Okay.  What is your

23   position regarding the proper field?  You said chip design

24   and signal processing?

25           MS. FRAZIER:  Signal processing, Your Honor, no

674

1   objection to that.

2            JUDGE BHATTACHARYYA:  All right.  Thank you.

3   Let's take a quick break.

4            (Whereupon, the proceedings recessed at 11:36

5   a.m.)

6            (In session at 11:38 a.m.)

7            JUDGE BHATTACHARYYA:  We're back on the public

8   record.

9            Based on the testimony and arguments I've just

10  heard, the objection is overruled.  Dr. Madisetti will be

11  admitted as an expert in the field of physiological

12  monitoring technologies.

13           Counsel for Apple can explore the extent of his

14  expertise on cross-examination.

15           MS. FRAZIER:  Thank you, Your Honor.

16           MR. CLAASSEN:  Your Honor, I'd like to clarify

17  that the time was charged to Apple with respect to the voir

18  dire and the objection.

19           JUDGE BHATTACHARYYA:  I understand the parties

20  have an agreement regarding how to charge time.  I ask that

21  the parties discuss it, and, if there's a dispute, you can

22  raise it before me.

23           MR. CLAASSEN:  Thank you, Your Honor.  We'll do

24  that.

25  BY MR. CLAASSEN:

1      Q.   Turning back to CDX-11C, let's turn to slide 3.

2           Dr. Madisetti, what was your assignment in this

3    case?

4      A.   Yes.  I was asked to study Masimo's '501, '502,

5    '648, and the '745 patents, specifically the asserted claims

6    determining whether Apple's accused products, the watches,

7    infringe the asserted claims, and also determine whether

8    Masimo's DI products practice the asserted DI claims.

9      Q.   Turning to the next slide -- turning to slide 6,

10   Dr. Madisetti, how did you arrive at your opinions?

11     A.   I reviewed a lot of evidence that was provided to

12   me, and these included the patents themselves, their file

13   histories, which I discuss there.  I also reviewed the

14   products themselves.  I reviewed the documentation.  I

15   reviewed Masimo's DI products as well as the accused Apple

16   products, technical documents that were provided to me,

17   testimony, both deposition as well as in this hearing, and

18   source code that I reviewed, physicals that I examined, and

19   testing that I also performed.

20     Q.   Turning to slide 8, Dr. Madisetti, based upon

21   your independent analysis, what is the summary of your

22   opinions in this case regarding infringement and domestic

23   industry technical prong?

24     A.   With respect to my opinions, as a summary, it is

25   my opinion that the accused Apple Watch products infringe

1    claim 12 of the '501, claims 22 and 28 of the '502, claims

2    12, 24, and 30 of the '648.  And the accused Apple products,

3    the watches, infringe claims 9 and 27 of the '745.

4             It is also my opinion that the Masimo DI products

5    satisfy the Rev. A article, satisfies claim 12 of the '501

6    patent, claims 12, 24, and 30 of the '648 patent.  And,

7    further, that Revision D, E, and W1 articles satisfy claim

8    12 of the '501, claim 28 of the '502, claims 12, 24, and 30

9    of the '648.

10            And, further, that Masimo's DI products Circle,

11   Wings, Rev. A, D, E, W1 articles satisfy claim 18 of the

12   '745 patent.

13        Q.   Turning back to -- do you expect to render

14   opinions later in this case, if necessary, regarding the

15   validity of Masimo's Asserted Patents?

16        A.   Yes, sir.

17        Q.   Turning back to slide 7, did you review any

18   stipulations between the parties that are relevant to your

19   opinions in this case?

20        A.   Yes.  I understand that the parties have

21   stipulated that Series 6, 7, and the Next Generation watches

22   all behave in the same manner, with respect to the relevant

23   features at issue.

24            So, therefore, my opinions with respect to any of

25   these products would apply to all of these products.

677

1          MR. CLAASSEN:  Your Honor, we're going to be

2    moving into some information that is Apple CBI.  I'd like to

3    move onto the Apple confidential CBI record.

4          (Whereupon, the hearing proceeded in confidential

5    session.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                O P E N   S E S S I O N

 2

 3                      CROSS-EXAMINATION

 4    BY MS. FRAZIER:

 5        Q.   Dr. Madisetti, during your testimony for

 6    Mr. Claassen, you've been reviewing the slides on the screen

 7    in front of you; is that correct?

 8        A.   Yes.

 9        Q.   And we will continue to put information up on the

10    screen.  There is also some information that we've provided

11    hard copies of also.

12             Do you have those binders available to you?

13        A.   Yes, I see one binder.  I see two binders.

14        Q.   Two binders, that's correct.

15             Now, Dr. Madisetti, the parties are on a time

16    clock here, so I'd ask you to answer my questions yes, no,

17    or I don't know.  Do you understand?

18        A.   Yes.

19        Q.   You have worked as an expert litigation witness

20    over 50 times, correct?

21        A.   Yes, over the past 15, 20 years.

22        Q.   You have had your deposition taken at least 80

23    times, correct?

24        A.   Yes.

25        Q.   You have testified at trial roughly 30 times?
```

1        A.   I don't remember the number, but I've testified

2   probably that many times.

3        Q.   Probably roughly 30 times?

4        A.   Yes.

5        Q.   You have served as a technical expert in cases

6   involving 4G LTE protocols; is that right?

7        A.   Yes.

8        Q.   You have served as a technical expert in cases

9   where the technology at issue was power over Ethernet,

10  correct?

11       A.   Yes.

12       Q.   You've served as a technical expert in cases

13  regarding networked storage devices?

14       A.   I'm not sure what you mean but probably.

15       Q.   Well, let's take a look at your CV,

16  Dr. Madisetti.  We'll put it up on the screen.  It is

17  CX-329, Exhibit A, page 2.  And if we could zoom in on the

18  IOEngine v. IMC/Imation.

19       A.   Yes.

20       Q.   Do you see you've served as a technical expert

21  regarding networked storage devices, correct?

22       A.   Yes.

23       Q.   You've served as a technical expert regarding

24  digital videos, correct?

25       A.   Yes.

1      Q.   You've served as a technical expert regarding

2   interactive graphical user interface technology, right?

3      A.   Yes.

4      Q.   You are currently serving as an expert in a case

5   regarding virtualization, correct?

6      A.   Cloud computing, yes.

7      Q.   Virtualization, correct?

8      A.   Yes.

9      Q.   Now I'd like to turn to your opinions regarding

10   Apple's alleged infringement of the --

11      A.   One second.  Excuse me.  One second, counsel.

12           MR. CLAASSEN:  I'm sorry.  I have to go into the

13   witness room for counsel.  Masimo has lost internet

14   connection.  We need to break until we're able to rejoin.

15           MS. FRAZIER:  I'd ask that we go off the record

16   during this technical break.

17           JUDGE BHATTACHARYYA:  That's fine.  Off the

18   record.

19           (At which time, the proceedings were off the

20   record.)

21           JUDGE BHATTACHARYYA:  Let's take a five-minute

22   break.

23           (Whereupon, the proceedings recessed at 3:04

24   p.m.)

25           (In session at 3:10 p.m.)

```
 1              MS. FRAZIER:  May I proceed, Your Honor?
 2              JUDGE BHATTACHARYYA:  Yes, let's go back on the
 3    record.  We are on the public record.
 4              You may proceed.
 5    BY MS. FRAZIER:
 6         Q.   Dr. Madisetti, I'd like to turn now to your
 7    opinions regarding Apple's alleged infringement of the '745
 8    patent.  Do you have that in mind?
 9         A.   Yes.
10         Q.   You heard yesterday the testimony of Mr. Al-Ali,
11    correct?
12         A.   Yes.
13         Q.   And you heard Mr. Al-Ali testify that shaping the
14    light was what was new about his patent, correct?
15         A.   Could you please repeat the question, counsel?
16         Q.   Sure.  Yes, no, or you don't remember, you heard
17    Mr. Al-Ali testify yesterday that shaping the light was what
18    was new about the '745 patent, correct?
19         A.   I heard Mr. Al-Ali say that.
20         Q.   And you've reviewed Mr. Al-Ali's deposition in
21    this case, correct?
22         A.   I reviewed his deposition, yes.
23         Q.   And Mr. Al-Ali has also acknowledged that
24    physiological measurement systems with diffuser that are
25    configured to spread light existed before the '745 patent,
```

 1    correct?

 2         A.   I don't recall that testimony.

 3         Q.   Sure.  Let me see if I can refresh your

 4    recollection.

 5              If we could bring up Mr. Al-Ali's February 16th

 6    deposition on page 56.

 7              Dr. Madisetti, this one is not in your binder.

 8              Line 13 through 18.  Mr. Al-Ali was asked:

 9              Would you agree that physiological measurement

10    systems with --

11              MR. CLAASSEN:  Your Honor, I think Masimo counsel

12    might have lost connection again.

13              I can hear, Your Honor.

14              JUDGE BHATTACHARYYA:  Please go ahead.  We have

15    Masimo counsel here.

16              MR. CLAASSEN:  Yes, Your Honor.

17    BY MS. FRAZIER:

18         Q.   Mr. Al-Ali was asked:

19              Question.  Would you agree that physiological

20    measurement systems with diffusers configured to receive

21    emitted light spread received light and emit the spread

22    light over a larger tissue area existed before the '745

23    patent?

24              Answer.  Yes.

25              Does that refresh your recollection that

768

1    Dr. Al-Ali testified that physiological measurement systems

2    with diffusers configured to receive emit light and spread

3    light over larger tissue areas existed before the '745

4    patent?

5            MR. CLAASSEN:  Your Honor, I ask that the witness

6    be shown the entirety of at least this page of the

7    transcript.  This is not his own testimony.  It's not

8    impeachment.  So I'd like him to be able to review the

9    content.

10           MS. FRAZIER:  We're happy to zoom out.

11           MR. CLAASSEN:  Please.

12      Q.   Dr. Madisetti, does that refresh your

13   recollection that Mr. Al-Ali said that?

14      A.   As I said, Mr. Al-Ali speaks for Mr. Al-Ali

15   speaks for himself.  These are not my opinions.

16      Q.   And do you agree or disagree that physiological

17   measurement systems with diffusers configured to spread

18   light over a larger tissue area existed before the '745

19   patent?

20      A.   As I described in my deposition, they don't -- in

21   my opinion they did not exist in the claimed manner.

22      Q.   Sir, stick with my question, if you could.  I'm

23   not asking about the claimed manner.  I'm just asking

24   whether you agree or disagree that physiological measurement

25   systems with emitters -- excuse me -- with diffusers

Heritage Reporting Corporation
(202) 628-4888

1    configured to receive light and spread that light over a

2    larger tissue area existed before the '745 patent, do you

3    agree or disagree?

4          MR. CLAASSEN:  Your Honor, I'm going to object.

5    This is outside the scope of the direct.

6          A.   I can't answer it without knowing the context.

7          JUDGE BHATTACHARYYA:  Let's pause for a minute.

8    I'd like Ms. Frazier to respond to the objection.

9          MS. FRAZIER:  Your Honor, this goes to

10   Dr. Madisetti's opinions regarding infringement of the '745

11   patent.  It's squarely within the scope of his direct.

12         MR. CLAASSEN:  Your Honor, these questions are

13   directed to validity issues.

14         JUDGE BHATTACHARYYA:  It does sound like you're

15   asking a validity question.  Can you link it to something --

16         MS. FRAZIER:  Sure, Your Honor, I'll move on.

17         JUDGE BHATTACHARYYA:  In that case the objection

18   is sustained.

19   BY MS. FRAZIER:

20         Q.   Dr. Madisetti, we're going to put up on the

21   screen claims 1 and 20.  These are the claims from which

22   claims 9 and 27 depend.

23         Those are the claims that you've alleged Apple

24   Watch Series 6 and 7 infringe, correct?

25         A.   Counsel, could you please tell me which patent

1    claim is this from?

2         Q.   Yes.  This is the '745 patent.  On the left side

3    of the screen we've put independent claim 1 and on the right

4    side of the screen we've put independent claim 20.

5              You recognize those claims, sir, correct?

6         A.   Yes.

7         Q.   And they are the independent claims from which

8    claims 9 and 27 depend, correct?

9         A.   Yes.

10        Q.   Okay.  Now both claim 9 and claim 27 of the '745

11   patent require a plurality of light-emitting diodes

12   configured to emit light in a first shape.  Do you see that?

13             And if we could highlight it on the screen.

14        A.   Yes, I agree, that that's a limitation of claim 1

15   and claim 20 with respect to that limitation.

16        Q.   And claims 1 and 20 also require a material

17   configured to be positioned between the plurality of

18   light-emitting diodes and tissue on a wrist of a user, the

19   material configured to change the first shape into a second

20   shape, correct?

21        A.   Again, I don't -- I mean, I will agree with you

22   that you are reading from the claim limitation.

23        Q.   And the '745 patent uses the term shape to refer

24   to geometric shape, such as a rectangular, circle, or

25   square, correct?

1      A.   I disagree.  It just calls it a shape.

2      Q.   Dr. Madisetti, let's see what you said in your

3  claim construction report in this case.

4           If we could bring up Dr. Madisetti's claim

5  construction report at paragraph 60.

6           MR. CLAASSEN:  Is this in his binders so he can

7  follow along?

8           MS. FRAZIER:  It's at tab 7 of his binder.

9      Q.   Dr. Madisetti, do you see there in the second

10  sentence you wrote:

11          The specification uses the term shape to refer to

12  patterns and geometry (such as rectangular, circle, or

13  square).

14          Do you see that?

15     A.   I see that.  These are non-limiting embodiments.

16     Q.   Now the '745 patent provides examples of shapes,

17  including shapes that are substantially rectangular,

18  correct?

19     A.   You would have to point me to the sections,

20  counsel.

21     Q.   You don't recall if the patent refers to shapes

22  that are substantially rectangular?

23     A.   Again, please show me the relevant section

24  because I would like to be very precise.

25     Q.   Dr. Madisetti, is it your position that the

1  shapes described by the '745 patent must be perfect

2  geometric shapes?

3      A.   I don't have an opinion on that issue beyond

4  what's in the claim itself.

5      Q.   Now the term second shape, as used in the claims

6  of the '745 patent, means a shape that is different than the

7  first shape, correct?

8      A.   Again, we have to refer to the claim

9  constructions of both parties and the claim language itself,

10  so I'm unsure.  You're referring to the claim or to the

11  claim construction positions, counsel?

12      Q.   Dr. Madisetti, you've offered an opinion that

13  Apple infringes the '745 patent, correct?

14      A.   Yes.

15      Q.   And you've offered the opinion that the MLA in

16  the Apple Watch changes the light from a first shape to a

17  second shape, correct?

18      A.   Again, that's one of the reasons, and I've

19  provided analysis and testing support for that limitation.

20      Q.   And you can agree that second shape as you

21  applied it for purposes of your infringement analysis means

22  a shape that is different from a first shape, correct?

23      A.   I've applied both constructions.

24      Q.   And we can agree that both constructions define a

25  second shape as a shape different than the first shape,

1   correct?

2       A.   Can I look at the constructions for both parties

3   just to make sure that I'm precise?

4       Q.   Do you know sitting here today if this definition

5   of second shape that you applied means a shape that is

6   different than the first shape?

7       A.   I understand that -- I understand how I applied

8   it, counsel.  I understand that I've also used the term's

9   plain and ordinary meaning and used a parentheses, so I want

10  to be very precise.

11      Q.   If you could just stick with my questions.

12           Second shape, as used in the claims of the '745

13  patent, your understanding is that encompasses a shape that

14  is different from the first shape, correct?  Yes or no?

15      A.   All I can say is that it is as required in the

16  claim.

17      Q.   Okay.  Now, Dr. Madisetti, a second shape in the

18  '745 patent is not different from the first shape if it

19  differs only in size, correct?

20      A.   I understand that's the construction that -- or

21  similar language has been proposed by Masimo, and it's part

22  of the file history.

23      Q.   Sir, for purposes of your analysis, you

24  understood that second shape is not different from a first

25  shape if it is different only in size, correct?

1         A.    Counsel, I applied both parties' constructions.

2         Q.    Can you answer my question yes or no, sir?

3         A.    Would you repeat your question, counsel?  I

4    applied both parties' construction, counsel, so --

5         Q.    And so in your application you understood that a

6    second shape is not different from a first shape, if it is

7    different only in size, correct?

8         A.    I applied the construction of both parties.

9         Q.    Can you answer my question yes or no?

10        A.    As I said, this question can't have a yes or no

11   answer.

12        Q.    Okay.  Dr. Madisetti, that's all you have to say.

13             Now you testified that in the Apple Watch the

14   microlens array is the thing that is configured to change

15   the first shape into a second shape, correct?

16        A.    Would you point me to something specific as to

17   what you're referring to?

18        Q.    So, sir, you do not know sitting here today if it

19   is your opinion that the microlens array is the material

20   configured to change the first shape into a second shape in

21   your analysis?

22        A.    That is the opinion that I -- that is part of my

23   opinion, yes.

24        Q.    Okay.  So you have testified to that, correct?

25        A.    Yes.

1          Q.   And in your opinion, in your analysis of the

2    Apple Watch, the first shape is like a square and the second

3    shape is circular, correct?

4          A.   At a high level, yes, but the focus was on the

5    shapes are different.

6          Q.   Well, let's see what you said at your deposition.

7    It's in tab 1 of your binder.  We'll bring it up on the

8    screen.

9               This is page 288, beginning at line 13 going on

10   to page 289, line 3.

11              Question.  You performed various tests that

12   attempted to take pictures of light as it exited the MLA.

13   Correct?

14              Answer.  I did not attempt.  These were actual

15   pictures.

16              Question.  And did those pictures show the shape

17   of light?

18              Answer.  Referring to my appendix, as I describe

19   in my appendix, Appendix H, how -- what the first shape and

20   the second shape are, and how they are different.

21              The first shape is like a square, and the second

22   shape is circular.

23              Were you asked those questions and did you give

24   those answers?

25         A.   Yes, that's what I said right now.

 1            MS. FRAZIER:  Your Honor, I'd like to go on the

 2     Apple confidential record, please.

 3            JUDGE BHATTACHARYYA:  We're moving to the Apple

 4     confidential record.

 5            (Whereupon, the hearing proceeded in confidential

 6     session.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

816

```
 1                O P E N   S E S S I O N

 2

 3              JUDGE BHATTACHARYYA:  Good afternoon,

 4   Dr. Venugopal.

 5              THE WITNESS:  Good afternoon.

 6              JUDGE BHATTACHARYYA:  I'm sorry.  I hopefully

 7   will get your name correct next time.

 8              THE WITNESS:  No worries.  No worries.

 9              JUDGE BHATTACHARYYA:  Do you understand that you

10   are under an obligation to tell the truth here today?

11              THE WITNESS:  Yes, I am.

12                    VIVEK VENUGOPAL,

13            having been first duly sworn and/or affirmed

14   on his oath, was thereafter examined and testified as

15   follows:

16                    DIRECT EXAMINATION

17   BY MS. FRAZIER:

18      Q.   Good afternoon.  Could you please introduce

19   yourself to Her Honor?

20      A.   Good afternoon.  My name is Vivek Venugopal.  I

21   live in Sunnyvale, California, and I'm an optical engineer

22   with Apple.

23      Q.   Could you please describe your educational

24   background?

25      A.   Yes, of course.  I have a master's in electrical
```

817

1    engineering from Rensselaer Polytechnic Institute and a

2    Ph.D. in biomedical engineering from the same.

3         Q.   When did you receive your Ph.D.?

4         A.   That was in December of 2011.

5         Q.   What did you do after that?

6         A.   I was working as a postdoctoral researcher for a

7    couple of years with Harvard Medical School at the medical

8    center in Boston.

9         Q.   And when did you join Apple?

10        A.   That would be in January of 2014.

11        Q.   Since joining Apple, what products have you

12   worked on?

13        A.   I have worked on all of the Apple Watches

14   exclusively, Series 0 through Series 7.

15        Q.   And what is your particular focus with respect to

16   the Apple Watch?

17        A.   I work on the optical architecture of the heart

18   rate monitors, the optical sensors which are used for heart

19   rate monitoring.

20        Q.   How many different optical sensors are there

21   across the Apple Watch Series 0 through 7?

22        A.   The resting heart rate on the health sensor, in

23   addition to that we also have ambient light sensors and

24   others, which I'm not involved with.

25        Q.   Now has the design of the optical sensor in the

1    Apple Watch changed over time?

2       A.   Yes, it has.  There have been three distinct

3    generations of optical designs in the Apple Watch.  The

4    first one -- we call them Generation 1 through 3.

5       Q.   And could you explain for Her Honor which

6    generations map to which series watch?

7       A.   Of course.  Gen 1 was for Series 0 through Series

8    3, Generation 2 was Series 4 and 5, and Gen 3 is Series 6

9    and 7.

10      Q.   Starting, Dr. Venugopal, with the Series 6, when

11   did Apple first sell Apple Watch Series 0, excuse me,

12   starting with Series 0, when did Apple first sell Apple

13   Watch Series 0?

14      A.   The first customer ship for Series 0 was in April

15   of 2015.

16      Q.   What was your role with respect to the optical

17   sensor in the Series 0 watch?

18      A.   When I started, I was brought in to work on the

19   Fresnel lens, specifically writing documentation and

20   specifications that can be used by vendors to design and

21   develop the lens.  Subsequently I was also involved in

22   testing.

23      Q.   And is the Fresnel lens part of the optical

24   sensor?

25      A.   Yes, it is.

819

1      Q.   What are the other parts of the optical sensor in

2   Apple Watch Series 0?

3      A.   Series 0 comprises of LEDs, green and infrared

4   LED, and two photodiodes, and there is also, as I said, the

5   Fresnel lenses, and we have the back crystal, which is

6   essentially the back housing of the watch, which is an

7   optical component as well.

8      Q.   I'd like to put up on the screen what's been

9   marked as RX-0392.

10          Do you recognize RX-0392?

11     A.   Yes, I do.

12     Q.   What is it?

13     A.   This is an Engineering Requirement Specification

14   or an ERS for one of the features using the optical sensor.

15          MS. FRAZIER:  Your Honor, if we could at this

16   time go on the Apple confidential record.

17          (Whereupon, the hearing proceeded in confidential

18   session.)

19

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3            JUDGE BHATTACHARYYA:  Good afternoon, Dr. Mehra.

 4            THE WITNESS:  Good afternoon.

 5            JUDGE BHATTACHARYYA:  Could you please pronounce

 6    your name?

 7            THE WITNESS:  Saahil Mehra, Saahil, yes.

 8            JUDGE BHATTACHARYYA:  Welcome.  Do you understand

 9    that you're under an obligation to tell the truth in your

10    testimony today?

11            THE WITNESS:  Yes, I do.

12                          SAAHIL MEHRA,

13             having been first duly sworn and/or affirmed

14    on his oath, was thereafter examined and testified as

15    follows:

16            MR. SELWYN:  May I proceed, Your Honor?

17            JUDGE BHATTACHARYYA:  Yes, please, go ahead.

18                       DIRECT EXAMINATION

19    BY MR. SELWYN:

20        Q.   Good afternoon.  Could you please introduce

21    yourself, tell us where you work and a little bit about

22    yourself, please?

23        A.   Sure.  My name is Saahil Mehra, and I work at

24    Apple.  I live in Boston with my wife and my two-year-old.

25        Q.   What is your current position at Apple?
```

1    A.   Currently I lead and I manage the mechanical

2  engineering or product design team that's responsible for

3  design, development, and validation of the health sensors

4  for Apple's products.

5    Q.   What is your educational background, sir?

6    A.   I have a Bachelor's in material science and

7  engineering from MIT in 2008, a Master's and a Ph.D. in

8  material science and engineering from Stanford in 2010 and

9  2014, and a certificate in biomedical engineering from

10  Stanford in 2019.

11    Q.   When did you join Apple?

12    A.   I joined Apple directly after my Ph.D. in late

13  2014.

14    Q.   At a high level, what work have you done on Apple

15  Watch?

16    A.   At a high level, I've been deeply involved in all

17  aspects of the product development for R&D life cycle for

18  health sensor features for the Apple Watch, including the

19  electrocardiogram and all of the optical health sensors,

20  which are the heart rate sensor, the pulse oximetry feature,

21  and also the optical proximity sensors.

22    Q.   Which versions of Apple Watch has your work

23  related to?

24    A.   I have been deeply involved with Apple Watch

25  design and development since the Series 4 onwards.

852

1          Q.   When did you begin working on the blood oxygen

2    feature of Apple Watch Series 6?

3          A.   I joined the team around mid 2018 after the early

4    prototyping feasibility had been established, and they were

5    looking for my expertise to help integrate this feature into

6    a system in the Apple Watch.

7          Q.   Did your work on the blood oxygen feature for

8    Apple Watch have anything to do with the work that you had

9    done on the heart sensor?

10         A.   Yes, very much so.  So pulse oximetry as a

11   feature is essentially heart rate sensing, but comparing the

12   amplitude of the signal at two different colors of light or

13   wavelengths of light.

14              And so all of the work that we did to design,

15   develop, and validate heart rate sensors over multiple

16   generations of the watch was a great engineering base for us

17   to build off of.

18              MR. SELWYN:  Your Honor, could we go on the Apple

19   confidential record.

20              (Whereupon, the hearing proceeded in confidential

21   session.)

22

23

24

25

```
1               C O N T E N T S

2            INDEX OF WITNESSES

3
                                    RE-    RE-
    WITNESS           DIRECT CROSS DIRECTCROSS

5  JACK GOLDBERG,..............612    636   657,  662

6                                          663

7  VIJAY MADISETTI,............664    763   808

8  VIVEK VENUGOPAL,............816    833   845   848

9  SAAHIL MEHRA,...............850

10

11

12

13  AFTERNOON SESSION                        718

14

15

16  CONFIDENTIAL SESSIONS                 617-635

17                                        639-657

18                                        660-663

19                                        678-762

20                                        777-815

21                                        820-849

22                                        853-end

23

24

25
```

```
 1                     C E R T I F I C A T E

 2   TITLE: CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES

 3   AND COMPONENTS THEREOF

 4   INVESTIGATION NO.:  337-TA-1276

 5   HEARING DATE:  June 8, 2022

 6   LOCATION:  Washington, D.C. - Remote

 7   NATURE OF HEARING:  Evidentiary Hearing

 8           I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
 9   above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:    June 29, 2022
     Signed:
11   ss//

12   Signature of the Contractor or the Authorized Contractor's
     Representative
13
             I hereby certify that I am not the court reporter
14   and that I have proofread the above-referenced transcript of
     the proceedings of the U.S. International Trade Commission
15   against the aforementioned court reporter's notes and
     recordings for accuracy in transcription in the spelling,
16   hyphenation, punctuation and speaker identification and did
     not make any changes of a substantive nature.  The
17   foregoing/attached transcript is a true, correct and
     complete transcription of the proceedings.
18   Signed:

19   ss//     Raymond G. Brynteson

20
             I hereby certify that I reported the
21   above-referenced proceedings of the U.S. International Trade
     Commission and caused to be prepared from my record media
22   and notes of the proceedings a true, correct and complete
     verbatim recording of the proceedings.
23   Signed:

24   ss//     Linda Kinkade

25
```

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

```
-------------------------------x

In the Matter of                   Investigation No.

CERTAIN LIGHT-BASED PHYSIOLOGICAL   337-TA-1276

MEASUREMENT DEVICES AND COMPONENTS

THEREOF

-------------------------------x
```

**OPEN SESSIONS**

```
Pages:     862 through 1167 (with excerpts)

Place:     Washington, D.C.

Date:June 9, 2022
```

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

862

```
 1              UNITED STATES INTERNATIONAL TRADE COMMISSION

 2                          Washington, D.C.

 3              Before the Honorable Monica Bhattacharyya

 4                       Administrative Law Judge

 5

 6      -------------------------------x

 7      In the Matter of                    Investigation No.

 8

 9      CERTAIN LIGHT-BASED PHYSIOLOGICAL    337-TA-1276

10      MEASUREMENT DEVICES AND COMPONENTS

11      THEREOF

12      -------------------------------x

13

14

15                        EVIDENTIARY HEARING

16                      Thursday, June 9, 2022

17                            Volume IV

18

19

20          The parties met via remote videoconferencing

21      pursuant to notice of the Administrative Law Judge at 9:30

22      a.m. Eastern.

23

24

25      Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR
```

```
 1   A P P E A R A N C E S:

 2   [All parties appeared via remote videoconferencing and/or

 3   telephonically.]

 4

 5   Counsel for Complainants Masimo Corporation and Cercacor

 6   Laboratories, Inc.:

 7           KNOBBE, MARTENS, OLSON & BEAR, LLP

 8           2040 Main Street, Fourteenth Floor

 9           Irvine, California 92614

10           (949) 760-0404

11               Stephen C. Jensen, Esq.

12               Joseph R. Re, Esq.

13               Sheila N. Swaroop, Esq.

14               Ted M. Cannon, Esq.

15               Kendall M. Loebbaka, Esq.

16               Douglas B. Wentzel, Esq.

17               Irfan A. Lateef, Esq.

18               Brian C. Claassen, Esq.

19               Daniel C. Kiang, Esq.

20               Douglas B. Wentzel, Esq.

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1    A P P E A R A N C E S (continued):

 2

 3    Counsel for Complainants Masimo Corporation and Cercacor

 4    Laboratories, Inc.:

 5            KNOBBE, MARTENS, OLSON & BEAR, LLP

 6            1717 Pennsylvania Avenue, NW, Suite 900

 7            Washington, DC 20006

 8            (202) 640-6400

 9                  Jonathan E. Bachand, Esq.

10

11            KNOBBE, MARTENS, OLSON & BEAR, LLP

12            925 4th Avenue, Suite 2500

13            Seattle, Washington 98104

14            (206) 405-2000

15                  Carol Pitzel Cruz, Esq.

16

17

18

19

20

21

22

23

24

25    CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Respondent Apple Inc.:

 4           WILMER CUTLER PICKERING HALE AND DORR LLP

 5           1875 Pennsylvania Avenue, NW

 6           Washington, DC 20006

 7           (202) 663-6000

 8               Michael D. Esch, Esq.

 9               David L. Cavanaugh, Esq.

10

11           WILMER CUTLER PICKERING HALE AND DORR LLP

12           2600 El Camino Real, Suite 400

13           Palo Alto, California 94306

14           (650) 858-6000

15               Mark D. Selwyn, Esq.

16

17

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1    A P P E A R A N C E S (continued):

 2

 3    Counsel for Respondent Apple Inc.:

 4            WILMER CUTLER PICKERING HALE AND DORR LLP

 5            60 State Street

 6            Boston, Massachusetts 02109

 7            (617) 526-6000

 8                    Joseph J. Mueller, Esq.

 9                    Richard Goldenberg, Esq.

10                    Sarah R. Frazier, Esq.

11                    Jonathan A. Cox, Esq.

12                    Nina Garcia, Esq.

13                    Cynthia D. Vreeland, Esq.

14

15

16            WILMER CUTLER PICKERING HALE AND DORR LLP

17            1225 17th Street, Suite 2600

18            Denver, Colorado 80202

19            (720) 598-3459

20                    Ravi S. Deol, Esq.

21

22

23

24

25        CONTINUED ON FOLLOWING PAGE
```

     1    A P P E A R A N C E S (continued):

     2

     3    Counsel for Respondent Apple Inc.:

     4            WILMER CUTLER PICKERING HALE AND DORR LLP

     5            350 South Grand Avenue, Suite 2400

     6            Los Angeles, California 90071

     7            (213) 443-5300

     8                 Derek Gosma, Esq.

     9

    10

    11

    12

    13

    14

    15

    16

    17            *** Index appears at end of transcript ***

    18

    19

    20

    21

    22

    23

    24

    25

868

```
 1              P R O C E E D I N G S
 2            (In session at 9:30 a.m.)
 3        JUDGE BHATTACHARYYA:  We'll start on the public
 4   record.  I believe there's some housekeeping matters to take
 5   care of.  Shall we begin with the admission of exhibits?
 6        MS. SWAROOP:  Yes.  Good morning, Your Honor,
 7   Sheila Swaroop for Complainants.
 8            I believe we have two lists from two days ago,
 9   and then I believe we have agreement on the list from today
10   as well for the admitted exhibits.
11        JUDGE BHATTACHARYYA:  All right.  So I have one
12   entitled Complainants' Corrected Table of Admitted Exhibits
13   for the Evidentiary Hearing on June 7th, 2022.
14            Beyond the objections that have already been
15   ruled upon, are there any further objections from Apple?
16        MR. MUELLER:  The one thing, Your Honor, and this
17   may be addressed in the version that you're looking at, and,
18   if it is, it's a moot point, but I think in one version of
19   the table there had been some demonstratives listed.
20            We have no objection to the demonstratives being
21   lodged with Your Honor, but we believe, as a formal matter,
22   they are not exhibits.
23        MS. SWAROOP:  Mr. Mueller, we addressed that.  We
24   prepared two separate lists of exhibits, so there's a list
25   of admitted exhibits and there's a separate list of
```

869

1    demonstrative exhibits, which we sent to you and your team

2    yesterday.  We're in agreement on that.

3              MR. MUELLER:  Then it's a moot point.  Thank you.

4              MS. SWAROOP:  Thank you.

5              JUDGE BHATTACHARYYA:  All right.  There's one

6    item on this corrected table that we discussed yesterday, I

7    believe with Mr. Claassen.  It has to do with whether the

8    physical sent to the ALJ, CPX-156C, will be listed as an

9    exhibit.

10             My understanding was that would not be a physical

11   exhibit; the photo would stay in --

12             MS. SWAROOP:  My apologies.  You're correct,

13   Your Honor.  If that was included, we'll resubmit again and

14   remove CPX-156 and make sure CPX-156A is on instead.

15             JUDGE BHATTACHARYYA:  There is no need to do

16   that.  I'll admit this list of exhibits that's entitled

17   Complainants' Corrected Table of Admitted Exhibits for the

18   Evidentiary Hearing on June 7th, 2022, with the exception of

19   CPX-156C, physical A, sent to ALJ.

20             Could you please send the list to the court

21   reporter and cross out that particular entry.

22             (Whereupon, the exhibits as recited by counsel

23   and reflected in the attached index were submitted and

24   received in evidence.)

25             MS. SWAROOP:  We will do that, Your Honor.  Thank

1    you.

2              JUDGE BHATTACHARYYA:  Then I have Complainants'

3    Table of Demonstratives for Evidentiary Hearing on June 6th

4    and June 7th, 2022.

5              Are there any objections to receiving those

6    demonstratives as demonstrative exhibits, not as substantive

7    evidence?

8              MR. MUELLER:  No objection, Your Honor.

9              JUDGE BHATTACHARYYA:  So those demonstratives

10   will be received.

11             (Whereupon, the exhibits as recited by counsel

12   and reflected in the attached index were submitted and

13   received in evidence.)

14             JUDGE BHATTACHARYYA:  Then I have a list entitled

15   Table of Admitted Exhibits for the Evidentiary Hearing on

16   June 8th, 2022.

17             Are there any objections to that table of

18   exhibits other than objections that have already been ruled

19   upon?

20             MR. MUELLER:  No further objections, Your Honor.

21             JUDGE BHATTACHARYYA:  Then the list of exhibits

22   in that table are admitted.  Please send a copy to the court

23   reporter.

24             (Whereupon, the exhibits as recited by counsel

25   and reflected in the attached index were submitted and

1  received in evidence.)

2        MS. SWAROOP:  We will do that, Your Honor.  Thank

3  you.

4        JUDGE BHATTACHARYYA:  Okay.  Thank you.

5        Anything further before we begin with the

6  witness?

7        MR. MUELLER:  Briefly, Your Honor.  The other

8  issue, which we emailed chambers about shortly before the

9  hearing, we continue to have concerns about the time

10  allocation.  We're not asking for a ruling right now.  We

11  don't want to --

12        MS. SWAROOP:  Your Honor, we would like to get

13  started because --

14        MR. MUELLER:  If I could please finish my

15  sentence.

16        At the end of the day yesterday Ms. Swaroop said

17  that I had wildly or significantly overstated the time in

18  balance when I said it was three and a half hours more

19  consumed by Masimo.

20        We checked.  It was actually three hours and 30

21  minutes, which is precisely what I said.

22        There's two problems that have emerged.  Number

23  one, apparently Masimo did not track time on Monday in a

24  granular fashion, objection by objection, witness by

25  witness.  We did.  We provided those numbers each day to

1  Masimo.  They haven't accepted our numbers for Monday

2  despite apparently not doing what we did.

3          The second thing, on meet and confers, they have

4  raised arguments about allocation that we think are

5  incorrect.  We're not going to raise them with Your Honor

6  right now.  We're going to continue to try to meet and

7  confer about this.

8          I raise it now, Your Honor, because, as I said at

9  the end of the day yesterday, we will not be able to achieve

10  a 50-50 split of the time for the week unless Masimo

11  confines its cross-examinations to make them quite short.

12  And it's hard for us to see how a rebuttal case on

13  invalidity is possible.  It's, of course, up to them how

14  they choose to allocate their time, and I won't -- I won't

15  do their job for them.

16          But I do think the concerns are significant

17  enough that at the end of the day we may need to raise it

18  again with Your Honor, and perhaps at that time request some

19  rulings.

20          Right now I'm not requesting anything specific,

21  but I am previewing that we continue to have very

22  significant concerns about the consumption of time.  Even

23  without tracking, Your Honor, you have been here, of course,

24  every day to observe the hearing, it's pretty clear Masimo

25  has taken far more time than we have, and at some point that

1    needs to change to achieve a 50-50 split.

2          MS. SWAROOP:  Your Honor, the grandstanding that

3    we hear every day from Mr. Mueller is one of the reasons why

4    some of these proceedings are taking so long.

5          We are ready to begin.  Mr. Mueller has no

6    requests for you, yet we're continuing to hear from him.  So

7    we're prepared to begin with our witnesses and conduct the

8    hearing.

9          JUDGE BHATTACHARYYA:  One question right now.

10    What are the parties' estimates as to how much time each

11    party has left?

12          MR. MUELLER:  Your Honor, our best estimate is

13    that they have three and three quarters hours.  We have

14    seven and one quarter hour, which is three and a half hours

15    more than they have, because they have used three and a half

16    hours more than we have.

17          I'll let my statements for the week stand for

18    themselves.  They're not grandstanding.

19          JUDGE BHATTACHARYYA:  Ms. Swaroop, do you have an

20    estimate of how much time Masimo has left?

21          MS. SWAROOP:  Masimo has left, I think we -- we

22    have calculated that I think we have spent two hours and 45

23    minutes more than Apple at this point in time.  Our original

24    estimate, I think, was at the end of our Masimo witnesses we

25    would be at two hours and 30 minutes more than Apple, which

1    makes sense, since we are presenting our direct case on a

2    number of issues that Apple refused to stipulate to.

3         The balance, which we informed Apple yesterday,

4    is that during today's presentation, when their witnesses

5    are going, they are going to spend way more time than we do.

6         So we think to it makes sense to revisit this at

7    the end of the day, see where we're at, and we can have a

8    discussion at this point.

9         JUDGE BHATTACHARYYA:  You don't have an estimate

10   right now as to how much time Masimo has left?  I

11   understand -- if you don't know, that's fine.

12        MS. SWAROOP:  Thank you, Your Honor.  We'll work

13   on getting that number.  We've been working on how much time

14   we have and the spread -- as to what the spread we had

15   originally projected, and we are in line with that.

16        JUDGE BHATTACHARYYA:  Okay.  Let's go ahead with

17   the witness.

18        MR. MUELLER:  Thank you, Your Honor.  We'll

19   resume with Dr. Mehra, please.

20                    SAAHIL MEHRA,

21        having been previously duly sworn and/or

22   affirmed on his oath, was thereafter examined and testified

23   further as follows:

24        MR. SELWYN:  Your Honor, may we begin on the

25   Apple confidential record, please.

1              JUDGE BHATTACHARYYA:  Yes.

2              (Whereupon, the hearing proceeded in confidential

3     session.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3              MR. MUELLER:  Your Honor, as our next witness we

 4    call Dr. Ueyn Block, and Ms. Frazier will do the

 5    examination.

 6              MS. FRAZIER:  Dr. Mehra, assuming it's okay with

 7    Her Honor, you are free to go.

 8              JUDGE BHATTACHARYYA:  Yes.  Thank you for your

 9    time.

10              THE WITNESS:  Thanks.  Sounds good.

11              JUDGE BHATTACHARYYA:  Good morning, Dr. Block.

12              THE WITNESS:  Good morning.

13              JUDGE BHATTACHARYYA:  Do you understand that you

14    have an obligation to tell the truth here today?

15              THE WITNESS:  Yes.

16                         UEYN BLOCK,

17              having been first duly sworn and/or affirmed

18    on his oath, was thereafter examined and testified as

19    follows:

20              JUDGE BHATTACHARYYA:  Thank you.

21              You may proceed.

22                    DIRECT EXAMINATION

23    BY MS. FRAZIER:

24         Q.   Good morning, Dr. Block.

25         A.   Good morning.
```

1       Q.   Could you please introduce yourself to Her Honor?

2       A.   Absolutely.  My name is Ueyn Block, and I work at

3    Apple.

4       Q.   What is your educational background?

5       A.   I have a Bachelor's degree in physics and

6    mathematics and then got a Master's and a Ph.D. degree in

7    applied physics at Stanford University.

8       Q.   What did you do after you defended your

9    dissertation at Stanford?

10      A.   I went from Stanford to a startup company working

11   on noninvasive biomedical optics devices and stayed there

12   for about six years.

13      Q.   And after that what did you do?

14      A.   I pursued a job at Apple and went directly from

15   that company to Apple.

16      Q.   When did you join Apple?

17      A.   I joined Apple in March of 2013.

18      Q.   Why were you interested in working at Apple?

19      A.   Basically I've been a longtime appreciator of the

20   company since using products dating back all the way to the

21   '80s, and for me it was some kind of a dream job.  I had

22   actually tried to get a job there straight out of graduate

23   school but didn't have the right qualifications at that

24   time, so I eventually got there.

25      Q.   Dr. Block, what products have you worked on

1   during your time at Apple?

2          A.   Primarily the Apple Watch since I first joined.

3          Q.   Which versions of Apple Watch have you worked on?

4          A.   All of them.

5          Q.   Starting with the first Apple Watch, if I refer

6   to that as the Series 0, will you understand what I'm

7   talking about?

8          A.   Yes.

9          Q.   What were your responsibilities with respect to

10   the Series 0 Apple Watch?

11          A.   When I started, we were at very early stages of

12   doing R&D and prototyping, and I was primarily working on

13   the overall optical architecture of the health sensors for

14   the Series 0 Apple Watch.

15          Q.   And at a high level, what are the components that

16   are part of the optical sensors in Apple Watch Series 0?

17          A.   Components such as the LEDs and photodiodes, the

18   windows and apertures in the back crystal, how they are all

19   arranged and how we create the overall optical architecture.

20          Q.   Now, Dr. Block, next to you in the room is what

21   has been marked as RPX-5.

22               Do you see that?

23          A.   Yes.

24          Q.   Could you tell us what RPX-5 is?  And if you

25   don't mind just holding it up.

1    A.   So it's an enclosed Series 0 Apple Watch.

2    Q.   And what -- excuse me.  Strike that.

3         You referred to the back crystal a moment ago.

4    Using RPX-5, could you show Her Honor what the back crystal

5    on the Series 0 is?

6    A.   Sure.  So on the back of the watch, the watch has

7    this metal housing, the front has a display, on the rear

8    side there's a circular protruding dome, I'm going to try to

9    hold it close, that sticks out of the metal housing.  This

10   circular dome is what we refer to as the back crystal on the

11   Series 0.

12        MS. FRAZIER:  Your Honor, at this point I'd like

13   to go on the Apple confidential record.

14        (Whereupon, the hearing proceeded in confidential

15   session.)

16

17

18

19

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3           MR. MUELLER:  Your Honor, for our next witness we

 4   call Dr. Steve Waydo, and Ms. Garcia will do the

 5   examination, Nina Garcia.

 6           MS. GARCIA:  Good morning, Your Honor.  Nina

 7   Garcia for Respondent Apple.

 8           JUDGE BHATTACHARYYA:  Good morning, Dr. Waydo.  I

 9   believe you're on mute.

10           THE WITNESS:  Good morning.

11           JUDGE BHATTACHARYYA:  Welcome.  Do you understand

12   that you are under an obligation to tell the truth here

13   today?

14           THE WITNESS:  I do.

15                       STEPHEN WAYDO,

16           having been first duly sworn and/or affirmed

17   on his oath, was thereafter examined and testified as

18   follows:

19           JUDGE BHATTACHARYYA:  You may proceed, counsel.

20                   DIRECT EXAMINATION

21   BY MS. GARCIA:

22      Q.   Good morning, sir.  Would you please introduce

23   yourself?  Where do you live?  Where do you work?

24      A.   My name is Stephen Waydo.  I live in Saratoga,

25   California, and I work for Apple.
```

1        Q.    What is your current role at Apple?

2        A.    I'm director of a group called HID Health.

3        Q.    What is HID Health?

4        A.    HID stands for human interface devices.  The

5   larger organization builds algorithms for sensors on a

6   variety of Apple products.  My team, in particular, is

7   responsible for health algorithms primarily on the Apple

8   Watch.

9        Q.    Dr. Waydo, could you briefly describe your

10  educational history?

11       A.    Yes.  I have a Bachelor's degree in aeronautics

12  and astronautics from the University of Washington that I

13  obtained in 2001, and a Ph.D. in control and dynamical

14  systems from Caltech that I obtained in 2007.

15       Q.    What did you do after you received your Ph.D.

16  from Caltech?

17       A.    Before and during graduate school I worked at

18  NASA Jet Propulsion Laboratory in Pasadena, and I continued

19  on there as a full-time employee for about six or eight

20  months after I finished my Ph.D.

21       Q.    Can you give an example of a project that you

22  worked on at NASA Jet Propulsion Lab?

23       A.    Yes.  I worked on a variety of robotic heat space

24  exploration missions.  The biggest one was a mission called

25  Deep Impact that flew out and took pictures of a comet in

1   2005.

2           (Clarification by reporter.)

3      Q.   Did you work anywhere else before joining Apple?

4      A.   Yes.  After JPL I worked at a startup called C8

5   Medisensors for about four and a half years.  At C8 we were

6   trying to build a noninvasive glucose measuring device.

7      Q.   When did you join Apple?

8      A.   I joined Apple in March of 2013.

9      Q.   What motivated you to join Apple, Dr. Waydo?

10     A.   Well, the startup I worked at was ultimately

11  unsuccessful, but I got very excited about the prospect of

12  the building consumer products, and I thought Apple offered

13  a tremendous learning opportunity to learn from the best

14  about how to build products, and to have the opportunity to

15  ship something at very large scale.

16     Q.   And when you joined Apple in 2013, were you hired

17  for a specific product?

18     A.   I was, although I didn't know it at the time.  So

19  the interview process is very secretive.  But I knew I would

20  be working on products, and I was informed on my first day

21  that the -- that I would be working on the first generation

22  Apple Watch.

23     Q.   What features did you work on for the first

24  generation Apple Watch?

25     A.   I worked on the algorithm supporting heart rate

1    sensing as well as wrist detection on the first Apple Watch.

2         Q.   And what specifically was your role in developing

3    the heart rate sensor for that first watch?

4         A.   The biggest part of my role was working together

5    with the hardware team to make sure that the hardware

6    sensors they were building were a good fit for the

7    algorithms we were building for particular end user

8    applications.  And by the time we shipped that first watch,

9    I was responsible overall for the heart rate algorithm

10   development.

11        Q.   Can you tell us briefly about the hardware and

12   software used for the heart rate sensing?

13             MS. GARCIA:  Your Honor, at this point we would

14   like to move onto the Apple confidential record.

15             JUDGE BHATTACHARYYA:  We're moving onto the Apple

16   confidential record.

17             (Whereupon, the hearing proceeded in confidential

18   session.)

19

20

21

22

23

24

25

```
 1                   O P E N   S E S S I O N

 2

 3              JUDGE BHATTACHARYYA:  We're moving to the public

 4    record.

 5              THE WITNESS:  Okay.

 6    BY MS. SWAROOP:

 7         Q.   Dr. Waydo, I believe in your direct testimony you

 8    said that you wanted to join Apple because you wanted to

 9    learn from the best, correct?

10         A.   Yes.

11         Q.   Okay.  And, Dr. Waydo, are you aware that Apple

12    has hired individuals from Masimo?

13         A.   Yes.

14         Q.   You know Mike O'Reilly, correct?

15         A.   I do.

16         Q.   You worked with Mike O'Reilly, correct?

17         A.   Yes.

18         Q.   And you filed a patent application with Mike

19    O'Reilly; isn't that correct?

20         A.   It's possible.  I don't know for sure.

21         Q.   Okay.  Let's bring up CX-1684.  It's in your

22    binder.  And we'll put it up on the screen.

23              Dr. Waydo, this is a published patent application

24    filed by Apple naming you and Michael O'Reilly among the

25    inventors; isn't that right?
```

1       A.   Yes.

2       Q.   Dr. Waydo, in your direct testimony you discussed

3   the heart rate sensing feature of the Series 0 watch; isn't

4   that right?

5       A.   Yes.

6       Q.   Okay.  And that watch involved a heart rate

7   measurement, correct?

8       A.   Yes.

9       Q.   Okay.  And the measurement of oxygen saturation

10  is a more difficult measurement than the heart rate

11  measurement, correct?

12      A.   It's different for sure.

13      Q.   It's more difficult, isn't it, Dr. Waydo?

14      A.   It's very different.  It solves a different set

15  of problems.  I don't know that I would characterize it as

16  more difficult.

17      Q.   Okay.  Let's go to your deposition, which is in

18  your binder, and we'll take a look at pages -- page 163,

19  line 15, to 164, line 3.

20      A.   Can you tell me where in my binder I can find

21  that?

22      Q.   It should be in your binder, if there's a tab

23  there, I believe it's CX-298C.

24      A.   Okay.  And then what pages?

25      Q.   Page 164 -- sorry -- page 163, line 15, to 164,

 1   line 3, and I have it up on the screen as well.

 2        A.   Okay.

 3        Q.   And the question was from your own counsel:

 4             What was your reaction to receiving the

 5   assignment of helping develop the blood oxygen feature for

 6   the Apple Watch?

 7             And your answer:

 8             I was both excited and, I'd say, intimidated.

 9   It's a more difficult measurement than the heart rate

10   measurement, and, however, embarking on a new sensing

11   development project is always exciting and quite a ride.  So

12   I was looking forward to it.

13             Were you asked that question and did you give

14   that answer at your deposition, Dr. Waydo?

15        A.   Yes.

16        Q.   Okay.  So you would agree, then, that oxygen

17   saturation is a more difficult measurement than heart rate

18   measurement, correct?

19        A.   It depends very much on the context, but in some

20   contexts, yes.

21        Q.   Okay.  And, in fact, it was extremely challenging

22   to develop the blood oxygen feature in the Apple Watch,

23   correct?

24        A.   Yes.

25        Q.   Now you've been involved in assessing the

1    accuracy of the blood oxygen feature of the Apple Watch,

2    correct?

3        A.   Not in a hands-on way, but I reviewed the data.

4        Q.   You understand when talking about accuracy that

5    there's a difference between sensitivity on the one hand and

6    specificity on the other hand, correct?

7        A.   Yes.

8        Q.   And let's talk first about sensitivity.

9             An Apple Watch that detects everyone who has a

10   particular medical condition would be an example of a highly

11   sensitive device, correct?

12       A.   Yes.

13       Q.   Okay.  And that's different from specificity,

14   correct?

15       A.   That's correct.

16       Q.   Okay.  An Apple Watch that detects medical

17   conditions in people who do not actually have that medical

18   condition would be an example of a device with low

19   specificity, correct?

20       A.   Yes.

21       Q.   Okay.  And in your direct today you didn't

22   present any information on false alarms, that is, people who

23   went to seek out medical care or thought something was wrong

24   with them based on something from the Apple Watch but had no

25   reason to do so, correct?

1      A.   Presented nothing to that effect, that's correct.

2      Q.   Okay.  Did you ever work with Chin San Han in

3  2013?

4      A.   Yes.

5      Q.   Are you aware that Mr. Han tore apart a Masimo

6  reflectance sensor during that time period?

7           MS. GARCIA:  Objection, Your Honor.  This lacks

8  foundation.

9           JUDGE BHATTACHARYYA:  Ms. Swaroop?

10          MS. SWAROOP:  I'm simply asking if he is aware,

11  Your Honor.

12          JUDGE BHATTACHARYYA:  The objection is overruled.

13     A.   Not that I can recall.

14     Q.   Dr. Waydo, there has been feedback in the press

15  about the unreliability of the blood oxygen feature of the

16  Apple Watch Series 6, correct?

17     A.   There's been a wide variety of feedback in the

18  press about the product, both positive and negative.

19     Q.   Okay.  Well, let's talk about some of that

20  feedback.  Let's go to CX-1606 in your book, and I'm also

21  going to put it on the screen.  It's an article from Input

22  Mag titled, quote, The Apple Watch's blood oxygen sensor is

23  less accurate than you think.

24          Do you see that?

25     A.   I see that.

1      Q.   Okay.  And let's turn to page 2.  Let's go to the

2   "Check with your doctor" paragraph.  In this article it

3   says, quote, some day Apple's blood oxygen monitoring could

4   be accurate enough to actually detect medical conditions,

5   but right now it's more of a gimmick than anything else.

6           Is that correct, Dr. Waydo?

7      A.   That's what this article says.

8      Q.   Right.  Let's go to CX-1608 in your book.  This

9   is an article from the Verge entitled Apple Watch Series 6

10  review, minute improvements.

11          Do you see that?

12     A.   What page are we looking at here?

13     Q.   Sure.  We're at CX-1608, page 1.

14     A.   Okay.

15     Q.   Okay.  And if we go to page 2, there's a heading,

16  "bad stuff."

17          Do you see that?

18     A.   I see that.

19     Q.   And the third bullet point, "blood oxygen

20  monitoring is unreliable."

21          Do you see that?

22     A.   I see that.  I think here they are referring to

23  difficulties getting successful measurements, because we

24  tried very hard not to produce inaccurate measurements.

25          MS. SWAROOP:  Okay.  We need to go to the Apple

1    CBI record at this point.

2              (Whereupon, the hearing proceeded in confidential

3    session.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3    BY MS. SWAROOP:

 4         Q.   Dr. Waydo, you've been aware of Masimo since

 5    2010, correct?

 6         A.   I think so.

 7         Q.   Okay.  And you're aware of Masimo's products,

 8    correct?

 9         A.   Not by model number, but generally speaking, yes.

10         Q.   Okay.  And in the specific area of clinical and

11    in-hospital monitoring, you consider Masimo to be an

12    important player and a leader; isn't that right, Dr. Waydo?

13         A.   I believe they are an important player.

14         Q.   And a leader, correct?

15         A.   I don't know.  I'm not deeply familiar with the

16    clinical market.

17         Q.   Okay.  Well, let's go to your deposition.  It's

18    in your binder, CX-298C, page 127, line 25, to 128, line 6.

19         A.   Can you repeat the page number again, please?

20         Q.   Sure.  Page 127, line 25 to 128, line 6.

21         A.   Okay.

22         Q.   And you were asked:

23              And do you consider Masimo to be a leader in that

24    field as well?

25              And you answered:
```

1          I consider Masimo to be an important player and a

2    leader just specifically in the area of clinical and

3    in-hospital monitoring.

4          Do you see that?

5    A.    Yes.  Masimo is certainly a market leader.  I

6    don't know the extent to which they are a technology leader.

7    Q.    So you were asked that question and you gave that

8    answer at your deposition, right, Dr. Waydo?

9    A.    Yes.

10   Q.    Thank you.

11         MS. SWAROOP:  I have no further questions.

12         MS. GARCIA:  Brief redirect, Your Honor.

13                   REDIRECT EXAMINATION

14         JUDGE BHATTACHARYYA:  Yes, go ahead.  We're on

15   the public record.  Do you want to stay on the public

16   record?

17         MS. GARCIA:  No, Your Honor.  We'll briefly go on

18   the confidential record please.

19         (Whereupon, the hearing proceeded in confidential

20   session.)

21

22

23

24

25

949

```
 1                 O P E N   S E S S I O N

 2

 3          JUDGE BHATTACHARYYA:  We're moving to the public

 4    record.

 5    BY MS. GARCIA:

 6       Q.   Dr. Waydo, you were also shown some articles that

 7    purported to describe the accuracy of Apple Watch.

 8            Do you recall that?

 9       A.   Yes.

10       Q.   Now as a factual matter, based on your work

11    developing the blood oxygen feature, how accurate are the

12    measurements that are presented to users?

13       A.   We've tested the watch to the same standards that

14    are used to assess clinical grade devices, and we meet the

15    general accepted standards for accuracy of blood oxygen

16    devices.

17       Q.   Dr. Waydo, you were asked some questions about

18    Dr. O'Reilly.

19            Do you recall that?

20       A.   Yes.

21       Q.   Did Dr. O'Reilly contribute any ideas to the

22    software or hardware of the Apple Watch blood oxygen

23    sensors?

24            MS. SWAROOP:  Objection, foundation.

25            MS. GARCIA:  I can restate it.
```

950

1        Q.    Dr. Waydo, what role, if any, did Dr. O'Reilly

2    have on your health sensing algorithm team with respect to

3    the development of the blood oxygen feature?

4        A.    Dr. O'Reilly is an anesthesiologist.  He has

5    extensive knowledge around the physiological, that's in

6    general, and physiological of PPG signals in particular, but

7    he has no engineering expertise and had no contributions to

8    the hardware or software.

9        Q.    Who did come up with the ideas for the software

10   and hardware of Apple Watch and the blood oxygen feature?

11       A.    The majority of the work happened between the

12   health sensing hardware team, I believe we have heard from a

13   few of them in this hearing, as well as my team.

14       Q.    Did any of those ideas come from Masimo?

15       A.    No.

16       Q.    Thank you, Dr. Waydo.

17             MS. GARCIA:  I have no further questions at this

18   time.

19                      RECROSS-EXAMINATION

20   BY MS. SWAROOP:

21       Q.    Ms. Garcia asked you about your familiarity of

22   accuracy with the Apple Watch health sensing features.

23             Do you recall that?

24       A.    Yes.

25       Q.    Okay.  Are you aware of a published study from

1    the Mayo Clinic indicating that the Apple Watch triggers a

2    number of false alarms causing people to go to the hospital

3    and resulting in unnecessary utilization of hospital

4    resources?

5         A.    We have a number of problems with that particular

6    study and the methodology there in general, but I'm aware of

7    the paper you're talking about.

8         Q.    Thank you.

9              MS. SWAROOP:  No further questions.

10             MS. GARCIA:  Nothing further, Your Honor.

11             Thank you, Dr. Waydo.

12             JUDGE BHATTACHARYYA:  Thank you for your time,

13   Dr. Waydo.

14             THE WITNESS:  Thank you.

15             MR. MUELLER:  We certainly defer to Your Honor,

16   but this might be a good time for the morning break before

17   our next witness.

18             JUDGE BHATTACHARYYA:  It sounds like a good idea.

19   Let's take a morning break now.  We're in recess for 15

20   minutes.

21             (Whereupon the proceedings recessed at 11:07

22   a.m.)s.

23             (In session at 11:23 a.m.)

24             JUDGE BHATTACHARYYA:  We're back on the record.

25             MR. MUELLER:  Thank you, Your Honor.  Apple calls

1    as its next witness Brian Land.

2            JUDGE BHATTACHARYYA:  Good morning, Mr. Land.  Do

3    you understand you're under an obligation to tell the truth

4    in your testimony today?

5            THE WITNESS:  Yes.

6                    BRIAN LAND,

7            having been first duly sworn and/or affirmed

8    on his oath, was thereafter examined and testified as

9    follows:

10           JUDGE BHATTACHARYYA:  Thank you.

11           MR. MUELLER:  May I proceed, Your Honor?

12           JUDGE BHATTACHARYYA:  Yes, please.

13                   DIRECT EXAMINATION

14   BY MR. MUELLER:

15       Q.   Good morning, Mr. Land.  Could you please

16   introduce yourself to Her Honor?

17       A.   Yes.  My name is Brian Land.  I live in Woodside,

18   California, and I work at Apple.

19       Q.   Sir, could you please describe your educational

20   background starting with college?

21       A.   Yes.  I have a Bachelor's of Science in Material

22   Science and Engineering from Cornell University, and I have

23   a Master of Science in Material Science and Engineering from

24   Stanford University.

25       Q.   Mr. Land, what year did you earn your Master's

1    from Stanford?

2         A.    1992.

3         Q.    And what did you do next?

4         A.    I went for work -- to work at a startup company

5    that designed sensors, specifically gyroscopes and

6    applications that integrated sensors and gyroscopes.

7         Q.    What was the name of that company?

8         A.    It was called Gyration.

9         Q.    For how long did you work at Gyration?

10        A.    I worked there 12 years.

11        Q.    What type of work did you do in that time?

12        A.    It was a small company.  It was a startup, so I

13   had to wear a lot of hats.  But the main tasks were

14   designing gyroscopes, designing test equipment, and

15   manufacturing equipment to build and test gyroscopes, and

16   then designing applications that integrated the gyroscopes

17   into bigger systems that we could try to sell to customers.

18        Q.    Sir, what did you find interesting about working

19   on these types of sensors?

20        A.    Well, I really like sensors because they require

21   engineering knowledge across multiple domains, examples

22   being electrical, mechanical, physics.  And the best design

23   requires really an understanding of all of them, and so I

24   got to apply many engineering skills.  And I also

25   particularly like sensors because they interface with the

954

1    world at large, they tell us something about the outside

2    world, and the world is complex, and, because it's complex,

3    it's a challenging engineering problem.

4         Q.   Now, sir, when did you leave Gyration to go to

5    work at Apple?

6         A.   It was spring of 2005.

7         Q.   And why did you make the decision to join Apple?

8         A.   Gyration was -- I really enjoyed working there,

9    but it was a small company and the products that we sold

10   were sold in modest numbers, and we did excellent

11   engineering work, we made great products, but I felt like I

12   had an opportunity to make a bigger impact at a company like

13   Apple, which is, you know, has been a premier company in the

14   electronics and computer space for many years.

15        Q.   What is your current position at Apple?

16        A.   It's -- my title is distinguished engineer.

17        Q.   Sir, what does it mean to be a distinguished

18   engineer at Apple?

19        A.   It's a title and a job level that is granted upon

20   engineers and technical people at Apple who have achieved

21   technical excellence during their time at Apple in

22   developing Apple products.

23        Q.   And, Mr. Land, in your responsibilities as a

24   distinguished engineer today, which group do you work with

25   at Apple?

1      A.    I lead a hardware development team called Health

2   Sensing Hardware.

3      Q.    How many engineers work under your supervision?

4      A.    It's about 55 or 56.

5      Q.    Which Apple products does the Health Sensing

6   Hardware Group that you head up contribute to, which Apple

7   product in the market today?

8      A.    It's primarily the Apple Watch, the health

9   sensors for the Apple Watch.

10     Q.    Now I want to just briefly rewind to when you

11  joined the company and the period between when you joined

12  Apple and when you began working on Apple Watch.

13           Do you have that time period in mind?

14     A.    Yes.

15     Q.    In that time period, sir, what were some of the

16  other products that you worked on?

17     A.    I've worked on many types of Apple products.  I

18  worked on the first iPhone.  I've worked -- I developed -- I

19  was part of the team that developed the touchscreen for the

20  first iPhone.  I was part of the team that developed the

21  touchscreen for the first iPad.

22           I've also worked on optical sensors, such as an

23  optical proximity sensor, which would be used in a phone to

24  turn the screen off when you bring it near your head so your

25  cheek doesn't push a button by mistake.

1          I've also worked on ambient light sensors, which

2     look out into the room to determine how bright the room is,

3     or if you're outdoors and can adjust the screen brightness

4     to a level that's appropriate for the room brightness.

5          Q.   Fair to say, you and your colleagues at Apple had

6     worked on many different types of sensors before the Apple

7     Watch?

8          A.   Yes.

9          Q.   Let me take you to the Apple Watch.  The very

10    first Apple Watch was called the Series 0; is that right,

11    sir?

12         A.   Yes, that's correct.

13         Q.   And that was released to the general public in

14    April of 2015.  Do I have that right?

15              MR. RE:  Leading, Your Honor.

16         A.   Yes, I think that's approximately correct.  It

17    was in the spring of 2015.

18              JUDGE BHATTACHARYYA:  I didn't rule on the

19    objection.

20              Mr. Mueller, can you rephrase so it's not

21    leading.

22              MR. MUELLER:  Sure.

23         Q.   When was the first Apple Watch, the Series 0,

24    released to the general public?

25         A.   It was the spring of 2015.  I don't remember the

1    exact date.

2         Q.   And when did you personally start work on what

3    became the Series 0?

4         A.   It would have been fall of 2012.

5         Q.   What were your responsibilities with respect to

6    the Series 0?

7         A.   I was in charge of the team that was tasked with

8    developing multiple optical sensors for the Apple Watch.

9    There were three.

10             One was the optical heart rate monitor, the

11   second was a optical, what we called wrist detection sensor,

12   which could determine when you removed the watch from your

13   wrist for purposes of data security, it would lock the watch

14   up if you removed it from your wrist, and I also worked on

15   the ambient light sensor for the Apple Watch.

16        Q.   Let's focus, if we could, on the heart rate

17   sensor.

18             What were some of the engineering challenges that

19   you and your colleagues confronted in designing the heart

20   rate sensor for the Series 0?

21        A.   Well, first of all, making a heart rate

22   measurement at the wrist was particularly challenging

23   because the wrist doesn't have a lot of blood volume there

24   to measure optically.  But even on top of that, which was

25   already a daunting problem, we had to fit into a very small

1    product.  As I mentioned, I've worked on many products, and

2    the watch was the smallest of all of them.  So we did not

3    have much space to fit the sensor itself.

4           The battery was small, so we had to make sure

5    that the heart rate worked with as low power as possible.

6    And we also had to work, because it was a mobile device, we

7    had to work in all these use cases throughout the day for

8    people, people are different size, different shapes, they

9    choose different bands, they choose different tightness of

10   bands, and we needed to make sure that the heart rate

11   monitor worked well in all the use cases that our customers

12   would expect.

13   Q.   Mr. Land, what was the engineering impact, if

14   any, of the industrial design of the Apple Watch?

15   A.   Yeah.  Industrial design is an important part of

16   the Apple product.  It defines, not only the outside shape

17   of the product, but the look and the feel, and the design

18   language, the aesthetics.

19          So we not only had to make a product that checked

20   all the boxes of low power, fit in this tiny form factor,

21   worked well across all the use cases, but we also had to

22   make sure that it was beautiful and compatible with the look

23   and feel of what the ID studio was going for for the product

24   vision.

25   Q.   Now you succeeded in meeting these challenges.

1   Do I have that right?

2        A.   Yes.

3        Q.   And what were some of the components in the heart

4   rate sensor for the Series 0 watch?

5        A.   We had an LED package, which had a couple of

6   different LED wavelengths in it, and we had packaged

7   photodiodes so LEDs emitted light, the photodiodes collected

8   the light.

9            We also had the apertures that the LEDs and

10  photodiodes were lined up to shine light through, and we

11  also had optical barriers to provide isolation internally.

12  And we built a custom electrical chipset that drove the LEDs

13  and processed signals from the photodiodes.

14       Q.   Mr. Land, what was the shape of the back crystal

15  in the Series 0 watch?

16       A.   It was dome-shaped.

17       Q.   Why was it dome-shaped?

18       A.   My understanding is the primary reason that it

19  was dome-shaped was to provide a little extra space to fit

20  the coils that were part of the wireless charging system.

21  The Apple Watch charges wirelessly through a dock that has a

22  complementary shape, and the dome-shape, when in combination

23  with the charging cradle, in addition to providing

24  additional space for the charging coils, it also provides a

25  self-centering mechanism so that, when you place it on the

1   cradle, it aligns itself well to the other -- the charger

2   for efficient wireless charging.

3           MR. MUELLER:  Your Honor, if we could go on the

4   Apple confidential record.

5           (Whereupon, the hearing proceeded in confidential

6   session.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 O P E N   S E S S I O N

 2

 3          JUDGE BHATTACHARYYA:  Moving to the public

 4  record.

 5  BY MR. MUELLER:

 6      Q.   Now, sir, the health sensing hardware developed

 7  by your team, there are, of course, other components beyond

 8  that hardware in the Apple Watch; is that fair?

 9      A.   Yes.

10      Q.   Let's take a look at RX-0319.  And this is a

11  public technical specification for the Apple Watch Series 6.

12          Can you give Her Honor just a few examples of

13  other features and functions in the Series 6 beyond the

14  features developed by your team?

15      A.   Yes.  There's audio, which can be used to listen

16  to music or make a phone call, speaker microphone.  There

17  are motion sensors that can be used to track your motion,

18  steps, your calories burnt through the day.  There is a

19  near-field communication sensor that you can use for a

20  point-of-sale display.

21          There's all sorts of wireless connectivity,

22  Bluetooth, Wi-Fi, including cellular networks for network

23  connectivity, and that's one of the particularly challenging

24  module that's in the Apple Watch, because there's a powerful

25  transmitter that needs to talk with cell phone towers that
```

1   are perhaps miles away, and that's a potential source of

2   interference for all the sensors.

3            There's also other health sensors.  There's an

4   ECG sensor.  There's a touchscreen.  There's -- and it's

5   really kind of a miniature computer in addition to all the

6   sensors.

7       Q.   If we go to RX-0306, a Watch Series 7 Technical

8   Specification, is there a similarly broad array of features,

9   sir?

10      A.   Yes.  The list between Series 6 and Series 7 is

11  quite similar.  There's a few I didn't mention, like GPS, to

12  tell you where you are on a map, there's a compass to give

13  you a heading if you're walking through a map, et cetera.

14      Q.   Now I think you touched on some of the challenges

15  posed by all of these different components.

16           Can you tell us a bit more about the challenges

17  of developing a blood oxygen sensor in light of all of the

18  other components that we see on the specifications that

19  we've gone through?

20      A.   Yes.  The Apple Watch is very compact.

21  Everything is co-located in a very tight space.  And every

22  single one of these sensors and modules is run by

23  electricity.  It can be a source of interference,

24  interference into the blood oxygen sensor.

25           And we had to, in addition to making an excellent

1    blood oxygen sensor, we also had to consider all of these

2    interference sources and design the integration of the blood

3    oxygen sensor into the watch in a way that avoided these

4    interference sources and worked under the use cases that we

5    care about.

6         Q.   And were you able to develop a reliable, accurate

7    sensor, notwithstanding those challenges?

8         A.   Yes, we were.

9         Q.   Now last few questions.  You understand there's

10   five patents that are being asserted by the Complainants in

11   this case?

12        A.   Yes.

13        Q.   Before this investigation, Mr. Land, had you

14   heard or seen anything about these five patents?

15        A.   No.

16        Q.   You are the head of the Health Sensing Hardware

17   team at Apple for the Apple Watch; is that correct?

18        A.   Yes.

19        Q.   To the best of your knowledge, sir, did any of

20   the software or hardware developed by your team come from

21   ideas that originated at Masimo?

22        A.   No.

23        Q.   Did Marcelo Lamego contribute any ideas to the

24   software or hardware of the Apple Watch?

25        A.   No.

973

1      Q.   Did Dr. Michael O'Reilly contribute to the ideas

2  to the software or hardware of the Apple Watch?

3      A.   No.

4      Q.   Who did come up with the ideas for the software

5  and hardware for the blood oxygen sensor in the Apple Watch?

6      A.   My team in conjunction with Steve Waydo's team

7  did all of the work to develop the blood oxygen sensor of

8  the Apple Watch.

9      Q.   My final question.  Are you proud of the work of

10  you and your team?

11      A.   Yes, absolutely.

12           MR. MUELLER:  Thank you, sir.

13           I pass the witness, Your Honor.

14                      CROSS-EXAMINATION

15  BY MR. RE:

16      Q.   Good morning, Mr. Land.  My name is Joseph Re.

17  Nice to meet you.

18      A.   Nice to meet you.

19      Q.   Are you at least generally aware of how Apple

20  markets the Series 6 and Series 7 watches?

21      A.   Somewhat, yes, a little bit.

22      Q.   And are you aware of the fact that Apple has made

23  a conscious effort to move from the consumer space into the

24  health care space?

25      A.   No.

1      Q.   Have you ever looked at Apple's websites,

2   particularly Apple Health Care?

3      A.   Apple Health Care?  I'm not aware of that

4   website.

5      Q.   Are you aware of how Apple markets the watch to

6   clinicians and doctors and hospitals on their website?

7      A.   No.

8      Q.   Are you aware of any company directive or

9   announcement that Apple is making an effort to move from

10  consumer electronics into the health care sector?

11     A.   I'm sorry.  Can you repeat the question?  I

12  didn't follow.

13     Q.   Are you aware of any company directive,

14  announcement, speech where Apple has made it very clear to

15  the world that they are moving from the consumer space into

16  health care and hospitals?

17     A.   No.

18     Q.   Okay.  Let me take a look and show you --

19          We're going to go on the Apple confidential

20  portion.

21          (Whereupon, the hearing proceeded in confidential

22  session.)

23

24

25

```
 1                   O P E N   S E S S I O N

 2

 3             JUDGE BHATTACHARYYA:  Welcome, Dr. Mannheimer.

 4             Do you understand that you are under an

 5   obligation to tell the truth in your testimony today?

 6             THE WITNESS:  I do.

 7                        PAUL MANNHEIMER,

 8              having been first duly sworn and/or affirmed

 9   on their oath, was thereafter examined and testified as

10   follows:

11             JUDGE BHATTACHARYYA:  Go ahead, Mr. Mueller.

12             MR. MUELLER:  It looks like we may have lost the

13   witness.  There we go.  We're ready to proceed.

14             JUDGE BHATTACHARYYA:  Sounds good.

15                     DIRECT EXAMINATION

16   BY MR. MUELLER:

17        Q.   Good afternoon, Dr. Mannheimer.  Can you please

18   introduce yourself to Her Honor?

19        A.   Yes.  Your Honor, my name is Paul Mannheimer.  I

20   live in Los Altos and I work at Apple.

21        Q.   Sir, what is your role at Apple?

22        A.   I'm a sensor architect and scientist.

23        Q.   What is your educational background starting with

24   college?

25        A.   I have my undergraduate degree in physics from
```

1    the University of California at Berkeley.

2         Q.    Did you earn any graduate degrees over the years?

3         A.    Yes.  I obtained My master's degree in applied

4    physics from Stanford University, and my Ph.D. from the

5    University of Lubeck in Germany in biomedical engineering.

6         Q.    Now when did you start to work for Apple?

7         A.    At the very end of 2014.

8         Q.    Before you worked at Apple what were you doing?

9         A.    Just prior to joining Apple I was an independent

10   consultant with my own consulting practice.

11        Q.    And before serving as an independent consultant,

12   did you work at another company?

13        A.    Yes, I did.  I worked at Nellcor.  Although at

14   the time they were Covidien, when I left, but it was Nellcor

15   and then a variety of flavors of Nellcor.

16        Q.    Dr. Mannheimer, for how long did you work at

17   Nellcor?

18        A.    I believe it was around 21 years.

19        Q.    And would that be from around 1987 to 2008?

20        A.    Yes, that's correct.

21        Q.    What did you do in those 20-plus years at

22   Nellcor?

23        A.    I developed pulse oximetry sensors, some

24   monitoring techniques, alarm handling techniques, I did

25   clinical studies, a variety of roles.

1      Q.   Let me put up on the screen RDX-3.02, and,

2   Dr. Mannheimer, what are we looking at on the left-hand side

3   of the of the screen?

4      A.   Those are Nellcor products, patient bedside

5   monitors, and a portable monitor at the bottom that uses

6   pulse oximetry technology.

7      Q.   And, sir, what setting were these Nellcor

8   products designed for?

9      A.   These were prescription-use pulse oximeters

10   intended for use in the hospital or a home care or other

11   critical and home-use settings.

12      Q.   Now, in your time at Nellcor, did you become

13   familiar with Masimo?

14      A.   Yes.

15      Q.   And how are Nellcor and Masimo situated in the

16   industry as compared to each other?

17      A.   They were competitors to one another.

18      Q.   Did you become familiar, at a high level, with

19   the Masimo product offerings in your years at Nellcor?

20      A.   Of that era, yes, I was.

21      Q.   If we could go to RDX-3.02.

22          What are we looking at here on the right-hand

23   side of the screen?

24      A.   Those are Masimo bedside monitors and portable

25   akin to what we see on the left.

1        Q.    Now what are some of the key considerations that

2    you had to deal with personally in working on clinical

3    products at Nellcor?

4        A.    Well, they need to be reliable, accurate, they

5    monitor continuously as a bedside safety monitor, relied

6    upon by clinicians.  The readings that were provided were

7    generally interpreted by clinicians, and -- that's the bulk

8    of it that I would call out.

9        Q.    Now you joined Apple in 2014; is that right, sir?

10       A.    Yes.

11       Q.    Why did you decide to join Apple?

12       A.    I had received a recruiting email from the Apple

13   recruiter that said they were interested.  I was intrigued,

14   because I didn't exactly know why.  Shortly after, the

15   company had their launch, early September of 2014,

16   announcing the watch, and so I got introduced to this

17   concept of heart rate monitoring and consumer wearables.  I

18   knew there were people at Apple from -- with medical

19   backgrounds but did not know other than what the blog sphere

20   suggested that they might have been working on.

21            After meeting a few of the people during my

22   interview process, it seemed like it would be a very

23   interesting place to be and an interesting time to work in a

24   consumer environment, consumer product environment.

25       Q.    When you joined Apple in 2014, what assignment

1    were you given?

2         A.   I didn't know what it was at the time of the

3    interview, but after joining, and several days later, Brian

4    Land told me that I would be asked to look into doing pulse

5    oximetry at the wrist for the Apple Watch.

6         Q.   And you joined, to be clear, Mr. Land's health

7    sensing hardware team?

8         A.   Yes, that's correct.

9         Q.   Now let's pull up RDX-03.03.

10        MR. MUELLER:  And let me go on the Apple

11   confidential record at this point to be safe.

12        (Whereupon, the hearing proceeded in confidential

13   session.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3           JUDGE BHATTACHARYYA:  Moving back to the public

 4   record.

 5   BY MR. MUELLER:

 6       Q.   Dr. Mannheimer, just a few more questions.

 7            There's been some suggestions in this hearing

 8   that the blood oxygen sensor in the Apple Watch is

 9   inaccurate.

10            Based on your own personal experience, as a

11   factual matter, is it accurate?

12       A.   Absolutely, it is.  Relative to the ISO standard,

13   which says the accuracy is calculated as a root means square

14   when tested in the manner precisely like we did from a study

15   protocol perspective, as we did at UC San Francisco, against

16   blood draws measured in a cooximeter, as well as the FDA

17   guidance, which is a similar document more specific to U.S.

18   use, recognizes the international standard plus some

19   additional requirements, and additional set of accuracy

20   requirements, the Apple Watch that we characterized meets

21   both the FDA and the ISO standard guidance for accuracy.

22       Q.   Dr. Mannheimer, this case involves five patents

23   asserted by the Complainants.

24            Before this investigation had you ever heard of

25   any of them?
```

1       A.   No, I had not.

2       Q.   Dr. Mannheimer, you were part of the research and

3   development project that resulted in the blood oxygen sensor

4   in the Series 6 and Series 7 watch, right?

5       A.   Yes.

6       Q.   In fact, fair to say you were at the heart of

7   that R&D process?

8       A.   Yes.

9       Q.   Dr. Mannheimer, did any, any, of the sensors,

10  hardware and software, come from Masimo?

11      A.   No.

12           MR. JENSEN:   Object, Your Honor, lacks

13  foundation.

14           JUDGE BHATTACHARYYA:   Would you explain a little

15  further?

16           MR. JENSEN:   How would he know whether the other

17  people did or did not rely upon Masimo information?  He can

18  only know what he relied upon, not what was in their heads.

19           MR. MUELLER:   I can rephrase, Your Honor.

20           JUDGE BHATTACHARYYA:   Okay.  Please do.

21  BY MR. MUELLER:

22      Q.   From your position at the heart of the research

23  and development of the blood oxygen sensor for the Apple

24  Watch, have you, Dr. Mannheimer, personally seen any

25  evidence that any of the software or hardware came from

1    Masimo ideas?

2         A.   No, I have not.

3         Q.   Who actually developed the software and the

4    hardware in the blood oxygen sensor in the Apple Watch

5    Series 6 and Series 7?

6         A.   The folks from my team in Brian's organization

7    and the HID team under Steve's organization.

8         Q.   Thank you, sir.

9              MR. MUELLER:  I have no further questions at this

10   time, and I pass the witness, Your Honor.

11             MR. JENSEN:  May I proceed, Your Honor?

12             JUDGE BHATTACHARYYA:  Yes, please go ahead.

13                       CROSS-EXAMINATION

14   BY MR. JENSEN:

15        Q.   Good morning for me, Dr. Mannheimer.  I think

16   it's your afternoon or getting close.

17        A.   Yes.

18        Q.   My name is Steven Jensen, one of Masimo's

19   lawyers.  Good to meet you.  I think we met in the '90s.  I

20   will be asking you some questions today.

21             Before we begin, you should have a sealed package

22   or an envelope there that you are welcome to open now.  We

23   will be looking at some of the documents in there.

24             Is it in the room with you?

25        A.   Yes.

1    Q.   If you could open that.

2         If I heard your testimony correctly, you've been

3    designing pulse oximetry sensors and pulse oximetry systems

4    for decades, correct?

5    A.   Yes.

6    Q.   If I heard you right, you worked on pulse

7    oximetry at Nellcor from 1987 to 2008; is that correct?

8    A.   Yes.

9    Q.   And so if I calculated in my head right, you were

10   part of the pulse oximetry team at Nellcor during the

11   development and introduction of at least the M3000, the O4,

12   the O5, the O5CI, and the N600 pulse oximeters; is that

13   correct?

14   A.   Yes, that's correct.

15   Q.   Did I miss any?

16   A.   I don't recall if there were additional form

17   factors that were created.

18   Q.   But at least those technologies you were involved

19   with the development, correct?

20   A.   Yes.

21   Q.   And you were at Nellcor in 2004 and testified for

22   Nellcor in a patent trial between Masimo and Nellcor, did

23   you not?

24   A.   Yes.

25        MR. MUELLER:  Your Honor -- I'm sorry,

1   Dr. Mannheimer.  Just give me a moment here.

2            I'm going to object on relevance grounds to

3   discussion of another litigation involving unrelated patents

4   asserted against products of another company developed in

5   another time period.  I don't think it's relevant to this

6   case what the infringement allegations were made in another

7   case involving different patents against a different

8   company.

9            MR. JENSEN:  Your Honor, I didn't ask any

10  questions about the content of that case, and it just simply

11  goes to bias and the high priority objection on this issue

12  was overruled on the Phillips decision, but I do not plan to

13  ask any questions about the content of that case, one

14  question only, the one I just asked.

15           JUDGE BHATTACHARYYA:  The objection is overruled.

16  Q.   So did you answer my question?  You testified in

17  that trial, correct?

18  A.   Yes.

19  Q.   Over the years you have designed many sensors for

20  different body locations, correct?

21  A.   Yes.

22  Q.   And I mean pulse oximetry sensors in that,

23  correct?

24  A.   That's how I interpreted it, yes.

25  Q.   And you have filed and been granted many patents

1011

1    on your pulse oximetry ideas, correct?

2        A.   Correct.

3            MR. JENSEN:  At this time, Your Honor, I'm going

4    to need to the move to the Apple confidential record.

5            (Whereupon, the hearing proceeded in confidential

6    session.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3                    AFTERNOON SESSION

 4                 (In session at 2:00 p.m.)

 5            JUDGE BHATTACHARYYA:  We're on the public record.

 6            MR. MUELLER:  Thank you, Your Honor.  We would

 7   like to call as our next witness Scott Cromar.

 8            Hello, Mr. Cromar.

 9            THE WITNESS:  Good morning or good afternoon.

10   Can you hear me and see me okay?

11            JUDGE BHATTACHARYYA:  I can.

12            THE WITNESS:  Okay.  Great.

13            JUDGE BHATTACHARYYA:  Do you understand that

14   you're under an obligation to tell the truth here today?

15            THE WITNESS:  Yes.

16                    SCOTT CROMAR,

17            having been first duly sworn and/or affirmed

18   on his oath, was thereafter examined and testified as

19   follows:

20            JUDGE BHATTACHARYYA:  Proceed, counsel.

21                  DIRECT EXAMINATION

22   BY MR. MUELLER:

23      Q.   Good afternoon, Mr. Cromar.  My name is Joe

24   Mueller, and I'd like to ask you a few questions, if I

25   could.
```

1     A.   Okay.

2     Q.   Mr. Cromar, you are an attorney, correct?

3     A.   Yes, that's correct.

4     Q.   And you prosecute patents, right, sir?

5     A.   Yes.

6     Q.   You've prosecuted in the range of a hundred or so

7  patents for Masimo or Cercacor, correct?

8     A.   I don't know what the specific number is.  That

9  might be right.  Something like that, quite a few.

10     Q.   Now, sir, you're a partner at Knobbe Martens,

11  right?

12     A.   Yes, that's right.

13     Q.   That's the same firm as Mr. Re and Ms. Swaroop

14  and their colleagues, correct?

15     A.   Yes.

16     Q.   Now you, sir, were the prosecutor and helped

17  primary responsibility for the prosecution of three of the

18  patents in this investigation; is that fair?

19     A.   Yes, that's right.

20     Q.   The '501, '502, and '648, correct?

21     A.   Correct.

22     Q.   Now the original priority application for those

23  patents was filed in 2008, right?

24     A.   Are you referring to the provisionals that the

25  patents-in-suit claim priority to?

 1      Q.   That's correct, sir.

 2      A.   I believe there were multiple provisionals, so

 3 they were -- I think they were filed in 2008 in different

 4 times in 2008.

 5      Q.   Now the '501, '502, and '648 were filed on

 6 September 24th of the year 2000, right?  I'm sorry.  2020.

 7 I misspoke.  2020.  Is that right, sir?

 8      A.   That's consistent with my recollection at the

 9 moment.  I would have to look at the files just to confirm

10 that that date is correct, but I believe that's correct.

11      Q.   Just to make this a little easier, if we could go

12 to tab 1 in the binder that you should have in front of you.

13 This is your deposition from this case.  You were deposed,

14 right, sir?

15      A.   Yes, I was deposed.  I don't know for sure which

16 binder you're referring to.  I have a binder that says

17 Cromar direct on it and there's also a sealed envelope.

18      Q.   You can open the sealed envelope right now, sir.

19      A.   Okay.  Let me grab that.  I was told that I

20 should open this on camera; is that correct?

21      Q.   Go right ahead.

22      A.   All right.  So I think, is this the binder that

23 you're referring to?

24      Q.   Yes, tab 1, please, sir.  Page 108, lines 14-17.

25 We can put these up on the screen too.

1          Question.  Okay.  So you filed the applications

2    for the '501, '502, and '648 patents on the same day, that

3    was September 24th, 2020, correct?

4          Answer.  I believe that's correct.

5          Does that refresh your memory, sir?

6          A.   Sorry.  You got a little ahead of me.  I was

7    trying to open to the correct page.  So you said it's page

8    108?

9          Q.   No -- that's right -- 108, lines 14-17, please,

10   sir.

11         A.   Okay.  I'm there now.

12         Q.   And you see here, you were asked whether you

13   filed these three patents on the same day, September 24th,

14   2020, correct?

15         A.   Correct.  I believe that's the correct date, but

16   I would have to go verify that by looking at the file

17   histories.

18         Q.   Now that's 12 years after 2008, right?

19         A.   Yes.  You're asking for the difference between

20   the year 2008 and the year 2020, correct?

21         Q.   Twelve years, right?

22         A.   That would be 12 years, that's right.

23         Q.   Now you couldn't identify at your deposition any

24   reason why, for example, the application for the '501 patent

25   could not have been filed earlier than September of 2020,

1  correct?

2      A.   I don't know that that's correct.  Can I refresh

3  my recollection, or do you have something that can remind

4  me?

5      Q.   Absolutely.  Let's go to page 90 in your

6  deposition, lines 2-11.

7          Question.  Sitting here today, you cannot

8  identify any reason why the application for the '501 patent

9  could not have been filed earlier than September 2020,

10  correct?

11          Yeah.  Again, I -- I haven't formed an opinion on

12  that, and I don't feel comfortable doing so as we sit here.

13          Were you asked that question and did you give

14  that answer?

15      A.   Yes, that's correct.  I believe my answer to the

16  question was that I haven't formed an opinion on it, and,

17  you know, at the time I hadn't formed an opinion on it.

18      Q.   Let's pull up CX-1287.  This is a press release

19  for the release of the Apple Watch Series 6.  Let me just

20  focus you on the date.

21          Do you see September 15th, 2020?

22      A.   Yeah, I see that on the screen.

23      Q.   That's nine days before you filed the

24  applications that led to the '501, '502, and '648 patents,

25  correct?

```
 1          A.   Just to confirm, I understand the question
 2     correctly, you're asking for the difference between
 3     September 15th, 2020, and September 24th, 2020?
 4          Q.   Nine days, right?
 5          A.   Yes, there's -- that would be nine days, that's
 6     right.
 7          Q.   Now over the course of the prosecution of these
 8     three patents, the '501, '502, and '648, you had access to
 9     confidential teardowns of the Apple Series 6 watch, correct?
10          A.   I am not sure -- the question sounds kind of like
11     it's potentially getting into privileged information, and
12     I'm not sure if I can answer.
13          Q.   Let me take you to your deposition, at page 245,
14     lines 12-18.
15               Question.  Did you see those nonpublic teardowns
16     of the Apple Watch Series 6 during prosecution of the '501,
17     '502, and '648 patents?
18               The Witness:  Yes, I think so.
19               Were you asked that question and did you give
20     that answer?
21          A.   I'm getting to that page.  I see that, yes, I
22     believe that's correct.
23          Q.   Now at your deposition you did not answer because
24     you said you could not answer without revealing privileged
25     information the following question:
```

1          You drafted the claims of the '501 patent

2     application to cover Apple Watch products.

3          At your deposition you were unable to answer that

4     question without revealing privileged information, true?

5          MR. RE:  Objection, Your Honor, again, seeing an

6     adverse inference from the assertion of the privilege which

7     is wholly improper and unethical.

8          MR. MUELLER:  It's neither improper nor

9     unethical, Your Honor.  Right now I'm not asking for any

10    adverse inference; I'm asking for the facts.

11         MR. RE:  No, the privilege has been asserted.  I

12    don't see why you're asking questions where you know the

13    privilege has been asserted.

14         MR. MUELLER:  Your Honor, what I asked was, you

15    couldn't answer the question on the grounds that it would

16    reveal privileged information.  This is precisely the same

17    question we asked an earlier witness in the hearing,

18    Your Honor.

19         MR. RE:  Sounds like we're in agreement.

20         MR. MUELLER:  That was not a sustained objection.

21    The question was permitted.  I'm asking the exact same form

22    of the question now.

23         JUDGE BHATTACHARYYA:  I'll allow the question.

24         Mr. Re, to the extent you want to argue, there

25    shouldn't be any adverse inference.

1        MR. RE:  I'm sorry.  I didn't hear Your Honor.

2   There was some noise from another room.

3        JUDGE BHATTACHARYYA:  To the extent you want to

4   argue that there should not be any inference, adverse

5   inference from that testimony, you're free to make that

6   argument, but I'm not going to sustain the objection.

7   BY MR. MUELLER:

8   Q.   Mr. Cromar, I want to repeat the question just to

9   make sure you have it fresh in mind.

10       At your deposition you didn't think you could

11  answer without revealing privileged information following

12  question:  You drafted the claims of the '501 patent

13  application to cover Apple Watch products.

14       You were asked that question and you said you

15  couldn't answer it without revealing privileged information,

16  true?

17  A.   Did you want to point me to part of the

18  deposition transcript so I can confirm that that's accurate?

19  Q.   Certainly.  Let's go to page 179, lines 13-20.

20       Question.  You drafted the claims of the '501

21  patent application to cover Apple Watch products, correct?

22       I don't think I can answer that without revealing

23  privileged information.

24       Were you asked that question and did you give

25  that answer?

1034

 1      A.   That seems correct.  Like I said earlier, it

 2  seems like the question is asking for potentially, you know,

 3  protected information, privileged information, so I'm not

 4  sure that I can answer it.

 5      Q.   Thank you, sir.

 6           MR. MUELLER:  I pass the witness.

 7                     CROSS-EXAMINATION

 8  BY MR. RE:

 9      Q.   Good afternoon or good morning for you,

10  Mr. Cromar.

11           You were asked about your awareness of the Apple

12  Watch during prosecution.  I wonder if you can tell me if

13  there's anything else you can recall with regard to Apple

14  during the prosecution of these applications that

15  Mr. Mueller raised with you.

16           MR. MUELLER:  Your Honor, I'm just going to

17  object to the question to the extent that it elicits

18  information that we were shielded from receiving on the

19  basis of a privilege assertion both at his deposition and

20  just now.

21           If it's going to be something different, I have

22  no objection, but I do object if we're now going to hear

23  facts that were not given at his deposition and were not

24  given when I just asked him questions a few minutes ago.

25           MR. RE:  Of course.

1035

1    Q.   Only stuff that you know is public and doesn't

2   involve an attorney-client communication.

3         MR. MUELLER:   I'm not sure what that question is

4   referring to, Your Honor, so I object to the form of the

5   question.

6         JUDGE BHATTACHARYYA:   I'm not going to sustain

7   the objection at this time.   Why don't we go ahead and see

8   what the testimony is.

9    A.   Just to confirm that I understand the question,

10  you're talking about around the time of the prosecution of

11  the patents-in-suit?

12   Q.   Yes.   Yes, and what was happening.

13   A.   Sure.   I recall that around that time Apple was

14  producing quite a bit of prior art through IPRs and District

15  Court litigation, and that that was information that we

16  wanted to make sure we took into consideration and filed an

17  IDS, for example, Masimo was developing their watch around

18  that time.   Prosecution of other patent applications was

19  going on.   Those are what I can think of at the moment.

20   Q.   Are you suggesting you used -- you sent to the

21  Patent Office IPR materials generated by Apple?

22   A.   Yeah, that's right.   I'd have to go look at the

23  file just to confirm exactly which materials or which IPRs

24  had, you know, started at that point, but that was

25  definitely information that was being filed in IDSes to the

1036

1    Patent Office during that time and that we were receiving.

2        Q.   One other area I want to get to.  Mr. Mueller

3    suggested or made some comment about a 12-year period.  Did

4    you remember that?

5        A.   Yes.

6        Q.   And he is talking about the 12-year period

7    between the filing of some provisional applications in 2008

8    and the filing of some patents in 2020.  Do you remember

9    that?  That's the 12-year period we're talking about?

10        A.   Yes, I remember.

11        Q.   And can you, very briefly, just describe for

12    Your Honor what was happening with regard to the patent

13    prosecution activity in this family of patents in that

14    12-year time frame?

15        A.   In this family there was active prosecution

16    through that time period.  I believe there were over 30

17    applications or continuations filed and actively prosecuted

18    during that time period.

19        Q.   Was there any sort of delay on your part in

20    prosecuting those patents in that period?

21        A.   No.

22             MR. RE:  I have no further questions.

23             Thank you, Mr. Cromar.

24             MR. MUELLER:  Very briefly, Your Honor.

25             JUDGE BHATTACHARYYA:  Yes, please proceed.

                         REDIRECT EXAMINATION
 1
 2   BY MR. MUELLER:
 3        Q.   I'm going to pull up a slide from my opening
 4   statement for just a moment, and this shows some of the
 5   prosecution activities for this family of patents.
 6             This is RDX-1.16.  Here we have the timeline for
 7   the '501, '502, and '648 patents.  Do you see that, sir?
 8        A.   Yes.  Excuse me.  Yes, I see that.
 9        Q.   And do you see in the top we have various, in
10   blue, Apple Watch releases, Apple Watch Series 0, Series 4,
11   Series 5, Series 6, do you see that?
12        A.   Yes, I see that.
13        Q.   Do you see that in each instance, in each
14   instance, you and other folks prosecuting applications in
15   this family on behalf of Masimo -- I'm not sure if it was
16   just you or others as well -- filed applications after the
17   Apple Watch models were released?  Do you see that, sir?
18        A.   I see the timeline and the notes on it.  I don't
19   think I could come to the conclusion that -- it seems like
20   you're implying.
21        Q.   Sir, you have no reason as you sit here right now
22   to contest the timeline shown on this slide, correct?
23        A.   No.  I think I do.
24        Q.   What specifically are you contesting in terms of
25   the chronology?

1     A.   Well, there's at least a couple of things.  The

2  first one, I would say, is I see a five-year gap arrow from

3  2008 to 2015.  I'm not sure what that represents.  I know

4  that during that time period in the family there were many

5  applications filed and being actively prosecuted.  So

6  that's, you know, that's just one example.

7          The slide also represents a 12-year delay, which

8  I just answered a question a moment ago, I do not believe

9  there was a delay.

10    Q.   Sir, I guess -- let me put it this way.  I'm not

11 asking you about the labeling.  I'm asking you about the

12 chronology.

13         You do not contest, do you, sir, that the dates

14 shown for Masimo filing applications in this family on this

15 slide are correct.

16    A.   Well, I don't know if this represents all the

17 filings in family.  It appears to me it's missing some of

18 the filings.  So to that extent I think it would be a

19 misrepresentation.

20         MR. MUELLER:  I have nothing further for this

21 witness, Your Honor.  I pass the witness.

22                     RECROSS-EXAMINATION

23 BY MR. RE:

24    Q.   Please explain what you mean why it is a

25 misrepresentation.

1039

```
 1              If we can keep that slide up.  Where did it go?
 2              MR. MUELLER:  We can pull it back up.
 3              MR. RE:  We'll do it from here.
 4         Q.   Before we begin, Mr. Cromar, have you ever seen
 5    this slide before?
 6         A.   No, I have not.
 7         Q.   Okay.  You didn't like the label "gap."  Can you
 8    please explain why you didn't like the five-year gap label?
 9         A.   Yes.  Like I said, I think during that time
10    period there were a dozen applications being actively
11    prosecuted in this family, including continuation filings
12    during that time period.
13         Q.   With regard to the 12-year delay, you said there
14    was no delay, but what did you mean why there's no delay?
15         A.   Well, I don't know what delay means in this
16    context, and if it's referring to a delay that I may have
17    done, I don't recall any delays so -- and, you know, like I
18    mentioned earlier, I believe through that 12-year time
19    period there were more than 30 applications being
20    prosecuted, and I only see a small fraction of those
21    represented on the slide.  It only mentions one, two --
22    let's see -- plus four plus two, so that's, you know, seven
23    applications.  I know that there were more than 30.  So I
24    don't know -- the delay seems like a misrepresentation and
25    this slide doesn't represent the family very well.
```

1    Q.   And in the misrepresentation, is there some sort
2    of correlation, we'll call it, between when you file
3    applications in those 30 cases or so you mentioned and the
4    releases of various Apple Watches?
5    A.   I don't think so, especially because a huge
6    portion of the prosecution happened before any Apple Watch
7    was released.  Like I said, in that early period there were
8    many applications, so I'm not sure how there could be a
9    correlation.
10   Q.   Okay.
11        MR. RE:  I have no further questions, Your Honor.
12        MR. MUELLER:  May I ask just one, Your Honor?
13        JUDGE BHATTACHARYYA:  Yes.
14                      REDIRECT EXAMINATION
15   BY MR. MUELLER:
16   Q.   You referred to or Mr. Re referred to
17   misrepresentations.  Sir, the application filing dates are a
18   public record, correct?
19   A.   I believe that's correct.  All of the
20   applications in the family were publicly -- they were
21   published and prosecuted in public.
22        MR. MUELLER:  Nothing further, Your Honor.
23        MR. RE:  If I can have one follow-up.
24   BY MR. RE:
25   Q.   Your suggestion of misleading, just so I

1041

```
 1    understand, it's not that information concerning the filing

 2    dates, you're suggesting it's misleading to the extent that

 3    it's missing additional information, is that what your point

 4    is?

 5              MR. MUELLER:  Your Honor, I'm going to object to

 6    the leading.  It's a highly leading question, I object.

 7              MR. RE:  I have no further questions.

 8              THE WITNESS:  I'm happy to clarify my answer,

 9    because I kind of recognize --

10              JUDGE BHATTACHARYYA:  If there's nothing further,

11    I will need to rule on the objection.

12              Mr. Re, are you withdrawing your question?

13              MR. RE:  I'm withdrawing the question,

14    Your Honor.

15              JUDGE BHATTACHARYYA:  Thank you for your time,

16    Mr. Cromar.

17              MR. MUELLER:  As our next witness we call

18    Mr. Majid Sarrafzadeh, and Mr. Selwyn will do the

19    examination.

20              JUDGE BHATTACHARYYA:  Welcome, Dr. Sarrafzadeh.

21    Did I pronounce your name correctly?

22              THE WITNESS:  You sure did.

23              JUDGE BHATTACHARYYA:  Okay.  Good.  Do you

24    understand that you are under an obligation to tell the

25    truth here today?
```

1    THE WITNESS:  I do.

2                        MAJID SARRAFZADEH,

3          having been first duly sworn and/or affirmed

4    on his oath, was thereafter examined and testified as

5    follows:

6          JUDGE BHATTACHARYYA:  Thank you.  You may go

7    ahead.  I think you're on mute, though.

8          MR. SELWYN:  Can you hear me now?

9          JUDGE BHATTACHARYYA:  Yes, perfectly.

10          MR. SELWYN:  Thank you.  May I proceed,

11    Your Honor?

12          JUDGE BHATTACHARYYA:  Yes.

13                        DIRECT EXAMINATION

14    BY MR. SELWYN:

15      Q.   Good afternoon, sir.  Could you please introduce

16    yourself?

17      A.   I'm Majid Sarrafzadeh.  I work and live in

18    Southern California.

19      Q.   Have you prepared a set of slides to present with

20    your testimony today?

21      A.   Yes, I have.

22      Q.   Can we have RDX-7-2?

23           Would you please describe your educational

24    background?

25      A.   Certainly.  I have received my Bachelor of

1   Science, Master of Science, and Ph.D., all in electrical and

2   computer engineering, from University of Illinois at

3   Urbana-Champaign.

4        Q.   While working towards your various degrees, did

5   you study electrical and thermal technologies?

6        A.   Yes, those are the two topics among others that I

7   have focused on.

8        Q.   Can we turn to RDX-7-3?

9             Where do you work today?

10       A.   I work at University of California at

11  Los Angeles, also known as UCLA.  I'm a distinguished

12  professor in both computer science and electrical and

13  computer engineering.

14       Q.   Have you had any positions or roles at UCLA in

15  addition to being a professor?

16       A.   Yes.  I have been co-director, cofounder, and

17  director of various national and local institutes, mostly in

18  the area of wireless, held, and handheld monitoring.

19       Q.   What is the UCLA Wireless Health Institute?

20       A.   It's an institute that tries to address health

21  care problems using technology.  They investigate problems

22  in collaboration with health care providers and go from

23  inception to hardware and software design to clinical trial,

24  patent filing at times, and eventually commercialization of

25  our ideas.

1044

1     Q.   Have you taught any classes at UCLA related to

2   sensors or medical devices?

3     A.   Yes, both at undergrad and graduate levels.  For

4   the past 20 some years I've been doing that continuously.

5     Q.   Have you conducted any research related to

6   sensors or medical devices?

7     A.   My research in the past 20 plus years has been on

8   sensors and medical technology devices.

9     Q.   Could we have RDX-7-4?

10        Would you please describe your experience in the

11   medical device industry?

12     A.   There has been numerous of them, but by way of

13   example, I'm a cofounder of three companies in this area

14   among a few other companies.  These three companies are

15   Bruin Biometrics, MediSense Wireless, and Wanda Health.

16     Q.   Do you have any experience with thermal

17   management technologies?

18     A.   Yes.  A number of my publications is related to

19   thermal management, a company that I cofounded in 1999

20   called Higher Design deals hardware and thermal management

21   of circuits.

22     Q.   Could we have RDX-7-5?

23        Do you have any publications, sir?

24     A.   I have a few.  I have about 600.  I think 550 or

25   so of them are peer-reviewed.  And a good number of them are

1    in various medical devices.  I've coauthored three books,

2    and I have a few patents, 25 plus of them, and one of

3    them -- sorry.

4        Q.   Please.  Finish.

5        A.   One of them is some of my publication and one of

6    the patents is entitled Apparatus Systems and Methods for

7    Tissue Oximetry and Perfusion Imaging.

8        Q.   Can we have RDX-7-6?

9             Let me ask you, sir, to be a little bit immodest

10   for a moment.  Have you received any awards for your work?

11       A.   I'm honored to have received a few awards.  One

12   is I'm a fellow of IEEE, Institute of Electrical and

13   Electronics Engineers, the number one electrical engineering

14   institution in the world.

15            I'm a fellow of National Academy of Inventors.

16   I'm truly humbled that Time Magazine named one of our

17   inventions and products for change -- for making a change in

18   health care standards as the best invention in medical

19   technology in 2020.

20            I also received the Best Innovation Award in

21   2018.  And also been blessed with a number of teaching

22   awards, both in my previous institution at Northwestern and

23   currently at UCLA.

24       Q.   Could we display CX-322-A?

25            Is this your CV?

1046

```
 1        A.   This seems to be a copy of my CV, correct.

 2        Q.   Is it accurate?

 3        A.   It seems to be fairly accurate, although I'm sure

 4   there a few additional publications.

 5             MR. SELWYN:  Your Honor, Apple offers Professor

 6   Majid Sarrafzadeh as an expert in physiological monitoring

 7   technologies including the design of pulse oximetry sensors.

 8             MR. RE:  No objection.

 9             JUDGE BHATTACHARYYA:  At this time

10   Dr. Sarrafzadeh is admitted as an expert in physiological

11   monitoring technologies including the design of pulse

12   oximetry sensors.

13   BY MR. SELWYN:

14        Q.   RDX-7-7, please.

15             What was your assignment, sir, for this case?

16        A.   My assignment was to analyze the validity of

17   patents '745 and '127 and domestic industry claims.  I was

18   asked to analyze infringement of the asserted claims.  And,

19   finally, analyze the technical prong of domestic industry

20   requirement.

21        Q.   Slide RDX-7-8.

22             In brief, what materials did you consider for

23   your assignment?

24        A.   The materials included but not limited to '745

25   and '127 patents and their prosecution histories, claim
```

1    construction briefing, statements and hearing transcripts,

2    Complainants' expert reports, including documents that were

3    cited there, prior art references, deposition transcripts,

4    conversations with a number of Apple engineers and other

5    experts, and the hearing testimony that has been going on

6    this week.

7         Q.   Can we begin, Professor, with the '127 patent?

8         A.   Surely.

9         Q.   Can we display, please, RDX-7-9?

10             What does the '127 patent discuss generally?

11        A.   This is related to a physiological monitoring

12   device, and, as you see, in Fig. 12 of the patent, light

13   emitters are shown that is in contact with the thermal mass

14   that is on a substrate, and there are temperature sensors

15   connected to them, to the thermal mass.

16        Q.   Slide 7-10.

17             What is the level of ordinary skill in the art of

18   the '127 patent?

19        A.   In my opinion, it's working knowledge of

20   physiological monitoring and thermal management technology,

21   one would have a Bachelor of Science in an academic

22   discipline emphasizing design of electrical and thermal

23   technologies in combination with training or at least one or

24   two years of related work experience with processing of data

25   information, including but not limited to physiological

1   monitoring technology.

2          Obviously, if somebody had a Master of Science in

3   relevant academic discipline with less than a year of

4   related work experience, that would qualify.

5          Q.   Slide 7-12.

6               What combinations of prior art references have

7   you compared to claim 9?

8          A.   Fundamentally two.  I have looked at combination

9   of Mendelson and Webster and Yamada and Noguchi.

10         Q.   On the screen our next slide is RDX-458.

11              What is that reference?

12         A.   This is an article by Mendelson that was

13   published in 1991, and it talks about gas monitoring in the

14   body.

15         Q.   When did you first become aware of that article?

16         A.   Roughly 20 years ago.

17         Q.   Can we put on the screen RX-35, which is slide

18   7-14.

19              What is this reference sir?

20         A.   This is a textbook called "Design of Pulse

21   Oximeters" by Webster.  This was published roughly in 1997.

22         Q.   When did you become aware of Webster?

23         A.   Give or take 20 years ago.

24         Q.   How well-known is the Webster textbook?

25         A.   It is one of the standard textbooks in the field.

1    Q.   Could we have slide 7-15?

2         When were pulse oximeters first commercially

3    introduced?

4    A.   Webster says that they were introduced in 1983,

5    but actually truly some of the earlier history goes back to

6    World War II, and first commercialization in 1973.

7    Q.   So let's turn now to the claim.  Can we have

8    slide 7-16?

9         Does Mendelson disclose the preamble of claim 7?

10   A.   Yes, that's undisputed.  If we look at Fig. 1016

11   at 24 of Mendelson, it talks about the noninvasive

12   reflective SAO2 sensor, and the corresponding figures show

13   some part of that.

14   Q.   Using Fig. 10.16 on the screen, can you briefly

15   explain how pulse oximeters work?

16   A.   I sure can.  We see the top figure in 1016, we

17   see a collection of red and infrared LEDs pointed in the

18   center.  They emit light to the tissue.  There are

19   separators between them called optical shields, and there

20   are a collection of photodiodes that collect the light after

21   it has been through the tissue, and they make a

22   determination of physiological parameters based on the

23   optical light received by the photodiodes.

24   Q.   Slide 7-17.

25        Let's look at limitation 7A.  In Mendelson, what

1  are the LEDs and photodiodes mounted on?

2      A.   As shown in Fig. 1016B of Mendelson, they are on

3  a ceramic substrate.

4      Q.   Is that another name for a circuit board?

5      A.   Also a circuit board or a printed circuit board.

6  Thank you.

7      Q.   Were circuit boards with thermal cores known

8  before the '127 patent?

9      A.   Yes, they have been known for many years, before

10  this patent.

11      Q.   Can we see RDX-7-18?

12           Professor, what is this document?

13      A.   This is a handbook called the "Multilayer Printed

14  Circuit Board" by Scarlett.

15      Q.   And if we could turn to RDX-7-19.

16           Turning to Fig. 24.30 of Scarlett, what does this

17  show?

18      A.   In Fig. 24.30 at 122 it shows the cross-section

19  of a metal core.  We see there is a reference to an aluminum

20  core that, as Scarlett describes, provides thermal

21  management to the core.

22      Q.   Is Scarlett RX-397, if you look at the lower

23  right-hand corner of the slide?

24      A.   Exactly right, RX-397 at 122.

25      Q.   Can we have slide RDX-7-17?

1      Does Mendelson render obvious the, quote, thermal

2  mass?

3      A.   Yes.  So we see that the LEDs and photodiodes are

4  mounted on a printed circuit board.  We know that there are

5  electrical connections.  That's really the main -- main way

6  of bringing electricity to LEDs and photodiodes.  And these

7  connections would provide thermal connectivity.

8      One of ordinary skill in the art would know that

9  you could implement this in a multilayer fashion and would

10 also know that, for example, using the concepts in Scarlett

11 as was very well-known, one could add metal core or thermal

12 core for better management.

13     Q.   What do you understand Mr. Goldberg alleges as a

14 thermal mass in Apple Watch?

15     A.   He alleges the metal layers of printed circuit

16 boards of the Apple Watches as the thermal mass.

17     Q.   Does Mendelson disclose such metal layers?

18     A.   Yes, we see that in Fig. 1016 that there are

19 metal layers in Mendelson.

20     Q.   What does Mr. Goldberg say is a thermal mass in

21 the Masimo current rainbow« sensors?

22     A.   He refers to the metal layers and the ceramic in

23 the current sensor.

24     Q.   Does Mendelson disclose such ceramic layers with

25 metal areas?

1    A.   Yes.  We see that in Fig. 1016, and the

2    corresponding description.

3    Q.   Now can we have RDX-7-20?

4         Does Mendelson disclose limitation 7B?

5    A.   Yes.  At RX-458, Mendelson in Fig. 1016, if we

6    look at that figure, on top we see there is a red and

7    infrared LEDs, and obviously through electrical connection

8    they are materially coupled to the thermal mass.

9    Q.   Can you explain how Mendelson renders obvious

10   LEDs thermally coupled to the thermal mass?

11   A.   Surely.  Because of electrical connection, we

12   know that the LEDs are connected by wires to the printed

13   circuit board, and that's the thermal connection.

14   Q.   Is there any dispute between you and Mr. Goldberg

15   on this limitation regarding Mendelson's disclosure of a

16   plurality of LEDs in a substrate?

17   A.   No.

18   Q.   Can we have 7-21?

19        Does Mendelson disclose limitation 7C?

20   A.   Yes, it does.  Again, at RX-458, Mendelson in

21   Fig. 1016 discloses red and infrared LEDs, and we know that

22   these are a plurality of operating wavelength -- multiple.

23   Q.   Is there any dispute between you and Mr. Goldberg

24   on this limitation?

25   A.   None.

1    Q.   Can we have slide 7-22?

2         Does Mendelson render obvious limitation 7D?

3    A.   Looking at RX-458 at 24, that's Fig. 1016, in the

4    same manner that I described earlier, in previous

5    limitation, LEDs and photodiodes are mounted on a printed

6    circuit board, and one would know that you could readily

7    implement these in multilayer and add thermal core to it.

8    Q.   Next slide, 7-23.

9         Does Mendelson in combination with Webster

10   disclose limitation 7E?

11   A.   Yes.  If we look at the textbook we looked at

12   earlier, Webster at RX-35, at 85, it says, one way to

13   compensate for LED temperature changes is to have a

14   temperature sensor built into the probe along with the LEDs

15   and photodiodes.

16   Q.   Why do you conclude from that that Webster

17   renders obvious the temperature sensor being thermally

18   coupled to the alleged thermal mass?

19   A.   Because it says that the temperature sensor is

20   going to be built into the probe along with the LEDs, and we

21   know there are going to be electrical connection for a

22   temperature sensor to work.

23   Q.   Slide 7-24.

24        Looking at limitation 7F, does Webster render

25   obvious a temperature sensor capable of determining a bulk

1    temperature for the thermal mass?

2         A.   Yes.  If we look at RX-35 at 85, Webster

3    discusses that there is a shift in LED peak wavelength due

4    to change in temperature, and that can cause error in SpO2

5    reading, and it says one way to compensate for that is for

6    LEDs temperature changes to have a temperature sensor built

7    into the probe.

8              Of course, one of ordinary skill would know that,

9    to take temperature measurement, in order to get the bulk

10   temperature in multiple locations, you would just add

11   multiple temperature sensors of Webster.

12        Q.   What --

13        A.   And obvious to do that.

14        Q.   What does Mr. Goldberg say measures a bulk

15   temperature in Apple Watch?

16        A.   He points to the thermistor in the Apple Watches.

17        Q.   Does Webster teach such a temperature sensor?

18        A.   We see that in section 553 at 85 of Webster, that

19   does exactly that.

20        Q.   Slide 7-25, please.

21             Does Webster disclose the operating wavelengths

22   of the LEDs dependent on the bulk temperature of the alleged

23   thermal mass?

24        A.   That's a fact of physics that has been known for

25   many years, but at RX-35, both at 74 and 83, Webster states

1055

1   that a wavelength depends on the so-called forbidden energy

2   gap, and energy gap is dependent on temperature.  So

3   wavelength is dependent on temperature via the energy gap.

4        Q.   Slide 7-26.

5             Does Mendelson disclose limitation 7G?

6        A.   Looking at RX-458 at 24, that's, again, Fig. 1016

7   of Mendelson, we see there are a collection of photodiodes

8   shown, and that's exactly what the limitation requires.

9        Q.   Does Mr. Goldberg dispute that?

10       A.   No.

11       Q.   Next slide, please.

12            Does Mendelson disclose limitation 7H?

13       A.   Yes, that is also undisputed.  Mendelson at

14   RX-458 at 21 shows an ear oximeter from Hewlett-Packard.  It

15   shows that the optics is collected at the ear location.  It

16   goes through a number of processing, such as A to D on a

17   central processor, and, finally, the digital display shows

18   the SpO2, the oxygen saturation.

19       Q.   Slide 7-28.

20            Does Mendelson in combination with Webster teach

21   claim 9?

22       A.   They do.  First of all, our macro here, RX-419 at

23   3, talks about what thermistors are.  They have been known

24   for many years as a resistive circuit, and Yamada and other

25   references, RX-381, specifically talks about a thermistor

1    that is a metal-resistant temperature detector.

2        Q.   Slide 7-29.

3             What fields are Mendelson and Webster related to?

4        A.   They are in the same field as the '127 patent,

5    physiological monitoring systems and devices.

6        Q.   Would a POSITA have been motivated to combine

7    Mendelson with Webster?

8        A.   Very much so.  If we look at RX-35, Webster, and

9    RX-458 at 24 Mendelson, one would be motivated to combine

10   the two.

11       Q.   Why is that?

12       A.   Because would know that you can improve the

13   functionality of what Mendelson talks about by bringing a

14   temperature sensor to improve the wavelength values of

15   Mendelson.

16       Q.   Relatedly, would a POSITA have had a reasonable

17   expectation of success in incorporating a temperature sensor

18   of Webster into Mendelson?

19       A.   Very much so.  These temperature sensors have

20   been known for several hundred years.  Very simple devices

21   and relatively low-tech.  So including them in Mendelson

22   would have been straightforward, and there would have been a

23   reasonable chance of success.

24       Q.   So does Mendelson in combination with Webster

25   disclose claim 9 of the '127 patent?

1        A.    Yes, it would.

2        Q.    Can we switch now to your opinion about Yamada

3   and Noguchi?

4        A.    Absolutely.

5        Q.    May we have slide 7-30?

6              Actually slide 7-31, please.

7              On the screen is RX-381.  What is that document?

8        A.    This is the Yamada reference, Japanese patent

9   application.

10       Q.    When was it published?

11       A.    This was published, the priority date it says is

12  2003.  I can't find the publication right now.  Because it's

13  not zoomed in, I have a hard time seeing it.

14       Q.    That's okay, Professor.

15       A.    Patent application is from 2004, as I see under

16  21.

17       Q.    What does the Yamada patent application discuss?

18       A.    It discusses a physiological monitoring system.

19  It's a wrist-worn device with a sensor placed on the

20  fingertip of a user.

21       Q.    Can we put on the screen 7-32 and RX-353?

22             What is RX-353?

23       A.    This is also a patent application by Noguchi.  It

24  was filed in 1992 and granted in '94.  It relates the

25  wavelength of an LED to temperature variation, among other

1    things.

2         Q.   Next slide, please.

3              Does Yamada disclose the preamble of claim 7?

4         A.   Yes, that's undisputed.  If we look at RX-41 and

5    Figs. 1 and 5, we see that both in the figure and the

6    corresponding text the notion of pulse oximeter is

7    disclosed.

8         Q.   Slide 7-34.

9              Does Yamada render obvious limitation 7A?

10        A.   Yes.  We'll see that from Fig. 5 RX-381, there

11   are LEDs and photodetectors mounted on the printed circuit

12   board.  We know that there is electrical connection among

13   them and to the power supply to make them work.  The

14   electrical connection, the wires provide thermal

15   connectivity.

16             Furthermore, a POSITA would know that you can

17   readily implement this in a multilayer fashion, also add

18   thermal cores in order to provide better thermal management

19   in the circuit.

20        Q.   Next slide, please.

21             Does Yamada disclose limitation 7B?

22        A.   Yes.  Looking at, again, RX-381, Fig. 5 at 43,

23   both Fig. 5 and the corresponding text talks about the first

24   light-emitting component, an LED, and a second

25   light-emitting component, another LED.

1    Q.   Does Yamada disclose LEDs thermally coupled to

2    the thermal mass?

3    A.   Yes.  For the same reason mentioned before, there

4    is an electrical connection between the LEDs and the rest of

5    the circuit and the metal of the circuit board, and that's

6    what provides thermal coupling.

7    Q.   Does Mr. Goldberg dispute that Yamada teaches the

8    light-emitting sources in a substrate?

9    A.   No.

10   Q.   Slide 7-36, please.

11        Does Yamada disclose limitation 7C?

12   A.   This is also undisputed.  If we look at RX-381 at

13   43, we'll see that Yamada specifies the light of a first

14   wavelength, maybe, for example, red light, the light of a

15   second wavelength, maybe, for example, near infrared, and we

16   know red and infrared operate at different wavelengths.

17   Q.   Slide 7-37.

18        How about limitation 7D, is that disclosed by

19   Yamada?

20   A.   Very similar to the discussion I had before, yes,

21   LEDs and photodiodes are implemented in a printed circuit

22   board, and the electrical connection provides the thermal

23   mass.  A POSITA would know that you can do this in a

24   multilayer fashion, and could add a thermal core of, for

25   example, Scarlett, to provide better thermal management.

1      Q.    Slide 7-38.

2            Does Yamada disclose limitation 7E?

3      A.    Very much so.  Looking at RX-381 at Fig. 5, 109,

4      paragraph 109, Yamada says that a temperature sensor may be

5      attached to the light probe 1, and attachment we know, among

6      other things, requires an electrical attachment, and that's

7      what provides thermal coupling to the thermal mass.

8      Q.    Slide 7-39.

9            Does Yamada disclose a temperature sensor capable

10     of determining a bulk temperature for the thermal mass?

11     A.    Yes.  Yamada RX-381 at, again, 109, says that a

12     temperature sensor may be attached to the light probe, and a

13     temperature sensor, for example, could be attached to the

14     surface.  And one of ordinary skill in the art would know

15     that you could easily use multiple temperature sensors in

16     order to do some sort of a bulk temperature of the thermal

17     mass.

18     Q.    What does Masimo accuse of meeting limitation 7F

19     in Apple Watch?

20     A.    Also the thermistor in Apple Watches is what

21     Masimo accuses.

22     Q.    Does Yamada teach that?

23     A.    As we saw in 109, it talks about the temperature

24     sensor here, so yes.

25     Q.    Slide 7-40.

1        Does Noguchi teach a temperature sensor?

2        A.   Yes.   Noguchi at RX-353 and RX-353, both in

3    column 1 and 2, talks about the fact that there is a

4    comprising temperature measurement means for measuring the

5    temperature of an LED.

6        Later, Noguchi says that a plurality of LEDs and

7    a plurality, multiple temperature measurement can be

8    utilized in this invention, and it goes talking about the

9    relation between the two.  So, yes, absolutely.

10       Q.   How would a skilled artisan have used Noguchi's

11   teaching in a pulse oximeter like Yamada?

12       A.   It would have taken the notion of the fact that

13   LED wavelength is a function of temperature and included

14   that in Yamada to provide better values for wavelength

15   estimation.

16       Q.   Slide 7-41.

17       Would a POSITA have found it obvious at the time

18   of the '127 application to combine Yamada with Noguchi?

19       A.   Very much so.  They are both -- Yamada is related

20   to pulse oximeter and physiological measurement.  Noguchi

21   talks about the impact of heat on temperature variation.  So

22   one would be very motivated to combine the two.

23       Q.   Why would one be motivated to combine Yamada with

24   Noguchi?

25       A.   Basically because of the notion of temperature

1   variation on wavelength would improve the functionality of

2   Yamada.

3       Q.   Relatedly, would a POSITA have had a reasonable

4   expectation of success combining in a Yamada with Noguchi?

5       A.   Very much so.  Again, this is a notion of a

6   temperature sensor that has been known for several hundred

7   years, very low-tech device, and would have been easily

8   added to Yamada's system.

9       Q.   7-42, please.

10          Does Yamada disclose limitation 7G?

11      A.   Yes.  Looking at RX-318 at Fig. 562, Yamada

12  states, and also in Fig. 5 it states, that a portion of the

13  light that traverses body tissue is received by the

14  light-receiving component, and that's undisputed.

15      Q.   Slide 7-43.

16          Does Yamada disclose limitation 7H?

17      A.   Yes, that's also undisputed.  RX-381, both at 62

18  and 65, talks about the strength signal for the light that

19  is sent to the analysis component, and it talks about the

20  CPU that performs the corresponding analysis.

21      Q.   Slide 7-44, please.

22          Does Yamada teach claim 9?

23      A.   That's undisputed.  RX-381 at 111 talks about a

24  thermistor that performs the temperature measurement.

25      Q.   Next slide, please.

1    Did you also conduct an analysis of secondary

2  considerations of nonobviousness for the '127 patent?

3    A.   Yes, I have.

4    Q.   And what factors did you consider?

5    A.   Long-felt but unmet need, commercial success,

6  industry praise, copying, failure of others, unexpected

7  results, and industry skepticism.

8    Q.   Slide 7-46.

9    Did you find the existence of a long-felt but

10  unmet need that was satisfied by the '127 patent?

11    A.   No, because, first of all, Webster says that

12  these things were known as far back as '80s and even before

13  that, so the notion of various components of the

14  physiological parameters, such as LEDs, et cetera, was

15  disclosed by Webster.  The notion of thermal mass for

16  improving thermal connectivity was disclosed, for example,

17  at RX-397 at 122, Fig. 24.3.

18    Q.   Slide --

19    A.   Also, sorry, Webster was disclosed at RX-35, as

20  we discussed earlier.

21    Q.   Slide 7-45.

22    Did you find any evidence of commercial success

23  indicative of nonobviousness?

24    A.   I have not seen any commercial success related to

25  this patent by Masimo.

1    Q.   How about industry praise, did you find any

2  evidence of that?

3    A.   I have not, not for Masimo, no.

4    Q.   Any evidence that you saw of copying, failure of

5  others, unexpected results, or industry skepticism?

6    A.   I haven't seen any of that, especially going

7  through the hearing this week.

8    Q.   Let's change subjects.  Let me turn to your

9  noninfringement opinion with respect to claim 9 of the '127

10  patent.

11         Can we have slide 7-48?

12         At a high level, can you tell us the reasons for

13  your opinion?

14    A.   Yes.  At a high level, that accused products do

15  not have a thermal mass, also they do not determine bulk

16  temperature for the thermal mass.

17         MR. SELWYN:  Your Honor, I think at this point we

18  can turn to the Apple and Masimo confidential record.

19         (Whereupon, the hearing proceeded in confidential

20  session.)

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3              MR. SELWYN:  May I proceed?

 4              JUDGE BHATTACHARYYA:  Yes.

 5   BY MR. SELWYN:

 6       Q.    Could we have please RDX-7-79?

 7              Professor, can we turn now to the '745 patent?

 8       A.    Absolutely.

 9       Q.    With reference to Fig. 7A, can you briefly

10   describe the '745 patent?

11       A.    Yes.  '745 patent talks about a physiological

12   monitoring system, and Fig. 7A shows a combination of LEDs

13   and photodetectors.  If you go to the next slide, I have

14   more details on that, I believe.

15       Q.    Slide 7-80.

16       A.    Exactly.  Thanks very much.

17              Fig. 7A and companion Fig. 7B shows that there is

18   a light emitter highlighted with label 702.  It emits light.

19   That light goes through a diffuser, diffuser 704.  And the

20   light goes through the tissue as shown with red arrows.  And

21   that comes back to a photodetector, a light detector 710.

22              And we see that the shape of the light as it

23   leaves the diffuser is an annular shape, and we can perhaps

24   better see that in Fig. 7B in the highlighted blue part.

25       Q.    Slide 7-81, please.
```

1      Who was a person of ordinary skill in the art of

2  the '745 patent?

3      A.   In my opinion, one of ordinary skill in the art

4  would be somebody with working knowledge of physiological

5  monitoring technologies, would have a Bachelor of Science in

6  an academic discipline emphasizing the design of electrical,

7  computer, or software technologies, in combination with

8  training or at least one or two years of related work

9  experience with capture and processing of data or

10  information, including but not limited to the physiological

11  monitoring technologies.

12      And, obviously, if somebody had a Master of

13  Science in a relevant academic discipline could have maybe

14  less than a year of related work experience in the same

15  discipline.

16      Q.   Next slide.

17      What reference or combinations of references are

18  you relying upon for your opinion regarding invalidity for

19  the '745?

20      A.   I have three.  The first one is the Apple Watch

21  Series 0; second one is Iwamiya in combination with

22  Sarantos; and, finally, Iwamiya in combination with Sarantos

23  and then Venkatraman.

24      Q.   Beginning with Apple Watch Series --

25      JUDGE BHATTACHARYYA:  Mr. Selwyn, could we take

1    our afternoon break now?

2              MR. SELWYN:  Of course.

3              JUDGE BHATTACHARYYA:  We're in recess for 15

4    minutes.

5              (Whereupon, the proceedings recessed at 3:33

6    p.m.)

7              (In session at 3:48 p.m.)

8              MR. SELWYN:  Good afternoon.

9              JUDGE BHATTACHARYYA:  We are back on the record.

10             MR. SELWYN:  I believe we're on the public record

11   at the moment, Your Honor.  May I proceed?

12             JUDGE BHATTACHARYYA:  Yes, please go ahead.

13   BY MR. SELWYN:

14        Q.   Could we have RDX-7-83?

15             Professor Sarrafzadeh, on the screen is RX-23.

16   Do you recognize that document?

17        A.   I do.  It's a press release from Apple dated

18   April 9, 2015, and it says it's available for purchase

19   online by April 24, 2015.

20        Q.   What does that document say about the date that

21   Apple released the Series 0?

22        A.   It says that the date is for sale is April 24,

23   2015.

24        Q.   How did you conduct your analysis of Apple Watch

25   Series 0?

1      A.   I looked at various documents available, I also

2   talked to and heard a number of Apple engineers in that

3   regard.

4      Q.   Did you speak with Dr. Venugopal?

5      A.   I did, yes.

6           MR. SELWYN:  Your Honor, we have to move, I

7   think, to the Apple confidential record now.

8           (Whereupon, the hearing proceeded in confidential

9   session.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   O P E N   S E S S I O N

 2

 3            MR. RE:  Thank you.

 4   BY MR. SELWYN:

 5       Q.   What conclusions did you reach with respect to

 6   Iwamiya in combination with Sarantos?

 7       A.   That they make the claims obvious.

 8       Q.   Can we have slide 7-99?

 9            Does Iwamiya disclose the preamble?

10       A.   It does.  That's undisputed, in RX-130, the

11   abstract, Iwamiya says an optical biological information

12   detecting apparatus, and that discloses it.

13       Q.   Slide 7100.

14            Does Iwamiya disclose limitation 1A of the '745

15   patent?

16       A.   That is also undisputed, in RX-130, and Fig. 4,

17   talks about the light-emitting unit, and in Fig. 4, I have

18   highlighted it as number 6 and colored red.

19       Q.   Slide 7-101.

20            Does Iwamiya disclose limitation 1B?

21       A.   It does.  Again, looking at RX-130, column 6 of

22   the patent, it talks about these annular light guide 7, and

23   they annularly diffuse and irradiate the observation light,

24   and I have annotated that with the annular shape under the

25   figure.
```

1    Q.   Does Mr. Goldberg dispute is that?

2    A.   No.

3    Q.   Next slide, please.

4         Is limitation 1C disclosed by Iwamiya?

5    A.   133 and column 4 -- column 8 and 14 of the patent

6    do talk about a silicon photodetector, yes.

7    Q.   Slide 7-103.

8         Does Iwamiya in combination with Sarantos

9    disclose limitation 1D?

10   A.   Sure.  Surface comprising a dark-colored coating,

11   Iwamiya talks about light shielding, that shields the light.

12   One option for that is, indeed, a dark-colored coating.  In

13   addition, Sarantos, specifically in RX-366 and Fig. 22,

14   talks about the dark-colored coating, black or otherwise,

15   rendered opaque, and the Iwamiya part is from RX-1130.

16   Q.   Does Iwamiya disclose limitation 1E?  If we go to

17   slide 7-104.

18   A.   It does.  RX-130, Fig. 3, columns 6 and 7 talks

19   about the first and second reflection layer, 13 and 15, and

20   we see that they provide the shielding that's required in

21   the claim, and that's undisputed.

22   Q.   Next slide.

23        Does Iwamiya disclose limitation 1F?

24   A.   Yes, at RX-130 and Fig. 10 in column 9, it is

25   undisputed that a CPU is shown and the CPU performs

1    biological information calculation.

2        Q.   Slide 7-106, please.

3            Does Iwamiya render obvious claim 9 of the '745

4    patent?

5        A.   Yes.  RX-130 talks about display unit of Iwamiya,

6    also at column 9, that displays a measurement result of the

7    biological information.  Oxygen saturation is a biological

8    information.

9        Q.   Slide 7-107.

10           Alternatively, does Iwamiya in combination with

11   Sarantos disclose claim 9?

12       A.   Yes.  As shown in RX-366, Sarantos talks about a

13   heart rate monitor, and it says it can do other

14   physiological parameters such as blood oxygenation level.

15       Q.   Would a POSITA have found it obvious to combine

16   Iwamiya and Sarantos?

17       A.   Yes.  They are both physiological monitoring

18   devices, as shown in RX-130 and RX-366, and they are in the

19   same area '745 patent.  Furthermore, they are actually both

20   wrist-worn devices.

21       Q.   Slide 7-109.

22           Would a POSITA have been motivated to combine the

23   dark-colored coating of Sarantos into Iwamiya at the time of

24   the application for the '745 patent?

25       A.   Yes.  Looking at RX-366, RX-130, and RX-35, we

1    see that the shielding that Iwamiya talks about can be

2    enhanced with the dark-colored coating of Sarantos, and

3    Webster further talks about black materials that are used to

4    prevent transmission of light.

5         Q.   Would a POSITA have reasonably expected success

6    in combining the dark-colored coating of Sarantos with

7    Iwamiya at the time of the application for the '745 patent?

8         A.   Absolutely.  These are low-tech additions.  This

9    dark-colored coating and also low cost, so one would have a

10   reasonable success of adding it and motivation.

11        Q.   Slide 7-110.

12             Would a POSITA have been motivated to combine

13   Sarantos teaching of a blood oxygen measurement with

14   Iwamiya's sensor at the time of the application for the '745

15   patent?

16        A.   Very much so.  If you look at RX-130 and RX-366,

17   Sarantos adds the fact that a PPG, such as blood oxygenation

18   level can be added, and that would enhance, by way of

19   example, what the biological information of Iwamiya is.

20        Q.   Would a POSITA have reasonably expected success

21   in combining Sarantos' teaching of making a blood oxygen

22   measurement with the Iwamiya sensor at the time of the

23   application for the '745?

24        A.   Yes.  As described in Sarantos and as we saw in

25   the literature way before that, one would have success of

1   combining Sarantos with Iwamiya.

2        Q.   Can we turn to slide 7-111?

3             And do you see on the screen RX-368?

4        A.   Yes.

5        Q.   What is that document?

6        A.   RX-368 is a patent with the first inventor

7   Venkatraman.

8        Q.   What's that patent about generally?

9        A.   Generally about the wearable heart rate sensor or

10  monitor.

11       Q.   Is it a wrist-worn wearable?

12       A.   Yes, it is.

13       Q.   Can we turn to the next slide, 7-112?

14            What conclusion did you reach with respect to

15  Iwamiya in with Sarantos and Venkatraman in the validity of

16  claims 18 and 27?

17       A.   I believe their combination make 18 and 27

18  obvious.

19       Q.   Can we have slide 7-113?

20            Does claim 15 differ from claim 1?

21       A.   There are actually a lot of similarities, but, as

22  shown in RDX-7113, there are some differences that I've

23  highlighted in blue.

24       Q.   Slide 7-114, please.

25            Does Iwamiya disclose the preamble of claim 15?

1    A.    That's undisputed.  I discussed this before.

2  Iwamiya in RX-130 talks about a biological information

3  apparatus.

4    Q.    Next slide.

5          Does Iwamiya disclose limitation 15A?

6    A.    That's undisputed.  Same discussion as 1A.  So in

7  RX-130, and also Fig. 4 and column 5, a wrist-worn device is

8  shown and discussed.

9    Q.    Slide 7116, please.

10         Does Iwamiya disclose limitation 15B?

11   A.    Again, this is undisputed.  I discussed that in

12  relation to 1B.  In RX-130 and Fig. 4, column 6, we see that

13  about material that changes the shape of light into an

14  annular light guide using a light, annular light guide, unit

15  7.

16   Q.    Slide 7-117.

17         Is limitation 15C disclosed by Iwamiya?

18   A.    Yes.  RX-133 shows that Figs. 2, 3, columns 6 and

19  7, Fig. 3 shows the reflection layer, and a top view of that

20  is shown in Fig. 2, where we see the circular shape.  This

21  is undisputed.

22   Q.    Slide 7-118.

23         Does Iwamiya disclose limitation 15D?

24   A.    Yes.  If we look at RX-130 and the corresponding

25  figure and columns, although I believe this limitation is

1    indefinite, but using Masimo's interpretation, there are a

2    number of photodiodes shown, and they would have, according

3    to Masimo's interpretation, they would be arranged in a

4    shape that corresponds to the shape of the portion of tissue

5    measurement that is encircled by the light block.

6        Q.   Slide 7-119.

7             Does Iwamiya disclose limitation 15E?

8        A.   Yes.  RX-130 shows that this is undisputed, I

9    discussed this before, a photodiode is shown.

10       Q.   Next slide.

11            Does Iwamiya disclose limitation 15F?

12       A.   Yes, that is also undisputed.  Looking at 130, we

13   see the photodiode and the LEDs are on the same side of the

14   tissue.  So that's the reflectance measurement

15   configuration.

16       Q.   What figure are you referring to?

17       A.   Fig. 4 of it.

18       Q.   Can we have slide 7-121?

19            Does Iwamiya disclose limitation 15G?

20       A.   Yeah, that's undisputed.  I went through this in

21   1E.  So RX-133 in Fig. 3 and column 6 and 7 show that.  We

22   see the reflection layer 13 and 15 are what provides the

23   optical isolation.

24       Q.   Next slide, please.

25            Is limitation 15H shown by Iwamiya?

1    A.   Sure.  That's also undisputed, same as 1F, we see

2    that in RX-133, Fig. 10 shows a processor and column 9

3    discusses what the CPU does to do biological information

4    calculation.

5         Q.   Can we have slide 7-123?

6              Does Venkatraman disclose limitation 15I?

7         A.   Yes, that is shown in RX-368 column 31.

8    Venkatraman shows a secondary device that can be a generic

9    device, and it talks about the monitoring device that may

10   transmit data to and from a secondary electronic device,

11   such as a cell phone, such as an iPhone.

12        Q.   Could we go back tor for one second to RDX-7-119?

13             Does Iwamiya teach multiple photodiodes?

14        A.   It does.  As I mentioned, in column 8 and 14, it

15   talks a plurality of light receiving units 9.  That's

16   multiple photodiodes.

17        Q.   And rolling forward to slide 7-124, would a

18   POSITA have found it obvious to combine Iwamiya with

19   Venkatraman at the time of the '745 application?

20        A.   Yes.  It was as shown in RX-368, Fig. 7, RX-130

21   at 25, and 9, the wristwatch of Venkatraman is also -- there

22   is also a wristwatch in Iwamiya, so one would be able to

23   combine the two.

24        Q.   Slide 7-125.

25             Would a POSITA have been motivated to combine

1   Iwamiya with Venkatraman at the time of the '745

2   application?

3        A.   Very much so.  As shown in RX-368 and RX-130,

4   column 57 and Fig. 4 respectively, the fact that a device

5   can be connected to an external smartphone and other devices

6   was known, and, therefore, taking Venkatraman and enhanced

7   the external connection of Iwamiya would have been obvious.

8        Q.   Would a POSITA had a reasonable expectation of

9   success in combining Iwamiya with Venkatraman?

10       A.   Very much so, because adding these external

11   devices was known for quite a bit of time.

12       Q.   Slide 7-126.

13            Does Iwamiya render obvious claim 18?

14       A.   Yes.  That's same as claim 9.  In RX-130, column

15   9, we see there is a display unit that displays a

16   measurement of the biological information, and oxygen

17   saturation is a biological information.

18       Q.   Slide 7-127.

19            Does Iwamiya together with Sarantos disclose

20   claim 18?

21       A.   Yeah.  I discussed that in relation to claim 9.

22   So RX-366 at 13, Sarantos talks about a heart rate and other

23   parameters such as a blood oxygenation level.

24       Q.   Would a POSITA have found it obvious to combine

25   Sarantos' teaching of a blood oxygen measurement with

1    Iwamiya sensor at the time of the '745 patent?

2        A.   Very much so, yes.

3        Q.   Why?

4        A.   Because they are both related to monitoring, and

5    adding the sensor will add extra functionality there.

6        Q.   What would have motivated a POSITA to combine

7    Sarantos' teaching of a blood oxygen measurement with the

8    Iwamiya sensor at the time of the '745 patent?

9        A.   By way of example, because Sarantos talks about

10   blood oxygenation level, and that would be one additional

11   parameter that Iwamiya can use.

12       Q.   And would a POSITA have had a reasonable

13   expectation of success in that combination?

14       A.   Yes, because as I discussed earlier, the notion

15   of doing blood oxygenation has been known according to

16   Webster for -- since early '80s or so.

17       Q.   Slide 7-128, please.

18            Can we look together at claim 27?  When you

19   discussed Iwamiya, was your analysis for limitation 1

20   Preamble through 1F the same as your analysis for

21   limitations 20 Preamble through 20F?

22       A.   Yes.

23       Q.   And is that true for Iwamiya in combination with

24   Sarantos as well?

25       A.   That's correct.

1    Q.   So let's go to limitation 20G, and can I have

2    slide 7-129?

3         Does Iwamiya in combination with Venkatraman

4    disclose limitation 20G?

5    A.   Yes.  RX-368 in various columns shows that

6    Venkatraman talks about a smartphone that has a capacity of

7    touch sensing.  We know smartphones have storage devices,

8    network interfaces, and all other requirements of 20G.

9    Q.   Would a POSITA have found it obvious to combine

10   Iwamiya with Venkatraman?

11   A.   Yes.  As I said, adding these external devices,

12   such as a cell phone, was done for quite a bit and was

13   obvious to do so.

14   Q.   What would have motivated a POSITA to combine

15   Iwamiya with Venkatraman?

16   A.   The fact that you can add these external devices

17   for better display and extra information gathering as

18   discussed in the combination.

19   Q.   Would a POSITA have reasonably expected success

20   in combining Iwamiya with Venkatraman?

21   A.   Yes.  This notion of adding external devices was

22   tested and done a number of times and a number of years

23   before this.

24   Q.   Slide 7-130, please.

25        Does Iwamiya in combination with Sarantos

 1   disclose claim 27?

 2        A.   Yes, it does.  In RX-366, that's Sarantos, column

 3   13 talks about that it might be desirable to include a

 4   separate light-emitting device that are each able to emit

 5   different wavelengths.  That's the number of wavelengths

 6   that's claim 27 discusses.

 7        Q.   Would a POSITA have been motivated to combine

 8   Sarantos' teaching of emitting multiple wavelengths with

 9   Iwamiya's sensor at the time of the '745 patent?

10        A.   Yes.  In fact, because it allows these multiple

11   wavelengths, they are both in the same area of biological

12   monitoring, one would be motivated to combine them.

13        Q.   Would a POSITA have reasonably expected success

14   in combining Iwamiya with Sarantos?

15        A.   Yes, because, again, adding these multiple

16   wavelengths in a biological monitoring device was known, as

17   Webster said, for many years.

18        Q.   Turning to secondary considerations and slide

19   7-131, what conclusion did you reach with respect to

20   long-felt but unmet need?

21        A.   My conclusion is that there has not been a

22   long-felt but unmet need.  As we saw today by Webster,

23   conventional pulse oximeters were known, photodiodes were

24   known, LEDs were known, materials that change the shape of

25   light were known.

1       As we discussed, for example, in Iwamiya,

2  processor for computations were known, light blocks have

3  been discussed and known for many years, and optical

4  shielding using dark-colored coating was also disclosed and

5  known.

6       Q.   Slide 7-132.

7            What conclusion did you reach with respect to

8  alleged commercial success?

9       A.   I believe there has been no success between the

10 accused Apple Watches and the claimed invention shown.

11      Q.   What was your conclusion with respect to the

12 remaining secondary considerations?

13      A.   I have not shown any evidence of the other

14 secondary considerations.

15      Q.   Can we have slide 7-133?

16           What conclusion did you reach regarding the

17 validity of claims 1 and 20 of the '745 patent under section

18 112?

19      A.   I think there is a lack of written description.

20 What we see in 1B and 20B are disclosed in 7A, a

21 physiological monitoring device.  The notion of dark-colored

22 coating is in a different embodiment, Fig. 3, as we can see

23 in '745 patent, respectively, Fig. 7A and Fig. 3.

24      Q.   Why did you find a lack of written support?

25      A.   Because each of them, 1B and 1D, corresponds to a

1   different embodiment, and there is no description on how to

2   combine these embodiments in the description of the patent.

3       Q.   May we have slide 7-134?

4            What conclusion did you reach regarding the

5   validity of claim 15 from the perspective of the

6   definiteness requirement?

7       A.   I believe, because of -- because of 15D

8   limitation, the claims are indefinite, especially the part

9   talking about the plurality of photodiodes that are arranged

10  in an array, having a special configuration corresponding to

11  a shape of the portion of tissue measurement site encircled

12  by the light block.

13           So here I've shown four photodiodes in purple

14  color in RX-7134, and obviously there are a number of shapes

15  that could correspond to these four photodiodes.  It can be

16  an X shape, it could be a triangle, it could be a square, it

17  could be many other shapes.  So it's not obvious what the

18  shape is.

19      Q.   Let's switch gears just a little bit to your

20  noninfringement opinion for the '745 patent.

21           Can we have slide 7-136?

22      A.   Yes.

23      Q.   Why is claim 9 of the '745 patent in your opinion

24  not infringed?

25      A.   Basically for two reasons.  And I believe there

1   are no materials that receive the lights having the same

2   shape as light emitted by LEDs, i.e., the first shape.

3   Also, there is no material that are configured to change the

4   first shape into a second shape.

5        Q.   In the claim language, why does the material need

6   to receive light in the same shape that was emitted by the

7   emitter?

8        A.   If we look at by way of example claim 1 --

9   limitation 1A, it says the LED light-emitting diodes emit

10  light in a first shape.  Then if we look at limitation 1B,

11  it says the material configured to change different shape

12  into a second shape.  So it refers back to the shape that it

13  was emitted.  These are the same first shape obviously.  The

14  same analysis for 20A and 20B.

15       Q.   Does claim 27 also require the material to

16  receive light in the same shape that was emitted by the

17  emitters?

18       A.   Yes.

19       Q.   Does claim 27 also require the material to change

20  the first shape into a second shape?

21       A.   Similarly, yes.

22       Q.   Turning now to slide 7-137, can you explain the

23  claimed material in the context of Fig. 7A and B?

24       A.   Yes.  Looking at '745, Fig. 7, A and B, we see

25  there is a light emitter labeled 702 that emits light in a

1   local shape.  That goes through a diffuser 704, and the

2   diffuser has an annular shape, and that's better seen in

3   Fig. 7B, the annular shape.

4           So it takes the light that is emitted from LED

5   and changes that to an annular shape.  So that's the change

6   of shape.

7           And we see the shape that is received that is

8   emitted from LED, that exact same shape is received by the

9   diffuser, because they abut each other, they touch each

10  other.

11          MR. SELWYN:  Your Honor, may we go onto the Apple

12  confidential record now, please.

13          JUDGE BHATTACHARYYA:  Moving onto the Apple

14  confidential record.

15          (Whereupon, the hearing proceeded in confidential

16  session.)

17

18

19

20

21

22

23

24

25

1135

1           O P E N   S E S S I O N

2

3    BY MR. RE:

4        Q.   Okay.  So you did consider the listing of

5    Masimo's awards and they were cited to as a document

6    reviewed in your expert report, right?

7        A.   I have looked at some awards of Masimo, yes.

8        Q.   And you decided to dismiss those because, in your

9    view, none of the awards could be attributed in any way to

10   Masimo's claimed inventions, right?

11       A.   Because Masimo did not show that, correct.

12       Q.   I want to show you what the document is, CX-1375.

13   This is the document you dismissed because Masimo didn't

14   show something.  Did I understand your testimony?

15       A.   Repeat your question, please.

16       Q.   Does this look familiar to you, this document?

17       A.   Yes, I've seen this before.

18       Q.   Right.  And you decided to dismiss them for the

19   reasons you gave on the record, right?

20       A.   No.  When I was at Motorola, they had 20,000

21   patents.  It doesn't mean each product is related to each of

22   those patents.  There is no proof from Masimo that these

23   awards are related to the claimed invention.  That's what

24   I'm saying.

25       Q.   I understand.  Okay.

1        A.    Thank you.

2        Q.    I want to show you what is also one of your

3   slides.  You showed some data from sitting with Mr. Scruggs

4   and the other experts, and that's slide RDX-157C.  Do you

5   remember this?

6        A.    Yes.

7        Q.    And you did not pull up the actual statistics of

8   your calculations, correct?

9        A.    I don't understand your question.

10        Q.    If we go -- do you remember doing an analysis of

11   these numbers for purposes in your -- in your expert report?

12        A.    I have discussed them in the joint report, yes.

13        Q.    Right.  And isn't it true that across the 15

14   groups of reportable comparison values the MightySat and

15   CPX-46C, the SpO2 and pulse rate numbers differed, on

16   average, by 3.5 percent and 2.1 beats per minute, correct?

17        A.    That's irrelevant.  The absolute difference

18   matters.  If I am, during COVID, if my pulse value is 97 --

19        Q.    Sir, I didn't ask you if you thought it was

20   relevant.  I didn't ask you.  I just want to know if my data

21   is correct --

22        A.    Say that again.

23        Q.    -- what I read to you.  If I can direct you to

24   paragraph 25 of your expert report.

25        A.    Sure.

1    Q.   I just want to know if I can read this into the

2    record because I didn't hear this in your presentation.

3              At the last sentence of your report it says:

4              Across the 15 groups of reportable comparison

5    values, the MightySat and MASITC_P_146 SpO2 and pulse rate

6    numbers differed, on average (in terms of absolute values or

7    their respective differences), by 3.53 percent and 2.1 bpm

8    respectively.

9              Did you write that and that's in your report?

10   A.   I did.

11   Q.   And that's talking about the data that's on

12   RDX-157, right?

13   A.   That's one aspect of the data.  There are more

14   important aspects that I just discussed, for example, the

15   absolute difference.

16   Q.   If we can pull up your slide.

17             I just want to make sure I have it correct in the

18   record.  I think we have -- hold on.  There might be a

19   typographical error.

20             I think you have -- I'm being alerted that there

21   might be a typographical error on your slide; isn't that

22   correct?

23   A.   I'm not aware of any.

24   Q.   Yeah.  It says CPX-146 bpm, or is that SpO2?  I

25   can't tell.

1138

1      A.   That's bpm.  On the lower side?  That's bpm,
2   beats per minute.
3      Q.   Right.  But SpO2, right above it --
4      A.   Oh, I think those are -- I'll double-check on
5   that, but I think they are bpm's too.
6      Q.   Okay.
7      A.   Doesn't make sense for SpO2 to be 65.  That's a
8   typo.  Please correct that, make that bpm.  Those are the
9   heart rate numbers.
10      Q.   So which one is incorrect?  Can you tell?
11      A.   Yes.  If you look at --
12      Q.   The ones --
13      A.   The one you have highlighted in yellow, at the
14   bottom, CPX-146 SpO2, that should be bpm.  And MightySat
15   SpO2 should be bpm, I believe.  I'll double-check that.
16      Q.   Right.  Those numbers obviously are beats per
17   minute and not SpO2, correct?
18      A.   You are correct.
19      Q.   Okay.
20           MR. RE:  I have no further questions.
21           Thank you, doctor.
22           THE WITNESS:  It's a pleasure, sir.
23           MR. SELWYN:  Your Honor, I have no redirect.
24           MR. RE:  Thank you, doctor.
25           THE WITNESS:  Thank you, Your Honor.

          1              JUDGE BHATTACHARYYA:  Thank you.

          2              MR. MUELLER:  Your Honor, we call as our next

          3    witness Robert Rowe.  I believe Your Honor said we would be

          4    going a little bit later today because of the NEXT Advocates

          5    Program.

          6              We call as our next witness Robert Rowe, and

          7    Ms. Vreeland will do the examination.

          8              MS. VREELAND:  Good afternoon.  Dr. Rowe, I

          9    believe, should be joining us.

         10              MS. SWAROOP:  Perhaps while we're waiting, we had

         11    shipped a binder to Dr. Rowe, and I know we have an

         12    agreement that it has to be opened on camera, but I think

         13    for purposes of speeding this up, we're happy to have him

         14    open our cross binder now so that we can begin the cross as

         15    soon as you're done with his direct examination.

         16              MS. VREELAND:  Absolutely.

         17              MS. SWAROOP:  Your Honor, I assume we're on the

         18    public record now?

         19              JUDGE BHATTACHARYYA:  Yes, we are.

         20              MS. SWAROOP:  Thank you.

         21              MS. VREELAND:  I apologize for the delay.  We

         22    were in coordination with his counsel, and I believe he will

         23    be here momentarily.

         24              Your Honor, we had told him that we would call

         25    him when his time -- it was hard for us to predict when the

1    cross-examination would be over.

2              JUDGE BHATTACHARYYA:  What's the name of

3    Mr. Rowe's counsel?

4              MS. VREELAND:  Tim Rawson is Dr. Rowe's counsel.

5              MR. RAWSON:  Good morning, Your Honor.  This is

6    Tim Rawson on behalf of Dr. Rowe.  He is going to be joining

7    us in just a moment.

8              MS. SWAROOP:  Mr. Rawson, I don't know if you

9    heard -- this is Sheila Swaroop -- if Dr. Rowe wants to open

10   his cross binder, and if you want to as well, we're happy to

11   have you do that now so that we don't waste time on the

12   record with that.

13             MS. VREELAND:  I believe Dr. Rowe has joined us.

14   I'm hoping everybody can see him on screen.

15             MR. RAWSON:  One thing I did want to raise,

16   Dr. Rowe had requested to have access to an electronic copy

17   of the '212 patent during his testimony, and I wondered if

18   Your Honor would entertain that notion.  I could send him

19   the exhibit that I just received from Masimo's counsel.

20             JUDGE BHATTACHARYYA:  If counsel has no

21   objections, that's fine with me.

22             MS. SWAROOP:  No objection from Masimo.  I

23   believe Apple's counsel also sent him the same exhibit.

24             MS. VREELAND:  Certainly no objection from us

25   either.

```
 1              JUDGE BHATTACHARYYA:  That's fine.

 2              MR. RAWSON:  Dr. Rowe, I just sent you an email

 3    with that exhibit.

 4              JUDGE BHATTACHARYYA:  Dr. Rowe, you might be on

 5    mute.

 6              Welcome, Dr. Rowe.  Do you understand that you

 7    are under an obligation to testify truthfully here today?

 8              THE WITNESS:  I do.

 9                        ROBERT ROWE,

10          having been first duly sworn and/or affirmed

11    on his oath, was thereafter examined and testified as

12    follows:

13              JUDGE BHATTACHARYYA:  Thank you.  You may

14    proceed.

15              MS. VREELAND:  Thank you.

16                   DIRECT EXAMINATION

17    BY MS. VREELAND:

18         Q.  Dr. Rowe, if you could begin by introducing

19    yourself to Her Honor.

20         A.  Yes, Your Honor.  I'm Robert Rowe.

21         Q.  Dr. Rowe, I'd like to focus my questions today on

22    the Lumidigm patent, but before I do, could you briefly

23    describe your personal background beginning with your

24    educational history?

25         A.  Sure.  I have a undergraduate degree in
```

1    mechanical engineering from Kettering University, used to be

2    called General Motors Institute.

3         After receiving the mechanical engineering

4    degree, I went on to University of Arizona, where I attained

5    a Ph.D. in optics with a primary focus on medical imaging,

6    but certainly covering a whole range of optics and physics.

7         From that point, after getting the degree, I took

8    an industrial postdoctoral appointment with Leica, the

9    precision optics company in Switzerland.

10        After that I returned to the United States and

11   had another postdoctoral appointment with Sandia National

12   Laboratories.  From there I became familiar with a very,

13   very recent startup that was developing medical measurement

14   technology for measuring glucose and other analytes,

15   noninvasively, optically.  So I joined that company.  It was

16   called Rio Grande Medical Technology, and later became

17   InLight Solutions.

18        After working there for a number of years, I and

19   some colleagues saw an opportunity to take that technology

20   and use it as a basis for a spinout company developing a

21   novel type of biometrics.  That company was called Lumidigm.

22        Lumidigm was successful for a number of years as

23   a startup, transitioning to a product-focused company.  In

24   2014 it was acquired by HID Global, which is a business unit

25   of Assa Abloy, a public company in Sweden.  And that is who

1  I'm with currently, HID Global.

2      Q.   I'd like to take you backwards with a couple more

3  questions before we turn to your Lumidigm patent.

4           Can you tell us what you were focused on at

5  Sandia Labs when you did the postdoc there?

6      A.   At Sandia there were a range of projects.  The

7  one -- one of them that wasn't classified and occupied a

8  fair bit of my time was a spectroscopic measurement of

9  semiconductor gases and trying to detect small amounts of

10 water vapor and other impurities in the gas using

11 spectroscopic techniques.

12     Q.   How did you decide to join Rio Grande Medical

13 when you completed that postdoc?

14     A.   They, Rio Grande, had a very close working

15 relationship with Sandia Laboratories.  Some of the

16 technology -- the original technology was shared with Sandia

17 Laboratories, so I became familiar with Rio Grande through

18 their collaboration, and just -- it just seemed like a

19 fabulous opportunity to join them.

20     Q.   Can you tell us about a few of the products you

21 worked on when you were at Rio Grande Medical?

22     A.   Sure.  The primary focus of the company was

23 noninvasive glucose measurement, something that a diabetic

24 could use to measure their blood sugar without drawing

25 blood, without poking themselves.  So we designed and built

1   a variety of different spectrometers to do that.

2          Secondarily, we would measure alcohol, which both

3   had a commercial potential, but then had some technical

4   advantages to be able to test equipment, the spectroscopic

5   equipment measuring alcohol.

6          And then a variety of analytes in the system that

7   are medically important, blood gases and a variety of

8   different analytes.

9      Q.   Did Rio Grande Medical make any products that

10  measured hemoglobin?

11     A.   You know, I don't remember that.  I was trying to

12  think about that, but it wasn't primary.  As I say, we

13  measured a variety, a wide variety of analytes, but I don't

14  recall exactly.

15     Q.   If I can take you back, then, to Lumidigm.  How

16  did you -- how did you decide to found Lumidigm?

17     A.   Well, technologically, what we found at Rio

18  Grande or InLights Solutions, as it became known, is that

19  the spectroscopic measurements that we were taking on people

20  had a bias.  From person to person they would look

21  different, and we would have to correct for each person in

22  order to get the medical measurements out.

23          Those lemons, if you will, became lemonade when

24  we realized that bias from person to person, that difference

25  from person to person, could be made into a biometric, a way

 1    to identify a person and distinguish between people.  So

 2    that was the technology or technological thought behind

 3    Lumidigm.

 4         Q.   And what was your personal role at Lumidigm?

 5         A.   Well, I was one of the founders of Lumidigm, and

 6    I was the Chief Technology Officer.

 7         Q.   Now your patent that we'll talk about in a moment

 8    mentioned something called "liveness detection."  Did

 9    Lumidigm ultimately incorporate any liveness detection

10    features into its products?

11         A.   It was a very important part of what we developed

12    all through the product family and the technology family

13    that we developed.  It was critical to be able to

14    distinguish between real living biometric samples, fingers,

15    for example, on humans, and those that were artificial of

16    some kind, or even those that were dead or otherwise not

17    living human fingers.

18         Q.   And were Lumidigm's products ultimately

19    successful?

20         A.   Yes.  Yeah.  Yeah.

21         Q.   And is Lumidigm still a standalone company?

22         A.   No.  It was acquired by HID in 2014.

23         Q.   And what did you do after HID acquired Lumidigm?

24         A.   For a couple of years I continued to be

25    associated and developing and working within HID on the

1146

1   Lumidigm biometrics, making further improvements there with

2   the rest of the team, but then I transitioned into

3   developing other biometrics, such as facial recognition, and

4   most recently transitioned into heading up a team of data

5   scientists working in the area of artificial intelligence,

6   broadly, across a variety of different application spaces.

7       Q.   I'd like to pull up now your '212 patent, RX-411.

8   Can you describe -- we'll pull it on the screen and it

9   should also be in your notebook.

10          Can you describe the work that you were doing at

11  Lumidigm that led to the ideas described in the '212 patent?

12      A.   Yeah.  So the electro-optic sensors that we were

13  designing and building for doing biometric measurements,

14  doing spectroscopic determinations of identity and also

15  liveness, we felt could be used for other purposes.  So the

16  '212 patent as well as other patents pertain to the extended

17  functionality of these electro-optic sensors.

18      Q.   And I see you at the very end of a very long list

19  of inventors.  What was your role in the work described in

20  the patent?

21      A.   Throughout the course of Lumidigm, including in

22  developing this patent, I was really the key inventor, the

23  person responsible for coming up with ideas and maturing

24  those ideas so they could be patented.

25          In this particular case many of the concepts came

1147

1  out of a brainstorming session that involved all the

2  different coinventors listed on this patent, but I was -- I

3  was the primary inventor.

4      Q.    And how did you end up at the end of the list?

5      A.    Yeah.  Rather than the tricky process of trying

6  to distinguish just how much each of these people

7  contributed and ordering it according to the value of their

8  contribution, my patent lawyers and I decided let's just

9  alphabetize by last name.

10     Q.    I'd like to ask you about some of the functions

11 you describe in your patent, starting with column 19, lines

12 16 to 28, which we'll put on the screen.

13     A.    Okay.

14     Q.    You describe here functionality that you call a

15 hemoglobin monitor and say that it can detect spectroscopic

16 changes that are correlated with oxygenation and hemoglobin

17 levels in the blood.

18         How would your sensor accomplish that function?

19     A.    So in the spectral range that we use, the visible

20 and the very near infrared, hemoglobin has a very, very

21 strong spectral signature, and we would see that spectral

22 signature in our data.

23         Furthermore, hemoglobin has -- has two different

24 aspects, an oxygenated hemoglobin and deoxygenated

25 hemoglobin, both of which are strong and both of which are

1   spectrally distinct from each other.

2           So seeing the hemoglobin in the spectral data and

3   seeing the two different forms of the hemoglobin was

4   something that our sense was very sensitive to.

5   Q.   I'd like to put up on the screen some of the

6   figures in your patent showing your potential sensor

7   designs, Figs. 3 through 7D.  We're going to put them all up

8   on the screen at the same time.

9           What were you illustrating in these figures?

10  A.   So this is a range of embodiments of the

11  inventions disclosed where we are showing in these figures

12  multiple LEDs.  They can be of the same wavelength.  They

13  can be of different wavelengths.

14          And we're also showing a detector or multiple

15  detectors that can be single element.  They can be

16  multi-element.  They can be one-dimensional arrays.  They

17  can be two-dimensional arrays.  And then all of the

18  different arrangement or some example arrangements of how

19  those components can be assembled.

20  Q.   I'd like to ask you just about a few of those

21  figures, starting with we're going to put on the screen

22  Fig. 3 and the accompanying text at 833 to 37.

23          What does your patent say about the example in

24  Fig. 3?

25          MS. SWAROOP:  Your Honor, I'd like to make an

1   objection with regard to Order No. 42.

2          Masimo filed a motion in limine with regard to

3   Dr. Rowe's testimony, and Your Honor ruled that any

4   questions regarding the disclosure of the Lumidigm reference

5   must be limited to Dr. Rowe's personal and factual knowledge

6   regarding the reference and may not seek opinion testimony

7   regarding how one of ordinary skill in the art would

8   interpret any particular disclosures.

9          So to the extent there's going to be testimony

10  beyond the four corners of this patent, we object as a

11  violation of Order No. 42.

12         MS. VREELAND:  Your Honor, if I may respond.

13  I've simply asked him what his patent discloses about

14  Fig. 3.  We've put on the screen the relevant disclosure,

15  and I've asked him what the patent says about Fig. 3.  I

16  believe that is squarely within what Your Honor said we

17  could do.

18         MS. SWAROOP:  Your Honor, if he deviates beyond

19  the text of what his patent says about Fig. 3, that is a

20  violation of Order 42.

21         JUDGE BHATTACHARYYA:  Let's continue with the

22  questioning.  To the extent you believe there are portions

23  of his testimony that are improper, we'll deal with it when

24  we get to that point.

25         MS. SWAROOP:  Thank you, Your Honor.

1        THE WITNESS:  Can you repeat your question, then,

2    please?

3        Q.   Yes.  The question was:  What does your patent

4    say about the example in Fig. 3?

5        A.   Would you like a verbatim reading or paraphrased?

6        Q.   Just a paraphrase for what the patent -- what the

7    patent is showing in Fig. 3.

8        A.   Yeah.  So Fig. 3 is showing an arrangement of

9    LEDs numbered 34 and a detector 36 which, again, can be a

10   single element, multi-element, 1D array or 2D array, and all

11   of that within a sensor head 32.

12       Q.   And --

13       MS. SWAROOP:  Object, move to strike everything

14   describing the characters of the detector that's not stated

15   here in this passage that counsel is showing Dr. Rowe.

16       MS. VREELAND:  I think the response, Your Honor,

17   would be that the patent in an earlier place says that that

18   single detector can be multiple detectors.

19       MS. SWAROOP:  Your Honor, now we have counsel

20   arguing about the disclosure.

21       MS. VREELAND:  Well, I think he --

22       MS. SWAROOP:  Your Honor, he also used words like

23   "it can be."  It does appear that he is now interpreting the

24   disclosure in direct violation of Order No. 42.

25       JUDGE BHATTACHARYYA:  Can we take a break for a

 1    minute?

 2              MS. VREELAND:  Absolutely.

 3              MS. SWAROOP:  Yes, Your Honor.  It's page 3 of

 4    order 42.

 5              (Brief recess.)

 6              JUDGE BHATTACHARYYA:  We're back on the record.

 7              Dr. Rowe can testify regarding his personal

 8    knowledge about what the invention is.  He can testify

 9    regarding his personal knowledge about what he wrote in the

10    patent.

11              To the extent that that's what he is testifying

12    about, it is going to be let in and given the appropriate

13    weight, and counsel can argue about the appropriate weight

14    it should be given in the post-hearing briefs, but he is not

15    limited precisely to reading the patent.

16              MS. SWAROOP:  Your Honor, can he be permitted to

17    testify -- he is using words like "can" and "may be able to

18    do this."  That seems to be exceeding the disclosure of the

19    patent in violation of Order 42 -- could be, it could be

20    doing this.

21              JUDGE BHATTACHARYYA:  I agree.  I think he should

22    avoid testimony like that.  To the extent there can be some

23    foundation laid for various options that he wrote about in

24    the patent, that's permissible, but general discussion about

25    what could theoretically happen is too much without a

1152

1    foundation.

2              MS. SWAROOP:  Thank you, Your Honor.

3              MS. VREELAND:  Thank you.

4         Q.   Why don't we just speed ahead and look at the

5    embodiment that you illustrate in Fig. 8B and describe in

6    the accompanying text at 1160 to 122.

7              What were you illustrating in Fig. 8B?

8         A.   So in 8B we're showing the electro-optic sensor

9    or one example of the electro-optic sensor on the back of a

10   wristwatch.

11        Q.   And in the accompanying text you say that any of

12   the sensor geometries previously disclosed can be used for

13   this application.

14             What sensor geometries had you previously

15   disclosed in the patent?

16        A.   The figures we were just -- we were just looking

17   at, the Figs. 3 through 7, I believe they were.

18        Q.   Okay.  So it would have been included the

19   illustrations that we previously discussed in Figs. 3

20   through 7B?

21        A.   Mm-hmm, correct.

22        Q.   And was there any previously disclosed discussion

23   of the sensor head?

24        A.   Yes.  Yes, quite a bit, yes.

25        Q.   Okay.  Great.

 1          MS. VREELAND:  Well, we'll stop there,

 2   Your Honor, since it's past Your Honor's stopping point.  No

 3   further questions.

 4          JUDGE BHATTACHARYYA:  All right.  Sounds good.

 5          There will be further questions tomorrow, I

 6   assume, Ms. Vreeland?  Will you continue with the witness

 7   tomorrow?

 8          MS. VREELAND:  We'll pass the witness.

 9          JUDGE BHATTACHARYYA:  All right.  So let's break

10   for today.

11          Is there anything that counsel needed to bring up

12   before we adjourn?

13          MS. SWAROOP:  Yes, Your Honor.

14          JUDGE BHATTACHARYYA:  Dr. Rowe, I'll see you

15   tomorrow for Ms. Swaroop's questioning.

16          THE WITNESS:  Okay.  May I leave now, Your Honor?

17          JUDGE BHATTACHARYYA:  Yes, you may leave.  Thank

18   you.

19          THE WITNESS:  All right.  Thank you.

20          MS. SWAROOP:  Your Honor, on the issue of the

21   clock, I did want to address one point.

22          I believe yesterday Mr. Mueller and this morning

23   had indicated to you that Masimo was several hours -- had

24   used several hours more of time than Masimo.

25          Based on our calculations, on the end of today,

1   Apple had, I believe, seven or eight witnesses, they

2   exceeded their time estimates for five of those, and, based

3   on our calculation, Apple is now at a point where they have

4   used more time than Masimo has in terms of hearing time.

5   And we are very concerned that we are not going to have

6   adequate time tomorrow to fully present our rebuttal case.

7          So we believe -- there is a slight dispute in

8   terms of the calculation of time, but we believe that, by

9   our calculation, they have used about 37 more minutes than

10  we have in total.  I think, under their calculation, they

11  will think that we have used 15 minutes more than them.  So

12  that's the spread we're looking at.

13         We think the dispute is based upon the fact that

14  there were lengthy objections that were argued, including

15  Mr. Scruggs and Mr. Goldberg, that Apple is counting -- is

16  charging us for, and we don't think that's correct.  So

17  that's the basis of the difference.

18         But we do think we have -- we're entitled to more

19  than three hours of the hearing day tomorrow in view of

20  where the time -- where we have ended up today after four

21  days of testimony.

22         MR. MUELLER:  Your Honor, if I could respond?

23         JUDGE BHATTACHARYYA:  Yes.

24         MR. MUELLER:  I disagree with the last point.  I

25  do think the parties are much closer now than they were at

1  the beginning of the day, that's certainly true.

2          I think at this point, Your Honor, the parties

3  should try to hash out the differences that Ms. Swaroop

4  referred to tonight and we can report back to Your Honor

5  first thing tomorrow morning.

6          It is definitely closer than it was at the

7  beginning of the day.  Again, I'm not going to agree with

8  that last estimate, but I think we can -- I hope we can --

9  hash out the remaining agreements tonight and we can report

10  on any outstanding issues to Your Honor first thing tomorrow

11  morning.

12          MS. SWAROOP:  Your Honor, we're happy to meet and

13  confer with Mr. Mueller and report to you first thing.

14  Thank you.

15          JUDGE BHATTACHARYYA:  One thing that would be

16  helpful, in order to save hearing time tomorrow is, to the

17  extent you come to a position, come to positions tonight, or

18  early tomorrow morning, if you can send me an email

19  previewing any disputes that you're going to want me to

20  resolve, then that will be helpful.  We can just summarize

21  what everybody's positions are on the record and I can

22  hopefully rule more quickly with that preview.

23          MR. MUELLER:  Thank you, Your Honor.  We will do

24  that.  I had just one more issue, but I'll wait to see if

25  Ms. Swaroop has any others first.

1156

```
 1          MS. SWAROOP:  I'm sure I'll have a response to
 2   yours, Mr. Mueller, but please go ahead.
 3          MR. MUELLER:  Maybe not.
 4          Your Honor, for this one, it's actually just a
 5   request to Your Honor.  Tomorrow morning my daughter is
 6   graduating eighth grade, and so, with Your Honor's
 7   permission, I would step out for about an hour and a half or
 8   so, maybe two hours, to attend the graduation.
 9          MS. SWAROOP:  We're pleased to have Mr. Mueller
10   attend his daughter's graduation.  I'm glad that he is able
11   to fit that in.
12          JUDGE BHATTACHARYYA:  I'm happy that you will
13   attend as well.  I assume there will be somebody on your
14   team who will be here.
15          MR. MUELLER:  Yes, Your Honor, absolutely.  Just
16   a preview, I should be here for the beginning of the day, so
17   I should be on camera from a different location at the
18   beginning of the day.
19          Ms. Vreeland will complete the examination of
20   Dr. Rowe, and then Ms. Vreeland will also do the examination
21   of our next witness, Dr. Warren.  I will be back before
22   Dr. Warren completes his testimony.
23          JUDGE BHATTACHARYYA:  Thank you very much
24   everyone.
25          MR. MUELLER:  Thank you, Your Honor.
```

1157

1          MS. SWAROOP:  Thank you.  See you tomorrow.

2

3          (Whereupon, at 5:31 p.m., the proceedings

4    adjourned, to reconvene the following day, June 10, 2022, at

5    9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1158

```
1                    C O N T E N T S

2                   INDEX OF WITNESSES

3
                                    RE-    RE-
     WITNESS              DIRECT CROSS DIRECTCROSS

5    SAAHIL MEHRA,...............876,

6                          876

7    UEYN BLOCK,.................895    903   910   914

8    STEPHEN WAYDO,..............918    934   946,  950

9                                       947

10   BRIAN LAND,.................952    973   985

11   PAUL MANNHEIMER,............993   1008  1023  1025

12   SCOTT CROMAR,...............1026  1034  1037, 1038

13                                     1040

14   MAJID SARRAFZADEH,..........1042  1128

15   ROBERT ROWE,................1141

16

17   AFTERNOON SESSION                            1026

18

19   CONFIDENTIAL SESSIONS  876-894    947-948   1012-1025

20                          899-917    961-969   1065-1087

21                          922-935    975-992   1092-1097

22                          943-944    998-1005  1114-1134

23

24

25
```

```
 1              COMPLAINANTS' CORRECTED TABLE OF ADMITTED
 2         EXHIBITS FOR THE EVIDENTIARY HEARING
 3         ON JUNE 7, 2022
 4              AMMAR AL-ALI
 5         CX-0494C
 6         CX-1634C
 7         CX-1638C
 8         JX-009 (CX-0004)
 9         CPX-0020C
10         CPX-0020aC
11              BILAL MUHSIN
12         CX-0680C
13         CX-0682C
14         CX-0778C
15         CX-0789C
16         CPX-0019aC
17         CPX-0019C
18         CPX-0146aC
19         CPX-0146C
20         CPX-0155aC
21         CPX-0155C
22         CPX-0156aC
23         CPX-0157aC
24         CPX-0157C
25              STEPHEN SCRUGGS
```

| 1  | CX-0389C |
| 2  | CX-0390C |
| 3  | CX-0392C |
| 4  | CX-0395C |
| 5  | CX-0473C |
| 6  | CX-0474C |
| 7  | CX-0536C |
| 8  | CX-0550C |
| 9  | CX-0551C |
| 10 | CX-0591C |
| 11 | CX-0593C |
| 12 | CX-0594C |
| 13 | CX-0595C |
| 14 | CX-0600C |
| 15 | CX-0605C |
| 16 | CX-0652C |
| 17 | CX-0653C |
| 18 | CX-0654C |
| 19 | CX-0655C |
| 20 | CX-0656C |
| 21 | CX-0658C |
| 22 | CX-0661C |
| 23 | CX-0665C |
| 24 | CX-0666C |
| 25 | CX-0675C |

|    |           |
|----|-----------|
| 1  | CX-0676C  |
| 2  | CX-0679   |
| 3  | CX-0685C  |
| 4  | CX-0701C  |
| 5  | CX-0704C  |
| 6  | CX-0705C  |
| 7  | CX-0709C  |
| 8  | CX-0710C  |
| 9  | CX-0772C  |
| 10 | CX-0784C  |
| 11 | CX-0790C  |
| 12 | CX-0801C  |
| 13 | CX-0805C  |
| 14 | CX-0806C  |
| 15 | CX-0812C  |
| 16 | CX-0813C  |
| 17 | CX-0814C  |
| 18 | CX-0815C  |
| 19 | CX-0835C  |
| 20 | CX-0836C  |
| 21 | CX-1111C  |
| 22 | CX-1124C  |
| 23 | CX-1125C  |
| 24 | CX-1128C  |
| 25 | CX-1129C  |

| | |
|---|---|
| 1 | CX-1132C |
| 2 | CX-1137C |
| 3 | CX-1185C |
| 4 | CX-1415C |
| 5 | RX-0263 |
| 6 | RX-0264 |
| 7 | RX-1183C |
| 8 | RX-1444 |
| 9 | CPX-0012C |
| 10 | CPX-0012aC |
| 11 | CPX-0013C |
| 12 | CPX-0013aC |
| 13 | CPX-0014 |
| 14 | CPX-0014a |
| 15 | CPX-0021aC |
| 16 | CPX-0021C |
| 17 | CPX-0029aC |
| 18 | CPX-0029C |
| 19 | CPX-0058aC |
| 20 | CPX-0058C |
| 21 | CPX-0065aC |
| 22 | CPX-0065C |
| 23 | CPX-0141aC |
| 24 | CPX-0141C |
| 25 | MICAH YOUNG |

| 1  | CX-0611C |
| 2  | CX-0617C |
| 3  | CX-0618C |
| 4  | CX-0620C |
| 5  | CX-0623C |
| 6  | CX-0624C |
| 7  | CX-0625C |
| 8  | CX-0626C |
| 9  | CX-0627C |
| 10 | CX-0628C |
| 11 | CX-0629C |
| 12 | CX-0630C |
| 13 | CX-0631C |
| 14 | CX-0632C |
| 15 | CX-0634C |
| 16 | CX-0635C |
| 17 | CX-0636C |
| 18 | CX-0637C |
| 19 | CX-0638C |
| 20 | CX-0639C |
| 21 | CX-0640C |
| 22 | CX-0641C |
| 23 | CX-0642C |
| 24 | CX-0643C |
| 25 | CX-0644C |

1164

```
 1          CX-0645C

 2          CX-0646C

 3          CX-0647C

 4          CX-0648C

 5          CX-0649C

 6          CX-1630

 7          CX-1637

 8             GERRY HAMMARTH

 9          CX-0633C

10             DANIEL McGAVOCK

11          CX-1293

12          CX-1409

13          CX-1616

14             JOSEPH KIANI (JUNE 6, 2022)

15          RX-1186

16          TABLE OF ADMITTED EXHIBITS FOR THE

17          EVIDENTIARY HEARING ON JUNE 8, 2022

18             JACK GOLDBERG

19          CX-0330

20          CX-0419C

21          CX-0597C

22          CX-0839C

23          CX-0840C

24          CX-0845

25          CX-0846
```

| 1  | CX-0847          |
|----|------------------|
| 2  | CX-0849          |
| 3  | CX-0850          |
| 4  | CX-0853          |
| 5  | CX-1724          |
| 6  | CPX-0154C        |
| 7  | VIJAY MADISETTI  |
| 8  | CX-0307iC        |
| 9  | CX-0329          |
| 10 | CX-1038C         |
| 11 | CX-1058C         |
| 12 | CX-1062C         |
| 13 | CX-1068C         |
| 14 | CX-1069C         |
| 15 | CX-1072C         |
| 16 | CX-1074C         |
| 17 | CX-1251C         |
| 18 | CX-1406          |
| 19 | CX-1407          |
| 20 | CX-1447          |
| 21 | CX-1449          |
| 22 | CX-1451          |
| 23 | CX-1492          |
| 24 | CX-1532          |
| 25 | CX-1546C         |

```
 1          CX-1548C

 2          CX-1646C

 3          CX-1647C

 4          CX-1705

 5          CX-1726

 6          CX-1727

 7          CPX-0159

 8          CPX-0159a

 9             VIVEK VENUGOPAL

10          RDX-4

11          RPX-0040C

12          RPX-0041C

13          RX-0392C

14          RX-0895C

15          CX-1683

16             SAAHIL MEHRA

17          RX-0677C

18          COMPLAINANT'S TABLE OF DEMONSTRATIVES FOR

19          EVIDENTIARY HEARING ON JUNE 6 and 7, 2022

20          CDX-0001C

21          CDX-0005C

22          CDX-0006C

23          CDX-0008C

24          CDX-0016C

25
```

1167

1        C E R T I F I C A T E

2    TITLE: CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES

3    AND COMPONENTS THEREOF

4    INVESTIGATION NO.:  337-TA-1276

5    HEARING DATE:  June 9, 2022

6    LOCATION:  Washington, D.C. - Remote

7    NATURE OF HEARING:  Evidentiary Hearing

8            I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
9    above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:   June 9, 2022
     Signed:
11   ss//

12   Signature of the Contractor or the Authorized Contractor's
     Representative
13
             I hereby certify that I am not the court reporter
14   and that I have proofread the above-referenced transcript of
     the proceedings of the U.S. International Trade Commission
15   against the aforementioned court reporter's notes and
     recordings for accuracy in transcription in the spelling,
16   hyphenation, punctuation and speaker identification and did
     not make any changes of a substantive nature.  The
17   foregoing/attached transcript is a true, correct and
     complete transcription of the proceedings.
18   Signed:

19   ss//        Raymond G. Brynteson

20
             I hereby certify that I reported the
21   above-referenced proceedings of the U.S. International Trade
     Commission and caused to be prepared from my record media
22   and notes of the proceedings a true, correct and complete
     verbatim recording of the proceedings.
23   Signed:

24   ss//        Linda Kinkade

25

Heritage Reporting Corporation
(202) 628-4888

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

---

```
-------------------------------x
```

In the Matter of                    Investigation No.

CERTAIN LIGHT-BASED PHYSIOLOGICAL    337-TA-1276

MEASUREMENT DEVICES AND COMPONENTS

THEREOF

```
-------------------------------x
```

**REVISED AND CORRECTED TRANSCRIPT**

**OPEN SESSIONS**

Pages:      1168 through 1459

Place:      Washington, D.C.

Date:       June 10, 2022

---

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

1168

1          UNITED STATES INTERNATIONAL TRADE COMMISSION

2                     Washington, D.C.

3          Before the Honorable Monica Bhattacharyya

4                   Administrative Law Judge

5

6    -------------------------------x

7    In the Matter of                    Investigation No.

8

9    CERTAIN LIGHT-BASED PHYSIOLOGICAL    337-TA-1276

10   MEASUREMENT DEVICES AND COMPONENTS

11   THEREOF

12   -------------------------------x

13

14

15                   EVIDENTIARY HEARING

16                  Friday, June 10, 2022

17                      Volume V

18

19

20        The parties met via remote videoconferencing

21   pursuant to notice of the Administrative Law Judge at 9:30

22   a.m. Eastern.

23

24

25   Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

1  A P P E A R A N C E S:

2  [All parties appeared via remote videoconferencing and/or

3  telephonically.]

4

5  Counsel for Complainants Masimo Corporation and Cercacor

6  Laboratories, Inc.:

7          KNOBBE, MARTENS, OLSON & BEAR, LLP

8          2040 Main Street, Fourteenth Floor

9          Irvine, California 92614

10         (949) 760-0404

11             Stephen C. Jensen, Esq.

12             Joseph R. Re, Esq.

13             Sheila N. Swaroop, Esq.

14             Ted M. Cannon, Esq.

15             Kendall M. Loebbaka, Esq.

16             Douglas B. Wentzel, Esq.

17             Irfan A. Lateef, Esq.

18             Brian C. Claassen, Esq.

19             Daniel C. Kiang, Esq.

20             Douglas B. Wentzel, Esq.

21

22

23

24

25  CONTINUED ON FOLLOWING PAGE

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Complainants Masimo Corporation and Cercacor

 4   Laboratories, Inc.:

 5           KNOBBE, MARTENS, OLSON & BEAR, LLP

 6           1717 Pennsylvania Avenue, NW, Suite 900

 7           Washington, DC 20006

 8           (202) 640-6400

 9               Jonathan E. Bachand, Esq.

10

11           KNOBBE, MARTENS, OLSON & BEAR, LLP

12           925 4th Avenue, Suite 2500

13           Seattle, Washington 98104

14           (206) 405-2000

15               Carol Pitzel Cruz, Esq.

16

17

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   Counsel for Respondent Apple Inc.:

 4           WILMER CUTLER PICKERING HALE AND DORR LLP

 5           1875 Pennsylvania Avenue, NW

 6           Washington, DC 20006

 7           (202) 663-6000

 8               Michael D. Esch, Esq.

 9               David L. Cavanaugh, Esq.

10

11           WILMER CUTLER PICKERING HALE AND DORR LLP

12           2600 El Camino Real, Suite 400

13           Palo Alto, California 94306

14           (650) 858-6000

15               Mark D. Selwyn, Esq.

16

17

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

1   A P P E A R A N C E S (continued):

2

3   Counsel for Respondent Apple Inc.:

4           WILMER CUTLER PICKERING HALE AND DORR LLP

5           60 State Street

6           Boston, Massachusetts 02109

7           (617) 526-6000

8               Joseph J. Mueller, Esq.

9               Richard Goldenberg, Esq.

10              Sarah R. Frazier, Esq.

11              Jonathan A. Cox, Esq.

12              Nina Garcia, Esq.

13              Cynthia D. Vreeland, Esq.

14

15

16          WILMER CUTLER PICKERING HALE AND DORR LLP

17          1225 17th Street, Suite 2600

18          Denver, Colorado 80202

19          (720) 598-3459

20              Ravi S. Deol, Esq.

21

22

23

24

25      CONTINUED ON FOLLOWING PAGE

1173

1    A P P E A R A N C E S (continued):

2

3    Counsel for Respondent Apple Inc.:

4           WILMER CUTLER PICKERING HALE AND DORR LLP

5           350 South Grand Avenue, Suite 2400

6           Los Angeles, California 90071

7           (213) 443-5300

8                Derek Gosma, Esq.

9

10

11

12

13

14

15

16

17           *** Index appears at end of transcript ***

18

19

20

21

22

23

24

25

```
 1                   P R O C E E D I N G S
 2              (In session at 9:30 a.m.)
 3          JUDGE BHATTACHARYYA:  It looks like there's no
 4     cross for Dr. Rowe; is that correct?
 5          MS. SWAROOP:  That's correct, Your Honor, but
 6     there is one issue that has arisen with regard to his
 7     deposition designations that we did want to raise with
 8     Your Honor this morning.
 9          JUDGE BHATTACHARYYA:  Okay.  Go ahead.
10          MS. SWAROOP:  Sure.  So we understood from the
11     motion in limine that we filed on Dr. Rowe, Apple made
12     representations that it was not intending to call Dr. Rowe
13     by deposition but rather call him live at the hearing, and
14     that was in their opposition to our motion in limine.  And
15     in Order 42 at page 2, Your Honor also reflected that,
16     indicating that Apple was not intending to present him by
17     deposition.
18              After Dr. Rowe completed his direct examination
19     yesterday, Apple asked us to withdraw our cross-examination
20     of Dr. Rowe, but at the same time we received a set of
21     designations from Apple for Dr. Rowe.
22              And so we understood that Apple would not be
23     presenting any designations from Dr. Rowe based upon the
24     representations that they made in opposing our motion in
25     limine and that Your Honor relied on in Order No. 42.  We
```

1    would like to object to that, Your Honor.

2            MS. VREELAND:  Just to be clear, we do not ask

3    that any designations be entered.  The trial testimony is

4    what we'll rely on.  So I don't think there's a dispute

5    here.

6            MS. SWAROOP:  Thank you.  I appreciate that

7    clarification.

8            So the chart that we got of the designations,

9    you'll be taking Dr. Rowe's designations off of that; is

10   that correct?

11           MS. VREELAND:  I think they've already been taken

12   off, yeah.

13           MS. SWAROOP:  Thank you.

14           We also have a couple of issues with regards to

15   exhibits for today.  So there is two specific I wanted to

16   raise.  One was an exhibit that came up in -- was referenced

17   in the presentation of Dr. Sarrafzadeh yesterday, and that

18   was CX-322bC, lower case b capital C, and the issue there is

19   that Apple had presented a version of that exhibit, and it's

20   an excerpt from Dr. Sarrafzadeh's report relating to some

21   testing.

22           And we are in agreement that certain images and

23   factual information relating to the tests can come in, but

24   we felt that the excerpt presented also included opinions

25   that we didn't think were appropriate, so we presented an

1    alternative version.

2            I think the parties would suggest that we submit

3    both exhibits to Your Honor, both parties' versions of that

4    exhibit, and Your Honor can make a decision as to which one

5    should be admitted.  So that, I think, is reflected on the

6    table of exhibits for yesterday.

7            MR. SELWYN:  Your Honor, we don't want to spend

8    time debating this.  We want to get moving this morning.  We

9    agree.  We'll submit both of them.  Your Honor will have

10   emails from the parties summarizing their arguments and

11   Your Honor can rule.

12           JUDGE BHATTACHARYYA:  All right.  If everyone

13   agrees on that procedure, we'll move in that fashion.

14           MS. SWAROOP:  Thank you, Your Honor.  And then

15   the last issue I wanted to raise is with an anticipated

16   exhibit coming up in the examination of Apple's expert,

17   Dr. Warren, and that is RX-1470C.

18           So what this exhibit appears to be is an excerpt

19   from a report that Dr. Warren submitted in this

20   investigation on the issue of domestic industry technical

21   prong.  And, again, this appears to be not simply test

22   results, but it's his -- things that he observed with regard

23   to the DI products.  It's not actually a test setup at all.

24           And so Dr. Sarrafzadeh testified about this in

25   his direct, and we think, if Apple would like to rely on

 1    Dr. Warren's objections or whatever it is, they should do
 2    that through his direct testimony rather than excerpting
 3    portions of his report and submitting that as part of the
 4    record.  So we do object to that as well.
 5         JUDGE BHATTACHARYYA:  Ms. Swaroop, this is a
 6    portion of Dr. Warren's report that you're concerned about?
 7         MS. SWAROOP:  Yes.  Dr. Warren is attempting to
 8    introduce portions of Dr. Warren's own report in his direct.
 9         JUDGE BHATTACHARYYA:  And you also mentioned
10    Dr. Sarrafzadeh.
11         MS. SWAROOP:  Yes, Your Honor.  They submitted a
12    joint report that they both signed on the issue of technical
13    prong domestic industry.  So the official title of it is a
14    rebuttal expert report from both of them.  So that's what
15    they're now seeking to introduce through Dr. Warren,
16    excerpts from his -- of his opinions.
17         JUDGE BHATTACHARYYA:  Thank you.
18         MS. VREELAND:  Your Honor, two responses.  First,
19    just a clarification on what it is.  It is a short excerpt
20    from Dr. Warren's report with the measurements he recorded
21    during the demonstration of the Masimo devices and also his
22    own work with them.
23         We think it is admissible for two reasons.
24    First, it is a summary of his work under Rule 106.  And,
25    secondly, and uniquely important, we have agreed twice

 1    during this trial to Masimo introducing similar summaries of

 2    their experts' work.  And I would point Your Honor

 3    specifically to CX-307IC, and we can put it on the screen if

 4    it would help Your Honor.  This is a 32-page excerpt from

 5    Dr. Madisetti's report relating to the testing he did.  It

 6    was not on their exhibit list.  They provided it as a new

 7    exhibit during the trial, and we agreed to its admission.

 8            Dr. Warren's Exhibit 1470C is much shorter.  It's

 9    only nine pages.  It's a very short excerpt from his expert

10    report with the testing data.  So we think it's admissible

11    for two reasons.

12            First, under Rule 106, and, secondly, we agreed

13    to allow Masimo to provide exactly the same type of excerpt

14    from Dr. Madisetti's report.

15            MS. SWAROOP:  Your Honor, if I could be heard.

16    Length has nothing to do with admissibility here.  The

17    Appendix I that counsel showed on the screen was an appendix

18    that was describing a test setup.

19            What we have here in RX-1470C is Dr. Warren's

20    observations about what he saw.  We did agree to the excerpt

21    from Dr. Sarrafzadeh because that was a test setup and we do

22    have a dispute over which version.  But really the issue is

23    over the content here, they're excerpting portions of his

24    opinions, and seeking to admit that into evidence.

25            If they want to submit his observations into

1   evidence, he should provide testimony about that.

2          MS. VREELAND:  Your Honor, if I may just respond.

3   He will proceed the testimony.  The specific thing we're

4   interested in are those measurement tables that

5   Dr. Sarrafzadeh testified about and that Dr. Warren will as

6   well, and we offered to redact anything else they wanted us

7   to redact from the exhibit.  They made no suggestions.

8          We're certainly happy to do further redactions.

9   We offered to do further redactions.  What we're really

10  interested in having in evidence are his tables of the

11  measurements he recorded during his work with the W1 and

12  during the demonstration.  Again, it's a much smaller thing

13  to add than what we agreed to add for Dr. Madisetti.

14         JUDGE BHATTACHARYYA:  It sounds like the

15  measurements themselves fall into this general category of

16  test data and test protocols that you believe are

17  admissible.

18         MS. SWAROOP:  That's correct, Your Honor.  The

19  measurement table itself would be fine with us.  I think the

20  issue is the text and the explanations there.

21         MS. VREELAND:  Your Honor, we offered to make

22  further redactions.  So I think this is something that the

23  parties can work through following this conversation as

24  we've offered to do from the start.

25         MS. SWAROOP:  I'm sure we can work that out,

1    Your Honor.

2              JUDGE BHATTACHARYYA:  All right.  Sounds good.

3              Can we go ahead with the witness or do we need to

4    take a break to --

5              MR. MUELLER:  Yes, Your Honor.  Our next witness

6    is Dr. Warren.  Ms. Vreeland will do the examination.  As I

7    said yesterday, I'm going to step out for a bit, but I will

8    be back.

9              JUDGE BHATTACHARYYA:  All right.  Thank you.

10             MR. MUELLER:  Thanks very much.

11             MS. SWAROOP:  Your Honor, I don't know if we need

12   to put it formally on the record, but we are not calling

13   Dr. Rowe for cross-examination.  We did inform Apple of that

14   yesterday, but I wanted to make that clear on the record as

15   well.  Dr. Rowe, not Dr. Warren.

16             JUDGE BHATTACHARYYA:  You're calling Dr. Rowe for

17   cross-examination?

18             MS. SWAROOP:  No, no.  I just wanted to make

19   clear that we are not seeking cross-examination of Dr. Rowe.

20   We're completed with that witness and we can begin with

21   Dr. Warren.

22             JUDGE BHATTACHARYYA:  Understood.  Thank you very

23   much.

24             Good morning, Dr. Warren.  I think you're on mute

25   still.

1181

1       THE WITNESS:  Good morning, Your Honor.  Good

2  morning everyone.

3       JUDGE BHATTACHARYYA:  Do you understand that

4  you're under an obligation to tell the truth in your

5  testimony today?

6       THE WITNESS:  Yes.

7                    STEVE WARREN,

8       having been first duly sworn and/or affirmed

9  on his oath, was thereafter examined and testified as

10  follows:

11       JUDGE BHATTACHARYYA:  Thank you.  You may proceed

12  counsel.

13                 DIRECT EXAMINATION

14  BY MS. VREELAND:

15     Q.   Dr. Warren, could you begin by introducing

16  yourself to Her Honor?

17     A.   Yes.  My name is Steve Warren.  I'm a professor

18  at Kansas State University.

19     Q.   You got your K-State purple on today?

20     A.   I do, yes, I have to represent.

21     Q.   How long have you been a professor at K-State?

22     A.   I started in '99, so about 23 years.

23     Q.   And can you briefly describe your educational

24  background?

25     A.   Yes.  I have three degrees in electrical

1182

1    engineering:  a Bachelor's and a Master's degree from Kansas

2    State, and then a doctorate from the University of Texas at

3    Austin, and then I've also done a postdoctoral appointment

4    at Sandia National Labs.

5        Q.    What was the focus of your research, your Ph.D.

6    research, at the University of Texas?

7        A.    That research was biomedical research.  It was

8    light tissue interaction or laser tissue interaction, where

9    we were using argon ion laser light to diagnose coronary

10   artery and aorta disease progression.

11       Q.    And what did you do after receiving your Ph.D.?

12       A.    I finished my doctorate, and then I went to

13   Sandia National Labs as a postdoctoral appointment, and I

14   worked for a group there that was working on a personal

15   status monitor project.

16       Q.    Was that a light-based sensor?

17       A.    It incorporated a light-based sensor, among other

18   things, yes.

19       Q.    What did you do after completing your work at

20   Sandia?

21       A.    After I finished at Sandia, I went to Kansas

22   State University to begin a professor appointment and I've

23   been there since.

24       Q.    How did you choose to go back to K-State?

25       A.    Well, I'm from Kansas originally, so it was nice

1   to bring kids back to grandparents.

2       Q.   What are your current responsibilities at Kansas

3   State?

4       A.   It is a three-prong appointment.  It's a

5   research, teaching, and service appointment.

6       Q.   Okay.  What technologies have you focused on at

7   Kansas State?

8       A.   We've worked on a lot of things, but for research

9   it's been primarily physiological monitoring tools, wearable

10  sensors, pulse oximeters specifically, signal analysis, and

11  engineering education, to name a few.

12      Q.   Can you provide some -- have you built or

13  developed any physiological sensors over the time that

14  you've worked at K-State?

15      A.   We've built dozens of different varieties of

16  sensors, accelerometers, pulse oximeters, motion units,

17  conductive plethysmographs, all kinds of different things.

18      Q.   Can you provide a few examples?

19      A.   Yeah.  A lot of our work deals with what I would

20  call vulnerable populations.  So the elderly, for example,

21  we've looked at various portable or ambulatory monitors for

22  use with aging.

23           Some of those units, if you turn them a quarter

24  turn, you get a different sensor every time you turn it a

25  quarter turn.  We've looked at portable pulse oximeters in

1     that environment, both wired and wireless.

2            And we've spent a fair amount of time doing

3     designs for kids with disabilities, specifically recently a

4     bed that monitors the child's heart rate and breathing rate

5     in-and-out bed activity and movement all night while they

6     sleep.

7        Q.   Have you published any papers in the field?

8        A.   We've published quite a lot. It's about 175

9     papers total that are peer-reviewed. I think about 80 or 85

10    percent of those are physiologic monitoring related.

11       Q.   How many of those would relate to pulse oximetry

12    then?

13       A.   I would bet more than half of the physiologic

14    ones.

15       Q.   And have you received any grants or funding for

16    your research?

17       A.   Yeah. Last count we were at 62 funded grants

18    since I started at Kansas State for about $14 million total.

19    Most of that was --

20       Q.   Go ahead.

21       A.   Most of that was through the National Science

22    Foundation, and we had a fair amount of funding through NASA

23    to look at wearable sensors.

24       Q.   Have you taught any classes?

25       A.   I teach every semester, usually two classes a

1185

1    semester.  This was my 33rd time on linear systems last

2    semester.

3        Q.   Have you included in those classes any teachings

4    on pulse oximetry?

5        A.   We address pulse oximetry directly in my

6    introduction to biomedical engineering class and in my

7    biomedical instrumentation course, but we also use those

8    signals in -- there's a graduate scientific computing class

9    that I've taught and that class I just mentioned, I use

10   those signals as test cases for the students.

11       Q.   What about laboratories, have you -- do you have

12   any laboratories that involve pulse oximetry?

13       A.   We've had a number of them, usually as part of

14   the biomedical instrumentation sequence.  It's a lecture lab

15   pair.

16       Q.   And when did you begin building pulse oximeters

17   with your students?

18       A.   Well, I started myself in the mid-'90s, but with

19   my students I started in about spring 2000 was when we had

20   our first units.

21       Q.   So that would have been about eight years before

22   the Poeze patents were filed?

23       A.   That's correct.

24       Q.   We're going to put on the screen RX-632.

25            Do you recognize RX-632?

1       A.   Yeah, these are some of my favorite students from
2   a fall 2002 biomedical instrumentation course.
3       Q.   Who are we seeing?
4       A.   Ryan Schmitz in the front currently works for
5   Garmin; Zanatil Furtis is behind him; and then behind her is
6   Jianchu Yao, who is an associate dean at East Carolina at
7   the moment.
8       Q.   For Mr. Schmitz, where is the sensor in the
9   photo?
10      A.   Ryan is acquiring a measurement from his wrist in
11  this photo.
12      Q.   Okay.  So were your students able to use these
13  pulse oximeters, then to, make measurements on their wrists?
14      A.   Yeah.  That was part of the fun part was having
15  them make measurements all over their bodies, in fact, with
16  these sensors.
17      Q.   Have you personally received any awards or
18  recognitions for your work at K-State?
19      A.   Well, I have, I mean, a number of them.  The one
20  that's my favorite, honestly, is an award I received about
21  two years ago.  It's a public service award that I received
22  from the college, and that was for our work, not only with a
23  disaster response team for tornado cleanup that I manage,
24  but also some work that we did for 15 years with Heartspring
25  to build tools with kids for special needs.

1    Q.   And would those, when you say "tools for kids

2    with special needs," what kinds of tools would those be?

3         We can take the photograph down.

4    A.   Yeah, these would be the beds that I mentioned or

5    wearable senses.  We worked on toothbrush design to track

6    how they brush their teeth as a training exercise.  Just a

7    variety of things that you might not imagine unless you

8    spend time with these children.

9    Q.   We're going to put on the screen CX-335.

10        Do you recognize this?

11   A.   I do.

12   Q.   What are we seeing?

13   A.   This is the front page from my academic CV.

14   Q.   And does CX-335 accurately summarize your work in

15   the field of light-based sensors and pulse oximetry?

16   A.   It does, yes.

17   Q.   Dr. Warren, have you ever testified at trial

18   before?

19   A.   No, this is the first time.

20   Q.   Well, I'll be the first, then, to move to admit

21   you as an expert witness.

22        Your Honor, we would move to admit Professor

23   Warren as an expert in biomedical engineering, medical

24   monitoring systems, biomedical instrumentation, biomedical

25   optics, light issue interaction, diagnostic systems,

1    wearable sensors, and biomedical signal processing.

2              JUDGE BHATTACHARYYA:  Any objection?

3              MR. CLAASSEN:  Just making sure I can read the

4    transcript of that impressive list.

5              No objection.

6              JUDGE BHATTACHARYYA:  Let me formally admit him.

7              Dr. Warren is hereby admitted as an expert in

8    biomedical engineering, medical monitoring systems,

9    biomedical instrumentation, biomedical optics, light issue

10   interaction, diagnostic systems, wearable sensors, and

11   biomedical signal processing.

12             MS. VREELAND:  Thank you, Your Honor.

13        Q.   Professor Warren, at a high level, what issues

14   have you been asked to consider in this case?

15        A.   I've been asked to look specifically at whether

16   the Apple products infringe a set of three patents we call

17   them the Poeze patents.

18        Q.   Any other issues?

19        A.   Yeah.  I've also been asked to address the

20   validity of the claim limitations that are specified in

21   those asserted patents.

22        Q.   And at a high level, have you reached any

23   opinions?

24        A.   Yeah, at a high level, I guess my opinions are

25   twofold.  The first is that the Apple Watch Series 6 and 7

1  do not infringe these patents, and my other opinion, at a

2  high level, is that these patents in terms of their claim

3  limitations are invalid based on prior art.

4      Q.   And have you put together -- have you helped put

5  together some demonstrative exhibits to explain the basis

6  for your opinion?

7      A.   Yes.

8      Q.   We're going to put on the -- and do you recognize

9  what we have on the screen, RDX-8.1?

10      A.   I do.  Yes, I do.  Thank you.

11      Q.   If we could turn to the next slide.

12           Professor Warren, how long have researchers been

13  using light-based sensors to take physiological

14  measurements?

15      A.   We have well-documented evidence that goes back

16  at least eighty years, although there's some work in the

17  late 1800's that applies as well.

18      Q.   When was RX-654, the Mathis article, published?

19      A.   This is a 1938 article that looked at light-based

20  transmission through the finger and the toe in a subject.

21      Q.   I'd like to ask you some questions about the

22  state of the art in July 2008, the priority date for the

23  Poeze patents.  Do you have that date in mind?

24      A.   I do.

25      Q.   If we could turn to the next slide.

1    In July 2008 what was known about the number of
2    LEDs that could be included in an optical sensor?
3    I'm sorry.  I'm going to skip that one and go one
4    more to RDX-8.5.
5    In July of 2008, what was known about the number
6    of LEDs that could be included in a light-based sensor?
7    A.    Well, I could say generally that the answer would
8    be a plurality and a plurality in sets.  I noted some
9    examples on this slide or this viewgraph.
10    For example, Smart is an interesting one, 1971.
11    It has 13 LEDs and this was 50 years ago.
12    McCarthy in the upper right, 1991, incorporated
13    eight LEDs, each of which could be included in sets or
14    co-located we would say.
15    If you look in the lower left, there's Haar --
16    oh, by the way, Smart, RX-473 is its number.  McCarthy
17    RX-489.
18    Haar in the lower left, RX-667, is an example of
19    a plurality of LEDs, which are also in sets; Scharf 137,
20    RX-335, is a good example of a pulse oximeter that uses
21    green light.
22    And then Lumidigm in the lower right, RX-411, is
23    a little more recent, but it has all kinds of
24    configurations.
25    Q.    On the next slide, what is a set of LEDs?

1    A.   A set of LEDs would be a grouping, and they could

2  be either in different locations but assigned to one another

3  as a group, or it could be what we would call a co-located

4  set, which might be, for example, three LED dies about the

5  size of a pepper speck, as we saw the other day in the same

6  physical package.

7    Q.   And in July of 2008, what was known about the

8  number of sets of LEDs that could be included in an optical

9  sensor?

10    A.   Well, as of that time it had already been known

11  for quite some time that you could work with LEDs in sets.

12  I included some examples here on the slide.

13         For example, McCarthy in the upper middle,

14  RX-489, in 1991 demonstrated this principle; Haar, which

15  I've already mentioned in the upper right, RX-667, did the

16  same.

17         There's a really an interesting, in the lower

18  left, an application from Walowit, RX-502, that used various

19  sets of sets of LEDs.

20         And then we have an additional set of examples,

21  I'll pull out Gratton, for example, on the lower right,

22  RX-456, that did LEDs in sets at different distances.

23    Q.   If we could turn to the next slide.

24         In July of 2008, what was known about the number

25  of photodiodes that could be included in an optical sensor?

1     A.   Yeah.  A person of ordinary skill would have
2   known at that time that you could include a plurality of
3   photodiodes.  I have examples here that note four or more
4   where they could be arranged radially, meaning in a circular
5   arrangement, or in what we would say is a rectilinear grid
6   or a Cartesian coordinate system.
7          So some of the examples of note here are from
8   1978.  I've noted two.  There's Orr, RX-495, and Cramer,
9   RX-670, and then, again, we see McCarthy on the upper row,
10   RX-489.  Mendelson in the top is really popular, RX-458.
11   And then if you look at the bottom, the Konig reference,
12   RX-487, has made an impact in this arena.
13     Q.   If we were to turn to the next slide, would you
14   be able to name even more?  And I won't stop you.
15     A.   This slide has some really good ones.  A good
16   example, I include, Lumidigm RX-411, in the upper left,
17   which we'll talk about much more later.
18          The Avni article in the upper right, second from
19   the right, is an interesting one, because that's a
20   swallowable GI pill that uses light as a sensing mechanism.
21   I listed our own sensor in the upper right, K-State 6D,
22   RPX-6.
23     Q.   I'm going to stop you there.  I think we got a
24   full list.
25          I'm going to ask you on the next slide, in July

1  of 2008, what was known about the use of openings with

2  opaque surfaces over photodiodes?

3      A.   Well, I would say in 2008 and many decades prior,

4  openings are a way for light or to allow light to get to a

5  detector.  A detector can't detect light without some sort

6  of opening above it.

7      Q.   And if we were to turn to the next slide, can you

8  provide some examples before 2008 -- July of 2008 -- of

9  devices that combine these concepts that you've been talking

10  about -- multiple LEDs, four or more photodiodes, and

11  openings over those photodiodes?

12      A.   Yes.  None of these tools existed in isolation.

13  A designer would have used a collection of a grouping or

14  permutation of many of them in their work.

15          One I really like a lot is Smart, RX-473, because

16  it incorporates the LEDs, the photodiodes, the opaque

17  material, the interior surfaces, the opaque surfaces, and

18  the openings all in one bundle, 50 years ago.

19      Q.   What are the others that you've identified on

20  this slide?  And just by name and exhibit number.

21      A.   Okay.  Haar, RX-667, and then McCarthy, RX-489,

22  Lumidigm, RX-411, and then finally Imai, RX-1220.

23      Q.   If we can turn to the next slide.

24          In July of 2008, what was known about the use of

25  transmissive coverings or windows over photodiodes?

1    A.   I noted earlier that you need an opening to allow

2    light to reach a detector.  A window is another way to allow

3    that to happen where a window is a physical piece of

4    material, or we call it a transmissive covering, where the

5    covering would allow light through, but it would also

6    physically protect the detector from dust and debris and

7    dirt, liquid, things of that nature.

8    Q.   What are your favorite examples here?

9    A.   I'll pick a few.  I really like Cramer RX-670 in

10   the upper left, because it's more than 40 years old.

11   Nippon, or what I call Jaib, RX-665, next to it.  Seiko,

12   we'll hear about in a moment, RX-666, and then also Haar,

13   RX-667.  And I might point out we also did this with Kansas

14   State, RX-648.

15   Q.   If we could turn to the last slide in this

16   series.

17        In July of 2008, what was known about the use of

18   structures protruding into the tissue in optical sensors?

19   A.   So a person of ordinary skill would have already

20   known that you could take a structure, we'll call it a

21   protrusion or a sensor head, and push that into tissue, and

22   what that would enable is that would push residual blood out

23   of the way and increase your AC-to-DC signal ratio, meaning

24   that you would see the tissue perfusion in a better way.

25        And there were a number of designs that did this.

1    Again, I like Smart, because it's so old, RX-473, but
2    Cramer, next to it, RX-670, also implemented this mechanism.
3        And Seiko in the bottom left, Seiko 131, which is
4    RX-666, not only implemented it, but explained well why the
5    technique was important and why it worked.
6    Q.    If we could go to the next slide.
7        Professor Warren, we're going to come back to the
8    Apple Watch later, but until then just a few preliminary
9    questions.
10       How long have optical sensors included four or
11   more sets of LEDs?
12   A.    At least since 1990, so 30 years.
13   Q.    How long have optical sensors included four or
14   more photodiodes arranged in quadrants?
15   A.    Cramer 1978 would be a good example, so 40 years.
16   Q.    How long have optical sensors included openings
17   with opaque surfaces over photodiodes?
18   A.    That goes all the way back to Herczfeld and Smart
19   in the late '60s.
20   Q.    And how long have optical sensors included convex
21   protrusions to conform to a measurement site?
22   A.    I would offer Smart for that one, early '70s.
23   Q.    We're going to turn now to RDX-8.88.
24       You mentioned earlier that you have built pulse
25   oximeters with your students in laboratory classes.  Do you

1  recognize -- let me just ask you to remind us the timing of

2  these laboratory courses.

3        A.   I took these pictures in fall 2002.

4        Q.   Okay.  What are we seeing on the top row?

5        A.   So the top row is just some example pictures from

6  a Tuesday evening session that we managed with the students

7  where I attempted to archive the pulse oximetry procedure.

8        Q.   Is that Mr. Schmitz again on the left taking a

9  measurement on his wrist?

10       A.   It is, yes.

11       Q.   And what are we seeing in the bottom row?

12       A.   So the bottom row is a collection of sensors that

13  were built by students.  On the left row we have some built

14  by Ryan, excuse me, by Austin Wareing.  And in the center

15  there were some other built by students as well as the

16  right.

17       Q.   I'd like to ask you about one in particular.

18  We're going to turn to RDX-889.

19            Do you recognize the student-made sensor in the

20  photo on the left here, RX-515?

21       A.   Yes.  This is a sensor that Austin Wareing built.

22       Q.   Okay.  And who was Austin Wareing?

23       A.   Oh, yes, Austin Wareing was an undergraduate

24  student in my laboratory working on an Honors Research

25  project.

1    Q.   Okay.  And at the time he created this sensor,

2   would he have met the agreed definition of a person of

3   ordinary skill in the art?

4    A.   No, he did not yet have his undergraduate degree.

5    Q.   When did he create this sensor?

6    A.   This was a summer 2004 project.

7    Q.   Can you describe at a high level the primary

8   components he included in his sensor?

9    A.   Yeah.  The sensor incorporated six photodiode

10   detectors.  These are large area detectors.  And they were

11   embedded on an interior foam surface, and that was

12   sandwiched then with another piece of foam on top.

13        And to provide openings, Austin cut holes in the

14   foam with an X-Acto knife, and then he cut the border around

15   the entire unit with a pair of scissors.

16    Q.   Do you recognize the photo on the top left,

17   RX-517?

18    A.   Yes.  On the top right, it's Austin's sensor

19   along with a data acquisition board to which it interfaced.

20    Q.   What components would that data acquisition board

21   have had?

22    A.   That was a board driven by a PIC microcontroller,

23   and it also had the sample on hold circuitry and some other

24   circuitry on it.

25    Q.   Including processors?

1     A.   Yes, the PIC microcontroller was a processor with
2  memory.
3     Q.   What are we seeing in the bottom right, RX-652?
4     A.   The image in the bottom right is a depiction of
5  one of the Bluetooth boards that we used with RX-0517.  This
6  was a Bluetooth board that we had just a small number of.
7     Q.   And we're going to quickly put on the ELMO three
8  physical exhibits, RPX-6, RPX-7, and RPX-33.
9          Do you recognize these?
10    A.   Yes, I do.
11    Q.   And how would you compare these to what we just
12  saw in the photos?
13    A.   They're the same units that were in the photos,
14  although I believe the one on the right is upside down.
15    Q.   Sorry about that.
16         We're going to turn, then, to RDX-890.
17         Did any of your students ever use more than two
18  LEDs in RDX-890?
19    A.   Yeah.  We looked at a previous viewgraph with
20  some students' sensors in it, and it incorporated four sets
21  of two LEDs around a central photodiode detector.  And there
22  is an image on the screen at the moment that depicts another
23  student's work that incorporates three LEDs.
24    Q.   Did any of your students ever include windows
25  over the photodiodes in their sensors?

```
 1          A.   Yeah.  One of the nice products available at the
 2    time is what we would call a can photodiode, which means a
 3    photodiode in a can with a window over the top to provide a
 4    lens and a protective function.
 5          Q.   And are we looking at RX-510 and RX-648?
 6          A.   Yes.
 7          Q.   If we could turn to the next slide.
 8               MR. CLAUSSEN:  Your Honor, I'd like to raise an
 9    objection before we move on.  My objection is that RPX --
10    want to make clear for the record that RPX-18 is not part of
11    the grounds for this case.  And so we object to any
12    implication that RPX-16 and RPX-18 are part of the grounds
13    for this case.
14               MS. VREELAND:  Your Honor, we're only introducing
15    the photos so we're not going --
16               MR. CLAASSEN:  With that representation, we can
17    move on.
18          Q.   If we could turn, then, to the next slide.
19               What is RX-508?
20          A.   This is a publication from 2005 that we presented
21    at the American Society for an Engineering Education
22    Conference.
23          Q.   And do you recognize the acquisition board and
24    the sensor in the bottom left excerpt from this article?
25          A.   Yes.  Those are the same two pieces of hardware
```

1    that we just saw on the ELMO unit.

2        Q.   Okay.  And if we could turn, then, to the next

3    exhibit.

4             What is RX-504?

5        A.   This is a poster that Austin used for a public

6    presentation in our college Honors Colloquium, the atrium

7    exercise, and it speaks to the design of his sensor head in

8    addition to the other hardware and software that was used.

9        Q.   And what did he highlight about his design?

10       A.   The highlighted element is -- speaks to the foam.

11   So the optical foam that we use or the black foam was

12   intended to be pliable so that the sensor head could conform

13   to tissue.  And there was a clear reason for using the foam

14   itself, and that was to essentially block light or prevent

15   light piping via the use of opaque material.

16       Q.   Let's turn, then, to the Poeze patents.  We're

17   going to go to RDX-814.

18            Do you recognize the three patents on the screen,

19   JX-1, JX-2, and JX-3?

20       A.   I do.

21       Q.   Can we call these the Poeze patents?

22       A.   Yes.

23       Q.   What types of pulse oximeters do the Poeze

24   patents show in their figures and embodiments?

25       A.   These would address what we would call clothespin

1  style transmissive finger clips.

2      Q.  If we could go to the next figure.

3          So in the examples in the Poeze figures, are the

4  LEDs and the photodiodes on the same side of the sensor?

5      A.  The LEDs and photodiodes are on different sides

6  of tissue, if that was the question you intended.

7      Q.  And do the Poeze patents say anything about

8  reflective pulse oximeters?

9      A.  That mode is mentioned briefly in the spec but

10  not in the pictures themselves.

11      Q.  And in the examples in the Poeze figures, what

12  part of the body is being used as the measurement site?

13      A.  These are all fingertip sensors.

14      Q.  Okay.  Have you read each of the -- the patent

15  specifications from front to back?

16      A.  I've read them front to back twice, but I've

17  studied a number of the other areas, many hours, countless

18  hours it seems at this point.

19      Q.  And have you seen anything anywhere in those

20  Poeze specifications about taking a measurement on a wrist?

21      A.  No.

22      Q.  Nothing?

23      A.  No.  There is only a mention to finger, toe,

24  hand, foot, ear, and forehead, as I recall, no wrist.

25      Q.  If we could turn to the next slide, RDX-816.

1202

1    Masimo has focused in particular on the fact that

2    the Poeze patents disclose pulse oximeters with a

3    protrusion.

4    What do the patents say about the shape of the

5    protrusion that you can use with the -- in the purported

6    invention?

7    A.    The specification states that it can be convex,

8    but then it also says it can be sized and shaped to conform

9    the tissue to a flat or relatively flat surface.  It also

10   states that it can be cylindrical or partially cylindrical.

11   And then it says here at the bottom of the

12   highlighted portion it could be sized and shaped differently

13   for different measurement sites.  So a variety of

14   descriptions of shapes and sizes.

15   Q.    Do the patents ever at any point suggest using a

16   convex protrusion for taking a measurement at a wrist?

17   A.    No.

18   Q.    We're going to turn to the next slide.

19   Masimo has focused in its testimony on the

20   reduction of light piping.  What do the Poeze patents say

21   about how to reduce light piping, if at all?

22   A.    The only thing the spec says about reducing light

23   piping, at least with regard to opaque material, is with

24   regard to the protrusion in the upper example, black or

25   other colored plastic.  And then with regard to the noise

1  shield in the bottom exhibit, opaque color such as black or

2  dark blue.

3      Q.   So are there any teachings in these

4  specifications, then, beyond using opaque materials?

5      A.   Not for light piping.

6      Q.   And how long have people in the industry been

7  using openings with opaque materials to reduce light piping?

8      A.   The Herczfeld reference shows it explicitly in

9  1969 so 50 years, decades.

10     Q.   Professor Warren, have you studied the asserted

11 claims of the Poeze patents?

12     A.   Yes.

13     Q.   And do you have an opinion on whether or not the

14 Poeze claims describe anything new or novel?

15     A.   My opinion is that they do not.  In fact, the

16 ideas or teachings are quite old.

17     Q.   We're going to turn next, then, to RDX-818, the

18 next slide, RDX-819.

19          Professor Warren, have you studied the Lumidigm

20 patent, RX-411?

21     A.   Yes.

22     Q.   How did you first become aware of the company

23 Lumidigm?

24     A.   I learned of Lumidigm as a spinoff from Rio

25 Grande Medical Technology, and I knew about them when I

1   worked at Sandia in Albuquerque in the mid-'90s.

2        Q.   How did you first become aware of the Lumidigm

3   '212 patent?

4        A.   I found this patent when I was doing a recessed

5   detector search online.

6        Q.   Can we call it Lumidigm for short?

7        A.   Yes, that's fine.

8        Q.   How would you characterize Lumidigm's

9   disclosures?

10       A.   The spec -- I think the real novelty is in the

11   idea of a personal identification system that uses liveness

12   as an additional indicator.

13            But one of the other benefits of the

14   specification is that it includes a collation of what was

15   known about the time of optical sensor heads that were used

16   in reflectance mode for spectroscopy purposes in terms of

17   their various LED and photodiode detector layouts.

18       Q.   We're going to pull on to the screen RX-411,

19   Figures 3 through 7B.

20            What does Lumidigm describe in connection with

21   these figures?

22       A.   These figures are various examples or exemplary

23   ideas of ways to lay out a variety of sources and detectors

24   in reflectance mode on a sensor such as this, including in

25   radial and rectilinear and Cartesian layout.

1    Q.   Does Lumidigm say anything about when you might

2    want to use various of these iterations of LEDs and

3    photodiodes?

4    A.   Well, Lumidigm states that any one of the given

5    sources, for example, can be sets of LEDs, and any one of

6    the given detectors can be a single detector or a plurality

7    or an array of detectors.

8         And, generally, with regard to how they might be

9    used, there's a section in the spec called extended

10   functionality that speaks to many different application

11   areas.

12   Q.   We're going to put on the screen Figs. 8A, 8B,

13   and 8C from the Lumidigm patent.

14        What was Lumidigm illustrating in these figures?

15   A.   These three figures illustrate portable

16   embodiments of this particular sensing approach.  Key fob on

17   the left, Figure 8A, Figure 8B would be a watch embodiment,

18   and Figure 8C would be an embodiment on the surface of a

19   phone.

20   Q.   And what does Lumidigm say about the types of

21   LEDs and photodiodes you can use in any of these

22   embodiments?

23   A.   Lumidigm states, with regard to any of these

24   portable embodiments, that any of the sensor geometries that

25   are presented in the specification can be applied.

1    And what I mean by that specifically is Figs. 1

2  through 7, for example, all show different layouts of sensor

3  heads, but additionally the specification itself describes

4  different geometrical layouts, different signal management

5  techniques, including what it calls a compound curvature

6  that would essentially relate to the shape of the sensor

7  head itself.

8       Q.   We're going to turn to the next slide, then.

9            Were you here for Ms. Swaroop's opening

10 statement?

11      A.   I was, yes.

12      Q.   Did you hear her describe Lumidigm's functions as

13 a wish list?

14      A.   Yes, I did.

15      Q.   Have you studied the functions referenced in the

16 Lumidigm patent that these devices can perform?

17      A.   I have, yes.

18      Q.   And how would you characterize these functions?

19      A.    I would characterize these functions as known

20 applications in reflectance spectroscopy where one might

21 want to employ then a reflectance mode sensor.

22           A fruit ripeness example is a good one.  While

23 that sounds esoteric in this context, this has been used

24 with Japanese fruit markets forever as a means to assess

25 fruit quality.

1207

1    Q.   And Professor Warren, have you compared

2    Lumidigm's disclosures to the asserted Poeze claims?

3    A.   Yes.

4    Q.   And what have you concluded?

5    A.   My conclusion is that Lumidigm invalidates every

6    one of those independent claim limitations for those

7    asserted patents.

8    Q.   And have you reached an alternative opinion on

9    whether Lumidigm alone would, at a minimum, render them

10   obvious?

11   A.   Yes.  My alternative opinion would be that these

12   claim limitations would be obvious in view of Lumidigm.

13   Q.   If we could turn to the next slide.

14        In reaching your opinions, what level of skill

15   did you assume a person of skill in the art would have had

16   in July of 2008?

17   A.   I've accepted this definition, which is a person

18   with a bachelor's degree in a discipline related to either

19   electrical, computer, or software technologies, plus one to

20   two years of work experience including with physiological

21   monitoring tools, or, alternatively, a master's degree in

22   less than a year of related experience.

23   Q.   We're going to show on the next slide your claim

24   chart for 501, claim 12, and we're going to turn to the

25   preamble of that claim.

1    How does Lumidigm teach the preamble of claim 1

2  from which claim 12 depends?

3    A.   So the preamble is a well-known idea.  The

4  thought here is that you have a user-worn device that

5  measures a physiological parameter of a user, and Lumidigm

6  teaches this explicitly through, we'll say Figure 8B as an

7  example, which is a wristwatch embodiment.

8    This is also addressed in column 11 in the spec,

9  which speaks to the wristwatch and says that any of the

10  sensor geometries that were disclosed can apply to this

11  particular application, meaning all of the other embodiments

12  in Figures 1 through 7 as well as the information that's in

13  the text itself.

14    Q.   We're going to turn, then, to the next slide.

15    How does Lumidigm teach element 1A?

16    A.   So this element speaks to three light-emitting

17  diodes, which, as I noted, have been known for many decades.

18    Lumidigm provides a specific example in Fig. 6,

19  for instance, where there are three LEDs on the same side of

20  a reflectance sensor head, but, in addition, Lumidigm states

21  in column 6 that these light-emitting diodes which can be

22  either at the same wavelength or at different wavelengths

23  can also consist of light sources that include sets of LEDs.

24    Q.   We're going to turn to the next slide.

25    How does Lumidigm teach element 1B?

1    A.   So element 1B is, again, quite well-known.  It

2  speaks to three photodiodes.  I'll use the same example as

3  in the prior claim limitation, which is Fig. 6 in Lumidigm,

4  which describes a sensor head in reflectance mode with three

5  photodiodes and three LEDs.

6         As a means of explanation, in column 6, Lumidigm

7  notes that this detector can comprise a single element, a

8  plurality of elements, or one or two-dimensional array,

9  meaning any one of these detectors, and that they can be

10  photodiodes.

11         And I underlined in red the indium gallium

12  arsenide material as well as silicon, which are typical

13  photodiodes for this wavelength range.

14    Q.   Is there any doubt in your mind that that

15  reference to indium gallium arsenide and silicon would

16  connote a photodiode to a person of skill in the art?

17    A.   No.  That's obvious.

18    Q.   If we could turn to the next slide.

19         How does Lumidigm teach the second part of

20  element 1B?

21    A.   So this is another well-known principle where you

22  arrange your, in this case photodiodes and LEDs, on an

23  interior surface, and your photodiodes are then configured

24  to receive light attenuated by the tissue of the user.  This

25  is illustrated well in Lumidigm Fig. 2.

1    So in Fig. 2 the red items are LED sources, each
2   of which sends light or photons into the tissue, and tissue
3   is normally forward-scattering, but you can get it to
4   reflect light back.  And in this case the light does reflect
5   back to a center photodiode, which is located in, we'll say,
6   a recessed well or cavity in the reflectance sensor head.
7    In this case the light does represent light that
8   has been attenuated or has propagated through tissue
9   consistent with Lumidigm column 3, and column 7, which also
10  addresses the tissue optical properties that would change
11  what you see at the detector.
12  Q.   We're going to turn to the next slide.
13       How does Lumidigm teach element 1C?
14  A.   So element 1C, again, it's a well-known idea of a
15  protrusion that's over the interior surface, which is the
16  surface that holds the sources and detectors, the protrusion
17  comprises or includes a convex surface.
18       Lumidigm addresses this directly in column 7,
19  where the spec states that the sensor head can have a
20  compound curvature on the optical surface, and the spec
21  teaches that this has several benefits.  One is to match the
22  profile of the device itself on the exterior, but also to
23  incorporate ergonomic features, meaning comfort and
24  usability for the user, features that allow for good optical
25  and mechanical coupling, or for other technical or stylistic

1   reasons.

2        Q.   What would a person of skill in the art have

3   understood in July of 2008 from this teaching?

4        A.   Well, it was already well-known that a convex

5   curvature itself could be a useful element in increasing

6   signal quality.  So a person of ordinary skill would see the

7   words "compound curvature" and realize that a practical

8   implementation of this would be a convex surface.

9        Q.   If we could turn to the next element.

10            How does Lumidigm teach element 1D?

11       A.   So element 1D, again, is quite well-known.  This

12   is a plurality of openings where an opening allows light to

13   reach a detector.  And these openings are positioned over

14   the three photodiodes individually.

15            Lumidigm addresses this generally and

16   specifically.  Lumidigm addresses it specifically in Fig. 6,

17   knowing that, when you read the spec, the cross-section in

18   Fig. 6 would be similar to Fig. 2, where each of the

19   photodiodes would be recessed and there would be an opening

20   over each photodiode.

21            And in terms of explanation, there is a very nice

22   but terse explanation in column 8, where the spec states to

23   the idea that, if you recess the photodiodes or detectors

24   from the sensor surface in an optically opaque material, you

25   can reduce the amount of light that's detected without going

1  through tissue, meaning, you don't want the light that goes

2  straight from the emitter to the photodiode and has not

3  passed through tissue first.

4      Q.   So what would a person of skill in the art in

5  July of 2008, then, have understood about how many openings

6  you should have in the sensor head?

7      A.   Well, they would have understood that the number

8  of openings wasn't really constrained.  In this case it's

9  mapped to the number of photodiodes, for example, that

10  exist.

11      Q.   Why don't we turn to the next element, 1E.

12          How does Lumidigm teach this?

13      A.   So element 1E is a little bit longer, but it

14  essentially speaks to the well-known idea of opaque lateral

15  surfaces, which comprise each of the openings, and this is

16  because the detector head or the protrusion would be made

17  out of opaque material.

18          These openings would allow light to reach the

19  photodiodes and the opaque lateral surfaces would have a

20  role of helping to avoid light piping through the

21  protrusion.

22          This idea is, again, illustrated in Fig. 2 where

23  the gray area in the sensor head is meant to represent the

24  opaque material in the viewgraph, and, as a result, when

25  there is an opening, then put in that material, the opaque

1213

 1    lateral surfaces would exist, and their purpose would be as

 2    noted in column 8, to perform optical blocking for light

 3    shunts or what is called light piping in this matter.

 4        Q.   If we could turn then to element 1F.  How does

 5    Lumidigm teach this?

 6        A.   So this is, again, a well-known idea where a

 7    processor is needed to manage the overall set of events.  In

 8    this case the processor will receive one or more signals

 9    from the photodiodes and then calculate a measurement of the

10    physiological parameter of the user based on those signals.

11            Lumidigm incorporates Fig. 9, which itself

12    includes a functional block diagram that has two blocks that

13    speak directly to processors, one is in the upper left, and

14    the other is called processing acceleration, which is kind

15    of a digital signal processor or a special feature

16    arrangement in the device.

17            And there are several excerpts in the spec, I

18    will note, columns 3 and 9 and 12, which describe the idea

19    that the processor performs the standard function, which is

20    to operate the device or operate the biometric sensor.  One

21    of those roles is also to digitize and record those data.

22            And then in column 12 the spec speaks to the idea

23    that any of the elements in Fig. 9 can either be arranged on

24    the same device, meaning in an integrated manner, or

25    separated out geographically or in a distributed way

1    depending on the needs of the system.

2         Q.   If we could turn to the next slide.

3              Before we -- actually, how does Lumidigm teach

4    the dependent claim 12, the limitations of dependent claim

5    12?

6         A.   So claim 12 is -- it's honestly a little bit of

7    an obvious statement, but the idea here is that, if you have

8    a convex surface and you position it next to tissue, any

9    pressure at all will conform the tissue into a convex shape

10   or, excuse me, a concave shape just because it would then

11   match the shape of the convex surface of the protrusion.

12        Q.   If we could turn to the next slide, and before we

13   turn to the next claim, I do want to go back to the preamble

14   slide just one more time and Lumidigm's description of its

15   watch embodiment.

16             What does Lumidigm say about the geometries that

17   can be included in its watch?

18        A.   Lumidigm states, and this is with regard to

19   Fig. 8B, by the way, the watch embodiment, Lumidigm states

20   in column 11 that any of the sensor geometries previously

21   disclosed or other equivalent configurations can be used for

22   this application.

23             And what the spec is saying is that the

24   geometries presented in Figs. 1 through 7 or the textual

25   descriptions, which, again, would include the compound

1215

1     curvature or the convex surface, any of those light

2     management features could be incorporated into an

3     embodiment, for example, such as 8B, which would be, we'll

4     call it, the watch embodiment.

5          Q.   If we could turn to the next slide, then.

6               What was your conclusion about how Lumidigm

7     compares to '501 claim, 12?

8          A.   My opinion is that Lumidigm as a singular

9     reference anticipates or discloses every one of the claim

10    limitations present in '501, claim 12.

11         Q.   We're going to turn, then, to the next claim,

12    '502, claim 22.

13              And am I correct that you have already explained

14    the basis for your opinion that Lumidigm meets '502 elements

15    19C and 19E in connection with your opinions on the similar

16    elements of '501, claim 12?

17         A.   Yes.

18         Q.   Let's turn, then, to the preamble of '502, claim

19    22, or the preamble of independent claim 19.

20              How does Lumidigm teach this?

21         A.   This preamble is similar to the prior preamble,

22    but it also adds the well-known idea of oxygen saturation --

23    excuse me -- oxygen saturation as a result.

24              Lumidigm, again, addresses this through the

25    wristwatch embodiment, so we'll go back to Fig. 8B, where

1    the wristwatch performs the functionality of, not only the

2    biometric sensor or reader, but also extended functionality

3    as a portable device that's mentioned later in the

4    specification where I will go to, not only columns 11 for

5    the wristwatch description, but also column 19, where there

6    are two descriptions to a hemoglobin monitor, or two

7    references to a hemoglobin monitor, but also to a system

8    that can measure oxygenation and/or hemoglobin levels in the

9    blood, or otherwise stated, to quantify oxygenation levels.

10       Q.   Professor Warren, would a person of skill in the

11   art in July of 2008 have needed any further details than

12   these to know how to implement pulse oximetry functionality

13   in Lumidigm's watch embodiment in 8B?

14       A.   No, because it was a standard reflectance mode

15   sensor application.  We had already seen a number of

16   publications in that area, and we got it to work ourselves

17   in the laboratory several years prior.  So a person of

18   ordinary skill would not have needed any additional

19   information to make that work in this kind of an embodiment.

20       Q.   When you said we did it ourselves in the

21   laboratory, were you referring to the measurements taken at

22   the wrist?

23       A.   Yes.  I did it myself in the mid-'90s, and then

24   when I started at Kansas State my own students built these

25   sensors and worked with them on their wrists.

1    Q.   You were here for the testimony of the Apple

2    witnesses; is that correct?

3    A.   Yes.

4    Q.   So you're aware that it took Apple many years to

5    implement blood oxygen measurements in the Apple Watch?

6    A.   Yes, I am.

7    Q.   And why did it take Apple so long, in your

8    opinion and from the evidence you've seen, why did it take

9    Apple so long to implement blood oxygen measurements in the

10   Apple Watch?

11   A.   Apple had a set of significant challenges to

12   overcome.  Not only were they severely limited on real

13   estate, but they were also limited on processor capabilities

14   given the amount of other applications that need to run also

15   on the watch.

16        And even though these -- the simple light

17   management problems such as addressed in the Poeze patents

18   had already been essentially solved in many cases, there

19   were still nuances of those light management features in

20   addition to the algorithms that needed to be developed to

21   make that entire package come together.

22   Q.   Great.  Let's turn to the next element, then,

23   22A -- 19A.

24        MR. CLAASSEN:  Your Honor, I want to object to

25   that last question.  That opinion testimony was not

1218

 1    disclosed in Dr. Warren's report.

 2            MS. VREELAND:  Your Honor, we can put on the

 3    screen the exact paragraph that discloses that.  It's

 4    paragraph 244 of his opening report.

 5            JUDGE BHATTACHARYYA:  Please go ahead.

 6            MS. VREELAND:  I'm actually going to display 243

 7    and 244 for the context, and it's paragraphs 243 and 244.

 8            Just for context, Your Honor, the discussion of

 9    the claim 22 Preamble refers to the earlier reference to

10    measuring blood oxygen, one of the '501 dependent claims

11    that is no longer in the case, but I'll show you the text

12    there that's incorporated by reference.

13            So in paragraph 243 Dr. Warren provided the

14    opinion that he just gave about how a person of skill in the

15    art would understand how to implement Lumidigm's device in a

16    pulse oximeter, and in paragraph 244 he explained how the

17    Apple Watch -- the reasons why the Apple Watch took longer

18    to develop and the challenges of the Apple Watch.

19            MR. CLAASSEN:  Your Honor, slide -- the processor

20    that was mentioned in slide 29 that Dr. Warren was

21    discussing is not mentioned in this paragraph 244.

22            JUDGE BHATTACHARYYA:  Could I see the remainder

23    of 244, I just want to read the whole paragraph 244, and

24    then slide 29.

25            MS. VREELAND:  It was the preamble for claim 22.

1          Your Honor, for context, he was explaining why it

2     took Apple longer to implement the blood oxygen measurement

3     in the Apple Watch.

4          MR. CLAASSEN:  Your Honor, if we could go back to

5     the report.

6          JUDGE BHATTACHARYYA:  Okay.  Could you clarify,

7     Mr. Claassen --

8          It's Mr. Claassen, correct?

9          MR. CLAASSEN:  That's correct, Your Honor.  Thank

10    you.

11         JUDGE BHATTACHARYYA:  Could you clarify exactly

12    what you're objecting to in terms of his testimony?

13         MR. CLAASSEN:  Your Honor, my understanding of

14    what's stated in paragraph 244 is that Dr. Warren is

15    discussing -- I'm trying to read it on the screen,

16    Your Honor -- the attractiveness and accuracy and nothing

17    about a processor or any specific use.  He was just

18    describing with respect to the slide that was presented.

19         MS. VREELAND:  May I respond, Your Honor?  He

20    says in the paragraph that begins, "I understand," I

21    understand it took years of work by the Apple engineers to

22    develop a successful wrist-worn pulse oximeter for consumers

23    that is also aesthetically pleasing and able to function in

24    combination with the many other features of the Apple Watch.

25         I think that's what Professor Warren was just

1   explaining, that you had to put all that software together

2   in a small watch.

3           MR. CLAASSEN:  Your Honor, if the testimony is

4   limited to what he states exactly in his report, we withdraw

5   the objection, but we would like the testimony to be exactly

6   what's in his report.

7           MS. VREELAND:  Your Honor, I would certainly be

8   happy to do that.

9           JUDGE BHATTACHARYYA:  Okay.  Why don't the

10  parties -- if the parties can work it out, that's wonderful.

11  We can revisit this later.

12      Q.   We'll go on to the next element, then.

13          Can you explain how Lumidigm teaches -- if we

14  could go to 19A and 22 --

15      A.   Yes, this is a pair of claim limitations that are

16  very similar in nature.  They both speak to a plurality of

17  emitters -- in the second case at least four emitters.

18          In the first case the plurality would comprise at

19  least two light-emitting diodes, and in the second case each

20  of the plurality of emitters would be a respective set of at

21  least three LEDs.

22          So a plurality of sets of two or four emitters

23  each of which had at least a set of three.  This is a

24  well-known idea in the literature, as I noted earlier, but

25  with respect specifically to Lumidigm, Lumidigm includes

1221

1    Figures 3 and -- let's see, 5, 7A and 7B -- where Lumidigm

2    states that each of the locations for the LEDs, which,

3    again, are the red dots on these figures, each of those

4    locations can be comprised of LEDs with the same or

5    different wavelengths, but also the light sources themselves

6    can include sets of LEDs --

7         Q.   Why don't we go --

8         A.   -- at each location.

9         Q.   Let's go, then, to the next limitation.

10             How does Lumidigm teach element 19B?

11        A.   So this is the well-known idea of four

12   photodiodes arranged on the user-worn device.  Lumidigm

13   addresses this specifically in Fig. 7A and 7B, where 7A

14   incorporates five photodiodes in a linear arrangement, and

15   Fig. 7B incorporates an 8x8 grid of 64 photodiodes.

16        Q.   Let's turn, then, to element 19C or 19D, excuse

17   me.

18             How does Lumidigm teach this?

19        A.   The notion of an optically transparent material

20   is, again, quite well-known where the material is in each of

21   the openings.  Lumidigm states in column 8 that an optical

22   relay, which is not shown in the diagram, between the sensor

23   and sensor surface and the skin, and helped to transfer

24   light by directionally either from the light source from the

25   skin or from the skin back to the detector.

1          And I've illustrated, for example, a well-known

2    optical relay, which is a lens, in the opening of the

3    photodiode that's depicted in Fig. 2, but Lumidigm also

4    states that you can use fiber-optic faceplates for this

5    purpose, where you could use a single faceplate for multiple

6    openings or you could do an individual -- a person of skill

7    would know that you could do an individual faceplate for

8    each of the individual openings as a means to provide light

9    but still optimize the process.

10   Q.   And what about the example, the fiber bundle,

11   what would a person of skill in the art understand about

12   that?

13   A.   Right.  This is one that I mentioned in my report

14   where you could use a fiber bundle to essentially direct the

15   light from a portion of tissue straight to the detector as a

16   means to optimize the detection process.

17   Q.   And in July 2008, what materials would a person

18   of skill in the art recognize a fiber-optic faceplate or a

19   fiber bundle would be made of?

20   A.   The individual fibers would have a glass core and

21   then either a glass or a plastic cladding and then a

22   protective layer.  A fiber-optic faceplate, by the way, is

23   like a bundle of spaghetti that you hold in your hand and

24   you cut sideways so that you get all the little fibers lined

25   up with one another.

1223

1    Q.   Why don't we go to the next element then, 19E,

2    excuse me, dependent claims 20 and 21.

3         How does Lumidigm teach these?

4    A.   These claims are paired -- they essentially

5    relate to the well-known notion that, if your processor can

6    receive a temperature signal, in this case from a

7    thermistor, it can then adjust the operation of the

8    user-worn device.

9         The importance of this, by the way, is that LEDs

10   change their behavior depending on temperature.  They, for

11   example, will change their center wavelength if the

12   temperature increases or decreases.

13        So these two claims speak to that, as does

14   Lumidigm.  And we can look at Lumidigm, for example, in

15   column 14, where Lumidigm states the goal to perform

16   explicit corrections to account for sensor to sensor

17   variations or environmental influences of temperature that

18   would involve the processor depicted in Fig. 9, and a person

19   of ordinary skill would realize that such a temperature

20   measurement could easily be done with a thermistor.

21   Q.   If we could turn to the next element.  Let me

22   actually ask you about your conclusion.

23        What did you conclude, then, about how Lumidigm

24   compares to '502, claim 22?

25   A.   My opinion is that, as a single reference,

1   Lumidigm anticipates or discloses every one of these

2   individual claim limitations.

3        Q.   Let's turn then to '502, claim 28.

4             And am I correct that you have already explained

5   the basis for your opinion that Lumidigm meets the preamble

6   and elements 28D, E, F, G, and in connection with your

7   opinions on the similar elements of the earlier claims?

8        A.   Yes.

9        Q.   Let's turn to element 28A, then.

10            How does Lumidigm teach elements 28A and 28B?

11       A.   So these claims are similar to the earlier ones

12  that -- but in this case we have a first set of LEDs and a

13  second set of LEDs where, within the first set, there is the

14  emission of light at a first wavelength and a second

15  wavelength, and in the second set of LEDs there is the same,

16  meaning an emission of light at the first wavelength and at

17  the second wavelength.

18            And I'll go back in this case to this well-known

19  idea as illustrated in Lumidigm Figs. 3 and 5 and 6 and 7A

20  and 7B, which --

21       Q.   Let's turn -- I'm sorry -- turn to the next slide

22  before your further explanation.

23            How does Lumidigm teach the first wavelength and

24  the second wavelength?

25       A.   Right.  I've illustrated here, and in this case

1225

1   I've included an animation that I thought would help, where

2   every source location that is depicted in any of these

3   figures, meaning 3, 5, 6, 7A and 7B, is a location where

4   then multiple wavelengths would be present, for example, in

5   a multi-chip LED package.

6          And I've also included an excerpt from a

7   publication that was incorporated by reference in the

8   Lumidigm -- this is by the same author -- I included Fig. 6

9   from RX-0411 where Fig. 6 is RX-0460 -- as a means to

10  illustrate that in static locations this specification

11  teaches the idea of multiple wavelengths in sets that can be

12  many, many LEDs.

13  Q.   Okay.  I'd like to quickly run through the rest

14  of the elements of claim 28.  We're going to turn to the

15  next slide.

16          How does Lumidigm teach element 28C?

17  A.   So the only new thing about 28C is that the four

18  photodiodes should be arranged in a quadrant configuration,

19  which, again, was quite well-known.  Lumidigm illustrates

20  this in Fig. 7B, which depicts an array or two-dimensional

21  array of photodiodes.

22          And I've illustrated with a green cross four

23  quadrants that you could use within this embodiments.  One

24  of ordinary skill could essentially choose any four of the

25  photodiodes within this arrangement and make those into a

1  quadrant and then include an opening over each one.

2       Q.   Let's turn to the next element, then, 28H.

3            How does Lumidigm teach this, if you could just

4  briefly tell us?

5       A.   Yeah.  This is the idea of an opaque wall, which

6  is well-known, where the opaque wall extends from the

7  interior surface to the surface of the protrusion.  That's

8  illustrated by the gray material in Fig. 2.

9       Q.   Okay.  If we could go to the next element, 28J.

10           How does Lumidigm teach this?

11      A.   A network surface configured to wirelessly

12 communicate an oxygen saturation was also a well-known idea.

13           Lumidigm teaches this in the Fig. 8B embodiment

14 through element 103, which is a wireless communication

15 depiction, as well as in Fig. 9, which has a communication

16 system block.

17           Additionally, in columns 13, 11 and 19, Lumidigm

18 describes the teaching of a wireless link or an interfacing

19 connection where the wireless link can also be embedded into

20 the fob, for example, or the watch, and that it could

21 communicate oxygenation levels as quantified by the device.

22      Q.   Let's turn to the next slide.

23           How does Lumidigm teach element 28K?  Again, you

24 can go quickly at this point.

25      A.   Yeah, element 28K is a touchscreen interface

1    which was well-known.  That's embodied in the highlighted

2    portion in the smartphone and PDA, which both would have had

3    at the time.

4         Q.   Would a person of skill in the art have

5    recognized that that could also be incorporated in a watch?

6         A.   Yes, it could be incorporated in any visual

7    depiction for a portable device.

8         Q.   Let's go to the next slide.

9              How does Lumidigm teach element 28L?

10        A.   Element 28L is the well-known idea of storage.

11   This is addressed in three separate boxes in Fig. 9, and in

12   columns 12 and 13 Lumidigm addresses the idea that storage

13   could be used to store the spectra that were obtained

14   meaning the information obtained from the individual.

15        Q.   If we could turn to the last slide.

16             How does Lumidigm teach 28M?

17        A.   Lumidigm depicts a strap in Fig. 8B.

18        Q.   And if we could turn to the next slide, what did

19   you conclude, then, about '502, claim 28?

20        A.   My opinion is that Lumidigm anticipates every one

21   of these individual claim limitations as a single reference.

22        Q.   Why don't we turn, then, to '648, claim 12, and

23   am I correct that you've already explained the basis for

24   your opinion that Lumidigm teaches the elements of

25   independent claim 8 and dependent claim 12 so that we can

1228

1  go -- except the housing, and we'll go to the housing?

2       A.   Yes.

3       Q.   How does Lumidigm teach the housing in element

4  8H?

5       A.   Lumidigm states in column 11 that the wristwatch

6  has a case.

7       Q.   Great.  And then what did you conclude, then, for

8  '648, claim 12, if we were to go to the next slide?

9       A.   My opinion is that Lumidigm anticipates or

10 discloses every limitation of claim 12.

11      Q.   Let's turn, then, to claims 24 and 30.

12           Am I correct that you've already explained the

13 basis for your opinion that Lumidigm teaches the elements of

14 independent claim 20?

15      A.   Yes.

16      Q.   Let's turn to dependent claim 24.

17           How does Lumidigm teach this?

18      A.   The idea of a protrusion comprising an opaque

19 material that prevents light piping is a restatement of what

20 we've already addressed.

21           Lumidigm discusses this in Fig. 2 and in column

22 8, which states that optically opaque material can be used

23 as an optical blocking mechanism.

24      Q.   And, finally, if we were to turn to dependent

25 claim 30, how does Lumidigm teach this?

1      A.   This claim addresses chamfered edges which were a

2   well-known mechanical principle at the time.  Those

3   chamfered edges would have been included in the face where

4   the edges of the face of the watch on Fig. 8B.

5           Additionally, those chamfered edges would be

6   elements that addressed in column 7 where the compound

7   curvature that we know represents a convex surface, would

8   incorporate ergonomic features, and it's those chamfered

9   edges that make for a comfort issue with regard to the usage

10  of the watch.

11     Q.   So if we could turn to the next slide, what did

12  you conclude then about '648, claims 24 and 30?

13     A.   My opinion is that Lumidigm anticipates all of

14  the limitations of claims 24 and 30.

15     Q.   Great.  So I'd like to go to the next slide.

16          I'd like to ask you about a few of the

17  limitations that, if we could turn one more slide, that

18  Masimo contends are missing in Lumidigm?

19          Do you agree that Masimo -- do you agree that

20  Lumidigm is missing any of these limitations?

21     A.   No, I disagree.

22     Q.   And if we -- do you have an opinion on whether or

23  not other prior art discloses those same limitations that

24  Masimo contends are missing?

25     A.   Yes, there's much other prior art, but I've

1  looked at Seiko 131 and Cramer for examples of additional

2  references as well as Webster and Apple 047.

3      Q.   And which combinations are you relying on for

4  which claims?

5      A.   Well, for all claims, Lumidigm in combination

6  with Seiko 131 and Cramer, but, specifically, for '502,

7  claim 22, Lumidigm in combination with Webster or Lumidigm,

8  Seiko and Cramer in combination with Webster, and then

9  specifically for '502, claim 28, Lumidigm and Webster in

10  combination with Apple 047, or Lumidigm, Seiko, Cramer and

11  Webster in combination with Apple 047.

12      Q.   And do you have an opinion on whether or not a

13  person of skill in the art would have been motivated to make

14  these combinations in July of 2008?

15      A.   Yes.  In all cases Lumidigm states the need

16  expressly for such combinations and a person of ordinary

17  skill would have easily gone to the references to find them.

18      Q.   Let's turn quickly, then, to the next slide, and

19  Seiko, RX-666.  When was Seiko filed?

20      A.   Seiko was filed in July 1996.

21      Q.   And at a high level, what does it disclose?

22      A.   Seiko discloses an embodiment very similar to one

23  that is in a Poeze figure, which is a pulse oximeter sensor

24  on a finger connected via cable to a display unit that's

25  worn on the wrist of the user.

1231

1    Q.   And if we were to turn to the next slide, what
2  does Seiko describe in its Figure 28 and the text in column
3  19?
4    A.   Seiko discloses what's called a light
5  transmittance plate, which is stated to be a convex surface.
6  And the purpose of this convex surface, as stated in Seiko,
7  is to move residual blood out of the way and increase the
8  quality of the measurement.
9    Q.   And let's turn, then, to the next slide, Cramer,
10  RX-670.  When was Cramer filed?
11    A.   Cramer was filed in 1978.
12    Q.   At a high level, what does it disclose?
13    A.   Cramer discloses a light-based wristwatch for
14  pulse rate measurements.
15    Q.   And if we were to turn to the next slide, what
16  does Cramer show -- what does it say about the embodiment of
17  its sensors shown in Figs. 2, 3, and 6?
18    A.   Cramer describes what it calls a raised boss
19  area, which is essentially a convex protrusion.  It consists
20  of two concentric raised annular areas of opaque material,
21  and those areas surround the four photodiodes, and they also
22  separate four photodiodes from the central emitter or LED.
23    Q.   And you said that -- you mentioned that Cramer
24  has four photodiodes.  What does Cramer say about those
25  photodiodes?

1    A.    Cramer notes that an example of a suitable

2    detector is a Clairex CLT 2160 photodiode.

3    Q.    If we were to turn to the next slide, do you

4    recognize RX-1221?

5    A.    Yes.  This is a depiction from the Clairex data

6    sheet, which depicts the can detector itself on the right

7    where there's a window or a lens on the top, and then the

8    photodiode sits down within that can at the focal point of

9    the lens to receive the detected light.

10   Q.    Okay.  So why don't we turn, then, to the next

11   slide, and I'd like to ask you about the limitations in all

12   of the Poeze claims relating to a protrusion with a convex

13   surface, and the limitation in claim 12 relating to

14   conforming the tissue into a concave shape.

15         If we were to turn to the next slide, how does

16   Seiko disclose these limitations?

17   A.    Seiko discloses the protrusion explicitly as a

18   means to increase the signal quality associated with the

19   light-based measurement via a convex protrusion.  It's

20   called a light transmittance plate in that example.

21   Q.    And how does Cramer teach these limitations?

22   A.    Cramer teaches that, with regard to the raised

23   boss area, that that boss area must be pressed into tissue

24   in order to get a measurement, and that you can do that

25   measurement with minimum discomfort to the user.

1233

1    Q.    And if we were to turn to the next slide, what is

2    the basis for your opinion that a person of skill in the art

3    would have been motivated to combine Lumidigm's watch with

4    Seiko's and Cramer's teachings of protrusions with convex

5    surfaces?

6    A.    So Lumidigm already expressly states that the

7    curvature on the optical surface could be a compound

8    curvature, which in the case of a convex surface would

9    natural mean a concave shape for the applied tissue.  And a

10   person of ordinary skill even independent of that expressed

11   disclosure would know that they could go to a reference like

12   Seiko or Cramer to teach different ways that you might

13   incorporate a convex protrusion into one of these

14   reflectance sensors.

15   Q.    Let's turn, then, to the next set of limitations

16   in all the claims relating to openings over photodiodes with

17   opaque surfaces to avoid, reduce, or prevent light piping.

18         If we could turn to the next slide, how does

19   Seiko -- how do Seiko and Cramer teach these limitations?

20   A.    The openings and patent and trademark surfaces in

21   Seiko are rendered in the opening above the photodiode in

22   Fig. 28, for example.  And Seiko also incorporates opaque

23   material in its casing.  Cramer teaches the similar notion

24   of openings with opaque surfaces with regard to the opaque

25   region that comprises, not only the sensor head, but the

1  boss regions, all of which help to prevent light piping

2  because of the fact that they are indeed opaque material.

3      Q.   And what about Cramer's can?

4      A.   Yeah, the can itself adds another layer of what

5  we could say is opaque material.  A person of ordinary skill

6  would realize that the can would be made from aluminum or

7  stainless steel or some material that was impervious to

8  light as a means to prevent light piping.

9      Q.   If we could turn to the next slide.

10         What, then, is the basis for your opinion that a

11 person of skill in the art would have been motivated to

12 combine Lumidigm's watch with Seiko's and Cramer's teachings

13 of openings over photodiodes with opaque surfaces to avoid

14 reduce or prevent light piping?

15     A.   Well, again, it's a twofold response.  The first

16 note is that Lumidigm expressly states the need for openings

17 over detectors that are themselves recessed in opaque

18 material, but, regardless of that disclosure, which was

19 well-known at the time, a person of ordinary skill could go

20 to Seiko and Cramer and a number of other references that

21 teach this particular concept.

22     Q.   Let's turn to the next slide, then, and the

23 limitations in '502 -- in the '502 and '648 claims relating

24 to optically transparent materials or windows within or

25 across the openings.

1         If we could turn to the next slide.

2         How do Seiko and Cramer teach these limitations?

3    A.   In Seiko, for example, these limitations are

4    taught through the light transmittance plate that I already

5    mentioned.  It's a transparent material that allows light to

6    reach the photodiode detector.

7         In Cramer, windows or transparent materials are

8    taught two different ways.  The first one, for example, is

9    the lens that exists at the top of the can above the

10   photodiode in this depiction, and the other is the windows

11   that are between the raised boss regions as depicted in

12   Fig. 6.

13   Q.   If we could turn to the next slide.

14        What is the basis for your opinion that a person

15   of skill in the art would have been motivated to combine

16   Lumidigm's watch with Seiko's and Cramer's teachings on the

17   use of optically transparent materials and windows over or

18   within openings -- over or within the openings over

19   photodiodes?

20   A.   The basis for my opinion is, first, that Lumidigm

21   expressly teaches this idea through the notion of an optical

22   relay, which is a general way to say a transparent material

23   for allowing light to pass.

24        And, in addition, independent of that idea, a

25   person of ordinary skill would have known that windows could

1   be used and that Seiko 131 and Cramer would be suitable

2   references to consult.

3        Q.   Finally, then, let's turn to the limitation in

4   the next slide -- limitation in claim 30 relating to a

5   protrusion with chamfered edges.

6             How do Seiko and Cramer disclose this limitation?

7        A.   Seiko discloses chamfered edges in several

8   figures.  I've noted Fig. 5 and Fig. 28 here where chamfered

9   edges are illustrated in Fig. 5 at the edges of the

10  protrusion, and in Fig. 28 on the opposite side of the

11  sensor as a comfort mechanism.

12            And in Cramer, chamfered edges are incorporated

13  in Fig. 3, as an example, where a chamfer allows the edge to

14  transition from the main watch body to the raised boss area

15  without a sharp, 90-degree orthogonal edge that would be

16  uncomfortable for the user.

17       Q.   And if we were to turn to the next slide, what is

18  the basis for your opinion that a person of skill in the art

19  would have been motivated to combine Lumidigm's watch with

20  Seiko's and Cramer's teachings of protrusions with chamfered

21  edges?

22       A.   The basis for my opinion, again, is twofold.  The

23  first thought is that the compound curvature and the need

24  for ergonomic features is expressly stated in Lumidigm.

25  Additionally, a person of ordinary skill would understand

1237

1   that chamfered edges have been around for many decades as a
2   means to soften transitions between surfaces and make items
3   such as watches more wearable.
4       Q.   If we could turn to the next slide, I'd like to
5   ask you about this combination of features that we've just
6   discussed -- the convex surface, the openings, the windows,
7   and the chamfered edges.
8            What is the basis for your opinion that a person
9   of skill in the art would have been motivated to combine all
10  these features in Lumidigm's watch?
11      A.   Well, these features are well-known management
12  features, and as a watch embodiment, for example, a person
13  of ordinary skill would realize that there had been many
14  other watch embodiments introduced into the literature,
15  including Seiko and Cramer, and that they would then form a
16  natural combination for teaching purposes.
17      Q.   Now you mentioned that Seiko and Cramer focused
18  on measuring pulse rate rather than blood oxygen.  Does that
19  impact your opinion in any way?
20      A.   No, not at all, because the same light management
21  features that you need to incorporate for a single
22  excitation wavelength to allow a pulse rate determination
23  are the same light management features that you need to
24  incorporate with multiple wavelengths to employ pulse
25  oximetry or any other kind of spectroscopy measurement.

1    Q.   Would a person of skill in the art have had a

2  reasonable expectation of success in making this

3  combination?

4    A.   Yes, the combination had already been done in

5  various forms as I illustrated with my combination slide

6  earlier.

7    Q.   If we could turn to the next slide.

8       What did you conclude, then, about the Lumidigm,

9  Seiko, and Cramer combination?

10    A.   Well, my conclusion is twofold.  My first opinion

11  is that the Lumidigm reference alone discloses and renders

12  these ideas obvious.  My second opinion is that Lumidigm

13  combined with Seiko 131 and Cramer as an alternative

14  additionally renders these claims obvious.

15    Q.   Let's turn, then, to just two more claims.  Claim

16  22 requires, in addition, a thermistor and processors to

17  adjust operations based on a thermistor.

18       At a high level, what was known in the art about

19  the use of thermistors at this time?

20    A.   At a high level, a person of ordinary skill would

21  know that a thermistor could be used to monitor temperature

22  and that that knowledge could be used to adjust the

23  calibration of a circuit or a system such as this.

24    Q.   Are you aware of other prior art teaching a

25  thermistor for pulse oximetry?

1    A.   Yes, there's a lot of teaching out there, but the

2    example I'll use is Webster from 1997.

3    Q.   How long have you had a copy of Webster?

4    A.   I got a photocopy of the book after it was

5    published in the late 1990s because we couldn't -- the

6    publisher ran out and I kept --

7    Q.   I'm sorry.

8    A.   And I've kept a copy for 20 years.

9    Q.   Could we go to the next slide?

10   How does Webster teach the elements and dependent

11   claims 20 and 21?

12   A.   So Webster addresses the idea of compensation for

13   LED temperature changes directly at page 85, where Webster

14   notes that a temperature sensor can be built into the probe

15   along with the LEDs and photodiodes.  That idea is

16   illustrated explicitly in Webster in Figure, I believe it's

17   3.4.

18   Q.   And if we were to turn to the next slide, what is

19   the basis of your opinion that a person of skill in the art

20   would have been motivated to combine Lumidigm's watch with

21   Webster's thermistor?

22   A.   The basis for my opinion is that Lumidigm

23   expressly states this need on its own, meaning, the

24   performing explicit corrections to account for environmental

25   influences of temperature, but, irrespective of what's

1   disclosed in Lumidigm, a person of ordinary skill would

2   realize that a thermistor would be an obvious way to

3   accomplish this mechanism.

4       Q.   If we could turn to the next slide, I'd also like

5   to ask you about claim 28.

6            We've discussed the thermistor, but we haven't

7   yet discussed the user interface with a touchscreen.

8            Are you aware of any prior art that a person of

9   skill in the art would have been aware of in July 2008

10  relating to a user interface with a touchscreen?

11      A.   This is a well-known mechanism, but I decided to

12  pull Apple 047 as an example of a reference for a

13  touchscreen.

14      Q.   And why did you look to Apple art?

15      A.   I thought it appropriate given that Apple has

16  such a history in this area and it fit well with the

17  embodiments that we're talking about.

18      Q.   If we could turn to the next slide.

19           How does the Apple '047 patent, RX-673, teach the

20  touchscreen in '502 claim 28?

21      A.   The central theme of this patent is that, if a

22  device incorporates a touchscreen, and you would then rotate

23  the device, the device would not only change from a portrait

24  to landscape orientation in its display, but it would also

25  display different kinds of information.

1    Q.   And if we could turn, then, to the next slide,

2    I'd like to start by asking you about the three pieces of

3    prior art that you've identified for claims 22 and 28 --

4    Lumidigm, Webster, and Apple.

5         What is the basis for your opinion on whether a

6    person of skill in the art would have been motivated to make

7    this combination and would have had a reasonable expectation

8    of success?

9    A.   Yeah, a person of ordinary skill would realize

10   that, to add the features of temperature sensing and

11   touchscreen to Lumidigm, they could look to a number of

12   references, but looking to Webster and Apple would be an

13   obvious choice.

14   Q.   And what would -- would they have had an

15   expectation of success in implementing that combination?

16   A.   They would have, because that combination had

17   already been used in other devices at the time with success.

18   Q.   Let me ask you, then, about the broader

19   combination.

20        If we were to turn to the next slide, and if I

21   were to ask you about the broader combination of Lumidigm,

22   Seiko, Cramer, Webster, and Apple 047, what is the basis for

23   your opinion that a person of skill in the art would have

24   been motivated to make that combination?

25   A.   This combination, to me, is a three plus one plus

1  plus one.  The three elements for the watch all go together.

2  It would be obvious, then, as a person of ordinary skill to

3  add the thermal sensing and the touchscreen elements via

4  Webster or Apple or any number of other references to

5  accomplish this.

6     Q.   Would a person of skill in the art have had a

7  reasonable expectation of success?

8     A.   Yes.  Not only had this been done, but these are

9  known elements.  The result would have been known.

10    Q.   So let's turn, then, to another issue.  I'd like

11 to ask you about the secondary considerations of

12 nonobviousness.

13         Have you considered these in connection with your

14 opinion?

15    A.   Yes.

16    Q.   And do you have an opinion on whether or not the

17 commercial success of Apple's Series 6 and 7 watches has

18 been due to the claimed inventions of the Poeze patents?

19    A.   I do.

20    Q.   And what is your opinion?

21    A.   Well, my opinion, as a commercial device, at a

22 high level, is that the Apple Watch incorporates a lot of

23 features.  The blood oxygen feature is only a small fraction

24 of the percentage of those features.  And it incorporates

25 only a small portion of the hardware functionality.

1           Additionally, the limitations that are in the
2     Poeze patent are quite old, and they would really not have
3     been effective in terms of teaching the Apple Watch
4     designers how to implement these light management features.
5           Q.   Do you have an opinion on whether or not the fact
6     that Apple spent years working on its watch indicates that
7     Apple could not have achieved the alleged inventions without
8     the Poeze claims?
9           A.   No.  As I noted, the light management features
10    were known.  The issues that Apple had to deal with were
11    issues that related more to building complex functionality
12    into a device that was already quite complex in an
13    environment where there were a lot of other features while
14    they were still under the same constraint to meet the
15    aesthetic and functional needs of a product that would be
16    consistent with their standards.
17          Q.   And did you --
18               MR. CLAASSEN:  Your Honor, I'm going to object
19    that that's outside the scope of his report.
20               MS. VREELAND:  Your Honor, it's in his report at
21    paragraphs 1802 to 1807.  I would be happy to display them.
22               JUDGE BHATTACHARYYA:  Let's see.
23               MR. CLAASSEN:  Your Honor, my response is that
24    that paragraph is, again, about the aesthetics, not the
25    complex functionality.

1     MS. VREELAND:  Your Honor, we would certainly be

2  happy to limit the testimony to be consistent with what was

3  in the report.  We think it was fully consistent with the

4  report, 1802 to 1806, and specifically 1806.

5     JUDGE BHATTACHARYYA:  This is basically the same

6  issue we had before or a similar issue.  Can the parties

7  work this out?  Otherwise, I will --

8     MS. VREELAND:  Yes.

9     MR. CLAASSEN:  Yes, Your Honor.

10     JUDGE BHATTACHARYYA:  Okay.

11  Q.   Let me ask you about, then, about Dr. Kiani's

12  suggestion in his testimony that there was skepticism in the

13  field about the use of curved protrusions before July of

14  2008.

15     Do you agree that there was skepticism in the

16  field on the use of curved protrusions?

17  A.   No.  It was actually quite the opposite.

18  Q.   Let me pull up briefly -- let me turn to the next

19  exhibit and ask you about RX-668, Mendelson's '799 patent.

20     Do you agree that Mendelson expressed skepticism

21  about the use of convex protrusions in pulse oximetry?

22  A.   No.  The first thought is that Mendelson is not

23  speaking of convex protrusions, but the second thought is

24  that this example is in the context of situations like fetal

25  monitoring or monitors over ribs or a forehead where there's

1245

1    a bone backing right behind the sensor and the tissue, and

2    that, if you press too hard, you move the residual blood out

3    of the way and you don't have any blood left.

4            But that is a really special case with too much

5    applied pressure.  Some of the other literature does a much

6    better job of explaining why, indeed, the convex protrusion

7    itself is a feature to be desired.

8        Q.   If we were to turn to the next slide, RPX-665,

9    what did Nippon teach in 1987 about protrusions?

10       A.   Nippon is one of many articles that conveys the

11   idea that, if the detector protrudes slightly into tissue,

12   not only can you get more repeatable coupling, but you can

13   increase the sensitivity of the sensor in this case, meaning

14   that the signal strength of the detected signal itself is

15   improved, consistent with what we've all seen in our own

16   laboratories.

17       Q.   If we were to turn to the next slide, Seiko and

18   Cramer, what did they teach even farther back in the 1970s

19   about convex protrusions?

20       A.   So I believe the date on Seiko might be

21   mislabeled here.  It should say 1996, I recall.

22           But Seiko 131 taught the notion that the convex

23   surface, light transmittance plate, could be used to

24   increase the quality of the signal, not only via positive

25   contact with a body surface, but Seiko includes a long

1    section on the removal of residual blood out of the way as a

2    result of added pressure so that the pulsatile signal would

3    be more available to the field of view of the sensor.

4         Q.   Okay.

5         A.   Cramer, likewise --

6         Q.   Go ahead.

7         A.   Well, Cramer, likewise, taught the idea where the

8    Cramer specification states that pressure needs to be

9    applied in order to push the boss region into tissue to make

10   an effective measurement, and that the boss arrangement with

11   its convex curvatures is effective to minimize the

12   discomfort to the wearer.

13        Q.   And have you, finally, have you seen any evidence

14   either over the course of this case or at this trial that

15   Apple copied the alleged inventions in the Poeze patents?

16        A.   I have not.

17        Q.   Let's turn, then, briefly to the written

18   descriptions in the Poeze patents.  We're going to put on

19   the screen RDX-8131.

20             Have you also considered whether the Poeze

21   specification supports and enables the asserted Poeze

22   claims?

23        A.   Yes, I have considered that.

24        Q.   And just briefly, have you identified any

25   embodiments in the Poeze patents that include the claimed

1    limitations of features recited in '501, claim 12, '502

2    claim 22, '502 claim 28, and '648, claim 12?

3         A.   No.  As an example, the combination of three

4    LEDs, three photodiodes, and a plurality of openings over

5    the photodiodes with opaque lateral surfaces as in claim 12,

6    I can't find a single embodiment.  The same is true of these

7    other descriptions that are on the same viewgraph.

8         Q.   Okay.  We're going to go to RDX-8.133.

9              Have you identified any -- any discussion or any

10   embodiments in the Poeze specification that include four

11   emitters each with three LEDs?

12        A.   No.

13        Q.   If we could turn to the next slide.

14             Have you identified any discussion in the Poeze

15   specification of the use of multiple sets of LEDs each with

16   LEDs emitting at a first wavelength and a second wavelength?

17        A.   I have not found one, no.

18        Q.   If we could turn to the next slide.

19             Have you identified anything in the Poeze

20   specification that would tell a person of skill in the art

21   how to implement a user interface with a touchscreen?

22        A.   I have only found two brief references to

23   touchscreens, so no.

24        Q.   Finally, on the next slide, have you seen

25   anything in the Poeze specification that provides guidance

1248

1    on reducing or avoiding light piping other than a general

2    reference to the use of opaque materials?

3         A.   No.  I've just seen a vague correlation between

4    the two, that's it.

5         Q.   Let's turn, then, to the issue of the basis for

6    your opinion that the Apple products do not infringe.

7              And you were here for the testimony of Apple's

8    engineers, correct?

9         A.   That's correct.

10        Q.   And have you also compared Apple's accused

11   products to the asserted Poeze claims?

12        A.   Yes.

13        Q.   And what did you conclude?

14        A.   I have concluded that they do not infringe those

15   claims.

16             MS. VREELAND:  Your Honor, we would like to go on

17   the Apple confidential record with Apple CBI.

18             (Whereupon, the hearing proceeded in confidential

19   session.)

20

21

22

23

24

25

```
 1                  O P E N   S E S S I O N

 2

 3           JUDGE BHATTACHARYYA:  Let's move back to the

 4   public record.

 5   BY MR. CLAASSEN:

 6       Q.   Are --

 7       A.   That's not completely correct, no.

 8       Q.   Hold on.

 9            Are we okay to proceed, Your Honor?

10            JUDGE BHATTACHARYYA:  Yes, you can proceed.

11       Q.   Dr. Warren, you should have a series of three

12   binders available to you for cross-examination.  You can go

13   ahead and open those now.

14            Dr. Warren, I want to make sure that you have the

15   right set of binders in front of you.  Could you open up the

16   first binder?  We'll verify that it's the right binder.

17            So the first binder has a label on its spine

18   that's binder 1 of 3.  Do you see that?

19       A.   Yes.

20       Q.   And there's an index, a table of contents.  Do

21   you see that?

22       A.   I do, yes.

23       Q.   Okay.  Thank you.  All right.  So we'll now move

24   on to the questions.

25            I had asked you before I asked you to open the
```

1262

 1   binders that you testified earlier today that this was your

 2   first time testifying in court; is that right?

 3        A.   This is the first time I've testified at trial.

 4        Q.   At trial; is that correct?

 5        A.   Yes.  I've testified in earlier depositions.

 6        Q.   So you did not mean to suggest to Her Honor that

 7   you have not been retained as an expert in litigation

 8   before, right?

 9        A.   Oh, no, certainly not.  That was not my

10   suggestion.

11        Q.   And you have been retained on behalf of Phillips

12   in a case against Masimo; is that right?

13        A.   That's correct.

14        Q.   And that case was -- your involvement in that

15   case was from approximately August 2013 to November 2016; is

16   that right?

17        A.   That sounds correct.

18        Q.   Dr. Warren, you talked earlier about a sensor

19   head called a Kansas State 6D.  Do you remember that?

20        A.   Yes.

21        Q.   You dug that Kansas State 6D head out of storage

22   at the request of counsel in this case.  Would you agree

23   with that?

24        A.   I would agree that I removed it from storage.

25        Q.   You removed it out of storage at the request of

1  counsel, right?

2      A.   Yes.

3      Q.   Just to be clear, you are withdrawing any opinion

4  that the Kansas State 6D invalidates any asserted claims; is

5  that correct?

6      A.   I never had the opinion that Kansas State 6D

7  invalidates any asserted claims on its own.  It was always

8  an obviousness argument.

9      Q.   So just to be clear, then, you are withdrawing

10 any opinion that the Kansas State 6D in the combinations

11 invalidates any asserted claims; is that correct?

12     A.   Well, I don't know that I can say that I'm

13 withdrawing an opinion because I don't know the legal

14 ramifications of that, but I had planned to offer those

15 opinions today, but I reduced my set of slides in order to

16 save Her Honor some time.

17     Q.   And you did not compare any Kansas State 6D

18 references, documents to the claims asserted in this case;

19 is that correct?

20     A.   That's incorrect.

21     Q.   Today.

22     A.   Today I don't recall that I did.

23     Q.   When you say you don't recall that you did, you

24 did not compare any of the claims asserted in this case to

25 the Kansas State 6D documents or sensor head, right?

1       A.   I did not formally present those in a slide, but

2   I don't recall if I mentioned anything in passing that you

3   would consider to meet that requirement.

4       Q.   And you didn't offer an opinion on obviousness

5   with respect to the Kansas State 6D and, for example, the

6   Seiko 131 and Haar references; is that correct?

7       A.   The intention of my opinions today was to note

8   that those techniques are old and that it would be obvious

9   for a person of ordinary skill to implement them.

10       Q.   And I'd like to make clear for the record that

11   counsel is withdrawing the opinions from you, Dr. Warren, on

12   Kansas State regarding obviousness of claims 12 of the '501,

13   12, 24, and 30 of the '648, claim 22 of the '502, and claim

14   28 of the '502.  Is that correct?

15       A.   I don't know how to respond to that because that

16   sounds like a legal matter.

17       Q.   But you didn't present any analysis on a

18   claim-by-claim basis with respect to Kansas State

19   right?

20       A.   That's correct.

21       Q.   Let's talk a little bit about the Lumidigm

22   reference.  Do you have that in mind?

23       A.   I do.

24       Q.   Fig. 2 of Lumidigm depicts an example where the

25   sensor head is flat, right?

1       A.    To my memory, yes.

2       Q.    Do you remember what Fig. 2 looks like without

3   having it in front of you?

4       A.    I do.

5       Q.    Okay.  Let's pull up RDX-8.26.

6             This is one of the slides you presented this

7   morning, isn't it, Dr. Warren?

8       A.    Yes.

9       Q.    You shaded the LEDs in red; is that correct?

10      A.    That is correct.

11      Q.    And this is the sensor head that is flat, right?

12      A.    Yes, it is the sensor head and not depicted with

13  a curvature, simply drawn.

14      Q.    When you say "simply drawn," you mean that you

15  annotated on this figure; is that correct?

16      A.    No.  What I mean by simply drawn is that Fig. 2

17  was drawn with simple constructs, straight lines and boxes

18  and arcs.

19      Q.    But it is, in fact, straight, isn't it?

20      A.    In this depiction the top of the sensor head is

21  indeed straight.

22      Q.    When you say "the top of the sensor head," what

23  are you referring to, Dr. Warren?

24      A.    The part of the sensor head that meets the tissue

25  is what I'm referring to.

1266

1    Q.   Is there a reference designator associated with

2  what you're talking about, and do you know what I mean by

3  "reference designator"?

4    A.   I don't know what you mean by reference

5  designator, but the way the cross-section is drawn in the

6  figure, if I consider down to be the bottom of the figure

7  and up to be the top of the figure, then the top of the

8  sensor head would be where the sensor head meets tissue.

9    Q.   Is there a number 39 associated with that line?

10   A.   39 looks like the closest label to the line of

11 which I speak.

12   Q.   Dr. Madisetti, you offered an opinion that a

13 person of ordinary skill in the art would know that a

14 protrusion can help improve signal quality of light-based

15 signals received by optical biosensing devices; is that

16 correct?

17   A.   You called me Dr. Madisetti.

18   Q.   Oh, I apologize.

19   A.   No, that's all right.

20   Q.   Running on very little sleep, Dr. Warren.  I

21 apologize.  I really -- I do apologize.

22   A.   I get it.  No worries.  That's okay.

23   Q.   So, Dr. Warren, you offered the opinion that a

24 person of ordinary skill in 2008 would know that a

25 protrusion can help improve signal quality of light-based

1  signals received by optical biosensing devices, right?

2       A.   Yes.

3       Q.   And, Dr. Warren, you analyzed the Mendelson '799

4  patent, right?

5       A.   I did look at that patent, yes.

6       Q.   You included that in your demonstratives today;

7  is that correct?

8       A.   The Mendelson '799?  I don't recall how it was

9  labeled -- as a document or an exhibit.

10       Q.   Okay.  Let's take a look at your demonstrative

11  RDX-8.127.

12       A.   Oh, I see.  I thought you meant the state of the

13  art section.

14       Q.   This is the Mendelson '799 reference, right?

15       A.   Yes.

16       Q.   And you highlighted a little bit of the text here

17  in Mendelson '799, right?

18       A.   I did.

19       Q.   But Mendelson '799 actually states that

20  variations in contact pressure between the sensor and the

21  skin can cause larger errors in reflection pulse oximetry

22  (as compared to the transmission pulse oximetry) -- as

23  compared to transmission pulse oximetry -- since some of the

24  blood near the superficial layers of the skin may be

25  normally displaced away from the sensor housing towards

1268

1    deeper subcutaneous structures, right?

2         A.   I see those words, yes.

3         Q.   And you didn't highlight those words, did you.

4         A.   No, I did not.

5         Q.   But they are on this slide, aren't they?

6         A.   They are on the slide, but the context as

7    displayed in Fig. 4 is that you see the skin layer a little

8    bit of tissue --

9         Q.   Dr. Warren, you've answered my question.  They're

10   on the slide, right?

11        A.   Those words are on the slide, yes.

12        Q.   That's all I asked you.

13             MR. CLAASSEN:  I'd like to go on the Apple

14   confidential record for a moment.

15             (Whereupon, the hearing proceeded in confidential

16   session.)

17

18

19

20

21

22

23

24

25

```
 1              O P E N   S E S S I O N

 2

 3   BY MR. CLAASSEN:

 4       Q.   Dr. Warren, you would agree that the Seiko

 5   reference, in the Seiko reference, the cover glass closes

 6   the through hole, right?

 7       A.   I would have to look at the document to see what

 8   the language is, whether it says a through hole or an

 9   opening, but I believe it says through hole, and, yes, the

10   cover glass closes the through hole.

11       Q.   So the cover glass closes the through hole in

12   Seiko 131, right?

13       A.   Such that the through hole no longer is -- no --

14       Q.   Yes or no, Dr. Warren?  Yes or no?

15       A.   The cover glass closes --

16       Q.   Dr. Warren, I would like you to stop.

17            Let's turn to your deposition, page 113.  It's in

18   your binder.  That's exhibit, tab 1, Exhibit CX-300, and I'd

19   like you to turn to page 113.

20       A.   Which binder are we in?

21       Q.   Binder 1, tab 1, and I'd like you to turn to page

22   113.

23       A.   Okay.  I'm with you.

24       Q.   Take a look at line 4, lines 4-6.  You were asked

25   the following question:
```

1        MS. VREELAND:  Your Honor, if I may just

2   interject.  I'm going to object to this because I think

3   there are multiple Seiko references in this case, and I

4   don't think that there's impeachment until we've established

5   that it is the same Seiko that he testified about.

6        MR. CLAASSEN:  I'll ask you generally the same

7   way the question was asked here.

8        Q.   The cover glass 23 discloses through hole 22 in

9   Seiko, correct?

10        JUDGE BHATTACHARYYA:  There's been an objection

11   posed.  Can you respond to it, Mr. Claassen?

12        MR. CLAASSEN:  Yes, Your Honor.  I could lay a

13   foundation or we could just move on.

14        JUDGE BHATTACHARYYA:  It's up to you, either one.

15        MR. CLAASSEN:  Okay.

16        Q.   Let's go back to your slides, this morning,

17   Dr. Warren, and let's pull up the Seiko 131 reference.

18        A.   To be clear, these are different Seikos.

19        Q.   Is it your opinion, then, is it your opinion that

20   the cover glass in Seiko 131 does not close the through

21   hole?

22        A.   My opinion is that the cover glass in Seiko 131

23   does close the through hole in terms of the opening at the

24   protrusion, but it's not consistent with my deposition

25   question.

1274

1        Q.    I understand.  I want to make sure that I

2    understand your opinions regarding whether the glass in

3    Seiko 131 closes the through hole.

4        A.    Yes, such that it no longer extends through the

5    protrusion.

6        Q.    Thank you, Dr. Warren.

7              Dr. Warren, I'd like to talk about --

8              We'll need to go on the Masimo confidential

9    record for a little bit.

10             (Whereupon, the hearing proceeded in confidential

11   session.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  O P E N   S E S S I O N

 2

 3              JUDGE BHATTACHARYYA:  Moving back to the public

 4      record.

 5              MR. CLAASSEN:  Actually I have -- we can stay on

 6      the Masimo --

 7      Q.   Dr. Warren, you did no clinical accuracy study on

 8      the --

 9              JUDGE BHATTACHARYYA:  Wait.

10              MR. CLAASSEN:  I can stay public.  This is fine.

11              JUDGE BHATTACHARYYA:  Okay.

12      Q.   Dr. Warren, you did no clinical accuracy study on

13      the CPX-146, right?

14      A.   No, and I did not conduct an RMS calculation as

15      required, which would have been more significant --

16      Q.   You've answered my question, Dr. Warren.

17      A.   I just did.

18      Q.   Dr. Warren, you've answered my question.

19           You did no RMS calculation, correct?

20      A.   That's correct.

21      Q.   Dr. Warren, you testified earlier today that you

22      did not find any mention of the wrist as a measurement site

23      in the '501 patent, right?

24      A.   That's correct.

25      Q.   But you were being very, very specific about the
```

1278

1    word "wrist" in that testimony, correct?

2         A.   That is correct.

3         Q.   You do know, however, that the '501 patent

4    actually expressly states that, quote, in some embodiments

5    the measurement site 102 is located somewhere along a

6    nondominant arm or a nondominant hand, e.g., a right-handed

7    person's left arm or a left hand, right?

8         A.   Yes.

9         Q.   Dr. Warren, you offered opinions based on the

10   combination of Lumidigm and a patent you called Seiko '131

11   that we were just about just a few minutes ago, right?

12        A.   Yes.

13        Q.   And you prepared some demonstrative slides

14   regarding your analysis of Seiko '131, right?

15        A.   That's correct.

16        Q.   Let's pull up RDX-8.75.

17             Dr. Warren, this was your analysis that you

18   presented this morning regarding the chamfered edge, right?

19        A.   This is part of it, yes.

20        Q.   And you see you wrote the limitation at the top

21   of the screen, right?

22        A.   That's correct.

23        Q.   And in this limitation that's on your slide, the

24   protrusion further comprises one or more chamfered edges,

25   right?

 1      A.   That's what the wording says, yes.

 2      Q.   That's what the claim limitation requires, right?

 3      A.   That's correct.

 4      Q.   I'd like to draw your attention to the bottom

 5 left portion of your demonstrative.  Do you see that?

 6      A.   I do.

 7      Q.   You highlighted the protrusion in yellow, right?

 8      A.   That's correct, part of it.

 9      Q.   When you say "part of it," is that part of it or

10 is that all of it?

11      A.   The whole front of the device protrudes in the

12 tissue, but the light transmittance plate is the convex

13 surface that comprises part of the protrusion.

14      Q.   So you understand that 341A that you've

15 highlighted in yellow is the protrusion, right?

16      A.   The light transmittance plate is the convex

17 portion of the protrusion in Seiko '131.

18      Q.   And you also annotated blue lines on Fig. 28,

19 right?

20      A.   That's correct.

21      Q.   You labeled those blue lines as a chamfered edge,

22 right?

23      A.   Yes.

24      Q.   And those blue lines are not on the protrusion

25 that you highlighted in yellow, right?

 1      A.    That's correct.  I stated earlier they were for

 2  comfort.

 3      Q.    You've answered my question.

 4            Dr. Warren, you also testified about that Kansas

 5  State 6D head.  Do you remember that?

 6      A.    I do.

 7      Q.    And you testified that the 6D head was made of a

 8  pliable foam, right?

 9      A.    That's correct.

10      Q.    And the pliable material on the 6D head allows

11  the sensor to conform to the measurement site, right?

12      A.    Yes.

13      Q.    The Kansas State 6D sensor head was not designed

14  with a convex surface, right?

15      A.    That's correct.

16      Q.    And the details of the Kansas State 6D system are

17  corroborated by RX-508; is that correct?

18      A.    I don't recall the number of the exhibit.

19      Q.    Okay.  Let's take a look at your RDX-8.91.

20      A.    Can you lead me to a tab or a binder?

21      Q.    It's on the screen.  This is the demonstrative

22  that you presented on the screen earlier.  Do you remember

23  that?

24      A.    Yes.

25      Q.    And the title of this slide is the K-State System

1281

1   Corroboration, and it's RX-508, right?

2        A.   Yes.

3        Q.   So the details of the Kansas State 6D system are

4   set forth in RX-508, right?

5        A.   Some of the details, yes.

6        Q.   Dr. Warren, you presented no opinion this morning

7   regarding the secondary consideration of failure of others,

8   right?

9             MS. VREELAND:  Objection to the form of the

10  question.

11       A.   I provided secondary considerations, but I --

12            JUDGE BHATTACHARYYA:  Let's resolve the

13  objection.

14            What's the problem with the form of the question?

15            MS. VREELAND:  I'm sorry.  I thought that -- I

16  thought that he -- well, I'll withdraw the objection.  I'll

17  withdraw the objection.

18       Q.   You can answer my question, Dr. Warren.

19       A.   I provided opinions on secondary considerations.

20  I don't recall that I was focusing specifically on failure

21  of others.

22            MR. CLAASSEN:  No further questions.

23            JUDGE BHATTACHARYYA:  Any redirect?

24            MS. VREELAND:  No redirect, Your Honor.

25            JUDGE BHATTACHARYYA:  All right.  Thank you very

1    much for your time, Dr. Warren.

2             THE WITNESS:  Thank you.  I appreciate it.

3             MS. FRAZIER:  With Your Honor's permission,

4    Dr. Warren, you may leave.

5             Your Honor, Apple's next witness will be Vince

6    Thomas, and he will be presented by my colleague Derek

7    Gosma.

8             MR. GOSMA:  Good morning, Your Honor.

9             JUDGE BHATTACHARYYA:  Good morning.

10            MR. LAQUER:  Good morning, Your Honor.

11            JUDGE BHATTACHARYYA:  Good morning.  Good

12   morning, Mr. Thomas.  Do you understand that you are under

13   an obligation to tell the truth here today?

14            THE WITNESS:  I do.

15                      VINCENT THOMAS,

16            having been first duly sworn and/or affirmed

17   on his oath, was thereafter examined and testified as

18   follows:

19                    DIRECT EXAMINATION

20   BY MR. GOSMA:

21       Q.   Could you please introduce yourself?

22       A.   Sure.  My name, full name, is Vincent Alexander

23   Thomas.  I'm a senior managing director with FTI Consulting.

24       Q.   What's your educational background?

25       A.   I have a Bachelor of Arts in economics from

1   DePauw University and I have a Master's in business

2   administration from Indiana University.

3        Q.   Do you have any professional credentials?

4        A.   Yes.  I'm a certified public accountant,

5   certified valuation analyst, certified licensing

6   professional, accredited in business evaluations, and a

7   certified patent valuation analyst.

8        Q.   Have you performed an analysis of domestic

9   industry in other investigations?

10       A.   Yes, in approximately 20 investigations.

11            MR. GOSMA:  Your Honor, we move to admit

12   Mr. Thomas as an expert in the field of economics and

13   financial analysis.

14            JUDGE BHATTACHARYYA:  Any objection?

15            MR. LAQUER:  No objections.

16            JUDGE BHATTACHARYYA:  Mr. Thomas is admitted as

17   an expert in the field of economics and financial analysis.

18   BY MR. GOSMA:

19       Q.   Mr. Thomas, have you prepared any demonstratives

20   to assist with your testimony today?

21       A.   I have.

22       Q.   Let's call those up now.  And for the record

23   these are RDX-9.  Let's call up RDX-9.2.

24            Can you summarize your opinions on the issues of

25   domestic industry and bonding?

1284

1      A.   Sure.  First, my first opinion is that the

2   Complainants through Mr. McGavock have not satisfied the

3   economic prong of domestic industry, either under sub-prong

4   A or sub-prong B.  I also -- it's also my opinion that they

5   have not shown that a bond is necessary let alone 100

6   percent bond.

7      Q.   Thank you.

8           MR. GOSMA:  Your Honor, at this time we need to

9   move onto the Masimo confidential record.

10           (Whereupon, the hearing proceeded in confidential

11   session.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   O P E N   S E S S I O N

2

3            MR. LAQUER:  May I proceed, Your Honor?

4            JUDGE BHATTACHARYYA:  Yes, you may.

5   BY MR. LAQUER:

6       Q.   Mr. Thomas, you've criticized Mr. McGavock for

7   supposedly having not performed any independent verification

8   of Masimo's domestic industry claim, correct?

9       A.   Correct.

10       Q.   And in your direct testimony, when criticizing

11   activities at Masimo's facilities, you said that you've been

12   to other manufacturers' facilities, correct?

13       A.   Correct.

14       Q.   And in preparing your rebuttal report, you

15   reviewed Mr. McGavock's statement in his report that he

16   visited multiple Masimo facilities in Irvine, California,

17   correct?

18       A.   I can't say verbatim, but he said something to

19   that effect, yes.

20       Q.   But you did not request to visit Masimo's

21   facilities, correct?

22       A.   I did not.

23       Q.   You weren't even aware that Apple had requested

24   that its technical expert conduct a similar inspection of

25   technical materials as Apple's technical expert, correct?

1322

1    A.    I don't -- I don't recall if I was -- I don't

2  believe I was.

3    Q.    And you reviewed the photographs of

4  Mr. McGavock's tour of the Masimo facilities, correct?

5    A.    That's correct.

6    Q.    But you are unable to assess whether or not

7  Masimo's manufacturing demonstrated in those photographs is

8  significant, correct?

9    A.    No, that doesn't -- those photographs don't tell

10 me anything.

11    Q.    Let's look at what you said in your deposition at

12 page 130 beginning on line 14.

13        Question.  So are you able to assess whether or

14 not the manufacturing that is demonstrated in those

15 photographs is significant or not?

16        Answer.  Well, again, it's pictures that were

17 taken on a one-day trip in February of, I believe February

18 of 2020, and without any context provided for Mr. McGavock.

19 So I don't know that I'm able to assess and respond to the

20 opinions he set forth and the basis for those opinions given

21 the lack of information and context of the photographs, and

22 that's in one particular day.

23        That was your sworn testimony, correct?

24    A.    That's correct.

25    Q.    And the pictures you were referring to were

1323

1   Mr. McGavock's photos of the tour of Masimo's Irvine

2   facilities, correct?

3        A.   I believe so, yes.

4        Q.   So you were asked to opine whether Masimo had

5   satisfied the domestic industry requirement, but you didn't

6   bother going to Masimo's domestic facilities, correct?

7        A.   That's absolutely correct.

8             MR. LAQUER:  No further questions.

9             MR. GOSMA:  No redirect, Your Honor.

10            JUDGE BHATTACHARYYA:  Thank you.

11            Thank you, Mr. Thomas.  You can step down now.

12            THE WITNESS:  Okay.  Thank you.

13            JUDGE BHATTACHARYYA:  Are we on the public record

14   now?

15            MS. SWAROOP:  I believe we are, Your Honor.

16            JUDGE BHATTACHARYYA:  Okay.

17            MS. SWAROOP:  I think we can go on the public

18   record, if we weren't before.

19            JUDGE BHATTACHARYYA:  Let's go back to the

20   public.

21            MR. MUELLER:  Thank you, Your Honor.  Thank you,

22   again, for the accommodation this morning.  I appreciate it.

23            JUDGE BHATTACHARYYA:  Of course.

24            MR. MUELLER:  A couple housekeeping matters.

25   First, Apple has a list of deposition designations and

1  associated exhibits that were submitted to your chambers

2  before the lunch break that we would like to move in.  Our

3  understanding is all objections have been resolved.  Unless

4  Ms. Swaroop --

5           MS. SWAROOP:  I'm just checking with my team.

6           Mr. Mueller, you are correct, we do not have any

7  outstanding objections with the clarifications we discussed

8  this morning, so that's correct.

9           JUDGE BHATTACHARYYA:  Okay.  I have a list before

10  me, "Respondent Apple Inc.'s Submission of Deposition

11  Designations and Exhibits."

12           I understand, Ms. Swaroop, you have no objection

13  to this particular list that I have now; is that correct?

14           MS. SWAROOP:  That's correct, Your Honor.

15           JUDGE BHATTACHARYYA:  Then that list of exhibits,

16  the deposition designations and associated exhibits is

17  admitted.  Please send a copy to the court reporter.

18           (Whereupon, the exhibits as recited by counsel

19  and reflected in the attached index were submitted and

20  received in evidence.)

21           MR. MUELLER:  Second, Your Honor, Apple submitted

22  to your chambers this morning a list of exhibits from the

23  evidentiary hearing yesterday, June 9th, that the parties

24  have agreed is ready to be moved in as well, Your Honor.

25  And it was submitted at 9:31 a.m. this morning.

1       JUDGE BHATTACHARYYA:  I have a list entitled

2   "Table of Admitted Exhibits for the Evidentiary Hearing on

3   June 9th, 2022."

4       Are there any objections to that -- admission of

5   those exhibits, Ms. Swaroop?

6       MS. SWAROOP:  Your Honor, we do have the

7   outstanding CX-322bC issue, so we both agree that the

8   exhibits can come in, it's just a question of which version,

9   and I think that's been submitted to Your Honor.  So that's

10  the current status.

11      JUDGE BHATTACHARYYA:  Okay.  I reviewed that

12  exhibit and the various alternative redactions to it.  I

13  understand that the parties are fine with me deciding which

14  one I think is more appropriate and moving that in.

15      If that's the understanding, then the Masimo

16  version I believe is more appropriate, the Apple version

17  still has material in it that goes beyond test protocols and

18  test data, so Masimo's version will be the one admitted.

19      (Whereupon, the exhibits as recited by counsel

20  and reflected in the attached index were submitted and

21  received in evidence.)

22      JUDGE BHATTACHARYYA:  With that clarification,

23  the exhibits listed on the Table of Admitted Exhibits for

24  the Evidentiary Hearing on June 9th, 2022 is admitted.

25  Please send a copy to the court reporter.

1    MR. MUELLER:  Your Honor, we'll go over the

2  transcript from this morning, and if there's any additional

3  exhibit that have not been submitted as of the list for

4  yesterday, we'll submit those to Your Honor as well.

5    But, with that, Apple rests.

6    JUDGE BHATTACHARYYA:  Very well.

7    MS. SWAROOP:  Your Honor, Masimo is ready to

8  begin its rebuttal case, and we understand this will be the

9  third and final phase of the evidentiary hearing.

10   At this point in time we have four remaining

11  expert witnesses that we intend to present.  And I did want

12  the court to know as well that we do have Mr. Kiani listed

13  as a rebuttal witness as well.  He is our only remaining

14  fact witness.

15   And at this point in time, unless testimony

16  elicited by Apple during cross of our remaining experts

17  requires additional factual testimony from Mr. Kiani to

18  rebut, we do not currently plan to call Mr. Kiani as a

19  rebuttal witness.

20   JUDGE BHATTACHARYYA:  Thank you for the

21  clarification.

22   MS. SWAROOP:  And with that, Your Honor, we are

23  ready to begin with Dr. Madisetti.  And my colleague,

24  Mr. Claassen, will be conducting that examination.

25   MR. MUELLER:  And Ms. Frazier will do the cross.

```
 1              JUDGE BHATTACHARYYA:  Hello again, Dr. Madisetti.
 2              THE WITNESS:  Good afternoon, Your Honor.
 3              JUDGE BHATTACHARYYA:  Just to be on the safe side
 4    I will ask you to swear or affirm again.
 5                      VIJAY MADISETTI,
 6              having been first duly sworn and/or affirmed
 7    on his oath, was thereafter examined and testified further
 8    as follows:
 9                    DIRECT EXAMINATION
10    BY MR. CLAUSSEN:
11         Q.   Good afternoon, Dr. Madisetti.
12         A.   Good afternoon, sir.
13         Q.   Did you prepare demonstrative slides regarding
14    your validity analysis for this case?
15         A.   Yes.
16         Q.   Let's take a look at CDX-12C, please.  We can
17    turn to slide 2.
18              Dr. Madisetti, can you please explain the summary
19    of your opinions regarding validity?
20         A.   Yes.  I'm offering an opinion with respect to the
21    asserted claims of the '501, the '502, the '648, and the
22    '745.  It is my opinion that Apple has failed to show that
23    any asserted claim is anticipated or rendered obvious.  They
24    originally had nine grounds challenging '501, '502, and '648
25    patents and three grounds challenging '745 patent.  My
```

1   opinions apply to all these grounds.

2            The specification in my opinion adequately

3   supports the asserted claims under Section 112, and

4   objective evidence confirms nonobviousness of the asserted

5   claims under the asserted grounds.

6       Q.   Let's turn to the next slide, slide 3.

7            What materials did you analyze in forming your

8   opinions on validity?

9       A.   I reviewed the patents, the file histories.  I

10  also reviewed the product references.  I applied the

11  knowledge of a POSITA.  I looked at the expert reports.  I

12  responded to them.  I reviewed the deposition testimonies,

13  where relevant, the documentary evidence that I had at my

14  possession and the physicals and did some testing again.

15      Q.   You mentioned something called a POSITA.  What is

16  the level of skill in the art that you applied?

17      A.   Yes.  As I describe in the next slide, for these

18  '501, '502, and '648, and '745 patents in the relevant time

19  frame, that's 2008 and 2015, it was a person with working

20  knowledge of physiological monitoring technologies, having a

21  BS degree in the academic disciplines that I list here,

22  electrical, computer, or software; some amount of training;

23  and one to two years of related work experience in these

24  areas.  Alternatively, a person could have a higher degree,

25  such as an MS degree, with less than a year of work

1   experience.  I also -- my opinions also apply under Apple's

2   experts level of skill in the art.

3       Q.   Turning to slide 7, what is shown on this slide?

4       A.   Yes.  These are the nine grounds that Apple had

5   originally applied.  For the Multi-Detector Patents, which

6   are the '501, '502, and the '648, and now I think based on

7   today's presentation by Dr. Warren, only six of these

8   grounds remain, 1 through 6, which are based on Lumidigm.

9           As you can see, as I tried to show from this

10  particular chart, that out of the nine grounds almost all

11  the references that I've highlighted in yellow have been

12  presented to the USPTO.  And the only references that appear

13  to remain are Lumidigm and Apple 047 and a Bluetooth board.

14      Q.   Turning to slide 9, please explain your analysis

15  regarding Lumidigm.

16      A.   Yes.  With respect to Lumidigm, Lumidigm has

17  several problems, and I list them here, and then I will

18  explain a little more.

19          Lumidigm does not disclose or suggest at least

20  the following claim features and elements:

21          There is no protrusion comprising a convex

22  surface.  This directly applies to claim elements '501, 1C,

23  claim 12, '502, 19C, and 28E, '648, 8D and 20C.

24          It has no protrusion at all or over an interior

25  surface.  This applies to '501, 1C, '502, 28E.  It has no

1    photodiodes disclosed '501, 1B, '502, 19B, 28C, 6488C, and

2    20B.  It has no openings or through holes in protrusion or

3    windows in opening.  And this applies to claim elements 1D

4    of the '501, 19C and 19D of the '502, 28F and 28G of the

5    '502, and 8E, 20D, and 20E of the '648.

6           It has no disclosure of SpO2 calculations or

7    measurements.  This affects the '502, 19 preamble, 28

8    preamble, and the '648, claim 12.  It has no claimed

9    cavities, '502, 28H; no opaque lateral surface or opaque

10   material configured to avoid or reduce light piping, element

11   1E of the '501, element 28F of the '502, element 24 -- claim

12   24 of the '648.

13          It has no thermistor, no adjustment responsive to

14   temperature, claim 20 of the '502, claim 21 of the '502,

15   claimed 28D and 28I of the '502.

16          And the only passing references to hemoglobin or

17   oxygen levels as something called extended functionality.

18   And I refer here, for example, to Fig. 2 that the Apple

19   seems to include as a part of their analysis.

20   Q.   Turning to the next slide, please explain your

21   analysis regarding the extended functionality of Lumidigm.

22   A.   Yes.  As I said, Apple relies on a passing

23   mention of hemoglobin in Lumidigm.  Lumidigm is just a

24   biometric identifier device.  Looking at RX-411 in columns

25   3, 35-37, 4, 7-29, 10, 11-21, and 19, 16-28, none of these

1  very vague mentions of hemoglobin link it to Fig. 8

2  embodiment that's shown on the right.

3          There's no mention of oxygenation and/or

4  hemoglobin levels, other than a broad discussion of what I

5  call as aspirational extended functionality.  So, again,

6  there's no link to Fig. 8B.  There's no disclosure or

7  suggestion of Lumidigm being configured to noninvasively --

8  noninvasively measure oxygen or oxygen saturation.

9          So those are some of the comments I make with

10  respect to how Lumidigm does not disclose this

11  functionality.

12    Q.    Turning to the next slide, please explain your

13  analysis regarding the lack of a protrusion comprising a

14  convex surface in Lumidigm.

15    A.    Yes.  Lumidigm sensors have a flat sensor

16  surface, 39, as shown here on Fig. 2.

17          And Lumidigm says the sensor head 32 may have

18  some compound curvature of the optical surface, which is

19  Lumidigm at column 7, 58-63.

20          But if you look at that disclosure on the bottom

21  right, that is described that the sensor head may have --

22  also have a compound curvature on the optical surface to

23  match the profile of a device on which it's mounted.

24          So if it were a wristwatch and it were mounted on

25  the hand, it would have a concave curvature at best.  So

1332

1    this is what Dr. Rowe, who is an inventor, confirms that I

2    describe on bullet 3, that Rowe admits that a concave

3    compound curvature would better approximate users tissue,

4    his deposition testimony CX-279C at 68-69.

5         So even this passing mention, if applied to

6    Fig. 8B would run contrary to Apple's incorrect argument

7    that somehow compound curvature could be convex, which I

8    disagree with.

9         Second is that Apple's argument is, again, trying

10   to conflate this 39 with some sort of protrusion.  It is

11   unclear whether it is conflating this optical surface as

12   having some sort of protrusion.  There's no distinction

13   between a protrusion or an interior surface.  There's no

14   disclosure of any sort of cavities or any opaque wall that's

15   formed.

16        All that is disclosed is some sort of movement of

17   this surface 39 up or down.  That does not make a

18   protrusion.  That does not make an interior surface that's

19   distinct from a protrusion.  It does not satisfy all these

20   other features.  Therefore, Lumidigm fails to disclose or

21   suggest to a POSITA a protrusion comprising a convex surface

22   arranged over or above the interior surface or photodiodes.

23        And Dr. Warren admitted that this figure is a

24   flat sensor surface.

25        Q.   Dr. Madisetti, you heard Dr. Warren testify about

1   something called Kansas State 6D, right?

2        A.   Yes.

3        Q.   Turning to slide 15, can you please briefly

4   explain Kansas State 6D?

5        A.   Yes.  Kansas State 6D was mentioned in passing.

6   It is an undergraduate project from more than 20 years ago.

7   It's a very -- it's not a user-worn device.  It has many

8   problems.  It has a foam type of description that is shown

9   here in the middle.  And there's no evidence that it was

10   ever -- it ever resulted as a user-worn device.  So it looks

11   like a very simple, basic undergraduate class project.

12        Q.   Dr. Madisetti, is your understanding that Kansas

13   State 6D is from approximately 2004 or 2005?

14        A.   Yes, it's more than 17 years, that's my

15   understanding.

16        Q.   Turning to slide 23, please explain your analysis

17   of Apple's third reference, Cramer?

18        A.   Yes.

19        Q.   Excuse me.  Seiko 131.

20        A.   Yes.  Seiko 131 is a second reference suggested

21   by Apple.  And there's, again, no protrusion comprising a

22   convex surface with openings.  And this applies to elements

23   1D of the '501, 19C, 28F of the '502, 8E and 20D of '648.

24             It just talks about one photo transistor, 32, and

25   so there's no protrusion.  There is no opaque lateral

1  surface/material configured to avoid or reduce light piping.

2  This directly applies to 1E of the '501, 28F of the '502,

3  claim 24 of the '648.

4         The alleged protrusion, 341, is just transparent

5  glass.  And Exhibit 666, column 10 and lines 30-33 and

6  36-41, there are no windows in the openings or openings in

7  the protrusion.  There's no protrusion comprising one or

8  more chamfered edges.  This applies to claim 30 of the '648.

9  And the no windows applies to '502, 19D, 28G of the '502,

10  and 8F and 20D of the '648.

11        So I defer to the embodiment that's related with

12  respect to Fig. 28, that I cross out that and say that

13  that's not a protrusion comprising a convex surface with

14  openings.

15    Q.   Turning to slide 25, please explain your analysis

16  of Apple's third reference, Cramer.

17    A.   Cramer, again, does not disclose or suggest at

18  least the following claim features and elements:

19        So, first of all, there are three embodiments I

20  show on the right, Figs. 2, Fig. 3, and Fig. 5.  Fig. 5 is

21  just a pressure sensor.  It's not even an optical sensor.

22  So it's not relevant in my opinion to this matter.

23        Further, with respect to Figs. 2 and Fig. 3, the

24  side view of Fig. 3 and then the top view as shown in

25  Fig. 2.  As you can see, Your Honor, there are just two

1   rings.  These are called bosses.  This is not even a

2   protrusion, as claimed.

3         There's no covering over -- there's no protrusion

4   arranged over or above the interior surface or the

5   photodiodes.  The photodiodes are shown in red -- sorry --

6   the emitter is shown in red.  And in blue you have the

7   detecters.

8         And as you can see, the protrusion, alleged

9   protrusion, is not a protrusion, it's not over these

10  photodiodes, there is -- as claimed.

11        So, secondly, this protrusion, this alleged

12  protrusion, in other words, there's no protrusion comprising

13  a convex surface as well.  And Fig. 5 embodiment is just a

14  pressure transducer.  And it's not having any photodiodes.

15        The Figs. 2 and 3, the bosses 22 and 22A, are

16  just annular rings.  They are not the claimed protrusion

17  with its properties.  This directly applies to claim

18  elements 1C of the '501, 19C of the '502, 28D of the '502,

19  28C of the '648, and then also claim elements 1C of the

20  '501, claim 12 of the '501, 19C, 28D of the '502, 8D and 20C

21  of the '648.

22        There are no openings or windows in the openings

23  in the protrusion as claimed.  Again, elements 1D of the

24  '501, 19C, 19D, and 29F and 28G of the '502, and 8E, 8F, and

25  20D of the '648.

1336

1     And there's no protrusion comprising the opaque

2  surface materials or the chamfered edges.  And this affects

3  1E of the '501, 28F of the '502, claim 24 and 30 of the

4  '648.

5     Q.   Turning to slide 27, please explain your analysis

6  of Webster.

7     A.   Yes.  Webster was, again, cited in the grounds.

8  And first, again, they refer to the exhibit, for example,

9  RX-35.  What it is referring to, Your Honor, is that it is a

10  transcutaneous P02 sensor.  Transcutaneous is not

11  noninvasive.  It is invasive.

12     So there's no thermistor in a user-worn Sp02

13  sensor.  Webster describes a transcutaneous Po2 sensor or

14  electrode using a heating element.

15     There's no motivation in Webster to add

16  thermistor to adjust operation of Lumidigm's Fig. 8B

17  biometric system.  So this affects claim 20, 21 of the '502,

18  28D and 28I of the '502.

19     Further, there are no windows and

20  openings/through holes of the protrusion as claimed.  This

21  affects 19D, 28G of the '502, 8F and 20D of the '648.

22     And there's no motivation in Webster to add

23  windows to Lumidigm's biometric system.  There's no

24  explanation of how the specific features of the reference is

25  to be combined and no expectation of success.

1    I will discuss these a little more after I

2  discuss a couple more of these prior art references.

3    Q.   Turning to slide 29, please explain your analysis

4  of Apple 047.

5    A.   Apple 047 is the reference, I believe, that is in

6  part of Apple's combinations.  Again, this is RX-673 shown

7  on the right.  It refers to an iPad-type device, and you can

8  see compared to the size of the hand.  It's not user-worn

9  physiological measurement device with a touchscreen

10  configured to display oxygen saturation measurements,

11  affecting claim element 28K of the '502.

12    A person of ordinary skill would not look to the

13  iPad-like device of Apple 047 to improve upon Fig. 8B of the

14  biometric system.

15    And then there's no motivation to combine

16  Lumidigm's biometric system with a touchscreen of '047 to

17  display a measurement that Lumidigm does not take.  We heard

18  from Dr. Rowe that the SpO2 measurement yesterday was not --

19  was not present.

20    There's no motivation to combine -- or this is

21  not in the grounds anymore, so we can omit the last bullet.

22    Q.   Now that we have discussed the shortcomings of

23  the references in Apple's combinations regarding Lumidigm,

24  can we turn to the next slide.  Can you explain your

25  analysis -- excuse me, slide 14 -- slide 13 --

1338

1        A.    Yes.  So we have the grounds with --

2        Q.    Let's turn to slide 13, Dr. Madisetti.

3        A.    Yes, slide 13.  So here after I have -- we have

4    to go to 13?

5        Q.    Correct.

6        A.    So here after I explain the basic references and

7    what they are missing, I also explain why there's no

8    motivation or reasonable expectation of success for, for

9    example, the protrusion comprising a convex surface.

10            Adding a protrusion comprising a convex surface

11   would add excessive pressure to the measurement site and

12   displace blood away from the sensor, which was known to

13   cause measurement errors.

14            So Mendelson '799, which is Exhibit CX-1733, on

15   pages 2 to 47, which is a reference, a prior art reference,

16   explicitly describes that variations in contact pressure

17   between the sensor and the skin can cause large errors in

18   reflection pulse oximetry (as compared to transmission pulse

19   oximetry), so reflection pulse oximetry is what is done in

20   the wrist, since some of the blood near the superficial

21   layers of the skin may be normally displaced away from the

22   sensor housing towards deeper subcutaneous structures.

23            Consequently, the highly reflective bloodless

24   tissue compartment near the surface of the skin would cause

25   large errors and so on.

1          So this clearly discourages one of ordinary skill

2    in the art and provides no motivation or an expectation of

3    success that the combination would actually work or have a

4    reasonable expectation of success.

5          Further, Rowe confirms that concave, not convex,

6    in the context of Lumidigm, would better approximate tissue

7    shape and provide better coupling with respect to Lumidigm.

8          So, therefore, one of ordinary skill in the art

9    would not understand the motivation or expect success and,

10   thus, would understand that adding a protrusion comprising a

11   convex surface would undesirably also add to the form

12   factor, in addition to causing measurement errors.

13   Q.   Dr. Madisetti, you mentioned Mendelson '799.

14   That's CX-1733, right?

15   A.   Yes.

16   Q.   Turning to slide 30 --

17   A.   Sorry.  Slide 14.

18   Q.   Let's go to slide 14.

19   A.   Yes.  Further, continuing on, the motivation to

20   combine and no expectation of success, there's no suggestion

21   or motivation to combine Lumidigm's Fig. 8B biometric system

22   with the alleged protrusions of Seiko 131 or Cramer, for the

23   reasons that are explained in Lumidigm alone.

24         In addition, the features of Seiko 131 and Cramer

25   that Apple relies on as a protrusion would be less

1  comfortable and does not align with Lumidigm's goal of

2  incorporating ergonomic features.  I rely, again, on RX-411,

3  column 7, 57-63.

4          Further, there's no motivation to combine

5  Lumidigm with an opaque lateral surface or an opaque

6  material configured to avoid, prevent, or reduce light

7  piping.

8          Lumidigm, Seiko 131, and Cramer fail to recognize

9  light piping as a problem at all or motivate a solution to

10  address it.  Any discussion in Lumidigm is not a discussion

11  of the light piping problem because it includes the surface

12  of the skin in Lumidigm.

13          There's no explanation of how these specific

14  features of these references would be combined.  And, thus,

15  there's no expectation of success as to the combination of

16  Lumidigm and Seiko 131 or Cramer.

17  Q.   Now that we've discussed the shortcomings of

18  Apple's combinations, can you explain your analysis on slide

19  30, please?

20  A.   Yes.  So going to the Lumidigm by itself, ground

21  1, whether it's anticipation or obviousness under Lumidigm,

22  Lumidigm has several problems.

23          It is -- for example, it doesn't have a user-worn

24  device configured to noninvasively measure oxygen saturation

25  as confirmed by Lumidigm and Dr. Rowe.  And here is the

1341

1    applicable claim elements that I read earlier.

2            On the right I say this is not present in

3    Lumidigm, and there is no motivation to combine and no

4    expectation of success.  And, further, it looks like a

5    hindsight that has driven this sort of combination, where

6    pieces of limitations were added piece by piece using the

7    asserted claims as a roadmap.

8            Then with respect to the user-worn device

9    configured to noninvasively measure a physiological

10   parameter and determine measurements of a user's tissue,

11   again, with respect to the '501 and the '648, the preambles

12   1 and 20, these are not present.  And there's no motivation

13   to combine or an expectation of success, and they are driven

14   by hindsight.

15           Similarly, with respect to the emitters and sets

16   of LEDs, each of two or more LEDs, they are not present in

17   Lumidigm.  And there's no motivation or expectation of

18   success to modify it.  And this affects limitations that

19   I've described here, 19A, 20, 28A, 28B, 8A, and 8B of the

20   '502 and the '648.

21           And then these additional limitations of at least

22   three photodiodes arranged on an interior surface of the

23   user-worn device, those limitations, again, are not present

24   and there is no motivation or expectation of success, other

25   than hindsight.

1342

1        There is no protrusion comprising a convex
2    surface for the reasons that I've described.  This is not
3    there.  In fact, it teaches away from using a convex
4    surface.
5        And this is, again, a hindsight in my opinion.
6    And there's no expectation of success or a motivation to
7    combine with respect to the limitations that I described
8    earlier.
9        Finally, these openings or through holes through
10   the protrusion, and over or aligned with photodiodes is not
11   present.  There's no motivation to modify or combine or
12   expectation of success.  This is, again, hindsight.  It
13   affects the limitations 1D, 19C, 28F, 8E, and 20D of the
14   Asserted Patents.
15       And, finally, there's no disclosure or
16   obviousness of opaque lateral surface configured to avoid
17   light piping through the protrusion, opaque surface
18   configured to reduce light piping, or other such limitations
19   of 1E, 28F, and 24 of the '501, '502, and the '648.  Again,
20   because these are not present, and this is hindsight, and no
21   motivation to modify or expect success, given the teachings
22   of Lumidigm.
23   Q.   Turning to slide 31, Dr. Madisetti, please very
24   briefly explain your analysis on this slide.
25   A.   Yes.  With respect to, I think it continues there

1   with this additional limitations that are missing.  The

2   window or optically transparent material in protrusion

3   openings or through holes is not present.  There is no

4   motivation to modify.  Again, hindsight.

5          Again, it does not calculate SpO2.  Again, this

6   is not present.  That's why I say no.  And there's no

7   motivation to modify or expectation of success.  Again,

8   hindsight.  There's no one or more processors configured to

9   calculate a physiological measurement, network interface,

10  touchscreen memory are not mentioned.  Again, the same

11  reasons, MC/ES hindsight.

12         The thermistor, adjust operation responsive to

13  temperature signal is not present, again, no motivation or

14  hindsight -- based on hindsight, and a protrusion further

15  comprising one or more chamfered edges is not present.  And

16  there's no motivation to add it or expectation of success as

17  driven by hindsight.

18     Q.   Turning to the next slide, slide 32,

19  Dr. Madisetti please very briefly explain your analysis on

20  this slide.

21     A.   Yes.  As I described in my analysis for Lumidigm

22  and I described Seiko and Cramer, the limitations that are,

23  again, not present and not -- and there's no motivation to

24  modify or expectation of success and driven by hindsight

25  that it's not a user device, it's not a user-worn device

1344

1    that is configured to noninvasively measure oxygen

2    saturation, it's not a user device configured to

3    noninvasively measure a physiological parameter, there are

4    no emitter sets, each with two or more LEDs, at least three

5    photodiodes arranged is, again, not present, protrusion

6    comprising a convex surface is not present, openings or

7    through holes through the protrusion over or aligned with

8    the photodiodes are not present, and the protrusion, as I

9    said, there's no motivation or expectation of success to

10   combine it with Seiko 131, for the reasons that I mentioned,

11   and there's no opaque electrical surface that affects all

12   these.

13       Q.   Turning to the next slide, your analysis

14   continues.

15       A.   Yes.  With respect to continuing with ground 2,

16   the window or optically transparent material in protrusion

17   openings or through holes again is not present in any of the

18   three in the combination.  And there is no motivation or

19   expectation to modify.

20            It is driven, again, by hindsight.  And all these

21   other such limitations, such as one or more processors,

22   network interface, on which Apple depends on Lumidigm,

23   again, are not present.  And there's no thermistor, and

24   there's no motivation to modify.  It's, again, driven by

25   hindsight, no expectation of success.

1345

1      Finally, the chamfered edge is not present in any

2  of the references, nor there is a motivation to modify or

3  expectation of success, it is purely hindsight.

4      Q.   Turning to slide 34, please very briefly explain

5  your analysis of this slide.

6      A.   Yes.  This ground 3 adds Lumidigm with Webster.

7  And as I described earlier, Lumidigm has lots of problems

8  with respect to these limitations shown here.  And Webster

9  only is focused on the thermistor, and thermistor was in the

10  case of an invasive sensor, that was subcutaneous or

11  transcutaneous.

12      For that reason, for the reasons that I describe

13  here, none of the limitations of '502 patent, claim 22,

14  which depends on claim 19 are either -- are rendered obvious

15  by ground 3.

16      Q.   Turning to slide 35, please very briefly explain

17  your analysis here.

18      A.   Yes.  With respect to ground 4, the Lumidigm and

19  Seiko 131, Cramer, and Webster, again, fail because for the

20  '502 patent, claim 22, as I describe here, for each of the

21  limitations in claim 19, they are not present in any of the

22  references.  There's no motivation to combine, expectation

23  of success.  In fact, Lumidigm teaches away against

24  protrusions.

25      And, further, there's no optically transparent

1346

1    material disclosed within any of the openings.  And if you

2    continue on the next slide.

3        Q.   Slide 36, please.

4        A.   Yes; so, again, the limitations 19E, 20, 21 and

5    22 are not met, because they are not present and there is no

6    motivation to modify, expectation of success, it is all

7    hindsight-driven.

8        Q.   Turning to slide 37, please very briefly explain

9    your analysis on this slide.

10       A.   Yes.  Ground 5, the Apple 047, which is the

11   iPad-like interface, again, this, as I described, that is

12   all the features of the '502, claim 28 and are not present

13   for the reasons I described earlier.  There's no motivation

14   to combine with Apple, no expectation of success.  It is all

15   hindsight-driven.

16            And if you go to the next slide, where they try

17   to combine the Apple 047, it is for the network interface,

18   touchscreen and memory.  And as I describe here, there's no

19   motivation or expectation of success, it is

20   hindsight-driven.  And all the limitations I list are not

21   present in any of these references, nor rendered obvious.

22       Q.   Turning to slide 39, please very briefly explain

23   your analysis on this slide.

24       A.   Yes.  Slide 39, I rely on my previous analysis

25   for Lumidigm, Seiko 131, Cramer, Webster, and Apple 047,

1 again, for the reasons that I described earlier, claim 28

2 and its limitations are, again, not present, and there's no

3 motivation to modify or expectation of success.  And in my

4 opinion they are driven by hindsight for the reasons that I

5 mentioned in the earlier grounds.

6      Q.   Turning to slide 40, please very briefly explain

7 your analysis on this slide.

8      A.   Continuing on ground 6, as I show here, with the,

9 no, no, no, all these are not present in any of these

10 references, Lumidigm, Seiko 131, Cramer, or Webster.  And

11 there's no motivation to combine or expectation of success.

12 For these reasons, it's my opinion that ground 6 does not

13 render obvious the asserted claims.

14      Q.   I want to move on now to your analysis of written

15 description support for the Multi-Detector Patents.  Do you

16 understand that I'd like to move to that topic?

17      A.   Yes.

18      Q.   Let's turn to slide 44, please.  Please explain

19 your analysis regarding written description support.

20      A.   Yes.  There is full written description support

21 for multiple LEDs, three or more photodiodes, and opaque

22 lateral surfaces.

23           So, as I described, with respect to Fig. 7B in

24 Exhibit JX-1, there is full support based on Figures 1,

25 Figures 3 to 4, Figures 7A, 7B, columns -- for the

1  limitations based on columns 26, column 27, column 38,

2  column 43, column 44, column 7, and column 6.  Multiple LEDs

3  with at least three photodiodes is disclosed because the

4  sensor 301 includes all the features of the earlier sensors

5  100 and 200, column 18, lines 39 to 42.

6          So then the specification clearly discloses the

7  sensors can be 701, can be implemented with any of the

8  sensors 101, 201, and 301 described above, column 26, 25

9  through 29.

10          Fig. 7B and Fig. 49 confirm that sensor 701 has

11 multiple emitters in housing 704 and multiple detectors.

12 And Fig. 14I discloses emitters 1404 are depicted in the

13 emitter shell, numerous embodiments with multiple emitters

14 and detectors, Figs. 1, 7, and 13.

15          The specification also describes in column 7,

16 column 27, column 28 that any protrusion embodiment may

17 include hard or opaque plastic with openings as claimed.

18 The shielding enclosure or box made of copper, opaque

19 material that includes openings as claimed.

20          So in my opinion specification adequately claims

21 configurations with multiple LEDs, three or more

22 photodiodes, and openings with opaque lateral surfaces

23 within the same embodiment.

24    Q.    And, Dr. Madisetti, you said adequately claims;

25 is that correct?

1      A.   Adequately describes and discloses.

2      Q.   So what is your opinion regarding written

3   description on this issue?

4      A.   It is my opinion that the claims with multiple

5   LEDs, three or more photodiodes and opaque lateral surfaces

6   have full written description support.

7      Q.   Turning to slide 45, please explain your analysis

8   regarding written descriptions support for sets of LEDs in

9   at least four emitters.

10      A.   Yes, as I describe again with respect to the

11   embodiment of Fig. 7B, emitters 104 included in the sensors

12   from 101, 201, 301, and 701 and described throughout the

13   specification as described as including sets of LEDs with

14   different wavelengths.

15           I refer, again, to columns 12, lines 3-25, column

16   18, 39-42, and column 26, 25-29, which show that sets of

17   optical sources that are capable of emitting visible and

18   near infrared optical radiation, and then Fig. 13 talks

19   about multistream -- discloses multistream process 1300

20   applicable to any of the sensors described above and using

21   emitter sets.

22           So sensors are described as having -- as many

23   sets of LEDs, as a number of -- as the number of detectors

24   or even more sets of LEDs than the number of detectors,

25   Figs. 13, 33, column 33, 18-51.

1350

1      The specification, JX-1, column 12, 16-25,

2  provides additional disclosure of claimed sets and emitters

3  as I cite here.

4      Q.   Turning to the next slide, please explain your

5  analysis of written description and enablement for an opaque

6  material configured to substantially reduce light piping?

7      A.   In my opinion written description and enablement

8  are disclosed by the specification itself and supported by

9  the specification itself of the '501, '502, and the '648,

10  where it explicitly describes protrusion can advantageously

11  include hard opaque plastic, helpful in reducing light

12  noise, including by light piping, Exhibit JX-1, column 7,

13  65-8, column 8, line 7.

14      The JX-1 at column 25, 48-59, describes adding --

15  discloses adding height of the protrusion reduces light

16  piping.  And I refer to the portion of the specification

17  here that adding height provides for greater thinning of the

18  measurement site and added height assists in deflecting

19  light piped through the sensor.

20      So I, again, refer to column 7, column 25, column

21  37, column 43, and Figs. 3C and 7B in the lines that I cite.

22      Q.   Dr. Madisetti, turning back to slide 45, please

23  explain your opinion regarding written description support

24  for the claimed LEDs and emitters.

25      A.   Counsel, which slide are you referring to?

1       Q.   Slide 45, please.

2       A.   Okay.  So with respect to the sets of LEDs and at

3   least four emitters, I think I covered this.

4       Q.   Can you please briefly explain the basis for your

5   opinion?

6       A.   As I said here, the emitters 104 included in

7   sensors 101, 201, 301, and 701, I refer to the

8   specification, column 12, 3-25, column 18, 39-42, column 26,

9   25-29, Figs. 7, 11, and 13 that describe emitters comprising

10  sets of LEDs.

11          I refer to Figure 13, which refers to

12  multi-process 1300 -- multistream process 1300 applicable to

13  any of the sensors described above and using emitter sets,

14  Figs. 13, column 33, lines 18-51.

15          And also the specification in column 12, 16

16  through 25, provides additional further disclosure of the

17  claimed sets and emitters, where it discloses that emitter

18  104 can be arranged in an array, such as described in U.S.

19  Publication Number 2006/0211924, filed September 21, 2006,

20  titled Multiple Wavelength Sensor Emitters, the disclosure

21  of which is incorporated by reference in its entirety.

22  Other --

23      Q.   Dr. Madisetti, my question may not have been

24  clear enough.  What was your overall final opinion based

25  upon this analysis?

1352

1    A.   Oh, I see.  I'm sorry for that.  It's my opinion

2    that there is full written description support and

3    enablement support for all the claims and their limitations,

4    including those that I described.

5    Q.   And turning back to slide 47 where we were, what

6    was your opinion regarding enablement of the touchscreen

7    display and indicia of measurements?

8    A.   Yes, as I show in the embodiment of Fig. 2C,

9    there is a disclosure of a touchscreen display that's in the

10   context of the pulse oximeter measurement.  And I rely upon

11   specification columns 16, lines 39-42, that talks about --

12   that discloses the features of monitoring devices 200 shown

13   in Figures 2A through 2D that may be combined with features

14   of other monitoring devices 200 shown.

15       And the specification further explains the

16   monitoring device 200 can employ any of a variety of user

17   interface designs, such as touchscreens.

18       And the monitor 209 can include display 210B that

19   can indicate a measurement.  Other analytes and other forms

20   of display can also appear on the monitor 209B.  And I refer

21   to 209C shown in Fig. 2C, also includes straps 214C that

22   allow the monitor 209C to be attached to the patient's limb

23   or the like.  I refer to Figures 2A through 2D, columns 16,

24   17, 18, and 17.

25   Q.   Going back to slide 46, Dr. Madisetti, could you

1    please explain the second bullet point in this slide?

2       A.   The second bullet point describes the

3    specification, column 25, 48-49, that an added height of the

4    protrusion reduces light piping.  So specifically in an

5    embodiment, the added height provides for greater thinning

6    of the measurement site.

7            In an embodiment, the added height assists in

8    deflecting light piped through the sensor.  This is because

9    light piped around the sensor passes through the sidewalls

10   of the added height without being directed towards the

11   detectors.

12      Q.   Dr. Madisetti, have we now talked about your

13   analysis for the validity of the Multi-Detector Patents?

14      A.   Yes.

15      Q.   What was your overall conclusion on written

16   description and enablement?

17      A.   My overall conclusion is that, for the grounds --

18   for the grounds based on the Lumidigm, it is my opinion that

19   there's no anticipation or any obviousness of the asserted

20   claims for the reasons that I cite.

21      Q.   What was your overall conclusion on the lack of

22   written description opinion that was offered by Dr. Warren?

23      A.   I provide -- it's my opinion that full written

24   description and enablement support is present for all the

25   claim limitations.

1    Q.   And what was your overall opinion regarding

2    obviousness?

3    A.   With respect to obviousness, it's my opinion that

4    for the grounds raised by Apple, it is my opinion that they

5    do not render any of the asserted claims as obvious.

6    Q.   And what was your opinion regarding anticipation?

7    A.   With respect to the anticipation ground, it's my

8    opinion that the grounds on anticipation do not render any

9    of the asserted claims as anticipated.

10   Q.   Turning now to your analysis of the '745 patent,

11   let's look at slide 61, please.

12        Explain your analysis of the Apple Watch Series

13   0.

14   A.   Yes.  With respect to Series 0, which appears in

15   the '745 patent ground 1 --

16   Q.   Dr. Madisetti, excuse me.  I think we actually

17   need to move on to CBI Apple record, unless I'm mistaken

18   from Apple's counsel.

19        MS. FRAZIER:  No, let's please go on to that

20   record.

21        JUDGE BHATTACHARYYA:  We're moving on to the

22   Apple confidential record.

23        (Whereupon, the hearing proceeded in confidential

24   session.)

25

1369

```
 1                    O P E N   S E S S I O N

 2

 3              JUDGE BHATTACHARYYA:  Moving back to the public

 4   record.

 5   BY MR. CLAASSEN:

 6      Q.    Dr. Madisetti, I'd like to turn to your analysis

 7   of the objective indicia of nonobviousness.

 8      A.    Yes.

 9      Q.    Let's turn to slide 84, please.  Will you briefly

10   explain your analysis regarding the objective indicia of

11   nonobviousness of the Asserted Patents?

12      A.    Yes.  With respect to the '501, '502, '648, and

13   the '745, I cite these various categories that there was

14   industry skepticism of, for example, SpO2 or oxygen

15   saturation at the wrist, for the '501, '502, '648, and the

16   '745 patents, and there's also skepticism about the

17   protrusion comprising a convex surface.

18              Also, these were unexpected results of the

19   claimed protrusion.  There was a failure of others, such as

20   Apple.  There are non-infringing alternatives that Apple

21   could have used for the asserted claims in the patents.

22              There's evidence of copying, and the commercial

23   success of the Apple Watch Series 6 and 7, and the nexus to

24   the patents and the claims that are asserted in this matter.

25      Q.    Before we move to the next slide, I do need to
```

1370

1    move back on to the Apple CBI record.

2            (Whereupon, the hearing proceeded in confidential

3    session.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    O P E N   S E S S I O N

 2

 3          JUDGE BHATTACHARYYA:  Moving back to the public

 4   record.

 5   BY MR. CLAASSEN:

 6      Q.   Dr. Madisetti, can you explain your analysis

 7   regarding skepticism?

 8      A.   Yes.  There was skepticism in the art for the

 9   claimed protrusions.  A POSITA would understand and expect

10   that adding undue pressure to the measurement site would

11   displace blood away from the sensor believed to cause

12   measurement errors, Mendelson 799, Exhibit 1733.

13          The patent specification, for example, JX-1,

14   Figs. 5, 21 through 15, lines 15 to 43, also confirm that

15   this -- confirm this issue, that a POSITA would understand

16   that adding -- confirm the improvement due to the asserted

17   claims.

18          Further, a POSITA would understand that adding

19   the claimed protrusion would impose such pressure and cause

20   the type of error explained in Mendelson 799.

21          A POSITA would also have been skeptical of the

22   claimed protrusion comprising a convex surface because

23   increasing the contact pressure between the sensor and the

24   skin in a manner believed to cause errors.

25          The Multi-Detector Patents' inventors found
```

1   unexpectedly that a protrusion comprising a convex surface

2   can significantly improve -- significantly improved the

3   signal-to-noise ratio SNR of pulse oximetry sensors, as

4   shown, for example, in Fig. 5, Exhibit JX-1, columns 21, 15

5   through -- 15 through 43.

6          Eight years after the Multi-Detector Patents,

7   Apple recognized the benefits of a protrusion and other

8   claim limitations, and a protrusion comprising a convex

9   surface has also shown in its patent filing, CX-1569,

10  figures 1B, columns 3, column 9, 26 through 44.

11  Q.   Turning to the next slide, please explain your

12  analysis regarding non-infringing alternatives.

13  A.   Apple can use non-infringing alternatives.  I've

14  identified two such alternatives.  One is the Withings

15  ScanWatch, shown in Exhibit CX-1555 at 8.  As I've shown,

16  the protrusion is flat there.  And then the Amazfit GTR 2e.

17  Both these watches measure oxygen saturation without using a

18  protrusion comprising a convex surface as claimed.  Amazfit

19  GTR 2e is Exhibit CX-1554.

20         Apple's choice to use the claimed protrusion in

21  the accused products rather than non-infringing alternative

22  is indicative of the nonobviousness of the asserted claims.

23         MR. CLAUSSEN:  I believe we need to go back on

24  the Apple CBI confidential record again.

25         (Whereupon, the hearing proceeded in confidential

1376

1   session.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                O P E N   S E S S I O N

 2

 3            JUDGE BHATTACHARYYA:  Moving back to the public

 4    record.

 5    BY MR. CLAASSEN:

 6        Q.   Dr. Madisetti, please explain your analysis of

 7    the commercial success in this case.

 8        A.   Yes.  Based on my discussion with and review of

 9    the report of Daniel McGavock, it is my understanding that

10    the increased sales of the Series 6 and 7 --

11            MR. CLAASSEN:  Dr. Madisetti, I would like to

12    stop you for a moment.  I think we do need to move back to

13    the Apple CBI record.

14            (Whereupon, the hearing proceeded in confidential

15    session.)

16

17

18

19

20

21

22

23

24

25
```

```
 1                  O P E N   S E S S I O N

 2

 3          JUDGE BHATTACHARYYA:  Hello again, Mr. Goldberg.

 4     Could you speak up?  Are you perhaps on mute still?

 5          THE WITNESS:  How about now?

 6          JUDGE BHATTACHARYYA:  That's great.

 7          THE WITNESS:  Thank you.

 8          JUDGE BHATTACHARYYA:  To be on the safe side, I'm

 9     going to swear you in again.

10                    JACK GOLDBERG,

11          having been first duly sworn and/or affirmed

12     on their oath, was thereafter examined and testified as

13     follows:

14                    DIRECT EXAMINATION

15     BY MR. LATEEF:

16          Q.  Mr. Goldberg, you watched Dr. Sarrafzadeh's

17     testimony yesterday, correct?

18          A.  Yes, I did.

19          Q.  Have you analyzed Dr. Sarrafzadeh's arguments

20     regarding validity of claim 9 of the '127 patent?

21          A.  Yes.

22          Q.  Did you consider Dr. Sarrafzadeh's definition of

23     a POSA in your analysis of the validity of claim 9?

24          A.  I did, and I used that definition in my analysis.

25          Q.  Okay.  And did you form an opinion regarding the
```

1392

 1   validity of claim 9?

 2        A.   Yes, I did.

 3        Q.   What is that opinion?

 4        A.   My opinion is that claim 9 is valid.

 5        Q.   Okay.  And have you prepared some demonstratives

 6   to assist you in explaining the validity of the '127 patent?

 7        A.   Yes.

 8        Q.   Could we please put up slide 1?

 9             Is this the first slide of the demonstratives

10   that you prepared?

11        A.   Yes, it is.

12        Q.   Okay.  Can you explain why Mendelson 1991 is

13   missing limitations of claim 9?

14        A.   Yes.  Mendelson 1991, Respondent's Exhibit 370,

15   has no thermal mass, no disclosure of the structure of its

16   ceramic substrate, and, therefore, does not disclose

17   elements 7A and 7D.

18             Further, there's no temperature sensor and

19   there's no thermistor disclosed by Mendelson, so elements 7E

20   and 7F and 9 are missing from Mendelson.

21             Further, there's no evidence that the addition of

22   a thermistor on Mendelson's ceramic substrate would

23   stabilize a bulk temperature such that the thermistor's

24   measurement of the bulk temperature would be a meaningful

25   measurement allowing LED wavelengths to be more reliably

1   estimated.

2       Q.   Okay.  Could we pull up Respondent's

3   demonstrative 7.27C.

4           Do you recall Dr. Sarrafzadeh discussing this

5   demonstrative slide?

6       A.   I do, in relation to element 7H, yes.

7       Q.   Okay.  And then on this slide near the top right

8   he has written "undisputed."

9       A.   I see that.

10      Q.   Yes.  Is there something on this slide that you

11  dispute?

12      A.   Yes.  There's a couple of things I'd like to

13  point out on this slide.

14          First of all, the image figure 1012 from

15  Respondent's Exhibit 458 has been annotated.  The annotation

16  in the upper right including the blue arrow and the notation

17  SpO2 is in error.  This is a diagram of an ear oximeter, not

18  a pulse oximetry, so that is just not true.

19          The other thing that he annotated is the blue

20  arrow on the left portion of the slide where it says, any

21  pulse oximeter, and I don't see this figure as being

22  representative of any pulse oximeter.

23      Q.   Are there any materials that informed your

24  opinion about these two points that you brought up?

25      A.   Yes.  Fig. 1012 is a very, well, nearly

1394

1    identical, to a similar figure in Webster, in the Webster

2    reference.  And the Webster reference describes this as a

3    1970s-era ear oximeter.  It's addressed in historical

4    fashion, and it points out that it precedes modern pulse

5    oximetry technology, and the slide does not show the

6    features of a modern pulse oximeter.

7         Q.   Okay.  Can we turn to your slide 2?

8              This looks like part of Dr. Sarrafzadeh's

9    presentation yesterday.  Do you recall this?

10        A.   I do.

11        Q.   And have you annotated this slide?

12        A.   Yes.  I added the red box shown the center of the

13   image surrounding Cheung, et al. 1993, and I also added the

14   box at the bottom where the Cheung reference is described in

15   more detail as being United States Patent 5,259,381.

16        Q.   Okay.  And Exhibit RX-35, is that the Webster --

17        A.   Oh, yes.  Yes, Webster is Respondent's Exhibit

18   35, and the excerpt on the slide is at page 85, and the

19   reference information is from page 87.

20        Q.   Okay.  And Dr. Sarrafzadeh did not rely on the

21   Webster reference for a thermal mass; is that correct?

22        A.   No, he did not.

23        Q.   Okay.  Turning to slide 3, could you please

24   explain your analysis of what limitations of claim 9 are

25   missing from Cheung?

1      A.   Yes.  Cheung, Respondent's Exhibit 406, the

2  figure here is Fig. 11 from that patent, Cheung's patent,

3  this figure shows a substrate containing LEDs and a

4  temperature sensor.

5           The point that's being made on the right portion

6  of the slide is from the file history of the '127 patent,

7  JX-008, at pages 360 to 367.

8           The allowable subject matter section in that

9  particular Office Action explains that the claims at issue

10  are allowed or over -- over the Cheung reference -- so that

11  the thermal mass that's present in Cheung does not satisfy

12  the requirements of the claims that were at issue.

13      Q.   Okay.  So in your opinion does Cheung have a

14  thermal mass?

15      A.   Cheung does not have a thermal mass.

16      Q.   Okay.  And why is that?

17      A.   Because in Cheung the mere placement of a

18  temperature sensor and LEDs on a substrate, which is not

19  described -- Cheung does not describe any aspect of the

20  substrate.  The substrate has no reference number.  Thermal

21  properties of the substrate are not described in any manner.

22  The temperature sensor is not there in order to provide a

23  bulk temperature measurement in the sense that it would be

24  meaningful in order to correct the wavelengths.

25      Q.   And what does the temperature sensor of Cheung

1  measure?

2       A.   Cheung describes the temperature sensor as

3  measuring the temperature of the sensor as a whole.

4       Q.   Okay.  And in your opinion does Mendelson and

5  Webster in combination disclose a thermal mass?

6       A.   No.  The combination of Mendelson and Webster

7  does not disclose a thermal mass.

8       Q.   And in your opinion does Mendelson and Webster

9  measure a bulk temperature of a thermal mass?

10      A.   No.  My opinion is that that combination does not

11 disclose the bulk temperature measurement either.

12      Q.   Okay.  Turning to slide 4, could you please

13 explain why Yamada 605 is missing limitations of claim 9?

14      A.   Yamada 605 is Respondent's Exhibit 381.  The

15 figure shown in the slide here is Fig. 5.  Fig. 5 includes a

16 substrate.

17           There is no thermal mass in Yamada 605.

18 Therefore, elements 7A and 7D are not disclosed.  Further,

19 there's no temperature sensor that is used for estimating

20 the LED operating wavelengths in Yamada 605, and, therefore,

21 elements 7E, 7F, and 9 are not disclosed.

22      Q.   Why is there no thermal mass disclosed in Yamada

23 605?

24      A.   Yamada 605 does not describe a thermal mass,

25 which stabilizes and normalizes in a manner that allows the

1    bulk temperature as measured by the temperature sensor.

2    There is no temperature sensor here in the diagram such that

3    it can be used for reliably estimating LED operating

4    wavelengths.

5          Rather, Yamada uses the temperature sensor to

6    sound an alarm or make the system aware when the temperature

7    gets too high for safety reasons, and that's shown in the

8    Exhibit 381 at paragraph 111.

9    Q.   Okay.  Turning to slide 5, could you please

10   explain why Noguchi is missing limitations 7A, 7D, and 7F?

11   A.   Yes.  Noguchi, Respondent's Exhibit 353,

12   describes a system that, first of all, is not involved with

13   physiological measurements, and there is no description of a

14   bulk temperature on which LED operating wavelengths depend.

15         Rather, Noguchi has a temperature measurement

16   means for measuring the temperature of an LED or the

17   temperature of the environment in which the LED is disposed.

18         The purpose of making that temperature

19   measurement, again, is not to provide any information that

20   would allow the system to correct for temperature-dependent

21   operating wavelengths.

22   Q.   Okay.  Could you explain why there's no thermal

23   mass in Noguchi?

24   A.   Well, Noguchi doesn't describe a thermal mass

25   that has the thermal characteristics and doesn't have the

1   properties that are required by the claim language, as I

2   understand the claim language as a person of skill would

3   understand the claim language.  The thermal mass needs to be

4   thermally coupled to LEDs, needs to be thermally coupled to

5   a temperature sensor, and needs to provide a bulk

6   temperature on which the LED operating wavelengths depend.

7            Noguchi's temperature sensor is not for that

8   purpose and does not provide a bulk temperature.

9       Q.   Turning to slide 6, please explain why Scarlett

10  lacks claim limitations?

11      A.   Yes, Scarlett, Respondent's Exhibit 397, the

12  figure is Fig. 24.30, it's a textbook that discusses printed

13  circuit board broadly, multilayer printed circuit boards,

14  and Scarlett emphasizes, and I'll quote, the problem of heat

15  removal from tightly packaged components, and expresses

16  that, it's an important consideration in board design, and

17  that this type of board that Scarlett is discussing can be

18  manufactured to alleviate the problem.

19            However, there's no suggestion in Scarlett that

20  removing heat from a thermal mass is the same or provides a

21  bulk temperature measurement that's meaningful in order to

22  estimate LED wavelengths.  The --

23      Q.   Why was -- sorry.  Go ahead.

24      A.   I was going to say, the purpose of the

25  multi-wired board shown in Scarlett is different.  It's

1    about -- it's about heat dissipation.

2        Q.   Why did Dr. Sarrafzadeh reference Scarlett in his

3    analysis?

4        A.   Scarlett was referenced as background material in

5    order to show obviousness to add thermal components to a

6    substrate, but Scarlett's purpose in adding those thermal

7    components does not correspond to any of the requirements of

8    the claim.

9        Q.   Okay.  Could we turn to your slide 7?

10        At a high level, in your opinion would claim 9

11    have been obvious in view of any of the combinations

12    discussed by Dr. Sarrafzadeh?

13        A.   No, it would not.  There are no pre-127 -- before

14    the '127 patent, there are no suggestions that disposing

15    a -- a disclosure that disposing a thermal mass within a

16    substrate thermally coupling the LEDs in a thermistor to the

17    thermal mass and measuring a bulk temperature would improve

18    accuracy.

19        Simply having LEDs and a temperature sensor on a

20    ceramic board does not meet the limitations of claim 9.

21        Q.   And could you please explain your opinion that

22    there's no motivation to combine any of the references?

23        A.   The Webster reference in combination with the

24    Mendelson reference does not meet the claim language.  One

25    would not be motivated to combine Mendelson with Webster in

 1    order to solve the problem that the '127 patent solves.

 2              In terms of Noguchi and Yamada, again, Noguchi is

 3    not about physiological measurements, and there would be no

 4    motivation to combine because Noguchi is addressing a

 5    different issue entirely.

 6              And, also, references to Scarlett doesn't help

 7    either, because Scarlett is addressing a problem that is

 8    different than what is addressed by the claim.

 9         Q.   Okay.  Could we turn to your next slide?

10              Could you explain your analysis of objective

11    indicia of nonobviousness?

12         A.   Yes.  My domestic industry analysis shows that

13    claim 9 covers early and current rainbow« sensors.  Those

14    rainbow« sensors have enjoyed significant commercial

15    success, and that success obviously depended on them

16    functioning to do what they were meant to do, which was to

17    measure a variety of physiological parameters in a manner

18    that hadn't been done before.

19              I've looked at Daniel, listened to Daniel

20    McGavock's testimony from earlier, and read his deposition,

21    and I saw his sales data, and I talked with him about the

22    commercial success and the fact that the rainbow« sensors'

23    functionality and success relied on the utilization of the

24    invention, the '127 patent, claim 9.

25              Further, the rainbow« sensors have received

1    significant industry praise.  Let me go back one step.

2         The sales data is shown in Complainants' Exhibit

3    649C.  Complainants' Exhibit 1378 is an exhibit showing many

4    awards that Masimo has received.  At page 66, for example,

5    there's an award specifically related to the rainbow«

6    sensors.

7         So there are many other awards that reference --

8    that reference the rainbow« sensors as being a significant

9    contribution.

10        The claim thermal mass and temperature sensor, as

11   I said, claim 9, is essential to the accuracy that drove

12   this commercial success and continues to drive the

13   commercial success and industry praise of the rainbow«

14   sensors.

15        There's also references that teach away from

16   using a temperature sensor on the substrate, such as the

17   Huiki reference, Respondent's Exhibit 346, at 19, lines 17

18   through 29, and the Webster reference, 35 at page 36.

19   Q.   What was that teaching away and those references?

20   A.   In Huiki and Webster, alternative methods for

21   ascertaining a measure of temperature in order to help with

22   the correction for temperature-dependent wavelength are

23   taught, and those alternatives are not what is covered by

24   claim 9 of the patent, of the '127 patent, alternatives,

25   such as measuring the forward voltage across the diodes, the

1     light-emitting diodes or having an awareness of the current

2     in those diodes.

3         Q.   And were you here to watch Mr. Diab's testimony

4     earlier this week?

5         A.   I was.

6         Q.   And did you rely on any of his testimony

7     regarding the rainbow« sensor technology and the '127

8     patent?

9         A.   I referenced in my earlier presentation Mohamed's

10    testimony in relation to the inventive material of the '127

11    patent and of the work that was put in in order to develop

12    the '127 patent and of his surprise.

13         I don't know if that's the right word, but his

14    delight and surprise that one could balance the thermal

15    properties of the substrate in such a manner and have the

16    success to provide that bulk temperature to estimate the

17    wavelengths in a meaningful way.

18         Q.   So based on your analysis of the prior art and

19    objective indicia of nonobviousness, what is your opinion

20    regarding the validity of claim 9?

21         A.   Again, I feel that claim 9 is indeed valid.

22         MR. LATEEF:  Pass the witness, Your Honor.

23         MR. SELWYN:  May I proceed, Your Honor?

24         JUDGE BHATTACHARYYA:  Yes.

25

1                         CROSS-EXAMINATION

2    BY MR. SELWYN:

3        Q.   Mr. Goldberg, you would agree that all of the

4    individual limitations of the asserted claims of the '127

5    patent were known in the prior art, correct?

6        A.   I would not.

7        Q.   You would not.  Okay.  Let's talk about what was

8    known in the prior art then, sir.

9             Oximeters having a detector capable of detecting

10   light emitted by light-emitting sources after tissue

11   attenuation were known before the '127 patent, correct?

12       A.   Yes.

13       Q.   Multilayer circuit boards were known before the

14   '127 patent, correct?

15       A.   Multilayer circuit boards are not a limitation of

16   the '127 patent.

17       Q.   Sir, were multilayer circuit boards known before

18   the '127 patent, yes or no?

19       A.   Yes, sir.

20       Q.   Were multilayer circuit boards with multiple

21   layers of thermally conductive copper known before the '127

22   patent?

23       A.   Yes.

24       Q.   Were multilayer circuit boards with a thermal

25   core known before the '127 patent?

1    A.   Yes.

2    Q.   Were pulse oximeters with ceramic substrates

3  known before the '127 patent?

4    A.   Yes.

5    Q.   Would you agree that oximeters with red and

6  infrared LED and a photodetector mounted on the same circuit

7  board were known before the '127 patent?

8    A.   Yes.

9    Q.   Oximeters with temperature sensors were known

10  before the '127 patent, correct?

11    A.   Yes.

12    Q.   Thermistors have been known for decades, correct?

13    A.   Yes.

14    Q.   As a property of physics, the wavelengths of LEDs

15  change based on temperature, correct?

16    A.   Yes, that's true.

17    Q.   And you'd agree that in prior art pulse oximeters

18  the wavelengths emitted by LEDs change with temperature,

19  correct?

20    A.   Yes.

21    Q.   It was known for an oximeter to adjust its

22  temperature of oxygen level based on temperature before the

23  '127 patent, correct?

24    A.   I did not understand your question.  I can't

25  answer that.

```
 1        Q.   Let me ask it again.  Was it known for an
 2   oximeter to adjust its determination of oxygen level based
 3   on temperature before the '127 patent?
 4        A.   Yes.
 5        Q.   Now, you testified about secondary considerations
 6   a moment ago, correct?
 7        A.   Yes, I did.
 8        Q.   Now, you never saw the '127 patent before you
 9   were hired for this matter, correct?
10        A.   I remember being asked that question before, and
11   I'm not sure because I've seen so many Masimo patents over
12   the years I've been involved with the technology for
13   decades.
14        Q.   Sir, isn't it true that the first time you recall
15   having seen the '127 patent is after you were engaged for
16   this matter?
17        A.   I would say that I certainly do not recall the
18   details, knowing the details of the '127 patent, previous --
19   previous to being involved in this suit.
20        Q.   That's not my question.  Let me ask again.
21             Yes or no, sir, the first time you recall having
22   seen the '127 patent is after you were engaged for this
23   matter, correct?
24        A.   As I sit here, it's the first time I recall, yes.
25        Q.   You've never seen the '127 patent referenced in
```

1   any publication, correct?

2        A.   No.  No, I haven't.

3        Q.   You're not aware of any books or papers or

4   articles that mention the '127 patent, correct?

5        A.   That's correct.

6        Q.   You're not aware of any awards or praise for the

7   '127 patent, correct?

8        A.   That specifically addressed the '127 patent, I'm

9   not aware of any awards or praise that specifically mentions

10   the '127 patent.

11        Q.   And you're not aware of any awards or praise

12   received by the named inventors of the '127 patent, correct?

13        A.   I did not -- I don't know.

14        Q.   In fact, you've never seen any reference to the

15   '127 patent anywhere except for Masimo's own documents,

16   correct?

17        A.   I would say yes.

18        Q.   You've never discussed the '127 patent with any

19   of the named inventors, correct?

20        A.   I guess not, no.

21        Q.   That wasn't something you were interested in

22   doing, correct?

23        A.   I didn't confer with the named inventors.  I have

24   to think.  I know -- I don't know if I could name all the

25   inventors actually, but I certainly -- certainly have had

1   discussions with Mohamed Diab broadly.  He is aware of my

2   involvement here.

3        Q.   Sir, focus on my question.  You've never

4   discussed the '127 patent with any of the named inventors,

5   correct?

6        A.   I don't think so.

7        Q.   You're not aware of any licenses to the '127

8   patent, correct?

9        A.   I'm not aware of any licenses.

10        Q.   And you haven't identified a shred of evidence,

11   either in your testimony today or in any of your reports in

12   this case, of any copying of the '127 patent by Apple; isn't

13   that true?

14        A.   I'm not sure I can answer that.

15        Q.   Well, let's pull up your deposition.  Can we have

16   page 176, lines 7-9?

17             Question -- were you asked this question and gave

18   this answer:

19             Question.  You haven't suggested in your report

20   that Apple copied the '127 patent, correct?

21             Answer.  I make -- I make no statement like that.

22             Were you asked that question and did you give

23   that answer?

24        A.   Yes, I did.

25        Q.   One last question, sir.  Before the '127 patent,

 1   it was known to use a temperature sensor on the LED

 2   substrate to compensate for wavelength changes due to

 3   temperature, correct?

 4       A.   I would say so, yes.

 5            MR. SELWYN:  Thank you.  Nothing further.

 6            MR. LATEEF:  We have nothing further, Your Honor.

 7   Thank you.

 8            JUDGE BHATTACHARYYA:  Thank you, Mr. Goldberg.

 9   You may step down.

10            MR. RE:  Good afternoon, Your Honor.

11            JUDGE BHATTACHARYYA:  Good afternoon.

12            MR. RE:  Masimo and Cercacor call as their next

13   witness Mr. Robert Stoll.

14            JUDGE BHATTACHARYYA:  Let's make sure Apple's

15   counsel is here.

16            MS. FRAZIER:  Your Honor, Ms. Vreeland will do

17   the cross-examination for this.

18            JUDGE BHATTACHARYYA:  Good afternoon, Mr. Stoll.

19            THE WITNESS:  Good afternoon, Your Honor.

20            JUDGE BHATTACHARYYA:  Do you understand that

21   you're under an obligation to tell the truth here today?

22            THE WITNESS:  I do.

23                      ROBERT STOLL,

24            having been first duly sworn and/or affirmed

25   on his oath, was thereafter examined and testified as

1409

1    follows:

2              JUDGE BHATTACHARYYA:  Thank you.

3              THE WITNESS:  Thank you.

4                        DIRECT EXAMINATION

5    BY MR. RE:

6         Q.   Mr. Stoll, where do you work today?

7         A.   I work for Faegre Drinker Biddle & Reath in

8    Washington, D.C.

9         Q.   And can you briefly summarize your experience in

10   the area of Patent Office requirements and procedures?

11        A.   I spent 29 years at the Patent and Trademark

12   Office.  I started off as a junior examiner.  I was promoted

13   to a supervisory examiner.  I had several promotions in the

14   management and policy area.  And I finished my career at the

15   Patent and Trademark Office as the Commissioner for Patents

16   where I oversaw eight thousand patent examiners and all

17   policy and procedures related to patent prosecution.  And I

18   ended there in the end of 2011, at which time I began at

19   Faegre, and I've been there about ten years, where I

20   supervise patent prosecution, I testify, I've represented

21   people through the Office of Enrollment and Discipline, I do

22   policy issues, and I troubleshoot complex applications.

23             MR. RE:  Your Honor, because I know this is

24   undisputed, Masimo and Cercacor offer Mr. Stoll as an expert

25   on Patent Office practice and procedure.

1        MS. VREELAND:  No objection, Your Honor.

2        JUDGE BHATTACHARYYA:  At this time -- let me

3   formally -- at this time Mr. Stoll is admitted as an expert

4   on Patent Office practice and procedure.

5        MR. RE:  Thank you, Your Honor.

6        Q.   Mr. Stoll, are you familiar with Apple's

7   allegations that the '501, '502, '648, and '745 patents are

8   unenforceable due to prosecution laches?

9        A.   I am.

10       Q.   And did you analyze specifically those

11  allegations?

12       A.   I did.

13       Q.   And what did you do to analyze the sufficiency or

14  the correctness of those allegations?

15       A.   I looked at the entire prosecution history of the

16  parent, the parents of those applications.

17       Q.   And I understand you prepared a demonstrative

18  slide to help illustrate your testimony.

19            Can we call that up?

20            What does this slide generally show?

21       A.   It shows key dates in the parent applications of

22  the '501, the '502, and the '648.

23       Q.   And do you understand that Apple alleges that

24  there was a five-year gap from the filing of the '352

25  application in 2010 to the filing of the '290 application in

 1    2015?

 2         A.   I do, but I don't really understand what the gap

 3    is or what any gap is.  This shows quite clearly that

 4    prosecution was progressing in these three applications in a

 5    normal pace consistent with practice at the Patent and

 6    Trademark Office in continuing applications, and I don't see

 7    any delay.

 8         Q.   Okay.  I wonder if you can also explain using

 9    this chart that I understand there was an abandonment of the

10    first case.  Do you see that?

11         A.   I do.

12         Q.   Did that abandonment in any way cause any delay

13    whatsoever in the prosecution of these patent applications?

14         A.   It did not.

15         Q.   And how do you know that?

16         A.   Because I can see that the 829,352 was filed way

17    before the application of the 534,827 and was progressing in

18    a normal pace for a continuing application.

19         Q.   I also notice that there's a publication date of

20    February 4th, 2010.  How does that affect your opinions with

21    regard to prosecution laches?

22         A.   Well --

23              MS. VREELAND:  Your Honor, we would object to the

24    extent there would be any opinions on the ultimate issue.  I

25    think Your Honor allowed him for purposes of Patent Office

1412

1    practice and procedure.

2                JUDGE BHATTACHARYYA:  That's correct.

3         Mr. Re, I'm assuming you're not seeking to elicit

4    opinions on the ultimate issue of prosecution laches.

5                MR. RE:  No.  I'll withdraw and rephrase.

6    BY MR. RE:

7         Q.   What's the practical effect of publication of the

8    application back in 2010?

9         A.   Well, you can see that on February 4th, 2010,

10   application number 827 published, which means that the

11   specification is in the public domain, and anyone can look

12   at the specification and the prosecution of the applications

13   after that, and they can know that, in fact, the subject

14   matter contained in that specification could be claimed at a

15   later date in either that particular application or

16   continuing applications as specified by statute.

17        Q.   I understand you've prepared another slide with

18   regard to the '745 prosecution; is that right?

19        A.   I did.

20        Q.   Can we call that up?

21             What does this slide show?

22        A.   This slide shows the key dates in the prosecution

23   of the parent of the '745 application.

24        Q.   Can you explain your opinion that this shows that

25   the '745 patent application followed normal and acceptable

1413

1    continuation practice?

2        A.    Absolutely.  You can see that it's published in

3    January of 2017.  You can see that there are actions going

4    back and forth between the Examiner and the applicant.  You

5    can see that it was issued.

6            Well, there's a Notice of Allowance on July 29th,

7    2019, and then there was a Petition to Withdraw to Consider

8    References, and a fairly quick Notice of Allowance after

9    that and payment of the issue fee.

10       Q.    Based on your experience, are you familiar with

11   the ways in which a patentee might delay prosecution?

12       A.    Yes, I am.

13       Q.    And explain what those ways are.

14       A.    Well, you could refuse to take an allowance, you

15   could delay an allowance, you could abandon allowed

16   application, you could not progress the prosecution of an

17   application in a manner that conforms with normal practice,

18   and you can take more time than you should with respect to

19   responding to actions.

20       Q.    And based on your review, did you form an opinion

21   as to whether any of those types of activities took place

22   during the prosecution of the Masimo patents at issue here?

23       A.    I did, and there was no delay, and there was none

24   of those actions that occurred, and this -- the prosecution

25   followed normal prosecution as provided by the statutes.

1414

1        Q.   Now I notice in the first parent it seems like

2   there was some delay with regard to issuance of the first

3   Office Action.  Did you notice that?

4        A.   Yes.  I think there was one -- there was a delay

5   in another one as well, and it was not uncommon back in that

6   time period to have two and a half to three years before the

7   Patent and Trademark Office picked up an application.

8        Q.   So that's a delay caused by the Patent Office

9   waiting to pick up the application, right?

10       A.   Yes, it is.

11            MS. VREELAND:  Object to the leading.

12       Q.   Why does it take the Patent Office sometimes so

13   long --

14            JUDGE BHATTACHARYYA:  Mr. Re, can you respond to

15   the objection?

16            MR. RE:  I'll withdraw.  I'll rephrase.

17            JUDGE BHATTACHARYYA:  All right.  Then the answer

18   is stricken to that question.

19       Q.   Why does it take the Patent Office so long to

20   pick up an application to issue a First Office Action

21   allowance or First Office Action response?

22       A.   Back in this time frame, we were in excess of

23   525,000 patent applications filed per year, they're in a

24   queue, and they normally examine the first received, and it

25   takes a while for the Court to get to the applications that

1  are later filed.

2      Q.   So based on your review of the file histories of

3  the patents at issue in this investigation, of which you are

4  opining, what is your final conclusion with regard to the

5  prosecution of the Poeze and '745 patent families?

6      A.   There was a continuous unbroken chain of patent

7  prosecution.  There was no delay.  And these conform with

8  the practices of continuation as provided for by practice.

9  I saw no issues related to any delay in the prosecution of

10  these applications.

11          MR. RE:  I have no further questions.  I pass the

12  witness.

13          MS. VREELAND:  Your Honor, we would like to take

14  up the implications of this testimony in our post-hearing

15  briefing, but we have no questions at this time.

16          JUDGE BHATTACHARYYA:  Thank you.

17          MR. RE:  Thank you.

18          JUDGE BHATTACHARYYA:  Thank you, Mr. Stoll.

19          THE WITNESS:  Thank you.  Have a great day,

20  Your Honor.

21          MS. SWAROOP:  Your Honor, our next witness will

22  be Daniel McGavock, and Mr. Laquer will be conducting that

23  examination.

24          MR. LAQUER:  Good afternoon.

25          THE WITNESS:  Good afternoon.

1416

```
 1          JUDGE BHATTACHARYYA:  Welcome back, Mr. McGavock.
 2                    DANIEL MCGAVOCK,
 3          having been first duly sworn and/or affirmed
 4   on his oath, was thereafter examined and testified as
 5   follows:
 6                    DIRECT EXAMINATION
 7   BY MR. LAQUER:
 8      Q.   Welcome back, Mr. McGavock.
 9      A.   Thank you.
10      Q.   Have you formed any opinion on commercial success
11   in connection with your work in this investigation?
12      A.   Yes.  It's my opinion that the Apple Series 6 and
13   7 Watch products have achieved commercial success, and that
14   that commercial success -- and that there was a nexus
15   between that commercial success and the asserted watch
16   patents in this litigation relating to the blood sensor
17   feature of those products.
18          And I've also -- I've also concluded that the
19   rainbow« DI product, domestic industry product, has achieved
20   commercial success, and there's a nexus between that
21   commercial success and the '127 patent.
22      Q.   Have you prepared demonstratives to assist with
23   your testimony on that subject?
24      A.   Yes, I have.
25      Q.   Let's go ahead and pull those up.
```

1417

1        Have you reviewed public statements from Apple

2   around the time of its launch of the Series 6 Watch?  Next

3   demonstrative.

4        A.   Yes, I have.  We're looking at CX- --

5        Q.   There's a different version.  Why don't you go

6   ahead, Mr. McGavock.

7        A.   Yes.  One of the first things I looked at was

8   there was a launch video produced in this case in which

9   Apple introduced the Series 6 watch, and it featured the

10  Chief Operating Officer of Apple.

11       And in that video they prominently discussed the

12  importance of the blood-sensing feature in the Series 6, and

13  that video -- I encourage you to watch it because there was

14  also discussion about the timing of the launch and the

15  importance of that technology given the COVID pandemic.

16       Q.   Thank you.  And let's go to the next slide.

17  There we go.

18       Do you recognize what's shown on the

19  demonstrative here?

20       A.   Yes.  I was just talking about CX-1289.  And the

21  Chief Operating Officer talks about an amazing new

22  capability, and he is referring to the blood oxygen sensor

23  right from your wrist.

24       Q.   Let's go on to the next slide.

25       Have you reviewed Apple's press release from the

1    Apple Watch Series 6?

2         A.   Yes, this went along with the launch.  It was

3    CX-1287, and it states that the Series 6 completely

4    redefines what a watch can do, and it discusses the blood

5    oxygen sensor in app.

6         Q.   Moving on to the next slide, have you reviewed

7    any marketing material from Apple regarding its accused

8    Apple Watch devices?

9         A.   Yes.  We're looking at CX-0252, and this is the

10   website for the Series 6 watch, and the first thing you see

11   is the display of the watch featuring the blood oxygen

12   feature.

13        What I found interesting, if you go to the

14   website, it's animated, it turns around.  It shows you the

15   infrared LED sensors.  And I also thought that the website

16   did a very good job of describing to consumers the

17   importance of measuring blood oxygen, and then it goes on to

18   state how the sensor works.  So I thought that was very

19   relevant to my opinion.

20        Q.   Let's go on to the next slide.

21        Have you reviewed any third-party material

22   regarding the Series 6 watch?

23        A.   Yes, several things.  Here are a couple examples.

24   CX-1643 is a Business Tech publication in which it describes

25   the Series 6, and it says that the blood oxygen sensor

1    dominated the introduction and was the feature that Apple

2    spent the most time talking about.

3        And CX-1301 is an excerpt from The New York Times

4    in which they state that the Apple Watch can be summed up in

5    two words, "blood oxygen."

6        And it describes the most significant new feature

7    in the Apple Watch Series 6 and also states it was not

8    otherwise that different from the prior year's Apple Watch.

9    Q.   Have you reviewed any market share data regarding

10   the Apple Watch Series?

11   A.   Yes.

12   Q.   Could we go to the next slide?

13   A.   Yes.  So the market share data is captured in

14   CX-1285 and CX-1286.  So if you look at the top of this

15   chart, this is overall Apple market share.

16       So the Series 6 was launched in Q4, so Q4 results

17   are the first time you actually see the results of the Apple

18   Watch Series 6.  So if you just compare year over year, Q4

19   of 2019 was 34 percent, and you have a significant jump in

20   share in Q4 of 2020.

21       And then CX-1295 and CX-1644 refer to an industry

22   publication in which it's recognized that the Series 6, as

23   of August '21, was by far the world's most popular

24   smartwatch model and by far the world's best selling

25   smartwatch at that time.  So that's somewhat after the

1   launch in August of 2021.

2       Q.   Dr. Madisetti mentioned a conversation that he

3   had with you.  Can you describe what you discussed with

4   Dr. Madisetti?

5       A.   Yes.  I discussed with him the nature of the

6   patents and just confirmed my understanding that the

7   asserted patents -- the blood oxygen feature incorporated in

8   the Apple Watch Series 6 and 7 Watches are covered by the

9   patents, and they're also fundamental to the performance of

10  that feature.

11      Q.   And how does that --

12           MR. MUELLER:  Your Honor, to the extent these

13  numbers come from any confidential documents, I would just

14  ask that the last minute be on the confidential record and

15  that we go on the confidential record to the extent there's

16  going to be any discussion of confidential numbers.

17           I don't know if these numbers are from

18  confidential sources or not, but out of an abundance of

19  caution I just wanted to put that on the record.

20           MR. LAQUER:  These are not, and we identified to

21  yesterday to Apple's counsel, which exhibits are

22  confidential.  Those exhibits are marked with a C as

23  demonstrative slides.

24           If there is some concern, we can go on the

25  confidential record and work it out later, though, if that

1421

1   would address Mr. Mueller's concern.

2            MR. MUELLER:  That sounds good.

3            MR. LAQUER:  The next slide I plan to go on the

4   confidential record anyways, so if you want to do it now

5   that's fine.

6            MR. MUELLER:  That would be great.

7            JUDGE BHATTACHARYYA:  Moving onto the Apple

8   confidential record.

9            (Whereupon, the hearing proceeded in confidential

10  session.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1425

1                    O P E N   S E S S I O N

2

3            JUDGE BHATTACHARYYA:  Moving back to the public

4    record.

5            MR. LAQUER:  May I proceed?

6            JUDGE BHATTACHARYYA:  Yes, you may.

7    BY MR. LAQUER:

8       Q.   Mr. McGavock, what are your conclusions regarding

9    the commercial success of the Apple Watch Series 6 and 7?

10      A.   That both products have achieved commercial

11   success and there's a nexus between that commercial success

12   and the blood oxygen sensing feature covered by the asserted

13   patents in this litigation.

14           MR. LAQUER:  Your Honor, at this point I would

15   like to go onto Masimo's confidential record.

16           JUDGE BHATTACHARYYA:  Moving onto the Masimo

17   confidential record.

18           (Whereupon, the hearing proceeded in confidential

19   session.)

20

21

22

23

24

25

```
 1                  O P E N   S E S S I O N

 2

 3              JUDGE BHATTACHARYYA:  Moving back to the public

 4    record.

 5                      CROSS-EXAMINATION

 6    BY MR. MUELLER:

 7         Q.   May I proceed, Your Honor?

 8              JUDGE BHATTACHARYYA:  Yes, please.

 9         Q.   Thank you.

10              Good afternoon, Mr. McGavock.

11         A.   Good afternoon.

12         Q.   Now you've offered opinions today, sir, on the

13    subject of commercial success with regard to the five

14    patents in suit, correct?

15         A.   Yes.

16         Q.   And today you are offering those opinions --

17              JUDGE BHATTACHARYYA:  We lost your sound.

18              MR. MUELLER:  I heard you the entire time.  There

19    was some glitch in my system here.  I apologize.  Is that

20    better?

21              THE WITNESS:  Yes.  Thank you.

22    BY MR. MUELLER:

23         Q.   Okay.  So, sir, you're offering these opinions on

24    commercial success today as part of Masimo's rebuttal case

25    on invalidity, correct?
```

```
 1       A.   Yes, that's my understanding.

 2       Q.   Now let me just try to break this down, if I

 3  could.

 4            You just now spoke about the rainbow« sensors

 5  which are the alleged domestic industry product for the '127

 6  patent, correct?

 7       A.   Yes.

 8       Q.   And you also talked about the Masimo Watch, with

 9  respect to the -- I'm sorry -- the Apple Watch, with respect

10  to the other four patents-in-suit; is that right, sir?

11       A.   That's correct, as well as the '127 patent.

12       Q.   And for the Apple Watch -- I'm sorry.  Let's set

13  the '127 patent to the side, and I want you to have in mind

14  the '745 patent, the '501, the '502, and the '648, so the

15  four other than the '127.

16            Do you have those in mind, sir?

17       A.   Yes, I do.  Thank you.

18       Q.   For those four patents, the alleged domestic

19  industry product is only, only the Masimo Watch, not the

20  rainbow« sensors, correct?

21       A.   That is correct.

22       Q.   But you did not offer any opinion today of the

23  commercial success of the Masimo Watch, right?

24       A.   That is correct, for good reasons.  May I

25  explain?
```

```
 1        Q.   And the good reasons are there, in fact, has been
 2   no commercial success to date for the Masimo Watch, correct?
 3        A.   I wouldn't state it that way.  I think they have
 4   made significant --
 5        Q.   Time is short.  If you want to take it up with
 6   your counsel, you can.  But if you could just answer me yes,
 7   no, or you can't answer the question, yes or no.  Okay, sir?
 8        A.   I was trying to answer.  I don't think it was a
 9   yes or no question.
10        Q.   Let me pose it as a yes or no question.
11             As of today, as of today, the Masimo Watch has
12   not achieved appreciable commercial success, yes, no, or you
13   can't answer the question?
14        A.   I disagree and I can explain why.
15        Q.   And, in fact, sir, you know that the Chief
16   Financial Officer of Masimo testified on Tuesday that he
17   wasn't sure whether the Masimo Watch had achieved $1,000 in
18   revenues as of today, and that was on the public record.
19   You understand that, sir, right?
20        A.   Yes.
21        Q.   Now you, in any event, have not offered any
22   opinion on commercial success of the Masimo Watch, correct?
23             MR. LAQUER:  I think you're going into Masimo
24   confidential business information.
25        Q.   No, I'm just saying you have offered no opinion
```

1   --

2           MR. LAQUER:  What you just spoke about regarding

3   sales quantities and dollar amounts --

4           MR. MUELLER:  No, that was in the public report.

5   I can confirm it was in the public record.

6       Q.   Sir, can you please answer my question?

7       A.   Well, I addressed -- I explain in my report that

8   I did not quantify metrics on the commercial success for the

9   Masimo Watch because it's not yet been fully launched.

10      Q.   Sir, yes or no, you have offered no opinion today

11  of commercial success with regard to the Masimo Watch,

12  correct?

13      A.   Correct.

14      Q.   Okay.  Now you instead offered an opinion of

15  commercial success with regard to the Apple Watch for these

16  four patents, right?

17      A.   Series 6 and Series 7, correct.

18      Q.   And that's, of course, based on the premise that

19  the Apple Watch Series 6 and Series 7, according to Masimo,

20  infringe those four patents, right?

21      A.   Yes, that's my assumption.

22      Q.   And, in fact, not only infringe, Dr. Madisetti

23  has offered the opinion that Apple copied those patents.

24  Did you see that, sir, that there's copying evidence?

25      A.   I didn't focus on that, but I'll accept that.

1432

1    Q.   Did you hear Dr. Madisetti's testimony today,

2    today, on copying?

3    A.   Yes.

4    Q.   And he suggested there was a nexus to this case,

5    that's why he was offering the testimony today, he said

6    there's copying evidence in the case, right?

7    A.   Yes.

8    Q.   Now you understand that Dr. Goldberg, in

9    contrast, conceded he had no copying evidence whatsoever

10   with respect to the '127 patent.  Did you hear him say that

11   not long ago?

12   A.   Yes.

13   Q.   And you also understand that six separate

14   individual Apple engineers took the stand and testified, and

15   every one of them said the ideas of the oxygen sensor in the

16   Apple Watch reflect their own ideas, not Masimo's ideas.

17   Did you hear that testimony?

18        MR. LAQUER:  Your Honor, I'll object, beyond the

19   scope of direct.  Mr. McGavock's testimony was specific to

20   the secondary consideration of commercial success.

21        MR. MUELLER:  Your Honor, the reason why I'm

22   getting into this is because he has to have a nexus between

23   the commercial success and the actual products.  The

24   asserted nexus here is infringement and copying.  That's the

25   claimed nexus between the products and the patents.  I'm

1    just testing that nexus.

2            MR. LAQUER:  Mr. McGavock did not mention copying

3    in his direct testimony.  Mr. Mueller's cross-examination is

4    beyond the scope.

5            JUDGE BHATTACHARYYA:  The objection is sustained.

6    BY MR. MUELLER:

7    Q.   Now today you showed a few articles or snippets

8    of articles, and I want to pull some of those up, if we

9    could.  CDX-19.005.

10           You say, commercial success, third-party articles

11   regarding Apple Watch Series 6 highlighted blood oxygen

12   sensor.

13           This is one of the slides that you showed today,

14   correct, sir?

15   A.   Yes.

16   Q.   And you said that Apple had emphasized the

17   importance of the blood oxygen sensor in marketing for the

18   Apple Watch, correct?

19   A.   Yes.

20   Q.   Particularly important during the pandemic,

21   correct?

22   A.   Yes.

23   Q.   And your own opinion is that the sensor was

24   important to Apple's commercial success; is that fair?

25   A.   I'm agreeing with Apple's views that this was a

1434

1    very important feature to the product.  I'm adopting how

2    they portrayed to the marketplace, to stockholders, to

3    customers, in the launch video, that's --

4        Q.   You think the blood oxygen sensor was an

5    important driver of the commercial success of the Apple

6    watch, correct?

7        A.   Yes.

8        Q.   And you think it's particularly important to the

9    public during a time of --

10       MR. LAQUER:  Your Honor, I'm going to object.

11   Mr. Mueller has repeatedly violated the Commission's order

12   not delegating the public interest to be taking evidence on

13   here.

14       Apple requested that in response to Masimo filing

15   the complaint.  The Commission chose not to delegate the

16   public interest.  And a very large amount of Mr. Mueller's

17   speaking during the past week has been seeking to build an

18   evidentiary record on the public interest after Apple was

19   specifically denied that request.

20       MR. MUELLER:  Your Honor, if I might.  The

21   witness has offered an opinion on commercial success today.

22   He has described the buying behavior of the public with

23   respect to this watch.  I think I'm entitled to ask a few

24   questions about the public behavior with respect to buying

25   the watch.

1      This is what he offered an opinion about within

2 the last half hour.

3      MR. LAQUER:  This question was not directed

4 toward public behavior on buying the watch.  This is another

5 attempt to build the public interest record for the purpose

6 of review by the Commission on that issue.  There will be a

7 time for that, but it is not now.

8      JUDGE BHATTACHARYYA:  Okay.  At this time the

9 objection is overruled.  I'm not even sure what the question

10 was going to be.  It was cut off in the middle.

11      You may renew your objection if the full question

12 comes out and it appears to be directed to public interest

13 and not directed to commercial success.

14      MR. LAQUER:  Thank you, Your Honor.

15 BY MR. MUELLER:

16      Q.   Mr. McGavock, you mentioned the pandemic during

17 your direct examination, did you not, sir?

18      A.   Yes, in reference to that video.

19      Q.   And you mentioned that the oxygen sensor was

20 particularly important to the commercial success of the

21 Apple Watch during the pandemic, correct, sir?

22      A.   Well, I wasn't intending to emphasize that point.

23 I was just referring to the content of the video while

24 waiting for the slide to show up.

25      Q.   Sir, I think you just told me two minutes ago

1    that you're adopting the views expressed by Apple that you

2    referred to.

3              Are you, yes or no, taking the view that the fact

4    that the blood oxygen sensor was introduced during the

5    pandemic was a factor in the commercial success of the Apple

6    Watch, yes or no?

7        A.   I believe it was a factor, the notion of

8    measuring blood oxygen, there was a higher awareness, I

9    believe, during that time frame.

10       Q.   In any event, you believe the oxygen sensor in

11   the Series 6 and Series 7 have been an important factor in

12   the commercial success of those two models of Apple Watch,

13   correct?

14       A.   Yes.

15       Q.   And you showed Her Honor these news clips right

16   here.  To help validate that opinion, these are articles

17   that discuss the blood oxygen sensor as one of the features

18   in the watch, correct?

19       A.   That's correct.

20       Q.   Now three days ago, on Tuesday, you showed some

21   different news clips.  I want to go to those.  CDX-15C.019.

22             This is a slide that you used in your direct

23   examination on Tuesday, correct, sir?

24       A.   Correct.

25       Q.   And you used The Washington Post article,

1   which -- the snippet of which talks about some criticism of

2   the blood oxygen sensor in the Apple Watch, right?

3        A.   Yes.

4        Q.   You also showed this engineering.com snippet that

5   also includes some criticism, correct?

6        A.   Yes.

7        Q.   And then you showed a Respiratory Care snippet at

8   the bottom here, again, the snippet refers to some

9   criticism, right, sir?

10       A.   Yes.

11       Q.   And I asked you some questions about this slide

12  on Tuesday.  I'm not going to go through all those again.

13  But the purpose of this was to suggest, as you suggested,

14  during your direct examination, that Apple had actually

15  caused injury to the blood oxygen sensor industry by

16  marketing a flawed blood oxygen sensor, correct?

17       A.   Yes.  I was in the context of discussing the bond

18  determination, that this is a risk factor for Masimo and its

19  DI product because Masimo has -- believes it has much more

20  accurate technology, medical-grade technology, and so these

21  shortcomings create a risk that I thought -- I suggested

22  might be taken into account in considering the bond.

23       Q.   Right.  So let's see if we can put this slide

24  right here, CDX-15C.019, side by side with the slide that I

25  just used, CDX-19.005, see if we can put these side by side.

1          So let me just make sure I have this straight.

2    Masimo's position in this case is that Apple is infringing

3    the five patents-in-suit, correct, sir?

4          A.   Yes.

5          Q.   That by using those patents, it has created a

6    sensor that is fundamentally flawed, and you believe that

7    there's a true problem caused by the flaws in that sensor,

8    correct?

9          A.   I'm not providing technical opinions and I'm not

10   sure --

11         Q.   Sir, stay with my question.  The slide on the

12   left --

13         A.   You're misstating the slide.

14         Q.   Time is short, and your counsel can ask you

15   questions.

16         But your opinion is that by creating a blood

17   oxygen sensor that purportedly infringes the five patents in

18   the suit, Apple has actually created a flawed sensor as

19   reflected in your slide, yes, no or you can't answer the

20   question?

21         A.   I can't answer the question.  I'm not providing

22   technical opinions, but the spotty performance --

23         Q.   Sir, please, yes, no, or you can't answer the

24   question.

25         A.   I can't answer the question without further

1439

1    explanation.

2         Q.   And then today, today, that same flawed sensor

3    you talked about on Tuesday, according to you flawed, is a

4    critical driver of commercial success that has driven sales

5    of the Apple Watch, right, sir?  Yes, no, or you can't

6    answer the question.

7         A.   That is correct.  So Apple has --

8         Q.   Sir, please, yes, no, or you can't answer the

9    question.

10        A.   Yes.

11             MR. MUELLER:  I have no further questions,

12   Your Honor.

13             MR. LAQUER:  Brief redirect, Your Honor.

14             JUDGE BHATTACHARYYA:  Yes.

15                     REDIRECT EXAMINATION

16   BY MR. LAQUER:

17        Q.   Mr. McGavock, why didn't you address the --

18             MR. MUELLER:  Your Honor, before he answers, I

19   want to object to any new opinions now.  It's way too late

20   for a new opinion of commercial success on the Masimo Watch.

21             It's Friday, close to 5:00 of the hearing, and

22   there's no way we should hear a new opinion on the Masimo

23   Watch with ten minutes left in the hearing.

24             MR. LAQUER:  This is directly responsive to a

25   question that counsel asked during cross-examination and

1    then cut the witness off during his answer.

2            MR. MUELLER:  No, Your Honor.  I asked him to

3    confirm he had not offered any opinion on the Masimo Watch,

4    and he confirmed it.  It's way too late to be receiving a

5    new opinion on the Masimo Watch.  That's not opening the

6    door to anything.  That's confirming that he had not offered

7    that opinion.

8            MR. LAQUER:  We disagree.  He could have made

9    that confirmation.  The record speaks for itself.  Just

10   based on the record and the briefing, he asked the question,

11   the door is open.  Mr. McGavock has the right to give a full

12   response on Masimo's clock.

13           MR. MUELLER:  Again, Your Honor, I object to any

14   new opinions coming in with ten minutes left in the hearing

15   ones that should have been disclosed months ago, if not all.

16           JUDGE BHATTACHARYYA:  Let's proceed.  I'm not

17   sure he's going to be offering any new opinions.  We can

18   take it up if he is offering new opinions.

19   BY MR. LAQUER:

20       Q.   Mr. McGavock, why did you not address the

21   commercial success of the Masimo Watch in your commercial

22   success analysis?

23       A.   Because it was, as described in my report, it's

24   pre-commercial launch, and my reports describe the fact that

25   so far it's achieved positive results with respect to the

1 pilot phase, and now they are in the limited marketing

2 phase.

3      Q.   Mr. Mueller also brought up articles that you

4 mention in connection with your bond analysis and compared

5 them to articles that you addressed in your commercial

6 success analysis.  And you were, it seemed, attempting to

7 give some more fulsome explanation to your answers there.

8           Can you explain the difference of your opinion in

9 the articles regarding the bond analysis articles as

10 compared to the commercial success analysis ones?

11      A.   Yes.  The commercial success articles were

12 focusing on the market and commercial performance of the

13 product and the way that Apple marketed the blood oxygen

14 feature.  And so Apple has clearly achieved commercial

15 success.

16           The other articles were discussing the actual

17 performance of those, more from a more technical standpoint.

18 And so it's an interesting combination where the

19 introduction -- Apple's achieved significant commercial

20 success using this technology, but at the same time is

21 creating risk for Masimo by not having what it believes to

22 be the appropriate level of medical-grade reliability and

23 quality.

24           MR. LAQUER:  I have no further questions.

25           MR. MUELLER:  I have no further questions for

1  this witness, Your Honor.

2            JUDGE BHATTACHARYYA:  Thank you, Mr. McGavock.

3            THE WITNESS:  Thank you.

4            JUDGE BHATTACHARYYA:  You can step down.

5            MS. SWAROOP:  Your Honor, I wasn't sure we could

6  do it, but we have completed all of our witnesses for both

7  sides here over the past five days, and this does complete

8  the presentation of Masimo's rebuttal case.

9            We do have a couple of housekeeping matters I

10 think we wanted to attend to.

11           JUDGE BHATTACHARYYA:  Yes.

12           MS. SWAROOP:  Would you like to do that now?

13           JUDGE BHATTACHARYYA:  Yes, I would.  Actually can

14 we take a break so I can make sure I have these documents in

15 my inbox and I can find them?

16           MS. SWAROOP:  Yes, Your Honor.

17           MR. MUELLER:  Certainly, Your Honor.

18           JUDGE BHATTACHARYYA:  Also, an item that I want

19 to take up is either the page limit or word limit for the

20 post-hearing briefs.

21           MS. SWAROOP:  That was on my list, Your Honor,

22 and I do believe we have agreement on that as well.

23           JUDGE BHATTACHARYYA:  Okay, great.  Then let's

24 take a three-minute break or so.

25           (Whereupon, the proceedings recessed.)

1    JUDGE BHATTACHARYYA:  We can go back on the

2  record.

3         Can you tell me which lists are being moved into

4  evidence at this time?

5         MS. SWAROOP:  Yes, Your Honor.  I believe there's

6  a list that has additional exhibits from June 6, 8, and 9

7  that were inadvertently omitted from the prior list.  I

8  think Ms. Frazier mentioned that earlier today.  We have

9  that list submitted to Your Honor.

10        JUDGE BHATTACHARYYA:  Yes, the list entitled

11 Table of Additional Admitted Exhibits for the Evidentiary

12 Hearing on June 6, 8, and 9, 2022.

13        Are there any objections to admission of these

14 exhibits?

15        MS. FRAZIER:  No, Your Honor.

16        JUDGE BHATTACHARYYA:  Then that list of exhibits

17 is admitted into evidence.

18        (Whereupon, the exhibits as recited by counsel

19 and reflected in the attached index were submitted and

20 received in evidence.)

21        JUDGE BHATTACHARYYA:  Please send a copy to the

22 court reporter.

23        MS. SWAROOP:  The second thing, Your Honor, I

24 believe we had also submitted a chart of demonstratives for

25 the demonstratives that were submitted yesterday, so that's

1    a separate chart from the admitted exhibits.

2              JUDGE BHATTACHARYYA:  Is this the Table of

3    Demonstratives for June 8th?

4              MS. SWAROOP:  Yes, Your Honor.

5              JUDGE BHATTACHARYYA:  I have a list entitled

6    Complainant's Table of Demonstratives for Evidentiary

7    Hearing on June 8th, 2022.

8              Do we have any objection to receiving these

9    demonstratives as demonstratives but not as substantive

10   evidence?

11             MS. FRAZIER:  No, Your Honor, with that

12   understanding, no objection.  And I understand the parties

13   will similarly compile a list based on today and submit that

14   to Your Honor as well.

15             JUDGE BHATTACHARYYA:  Then that list is accepted

16   purely for demonstrative purposes.  Please send a list to

17   the court reporter.

18             Are there any others at this time?

19             MS. SWAROOP:  No, Your Honor.  As Ms. Frazier

20   mentioned, the parties have an agreement to create a list

21   for today's exhibits and I believe either exchange that or

22   submit that on Monday.  So we'll plan to do that.

23             JUDGE BHATTACHARYYA:  Typically we do it before

24   the close of the hearing today, if that's possible.  If it's

25   not possible, there will need to be a motion to reopen the

1    record to have those exhibits admitted.  That's not a huge

2    problem, if the parties want to go that way, but typically

3    we try to take a 10- or 15-minute break and get it all done

4    today.  Let me know what you would like to do.

5            MS. FRAZIER:  Your Honor, Apple is happy, I

6    think, with 10 or 15 minutes we should easily be able to

7    compile the list and hopefully reach agreement with

8    Ms. Swaroop's team.

9            MS. SWAROOP:  Your Honor, I'm not sure that we

10   can.  I know there were some issues with exhibits, so I'm

11   not sure 10 or 15 minutes will be enough time for us.  Apple

12   had proposed Monday, so we're happy to stick with Apple's

13   proposal and file a joint motion to submit the exhibits on

14   Monday.

15           JUDGE BHATTACHARYYA:  Yes, file a joint motion.

16   Hopefully, there will be no objections that will introduce

17   more complications if there are objections.

18           Anything further?

19           MR. MUELLER:  Your Honor, one last thing.  I

20   wanted to recognize Nina Garcia, who is our NEXT attorney in

21   this program, and thank you for the program.  And we thank

22   you, again, for the time and your consideration over the

23   course of the hearing.  We appreciate it.

24           MS. SWAROOP:  Your Honor -- please go ahead.

25           JUDGE BHATTACHARYYA:  Just that I'm very pleased

1446

1    that both parties are participating in the NEXT Advocates

2    Program.  We're really hoping that it will encourage further

3    participation by less-experienced attorneys.  So thank you

4    for participating in it.

5         MS. SWAROOP:  Your Honor, I did have one more

6    housekeeping item.  We did reach agreement on the

7    post-hearing brief proposal.  Did Your Honor want us to set

8    forth what that agreement is on the record today?

9         JUDGE BHATTACHARYYA:  Yes.  Let me know your

10   proposal.  I may not approve it.  I'll issue an order on

11   Monday with the final page limit or word limit, but I'd like

12   to hear your proposal.

13        MS. SWAROOP:  Yes, Your Honor.  The proposal we

14   made was, and I believe we have agreement, was from one of

15   your investigations.  It would be a word count limit of

16   125,000 words, images can be included, and if images include

17   more than 20 words, then that would be counted towards the

18   word limit, but if there are 20 words or less on the image,

19   that wouldn't be counted towards the word count.

20        JUDGE BHATTACHARYYA:  Okay.  Would you mind

21   sending that to me in an email as well?

22        MS. SWAROOP:  Yes, Your Honor, we would be happy

23   to do that.

24        Your Honor, on behalf of Masimo and our team here

25   in California, we also wanted to express our sincere thanks

1   and appreciation for the time that you spent this week to

2   hear from all of our Masimo and Cercacor inventors and all

3   of our witnesses.

4           We would have loved to be there in Washington,

5   D.C. with you to present the case, but we did our best with

6   the logistics of the remote hearing, and we do very much

7   appreciate the careful consideration that you've given to

8   the evidence this week.

9           JUDGE BHATTACHARYYA:  Thank you.

10          MR. MUELLER:  We echo that, Your Honor.  We

11  really do appreciate all of it, the entire week, we have

12  appreciated your careful consideration at every step along

13  the way, so thank you very much.

14          JUDGE BHATTACHARYYA:  Thank you.  I want to thank

15  counsel for their very helpful presentations.  This is a

16  contentious case, and I think that your professionalism

17  really helped in moving us through and letting us finish on

18  time.  Thank you very much for that.

19          I also want to thank Linda, our court reporter,

20  who did a wonderful job also getting us through this week,

21  and my attorney advisor, Ted Jou, who has helped at every

22  point in this investigation.

23          I hope everybody is able to relax over the

24  weekend after this week at work and thank you so much.

25          MR. MUELLER:  You too, Your Honor.  Have a good

1448

1    weekend.

2              MS. SWAROOP:  Thank you, Your Honor.

3    //

4                   (Whereupon, the proceedings concluded at

5    5:03 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1449

```
 1                    C O N T E N T S

 2                   INDEX OF WITNESSES

 3
                                         RE-    RE-
     WITNESS                 DIRECT CROSS DIRECTCROSS

 5   STEVE WARREN,..............1181   1260

 6   VINCENT THOMAS,............1282   1312

 7   VIJAY MADISETTI,...........1327   1383  1388

 8   JACK GOLDBERG,.............1391   1403

 9   ROBERT STOLL,..............1409

10   DANIEL MCGAVOCK,...........1416   1428  1439

11

12

13

14   AFTERNOON SESSION                         1312

15

16

17   CONFIDENTIAL SESSIONS   1249-1260       1380-1390

18                           1269-1271       1422-1424

19                           1275-1276       1426-1427

20                           1285-1320

21                           1355-1368

22                           1371-1373

23                           1377-1378

24

25
```

1450

```
1              Additional Exhibits Provided for Admission
2              Pursuant to Order No. 50
3              Table of Admitted Exhibits for the Evidentiary
4    Hearing on June 8, 2022
5              JACK GOLDBERG
6              CX-0330
7              CX-0419C
8              CX-0597C
9              CX-0839C
10             CX-0840C
11             CX-0845
12             CX-0846
13             CX-0847
14             CX-0849
15             CX-0850
16             CX-0853
17             CX-1724
18             CPX-0154C
19             VIJAY MADISETTI
20             CX-0307iC
21             CX-0329
22             CX-1038C
23             CX-1058C
24             CX-1062C
25             CX-1068C
```

| | |
|---|---|
| 1 | CX-1069C |
| 2 | CX-1072C |
| 3 | CX-1074C |
| 4 | CX-1251C |
| 5 | CX-1406 |
| 6 | CX-1407 |
| 7 | CX-1447 |
| 8 | CX-1449 |
| 9 | CX-1451 |
| 10 | CX-1492 |
| 11 | CX-1532 |
| 12 | CX-1546C |
| 13 | CX-1548C |
| 14 | CX-1646C |
| 15 | CX-1647C |
| 16 | CX-1705 |
| 17 | CX-1726 |
| 18 | CX-1727 |
| 19 | CPX-0159 |
| 20 | CPX-0159a |
| 21 | VIVEK VENUGOPAL |
| 22 | RDX-4 |
| 23 | RPX-0040C |
| 24 | RPX-0041C |
| 25 | RX-0392C |

1452

```
 1          RX-0895C

 2          CX-1683

 3          SAAHIL MEHRA

 4          RX-0677C

 5          Complainants' Table of Demonstratives for

 6   Evidentiary Hearing on June 8, 2022

 7          CDX-0013C

 8          CDX-0011C

 9          Complainants' Table of Demonstratives for

10   Evidentiary Hearing on June 6 and 10, 2022

11          CDX-0017C

12          CDX-0012C

13          CDX-0014C

14          CDX-0016C

15          CDX-0019C

16          Joint Table of Admitted Exhibits

17          (June 9 and 10, 2022)

18          DR. MAJIF SARRAFZADEH (June 9, 2022)

19          CPX-0106a

20          PROF. STEVEN WARREN, Ph.D. (June 10, 2022)

21          CX-1789C

22          CX-0335

23          RPX-001

24          RPX-002

25          RPX-006
```

| | |
|---|---|
| 1 | RPX-007 |
| 2 | RPX-033 |
| 3 | RX-0249C |
| 4 | RX-0252C |
| 5 | RX-0335 |
| 6 | RX-0456 |
| 7 | RX-0460 |
| 8 | RX-0473 |
| 9 | RX-0478 |
| 10 | RX-0484 |
| 11 | RX-0487 |
| 12 | RX-0489 |
| 13 | RX-0495 |
| 14 | RX-0502 |
| 15 | RX-0504 |
| 16 | RX-0508 |
| 17 | RX-0510 |
| 18 | RX-0515 |
| 19 | RX-0517 |
| 20 | RX-0519 |
| 21 | RX-0520 |
| 22 | RX-0523 |
| 23 | RX-0624 |
| 24 | RX-0632 |
| 25 | RX-0635 |

| | |
|---|---|
| 1 | RX-0648 |
| 2 | RX-0652 |
| 3 | RX-0654 |
| 4 | RX-0665 |
| 5 | RX-0666 |
| 6 | RX-0667 |
| 7 | RX-0668 |
| 8 | RX-0670 |
| 9 | RX-0673 |
| 10 | RX-0700 |
| 11 | RX-0748 |
| 12 | RX-0812 |
| 13 | RX-1220 |
| 14 | RX-1221 |
| 15 | RX-1470C |
| 16 | VINCENT THOMAS (June 10, 2022) |
| 17 | RX-1462C |
| 18 | VIJAY MADISETTI (June 10, 2022) |
| 19 | CX-0097C |
| 20 | CX-0185C |
| 21 | CX-1461 |
| 22 | CX-1554 |
| 23 | CX-1555 |
| 24 | CX-1711C |
| 25 | CX-1733 |

```
 1          JACK GOLDBERG (June 10, 2022)

 2          RX-0346

 3          RX-0370

 4          RX-0406

 5          DANIEL McGAVOCK (June 10, 2022)

 6          CX-0252

 7          CX-1285

 8          CX-1286

 9          CX-1289

10          CX-1295

11          CX-1301

12          CX-1643

13          CX-1644

14          CX-1771C

15          Table of Admitted Exhibits for the Evidentiary

16    Hearing on June 9, 2022

17          UEYN BLOCK

18          CX-0187C

19          CX-1568

20          CX-1694

21          CX-1790C

22          CX-1806

23          SCOTT CROMAR

24          CX-1287

25          STEVE WAYDO
```

| 1 | CX-1606 |
| 2 | CX-1608 |
| 3 | CX-1684 |
| 4 | CX-1802C |
| 5 | CX-1805C |
| 6 | RX-0307C |
| 7 | BRIAN LAND |
| 8 | CX-0177 |
| 9 | CX-1793C |
| 10 | CX-1800C |
| 11 | RX-0094C |
| 12 | RX-0319 |
| 13 | RX-0897C |
| 14 | RX-0396C |
| 15 | MANNHEIMER |
| 16 | CX-1569 |
| 17 | RX-0895 |
| 18 | CPX-0191 |
| 19 | MEHRA |
| 20 | RX-0087C |
| 21 | RX-0093C |
| 22 | RX-0338C |
| 23 | SARRAFZADEH |
| 24 | CX-0322bC_Resp |
| 25 | CX-0322bC_Compls |

| 1  | CX-0444  |
| 2  | CX-0587C |
| 3  | CX-1375  |
| 4  | RX-0023  |
| 5  | RX-0035  |
| 6  | RX-0041C |
| 7  | RX-0082C |
| 8  | RX-0130  |
| 9  | RX-0239C |
| 10 | RX-0240C |
| 11 | RX-0241C |
| 12 | RX-0242C |
| 13 | RX-0243C |
| 14 | RX-0244C |
| 15 | RX-0245C |
| 16 | RX-0246C |
| 17 | RX-0250C |
| 18 | RX-0259C |
| 19 | RX-0260C |
| 20 | RX-0262C |
| 21 | RX-0265C |
| 22 | RX-0266C |
| 23 | RX-0267C |
| 24 | RX-0268C |
| 25 | RX-0269C |

```
 1          RX-0270C

 2          RX-0271C

 3          RX-0272C

 4          RX-0273C

 5          RX-0274C

 6          RX-0275C

 7          RX-0276C

 8          RX-0308C

 9          RX-0353

10          RX-0366

11          RX-0368

12          RX-0381

13          RX-0397

14          RX-0414C

15          RX-0458

16          ADMITTED PURSUANT TO ORDER NO. 56

17          RX-1397C

18          RX-1447C

19

20

21

22

23

24

25
```

1          C E R T I F I C A T E

2   TITLE: CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES

3   AND COMPONENTS THEREOF

4   INVESTIGATION NO.:  337-TA-1276

5   HEARING DATE:  June 10, 2022

6   LOCATION:  Washington, D.C. - Remote

7   NATURE OF HEARING:  Evidentiary Hearing

8          I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
9   above-referenced proceedings of the U.S. International Trade
     Commission.
10  Date:   June 29, 2022
     Signed:
11  ss//

12  Signature of the Contractor or the Authorized Contractor's
     Representative
13

14         I hereby certify that I am not the court reporter
     and that I have proofread the above-referenced transcript of
15  the proceedings of the U.S. International Trade Commission
     against the aforementioned court reporter's notes and
16  recordings for accuracy in transcription in the spelling,
     hyphenation, punctuation and speaker identification and did
17  not make any changes of a substantive nature.  The
     foregoing/attached transcript is a true, correct and
18  complete transcription of the proceedings.
     Signed:

19  ss//

20

21         I hereby certify that I reported the
     above-referenced proceedings of the U.S. International Trade
22  Commission and caused to be prepared from my record media
     and notes of the proceedings a true, correct and complete
23  verbatim recording of the proceedings.
     Signed:

24  ss//

25

Heritage Reporting Corporation
(202) 628-4888