# EXHIBIT N

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| APPLE INC.,<br>    *Plaintiff*,<br><br>v.<br><br>MASIMO CORPORATION and<br>SOUND UNITED, LLC,<br>    *Defendants.* | C.A. No. 22-1377-MN |

**Declaration of Dr. Itamar Simonson**

TABLE OF CONTENTS

I.     BACKGROUND, QUALIFICATIONS, AND ASSIGNMENT.......................................... 1

II.    SUMMARY OF CONCLUSIONS.............................................................................. 5

       A.    The Design Impact Survey............................................................................ 5

       B.    The Association Survey ................................................................................ 6

III.   SURVEY TO ASSESS WHETHER THE APPEARANCE AND DESIGN OF THE
       BACK OF W1 IMPACTS CONSUMERS' PURCHASE DECISIONS........................... 7

       A.    Objective and Methodology......................................................................... 7

       B.    Respondent Universe ................................................................................... 7

       C.    Main Questionnaire..................................................................................... 8

       D.    Summary of Findings................................................................................... 9

IV.    SURVEY TO ASSESS WHETHER CONSUMERS ASSOCIATE THE DESIGN OF
       THE BACK OF W1 WITH APPLE ........................................................................ 16

       A.    Objective and Methodology....................................................................... 16

       B.    Respondent Universe ................................................................................. 16

       C.    Main Questionnaire................................................................................... 17

       D.    Summary of Findings................................................................................. 18

V.     CONCLUSION.................................................................................................. 21

I, Itamar Simonson, state and declare as follows:

# I.      BACKGROUND, QUALIFICATIONS, AND ASSIGNMENT

1.      I served as the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University, from 1993 through 2020.  Since the beginning of 2021, I am the Sebastian S. Kresge Emeritus Professor of Marketing (while continuing to teach and advise doctoral students at the Stanford Business School).  A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Appendix A.

2.      I hold a Ph.D. in Marketing from the Duke University Fuqua School of Business, a Master's degree in Business Administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree with majors in Economics and Political Science from The Hebrew University.

3.      My field of expertise is consumer behavior, marketing management, the role of price, brand, and product features on consumer behavior, research methods, the design and analysis of consumer surveys and common survey mistakes, and human judgment and decision-making. Most of my research has focused on consumers' purchasing behavior, and the effects of product characteristics (such as brand name, price, and features), the competitive context, and marketing activities (such as promotions and advertising) on buying decisions.

4.      I have published numerous articles in my career in various areas, which are listed in my C.V. (Appendix A).  I have also co-authored a chapter on "Demand Effects in Likelihood of Confusion Surveys," in the ABA-published book entitled *Trademark and Deceptive Advertising Surveys*.[1]

5.      I have received various awards, including (a) the 2007 Society for Consumer Psychology Distinguished Scientific Achievement Award; (b) an Honorary Doctorate from the University of Paris – Sorbonne Universities; (c) the award for the Best Article published in the *Journal of Consumer Research* (the major journal on consumer behavior) between 1987 and 1989; (d) the 1997 O'Dell Award, given for the *Journal of Marketing Research* (the major journal on

---

[1] Itamar Simonson and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," *Trademark and Deceptive Advertising Surveys*, Chapter 11, Shari Diamond and Jerre Swann, Eds., American Bar Association.

1

marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (e) the 2001 O'Dell award (and a finalist for the O'Dell Award in 1995, 2002, 2004, 2005, 2007, 2008, and 2012); (f) the award for the Best Article published in the *Journal of Public Policy & Marketing* (the main journal on public policy and legal aspects of marketing) between 1993 and 1995; (g) the Ferber Award from the Association for Consumer Research, the largest association of consumer researchers in the world; (h) Elected Fellow of the Association for Consumer Research; (i) the 2016 American Marketing Association Award for the Best Book in Marketing[2]; (j) the 2002 American Marketing Association award for the Best Article in the area of services marketing; and (k) the 2016 Association for Consumer Research Conference Best Paper Award.

6.      At Stanford University, I have taught MBA and executive courses on Marketing Management, covering such topics as brand management and brand equity, buyer behavior, developing marketing strategies, pricing, building brand equity, advertising, sales promotions, and retailing.  I have also taught courses dealing with the Marketing of High Technology Products, Business-to-Business Marketing, Behavioral Economics, and Critical-Analytical Thinking.  Over the past several years, I have also taught an MBA course regarding "Applied Behavioral Economics," which examines the judgment and decision-making behavior and common errors/tendencies of managers, organizations, and consumers.  In addition to teaching MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.

7.      All doctoral courses that I have taught over the past 33 years have involved educating students regarding proper and improper ways to conduct and evaluate consumer and managerial decision-making studies.  For example, in addition to general principles of decision-making, the courses examine the various stages involved in a consumer survey, including defining the problem to be investigated, selecting and developing the research approach, collecting and analyzing data, and deriving conclusions.  In each class meeting, we carefully investigate the key errors (if any) in the research we discuss, and I teach the doctoral students what key aspects they

---

[2] The book that received the Best Book in Marketing Award, is titled: "*Absolute Value: What Really Influences Customers in the Age of (Nearly) Perfect Information.*"  Its primary focus is on consumer decision making in the age of the Internet.

should focus on when designing and evaluating studies.  One doctoral course I have taught over the past 25 years has focused on studies of psychological and behavioral aspects of consumer decision-making and judgment and decision-making more generally.

8.      Prior to joining Stanford University, during the six years that I was on the faculty of the University of California at Berkeley (1987-93), I taught an MBA Marketing Management course, a Ph.D. course on buyer behavior, and a Ph.D. course on buyer decision-making.  I also taught in various executive-education programs, including a program for marketing managers in high-technology companies.

9.      After completing my MBA studies and before starting my Ph.D. program, I worked for five years in a marketing capacity in a subsidiary of Motorola Inc., serving in the last two years as the product-marketing manager for various communications products.  My work included (a) defining new products and designing marketing plans for new product introductions, (b) customer and competitor surveys and analysis, (c) pricing and advertising, and (d) sales forecasting.

10.     I have conducted, supervised, or evaluated well over 2,000 marketing research studies dealing with various aspects of consumer behavior, covering topics such as branding, pricing, product configurations, marketing strategies, and advertising-related issues.  Based on this experience, as well as my education, teaching, participation in consumer-research conferences, and numerous projects with companies and students, I have developed expertise in how to design consumer surveys, how to conduct consumer surveys, problems and pitfalls that are common in consumer surveys, how to analyze the data from consumer surveys, and what the results of consumer surveys can—and cannot—show.

11.     I serve on the editorial boards of various peer-reviewed journals, such as the Journal of Consumer Research, the Journal of Marketing Research, the Journal of the Academy of Marketing Science, and the Journal of Consumer Psychology.  In addition, I am the Co-Editor of the Consumer Psychology Review journal.  I also frequently review articles submitted to journals in other fields, such as psychology, decision-making, and economics.  Almost all the articles I review include surveys that I carefully examine, often identifying issues that need to be addressed and suggesting to the authors how to conduct new studies.  I received (twice) the Outstanding Reviewer Award from the Journal of Consumer Research.  As a reviewer, I am

asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals. In addition, I have worked as a consultant for companies and organizations on a variety of marketing and buyer behavior topics, the design of consumer surveys, and the measurement of consumer preferences.

12.     I have also served as an expert in well over 200 prior litigations involving various marketing and buyer behavior issues (including consumer surveys), technology marketing, the impact of product features, class actions, trademark-related matters, false advertising, branding, survey methods, and other issues. My surveys and expert opinions have been relied upon by various courts.[3] A list of cases in which I testified as an expert during the past four years is included with this declaration as Appendix B. I am being compensated at my standard billing rate of $850 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this

---

[3] *See, e.g.*, *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 626 n.210 (S.D.N.Y. 2007) (noting that Dr. "Simonson is eminently qualified to analyze survey techniques");; *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. 15-cv-2370, 2017 WL 6611635, at *29 (C.D. Cal. Dec. 21, 2017) ("Dr. Simonson is exceptionally well credentialed in survey work."); *VIP Prods., Inc. v. Jack Daniel's Props., Inc.*, No. 14-cv-2057, 291 F. Supp. 3d 891, 902 (D. Ariz. 2018) ("Dr. Simonson has served as an expert witness on numerous occasions, providing testimony on issues related to marketing, consumer behavior, trademark-related matters, false advertising, and branding."); *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 745 (S.D.N.Y. 2011) (agreeing with Dr. Simonson's survey analysis); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 232–42 (S.D.N.Y. 2010) (relying on Dr. Simonson's opinions to exclude opposing expert's survey); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1043–44, 1048, 1050 (S.D. Ind. 2000) (repeatedly citing Dr. Simonson's expert report as support for excluding opposing expert's survey); *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1016 (N.D. Cal. 2017) (relying on Dr. Simonson's survey: "Fetzer's expert's analysis using a modified Eveready survey was far superior to the two room survey emtacticed by Sazerac's expert"); *Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Cv. 550(JFK), 2007 WL 2258688, at *9–10, 15–16 (S.D.N.Y. Aug. 6, 2007) (embracing Dr. Simonson's report as stating "unassailable commonsense" and denying motion to exclude his testimony); *Schechner. v. Whirlpool Corp.*, No. 2:16-cv-12409, 2018 U.S. Dist. LEXIS 221847, at *27 (E.D. Mich. Oct. 30, 2018) ("Simonson's credentials are impressive, and his qualifications related to consumer research cannot be reasonably challenged."); *Gutierrez v. Wells Fargo Bank, N.A.*, No. C-07-05923-WHA, Dkt. No. 477 at 51 (N.D. Cal. Aug. 10, 2010) ("This remarkably candid opinion was echoed throughout Expert Simonson's *direct* testimony"). In June 2021, a Court opined as follows about a survey that I presented at trial: "The Court finds that the survey performed by Dr. Simonson was exemplary and a model of how litigation surveys should be conducted. The Court, accordingly, affords the survey's results and conclusions based thereon a high degree of credibility and weight." (*People of the State of California v. Macy's Inc.*; Statement of Decision; Superior Court of CA, County of Los Angeles; Case No. BC643040).

matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

13.     I was asked by counsel for Apple Inc. to design surveys that examine: (a) whether the design and appearance of the back of the Masimo and Apple smartwatches impact consumers' purchase decisions, and (b) whether consumers who are exposed to the design of the back of the Masimo W1 smartwatch and the back of the smartwatches of leading brands (including an Apple Watch) associate the design of the back of the Masimo smartwatch with any other company or brand.  Documents that I considered in connection with preparation of this declaration are cited and referenced herein and/or listed in Appendix C.

## II.     SUMMARY OF CONCLUSIONS

### A.     The Design Impact Survey

14.     A Design Impact Survey was conducted to assess whether the design of the backs of W1, Apple Watch Series 5, and Apple Watch Series 8 impacts the purchase decisions of a significant number of smartwatch purchasers.[4]  The 590 qualified respondents, who expect to purchase a smartwatch within the next 12 months, were shown different features of a smartwatch and were asked to select all those that would impact their smartwatch purchase decisions.[5]

15.     The survey results indicated that the design of the backs of W1, Apple Watch Series 5, and Apple Watch Series 8 impact the purchase decisions of those products for a statistically significant percentage of consumers.  The results are more pronounced among the majority of respondents who indicated a high familiarity with smartwatches.  For example, 36.6% of the smartwatch-familiar respondents indicated that the design of the back of W1 will impact their

---

[4] Throughout the survey questionnaires, I use an image of Apple Watch Series 4 for Apple Watch Series 5 and an image of Apple Watch Series 6 for Apple Watch Series 8.  I used those images because: (1) the design of the back of Apple Watch Series 4 is the same as Apple Watch Series 5 and the design of the back of Apple Watch Series 6 is the same as Apple Watch Series 8; and (2) Apple's own website uses an image of Apple Watch Series 4 for Apple Watch Series 5 and an image of Apple Watch Series 6 for Apple Watch Series 8.  However, I blurred the specific number of the model (e.g., "4" in Apple Watch Series 4) to avoid any respondent confusion.

[5] *See* Exhibits 1–3.  Data on 600 respondents were collected.  However, 10 respondents were excluded from the analyses in this declaration because they answered that they considered 20 or more smartwatch brands before making their purchase decision or that they were familiar with 20 or more smartwatch brands.  This resulted in a final sample size of 590 respondents.

purchase decision.[6]  This finding is consistent with the prominent display of the design of W1's back on the Masimo website.[7]

### B.     The Association Survey

16.     The Association Survey was designed to assess whether consumers who are exposed to the design of the back of W1 (versus a Control smartwatch) and the design of the backs of leading smartwatch brands (including either the design of the back of Apple Watch Series 5 or Apple Watch Series 8) associate the design of the back of W1 with any other company or brand.

17.     A total of 787 qualified respondents, who expect to purchase a smartwatch in the next 12 months, participated in the survey.[8]  They were shown (in random order) the designs of the backs of five smartwatches (Apple Watch Series 5 or Apple Series 8, Samsung Galaxy Watch 5, Garmin Forerunner 955, Fitbit Sense 2, and Amazfit GTR 4) and were then asked about an additional smartwatch: W1 (the Test smartwatch) or the Ticwatch Pro 3 Ultra (the Control smartwatch).  As indicated, within the Test and Control groups, about half of the respondents saw (alongside the other smartwatches) the Apple Watch Series 5 or the Apple Watch Series 8. They were asked whether they associated the smartwatch they were asked about (i.e., W1 or the Ticwatch) with any company or brand, or with no other company or brand.

18.     The results showed a very large difference between the share of respondents who associated W1 with Apple compared with those who associated the Ticwatch with Apple. Among those also shown the Apple Watch Series 5 (among other smartwatches), 50.0% of the respondents associated W1 with Apple, compared with 10.0% of those asked about the Control watch.[9]  And among those shown Apple Watch Series 8 (among other watches), 41.6% of the respondents associated W1 with Apple, compared with 14.8% of those asked about the Control watch.[10]

---

[6] *See*, Exhibit 1I.

[7] https://www.masimopersonalhealth.com/products/masimo-w1

[8] *See*, Exhibits 4–5.  Data were collected on 801 respondents.  However, 14 respondents were excluded from any analyses in this declaration because they answered that they considered 20 or more smartwatch brands before making their purchase decision.  This resulted in a final sample size of 787 respondents.

[9] This difference is statistically significant at the 99% confidence level (t = 9.7, p < .001).

[10] This difference is statistically significant at the 99% confidence level (t = 6.2, p < .001).

### III.   SURVEY TO ASSESS WHETHER THE APPEARANCE AND DESIGN OF THE BACK OF W1 IMPACTS CONSUMERS' PURCHASE DECISIONS

#### A.   Objective and Methodology

19.     The objective of the survey was to assess whether the appearance / design of the back of W1 is a factor that impacts consumers' purchase decisions (i.e., is material to consumers' purchase decisions).  Prior research has shown that even simple, equal weighting of all attributes/features that a decision maker (e.g., a consumer) considers can generate rather accurate predictions of decisions (as compared with relying on intuition).[11]  The respondents were 600 consumers who expect to purchase a smartwatch within the next 12 months.  In addition, when purchasing a smartwatch, they will make the decision as to which smartwatch they will buy.

20.     The complete survey questionnaire is presented in Appendix D.  The screenshots of the survey's questionnaire as seen by respondents are presented in Appendix E.  The information regarding terminated participants is presented in Appendix F.

#### B.   Respondent Universe

21.     To qualify for participation in the survey, prospective respondents had to meet the following criteria:

a.  They were needed to meet the gender, age, and geographic quotas.

b.  They and members of their household did not work in industries that might make them unrepresentative (e.g., advertising, market research, a company that makes or distributes smartwatches).

c.  They will "probably" or "definitely" purchase a smartwatch within the next 12 months.

d.  They will decide which smartwatch they purchase.

e.  When purchasing a smartwatch, they will consider two or more brands.

---

[11] *See, e.g.*, Robyn Dawes (1979), "The Robust Beauty of Improper Linear Models in Decision Making," *American Psychologist*, 34, 571–582.

### C.     Main Questionnaire

22.     Qualified respondents were first asked two preliminary questions about (i) their level of familiarity with smartwatches, and (ii) the number of smartwatch brands they are familiar with.

23.     Respondents took one of three versions of the Design Impact Survey that differed with respect to the specific watch shown to them:  Masimo (W1), Apple Watch Series 5, or Apple Watch Series 8.  They received a brief description (and, for most, a depiction) of 13 smartwatch features, in random order (see Appendix D); each page presented about three features and their respective explanations.  Respondents could review these explanations again for the remainder of the survey.  Although smartwatches are often described using more features,[12] the 13 features included in the survey represent typical attributes on which smartwatches are described on websites where they are sold (e.g., the brand's own website and online stores such as Best Buy and Amazon).

24.     The features include two appearance aspects: the front/face of the smartwatch and the design of the back of the watch.  The design of the back of the smartwatch is often displayed when a smartwatch is presented online to consumers, and in brick-and-mortar stores, consumers can view the smartwatch from both sides.  For example, the webpage for the Masimo W1 prominently displays the design of the back of W1.[13]

25.     One of the features served as a reference point, because, though it is a feature that may be desired by certain smartwatch consumers, it was not expected to significantly impact purchase decisions.  The reference point feature was described as follows:

> Two Time Zone Display:
> Some smartwatches can display the time in two time zones at the same
> time (such as both on the East coast and the West coast of the U.S.).

---

[12] *See, e.g.*, https://www.apple.com/apple-watch-series-8/?afid=p238%7CsyiinHxnI-
dc_mtid_20925qtb42335_pcrid_643476278074_pgrid_142097054058_&cid=wwa-us-kwgo-watch-slid---
Brand-AppleWatchSeries8--; https://www.garmin.com/en-US/p/777655#specs.
[13] https://www.masimopersonalhealth.com/products/masimo-w1.

26.     Although this feature is offered with various smartwatch "faces," including for Apple Watch (as well as for various analog watches),[14] my prior research[15] indicates that it does not enhance the watch's purchase likelihood for many consumers (though it can positively impact the purchase likelihood of some consumers[16]).  Given that it generally does not enhance purchase likelihood, it offers a reference point for other features.

27.     After reviewing the 13 features, respondents were presented with the features of one of the three watches (depending on the version of the survey they were taking).  They were given the following instructions:[17]

> PLEASE READ CAREFULLY
> Next, you will see a smartwatch described in terms of the features you just reviewed.  Please review carefully the specific features of the smartwatch. You can review the meaning of each feature by clicking on it.

28.     Respondents were then asked to mark those features that would impact their purchase decisions.  In case they did not know or were not sure if a feature would impact their purchase decision, they were instructed to not select that feature: "If you don't know or are not sure if a feature will impact your purchase decision, please do not select it."[18]

### D.     Summary of Findings

29.     200 respondents were asked about one of the three smartwatches:  W1, Apple Watch Series 5, or Apple Watch Series 8, for a total of 600 respondents who met the screening criteria outlined above (*see also* Appendix D).  10 respondents who answered that they considered 20 or more smartwatch brands in QS100 or that they were familiar with 20 or more smartwatch brands in Q1 are excluded from all analyses in this declaration.

---

[14] See, e.g., https://apps.garmin.com/en-US/apps/230667a0-e5a6-49bc-aefd-856806870d7a.

[15] Itamar Simonson, Ziv Carmon, and Suzanne O'Curry (1994), "Experimental Evidence on the Negative Effect of Product Features and Sales Promotions on Brand Choice," *Marketing Science*, 13 (1), 23-40 (the article's Study 3).

[16] *See, e.g.*, https://watchesyoucanafford.com/dual-time-and-gmt-watches/#:~:text=For%20the%20frequent%20traveler%20or,is%20quite%20practical%20as%20well.

[17] *See*, Appendix E.

[18] *See,* Appendix E.

30.     In one of the screener questions (QS100), respondents were asked approximately how many smartwatch brands they expected to consider before making their purchase decision. Respondents in the three surveys - W1, Apple Watch Series 5, and Apple Watch Series 8 - reported to consider an average of 3.3, 3.1, 3.3 smartwatch brands, respectively.  Figure 1 shows the distributions of the responses for the three surveys.

**Figure 1: Number of Brands to Consider (Design Impact Survey)[19]**

MASIMO

| Number of Brands | Respondents N = 197 |
|---|---|
| 2 | 39.6% |
| 3 | 35.0% |
| 4 | 13.2% |
| 5 | 6.6% |
| 6 | 0.5% |
| 7 | 0.0% |
| 8 | 0.5% |
| 9+ | 4.6% |

APPLE WATCH SERIES 5

| Number of Brands | Respondents N = 198 |
|---|---|
| 2 | 43.9% |
| 3 | 33.3% |
| 4 | 9.6% |
| 5 | 7.1% |
| 6 | 3.0% |
| 7 | 0.0% |
| 8 | 1.0% |
| 9+ | 2.0% |

---

[19] *See also,* Exhibits 1F, 2F, and 3F.

APPLE WATCH SERIES 8

| Number of Brands | Respondents N = 195 |
|:---:|:---:|
| 2 | 41.0% |
| 3 | 33.3% |
| 4 | 8.7% |
| 5 | 9.7% |
| 6 | 1.5% |
| 7 | 0.0% |
| 8 | 1.0% |
| 9+ | 4.6% |

31.    In the main questionnaire, respondents were first asked about their level of familiarity with smartwatches (Q1).  Respondents in the 3 surveys – W1, Apple Watch Series 5, and Apple Watch Series 8 – reported an average familiarity of 6.8, 6.8, and 7.2, respectively, with 0 indicating very unfamiliar and 10 indicating very familiar.  Respondents who answered 6 – 10 were classified as "familiar with smartwatches" whereas respondents who answered 0–5 were classified as "unfamiliar with smartwatches."  The majority of respondents in all three groups (between 68% and 74% of the respondents) were in the "familiar" category.

**Figure 2: Familiarity with smartwatch[20]**

MASIMO

| Familiarity | Respondents N = 197 |
|:---:|:---:|
| Familiar | 68.0% |
| Unfamiliar | 32.0% |

APPLE WATCH SERIES 5

| Familiarity | Respondents N = 198 |
|:---:|:---:|
| Familiar | 70.7% |
| Unfamiliar | 29.3% |

---

[20] *See also,* Exhibits 1G, 2G, and 3G.

11

APPLE WATCH SERIES 8

| Familiarity | Respondents N = 195 |
|---|---|
| Familiar | 73.8% |
| Unfamiliar | 26.2% |

32.    When asked about how many smartwatch brands they were familiar with (Q2), a majority of the qualified respondents were familiar with 2 – 4 smartwatch brands across all 3 surveys.  On average, respondents reported that they were familiar with 3.4, 3.2, and 3.5 smartwatch brands in the surveys about W1, Apple Watch Series 5, and Apple Watch Series 8, respectively.

**Figure 3: Number of Familiar Brands[21]**

MASIMO

| Number of Brands | Respondents N = 197 |
|---|---|
| 0 | 1.5% |
| 1 | 9.6% |
| 2 | 25.4% |
| 3 | 31.0% |
| 4 | 11.2% |
| 5 | 12.2% |
| 6 | 2.5% |
| 7 | 0.5% |
| 8 | 2.5% |
| 9+ | 3.6% |

---

[21] *See also*, Exhibits 1H, 2H, and 3H.

APPLE WATCH SERIES 5

| Number of Brands | Respondents<br>N = 198 |
|:---:|:---:|
| 0 | 2.5% |
| 1 | 7.6% |
| 2 | 31.3% |
| 3 | 32.8% |
| 4 | 7.6% |
| 5 | 9.1% |
| 6 | 3.0% |
| 7 | 2.0% |
| 8 | 2.0% |
| 9+ | 2.0% |

APPLE WATCH SERIES 8

| Number of Brands | Respondents<br>N = 195 |
|:---:|:---:|
| 0 | 2.1% |
| 1 | 5.6% |
| 2 | 32.3% |
| 3 | 26.7% |
| 4 | 12.8% |
| 5 | 9.7% |
| 6 | 1.0% |
| 7 | 1.5% |
| 8 | 2.1% |
| 9+ | 6.2% |

33.     The key question referred to features that would impact purchase decisions.  That is, respondents were asked to select features that would impact their smartwatch purchase decisions. Across the three versions of the Design Impact Survey, between 28% and 32% of the respondents indicated that the appearance and design of the back of the watch would impact their purchase decision.  For respondents classified as "smartwatch familiar," between 32% and 37% indicated that the appearance and design of the back of the watch would impact their purchase decisions.

**Figure 4: Features that Impact Purchase Decision, the Design Impact Survey[22]**

MASIMO

| Feature | All Respondents | Familiar with Smartwatches |
|---|---|---|
| | N = 197 | N = 134 |
| Appearance and design: front of the watch | 78.7% | 82.1% |
| Appearance and design: back of the watch | 30.5% | 36.6% |
| Battery life | 80.7% | 79.9% |
| Fitness tracking | 72.1% | 72.4% |
| Heart monitoring | 68.5% | 70.1% |
| Materials and finishes | 44.2% | 45.5% |
| Physiological data monitoring | 56.3% | 56.7% |
| Price | 68.0% | 70.9% |
| Sleep tracking | 59.4% | 61.2% |
| Two time zone display | 13.7% | 15.7% |
| Variety and number of apps | 60.4% | 63.4% |
| Water resistance | 72.1% | 73.1% |
| Weight | 36.5% | 41.8% |

APPLE WATCH SERIES 5

| Feature | All Respondents | Familiar with Smartwatches |
|---|---|---|
| | N = 198 | N = 140 |
| Appearance and design: front of the watch | 75.8% | 78.6% |
| Appearance and design: back of the watch | 28.3% | 32.1% |
| Battery life | 77.3% | 79.3% |
| Fitness tracking | 60.6% | 60.7% |
| Heart monitoring | 61.6% | 61.4% |
| Materials and finishes | 37.9% | 39.3% |
| Physiological data monitoring | 47.5% | 50.0% |
| Price | 73.7% | 75.7% |
| Sleep tracking | 54.5% | 55.7% |
| Two time zone display | 12.1% | 12.1% |
| Variety and number of apps | 54.0% | 54.3% |
| Water resistance | 65.2% | 65.0% |
| Weight | 35.4% | 36.4% |

---

[22] *See also,* Exhibit 1I, 2I, and 3I.

APPLE WATCH SERIES 8

| Feature | All Respondents N = 195 | Familiar with Smartwatches N = 144 |
|---|---|---|
| Appearance and design: front of the watch | 70.8% | 74.3% |
| Appearance and design: back of the watch | 31.8% | 33.3% |
| Battery life | 74.4% | 74.3% |
| Fitness tracking | 56.9% | 54.9% |
| Heart monitoring | 57.9% | 60.4% |
| Materials and finishes | 37.9% | 44.4% |
| Physiological data monitoring | 42.1% | 46.5% |
| Price | 67.7% | 66.0% |
| Sleep tracking | 42.6% | 46.5% |
| Two time zone display | 15.9% | 17.4% |
| Variety and number of apps | 51.8% | 56.3% |
| Water resistance | 59.0% | 57.6% |
| Weight | 34.9% | 35.4% |

34.     Thus, a significant percentage of respondents indicated that the design of the back of the smartwatch would impact their purchase decisions, and this finding is more pronounced for the smartwatch-familiar respondents.  Moreover, even if one were to use the Two-Time Zone Display as a reference point (even though, as noted above, this feature is useful for a segment of consumers such as those who frequently travel), the differences are statistically significant.  For example, based on all respondents who evaluated W1, a statistically significantly higher percentage of respondents (30.5% versus 13.7%) indicated that the design of the back of the watch impacts their purchase decisions (t = 4.25, p < .01).

15

## IV.   SURVEY TO ASSESS WHETHER CONSUMERS ASSOCIATE THE DESIGN OF THE BACK OF W1 WITH APPLE

### A.   Objective and Methodology

35.   The Association Survey was designed to test whether a consumer who is considering buying a smartwatch and is exposed to the design of the back of W1 as well as the design of the backs of leading smartwatches (including Apple Watch) is likely to associate or connect the design of the back of W1 with any other company or brand.  It is noteworthy that a great deal of research has highlighted the extent and significance of the impact of design and aesthetic product aspects on the product's value to the consumer and the product's image and associations.[23]

36.   The survey participants were approximately 800 prospective smartwatch buyers who took one of two versions of the Association Survey that differed with respect to the Apple Watch included in the survey: Apple Watch Series 5 or Apple Watch Series 8.  In each version of the survey, respondents were assigned to either a Test group (where they were asked about W1) or a Control group (where they were asked about a Ticwatch smartwatch).  Both groups were asked whether they associated the design of the back of the Masimo/Ticwatch smartwatch with any other company or brand, such as one of the companies/brands of the leading smartwatch providers, or did not associate it with any other company or brand (or did not know).

37.   The complete survey questionnaire is presented in Appendix D.  The screenshots of the entire survey as seen by respondents, both the Test and Control versions, are presented in Appendix E.  The information regarding terminated participants is presented in Appendix F.

### B.   Respondent Universe

38.   To qualify for participation in the Association Survey, prospective respondents had to meet the following criteria:

---

[23] For reviews, see, e.g., N. Crilly et al. (2004), "Seeing things: consumer response to the visual domain in product design," *Design Studies*, 25, 547-577; B. Schmitt and A. Simonson (1997), *Marketing Aesthetics*, The Free Press.

      a.  They were needed to meet the gender, age, and geographic quotas.

          b.  They and members of their household did not work in industries that might make them unrepresentative (e.g., advertising, market research, a company that makes or distributes smartwatches).

          c.  They will "probably" or "definitely" purchase a smartwatch within the next 12 months.

          d.  They will decide which smartwatch they purchase.

          e.  When purchasing a smartwatch, they will consider two or more brands.

### C.   Main Questionnaire

39.   Qualified respondents were first given the following instruction:

- Please take the survey in one session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.
- If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option.

40.   As indicated earlier, respondents took one of two versions of the Association Survey that differed with respect to the model of Apple Watch they were shown:  Apple Watch Series 5 or Apple Watch Series 8.  Respondents were shown pictures of the design of the backs of five smartwatches, including an Apple Watch whose model depends on the survey they took, Samsung Galaxy Watch 5, Garmin Forerunner 955, Fitbit Sense 2, and Amazfit GTR 4.  These are recently-released smartwatches from popular companies and/or brands that sell smartwatches.  Respondents were able to click on the pictures to enlarge the images.

41.   For each version of the Association Survey respondents were randomly assigned to the Test and Control groups.  In the Test group, respondents were shown the design of the back of

17

W1, while the respondents in the Control group were shown the design of the back of the Ticwatch Pro 3 Ultra.  Respondents then were asked which smartwatch company or brand, if any, they associate with the design of the back of the smartwatch just shown.  They were also given the following instructions:

> Select one response, such as one of the companies/brands listed below, or write in your own answer, or select the option to indicate that you do not associate the design of the back of the smartwatch shown above with any smart watch company or brand, or indicate that you don't know or are unsure.

42.    The respondents could then select one of the five brands shown to them, or specify another brand, or indicate that they did not associate the design of the back of the watch shown with any brands, or indicate that they do not know.  While answering the question, respondents could also review pictures of the design of backs of the five smartwatches previously shown to them.

### D.    Summary of Findings

43.    A total of 801 respondents, who expect to purchase a smartwatch in the next 12 months, participated in the survey, comprising the Test and Control groups for the two versions of the survey.  There were about 200 respondents in each group for each survey.  All respondents met the screening criteria outlined above (*see also* Appendices D and E).  Fourteen respondents who answered that they considered 20 or more smartwatch brands in QS100 were excluded from all analyses.  For the survey that included the design of the back of Apple Watch Series 5, qualified respondents in the control group expected to consider an average of 3.1 smartwatch brands and respondents in the test group expected to consider an average of 3.0 smartwatch brands.  For the survey that included the design of the back of Apple Watch Series 8, respondents in the control group expected to consider an average of 3.0 smartwatch brands and respondents in the test group expected to consider an average of 3.2 smartwatch brands.

**Figure 6: Number of Brands to Consider, The Association Survey[24]**

SURVEYS SHOWING APPLE WATCH SERIES 5

| Number of Brands | Control Group<br>N = 200 | Test Group<br>N = 194 |
|:---:|:---:|:---:|
| 2 | 48.5% | 42.8% |
| 3 | 29.0% | 37.6% |
| 4 | 8.0% | 10.3% |
| 5 | 9.5% | 6.7% |
| 6 | 1.5% | 0.5% |
| 7 | 0.5% | 0.0% |
| 8 | 0.5% | 0.0% |
| 9+ | 2.5% | 2.1% |

SURVEYS SHOWING APPLE WATCH SERIES 8

| Number of Brands | Control Group<br>N = 196 | Test Group<br>N = 197 |
|:---:|:---:|:---:|
| 2 | 43.9% | 41.1% |
| 3 | 35.7% | 34.5% |
| 4 | 5.1% | 8.6% |
| 5 | 11.2% | 10.7% |
| 6 | 1.0% | 1.5% |
| 7 | 2.0% | 0.5% |
| 8 | 0.0% | 1.0% |
| 9+ | 1.0% | 2.0% |

44.     The results of the surveys demonstrated that the majority of respondents indicated that the appearance and design of smartwatches impacted their purchase decision.  This applies to all participants in the Association Survey (*see* QS110).  This screener question also identifies respondents whose purchase decision was impacted by fitness features, including physiological data monitoring, sleep tracking, fitness tracking, and heart monitoring.

---

[24] *See also*, Exhibits 4F and 5F.

**Figure 7: Features that Impact Purchase Decision, Association Survey[25]**

SURVEYS SHOWING APPLE WATCH SERIES 5

| Feature | Control Group N = 200 | Test Group N = 194 |
|---|---|---|
| Appearance and design of the watch | 62.0% | 69.1% |
| Battery life | 70.5% | 77.8% |
| Fitness tracking | 58.5% | 66.0% |
| Heart monitoring | 51.0% | 53.1% |
| Materials and finishes | 41.0% | 42.8% |
| Physiological data monitoring | 41.0% | 40.7% |
| Price | 75.5% | 79.4% |
| Sleep tracking | 43.0% | 45.4% |
| Variety and number of apps | 42.0% | 37.6% |
| Water resistance | 67.5% | 69.6% |
| Weight | 38.0% | 32.5% |
| Other | 1.0% | 1.5% |
| None of the above | 1.0% | 1.0% |

SURVEYS SHOWING APPLE WATCH SERIES 8

| Feature | Control Group N = 196 | Test Group N = 197 |
|---|---|---|
| Appearance and design of the watch | 56.1% | 63.5% |
| Battery life | 71.4% | 77.2% |
| Fitness tracking | 70.9% | 68.0% |
| Heart monitoring | 55.1% | 50.8% |
| Materials and finishes | 42.3% | 38.6% |
| Physiological data monitoring | 40.8% | 35.5% |
| Price | 76.0% | 77.7% |
| Sleep tracking | 48.5% | 46.2% |
| Variety and number of apps | 39.3% | 40.6% |
| Water resistance | 64.3% | 62.4% |
| Weight | 33.2% | 39.1% |
| Other | 1.0% | 1.0% |
| None of the above | 0.5% | 1.5% |

45.     Importantly, the results of Q1 showed a very large difference between the share of respondents who associated W1 with Apple and those who associated the Ticwatch with Apple. Among those shown Apple Watch Series 5 (among other watches), 50.0% of the respondents associated W1 with Apple, compared with 10.0% of those asked about the Control watch.[26] And

---

[25] *See also,* Exhibits 4G and 5G.
[26] This difference is statistically significant at the 99% confidence level (t = 9.7, p < .001).

among those shown Apple Watch Series 8 (among other watches),  41.6% of respondents associated W1 with Apple, compared with 14.8% of those asked about the Control watch.[27]

**Figure 8: Associated Brand[28]**

SURVEYS SHOWING APPLE WATCH SERIES 5

| | Fitness Group | | Overall Group | |
| --- | --- | --- | --- | --- |
| Brand | Control Group N = 158 | Test Group N = 159 | Control Group N = 200 | Test Group N = 194 |
| Amazfit | 18.4% | 5.7% | 19.5% | 4.6% |
| Apple | 10.1% | 50.9% | 10.0% | 50.5% |
| Fitbit | 10.1% | 10.7% | 9.0% | 9.3% |
| Garmin | 18.4% | 7.5% | 17.5% | 7.7% |
| Samsung | 21.5% | 13.2% | 22.5% | 14.4% |
| Other | 0.6% | 0.6% | 0.5% | 1.0% |
| Don't know | 9.5% | 6.3% | 10.0% | 7.7% |
| No association | 11.4% | 5.0% | 11.0% | 4.6% |

SURVEYS SHOWING APPLE WATCH SERIES 8

| | Fitness Group | | Overall Group | |
| --- | --- | --- | --- | --- |
| Brand | Control Group N = 173 | Test Group N = 165 | Control Group N = 196 | Test Group N = 197 |
| Amazfit | 18.5% | 4.2% | 17.3% | 3.6% |
| Apple | 15.0% | 43.6% | 14.8% | 41.6% |
| Fitbit | 12.7% | 6.1% | 13.3% | 8.1% |
| Garmin | 14.5% | 9.7% | 13.3% | 8.6% |
| Samsung | 25.4% | 20.0% | 23.5% | 20.8% |
| Other | 0.0% | 0.6% | 0.0% | 0.5% |
| Don't know | 4.6% | 4.8% | 7.1% | 6.6% |
| No association | 9.2% | 10.9% | 10.7% | 10.2% |

## V.      CONCLUSION

46.      In conclusion, the results of the Design Impact Survey indicated that the design of the back of W1, Apple Watch Series 5, and Apple Watch Series 8 impacts the purchase decisions of a statistically significant percentage of consumers.  The results are more pronounced among the

---

[27] This difference is statistically significant at the 99% confidence level (t = 6.2, p < .001).
[28] *See also,* Exhibits 4H and 5H.

majority of respondents who indicated a high familiarity with smartwatches.  For example, 36.6% of the smartwatch-familiar respondents indicated that the design of the back of W1 will impact their purchase decision.  This finding is consistent with the prominent display of W1's back design on Masimo's website.

47.     The results of the Association Survey showed that, among respondents who view the design of the back of W1 and the design of the backs of other leading smartwatches, there was a very large difference between the share of respondents who associated W1 with Apple as compared to respondents who associate a Control smartwatch with Apple.  Specifically, among those shown the Apple Watch Series 5 (among other watches), 50.0% of respondents associated W1 with Apple, compared with 10.0% of those asked about the Control watch.[29]  And among those shown Apple Watch Series 8 (among other watches),  41.6% of respondents associated W1 with Apple, compared with 14.8% of those asked about the Control watch.[30]

Date :  1/27/2023

*I. Simonson*

_____
Itamar Simonson, Ph.D.

---

[29] This difference is statistically significant at the 99% confidence level (t = 9.7, p < .001).
[30] This difference is statistically significant at the 99% confidence level (t = 6.2, p < .001).

## Exhibit 1A
## Design Impact Survey – Masimo Watch[1]
## Overall Respondent Breakdown[2]

| Attribute | Target Quota | Respondents N = 197 |
|---|---|---|
| **Gender / Age** | | |
| Male 18–39 | 25% | 25.4% |
| Male 40+ | 25% | 24.9% |
| Female 18–39 | 25% | 24.4% |
| Female 40+ | 25% | 25.4% |
| Other 18–39 | NA | 0.0% |
| Other 40+ | NA | 0.0% |
| | | |
| **Region** | | |
| Midwest | 22% | 21.3% |
| Northeast | 18% | 18.3% |
| South | 35% | 35.0% |
| West | 25% | 25.4% |

Note:
[1] Respondents were shown images of a Masimo watch in Q3.
[2] Three respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

# Exhibit 1B
## Design Impact Survey – Masimo Watch[1]
## QS50:  Do you, or does any member of your household, currently work for any of the following?[2][3]

| Employer[4] | Respondents N = 197 |
|---|---|
| A company that makes or distributes computer chips | 0.0% |
| A company that makes or distributes televisions | 0.5% |
| A company that makes or distributes video game consoles | 0.0% |
| None of these | 99.5% |

Note:

[1] Respondents were shown images of a Masimo watch in Q3.

[2] All respondents who answered that they or a family member worked for "A company that makes or distributes smartwatches," "A market research firm or a marketing research department of a company," or "An advertising, public relations or marketing agency or advertising department of a company" in QS50 were terminated from the survey.  Three respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3] Percentages shown may not sum to 100% because respondents were allowed to select more than one response for the question.

[4] The order of these options was randomized when presented in the survey.

# Exhibit 1C

# Design Impact Survey – Masimo Watch[1]

# QS60:  Which of the following devices are you using right now to take this survey?[2]

| Device[3] | Respondents<br>N = 197 |
|---|---|
| Desktop computer | 15.2% |
| Laptop computer | 18.8% |
| Smartphone | 55.8% |
| Tablet | 10.2% |

Note:

[1] Respondents were shown images of a Masimo watch in Q3.

[2] All respondents who answered that they were using a cell phone (not a smartphone) or other device in QS60 were terminated from the survey.  Three respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3] The order of these options was randomized when presented in the survey.

# Exhibit 1D
# Design Impact Survey – Masimo Watch[1]
# QS70:  Which of the following types of consumer electronics do you own?[2][3]

| Device[4] | Respondents<br>N = 197 |
|---|---|
| Gaming console | 72.6% |
| Smartphone | 99.0% |
| Smartwatch | 61.4% |
| Tablet | 74.6% |

Note:
[1] Respondents were shown images of a Masimo watch in Q3.
[2] All respondents who answered "None of the above" or "Don't know" in QS70 were terminated from the survey.  Three respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3] Percentages shown do not sum to 100% because respondents were allowed to select more than one response for the question.
[4] The order of these options was randomized when presented in the survey.

# Exhibit 1E

## Design Impact Survey – Masimo Watch[1]

## QS80: Which of the following types of consumer electronics products do you expect to purchase in the next 12 months?[2]

| Purchase Decision[3] | Respondents N = 197 |
|---|---|
| I definitely will purchase [a smartwatch] in the next 12 months | 45.7% |
| I probably will purchase [a smartwatch] in the next 12 months | 54.3% |

Note:

[1] Respondents were shown images of a Masimo watch in Q3.

[2] All respondents who answered "I may or may not purchase [a smartwatch] in the next 12 months," "I probably will not purchase [a smartwatch] in the next 12 months," or "I definitely will not purchase [a smartwatch] in the next 12 months" in QS80 were terminated from the survey. Three respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3] Respondents were asked the same question about Gaming consoles, Smartphones, and Tablets.

# Exhibit 1F

## Design Impact Survey – Masimo Watch[1]

## QS100:  If/when you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?[2]

| Number of Brands[3] | Respondents N = 197 |
|:---:|:---:|
| 2 | 39.6% |
| 3 | 35.0% |
| 4 | 13.2% |
| 5 | 6.6% |
| 6 | 0.5% |
| 7 | 0.0% |
| 8 | 0.5% |
| 9+ | 4.6% |

Note:

[1]  Respondents were shown images of a Masimo watch in Q3.

[2]  All respondents who answered that they considered only zero or one smartwatch brand in QS100 were terminated from the survey.  Three respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3]  Respondents expected to consider an average of 3.3 smartwatch brands.

# Exhibit 1G
# Design Impact Survey – Masimo Watch[1]
# Q1: How familiar or unfamiliar are you with smartwatches?[2]

| Familiarity[3] | Respondents N = 197 |
|---|---|
| Familiar | 68.0% |
| Unfamiliar | 32.0% |

Note:
[1]  Respondents were shown images of a Masimo watch in Q3.
[2]  Three respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3]  Respondents who responded 0–5 on a 0–10 scale of familiarity were considered unfamiliar with smartwatches, and respondents who responded 6–10 were considered familiar with smartwatches. Respondents reported an average familiarity of 6.8 on a 0–10 scale.

# Exhibit 1H
## Design Impact Survey – Masimo Watch[1]
## Q2: How many smartwatch brands are you familiar with?[2][3]

| Number of Brands[4] | Respondents N = 197 |
|:---:|:---:|
| 0 | 1.5% |
| 1 | 9.6% |
| 2 | 25.4% |
| 3 | 31.0% |
| 4 | 11.2% |
| 5 | 12.2% |
| 6 | 2.5% |
| 7 | 0.5% |
| 8 | 2.5% |
| 9+ | 3.6% |

Note:
[1] Respondents were shown images of a Masimo watch in Q3.
[2] Three respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3] All respondents in this survey were familiar with fewer than 20 smartwatch brands.
[4] Respondents are familiar with an average of 3.4 smartwatch brands.

# Exhibit 1I

## Design Impact Survey – Masimo Watch[1]

## Q3: Please select the features that you expect will impact your purchase decision[2][3]

| Feature[5] | All Respondents | Familiar with Smartwatches[4] |
|---|---|---|
|  | N = 197 | N = 134 |
| Appearance and design: front of the watch | 78.7% | 82.1% |
| Appearance and design: back of the watch | 30.5% | 36.6% |
| Battery life | 80.7% | 79.9% |
| Fitness tracking | 72.1% | 72.4% |
| Heart monitoring | 68.5% | 70.1% |
| Materials and finishes | 44.2% | 45.5% |
| Physiological data monitoring | 56.3% | 56.7% |
| Price | 68.0% | 70.9% |
| Sleep tracking | 59.4% | 61.2% |
| Two time zone display | 13.7% | 15.7% |
| Variety and number of apps | 60.4% | 63.4% |
| Water resistance | 72.1% | 73.1% |
| Weight | 36.5% | 41.8% |

Note:
[1] Respondents were shown images of a Masimo watch in Q3.
[2] Three respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3] Percentages shown do not sum to 100% because respondents were allowed to select more than one response for the question.
[4] Respondents who responded 6–10 on a 0–10 scale of familiarity in Q1 were considered familiar with smartwatches.
[5] The order of these features was randomized when presented in the survey.

## Exhibit 2A
## Design Impact Survey – Apple Watch Series 5[1]
## Overall Respondent Breakdown[2]

| Attribute | Target Quota | Respondents N = 198 |
|---|---|---|
| **Gender / Age** | | |
| Male 18–39 | 25% | 24.7% |
| Male 40+ | 25% | 25.3% |
| Female 18–39 | 25% | 24.7% |
| Female 40+ | 25% | 25.3% |
| Other 18–39 | NA | 0.0% |
| Other 40+ | NA | 0.0% |
| | | |
| **Region** | | |
| Midwest | 22% | 22.7% |
| Northeast | 18% | 18.7% |
| South | 35% | 34.3% |
| West | 25% | 24.2% |

Note:
[1] Respondents were shown images of the Apple Watch Series 5 in Q3.
[2] Two respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

# Exhibit 2B
# Design Impact Survey – Apple Watch Series 5[1]
# QS50:  Do you, or does any member of your household, currently work for any of the following?[2][3]

| Employer[4] | Respondents<br>N = 198 |
|---|---|
| A company that makes or distributes computer chips | 2.5% |
| A company that makes or distributes televisions | 1.0% |
| A company that makes or distributes video game consoles | 1.5% |
| None of these | 97.0% |

Note:

[1] Respondents were shown images of the Apple Watch Series 5 in Q3.

[2] All respondents who answered that they or a family member worked for "A company that makes or distributes smartwatches," "A market research firm or a marketing research department of a company," or "An advertising, public relations or marketing agency or advertising department of a company" in QS50 were terminated from the survey.  Two respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3] Percentages shown may not sum to 100% because respondents were allowed to select more than one response for the question.

[4] The order of these options was randomized when presented in the survey.

## Exhibit 2C
## Design Impact Survey – Apple Watch Series 5[1]
## QS60:  Which of the following devices are you using right now to take this survey?[2]

| Device[3] | Respondents N = 198 |
|---|---|
| Desktop computer | 14.6% |
| Laptop computer | 21.2% |
| Smartphone | 58.1% |
| Tablet | 6.1% |

Note:
[1]  Respondents were shown images of the Apple Watch Series 5 in Q3.
[2]  All respondents who answered that they were using a cell phone (not a smartphone) or other device in
      QS60 were terminated from the survey.  Two respondents answered that they considered 20 or more
      smartwatch brands in QS100 and have been excluded from the analysis.
[3]  The order of these options was randomized when presented in the survey.

# Exhibit 2D
## Design Impact Survey – Apple Watch Series 5[1]
## QS70:  Which of the following types of consumer electronics do you own?[2][3]

| Device[4] | Respondents<br>N = 198 |
|---|---|
| Gaming console | 70.2% |
| Smartphone | 99.0% |
| Smartwatch | 65.2% |
| Tablet | 81.3% |

Note:

[1] Respondents were shown images of the Apple Watch Series 5 in Q3.

[2] All respondents who answered "None of the above" or "Don't know" in QS70 were terminated from the survey.  Two respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3] Percentages shown do not sum to 100% because respondents were allowed to select more than one response for the question.

[4] The order of these options was randomized when presented in the survey.

# Exhibit 2E

# Design Impact Survey – Apple Watch Series 5[1]

# QS80: Which of the following types of consumer electronics products do you expect to purchase in the next 12 months?[2]

| Purchase Decision[3] | Respondents<br>N = 198 |
|---|---|
| I definitely will purchase [a smartwatch] in the next 12 months | 48.5% |
| I probably will purchase [a smartwatch] in the next 12 months | 51.5% |

Note:
[1] Respondents were shown images of the Apple Watch Series 5 in Q3.
[2] All respondents who answered "I may or may not purchase [a smartwatch] in the next 12 months," "I probably will not purchase [a smartwatch] in the next 12 months," or "I definitely will not purchase [a smartwatch] in the next 12 months" in QS80 were terminated from the survey.  Two respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3] Respondents were asked the same question about Gaming consoles, Smartphones, and Tablets.

## Exhibit 2F

## Design Impact Survey – Apple Watch Series 5[1]

## QS100:  If/when you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?[2]

| Number of Brands[3] | Respondents<br>N = 198 |
|:---:|:---:|
| 2 | 43.9% |
| 3 | 33.3% |
| 4 | 9.6% |
| 5 | 7.1% |
| 6 | 3.0% |
| 7 | 0.0% |
| 8 | 1.0% |
| 9+ | 2.0% |

Note:
[1]  Respondents were shown images of the Apple Watch Series 5 in Q3.
[2]  All respondents who answered that they considered only zero or one smartwatch brand in QS100 were terminated from the survey.  Two respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3]  Respondents expected to consider an average of 3.1 smartwatch brands.

# Exhibit 2G
# Design Impact Survey – Apple Watch Series 5[1]
# Q1: How familiar or unfamiliar are you with smartwatches?[2]

| Familiarity[3] | Respondents N = 198 |
|---|---|
| Familiar | 70.7% |
| Unfamiliar | 29.3% |

Note:

[1]  Respondents were shown images of the Apple Watch Series 5 in Q3.

[2]  Two respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3]  Respondents who responded 0–5 on a 0–10 scale of familiarity were considered unfamiliar with smartwatches, and respondents who responded 6–10 were considered familiar with smartwatches. Respondents reported an average familiarity of 6.8 on a 0–10 scale.

# Exhibit 2H
# Design Impact Survey – Apple Watch Series 5[1]
# Q2: How many smartwatch brands are you familiar with?[2][3]

| Number of Brands[4] | Respondents N = 198 |
|---|---|
| 0 | 2.5% |
| 1 | 7.6% |
| 2 | 31.3% |
| 3 | 32.8% |
| 4 | 7.6% |
| 5 | 9.1% |
| 6 | 3.0% |
| 7 | 2.0% |
| 8 | 2.0% |
| 9+ | 2.0% |

Note:
[1] Respondents were shown images of the Apple Watch Series 5 in Q3.
[2] Two respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3] All respondents in this survey were familiar with fewer than 20 smartwatch brands.
[4] Respondents are familiar with an average of 3.2 smartwatch brands.

## Exhibit 2I
## Design Impact Survey – Apple Watch Series 5[1]
## Q3: Please select the features that you expect will impact your purchase decision[2][3]

| Feature[5] | All Respondents | Familiar with Smartwatches[4] |
|---|---|---|
| | N = 198 | N = 140 |
| Appearance and design: front of the watch | 75.8% | 78.6% |
| Appearance and design: back of the watch | 28.3% | 32.1% |
| Battery life | 77.3% | 79.3% |
| Fitness tracking | 60.6% | 60.7% |
| Heart monitoring | 61.6% | 61.4% |
| Materials and finishes | 37.9% | 39.3% |
| Physiological data monitoring | 47.5% | 50.0% |
| Price | 73.7% | 75.7% |
| Sleep tracking | 54.5% | 55.7% |
| Two time zone display | 12.1% | 12.1% |
| Variety and number of apps | 54.0% | 54.3% |
| Water resistance | 65.2% | 65.0% |
| Weight | 35.4% | 36.4% |

Note:
[1] Respondents were shown images of the Apple Watch Series 5 in Q3.
[2] Two respondents answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3] Percentages shown do not sum to 100% because respondents were allowed to select more than one response for the question.
[4] Respondents who responded 6–10 on a 0–10 scale of familiarity in Q1 were considered familiar with smartwatches.
[5] The order of these features was randomized when presented in the survey.

# Exhibit 3A
# Design Impact Survey – Apple Watch Series 8[1]
# Overall Respondent Breakdown[2]

| Attribute | Target Quota | Respondents N = 195 |
|---|---|---|
| **Gender / Age** | | |
| Male 18–39 | 25% | 25.1% |
| Male 40+ | 25% | 25.6% |
| Female 18–39 | 25% | 24.6% |
| Female 40+ | 25% | 24.6% |
| Other 18–39 | NA | 0.0% |
| Other 40+ | NA | 0.0% |
| | | |
| **Region** | | |
| Midwest | 22% | 21.5% |
| Northeast | 18% | 17.4% |
| South | 35% | 35.4% |
| West | 25% | 25.6% |

Note:
[1] Respondents were shown images of the Apple Watch Series 8 in Q3.
[2] Five respondents answered that they considered 20 or more smartwatch brands in QS100 or that they
    were familiar with 20 or more smartwatch brands in Q2 and have been excluded from the analysis.

# Exhibit 3B

## Design Impact Survey – Apple Watch Series 8[1]

## QS50:  Do you, or does any member of your household, currently work for any of the following?[2][3]

| Employer[4] | Respondents N = 195 |
|---|---|
| A company that makes or distributes computer chips | 2.1% |
| A company that makes or distributes televisions | 0.5% |
| A company that makes or distributes video game consoles | 0.5% |
| None of these | 96.9% |

Note:
[1] Respondents were shown images of the Apple Watch Series 8 in Q3.
[2] All respondents who answered that they or a family member worked for "A company that makes or distributes smartwatches," "A market research firm or a marketing research department of a company," or "An advertising, public relations or marketing agency or advertising department of a company" in QS50 were terminated from the survey.  Five respondents answered that they considered 20 or more smartwatch brands in QS100 or that they were familiar with 20 or more smartwatch brands in Q2 and have been excluded from the analysis.
[3] Percentages shown may not sum to 100% because respondents were allowed to select more than one response for the question.
[4] The order of these options was randomized when presented in the survey.

# Exhibit 3C

## Design Impact Survey – Apple Watch Series 8[1]

## QS60:  Which of the following devices are you using right now to take this survey?[2]

| Device[3] | Respondents N = 195 |
|---|---|
| Desktop computer | 14.9% |
| Laptop computer | 27.2% |
| Smartphone | 54.9% |
| Tablet | 3.1% |

Note:

[1]  Respondents were shown images of the Apple Watch Series 8 in Q3.

[2]  All respondents who answered that they were using a cell phone (not a smartphone) or other device in QS60 were terminated from the survey.  Five respondents answered that they considered 20 or more smartwatch brands in QS100 or that they were familiar with 20 or more smartwatch brands in Q2 and have been excluded from the analysis.

[3]  The order of these options was randomized when presented in the survey.

# Exhibit 3D

## Design Impact Survey – Apple Watch Series 8[1]

## QS70: Which of the following types of consumer electronics do you own?[2][3]

| Device[4] | Respondents N = 195 |
|---|---|
| Gaming console | 72.8% |
| Smartphone | 99.0% |
| Smartwatch | 63.6% |
| Tablet | 81.0% |

Note:

[1] Respondents were shown images of the Apple Watch Series 8 in Q3.

[2] All respondents who answered "None of the above" or "Don't know" in QS70 were terminated from the survey. Five respondents answered that they considered 20 or more smartwatch brands in QS100 or that they were familiar with 20 or more smartwatch brands in Q2 and have been excluded from the analysis.

[3] Percentages shown do not sum to 100% because respondents were allowed to select more than one response for the question.

[4] The order of these options was randomized when presented in the survey.

# Exhibit 3E

## Design Impact Survey – Apple Watch Series 8[1]

## QS80: Which of the following types of consumer electronics products do you expect to purchase in the next 12 months?[2]

| Purchase Decision[3] | Respondents<br>N = 195 |
|---|---|
| I definitely will purchase [a smartwatch] in the next 12 months | 48.2% |
| I probably will purchase [a smartwatch] in the next 12 months | 51.8% |

Note:

[1] Respondents were shown images of the Apple Watch Series 8 in Q3.

[2] All respondents who answered "I may or may not purchase [a smartwatch] in the next 12 months," "I probably will not purchase [a smartwatch] in the next 12 months," or "I definitely will not purchase [a smartwatch] in the next 12 months" in QS80 were terminated from the survey. Five respondents answered that they considered 20 or more smartwatch brands in QS100 or that they were familiar with 20 or more smartwatch brands in Q2 and have been excluded from the analysis.

[3] Respondents were asked the same question about Gaming consoles, Smartphones, and Tablets.

# Exhibit 3F

## Design Impact Survey – Apple Watch Series 8[1]

## QS100:  If/when you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?[2]

| Number of Brands[3] | Respondents N = 195 |
|---|---|
| 2 | 41.0% |
| 3 | 33.3% |
| 4 | 8.7% |
| 5 | 9.7% |
| 6 | 1.5% |
| 7 | 0.0% |
| 8 | 1.0% |
| 9+ | 4.6% |

Note:
[1] Respondents were shown images of the Apple Watch Series 8 in Q3.
[2] All respondents who answered that they considered only zero or one smartwatch brand in QS100 were terminated from the survey.  Five respondents answered that they considered 20 or more smartwatch brands in QS100 or that they were familiar with 20 or more smartwatch brands in Q2 and have been excluded from the analysis.
[3] Respondents expected to consider an average of 3.3 smartwatch brands.

# Exhibit 3G
# Design Impact Survey – Apple Watch Series 8[1]
# Q1: How familiar or unfamiliar are you with smartwatches?[2]

| Familiarity[3] | Respondents<br>N = 195 |
|---|---|
| Familiar | 73.8% |
| Unfamiliar | 26.2% |

Note:

[1] Respondents were shown images of the Apple Watch Series 8 in Q3.

[2] Five respondents answered that they considered 20 or more smartwatch brands in QS100 or that they were familiar with 20 or more smartwatch brands in Q2 and have been excluded from the analysis.

[3] Respondents who responded 0–5 on a 0–10 scale of familiarity were considered unfamiliar with smartwatches, and respondents who responded 6–10 were considered familiar with smartwatches. Respondents reported an average familiarity of 7.2 on a 0–10 scale.

**Exhibit 3H**

**Design Impact Survey – Apple Watch Series 8[1]**

**Q2: How many smartwatch brands are you familiar with?[2]**

| Number of Brands[3] | Respondents N = 195 |
|---|---|
| 0 | 2.1% |
| 1 | 5.6% |
| 2 | 32.3% |
| 3 | 26.7% |
| 4 | 12.8% |
| 5 | 9.7% |
| 6 | 1.0% |
| 7 | 1.5% |
| 8 | 2.1% |
| 9+ | 6.2% |

Note:
[1]  Respondents were shown images of the Apple Watch Series 8 in Q3.
[2]  Five respondents answered that they considered 20 or more smartwatch brands in QS100 or that they
      were familiar with 20 or more smartwatch brands in Q2 and have been excluded from the analysis.
[3]  Respondents are familiar with an average of 3.5 smartwatch brands.

# Exhibit 3I
# Design Impact Survey – Apple Watch Series 8[1]
# Q3: Please select the features that you expect will impact your purchase decision[2][3]

| Feature[5] | All Respondents | Familiar with Smartwatches[4] |
|---|---|---|
| | N = 195 | N = 144 |
| Appearance and design: front of the watch | 70.8% | 74.3% |
| Appearance and design: back of the watch | 31.8% | 33.3% |
| Battery life | 74.4% | 74.3% |
| Fitness tracking | 56.9% | 54.9% |
| Heart monitoring | 57.9% | 60.4% |
| Materials and finishes | 37.9% | 44.4% |
| Physiological data monitoring | 42.1% | 46.5% |
| Price | 67.7% | 66.0% |
| Sleep tracking | 42.6% | 46.5% |
| Two time zone display | 15.9% | 17.4% |
| Variety and number of apps | 51.8% | 56.3% |
| Water resistance | 59.0% | 57.6% |
| Weight | 34.9% | 35.4% |

Note:
[1] Respondents were shown images of the Apple Watch Series 8 in Q3.
[2] Five respondents answered that they considered 20 or more smartwatch brands in QS100 or that they were familiar with 20 or more smartwatch brands in Q2 and have been excluded from the analysis.
[3] Percentages shown do not sum to 100% because respondents were allowed to select more than one response for the question.
[4] Respondents who responded 6–10 on a 0–10 scale of familiarity in Q1 were considered familiar with smartwatches.
[5] The order of these features was randomized when presented in the survey.

**Exhibit 4A**

**Association Survey – Apple Watch Series 5[1]**

**Overall Respondent Breakdown[2]**

| Attribute | Target Quota | Overall<br>N = 394 | Control Group[3]<br>N = 200 | Test Group[4]<br>N = 194 |
|---|---|---|---|---|
| **Gender / Age** | | | | |
| Male 18–39 | 25% | 24.1% | 24.5% | 23.7% |
| Male 40+ | 25% | 25.4% | 25.0% | 25.8% |
| Female 18–39 | 25% | 25.1% | 25.0% | 25.3% |
| Female 40+ | 25% | 25.4% | 25.5% | 25.3% |
| Other 18–39 | NA | 0.0% | 0.0% | 0.0% |
| Other 40+ | NA | 0.0% | 0.0% | 0.0% |
| | | | | |
| **Region** | | | | |
| Midwest | 22% | 22.3% | 22.5% | 22.2% |
| Northeast | 18% | 17.8% | 18.0% | 17.5% |
| South | 35% | 34.8% | 34.5% | 35.1% |
| West | 25% | 25.1% | 25.0% | 25.3% |

Note:
[1] In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 5.
[2] One respondent in the Control Group and six respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3] "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.
[4] "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

# Exhibit 4B
## Association Survey – Apple Watch Series 5[1]
## QS50:  Do you, or does any member of your household, currently work for any of the following?[2][3]

| Employer[4] | Control Group[5]<br>N = 200 | Test Group[6]<br>N = 194 |
|---|---|---|
| A company that makes or distributes computer chips | 1.5% | 2.1% |
| A company that makes or distributes televisions | 1.0% | 0.0% |
| A company that makes or distributes video game consoles | 0.5% | 1.5% |
| None of these | 97.5% | 96.4% |

Note:

[1] In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 5.

[2] All respondents who answered that they or a family member worked for "A company that makes or distributes smartwatches," "A market research firm or a marketing research department of a company," or "An advertising, public relations or marketing agency or advertising department of a company" were terminated from the survey.  One respondent in the Control Group and six respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3] Percentages shown may not sum to 100% because respondents were allowed to select more than one response for the question.

[4] The order of these options was randomized when presented in the survey.

[5] "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

[6] "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

# Exhibit 4C
# Association Survey – Apple Watch Series 5[1]
# QS60:  Which of the following devices are you using right now to take this survey?[2]

| Device[3] | Control Group[4]<br>N = 200 | Test Group[5]<br>N = 194 |
|---|---|---|
| Desktop computer | 17.5% | 17.5% |
| Laptop computer | 21.5% | 25.3% |
| Smartphone | 58.5% | 52.6% |
| Tablet | 2.5% | 4.6% |

Note:
[1]  In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 5.
[2]  All respondents who answered that they were using a cell phone (not a smartphone) or other device were terminated from the survey.  One respondent in the Control Group and six respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3]  The order of these options was randomized when presented in the survey.
[4]  "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.
[5]  "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

# Exhibit 4D

## Association Survey – Apple Watch Series 5[1]

## QS70:  Which of the following types of consumer electronics do you own?[2][3]

| Device[4] | Control Group[5] N = 200 | Test Group[6] N = 194 |
|---|---|---|
| Gaming console | 70.5% | 68.6% |
| Smartphone | 97.0% | 97.4% |
| Smartwatch | 58.5% | 56.7% |
| Tablet | 78.0% | 78.4% |

Note:

[1] In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 5.

[2] All respondents who answered "None of the above" or "Don't know" were terminated from the survey.  One respondent in the Control Group and six respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3] Percentages shown do not sum to 100% because respondents were allowed to select more than one response for the question.

[4] The order of these options was randomized when presented in the survey.

[5] "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

[6] "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

# Exhibit 4E

## Association Survey – Apple Watch Series 5[1]

## QS80: Which of the following types of consumer electronics products do you expect to purchase in the next 12 months?[2]

| Purchase Decision[3] | Control Group[4]<br>N = 200 | Test Group[5]<br>N = 194 |
|---|---|---|
| I definitely will purchase [a smartwatch] in the next 12 months | 39.2% | 44.5% |
| I probably will purchase [a smartwatch] in the next 12 months | 60.8% | 55.5% |

Note:

[1]  In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 5.

[2]  All respondents who answered "I may or may not purchase [a smartwatch] in the next 12 months," "I probably will not purchase [a smartwatch] in the next 12 months," and "I definitely will not purchase [a smartwatch] in the next 12 months" were terminated from the survey.  One respondent in the Control Group and six respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3]  Respondents were asked the same question about Gaming consoles, Smartphones, and Tablets.

[4]  "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

[5]  "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

## Exhibit 4F

## Association Survey – Apple Watch Series 5[1]
## QS100: If/when you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?[2]

| Number of Brands[3] | Control Group [4]<br>N = 200 | Test Group [5]<br>N = 194 |
|---|---|---|
| 2 | 48.5% | 42.8% |
| 3 | 29.0% | 37.6% |
| 4 | 8.0% | 10.3% |
| 5 | 9.5% | 6.7% |
| 6 | 1.5% | 0.5% |
| 7 | 0.5% | 0.0% |
| 8 | 0.5% | 0.0% |
| 9+ | 2.5% | 2.1% |

Note:
[1] In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 5.
[2] All respondents who answered that they considered only zero or one smartwatch brand were terminated from the survey. One respondent in the Control Group and six respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3] Respondents in the Control Group expected to consider an average of 3.1 smartwatch brands and respondents in the Test Group expected to consider an average of 3.0 smartwatch brands.
[4] "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.
[5] "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

**Exhibit 4G**

**Association Survey – Apple Watch Series 5[1]**
**QS110: Which, if any, of the following features do you expect will impact your decision of which smartwatch to purchase?[2][3]**

| Feature[4] | Control Group[5] N = 200 | Test Group[6] N = 194 |
|---|---|---|
| Appearance and design of the watch | 62.0% | 69.1% |
| Battery life | 70.5% | 77.8% |
| Fitness tracking | 58.5% | 66.0% |
| Heart monitoring | 51.0% | 53.1% |
| Materials and finishes | 41.0% | 42.8% |
| Physiological data monitoring | 41.0% | 40.7% |
| Price | 75.5% | 79.4% |
| Sleep tracking | 43.0% | 45.4% |
| Variety and number of apps | 42.0% | 37.6% |
| Water resistance | 67.5% | 69.6% |
| Weight | 38.0% | 32.5% |
| Other | 1.0% | 1.5% |
| None of the above | 1.0% | 1.0% |

Note:
[1] In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 5.
[2] One respondent in the Control Group and six respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis
[3] Percentages shown do not sum to 100% because respondents were allowed to select more than one response for the question.
[4] The order of these features was randomized when presented in the survey.
[5] "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.
[6] "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

# Exhibit 4H
## Association Survey – Apple Watch Series 5[1]
## Q1: Which, if any, smartwatch company or brand do you associate with the design of the back of the smartwatch shown above?[2]

| Brand | Fitness Group[3] | | Overall Group | |
| | Control Group [4] N = 158 | Test Group [5] N = 159 | Control Group [4] N = 200 | Test Group [5] N = 194 |
|---|---|---|---|---|
| Amazfit | 18.4% | 5.7% | 19.5% | 4.6% |
| Apple | 10.1% | 50.9% | 10.0% | 50.5% |
| Fitbit | 10.1% | 10.7% | 9.0% | 9.3% |
| Garmin | 18.4% | 7.5% | 17.5% | 7.7% |
| Samsung | 21.5% | 13.2% | 22.5% | 14.4% |
| Other | 0.6% | 0.6% | 0.5% | 1.0% |
| Don't know | 9.5% | 6.3% | 10.0% | 7.7% |
| No association | 11.4% | 5.0% | 11.0% | 4.6% |

Note:
[1] In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 5.
[2] One respondent in the Control Group and six respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3] "Fitness Group" consists of respondents who indicate in QS110 that at least one of the fitness-related smartwatch features (physiological data monitoring, sleep tracking, fitness tracking, and heart monitoring) will impact their purchase decision.
[4] "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.
[5] "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

# Exhibit 5A

## Association Survey – Apple Watch Series 8[1]

## Overall Respondent Breakdown[2]

| Attribute | Target Quota | Overall N = 393 | Control Group [3] N = 196 | Test Group [4] N = 197 |
|---|---|---|---|---|
| **Gender / Age** | | | | |
| Male 18–39 | 25% | 24.9% | 26.0% | 23.9% |
| Male 40+ | 25% | 24.9% | 24.5% | 25.4% |
| Female 18–39 | 25% | 25.2% | 25.5% | 24.9% |
| Female 40+ | 25% | 24.9% | 24.0% | 25.9% |
| Other 18–39 | NA | 0.0% | 0.0% | 0.0% |
| Other 40+ | NA | 0.0% | 0.0% | 0.0% |
| | | | | |
| **Region** | | | | |
| Midwest | 22% | 21.9% | 21.9% | 21.8% |
| Northeast | 18% | 17.6% | 17.3% | 17.8% |
| South | 35% | 35.4% | 35.2% | 35.5% |
| West | 25% | 25.2% | 25.5% | 24.9% |

Note:

[1] In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 8.

[2] Four respondents in the Control Group and three respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3] "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

[4] "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

# Exhibit 5B

## Association Survey – Apple Watch Series 8[1]

## QS50:  Do you, or does any member of your household, currently work for any of the following?[2][3]

| Employer[4] | Control Group[5]<br>N = 196 | Test Group[6]<br>N = 197 |
|---|---|---|
| A company that makes or distributes computer chips | 1.0% | 1.0% |
| A company that makes or distributes televisions | 0.5% | 1.0% |
| A company that makes or distributes video game consoles | 1.5% | 1.0% |
| None of these | 98.5% | 98.0% |

Note:

[1]  In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 8.

[2]  All respondents who answered that they or a family member worked for "A company that makes or distributes smartwatches," "A market research firm or a marketing research department of a company," or "An advertising, public relations or marketing agency or advertising department of a company" were terminated from the survey.  Four respondents in the Control Group and three respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3]  Percentages shown may not sum to 100% because respondents were allowed to select more than one response for the question.

[4]  The order of these options was randomized when presented in the survey.

[5]  "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

[6]  "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

## Exhibit 5C

## Association Survey – Apple Watch Series 8[1]

## QS60:  Which of the following devices are you using right now to take this survey?[2]

| Device[3] | Control Group[4]<br>N = 196 | Test Group[5]<br>N = 197 |
|---|---|---|
| Desktop computer | 12.8% | 12.2% |
| Laptop computer | 13.8% | 12.7% |
| Smartphone | 68.4% | 68.5% |
| Tablet | 5.1% | 6.6% |

Note:

[1] In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 8.

[2] All respondents who answered that they were using a cell phone (not a smartphone) or other device were terminated from the survey.  Four respondents in the Control Group and three respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3] The order of these options was randomized when presented in the survey.

[4] "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

[5] "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

## Exhibit 5D

## Association Survey – Apple Watch Series 8[1]

## QS70:  Which of the following types of consumer electronics do you own?[2][3]

| Device[4] | Control Group[5]<br>N = 196 | Test Group[6]<br>N = 197 |
|---|---|---|
| Gaming console | 79.6% | 76.6% |
| Smartphone | 99.5% | 99.0% |
| Smartwatch | 63.3% | 61.9% |
| Tablet | 84.2% | 81.2% |

Note:
[1]  In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 8.
[2]  All respondents who answered "None of the above" or "Don't know" were terminated from the survey.  Four respondents in the Control Group and three respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3]  Percentages shown do not sum to 100% because respondents were allowed to select more than one response for the question.
[4]  The order of these options was randomized when presented in the survey.
[5]  "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.
[6]  "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

# Exhibit 5E

## Association Survey – Apple Watch Series 8[1]

## QS80: Which of the following types of consumer electronics products do you expect to purchase in the next 12 months?[2]

| Purchase Decision[3] | Control Group[4]<br>N = 196 | Test Group[5]<br>N = 197 |
|---|---|---|
| I definitely will purchase [a smartwatch] in the next 12 months | 41.6% | 49.5% |
| I probably will purchase [a smartwatch] in the next 12 months | 58.4% | 50.5% |

Note:

[1]  In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 8.

[2]  All respondents who answered "I may or may not purchase [a smartwatch] in the next 12 months," "I probably will not purchase [a smartwatch] in the next 12 months," and "I definitely will not purchase [a smartwatch] in the next 12 months" were terminated from the survey.  Four respondents in the Control Group and three respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3]  Respondents were asked the same question about Gaming consoles, Smartphones, and Tablets.

[4]  "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

[5]  "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

**Exhibit 5F**

**Association Survey – Apple Watch Series 8[1]**
**QS100: If/when you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?[2]**

| Number of Brands[3] | Control Group[4]<br>N = 196 | Test Group[5]<br>N = 197 |
|---|---|---|
| 2 | 43.9% | 41.1% |
| 3 | 35.7% | 34.5% |
| 4 | 5.1% | 8.6% |
| 5 | 11.2% | 10.7% |
| 6 | 1.0% | 1.5% |
| 7 | 2.0% | 0.5% |
| 8 | 0.0% | 1.0% |
| 9+ | 1.0% | 2.0% |

Note:
[1] In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 8.
[2] All respondents who answered that they considered only zero or one smartwatch brand were terminated from the survey.  Four respondents in the Control Group and three respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3] Respondents in the Control Group expected to consider an average of 3.0 smartwatch brands and respondents in the Test Group expected to consider an average of 3.2 smartwatch brands.
[4] "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.
[5] "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

**Exhibit 5G**

**Association Survey – Apple Watch Series 8[1]**
**QS110: Which, if any, of the following features do you expect will impact your decision of which smartwatch to purchase?[2][3]**

| Feature[4] | Control Group[5] N = 196 | Test Group[6] N = 197 |
|---|---|---|
| Appearance and design of the watch | 56.1% | 63.5% |
| Battery life | 71.4% | 77.2% |
| Fitness tracking | 70.9% | 68.0% |
| Heart monitoring | 55.1% | 50.8% |
| Materials and finishes | 42.3% | 38.6% |
| Physiological data monitoring | 40.8% | 35.5% |
| Price | 76.0% | 77.7% |
| Sleep tracking | 48.5% | 46.2% |
| Variety and number of apps | 39.3% | 40.6% |
| Water resistance | 64.3% | 62.4% |
| Weight | 33.2% | 39.1% |
| Other | 1.0% | 1.0% |
| None of the above | 0.5% | 1.5% |

Note:
[1]  In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 8.
[2]  Four respondents in the Control Group and three respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.
[3]  Percentages shown do not sum to 100% because respondents were allowed to select more than one response for the question.
[4]  The order of these features was randomized when presented in the survey.
[5]  "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.
[6]  "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

# Exhibit 5H
## Association Survey – Apple Watch Series 8[1]
## Q1: Which, if any, smartwatch company or brand do you associate with the design of the back of the smartwatch shown above?[2]

| Brand | Fitness Group[3] | | Overall Group | |
|---|---|---|---|---|
| | Control Group [4] N = 173 | Test Group [5] N = 165 | Control Group [4] N = 196 | Test Group [5] N = 197 |
| Amazfit | 18.5% | 4.2% | 17.3% | 3.6% |
| Apple | 15.0% | 43.6% | 14.8% | 41.6% |
| Fitbit | 12.7% | 6.1% | 13.3% | 8.1% |
| Garmin | 14.5% | 9.7% | 13.3% | 8.6% |
| Samsung | 25.4% | 20.0% | 23.5% | 20.8% |
| Other | 0.0% | 0.6% | 0.0% | 0.5% |
| Don't know | 4.6% | 4.8% | 7.1% | 6.6% |
| No association | 9.2% | 10.9% | 10.7% | 10.2% |

Note:

[1] In this survey, respondents were asked a multiple choice question on brand association, and were shown the backs of the smartwatches.  For the Apple watch option, respondents were shown an image of the back of the Apple Watch Series 8.

[2] Four respondents in the Control Group and three respondents in the Test Group answered that they considered 20 or more smartwatch brands in QS100 and have been excluded from the analysis.

[3] "Fitness Group" consists of respondents who indicate in QS110 that at least one of the fitness-related smartwatch features (physiological data monitoring, sleep tracking, fitness tracking, and heart monitoring) will impact their purchase decision.

[4] "Control Group" indicates respondents were shown an image of the back of a Ticwatch watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

[5] "Test Group" indicates respondents were shown an image of the back of a Masimo watch and were asked which smartwatch company or brand they associated with the design of the back of the shown watch.

# APPENDIX A
# CV

Itamar Simonson

**ADDRESSES**                                                                August 2022

Home Office:                                        (University) Office:

 1561 Newlands Ave.                        Graduate School of Business

 Burlingame, CA 94010                      655 Knight Center, Stanford University

 Cell: (650) 387-7677                        Stanford, CA 94305-5015

 itamar.simonson@gmail.com                  itamars@stanford.edu


**EDUCATION**

Ph.D.                         Duke University, Fuqua School of Business
                              Major: Marketing;  May 1987


M.B.A.                        UCLA,  Graduate School of Management
                              Major: Marketing;  March 1978

B.A.                          Hebrew University, Jerusalem, Israel
                              Major: Economics, Political Science;  August 1976

**ACADEMIC POSITIONS**

July 1987 - June 1993         University of California, Berkeley
                                Haas School of Business
                                Assistant Professor


July 1993 – Aug. 1996         Stanford Graduate School of Business
                                Associate Professor of Marketing


Sept. 1996 – Aug. 1999        Stanford Graduate School of Business
                              Professor of Marketing


Sept. 1999 –    Dec. 2020     Stanford Graduate School of Business
                              Sebastian S. Kresge Professor of Marketing


Jan. 2021 – Present           Stanford Graduate School of Business
                              Sebastian S. Kresge Emeritus Professor of Marketing


1994 – 2000                   Stanford Graduate School of Business
                                Marketing Group Head


2000, 2004, 2012              Visiting Professor of Marketing: MIT; NYU; Columbia

A-2

**AWARDS**

- Best Article in the *Journal of Consumer Research* during the period 1987-1989.

- The 1997 O'Dell Award (for the *Journal of Marketing Research* article that has had the greatest impact on the marketing field in the previous five years).

- The 2001 O'Dell Award.

- Honorary Doctorate: University of Paris II – Sorbonne Universities.

- The American Marketing Association Best Book in Marketing Award.

- Elected Fellow of the Association for Consumer Research.

- The 2007 Society for Consumer Psychology Distinguished Scientific Achievement Award.

- Finalist for the O'Dell Award:  1995;  2002;  2004;  2005;  2007;  2008; 2012.

- Best Article in the *Journal of Public Policy & Marketing*  during the period 1993-1995.

- The 2016 Association for Consumer Research Conference Best Paper Award.

- The 2002 American Marketing Association Award for the Best Article on Services Marketing.

- The Association for Consumer Research 1990 "Ferber Award."

- Finalist for the 2003 Paul Green Award (for the *Journal of Marketing Research* article with the greatest potential to contribute to the practice of marketing research).

- Runner-up for the 2005 *Journal of Consumer Research* Best Article Award.

- Winner in the Marketing Science Institute and Direct Marketing Association competition on "Understanding and Measuring the Effect of Direct Marketing."

- Runner-up for the 1993 *California Management Review* Best Article Award.

- National Science Foundation Grant (for 1996-8).

- Outstanding Reviewer Award, *Journal of Consumer Research*, 2005, 2009.

- Honorable Mention for the Sloan Executive Program Teaching Award.


**TEACHING EXPERIENCE**

Stanford University:

       Marketing Management  (for MBAs and the Sloan Executive Program)

       Marketing to Businesses (for MBAs);  Technology Marketing  (for MBAs)

       Critical Analytical Thinking (for MBAs)

       Research Methods for Studying Consumer Behavior  (a Ph.D. Course)

       Applied Behavioral Economics  (at the MBA and Ph.D. levels)

       Buyer Behavior (a Ph.D. course)

University Of California, Berkeley:

       MBA, Ph.D. and Executive Education Classes on Marketing Management and Consumer Behavior.

**BUSINESS EXPERIENCE**

October 1978-August 1983    Motorola, Inc.
Worked in an international subsidiary; responsibilities included marketing research and customer analysis, customer surveys, definition of new products, pricing, analysis of sales force performance, competitive intelligence, and forecasting.  Conducted studies of consumers and markets for various communications products.  Last two years served as Product Marketing Manager for communications products.

**Consulting**:

Consulted for clients from a wide range of industries such as technology, communications, services, and manufacturing sectors.
Expert witness assignments: trademark infringement, deceptive advertising, surveys, consumer behavior, marketing management, branding, retailing, distribution, assessment of demand drivers and feature value, and other marketing issues.


**PUBLICATIONS**

Ioannis Evangelidis, Jonathan Levav, and Itamar Simonson, "The Upscaling Effect," *Journal of Consumer Research*, Forthcoming.

Ioannis Evangelidis, Jonathan Levav, and Itamar Simonson (2022), "A Reexamination of the Impact of Decision Conflict on Choice Deferral," *Management Science*, Forthcoming.

Itamar Simonson (2022), "Experimentation, Serendipity, and Strategy in Research Discovery," *Review of Marketing Research.*

David Gal and Itamar Simonson (2021), "Predicting Consumers' Choices in the Age of the Internet, AI, and Almost Perfect Tracking: Some Things Change, the Key Challenges Do Not," *Consumer Psychology Review*, 4 (1), 135-152.

Itamar Simonson (2020), "The Real Time Cognitive Value of Eating Kale, Helping, and Doing Something Special: "Concurrent Experience Evaluation" (CEE), Its Drivers and Moderators, and Research Directions," *Journal of Consumer Psychology*, 30, 688-711.

Franklin Shaddy, Ayelet Fishbach, and Itamar Simonson (2021), "Tradeoffs in Choice," *Annual Review in Psychology*, 72, 181-206.

Haiyang Yang, Ziv Carmon, and Itamar Simonson (2020), "Preference for Practical versus Theoretical Knowledge: Conceptualization and Consumer Behavior Predictions," *Review of Marketing Research*, Vol. 17, Dawn Iaccabucci Editor.

Louise Twito, Salomon Israel, Itamar Simonson, and Ariel Knafo-Noam (2019), "The Motivational Aspect of Children's Delayed Gratification: Values and Decision Making in Middle Childhood," *Frontiers in Psychology*.

A-4

Itamar Simonson (2018), "Understanding Consumer Choices Involving Environmental and Utilitarian Attributes: The Role of Dimensional Comparability and Compromisibility," *Journal of Environmental Analysis & Ecology Studies*, Vol. 3.

Itamar Simonson and Ran Kivetz (2018), "Bringing (Contingent) Loss Aversion Down to Earth – A Comment," *Journal of Consumer Psychology*, *Journal of Consumer Psychology*, 28, 517-522.

Ioannis Evangelidis, Jonathan Levav, and Itamar Simonson (2018), "The Asymmetric Impact of Context Effects on Advantaged versus Disadvantaged Options," *Journal of Marketing Research*, 55, 239-253.

Itamar Simonson, Aner Sela, and Sanjay Sood (2017), "Preference-Construction Habits: The Case of Extremeness Aversion," *Journal of the Association for Consumer Research*, 2, 3, 322-332.

Itamar Simonson (2016), "Imperfect Progress: An Objective, Quality Assessment of the Role of User Reviews in Consumer Decision Making," *Journal of Consumer Research*, 42, 840-845.

Itamar Simonson (2016), "The Construction of the Consumer Decision Making Field by Jim Bettman – The Case of Preference Construction," in *Legends in Consumer Behavior*, I. Simonson, editor.

Leilei Gao and Itamar Simonson (2016), "The positive effect of assortment size on purchase likelihood: The moderating influence of decision order," *Journal of Consumer Psychology*, 26, 542-549.

Itamar Simonson (2015), "Mission (Largely) Accomplished:  What's Next for Consumer BDT-JDM Researchers?" *Journal of Marketing Behavior*, 1, 9-35.

Itamar Simonson (2015), "The BDT Effect and Future:  A Reply to John Lynch and Norbert Schwarz" *Journal of Marketing Behavior*, 1, 59-73.

Itamar Simonson (2014), "Vices and Virtues of Misguided Replications:  The Case of Asymmetric Dominance," *Journal of Marketing Research*; 51 (4), 514-9.

Itamar Simonson and Emanuel Rosen (2014), *Absolute Value: What Really Influences Customers in the Age of (Nearly) Perfect Information*, HarperCollins Publishers.

Itamar Simonson and Emanuel Rosen (2014), "What Marketers Misunderstand About Online Reviews," *Harvard Business Review*, January, 23-25.

(*HBR Blog*:  "Three Long-Held Concepts Every Marketer Should Rethink," January 22, 2014)

Leilei Gao, YanLiu Huang, and Itamar Simonson (2014), "The Influence of Initial Possession Level on Consumers' Adoption of A Collection Goal: A Tipping Point Effect," *Journal of Marketing*, 78, 143-156.

Aner Sela, Itamar Simonson, and Ran Kivetz (2013), "Beating the Market: The Allure of Unintended Value," *Journal of Marketing Research*, Vol. L (December), 691-705.

Itamar Simonson, James Bettman, Thomas Kramer, and John Payne (2013), "Comparison Selection: An Approach to the Study of Consumer Judgment and Choice," *Journal of Consumer Psychology*, 23(1), 137-149.

Itamar Simonson, James Bettman, Thomas Kramer, and John Payne (2013), "Directions for Judgment and Decision Making Research Based on Comparison Selection:  Reply to Arkes, Johnson, and Kardes," *Journal of Consumer Psychology*, 23(1), 161-3.

Itamar Simonson and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," Ch. 11 in *Trademark and False Advertising Surveys*, Edited by Shari Diamond and Jerre Swann, American Bar Association.

Thomas Kramer, Michal Maimaran, and Itamar Simonson (2012), "Asymmetric Option Effects on Ease of Choice Criticism and Defense," *OBHDP*, 117, 179-91.

Michal Maimaran and Itamar Simonson (2011), "Multiple Routes to Self Versus Other-Expression in Consumer Choice," *Journal of Marketing Research*, August, 755-66.

Itamar Simonson and Aner Sela (2011), "On the Heritability of Consumer Decision Making:  An Exploratory Approach for Studying Genetic Effects on Judgment and Choice," *Journal of Consumer Research*, 37, 951-66.

Stephen Nowlis, Ravi Dhar, and Itamar Simonson (2010), "The Effect of Decision Order on Purchase Quantity Decisions," *Journal of Marketing Research*, 40 (4), 725-737.

Chezy Ofir, Itamar Simonson, and Song-Oh Yoon (2009), "The Robustness of the Effects of Consumers' Participation in Market Research: The Case of Service Quality Evaluations," *Journal of Marketing*, 73 (November), 105-14.

Aimee Drolet, Mary Frances Luce, and Itamar Simonson (2009), "When Does Choice Reveal Preference? Moderators of Heuristic vs. Goal Based Choice," *Journal of Consumer Research*, 36 (1).

Itamar Simonson (2008), "Regarding Inherent Preferences," *Journal of Consumer Psychology*, 18, 191-196.

Itamar Simonson (2008), "Will I Like a 'Medium' Pillow?  Another Look at Constructed and Inherent Preferences," *Journal of Consumer Psychology*, 18, 155-169.

Song-Oh Yoon and Itamar Simonson (2008), "The Context of Construction as a Determinant of the Strength and Stability of Consumer Preferences," *Journal of Consumer Research*, 35, September, 324-336.

Itamar Simonson (2007), "Decision Making," *Encyclopedia of Social Psychology*; Sage.

Jonah Berger, Michaela Draganska, and Itamar Simonson (2007), "The Influence of Product Variety on Brand Perceptions, Choice, and Experience," *Marketing Science*, 26, July-August, 460-72.

Nathan Novemsky, Ravi Dhar, Norbert Schwarz, and Itamar Simonson (2007), "Preference Fluency in Choice," *Journal of Marketing Research*, XLIV, 347-356.

Chezy Ofir and Itamar Simonson (2007), "The Effect of Stating Expectations on Customer Satisfaction and Shopping Experience," *Journal of Marketing Research*, February, 164-174.

Ray Fisman, Sheena Iyengar, Emir Kamenica, and Itamar Simonson (2007), "Racial Preferences in Dating," *Review of Economic Studies*, 75, 1, 117-132.

Raymond Fisman, Sheena Iyengar, Emir Kamenica, and Itamar Simonson (2006), "Gender Differences in Mate Selection: Evidence from a Speed Dating Experiment," *Quarterly Journal of Economics*, 121 (2), 673-697.

Itamar Simonson (2005), "Determinants of Customers' Responses to Customized Offers: Conceptual Framework and Research Propositions," *Journal of Marketing*, 69 (January), 32-45.

Itamar Simonson (2005), "In Defense of Consciousness:  The Role of Conscious and Unconscious Inputs in Consumer Choice," *Journal of Consumer Psychology*,15(3), 211-217.

Donnel Briley, Michael Morris, and Itamar Simonson (2005), "Cultural Chameleons: Biculturals, Conformity Motives, and Decision Making," *Journal of Consumer Psychology*, 15 (4), 351-362.

Uptal Dholakia and Itamar Simonson (2005), "The Effect of Explicit Reference Points on Consumer Choice and Online Bidding Behavior," *Marketing Science*, 24, 206-17.

Itamar Simonson, Thomas Kramer, and Maia Young (2004), "Effect Propensity," *Organizational Behavior and Human Decision Processes*, 95 (November), 156-74.

Itamar Simonson and Aimee Drolet (2004), "Anchoring Effects on Consumers' Willingness-to-Pay and Willingness-to-Accept," *Journal of Consumer Research*, 31 (December), 681-90.

Ran Kivetz and Itamar Simonson (2003) "The Idiosyncratic Fit Heuristic: The Role of Effort Advantage in Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40 (November), 454-67.

Dan Ariely and Itamar Simonson (2003), "Buying, Bidding, Playing, or Competing?  Value Assessment and Decision Dynamics in Online Auctions," *Journal of Consumer Psychology*, 13(1&2), 113–123.

Ravi Dhar and Itamar Simonson (2003), "The Effect of Forced Choice on Choice," *Journal of Marketing Research*, 40 (May), 146-60.

Ran Kivetz and Itamar Simonson (2002), "Self Control for the Righteous: Toward a Theory of Luxury Pre-Commitment," *Journal of Consumer Research*, 29 (September), 199-217.

Ran Kivetz and Itamar Simonson (2002), "Earning the Right to Indulge:  Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," *Journal of Marketing Research*, 39 (May), 155-70.

Chezy Ofir and Itamar Simonson (2001), "In Search of Negative Customer Feedback: The Effect of Expecting to Evaluate on Satisfaction Evaluations," *Journal of Marketing Research*, 38 (May), 170-82.

Itamar Simonson, Ziv Carmon, Ravi Dhar, Aimee Drolet, and Stephen Nowlis (2001), "Consumer Research: In Search of Identity," *Annual Review of Psychology*, 52, 249-275.

Donnel Briley, Michael Morris, and Itamar Simonson (2000), "Reasons as Carriers of Culture: Dynamic Vs. Dispositional Models of Cultural Influence on Decision Making," *Journal of Consumer Research*, 27 (September), 157-178.

Aimee Drolet, Itamar Simonson, and Amos Tversky (2000), "Indifference Curves that Travel with the Choice Set," *Marketing Letters*, 11(3), 199-209.

Stephen Nowlis and Itamar Simonson (2000), "Sales promotions and the Choice Context as Competing Influences on Consumer Decision Making," *Journal of Consumer Psychology*, 9(1), 1-17.

Ran Kivetz and Itamar Simonson (2000), "The Effect of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427-48.

Itamar Simonson and Stephen Nowlis (2000), "The Effect of Explaining and Need for Uniqueness on Consumer Decision Making:  Unconventional Consumer Choices Based on Reasons," *Journal of Consumer Research*, 27 (June), 49-68.

Itamar Simonson (1999), "The Effect of Product Assortment on Consumer Preferences," *Journal of Retailing*, 75(3), 347-70.

Ravi Dhar and Itamar Simonson (1999), "Making Complementary Choices in Consumption Episodes:  Highlighting Versus Balancing" *Journal of Marketing Research*, 36 (February), 29-44.

Houghton, David, ..., and Itamar Simonson (1999), "Correction Processes in Consumer Choice," *Marketing Letters*, 10(2),107-112.

Ziv Carmon and Itamar Simonson (1998), "Price-Quality Tradeoffs in Choice Versus Matching: New Insights into the Prominence Effect," *Journal of Consumer Psychology*, 7(4), 323-343.

Stephen Nowlis and Itamar Simonson (1997), "Attribute–Task Compatibility as a Determinant of Consumer Preference Reversals," *Journal of Marketing Research*, 34 (May), 205-218.

Joel Huber, …, and Itamar Simonson (1997), "Thinking About Values in Prospect and Retrospect: Maximizing Experienced Utility," *Marketing Letters*, 7, 324-334.

Stephen Nowlis and Itamar Simonson (1996), "The Impact of New Product Features on Brand Choice," *Journal of Marketing Research*, 33 (February), 36-46.

Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," *Journal of Public Policy and Marketing*, 13(2), 181-199.

Itamar Simonson, "Shoppers' Easily Influenced Choices," *NY Times*, 11/6/1994.

Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," *Trademark Reporter*, 84 (2), 199-223.

Itamar Simonson, Ziv Carmon, and Suzanne O'Curry (1994), "Experimental Evidence on the Negative Effect of Product Features and Sales Promotions on Brand Choice," *Marketing Science*, 13 (1), 23-40.

Itamar Simonson (1993), "Get Closer to Your Customers by Understanding How They Make Choices," *California Management Review*, 35 (4), 68-84.

Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," *Trademark Reporter*, 83 (3), 364-393.

Itamar Simonson, Stephen Nowlis, and Katherine Lemon (1993), "The Effect of Local Consideration Sets on Global Choice Between Lower Price and Higher Quality," *Marketing Science*, 12 (4), 357-377.

Itamar Simonson, Stephen Nowlis, and Yael Simonson (1993), "The Effect of Irrelevant Preference Arguments on Consumer Choice," Journal of Consumer Psychology, 2 (3), 287-306.

Eldar Shafir, Itamar Simonson, and Amos Tversky (1993), "Reasons-Based Choice," *Cognition*, 49, 11-36.

Amos Tversky and Itamar Simonson (1993), "Context-Dependent Preferences," *Management Science*, 39 (10), 1179-1189.

Itamar Simonson (1992), "Influences of Anticipating Regret and Responsibility on Purchase Decisions," *Journal of Consumer Research*, 19 (June), 105-118.

Itamar Simonson and Peter Nye (1992), "The Effect of Accountability on Susceptibility to Decision Errors",  *Organizational Behavior and Human Decision Processes*, 51 (3), 416-446.

Itamar Simonson and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," *Journal of Marketing Research*, 29 (August), 281-295.

Itamar Simonson and Barry Staw (1992), "De-Escalation Strategies: A Comparison of Techniques for Reducing Commitment to Losing Courses of Action,"  *Journal of Applied Psychology*, 77 (4), 419-426.

Itamar Simonson and Russell S. Winer (1992), "The Influence of Purchase Quantity and Display Format on Consumer Preference for Variety," *Journal of Consumer Research*, 19 (June), 133-138.

Ravi Dhar and Itamar Simonson (1992), "The Effect of the Focus of Comparison on Consumer Preferences,"  *Journal of Marketing Research*, 29 (November), 430-440.

William T. Ross and Itamar Simonson (1991), "Evaluations of Pairs of Experiences: A Preference for Happy Endings," *Journal of Behavioral Decision Making*, 4(4), 273-282.

Itamar Simonson (1991), "The Effect of Buying Decisions on Consumers' Assessments of Their Tastes", *Marketing Letters*, 2, 1, 5-14.

Itamar Simonson (1990), "The Effect of Purchase Quantity and Timing on Variety Seeking Behavior," *Journal of Marketing Research*, 27 (May), 150-162.

Itamar Simonson (1989), "Choice Based on Reasons: The Case of Attraction and Compromise Effects," *Journal of Consumer Research*, 16 (September), 158-174.

Itamar Simonson, Joel Huber, and John Payne (1988), "The Relationship Between Prior Brand Knowledge and Information Acquisition Order", *Journal of Consumer Research*, (March), 14, 566-78.

**ARTICLES  UNDER  REVIEW/REVISION**

Franklin Shaddy, Ayelet Fishbach, and Itamar Simonson, "Why Invoking the Self Attenuates Variety Seeking, the Compromise Effect, and Balancing." (Revised for resubmission)

Wendy Liu and Itamar Simonson, "Shortlisting – Not Overwhelmed But Biased." (Revised for resubmission)

Aner Sela and Itamar Simonson, "The Feeling of Preference: Preference Expression in the Absence of Preferences." (Revised for resubmission)

Ioannis Evangelidis, Jonathan Levav, and Itamar Simonson, "The Upscaling Effect."

Jen Park and Itamar Simonson, "Rejection and Closure: Why Options that Survive Rejection Are More Attractive."

**Doctoral Dissertations Chaired:**

Ravi Dhar (Chaired Professor, Yale U.)
Aimee Drolet (Chaired Professor, UCLA)
Stephen Nowlis (Chaired Professor, Washington U., St. Louis)
Ziv Carmon (Chaired Professor, INSEAD)
Ran Kivetz (Chaired Professor, Columbia U.)
Donnel Briley (Professor, U.O. Sydney)
Thomas Kramer (Professor, U.O. California, Riverside)
Wendy Liu (Professor, U.O. California, San Diego)
Sanjay Sood (Professor, UCLA)
Song-Oh Yoon (Professor, Korea University)
Michal Maimaran (Clinical Professor, Kellogg School)
Leilei Gao (Professor, Chinese University, Hong Kong)
Wendy De La Rosa (Assistant Professor, Wharton School, U.O. Penn.)
Aner Sela (Professor, U. O. Florida)
Jonah Berger (Associate Professor, Wharton School, U.O. Penn.)
Jen Park (Assistant Professor, University of British Columbia)

**EDITORIAL ACTIVITIES**

(In-coming)  Co-Editor of *Consumer Psychology Review*

Editorial Boards:  *Journal of Marketing Research, Journal of Consumer Psychology, Journal of Consumer Research, International Journal of Research in Marketing, Journal of Marketing in Emerging Economies, Marketing Letters*, *Journal of Academy of Marketing Science*, *Review of Marketing Research*.

Reviewer for *Marketing Science, Journal of Behavioral Decision Making, Science, Management Science, Journal of Retailing and Consumer Services, Journal of Marketing, Journal of Retailing, Organizational Behavior and Human Decision Processes, Journal of Experimental Psychology, Psychological Review, Psychological Bulletin, Journal of Personality and Social Psychology, Psychological Science, California Management Review, Journal of Economic Psychology*, *European Journal of Social Psychology, Journal of Judgment and Decision Making, Medical Decision Making,* and National Science Foundation.

**PROFESSIONAL AFFILIATIONS**

                                  Association for Consumer Research
                                  Judgment and Decision Making Society

# APPENDIX B
# TESTIMONY LIST

Cases in which Dr. Itamar Simonson Testified as an Expert at Trial or by Deposition in the Past Four Years

1.  Promotion In Motion v. Haribo America (Dist. of NJ; 19-cv-14183-MCA-LDW) (Deposition).

2.  RingCentral, Inc. v. Nextiva, Inc. (Nor. Dist. of CA, SJ Div.; 5:19-cv-02626) (Deposition).

3.  San Diego County Credit Union v. Citizens Equity First Credit Union (South. Dist. of CA; 3:18-cv-00967-GPC-RBB) (Trial).

4.  Car Freshner Corp. v. Crocs, Inc. (Nor. Dist. of NY; 7:16-cv-0068) (Deposition)

5.  William Brady v. Bayer et al. (State of CA Superior Court, Orange Country; 0-2016-00839608-CU-MC-CXC) (Deposition).

6.  MGFB Properties, Inc. et al. v. Viacom, Inc. et al. (Nor. Dist. FL; 5:19-00257) (Deposition).

7.  Sprint Spectrum et al. v. AT&T Mobility (SDNY; 19-CIV-1215) (Deposition).

8.  Jack Daniel's Properties v. VIP (US Dist. of Ariz., CV 14-02057) (Trial).

9.  The People of the State of California v. Macy's Inc. (Superior Court of CA, County of Los Angeles; BC643040) (Trial).

10. Jerome's Furniture Warehouse v. Ashley Furniture Industries (South. Dist. CA; 20-cv-1765) (Deposition).

11. American Eagle Outfitters v. Walmart (W.D. of PA; 2:20-cv-00412) (Deposition).

12. Jill Hennessey v. Kohl's Corp. (East. Dist. of Missouri; 4:19-01866) (Deposition)

13. Warner Bros. Entertainment v. Random Tuesday, Inc. (Cent. Dist. CA; 2:20-cv-02416) (Deposition).

14. Simmons et al. v. Ford Motor Company (S.D. FL; 18-cv-81558-RAR) (Deposition).

15. Maxell, Ltd. v. Apple Inc. (East. Dist. of TX; 5:19–cv–0036) (Deposition).

16. Polaris PowerLED Technologies v. Samsung Electronics America et al. (E.D. of Texas, Marshall Div., 2-17-cv-00715) (Deposition).

17. Koninklijke Philips Electronics N.V. v. Hunt Control Systems (Dist. of NJ, 11-03684) (Trial).

18. Ericsson Inc. v. Apple Inc. (EDTX, Marshall Div.; 2:21-cv-336 (Deposition).

19.     Stitch, Ltd. v. TikTok, Inc. (SD-CA; 3:21-cv-00626)) (Deposition).

20.     Sazerak Company, Inc. v. Fetzer Vineyard, Inc. (N. D. of CA; 3:15-cv-04618) (Trial)

21.     Koss Corp. v. Apple Inc. (WDTX; 6:20-cv-00665) (Deposition).

22.     Margarita Delgado, et al. v. Ocwen Loan Servicing et al. (East. Dist. of NY; 1:13-cv-04427) (Deposition).

23.     Thrive Natural Care v. Thrive Causemetics (Cent. Dist. of CA; 2:20-cv-9091-PA-AS) (Deposition).

24.     Contour IP v. GoPro, Inc. (N.D. of CA; 21-cv-2143) (Deposition).

25.     Burnett, Camp, et al. v. Conseco Life Insurance (So. Dist. of Indiana; 1:18-cv-00200-JPH-DML) (Deposition).

26.     Duracell U. S. Operations v. Energizer Brands (SDNY; 1:20-cv-07318) (Depositions).

27.     Milan et al. v. Clif Bar & Company (Nor. Dist. of CA; 18-02354) (Deposition).

28.     PNC Bank v. Trilegiant Corp. et al. (Court of Common Pleas, Allegheny County, PA; G.D. 15-020824) (Deposition).

29.     IPA Technologies Inc. v. Amazon.com, Inc. (Dist. of Delaware; 1:16-cv-01266-RGA) (Deposition).

30.     CFA Institute v. American Retirement Association (West. Dist. of VA; 3:19CV00012) (Deposition).

31.     Rovi Guides, Inc. v. Videotron LTD. (Federal Court, Ottawa; Docket T-921-17) (Trial).

32.     Federal Trade Commission v. LendingClub Corp. (Nor. Dist. Of CA; 3:18-cv-02454-JSC) (Deposition).

33.     ID Tech v. Samsung Electronics (Cent. Dist. of CA.; 8:17-cv-01748) (Deposition).

34.     Instagram, LLC v. Instagoods Pty Ltd (USPTO, Application no.: 88923261) (Deposition).

35.     American Airlines v. Delta Air Lines (North. Dist. of TX, Ft Worth Div.; 4:19-CV-01053-O) (Deposition)

36.     Innovation Sciences v. Amazon.com et al. (East. Dist. of TX, Sherman Div.; 4:18-cv-00474) (Deposition).

37.     Strategic Partners, Inc. v. Figs, Inc. (CD-CA; 2:19-cv-02286) (Trial).

38.     (on behalf of Sound Exchange) Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate those Performances (Web V) (U.S. Copyright Royalty Board) (Trial).

39.     Re. Apple iPhone Antitrust litigation (Nor. Dist. CA, Oakland Div.; 4:11-cv-
        06714-YG) (Deposition).

40.     Monster Energy Company v. BeastUp LLC (East. Dist. of CA; 17cv1605 KJM-
        JDP) (Trial).

41.     The People of the State of California v. HRB Tax Group et al. (Superior Court,
        County of LA; 19STCV15742) (Deposition).

42.     Jackpocket, Inc. v. LottoMatrix NY LLC et al. (SDNY; 22-cv-05772)
        (Deposition).

# APPENDIX C
# DOCUMENTS CONSIDERED LIST

**Academic Articles**

- Itamar Simonson, Ziv Carmon, and Suzanne O'Curry (1994), "Experimental Evidence on the Negative Effect of Product Features and Sales Promotions on Brand Choice," *Marketing Science*, 13 (1), 23–40.

- Nathan Crilly, James Moultrie and P. John Clarkson (2004), "Seeing things: consumer response to the visual domain in product design," *Design Studies*, 25, 547–577.

- Robyn Dawes (1979), "The Robust Beauty of Improper Linear Models in Decision Making," *American Psychologist*, 34 (7), 571–582.

**Books**

- Bernd H. Schmitt and Alex. Simonson (1997), *Marketing Aesthetics*, New York: The Free Press.

- Itamar Simonson and Emanuel Rosen (2014), Absolute Value: What Really Influences Customers in the Age of (Nearly) Perfect Information, Harper Collins.

- Itamar Simonson and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," *Trademark and Deceptive Advertising Surveys*, Chapter 11, edited by Shari Diamond and Jerre Swann, Chicago: American Bar Association.

**Legal Documents**

- Complaint for Patent Infringement, *Apple Inc. v. Masimo Corporation and Sound United LLC*, Unted States Disctric Court for the District of Delaware, Case No. 1:22-cv-01377-UNA, October 20, 2022.

- *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 745 (S.D.N.Y. 2011).

- *Gutierrez v. Wells Fargo Bank, N.A.*, No. C-07-05923-WHA, Dkt. No. 477 at 51 (N.D. Cal. Aug. 10, 2010).

- *Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Cv. 550(JFK), 2007 WL 2258688, at *9–10, 15–16 (S.D.N.Y. Aug. 6, 2007).

- *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 626 n.210 (S.D.N.Y. 2007).

- *People of the State of California v. Macy's Inc.*, Statement of Decision, Superior Court of CA, County of Los Angeles, Case No. BC643040).

- *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1016 (N.D. Cal. 2017).

- *Schechner. v. Whirlpool Corp.*, No. 2:16-cv-12409, 2018 U.S. Dist. LEXIS 221847, at *27 (E.D. Mich. Oct. 30, 2018).

- *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1043–44, 1048, 1050 (S.D. Ind. 2000).

- *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. 15-cv-2370, 2017 WL 6611635, at *29 (C.D. Cal. Dec. 21, 2017).

- *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 232–42 (S.D.N.Y. 2010).

- *VIP Prods., Inc. v. Jack Daniel's Props., Inc.*, No. 14-cv-2057, 291 F. Supp. 3d 891, 902 (D. Ariz. 2018).

**Websites**

- A healthy leap ahead, *Apple*, https://www.apple.com/apple-watch-series-8/?afid=p238%7CsyiinHxnI-dc_mtid_20925qtb42335_pcrid_643476278074_pgrid_142097054058_&cid=wwa-us-kwgo-watch-slid---Brand-AppleWatchSeries8--.

- About watchOS 8 Updates, *Apple*, https://support.apple.com/en-us/HT212790.

- Amazfit - GTS 4 Mini Smartwatch - Midnight Black, *Best Buy*, https://www.bestbuy.com/site/amazfit-gts-4-mini-smartwatch-midnight-black/6510158.p?skuId=6510158 in the first video around 00:20.

- Apple Watch Series 5 – Technical Specifications, *Apple*, https://support.apple.com/kb/SP808?locale=en_US.

- Apple Watch Series 8, *Apple*, https://www.apple.com/apple-watch-series-8/.

- Apple Watch Series 8 – Technical Specifications, *Apple*, https://support.apple.com/kb/SP878?locale=en_US

- Apple Watch Series 8 (GPS) 41 mm Aluminum Case with Midnight Sport Band, *Best Buy*, https://www.bestbuy.com/site/apple-watch-series-8-gps-41mm-aluminum-case-with-midnight-sport-band-s-m-midnight/6340248.p?skuId=6340248#anchor=productVariations.

- Apple Watch Series 8 (GPS) 41 mm Aluminum Case with Starlight Sport Band, *Best Buy*, https://www.bestbuy.com/site/apple-watch-series-8-gps-41mm-aluminum-case-with-starlight-sport-band-s-m-starlight/6340250.p?skuId=6340250

- Change your Apple Watch band, *Apple*, https://support.apple.com/en-us/HT204818.

- Christian de Looper, "Mobvoi TicWatch Pro 3 Ultra GPS smartwatch review," *BGR*, August 17, 2022, https://bgr.com/reviews/mobvoi-ticwatch-pro-3-ultra-gps-smartwatch-review/

- Erik Rowe, "20 Dual Time and GMT Watches You Will Surely Love," *Watches You Can Afford*, June 4, 2022, https://watchesyoucanafford.com/dual-time-and-gmt-watches/#:~:text=For%20the%20frequent%20traveler%20or,is%20quite%20practical%20as%20well.

- Fitbit - Sense 2 Advanced Health Smartwatch - Graphite, *Best Buy*, https://www.bestbuy.com/site/fitbit-sense-2-advanced-health-smartwatch-graphite/6514034.p?skuId=6514034 in the third video around 00:23.

- Forerunner® 955, *Garmin*, https://www.garmin.com/en-US/p/777655#specs.

- Garmin - Forerunner 955 GPS Smartwatch 47 mm Fiber -reinforced polymer - Whitestone, *Best Buy*, https://www.bestbuy.com/site/garmin-forerunner-955-gps-smartwatch-47-mm-fiber-reinforced-polymer-whitestone/6513334.p?skuId=6513334.

- Geek Squad Certified Refurbished Apple Watch Series 5 (GPS) 44mm Aluminum Case with Black Sport Band - Space Gray Aluminum, *Best Buy*, https://www.bestbuy.com/site/geek-squad-certified-refurbished-apple-watch-series-5-gps-44mm-aluminum-case-with-black-sport-band-space-gray-aluminum/6519248.p?skuId=6519248.

- Masimo W1 - Advanced Health Tracking Watch, *Masimo*, https://www.masimopersonalhealth.com/products/masimo-w1.

- Multi Time Zone Digital, *Garmin*, https://apps.garmin.com/en-US/apps/230667a0-e5a6-49bc-aefd-856806870d7a.

- Remove, change, and fasten Apple Watch bands, *Apple*, https://support.apple.com/guide/watch/remove-change-and-fasten-apple-watch-bands-apd3cc13d48f/watchos.

- Samsung - Galaxy Watch5 Aluminum Smartwatch 40mm BT - Bora Purple, *Best Buy*, https://www.bestbuy.com/site/samsung-galaxy-watch5-aluminum-smartwatch-40mm-bt-bora-purple/6510878.p?skuId=6510878.

- Strap Release Band on Series 5 Apple Watch, *Apple*, https://discussions.apple.com/thread/251705603.

- Track daily activity with Apple Watch, *Apple*, https://support.apple.com/guide/watch/track-daily-activity-with-apple-watch-apd3bf6d85a6/6.0/watchos/6.0.

- Track important health information with Apple Watch, *Apple*, https://support.apple.com/guide/watch/track-important-health-information-apple-apdc2bf82d90/watchos.

- Track your sleep on Apple Watch and use Sleep on iPhone, *Apple*, https://support.apple.com/en-us/HT211685.

- Track your sleep with Apple Watch, *Apple*, https://support.apple.com/guide/watch/sleep-apd830528336/7.0/watchos/7.0.

- Use Low Power Mode on your Apple Watch, *Apple*, https://support.apple.com/en-us/HT213336.

- watchOS 7 New Features include sleep tracking, new work outs, hand washing detection, and more, *9to5Mac*, https://9to5mac.com/guides/watchos-7/page/2/.

# APPENDIX D
# SURVEY QUESTIONNAIRE

# APPENDIX D.1
# DESIGN IMPACT SURVEY
# MASIMO
# SURVEY QUESTIONNAIRE

## SCREENER

**Overview and Quotas**

N=200

**Quotas:**

| Attribute | Target Percentage |
|---|---|
| **Age / Gender** | |
| Male 18-39 | 25% |
| Male 40+ | 25% |
| Female 18-39 | 25% |
| Female 40+ | 25% |
| **Region** | |
| Midwest | 22% |
| Northeast | 18% |
| South | 35% |
| West | 25% |

**[INSERT DEVICE SNIFFER AT BEGINNING OF SURVEY. IF RESPONDENT IS NOT ON DESKTOP, LAPTOP, SMARTPHONE, OR TABLET, PROMPT TO RE-ENTER THE SURVEY ON A QUALIFIED DEVICE]**

**Screening**

**[SCREENER INTRODUCTION]**

Thank you for participating in our survey. Please take a few moments to complete our questions. If you usually wear eyeglasses or contacts while using a computer, tablet, or smartphone, please put them on now.

**[NEXT PAGE]**

QS10.  So that we can confirm that you are actually a person, please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue.  Do NOT include any spaces.  Type all of the characters together.

TEXT BOX: _____

**[ASK QS10a IF RESPONDENT FAILS QS10]**

QS10a.  Please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue.  Do NOT include any spaces.  Type all of the characters together.

TEXT BOX: _____

**[TERMINATE IF RESPONDENT FAILS QS10a]**

**[NEXT PAGE]**

QS20. What is your gender? *(Select one response.)*

**[RANDOMIZE]**

1. Male
2. Female
**3.** Other **[ANCHOR]**

**[NEXT PAGE]**

QS30. Which of the following groups listed below includes your age? *(Select one response.)*

1. Under 18 **[TERMINATE]**
2. 18-39
3. 40 or older

**[TERMINATE RESPONDENT IF AGE IN QS30 AND GENDER IN QS20 DO NOT MATCH PASSED IN PARAMETERS FROM PANEL]**

QS40. In which of the following states do you live? *(Select one response.)*

**[INSERT DROP DOWN LIST OF 50 STATES AND "WASHINGTON DC" IN ALPHABETIC ORDER.  INCLUDE OPTION FOR "OTHER". TERMINATE IF RESPONDENT CHOOSES "OTHER"]**

**[NEXT PAGE]**

QS50. Do you, or does any member of your household, currently work for any of the following? *(Select **all** that apply.)*

**[RANDOMIZE 1-6]**

1. An advertising, public relations or marketing agency or advertising department of a company **[TERMINATE]**
2. A market research firm or a marketing research department of a company **[TERMINATE]**
3. A company that makes or distributes smartwatches **[TERMINATE]**
4. A company that makes or distributes video game consoles
5. A company that makes or distributes computer chips
6. A company that makes or distributes televisions
7. None of these **[ANCHOR; CONTINUE]**

**[NEXT PAGE]**

QS60. Which of the following devices are you using right now to take this survey? *(Select one response.)*

**[RANDOMIZE]**
1. Desktop computer
2. Laptop computer
3. Tablet (such as an iPad, Android tablet, etc.)
4. Cell phone (not a smartphone) **[TERMINATE]**
5. Smartphone
6. Other (please specify): _____ **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

QS70. Which of the following types of consumer electronics products do you own? *(Select **all** that apply.)*

**[RANDOMIZE]**
1. Smartwatch
2. Gaming console
3. Smartphone
4. Tablet
5. None of the above **[ANCHOR; TERMINATE]**
6. Don't know **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

QS80.  Which of the following types of consumer electronics products do you expect to purchase in the next 12 months? *(Select one response for each row.)*

**[SHOW ROWS IN THE SAME ORDER AS THE DEVICES WERE SHOWN IN QS70; RANDOMLY SHOW COLUMNS 2 THROUGH 6 IN ASCENDING OR DESCENDING ORDER.]**

|  | I definitely will purchase in the next 12 months | I probably will purchase in the next 12 months | I may or may not purchase in the next 12 months | I probably will <u>not</u> purchase in the next 12 months | I definitely will <u>not</u> purchase in the next 12 months |
|---|---|---|---|---|---|
| Smartwatch | **[CONTINUE TO QS90]** | **[CONTINUE TO QS90]** | **[TERMINATE]** | **[TERMINATE]** | **[TERMINATE]** |
| Gaming console |  |  |  |  |  |
| Smartphone |  |  |  |  |  |
| Tablet |  |  |  |  |  |

**[IF "DEFINITELY WILL BUY" OR "PROBABLY WILL BUY" SMARTWATCH, CONTINUE TO QS90, OTHERWISE TERMINATE.]**

**[NEXT PAGE]**

QS90. You indicated that you will **["PROBABLY" OR "DEFINITELY" DEPENDING ON THE RESPONSE IN QS80]** purchase a new smartwatch in the next 12 months. Will you be the person who will decide which smartwatch you will purchase? *(Select one response.)*
**[RANDOMIZE ORDER OF 1 AND 2.]**
1. Yes, I will decide
2. No, I will not decide **[TERMINATE]**
3. Don't know **[TERMINATE]**

**[NEXT PAGE]**

QS100. **[IF "PROBABLY" IN QS80 THEN "IF" ELSE "WHEN"]** you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?
**[INSERT TEXT BOX AND ALLOW RESPONDENTS TO ENTER ANY WHOLE NUMBER. DO NOT ALLOW ANY CHARACTERS OTHER THAN WHOLE NUMBERS. TERMINATE IF RESPONSE IS 1 OR 0; OTHERWISE CONTINUE TO QS110.]**

**[NEXT PAGE]**

You have qualified to take this survey. Before continuing, please carefully read these instructions:
- Please take the survey in <u>one</u> session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.

*(Select one response.)*
1. I understand and agree to the above instructions
2. I do <u>not</u> understand or do <u>not</u> agree to the above instructions **[TERMINATE]**

**Main Questionnaire**

**N=200**

**[MAIN QUESTIONNAIRE INTRODUCTION]**

You should complete this survey without stopping in the middle. Please make sure <u>not</u> to consult anyone and <u>not</u> to open another browser while working on this survey.

**[NEXT PAGE]**
<u>Q1.</u> How familiar or unfamiliar are you with smartwatches? *(Enter a whole number between 0 and 10. 0 indicates very unfamiliar and 10 indicates very familiar.)*
**[REQUIRE USERS TO ENTER A WHOLE NUMBER BETWEEN 0-10.]**

**[NEXT PAGE]**
<u>Q2.</u> How many smartwatch brands are you familiar with? *(Enter a whole number.)*
**[REQUIRE USERS TO ENTER A WHOLE NUMBER.]**

**[NEXT PAGE]**

**[SHOW THE FOLLOWING MESSAGE ONLY TO SMARTPHONE USERS]**
The following pages are optimized for landscape mode on your smartphone. Please rotate your phone to landscape orientation for a better experience.

**[NEXT PAGE]**
<u>Please read the following information about smartwatch features carefully.</u>

Later you will be asked to evaluate a new smartwatch based on its features.

When you are finished reviewing the features on each screen, click "CONTINUE" to continue.

*On each screen, the "CONTINUE" button will appear after you review the features on that page.*

**[NEXT PAGE]**

**[RANDOMIZE THE ORDER OF THE FEATURES, BUT THE FEATURES CALLED "APPEARANCE AND DESIGN: FRONT OF THE WATCH" AND "APPEARANCE AND DESIGN: BACK OF THE WATCH" SHOULD ALWAYS BE SHOWN ON THE SAME SCREEN WITH FRONT OF WATCH SHOWN BEFORE BACK OF WATCH. SHOW THREE FEATURES AND DESCRIPTIONS PER PAGE]**
**[DELAY NEXT BUTTON 10 SECONDS BETWEEN EACH PAGE WITH FEATURE/DESCRIPTIONS]**
**[THE FRONT AND BACK DESIGN FEATURES WILL BE PICTURES]**

Price:
Price refers to the amount of money you pay to *purchase a smartwatch outright in-full* (i.e., not on an installment plan).  Typical prices range between $99 and $1,000, depending on features, specs, and models/brands.

Battery Life:
"Battery life" means the length of time the smartwatch can continue to work before it needs its battery to be recharged. Typical smartwatch batteries last between a day and a week on a single charge.



Variety and Number of Apps:
Smartwatches vary with respect to the number of compatible apps.



<u>Appearance and Design: Front of the Watch</u>: On some smartwatches, you can change the watch face by choosing among available options.



<u>Physiological Data Monitoring</u>:
Some smartwatches offer physiological data monitoring such as Hydration Index (Hi), oxygen level (SpO2), respiration rate, pleth variability index, and perfusion index.



<u>Appearance and Design:  Back of the Watch</u>:  The back of the watch sits against your wrist.



<u>Materials and Finishes</u>:
Smartwatches can come in a variety of materials and finishes, including aluminum, stainless steel, ceramic, and titanium.



<u>Sleep Tracking</u>:
Some smartwatches offer a special app for tracking your sleep, such as total sleep time, REM, and deep sleep, and provide health reports based on tracked sleep.



<u>Fitness Tracking</u>:

D.1-9

Some smartwatches offer fitness tracking to monitor your daily activity, provide insight into fitness data trends, and allow you to share the fitness data.



<u>Weight</u>:
Typical smartwatches weigh around 30-55 grams.



<u>Water Resistance</u>:
Some smartwatches offer water resistance up to 60 meters, others offer water resistance at shallower depths, and others do not offer water resistance.



<u>Heart Monitoring</u>:

Some smartwatches can get a quick read on your heart rate, or check your heart rhythm.



Two Time Zone Display:
Some smartwatches can display the time in two time zones at the same time (such as both on the East coast and the West coast of the U.S.).



**[NEXT PAGE]**
PLEASE READ CAREFULLY

Next, you will see a smartwatch described in terms of the features you just reviewed. Please review carefully the specific features of the smartwatch.  You can review the meaning of each feature by clicking on it.

**[SHOW THE TABLE BELOW ON THE SCREEN, AND DELAY NEXT BUTTON 20 SECONDS]**
**[ORDER THE FEATURES IN THE SAME ORDER AS SHOWN IN PRIOR SCREENS]**
**[INCLUDE A HYPERLINK FOR EACH FEATURE CATEGORY (LEFT COLUMN) THAT LINKS TO THE DESCRIPTION FOR THAT FEATURE CATEGORY FROM THE FEATURE DESCRIPTIONS PREVIOUSLY SHOWN**

**TO RESPONDENTS; ALLOW RESPONDENTS TO CLICK/TAP THE LINK FOR A POP-UP]**

| Feature | |
|---|---|
| Price | $499.00 |
| Battery Life | 24 Hours |
| Variety and Number of Apps | Greater than 5 |
| Appearance and Design: Front of the Watch |  |
| Physiological Data Monitoring | Yes |
| Appearance and Design: Back of the Watch |  |
| Materials and Finishes | Aluminum |
| Sleep Tracking | Yes |
| Fitness Tracking | Yes |
| Weight | 34 grams |
| Water Resistance | Yes |
| Heart Monitoring | Yes |
| Two Time Zone Display | No |

**[NEXT PAGE]**

Q3. Now suppose that you were considering purchasing this smartwatch.  Please select the features that you expect will impact your purchase decision. If you don't know or are not sure if a feature will impact your purchase decision, please do not select it.

**[THE TABLE SHOULD BE EXACTLY THE SAME AS THE TABLE SHOWN IN THE PREVIOUS PAGE, WITH THE ONLY EXCEPTION OF THE COLUMN OF CHECKBOXES ON THE RIGHT]**

| Feature | | Would Impact Your Purchase Decision? |
|---|---|---|
| Price | $499.00 | [Checkbox] |
| Battery Life | 24 Hours | [Checkbox] |
| Variety and Number of Apps | Greater than 5 | [Checkbox] |
| Appearance and Design: Front of the Watch |  | [Checkbox] |
| Physiological Data Monitoring | Yes | [Checkbox] |
| Appearance and Design:  Back of the Watch |  | [Checkbox] |
| Materials and Finishes | Aluminum | [Checkbox] |
| Sleep Tracking | Yes | [Checkbox] |
| Fitness Tracking | Yes | [Checkbox] |
| Weight | 34 grams | [Checkbox] |
| Water Resistance | Yes | [Checkbox] |
| Heart Monitoring | Yes | [Checkbox] |
| Two Time Zone Display | No | [Checkbox] |

**[NEXT PAGE]**

F1. Thank you for completing this survey.

# APPENDIX D.2
# DESIGN IMPACT SURVEY
# APPLE WATCH SERIES 5
# SURVEY QUESTIONNAIRE

# SCREENER

**Overview and Quotas**

N=200

**Quotas:**

| Attribute | Target Percentage |
|---|---|
| **Age / Gender** | |
| Male 18-39 | 25% |
| Male 40+ | 25% |
| Female 18-39 | 25% |
| Female 40+ | 25% |
| **Region** | |
| Midwest | 22% |
| Northeast | 18% |
| South | 35% |
| West | 25% |

**[INSERT DEVICE SNIFFER AT BEGINNING OF SURVEY. IF RESPONDENT IS NOT ON DESKTOP, LAPTOP, SMARTPHONE, OR TABLET, PROMPT TO RE-ENTER THE SURVEY ON A QUALIFIED DEVICE]**

**Screening**

**[SCREENER INTRODUCTION]**

Thank you for participating in our survey. Please take a few moments to complete our questions. If you usually wear eyeglasses or contacts while using a computer, tablet, or smartphone, please put them on now.

**[NEXT PAGE]**

QS10.  So that we can confirm that you are actually a person, please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue.  Do NOT include any spaces.  Type all of the characters together.

TEXT BOX: _____

**[ASK QS10a IF RESPONDENT FAILS QS10]**

QS10a.  Please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue.  Do NOT include any spaces.  Type all of the characters together.

TEXT BOX: _____

**[TERMINATE IF RESPONDENT FAILS QS10a]**

**[NEXT PAGE]**

QS20. What is your gender? *(Select one response.)*

**[RANDOMIZE]**

1. Male
2. Female
**3.** Other **[ANCHOR]**

**[NEXT PAGE]**

QS30. Which of the following groups listed below includes your age? *(Select one response.)*

1. Under 18 **[TERMINATE]**
2. 18-39
3. 40 or older

**[TERMINATE REPSONDENT IF AGE IN QS30 AND GENDER IN QS20 DO NOT MATCH PASSED IN PARAMETERS FROM PANEL]**

QS40. In which of the following states do you live? *(Select one response.)*

**[INSERT DROP DOWN LIST OF 50 STATES AND "WASHINGTON DC" IN ALPHABETIC ORDER.  INCLUDE OPTION FOR "OTHER". TERMINATE IF RESPONDENT CHOOSES "OTHER"]**

**[NEXT PAGE]**

<u>QS50.</u> Do you, or does any member of your household, currently work for any of the following? *(Select **all** that apply.)*

**[RANDOMIZE 1-6]**

1. An advertising, public relations or marketing agency or advertising department of a company **[TERMINATE]**
2. A market research firm or a marketing research department of a company **[TERMINATE]**
3. A company that makes or distributes smartwatches **[TERMINATE]**
4. A company that makes or distributes video game consoles
5. A company that makes or distributes computer chips
6. A company that makes or distributes televisions
7. None of these **[ANCHOR; CONTINUE]**

**[NEXT PAGE]**

<u>QS60.</u> Which of the following devices are you using right now to take this survey? *(Select one response.)*

**[RANDOMIZE]**
1. Desktop computer
2. Laptop computer
3. Tablet (such as an iPad, Android tablet, etc.)
4. Cell phone (not a smartphone) **[TERMINATE]**
5. Smartphone
6. Other (please specify): _____ **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

<u>QS70.</u> Which of the following types of consumer electronics products do you own? *(Select **all** that apply.)*

**[RANDOMIZE]**
1. Smartwatch
2. Gaming console
3. Smartphone
4. Tablet
5. None of the above **[ANCHOR; TERMINATE]**
6. Don't know **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

<u>QS80.</u>  Which of the following types of consumer electronics products do you expect to purchase in the next 12 months? *(Select one response for each row.)*

**[SHOW ROWS IN THE SAME ORDER AS THE DEVICES WERE SHOWN IN QS70; RANDOMLY SHOW COLUMNS 2 THROUGH 6 IN ASCENDING OR DESCENDING ORDER.]**

|  | I definitely will purchase in the next 12 months | I probably will purchase in the next 12 months | I may or may not purchase in the next 12 months | I probably will <u>not</u> purchase in the next 12 months | I definitely will <u>not</u> purchase in the next 12 months |
|---|---|---|---|---|---|
| Smartwatch | **[CONTINUE TO QS90]** | **[CONTINUE TO QS90]** | **[TERMINATE]** | **[TERMINATE]** | **[TERMINATE]** |
| Gaming console |  |  |  |  |  |
| Smartphone |  |  |  |  |  |
| Tablet |  |  |  |  |  |

**[IF "DEFINITELY WILL BUY" OR "PROBABLY WILL BUY" SMARTWATCH, CONTINUE TO QS90, OTHERWISE TERMINATE.]**

**[NEXT PAGE]**

<u>QS90.</u> You indicated that you will **["PROBABLY" OR "DEFINITELY" DEPENDING ON THE RESPONSE IN QS80]** purchase a new smartwatch in the next 12 months. Will you be the person who will decide which smartwatch you will purchase?  *(Select one response.)*
**[RANDOMIZE ORDER OF 1 AND 2.]**
1. Yes, I will decide
2. No, I will not decide **[TERMINATE]**
3. Don't know **[TERMINATE]**

**[NEXT PAGE]**

<u>QS100.</u> **[IF "PROBABLY" IN QS80 THEN "IF" ELSE "WHEN"]** you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?
**[INSERT TEXT BOX AND ALLOW RESPONDENTS TO ENTER ANY WHOLE NUMBER. DO NOT ALLOW ANY CHARACTERS OTHER THAN WHOLE NUMBERS. TERMINATE IF RESPONSE IS 1 OR 0; OTHERWISE CONTINUE TO QS110.]**

**[NEXT PAGE]**

You have qualified to take this survey. Before continuing, please carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.

*(Select one response.)*
1. I understand and agree to the above instructions
2. I do <u>not</u> understand or do <u>not</u> agree to the above instructions **[TERMINATE]**

**Main Questionnaire**

**N=200**

**[MAIN QUESTIONNAIRE INTRODUCTION]**

You should complete this survey without stopping in the middle.  Please make sure <u>not</u> to consult anyone and <u>not</u> to open another browser while working on this survey.

**[NEXT PAGE]**
<u>Q1.</u> How familiar or unfamiliar are you with smartwatches? *(Enter a whole number between 0 and 10. 0 indicates very unfamiliar and 10 indicates very familiar.)*
**[REQUIRE USERS TO ENTER A WHOLE NUMBER BETWEEN 0-10.]**

**[NEXT PAGE]**
<u>Q2.</u> How many smartwatch brands are you familiar with? (*Enter a whole number.)*
**[REQUIRE USERS TO ENTER A WHOLE NUMBER.]**

**[NEXT PAGE]**

**[SHOW THE FOLLOWING MESSAGE ONLY TO SMARTPHONE USERS]**
The following pages are optimized for landscape mode on your smartphone. Please rotate your phone to landscape orientation for a better experience.

**[NEXT PAGE]**
<u>Please read the following information about smartwatch features carefully.</u>

Later you will be asked to evaluate a new smartwatch based on its features.

When you are finished reviewing the features on each screen, click "CONTINUE" to continue.

*On each screen, the "CONTINUE" button will appear after you review the features on that page.*

**[NEXT PAGE]**

**[RANDOMIZE THE ORDER OF THE FEATURES, BUT THE FEATURES CALLED "APPEARANCE AND DESIGN: FRONT OF THE WATCH" AND "APPEARANCE AND DESIGN: BACK OF THE WATCH" SHOULD ALWAYS BE SHOWN ON THE SAME SCREEN WITH FRONT OF WATCH SHOWN BEFORE BACK OF WATCH. SHOW THREE FEATURES AND DESCRIPTIONS PER PAGE]**
**[DELAY NEXT BUTTON 10 SECONDS BETWEEN EACH PAGE WITH FEATURE/DESCRIPTIONS]**
**[THE FRONT AND BACK DESIGN FEATURES WILL BE PICTURES]**

Price:
Price refers to the amount of money you pay to *purchase a smartwatch outright in-full* (i.e., not on an installment plan).  Typical prices range between $99 and $1,000, depending on features, specs, and models/brands.

Battery Life:
"Battery life" means the length of time the smartwatch can continue to work before it needs its battery to be recharged. Typical smartwatch batteries last between a day and a week on a single charge.



Variety and Number of Apps:
Smartwatches vary with respect to the number of compatible apps.



Appearance and Design: Front of the Watch: On some smartwatches, you can change the watch face by choosing among available options.



Physiological Data Monitoring:
Some smartwatches offer physiological data monitoring such as Hydration Index (Hi), oxygen level (SpO2), respiration rate, pleth variability index, and perfusion index.



Appearance and Design:  Back of the Watch:  The back of the watch sits against your wrist.



<u>Materials and Finishes</u>:

Smartwatches can come in a variety of materials and finishes, including aluminum, stainless steel, ceramic, and titanium.



<u>Sleep Tracking</u>:

Some smartwatches offer a special app for tracking your sleep, such as total sleep time, REM, and deep sleep, and provide health reports based on tracked sleep.



<u>Fitness Tracking</u>:

Some smartwatches offer fitness tracking to monitor your daily activity, provide insight into fitness data trends, and allow you to share the fitness data.



Weight:
Typical smartwatches weigh around 30-55 grams.



Water Resistance:
Some smartwatches offer water resistance up to 60 meters, others offer water resistance at shallower depths, and others do not offer water resistance.



Heart Monitoring:
Some smartwatches can get a quick read on your heart rate, or check your heart rhythm.



<u>Two Time Zone Display</u>:
Some smartwatches can display the time in two time zones at the same time (such as both on the East coast and the West coast of the U.S.).



**[NEXT PAGE]**
<u>PLEASE READ CAREFULLY</u>

Next, you will see a smartwatch described in terms of the features you just reviewed. Please review carefully the specific features of the smartwatch.  You can review the meaning of each feature by clicking on it.

**[SHOW THE TABLE BELOW ON THE SCREEN, AND DELAY NEXT BUTTON 20 SECONDS]**
**[ORDER THE FEATURES IN THE SAME ORDER AS SHOWN IN PRIOR SCREENS]**
**[INCLUDE A HYPERLINK FOR EACH FEATURE CATEGORY (LEFT COLUMN) THAT LINKS TO THE DESCRIPTION FOR THAT FEATURE CATEGORY FROM THE FEATURE DESCRIPTIONS PREVIOUSLY SHOWN TO RESPONDENTS; ALLOW RESPONDENTS TO CLICK/TAP THE LINK FOR A POP-UP]**

| Feature | |
|---|---|
| Price | $212.99 |
| Battery Life | 18 Hours |
| Variety and Number of Apps | Greater than 5 |
| Appearance and Design: Front of the Watch |  |
| Physiological Data Monitoring | Yes |
| Appearance and Design: Back of the Watch |  |
| Materials and Finishes | Aluminum |
| Sleep Tracking | Yes |
| Fitness Tracking | Yes |
| Weight | 30.8 grams |
| Water Resistance | Yes |
| Heart Monitoring | Yes |
| Two Time Zone Display | No |

**[NEXT PAGE]**

Q3. Now suppose that you were considering purchasing this smartwatch. Please select the features that you expect will impact your purchase decision. If you don't know or are not sure if a feature will impact your purchase decision, please do not select it.

**[THE TABLE SHOULD BE EXACTLY THE SAME AS THE TABLE SHOWN IN THE PREVIOUS PAGE, WITH THE ONLY EXCEPTION OF THE COLUMN OF CHECKBOXES ON THE RIGHT]**

| Feature | | Would Impact Your Purchase Decision? |
|---|---|---|
| Price | $212.99 | [Checkbox] |
| Battery Life | 18 Hours | [Checkbox] |
| Variety and Number of Apps | Greater than 5 | [Checkbox] |
| Appearance and Design: Front of the Watch |  | [Checkbox] |
| Physiological Data Monitoring | Yes | [Checkbox] |
| Appearance and Design: Back of the Watch |  | [Checkbox] |
| Materials and Finishes | Aluminum | [Checkbox] |
| Sleep Tracking | Yes | [Checkbox] |
| Fitness Tracking | Yes | [Checkbox] |
| Weight | 30.8 grams | [Checkbox] |
| Water Resistance | Yes | [Checkbox] |
| Heart Monitoring | Yes | [Checkbox] |
| Two Time Zone Display | No | [Checkbox] |

**[NEXT PAGE]**

F1. Thank you for completing this survey.

# APPENDIX D.3
# DESIGN IMPACT SURVEY
# APPLE WATCH SERIES 8
# SURVEY QUESTIONNAIRE

## SCREENER

**Overview and Quotas**

N=200

**Quotas:**

| Attribute | Target Percentage |
|---|---|
| **Age / Gender** | |
| Male 18-39 | 25% |
| Male 40+ | 25% |
| Female 18-39 | 25% |
| Female 40+ | 25% |
| **Region** | |
| Midwest | 22% |
| Northeast | 18% |
| South | 35% |
| West | 25% |

**[INSERT DEVICE SNIFFER AT BEGINNING OF SURVEY. IF RESPONDENT IS NOT ON DESKTOP, LAPTOP, SMARTPHONE, OR TABLET, PROMPT TO RE-ENTER THE SURVEY ON A QUALIFIED DEVICE]**

**Screening**

**[SCREENER INTRODUCTION]**

Thank you for participating in our survey. Please take a few moments to complete our questions. If you usually wear eyeglasses or contacts while using a computer, tablet, or smartphone, please put them on now.

**[NEXT PAGE]**

QS10.  So that we can confirm that you are actually a person, please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue.  Do NOT include any spaces.  Type all of the characters together.

TEXT BOX:  _____

**[ASK QS10a IF RESPONDENT FAILS QS10]**

QS10a.  Please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue.  Do NOT include any spaces.  Type all of the characters together.

TEXT BOX:  _____

**[TERMINATE IF RESPONDENT FAILS QS10a]**

**[NEXT PAGE]**

QS20. What is your gender? *(Select one response.)*

**[RANDOMIZE]**

1. Male
2. Female
**3.** Other **[ANCHOR]**

**[NEXT PAGE]**

QS30. Which of the following groups listed below includes your age? *(Select one response.)*

1. Under 18 **[TERMINATE]**
2. 18-39
3. 40 or older

**[TERMINATE REPSONDENT IF AGE IN QS30 AND GENDER IN QS20 DO NOT MATCH PASSED IN PARAMETERS FROM PANEL]**

QS40. In which of the following states do you live? *(Select one response.)*

**[INSERT DROP DOWN LIST OF 50 STATES AND "WASHINGTON DC" IN ALPHABETIC ORDER.  INCLUDE OPTION FOR "OTHER". TERMINATE IF RESPONDENT CHOOSES "OTHER"]**

**[NEXT PAGE]**

QS50. Do you, or does any member of your household, currently work for any of the following? *(Select **all** that apply.)*

**[RANDOMIZE 1-6]**

1. An advertising, public relations or marketing agency or advertising department of a company **[TERMINATE]**
2. A market research firm or a marketing research department of a company **[TERMINATE]**
3. A company that makes or distributes smartwatches **[TERMINATE]**
4. A company that makes or distributes video game consoles
5. A company that makes or distributes computer chips
6. A company that makes or distributes televisions
7. None of these **[ANCHOR; CONTINUE]**

**[NEXT PAGE]**

QS60. Which of the following devices are you using right now to take this survey? *(Select one response.)*

**[RANDOMIZE]**
1. Desktop computer
2. Laptop computer
3. Tablet (such as an iPad, Android tablet, etc.)
4. Cell phone (not a smartphone) **[TERMINATE]**
5. Smartphone
6. Other (please specify): _____ **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

QS70. Which of the following types of consumer electronics products do you own? *(Select **all** that apply.)*

**[RANDOMIZE]**
1. Smartwatch
2. Gaming console
3. Smartphone
4. Tablet
5. None of the above **[ANCHOR; TERMINATE]**
6. Don't know **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

QS80. Which of the following types of consumer electronics products do you expect to purchase in the next 12 months? *(Select one response for each row.)*

**[SHOW ROWS IN THE SAME ORDER AS THE DEVICES WERE SHOWN IN QS70; RANDOMLY SHOW COLUMNS 2 THROUGH 6 IN ASCENDING OR DESCENDING ORDER.]**

| | I definitely will purchase in the next 12 months | I probably will purchase in the next 12 months | I may or may not purchase in the next 12 months | I probably will <u>not</u> purchase in the next 12 months | I definitely will <u>not</u> purchase in the next 12 months |
|---|---|---|---|---|---|
| Smartwatch | **[CONTINUE TO QS90]** | **[CONTINUE TO QS90]** | **[TERMINATE]** | **[TERMINATE]** | **[TERMINATE]** |
| Gaming console | | | | | |
| Smartphone | | | | | |
| Tablet | | | | | |

**[IF "DEFINITELY WILL BUY" OR "PROBABLY WILL BUY" SMARTWATCH, CONTINUE TO QS90, OTHERWISE TERMINATE.]**

**[NEXT PAGE]**


<u>QS90.</u> You indicated that you will **["PROBABLY" OR "DEFINITELY" DEPENDING ON THE RESPONSE IN QS80]** purchase a new smartwatch in the next 12 months. Will you be the person who will decide which smartwatch you will purchase?  *(Select one response.)*
**[RANDOMIZE ORDER OF 1 AND 2.]**
1. Yes, I will decide
2. No, I will not decide **[TERMINATE]**
3. Don't know **[TERMINATE]**

**[NEXT PAGE]**

<u>QS100.</u> **[IF "PROBABLY" IN QS80 THEN "IF" ELSE "WHEN"]** you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?
**[INSERT TEXT BOX AND ALLOW RESPONDENTS TO ENTER ANY WHOLE NUMBER. DO NOT ALLOW ANY CHARACTERS OTHER THAN WHOLE NUMBERS. TERMINATE IF RESPONSE IS 1 OR 0; OTHERWISE CONTINUE TO QS110.]**

**[NEXT PAGE]**

You have qualified to take this survey. Before continuing, please carefully read these instructions:
- Please take the survey in <u>one</u> session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.

*(Select one response.)*
1. I understand and agree to the above instructions
2. I do <u>not</u> understand or do <u>not</u> agree to the above instructions **[TERMINATE]**

**Main Questionnaire**

**N=200**

**[MAIN QUESTIONNAIRE INTRODUCTION]**

You should complete this survey without stopping in the middle.  Please make sure <u>not</u> to consult anyone and <u>not</u> to open another browser while working on this survey.

**[NEXT PAGE]**
<u>Q1.</u> How familiar or unfamiliar are you with smartwatches? *(Enter a whole number between 0 and 10. 0 indicates very unfamiliar and 10 indicates very familiar.)*
**[REQUIRE USERS TO ENTER A WHOLE NUMBER BETWEEN 0-10.]**

**[NEXT PAGE]**
<u>Q2.</u> How many smartwatch brands are you familiar with? (*Enter a whole number.)*
**[REQUIRE USERS TO ENTER A WHOLE NUMBER.]**

**[NEXT PAGE]**

**[SHOW THE FOLLOWING MESSAGE ONLY TO SMARTPHONE USERS]**
The following pages are optimized for landscape mode on your smartphone. Please rotate your phone to landscape orientation for a better experience.

**[NEXT PAGE]**
<u>Please read the following information about smartwatch features carefully.</u>

Later you will be asked to evaluate a new smartwatch based on its features.

When you are finished reviewing the features on each screen, click "CONTINUE" to continue.

*On each screen, the "CONTINUE" button will appear after you review the features on that page.*

**[NEXT PAGE]**

**[RANDOMIZE THE ORDER OF THE FEATURES, BUT THE FEATURES CALLED "APPEARANCE AND DESIGN: FRONT OF THE WATCH" AND "APPEARANCE AND DESIGN: BACK OF THE WATCH" SHOULD ALWAYS BE SHOWN ON THE SAME SCREEN WITH FRONT OF WATCH SHOWN BEFORE BACK OF WATCH. SHOW THREE FEATURES AND DESCRIPTIONS PER PAGE]**
**[DELAY NEXT BUTTON 10 SECONDS BETWEEN EACH PAGE WITH FEATURE/DESCRIPTIONS]**
**[THE FRONT AND BACK DESIGN FEATURES WILL BE PICTURES]**

Price:
Price refers to the amount of money you pay to *purchase a smartwatch outright in-full* (i.e., not on an installment plan).  Typical prices range between $99 and $1,000, depending on features, specs, and models/brands.

Battery Life:
"Battery life" means the length of time the smartwatch can continue to work before it needs its battery to be recharged. Typical smartwatch batteries last between a day and a week on a single charge.



Variety and Number of Apps:
Smartwatches vary with respect to the number of compatible apps.



<u>Appearance and Design: Front of the Watch</u>: On some smartwatches, you can change the watch face by choosing among available options.



<u>Physiological Data Monitoring</u>:
Some smartwatches offer physiological data monitoring such as Hydration Index (Hi), oxygen level (SpO2), respiration rate, pleth variability index, and perfusion index.



Appearance and Design:  Back of the Watch:  The back of the watch sits against your
wrist.



Materials and Finishes:
Smartwatches can come in a variety of materials and finishes, including aluminum,
stainless steel, ceramic, and titanium.



Sleep Tracking:
Some smartwatches offer a special app for tracking your sleep, such as total sleep time,
REM, and deep sleep, and provide health reports based on tracked sleep.



<u>Fitness Tracking</u>:
Some smartwatches offer fitness tracking to monitor your daily activity, provide insight into fitness data trends, and allow you to share the fitness data.



<u>Weight</u>:
Typical smartwatches weigh around 30-55 grams.



<u>Water Resistance</u>:
Some smartwatches offer water resistance up to 60 meters, others offer water resistance at shallower depths, and others do not offer water resistance.



<u>Heart Monitoring</u>:
Some smartwatches can get a quick read on your heart rate, or check your heart rhythm.



<u>Two Time Zone Display</u>:
Some smartwatches can display the time in two time zones at the same time (such as both on the East coast and the West coast of the U.S.).



**[NEXT PAGE]**
<u>PLEASE READ CAREFULLY</u>

Next, you will see a smartwatch described in terms of the features you just reviewed. Please review carefully the specific features of the smartwatch.  You can review the meaning of each feature by clicking on it.

**[SHOW THE TABLE BELOW ON THE SCREEN, AND DELAY NEXT BUTTON 20 SECONDS]**
**[ORDER THE FEATURES IN THE SAME ORDER AS SHOWN IN PRIOR SCREENS]**
**[INCLUDE A HYPERLINK FOR EACH FEATURE CATEGORY (LEFT COLUMN) THAT LINKS TO THE DESCRIPTION FOR THAT FEATURE CATEGORY FROM THE FEATURE DESCRIPTIONS PREVIOUSLY SHOWN**

**TO RESPONDENTS; ALLOW RESPONDENTS TO CLICK/TAP THE LINK FOR A POP-UP]**

| Feature | |
|---|---|
| Price | $399.00 |
| Battery Life | 18 Hours |
| Variety and Number of Apps | Greater than 5 |
| Appearance and Design: Front of the Watch |  |
| Physiological Data Monitoring | Yes |
| Appearance and Design: Back of the Watch |  |
| Materials and Finishes | Aluminum |
| Sleep Tracking | Yes |
| Fitness Tracking | Yes |
| Weight | 31.9 grams |
| Water Resistance | Yes |
| Heart Monitoring | Yes |
| Two Time Zone Display | No |

[NEXT PAGE]

Q3. Now suppose that you were considering purchasing this smartwatch.  Please select the features that you expect will impact your purchase decision. If you don't know or are not sure if a feature will impact your purchase decision, please do not select it.
**[THE TABLE SHOULD BE EXACTLY THE SAME AS THE TABLE SHOWN IN THE PREVIOUS PAGE, WITH THE ONLY EXCEPTION OF THE COLUMN OF CHECKBOXES ON THE RIGHT]**

| Feature | | Would Impact Your Purchase Decision? |
|---|---|---|
| Price | $399.00 | [Checkbox] |
| Battery Life | 18 Hours | [Checkbox] |
| Variety and Number of Apps | Greater than 5 | [Checkbox] |
| Appearance and Design: Front of the Watch |  | [Checkbox] |
| Physiological Data Monitoring | Yes | [Checkbox] |
| Appearance and Design:  Back of the Watch |  | [Checkbox] |
| Materials and Finishes | Aluminum | [Checkbox] |
| Sleep Tracking | Yes | [Checkbox] |
| Fitness Tracking | Yes | [Checkbox] |
| Weight | 31.9 grams | [Checkbox] |
| Water Resistance | Yes | [Checkbox] |
| Heart Monitoring | Yes | [Checkbox] |
| Two Time Zone Display | No | [Checkbox] |

**[NEXT PAGE]**

F1. Thank you for completing this survey.

# APPENDIX D.4
# ASSOCIATION SURVEY
# APPLE WATCH SERIES 5
# SURVEY QUESTIONNAIRE

# SCREENER

**Overview and Quotas**

**Two cells:**
Cell 1B (Test): N=200
Cell 2B (Control): N=220

**Quotas:**

Within each cell:

| Attribute | Target Percentage |
| --- | --- |
| **Age / Gender** | |
| Male 18-39 | 25% |
| Male 40+ | 25% |
| Female 18-39 | 25% |
| Female 40+ | 25% |
| **Region** | |
| Midwest | 22% |
| Northeast | 18% |
| South | 35% |
| West | 25% |

**[INSERT DEVICE SNIFFER AT BEGINNING OF SURVEY. IF RESPONDENT IS NOT ON DESKTOP, LAPTOP, SMARTPHONE, OR TABLET, PROMPT TO RE-ENTER THE SURVEY ON A QUALIFIED DEVICE]**

**Screening**

**[SCREENER INTRODUCTION]**

Thank you for participating in our survey. Please take a few moments to complete our questions. If you usually wear eyeglasses or contacts while using a computer, tablet, or smartphone, please put them on now.

**[NEXT PAGE]**

QS10.  So that we can confirm that you are actually a person, please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue.  Do NOT include any spaces.  Type all of the characters together.

TEXT BOX:  _____

**[ASK QS10a IF RESPONDENT FAILS QS10]**

QS10a.  Please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue.  Do NOT include any spaces.  Type all of the characters together.

TEXT BOX:  _____

**[TERMINATE IF RESPONDENT FAILS QS10a]**

**[NEXT PAGE]**

QS20. What is your gender? *(Select one response.)*

**[RANDOMIZE]**

1.  Male
2.  Female
3.  Other **[ANCHOR]**

**[NEXT PAGE]**

QS30. Which of the following groups listed below includes your age? *(Select one response.)*

1.  Under 18 **[TERMINATE]**
2.  18-39
3.  40 or older

**[TERMINATE REPSONDENT IF AGE IN QS30 AND GENDER IN QS20 DO NOT MATCH PASSED IN PARAMETERS FROM PANEL]**

QS40. In which of the following states do you live? *(Select one response.)*

**[INSERT DROP DOWN LIST OF 50 STATES AND "WASHINGTON DC" IN ALPHABETIC ORDER.  INCLUDE OPTION FOR "OTHER". TERMINATE IF RESPONDENT CHOOSES "OTHER"]**

**[NEXT PAGE]**

<u>QS50.</u> Do you, or does any member of your household, currently work for any of the following? *(Select **all** that apply.)*

**[RANDOMIZE 1-6]**

1. An advertising, public relations or marketing agency or advertising department of a company **[TERMINATE]**
2. A market research firm or a marketing research department of a company **[TERMINATE]**
3. A company that makes or distributes smartwatches **[TERMINATE]**
4. A company that makes or distributes video game consoles
5. A company that makes or distributes computer chips
6. A company that makes or distributes televisions
7. None of these **[ANCHOR; CONTINUE]**

**[NEXT PAGE]**

<u>QS60.</u> Which of the following devices are you using right now to take this survey? *(Select one response.)*

**[RANDOMIZE]**
1. Desktop computer
2. Laptop computer
3. Tablet (such as an iPad, Android tablet, etc.)
4. Cell phone (not a smartphone) **[TERMINATE]**
5. Smartphone
6. Other (please specify): _____ **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

<u>QS70.</u> Which of the following types of consumer electronics products do you own? *(Select **all** that apply.)*

**[RANDOMIZE]**
1. Smartwatch
2. Gaming console
3. Smartphone
4. Tablet
5. None of the above **[ANCHOR; TERMINATE]**
6. Don't know **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

QS80.  Which of the following types of consumer electronics products do you expect to purchase in the next 12 months? *(Select one response for each row.)*

**[SHOW ROWS IN THE SAME ORDER AS THE DEVICES WERE SHOWN IN QS70; RANDOMLY SHOW COLUMNS 2 THROUGH 6 IN ASCENDING OR DESCENDING ORDER.]**

| | I definitely will purchase in the next 12 months | I probably will purchase in the next 12 months | I may or may not purchase in the next 12 months | I probably will <u>not</u> purchase in the next 12 months | I definitely will <u>not</u> purchase in the next 12 months |
|---|---|---|---|---|---|
| Smartwatch | **[CONTINUE TO QS90]** | **[CONTINUE TO QS90]** | **[TERMINATE]** | **[TERMINATE]** | **[TERMINATE]** |
| Gaming console | | | | | |
| Smartphone | | | | | |
| Tablet | | | | | |

**[IF "DEFINITELY WILL BUY" OR "PROBABLY WILL BUY" SMARTWATCH, CONTINUE TO QS90, OTHERWISE TERMINATE.]**

**[NEXT PAGE]**

QS90. You indicated that you will **["PROBABLY" OR "DEFINITELY" DEPENDING ON THE RESPONSE IN QS80]** purchase a new smartwatch in the next 12 months. Will you be the person who will decide which smartwatch you will purchase?  *(Select one response.)*
**[RANDOMIZE ORDER OF 1 AND 2.]**
  1.  Yes, I will decide
  2.  No, I will not decide **[TERMINATE]**
  3.  Don't know **[TERMINATE]**

**[NEXT PAGE]**

QS100. **[IF "PROBABLY" IN QS80 THEN "IF" ELSE "WHEN"]** you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?
**[INSERT TEXT BOX AND ALLOW RESPONDENTS TO ENTER ANY WHOLE NUMBER. DO NOT ALLOW ANY CHARACTERS OTHER THAN WHOLE NUMBERS. TERMINATE IF RESPONSE IS 1 OR 0; OTHERWISE CONTINUE TO QS110.]**

**[NEXT PAGE]**

QS110. Which, if any, of the following features do you expect will impact your decision of which smartwatch to purchase? If you don't know or are not sure if a feature will impact your purchase decision, please do not select it. *(Select **all** that apply.)*
**[RANDOMIZE 1-11]**
1. Price
2. Appearance and design of the watch
3. Battery life
4. Physiological data monitoring (e.g., oxygen level, respiration rate)
5. Variety and number of apps
6. Materials and finishes (e.g., titanium, steel)
7. Sleep tracking
8. Fitness tracking
9. Weight
10. Water resistance
11. Heart monitoring
12. Other (please specify): _____ **[ANCHOR]**
13. None of the above **[ANCHOR; EXCLUSIVE]**

**[NEXT PAGE]**

You have qualified to take this survey. Before continuing, please carefully read these instructions:
- Please take the survey in <u>one</u> session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.
- If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option.

*(Select one response.)*
1. I understand and agree to the above instructions
2. I do <u>not</u> understand or do <u>not</u> agree to the above instructions **[TERMINATE]**

**Main Questionnaire**

**[ASSIGN RESPONDENTS TO CELLS BASED ON LEAST FILL PROPORTIONATELY SO THAT BOTH CELLS FILL AT THE SAME RATE]**
**[CELL 1B (TEST): N=200]**

**[CELL 2B (CONTROL): N=200]**

**[MAIN QUESTIONNAIRE INTRODUCTION FOR CELL 1 AND CELL 2]**

You should complete this survey without stopping in the middle.  Please make sure <u>not</u> to consult anyone and <u>not</u> to open another browser while working on this survey.

During this survey, you will be shown a number of images. If you would like to look at any image more closely, please click on that image.

**[NEXT PAGE]**

Intro1. Suppose that while looking for a smartwatch on the Internet, for example, on Best Buy's website, you see the following designs of the backs of five smartwatches.

As a reminder, if you would like to look at any image more closely, please click on that image.

**[RANDOMIZE THE ORDER OF THE ROWS; DO NOT RANDOMIZE ORDER OF THE COLUMNS.]**

**[ALL IMAGES SHOULD BE APPROXIMATELY THE SAME SIZE AND FIT IN THE SAME SIZE BOX; ALLOW RESPONDENTS TO ZOOM IN ON ANY IMAGE BY CLICKING ON IT.]**

**[DELAY CONTINUE BUTTON FOR 15 SECONDS.]**

| | |
|---|---|
| Apple Watch Series 5 |  |
| Samsung Galaxy Watch 5 |  |

| Garmin Forerunner 955 |  |
| Fitbit Sense 2 |  |
| Amazfit GTR 4 |  |

**[NEXT PAGE]**

**[SHOW INTRO2_CELL_1B TO RESPONDENTS ASSIGNED TO CELL 1B; SHOW INTRO2_CELL_2B TO RESPONDENTS ASSIGNED TO CELL 2B; TEST RESPONDENTS (CELL 1B) SHOULD SEE MASIMO WATCH; CONTROL RESPONDENTS (CELL 2B) SHOULD SEE TICWATCH PRO 3 ULTRA].**

**[ALL IMAGES SHOULD BE THE SAME SIZE AS THE IMAGES IN INTRO1; ALLOW RESPONDENTS TO ZOOM IN ON ANY IMAGE BY CLICKING ON IT.]**

**[DELAY CONTINUE BUTTON FOR 10 SECONDS.]**

Intro2_Cell_1B. Suppose now that you come across the following design of the back of another smartwatch on the Internet (shown below).  Please evaluate it.

**[SHOW PICTURE OF MASIMO WATCH]**



Intro2_Cell_2B. Suppose now that you come across the following design of the back of another smartwatch on the Internet (shown below).  Please evaluate it.

**[SHOW PICTURE OF TICWATCH PRO 3 ULTRA]**



**[NEXT PAGE]**
**[AT Q1, SHOW THE IMAGE FROM INTRO2_CELL_1B OR INTRO2_CELL_2B AS APPLICABLE ON THE TOP OF THAT PAGE ABOVE THE QUESTION]**

Q1. Which, if any, smartwatch company or brand do you associate with the design of the back of the smartwatch shown above? *(Select one response, such as one of the companies/brands listed below, or write in your own answer, or select the option to indicate that you do not associate the design of the back of the smartwatch shown above with any smart watch company or brand, or indicate that you don't know or are unsure.)*
**[RANDOMIZE 1-5]**

1. Apple
2. Fitbit
3. Garmin
4. Amazfit
5. Samsung
6. Other (please specify): _____ **[ANCHOR]**

D.4-9

7. I do not associate the design of the back of the smartwatch shown above with any smartwatch company or brand **[ANCHOR]**
8. Don't know/Unsure **[ANCHOR]**

**[ALL IMAGES SHOULD BE APPROXIMATELY THE SAME SIZE AND FIT IN THE SAME SIZE BOX; ALLOW RESPONDENTS TO ZOOM IN ON ANY IMAGE BY CLICKING ON IT.]**
**[THIS TABLE SHOULD BE THE EXACT SAME TABLE AS WE SHOW IN INTRO1.]**



| | |
|---|---|
| Apple Watch Series 5 | |
| Samsung Galaxy Watch 5 | |
| Garmin Forerunner 955 | |
| Fitbit Sense 2 | |

| Amazfit GTR 4 |  |

**[NEXT PAGE]**

**[ALL GO TO F1]**

F1. Thank you for completing this survey.

# APPENDIX D.5
# ASSOCIATION SURVEY
# APPLE WATCH SERIES 8
# SURVEY QUESTIONNAIRE

# SCREENER

## Overview and Quotas

**Two cells:**
Cell 1A (Test): N=200
Cell 2A (Control): N=200

**Quotas:**

Within each cell:

| Attribute | Target Percentage |
|---|---|
| **Age / Gender** | |
| Male 18-39 | 25% |
| Male 40+ | 25% |
| Female 18-39 | 25% |
| Female 40+ | 25% |
| **Region** | |
| Midwest | 22% |
| Northeast | 18% |
| South | 35% |
| West | 25% |

**[INSERT DEVICE SNIFFER AT BEGINNING OF SURVEY. IF RESPONDENT IS NOT ON DESKTOP, LAPTOP, SMARTPHONE, OR TABLET, PROMPT TO RE-ENTER THE SURVEY ON A QUALIFIED DEVICE]**

## Screening

**[SCREENER INTRODUCTION]**

Thank you for participating in our survey. Please take a few moments to complete our questions. If you usually wear eyeglasses or contacts while using a computer, tablet, or smartphone, please put them on now.

**[NEXT PAGE]**

QS10.  So that we can confirm that you are actually a person, please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue.  Do NOT include any spaces.  Type all of the characters together.

TEXT BOX:  _____

**[ASK QS10a IF RESPONDENT FAILS QS10]**

QS10a.  Please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue.  Do NOT include any spaces.  Type all of the characters together.

TEXT BOX:  _____

**[TERMINATE IF RESPONDENT FAILS QS10a]**

**[NEXT PAGE]**

QS20. What is your gender? *(Select one response.)*

**[RANDOMIZE]**

1.  Male
2.  Female
3.  Other **[ANCHOR]**

**[NEXT PAGE]**

QS30. Which of the following groups listed below includes your age? *(Select one response.)*

1.  Under 18 **[TERMINATE]**
2.  18-39
3.  40 or older

**[TERMINATE REPSONDENT IF AGE IN QS30 AND GENDER IN QS20 DO NOT MATCH PASSED IN PARAMETERS FROM PANEL]**

QS40. In which of the following states do you live? *(Select one response.)*

**[INSERT DROP DOWN LIST OF 50 STATES AND "WASHINGTON DC" IN ALPHABETIC ORDER.  INCLUDE OPTION FOR "OTHER". TERMINATE IF RESPONDENT CHOOSES "OTHER"]**

**[NEXT PAGE]**

<u>QS50.</u> Do you, or does any member of your household, currently work for any of the following? *(Select **all** that apply.)*

**[RANDOMIZE 1-6]**

1. An advertising, public relations or marketing agency or advertising department of a company **[TERMINATE]**
2. A market research firm or a marketing research department of a company **[TERMINATE]**
3. A company that makes or distributes smartwatches **[TERMINATE]**
4. A company that makes or distributes video game consoles
5. A company that makes or distributes computer chips
6. A company that makes or distributes televisions
7. None of these **[ANCHOR; CONTINUE]**

**[NEXT PAGE]**

<u>QS60.</u> Which of the following devices are you using right now to take this survey? *(Select one response.)*

**[RANDOMIZE]**
1. Desktop computer
2. Laptop computer
3. Tablet (such as an iPad, Android tablet, etc.)
4. Cell phone (not a smartphone) **[TERMINATE]**
5. Smartphone
6. Other (please specify): _____ **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

<u>QS70.</u> Which of the following types of consumer electronics products do you own? *(Select **all** that apply.)*

**[RANDOMIZE]**
1. Smartwatch
2. Gaming console
3. Smartphone
4. Tablet
5. None of the above **[ANCHOR; TERMINATE]**
6. Don't know **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

QS80.  Which of the following types of consumer electronics products do you expect to purchase in the next 12 months? *(Select one response for each row.)*

**[SHOW ROWS IN THE SAME ORDER AS THE DEVICES WERE SHOWN IN QS70; RANDOMLY SHOW COLUMNS 2 THROUGH 6 IN ASCENDING OR DESCENDING ORDER.]**

| | I definitely will purchase in the next 12 months | I probably will purchase in the next 12 months | I may or may not purchase in the next 12 months | I probably will <u>not</u> purchase in the next 12 months | I definitely will <u>not</u> purchase in the next 12 months |
|---|---|---|---|---|---|
| Smartwatch | **[CONTINUE TO QS90]** | **[CONTINUE TO QS90]** | **[TERMINATE]** | **[TERMINATE]** | **[TERMINATE]** |
| Gaming console | | | | | |
| Smartphone | | | | | |
| Tablet | | | | | |

**[IF "DEFINITELY WILL BUY" OR "PROBABLY WILL BUY" SMARTWATCH, CONTINUE TO QS90, OTHERWISE TERMINATE.]**

**[NEXT PAGE]**

QS90. You indicated that you will **["PROBABLY" OR "DEFINITELY" DEPENDING ON THE RESPONSE IN QS80]** purchase a new smartwatch in the next 12 months. Will you be the person who will decide which smartwatch you will purchase?  *(Select one response.)*
**[RANDOMIZE ORDER OF 1 AND 2.]**
   1.  Yes, I will decide
   2.  No, I will not decide **[TERMINATE]**
   3.  Don't know **[TERMINATE]**

**[NEXT PAGE]**

QS100. **[IF "PROBABLY" IN QS80 THEN "IF" ELSE "WHEN"]** you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?
**[INSERT TEXT BOX AND ALLOW RESPONDENTS TO ENTER ANY WHOLE NUMBER. DO NOT ALLOW ANY CHARACTERS OTHER THAN WHOLE NUMBERS. TERMINATE IF RESPONSE IS 1 OR 0; OTHERWISE CONTINUE TO QS110.]**

**[NEXT PAGE]**

<u>QS110.</u> Which, if any, of the following features do you expect will impact your decision of which smartwatch to purchase? If you don't know or are not sure if a feature will impact your purchase decision, please do not select it. *(Select **all** that apply.)*
**[RANDOMIZE 1-11]**
1. Price
2. Appearance and design of the watch
3. Battery life
4. Physiological data monitoring (e.g., oxygen level, respiration rate)
5. Variety and number of apps
6. Materials and finishes (e.g., titanium, steel)
7. Sleep tracking
8. Fitness tracking
9. Weight
10. Water resistance
11. Heart monitoring
12. Other (please specify): _____ **[ANCHOR]**
13. None of the above **[ANCHOR; EXCLUSIVE]**

**[NEXT PAGE]**

You have qualified to take this survey. Before continuing, please carefully read these instructions:
- Please take the survey in <u>one</u> session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.
- If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option.

*(Select one response.)*
1. I understand and agree to the above instructions
2. I do <u>not</u> understand or do <u>not</u> agree to the above instructions **[TERMINATE]**

**Main Questionnaire**

**[ASSIGN RESPONDENTS TO CELLS BASED ON LEAST FILL PROPORTIONATELY SO THAT BOTH CELLS FILL AT THE SAME RATE]**
**[CELL 1A (TEST): N=200]**

**[CELL 2A (CONTROL): N=200]**

**[MAIN QUESTIONNAIRE INTRODUCTION FOR CELL 1A AND CELL 2A]**

You should complete this survey without stopping in the middle.  Please make sure <u>not</u> to consult anyone and <u>not</u> to open another browser while working on this survey.

During this survey, you will be shown a number of images. If you would like to look at any image more closely, please click on that image.

**[NEXT PAGE]**

Intro1. Suppose that while looking for a smartwatch on the Internet, for example, on Best Buy's website, you see the following designs of the backs of five smartwatches.

As a reminder, if you would like to look at any image more closely, please click on that image.

**[RANDOMIZE THE ORDER OF THE ROWS; DO NOT RANDOMIZE ORDER OF THE COLUMNS.]**

**[ALL IMAGES SHOULD BE APPROXIMATELY THE SAME SIZE AND FIT IN THE SAME SIZE BOX; ALLOW RESPONDENTS TO ZOOM IN ON ANY IMAGE BY CLICKING ON IT.]**

**[DELAY CONTINUE BUTTON FOR 15 SECONDS.]**

| | |
|---|---|
| Apple Watch Series 8 |  |
| Samsung Galaxy Watch 5 |  |

| Garmin Forerunner 955 |  |
| Fitbit Sense 2 |  |
| Amazfit GTR 4 |  |

**[NEXT PAGE]**

**[SHOW INTRO2_CELL_1A TO RESPONDENTS ASSIGNED TO CELL 1A; SHOW INTRO2_CELL_2A TO RESPONDENTS ASSIGNED TO CELL 2A; TEST RESPONDENTS (CELL 1A) SHOULD SEE MASIMO WATCH; CONTROL RESPONDENTS (CELL 2A) SHOULD SEE TICWATCH PRO 3 ULTRA].**

**[ALL IMAGES SHOULD BE THE SAME SIZE AS THE IMAGES IN INTRO1; ALLOW RESPONDENTS TO ZOOM IN ON ANY IMAGE BY CLICKING ON IT.]**

**[DELAY CONTINUE BUTTON FOR 10 SECONDS.]**

Intro2_Cell_1A. Suppose now that you come across the following design of the back of another smartwatch on the Internet (shown below).  Please evaluate it.

**[SHOW PICTURE OF MASIMO WATCH]**



Intro2_Cell_2A. Suppose now that you come across the following design of the back of another smartwatch on the Internet (shown below).  Please evaluate it.

**[SHOW PICTURE OF TICWATCH PRO 3 ULTRA]**



**[NEXT PAGE]**
**[AT Q1, SHOW THE IMAGE FROM INTRO2_CELL_1A OR INTRO2_CELL_2A AS APPLICABLE ON THE TOP OF THAT PAGE ABOVE THE QUESTION]**

Q1. Which, if any, smartwatch company or brand do you associate with the design of the back of the smartwatch shown above? *(Select one response, such as one of the companies/brands listed below, or write in your own answer, or select the option to indicate that you do not associate the design of the back of the smartwatch shown above with any smart watch company or brand, or indicate that you don't know or are unsure.)*
**[RANDOMIZE 1-5]**

1. Apple
2. Fitbit
3. Garmin
4. Amazfit
5. Samsung
6. Other (please specify): _____ **[ANCHOR]**

7. I do not associate the design of the back of the smartwatch shown above with any smartwatch company or brand **[ANCHOR]**
8. Don't know/Unsure **[ANCHOR]**

**[ALL IMAGES SHOULD BE APPROXIMATELY THE SAME SIZE AND FIT IN THE SAME SIZE BOX; ALLOW RESPONDENTS TO ZOOM IN ON ANY IMAGE BY CLICKING ON IT.]**
**[THIS TABLE SHOULD BE THE EXACT SAME TABLE AS WE SHOW IN INTRO1.]**



| Apple Watch Series 8 | |
| Samsung Galaxy Watch 5 | |
| Garmin Forerunner 955 | |
| Fitbit Sense 2 | |

| Amazfit GTR 4 |  |

**[NEXT PAGE]**

**[ALL GO TO F1]**

F1. Thank you for completing this survey.

# APPENDIX E
# SURVEY SCREENSHOTS

# APPENDIX E.1
# DESIGN IMPACT SURVEY MASIMO
# SURVEY SCREENSHOTS

**January 2023**



S10



S10a



S20



S30



Which of the following groups listed below includes your age?
*(Select one response.)*

○ Under 18
○ 18-39
○ 40 or older

Continue

S40



S50



S60



S70



S80

29%

Which of the following types of consumer electronics products do you expect to purchase in the next 12 months?
*(Select one response for each row.)*

| | I definitely will purchase in the next 12 months | I probably will purchase in the next 12 months | I may or may not purchase in the next 12 months | I probably will not purchase in the next 12 months | I definitely will not purchase in the next 12 months |
|---|---|---|---|---|---|
| Tablet | ○ | ○ | ○ | ○ | ○ |
| Smartphone | ○ | ○ | ○ | ○ | ○ |
| Smartwatch | ○ | ○ | ○ | ○ | ○ |
| Gaming console | ○ | ○ | ○ | ○ | ○ |

Continue

S90



S100



Qualify

44%

You have qualified to take this survey. Before continuing, please carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.

*(Select one response.)*

○ I understand and agree to the above instructions

○ I do <u>not</u> understand or do <u>not</u> agree to the above instructions

Continue



You should complete this survey without stopping in the middle. Please make sure <u>not</u> to consult anyone and <u>not</u> to open another browser while working on this survey.

Continue

Q1

52%

How familiar or unfamiliar are you with smartwatches?

*(Enter a whole number between 0 and 10. 0 indicates very unfamiliar and 10 indicates very familiar.)*

Continue

Q2

56%

How many smartwatch brands are you familiar with?
*(Enter a whole number.)*

Continue



<u>Please read the following information about smartwatch features carefully.</u>

Later you will be asked to evaluate a new smartwatch based on its features.

When you are finished reviewing the features on each screen, click "CONTINUE" to continue.

*On each screen, the "CONTINUE" button will appear after you review the features on that page.*

Continue

Fitness Tracking:

Some smartwatches offer fitness tracking to monitor your daily activity, provide insight into fitness data trends, and allow you to share the fitness data.



Physiological Data Monitoring:

Some smartwatches offer physiological data monitoring such as Hydration Index (Hi), oxygen level (SpO2), respiration rate, pleth variability index, and perfusion index.



Water Resistance:

Some smartwatches offer water resistance up to 60 meters, others offer water resistance at shallower depths, and others do not offer water resistance.





Weight:
Typical smartwatches weigh around 30-55 grams.

Sleep Tracking:
Some smartwatches offer a special app for tracking your sleep, such as total sleep time, REM, and deep sleep, and provide health reports based on tracked sleep.

Price:
Price refers to the amount of money you pay to *purchase a smartwatch outright in-full* (i.e., not on an installment plan). Typical prices range between $99 and $1,000, depending on features, specs, and models/brands.

Heart Monitoring:
Some smartwatches can get a quick read on your heart rate, or check your heart rhythm.

Materials and Finishes:
Smartwatches can come in a variety of materials and finishes, including aluminum, stainless steel, ceramic, and titanium.

Two Time Zone Display:
Some smartwatches can display the time in two time zones at the same time (such as both on the East coast and the West coast of the U.S.).



E.1-21



Variety and Number of Apps:
Smartwatches vary with respect to the number of compatible apps.

Battery Life:
"Battery life" means the length of time the smartwatch can continue to work before it needs its battery to be recharged. Typical smartwatch batteries last between a day and a week on a single charge.

Appearance and Design: Front of the Watch:
On some smartwatches, you can change the watch face by choosing among available options.

Appearance and Design: Back of the Watch:
The back of the watch sits against your wrist.



84%

| Feature | |
|---|---|
| **Fitness Tracking** | Yes |
| **Physiological Data Monitoring** | Yes |
| **Water Resistance** | Yes |
| **Weight** | 34 grams |
| **Sleep Tracking** | Yes |
| **Price** | $499.00 |
| **Heart Monitoring** | Yes |
| **Materials and Finishes** | Aluminum |
| **Two Time Zone Display** | No |
| **Variety and Number of Apps** | Greater than 5 |
| **Battery Life** | 24 Hours |
| **Appearance and Design: Front of the Watch** |  |
| **Appearance and Design: Back of the Watch** | |

Q3

88%

Now suppose that you were considering purchasing this smartwatch. Please select the features that you expect will impact your purchase decision. If you don't know or are not sure if a feature will impact your purchase decision, please do not select it.

| Feature | | Would Impact Your Purchase Decision? |
|---|---|---|
| Fitness Tracking | Yes | ☐ |
| Physiological Data Monitoring | Yes | ☐ |
| Water Resistance | Yes | ☐ |
| Weight | 34 grams | ☐ |
| Sleep Tracking | Yes | ☐ |
| Price | $499.00 | ☐ |
| Heart Monitoring | Yes | ☐ |
| Materials and Finishes | Aluminum | ☐ |
| Two Time Zone Display | No | ☐ |
| Variety and Number of Apps | Greater than 5 | ☐ |
| Battery Life | 24 Hours | ☐ |
| Appearance and Design: Front of the Watch |  | ☐ |
| Appearance and Design: Back of the Watch | | ☐ |

Continue

## Survey Completed - Thank You

Thank you for taking our survey. Your efforts are greatly appreciated!

# APPENDIX E.2
# DESIGN IMPACT SURVEY
# APPLE WATCH SERIES 5
# SURVEY SCREENSHOTS

**January 2023**



S10



So that we can confirm that you are actually a person, please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue. Do NOT include any spaces. Type all of the characters together.

dYXbm

Continue

S10a



S20



S30



S40



S50



S60



Which of the following devices are you using right now to take this survey?
*(Select one response.)*

○ Tablet (such as an iPad, Android tablet, etc.)

○ Cell phone (not a smartphone)

○ Smartphone

○ Desktop computer

○ Laptop computer

○ Other (please specify): [                    ]

Continue

S70



S80



28%

Which of the following types of consumer electronics products do you expect to purchase in the next 12 months?

*(Select one response for each row.)*

|  | I definitely will not purchase in the next 12 months | I probably will not purchase in the next 12 months | I may or may not purchase in the next 12 months | I probably will purchase in the next 12 months | I definitely will purchase in the next 12 months |
|---|---|---|---|---|---|
| Tablet | ○ | ○ | ○ | ○ | ○ |
| Gaming console | ○ | ○ | ○ | ○ | ○ |
| Smartwatch | ○ | ○ | ○ | ○ | ○ |
| Smartphone | ○ | ○ | ○ | ○ | ○ |

Continue

S90



S100



When you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?

*(Enter a whole number.)*

Continue

Qualify

44%

You have qualified to take this survey. Before continuing, please carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.

*(Select one response.)*

○ I understand and agree to the above instructions

○ I do <u>not</u> understand or do <u>not</u> agree to the above instructions

Continue



Q1

52%

How familiar or unfamiliar are you with smartwatches?

*(Enter a whole number between 0 and 10. 0 indicates very unfamiliar and 10 indicates very familiar.)*

Continue

Q2

56%

How many smartwatch brands are you familiar with?
*(Enter a whole number.)*

Continue



Please read the following information about smartwatch features carefully.

Later you will be asked to evaluate a new smartwatch based on its features.

When you are finished reviewing the features on each screen, click "CONTINUE" to continue.

*On each screen, the "CONTINUE" button will appear after you review the features on that page.*

Continue

64%

Materials and Finishes:
Smartwatches can come in a variety of materials and finishes, including aluminum, stainless steel, ceramic, and titanium.



Battery Life:
"Battery life" means the length of time the smartwatch can continue to work before it needs its battery to be recharged. Typical smartwatch batteries last between a day and a week on a single charge.

Two Time Zone Display:
Some smartwatches can display the time in two time zones at the same time (such as both on the East coast and the West coast of the U.S.).

Weight:
Typical smartwatches weigh around 30-55 grams.

Fitness Tracking:
Some smartwatches offer fitness tracking to monitor your daily activity, provide insight into fitness data trends, and allow you to share the fitness data.

Water Resistance:
Some smartwatches offer water resistance up to 60 meters, others offer water resistance at shallower depths, and others do not offer water resistance.



<u>Price</u>:
Price refers to the amount of money you pay to *purchase a smartwatch outright in-full* (i.e., not on an installment plan). Typical prices range between $99 and $1,000, depending on features, specs, and models/brands.

<u>Variety and Number of Apps</u>:
Smartwatches vary with respect to the number of compatible apps.



<u>Sleep Tracking</u>:
Some smartwatches offer a special app for tracking your sleep, such as total sleep time, REM, and deep sleep, and provide health reports based on tracked sleep.



Physiological Data Monitoring:
Some smartwatches offer physiological data monitoring such as Hydration Index (Hi), oxygen level (SpO2), respiration rate, pleth variability index, and perfusion index.

Heart Monitoring:
Some smartwatches can get a quick read on your heart rate, or check your heart rhythm.

Appearance and Design: Front of the Watch:
On some smartwatches, you can change the watch face by choosing among available options.

Appearance and Design: Back of the Watch:
The back of the watch sits against your wrist.



84%

| Feature | |
|---|---|
| **Materials and Finishes** | Aluminum |
| **Battery Life** | 18 Hours |
| **Two Time Zone Display** | No |
| **Weight** | 30.8 grams |
| **Fitness Tracking** | Yes |
| **Water Resistance** | Yes |
| **Price** | $212.99 |
| **Variety and Number of Apps** | Greater than 5 |
| **Sleep Tracking** | Yes |
| **Physiological Data Monitoring** | Yes |
| **Heart Monitoring** | Yes |
| **Appearance and Design: Front of the Watch** |  |
| **Appearance and Design: Back of the Watch** | |

88%

Now suppose that you were considering purchasing this smartwatch. Please select the features that you expect will impact your purchase decision. If you don't know or are not sure if a feature will impact your purchase decision, please do not select it.

| Feature | | Would Impact Your Purchase Decision? |
|---|---|---|
| Materials and Finishes | Aluminum | ☐ |
| Battery Life | 18 Hours | ☐ |
| Two Time Zone Display | No | ☐ |
| Weight | 30.8 grams | ☐ |
| Fitness Tracking | Yes | ☐ |
| Water Resistance | Yes | ☐ |
| Price | $212.99 | ☐ |
| Variety and Number of Apps | Greater than 5 | ☐ |
| Sleep Tracking | Yes | ☐ |
| Physiological Data Monitoring | Yes | ☐ |
| Heart Monitoring | Yes | ☐ |
| Appearance and Design: Front of the Watch |  | ☐ |
| Appearance and Design: Back of the Watch |  | ☐ |

Continue

### Survey Completed - Thank You

Thank you for taking our survey. Your efforts are greatly appreciated!

# APPENDIX E.3
# DESIGN IMPACT SURVEY
# APPLE WATCH SERIES 8
# SURVEY SCREENSHOTS

**January 2023**



QS10



QS10a



Please enter the code exactly as it appears in the image below, including upper and lower case letters, and then click the "Continue" button to continue. Do NOT include any spaces. Type all of the characters together.

JBuva

Continue

QS20



QS30



QS40



QS50



QS60



QS70



QS80



QS90



QS100



Qualify

44%

You have qualified to take this survey. Before continuing, please carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.

*(Select one response.)*

○ I understand and agree to the above instructions

○ I do <u>not</u> understand or do <u>not</u> agree to the above instructions

Continue



You should complete this survey without stopping in the middle. Please make sure <u>not</u> to consult anyone and <u>not</u> to open another browser while working on this survey.

Continue

Q1

52%

How familiar or unfamiliar are you with smartwatches?

*(Enter a whole number between 0 and 10. 0 indicates very unfamiliar and 10 indicates very familiar.)*

Continue

Q2

56%

How many smartwatch brands are you familiar with?
*(Enter a whole number.)*

Continue



64%

Appearance and Design: Front of the Watch:
On some smartwatches, you can change the watch face by choosing among available options.



Appearance and Design: Back of the Watch:
The back of the watch sits against your wrist.

Price:
Price refers to the amount of money you pay to *purchase a smartwatch outright in-full* (i.e., not on an installment plan). Typical prices range between $99 and $1,000, depending on features, specs, and models/brands.



Variety and Number of Apps:
Smartwatches vary with respect to the number of compatible apps.

Water Resistance:
Some smartwatches offer water resistance up to 60 meters, others offer water resistance at shallower depths, and others do not offer water resistance.

Weight:
Typical smartwatches weigh around 30-55 grams.

Sleep Tracking:
Some smartwatches offer a special app for tracking your sleep, such as total sleep time, REM, and deep sleep, and provide health reports based on tracked sleep.



Heart Monitoring:
Some smartwatches can get a quick read on your heart rate, or check your heart rhythm.

Fitness Tracking:
Some smartwatches offer fitness tracking to monitor your daily activity, provide insight into fitness data trends, and allow you to share the fitness data.

Battery Life:
"Battery life" means the length of time the smartwatch can continue to work before it needs its battery to be recharged. Typical smartwatch batteries last between a day and a week on a single charge.



Materials and Finishes:
Smartwatches can come in a variety of materials and finishes, including aluminum, stainless steel, ceramic, and titanium.

Physiological Data Monitoring:
Some smartwatches offer physiological data monitoring such as Hydration Index (Hi), oxygen level (SpO2), respiration rate, pleth variability index, and perfusion index.

Two Time Zone Display:
Some smartwatches can display the time in two time zones at the same time (such as both on the East coast and the West coast of the U.S.).



E.3-22





| Feature | |
|---|---|
| Appearance and Design: Front of the Watch | |
| Appearance and Design: Back of the Watch | |
| Price | $399.00 |
| Variety and Number of Apps | Greater than 5 |
| Water Resistance | Yes |
| Weight | 31.9 grams |
| Sleep Tracking | Yes |
| Heart Monitoring | Yes |
| Fitness Tracking | Yes |
| Battery Life | 18 Hours |
| Materials and Finishes | Aluminum |
| Physiological Data Monitoring | Yes |
| Two Time Zone Display | No |

Q3



**Survey Completed - Thank You**

Thank you for taking our survey. Your efforts are greatly appreciated!

# APPENDIX E.4 ASSOCIATION SURVEY APPLE WATCH SERIES 5 SURVEY SCREENSHOTS

**January 2023**



QS10



QS10a



QS20



QS30



QS40



QS50



QS60



QS70

31%

Which of the following types of consumer electronics products do you own?
*(Select **all** that apply.)*

☐ Smartphone
☐ Tablet
☐ Smartwatch
☐ Gaming console
☐ None of the above
☐ Don't know

Continue

QS80



## QS90



QS100



When you purchase a new smartwatch in the next 12 months, approximately how many smartwatch brands do you expect to consider before making your purchase decision?

Continue

QS110

55%

Which, if any, of the following features do you expect will impact your decision of which smartwatch to purchase? If you don't know or are not sure if a feature will impact your purchase decision, please do not select it.
*(Select **all** that apply.)*

☐ Appearance and design of the watch

☐ Materials and finishes (e.g., titanium, steel)

☐ Variety and number of apps

☐ Weight

☐ Price

☐ Battery life

☐ Fitness tracking

☐ Heart monitoring

☐ Water resistance

☐ Sleep tracking

☐ Physiological data monitoring (e.g., oxygen level, respiration rate)

☐ Other (please specify): [            ]

☐ None of the above

Continue

## Qualify

60%

You have qualified to take this survey. Before continuing, please carefully read these instructions:

- Please take the survey in one session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.
- If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option.

*(Select one response.)*

○ I understand and agree to the above instructions

○ I do not understand or do not agree to the above instructions

Continue



Suppose that while looking for a smartwatch on the Internet, for example, on Best Buy's website, you see the following designs of the backs of five smartwatches.

As a reminder, if you would like to look at any image more closely, please click on that image.



Cell 1B



Suppose now that you come across the following design of the back of another smartwatch on the Internet (shown below). Please evaluate it.

Cell 2B

75%

Suppose now that you come across the following design of the back of another smartwatch on the Internet (shown below). Please evaluate it.



## Q1 – Cell 1B



## Q1 – Cell 2B



**Survey Completed - Thank You**

Thank you for taking our survey. Your efforts are greatly appreciated!

# APPENDIX E.5
# ASSOCIATION SURVEY
# APPLE WATCH SERIES 8
# SURVEY SCREENSHOTS

**January 2023**



as

## QS10



QS10a



QS20



QS30



QS40



QS50



QS60



QS70



QS80



QS90



QS100



QS110

55%

Which, if any, of the following features do you expect will impact your decision of which smartwatch to purchase? If you don't know or are not sure if a feature will impact your purchase decision, please do not select it.

*(Select **all** that apply.)*

☐ Price

☐ Weight

☐ Appearance and design of the watch

☐ Materials and finishes (e.g., titanium, steel)

☐ Physiological data monitoring (e.g., oxygen level, respiration rate)

☐ Variety and number of apps

☐ Battery life

☐ Heart monitoring

☐ Fitness tracking

☐ Sleep tracking

☐ Water resistance

☐ Other (please specify): [_____]

☐ None of the above

Continue

Qualify

60%

You have qualified to take this survey. Before continuing, please carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.
- Please maximize your browser and keep it maximized for the survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear glasses or contact lenses when viewing a computer, tablet or smartphone screen, please put them on/in before continuing to the next page.
- If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option.

*(Select one response.)*

○ I understand and agree to the above instructions

○ I do <u>not</u> understand or do <u>not</u> agree to the above instructions

Continue



You should complete this survey without stopping in the middle. Please make sure not to consult anyone and not to open another browser while working on this survey.

During this survey, you will be shown a number of images. If you would like to look at any image more closely, please click on that image.

Continue

70%

Suppose that while looking for a smartwatch on the Internet, for example, on Best Buy's website, you see the following designs of the backs of five smartwatches.

As a reminder, if you would like to look at any image more closely, please click on that image.



| Garmin Forerunner 955 | |
| Samsung Galaxy Watch 5 | |
| Apple Watch Series 8 | |
| Amazfit GTR 4 | |
| Fitbit Sense 2 | |

Cell 1A

75%

Suppose now that you come across the following design of the back of another smartwatch on the Internet (shown below). Please evaluate it.



Cell 2A

75%

Suppose now that you come across the following design of the back of another smartwatch on the Internet (shown below). Please evaluate it.



## Q1 – Cell 1A



## Q1 Cell 2A



**Survey Completed - Thank You**

Thank you for taking our survey. Your efforts are greatly appreciated!

# APPENDIX F
# TERMINATION REPORT

# APPENDIX F.1
# DESIGN IMPACT SURVEY MASIMO
# TERMINATION REPORT

| Design Impact Survey - Masimo - Termination Report Summary | |
|---|---|
| Completes | 200 |
| Total Incomplete | 54 |
| Total Terminates | 1192 |
| Total Overquota | 3 |
| **Total** | **1449** |

| Incompletes | |
|---|---|
| INCOMPLETE_MAIN | 6 |
| INCOMPLETE_SCR | 48 |
| **Overquota** | |
| Overquota: Age or Gender | 3 |
| **Terminates** | |
| QS10: Did not pass CAPTCHA | 47 |
| QS20: Gender did not match/Did not select 'Other' | 5 |
| QS30: Under 18 | 8 |
| QS30: Age did not match | 8 |
| QS50: Worked in sensitive industry | 63 |
| QS60: Not on approved device | 58 |
| QS70: Did not know or own any qualifying devices | 20 |
| QS80: Did not plan to purchase smartwatch in next 12 months | 895 |
| QS90: Would not be decision maker for smartwatch | 8 |
| QS100: Would only consider 0 or 1 brand | 80 |

# APPENDIX F.2
# DESIGN IMPACT SURVEY
# APPLE WATCH SERIES 5
# TERMINATION REPORT

| Design Impact Survey - Apple Watch Series 5 - Termination Report Summary ||
|---|---|
| Completes | 200 |
| Total Incomplete | 43 |
| Total Terminates | 979 |
| Total Overquota | 4 |
| **Total** | **1226** |

| Incompletes ||
|---|---|
| INCOMPLETE_MAIN | 2 |
| INCOMPLETE_SCR | 41 |
| **Overquota** ||
| Overquota: Age or Gender | 4 |
| **Terminates** ||
| QS10: Did not pass CAPTCHA | 35 |
| QS20: Gender did not match/Did not select 'Other' | 12 |
| QS30: Under 18 | 6 |
| QS30: Age did not match | 14 |
| QS50: Worked in sensitive industry | 86 |
| QS60: Not on approved device | 63 |
| QS70: Did not know or own any qualifying devices | 25 |
| QS80: Did not plan to purchase smartwatch in next 12 months | 658 |
| QS90: Would not be decision maker for smartwatch | 4 |
| QS100: Would only consider 0 or 1 brand | 76 |

F.2-2

# APPENDIX F.3
# DESIGN IMPACT SURVEY
# APPLE WATCH SERIES 8
# TERMINATION REPORT

| Design Impact Survey - Apple Watch Series 8 - Termination Report Summary ||
|---|---|
| Completes | 200 |
| Total Incomplete | 54 |
| Total Terminates | 1221 |
| Total Overquota | 14 |
| **Total** | **1489** |

| Incompletes ||
|---|---|
| INCOMPLETE_MAIN | 7 |
| INCOMPLETE_SCR | 47 |
| **Overquota** ||
| Overquota: Age or Gender | 14 |
| **Terminates** ||
| QS10: Did not pass CAPTCHA | 38 |
| QS20: Gender did not match/Did not select 'Other' | 19 |
| QS30: Under 18 | 9 |
| QS30: Age did not match | 23 |
| S40: Did not live in US | 1 |
| QS50: Worked in sensitive industry | 60 |
| QS60: Not on approved device | 76 |
| QS70: Did not know or own any qualifying devices | 29 |
| QS80: Did not plan to purchase smartwatch in next 12 months | 869 |
| QS90: Would not be decision maker for smartwatch | 14 |
| QS100: Would only consider 0 or 1 brand | 83 |

# APPENDIX F.4 ASSOCIATION SURVEY APPLE WATCH SERIES 5 TERMINATION REPORT

| Association Survey - Apple Watch Series 5 - Termination Report Summary | |
|---|---|
| Completes | 401 |
| Total Incomplete | 102 |
| Total Terminates | 2934 |
| Total Overquota | 55 |
| **Total** | **3492** |

| Incompletes | |
|---|---|
| INCOMPLETE_MAIN | 0 |
| INCOMPLETE_SCR | 102 |
| **Overquota** | |
| Overquota: Age or Gender | 55 |
| **Terminates** | |
| QS10: Did not pass CAPTCHA | 113 |
| QS20: Gender did not match/Did not select 'Other' | 42 |
| QS30: Under 18 | 23 |
| QS30: Age did not match | 41 |
| S40: Did not live in US | 1 |
| QS50: Worked in sensitive industry | 176 |
| QS60: Not on approved device | 175 |
| QS70: Did not know or own any qualifying devices | 58 |
| QS80: Did not plan to purchase smartwatch in next 12 months | 2111 |
| QS90: Would not be decision maker for smartwatch | 26 |
| QS100: Would only consider 0 or 1 brand | 167 |
| Qualify: Did not understand or agree to instructions | 1 |

F.4-2

# APPENDIX F.5
# ASSOCIATION SURVEY
# APPLE WATCH SERIES 8
# TERMINATION REPORT

| Association Survey - Apple Watch Series 8 - Termination Report Summary | |
|---|---|
| Completes | 400 |
| Total Incomplete | 124 |
| Total Terminates | 2243 |
| Total Overquota | 60 |
| **Total** | **2827** |

| Incompletes | |
|---|---|
| INCOMPLETE_MAIN | 0 |
| INCOMPLETE_SCR | 124 |
| **Overquota** | |
| Overquota: Age or Gender | 60 |
| **Terminates** | |
| QS10: Did not pass CAPTCHA | 88 |
| QS20: Gender did not match/Did not select 'Other' | 38 |
| QS30: Under 18 | 16 |
| QS30: Age did not match | 46 |
| S40: Did not live in US | 2 |
| QS50: Worked in sensitive industry | 170 |
| QS60: Not on approved device | 144 |
| QS70: Did not know or own any qualifying devices | 31 |
| QS80: Did not plan to purchase smartwatch in next 12 months | 1534 |
| QS90: Would not be decision maker for smartwatch | 15 |
| QS100: Would only consider 0 or 1 brand | 159 |

F.5-2

# EXHIBIT O

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

APPLE INC.,

                 Plaintiff,

      v.

MASIMO CORPORATION and
SOUND UNITED, LLC,

                 Defendants.

MASIMO CORPORATION,

                 Counter-Claimant,

      v.

APPLE INC.,

                 Counter-Defendant.

C.A. No. 1:22-1377-MN

**DECLARATION OF JAMES
MALACKOWSKI IN SUPPORT OF
APPLE INC.'S MOTION FOR AN
EXPEDITED TRIAL**

## TABLE OF CONTENTS

I. Assignment. ................................................................................................. 1

II. Qualifications. .............................................................................................. 1

III. Summary of Opinions. .................................................................................. 3

IV. Legal Standards ............................................................................................. 4

V. Background .................................................................................................... 5

    A. Apple, Apple Watch, And Apple's Reputation For Innovation And Design. ........ 5

    B. Apple Has Been Awarded Patent Protection For Its Innovative Designs That Are Embodied In Apple Watch .................................................................. 10

    C. Apple Watch's Designs Form A Key Part Of Apple Watch's Success. .............. 14

    D. Masimo Corporation Is A Hospital Equipment Company That Only Just Recently Released Its First Smartwatch, W1. ........................................................ 20

    E. Masimo's W1 Is Substantially Similar To The Patented Designs In The Asserted Patents. ................................................................................... 25

    F. Masimo Acquired Sound United To Distribute W1 And Intends To Substantially Expand Its Sales Of W1 And Other Similar Products In The Latter Half Of 2023. .................................................................................... 27

VI. Apple Is Likely to Sustain Irreparable Harm From Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half of 2023 ...................................... 33

    A. Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half Of 2023 Is Likely To Cause Apple Irreparable Harm By Requiring Apple To Compete With Its Own Patented Designs And, Consequently, Lose Product Market Share, Sales, Revenues, And Profits Related To Apple Watch .................................... 34

        1. Apple Watch And W1 Will Compete In The Latter Half Of 2023 If Masimo's Distribution Plans Come To Fruition. ................................... 34

        2. Competition Between Apple Watch And W1 In The Latter Half Of 2023 Will Cause Apple Irreparable Harm By Improperly Requiring Apple To Compete With Its Own Patented Designs, Resulting In Irreparable Lost Product Market Share, Sales, Revenues, And Profits. ............................ 40

        3. The Likely Irreparable Harm To Apple From Requiring Apple To Compete With Its Own Patented Inventions And Consequently Lose Product Market Share In The Latter Half Of 2023 Is Causally Linked To Masimo's Unauthorized Use Of The Patented Designs In The Asserted Patents. ........................................................................ 45

    B. Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half Of 2023 Will Result In Irreparable Harm To Apple's Reputation As An Innovator of Product Designs And Provider Of High-Quality Products. ................................. 49

i

1.   Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half Of 2023 Will Cause Irreparable Harm To Apple's Reputation As An Innovator Of Product Designs. ................................................. 50

2.   Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half Of 2023 Will Cause Irreparable Harm To Apple's Reputation As A Provider Of High Quality Products. ........................................................ 53

3.   The Likely Irreparable Harm To Apple's Reputation In The Latter Half Of 2023 Is Causally Linked To Masimo's Use Of The Patented Designs In the Asserted Patents. ................................................... 55

C.   The Likely Irreparable Harms To Apple In The Latter Half Of 2023 Will Not Be Redressed By Calculating Damages Based On Masimo's Profits. ....................... 55

1.   Apple's Likely Irreparable Harm In The Latter Half Of 2023 Will Not Be Redressed By A Reasonable Royalty. ....................................................... 56

2.   Apple's Likely Irreparable Harm In The Latter Half Of 2023 Will Not Be Redressed By Disgorging Masimo's Profits. ............................................. 57

D.   Enjoining Distribution Of W1 During 2023 Will Mitigate The Irreparable Harms To Apple Resulting From Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half Of 2023. ........................................................... 58

VII.   A Post-Trial Injunction Is Not Likely To Significantly Harm Masimo. .......................... 58

VIII.   Apple Watch's Patented Designs Have Experienced Significant Commercial Success And Industry Praise. ........................................................ 59

I, James Malackowski, state and declare as follows:

## I.     ASSIGNMENT.

1.     I have been asked by counsel for Apple Inc. ("Apple") to provide this Declaration in connection with Apple's Motion for An Expedited Trial, which seeks an expedited trial date to adjudicate Masimo Corporation's ("Masimo") and Sound United, LLC's ("Sound United") (together, "Masimo") liability for importing, marketing, selling, offering to sell, and/or otherwise commercializing within the United States Masimo's W1 smartwatch ("W1") with designs that are alleged to infringe Apple's design patents (among other intellectual property).

2.     I understand that Apple is seeking an expedited trial to ultimately seek post-trial injunctive relief against Masimo immediately following trial to mitigate the irreparable harm that Apple is likely to sustain in 2023, particularly the latter half of 2023, from Masimo's ongoing and escalating sales of W1.  I have been asked to address economic issues relating to irreparable harm, any harm to Masimo that is likely to result from a post-trial injunction, and commercial success and industry praise related to the patented designs in the Asserted Patents.

3.     A listing of documents reviewed in this case is included in the footnotes to this Declaration and/or the summary provided in **Appendix 2**.  References to documents are meant to provide examples of supporting information but are not intended to be a comprehensive or exhaustive list of all known support, or to signify a heightened level of importance.  I reserve the right to supplement my opinions and the bases for my opinions in the event any additional information or opinions are submitted by the parties or experts in this matter.

## II.    QUALIFICATIONS.

4.     I am a Co-founder and Senior Managing Director of Ocean Tomo, LLC, a part of J.S. Held.  Ocean Tomo provides Financial Expert, Management Consulting, and Advisory services related to intellectual property (IP).  Practice offerings address economic damage

1

calculations and testimony; technology and intangible asset valuation; strategy and risk management consulting; debt and equity private placement; and IP brokerage.  With more than 100 offices globally, J.S. Held assists clients – corporations, insurers, law firms, governments, and institutional investors – on complex technical, scientific, and financial matters across all assets and value at risk.

5.      Along with Supreme Court Justice Stephen Breyer, I was inducted into the IP Hall of Fame in 2022, chosen by the IP Hall of Fame Academy from a long list of nominees put forward by the global IP community.  I was recognized by the Academy in 2022 with the Q. Todd Dickinson Award, which honors those who have made significant contributions to IP as a business asset.  My inclusion into the IP Hall of Fame follows annual recognition since 2007 by leading industry publications as one of the "World's Leading IP Strategists."

6.      On more than 100 occasions, I have served as an expert in U.S. Federal Court, U.S. Bankruptcy Court, State Court, Court of Chancery, the Ontario Superior Court of Justice, the U.S. Patent and Trademark Office Patent Trial and Appeal Board, and global arbitrations on questions relating to IP economics including the subjects of valuation, reasonable royalty, lost profits, price erosion, profit disgorgement, commercial success, irreparable harm, equities of a potential injunction, corrective advertising, creditor allocations, business significance of licensing terms including RAND obligations, and venture financing including expected risk / return.  I have publicly addressed policy issues affecting international trade and have provided expert opinions concerning antidumping and countervailing duties imposed by the U.S. Department of Commerce as well as testimony on domestic industry, bond, and remedies before the ITC.  I have substantial experience as a Board Director for leading technology corporations and research organizations as well as companies with critical brand management issues.

7.      I am a Past President of The Licensing Executives Society International, Inc. ("LESI"), with oversight for more than ten thousand members in 32 countries.  As President of LESI, I helped facilitate the development of professional standards among members engaged in the licensing of technology of IP rights.  I also oversaw initiatives to inform and educate the public – international bodies, government bodies, and the business community – concerning the economic significance of licensing and importance of developing professional standards.

8.      I am a Summa Cum Laude graduate of the University of Notre Dame majoring in accountancy and philosophy.  I am Certified/Accredited in Financial Forensics, Business Valuation and Blockchain Fundamentals.  I am a Certified Licensing Professional and a Registered Certified Public Accountant in the State of Illinois.  My curriculum vitae, which sets forth my qualifications to be an expert witness in this case, is attached hereto as **Appendix 1**.  My hourly billing rate on this matter is $1,200.  My and/or Ocean Tomo's compensation is not dependent on the outcome of this matter.  Ocean Tomo's work on this matter was performed by me or under my supervision.

## III.     SUMMARY OF OPINIONS.

9.      While my opinions are set forth throughout this Declaration, in summary, I have concluded the following:

- In the absence of an expedited trial, Apple is likely to sustain irreparable harm in 2023, specifically in the latter half of 2023, from Masimo's ongoing and escalating sales of W1 in the forms of:

  o  Present and future lost product market share[1] comprising lost unit sales, revenues, and profits from Apple Watch; and

---

[1] I understand Apple disputes Masimo's definition of an alleged relevant market for the sale of "health watches" in the United States in its antitrust counterclaims in *Apple Inc. v. Masimo Corp. et al.*, C.A. No. 1:22:cv-01378-MN, D.I. 15 (D. Del. Dec. 14, 2022).  As discussed in my

- o  Present and future lost brand value resulting from an adverse impact on: (1) Apple's reputation as an innovator of uniquely designed products; and (2) Apple's reputation as a provider of high-quality consumer products.

In my opinion, the foregoing harms are not quantifiable to a reasonable degree of economic certainty and are therefore irreparable.  The non-quantifiable and irreparable nature of the foregoing harms is due in part to the fact that the harms are not limited to the time during the pendency of this case but will continue even if Apple is successful in obtaining post-trial injunctive relief.

I have further concluded that:

- Apple's potential recovery of Masimo's profits or a reasonable royalty based on Masimo's sales and profits related to W1 will not sufficiently compensate Apple for the irreparable harms described herein that Apple is likely to sustain from Masimo's ongoing and escalating sales of W1;

- Enjoining Masimo's distribution of W1 during 2023 will mitigate the likely irreparable harm to Apple resulting from Masimo's ongoing and escalating sales of W1 in the latter half of 2023;

- A post-trial injunction is not likely to cause substantial harm to Masimo; and

- Apple Watch's patented designs have experienced significant commercial success and industry praise.

## IV.   LEGAL STANDARDS

10.     I am not an attorney.  Apple's counsel has conveyed to me certain legal principles relevant to my analysis in this report. I am relying on their instructions for these legal standards and I have applied these legal standards in forming my opinions in this report.  I have included my understanding of these legal principles below.

---

opinions herein, Apple will be irreparably harmed by Masimo's unfair gain of share in any relevant market in which W1 and Apple Watch compete because of Masimo's sales of its infringing W1 product.

11.     I understand that irreparable injury encompasses different types of losses that are often difficult to quantify, including lost market share and erosion in reputation and brand distinction.

12.     I understand that a finding of irreparable harm requires proof of a nexus between the alleged harm and the alleged infringement.

## V.     BACKGROUND

### A.     Apple, Apple Watch, And Apple's Reputation For Innovation And Design.

13.     Apple indisputably is one of the most innovative companies of the 21st century.

14.     Since its founding in 1976, Apple has been in the business of, among other things, designing, manufacturing, marketing, and selling, worldwide, consumer electronics, including smartphones, laptops, tablets, and wearables, like Apple Watch, and related accessories and applications.[2]

15.     Beginning in 2015, for example, Apple released its first Apple Watch.[3]   Nearly eight years later, in September 2022, Apple released its newest versions of Apple Watch, including Apple Watch Series 8 and Apple Watch Ultra.[4,5]

---

[2] Apple 2022 Form 10-K, pp. 1, 5; "The Founding of Apple Computers, Inc.," *Library of Congress*, https://guides.loc.gov/this-month-in-business-history/april/apple-computers-founded.

[3] "Apple Unveils Apple Watch—Apple's Most Personal Device Ever," *Apple*, https://www.apple.com/newsroom/2014/09/09Apple-Unveils-Apple-Watch-Apples-Most-Personal-Device-Ever/.

[4] "Apple reveals Apple Watch Series 8 and the new Apple Watch SE," *Apple*, https://www.apple.com/newsroom/2022/09/apple-reveals-apple-watch-series-8-and-the-new-apple-watch-se/.

[5] "Introducing Apple Watch Ultra," *Apple*, https://www.apple.com/newsroom/2022/09/introducing-apple-watch-ultra/.

16.     With every product that Apple develops, design is a pre-eminent focus and consideration.  That focus on design has led Apple to become one of the most innovative companies in the world.  Apple Watch, including Apple's newest versions of Apple Watch, continue Apple's long history as a global leader in product development and design.

17.     For example, from 2010 to 2018, PwC ranked Apple as the most innovative company eight times, ranking it only behind Alphabet (Google) in 2017, as shown below in **Figure 1**.[6]

**Figure 1**
**PwC's Annual Rankings of Most Innovative Companies, 2010 to 2018[7]**



18.     According to PwC, "[a]t Apple, innovation has always been a top executive-team agenda item. . . . but Apple has also elevated innovation – and specifically, design – within the

---

[6] "What the top innovators get right," *Strategy+Business*, *a PWC publication*, https://www.strategy-business.com/feature/What-the-Top-Innovators-Get-Right.

[7] "What the top innovators get right," *Strategy+Business*, *a PWC publication*, https://www.strategy-business.com/feature/What-the-Top-Innovators-Get-Right.

organization."[8]  Apple CEO, Tim Cook, has stated that "innovation is in the company's DNA, and that its culture is not something that can be formulaically copied."[9]

19.     A 2018 article published by PwC titled, "What the top innovators get right," describes Apple as "Silicon Valley's poster child for innovation excellence and the perennial leader of [PwC's] '10 Most Innovative Companies' list."[10]  According to PwC, "[w]hat's driven Apple's commercial and financial success, after all, is its ability to design and develop distinctive new products and services and bring them to market successfully."[11]

20.     Similarly, a 2020 Harvard Business Review article titled "How Apple is Organized for Innovation," provides that "Apple's main purpose is to create products that enrich people's daily lives.  That involves not only developing entirely new product categories such as the iPhone and [] Apple Watch, but also continually innovating within those categories."[12]

21.     Boston Consulting Group likewise recently identified Apple as its most innovative company of 2022, ahead of other high-tech companies such as Microsoft, Amazon, Alphabet

---

[8] "What the Top Innovators Get Right," *Strategy+Business*, *a PWC publication*, https://www.strategy-business.com/feature/What-the-Top-Innovators-Get-Right.

[9] "What the Top Innovators Get Right," *Strategy+Business*, *a PWC publication*, https://www.strategy-business.com/feature/What-the-Top-Innovators-Get-Right.

[10] "What the Top Innovators Get Right," *Strategy+Business*, *a PWC publication*, https://www.strategy-business.com/feature/What-the-Top-Innovators-Get-Right.

[11] "What the top innovators get right," *Strategy+Business*, *a PWC publication*, https://www.strategy-business.com/feature/What-the-Top-Innovators-Get-Right.

[12] "How Apple Is Organized for Innovation," *Harvard Business Review*, https://hbr.org/2020/11/how-apple-is-organized-for-innovation.

(Google), and Tesla.[13]   In fact, from 2005 to 2022, Boston Consulting Group ranked Apple the "Most Innovative Company" every year, except for 2019 for which Apple ranked third.[14]

22.     Apple's strong reputation as an innovator specifically includes its innovation in design.   Apple's commitment to product design is widely recognized, as illustrated by the following exemplary publications:

- The Christian Science Monitor – A 2011 article titled "What do Apple, GM, and P&G share? Design." describes "Apple [as] the premier example of a company that has combined technical excellence with design brilliance."   "'Design has played a huge role in Apple's success,' says Josh Linkner, chairman of ePrize, a brand marketing company based in Detroit whose clients include Coca-Cola, AT&T, and Microsoft. 'It's proof that design drives economic gain.'"[15]

- Innovation Management – A 2017 article titled "Lessons from Apple on Why Aesthetic Innovation is Important," provides that:

  o "There's a lot of good-looking hardware out there, but most people agree that Apple has most of the competition beat – and has often been the inspiration for other manufacturers.   Its sleek and simple designs are impressively minimalist, while staying high-quality and highly functional."

  o "The aesthetics of the products embody Apple and its values – reinforcing trust and acting as a status symbol for buyers."

  o "The design process at [Apple] can be lengthy, and the aesthetics of the next cutting-edge technology are as important as the hardware itself."[16]

- Cleverism.com – A 2019 post titled "Why Apple Design is Successful" describes the significance of Apple's designs:

---

[13] "Most Innovative Companies 2022" *Boston Consulting Group,* https://web-assets.bcg.com/63/15/963298f5460f8b768403b24ac242/bcg-most-innovative-companies-2022-sep-2022-1.pdf , p. 3.

[14] "16 Years of the Most Innovative Companies," *Boston Consulting Group*, https://www.bcg.com/publications/most-innovative-companies-historical-rankings.

[15] "What do Apple, GM, and P&G share? Design." *The Christian Science Monitor*, https://www.csmonitor.com/Business/2011/0323/What-do-Apple-GM-and-P-G-share-Design.

[16] "Lessons from Apple on Why Aesthetic Innovation is Important," *Innovation Management,* https://innovationmanagement.se/2017/06/22/lessons-from-apple-on-why-aesthetic-innovation-is-important/.

- o "Groundbreaking. Pioneering. Enduring. All these words apply to the Apple design. One cannot discuss the success of Apple – the company – as a whole without touching on its design philosophies and sensibilities."

- o "Ask Apple users why they stick to Apple products despite the fact that there are a lot of other . . . alternatives out there, and they will give you a lot of reasons, most of which are centered on design."

- o "When Apple designs a good-looking product, you can tell that it really is good-looking.  Other brands and manufacturers shamelessly copy the design features of Apple products, and they are rarely able to do it right."

- o "Apple creates designs that instill 'pride and ownership.'  Apple products are instantly recognizable at first glance, and they have now become status symbols of sort.  This is another proof of how iconic Apple's simple designs are."

- o "Apple is a pioneer when it comes to design. . . . Apple introduces a new, cutting-edge design, competitors try to copy it, but by the time they are able to, Apple is already hard at work [on] another breakthrough design."[17]

- <u>Business Insider</u> – A 2020 video titled "Why Apple Products are so Expensive," indicates that "Apple has, over the years, built a reputation for quality and the industrial design of its products" which has "created millions of loyal customers."  According to the video, consumers should "think of Apple as a luxury brand.  As with Gucci or Hermès, customers pay more because the logo is a status symbol."[18]

- <u>Medium.com</u> – A 2021 article titled "Are Apple Products Really Worth It?" provides that Apple's "[r]eaching such a level of quality demands a lot of time, research, and innovation."  The article also provides "[w]e all love the amazing and relentless finishing on Apple products.  Even without the logo, it's easy to recognize Apple's signature bezel finishes."[19]

- <u>Medium.com</u> – Another 2021 Medium.com article titled "What makes Apple designs so good," provides that "Apple counts design as the foundation principle.  It is the starting point of their development process for any new product."  This article also states that "[w]hile Apple is known for its great technology, a big part of its reputation lies in its clean minimalist design" and that a "key aspect of Apple's design is

---

[17] "Why the Apple Design is So Successful," *Cleverism*, https://www.cleverism.com/why-apple-design-successful/.

[18] "Why Apple Products are so Expensive," *Business Insider*, https://www.businessinsider.com/why-apple-products-are-so-expensive-iphone-macbook-2019-11, video transcription.

[19] "Are Apple Products really Worth It?" *Medium*, https://medium.com/geekculture/are-apple-products-really-worth-it-b0631dee8ac2.

simplicity.   More than being flashy or eye-catching.   Apple always designed its products to look clean, simple, and straightforward."[20]

23.     In addition, I understand that Apple's Director of Apple Watch Product Management, Eric Jue, submitted a declaration in support of Apple's Motion For An Expedited Trial.  Mr. Jue's statements further demonstrate Apple's status as a global leader in product innovation and design.

24.     According to Mr. Jue:

Apple is an innovative, design-driven company that has worked extensively over decades to create a marketing identity that connects Apple as a brand with its unique products.  Apple markets its products—including Apple Watch—to convey that message.  For example, Apple frequently advertises Apple Watch with the product design front-and-center, set against a plain background with minimal text, or with simple text describing a key feature or benefit that supports the imagery.  Apple has invested heavily in promoting Apple Watch, including through multiple major, high-profile advertising campaigns and significant expenditures of time, money, and effort.  Such investments help establish Apple's reputation of innovation and design.[21]

25.     Thus, for at least the reasons above, Apple's reputation as a global leader in product innovation and design cannot be subject to any serious dispute.

**B.     Apple Has Been Awarded Patent Protection For Its Innovative Designs That Are Embodied In Apple Watch.**

26.     In this case, I understand that Apple has asserted U.S. Patent No. D883,279 ("the D'279 Patent"); U.S. Patent No. D947,842 ("the D'842 Patent"); U.S. Patent No. D962,936 ("the D'936 Patent") (together, "the Watch Patents"); and U.S. Patent No. D735,131 ("the D'131 Patent") (together with the Watch Patents, "the Asserted Patents").

---

[20] "What makes Apple design so good," *Medium*, https://medium.com/macoclock/what-makes-apple-design-so-good-d430ef97c6d2.

[21] Declaration of Eric Jue dated Jan. 18, 2023 at ¶ 4.

27. **Figures 2–4** below comprise illustrations from the Watch Patents reflecting certain views of designs that I understand are protected by the Asserted Patents.

**Figures 2–4**
**Exemplary Views Of The Watch Patents[22]**



| **Figure 2**<br>Figure 4 of the Asserted '279 Patent[23] | **Figure 3**<br>Figure 2 of the Asserted D'842 Patent[24] | **Figure 4**<br>Figure 4 of the Asserted D'936 Patent[25] |
|---|---|---|

28. I further understand that certain versions of Apple Watch practice one or more of the Asserted Patents by including the patented designs on the back of Apple Watch. Specifically, I understand that the versions of Apple Watch that practice one or more of the Asserted Patents include Apple Watch Series 4, Apple Watch Series 5, Apple Watch Series 6, Apple Watch Series 7, Apple Watch Series 8, and Apple Watch Ultra.[26]

29. While Apple has updated the design of the back of Apple Watch over time, I also understand that Apple Watch continues to incorporate designs of the Asserted Patents in Apple Watch to create consistency in Apple's products that enables customers to identify Apple Watch

---

[22] Declaration of Alan D. Ball dated Jan. 29, 2023 at ¶¶ 72-110.

[23] The D'279 Patent, Sheet 4 of 7.

[24] The D'842 Patent, Sheet 2 of 7.

[25] The D'936 Patent, Sheet 4 of 7.

[26] Declaration of Alan D. Ball dated Jan. 29, 2023 at ¶¶ 111-123.

11

as a uniquely "Apple" product.[27]  **Figures 5–6** reflects the evolution of the design of the back of Apple Watch, in part, beginning with Apple Watch Series 4 and Apple Watch Series 5 on the left-hand side of the figure and progressing to Apple Watch Series 6, Apple Watch Series 7, Apple Watch Series 8, and Apple Watch Ultra on the right-hand side of the figure.

**Figures 5–6**
**Evolution Of Apple Watch Back Design**[28]

| Figure 5<br>Apple Watch Series 4;<br>Apple Watch Series 5 | Figure 6<br>Apple Watch Series 6; Apple<br>Watch Series 7; Apple Watch<br>Series 8; Apple Watch Ultra |
|---|---|
|  | |

30.     Those versions of Apple Watch that practice one or more of the Asserted Patents were released on the following dates:

| Apple Watch Version | Release Date |
|---|---|
| Apple Watch Series 4 | September 21, 2018[29,30]<br>(Discontinued) |

---

[27] Declaration of Peter Russell-Clarke dated Jan. 12, 2023 at ¶ 9.

[28] Complaint, 1:22-CV-01377, October 20, 2022, p. 6; *see also* Declaration of Alan D. Ball dated Jan. 29, 2023 at ¶¶ 69, 111-123.

[29] "Apple Watch Series 4: Beautifully redesigned with breakthrough communication, fitness and health capabilities," *Apple*, https://www.apple.com/newsroom/2018/09/redesigned-apple-watch-series-4-revolutionizes-communication-fitness-and-health/.

[30] "Apple discontinued last year's Apple Watch Series 4 after announcing its brand-new watch – here's how to decide between the Series 3 and Series 5, *Business Insider*, https://www.businessinsider.com/apple-watch-series-4-discontinued-series-5-vs-series-3-2019-9.

| Apple Watch Series 5 | September 20, 2019[31] |
| Apple Watch Series 6 | September 18, 2020[32] |
| Apple Watch Series 7 | October 15, 2021[33] |
| Apple Watch Series 8 | September 16, 2022[34] |
| Apple Watch Ultra | September 23, 2022[35] |

31.     I understand that each version of Apple Watch above that practices one or more of the Asserted Patents, except Apple Watch Series 4, are currently available for sale, including at national retailers like Best Buy.[36]  However, I understand that Apple Watch Series 5 is only being sold as a refurbished product.[37]

32.     Apple's success in innovation and design has made the Apple Watch a leading smartwatch in the market.  Indeed, since Apple released Apple Watch Series 4 in 2018, Apple has

---

[31] "Apple unveils Apple Watch Series 5," *Apple*, https://www.apple.com/newsroom/2019/09/apple-unveils-apple-watch-series-5/.

[32] "Apple Watch Series 6 delivers breakthrough wellness and fitness capabilities," *Apple*, https://www.apple.com/newsroom/2020/09/apple-watch-series-6-delivers-breakthrough-wellness-and-fitness-capabilities/.

[33] "Apple Watch Series 7 orders start Friday, October 8, with availability beginning Friday, October 15," *Apple*, https://www.apple.com/newsroom/2021/10/apple-watch-series-7-orders-start-friday-october-8/.

[34] "Apple reveals Apple Watch Series 8 and the new Apple Watch SE," *Apple*, https://www.apple.com/newsroom/2022/09/apple-reveals-apple-watch-series-8-and-the-new-apple-watch-se/.

[35] "Introducing Apple Watch Ultra," *Apple*, https://www.apple.com/newsroom/2022/09/introducing-apple-watch-ultra/.

[36] "Apple Watch Series 5 Search Results, *Best Buy*, https://www.bestbuy.com/site/searchpage.jsp?id=pcat17071&st=apple+watch+series+5.

[37] "Apple Watch Series 5 Search Results, *Best Buy*, https://www.bestbuy.com/site/searchpage.jsp?id=pcat17071&st=apple+watch+series+5.

had the highest percentage of global smartwatch shipments each year, making Apple Watch the most popular smartwatch ever.[38]

33.    Apple Watch's historic and ongoing success clearly establishes Apple as instrumental in the development of smartwatches.  Based on the data and information herein, I have every reason to expect that Apple will again be the leading smartwatch sold in 2023.

**C.    Apple Watch's Designs Form A Key Part Of Apple Watch's Success.**

34.    The significance of Apple Watch's designs has been well recognized and those designs are important to consumers' decisions to purchase Apple Watch.

35.    For example, the significance of Apple Watch's designs, including the design of Apple Watch Series 4 – 8 and Apple Watch Ultra, which practice the Asserted Patents, is illustrated by at least the following exemplary publications:

- <u>CNBC</u> – In a 2014 article, the CEO of Garrick, a London based watchmaker, stated that "[f]rom a design point of view it is a winner. [Apple has] the dimensions right and it is a stylish timepiece.  It gets people interested in watches again."  The CEO of British watchmaker IWI added that "[i]t looks good, there is no question. The combination of straps and the way they have done that show's they've made a good watch."[39]

- <u>Hodinkee</u> – A 2014 product review by this online resource and shop for modern and vintage wristwatch enthusiasts[40] provides that "Apple got more details right on their watch than the vast majority of Swiss and Asian brands do with similarly priced watches, and those details add up to a really impressive piece of design."  The review also provides that "[t]he overall level of design in the Apple Watch simply blows away anything – digital or analog– in the watch space at $350.  There is nothing that comes

---

[38] "Quarterly smartwatch unit shipment share worldwide from 2018 to 2022, by vendor," *Statista*, https://www.statista.com/statistics/910862/worldwide-smartwatch-shipment-market-share.

[39] "Apple Watch design: 'damn good' or 'bulky'?" *CNBC*, https://www.cnbc.com/2014/09/11/apple-watch-design-damn-good-or-bulky.html.

[40] "Our Story," *Hodinkee*, https://www.hodinkee.com/pages/our-story.

close to the fluidity, attention to detail, or simple build quality found on the Apple Watch in this price bracket."[41]

- <u>Wristly.co</u> – According to Wristly, a 2015 survey of customer satisfaction with the first-generation Apple Watch found that 95 percent of 800 respondents were satisfied with aesthetics/design, with 74 percent of respondents "very satisfied/ delighted." **Figure 7** illustrates that "Build quality/Durability" and "Aesthetics/ Design" were the Apple Product characteristics that provided the most customer satisfaction.[42]

**Figure 7**
**2015 Apple Watch Survey Results**



- <u>Counterpoint Research</u> –  An October 2018 article reported the findings of a customer survey which stated that "Apple [had] successfully established itself as a fashion brand; six out of ten respondents cited design as a key reason for choosing Apple Watch."  The survey results also indicated that "Apple was the top smartwatch brand last year.  With

---

[41] "In-Depth: A Watch Guy's Thoughts on The Apple Watch After Seeing It In The Metal (Tons of Live Photos)," *Hodinkee*, https://www.hodinkee.com/articles/hodinkee-apple-watch-review.

[42] "First large scale Apple Watch customer satisfaction study," *Medium*, https://medium.com/wristly-thoughts/wristly-apple-watch-insider-s-report-12-35463dc919b2.

the Apple Watch Series 4 the company further enriches its position as a preferred smartwatch brand for a consumer's next purchase."[43]

- 9to5Mac – A December 2018 review comparing the Apple Watch Series 4 with its predecessor Series 3 by an online resource noting that "[w]hen people ask me what's different about the new Apple Watch Series 4, my immediate answer is simply the design.  The review provides that "[t]he back of Series 4 is [] very attractive. You don't see it when you're wearing the watch, but it's worth admiring," specifically noting that "[t]he upgraded heart rate sensor has been redesigned to look less technical and more balanced."

- The brandgym – A 2019 article titled "How Apple Watch Used Distinctive Design To Dominate The Smartwatch Market" noted that "Apple's watch was just that, a beautifully designed and distinctive watch, from Apple."  The article indicated that "[o]ther so called 'smart watches' that had been on the market longer, such as Fitbit, had functionality but didn't look that cool as a watch."[44]

- The Next Web – An October 2020 review described the Apple Watch as "a thing of absolute beauty."  According to the review, "[t]he Apple Watch's design has become classic… [i]t's recognizable, something you can spot from afar."  The article also indicates that: "[i]t's functional, it's recognizable, and it's beautiful."[45]

- A UX Researcher's Review – A 2021 review scored the Apple Watch 9.2 out of 10 for aesthetics "because of how minimal and beautiful this device looks."  The review stated that "[w]hen it comes to appearances, Apple knows the game almost better than any other competitor in the industry.  The simple look of the device with just a band on each side gives the impression of simplicity to anyone who hasn't seen a proper implementation of a smartwatch."[46]

- Digital Trends – A 2022 review of Apple Watch Series 8 by this online resource highlighting Apple's generally unchanging Apple Watch product design, noting that "[w]hen you have a design foundation that's this good, it's understandable why that is" and that "Apple's execution of the Apple Watch's design is also as excellent as it's ever been."

---

[43] "Apple Watch Leads Customer Preferences in The USA," *Counterpoint Research*, https://www.counterpointresearch.com/apple-watch-leads-customer-preferences-usa/.

[44] "How Apple Watch Used Distinctive Design to Dominated (sic) the Smartwatch Market," *The brandgym*, https://thebrandgym.com/apple-watch-brand-stretch/.

[45] "The Apple Watch design is already a classic – will it ever change?" *The Next Web*, https://thenextweb.com/news/apple-watch-design-classic-future-analysis.

[46] "A UX researcher's review of the Apple Watch" *Medium UX Collective*, https://uxdesign.cc/a-ux-researchers-review-of-the-apple-watch-54daeb4ee89d/.

- <u>Forbes</u> – A 2022 review of Apple Watch Series 8 by this online resource, noting that the Series 8 is "best for" its "slick design." The reviewer highlights the various design features of the Series 8, concluding "if you've liked the looks of any previous Apple Watch, you'll surely like this."

- <u>Tom's Guide</u> – A 2023 review of Apple Watch Series 8 by this online resource, identifying "design" as a "Pro" and noting that "design . . really makes[s] Series 8 shine." The review further attributes the "design" of Apple Watch to making "the experience as great as it is."

36.     In addition, I understand that another expert retained by Apple, Itamar Simonson, conducted surveys to assess the materiality of the design of the back of Apple Watches in relation to consumer purchasing decisions.[47]  I understand that Dr. Simonson's surveys included an assessment of Apple Watch Series 5 and Apple Watch Series 8.

37.     I understand that the results of Dr. Simonson's surveys showed that 28.3 percent of respondents identified the design of the back of Apple Watch Series 5 as a feature that would impact their decision to purchase the watch and 31.8 percent of respondents identified the design of the back of Apple Watch Series 8 as feature that would impact their decision to purchase the watch.[48]  I understand that those numbers increase to 32.1 percent and 33.3 percent, respectively, when focusing on respondents who are familiar with smartwatches.[49]  Those results confirm the sentiment in the articles above that Apple's design, and specifically the design on the back of Apple Watches that practice the Asserted Patents, has a connection to consumer purchasing decisions of Apple Watch.

38.     I also understand that one of Apple Watch's designers and an inventor on the Asserted Patents, Peter Russell-Clark, submitted a declaration in support of Apple's Motion for an

---

[47] Declaration of Itamar Simonson dated Jan. 27, 2023  at ¶¶ 19-34.

[48] Declaration of Itamar Simonson dated Jan. 27, 2023  at ¶ 33, Fig. 4.

[49] Declaration of Itamar Simonson dated Jan. 27, 2023  at ¶ 33, Fig. 4.

Expedited Trial.  Mr. Russell-Clark's statements further support the notion that the designs of the back of the versions of Apple Watch that practice the Asserted Patents form a key part of Apple Watch's success.

39.    According to Mr. Russell-Clarke, the design of the back of Apple Watch "was and remains a key part of [Apple Watch's] development and identity" and forms "part of the watch's overall visual appeal."[50]  He states that Apple Watch's design was inspired by "traditional luxury watchmaking" in which "watches will often include a fully or partially transparent back so that the consumer can see portions of the high-quality internal mechanisms, such as gears and the materials from which they are crafted."[51]  Thus, "[a]s an homage to such classic luxury watches, Apple's design team took special care to make the back of Apple Watch—which houses its sensors (electrodes, LEDs, and photodiodes) and other components—aesthetically beautiful."[52]  Mr. Russell-Clark and his team focused heavily on design and kept "aesthetics at the forefront"[53] because, according to Mr. Russell-Clark, "[i]f a product works perfectly, but is aesthetically unappealing, it is unlikely to be a successful product."[54]  I agree, and the inverse is also true: the tremendous success of Apple Watch therefore shows that Apple Watch's beautiful designs form a key part of Apple Watch's success.

40.    Additional statements by Mr. Jue also demonstrate that the design of the back of the versions of Apple Watch that practice the Asserted Patents form a key part of Apple Watch's success.  According to Mr. Jue:

---

[50] Declaration of Peter Russell-Clarke dated Jan. 12, 2023 at ¶¶ 4, 7.

[51] Declaration of Peter Russell-Clark dated Jan. 12, 2023 at ¶ 7.

[52] Declaration of Peter Russell-Clark dated Jan. 12, 2023 at ¶ 7.

[53] Declaration of Peter Russell-Clark dated Jan. 12, 2023 at ¶ 10.

[54] Declaration of Peter Russell-Clark dated Jan. 12, 2023 at ¶ 10.

"[T]he Apple Watch design—particularly its hardware design—is critical. Apple promotes Apple Watch not just as a piece of technology, but as a beautiful and thoughtfully designed watch. Its back is thoughtfully designed and beautiful, paying homage to the tradition of luxury watches. And Apple has focused marketing efforts on the design of the back of Apple Watch."[55]

41.    Mr. Jue elaborates that "[t]he design of the back of Apple Watch has been a focus throughout the product's lifespan," and that "[i]n a promotional video played at the outset of the announcement [of Apple Watch Series 4], Apple highlighted the back of Apple Watch, focusing on its design without any technical explanation,"[56] as shown below:

**Figure 8**
**Apple Watch Series 4 Promotional Video[57]**



42.    Mr. Jue further recounts how, when Apple began to "discuss the back of Apple Watch specifically, the very first statement it made is that 'the back of Series 4 is ***absolutely beautiful***,' and demonstrated that beauty with another image of the back design,"[58] reproduced below:

---

[55] Declaration of Eric Jue dated Jan. 18, 2023 at ¶ 5.

[56] Declaration of Eric Jue dated Jan. 18, 2023 at ¶¶ 6, 7.

[57] Declaration of Eric Jue dated Jan. 18, 2023 at ¶ 7.

[58] Declaration of Eric Jue dated Jan. 18, 2023 at ¶ 9.

**Figure 9**
**Photograph From Apple Watch Series 4 Promotional Event[59]**



43.     Mr. Jue further articulates that:

"Apple Watch's back design was not only a key at launch.  In marketing Apple Watch generally, Apple internally utilizes a select few 'themes,' including the watch's 'health component,' i.e., the watch as a wellness tool.  The most visual aspect of Apple Watch's health component is the back of the watch."[60]

44.     Accordingly, and as stated by Mr. Jue, "the aesthetic design of the back has been an important pillar in the marketing and success of Apple Watch."[61]

**D.     Masimo Corporation Is A Hospital Equipment Company That Only Just Recently Released Its First Smartwatch, W1.**

---

[59] Declaration of Eric Jue dated Jan. 18, 2023 at ¶ 9.

[60] Declaration of Eric Jue dated Jan. 18, 2023 at ¶ 10.

[61] Declaration of Eric Jue dated Jan. 18, 2023 at ¶ 10.

45.     Masimo is a publicly traded medical technology company that develops and produces numerous hospital products, including patient monitors.[62,63]   Masimo's securities are listed on the NASDAQ stock exchange under the ticker symbol: MASI.

46.     Historically, Masimo has primarily sold products to hospitals and medical professionals for use in professional healthcare settings.[64]   According to Masimo, Masimo is "highly dependent" on Masimo's SET and rainbow SET technologies, which involve pulse oximetry technology and "serve as the basis for [Masimo's] primary product offerings."[65]   In addition, because Masimo's devices use "single use sensors," Masimo's business has been described as a "razor/razor blade business model with the devices using [those] single-use sensors pursuant to five-year contracts resulting in 80% recurring revenue for Masimo."[66]

47.     As of about January 30, 2023, Masimo's market capitalization was about $9.0 billion.[67]   **Figure 10** below recounts that Masimo reported annual operating income of $221.2 million, $255.8 million, and $275.8 million in 2019, 2020, and 2021, respectively.

---

[62] "About Masimo," *Masimo*, https://www.masimo.com/company/masimo/about/.

[63] "Company Evolution: About Masimo," *Masimo*, https://www.masimo.com/company/masimo/evolution/.

[64] "Company Evolution: About Masimo," *Masimo*, https://www.masimo.com/company/masimo/evolution/.

[65] "About Masimo," *Masimo*, https://www.masimo.com/company/masimo/about/; Masimo 2021 Form 10-K, p. 38.

[66] "How activist Politan Capital may find an opportunity to trim costs, build value at Masimo," *CNBC*, https://www.cnbc.com/2022/08/20/how-activist-politan-capital-may-find-an-opportunity-to-trim-costs-build-value-at-masimo.html.

[67] "Masimo Corp, NASDAQ:MASI," *Google Finance*, https://www.google.com/finance/quote/MASI:NASDAQ?sa =X&ved=2ahUKEwiRr8jPmoH8AhXSl%20GoFHQWOCr8Q3ecFegQIJRAY.

**Figure 10**
**Masimo Operating Income, 2019 to 2021[68]**

| *In Millions* | 2019 | 2020 | 2021 |
|---|---|---|---|
| Revenue | | | |
| Product | $936.4 | $1,143.7 | $1,239.2 |
| Royalty and other revenue | 1.4 | 0.0 | 0.0 |
| Total Revenue | $937.8 | $1,143.7 | $1,239.2 |
| COGS | 308.7 | 400.7 | 430.8 |
| Gross Profit | $629.2 | $743.1 | $808.3 |
| Operating Expenses | | | |
| Selling, General and Admin | $314.7 | $369.1 | $395.3 |
| Research and Development | 93.3 | 118.7 | 137.2 |
| Litigation settlement and other | 0.0 | -0.5 | 0.0 |
| Total Operating Expenses | $408.0 | $487.2 | $532.5 |
| Operating Income | $221.2 | $255.8 | $275.8 |

48.     On August 31, 2022, Masimo announced the release of a new product in the United States called "W1."[69]  According to Masimo, W1 is a smartwatch that offers accurate, continuous health measurements and data.[70,71]  The price of W1 started at $499.[72]  Prior to releasing W1, I

---

[68] Masimo 2021 Form 10-K, p. F-6.

[69] "Medical Pioneer Masimo Announces the Full Market Consumer Release of the Masimo W1™, the First Watch to Offer Accurate, Continuous Health Data," *Masimo*, https://investor.masimo.com/news/news-details/2022/Medical-Pioneer-Masimo-Announces-the-Full-Market-Consumer-Release-of-the-Masimo-W1-the-First-Watch-to-Offer-Accurate-Continuous-Health-Data/default.aspx.

[70] "*Masimo LinkedIn page*," *LinkedIn*, https://www.linkedin.com/feed/update/urn:li:activity:7020126785317048320/.

[71] "Medical Pioneer Masimo Announces the Full Market Consumer Release of the Masimo W1™, the First Watch to Offer Accurate, Continuous Health Data," *Masimo*, https://investor.masimo.com/news/news-details/2022/Medical-Pioneer-Masimo-Announces-the-Full-Market-Consumer-Release-of-the-Masimo-W1-the-First-Watch-to-Offer-Accurate-Continuous-Health-Data/default.aspx.

[72] "Masimo W1™," *Masimo*, https://www.masimopersonalhealth.com/products/masimo-w1.

understand that Masimo—as a hospital equipment company since its founding in 1989—had never designed, marketed, or sold a smartwatch.[73]

49.     Masimo's advertisements and marketing materials related to W1 indicate that the design of the back of W1 is a key feature of W1.  Masimo heavily features the design of the back of W1 in its product advertisements.[74]

50.     For example, the back of W1 comprises the single largest image on W1's webpage:

**Figure 11**
**Advertisements Of W1 On Masimo's Website**[75]



51.     Numerous other images on Masimo's website emphasize the design on the back of W1:

---

[73] "Company Evolution: About Masimo," *Masimo*, https://www.masimo.com/company/masimo/evolution/.

[74] "Masimo W1™," *Masimo*, https://www.masimopersonalhealth.com/products/masimo-w1.

[75] "Masimo W1™," *Masimo*, https://www.masimopersonalhealth.com/products/masimo-w1.

**FIGURES 12-14**
**Advertisements Of W1 On Masimo's Website**[76]

| Figure 12 | Figure 13 | Figure 14 |
|---|---|---|

 

52.     Masimo also promotes consumer reviews on its website that likewise focus on W1's design.  For example, one consumer review Masimo promotes on its website provides that the consumer "personally [wore] [] W1 and [was] impressed by its comfort and stylish look . . . ."[77]

53.     Masimo so heavily features W1's designs, including the design of the back of W1, because Masimo understands—and agrees with Mr. Russell-Clark—that consumers "[c]onsider quality of design to be a reflection of the quality of engineering," as evidenced by the illustration below in **Figure 15** that Masimo included in a recent presentation to its investors. [78]

---

[76] "Masimo W1™," *Masimo*, https://www.masimopersonalhealth.com/products/masimo-w1.

[77] "Medical Pioneer Masimo Announces the Full Market Consumer Release of the Masimo W1™, the First Watch to Offer Accurate, Continuous Health Data," *Masimo*, https://investor.masimo.com/news/news-details/2022/Medical-Pioneer-Masimo-Announces-the-Full-Market-Consumer-Release-of-the-Masimo-W1-the-First-Watch-to-Offer-Accurate-Continuous-Health-Data/default.aspx.

[78] Masimo Investor Day, December 13, 2022.

24

**Figure 15**
**Masimo's View Of How Consumers View Brands**[79]



54.     Indeed, according to Masimo's current COO of its Consumer division Blair Tripodi, "quality and design[] go hand in hand."[80]  Tripodi elaborated that, during Masimo's investor day presentations, investors will see "how important design is" for wearables and "how important design is for health care as well."[81]

**E.     Masimo's W1 Is Substantially Similar To The Patented Designs In The Asserted Patents.**

55.     I understand that Apple has retained another expert in this case with expertise in industrial design to assess the similarities between, on the one hand, Apple Watch and the patented

---

[79] Masimo Investor Day, December 13, 2022.

[80] "Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

[81] "Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

designs in the Asserted Patents and, on the other hand, W1, to demonstrate Apple's likelihood of

success on the merits in this case to support Apple's request for an expedited trial.[82]

56.     As shown in Mr. Ball's report and below in **Figure 16** and **Figure 17**, the design

of the back of W1 and the patented designs of Apple Watch are substantially similar:

**Figure 16**
**Exemplary Comparison: W1 And The Patented Designs Of The Asserted Patents**[83]



---

[82] Declaration of Alan D. Ball dated Jan. 29, 2023.

[83] Declaration of Alan D. Ball dated Jan. 29, 2023 at ¶¶ 135-143; ; *see also* Declaration of Alan D. Ball dated Jan. 29, 2023 at ¶¶ 157-165 and 180-188.

26

**Figure 17**
**Exemplary Comparison: W1 And Apple Watch**[84]



57.     In fact, I understand that Apple has accused Masimo of copying Apple Watch's patented designs.[85]

> **F.     Masimo Acquired Sound United To Distribute W1 And Intends To Substantially Expand Its Sales Of W1 And Other Similar Products In The Latter Half Of 2023.**

58.     As explained above, prior to releasing W1, Masimo had never sold smartwatches.[86] Thus, Masimo required new distribution capacity to support W1's release.

---

[84] Declaration of Alan D. Ball dated Jan. 29, 2023 at ¶¶ 148-156; *see also* Declaration of Alan D. Ball dated Jan. 29, 2023 at ¶¶ 170-178 and 193-201.

[85] Complaint, 1:22-CV-01377, October 20, 2022, p. 19 – 30.

[86] *See* Section V.D, *supra*.

59.     In February 2022, six months before Masimo released W1, Masimo issued a press release that it intended to acquire Sound United[87] for $1.025 billion.[88]  The acquisition closed two months later in April 2022.[89]

60.     According to Investor's Business Daily, Masimo's acquisition of Sound United gave Masimo "access to an established distribution channel with major retailers."[90]  Masimo similarly stated that it purchased Sound United to "leverage Sound United's expertise across consumer channels to accelerate distribution of the combined company's expanding portfolio of consumer-facing healthcare products"[91] and "accelerate [its] success in gaining adoption of integrated home-based telemedicine solutions, first with the Masimo Watch W1."[92]  Masimo's CEO has stated on an earnings call that Masimo liked Sound United for its "management team" and "distribution channel" and that Sound United is "essential" to what Masimo is doing for its

---

[87] "Sound United Enters into Agreement to Be Acquired by Masimo Corporation," *Masimo*, https://www.soundunited.com/news/sound-united-enters-into-agreement-to-be-acquired-by-masimo-corporation.

[88] "MASI Stock: The Masimo-Sound United Deal That Has Investors Scratching Their Heads," *InvestorPlace*, https://investorplace.com/2022/02/masi-stock-the-masimo-sound-united-deal-that-has-investors-scratching-their-heads/.

[89] "Masimo Closes Acquisition of Sound United," *Masimo*, https://investor.masimo.com/news/news-details/2022/Masimo-Closes-Acquisition-of-Sound-United/default.aspx.

[90] "Is Masimo 'Crazy Like A Fox' For Spending $1.03 Billion To Buy Sound United?," *Investor's Business Daily*, https://www.investors.com/news/technology/masimo-stock-is-its-sound-united-buyout-crazy/.

[91] "Masimo Closes Acquisition of Sound United," *Masimo*, https://investor.masimo.com/news/news-details/2022/Masimo-Closes-Acquisition-of-Sound-United/default.aspx.

[92] "Masimo (MASI) Q4 2021 Earnings Call Transcript," *The Motley Fool*, https://www.fool.com/earnings/call-transcripts/2022/02/15/masimo-masi-q4-2021-earnings-call-transcript/.

"important product," W1.[93]  Notably, Masimo has already implemented its goal of using Sound United's management team to sell and distribute W1.  For example, current COO of Masimo's Consumer division, Blair Tripodi, was formerly Sound United's Chief Commercial Officer.[94]

61.     The  magnitude of Masimo's pivot to selling a smartwatch to consumers rather than hospital products to hospitals is evidenced by the significant concerns that Masimo's acquisition caused Masimo's investors.  As reported by Investor's Business Daily, Masimo's "investors and analysts weren't impressed" with the acquisition.[95]   In fact, when Masimo announced the acquisition, Masimo's stock price declined by  33.8 percent, from $229 on February 15, 2022, to $144 on February 16, 2022.[96]  That decrease in stock price resulted in lost market capitalization of about $4.6 billion.[97]

62.     As noted by CNBC, "news of the acquisition sent the stock into a nosedive . . . . [as] [c]learly, the market was concerned with the lack of strategic discipline" at Masimo.[98]

---

[93] "Masimo (MASI) Q4 2021 Earnings Call Transcript," *The Motley Fool*, https://www.fool.com/earnings/call-transcripts/2022/02/15/masimo-masi-q4-2021-earnings-call-transcript/.

[94] "Masimo Appoints New Leader for Consumer Division," *Masimo*, https://investor.masimo.com/news/news-details/2022/Masimo-Appoints-New-Leader-for-Consumer-Division/default.aspx.

[95] "Is Masimo 'Crazy Like A Fox' For Spending $1.03 Billion To Buy Sound United?," *Investor's Business Daily*, https://www.investors.com/news/technology/masimo-stock-is-its-sound-united-buyout-crazy/.

[96] "Masimo Corporation – Stock Chart," *S&P Capital IQ*, https://www.capitaliq.spglobal.com/web/client?auth=inherit#company/stock?id=4812814.

[97] "How activist Politan Capital may find an opportunity to trim costs, build value at Masimo," *CNBC*, https://www.cnbc.com/2022/08/20/how-activist-politan-capital-may-find-an-opportunity-to-trim-costs-build-value-at-masimo.html.

[98] "How activist Politan Capital may find an opportunity to trim costs, build value at Masimo," *CNBC*, https://www.cnbc.com/2022/08/20/how-activist-politan-capital-may-find-an-opportunity-to-trim-costs-build-value-at-masimo.html.

Another commentator stated that "Wall Street turned a total thumbs down on the transaction."[99] BioWorld reported that the acquisition both "stunned and dismayed analysts and investors."[100]

63.     Concern over the direction of Masimo caused at least one activist investor to "push the medical device maker to make changes."[101]  In August 2022, activist investor Politan Capital Management announced that it owned nearly a 9.0 percent stake in Masimo[102] and pushed for a seat on its Board of Directors.[103]

64.     Recently, after an Investor Day conference in December 2022,[104] industry analysts remarked Masimo's strategy is just now "emerging from [a] fog,"[105] and Masimo "elaborated on why it spent $1.025 billion to buy Sound United."[106]

---

[99] "Masimo Acquisition of Sound United Spurs Ugly Activist Shareholder Lawsuit," *Strata-Gee*, https://www.strata-gee.com/masimo-acquisition-of-sound-united-spurs-ugly-activist-shareholder-lawsuit/.

[100] "To Wall Street's surprise, Masimo acquires Sound United for $1B+," *BioWorld*, https://www.bioworld.com/articles/516146-to-wall-streets-surprise-masimo-acquires-sound-united-for-1b?v=preview.

[101] "Koffey's Politan takes 9% stake in Masimo, to push for change," *Reuters*, https://www.reuters.com/business/healthcare-pharmaceuticals/activist-investor-politan-capital-reports-84-stake-masimo-corp-2022-08-16/.

[102] "Koffey's Politan takes 9% stake in Masimo, to push for change," *Reuters*, https://www.reuters.com/business/healthcare-pharmaceuticals/activist-investor-politan-capital-reports-84-stake-masimo-corp-2022-08-16/.

[103] "Hedge Fund Sues Masimo Corp. In Del. Over Bylaw Changes," *Law360*, https://www.law360.com/articles/1542262/hedge-fund-sues-masimo-corp-in-del-over-bylaw-changes.

[104] Masimo Investor Day, December 13, 2022.

[105] "Masimo, Sound United Parent, to Expand Denon's HEOS System," *Strata-Gee*, https://www.strata-gee.com/masimo-sound-united-parent-to-expand-denons-heos-system/.

[106] "Masimo will turn millions of home entertainment systems into health hubs," *Mass Device*, https://www.massdevice.com/masimo-millions-home-sound-systems-health-hubs/.

65.     Specifically, Masimo's executives stated that its strategy is to incorporate W1 into a cloud-based health network using a product called an "HEOS device" produced by a company operated by Sound United called Denon.[107]   Masimo Chief Operating Officer Blair Tripodi explained that the HEOS device "will behave as an extension to [a] Masimo Health Cloud and connect [consumers'] data through [their] W1 device or other Masimo creative devices to the cloud."[108]   Industry commentators elaborated that "[a] W1 in the home will continuously monitor key health data, such as oxygen saturation, pulse rate, respiration rate, hydration, and body temperature. Via the home network, this data will be wirelessly relayed to the HEOS and Masimo Health cloud for storage, analysis, reporting, and transfer."[109]

66.     Tripodi also announced that, while Masimo has increased the number of its devices in consumer homes from about 1,000 in 2020 to 23,000 today, "[b]y the end of 2023, [Masimo] will turn on a grand total of 4 million devices worldwide," in part due to Masimo's August 2022 launch of W1.[110]

67.     Also during Masimo's Investor Day conference, Masimo Chief Financial Officer Micah Young confirmed that Masimo is not only planning to use Sound United for the distribution of the HEOS device, but also for distributing W1.   Young stated that, because of Masimo's

---

[107] "HEOS," *Denon*, https://www.denon.com/en-us/category/heos; "Masimo Closes Acquisition of Sound United," *Masimo*, https://investor.masimo.com/news/news-details/2022/Masimo-Closes-Acquisition-of-Sound-United/default.aspx.

[108] "Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

[109] "Masimo, Sound United Parent, to Expand Denon's HEOS System," *Strata-Gee*, https://www.strata-gee.com/masimo-sound-united-parent-to-expand-denons-heos-system/.

[110] "Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

acquisition of Sound United, Masimo "now ha[s] immediate access to over 20,000 points of retail distribution."   Young further noted that Masimo plans to launch W1 into Sound United's distribution channel in the second half to late 2023.[111]   Accordingly, Masimo has confirmed that W1 will likely soon be on sale in some of the same national retailers that sell Apple Watch, including Amazon and Best Buy, as shown in an illustration below from Masimo's Investor Day:

**Figure 18**
**Masimo's Omni-Channel Go-To-Market Strategy**[112]



68.     Importantly, Masimo also indicated at the conference it intends to include the same sensor (*e.g.* the same back of the watch design) design included in W1 in at least two more watches, called the "Freedom" and "B1," and that Masimo also intends to launch those watches through

---

[111] "Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

[112] "2022 Investor Day," *Masimo*, https://s24.q4cdn.com/336820108/files/doc_presentations/Masimo-2022-Investor-Day-121322.pdf, p. 13.

Sound United's distribution channel in the second half of 2023.[113]  For example, Masimo Chief Operating Officer Bilal Muhsin stated that the "health module that's in the back of the W1 today . . . will go into different products," including the Freedom and B1 watches.[114]  Another Masimo executive confirmed that the "health sensor for wearables currently being deployed in [] W1 is launching in the premium consumer watch segment format with Freedom and B1."[115]

69.     Accordingly, Masimo is currently selling W1, intends to sell two additional watches that Masimo has suggested will use the same infringing back design as W1 in the latter half of 2023, and intends to sell all three watches through Sound United's national distribution channels, which includes national retailers that also sell Apple Watch like Best Buy and Amazon, in the latter half of 2023.

## VI.  APPLE IS LIKELY TO SUSTAIN IRREPERABLE HARM FROM MASIMO'S ONGOING AND ESCALATING SALES OF W1 IN THE LATTER HALF OF 2023.

70.     As explained in further detail below, in my opinion, Apple is likely to sustain irreparable harm in 2023, specifically in the latter half of 2023, as a result Masimo's ongoing and escalating sales of W1 as well as other smart watches that Masimo has suggested will use the same infringing design.  Accordingly, it is also my opinion that the post-trial enjoinment of Masimo's sale of W1 prior to Masimo's planned ramp up of the distribution of W1 in the latter half of 2023

---

[113] "Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

[114] "Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

[115] "Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

would mitigate the likely irreparable harms to Apple caused by Masimo's ongoing and escalating sales of W1.

      **A.**      **Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half Of 2023 Is Likely To Cause Apple Irreparable Harm By Requiring Apple To Compete With Its Own Patented Designs And, Consequently, Lose Product Market Share, Sales, Revenues, And Profits Related To Apple Watch.**

           **1.**      **Apple Watch And W1 Will Compete In The Latter Half Of 2023 If Masimo's Distribution Plans Come To Fruition.**

71.     In my opinion, Apple Watch will compete directly with W1 at least as early as the latter half of 2023 for at least six reasons.

72.     *First*, although Apple Watch offers an array of features not offered by W1, such as the ability to make and receive phone calls, the ability to send and receive text messages, the ability to communicate with iPhones, GPS tracking, and Siri commands (e.g., alarms, timers, reminders),[116] Masimo maintains that its product will be in direct competition with the Apple Watch in the U.S.[117]

---

[116] "66 essential Apple Watch tips and features everyone should know," *Wareable*, https://www.wareable.com/apple/apple-watch-tips-and-tricks-iwatch-7383.

[117] "Masimo (MASI) Q2 2022 Earnings Call Transcript," *The Motley Fool*, https://www.fool.com/earnings/call-transcripts/2022/08/10/masimo-masi-q2-2022-earnings-call-transcript/.

73.     Masimo characterizes its watch as a "smartwatch" in its own social media posts.[118] Numerous third-party publications have referenced W1 as a "smartwatch."[119,120,121]   And, Masimo itself has asserted that W1 will compete in a market segment "defined by smart watches."

74.     According to Masimo:

> The consumer health market today is primarily defined by smart watches that purport to monitor various physiological parameters. . . .  [W]e believe Masimo is perfectly positioned to impact this growing market segment and to provide the necessary technology, just as we are doing in the hospital market.  We believe we can grow even faster by empowering everyday people through our core technology to live healthier and better lives, both in the hospital and in the home.[122]

75.     Masimo has further stated that W1 and Freedom (to be released in 2023) "should command 100%" of the smartwatch market segment.[123]  During Masimo's Q2 2022 earnings call, Mr. Kiani provided the following answer to an analyst's[124] question:

[118] *Masimo LinkedIn page*, https://www.linkedin.com/feed/update/urn:li:activity:7020126785317048320/.

[119] "Masimo Releases Smart Watch With Continuous Monitoring of Biometrics Such as Pulse, Heart Rate Variability," *Sports Business Journal*, https://www.sportsbusinessjournal.com/Daily/Issues/2022/08/31/Technology/masimo-smart-watch-masimo-w1-biometrics-pulse-hrv-oxygen.

[120] "Masimo's first smartwatch packs a hydration index," *Gadgets & Wearables*, https://gadgetsandwearables.com/2022/12/08/masimo-w1-health-tracking-watch/.

[121] "Masimo W1 smartwatch with accurate pulse oximeter receives Hydration Index feature," *Notebookcheck*, https://www.notebookcheck.net/Masimo-W1-smartwatch-with-accurate-pulse-oximeter-receives-Hydration-Index-feature.674864.0.html.

[122] "Medical Pioneer Masimo Announces the Full Market Consumer Release of the Masimo W1™, the First Watch to Offer Accurate, Continuous Health Data," *Masimo*, https://investor.masimo.com/news /news-details/2022/Medical-Pioneer-Masimo-Announces-the-Full-Market-Consumer-Release-of-the-Masimo-W1-the-First-Watch-to-Offer-Accurate-Continuous-Health-Data/default.aspx.

[123] "Masimo (MASI) Q2 2022 Earnings Call Transcript," *The Motley Fool*, https://www.fool.com/earnings/call-transcripts/2022/08/10/masimo-masi-q2-2022-earnings-call-transcript/.

[124] Mr. Michael Matson, Needham & Company, LLC, Research Division.

Q.     With the consumer strategy in the smartwatch, maybe you could talk about what you think it is about your smartwatch, the W1 or the upcoming Freedom watch, which is really going to kind of help differentiate you in the market versus some of the bigger companies out there like Apple or Samsung.

. . . .

A.     [W]e have some unique new parameters that have never been released in a commercial watch before for both healthcare and consumer wellness, which we're hoping to release with the launch of W1.  And then as far as Freedom, I want to just tell you the things I've said before and know more because of the competitive nature of this business.  But **we believe we have a compelling design**, we believe with the addition of the Android features and some unique features that, again, have never been made available before.  **We think we have a great product**.  So **we think we have a product that should command 100% market share**, which is what you want to have, what you want for your team to feel.[125]

76.     Accordingly, because Masimo has suggested that W1 will directly compete with Apple Watch, and because Masimo asserts that its products, which include (or will include) the patented designs of the Asserted Patents, should command "100%" share, Apple Watch and W1 will necessarily directly compete at least as early as the latter half of 2023.

77.     Notably, future competition between Apple Watch and W1 is made even more likely because of Masimo's apparent long-term commitment to entering the smartwatch segment. For example, the amount that Masimo paid to acquire Sound United—over $1 billion dollars— relative to Masimo's market capitalization indicates Masimo's serious and long-term intentions to pivot into the smartwatch segment—a new strategic direction for Masimo.  Indeed, as evidenced by the steep decline in the value of Masimo's stock by more than 35 percent–equating to lost market capitalization of $4.6 billion—following Masimo's announcement of its acquisition of Sound United, Masimo's investors recognized Masimo's serious intentions in entering the

---

[125] "Masimo (MASI) Q2 2022 Earnings Call Transcript," *The Motley Fool*, https://www.fool.com/earnings/call-transcripts/2022/08/10/masimo-masi-q2-2022-earnings-call-transcript/, (emphasis added).

36

segment.[126]  If Masimo's entry into the smartwatch segment was merely temporary or exploratory, Masimo's investors would not have reacted so strongly (if at all).

78.   **Second**, Apple Watch and W1 are expected to be offered at some of the same national retailers, including Best Buy and Amazon, at least as early as the latter half of 2023.[127] As explained above, Sound United purportedly provides Masimo "immediate access" to 20,000 points of distribution, including at major retailers like Best Buy and Amazon.[128]  An August 2022 Wall Street Journal article observed the Sound United acquisition "gave [Masimo] access to consumer distribution channels such as Best Buy, which will be useful as it rolls out its own health-focused smartwatches."[129]  Apple Watch is also sold in Best Buy retail stores and online on BestBuy.com and Amazon.com.[130]  Thus, at least as early as the latter half of 2023, Apple Watch and W1 are likely to be sold side-by-side in the same retailers and distribution channels, further evidencing direct competition between those products.

---

[126] "Masimo completes acquisition of Sound United," *Mass Device*, https://www.massdevice.com/masimo-completes-acquisition-of-sound-united/; "How activist Politan Capital may find an opportunity to trim costs, build value at Masimo," *CNBC*, https://www.cnbc.com/2022/08/20/how-activist-politan-capital-may-find-an-opportunity-to-trim-costs-build-value-at-masimo.html.

[127] "2022 Investor Day," *Masimo*, https://s24.q4cdn.com/336820108/files/doc_presentations/Masimo-2022-Investor-Day-121322.pdf, p. 13.

[128] "Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

[129] "Activist Politan Capital Has 9% Stake in Masimo," *Wall Street Journal*, https://www.wsj.com/articles/activist-politan-capital-has-9-stake-in-masimo-11660600800.

[130] "Apple Watch," *Best Buy*, https://www.bestbuy.com/site/wearable-technology/apple-watch-device-accessories/pcmcat748300489081.c?id=pcmcat748300489081; "Apple Watch," *Amazon.com*, https://www.amazon.com/stores/page/47259FD7-DAA2-4BD0-8CDF-BB87B8981EB6?ingress=2&visitId=314e8917-521a-4745-b02d-34de24ffb0b8&ref_=ast_bln.

79.   ***Third***, Apple Watch and W1 are offered at similar price points.  As stated above, Masimo currently retails for $499.[131]  The initial prices of the versions of Apple Watch that practice one or more of the Asserted Patents are as follows:

| Apple Watch Version | Base Price |
|---|---|
| Apple Watch Series 4 | $399 - $499 [132] |
| Apple Watch Series 5 | $399 - $499 [133] |
| Apple Watch Series 6 | $399 - $499 [134] |
| Apple Watch Series 7 | $399[135] |
| Apple Watch Series 8 | $399[136] |
| Apple Watch Ultra | $799[137] |

80.   The similar price points between Apple Watch and W1 further evidence Apple and Masimo's direct competition if Masimo is allowed to proceed with its distribution plans in the latter half of 2023.

---

[131] "Masimo W1™," *Masimo*, https://www.masimopersonalhealth.com/products/masimo-w1.

[132] "Apple Watch Series 4: Beautifully redesigned with breakthrough communication, fitness and health capabilities," *Apple*, https://www.apple.com/newsroom/2018/09/redesigned-apple-watch-series-4-revolutionizes-communication-fitness-and-health/.

[133] "Apple unveils Apple Watch Series 5," *Apple*, https://www.apple.com/newsroom/2019/09/apple-unveils-apple-watch-series-5/.

[134] "Apple Watch Series 6 delivers breakthrough wellness and fitness capabilities," *Apple*, https://www.apple.com/newsroom/2020/09/apple-watch-series-6-delivers-breakthrough-wellness-and-fitness-capabilities/.

[135] "Apple Watch Series 7 orders start Friday, October 8, with availability beginning Friday, October 15," *Apple*, https://www.apple.com/newsroom/2021/10/apple-watch-series-7-orders-start-Friday-october-8/.

[136] "Apple reveals Apple Watch Series 8 and the new Apple Watch SE," *Apple*, https://www.apple.com/newsroom/2022/09/apple-reveals-apple-watch-series-8-and-the-new-apple-watch-se/.

[137] "Introducing Apple Watch Ultra," *Apple*, https://www.apple.com/newsroom/2022/09/introducing-apple-watch-ultra/.

81.     ***Fourth***, Apple Watch and W1 each offer health and fitness tracking and monitoring features.[138]

82.     ***Fifth***, Masimo itself has recognized that Apple Watch and W1 will compete.  For example, Masimo's 2021 Form 10-K provides:

> Some of the world's largest technology companies that have not historically operated in the healthcare or medical device space, such as Alphabet Inc., Amazon.com, Inc., Apple Inc., Samsung Electronics Co., Ltd. and others, have developed or may develop products and technologies that may compete with our current or future products and technologies.  For example, in September 2020, Apple, Inc. announced that its Apple Watch Series 6 includes a pulse oximetry monitoring feature, which may compete with certain of our existing products and products in development, including the consumer versions of our iSpO and MightySat pulse oximeters.  In addition, in September 2021, Apple, Inc. announced that its Apple Watch Series 7 includes a blood oxygen level monitoring feature and a sleep tracking function, both of which compete with our existing products.[139]

83.     Indeed, Masimo repeatedly mentioned Apple during its Investor Day presentation.[140]

84.     ***Sixth***, and finally, recent publications confirm the anticipated competition between Apple Watch and W1.  For example, a 2022 article by FirstWord Healthtech titled, "How a billion-dollar merger could ring in the era of hearables," provides that W1 does "not seem to differ that much from" competing product offerings like those of Apple:

> Apart from Masimo's long-standing reputation as a leader in critical care monitoring to give the technology gravitas, what W1 offers would not seem to

---

[138] *See, e.g.* "Apple Watch Series 8," *Apple*, https://www.apple.com/apple-watch-series-8/; "Masimo W1™," *Masimo*,  https://www.masimopersonalhealth.com/products/masimo-w1.

[139] Masimo 2021 Form 10-K, p. 39.

[140] "Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

differ that much from what the likes of Apple, Samsung, Fitbit, Garmin, Withings (the list is long) also offer.[141]

85.    A recent product review likewise confirmed that W1 will compete with Apple Watch just like other "copycat" devices.  According to the review, Masimo "is taking a bold step by putting that technology on [W1] to sell to consumers, competing against tech giants Apple and Samsung, as well as a host of **other copycats** [, like Masimo,] in this emerging space of wearable technology."[142]

86.    Accordingly, for at least the reasons above, in my opinion, Apple Watch will directly compete with W1 as early as the latter half of 2023.

> 2.    **Competition Between Apple Watch And W1 In The Latter Half Of 2023 Will Cause Apple Irreparable Harm By Improperly Requiring Apple To Compete With Its Own Patented Designs, Resulting In Irreparable Lost Product Market Share, Sales, Revenues, And Profits.**

87.    As stated above, I understand that W1 incorporates the patented designs of the Asserted Patents.[143]  In view of that understanding, and in view of the anticipated competition between Apple Watch and W1 in the latter half of 2023, it is my opinion that Masimo's ongoing and escalating sales of W1 during 2023 is likely to cause Apple irreparable harm by causing Apple to compete against its own patented designs, lose market share to Masimo, and sustain unquantifiable lost unit sales, revenues, and profits related to Apple Watch.

---

[141] "Spotlight On: How a billion-dollar merger could ring in the era of hearables," *FirstWord Healthtech*, https://www.firstwordhealthtech.com/story/5510895.

[142] "Masimo's W1: A Game Changer in Watch Industry," *Orange Country Business Journal*, https://www.ocbj.com/healthcare/masimos-w1-a-game-changer-in-watch-industry/ (emphasis added); *see* Declaration of Alan D. Ball dated Jan. 29, 2023 at ¶¶ 148-156, 170-178, 193-201.

[143] *See* Section V.E, *supra*; *see also* Declaration of Alan D. Ball dated Jan. 29, 2023 at ¶¶ 111-123.

88.    *First*, Masimo's ongoing and escalating sales of W1 during 2023 is likely to cause Apple irreparable harm by causing Apple to compete against its own patented designs.

89.    "Knockoffs" like W1 diminish the value of Apple Watch to consumers because consumers (or, their friends) can purchase a similar-in-design product from another source.[144] Indeed, the ready availability of W1, which Masimo intends to eventually distribute in 2023 through "[20,000] Points of Retail and Custom Installations,"[145] creates a disincentive for consumers to buy the authentic Apple Watch and consumers may no longer view Apple Watch as unique or as desirable.[146]   As an article from *Organisation for Economic Co-operation and Development* puts it: "[t]he proliferation of counterfeit versions of luxury goods can make the genuine articles less desirable to their traditional consumers."[147]   I agree.   And, because I understand that W1 incorporates the patented designs of the Asserted Patents, in my opinion the harms above, which are unquantifiable, will be caused to Apple by Masimo's ongoing and escalating sales of W1 in the latter half of 2023.

---

[144] *See, e.g.,* "The Economic Impact of Counterfeiting and Piracy: Executive Summary," *Organisation for Economic Co-operation and Development*, 2007, https://www.oecd.org/sti/38707619.pdf, p. 18.

[145] Figure 18; "2022 Investor Day," *Masimo*, https://s24.q4cdn.com/336820108/files/doc_presentations/Masimo-2022-Investor-Day-121322.pdf, p. 13.

[146] *See, e.g.,* "The Economic Impact of Counterfeiting and Piracy: Executive Summary," *Organisation for Economic Co-operation and Development*, 2007, https://www.oecd.org/sti/38707619.pdf, p. 18.

[147] *See, e.g.,* "The Economic Impact of Counterfeiting and Piracy: Executive Summary," *Organisation for Economic Co-operation and Development*, 2007, https://www.oecd.org/sti/38707619.pdf, p. 18.

90.     **Second**, requiring Apple to compete with its own patented technology in the latter half of 2023 will result in irreparable harm to Apple in the form of lost market share by Apple and gains in market share by Masimo with long term effects.

91.     According to a *Harvard Business Review* article titled "Market Share—a Key to Profitability": "[m]arket share is more important for infrequently purchased products than for frequently purchased ones . . . . Infrequently purchased products tend to be durable, higher unit-cost items such as capital goods, equipment, and consumer durables, which are often complex and difficult for buyers to evaluate. Since there is a bigger risk inherent in a wrong choice, the purchaser is often willing to pay a premium for assured quality."[148]

92.     That dynamic applies here in view of the anticipated competition between Apple Watch and W1 in the latter half of 2023.

93.     Indeed, Masimo's competing sales of W1 will erode Apple's market share to Masimo's benefit.[149]   That   lost market share is likely to lead to unquantifiable financial consequences.

94.     For example, losses in market share by Apple to Masimo will likely result in Apple having to increase its marketing and sales efforts for Apple Watch, to distinguish Apple Watch

---

[148] "Market Share—a Key to Profitability," *Harvard Business Review*, 1975, https://hbr.org/1975/01/market-share-a-key-to-profitability.

[149] For purposes of this report, I was not asked to define any specific market in which Apple Watch and W1 will compete.  No such definition is required.  Apple Watch will directly compete with W1.  And because W1 is the first watch Masimo has sold, Masimo is a new entrant to any market in which watches are sold.  Thus, regardless of how the market is defined, sales of W1 are likely to result in a lesser amount of share of that market for Apple and some greater amount of share of that market for Masimo.  It is those changes in market share—Apple's loss of market share and Masimo's gain of market share—that, in my opinion, is likely to result in the unquantifiable harms to Apple described herein.

from Masimo's infringing product, thereby decreasing Apple's overall profitability for Apple Watch.

95.    Moreover, Apple will be irreparably damaged by Masimo's presence as a new direct competitor and Masimo's gains in market share from its unauthorized use of Apple's patented designs.  The harm from Masimo's gains in market share are unquantifiable, long-term, not easily reversible, and therefore irreparable.

96.    Indeed, through its sales of W1, Masimo is attempting to benefit from Apple's investments in the design of Apple Watch (among other features of Apple Watch) by marketing a product design–Apple's design–that is already proven and familiar to consumers to gain a foothold in a new market related to watches.[150]  In other words, Masimo is using the patented designs of the Asserted Patents in W1 without authorization to directly compete and gain market share, and such unauthorized use will result in the existence of a new competitor to Apple that would not otherwise exist but for Masimo's infringement.

97.    Using another's intellectual property to enter a market irreparably harms the prior participants in that market by creating new competitor to compete for market share that would not otherwise exist but for the competitor's infringement.  And, notably, the improper foothold that the new competitor gains by virtue of its infringement cannot be addressed by a later redesign to the accused product (e.g., upon the finding of infringement) at least because consumer interest in

---

[150] "Apple Watch Leads Customer Preferences in The USA," *Counterpoint Research*, https://www.counterpointresearch.com/apple-watch-leads-customer-preferences-usa/;  "How Apple Watch Used Distinctive Design to Dominated the Smartwatch Market," *the brand gym*, https://thebrandgym.com/apple-watch-brand-stretch/; "The Apple Watch design is already a classic – will it ever change?" *The Next Web*, https://eW/news/apple-watch-design-classic-future-analysis.

even the re-designed product will be based at least in part on the new competitor's prior infringing acts.

98.    **Third**, Apple's lost market share resulting from Masimo's ongoing and escalating sales of W1 during 2023 is likely to cause Apple to lose unquantifiable unit sales, revenues, and profits related to Apple Watch.  A single sale of W1 in place of a single sale of Apple Watch will not merely result in a 1:1 lost sale of Apple Watch.  Instead, a sale of W1 in place of Apple Watch will cause Apple unquantifiable lost future sales, revenues, and profits from Apple Watch because Apple will lose future sales from repeat purchasers and customers who are referred to Apple Watch from prior Apple Watch purchasers.  Those benefits—repeat purchasers and word-of-mouth sales, each of which is garnered by Apple Watch's premier design and quality—are significant, cannot be quantified to a reasonable degree of economic certainty, and are lost when a consumer purchases W1 instead of Apple Watch.  Apple's loss of those significant benefits is therefore irreparable.

99.    Indeed, Apple Watch purchasers are likely to successively purchase different versions of Apple Watch over time because of the strong brand loyalty Apple has created because of its premier engineering and design.  As reported by Business Insider, "Apple has, over the years, built a reputation for quality and the industrial design of its products" that has "created millions of **loyal** customers."[151]   Apple's brand loyalty, garnered by Apple Watch's premier quality and design, results in customers being much more likely to purchase Apple Watch after making an initial purchase.  A sale of W1 by Masimo that replaces a sale of Apple Watch will prevent Apple from gaining those additional sales that would have resulted from Apple's brand loyalty but for Masimo's sale of W1.

---

[151] "Why Apple Products are so Expensive," *Business Insider*, https://www.businessinsider.com/why-apple-products-are-so-expensive-iphone-macbook-2019-11, video transcription.

100.     Apple's strong brand loyalty will also compel Apple Watch purchasers to advertise and recommend Apple Watch to their friends and family, often referred to as word-of-mouth sales.[152] Those types of advertisements and recommendations will lead to additional sales of Apple Watch.   Thus, a sale of W1 by Masimo that replaces a sale of Apple Watch will prevent Apple from benefiting from word-of-mouth advertisements and recommendations by prior Apple Watch purchasers and thereby prevent Apple from gaining an unquantifiable number of sales of Apple Watch from those recommendations.

101.     Accordingly, in view of my understanding that W1 practices the Asserted Patents, and in view of the anticipated competition between Apple Watch and W1 in the latter half of 2023, it is my opinion that Masimo's ongoing and escalating sales of W1 during 2023 is likely to cause Apple irreparable harm by causing Apple to compete against its own patented technology, lose market share to Masimo, and lose unquantifiable unit sales, revenues, and profits related to Apple Watch.

**3.     The Likely Irreparable Harm To Apple From Requiring Apple To Compete With Its Own Patented Inventions And Consequently Lose Product Market Share In The Latter Half Of 2023 Is Causally Linked To Masimo's Unauthorized Use Of The Patented Designs In The Asserted Patents.**

102.     In my opinion, Masimo's use of the patented designs in the Asserted Patents has a nexus to the likely irreparable harms to Apple described above.   That nexus is shown through the importance of the patented designs in the Asserted Patents to consumers' purchasing decisions.

---

[152] "How Word of Mouth Advertising Made The Apple Watch A Star!," *Mobile Mob*, https://mobilemob.com.au/blogs/news/how-word-of-mouth-advertising-made-apple-watch-the-star-of-the-show; "Steve Jobs' Advertising Strategy Is Why Apple Still Tops the Market," *Observer*, https://observer.com/2017/12/steve-jobs-advertising-strategy-is-why-apple-still-tops-the-market/.

Masimo's unauthorized use of those patented designs will continue to result in Apple's lost market share, sales, revenues, and profits.[153]

103.   I am aware of at least three sources of evidence that demonstrate the connection between the patented designs in the Asserted Patents and consumer purchasing decisions, and the importance of the patented designs to consumer purchasing decisions: Masimo's own statements and advertisements, survey evidence, and relevant industry publications.

104.   First, Masimo's own advertisements reflect the connection between the patented designs in the Asserted Patents and consumer purchasing decisions, and the importance of those designs to consumer purchasing decisions, and thus demonstrate the nexus between Masimo's use of Apple's patented designs and Apple's anticipated lost product market share.

105.   For example, Masimo's advertisements heavily feature the design of the back of W1, which incorporates Apple's patented designs, on Masimo's webpage marketing W1.  As shown in **Figure 11** above, the design of the back of W1 is prominently featured in Masimo's marketing material and comprises the single largest image on W1's webpage, indicating that Masimo considers the design to be important to consumers.  Numerous other images on Masimo's website also emphasize the design on the back of W1, as shown in **Figures 12-14**, further evidencing the importance of W1's back's design.

---

[153] I am qualified to evaluate the causal nexus between Apple's harm and Masimo's use of the Asserted Patents based, in part, on my experience as a licensing professional who regularly assists clients with the valuation of IP, both inside and outside of litigation.  More specifically, I have experience negotiating licensing/sales agreements for IP assets, the terms of which are predicated on identifying the specific economic benefits and value derived from the IP being licensed.  I am also qualified based on my experience as a financial professional and Certified Public Accountant who regularly assists clients with the evaluation of potential businesses and markets that could possibly be created from the development and commercialization of IP.

106.    Masimo's promotion of consumer reviews likewise focuses on W1's design.  For example, one consumer review that Masimo promotes on its website provides that the consumer "personally [wore] [] W1 and [was] impressed by its comfort and stylish look . . . ."[154]  Masimo's own CEO admitted that Masimo relies on W1's design to attract sales, stating that Masimo thinks it "[has] a compelling design."[155]   Masimo's current COO of its Consumer division Blair Tripodi stated during Masimo's recent investor day conference that "quality and design[] go hand in hand" and wanted to show Masimo's investors "how important design is" for wearables and "how important design is for health care as well."[156]

107.    Notably, the importance of the back of the design of W1 to consumer purchasing decisions is also evidenced by Masimo's decision to use the patented designs of Apple Watch for the design of the back of W1 rather than any other design.  As shown above, Apple is a global leader in product development and design.  The fact that Masimo used the same design as Apple Watch—as evidenced by Mr. Ball's declaration—for the design of the back of W1 to launch a new product rather than some other design demonstrates the importance of the back of W1 to Masimo's success.  Masimo could have chosen any other design but chose Apple's patented designs because of Apple's reputation as a leader in design.

---

[154] "Medical Pioneer Masimo Announces the Full Market Consumer Release of the Masimo W1™, the First Watch to Offer Accurate, Continuous Health Data," *Masimo*, https://investor.masimo.com/news/news-details/2022/Medical-Pioneer-Masimo-Announces-the-Full-Market-Consumer-Release-of-the-Masimo-W1-the-First-Watch-to-Offer-Accurate-Continuous-Health-Data/default.aspx.

[155] "Masimo (MASI) Q2 2022 Earnings Call Transcript," The Motley Fool, https://www.fool.com/earnings/call-transcripts/2022/08/10/masimo-masi-q2-2022-earnings-call-transcript/.

[156] "Masimo Corporation (MASI) | Transcript (Analyst or Investor Day): Event on 12/13/2022" *S&P Capital IQ*, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

108.   Thus, in my opinion, each of the foregoing facts show a nexus between Masimo's use of the patented designs in the Asserted Patents and the irreparable harm to Apple in the form of lost product market share from such use.

109.   Second, survey evidence shows a connection between the patented designs in the Asserted Parents and consumer purchasing decisions, and thus demonstrates that Masimo's use of Apple's patented designs has a nexus to Apple's anticipated product market share.

110.   I understand that another expert retained by Apple, Dr. Simonson, asked respondents about various features of W1 that would impact their purchasing decision.  Of the 197 respondents surveyed, up to 30.5 percent stated that the design of the back of W1 would impact their decision, and that number increased to 36.6 percent when focusing on respondents who are familiar with smartwatches.[157]  While respondents also identified other features as impactful to their purchasing decision, I understand that a patented feature need not be the only feature that drives consumer purchasing decisions to show nexus.  Moreover, I understand that Dr. Simonson included another feature in the survey, "Two Time Zone Display," and assessed the relative materiality of the design of the back of W1 to that feature.  The results show that the design of the back of W1 was selected more than twice as often as "Two Time Zone Display," further evidencing how the design of the back of W1 impacts consumer purchasing decisions.[158]

111.   Third, industry publications demonstrate the importance of design to smartwatch consumers,[159] and that general importance of design applies equally to the design of the back of the watch.  Indeed, the backs of the smartwatches constitute a substantial portion of the surface

---

[157] Declaration of Itamar Simonson dated Jan. 27, 2023 at ¶ 33, Fig.4.

[158] Declaration of Itamar Simonson dated Jan. 27, 2023 at ¶ 33, Fig.4.

[159] *See* Section V.A, *supra*.

area of smartwatches that a smartwatch provider can design.  Clearly, consumers' focus on the beautiful "design" of smartwatches is not limited to only one side of a smartwatch (e.g., the front of the watch).  Indeed, the general importance of the design of the back of smartwatches is further supported by Mr. Jue's and Mr. Russell-Clarke's statements regarding Apple's thoughtful design of the back of Apple Watch.[160]

112.    Accordingly, in my opinion, the foregoing evidence demonstrates that Masimo's use of the patented designs in the Asserted Patents has a nexus to the likely harm to Apple's market share, sales, revenues, and profits of Apple Watch in the latter half of 2023.

**B.    Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half Of 2023 Will Result In Irreparable Harm To Apple's Reputation As An Innovator of Product Designs And Provider Of High-Quality Products.**

113.    As stated above, the designs of the backs of W1 and Apple Watch are substantially similar, and Apple has accused Masimo of copying the patented designs in the Asserted Patents that are embodied in Apple Watch.[161]

114.    Because of those substantial similarities between Apple Watch and W1, consumers may have one of two reactions upon encountering W1, each of which is likely to cause irreparable harm to Apple's reputation.  First, consumers may mistakenly conclude that Apple's iconic designs are common because they appear on a non-Apple product, resulting in irreparable harm to Apple's reputation as an innovator.  Second, alternatively, consumers may mistakenly associate Apple with W1—a product of lesser quality, resulting in irreparable harm to Apple's reputation for high-quality products.  In my opinion, each type of harm to Apple is irreparable.

---

[160] *See* Section V.C, *supra*.

[161] *See* Section V.E, *supra*.

1.    **Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half Of 2023 Will Cause Irreparable Harm To Apple's Reputation As An Innovator Of Product Designs.**

115.    As set forth above (*see* Section V.A–Section V.C), Apple is widely regarded as a leading innovator of consumer electronics designs, and various product reviews and publications recognize the significance of Apple's design innovation in Apple Watch.[162]   Through years of investments, Apple has gained a hard-earned reputation for its innovative approach to design, which forms a substantial part of its brand identity and brand value.[163]   Indeed, Apple's iconic designs, including Apple's designs in Apple Watch, are a central pillar of Apple's value proposition to Apple customers.[164]   Accordingly, consumers expect that Apple's innovative designs will exclusively be found on Apple's products, and Apple's distinctive aesthetics give Apple a unique advantage in the consumer electronics marketplace.[165]

---

[162] "What do Apple, GM, and P&G share? Design." *The Christian Science Monitor*, https://www.csmonitor.com/Business/2011/0323/What-do-Apple-GM-and-P-G-share-Design; "Lessons from Apple on Why Aesthetic Innovation is Important," *Innovation Management,* https://innovationmanagement.se/2017/06/22/lessons-from-apple-on-why-aesthetic-innovation-is-important/.

[163] "Why the Apple Design is So Successful," *Cleverism*, https://www.cleverism.com/why-apple-design-successful/;  "Why Apple Products are so Expensive," *Business Insider*, https://www.businessinsider.com/why-apple-products-are-so-expensive-iphone-macbook-2019-11, video transcription; "Are Apple Products really Worth It?" *Medium*, https://medium.com/geekculture/are-apple-products-really-worth-it-b0631dee8ac2.

[164] "How Apple's thoughtful, measured approach is building a revolution in health," *TechCrunch*, https://techcrunch.com/2022/06/13/apple-health-executive-interviews/.

[165] *See* Appel, Gil, et al., "The Short- and Long-term Impacts of Fashion Knockoffs on Original Items," *Marketing Science Institute*, 2013, https://msbfile03.usc.edu/digitalmeasures/gappel/intellcont/MSI_Report_13-1081-1.pdf, p. 9.

116.    In my opinion, if Apple's designs are found in another product, as they are in W1, consumers may conclude that Apple's designs are commonplace and no longer unique or innovative.[166]  That conclusion will lead to long-lasting harm to Apple's brand.[167]

117.    As stated above in relation to Apple's lost product market share, "[k]nockoffs" like W1 diminish the value of Apple Watch to consumers because consumers (or, their friends) can purchase a similar-in-design product from another source.[168]  The ready availability of W1, which Masimo intends to distribute through "[20,000] Points of Retail and Custom Installations,"[169] creates a disincentive for consumers to buy the authentic Apple Watch.[170]  That consequence of Masimo's use of the patented designs in the Asserted Patents irreparably harms Apple not only in the form of lost product market share, but also irreparably harms Apple's reputation as an innovator.

118.    According to a 2013 report of the impact of fashion knockoffs by *Marketing Science Institute*, "the entry of a knockoff has an overall negative effect on the financial

---

[166] *See* Appel, Gil, et al., "The Short- and Long-term Impacts of Fashion Knockoffs on Original Items," *Marketing Science Institute*, 2013, https://msbfile03.usc.edu/digitalmeasures/gappel/intellcont/MSI_Report_13-1081-1.pdf, p. 4.

[167] Appel, Gil, et al., "The Short- and Long-term Impacts of Fashion Knockoffs on Original Items," *Marketing Science Institute*, 2013, https://msbfile03.usc.edu/digitalmeasures/gappel/intellcont/MSI_Report_13-1081-1.pdf, p. 5.

[168] *See, e.g.,* "The Economic Impact of Counterfeiting and Piracy: Executive Summary," *Organisation for Economic Co-operation and Development*, 2007, https://www.oecd.org/sti/38707619.pdf, p. 18.

[169] Figure 18; "2022 Investor Day," *Masimo*, https://s24.q4cdn.com/336820108/files/doc_presentations/Masimo-2022-Investor-Day-121322.pdf, p. 13.

[170] *See, e.g.,* "The Economic Impact of Counterfeiting and Piracy: Executive Summary," *Organisation for Economic Co-operation and Development*, 2007, https://www.oecd.org/sti/38707619.pdf, p. 18.

performance of the original.  In over 97% of cases, the combined harm due to substitution and uniqueness is greater than the positive effect of acceleration."[171]  The report concludes that "[t]hese results support the concerns voiced by industry groups regarding the harm done by knockoffs."[172]

119.    The *Marketing Science Institute* report further described the harm to a brand from the loss of uniqueness as follows:

- "[F]or many products, and fashions in particular, consumers' need for uniqueness plays a significant role in their adoption and attrition decisions [] and consequently aggregate market demand.  Thus, even if consumers cannot differentiate between a copy and the original design, the mere presence of more items in the market will affect the degree to which consumers perceive a design as unique and so can create monetary harm to the original product."[173]

- "The need for uniqueness is increasingly recognized as a major driver of consumer behavior in the context of fashions yet can be observed in various markets."[174]

- "Studies have further investigated the role of uniqueness in increasing the desirability of certain goods…and have shown that a loss of uniqueness can cause customers to be upset[]. Thus, the introduction of a knockoff might create harm to the original product merely by increasing the number of items in the market."[175]

---

[171] Appel, Gil, et al., "The Short- and Long-term Impacts of Fashion Knockoffs on Original Items," *Marketing Science Institute*, 2013, https://msbfile03.usc.edu/digitalmeasures/gappel /intellcont/MSI_Report_13-1081-1.pdf, p. 5.

[172] Appel, Gil, et al., "The Short- and Long-term Impacts of Fashion Knockoffs on Original Items," *Marketing Science Institute*, 2013, https://msbfile03.usc.edu/digitalmeasures/gappel /intellcont/MSI_Report_13-1081-1.pdf, p. 5.

[173] Appel, Gil, et al., "The Short- and Long-term Impacts of Fashion Knockoffs on Original Items," *Marketing Science Institute*, 2013, https://msbfile03.usc.edu/digitalmeasures/gappel/ intellcont/MSI_Report_13-1081-1.pdf, p. 4.

[174] Appel, Gil, et al., "The Short- and Long-term Impacts of Fashion Knockoffs on Original Items," *Marketing Science Institute*, 2013, https://msbfile03.usc.edu/digitalmeasures/gappel/ intellcont/MSI_Report_13-1081-1.pdf, p. 9.

[175] Appel, Gil, et al., "The Short- and Long-term Impacts of Fashion Knockoffs on Original Items," *Marketing Science Institute*, 2013, https://msbfile03.usc.edu/digitalmeasures/gappel/ intellcont/MSI_Report_13-1081-1.pdf, p. 9.

120.     I agree with these articulations of harm to designers resulting from knockoff products and, in my opinion, those harms are likely to result in relation to Masimo's use of the patented designs in the Asserted Patents.  While the report's findings are about fashion knockoffs, the report's findings are directly applicable to the likely harm to Apple by W1 at least because, as consumer wearables, Apple Watch and W1 embody both function *and* fashion.  That is exactly why the design of watches like Apple Watch and W1 is so important to consumers, and why the copying of the design of watches like Apple Watch can be so harmful and damaging to Apple.

121.     Accordingly, in my opinion, Masimo's continued unauthorized use of the patented designs in the Asserted Patents will cause irreparable, long-term damage to Apple's brand value by harming Apple's reputation as an innovator of iconic and distinctive designs.

### 2.     Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half Of 2023 Will Cause Irreparable Harm To Apple's Reputation As A Provider Of High Quality Products.

122.     In my opinion, Masimo's ongoing and escalating sales of W1 is likely to cause irreparable harm to Apple's reputation as a provider of high-quality watches.

123.     I understand that, despite using the design of the back of Apple Watch, W1's details, materials, and finishes do not have the same sophisticated and premium appearance as Apple Watch.[176]  However, because of the design similarities of Apple Watch and W1, Masimo's sales of W1 will likely result in irreparable harm to Apple's reputation as a provider of high quality products because consumers may mistakenly believe that Apple is somehow involved in the design, manufacture, and/or licensing of W1 and its inferior product quality.[177]

---

[176] Declaration of Alan D. Ball dated Jan. 29, 2023 at ¶¶ 126-127.

[177] "Understanding Product Quality: What It Is and Why It Matters," *Indeed*, https://www.indeed.com/career-advice/career-development/product-quality ("[P]roduct quality earns customer loyalty [and] helps establish brand recognition"); New Consumer Survey

124.    For example, consumers may see the lower quality details, materials, and finishes of W1 on others in public, or potentially view negative reviews for W1 online, and develop a negative opinion of Apple.

125.    I understand that Dr. Simonson's survey evidence supports my conclusion that a mistaken association between Apple and W1 by consumers is likely.  Specifically, I understand that Dr. Simonson showed 194 respondents in the test group, and 200 respondents in the control group, the design of the back of W1 and inquired as to whether the respondent associated that design with a company or brand (if any).[178]   I further understand that up to 50.5 percent of respondents associated the design of the back of W1 with Apple, relative to the 10.0 percent of respondents who associated the design of the back of a control smartwatch with Apple.[179]   That is an extremely high degree of association between W1 and Apple.  Thus, if consumers accurately conclude that W1 is a product of lesser quality, it is likely that consumers will mistakenly associate W1 with Apple and thereby associate Apple with a lesser-quality product.  The harm to Apple from that mistaken association cannot be reversed or quantified to a reasonable degree of economic certainty and thus constitutes irreparable harm to Apple.

126.    Accordingly, in my opinion, Masimo's continued unauthorized use of the patented designs in the Asserted Patents will cause irreparable, long-term damage to Apple's brand value by harming Apple's reputation as a provider of high-quality products.

---

Highlights Shift in Mindset - Consumers Valuing Quality Over Price When Selecting Products," *First Insight*, https://www.firstinsight.com/press-releases/quality-more-important-than-price-study ("Quality is becoming more important than price to most consumers, as 53 percent rate quality as the most important factor when making purchases").

[178] Declaration of Itamar Simonson dated Jan. 27, 2023 at ¶ 45, Fig. 8.

[179] Declaration of Itamar Simonson dated Jan. 27, 2023 at ¶ 45, Fig. 8.

> **3.    The Likely Irreparable Harm To Apple's Reputation In The Latter Half Of 2023 Is Causally Linked To Masimo's Use Of The Patented Designs In the Asserted Patents.**

127.    As explained above, due to W1's use of the patented designs in the Asserted Patents, Masimo's use of the patented designs may cause one of two consumer reactions: they may either (1) mistakenly conclude that Apple's iconic designs are common because they show up on a non-Apple product, resulting in irreparable harm to Apple's reputation for innovation, or (2) mistakenly associate Apple with W1 (a poorer-quality product), resulting in irreparable harm to Apple's reputation for high-quality products.[180]   Each of those harms is specifically tied to the design of the back of W1 and therefore bears a nexus to Masimo's use of the patented designs.

128.    Indeed, as explained above, Dr. Simonson's survey evidence directly shows that the public is likely to associate the design of the back of W1 with Apple.   That survey evidence alone is sufficient to establish a causal nexus for the irreparable harm to Apple's reputation that is likely to result from Masimo's ongoing and escalating sales of W1 in the latter half of 2023.

129.    Accordingly, in my opinion, the foregoing evidence supports a causal nexus between the Asserted Patents and the harm to Apple's reputation that Apple is likely to sustain from Masimo's ongoing and escalating sales of W1.

> **C.    The Likely Irreparable Harms To Apple In The Latter Half Of 2023 Will Not Be Redressed By Calculating Damages Based On Masimo's Profits.**

130.    The foregoing paragraphs demonstrate my opinions that the harms to Apple from Masimo's unauthorized use of the patented designs in the Asserted Patents are unquantifiable and therefore irreparable in nature.  However, even if Apple were to try to calculate a recovery based on Masimo's unauthorized sales and/or profits of W1 (e.g., a calculation of a reasonable royalty

---

[180] *See* Section VI.B.2, *supra.*

or of Masimo's profits), those measures of recovery will not redress Apple's harms and therefore cannot adequately compensate Apple for Masimo's infringement. Accordingly, the irreparable harms to Apple will not be redressed by monetary recovery based on a reasonable royalty or Masimo's profits.

       **1.**     **Apple's Likely Irreparable Harm In The Latter Half Of 2023 Will Not Be Redressed By A Reasonable Royalty.**

131.    35 U.S. Code § 284 states in part that:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

132.    The determination of a reasonable royalty considers many factors. The seminal authority on this issue, *Georgia-Pacific Corp. v. United States Plywood Corp.*,[181] provides 15 factors which may be relevant to a determination of a reasonable royalty.

133.    The reasonable royalty measure of damages for patent infringement is sometimes structured as a running royalty based on a percentage of the net sales of an infringing product. A reasonable royalty structured as a running royalty may also be calculated as a fixed sum per unit sale of an infringing product. Alternatively, a reasonable royalty may be structured as an upfront, lump-sum payment.

134.    Regardless of the structure, as a starting point, a reasonable royalty is often influenced by the Cost, Market, and Income Approaches to valuation. The Income Approach is a direct measure of profitability.

135.    Here, Masimo's profitability from sales of W1 will likely reflect the start-up nature of Masimo's smartwatch business and will not reflect the value of the technologies that W1

---

[181] 318 F.Supp. 1116 (S.D.N.Y. 1970).

embodies.  Thus, any calculation of a reasonable royalty based on Masimo's profitability will not be adequate to compensate Apple.

136.    As indicated above, the release of W1 on August 31, 2022 constituted Masimo's first release of a Masimo smartwatch.  It is unlikely that the value of the technologies embodied in W1 will be reflected in Masimo's profits until Masimo's unit sales reach sufficient levels to achieve manufacturing and operating efficiencies.  It is further unlikely that Masimo will reach such levels of unit sales during the pendency of these proceedings.

137.    Accordingly, although Apple is entitled to a reasonable royalty upon the finding of infringement of a valid claim of the Asserted Patents pursuant to §284 of the Patent Act, the reasonable royalty measure of recovery, based on the Income Approach, likely will not sufficiently address the harm that Apple will sustain from Masimo's sale of W1 during this case.

### 2.    Apple's Likely Irreparable Harm In The Latter Half Of 2023 Will Not Be Redressed By Disgorging Masimo's Profits.

138.    35 U.S. Code § 289 provides an "[a]dditional remedy for infringement of design patent[s]" based on an infringer's unjust enrichment:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profits, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

139.    Thus, in addition to the measures of recovery available under §284, §289 also provides for the recovery of a defendant's profits for infringement of a design patent.  As each of the Asserted Patents are design patents, this measure of recovery is available to Apple.

140.    However, as stated above, Masimo's profitability from sales of W1 likely will not reflect the value of the technologies embodied in W1 until Masimo's unit sales reach sufficient

levels to achieve manufacturing and operating efficiencies, which is not likely to occur during these proceedings.  Accordingly, although Apple is entitled to Masimo's profits upon the finding of infringement of a valid claim of an Asserted Patents pursuant to §289 of the Patent Act, those profits likely will not be adequate to compensate Apple.

> **D.    Enjoining Distribution Of W1 During 2023 Will Mitigate The Irreparable Harms To Apple Resulting From Masimo's Ongoing And Escalating Sales Of W1 In The Latter Half Of 2023.**

141.    As stated above, Masimo has specific plans to expand and accelerate its sales of W1 in the latter half of 2023, including through Sound United's distribution channels, which include major national retailers that also sell Apple Watch like Best Buy.[182]  In my opinion, Apple will suffer each of the previously described harms most significantly in the latter half of 2023 if Masimo is not enjoined prior to implementing its planned, large expansion of sales of W1 in the second half of the year.  Accordingly, it is also my opinion that the post-trial enjoinment of Masimo's sales of W1 prior to Masimo's planned ramp up of the distribution of W1 in the second half of 2023 would mitigate the likely irreparable harms to Apple caused by Masimo's ongoing and escalating sales of W1.

## VII.    A POST-TRIAL INJUNCTION IS NOT LIKELY TO SIGNIFICANTLY HARM MASIMO.

142.    Masimo is unlikely to suffer any significant harm to its business if sales of W1 are enjoined following a trial in this case.  As stated above, historically, Masimo's core business is hospital devices and those products are not implicated in this case.[183]  W1 has therefore not yet become a core product of Masimo and sales of W1 will not immediately constitute a large portion

---

[182] Figure 18; "2022 Investor Day," *Masimo*, https://s24.q4cdn.com/336820108/files/doc_presentations/Masimo-2022-Investor-Day-121322.pdf, p. 13.

[183] *See* Section V.D, *supra*.

of Masimo's overall sales.  Indeed, W1 was just released to the public in the United States on August 31, 2022.  As a result, W1 has not yet seen widespread adoption or entrenchment in the market, and thus Masimo need not rely on the sale of W1 for Masimo's operations.  Accordingly, enjoinment of Masimo's sales of W1 post-trial is unlikely to cause significant hardship to Masimo's business.

## VIII.   APPLE WATCH'S PATENTED DESIGNS HAVE EXPERIENCED SIGNIFICANT COMMERCIAL SUCCESS AND INDUSTRY PRAISE.

143.   As stated above, the versions of Apple Watch that practice one or more of the Asserted Patents were released on the following dates:

| Apple Watch Version | Release Date |
| --- | --- |
| Apple Watch Series 4 | September 21, 2018[184,185] (Discontinued) |
| Apple Watch Series 5 | September 20, 2019[186] |
| Apple Watch Series 6 | September 18, 2020[187] |
| Apple Watch Series 7 | October 15, 2021[188] |
| Apple Watch Series 8 | September 16, 2022[189] |

---

[184] "Apple Watch Series 4: Beautifully redesigned with breakthrough communication, fitness and health capabilities," *Apple*, https://www.apple.com/newsroom/2018/09/redesigned-apple-watch-series-4-revolutionizes-communication-fitness-and-health/.

[185] "Apple discontinued last year's Apple Watch Series 4 after announcing its brand-new watch – here's how to decide between the Series 3 and Series 5, *Business Insider*, https://www.businessinsider.com/apple-watch-series-4-discontinued-series-5-vs-series-3-2019-9.

[186] "Apple unveils Apple Watch Series 5," *Apple*, https://www.apple.com/newsroom/2019/09/apple-unveils-apple-watch-series-5/.

[187] "Apple Watch Series 6 delivers breakthrough wellness and fitness capabilities," *Apple*, https://www.apple.com/newsroom/2020/09/apple-watch-series-6-delivers-breakthrough-wellness-and-fitness-capabilities/.

[188] "Apple Watch Series 7 orders start Friday, October 8, with availability beginning Friday, October 15," *Apple*, https://www.apple.com/newsroom/2021/10/apple-watch-series-7-orders-start-friday-october-8/.

[189] "Apple reveals Apple Watch Series 8 and the new Apple Watch SE," *Apple*, https://www.apple.com/newsroom/2022/09/apple-reveals-apple-watch-series-8-and-the-new-apple-watch-se/.

| Apple Watch Ultra | September 23, 2022[190] |
|---|---|

144.    I understand that each of those versions of Apple Watch that practice one or more of the Asserted Patents, except Apple Watch Series 4, are currently available for sale, including at national retailers like Best Buy.[191]  However, I understand that Apple Watch Series 5 is only being sold as a refurbished product.[192]

145.    Apple's success in innovation and design has resulted in Apple Watch repeatedly ranking as the highest selling smartwatch.  Indeed, since Apple Watch released Apple Watch Series 4 in 2018, Apple has had the highest percentage of the global smartwatch shipments each year, making Apple Watch the most popular smartwatch ever.[193]

146.    Accordingly, in my opinion, the versions of Apple Watch that practice one or more Asserted Patents, including at least Apple Watch Series 4, Apple Watch Series 5, Apple Watch Series 6, Apple Watch Series 7, Apple Watch Series 8, and Apple Watch Ultra, have experienced significant commercial success.

147.    Additionally, Apple Watch's designs, including the design of Apple Watch Series 4 – 8 and Apple Watch Ultra, which practice the Asserted Patents, have received industry praise in numerous publications.[194]

---

[190] "Introducing Apple Watch Ultra," *Apple*, https://www.apple.com/newsroom/2022/09/introducing-apple-watch-ultra/.

[191] "Apple Watch Series 5 Search Results, *Best Buy*, https://www.bestbuy.com/site/searchpage.jsp?id=pcat17071&st=apple+watch+series+5.

[192] "Apple Watch Series 5 Search Results, *Best Buy*, https://www.bestbuy.com/site/searchpage.jsp?id=pcat17071&st=apple+watch+series+5.

[193] "Quarterly smartwatch unit shipment share worldwide from 2018 to 2022, by vendor," *Statista*, https://www.statista.com/statistics/910862/worldwide-smartwatch-shipment-market-share.

[194] *See supra* ¶¶ 34-35.

148.     Further, Apple's commercial success and industry praise is directly related, in part, to the patented designs in the Asserted Patents.

149.     I understand that Dr. Simonson's surveys included questions regarding the materiality of the design of the back of Apple Watches in relation to consumer purchasing decisions, and the impact of the design on consumer purchasing decisions.[195]   Specifically, I understand that Dr. Simonson's surveys included assessment of Apple Watch Series 5 and Apple Watch Series 8, which, as shown above in **Figures 5–6**, addresses all versions of Apple Watch that practice the Asserted Patents because Apple Watch Series 4 and Series 5 have the same back design and Apple Watch Series 6, Apple Watch Series 7, Apple Watch Series 8, and Apple Watch Ultra have the same back design.

150.     I understand that, of the 198 respondents surveyed, 28.3 percent stated that the design of the back of Apple Watch Series 5 would impact their purchasing decision and of the 195 respondents surveyed, 31.8 percent stated that the design of the back of Apple Watch Series 8 would impact their purchasing decision.[196]   I understand that those numbers increase to 32.1 percent and 33.3 percent, respectively,  when focusing on respondents who are familiar with smartwatches.  While respondents also identified other features as impactful to their purchasing decision, I understand that a patented feature need not be the only feature that drives consumer purchasing decisions to show a nexus to commercial success and industry praise.  Moreover, the results show that the design of the back of Apple Watch was selected approximately twice more frequently than "Two Time Zone Display," further evidencing the impact of the design of the back of Apple Watch to its commercial success and industry praise.

---

[195] Declaration of Itamar Simonson dated Jan. 27, 2023 at ¶¶ 19-34.

[196] Declaration of Itamar Simonson dated Jan. 27, 2023 at ¶ 33, Fig. 4.

151.    In addition, and as stated above in relation to the nexus between Masimo's use of the patented designs in the Asserted Patents and Apple's likely lost product market share, relevant industry publications identified above show the importance of design to the smartwatches generally,[197] and that general importance of design applies equally to the design of the back of Apple Watch.  Indeed, the back of the watch constitutes a substantial portion of the surface area of smartwatches that a smartwatch provider can design.  Clearly, consumers' focus on the beautiful "design" of smartwatches is not limited to only one side of a smartwatch (e.g., the front of the watch).  Indeed, the general importance of the design of the back of smartwatches is further supported by Mr. Jue's and Mr. Russell-Clarke's statements regarding Apple's thoughtful design of the back of Apple Watch.[198]

152.    Accordingly, Apple's commercial success and industry praise for Apple Watch is directly related to the patented designs in the Asserted Patents.

Date:  January 30, 2023

Respectfully submitted,

James E. Malackowski

---

[197] Section V.A, *supra*.

[198] Section V.C, *supra*.

# Appendix 1



January 27, 2023

# JAMES E. MALACKOWSKI
## CURRICULUM VITAE

**James E. Malackowski** is a Co-founder and Senior Managing Director of Ocean Tomo, LLC, a part of J.S. Held.  Ocean Tomo provides Financial Expert, Management Consulting, and Advisory services related to intellectual property (IP) and other intangible assets; corporate accounting investigations; regulatory and reporting obligations; solvency and restructuring; and contractual or competition disputes. Practice offerings address economic damage calculations and testimony; accounting investigations and financial forensics; technology and intangible asset valuation; strategy and risk management consulting; mergers and acquisitions; debt and equity private placement; and IP brokerage.  Subsidiaries of Ocean Tomo include Ocean Tomo Investments Group, LLC, a registered broker-dealer.  With more than 100 offices globally, J.S. Held assists clients – corporations, insurers, law firms, governments, and institutional investors – on complex technical, scientific, and financial matters across all assets and value at risk.

Along with Supreme Court Justice Stephen Breyer, Mr. Malackowski was inducted as the 87th member of the IP Hall of Fame, chosen by the IP Hall of Fame Academy from a longlist of nominees put forward by the global IP community. Mr. Malackowski was recognized by the Academy in 2022 with the Q. Todd Dickinson Award, which honors those who have made significant contributions to IP as a business asset. Mr. Malackowski's inclusion into the IP Hall of Fame follows annual recognition since 2007 by leading industry publications as one of the 'World's Leading IP Strategists'.  Significantly, Mr. Malackowski is listed among "50 Under 45" by *IP Law & Business™*; included in the *National Law Journal's* inaugural list of 50 Intellectual Property Trailblazers & Pioneers; and, named as one of "The Most Influential People in IP" by *Managing Intellectual Property™*.  Mr. Malackowski was named as 1 of 50 individuals, companies and institutions that framed the first 50 issues of *IAM Magazine* as well as 1 of 60 leading global Economics Expert Witnesses by the same publication in 2014.  In 2011 Mr. Malackowski was selected by the World Economic Forum as one of less than twenty members of the Network of Global Agenda Councils to focus on questions of IP policy.  In 2013 he was inducted into the Chicago Area Entrepreneurship Hall of Fame by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration.  In 2018, Mr. Malackowski joined the Standards Development Organization Board of the Licensing Executives Society (USA & Canada), Inc. governing voluntary consensus-based professional practices that are guided in their development by the American National Standards Institute's (ANSI's) Essential Requirements.  LES standards are designed to encourage and teach consensus practices in many of the business process aspects of intellectual capital management.

On more than one hundred occasions, Mr. Malackowski has served as an expert in U.S. Federal Court, U.S. Bankruptcy Court, State Court, Court of Chancery, the Ontario Superior Court of Justice, the U.S. Patent and Trademark Office Patent Trial and Appeal Board, and global arbitrations on questions relating to intellectual property economics including the subject of valuation, reasonable royalty, lost profits, price erosion, commercial success, corrective advertising, creditor allocations, Hatch Waxman Act market exclusivity, business significance of licensing terms including RAND obligations, venture financing including expected risk / return, and equities of a potential injunction.  Mr. Malackowski's experience extends to matters of general business valuation and commercial disputes, both domestic and foreign.  Mr. Malackowski has publicly addressed policy issues affecting international trade and has provided expert opinions concerning antidumping and countervailing duties imposed by the U.S. Department of Commerce as well as testimony on domestic industry, bond, and remedies before the International Trade Commission.



Mr. Malackowski has substantial experience as a Board Director for leading technology corporations and research organizations as well as companies with critical brand management issues. He is Past President of The Licensing Executives Society International, Inc., with oversight for more than ten thousand members in thirty-two countries. Mr. Malackowski has focused his non-for-profit efforts with organizations leveraging science and innovation for the benefit of children and students, including those located in lesser developed countries. He has served for more than two decades as a Trustee or Director of the National Inventors Hall of Fame, Inc., an organization providing summer enrichment programs for more than 100,000 students annually. For more than ten years Mr. Malackowski served as a Director of Chicago's Stanley Manne Children's Research Institute, advancing the organization's agenda to measure and report the impact of its pediatric research. He recently completed service on the Pritzker School of Molecular Engineering Council at the University of Chicago and continues as an Advisor to the Venture Builder Community at the University of Notre Dame.

Mr. Malackowski is a frequent speaker on emerging technology markets and related financial measures. He has addressed mass media audiences including Bloomberg Morning Call, Bloomberg Evening Market Pulse, Bloomberg Final Word, CNBC Closing Bell, CNBC On the Money, CNBC Street Signs, CNBC Worldwide Exchange, CBS News Radio and Fox Business National Television as well as other recognized news-based internet video channels. Mr. Malackowski is a current or past judge for numerous new venture competitions awarding financial grants recognizing intellectual property protected products and services developed by students, university faculty, and professional entrepreneurs.

As an inventor, Mr. Malackowski has more than twenty issued U.S. patents. He is a frequent instructor for graduate studies on IP management and markets and a Summa Cum Laude graduate of the University of Notre Dame majoring in accountancy and philosophy. Mr. Malackowski is Certified/Accredited in Financial Forensics, Business Valuation and Blockchain Fundamentals. He is a Certified Licensing Professional and a Registered Certified Public Accountant in the State of Illinois. Mr. Malackowski has been certified to receive United States Sensitive Security Information (SSI) as governed by Title 49 Code of Federal Regulations.

| | |
|---|---|
| **EMPLOYMENT** | Co-Founder and Senior Managing Director, *Ocean Tomo, LLC, a part of J.S. Held.,* July 1, 2003 to present. Mr. Malackowski is responsible for all aspects of the firm's intellectual property focused merchant banking practice. Mr. Malackowski served as Chairman from the firm's founding in 2003 until acceptance of Bow River Capital as a strategic partner in 2020. He served as Chief Executive Officer of Ocean Tomo, LLC from formation until its sale to J.H. Held in 2022. |
| | President and Chief Executive Officer, *IP Equity Management, LLC,* doing business as Duff & Phelps Capital Partners, March 1, 2002 to June 30, 2003. The firm's intellectual property structured finance efforts were consolidated with Ocean Tomo on July 1, 2003. |
| | Principal and Founder, *VIGIC Services, LLC,* July 1, 2000 to February 28, 2002. Mr. Malackowski identified and evaluated intellectual capital based private equity investment opportunities and served as an advisor to four completed transactions. |
| | Principal and co-Founder, *IPC Group LLC,* August 1, 1988 – June 30, 2000. Mr. Malackowski also held the offices of President and CEO and was a Board member / chairman of the firm. Along with four co-founders, Mr. Malackowski |



grew IPC Group to become the largest professional services firm specializing in intellectual property valuation and strategy consulting. IPC Group was sold in 1999 later changing its name to InteCap.

Executive Consultant, *Peterson & Co. Consulting*, Chicago, June 3, 1985 – July 30, 1988. Mr. Malackowski began with Peterson as a Staff Consultant and was the firm's quickest promotion to both Senior Consultant and Executive Consultant. Mr. Malackowski helped to establish the firm's intellectual property litigation and valuation practice. Peterson & Co. was sold to Saatchi & Saatchi PLC in 1988.

---

**NON-PROFIT AND ASSOCIATION EXPERIENCE**

Mr. Malackowski has been active in The Licensing Executives Society (LES) locally, nationally and internationally. LES is the premiere global professional association of technology transfer and intellectual asset management professionals with more than 9,000 members in more than 32 countries.

Mr. Malackowski is Past President of the Licensing Executives Society International, LLC, where his experience included the following positions:

- Director, LES Standards Development Organization (2018 – present)
- Chair, Past President's Council (2012 – 2013)
- President and Member of the Board (2011 - 2012)
- President Elect and Member of the Board (2010 - 2011)
- Secretary and Member of the Board (2007 - 2010)
- Member and Permanent Alternate, Board of Delegates (1992 - 2005)
- Past Chair, Membership, Investment, Education, Long-range Planning and Global Technology Impact Forum Committees.

Mr. Malackowski's term as President of LESI has been recognized for creation of the LESI Global Technology Impact Forum and concurrent Invent For Humanity™ Technology Transfer Exchange Fair; formalizing the National Presidents' Council; establishing the position of a permanent Executive Director; and, restructuring the leadership of LESI committees utilizing a Chair, Past Chair, Chair Elect ladder combined with functional responsibilities for committee Vice Chairs. This later organizational stamp is based largely on Mr. Malackowski's experience as President of LES USA & Canada described below where he led a restructuring of the Board from a regional to a functional focus for each officer and Trustee. As with his tenure at his national Society discussed below, Mr. Malackowski led a financial turn-around returning LESI to positive cash flow following its' only two years of loss.

Mr. Malackowski is also Past President of The Licensing Executives Society (USA and Canada), Inc. where he held numerous offices in the organization including:

- President and Member of the Board (2001 – 2002)
- International Vice President and Member of the Board (2000)
- Treasurer and Member of the Board (1996 -- 1999)
- Trustee and Member of the Board (1992 – 1996)



- Chair, Annual Meeting in Miami Beach (1998) and the Summer Meeting in Chicago (1997)

Mr. Malackowski presided over a restructuring of the LES USA & Canada Board and a financial turn-around returning the organization to positive cash flow following its only two years of loss to such date. Mr. Malackowski is the youngest President to hold office at LES USA & Canada as well as at LES International.

In 2007, Mr. Malackowski was the Founding Chair of the Board of Governors for what is now Certified Licensing Professionals, Inc., administrator of the Certified Licensing Professional (CLP) program for professionals in the fields of licensing, business development and commercialization of intellectual property. More than 1,000 individuals involved in patenting, marketing, valuation, IP law, negotiation, and intellectual asset management have earned the CLP certification. CLP, Inc. is a 501(c)(6) organization whose mission is to elevate the licensing profession through knowledge and standards.

In 2018 Mr. Malackowski joined the Standards Development Organization Board of LES USA & Canada. LES standards are voluntary consensus-based professional practices that are guided in their development by the "American National Standards Institute's (ANSI's) Essential Requirements." ANSI is the unique accrediting agency in the United States for voluntary consensus standards development organizations. LES is an accredited ANSI Standards Developer and as such guarantees its constituents that its standards will be developed in a fair, balanced, consensus-based, due process driven way. LES standards are designed to encourage and teach consensus practices in many of the business process aspects of intellectual capital management and, where appropriate, offer enterprises the opportunity to differentiate themselves based on their use of these consensus professional practices, through certification of conformance to those standards.

Mr. Malackowski extends significant time to non-profit activities directed towards a further understanding of the economic importance of innovation and intellectual property, in both the United States and developing economies. These efforts include:

- Founding Board Member and member of the Executive Committee, United Stages Intellectual Property Alliance (USIPA) and Global Intellectual Property Alliance, (2020 -)
- Judge, University of Notre Dame McCloskey Venture Competition (2019 -)
- Advisory Council, University of Chicago, Pritzker School of Molecular Engineering (2018 - 2022)
- Judge, Illinois Technology Association, CityLIGHTS™ Innovation Awards (2013 - 2020)
- Member, World Economic Forum Network of Global Agenda Councils (2011 - 2012)
- Member, Master of IP Management & Markets Advisory Council, Chicago-Kent College of Law | Illinois Tech (2008 - )
- Director, International Intellectual Property Institute, Washington D.C., (2002 - 2007)
- Resident Advisor, U.S. Information Agency, (1999)



- Resident Advisor, U.S. Department of Commerce Commercial Law and Development Program (1997)
- Founder and Chairman, The Center for Applied Innovation, Inc. (2004 -)

Recognizing the economic value created by new businesses enterprise protected by intellectual property, Mr. Malackowski has been appointed as a judge in numerous new venture competitions including:

- Judge, University of Notre Dame McCloskey Venture Competition (2019 -)
- Judge, 1st Source Bank Commercialization Awards (2019 -)
- Judge, Illinois Technology Association, CityLIGHTS™ Innovation Awards (2013 – 2020)
- PBS *Everyday Edisons* (2008)

In addition to his university instruction described herein, Mr. Malackowski focuses his non-for-profit efforts with those organizations leveraging science and innovation for the benefit of children.

- Director, Children's Research Fund (2013); Co-Chair Annual Fund Campaign (2013)
- Director, National Inventors Hall of Fame, Inc. (NIHF) including service as a Member, Trustee or Director of related subsidiaries and Board Committees (2001 - 2022).   The NIHF has provided summer enrichment programs for significantly more than one million students including Camp Invention™ for kids in grades 1-6 (and their parents and teachers); Collegiate Inventors Competition™ for college students (and their mentors); and, Club Invention™ for kids in grades 1-6 (and their parents and teachers).  NIHF provides more than 20,000 camp scholarships annually for children in financial need.
- President's Council, Chicago Museum of Science and Industry (2005 - 2011) including participation on the Education Advisory Committee (2007 - 2009) and the Alternative Revenue Committee (2008 - 2011)
- Director, Stanley Manne Children's Research Institute (2009 - 2020) including Chair of the Board's Technology Transfer Committee (2014 - 2020) and the Strategic Planning Resources Committee (2011 - 2012).  Mr. Malackowski is recognized for initiating the development of a program to measure and track innovation metrics relevant to the Institute.

Mr. Malackowski was the Founder of the Center for Applied Innovation, a Chicago based non-for-profit with both local and international programs.  CAI was created to manage education, public policy outreach and related economic activity around applied technology and intellectual property (IP) rights in the State of Illinois and around the world.

- CAI created and patented the first commoditized contract for technology licensing, the Unit License Right™.  This innovation has been licensed to the Chicago-based Intellectual Property Exchange International.
- Under Mr. Malackowski's continued leadership as Chairman, CAI organizes the Invent for Humanity™ Technology Transfer Exchange Fair (InventforHumanity.org) launched in January, 2012, in Geneva, Switzerland. Invent for Humanity showcases field-ready, sustainable



innovations, known as "appropriate technologies", leveraging the experience of licensing professionals to match and structure the actual transfer of such technology to meet recognized needs of emerging market economies.

Mr. Malackowski's association and non-profit activities are informed in part by his participation in the Harvard Business School Executive Education Program on Governing for Nonprofit Excellence, November 2000.  Mr. Malackowski's Board service is informed by his participation at the Rock Center Corporate Governance Directors College for Venture-Backed Company Directors, Stanford University, March 2016.

---

**RELATED OFFICES**

*Berg, LLC*, Member, Council of Advisors, Senior Advisor, Intellectual Property Licensing & Innovation (2012 - 2015)

*The Copyright Hub, LLC d/b/a 3Discovered*, Founder.  The company was formed as a collaborative venture between Ocean Tomo, LLC and Liberty Advisor Group in 2013.  3Discovered is a current portfolio company of US-based venture capital firm AITV.  Mr. Malackowski served as Chairman of the company through September 2016.  (2103 – 2106)

*Career Capture, LLC*, Secretary (2022 - ).  Career Capture is a video based recruiting platform focused on engineering and technical school graduates entering the labor market.  The company is a University of Southern California Iovine & Young Academy project led by Chase J. Malackowski (son).

*Curious Networks, Inc.*, Director, (1999 - 2000), Co-Chair of the Board's Strategic Partnership Committee.  Mr. Malackowski led the company's first and second round of venture funding.

*ewireless, Inc.* (f/k/a JEMAN Holdings, Inc. d/b/a Cellular Linking), Director, (1995-1999, 2000-2002)

*Ford Global Technologies, Inc.*, Ford Motor Company, Director (1997 - 2001).  Mr. Malackowski advised Ford Motor Company on the original business strategy which led to the formation of FGTI.  FGTI was the largest known technology management company in the United States during Mr. Malackowski's term.

*Infocast, Corporation* (OTC BB: IFCC.OB), Director (2001-2002).  Member of the Audit and Compensation Committees.  Mr. Malackowski led the transition of the company's senior management team and continued U.S. based funding efforts.

*Insignis, Inc.*, Director (2000 - 2002)  Mr. Malackowski led the company's first round of venture funding.  Insignis is a Chicago based provider of institutional financial data services.



*The Intellectual Property Coin Group, Inc.*, Chairman and Co-Founder (2018 - 2021).  The company is a planned Ethereum based blockchain platform and related cryptocurrency designed to facilitate IP based transactions.

*The Intellectual Property Exchange International, Inc.*  Mr. Malackowski was the founder of the company guiding initial product development of IPXI and recruitment of executive management.  In 2011, IPXI was funded by an industry consortium including the Chicago Board Options Exchange.  Mr. Malackowski was the Chair or Co-Chair of the Exchange from inception to February 26, 2015.

*JEMAN Technologies, Inc.*, Founder. (1995 – 1999).  Mr. Malackowski led the company's efforts to develop new technologies related to wireless direct response services.  JEMAN was sold to ewireless, Inc. in 1999 as part of a venture transaction funded by Bedrock Capital Partners and Tredegar Investments.

*Positive Growth Ventures, LLC*, Chairman. (2021 - ).  Mr. Malackowski organized the formation of an industry collective to facilitate direct-to-consumer cooperative advertising for health supplements and related medical products.

*Silent-Yachts, GmbH*, Member, Advisory Board (2021 - ).  Mr. Malackowski provides general business advice to both the company's chief executive as well as its U.S. distributor of solar-electric catamarans.  Silent-Yachts is located in Magdalensberg, Kärnten, Austria.

*Solutionary, Inc.*, Director (2000 - 2013).  Arranged and advised on Solutionary's asset acquisition of S3Networks effective August 31, 2001 and sale to strategic buyer in 2013.  Member of the Board's Compensation Committee.

*Sendle, Pty*, Advisor (2012 - 2015).  See www.Sendle.com.

---

| **EDUCATION AND CERTIFICATION** | University of Notre Dame, B.B.A., Bachelor of Business Administration with majors in Accountancy and Philosophy.  Graduated Summa Cum Laude, 1985. |

Registered Certified Public Accountant, State of Illinois Certificate Number 41,187 issued January 16, 1986; License No. 239.007831; Expires September 24, 2022.

Certified Licensing Professional, Certificate Number 1606 issued July 1, 2008; Recertification through November 29, 2022.

Certified in Financial Forensics, CFF™, American Institute of Certified Public Accountants, Certificate Number 391 issued July 31, 2008; Expires July 31, 2023.

Accredited in Business Valuation, ABV™, American Institute of Certified Public Accountants, Certificate Number 4278 issued May 31, 2014; Expires July 31, 2023.



Accredited in Blockchain Fundamentals for Accounting and Finance Professionals, American Institute of Certified Public Accountants, Certificate Number 15860970, 2018 - 2020.

---

**UNIVERSITY INSTRUCTION**

John Marshall Law School, Intellectual Property Damages (1992 - 1994)

DePaul University, Intellectual Property Entrepreneurial Finance (2003)

The George Washington University Law School, Intellectual Property Management (2004)

The University of Chicago Graduate School of Business:

- Intellectual Property Investment (2004 - 2006)
- Entrepreneurial Discovery, MBA Course 34705, Adjunct Professors Mark Tebbe and Brian Coe (Fall 2014 - 2015)

Indiana University Kelly School of Business, Intellectual Property Finance (2005)

University of Notre Dame, Mendoza College of Business, Adjunct Instructor:

- MBA Interterm Intensives, Intellectual Property Based Market Transactions, Valuation and Trading (Fall 2006, Fall 2008)
- MBA Executive Program, Course MBAE 70639, Intellectual Property, (Spring Semester 2008)
- MBA Program, Litigation Support and Valuation (Spring 2009)
- Notre Dame Law School, Advanced Trial Advocacy, LAW 75713-10 (Spring 2017)
- Member, Venture Builder Community Advisory Board (2019 - )

University of California at Berkeley Haas School of Business, Innovation Markets (2008)

Chicago-Kent College of Law, Adjunct Professor of Law, IP Financial Markets and Legal Principles (Fall 2008)

Rutgers Professional Science Master's Program, Fundamentals of Intellectual Property (Summer 2011)

Northwestern University Kellogg School of Management, Adjunct Instructor:

- MGMT 441, Intellectual Property Management, Clinical Professor James G. Conley (Fall 2012, Spring 2013 - 2017)
- DSGN 460, Innovation in Context, McCormick Engineering School (Spring 2017)



University of Texas McCombs School of Business, MBA Course:  Open Innovation, Professor Sirkka Jarvenpaa (Spring 2013)

University of Arizona, James E. Rogers College of Law, Advisor, Intellectual Property & Entrepreneurship Clinic (2017 - )

- IP Valuation (Spring 2017)
- IP Valuation for Commercial Transactions (Spring 2019)

University of Southern California, Lloyd Greif Center for Entrepreneurial Studies at the Marshall School of Business, Entrepreneurs Guide to Intellectual Property, Professor Luke L. Dauchot, JFF 322 (Fall 2017)

---

**MEMBERSHIPS**

American Institute of Certified Public Accountants, Member 01182237 (1985 -)
The Economic Club of Chicago (1990 - 2019)
The Licensing Executives Society (1988 - )
Young Presidents' Organization ("YPO" / "YPO Gold" Chicago Chapter, 2006 – 2017) (Mid-America U.S. At Large Chapter, 2019 - 2021)

---

**RECOGNITION AND AWARDS**

Individually, Mr. Malackowski has been recognized for his expertise as well as his work in developing markets for intellectual property transfer including:

- Inductee, IP Hall of Fame (2022).  Mr. Malackowski was inducted as the 87th member of IP Hall of Fame, joining 13 current or former Directors of governmental patent offices, 10 former judges, two past U.S. Presidents, Nikola Tesla, and Thomas Edison.
- Received Q. Todd Dickinson Award, which honors those who have made significant contributions to IP as a business asset (2022)
- *EY Entrepreneur Of The Year®*, Regional Semifinalist (2019 and 2020)
- "IAM Global Leaders", *IAM Magazine* (2020)
- "IAM Patent 1000: The World's Leading Patent Professionals", *IAM Magazine* (2015-2021)
- Named to the *National Law Journal's* inaugural list of 50 Intellectual Property Trailblazers & Pioneers.  (August 2014)
- Named as 1 of 60 leading global Economics Expert Witnesses in the *IAM Patent 1000, IAM Magazine.* Selection based on interviews by IAM researchers with more than 100 patent litigators.  (May 2014)
- Inductee, Chicago Area Entrepreneurship Hall of Fame as selected by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration, (2013; 28th Year of Program)
- Named as 1 of 50 Individuals, Companies and Institutions that Framed the First 50 Issues of *IAM Magazine*, November / December 2011.
- "IP Personalities of 2008", *IAM blog* by Joff Wild, Editor
- "IAM Strategy 300:  The World's Leading IP Strategists", *IAM Magazine* (2012-2021); formally presented and included as "World's 250 Leading IP Strategists", *IAM Magazine* (2009-2011)
- "50 Under 45", *IP Law & Business™* (2008)



- "The Most Influential People in IP", *Managing Intellectual Property*™ (2007)
- Member, IP Hall of Fame Academy (2007- )

Ocean Tomo as a firm has been likewise recognized for its accomplishments including:

- Ocean Tomo was chosen as the exclusive U.S. representative for the 2016 Healthcare & Pharma Leading Expert Awards by *Global Health & Pharma Magazine*.
- Ocean Tomo was recognized as a member of the *2015 Inc.5000®* list of fastest-growing private companies in America.
- Ocean Tomo was honored in 2011 with the "Best of Chicago Award in Investment Advisory Services" by the U.S. Commerce Association (USCA).
- In addition to Mr. Malackowski, Ocean Tomo as a firm was named as 1 of 50 Individuals, Companies, and Institutions that Framed the First 50 Issues of *IAM Magazine*, November / December 2011 and the only firm other than Microsoft (2 of 50 mentions) to be recognized multiple times (5 of 50 mentions).
- The firm's Chicago office was presented the *2011 Alfred P. Sloan Awards for Business Excellence in Workplace Flexibility* after having been finalist for scoring in the top 20% of all firm's measured nationally.
- Ocean Tomo was recognized in 2010 by Corporate Voices for Working Families for its work-life balance as part of the National Workplace Flexibility Campaign published by *USA Today*.
- Ocean Tomo was recognized as a juried Finalist for the Illinois Technology Association 2010 CityLIGHTS Award for raising the stature of the Illinois technology industry.
- Selected as case study organization for Haas School of Business, University of California, Berkeley (2009)
- Selected as case study organization for Harvard Business School MBA Program (2008)
- Ocean Tomo was named one of 20 small and mid-sized firms recognized as the "Best Places to Work in Illinois" by Best Companies Group in a competition sponsored by the Illinois Chamber of Commerce and the Illinois State Council Society for Human Resource (2007)
- Ocean Tomo Auctions received the 2006 Chicago Innovation Award for most innovative new product or service introduced between January 1, 2005, and July 31, 2006, that uniquely satisfied unmet needs in the marketplace. The award was presented by Kuczmarski & Associates and the *Chicago Sun-Times*.
- Ocean Tomo Auctions was awarded the Department of Commerce Technology Administration & National Knowledge & Intellectual Property Management 2006 Innovator of the Year Award.
- Ocean Tomo was recognized as a "Top Ten IP Newsmakers of 2006" by *IP Law & Business*, Almanac 2006.

Numerous authors and graduate business programs have written case studies about Ocean Tomo and its affiliates including:



- Piscione, Deborah Perry, <u>The Risk Factor</u>, Copyright 2014.
- Houle, David, <u>Entering the Shift Age</u>, Copyright 2013.
- Kuczmarski, Thomas D., Dan Miller and Luke Tanen, <u>Innovating Chicago-Style: How Local Innovators Are Building The National Economy</u>, Copyright 2012.
- Houle, David, <u>The Shift Age</u>, Copyright 2007.
- Chesbrough, Henry, <u>Open Business Models: How to Thrive in the New Innovation Landscape</u>, Copyright 2006.
- Harvard Business School Case Study
- University of California Business School Case Study

---

| | |
|---|---|
| **RELATED U.S. SPEECHES AND PUBLICATIONS** | "The Determination of a Reasonable Royalty: Hypothetical Negotiation v. A General License Agreement", The Licensing Executives Society, Chicago Chapter, December 8, 1987. |

"The Business Economics of Technology Development", The Licensing Executives Society, New England Chapter, February 9, 1988.

"The Importance of Protecting Intellectual Property Through Corporate Transition", Licensing Executives Society, National Meeting, October 18, 1989, Moderator.

"Valuation of Intellectual Property Rights", The Chicago Bar Association, March 6, 1990.

"Dispute Resolution -- There Are Alternatives!", Licensing Executives Society, National Meeting, October 22, 1990.

"How to Value a License", Adding to the Bottomline Through Licensing, LES / John Marshall Law School, November 1, 1990.

"An Advanced Discussion on Licensing and Patent Damages", Licensing Executives Society, National Meeting, October 28, 1992.

"An Advanced Discussion on Patent Damages", Licensing Executives Society, National Meeting, October 18, 1993.

Royalty Provisions in Technology License Agreements, Technology Transfers, American Conference Institute, November 15 & 16, 1993.

"Commercializing Technology and the Intellectual Property Quality Management Imperative", Technology Transfer, American Conference Institute, June 20 & 21, 1994.

"How to Accurately Value Software", The Software Protection and Litigation Institute, July 28 & 29, 1994.



"IP Damages Advanced Case Studies", Licensing Executives Society, National Meeting, October 19, 1994.

"Preparation and Presentation of Damages by Outside Consultants", AIPLA Mid-Winter Meeting, February 1, 1995

"Damages Discovery - An Expert's Perspective", Intellectual Property Law Association, New York, December 15, 1995.

"Pre-Litigation Damages Techniques: Patents and More", The Intellectual Property Strategist, March 1996.

"Corporate Exposures to Copyright, Patent, Trademark, and Trade Secret Claims", Digital Bullets - Digital Shields: A Financial Perspective, American Conference Institute, New York, March 5, 1996.

"IP Management and Taxation - How companies are proactively managing IP assets to maximize shareholder value, including measuring contribution of IP protection to corporate value", American Bar Association, Virginia, April 11, 1996.

"Effectively Select & Use Experts in Trademark & Copyright Cases", AIPLA Spring Meeting, Boston, May 1, 1996.

"The Industry-University Interface: Mechanisms For Technology Transfer", 1996 AUTM Central Region / Licensing Executives Society Chicago Chapter, Chicago, July 21, 1996.

"Valuing Health Care Technologies", Licensing Executives Society Winter Meeting, South Carolina, March 13, 1997.

"Creative Marketing & Packaging - How to Differentiate Yourself in a Competitive Market", CTIA Annual Meeting, Atlanta, February 23, 1998.

"Intellectual Property Valuation: The Latest Techniques from Boardroom and Courtroom", Patent Law Association of South Florida Annual Meeting, Fort Lauderdale, October 22, 1998.

"The Aftermath of Rite-Hite v. Kelly", 16th Judicial Conference of the U.S. Court of Appeals for the Federal Circuit, Washington D.C., April 6, 1999.

"Expert Admissibility After Daubert", Wisconsin Academy of Trial Lawyers, Milwaukee, December 3, 1999.

"Intellectual Property Strategic Planning: a Corporate Perspective", Research Directors Association of Chicago, Winter Meeting, January 10, 2000.

"Intellectual Property Asset Management: Linking IP and Corporate Strategy", 44th Annual Conference on Developments in Intellectual Property Law, John Marshall Law School, Chicago, February 25, 2000.



"Boost Your Client's Intellectual Capital IQ: Get Top Management Involved", <u>Corporate Legal Times</u>, October 2000, p. 104.

"Strategic and Financial Opportunities for Privately Held and Public Middle Market Companies:  Building Shareholder Value", The Standard Club, Chicago, October 5, 2000.

"Commercializing Intellectual Capital Through Venture Funding", LESI Expanded Board of Directors Meeting and Seminar, Delray Beach, Florida, January 26, 2001; LES Chicago Meeting, May 10, 2001.

"New Paths to Growth:  Joint Ventures and Accessing Equity Capital", Panel Presentation and Discussion, LaSalle Street Project Economic Summit, Chicago, May 10, 2001.

*ViewPoints*, The Newsletter of the Licensing Executives Society (U.S.A. and Canada), Inc., President's Column: Vol. VIII No. 5, Nov. / Dec. 2001, "President Changes the Way LES Does Business";  Vol. VIV No. 1, Jan. / Feb. 2002, "It's Time To Count Our Intellectual Assets"; Vol. VIV No. 2; Vol. VIV No. 3, May / June 2002, "Mid-Year Review"; Vol. VIV No. 4, July / August 2002, "Ethical Issues Related To Intellectual Property".

"Venture Investment Grounded In Intellectual Capital", <u>From Ideas To Assets: Investing Wisely in Intellectual Property</u>, Edited by Bruce Berman, John Wiley & Sons, Inc., 2002.

"Current Issues in Accounting for Intangibles", Congressional Economic Leadership Institute, Panel Presentation and Discussion with Steven H. Wallman, Former Commissioner, United States Securities and Exchange Commission, Washington, DC, May 1, 2002.

"Intellectual Capital Based Corporate Carve-outs: Strategy, Structure and Funding", James E. Malackowski and Suzanne Harrison, <u>The LESI Guide to Licensing Best Practices</u>, Edited by Robert Goldscheider, John Wiley & Sons, Inc., 2002.

"Intellectual Property Finance: Securitization to Venture Capital", American Bar Association Intellectual Property Law Conference, Philadelphia, June 28, 2002.

"The IIPI Roundtable:  The New Emphasis on Patent Value – Opportunities and Challenges", Washington DC, July 22, 2002.

"Moving Technology from University to Marketplace:  Business Creation and the Venture Capital Community, Licensing Executives Society Annual Conference, Chicago, September 24, 2002.

"Presidents' Forum on Intellectual Property:  A Leadership Discussion with The Licensing Executives Society, the American Intellectual Property Law Association, the Association of University Technology Managers, the Intellectual Property Owners Association, The National Inventors Hall of Fame, and BIO", Licensing Executives Society Annual Conference, Chicago, September 24, 2002.



"Extracting Value From Your Intellectual Asset Portfolio: Ensuring ROI from IP and Technology Assets", World Research Group, November 22, 2002, Chicago, Illinois.

"Licensing", American Intellectual Property Law Association 2003 Mid-Winter Institute, Marco Island, Florida, January 22 – 25, 2003.

"Cashing in on Chicago: A Closer Look at Liquidity in the Heartland", The Executives' Club of Chicago, Panel Discussion, February 11, 2003.

Conference Chair and Speaker, "Optimizing Valuation & Value Realization of your IP/Intellectual Assets", World Research Group, Las Vegas, February 27-28, 2003.

Live Webcast, "Turning Your Intellectual Property into Cash", Ernst & Young Business Insights, April 28, 2003.

Intermediate PDS Workshop: Application of Private Equity and Leveraged Finance Investing to Intellectual Property, LES / AUTM Summer Meeting, Philadelphia, May 8, 2003.

World Research Group, Advanced Intellectual Property Structured Finance, Conference Co-Chairperson, New York City, June 29-30, 2003.

The Conference Board, The 2003 Conference on Intellectual Asset Management & Value Reporting, "Application of Private Equity and Leveraged Finance Investing to Intellectual Property", Chicago, June 4, 2003.

Intellectual Property and Information Technology for Investment Funds, "Intellectual Capital Equity Management", Panel Discussion Sponsored by Schulte Roth & Zabel, New York City, June 18, 2003.

Chicago Capital Access Forum III, "Private Investors: The Case for Domestic Emerging Market Investments", Panel Discussion, Chicago, June 26, 2003.

Pension Consultants' Forum, "Extracting Value from Private Equity Investing", World Research Group, Chicago, July 22, 2003.

Midwest Intellectual Property Institute, "Intellectual Capital Equity Management", Minneapolis, September 19, 2003.

"Intellectual Asset Strategies", Add-On Seminar at the 2003 Licensing Executives Society Annual Meeting, San Diego, September 25, 2003.

"Leveraging Intellectual Property", Keynote Speaker, Thomson Financial Thought Leadership Forum, New York, October 8, 2003.

"Beyond Licensing: Innovative Techniques for Extracting Value", Advanced Forum on Licensing Intellectual Property, San Francisco, December 9, 2003.



<u>Intellectual Asset Management</u>, *Column:  IP Merchant Banker*, Douglas R. Elliott & James E. Malackowski, Issue 01, "Challenges of the Fifth Epoch", July / August 2003; Issue 02, "What the Market Fortells", September / October 2003; Issue 03, "Economics, Ethos and Intellectual Ethics", December / January 2004; Issue 04, "Patent Predictions – facts or fictions?", February / March 2004; "Wealth management in the age of patents", June / July 2004; "Patent pools – the 80% solution", August / September 2004.

"Intellectual Capital Equity Management:  IP as an Asset Class", Minnesota State Bar Association Continuing Legal Education, Minneapolis, January 15-16, 2004.

"Understanding the Motivations Behind an IP Structured Finance Transaction", "Analyzing the Anatomy of A Patent-Based Structured Finance Transaction", World Research Group, New York, January 21-22, 2004.

"Managing Your Intellectual Property", Investment Banking for Women / Minority Owned Business Enterprises, Annual Forum, Conference Co-Chairperson, Chicago, March 3-5, 2004.

"Private Equity: Investor Capital for Mature Businesses", Dream*Makers* Forum 2004, Santa Barbara, California, March 7 – 10, 2004.

"IP Finance:  Convergence of IP Valuation and Value Creation", World Research Group 2nd Annual Strategies and Solutions for Optimizing IP Valuation & Value Creation, Chicago, March 23 – 24, 2004.

"Leveraging the Value of Intellectual Property", Creating, Managing & Valuing an Intellectual Property Portfolio, Vedder Price Conference Series, Chicago, April 28, 2004.

"Federal Circuit Damages Decision Emphasizes the Importance of Sound Economic Models", IP Review, McDermott Will & Emery, with Robert M. Hess, Spring 2004.

"Intellectual Property Merchant Banking:  Leveraging Corporate Intangible Assets", The Licensing Executives Society (U.S.A. & Canada), Inc., Fairfield-Westchester Counties Chapter, June 23, 2004.

"Intellectual Property Financing and Securitization:  Conclusions and Future Implications for Financing the IP Market", New York, New York, July 21, 2004.

"Emerging Financial Concepts in IP Asset Management", Mining Patent Portfolios, Seattle, Washington, September 13, 2004.

"Intellectual Property Investment", National Institutes of Health, Commercialization Assistance Program, Larta Institute, Chicago, November 12, 2004.

"Using Intellectual Property to Grow", <u>The Beacon</u>, Chicagoland Entrepreneurial Center, Volume 3, Issue 4, December 10, 2004.



"Techniques for Assessing the Value of Your IP Portfolio", The Wall Street Transcript Intellectual Property Conference, New York, January 27, 2005.

"The Tipping Point: Assessing Major Challenges and Growth Opportunities in IP Finance", Moderator, The 3rd Annual Advancing IP Structured Finance World Research Group Conference", New York, February 3, 2005.

"Commerce One IP Auction", Optimizing IP Valuation and Value Creation, World Research Group Conference, Miami, March 30-31, 2005.

"Intellectual Capital Equity Management: IP As An Asset Class", Minnesota Continuing Legal Education Conference, Minneapolis, May 12, 2005.

"Techniques for Evaluating IP Potential", Life for After Rembrandts, Law Seminars International, Chicago, Illinois, August 4, 2005.

Keynote Address, 2nd Annual Intellectual Property Financing and Securitization Summit, New York, September 26, 2005.

"The Power of Intellectual Property in Private Equity Deals", Association for Corporate Growth and The Licensing Executives Society Connecticut Chapters, Greenwich, Connecticut, October 6, 2005.

"Maximizing the Value of Distressed Debt Backed by Intellectual Property", Financial Research Associates Distressed Debt Summit 2005, New York, October 7, 2005.

"To Sell or Not to Sell", Licensing in the Boardroom 2005, a supplement to *Intellectual Asset Management* magazine, 2005.

Patent Auctions & Marketplaces: Leveraging Value from Under-employed Technologies, IP Master Class Presentation, Washington DC, January 10, 2006.

"Risky Business: Overlooking Patents as Financial Assets", Making Innovation Pay, Edited by Bruce Berman, Published by John Wiley & Sons, Inc., 2006.

"The State of Development & Current Trends in IP Structured Finance" and "The Tipping Point: Assessing Major Challenges, Growth Opportunities and Future Trends in IP Finance", Moderator, The 4th Annual Summit on IP Structured Finance, New York, March 22-23, 2006.

"Generating Revenue From Your Inventions", IIR 2nd Annual Summit on IP Rights for Financial Services, New York, April 25-26, 2006.

"A Behind the Scenes Look at the Patent Bazaar: How Companies and Industry Are Buying and Selling Patents", Innovators in IP Litigation, IP Law & Business, San Jose, California, May 17, 2006.

"Patent Markets and Their Impact to R&D Strategy", Industrial Research Institute Annual Meeting, May 21-24, 2006, Colorado.



USC Gould School of Law 2006 Intellectual Property Institute; Featured Speaker, "A Final Word"; Panelist, "Patent Trolls: The Good, the Bad and the Ugly"; May 23, 2006, Los Angeles.

"Patent Auctions: Past, Present & Future", The 50th Annual Conference on Developments in Intellectual Property Law, John Marshall Law School Center for Intellectual Property Law, May 25-26, 2006, Chicago.   Speech published as "The Intellectual Property Marketplace: Past, Present and Future", 5 J. Marshall Rev. of Intell. Prop. L. 605, (2006)

"Patent Auctions: Risky Endeavor or Legitimate Market Opportunity?", Strafford Legal Teleconference Presentations, June 8, 2006.

The Intellectual Property Investment Summit:  Connecting Investors with Strategic Intellectual Property Opportunities, presented by the Center for Applied Innovation, Summit Co-Chairperson, June 15, 2006, Chicago.

Innovative Structures for Acquiring Intellectual Property:  The Benefits, Challenges and Process, LSI Law Seminars International, Program Co-Chair, July 17, 2006, Chicago.

"Licensing and Intellectual Property", Chicago Regional Independent Inventor's Conference, Presented by the United States Patent and Trademark Office, Northwestern University School of Law, and the National Inventors Hall of Fame Foundation, July 28-29, 2006, Chicago.

"Reinventing the IP Marketplace – The Exclusive Ocean Tomo Patent Auction Case Study", IP Licensing Summit: Practical Strategies to Maximize Revenue in Today's Challenging Intellectual Property Marketplace, August 21-23, 2006, New York.

"Unlocking the Value of Intellectual Property Rights", Conference of the International Bar Association, September 20, 2006, Chicago.

"This Too Shall Pass", Americas IP Focus 2006, Managing Intellectual Property Rights, Copyright, Euromoney Institutional Investor, PLC, 2006.

"Developing Markets for Intellectual Assets and Technology", 21st Annual Intellectual Assets and Technology Law Institute, October 5 & 6, 2006, Irving, Texas.

"Patent Damages" and "Patent Reform Efforts: An Update and Review", The Sedona Conference Patent Litigation VII, October 12-13, 2006, Sedona, Arizona.

"Patent Auctions", 44th Annual Intellectual Property Law Conference, The Center for American and International Law, November 9-10, 2006, Plano, Texas.

"The Future of Developing IP Markets", 3rd Annual Monetization of Intellectual Property & Intangible Assets, Strategic Research Institute, November 16-17, 2006, Boston.



"The IP Transactional Landscape", Economics of IP Based Transactions, National Knowledge & Intellectual Property Management Taskforce Series Program, November 29-30, 2006, Washington, D.C.

Keynote Presentation, The Business of Intellectual Property Conference, Tech Council of Maryland, Rockville, Maryland, January 10, 2007.

Luncheon Speaker, Corporate Intellectual Property Roundtable, Georgia State University College of Law, Atlanta, January 24, 2007.

"Patent Markets", American Intellectual Property Law Association, 2007 Mid-Winter Institute, New Orleans, January 24-27, 2007.

"Assessing the Real Value of Your IP Portfolio" and "Growing IP Impact on Public and Semi-Public Markets", The 5th Annual Summit on Monetizing, Financing & Securitizing IP, New York, January 30-31, 2007.

"Ocean's 300", Moderator, World Intellectual Property Review 2007, pp. 16-20.

"The Intellectual Property Marketplace: Emerging Transaction and Investment Vehicles", Co-author with Cardoza, Gray and Conroy, *The Licensing Journal*, Aspen Publishers, Vol. 27, No. 2, pages 1 - 11, February 2007.

"The Importance of Emerging Intellectual Property Market Opportunities to the City of Chicago", Keynote Speaker, Notre Dame Club of Chicago Meeting, Chicago, March 8, 2007.

"The Intellectual Property Marketplace", Harvard Business School Club of New York, New York, April 12, 2007.

Keynote Address, BRICs & Mortar: Technological Drivers in Booming Economies of Brazil, Russia, India and China, Northwestern University Journal of Technology & Intellectual Property Second Annual Symposium, Chicago, April 13, 2007.

"Innovation Measurement:  The Economic Impact of Patent Value", Co-author with Barney, Cardoza, Walker and Gray, Submission to United States Department of Commerce Economics and Statistics Administration, Pursuant to Notice in the Federal Register, Vol. 72, No. 71, 18627, May 11, 2007.

"Objective Patent Valuation", Business Meeting, Association of Corporate Patent Counsel, Newport, Rhode Island, June 27, 2007.

"Intellectual Property Exchange Chicago", a two-day symposium presented by The National Knowledge & Intellectual Property Management Taskforce and The Center for Applied Innovation, Moderator and Speaker, July 17 – 18, 2007, Chicago.

"Start-up Stories: Tales from the Front Line", TiE Midwest, August 1, 2007, Chicago.



Keynote Address, Notre Dame Financial Executives Alumni Conference, September 21, 2007, South Bend, Indiana.

"The Birth of an IP Marketplace", Missouri Bar Association Seminar, November 2, 2007, St. Louis, Missouri.

"Market Forces and IP", The Giles S. Rich American Inn of Court, Howard University, January 17, 2008.

"Market for Technology:  Challenges and Opportunities", Panel Discussion on Impediments to Technology Markets, Duke University's Fuqua School of Business, February 20, 2008.

"IP Markets – An Intangible Walk Down Wall Street", Keynote Address, Securities Industry and Financial Markets Association, March 11, 2008, New York.

"Patent Valuation, Is there One or Many?", Mini-Plenary Session of the High Tech Sector, The Licensing Executives Society International Annual Meeting, May 7, 2008, Chicago.

"What is Patent Quality – A Merchant Banc's Perspective", with Jonathan A. Barney, *les Nouvelles*, June 2008, p. 123 – 134.

"Intangibles in the Firm and Financial Markets", *Intangible Assets: Measuring and Enhancing Their Contribution to Corporate Value and Economic Growth*, The National Academies, Washington DC, June 23, 2008.

"Developing IP Markets:  Opportunity for the Financial Services Industry", Keynote Address, The 5th Annual Patents & The Financial Services Industry Symposium, New York, July 29, 2008.

"New Trends in Monetizing IP Rights:  Trolls, Licensing and Securitization", Managing *Intellectual Property* Webinar, September 3, 2008.

"Magnificent Mile – Shopping for the Ideal IP Expert", DRI Intellectual Property Litigation Seminar, September 4-5, 2008, Chicago.

From Assets to Profits: Competing for IP Value and Return, Contributing Author, Edited by Bruce Berman, John Wiley & Sons, November 2008.

Ocean Tomo:  The New Kid on the (Auction) Block is All Grown Up, Institute for Law and Technology, 46th Annual Conference on Intellectual Property Law, November 10 – 11, 2008, Plano, Texas.

Federal Trade Commission:  The Evolving Intellectual Property Marketplace, Keynote Address, Public Hearings, April 17, 2009, Washington, DC.

"Protecting and Commercializing New Ideas", CoreNet Global Chicago Chapter Meeting, Chicago, May 13, 2009.



"The Future of the IP Marketplace", Moderator and Plenary Speaker, IP Markets 2009, Chicago, July 23, 2009.

"Staying Ahead of the Curve – Strategic Intelligence, Value Assessments and Monetization in a Highly Competitive Economy", The 6th Annual Patents & The Financial Services Industry Conference, New York City, July 28-29, 2009.

"Helping Companies in a Down Economy: Strategic Planning for Identifying and Valuing Your IP", American Bar Association Annual Meeting, Chicago, July 31, 2009.

"Managing IP During Uncertain Times", NanoBusiness Alliance Conference, Chicago, September 8, 2010.

National Economic Framework for Intellectual Property Based Commerce, A Research Report by the National Knowledge & Intellectual Property Management Taskforce, Net Worth Press, 2009.

"The Role of IP in Tough Economic Times and How to Use it to Your Advantage:  Corporate Recovery and Restructuring", Licensing Executives Society Annual Meeting, San Francisco, October 19, 2009.

"Global IP Market Development", 11th Annual Utah IP Summit, Salt Lake City, February 13, 2010.

"Law, Economics, Business and Policy Implications for Innovation and Competition of Diverse Business Models for Using Patents", Stanford University Hoover Institution Annual Conference, Stanford, California, June 25, 2010.

"Establishing an Objective Value of IP", IPO Annual Meeting, Atlanta, September 14, 2010.

"Intellectual Property and the Marketplace:  Hot Topics Impacting the Role of Patents, Trademarks and Copyrights in Today's Business World", Vedder Price Illinois Continuing Legal Education Forum, Chicago, October 6, 2010.

"IP Essentials for the Chief Executive Officer", Illinois Technology Association, Chairman's Dinner Keynote Speaker, Chicago, October 20, 2010.

"Valuation of IP in Emerging Market Platforms", 2010 IP Damages Institute, CalCPA Education Foundation, Los Angeles, November 8, 2010.

"Shifting Sands:  What is Discoverable and Admissible for Damages, Willfulness and Other Purposes", Intellectual Property Owners Association CLE Roundtable, Washington, DC, March 21, 2011.

"Intellectual Property: From Asset-to-Asset Class", Intellectual Property Strategies for the 21st Century Corporation, Bryer, Lebson & Asbell Editors, John Wiley & Sons, Inc., 2011.



"The Next Big Think in Monetizing IP: A Natural Progression to Exchange-Traded Units", Ian D. McClure co-author, *LANDSLIDE*, A Publication of the ABA Section of Intellectual Property Law, Volume 3, Number 5, May/June 2011, pp. 32-37.

"Risk Management Strategies to Defend Against Patent Trolls and the New Trend in Patent Royalty Trusts", 2011 Congress on Patent Strategies for the Financial Services Industry, New York, September 19-20, 2011.

"Patent Quality and its Impact on Valuation", Licensing Executives Society United States and Canada, Inc., Annual Meeting, San Diego, October 17, 2011.

Introduction, "LESI Global Technology Impact Forum (GTIF) Creates Tech Transfer Platform", *les Nouvelles*, Journal of the Licensing Executives Society International, Volume XLVII No. 2, June 2012.

Panelist, "IP Monetization", McDermott Will & Emery 2012 Intellectual Property Symposium, Chicago, June 14, 2012.

Keynote Address, Northwestern Law Fifth Annual Conference on Entrepreneurship and Innovation, Chicago, June 14, 2012.

"IP Market Development", 38th Annual Intellectual Property Law Summer Institute, Sponsored by the Intellectual Property Law Section of the State Bar of Michigan, Traverse City, Michigan, July 21, 2012.

"An Investors' Perspective on IP", CenterForce IP Strategy Summit, New York City, New York, November 13, 2012.

"Investing in IP", DealFlow Media Webinar, January 10, 2013.

"Evolving IP Marketplace", American Intellectual Property Law Association, Mid-Winter Meeting, Tampa, Florida, February 1, 2013.  Includes paper: *New Emphasis on the Analytical Approach of Apportionment In Determination of a Reasonable Royalty* by James E. Malackowski, Justin Lewis and Robert Mazur.

"An Inventor's Walk Down Wall Street", PatCon 3 at Illinois Institute of Technology Chicago-Kent School of Law, Chicago, April 12, 2013.

*Report on Judge Rader Comments at the 2013 LESI Annual Conference*, LES Global News, Vol. XLVIII No. 2, June 2013.

"Strategic Insights", Plenary Panel Discussion, IPBC 2013, IP Business Congress, Boston, June 9, 2013.

"IP and Antitrust", Panel Discussion, McDermott 2013 IP Symposium, June 13, 2013, Chicago.

*IP Investments and Markets* Presented by the Center for Applied Innovation, Panelist on IP Marketplace, Chicago, June 25-26, 2013.



*Capturing Innovation*, Irish Entrepreneurs:  An Affiliate Group of the Notre Dame Club of Chicago, Chicago, September 5, 2013.

*Preventing the Napsterization of 3D Printing:  Areas for Industry Collaboration and Transparency*, Inside 3D Printing Conference and Expo, San Jose, California, September 18, 2013.

*The Latest Thinking about Non-Practicing Entities*, 2013 AIPLA Annual Meeting, Washington, DC, October 25, 2013.

*Challenges and Opportunities in Asia*, Think Asia, Think Hong Kong: IP, Technology & China/U.S. Opportunities, The Hong Kong Business Association of the Midwest, Chicago, November 19, 2013.

*Rationalizing Remedies,* The 2013 Patent Institute presented by Cravath Swain & Moore, New York, December 5, 2013.

*Special Address:  Looking to the Future of the Intellectual Property Marketplace – Where Will We Be in 2020?,* Best Practices in Patent Monetization, Law Seminars International, San Francisco, March 6-7, 2014.

*Reinventing Finance:  Funding Innovation Beyond Silicon Valley*, Forbes Reinventing America Summit, Chicago, March 27-28, 2014.

*IP Pricing – Current Issues for Markets and Courts*, Georgia State University / Licensing Executives Society Joint Meeting, Atlanta, May 28, 2014.

*The Growing Global 3DP IP Market & How Much Is At Stake*, 3D Printing Politics, Washington D.C., September 17, 2014.

*The Changing Role of the Expert*, 2014 IP Institute presented by the Engleberg Center on Innovation Law & Policy at New York University and Cravath, Swaine & Moore, LLP, New York, December 4, 2104.

"Intellectual Property Exchange", Dallas Chapter Meeting of the Licensing Executives Society (USA & Canada), Inc., Dallas, January 22, 2015.

"Actavis, Valuation, and Fairness Opinions", 2015 Generic Pharmaceutical Association Annual Meeting, Miami, February 9-11, 2015.

Patent Damages Roundtable, USC Gould School of Law 2015 Intellectual Property Institute, Los Angeles, March 23, 2015.

"Intellectual Property Impact on M&A", Transaction Advisors Midwest Symposium, Chicago, September 17, 2015

"The Changing Landscape of Patent Value and Patent Risks", 2016 Berkeley Law / Cleary Gottlieb M&A-IP-Antitrust Conference, Berkeley Center for Law, Business and the Economy, San Francisco, January 29, 2016.

"Damages Experts on Evidence and Gatekeeping", The University of Texas School of Law Conference on Patent Damages, Austin, Texas, June 9-10, 2016.



"Investing In Innovation: Global Trends In Innovation and Sustainability", CFA Society of Chicago, Chicago, September 28, 2016.

IP Remedies Roundtable and Workshop, USC Gould School of Law 2017 Intellectual Property Institute, Los Angeles, March 20, 2017.

"Economic Tools Used for Damages Estimation", Panel Discussion, Intellectual Property Owners Association, Chicago, June 7, 2017.

"Quantitative Approaches to Determining FRAND Royalties", Intellectual Property Owners Association Annual Meeting, San Francisco, September 18, 2017.

"The Intersection of Intellectual Property, Blockchain and Cryptocurrency", Licensing Executives Society International Annual Conference, San Diego, April 30, 2018 – May 1, 2018.

"Best Practices and Useful Tools for Assessing the Value of Your Company's IP", American Intellectual Property Law Association 2018 Spring Meeting, May 15 - 17, 2018.

"Practical Blockchain", IDEA Week Innovation Festival, South Bend, Indiana, April 8, 2019.

"Blockchain Primer," Introductory Remarks by Hon. Kara F. Stoll, The Giles S. Rich American Inn of Court, Washington D.C., February 11, 2020.

*Managing Your Intellectual Property*, LESI Business Briefings, Series Co-author, May 2020.

"IP Transaction Ecosystem: An Update on Market Activity", LES USA & Canada, Inc., Greater Washington D.C. Chapter, September 9, 2021.

"Judicial Perspectives on Using Damages Specialty Experts", Intellectual Property Law Association of Chicago, Litigation Committee, September 15, 2021

"Global Patent Issues", Plenary Panel, University of Illinois Chicago 65th Annual IP Law Conference, UIC School of Law, Chicago, November 4, 2021.

| | |
|---|---|
| **INTERNATIONAL SPEECHES AND PUBLICATIONS** | "Taxation Issues when Licensing with the U.S.", Licensing Executives Society International, South Africa Conference, January 28, 1996. |
| | "Intellectual Property Damages: Advanced Case Studies", Licensing Executives Society Annual Meeting, Puerto Rico, September 30, 1996. |
| | "License Agreement Royalty Audits: Untapped Riches Or Fool's Gold?", Licensing Executives Society Annual Meeting, Puerto Rico, October 1, 1996 |



"Valuation of IPR", Conference on Appeals Related to Intellectual Property, Bucharest, Romania, November 20, 1997.

"Avaliacao e Contabilizacao de Propriedade Intellectual – Metodologia e Aspectos Fiscais", XIX Seminario Nacional de Propriedade Intellectual, Rio de Janeiro, Brazil, August 16, 1999.

"Avaliacao e Contabilizacao de Propriedade Intelectual", Conferencia pela Consulate General of the United States of America, Sao Paolo, Brazil, August 18, 1999.

"Avaliacao e Contabilizacao de Propriedade Intelectual", Conferencia pela Consulate General of the United States of America, Curitiba, Brazil, August 20, 1999.

"IP Valuation Trends", Licensing Add-on Seminar, LESI Annual Conference, Krasnapolsky, Amsterdam, Netherlands, May 21, 2000.

"Intellectual Property from a Board Room Window", Plenary Session II LESI Strategies, LESI Annual Conference, Krasnapolsky, Amsterdam, Netherlands, May 23, 2000.

"Due Diligence in an Intellectual Capital Focused Investment", LES Annual Conference Add-on Session, Toronto, September 14, 2000.

"What's New in Intellectual Property Asset Management", Panel Discussion, 8th Annual Intellectual Property Law Institute, State Bar of Georgia,  Puerto Vallarta Mexico,  November 15, 2002.

"Les brevets en tant qu'actifs economiques: comment les exploiter au mieux" and "Brevets et financement: couvrir les couts, trouver des investisseurs", Un System Du Brevet Competitif Pour L'Europe,  sponsored by the European Patent Office, Brussels, May 3-4, 2006.

"What is Patent Quality?", Co-author with Jonathan A. Barney, Paper Presented to the Colloquium on a Comprehensive Approach to Patent Quality, Federation Internationale Des Conseils En propriete Industrielle, Amsterdam, June 8-9, 2007.

"Fostering Innovation with Seed Money and Venture Capital", Licensing Executives Society International Annual Conference, Zurich, June 19, 2007.

"Legal Problems Arising from Auctioning of IPR", Bi-Annual International Forum, Association Internationale Pour La Protection De La Propriete Intellectuelle, October 6, 2007.

"IP Auctions", Plenary Address, The Licensing Executives Society Annual Meeting, October 16, 2007, Vancouver, Canada.

"IP Valuation for IPO's", Warsaw Stock Exchange Executive Conference, June 27, 2008, Warsaw, Poland.



"IP As A Business Tool", Licensing Executives Society International Conference, January 29-30, 2009, New Delhi, India.

"Global IP Market Development", Keynote Address, The Licensing Executives Society Australia and New Zealand, April 2-4, 2009, Camberra, Australia.

"Global IP Market Development", The Licensing Executives Society Philippines, June 8, 2009, Manila, Philippines.
Entwicklung einer Infrastruktur im Blickpunkt, Der Intellectual Property Exchange, *IP Manager: Journal for the Knowledge Economy*, 01/2009.

"Global IP Market View", Division des Analyses Economiques et des Statistiques, Organization de Cooperation et de Developpement Economiques, January 8, 2010, Paris, France.

"Global IP Market View", BusinessEurope Patents Working Group Meeting, The Confederation of European Business a.l.a.b.l., January 28, 2010, Brussels, Belgium.

"Global IP Market View", Inaugural Annual Conference, LES Turkey, January 29, 2010, Istanbul, Turkey.

"Commercialization Strategies for Industrial Property Assets", LES Brazil Annual Congress, January 28, 2011, Rio de Janeiro, Brazil.

"Developing Commercial IP Markets", LES Arab Countries and Abu Dhabi Higher Colleges of Technology Seminar, October 12, 2011, Abu Dhabi, UAE.

"Asian IP Market Development", LES Asia Pacific Meeting, LES Singapore, November 9-10, 2011, Singapore.

"Patent Auctions & Technology in an Emerging Global Economy", LES Philippines, November 16, 2011, Manila.

"Tech Transfer for Humanitarian Purpose", LESI Annual Conference, April 2, 2012, Auckland.

Moderator, "New Challenges in ICT: How to Compete Using IP Assets", LES Pan European Meeting, Rome, June 12, 2012.

Workshop Panelist, "Accelerate Licensing & Avoid Litigation: Effective Use of Transparency, Investors & Risk Management Tools", LES Pan European Meeting, Rome, June 12, 2012.

Keynote Speech, "Research Trends Around the Globe on Licensing", LES Asia Pacific Regional Conference, Tokyo, Japan, September 3, 2012.

"Investing in IP and Developing IP Monetization and Risk Markets: U.S. Perspective", LES Scandinavia Annual Meeting, Helsinki, Finland, September 12, 2012.



"El Mercado Global De Tecnologia", LESI Innovation Tour, LES Mexico and Asociacion Mexicana de Directivos de la Investigation Aplicada y el Desarrollo Tecnologico, A.C., Mexico City, Mexico, September 21, 2012.

Research Handbook on Intellectual Property Licensing, Forward, Jacques de Werra, University of Geneva, Editor, Edward Elgar Publishing, 2012.

"Markets for Humanitarian Technology Transfer" and "Adoption by Resolution of LESI IP Business Principles", LESI Global Technology Impact Forum, Geneva, Switzerland, January 22, 2013.

Forward, Research Handbook on Intellectual Property Licensing, Edited by Jacques de Werra, Edward Elgar Publishing Limited, 2013.

"IP Market Development" / "Simplicity in Global IP Valuation", LESI Annual Conference, Rio de Janeiro, Brazil, April 10, 2013.

"Collaboration for IP Based Accounting and Reporting", LESI Global Technology Impact Forum, Geneva, Switzerland, January 20-21, 2014.

"IP Licensing and Intermediaries", LES Asia-Pacific Regional Conference, Seoul, Korea, November 4-6, 2014.

"Building IP Transaction Platforms", Keynote Presentation, 14th Annual Shanghai International Intellectual Property Forum, Hosted by the World Intellectual Property Organization, (Shenzhen, China, December 7, 2017 as an advance local presentation) Shanghai, China, December 13, 2017.

"Building and Enforcing a Global Portfolio for Protection and Monetization", Moderator, 2018 LES IP100 Executive Forum, Phoenix, Arizona, February 15-16, 2018.

"Valuation of IP In the Eye of the Beholder" and "IP Monetization Lifecycle", Moderator, Inaugural IP Conference on Issues that Make a Difference, University of Arizona Law, Tucson, Arizona, March 5-6, 2018.

Best Practices and Useful Tools For Assessing the Value of IP, Co-authored with Mick Baciu and Drew Sills, American Intellectual Property Law Association 2018 Spring Meeting, Seattle, Washington, May 15-17, 2018.

"Toward Early Dispute Resolution of Standard Essential Patents in the 5G Era", International Arbitration Center Tokyo, Mock Arbitration, Tokyo, Japan, June 29, 2018.

"Practical Blockchain", LESI Annual Conference, Yokohama, Japan, May 28, 2019.

"Managing Your Intellectual Property", LESI Business Briefing Report, published by the Licensing Executives Society International, Inc., Copyright 2020.



"Managing Your Intellectual Property", Rigorous Empirical Research on Intellectual Property, virtual presentation by 4iP Council and the Licensing Executives Society International, September 29, 2020.

"A Global Economic Framework for Intellectual Based Commerce", World IP Forum, India, April 30, 2021.

"Growth Financing", European Patent Office High-Tech Business Forum, European Patent Academy, October 28, 2021.

| | |
|---|---|
| **TELEVISION, RADIO AND EDITORIAL** | Bloomberg Morning Call with Brian Sullivan, "Patent Auctions", March 3, 2006. |

CNBC Closing Bell, "Patents for Purchase", Interview with Maria Bartilomo, April 4, 2006.

CNBC On the Money, "Patents for Sale", Interview and Report by Scott Wapner, April 7, 2006.

Bloomberg Morning Call with Brian Sullivan, "Ocean Tomo 300 Index" and "Fall Intellectual Property Auction", September 13, 2006.

CBS WBBM-AM News Radio with Andy Giersher, Noon Business Hour, "New Stock Market Index", December 2, 2006 plus repeats.

Bloomberg Evening *Market Pulse* with Pimm Fox, "Stock Selections with Strong Patents", January 9, 2007.

Judge, *Everyday Edisons: Ordinary People, Extraordinary Ideas*, a Public Broadcasting System documentary series, 2nd Season, to be aired 2008.

Bloomberg Final Word with Brian Sullivan, "Changes in IP Laws Affect Stock Price", March 10, 2008.

FOX Business National, "Investing in Patents", June 5, 2008.

"It's the auto technology, Congress", *The Detroit News*, detnews.com, December 2, 2008.

FOX Business National, "Capturing Value from IP During a Recession", January 12, 2009.

FOX Business National, "The Value of Technology and Patents in a Chrysler Bankruptcy", May 1, 2009.

FOX Business National, "Exchange Looks to Value Patents", October 5, 2009.

TV Tokyo, "IP Markets, October 4, 2010.

FOX Business National, "Patent Litigation Trends", October 4, 2010.



CNBC Street Signs, "Patent-Palooza", July 26, 2011.

CNBC Street Signs, "Patent Battleground", August 15, 2011.

CNBC Street Signs, "IPXI: Trading Patents in 2012", December 14, 2011.

CEO IntroNet, May 16, 2012.

CNBC Street Signs, "Research In Motion's Patent Portfolio, May 30, 2012.

Crain's Chicago Business, Chicago Business Video, "Preview of the Eureka Index", April 25, 2013.

CNBC Street Signs, "Valuing Intangible Assets", August 5, 2013.

Chicago Tribune Blue Sky Innovation, "Why Robots Roam the Halls…", July 16, 2014.

CNBC Worldwide Exchange, "The Big Battle Over Intellectual Property:  U.S. – China Trade Tariffs and IP", March 26, 2018.

---

**EXPERT TESTIMONY**

01 Communique Laboratory, Inc. v. Citrix Systems, Inc. & Citrix Online, LLC
Civil Action 1:06-CV-0253 (N.D. Ohio)
United States District Court for the Northern District of Ohio
Deposition Testimony

Abiomed Inc. v. Maquet Cardiovascular LLC
No. 1:16-cv-10914-FDS
United States District Court for the District of Massachusetts
Deposition Testimony

ABS Global, Inc. v. Inguran, LLC d/b/a Sexing Technologies and XY, LLC v. Genus, PLC
Civil Action: 14-cv503-wmc
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Acadia Research Group, LLC and Lifeport Sciences, LLC v. Boston Scientific Corporation
AAA File No. 02-15-0004-9460
American Arbitration Association
Hearing and Deposition Testimony

Acantha LLC v. DePuy Synthese Sales, Inc., DePuy Synthes Products, Inc., DePuy Synthes, Inc., Johnson & Johnson, Inc. Synthes, Inc. Synthes USA, LLC, DePuy Orthopaedics, Inc. and DePuy Spine, LLC
Case No. 1:15-cv-01257-WCG
United States District Court for the Eastern District of Wisconsin Green Bay Division



Trial and Deposition Testimony

Acorda Therapeutics, Inc. v. Alkermes PLC
Case No. 01-20-0010-8421
American Arbitration Association
Hearing and Deposition Testimony

Advanced Aerospace Technologies, Inc. v. The United States of America and
The Boeing Company and Institu, Inc.
Case No. 12-85C
United States Court of Federal Claims
Deposition Testimony

Advanced Micro Devices, Inc. and ATI Technologies, ULC v. Samsung
Electronics Co. Ltd. et al.
No. CV-08-0986-SI
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

Advanced Technology Materials, Inc. v. Praxair, Inc.,
Civil Action No.03 CV 5161 (RO)
United States District Court for the Southern District of New York
Deposition Testimony

A.I.T. Industries, Inc., f/k/a Photocentron, Inc. v. Yordan Vurich and Opti-Vue, Inc.
Civil Action No.94-C-5196
Deposition Testimony

Allan Stimmel v. Eugene Weiner, Kurt Gutfreund and M & L International, Inc.
Civil Action No. 89 C 6510 (ACW)
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Allscripts Healthcare, LLC v. DR / Decision Resources, LLC
Case No. 1:19-cv-11038
United States District Court for the District of Massachusetts
Trial and Deposition Testimony

Altana Pharma AG and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva
Pharmaceuticals Industries Ltd., et. al.
Civil Action No. 04-2355
United States District Court for the District of New Jersey
Deposition Testimony

Altria Client Services LLC and U.S. Smokeless Tobacco Company LLC v. R.J.
Reynolds Vapor Company and Modoral Brands, Inc.
Civil Action No. 1:20-cv-00472
Trial and Deposition Testimony



Analog Devices, Inc. v. Christopher Michalski, Kiran Karnik and Maxim
Integrated Products, Inc.
Case 01 CVS 10614
State of North Carolina Superior Court Division, County of Guilford
Deposition Testimony

Andrx Pharmaceuticals, LLC v. GlaxoSmithKline, PLC and SmithKline
Beecham Corporation
Case No. 05-23264-CIV-Graham/O'Sullivan
United States District Court for the Southern District of Florida
Deposition Testimony

Appian Corporation v. Pegasystems Inc. and Youyong Zou
Case No 2020 07216
Virginia: In the Circuit Court of the Fairfax County
Trial and Deposition Testimony

Appliance Computing III, Inc. Redfin Corporation
Case No. 6:20-cv-00376-ADA
United States District Court for the Western District of Texas
Trial and Deposition Testimony

Applied Medical Resources Corporation v. Gaya Limited
AAA Case No. 50 133T00316 06
Arbitration Testimony

Arendi S.A.R.L. v. Apple Inc.
Case No. 1:12-cv-01596
United States District Court for the District of Delaware
Deposition Testimony

Arthur Takeall v. PepsiCo, Inc.
Civil Action S92-766
United States District Court for the District of Maryland
Deposition Testimony

Ashley Furniture Industries v. Laura Ashley Holdings Plc and Laura Ashley, Inc.
AAA File No. 51 133 Y 01056 08
American Arbitration Association
Arbitration and Deposition Testimony

Atlantic Richfield Company, Chevron U.S.A., Inc., Exxon Corporation, Mobil
Oil Corporation, Shell Oil Products Company and Texaco Refining &
Marketing, Inc. v. Unocal Corporation and Union Oil Company of California
and  Union Oil Company of California v. Atlantic Richfield Company, Chevron
U.S.A., Inc., Exxon Corporation, Mobil Oil Corporation, Shell Oil Products
Company and Texaco Refining & Marketing, Inc.
Civil Action No. CV-95-2379 KMW(JRx)
Trial and Deposition Testimony

Avery Dennison Corp. et al v. FLEXcon Company, Inc.
Civil Action No. 96-C 4820



United States District Court for the Northern District of Illinois, Eastern Division
Deposition Testimony

Aylus Networks, Inc. vs. Apple, Inc.
Case No. 3:13-cv-4700
United States District Court for the Northern District of California
Deposition Testimony

Bath & Body Works Brand Management, Inc. v. Summit Entertainment, LLC
Case No. 11 Civ 1594 (GBD)
United States District Court for the Southern District of New York
Deposition Testimony

Baxalta Inc. and Baxalta, GMbH v. Genentech, Inc.
C.A. No. 17-cv-00509-TBD
United States District Court for the District of Delaware
Deposition Testimony

Baxter International Inc. and Baxter Healthcare Corp. v. CyDex Pharmaceuticals, Inc.
AAA Case No. 01-21-0002-6106
American Arbitration Association
Deposition Testimony

Bayer Pharma AG, Bayer Intellectual Property GMBH and Bayer Healthcare Pharmaceuticals, Inc. v. Watson Laboratories, Inc.
Civil Action No 12-517-GMS
United States District Court for the District of Delaware
Trial and Deposition Testimony

Beloit Corp v. Voith, Inc. & J.M. Voith GmbH
Civil Action No. 92 C 0168 C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Bio-Rad Laboratories, Inc. and the President and Fellows of Harvard College v. 10x Genomics, Inc.
Case No. 1:19-cv-12533
United States District Court for the District of Massachusetts
Deposition Testimony

Bio-Rad Laboratories, Inc., the University of Chicago, Lawrence Livermore National Security, LLC and Fellows of Harvard College v. Stilla Technologies, Inc and Stilla Technologies
Case No. 1:19-cv-11587
United States District Court for the District of Massachusetts
Deposition Testimony

Bio-Rad Laboratories, Inc. and the University of Chicago v. 10x Genomics, Inc.
Case No. 15-152-RGA
United States District Court for the District of Delaware



Trial and Deposition Testimony

Board of Trustees of the Leland Stanford Junior University and Litton Systems, Inc. v. Tyco International LTD., Tyco International, Inc., Tyco Telecommunications, Inc, Tyco Networks, Inc., Lucent Technologies, Inc., Agere Systems, Inc., JDS Uniphase Corporation, Ciena Corporation, Pirelli S.p.A., Ericsson, Inc., Telefonaktiebolaget Lm Ericsson and Ericsson Microelectronics Ab, Optoelectronic Products.
Case No. Cv-00-10584-TJH (RCx)
United States District Court for the Central District of California – Western California
Deposition Testimony

Bracco Diagnostics, Inc. v. Amersham Health Inc., Amersham Health AS, Amersham plc and Amersham Health Inc. v. Bracco Diagnostics, Inc.
Civil Action No. 03-6025
United States District Court for the District of New Jersey
Trial and Deposition Testimony

Brian D. Zdeb, et al v. Baxter International, Inc.
Civil Action No. 91-L-8726
Appellate Court of Illinois, First District, Sixth Division
Trial and Deposition Testimony

Briggs & Stratton Corporation v. Kohler Company
Case No. 05-C-0025-C
United States District Court for the Western District of Wisconsin
Deposition Testimony

Bristol-Myers Squibb Company v. Apotex Inc. and Apotex Corp.
Civil Action No. 3:10-cv-05810 (MLC)
United States District Court for District of New Jersey
Deposition Testimony

Brocade Communications Systems, Inc. and Foundry Networks, LLC v. A10 Networks, Inc. et al.
Case No. 10-cv-03428 LHK
United States District Court for the Northern District of California San Jose Division
Trial and Deposition Testimony

Callpod, Inc. v. GN Netcom, Inc. et al.
Case No. 06-CV-4961
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

CareDx, Inc. v. Natera, Inc.
Case No. 1:19-cv-00662-CFC-CJB
United States District Court for the District of Delaware
Trial and Deposition Testimony

CareFusion 303 v. Sigma International



Case No 10cv0442 DMS (WMC)
United States District Court for the Northern District of California
Trial and Deposition Testimony

Carter Bryant v. Mattel, Inc. and Consolidated Actions
United States District Court for the Central District of California Southern Division
Case No. CV 04-9049-DOC (RNBx)
Consolidated with Nos. CV 04-9059 and CV 05-2727
Trial and Deposition Testimony

Catalina Marketing Corp. v. Advanced Promotion Technologies, Inc.
Civil Action No. CV 93-4741 WJR (Sx)
Deposition Testimony

Caterpillar Inc. v. International Truck & Engine Corp., Siemens Diesel Systems Technology, LLC, Sturman Industries, Inc., Sturman Engine Systems, LLC, Oded E. Sturman and Carol K. Sturman
United States District Court for the District of South Carolina, Columbia Division
Case No. 3:03-1739-17
Deposition Testimony

Catherine Alexander v. Take-Two Interactive Software, et al.
United States District Court for the Southern District of Illinois East St. Louis Division
Civil Action No. 3:18-cv-966-MJR-MAB
Trial Testimony

CEATS, Inc. v. Continental Airlines, Inc., AeroSvit Airlines, CJSC, Air China, Ltd., Air Europa Lineas Aereas, SAU, AirTran Airways, Inc., Alaska Airlines, Inc., Horizon Air Industries, Inc., All Nippon Airways Co., Ltd., Aerovias Del Contenente Americano SA, Brendan Airways, LLC, Caribbean Airlines, Ltd., Delta Air Lines, Inc., EgyptAir Airlines, Co., Frontier Airlines, Inc., JetBlue Airways Corporation, Malaysia Airline System Berhad, Qatar Airways Company QCSC, Alia Royal Jordanian, PLC, TAM, SA, Thai Airways International Public Co., Ltd., United Air Lines, Inc., US Airways, Inc., Virgin America, Inc.
Case No. 6:10-cv-120 LED
United States District Court for the Eastern District of Texas Tyler Division
Trial and Deposition Testimony

CEATS, Inc. v. Granada Theater, Live Nation Worldwide, Inc., Ticketmaster, LLC, Tickets.com, Inc., Ticket Software, LLC, Ticket Network, Inc., TicketsNow.com, Inc., TNow Entertainment Group, Inc., Concur Technologies, Inc.
Case No. 6:10-cv-120 LED
United States District Court for the Eastern District of Texas Tyler Division
Trial and Deposition Testimony

Centripetal Networks, Inc. v. Cisco Systems, Inc.
Case No. 2:18-CV-00094-HCM-LRL
United States District Court for the Eastern District of Virginia Norfolk Division



Trial and Deposition Testimony

Cheetah Omni, LLC v. Alcatel-Lucent USA Inc., et al. (on behalf of Tellabs North America, Inc.)
Case No. 6:11CV390
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

Ciba Specialty Chemicals Corporation v. Hercules Inc. and Cytec Industries, Inc.
Civil Action No. 04-293
United States District Court for the District of Delaware
Deposition Testimony

Cisco Systems, Inc. and Cisco Technology, Inc. v. Jedd Williams
In Arbitration before JAMS
Reference No. 1310025030
Deposition Testimony

Cisco Systems, Inc. and Cisco Technology, Inc. v. Plantronics, Inc., et al.
Case No. 4:19-CV-07562
United States District Court for the Northern District of California
Deposition Testimony

Comair Rotron, Inc. v. Matsushita Electric Corporation of America, et al. - New Jersey Action
Civil Action No. 85-4308 (HLS)
Trial and Deposition Testimony

Comet Technologies USA Inc. v. XP Power LLC
Case No. 5:20-CV-06408-NC
United States District Court for the Northern District of California
Trial and Deposition Testimony

Commonwealth Scientific and Industrial Research Organization v. Lenovo (United States) et al.
United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:09-cv-00399-LED
Deposition Testimony

Commonwealth Scientific and Industrial Research Organization v. Cisco Systems, Inc.
United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:11-cv-00343-LED
Trial and Deposition Testimony

Commonwealth Scientific and Industrial Research Organization v. MediaTek Inc., et al.
United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:12-cv-578-LED
Deposition Testimony



Computer Generated Solutions, Inc. v. Peter Loral, Loral Incorporated, PJK, Inc. and Belle Loral, LLC
Civil Action No. 97 Civ. 6298 (MBM)
Deposition Testimony

Construction Technology, Inc. v. Cybermation, Inc. et al.
Civil Action No. 91 Civ. 7474 (JSM)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Cordis Corporation v. SciMed Life Systems, Inc.
Case No. CV 4-96-261
United States Court for the District of Minnesota
Deposition Testimony

CoStar Realty Information, Inc. v. Civix-DDI, LLC and Civix-DDI, LLC v. LoopNet, Inc.
Case No. 1:12-cv-04968 (consolidated with 07091 and 08632)
United States District Court for the Northeastern District of Illinois Eastern Division
Deposition Testimony

C.R. Bard v. M3 Systems
Civil Action No. 93 C-4788
Trial Testimony

Crocs, Inc. v. Effervescent, Inc. et al.
Civil Action No. 06-cv-00605-PAB-KMT
United States District Court for the District of Colorado
Deposition Testimony

Cuker Interactive, LLC v. Pillsbury Winthrop Shaw Pittman LLP
AAA Case No. 01-18-0001-5005
American Arbitration Association
Arbitration Testimony

Curtis Amplatz and Carina Royalty, LLC v. AGA Medical Corporation
Court File No. 27-CV-10-27664
State of Minnesota District Court, County of Hennepin, Fourth Judicial District
Trial Testimony

DaiNippon Screen Mfg., Co. Ltd. *et al*. v. Scitex Corp. Ltd. *et al*.
Case No. C 96-3296 FMS
United States District Court for the Northern District of California
Arbitration and Deposition Testimony

Dalmatia Import Group, Inc. and Maia MaGee v. Foodmatch, Inc., Lancaster Fine Foods, Inc. et al.
Case No. 2:16-cv-02767-EGS
United States District Court for the Eastern District of Pennsylvania
Trial and Deposition Testimony



Dana-Farber Cancer Institute, Inc. v. Bristol-Myers Squibb, Co., E.R. Squibb &
Sons, LLC and Ono Pharmaceutical Co. Ltd.
Civil Action No. 1:19-cv-11380
United States District Court for the District of Massachusetts
Deposition Testimony

Digital-Vending Services International, Inc. v. The University of Phoenix, Inc.
Civil Action No. 2:09-cv-00555
United States District Court for the Eastern District of Virginia
Deposition Testimony

Design Solange, Ltd., Inc. v. Lane Bryant, Inc.
Civil Action No. 94 CIV 1299 (JFK)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Donald R. Cameron, et al. v. Apple Inc.
Civil Action No. 4:19-cv-03074-YGR
United States District Court for the Northern District of California
Deposition Testimony

DTS, Inc. and DTS Licensing Ltd. v. Nero AG and Nero Inc.
Case No. 2:14-cv-09791-RGK-PJW
United States District Court for the Central District of California
Deposition Testimony

Durel Corporation v. Osram Sylvania, Inc.
Civil Action No. 95-1750 PHx (EHC)
United States District Court for the District of Arizona
Trial and Deposition Testimony

Dynetix Design Solutions, Inc. v. Synopsys, Inc. and Does 1-50
Case No. 5:11-cv-05973-PSG
United States District Court for the Northern District of California
Deposition Testimony

Dyson, Inc. v. Bissell Homecare, Inc.
Case No. 10-cv-08126
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

Edward K. Isbey, Jr. v. Cooper Companies, Inc.
Civil Action No. 89-CVS-3776
Supreme Court of North Carolina
Deposition Testimony

Ellison v. The Chicago Heart Association
Civil Action No. 92-K-706
Deposition Testimony

Emblaze Ltd. v. Apple Inc.
Civil Action No. 45:11-cv-01079-SBA (PSG)



United States District Court for the Northern District of California San Jose
Division
Trial and Deposition Testimony

Energy Conversion Devices Liquidation Trust v. Ovonyx, Inc., Micron
Technology Inc. and Intel Corporation et al.
Case No. 12-43166-TJT
United States Bankruptcy Court, Eastern District of Michigan Southern Division
Deposition Testimony

Enterasys Networks, Inc. v. Extreme Networks, Inc.
Civil Action No. 07-C-0229-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Epic Games, Inc. v. Apple Inc.
Civil Action No. 4:20-cv-05640-YGR
United States District Court for the Northern District of California Oakland
Division
Trial and Deposition Testimony

Errant Gene Therapeutics, LLC v. Sloan Kettering Institute for Cancer Research
and Bluebird Bio Inc.
Index No. 150586/2017
Supreme Court of the State of New York
Trial and Deposition Testimony

Escada Beaute, et al. v. The Limited Inc. et al.
Civil Action No. 92-CIV-7530 (LLS)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Esquel Enterprises, Ltd., v. TAL Apparel Limited and TALTECH Limited
Civil Action No. C04-974Z
United States District Court for the Western District of Washington at Seattle
Deposition Testimony

EVEMeta, LLC v. Siemens Convergence Creators Corporation, Synacore, Inc.
Case No. 23139/MK
Supreme Court of New York for the County of New York
Deposition Testimony

Express, LLC v. Fetish Group, Inc.
Civil Action No. CV05-2931 SWV (JTLx)
United States District Court for the Central District of California Western
Division
Deposition Testimony

Extreme Networks, Inc. v. Enterasys Networks, Inc.
Civil Action No. 07-C-0229-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony



Facebook, Inc. & Subsidiaries v. Commission of Internal Revenue
Docket No. 21959-16
U.S. Tax Court
Trial Testimony

Fairchild Semiconductor Corporation and System General Corporation v. Power Integrations, Inc.
Civil Action No. 12-00540
United States District Court for the District of Delaware
Trial and Deposition Testimony

Faye Fish Estate et al. v. Beech Aircraft et al.
Civil Action No. 631333
Deposition Testimony

FidoPharm, Inc. & Omnipharm, Ltd. v. Cheminova, Inc. A/S
AAA Case No. 50 503 T 00266 12
American Arbitration Association
Hearing Testimony

First Quality Tissue, LLC v. Irving Consumer Products Limited and Irving Consumer Products, Inc.
Case No. 1:19-cv-00428
United States District Court for the District of Delaware
Deposition Testimony

Footstar, Inc. et al v. Kmart Corporation
Chapter 11 Case No. 04-22350 (ASH)
United States Bankruptcy Court for the Southern District of New York
Deposition Testimony

Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.
Case No.: CV07-02-962
United States District Court for the Central District for the State of California
Deposition Testimony

Fractus, S.A. v. Samsung Electronics Co. Ltd.; et al (including LG Electronics, Inc. and related parties)
Civil Action No. 6:09cv203
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

Fujitsu Ltd. v. Tellabs, Inc. et al.
Case No. 1:09-cv-04530
United States District Court for the Northern District of Illinois Eastern Division
Trial and Deposition Testimony

FXOne, LLC & Rosario Ingargiola v. Seabury Financial Solutions, et. al
JAMS New York, New York
Arbitration Hearing Testimony



General Mills, Inc. and General Mills IP Holdings II, LLC v. Fage Dairy
Industry, S.A., Fage USA Dairy Industry, Inc. and Fage USA Holdings, Inc.
United States District Court for the Northern District of New York
Deposition Testimony

Georgia-Pacific Corp. v. United States Gypsum Co. and L&W Supply Co.
Civil Action No. 94-989-RRM
United States District Court for the District of Delaware
Trial Testimony

Gibson Guitar Corp. v. Heritage Guitar, Inc. and Lasar Music Corp.
Civil Action No. 3-90-0009
Deposition Testimony

Gilberto Arvelo v. American International Insurance
Civil Action No. 93-1287
United States District Court for the District of Puerto Rico
Deposition Testimony

The Gillette Company LLC v. Dollar Shave Club, Inc., Dorco Company Ltd.,
and Pace Shave, Inc.
Case No. 1:15-CV-01158 (LPS)
United States District Court for the District of Delaware
Deposition Testimony

Google LLC v. Anthony Levandowski and Lior Ron
JAMS Ref No. 1100086069
Hearing and Deposition Testimony

Google LLC v. Sonos, Inc.
United States District Court for Northern District of California
Civil Action No. 3:20-cv-06754
Deposition Testimony

Government Employees Insurance Company v. Google, Inc. and Overture
Services, Inc.
United States District Court, Eastern District of Virginia, Alexandria Division
Civil Action No: 1:04cv507
Deposition Testimony

Group One v. Hallmark
Civil Action No. 97-1224-CV-W-1
United States District Court for the Western District of Missouri, Western
Division
Deposition Testimony

GSI Technology, Inc. v. United Memories, Inc., Integrated Silicon Solution, Inc.
Case No. 13-CV-1081-PSG
United States District Court for the Northern District of California, San Jose
Division
Trial and Deposition Testimony



Guardant Health, Inc. v. Natera, Inc.
Case No. 3:21-CV-04062-EMC
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

hiQ Labs, Inc. v. LinkedIn Corporation
Civil Action No. 3:17-cv-03301
United States District Court for the Northern District of California
Deposition Testimony

Hitachi, Ltd. v. Samsung Display Devices Co., Ltd. and Samsung Display
Devices Co., Inc. and Samsung Electronics Co., Ltd. and Samsung Electronics
America Inc. and Office Depot
Civil Action No. 97-1988-A
United States District Court for the Eastern District of Virginia
Deposition Testimony

Hoechst Celanese Corporation v. Chase Plastic Services and Kevin P. Chase
Civil Action No. 94-75361
United States District Court
Trial and Deposition Testimony

Hoechst Celanese Corporation v. Nylon Engineering Resins, Inc.
Civil Action No. 94-346-CIV-FTM-24D
United States District Court for the Middle District of Florida
Trial Testimony

Huawei Technologies Co. Ltd. v. Verizon Communications, Inc. et al.
Civil Action No. 2:20-cv-00030
United States District Court for the Eastern District of Texas Marshall Division
Trial and Deposition Testimony

ICON Health & Fitness, Inc. v. Peloton Interactive, Inc.
Case No. 1:20-cv-01386-RGA
United States District Court for the District of Delaware
Deposition Testimony

iHance, Inc. v. Eloqua Limited and Eloqua Corporation
Case No. 2;11-CV-257-MSD-TEM
United States District Court for the Eastern District of Virginia Norfolk Division
Deposition Testimony

Illumina, Inc. et. al v. Ariosa Diagnostics, Inc.
Case No 3:14-cv-01921-SI
United States District Court for the Northern District of California
Trial and Deposition Testimony

Immunocept, LLC, Patrice Anne Lee, and James Reese Matson v. Fullbright &
Jaworski, LLP
Cause No. A 05 CA 334 SS
United States District Court of Texas, Austin Division



Deposition Testimony

Impact Engine, Inc. v. Google LLC
Case No. 3:19-cv-01301-CAB-DEB
United States District Court for the Southern District of California
Deposition Testimony

In Re Apple iPhone Antitrust Litigation
Civil Action No. 4:11-cv-06714-YGR
United States District Court for the Northern District of California
Deposition Testimony

In Re Gabapentin Patent Litigation
MDL Docket No. 1384 (FSH)
Master Civil Action No. 00-2931 (FSH)
On behalf of Defendants Teva Pharmaceutical Industries Ltd. and IVAX
Corporation and related parties
United States District Court for the District of New Jersey
Deposition Testimony

In Re Nortel Networks Inc. et al. and
In the Matter of the Companies' Creditors Arrangement Act
Case No. 09-10138 (KG) and R.S.C. 1985, c. C-36
United States Bankruptcy Court for the District of Delaware and the Ontario
Superior Court of Justice
Trial and Deposition Testimony

In the Matter of Arbitration Between Open Text, Inc., Claimant, and State
Employee's Credit Union, Respondent
JAMS Arbitration No. 1400015026
Arbitration Testimony

In the Matter of Certain Botulinum Toxin Products, Processes for
Manufacturing or Relating to Same and Certain Products Containing Same
Investigation No. 337-TA-1145
On behalf of Allergan plc, Allergan, Inc. and Medytox Inc.
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Computer Network Security Equipment and Systems,
Related Software, Components Thereof, and Products Containing Same
Investigation No. 337-TA-1314
On behalf of Respondent Centripetal Networks, Inc.
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Electronic Devices with Graphics Data Processing
Systems, Components Thereof, and Associated Software
Investigation No. 337-TA-813
On behalf of Respondent Apple Inc.
United States International Trade Commission
Deposition Testimony



In the Matter of Certain Pre-Filled Syringes for Intravitreal Injection and Components Thereof
Investigation No. 337-TA-1207
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Robotic Floor Cleaning Devices and Components Thereof
Investigation No. 337-TA-1252
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same (III)
Investigation No. 337-TA-630
On behalf of Respondents Acer, Nanya and Powerchip
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Short-Wavelength Light Emitting Diodes, Laser Diodes, and Products Containing Same
Investigation No. 337-TA-640
On behalf of Respondent Panasonic
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Wearable Activity Tracking Devices, Systems and Components Thereof
Investigation No. 337-TA-973
On Behalf of Complainant Fitbit, Inc.
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Wiper Blades
Investigation No. 337-TA-816
On behalf of Respondents
United States International Trade Commission
Hearing (written) and Deposition Testimony

Industrial Print Technologies, LLC v. O'Neil Data Systems, Inc. and Hewlett-Packard Company et. al
Case No. 3:15-cv-01100-M, 01101-M, 01103-M, 01104-M and 01106-M
United States District Court for the Northern District of Texas Dallas Division
Deposition Testimony

InLine Connection, Corp v. AOL Time Warner, Inc. and American Online, Inc
Civil Action 02-272
United States District Court for the District of Delaware
Deposition Testimony

InLine Connection, Corp v. Earthlink, Inc.



Civil Action 02-477
United States District Court for the District of Delaware
Deposition Testimony

Innovention Toys, LLC v. MGA Entertainment, Inc., Wal-Mart Stores, Inc. and
Toys 'R Us, Inc.
Civil Action No. 07-6510
United States District Court for the Eastern District of Louisiana
Trial and Deposition Testimony

Intel Corporation v. Future Link Systems, LLC
Civil Action No. 14-377(LPS)
United States District Court for the District of Delaware
Deposition Testimony

InterDigital Technology Corporation v. Motorola, Inc.
Civil Action No. 94-73
United States District Court for the District of Delaware
Trial and Deposition Testimony

International Business Machines Corporation v. Groupon, Inc.
C.A. No. 16-122-LPS-CJB
United States District Court for the District of Delaware
Trial and Deposition Testimony

Invensas Corporation v. Renesas Electronics Corporation and Renesas
Electronics America, Inc.
Case No. 11-cv-00448-GMS
United States District Court for the District of Delaware
Deposition Testimony

Invention Capital Partners v. Phoenix Technologies Ltd., Marlin Equity
Partners, et. al
Case No: 113CV242491
Superior Court of the State of California County of Santa Clara
Deposition Testimony

Isogon Corporation v. Amdahl Corporation
Civil Action No. 97 CIV 6219 (SAS)
United States District Court for the Southern District of New York
Deposition Testimony

J.M. Voith GmbH v. Beloit Corp.
Civil Action No. 93C-0902C
United States District Court for the Western District of Wisconsin
Trial Testimony

J.M. Voith GmbH v. Beloit Corp.
Civil Action No. 93C-0905C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony



Jaguar Land Rover Limited v. Bentley Motors Limited and Bentley Motors, Inc.
Case No. 2:18-cv-320-MSD-LRL
United States District Court for the Eastern District of Virginia, Norfolk
Division
Deposition Testimony

Jamdat Mobile, Inc. v. JAMSTER International Sarl, Ltd; JAMBA! GMBH; and
Verisign, Inc.
Civil Action No. CV05-3945 PA (FMOx)
Deposition Testimony

James Hayden v. 2K Games, Inc. and Take-Two Interactive Software, Inc.
Civil Action No. 1:17-cv-02636-CAB
United States District Court for the Northern District of Ohio Eastern Division
Deposition Testimony

Jenner & Block LLP v. Parallel Networks, LLC and EpicRealm Licensing LP
JAMS Arbitration No. 1310019934
Arbitration and Deposition Testimony

John W. Evans, et al. v. General Motors Corporation
Docket # X06-CV-94-0156090S
Superior Court of Connecticut Judicial District of Waterbury
Deposition Testimony

Joy Recovery Technology Corp. v. The Penn Central Corp. and Carol Cable
Company, Inc., aka General Cable Industries, Inc.
Civil Action No. 93 C 0992
Deposition Testimony

K-Tube Corp. v. Sterling Stainless Tube Corp. et al.
Case No. CV 90 1653 JLQ (M)
Trial and Deposition Testimony

Kay-Cee Enterprises, Inc. v. Amoco Oil Company
Civil Action No. 97-2406 (JWL)
United States District Court for the District of Kansas
Trial and Deposition Testimony

Kennecott Corporation v. Kyocera International
Civil Action No. 80-0516 R (M)
United States District Court for the Southern District of California
Deposition Testimony

Keurig, Inc. v. Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.
C.A. No. 07-17 (GMS)
United States District Court for the District of Delaware
Deposition Testimony

Kimberly-Clark Corporation v. Cardinal Health 200, LLC
Civil Action No. 1:10 CV-0034-CAP
United States District Court Northern District of Georgia, Atlanta Division



Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc. and Wake Forest University Health Services v. Bluesky Medical Group, Inc., Richard Weston, Medela AG, Medela, Inc., and Patient Care Systems, Inc.
Civil Action SA-03-CA-0832-RG
United States District Court Western District of Texas San Antonio Division
Trial and Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc. and Wake Forest University Health Services v. Bluesky Medical Group, Inc. and Smith & Nephew, Inc.
Case No. SA:08-CV-00102-WRF
United States District Court Western District of Texas San Antonio Division
Preliminary Injunction Hearing, Trial and Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc., KCI Medical Resources, Medical Holdings Limited, KCI Manufacturing and Wake Forest University Health Sciences v. Convatec, Inc., Boehringer Wound Systems, LLC and Boehringer Technologies, LP
Civil Action No. 1:08-CV-00918-WO-LPA
United States District Court for the Middle District of North Carolina
Deposition Testimony

Kruse Technology Partnership v. Caterpillar, Inc.
Case No. CV 04-10435
United States District Court for the Central District of California
Deposition Testimony

Kuryakan Holdings LLC v. Ciro, LLC et al
Civ. No. 3:15-CV-00703
United States District Court for the Western District of Wisconsin
Deposition Testimony

Leo Pharma A/S v. Tolmar, Inc. et al.
United States District Court for District of Delaware
C.A. No. 10-269 (SLR)
Deposition Testimony

Lincoln Electric Company, et al. v. National Standard, LLC
No. 1:09-cv-01886-DCN
United States District Court of Ohio Eastern Division
Deposition Testimony

LNP Engineering Plastics, Inc. and Kawasaki Chemical Holding Co., Inc. v. Miller Waste Mills, Inc. trading as RTP Company
Civil Action No. 96-462 (RRM)
United States District Court for the District of Delaware
Trial Testimony

Lotes Co. Ltd. v. Hon Hai Precision Industry Co. Ltd and Foxconn Electronics, Inc.
Civil Action No. 3:11-cv-01036-WHA



United States District Court for the Northern District of California San Francisco Division
Deposition Testimony

Lucent Technologies Inc. v. Extreme Networks, Inc.
Civil Action No. 03-508 (JJF)
United States District Court for the District of Delaware
Trial and Deposition Testimony

Lunar Corp. & The UAB Research Foundation v. EG&G Astrophysics Research Corp.
Civil Action No. 96-C-199-S
Trial Testimony

Match Group, LLC v. Bumble Trading Inc. et al.
Civil Action 6:18-cv-00080
United States District Court for the Western District of Texas Waco Division
Deposition Testimony

Matsushita Electric Industrial Co., Ltd. v. MediaTek, Inc., Oppo Digital., and Micro-Star International Computer Corp.
Case No. C05-03148 MMC
United States District Court for the Northern District of California San Francisco Division
Deposition Testimony

McKinley v. Zdeb
Civil Action No. 99-S-1178
United States District Court for the District of Colorado
Fact Deposition Testimony

Medgraph, Inc. v. Medtronic, Inc.
Case No. 6:09-cv-06610-DGL-MWP
United States District Court for the Western District of New York Rochester Division
Deposition Testimony

MedImpact Healthcare Systems, Inc. et al v. IQVIA, Inc. et al.
Case No. 3:19-cv-1865-GPC-DEB
United States District Court for the Southern District of California
Deposition Testimony

Medtronic Xomed, Inc. v. Gryus ENT LLC
Case No.: 3:04CV400-J-32 MCR
United States District Court for the Middle District of Florida Jacksonville Division
Deposition Testimony

MEI, Inc. v. JCM American Corp & Japan Cash Machine Co. Ltd.
Civil Action No. 09-00351
United States District Court for the District of New Jersey
Deposition Testimony



Meribear Productions, Inc. v. Showroom Interiors, Inc. et. al.
Case No. VC065653
Superior Court of the State of California, County of Los Angeles
Deposition Testimony

Message Phone, Inc. v. SVI Systems, Inc. and Tharaldson Properties
Civil Action No. 379CV-1813H
Trial Testimony

Mexichem Amanco Holdings, S.A. de C.V. v. The Chemours Company and The Chemours Company FC, LLC
Civil Action No. 4:20-cv-01960
Deposition Testimony

MGA Entertainment, Inc. and Isaac Larian v. Hartford Insurance Company of the Midwest, Harford Fire Insurance Company, The Hartford Financial Services Group and Does 1 through 10.
Case No. CV 08-0457 DOC (RNBx)
United States District Court for the Central District of California Southern Division
Deposition Testimony

Military Professional Services, Inc. v. BancOhio National Bank
Civil Action No. 91-5032
Deposition Testimony

Milwaukee Electric Tool Corporation, Metco Battery Technologies, LLC AC (Macao Commercial Offshore) Limited and Techtronic Industries Co. Ltd. v. Snap-On Incorporated
Case No. 2:14-cv-01296
United States District Court for the Eastern District of Wisconsin
Trial and Deposition Testimony

Minebea Co., Ltd., Precision Motors Deutsche Minebea GmbH, and Nippon Miniature Bearing Corp. v. George Papst, Papst Licensing GmbH, and Papst Licensing Verwaltungsgesellschaft MIT Beschrankter Haftung
Civil Action No. 97-CV-590 (PLF)
Trial and Deposition Testimony

Mitek Surgical Products, Inc. v. Arthrex, Inc.
Case No. 1:96CV 0087S
United States District Court for the District of Utah, Central Division
Deposition Testimony

Mitsubishi Electric Corp., Koninklijke Philips N.V., Thomson Licensing, GE Technology Development, Inc. Panasonic Corporation and Sony Corporation v. Sceptre, Inc.
Case No. 2:14-cv-04994-ODW-AJW
United States District Court for the Central District of California
Deposition Testimony



Money Suite Company v. Insurance Answer Center, LLC; Answer Financial, Inc.; AllState Insurance Company; Esurance Insurance Services, Inc.
United States District Court Central District of California Southern Division
Deposition Testimony

Motorola, Inc. v. InterDigital Technology Corporation
Civil Action No. 93-488
United States District Court for the District of Delaware
Trial and Deposition Testimony

Motorola Solutions, Inc. and Motorola Solutions Malaysia SDN, BHD v. Hytera Communications Corporation Ltd., Hytera America, Inc. and Hytera Communications America (West), Inc.
Civil Action No. 1:17-cv-1973
United States District Court for the Northern District of Illinois Eastern Division
Trial and Deposition Testimony

Motorsport Aftermarket Group, Inc. v. Thomas Ellsworth
AAA Case No. 01-15-0006-1319
American Arbitration Association
Hearing Testimony

Natera, Inc. v. ArcherDx, Inc., ArcherDx, LLC and Invitae Corp.
Civil Action No. 20-125-LPS
United States District Court for the District of Delaware
Deposition Testimony

Nellcor Puritan Bennett, LLC v. CAS Medical Systems, Inc.
Case No. 2:11-CV-15697
United States District Court for the Eastern District of Michigan Southern Division
Deposition Testimony

Netlist, Inc. v. Diablo Technologies, Inc.
Civil Action No. 4:13-CV-05962-YGR
United States District Court for the Central District of California Oakland Division
Trial Testimony

Nomadix, Inc. v. Hewlett-Packard Company, et al.
Civil Action No. CV09-08441 DDP(VBKx)
United States District Court for the Central District of California Western Division
Deposition Testimony

Nomix Corporation v. Quikrete Companies, Inc.
Civil Action No. H88-463-AHN
Trial and Deposition Testimony

Optical Air Data Systems, LLC v. L-3 Communications Corporation et al.
Civil Action No. N17C-05-619
Superior Court of the State of Delware



Trial and Deposition Testimony

Oracle America, Inc. v. Google, Inc.
Case No. 3:10-CV-03561-WHA
United States District Court for the Northern District of California San Francisco Division
Deposition Testimony

Orthofix, Inc., et al v. EBI Medical Systems, Inc., et al.
Civil Action No. 95-6035 (SMO)
United States District Court for the District of New Jersey
Trial and Deposition Testimony

PACT XPP Schweiz AG et al. v. Intel Corporation
Civil Action No. 19-cv-01006-JDW
United States District Court for the District of Delaware
Deposition Testimony

Pharmacia & Upjohn Company, LLC v. Sicor Inc. and Sicor Pharmaceuticals, Inc.
Civil Action No. 04-833 (KAJ)
United States District Court for the District of Delaware
Deposition Testimony

Picker International, Inc. v. Mayo Foundation, et al.
Case No. 95-CV-2028
United States District Court for the Northern District of Ohio, Eastern Division
Trial and Deposition Testimony

Penda Corporation v. United States of America and Cadillac Products, Inc.
Case No. 473-89-C
United States Court of Federal Claims
Trial and Deposition Testimony

Peter Daou and James Boyce v. Arianna Huffington, Kenneth Lerer and TheHuffingtonPost.com, Inc.
Index No. 651997/2010
Supreme Court of the State of New York, County of New York
Deposition Testimony

PlastiPak Packaging, Inc. v. Premium Waters Inc.
Case No. 3:20-cv-00098
United States District Court for the Western District of Wisconsin
Deposition Testimony

Plexxikon Inc. v. Novartis Pharmaceuticals Corporation
Case No. 4:17-cv-04405-HSG
United States District Court for the Northern District of California Oakland Division
Trial Deposition Testimony

Power Integrations, Inc. v. Fairchild Semiconductor International, Inc., Fairchild Semiconductor Corporation and System General Corporation



Case No. 3:09-cv-05235-MMC
United States District Court for the Northern District of California
Trial and Deposition Testimony

Powertech Technology, Inc. v. Tessera, Inc.
Case No. CV10-00945EMC
United States District Court for the Northern District of California
Deposition Testimony

Praxair, Inc. and Praxair Technology, Inc. v. ATMI, Inc. and Advanced
Technology Materials, Inc.
Civil Action No. 03-1158-SLR
United States District Court District of Delaware
Deposition Testimony

Prism Technologies, LLC v. AT&T Mobility, LLC
Civil Action No. 8:12-cv-122-LES-TDT
United States District Court of Nebraska
Deposition Testimony

Prism Technologies, LLC v. T-Mobile USA, Inc.
Civil Action No. 8:12-cv-00124
United States District Court of Nebraska
Trial and Deposition Testimony

Prism Technologies, LLC v. Sprint Spectrum L.P. d/b/a/ Sprint PCS
Civil Action No. 8:12-cv-123-LES-TDT
United States District Court of Nebraska
Trial and Deposition Testimony

The Procter & Gamble Company v. Paragon Trade Brands, Inc.
Civil Action No. 94-16-LON
United States District Court for the District of Delaware
Trial and Deposition Testimony

Purecircle USA Inc. and Purecircle SDN BHD v. Sweegen, Inc. and Phyto Tech
Corp.
Case No. 8:18-CV-1679 JVS (JDE)
United States District Court for Central District of California Southern Division
Deposition Testimony

QR Spex, Inc. and Thomas G. Swab v. Motorola, Inc. and Frog Design, Inc.
Civil Action No 03-6284 JFW (FMOx)
United States District Court for the Central District of California
Deposition Testimony

Qualcomm, Inc. v. InterDigital Communications Corporation
Case No. 93-1091G (LSP)
Deposition Testimony

Quickie, LLC v. Medtronic, Inc.
Civil Action No. 02 CV 1157 (GEL)



United States District Court for the Southern District of New York
Deposition Testimony

Radware, LTD, and Radware, Inc. v. F5 Networks, Inc.
Civil Action No. 5:13-cv-02024 RMW
United States District Court for the Southern District of California San Jose
Division
Trial and Deposition Testimony

Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG et. Al
Case IPR2021-00816
United States Patent and Trademark Office Before the Patent Trial and Appeal
Board
Deposition Testimony and Written Declaration

Remcor v. Scotsman/Booth
Civil Action No. 93 C 1822
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Remcor v. Servend
Civil Action No. 93 C 1823
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Rensselaer Polytechnic Institute and Dynamic Advances, LLC v. Apple Inc.
Case No 1:13-cv-00633 (DNH/DEP)
United States District Court for the Northern District of New York
Deposition Testimony

Research Corporation Technologies, Inc. v. Hewlett-Packard Company
Civil Action No. CIV 95-490-TUC-JMR
United States District Court for the District of Arizona
Deposition Testimony

Robert E. Morley, Jr. and REM Holdings 3, LLC v. Square, Inc., Jack Dorsey
and James McKelvey, Jr.
No. 4:14-cv-00172-CDP
United States District Court for the Eastern District of Missouri
Deposition Testimony

Roche Diabetes Care, Inc. v. Insulet Corporation
Case No. 1:20-cv-00825
United States District Court for the District of Delaware
Deposition Testimony

Rommy Hunt Revson v. The Limited, Inc. et al.
Civil Action No. 90-3840 (MGC)
Deposition Testimony



Ronald A. Katz Technology Licensing, LP v. Ameren Corporation; Union Electric Company; Central Illinois Public Service Company; Cilcorp, Inc.; Central Illinois Light Company
Case No. 07-4955 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. AOL, LLC, CompuServe Interactive Services and Netscape Communications Corporation
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Cablevision Systems Corporation et. al.
Case No. 2:07-ML-01816 / 02314 RGK-FFM
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Charter Communications, Inc.; Charter Communications Holding Company, LLC; Charter Communications Operating, LLC; and Charter Communications Entertainment I, LLC
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. CIGNA Corporation, CIGNA Health Corporation, CIGNA HealthCare of Delaware, Inc., Tel-Drug of Pennsylvania, LLC and Tel-Drug, Inc.
CV 07-2192 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Comcast Corporation, Sirius-XM Radio, Inc., et al.
NO. 2:07-ML-01816-C RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. DHL Holdings (USA) Inc., DHL Express (USA), Inc., and Sky Courier, Inc.
Case No. 07-ml-01816-B RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Fifth Third Bankcorp, Fifth Third Bank, Fifth Third Bank (Central Ohio)
Case No. 07-4960 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony



Ronald A. Katz Technology Licensing, LP v. Time Warner Cable Inc., Time Warner NY Cable LLC and Time Warner Entertainment Company, L.P.
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. United States Cellular Corporation, TDS Telecommunications Corporation and TDS Metrocom, LLC
Case No.07-ML-01816-B-RGK (FFMX)
United States District Court for the Central District of California
Deposition Testimony

Rosetta Stone Ltd. v. Google Inc.
Civil Action No. 1:09 CV 736 GBL / JFA
United States District Court for the Eastern District of Virginia
Deposition Testimony

RWM Kinetic Enterprises, Inc. and Thomas J. Ring v. Kinetic Concepts, Inc. and KCI Therapeutic Services, Inc.
Case No. SA-96-CA-603-OG
United States District Court for the Western District of Texas San Antonio Division
Trial Testimony

Sanofi-Aventis U.S. LLC and Regeneron Pharmaceuticals, Inc. v. Genentech, Inc. and City of Hope
Case No. 2:15-CV-05685
United States District Court for the Central District of California Western Division
Deposition Testimony

Sanyo Electric Co., Ltd. v. Intel Corporation
Civil Action No. 2018-0723-MTZ
Court of Chancery of the State of Delaware
Deposition Testimony

Saxon Innovations, LLC v. Nokia Corp, et al. (including Samsung Electronics, Co. and related parties)
Civil Action No. 6:07-cv-490-LED-JDL
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

SecurityPoint Holdings, Inc. v. The United States
Case No. 1:11-cv-00268-EGB
In the United States Federal Court of Claims
Deposition and Trial Testimony

Semiconductor Energy Laboratory Co., Ltd. v. Samsung Electronics Co., Ltd., S-LCD Corporation, Samsung Electronics America, Inc. Samsung Telecommunications America, LLC
Civil Action No. 3:09-cv-00001
United States District Court for the Western District of Wisconsin



Deposition Testimony

Selex Galileo, Inc. v. Nomir Medical Technologies, Inc.
Case No. 01-17-0003-0930
American Arbitration Association
Hearing Testimony

Seven Networks, LLC v. Apple Inc.
Civil Action No. 2:19-cv-115-JRG
United States District Court for the Western District of Texas Marshall Division
Deposition Testimony

Shuffle Tech International, LLC and Aces Up Gaming, Inc. and Poydras-Talrick
Holdings, LLC v. Scientific Games Corporation and Bally Technologies, Inc.
(d/b/a SHFL Entertainment or Shuffle Master) and Bally Gaming, Inc.
Civil Action No. 1:15-cv-3702
United States District Court for the Northern District of Illinois Eastern Division
Trial and Deposition Testimony

Silicon Image, Inc. v. Analogix Semiconductor, Inc.
Case No. C 07-00635 JCS
United States District Court for the Northern District of California, San
Francisco Division
Deposition Testimony

Site Microsurgical Systems v. The Cooper Companies
Civil Action S92-766
Deposition Testimony

Slot Speaker Technologies, Inc. v. Apple Inc.
Case No. 4:13-cv-01161-HSG
United States District Court Northern District of California Oakland Division
Deposition Testimony

SmartPhone Technologies, LLC v. Research In Motion Corp. et. al (on behalf
LG Electronics, Inc. and LG Electronics USA, Inc.)
Civil Action No. 6:10cv74-LED
United States District Court Eastern District of Texas Tyler Division
Deposition Testimony

St. Clair Intellectual Property Consultants v. Fuji Photo Film Co., Ltd., Fuji
Photo Film U.S.A., Inc., Fujifilm America, Inc., et al.
Civil Action No. 03-241 JJF
United States District Court for the District of Delaware
Trial and Deposition Testimony

Steven E. Berkheimer v. Hewlett-Packard Company
Case No. 1:12-cv-09023
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

STMicroelectronics, Inc. v. SanDisk Corp.



C.A. No. 4:05CV44
United States District Court of Texas Sherman Division
Deposition Testimony

STMicroelectronics, Inc. v. SanDisk Corp.
C.A. No. 4:05CV45
United States District Court of Texas Sherman Division
Deposition Testimony

Sunoco Partners Marketing & Terminals L.P. v. U.S. Venture, Inc., U.S. Oil,
and Technics, Inc.
Civil Action No. 4:19-cv-01145
United States District Court for the Southern District of Texas Houston Division
Trial and Deposition Testimony

Sunoco Partners Marketing & Terminals L.P. v. U.S. Venture, Inc., U.S. Oil,
and Technics, Inc.
Civil Action No. 1:15-CV-8178
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

Synopsys, Inc. v. Ubiquiti Networks, Inc. et al.
Civil Action No. 3:17-cv-00561-WHO
United States District Court for the Northern District of California
Deposition Testimony

Takata Corp. v. Allied Signal, Inc. and Breed Technologies, Inc.
Civil Action CV-95-1750
Deposition Testimony

Technol Medical Products, Inc., et al v. Robert Busse & Co., Inc.
Civil Action No. 3:94-CV-2284-X
Deposition Testimony

Tekmira Pharmaceuticals Corporation and Protiva Pharmaceuticals, Inc. v.
Alnylam Pharmaceuticals, Inc. and AlCana Technologies, Inc.
Civil Action No. 11-1010-BLS2
Massachusetts Superior Court for Suffolk County
Deposition Testimony

Tessera, Inc. v. Advanced Micro Devices, Inc. et al.
Case No. 4:05-cv-04063-CW
United States District Court for Northern District of California Oakland Division
Deposition Testimony

Tessera, Inc. v. UTAC (Taiwan) Corporation
Case No.: 5:10-cv-04435-EJD
United States District Court for Northern District of California San Jose
Division
Deposition Testimony

Therma-Tru Corporation v. Caradon Peachtree, Inc.



Civil Action No. 95-CV-75534-DT
Deposition Testimony

Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation, v. ROSS Intelligence Inc.
Case No. 20-613-SB
United States District Court for the District of Delaware
Deposition Testimony

Toro Company v. MTD Products Inc., MTD Consumer Group Inc., and Cub Cadet LLC
Civil Action No 10-cv-007-JNE-TNL
United States District Court for the District of Minnesota
Deposition Testimony

Ultratec, Inc. and CapTel, Inc. v. Sorenson Communications, Inc. and CaptionCall, LLC
Case No.: 3:14-cv-66-BBC
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Unwired Planet, LLC v. Apple, Inc.
Case No. 3:13-cv-4134-VC
United States District Court for the Northern District of California San Francisco Division
Deposition Testimony

U.S.A. Dawgs, Inc. et al. v. Ronald Synder, et al.
Civil Action No. 16-cv-02004-PAB-KMT
United States District Court for the District of Colorado
Deposition Testimony

Valmet Paper Machinery, Inc. and Valmet-Charlotte, Inc. v. Beloit Corporation
Civil Action No. 93-C-587-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Verinata Health, Inc. and the Board of Trustees of the Leland Stanford Junior University v. Sequenom, Inc. and Sequenom Center for Molecular Medicine, LLC.
Case No. 3:12-cv-00865-SI
Deposition Testimony

Verinata Health, Inc. v. Ariosa Diagnostics, Inc.
Case No. 3:12-cv-055501-SI
United States District Court for the Northern District of California
Trial and Deposition Testimony

Viacom International Inc. v. MGA Entertainment, Inc.
Case No.: 2:15-cv-09621-R (Ex)
United States District Court for the Central District of California
Deposition Testimony



VimpelCom Ltd. v. Orascom TMT Investments S.a.r.l.
London Court of International Arbitration
Arbitration No: 153077
Hearing Testimony

Volterra Semiconductor Corporation v. Primarion, Inc., Infineon Technologies
AG and Infineon Technologies North America Corporation
Case No. C 08-05129 CRB
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

Wang Laboratories, Inc. v. America Online, Inc. and Netscape Communications
Corporation
Civil Action No. 97-1628-A
United States District Court for the Eastern District of Virginia
Deposition Testimony

Wang Laboratories, Inc. v. FileNet Corporation
Civil Action No. 94-12141-RCL
Deposition Testimony

Waukesha Cherry-Burrell v. Wrightech Corporation
Civil Action No. 96-CV-00384
Deposition Testimony

Waymo LLC v. Uber Technologies, Inc., Ottomotto LLC and Otto Trucking LLC
Case No. 3:17-cv-00939-WHA
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

Whirlpool Corporation v. Drinker Biddle & Reath LLP et. al.
Case No. 2015-L-007631
Circuit Court of Cook County, Illinois
Trial and Deposition Testimony

Xoma LLC v. MorphoSys AG
Case No. 01-21-4508
American Arbitration Association
Hearing Testimony

Zenith Electronics LLC, Panasonic Corporation, U.S., Philips Corporation, and
the Trustees of Columbia University in the City of New York v. Sceptre, Inc.
Case No. 9:13-CV-80567
United States District Court for the Central District of California
Deposition Testimony

Zenith Electronics LLC v. Vizio, Inc.; Westinghouse Digital Electronics LLC, et al.
No. 5:06CV246-DF
United States District Court for the Eastern District of Texas
Texarkana Division



Deposition Testimony

ZiiLabs Inc., Ltd. v. Samsung Electronics Co. Ltd (and related Samsung parties) and Apple Inc.
Case No. 2:14-cv-00203
United States District Court for the Eastern District of Texas Marshall Division
Deposition Testimony

In the Matter of Certain Robotic Floor Cleaning Devices and Components Thereof
Case No. 337-TA-1252
On behalf of the Respondents SharkNinja Operating LLC, SharkNinja Management LLC, SharkNinja Management Company, SharkNinja Sales Company, SharkNinja Hong Kong Co. Ltd., and EP Midco LLC
United States International Trade Commission
Deposition Testimony

---

**PATENTS**

Inventor, United States Patent No. 5,752,186, Access Free Wireless Telephony Fulfillment Service System, May 12, 1998.

Inventor, United States Patent No. 5,867,780, Access Free Wireless Telephony Fulfillment Service System, February 2, 1999.

Inventor, United States Patent No. 6,397,057, System and Method of Providing Advertising Information to a Subscriber Through a Wireless Device, May 28, 2002.

Inventor, United States Patent No. 6,411,803, System and Method of Providing Service Information to a Subscriber Through a Wireless Device, June 25, 2002.

Inventor, United States Patent No. 6,769,767, Eyewear with Exchangeable Temples Housing a Transceiver Forming Ad Hoc Networks with Other Devices, August 3, 2004.

Inventor, United States Patent No. 6,839,556, System and Method of Providing Information to a Subscriber through a Wireless Device, January 4, 2005.

Inventor, United States Patent No. 6,911,172, Method of Manufacturing Eyewear, June 28, 2005.

Inventor, United States Patent No. 6,929,365, Eyewear with Exchangeable Temples Housing Bluetooth Enable Apparatus, August 16, 2005.

Inventor, United States Patent No. 7,181,200, Method of Providing Information to a Telephony Subscriber, February 20, 2007.

Inventor, United States Patent No. 7,353,202, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, April 1, 2008.



Inventor, United States Patent No. 7,769,685, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, August 3, 2010.

Inventor, United States Patent No. 7,813,716, Method of Providing Information to a Telephony Subscriber, October 12, 2010.

Inventor, United States Patent No. 7,885,897, Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights, February 8, 2011.

Inventor, United States Patent No. 7,930,231, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, April 19, 2011.

Inventor, United States Patent No. 7,987,142, Intellectual Property Trading Exchange, July 26, 2011.

Inventor, United States Patent No. 8,041,341, System of Providing Information to a Telephony Subscriber, October 18, 2011.

Inventor, United States Patent No. 8,180,711, Intellectual Property Trading Exchange, May 15, 2012.

Inventor, United States Patent No. 8,255,932, System and Method for Managing Intellectual Property-Based Risks, January 15, 2013.

Inventor, United States Patent No. 8,515,851, Method and System for Generating an Index of Securities, August 20, 2013.

Inventor, United States Patent No. 8,554,687, Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights, October 8, 2013.

Inventor, United States Patent No. 8,694,419, Methods and Systems for Utilizing Intellectual Property Assets and Rights, April 8, 2014.

Inventor, United States Patent No. 8,787,878, System of Providing Information to a Telephony Subscriber, July 22, 2014.

Inventor, United States Patent No. 8,831,985, Financial Instrument Based on Content and Methods for Valuation, September 9, 2014.

Inventor, United States Patent No. 8,880,031, System of Providing Information to a Telephony Subscriber, November 4, 2014.

Inventor, United States Patent No. 9,058,628, Marketplace for Trading Intangible Asset Derivatives and a Method for Trading Intangible Asset Derivatives, June 16, 2015.

Inventor, United States Patent No. 9,244,292, Eyewear with Exchangeable Temples Housing A Radio Frequency, January 26, 2016.



---

**CONTACT**            James E. Malackowski
                       **Co-founder and Senior Managing Director**
                       Ocean Tomo, LLC, a part of J.S. Held
                       Miami, Florida

                       312-327-4410 Direct
                       jmalackowski@oceantomo.com

# Appendix 2

*Apple Inc., v. Masimo Corporation and Sound United, LLC*

**DOCUMENTS CONSIDERED**

Appendix 2.1

**Case Law**

35 U.S.C § 284

35 U.S.C § 289

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970).

**Declarations of Others**

Declaration Of Alan D. Ball In Support Of Plaintiff Apple Inc.'s Motion For An Expedited Trial, January 29, 2023.

Declaration Of Eric Jue In Support Of Apple Inc.'s Motion For An Expedited Trial, January 18, 2023.

Declaration Of Dr. Itamar Simonson, January 27, 2023.

Declaration Of Peter Russell-Clarke In Support Of Apple Inc.'s Motion For An Expedited Trial, January 12, 2023.

**Legal Filings**

Complaint, 1:22-CV-01377, October 20, 2022.

**Patents**

U.S. Patent No. D735,131

U.S. Patent No. D883,279

U.S. Patent No. D947,842

U.S. Patent No. D962,936

**Public Sources**

"16 Years of the Most Innovative Companies," Boston Consulting Group, https://www.bcg.com/publications/most-innovative-companies-historical-rankings.

"2022 Investor Day," Masimo, https://s24.q4cdn.com/336820108/files/doc_presentations/Masimo-2022-Investor-Day-121322.pdf.

"66 essential Apple Watch tips and features everyone should know," Wareable, https://www.wareable.com/apple/apple-watch-tips-and-tricks-iwatch-7383.

"A UX researcher's review of the Apple Watch" Medium UX Collective, https://uxdesign.cc/a-ux-researchers-review-of-the-apple-watch-54daeb4ee89d/.

"About Masimo," Masimo, https://www.masimo.com/company/masimo/about/.

"Activist Politan Capital Has 9% Stake in Masimo," Wall Street Journal, https://www.wsj.com/articles/activist-politan-capital-has-9-stake-in-masimo-11660600800.

Appel, Gil, et al., "The Short- and Long-term Impacts of Fashion Knockoffs on Original Items," Marketing Science Institute, 2013, https://msbfile03.usc.edu/digitalmeasures/gappel /intellcont/MSI_Report_13-1081-1.pdf.

"Apple discontinued last year's Apple Watch Series 4 after announcing its brand-new watch – here's how to decide between the Series 3 and Series 5, Business Insider, https://www.businessinsider.com/apple-watch-series-4-discontinued-series-5-vs-series-3-2019-9.

"Apple reveals Apple Watch Series 8 and the new Apple Watch SE," Apple, https://www.apple.com/newsroom/2022/09/apple-reveals-apple-watch-series-8-and-the-new-apple-watch-se/.

"Apple unveils Apple Watch Series 5," Apple, https://www.apple.com/newsroom/2019/09/apple-unveils-apple-watch-series-5/.

"Apple Unveils Apple Watch—Apple's Most Personal Device Ever," Apple, https://www.apple.com/newsroom/2014/09/09Apple-Unveils-Apple-Watch-Apples-Most-Personal-Device-Ever/.

"Apple Watch design: 'damn good' or 'bulky'?" CNBC, https://www.cnbc.com/2014/09/11/apple-watch-design-damn-good-or-bulky.html.

"Apple Watch Leads Customer Preferences in The USA," Counterpoint Research, https://www.counterpointresearch.com/apple-watch-leads-customer-preferences-usa/.

"Apple Watch Series 4: Beautifully redesigned with breakthrough communication, fitness and health capabilities," Apple, https://www.apple.com/newsroom/2018/09/redesigned-apple-watch-series-4-revolutionizes-communication-fitness-and-health/.

"Apple Watch Series 5 Search Results, Best Buy, https://www.bestbuy.com/site/searchpage.jsp?id=pcat17071&st=apple+watch+series+5.

"Apple Watch Series 6 delivers breakthrough wellness and fitness capabilities," Apple, https://www.apple.com/newsroom/2020/09/apple-watch-series-6-delivers-breakthrough-wellness-and-fitness-capabilities/.

"Apple Watch Series 7 orders start Friday, October 8, with availability beginning Friday, October 15," Apple, https://www.apple.com/newsroom/2021/10/apple-watch-series-7-orders-start-friday-october-8/.

"Apple Watch Series 8," Apple, https://www.apple.com/apple-watch-series-8/.

"Apple Watch," Amazon, https://www.amazon.com/stores/page/47259FD7-DAA2-4BD0-8CDF-BB87B8981EB6?ingress=2&visitId=314e8917-521a-4745-b02d-34de24ffb0b8&ref_=ast_bln.

"Apple Watch," Best Buy, https://www.bestbuy.com/site/wearable-technology/apple-watch-device-accessories/pcmcat748300489081.c?id=pcmcat748300489081.

"Are Apple Products really Worth It?" Medium, https://medium.com/geekculture/are-apple-products-really-worth-it-b0631dee8ae2.

"Company Evolution: About Masimo," Masimo, https://www.masimo.com/company/masimo/evolution/.

"First large scale Apple Watch customer satisfaction study," Medium, https://medium.com/wristly-thoughts/wristly-apple-watch-insider-s-report-12-35463dc919b2.

"Hedge Fund Sues Masimo Corp. In Del. Over Bylaw Changes," Law360, https://www.law360.com/articles/1542262/hedge-fund-sues-masimo-corp-in-del-over-bylaw-changes.

"HEOS," Denon, https://www.denon.com/en-us/category/heos.

"How activist Politan Capital may find an opportunity to trim costs, build value at Masimo," CNBC, https://www.cnbc.com/2022/08/20/how-activist-politan-capital-may-find-an-opportunity-to-trim-costs-build-value-at-masimo.html.

*Apple Inc., v. Masimo Corporation and Sound United, LLC*
**DOCUMENTS CONSIDERED**
Appendix 2.1

### Public Sources

"How Apple Is Organized for Innovation," Harvard Business Review, https://hbr.org/2020/11/how-apple-is-organized-for-innovation.

"How Apple Watch Used Distinctive Design to Dominated the Smartwatch Market," the brand gym, https://thebrandgym.com/apple-watch-brand-stretch/.

"How Apple's thoughtful, measured approach is building a revolution in health," TechCrunch, https://techcrunch.com/2022/06/13/apple-health-executive-interviews/.

"How Word of Mouth Advertising Made The Apple Watch A Star!," Mobile Mob, https://mobilemob.com.au/blogs/news/how-word-of-mouth-advertising-made-apple-watch-the-star-of-the-show.

"In-Depth: A Watch Guy's Thoughts on The Apple Watch After Seeing It in The Metal (Tons of Live Photos)," Hodinkee, https://www.hodinkee.com/articles/hodinkee-apple-watch-review.

"Introducing Apple Watch Ultra," Apple, https://www.apple.com/newsroom/2022/09/introducing-apple-watch-ultra/.

"Is Masimo 'Crazy Like A Fox' For Spending $1.03 Billion To Buy Sound United?," Investor's Business Daily, https://www.investors.com/news/technology/masimo-stock-is-its-sound-united-buyout-crazy/.

"Koffey's Politan takes 9% stake in Masimo, to push for change," Reuters, https://www.reuters.com/business/healthcare-pharmaceuticals/activist-investor-politan-capital-reports-84-stake-masimo-corp-2022-08-16/.

"Lessons from Apple on Why Aesthetic Innovation is Important," Innovation Management, https://innovationmanagement.se/2017/06/22/lessons-from-apple-on-why-aesthetic-innovation-is-important/.

"Market Share—a Key to Profitability," Harvard Business Review, 1975.

"MASI Stock: The Masimo-Sound United Deal That Has Investors Scratching Their Heads," InvestorPlace, https://investorplace.com/2022/02/masi-stock-the-masimo-sound-united-deal-that-has-investors-scratching-their-heads/.

Masimo 2021 Form 10-K.

"Masimo (MASI) Q2 2022 Earnings Call Transcript," The Motley Fool, https://www.fool.com/earnings/call-transcripts/2022/08/10/masimo-masi-q2-2022-earnings-call-transcript/.

"Masimo (MASI) Q4 2021 Earnings Call Transcript," The Motley Fool, https://www.fool.com/earnings/call-transcripts/2022/02/15/masimo-masi-q4-2021-earnings-call-transcript/.

"Masimo Acquisition of Sound United Spurs Ugly Activist Shareholder Lawsuit," Strata-Gee, https://www.strata-gee.com/masimo-acquisition-of-sound-united-spurs-ugly-activist-shareholder-lawsuit/.

"Masimo Appoints New Leader for Consumer Division," Masimo, https://investor.masimo.com/news/news-details/2022/Masimo-Appoints-New-Leader-for-Consumer-Division/default.aspx.

"Masimo Closes Acquisition of Sound United," Masimo, https://investor.masimo.com/news/news-details/2022/Masimo-Closes-Acquisition-of-Sound-United/default.aspx.

"Masimo completes acquisition of Sound United," Mass Device, https://www.massdevice.com/masimo-completes-acquisition-of-sound-united/.

"Masimo Corp, NASDAQ:MASI," Google Finance, https://www.google.com/finance/quote/MASI:NASDAQ?sa=X&ved=2ahUKEwiRr8jPmoH8AhXSl%20GoFHQWOCr8Q3ecFegQIJRAY.

"Masimo Corporation – Stock Chart," S&P Capital IQ, https://www.capitaliq.spglobal.com/web/client?auth=inherit#company/stock?id=4812814.

"Masimo Corporation (MASI) | Transcript(Analyst or Investor Day): Event on 12/13/2022" S&P Capital IQ, https://www.capitaliq.spglobal.com/apisv3/docviewer/documents?mid=197045029.

"Masimo LinkedIn page," LinkedIn, https://www.linkedin.com/feed/update/urn:li:activity:7020126785317048320/.

"Masimo Releases Smart Watch With Continuous Monitoring of Biometrics Such as Pulse, Heart Rate Variability," Sports Business Journal, https://www.sportsbusinessjournal.com/Daily/Issues/2022/08/31/Technology/masimo-smart-watch-masimo-w1-biometrics-pulse-hrv-oxygen.

"Masimo W1 smartwatch with accurate pulse oximeter receives Hydration Index feature," Notebookcheck, https://www.notebookcheck.net/Masimo-W1-smartwatch-with-accurate-pulse-oximeter-receives-Hydration-Index-feature.674864.0.html.

"Masimo W1™," Masimo, https://www.masimopersonalhealth.com/products/masimo-w1.

"Masimo will turn millions of home entertainment systems into health hubs," Mass Device, https://www.massdevice.com/masimo-millions-home-sound-systems-health-hubs/.

"Masimo, Sound United Parent, to Expand Denon's HEOS System," Strata-Gee, https://www.strata-gee.com/masimo-sound-united-parent-to-expand-denons-heos-system/.

"Masimo's first smartwatch packs a hydration index," Gadgets & Wearables, https://gadgetsandwearables.com/2022/12/08/masimo-w1-health-tracking-watch/.

"Masimo's W1: A Game Changer in Watch Industry," Orange Country Business Journal, https://www.ocbj.com/healthcare/masimos-w1-a-game-changer-in-watch-industry/ (emphasis added).

"Medical Pioneer Masimo Announces the Full Market Consumer Release of the Masimo W1™, the First Watch to Offer Accurate, Continuous Health Data," Masimo, https://investor.masimo.com/news/news-details/2022/Medical-Pioneer-Masimo-Announces-the-Full-Market-Consumer-Release-of-the-Masimo-W1-the-First-Watch-to-Offer-Accurate-Continuous-Health-Data/default.aspx.

"Most Innovative Companies 2022" Boston Consulting Group, https://web-assets.bcg.com/63/15/963298f5460f8b768403b24ac242/bcg-most-innovative-companies-2022-sep-2022-1.pdf.

"New Consumer Survey Highlights Shift in Mindset - Consumers Valuing Quality Over Price When Selecting Products," First Insight, https://www.firstinsight.com/press-releases/quality-more-important-than-price-study.

"Our Story," Hodinkee, https://www.hodinkee.com/pages/our-story.

"Quarterly smartwatch unit shipment share worldwide from 2018 to 2022, by vendor," Statista, https://www.statista.com/statistics/910862/worldwide-smartwatch-shipment-market-share.

"Sound United Enters into Agreement to Be Acquired by Masimo Corporation," Masimo, https://www.soundunited.com/news/sound-united-enters-into-agreement-to-be-acquired-by-masimo-corporation.

"Spotlight On: How a billion-dollar merger could ring in the era of hearables," FirstWord Healthtech, https://www.firstwordhealthtech.com/story/5510895.

"Steve Jobs' Advertising Strategy Is Why Apple Still Tops the Market," Observer, https://observer.com/2017/12/steve-jobs-advertising-strategy-is-why-apple-still-tops-the-market/.

"The Apple Watch design is already a classic – will it ever change?" The Next Web, https://eW/news/apple-watch-design-classic-future-analysis.

"The Apple Watch design is already a classic – will it ever change?" The Next Web, https://thenextweb.com/news/apple-watch-design-classic-future-analysis.

"The Economic Impact of Counterfeiting and Piracy: Executive Summary," Organisation for Economic Co-operation and Development, 2007, https://www.oecd.org/sti/38707619.pdf.

"The Founding of Apple Computers, Inc.," Library of Congress, https://guides.loc.gov/this-month-in-business-history/april/apple-computers-founded.

"To Wall Street's surprise, Masimo acquires Sound United for $1B+," BioWorld, https://www.bioworld.com/articles/516146-to-wall-streets-surprise-masimo-acquires-sound-united-for-1b?v=preview.

"Understanding Product Quality: What It Is and Why It Matters," Indeed, https://www.indeed.com/career-advice/career-development/product-quality ("[P]roduct quality earns customer loyalty [and] helps establish brand recognition").

"What do Apple, GM, and P&G share? Design." The Christian Science Monitor, https://www.csmonitor.com/Business/2011/0323/What-do-Apple-GM-and-P-G-share-Design.

"What makes Apple design so good," Medium, https://medium.com/macoclock/what-makes-apple-design-so-good-d430ef97c6d2.

*Apple Inc., v. Masimo Corporation and Sound United, LLC*
**DOCUMENTS CONSIDERED**
Appendix 2.1

**Public Sources**

"What the top innovators get right," Strategy+Business, a PWC publication, https://www.strategy-business.com/feature/What-the-Top-Innovators-Get-Right.

"Why Apple Products are so Expensive," Business Insider, https://www.businessinsider.com/why-apple-products-are-so-expensive-iphone-macbook-2019-11, video transcription.

"Why the Apple Design is So Successful," Cleverism, https://www.cleverism.com/why-apple-design-successful/.

# EXHIBIT P

```
1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -
     SECUREBUY, LLC,
4                                       :  CIVIL ACTION
                 Plaintiff,             :
5    v                                  :
                                        :
6    CARDINALCOMMERCE CORPORATION,      :
                                        :  NO. 13-1792-LPS
7                Defendant.             :
                               - - -

8
                          Wilmington, Delaware
9                        Friday, February 7, 2014
                           Telephone Conference
10
                               - - -
11
     BEFORE:         HONORABLE LEONARD P. STARK, U.S.D.C.J.
12
     APPEARANCES:                    - - -
13

14              SHAW KELLER, LLP
                BY:  KAREN E. KELLER, ESQ.
15
                    and
16
                ROTHWELL FIGG ERNST & MANBECK, P.C.
17              BY:  BRIAN A. TOLLEFSON, ESQ., and
                     JENNIFER B. MAISEL, ESQ.
18                   (Washington, District of Columbia)

19                      Counsel for SecureBuy, LLC

20
                PEPPER HAMILTON LLP
21              BY:  JAMES G. McMILLAN, III, ESQ.

22                  and

23

24
                               Brian P. Gaffigan
25                             Registered Merit Reporter
```

```
 1   APPEARANCES:  (Continued)

 2
                  GOODWIN PROCTER, LLP
 3                BY:  MARK J. ABATE, ESQ., and
                       MICHAEL S. DeVINCENZO, ESQ.
 4                     (New York, New York)

 5                     and

 6                GOODWIN PROCTER, LLP
                  BY:  JENNIFER A. ALBERT, ESQ.
 7                     (Washington, District of Columbia)

 8                     Counsel for CardinalCommerce Corporation

 9

10                           - oOo -

11                    P R O C E E D I N G S

12                (REPORTER'S NOTE:  Telephone conference was held

13   in chambers, beginning at 3:01 p.m.)

14                THE COURT:  Good afternoon, everybody.  This is

15   Judge Stark.  Who is there, please?

16                MR. McMILLAN:  Good afternoon, Judge Stark.

17   This is James McMillan from Pepper Hamilton for the

18   defendant CardinalCommerce Corporation.  This is our motion

19   so I guess I'll introduce my people first, if that is okay.

20                THE COURT:  You have already started.  Go ahead.

21                MR. McMILLAN:  I have on the line from my

22   co-counsel, Goodwin Procter in New York City, I have

23   Jennifer Albert, Mark Abate, and Michael DeVincenzo.  Also

24   on the line with us is Michael Keresman is the Chief

25   Executive Officer of CardinalCommerce.  With the Court's
```

1  permission, Mr. Abate will present the motion today.

2           THE COURT:  That's fine.  Good afternoon to all

3  of you.

4           MS. KELLER:  Good afternoon, Your Honor.  It's

5  Karen Keller of Shaw Keller on behalf of SecureBuy.  And on

6  the line today are Brian Tollefson and Jennifer Maisel of

7  the Rothwell Fig firm in Washington, D.C. and James Packer,

8  general counsel for SecureBuy.  And Brian Tollefson from

9  Rothwell Fig will be presenting the argument on behalf of

10  SecureBuy.

11           THE COURT:  That's fine.  Thank you.

12           I have my court reporter here with me.  For the

13  record, it is our case of SecureBuy LLC versus CardinalCommerce,

14  our Civil Action No. 13-792-LPS.  We're here today to discuss

15  the defendant's motion for a preliminary injunction based on

16  alleged infringement by the plaintiff of claim 1 of the '429

17  patent and also to discuss the alternative relief requested by

18  CardinalCommerce of an expedited trial.

19           I want to hear from the defendant first on both

20  of those matters and then we'll turn it over to the plaintiff.

21  So, Mr. Abate, the floor is yours.

22           MR. ABATE:  Thank you, Your Honor.  And thank

23  you for expediting briefing and hearing our motion and for

24  allowing us to appear before you today.

25           CardinalCommerce, Your Honor, is a leader and

1    innovator in the field of payment authentication processing

2    for Internet transaction, and it holds a number of patents

3    in that field including the three patents in this suit.

4         The patents generally relate to novel systems

5    for supporting processing of Internet transactions between

6    customers and merchants through the use of a centralized

7    authentication processing system, and Cardinal practices the

8    patents in suit and has spent 12 years developing the market

9    for its patented inventions.

10        In November, SecureBuy filed this declaratory

11   judgment action of invalidity and noninfringement for the

12   three patents in suit.  CardinalCommerce counterclaimed for

13   infringement.  And SecureBuy also filed petitions for

14   Covered Business Method review of the patents in suit in the

15   Patent Office.

16        We're here today because after SecureBuy filed

17   its declaratory judgment suit and after Cardinal had

18   answered and counterclaimed.  And after SecureBuy filed its

19   petitions for Covered Business Method review of the patents,

20   SecureBuy decided to attempt to circumvent the processes

21   that it initiated and take matters into its own hands by

22   giving away free of charge the infringing features of its

23   SecureBuy 2.0 product.

24        In that action, Your Honor, SecureBuy's giveaway

25   of its infringing product threatens to destroy the market

1    for the patented product, and that threat is what

2    precipitated Cardinal's motion for preliminary injunction.

3           Now, before addressing the four preliminary

4    injunction factors, I would like to address at a high level

5    the way we see the landscape of the dispute before the Court

6    today.

7           SecureBuy filed its Covered Business Method

8    petition, Your Honor, with an intent to obtain a stay of

9    this litigation.  They said that in their papers.  They have

10   admitted that.  And that would give SecureBuy a multiyear

11   runway to destroy the market for our patented invention.

12          Now, there is some dispute between the parties

13   as to how long that runway might be, Your Honor, but when

14   you include the process of the Patent Office, the appeal,

15   coming back to this Court and a subsequent appeal from this

16   Court's decision, it would be a number of years.

17              THE COURT:  Let me interrupt you then.

18              MR. ABATE:  But then --

19              THE COURT:  Mr. Abate, I have some questions for

20   you.

21              MR. ABATE:  Sure.

22              THE COURT:  So they suggest in one of their

23   letters that you have already essentially conceded that

24   if the CBM is granted, the case should be stayed.  Is that

25   correct?

1         MR. ABATE:  No such thing, Your Honor.  Our

2    letter doesn't say that, and we would never concede that,

3    and that is why we're asking for an expedited trial.  The

4    giveaway of the accused product has now changed the

5    landscape and absolutely makes stay inappropriate.

6         I should mention there is no stay motion pending

7    before the Court.  Under the statute, the stay has to be

8    made by motion, it can't be sua sponte; but we absolutely

9    would oppose a stay because of their conduct which is

10   leading to irreparable harm, their conduct of giving away

11   the infringing features of the patent.

12        So, Your Honor, then after setting this

13   litigation and the CBM in motion, that is when they launched

14   their giveaway of the patented features to disrupt the

15   market and to gain access to our customers.  And, Your

16   Honor, they did so with the intent that they would stay this

17   action, delaying resolution of our claims for many years

18   and knowing that the delay would allow the giveaway and the

19   infringing product time to take hold and destroy the market

20   for the patented invention.

21        I would suggest to you the filing of the CBM

22   review and the expressed intent to request stay of this

23   litigation is calculated to allow the giveaway of the

24   infringing product ample time to destroy the market and for

25   them to get in and steal our customers.

1          Now, when SecureBuy hatched this plan, Your Honor,

2     it failed to consider an important thing.  What it failed to

3     consider is the law does not allow this type of conduct during

4     ongoing litigation.  Preliminary injunctions are available to

5     preclude attempted circumvention of the District Court process.

6     Specifically, they preclude upsetting the status quo in a way

7     that would cause irreparable harm.

8          This next point, Your Honor, is very important.

9     Those goes to SecureBuy's conduct.  In their brief, they

10    talk about how their product has a number of features; and

11    we see that discussed in Mr. Wooten's declaration.  And I

12    know we have client representatives on the phone so I'm not

13    going to mention anything that is confidential but I might

14    just point to a few things in the public declaration.

15         This comes from paragraph 9 on page 3.  He

16    points out that the accused products have real-time passive

17    authentication.  That is one feature.

18         Another feature is client-controlled risk-based

19    fraud scoring that interacts with a proprietary patent

20    pending 3-D Secure decision engine, and it goes on.

21         A third feature is active authentication which

22    deploys within the merchant shopping cart and checkout

23    process without using popup windows or redirections.

24         A fourth feature is a patent-pending decision

25    engine that alerts the merchant when the issuing bank may

1    not accept liability under the terms of the card.

2              There is more, Your Honor.  There are actually

3    eight or nine features, some of which are patented, including

4    patented biometric e-signatures and others which are not, the

5    ones I mentioned and screen-scraping technology.

6              But the point is, Your Honor, there are a lot

7    of features in this accused product.  They could have given

8    away any one of those features if they wanted to make a

9    splash; and you know what?  They didn't.  They didn't.  The

10   feature they gave away was the patented feature -- the

11   feature that Cardinal had patented, that Cardinal built a

12   business on.  That's the only feature they choose to give

13   away.

14             So I would suggest to you, Your Honor, that the

15   giveaway was targeted directly at the patented product.  It

16   was targeted directly at the market for our patented product,

17   and it was targeted directly to destroy that market.

18             SecureBuy is willing to cannibalize our market,

19   the market that Cardinal created with its own technology,

20   that it dedicated 12 years of time to develop, destroy that

21   market for its own ends.

22             THE COURT:  All right.  Mr. Abate.

23             MR. ABATE:  I see this as a concerted --

24             THE COURT:  A couple more questions.

25             You have referenced the status quo.  Isn't the

1    status quo that the two of you are competitors, apparently

2    fierce competitors? And shouldn't I allow that to continue?

3            MR. ABATE: Your Honor, we're not against free

4    and fair competition, but what I would suggest to you is

5    they're misusing the process to launch this giveaway of the

6    infringing feature. They're misusing the process as indicated

7    by their intent to move for a stay. They're trying to delay

8    the District Court process as long as possible and allow them

9    ample time to get in and destroy the market by giving away the

10   infringing feature.

11           What we're asking for in our motion is merely an

12   injunction as to that infringing feature. They can still

13   sell the product with all the other infringing features, and

14   that is free and fair competition.

15           THE COURT: What if they were ordered to

16   return to their prior strategy and charge for the accused

17   infringing functionality?

18           MR. ABATE: That is an interesting question. I

19   don't know how that would work in terms of, you know, the

20   Department of Justice has regulations about competitors

21   talking about pricing. So I don't know how that would be

22   monitored if they were to return to their prior level of

23   pricing.

24           But I don't think it's workable as I work

25   through it because I don't see how we could monitor what

1     they are doing. In other words, they may stop announcing it

2     publicly, but what are their salesmen really doing in the

3     field? There is no way to monitor that, Your Honor. So I

4     would suggest to you that while a creative solution, I don't

5     think it's workable in this situation.

6          I think the workable solution is what we asked

7     for, which is either enjoining as to the infringing feature

8     or an expedited trial to resolve this quickly before the

9     giveaway pricing takes hold.

10         THE COURT: And you have made numerous

11     references in the papers and today already to your client

12     being the pioneer in this field and having created the

13     market. Do I have evidence of that in the record to this

14     point other than the fact that you own these patents?

15         MR. ABATE: I think it's in the record. I mean

16     it's in the declaration of Mr. Keresman and also that we own

17     these patents. This particular field, this focused area of

18     the invention in the patents is the thing we're saying we

19     pioneered.

20         THE COURT: All right. Before you get into the

21     merits, and I'm only going to have you get into the merits

22     just briefly, but talk to me a little bit about whether you

23     met and conferred at all prior to filing this motion.

24         You have seen that there was a reference that

25     you violated our Local Rule 7.1.1, and it seems from the

1    response that you acknowledge you violated it but want

2    me just to sort of not pay attention to that.  Help me

3    understand what really happened and why I shouldn't be

4    concerned that this emergency motion was sort of dropped on

5    us perhaps without any effort to work out a resolution.

6        MR. ABATE:  Well, Your Honor, we viewed the meet

7    and confer as being it would have been futile to try to suggest

8    to them that they would have to agree to an injunction while

9    the litigation was ongoing.

10        And you see, Your Honor, in the opposition we're

11    faced with an allegation that we waited too long and there

12    should be laches applied.  There was also something else

13    bearing on our mind:  That we had to deal with pulling this

14    together through the holidays and, you know, get an expert

15    onboard and things like that, and we were trying to get it

16    on file as soon as we could so that the Court would be able

17    to consider it.

18        THE COURT:  All right.  And what about this

19    action they also filed in Mississippi?  How should, if at

20    all, that affect the analysis I have to undertake?

21        MR. ABATE:  I think it has no affect at all.

22    The Mississippi case, we filed the motion to dismiss for

23    lack of personal jurisdiction, but there is also a second

24    basis of that motion which is improper claim splitting

25    that they filed in both courts, both in Delaware and in

1    Mississippi.  The cases were filed on the same day.  We have

2    consented to jurisdiction in Delaware, and we believe the

3    case should go forward in Delaware.  The case is now moving

4    forward in Delaware; and the Mississippi case is bogged down

5    in some motions and it is really not going forward.

6            But I think it has no impact.  We believe our

7    motion to dismiss will be granted and we will move forward

8    with the case in Delaware.

9            THE COURT:  So I'll give you a couple of

10    minutes to talk about the merits.  But start, if you would,

11    on validity.  And do you accept that as part of your showing

12    of likelihood of success on the merits, you have to persuade

13    me that all of the validity challenges lack substantial merit?

14            MR. ABATE:  Yes, we would agree that that is the

15    standard.  We have to show that they lacked merit, and we

16    believe we have.

17            There are seven different bases of invalidity

18    that are alleged.  Five of them were asserted in the CBM

19    petitions, and there were two that were asserted for the

20    first time in the opposition of the preliminary injunction.

21            I think the fact that SecureBuy didn't feel it

22    necessary to add two bases speaks volumes.  It shows a lack

23    of confidence in the basis they originally set forth in the

24    CBM petition.

25            There is no reference, Your Honor, and no

1    combination of references that disclose all of the elements

2    in the patent.  What SecureBuy is doing is using the

3    teachings of the patent as a roadmap to pick and choose and,

4    in fact, restructure the elements in the prior art and

5    change them around to allegedly arrive at the claimed

6    invention; and the Federal Circuit said that is hindsight

7    and that is not an appropriate analysis for obviousness.

8         I would point out that the two new bases for

9    invalidity that are being alleged now rely on references

10   that are not prior art at all.  The one allegation depends

11   on the '429 patent not being entitled to its effective

12   filing date; and I think we have shown in our reply that

13   they were mistaken.  That it does, in fact, teach both

14   credit and debit card and other types of transactions.  It

15   uses credit and debit cards as examples of the '002 -- I'm

16   sorry.  The '002 patent is the one that we're looking at

17   for the disclosure, and it shows that the '429 is entitled

18   to that filing date of the '002; in fact, of the provisional

19   application, going all the way back to provisional.

20        But the other basis for the allegation, the new

21   basis for invalidity that alleged based on this Raja Sacarin

22   (phonetic) reference also turns out in looking at that a

23   little bit more, we realize Raja Sacarin is not prior art

24   because it's not entitled to its provisional date.

25        The teachings that SecureBuy relies on in that

1   reference are not disclosed in its provisional patent

2   application.  So when they say it's prior art based on its

3   provisional application, they didn't give Your Honor the

4   provisionals, but when we looked at those we realized there

5   was no disclosure of the prior art.

6           You know, I would like to address -- that was

7   sort of an overview and I would like to address some of the

8   invalidity allegations in some detail.  Your Honor, are

9   there any particular ones you are most focused on or would

10  you like me to address each one in turn?

11          THE COURT:  I will give you a couple minutes.

12  You can run through them.  I read what you put in the

13  letter, of course, and I have looked at the CBM petition.

14  You don't have an expert to support you so I think it's a

15  pretty uphill battle to persuade me at this point on this

16  record that all seven of them lack substantial merit.  But

17  if you have something to add in addition to what you put in

18  writing, go ahead.

19          MR. ABATE:  Well, Your Honor, let me start with

20  the Weller reference.  The Weller reference, it just doesn't

21  disclose all of the elements of the claim.  They argue that

22  is anticipation, and it doesn't have all the elements of the

23  claim so it's not an anticipation.  It's as simple as that.

24  They essentially admit this when they rely on inherency.

25          This patent was also art of record before the

1    Patent Office.  That makes proving invalidity more difficult.

2    In fact, it's similar to what is disclosed in the background

3    of the patent.  It requires merchants to install plug-in

4    software in their payment processing system.

5            This is shown in the patent at Figure 1.  If you

6    look at Figure 1 of Weller, on the right-hand side, you see

7    there is an identification of a merchant and merchant

8    plug-in software.  So this is really very similar to what we

9    have -- I'm sorry.  Did I say ...  I'm looking to see which.

10   Oh, yes.  I'm sorry.  It is Figure 1.

11           Yes.  Figure 1, the merchant is No. 132 and the

12   merchant plug-in software is 134.  And this is very similar

13   to what we see in the background of the invention, that

14   there is a merchant that has plug-in software that is loaded

15   locally.  So it does not have the claim element that you

16   need a server, a third-party server, which is the server

17   receiving payment information and determining and selecting

18   among authentication protocols.

19           This patent also, Weller, does not disclose a

20   plurality of authentication protocols.  There is a merchant

21   with a plug-in.  It's one protocol that is being used.  So

22   Weller doesn't anticipate.

23           Now, if we go to Swain, the next argument they

24   make is Weller in combination with Swain.  And I can just

25   spend a minute on this.  So Swain discloses a virtual wallet.

1    And what this is, Your Honor, by analogy to something you

2    may have done in your own life, you may -- you know, if you

3    are buying something on a website, for example, Amazon, you

4    might register with Amazon, put your personal information,

5    your address, your name, your credit card information, to

6    become a registered user.  That information is then stored

7    on the Amazon server, and you can purchase from Amazon

8    without having to reenter that information every time you

9    want to make a purchase.

10         So Swain, you can consider that, what I just

11   described with Amazon, you can think of that as an Amazon

12   specific wallet.  So what Swain is describing is a virtual

13   wallet that is not specific to any one merchant.  It would

14   be stored up in the cloud, and it would be available for use

15   with many merchants.  You would have your information stored

16   in the virtual wallet, your personal information, your

17   credit cards, and that can be used with various merchants.

18         So if you combine the Weller reference with the

19   Swain reference, you don't get the patented invention.  What

20   you would end up with is the Weller system for consumer

21   authentication using one merchant plug-in stored on the

22   merchant server in conjunction with a Swain wallet for

23   allowing a customer to make purchases using a virtual wallet.

24         What SecureBuy is saying is someone would be

25   motivated to really tear this apart, not pick and choose but

1   actually tear it apart and take all of the wallet

2   functionality out of Swain and somehow reconstruct it such

3   that you would have the patented invention.  And what

4   they're doing is using the '429 disclosure to pick, choose,

5   and reconstruct the prior art to get to where they want to

6   be, which is to say that the patent is invalid as obvious.

7           The next combination they make suffers from the

8   same problem.  It's the background of the '429 background in

9   view of the K reference.  It's the same thing.  We have the

10  background of the patent; and the K reference, again, has

11  nothing to do with authentication.  It's a front-end proxy

12  server, and it serves as a single entry point to a website.

13  It sits between a consumer and a merchant, and it

14  facilitates access to content on the website.

15          THE COURT:  All right.  What about --

16          MR. ABATE:  Yes.

17          THE COURT:  That is good.  I have heard a lot,

18  plenty at this point on obviousness.  Talk briefly about the

19  101 challenge.

20          MR. ABATE:  Okay.  Well, I'm turning to that.  K

21  is the same thing as Weller.  You can't put it together.  It

22  doesn't get you there.  Same argument, just slightly

23  different teachings.

24          Okay.  101, there is nothing abstract about

25  our claimed invention.  It specifically recites parties

1    communicating over a network with a server of a third party

2    that determines, based on payment information, which of a

3    plurality of authentication protocols to use for processing

4    a transaction, and then facilitates authentication of the

5    consumer by the issuing bank or service organization.  The

6    claims are very specific in that regard.

7            I mentioned in our paper that there was a similar

8    challenge raised in Australia that was rejected by the

9    Australian court.  I understand, Your Honor, the laws differ

10   and the claims are slightly different there, but the rationale

11   is very similar to our case law.  The Australian Patent Office

12   talked about the functionality and juxtaposition of tangible

13   network features.  That is what it saw in the claim; and the

14   Federal Circuit cases have recognized that.

15           I would also point out that if you start with

16   the background of the invention, you see that we're talking

17   about a very technical problem.  The problem is, the problem

18   the inventors were facing was that merchants were typically

19   required to install software in their payment processing

20   system related to each different payment brand, and this was

21   very onerous.  It was onerous in terms of maintenance, and

22   it was onerous in terms of the storage and the processing

23   power needed to run those systems.

24           And then the patent discloses a very technical

25   solution to that problem.  It says that these problems are

1   overcome by using the central processing system that stores

2   all the authentication plug-in centrally away from the

3   merchant and allows the merchants to process payment with a

4   single implementation regardless of the payment brand.

5          Then the claim tracks that.  I have sort of

6   summarized the claim, but it tracks that:  receiving,

7   determining, selecting.  Those various steps are all being

8   used by the central processing system.  It has software

9   layers for doing these various steps to facilitate the

10   authentication of the transaction.

11          This can be distinguished from the cases where

12   the Federal Circuit and the Patent Office have found in some

13   cases the patent is invalid under Section 101.  So, for

14   example, a very recent case, just last month, the Federal

15   Circuit invalidated the patent under Section 101 where the

16   patent was related to a method for guiding selection of a

17   treatment regimen for a patient with a known disease.  And

18   the claim referred to use of the computer to gather

19   information and to take the patient's data and do certain

20   searching and exit databases, but nonetheless the patent was

21   held invalid because the Court said it was directed to the

22   abstract idea of a series of mental steps that are routinely

23   done by doctors.

24          Well, that is just not the case here.  Our

25   system is capable of serving billions of customers with, you

1    know, trying to make purchases from millions of merchants

2    involving thousands of issuing banks in a relatively

3    seamless way, and it includes a server involved in that,

4    and the server specifically forwards and routes messages

5    according to authentication protocol through the computer

6    network.  This is not a method that can be done with the pen

7    and paper.

8              Your Honor, just by way of reference, our

9    commercial product has six million lines of code.  So this

10   is really very different from the cases that where Section

11   101 has been applied.  This is a very technical problem, a

12   technical solution, and the claim very specifically identifies

13   what we're covering.  There is no ambiguity there.

14             THE COURT:  All right.  Let me --

15             MR. ABATE:  And the server is in fact -- one

16   last thing.  I'm sorry, Your Honor.

17             The server is integral and necessary to that

18   process because the education protocol as taught in the spec

19   requires formatting and routing messages, and that involves

20   putting headers on messages, arranging the bits in a certain

21   way.  This is a process where the computer is integral.

22   It's not something that can be done with a pen and paper.

23             THE COURT:  All right.  Let me ask you two other

24   questions, and then I want to hear from the plaintiff.

25             MR. ABATE:  Sure.

1          THE COURT:  On irreparable harm, there is some

2    back and forth about possible licensing efforts.  I want

3    to better understand what was going on there and why that

4    effort, whatever it was, doesn't suggest that there will be

5    a way, at the end of the day, to quantify whatever harm

6    there may be to your client between now and whenever this

7    case would go to trial.

8          MR. ABATE:  Sure.  Your Honor, the first thing

9    is we never licensed the patent; and the offer, it wasn't

10   an offer to license the patent.  What it was, was an offer

11   to settle the case based on SecureBuy using our system.  In

12   other words, we would sort of -- see, we're an OEM in a

13   sense.  We're going to be running our -- they're going to

14   be using our system.  They're going to be directing their

15   customers to our system.  So the settlement is no in no way

16   a value of the patent; and that is because of the way the

17   deal was structured.  SecureBuy was using and paying for our

18   service.

19          So the critical thing here, Your Honor, is we

20   would be able to maintain our goodwill with our customers.

21   We would be able to maintain our reputation as a market

22   leader.  We would be able to maintain our market share.  And

23   these are all the types of things that the Federal Circuit

24   and the District of Delaware have recognized in numerous

25   cases as being appropriate bases for granting a P.I.

1          You know, like in the *Bendix* case, for example,

2     the Court talked about the infringer and the patentee being

3     direct competitors.

4          In the *Martek Biosciences*, the infringer was

5     targeting the patentee's customers.  That is exactly what

6     SecureBuy is doing here.  That case also talked about

7     likelihood of losing market share that you may not be able

8     to recapture.  These are the types of harms that are

9     irreparable.

10         The *Novozymes* case in this district also talked

11    the patent, the right to exclude in the patent cannot be

12    equated with monetary damages.  Here, the irreparable harm

13    is flowing from their attempts to usurp our pioneering

14    position in the market and our goodwill with customers.

15         When there is potential for loss of market share

16    and loss of goodwill, again, that has been recognized in a

17    number of cases as irreparable harm.  That is what we're

18    dealing with here.

19         They specifically went to this -- you know, I

20    call it pricing but they are giving the product away.  They

21    emphasize this was very dramatic, the dramatic nature of

22    this.  They would lose millions as a result of this

23    giveaway.  They say, no, we're not simply giving this away,

24    we're using this as an opportunity to gain exposure for our

25    other technology to Cardinal's customers.  And they noted

1    specifically the cost of client acquisition is extremely

2    expensive and the giveaway would be a good mechanism to gain

3    an audience with merchants and expose them to SecureBuy's

4    other technology.

5            Your Honor, they're attempting to destroy our

6    market.  And as I said at the outset, there are a lot of

7    features in their product they could have given away.  They

8    gave away our feature, our patented feature.  They are

9    trying to destroy our market to get in front of our

10   customers, to monetize our invention, and those are

11   irreparable harms that are recognized.

12           THE COURT:  All right.  One more question for

13   you at this point.  As I consider whether to expedite the

14   trial, your request for alternative relief, I think a big

15   concern I have is that we might end up wasting the parties'

16   time and money as well as the Court's if the CBM petition

17   is granted.  And if potentially, for instance, you end up

18   amending the claims, it seems foreseeable these things may

19   happen, and we may find ourselves going to trial or on the

20   eve of trial on claims that don't exist any longer in the

21   form that they exist now.  Help me see if I can be more

22   comfortable with that.

23           MR. ABATE:  I'm glad you raised that because I

24   noticed, in re-reading the briefing, I noticed that was one

25   thing we didn't answer.  We will not be amending the claims;

1    and I can say that with certainty.  And the reason why is

2    we have pending applications before the Office in the same

3    family.  We will keep the claims in the three patents

4    exactly as they are.  And if we feel the need to make

5    amendments, we will do it in the pending applications, not

6    in these applications.  So there will be no amendment of

7    these claims.  We are not going to get to the situation you

8    described where on the eve of trial, the claims have been

9    changed.  That is not going to happen.

10                 I think with respect to the CBM, we're fairly

11   confident -- we're very confident that the CBM will not be

12   granted.  I think it's pretty clear, as I was saying

13   earlier, that they are picking and choosing.  They don't

14   have anticipation.  The Section 101 cases are very different

15   than this type of case.  The obviousness challenges are

16   very weak in that they reconstruct the prior art, pull out

17   different features, really destroy the references and put

18   them back together to say that the claims are invalid as

19   obvious; and they don't show any motivation for doing that.

20                 If you look at the expert declaration, it's

21   extremely thin.  It just doesn't have the -- they just

22   don't have it to show the patents are invalid.  We are very

23   confident that we will do well in the CBM process, but I

24   think that, you know, the critical thing here from our

25   standpoint is the irreparable harm that is going to result.

1    We think that they shouldn't be allowed fo use the CBM

2    process in conjunction with this calculated plan that they

3    have, Your Honor.

4              I would suggest to you that they filed the

5    complaint on November 1st, they filed the CBMs on

6    November 15th, and they announced in their press release on

7    November 19th that they're giving this product away.  And

8    I would suggest to you that that was not by happenstance.

9    That is a calculated effort to get into the market in an

10   unfair way, to use the process to give them a long runway

11   to destroy our market.  That is why we're here for the

12   preliminary injunction.

13             THE COURT:  All right.

14             MR. ABATE:  And --

15             THE COURT:  Mr. Abate, I have let you go on for

16   quite awhile, and you will have a chance for rebuttal; but

17   let me hear now from Mr. Tollefson, please.

18             Go ahead.

19             MR. TOLLEFSON:  Thank you, Your Honor.

20             Before I get into the things that I had planned

21   on saying, I would just like to point out that Mr. Abate

22   made an interesting concession there at the end of his time.

23   He states that they have no intention to amend any claims

24   during the CBM process.

25             Now, their motion is entirely based on a single

1    claim from a single one of patents.  It happens to be the

2    broadest claim that they could be asserting, or at least

3    that is how I understand it.  So based on this concession,

4    the way I see it is there is an extremely high likelihood

5    that claim 1 of the '849 patent will be disclaimed through

6    the CBM process in lieu of patents not in suit and patents

7    not material to this motion.  So I think that concession I

8    think is informative that this particular motion is not

9    soundly based on the merits.

10          Now, the law on preliminary injunction and

11   expedited trial overlaps, as I'm sure the Court is aware.

12   That they both require equitable harm and the showing of a

13   likelihood of success on the merits, although the amount of

14   showing might be different.  If we look at the Court of

15   Chancery cases, they're very instructive on the matter.

16          Since Cardinal failed to show both, this Court

17   should deny the motion in its entirety and grant neither

18   relief sought.

19          First, as the Court already noted today,

20   SecureBuy, although it publicly announced on November 19th

21   its new marketing initiative and Cardinal found out no later

22   than November 20th, they waited nearly two months to file

23   their motion and made no attempt to explain its delay other

24   than a mention of the holidays.  I guess they were fearful

25   meeting and conferring with SecureBuy's counsel would cause

1    even more delay.

2            THE COURT:  Well, let me stop you there,

3    Mr. Tollefson.  Because I think you say in the letter it's a

4    five week delay, and I imagine there are circumstances and

5    you point to a Chancery case where maybe something on the

6    order of five weeks could give rise to laches, but you don't

7    make any argument that I see as to how five weeks could be a

8    basis for laches such that I should deny this motion.  So

9    help me understand if that is really one of the arguments

10   you are pressing.

11           MR. TOLLEFSON:  Well, if my papers said that it

12   was only five weeks, then maybe my math was incorrect or

13   there was a typo because November 20th to I believe the

14   motion was filed on January 28th, so that is more than five

15   weeks.  But, regardless, five weeks is enough time to

16   cause prejudice, so there is prejudice to our client.

17           As represented and testified to in the papers,

18   this plan has been in the works far before Cardinal even

19   approached SecureBuy.  And they have been marketing, they

20   have been making marketing efforts, and if now there was an

21   injunction against providing the SecureBuy 3-D Secure MPI,

22   that would essentially gut their only product which is the

23   SecureBuy 2.0 platform.  It would also destroy any credibility

24   that they have.  So there will be significant prejudice to

25   SecureBuy.  That is enough to merit denying the motion based

1    on the delay.

2                  THE COURT:  All right.  You can move on.

3                  MR. TOLLEFSON:  Thank you.  An understanding

4    of the technology will probably make it a little easier to

5    understand the allegations here.

6                  Now, Cardinal talked about our product having a

7    number of different features and that we could have given

8    away any number of those features.  The fact is that the MPI

9    is a very small part of the product.  It's a small piece of

10   code, and it doesn't correlate to Cardinal's product which

11   is called Sentinel.  What Mr. Keresman testified is that the

12   Cardinal Sentinel product amounts of upwards of 75 percent

13   of their business; and I think the suggestion there is that

14   we're going to be cutting into a significant part of their

15   business, but that is just not the case at all.

16                 The 3-D Secure MPI is a very finite feature that

17   relates to a very specific type of processing that occurs.

18   It's not just any merchant plug-in.  It doesn't process every

19   kind of authentication protocol that exists.  It processes

20   very, very specific narrow types of payments, and what is

21   called Active 3-D authentication.

22                 What that is, is if you log into the website

23   to make a purchase, maybe Valentine's Day is coming up

24   and you want to buy flowers.  You put in your credit card

25   information and you hit go, and then it says a transaction

1    has been authorized and you get a receipt sent to your

2    e-mail.  That is not a 3-D Secure transaction.  So those

3    sorts of transactions are not in jeopardy based on the

4    provision of this 3-D Secure MPI by SecureBuy.  That is not

5    what this case is about.

6            This is a very, very narrow piece of code that

7    only relates to high risk transactions.  What it does is it

8    invokes a protocol which is called 3-D Secure, and it requires

9    the customer to take additional steps to authenticate him or

10   herself.  For example, with MasterCard, their 3-D Secure

11   initiative requires that the MasterCard holder, in addition to

12   putting all their information in, they will get a popup and

13   then they will have to put in a password.

14           Now, most people on this phone call probably

15   haven't been exposed to that because the vast majority of

16   transactions that occur on the Internet are not authenticated

17   via 3-D Secure.  So what we're talking about is a provision

18   of a product by our client that doesn't cause any risk to

19   think they're going to lose any of their business.  It

20   doesn't cause any risk they're going to destroy the market.

21   We're talking a very, very finite product that only relates

22   to, say, somewhere around 10 percent of the transactions

23   that Cardinal processes.

24           The evidence that was put forth upon which

25   Cardinal's motion was based fails to draw the connection

1    between the revenue brought in by a similar product or

2    the transactions made to the actual product that they're

3    accusing.  So I think it's really important to understand

4    we're talking about a patent, one patent claim that covers

5    all kinds of authentication, and they're accusing a single

6    product which is a really, really small piece and only

7    relates to a very small percentage of Cardinal's business.

8            THE COURT:  Is the accused functionality,

9    Mr. Tollefson, one that your client could technologically

10    disable?

11            MR. TOLLEFSON:  Well, could?  Technologically,

12    it could.  It would essentially gut their product.  This

13    particular piece of code is embedded in their product offering

14    and it would make their product offering incomplete.

15            THE COURT:  So help me understand how it would gut

16    the product if it's only one of a number of functionalities

17    and it only gets implicated in a small number of transactions

18    in the market.

19            MR. TOLLEFSON:  Okay.  So the SecureBuy 2.0

20    product is a comprehensive fraud protection product which

21    provides a number of features to merchants.  And so like as

22    an example, it may provide things like risk assessment which

23    has nothing to do with the patent.  So risk assessment may

24    be, for example, looking at the location of the computer

25    that is making the purchase request and doing some sort of

1    risk assessment there and then providing maybe some sort of

2    deliverable to the merchant along with other information or

3    may even -- I don't want to get too far into it because

4    there are some proprietary technology that is confidential

5    to SecureBuy.

6           The MPI is not what sells the products.  What

7    sells these products, CardinalCommerce, it has all kinds of

8    features, none of which have to do with the patent claim,

9    claim 1 of the '429 patent.  There are all these additional

10   features like latency detection and -- I'm sorry.  I'm

11   looking for my piece of paper -- DCS compliance, system

12   monitoring, device compatibility, latency monitoring and all

13   kinds of other features that Cardinal counts are important,

14   in fact, critical qualities to its product, and the SecureBuy

15   system is sort of the same way.  It has all these other

16   features.

17          SecureBuy is marketing itself as being focused

18   on fraud protection and trying to protect the merchant in

19   that way.  So the MPI is important to its product because it

20   invokes this 3-D Secure process which is really important

21   for high risk transactions.  So while the MPI is a little

22   piece, it is sort of an important piece and all the code for

23   the 2.0 system is especially tailored to work with our MPI.

24   So if you ripped that out, it's not like we could plug in

25   someone else's MPI and just make it work.

```
 1              THE COURT:  All right.  Tell me a little bit
 2    more about the marketplace because another seeming tension
 3    I have had trouble understanding is that evidently the
 4    giveaway was announced with much fanfare and was touted by
 5    your client as being somewhat revolutionary, but on the
 6    other hand, you seem be arguing there are lots and lots of
 7    competitors in this market and you are not doing something
 8    much different than other folks already in the market.  I'm
 9    having trouble understanding exactly what is going on there.
10              MR. TOLLEFSON:  Right.  I understand.  So
11    SecureBuy is a very small company, and it is using a developed
12    marketing plan in order to try to, as they say, board more
13    clients.
14              There are other companies out there that provide
15    MPIs.  There are other companies out there that provide
16    comprehensive systems.  Cardinal is not the only company that
17    does it.  There are hundreds of companies that are -- maybe
18    100 plus companies that offer these sort of products and offer
19    an MPI, which is a merchant plug-in; and Cardinal does not
20    claim to have invented the merchant plug-in, as Mr. Abate
21    explained.  Their patent and the claim at issue here is about
22    putting that merchant plug-in on a third-party server so that
23    multiple merchants can access it.
24              There are lots of competitors in the marketplace.
25    Most companies in the marketplace charge per transaction for
```

1    use of their systems.  It is my understanding that Cardinal

2    does the same.  So I'm not really sure how our giveaway of the

3    MPI will destroy the market because these products are being

4    driven by the comprehensive solutions that are provided.

5         SecureBuy's marketing plan involves a process to

6    merchants that they can use the merchant plug-in any way

7    they want as long as they comply with the card association

8    rules, but we do that because, as we tout in fact in the

9    press releases that Cardinal cite to, we explain that the

10   3-D Secure MPI is an important piece to a comprehensive

11   solution.

12        If you refer to the e-mail that they claim as

13   providing a basis for their allegation that we're targeting

14   their customers, you note that they say that SecureBuy, I'm

15   paraphrasing, is telling them that they do the same and more

16   for less.  But that's not a reference solely to the MPI.  I

17   mean what SecureBuy wants to do is sell.  It's not in the

18   business to not make money.  It wants to sell its comprehensive

19   product which includes the MPI.

20        So this is really a marketing strategy.  As is

21   well known in the industry, in the software industry, it's

22   a loss leader.  You take some of your software, you give it

23   away with the hopes to sell other products and services.

24   And that is certainly the case here.

25        Now, I should point out that Cardinal has made

1    no effort to explain how they believe that giving away the

2    MPI per se infringes their patent claim.  So they have

3    charted some process from our developer's guide, but in fact

4    the press release that Cardinal relies on states that the

5    merchants can use the MPI in a way they want; and Cardinal,

6    of course, would never take the position that if the MPI is

7    on the merchant website, that that is infringing.  I don't

8    think they can take that position.  I just want to point out

9    that Cardinal has failed to make any attempt to show that

10   giving away the MPI itself is an act of infringement.

11            Now, also, since Cardinal fails to make a

12   connection between what the MPI does, and like how many

13   transactions it would lose through our MPI, which only does

14   a small percentage of the overall type of transactions that

15   Cardinal handles, the type of harm that they're suggesting

16   might occur is speculative.  Although it's speculative, it's

17   completely calculable.

18            If it's okay with, Your Honor, I would like to

19   move on to the license issue.

20            THE COURT:  Sure.

21            MR. TOLLEFSON:  So Cardinal states it never

22   licensed the '429 patent.  That is a tough representation to

23   understand.  Certainly, they tout how many merchants they

24   process and how many partners that they have.

25            I'm not going to get into too many details over

1 the business proposal that was provided because there is a

2 dispute in the Mississippi action over the submission of the

3 business proposal.  The business proposal was not an offer

4 to settle the litigation.  The litigation didn't exist when

5 the business proposal was first made.

6   The bottom line, as we understand it, they

7 charge, Cardinal charges people per transaction for the use

8 of their system which they claim is covered by the patent.

9 And so whether they say that they don't license the '429

10 patent, it's really irrelevant because it's legally

11 economically the same thing as giving a license.

12   The law on implied license goes back well into the

13 1800s.  It's bedrock that if you make a sale of a patented

14 product where you allow someone to use your patented product,

15 that there is an implied license to the patent that transfers

16 with that use or that sale.  So it's really no issue that they

17 claim that they have never patented -- excuse me, they never

18 licensed the '429 patent because their customers don't have a

19 piece of paper that says they have a license.

20   The bottom line is that any harm can be tracked

21 and can be calculated because there are lots of companies

22 out there that charge per transaction, and Cardinal is one

23 of them.  So the idea that this is irreparable harm is

24 baffling to me.  It's not a pharmaceutical case where there

25 are lots of expert testimony and case law on the submission

1      of a generic drug into the market.  This is sort of a garden

2      variety technology case where all the information can be

3      tracked and damages can easily be calculated.

4              So Cardinal makes the assertion also that it has

5      no other products other than Sentinel and would not be able

6      to cross-sell other products to its customers; and I think

7      that point is misleading.  So since the accused product is

8      just the -- the subject of the motion is just this very narrow

9      MPI, it's going to have very little affect on Cardinal's

10     overall marketing and overall product offering because it's

11     really just a very, very tiny, tiny piece of its business.

12             As to validity, I don't think I need to get

13     into the weeds on all the issues.  Obviousness is a mixed

14     question of law and fact, and there is an ample amount of

15     expert testimony in the record.

16             As to how one skilled in the art would view the

17     references, the expert testimony speaks for itself.  It is

18     uncontroverted and Cardinal offers nothing but attorney

19     argument on those points.

20             I would like to address the priority issue which

21     I think that Cardinal doesn't seem to take very seriously.

22             In the patent that is the subject of the motion,

23     the '429 patent, there is so much new subject matter that

24     it is hard to imagine that the priority challenge is not

25     significant.  In fact, if one were to compare the summary of

1    the invention of the '429 patent to the summary of the

2    invention of the '002 patent, over 75 percent of the words

3    were changed.  These were not just insignificant words.

4    These are actually very significant changes where the word

5    "payment instrument" is broadened to mean payment option.

6    There are listings of different kinds of payment networks.

7          This is all classic new matter, and the law is

8    clear.  If the full scope of the claims are not supported in

9    the priority document, then there is no entitlement to that

10    date.  We believe that there is a very substantial challenge

11    to the priority date of the '429 patent, thereby opening it

12    up to other prior art, including the publication of its own

13    patent application.  This is a critical error, and Cardinal

14    has failed to rebut it.

15         THE COURT:  All right.  Now, I recognize,

16    Mr. Tollefson, you ultimately hope that this case plays out

17    in a way that your CBM petition is granted and you would

18    ask the Court to stay this action.  I don't have any of that

19    in front of me because, of course, those things haven't

20    happened yet, but I think we all know, and I don't think you

21    have denied it, that is what you hope is going to happen.

22    So I'm thinking about the stay and how that might factor

23    into the discretionary decisions I have to make now.

24         So thinking in that forward-looking way, why

25    would I stay this case when you are both obviously vigorous

1  competitors with one another?  This appears to be a market

2  that is evolving and the technology might be evolving.  As

3  you already alluded to, you have got various invalidity

4  defenses that you have already come up with to this point in

5  the case that aren't part of your CBM, meaning unless you

6  prevail entirely in the CBM proceeding, I'm still going to

7  have a case left at the end of that.

8          So, again, looking forward, recognizing you

9  haven't yet asked me to stay the case, can you foresee how

10 I would be persuaded under these circumstances ever to stay

11 this case?

12         MR. TOLLEFSON:  Absolutely.  In fact, it would

13 be hard for me to comprehend circumstances that would

14 convince you not to stay the case.

15         First, I go to the actual intent and sort of back

16 story.  It was always our intention to fight this where we

17 think that the fight should occur, and that is the United

18 States Patent and Trademark Office.  We think these patents

19 are the classic patents that are covered by the American

20 Invents Act.  These are bad Covered Business Method patents.

21 Congress has made clear that it created this process specific-

22 ally to address these sorts of patents.  And Congress has also

23 made clear that it's nearly impossible to imagine a scenario

24 where the District Court would not issue a stay in this

25 situation.

```
 1              Now, all the patent claims and all the patents

 2    are challenged in the CBM petitions.  There isn't a single

 3    case in which the Patent Trial and Appeal Board, we call it

 4    the PTAB, has failed to initiate a trial on a patent

 5    challenged under the Covered Business Method protocol.

 6              There have been several petitions that have

 7    been -- denied is not the proper word.  A trial has not been

 8    instituted.  But most of those petitions involved a case

 9    where the parties settled the suit before -- settled the

10    overall dispute and submitted a request to the PTAB to not

11    institute a trial.

12              There were two petitions in the Apple Sight

13    Sound case that were denied, but in that instance, Apple

14    brought their grounds up in multiple petitions and the

15    patents were put into review.  Trials were instituted on

16    other grounds.

17              So in fact, there is 100 percent rate right now

18    for Covered Business Method patent review as it relates to

19    patents being challenged.

20              Now, as your Honor knows, there is a statute

21    that lays out the factors.  It's a four factor test.  And

22    Congress has said that there is a very heavy thumb on the

23    scale in favor of a stay.

24              So the factors are:  potential to simplify the

25    issues, stage of the proceedings, potential prejudice, and
```

1    reduction of burden on the courts and the parties.

2            Here, all the claims are being challenged.  And

3    you have the representation of Cardinal that they're not

4    going to amend any of the claims.  So there is a near

5    certainty that the issues are going to be reduced in the

6    form of disclaimed claims, and a reduction in the number

7    of claims at issue.

8            Now, the stage of the proceedings.  We filed the

9    complaint in Delaware second after the Mississippi action and

10   didn't serve either complaint because we wanted to discuss

11   possible settlement and Cardinal, even though we hadn't served

12   the complaint, answered in Delaware and not in Mississippi,

13   obviously to try to secure Delaware as the forum, and then

14   they have been the aggressor in the litigation.

15           We see this motion essentially for the expedited

16   trial as an attempt to get this case moving, as Mr. Abate

17   suggested, so that at the time that the petitions are

18   granted, he will be able to say to Your Honor that this case

19   is halfway to trial.

20           So if this case were to follow its sort of

21   normal process, we wouldn't even be to a Rule 16 order yet.

22   And if there was a Rule 16 order, if there were a Rule 16

23   order, at that time it would have told Your Honor that there

24   are CBM proceedings, that the petition should be acted on by

25   the Patent Office in and around April and ask Your Honor's

1  advice as to whether you wanted us to file a formal motion

2  or if you wanted to just extend the schedule out to see what

3  happened.  So that is why we haven't filed the motion for

4  stay yet.

5       But looking at the statute, there seems almost

6  no reason not to stay this case.  And, in fact, I would like

7  to reference Your Honor to a case, *Chicago Board of Options*

8  *Exchange v International Securities Exchange*, Case No.

9  13-cv-1339 in the Southern District of New York where a

10  motion for stay was filed by defendants in that case.

11       The case was very far along.  The parties were

12  direct competitors.  There was a very strong showing of

13  infringement and of prejudice, but Judge Furman stayed the

14  case anyway and the petitions had not even yet been granted.

15  And what Judge Furman said is that he ruled that the Patent

16  Trial and Appeals Board trial practice guide states that

17  the proceedings begin with the filing of the petition.  He

18  decided and held in that case that he needed to stay the

19  case then based on the four factor test even though the

20  petitions had not yet been decided because the statute says

21  upon a proceeding.  It doesn't say upon the grant of a

22  petition.

23       So in summary, the CBMs will narrow the issues

24  for this Court.  I know that this Court is extremely

25  burdened, and it will reduce the burden on the Court, it

1    will reduce the burden on the parties.

2         Also, Cardinal contends it is a small company.

3    SecureBuy is an even smaller company.  And so the prejudice

4    and the cost on the parties will be extremely significant to

5    have to handle the three CBM proceedings and an expedited

6    trial at the same time.

7         THE COURT:  All right.  So you sketched out

8    what you think is their plan.  On the flip side to you, did

9    you have to file the litigation here and in Mississippi?

10   Couldn't you have just tried to proceed with the PTO?

11        MR. TOLLEFSON:  Could we have just filed the

12   CBMs?  Yes, we could have, Your Honor.  We choose to file

13   the District Court lawsuit first in order to sue.

14        THE COURT:  All right.  So if I go ahead and

15   schedule a trial and do it on an expedited basis, wouldn't

16   the prejudice to you be less than in the ordinary case not

17   just because you choose to file a case here but because you

18   have obviously done a lot of work that will help you get a

19   big headstart in this case through the preparation of the

20   CBM petition.  You have sketched out a whole lot of your

21   invalidity defenses.  You have an expert.  You I think made

22   some arguments about claim construction.

23        Help me understand why under those circumstances

24   it would be prejudicial to you to have a trial something

25   like six months from now.

1          MR. TOLLEFSON:  Well, first of all, we have

2    already paid for the CBM proceedings, and the Patent Office

3    is best suited to handle the validity issues in this case.

4          Second of all, it's going to be extremely,

5    extremely expensive and burdensome to prepare a patent case

6    for trial in six months.  And although we have prepared

7    expert testimony in connection with the CBMs, we're talking

8    about conducting a full patent case with three patents

9    and discovery and all that.  It would just be extremely

10   burdensome.

11         I submit to Your Honor that the marketing

12   efforts by my client have absolutely nothing to do with

13   Cardinal or this lawsuit.  We see no reason why this case

14   should be handled any differently than any other declaratory

15   judgment action.  It would be far less prejudicial on our

16   client to handle the CBMs than to handle a full-blown

17   District Court litigation in six months.

18         THE COURT:  One more thing, Mr. Tollefson.

19   There is this back and forth in the most recent letters

20   about the securebuycommerce.com domain, and reading between

21   the line it appears that the facts that your client owned

22   that domain name for some time but only just started using

23   it maybe days ago but after the preliminary injunction

24   motion was filed.

25         Do I understand the correctly?  And how, if at

1    all, does that fit into the analysis I have to undertake?

2             MR. TOLLEFSON:  No, Your Honor.  You do not

3    understand the fact correctly.  That allegation was made out

4    of hole cloth.  I don't understand where the allegation came

5    from.  In fact, I can reference Your Honor to, for example,

6    Exhibit D, which is part of Cardinal's own filing.  If you

7    look at page 1 of Exhibit D, it says www.securebuycommerce.com.

8             I can reference you to other exhibits that

9    CardinalCommerce had in their possession that reference

10   www.securebuycommerce.com.  This has been their website

11   since April.  I have no idea where that allegation came

12   from.  It was made out of hole cloth.  We have never owned

13   securebuy.com.  And we didn't, after the preliminary

14   injunction was filed, change this.

15            THE COURT:  Is there anything else from you,

16   Mr. Tollefson?

17            MR. TOLLEFSON:  No, Your Honor.

18            THE COURT:  Back to you, Mr. Abate.

19            MR. ABATE:  Thank you, Your Honor.  So on the

20   issue of the burden of hardship, I think Your Honor figured

21   this out.  SecureBuy just can't have it both ways.  They are

22   arguing the demand for the platform is coming from other

23   features.  You know, that the accused portion is just this

24   little itty-bitty piece, but then they also argue that if

25   you were to take out that little itty-bitty piece, the

1   platform would be wholly anticompetitive.  They couldn't

2   compete in the market.

3            Well, they just can't have it both ways.  Either

4   the demand is coming from the other features, in which case

5   they would not detrimentally impacted by the -- (beeping

6   sound) -- to the patented feature.  Or -- I'm sorry.  I sort

7   of beeped.  Did we lose anyone?

8            THE COURT:  I don't know.  Is Mr. Tollefson is

9   still on?

10           MR. ABATE:  If you are still on, Your Honor, I

11  can continue.

12           THE COURT:  I'm here.  How about the plaintiff?

13  Are you still there?  Uh-oh.  Mr. Tollefson?

14           MR. TOLLEFSON:  No, I am, Your Honor.

15           THE COURT:  Oh, okay.  All right.  Go ahead.

16           MR. ABATE:  I just want to make sure everyone is

17  still on.

18           So either this is, the other features drive

19  demand, in which case removing this little portion which --

20  (beeping sound) -- can be removed, you know, shouldn't have

21  an impact on its ability to sell its other features or the

22  entire platform would be uncompetitive without this feature.

23  If that is the case --

24           RECORDED VOICE:  Joining the meeting.

25           MR. ABATE:  -- that shows a nexus of the relief

```
 1    we're requesting --

 2                THE COURT:  Hold on a second.

 3                MR. ABATE:  -- to the infringement.

 4                THE COURT:  Mr. Abate, I'm sorry.

 5                Has somebody just joined us?

 6                MS. KELLER:  I'm sorry, Your Honor.  It's Karen

 7    Keller.  My phone was disconnected, so I just dialled right

 8    back in.

 9                THE COURT:  Mr. Tollefson, are you still there?

10    Mr. Tollefson?  Mr. Tollefson, are you still there?

11                Mr. Keller, do you know if your co-counsel are

12    still there?

13                MS. KELLER:  I'm going to check with them, Your

14    Honor.  I don't know if something happened with the line or

15    something else.  I'll check with them.

16                THE COURT:  All right.

17                MR. McMILLAN:  This is Mr. McMillan.  I'm still

18    here, and I'm the one who initiated the call, so we do still

19    have a conference line.

20                THE COURT:  Mr. Abate, you are still there;

21    correct?

22                MR. ABATE:  Yes, I am.

23                THE COURT:  All right.  Just hold on until we

24    find out where Mr. Tollefson is.

25                (Pause.)
```

1            RECORDED VOICE:  Joining the meeting.

2            MR. TOLLEFSON:  Brian Tollefson for SecureBuy.

3            THE COURT:  All right.  So Mr. Tollefson.

4            MR. TOLLEFSON:  Sorry.  I was dropped off the

5  line somehow.

6            THE COURT:  Ms. Keller, you are there?

7            MS. KELLER:  Yes, I am, Your Honor.  Thank you.

8            THE COURT:  Mr. Abate, you are still there?

9            MR. ABATE:  Yes.

10          THE COURT:  All right.  I think you probably

11  ought to go back and repeat the best you can the point you

12  were trying to make.  Go ahead.

13          MR. ABATE:  Yes.  The point is that they're

14  taking just inconsistent positions.  They say that,

15  SecureBuy is saying the majority of the demand is coming

16  from other features, not the patented feature in the accused

17  product.  They admitted that feature can be disabled.  It

18  can be removed from the product.

19           If that is the case, if the majority of the

20  demand is coming from those other features, then their

21  business should not be impacted by an injunction that just

22  goes to the patented feature, which is what we're asking

23  for.

24           But then they also say that -- to the contrary,

25  they say, well, it would render the whole platform

1    uncompetitive to take out that one feature. Well, if that

2    is the case, then certainly we have established a nexus

3    between the infringement and the relief requested. So

4    they're taking sort of inconsistent positions there.

5         I would point out on the burden of harms, the

6    harm we're talking about is the irreparable harm to

7    CardinalCommerce that I mentioned earlier, the loss of

8    market share, price erosion, reputational harm, loss of

9    goodwill, loss of our position as a leader in the industry,

10   that type of thing, recognized in the case if infringement

11   continues.

12        On the other hand, the harm that is imposed by

13   SecureBuy is a harm that is imposed as a matter of law. The

14   Federal Circuit has said that if you create a business out of

15   an infringing product, you should not be heard to complain if

16   you are forced to stop using that infringing product.

17        I would also point out that SecureBuy referenced

18   the statements of Senator Schumer in the legislative history

19   about the CBM process being designed to get these invalid

20   patents off the record.

21        If you look at that statement, Your Honor, it is

22   clearly directed to non-practicing entities that are not

23   legitimate, he says the words "legitimate businesses."

24   These are patents not being asserted by legitimate businesses.

25        Well, we're certainly a legitimate business.

1    We're competitors in this industry.  So the comment that

2    they rely on in the legislative history really just doesn't

3    apply here.

4            Now, one other thing I want to talk about is on

5    the issue of infringement.  If you look at their reply

6    paper, Your Honor, nowhere in that paper will you see the

7    words "SecureBuy does not infringe."  They haven't said

8    that they do not infringe.  They have essentially admitted

9    infringement.

10           They say that we haven't carried our burden

11   because the way we tried to show infringement involves

12   multiple parties.  But that is not the case.  You can look

13   at the way we did the claim read.  It's all directed to the

14   SecureBuy server and the interactions with that server.  But

15   the point is they don't even dispute infringement.  They

16   don't dispute it.

17           I would point out that the representation of the

18   business is just incorrect.  We've said that 75 percent of

19   Cardinal's business is Sentinel.  In fact, there is a

20   greater of number of transactions than 75 percent that

21   actually use 3-D Secure.  It's a much greater number of

22   transactions.  I think SecureBuy said 10 to 15 percent of

23   transactions or something.  That may be in their case but

24   not in ours.

25           Just maybe a few other items I might like to

1        address.

2                You know, SecureBuy talked about the harm being

3        calculable as damages.  It isn't, Your Honor.  It's a

4        growing market.  It's really important to establish yourself

5        in this developing market.  We, as referenced in one of the

6        declarations, the Keresman declaration, we recently received

7        an award from the Merchant Risk Trade Association which we

8        mentioned had this annual meeting in March.  We received the

9        award at last year's meeting, and this type of positioning

10       that we have and the market that we built is not compensable

11       in damages.

12               I really don't know what he is talking about

13       when he referenced the idea of implied licenses.  We don't

14       sell or license our patent to anyone.  We provide a service

15       and people use that service.

16               That doesn't give them a license to develop a

17       competing service.  They're paying for using the service.

18       They're buying the service from us.  That is not licensing

19       a patent or valuation of a patent.

20               I would like to turn to some of those stay

21       factors that you mentioned also, Your Honor.

22               I think the most significant issue here that

23       would prevent the stay is the specific factor about undue

24       prejudice on the nonmoving party.  So in this situation, if

25       we're talking about a stay, SecureBuy would be the moving

1     party, we would be the nonmoving party.  And we pointed

2     to the irreparable harm being created here by their new

3     giveaway of the infringing product, a giveaway that they

4     implemented after starting a litigation, after the CBM was

5     started.  They did this consciously knowing that we have a

6     patent in this market and we believe they were infringing.

7            And one aspect of this undue prejudice to the

8     moving party that is looked at, and this is recognized in

9     the *Market-Alerts* case of Judge Sleet but other cases as

10    well, is the relationship between the parties.  We're direct

11    competitors.  And, specifically, we're not only direct

12    competitors but they're trying to undermine our market with

13    this giveaway of the infringing technology.

14           In *Market-Alerts*, the Court specifically stated

15    they were reluctant to stay proceedings when the parties are

16    direct competitors.

17           Also, there is an apprehension to, or there is

18    a reluctance to grant stay when the consequences to the

19    patentee might be outside, was the language used.  And that

20    is exactly what we're talking about here.  They say outside

21    consequences in terms of loss of market share and erosion of

22    goodwill.  That is exactly what we're talking about here.

23           So that factor weighs very heavily in our favor

24    against any stay.  Again, there is no stay motion pending,

25    but we're looking down the road, so I wanted to mention

1   that.

2           I do believe that we're not talking about a

3   significant reduction of burden on the parties and the Court

4   because SecureBuy stated in its papers and here today that

5   they're going to continue to contest invalidity on grounds

6   that are not raised in the CBM.

7           There are lots of claims in that CBM.  I think

8   it is very unlikely, it's tremendously unlikely that every

9   claim is going to be invalidated.  In fact, when SecureBuy

10  presented the statistics about what is going on in the

11  Patent Office, they failed to mention that it is very common

12  for the Patent Office to not grant in toto the request.  So

13  oftentimes, the requests are granted in part as to certain

14  claims or certain prior art references but they're not granted

15  in toto.  So there is a high likelihood that we're going to

16  be back here with claims from these patents.  And SecureBuy

17  again, as I said, is going to raise invalidity challenges.

18  So there is not, there is not much reduction in effort that

19  is going to be seen by any proposed stay on SecureBuy's part.

20          I would point out, Your Honor, that CBM has yet

21  to be instituted.  We don't know where that is going to go.

22  There is just no way of telling whether the issue will be

23  narrowed for trial, but we're facing immediately irreparable

24  harm.  That is why we asked for, in the alternative, if you

25  don't grant the preliminary injunction, that you at least

```
 1    consider our motion for expedited trial.

 2               I think as Your Honor correctly pointed out,

 3    this case is far along and that both parties have done a lot

 4    of work.  We have put out our infringement proof as to one

 5    claim.  They have already put out their invalidity as to

 6    every claim in all three patents.  And I think we could move

 7    quickly into discovery through their essential admission of

 8    infringement here in these papers, but also we see that in

 9    the CBM papers by the way, Your Honor.  In their 101

10    argument, they essentially admit that they're infringing the

11    way they make that argument.

12               But the point is I think they're going to make

13    this primarily a validity case and not a noninfringement case.

14    Therefore, I think we really are ready to move forward and an

15    expedited trial would not be prejudicial to either side.

16               Let me see.  I think that is all I have to say.

17    I just would close with one point, you know, just a mea

18    culpa, Your Honor.

19               We got the timing wrong with the SecureBuy

20    Commerce name, but the point really there is that there is

21    about a million words in the English language.  And when

22    they realized that the SecureBuy name was unavailable, they

23    could have chosen any number of terms to put after

24    SecureBuy.  For example, SecureBuy Payments or SecureBuy

25    Processing or SecureBuy Transactions or SecureBuy
```

```
 1    Authentication, and they choose SecureBuy Commerce, I just

 2    think it's sort of insulting to all of our intelligence to

 3    suggest there was some other reason to do that other than to

 4    try to affiliate yourself with the market leader.

 5              So that is my comment.  I do apologize for

 6    getting the timeline wrong, but I did want to point out the

 7    name.  I think that is significant.

 8              I guess one other point on the motion for

 9    expedited trial.  What we're proposing is exactly what this

10    Court did in the Eaton case when it declined a PI in that

11    case and said an expedited trial would be appropriate and

12    imposed a six-month deadline.  The facts in that case are

13    so similar to ours in that it was a similar situation where

14    the party was giving away the product.  And the Court said,

15    well, I'm not going to grant a PI but I am going to go for

16    an expedited trial, six months to trial.  And I think that

17    is doable in this case.  We have already prepared a proposed

18    scheduling order which we could send to the other side if

19    that is necessary.

20              And, Your Honor, lastly, I would like to thank

21    you again for hearing our motion today and expediting the

22    process.

23              THE COURT:  All right.  Thank you.  Let me thank

24    all the parties for moving quickly.  The briefing even under

25    the time constraints I imposed was very, very good, very
```

1  helpful, as has been the argument today.  That puts me

2  happily in a position in which I'm able to rule on the

3  preliminary injunction motion and the request for an

4  expedited trial at this time.

5          I think it's to everyone's benefit really given

6  the fact that the parties are direct competitors that I not

7  leave these issues hanging out there any longer than need

8  be.  So I do thank all the parties for putting me in a

9  position where I am able to make the rulings that I think

10  are necessary.

11          Without dragging out the drama unnecessarily,

12  what I have decided to do is to deny the preliminary

13  injunction but to grant the request for an expedited trial.

14  So I'm denying the principal relief sought by the defendant

15  here but granting their alternative relief.

16          Let me try to briefly explain to you how I came

17  to that conclusion.  First, I'll talk about the preliminary

18  injunction.

19          As everyone recognizes, a motion for preliminary

20  injunction is a request for extraordinary relief.  And it's

21  a matter left to the Court's sound discretion.

22          I don't want to linger too much on Local Rule

23  7.1.1, but I will say, as has been alluded to and as all

24  counsel on this call know, this Court is overburdened.  We

25  all have hundreds of patent cases, and I know that requests

1    for expedited treatment are made only after careful

2    consideration and recognition as to the burdens that are

3    already on this Court and the increased burden that comes

4    with the request for expedited treatment.

5            In that regard, it's a little hard to understand

6    why defendant wouldn't feel it appropriate to take the

7    extra step and reach out to plaintiff and see if one more

8    conversation just might possibly lead to some type of

9    resolution that could eliminate the need for burdening the

10   Court with an expedited emergency request.

11           Clearly, the parties have had discussions about

12   some of the underlying issues, and it's clear obviously at

13   this point that there was no way the plaintiff was going to

14   agree certainly to an injunction.  So I'm certainly not

15   basing my decision on what appears to be a violation of our

16   local rule, but I do think it is important that parties in

17   all instances, and certainly before requesting expedited

18   relief, avail themselves of all reasonable opportunities to

19   talk with one another, to see if that request is really

20   necessary to the Court.

21           In any event, turning to the factors.

22           Obviously, the law is well settled as to what the

23   factors are.  There is no dispute about that.  Ultimately, the

24   Court is just simply not persuaded that the extraordinary

25   relief sought principally by the defendant is warranted here.

1   That is because on at least two of the four factors, I'm not

2   at this point persuaded that the defendant, the moving party

3   here, had met its burden.

4          First, I find that the defendant CardinalCommerce

5   has failed to show a likelihood of success on the merits.

6   That is because in the context here, in order to make that

7   showing, the Court would have to be satisfied that each of

8   the invalidity defenses asserted by the plaintiff SecureBuy

9   lacks substantial merit.  At this point, I'm just not simply

10  convinced of that on all of the bases that have been asserted

11  by SecureBuy.

12         Primarily -- and I'm not going to get into the

13  weeds.  There is a lot in the record here, and we have

14  looked at it all, including the CBM filing and the expert

15  testimony.  Primarily, the Section 101 patentable subject

16  matter and the obviousness defenses certainly strike me

17  at this point as establishing substantial questions of

18  patentability.

19         Those substantial questions remain notwithstanding

20  the fact that, for instance, with respect to obviousness, much

21  of the prior art was in fact before the PTO previously, and I

22  know that the Australian Patent Office has rejected seemingly

23  similar defenses under what might be a similar legal regime.

24         I certainly recognize the defendant has made

25  good points in response to the invalidity defenses, although

1  I do note there is no expert testimony provided by the

2  defendant in support of its arguments against invalidity

3  defenses.

4         But when I put all of that together, again, I

5  end up with the conclusion that the defendant has failed

6  to persuade me that all of the invalidity defenses lack

7  substantial merit; and under the procedural posture we're

8  at, I think that is dispositive and really warrants me

9  denying the request for preliminary injunction.

10         Let me say in that regard, I have considered,

11  of course, the fact that there is the CBM petition pending;

12  and I think it's likely, certainly given the statistics,

13  it's likely that the CBM petition will be granted and there

14  is some possibility, of course, then that the CBM will

15  ultimately result in invalidation of the one patent claim

16  that the present motion is predicated on, claim 1 of the

17  '429 patent.

18         I say all that, and it's relevant to the

19  likelihood of success on the merits point, because there is

20  a different standard in front of the PTAB for invalidating

21  claim 1 of the '429.  It seems that it is easier to

22  invalidate it in front of the PTAB than it is here.  The

23  chances that that will happen and will happen before we get

24  to final judgment I think are proper considerations as I

25  consider the likelihood of success on the merits, and so I

1    have factored that in, and again it's yet another reason

2    that I think that the defendant has not met its burden on

3    likelihood of success on the merits.

4            The separate and second ground where I think

5    the defendant has fallen short is its effort to show that

6    it will be irreparable harmed between now and trial.  And

7    given that I am going to expedite trial, that actually has

8    the effect of making it harder for the defendant to show

9    irreparable harm because we're going to go to trial in about

10   six months, and so that limits, of course, the amount of

11   time that damage could occur.

12           But, ultimately, I'm just not at this point on

13   this record persuaded that whatever harm results from any

14   infringement that may ultimately be proven, that it would

15   not be compensable by money damages and relief in the form

16   of a permanent injunction.  There is no evidence here,

17   despite some back-and-forth in the letters, there is no

18   evidence that the plaintiff would be unable to pay a damages

19   award.  It is clear there are other competitors in the

20   marketplace besides just the two in this suit.

21           There were at least discussions in the recent past

22   that might have led to resolution, a business resolution of

23   the disputes between these parties.  And while, of course, I

24   don't know all the details and it appears they didn't involve

25   specifically a license to the '429 patent, the fact remains

1    that there is some solution that the defendant could envision

2    that today would remedy any harm that the defendant thinks

3    it has already suffered or would suffer in the future, and

4    that is a data point that gives me greater confidence that

5    ultimately six or so months from now, if we need to, we can

6    ultimately calculate and craft a proper remedy for the

7    defendant for any harm that might occur between now and then.

8            There is also the dispute, of course, as to how

9    big is this market and how much, for what percentage of the

10   marketplace are the two parties actually competing?  I'm

11   not in a position to resolve that right now, of course, but

12   I also am not in a position to discount the plaintiff's

13   contentions there which, if true, would mean that the amount

14   of damage that the plaintiff could cause to the defendant

15   relates to only a small percentage of the marketplace.

16           Having said all that, I think it is important to

17   emphasize to you that I've made this decision quickly at the

18   defendant's request that I expedite things, and the burden

19   is on the defendant on all of these points.  And I mentioned

20   those two points together because I will certainly acknowledge

21   that my understanding of the technology here, my understanding

22   of the market here is only as good as it can be given that

23   this motion came in about a week ago and we have moved as

24   quickly as we can.

25           So to the extent I have misunderstood the

1  technology or misunderstood the invalidity arguments or

2  misunderstood or misapprehended the marketplace and the

3  two parties' positions in it, all of that weighs against

4  the defendant.  None of it was intentional but it's just if

5  so, if there have been errors here, they are the result of

6  moving as quickly as possible at the defendant's request,

7  and the burden is on the defendant.  So since I'm not

8  persuaded of the things that the defendant had to persuade

9  me of, rightly or wrongly, it all a leads to, again, the

10 conclusion that the preliminary injunction should not be

11 granted.

12      But I am going to, as I said at the outset,

13 grant their alternative request for an expedited trial.

14 This decision I view as totally discretionary, completely

15 within the scope of my authority to manage my schedule.

16      I don't believe that there are any factors that I

17 am obligated to consider or that the defendant is obligated

18 to show.  That's not to say that I intend to schedule every

19 patent case for trial within six months, but I think I am

20 certainly free to do so.

21      In any event, what I am doing in this case,

22 there is precedent for here in the District of Delaware as

23 has been referenced by the defendants, and I think it is

24 consistent with what some courts with the so-called "rocket

25 dockets" do in all patent cases.  So I certainly think it's

1    well within my discretion to grant the alternative relief

2    requested by the defendants.

3         And I think it is appropriate for factors

4    including that the parties are fierce competitors with one

5    another, the nature of the allegations about the technology

6    and about the market, the defendant's allegation that it's

7    the pioneer.  The defendant's allegations about harm I think

8    are pertinent to a decision as to how quickly to move this

9    case along.  And also quite importantly here is that the

10    case appears to be relatively narrow and the parties appear

11    to be far along, certainly by comparison, to where most

12    cases are a couple months after they have been filed.

13         The plaintiff has worked out many of its

14    invalidity defenses, has an expert, has stated some

15    positions relating to claim construction.  It's not even

16    clear to me that there is going to be much dispute regarding

17    infringement in this case.

18         At the end of the day, it was the plaintiff's

19    decision to file litigation, to do so before they filed the

20    CBM petition, and to do so in this court.  And having chosen

21    voluntarily to do all those things, it's hard for me to

22    credit the protestations as to the unfair or heavy burden

23    that will befall the plaintiff from having to litigate a

24    case that it voluntarily brought here with the timing that

25    it brought here.

1          That's the facts and the circumstances as they

2     are now and they lead to a conclusion, as I say, for a trial

3     on an expedited basis.

4          I imagine that while I don't have a stay motion

5     in front of me now, I can certainly easily foresee that a

6     motion for a stay may come at some point in this case and

7     really all I can say about that is we will deal with it if,

8     and when, it comes.  And we will, of course, make a careful

9     analysis of the factors based on whatever those factors are

10    at the time that the motion comes in.  And I'm not going to

11    speculate any further as to when it will come in or what the

12    facts and circumstances will be at that time.  We'll have

13    that fight at that time, if we need to.

14         So let me be a little bit more concrete.

15         We are going to have trial beginning on Monday,

16    August 4th of this year.  We will hold aside that whole

17    weaning of August 4th through August 8th.  And I want the

18    parties to meet and confer and submit a proposed scheduling

19    order by next Tuesday that will culminate in that trial on

20    August 4th.

21         The defendant has suggested that they have

22    already started working on a proposal for scheduling.  They

23    should certainly get that proposal into the plaintiff's

24    hands as soon as possible so that ultimately I can see

25    ideally a joint proposal next Tuesday, but if not joint,

1    then the competing proposals.  Delaware counsel certainly

2    know what my form scheduling order is and how to identify

3    disputes in that form.  And if need be, we'll get you on

4    the phone again some time very soon to discuss whatever

5    scheduling disputes there are.

6              I would suggest that the parties in their meet

7    and confer discuss the possibility of a very early Markman

8    hearing.  It would seem to me that you can probably identify

9    some, if not all, of the key Markman disputes very, very

10   soon; and we could get you to a Markman hearing quickly.

11             I am skeptical whether there will be time in the

12   schedule for case dispositive motions, but that is something

13   you should all discuss.  And I also want you to discuss how

14   to narrow this case as much as possible and as early as

15   possible, including narrowing the claims that are at issue

16   and narrowing the prior art that might be relied on, but

17   I'm not prejudging any of that, but certainly I am going

18   to be open to the possibility of taking whatever steps are

19   necessary in order to manageably get this case to August 4th,

20   which as I indicated is our trial date.

21             That is all I have to say at this time, but let

22   me see.  I have said a lot.  I want to make sure there isn't

23   any misunderstanding or any question.

24             So, first, Mr. Abate.

25             MR. ABATE:  I have nothing to add, Your Honor.

1   Thank you for your ruling.  Again, thank you for the

2   expedited process.

3               THE COURT:  And Mr. Tollefson.

4               MR. TOLLEFSON:  No questions, Your Honor.

5               THE COURT:  All right.  Well, thank you all very

6   much for your time and your excellent efforts.  Have a good

7   weekend.  Good-bye.

8               (Telephone conference ends at 4:43 p.m.)

9

10          I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

11

12                          /s/ Brian P. Gaffigan
                          Official Court Reporter
13                          U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT Q

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GAVRIELI BRANDS LLC, a California Limited Liability Company,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>SOTO MASSINI (USA) CORP., a Delaware corporation; SOTO MASSINI S.R.L.S., an Italian limited company; and THOMAS PICHLER, an individual,<br><br>　　　　　Defendants. | Civil Action No. 18-462-GMS |

## SCHEDULING ORDER

This ___ day of July 2018, the parties having determined after discussion that the matter cannot be resolved at this juncture by settlement, voluntary mediation or binding arbitration;

IT IS ORDERED that:

1. **Rule 26(a) Initial Disclosures**. Unless otherwise agreed to by the Parties, they shall have made their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a) on or before **June 29, 2018**.

2. **Joinder of other Parties and Amendment of Pleadings**. All motions to join other parties and amend the pleadings shall be filed on or before _____.

3. **Reliance Upon Advice of Counsel**. Defendants shall inform Plaintiff whether they intend to rely upon advice of counsel as a defense to willful infringement no later than _____. If Defendants elect to rely on advice of counsel as a defense to willful infringement, Defendants shall produce any such opinions on which Defendants intend to rely to Plaintiff no later than _____.

4.  ***Markman* Claim Construction Hearing**.  A *Markman* claim construction hearing shall be held on _____ at _____.  The *Markman* hearing is scheduled for ____ hours with each side having ____ hours.  The parties shall meet and confer regarding narrowing and reducing the number of claim construction issues.  On or before _____, the Parties shall submit a Final Joint Claim Chart which shall include citations to intrinsic evidence.  The Plaintiff shall submit to the court, a Joint Appendix of Intrinsic Evidence (the "Joint Appendix") containing all intrinsic evidence relied upon in the claim construction briefing.  A sample table of contents of the Joint Appendix can be located on this court's website at www.ded.uscourts.gov.  The Joint Appendix shall be filed on the same day as the answering claim construction briefs.  The Parties shall file opening claim construction briefs on _____, and answering claim construction briefs on _____. Briefing will be presented pursuant to the court's Local Rules.

5.  **Discovery**. Plaintiff shall identify the accused products and the asserted patents they alleged infringe, and produce the file histories for each asserted patent on or before **July 27, 2018**.  Defendants shall produce core technical and design documents related to accused products, including design drawings, manuals, product literature, schematics, and specifications on or before **August 31, 2018**.  Plaintiff shall produce an initial claim chart relating each accused product to the asserted claims each product allegedly infringes on or before **October 5, 2018**.  Defendants shall produce invalidity contentions for each asserted claim, as well as the related invalidating references on or before **November 2, 2018**.  All fact discovery in this case shall be initiated so that it will be completed on or before **December 12, 2018**.  Opening expert reports on issues on which a party bears the burden of proof shall be served on or before **January 18, 2019**.  Rebuttal expert reports shall be served on or before **February 15, 2019**.  Expert Discovery in this case shall be initiated so that it will be completed on or before **March 1, 2019**.

        a.     **Discovery and Scheduling Matters**: Should counsel find they are unable to resolve a discovery[1] or scheduling matter, the party seeking the relief shall contact chambers at (302) 573-6470 to schedule a telephone conference.  Not less than forty-eight hours prior to the teleconference, the Parties shall file with the court, via electronic means (CM/ECF), a **Joint Letter Agenda**, which is **<u>non-argumentative</u>**, not to exceed two (2) pages outlining the issue(s) in dispute. A sample letter can be located on this court's website at www.ded.uscourts.gov.  After the Parties have had three (3) discovery teleconferences, they will be required to file a joint letter showing good cause why the court should permit a fourth discovery teleconference.  Should the court find further briefing necessary upon conclusion of the telephone conference, unless otherwise directed, the party seeking relief shall file with the court a **<u>TWO PAGE LETTER</u>**, exclusive of exhibits, describing the issues in contention.  The responding party shall file within five (5) days from the date of service of the opening letter an answering letter of no more than **TWO PAGES**.  The party seeking relief may then file a reply letter of no more than **TWO PAGES** within three (3) days from the date of service of the answering letter.

        6.     **<u>Confidential Information and Papers filed under Seal</u>**.  Should counsel find it will be necessary to apply to the court for a protective order specifying terms and conditions for the disclosure of confidential information, they should confer and attempt to reach an agreement on a proposed form of order and submit it to the court within ten (10) days from the date of this order.  When filing papers under seal, counsel should deliver to the Clerk an original and two copies of the papers.

---

[1] Unless the court otherwise orders, should counsel be unable to agree on the discovery of paper and electronic documents, the court's "Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI") shall govern.

If after making a diligent effort the Parties are unable to agree on the contents of the joint proposed protective order, then they shall follow the dispute resolution process outlined in paragraph 5(a).

7. **Settlement Conference**. Pursuant to 28 U.S.C. § 636, this matter is referred to the United States Magistrate Judge for the purpose of exploring the possibility of a settlement. The Parties shall wait to be contacted by the assigned United States Magistrate Judge.

8. **Summary Judgment Motions**. Prior to filing any summary judgment motion, the Parties must submit letter briefs seeking permission to file the motion. The opening letter brief shall be no longer than five (5) pages and shall be filed with the Court no later than **March 15, 2019**. Answering letter briefs shall be no longer than five (5) pages and filed with the court no later than **March 29, 2019**. Reply letter briefs shall be no longer than three (3) pages and filed with the Court on or before **April 5, 2019**. If the Court determines that argument is necessary to assist in the resolution of any request to file summary judgment, it shall notify the Parties of the date and time on which the Court will conduct a telephone conference to hear such argument. **Unless the Court directs otherwise, no letter requests to file a motion for summary judgment may be filed at a time before the dates set forth in paragraph 8.**

9. **Case Dispositive Motions**: To the extent permitted, all case or issue dispositive motions shall be served and filed within two weeks of the Court's decision to permit the filing of such motions. Briefing will be presented pursuant to the Court's Local Rules. The Parties may agree on an alternative briefing schedule. Any such agreement shall be in writing and filed with the Court for the Court's approval. Any request for extensions of time as set forth in this Scheduling Order **must** be accompanied by an explanation or your request will be denied.

10.     **Applications by Motion**. Except as provided in this Scheduling Order or for matters relating to scheduling, any application to the Court shall be by written motion filed, via electronic means (CM/ECF).  Unless otherwise requested by the Court, counsel shall **not** deliver copies of papers or correspondence to Chambers.  Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

11.     **Oral Argument**.  If the Court believes that oral argument is necessary, the Court will schedule a hearing Pursuant to District of Delaware Local Rule 7.1.4.

12.     **Pretrial Conference**.  On **April 16, 2019**, beginning at **10:00 a.m.**, the Court will hold a Pretrial Conference in Courtroom 4A.  Unless otherwise ordered by the Court, the parties should assume that filing the Joint Pretrial Order satisfies the pretrial disclosure requirement in Federal Rule of Civil Procedure 26(a)(3). A sample form of Pretrial Order can be located on this court's website at www.ded.uscourts.gov.  Thirty days before the Pretrial Order is due, Plaintiff's counsel shall forward to Defendants' counsel a draft of the pretrial order containing the information Plaintiff proposes to include in the draft.  Defendants' counsel shall, in turn, provide to Plaintiff's counsel any comments on the Plaintiff's draft, as well as the information Defendants propose to include in the proposed pretrial order.  **Motions *in limine*[2]: NO MOTIONS *IN LIMINE* SHALL BE FILED**; instead, the Parties shall be prepared to address their evidentiary issues at the Pretrial Conference and during trial (before and after the trial day). The Parties shall file with the court the **joint** Proposed Final Pretrial Order in accordance with the terms and with the information required by the form of Final Pretrial Order, which can be located on this court's website at www.ded.uscourts.gov on or before **March 29, 2019**.

---

[2]  The Parties should simply list, in an Exhibit to be attached to the Pretrial order, the issues  under a heading such as "Plaintiffs' [name of party] List of Evidentiary Issues It Intends To Raise."

14. **Trial**. This matter is scheduled for a **five** day **jury** trial beginning at **9:30** a.m. on **April 29, 2019** in Courtroom 4A.

15. **Scheduling**: The Parties shall contact chambers, at (302) 573-6470, only in situations where scheduling relief is sought, and only then when ALL participating counsel is on the line for purposes of selecting a new date.


_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT R

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| APPLE INC., | |
| *Plaintiff,* | |
| v. | C.A. No. 22-1377-MN |
| MASIMO CORPORATION and SOUND UNITED, LLC, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

**EXEMPLARY EIGHT-MONTH PROPOSED
SCHEDULING ORDER [PATENT, NON-ANDA]**

This_____ day of_____, 2023, the Court having conducted an

initial Rule 16(b) scheduling conference pursuant to Local Rule 16.1(b), and the parties having

determined after discussion that the matter cannot be resolved at this juncture by settlement,

voluntary mediation, or binding arbitration;

IT IS HEREBY ORDERED that:

1.    Rule 26(a)(l) Initial Disclosures and E-Discovery Default Standard.   Unless

otherwise agreed to by the parties, the parties shall make their initial disclosures pursuant to

Federal Rule of Civil Procedure 26(a)(l) within five (5) days of the date the Court enters this Order.

If they have not already done so, the parties are to review the Court's Default Standard for

Discovery, Including Discovery of Electronically Stored Information (''ESI"), which is posted at

http://www.ded.uscourts.gov (*see* Other Resources, Default Standard for Discovery)  and is

incorporated herein by reference.

2.    Joinder of Other Parties and Amendment of Pleadings. All motions to join other

parties, and to amend or supplement the pleadings, shall be filed on or before **[4 weeks after Order**

**Granting Motion For An Expedited Trial**]. Unless otherwise ordered by the Court, any motion to join a party or motion to amend the pleadings shall be made pursuant to the procedures set forth in Paragraphs 8(g) and 9.

3.  <u>Application to Court for Protective Order.</u> Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court within ten (10) days from the date the Court enters this Order.  Should counsel be unable to reach an agreement on a proposed form of order, counsel must follow the provisions of Paragraph 8(g) below.

Any proposed protective order must include the following paragraph:

> <u>Other Proceedings.</u> By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated "confidential" [the parties should list any other level of designation, such as "highly confidential," which may be provided for in the protective order] pursuant to this order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

4.  <u>Papers Filed Under Seal.</u> In accordance with section G of the Revised Administrative Procedures Governing Filing and Service by Electronic Means, a redacted version of any sealed document shall be filed electronically within seven (7) days of the filing of the sealed document.

5.  <u>Courtesy Copies.</u> The parties shall provide to the Court two (2) courtesy copies of all briefs and any other document filed in support of any briefs (*i.e.*, appendices, exhibits, declarations, affidavits etc.). This provision also applies to papers filed under seal. All courtesy copies shall be double-sided.

6.      ADR Process.  This matter is referred to a magistrate judge to explore the possibility of alternative dispute resolution.

7.      Disclosures. Absent agreement among the parties, and approval of the Court:

(a)      By **[5 days after Order Granting Motion For An Expedited Trial]**, Plaintiff shall identify the accused product(s), including accused methods and systems, and its damages model, as well as the asserted patent(s) that the accused product(s) allegedly infringe(s). Plaintiff shall also produce the file history for each asserted patent.

(b)      By **[2 weeks after Order Granting Motion For An Expedited Trial]**, Defendant shall produce core technical documents related to the accused product(s), sufficient to show how the accused product(s) work(s), including but not limited to non-publicly available operation manuals, product literature, schematics, and specifications. Defendant shall also produce sales figures for the accused product(s).

(c)      By **[2 weeks after Order Granting Motion For An Expedited Trial]**, Plaintiff shall produce an initial claim chart relating each known accused product to the asserted claims each such product allegedly infringes.

(d)      By **[3 weeks after Order Granting Motion For An Expedited Trial]**, Defendant shall produce its initial invalidity contentions for each asserted claim, as well as the known related invalidating references.

(e)      By **[8 weeks after Order Granting Motion For An Expedited Trial]**, Plaintiff shall provide final infringement contentions.

(f)      By **[9 weeks after Order Granting Motion For An Expedited Trial]**, Defendant shall provide final invalidity contentions.

8.      Discovery. Unless otherwise ordered by the Court or agreed to by parties, the limitations on discovery set forth in the Federal Rules shall be strictly observed.

(a)      Fact Discovery Cut Off. All fact discovery in this case shall be initiated so

3

that it will be completed on or before **[10 weeks after Order Granting Motion For An Expedited Trial]**.

    (b)    <u>Document Production.</u>    Document production shall be substantially complete by **[**7 weeks after Order Granting Motion For An Expedited Trial**]**.

    (c)    <u>Requests for Admission.</u>  A maximum of 30 requests for admission are permitted for each side.

    (d)    <u>Interrogatories.</u>

    i.    A maximum of 15 interrogatories, including contention interrogatories, are permitted for each side.

    ii.    The Court encourages the parties to serve and respond to contention interrogatories early in the case. In the absence of agreement among the parties, contention interrogatories, if filed, shall first be addressed by the party with the burden of proof. The adequacy of all interrogatory answers shall be judged by the level of detail each party provides (*i.e.*, the more detail a party provides, the more detail a party shall receive).

    (e)    <u>Depositions.</u>

    i.    <u>Limitation on Hours for Deposition Discovery.</u> Each side is limited to a total of 35 hours of taking fact testimony by deposition upon oral examination.

    ii.    <u>Location of Depositions.</u>  Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district. Exceptions to this general rule may be made by order of the Court. A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

(f)      Disclosure of Expert Testimony.

i.      Expert Reports. For the party who has the initial burden of proof on the subject matter, the initial Federal Rule of Civil Procedure 26(a)(2) disclosure of expert testimony is due on or before **[12 weeks after Order Granting Motion For An Expedited Trial]**. The supplemental disclosure to contradict or rebut evidence on the same matter identified by another party is due on or before **[14 weeks after Order Granting Motion For An Expedited Trial]**. Reply expert reports from the party with the initial burden of proof are due on or before **[16 weeks after Order Granting Motion For An Expedited Trial]**. No other expert reports will be permitted without either the consent of all parties or leave of the Court. Along with the submissions of the expert reports, the parties shall advise of the dates and times of their experts' availability for deposition.

ii.      Expert Report Supplementation. The parties agree they **[will]** permit expert declarations to be filed in connection with motions briefing (including case-dispositive motions).

iii.      Objections to Expert Testimony. To the extent any objection to expert testimony is made pursuant to the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), as incorporated in Federal Rule of Evidence 702, it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court. Briefing on such motions is subject to the page limits set out in connection with briefing of case dispositive motions.

iv.      Expert Discovery Cut-Off. All expert discovery in this case shall be initiated so that it will be completed on or before **[18 weeks after Order Granting Motion For An Expedited Trial]**.

(g)      Discovery Matters and Disputes Relating to Protective Orders.

5

i.      Any discovery motion filed without first complying with the following procedures will be denied without prejudice to renew pursuant to these procedures.

ii.      Should counsel find, after a reasonable effort pursuant to Local Rule 7.1.1 that they are unable to resolve a discovery matter or a dispute relating to a protective order, the parties involved in the discovery matter or protective order dispute shall contact the Court's Judicial Administrator to schedule an argument.

iii.      On a date to be set by separate order, generally not less than four (4) days prior to the conference, the party seeking relief shall file with the Court a letter, not to exceed three (3) pages, outlining the issues in dispute and its position on those issues. On a date to be set by separate order, but generally not less than three (3) days prior to the conference, any party opposing the application for relief may file a letter, not to exceed three (3) pages, outlining that party's reasons for its opposition.

iv.      The parties shall provide to the Court two (2) courtesy copies of its discovery letter and any other document filed in support of any letter (*i.e.*, appendices, exhibits, declarations, affidavits etc.). This provision also applies to papers filed under seal. All courtesy copies shall be double-sided.

v.      Should the Court find further briefing necessary upon conclusion of the conference, the Court will order it. Alternatively, the Court may choose to resolve the dispute prior to the conference and will, in that event, cancel the conference.

9.      <u>Motions to Amend / Motions to Strike.</u>

(a)      Any motion to amend (including a motion for leave to amend) a pleading or any motion to strike any pleading or other document shall be made pursuant to the discovery dispute procedure set forth in Paragraph 8(g) above.

(b)      Any such motion shall attach the proposed amended pleading as well as a

6

"redline" comparison to the prior pleading or attach the document to be stricken.

       10.    <u>Technology Tutorials.</u>  Although technology tutorials are not required by the Court, they are appreciated and, if any party chooses to file such a tutorial, it shall be submitted on or before the date that the Joint Claim Construction Brief is filed.

       11.    <u>Claim Construction Issue Identification.</u> On **[DATE]**, the parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court. Subsequent to exchanging that list, the parties will meet and confer to prepare a Joint Claim Construction Chart to be submitted two weeks prior to service of the opening claim construction brief. The parties' Joint Claim Construction Chart should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include each party's proposed construction of the disputed claim language with citation(s) only to the intrinsic evidence in support of their respective proposed constructions. Intrinsic evidence (including copies of the patent(s) at issue) shall NOT be attached to the joint claim construction chart and, instead, the parties shall include a joint appendix with the joint claim construction brief, and the joint appendix shall include a copy of the patent(s) at issue and portions of all relevant intrinsic evidence that would have otherwise been included with the joint claim construction chart, as well as any additional evidence cited in the parties' briefing.

       12.    <u>Claim Construction Briefing.</u> The Plaintiff shall serve, but not file, its opening brief, not to exceed 20 pages, on **[DATE]**. The Defendant shall serve, but not file, its answering brief, not to exceed 30 pages, on **[DATE]**. The Plaintiff shall serve, but not file, its reply brief, not to exceed 20 pages, on **[DATE]**. The Defendant shall serve, but not file, its sur-reply brief, not to exceed 10 pages, on **[DATE]**. No later than **[DATE]**, the parties shall file a Joint Claim Construction Brief. The parties shall copy and paste their unfiled briefs into one brief, with their positions on each claim term in sequential order, in substantially the form below. If the joint brief

as submitted is more than 80 pages, the parties must certify that the page limits (or equivalent word counts) in the Scheduling Order have been complied with and provide a brief explanation (e.g., formatting issues, listing of agreed-upon terms) as to why the brief is longer than 80 pages.

## JOINT CLAIM CONSTRUCTION BRIEF

I.      Agreed-Upon Constructions

II.     Disputed Constructions

      [TERM 1]

            1.      Plaintiff's Opening Position

            2.      Defendant's Answering Position

            3.      Plaintiff's Reply Position

            4.      Defendant's Sur-Reply Position

      [TERM 2]

            1.      Plaintiff's Opening Position

            2.      Defendant's Answering Position

            3.      Plaintiff's Reply Position

            4.      Defendant's Sur-Reply Position

The parties need not include any general summaries of the law relating to claim construction. If there are any materials that would be submitted in an index, the parties shall submit them in a Joint Appendix.

      13.    <u>Hearing on Claim Construction.</u>  Beginning at_____on **[DATE]**, the Court will hear argument on claim construction. The parties need not include any general summaries of the law relating to claim construction in their presentations to the Court. The parties shall notify the Court, by joint letter submission, no later than the date on which their joint claim construction brief is filed: (i) whether they request leave to present testimony at the hearing; and (ii) the amount

of time they are requesting be allocated to them for the hearing.

Provided that the parties comply with all portions of this Scheduling Order, and any other orders of the Court, the parties should anticipate that the Court will issue its claim construction order within sixty (60) days of the conclusion of the claim construction hearing. If the Court is unable to meet this goal, it will advise the parties no later than sixty (60) days after the conclusion of the claim construction hearing.

14. <u>Supplementation.</u> Absent agreement among the parties, and approval of the Court, no later than **[8 weeks after Order Granting Motion For An Expedited Trial]** the parties must finally supplement, *inter alia,* the identification of all accused products and of all invalidity references.

15. <u>Case Dispositive Motions.</u>

(a) All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before **[19 weeks after Order Granting Motion For An Expedited Trial]** [a date approximately four months prior to the pretrial conference, the four months being calculated from the conclusion of the briefing]. Briefing will be presented pursuant to the Court's Local Rules. No case dispositive motion under Rule 56 may be filed more than ten (10) days before the above date without leave of the Court.

(b) <u>Concise Statement of Facts Requirement.</u> Any motion for summary judgment shall be accompanied by a separate concise statement, not to exceed six (6) pages, which details each material fact which the moving party contends is essential for the Court's resolution of the summary judgment motion (not the entire case) and as to which the moving party contends there is no genuine issue to be tried. Each fact shall be set forth in a separate numbered paragraph and shall be supported by specific citation(s) to the record.

Any party opposing the motion shall include with its opposing papers a response to

the moving party's concise statement, not to exceed six (6) pages, which admits or disputes the facts set forth in the moving party's concise statement on a paragraph-by-paragraph basis. To the extent a fact is disputed, the basis of the dispute shall be supported by specific citation(s) to the record.  Failure to respond to a fact presented in the moving party's concise statement of facts shall indicate that fact is not in dispute for purposes of summary judgment. The party opposing the motion may also include with its opposing papers a separate concise statement, not to exceed four (4) pages, which sets forth material facts as to which the opposing party contends there is a genuine issue to be tried. Each fact asserted by the opposing party shall also be set forth in a separate numbered paragraph and shall be supported by specific citation(s) to the record.

The moving party shall include with its reply papers a response to the opposing party's concise statement of facts, not to exceed four (4) pages, on a paragraph-by-paragraph basis. Failure to respond to a fact presented in the opposing party's concise statement of facts shall indicate that fact remains in dispute for purposes of summary judgment.

(c)      Page limits combined with Daubert motion page limits. Each party is permitted to file as many case dispositive motions as desired provided, however, that each **SIDE** will be limited to a combined total of 40 pages for all opening briefs, a combined total of 40 pages for all answering briefs, and a combined total of 20 pages for all reply briefs regardless of the number of case dispositive motions that are filed. In the event that a party files, in addition to a case dispositive motion, a Daubert motion to exclude or preclude all or any portion of an expert's testimony, the total amount of pages permitted for all case dispositive and Daubert motions shall be increased to 50 pages for all opening briefs, 50 pages for all answering briefs, and 25 pages for all reply briefs for each **SIDE**.[1]

---

[1]      The parties must work together to ensure that the Court receives no more than a *total* of *250 pages* (*i.e.*, 50 + 50 + 25 regarding one side's motions, and 50 + 50 + 25 regarding the

other side's motions) of briefing on all case dispositive motions  and *Daubert* motions that are covered by this scheduling order and any other scheduling order entered in any related case that is proceeding on a consolidated or coordinated pretrial schedule.

16.    <u>Applications by Motion.</u> Except as otherwise specified herein, any application to the Court shall be by written motion. Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

*17.*    <u>Motions *in Limine.*</u> Motions *in limine* shall not be separately filed. All *in limine* requests and responses thereto shall be set forth in the proposed pretrial order. Each **SIDE** shall be limited to three (3) *in limine* requests, unless otherwise permitted by the Court. The *in limine* request and any response shall contain the authorities relied upon; each *in limine* request may be supported by a maximum of three (3) pages of argument, may be opposed by a maximum of three (3) pages of argument, and the side making the *in limine* request may add a maximum of one (l) additional page in reply in support of its request. If more than one party is supporting or opposing an *in limine* request, such support or opposition shall be combined in a single three (3) page submission (and, if the moving party, a single one (1) page reply), unless otherwise ordered by the Court. No separate briefing shall be submitted on *in limine* requests, unless otherwise permitted by the Court.

18.    <u>Pretrial Conference.</u> On _____ **[Appx. 31 weeks (7 months) after Order Granting Motion For An Expedited Trial]**, the Court will hold a pretrial conference in Court with counsel beginning at_____. Unless otherwise ordered by the Court, the parties should assume that filing the pretrial order satisfies the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(3). The parties shall file with the Court the joint proposed final pretrial order in compliance with Local Rule 16.3(c) and the Court's Preferences and Procedures for Civil Cases not later than seven (7) days before the pretrial conference. Unless otherwise ordered by the Court, the parties shall comply with the timeframes set forth in Local Rule 16.3(d)(1)-(3) for the preparation of the joint proposed final pretrial order.

The parties shall provide the Court two (2) double-sided courtesy copies of the joint proposed final pretrial order and all attachments. The proposed final pretrial order shall contain a table of contents and the paragraphs shall be numbered.

19.     Jury Instructions, Voir Dire, and Special Verdict Forms. Where a case is to be tried to a jury, pursuant to Local Rules 47.1(a)(2) and 51.1 the parties should file (i) proposed voir dire, (ii) preliminary jury instructions, (iii) final jury instructions, and (iv) special verdict forms seven (7) business days before the final pretrial conference. This submission shall be accompanied by a courtesy copy containing electronic files of these documents, in Microsoft Word format, which may be submitted by e-mail to mn_civil@ded.uscourts.gov.

20.     Trial. This matter is scheduled for a day jury trial beginning at 9:30 a.m.  on

_____ **[Appx. 35 weeks (8 months) after Order Granting Motion For An Expedited Trial]**, with the subsequent trial days beginning at 9:00 a.m. Until the case is submitted to the jury for deliberations, the jury will be excused each day at 4:30 p.m. The trial will be timed, as counsel will be allocated a total number of hours in which to present their respective cases.

21.     Judgment on Verdict and Post-Trial Status Report. Within seven (7) days after a jury returns a verdict in any portion of a jury trial, the parties shall jointly submit a form of order to enter judgment on the verdict. At the same time, the parties shall submit a joint status report, indicating among other things how the case should proceed and listing any post-trial motions each party intends to file.

22.     Post-Trial Motions. Unless otherwise ordered by the Court, all ***SIDES*** are limited to a maximum of 20 pages of opening briefs, 20 pages of answering briefs, and 10 pages of reply briefs relating to any post-trial motions filed by that side, no matter how many such motions are filed.

_____

The Honorable Maryellen Noreika
United States District Judge

Counsel Shall Provide a Chart of All Relevant Deadlines

| EVENT | PROPOSED DEADLINE |
|---|---|
| Deadline for each party to serve initial disclosures pursuant to Rule 26(a)(1) and Default Standard for Discovery (¶1) | 5 days after Order Granting Motion For An Expedited Trial |
| Deadline for Apple to identify all accused product(s), its damages model, as well as the asserted patent(s) that the accused product(s) allegedly infringe(s), and to produce the file history for each asserted patent (¶7(a)) | 5 days after Order Granting Motion For An Expedited Trial |
| Deadline for the parties to file a proposed protective order (¶3) | 10 days after Order Granting Motion For An Expedited Trial |
| Deadline for Masimo to produce core technical documents related to the accused product(s) sufficient to show how the accused product(s) work (¶7(b)) | 2 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for Apple to serve initial infringement contentions (¶7(c)) | 2 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for Masimo to serve initial invalidity contentions, as well as produce the known related invalidating references (¶7(d)) | 3 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for joinder of other parties and amendment of pleadings (¶2) | 4 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for the substantial completion of document production (¶8(b)) | 7 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for the parties to finally supplement the identification of all accused products and all invalidity references (¶14) | 8 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for Apple to serve final infringement contentions (¶7e) | 8 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for Masimo to serve final invalidity contentions (¶7(f)) | 9 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for the close of fact discovery (¶8(a)) | 10 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for opening expert reports for each party that bears the initial burden of proof (¶8(f)(i)) | 12 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for rebuttal expert reports (¶8(f)(i)) | 14 weeks after S Order Granting Motion For An Expedited Trial |
| Deadline for reply expert reports (¶8(f)(i)) | 16 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for the completion of expert discovery (¶8(f)(iv)) | 18 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for the parties to file all case dispositive and *Daubert* motions, as well as an opening brief, statement of facts, and affidavits, if any (¶15) | 19 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for the parties to oppose case dispositive and *Daubert* motions (¶15) | 21 weeks after Order Granting Motion For An Expedited Trial |

| EVENT | PROPOSED DEADLINE |
|---|---|
| Deadline for the parties to reply to case dispositive and *Daubert* motions (¶15) | 22 weeks after Order Granting Motion For An Expedited Trial |
| Deadline for parties to file joint pretrial order (¶18) | 7 days prior to Pretrial Conference |
| Deadline for the parties to file proposed jury instructions, voir dire, and verdict forms | 7 days prior to Pretrial Conference |
| Pretrial Conference | Appx. 31 weeks (7 months) after Order Granting Motion For An Expedited Trial |
| Trial | Appx. 35 weeks (8 months) after Order Granting Motion For An Expedited Trial |