# ATTACHMENT  A

Case 1:22-cv-01377-MN-JLH Document 110-1 Filed 05/30/23 Page 2 of 134 PageID #:8319
Case 8:20-cv-00048-JVS-JDE Document 61 Filed 06/26/20 Page 1 of 92 Page ID
#:4187

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
steve.jensen@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Stephen W. Larson (Bar No. 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404; Facsimile: (949)-760-9502

Adam B. Powell (Bar. No. 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
12790 El Camino Real
San Diego, CA 92130
Telephone: (858) 707-4000; Facsimile: (858) 707-4001

Attorneys for Plaintiffs,
Masimo Corporation and Cercacor Laboratories, Inc.

*Counsel for Defendants listed on next page.*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., a California corporation <br><br> Defendant. | Case No. 8:20-cv-00048-JVS-JDE <br><br> **JOINT STIPULATION REGARDING PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER** <br><br> [Discovery Document: Referred to Magistrate Judge John D. Early] <br><br> Date: July 23, 2020 <br> Time: 10:00 a.m. <br> Ctrm: 6A <br><br> Discovery Cut-Off: 7/5/2021 <br> Pre-Trial Conference: 3/21/2022 <br> Trial: 4/5/2022 <br><br> Hon. James V. Selna <br> Magistrate Judge John D. Early |

JOSHUA H. LERNER, SBN 220755
    jlerner@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street Suite 3000
San Francisco, CA 94105
Tel.: 415.393.8200 / Fax: 415.393.8306

H. MARK LYON, SBN 162061
    mlyon@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel.: 650.849.5300 / Fax: 650.849.5333

BRIAN M. BUROKER, *pro hac vice*
    bburoker@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel.: 202.955.8541 / Fax: 202.467.0539

BRIAN A. ROSENTHAL, *pro hac vice*
    brosenthal@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.2339 / Fax: 212.817.9539

ILISSA SAMPLIN, SBN 314018
    isamplin@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000 / Fax: 213.229.7520

ANGELIQUE KAOUNIS, SBN 209833
    akaounis@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
2029 Century Park East Suite 4000
Los Angeles, CA 90067
Tel.: 310.552.8546 / Fax: 310.552.7026

Attorneys for Defendant Apple Inc.

**TABLE OF CONTENTS**

**Page No.**

I.    INTRODUCTORY STATEMENTS ................................................................1

    A.   Plaintiffs' Introductory Statement ..............................................1

    B.   Defendant's Introductory Statement ...........................................4

II.   DISPUTES REGARDING PROTECTIVE ORDER ...........................7

    A.   Section 3 – Filings Under Seal .....................................................7

        1.   Plaintiffs' Position ...............................................................8

        2.   Defendant's Position............................................................8

    B.   Sections 5.5 and 6 – Use of Protected Material at Trial ..........11

        1.   Plaintiffs' Position .............................................................12

        2.   Defendant's Position..........................................................13

    C.   Section 9.1 – Export Regulations ...............................................15

        1.   Plaintiffs' Position .............................................................15

        2.   Defendant's Position..........................................................16

    D.   Section 9.2(b) and (j)– Disclosure of Confidential
        Information ....................................................................................19

        1.   Plaintiffs' Position .............................................................20

        2.   Defendant's Position..........................................................21

    E.   Section 9.2(f) – Disclosure of Confidential Information..........23

        1.   Plaintiffs' Position .............................................................24

        2.   Defendant's Position..........................................................26

    F.   Section 9.3 – Use of Highly Confidential Information.............29

        1.   Plaintiffs' Position .............................................................30

            a.   The Court Should Reject Apple's
               "Relationship" Restriction ...................................30

**TABLE OF CONTENTS**
*(Cont'd)*

Page No.

       i.    Apple Cannot Show Jensen Will Inadvertently Disclose Protected Material ...................................... 32

       ii.    Apple Cannot Show It Will Suffer Harm ........................................................ 33

       iii.    Apple's Restriction Would Prejudice Plaintiffs ................................................. 34

    b.    The Court Should Reject Apple's Attempt to Provide Plaintiffs' Trade Secrets To Its In-House Counsel ................................ 35

  2.    Defendant's Position ................................................ 36

    a.    This Court Should Bar Those Who are Either Competitive Decision-Makers Or Are Present Board Members Or Were Board Members Within The Last Two Years From Accessing Confidential Materials ...................... 37

       i.    The Relationship Between Mr. Jensen And Plaintiffs Presents An Unacceptable Risk Of Inadvertent Disclosure Of Confidential Information In This Case .......................... 39

       ii.    The Nature of Mr. Jensen's Service on Cercacor's Board of Directors Conflicts With The Obligation To Remain Silent Under A Protective Order .......................................... 41

       iii.    The Risk Of Inadvertent Disclosure of Apple's Confidential Information Outweighs Harm To Plaintiffs, If Any ...... 45

    b.    Apple's Provision Providing Trade Secrets to its In-House Counsel ....................................... 47

G.    Section 10 – Prosecution Bar .................................................. 49

  1.    Plaintiffs' Position .......................................................... 52

# TABLE OF CONTENTS
## *(Cont'd)*

Page No.

2. Defendant's Position ...................................................... 54

    a. The Prosecution Bar Should Prohibit Those Who Receive Apple's Confidential Information From Participating in *Inter Partes* Review Unless The Patent Owner Does Not Attempt to Amend Its Claims ............. 55

    b. The Significant Risk Of Inadvertent Disclosure Justifies The Inclusion Of An Acquisition Bar In The Protective Order ............. 59

H. Sections 4.5 and 11 – Source Code .......................................... 63

    1. Plaintiffs' Position ................................................ 66

        a. Section 4.5 ................................................... 67

        b. Section 11(f) ................................................ 68

        c. Section 11(h) ................................................ 69

        d. Section 11(i) ................................................. 70

        e. Section 11(j) ................................................. 71

        f. Section 11(k) ................................................ 72

        g. Section 11(l) ................................................. 73

    2. Defendant's Position .......................................... 73

        a. Section 4.5 ................................................... 73

        b. Section 11(f) ................................................ 74

            i. Generating Source Code as PDF Copies ............................................ 74

            ii. Printing More Than 200 Pages ................. 75

            iii. Printing Directory Paths Information ........ 76

        c. Section 11(h) ................................................ 77

Case 1:22-cv-01377-MN-JLH   Document 110-1   Filed 05/30/23   Page 7 of 134 PageID #: 8324
Case 8:20-cv-00048-JVS-JDE   Document 611   Filed 06/26/20   Page 6 of 92   Page ID
#:4192

**TABLE OF CONTENTS**
*(Cont'd)*

Page No.

|  |  |  |  |
|---|---|---|---|
| | d. | Section 11(i) | 77 |
| | e. | Section 11(j) | 79 |
| | | i. | Increasing the Number of Reviewers | 79 |
| | | ii. | Restrictions on how source code may be transported | 80 |
| | f. | Section 11(k) | 81 |
| | | i. | Bringing Source Code to the Deposition | 81 |
| | | ii. | Maintaining Marked Deposition Exhibits | 81 |
| | g. | Section 11(l) | 82 |
| I. | Section 17 – Disposition After Trial | 82 |
| | 1. | Plaintiffs' Position | 83 |
| | 2. | Defendant's Position | 83 |

Plaintiffs MASIMO CORPORATION ("Masimo") and CERCACOR LABORATIES, INC. ("Cercacor") and Defendant APPLE INC. ("Apple") hereby submit this Joint Stipulation Regarding Plaintiffs' Motion for a Protective Order, pursuant to Fed. R. Civ. P. 26(c) and L.R. 37-1 *et seq.*

## I. **INTRODUCTORY STATEMENTS**

Pursuant to Judge Selna's June 23, 2020 Order (ECF No. 59), the parties have appended to Adam Powell's Declaration as Exhibit 4 a redlined version of the protective order that shows the parties' competing proposals on the disputed provisions addressed herein. The redline changes reflect Apple's proposals that differ from Plaintiffs' proposals. In addition, a clean version of Plaintiffs' full proposed protective order is appended to Adam Powell's Declaration as Exhibit 2, and a clean version of Apple's full proposed protective order is appended to Ilissa Samplin's Declaration as Exhibit A.

## A. **Plaintiffs' Introductory Statement**

Plaintiffs understand the Court expects customized protective orders to be based on its Model Protective Order (the "Model Order"), which is attached as Powell Decl., Ex. 1. Thus, Plaintiffs offered to prepare a draft based on the Model Order. Powell Decl. ¶ 6. Apple refused and insisted on preparing the initial draft. *Id.* Plaintiffs agreed, but only on the condition that Apple would base its draft on the Model Order. *Id.* Unfortunately, Apple provided a draft several weeks later that bore no relationship to the Model Order. *See id.*, Ex. 5 at 11-41. Plaintiffs again asked Apple to provide a draft based on the Model Order, but Apple refused. *Id.*, Ex. 6 at 2. Thus, Plaintiffs prepared a draft based on the Model Order. *Id.*, Ex. 6 at 1, 15-37. Since then, the parties engaged in numerous meet-and-confers and exchanged numerous drafts to narrow their disputes. *Id.* ¶¶ 9-10 and Exs. 7-8. The parties were unable to resolve all issues and now present competing proposals.

Plaintiffs' proposal tracks the Court's Model Order as closely as possible.

Case 1:22-cv-01377-MN-JLH Document 110-1 Filed 05/30/23 Page 9 of 131 PageID #: 8326
Case 8:20-cv-00048-JVS-JDE Document 611 Filed 06/26/20 Page 8 of 92 Page ID
#:4194

For issues not addressed by the Model Order, Plaintiffs proposed using the language this Court recently adopted in *Masimo v. True Wearables*, No. 8:18-cv-02001-JVS-JDE ("*True Wearables*"). The provisions this Court adopted in *True Wearables* make sense here because Apple argued the two cases were related and involve "nearly identical" allegations. *See* Powell Decl., Ex. 24 (Apple's Notice of Related Cases) at 3. Instead of using this Court's Model Order, or the *True Wearables* Order, Apple primarily relies on provisions from something it calls "Apple's standard protective order." Apple's proposals are inappropriate for many reasons.

First, many of Apple's proposals conflict with the Court's Model Order, Local Rules, and Ninth Circuit precedent. For example, Apple proposes changing the Model Order by: (1) providing that the mere designation of information as "Highly Confidential" or "Source Code" constitutes good cause for sealing the information (Section II.A, *infra*), (2) eliminating this Court's provisions concerning how information is used at trial (Section II.B, *infra*), (3) improperly limiting the individuals who can access "Confidential" information (Section II.D, *infra*), and (4) modifying the process of returning or destroying designated information after Final Disposition (Section II.J, *infra*). Apple fails to justify these changes to the Court's Model Order.

Second, the parties agreed to add a "Highly Confidential" tier to the Model Order, but Apple inappropriately narrows who may access such information. *See* Section II.F, *infra*. Apple proposes language that would deprive Plaintiffs of their chosen counsel, Stephen Jensen, who has been representing Plaintiffs in litigation against Plaintiffs' competitors for decades. This Court rejected nearly identical language in *True Wearables*. Powell Decl., Ex. 13 at 8. This Court then affirmed Jensen is not a "competitive decision-maker" and may access Highly Confidential information. *Id.*, Ex. 14 at 5-6.

Apple identifies no reason why this Court should reach a contrary conclusion in this case.

Third, the parties agreed to add a "Source Code" tier to the Model Order, but Apple defines "source code" to include technical documents that are not source code and imposes unreasonable restrictions on reviewing "source code." Section II.H, *infra*. As a result, Apple's proposal significantly hinders Plaintiffs' ability to review anything Apple designates as source code. Apple also includes numerous provisions seeking Plaintiffs' work product, including a provision requiring advanced notice of the specific source code printouts Plaintiffs will use at depositions. Apple's counsel also insists they may review any work product inadvertently left behind by Plaintiffs in the source code review room, which is contrary to their ethical duties.

Fourth, Apple asserts that a consultant that worked for Plaintiffs in *True Wearables* may serve as Apple's e-discovery consultant in this case, despite Apple asserting the two cases are "nearly identical." *See* Section II.E, *infra*. Apple takes that position even though the consultant obtained access to Plaintiffs' highly confidential and ***privileged*** information in *True Wearables*. The consultant also obtained privileged information while serving as Plaintiffs' expert witness in another matter that Apple asserted is relevant to this case. Apple does not explain why it cannot use one of the dozens of other available consultants who have not worked for Plaintiffs on related matters.

Fifth, the parties agreed to add a patent prosecution bar to the Model Order, but Apple proposes unworkable terms. *See* Section II.G, *infra*. For example, Apple proposes that Plaintiffs' outside counsel may participate in *inter partes* review, but ***only if*** Plaintiffs waive their right to amend the claims. That is one-sided and forces Plaintiffs to choose between using its preferred counsel and waiving its right to amend the claims. The Court should adopt Plaintiffs'

proposal, which properly allows outside counsel to participate so long as they are not involved in amending the claims.

Finally, Apple insists that Protected Material may not be taken outside the U.S. or provided to any foreign national. *See* Section II.C, *infra*. Apple attempts to justify its proposal on U.S. export regulations, but its proposal is more onerous than U.S. export regulations. For example, Apple's proposal bars Plaintiffs from using foreign nationals as expert witnesses or conducting depositions outside the U.S., even if doing so does not violate export regulations. The Court should adopt Plaintiffs' proposal, which places the burden on the Receiving Party to comply with applicable export regulations.

Accordingly, Plaintiffs respectfully request the Court enter their proposed protective order, which is attached to the Powell Declaration as Exhibit 2.

**B.     Defendant's Introductory Statement**

Plaintiffs have approached the protective order negotiations from the premise that this Court's model protective order—what Plaintiffs term the "Model Order"—governs in the event of any disputes between the parties. Apple respectfully disagrees with Plaintiffs' position, and further notes that Plaintiffs have been more than willing to take a contrary stance when it suits their interests (e.g., advocating for an unprecedented provision that would restrict Apple from using the e-discovery vendor of its choosing). This Court's instructions state merely that "[a] model protective order is attached below." The Court's rules do not instruct parties to adopt all provisions in the Model Order, do not provide that the Model Order controls in the event of any disputes, and do not even require parties to submit a redline between their protective order proposals and the Model Order. Plaintiffs' suggestion that their proposed protective order is more appropriate because it purportedly "tracks the Court's Model Order as closely as possible" therefore is not persuasive. Nor is it true. Plaintiffs are proposing many provisions that do not appear in the Model Order

at all, proving *Apple's* point—which is that this case involving patent, trade secret, and highly sensitive information requires different protections against the use and disclosure of confidential information than a run-of-the mill litigation.

Equally unpersuasive is Plaintiffs' argument that any departures from the Court's Model Order should track the language in the protective order entered in the *True Wearables* case. While it is true that Apple filed a notice of related cases given certain allegations common to this lawsuit and *True Wearables*, Apple is differently situated from True Wearables, including in ways that bear directly on the protective order disputes here. Apple is one of the largest technology companies in the world and the accused products in this case, the Apple Watch Series 4 and 5, are extremely valuable products already in the wearables space. True Wearables, Inc., by contrast, is a six-year old medical device start-up. Moreover, Apple is not a party in *True Wearables* and therefore was not involved in the negotiations regarding the protective order in that case or the briefing leading up to entry of that protective order. Plaintiffs' suggestion that Apple should be automatically or presumptively bound by the *True Wearables* protective order or any other rulings entered in that case therefore is not sensible or fair. This lawsuit is a separate action involving different parties, considerations, and confidential information. These protective order disputes should be decided with those facts in mind; the protective order and decisions in *True Wearables* should not be treated as presumptively valid or binding here.

Notably, Plaintiffs have resisted—and fail to mention at all—the Model Order the Northern District of California has adopted for cases "involving patents, highly sensitive confidential information and/or trade secrets," in recognition of the heightened protections necessary for, and sensitivities involving, information of the type at issue in this action. *See* Samplin Decl. Ex. D. Apple proposed provisions from the Northern District's Model. Plaintiffs dismissed them on the mere basis that they are not in this Court's Model Order.

But Plaintiffs have recognized the value in adopting provisions from the Northern District's Model for like cases proceeding in this District. *See, e.g.*, Joint Stip. at 9, *Masimo Corp. v. Mindray DS USA Inc*, 2014 WL 12597116 (C.D. Cal. Feb. 13, 2014), ECF No. 111 ("*Masimo's* proposal is modeled after the Northern District of California's Model Protective Order . . . which was the basis for nearly every other aspect of the parties' Proposed Stipulated Protective Order.") (emphasis added). Judge Selna likewise has looked to Northern District rules in cases like this one. *See* Samplin Decl. Ex. C, at 52.

Apple has agreed to the majority of the provisions contained in this Court's Model Order. Apple respectfully submits, however, that in this case involving patent, trade secret, and source code information—some of the most sensitive information in Apple's *and* Plaintiffs' possession—certain heightened protections are necessary, including those proposed by Apple here, for example:

- precluding a party's competitive decision-makers and Board members form accessing Apple's highly confidential information given the inherent risk for the inadvertent disclosure of confidential information;

- extending the agreed-upon prosecution bar to those who receive access to confidential information from participating in the acquisition of new patents given the risk that litigation counsel will use their acquired knowledge to advise a client on which patents to acquire;

- barring counsel who receive access to highly confidential materials from participating in IPR proceedings that involve claim amendments given the likelihood that counsel's knowledge will be used to guide co-counsel toward or away from making amendments;

- access by a limited number of Apple's in-house counsel to Plaintiffs' highly confidential information, including their alleged trade secrets,

which is fairly standard in high stakes trade secret cases like this one;[1]

- prohibitions on the export of confidential materials—in this case that does not involve parties, experts, or evidence located abroad—given the heightened risk of misuse and unauthorized access; and

- automatic return or destruction of the parties' confidential material—including their highly sensitive source code and trade secret-related information—60 days following the final disposition of this action.

Apple is advocating for standard and reasonable protections for its sensitive Apple Watch-related information, and respectfully requests that the Court enter its proposed protective order attached to the Samplin Declaration as Exhibit A.

## II. **DISPUTES REGARDING PROTECTIVE ORDER**

The parties have reached an impasse on the following issues.

**A.    Section 3 – Filings Under Seal**

The Parties' dispute on Section 3 is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

3.    ACNOWLEDGMENT   OF   UNDER   SEAL   FILING PROCEDURE

. . . The parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL does not—without the submission of competent evidence by declaration, establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable—constitute good cause.  But designation of information as HIGHLY CONFIDENTIAL –

---

[1] On June 25, 2020, the Court dismissed Plaintiffs' trade secret claim. ECF No. 60.  However, the Court granted Plaintiffs 30 days to amend.  Apple is cognizant of, and objects to, any protective order provisions that will hinder its ability to defend against a future trade secret misappropriation claim.

-7-

Case 8:20-cv-00048-JVS-JDE Document 116-1 Filed 05/26/20 Page 15 of 131 Page ID #:8320

SOURCE CODE or HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY shall be presumptively deemed to present good cause for filing under seal. Nothing in this section shall in any way limit or detract from this Protective Order's requirements as to Source Code.

## 1. Plaintiffs' Position

Plaintiffs propose adopting the language from this Court's Model Order. *Compare* Powell Decl., Ex. 1 (Model Order) at 3 *with* Ex. 2 (Plaintiffs' proposal) at 2. Plaintiffs' proposal (and the Model Order) are consistent with the Local Rules, which state that merely designating information "confidential pursuant to a protective order is ***not*** sufficient justification for filing under seal; a person seeking to file such documents under seal must comply with L.R. 79-5.2.2(b)." L.R. 79-5.2.2(a)(i) (emphasis added). Apple's proposal deviates from the Model Order and Local Rules by including a provision that the designation of information as highly confidential or source code is "presumptively deemed to present good cause for filing under seal." *See* Powell Decl., Ex. 4 at 2-3. Plaintiffs' objection was based solely on the Court's Model Order and Local Rules.

## 2. Defendant's Position

Apple's proposal does not alleviate the parties' obligations to follow the procedures set forth in Local Civil Rule 79-5 relating to "CONFIDENTIAL" information. Apple's proposal merely recognizes that because this case will involve the production of source code, highly confidential competitive information, and potentially trade secrets, elevated designations for such material necessarily raise a presumption of good cause for filing under seal. Throughout the course of the parties' negotiations, Plaintiffs' counsel stated that while they would not advocate for Apple's proposed language, they would indicate to the Court that they do not object to it. *See, e.g.*, Samplin Decl. Ex.

G, at 153 [June 3, 2020 Email from A. Powell] (stating, with respect to Section 3 of the protective order, that Plaintiffs "will not include Apple's edits in our draft, but we will indicate that we do not oppose the changes if the Court deems them acceptable"). Apple therefore was surprised when Plaintiffs failed to indicate their non-opposition in this submission.

The public's right of access is important, and clearly upheld in Apple's proposed protective order (Samplin Decl. Ex. A [Apple's proposed protective order]; *see also* Powell Decl. Ex. 4 [parties' combined proposed protective orders]), but such a right "is not absolute and can be overridden given sufficiently compelling reasons for doing so." *Foltz v. State Farm Mut. Auto Ins. Comp.*, 331 F.3d 1122, 1135 (9th Cir. 2003). Compelling reasons include to protect "sources of business information that might harm a litigant's competitive standing" (*Ctr. For Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016), *cert. denied sub nom. FCA U.S. LLC v. Ctr. for Auto Safety*, 137 S. Ct. 38 (2016) (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)), and "to prevent disclosure of materials . . . including, *but not limited to*, trade secrets or other confidential research, development, or commercial information" (*Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002) (emphasis in original)). The parties' agreed definitions of the elevated designations of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" *presumptively* fall into those categories worthy of protection:

- "'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY': extremely confidential and/or sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party."

- "'HIGHLY CONFIDENTIAL – SOURCE CODE': extremely

> sensitive "Confidential Information or Items" representing computer code, scripts, assembly, binaries, object code, source code listings (e.g., file names and path structure), descriptions of source code (e.g., descriptions of declarations, functions, and parameters), object code listings, and Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip, disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party . . . ."

Compelling reasons are fairly certain to justify the filing under seal of any materials marked with these elevated designations in *this* case—where highly confidential information, source code, competitive information, and potentially trade secrets are at issue. Put differently, Plaintiffs have no cognizable argument that materials satisfying the above definitions should be available to the public. In this case where Plaintiffs have asserted that Apple has misappropriated *Plaintiffs'* purported trade secrets (and may continue to attempt to assert their misappropriation claim even though it has thus far been dismissed), Plaintiffs should be equally interested in a presumption preventing disclosure of their highly confidential and source code information. That is why Apple's proposed language—which would have bilateral effect—makes sense. And if a situation arises in which the presumption is too broad for a particular application, the presumption can be rebutted.

Further, this presumption will relieve administrative burden for both the parties and the Court, as it will curtail numerous submissions seeking to justify highly confidential and source code redactions where the parties are in agreement about those redactions. Apple's proposal would limit the need for briefing on this topic to those situations where the designations actually are disputed. Apple's proposed approach makes practical and efficient sense in a

case where the parties already know that information designated highly confidential will feature source code and potentially trade secrets that should be redacted in Court submissions.

**B.    Sections 5.5 and 6 – Use of Protected Material at Trial**

The Parties' dispute on Sections 5.6 and 6 is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

5.    SCOPE

. . .

5.6    Any use of Protected Material at trial shall be governed by ~~the orders of the trial judge and other applicable authorities~~ <u>a separate agreement or order</u>. This Order does not govern the use of Protected Material at trial.

6.    DURATION

Even after Final Disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing, a court order otherwise directs, or the information was made public during trial. For purposes of this Order, "Final Disposition" occurs after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals. ~~Once a case proceeds to trial, information that was designated or maintained pursuant to this protective order used or introduced as an exhibit at trial becomes public and will be presumptively available to all members of the public, including the press, unless compelling reasons supported by specific factual findings to proceed otherwise are made to the trial judge. *See Kamakana*, 447 F.3d at 1180-81 (distinguishing "good cause" showing for sealing documents~~

produced in discovery from "compelling reasons" standard when merits-related documents are part of court record).Pursuant to Paragraph 5.6 above, any use of Protected Material at trial shall be governed by a separate agreement or order.

**1.    Plaintiffs' Position**

Plaintiffs again propose adopting this Court's Model Order on these provisions.  *Compare* Powell Decl., Ex. 1 (Model Order) at 6 *with* Ex. 2 (Plaintiffs' proposal) at 7.[2]  Plaintiffs' proposal (and the Court's Model Order) properly recognize that a separate order from the trial Court will govern the use of Protected Material at trial and that Ninth Circuit precedent imposes a higher burden to seal information introduced at trial.  *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1180-81 (9th Cir. 2006).  This language is commonly included in protective orders.  *See, e.g.*, *Glaukos Corp. v. Ivantis, Inc.*, No. 8:18-cv-00620-JVS-JDE, Dkt. No. 36 (C.D. Cal. Aug. 3, 2018) (Powell Decl., Ex. 21) at 3.

Apple proposes modifying these provisions to improperly provide that the treatment of protected material at trial may be governed by a separate "agreement" without the Court's input.  Powell Decl., Ex. 4 at 7.  Apple also removes the Court's recitation of the Ninth Circuit standard for sealing material at trial.  *See Kamakana*, 447 F.3d at 1180-81; *Oliner v. Kontrabecki*, 745 F.3d 1024, 1025–26 (9th Cir. 2014) ("In keeping with the strong public policy favoring access to court records, most judicial records may be sealed only if the court finds 'compelling reasons.'").  Apple provides no justification for

---

[2] The parties agreed to minor changes to the Model Order to make clear that information designated pursuant to the Protective Order but ***not*** introduced at trial remains protected by the Protective Order.  *Compare* Powell Decl., Ex. 1 (Model Order) at 6 *with* Ex. 2 (Plaintiffs' proposal) at 7.

removing this Court's correct recitation of the law. The Court should adopt its standard language and reject Apple's unsupported modifications.

## 2.   **Defendant's Position**

Apple does not take issue with the Ninth Circuit law cited in this Court's Model Order, or with the uncontroverted fact that there is a strong public policy favoring access to court records, including at trial. Apple's simple position is that the parties are far off from any trial in this action—having yet to even produce a single confidential document in this case—and therefore the Court should defer entering orders about how the parties' highly sensitive information, including source code and potentially trade secrets, will be treated at a trial. Indeed, this Court's instructions to parties about protective orders states that "no proposed discovery protective order should purport to control the handing of materials at trial," and is precisely what Apple seeks to avoid.

Notably, the Northern District's Model Order for cases "involving patents, highly sensitive confidential information and/or trade secrets" provides that "[a]ny use of Protected Material at trial shall be governed by a separate agreement or order"—which is the exact language Apple is proposing here. Samplin Decl. Ex. D, at 59 [Northern District of California's Model Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets ("N.D. Cal. Model Order") § 3]; *see also id.* Ex. A, at 12 [Apple's proposed protective order provision for this case]. While Apple recognizes that the Central District of California has not published its own distinct Model Order for cases "involving patents, highly sensitive confidential information and/or trade secrets" (this case involves all three), courts within the Central District routinely follow the Northern District's model.[3] *See, e.g.*, *Masimo Corp. v. Mindray DS USA Inc*, No. 12-02206-CJC

---

[3] The Northern District also uses a default Patent Local Rule 2-2 Interim

(JPRx), 2014 WL 12597116 (C.D. Cal. Apr. 15, 2014) (affirming the magistrate judge's protective order, which was based on the Northern District of California's model protective order and provided for a two-year prosecution bar); *see also* Order at 2, *Freed Designs, Inc. v. Sig Sauer, Inc.*, No. 13-9570-ODW (AGRx) (C.D. Cal. July 9, 2014), ECF No. 28 ("The Court is agreeable to the entry of a protective order that tracks the language of the Northern District of California's Patent Local Rule 2-2 Model Protective Order."); Order at 3, *Black Hills Media, LLC v. Pioneer Corp.*, No. 13-05980-SJO (PJWx) (C.D. Cal. Sep. 24, 2013), ECF No. 59 ("If the parties are unable to agree on a protective order, the Court will enter the Northern District of California's Patent Local Rule 2-2 Interim Model Protective Order.").  The Northern District's position on this issue is sensible given the type of Protected Material that will be involved in, and the current posture of, this case.  Indeed, Plaintiff Masimo has previously agreed in this District to the Northern District language that Apple is proposing for this case.  *See* Joint Stip. at 9, *Masimo Corp. v. Mindray DS USA Inc*, 2014 WL 12597116 (C.D. Cal. Feb. 13, 2014), ECF No. 111.

To be clear, Apple does not dispute that this Court will need to be involved in any decision about how Protected Material will be treated at trial, should a trial occur in this action.  Apple therefore is confused by Plaintiffs' suggestion that Apple has recommended that the parties reach agreements about trial procedure without this Court's involvement.  To the contrary, Apple fully expects the Court to be instrumental in deciding this issue—with final say about

---

Model Protective Order, which courts within the Central District routinely follow as well.  *See* N.D. Cal., Patent Local Rule 2-2 Interim Model Protective Order,      https://www.cand.uscourts.gov/wp-content/uploads/forms/model-protective-orders/Interim-Patent-Protective-Order-Rule-2-2.docx   (last   visited June 24, 2020).  The two Northern District model orders are identical in relevant respects.

how the parties' Protected Material will be treated at trial. Apple simply proposes that the Court adopt the Northern District's proffered method for handling the treatment at trial of Protected Material in cases like this one—that is, deferring the issue until the case gets closer to trial, as most litigations resolve before that point, thereby mooting this issue completely.

**C.** **Section 9.1 – Export Regulations**

The Parties' dispute on Section 9.1 is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

9.1 Basic Principles.

. . .

Protected Material must be stored and maintained by a Receiving Party <u>at a location in the United States and</u> in a secure manner that ensures that access is limited to the persons authorized under this Order. ~~The Receiving Party will take any reasonably necessary precautions to comply with applicable United States Export Administration Regulations.~~ <u>To ensure compliance with applicable United States Export Administration Regulation, Protected Material may not be exported outside the United States or released to any foreign national (even if within the United States).</u>

**1.** **Plaintiffs' Position**

Plaintiffs again proposed adopting the Court's Model Order, which does not discuss export regulations. Apple insists that no Protected Material may be taken to ***any*** foreign country or provided to ***any*** foreign national (even within the United States). Powell Decl., Ex. 4 at 12. Apple attempted to justify those provisions by referencing U.S. export regulations. But Apple's proposal goes far beyond what is required by U.S. export regulations. For example, Apple's proposal would prevent a Canadian citizen who is a U.S. permanent resident

-15-

from serving as outside counsel or as an expert witness. Apple's proposal would also prevent the parties from taking depositions in *any* other country. Additionally, Apple's proposal could be interpreted as requiring outside counsel to discriminate based on national origin.

During the conference of counsel, Apple argued the parties could consider deviating from Apple's draconian language on a case-by-case basis. For example, Apple suggests Plaintiffs could ask Apple's permission to designate a foreign national as an expert, or to take Apple's materials outside the country for depositions. Apple thereby proposes giving itself improper leverage to deny Plaintiffs their choice of expert witness and prevent depositions that Apple deems undesirable.

The Court should adopt Plaintiffs' proposal, which would accomplish Apple's stated goals without providing Apple undue leverage. Plaintiffs propose requiring the Receiving Party to take whatever procedures may be reasonably necessary to comply with applicable export regulations. Such language is common when one or more parties alleges protected material may be subject to export regulations. Indeed, Apple has recently *stipulated* to similar language. *Pinn, Inc. v. Apple Inc.*, Case No. 8:19-cv-01805-DOC-JDE, Dkt. No. 60 (C.D. Cal. March 13, 2020) (Powell Decl., Ex. 17) at 16 ("Each party receiving Protected Material shall comply with all applicable export control statutes and regulations").

### 2. **Defendant's Position**

Apple's proposal regarding export control is not controversial. It provides that Protected Material should not be exported outside the United States or to any foreign national in order to comply with federal regulation and protect the parties' sensitive information. This provision should not impose *any* burden on Plaintiffs, given that all of Plaintiffs' counsel are located in the United States and discovery regarding the claims and defenses in this case

should not involve sending sensitive information abroad.[4]  By the opposite token, it should be clear why these provisions are critical—given the heightened risk of misuse and unauthorized access of information in countries outside the United States, differing views of business sensitivity and privacy, and Apple's inability to obtain justice, enforce the protective order, or reverse or prevent ongoing harm should its Protected Material be compromised outside the United States.

Plaintiffs' quote from one of Apple's "recently *stipulated*" protective orders does not support their position on this issue.  While Plaintiffs are correct that the protective order they reference from an entirely different case says that the parties "shall" comply with export rules, Plaintiffs omit the lengthy remainder of the paragraph, which is key:  "No party receiving Protected Material may allow it to leave the territorial boundaries of the United States of America or to be made available to any foreign national who is not (i) lawfully admitted for permanent residence in the United States or (ii) identified as a protected individual under the Immigration and Naturalization Act (8 U.S.C. 1324b(a)(3))."  The protective order further provided an exception from export prohibitions where non-source code Protected Material is reasonably necessary for use in a deposition in a foreign country.  Apple offered in this case to consider reasonable carve outs to address Plaintiffs' concerns, but Plaintiffs did not propose a workable solution.

Instead, Plaintiffs took the position that they should have the right to export Apple material outside the United States at will—but that they would

---

[4] If the case eventually requires depositions or experts located outside the United States, the parties can revisit the issue at that time, and attempt to reach agreement about the export of specific materials to the extent necessary.  Thus far, Plaintiffs have not expressed that they anticipate any need to hire experts or conduct depositions abroad.

agree to a provision requiring them to give notice to Apple before doing so, and then Apple would have the burden of proving that Plaintiffs should be prevented from exporting.  Plaintiffs' proposal was unworkable, because it would have imposed on Apple the burden to prevent transfer of Apple materials abroad, when the burden should be on *Plaintiffs* to justify any such transfer in the first place.  Notably, in proposing this notice provision, Plaintiffs at least recognized that Apple could be harmed by unfettered disclosure of its confidential material abroad.  Yet, once the parties failed to reach agreement on this export provision, Plaintiffs reverted to their original proposal (sans any notice of export), which leaves Apple's confidential material *without any protections* in this regard.

It is not clear to Apple why Plaintiffs are insisting on a provision to permit export of Apple's data outside the United States—particularly given that when Apple asked Plaintiffs if they have export plans, Plaintiffs responded in the negative.  Apple has yet to hear a compelling justification for this dispute, and therefore continues to seek sensible and definitive protections against the export of its sensitive materials abroad, particularly given the information that will be at issue in this case.[5]

_____

[5] The theft of intellectual property by foreign companies and nationals is an indisputable issue for American companies, including Apple; in fact, it is considered one of the greatest threats to American businesses and the U.S. economy.  The United States has responded in kind, including with the White House Annual Intellectual Property Report from 2019 discussing the country's focus on combatting the theft of trade secrets by international actors (https://www.whitehouse.gov/wp-content/uploads/2020/04/IPEC-2019-Annual-Intellectual-Property-Report.pdf), the Department of Justice Task Force on Intellectual Property, which "confront[s] the growing number of domestic and international intellectual property (IP) crimes" (https://www.justice.gov/iptf), and a trade deal with China entered earlier this year to, among other things, protect trade secrets, increase the scope of liability for trade secret misappropriation, and prohibit unauthorized disclosure by government personnel or third parties in proceedings (Economic and Trade Agreement

**D.    Section 9.2(b) and (j)– Disclosure of Confidential Information**

The Parties' dispute on Sections 9.2(b) and (j) is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

9.2    Disclosure of "CONFIDENTIAL" Information or Items.

. . .

(b) ~~the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action~~ Not more than three (3) representatives of the Receiving Party who are officers or employees (including House Counsel) to whom disclosure is reasonably necessary for this Action, provided that:  (a) each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; and (b) no unresolved objections to such disclosure exist after proper Pre-Access Disclosure Requirements are provided to all Parties and all objections have been resolved under the Objections Process under 9.2(c) below;

. . .

(j) during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the form attached as Exhibit A hereto; and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A),

---

Between the United States of America and the People's Republic of China: Phase 1 (January 15, 2020)).  In this context, Apple's proposal to limit export of its extremely sensitive materials is not only reasonable, but critical.

unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

### 1. Plaintiffs' Position

Plaintiffs again propose adopting the Court's Model Order. *Compare* Powell Decl., Ex. 1 (Model Order) at 10-11 *with* Ex. 2 (Plaintiffs' proposal) at 13, 16. Courts in this district routinely include similar provisions in protective orders. *See, e.g.*, *Uniloc 2017 LLC v. Netflix, Inc.*, No. 8:18-cv-02055-GW-DFM, Dkt. No. 80 (C.D. Cal. Aug. 5, 2019) (Powell Decl., Ex. 19) at 3-4 (permitting disclosure of confidential material to "[t]he officers, directors, and employees of the receiving party to whom disclosure is reasonably necessary, and who have signed the Agreement to Be Bound (Exhibit A)" and "During their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the Agreement to be Bound (Exhibit A)"); *XR Comms., LLC v. D-Link Systems, Inc.*, No. 8:17-cv-00596-JVS-JCG, Dkt. No. 113 (C.D. Cal. Mar. 6, 2018) (Powell Decl., Ex. 20) at 4 (same).

Apple proposes limiting Section 9.2(b) to only three individuals who must be disclosed ***and*** approved by the opposing party. Powell Decl., Ex. 4 at 13. Apple completely strikes Section 9.2(j). *Id.*, Ex. 4 at 16. During the conference of counsel, Apple provided no justification for its proposals. Instead, it asserted its proposal on 9.2(b) was a "standard" Apple provision and that it has not agreed to a provision similar to Section 9.2(j) in other cases. Apple's asserted preference is not sufficient justification for departing from the Court's Model Order.

Plaintiffs' proposal (and the Model Order) are reasonable. Section 9.2(b) allows the parties to show "Confidential" information to party employees if it is

reasonably necessary.  For example, litigants routinely designate non-public communications between the parties as "Confidential" because they need not be kept confidential from employees of the opposing party, but should not be made public.  Section 9.2(j) allows the parties to show "Confidential" information to witnesses during their depositions if it is "reasonably necessary" and the individual agrees to be bound by the Protective Order.  These provisions are entirely appropriate because they apply only to the lowest tier of "Confidential" information.  *See* Section 9.3 and 11, *infra*.  More sensitive information, like trade secrets, may be designated "Highly Confidential – Attorneys' Eyes Only" or "Highly Confidential – Source Code" and may not be viewed by individuals authorized under Sections 9.2(b) and (h).  That is one important purpose of a multi-tier Protective Order.  The Court should adopt Plaintiffs' proposal.

### 2.  **Defendant's Position**

The parties dispute how many and which types of individuals should have access to Protected Material on behalf of the Receiving Party.  Plaintiffs' proposal seeks an unlimited grant of access to all of their officers, directors, and employees under the ambiguous cover of "reasonably necessary" without any advanced designation.  Under this proposal, Apple would have no way of knowing, for example, how many people at Masimo have been shown Apple's confidential information or any basis to discern how Masimo concluded that disclosure to those people was "reasonably necessary."  Apple should not be forced to provide that type of discretion to an adversary.

Apple's proposal provides an appropriate safeguard against Plaintiffs applying the vague "reasonably necessary" language in a way that would unnecessarily expose Apple's confidential information to Plaintiffs' employees.  In addition, a restriction on the number of employees that may view confidential materials is appropriate to further limit the risk of misuse.  Plaintiffs' proposal does not afford Apple either protection and such protections are absolutely

necessarily.  For example, if Plaintiffs have a team of engineers currently working on the development of a potentially competing product (e.g., a competing smartwatch), Apple should have the right to oppose disclosure *before* Plaintiffs determine that disclosure of Apple's confidential information to that team of engineers is reasonably necessary.  Under Plaintiffs' proposal, Plaintiffs could provide this sensitive information to a team of four or more such engineers if Plaintiffs deemed it reasonably necessary.  Under Plaintiffs' proposal, Apple would not have a right to oppose this disclosure, nor would it even know that the disclosure occurred.

Plaintiffs have submitted provisions from protective orders in other cases that do not limit the number of people with access to confidential information and that do not provide a right of objection, but those provisions are inapposite here.  In contrast to the parties in the cited cases, Apple is one of the largest technology companies in the world, whose value lies in the protection and security of its proprietary and confidential information.  The need to limit the exposure and dissemination of its confidential information is apparent and should be observed.  In expanding the number of Plaintiffs' recipients of Apple's confidential information, Plaintiffs' proposal unnecessarily extends the vulnerability and exposure of Apple's confidential information beyond any level necessary to the prosecution of this case.

Moreover, to support their proposal, Plaintiffs identify a practice that some litigants "routinely designate non-public communications between the parties as 'Confidential' . . . because they should not be made public."  In so doing, Plaintiffs disregard the purpose of confidentiality designations as protections against the improper access to private information.  Plaintiffs' argument also neglects the fact that a majority of documents that receive the "confidential" designation receive do so not merely because they should be kept private, but also because they should be kept confidential from employees of the

opposing party—particularly where those employees may be working on a future competitive product or are involved in some other work that would provide the Producing Party with a basis to object.

Plaintiffs' Section 9(j) proposal is objectionable for many of the same reasons as their proposal in 9(b). Like 9(b), Plaintiffs' proposal in Section 9(j) would enable disclosure of confidential information to a deposition witness without any prior ability for Apple to object. Section 9(j) permits Plaintiffs to transmit Apple's "confidential" information to *any* individual who signs an acknowledgement form, even one signed on the spot during a deposition. Denying Apple the ability to raise any objections to that person seeing Apple's confidential information would create an end-run around the provisions needed in 9(b) for Plaintiffs' employees and is even more important if Plaintiffs seek to depose Apple's competitors, business partners, or others who should not be permitted to review Apple confidential information at all. Plaintiffs' proposed Section 9(j) would enable *anyone* that Plaintiffs call for deposition in this case to view Apple's non-public information. That is not how the process is supposed to work—and it risks improper disclosure of Apple's highly sensitive information and gamesmanship on the part of Plaintiffs in noticing depositions in this case. The Court should reject Plaintiffs' proposed Section 9(j) in its entirety.

**E.      Section 9.2(f) – Disclosure of Confidential Information**

The Parties' dispute on Section 9.2(f) is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

(f) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A)~~, provided that the name of~~

1    ~~any e-discovery vendors must be disclosed at least fourteen (14)~~
2    ~~days before providing the e-discovery vendor with Protected~~
3    ~~Material so that the Producing Party has an opportunity to object~~
4    ~~pursuant to the objection procedure set forth in subparagraph (c)~~
5    ~~above;~~

6    ### 1.    **Plaintiffs' Position**

7    Plaintiffs propose the parties provide advance disclosure of e-discovery
8    consultants and an opportunity to object.  This provision is not present in the
9    Model Order, but is necessary in this case to prevent a specific risk associated
10   with Apple using Consilio LLC as an e-discovery consultant.  Consilio working
11   for Apple in this case is highly problematic because Consilio worked for
12   Plaintiffs in matters that Apple considers directly relevant to this case.  Consilio
13   thereby obtained access to Plaintiffs' highly confidential and privileged
14   information *relevant to this case*.

15   In particular, Plaintiffs retained Consilio in *True Wearables*, which Apple
16   asserts is a related case that involves issues "nearly identical" to this case.
17   Powell Decl. ¶ 11 and Ex. 24 (Apple's Notice of Related Cases) at 3.  Apple has
18   already pursued discovery concerning *True Wearables*, including requesting
19   "All documents produced by Masimo and Cercacor in [*True Wearables*]."
20   Powell Decl. ¶ 13.  In its role as Plaintiffs' e-discovery consultant in that "nearly
21   identical" case, Consilio collected Plaintiffs' highly confidential and privileged
22   information.  *Id.* ¶ 11.  Consilio hosted Plaintiffs' documents in a database,
23   including non-produced documents that were not responsive and/or privileged.
24   *Id.*  While Plaintiffs have since terminated Consilio's involvement in *True*
25   *Wearables*, Consilio still had access to those files around the time Plaintiffs
26   filed this lawsuit.  *Id.*

27   Consilio was also Plaintiffs' forensic expert in *Masimo Corp. v. Sotera*
28   *Wireless Inc.*, No. 30-2013-00649172-CU-IP-CJC (Cal. Sup. Ct.) ("*Sotera*").

*Id.* ¶ 12. In *Sotera*, Consilio analyzed forensic images of devices used by former Masimo employees who left to work for Sotera. *Id.* One of those employees was a Masimo executive involved in both Masimo's engineering and marketing departments. *Id.* Consilio even ***testified*** for Masimo at trial in that matter. *Id.* Two individual forensic consultants who worked for Plaintiffs in *Sotera* are presently Consilio's "Senior Director – Digital Forensics & Expert Services" and "Senior Manager in Digital Forensics and Expert Services (DFES group)." *Id.*, Ex. 9. *Sotera* is currently stayed and Consilio retains access to Plaintiffs' information because the matter has not yet been dismissed. *Id.* ¶ 12.

Similar to *True Wearables*, Apple initially asserted *Sotera* was relevant to this case by seeking production of "All Documents and Communications relating to the trade secrets which You alleged were misappropriated by the defendants in [*Sotera*]." *Id.* ¶ 13. Apple claims it no longer asserts *Sotera* is relevant because Plaintiffs indicated they are not aware of overlapping trade secrets in the two cases. *Id.* ¶ 14. However, Apple expressly reserved the right to pursue discovery regarding *Sotera*. *Id.* Additionally, Apple cannot deny that Consilio obtained privileged information in *Sotera* regarding other related issues, including Masimo's strategies for litigating trade secret cases.

During the conference of counsel, Plaintiffs told Apple this provision was necessary only to prevent Consilio from working for Apple on this case. *Id.* Plaintiffs told Apple they would agree to remove this provision if Apple agreed not to use Consilio. *Id.* Doing so would both protect Plaintiffs' information ***and*** reduce the risk of Apple's counsel being disqualified if Consilio intentionally or inadvertently conveyed to them Plaintiffs' privileged information. Apple refused, but never explained why Apple must use Consilio instead of the dozens of other available e-discovery consultants. *Id.* Apple's insistence on using Consilio is troubling. Consilio apparently has no concern about working for Plaintiffs in *True Wearables* and working for Apple in this

case. Consilio presents an unacceptably high risk of improperly disclosing Plaintiffs' confidential and privileged information to Apple, even inadvertently, as well as unquestionably presenting an appearance of impropriety and conflicted loyalty.

Disqualification is appropriate where both (1) a confidential relationship exists and (2) confidential information was disclosed to the consultant. *Broadcom Corp. v. Emulex Corp.*, 2010 WL 11465478, at *1 (C.D. Cal. Apr. 5, 2010) (J. Selna). The Court should "also consider prejudice to both parties and whether disqualification would promote the integrity of the legal process." *Id.* (granting motion for disqualification). As discussed above, Consilio had a confidential relationship with Plaintiffs and received confidential and privileged information from Plaintiffs in cases that Apple asserts are relevant to this matter. While the prejudice to Plaintiffs of improper disclosure would be severe (and the appearance of impropriety is already highly concerning), Apple will suffer no prejudice from simply using a different e-discovery consultant. *See id.* (finding no prejudice because the defendant could find a new expert). Requiring Apple to use a different consultant would promote the integrity of the legal process by avoiding actual and apparent conflicts of interest.

Accordingly, the Court should bar Apple from using Consilio in this case, or at least adopt Plaintiffs' proposal so that Plaintiffs have an opportunity to object if Apple attempts to retain Consilio in connection with this case.

### 2.  __Defendant's Position__

Plaintiffs' efforts to disqualify Apple's discovery vendor Consilio through a proposed protective order provision is unprecedented and inappropriate. If Plaintiffs have concerns about Apple's use of Consilio in this case, they should attempt to satisfy their burden of disqualifying Apple's discovery vendor through a properly noticed motion on the issue. A proposed protective order provision is not the appropriate vehicle.

Indeed, Apple suspects that Plaintiffs are attempting to backdoor this issue in through a proposed protective order provision precisely because the case law does not support a request for a discovery vendor's disqualification under the circumstances present here. In *Gordon v. Kaleida Health*, for example, a discovery vendor (D4) provided services to both the plaintiffs and the defendants *in the same matter*, and the court determined there was "no need to protect Defendants from the risk of possible prejudicial disclosure of Defendants' confidential information as a result of D4's providing ESI consulting services to Plaintiffs." 2013 WL 2250506, at *10 (W.D.N.Y. May 21, 2013). Here, Consilio did not provide any discovery services to Plaintiffs in connection with the present lawsuit—and, therefore, this is even more of a clear-cut case than the *Gordon* case involving services provided to both the plaintiffs and the defendants in the *same* matter. Consilio's services for Plaintiffs on the related *True Wearables* lawsuit were minimal and short-lived. And Consilio's services for Plaintiffs in the *Sotera* lawsuit were for a matter that Plaintiffs have steadfastly represented has nothing to do with this case.

With respect to the *True Wearables* case, to which Apple is not a party, approximately a year and a half ago, Plaintiffs' counsel sent Consilio a comparatively small amount of data. Consilio processed and hosted that data from Plaintiffs *but never reviewed* the data. After a few months of no activity, Plaintiffs' counsel asked Consilio to return the data—because Plaintiffs had decided to host the data through their outside counsel—and Consilio complied. Consilio later informed Plaintiffs' counsel that it would work with Apple, not Plaintiffs, on any matters involving Masimo where Apple is a defendant (including this case). Consilio no longer has possession of any of Plaintiffs' data from *True Wearables*, did not review any of the small amount of *True Wearables*-related data that it previously received from Plaintiffs, and has not performed any work for Plaintiffs in connection with the present case.

Plaintiffs' reference to the *Sotera* matter is even more perplexing. As Apple explained to Plaintiffs during multiple meet and confers, the *only* reason Apple propounded a discovery request in this case that mentioned the *Sotera* matter is because *Sotera* involved allegations of trade secret misappropriation by Plaintiff Masimo. Given the vague nature of Plaintiffs' allegations of their purported trade secrets in this case, Apple had no basis to rule out the potential relevance of any other claim of trade secret misappropriation brought by either Plaintiff, including by Plaintiff Masimo in the *Sotera* case. As soon as Plaintiffs represented to Apple that they *did not believe* that any of the trade secrets alleged in *Sotera* overlap with the purported trade secrets alleged in this case, Apple agreed not to further pursue the request—but reserved all rights because Plaintiffs' representation was not a conclusive or definitive one. In any event, Plaintiffs' repeated position has been that *Sotera* is not relevant to this lawsuit, and Apple has not pressed the issue (and has no plans to do so, particularly now that the trade secret claim has been dismissed). Plaintiffs' reference to *Sotera* in this submission therefore is surprising, to say the least—as is Plaintiffs' suggestion that Apple would agree or concede that Consilio has obtained "privileged information" about "Masimo's strategies for litigating trade secret cases" that would preclude Consilio from serving as a discovery vendor for Apple in this case. Apple *disagrees* with that assertion, and believes the case law is clear that the facts at issue here do not create a conflict that warrants Consilio's exclusion, let alone an unprecedented protective order provision with the same effect.

Plaintiffs' efforts to disqualify Apple's discovery vendor through a proposed protective order provision are meritless. If Plaintiffs have non-frivolous concerns about Apple's use of Consilio in this case, they can file a properly noticed motion. That will give Apple a full and fair opportunity to respond—including with citations to all of the case law that refutes Plaintiffs'

argument, with a response to Plaintiffs' bald assertion that Apple "will suffer no prejudice from simply using a different e-discovery consultant," which is false, and with a declaration from Consilio that, among other things, refutes Plaintiffs' suggestion that Consilio has reviewed or continues to have possession of Plaintiffs' privileged information.[6]  A disqualification ruling does not belong in a protective order provision.[7]

**F.  <u>Section 9.3 – Use of Highly Confidential Information</u>**

The Parties' dispute on Section 9.3 is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

9.3.  Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items.   Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to the individuals identified in Paragraphs 9.2 (a), (c)-(i), ~~who are not competitive decision-makers of a Party.~~ <u>provided that such Outside Counsel under Paragraph 9.2(a) is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on</u>

---

[6] Apple has not submitted a declaration from Consilio with this Joint Stipulation given its position that this dispute is not ripe for adjudication in connection with protective order briefing.  Apple certainly will be prepared with such a declaration if and when the Court considers this issue, and therefore respectfully requests an opportunity to submit such a declaration at the appropriate time—before the Court decides this issue.

[7] Adding a "notice and objection" provision like the one alternatively proposed by Plaintiffs will serve only to kick the can down the road on the same (meritless) issue, and therefore should be rejected.

behalf of a Party or a competitor of a Party and such proposed Outside Counsel did not, at the time the lawsuit was filed or within the previous two (2) years from the date the lawsuit was filed, have a business or ownership interest in a Party (i.e., was not a Board member, Director, officer, employee, or hold a title with a Party). Additionally, whether Plaintiffs' trade secret disclosure under California Code of Civil Procedure Section 2019.210 is designated "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY," access to said disclosure shall be permitted for three (3) Apple House Counsel.

### 1. Plaintiffs' Position

Plaintiffs again propose language similar to the language this Court adopted in *True Wearables*. *Compare* Powell Decl., Ex. 2 (Plaintiffs' proposal) at 16 *with* Ex. 13 (*True Wearables*) at 8. Apple replaced that language with a proposal that (a) seeks to prevent certain of Plaintiffs' **outside** counsel from accessing "Highly Confidential" information, yet (b) seeks to allow three of Apple's **in-house** counsel access to Plaintiffs' "Highly Confidential" trade secret information in Plaintiffs' Section 2019.210 statement. *Id.*, Ex. 4 at 17. The Court should adopt Plaintiffs' proposal on both issues.

### a. The Court Should Reject Apple's "Relationship" Restriction

Apple proposes language that is nearly identical to the language this Court previously rejected in *True Wearables*. In that case, the defendant asked this Court to allow access only to individuals who, within two years prior to filing suit, did "not have a business or ownership interest in a Party (*i.e.*, not competitive decision makers, Board members, Directors, employees, owners, shareholders, or affiliates of a Party)." Powell Decl., Ex. 12 at 9. The defendants were trying to prevent Stephen Jensen from participating in the case.

After extensive briefing, this Court rejected the defendants' proposal and adopted language similar to the language Plaintiffs propose in this case, which bars only "competitive decisionmakers." *Id.*, Ex. 13 at 8. This Court then rejected the defendants' direct challenge to Jensen and concluded he was ***not*** a "competitive decisionmaker." *Id.*, Ex. 14 at 5-6.

Here, Apple proposes language that is nearly identical to the language this Court previously rejected. In particular, Apple seeks to allow access only to individuals who, within two years prior to filing suit, did not "have a business or ownership interest in a Party (i.e., was not a Board member, Director, officer, employee, or hold a title with a Party)." Powell Decl., Ex. 4 at 17. Apple has not explained why this provision is necessary or provided any factual or legal basis, whatsoever, for this provision. Indeed, Apple recently stipulated to a protective order without such language. *See Pinn* (Powell Decl., Ex. 17) at 8. It appears Apple is proposing this unusual language to exclude Jensen because Apple added the language to its proposal as the parties in *True Wearables* were litigating the same issue. Moreover, it does not appear that any of Plaintiffs' other outside counsel could be impacted by this provision. Thus, while Plaintiffs are in the dark as to Apple's reason or basis for this provision, Plaintiffs will direct their arguments towards Jensen in particular.

To restrict access to highly confidential information, Apple has the burden of showing an unacceptably high risk of inadvertent disclosure. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992). Apple also bears "the burden of showing that specific prejudice or harm will result from the disclosure of each document (or item of information) that it seeks to protect." *Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*, 242 F.R.D. 552, 554 (C.D. Cal. 2007) (citing *Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1130 (9th Cir. 2003)). The district court must balance the risk of the disclosure against the risk to the receiving party that the denial of access would

impair prosecution of its claims. *Brown Bag*, 960 F.2d at 1470; *see also In re Deutsche Bank,* 605 F.3d 1373, 1380 (Fed Cir. 2010). Apple cannot satisfy any of those requirements here.

### i.       Apple Cannot Show Jensen Will Inadvertently Disclose Protected Material

To evaluate the risk of inadvertent disclosure, the Court should examine "the factual circumstances surrounding [Jensen's] activities, association, and relationship with a party." *U.S. Steel*, 730 F.2d at 1468. A "crucial factor" is whether Jensen is "involved in 'competitive decisionmaking'; that is advising on pricing or design 'made in light of similar or corresponding information about a competitor.'" *Brown Bag*, 960 F.2d at 1470 (quoting *U.S. Steel*, 730 F.2d at 1468 n.3). Here, this Court recently determined Jensen is not involved in "competitive decisionmaking" for Plaintiffs. Powell Decl., Ex. 14 at 5-6; *see also* Jensen Decl. ¶ 10; Kiani Decl. ¶ 6.

A protective order also mitigates risk because courts presume attorneys will abide by protective orders and not expose themselves to contempt sanctions. *Coventry First LLC v. 21st Servs.*, No. 05CV2179-IEG (NLS), 2005 WL 8173350, at *5 (S.D. Cal. Dec. 22, 2005) ("[I]n the absence of any actual evidence of bad faith, the Court declines to presume [the attorneys] will disclose [the] confidential information, thereby breaching the protective order and exposing themselves to contempt sanctions.") (*citing Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1211 (Fed. Cir. 1987)). Not only have the parties agreed to a protective order, they even agree on barring Jensen and the rest of Plaintiffs' litigation team from engaging in patent prosecution.

At most, Apple may show Jensen is in contact with corporate officers who make competitive decisions. But that is not enough. *See Matsushita Elec. Indus. Co. v. United States*, 929 F.2d 1577, 1580 (Fed. Cir. 1991) (finding "largely irrelevant" regular contact with corporate officials who make policy or

competitive decisions). Rather, "the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party . . . must govern any concern for inadvertent or accidental disclosure." *U.S. Steel*, 730 F.2d at 1468 ("Whether an unacceptable opportunity for inadvertent disclosure exists, however, must be determined, as above indicated, by the facts on a counsel-by-counsel basis").

Interaction with decision makers is insufficient because the issue does not turn on the functions of the people a lawyer meets with, but on the functions of the lawyer. As the Federal Circuit observed, "the standard is not 'regular contact' with other corporate officials who make 'policy,' or even competitive decisions, but 'advice and participation' in 'competitive decisionmaking.'" *Id.* at 1580. Lead litigation lawyers regularly report to boards and corporate officers about ongoing litigation, despite the lawyers having access to highly confidential information and the boards and officers engaging in competitive decision-making. The point is that the people who have access to the highly confidential information are not the people making the competitive decisions. If the standard were physical proximity to, or regular interaction with, competitive decision makers, no lead litigation counsel would ever see confidential information.

Apple cannot meet its burden of showing Jensen, or any other lawyer at Knobbe Martens, poses an unacceptably high risk of inadvertent disclosure.

### ii. **Apple Cannot Show It Will Suffer Harm**

Apple also has not even attempted to meet its "burden of showing that specific prejudice or harm will result from the disclosure of each document (or item of information) that it seeks to protect." *Nutratech*, 242 F.R.D. at 554. Apple's proposed language does not specify any particular information Jensen should be excluded from viewing. Apple also failed to explain any particular harm that Apple would suffer from Jensen viewing such information.

-33-

### iii. **Apple's Restriction Would Prejudice Plaintiffs**

Exclusion of Jensen would also prejudice Plaintiffs. *See In re Deutsche Bank,* 605 F.3d 1373, 1380 (Fed. Cir. 2010) ("[T]he district court must balance [the risk of disclosure] against the potential harm to the opposing party from restrictions on that party's right to have the benefit of counsel of its choice"). Jensen has served as Masimo's outside counsel for over twenty-five years. *See* Kiani Decl. ¶ 4; Jensen Decl. ¶ 2. During that time, Jensen has represented Plaintiffs in numerous cases involving Masimo's direct competitors and the exchange of highly confidential information. Jensen Decl. ¶ 3. Plaintiffs rely heavily on Jensen to evaluate and manage all of their intellectual property litigation and other litigation concerning the companies' technologies. *Id.* ¶¶ 6-7; Kiani Decl. ¶¶ 4-5. Over the years, Jensen has gained extensive knowledge of Plaintiffs' technology. This has given him a unique ability to readily discern when others are using that technology, assuming, of course, he can see the relevant evidence. No other lawyer has Jensen's breadth of understanding of Plaintiffs' technology and trade secrets. Kiani Decl. ¶¶ 5, 9; Jensen Decl. ¶ 5-6, 9-10.

Although numerous opponents have tried to deprive Masimo of Jensen's leadership in litigation, they have never succeeded. Every court to address this issue has allowed Jensen access to highly confidential materials or information. Jensen Decl. ¶ 4. Indeed, this Court twice rejected the *True Wearables* defendants' attempts to bar Jensen from accessing highly confidential information. Powell Decl., Exs. 22 and 23. Additionally, Apple's outside counsel in this case unsuccessfully attempted to exclude Jensen on behalf of another client in another case. *Id.*, Ex. 18 at 24-25. This recurrence suggests that Plaintiffs' adversaries, including Apple, are well aware that depriving Plaintiffs of their experienced choice of counsel would severely prejudice Plaintiffs.

1    Jensen is accustomed to abiding by protective orders, appropriately

2    handling and maintaining designated materials, and ensuring that he never

3    reveals those materials, or the confidential information they contain, to his

4    clients. Jensen Decl. ¶¶ 5 and 9; Kiani Decl. ¶ 10. Moreover, when appropriate,

5    Jensen uses the best safeguard possible—he refrains from engaging in any

6    discussion that could arguably implicate any information revealed to him under

7    a protective order—as should any other outside lawyer. Jensen Decl. ¶ 5; Kiani

8    Decl. ¶ 10. Because the actual prejudice to Plaintiffs outweighs any alleged—

9    although unexplained—harm to Apple, this Court should reject Apple's

10   proposed restriction.

11            **b.** **The Court Should Reject Apple's Attempt to Provide**

12            **Plaintiffs' Trade Secrets To Its In-House Counsel**

13   Apple argued Plaintiffs' Section 2019.210 disclosure must be detailed and

14   that this particular case requires a "more exacting level of particularity" than

15   standard trade secret cases. Powell Decl., Ex. 25 at 21 n.1. Despite advocating

16   for such a high standard, Apple insists that three of its ***in-house*** lawyers should

17   have access to the highly confidential trade secrets set forth in Plaintiffs'

18   Section 2019.210 disclosure. *Id.*, Ex. 4 at 17. Apple provides no support or

19   justification for requiring Plaintiffs to disclose ***trade secrets*** to Apple

20   employees. Apple's proposal thus creates a significant risk of further

21   misappropriation of Plaintiffs' trade secrets.

22   "Requiring a party to rely on its competent outside counsel does not

23   create an 'undue and unnecessary burden'" *See Intel Corp. v. VIA Techs., Inc.*,

24   198 F.R.D. 525, 529 (N.D. Cal. 2000) (rejecting Intel's request to allow its in-

25   house counsel access to highly confidential material because Intel was

26   represented by competent outside counsel); *see also CytoSport, Inc. v. Vital

27   Pharm., Inc.*, 2010 WL 1904840, at *2 (E.D. Cal. May 10, 2010) (rejecting

28   request for outside counsel to view confidential material because forcing

defendant to "rely on competent outside counsel does not create an 'undue and unnecessary burden,' sufficient to demonstrate actual prejudice"). Here, Apple is represented by Gibson Dunn, which claims it has 20 offices, 1300+ lawyers, and "129 years of excellence." *See* https://www.gibsondunn.com (accessed June 19, 2020). Apple will suffer no prejudice from denying Apple's in-house counsel access to Plaintiffs' trade secrets.

Apple's proposal also highlights its continued lopsided approach to litigating this case. Apple is simultaneously seeking to prevent one of Plaintiffs' ***outside*** counsel from accessing all highly confidential information while providing three of Apple's ***in-house*** counsel access to Plaintiffs ***trade secrets***. *See* Powell Decl., Ex. 4 at 17. Nothing supports such a one-sided and inequitable proposal. The Court should adopt Plaintiffs' proposal.

### 2. Defendant's Position

The parties have two disputes over which individuals should receive access to another party's highly confidential information. *First,* Apple seeks entry of a protective order that denies access of its highly confidential and sensitive "attorneys' eyes only" documents to a party's outside counsel who are competitive decision-makers or have served on a party's Board of Directors within the last two years. This request is a reasonable and necessary measure to protect Apple's valuable technical information from inadvertent disclosure or misuse. *Second*, to the extent Plaintiffs replead their trade secret claim, Apple seeks to have a limited number of its in-house counsel receive access to Plaintiffs' alleged trade secrets, given the integral role in-house counsel is playing in the defense of this matter.

a. **This Court Should Bar Those Who are Either Competitive Decision-Makers Or Are Present Board Members Or Were Board Members Within The Last Two Years From Accessing Confidential Materials**

The parties agree that this action will involve disclosure of trade secret and other confidential and proprietary information; the parties disagree as to whether outside counsel who are competitive decision-makers or serve on a party's Board of Directors should be permitted access to highly confidential documents designated by Apple as "Attorneys' Eyes Only." In support of their argument that such persons should have access, Plaintiffs rely on their briefing in the *True Wearables* case. However, Apple was not a party to that briefing and Plaintiffs' attempts to liken this case to *True Wearables* fails in any event. In *True Wearables*, Plaintiffs asserted trade secret and infringement claims against the six-year old medical device start-up True Wearables, Inc. This is an inapposite comparison to the present case with Apple, one of the largest technology companies in the world. The accused products in this case, the Apple Watch Series 4 and 5, are extremely successful and valuable products already in the wearables space—far different than the fledgling startup in *True Wearables*.

Ninth Circuit precedent is clear that district courts may preclude access to a party's confidential and proprietary information from those involved in an opposing party's competitive decision-making. *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992). The Federal Circuit has defined what "competitive decision-making" means,[8] and, to avoid any doubt as

---

[8] Competitive decision-making is "[s]horthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions . . . made in light of similar or corresponding information about a competitor." *See U.S. Steel*

to its meaning, Apple's proposal explicitly incorporates that definition.  Mr. Jensen, is a long-time contributor to Plaintiffs' competitive decision-making. Mr. Jensen's extensive participation in Plaintiffs' business enterprises creates an untenable risk that his access to Apple's confidential information will lead to the inadvertent disclosure to those most capable of misusing Apple's information. But excluding competitive decision makers alone is not enough to resolve the dispute, because Plaintiffs argue that one of their outside counsel, Mr. Jensen, should not meet the Court's definition of a competitive decision maker, a position that Apple strongly disputes.  Rather than defer that issue to a later discovery dispute, Apple's proposed protective order also explicitly excludes current Board Members and those that have served in that role within the last two years, which would exclude Mr. Jensen since he is a current member of the Board of Directors of Plaintiff Cercacor.  Restricting access from Board members has been consistently upheld in cases in which courts have been asked to impose those restrictions because participation at Board meetings "present[s] an unacceptable opportunity for the inadvertent disclosure of confidential information" because of the conflicting duty of disclosure inherent in Board service and an individual's consent to abide by a protective order. *See, e.g.*, *Meridian Enters. Corp. v. Bank of Am. Corp.*, 2008 WL 474326, at *4 (E.D. Mo. Feb. 15, 2008); *Norbrook Labs., Ltd. v. G.C. Hanford Mfg. Co.*, 2003 WL 1956214 (N.D.N.Y. April 24, 2003).

Here, good cause exists for granting Apple's protective order. *First*, the nature and pervasive scope of Mr. Jensen's involvement with Plaintiffs' business enterprises cannot be adequately separated from his concurrent role in Plaintiffs' wider litigation licensing business in a way that will otherwise ensure the confidentiality of Apple's information. *Second*, Mr. Jensen's service on

_____

*Corp. v. United States*, 730 F.2d 1465, 1468 & n.3 (Fed. Cir. 1984).

Plaintiff Cercacor's Board of Directors and its attendant fiduciary duty to that Board evince the conflict of interests inherent in allowing him access to Apple's confidential trade secret information.  *Third*, the balance of hardships clearly favors Mr. Jensen's exclusion in this case.  The harm to Apple of inadvertent disclosure of its most confidential information to Plaintiffs is substantial, given that this information is its "crown jewel," disclosure to other companies of which would create substantial harm to Apple.  *See* Corp. Couns. Gd. To Software Trans. § 8:2; *see also, e.g.*, *buySAFE, Inc. v. Google, Inc.*, No. 3:13-CV-781, 2014 WL 2468553, at *2 (E.D. Va. June 2, 2014).  By contrast, Mr. Jensen's exclusion would pose little harm to Plaintiffs, who employ a variety of highly competent counsel (over fifteen partners and associates have appeared on filings and meet and confers in this case) to represent them in this and other cases.  Accordingly, an order preventing Mr. Jensen and others similarly situated from viewing Apple's confidential information will not meaningfully impair Plaintiffs' ability to conduct this litigation; it will simply prevent the inadvertent misuse or disclosure in other existing or potential litigation of confidential information obtained from this litigation.

### i.    The Relationship Between Mr. Jensen And Plaintiffs Presents An Unacceptable Risk Of Inadvertent Disclosure Of Confidential Information In This Case

The decision to exclude counsel from discovery requires an assessment in each case of "the risk of inadvertent disclosure."  *In re Matsushita Electric Industrial Co. v. United States*, 929 F.2d 1577, 1579 (Fed. Cir. 1994) (quoting *U.S. Steel Corp.*, 730 F.2d at 1468).  That risk, in turn, "must be determined . . . by the facts on a counsel-by-counsel basis."  *Id.*  Although the Federal Circuit has stated that the key inquiry in evaluating that risk involves determining whether the lawyer is involved in his client's "competitive decision making," it

-39-

has also made clear that that term is simply "shorthand" for broader considerations relevant to assessing the risk of inadvertent disclosure, such as "a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions." *U.S. Steel Corp*. 730 F.2d at 1468 n.3. As one court has noted, "involvement in competitive decisionmaking, while an important consideration [under *U.S. Steel Corp*.], is not necessarily the exclusive one," and proper analysis under *U.S. Steel* involves a "careful and comprehensive inquiry" into the lawyer's "role in the affairs of [his client's] company, his association and relationship with those in the corporate hierarchy who are competitive decisionmakers, and any other factor that enhances the risk of inadvertent disclosure." *Autotech Techs. Ltd. P'ship v. AutomationDirect.com, Inc*., 237 F.R.D. 405, 408 (N.D. Ill. 2006).

Therefore, the determination of whether Mr. Jensen may be excluded from access to confidential information involves a factual inquiry into whether his "activities, association, and relationship" with Plaintiffs "are such as to involve counsel's advice and participation in any or all" of Plaintiffs' decisions in operating their licensing business. *U.S. Steel Corp.*, 730 F.2d at 1468 n.3.

Over the course of Mr. Jensen's longstanding representation of Plaintiffs, Mr. Jensen has served as both a day-to-day and long-term strategy advisor. He has evaluated the companies' intellectual property portfolios and overseen legal due diligence, and he also served as Masimo's acting Senior Vice President of OEM Business, Business Development and General Counsel. *See* Biography of Steve Jensen, *accessible at* https://www.knobbe.com/attorneys/steve-jensen. It was in this capacity that Mr. Jensen made business decisions relating to the manufacture of Masimo's equipment and components.

In a 2020 declaration describing Mr. Jensen's role as Plaintiffs' attorney, the former Chief Technology Officer at Masimo Corporation stated Mr. Jensen "would advise Masimo about when to file patent applications, where to file

1  patent applications, whether to pursue continuations, and other decisions related
2  to creating patent portfolio value." *Masimo Corp. v. True Wearables*, No. 3:18-
3  CV-02001-JVS-JDE, Dkt. 82-6, Ex. 6 at ¶ 4 (Mar. 16, 2020).   Indeed,
4  Mr. Jensen is listed as an attorney of record before the USPTO on each of the
5  patents-in-suit and thus, may become a witness in this litigation, as the
6  prosecuting patent attorney may sometimes be deposed regarding the statements
7  made to the Patent and Trademark Office.

8       Taken together, these facts create a situation in which Mr. Jensen's
9  experience as a business decision-maker is impossible to separate from his role
10  as Plaintiffs' outside counsel.   Given the depth of his involvement and
11  investment in Plaintiffs' business, Mr. Jensen should not be permitted to access
12  Apple's highly confidential information.

13              ii.     **The Nature of Mr. Jensen's Service on Cercacor's**
14                      **Board of Directors Conflicts With The Obligation**
15                      **To Remain Silent Under A Protective Order**

16       Directors are fiduciaries of a corporation and, as such, occupy positions
17  of trust and confidence on which corporate officials must rely.  *In re Allegheny*
18  *Int'l, Inc*., 954 F.2d 167, 180 (3d Cir. 1992).  A significant part of a director's
19  duty of loyalty is to disclose to other decision-makers all information in his
20  possession germane to a transaction at issue.  *Id.*

21       A Board member's duty of disclosure arises from a director's general
22  duties of care, good faith, and loyalty to the corporation, and the duty of
23  disclosure requires that directors "disclose fully and fairly all material
24  information within the board's control."  *Skeen v. Jo-Ann Stores*, 750 A.2d 1170
25  (Del. 2000).  The American Bar Association's Corporate Director's Guidebook
26  states that corporate directors have the following duty of disclosure:

27
28              As fiduciaries, directors have an obligation to take
                reasonable  steps  to  ensure  that  shareholders  are

furnished with all relevant material information known to the directors … . Likewise, directors also have the duty to information their fellow directors and management about information known to the director that is relevant to corporate decisions.

ABA Section of Business Law, Corporate Director's Guidebook Fifth Edition, § 3(C)(4) (2007) (Exhibit A).

Apple's proposal seeks to exclude outside counsel with service on a Party's or a competitor of a Party's Board of Directors. The reason for this is because such counsel bear fiduciary duties of disclosure to their Board of Directors, yet must also abide by their ethical obligations as attorneys to the protective order. To permit these oft-conflicting commitments unnecessarily jeopardizes the security of Apple's most sensitive information.

Plaintiffs seek to invite these very risks by requesting that Mr. Jensen, member of both Cercacor's Board of Directors and Masimo's Board of Directors of the Masimo Foundation for Ethics, Innovation and Competition in Healthcare, receive access to Apple's highly confidential information. Plaintiffs' contentions that Mr. Jensen does not make business decisions would mean that he does not fulfill his obligations to either Board as a director and thus, cannot mean what they said. Directors are required to make decisions related to the business of the corporation in order to fulfill their fiduciary obligations. Mr. Jensen's duties of disclosure inherent in his service on the Boards of both Plaintiffs directly fan the flames of the risks created in granting Mr. Jensen access to Apple's protected information. The confidential technical information about Apple's business which Mr. Jensen learns through an "attorneys' eyes only" disclosure constitutes information that would be relevant to a variety of Plaintiffs' corporate decisions. As such, Mr. Jensen's fiduciary duty to disclose such information would obligate Mr. Jensen to inform the other directors of Cercacor about any confidential "attorneys' eyes only" information

of Apple's that was also relevant to Cercacor's corporate decisions. Accordingly, Courts have recognized that there is direct conflict between outside counsel's obligations to abide by a protective order and his simultaneous fiduciary duty to the corporation as a Board member and have uniformly refused to allow access by individuals such as Mr. Jensen to the highly confidential/trade secret information of another party. *See Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.* 2003 WL1956214, at *5 (N.D.N.Y. Apr. 24, 2003) ("While the court does not doubt [outside counsel and Board member] Mr. Heath's assurances that he will abide by the protective order, it cannot endorse a situation that places Mr. Heath's ethical obligations as an attorney in direct competition with his fiduciary duty to Hanford); *see also Meridian Enters. Corp. v. Bank of Am. Corp.*, 2008 WL474326, at *3 (E.D. Mo. Feb. 15, 2008) (finding "that the risk of inadvertent disclosure is great because Mr. McMullin is both a shareholder of [Plaintiff] and a member of its Board of Directors, and therefore has a fiduciary duty to [Plaintiff] to disclose all information in his possession germane to issues discussed").

To the extent Plaintiffs may argue that they have no interest in Apple's underlying technology, that is false. Plaintiffs' contention is belied by the fact that Cercacor sells a device that "measures hemoglobin" and "are synced via Bluetooth to an app which can display trends over time." *See Medgadget @ CES 2016: Cercacor's Ember Non-Invasive Hemoglobin Sensor*, Scott Jung, Medgadget (Jan. 8, 2016), https://www.medgadget.com/2016/01/medgadget-ces-2016-cercacors-ember-non-invasive-hemoglobin-sensor.html; *see also Athletes can know their hemoglobin instantly with Ember* (Jan. 18, 2016), https://www.sportswearable.net/athletes-can-know-their-hemoglobin-instantly-with-ember/ ("Cercacor has produced a wearable which will provide you with real-time data."). Plaintiffs' product is designed to interact with Apple's iPhone and the accused Apple Watch also interacts with the iPhone. The likelihood of

future overlap between the technology that the accused products practice and those of the products that Plaintiffs sell is increasing. Indeed, Cercacor's product and the Apple Watch are both wearables and are targeted to the consumer market. The wearable market is growing, especially as it relates to health-related applications. It is incredibly unfair and prejudicial for Cercacor to have a member of its Board of Directors with a fiduciary duty to steer that company in the right direction to have had access to Apple's highly confidential technical, financial, and source code information.

Assume, for example, that Cercacor is considering introducing a new feature that technical documentation from Apple shows to have been rejected as unsuccessful. By virtue of his access to Apple's highly confidential financial, technical, and source code information, Mr. Jensen knows that Apple has already rejected that feature as being unworkable. As a result, Mr. Jensen, sitting in the Board meeting considering the issue, knows that Cercacor will be wasting million dollars if it proceeds. Does he tell the Board and the shareholders? Mr. Jensen has a fiduciary duty to advise the company and at the same time, a prohibition from disclosing that information under the protective order in this case. That is why the concern is so acute for Board members. As explained in *Norbrook Labs*, Board members and those with competitive decision-making should be denied access to Apple's "attorneys' eyes only" highly confidential technical, financial, and source code information. 2003 WL1956214, at *5.

And where source code is involved, the risk is even greater. Indeed, Plaintiffs cite no cases in this court or the Federal Circuit where Board members of a reviewing party are subsequently allowed to view a competitor's guarded technical information.

### iii. The Risk Of Inadvertent Disclosure of Apple's Confidential Information Outweighs Harm To Plaintiffs, If Any

This litigation involves sensitive and highly confidential technology present in the Accused Products (the Apple Watch Series 4 and 5). Thus, the confidential technical documents at issue is information that Apple must be careful not to allow to fall into the hands of those that may be interested in developing products that may compete with or otherwise exploit the technology in the Accused Products or drafting patent claims to read on those products. Any disclosure or improper use of Apple's confidential information by Mr. Jensen or any outside counsel, even if inadvertent, would severely harm Apple by revealing its proprietary technology. Indeed, Apple could lose the entire competitive advantage offered by its proprietary features if its source code were disclosed.

We emphasize, of course, that our concern is inadvertent disclosure. We do not question Mr. Jensen's integrity as an officer of the court. But as the Federal Circuit has stated, "[i]nadvertence, like the thief-in-the-night, is no respecter of its victims." *U.S. Steel Corp.*, 730 F.2d at 1468. Where counsel is, like Mr. Jensen, an integral part of his client's litigation licensing enterprise, and is exposed to confidential information that may aid in advancing that enterprise, "compartmentalization of protected information is . . . 'a feat beyond the compass of ordinary minds.'" *Autotech*, 237 F.R.D. at 408 (quoting *Shepard v. United States*, 290 U.S. 96 (1933)). Or, to put it more bluntly: "once knowledge has been gained, a person cannot perform a prefrontal lobotomy on himself." *Id.* at 408 n.3.

The issue of inadvertent disclosure can take on additional significance in cases involving patents and trade secrets when the firm representing a party in litigation matters also represents the party in patent prosecution and other

intellectual property matters related to patent prosecution. *See In re Deutsche Bank Tr. Co. Ams.*, 605 F.3d 1373 (Fed. Cir. 2010). While Mr. Jensen says that he no longer is involved in patent prosecution for Plaintiffs, his partners and associates are. He works regularly with those colleagues in patent litigation matters and the risk of inadvertent disclosure within his firm is thus a significant concern. For attorneys involved in "making strategic decisions on the type and scope of patent protection that might be available or worth pursuing, . . . competitive decisionmaking may be a regular party of their representation." *Id.* at 1380. In such instances, "the risk of inadvertent disclosure of competitive information learned during litigation is therefore much greater." Even where an attorney is not directly involved in patent prosecution, these attorneys may have "the opportunity to influence the direction of prosecution," and the risk of inadvertent disclosure may nonetheless arise. *Id.*

In short, granting Mr. Jensen unrestricted access to confidential information about Apple's methods and systems would expose Apple to endless litigation, even if Mr. Jensen conducts himself entirely in good faith.

By contrast, denying Mr. Jensen access to confidential information would impose no significant harm on Plaintiffs. Plaintiffs retain highly competent outside counsel to conduct their litigation, and have more than adequate resources to retain additional counsel if they deem it necessary. Plaintiffs have other highly competent counsel that have been involved in this case since its beginning (and even in previous cases). Indeed, Mr. Jensen is not designated as lead counsel—that is the role of Mr. Joseph Re. The availability of competent outside counsel is typically sufficient to defeat any claim that exclusion of in-house counsel would unduly prejudice the nonmoving party. *See, e.g., A. Hirsch Inc. v. United States*, 657 F. Supp. 1297, 1305 (Ct. Int'l Trade 1987) ("in view of retained counsel's competence, it is not clear how plaintiffs' position will be prejudiced by excluding [in-house] counsel from access"); *Brown Bag*

*Software*, 960 F.2d at 1471 (finding no prejudice where outside counsel had sufficient time and resources to review confidential materials and was competent). The balance of hardships, therefore, strongly favors denying Mr. Jensen access to Apple's confidential information.

### b. **Apple's Provision Providing Trade Secrets to its In-House Counsel**

Plaintiffs argue that Apple's proposal would result in a one-sided approach whereby its in-house counsel would receive access to Plaintiffs' alleged trade secrets and Plaintiffs' in-house counsel would not receive the same. But by nature of their trade secret misappropriation claim, Plaintiffs have alleged that Apple already has possession of their trade secrets.[9] If Plaintiffs' trade secret information is already in Apple's possession, as Plaintiffs contend, then Plaintiffs should have no qualms about sharing that information with the persons at Apple directly involved in the defense of this lawsuit. And as Apple has explained repeatedly, a very limited number of Apple's in-house counsel need access to this information in a case where Plaintiffs have asserted a serious, high exposure claim of trade secret misappropriation against the company. Contrary to Plaintiffs' assertions, the competence of Apple's outside counsel does not absolve in-house counsel's need for access to this information.

Apple's in-house counsel is integrally involved in the defense of this lawsuit. They need to know the purported trade secrets that Plaintiffs contend were misappropriated (to the extent Plaintiffs replead that any purported trade secrets were in fact misappropriated by Apple) in order to advise on strategy— and, more importantly, to guide document collection and production, which

---

[9] Of course, Apple recognizes that the trade secret claim has been dismissed from this case. However, because the claim was dismissed with leave to replead, Apple wants to make sure that this protective order adequately serves its interests and needs in the event the claim is repleaded.

depends on the purported trade secrets actually at issue, if any. In-house counsel is overseeing document discovery, and therefore needs to know the identity of the purported trade secrets so that it can manage the search for responsive documents, and also prevent disclosure of *Apple's* trade secrets.

Moreover, Apple genuinely does not believe that it possesses any of Plaintiffs' trade secrets—nor does Apple want any of Plaintiffs' trade secrets. In-house counsel needs to know what information Plaintiffs claim Apple misappropriated, if any, so that it can address the allegations internally and excise any alleged trade secrets from Apple products as soon as possible. In-house counsel cannot do so without any information about the particular, alleged trade secrets at issue in this case—thereby hindering Apple's ability to mitigate damages to the extent Plaintiffs have a valid misappropriation claim, as is Apple's duty under the law. For these reasons, it is incredibly common for parties in trade secret cases to agree that a limited number of in-house counsel will have access to attorneys' eyes only information, including the plaintiffs' Section 2019.210 disclosure. *See, e.g.*, Transcript of Case Management Proceedings, *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA (N.D. Cal. March 16, 2017), ECF. No. 63 (permitting disclosure of highly confidential materials to one in-house counsel upon his or her agreement to be bound by the protective order); Order at 10, *Bladeroom Grp. Ltd., et al., v. Facebook, Inc.*, No. CV-15-01370-EJD (N.D. Cal. Aug. 3, 2015) ECF No. 54 (permitting disclosure of attorneys' eyes only material to two designated in-house counsel who have no involvement in competitive decision-making, to whom disclosure is reasonably necessary for the litigation, and who have agreed to be bound by the protective order); *MMCA Grp., Ltd. v. Hewlett-Packard Co.*, 2009 WL 595537, at *1 (N.D. Cal. Mar. 5, 2009) (granting two of defendants' in-house attorneys access to attorneys' eyes only material given small risk of disclosure where the "attorneys who would be given access to AEO materials would be

litigation attorneys with no involvement" in defendants' business affairs); *see also, e.g.*, Order at 10, *Mastronardi Int'l Ltd. v. SunSelect*, 18-cv-00737-AWI-JLT, 2019 WL 3996608, at *9 (E.D. Cal. Aug. 23, 2019) ECF No. 60 (permitting disclosure of attorneys' eyes only material to any number of designated in-house counsel who are not involved competitive decision-making, to whom disclosure is reasonably necessary for the litigation, and who have agreed to be bound by the protective order).

## G.  Section 10 – Prosecution Bar

The Parties' proposals regarding the patent prosecution bar in Section 10 are not amenable to convenient redlining and are presented separately below.

**Plaintiffs' proposal:**

> After the adoption of this provision by the parties, Outside Counsel of Record and any person associated with a Party who receive a Producing Party's material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order who accesses or otherwise learns of, in whole or in part, said material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order shall not prepare, prosecute, supervise, advise, counsel, or assist in the preparation or prosecution of any patent application seeking a patent on behalf of the Receiving Party or its acquirer, successor, or predecessor in the field of non-invasive monitoring during the pendency of this Action and for two years after final termination of this action.  To avoid any doubt, "prosecution" as used in this paragraph does not include representing or advising a Party before a domestic or foreign agency in connection with a reissue, ex parte

reexamination, covered business method review, *inter partes* review, opposition, cancelation, or similar proceeding; though in connection with any such agency proceeding involving the patents-in-suit, Outside Counsel of Record for a Receiving Party shall not: (i) participate in the preparation, prosecution, supervision, advice, counsel, or assistance of any amended claims; (ii) reveal a Producing Party's Protected Material to any prosecuting reexamination counsel or agent; or (iii) use a producing Party's Protected Material for any purpose not permitted by Section 5. The applicability of this provision is to be determined on an individual-by-individual basis such that an individual attorney who has not received Protected Material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" is not restricted from undertaking any activities by virtue of this provision even if said individual attorney is employed by or works for the same firm or organization as an individual who has received such Protected Material.

**Apple's proposal:**

Plaintiffs' Language: Absent written consent from the Producing Party, any individual who receives access to "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information shall not be involved, directly or indirectly, in the (i) prosecution of patents or patent applications relating to non-invasive physiological monitoring, including without limitation the patents at issue in this action and any patent or application claiming priority to or otherwise related to the patents at issue in this action,

-50-

before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office") or (ii) the acquisition of patents (including patent applications), or the rights to any such patents or patent applications with the right to sublicense, relating to the functionality, operation, and design of non-invasive physiological monitoring technologies. For purposes of this Paragraph, "prosecution" means advising on, consulting on, preparing, prosecuting, drafting, editing, and/or amending of patent applications, specifications, claims, and/or responses to office actions, or otherwise affecting the scope of claims in patents or patent applications relating to the functionality, operation, and design of non-invasive physiological monitoring technologies (generally or as described in any patent in suit), before any foreign or domestic agency, including the United States Patent and Trademark Office;. To avoid any doubt, "prosecution" as used in this Paragraph does not include providing patent prosecution counsel with public information to submit to the Patent Office. "Prosecution" as used in this Paragraph also does not include representing a party before a domestic or foreign agency in a patent challenge (including, but not limited to, a reissue protest, *ex parte* reexamination, *inter partes* reexamination, *inter partes* review, covered business method review, post-grant review or other patent office proceedings in the United States or elsewhere on behalf of a patentee but only if no amendments to the claims are made to the patent or patent application by anyone during that process. If an individual that has had access to "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL –

SOURCE CODE" information and participates in a reissue protest, *ex parte* reexamination, *inter partes* reexamination, *inter partes* review, covered business method review, post-grant review, or other patent office proceedings in the United States or elsewhere on behalf of a patentee, the claims of the patent involved in such proceedings may not be amended by anyone without violating this protective order. These prohibitions are not intended to and shall not preclude counsel from participating directly or indirectly in proceedings on behalf of a Party challenging the validity of any patent. This Prosecution Bar shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information is first received by the affected individual and shall end two (2) years after final resolution of this action, including all appeals.

### 1. **Plaintiffs' Position**

The parties agree to add a prosecution bar to the Court's Model Order.[10] Plaintiffs propose the Court adopt a prosecution bar based on the language from *True Wearables*. *Compare* Powell Decl., Ex. 2 (Plaintiffs' proposal) at 17-18 *with* Ex. 13 (*True Wearables*) at 18-19. The *True Wearables* prosecution bar is straightforward and properly allows both sides' outside counsel to participate in post-grant patent proceedings before the Patent Office, but bars outside counsel from participating in amending the claims. Thus, Plaintiffs' proposal prevents the inadvertent use of highly confidential information to amend claims without substantively prejudicing the patentee.

---

[10] Apple's proposal incorrectly and confusingly begins with the phrase "Plaintiffs' Language." That appears to be a typographical error.

1   Apple has previously ***stipulated*** to similar language in other cases.  *Pinn*
2   (Powell Decl., Ex. 17) at 15 (permitting "participation in inter partes review
3   except to amend claims").   This Court also routinely includes similar language.
4   *See Netflix* (Powell Decl., Ex. 19) at 13 (permitting participation in *inter partes*
5   *review* proceedings, "but counsel may not participate in the drafting of any new
6   or amended claims in any such proceeding"); *XR Comms.* (Powell Decl., Ex. 20)
7   at 13 (same); *Uniloc 2017 LLC v. Microsoft Corp.*, No. 8:18-cv-02224-AG-
8   JDE, Dkt. No. 30 (C.D. Cal. May 2, 2019) (Powell Decl., Ex. 23) at 10 (same).
9   Indeed, other courts have rejected this same proposal by Apple in other cases,
10  and adopted restrictions similar to Plaintiffs' proposal.  *LBT IP I LLC v. Apple*
11  *Inc.*, No. 1-19-cv-01245, Dkt. No. 28 (D. Del. April 27, 2020) (Powell Decl.,
12  Ex. 15) at 1 (rejecting Apple's proposal and allowing outside counsel to
13  participate in Patent Office proceedings as long as they are not involved in
14  "direct or indirect claim drafting or claim amendment activity"); *Achates*
15  *Reference Publishing, Inc. v. Symantec et al.*, No. 2:11-cv-294-JRG-RSP, Dkt.
16  No. 447 (E.D. Tex. August 20, 2013) (Powell Decl., Ex. 16) at 1-2 (same).

17      Nevertheless, Apple proposes a one-sided and problematic prosecution
18  bar.  *See* Powell Decl., Ex. 4 at 18-20.  Apple proposes that its outside counsel
19  can always participate in all aspects of challenging Plaintiffs' patents, but
20  Plaintiffs' outside counsel can be involved in such proceedings "***only if*** no
21  amendments to the claims are made to the patent or patent application by
22  anyone during this process."  *Id.* at 19 (emphasis added).  Apple also proposes
23  that, if Plaintiffs' outside counsel is involved in post-grant proceedings, "the
24  claims of the patent involved in such proceedings may not be amended ***by***
25  ***anyone*** without violating this protective order."  *Id.* (emphasis added).  Apple's
26  proposal unfairly forces Plaintiffs to choose between preserving their right to
27  amend their claims during post-grant proceedings or using their preferred
28  counsel.

1   Plaintiffs proposal also makes clear that the prosecution bar applies "on
2   an individual-by-individual basis," such that only individual attorneys who
3   actually receive access to Highly Confidential information are barred from
4   patent prosecution.  *Id.*, Ex. 2 at 17-18.  Other individuals at the same firm who
5   have not received highly confidential information should not be restricted
6   because such individuals present no risk of inadvertent use or disclosure.  This
7   language should be included to avoid any later argument that access by
8   individual attorneys disqualifies the entire firm.  The Court should adopt
9   Plaintiffs' proposal.

10      **2.    <u>Defendant's Position</u>**

11      The parties agree that a prosecution bar is appropriate for this matter
12  because individuals granted access to confidential information, especially source
13  code and other technical information, should not be permitted to use that
14  information to prosecute patents.  *See generally In re Deutsche Bank Tr. Co.*
15  *Ams.*, 605 F.3d 1373, 1381 (Fed. Cir. 2010).  The parties disagree, however, as
16  to two issues.  *First*, Apple proposes that the prosecution bar provisions should
17  preclude attorneys and others that have seen Protected Material from
18  participating in any Patent Trial Appeal Board ("PTAB") proceedings such as
19  *inter partes* review ("IPR") proceedings that will involve claim amendments to
20  avoid the risk of inadvertent disclosure of that confidential information during
21  the process of amending the claims.  *Second*, Apple's position is that the
22  prosecution bar should extend to the acquisition of patents because just as patent
23  prosecution involves the risk that an attorney might inadvertently use another
24  party's confidential information to procure patent rights in new and pending
25  applications based on that other party's confidential information, so too can that
26  attorney assist in buying patents that relate to the other party's confidential
27  information.  Plaintiffs did not address this issue in their portion of the joint
28  stipulation, but had previously rejected it during the meet and confer process.

**a.** **The Prosecution Bar Should Prohibit Those Who Receive Apple's Confidential Information From Participating in *Inter Partes* Review Unless The Patent Owner Does Not Attempt to Amend Its Claims**

The parties dispute the extent to which the protective order should bar outside counsel who access another party's highly confidential materials from participating in IPR proceedings that involve claim amendments. Plaintiffs contend that such counsel should have full ability to participate in all non-amendment aspects of such proceedings. Apple does not object to Plaintiffs' counsel's participation in IPR proceedings that will not involve claim amendments. In that type of proceeding, the claims cannot be narrowed or modified in a way that improperly uses the other party's confidential information. But Apple does object to an attorney that receives confidential, highly confidential and source code material from an opponent from then being an attorney in an IPR where the claims of the patent the attorney is representing will be amended. For purposes of discussion, we will discuss this in the context of Apple's highly confidential information and Plaintiffs' counsel seeking to participate in representing Plaintiffs in IPRs that involve amendments. In that context, Apple's objections to allowing Plaintiffs' counsel that view its confidential, highly confidential, and source code information from participating in any IPR proceeding where the claims of the patent are amended is grounded in the same concern as barring the same counsel from actually amending the claims—the risk of inadvertent disclosure of information.

Plaintiffs' reliance on previous protective orders where Apple has stipulated not to include this additional protection misses the point. Prior experience has demonstrated to Apple the need for this additional level of protection due to the appearance of impropriety that arises in litigation counsel who are barred from working on claim amendments being co-counsel with

amendment counsel in the IPR and both sets of counsel signing onto the pleadings with the PTAB. The concern is particularly acute here because Plaintiffs are highly litigious companies that that have shown time and again that they are willing to sue companies they view as a threat to their business. Knobbe Martens, Plaintiffs' law firm in this litigation (and virtually all of Masimo's intellectual property cases), also handles all of Plaintiffs' patent prosecution and is intimately involved in their corporate strategy and decision-making. The need for heightened protection of Apple's Protected Material is particularly important here.

This issue has arisen in many cases, and courts frequently fashion protective orders that prohibit the participation by litigation counsel in any post-grant review proceedings, in any capacity.[11] Apple's proposal is much less restrictive, as it would permit Plaintiffs' litigation counsel who have had access to Protected Material to participate in post-grant review proceedings that do not involve claim amendments. To be clear, counsel that have seen Protected Material have to make a choice at the time an IPR or other PTAB proceeding is filed. That counsel can choose to appear as counsel for a patent owner in an IPR

---

[11] *See, e.g.*, *Boston Sci. Corp. v. Cook Grp. Inc.*, No. 15-980, 2017 WL 547903, at *2 (D. Del. Feb. 10, 2017); *Telebuyer, LLC v. Amazon.com, Inc.*, No. 13-CV-1677, 2014 WL 5804334, at 5-*7 (W.D. Wash. July 7, 2014); *buySAFE, Inc. v. Google, Inc.*, No. 3:13-CV-781, 2014 WL 2468553, at *2 (E.D. Va. June 2, 2014); *Bear Creek Technologies Inc. v. Verizon Services Corp.*, No. 12-CV-600, 2012 WL 3190762, at *2 n.6 (D. Del. July 25, 2012); *Pragmatus AV, LLC v. Facebook, Inc*, No. 5:11-CV-2168, 2012 WL 12355858, at *1 (N.D. Cal. July 5, 2012); *55 Brake, LLC v. Audi of Am.*, No. 1:CV 08-177-BLW, 2011 WL 2747523, at *1–*2 (D. Idaho July 13, 2011); *Edwards Lifesciences AG v. CoreValve, Inc.*, No. 08-91-GMS, 2011 WL 10565589, at *1 (D. Del. Feb. 23, 2011); *Methode Electronics, Inc. v. Delphi Automotive Systems LLC*, No. 09-CV-13078, 2009 WL 3875980, at *4 (E.D. Mich. 2009), *affirming and modifying in part magistrate's order*, 679 F. Supp. 2d 828, 835–36 (E.D. Mich. Jan. 19, 2010).

with the understanding that the claims of that patent will not be able to be amended even by other counsel involved in the IPR. If Plaintiffs believe that an amendment is going to be made, then it can hire other counsel that have not seen Apple's confidential, highly confidential, and source code information to handle the IPR and make the amendments.

The protections Apple seeks are especially warranted in cases where, as here, the case concerns the disclosure of a company's source code—valuable information that Apple considers the "crown jewels" of its intellectual property portfolio. *Unwired Planet LLC v. Apple Inc*., No. 3:12-CV-00505-RCJ, 2013 WL 1501489, at *5 (D. Nev. Apr. 11, 2013). Such cases "may require the bar to extend to post-issuance proceedings because they involve highly confidential information, such as source code, which, if disclosed, could compromise the value of the disclosing party's products." *Mirror Worlds Techs., LLC v. Facebook, Inc*., No. 17-CV-3473 (JGK), 2017 WL 5969334, at *2 (S.D.N.Y. Nov. 20, 2017) (quotations omitted); *cf. Drone Techs., Inc., v. Parrot S.A*., 838 F.3d 1283, 1300 n.13 (Fed, Cir. 2016) ("[S]ource code requires additional protections to prevent improper disclosure because it is often a company's most sensitive and most valuable property. As a result, district courts regularly provide for additional restrictions on discovery to account for the unique characteristics of source code.") (citation omitted).

Courts have recognized the risks in allowing litigation counsel to participate in post-grant proceedings where claims may be amended. *See, e.g.*, *Mirror Worlds Techs., LLC* 2017 WL 5969334, at *3 (citing *Telebuyer*, 2014 WL 5804334, at *6) ("When a[n] attorney gains access to highly confidential information in an infringement case, there is a risk that the attorney will be able to use that information to . . . amend . . . the scope of [the patent] claims to sustain them against a challenge in a post-issuance proceeding."). Plaintiffs argue that their attorneys who obtain access to Apple's confidential materials

should be allowed to participate in any IPR proceeding up until the patents are amended. If Plaintiffs decide to move to amend the challenged patent in the IPR, it is only at that point, Plaintiffs argue, that those attorneys who have viewed Apple's confidential materials could continue as counsel in the IPR and they would simply have co-counsel join the IPR to be the ones to work on the amendments. However, Plaintiffs' proposal misses the point of these protections. Those who have viewed Apple's confidential, highly confidential, and source code information are at risk for inadvertently disclosing the information to amendment counsel. Plaintiffs' counsel with that knowledge would be co-counseling with amendment counsel. In that environment, the risk of inadvertent disclosure is extremely high—that is, that the litigation counsel with knowledge of Apple's highly confidential information could guide amendment counsel to make amendments that would cover Apple products or steer amendment counsel away from making amendments that would exclude features in Apple's products. It is difficult "for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so." *In re Deutsche Bank Tr. Co. Ams.*, 605 F.3d 1373, 1378 (Fed. Cir. 2010).

Plaintiffs further argue that this provision is a matter of fairness. They call Apple's proposal "one-sided" in that it would permit its outside counsel to participate in all aspects of challenging Plaintiffs' patents. Again, Plaintiffs fail to appreciate the purpose of this protection. Plaintiffs' outside counsel are receiving access to Apple's most valuable and protected confidential information. The need for minimizing the risk of inadvertent disclosure is clear. Even if Apple's litigation counsel reviewed Plaintiffs' highly confidential and source code information, there is no risk of misusing that information in attacking Plaintiffs' patents.

Plaintiffs' last paragraph in their statement on this section attempts to characterize the parties as disputing whether the application of the prosecution bar applies on an individual-by-individual basis. Apple has never taken the position that a prosecution bar should apply to all individuals at the law firm receiving highly confidential information. Indeed, no reading of its proposal could support such an interpretation. It is clear from its proposal that the prosecution bar shall apply to those in receipt of highly confidential information on an individual basis.

Apple's proposal strikes an appropriate balance between the parties' interests. It would permit Plaintiffs' trial counsel to represent Plaintiffs in post-grant review proceedings involving asserted patents that are not to be amended during those proceedings—thereby minimizing any burden or hardship on Plaintiffs. But that decision would need to be made in advance of entering an appearance in that post-grant proceeding. If amendments are to be made, then Plaintiffs would need to engage other counsel that have not reviewed Apple's confidential, highly confidential, or source code information to represent it in the post-grant proceedings on that patent from the outset of the proceeding. Plaintiffs' proposal, in contrast, would allow Plaintiffs' trial counsel to (consciously or subconsciously) use their knowledge of Apple's highly sensitive documents in such proceedings to strategically narrow Plaintiffs' patent claims in an effort to avoid the prior art while still covering aspects of Apple's products. The provision that Apple proposes is needed to protect against this exact risk, and should be included in the protective order entered in this case.

### b. The Significant Risk Of Inadvertent Disclosure Justifies The Inclusion Of An Acquisition Bar In The Protective Order

Both parties agree that a patent prosecution bar should be put in place. The fundamental rationale behind such bars is that a person involved in writing

patent claims in a pending patent application may choose to write the claim to cover technology he or she saw in the confidential files of the opposing party or to avoid amending or adding claims in pending patent applications that would not cover the confidential technology of the other party. That fundamental principle is equally applicable when an attorney is advising clients on whether to purchase new patents for its portfolio.  In both situations, the attorney is being asked to provide advice to the client that could result in the client having new patent claims that can be asserted against the adversary.

Thus, to prevent counsel's inadvertent reliance on confidential information, a patent acquisition bar provision should be ordered to prohibit any of Plaintiffs' counsel who actually review Apple's sensitive technical material from participating in patent acquisitions relating to that material's subject matter until two year after the case ends.

A patent acquisition bar is a reasonable compromise on a necessary protection.  Courts regularly find it appropriate to restrict individuals who receive another party's confidential technical information from later assisting in the acquisition of patents covering the disclosed technology.[12]  The rationale for

_____

[12] *See, e.g.,* Order at 5, *Realtime Adaptive Streaming LLC v. Google LLC*, No. 18-CV-03629 (C.D. Cal. July 18, 2019), ECF No. 80; *Intellectual Ventures I, LLC v. Lenovo Group Ltd.*, 2019 WL 343242, at *4 (D. Mass. Jan. 25, 2019); Order at 3, *Uniloc USA, Inc. v. Apple Inc.*, No. 18-CV-00572 (N.D. Cal. July 2, 2018), ECF No. 107; Order at 10, *Univ. of Va. Patent Found. v. Gen. Elec. Co.*, No. 14-CV-00051 (W.D. Va. June 11, 2015), ECF No. 61; *Telebuyer*, 2014 WL 5804334, at *7; *Inventor Holdings, LLC v. Google, Inc.*, 2014 WL 4369504, at *2 (D. Del. Aug. 27, 2014); *Catch A Wave Techs., Inc. v. Sirius XM Radio, Inc.*, No. 12-CV-05791, 2013 WL 9868422, at *1 (N.D. Cal. Aug. 6, 2013); *EPL Holdings, LLC v. Apple Inc.*, No. C-12-04306, 2013 WL 2181584, at *5 (N.D. Cal. May 20, 2013); *Unwired Planet LLC v. Apple Inc.*, No. 12-CV-00505, 2013 WL 1501489, at *7 (D. Nev. Apr. 11, 2013); Transcript at 29:20–30:4, *Intellectual Ventures I LLC v. Altera Corp.*, No. 10-CV-00065 (D. Del. Aug. 1, 2012), ECF No. 145; *E-Contact Techs., LLC v. Apple, Inc.*, No. 11-CV-00426,

such restrictions is well-established:  "It is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so."  *In re Deutsche Bank Tr. Co. Ams.*, 605 F.3d 1373, 1378 (Fed. Cir. 2010) (alteration omitted) (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980)).  Notwithstanding general provisions "specifying that designated confidential information may be used only for purposes of the current litigation," and notwithstanding the good faith of all individuals involved, courts recognize that "there may be circumstances in which even the most rigorous efforts . . . to preserve confidentiality . . . may not prevent inadvertent compromise."  *Id.*; *see also Catch A Wave Techs., Inc. v. Sirius XM Radio, Inc.*, No. 12-CV-05791, 2013 WL 9868422, at *1 (N.D. Cal. Aug. 6, 2013) ("The patent acquisition bar . . . adds an additional layer of protection by prohibiting not just disclosure and use, but also advising.").

Plaintiffs recognized and endorsed these settled principles when they agreed to a prosecution bar nearly identical in scope to the proposed acquisition bar.  The justification underlying these two provisions is identical—it will be difficult, if not impossible, for an individual who has seen Apple's confidential information to segregate that information mentally when later advising on patent prosecution or acquisition related to that information.  The risks of inadvertent disclosure and competitive misuse are the same with respect to both prosecution and acquisition:

> Counsel for Plaintiff has acquiesced to the imposition of a patent prosecution bar, and, therefore, apparently agrees that there could possibly be a risk of

2012 WL 11924448, at *2 (E.D. Tex. June 19, 2012); *cf. Blackbird Tech LCC v. Serv. Lighting & Elec. Supplies, Inc.*, No. 15-CV-00053, 2016 WL 2904592, at *6 (D. Del. May 18, 2016) (requiring covenant not to sue on patents acquired during duration of protective order).

> inadvertent disclosure of Defendants' confidential information in the course of representing their client before the PTO. Therefore, it is hard to conceive that there would be little or no risk of inadvertent disclosure when these same attorneys advise their client in matters regarding acquisitions of patents.

*E-Contact Techs., LLC v. Apple, Inc.*, No. 11-CV-00426, 2012 WL 11924448, at *2 (E.D. Tex. June 19, 2012); *see also EPL Holdings, LLC v. Apple Inc.*, No. C-12-04306, 2013 WL 2181584, at *4 (N.D. Cal. May 20, 2013) (explaining that patent acquisition and prosecution create the same risk of inadvertent use because "litigation counsel may consciously or subconsciously use their knowledge . . . to advise a client on which patents to acquire"). And the concern is further heightened here because Plaintiffs seek Apple's valuable source code and other technical documentation. The disclosure of this confidential technology carries significant risks of inadvertent disclosure and competitive misuse. *See Telebuyer, LLC v. Amazon.com, Inc.*, No. 13-CV-01677, 2014 WL 5804334, at *2 (W.D. Wash. July 7, 2014) (describing source code as "highly confidential, technical information" that poses a "heightened risk of inadvertent disclosure") (citation omitted); *Applied Signal Technology, Inc. v. Emerging Markets Commc'ns, Inc.*, 2011 WL 197811 at *2 (N.D. Cal. Jan. 20, 2011) ("confidential technical documents, including source code . . . may pose a heightened risk of inadvertent disclosure").

In sum, Apple should not be forced to incur the risk that Plaintiffs' counsel will inadvertently rely on Apple's highly sensitive technical information to make competitive decisions regarding the acquisition of patents or patent rights related to the technology at issue. In light of the foregoing, this Court should enter Apple's proposed acquisition bar.

**H.** **Sections 4.5 and 11 – Source Code**

The Parties' disputes on Sections 4.5 and 11 are shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

4.5 "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code, scripts, assembly, binaries, object code, source code listings (e.g., file names and path structure), descriptions of source code comments, (e.g., descriptions of declarations, functions, and parameters), object code listings, and Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip, disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party. Other documents that quote source code may be designated pursuant to this Paragraph, provided that the Producing Party also produces a redacted version designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY," which removes the quoted source code. Native Computer Aided Design (CAD) files may be designated pursuant to this Paragraph, provided that any printouts of CAD files shall be designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY" and will not be included in the page limits discussed in Section 11 below.

11. SOURCE CODE

. . .

(f)     The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in Paragraph (c) in the first instance. ~~The Receiving Party may generate PDF copies of limited portions of source code on the source code computer for purposes of asking the Producing Party to produce paper copies.~~ Any printed portion that consists of more than fifteen (15) pages of a continuous block of Source Code ~~or more than two hundred (200) pages total~~ shall be presumed to be excessive, and the burden shall be on the Receiving Party to demonstrate the need for such a printed copy. <u>The Receiving Party may print out no more than two hundred (200) pages total.</u> Within ten (10) days, the Producing Party shall either (i) provide one copy set of such pages to the Receiving Party or (ii) inform the Requesting Party that it objects that the printed portions are excessive and/or not done for a permitted purpose. The Parties will cooperate in good faith if a different timeframe for production is required.  If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party shall be entitled to seek a Court resolution of whether the printed Source Code in question is narrowly tailored and was printed for a permitted purpose.  The burden shall be on the Receiving Party to demonstrate that such printed portions are no more than is reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere.  The printed pages shall constitute

1    part of the Source Code produced by the Producing Party in this

2    action. ~~Printing of directory paths or structures and file names~~

3    ~~shall not count toward the consecutive or aggregate page count~~

4    ~~listed in this section.~~

5    . . .

6    (h)  . . . The Producing Party shall not be responsible for any

7    items left in the room following each inspection session, and the

8    Receiving Party shall have no expectation of confidentiality for

9    any items left in the room following each inspection session

10   without a prior agreement to that effect. ~~However, if the~~

11   ~~Producing Party locates any material that appears to contain the~~

12   ~~work product of the Receiving Party, the Producing Party shall not~~

13   ~~review the material and shall contact the Receiving Party in~~

14   ~~accordance with their ethical duties.~~ . . .

15   (i)  . . . Upon ~~three (3) days'~~ <u>one (1) day's</u> advance notice to the

16   Receiving Party by the Producing Party, the Receiving Party shall

17   provide a copy of this log to the Producing Party.

18   (j)  . . . ~~Absent agreement of the Parties or order of this Court,~~

19   ~~no~~<u>No</u> more than a total of fifteen (15) individuals identified by the

20   Receiving Party shall have access to the printed portions of the

21   Source Code (except insofar as such code appears in any court

22   filing or expert report). ~~The Parties agree to cooperate in good~~

23   ~~faith if it becomes necessary for more than fifteen (15) individuals~~

24   ~~to have access to the printed portions of the Source Code. A~~

25   ~~Producing Party's source code material may only be transported by~~

26   ~~the Receiving Party at the direction of a person authorized under~~

27   ~~these provisions to another person authorized under these~~

28

provisions, on paper via hand carry, Federal Express, or other ~~similarly reliable courier.~~

(k)     For depositions, the Receiving Party shall not bring copies of any printed Source Code.  Rather, at least ten (10) days before the date of the deposition, the Receiving Party shall notify the Producing Party <u>about the specific portions of Source Code</u> it wishes to use ~~Source Code~~ at the deposition, and the Producing Party shall bring printed copies of ~~the Source Code~~ <u>those portions</u> to the deposition for use by the Receiving Party.  Copies of Source Code that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers.  ~~The Producing Party shall maintain the marked deposition exhibits during the pendency of this case.  All other~~ <u>All</u> paper copies of Source Code brought to the deposition by the Producing Party shall remain with the Producing Counsel's outside counsel for secure destruction in a timely manner following the deposition.

(l)     . . . If a Party reasonably believes that it needs to submit a portion of Source Code as part of a filing with the Court, the Parties shall meet and confer as to how to make such a filing while protecting the confidentiality of the Source Code and such Source Code will not be filed absent agreement from the Producing Party that the confidentiality protections will be adequate ~~or order of this Court~~. . . .

## 1.     <u>Plaintiffs' Position</u>

The Court's Model Order does not address source code.  Thus, Plaintiffs proposed the Court adopt language that corresponds to the source code

provisions from *True Wearables*.  *See* Ex. 13 (*True Wearables*) at 8-12.  Apple replaced Plaintiffs' proposal in its entirety and refused to compromise.  In an effort to narrow the disputes, Plaintiffs agreed to work from Apple's proposal.  Apple adopted some of Plaintiffs' changes but largely maintained its refusal to compromise.  Apple initially refused to even ***explain*** its objections.  *See* Powell Decl., Ex. 8 at 9, 11.  Apple first provided some explanation of its position a few days before Plaintiffs provided their portion of this joint stipulation.  *Id.*, Ex. 8 at 4-8.  Plaintiffs address the disputes in turn below.

### a.  <u>Section 4.5</u>

Plaintiffs proposed including the *True Wearables* definition of "source code."  *See* Ex. 13 at 7 ("To the extent such Protected Material includes computer source code and/or live data (that is, data as it exists residing in a database or databases) (i.e., 'Source Code Material'), the producing party may designate such Protected Material as 'RESTRICTED CONFIDENTIAL SOURCE CODE.'").  That is a standard and commonly used definition of "source code" that includes actual source code and live data.  *See also Intellectual Pixels Ltd. v. Sony Interactive Entertainment LLC*, No. 8:19-cv-01432-JVS-KES, Dkt. No. 49 (C.D. Cal. Nov. 15, 2019) (Powell Decl., Ex. 22) at 6 (providing the same definition for "source code").  Nevertheless, Apple rejected Plaintiffs' proposal.

In an effort to compromise, Plaintiffs agreed to much of Apple's definition.  However, Plaintiffs could not agree to Apple's insistence that mere "descriptions" of source code can be designated as "source code."  *See* Powell Decl., Ex. 4 at 4.  That term is far too vague and would invite disputes as to whether a technical document describing product functions performed by source code constitutes a "description" of source code.  Apple's proposal will impermissibly sweep in many technical documents that are not source code.  Apple's overly broad definition of what constitutes "source code," combined

with Apple's overly restrictive procedures for reviewing source code discussed below, would significantly hinder Plaintiffs' ability to review Apple's technical documents.

### b. Section 11(f)

The parties have several disputes regarding Section 11(f). First, Plaintiffs propose that "[t]he Receiving Party may generate PDF copies of limited portions of source code on the source code computer for purposes of asking the Producing Party to produce paper copies." Powell Decl., Ex. 4 at 21-22. Generating an electronic PDF copy on the source code computer is the most efficient way for a Receiving Party to tell the Producing Party what portion of the source code it would like printed. This approach also avoids disputes over whether the Producing Party printed source code in an illegible format, or in a format that uses more of a Receiving Party's allocated pages than necessary.

Apple argues the producing party should create paper copies only when they are "not objectionable or any objections are resolved." *Id.*, Ex. 8 at 6. That makes no sense because this provision does *not* involve printing paper copies. It merely allows the Receiving Party to create—*on the source code computer*—an electronic copy that the Producing Party can print *if* any objections have been resolved. Plaintiffs' proposal does not allow the Receiving Party to create paper copies of anything.

Second, Plaintiffs propose that the Receiving Party may move the Court for permission to print more than 200 pages total. *Id.*, Ex. 4 at 22. Apple argues this provision is unnecessary and could be "misconstrued as Apple agreeing that printing more than 200 pages may be necessary in this case." *Id.*, Ex. 8 at 6. Plaintiffs recognize Apple does not agree that printing more 200 pages may be necessary. All Plaintiffs seek is the ability to *ask the Court* to increase that page limit. *See Microsoft* (Powell Decl., Ex. 23) at 7 (permitting party to ask to print additional pages beyond page limit)

In contrast, Apple proposes language that arguably prohibits the Receiving Party from even **asking** this Court to increase the 200-page total limit. Powell Decl., Ex. 4 at 22. Apple's proposal specifically mentions a procedure allowing parties to increase the 15-consecutive-page limit but **not** the 200-page total limit. *Id.* That language could easily be misconstrued as the parties agreeing the 200-page limit can **never** be increased, particularly in light of Apple' refusal to agree to Plaintiffs' proposal providing that a party may ask the Court for leave to print more than 200 pages.

Third, Plaintiffs propose that printing directory paths or structures and filenames do not count towards the consecutive or aggregate page limits described. *Id.* This is appropriate because paths and filenames are not source code; they are analogous to a table of contents. The metadata included in directory listings also establish when a file was last modified and can also be used to show whether a file was modified from a prior version. A printed copy of the paths and filenames makes review of the actual source code far more efficient.

Apple claims Masimo intends to use directory printouts to "facilitate some of its review of the code (which includes the structure of how files are grouped into file paths) outside of the source code review room." Powell Decl., Ex. 8 at 5. That again makes no sense. While paths and filenames can be designated and protected under the source code provisions, they are **not** actual source code. Maintaining a copy of paths and filenames is important to easily track a parties' review of the **actual** source code in the source code review room.

c.  **Section 11(h)**

The parties agree that the Receiving Party should not store notes or other material in the source code review room beyond the time when the party is reviewing code in the room. However, Plaintiffs believe counsel should abide

by their ethical duties not to review any work product that may be inadvertently left behind.  Powell Decl., Ex. 4 at 23.  This is consistent with counsel's ethical duty to "refrain from examining" another attorney's work product and "promptly notify the sender." California Professional Rule of Conduct 4.4; *see also Rico v. Mitsubishi Motors Corp.*, 42 Cal. 4th 807, 808 (2007).  Plaintiffs' proposal is also consistent with the Federal Rules of Civil Procedure and Federal Rules of Evidence, which reject automatic waiver of privilege based on inadvertent disclosure.  *See* Fed. R. Civ. P. 26(b)(5)(B); Fed. R. Evid. 502(b).

Apple argues Plaintiffs' proposal is "contrary" to prior provisions stating reviewers have no "expectation of confidentiality for materials left behind in the source code review room" and should "clean up."  Powell Decl., Ex. 8 at 6.  That is why Plaintiffs included this provision: to clarify that if a party **accidentally** leaves work product behind, it should not be reviewed or used.  Apple's refusal to agree to this simple provision is troubling and reinforces the need for Plaintiffs' proposal.

### d.    <u>Section 11(i)</u>

The parties agree on this section except Apple demands a ***one-day*** response to any requests for a log of individuals who review paper copies of source code.  Powell Decl., Ex. 4 at 23.  That is unreasonable.  For example, one party may request a log on Christmas Eve and assert a violation occurred if the opposing party does not respond on Christmas Day.   Plaintiffs provide a reasonable three-day notice period, which balances prompt disclosure with avoiding unduly harassing opposing counsel on weekends and holidays.  Apple previously stipulated to protective orders that included a similar log, but did not include a one-day response time.  *See Pinn* (Powell Decl., Ex. 17) at 14.  This Court has also adopted orders requiring similar logs be provided on ***seven*** days' notice.  *Microsoft* (Powell Decl., Ex. 23) at 8.

### e. **Section 11(j)**

The parties have two disputes regarding Section 11(j).  First, Plaintiffs propose that the number of individuals authorized to access printed Source Code can be increased beyond 15 individuals, but only by agreement of the parties or order of this Court.  Powell Decl., Ex. 4 at 24.  This could become necessary if, for example, individuals authorized to access source code need to be replaced because they withdraw from this case.  Apple argued that, in other "extremely large cases, the parties have been able to manage within the 10 person limit and thus, Apple cannot imagine a situation in which more than 15 people will become necessary."  *Id.*, Ex. 8 at 10.  Whether this provision was necessary in other cases has nothing to do with whether it might become necessary in this case.  There is no valid reason to preclude a party from even *asking* Apple or the Court to increase the limit.  *See CBS Interactive, Inc. v. Etilize, Inc.*, 257 F.R.D. 195, 201 (N.D. Cal. 2009) ("[D]istrict courts have inherent authority to grant a motion to modify a protective order where 'good cause' is shown.'").

Second, Plaintiffs propose printed source code may be transported to and from individuals authorized to view the source code via hand carry, Federal Express, or other similarly reliable carrier.  Powell Decl., Ex. 4 at 24.  Apple rejected that proposal entirely.  *Id.*  Without this language, counsel may be required to personally fly source code printouts to their experts for use in preparing expert reports.  That would be unduly restrictive.  Indeed, this Court routinely includes language similar to Plaintiffs' proposal.  *See Intellectual Pixels* (Powell Decl., Ex. 22) at 10 (permitting parties to transfer printed source code by "hand carry, via Federal Express, or via other similarly reliable courier with tracking capabilities"); *Microsoft* (Powell Decl., Ex. 23) at 8 (permitting parties to transport printed source code pages by "reliable hand carry" and "Federal Express").  Indeed, Apple previously stipulated to the inclusion of similar language.  *See Pinn* (Powell Decl., Ex. 17) at 13 (allowing transportation

1    "via hand carry, Federal Express or other similarly reliable courier").

2              **f.     Section 11(k)**

3         The parties have two disputes regarding Section 11(k).  First, Plaintiffs

4    propose that the Producing Party bring all printed source code to depositions

5    upon request.  Powell Decl., Ex. 4 at 24.  This is reasonable and not unduly

6    burdensome because the parties have agreed to a presumptive limit that no more

7    than 200 pages that will be printed.

8         In contrast, Apple requires ten days' advanced notice of the *specific*

9    portions of printed code that will be addressed at a deposition.  *Id.*  Apple's

10   proposal is highly problematic because it seeks disclosure of work product

11   regarding the specific portions of the code about which the questioning attorney

12   will ask, and would give the Producing Party an unfair advantage by knowing

13   exactly what material will be addressed at a given deposition.   Further,

14   deposition preparation often continues up to the day of the deposition, and

15   relevant code is likely to be identified by the witness during the deposition.  A

16   10-day advance notice that requires identification of only specific portions of

17   code is not workable.  The Court should follow the standard rule that does not

18   require advanced notice of exhibits that will be used at a deposition.  *Sporck v.*

19   *Peil*, 759 F.2d 312, 316 (3d Cir. 1985) ("[T]he selection and compilation of

20   documents by counsel in this case in preparation for pretrial discovery falls

21   within the highly-protected category of opinion work product."); *Stevens v.*

22   *Corelogic, Inc*, 2016 WL 397936, at \*9 (S.D. Cal. Feb. 2, 2016) ("[C]ourts in

23   this Circuit have viewed *Sporck* favorably.").

24        Second, Plaintiffs propose that the Producing Party maintain marked

25   deposition exhibits during the pendency of this case.  Powell Decl., Ex. 4 at 24.

26   Apple struck this provision and proposes that the Producing Party destroy all

27   deposition exhibits containing source code.  *Id.* at 24-25.  There is no potential

28   harm from the ***Producing Party's*** outside counsel maintaining a copy of the

exhibit. Moreover, Apple's proposal could create evidentiary issues if the parties later dispute the content of an exhibit that was introduced at a deposition.

### g. Section 11(l)

Plaintiffs proposal merely confirms that this Court has the authority to order a party to file source code over the objection of the Producing Party. Powell Decl., Ex. 4 at 25. That is necessarily part of this Court's inherent authority to manage its docket. Apple struck Plaintiffs' proposed language and refused to explain its objection even after Plaintiffs repeatedly asked Apple to do so. *See Id.*, Ex. 8 at 8.

Accordingly, the Court should adopt Plaintiffs' proposed source code provisions.

### 2. Defendant's Position

Over the course of three months, Apple has diligently negotiated with plaintiffs the terms of a protective order, despite Plaintiffs' repeated efforts to delay that process. Plaintiffs' accusations that Apple has refused to compromise or explain its objections are demonstrably false. Plaintiffs raised new disputes each time the parties exchanged proposed protective order provisions, making it impossible for the parties to focus on the specific issues in dispute and drawing the negotiation process out indefinitely.

### a. Section 4.5

The parties dispute whether descriptions of source code should receive a "Highly Confidential – Source Code" designation in order to protect Apple's sensitive technical information. As Apple explained to Plaintiffs numerous times during this process, Apple's source code is extremely sensitive and every other business in its industry seeks to review its contents. The designation of descriptions of source code as "highly confidential" and thus requiring the same protections afforded source code is necessary to preserve Apple's valuable technical information from improper disclosure or use. Apple goes to great

lengths to limit the use and review of its source code by any individuals, including its own employees and counsel. These protections extend to descriptions of the source code. Descriptions of source code in internal documents and emails can and often do reveal important details about how the source code operates and thus deserve the same level of protection as the source code itself. Indeed, some descriptions are even more revealing of the operation of the products than the source code itself because the descriptions use simple and clear terms to explain how the source code works rather than source code terminology that can be complex to understand, particularly if one function calls a second function, which in turn calls a third, for example. Having a higher level description of what is happening is extremely valuable. Thus, limiting the provision to only source code comments is not sufficient. Apple's proposal to bestow the same protections accorded to source code unto descriptions of source code is a reasonable and necessary protection of its valuable and sensitive asset.

Moreover, Plaintiffs incorrectly claim that Apple's proposal is "overly broad." Apple's proposal cabins the types of technical documents to which this provision applies by proposing the few types of documents that should receive this designation: "(e.g., descriptions of declarations, functions, and parameters)." Powell Decl. Ex. 3, at 57.

This Court should adopt Apple's proposal.

### b. **Section 11(f)**

#### i. **Generating Source Code as PDF Copies**

Plaintiffs propose generating electronic PDF copies of source code on the source code computer for the purpose of "asking the Producing Party to produce paper copies." Plaintiffs' proposal is an unreasonable request that does not justify exposing Apple's confidential source code to impermissible disclosure or use by converting it to an electronic PDF copy. There are far more common and less risky means of telling the Producing Party what portion of the source code

the Receiving Party would like printed—for instance, indicating the starting and ending points of desired portions of source code. This is how typical litigation discovery and review of confidential, valuable information occurs. Notably, such language is not present in the provisions of the Protective Order entered in *True Wearables*. Powell Decl., Ex. 13. Yet at the last minute, Plaintiffs requested this unnecessary and inefficient provision. It should be rejected.

Plaintiffs' claim that this provision is "the most efficient" neglects the aims of a protective order—to minimize the unnecessary risk of improper disclosure and use of a party's most sensitive and confidential information. Permitting the printing of Apple's valuable source code to an electronic PDF copy contravenes these aims and this Court therefore should reject Plaintiffs' proposal.

### ii. Printing More Than 200 Pages

In the beginning of this negotiation, Apple proposed a one-hundred page limit of any printed portion of source code, because, as it explained to Plaintiffs numerous times and still maintains, such a limit is more than necessary to allow Plaintiffs to sufficiently review any such portion of Apple's information at issue in this case. In the interests of compromise, Apple agreed to compromise on a two-hundred page limit of any printed portion of source code. Now, however, Plaintiffs drags the dispute on further. Plaintiff seeks to add language explicitly permitting a reviewing party to demonstrate the need for any printed portion of source code beyond two hundred pages. This provision should be rejected for two reasons. *First*, Plaintiffs' provision is unwarranted in light of the already-agreed provision in the protective order that the Protective Order may be modified by the Court. *See* Samplin Decl. Ex. A, at 32 ("Protective Order") ("Modification by Court. This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order sua sponte in the interests of justice. All disputes between the Parties

-75-

concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the Central District of California."). *Second*, a two hundred page limit is more than adequate for Plaintiffs to view any printed portion of the source code and, therefore, Apple does not agree to include language that might be interpreted by the Court as suggesting that modification of that limit was contemplated by the parties.

### iii. Printing Directory Paths Information

This is another provision that Plaintiffs inserted late in the parties' negotiations over Section 11, which delayed bringing this protective order dispute to the Court. As a further attempt to expand the number of pages it can print, Plaintiffs asked for source code directory paths, structures, and file names to be excluded. But those pieces of information *are* source code—they are absolutely necessary to enable a computer to compile the source code into executable instructions and are used universally across computing systems and languages. Source code directory paths provide detailed information about the source code and are thus just as sensitive as the source code instructions. Source code directory paths and file structures should count toward the page limits described. Moreover, it was with this understanding that source code directory paths, structures, and file names would be included in the page count that Apple, in the interest of compromise, agreed to a two-hundred-page limit of any printed portion source code, a limit more than adequate for review of any printed portion of the source code.

Permitting Plaintiffs to sidestep limits on source code printing takes away the incentive for Plaintiffs to be careful and deliberate in choosing portions of code to print, and encourages Plaintiffs to print out larger portions of code than truly necessary and review them at their leisure in their office or at home (i.e., outside of the secure environment). Plaintiffs' preferences and convenience

plainly do not outweigh the need to protect Apple's valuable and vulnerable source code.  As Apple explained during meet-and-confer discussions with Plaintiffs, the entire purpose of having a source code review room, in which the source code is made available for review (and the existence of which the parties agree is necessary), is for the review to occur in the secure environment. Plaintiffs' "preference and convenience should not trump the need to protect the source code for what Apple considers to be its crown jewels—the products at issue in this case."  *Unwired Planet LLC v. Apple Inc.*, No. 3:12-CV-00505-RCJ, 2013 WL 1501489, at *5 (D. Nev. Apr. 11, 2013).

### c.  Section 11(h)

The parties dispute who must bear the burden of locating any material left in the source code review room.  Plaintiffs seek to require the Producing Party to review any confidential material left in the review room and to contact the Receiving Party regarding the identification of such material.

Plaintiffs request an unnecessary imposition on the Producing Party to contact the Receiving Party and to make judgments about whether something the Producing Party leaves behind is work product or not.  To streamline the process of the review, Apple requests that Plaintiffs be responsible for all materials, potential work product or otherwise, left in the review room.  If anything is left behind, the Receiving Party should bear the burden of notifying the Producing Party.

### d.  Section 11(i)

Apple seeks one-day advance notice for the Receiving Party to provide the Producing Party with a log of the reviewers and recipients of paper copies of the source code.  As Apple has explained to Plaintiffs in the parties' meet-and-confers, if one party determines that its source code has been disclosed or used contrary to the provisions of the Protective Order, that party needs every tool at its disposal to stop the further dissemination of the source code.  These

provisions are necessary because past experience demonstrates that misuse can occur and, in fact, in at least one instance, the absence of more urgent measures like this provision impaired Apple's ability to act as quickly as it would have liked to prevent further risk of misuse. In *Valencell Inc. v. Apple Inc.*, the plaintiffs sent a shipment consisting almost entirely of Apple's documents marked "Highly Confidential – Attorneys' Eyes Only" to be used by the plaintiffs' counsel at the deposition of an Apple witness. Order at 2, *Valencell Inc. v. Apple Inc.* (E.D.N.C. Aug. 28, 2017) ECF No. 216. Instead of being sent to the hotel where Plaintiffs' counsel was staying, the shipment was misdirected to a third party who then alerted Apple of his receipt of its materials. Despite being aware of the non-delivery, the plaintiffs delayed in disclosing to Apple the disruptions in the shipment. *Id.* at 3. Only when Apple contacted the plaintiffs and requested the source code log did the plaintiffs subsequently notify Apple of this disruption and of a second unrelated missing shipment "consisting of almost 1,000 pages of Apple's source code" that been intended to be sent to one of the plaintiffs' experts but instead was reported by FedEx as never having left its distribution center and was not received by the expert. *Id.* If Apple's source code is sent to the wrong individual or left at a FedEx distribution center, both of which occurred in *Valencell*, Apple would need to know immediately every person that had access to the source code to identify the potential source of that leak. In such a situation, three days would be completely inadequate. Turning Plaintiffs' example around, if Apple source code was leaked on the Internet on Christmas Eve, then Apple would indeed expect to have a list of the people who had access to it on Christmas Day. This provision hopefully will never be necessary. But, if it is necessary to request a log, the requesting party deserves a response within one day. Plaintiffs' "preference and convenience should not trump the need to protect the source code for what Apple considers to be its crown jewels—the products at issue in this case." *Unwired Planet LLC v. Apple*

*Inc.*, No. 3:12-CV-00505-RCJ, 2013 WL 1501489, at *5 (D. Nev. Apr. 11, 2013).

### e. Section 11(j)

The parties dispute (1) language concerning how many individuals may review and receive the Producing Party's source code on behalf of the Receiving Party; and (2) the transportation of source code by the Receiving Party.

### i. Increasing the Number of Reviewers

Much like the dispute over number of pages of source code that can be printed, here, Apple originally proposed a limit of ten people to access source code, but agreed to a compromise of fifteen people on behalf of a Receiving Party. A limit on the number of reviewers of a party's source code is a necessary protection against the risk of inadvertent disclosure. Plaintiffs' attempt to permit the increase the limit of the number of reviewers beyond fifteen should fail for the same reason that the Court should reject similar language in the page limit provision above. Plaintiffs' provision is unwarranted in light of the already-agreed provision that the protective order may be modified. *See* Samplin Decl. Ex. A, at 32 ("Modification by Court. This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order sua sponte in the interests of justice. All disputes between the Parties concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the Central District of California."). Further, Apple opposes inclusion of any provision in this protective order suggesting that it agrees that adding more people to that limit was contemplated. Apple does not contemplate either party needing more than fifteen individuals to review the other side's source code.

ii.     **Restrictions on how source code may be transported**

This is another example of Plaintiffs' many attempts to indefinitely draw out the negotiation of the protective order. Each time the parties exchanged protective order provisions, Plaintiffs inserted new clauses into agreed-upon sections and manufactured new disputes. This provision was added in the latest version Plaintiffs sent despite months of negotiation over the protective order without any suggestion by Plaintiffs that a transportation provision was needed.

Plaintiffs propose unnecessary language outlining who may transport printed source code to and from individuals authorized to view the source code. The protective order already provides provisions on how many copies can be made and where they are to be stored and by whom. *See* Powell Decl. Ex. 3, at 74 ("The Receiving Party's outside counsel of record and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents duplication of or unauthorized access to the Source Code."). Plaintiffs argue that the absence of this language suggests that a party may be "required to personally fly source code printouts to their experts for use in preparing expert reports." That may be the case. Apple's source code is extremely sensitive and Apple should not have to take the risk that it will be lost in the mail, FedEx, or any other courier service. *See Valencell* at 2 (shipment consisting "almost entirely of Apple documents" marked "Attorneys' Eyes Only" "were intended to be sent to the hotel where [the plaintiffs'] counsel would be staying, but were misdirected by an unknown man to a third party"); *id.* at 2 ("The other shipment . . . [consisting] of almost 1,000 pages of Apple's source code . . . was to be sent to [the plaintiffs'] expert, but he did not receive the shipment and it is reported by FedEx as never having left its Fort Worth Distribution Center.").

Source code is going to be produced in a single location for review.

Thus, the experts will be traveling to the source code review room to complete the review. It is not too much of a burden to require that they obtain printed copies in a similar fashion.

### f.  Section 11(k)

#### i.  Bringing Source Code to the Deposition

The parties dispute whether the Producing Party shall bring all printed source code to depositions upon request or whether the Producing Party shall receive ten days' notice to bring specific portions of source code to be addressed at a deposition.

Plaintiffs request the Producing Party bear the burden of bringing *all* of the printed source code to the deposition. Apple does not agree. Instead, Apple's proposal requires Plaintiffs to identify only the portions of the source code they need and avoid needlessly exposing Apple's source code to inadvertent or improper disclosure. It also forces Plaintiffs to be careful and deliberate in choosing portions of code to print, discouraging Plaintiffs from requesting the printing of larger portions of code than truly necessary. Apple's provision ensures the adequate protection of its confidential information. This Court should accept Apple's proposal.

#### ii.  Maintaining Marked Deposition Exhibits

The parties dispute whether the Producing Party must maintain marked deposition exhibits during the pendency of this case. Plaintiffs argue that there is no potential harm in requiring Apple to maintain paper copies of its confidential source code. Not so. Plaintiffs' proposal unnecessarily preserves Apple's confidential technical information in a medium that allows it to be easily misused. By contrast, there is no risk, as Plaintiffs argue, that Apple's proposal could create the evidentiary issue that the parties might dispute the content of an exhibit introduced at a deposition. The exhibit is clearly identified by the court reporter and the deposition transcript and Apple cannot foresee any

scenario that results in the outcome Plaintiffs describe.

### g. Section 11(l)

The parties dispute whether the protective order requires confirmation that the Court has the authority to order a party to file source code over the objection of the Producing Party. Plaintiffs' provision is redundant and unwarranted in light of the already-agreed provision in the protective order that the Protective Order may be modified. *See* Samplin Decl. Ex. A, at 32 ("Modification by Court. This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order sua sponte in the interests of justice. All disputes between the Parties concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the Central District of California.").

As Plaintiffs admit, their proposal merely restates the Court's inherent authority—something that Apple has never disagreed with. This is another example of Plaintiffs' many attempts to indefinitely draw out the negotiation process of the protective order. Each time the parties exchanged protective order provisions, Plaintiffs inserted new clauses into agreed-upon sections, manufacturing new disputes and making it impossible for the parties to identify the issues actually in dispute. This is one such example.

In light of the foregoing, this Court should reject Plaintiffs' language.

### I. Section 17 – Disposition After Trial

The Parties' dispute on Section 17 is shown below, with underlined text showing Apple's proposed additions to Plaintiffs' proposal and strikethrough text showing Apple's proposed deletions to Plaintiffs' proposal:

17. FINAL DISPOSITION

~~After~~Not later than sixty (60) days after the Final Disposition of this Action, as defined in Paragraph 6, ~~within 60 days of a written~~

1    ~~request by the Designating Party,~~ each Receiving Party shall return

2    all Protected Material to the Producing Party or destroy such

3    material. . . .

4    **1.    Plaintiffs' Position**

5    Plaintiffs again propose following the Court's Model Order.  *Compare*

6    Powell Decl., Ex. 1 (Model Order) at 14-15 *with* Ex. 2 (Plaintiffs' proposal) at

7    28-29.  The Court's Model Order provides that information should be deleted or

8    returned at the end of the case within 60 days of receiving a request from the

9    opposing party.  This provision makes sense, as it helps prevent inadvertent

10   failures to delete or return information and avoids any dispute as to the precise

11   date of "Final Disposition."  This language is commonly included in protective

12   orders.  *See, e.g.*, *Glaukos* (Powell Decl., Ex. 21) at 16.

13   Apple proposes that the obligation to return or destroy be automatically

14   triggered by "Final Disposition."  Powell Decl., Ex. 4 at 30.  Apple provides no

15   justification for departing from the Court's Model Order other than suggesting

16   Apple used automatic provisions in other cases.  Plaintiffs believe the Court's

17   standard language reflects the better practice.  Plaintiffs also do not believe that

18   Apple's prior practice in other cases is a sufficient reason to depart from this

19   Court's Model Order.  Moreover, it makes practical sense to place the burden on

20   the Producing Party to remember to ask for the return or destruction of its

21   confidential information.  The Court should adopt Plaintiffs' proposal.

22   **2.    Defendant's Position**

23   The parties are in agreement about every aspect of this provision, besides

24   Plaintiffs' request for a requirement of written notice to trigger return or

25   destruction of Protected Material following Final Disposition.  This case will

26   involve production of highly confidential technical information, including

27   source code.  Apple therefore already is certain that it wants Plaintiffs to return

28   or destroy all such material that they receive from Apple following the

resolution of this action, and Apple assumes that Plaintiffs want the same from Apple with respect to their sensitive information and source code. The parties should not be required to provide formal, written notice to effectuate that result.

Plaintiffs' argument that written notice is necessary to ascertain the timing of "Final Disposition" is wrong. Apple has reached agreement with opposing parties in scores of other litigations on the language it proposes here (i.e., return or destruction of Protected Material following Final Disposition of the action, without written notice), and has never in those cases encountered an unsolvable issue with respect to the meaning of "Final Disposition." Final disposition is not a nebulous concept. It will be very clear to Plaintiffs when they should return or destroy Apple's Protected Material—and on the off chance it is not, Plaintiffs can simply send Apple's counsel an email seeking guidance.

Likewise unpersuasive is Plaintiffs' statement that it "makes practical sense to place the burden on the Producing Party to remember to ask for the return or destruction of its confidential information." In fact, the statement is concerning, as it underscores Plaintiffs' belief that if Apple inadvertently fails to satisfy the formality of written notice, Plaintiffs get to hold onto Apple's highly confidential information, including source code and potentially trade secrets, indefinitely. That is certainly not how these protective order provisions are meant to work. Indeed, it would defeat the very purpose of a protective order— which is meant to govern the receipt, possession, and use of other parties' confidential information during the pendency of the lawsuit for which the confidential information was produced in the first place.

Finally, as is clear from the text, Apple is not requesting a unilateral provision. Apple's proposal is bilateral—and would relieve Apple *and* Plaintiffs from the formality of written notice to compel destruction or return of materials that they already know they do not want circulating outside of their respective companies following Final Disposition of this action. Frankly, Apple

is surprised that the parties were unable to resolve this issue without court intervention, as Apple's proposal seems to be in the best interests of all parties—preventing a "gotcha" where a party simply forgets that the protective order requires the formality of written notice to effectuate return or destruction.

Apple recognizes that this Court's general Model Order includes the "written request" language Plaintiffs seek. Apple nonetheless respectfully submits that written requests should not be required to compel return or destruction of the Protected Material that will be involved in this case—which has the potential to include some of the most sensitive information at Apple. Apple notes that the Northern District's Model Order does not require written notice for the return or destruction of Protected Material following Final Disposition of the action. *See* Samplin Decl. Ex. D, at 74. While Apple recognizes that this District has not published its own distinct Model Order for cases "involving patents, highly sensitive confidential information and/or trade secrets," Apple submits that the Northern District's language on this dispute, for this particular type of case, is instructive.

Simply put, short of pointing to this Court's Model Order, Plaintiffs have provided no practical or legal reason to oppose Apple's sensible and customary proposal. Apple respectfully requests that the Court so order Apple's proposed version of this protective order provision accordingly.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 26, 2020    By: */s/ Adam B. Powell*
_____
Joseph R. Re
Stephen C. Jensen
Perry D. Oldham
Stephen W. Larson
Adam B. Powell

Attorneys for Plaintiffs
Masimo Corporation and
Cercacor Laboratories

-85-

GIBSON, DUNN & CRUTCHER LLP

Dated:  June 26, 2020

By: */s/ Ilissa Samplin (with permission)*
    Joshua H. Lerner
    H. Mark Lyon
    Brian M. Buroker
    Brian A. Rosenthal
    Ilissa Samplin
    Angelique Kaounis

    Attorneys for Defendant Apple Inc.

# ATTACHMENT  B

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

MASIMO CORPORATION,
a Delaware corporation; and
CERCACOR LABORATORIES, INC.,
a Delaware corporation,

        Plaintiffs,

    v.

APPLE INC.,
a California corporation,

        Defendant.

CASE NO. 8:20-cv-00048-JVS (JDEx)

PROTECTIVE ORDER

Based on Plaintiffs' Motion for Protective Order (Dkt. 61, "Motion"), the Joint Stipulation of the parties (Dkt. 61-1), the evidence submitted in support of and in opposition to the Motion (Dkt. 61-2 to 61-5), including the parties' respective proposed protective orders (Dkt. 61-2, Exh. 2, and Dkt. 61-5, Exh. A), and the June 23, 2020 Order by the Honorable Judge James V. Selna, United States District Judge (Dkt. 59), and good cause appearing therefor, the Motion is granted, in part, and the Court finds and orders as follows.

## 1. PURPOSES AND LIMITATIONS

Discovery in this action is likely to involve production of confidential, proprietary or private information for which special protection from public disclosure and from use for any purpose other than pursuing this litigation may be warranted. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery, including disclosures under Rule 26, and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

## 2. GOOD CAUSE STATEMENT

This action is likely to involve trade secrets, customer and pricing lists and other valuable research, development, commercial, financial, technical and/or proprietary information for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of, among other things, confidential business or financial information, information regarding confidential business practices, or other confidential research, development, or commercial information (including information implicating privacy rights of third parties), information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law. Accordingly, to expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in preparation for and in the conduct of trial, to address their handling at the end of the litigation, and serve the ends of justice, a protective order for such

-1-

information is justified in this matter, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure or any other applicable authority. It is the intent of the parties that information will not be designated as confidential for tactical reasons and that nothing be so designated without a good faith belief that it has been maintained in a confidential, non-public manner, and there is good cause why it should not be part of the public record of this case.

3.      ACKNOWLEDGMENT OF UNDER SEAL FILING
        PROCEDURE

The parties further acknowledge, as set forth in Section 14.3, below, that this Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal. There is a strong presumption that the public has a right of access to judicial proceedings and records in civil cases. In connection with non-dispositive motions, good cause must be shown to support a filing under seal. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006), *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002), *Makar-Welbon v. Sony Electrics, Inc.*, 187 F.R.D. 576, 577 (E.D. Wis. 1999) (even stipulated protective orders require good cause showing), and a specific showing of good cause with proper evidentiary support and legal justification, must be made with respect to Protected Material that a party seeks to file under seal. The parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL does not—without the submission of competent evidence by declaration, establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable— constitute good cause.

Further, if a party requests sealing related to a dispositive motion or trial, then compelling reasons, not only good cause, for the sealing must be shown, and the relief sought shall be narrowly tailored to serve the specific interest to be protected. *See Pintos v. Pacific Creditors Ass'n.*, 605 F.3d 665, 677-79 (9th Cir. 2010). For each item or type of information, document, or thing sought to be filed or introduced under seal in connection with a dispositive motion or trial, the party seeking protection must articulate compelling reasons, supported by specific facts and legal justification, for the requested sealing order. Again, competent evidence supporting the application to file documents under seal must be provided by declaration.

Any document that is not confidential, privileged, or otherwise protectable in its entirety will not be filed under seal if the confidential portions can be redacted. If documents can be redacted, then a redacted version for public viewing, omitting only the confidential, privileged, or otherwise protectable portions of the document, shall be filed. Any application that seeks to file documents under seal in their entirety should include an explanation of why redaction is not feasible.

4.   <u>DEFINITIONS</u>

4.1   Action: this pending federal lawsuit.

4.2   Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

4.3   "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26, and as specified above in the Good Cause Statement.

4.4   "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely confidential and/or sensitive "Confidential

-3-

Information or Items," disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party.

4.5 "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code, scripts, assembly, binaries, object code, source code listings (e.g., file names and path structure), source code comments, object code listings, and Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip, disclosure of which to another Party or Non-Party is likely to cause harm or significant competitive disadvantage to the Producing Party.  Other documents that quote source code or internal documents that contain specific descriptions of source code (e.g. descriptions of declarations, functions, and parameters) that describe how the source code operates, to be narrowly applied, may be designated pursuant to this Paragraph, provided that the Producing Party also produces a redacted version designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY," which removes the quoted source code or specific descriptions of source code.  Native Computer Aided Design (CAD) files may be designated pursuant to this Paragraph, provided that any printouts of CAD files shall be designated "HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY" and will not be included in the page limits discussed in Section 11 below.

4.6 Counsel: Outside Counsel of Record and House Counsel (as well as their support staff).

4.7 Designating Party or Producing Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL," HIGHLY CONFIDENTIAL –

-4-

Case 1:23-cv-01377-MNS-JHT  Document 170-1  Filed 05/30/23  Page 100 of 131  PageID #:
Case 8:20-cv-00048-JVS-JDE  Document 657  Filed 06/30/20  Page 6 of 92  Page ID #:361
8417

ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

    4.8    Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery.

    4.9    Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this Action.

    4.10   House Counsel: attorneys who are employees of a party to this Action.  House Counsel does not include Outside Counsel of Record or any other outside counsel.

    4.11   Non-Party: any natural person, partnership, corporation, association or other legal entity not named as a Party to this action.

    4.12   Outside Counsel of Record: attorneys who are not employees of a party to this Action but are retained to represent a party to this Action and have appeared in this Action on behalf of that party or are affiliated with a law firm that has appeared on behalf of that party, and includes support staff.

    4.13   Party: any party to this Action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

    4.14   Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

    4.15   Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

4.16   Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."  Protected Material shall not include:  (i) advertising materials that have been actually published or publicly disseminated; and (ii) materials that show on their face they have been disseminated to the public.

4.17   Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

5.   SCOPE

5.1   All Protected Material shall be used solely for this case or any related appellate proceeding, and not for any other purpose whatsoever, including without limitation any other litigation, patent prosecution or acquisition, patent reexamination or reissue proceedings, or any business or competitive purpose or function.  Protected Material shall not be distributed, disclosed or made available to anyone except as expressly provided in this Order.

5.2   The protections conferred by this Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel in court or in other settings that might reveal Protected Material.

5.3   Nothing in this Protective Order shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material to any person for any purpose.

Case 4:22-cv-01977-MWB-JLT   Document 170-1   Filed 05/30/23   Page 102 of 131   PageID #:
8419
Case 3:23-cv-00048-NYS-JLT   Document 57   Filed 06/30/23   Page 9 of 92   PageID 563

5.4 This Order does not preclude any Party or Non-Party from using Protected Material with the consent of the Producing Party or by order of the Court.

5.5 This Order does not preclude any Party or Non-Party from moving the Court for additional protection of any Discovery Material or modification of this Order, including, without limitation, moving for an order that certain matter not be produced at all.

5.6 Any use of Protected Material at trial shall be governed by the orders of the trial judge and other applicable authorities. This Order does not govern the use of Protected Material at trial.

6. <u>DURATION</u>

Even after Final Disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing, a court order otherwise directs, or the information was made public during trial. For purposes of this Order, "Final Disposition" occurs after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals.

7. <u>DESIGNATING PROTECTED MATERIAL</u>

7.1 <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.

Mass, indiscriminate or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber the case development process or to impose unnecessary expenses and burdens on other parties) may expose the Designating Party to sanctions.

-7-

1    If it comes to a Designating Party's attention that information or items
2    that it designated for protection do not qualify for protection, that Designating
3    Party must promptly notify all other Parties that it is withdrawing the
4    inapplicable designation.

5    7.2    <u>Manner and Timing of Designations</u>. Except as otherwise provided
6    in this Order, or as otherwise stipulated or ordered, Disclosure of Discovery
7    Material that qualifies for protection under this Order must be clearly so
8    designated before the material is disclosed or produced.

9    Designation in conformity with this Order requires:

10    (a) for information in documentary form (e.g., paper or electronic
11    documents, but excluding transcripts of depositions or other pretrial or trial
12    proceedings), that the Producing Party affix at a minimum, the legend
13    "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES
14    ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" (hereinafter
15    "Confidentiality legend"), to each page that contains protected material. If only
16    a portion of the material on a page qualifies for protection, the Producing Party
17    also must clearly identify the protected portion(s) (e.g., by making appropriate
18    markings in the margins).  For digital files being produced, the Producing Party
19    may mark each viewable page or image with the appropriate designation, and
20    mark the medium, container, and/or communication in which the digital files
21    were contained.

22    A Party or Non-Party that makes original documents available for
23    inspection need not designate them for protection until after the inspecting Party
24    has indicated which documents it would like copied and produced. During the
25    inspection and before the designation, all of the material made available for
26    inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS'
27    EYES ONLY." After the inspecting Party has identified the documents it wants

28    -8-

copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate Confidentiality legend to each page that contains Protected Material. If only a portion of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b) for testimony given in depositions that the Designating Party identifies the Disclosure or Discovery Material on the record at the time the testimony is given or by sending written notice of which portions of the transcript of the testimony are designated within 30 days of receipt of the transcript of the testimony.  During the 30-day period, the entire transcript will be treated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony dealing with such Protected Material.  In such cases the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order.  In the event the deposition is recorded (by video or otherwise), the original and all copies of the recording shall be  designated pursuant to the terms of this Protective Order.  Counsel for any Producing Party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter and videographer (if any), any person who is not authorized by this Protective Order to receive or access Protected Material based on the designation of such Protected Material.  Such right of exclusion shall be applicable only during periods of examination or testimony regarding such Protected Material.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information is stored the appropriate Confidentiality legend. If only a portion or portions of the information warrants protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

(d) When electronic files or documents are printed for use at deposition, in a court proceeding, or for provision in printed form to an expert or consultant pre-approved pursuant to Paragraph 9.2(c), the party printing the electronic files or documents shall affix a legend to the printed document corresponding to the designation of the Designating Party and including the production number and designation associated with the native file. The parties reserve the right to object to the use of any image format version of a document produced in native file format to the extent any information has been altered.

7.3   <u>Inadvertent Failures to Designate</u>. An inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material, provided that the Producing Party notifies all Receiving Parties that such Discovery Material is protected under one of the categories of this Order within fourteen (14) days of the Producing Party learning of the inadvertent failure to designate. Upon such timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order. The Producing Party shall reproduce the Protected Material with the correct confidentiality designation within seven (7) days upon its notification to the Receiving Parties. Upon receiving the Protected Material with the correct confidentiality designation, the Receiving

Parties shall return or securely destroy all Discovery Material that was not designated properly.

A Receiving Party shall not be in breach of this Order for any use of such Discovery Material before the Receiving Party receives such notice that such Discovery Material is protected under one of the categories of this Order, unless an objectively reasonable person would have realized that the Discovery Material should have been appropriately designated with a confidentiality designation under this Order. Once a Receiving Party has received notification of the correct confidentiality designation for the Protected Material with the correct confidentiality designation, the Receiving Party shall treat such Discovery Material (subject to the exception in the following Paragraph below) at the appropriately designated level pursuant to the terms of this Order.

A subsequent designation of "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" shall apply on a going forward basis and shall not disqualify anyone who reviewed "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" materials while the materials were not marked "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" from engaging in the activities set forth in Paragraph 10.

## 8    CHALLENGING CONFIDENTIALITY DESIGNATIONS

8.1.    <u>Timing and Form of Challenges</u>. Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.   Any challenge to a designation of Discovery Material under this Order shall comply with the procedures set forth in Local Rule 37-1.

-11-

8.2    <u>Meet and Confer</u>. It shall be the responsibility of the Challenging Party to initiate the dispute resolution process under Local Rule 37-1 et seq.

8.3    <u>Joint Stipulation</u>. Any challenge submitted to the Court shall be via a joint stipulation pursuant to Local Rule 37-2.

8.4    The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived or withdrawn the confidentiality designation, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

## 9    <u>ACCESS TO AND USE OF PROTECTED MATERIAL</u>

9.1    <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in accordance with Section 5. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the Action has been terminated, a Receiving Party must comply with the provisions of section 17 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party in a secure manner at a location in the United States that ensures that access is limited to the persons authorized under this Order. For any Protected Material that is subject to export control, such material shall be so marked or designated by the Designating Party and the Receiving Party shall upon receipt be responsible for complying with all applicable United States Export Administration Regulations and shall take all reasonable steps to so comply,

including taking steps to ensure such material is not exported outside the United States or provided to foreign nationals to whom such assess is restricted.

Nothing in this Protective Order shall be construed to prevent counsel from advising their clients with respect to this case based in whole or in part upon Protected Materials, provided counsel does not disclose the Protected Material itself except as provided in this Order.

Nothing in this Protective Order shall preclude a party from using material obtained lawfully from a source other than the Producing Party, even if the Producing Party also designated the material pursuant to this Protective Order.

9.2    <u>Disclosure of "CONFIDENTIAL" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action, including the expert's support staff, provided that: (1) such consultants or experts are not presently an officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party and (2) such expert or consultant is not

-13-

involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party.  At least fourteen (14) days before access to the Protected Material is to be given to a consultant or expert, the consultant or expert shall complete the "Acknowledgment and Agreement to Be Bound" (Exhibit A) and the same shall be served upon the producing Party along with the following "Pre-Access Disclosure Requirements":

(i)     a current curriculum vitae of the consultant or expert;

(ii)    identification of the consultant or expert's present employer and job title;

(iii)   identification of all of the person's past and current employment and consulting relationships in the past five years, including direct relationships and relationships through entities owned or controlled by the person, including but not limited to, an identification of any individual or entity with or for whom the person is employed or to whom the person provides consulting services relating to the design, development, operation, or patenting of non-invasive physiological monitoring technologies, or relating to the acquisition of intellectual property assets relating to non-invasive physiological monitoring;

(iv)    identification (by application number, title, and filing date) of all pending patent applications on which the person is named as an inventor, in which the person has any ownership interest, or as to which the person has had or anticipates in the future any involvement in advising on, consulting on, preparing, prosecuting, drafting, editing, amending, or otherwise affecting the scope of the claims; and

-14-

(v)     a listing (by name and number of the case, filing date, and location of court) of any litigation in connection with which the person has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.

The Party seeking to disclose Protected Material shall provide such other information regarding the person's professional activities reasonably requested by the Producing Party for it to evaluate whether good cause exists to object to the disclosure of Protected Material to the outside expert or consultant. Objection Process: The producing party may object to and notify the receiving Party in writing that it objects to disclosure of Protected Material to the consultant or expert.  In the absence of an objection within fourteen (14) days of the date on which the Producing Party receives notice that a consultant or expert will be given access to Protected Material, the person shall be deemed approved under this Protective Order.  There shall be no disclosure of Protected Material to the person prior to expiration of this fourteen (14) day period.  If an objection is received within that fourteen (14) day period, the Parties agree to meet and confer within seven (7) days following the objection and to use good faith to resolve any such objection.  If the Parties are unable to resolve any objection, the objecting Party shall serve on the other Party a Joint Stipulation pursuant to Local Rule 37-2.1 within seven (7) days of the meet and confer.  The objecting Party shall have the burden of proving the need for a protective order.  No disclosure shall occur until all such objections are resolved by agreement or Court order;

(d) the court and its personnel;

(e) court reporters, videographers, and their staff;

-15-

(f)  professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g)  the author, recipient, or custodian of a document containing the information, or any other individual who appears to have had access to the specific information at issue based on the face of the document, the document's metadata, other documents, or sworn witness testimony;

(h)  any mediators or settlement officers and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions;

(i)  any other person with the prior written consent of the Producing Party; and

(j)  during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the form attached as Exhibit A hereto; and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Protective Order. If a Designating Party believes a party is not acting in good faith in seeking to show Protected Material to a witness during a deposition, the Designating Party may seek a further protective order under Local Rule 37 to prevent the showing of Protected Material to the witness, with the Designating Party bearing the burden

-16-

of proof to show that the party seeking to show Protected Material to a witness during a deposition is not acting in good faith.

9.3. <u>Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to the individuals identified in Paragraphs 9.2 (a), (c)-(i), who are not competitive decision-makers of a Party as defined by applicable authorities.

10. <u>PROSECUTION BAR</u>

After the adoption of this provision by the parties, Outside Counsel of Record and any person associated with a Party who receive a Producing Party's material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order who accesses or otherwise learns of, in whole or in part, said material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" under this Protective Order shall not prepare, prosecute, supervise, advise, counsel, or assist in the preparation or prosecution of any patent application seeking a patent on behalf of the Receiving Party or its acquirer, successor, or predecessor in the field of non-invasive monitoring during the pendency of this Action and for two years after final termination of this action. To avoid any doubt, "prosecution" as used in this paragraph does not include representing or advising a Party before a domestic or foreign agency in connection with a reissue, ex parte reexamination, covered business method review, *inter partes* review, opposition, cancelation, or similar proceeding; though in connection with any such agency proceeding involving the patents-in-suit, Outside Counsel

-17-

of Record for a Receiving Party shall not: (i) participate in the preparation, prosecution, supervision, advice, counsel, or assistance of any amended claims; (ii) reveal a Producing Party's Protected Material to any prosecuting reexamination counsel or agent; or (iii) use a producing Party's Protected Material for any purpose not permitted by Section 5. The applicability of this provision is to be determined on an individual-by-individual basis such that an individual attorney who has not received Protected Material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" is not restricted from undertaking any activities by virtue of this provision even if said individual attorney is employed by or works for the same firm or organization as an individual who has received such Protected Material.

11.   SOURCE CODE

(a)   To the extent production of source code becomes necessary in this case, a Producing Party may designate source code as "HIGHLY CONFIDENTIAL - SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code. Nothing in this Order shall be construed as a representation or admission that Source Code is properly discoverable in this action, or to obligate any Party to produce any Source Code.

(b)   Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information including the Prosecution Bar set forth in Paragraph 10, and may be disclosed only to the individuals identified in Paragraphs 9.2(a), (c), (d), (e), (g), and (j), subject to the restrictions set forth in Paragraph 9.3.

(c)   Any source code produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and

-18-

searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel in the Central District of California or another mutually agreed upon location. The source code shall be made available for inspection on a secured computer in a secured room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device.  No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the Source Code Review Room. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code.

(d)     The Producing Party shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, if such tools exist and are presently used in the ordinary course of the Producing Party's business.  The Receiving Party's outside counsel and/or experts may request that commercially available software tools for viewing and searching Source Code be installed on the secured computer, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the Producing Party approves such software tools; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with all of the protections herein.  The Receiving Party must provide the Producing Party with the CD or DVD containing such licensed software tool(s) at least fourteen (14) days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for

-19-

use on the Source Code Computer.     The Parties agree to cooperate in good faith if additional software becomes necessary on an expedited basis.

(e)     The Receiving Party's outside counsel and/or experts shall be entitled to take notes relating to the Source Code but may not copy the Source Code into the notes and may not take such notes electronically on the Source Code Computer itself or any other computer.

(f)     The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in Paragraph (c) in the first instance.  Any printed portion that consists of more than fifteen (15) pages of a continuous block of Source Code or more than two hundred (200) pages total shall be presumed to be excessive, and the burden shall be on the Receiving Party to demonstrate the need for such a printed copy.  Within ten (10) days, the Producing Party shall either (i) provide one copy set of such pages to the Receiving Party or (ii) inform the Requesting Party that it objects that the printed portions are excessive and/or not done for a permitted purpose.  The Parties will cooperate in good faith if a different timeframe for production is required.  If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party shall be entitled to seek a Court resolution of whether the printed Source Code in question is narrowly tailored and was printed for a permitted purpose.  The burden shall be on the Receiving Party to demonstrate that such printed portions are no more than is reasonably necessary for a permitted purpose and not merely printed for the purposes of review and analysis elsewhere.  The printed pages

-20-

shall constitute part of the Source Code produced by the Producing Party in this action.

(g)    All persons who will review a Producing Party's Source Code on behalf of a Receiving Party, including members of a Receiving Party's outside law firm, shall be identified in writing to the Producing Party at least five (5) days in advance of the first time that such person reviews such Source Code.  Such identification shall be in addition to any other disclosure required under this Order.   All persons viewing Source Code on the source code computer shall sign on each day they view Source Code a log that will include the names of persons who enter the locked room to view the Source Code and when they enter and depart.  The log shall be kept by the Producing Party.

(h)    Unless otherwise agreed in advance by the Parties in writing, following each day on which inspection is done under this Order, the Receiving Party's outside counsel and/or experts shall remove all notes, documents, and all other materials from the Source Code Review Room; failure to do so could be deemed a waiver of confidentiality to any materials left behind.  The Producing Party is not responsible for any items left in the room following each inspection session. But all counsel remain bound by their ethical duties regarding the handling and possible return of work product inadvertently left behind by a representative of an opposing party. Proper identification of all authorized persons shall be provided prior to any access to the secure room or the computer containing Source Code.  Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the secure room or the Source Code Computer may be denied, at the discretion of the supplier, to any individual who fails to provide proper identification.

(i)     The Receiving Party's outside counsel of record may make no more than three (3) additional paper copies of any portions of the Source Code received from a Producing Party pursuant to Paragraph 11(f), not including copies attached to court filings or used at depositions, and shall maintain a log of all paper copies of the Source Code.  The log shall include the names of the reviewers and/or recipients of paper copies and locations where the paper copies are stored.  Upon request from the Producing Party, the Receiving Party shall provide a copy of this log to the Producing Party as soon reasonably practicable and in no event more than three (3) days after receipt of such request.

(j)     The Receiving Party's outside counsel of record and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents duplication of or unauthorized access to the Source Code, including, without limitation, storing the Source Code in a locked room or cabinet at all times when it is not in use.  Absent agreement of the Parties or order of this Court, no more than a total of fifteen (15) individuals identified by the Receiving Party shall have access to the printed portions of the Source Code (except insofar as such code appears in any court filing or expert report).  The Parties agree to cooperate in good faith if it becomes necessary for more than fifteen (15) individuals to have access to the printed portions of the Source Code. Nothing in this paragraph reflects an agreement by any Party in advance that access by more than fifteen individuals is warranted.

(k)     For depositions, the Receiving Party shall not bring copies of any printed Source Code.  Rather, at least ten (10) days before the date of the deposition, the Receiving Party shall notify the Producing Party it wishes to use Source Code at the deposition, and the Producing Party shall bring printed

-22-

copies of the Source Code to the deposition for use by the Receiving Party. Copies of Source Code that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers. The Producing Party shall maintain the marked deposition exhibits during the pendency of this case. All other paper copies of Source Code brought to the deposition by the Producing Party shall remain with the Producing Counsel's outside counsel for secure destruction in a timely manner following the deposition.

(l) Except as provided in this sub-paragraph, absent express written permission from the Producing Party, the Receiving Party may not create electronic images, or any other images, or make electronic copies, of the Source Code from any paper copy of Source Code for use in any manner (including by way of example only, the Receiving Party may not scan the Source Code to a PDF or photograph the code). Images or copies of Source Code shall not be included in correspondence between the Parties (references to production numbers shall be used instead), and shall be omitted from pleadings and other papers whenever possible. If a Party reasonably believes that it needs to submit a portion of Source Code as part of a filing with the Court, the Parties shall meet and confer as to how to make such a filing while protecting the confidentiality of the Source Code and such Source Code will not be filed absent agreement from the Producing Party that the confidentiality protections will be adequate or order of this Court. If a Producing Party agrees to produce an electronic copy of all or any portion of its Source Code or provide written permission to the Receiving Party that an electronic or any other copy needs to be made for a Court filing, access to the Receiving Party's submission, communication, and/or disclosure of electronic files or other materials

-23-

containing any portion of Source Code (paper or electronic) shall at all times be limited solely to individuals who are expressly authorized to view Source Code under the provisions of this Order. Where the Producing Party has provided the express written permission required under this provision for a Receiving Party to create electronic copies of Source Code, the Receiving Party shall maintain a log of all such electronic copies of any portion of Source Code in its possession or in the possession of its retained consultants, including the names of the reviewers and/or recipients of any such electronic copies, and the locations and manner in which the electronic copies are stored. Additionally, any such electronic copies must be labeled "HIGHLY CONFIDENTIAL - SOURCE CODE" as provided for in this Order.

12.   PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena, including one issued by any court, arbitral, administrative or legislative body or a court order issued in other litigation, that requests or compels disclosure of any Protected Material, that Party must:

(a) promptly notify in writing each Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected. If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this

-24-

action as "CONFIDENTIAL," HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

13.    A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a) The terms of this Order are applicable to information produced by a Non-Party in this Action and designated as Protected Material. Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

-25-

(3) make the information requested available for inspection by the Non-Party, if requested.

(c) If the Non-Party fails to seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

14.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order and (d) request such person or persons to execute the "Acknowledgment an Agreement to Be Bound" attached hereto as Exhibit A.  Unauthorized or inadvertent disclosure does not change the status of Discovery Material or waive a Producing Party's right to maintain the disclosed document or information as Protected Material.

-26-

## 15.   INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

(a) The inadvertent production by a Party of Discovery Material subject to the attorney-client privilege, work-product protection, or any other applicable privilege or protection, despite the Producing Party's reasonable efforts to prescreen such Discovery Material prior to production, will not waive the applicable privilege and/or protection if a request for return of such inadvertently produced Discovery Material is made promptly after the Producing Party learns of its inadvertent production.

(b) Upon a request from any Producing Party who has inadvertently produced Discovery Material that it believes is privileged and/or protected, each Receiving Party shall immediately return such Protected Material or Discovery Material and all copies to the Producing Party, except for any pages containing privileged markings by the Receiving Party which shall instead be destroyed and certified as such by the Receiving Party to the Producing Party.

(c) Nothing herein shall prevent the Receiving Party from preparing a record for its own use containing the date, author, addresses, and topic of the inadvertently produced Discovery Material and such other information as is reasonably necessary to identify the Discovery Material and describe its nature to the Court in any motion to compel production of the Discovery Material.

## 16.   MISCELLANEOUS

16.1   <u>Right to Further Relief</u>. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

16.2   <u>Right to Assert Other Objections</u>. By agreeing to the entry of this Protective Order, no Party waives any right it otherwise would have to object to

-27-

disclosing or producing any information or item on any ground not addressed in this Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

16.3    <u>Filing Protected Material</u>. A Party that seeks to file under seal any Protected Material must comply with Local Civil Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material. If a Party's request to file Protected Material under seal is denied by the court, then the Receiving Party may file the information in the public record unless otherwise instructed by the court.

16.4    <u>Termination of Matter and Retention of Jurisdiction</u>.  The Parties agree that the terms of this Protective Order shall survive and remain in effect after the Final Disposition of the above-captioned matter.  The Court shall retain jurisdiction after Final Determination of this matter to hear and resolve any disputes arising out of this Protective Order.

16.5    <u>Successors</u>.  This Order shall be binding upon the Parties hereto, their successors, and anyone who obtains access to Protected Material.

16.6    <u>Modification by Court</u>.  This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order sua sponte in the interests of justice.  All disputes between the Parties concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the Central District of California.

16.7    <u>Computation of Time</u>.  The computation of any period of time prescribed or allowed by this Order shall be governed by the provisions for computing time set forth in Federal Rules of Civil Procedure 6.

17.   FINAL DISPOSITION

After the Final Disposition of this Action, as defined in Paragraph 6, within 60 days of a written request by the Designating Party, each Receiving Party shall return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material, but must return or destroy any pleadings, correspondence, and consultant or expert work product that contain information designated "HIGHLY CONFIDENTIAL – SOURCE CODE." Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Paragraph 6 (DURATION).

/ / /

/ / /

/ / /

/ / /

-29-

18.    <u>VIOLATION</u>

Any violation of this Order may be punished by appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

**IT IS SO ORDERED.**

Dated:  June 30, 2020

_____

JOHN D. EARLY
United States Magistrate Judge

-30-

**EXHIBIT A**

I, _____, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *Masimo Corp., et al. v. Apple Inc.*, United States District Court, Central District of California, Southern Division, Civil Action No. 8:20-cv-00048-JVS (JDEx). Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order.

Name of individual: _____

Present occupation/job description: _____

_____

_____

Name of Company or Firm: _____

Address:_____

Dated: _____

_____

[Signature]

-31-

# ATTACHMENT  C

# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

———

(302) 658-9200
(302) 658-3989 FAX

ETHAN H. TOWNSEND
(302) 351-9343
etownsend@mnat.com

July 25, 2014

**BY CM/ECF AND HAND DELIVERY**
The Honorable Leonard P. Stark
United States District Court
844 N. King Street
Wilmington, DE 19801-3555

> Re: *Parallel Networks* Related Actions, C.A. Nos. 13-1412-LPS, 13-1413-LPS, 13-1414-LPS, 13-1476-LPS, 13-1477-LPS, 13-1481-LPS, 13-1943-LPS, 13-2001-LPS, 13-2051-LPS, 13-2085-LPS:  Proposed Protective Order Dispute

Dear Chief Judge Stark:

Defendants submit this responsive letter brief regarding the disputed provisions of the proposed protective order, which Plaintiff attached to its July 24 letter.  (D.I. 25, Ex. A.)

**Section 27 – Scope of Prosecution Bar:**  The parties only dispute (1) whether the scope of the prosecution bar should extend to post-grant proceedings, and (2) whether an ethical wall should be required.

*First*, the inclusion of post-grant proceedings within the scope of the bar is necessary to prevent Defendants' confidential information from being misused – even if inadvertently – to amend, adjust, or otherwise impact claim scope before the PTO.  Plaintiff acknowledges that risk by agreeing that the "purpose of a prosecution bar is to preclude the counsel from using confidential information that is learned in the litigation in crafting new claims." (D.I. 25 at 3.)  Post-grant proceedings, such as the new AIA proceedings and the prior reexamination procedures, provide a patentee with the opportunity to amend or substitute claims (or to otherwise impact claim scope though argument) and thus carry an equal risk as the prosecution of patent applications and re-issue applications.  Accordingly, and for good reason, courts have extended prosecution bars to cover reexamination and new AIA review proceedings.  *See, e.g.*, *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, No. 11-6391 (D.I. 199) (N.D. Cal. June 11, 2013) (granting motion to amend protective order to apply prosecution bar to cover IPRs); *Prilotec, Inc. v. Scentair Techs., Inc.*, No. 12-483 (D.I. 62) (E.D. Wis. May 17, 2013) (barring litigation counsel from participating in IPRs).  Likewise, in *ReefEdge Networks, LLC v. Aruba Networks Inc.*, this Court resolved a similar dispute over the breadth of the protective order by ruling that PTAB review and reexamination proceedings should be included within the scope of the prosecution bar.  *See, e.g.*, D.I. 43 ¶ 19 (protective order) and D.I. 49 at 33-34 (hearing) in *ReefEdge*, C.A. No. 12-1042-LPS ("And I think it follows as well that any PTO proceedings includes any PTO proceedings including the more recent ones created under the AIA.").

The Honorable Leonard P. Stark
July 25, 2014
Page 2

*Second*, an ethical wall is an important element to implement a prosecution bar effectively because it safeguards against the risk that litigation counsel receiving Defendants' confidential information will inadvertently disclose that information to counsel prosecuting patents or otherwise acting in the PTO.  Merely preventing trial counsel from being directly involved in amending claims does not provide meaningful protection.[1]  As the Federal Circuit explained in *Deutsche Bank*, the risk of inadvertent disclosure is a real danger because "it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so."  *In re Deutsche Bank Trust Co. Ams.*, 604 F.3d 1373, 1381 (Fed. Cir. 2010).  It is virtually impossible for the human mind to seal off confidential information about the accused products (and the necessary scope the claims must have to ensnare them) when discussing, for example, the types of arguments that could be made and positions that could be taken in an IPR regarding distinctions over prior art.  Plaintiff's proposal ignores that risk and goes so far as to allow litigation counsel to "consult[] and "assist[]" counsel acting before the PTO.  Balanced against the substantial risk described in *Deutsche Bank*, the burden on Plaintiff of an ethical barrier is slight, particularly given that Plaintiff has multiple attorneys representing it, including an entirely separate law firm (Baker Botts LLP) representing it in PTO matters; Baker Botts in fact prosecuted the patents-in-suit.  For those reasons, this Court in *ReefEdge* approved an ethical wall that was identical in substance to the wall Defendants have proposed here.  *See* D.I. 43 ¶ 19 (protective order) and D.I. 49 at 32-33 (hearing) in *ReefEdge*, C.A. No. 12-1042-LPS (and related cases) ("[C]ounsel, like all of us, is human" and this creates the risk that "inadvertently, perhaps even unknowingly, counsel could be unfairly making use of confidential information in the context of a proceeding before the PTO.").

**Section 14(d)(iii) – Source Code Logging:**  Defendants are all high-tech companies.  For each Defendant, its source code is among the company's most important asset.  Maintaining a record of who has accessed their source code and when it was accessed is essential to manage the disclosure of their source code and to trace the source of any inadvertent disclosures.

Thus, Defendants propose that *all* individuals who access the source code should appear on the log.  Plaintiff has not explained why identifying on the log outside counsel and their employees – who in this instance include technical experts who otherwise would be subject to the agreed restrictions on outside technical experts – would be burdensome or unfair,[2] nor does any persuasive reason exist for treating outside counsel and their employees differently than technical experts or any other individuals involved in the litigation.[3]  Indeed, it seems unlikely that outside counsel and staff would have any particular need to access the original printed pages of source code on a regular basis (instead, that job would be largely done by the technical

---

[1]   Plaintiff states this District has recognized the need for trial counsel to discuss prior art with separate counsel.  But the trial transcript cited by Plaintiff does not support this – the Court merely states that trial counsel "cannot participate in the competitive decision making."  (D.I. 25, Ex. D at 20.)

[2]   There is no burden.  Signing in and out before and after reviewing the source code is trivial.

[3]   Plaintiff's assertion that attorneys are under other ethical obligations does not address the need for a complete log of those who accessed the code to reconstruct the source of a disclosure.

The Honorable Leonard P. Stark
July 25, 2014
Page 3

expert).  More to the point, the goal of avoiding repeated, routine access is precisely the reason to treat these materials differently than other materials, *i.e.*, to have a constant reminder (via a set procedure) that printed source code should *not* be indiscriminately accessed and handled, but instead accessed only when necessary, thereby minimizing the chance of an inadvertent mishandling of the material.  Given the extreme sensitivity of the material, and the minimal burden involved, outside counsel and their employees should be included on the log.

Defendants propose that, in addition to the date of access, each individual's time and duration of access should be recorded.  This is standard practice for source-code logs both inside and outside of litigation.  The purpose is to leave an "audit trail" in the event a problem arises so that events leading up to the issue can be reconstructed and proper remedial action taken.  Again, Plaintiff has not identified any specific burden that would arise from the recording of that standard information.

**Section 18 – Export Control Requirements:**  The disagreement here arises out of each party's indisputable obligation to comply with U.S. Export Administration Regulations ("EAR") for certain types of technical information in the possession of Defendants that will be produced in this case.  Plaintiff's contention that complying with those obligations would be "unduly burdensome" and that its EAR obligations would somehow be released simply by an order to comply with a protective order confirms Defendants' concerns.  (*See* D.I. 25 at 2.)

To be clear, all of the accused products (and, thus, the subject matter of the document production from Defendants) fall within the EAR's category of "telecommunications/networking equipment," subjecting them to some form of export control.  *See* 15 C.F.R. § 774 Supp. No. 1 Cat. 5.  As a result, many of Defendants' technical, non-public documents and information associated with those products is restricted by federal regulation from being disclosed to nationals of countries other than the United States and Canada without U.S. government authorization.  *See* 15 C.F.R. §§ 774 Supp. No. 1 Cat. 5; 738 Supp. No. 1.  Although the regulations are referred to as "export control," the restrictions exist even if the foreign nationals are located in the United States.  *Id.*  In light of those regulations, Defendants' protective-order proposal would have the party receiving such information acknowledge its EAR obligations and agree to certain compliance mechanisms, including, for instance, the maintenance of adequate controls to prevent unauthorized foreign nationals from accessing a producing party's confidential information.  The proposal is identical in substance to the "Export Control Requirements" provision this Court approved in *ReefEdge*.  *See* D.I. 43 ¶ 18 (protective order) and D.I. 49 at 35-36 (hearing) in *ReefEdge*, C.A. No. 12-1042-LPS (and related cases).

Although Plaintiff did not dispute in the meet-and-confer that it will be obligated to comply with EAR (instead arguing that the proposed language was unnecessary), Plaintiff appears to have reversed course in its letter.  Apart from Defendants' reasonable concern about whether Plaintiff will comply with its EAR obligations, Plaintiff's approach would put Defendants in the position of producing documents directly to a party (Plaintiff) that may well give access to those documents to foreign nationals.  The proposed restriction will ensure that Defendants will not disclose information in a way that violates the EAR, even if the disclosure is otherwise permitted by the protective order.  To be clear, Defendants' proposal does not impose on Plaintiff any burden and obligation beyond that already present by virtue of the EAR.  Accordingly, Defendants believe that the protective order, as the procedural vehicle that implements the restrictions attendant to the production of documents in this case, should contain the acknowledgement on this restriction.

The Honorable Leonard P. Stark
July 25, 2014
Page 4

Respectfully submitted,

*/s/ Ethan H. Townsend*

Ethan H. Townsend (#5813)

cc:    Clerk of the Court
       All Counsel of Record