# EXHIBIT 1

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| APPLE INC., | |
| *Plaintiff*, | |
| v. | C.A. No. 22-1378-MN-JLH |
| MASIMO CORPORATION and SOUND UNITED, LLC, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |
| MASIMO CORPORATION and CERCACOR LABORATORIES, INC., | |
| *Counter-Claimants*, | |
| v. | |
| APPLE INC. | |
| *Counter-Defendant*. | |

**DEFENDANT MASIMO CORPORATION'S RESPONSES AND OBJECTIONS TO
APPLE INC.'S SECOND SET OF INTERROGATORIES (4-14)**

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



June 26, 2023                               PHILLIPS MCLAUGHLIN & HALL, P.A.


*Of Counsel:*                              By: */s/ John C. Phillips, Jr.*
                                               John C. Phillips, Jr. (No. 110)
Joseph R. Re                                   Megan C. Haney (No. 5016)
Stephen C. Jensen                              1200 North Broom Street
Stephen W. Larson                              Wilmington, DE 19806
Benjamin A. Katzenellenbogen                   (302) 655-4200 Telephone
Jared C. Bunker                                (302) 655-4210 Fax
KNOBBE, MARTENS, OLSON & BEAR, LLP             jcp@pmhdelaw.com
2040 Main Street, 14th Floor                   mch@pmhdelaw.com

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Irvine, CA  92614
(949) 760-0404 Telephone
(949) 760-9502 Facsimile
joe.re@knobbe.com
steve.jensen@knobbe.com
Stephen.larson@knobbe.com
Ben.katzenellenbogen@knobbe.com
Jared.bunker@knobbe.com

Brian Horne
KNOBBE, MARTENS, OLSON & BEAR, LLP
1925 Century Park East, Suite 600
Los Angeles, CA 90067
(310) 551-3450 Telephone
(310) 551-3458 Facsimile
brian.horne@knobbe.com

Adam Powell
KNOBBE, MARTENS, OLSON & BEAR, LLP
3579 Valley Centre Drive, Suite 300
San Diego, CA 92130
(858) 707-4000 Telephone
(858) 707-4001 Facsimile
adam.powell@knobbe.com

*Counsel for Defendant
Masimo Corporation*

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2023, a true and correct copy of the foregoing document was served on the following counsel of record at the addresses and in the manner indicated:

*VIA ELECTRONIC MAIL:*

| | |
|---|---|
| David E. Moore<br>Bindu A. Palapura<br>Hercules Plaza, 6th Floor<br>1313 N. Market Street<br>Wilmington, DE 19801<br>dmoore@potteranderson.com<br>bpalapura@potteranderson.com | Peter C. Magic<br>DESMARAIS LLP<br>101 California Street<br>San Francisco, CA 94111<br>pmagic@desmaraisllp.com |
| John M. Desmarais<br>Kerri-Ann Limbeek<br>Cosmin Maier<br>Jordan N. Malz<br>Benjamin N. Luehrs<br>Joze Welsh<br>Jamie L. Kringstein<br>Jennifer M. Przybylski<br>Carson Olsheski<br>Desmarais LLP<br>230 Park Avenue<br>New York, NY 10169<br>jdesmarais@desmaraisllp.com<br>klimbeek@desmaraisllp.com<br>cmaier@desmaraisllp.com<br>jmalz@desmaraisllp.com<br>bluehrs@desmaraisllp.com<br>jwelsh@desmaraisllp.com<br>jkringstein@desmaraisllp.com<br>jprzybylski@desmaraisllp.com<br>colsheski@desmaraisllp.com | Jennifer Milici<br>Dominic Vote<br>Leon B. Greenfield<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Avenue, NW<br>Washington DC 20006<br>jennifer.milici@wilmerhale.com<br>dominic.vote@wilmerhale.com<br>leon.greenfield@wilmerhale.com |
| Mark A. Ford<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>60 State Street<br>Boston, MA 02109<br>mark.ford@wilmerhale.com | |

June 26, 2023

CONFIDENTIAL – ATTORNEYS' EYES ONLY

*/s/ Megan C. Haney*
Megan C. Haney (#5016)

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| APPLE INC., | C.A. No. 22-1377-MN-JLH |
| *Plaintiff,* | |
| v. | **JURY TRIAL DEMANDED** |
| MASIMO CORPORATION and SOUND UNITED, LLC, | |
| *Defendants.* | |
| MASIMO CORPORATION, | |
| *Counter-Claimant,* | |
| v. | |
| APPLE INC. | |
| *Counter-Defendant.* | |
| APPLE INC., | C.A. No. 22-1378-MN-JLH |
| *Plaintiff,* | |
| v. | **JURY TRIAL DEMANDED** |
| MASIMO CORPORATION and SOUND UNITED, LLC, | |
| *Defendants.* | |
| MASIMO CORPORATION and CERCACOR LABORATORIES, INC., | |
| *Counter-Claimants,* | |
| v. | |
| APPLE INC. | |
| *Counter-Defendant.* | |

**MASIMO CORPORATION, SOUND UNITED, LLC, AND CERCACOR LABS., INC.'S RESPONSES AND OBJECTIONS TO APPLE INC.'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS (56-96)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants Masimo Corporation and Sound United, LLC and Counter-Claimants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo") hereby respond to Plaintiff Apple Inc.'s ("Apple") Second Set of Requests for Production of Documents and Things (56-96).

## **GENERAL STATEMENT AND OBJECTIONS**

The following General Objections apply to all requests, whether or not a general objection is referred to specifically in response to any particular request:

1.      Masimo incorporates by reference the general statement and objections made in Defendants Masimo Corporation and Sound United, LLC's Responses and Objections to Apple Inc.'s First Set of Requests for Production of Documents and Things to the Definitions and Instructions set forth in Apple's First Set of Requests for the Production of Documents and Things to Defendants.

2.      Masimo objects to Plaintiff's definitions of "Cercacor Laboratories" and "Cercacor" to the extent they call for information or documents that are protected by the attorney-client privilege, work product immunity, or any other applicable privilege or immunity. Masimo further objects to Plaintiff's definitions of "Cercacor Laboratories" and "Cercacor" as overly broad and unduly burdensome. As used herein, "Cercacor Laboratories" and "Cercacor" shall mean Cercacor Laboratories, Inc.

3.      The following responses are based upon information currently available to and located by Defendants. Discovery is still continuing and Defendants therefore reserve the right to amend, supplement, and/or alter these responses as warranted during the course of discovery.

Subject to and without waiving the foregoing General Objections, Defendants respond to Plaintiff's Requests as follows:

documents located after a reasonable search that are within its possession, custody, or control to the extent not already produced.

**REQUEST FOR PRODUCTION NO. 61:**

All invoices Masimo, Sound United, or Cercacor received from any law firm, expert, consultant, or vendor that include any fees or costs associated with this Litigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 61:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as overly broad and unduly burdensome as it seeks "all invoices" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case.  Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, and subject to entry of a protective order and an ESI stipulation in this action, Masimo will produce documents sufficient to show the fees and costs associated with Masimo's antitrust claims in this Litigation invoiced by and paid to any law firm, expert, consultant, or vendor.

**REQUEST FOR PRODUCTION NO. 62:**

All documents concerning any agreement by or on behalf of Masimo, Sound United, or Cercacor with any law firm, expert, consultant, or vendor concerning fees and/or costs associated with this Litigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 62:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as seeking documents not relevant to any claim or defense in this litigation. Masimo further

objects to this request as overly broad and unduly burdensome as it seeks "all documents" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case. Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, Masimo is willing to meet and confer on this Request.

**REQUEST FOR PRODUCTION NO. 63:**

Documents sufficient to show the date and amount of each payment made by or on behalf of Masimo, Sound United, or Cercacor to any law firm, expert, consultant, or vendor relating in any way to this Litigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 63:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as overly broad and unduly burdensome as it seeks documents that are not relevant to any claim or defense in the above-captioned litigation or are not proportional to the needs of the case. Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, and subject to entry of a protective order and an ESI stipulation in this action, Masimo will produce documents sufficient to show the date and amount of each payment made by or on behalf of Masimo, Sound United, or Cercacor to any law firm, expert, consultant, or vendor associated with this Litigation.

**REQUEST FOR PRODUCTION NO. 64:**

All budgets and forecasts of fees and/or costs associated with this Litigation, including without limitation any budgets or forecasts prepared by or for Masimo, Sound United, and Cercacor's law firm(s), expert(s), consultant(s), or vendor(s).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 64:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as seeking documents not relevant to any claim or defense in this litigation. Masimo further objects to this request as overly broad and unduly burdensome as it seeks "all budgets and forecasts" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case. Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Accordingly, Masimo does not agree to search for and produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 65:**

All documents, including all communications, business plans, or financial records, that reference or otherwise discuss any fees or costs associated with this Litigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 65:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as overly broad and unduly burdensome as it seeks "all documents," including "all communications, business plans, or financial records" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case. Masimo further objects that the phrase "financial records" is vague and

ambiguous in the context of this request.  Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, and subject to entry of a protective order and an ESI stipulation in this action, Masimo will produce documents sufficient to show the fees and costs associated with Masimo's antitrust claims in this Litigation invoiced by and paid to any law firm, expert, consultant, or vendor.

**REQUEST FOR PRODUCTION NO. 661:**

All documents concerning any insurance policies applicable to Masimo's or Sound United's defense of patent claims, including without limitation any correspondence with any insurance carrier concerning such claims.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 66:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as overly broad and unduly burdensome as it seeks "all documents" and "any insurance policies applicable to Masimo's or Sound United's defense of patent claims" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case.  Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, and subject to entry of a protective order and an ESI stipulation in this action, Masimo represents that no documents responsive to this request are within its possession, custody, or control.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 73:**

Masimo incorporates its General Statement and Objections.  Masimo further objects to this request as overly broad and unduly burdensome as it seeks "all documents" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case.  Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, and subject to entry of a protective order and an ESI stipulation in this action, Masimo will produce responsive, non-privileged documents located after a reasonable search that are within its possession, custody, or control to the extent not already produced.

**REQUEST FOR PRODUCTION NO. 74:**

All documents referring to any factors impacting or potentially impacting actual or forecasted sales volume, revenue, and/or profits of any Masimo Watch Product, including without limitation the sales of other Masimo products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 74:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as seeking documents not relevant to any claim or defense in this litigation. Masimo further objects to this request as overly broad and unduly burdensome as it seeks "all documents" relating to the specified topic and seeks documents referring to "any factors impacting or potentially impacting" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case.  Masimo further objects

to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, and subject to entry of a protective order and an ESI stipulation in this action, Masimo will produce responsive, non-privileged forecasts and projections regarding any Masimo Watch Product located after a reasonable search to the extent not already produced.  To the extent Apple seeks additional documents responsive to this Request, Masimo is willing to meet and confer on this Request.

**REQUEST FOR PRODUCTION NO. 75:**

Any document discussing the impact of any version of the Apple Watch on sales, or forecasted sales, of any Masimo product on the market or in development, including non-watch products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 75:**

Masimo incorporates its General Statement and Objections.  Masimo further objects to this request as overly broad and unduly burdensome as it seeks "any document" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case.  Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, and subject to entry of a protective order and an ESI stipulation in this action, Masimo will produce responsive, non-privileged documents located after a reasonable search that are within its possession, custody, or control to the extent not already produced.

**REQUEST FOR PRODUCTION NO. 76:**

All documents concerning projected or forecasted companywide sales volume, revenue, and/or profit, without limitation to product or service, for Masimo, Sound United, and Cercacor.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 76:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as seeking documents not relevant to any claim or defense in this litigation. Masimo further objects to this request as overly broad and unduly burdensome as it seeks "all documents" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case.  Masimo further objects to this request as overly broad and unduly burdensome as it seeks "projected or forecasted companywide sales volume, revenue, and/or profit, without limitation to product or service," and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case. Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, Masimo is willing to meet and confer on this Request.

**REQUEST FOR PRODUCTION NO. 77:**

All documents concerning Masimo's, Sound United's, and Cercacor's companywide litigation budget and expenditures, including documents sufficient to show for each month and quarter (1) the total litigation budget and actual expenditure and (2) any changes to Masimo's total litigation budget over time and, if any, the reasons for such changes.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 77:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as seeking documents not relevant to any claim or defense in this litigation. Masimo further objects to this request as overly broad and unduly burdensome as it seeks "all documents" relating to the specified topic, and seeks documents showing "any changes," and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case. Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, Masimo will produce documents sufficient to show the fees and costs associated with Masimo's antitrust claims in this Litigation invoiced by and paid to any law firm, expert, consultant, or vendor.

**REQUEST FOR PRODUCTION NO. 78:**

For the period since January 1, 2020, on a monthly and quarterly basis, all projections or forecasts for Masimo's, Sound United's, and Cercacor's total companywide litigation expenditures.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 78:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as seeking documents not relevant to any claim or defense in this litigation. Masimo further objects to this request as overly broad and unduly burdensome as it seeks "all projections or forecasts" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case. Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Accordingly, Masimo does not agree to search for and produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 79:**

Any other document upon which you intend to rely as evidence of any harm, injury, or damages sustained as a result of any conduct by Apple alleged in the Counterclaims.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 79:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as overly broad and unduly burdensome as it seeks "any other document" relating to the specified topic, and thereby seeks documents neither relevant to any claim or defense in this litigation nor proportional to the needs of the case. Masimo further objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product immunity, or any other privilege or immunity.

Subject to and without waiving the foregoing objections, and subject to entry of a protective order and an ESI stipulation in this action, Masimo will produce responsive documents located after a reasonable search that are within its possession, custody, or control to the extent not already produced.

**REQUEST FOR PRODUCTION NO. 80:**

All documents concerning sales plans and strategies for any Masimo Watch Product, including without limitation all business plans, launch plans, SWOT analyses, and competitive analyses.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 80:**

Masimo incorporates its General Statement and Objections. Masimo further objects to this request as overly broad and unduly burdensome as it seeks "all documents" relating to the specified

Subject to and without waiving the foregoing objections, and subject to entry of a protective order and an ESI stipulation in this action, Masimo will produce responsive, non-privileged documents located after a reasonable search that are within its possession, custody, or control to the extent not already produced.

Respectfully submitted,

June 9, 2023

PHILLIPS MCLAUGHLIN & HALL, P.A.

By: /s/ John C. Phillips, Jr.
John C. Phillips, Jr. (No. 110)
Megan C. Haney (No. 5016)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200 Telephone
(302) 655-4210 Fax
jcp@pmhdelaw.com
mch@pmhdelaw.com

*Of Counsel:*

Joseph R. Re
Stephen C. Jensen
Stephen W. Larson
Perry D. Oldham
Benjamin A. Katzenellenbogen
Douglas B. Wentzel
Jared C. Bunker
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
(949) 760-0404 Telephone
(949) 760-9502 Facsimile
joe.re@knobbe.com

*Counsel for Defendants*
*Masimo Corporation and Sound United, LLC and Counterclaimants Masimo Corporation and Cercacor Laboratories, Inc.*

Brian Horne
KNOBBE, MARTENS, OLSON & BEAR, LLP
1925 Century Park East, Suite 600
Los Angeles, CA 90067
(310) 551-3450 Telephone
(310) 551-3458 Facsimile
brian.horne@knobbe.com

Adam Powell
KNOBBE, MARTENS, OLSON & BEAR, LLP

-34-

3579 Valley Centre Drive, Suite 300
San Diego, CA 92130
(858) 707-4000 Telephone
(858) 707-4001 Facsimile
adam.powell@knobbe.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2023, a true and correct copy of the foregoing document was served on the following counsel of record at the addresses and in the manner indicated:

*VIA ELECTRONIC MAIL:*

| | |
|---|---|
| David E. Moore<br>Bindu A. Palapura<br>Hercules Plaza, 6th Floor<br>1313 N. Market Street<br>Wilmington, DE 19801<br>dmoore@potteranderson.com<br>bpalapura@potteranderson.com | John M. Desmarais<br>Kerri-Ann Limbeek<br>Cosmin Maier<br>Jordan N. Malz<br>Benjamin N. Luehrs<br>Joze Welsh<br>Jamie L. Kringstein<br>Jennifer M. Przybylski<br>Carson Olsheski<br>Desmarais LLP<br>230 Park Avenue<br>New York, NY 10169<br>jdesmarais@desmaraisllp.com<br>klimbeek@desmaraisllp.com<br>cmaier@desmaraisllp.com<br>jmalz@desmaraisllp.com<br>bluehrs@desmaraisllp.com<br>jwelsh@desmaraisllp.com<br>jkringstein@desmaraisllp.com<br>jprzybylski@desmaraisllp.com<br>colsheski@desmaraisllp.com |
| Peter C. Magic<br>DESMARAIS LLP<br>101 California Street<br>San Francisco, CA 94111<br>pmagic@desmaraisllp.com | Jennifer Milici<br>Dominic Vote<br>Leon B. Greenfield<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Avenue, NW<br>Washington DC 20006<br>jennifer.milici@wilmerhale.com<br>dominic.vote@wilmerhale.com<br>leon.greenfield@wilmerhale.com |
| Mark A. Ford<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>60 State Street<br>Boston, MA 02109<br>mark.ford@wilmerhale.com | |

June 9, 2023

-1-

_/s/ Megan C. Haney_
Megan C. Haney (#5016)

# EXHIBIT 3

WILMERHALE

Mark A. Ford

+1 617 526 6423 (t)
+1 617 526 5000 (f)
mark.ford@wilmerhale.com

June 30, 2023

**By E-mail**

Jared Bunker
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
Jared.Bunker@knobbe.com

Re:  Apple v. Masimo, Civ. A. No. 22-1377, 22-1378 (D. Del.)

Dear Jared:

We write regarding certain deficiencies in Masimo's[1] responses to Apple's Second Set of Requests for Production of Documents and Things (56-96) (the "Requests").[2]

## I.      The Scope of Masimo's Reasonably Diligent Search

For many of the Requests, Masimo states:

> Subject to and without waiving the foregoing objections, and subject to entry of a protective order and an ESI stipulation in this action, Masimo will produce responsive, non-privileged documents located after a reasonably diligent search that are within its possession, custody, or control, to the extent not already produced.

*See* RFPs 56, 59-63, 67-70, 72-75, 79-87, 91-96.  Furthermore, despite stating objections, Masimo has not stated that any responsive materials are being withheld on the basis of that objection, as required by Rule 34(b)(2)(C).  Accordingly, we understand this to mean the following:

> Masimo will produce **all** non-privileged documents responsive to the full scope of the Request that it locates through its reasonably diligent search and will not withhold any responsive document reviewed as part of that search, except based on a valid privilege claim.

---

[1] Defendants' and Counterclaim Plaintiff's Responses & Objections to Apple's Second Set of Requests for Production of Documents and Things (56-96) define "Masimo" as including Masimo Corporation, Sound United, LLC and Cercacor Laboratories, Inc.  For convenience, we do the same here.  To the extent we focus on individual defendants or counterclaim-plaintiffs, we will do so referencing "Masimo Corp.," "Sound United" and/or "Cercacor."

[2] In light of the expedited schedule, we raise these disputes now, but may raise additional disputes regarding other deficiencies in Masimo's production and discovery responses in future correspondence, including, for instance, as they become apparent in light of Masimo's production during discovery and as the litigation proceeds.

WILMERHALE

Jared Bunker
June 30, 2023
Page 2

To the extent Masimo locates any responsive document in its reasonably diligent search that it believes was privileged, and for which it believes that privilege has not been waived, it will produce a privilege log identifying that document, the author and all recipients, the basis for the claim of privilege, and the subject matter of the document, subject to the parties' agreed-upon privilege carve outs.

The reasonably diligent search will include at least the review of all ESI based on the parties' search term and custodian negotiations (or any order of the Court to the extent agreement is not reached).

The reasonably diligent search should also include a search of all accessible central files or repositories that are likely to contain responsive information, including without limitation those Masimo disclosed pursuant to ¶ 3 of the Delaware Default Standard for Discovery. Specifically, and without limitation, Apple expects that Masimo will search applicable central files or repositories for at least the following requests: RFPs 56, 61-66, 68-70, 76-78, 80, 82, 83, 88, 89, 91, 96.

To the extent Masimo disagrees with any of the foregoing, please explain Masimo's position.

## II.   Discovery of Actual and Forecasted Litigation Costs (RFPs 61-66, 76-78)

Masimo claims that its litigation costs constitute damages and antitrust injury under its *Walker Process* Section 2 theory. *See* D.I. No. 15, Civ. A. No. 22-01378, at ¶¶ 216. Apple is therefore entitled to the ordinary course documents relevant to those costs, produced on an ongoing basis through trial, so that Apple can test any claims Masimo makes about them in the course of this litigation.

RFP 61 seeks "[a]ll invoices Masimo [Corp.], Sound United, or Cercacor received from any law firm, expert, consultant, or vendor that include any fees or costs associated with this Litigation." Masimo first objects on the grounds that it is overly broad and unduly burdensome to produce all requested invoices. We disagree. *First*, this response is inconsistent with your response to Interrogatory No. 4, where Masimo states: "The amounts of money Masimo has expended defending against Apple's knowing assertion of fraudulent patents may be determined by examining Masimo business records …. Masimo will produce those business records." *Second*, we would expect Masimo could locate each such invoice with reasonable ease, and/or request copies from the relevant firm or vendor. These documents, along with all associated payment records, are the primary evidence of the central form of damages Masimo has articulated to date, and therefore any claim that the burdens associated with collecting and producing those is not "proportional to the needs of the case" is without merit. *Third*, we do not agree that Masimo can simply produce "documents sufficient to show" fees and costs, per Masimo's response. It is not sufficient to provide a document prepared for this litigation, or even a summary document prepared in the ordinary course. Given the narrow scope of this Request, Apple is entitled to the ordinary

**WILMERHALE**

Jared Bunker
June 30, 2023
Page 3

course invoices so it can assess whether the amounts cited constitute recoverable damages. ***Finally***, Masimo intends to limit the production of information to fees and costs "associated with Masimo's antitrust claims." To the extent Masimo intends to exclude invoices that include fees and costs related to other claims in this litigation, including fees and costs associated with Apple's asserted patent claims, that limitation is improper.

RFP 62 seeks "[a]ll documents concerning any agreement by or on behalf of Masimo [Corp.], Sound United, or Cercacor with any law firm, expert, consultant, or vendor concerning fees and/or costs associated with this Litigation." You offer to meet and confer regarding this Request, and we stand ready to do so. These agreements are critical to discovering the extent by which the patents at issue in Masimo's *Walker Process* claims have added to Masimo's litigation costs, if at all.

RFPs 64-65 and 77-78 concern budgets and forecasts for litigation costs associated with this litigation, documents discussing those costs, as well as company-wide litigation budgets, expenditures and forecasts.[3] RFP 76 is directed to the companies' overall revenue, profits, and forecasts. As to RFPs 64 and 78 (budgets and forecasts, companywide litigation expenditures), Masimo refused to produce any documents. As to RFPs 65 and 77 (documents relating to those costs, and companywide litigation forecasts), Masimo agrees only to produce "documents sufficient to show the fees and costs associated with Masimo's antitrust claims in this Litigation." These responses are insufficient. Masimo claims that Apple's assertion of patents that were allegedly procured by fraud has "caused Masimo to lose customers, investors, and business opportunities." *See* Masimo's Response to Interrogatory No. 4. Masimo also claims that Apple's assertion of these patents is an attempt at "raising Apple's rival's costs." *See* Masimo's Response to Interrogatory No. 9. To the extent Masimo claims that the litigation costs it has incurred as alleged *Walker Process* damages impaired the company's ability to compete in any other way, we are entitled to the full scope of discovery under these Requests, including RFP 76.

As to RFP 66, we understand your response to mean that Masimo is not aware of any insurance policy that would apply to any aspect of its defense of Apple's patent claims. Please correct us if we are mistaken.

## II.     Other Discovery Requests

### Sales Data

In response to RFP 67, which seeks sales data for Masimo's Watch Products, Masimo agreed to provide "documents sufficient to show all sales of Masimo Watch Products in the United States

---

[3] We summarize the Requests for simplicity only. In doing so, we are not narrowing the scope of the Requests in any way.

WILMERHALE

Jared Bunker
June 30, 2023
Page 4

since January 1, 2020," without confirming that it would include any of the specific transaction details outlined in our request.  By contrast, Masimo's RFP 72 to Apple requested detailed transactional data, and specified 19 data fields.  The parties should meet and confer to discuss an appropriate level of data production that is proportional to the needs of the case.

**RFP 74**

RFP 74 seeks documents "referring to any factors impacting or potentially impacting actual or forecasted sales volume, revenue, and/or profits of any Masimo Watch Product...."  In response, Masimo agrees to produce only "forecasts and projections," but refuse to provide documents regarding the "factors impacting or potentially impacting actual or forecasted sales volume, revenue, and/or profits" of the relevant products.  And Masimo's only purported justification for refusing to produce documents on factors impacting sales and profitability of the accused products is its assertion that those documents are not "relevant to any claim or defense in this litigation." *See* Response No. 74.  But factors impacting sales and profitability of the relevant products is relevant to at least Apple's claims for patent infringement and Masimo's assertion that it has been injured by Apple's alleged conduct.

**RFP 88**

RFP 88 seeks documents "concerning Masimo's acquisition of Viper Holdings and Sound United related to any Masimo Watch Product, including…any analysis of the forecasted market shares for the sale of any Masimo Watch Product resulting from the acquisition."  In response, you agree to produce only "final acquisition documents" and "forecasts and projections" for the sale of any Masimo Watch Product and offer to meet and confer regarding the remaining scope of the request—despite providing no basis for its objection to the full scope of the request other than some unidentified burden.  Masimo provides no explanation for declining to produce other documents concerning its acquisition of Viper Holdings and Sound United, including, but not limited to, any documents relating to the transaction's impact on sales of Masimo Watch Products, market share for Masimo Watch Products, or Masimo's goals and strategies concerning Masimo Watch Products.  These documents are relevant to assessing market share and Masimo's alleged injury.  Again, Masimo's unexplained attempt to limit its production has no valid basis.

**RFP 89**

RFP 89 seeks documents concerning the relationship between Masimo Corp., Sound United, or Cercacor, and the Third Parties to whom Masimo Corp., Sound United or Cercacor sells or distributes any Masimo Watch Product, including "forecasted sales, purchase orders, invoices, distribution agreements, or other contractual agreements."  In response, you agree to produce "distribution agreements, indemnity agreements, and a representative sample of purchase orders and invoices…" related to the W1 and W1 charger.  Masimo, however, excludes documents related to the other accused products in this case, e.g., Masimo's Freedom, as well as documents regarding

WILMERHALE

Jared Bunker
June 30, 2023
Page 5

"forecasted sales."  But those documents are relevant to assessing Masimo's claimed antitrust injury and to the impact of Masimo's infringement of Apple's patent and damages stemming from that infringement.  In addition, the parties should meet and confer to discuss the "representative sample" of purchase orders and invoices you agree to produce.

Please confirm that Masimo will remedy the deficiencies described above or provide Masimo's position regarding those issues.  Pursuant to the parties' agreement, we will expect your response within 7 days.  If Masimo does not agree to remedy to the deficiencies discussed above, we are available to meet and confer on July 13 at 3pm ET and July 14 at 1pm ET.

Best regards,

*/s/ Mark A. Ford*

Mark A. Ford

# EXHIBIT 4

WILMERHALE

July 12, 2023

**Mark A. Ford**

+1 617 526 6423 (t)
+1 617 526 5000 (f)
mark.ford@wilmerhale.com

**By E-mail**

Justin J. Gillett
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Justin.Gillett@knobbe.com

Re: *Apple v. Masimo*, Civ. A. No. 22-1377, 22-1378 (D. Del.)

Dear Justin:

I write in response to your July 8th letter to correct and clarify mischaracterizations made about Apple's position with respect to several of Masimo's requests for production ("RFPs"), and to address various omissions as well. I also outline proposed compromises that we can discuss during our scheduled meet-and-confer later today. Finally, I address Masimo's position regarding certain RFPs that Apple has served.

I.       **Apple's Positions Regarding Masimo RFPs**

    A.       **Discovery Concerning Masimo's Monopoly Leveraging (App Store) Theories And "Predatory Infringement"**

While Judge Hall recommended denial of Apple's motion to dismiss, she held only that Masimo's *Walker Process* theory was viable. She expressly "questioned" the viability of Masimo's monopoly leveraging and "predatory infringement" theories of antitrust liability, and specifically indicated that she would permit discovery only if it were proportional to a "viable" theory. For that reason, Apple will maintain that the Court should not compel discovery on these theories, let alone the sweeping, overly broad, and unduly burdensome discovery Masimo seeks.

Your letter also ignores the many other bases we articulated for resisting discovery on these topics – not least of which is Masimo's own admission that Apple did not, in fact, refuse the Masimo Health App. While we question the propriety of Masimo continuing to press a knowingly false "refusal to deal" claim, we certainly do not believe the claim warrants boundless discovery into Apple's App Store business. Moreover, Masimo's requests relating to the invalid theories are so broad as to seek discovery into alleged injuries to third parties, who are not even participants in the so-called "health watch market," and into *any claim* by *any party* that Apple has infringed or otherwise misappropriated technologies. Masimo has no standing to litigate such claims even if they were based on legitimate antitrust theories.

WilmerHale

Justin J. Gillett
July 12, 2023
Page 2

Next, Judge Hall never "observed" that the requests at issue were relevant to Apple's "predatory intent" for purposes of Masimo's attempted monopolization claim. She simply asked a question during the hearing on the motion to dismiss. It is inappropriate for Masimo to infer any sort of holding about the scope of discovery from that question into Judge Hall's subsequent R&R. Nevertheless, I responded to this argument during the meet-and-confer, and we are prepared to address it before Judge Hall.

Similarly, the argument that Masimo's sweeping discovery into "predatory" infringement is somehow relevant to whether Apple willfully infringed the Masimo patents at issue, let alone proportional to the issues in this case, is meritless, especially given the cross-use of C.D. Cal. discovery. Apple has not refused to produce documents regarding Apple's culture and practices regarding respect for IP rights generally. Instead, Apple is refusing to produce irrelevant documents regarding communications with third parties (e.g., RFPs 84, 89-90), specific decisions regarding irrelevant third-party IP (e.g., RFP 85), and additional documents regarding issues that have been thoroughly explored in the C.D. Cal. case (e.g., RFPs 86-87).

Accordingly, we stand on our objections to RFPs 62-63, 83-90. For the same reasons, Apple declines to make any production in response to RFP 80 (concerning Masimo's FDA strategies), which you explained is also directed to Masimo's monopoly leveraging claim. In addition, based on Masimo's admission that it did not provide any confidential information to Apple as part of the App Store review, RFP 80 constitutes an improper fishing expedition.

With respect to RFPs 76-79 and 81-82, for which Apple initially offered to produce a narrow scope of documents pertaining to the review of the Masimo and Cercacor apps mentioned in the Counterclaims, Apple will follow through on its agreement to produce this narrow scope without prejudice to its position that the requested discovery is not relevant to any viable theory. Apple has not "withdrawn" any prior agreement to produce documents.

### B.    Geographic Scope

We confirm that –for purposes of this litigation–Apple will not contest that the relevant geographic market is the United States. As a result, Masimo agreed it will not pursue RFPs 57-61 and accepts the narrowing of the geographic scope for RFPs 53, 66-69, and 71 to the United States.

### C.    Patent-Related Discovery Requests

With respect to RFPs 74-75 (Apple's IP policies and enforcement) and RFP 92 (documents relating to Apple's decision to assert the *Walker Process*-challenged patents), Apple agrees to conduct a reasonably diligent search for non-privileged responsive documents within its possession, custody, and control.

WILMERHALE

Justin J. Gillett
July 12, 2023
Page 3

### D.    "Ecosystem" Discovery

With respect to RFPs 112-114, Apple is willing to undertake a reasonably diligent search for documents that discuss whether and how any so-called "ecosystem" of Apple products relates to the Apple Watch.  Indeed, as indicated in Apple's objections and responses, such documents would already be covered by other requests to which Apple has agreed to produce documents, including, for instance, RFPs 51, 56, 99, and 105.  Masimo's requests for all documents related to any "ecosystem" on any Apple users and product lines – including products not at issue in this case – are overbroad, unduly burdensome, and not proportional.

### E.    Duplicative Discovery

As explained on our call, Apple qualifies that Masimo's discovery requests should not be "duplicative of discovery subject to the parties' cross-use agreement and the Court's oral order regarding permissible cross use" in three ways.

First, Apple reserves the right to de-dupe documents against those already produced.  Masimo wants to ensure that documents are only deduped if the metadata (including custodian data) are identical, and Apple is investigating the implications of that demand.

Second, to the extent that Apple has already completed a reasonably diligent search for a category of documents for a case subject to cross-use, it is unduly burdensome to require Apple to engage in the same search.  This does not mean Apple refuses to update production categories where it has agreed to do so through its RFP responses.

Third, with respect to Masimo's claims that Apple engaged in so-called "Sherlocking" and "efficient infringement," discovery into those issues is complete by virtue of what was done in the C.D. Cal. litigation.  Anything more would be unnecessarily cumulative.  For the reasons discussed above, however, Apple believes these topics are irrelevant to any viable theory in this case.

## II.    <u>Masimo's Positions Regarding Apple RFPs</u>

### A.    Litigation Cost Discovery

We understand Masimo intends only to produce a spreadsheet of costs it unilaterally deems to be a result of Apple's assertion of the *Walker Process*-challenged patents, without any description of the work performed or any discovery into Masimo's various fee arrangements.  Masimo claims it has established a billing code associated with the defense of those *Walker Process*-challenged patents and related IPR claims, but Masimo's proposal provides Apple's attorneys and experts no basis by which to challenge Masimo's asserted calculation of antitrust damages.  Nor would Masimo's proposal provide any basis to segregate the alleged costs among the *Walker Process*-challenged patents, as would be necessary, for instance, if Masimo's claims are rejected in part.

WILMERHALE

Justin J. Gillett
July 12, 2023
Page 4

Despite this, we understand Masimo intends to seek those costs as treble damages, and also contends that those costs resulted in other consequential harms to the company, including impairing its ability to compete.

We do not believe it is appropriate for Masimo to put its litigation costs at issue and simultaneously selectively withhold all ordinary course documents that would permit Apple to test Masimo's claimed costs through fact and expert discovery. Accordingly, unless Masimo offers additional discovery, Apple intends to move to compel production of documents in response to RFPs 61-62, 64-65, and 77-78.

In addition, Apple maintains that documents responsive to RFP 76 are necessary to test any claim regarding the financial impact of those alleged litigation costs. Please confirm that Masimo will produce the requested financials.

### B.    Documents Concerning Sound United Acquisition

Masimo indicated that it may be willing to produce documents concerning the Sound United acquisition that relate to the transaction's impact on sales of Masimo Watch Products, market share for Masimo Watch Products, and Masimo's goals and strategies concerning Masimo Watch Products. Subject to Masimo's confirmation, that would resolve Apple's inquiries regarding RFP 88.

### C.    Documents Concerning Customer/Distributor Relationships

Masimo took the position that documents concerning sales strategies and plans with respect to specific customers and distributors would not fall within the scope of RFP 89, which seeks all documents concerning relationships with those customers or distributors. Putting that dispute aside, such documents fall within the scope of RFP 80 (all documents concerning sales plans and strategies for any Masimo Watch Product), and Masimo has agreed to produce all documents responsive to RFP 80 that it locates through its reasonably diligent search.

## III.   Issues Concerning Both Parties' Productions

### A.    Sales Data

As to Masimo RFP 72 and Apple RFP 67, the parties have agreed to continue negotiating an appropriate scope for a reciprocal sales data exchange.

WilmerHale

Justin J. Gillett
July 12, 2023
Page 5

### B.    Expert Disclosures

With respect to Masimo RFP 116, Apple maintains that the appropriate scope of reciprocal expert discovery—in terms of what is disclosed and when—should be governed by Fed. R. Civ. P. 26(b)(4)(C).  We await your response.

### C.    Temporal Limitations

As you previously observed, Apple proposed that document discovery on Masimo's antitrust claims reach back two years before the filing of the complaint (i.e., to December 12, 2020) with the exception of certain specified topics that Apple agreed to search back to January 1, 2020.  Your July 8, 2023, letter proposes that the relevant time period for seven of your RFPs (64-65, 77-79, and 81-82) reach back four years before the filing of the action.  We are confused why you would apply this date range to those requests, and suggest we continue discussing a reciprocal date range for antitrust and false advertising discovery during our scheduled meet-and-confer on July 12, 2023.

### D.    Politan-Related Documents

Masimo's request for discovery into communications between Apple and Politan is an improper use of discovery in this case to serve Masimo's management's interest in an ongoing dispute against Politan.  Further, the meet-and-confer revealed that Masimo has no valid grounds to believe there were any such communications.  Without suggesting that any such documents existed, Apple offered in response to Interrogatory No. 16 a compromise that it would search custodial ESI.  We continue to think that compromise is reasonable.

Masimo, however, has since put the Politan litigation squarely at issue in this case, claiming that the litigation itself, and the costs incurred as a result, were somehow caused by Apple's assertion of the *Walker Process*-challenged patents.  This assertion has forced Apple to serve on Masimo discovery relating to that litigation.  *See* RFPs 127-128, 213-218.  Accordingly, if Masimo agrees to search for and produce documents responsive to those requests, Apple will agree to undertake a reasonably diligent search for any documents or communications responsive to RFP 118.  We can discuss this compromise further during our July 12, 2023 meet-and-confer.

### E.    Reasonably Diligent Email Search

Both parties must undertake a reasonably diligent search for responsive documents.  For non-email, that includes searching central files and databases that are likely to contain responsive materials.  It also involves collecting documents from individual custodians.  With respect to email, however, Apple maintains that a reasonably diligent search is a review of email pulled based on the parties' custodian and search term negotiations.  The parties have agreed to 20 email custodians

**WILMERHALE**

Justin J. Gillett
July 12, 2023
Page 6

and 20 search strings.  It is unduly burdensome to also require custodians to search through their own emails for responsive materials.

**F.      Clarification On Parties' Agreements to Produce**

We confirm that where Apple set forth a category of documents that it would produce in response to an RFP, it intends to produce all documents falling within that category that it identifies based on a reasonably diligent search.  It will not "filter out" any responsive documents within those categories that Apple deems irrelevant.  To the extent Apple learns that a category of documents implicates an unduly burdensome scope of irrelevant materials, we will raise that issue with Masimo.  We likewise understand that where Masimo agrees to produce non-privileged responsive documents, it intends to produce all documents falling within the full scope of the request that it locates after a reasonably diligent search, and Masimo too will not "filter out" any materials it deems irrelevant or otherwise narrow the scope of the production.

**G.      Vagueness Objections**

With respect to Masimo RFPs 53 (documents related to interchangeability) and 57 (documents relating to Apple Watch's position in the marketplace), Apple objected on vagueness grounds and offered a more defined scope.  With respect to Apple RFP 74, Masimo claims that it will not search for documents "referring to any factors impacting or potentially impacting actual or forecasted sales volume, revenue, and/or profits of any Masimo Watch Product," even after we clarified that Apple is seeking documents that specifically discuss things as potentially impacting the demand for or price of the Masimo Watch Products.  We suggest that, rather than burden Judge Hall with these disputes, both parties undertake a good faith search for documents responsive to these issues, including by running proposed search terms that may return such documents.

Best regards,

*/s/ Mark A. Ford*

# EXHIBIT 5

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
**T** (949) 760-0404

Justin Gillett
Justin.Gillett@knobbe.com

July 14, 2023

**VIA EMAIL**

Mark Ford
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

Re:      *Apple v. Masimo*, Civil Action No. 22-1377; 22-1378

Dear Mark:

I write regarding the parties' July 12 meet and confer regarding Apple's antitrust-related requests for production.

## Litigation Costs

As Masimo explained, Masimo is willing to produce non-privileged information regarding litigation costs that is proportional to the needs of the case, i.e., the amounts for work done to defend against Apple's fraudulently obtained patents in this case and in IPRs. During the July 10 and 12 conference, Masimo reported that it is willing to provide documents sufficient to show these amounts. Contrary to Apple's letter, Masimo did not state that such discovery would be limited to "a spreadsheet of costs…." Masimo explained that such documents would identify amounts corresponding to a specific billing sub-code used to record time spent as the result of Apple's assertion of its fraudulently obtained patents in this case. Such documents would also identify amounts billed to Masimo for IPRs regarding the fraudulently obtained patents. Masimo explained that, to the extent Apple seeks to contest any individual time entries, the parties should agree to the use of a Special Master after trial, as adopted in *TransWeb v. 3M* and proposed in *Guardant v. PGDx*. Such an approach would avoid the privilege, work product and confidentiality issues raised by Apple's demand. Apple rejected that proposal. Masimo also further explained why Apple's RFPs 61-62, 64-65 and 76-78 are otherwise not reasonable or proportional. Masimo maintains that its proposed production is reasonable and otherwise stands on its objections to these requests.

## Documents Regarding Sound United Acquisition

Apple **RFP 88** seeks documents concerning Masimo's acquisition of Viper Holdings and Sound United, including forecasted market shares for Masimo Watch Products. Masimo previously agreed to produce final acquisition documents for Viper Holdings and Sound United, and to produce forecasts and projections for the sale of Masimo Watch Products. Apple's June 30 letter further requested documents related to the transaction's impact on (i) sales of Masimo Watch Products, (ii) market share for Masimo Watch Products, and (iii) Masimo's goals and strategies concerning Masimo Watch Products. During the July 10 conference, Masimo explained that forecasts and projections would cover at least the first two of those categories and that, if it resolved the issue, Masimo would agree to search for the third category. Apple agreed to this proposal and thus Masimo understands that the parties' dispute as to RFP 88 is resolved.

## Documents Concerning Customer/Distributor Relationships

During the parties' meet and confer regarding Apple's **RFP 89**, Apple asked Masimo to confirm that customer- and distributor-specific sales strategies and plans fall within the scope of RFP 80. Masimo will produce non-privileged customer-specific sales strategies and plans that are within Masimo's possession, custody or control that are located from a reasonable search for documents responsive to RFP 80. Masimo thus believes the parties' dispute regarding RFP 89 is resolved.

**Knobbe Martens**

### Sales Data

The parties agreed to continue negotiating a reciprocal exchange of sales data in connection with Masimo **RFP 72** and Apple **RFP 67**.

### Expert Disclosures

The parties are still discussing the discovery Apple will produce in response to Masimo's **RFP 116** in connection with a mutual exchange of such discovery.

### Temporal Limitations

During the July 6 and 12 conferences, Masimo proposed a time period for antitrust RFPs extending to four years before the filing of this action.  Masimo explained that this four-year date corresponds to the statute of limitations and also roughly coincides with the release of Apple Watch Series 4.  Apple declined Masimo's proposal.

### Politan Related Documents

Apple conditioned its response to Masimo's Politan-related discovery requests on Masimo agreeing to produce documents in response to Apple RFPs 127-128 and 213-218, which Apple did not serve until June 30 and July 7, respectively.  Masimo fails to see any equivalency between (1) Masimo's targeted request for communications between Apple and Politan, and (2) Apple's RFPs 127-128 and 213-218, which broadly request, for example, "all documents produced, served, or filed in the Politan Litigation," RFP 127.  Masimo will respond to Apple's RFPs 127-128 and 213-218 in due course, serving objections and meeting and conferring as necessary.

### Email Searching

During the parties' meet and confer, Apple indicated it will rely solely on ESI searches to satisfy its obligations with regard to emails.  Masimo disagrees with this approach.

### Filtering for "Relevance"

Masimo understands that neither party will apply a "relevance" filter to withhold documents.

### Dispute Regarding Apple's RFP 74

Apple **RFP 74** seeks documents referring to "any factors impacting or potentially impacting actual or forecasted" financial information.  During the July 10 conference, Masimo explained that RFP 74 is, among other things, vague and overbroad.  Masimo asked Apple how Masimo could search for documents referring to "factors" that "potentially" impact actual or "forecasted" financial information.  Apple responded by identifying examples of different types of documents, including emails on different topics, that might be responsive to Apple's request.  Masimo responded that Apple's examples demonstrated the vague and broad scope of RFP 74, which is not reasonable or proportional.  Masimo stated its willingness to consider Apple using one or more of its ESI search terms to seek responsive emails.

Best regards,

Justin J. Gillett

# EXHIBIT 6

Case 2:12-cv-01137-MN-JLH   Document 307-1   Filed 07/28/23   Page 67 of 173 PageID #:
13149
Case 2:10-cv-04413-FSH-JBC   Document 967   Filed 09/24/13   Page 1 of 49 PageID: 27461

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

TRANSWEB, LLC,

              Plaintiff,

       v.

3M INNOVATIVE PROPERTIES COMPANY, ET AL.,

            Defendants.

Civil Action No. 10-cv-4413 (FSH)(PS)

# REPORT AND RECOMMENDATION OF
# HON. ALFRED M. WOLIN, U.S.D.J. (Ret.), SPECIAL MASTER,
# PURSUANT TO THE COURT'S DECEMBER 17, 2012 ORDER

# TABLE OF CONTENTS

**PAGE #**

TABLE OF AUTHORITIES ...................................................................................ii-iv

PRELIMINARY STATEMENT ..................................................................................1

SCOPE OF REFERRAL...............................................................................................2

BACKGROUND ...........................................................................................................2

DISCUSSION ................................................................................................................3

A.   Legal Standards ..................................................................................6

    1.   Standard Of Establishing The Amount Of Patent Defense
        Fees Damages Under § 4 Of The Clayton Act ............................6

    2.   Standard Of Establishing The Amount Of Antitrust Costs
        of Suit Under § 4 Of The Clayton Act..........................................11

B.   Miscellaneous Arguments Raised By 3M..............................................14

    1.   Block Billing.....................................................................................14

    2.   Abusive Litigation Tactics...............................................................17

    3.   Travel Time.......................................................................................18

    4.   The October 15, 2012 Housekeeping Conference ........................21

    5.   Sham Litigation................................................................................24

    6.   Mock Trial.........................................................................................26

    7.   Mitigation.........................................................................................30

    8.   TransWeb's Hourly Rates................................................................31

FINDINGS AND RECOMMENDATIONS ................................................................36

CONCLUSION .............................................................................................................44

# TABLE OF AUTHORITIES

**CASES CITED**                                                    **PAGE #**

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
   228 F.3d. 429 (3rd Cir. 2000) ...........................................................7

*Callahan v. A.E.V., Inc.*,
   182 F.3d 237 (3d Cir. 1999) ............................................................7

*Drazin v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*,
   2013 WL 2563727 (3d Cir. June 11, 2013) ....................................11

*EEOC v. CRST Van Expedited, Inc.*,
   2010 WL 520564 (N.D. Iowa Feb. 10, 2010) .................................29

*Eichenlaub v. Township of Indiana*,
   214 Fed.Appx. 218 (3d Cir. 2007) .................................................25

*Evans v. Port Auth. of N.Y. and N.J.*,
   273 F.3d 346 (3d Cir. 2001) ...........................................................12

*Federal Trade Commission v. Circa Direct LLC*,
   912 F.Supp.2d 165 (D.N.J. 2012)...................................................15

*Glass v. Snellbaker*,
   2008 WL 4416450 (D.N.J. Sept. 23, 2008)...............................19, 29

*Goss International Corp. v. Tokyo Kikai Seisakusho, Ltd.*,
   2004 WL 1234130 (N.D. Iowa June 2, 2004)................................29

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
   995 F.2d 414 (3d Cir. 1993) ..........................................................24

*Gunter v. Ridgewood Energy Corp.*,
   223 F.3d 190 (3d Cir.2000) .......................................................11, 12

*Hensley v. Eckerhart*,
   461 U.S. 424,
   103 S.Ct. 1933,
   76 L.Ed.2d 40 (1983).................................................................12, 25

# TABLE OF AUTHORITIES

## **CASES CITED**                                                          **PAGE #**

*In Re Flonase Antitrust Litigation*,
    798 F.Supp.2d 619 (E.D. Pa. 2011).......................................................9, 10

*In re Lower Lake Erie Iron Ore Antitrust Litigation*,
    998 F.2d 1144 (3rd Cir. 1993) ...........................................................*passim*

*J & J Snack Foods Corp. v. Earthgrains Co.*,
    2003 WL 21051711 (D.N.J. May 9, 2003).......................................13

*Johnson v. Georgia Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ...........................................................13

*J. Truette Payne Company, Inc. v. Chrysler Motors Corp.*,
    451 U.S. 557,
    101 S.Ct. 1923,
    68 L.Ed.2d 442 (1981)...................................................................10

*Majestic Box Company, Inc. v. Reliance Insurance Co. of Illinois*,
    1998 WL 720463 (E.D. Pa. Sept. 2, 1998).......................................28

*Maldonado v. Houston*,
    256 F.3d 181 (3d Cir. 2001) .............................................................13

*Microsoft Corp. v. United Computer Resources of New Jersey*,
    216 F.Supp.2d 383 (D.N.J. 2002) ....................................................38

*Minor v. Christie's, Inc.*,
    2011 WL 902235 (N.D.Cal. Jan. 29, 2011).......................................18

*Montanez v. Chicago Police Officers FICO*,
    2013 WL 1110870,
    __ F.Supp.2d __ (N.D. Ill. March 18, 2013) .....................................28

*Pawlak v. Greenawalt*,
    713 F.2d 972 (3d Cir.1983) .............................................................12

*Planned Parenthood v. Attorney General of the State of New Jersey*,
    297 F.3d 253 (3d Cir. 2002) ..........................................................12, 18-19

# TABLE OF AUTHORITIES

## CASES CITED                                                                    PAGE #

*Port Drivers Federation 18 Inc., et al v. All Saints*,
    2011 WL 3610100 (D.N.J. Aug. 16, 2011) ......................................................14

*Public Interest Research Group of New Jersey, Inc. v. Windall*,
    51 F.3d 1179 (3d Cir. 1995) ......................................................................13

*Rode v Dellaciprete*,
    892 F.2d 1177 (3d Cir. 1990) ...............................................................12, 13

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3rd Cir. 1998) ................................................................7, 10

*Rozell v. Ross-Holst*,
    576 F. Supp. 2d 527 (S.D.N.Y. 2008) .....................................................28

*Varacallo v. Massachusetts Mut. Life Ins. Co.*,
    226 F.R.D. 207 (D.N.J. 2005) ...............................................................11

*Wade v. Colaner*,
    2010 WL 5479625 (D.N.J. Dec. 28, 2010) ...............................................14

*Walker Process Eqpt., Inc. v. Food Machinery Corp.*,
    382 U.S. 172,
    86 S.Ct. 347,
    15 L.Ed.2d 247 (1965)...........................................................................3

*Walsh v. Alarm Sec. Grp., Inc.*,
    95 Fed.Appx. 399 (3d Cir 2004).............................................................31

*Warren Distrib. Co. v. InBev USA, LLC*,
    2011 WL 770005 (D.N.J. Feb. 28, 2011).................................................15

*William Failla v. City of Passai*c,
    146 F.3d 149 (3d Cir. 1998) ..................................................................25

## RULES CITED

Fed.R.Civ.P. 37(a)(5)(A)(ii-iii)...................................................................17

## PRELIMINARY STATEMENT

This Report and Recommendation ("R&R") on fees as recoverable damages represents a concerted effort of the Special Master and Counsel to fashion a meaningful response to a patent and antitrust jury verdict returned on November 30, 2012.  On that date, the jury found in favor of TransWeb, LLC ("TransWeb") that: (1) two claims by 3M Innovative Properties Company and 3M Company (collectively "3M") of patent infringement were invalid as obvious and that TransWeb had not infringed 3M's '458 patent; (2) two of 3M's patents were unenforceable due to inequitable conduct; and (3) 3M violated the antitrust laws by attempting to enforce fraudulently-procured patents.  (*See* Verdict Form, docket entry no. 512.)

The jury also found that TransWeb was entitled to $34,412.00 in lost profits, and more significantly, its attorneys' fees.  (*Id.*)  Finally, the jury found in favor of 3M in connection with TransWeb's claim that 3M had engaged in sham litigation.  (*Id.*)  Although the jury decided the legal issues submitted to it, by consent of the parties, the quantum of damages to be awarded – TransWeb's attorneys' fees incurred in defending 3M's patent claims, and its attorneys' fees incurred in its successful antitrust claim against 3M – was deferred for decision by a Special Master.   For the reasons set forth below, the Special Master concludes and recommends that TransWeb is entitled to $26,146,493.45 in attorneys' fees.

## SCOPE OF REFERRAL

On December 17, 2012, the Court, with the consent of the parties, appointed the Hon. Alfred M. Wolin, U.S.D.J. (Ret), as the Special Master. The Court, in its mandate of appointment, directed that the Special Master proceed with all reasonable diligence to determine the amount of attorneys' fees to be awarded as damages, including the amount of attorneys' fees spent in defense of the patent infringement suit. (*See* December 17, 2012 Order, docket entry no. 523, ¶1.) The Order also provided the Special Master with "full discretion to fashion any appropriate remedy[.]" (*Id.* at ¶2.) Additionally, the R&R prepared by the Special Master must set forth in full any decision reached along with the basis for that decision. (*Id.* at ¶4.)

## BACKGROUND

Because this R&R is written primarily for the parties and the Court, a full exposition of the facts is unnecessary. Their intimacy with the legal issues over a two-year period provides the Special Master with a license to engage in brevity. 3M initiated litigation in the District of Minnesota that was subsequently dismissed without prejudice after TransWeb asserted lack of <u>in personam</u> jurisdiction. That was succeeded by an action filed in the District of New Jersey wherein TransWeb sought declaratory relief that two of 3M's patents – the '458 and the '551 patents - were fraudulently obtained from the U.S. Patent & Trademark Office ("PTO") and

were unenforceable and not infringed.  By way of counterclaim, 3M sought to enforce the '458 and '551 patents and alleged that TransWeb had infringed them. TransWeb denied infringement and ultimately filed an amended complaint alleging that 3M had violated the antitrust laws.  TransWeb's antitrust claims included, inter alia, what is known as a "Walker Process" claim premised on the actual or attempted enforcement of a fraudulent patent and permits the receipt of trebled damages, *see Walker Process Eqpt., Inc. v. Food Machinery Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), and a claim for sham litigation. The jury found in favor of TransWeb with regard to the patent claims and the Walker Process antitrust claim, and in favor of 3M on TransWeb's sham litigation claim.

## DISCUSSION

Although the parties have asserted many issues, some are more complex than others.  For purposes of this R&R, it is unnecessary to list the full panoply of legal issues that exist.  For example, it is undisputed that the dual burdens of production and persuasion rest with TransWeb.  Moreover, the parties are in agreement that the patent defense fees incurred by TransWeb are trebled and that the antitrust costs of suit are awarded on a one-to-one basis.  (*See* Joint Letter, dated January 4, 2013, pp. 2-4.)

In any event, all controverted issues will be addressed, some summarily and others in greater detail.  3M asserts that TransWeb was an abusive litigant whose

Case 2:12-cv-04413-FSN-JBC   Document 967-1   Filed 09/24/13   Page 6 of 49 PageID: 27469
Case 2:12-cv-04413-FSN-JBC   Document 967-1   Filed 07/28/23   Page 75 of 173   PageID:
13157

conduct unduly exacerbated the quantum of fees, is not entitled to Walker Process

trebled damages because it dismissed its patent infringement claims, engaged in

block billing instead of task billing, failed to mitigate its damages, failed to prove

that its damages were proximately caused by 3M, charged excessive hourly rates,

improperly billed its full rate while traveling, and, finally, should receive a

negative multiplier because of the jury's rejection of TransWeb's sham litigation

claim.

TransWeb asserts that it has engaged in conservative billing, did not bill for

miscellaneous items or for the participation of local counsel and, in the face of

doubt, placed certain patent defense fees with antitrust fees to avoid arguments

over the trebling aspect of antitrust damages.[1]  Lastly, because 3M failed to proffer

to the jury evidence that TransWeb failed to mitigate its damages, TransWeb

asserts that the failure to mitigate defense is unavailable to 3M in these

proceedings.

To address the overarching legal issues, the Special Master set a briefing

schedule for the parties.  After the parties briefed these issues, the Special Master

established a protocol to address the parties' specific contentions with respect to

---

[1] As an example, TransWeb designated all time entries for Adam Wolfson, Esq. as
"antitrust" because the vast majority of his work was on the antitrust portion of the
case.  Nevertheless, TransWeb maintains that Mr. Wolfson was definitely involved
on patent defense related portions of the case too.  (*See* Certification of Michael E.
Williams dated February 1, 2013 ("Williams Cert."), ¶29.)

the time entries of TransWeb's lead counsel, Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"). First, TransWeb was required to prepare a spreadsheet reflective of the block billed invoices for fees it asserts represent compensable damages. The spreadsheet that TransWeb submitted provided the: (1) date of service; (2) timekeeper; (3) description of services rendered; (4) hours; (5) hourly rate; (6) gross fee; and (7) TransWeb's designation (P, A or M) as to the nature of the fee. A designation of "P" represented a time charge that TransWeb contended was patent defense-related, and therefore, subject to trebling. An "A" represented a time charge that TransWeb contended was antitrust-related for which it would receive the gross fee associated with that entry. Finally, an "M" represented a miscellaneous fee for which TransWeb was not seeking antitrust damages or costs of suit. Concurrently with and subsequent to the submission of its spreadsheet, TransWeb also submitted affidavits which explained the bases for its designations.

3M then added three additional columns to that spreadsheet. These columns represented 3M's designation (P, A or M) for each TransWeb time entry, a category setting forth the nature of its objection and a category for commentary so 3M could further explicate its reasons for challenge to the TransWeb entry. In a final column, TransWeb listed paragraph numbers from previously filed affidavits that it asserted supported its designation. There were many time entries for which the parties agreed upon the designation. For those entries, subject to 3M's

challenge to Quinn Emanuel's hourly rates and its objection to Quinn Emanuel's travel time billing entries, there is no dispute.

On June 5, 2013 the Special Master held an in-person hearing (the "June 5 Hearing"). The June 5 Hearing, with the consent of counsel, consisted of oral argument in accord and consistent with the above-referenced methodology and that would provide the matrices to be used in the damage determinative process. At the June 5 Hearing, the parties also compromised their positions on a number of time entries and settled on some form of designation. Such compromises included utilizing an "A" where TransWeb had designated the entry as a "P" and 3M had designated the entry as an "M"; others involved keeping a TransWeb designated entry as a "P", but utilizing a paralegal rate for the charge instead of the lawyer's hourly rate.

### A. **Legal Standards**

### 1. **Standard Of Establishing The Amount Of Patent Defense Fees Damages Under § 4 Of The Clayton Act**

A threshold issue in determining the amount of TransWeb's antitrust damages is the burden that TransWeb must satisfy. In that regard, the parties' position varies greatly. TransWeb contends that it need only provide the Special Master with "a reasonable estimate" of its attorneys' fees. (*See* TransWeb Post-Trial Br., p. 20.) By contrast, 3M contends that TransWeb must demonstrate that 3M's patent claims proximately caused the damage that TransWeb suffered, i.e. its

attorneys' fees.  (*See* June 5 Hearing Transcript, p. 9:8-11; 3M Post-Trial Opp. Br.,

pp. 34-35.)  As set forth below, the parties' positions are not inconsistent.

In the antitrust context, the Third Circuit has considered this burden on a

number of occasions.  *See, e.g., Callahan v. A.E.V., Inc.*, 182 F.3d 237 (3d Cir.

1999); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3rd Cir. 1998); *In re Lower

Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3rd Cir. 1993).   In

*Callahan*, the Court emphasized a "vital distinction" in the context of an antitrust

case,  namely that "proof of fact of damage and proof of the actual amount of

damages are two distinct steps."  *Callahan*, 182 F.3d at 259.  Similarly, in *Rossi*,

the Court held that:

> In antitrust cases, there are ultimately two related, but distinct,
> inquiries to establish antitrust injury.   First, the plaintiff must
> prove the *fact* of antitrust injury, as part of his *prima facie* case;
> then, he must make a showing regarding the amount of
> damages in order to justify an *award* by the finder of fact.

*Rossi*, 156 F.3d at 484 (emphasis in the original).  The cases cited by the parties

clearly establish, as 3M contends, that proximate causation of an antitrust injury --

here, incurring legal fees to defend the patent infringement claim -- is an element

that must be satisfied to prove the fact of damage.  *See Callahan*, 182 F.3d at 250

("to recover damages, an antitrust plaintiff must prove causation, described in our

jurisprudence as 'fact of damage or injury'") (quoting *Rossi,* 156 F.3d at 483);

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d. 429, 437-43 (3rd Cir. 2000)

(holding that because plaintiffs failed to establish proximate cause of their alleged antitrust injury, the district court properly dismissed their claims); *In Re Lower Lake Erie Iron Ore*, 998 F.2d at 1176 (holding that "*once causation is determined*, however, the actual amount of damages may result from a 'reasonable estimate as long as [the amount] is not the product of speculation or guess work'") (emphasis added).

The Third Circuit law plainly establishes that "fact of damage" analysis goes only to establishing liability under the antitrust laws, and the amount of damages analysis occurs only <u>after</u> a determination has been made as to the "fact of damage." The Special Master's assignment does not involve a "fact of damage" analysis. This is clear from: paragraphs 5 and 7 of the Verdict Form (finding that "3M violate[d] the antitrust laws by enforcing or attempting to enforce fraudulently procured patents" and that TransWeb is "entitled to its attorneys' fees"); paragraph 1 of Judge Hochberg's December 17, 2012 Order ("The Special Master shall proceed with all reasonable diligence to decide <u>amount</u> of attorneys' fees to be awarded as damages in this case, including the amount of attorneys' fees spent in defense of the patent infringement suit"); and page 2 of the parties' Joint Letter, dated January 4, 2013, and submitted to the Special Master ("The parties stipulated to a procedure whereby the jury would decide the TransWeb's <u>entitlement</u> to attorneys' fee damages, but not the <u>amount</u>.") (emphasis added).

8

Thus, while 3M's contention that TransWeb must establish that its patent claims proximately caused TransWeb to incur its attorneys' fees is true, those issues have already been decided by the jury and are not before the Special Master. Indeed, the case law cited by 3M does not demonstrate that proximate causation must be established in determining the amount of damages once liability has been determined.

The primary case relied upon by 3M is *In Re Flonase Antitrust Litigation*, 798 F.Supp.2d 619 (E.D. Pa. 2011). That case, however, does not discuss the amount of antitrust damages. Rather, the opinion focuses on whether plaintiffs had established an antitrust injury, i.e. the fact of damage. Specifically, plaintiffs contended that defendants' antitrust violations resulted in a delayed entry of nasal sprays into the market. *Id*. at 621. Defendants moved for summary judgment because it argued that plaintiffs could not establish that defendants' conduct was the "actual cause" of the delayed entry of plaintiffs' nasal sprays into the market. *Id*. at 626. The Court discussed in detail the requirement of causation in determining whether an antitrust injury occurred, *id*. at 627-32, and ultimately denied the summary judgment motion because there was a fact issue as to the chain of causation between [defendants'] conduct and plaintiffs' injuries. *Id*. at 633. Because liability had not been established, the Court never addressed the issue as

to the amount of the antitrust damages. Accordingly, *In Re Flonase* is not relevant to the Special Master's assignment.

3M's reliance on *J. Truette Payne Company, Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) is also misplaced. That case involved damages pursuant to § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act. The Supreme Court distinguished § 2(a) claims from claims brought under § 4 of the Clayton Act. The Court held that § 2(a) claims only require proof that the effect of the improper conduct "*may be* substantially to lessen competition," as opposed to § 4 claims that requires proof of "*actual injury*" to the plaintiff flowing from the anticompetitive conduct. *Id.* at 561-62 (emphasis in the original). Thus, *J. Truette* is construing a provision of the Clayton Act that is not applicable here. Moreover, the Court concluded that even though a lower burden existed for § 2(a) claims than § 4 claims, for the amount of damages, the burden was "to some extent lightened." *Id.* at 568. In short, nothing in *J. Truette* establishes that proximate causation is required in determining the amount of damages for violations of § 4 of the Clayton Act.

The Special Master concludes that TransWeb's burden in establishing the amount of damages is satisfied by providing a reasonable estimate. *Rossi*, 156 F.3d at 484 (quoting *In Re Lower Lake Erie Iron Ore*, 998 F.2d at 1176). To meet this burden, TransWeb must show that it has a "rationale, reasonable basis for

10

supposing the damages' figure that [it] came up with is a reasonable estimate, a fair estimate of" its legal fees that were devoted to patent defense.  *In Re Lower Lake Erie Iron Ore*, 998 F.2d at 1176.  This construct, as opposed to the lodestar analysis described below, makes sense because the patent defense legal fees incurred by TransWeb in this matter were, in fact, actually paid.  Thus, to make TransWeb whole from a damage point of view, a reasonable estimate of the damages suffices.[2]

### 2. Standard Of Establishing The Amount Of Antitrust Costs of Suit Under § 4 Of The Clayton Act

With respect to TransWeb's costs of suit for the antitrust claims, both parties correctly agree that the TransWeb's attorneys' fees must be analyzed under the lodestar analysis.  The lodestar for a fee application begins "by 'multiplying the number of hours…the attorneys reasonably worked on a client's case by a reasonable hourly billing rate for such services,' taking into account various factors."  *Drazin v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, 2013 WL 2563727 at *2 n. 3 (3d Cir. June 11, 2013) (quoting *Gunter v. Ridgewood Energy*

---

[2] Although TransWeb's burden is to simply provide a reasonable estimate of its damages, the Special Master has nonetheless considered the hourly rates charged by Quinn Emanuel's lawyers, as well as the number of hours billed by the laywers for particular tasks, to determine whether the antitrust damages sought by TransWeb are rational and reasonable.  *See Varacallo v. Massachusetts Mut. Life Ins. Co.,* 226 F.R.D. 207, 249 (D.N.J. 2005) (to determine the reasonableness of fees, it is sensible to consider alternative methods). These are discussed in other parts of the R&R.

*Corp.,* 223 F.3d 190, 195 n.1 (3d Cir.2000)).[3]

In determining the appropriate number of hours to multiply by the hourly rate, it is incumbent upon the Court or Special Master to exclude from the fee application any hours that were not "reasonably expended." *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). "Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary." *Rode v. Dellaciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). *See also Evans v. Port Auth. of N.Y. and N.J.*, 273 F.3d 346, 362 (3d Cir. 2001) (holding that after the hourly rate is established the Court must conduct a "thorough and searching analysis" to determine what charges should be excluded). Moreover, the fee petition must be specific enough so it can be determined if "the hours claimed are unreasonable for the work performed.'" *Rode*, 892 F.2d at 1190 (quoting *Pawlak v. Greenawalt*, 713 F.2d 972, 978 (3d Cir.1983)).

The analytical construct for the reasonableness of the hourly rate charged by an attorney is usually decided by a review of the prevailing market rates charged in the relevant community. What constitutes a reasonable market rate depends upon the essential character and complexity of the legal services rendered. To determine

---

[3] The loadstar analysis includes reimbursement of attorneys' fees "for the time spent litigating its fee application." *Planned Parenthood v. Attorney General of the State of New Jersey*, 297 F.3d 253, 268 (3d Cir. 2002). As part of its approach in this case, however, TransWeb is not seeking all of its counsel fees in connection with its fee application. (*See* Williams Cert., ¶26.)

a reasonable hourly rate, a court "should assess the experience and the skill of the prevailing attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Maldonado v. Houston*, 256 F.3d 181, 184 (3d Cir. 2001) (quoting *Rode*, 892 F.2d at 1183); *J & J Snack Foods Corp. v. Earthgrains Co.*, 2003 WL 21051711, *7 (D.N.J. May 9, 2003) (finding a reasonable hourly rate takes into account both the "reasonable market rate for the essential character and complexity of the legal services rendered", and "rates for similar services by lawyers of reasonably comparable skill, experience, and reputation") (quotation and citation omitted).

In lodestar cases, the Third Circuit has acquiesced to the Fifth Circuit's twelve-factor test enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) to guide courts in their analysis. *See, e.g., Public Interest Research Group of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1185 n. 8 (3d Cir. 1995). While not all twelve factors apply here, the following factors are inherent in this litigation: (1) the time and labor required by the matter; (2) the novelty and difficulty of the questions presented; (3) the skill requisite to perform the legal service properly; (5) the customary fee for similar work; (8) the amount involved and the results obtained; and (9) the experience, reputation and ability of the attorneys.

Cognate and a necessary measure for the lodestar analysis here is evidence beyond a generalized statement as to the community billing rate charged by attorneys of equivalent skill and experience performing work of similar complexity.  This burden is traditionally and best satisfied by the submission of affidavits of other attorneys either in the relevant community or other attorneys who possess the qualifications to attest to the range of prevailing rates charged by attorneys with similar skill and experience.  In fact, in *Port Drivers Federation 18 Inc., et al v. All Saints*, 2011 WL 3610100, *4 (D.N.J. Aug. 16, 2011), Judge Walls was extremely critical of an attorney's statement as to his customary billing rate as a substitute for affidavits from other practitioners to establish the community billing rate charged by attorneys of equivalent skill and experience performing work of similar complexity.

### B.   Miscellaneous Arguments Raised By 3M

### 1.   Block Billing

3M argues that because Quinn Emanuel used the "block billing" time entry method, rather than "task billing" their antitrust and patent defense fees, TransWeb's measure of damages is inadequate.  (*See* 3M Post-Trial Opp. Br., pp. 33-34.)  Although 3M criticizes Quinn Emanuel for failing to distinguish between their antitrust and patent defense fees, there is no per se bar to block billing in this Circuit.  *See Wade v. Colaner*, 2010 WL 5479625, *6 (D.N.J. Dec. 28, 2010)

(citing cases).    Indeed, 3M's brief does not cite to any authority that prohibits
block billing.

Rather, time entries must only "be specific enough to allow the district court
to determine if the hours claimed are unreasonable for the work performed."
*Federal Trade Commission v. Circa Direct LLC*, 912 F.Supp.2d 165, 175 (D.N.J.
2012) (quoting *Warren Distrib. Co. v. InBev USA, LLC*, 2011 WL 770005, *17
(D.N.J. Feb. 28, 2011)).  "Although block billing may often result in a number of
vague entries, rather than excluding an entire entry, the court should examine the
listed activities and the time spent conducting each activity to determine whether
the hours reasonably correlate to all of the activities performed."  *Warren Distrib.
Co.*, 2011 WL 770005 at *17 (internal citation and quotation omitted).

Here, 3M's primary concern relating to the billing methodology used by
Quinn Emanuel is that TransWeb may seek treble damages for an entire billing
entry even though a portion or all of the block billed entry is vague.  *See* 3M Post-
Trial Opp. Br., p. 32.   3M's point is well taken.  In such a situation, it would be
unfair to treble the entire entry.   By the same token, however, from the
documentation reviewed by the Special Master, it is readily apparent that the
primary issues in this case pertained to patent defense.  In that regard, the attorney
for TransWeb who managed and supervised the litigation has certified that
approximately 75% of Quinn Emanuel's time was spent on patent defense.  (*See*

Williams Cert., ¶¶25, 33.)  Consistent with that assertion was 3M's statement to the jury that "this case is about infringement of a valid United States patent." (*See id.*, ¶22.)

Accordingly, where portions of block billed entry simply stated something like "prepare for trial" and TransWeb designated the entry as a "P", the Special Master presumptively designated that portion of the entry as 75% "P" and 25% "A".  However, the Special Master has adjusted those percentages if, from another portion of the time entry or the surrounding context, the Special Master could determine that an adjustment would be fair and just under the circumstances.  For example, on Harold A. Barza's March 26, 2012 time entry, it states that he spent 3.3 hours working on the mock trial, pretrial requirements and trial exhibits.  Because the mock trial pertained solely to patent defense-related issues (*see infra*, p. 30), and the other time portions of the time entry were 75% patent defense-related and 25% antitrust, the Special Master has allocated 90% of Mr. Barza's March 26, 2012 time entry to patent defense ("P"), and 10% to antitrust ("A").  Additionally, the Special Master did not find that any of the work performed during trial to be "M."  Similarly, for TransWeb's time entries at the beginning of the case and well prior to TransWeb filing its antitrust claims, the Special Master did not redesignate any portion of the time charges as "A" instead of "P".

Utilizing this methodology, Quinn Emanuel's billing entries are sufficiently specific for the Special Master to determine whether the listed activities reasonably correspond to the antitrust and patent defense hours that TransWeb claims.

## 2.   Abusive Litigation Tactics

3M contends that TransWeb engaged in unnecessary and abusive litigation tactics that bloated its attorney fees.  (*See* 3M Post-Trial Opp. Br., pp. 8-16.) TransWeb denies 3M's allegations and underscores the oppressive litigation measures initiated by 3M beginning with 3M's litigation in its home state of Minnesota which was ultimately dismissed based on lack of jurisdiction.  A fair reading of the post-trial briefs submitted by the parties in regard to TransWeb's fee application and proposed allocation between antitrust damages and antitrust costs of suit convinces the Special Master that the parties equally engaged in partisan adversarial conduct that required several meet and confers, Court intervention[4] and the appointment of a Special Master to deal with issues of privilege.

It is not necessary for the Special Master in this fee application to recount each charge and counter-charge the parties have leveled against each other.  This is a fact-driven inquiry.  3M's dismissal of 55 patent claims two weeks before trial

---

[4] 3M argues that TransWeb did not comply with certain discovery requests, which resulted in Magistrate Judge Shwartz granting the relief 3M requested.  (*See* 3M Post-Trial Opp. Brief, pp. 8-9.)   The fact that the Magistrate granted relief to 3M does not equate to abusive litigation tactics by TransWeb.  The Federal Rules of Civil Procedure specifically contemplate circumstances where discovery disputes are not motivated by abusive conduct.  *See, e.g.*, Fed. R. Civ. P. 37(a)(5)(A)(ii-iii).

and TransWeb's dismissal of its patent infringement claims against 3M are the type of litigation tactics that extenuate the circumstances and lead to wasteful expenditure of counsel fees. Moreover, the collective production of 166,000 pages of documents, 3M's demand that TransWeb produce thousands of physical samples of every product it ever manufactured, the exchange of multiple sets of interrogatories and demands for admissions, 407 privilege objections, TransWeb's 7 sets of requests for production, 38 days of depositions from 30 different witnesses including experts, broadly stated motion practice with voluminous supporting exhibits and certifications reflect bare-knuckled litigation of a steadfast nature by both TransWeb and 3M. Such conduct is "par for the course in high-stakes litigation." *Minor v. Christie's, Inc.*, 2011 WL 902235, *6 (N.D.Cal. Jan. 29, 2011).

Against this backdrop, notwithstanding the complexity of the issues, the Special Master will not sanction TransWeb by way of fee limitation due to 3M's perceived abusive litigation tactics.

### 3.   Travel Time

A number of the entries for which TransWeb seeks payment involved time for travel related to the case. The Third Circuit has generally determined that travel time for litigation in New Jersey is compensable. *See Planned Parenthood of Central New Jersey*, 297 F.3d at 267-68. As a threshold matter, an issue arose as

to what percentage of the travel time was recoverable, regardless of whether it was characterized as a "P" or an "A".   At the hearing, 3M's counsel proposed that 50% of the travel time should be recoverable, subject to the Special Master's discretion to adjust the percentage as necessary.  (*See* June 5 Hearing Transcript, pp. 86:16-19, 89:20-90:6.)   TransWeb's counsel agreed to the 50% number for travel time where little or no work was performed while traveling.   (*See id*., p. 88:6-15.) However, TransWeb contended that where substantive work was being performed on the case while traveling, 100% of the travel time would be compensable.  (*See id*., p. 90:11-13.)

The Special Master agrees that if TransWeb's counsel was working while traveling, then TransWeb should receive 100% percent of the time charge while that attorney was in transit.  *See Glass v. Snellbaker*, 2008 WL 4416450, *9 (D.N.J. Sept. 23, 2008) (concluding that "generally, time spent in travel is compensable at the attorney's rate if legal work is being performed during travel") (citing *Planned Parenthood of Central New Jersey*, 297 F.3d at 267).

In determining whether to allocate 50% of the travel time charge or 100% of the travel time charge, the Special Master has considered a variety of factors, including the information contained in the time charge and the circumstances surrounding the travel.  (*See, e.g.*, June 5 Hearing Transcript, p. 165:6-8 (where TransWeb's counsel testified that "you can assume after [taking Mr. Jones'

deposition during the] day, I did not do much work on the flight home to L.A."); p. 206 (after a 12 or 13 hour deposition, TransWeb's counsel agreed "that it's not likely that [the attorney] worked on the flight back").)  Some of the time entries involving travel also appear to have involved some work being performed while traveling, but not work that would utilize the entire trip.  In such situations, the Special Master allocated and awarded less than 100% of the attorney's rate for a portion of the travel time.

In analyzing the travel time entries, the Special Master looked at the typical time associated with travel to/from various destinations.  For instance, by reference to airplane schedules, the Special Master determined that the time in the air when traveling from Newark to Los Angeles is approximately 6.0 hours.  Additionally, the Special Master has added an additional 1.5 hours to the travel for time spent waiting in the airport and other events associated with flying from one location to another.  Thus, for purposes of this assignment, the typical travel time from Newark, Philadelphia or Washington D.C. to Los Angeles is 7.5 hours.  Similarly, using the same methodology, the Special Master has set the typical travel time from Minneapolis to Los Angeles at 5.5 hours.[5]

---

[5] A similar construct was used in other miscellaneous travel entries, which included, inter alia, San Francisco to Los Angeles and Minneapolis to St. Louis.

### 4.      The October 15, 2012 Housekeeping Conference

Two of TransWeb's time entries on October 15, 2012 -- one by Mr. Williams and one by Mr. Barza -- pertain to time spent in Court negotiating and then arguing *in* *limine* motions before Judge Hochberg.   The time charges also included return travel to Los Angeles from Newark after the conference concluded. TransWeb designated these entries as "P".  Initially, 3M designated the entries as "M"; however, at the hearing, 3M changed its designation from "M" to "A".  (*See* June 5 Hearing Transcript, p. 322:11-19.)   Still, the parties disagreed as to the characterization of the time spent in Court. (*See id.*, pp. 321:20 to 323:18.) Accordingly, the Special Master requested that the parties submit the transcript from the October 15, 2012 housekeeping conference and hearing, along with designations of the parties as to what was being argued at a particular time.  (*See id.*, pp. 323:22-324:8.)

This proved to be a useful request because, for many pages of the transcript, the parties do not dispute the characterization of the argument before Judge Hochberg.  For example, it is undisputed that the argument related to patent entries on the following pages:

> Page 3, line 13 to page 4, line 10;
> Page 6, line 8 to page 21, line 10; and
> Page 29, line 8 to page 36, line 7;

It is further undisputed that the argument related to patent and antitrust claims on the following pages:

> Page 2, line 1 to page 2, line 23;
> Page 4, line 11 to page 5 line 6; and
> Page 36, line 8 to page 37, line 20;

Finally, it is undisputed that argument related to exclusively antitrust claims on the following pages:

> Page 37, line 21 to page 55, line 4.

Consequently, there are only four passages about which the parties dispute. They are as follows:

> 1) Page 2, line 24 to page 3, line 12;
> 2) Page 5, line 7 to page 6, line 7;
> 3) Page 21, line 11 to page 29, line 7; and
> 4) Pages 55, line 5 to page 79, line 19

The Special Master has reviewed these passages and concludes as follows. The first two disputed passages are both very short and, after reviewing them in the context in which the passages occurred, the Special Master concludes that both are patent related. The third passage can be broken down into numerous parts. The Special Master concludes as follows: page 21, line 11 to page 22, line 4 is patent related;[6] page 22, lines 5-10 are antitrust related; page 22, line 11 to page 23, line

---

[6] These lines of the transcript, as well as other parts of the third passage, when fairly read, pertain to how many of the 57 patent infringement claims alleged by 3M were actually going to be asserted at trial. Nevertheless, 3M argues that this passage should be designated as antitrust because the unasserted patent

10 is patent related; page 23, lines 11-14 are antitrust related; page 23, line 15 to page 26 line 23 is patent related; and page 26, line 24 to page 29 line 7 is patent related.

The fourth disputed passage concerns generic trial related issues, such as days and times on which the trial should be conducted, jury charges, confidentiality of court exhibits, how voir dire was going to be conducted, etc. The Special Master concludes that this passage applies to both the patent defense and antitrust portions of the case.

To summarize the foregoing and the 78 pages of the transcript: 33 pages pertain to patent defense issues; 18 pages pertain to antitrust issues; and 27 pages pertain to both patent defense and antitrust issues.  Because patent defense was the primary issue in the case (*see supra*, p.  23), for the pages spent on both topics the Special Master has determined 75% of the pages to be allocable to patent defense, and 25% of the pages to be allocable to antitrust.  Accordingly, the Special Master concludes that 53 of the 78 pages pertain to patent defense and 25 pages pertain to

---

infringement claims also related to TransWeb's sham litigation claim.  3M's position defies logic.  3M is the party that asserted the patent infringement claims against which TransWeb had to defend.  Discussion with counsel and the Court shortly before trial about how many of those patent infringement claims that 3M was going to assert, plainly relates to patent related activity in the case.

antitrust.[7]   Thus, the Special Master finds that 68% of the time charges devoted to the housekeeping conference  (53 divided by 78)  will be treated as patent defense fees and 32% of the time charges (25 divided by 78) will be treated antitrust fees.

### 5.   Sham Litigation

After 3M asserted its patent infringement counterclaims against TransWeb, TransWeb amended its complaint to assert claims that, <u>inter</u> <u>alia</u>, 3M committed Walker Process fraud and engaged in sham litigation.  At trial, TransWeb prevailed on its Walker Process fraud claim, but the jury decided that 3M did not engage in sham litigation.   Because of the jury's decision, 3M contends that TransWeb achieved only limited success on its antitrust claims and because of this limited success, TransWeb's reasonable attorneys' fees under the Clayton Act should be reduced by 50%.  The 50% factor rests on the premise that TransWeb pursued two antitrust claims Walker Process Fraud and sham litigation, but only prevailed on the Walker Process Fraud claim.

3M cites to *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp*., 995 F.2d 414, 423-424 (3d Cir. 1993) for the principle that a limited success multiplier should be applied when a plaintiff pursues unsuccessful claims.  3M further argues that no fee may be rewarded for services on an unsuccessful claim, citing to

---

[7] The calculation of 53 pages is derived by adding 33 pages that pertain to patent defense, plus 75% of 27 pages, which approximates to 20.  The calculation of 25 pages of antitrust is derived by adding to the 18 pages of antitrust discussion, plus 25% of the 27 pages, which approximates to 8.

*Hensley*, 461 U.S. at 434. The holding in *Hensley* is not that narrow and simplistic. Rather, *Hensley* distinguished between unsuccessful claims that are completely unrelated and unsuccessful claims that arose from a common nucleus of facts or legal theories. As to the latter scenario, the Supreme Court observed that:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Hensley*, 461 U.S. at 435.

Similarly, the jurisprudence of the Third Circuit does not require success on all claims. A prevailing plaintiff such as TransWeb need only show that the unsuccessful claims arose from a common core of facts and are not distinct in all respects from the successful claims. *William Failla v. City of Passai*c, 146 F.3d 149, 160 n.15 (3d Cir. 1998). In *Eichenlaub v. Township of Indiana,* the Court found that because the core factual complaint and related legal theory survived to trial and were accepted by the jury in favor of the plaintiff, the time expended on the dismissed claims was not excessive, nor unrelated to the focus of the case. 214 Fed.Appx. 218, 222 (3d Cir. 2007). Moreover, work on the dismissed cause of action was useful and necessary to maintain the litigation. *Id.*

Here, the relationship between the patent infringement claims and TransWeb's assertion of antitrust claims form the necessary common core of facts notwithstanding TransWeb's lack of success on its sham litigation claims. Moreover, the significance of TransWeb's overall relief here cannot be underestimated. Viewed in its entirety, TransWeb scored a resounding victory. A negative multiplier is inappropriate, and a reduction in fees is unjustified for a lack of success on the sham litigation claim.

### 6. Mock Trial

3M contends that TransWeb's mock trial fees were excessive in that "TransWeb's counsel ran up more than a third of million dollars [$335,395.50] in attorneys' fees alone for testing only some of the issues that ultimately went to the jury in this case." (*See* 3M Letter, dated June 18, 2013, p. 2.) The Special Master finds 3M's position regarding the amount of fees spent on the mock trial to be somewhat distorted. The record does not reflect that TransWeb spent $335,395.50 in attorneys' fees on mock trial issues. Rather, the record reflects that the total of all TransWeb's block-billed entries containing at least one reference to the mock trial is $335,395.50. However, many of those entries clearly and unmistakably pertain to issues other than the mock trial.

For example, on February 27, 2012, Michael Williams billed 6.8 hours to the case. On that day, Mr. Williams worked on summary judgment briefs and Daubert

briefs.  He also had a telephone conference regarding inequitable conduct issues. He had a team meeting regarding the summary judgment motion and the Daubert motions.  Mr. Williams sent an email to the team regarding mock issues.  It is plain from Mr. Williams' entry that only a tiny fraction of his time that day was devoted to the mock trial.    However, in computing the alleged mock trial amount, 3M included <u>all</u> of the time Mr. Williams billed that day multiplied by his hourly rate.

Similarly, on March 15, 2012, Adam Wolfson billed 7.4 hours to the case. Mr. Wolfson's tasks that day included reviewing and revising the summary judgment opposition brief, and the responses to 3M's statement of material facts. He also drafted a supplemental statement of material facts, and exchanged emails with the team about the motion.  The only time devoted that day to the mock trial was a conference he had with Mr. Barza.   Again, it is plain from the tasks performed by Mr. Wolfson on that day that virtually all of his time was spent on issues other than the mock trial.  Nevertheless, 3M allocated to the mock trial <u>all</u> of the time Mr. Wolfson billed that day multiplied by his hourly rate.

There are other examples where 3M has lumped into the mock trial pot time spent by TransWeb attorneys on other matters.  Moreover, there are other time entries in which the time spent by TransWeb's counsel was applicable to both mock trial and other portions of the case.  For instance, on January 1, 2012, Mr. Barza reviewed the Grannis deposition "for trial and mock preparation and

possible summary judgment motions." Because Mr. Barza's work applied to both trial preparation and summary judgment motions and, thus, would have been performed regardless of whether TransWeb conducted a mock trial, it would be inappropriate to allocate all of that time to the mock trial, as 3M did.

Nevertheless, TransWeb did spend a fair amount of time devoted to the mock trial process.  In its final analysis, 3M really does not quibble with the decision to conduct a mock trial in this matter.  (*See* June 5 Hearing Transcript, pp. 278-79.)  The law supports that mock trials and/or focus groups are compensable in complex cases.  *See, e.g., Majestic Box Company, Inc. v. Reliance Insurance Co. of Illinois*, 1998 WL 720463, *5 (E.D. Pa. Sept. 2, 1998); *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 540 (S.D.N.Y. 2008).

3M contends, however, that TransWeb should not be permitted to recover all of its mock trial fees because they are excessive.   In that regard, 3M has submitted a number of cases to the Special Master in which the Court did not permit the prevailing party to receive any compensation for mock trials, or limited the amount of compensation to be received.   Careful review of those cases does not persuade the Special Master that TransWeb's mock trial amounts should be reduced.  For example, 3M relies upon *Montanez v. Chicago Police Officers FICO*, 2013 WL 1110870 (N.D. Ill. March 18, 2013).   *Montanez* was a 42 U.S.C. §1983 case in which plaintiffs alleged that defendants had used excessive force.  *Id*. at *1.  After

construing the fee application, the court concluded that the case was "not sufficiently complex to justify a mock trial, and Plaintiff may not recover for any of that time."[8]  *Id.* at *9.  3M cites two other cases in which the Court did not awarded any fees incurred for mock trials, namely *EEOC v. CRST Van Expedited, Inc.*, 2010 WL 520564, *17 (N.D. Iowa Feb. 10, 2010) and *Goss International Corp. v. Tokyo Kikai Seisakusho, Ltd.*, 2004 WL 1234130, *7 (N.D. Iowa June 2, 2004).  Interestingly, both of those cases were decided by the same Judge.  More significantly, although the Court recognized that courts have permitted mock trial expenses (*see EEOC*, 2010 WL 520564 at *17), in both of those cases the court concluded without much explanation that a mock jury "was not reasonably necessary to further the litigation in this case."[9]  *See id.; Goss International Corp.*, 2004 WL 1234130 at *7.  Finally, 3M relies upon an employment related matter, *Glass v. Snellbaker*, 2008 WL 4416450, *7 (D.N.J. Sept. 23, 2008), which allegedly involved, *inter alia*, a retaliatory transfer in violation of plaintiff's first amendment rights.  In *Glass*, the Court only slightly reduced the amount of time spent on a mock trial.

---

[8] The court did recognize that certain Seventh Circuit cases had allowed mock trial expenses where complicated matters involving constitutional issues were at stake. *Id*.

[9] The Special Master notes that one of those matters did not go to trial.  *See EEOC* at *17.

Case 2:22-cv-04135-MN-JBC   Document 367-1   Filed 07/28/23   Page 101 of 173 PageID #:
Case 2:10-cv-04413-FSN-JBC   Document 901-1   Filed 09/24/13   Page 35 of 49 PageID #:
13183

None of the cases cited by 3M remotely approaches the complexity or the magnitude of the claims at issue here.    This matter, which was tried to a jury, involved claims of patent infringement relating to plasma-fluorinated filtration media.  The underlying complexity of this matter, which in all likelihood would not be easily understood by a typical jury, is precisely the type of case which would justify the use of a mock trial.  More significantly, as noted above, because all of the mock trial issues pertained to patent defense (*see* Supplemental Certification of Michael E. Williams dated May 22, 2013 ("Supplemental Williams Cert."), ¶24), these are part of TransWeb's patent defense damages for which TransWeb need only demonstrate a reasonable estimate of its legal fees.    From TransWeb's overwhelming success on the patent-related issues in this case, it is obvious that the information that counsel gleaned from the mock trial helped form the nature of TransWeb's presentation to the jury.  The Special Master is satisfied that TransWeb has easily satisfied that standard and, given the complexity of this matter and the fact that the jury ruled in favor of TransWeb on all patent-related claims, a reduction of TransWeb's fees devoted to the mock trial is neither warranted nor appropriate.

### 7.    Mitigation

3M asserts that TransWeb failed to mitigate its damages notwithstanding the fact that 3M failed to identify mitigation as a factual or legal issue in the final

Case 2:22-cv-04377-MN-JBC   Document 367-1   Filed 07/28/23   Page 102 of 173 PageID #:
13184
Case 2:12-cv-04437-SN-JBC   Document 361-1   Filed 09/24/13   Page 30 of 49 PageID #2436

Pretrial Order or in 3M's statement of contested facts.  (*See* TransWeb Post-Trial Reply, Br., p. 3.)   Moreover, 3M never adduced any evidence at trial that TransWeb failed to mitigate its damages.  (*Id*.)  Without the presentation of any evidence to the Special Master to show that TransWeb failed to mitigate its damages at trial, 3M has waived the mitigation defense.  *See Walsh v. Alarm Sec. Grp., Inc*., 95 Fed.Appx. 399, 403 (3d Cir 2004).

### 8.    TransWeb's Hourly Rates

It is beyond dispute that TransWeb is entitled to both its antitrust damages and costs of suit.  It is hotly disputed, however, <u>inter alia</u>, whether the hours expended by Quinn Emanuel lawyers are reasonable and whether the hourly rates they charged to TransWeb are likewise reasonable.  3M's lawyers have rigorously reviewed Quinn Emanuel's block billing entries and challenged 656 separate time entries.  The vigor of their challenge is reflected in the June 5, 2013 hearing transcript that memorialized a ten hour proceeding before the Special Master during which oral argument was advanced as to the reasonableness of Quinn Emanuel's hours expended, the hourly rate charged for those services, and the categorization by TransWeb of its counsel's individual time entries.

Moreover, at the Special Master's request, both TransWeb and 3M submitted affidavits in regard to reasonable hourly rates for a prevailing party in the environs of New Jersey and, more significantly, affidavits from attorneys

experienced in the patent or intellectual property field in cases of similar scope and complexity to the subject matter of this action.  During the litigation, the hourly rates for each Quinn Emanuel attorney working on the case periodically increased as reflected in their block billings.  The billing for Quinn Emanuel partners ranged from $760 to $970 for partners and "of counsel," while associates billing rates ranged from $420 to $680.  George L. Graff, Esq., licensed in New York, is an experienced patent and intellectual property litigation attorney with approximately 39 years of litigation experience.  From his experience, Mr. Graff recognizes that a large multi-national company with extensive resources such as 3M can threaten the very existence of a small competitor such as TransWeb by its asserted infringement claims and, thus, views TransWeb's choice of counsel as appropriate despite Quinn Emanuel's lack of relationship to the District of New Jersey.  (*See* Graff Decl., ¶7.)  He continues that patent litigation requires extensive specialized knowledge and that Quinn Emanuel was an appropriate choice for TransWeb in this case.  Mr. Graff's hourly rate was $915 in January 2009 and, based on his firm's current billing rates, his hourly rate would exceed $1000 per hour if he had not retired. (*See id*., ¶12.)  He concludes that the billing rates charged by Quinn Emanuel are well within the range of billing rates of attorneys of similar qualifications and certainly reasonable.  (*Id*.)

Hugh Steven Wilson, in his current capacity at Burford Capital Limited, provides litigation financing for a number of patent disputes and is involved in the process of screening cases and law firms.  Mr. Wilson previously practiced law with Latham & Watkins and was the former Chairman of the National Litigation Department.  (*See* Wilson Decl., ¶3.)  His exposure to, and experience in, handling complex litigation matters brought familiarity to billing rates charged by other top-notch litigation firms against which Latham & Watkins competed.  He acknowledges that patent fees are generally billed on an hourly rate basis unless there exists the potential for a contingency based success fee.  (*See id*. ¶7.)  Moreover, because of the complexity of patent cases and the success of patent litigators with juries, their hourly rates are often higher than most other litigation practice areas.  (*Id*.)  Mr. Wilson is familiar with Quinn Emanuel as one of the premier litigation firms in the country, particularly in the field of patent litigation.  Similar to Mr. Graff, he finds that the hourly rates charged by Quinn Emanuel are within the range of prevailing rates for premium quality counsel in patent litigation.  (*See id*., ¶8.)  Both Mr. Graff and Mr. Wilson point to the success that was achieved in this case as an additional factor that informs their respective opinions.

3M initially submitted two declarations.  The first declaration is from Francis H. Morrison III, a member of Axinn Veltrop & Harkrider LLP, a

Case 2:22-cv-04376-MN-JBC   Document 207-1   Filed 07/28/23   Page 105 of 173 PageID #:
13187
Case 2:10-cv-04413-FSN-JBC   Document 467-1   Filed 09/24/13   Page 39 of 49 PageID #: 2459

participant in this litigation.  Mr. Morrison is an experienced patent attorney who opines that clients in significant patent matters are sophisticated and frequent consumers of legal services who aggressively negotiate for discounts off standard attorneys' rates.  (*See* Morrison Decl., ¶9.)  His lead counsel hourly rate in TransWeb fluctuated between $630 and $750.  (*Id*.)  Other negotiated rates for Axinn lawyers ranged from $525 to $652.50 for other partners, $275 to 562.50 for associates and $180 to $190 for paralegals.  (*See id*., ¶10.)  He acknowledges that 3M negotiated significant discounts off the hourly rates of the Axinn lawyers.  (*See id*., ¶11.)  For instance, 3M paid Michael Keeley $621 per hour, Jeremy Lowe $525 per hour, John Tanski $430 per hour, $290 per hour for a junior litigation associate and $190 per hour for a paralegal.  (*Id*.)

The second 3M declaration is from Hildy Bowbeer, Esq., who is the Assistant Chief Intellectual Property Counsel in the Office of Intellectual Property Counsel at 3M Innovative Properties Company, a subsidiary of 3M Company.  Her role is to manage intellectual property litigation for 3M.  (*See* Bowbeer Decl., ¶1. In that role, she selects and retains outside counsel for patent infringement litigation, negotiates fee arrangements and reviews their invoices.  (*See id*., ¶5.) She unabashedly acknowledges that 3M, as a regular business practice, aggressively negotiates discounted fee arrangements and only on rare occasions pays the standard or "rack" rates of outside patent litigation counsel.  (*See id*., ¶7.)

Currently, 3M is involved in 31 patent infringement cases and, in most of those cases, a fixed or capped fee has been negotiated.  (*See id.*, ¶8.)  In the TransWeb case, both Fish & Richardson and Axinn represented 3M subject to negotiated fee arrangements that represented substantial discounts from their firms' standard hourly rates.  (*See id.*, ¶¶9, 11.)

The Special Master is unimpressed with the declarations of Mr. Morrison and Ms. Bowbeer.  These declarations, along with a subsequent declaration by John C. Adkisson, Esq., lack compelling force in the circumstances of this case.  TransWeb never possessed the economic muscle of 3M, a large multi-national company with extensive resources, and a multitude of litigation from which it could compel premier law firms to discount their typical hourly rates.  Indeed, at its peak, TransWeb never had more than 55 employees.  (*See* Williams Cert., ¶2.)  Thus, by stark contrast, TransWeb's very survival was linked to its patent defense in this case and, but for the intervention of Clarcor, Inc., TransWeb would have been unable to pay its attorneys' fees whether discounted or at standard rates.  There is no analogy between 3M's engagement of outside counsel with negotiated fees and the dire straits in which TransWeb found itself.

## FINDINGS AND RECOMMENDATIONS

Against this backdrop of representative jurisprudence and from the briefs and relevant affidavits submitted in connection with Quinn Emanuel's fee application, the Special Master determines that:

(1)     Quinn Emanuel is one of the top litigation firms in the country, particularly in the field of patent and complex commercial litigation;

(2)     The case at bar was a complex patent litigation with related antitrust issues;

(3)     3M's counsel, Axinn Veltrop & Harkrider LLP and Fish & Richardson, are distinguished legal counsel in their respective fields of legal expertise;

(4)     As George L. Graff stated in his declaration "this matter was extraordinary in every respect";

(5)     The time and labor required of all counsel can best be characterized as intensive;

(6)     The substantive issues involved were novel and difficult;

(7)     Quinn Emanuel, through its array of attorneys assigned to this litigation, possessed the skill requisite to properly perform the legal services requested of them;

Case 2:22-cv-01377-MN-JLH   Document 361-1   Filed 07/28/23   Page 108 of 173 PageID #:
13190
Case 2:10-cv-04413-FSH-JBC   Document 967-1   Filed 09/24/13   Page 41 of 49 PageID #: 27442

(8)    Michael E. Williams and Harold A. Barza of Quinn Emanuel, who were the primary supervisors and participants in this litigation, are distinguished attorneys who possess outstanding academic credentials and trial experience in their respective fields of expertise;

(9)    There existed much overlap between the patent and antitrust issues;

(10)   TransWeb's survival as a company was dependent upon its ability to continue to manufacture and distribute plasma-fluorinated filtration media;

(11)   TransWeb did not possess the ability to negotiate fixed hourly rates for legal representation in contrast to 3M's ability to negotiate fixed rates for legal representation at a reduced rate from their attorneys' normal hourly rates;

(12)   Except for a 10% discount during the early investigative stages of this litigation, all of Quinn Emanuel's attorneys' fees were paid by either TransWeb or Clarcor;

(13)   Because of the attorney skills demonstrated by Quinn Emanuel, TransWeb was the prevailing party on all issues submitted to the jury except for the jury's finding that 3M did not engage in sham litigation;

(14)   TransWeb did not submit any billings for local counsel in Minnesota and New Jersey;

Case 2:12-cv-01177-MN-JBC   Document 207-1   Filed 07/28/23   Page 109 of 173 PageID #:
13191
Case 2:10-cv-04413-FSH-JBC   Document 467-1   Filed 09/24/13   Page 43 of 49 PageID #: 2743

(15)   TransWeb did not seek reimbursement for fees billed by paralegals and other critical non-attorney support staff whose labor contributes to the attorneys' work product and is compensable as part of legal fees[10];

(16)   Quinn Emanuel voluntarily adopted a conservative approach to billing;

(17)   Michael E. Williams personally reviewed all of the invoices;

(18)   3M's challenges to total entries have been appropriately reduced during the allocation process where appropriate;

(19)   Quinn Emanuel does not seek reimbursement for "M" designations arising out of the allocation process;

(20)   It was reasonable for TransWeb to retain Quinn Emanuel as its lead counsel and for 3M likewise to retain out-of-state defense counsel;

(21)   The applicable standard for TransWeb's antitrust damages, *i.e.* its patent defense fees, is "a reasonable estimate" of its legal fees that were devoted to patent defense.  *See In Re Lower Lake Erie Iron Ore*, 998 F.2d at 1176;

(22)   The applicable standard for TransWeb's antitrust costs of suit, *i.e.* its legal fees associated with its antitrust claim, is the lodestar analysis;

---

[10] *See Microsoft Corp. v. United Computer Resources of New Jersey*, 216 F.Supp.2d 383, 388 n.2 (D.N.J. 2002) (holding that paralegal fees are properly considered part of legal fees incurred).

Case 2:22-cv-04377-MN-JBC   Document 307-1   Filed 07/28/23   Page 110 of 173 PageID #:
13192
Case 2:10-cv-04413-FSN-JBC   Document 367-1   Filed 09/24/13   Page 44 of 49 PageID #:44

(23)  Quinn Emanuel's use of block billing as opposed to task billing is acceptable in the Third Circuit;

(24)  TransWeb's application for attorneys' fees should not be reduced due to 3M's perceived abusive litigation tactics;

(25)  For time spent traveling, TransWeb is entitled to recover 100% of its fees where substantial work was being performed in transit, 50% of its fees where little or no work was performed during transit and, for time entries that fell in between, the Special Master utilized his discretion;

(26)  68% of the housekeeping conference pertained to patent defense-related issues and 32% related to antitrust-related issues;

(27)  Because TransWeb's claims arose from a common core of facts, there will be no reduction in TransWeb's fees due to the fact that TransWeb did not prevail on its sham litigation claim;

(28)  Given the complexity of this matter, TransWeb's decision to conduct a mock trial on the patent defense-related claims was appropriate and reasonable;

(29)  3M has waived its defense that TransWeb failed to mitigate its damages;

(30)  TransWeb's hourly rates are appropriate especially given the complex nature of the patent and antitrust claims, TransWeb's inability to negotiate lower rates and TransWeb's resounding victory at trial;

(31)   For the TransWeb time entries in which 3M did not challenge the designation of "P" or "A", the Special Master determines that TransWeb is entitled to $20,773,552.  The supporting documentation for that number is set forth in a spreadsheet that was initially submitted by the parties containing the non-disputed time charges.  The Special Master has added three additional columns to that spreadsheet:  (i) the hourly rate approved by the Special Master for the lawyer; (ii) a multiplier of "3" or "1"; and (iii) the total amount awarded for that line item.  A multiplier of "3" was used for items that pertained to patent defense to capture the trebling, and "1" was used for line items that pertained to antitrust.  In that regard, attached hereto as Exhibit A is a spreadsheet of the non-challenged time entries;

(32)   For the TransWeb time entries in which the parties settled their differences at the hearing, the Special Master determines that TransWeb is entitled to $460,574.75.  The supporting documentation for that amount is set forth in Exhibit B.  Initially, the parties jointly submitted that spreadsheet to the Special Master before the June 5 hearing.  The first column represented the entry number that the parties disputed.[11]  After the June 5 hearing, the parties jointly submitted a

---

[11] Each sequential entry number represented a unique identifier for a particular time charge that was in dispute prior to the hearing.  Because the parties resolved some of the disputed entries at the hearing and not others, there is a separate attachment to the R&R for each group.  To maintain the unique identifier, the parties and the Special Master have kept the original entry number next to the particular time charge associated with it.  Accordingly, the Entry Numbers on the two attachments (Exhibits B & C) will not always be sequential.

Case 2:22-cv-04377-MN-JBC   Document 2017-1   Filed 07/28/23   Page 112 of 173   Page ID #:
13194
Case 2:10-cv-04413-FSN-JBC   Document 967-1   Filed 09/24/13   Page 46 of 49   PageID: 2446

spreadsheet for each of the entries where they had agreed upon the designation. The Special Master has added four columns to that spreadsheet to assist in the computation. The additional columns include: (i) the hourly rate approved by the Special Master; (ii) the hours discounted by the Special Master;[12] (iii) the multiplier; and (iv) the total;

(33)   The final category of time charges concerns those upon which there was disagreement by the parties. The Special Master determines that TransWeb is entitled to $4,912,366.70 for those disputed entries. The supporting documentation for that amount is set forth in Exhibit C. After the June 5 hearing, the parties jointly submitted to the Special Master a spreadsheet regarding all of the disputed entries. To that spreadsheet, the Special Master added six additional columns. They are as follows: (i) a column that shows the hourly rate utilized by the Special

---

[12] On September 23, 2011, Mr. Williams deposed Mr. Rousseau in Minneapolis and then traveled to St. Louis on another matter before returning to Los Angeles. The Special Master has determined that the time associated with the travel from Minneapolis to St. Louis was 2.6 hours. Further, the Special Master has concluded that 50% of that travel should be associated with this matter (because he would have had to returned to Los Angeles at some point), and 50% of that travel should be associated with the other matter because he had to travel to St. Louis regardless of the *TransWeb v. 3M* litigation. Accordingly, the Special Master concludes that Mr. Williams should be entitled to his full hourly rate for 10.1 hours, half of his hourly rate for 1.3 hours as it appears not much work was performed on this matter after Mr. Roussau's deposition, and 1.3 hours as non-recoverable because it pertained to a different case.

Master[13]; (ii) a travel-related rate multiplier; (iii) the number of travel or work

hours approved by the Special Master for a particular time entry[14]; (iv) a

percentage of work hours covered[15]; (v) a multiplier of "3" or "1" or "0" depending

---

[13] On some entries, the Special Master found that the time entry reflected work that could have been performed by a paralegal. For example, on April 27, 2012, one of the lawyers reviewed correspondence and reviewed and revised the case calendar. For that entry, the Special Master concluded that it could have been performed by a paralegal. Therefore, the Special Master adjusted the attorney's hourly rate to that of Quinn Emanuel's paralegals.

[14] The travel rate multiplier and approved travel hours were established to account for travel where no work was being performed. For such an entry, the portion of that entry that pertained only to travel was reduced by 50%. (*See supra*, p. 18.) For example, on November 14, 2011 (time entry number 260), Mr. Williams prepared for and participated in the Markman hearing and had a conference with in-house and local counsel, and then he returned to Los Angeles from Philadelphia. His time entry for that day was 16.5 hours and the Special Master determined that 9.0 hours was fully compensable and 7.5 hours should be reduced by 50%. The Special Master created two rows for that entry: 260(A) and 260(B). For the 9 hours of work done that day, the travel rate multiple was set at 1, meaning that all of Mr. Williams' time was compensable. This is set forth in row 260(A). For Mr. Williams' 7.5 hours of return travel, his travel rate multiplier was set to 0.5, meaning that the recovery for his return travel would be reduced by 50%. This is set forth in row 260(B). By contrast, on September 14, 2011 (time entry number 181), Mr. Wolfson traveled to Minnesota and prepared for the Grannis deposition. For that entry, all of Mr. Wolfson's time was compensable. For time entries where no travel occurred, the travel rate multiplier was always set to 1.

[15] For many disputed entries, the gravamen of the dispute concerned an allegation that TransWeb's time entry was too vague, and therefore, it should either be disallowed in its entirety or applied to antitrust costs of suit. However, as discussed above, the Special Master presumptively apportioned a time entry such as "prepare for trial" as 75% patent related and 25% antitrust related. Accordingly, to capture that, this column was established to reflect what portion of the work pertained to a particular category. As an example, on November 17, 2012 (time entry number 638), Ms. Roddy billed 9.0 hours for trial preparation. Thus, the

Case 2:22-cv-04377-MN-JHR   Document 301-1   Filed 07/28/23   Page 114 of 173 PageID #:
Case 2:10-cv-04413-FSH-JBC   Document 967-1   Filed 09/24/13   Page 43 of 49 PageID: 27448
13196

upon whether the time entry (or a portion of the time entry) was patent related,

antitrust related or miscellaneous;[16] and (vi) a total column, which reflects the total

amount awarded for that particular time entry.

---

Special Master created two rows for the entry both of which reflected 9.0 hours of
work.   However, on the first row, entry number 638(A), the Special Master
multiplied that number by .75 to show that three quarters of the 9.0 hours was
patent related.   On the second row, entry number 638(B), the Special Master
multiplied that number by .25 to show that one quarter of the 9.0 hours was
antitrust related.

[16] As discussed above, for many entries the Special Master allocated a portion of a
particular time entry to patent defense and a portion of a particular time entry to
antitrust.   Again using Roddy's November 17, 2012 time entry as an example,
which was discussed in footnote 13, entry 638(A) used a multiplier of 3 to reflect
the trebling of that portion of Ms. Roddy's time entry, and entry 638(B) used a
multiplier of 1 to reflect the antitrust portion of Ms. Roddy's entry.    Some entries
also used a multiplier of 0 for a portion of the entry.  This occurred for time that
was unrelated to patent defense and antitrust defense.  *See, e.g.*, Entry 335(B)
(finding that 5% of the time entry was not recoverable because it involved emails
for a stipulation of dismissal that did not relate to patent defense or TransWeb's
antitrust claims).

## <u>CONCLUSION</u>

For the reasons set forth above, the Special Master recommends and Orders that TransWeb is entitled to $20,773,552.00 for the time entries upon which 3M did not challenge; $460,574.75 for the time entries upon which the parties agreed upon at the June 5, 2013 hearing, and $4,912,366.70 for the disputed time entries. Thus, the total amount of TransWeb's fees and costs is $26,146,493.45.

/s/   *Alfred M. Wolin*
**SAIBER LLC**
18 Columbia Turnpike
Suite 200
Florham Park, New Jersey 07932
(973) 622-3333

DATED:  September 24, 2013

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GUARDANT HEALTH, INC. | |
|       Plaintiff/Counterclaim-Defendant | |
| v. | C.A. No. 17-cv-1623-LPS-CJB |
| PERSONAL GENOME DIAGNOSTICS, INC., | **FILED UNDER SEAL** |
|       Defendant/Counterclaim-Plaintiff. | |
| GUARDANT HEALTH, INC. | |
|       Plaintiff/Counterclaim-Defendant | |
| v. | C.A. No. 17-cv-1616-LPS-CJB |
| FOUNDATION MEDICINE, INC., | **FILED UNDER SEAL** |
|       Defendant/Counterclaim-Plaintiff. | |

## GUARDANT HEALTH, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE THE TESTIMONY OF DR. BRADLEY REIFF

Dated: December 10, 2019

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
WEIL, GOTSHAL &MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff*

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................ 5

I.     Undisputed Material Facts Regarding the Talasaz Patents................................... 5

II.    Undisputed Material Facts Regarding the Steemers Presentation ...................... 5

III.   Undisputed Material Facts Regarding the '992 Patent ....................................... 5

IV.   Undisputed Material Facts Regarding The Highly Competitive CLB Space .................... 6

SUMMARY JUDGMENT LEGAL STANDARD ....................................................... 8

SUMMARY JUDGMENT ARGUMENT ..................................................................... 8

I.     DEFENDANTS' INVENTORSHIP DEFENSE AND COUNTERCLAIMS FOR
UNENFORCEABILITY OF THE TALASAZ PATENTS FAIL AS A MATTER
OF LAW ............................................................................................................... 8

II.    FMI CANNOT MEET ITS BURDEN TO CLEARLY AND CONVINCINGLY
PROVE OBVIOUSNESS ................................................................................... 21

III.   PGDX'S MONOPOLIZATION COUNTERCLAIMS FAIL AS A MATTER OF
LAW ON MULTIPLE, INDEPENDENT GROUNDS .................................... 23

*DAUBERT* MOTION LEGAL STANDARD .............................................................. 39

*DAUBERT* ARGUMENT ............................................................................................ 40

I.     DR. REIFF'S OPINIONS ON ANTICOMPETITIVE EFFECTS ARE
UNRELIABLE AND DO NOT FIT THE  FACTS OF THE RELEVANT
MARKET ............................................................................................................ 40

II.    DR. REIFF'S OPINION ON MONOPOLY POWER IS UNRELIABLE ...................... 46

III.   DR. REIFF IS UNQUALIFIED TO PROVIDE AN OPINION ON THE '992
PATENT .............................................................................................................. 47

IV.   DR. REIFF'S DAMAGES OPINION IS INADMISSIBLE FOR NUMEROUS
REASONS ........................................................................................................... 47

CONCLUSION ................................................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) ................................................................. 22

*Aequus Techs., L.L.C. v. gh, L.L.C.*,
   Civ. No. 03–5139, 2011 WL 310668 (D.N.J. Jan. 28, 2011) ................................. 48

*Apotex, Inc. v. Cephalon, Inc.*,
   321 F.R.D. 220, 228 (E.D. Pa. 2017)......................................................... 50

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990)........................................................................ 37

*Augustine Med., Inc. v. Mallinckrodt, Inc.*,
   Case No. 01-387-SLR, 2003 WL 1873836 (D. Del. Apr. 9, 2003) ....................... 37, 38, 39, 46

*Barr Labs, Inc. v. Abbot Labs*,
   978 F.2d 98 (3d Cir. 1992) ................................................................ 30, 34

*Baxter Int'l Inc. v. McGaw, Inc.*,
   149 F.3d 1321 (Fed. Cir. 1998) .............................................................. 18

*Bone Care Int'l, LLC v. Pentech Pharm., Inc.*,
   No. 08-cv-1083, 2010 U.S. Dist. LEXIS 39984 (N.D. Ill. Apr. 23, 2010).................... 17

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)........................................................................ 47

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
   429 U.S. 477 (1977)...................................................................... 26, 27

*Brunswick Corp. v. Riegel Textile Corp.*,
   752 F.2d 261 (7th Cir. 1984) .......................................................... 25, 26, 42

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
   350 F.3d 316 (3d. Cir. 2003) ............................................................... 40

*California Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972)........................................................................ 33

*Caterpillar Inc. v. Sturman Indus., Inc.*,
   387 F.3d 1358 (Fed. Cir. 2004) .............................................................. 13

*Coleman Motor Co. v. Chrysler Corp.,*
    525 F.2d 1338 (3d Cir. 1975) ................................................................ 49, 50

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) ......................................................... 40, 44, 46

*Consol. Aluminum Corp. v. Foseco Int'l, Ltd.,*
    910 F.2d 804 (Fed. Cir. 1990) ............................................................... 16, 18

*CVD, Inc. v. Raytheon,*
    769 F.2d 842 (1st Cir. 1985) ........................................................................ 49

*Daubert v. Merrell Dow Pharm.,*
    509 U.S. 579 (1993) .................................................................................... 40

*Eli Lilly & Co. v. Aradigm Corp.,*
    376 F.3d 1352 (Fed. Cir. 2004) .................................................................... 9

*Eon Corp. IP Holdings, LLC v. T-Mobile USA, Inc.,*
    No. 6:10-cv-379-LED-JDL, 2011 WL 13134896 ...................................... 19

*eSpeed, Inc. v. Brokertec USA, LLC,*
    417 F. Supp. 2d 580 (D. Del. Feb. 22, 2006) .............................................. 20

*Ethicon, Inc. v. U.S. Surgical Corp.,*
    135 F.3d 1456 (Fed. Cir. 1998) ............................................................... 9, 12

*Forest Labs., LLC v. Sigmapharm Labs., LLC,*
    918 F.3d 928 (Fed. Cir. 2019) ..................................................................... 21

*FTC v. Whole Foods Mkt., Inc.,*
    548 F.3d 1028 (D.C. Cir. 2008) ................................................................... 41

*General Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ............................................................................... 40, 46

*Handgards, Inc. v. Ethicon, Inc.,*
    743 F.2d 1282 (9th Cir. 1984) ..................................................................... 49

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.,*
    423 F.3d 374 (3d Cir. 2005) ................................................................... 29, 33

*Hess v. Advanced Cardiovascular Sys., Inc.,*
    106 F.3d 976 (Fed. Cir. 1997) ....................................................................... 9

*Hoffmann-La Roche, Inc. v. Promega Corp,*
    319 F. Supp. 2d 1011 (N.D. Cal. 2004) ...................................................... 17

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ........................................................................... 30

*In re Dollar Tree, Inc.*,
    File No. 141-0207, 2015 WL 4484209 (F.T.C. July 13, 2015) ................................. 43

*J. Truett Payne Co., Inc., v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981) ........................................................................... 42

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing*,
    588 F.3d 908 (6th Cir. 2009) ........................................................... 41, 43, 44

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
    No. 2:06–cv–1797, 2014 WL 982848 (E.D. Pa. Mar. 13, 2014 ............................. 25

*Kolcraft Enterprises, Inc. v. Graco Children's Prod., Inc.*,
    927 F.3d 1320 (Fed. Cir. 2019) ............................................................. 11

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................... 40

*Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*,
    No. 07–127–LPS–MPT, 2014 WL 529983 (D. Del. Feb. 7, 2014) ........................ 47

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................ 8

*Medtronic Minimed Inc. v. Smiths Med. MD Inc.*,
    371 F. Supp. 2d 578 (D. Del. 2005) ........................................................ 38

*Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd.*,
    362 Fed. Appx. 332 (3d Cir. 2010) ........................................................ 39

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
    838 F.3d 421 (3d Cir. 2016) ........................................................ 29, 35, 41

*Nartron Corp. v. Schukra U.S.A. Inc.*,
    558 F.3d 1352 (Fed. Cir. 2009) ......................................................... 8, 15

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000) .............................................................. 40

*Pers. Web Techs., LLC v. Apple, Inc.*,
    848 F.3d 987 (Fed. Cir. 2017) ............................................................ 21

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    2009 WL 4928024 (D. Del. Dec. 18, 2009) ............................................... 17

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010) .................................................. 30

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................ 29

*ScentSational Techs. LLC v. PepsiCo, Inc.*,
    773 F. App'x 607 (Fed. Cir. 2019)........................................ 9

*Sonos, Inc. v. D & M Holdings, Inc.*,
    297 F. Supp. 3d 501 (D. Del. 2017)...................................... 48

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ............................................................ 28

*Sprint Commc'ns Co., L.P. v. Charter Commc'ns, Inc.*,
    Case No. 1:17-cv-01734-RGA, 2019 WL 1082067
    (D. Del., Mar. 7, 2019) .................................................. 38, 39, 48

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
    537 F.3d 1357 (Fed. Cir. 2008) ........................................... 16

*TransWeb, LLC v. 3M innovative Props., Co.*,
    812 F.3d 1295 (Fed. Cir. 2016) ..................................... passim

*Tunis Bros. Co., Inc. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991) ................................................ 27

*U. S. v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956).......................................................... 29

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ...................................... 27, 30, 35

*United States v. Grinnell Corp.*,\
    384 U.S. 563 (1966)....................................... 28, 35, 36

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)........................................................ 35, 47

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965)..................................................... passim

## Statutes

15 U.S.C. § 15(a) ............................................................ 37

FED. R. EVID. 702 ...................................................... 39, 40

FTC Act § 13(b)..................................................................................................................... 41

## INTRODUCTION

Dr. AmirAli Talasaz is the sole inventor of the asserted '731, '822, and '743 Patents ("Talasaz Patents"). To attempt to avoid liability for infringing these patents, Defendants have concocted a story that Dr. Helmy Eltoukhy, co-founder and current CEO of Guardant, jointly conceived of the inventions of the Talasaz Patents with Dr. Talasaz while Dr. Eltoukhy still employed by Illumina. However, Defendants' story is not supported by the evidence, much less the clear and convincing evidence required to prove that Dr. Talasaz was not the sole inventor.

Dr. Talasaz and Dr. Eltoukhy both worked on DNA sequencing at Illumina between 2009 and 2012. While at Illumina, they jointly founded Guardant in 2011 with the "idea of using cell-free DNA for the detection and monitoring cancer." Illumina was aware of their efforts, which could result in a major new customer for Illumina. After being asked to remain at Illumina for 6 months, Dr. Talasaz left in June 2012 to work at Guardant full-time. There, Dr. Talasaz first conceived of the inventions in the Talasaz Patents and filed U.S. Provisional Application No. 61/696,734 ("2012 Provisional") on September 4, 2012. Dr. Eltoukhy was a Guardant advisor, investor, and board member in 2012 and became a Guardant employee in January 2013.

Both Dr. Talasaz and Dr. Eltoukhy—the two people most knowledgeable about whether Dr. Eltoukhy conceived the Talasaz Patents—have consistently maintained that Dr. Talasaz solely conceived of the inventions. Defendants have not identified evidence that creates a material dispute of fact, and their own experts' admissions undermine their allegation. Defendants cite Illumina documents and communications from Dr. Eltoukhy to Dr. Talasaz allegedly showing aspects of the claimed invention, but all this evidence shows is information from Illumina that is undisputedly prior art. Defendants mainly rely on three slides ("Steemers Presentation") created by Dr. Frank Steemers, an Illumina employee, sent in June 2012 to Dr. Eltoukhy who forwarded them to Dr. Talasaz. As an initial matter, the Steemers Presentation was not drafted by Dr. Eltoukhy. Thus, it

cannot show that Dr. Eltoukhy conceived of any ideas in that presentation. Additionally, the Steemers Presentation undisputedly reflects the prior art at the time. A person who contributes nothing more than prior art is not a joint inventor. Thus, this presentation, even if it were written by him, does not show that Dr. Eltoukhy was improperly left off the Talasaz Patent applications.

Tellingly, Illumina, who under Defendants' theory would have co-ownership of the Talasaz Patents, has not laid claim to these inventions despite being subpoenaed by Defendants and participating in discovery. In fact, Guardant has been a steadfast Illumina customer since the beginning and has purchased Illumina sequencers as early as 2012.

For these reasons, summary judgment is proper on Defendants' inventorship and inequitable conduct allegations. PGDx D.I. 284 (Counterclaims IX-XII) and FMI D.I. 168 (Counterclaims 3, 6, 9, 12).[1]

Additionally, summary judgment is proper on FMI's obviousness allegations. FMI fails to provide sufficient support for its 14 different obviousness combinations by failing to explain how or why a skilled artisan would have combined them. Instead, Dr. Stacey Gabriel, FMI's expert, treats the prior art as a grab bag, and pieces together various aspects of references until it allegedly adds up to the claimed inventions. Dr. Gabriel admits that the only reason she combined some of the references was that they were "relevant." This type of analysis fails to meet FMI's burden to provide clear and convincing evidence that a person of ordinary skill in the art would have been motivated to combine the prior art. For these reasons, summary judgment is appropriate.

Further, summary judgment is proper on PGDx's antitrust claims. The heart of PGDx's Sherman Act Section 2 counterclaims is that Guardant's enforcement of its patent rights protecting

---

[1] All docket citations reference the 17-cv-01623 docket unless otherwise noted. "FMI D.I." references the 17-cv-01616 docket.

its ground-breaking cancer diagnostic technology will inappropriately harm competition. But now that discovery is over, PGDx has no evidence from a single patient, oncologist, pharmaceutical manufacturer, medical insurer, or competitor to support its theory. And, FMI, another Guardant competitor, does not assert these claims against Guardant.  Far from being a "monopolist," Guardant is a first-mover in a competitive and emerging marketplace where large, powerful buyers control prices. As a result, PGDx has **no evidence** that Guardant's enforcement of its patent rights will increase prices, lower output, or reduce the quality of comprehensive liquid biopsy tests. Put simply, PGDx's counterclaims turn antitrust law on its head and run afoul of Supreme Court precedent that antitrust law **protects competition, not competitors**.

Accordingly, Guardant moves for summary judgment with respect to Count XIII and Count XIV on several, independent grounds. **First**, PGDx's antitrust counterclaims fail because there was no inequitable conduct. **Second**, the Patents-in-Suit encompass patentable technology. Even if PGDx's inventorship contentions were right (and they are not), the Patents-in-Suit would still be valid and held, under their theory, jointly by Guardant and Illumina. This conduct cannot violate Sherman Act Section 2 because it did not create a monopoly *that would not otherwise exist*. **Third**, a private antitrust plaintiff, like PGDx, must show harm to competition. PGDx has a complete failure of proof across every competition metric **(price, output, quality)** and there is no evidence that any customer has been or will be harmed. **Fourth**, no reasonable fact-finder could conclude that Guardant has the "monopoly power" to control prices and exclude competition in an industry that is growing rapidly from existing and potential entrants fueled by large outside investors, and where no firms are making any money. **Fifth**, PGDx cannot show Guardant has "willfully acquired" any "monopoly power" through anticompetitive conduct when, with the sole exception of this lawsuit, all of Guardant's commercial practices identified by PGDx are **procompetitive**.

*Lastly*, discovery has borne out that PGDx's claimed lost profit damages from supposedly lost "customers, investors, and opportunities" due to Guardant's conduct also were meritless. PGDx's attorney's fees and costs to defend this patent infringement lawsuit, standing alone without any harm to competition from such lawsuit, are not cognizable antitrust damages.

In addition, the opinions of PGDx's economic expert, Dr. Bradley Reiff, are unreliable. *First*, Dr. Reiff attempts to prove actual harm to competition based on a single firm's conduct by misapplying tests used *exclusively* in the merger context under a different statute—Clayton Act Section 7. This is why Dr. Reiff has no calculation of what prices Guardant would charge if it can enforce its patent rights and he does not know what would happen to output. *Second*, even if such merger tests could be applied for this purpose (and they should not be), Dr. Reiff misapplied them and ignored all sorts of highly relevant inputs that merger regulators consider when applying these tests in the merger context, i.e., actual prices before the merger, views of customers, and views of competitors. *Third*, Dr. Reiff fails to disaggregate the purported effects of Guardant's anticompetitive conduct from the effects of Guardant's legal and procompetitive conduct. Thus, even if Dr. Reiff could show harm to competition (which he cannot), he cannot prove that any such harm was the result of Guardant's alleged anticompetitive conduct. *Fourth*, Dr. Reiff's opinion on the "monopoly power" of Guardant is of no utility to any fact-finder as it yields "false positives" in this and virtually every industry and was premised in part on Guardant testimony that he misinterpreted. *Fifth*, Dr. Reiff's testimony concerning patent related issues are inadmissible because he does not possess the required specialized expertise in patent law. *Finally*, Dr. Reiff's damages "calculation" merely adds up the fee and cost information from highly redacted summaries of invoices and trebles the amount. Dr. Reiff did no independent analysis of the bills, is not qualified to analyze legal bills, and failed to disaggregate the legal fees amongst the various

patents-in-suit, and, as result, his opinion will not help the trier of fact.  Guardant respectfully

requests the entry of summary judgment on Count XIII and Count XIV of PGDx's counterclaims,

and the exclusion of Dr. Reiff's expert testimony.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.    Undisputed Material Facts Regarding the Talasaz Patents**

Defendants do not dispute that Dr. AmirAli Talasaz is properly named as an inventor. *See*

*generally* D.I. 284 (PGDx Ans. To 3rd Amd. Complaint), Counterclaims, D.I. 168 (FMI Ans. To

3rd Amd. Complaint), Counterclaims. Defendants also do not dispute that Dr. Eltoukhy does not

claim to be an inventor of the Talasaz Patents. *Id.*

**II.    Undisputed Material Facts Regarding the Steemers Presentation**

On June 27 and 28, 2012 Dr. Eltoukhy received the Steemers Presentation. Ex. 58. Shortly

after receiving it, Dr. Eltoukhy forwarded it to Dr. Talasaz. Ex. 1. The information in the Steemers

Presentation was prior art at the time it was sent. Ex. 2 (Cooper PGDx Rebuttal) ¶ 393; Ex. 3 ¶ 429

(Cooper FMI Rebuttal); Ex. 4 (Harismendy Rpt.) ¶ 1233; Ex. 5 at 347:8-19 (Metzker Dep.).

**III.    Undisputed Material Facts Regarding the '992 Patent**

Defendants do not dispute that the '992 Patent properly lists Dr. Eltoukhy and Dr. Talasaz

as inventors. *See* PGDx D.I. 284, Counterclaims ¶ 31; FMI D.I. 168, Counterclaims ¶¶ 57-62. Dr.

Talasaz began his employment at Guardant in July 2012, *see* Ex. 6 at 23:6-7 (Talasaz Dep.), and

Dr. Eltoukhy in January 2013, *see* Ex. 7 at 23:4-5 (Eltoukhy Dep.). The family of patents giving

rise to this litigation began with the filing of four provisional applications by Guardant from

September of 2012 to July of 2013—U.S. Provisional Application Numbers 61/696,734,

61/704,400, 61/793,997, and 61/845,897. The '731, the '743, and the '822 Patents ("Talasaz

Patents") are continuations of Application Number 14,425,189, which claims priority to all four

of the above-referenced provisional applications. *See* D.I. 20-1 – 20-3. The '992 Patent resulted

from a related but distinct priority chain. The '992 Patent is a continuation of Application Number 14,855,301, which is a continuation of PCT Number US2014/00048. *See* D.I. 20-4. PCT Number US2014/00048 is a continuation in part of Application Numbers 14,425,189 and PCT/US2013/058061, and claims priority to provisional application number 61/948,530. *See id*.

## IV.     Undisputed Material Facts Regarding The Highly Competitive CLB Space

*CLB Market is New and Growing*. Prior to the advent of the first CLB product (Guardant360) by Guardant in 2014, patients being tested for cancer had to rely on invasive tissue biopsies. *See* Ex. 8 (Guardant Press Release); Ex. 9 at -263 (Cowen Report (2018)). Since that time, others, including PGDx and FMI, have entered the market. Ex. 10 (PGDx Press Release (2016)); Ex. 11 (FMI About Website); Ex. 12 ¶ 13 (Reiff Rpt.); Ex. 13 ¶¶ 66–67 (Becker Rebuttal); Ex. 48 ¶ 30 (Reiff Reply). As such, it is undisputed that the CLB market is a new market. ███████

███████████████████████████████████████████████████████

██████████████              REDACTED              ████████████████

This new market is rapidly expanding, as output in the market has been increasing, Ex. 12 at Exhibit 4 (Reiff Rpt.), new entrants have joined the market, and ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ Current market players have received significant investments. *See* Ex. 13 ¶ 67 (Becker Rebuttal). For example, Roche completed its acquisition of FMI valued at $5.3 billion in June 2018. Ex. 22.

REDACTED

and is currently planning an initial public offering in 2020. Ex. 24.

*Guardant Has a Superior Product.* Guardant has effectively advocated for adoption and coverage of liquid biopsy tests by publishing 80 articles and undertaking 29 clinical outcome studies. Ex. 9 at -262-263. Additionally, Guardant's product has a faster turnaround time than those

of its competitors, Ex. 25 at -125 (Civik Ex. 6); Ex. 18 at -239, and has consistently won bake-offs

against its competitors. Ex. 26 at -344. Likewise, Guardant has regularly been recognized as the

leading innovator and pioneer in the market. Ex. 18 at -228; *see also* Ex. 23 at -344.


REDACTED


***Guardant Has No Pricing Power.*** Guardant sells its products and services to: (1) clinicians

working as oncologists at hospitals and in private practice, where Guardant seeks reimbursement—

from either government or other large private insurers—for its products or services ordered by

oncologists and provided to patients, Ex. 15 at 3; and (2) pharmaceutical companies such as Merck,

Pfizer, Novartis, and AstraZeneca. Ex. 50 at Pharma Detail Tab. Guardant's prices to both of these

customers ███████████████████████████████████ Ex. 13, Ex. SLB-1 (Becker

Rebuttal), and have roughly remained the same over time. Ex. 29.

In the clinical space, Guardant and its competitors obtain payment by seeking

reimbursement from insurers. Reimbursement is a key factor and consideration in the industry for

Guardant, ████ and FMI. *See* Ex. 15 at 3, 17-18, 79 (Guardant 10-K (2018)); ██████████

Ex. 17 at 24 (FMI 10-K (2017)). With respect to government insurers, Medicare sets the scope of

coverage as well as a fixed reimbursement rate for Guardant's product. Ex. 15 at 3 (Guardant 10K

(2018)); *see also* Ex. 17 at 24–25 (FMI 10-K (2017)). With respect to private insurers, payment

varies depending on whether Guardant has contracted with the insurer as a "participating provider." Insurers generally reimburse participating providers pursuant to a negotiated fee schedule, but only for covered uses. Ex. 15 at 3 (Guardant 10-K (2018)). For non-participating providers, insurers have discretion in setting the reimbursement rate, and in some cases do not reimburse the providers at all. Ex. 15 at 3, 17-18, 79 (Guardant 10-K (2018)); Ex. 17 at 24 (FMI 10-K (2017)). Therefore, the list price set by Guardant is only tangentially related to the payment received by clinical customers.

In the pharmaceutical space, Guardant conducts substantial repeat business with large pharmaceutical companies whom Guardant seeks to build long term relationships

REDACTED            These pharmaceutical companies leverage their size and understanding of the services provided in negotiating discounted prices with suppliers. Furthermore, many of Guardant's current contracts with pharmaceutical customers will run for multiple years at the agreed upon prices, limiting Guardant's ability to change pricing. Ex. 13 ¶ 94 (Becker Rebuttal).

## SUMMARY JUDGMENT LEGAL STANDARD

Guardant is "entitled to summary judgment as a matter of law" if it "shows that there is no genuine dispute as to any material fact." Defendants must then "come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## SUMMARY JUDGMENT ARGUMENT

**I. DEFENDANTS' INVENTORSHIP DEFENSE AND COUNTERCLAIMS FOR UNENFORCEABILITY OF THE TALASAZ PATENTS FAIL AS A MATTER OF LAW**

### A.   Legal Standard

Inventorship is a question of law based on underlying facts. *Nartron Corp. v. Schukra U.S.A. Inc.*, 558 F.3d 1352, 1356 (Fed. Cir. 2009). Furthermore, "[t]he inventors as named in an

issued patent are presumed to be correct." *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997) (internal citations omitted). A party alleging non-joinder of inventors "must meet the heavy burden of proving its case by clear and convincing evidence." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004).

"[T]he alleged co-inventor must prove his contribution to the conception of the invention by more than his own testimony concerning the relevant facts." *ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607, 611 (Fed. Cir. 2019) ("To satisfy that burden [of inventorship], the alleged co-inventor must prove his contribution to the conception of the invention by more than his own testimony concerning the relevant facts."). *Id.* "Taken together, the alleged co-inventor's testimony and the corroborating evidence must show inventorship by clear and convincing evidence." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1464 (Fed. Cir. 1998).

### B. Defendants Cannot Show By Clear And Convincing Evidence That The Inventorship Of The Talasaz Patents Is Wrong

Defendants have supplied no material evidence—corroborating or otherwise—showing that someone other than Dr. Talasaz contributed anything beyond prior art. Through Dr. Harismendy's (PGDx) and Dr. Metzker's (FMI) expert reports, Defendants cite to a multitude of piecemeal documents related to Illumina's work on sequencing to support their claim that Dr. Eltoukhy or a large group of Illumina employees contributed to the conception of the Talasaz Patents. However, these documents fail to support Defendants' conflicting theories.

#### 1. Dr. Eltoukhy And Dr. Talasaz Have Consistently Identified Dr. Talasaz As The Sole Inventor

The two people best positioned to know whether Dr. Eltoukhy is a co-inventor of the Talasaz Patents are Dr. Talasaz and Dr. Eltoukhy. Both have consistently testified that Dr. Talasaz was the sole inventor of each claim.

Q: Okay. And so – so your testimony is that AmirAli is the sole inventor on

9

the first three, and you are only a co-inventor with Stefanie Mortimer on the
'992?

A: I believe that's the case, yes.

Ex. 7 at 277:8-12 (Eltoukhy Dep.); Ex. 31 at 507:4-6 (Talasaz Dep.) ("I don't recall any technical

contribution in the inventions that we are talking about by [Dr. Eltoukhy]. This was my field.").

Dr. Harismendy admitted that he did not even know whether Dr. Eltoukhy ever conceived

of the claimed inventions in the Talasaz Patents:

A: Do you know if he ever arrived at a definite and permanent idea of the
complete and operative invention at any point in time?

A: I don't know that.

Ex. 32 at 432:17-20 (Harismendy Dep.). Likewise, Dr. Metzker admitted that he has performed no

analysis as to whether Dr. Talasaz was the first to conceive of the inventions claimed in the Talasaz

Patents even though he is named as the sole inventor and that is apparently being challenged:

Q. Okay. With respect to the '822, '743 and '731 patents, those three
patents, do you have any reason to deny that Dr. Talasaz was the first person
to have a firm and definite idea of the claim combination as a whole of those
claims?

A. I haven't done that analysis. I have no opinion.

Ex. 33 at 86:5-12 (Metzker Dep., 10/7/19). Further, Dr. Metzker did not even know if Dr. Eltoukhy

participated in the conception or the development of the Talasaz Patents while at Illumina:

Q. Did Dr. Eltoukhy participate in the conception or the development of the
inventions of the claims-in-suit while at Illumina?

A. I'll give you the same answer. I can't go any further than what's stated in
this paragraph. I haven't -- *I haven't done that analysis.* I would need more
time to think about that, and I would probably need to look at more
documents.

Ex. 5 at 414:2-11 (objections omitted).  He also could not identify a single idea that came from

just Dr. Eltoukhy. Ex. 5 at 327:23-24 (Metzker Dep., 10/8/19) ("I cannot identify just an idea from

Dr. Eltoukhy").

The necessary implication of Dr. Harismendy and Dr. Metzker not knowing if Dr. Eltoukhy ever participated in the conception of the Talasaz Patents or if Dr. Talasaz was the first person to have a firm and definite idea of the claim combination is that Defendants have not satisfied the legal standard of proving that the inventorship on the Talasaz Patents is wrong. *See Kolcraft Enterprises, Inc. v. Graco Children's Prod., Inc.*, 927 F.3d 1320, 1324 (Fed. Cir. 2019) ("Conception is the formation, in the mind of the inventor of a ***definite and permanent idea*** of the complete and operative invention, as it is thereafter to be applied in practice.") (internal citations omitted) (emphasis added).

As discussed below, in the face of all this, the documents and testimony cited by Defendants and their experts are insufficient to allow a reasonable jury to conclude that Defendants' burden is met.

### 2. The Steemers Presentation Is Not Evidence That Dr. Eltoukhy Jointly Conceived of the Invention

Defendants both rely on the fact that Dr. Eltoukhy forwarded the Steemers Presentation to Dr. Talasaz. Ex. 1. The forwarding of documents by Dr. Eltoukhy—documents that Dr. Eltoukhy neither wrote not created—does not constitute evidence of joint inventorship ***by Dr. Eltoukhy***. For the other Illumina employees, including Dr. Steemers, they still do not satisfy Defendants' burden of proof, because the Steemers Presentation reflects an approach already in the prior art—Kinde, as Dr. Metzker admitted:

> Q: Can you identify anything different? Can you identify anything meaningful in the – in the Steemers documents that's not disclosed in Kinde?
>
> * * *
>
> A: Not in a meaningful way.

Ex. 5 at 347:8-19 (Metzker Dep., 10/8/19). Dr. Harismendy admitted he had not even analyzed the

possibility. Ex. 32 at 441:25-442:6 (Harismendy Dep.). Indeed, PGDx does not allege that other Illumina employees are inventors, even if though FMI argues they are.

Dr. Harismendy also admitted that he did not have evidence one way or the other whether Dr. Talasaz independently came up with the concepts in the Steemers Presentation. Ex. 32 at 476:16-481:21 (Harismendy Dep.) ("I don't know if Dr. Talasaz conceived the concept of the Steemers slides."). And, Dr. Harismendy was unsure whether the information in the Steemers Presentation was redundant to information that Dr. Eltoukhy had already known in the prior art. Ex. 32 at 445:13-446:3 (Harismendy Dep.). Notably, while Dr. Harismendy recognized that Guardant's expert Dr. Cooper explained that the approach disclosed in Steemers is similar to the Kinde prior art, he does not dispute this point. Ex. 4 ¶ 1233 (Harismendy Rpt.); Ex. 32 at 439:19-442:6 (Harismendy Dep.).

Because Defendants do not dispute that the information in the Steemers Presentation was disclosed in the Kinde prior art, Dr. Eltoukhy's receipt of the Steemers Presentation cannot prove that he is an inventor of the Talasaz Patents. Indeed, a person cannot be an inventor if they only contribute what was already known to one of skill in the art. *See Ethicon*, 135 F.3d at 1460 ("One who simply provides the inventor with well-known principles or explains the state of the art without ever having a firm and definite idea of the claimed combination as a whole does not qualify as a joint inventor."). Thus, PGDx's reliance on Dr. Eltoukhy's transmission of the Steemers Presentation to support its argument that Dr. Eltoukhy is an inventor of the Talasaz Patents should not survive summary judgment.

### 3. The Remaining Materials Identified By Defendants Are Not Evidence That Dr. Eltoukhy Jointly Conceived The Invention

PGDx's Dr. Harismendy next relies on conversations between Dr. Eltoukhy and Dr. Talasaz, in which they discuss ███████████████████████



. *See Caterpillar Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1377-78 (Fed. Cir. 2004) (insignificant contributions are insufficient to invalidate a patent for improper inventorship).

The remainder of the PGDx's evidence focuses on statements revolving around emails sent from and received by Dr. Eltoukhy regarding:

. Dr. Harismendy also relies on the testimony of other Guardant employees Stefanie Mortimer (Ex. 4 ¶¶ 1245-47 (Harismendy Rpt.)); Richard Lanman (Ex. 4 ¶¶ 1248-50 (Harismendy Rpt.)), Justin Odegaard (Ex. 4 ¶ 1251 (Harismendy Rpt.)). However, Dr. Odegaard and Dr. Lanman were only relaying on what they believed to be company lore—not direct knowledge, and Dr. Harismendy admitted at various times during his deposition that reliance on these sources was imprudent. Ex. 32 at 457:9-13, 462:6-17. Likewise, with respect to Dr. Mortimer's testimony, Dr. Harismendy relies on an alleged conception in Dr. Eltoukhy's "pool house", but Dr. Mortimer made clear that this was only her understanding regarding the conception of the company and she "was not there." Ex. 35 at 23:14-24:15 (Mortimer Dep.).

In support of FMI's theory that multiple Illumina employees substantially contributed to the conception of the Talasaz Patents, Dr. Metzker relies on documents that show only prior art

and individual elements, not the claimed invention as a whole. Like with the Steemers Presentation, Dr. Metzker cannot dispute that the Illumina information he cites was in the prior art. Ex. 33 at 151:17-23 (Metzker Dep.) ("I did not do a prior art comparison with confidential Illumina documents."); *see also id.* at 245:18-20 ("Again, I know what was going on in Illumina. I did not look at the prior art of what was going on in the prior art."). A person who does not contribute beyond what was known to a skilled artisan is not a joint inventor. *See supra* Section I.B.2. Further, Dr. Metzker admitted he has no opinion as to whose idea it was to combine the different steps for any claims-in-suit:

> Q. . . . ***Do you have any idea whose idea it was to combine the different steps of Claim 1 of the '731 patent in order to make that claimed invention?***
>
> * * *
>
> A. I have no opinion on that.
>
> Q. Do you have an opinion on that for ***any of the claims-in-suit***?
>
> A. ***I do not***.

Ex. 33 at 75:7-20. Without evidence that someone contributed an inventive aspect of the invention (not just non-inventive steps or prior art), FMI's claim fails.

Dr. Metzker repeatedly relies on a document entitled, "███████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ That Dr. Eltoukhy was in possession of a document related to general sequencing methods cannot prove conception of the claimed invention by Dr. Eltoukhy himself, or anyone else at Illumina. Indeed, there is no disclosure anywhere in this document of any process that remotely resembles anything like the claimed invention of the Asserted Patents. *See* Ex. 3 ¶ 449. Documents like this and the

many others that FMI and Dr. Metzker rely upon amount to isolated disclosures of general individual concepts, in a context wholly unrelated to the claimed invention. *See Nartron Corp. v. Schukra U.S.A. Inc.*, 558 F.3d 1352, 1356 (Fed. Cir. 2009).

For these reasons, there is no genuine issue of material fact and Defendants' inventorship defenses fail as a matter of law. Defendants simply lack proof of inventors other than Dr. Talasaz.

### 4. Illumina Knew Of Dr. Eltoukhy's And Dr. Talasaz's Effort With Guardant And Did Not Raise Objections

Dr. Eltoukhy's and Dr. Talasaz's supervisor at Illumina was Mostafa Ronaghi, Illumina's Chief Technology Officer. █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

Additionally, Guardant has been a continual customer of Illumina since 2012. ████████

████████████████████████████████████████████████████

███████████   Indeed, the Asserted Patents disclose the use of an Illumina sequencer and Guardant360 uses Illumina sequencers today. *See, e.g.*, D.I. 20-1 at 58:46-48 ('731 Patent). Illumina has also been directly involved in this case. Illumina was subpoenaed by PGDx and has produced █████ pages of documents including Dr. Eltoukhy's emails when he was still employed by Illumina. Ex. 40 (PGDx Illumina Subpoena); Ex. 41 (FMI Illumina Subpoena). Illumina has participated in a discovery hearing in this case and is well aware of PGDx's allegations. *See* 8/5/2019 Minute Entry for proceedings held before Judge Burke.

Illumina has not asserted that Dr. Eltoukhy or anyone else at Illumina is an inventor.

### C. Defendants Cannot Prove Inequitable Conduct For The Talasaz Patents

Because the evidence cannot support Defendants' claim of improper inventorship for the Talasaz Patents, their inequitable conduct claims must fail as well. Because Dr. Talasaz was correctly named as the sole inventor of the Talasaz Patents, there could be no fraud on the Patent Office. Further, Defendants must show that the specific intent to deceive is "the single most reasonable inference able to be drawn from the evidence" and have not done so. *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008).

For these reasons, there can be no genuine issue of material fact that Defendants' counterclaims for unenforceability of the Talasaz Patents fail as a matter of law.

### D. The '992 Patent Is Enforceable Even Under Defendants' Radical View of Infectious Inequitable Conduct

The '992 Patent is a continuation-in-part to the parent application of Talasaz Patents and names Dr. Eltoukhy, Dr. Talasaz, and Dr. Mortimer as inventors.  D.I. 20-4.  It is undisputed that the inventors are properly named on the '992 Patent. Ex. 42 at 33 (PGDx 5/13/2019 invalidity contentions); FMI D.I. 168, Counterclaims ¶¶ 57-62; *see also* D.I. 285 (Guardant's Motion to Dismiss PGDx's Counterclaims) at 3. Instead, Defendants claim that the '992 Patent is unenforceable by virtue of infectious inequitable conduct. This theory fails as a matter of law.

Under the doctrine of infectious unenforceability, a finding of inequitable conduct with regard to an earlier patent application may render the claims of a later, related patent unenforceable only where the inequitable conduct in prosecuting the earlier patent has "an immediate and necessary relation" to the enforcement of the later patents. *Consol. Aluminum Corp. v. Foseco Int'l, Ltd.*, 910 F.2d 804, 810-11 (Fed. Cir. 1990). To satisfy the "immediate and necessary relation" test, Courts require the Defendant to come forward with a sufficient factual basis to demonstrate how the inequitable conduct with respect to an earlier patent relates to the enforcement of the later patent. *See Hoffmann-La Roche, Inc. v. Promega Corp*, 319 F. Supp. 2d 1011, 1022-24 (N.D. Cal.

2004). "Defendants must allege more than a relationship between the patents" for a Court to find that a sufficient factual basis exists. *Bone Care Int'l, LLC v. Pentech Pharm., Inc.*, No. 08-cv-1083, 2010 U.S. Dist. LEXIS 39984, at *11 (N.D. Ill. Apr. 23, 2010) (citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2009 WL 4928024, at *9 (D. Del. Dec. 18, 2009)).

### 1. Defendants Cannot Prove An Immediate and Necessary Relationship

The doctrine of infectious unenforceability does not apply to the '992 Patent because there is no "immediate and necessary relation" between the alleged misconduct and the enforcement of the '992 Patent. The Defendants have not explained how the alleged failure to disclose an inventor for the Talasaz Patents "permeated the prosecution of" the '992 Patent – which lists its inventors properly.  The Defendants merely allege a "significant relationship" between the '992 Patent and the Talasaz Patents, their "almost identical" specifications, and their allegation that the claims are directed to similar concepts. D.I. 284, Counterclaims ¶¶ 31, 34, 50; *see also* FMI D.I. 148 ¶¶ 14, 56, 73 (stating that the asserted patents are all "directed generally to a method of extracting cell-free DNA" and that the '992 Patent is "substantially similar" and has a "nearly identical" specification to the Talasaz Patents). This is not a sufficient factual basis to prove infectious unenforceability. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2009 WL 4928024, at *9 (D. Del. Dec. 18, 2009) (finding that the connections among the patents at issue— that "their specifications are related and share some figures, [and] that many of the claims of each patent include substantively the same limitations—are "not sufficient to establish the required immediate and necessary relation") (internal quotations omitted).

### 2. The Facts of This Case Are Distinguished From Cases Applying the Doctrine of Infectious Unenforceability

The undisputed facts in this case are sharply distinguishable from the body of case law in which Courts have applied the doctrine of infectious unenforceability. Courts are stringent in

requiring that misconduct in the prosecution of an earlier patent be of consequence to the enforcement of the patent claims at issue, and while Courts have declined to apply a test of but-for causation, they generally require factual allegations that call into question the processes by which the later patent issued. *See e.g. Baxter Int'l Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1331-32 (Fed. Cir. 1998) (declining to apply a theory of infectious unenforceability because the prior art that was improperly omitted from prosecution in the parent application was "not relevant to the claims" of the later patent). Accordingly, findings that conduct in an earlier patent permeated the prosecution of other patents-in-suit often involve situations where information was withheld in an earlier application that would have made it easier to prosecute the later application. *See e.g. Consol. Aluminum*, 910 F.2d at 811 (applying the doctrine of infectious unenforceability upon finding that if the best mode had been disclosed in the earlier application, the applicants would not have been able to make a crucial argument during prosecution of the later application).

By contrast, failure to name an inventor in the Talasaz Patents would have had no effect on the Plaintiff's ability to prosecute the application that resulted in the '992 Patent. The case law demonstrates that where, as here, the process by which the '992 Patent issued was in no way affected by the alleged misconduct with respect to the Talasaz Patents, the doctrine of infectious unenforceability does not apply.

Furthermore, the familial linkage between the '992 Patent and the Talasaz Patents is far more tenuous than the familial relationships generally relied on in infectious unenforceability cases. Although Courts have not articulated an explicit requirement for the relationship between two patents in order for infectious unenforceability to apply, many have emphasized close relationships, and have considered whether applications rely on the same application for priority purposes. *See Eon Corp. IP Holdings, LLC v. T-Mobile USA, Inc.*, No. 6:10-cv-379-LED-JDL,

2011 WL 13134896, at \*7 ("[F]or infectious unenforceability to apply, the related patent must bear an immediate and necessary relation to the inequitable conduct that occurred in the *parent* application.") (emphasis added); *Semiconductor v. Samsung*, 4 F. Supp. 2d at 493 (finding it significant that the '636 patent and the '132 patent claimed priority to the same application, while stating in dicta that despite the fact that the patents shared a specification and derived priority from the same application, it would be "an extension of existing law" to hold that inequitable conduct in the "prosecution of the '132 patent application necessarily renders unenforceable all the claims of the '636 patent"). The '992 Patent is not a direct continuation of any of the Talasaz Patents, and does not derive priority from the same set of applications as the Talasaz Patents. Rather, the '992 Patent derives priority from U.S. Provisional Application 61/948,530 which was filed March 5, 2014, and the claims of the '992 Patent are not fully supported by the disclosures in the provisional applications that the Talasaz Patents derive priority from. *See* D.I. 285-2 (Guardant's response to PGDx Interrogatory No. 9) at 23-28; *see also* D.I. 285 (Guardant's Motion to Dismiss Counterclaims) at 2. Neither of Defendants' expert has made any showing that the claims of the '992 Patent derive priority from the 2012 Provisional Applications from which the Talasaz Patents derive priority.

Furthermore, the familial linkage between the '992 Patent and the Talasaz Patents is far more tenuous than the familial relationships generally relied on in infectious unenforceability cases. Although Courts have not articulated an explicit requirement for the relationship between two patents in order for infectious unenforceability to apply, many have emphasized close relationships, and have considered whether applications rely on the same application for priority purposes. *See Eon Corp. IP Holdings, LLC v. T-Mobile USA, Inc.*, No. 6:10-cv-379-LED-JDL, 2011 WL 13134896, at \*7 ("[F]or infectious unenforceability to apply, the related patent must bear

an immediate and necessary relation to the inequitable conduct that occurred in the *parent* application.") (emphasis added); *Semiconductor v. Samsung*, 4 F. Supp. 2d at 493 (finding it significant that the '636 patent and the '132 patent claimed priority to the same application, while stating in dicta that despite the fact that the patents shared a specification and derived priority from the same application, it would be "an extension of existing law" to hold that inequitable conduct in the "prosecution of the '132 patent application necessarily renders unenforceable all the claims of the '636 patent"). The '992 Patent is not a direct continuation of any of the Talasaz Patents, and does not derive priority from the same set of applications as the Talasaz Patents. Rather, the '992 Patent derives priority from U.S. Provisional Application 61/948,530 which was filed March 5, 2014, and the claims of the '992 Patent are not fully supported by the disclosures in the provisional applications that the Talasaz Patents derive priority from. *See* D.I. 285-2 (Guardant's response to PGDx Interrogatory No. 9) at 23-28; *see also* D.I. 285 (Guardant's Motion to Dismiss Counterclaims) at 2. Neither of Defendants' expert has made any showing that the claims of the '992 Patent derive priority from the 2012 Provisional Applications from which the Talasaz Patents derive priority.

### 3. The Purpose of the Doctrine of Infectious Unenforceability is Not Served by Application in this Case

The equitable remedy of infectious unenforceability is designed to prevent patent owners from being able to "manipulat[e] the patent process" to "avoid the consequences of that conduct through a scheme of divisional and continuation applications." *eSpeed, Inc. v. Brokertec USA*, LLC, 417 F. Supp. 2d 580, 595 (D. Del. Feb. 22, 2006). The claims of the '992 Patent are sufficiently distinguished from the claims of the Talasaz Patents and should not be considered part of the same invention. The '992 Patent derives priority from a different application than the other Talasaz Patents, and the claims of the '992 Patent would not have been supported without the

supplemental disclosure of this additional later provisional application.[2] The '992 Patent also lists an additional inventor who contributed to the concept employing the added material and was never employed by Illumina. Thus, the claims of the '992 Patent could not have been contained in the same application as the Talasaz Patent.

## II.     FMI CANNOT MEET ITS BURDEN TO CLEARLY AND CONVINCINGLY PROVE OBVIOUSNESS

FMI has failed to provide sufficient reasoning to support its 14 different obviousness combinations by failing to explain how or why a skilled artisan would have combined them. To survive summary judgment, FMI must provide clear and convincing evidence "that a person of ordinary skill in the art would have been motivated to combine the prior art in the way claimed by the [] patent claims at issue and had a reasonable expectation of success in doing so." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 991 (Fed. Cir. 2017). FMI has failed to make such a showing. Dr. Gabriel instead treats the prior art as a grab bag, piecing together various aspects of the reference with hindsight until it allegedly adds up to the claimed invention. This type of analysis is improper and fails to meet FMI's burden when alleging obviousness.

"An invention is not obvious simply because all of the claimed limitations were known in the prior art at the time of the invention. Instead, [courts] ask whether there is a reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success." *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 934 (Fed. Cir. 2019) (internal citations omitted). A jury

---

[2] Specifically, the claims of the '992 Patent require ligation comprising "using more than 10x molar excess of the adaptors as compared to the cfDNA molecules, thereby generating tagged parent polynucleotides." D.I. 20-4 at claim 1. This limitation does not have support in the 2012 Provisional, as was invented by Dr. Stefanie Mortimer who is not a named inventor on any of the Talasaz Patents.

cannot reasonably find the motivation to support obviousness based solely on testimony that "is generic and bears no relation to any specific combination of prior art elements," and that "fails to explain why a person of ordinary skill in the art would have combined elements from specific references in the way the claimed invention does." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012).

A.      **FMI Has Failed To Establish The Necessary Elements To Prove Obviousness**

Dr. Gabriel offers 14 different combinations of the alleged prior art to attempt to prove obviousness. However, for each of these combinations, she fails to establish the motivations for combining the elements in the way she alleges or to establish why there would be a reasonable expectation of success. Rather, Dr. Gabriel provides charts that piece together multiple references (*see generally* Ex. 43, at Exs. A1-D4) and fails to explain how each of these pieces fit together on a claim by claim basis. For example, with respect to the combination of Kinde 2011, Schmitt, and Schmitt 2012, Dr. Gabriel admitted that she combined them only because they are "relevant":

> Q. So because both steps -- both references you think are incredibly relevant, you just combine them?
>
> A. I'm using them together to discuss each and every one of these claim limitations that we talked about.
>
> *Q. Just because both of them are relevant?*
>
> *A. Yes.*

Ex. 44 at 140:8-18 (Gabriel Dep.) (objections omitted) (emphasis added).

This type of generic reasoning and non-existent analysis is insufficient to prove obviousness. Rather than explain how a person of ordinary skill in the art would be motivated to combine the various references on a limitation by limitation basis in the attached charts (Ex. 44 at 100:8-20 (Gabriel Dep.)), Dr. Gabriel provides sweeping generalizations on the motivations of a person of ordinary skill in the art generically. *See generally* Ex. 45 at Section XII.C.2.c-f,

XII.D.2.c-e, XII.E.2.c-d, XII.F.2.c-d (Gabriel Rpt.)

Dr. Gabriel's opinion is impermissible hindsight. Dr. Gabriel looked to the claims themselves, found the relevant elements, and then "combined" them. For example, with respect to her Fan, Forshew, Schmitt, and Schmitt 2012 combination, she admitted that her rationale for the combination was simply that each one "brings in elements that make the claims obvious." Ex. 44 at 156:17-158:5 (Gabriel Dep.). Likewise, for the combination of Schmitt, Schmitt 2012, Kinde, and Taipale, Dr. Gabriel simply looked to the elements of the claim when identifying the combination. Ex. 44 at 150:2-10 (Gabriel Dep.). Because FMI has failed to meet its burden to show a motivation to combine the prior art in the way claimed by the patent claims at issue and a reasonable expectation of success in doing so, summary judgment is appropriate.

## III. PGDX'S MONOPOLIZATION COUNTERCLAIMS FAIL AS A MATTER OF LAW ON MULTIPLE, INDEPENDENT GROUNDS

### A. Threshold Patent Requirement #1 – No Fraud on the Patent Office

To prevail on a *Walker Process* claim, an antitrust-plaintiff must show that the patent was obtained by fraud on the PTO. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 178 (1965). The evidentiary showing required to satisfy the first *Walker Process* element is "nearly identical" to that required to prove inequitable conduct. *TransWeb, LLC v. 3M innovative Props.*, Co., 812 F.3d 1295, 1307 (Fed. Cir. 2016). As established above in sections I.B and I.C, PGDx cannot show that anyone other than Dr. Talasaz was an inventor of the Talasaz Patents. Thus, the Defendant cannot prove that there was any specific intent to deceive the PTO.

### B. Threshold Patent Requirement #2 – The '992 Patent is Enforceable in and of Itself

PDGx does not dispute that the inventorship is correct with respect to the '992 Patent. *See* Ex. 42 at 3 (5/13/2019 PGDx Invalidity Contentions). Thus, there was no misrepresentation to the PTO about the '992 Patent, and PGDx cannot prove the elements of fraud on the PTO required to

prevail on a *Walker Process* claim. Furthermore, even assuming that the elements of fraud are not specific to the patent at issue, and may be proven based on misconduct with respect to another patent, the Defendant's *Walker Process* claim still fails. That is, even assuming that the alleged omission of inventors from the Talasaz Patents can be relied on to prove fraud with respect to the '992 Patent, the Defendant's claim fails as a matter of law at least because PGDx cannot show that the '992 Patent would not have issued but for the alleged misrepresentation.

As discussed above with respect to the Defendant's infectious unenforceability claim, the inventorship of the other patents-in-suit had no bearing on the prosecution or enforcement of the '992 Patent. Even taking the Defendant's assertion that Dr. Eltoukhy invented "fundamental ideas" underlying the entire Guardant patent family as true, there would have been no difference in the issuance of the claims of the '992 Patent. In the alternative, if Dr. Eltoukhy was not named as an inventor and the Talasaz Patents were rejected for incorrect inventorship during prosecution, the '992 Patent would not have been affected. The '992 Patent is not a continuation of the Talasaz Patents (rather a continuation-in-part), and in fact, the claims of the '992 Patent derive priority from a later provisional application as discussed above in Section I.D. Therefore, whether or not the applications that resulted in the Talasaz Patents continued through prosecution would have been irrelevant to the status of the '992 Patent.

PGDx also may not rely on their claim of infectious unenforceability as a proxy for fraud on the PTO. Even if the Defendant could prevail on its claim of infectious unenforceability for the '992 Patent, it would still fall short of demonstrating the elements required to prevail on a *Walker Process* claim. Proving infectious unenforceability does not require a showing of but-for causation as is required to prevail on a *Walker Process* claim. *Robocast, Inc. v. Microsoft Corp.*, 21 F. Supp. 3d 320, 338 (D. Del. 2014) (explaining that "requiring that inequitable conduct itself have a causal

effect on the issuance of the claims at issue" would eliminate the need for the doctrine of infectious unenforceability). Infectious unenforceability is not a finding of fraud, it is a finding that a patent is unenforceable despite the absence of fraud with respect to that patent. Thus, a finding of infectious unenforceability does not demonstrate materiality of the alleged misconduct with respect to the prosecution of the '992 Patent, and therefore does not rise to the level of fraud on the PTO and cannot be relied on as the basis for a *Walker Process* claim.

### C. Threshold Patent Requirement #3 – The Patents-in-suit are Valid and Patentable So Competition Cannot be Harmed Regardless of the Owner

For a patent fraud actually to create or threaten to create monopoly power, and hence violate Sherman Act Section 2, the invention sought to be patented *must not be patentable*. *See Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir. 1984) (Posner, J.). In *Brunswick*, Judge Posner held that the theft of a valid patent could not violate Section 2 because it could not create a monopoly that would otherwise not exist. *See id.* at 266. That is, the stolen valid patent has no tendency to raise prices, reduce output, or cause any other kind of antitrust injury because it merely transfers a valid patent from the rightful owner to someone else.[3] Invalidity of the patent is a necessary element of a *Walker Process* claim because a valid patent does not harm PGDx, who faces "the same circumstances they would have even if the misconduct had not occurred." *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06–cv–1797, 2014 WL 982848, at *11 (E.D. Pa. Mar. 13, 2014) (holding that invalidity is an element of *Walker Process* fraud because "'stealing a valid patent' is not an antitrust violation") (citing *Brunswick*, 752 F. 2d at 265). Therefore, in order to prevail on its Section 2 claims, PGDx must show that but for the

---

[3] In *Brunswick*, plaintiff Brunswick alleged that it had developed a process for making antistatic yarn, and disclosed the process to defendant Riegel, who promised to recognize Brunswick's priority to the process. *See id.* at 264. Instead, when Riegel obtained a patent for that process in its own name, Brunswick sued Riegel for violation of Sherman Act Section 2. *See id.*

alleged fraud, the patents would not have been issued to anyone. *See Brunswick,* 752 F.2d at 265.

Here, applying PGDx's alleged theory, it is undisputed that the patents **would have still issued** with Illumina and Guardant as co-owners. *See* D.I. 284 at Counterclaims ¶ 11 (alleging that the omitted inventor Helmy Eltoukhy "had obligations to assign any inventions to Illumina"); ¶ 157 (alleging that Guardant sought "to prevent Illumina from asserting an ownership interest in the Patents-in-Suit"). Therefore, Guardant's alleged misconduct cannot harm PGDx, who faces the same circumstances they would have—being sued for patent infringement—if the misconduct had not occurred. The absence of harm to PGDx is grounded in the reality faced by the parties involved. Illumina has vigorously enforced its patent rights by suing its customers and licensees for patent infringement, Ex. 46 (Ariosa Compl.); Ex. 47 (Natera Compl.), and PGDx has set forth **no evidence** that it would not have been sued for infringement if the patents were co-owned.

The validity of these patents removes the causal link between Guardant's conduct and any alleged injury to PGDx, "who has no right in the first instance to practice another's valid patent." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶705. (4th Ed. 2018). Therefore, PGDx's Section 2 counterclaims fail as a matter of law. *See Brunswick*, 752 F.2d at 266.

### D. Threshold Antitrust Requirement – No Harm to Competition From Guardant's Enforcement of Its Patents

Even if PGDx could establish fraud or inequitable conduct (which it cannot), it must still prove all other elements necessary to establish a Sherman Act monopolization claim to prevail on its *Walker Process* claim. *See Walker Process*, 382 U.S. at 178. It is axiomatic that the antitrust laws were enacted "for the protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488 (1977). PGDx must therefore prove harm to "competition, and not merely competitors" in order to prevail on a Section 2 Claim. *United States v. Dentsply*

*Int'l, Inc.,* 399 F.3d 181, 187 (3d Cir. 2005). PGDx "must prove that the challenged conduct affected the prices, quantity or quality of goods or services." *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1991).

PGDx has no evidence that price, quality, and output have been harmed by the enforcement of Guardant's patent rights. *See* D.I. 284 (PGDx Ans. to 3rd Amd. Complaint), Counterclaims ¶ 78. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ PGDx also provides no evidence that price, quality and output will be harmed in the future. PGDx's theory of harm is therefore a flagrant subversion of the antitrust laws, which were enacted "for the protection of competition, not competitors." *Brunswick*, 429 U.S. at 488.

**Prices.** ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Despite allegations that Guardant's anticompetitive conduct "will result in higher prices," Dr. Reiff did not even attempt to calculate what prices Guardant would charge if it can enforce its patent rights (hereinafter the "but-for world"). *See* Ex. 28 at 170:17-20 (Reiff Dep.). Furthermore, as discussed on pages 30–31, *infra*, the evidence is undisputed that Guardant cannot control prices in the relevant market.

**Quantity.** ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. Dr. Reiff unequivocally admits that output has been growing over time. *See* Ex. 28 at 93:18–94:5 (Reiff Dep.). Moreover, Dr. Reiff failed to analyze whether output would be restricted in the but-for world, and claimed

that "it was not necessary to do such an analysis." *See id.* at 93:18-94:5; 95:17-22.

*Quality.* Although PGDx alleged that Guardant's conduct threatens to harm healthcare providers and patients, *see* D.I. 284 (PGDx Ans. to 3rd Amd. Complaint), Counterclaims ¶¶ 78, 80, Dr. Reiff does not cite to a single piece of evidence from any healthcare provider or patient. As discussed in Section III.F, *infra* at page 35–36, the evidence is undisputed that Guardant has been a market leader with respect to quality, and has been integral in achieving widespread insurance coverage and adoption of liquid biopsies.

*Freeriding Guardant's Market Leadership.* Since entering the market, Guardant has assembled an industry leading volume of clinical data which "has led to adoption [of liquid biopsy products] by more than half of the oncologists practicing in the US today." *See* Ex. 13 ¶¶ 46-7 (Becker Rebuttal). Guardant's clinical data was a critical factor in obtaining insurance coverage and reimbursement for liquid biopsy products. *See id.* ███████████████████████ are able to free ride on the precedents set by Guardant's market leadership. *See id.* ¶ 54.

REDACTED

### E.    Substantive Sherman Act Section 2 Element #1 – Guardant Does Not Have Monopoly Power or a Dangerous Probability of Achieving Monopoly Power

The elements of a Sherman Act Section 2 monopolization claim are: "(1) possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power, as distinguished from the growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). The elements of a Section 2 attempted monopolization claim are: (1) predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447 (1993).

Monopoly power is defined as "the power to control prices or exclude competition." *U. S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). More precisely, it is "the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable." *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (internal citations omitted). Monopoly power can be demonstrated through direct evidence, which is only rarely available, or circumstantial evidence. *See id.* at 381. Here, PGDx has not established—and cannot establish—that Guardant has monopoly power through either direct evidence or circumstantial evidence.

To determine whether PGDx has offered direct evidence of monopoly power, the Court must examine whether the record includes any proof of supracompetitive pricing or restricted output. *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434 (3d Cir. 2016). As discussed on pages 27–28, *supra*, the evidence is undisputed Guardant's ***prices have not increased*** since the filing of the lawsuit. It is also undisputed that Guardant has not restricted output, and ***that overall output has increased over time***. Therefore, no reasonable factfinder could conclude that PGDx has established monopoly power through direct evidence.

In the absence of direct evidence, PGDx must establish monopoly power through circumstantial evidence by proving that Guardant had a dominant share of the relevant market which is protected by high barriers to entry, and that existing competitors cannot expand output. *See Harrison Aire*, 423 F.3d 374*; see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) ("[T]he ability to control output and prices . . . depends largely on the ability of existing firms to quickly increase their own output."). In assessing whether Guardant has a dangerous probability of achieving monopoly power, the Court must also consider factors other than market share, including "strength of competition, probable development of the industry, [and]

the barriers to entry." *Barr Labs, Inc. v. Abbot Labs*, 978 F.2d 98, 112 (3d Cir. 1992). Importantly, in a technology driven, fast-paced space like the CLB market, PGDx must prove that Guardant has durable monopoly power, not fleeting power. *See Dentsply*, 399 F.3d at 188¬89 ("[I]n evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share.").

PGDx attempts to establish monopoly power through circumstantial evidence presented by Dr. Reiff, who opines that Guardant has monopoly power based on: (1) Guardant's market shares; (2) ability to control prices; (3) high gross profit margin; and (4) high barriers to entry. *See* Ex. 12 ¶ 60 (Reiff Rpt.). However, for the reasons set forth below, no reasonable factfinder could conclude that such circumstantial evidence can sufficiently establish monopoly power.

### 1.    Market Share Alone Cannot Establish Monopoly Power

As a matter of law, high market share alone is not enough to establish the possession of monopoly power. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010) ("[M]arket share, while crucial, may not always be determinative.") Dr. Reiff admitted this point unequivocally. Ex. 28 at 147:11-14 (Reiff Dep.) ("[Q]: Dr. Reiff, would you agree as a matter of economics that a firm does not have monopoly power solely based on a high market share? [A]: Yes, not solely based on that."). ███████████████████████████

████████████████████████████████████████████████████

Monopoly power also cannot be presumed from Guardant's patent rights. *See Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 38-42 (2006). Therefore, Guardant's market share, standing alone, is insufficient as a matter of law to imply monopoly power.

### 2.    Guardant Does Not Control Prices

PGDx has also failed to adduce any evidence showing that Guardant either has or will have the ability to control prices. Dr. Reiff's opinion with respect to ability to control prices is erroneous and inadmissible because it is based on: (1) a flawed and unreliable gross profit margin analysis;

(2) a misinterpretation of testimony from Bill Getty; and (3) a failure to consider the commercial

realities of the CLB market, where large buyers dictate pricing and terms of payment.

### a) Dr. Reiff's Opinion Regarding Guardant's Purported Ability to Set Prices is Erroneous

*Misinterpretation of Testimony.* In his opening report, Dr. Reiff claims that Bill Getty, a

Senior Director of Marketing at Guardant, ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

*Flawed and Unreliable Gross Profit Margin Analysis.* Dr. Reiff's gross margin analysis

serves zero value in assessing whether monopoly power exists as it is preposterously over

inclusive. Dr. Reiff assumes that market power exists whenever a firm's gross margin is positive.

*See* Ex. 12 ¶ 54.[4] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Furthermore, Dr. Reiff's test would conclude that

market power exists *in all 94 US industry sectors* which have a positive gross margin. Ex. 13 at

Exhibit SLB-6. As set forth, *infra* at p. 46, the outrageous number of false positives generated by

---

[4] *Modern Industrial Organization*—which Dr. Reiff cited to in support of this assumption—
explicitly states that "the observation of *pricing above marginal costs does not imply* that a firm
necessarily possesses market power." Dennis W. Carlton and Jeffrey M. Perloff, *Modern
Industrial Organization*, 4th ed., p. 82-83 and 117 (emphasis added).

Dr. Reiff's gross margin analysis renders it an improper and unreliable test for monopoly power.

> **b)** **The Evidence is Undisputed That Guardant Cannot Control Prices in Either the Clinical or Pharmaceutical Submarket**

The uncontroverted record evidence shows that Guardant does not, and cannot control prices in either the clinical or pharmaceutical submarket. The actual pricing dynamics of both submarkets are described in the rebuttal report of Dr. Becker, who, unlike Dr. Reiff, cites to (i) discussions with the appropriate Guardant executives (Derek Bertocci and Daniel Simon); (ii) evidence from competitors such as PGDx and FMI; and (iii) and customers such as ███████████ ██████████. *See* Ex. 13 ¶¶ 34–43 (Becker Rebuttal).

*Clinical Market.* Guardant does not control prices in the clinical market, where liquid biopsy providers generally seek reimbursements from either private insurers or government insurers. *See id.* ¶ 34; Ex. 15 at 32 (Guardant 10K (2018)). With respect to government insurers, and private insurers for which Guardant is a nonparticipating provider, the insurer decides the amount they are willing to reimburse, and may decide to provide no reimbursement at all whatsoever. *See* Ex. 13 ¶ 36 (Becker Rebuttal); Ex. 15 at 32 (Guardant 10K (2018)). ████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████ *See* Ex. 13 ¶ 35 (Becker Rebuttal).

*Pharmaceutical Market.* Dr. Becker concluded that there is no evidence that Guardant has the power to control prices in the pharmaceutical market. ████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

> **3.** **Guardant Has Not Excluded Competition**

No reasonable factfinder could conclude, as Dr. Reiff did, that Guardant has the ability to exclude competition by merely advocating for performance standards in Medicare coverage decisions. As Dr. Reiff admitted, the **coverage decisions are made by Medicare, not Guardant**. *See* Ex. 28 at 158:25-159:4 (Reiff Dep.). Since it is undisputed that Guardant is not the decision-maker for performance standards in coverage decisions, *a fortiori* it cannot exclude competition.

Yet again, Dr. Reiff attempts to support his opinion with misrepresentations of testimony from Guardant employees. *See* Ex. 48 at n.12 (Reiff Reply). ███████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

Moreover, it would turn antitrust law on its head for Guardant to be condemned as a "monopolist" for conduct that is immune from liability. After all, Guardant's conduct is protected under the *Noerr-Pennington* doctrine, which generally provides that petitioning governmental agencies is immune from antitrust liability under the First Amendment. *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

### 4.      Barriers to Entry Are Not High in This Dynamic Marketplace

A firm cannot possess monopoly power unless it has a dominant share of the market which is protected by significant barriers to entry. *See Harrison Aire,* 423 F.3d 381. In analyzing barriers to entry, the actual history of entry is a significant factor which is given substantial weight. *See* U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES MERGER

GUIDELINES 27 (2010) (hereinafter "MERGER GUIDELINES"). In *Barr Labs*, the Third Circuit found that barriers to entry were not high when the evidence demonstrated "continued entry of competition, albeit with small initial market share" in the relevant market. 978 F.2d at 113–14. The record evidence shows that the barriers to entry for the CLB market are not high.

The evidence is undisputed that at least three new providers (PGDx, FMI, and Resolution Bioscience) have in fact entered the CLB market since Q4 of 2016, which shows that any purported barriers identified by Dr. Reiff are not insurmountable. *See id.* at 114 (six new entrants in six years "established that whatever barrier to entry FDA approval for new products poses, that barrier is not insurmountable"). Dr. Reiff improperly focuses on one year of market share data and fails to account for dozens of potential entrants backed by large outside investors, including (1) Natera; (2) GRAIL; (3) Freenome; (4) Thrive; and (5) Inviata. *See* Ex. 13 ¶¶ 65–7 (Becker Rebuttal).


REDACTED


Furthermore, an October 2018 Cowen Equity report noted that barriers to entry were *declining*, and that the competitive landscape will only become more crowded. *See id.* Ex. 13 ¶ 70 (Becker Rebuttal); Ex. 9 at -265. A William Blair report from the same month states that competition consists of *dozens* of companies. Ex. 13 ¶ 73 (Becker Rebuttal); Ex. 52 at -426. While Dr. Reiff relied on these reports in defining the market, *see* Ex. 12 ¶¶ 29, 33 n.70 (Reiff Rpt.), he disregarded them when they could not be reconciled with his erroneous opinion of high barriers.

Dr. Reiff also provides no evidence that current competitors cannot expand output to compete with Guardant. *See* Ex. 28 at 99:5-15 (Reiff Dep.). In fact, the evidence is undisputed that

new entrants can quickly expand output and market share

REDACTED

Therefore, no reasonable

factfinder could conclude that Guardant has the ability to maintain market share, which is required

to support a finding of monopoly power. *See Dentsply*, 399 F.3d at 188¬89 ("[I]n evaluating

monopoly power, it is not market share that counts, but the ability to *maintain* market share").

Dr. Reiff's conclusion is also unreliable as it is based on yet another erroneous

interpretation of the evidence. Dr. Reiff claims that a



### F. Substantive Sherman Act Section 2 Element #2 – Guardant has Not Willfully Acquired or Maintained any Claimed Monopoly Power

Even if PGDx could establish that Guardant had monopoly power (which it cannot), it must

still prove that Guardant's market position was the result of "willful acquisition or maintenance .

. . as distinguished from the . . . consequence of a superior product [or] business acumen." *United

States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Possession of monopoly power is not

unlawful unless it is accompanied by an element of anticompetitive conduct. *Verizon Commc'ns

Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). PGDx therefore must

"provide evidence of the anticompetitive nature" of a Guardant's conduct. *Mylan*, 838 F.3d at 438.

---

[5] The term "commoditize" means "to render (a good or service) widely available and interchangeable with one provided by another company." *Commoditize*, MERRIAM WEBSTER, available at https://www.merriam-webster.com (last accessed Dec. 2, 2019).

PGDx has failed to produce a single shred of evidence showing that Guardant's market position is the result the allegedly anticompetitive conduct, as opposed to the result of its superior product and procompetitive market leadership:

- **Superior Product.** The evidence is uncontroverted that that Guardant's product was superior to those of its competitors, and that Guardant consistently won bakeoffs against its competitors. *See* Ex. 13 ¶¶ 48, 50–52 (Becker Rebuttal). ████████████████

- **First Mover Advantage**. It is also undisputed that Guardant enjoys a first mover advantage in the market. *See* Ex. 13 ¶ 45 (Becker Rebuttal); Ex. 9 at -263. ████████

- **Widespread Adoption of Liquid Biopsies.** As described on pages 27–28, *supra*, it is undisputed that Guardant was integral in achieving widespread insurance coverage and adoption of liquid biopsies.

- REDACTED

Dr. Reiff admitted that *he did not even attempt to distinguish* which portion of Guardant's market share is the result of the allegedly anticompetitive conduct, as opposed to the above listed procompetitive and legitimate conduct. *See* Ex. 28 at 123:7-15 (Reiff. Dep.). Dr. Reiff testified that "there is no way to sort out the effects of the alleged [anticompetitive] conduct from effects of other activities." *Id.* Instead, he concludes that Guardant's current market position "results from *all* of its conduct and characteristics, *including* its supposed efficiency, its supposed first mover advantage and the alleged anticompetitive conduct." Ex. 48 ¶ 20 (Reiff Reply) (emphasis added).

In light of Dr. Reiff's admission, no reasonable factfinder could disaggregate the conduct observed in the marketplace and conclude that Guardant's market position was the result of "willful acquisition or maintenance" as distinguished from the "consequence of a superior product [or] business acumen." *Grinnell Corp.*, 384 U.S. at 570–71. Therefore, Guardant is entitled to

summary judgment on the antitrust counterclaims. *See Augustine Med., Inc. v. Mallinckrodt, Inc.*, Case No. 01-387-SLR, 2003 WL 1873836, at *7 (D. Del. Apr. 9, 2003) (granting summary judgment on *Walker Process* claims because the expert "made no effort to segregate the effects of legitimate activities from whatever effects there might be in the market from the alleged anticompetitive activities.").

### G. Final Antitrust Requirement – PGDx Has Not Suffered Any Cognizable Damages

PGDx must also satisfy the antitrust injury requirement of Clayton Act Section 4 by showing that it was "injured in [its] business or property by reason of" conduct forbidden by the antitrust laws. 15 U.S.C. § 15(a). Proof of a Sherman Act violation does not itself establish an antitrust injury, and PGDx cannot recover by merely establishing an injury casually linked to a violation of the Sherman Act. *See Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990). Rather, PGDx must prove the existence of losses stemming from a competition—reducing aspect or effect of Guardant's behavior. *Id.* at 344.

### 1. PGDx Has No Evidence of a Lost Sale or Investor Due to the Patent Lawsuit

The District of Delaware's decision in *Augustine*, where summary judgment was granted, is instructive. 2003 WL 1873836. In *Augustine*, the court granted summary judgment on the *Walker Process* counterclaims in favor of the patentee because the counterclaim-plaintiff offered no proof of "of any lost sales or other specific obstacles to [counterclaim-plaintiff's] ability to compete related to [patentee's] alleged anticompetitive activities," and therefore could not prove that it was injured by the alleged conduct. *See id.* at *9. As was the case in *Augustine*, PGDx offers no proof of any injury caused by Guardant's conduct.

***No Lost Sales*.** There is no evidence in the record that PGDx lost even one sale due to the patent lawsuit. In fact, PGDx has conceded that it cannot prove any lost sales by foregoing a claim

of damages. *See Medtronic Minimed Inc. v. Smiths Med. MD Inc.*, 371 F. Supp. 2d 578, 584 (D. Del. 2005) ([A]ntitrust plaintiff's decision not to pursue a claim of damages was viewed as "an apparent admission that it cannot prove that it lost any sales"). Dr. Reiff also admitted that he did not perform any damage analysis based on lost sales, and explained that he was "trying to avoid doing anything that would be speculative on damages." Ex. 28 at 41:13-19 (Reiff Dep.).

**No Lost Investors or Opportunities.** Despite conclusory allegations of lost investors and opportunities, PGDx has failed to identify any such investor. Dr. Reiff did not speak to *any* potential investor as part of his analysis, and *knew nothing* at all about PGDx investors or PGDx's ability to secure investments. *See id.* at 73:7-14; 74:10-79:1.

REDACTED

Furthermore, PGDx is aiming for an Initial Public Offering toward the end of 2020. *See* Ex. 24 (Doug Ward Interview) Because PGDx has failed to adduce any evidence "of any lost sales or other specific obstacles" to its ability to compete, Guardant is entitled to summary judgment. *See Augustine*, 2003 WL 1873836, at *7.

### 2. Litigation Expenses Claimed by PGDx are not Cognizable in this Case and do not Constitute Antitrust Injury

PGDx chose to forego lost profit damages, and instead claims only the litigation expenses associated with defending the patent suit as damages in a misguided attempt to stretch the holding of the *TransWeb* case far beyond the four corners of the Federal Circuit's ruling. However, litigation expenses claimed by PGDx do not satisfy antitrust injury requirement of Clayton Act Section 4 per se, but "only when competition would be impacted by a verdict for the plaintiff." *See Sprint Commc'ns Co., L.P. v. Charter Commc'ns, Inc.*, Case No. 1:17-cv-01734-RGA, 2019 WL 1082067, at *5 (D. Del., Mar. 7, 2019) (interpreting *TransWeb*, 812 F.3d 1295). Here, PGDx

has provided no proof that competition would be impacted for all of the reasons stated above.

In *Sprint*, the plaintiff filed a patent infringement suit against defendant, who then asserted *Walker Process* counterclaims against plaintiff. *See* 2019 WL 1082067 at *1. The court ruled that defendant's attorney fees did not constitute an antitrust injury because a patent verdict in favor the plaintiffs would not have forced the defendants to exit the market. *See id.* at *6.

The holding of *Sprint* is instructive here because PGDx has consistently taken the position that "multiple commercially acceptable non-infringing alternatives exist for each of the Patents-at-Issue." *See, e.g.* Ex. 55 (PGDx Interrogatory Responses); Ex. 57 ¶ 198 (Harismendy Rebuttal). Therefore, enforcement of Guardant's patent rights would ***not*** reduce PGDx's ability to compete because PGDx can easily design "non-infringing alternative" products and continue selling those products in the CLB market. If PGDx would still able to compete in the CLB market after a patent verdict in Guardant's favor, then their attorney's fees would not constitute antitrust injury as a matter of law. *See Sprint*, 2019 WL 1082067 at *6.

In sum, PGDx has failed to adduce a single shred of evidence to back up any of their antitrust counterclaims. Furthermore, the attorney fees claimed by PGDx fail to constitute an antitrust injury as a matter of law without any harm to competition. *See Sprint*, 2019 WL 1082067 at *6. PGDx's failure of proof entitles Guardant to summary judgment on the antitrust counterclaims. *See Augustine*, 2003 WL 1873836 at *9.

### ***DAUBERT* MOTION LEGAL STANDARD**

PGDx bears "the burden of demonstrating that [Dr. Reiff's] testimony satisfie[s] the requirements of Rule 702." *Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd.*, 362 Fed. Appx. 332, 335 n.2 (3d Cir. 2010). For an expert's testimony to be admissible, Rule 702 requires an expert's opinion to: (1) assist the trier of fact; (2) be based on sufficient facts or data; (3) be the product of reliable principles and methods; and (4) apply those principles and methods reliably to

the facts of the case. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579,

589–93 (1993). Under Rule 702, the Court acts as a gatekeeper to ensure that the proffered

testimony is reliable and relevant. *Daubert*, 509 U.S. at 589.

To satisfy the requirements of Rule 702, Dr. Reiff must meet "the trilogy of restrictions on

expert testimony: qualification, reliability, and fit." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350

F.3d 316, 321 (3d. Cir. 2003) (internal citations omitted); *In re Paoli R.R. Yard PCB Litig.*, 35

F.3d 717, 741–43 (3d Cir. 1994). Courts can consider the following factors, among others, when

assessing reliability: "whether the method has been subject to peer review" and "whether the

method is generally accepted." *Calhoun,* 350 F.3d at 321 (internal quotations omitted).

The fit element requires a court to consider the "reasonableness of using [Dr. Reiff's

approach] . . . to draw a conclusion regarding the particular matter to which the expert testimony

was directly relevant." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153–54 (1999). Dr.

Reiff's opinion must also "incorporate all aspects of the economic reality" of the CLB market.

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000). A court need not

"admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

*General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## *DAUBERT* ARGUMENT

**I.    DR. REIFF'S OPINIONS ON ANTICOMPETITIVE EFFECTS ARE UNRELIABLE AND DO NOT FIT THE  FACTS OF THE RELEVANT MARKET**

### A.    Dr. Reiff Has No Basis for Taking a Test Used for Merger Transactions Out of Context to Analyze the Effects of Guardant's Lawsuit

Dr. Reiff's opinions on anticompetitive effects are inherently unreliable as he used non-

peer reviewed, modified economic tests outside of their usual context. An important consideration

in any reliability analysis is whether the expert's methods have been peer reviewed or published.

*Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). Moreover, when a test has been

modified from its original form, it has been found to be unreliable. *See Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing*, 588 F.3d 908, 918 (6th Cir. 2009).

Specifically, Dr. Reiff employed the following three tests to show that Guardant would raise prices, if successful after its patent lawsuit: (1) the hypothetical monopolist test, or the small but significant and non-transitory increase in price test ("SSNIP"); (2) the Herfindahl-Hirschman Index analysis ("HHI"); and (3) the Upward Pricing Pressure analysis ("UPP"). *See* Ex. 12 ¶¶ 74–75 & n.133 (Reiff Rpt.); Ex. 48 ¶¶ 35–36, 41–48 (Reiff Reply). The SSNIP test is a test utilized to define the relevant market, the HHI is used to assess market concentration, and the UPP is used to test pricing of differentiated products, but none of these tests show the magnitude of a potential price change. MERGER GUIDELINES, *supra*, 8–9, 18–21.

The Department of Justice and Federal Trade Commission (the "Agencies") utilize these tests when examining horizontal mergers between competitors. *Id.* However, the Agencies note that the Guidelines "are not intended to describe how the Agencies analyze cases other than horizontal mergers." *Id.* at 1. PGDx and Dr. Reiff run afoul of this guidance from the Agencies.

Importantly, when evaluating mergers under Clayton Act Section 7, the Agencies consider whether the effect of the merger "may be substantially to lessen competition, or tend to create a monopoly."[6] *Id.* However, as the Supreme Court held nearly forty years ago, a violation of Clayton Act Section 2(a) or Section 7 does not give rise to a damages claim under Clayton Act Section 4—

---

[6] Under Clayton Act Section 7, the FTC only needs to have "reason to believe" that a merger may substantially lessen competition for a preliminary injunction. FTC Act § 13(b). Thus, the required showing under FTC Section 13(b) action is lower than under Sherman Act Section 2. *Compare FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008) (under Section 13(b) the FTC "does not need detailed evidence of anticompetitive effect at this preliminary phase"), *with Mylan Pharm.*, 838 F.3d at 438, 41 (holding that a party seeking to impose Section 2 liability must provide "evidence of the anticompetitive nature of a defendant's conduct").

a required element for private parties asserting a claim under Sherman Act Section 2. *J. Truett Payne Co., Inc.*, *v. Chrysler Motors Corp.*, 451 U.S. 557, 561–62 (1981) (quoting *Brunswick Corp.*, 429 U.S. at 486) ("'[T]o recover damages [under Clayton Act § 4] respondents must prove more than the petitioner violated [Clayton Act] § 7, since such proof establishes only that injury may result' . . . . [P]roof of a violation [of Clayton Act § 2(a)] does not mean that a disfavored purchaser has been actually 'injured' within the meaning of [Clayton Act] § 4."). The Supreme Court reasoned that Clayton Act Section "2(a) is a *prophylactic statute* that is violated merely upon a showing [that] 'the effect of such discrimination *may be* substantially to lessen competition[,]'" whereas, Clayton Act Section 4 is a *remedial statute* that provides damages only when a person has proven *actual* injury. *Id.* (emphasis added). Therefore, Dr. Reiff's use of tests to analyze mergers that "may substantially lessen competition" to somehow show actual effects from a patent lawsuit, directly ignores Supreme Court precedent. *Id.* at 562. As set forth below, there are a host of additional problems with Dr. Reiff's use of these merger tests.

**UPP.** Dr. Reiff used the UPP outside of its normal context of a merger analysis, and instead used it in a monopolization claim, which he admitted he had never seen done before. Ex. 28 at 189:8-9 (Reiff Dep.). Dr. Reiff also admitted that he used a *modified version* of the UPP analysis to fit the monopolization context, and that he knew of no academic literature that endorsed his modified version. *Id.* at 185–189:4 ("[Q.] Can you cite me any literature that has used this UPP test as you have applied it here in a patent infringement antitrust counterclaim? [A.] Other than when I used it in *TransWeb*, I don't know.").[7] Moreover, Dr. Reiff did not complete a UPP analysis

---

[7] In *TransWeb*, the opposing party did not challenge Dr. Reiff's expert report on the basis that the UPP was modified. 812 F.3d 1295. Thus, his use of a UPP analysis in another case does not establish the propriety of that merger test to show anticompetitive effects in a *Walker Process* Sherman Act Section 2 claim for monopolization.

for the scenario where only "one of PGDx or FMI is enjoined[,] but not the other[,]" and instead only speculated "that there would be a significant loss of competition". *Id.* at 97:19–98:6.

Furthermore, the Federal Trade Commission notes that the UPP is "only a starting point" for the Commission's inquiry, as it is "a useful initial screen" not "as a rigid presumption of harm." *In re Dollar Tree, Inc.*, File No. 141-0207, 2015 WL 4484209, at \*2 (F.T.C. July 13, 2015). Likewise, the academic article relied upon by Dr. Reiff for his UPP analysis clearly states that the UPP does not "capture the full complexity of competitive effects" and that a more comprehensive "back end analysis" would be needed to actually quantify the effects. Joseph Farrell & Carl Shapiro, *Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition*, B.E. J. OF THEORETICAL ECON., Jan. 2010, at 3.

**HHI.** Dr. Reiff has also not seen the HHI used in the context of a monopolization claim in economic literature. Ex. 28 at 189:19–22 (Reiff Dep.). The HHI is used to analyze market concentration, not anticompetitive effects, and is not "a rigid screen," but only a starting point for the Agencies to analyze other "competitive factors." MERGER GUIDELINES, *supra*, at 18–19.

**SSNIP.** Dr. Reiff used the SSNIP to show pricing effects, when it is typically employed to determine the relevant market, and as a result, he needed to modify the SSNIP from its usual form. *See* Ex. 28 at 180:16–23 (Reiff Dep.) (admitting modification of the SSNIP "to say you have to lose all of the competition.").

In *Kentucky Speedway*, an expert used a SSNIP test for its proper purpose to determine the relevant market. 588 F.3d at 916–18. However, the court determined that the SSNIP test was not credible because the expert created his "own version" of the SSNIP test that "ha[d] not been tested; had[] not been subjected to peer review and publication; [had] no standards controlling it; and [had] no showing that it enjoys general acceptance within the scientific community." *Id.* at 918.

43

Just like the expert in *Kentucky Speedway*, Dr. Reiff used a modified version of the SSNIP test. However, Dr. Reiff did not implement the SSNIP test for its proper purpose. Similarly, Dr. Reiff used his own, modified version of the UPP test and used the HHI outside of its proper purpose. Accordingly, Dr. Reiff's use of the SSNIP, UPP, and HHI should be excluded as less reliable than the use of the SSNIP test in *Kentucky Speedway*.

### B. Dr. Reiff's Methodology Does Not Fit the Facts of the CLB Market

The SSNIP, HHI, and UPP tests employed by Dr. Reiff cannot show anticompetitive effects because they completely disregard the "economic reality" of the CLB marketplace. *Concord Boat*, 207 F.3d at 1057 (an expert's failure to account for the "economic reality" of the market makes his testimony mere speculation and "is not competent proof"). As set out in Section III.E. on page 33–34, *supra*, Dr. Reiff's analysis fails to account for the economic realities of the market going forward (*i.e.* new and potential entrants and rapidly advancing technology) and relies solely on one year of market share data in a market that did not even exist before 2014. Furthermore, Dr. Reiff did not even attempt to analyze other types of critical evidence used by the Agencies in evaluating horizontal mergers, such as evidence concerning "natural experiments" or information from customers and other industry participants. MERGER GUIDELINES, *supra*, at 3–5.

*Natural Experiment.* Dr. Reiff did not consider the only natural experiment available with respect to pricing (*i.e.* whether Guardant's prices changed when PGDx and FMI entered the market) because the "period before [PGDx and FMI] entered was largely a start-up period for Guardant before it had established itself." Ex. 48 ¶ 41 (Reiff Reply); *see also* Ex. 28 at 174–179 (Reiff Dep.). However, Dr. Reiff used data from the same "start-up" period against Guardant to support other conclusions in his report. *See* Ex. 28 at 222:23–223:8 (Reiff Dep.) ("[Q.] So you looked at evidence in this case from Guardant before PGDx and FMI launched in coming to your opinions that there are barriers to entry in this market and that Guardant's monopoly power has

been achieved in part through its alleged scheme, right? [A.] Yes, in part. [Q.] And so for that purpose of your analysis information from Guardant before PGDx and FMI you considered, right? [A.] Yes.").  ███████████████████████████████████████████

██████████████████████████████████████████████████████████████

**Pricing Structure in the Market.** Dr. Reiff also did not consider the economic realities of pricing in the CLB market. For instance, Dr. Reiff claims that elimination of PGDx and FMI from the market would "likely lead to increased prices." Ex. 48 ¶ 35 (Reiff Reply). However, Dr. Reiff admitted that Guardant does not actually receive payments based on the list price it sets; instead, "as a matter of the business reality of the marketplace all three firms are subject to reimbursement by third-party payors where they may not get what they set their list price at for their products." Ex. 28 at 145:20-24 (Reiff Dep.). Despite acknowledging this powerful check on Guardant's (and PGDx's and FMI's) prices, Dr. Reiff ignored third-party reimbursement in concluding that Guardant will "likely" be able to increase prices if successful in this lawsuit.

**Customer and Competitor Information.** Dr. Reiff also failed to consider or even solicit information from any customers or competitors in the market—other than a limited subset from FMI that Guardant fought to get admitted into this case. Ex. 28 at 31:16-21 (Reiff Dep.) ("[Q.] [D]id you ask [Doug Ward] to speak any of PGDx's customers … [A.] I did not ask him to speak to his customers."); 100–02, 105 (limited scope of Dr. Reiff's review of FMI's information); 107:20-23, 109:20-23 (admitting that he did not speak to, or review documents from, a single customer). Likewise, Dr. Reiff failed to consider ██████████████████████████ ███████████████████ and that Guardant was clearly the first mover, which this Court ruled to be relevant to this case. *See* D.I. 205; Section III.F, *supra*, at 36; Ex. 20 at 133:14-20 (Lipson Dep.). The Court should exclude Dr. Reiff's *ipse dixit* opinion regarding anticompetitive effects.

### C.    Dr. Reiff's Analysis Failed to Disaggregate Competitive Effects

Dr. Reiff did not separate the effects of Guardant's procompetitive conduct from the effects of its alleged anticompetitive conduct, which is grounds for exclusion of his opinion. *See Augustine*, 2003 WL 1873836, at *9 & n.7; *see also Concord Boat*, 207 F.3d at 1057. The Circuit Court in *Concord Boat* found that the expert report "did not incorporate all aspects of the economic reality . . . [and] ***did not separate lawful from unlawful conduct***," which should have led to its exclusion. 207 F.3d at 1057 (emphasis added). Dr. Reiff claimed that "there [was] no way to sort out the effect of the alleged conduct from effects of other activities . . . ." Ex. 28 at 123:7-15 (Reiff Dep.). As set forth on pages 35–36, *supra*, Dr. Reiff's failure is highlighted by undisputed evidence of Guardant's procompetitive conduct. Dr. Reiff's opinions are thus of no use in determining whether any claimed harm was, is or will be the result of the alleged anticompetitive conduct.

## II.    DR. REIFF'S OPINION ON MONOPOLY POWER IS UNRELIABLE

As explained above, Dr. Reiff's monopoly power analysis is unreliable as it fails to account for numerous factors that are critical to a monopoly power determination. *See generally* SJ Brief Section III.E. In essence, Dr. Reiff's monopoly power analysis is based on: (1) a measure of gross profit margin, which would lead to the absurd conclusion that "even [a] corner deli . . . has market power[,]" Ex. 28 at 148:24–149:18 (Reiff Dep.); and (2) a mistaken belief that Guardant sets the price in the market, which was based on a Guardant executive's testimony that Dr. Reiff admitted he misinterpreted. *Id.* at 199:2–209:20. Such a conclusion cannot form the basis of a proper expert opinion, as it is based purely on Dr. Reiff's *ipse dixit*. *General Elec.*, 522 U.S. at 146.

Even assuming any of Dr. Reiff's monopoly power measures would be appropriate, which they are not, using such measures in this case would create a "false positive" exposing a dynamic innovator in a nascent market to potential treble damage exposure as a "monopolist." The Supreme Court has definitively warned against measures that create false positives in monopolization cases.

*Trinko*, 540 U.S. at 414 ("The cost of false positives counsels against an undue expansion of § 2 liability."); *cf. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993) (internal citations omitted) ("mistaken inferences" in antitrust cases "chill the very conduct the antitrust laws are designed to protect"); *Matsushita*, 475 U.S. at 594 (same).

## III.  DR. REIFF IS UNQUALIFIED TO PROVIDE AN OPINION ON THE '992 PATENT

Any opinion offered by Dr. Reiff related to the '992 Patent is inadmissible, as Dr. Reiff is unqualified to testify on patents or patent law. When an expert admits that "he has [] no expertise", a court should take the expert at his word and exclude the testimony. *See Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, No. 07–127–LPS–MPT, 2014 WL 529983, at *5 (D. Del. Feb. 7, 2014). Dr. Reiff attempts to opine on the effect of the pending motion to dismiss on the '992 Patent and claims that it is "illogical to assume that PGDx would have faced an infringement claim based only on the '992 Patent without the other patents", as the '992 Patent was a continuation-in-part of the other patents. Ex. 48 ¶ 50 n.69 (Reiff Reply); *see also* D.I. 285. However, Dr. Reiff admitted during his deposition that he is not an expert in patents or patent law. Ex. 28 at 9:9-18 (Reiff Dep.). Furthermore, when asked about the work done on the '992 Patent as it relates to the other patents at issue, Dr. Reiff stated that he does not "have the technical expertise to evaluate that information." *Id.* at 84:23–85:2. Therefore, Dr. Reiff has no basis to offer any opinion on the '992 Patent whatsoever, and the Court should exclude any such testimony from Dr. Reiff.

## IV.  DR. REIFF'S DAMAGES OPINION IS INADMISSIBLE FOR NUMEROUS REASONS

### A.  Dr. Reiff's Damages Calculation Was Nothing More Than Basic Arithmetic That a Jury Can Calculate Itself

Dr. Reiff's damages opinion will not assist the trier of fact, as he did not do an independent analysis of the legal bills. An expert cannot usurp the role of the jury by completing tasks that do

not require an expert's opinion. *See, e.g., Sonos, Inc. v. D & M Holdings, Inc.*, 297 F. Supp. 3d 501, 521 (D. Del. 2017). For example, in *Aequus Techs., L.L.C. v. gh, L.L.C.*, the expert offered a damages opinion "without providing any analysis." Civ. No. 03–5139, 2011 WL 310668, at *3 (D.N.J. Jan. 28, 2011). The court determined that it was not "beyond a juror's common experience" to determine these damages without the assistance of an expert, and held that the damages opinion was "unnecessary and [would] be stricken from the expert's report." *Id.* Here, just like in *Aequus*, Dr. Reiff did no "independent analysis of the appropriateness of any of the bills that [he] tallied", and instead just "add[ed] up the costs." Ex. 28 at 51:25–52:24 (Reiff Dep.). A jury is more than capable of adding up total numbers, and Dr. Reiff's opinion will not assist the jury in this endeavor.

## B. Dr. Reiff Is Unqualified to Analyze the Highly Redacted Legal Bills

Even if Dr. Reiff had performed an analysis of the legal bills, his opinion should still be excluded for two reasons. First, Dr. Reiff admitted that "it is not within [his] area of expertise to judge [] the appropriateness of the [legal] bill." *Id.* at 51:14–52:6. Instead, he boldly asserted that determining the appropriateness of legal bills is the province of the Court. *Id.*; *id.* at 56:5–57:1 ("[T]hese costs can be evaluated by the court and there can be a judgment as to whether they seem like the appropriate level of costs. But that is not something that I as an economist can evaluate."). However, there is no support for Dr. Reiff's claim that the court will determine the amount of damages in an antitrust case. The sole basis for Dr. Reiff's belief is his experience in *TransWeb*. But, in *TransWeb,* the parties reached a stipulation to allow the court to determine the attorney fee based damages, while the jury decided liability. 2013 WL 11312429, at *4 (D.N.J. Sept. 24, 2013).[8]

---

[8] As mentioned above, the limited holding of *TransWeb* was clarified by *Sprint*, 2019 WL 1082067, at *5, which held that attorney's fees could constitute an antitrust injury "only when competition would be impacted by a verdict for the plaintiff." PGDx has a complete failure of proof on this critical competition point.

Here, Guardant has not agreed to let PGDx off the hook, as it has not agreed to any such stipulation.

Notably, in *TransWeb*, the Federal Circuit looked to numerous cases for guidance to determine that attorney's fees could constitute antitrust injury in a *Walker Process* case. 812 F.3d at 1311. Of those cases that were decided by a jury, *CVD, Inc. v. Raytheon*, 769 F.2d 842 (1st Cir. 1985), and *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282 (9th Cir. 1984), ***both juries decided the actual amount of damages in the form of attorneys' fees that the plaintiff would receive***. *See CVD, Inc.*, 769 F.2d at 859; *Handgards, Inc.*, 743 F.2d at 1295–98. Thus, Dr. Reiff's addition of legal bills will not help the fact-finder and is properly excluded in this case.

Second, the legal bills produced were nearly entirely redacted and summary in form with no back-up data. *See* Ex. 56; Ex. 53; *see also* Ex. 28 at 48:7-15, 59:11-14 (Reiff Dep.)

REDACTED

. at 47:11–63:9.

Even if Dr. Reiff had the required expertise to judge the appropriateness of the legal bills, he could not offer any legitimate opinion based on the highly redacted legal bills produced.

### C. The Inability to Disaggregate Legal Fees Amongst the Various Patents-in-Suit Makes Any Damages Calculation Pure Speculation

Dr. Reiff has failed to separate the legal bills between the various patents, and he claims that doing so would be impossible. Ex. 28 at 196:11–198:23 (Reiff Dep.). If this Court finds that the '992 Patent was not fraudulently obtained, then it would be impossible for the jury to properly allocate damages amongst the remaining patents. *See* D.I. 285; *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975) (vacating judgment for Plaintiff because damages

figures advanced by plaintiff's experts were attributable to both lawful and unlawful competition); *Apotex, Inc. v. Cephalon, Inc*., 321 F.R.D. 220, 228, 235–36 (E.D. Pa. 2017) (citing *Coleman Motor Co.., 525* F.2d at 1353) ("The [Third Circuit] has held that a failure to consider the probable effects of lawful competition . . . will lead to a damages award that is based on speculation and guesswork."). Dr. Reiff only relied on heavily redacted summary invoices with no supporting back-up, and has no way of knowing what is included in his damages calculation. Thus, Dr. Reiff's damages calculation should also be rejected for failing to disaggregate damages and limit them solely to antitrust counterclaim work attributable to the allegedly fraudulently obtained patents.

## **CONCLUSION**

For the foregoing reasons, Guardant respectfully requests the Court grant summary judgment on Defendants' inventorship defenses and inequitable conduct counterclaims, FMI's obviousness combinations, and PGDx's antitrust counterclaims, and exclude Dr. Reiff's opinions.

Dated: December 10, 2019

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street
12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
WEIL, GOTSHAL &MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

*Attorneys for Plaintiff*