# EXHIBIT 3

**IN THE U.S. DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| APPLE INC., | |
| *Plaintiff*, | |
| v. | C.A. No. 1:22-cv-01377 (MN) (JLH) |
| MASIMO CORPORATION and SOUND UNITED, LLC, | |
| *Defendants*. | |

**DECLARATION OF JAMES E. YOUNGBLOOD IN SUPPORT OF DEFENDANTS**
**MASIMO CORPORATION AND SOUND UNITED, LLC'S MOTION TO STAY**

I, James E. Youngblood, declare as follows:

1.      I am a partner with the law firm of Knobbe, Martens, Olson & Bear, LLP, counsel for Defendants Masimo Corporation and Sound United, LLC in the above-captioned matter. I have personal knowledge of the matters set forth herein and if I am called upon to testify, I could and would testify competently thereto.

2.      Attached as **Exhibit A** is a true and correct copy of "Two Years in Review: Rehearing Petitions in Patent Cases" from the Intellectual Property & Technology Law Journal, Vol. 35, No. 4 (April 2023), downloaded from https://www.lw.com/en/people/admin/upload/SiteAttachments/Bell-Fry-Zhang.pdf.

3.      Attached as **Exhibit B** are two printouts from the website Fed Circuit Blog's "En Banc Petitions" page (https://fedcircuitblog.com/en-banc/petitions/).  The first page shows the number of recent *en banc* petitions when selecting "Granted" under the "Status" filter. The second page shows the number of recent *en banc* petitions when selecting "Denied" under the "Status" filter.

4.      Attached as **Exhibit C** is a true and correct copy of a Reuters news article attributed to Deirdre M. Wells, William H. Milliken, and Kristina Caggiano Kelly, entitled "Is Federal Circuit on the verge of upending harmonious co-existence between design patents and utility patents?" (July 31, 2023), downloaded from https://www.reuters.com/legal/legalindustry/is-federal-circuit-verge-upending-harmonious-co-existence-between-design-patents-2023-07-31/.

5.      Attached as **Exhibit D** is a true and correct copy of a news article attributed to Hodgson Russ LLP, entitled "Federal Circuit Set to Rehear Case En Banc Impacting the

Longstanding Test for Design Patent Obviousness" (Aug. 10, 2023), downloaded from https://www.jdsupra.com/legalnews/federal-circuit-set-to-rehear-case-en-3060524/.

6.      Attached as **Exhibit E** is a true and correct copy of a news article attributed to Eileen Mcdermott, entitled "Full Federal Circuit to Review Challenge to Test for Design Patent Obviousness," (June 30, 2023), downloaded from https://ipwatchdog.com/2023/06/30/full-federal-circuit-to-review-challenge-to-test-for-design-patent-obviousness/.

7.      Attached as **Exhibit F** are printouts of case summaries for the last ten years of *en banc* patent cases from the website Fed Circuit Blog's "En Banc Cases" page (https://fedcircuitblog.com/en-banc/cases/?action=search-en-banc-cases&keyword=&date=&subject=Patent).

8.      Attached as **Exhibit G** is a true and correct copy of the Brief for the United States as Amicus Curiae on Rehearing En Banc in Support of Neither Party, *LKQ Corp. v. GM Glob. Tech. Operations LLC*, Case No. 21-2348, ECF No. 120 (Fed. Cir. Aug. 28, 2023).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 7, 2023 in Irvine, California.

/s/ *James E. Youngblood*
James E. Youngblood

57174760

# EXHIBIT A

# Intellectual Property & Technology Law Journal

Edited by the Technology and Proprietary Rights Group of Weil, Gotshal & Manges LLP

**VOLUME 35 • NUMBER 4 • APRIL 2023**

## Two Years in Review: Rehearing Petitions in Patent Cases

**By Gabriel K. Bell, Ashley M. Fry and Kevin N. Zhang**

The U.S. Court of Appeals for the Federal Circuit has not granted a petition for en banc rehearing in a patent case in more than six years.[1] In 2021 and 2022, the court granted only a handful of petitions for panel rehearing in patent cases. Notwithstanding the overall low success rate of rehearing petitions, the Federal Circuit is more likely to call for a response to a petition when an amicus curiae files a brief in support of the petitioner. Whether or not this impact is causal (or merely correlative), it suggests that parties seeking rehearing are well-advised to muster amicus support.

This article provides a brief overview of the Federal Circuit's rehearing procedures, examines how the court has acted on petitions for panel rehearing and/or en banc rehearing filed in 2021 and 2022, and presents key takeaways for parties and interested industry players.

## OVERVIEW OF FEDERAL CIRCUIT'S REHEARING PROCEDURES

This section describes the nuts and bolts of the Federal Circuit's rehearing procedures.

A petition for rehearing is an optional procedure available to parties after the Federal Circuit enters judgment in an appeal.[2] A party can either ask for panel rehearing (by the original three-judge panel) or en banc rehearing (by the full Federal Circuit) – or both.[3] Petitioners seeking panel rehearing must state "with particularity" each point of law or fact that the court has overlooked or misapprehended.[4]

Petitioners seeking en banc rehearing must state that either (a) the panel decision is contrary to Supreme Court or Federal Circuit precedent such that en banc consideration is necessary "to secure or maintain uniformity of the court's decisions," or (b) the appeal involves "a question of exceptional importance."[5]

Once filed, rehearing petitions go through a two-stage review process. At the first stage, the court distributes all rehearing petitions to the panel, regardless of whether the petition is styled as a petition for panel rehearing, a petition for en banc rehearing, or a combined petition for panel and en banc rehearing.[6] The panel has 10 working days – roughly two weeks – to consider whether to act on the petition.[7] Any single panel member may invite a response from the non-petitioning parties,

Gabriel K. Bell (gabriel.bell@lw.com), a partner in the Washington, D.C. office of Latham & Watkins LLP and chair of the firm's Intellectual Property Appellate Practice, advises clients on intellectual property litigation in the Federal Circuit and federal district courts. Ashley M. Fry (ashley.fry@lw.com) and Kevin N. Zhang (kevin.n.zhang@lw.com) are associates in the firm's Washington, D.C. office.

i.e., calling for a response.[8] After the court receives a response, the panel has another 10 working days to consider whether to grant or deny the rehearing petition.[9] If no panel member calls for a response or if a majority of the panel does not vote to grant, the panel rehearing petition fails.[10]

Then, if the petition requests en banc action, the court proceeds to the second stage and distributes the petition to the active judges of the court.[11] The full court also has 10 working days to consider whether to call for a response, and any single judge may do so.[12] If no one calls for a response, the en banc rehearing petition fails as a matter of course.[13] If a response is requested and filed, the full court then has 10 more working days to consider whether to initiate a poll on en banc rehearing.[14] Any single judge may request a poll, but a majority of the active judges must vote to rehear the appeal en banc in order for the petition to be granted.[15] At any point in the second stage, the panel may retrieve the petition from the full court, and the two-stage review process repeats.[16]

The Federal Circuit Rules permit amici curiae to seek leave to file amicus briefs in support of the petitioner, the respondent, or neither party.[17] Motions for leave to file must be accompanied by the amicus curiae's brief.[18] If, at either stage, the court grants rehearing, it might simply reissue a revised decision, or call for additional briefing and/or oral argument before issuing another decision.[19]

## REHEARING PETITIONS IN 2021 AND 2022

In 2021 and 2022, the Federal Circuit received and resolved 129 petitions for panel rehearing, en banc rehearing, or both in patent cases.[20] The court called for a response to 45 of the 129 petitions − approximately 35%. But the court granted, at least in part, only six petitions − a grant rate of about 4.7%. All six were petitions for panel rehearing.

**Table 1**

| Year | Petitions (Grants/Total) | Calls for Response (Calls/Total) |
|------|--------------------------|----------------------------------|
| **2021** | **1 / 79** (1.3%) | **24 / 79** (30.4%) |
| **2022** | **5 / 50** (10.0%) | **21 / 50** (42.0%) |
| **Both** (2021 and 2022) | **6 / 129** (4.7%) | **45 / 129** (34.9%) |

Comparing the two years, the number of petitions for rehearing of patent cases decreased from 79 petitions in 2021 to 50 petitions in 2022.[21] At the same time, the number of calls for a response stayed roughly the same − 24 in 2021 and 21 in 2022. Ultimately, as seen in Table 1, the court granted one panel rehearing petition in 2021 and five in 2022. Each of those grants occurred after a call for response.

Overall, in 2021 and 2022, the court took an average of 44.7 ± 28.9 days to rule on a rehearing petition.[22] As one would expect, the court ruled much more quickly on petitions that were denied without a call for a response (30.9 ± 8.8 days) than it did on petitions that were denied after a call for a response (67.2 ± 28.6 days) or the six petitions that it granted after a call for response (91.0 ± 64.5 days).

In the 45 cases in which the court called for a response, it generally did so 17.5 ± 11.8 days after the filing of the rehearing petition. Eighteen of these 45 calls for a response (or 40%) occurred within 14 days after the filing of the rehearing petition (i.e., during the first stage of the court's review process, when the panel reviews the petition).[23] In 2021 and 2022, the quickest call for a response was the same day as the filing of the petition, and the slowest call for a response was 52 days after the filing of the petition.

As seen in Table 2, the court's pace in calling for a response and ruling on a petition did not vary significantly between 2021 and 2022:

### The Amicus Effect

Based on our review of rehearing petitions in patent cases in the last two years, the Federal Circuit is more likely to call for a response in cases with an amicus brief filing than in cases without. However, no amicus briefs were filed in support of the six petitions that were granted.

In 2021 and 2022, amici curiae filed briefs supporting the petitioner in 18 patent cases and supporting the respondent in one patent case. In five of the 19 cases (including the case with an amicus brief supporting the respondent), the Federal Circuit called for a response to the petition for rehearing before any amicus curiae moved for leave to file an amicus brief. For these five cases, therefore, the amicus brief(s) obviously could not have encouraged the court to call for a response.

Of the remaining 14 cases with at least one amicus brief filing, the court called for a response in 10 cases − a call rate of about 71.4%. By contrast, in

**Table 2**

| Year | Time From Petition to Call for Response (Days) | Time From Petition to Ruling (Days) | | | |
|---|---|---|---|---|---|
| | | Denials With No Call for Response | Denials After Call for Response | Grants After Call for Response | All Petitions |
| **2021** | 15.5 ± 12.1 (n = 24) | 31.9 ± 8.2 (n = 55) | 73.8 ± 34.3 (n = 23) | 49.0 ± 0.0 (n = 1) | 44.3 ± 27.3 (n = 79) |
| **2022** | 19.7 ± 11.3 (n = 21) | 29.1 ± 9.6 (n = 29) | 57.6 ± 13.6 (n = 16) | 99.4 ± 68.4 (n = 5) | 45.2 ± 31.5 (n = 50) |
| **Both** (2021 and 2022) | 17.5 ± 11.8 (n = 45) | 30.9 ± 8.8 (n = 84) | 67.2 ± 28.6 (n = 39) | 91.0 ± 64.5 (n = 6) | 44.7 ± 28.9 (n = 129) |

the 110 cases with no amicus brief filing, the court called for a response in only 30 cases – a call rate of about 27.3%.[24] That is a stark difference, although whether the relationship is causal or correlative – or a bit of both – is unclear. On the other hand, there were no amicus briefs in the six granted petitions.

## THE SIX GRANTED PETITIONS FOR PANEL REHEARING

The grounds for rehearing asserted in the six granted petitions reinforce the Federal Circuit's general stance that rehearing petitions are rarely successful.[25] Again, these six represent 4.7% of all rehearing petitions in patent cases that the Federal Circuit received and resolved in 2021 and 2022. For the majority of these six petitions, the basis for the court's grant appears to be reasons other than a rote recitation of previously presented and rejected arguments.

In three of the six petitions, after the petitioner identified discrete factual or legal errors in the panel opinion – "point[s] of law or fact that . . . the court has overlooked or misapprehended"[26] – the panel granted (at least in part) the rehearing petition and issued a modified opinion, albeit reaching the same outcome. These three cases are:

- *Nature Simulation Systems Inc. v. Autodesk, Inc.*, No. 20-2257

  o *Original Opinions*: A panel reversed a district court ruling of invalidity for indefiniteness and remanded for further proceedings.[27] One panel member dissented.[28]

  o *Grounds for Rehearing*: The petitioner identified and took issue with specific language

in the original majority decision about (1) the deference accorded to U.S. Patent and Trademark Office (PTO) examiner determinations of definiteness during prosecution and (2) the relevance of written description, enablement, and best mode to the indefiniteness inquiry.[29]

  o *Modified Opinions*: The same panel issued modified majority and dissenting opinions.[30] The modified majority opinion removed the specific language objected to in the rehearing petition and bolstered the disposition with additional reasoning, to which the dissent responded.[31]

- *Polygroup Ltd. MCO v. Willis Electric Company*, Nos. 21-1401, -1402

  o *Original Opinions*: A panel reversed-in-part, vacated-in-part, and remanded a Patent Trial and Appeal Board (PTAB) final written decision of patentability.[32] One panel member dissented in part.[33]

  o *Grounds for Rehearing*: The petitioner objected to the inclusion of an unappealed patent claim in the original opinions' list of reviewed claims.[34]

  o *Modified Opinions*: The same panel of judges issued modified majority and dissenting in part opinions removing references to the unappealed patent claim.[35]

- *Edgewell Personal Care Brands v. Munchkin, Inc.*, No. 20-1203

o *Original Opinion*: A panel vacated-in-part, reversed-in-part, and remanded a district court's grant of summary judgment of noninfringement.[36]

o *Grounds for Rehearing*: The petitioner asserted that the panel overlooked its arguments on an additional, independent basis for affirming the district court's grant of summary judgment of noninfringement.[37]

o *Modified Opinion*: The same panel of judges issued a modified opinion disposing of the purportedly overlooked argument.[38]

In a fourth granted petition, the outcome likewise did not change. There, the petitioner identified a conflict of interest with one of the judges on the initial panel that summarily affirmed under Federal Circuit Rule 36(a).[39] Two judges on the panel recused, and the court constituted a new panel that issued a short, non-precedential per curiam opinion affirming.[40] The newly constituted panel also admonished the petitioner for its delay in raising the conflict until after oral arguments and entry of judgment in the appeal.[41]

The remaining two granted petitions are the only ones that changed the outcome. In one, a panel affirmed a PTAB final written decision of patentability solely based on its affirmance in a companion appeal of a district court judgment that overlapping claims of the same patent were invalid for lack of written description.[42] The petitioner asserted that the court should have vacated the PTAB final written decision because, in these circumstances, the appeal was moot.[43] The panel agreed with the petitioner and issued per curiam orders vacating the original opinion and the PTAB final written decision.[44]

> **Filing an amicus brief in support of a petitioner is a good way for non-parties to draw the Federal Circuit's attention to particular issues.**

In the other case, an initial panel ruled 2–1 to affirm a district court judgment finding written description support for a negative limitation.[45] Following the rehearing petition and response (and

one panel member's retirement), a modified panel ruled 2-1 to reverse the district court judgment.[46]

## TAKEAWAYS FOR PETITIONERS/ PARTIES THAT LOSE ON APPEAL

Petitioners face a steep uphill climb when trying to convince a panel or the full court to rehear their case. Securing a different outcome is even more difficult. Indeed, in the past two years, petitioners in only two patent cases persuaded the court to reach a different result.

Petitioners should refrain from viewing rehearing petitions as a second chance to present their best arguments on appeal. Indeed, several members of the court have urged litigants to be more selective.[47] General disagreements with the panel's application of the law to facts or exaggerated conflicts with precedent are unlikely to gain traction.

## TAKEAWAYS FOR RESPONDENTS/ PARTIES THAT WIN ON APPEAL

If at least one judge is interested in a rehearing petition, parties that prevail on appeal should expect a call for a response within a few weeks of the filing of the rehearing petition. Responses provide a valuable opportunity to counterbalance the petitioner's (and any amicus curiae's) framing of the panel opinion.

In any event, the vast majority of petitions are denied, even when the court calls for a response. In such cases, the petition is typically denied within two or three months after the petition is filed. If the court does not call for a response, the denial typically takes about one month.

## TAKEAWAYS FOR INTERESTED INDUSTRY PLAYERS

Filing an amicus brief in support of a petitioner is a good way for non-parties to draw the Federal Circuit's attention to particular issues. The court is generally receptive to receiving amicus briefs, and the court appears more willing to call for a response to a rehearing petition if an amicus brief has been filed.

## CONCLUSION

- In 2021 and 2022, the U.S. Court of Appeals for the Federal Circuit called for a response to more than one-third of rehearing petitions filed in patent cases, but granted fewer than 5% of them.

- The court called for a response in more than 70% of cases with at least one amicus brief in support of the petitioner.

- The court granted panel rehearing in only six patent cases, and only changed its disposition twice.

- The court did not grant en banc rehearing in any patent case.

## Notes

1. See En Banc Cases, Fed Circuit Blog, https://fedcircuitblog.com/en-banc/cases/ (last visited Jan. 27, 2023). The Federal Circuit last granted a petition for en banc rehearing in 2017 in Wi-Fi One, LLC v. Broadcom Corp, 851 F.3d 1241 (Fed. Cir. 2017) (mem.). See id. (January 4, 2017 order granting petition for en banc rehearing). Since Wi-Fi One, in patent cases, the Federal Circuit has sua sponte ordered rehearing en banc and issued an opinion with an en banc footnote. NantKwest, Inc. v. Matal, 869 F.3d 1327 (Fed. Cir. 2017) (mem.) (August 31, 2017 order for sua sponte rehearing en banc); Click-to-Call Techs., LP v. Ingenio, Inc., 899 F.3d 1321, 1328 n.3 (Fed. Cir. 2018) (en banc footnote). But it has yet to grant a petition for en banc rehearing in a patent case since Wi-Fi One.
2. See Fed. Cir. R. 35, 40.
3. See Fed. R. App. P. 35(b), 40(a); Fed. Cir. R. 35(d).
4. See Fed. R. App. P. 40(a)(2); Fed. Cir. R. 40(a)(5).
5. See Fed. R. App. P. 35(a), (b); Fed. Cir. R. 35(b)(2).
6. See Internal Operating Procedures (hereinafter, IOP) #12(1)(b), #14(2)(a), U.S. Ct. of Appeals for the Fed. Cir., https://cafc.uscourts.gov/wp-content/uploads/RulesProceduresAndForms/InternalOperatingProcedures/InternalOperatingProcedures.pdf (last updated July 22, 2022).
7. Id. #12(1)(b).
8. See id. #12(4)(b). A party may decline to respond, id., although in practice that is rare. See Order, VDPP LLC v. VIZIO, Inc., No. 21-2040 (Fed. Cir. June 29, 2022), ECF No. 61.
9. See IOP #12(4)(b).
10. See id. #12(2), (3)(a).
11. See id. #12(1)(a), #14(2)(a).
12. See id. #14(2)(a).
13. See id. #14(2)(b).
14. See id. #14(2)(c).
15. See id. #14(2)(c), (5).
16. See id. #14(2)(e).
17. See Fed. Cir. R. 35(g), 40(g).
18. See id.
19. See IOP #12(3)(b), #14(2)(f).
20. The Federal Circuit struck one of the 129 petitions for noncompliance with its rules, and a petitioner withdrew a second petition prior to the court ruling on it. See Order, Pop Top Corp. v. Rakuten Kobo Inc., No. 21-2174 (Fed. Cir. Aug. 23, 2022), ECF No. 53 (striking rehearing petition); Order, Bio-Rad Lab'ies, Inc. v. ITC, No. 20-1475 (Fed. Cir. July 28, 2021), ECF No. 84 (granting motion to withdraw rehearing petition). As of December 31, 2022, another four petitions remained pending, and this article does not address them. Our review also does not include an additional two petitions for initial en banc hearing in patent cases, both of which were denied. See Order, Jump Rope Sys., LLC v. Coulter Ventures, LLC, No. 22-1264 (Fed. Cir. May 5, 2022), ECF No. 11; Roku, Inc. v. Universal Elecs., Inc., No. 22-1216 (Fed. Cir. Dec. 30, 2021), ECF No. 12.
21. The marked decrease in filings of rehearing petitions in patent cases may, in part, be the result of comments made by Federal Circuit judges at a conference in March 2022 urging attorneys to be more selective in seeking rehearing. See Ryan Davis, Fed. Cir. Judges Say Cool It with the Rehearing Petitions, Law360 (Mar. 17, 2022, 8:08 PM), https://www.law360.com/articles/1475014.
22. Unless otherwise noted, all plus-minus values are mean ± sample standard deviation.
23. Although calls for a response ordered within 14 days after the filing of a rehearing petition are likely made by a panel member, we cannot say conclusively whether a panel member or judge on the full court made the call. A judge on the full court may have taken interest in a case, as can happen during the 10-day full-court review of any precedential opinions prior to their issuance. Federal holidays and administrative procedures may give the panel more than 14 days to consider a rehearing petition. And, sometimes, the panel has discretion to extend the review period. See Letter to Appellee Biogen MA Inc., Mylan Pharms. Inc. v. Biogen MA Inc., No. 20-1673 (Fed. Cir. Mar. 21, 2022), ECF No. 66 (calling for a response 52 days after the filing of a petition for panel rehearing only).
24. Even if the 110 cases were added to the five cases in which the court called for a response before a motion for leave to file an amicus brief, the call rate of 30.4% (or 35/115) would still be substantially lower.
25. Petitions for Rehearing & Rehearing En Banc, U.S. Ct. of Appeals for the Fed. Cir., https://cafc.uscourts.gov/home/case-information/case-filings/petitions-for-rehearing-rehearing-en-banc/ (last visited Jan. 27, 2023).
26. See Fed. R. App. P. 40(a)(2); Fed. Cir. R. 40(a)(5).

27. Nature Simulation Sys. Inc. v. Autodesk, Inc., 23 F.4th 1334, 1336 (Fed. Cir. 2022).

28. Id. at 1344 (dissent).

29. Autodesk, Inc.'s Combined Petition for Panel & En Banc Rehearing, Nature Simulation Sys. Inc. v. Autodesk, Inc., No. 20-2257 (Fed. Cir. Mar. 21, 2022), ECF No. 35.

30. Nature Simulation Sys. Inc. v. Autodesk, Inc., 50 F.4th 1358, 1360 (Fed. Cir. 2022); id. at 1368 (dissent).

31. See id. at 1367–68; id. at 1371 (dissent).

32. Polygroup Ltd. MCO v. Willis Elec. Co., Nos. 21-1401, -1402, 2022 WL 167466, at *1 (Fed. Cir. Jan. 19, 2022).

33. Id. at *5 (dissent in part).

34. Combined Petition of Appellee Willis Electric Co., Ltd. for Panel Rehearing or Rehearing En Banc, Polygroup Ltd. MCO v. Willis Elec. Co., Nos. 21-1401, -1402 (Fed. Cir. Feb. 18, 2022), ECF No. 46.

35. See Polygroup Ltd. MCO v. Willis Elec. Co., Nos. 21-1401, -1402, 2022 WL 1183332, at *1 (Fed. Cir. Apr. 20, 2022); id. at *5 (dissent in part).

36. Edgewell Pers. Care Brands, LLC v. Munchkin, Inc., 989 F.3d 1358, 1361 (Fed. Cir. 2021).

37. Petition for Rehearing of Defendant-Appellee, Edgewell Pers. Care Brands, LLC v. Munchkin, Inc., No. 20-1203 (Fed. Cir. Apr. 7, 2021), ECF No. 48.

38. Edgewell Pers. Care Brands, LLC v. Munchkin, Inc., 998 F.3d 917, 919 (Fed. Cir. 2021).

39. W. Plastics, Inc. v. DuBose Strapping, Inc., Nos. 21-1371, -1372, 2021 WL 5985361, at *1 (Fed. Cir. Dec. 17, 2021); Defendant-Appellant's Petition for Rehearing En Banc, W. Plastics, Inc. v. DuBose Strapping, Inc., Nos. 21-1371, -1372, (Fed. Cir. Jan. 18, 2022), ECF No. 44; Order, W. Plastics, Nos. 21-1371, -1372 (Fed. Cir. Feb. 25, 2022), ECF No. 50.

40. W. Plastics, 2022 WL 576218, at *1.

41. W. Plastics, 2022 WL 576218, at *1 n.1.

42. Mylan Pharms. Inc. v. Biogen MA Inc., No. 20-1673, 2021 WL 5571658, at *1 (Fed. Cir. Nov. 30, 2021).

43. Appellant's Petition for Panel Rehearing, Mylan Pharms. Inc. v. Biogen MA Inc., No. 20-1673 (Fed. Cir. Jan. 28, 2022), ECF No. 64.

44. Mylan Pharms. Inc. v. Biogen MA Inc., No. 20-1673, 2022 WL 1089900, at *1 (Fed. Cir. Apr. 8, 2022); Mylan Pharms. Inc. v. Biogen MA Inc., No. 20-1673, 2022 WL 14461991, at *1 (Fed. Cir. Oct. 25, 2022).

45. Novartis Pharms. Corp. v. Accord Healthcare, Inc., 21 F.4th 1362, 1365 (Fed. Cir. 2022).

46. Novartis Pharms. Corp. v. Accord Healthcare, Inc., 38 F.4th 1013, 1015 (Fed. Cir. 2022).

47. See Davis, supra note 21.

Copyright © 2023 CCH Incorporated. All Rights Reserved.
Reprinted from *Intellectual Property & Technology Law Journal*, April 2023, Volume 35, Number 4, pages 3–8, with permission from Wolters Kluwer, New York, NY, 1-800-638-8437, www.WoltersKluwerLR.com



# EXHIBIT B



# En Banc Petitions

**SEARCH BY**

Case Name, Appeal Number, Question(s) Presented

**STATUS**

Granted

**SUBJECT**

Any

🔍

**1 Petition**

| | |
|---|---|
| **Appeal No.** | 21-2348 |
| **Case** | LKQ Corporation v. GM Global Technology Operations LLC |
| **Subject** | Patent     `3 Amici` |
| **Status** | Granted |
| **Question(s) Presented** | "Whether the rigid approach to evaluating the obviousness of designs under In re Rosen, 673 F.2d 388, 391 (CCPA 1982) and Durling v. Spectrum Furniture Co., Inc., 101 F.3d 100... |



# En Banc Petitions

**SEARCH BY**

Case Name, Appeal Number, Question(s) Presented

**STATUS**

Denied ▾

**SUBJECT**

Any ▾

🔍

**306 Petitions**

| | |
|---|---|
| **Appeal No.** | 23-1362 |
| **Case** | Vroom, Inc. v. Sidekick Technology, LLC |
| **Subject** | Patent |
| **Status** | Denied |
| **Question(s) Presented** | "Whether a district court's judgment on the pleadings in favor of the plaintiffs that all of the defendant's asserted patent claims are invalid is sufficiently final for this Court to... |

| | |
|---|---|
| **Appeal No.** | 23-1247 |

# EXHIBIT C

Learn more about **LSEG**



🔍   ☰

⊞ My View    👤 Following    🔖 Saved

Legal Industry | Attorney Analysis | Intellectual Property

## Is Federal Circuit on the verge of upending harmonious co-existence between design patents and utility patents?

By **Deirdre M. Wells**, **William H. Milliken** and **Kristina Caggiano Kelly**

July 31, 2023 7:37 AM PDT · Updated 22 days ago

🔖   Aa   ⤴

**Commentary**

Attorney Analysis from Westlaw Today, a part of Thomson Reuters.



A gavel and a block is pictured at the George Glazer Gallery antique store in this illustration picture taken in Manhattan, New York City, U.S., August 18, 2020.
REUTERS/Andrew Kelly/Illustration *Acquire Licensing Rights* ↗



**Law Firms**

**Sterne, Kessler, Goldstein & Fox P.L.L.C.**

Follow

July 31, 2023 - Design patents and utility patents have co-existed in harmony — each staying in its own lane, covering its own subject matter — for over 180 years. The U.S. Patent Act was enacted in 1790, and the first U.S. utility patent was issued on July 31, 1790. The utility patent was issued to Samuel Hopkins for a process for making potash, an ingredient used in fertilizer. It was signed by President George Washington.

Fifty-two years later — in 1842 — Congress passed a statute providing for the grant of patents covering new and original designs. The first U.S. design patent was issued later that year on Nov. 9, 1842. The design patent was issued to George Bruce for a new font.

For the 181 years since then, the two types of patents have developed on parallel, yet distinct courses. While both types of patents allow their holders to exclude others from using their ideas without their permission during the life of the patent, they have developed several differences. For example, differences between the two types of patents include the length of their exclusionary period, the cost of obtaining and maintaining them, what they cover (the appearance or look of something versus its function), the analysis used to determine whether someone is infringing them, and — importantly for this article — the analysis used to determine whether they are obvious.

Now the harmonic co-existence enjoyed for nearly two centuries by design patents and utility patents may be on the verge of extinction. For the first time in over five years, the U.S. Court of Appeals for the Federal Circuit will be hearing a patent case en banc — and not just any patent case. It is a case that questions whether the obviousness analysis applied to design patents should be merged with — or changed in view of — the analysis applied to utility patents.

The case is LKQ Corporation v. GM Global Technology Operations LLC. It is an appeal from an inter partes review proceeding brought by LKQ challenging GM's design patent.

LKQ was once a licensed repair part vendor for GM. But after renewal negotiations fell through in early 2022, GM informed LKQ that the parts LKQ was selling were no longer licensed and therefore infringed GM's design patent. In response, LKQ sought to invalidate GM's auto fender design patent in an inter partes review.

The U.S. Patent Trial and Appeal Board (PTAB) ruled in GM's favor — finding that LKQ had not shown that the patent was obvious. LKQ appealed to the Federal Circuit. LKQ argued that the U.S. Supreme Court's decision in KSR International Co. v. Teleflex Inc., 550 U.S. 398 (2007) — a case involving the obviousness analysis for utility patents — should apply to design patents.

In particular, LKQ argued that the currently applied obviousness standard for design patents (which the PTAB applied in the LKQ's IPR) is inappropriate and should more closely parallel the obviousness standard used for utility patents. In an opinion issued on Jan. 20, 2023, the Federal Circuit rejected LKQ's argument and affirmed the PTAB's finding. But, on June 30, 2023, the full Federal Circuit agreed to hear the case en banc and consider whether the design patent obviousness analysis requires modification.

The current test for design patent obviousness is based on In re: Rosen (a CCPA (Court of Customs and Patent Appeals) decision from 1982) and Durling v. Spectrum Furniture (a Federal Circuit decision from 1996). Under the current test, for a challenger to invalidate a design patent claim based on obviousness, the challenger must satisfy a two-step test.

First, the challenger must show there is a single primary reference which has "characteristics [that are] 'basically the same' as the claimed design." Second, the challenger must show that the gap between the primary reference and the claimed design can be bridged by one or more secondary references. These references must be related enough in appearance to the claimed design that "an ordinary designer would have modified the primary reference to create a design with the same overall visual appearance as the claimed design."

This, according to LKQ, stands in sharp contrast to the more flexible standard for obviousness of utility patents — a standard that LKQ argues should apply to all patents, regardless of type. In 2007, the U.S. Supreme Court in KSR rejected the strict function-way-result test the Federal Circuit had been applying in determining obviousness of utility patent claims.KSR held that an ordinarily skilled inventor could look beyond the field of the problem trying to be solved to create a unique solution. The Court stated that obviousness inquiries should use "an expansive and flexible approach" rather than "a rigid rule."

The case currently before the Federal Circuit (and the eventual en banc decision) could dramatically change the design patent landscape — in a myriad of unknown and unpredictable ways. GM (and those opposed to changes to the obviousness analysis) argue that there is no reason to overturn decades of established case law on obviousness in design patents based on a KSR decision that pertained only to utility patents (with a different purpose and different coverage).

The current two-step design patent obviousness test has been applied for over two and a half decades and provides a high degree of certainty for all parties involved. Those arguing against applying KSR to design patents see no reason to change a design patent obviousness test that is well understood by both courts and litigants.

So the fate of issued, pending, and yet-to-be-filed design patents waits in the wings as the Federal Circuit considers whether to change the design patent obviousness analysis — either to that of utility patents (as modified in KSR) or to some other (yet to be defined) standard. In addition to added unpredictability, a change in the test would likely also raise litigation costs as litigants and courts grapple to understand and apply a new obviousness standard.

And — perhaps most concerning — if the Federal Circuit modifies the obviousness analysis for design patents to be more aligned with the analysis applied to utility patents, what else will one day be merged between the two? The infringement analysis? The lifetime of the patent? The very purpose and scope of their coverage?

Perhaps recognizing the importance of this case — particularly to current and future design patent holders — the Federal Circuit has asked for feedback from the government and issued an open call for amici, in addition to briefing from the parties. The oral argument is not yet scheduled.

Regardless of the outcome — whether the Federal Circuit's decision confirms (or evaporates) the parallel yet distinct trajectories of design and utility patents — the case will have widespread impact on the patent community.

The writers are regular, joint contributing columnists on intellectual property law for Reuters Legal News and Westlaw Today.

---

Opinions expressed are those of the author. They do not reflect the views of Reuters News, which, under the Trust Principles, is committed to integrity, independence, and freedom from bias. Westlaw Today is owned by Thomson Reuters and operates independently of Reuters News.

Acquire Licensing Rights 🗗

Feedback



**Deirdre M. Wells**

Deirdre M. Wells is a director in Sterne, Kessler, Goldstein & Fox's trial and appellate practice group. She has patent litigation experience before federal district courts, the International Trade Commission, and the U.S. Court of Appeals for the Federal Circuit, and has represented clients in fields including Hatch-Waxman Paragraph IV pharmaceuticals, chemical arts, medical devices, biotechnology, data storage devices, internet search technology, electrical connectors, wireless broadband technology, telephone systems, and mobile content delivery. She has a continuing focus on design patent enforcement and can be reached at dwells@sternekessler.com.





### William H. Milliken

William H. Milliken is a director in the firm's trial and appellate practice group. His practice focuses on patent litigation in U.S. district courts and the Federal Circuit, with a particular emphasis on cases arising under the Hatch-Waxman Act. He has experience drafting appellate briefs filed in the U.S. Courts of Appeals, briefing and arguing complex motions before the federal district courts, and assisting with trial preparation in Hatch-Waxman and other patent infringement litigation. He can be reached at wmilliken@sternekessler.com.





### Kristina Caggiano Kelly

Kristina Caggiano Kelly is a director in the firm's trial and appellate practice group, representing clients in all stages of litigation before the Patent Trial and Appeal Board, International Trade Commission, district courts, Federal Circuit, and Supreme Court. She has experience in both inter partes disputes and patent prosecution in a variety of technological areas, including Hatch-Waxman filings, interference practice, and opinion work. She can be reached at kckelly@sternekessler.com.



## Read Next / Editor's Picks

World
**Sigma Lithium, eyeing buyout, sues ex-CEO and daughter-in-law over trade secrets**
2:23 AM UTC



Plaintiffs' Bar
**Lawyer Tom Girardi's mental competency at issue in hearing set for Wednesday**
3:20 AM UTC



Employee Benefits & Executive Compensation
**Activist behind US affirmative action cases sues major law firms**
ago



Copyright
**Office Depot eyes $2 million in attorney fees after beating copyright claim**
2:08 AM UTC



# EXHIBIT D

August 10, 2023

# Federal Circuit Set to Rehear Case En Banc Impacting the Longstanding Test for Design Patent Obviousness

Alfonzo Cutaia, Samuel Kielar, Nathaniel Lucek, Charles Rauch, R. Kent Roberts, George Snyder

Hodgson Russ LLP

+ Follow    Contact



On June 30, 2023, the U.S. Court of Appeals for the Federal Circuit granted a petition for rehearing *en banc* in *LKQ Corp. v. GM Global Tech. Operations*. The full court will consider whether forty years of established precedent regarding the obviousness of design patents should be revised or overturned in light of the Supreme Court's *KSR Int'l Co. v. Teleflex* decision, which involved the standard of obviousness for utility patents.

As background, the United States Court of Customs and Patent Appeals (CCPA) decision of *In re Rosen* in 1982 and subsequent Federal Circuit decision of *Durling v. Spectrum Furniture Co.* in 1996 set forth a two-step analysis for design patent obviousness. First, it must be determined whether a primary reference (i.e., a *Rosen* reference) exists with characteristics that are "basically the same" as the claimed design. Then, if a satisfactory primary reference exists, the court must consider whether an ordinary designer would have modified the primary reference to create a design with the same overall visual appearance as the claimed design. If no *Rosen* reference exists, there can be no finding of obviousness.

The Federal Circuit's decision in *Apple v. Samsung Electronics* illustrates the high bar for design patent obviousness. There, the court considered whether a prior art "Fidler tablet" qualified as a

Privacy - Terms

*Rosen* reference against Apple's U.S. Pat. No. **D504,889** (the "D'889 patent") for its iPad:



In comparing the above designs, the Federal Circuit determined that the Fidler tablet did not create the same visual impression as the D'889 patent due to various differences in design. As a result, the district court's finding that the Fidler tablet qualified as a *Rosen* reference was overturned.

While *Rosen-Durling* sets forth the current standard for design patent obviousness, the Supreme Court's 2007 decision in *KSR* governs the standard for utility patents. In *KSR,* the Supreme Court considered whether the Federal Circuit's teaching, suggestion, motivation (TSM) test should be the *sole* test for obviousness. The TSM test provided safeguards against hindsight reconstruction of a patent claim by requiring that the prior art, nature of the problem to be solved, or knowledge of those skilled in the art, reveal some motivation or suggestion to combine the prior art teachings. However, the Supreme Court found the TSM test to be overly rigid and inconsistent with common sense, ordinary skill, and ordinary creativity that a person having ordinary skill in the art would employ. Consequently, the Court adopted a more expansive and flexible framework

to the obviousness inquiry: whether the improvement is more than the predictable use of prior art elements according to their established functions.

The present case stems from LKQ's petition for *inter partes* review of GM's U.S. Design Patent No. **D797,625** (the "D'625 patent") for a vehicle front fender, which asserted that the '625 patent was anticipated by U.S. Design Patent No. **D773,340** ("Lian") and/or obvious over Lian in view of a 2010 Hyundai Tucson design. The USPTO Patent Trial and Appeal Board found that Lian did not qualify as a proper primary reference under *Rosen*, and therefore LKQ had failed to demonstrate that the '625 patent was obvious. On appeal, LKQ argued that the Board's decision should be overturned, in part, because *KSR* implicitly overruled the two-step analysis of *Rosen* and *Durling*. LKQ contended that the "basically the same" requirement was an overly-restrictive view of obviousness, similar to the "rigid" TSM test rejected by the Supreme Court in *KSR*.

In its original *per curiam* decision on January 20, 2023, the Federal Circuit noted that its three-judge panel could not overrule its prior decisions in *Rosen* and *Durling* without a "clear directive from the Supreme Court" since panels "are bound by prior panel decisions until they are overruled by the court *en banc*." Now that the court has agreed to rehear the case *en banc*, it requested briefing on several issues, including whether: (1) *KSR* overrules or abrogates *In re Rosen* and *Durling*; and (2) the *Rosen-Durling* test should be modified or eliminated.

LKQ's opening brief is due August 14, 2023, and GM's response is due within 45 days of service of LKQ's opening brief. Amicus briefs supporting LKQ's position or supporting neither position must be filed within 14 days after service of LKQ's opening brief, and amicus briefs supporting GM's position must be filed within 14 days after service of GM's response. LKQ may file a reply brief within 30 days of GM's response.

The Federal Circuit's *en banc* review seems likely lead to a clarification of *Rosen* or set forth a new test. As LKQ argued, the *Rosen* framework can be rigid, running contrary to the Supreme Court's flexible approach in *KSR*. However, *KSR*'s association of "predictability" with obviousness cannot apply to design patents: when would a combination of design elements not be visually predictable? The obviousness standard cannot give examiners and courts free reign to recreate a design-soufflé with knowledge of its recipe. Perhaps the current application of Rosen is too strict, but a KSR-like standard would eviscerate the U.S. design patent system. Any revised obviousness standard would need to be more like *Rosen* than *KSR* to prohibit shopping for individual visual elements and preserve industrial design rights.



# EXHIBIT E



# Full Federal Circuit to Review Challenge to Test for Design Patent Obviousness



**EILEEN MCDERMOTT**

JUNE 30, 2023, 03:15 PM    💬 2

---

> "In its petition, LKQ explained that design patents are 'generally subject to the same requirements as patents for inventions' and that *KSR*'s holding that obviousness should be 'an assessment that focuses on the knowledge and motivations of a person having ordinary skill in the relevant art' should therefore apply."

---

The U.S. Court of Appeals for the Federal Circuit (CAFC) has granted a rare en banc review of its January, 2023, decision in *LKQ Corporation v. GM Global Technology Operations*, which affirmed a Patent Trial and Appeal Board (PTAB) ruling that LKQ failed to show by a preponderance of the evidence that GM's design patent was anticipated or would have been obvious.



U.S. Patent D855,508 covers a "vehicle front skid bar." In its January decision, the Federal Circuit explained that "applying the tests established in *Rosen* and *Durling*, the Board found that LKQ failed to identify a sufficient primary reference, and therefore failed to prove obviousness by a preponderance of the evidence.

The so-called *Rosen-Durling* test requires that, first, under *In re Rosen* (C.C.P.A., 1982), courts identify a prior art reference "the design characteristics of which are basically the same as the claimed design." Next, under *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir., 1996)), if such a reference is

identified, the court consider whether it can be modified based on other references to come up with "the same overall visual appearance as the claimed design."

The Federal Circuit ultimately said that "[w]e, as a panel, cannot overrule *Rosen* or *Durling* without a clear directive from the Supreme Court."

LKQ argued in its petition for en banc rehearing in March that the CAFC and its predecessor court have been applying a "rigid approach" to determining obviousness of design patents for 40 years, and that the Supreme Court's 2007 holding in *KSR International v. Teleflex, Inc.* expressly overruled such an approach. The petition asked the en banc court to consider the following two questions:

> "1. Whether the rigid approach to evaluating the obviousness of designs under *In re Rosen*, 673 F.2d 388, 391 (CCPA 1982) and *Durling v. Spectrum Furniture Co., Inc.*, 101 F.3d 100 (Fed Cir. 1996) is consistent with the Supreme Court's interpretation of 35 U.S.C. § 103 in KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398 (2007); and

> 2. What standard, consistent with *KSR* and 35 U.S.C. §171, should replace the current requirement that a patent challenger identify a primary reference that is basically the same as the claimed design as a prerequisite to evaluating obviousness and the further limitation that allows modification of the primary reference only if there is a secondary reference that is "so related" to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other."

In its petition, LKQ explained that design patents are "generally subject to the same requirements as patents for inventions" and that *KSR*'s holding that obviousness should be "an assessment that focuses on the knowledge and motivations of a person having ordinary skill in the relevant art" should therefore apply.

In today's Federal Circuit decision to grant en banc review, the court vacated the January panel opinion and asked the parties to address six specific questions in their briefs, paraphrased below:

- Does *KSR* abrogate *In Re Rosen* and *Durling*?
- If it does not, should the court nonetheless modify the *Rosen-Durling* test in any way in view of *KSR*'s holding that obviousness tests should not be rigid?
- What should the new test be if so?
- Has any precedent from the CAFC already taken steps to clarify *Rosen-Durling*?
- Would eliminating or modifying the test create uncertainty?
- What differences are there between design and utility patents and what role should those difference play in a test for design patent obviousness?

The court also invited the views of the U.S. Solicitor General.

It has been some time since the Federal Circuit has gone en banc to clarify patent law. Retired CAFC Chief Judge Paul Michel has commented on this fact in the context of patent eligibility law numerous times recently, and last year said at an IPWatchdog event that "there's been a tremendous failure on the part of the Federal Circuit, first to provide clarity and rigorous analysis and rationalism, but secondly to clean up disparate decisions and provide clarity by going en banc."

Chris Carani of McAndrews Held & Malloy called the development "historic":

> "The case marks an historic occasion in design patent jurisprudence; it is only the second time that the en banc Federal Circuit has taken on a design patent case.  The last time was in 2008 for the seminal case of _Egyptian Goddess v. Swisa_.
>
> The en banc court seems to have the appetite to fundamentally rework the test for determining whether a design patent complies with the Patent Act's non-obviousness requirement. Changes to the test will not only affect design patents for years to come but also the hundreds of thousands of currently issued design patents.
>
> By the nature of its questions, the en banc Federal Circuit realizes that reworking this area of the law is not as simple as striking down the currently employed test or applying the Supreme Court's _KSR_ test, which regards utility patents (not design patents). If it makes a change (which it seems poised to do), the en banc court has signaled that it needs a viable alternative test to put in its place that avoids the concerns of a rigid rule, while taking into account the peculiar aspects of design patents."

_This article has been updated since publication to include Chris Carani's commentary._



**EILEEN MCDERMOTT**

Eileen McDermott is the Editor-in-Chief of IPWatchdog.com. Eileen is a veteran IP and legal journalist, and no stranger to the intellectual property world, having held editorial and managerial positions at [...see more]

**Warning & Disclaimer:** The pages, articles and comments on IPWatchdog.com do not constitute legal advice, nor do they create any attorney-client relationship. The articles published express the personal opinion and views of the author as of the time of publication and should not be attributed to the author's employer, clients or the sponsors of IPWatchdog.com. Read more.

# EXHIBIT F



← Back to En Banc Cases

# Click-to-Call Technologies, LP v. Ingenio, Inc.

| APPEAL NO. | OP. BELOW | OPINION | SUBJECT | AUTHOR |
|---|---|---|---|---|
| 15-1242 | PATO | August 16, 2018 | Patent | O'Malley |

## Question(s) Presented

"[W]hether 35 U.S.C. § 315(b)'s time bar applies to bar institution when an IPR petitioner was served with a complaint for patent infringement more than one year before filing its petition, but the district court action in which the petitioner was so served was voluntarily dismissed without prejudice."

## Holding

"The en banc court holds that § 315(b)'s time bar applies in such a scenario."

## Posts About this Case

**Recent En Banc Activity**
November 17, 2022

**Recent En Banc Activity**
November 2, 2022

**Recent En Banc Activity**
October 19, 2022

**Recent En Banc Activity**
September 21, 2022

| DATE | SELECTED PROCEEDINGS AND ORDERS |
|---|---|

| December 5, 2016 | Click-to-Call's Petition for Rehearing En Banc |
| January 19, 2018 | Order on Petition for Panel Rehearing |
| February 5, 2018 | Supplemental Brief of Appellant |
| February 21, 2018 | Supplemental Brief of Appellees in Response to Court's January 19, 2018 Order |
| March 5, 2018 | Second Supplemental Brief for Intervenor |
| May 1, 2018 | Panel Oral Argument |
| August 16, 2018 | Opinion |



FedCircuitBlog

← Back to En Banc Cases

# Nantkwest, Inc. v. Iancu

| APPEAL NO. | OP. BELOW | OPINION | SUBJECT | AUTHOR |
|---|---|---|---|---|
| 16-1794 | DCT | July 27, 2018 | Patent | Stoll |

## Question(s) Presented

"When the United States Patent and Trademark Office's Patent Trial and Appeal Board ('Board') affirms an examiner's rejection of a patent application, § 145 of the Patent Act permits the disappointed applicant to challenge the Board's decision in district court. Applicants who invoke § 145 are required by statute to pay '[a]ll the expenses of the proceedings' incurred by the U.S. Patent and Trademark Office ('PTO') in defending the Board's decision, regardless of the outcome. Historically, the agency relied on this provision to recover sums it spent on travel and printing and, more recently, expert witnesses. Now, 170 years after Congress introduced § 145's predecessor, the agency argues that § 145 also compels applicants to pay its attorneys' fees." Does § 145 compel applicants to pay the PTO's attorneys' fees?

## Holding

"We hold that it does not, for the American Rule prohibits courts from shifting attorneys' fees from one party to another absent a 'specific and explicit' directive from Congress. The phrase '[a]ll the expenses of the proceedings' falls short of this stringent standard."

| DATE | SELECTED PROCEEDINGS AND ORDERS |
|---|---|
| June 6, 2016 | Brief for Appellant |
| September 6, 2016 | Brief of Plaintiff-Appellee Nantkwest, Inc. |

| October 11, 2016 | Reply Brief |
| February 9, 2017 | Panel Oral Argument |
| June 23, 2017 | Panel Opinion |
| August 31, 2017 | Order Granting Sua Sponte Rehearing En Banc |
| November 15, 2017 | Brief for the Appellant on Rehearing En Banc |
| January 16, 2018 | En Banc Brief of Plaintiff-Appellee Nantkwest, Inc. |
| January 31, 2018 | Reply Brief for the Appellant on Rehearing En Banc |
| March 8, 2018 | En Banc Oral Argument |
| July 27, 2018 | En Banc Opinion |





← Back to En Banc Cases

# Wi-Fi One, LLC v. Broadcom Corp.

| APPEAL NO. | OP. BELOW | OPINION | SUBJECT | AUTHOR |
|---|---|---|---|---|
| 15-1944, 15-1945, 15-1946 | PATO | January 8, 2018 | Patent | Reyna |

## Question(s) Presented

"Congress has prohibited the Director of the United States Patent and Trademark Office from instituting inter partes review if the petition requesting that review is filed more than one year after the petitioner, real party in interest, or privy of the petitioner is served with a complaint for patent infringement. 35 U.S.C. § 315(b). Congress also provided that the Director's determination 'whether to institute an inter partes review under this section shall be final and nonappealable.' Id. § 314(d). The question before us is whether the bar on judicial review of institution decisions in § 314(d) applies to timebar determinations made under § 315(b). In Achates Reference Publishing, Inc. v. Apple Inc., 803 F.3d 652, 658 (Fed. Cir. 2015), a panel of this court held in the affirmative that a § 315(b) time-bar determination is final and nonappealable under § 314(d). Today, the court revisits this question en banc."

## Holding

"We recognize the strong presumption in favor of judicial review of agency actions. To overcome this presumption, Congress must clearly and convincingly indicate its intent to prohibit judicial review. We find no clear and convincing indication of such congressional intent. We therefore hold that the time-bar determinations under § 315(b) are appealable, overrule Achates's contrary conclusion, and remand these cases to the panel for further proceedings consistent with this opinion."

| DATE | SELECTED PROCEEDINGS AND ORDERS |
|---|---|

| August 1, 2016 | Panel Oral Argument (Part 1) |
| August 1, 2016 | Panel Oral Argument (Part 2) |
| September 16, 2016 | Panel Opinion |
| October 17, 2016 | Wi-Fi One, LLC's Combined Petition for Rehearing En Banc and Panel Rehearing |
| November 18, 2016 | Appellee Broadcom Corporation's Response to Appellant Wi-Fi One, LLC's Combined Petition for Rehearing En Banc and Panel Rehearing |
| January 4, 2017 | Order on Petition for Rehearing |
| February 13, 2017 | Appellant Wi-Fi One, LLC's Supplemental En Banc Brief |
| March 15, 2017 | Supplemental Brief for Appellee Broadcom Corporation on Rehearing En Banc |
| March 22, 2017 | En Banc Brief for Intervenor Michelle K. Lee, Director, United States Patent and Trademark Office |
| April 12, 2017 | Appellant Wi-Fi One, LLC's En Banc Reply Brief |
| May 4, 2017 | En Banc Oral Argument |
| January 8, 2018 | En Banc Opinion |





FedCircuitBlog

← Back to En Banc Cases

# Aqua Products, Inc. v. Matal

| APPEAL NO. | OP. BELOW | OPINION | SUBJECT | AUTHOR |
|---|---|---|---|---|
| 15-1177 | PATO | October 4, 2017 | Patent | O'Malley |

## Question(s) Presented

"In this appeal, we consider the proper allocation of the burden of proof when amended claims are proffered during inter partes review proceedings ('IPRs') under the Leahy-Smith America Invents Act ('AIA')."

## Holding

"Upon review of the statutory scheme, we believe that [35 U.S.C.] § 316(e) unambiguously requires the petitioner to prove all propositions of unpatentability, including for amended claims."

| DATE | SELECTED PROCEEDINGS AND ORDERS |
|---|---|
| May 25, 2016 | Panel Opinion |
| June 6, 2016 | Appellant's Petition for Rehearing En Banc |
| July 6, 2016 | Response to the Petition for Rehearing En Banc for Intervenor |
| August 12, 2016 | Order On Petition for Rehearing |
| September 26, 2016 | Supplemental Brief for Appellant Aqua Products, Inc. on Rehearing En Banc |

| | |
|---|---|
| October 26, 2016 | Supplemental Brief on Rehearing En Banc for Intervenor |
| November 10, 2016 | Corrected Supplemental Reply Brief for Appellant Aqua Products, Inc. on Rehearing En Banc |
| December 9, 2016 | En Banc Oral Argument |
| October 4, 2017 | En Banc Opinion |





FedCircuitBlog

← Back to En Banc Cases

# Medicines Company v. Hospira, Inc.

| APPEAL NO. | OP. BELOW | OPINION | SUBJECT | AUTHOR |
|---|---|---|---|---|
| 14-1469, 14-1504 | DCT | July 11, 2016 | Patent | O'Malley |

## Question(s) Presented

"Today, we consider the circumstances under which a product produced pursuant to the claims of a product-by-process patent is 'on sale' under 35 U.S.C. § 102(b). This is important because, if 'on sale' more than one year before the filing of an application for a patent on the governing claims, any issued patent is invalid and the right to exclude others from making, using, and selling the resulting product is lost."

## Holding

"We conclude that, to be 'on sale' under § 102(b), a product must be the subject of a commercial sale or offer for sale, and that a commercial sale is one that bears the general hallmarks of a sale pursuant to Section 2-106 of the Uniform Commercial Code. We conclude, moreover, that no such invalidating commercial sale occurred in this case. . . . [W]e first clarify that the mere sale of manufacturing services by a contract manufacturer to an inventor to create embodiments of a patented product for the inventor does not constitute a 'commercial sale' of the invention. We then address the issue of 'stockpiling' by an inventor and clarify that 'stockpiling' by the purchaser of manufacturing services is not improper commercialization under § 102(b). We explain that commercial benefit—even to both parties in a transaction—is not enough to trigger the on-sale bar of § 102(b); the transaction must be one in which the product is 'on sale' in the sense that it is 'commercially marketed.'"

| DATE | SELECTED PROCEEDINGS AND ORDERS |
|---|---|
| March 6, 2015 | Panel Oral Argument |

| July 2, 2015 | Panel Opinion |
| July 31, 2015 | Combined Petition for Panel Rehearing and Rehearing En Banc |
| September 8, 2015 | Defendant-Cross-Appellant Hospira, Inc.'s Opposition to Petition for Rehearing En Banc |
| November 13, 2015 | Order On Petition for Panel Rehearing and Rehearing En Banc |
| January 11, 2016 | Principal Brief of Defendant-Cross-Appellant Hospira, Inc. in Response to the Court's November 13, 2015 Order |
| February 24, 2016 | En Banc Brief of Plaintiff-Appellant The Medicines Company |
| March 14, 2016 | Reply Brief of Defendant-Cross-Appellant Hospira, Inc. in Response to the Court's November 13, 2015 Order |
| May 5, 2016 | En Banc Oral Argument |
| July 11, 2016 | En Banc Opinion |





← Back to En Banc Cases

# Lexmark Int'l, Inc. v. Impression Products, Inc.

| APPEAL NO. | OP. BELOW | OPINION | SUBJECT | AUTHOR |
|---|---|---|---|---|
| 14-1617, 14-1619 | DCT | February 12, 2016 | Patent | Taranto |

## Question(s) Presented

"We decided to hear this case en banc to consider whether two decisions of this court concerning the uncodified doctrine of patent exhaustion—one decision from 1992, the other from 2001—remain sound in light of later decisions of the Supreme Court."

## Holding

"First, we adhere to the holding of Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700 (Fed. Cir. 1992), that a patentee, when selling a patented article subject to a single-use/no-resale restriction that is lawful and clearly communicated to the purchaser, does not by that sale give the buyer, or downstream buyers, the resale/reuse authority that has been expressly denied. Such resale or reuse, when contrary to the known, lawful limits on the authority conferred at the time of the original sale, remains unauthorized and therefore remains infringing conduct under the terms of [35 U.S.C.] § 271."

"Second, we adhere to the holding of Jazz Photo Corp. v. International Trade Comm'n, 264 F.3d 1094 (Fed. Cir. 2001), that a U.S. patentee, merely by selling or authorizing the sale of a U.S.-patented article abroad, does not authorize the buyer to import the article and sell and use it in the United States, which are infringing acts in the absence of patentee-conferred authority."

| DATE | SELECTED PROCEEDINGS AND ORDERS |
|---|---|
| March 6, 2015 | Panel Oral Argument |

| April 14, 2015 | Order Sua Sponte Granting Hearing En Banc |
| June 12, 2015 | Brief for Defendant-Appellant Impression Products, Inc. on En Banc Review |
| August 12, 2015 | En Banc Brief for Plaintiff-Cross-Appellant Lexmark International, Inc. |
| August 27, 2015 | Reply Brief for Defendant-Appellant Impression Products, Inc. on En Banc Review |
| October 2, 2015 | En Banc Oral Argument |
| February 12, 2016 | En Banc Opinion |
| March 28, 2016 | Errata |





← Back to En Banc Cases

# SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC

| APPEAL NO. | OP. BELOW | OPINION | SUBJECT | AUTHOR |
|---|---|---|---|---|
| 13-1564 | DCT | September 18, 2015 | Patent | Prost |

## Question(s) Presented

"We convene en banc to resolve whether, in light of the Supreme Court's recent decision in Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962 (2014), laches remains a defense to legal relief in a patent infringement suit."

## Holding

"We conclude that Congress codified a laches defense in 35 U.S.C. $ 282(b)(1) that may bar legal remedies. Accordingly, we have no judicial authority to question the law's propriety."

## Posts About this Case

### Recent En Banc Activity
June 2, 2021

| DATE | SELECTED PROCEEDINGS AND ORDERS |
|---|---|
| April 8, 2014 | Panel Oral Argument |

| September 17, 2014 | Panel Opinion |
| October 15, 2014 | Combined Petition for Panel Rehearing and Rehearing En Banc of Plaintiffs-Appellants SCA Hygiene Products Aktiebolag and SCA Personal Care, Inc. |
| November 4, 2014 | Response of Defendants-Appellees to Combined Petition for Rehearing and Rehearing En Banc |
| December 30, 2014 | Order On Petition for Rehearing En Banc |
| February 27, 2015 | Non-Confidential En Banc Brief of Plaintiffs-Appellants SCA Hygiene Products Aktiebolag and SCA Personal Care, Inc. |
| April 16, 2015 | En Banc Brief of Defendants-Appellees |
| May 15, 2015 | En Banc Reply Brief of Plaintiffs-Appellants SCA Hygiene Products Aktiebolag and SCA Personal Care, Inc. |
| June 19, 2015 | En Banc Oral Argument |
| September 18, 2015 | En Banc Opinion |





← Back to En Banc Cases

# Lighting Ballast Control LLC v. Philips Electronics North America Corp.

| APPEAL NO. | OP. BELOW | OPINION | SUBJECT | AUTHOR |
|---|---|---|---|---|
| 12-1014 | DCT | February 21, 2014 | Patent | Newman |

## Question(s) Presented

"This court undertook rehearing en banc for the purpose of reconsidering the standard of appellate review of claim construction."

## Holding

"[W]e apply the principles of stare decisis, and confirm the Cybor standard of de novo review of claim construction, whereby the scope of the patent grant is reviewed as a matter of law."

| DATE | SELECTED PROCEEDINGS AND ORDERS |
|---|---|
| July 9, 2012 | Panel Oral Argument |
| January 2, 2013 | Panel Opinion |
| January 31, 2013 | Petition for Rehearing En Banc |
| February 19, 2013 | Response to Petition for Rehearing En Banc |
| February 20, 2013 | Reply Brief in Support of Petition for Rehearing En Banc |

| March 15, 2013 | Order Granting Petition for En Banc Rehearing |
| May 20, 2013 | Rehearing En Banc Brief of Defendant-Appellant |
| June 24, 2013 | Rehearing En Banc Response Brief of Plaintiff-Appellee |
| July 19, 2013 | Rehearing En Banc Reply Brief of Defendant-Appellant |
| September 13, 2013 | En Banc Oral Argument |
| February 21, 2014 | En Banc Opinion |



# EXHIBIT G

IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL
CIRCUIT

LKQ CORPORATION, KEYSTONE AUTOMOTIVE INDUSTRIES, INC.,
*Appellants*,

v.

GM GLOBAL TECHNOLOGY OPERATIONS LLC,
*Appellee,*

_____

No. 2021-2348

_____

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK
OFFIC, PATENT TRIAL AND APPEAL BOARD IN IPR202-00534.

_____

**BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE***
**ON REHEARING *EN BANC* IN SUPPORT OF NEITHER PARTY**

_____

Of Counsel:

Melissa N. Patterson
Brian J. Springer
 *Attorneys, Appellate Staff*

Civil Division, Room 7537
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 616-5446



August 28, 2023

Thomas W. Krause
 *Solicitor*
William La Marca
 *Special Counsel for IP Litigation*
Brian Racilla
 *Associate Solicitor*

Office of the Solicitor
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035
*Attorneys for the Director of the*
*United States Patent and Trademark Office*

# TABLE OF CONTENTS

I.    INTEREST OF THE UNITED STATES...………………………………  1

II.    STATEMENT OF THE CASE...……………………………………  2

    A.  Background……………………………………………………...  3

        1.  Legal Background…………………………………………..  3

        2.  The underlying IPR proceeding…………………………….  7

        3.  This Court's panel decision affirming the Board…………………  9

III.    SUMMARY OF THE ARGUMENT……………………………………..  11

IV.    ARGUMENT………………………………….………………………  13

    A.  The Supreme Court's Expansive and Flexible Approach to § 103 Provides a Foundation for the Proper Obviousness Analysis for Design Patents…………………………………………………………  14

    B.  While the *Rosen-Durling* Test Protects Against Hindsight, Its Rigid Application Runs Counter to an Appropriately Expansive and Flexible Obviousness Inquiry………………………………………...  18

        1.  *Rosen's* articulation of the "basically the same" test was to broadly protect against improper use of hindsight………………………..  19

        2.  The *Rosen-Durling* test runs counter to the Supreme Court's expansive and flexible approach to § 103………………………..  22

    C.  The Court Should Modify the *Rosen-Durling* Test to Ensure Its Consistency With the Supreme Court's Guidance Regarding § 103…..  26

    D.  Policy Considerations Support the Retention of the Rosen-Durling Framework, but the Court's Clarification Is Necessary To Ensure Its Application Consistent With Supreme Court Precedent……………...  29

V.    CONCLUSION…..………………………………………………………  32

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Borden,*
    90 F.3d 1570 (Fed. Cir. 1996)................................................................. 4, 15, 21

*Campbell Soup Co. v. Gamon Plus, Inc.,*
    10 F.4th 1268 (Fed. Cir. 2021) ...................................................15, 22, 24, 28

*Campbell Soup Co. v. Gamon Plus, Inc.,*
    939 F.3d 1335 (Fed. Cir. 2019) ................................................................. 16

*In re Cho,*
    813 F.2d 378 (Fed. Cir. 1987)................................................................... 25

*Durling v. Spectrum Furniture Co., Inc.,*
    101 F.3d 100 (Fed. Cir. 1996)............................................................*passim*

*Gorham Co. v White,*
    81 U.S. 511 (1871)................................................................................... 29

*Graham v John Deere Co.,*
    383 U.S. 1 (1966) .............................................................................*passim*

*In re Jennings,*
    182 F.2d 207 (C.C.P.A. 1950).............................................................19, 20

*In re Kahn,*
    441 F.3d 977 (Fed. Cir. 2006) .................................................................... 5

*KSR Int'l Co. v Teleflex, Inc.,*
    550 U.S. 398 (2007)..........................................................................*passim*

*LKQ Corp. v. GM Global Technology Operations LLC,*
    2023 WL 328228 (Fed. Cir. Jan. 20, 2023) ................................... 2, 9, 10, 11

*Mintz v. Dietz & Watson, Inc.,*
    679 F.3d 1372 (Fed. Cir. 2012) ................................................................ 28

*MRC Innovations, Inc. v. Hunter Mfg., LLP,*
    747 F.3d 1326 (Fed. Cir. 2014) ...................................................... 16, 22, 29

*Randall Mfg. v. Rea,*
    733 F.3d 1355 (Fed. Cir. 2013) ...................................................... 18

*In re Rosen,*
    673 F.2d 388 (C.C.P.A. 1982) ....................................................*passim*

*Samsung Elecs. Co. v. Apple Inc.,*
    580 U.S. 53 (2016) ...................................................................... 4, 25

*In re Schnell,*
    46 F.2d 203 (C.C.P.A. 1931) ........................................................ 4

*Smith v. Whitman Saddle Co.,*
    148 U.S. 674 (1893) .............................................................. 2, 23, 24

*South Corp. v. United States,*
    690 F.2d 1368 (Fed. Cir. 1982) .................................................... 13

*State Oil Co. v. Khan,*
    522 U.S. 3 (1997) ........................................................................ 13

*Stone Container Corp. v. United States,*
    229 F.3d 1345 (Fed. Cir. 2000) .................................................... 24

*Titan Tire Corp. v. Case New Holland, Inc.,*
    566 F.3d 1372 (Fed. Cir. 2009) .................................................... 16

*Troy v. Samson Mfg. Corp.,*
    758 F.3d 1322 (Fed. Cir. 2014) .................................................... 13

**Statutes**

35 U.S.C. §§ 1, 2 (2006) ................................................................ 1

35 U.S.C. § 103 ....................................................................*passim*

35 U.S.C. §§ 103 and 171(b) .......................................................... 2

iii

35 U.S.C. § 171(a) ........................................................................................... 3

35 U.S.C. § 171(b) .....................................................................................4, 15

Patent Act .................................................................................................4, 23

Patent Act of 1842, § 3, 5 Stat. 543, 543-44 ............................................... 3

U.S. Code Title 35 .......................................................................................3, 4

## Other Authorities

37 C.F.R. § 1.153(a) ........................................................................................ 4

MPEP § 1504.03(I) ....................................................................................... 15

Rebecca S. Eisenberg, *Obvious to Whom? Evaluating Inventions from the Perspective of PHOSITA*, Berkeley Tech. L. J. 19(3):885-906 (2004) ....................... 17

USPTO 2022-2026 Strategic Plan, Objectives 2.1 and 4 available at https://www.uspto.gov/sites/default/files/documents/USPTO_2 022-2026_Strategic_Plan.pdf (last accessed Aug. 22, 2023) ..................................... 1

iv

## I.  INTEREST OF THE UNITED STATES

The United States respectfully submits this *amicus* brief in response to the Court's invitation.  The United States Patent and Trademark Office (USPTO) is the executive-branch agency responsible for examining patent applications, issuing patents, conducting post-issuance review of patents, and through the Department of Commerce (DOC), advising the President on domestic and international issues of intellectual property policy.  *See* 35 U.S.C. §§ 1, 2 (2006).  In furtherance of its Constitutional mandate, the USPTO works to "issue and maintain robust and reliable patents that incentivize and protect innovation" and that can be used as a tool to "bring innovation to impact for the public good."[1]  Over the past decade, the USPTO has received increasing numbers of design patent applications, illustrating the increasingly prominent role designs play in our economy.  Presently, the USPTO receives approximately 50,000 design patent applications a year.  Design protection not only allows companies to differentiate their offerings, but can also guard against knock-off goods that erode our economy.  The U.S. Government has an interest in a standard for obviousness that (i) incentivizes initial innovation, as well as the public disclosures that facilitate follow-on innovation, (ii) results in a robust and

---

[1] See USPTO 2022-2026 Strategic Plan, Objectives 2.1 and 4 available at https://www.uspto.gov/sites/default/files/documents/USPTO_2022-2026_Strategic_Plan.pdf (last accessed Aug. 22, 2023).

reliable patent right that can be used to attract the investment needed to bring innovations to market, (iii) fosters competition, and (iv) can be equitably and consistently applied by patent examiners, the USPTO's Central Reexamination Unit and Patent Trial and Appeal Board (PTAB), and the courts.

## II.    STATEMENT OF THE CASE

This matter arises from an appeal to this Court from *inter partes* review proceeding no. IPR2020-00534 regarding U.S. design patent no. D797,625.  After the panel issued its decision, *LKQ Corp. v. GM Global Technology Operations LLC*, 2023 WL 328228 (Fed. Cir. Jan. 20, 2023), LKQ petitioned for rehearing *en banc*.  LKQ asserted that the obviousness test for design patents established in *In re Rosen*, 673 F.2d 388 (C.C.P.A. 1982), and *Durling v. Spectrum Furniture Co., Inc.*, 101 F.3d 100 (Fed. Cir. 1996) – the test applied by the Board in this case – is contrary to the statutory language of 35 U.S.C. §§ 103 and 171(b), and Supreme Court precedent including  *KSR Int'l Co. v Teleflex, Inc.*, 550 U.S. 398 (2007), *Graham v John Deere Co.*, 383 U.S. 1 (1966), and *Smith v. Whitman Saddle Co.*, 148 U.S. 674 (1893).  The Court vacated the panel opinion, granted rehearing *en banc*, and invited the United States to participate as amicus curiae.  ECF No. 86 (No. 21-2348).

The Court's order lists six questions regarding what effect, if any, *KSR* has on *Rosen* and *Durling* and whether the Court should eliminate or modify the *Rosen-Durling*

test. *Id.* The key issues are how *KSR* should be applied to design patents and to what extent *KSR* requires that the *Rosen-Durling* test be clarified and/or modified. For the reasons articulated below, the United States urges the Court to clarify that the *Rosen-Durling* test should be modified to better accord with the principles underlying the *KSR* decision's discussion of § 103. Such a modification would return to the first principles of obviousness articulated in *Rosen* and *Durling*, flow from the application of *KSR* to the design patent context, and advance the USPTO's mission by articulating an approach that could be equitably and consistently applied by the Office.

### A.  Background

#### 1.  Legal background

Since 1842, the patent laws have authorized the issuance of patents not only for useful inventions, but also for ornamental designs. *See* Patent Act of 1842, § 3, 5 Stat. 543, 543-44; *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 524 (1872). "[S]ubject to the conditions and requirements of" Title 35 of the U.S. Code, a patent is available to "[w]hoever invents any new, original and ornamental design for an article of manufacture." 35 U.S.C. § 171(a). A patentable design "gives a peculiar or distinctive appearance to the manufacture, or article to which it may be applied, or

3

to which it gives form." *Samsung Elecs. Co. v. Apple Inc.*, 580 U.S. 53, 56 (2016)

(quoting *Gorham*, 81 U.S. at 525).

Design patents contain a single claim stating that the patent claims an

"ornamental design" for a particular "article" of manufacture, "as shown" in

drawings contained in the specification.  37 C.F.R. § 1.153(a).  A patent may be

obtained for a surface design such as an "ornament, impression, print, or picture"

that is applied to an article of manufacture or for the "design for a shape or

configuration for an article of manufacture."  *In re Schnell*, 46 F.2d 203, 209 (C.C.P.A.

1931).

The Patent Act specifies that "[t]he provisions of [Title 35] relating to patents

for inventions shall apply to patents for designs, except as otherwise provided."  35

U.S.C. § 171(b).  Thus, the obviousness inquiry under 35 U.S.C. § 103 applies to

design patents.  *See In re Borden*, 90 F.3d 1570, 1574 (Fed. Cir. 1996) ("Design patents

are subject to the same conditions on patentability as utility patents, including the

nonobviousness requirement of 35 U.S.C. § 103.").

The Supreme Court in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1

(1966)—interpreting 35 U.S.C. § 103 in the context of utility patents—identified

various factors relevant in determining whether a claimed invention would have

been obvious.  The Court instructed that "the scope and content of the prior art are

4

to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Id.* at 17. The Court indicated that "secondary considerations," like "commercial success, long felt but unsolved needs, [and] failure of others," may be useful "indicia of obviousness or nonobviousness." *Id.* at 17-18.

In the intervening years, the Federal Circuit had held that there must be "[a] suggestion, teaching, or motivation to combine the relevant prior art teachings" to render the claimed invention impermissibly obvious under § 103. *In re Kahn*, 441 F.3d 977, 987 (Fed. Cir. 2006). The Supreme Court rejected that "teaching, suggestion, or motivation" test in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). The Court determined that this "rigid approach" could not be squared with the "expansive and flexible approach" that the statute and Supreme Court cases call for. *Id.* at 415. While recognizing that the Federal Circuit's test "captured a helpful insight" by examining the "reason[s] that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does," the Court rejected the application of "rigid and mandatory formulas" in determining whether an invention would have been obvious. *Id.* at 418-19.

This case concerns the Federal Circuit's obviousness jurisprudence in the design patent context. The Federal Circuit decisions most relevant here—*In re Rosen*, 673 F.2d 388 (C.C.P.A. 1982), and *Durling v. Spectrum Furniture Co.*, 101 F.3d 100 (Fed. Cir. 1996)—set forth the *Rosen-Durling* standard. In *Rosen*, the court declared that "there must be a reference, a something in existence, the design characteristics of which are basically the same as the claimed design in order to support a holding of obviousness." *Rosen*, 673 F.2d at 391. In other words, the court required "an adequate starting point, a basic reference which embodies similar design concepts." *Id.*

In *Durling*, the Federal Circuit articulated the test as follows: "the first step in an obviousness analysis for a design patent" involves "determin[ing] whether there is a single reference that creates 'basically the same' visual impression" as the patented design as a whole. 101 F.3d at 103 (quoting *Rosen*, 673 F.2d at 391). If such a reference exists, other references "may only be used to modify th[at] primary reference if they are so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other." *Id.* (alteration and quotation marks omitted).

6

## 2.    The underlying IPR proceeding

This case concerns *inter partes* review of GM Global's U.S. design patent no. D797,625 (the "'625 patent"), which claims an "ornamental design for a vehicle front fender."  LKQ contended that the '625 patent was anticipated or would have been obvious in view of Lian (U.S. design patent no. D773,340), identified as the "primary" *Rosen* reference, and Tucson,[2] identified as the "secondary" *Durling* reference.  A side-by-side comparison of the '625 patent's claimed design and the primary and secondary references provided by LKQ in its petition for rehearing en banc is reproduced below:

---

[2] 2010 Hyundai Tucson Brochure, copyright 2009, *available at* https://www.auto-brochures.com/makes/Hyundai/Tucson/Hyundai_US%20Tucson_2010.pdf (last accessed Aug. 16, 2023).

| '625 PATENT *CLAIMED DESIGN* | LIAN (PRIOR ART) *PRIMARY REFERENCE* | TUCSON (PRIOR ART) *SECONDARY REFERENCE* |
|---|---|---|

In analyzing obviousness, the Board "consider[ed] the overall appearance of the claimed design from the perspective of the ordinary designer . . . [to determine] whether or not the overall appearance of Lian is 'basically the same' as the claimed fender." Appx51 (citing *MRC Innovations, Inc. v. Hunter Mfg., LLP*, 747 F.3d 1326, 1331 (Fed. Cir. 2014)). The Board identified several differences including: (1) the

8

wheel arch shape and terminus, (2) the door cut line, (3) the protrusion, (4) the sculpting, (5) the first and second creases, (6) the inflection line (i.e., third crease), and (7) the concavity line.  Appx30-45.  The Board determined that these "visually disparate" features contributed to different overall appearances; whereas Lian has a linear, angled appearance, the claimed design is smooth and curved.  Appx43. Because of these differences, the Board determined that Lian was not "basically the same" design and thus could not serve as a *Rosen* reference for purposes of the *Rosen-Durling* test.  That ended the Board's obviousness inquiry.  Under the *Rosen-Durling* test, the Board did not go on to analyze either what LKQ's secondary Tucson reference discloses or what an ordinary designer would have known at the time of the invention.  Appx58.

### 3. This Court's panel decision affirming the Board

On appeal, a panel of this Court affirmed the Board's decision.  In affirming, the panel held that it was "bound to apply existing [design patent] law to this appeal" because it was "not clear" that the Supreme Court's decision in *KSR* "overruled *Rosen* and *Durling*."  *LKQ Corp. v GM Global Tech*, 2023 WL 328228, at *6 (Fed. Cir. Jan. 20, 2023).  In particular, the panel noted that "*KSR* did not involve or discuss design patents," the subject "addressed by *Rosen* and *Durling*."  *Id.* at *6. With respect to this case, the panel found that the Board had properly stopped the

analysis at step one of the *Rosen-Durling* test because LKQ had failed to establish that the Lian reference was "basically the same" as the claimed design. *Id.*

Judges Lourie and Stark provided separate opinions expressing views about whether the *Rosen-Durling* test should be revised in light of *KSR*. Judge Lourie contended that *KSR* "did not overrule *Rosen*," because *KSR* did not involve design patents which are "quite different compared with utility patents." *Id.* at *8-9. He noted that "*Rosen* was not essentially incorrect" and that its statement that "the primary reference must have the design characteristics that are 'basically the same' as those of the claimed design … hardly reflects the rigidity" condemned by *KSR*. *Id.* at *8. While Judge Lourie recognized that *Rosen* may have "overstated its point" in formulating the basically-the-same standard, he observed that the obviousness inquiry "has to start from somewhere." *Id.*

Judge Stark agreed that substantial evidence supported the Board's determination that LKQ had failed to show that the '625 patent was anticipated or would have been obvious, but he declined to join the majority in rejecting the argument that *KSR* overruled *Rosen* because he found that LKQ had forfeited that argument. *Id.* While acknowledging that "it was not clear the Supreme Court has overruled *Rosen* or *Durling*," Judge Stark emphasized that "a strong case can be made that the step one *Rosen* reference requirement is precisely the type of limiting, rigid

10

rule *KSR* faulted" because failure to identify a *Rosen* reference requires the obviousness analysis to stop. *Id.* at *13. As a result, Judge Stark expressed concern that the current framework can "prevent the consideration of a combination of prior art references," "deprive the tribunal of the opportunity to consider other factors that often drive the analysis in utility patent obviousness cases," and "prevent consideration of the ordinary designer's creativity." *Id.* Judge Stark also observed that "[a]dditional rigidity that might not be appropriate in a post-*KSR* world arguably exists at step two of the *Durling* test, which limits consideration solely to prior art references that are 'so related' to the identified *Rosen* reference that 'the appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Id.* In sum, Judge Stark recognized there was "substantial tension between the Supreme Court's holding in *KSR* and [the] *Durling* test." *Id.*

## III.    SUMMARY OF THE ARGUMENT

There is no question that the principles the Supreme Court has announced regarding § 103, including the *Graham* factors and *KSR*'s emphasis on the need for an "expansive and flexible" approach, apply to design patents. The only question is how those principles should apply. While this Court's *Rosen-Durling* test reflects helpful insights that help guard against the improper use of hindsight in the

11

obviousness inquiry, it has become overly restrictive in several respects, and should be reformulated to reflect the expansive and flexible principles the Supreme Court has articulated in the utility-patent context.

The United States therefore urges the Court to adopt a test that preserves the basic *Rosen-Durling* framework but replaces *Rosen*'s "basically the same" terminology with language directing the examiner or other factfinder to inquire whether there is a suitable starting point or base reference broadly having a similar overall visual effect as the claimed design. The Court should make clear that the lack of such a reference should not cut off the obviousness inquiry but may signal that the obviousness case is not particularly strong. The Court should also eliminate *Durling*'s "so-related" requirement in order to allow the decisionmaker to take into account the ordinarily skilled designer's experience, creativity, and common sense, when considering combinations involving the base reference.

Under such an approach, at each step of the inquiry, the decisionmaker should consider the claimed design as a whole and take into account not just the ordinarily skilled designer's experience, creativity, and common sense, but also may consider factors including what market demands and industry customs exist in the design community, which ornamental features are commonplace in the relevant field, the extent to which ornamental features are motivated by functional

12

considerations, and whether industry designers face similar design problems as other industries or otherwise look to other industries for design ideas.

## IV.   ARGUMENT

The *Rosen-Durling* test, currently applied, is in tension with the Supreme Court's instructions in *KSR* that § 103's obviousness inquiry is to be conducted through an expansive and flexible approach.  If *Rosen* and *Durling* had been decisions of the Supreme Court, this Court would be bound to follow them even after *KSR* because "it is [the Supreme] Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).  However, panels have more leeway to conclude that this Court's own precedent "has been implicitly overruled as inconsistent with intervening Supreme Court authority." *Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014).  This Court need not decide whether those circumstances are satisfied here because the *en banc* Court has the power to modify or overrule its past precedent, including *Rosen* and *Durling*, even absent intervening guidance from the Supreme Court.  *South Corp. v. United States*, 690 F.2d 1368, 1370 n.2 (Fed. Cir. 1982).

In the view of the United States, an expansive and flexible approach should guide the obviousness inquiry in the design-patent, as well as the utility-patent, context (section A).  The *Rosen-Durling* test was originally designed to protect against

13

the improper use of hindsight bias to deem designs obvious, but it has been too

rigidly applied (section B).  An appropriate inquiry would preserve the *Rosen-Durling*

guardrail against hindsight, while not depriving decisionmakers of the full panoply of

tools for assessing obviousness (section C).  Finally, such an approach would

comport with sound patent policy and the USPTO's interest in an obviousness

inquiry that can be fairly administered by its examiners across tens of thousands of

patent applications (section D).

### A.  The Supreme Court's Expansive and Flexible Approach to § 103 Provides a Foundation for the Proper Obviousness Analysis for Design Patents

A patent may not be granted "if the differences between the claimed

invention and the prior art are such that the claimed invention as a whole would

have been obvious before the effective filing date of the claimed invention to a

person having ordinary skill in the art to which the claimed invention pertains."  35

U.S.C. § 103.  As the Supreme Court explained in the utility patent context, this

obviousness analysis turns on "several basic factual inquiries," including (1) "the

scope and content of the prior art," (2) "differences between the prior art and the

claims at issue," (3) "the level of ordinary skill in the pertinent art," and (4) any

"secondary considerations [such] as commercial success, long felt but unmet needs,

[and] failure of others" that may have value as "indicia of obviousness or

14

nonobviousness." *Graham*, 383 U.S. at 17-18; *see also* MPEP § 1504.03(I).

Importantly, design patents have no exemption from § 103 (*see* 35 U.S.C. § 171(b)), and the obviousness framework articulated in *Graham* applies equally to the design-patent context. *See Borden*, 90 F.3d at 1574 ("Design patents are subject to the same conditions on patentability as utility patents, including the nonobviousness requirement of 35 U.S.C. § 103."). As reflected in the fourth *Graham* factor, objective evidence of nonobviousness, such as commercial success and copying of the design by others, may be relevant to the evaluation of obviousness of a design claim, *see* MPEP § 1504.03(I), subject to the same requirements as utility patents, including the necessary showing that the evidence of nonobviousness is sufficiently connected to the claimed design. *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1276 (Fed. Cir. 2021).

This Court has recognized that the *Graham* factors apply to the visual obviousness analysis required by design claims. For example, this Court explained that the first three *Graham* factors are folded into and addressed by "determining whether a designer of ordinary skill would have combined teachings of the prior art to create 'the same overall visual appearance as the claimed design.'" *Campbell Soup*, 10 F.4th at 1275 (quoting *Durling*, 101 F.3d at 103). This comports with this Court's longstanding recognition, including in *Rosen* and *Durling*, that "the ultimate inquiry

15

under § 103 is whether the claimed design"– that is, the overall appearance or visual effect – "would have been obvious to a designer of ordinary skill who designs articles of the type involved." *Durling*, 101 F.3d at 103 (citing *Rosen*, 673 F.2d at 390); *see also Campbell Soup Co. v. Gamon Plus, Inc.*, 939 F.3d 1335, 1339-40 (Fed. Cir. 2019); *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1380-81 (Fed. Cir. 2009). And, a critical part of that analysis involves visually comparing the claimed design with the design disclosed in the prior art, *see Durling*, 101 F.3d at 103 (asking "whether one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design"), as well as assessing secondary considerations when presented, *see MRC*, 747 F.3d at 1335-36.

In *KSR*, addressing a utility patent, the Supreme Court cautioned against "transform[ing] [a] general principle into a rigid rule that limits the obviousness inquiry," even when "[t]here is no necessary inconsistency between the idea underlying [a particular] test and the *Graham* analysis." *KSR*, 550 U.S. at 419. The Supreme Court explained that § 103 requires "an expansive and flexible approach" that eschews "rigid and mandatory formulas." *Id.* at 415, 419. A particularly strong obviousness case will exist if the prior art is very similar to the claimed invention and "the simple substitution of one known element for another" would close the gap. *Id.* at 417. And, when the analysis involves the more complicated endeavor of

16

combining "interrelated teachings of multiple patents," decisionmakers may consult "the effects of demands known to the design community or present in the marketplace" and "the background knowledge possessed by a person having ordinary skill in the art." *See id.* at 418.  Further, it can be important to consider the "need[s] or problem[s] known in the field of endeavor" that would have prompted a skilled artisan to make the requisite combination.  *Id.* at 420.  The inquiry, however, should not ignore "inferences and creative steps" or "common sense" possessed by skilled artisans in the field.  *Id.* at 418, 421; *see also id.* at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton."); *see also* Rebecca S. Eisenberg, *Obvious to Whom? Evaluating Inventions from the Perspective of PHOSITA*, Berkeley Tech. L. J. 19(3):885-906 (2004) ("An invention that seems obvious to a person having ordinary skill in the field might nonetheless seem patentworthy to a person who lacks such skill, even after reading the prior art record.").

While aspects of the obviousness inquiry the Supreme Court has articulated in utility-patent cases may take on a slightly different focus or salience when applied to design patents, the fundamentals of that inquiry should be the same.  For example, the analysis proceeds from the perspective of a legally fictitious person with ordinary skill designing articles of the type involved.  Whereas the hypothetical skilled artisan in the utility context seeks to improve a product's operation, the hypothetical skilled

17

designer in the design patent context seeks to improve a product's appearance. But as in the case of the skilled artisan, the skilled designer's background knowledge will be informed by the state of the art, including what market demands and industry customs exist in the design community, which ornamental features are commonplace in the relevant field, and whether industry designers face similar design problems as other industries or otherwise look to other industries for design ideas. *Cf. Randall Mfg. v. Rea*, 733 F.3d 1355, 1363 (Fed. Cir. 2013) (approving the use of documentary evidence to show "a familiar, even favored, approach" in the relevant art). These considerations provide insight into the types of design choices that a skilled designer would make. Thus, there is no reason that *KSR*'s discussion of the expansive and flexible principles undergirding the obviousness inquiry should not be equally applicable in the design patent context.

### B.   While the *Rosen-Durling* Test Protects Against Hindsight, Its Rigid Application Runs Counter to an Appropriately Expansive and Flexible Obviousness Inquiry.

As originally formulated, the *Rosen-Durling* test was intended to guard against hindsight bias, and it continues to serve that valuable purpose. As currently applied, however, the test is in tension with the expansive and flexible approach reaffirmed in *KSR*.

### 1.   *Rosen*'s articulation of the "basically the same" test was to broadly protect against improper use of hindsight

18

In *Rosen*, the claimed design was to a coffee table with a circular glass top with notches cut into three V-shaped legs to slot in the tabletop. 673 F.2d at 389. The primary prior-art reference disclosed a desk with a semi-circular opaque top where notches were cut into the tabletop itself to slot in three V-shaped legs. *Id.* The Court explained that achieving the coffee table's "visual impression of lightness and suspension in space" was not simply a matter of modifying the desk by "interchang[ing]" or "add[ing]" features from other references. *Id.* at 391. Instead, that sort of modification would "destroy fundamental characteristics" of the desk. *Id.* The Court therefore reversed the agency's rejection on obviousness grounds, disagreeing that the coffee table design could be characterized "as a mere 'regrouping' of various furniture elements, without providing a basic reference which this 'regrouping' might modify." *Id.*

The *Rosen* Court applied an earlier opinion from this Court's predecessor that had overturned an obviousness rejection that was made by "selecting features taken from five different patents, that is, [one] feature from one patent, another from another, etc." to arrive at the proposed design. *In re Jennings*, 182 F.2d 207, 208 (C.C.P.A. 1950). The *Jennings* Court explained that "the appearance of the design must be viewed as a whole, as shown by the drawing, or drawings, and compared with something in existence—not with something that might be brought into

19

existence by selecting individual features from prior art and combining them, particularly where combining them would require modification of every individual feature." *Id.* In other words, a proposed obviousness combination may fail where there is no prior art with a similar overall visual impression. This articulation is expansive and flexible but still protects against hindsight reconstructions. It does not unduly constrict the references that may ground the analysis and serve as a helpful starting point; however, it also views the design as a whole and thereby discourages a narrow focus on (or a process of picking and choosing) individual features from disparate references.

Relying on the principles underlying the *Jennings* decision, the *Rosen* Court explained that the examiner must identify a primary reference—i.e., prior art already in existence—whose modification or combination with other references to achieve the claimed design would not "require modification of every individual feature" or "destroy fundamental characteristics" of the primary reference's design. *Rosen*, 673 F.2d at 391 (quoting *Jennings*, 182 F.2d at 208). This rationale recognizes a key concept in obviousness jurisprudence—namely, an analysis that depends on mixing and matching disparate design elements across a range of sources without a compelling reason may be infected by "hindsight bias" and "*ex post* reasoning"—that was later reinforced by the Supreme Court. *KSR*, 550 U.S. at 421.

20

It was in this context that the *Rosen* Court observed that the Board had failed to identify an "adequate starting point":

> The board's reliance upon obviousness of construction, apropos of a mechanical patent, ignores the need for an adequate starting point, a basic reference which embodies similar design concepts.

673 F.2d at 391.  In summarizing this proposition, the *Rosen* Court coined the "basically the same" language when it stated that "there must be a reference, a something in existence, the design characteristics of which are basically the same as the claimed design in order to support a holding of obviousness." *Id.*  Therefore, the *Rosen* Court's use of "basically the same" is best read as highlighting the usefulness of "an adequate starting point, a basic reference which embodies similar design concepts."[3]

    **2.**    **The *Rosen-Durling* test runs counter to the Supreme Court's expansive and flexible approach to § 103**

---

[3] Citing to *Rosen*, this Court has previously recognized the broader meaning of the phrase, stating "[i]n order for secondary references to be considered, however, there must be some suggestion in the prior art to modify the *basic design* with features from the secondary references." *Borden*, 90 F.3d at 1574 (emphasis added).

As currently expressed, the *Rosen-Durling* test involves a two-step process. The first step requires the identification of a single reference, "a something in existence, the design characteristics of which are basically the same as the claimed design." *Rosen*, 673 F.2d at 391. Recently, this Court synthesized its case law to explain that "[t]o be 'basically the same,' the designs at issue cannot have substantial differences in their overall visual appearances or require major modifications; any differences must instead be slight." *Campbell Soup*, 10 F.4th at 1275 (cleaned up; citations omitted). The obviousness analysis moves to the second step only if the first step is satisfied. In the second step, "other 'secondary' references may be used to modify [the primary reference] to create a design that has the same overall visual appearance as the claimed design," as long as the secondary references are "so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other." *MRC*, 747 F.3d at 1331 (cleaned up; citation omitted). In *MRC*, the Court explained that a reference may be considered "sufficiently 'related' for that test to apply" when the reference design is "'closely akin' to the claimed design." 747 F.3d at 1334 (quoting *In re Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996)).

While the *Rosen-Durling* test captures some helpful insights, the test has been interpreted too narrowly and applied too rigidly. As applied, the test often operates

22

as a bright-line rule because the obviousness analysis ends if there is no primary *Rosen* reference that satisfies the strict requirement of having "basically the same" visual impression as the claimed design. The obviousness inquiry can likewise end prematurely in the second step, if no secondary reference satisfies *Durling*'s strict requirement that it be "so related" to the primary reference. Such categorical rules conflict with the more expansive and flexible approach to obviousness espoused in *Graham* and *KSR*, as well as other Supreme Court cases rejecting bright-line rules that were not adequately grounded in the Patent Act.

 *Rosen*'s "basically the same" and *Durling*'s "so-related" inquiries also conflict with the obviousness approach in early Supreme Court precedent. *See Smith v. Whitman Saddle,* 148 U.S. 674 (1893). In *Whitman Saddle*, the claimed design was for a saddle that essentially combined the front half of one prior art saddle with the rear half of another prior art saddle. The Court highlighted evidence in the record that showed "there were several hundred styles of saddles or saddletrees belonging to the prior art, and that it was customary for saddlers to vary the shape and appearance of saddletrees in numerous ways, according to the taste and fancy of the purchaser." 148 U.S. at 681. The Court also found the evidence showed that both halves of the claimed saddle design were used on a variety of prior-art saddles and determined that "the addition of a known cantle to a known saddle, in view of the fact that such

23

use of the cantle was common," did not produce a patentable design. *Id.* The Court

indicated that the claimed design would have been obvious in view of its analysis of

the considerations underlying saddle design, even though neither prior-art saddle

would likely qualify as "basically the same" as the claimed design or "so related" to

each other under the current conception of the *Rosen-Durling* test. The proper

obviousness analysis should be more flexibly applied to permit factfinders to

consider the universe of prior art and other design considerations that would point

to the obviousness of a claimed design.[4]

 To the extent that this Court's case law reads *Rosen* to allow only "slight"

differences between the claimed design and the prior art, *Campbell Soup*, 10 F.4th at

1275, that formulation is narrower than the *Rosen* court originally indicated and has

impacted the USPTO's and courts' ability to make and sustain obviousness

rejections of design claims. Over time, these tribunals have shifted from the original

broader understanding of *Rosen* toward an impermissibly rigid application of the

"basically the same" standard. *See, e.g.*, LKQ Br. at 49-50, ECF No. 91 (*compare*

*Carter* (C.C.P.A. 1982), *Petersen Mfg.* (Fed. Cir. 1984), *Black & Decker* (N.D. Ill. 1986)

---

[4] While it is possible to view *Whitman Saddle*'s discussion of patentability as dicta
because the case ultimately affirmed on the basis of non-infringement, 148 U.S. 674,
that discussion is at minimum "explicit and carefully considered" statements from
the Supreme Court regarding obviousness that this Court "must follow." *Stone
Container Corp. v. United States*, 229 F.3d 1345, 1350 (Fed. Cir. 2000).

*with Para Gear Equip.* (N.D. Ill. 2005), *Apple* (Fed. Cir. 2012); *see also Vanguard* (B.P.A.I. 2009) (holding that a credit card without a hole in it could not serve as a *Rosen* reference for claimed design of a credit card with a hole), *aff'd Vanguard Identification Systems, Inc. v. Kappos*, 407 F. App'x 479 (Fed. Cir. 2011)).[5]

The facts of this case highlight the need for a more expansive and flexible approach to the obviousness inquiry in the design-patent context. As shown above, the '625 patent design is visually quite similar to the prior art design depicted in Lian, yet the Board—following this Court's current articulation of *Rosen* and *Darling*—determined that the two were not "basically the same." Although the United States does not have a view as to whether the '625 patent should be declared obvious in light of the differences found by the Board, the Board should have had the opportunity to consider whether those missing features could be found in other similar prior-art references or could be shown to be commonly used elements of automotive styling as relevant considerations. Application of the "basically the same" test improperly cut off all further consideration of what an ordinary designer

_____

[5] We note that this Court in *In re Cho*, 813 F.2d 378 (Fed. Cir. 1987), rejected an argument that a design feature that was functional should be discounted in the obviousness analysis. While it is possible to limit *Cho* to its facts, we believe that the *en banc* Court here can usefully clarify that functional considerations can sometimes drive design choices, and features chosen for functional reasons may receive diminished weight in the obviousness analysis.

might have considered obvious and precluded any consideration whatsoever of the secondary reference that showed a similar fender design in the same industry with features missing from Lian. In short, the obviousness analysis should not be truncated at the first step as it was here.

### C. The Court Should Modify the *Rosen-Durling* Test To Ensure Its Consistency With the Supreme Court's Guidance Regarding § 103

As demonstrated by the examples above, the "basically the same" language of *Rosen* has been read to eliminate appropriate starting-point references and to foreclose consideration of facts that might demonstrate that a designer of ordinary skill would have combined teachings of the prior art to create the same overall visual effect as the claimed design. The origin of this problem lies largely in the choice of terminology—i.e., "basically the same"—used by the *Rosen* court to describe how to identify a proper starting point for the obviousness inquiry, not in the underlying principles on which the decision was based. This Court should modify the *Rosen-Durling* test to ensure an expansive and flexible approach in alignment with *KSR*.

Accordingly, the Court should replace the "basically the same" terminology, jettison the so-related requirement, clarify that *Rosen* and *Durling* should still serve as a framework for protecting against hindsight, and caution that the test should not be used as a rigid tool that truncates the obviousness analysis. Under this

26

reformulation, the inquiry begins with an "adequate starting point" reference to properly ground the obviousness analysis.  After all, § 103 itself focuses on "the differences between the claimed invention and the prior art," 35 U.S.C. § 103, and "the scope and content of the prior art," *Graham*, 383 U.S. at 17.  The most pertinent references are those that broadly have a similar overall visual effect as the claimed design.  Where "every individual feature" of a reference would have to be modified, or where a modification would "destroy fundamental characteristics" of the reference's design, that reference would not provide a particularly helpful starting point.  *Rosen*, 673 F.2d at 391 (quoting *Jennings*, 182 F.2d at 208).  Under this modified approach, the focus on the claimed design as a whole avoids affording outsized significance to individual features but does not demand that there be a reference that is virtually identical to the claimed design.

After identifying a base reference, the next step in the obviousness inquiry should examine the extent to which that reference needs to be modified in order to achieve the claimed design, considering secondary references along with an ordinary designer's experience, creativity, and common sense.  Taking into account the characteristics of a designer in the field, the test would allow for modifications that are driven by consumer demand for certain features, that are motivated by functional considerations, or that embody features so prevalent in the prior art that

adding them to a claimed design would be an obvious design choice. Furthermore, rather than automatically terminating the inquiry in the absence of a strikingly similar base reference, the examiner or other factfinder should have flexibility to assess nonobviousness in light of the sorts of evidence identified above.

This approach would provide important guidance while preserving the expansive and flexible inquiry the Supreme Court has announced in applying § 103 to utility patents. When considering a design patent, the first three *Graham* factors are examined by determining whether a designer of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design. *See Campbell Soup*, 10 F.4th at 1275. However, the objective indicia of nonobviousness accounted for in the fourth *Graham* factor—which "help inoculate the obviousness analysis against hindsight," *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012)—have proven difficult to apply in the design patent context given the difficulty of demonstrating a nexus between the evidence of nonobviousness and the claimed design. *Campbell Soup*, 10 F.4th at 1277 n.1 ("[I]t is . . . hard to envision a commercial product that lacks any significant functional features such that it could be coextensive with a design patent claim."); *see also MRC*, 747 F.3d at 1336. The proposed test preserves *Rosen-Durling*'s protection against

28

hindsight and thus compensates for the ineffectiveness of objective indicia in the design context.

### D. Policy Considerations Support the Retention of the *Rosen-Durling* Framework, but the Court's Clarification Is Necessary To Ensure Its Application Consistent With Supreme Court Precedent

The U.S. patent system seeks to provide incentives for innovation and public disclosures that will contribute to follow-on innovation, while not unduly restricting competition. As the Supreme Court explained in *Gorham v White*, 81 U.S. 511 (1871):

> The acts of Congress which authorize the grant of patents for designs were plainly intended to give encouragement to the decorative arts. . . . The law manifestly contemplates that giving certain new and original appearances to a manufactured article may enhance its salable value, may enlarge the demand for it, and may be a meritorious service to the public. It therefore proposes to secure for a limited time to the ingenious producer of those appearances the advantages flowing from them.

*Id.* at 524-25. If a design would be obvious only when the overall appearance of the prior art is nearly identical to the claimed design, there is a risk of overrunning the marketplace with otherwise-obvious designs, thwarting legitimate competition. *See KSR*, 550 U.S. at 402 ("Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, for patents combining previously known elements, deprive prior inventions of their value or

29

utility."). On the other hand, if obviousness can be found by picking and choosing ornamental features from disparate references without explanation, then current patent holders will be vulnerable to broad invalidity challenges and prospective patent seekers will be unable to obtain the protection required to encourage innovation.

Over the past decade, the USPTO has received increasing numbers of design patent applications, illustrating the prominent role designs play in our economy. Presently, the USPTO receives approximately 50,000 design patent applications a year. Design patents not only allow companies to differentiate their offerings, but they can also protect against knock-off goods that can erode our economy. While this case concerns an invalidity challenge to an issued patent, this Court's guidance regarding the obviousness inquiry will also affect the patent-application process, in which USPTO patent examiners must determine whether a design is sufficiently nonobvious that a patent grant is warranted in the first instance. Any obviousness inquiry should account for the on-the-ground need for guidance that can be fairly and equitably administered by examiners across the tens of thousands of design-patent applications the USPTO receives each year.

LKQ's proposal overlooks many of these practical concerns. For example, LKQ asserts that "*courts and litigants* would have no peculiar difficulty in comparing

image-based design patent claims with prior art designs" because they can employ "the *assistance of design experts*."  LKQ Br. at 58-59, ECF No. 91 (emphases added); *see also id.* at 36-38 (arguing that "*courts* have access to a variety of sources of evidence to assist them" including *expert testimony* about "wealth of knowledge and creativity" in a field, "knowledge of design trends and engineering constraints," "awareness of competitors' designs," and "design demands and market pressures.") (emphasis added).  However, this approach would prove infeasible to administer during examination, where the USPTO has limited means and resources to gather evidence. *See id.* at 36.  The Court should not endorse a regime that erases the importance of an appropriate starting point and leaves decisionmakers without guidance about how to "apply flexible principles to determine what the [skilled designer] would have found obvious."  *See id.* at 42.

## V.    CONCLUSION

To ensure the obviousness standard is properly applied, the United States respectfully urges the Court to clarify that the *Rosen-Durling* test should be modified to accord with the Supreme Court's approach to § 103.

Respectfully submitted,


*/s/Thomas W. Krause*
THOMAS W. KRAUSE
*Solicitor*

WILLIAM La MARCA
*Special Counsel for IP Litigation*

BRIAN RACILLA
*Associate Solicitor*

OFFICE OF THE SOLICITOR
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
*Attorneys for the Director of the*
*United States Patent and Trademark Office*

# CERTIFICATE OF COMPLIANCE WITH
# FEDERAL RULES OF APPELLATE PROCEDURE 29(d) AND 32(a)(7)(B)

I hereby certify that this amicus brief complies with the type-face and volume limitations set forth in Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) because the type face is Garamond, proportionally spaced, fourteen-point font, and the number of words in this brief is 6846, according to the word count of Microsoft Word

/s/ Thomas W. Krause
THOMAS W. KRAUSE
*Office of the Solicitor*
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
Tel: (571) 272-9035