# EXHIBIT A

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            IN AND FOR THE DISTRICT OF DELAWARE
 3
   APPLE INC.,                    )
 4   -----------------Plaintiff,  )
 5            vs.                  ) Case No.
                                   ) 22-1377-MN-JLH
 6   MASIMO CORP, et al.,          ) 22-1378-MN-JLH
 7   --------------------Defendant. )
 8
 9
10           TRANSCRIPT OF DISCOVERY CONFERENCE
11
12           DISCOVERY CONFERENCE had before the
13   Honorable Jennifer L. Hall, U.S.M.J., in
14   Courtroom 2B on the 3rd day of August, 2023.
15
16                    APPEARANCES
17        POTTER ANDERSON & CORROON LLP
            BY:  DAVID MOORE, ESQ.
18
                      -and-
19
        WILMER CUTLER PICKERING HALE AND DORR LLP
20        BY:  JENNIFER MILICI, ESQ.
               MARK FORD, ESQ.
21             LYDIA TURNAGE, ESQ.
22                    -and-
23        DESMARAIS LLP
            BY:  JEFF SEDDON, ESQ.
24             BEN LUEHRS, ESQ.
25
                           Counsel for Plaintiff
```

2

```
 1   (Appearances continued.)

 2

 3        PHILLIPS MCLAUGHLIN & HALL P.A.
            BY:  MEGAN HANEY, ESQ.

 4                    -and-

 5        KNOBBE MARTENS
            BY:  STEPHEN LARSON, ESQ.
 6
                           Counsel for Defendant
 7

 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1            THE COURT:  All right.  So we're here
 2   for some discovery disputes.  Why don't we have
 3   folks make their appearances for the record
 4            MR. MOORE:  Good morning, Your Honor.
10:06AM  5   David Moore from Potter Anderson on behalf of
 6   Apple.  I'm joined by co-counsel from Wilmer
 7   Hale Jennifer Milici, Mark Ford, and Lydia
 8   Turnage.  Also joined by Jeff Seddon and Ben
 9   Luehrs from Desmarais, and also Natalie Pous
10:07AM 10   and Jack Pararas from Apple.
11            THE COURT:  Hi.  Good morning,
12   everybody.
13            They've got you out numbered today.
14            MS. HANEY:  Yes, Your Honor.  Good
10:07AM 15   morning.  Megan Haney from Phillips,
16   McLaughlin, and Hall, and I'm joined today by
17   Steve Larson from Knobbe.
18            THE COURT:  Good morning.
19            Well, I've got a giant stack of discovery
10:07AM 20   disputes in front of me.  I can tell you we've
21   looked them over closely.  One thing I will say
22   is this:  You probably have a better
23   recollection of everything that's happened in
24   this courtroom than I do because I know, and I
10:07AM 25   can tell the way this case has been going, you
```

4

```
 1   guys have been spending a lot of time on it.
 2   I've got to tell you I've got hundreds of other
 3   cases.  You may have to remind me of
 4   allegations and things that happened.  We had a
10:07AM  5   lot going on in the courthouse this month, as
 6   you all know.
 7            So let's start with the dispute that I
 8   read first, which is Apple's first dispute, and
 9   it talks about Masimo allegedly withholding
10:08AM 10   evidence related to antitrust.
11            MR. FORD:  Good morning, Your Honor.
12   Mark Ford.  I've been here a few times.  First
13   time I get to talk, which is nice.
14            So, Your Honor, this is the first of two
10:08AM 15   disputes that Apple brings.  It relates to the
16   Walker Process damages.  And, frankly, this is
17   about whether Apple gets any meaningful
18   discovery at all into what may be the only
19   claim of damages Masimo brings.
10:08AM 20            Imagine a plaintiff saying you cost me
21   tens of millions of dollar because I had to
22   hire a contractor, but I'm not going to give
23   you the details and underlying invoices for
24   what I paid for that would allow you to test
25   that or substantiate whether what I'm paying
```

5

1  for is something it cost.  No litigant would
2  ever be allowed to do that.  That's what Masimo
3  wants to do here times three, because they're
4  seeking treble damages.  They want to say to
10:09AM 5  Apple, "I want to tell you what my lawyers
6  calculated as the portion of litigation fees
7  which are entitled to treble damages, and you
8  will have no ability to test that in front of a
9  jury."
10:09AM 10      The DC Circuit decision in *Ideal Electric*
11  confronts this entirely.  It's the leading case
12  that's cited in our papers.  It says when a
13  party claims litigation costs as damages, as
14  Masimo does here, the underlying invoices are
10:09AM 15  business records that are discoverable just
16  like any business record underlying any damages
17  claim, and the privilege gives way to the
18  defendant's right to claim privilege.
19      So there are a few types of requests
10:09AM 20  here.  I'm going to start with the part of our
21  motion that seeks underlying time entry detail.
22  If you remember from your time in private
23  practice --
24      THE COURT:  Absolutely.  And I want
10:09AM 25  to give you a chance to say what you want to

6

1  say.  Let me tell you what I'm thinking here.
2  I get your point.  Understood.  You need to
3  have more information to test the fact that
4  these attorneys fees were incurred working on
5  the patents that are accused of Walker Process.
10:10AM 6      On the other hand, I know what they're
7  going to say, which is, they're not going to be
8  turning over to you in realtime everything
9  they've been doing every month on all of the
10:10AM 10  litigation.  How are we going to solve this?
11  Because I would never order that.
12      MR. FORD:  I think that makes sense.
13  I'll cut right to the chase, which is, it
14  sounds like you understand the relevance of it.
10:10AM 15      THE COURT:  I absolutely do.  You
16  need to be able test whether the fees they're
17  saying were incurred were, in fact, incurred
18  working on particular patents.  You don't need
19  to know exactly the details about what they
10:10AM 20  were doing on those particular patents.  You
21  don't; right?  If you can have some way to test
22  it --
23      MR. FORD:  So first thing I'll say
24  is, I actually don't think the privilege or
10:11AM 25  sensitivity gets in the way of fundamental

7

1  fairness.
2      The first point I'll make, which is the
3  fundamental part is, Masimo put these records
4  at issue by saying essentially saying these are
10:11AM 5  the amounts my lawyers claim are associated
6  with these patents.  By doing that, you can't
7  then say, "I'm not going to allow you discovery
8  about into what my lawyers said these patents
9  are about."  That's classic at-issue subject
10:11AM 10  matter waiver.  It would be like a litigant
11  saying, "I don't willfully infringe because my
12  lawyer said I didn't infringe.  Here's a
13  one-line e-mail that says you don't infringe,
14  but I'm not going to produce the ten-page
10:11AM 15  memo."
16      I think, candidly, although there's a
17  waiver, and that's, I think, pretty clear, I
18  think there's really not much that truly
19  privileged.  For example, the fact that
10:11AM 20  Mr. Larson is here arguing the motion to
21  dismiss, that fact is not privileged.  He goes
22  back tonight and writes on time entry, "Argue
23  motion to dismiss, 1.2 hours."  It doesn't
24  become privileged.  There's not any actionable
10:12AM 25  sort of intelligence, but it does allow us to

8

1  test the claim.  There's, frankly, no other way
2  for us to guard against overstatement.  If I
3  could have a moment at the end --
4      THE COURT:  At the end of the day,
10:12AM 5  isn't it always going to be true in any case
6  for those attorney fees?  Normally, you have a
7  billing record, and all of the billing records
8  is what is sought as damages.  And, you know,
9  maybe there's other types of cases where you're
10:12AM 10  seeking attorney fees and you're arguing
11  whether or not that's reasonable.  That may not
12  be the case, but the fact that they
13  were incurred --
14      MR. FORD:  This is about allocation.
10:12AM 15  It's not only that it's occurred.  We need to
16  know whether -- you can't have just Masimo
17  decide whether it's properly allocated to
18  treble damages or not.  They're only allowed
19  treble damages for a small piece.  Without
10:12AM 20  knowing that this is drafting an interrogatory
21  response concerning the XYZ patent, we don't
22  know whether they're improperly allocating.
23      What I would suggest as a path forward --
24  because I understand what you're saying.  As a
10:12AM 25  litigator, it's not like I really appreciate,

9

1  one, we don't need it realtime.  It can trail
2  by a couple months if that helps.
3       Two, the vast majority of these entries
4  really don't reveal client confidence and
5  really don't reveal a strategy.  The fact that
6  I worked on the motion to compel isn't going to
7  give them much advantage.  To the extent
8  there's anything in these time entries that
9  truly does reveal a client confidence or an
10  undisclosed, strategy, it seems like Masimo has
11  a decision, that any company has to make.
12  Either, one, produce it and claim damages or,
13  two, redact it and don't claim damages.
14       What it seems like they can't do is have
15  their cake and eat it too.  There's a
16  fundamental fairness in any damages claim.
17  Your Honor, it's critically important not only
18  to whether -- the exact calculation of this
19  damage is really important in this case because
20  I believe the incremental costs are going to be
21  quite small if they're properly allocated.  At
22  best, seven claims of the ten.  They can't
23  recover for the cost they would have incurred
24  anyway for the other three.  But they may only
25  prove that one of these patents was

10

1  fraudulently cured.  Maybe the incremental
2  costs they incurred that they wouldn't
3  otherwise have to incur in defending is quite
4  small.  That's significant to present to a
5  jury; right?  Because it undermines the theme.
6  It undermines the theme, Your Honor, that by
7  bringing this claim it was predatory tactic.
8       THE COURT:  I get it.  I get it.  I
9  get it.  I think maybe what we need -- and
10  we'll hear from the other side -- is a better
11  understanding of what they're reporting on that
12  billing code and maybe we can work out
13  something where you get information about the
14  total amount incurred and what percentage this
15  is about.  I don't want to have a situation
16  where I'm looking at billing records, but if
17  you're saying this evidence is critically
18  important, I guess that's the type of thing we
19  could do.  I'm not quite sure it's necessary.
20  Let's hear from the other side how they're
21  billing this code and see if we can figure out
22  a path forward.
23       Do you understand what I'm asking?
24       MR. LARSON:  I do, Your Honor.  Thank
25  you.  Steve Larson for defendant and

11

1  counterclaimant Masimo.
2       As for the question of how we're willing
3  to do the code, the attorneys have been
4  instructed -- and I don't want to reveal
5  anything internally about communications -- but
6  if the work pertains to the fraudulently
7  obtained patents, there's a special code for
8  that the attorneys are supposed to use.  If the
9  work pertains, for example, the antitrust case,
10  for example, what I'm doing, that's a different
11  code.  That's not a matter of damages for the
12  jury.  After the fact we're going to seek
13  attorney's fees, but that's not going to be
14  part of the damages claim.  That's not because
15  of the fraudulent patents.  That's just from
16  litigating the antitrust allegations.
17       THE COURT:  What happens if the work
18  pertains to litigation generally?  Where does
19  that get billed?  Does that get allocated?
20       MR. LARSON:  If it's work that we
21  believe we would have done because of the
22  fraudulent patents, then it should be billed in
23  the fraudulent patent code.  We could also --
24  if there's questions about this sort of
25  allocation, we've given them an option.  We've

12

1  given them a path forward on a golden platter.
2  They say the costs aren't that high, so I don't
3  see a reason for burdensome discovery for
4  something that's not going to be that great
5  magnitude.
6       What we've offered to them is we're going
7  to provide invoices, monthly invoices, with the
8  totals actually paid by Masimo that are
9  attributed to specifically to the fraudulent
10  patents.
11       THE COURT:  Are you telling what goes
12  to the other patents too?  Shouldn't they be
13  able to know what percentage is being spent on
14  these patents so they can eyeball it or test it
15  to make sure it sounds reasonable?
16       MR. LARSON:  Right.  What we said is,
17  in terms of total cost, if the question is, are
18  these costs harming our ability to compete, we
19  can give them total costs, and they can compare
20  that if they want to have total litigation
21  costs, that sort of information.  These fees
22  don't answer that, but we can provide that.
23       We can go to the jury with these monthly
24  invoices that have the total amounts.  It was
25  the exact discovery provided in the *Garden* case

13

```
 1   that Judge Burke was sufficient, that it was
 2   proper for the expert to rely on --
 3          THE COURT:  Is there any objection if
 4   I allocate between recoverable costs --
 5          MR. LARSON:  Not all the patents were
 6   accused of fraud in that case.
 7          Yes, in that case, there was an issue of
 8   not all the patents being accused of fraud.  In
 9   that case, Judge Burke noted that he didn't see
10   a reason for the expert to have to go through
11   all the detailed hourly entries.  That's really
12   the issue.  We provide them invoices, provide
13   the total amounts.  When you go into these
14   specific hourly entries, that's very
15   problematic and potentially prejudicial, for us
16   to give them realtime updates on what we're
17   doing.
18          THE COURT:  They say they don't want
19   that anymore.  That's off the table.  Realtime
20   updates are off the table.
21          MR. LARSON:  They said they might
22   want it a few months after the fact.  The
23   question I have is where all this is going.
24   Are we going to have attorneys being deposed?
25   Are we going to have attorneys on the stand?
```

14

```
 1   Are we going to have a sort of minitrial on the
 2   reasonableness of fees, which I think they
 3   raise and argue?  They're going to question
 4   whether our fees are reasonable.
 5          First of all, I don't think there is a
 6   reasonableness requirement for damages, and
 7   that's in the Judge Burke case we cited.
 8   That's also a case we cited from Wisconsin,
 9   that there's not a reasonable aspect.  If we're
10   going to into the reasonableness of fees, I
11   think it's fair that we're going to want to
12   have assessment of their fees as well so the
13   jury can see what's reasonable.  If we're going
14   to be questioned about one attorney coming to a
15   Delaware hearing, I should be able to point
16   out --
17          THE COURT:  I'm not seeing a world
18   where we're discussing the reasonableness of
19   fees.  I am seeing a world where they say
20   you're claiming that you spent -- whatever
21   number I throw out is going to show my lack of
22   understanding about how much this case costs.
23   They're going to say you guys want $5 million
24   in fees for litigating these patents, and
25   you're going to spend that money anyway, even
```

15

```
 1   if you didn't assert these patents.  That's
 2   what they want to say, so how are we going to
 3   get them the information so they can say that?
 4          MR. LARSON:  That's the solution we
 5   provided to them, which is if this is really
 6   worried about the number being high with some
 7   sort of audit taking place with regard to the
 8   particular entries, what we've offered them is,
 9   we'll go to the jury trial.  You'll have your
10   jury trial with the amounts that we have.  And
11   after trial, we can have an audit with a
12   special master or some other proceeding with
13   the Court, to go through the entries where the
14   damages award can only be reduced because maybe
15   there's an allocation error along the way.
16          This is really about a concern about the
17   damages being too high.  I think that's an
18   excellent solution.  I'm not sure why they
19   wouldn't accept that.  I think that -- it's
20   also an issue of, well, we want a sense of all
21   the fees you're spending, for example, on all
22   the patents, some total number.  That's
23   something we could work out.  That's not
24   something they offered before, but we could
25   provide that if that's the question.
```

16

```
 1          Our real concern is these particular
 2   requests are very broad and burdensome and we
 3   don't want to provide hourly entries in
 4   realtime.  Most of Apple's case, it's really
 5   after the fact entirely when anything was
 6   provided.
 7          I want to make a couple more points that
 8   I think the default here is we do believe these
 9   billing fees, hourly fees, are privileged.  We
10   cited Third Circuit case.  We cited a District
11   Court case from the Third Circuit on this.
12   Montgomery was a Third Circuit case.  Lane vs.
13   State Farm was a District Court case from
14   Pennsylvania.  Apple cites a treatise and a
15   couple cases from outside the Third Circuit,
16   but we think if you look at the caselaw we
17   cited, the default is yes, these billing
18   entries are privileged, and they're very
19   sensitive.
20          We think it would be very prejudicial,
21   and I don't know where Apple is going in terms
22   of having a trial -- if they want to have a
23   trial in front of the jury about these
24   attorneys and how they bill their time.  I
25   don't think that's something we want to do.
```

17

1	Those are the solutions we have in mind.
2	We've offered, at least, the idea of a
3	post-trial sort of check or audit of the fees.
4	We'd be open to the possibility of giving them
5	a total amount on the other patents so they can
6	compare that.  That's a possibility.  I'm open
7	to other solutions.
8	Seems to me there's points I want to
9	make.
10	The other thing about -- I do maintain
11	that these requests in particular are very
12	burdensome and broad and, for example, seek
13	very detailed discovery as to all the patents
14	at issue, all the consultants, whether we're
15	seeking a fee or not, so I want to make sure
16	that's out there.
17	THE COURT:  Have a seat.
18	Why don't you tell me what is the
19	particular problem with them going to a jury
20	with the total amount that they claim -- and
21	you've got the opportunity to say to the jury
22	that's too high, but if the jury ultimately
23	awards their number and they've agreed the
24	number can only be reduced at that point by the
25	Court after, is that a Seventh Amendment

18

1	problem?
2	MR. FORD:  It's a Seventh Amendment
3	problem because we have a Seventh Amendment
4	right to have the jury decide the amount of
5	damages, and they would be --
6	THE COURT:  That's what I said, but
7	they would be deciding it and then it would
8	only get reduced.  It would only be in your
9	favor afterward.
10	MR. FORD:  The fact that we don't get
11	to truly test in front of the jury the amount
12	of damages -- so they're presenting the
13	situation where we would essentially get a
14	black box in front of the jury and not be able
15	to really get into their allocation, and the
16	jury would assume the damages are more.  And
17	that has a significant effect, Your Honor,
18	because there are secondary effects to these
19	costs.
20	They're arguing that these costs impair
21	our ability to compete, we've lost sales, we
22	didn't invest.  So the jury needs to really
23	understand what those costs actually were to
24	make that true assessment of whether there was
25	any harm to competition, number one.

19

1	And, number two, I want to get to the fee
2	agreements.  It's conceivable that the
3	underlying fee agreement might show that
4	there's no incremental costs at all.  There
5	might be a fixed fee agreement in place where
6	if they prevail on only one patent, they would
7	have incurred the same amount of fixed fee even
8	if there were nine patents-in-suit.  The
9	result, if we're able to prove that, is they
10	have no injury at all.  They have no standing.
11	The claim fails.
12	I think this goes to the liability.  It
13	goes to the jury's understanding of the
14	magnitude and effect.  Respectfully, I don't
15	think Apple can be put in a position to choose
16	between the Seventh Amendment and the
17	reasonable discovery.  I will say this, though:
18	He pointed to two cases the *Garden* case --
19	THE COURT:  I read them.  I'm good.
20	I'm ready to talk about this.  We've had a lot
21	of cases with a lot of sound-bites.  I get it.
22	Here's what we're going to do:  I don't
23	think my thinking on this has changed after
24	talking to everybody today.  We all know the
25	situation we're in, is that it would be great

20

1	for your side to get all the billing records to
2	see what they're up to.  That's not going to
3	happen.  On the other hand, you get more than
4	just a number.  We need to figure out what the
5	balance is going to be here.
6	It's not enough -- you've got to give
7	them more than just saying here's the numbers
8	for this billing code and it's too much to turn
9	over all the invoices.
10	So at a minimum, what I think we need is
11	information from Masimo provided to Apple that
12	has to do with what the fee arrangements
13	generally are, and that can be provided in the
14	form of the documents or a declaration with
15	attached documents, but they need to understand
16	under oath how these fees are being charged, to
17	and include how decisions are being made to put
18	stuff on this billing code.  I also don't think
19	it's unreasonable for them to have an
20	understanding about what percentage of the
21	total litigation costs the billing codes amount
22	to.
23	And then if there are any further
24	disputes about the details and how this is
25	going to go forward, I'm not saying that I'm

21

1  not going to review billing records, and I'm
2  not saying that billing records don't have to
3  get produced at this point.  But I hope you
4  all, with that guidance, can work out the rest
10:25AM 5  of this because you know what you need.
6       I don't expect -- as I'm thinking how
7  this trial is going proceed, the biggest issue
8  of the day is going to be whether it should
9  have been $4 million for billing on these
10:25AM 10  patents or five or whatever it is.  So I'm
11  taking that into account, but also I don't have
12  a sense of how much money we're talking about
13  here.  If there are further disputes about
14  this, each side needs to come up with the most
10:25AM 15  reasonable proposal for getting the other side
16  what they need, and I'll just pick one.  And so
17  that's an incentive to be reasonable about it.
18       So just to be clear for the record, the
19  ruling on this, which is pursuant to Federal
10:26AM 20  Rule of Civil Procedure 26, this is a discovery
21  ruling about what needs to get produced that's
22  proportional to the needs of the case, taking
23  into account burden.
24       Anything else?
10:26AM 25       This paragraph on page three where Apple

22

1  states budgets and forecasts for those fees and
2  costs, that whole second paragraph of requests
3  is denied.
4       All right.  So let's go to Issue 2.
10:26AM 5  Documents on factors impacting forecasts and
6  proper billing.  So you're getting forecasts
7  and projections, but you want something else,
8  but they say, "What do you want us to look
9  for?"  Is this dispute concrete?
10:27AM 10       MR. FORD:  I'm hoping to clarify it.
11  We tried during meet-and-confers, and there may
12  be some developments that help me to clarify.
13  They agreed to provide forecasts for the sale
14  of the watch, the W1, maybe the Freedom as
10:27AM 15  well.  What we want is internal Masimo analysis
16  about what's driving the forecast.  What's
17  driving demand?  What factors are impacting
18  demand?
19       And it goes to damages, Your Honor.  In
10:27AM 20  this case, across a number of claims, Masimo
21  is, essentially, blaming Apple for
22  underperformance in the marketplace.  Blaming
23  false advertising, blaming the alleged patent
24  infringement, blaming the litigation costs.
10:27AM 25  It's saying that it's hurting its sales.  We're

23

1  losing sales.
2       If internally, Masimo's pointing to other
3  market factors, just supply factors at the
4  manufacturer, that's obviously relevant.  We
10:27AM 5  just don't want to see an expert to look at a
6  forecast going down and blame Apple if
7  internally what Masimo is saying is pointing to
8  something else.
9       During the meet-and-confers, we tried to
10:28AM 10  explain this to Masimo to get them to
11  understand what we meant by "factors."  I think
12  what might clarify is the recent press release
13  by Masimo.  I'm happy to show this to you.
14  It's very recent.  It's from July 17th.
10:28AM 15  Basically, what happens, Masimo adjusted its
16  guidance and forecasts and said the reason why
17  our healthcare revenue is down relates to a
18  number of factors:  Orders were delayed,
19  inpatient census went down, there were labor
10:28AM 20  shortages at hospitals, our OEM partners were
21  unable to provide patient monitoring.  This is
22  precisely the type of thing that pertains to
23  the W1 and forecasts that's common in any case.
24  This is why we're not doing well in the
10:28AM 25  marketplace.

24

1       THE COURT:  Now, they say they asked
2  you for search terms, that they'll run them for
3  you.  Did you do search terms?
4       MR. FORD:  We have provided search
10:28AM 5  terms.  I think my concern is they're not
6  necessarily agreeing to produce the responsive
7  documents that hit on the search terms.  So we
8  provided search terms that, one, for purposes
9  of e-mail collection, should, we hope, identify
10:29AM 10  the documents.  But then I just think we need
11  them to acknowledge they'll produce more than
12  just the forecasts and also produce the
13  analysis underlying the forecast.
14       THE COURT:  I think that's in their
10:29AM 15  letter.  Let's hear from them and we'll see if
16  there's --
17       MR. FORD:  And the second part is I
18  just think this is something that you would
19  have to do search beyond e-mail.  They're
10:29AM 20  essential files about forecasts and business
21  plans.  I would expect you can ask the company,
22  the leadership of the group, where is the
23  analysis that goes into forecasts?  Even if
24  it's not in certain e-mails, that's something
10:29AM 25  that, as a general matter, both sides are doing

25

1 that essential file collection to make sure we
2 have the key documents.
3        Thank you, Your Honor.
4        THE COURT:  All right.  Thank you.
10:29AM 5        MR. LARSON:  First of all, I want to
6 make clear that it's not our goal to run these
7 search terms and not produce the documents that
8 would result from the search terms.  We saw
9 that as a potential solution because the
10:29AM 10 problem with our can request is every time we
11 ask them to sort of explain what factors may
12 potentially impact actual or forecasted
13 information, we get lots of different examples
14 of different types of documents.  We want to
10:30AM 15 make we fulfill our discovery obligations.
16 It's very difficult, even from the last
17 example, there was a long list of different
18 types of documents.
19        THE COURT:  But I kind of understood
10:30AM 20 with that example, like, sort of what they're
21 after.  They issued a press release that says
22 here's why we think our forecasts are the way
23 they are.  Can you talk to the folks and see --
24        MR. LARSON:  I need to get a copy of
10:30AM 25 the press release.  I haven't seen this before.

26

1 This is brand new, but it wouldn't surprise me
2 that Masimo would identify various factors.  I
3 don't know if that's all the factors.  It
4 sounds like a lot of different types of
10:30AM 5 categories of documents.  That's why we think a
6 search term approach makes sense for this
7 document request.  Maybe a document sufficient
8 to show factors that impact would be okay
9 because then we could ask Masimo executives,
10:30AM 10 hey, what do you think?  What types of document
11 would show this?
12        THE COURT:  It's hard for me, because
13 I don't know what the answer is.  Based on what
14 you're hearing today and based on what I'm
10:31AM 15 hearing from you today, you're not saying
16 you're not going to produce those types of
17 documents.
18        MR. LARSON:  No.  I mean, our issue
19 is not we're going to produce those types of
10:31AM 20 documents.  We're going to produce financial
21 forecasts.  We're going to run their search
22 terms.  We'll produce the results of the search
23 terms.  When we agree to produce documents
24 responsive to a request, we want to make sure
10:31AM 25 we know what we're supposed to do and what

27

1 documents are being sought.  That's the issue
2 with this request.
3        THE COURT:  What do you need to know
4 from him sitting here today?
10:31AM 5        MR. LARSON:  I guess if we had a
6 clear list of the different factors.
7        THE COURT:  They don't know what the
8 factors are.  They're trying to find out what
9 the factors are.
10:31AM 10        MR. FORD:  I might be able to
11 simplify.  I think -- maybe this is my failure
12 during the meet-and-confer.  I'm not asking
13 Mr. Larson, as an economist, to figure out all
14 the potential factors and create all documents,
10:31AM 15 all labor shortages, things like that.  I'm
16 asking to look at what your executives are
17 saying are the reason why the forecasts are
18 changing.  Start with that.  Start with
19 documents and analysis about the forecast or
10:32AM 20 outlook.
21        THE COURT:  I don't know how these
22 documents are kept.  They might be able to look
23 for them?
24        MR. FORD:  I think there are probably
10:32AM 25 e-mails between executives where they're

28

1 working on the forecast and they're talking
2 back and forth about why we should move the
3 forecast up or down.  I can't guess all the
4 factors.  I'm not a businessperson.  I don't
10:32AM 5 think he needs to start with the factors.  I
6 think you start with what's the work that goes
7 into the forecast, and if those documents are
8 showing Masimo business people point to other
9 reasons for underperforming, the document is
10:32AM 10 responsive.  I can't come up with an exhaustive
11 list of all the reasons the product is
12 underperforming because I'm not the
13 businessperson.
14        THE COURT:  I know.  Generally, the
10:32AM 15 way this is done is people search with search
16 terms.
17        MR. FORD:  So we provided search
18 terms like forecast, budget, all that stuff.
19 You look at an e-mail, and it will be talking
10:32AM 20 about the budget, and we're going to lower the
21 forecast because our suppliers are delayed.
22        THE COURT:  I'm not hearing from them
23 they're going to withhold them.  Have a seat
24 and let them respond.
10:33AM 25        Do you think we might benefit from

29

1  additional meet-and-confer on this issue?
2       MR. LARSON:  Potentially.  We're
3  having a meet-and-confer about the search
4  terms, of course, in general about the burden
10:33AM 5  and how many hits they are.  I think a document
6  sufficient to show would make us more
7  comfortable.  We could talk to the executives,
8  try figure out what the factors are and provide
9  some category of documents.  Our only concern
10:33AM 10  is to make sure we agree to produce all
11  documents, that we know what we're searching
12  for and looking for.
13       THE COURT:  Why don't you
14  meet-and-confer on that.  I'm not going to say
10:33AM 15  documents sufficient to show is enough at this
16  point, because I have no idea what exists, and
17  sounds like you don't either.
18       So they're not refusing to produce those.
19  Those are going to move forward in the ordinary
10:33AM 20  course, and you all are going to meet about
21  burden, and that's subjects to any future
22  rulings under Rule 26.
23       So I think that's the first set of
24  disputes, so let's move on.
10:34AM 25       So now we've got Masimo's disputes.  So

30

1  let me get those pulled up.  These are the
2  disputes, also, about the antitrust
3  counterclaims.  Let's take these one by one.
4       Go ahead, Counsel.
10:34AM 5       MR. LARSON:  Thank you, Your Honor.
6       So I'll begin with the first section of
7  our letter, and this is where we're requesting
8  the Court's assistance, just to begin with,
9  before we get into particular document
10:34AM 10  requests, and we want clarity that there's no
11  general embargo on predatory infringement
12  discovery or IOS discovery.  The reason this is
13  important is Apple says they're not going to
14  answer 'rogs, they're not going to supplement
10:35AM 15  their initial disclosures, they're not going to
16  provide pretrial disclosures.  They've asked us
17  to not provide expert discovery on this and
18  have expert reports on this.
19       And really, the argument has to do with
10:35AM 20  discovery-type arguments.  They're really about
21  the Court's report and recommendation, and we
22  don't view the Court's report and
23  recommendation as saying that it was going to
24  blatantly embargo discovery on those issues.
10:35AM 25  We read it as saying the Court will consider

31

1  individual requests as they came up.
2       So there's been a lot of --
3       THE COURT:  Let's talk about the
4  predatory infringement request for production.
10:35AM 5  It was very helpful that you attached as
6  Exhibit 1 a summary of what's going on here.
7       So which ones are the predatory
8  infringement?
9       MR. LARSON:  Predatory infringement
10:35AM 10  is the next section of the letter.  That's 83
11  to 84 and 86 to 90.
12       THE COURT:  83 talks about all
13  documents and communications referencing,
14  relating to, or discussing the practice of
10:35AM 15  efficient infringement for the practice of
16  infringing and appropriating intellectual
17  property even after being informed of such
18  conduct because it is more advantageous to do
19  so that to pay for lawful use or draw up the
10:36AM 20  intellectual property.
21       That request is going to be denied as not
22  proportional to the needs of the case.
23       What's the next one?
24       MR. LARSON:  That's 83, Your Honor.
10:36AM 25       THE COURT:  Yes.

32

1       MR. LARSON:  The next one is 84.
2       THE COURT:  84.  All communications
3  with third parties related to allegations that
4  Apple unlawfully acquired or used intellectual
10:36AM 5  property.  Merit two responsive documents
6  regarding -- this sounds like a trade secrets
7  dispute that you had with them; right?  Is this
8  something different?
9       MR. LARSON:  This is something
10:36AM 10  different.  I think what's important here, the
11  point I wanted to make on some of these
12  requests, and for a number of these requests,
13  is we saw Apple argue in its motion to dismiss,
14  and we're going to see Apple argue again on the
10:37AM 15  motion for summary judgment, say, "Masimo,
16  you've only shown harm to yourself.  You
17  haven't shown harm to competition."  So Apple
18  is saying, "We'll provide these documents as to
19  you, Masimo, but we're not going to provide
10:37AM 20  discovery as to this practice as regards other
21  parties," which is what we need to show or want
22  to show harm to competition.
23       So I think just for a little bit of
24  perspective here, we did take Your Honor's
10:37AM 25  ruling into account, and I think Apple has

33

1 seasoned counsel that I think can confirm that
2 the discovery we're seeking here is really a
3 drop in the bucket to what you typically have
4 in big antitrust cases. It's very expensive
5 and burdensome discovery.
6          THE COURT: I understand.
7          MR. LARSON: It's really focused on
8 the facts of what actually occurred, is what
9 we're seeking with these requests. And I'm
10 hoping this will be our main, only discovery
11 dispute about antitrust discovery. These are
12 the requests that we brought to the Court that
13 we feel we need to be able to develop that part
14 of the case.
15          THE COURT: Okay. 84 is also denied.
16 What's the next one?
17          MR. LARSON: 86.
18          THE COURT: 86. Denied.
19          MR. LARSON: Can I ask for
20 clarification on that?
21          THE COURT: That's denied pursuant to
22 Rule 26. It's not proportional to the needs of
23 the case.
24          MR. LARSON: That answered my
25 question. So it's not a blanket embargo for

34

1 predatory infringement discovery?
2          THE COURT: These particular requests
3 are denied.
4          MR. LARSON: Thank you, Your Honor.
5 Next one is 87.
6          THE COURT: Denied.
7          MR. LARSON: Next one is 88.
8          THE COURT: Denied.
9          MR. LARSON: 89. And can I offer a
10 little bit of argument on this one?
11          THE COURT: That's fine.
12          MR. LARSON: Again, you see here,
13 we're referring to specific parties, and these
14 are parties that I mentioned in our complaint
15 that we believe Apple engaged in the practice
16 of predatory infringement with regarding these
17 parties. And again, Apple is going to argue
18 we're only showing harm in competition to
19 ourselves and not these other parties. This is
20 the the type of discovery that we would seek to
21 be able that establish that. I don't see
22 arguments about burden or proportionality.
23 It's really just about relevance, and what
24 Apple argues about these parties is these
25 parties aren't in the relevant market. To the

35

1 extent that's true, we believe it's because of
2 the conduct that Apple engaged in.
3          THE COURT: I understand the
4 argument, but that one is also denied. I
5 appreciate your argument.
6          MR. LARSON: Understood.
7 Next one is 90.
8          THE COURT: Denied.
9          MR. LARSON: And next one is -- I
10 believe that's --
11          THE COURT: Predatory infringement.
12          MR. LARSON: Predatory infringement.
13          THE COURT: Okay. Monopoly
14 leveraging.
15 So I'm confused about 62. I'll be honest
16 with you. It's about -- I thought the market
17 you wanted was the market for IOS app
18 distribution. Am I a moron? Isn't that a high
19 percent? Don't they have a monopoly on that
20 market? Is there something I'm not getting?
21 What am I missing out on?
22          MR. LARSON: What they're going to
23 argue is that's not about the market. They're
24 going to say that it should be a broader
25 market, and this really goes to the ecosystem

36

1 request, so I'll go back on that. That's
2 request 112 and 114.
3 This set of requests have to do with
4 Apple's conduct in that market, and so
5 request -- the question of whether that is a
6 market, 112 and 114, we'll get to that in a
7 second unless you want to go ahead and address
8 that. These are less about what that market is
9 and more about the conduct in that market,
10 showing that Apple has monopoly power in the
11 market. And Apple hasn't conceded that. If
12 Apple were to say that's not an issue here,
13 that would be fine, but barring that, it's
14 something that we need to pursue.
15          THE COURT: Okay. All right. So
16 what is it -- give me the type of idea of the
17 type of thing you're looking for in -- you want
18 to talk about 112 first? We can talk about 112
19 first.
20 So 112 has to do with documents and
21 things referring to Apple Watch and Apple's
22 ecosystem with interconnected products, and
23 they don't what to produce that. No, they're
24 happy to produce that. They just don't want to
25 talk about stuff that doesn't have to do with

37

1  the watch, so whatever the hot now product is,
2  they don't want to give you documents on that.
3      MR. LARSON:  The issue is not that --
4  we would be happy if the ecosystem documents
5  are limited to documents that also talk about
6  the watch.
7      THE COURT:  Is there a dispute on
8  that then?
9      MR. FORD:  We're happy to produce
10  documents related to the ecosystem as it
11  pertains to the watch business.  It's just the
12  stuff that's totally unrelated to the watch.
13      THE COURT:  We're okay on that?
14      MR. LARSON:  The issue is they said
15  what they produced is not what we're seeking at
16  all with these requests.  Literally, what they
17  say is documents showing how the ecosystem
18  increases demand for the Apple Watch, which is
19  not what we're trying to show here.  Here,
20  we're trying to show that there's a discrete
21  market for the IOS apps, and the way you do
22  that under caselaw show that a particular
23  market or submarket, you show it's very sticky.
24  You show that once a customer makes a decision,
25  for example, to go with Apple, now it's in

38

1  Apple's ecosystem.  It's going to be stuck
2  there, and that's under the *Kodak* case --
3      THE COURT:  Give me -- paint a
4  picture in my mind about what type of document
5  you're looking for.  Give me an example.
6      MR. LARSON:  These are documents that
7  talk about how difficult it is, for example,
8  for a customer to leave Apple's ecosystem.  In
9  the context of the Apple Watch, it's fine.  In
10  fact, we have search terms on that.  We'd be
11  happy to rely on our search terms on that, but
12  we want to make sure when they provide
13  documents, they're going to provide all the
14  documents and not limit it to documents that
15  show how Apple's ecosystem increases the demand
16  for Apple Watch, which is what they said they
17  would provide.
18      THE COURT:  Do you understand what
19  he's talking about?
20      MR. FORD:  Yeah, I think he's
21  interpreting our statement too narrowly.  I
22  think what he's talking about is demand.  We've
23  also agreed to produce documents related to the
24  willingness or ability of Apple Watch users to
25  switch to other products.

39

1      THE COURT:  Is everything --
2      MR. FORD:  Everything he's describing
3  there, we're willing to produce.
4      MR. LARSON:  I'm not sure.  When he
5  says I think that is about demand, maybe we're
6  two ships passing in the night.  If they say
7  they'll run the search, they'll produce the
8  documents from the search, subject to the
9  parties' negotiations about burden and there
10  being too many hits, then I think we're okay on
11  that one.
12      THE COURT:  Okay.  Great.  We're
13  making progress.  That's 112 and 113 and that
14  114 kind of seems the same too; is that right?
15      MR. FORD:  That's my assessment.
16      MR. LARSON:  Those are all related.
17  Same issue.
18      THE COURT:  So those are good.  Let's
19  go back, now, to 62 and 63.  Is that kind of
20  the same thing?
21      MR. LARSON:  These have to do with
22  market definition and market power and
23  distribution markets and in particular -- if
24  you give me one moment.
25      THE COURT:  Take your time.

40

1      MR. LARSON:  So I mean, I think we
2  see this as a pretty narrow request.  These are
3  literally Apple documents talking about market
4  definition where Apple itself is saying, hey,
5  here's what the market is.  We think those
6  documents would be very relevant to disputes,
7  if any, about what the market is.  I think
8  there's going to be a dispute.  They're going
9  to say the market shouldn't be limited to an
10  IOS path market.
11      This didn't come up in the motion to
12  dismiss.  They didn't challenge our allegations
13  on that in the motion to dismiss.  Clearly,
14  it's going to be part of the dispute in the
15  case.  They're going to challenge in summary
16  judgment.
17      THE COURT:  Do you know what they're
18  asking for on 62 and 63?
19      MS. MILICI:  Your Honor, I understand
20  what the requests say.  I disagree that this is
21  a narrow request.  It's an exceptionally broad
22  request, but in addition, it's not in service
23  of any viable antitrust theory.  This is a
24  refusal-to-deal claim, which the Supreme Court
25  said is immune from antitrust scrutiny.  It's

41

1   given reasons why the refusal-to-deal duty
2   should not be expanded, and that includes the
3   risk of having central control of courts making
4   decisions about what Apple can and can't say to
5   app developers, how many days it can take to
6   review an app.
7       A lot of these requests are in service of
8   the refusal-to-deal claim that the Supreme
9   Court has clearly stated is immune from
10  antitrust scrutiny.  We cited Judge Boasberg's
11  decision in *U.S. vs. Facebook* explaining why
12  this can't be included in a monopoly brought
13  kind of theory.  We have decisions from Judge
14  Coe in the *Freehand* case refusing to consider
15  refusal to deal in a monopoly brought claim.
16  That's how this should be dealt with.
17      THE COURT:  I agree.  I appreciate
18  it.  Spoiler alert is that I'm not going to
19  make any decisions about refusal-to-deal claims
20  today, but you probably all knew I was going to
21  say that.
22      But you have, nevertheless, offered to do
23  some amount of discovery that would allow them
24  to probe this issue.  What --
25      Let me ask you, Counsel, what more

42

1   besides what they've offered you think you
2   need.
3       MR. LARSON:  Well, I think on this
4   request, they haven't offered anything, unless
5   I'm mistaken.  I think the issue here is that's
6   why we want clarity about --
7       THE COURT:  62 and 63.  Apple has
8   agreed to produce -- okay.  So 62 and 63.
9   Yeah, I see.  So they don't want to produce 62
10  and 63 at all.
11      MR. LARSON:  The issue of the
12  categorical -- what they view as a categorical
13  bar on discovery, and they made a few points in
14  the responsive brief that I'd love to address,
15  but if Your Honor --
16      THE COURT:  Let's ask this.  Why
17  doesn't everybody sit down for a minute so we
18  can be comfortable.
19      So 63 talks about all documents,
20  communications, and things referring to or
21  relating to Apple's control of IOS app
22  distribution.  I'm inclined to allow some
23  discovery of that.  They've given you the
24  policies and things.  What more do you want
25  than that?

43

1       MR. LARSON:  Well, they say they're
2   going to provide just policies, and I guess if
3   there's Apple documents discussing the fact
4   that they control IOS app distribution, they
5   have complete control over that, I'd be happy
6   to narrow it to documents referring to that if
7   that would be helpful.
8       MS. MILICI:  I'm still not sure what
9   they're looking for.  These are incredibly
10  broad requests.  They're asking for how Apple
11  views the market for distribution of apps,
12  which is incredibly broad.  I'm not sure what
13  the narrowing is, but I do think fundamentally
14  the issue here is that this isn't related to
15  any monopolization of the health watch.  This
16  market definition exercise that they want to
17  engage in has nothing to do with the claims,
18  and it's disproportionate under Rule 26.
19      THE COURT:  All right.  I'm -- why
20  don't you have a seat.
21      I'm going to ask you all to
22  meet-and-confer on this more.  I'll hear it
23  again.  I do agree that the request, as
24  drafted, is incredibly broad.  Why don't you
25  come up with a proposal about how you can

44

1   narrow it and an explanation as to why you need
2   it so I can understand better, and I can hear
3   it again if you can't get it worked out.
4   That's 62 and 63.
5       And then we've got -- Apple has offered
6   some stuff for 76 and 81.  That's -- 81 talks
7   about all documents, communications, and things
8   referring or relating to Apple's App Store
9   review guidelines as referenced in the
10  counterclaims.
11      I don't understand what you're looking
12  for here.  Tell me the type of thing.  You have
13  the guideline itself.  You want it narrowed to
14  responsive documents relating to the relevant
15  technology?  What are you thinking?  Like, you
16  want to see who else they have not approved?
17      MR. LARSON:  So the reference to the
18  review guideline 1.4.1 refers to the conduct at
19  issue here, that they would use this guideline
20  to exclude competitors, and our narrowing to,
21  essentially, health watches, apps related to
22  health watches, is our attempt to substantially
23  narrow the universe of potential documents to
24  just other companies, like Masimo, with a watch
25  with particular health features and the app

relating to that watch where Apple used that review guideline to exclude them.

THE COURT: Have a seat. It's okay.

Did that happen? Do you have documents like that?

MS. MILICI: Your Honor, I do want to address this fundamental misconception of what it means to show harm to competition. It doesn't mean to show harm to another competitor, and these companies are not competitors.

THE COURT: I know. I'm just trying to see the easiest way out of this dispute. For me, the easiest way might be there are no such documents.

MS. MILICI: Your Honor, what that would entail is a search of every app that's ever been reviewed to see whether it meets this definition, and I would say it hasn't even happened as to Masimo. Masimo's apps have been available since December, despite the fact that they continue to include in pleadings to this Court an allegation that they have been refused access. They have not. Their apps were reviewed in a short period of time and approved

and available on the App Store. This didn't even happen as to them.

MR. LARSON: Your Honor, I would disagree with that.

THE COURT: What's 1.4.1?

MS. MILICI: Your Honor, I don't have the guideline in front of me, but I understand it's a guideline about the review process for apps that have a medical component.

THE COURT: You can have a seat. That's fine. Everybody can remain seated.

I'm not going to say that this request is denied at this point. Why don't we go back and see what the burden is to make some production relevant to this.

MS. MILICI: Your Honor --

THE COURT: "All documents and communications and things" is way too broad.

MS. MILICI: I just want to be heard on this for a second because, fundamentally, I think what we're getting at here is this runs into exactly what the Supreme Court said Courts shouldn't be doing, which is to look at each of Apple's deals and say, did Apple take too many days to review that app? Did it ask a question

that the Court would prefer that it not ask? This is a micromanaging of Apple's deals.

THE COURT: To be clear, all we're talking about here today is discovery. That's all we're talking about here today. So Federal Rules of Civil Procedure 26 asks me to look at whether the discovery request is proportional to the needs of the case, and if I can't see how much burden it is. Even if it has very minimal relevance, I can't make that assessment. With the record before me, I can't.

Why don't we go back. I'm telling you on its face this request is broad no matter what the relevance. So let's go back. Nobody is making any decisions about the merits at this point. We're talking about discovery.

All right. 82. I think 82 seems substantially similar to me.

MR. LARSON: Your Honor, may I make -- so Apple -- at issue here is Apple agreed to provide responsive documents, but only if they involve Masimo. The issue is, again, will this just involve Masimo? Because they're going to argue we can't show harm to

competition, are we going to get information where Apple did this to other companies? I disagree with some of the argument that we're hearing about harm. I think harm to competition and harm to Masimo is absolutely relevant, and that's how you show, and I think we need this to show harm to competition.

But that's the issue here, again, whether it should just be limited to Masimo or whether it should also involve other companies with health-related apps.

MS. MILICI: Your Honor, if I can respond to that, *Philadelphia Taxi* case explains what harm to competition means. It means harm to consumers. It's not, as in that case, if there were more taxi operators that were injured, it would change the outcome of the case. The issue here is, did the harm to Masimo cause a harm to consumers, not or other companies that are not even in this market.

MR. LARSON: That's how you show harm to competition, is to show that this is harm -- obviously, just harming Masimo where Masimo can be a competitive force that can harm competition. If Coke excludes Pepsi, that can

49

1 harm competition. But especially when we know
2 they already argued it. They're going to argue
3 it again. Masimo you only showed you were
4 harmed. You didn't show any other party was
5 harmed. That's the issue here with the
6 discovery.
7         THE COURT: Standby. Standby.
8 Everybody take a break.
9         I'm going to need more briefing on 81 and
10 82 if you all can't get it worked out.
11         MR. LARSON: Your Honor, would you
12 like more briefing after we meet and confer?
13         THE COURT: Yes, please. Meet and
14 confer. I'd like an understanding. I'd like
15 the two parties to have an understanding what's
16 being asked for and why that would be
17 burdensome before I hear it again, though.
18         All right so that's 81 and 82.
19         So 80 is a strange one because 80 asks
20 Apple for communications referring or relating
21 to Masimo's strategies. What are we asking for
22 here?
23         MR. LARSON: Away from the issue of
24 harm to others, now we're focusing specifically
25 on Masimo. And our allegations here -- and we

50

1 provided a supplemental 'rog response that lays
2 out our allegations in more detail, but the
3 allegations are that Apple was seeking
4 information about Masimo's FDA strategies, and
5 that while we didn't give Apple the highly
6 confidential communication with the FDA that
7 Apple wanted, Apple had the ability to ask and
8 receive in response to many questions, very
9 targeted and focused questions, information
10 that was not readily available that would not
11 be readily available to other competitors.
12 Individual pieces, you may have been able to go
13 out and find in the public, but we put them all
14 together and tied them up with a bow and
15 provided them to Apple in response to all the
16 specific questions, and they all have to do
17 with our FDA strategies.
18         And the theory here and our belief is
19 that when you look at the timing of when this
20 occurred, for example, with the safety net,
21 Apple wouldn't approve our app until Apple came
22 out with its own pulse oximetry feature right
23 at the time. With regard to the W1, this is
24 the release of the W1. You have the issues
25 again with Apple, that Apple was doing this to

51

1 obtain information about Masimo's FDA
2 strategies because Apple was attempting to do
3 the same.
4         This request is specifically about Apple
5 discussing Masimo's FDA strategies, which
6 presumably, there wouldn't be many documents
7 about that. If there are, they would be highly
8 relevant. That's what this request is about.
9         MS. MILICI: Your Honor, I do want to
10 respond to some of this.
11         The theory that he's saying is that Apple
12 took three months when it was reviewing the
13 safety net app, which by the way, does not
14 connect to a watch. It has nothing to do with
15 watching. During two months of that time,
16 Masimo was not responding to requests for
17 information. But their theory is by asking is
18 this FDA approved -- and this was an app that
19 was supposed to be used by patients in a
20 hospital -- by asking, is this FDA approved,
21 somehow that means that Apple violated the
22 antitrust laws and monopolized the health watch
23 market even though product is not a health
24 watch. The theory here is so divorced from
25 anything on which relief can be granted, that

52

1 it cannot be proportional under Rule 26.
2         THE COURT: I understand your point.
3 Are there really that many documents that -- no
4 idea.
5         Yeah. So everybody is on the same page,
6 to the extent anybody is arguing merits, I
7 promise you, I will forget. So don't worry
8 about correcting the record on stuff like that
9 because I have a lot going on.
10         So the fact of the matter was is, Apple
11 asked Masimo about FDA, Apple communication
12 between the parties, and Apple has got some
13 internal documents about Masimo's FDA. Figure
14 out how burdensome that would be, and that's
15 how we'll move forward on that. If it's
16 burdensome, come back.
17         MS. MILICI: Your Honor, I just want
18 to clarify one thing. You had asked for
19 additional briefing on RFP 80 and 81. Should
20 we also submit additional briefing on RFP 62
21 and 63 if we're unable to reach agreement?
22         THE COURT: I'll hear it if it's a
23 question of burden. If it's a question of
24 relevance, I don't want to --
25         MS. MILICI: But if we can't on the

53

1  scope --
2          THE COURT:  That's fine.
3          We've gotten to the time period issue.  I
4  can tell you this one I feel comfortable with
5  that.  I think Apple's proposal is more than
6  appropriate.  So I won't hear argument on that.
7  We're going to go with Apple's proposal about
8  the time period.
9          MR. LARSON:  Can I ask one point of
10  clarification on that?  In the briefing --
11          THE COURT:  I was persuaded by their
12  argument.
13          MR. LARSON:  I want to clarify what
14  that time period is.  In the briefing, it
15  suggested it may be ten months before filing
16  the complaint, and that seems very narrow.
17          THE COURT:  Apple offered to extend
18  antitrust discovery to January 1, 2020.
19          MR. LARSON:  Thank you, Your Honor.
20          THE COURT:  All right.  Then we've
21  got Masimo's additional letter.  The first
22  issue, it looked like some stuff had happened
23  since we got the opening letter.  I don't
24  really want to hear about it until after you've
25  had a chance to meet-and-confer about whether

54

1  or not the supplement is appropriate.
2  Sometimes I want to do that while everyone is
3  here, but I don't think that's going to be
4  productive to do today.
5          And then we've got this deadline for
6  waiving privilege.  Is anybody going to waive
7  privilege?  Really?
8          Let's hear from Apple.  You don't have to
9  tell me, but, like, do you think there should
10  be a deadline and what it should be.
11          MR. SEDDON:  Your Honor, we don't
12  think a deadline is necessary, but to the
13  extent there is a deadline, we looked at what
14  the parties are doing in discovery, what
15  they're negotiating on ESI.  We would be
16  prepared to give a notice, if we're going to
17  waive privilege, and I'm not forecasting that
18  we are by any means, if we were going to do so,
19  we would be prepared to do so by August 17th.
20  We think there should be a week after that to
21  provide any supplemental disclosure of
22  privilege log or whatever is necessary, so by
23  August 24th.
24          THE COURT:  August 17th.
25          MR. LARSON:  That's what they offered

55

1  in their brief.  The issue is they say they're
2  going to provide the intent to waive on
3  August 17th, and then, if they don't provide a
4  date, they're going to supplement all discovery
5  including 'rog responses.  We're going to get a
6  document and privilege log August 24th.  It's
7  very late in process.  They've had eight months
8  to decide to waive privilege.  We're deciding
9  ESI search terms right now.
10          THE COURT:  Do you think they're
11  going to waive privilege?
12          MR. LARSON:  I don't know if they're
13  going to waive privilege.  If they're going to
14  cite counsel, for example -- but I should point
15  out, Your Honor, a new development which is
16  yesterday we received a 'rog response from them
17  late last night that apparently purports to
18  assert inequitable conduct allegations against
19  Masimo.  We just received that last night.
20  Apple has had eight months to decide whether to
21  waive privilege.  I can't say -- I haven't
22  investigated whether Masimo would want to have
23  any type of waiver, but we don't think 7 days
24  10 days.  What we ask for would be appropriate
25  as to the new allegations from Apple.  Before

56

1  you rule, I want to make that clear.
2          THE COURT:  Look, we'll set it at
3  August 17th.  That's two weeks from now, and
4  then we'll see where the chips fall and move on
5  from there.  I don't know what else I can say.
6          I appreciate counsels' skill and
7  preparation and outstanding letters that I
8  received it's hard in any case, and especially
9  in this case, for the Court to make reasoned
10  decisions based on an incomplete record, which
11  is what I have, and I have to do the best I can
12  with the facts in front of me and, hopefully,
13  that's been apparent to you today, that I'm
14  trying to do the best I can.
15          You all have got I don't know how many
16  attorneys sitting in this room working on this.
17  When the disputes percolate up to me, I can
18  only do what I can do with the information I
19  have.  The train is headed to the station or
20  off the cliff, but the train left the station
21  on this set of litigation.  We'll see you all
22  the next time.
23          MR. LARSON:  Your Honor, may I raise
24  one more topic?  And we're simply seeking
25  guidance from the Court.  We raised this with

57

1  Apple. We're not sure if a letter, whatever
2  would be appropriate. We wanted to raise the
3  fact that the Federal Circuit has taken en banc
4  a number of foundational questions as to
5  obviousness for design patents. This is pretty
6  rare. It's been five years since the Federal
7  Circuit has gone en banc. If you look at the
8  questions the Federal Circuit is answering,
9  they're really foundational questions that we
10 think could substantially change the law on
11 obviousness for design patents and questions
12 for the KSR changes.
13     We raised this with Apple. It's not a
14 situation, for example, where you have two
15 alternative claim constructions. We really
16 have no idea where the law is going to end up
17 on this, so we think whatever reports we serve
18 would have to be completely redone. We
19 proposed the possibility of vacating that
20 deadline and visiting this in January. We just
21 want your guidance.
22     THE COURT: They dispute -- what's
23 Apple's view? I assume you're disputing that.
24     MR. LUEHRS: Your Honor, they're
25 trying to stay Apple's design patent claims

58

1  because there's a pending issue on appeal.
2      THE COURT: I understand. The train
3  is going to keep plowing full speed ahead, and
4  we'll deal with it in January when we've got
5  some information from the Federal Circuit and
6  how it shakes out.
7      Thanks, everybody.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

59

1                    C E R T I F I C A T E

2  STATE OF DELAWARE        )
                             ) ss:
3  COUNTY OF NEW CASTLE      )

4      I, Deanna L. Warner, a Certified
5  Shorthand Reporter, do hereby certify that as
6  such Certified Shorthand Reporter, I was
7  present at and reported in Stenotype shorthand
8  the above and foregoing proceedings in Case
9  Number 22-1377-MN-JLH, *APPLE INC. Vs. MASIMO*
10 *CORP, et al*, heard on August 3, 2023.
11     I further certify that a transcript of
12 my shorthand notes was typed and that the
13 foregoing transcript, consisting of 59
14 typewritten pages, is a true copy of said
15 DISCOVERY CONFERENCE.
16     SIGNED, OFFICIALLY SEALED, and FILED
17 with the Clerk of the District Court, NEW
18 CASTLE County, Delaware, this 6th day of
19 August, 2023.
20
21     _____
22     Deanna L. Warner, CSR, #1687
       Speedbudget Enterprises, LLC
23
24
25

# #

**#1687** [1] - 59:21

**'**

**'rog** [1] - 50:1, 55:5, 55:16
**'rogs** [1] - 30:14

# 1

**1** [2] - 31:6, 53:18
**1.2** [1] - 7:23
**1.4.1** [2] - 44:18, 46:5
**10** [1] - 55:24
**112** [6] - 36:2, 36:6, 36:18, 36:20, 39:13
**113** [1] - 39:13
**114** [3] - 36:2, 36:6, 39:14
**17th** [5] - 23:14, 54:19, 54:24, 55:3, 56:3

# 2

**2** [1] - 22:4
**2020** [1] - 53:18
**2023** [3] - 1:14, 59:10, 59:19
**22-1377-MN-JLH** [2] - 1:5, 59:9
**22-1378-MN-JLH** [1] - 1:6
**24th** [2] - 54:23, 55:6
**26** [6] - 21:20, 29:22, 33:22, 43:18, 47:6, 52:1
**2B** [1] - 1:14

# 3

**3** [1] - 59:10
**3rd** [1] - 1:14

# 4

**4** [1] - 21:9

# 5

**5** [1] - 14:23
**59** [1] - 59:13

# 6

**62** [8] - 35:15, 39:19, 40:18, 42:7, 42:8, 42:9, 44:4, 52:20
**63** [8] - 39:19, 40:18, 42:7, 42:8, 42:10, 42:19, 44:4, 52:21
**6th** [1] - 59:18

# 7

**7** [1] - 55:23
**76** [1] - 44:6

# 8

**80** [1] - 49:19, 52:19
**81** [5] - 44:6, 49:9, 49:18, 52:19
**82** [4] - 47:18, 49:10, 49:18
**83** [3] - 31:10, 31:12, 31:24
**84** [4] - 31:11, 32:1, 32:2, 33:15
**86** [3] - 31:11, 33:17, 33:18
**87** [1] - 34:5
**88** [1] - 34:7
**89** [1] - 34:9

# 9

**90** [3] - 31:11, 35:7

# A

**ability** [5] - 5:8, 12:18, 18:21, 38:24, 50:7
**able** [10] - 6:16, 12:13, 14:15, 18:14, 19:9, 27:10, 27:22, 33:13, 34:21, 50:12
**absolutely** [3] - 5:24, 6:15, 48:5
**accept** [1] - 15:19
**access** [1] - 45:24
**account** [3] - 21:11, 21:23, 32:25
**accused** [3] - 6:5, 13:6, 13:8
**acknowledge** [1] - 24:11
**acquired** [1] - 32:4
**actionable** [1] - 7:24
**actual** [1] - 25:12
**addition** [1] - 40:22
**additional** [4] - 29:1, 52:19, 52:20, 53:21
**address** [3] - 36:7, 42:14, 45:7
**adjusted** [1] - 23:15
**advantage** [1] - 9:7
**advantageous** [1] - 31:18
**advertising** [1] - 22:23
**agree** [4] - 26:23, 29:10, 41:17, 43:23
**agreed** [5] - 17:23, 22:13, 38:23, 42:8, 47:22
**agreeing** [1] - 24:6
**agreement** [3] - 19:3, 19:5, 52:21
**agreements** [1] - 19:2
**ahead** [3] - 30:4, 36:7, 58:3
**al** [2] - 1:6, 59:10
**alert** [1] - 41:18
**allegation** [1] - 45:23
**allegations** [5] - 4:4, 11:16, 32:3, 40:12, 49:25, 50:2, 50:3, 55:18, 55:25
**alleged** [1] - 22:23
**allegedly** [1] - 4:9
**allocate** [1] - 13:4
**allocated** [3] - 8:17, 9:21, 11:19
**allocating** [1] - 8:22
**allocation** [4] - 8:14, 11:25, 15:15, 18:15
**allow** [5] - 4:24, 7:7, 7:25, 41:23, 42:22
**allowed** [2] - 5:2, 8:18
**alternative** [1] - 57:15
**amendment** [3] - 17:25, 18:2, 19:16
**Amendment** [1] - 18:3
**amount** [8] - 10:14, 17:5, 17:20, 18:4, 18:11, 19:7, 20:21, 41:23
**amounts** [4] - 7:5, 12:24, 13:13, 15:10
**analysis** [4] - 22:15, 24:13, 24:23, 27:19
**AND** [2] - 1:2, 1:19
**Anderson** [1] - 3:5
**ANDERSON** [1] - 1:17
**answer** [3] - 12:22, 26:13, 30:14
**answered** [1] - 33:24
**answering** [1] - 57:8
**antitrust** [1] - 4:10,

11:9, 11:16, 30:2, 33:4, 33:11, 40:23, 40:25, 41:10, 51:22, 53:18
**anyway** [2] - 9:24, 14:25
**app** [13] - 35:17, 41:5, 41:6, 42:21, 43:4, 44:8, 44:25, 45:17, 46:1, 46:25, 50:21, 51:13, 51:18
**apparent** [1] - 56:13
**appeal** [1] - 58:1
**appearances** [1] - 3:3
**APPEARANCES** [1] - 1:16
**Appearances** [1] - 2:1
**apple** [1] - 55:20
**APPLE** [2] - 1:3, 59:9
**Apple** [65] - 3:6, 3:10, 4:15, 4:17, 5:5, 16:14, 16:21, 19:15, 20:11, 21:25, 22:21, 23:6, 30:13, 32:4, 32:13, 32:14, 32:17, 32:25, 34:15, 34:17, 34:24, 35:2, 36:10, 36:11, 36:12, 36:21, 37:18, 37:25, 38:9, 38:16, 38:24, 40:3, 40:4, 41:4, 42:7, 43:3, 43:10, 44:5, 45:1, 46:24, 47:21, 48:2, 49:20, 50:3, 50:5, 50:7, 50:15, 50:21, 50:25, 51:2, 51:4, 51:11, 51:21, 52:10, 52:11, 52:12, 53:17, 54:8, 55:25, 57:1, 57:13
**Apple's** [15] - 4:8, 16:4, 36:4, 36:21, 38:1, 38:8, 38:15, 42:21, 44:8, 46:24, 47:2, 53:5, 53:7, 57:23, 57:25
**appreciate** [4] - 8:25, 35:5, 41:17, 56:6
**approach** [1] - 26:6
**appropriate** [4] - 53:6, 54:1, 55:24, 57:2
**appropriating** [1] - 31:16
**approve** [1] - 50:21
**approved** [4] - 44:16, 45:25, 51:18, 51:20
**apps** [7] - 37:21, 43:11, 44:21, 45:20, 45:24, 46:9, 48:11
**Argue** [1] - 7:22

**argue** [7] - 14:3, 32:13, 32:14, 34:17, 35:23, 47:25, 49:2
**argued** [1] - 49:2
**argues** [1] - 34:24
**arguing** [4] - 7:20, 8:10, 18:20, 52:6
**argument** [7] - 30:19, 34:10, 35:4, 35:5, 48:3, 53:6, 53:12
**arguments** [2] - 30:20, 34:22
**arrangements** [1] - 20:12
**aspect** [1] - 14:9
**assert** [2] - 15:1, 55:18
**assessment** [4] - 14:12, 18:24, 39:15, 47:11
**assistance** [1] - 30:8
**associated** [1] - 7:5
**assume** [2] - 18:16, 57:23
**at-issue** [1] - 7:9
**attached** [2] - 20:15, 31:5
**attempt** [1] - 44:22
**attempting** [1] - 51:2
**attorney** [3] - 8:6, 8:10, 14:14
**attorney's** [1] - 11:13
**attorneys** [7] - 6:4, 11:3, 11:8, 13:24, 13:25, 16:24, 56:16
**attributed** [1] - 12:9
**audit** [3] - 15:7, 15:11, 17:3
**August** [9] - 1:14, 54:19, 54:23, 54:24, 55:3, 55:6, 56:3, 59:10, 59:19
**available** [4] - 45:21, 46:1, 50:10, 50:11
**award** [1] - 15:14
**awards** [1] - 17:23

# B

**balance** [1] - 20:5
**banc** [2] - 57:3, 57:7
**bar** [1] - 42:13
**barring** [1] - 36:13
**based** [3] - 26:13, 26:14, 56:10
**become** [1] - 7:24
**begin** [2] - 30:6, 30:8
**behalf** [1] - 3:5
**belief** [1] - 50:18
**BEN** [1] - 1:24

**Ben** [1] - 3:8
**benefit** [1] - 28:25
**best** [3] - 9:22, 56:11, 56:14
**better** [3] - 3:22, 10:10, 44:2
**between** [4] - 13:4, 19:16, 27:25, 52:12
**beyond** [1] - 24:19
**big** [1] - 33:4
**biggest** [1] - 21:7
**bill** [1] - 16:24
**billed** [2] - 11:19, 11:22
**billing** [15] - 8:7, 10:12, 10:16, 10:21, 16:9, 16:17, 20:1, 20:8, 20:18, 20:21, 21:1, 21:2, 21:9, 22:6
**bit** [2] - 32:23, 34:10
**bites** [1] - 19:21
**black** [1] - 18:14
**blame** [1] - 23:6
**blaming** [4] - 22:21, 22:22, 22:23, 22:24
**blanket** [1] - 33:25
**blatantly** [1] - 30:24
**Boasberg 's** [1] - 41:10
**bow** [1] - 50:14
**box** [1] - 18:14
**brand** [1] - 26:1
**break** [1] - 49:8
**brief** [2] - 42:14, 55:1
**briefing** [6] - 49:9, 49:12, 52:19, 52:20, 53:10, 53:14
**bringing** [1] - 10:7
**brings** [2] - 4:15, 4:19
**broad** [9] - 16:2, 17:12, 40:21, 41:12, 43:10, 43:12, 43:24, 46:18, 47:14
**broader** [1] - 35:24
**brought** [2] - 33:12, 41:15
**bucket** [1] - 33:3
**budget** [2] - 28:18, 28:20
**budgets** [1] - 22:1
**burden** [8] - 21:23, 29:4, 29:21, 34:22, 39:9, 46:14, 47:9, 52:23
**burdensome** [7] - 12:3, 16:2, 17:12, 33:5, 49:17, 52:14, 52:16
**Burke** [3] - 13:1, 13:9, 14:7

**business** [5] - 5:15, 5:16, 24:20, 28:8, 37:11
**businessperson** [2] - 28:4, 28:13
**BY** [2] - 1:17, 1:23

## C

**cake** [1] - 9:15
**calculated** [1] - 5:6
**calculation** [1] - 9:18
**candidly** [1] - 7:16
**cannot** [1] - 52:1
**case** [34] - 3:25, 5:11, 8:5, 8:12, 9:19, 11:9, 12:25, 13:6, 13:7, 13:9, 14:7, 14:8, 14:22, 16:4, 16:10, 16:11, 16:12, 16:13, 19:18, 21:22, 22:20, 23:23, 31:22, 33:14, 33:23, 38:2, 40:15, 41:14, 47:8, 48:13, 48:16, 48:18, 56:8, 56:9
**Case** [1] - 1:5, 59:8
**caselaw** [2] - 16:16, 37:22
**cases** [6] - 4:3, 8:9, 16:15, 19:18, 19:21, 33:4
**CASTLE** [2] - 59:3, 59:18
**categorical** [2] - 42:12
**categories** [1] - 26:5
**category** [1] - 29:9
**census** [1] - 23:19
**central** [1] - 41:3
**certain** [1] - 24:24
**Certified** [1] - 59:4, 59:6
**certify** [2] - 59:5, 59:11
**challenge** [2] - 40:12, 40:15
**chance** [2] - 5:25, 53:25
**change** [2] - 48:17, 57:10
**changed** [1] - 19:23
**changes** [1] - 57:12
**changing** [1] - 27:18
**charged** [1] - 20:16
**chase** [1] - 6:13
**check** [1] - 17:3
**chips** [1] - 56:4
**choose** [1] - 19:15
**Circuit** [6] - 16:11,

16:12, 57:3, 57:7, 57:8, 58:5
**circuit** [3] - 5:10, 16:10, 16:15
**cite** [1] - 55:14
**cited** [7] - 5:12, 14:7, 14:8, 16:10, 16:17, 41:10
**cites** [1] - 16:14
**civil** [2] - 21:20, 47:6
**claim** [16] - 4:19, 5:17, 5:18, 7:5, 8:1, 9:12, 9:13, 9:16, 10:7, 11:14, 17:20, 19:11, 40:24, 41:8, 41:15, 57:15
**claiming** [1] - 14:20
**claims** [6] - 5:13, 9:22, 22:20, 41:19, 43:17, 57:25
**clarification** [2] - 33:20, 53:10
**clarify** [5] - 22:10, 22:12, 23:12, 52:18, 53:13
**clarity** [2] - 30:10, 42:6
**classic** [1] - 7:9
**clear** [6] - 7:17, 21:18, 25:6, 27:6, 47:3, 56:1
**clearly** [2] - 40:13, 41:9
**Clerk** [1] - 59:17
**client** [2] - 9:4, 9:9
**cliff** [1] - 56:20
**closely** [1] - 3:21
**co** [1] - 3:6
**co-counsel** [1] - 3:6
**code** [8] - 10:12, 10:21, 11:3, 11:7, 11:11, 11:23, 20:8, 20:18
**codes** [1] - 20:21
**Coe** [1] - 41:13
**Coke** [1] - 48:25
**collection** [2] - 24:9, 25:1
**comfortable** [3] - 29:7, 42:18, 53:4
**coming** [1] - 14:14
**common** [1] - 23:23
**communication** [2] - 50:6, 52:11
**communications** [7] - 11:5, 31:13, 32:2, 42:20, 44:7, 46:18, 49:20
**companies** [5] - 44:24, 45:10, 48:2, 48:10, 48:20

**company** [2] - 9:11, 24:21
**compare** [2] - 12:19, 17:6
**compel** [1] - 9:6
**compete** [2] - 12:18, 18:21
**competition** [12] - 18:25, 32:17, 32:22, 34:18, 45:8, 48:1, 48:5, 48:7, 48:14, 48:22, 48:25, 49:1
**competitive** [1] - 48:24
**competitor** [1] - 45:10
**competitors** [3] - 44:20, 45:11, 50:11
**complaint** [2] - 34:14, 53:16
**complete** [1] - 43:5
**completely** [1] - 57:18
**component** [1] - 46:9
**conceded** [1] - 36:11
**conceivable** [1] - 19:2
**concern** [4] - 15:16, 16:1, 24:5, 29:9
**concerning** [1] - 8:21
**concrete** [1] - 22:9
**conduct** [6] - 31:18, 35:2, 36:4, 36:9, 44:18, 55:18
**confer** [8] - 27:12, 29:1, 29:3, 29:14, 43:22, 49:12, 49:14, 53:25
**CONFERENCE** [3] - 1:9, 1:12, 59:15
**confers** [2] - 22:11, 23:9
**confidence** [2] - 9:4, 9:9
**confidential** [1] - 50:6
**confirm** [1] - 33:1
**confronts** [1] - 5:11
**confused** [1] - 35:15
**connect** [1] - 51:14
**consider** [2] - 30:25, 41:14
**consisting** [1] - 59:13
**constructions** [1] - 57:15
**consultants** [1] - 17:14
**consumers** [2] - 48:15, 48:19
**context** [1] - 38:9
**continue** [1] - 45:22
**continued** [1] - 2:1
**contractor** [1] - 4:22
**control** [4] - 41:3,

42:21, 43:4, 43:5
**copy** [2] - 25:24, 59:14
**CORP** [2] - 1:6, 59:10
**correcting** [1] - 52:8
**CORROON** [1] - 1:17
**cost** [4] - 4:20, 5:1, 9:23, 12:17
**costs** [16] - 5:13, 9:20, 10:2, 12:2, 12:18, 12:19, 12:21, 13:4, 14:22, 18:19, 18:20, 18:23, 19:4, 20:21, 22:2, 22:24
**Counsel** [1] - 2:6
**counsel** [6] - 1:25, 3:6, 30:4, 33:1, 41:25, 55:14
**counsels '** [1] - 56:6
**counterclaimant** [1] - 11:1
**counterclaims** [2] - 30:3, 44:10
**COUNTY** [1] - 59:3
**County** [1] - 59:18
**couple** [3] - 9:2, 16:7, 16:15
**course** [2] - 29:4, 29:20
**COURT** [76] - 1:1, 3:1, 3:11, 3:18, 5:24, 6:15, 8:4, 10:8, 11:17, 12:11, 13:3, 13:18, 14:17, 17:17, 18:6, 19:19, 24:1, 24:14, 25:4, 25:19, 26:12, 27:3, 27:7, 27:21, 28:14, 28:22, 29:13, 31:3, 31:12, 31:25, 32:2, 33:6, 33:15, 33:18, 33:21, 34:2, 34:6, 34:8, 34:11, 35:3, 35:8, 35:11, 35:13, 36:15, 37:7, 37:13, 38:3, 38:18, 39:1, 39:12, 39:18, 39:25, 40:17, 41:17, 42:7, 42:16, 43:19, 45:3, 45:12, 46:5, 46:10, 46:17, 47:3, 49:7, 49:13, 52:2, 52:22, 53:2, 53:11, 53:17, 53:20, 54:24, 55:10, 56:2, 57:22, 58:2
**Court** [13] - 15:13, 16:13, 17:25, 30:25, 33:12, 40:24, 41:9, 45:23, 46:22, 47:1, 56:9, 56:25, 59:17
**court** [1] - 16:11

**Court's** [3] - 30:8, 30:21, 30:22
**courthouse** [1] - 4:5
**Courtroom** [1] - 1:14
**courtroom** [1] - 3:24
**courts** [1] - 41:3
**Courts** [1] - 46:22
**create** [1] - 27:14
**critically** [2] - 9:17, 10:17
**CSR** [1] - 59:21
**cured** [1] - 10:1
**customer** [2] - 37:24, 38:8
**cut** [1] - 6:13
**CUTLER** [1] - 1:19

**D**

**damage** [1] - 9:19
**damages** [21] - 4:16, 4:19, 5:4, 5:7, 5:13, 5:16, 8:8, 8:18, 8:19, 9:12, 9:13, 9:16, 11:11, 11:14, 14:6, 15:14, 15:17, 18:5, 18:12, 18:16, 22:19
**date** [1] - 55:4
**David** [1] - 3:5
**DAVID** [1] - 1:17
**days** [4] - 41:5, 46:25, 55:23, 55:24
**DC** [1] - 5:10
**deadline** [5] - 54:5, 54:10, 54:12, 54:13, 57:20
**deal** [6] - 40:24, 41:1, 41:8, 41:15, 41:19, 58:4
**deals** [2] - 46:24, 47:2
**dealt** [1] - 41:16
**Deanna** [2] - 59:4, 59:21
**December** [1] - 45:21
**decide** [4] - 8:17, 18:4, 55:8, 55:20
**deciding** [2] - 18:7, 55:8
**decision** [4] - 5:10, 9:11, 37:24, 41:11
**decisions** [6] - 20:17, 41:4, 41:13, 41:19, 47:16, 56:10
**declaration** [1] - 20:14
**default** [2] - 16:8, 16:17
**Defendant** [2] - 1:7, 2:6
**defendant** [1] - 10:25

**defendant 's** [1] - 5:18
**defending** [1] - 10:3
**definition** [4] - 39:22, 40:4, 43:16, 45:19
**Delaware** [2] - 14:15, 59:18
**DELAWARE** [2] - 1:2, 59:2
**delayed** [2] - 23:18, 28:21
**demand** [6] - 22:17, 22:18, 37:18, 38:15, 38:22, 39:5
**denied** [11] - 22:3, 31:21, 33:15, 33:18, 33:21, 34:3, 34:6, 34:8, 35:4, 35:8, 46:13
**deposed** [1] - 13:24
**describing** [1] - 39:2
**design** [3] - 57:5, 57:11, 57:25
**Desmarais** [1] - 3:9
**DESMARAIS** [1] - 1:23
**despite** [1] - 45:21
**detail** [2] - 5:21, 50:2
**detailed** [2] - 13:11, 17:13
**details** [3] - 4:23, 6:19, 20:24
**develop** [1] - 33:13
**developers** [1] - 41:5
**development** [1] - 55:15
**developments** [1] - 22:12
**different** [8] - 11:10, 25:13, 25:14, 25:17, 26:4, 27:6, 32:8, 32:10
**difficult** [2] - 25:16, 38:7
**disagree** [3] - 40:20, 46:4, 48:3
**disclosure** [1] - 54:21
**disclosures** [2] - 30:15, 30:16
**discoverable** [1] - 5:15
**DISCOVERY** [3] - 1:9, 1:12, 59:15
**discovery** [32] - 3:2, 3:19, 4:18, 7:7, 12:3, 12:25, 17:13, 19:17, 21:20, 25:15, 30:12, 30:17, 30:20, 30:24, 32:20, 33:2, 33:5, 33:10, 33:11, 34:1, 34:20, 41:23, 42:13, 42:23, 47:4, 47:7,

47:17, 49:6, 53:18, 54:14, 55:4
**discovery -type** [1] - 30:20
**discrete** [1] - 37:20
**discussing** [4] - 14:18, 31:14, 43:3, 51:5
**dismiss** [5] - 7:21, 7:23, 32:13, 40:12, 40:13
**disproportionate** [1] - 43:18
**dispute** [10] - 4:7, 4:8, 22:9, 32:7, 33:11, 37:7, 40:8, 40:14, 45:13, 57:22
**disputes** [10] - 3:2, 3:20, 4:15, 20:24, 21:13, 29:24, 29:25, 30:2, 40:6, 56:17
**disputing** [1] - 57:23
**distribution** [5] - 35:18, 39:23, 42:22, 43:4, 43:11
**district** [1] - 16:10
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 16:13, 59:17
**divorced** [1] - 51:24
**document** [8] - 26:7, 26:10, 28:9, 29:5, 30:9, 38:4, 55:6
**documents** [51] - 20:14, 20:15, 22:5, 24:7, 24:10, 25:2, 25:7, 25:14, 25:18, 26:5, 26:17, 26:20, 26:23, 27:1, 27:14, 27:19, 27:22, 28:7, 29:9, 29:11, 29:15, 31:13, 32:5, 32:18, 36:20, 37:2, 37:4, 37:5, 37:10, 37:17, 38:6, 38:13, 38:14, 38:23, 39:8, 40:3, 40:6, 42:19, 43:3, 43:6, 44:7, 44:14, 44:23, 45:4, 45:15, 46:17, 47:22, 51:6, 52:3, 52:13
**dollar** [1] - 4:21
**done** [2] - 11:21, 28:15
**DORR** [1] - 1:19
**down** [5] - 23:6, 23:17, 23:19, 28:3, 42:17
**drafted** [1] - 43:24
**drafting** [1] - 8:20
**draw** [1] - 31:19

**driving** [2] - 22:16, 22:17
**drop** [1] - 33:3
**during** [4] - 22:11, 23:9, 27:12, 51:15
**duty** [1] - 41:1

**E**

**e-mail** [4] - 7:13, 24:9, 24:19, 28:19
**e-mails** [2] - 24:24, 27:25
**easiest** [2] - 45:13, 45:14
**eat** [1] - 9:15
**economist** [1] - 27:13
**ecosystem** [8] - 35:25, 36:22, 37:4, 37:10, 37:17, 38:1, 38:8, 38:15
**effect** [2] - 18:17, 19:14
**effects** [1] - 18:18
**efficient** [1] - 31:15
**eight** [2] - 55:7, 55:20
**either** [2] - 9:12, 29:17
**electric** [1] - 5:10
**embargo** [3] - 30:11, 30:24, 33:25
**en** [2] - 57:3, 57:7
**end** [3] - 8:3, 8:4, 57:16
**engage** [1] - 43:17
**engaged** [2] - 34:15, 35:2
**entail** [1] - 45:17
**Enterprises** [1] - 59:22
**entirely** [2] - 5:11, 16:5
**entitled** [1] - 5:7
**entries** [8] - 9:3, 9:8, 13:11, 13:14, 15:8, 15:13, 16:3, 16:18
**entry** [2] - 5:21, 7:22
**error** [1] - 15:15
**ESI** [2] - 54:15, 55:9
**especially** [2] - 49:1, 56:8
**ESQ** [8] - 1:17, 1:20, 1:20, 1:21, 1:23, 1:24, 2:3, 2:5
**essential** [2] - 44:20, 25:1
**essentially** [4] - 7:4, 18:13, 22:21, 44:21
**establish** [1] - 34:21
**et** [2] - 1:6, 59:10

**evidence** [2] - 4:10, 10:17
**exact** [2] - 9:18, 12:25
**exactly** [2] - 6:19, 46:22
**example** [13] - 7:19, 11:9, 11:10, 15:21, 17:12, 25:17, 25:20, 37:25, 38:5, 38:7, 50:20, 55:14, 57:14
**examples** [1] - 25:13
**excellent** [1] - 15:18
**exceptionally** [1] - 40:21
**exclude** [2] - 44:20, 45:2
**excludes** [1] - 48:25
**executives** [4] - 26:9, 27:16, 27:25, 29:7
**exercise** [1] - 43:16
**exhaustive** [1] - 28:10
**Exhibit** [1] - 31:6
**exists** [1] - 29:16
**expanded** [1] - 41:2
**expect** [2] - 21:6, 24:21
**expensive** [1] - 33:4
**expert** [5] - 13:2, 13:10, 23:5, 30:17, 30:18
**explain** [2] - 23:10, 25:11
**explaining** [1] - 41:11
**explains** [1] - 48:14
**explanation** [1] - 44:1
**extend** [1] - 53:17
**extent** [4] - 9:7, 35:1, 52:6, 54:13
**eyeball** [1] - 12:14

**F**

**face** [1] - 47:14
**Facebook** [1] - 41:11
**fact** [15] - 6:3, 6:17, 7:19, 7:21, 8:12, 9:5, 11:12, 13:22, 16:5, 18:10, 38:10, 43:3, 45:21, 52:10, 57:3
**factors** [17] - 22:5, 22:17, 23:3, 23:11, 23:18, 25:11, 26:2, 26:3, 26:8, 27:6, 27:8, 27:9, 27:14, 28:4, 28:5, 29:8
**facts** [2] - 33:8, 56:12
**fails** [1] - 19:11
**failure** [1] - 27:11
**fair** [1] - 14:11

**fairness** [2] - 7:1, 9:16
**fall** [1] - 56:4
**false** [1] - 22:23
**farm** [1] - 16:13
**favor** [1] - 18:9
**FDA** [9] - 50:4, 50:6, 50:17, 51:1, 51:5, 51:18, 51:20, 52:11, 52:13
**feature** [1] - 50:22
**features** [1] - 44:25
**Federal** [3] - 57:6, 57:8, 58:5
**federal** [3] - 21:19, 47:5, 57:3
**fee** [6] - 17:15, 19:1, 19:3, 19:5, 19:7, 20:12
**fees** [19] - 5:6, 6:4, 6:16, 8:6, 8:10, 11:13, 12:21, 14:2, 14:4, 14:10, 14:12, 14:19, 14:24, 15:21, 16:9, 17:3, 20:16, 22:1
**few** [4] - 4:12, 5:19, 13:22, 42:13
**figure** [5] - 10:21, 20:4, 27:13, 29:8, 52:13
**file** [1] - 25:1
**FILED** [1] - 59:16
**files** [1] - 24:20
**filing** [1] - 53:15
**financial** [1] - 26:20
**fine** [5] - 34:11, 36:13, 38:9, 46:11, 53:2
**first** [12] - 4:8, 4:14, 6:23, 7:2, 14:5, 25:5, 29:23, 30:6, 36:18, 36:19, 53:21
**First** [1] - 4:12
**five** [2] - 21:10, 57:6
**fixed** [2] - 19:5, 19:7
**focused** [2] - 33:7, 50:9
**focusing** [1] - 49:24
**folks** [2] - 3:3, 25:23
**FOR** [1] - 1:2
**force** [1] - 48:24
**Ford** [2] - 3:7, 4:12
**FORD** [17] - 1:20, 4:11, 6:12, 6:23, 8:14, 18:2, 18:10, 22:10, 24:4, 24:17, 27:10, 27:24, 28:17, 37:9, 38:20, 39:2, 39:15
**forecast** [9] - 22:16, 23:6, 24:13, 27:19,

28:1, 28:3, 28:7, 28:18, 28:21
**forecasted** [1] - 25:12
**forecasting** [1] - 54:17
**forecasts** [12] - 22:1, 22:5, 22:6, 22:13, 23:16, 23:23, 24:12, 24:20, 24:23, 25:22, 26:21, 27:17
**foregoing** [2] - 59:8, 59:13
**forget** [1] - 52:7
**form** [1] - 20:14
**forth** [1] - 28:2
**forward** [6] - 8:23, 10:22, 12:1, 20:25, 29:19, 52:15
**foundational** [2] - 57:4, 57:9
**frankly** [2] - 4:16, 8:1
**fraud** [2] - 13:6, 13:8
**fraudulent** [4] - 11:15, 11:22, 11:23, 12:9
**fraudulently** [2] - 10:1, 11:6
**freedom** [1] - 22:14
**Freehand** [1] - 41:14
**front** [7] - 3:20, 5:8, 16:23, 18:11, 18:14, 46:7, 56:12
**fulfill** [1] - 25:15
**full** [1] - 58:3
**fundamental** [4] - 6:25, 7:3, 9:16, 45:7
**fundamentally** [2] - 43:13, 46:20
**future** [1] - 29:21

**G**

**garden** [2] - 12:25, 19:18
**general** [3] - 24:25, 29:4, 30:11
**generally** [3] - 11:18, 20:13, 28:14
**giant** [1] - 3:19
**given** [4] - 11:25, 12:1, 41:1, 42:23
**goal** [1] - 25:6
**golden** [1] - 12:1
**granted** [1] - 51:25
**great** [3] - 12:4, 19:25, 39:12
**group** [1] - 24:22
**guard** [1] - 8:2
**guess** [4] - 10:18, 27:5, 28:3, 43:2
**guidance** [4] - 21:4,

23:16, 56:25, 57:21
**guideline** [6] - 44:13, 44:18, 44:19, 45:2, 46:7, 46:8
**guidelines** [1] - 44:9
**guys** [2] - 4:1, 14:23

**H**

**HALE** [1] - 1:19
**Hale** [1] - 3:7
**Hall** [2] - 1:13, 3:16
**HALL** [1] - 2:2
**hand** [2] - 6:6, 20:3
**HANEY** [2] - 2:3, 3:14
**Haney** [1] - 3:15
**happy** [6] - 23:13, 36:24, 37:4, 37:9, 38:11, 43:5
**hard** [2] - 26:12, 56:8
**harm** [21] - 18:25, 32:16, 32:17, 32:22, 34:18, 45:8, 45:9, 47:25, 48:4, 48:5, 48:7, 48:14, 48:15, 48:18, 48:19, 48:21, 48:22, 48:24, 49:1, 49:24
**harmed** [2] - 49:4, 49:5
**harming** [2] - 12:18, 48:23
**headed** [1] - 56:19
**health** [7] - 43:15, 44:21, 44:22, 44:25, 48:11, 51:22, 51:23
**health-related** [1] - 48:11
**healthcare** [1] - 23:17
**hear** [10] - 10:10, 10:20, 24:15, 43:22, 44:2, 49:17, 52:22, 53:6, 53:24, 54:8
**heard** [2] - 46:19, 59:10
**hearing** [5] - 14:15, 26:14, 26:15, 28:22, 48:4
**help** [1] - 22:12
**helpful** [2] - 31:5, 43:7
**helps** [1] - 9:2
**hereby** [1] - 59:5
**Hi** [1] - 3:11
**high** [5] - 12:2, 15:6, 15:17, 17:22, 35:18
**highly** [2] - 50:5, 51:7
**hire** [1] - 4:22
**hit** [1] - 24:7
**hits** [2] - 29:5, 39:10

**honest** [1] - 35:15
**Honor** [30] - 3:4, 3:14, 4:11, 4:14, 9:17, 10:6, 10:24, 18:17, 22:19, 25:3, 30:5, 31:24, 34:4, 40:19, 42:15, 45:6, 45:16, 46:3, 46:6, 46:16, 47:20, 48:12, 49:11, 51:9, 52:17, 53:19, 54:11, 55:15, 56:23, 57:24
**Honor's** [1] - 32:24
**Honorable** [1] - 1:13
**hope** [2] - 21:3, 24:9
**hopefully** [1] - 56:12
**hoping** [2] - 22:10, 33:10
**hospital** [1] - 51:20
**hospitals** [1] - 23:20
**hot** [1] - 37:1
**hourly** [4] - 13:11, 13:14, 16:3, 16:9
**hours** [1] - 7:23
**hundreds** [1] - 4:2
**hurting** [1] - 22:25

**I**

**idea** [5] - 17:2, 29:16, 36:16, 52:4, 57:16
**ideal** [1] - 5:10
**identify** [2] - 24:9, 26:2
**imagine** [1] - 4:20
**immune** [2] - 40:25, 41:9
**impact** [2] - 25:12, 26:8
**impacting** [2] - 22:5, 22:17
**impair** [1] - 18:20
**important** [5] - 9:17, 9:19, 10:18, 30:13, 32:10
**improperly** [1] - 8:22
**IN** [2] - 1:1, 1:2
**INC** [2] - 1:3, 59:9
**incentive** [1] - 21:17
**inclined** [1] - 42:22
**include** [2] - 20:17, 45:22
**included** [1] - 41:12
**includes** [1] - 41:2
**including** [1] - 55:5
**incomplete** [1] - 56:10
**increases** [2] - 37:18, 38:15
**incredibly** [3] - 43:9,

43:12, 43:24
**incremental** [3] - 9:20, 10:1, 19:4
**incur** [1] - 10:3
**incurred** [8] - 6:4, 6:17, 8:13, 9:23, 10:2, 10:14, 19:7
**individual** [2] - 31:1, 50:12
**inequitable** [1] - 55:18
**information** [13] - 6:3, 10:13, 12:21, 15:3, 20:11, 25:13, 48:1, 50:4, 50:9, 51:1, 51:17, 56:18, 58:5
**informed** [1] - 31:17
**infringe** [3] - 7:11, 7:12, 7:13
**infringement** [10] - 22:24, 30:11, 31:4, 31:8, 31:9, 31:15, 34:1, 34:16, 35:11, 35:12
**infringing** [1] - 31:16
**initial** [1] - 30:15
**injured** [1] - 48:17
**injury** [1] - 19:10
**inpatient** [1] - 23:19
**instructed** [1] - 11:4
**intellectual** [3] - 31:16, 31:20, 32:4
**intelligence** [1] - 7:25
**intent** [1] - 55:2
**interconnected** [1] - 36:22
**internal** [2] - 22:15, 52:13
**internally** [3] - 11:5, 23:2, 23:7
**interpreting** [1] - 38:21
**interrogatory** [1] - 8:20
**invest** [1] - 18:22
**investigated** [1] - 55:22
**invoices** [7] - 4:23, 5:14, 12:7, 12:24, 13:12, 20:9
**involve** [3] - 47:23, 47:24, 48:10
**IOS** [6] - 30:12, 35:17, 37:21, 40:10, 42:21, 43:4
**issue** [50] - 7:4, 7:9, 13:7, 13:12, 15:20, 17:14, 21:7, 22:4, 26:18, 27:1, 29:1, 36:12, 37:3, 37:14, 39:17, 41:24, 42:5,

42:11, 43:14, 44:19, 47:21, 47:23, 48:8, 48:18, 49:5, 49:23, 53:3, 53:22, 55:1, 58:1
**issued** [1] - 25:21
**issues** [2] - 30:24, 50:24
**itself** [1] - 40:4, 44:13

**J**

**jack** [1] - 3:10
**January** [3] - 53:18, 57:20, 58:4
**JEFF** [1] - 1:23
**Jeff** [1] - 3:8
**Jennifer** [2] - 1:13, 3:7
**JENNIFER** [1] - 1:20
**joined** [3] - 3:6, 3:8, 3:16
**Judge** [5] - 13:1, 13:9, 14:7, 41:10, 41:13
**judgment** [2] - 32:15, 40:16
**July** [1] - 23:14
**jury** [16] - 5:9, 10:5, 11:12, 12:23, 14:13, 15:9, 15:10, 16:23, 17:19, 17:21, 17:22, 18:4, 18:11, 18:14, 18:16, 18:22
**jury's** [1] - 19:13

**K**

**keep** [1] - 58:3
**kept** [1] - 27:22
**key** [1] - 25:2
**kind** [4] - 25:19, 39:14, 39:19, 41:12
**KNOBBE** [1] - 2:5
**Knobbe** [1] - 3:17
**knowing** [1] - 8:20
**Kodak** [1] - 38:2
**KSR** [1] - 57:12

**L**

**labor** [2] - 23:19, 27:15
**lack** [1] - 14:21
**Lane** [1] - 16:12
**LARSON** [51] - 2:5, 10:24, 11:20, 12:16, 13:5, 13:21, 15:4, 25:5, 25:24, 26:18, 27:5, 29:2, 30:5,

31:9, 31:24, 32:1, 32:9, 33:7, 33:17, 33:19, 33:24, 34:4, 34:7, 34:9, 34:12, 35:6, 35:9, 35:12, 35:22, 37:3, 37:14, 38:6, 39:4, 39:16, 39:21, 40:1, 42:3, 42:11, 43:1, 44:17, 46:3, 47:20, 48:21, 49:11, 49:23, 53:9, 53:13, 53:19, 54:25, 55:12, 56:23
**Larson** [4] - 3:17, 7:20, 10:25, 27:13
**last** [3] - 25:16, 55:17, 55:19
**late** [1] - 55:7, 55:17
**law** [2] - 57:10, 57:16
**lawful** [1] - 31:19
**laws** [1] - 51:22
**lawyer** [1] - 7:12
**lawyers** [3] - 5:5, 7:5, 7:8
**lays** [1] - 50:1
**leadership** [1] - 24:22
**leading** [1] - 5:11
**least** [1] - 17:2
**leave** [1] - 38:8
**left** [1] - 56:20
**less** [1] - 36:8
**letter** [6] - 24:15, 30:7, 31:10, 53:21, 53:23, 57:1
**letters** [1] - 56:7
**leveraging** [1] - 35:14
**liability** [1] - 19:12
**limit** [1] - 38:14
**limited** [3] - 37:5, 40:9, 48:9
**line** [1] - 7:13
**list** [3] - 25:17, 27:6, 28:11
**literally** [2] - 37:16, 40:3
**litigant** [2] - 5:1, 7:10
**litigating** [2] - 11:16, 14:24
**litigation** [8] - 5:6, 5:13, 6:10, 11:18, 12:20, 20:21, 22:24, 56:21
**litigator** [1] - 8:25
**ll** [1] - 41:7
**LLC** [1] - 59:22
**LLP** [3] - 1:17, 1:19, 1:23
**log** [2] - 54:22, 55:6
**look** [11] - 16:16, 22:8, 23:5, 27:16, 27:22,

28:19, 46:23, 47:6, 50:19, 56:2, 57:7
**looked** [3] - 3:21, 53:22, 54:13
**looking** [6] - 10:16, 29:12, 36:17, 38:5, 43:9, 44:11
**losing** [1] - 23:1
**lost** [1] - 18:21
**love** [1] - 42:14
**lower** [1] - 28:20
**Luehrs** [1] - 3:7
**LUEHRS** [2] - 1:24, 57:24
**Lydia** [1] - 3:7
**LYDIA** [1] - 1:21

**M**

**magnitude** [2] - 12:5, 19:14
**mail** [4] - 7:13, 24:9, 24:19, 28:19
**mails** [2] - 24:24, 27:25
**main** [1] - 33:10
**maintain** [1] - 17:10
**majority** [1] - 9:3
**manufacturer** [1] - 23:4
**MARK** [1] - 1:20
**Mark** [2] - 3:7, 4:12
**market** [25] - 23:3, 34:25, 35:16, 35:17, 35:20, 35:23, 35:25, 36:4, 36:6, 36:8, 36:9, 36:11, 37:21, 37:23, 39:22, 40:3, 40:5, 40:7, 40:9, 40:10, 43:11, 43:16, 48:20, 51:23
**marketplace** [2] - 22:22, 23:25
**markets** [1] - 39:23
**MARTENS** [1] - 2:5
**Masimo** [36] - 4:9, 4:19, 5:2, 5:14, 7:3, 8:16, 9:10, 11:1, 12:8, 20:11, 22:15, 22:20, 23:7, 23:10, 23:13, 23:15, 26:2, 26:9, 28:8, 32:15, 32:19, 44:24, 45:20, 47:23, 47:24, 48:5, 48:9, 48:19, 48:23, 49:3, 49:25, 51:16, 52:11, 55:19, 55:22
**MASIMO** [2] - 1:6, 59:9

**Masimo's** [9] - 23:2, 29:25, 45:20, 49:21, 50:4, 51:1, 51:5, 52:13, 53:21
**master** [1] - 15:12
**matter** [5] - 7:10, 11:11, 24:25, 47:14, 52:10
**McLaughlin** [1] - 3:16
**MCLAUGHLIN** [1] - 2:2
**mean** [2] - 26:18, 40:1, 45:9
**meaningful** [1] - 4:17
**means** [5] - 45:8, 48:14, 48:15, 51:21, 54:18
**meant** [1] - 23:11
**medical** [1] - 46:9
**meet** [11] - 22:11, 23:9, 27:12, 29:1, 29:3, 29:14, 29:20, 43:22, 49:12, 49:13, 53:25
**meet-and-confer** [6] - 27:12, 29:1, 29:3, 29:14, 43:22, 53:25
**meet-and-confers** [2] - 22:11, 23:9
**meets** [1] - 45:18
**MEGAN** [1] - 2:3
**Megan** [1] - 3:15
**memo** [1] - 7:15
**mentioned** [1] - 34:14
**merit** [1] - 32:5
**merits** [2] - 47:16, 52:6
**micromanaging** [1] - 47:2
**might** [8] - 13:21, 19:3, 19:5, 23:12, 27:10, 27:22, 28:25, 45:14
**Milici** [1] - 3:7
**MILICI** [1] - 1:20, 40:19, 43:8, 45:6, 45:16, 46:6, 46:16, 46:19, 48:12, 51:9, 52:17, 52:25
**million** [2] - 14:23, 21:9
**millions** [1] - 4:21
**mind** [2] - 17:1, 38:4
**minimal** [1] - 47:10
**minimum** [1] - 20:10
**minitrial** [1] - 14:1
**minute** [1] - 42:17
**misconception** [1] - 45:7
**missing** [1] - 35:21

**mistaken** [1] - 42:5
**moment** [2] - 8:3, 39:24
**money** [2] - 14:25, 21:12
**monitoring** [1] - 23:21
**monopolization** [1] - 43:15
**monopolized** [1] - 51:22
**monopoly** [5] - 35:13, 35:19, 36:10, 41:12, 41:15
**Montgomery** [1] - 16:12
**month** [2] - 4:5, 6:9
**monthly** [2] - 12:7, 12:23
**months** [7] - 9:2, 13:22, 51:12, 51:15, 53:15, 55:7, 55:20
**Moore** [1] - 3:5
**MOORE** [2] - 1:17, 3:4
**morning** [5] - 3:4, 3:11, 3:15, 3:18, 4:11
**moron** [1] - 35:18
**most** [2] - 16:4, 21:14
**motion** [8] - 5:21, 7:20, 7:23, 9:6, 32:13, 32:15, 40:11, 40:13
**move** [5] - 28:2, 29:19, 29:24, 52:15, 56:4
**MR** [69] - 3:4, 4:11, 6:12, 6:23, 8:14, 10:24, 11:20, 12:16, 13:5, 13:21, 15:4, 18:2, 18:10, 22:10, 24:4, 24:17, 25:5, 25:24, 26:18, 27:5, 27:10, 27:24, 28:17, 29:2, 30:5, 31:9, 31:24, 32:1, 32:9, 33:7, 33:17, 33:19, 33:24, 34:4, 34:7, 34:9, 34:12, 35:6, 35:9, 35:12, 35:22, 37:3, 37:9, 37:14, 38:6, 38:20, 39:2, 39:4, 39:15, 39:16, 39:21, 40:1, 42:3, 42:11, 43:1, 44:17, 46:3, 47:20, 48:21, 49:11, 49:23, 53:9, 53:13, 53:19, 54:11, 54:25, 55:12, 56:23, 57:24
**MS** [12] - 3:14, 40:19, 43:8, 45:6, 45:16,

46:6, 46:16, 46:19, 48:12, 51:9, 52:17, 52:25

**N**

narrow [6] - 40:2, 40:21, 43:6, 44:1, 44:23, 53:16
narrowed [1] - 44:13
narrowing [2] - 43:13, 44:20
narrowly [1] - 38:21
Natalie [1] - 3:9
necessarily [1] - 24:6
necessary [3] - 10:19, 54:12, 54:22
need [21] - 6:2, 6:16, 6:18, 8:15, 9:1, 10:9, 20:4, 20:10, 20:15, 21:5, 21:16, 24:10, 25:24, 27:3, 32:21, 33:13, 36:14, 42:2, 44:1, 48:7, 49:9
needs [8] - 18:22, 21:14, 21:21, 21:22, 28:5, 31:22, 33:22, 47:8
negotiating [1] - 54:15
negotiations [1] - 39:9
net [2] - 50:20, 51:13
never [1] - 6:11
nevertheless [1] - 41:22
new [3] - 26:1, 55:15, 55:25
NEW [2] - 59:3, 59:17
next [9] - 31:10, 31:23, 32:1, 33:16, 34:5, 34:7, 35:7, 35:9, 56:22
nice [1] - 4:13
night [3] - 39:6, 55:17, 55:19
nine [1] - 19:8
nobody [1] - 47:15
normally [1] - 8:6
noted [1] - 13:9
notes [1] - 59:12
nothing [2] - 43:17, 51:14
notice [1] - 54:16
Number [1] - 59:9
number [12] - 14:21, 15:6, 15:22, 17:23, 17:24, 18:25, 19:1, 20:4, 22:20, 23:18, 32:12, 57:4
numbered [1] - 3:13

numbers [1] - 20:7

**O**

oath [1] - 20:16
objection [1] - 13:3
obligations [1] - 25:15
obtain [1] - 51:1
obtained [1] - 11:7
obviously [2] - 23:4, 48:23
obviousness [2] - 57:5, 57:11
occurred [3] - 8:15, 33:8, 50:20
OEM [1] - 23:20
OF [4] - 1:2, 1:9, 59:2, 59:3
offer [1] - 34:9
offered [10] - 12:6, 15:8, 15:24, 17:2, 41:22, 42:1, 42:4, 44:5, 53:17, 54:25
OFFICIALLY [1] - 59:16
once [1] - 37:24
one [28] - 3:21, 7:13, 9:1, 9:12, 9:25, 14:14, 18:25, 19:6, 21:16, 24:8, 30:3, 31:23, 32:1, 33:16, 34:5, 34:7, 34:10, 35:4, 35:7, 35:9, 39:11, 39:24, 49:19, 52:18, 53:4, 53:9, 56:24
one-line [1] - 7:13
ones [1] - 31:7
open [2] - 17:4, 17:6
opening [1] - 53:23
operators [1] - 48:16
opportunity [1] - 17:21
option [1] - 11:25
order [1] - 6:11
orders [1] - 23:18
ordinary [1] - 29:19
otherwise [1] - 10:3
ourselves [1] - 34:19
outcome [1] - 48:17
outlook [1] - 27:20
outside [1] - 16:15
outstanding [1] - 56:7
overstatement [1] - 8:2
own [1] - 50:22
oximetry [1] - 50:22

**P**

P.A [1] - 2:2
page [3] - 7:14, 21:25, 52:5
pages [1] - 59:14
paid [2] - 4:24, 12:8
paint [1] - 38:3
papers [1] - 5:12
paragraph [2] - 21:25, 22:2
Pararas [1] - 3:10
part [6] - 5:20, 7:3, 11:14, 24:17, 33:13, 40:14
particular [4] - 6:18, 6:20, 15:8, 16:1, 17:11, 17:19, 30:9, 34:2, 37:22, 39:23, 44:25
parties [11] - 32:3, 32:21, 34:13, 34:14, 34:17, 34:19, 34:24, 34:25, 49:15, 52:12, 54:14
parties' [1] - 39:9
partners [1] - 23:20
party [2] - 5:13, 49:4
passing [1] - 39:6
patent [5] - 8:21, 11:23, 19:6, 22:23, 57:25
patents [23] - 6:5, 6:18, 6:20, 7:6, 7:8, 9:25, 11:7, 11:15, 11:22, 12:10, 12:12, 12:14, 13:5, 13:8, 14:24, 15:1, 15:22, 17:5, 17:13, 19:8, 21:10, 57:5, 57:11
patents-in-suit [1] - 19:8
path [4] - 8:23, 10:22, 12:1, 40:10
patient [1] - 23:21
patients [1] - 51:19
pay [1] - 31:19
paying [1] - 4:25
pending [1] - 58:1
Pennsylvania [1] - 16:14
people [2] - 28:8, 28:15
Pepsi [1] - 48:25
percent [1] - 35:19
percentage [3] - 10:14, 12:13, 20:20
percolate [1] - 56:17
period [4] - 45:25,

53:3, 53:8, 53:14
perspective [1] - 32:24
persuaded [1] - 53:11
pertains [5] - 11:6, 11:9, 11:18, 23:22, 37:11
Philadelphia [1] - 48:13
PHILLIPS [1] - 2:2
Phillips [1] - 3:15
pick [1] - 21:16
PICKERING [1] - 1:19
picture [1] - 38:4
piece [1] - 8:19
pieces [1] - 50:12
place [2] - 15:7, 19:5
Plaintiff [2] - 1:4, 1:25
plaintiff [1] - 4:20
plans [1] - 24:21
platter [1] - 12:1
pleadings [1] - 45:22
plowing [1] - 58:3
point [13] - 6:2, 7:2, 14:15, 17:24, 21:3, 28:8, 29:16, 32:11, 46:13, 47:17, 52:2, 53:9, 55:14
pointed [1] - 19:18
pointing [2] - 23:2, 23:7
points [3] - 16:7, 17:8, 42:13
policies [2] - 42:24, 43:2
portion [1] - 5:6
position [1] - 19:15
possibility [3] - 17:4, 17:6, 57:19
post [1] - 17:3
post-trial [1] - 17:3
potential [3] - 25:9, 27:14, 44:23
potentially [3] - 13:15, 25:12, 29:2
Potter [1] - 3:5
POTTER [1] - 1:17
Pous [1] - 3:9
power [2] - 36:10, 39:22
practice [5] - 5:23, 31:14, 31:15, 32:20, 34:15
precisely [1] - 23:22
predatory [9] - 10:7, 30:11, 31:4, 31:7, 31:9, 34:1, 34:16, 35:11, 35:12
prefer [1] - 47:1
prejudicial [2] - 13:15,

16:20
preparation [1] - 56:7
prepared [2] - 54:16, 54:19
present [2] - 10:4, 59:7
presenting [1] - 18:12
press [3] - 23:12, 25:21, 25:25
presumably [1] - 51:6
pretrial [1] - 30:16
pretty [3] - 7:17, 40:2, 57:5
prevail [1] - 19:6
private [1] - 5:22
privilege [12] - 5:17, 5:18, 6:24, 54:6, 54:7, 54:17, 54:22, 55:6, 55:8, 55:11, 55:13, 55:21
privileged [5] - 7:19, 7:21, 7:24, 16:9, 16:18
probe [1] - 41:24
problem [4] - 17:19, 18:1, 18:3, 25:10
problematic [1] - 13:15
procedure [2] - 21:20, 47:6
proceed [1] - 21:7
proceeding [1] - 15:12
proceedings [1] - 59:8
process [3] - 6:5, 46:8, 55:7
Process [1] - 4:16
produce [2] - 7:14, 9:12, 24:6, 24:11, 24:12, 25:7, 26:16, 26:19, 26:20, 26:22, 26:23, 29:10, 29:18, 36:23, 36:24, 37:9, 38:23, 39:3, 39:7, 42:8, 42:9
produced [3] - 21:3, 21:21, 37:15
product [3] - 28:11, 37:1, 51:23
production [2] - 31:4, 46:14
productive [1] - 54:4
products [2] - 36:22, 38:25
progress [1] - 39:13
projections [1] - 22:7
promise [1] - 52:7
proper [2] - 13:2, 22:6
properly [2] - 8:17, 9:21
property [3] - 31:17,

31:20, 32:5
**proportional** [5] - 21:22, 31:22, 33:22, 47:7, 52:1
**proportionality** [1] - 34:22
**proposal** [4] - 21:15, 43:25, 53:5, 53:7
**proposed** [1] - 57:19
**prove** [2] - 9:25, 19:8
**provide** [21] - 12:7, 12:22, 13:12, 15:25, 16:3, 22:13, 23:21, 29:8, 30:16, 30:17, 32:18, 32:19, 38:12, 38:13, 38:17, 43:2, 47:22, 54:21, 55:2, 55:3
**provided** [10] - 12:25, 15:5, 16:6, 20:11, 20:13, 24:4, 24:8, 28:17, 50:1, 50:15
**public** [1] - 50:13
**pulled** [1] - 30:1
**pulse** [1] - 50:22
**purports** [1] - 55:17
**purposes** [1] - 24:8
**pursuant** [2] - 21:19, 33:21
**pursue** [1] - 36:14
**put** [4] - 7:3, 19:15, 20:17, 50:13

**Q**

**questioned** [1] - 14:14
**questions** [8] - 11:24, 50:8, 50:9, 50:16, 57:4, 57:8, 57:9, 57:11
**quite** [3] - 9:21, 10:3, 10:19

**R**

**raise** [3] - 14:3, 56:23, 57:2
**raised** [2] - 56:25, 57:13
**rare** [1] - 57:6
**reach** [1] - 52:21
**read** [3] - 4:8, 19:19, 30:25
**readily** [2] - 50:10, 50:11
**ready** [1] - 19:20
**real** [1] - 16:1
**really** [7] - 7:18, 8:25, 9:4, 9:5, 9:19, 13:11,

15:5, 15:16, 16:4, 18:15, 18:22, 30:19, 30:20, 33:2, 33:7, 34:23, 35:25, 52:3, 53:24, 54:7, 57:9, 57:15
**realtime** [5] - 6:8, 9:1, 13:16, 13:19, 16:4
**reason** [5] - 12:3, 13:10, 23:16, 27:17, 30:12
**reasonable** [8] - 8:11, 12:15, 14:4, 14:9, 14:13, 19:17, 21:15, 21:17
**reasonableness** [4] - 14:2, 14:6, 14:10, 14:18
**reasoned** [1] - 56:9
**reasons** [3] - 28:9, 28:11, 41:1
**receive** [1] - 50:8
**received** [3] - 55:16, 55:19, 56:8
**recent** [2] - 23:12, 23:14
**recollection** [1] - 3:23
**recommendation** [2] - 30:21, 30:23
**record** [7] - 3:3, 5:16, 8:7, 21:18, 47:11, 52:8, 56:10
**records** [7] - 5:15, 7:3, 8:7, 10:16, 20:1, 21:1, 21:2
**recover** [1] - 9:23
**recoverable** [1] - 13:4
**redact** [1] - 9:13
**redone** [1] - 57:18
**reduced** [3] - 15:14, 17:24, 18:8
**reference** [1] - 44:17
**referenced** [1] - 44:9
**referencing** [1] - 31:13
**referring** [6] - 34:13, 36:21, 42:20, 43:6, 44:8, 49:20
**refers** [1] - 44:18
**refusal** [5] - 40:24, 41:1, 41:8, 41:14, 41:19
**refusal-to-deal** [4] - 40:24, 41:1, 41:8, 41:19
**refused** [1] - 45:23
**refusing** [2] - 29:18, 41:14
**regard** [2] - 15:7, 50:23
**regarding** [2] - 32:6,

34:16
**regards** [1] - 32:20
**related** [8] - 4:10, 32:3, 37:10, 38:23, 39:16, 43:14, 44:21, 48:11
**relates** [2] - 4:15, 23:17
**relating** [6] - 31:14, 42:21, 44:8, 44:14, 45:1, 49:20
**release** [4] - 23:12, 25:21, 25:25, 50:24
**relevance** [5] - 6:14, 34:23, 47:10, 47:15, 52:24
**relevant** [7] - 23:4, 34:25, 40:6, 44:14, 46:15, 48:6, 51:8
**relief** [1] - 51:25
**rely** [2] - 13:2, 38:11
**remain** [1] - 46:11
**remember** [1] - 5:22
**remind** [1] - 4:3
**report** [2] - 30:21, 30:22
**reported** [1] - 59:7
**Reporter** [2] - 59:5, 59:6
**reporting** [1] - 10:11
**reports** [2] - 30:18, 57:17
**request** [19] - 25:10, 26:7, 26:24, 27:2, 31:4, 31:21, 36:1, 36:2, 36:5, 40:2, 40:21, 40:22, 42:4, 43:23, 46:12, 47:7, 47:14, 51:4, 51:8
**requesting** [1] - 30:7
**requests** [17] - 5:19, 16:2, 17:11, 22:2, 30:10, 31:1, 32:12, 33:9, 33:12, 34:2, 36:3, 37:16, 40:20, 41:7, 43:10, 51:16
**requirement** [1] - 14:6
**respectfully** [1] - 19:14
**respond** [3] - 28:24, 48:13, 51:10
**responding** [1] - 51:16
**response** [5] - 8:21, 50:1, 50:8, 50:15, 55:16
**responses** [1] - 55:5
**responsive** [7] - 24:6, 26:24, 28:10, 32:5, 42:14, 44:14, 47:22

**rest** [1] - 21:4
**result** [2] - 19:9, 25:8
**results** [1] - 26:22
**reveal** [4] - 9:4, 9:5, 9:9, 11:4
**revenue** [1] - 23:17
**review** [7] - 21:1, 41:6, 44:9, 44:18, 45:2, 46:8, 46:25
**reviewed** [2] - 45:18, 45:25
**reviewing** [1] - 51:12
**RFP** [2] - 52:19, 52:20
**risk** [1] - 41:3
**room** [1] - 56:16
**Rule** [4] - 29:22, 33:22, 43:18, 52:1
**rule** [2] - 21:20, 56:11
**rules** [1] - 47:6
**ruling** [3] - 21:19, 21:21, 32:25
**rulings** [1] - 29:22
**run** [4] - 24:2, 25:6, 26:21, 39:7
**runs** [1] - 46:21

**S**

**safety** [2] - 50:20, 51:13
**sale** [1] - 22:13
**sales** [3] - 18:21, 22:25, 23:1
**saw** [2] - 25:8, 32:13
**scope** [1] - 53:1
**scrutiny** [2] - 40:25, 41:10
**SEALED** [1] - 59:16
**search** [21] - 24:2, 24:3, 24:4, 24:7, 24:8, 24:19, 25:7, 25:8, 26:6, 26:21, 26:22, 28:15, 28:17, 29:3, 38:10, 38:11, 39:7, 39:8, 45:17, 55:9
**searching** [1] - 29:11
**seasoned** [1] - 33:1
**seat** [5] - 17:17, 28:23, 43:20, 45:3, 46:10
**seated** [1] - 46:11
**second** [4] - 22:2, 24:17, 36:7, 46:20
**secondary** [1] - 18:18
**secrets** [1] - 32:6
**section** [2] - 30:6, 31:10
**Seddon** [1] - 3:8
**SEDDON** [2] - 1:23,

54:11
**see** [20] - 10:21, 12:3, 13:9, 14:13, 20:2, 23:5, 24:15, 25:23, 32:14, 34:12, 34:21, 40:2, 42:9, 44:16, 45:13, 45:18, 46:14, 47:8, 56:4, 56:21
**seeing** [2] - 14:17, 14:19
**seek** [3] - 11:12, 17:12, 34:20
**seeking** [5] - 5:4, 8:10, 17:15, 33:2, 33:9, 37:15, 50:3, 56:24
**seeks** [1] - 5:21
**sense** [4] - 6:12, 15:20, 21:12, 26:6
**sensitive** [1] - 16:19
**sensitivity** [1] - 6:25
**serve** [1] - 57:17
**service** [2] - 40:22, 41:7
**set** [4] - 29:23, 36:3, 56:2, 56:21
**seven** [1] - 9:22
**seventh** [2] - 17:25, 19:16
**Seventh** [2] - 18:2, 18:3
**shakes** [1] - 58:6
**ships** [1] - 39:6
**short** [1] - 45:25
**shortages** [2] - 23:20, 27:15
**Shorthand** [2] - 59:5, 59:6
**shorthand** [2] - 59:7, 59:12
**show** [23] - 14:21, 19:3, 23:13, 26:8, 26:11, 29:6, 29:15, 32:21, 32:22, 37:19, 37:20, 37:22, 37:23, 37:24, 38:15, 45:8, 45:9, 47:25, 48:6, 48:7, 48:21, 48:22, 49:4
**showed** [1] - 49:3
**showing** [4] - 28:8, 34:18, 36:10, 37:17
**shown** [2] - 32:16, 32:17
**side** [5] - 10:10, 10:20, 20:1, 21:14, 21:15
**sides** [1] - 24:25
**SIGNED** [1] - 59:16
**significant** [2] - 10:4, 18:17
**similar** [1] - 47:19

**simplify** [1] - 27:11
**simply** [1] - 56:24
**sit** [1] - 42:17
**sitting** [2] - 27:4, 56:16
**situation** [4] - 10:15, 18:13, 19:25, 57:14
**skill** [1] - 56:6
**small** [3] - 8:19, 9:21, 10:4
**solution** [3] - 15:4, 15:18, 25:9
**solutions** [2] - 17:1, 17:7
**solve** [1] - 6:10
**sometimes** [1] - 54:2
**sort** [8] - 7:25, 11:24, 12:21, 14:1, 15:7, 17:3, 25:11, 25:20
**sought** [2] - 8:8, 27:1
**sound** [1] - 19:21
**sound-bites** [1] - 19:21
**sounds** [5] - 6:14, 12:15, 26:4, 29:17, 32:6
**special** [2] - 11:7, 15:12
**specific** [3] - 13:14, 34:13, 50:16
**specifically** [2] - 12:9, 49:24, 51:4
**speed** [1] - 58:3
**Speedbudget** [1] - 59:22
**spend** [1] - 14:25
**spending** [2] - 4:1, 15:21
**spent** [2] - 12:13, 14:20
**spoiler** [1] - 41:18
**ss** [1] - 59:2
**stack** [1] - 3:19
**stand** [1] - 13:25
**standby** [2] - 49:7
**standing** [1] - 19:10
**start** [6] - 4:7, 5:20, 27:18, 28:5, 28:6
**State** [1] - 16:13
**STATE** [1] - 59:2
**statement** [1] - 38:21
**states** [1] - 22:1
**STATES** [1] - 1:1
**station** [2] - 56:19, 56:20
**stay** [1] - 57:25
**Stenotype** [1] - 59:7
**STEPHEN** [1] - 2:5
**Steve** [2] - 3:17, 10:25

**sticky** [1] - 37:23
**still** [1] - 43:8
**store** [2] - 44:8, 46:1
**strange** [1] - 49:19
**strategies** [5] - 49:21, 50:4, 50:17, 51:2, 51:5
**strategy** [2] - 9:5, 9:10
**stuck** [1] - 38:1
**stuff** [7] - 20:18, 28:18, 36:25, 37:12, 44:6, 52:8, 53:22
**subject** [2] - 7:9, 39:8
**subjects** [1] - 29:21
**submarket** [1] - 37:23
**submit** [1] - 52:20
**substantially** [3] - 44:22, 47:19, 57:10
**substantiate** [1] - 4:25
**sufficient** [4] - 13:1, 26:7, 29:6, 29:15
**suggest** [1] - 8:23
**suggested** [1] - 53:15
**suit** [1] - 19:8
**summary** [3] - 31:6, 32:15, 40:15
**supplement** [3] - 30:14, 54:1, 55:4
**supplemental** [2] - 50:1, 54:21
**suppliers** [1] - 28:21
**supply** [1] - 23:3
**supposed** [3] - 11:8, 26:25, 51:19
**Supreme** [3] - 40:24, 41:8, 46:22
**surprise** [1] - 26:1
**switch** [1] - 38:25

**T**

**table** [2] - 13:19, 13:20
**tactic** [1] - 10:7
**talks** [4] - 4:9, 31:12, 42:19, 44:6
**targeted** [1] - 50:9
**taxi** [2] - 48:13, 48:16
**technology** [1] - 44:15
**ten** [3] - 7:14, 9:22, 53:15
**ten-page** [1] - 7:14
**tens** [1] - 4:21
**term** [1] - 26:6
**terms** [17] - 12:17, 16:21, 24:2, 24:3, 24:5, 24:7, 24:8, 25:7, 25:8, 26:22, 26:23, 28:16, 28:18, 29:4, 38:10, 38:11,

55:9
**test** [8] - 4:24, 5:8, 6:3, 6:16, 6:21, 8:1, 12:14, 18:11
**THE** [77] - 1:1, 1:2, 3:1, 3:11, 3:18, 5:24, 6:15, 8:4, 10:8, 11:17, 12:11, 13:3, 13:18, 14:17, 17:17, 18:6, 19:19, 24:1, 24:14, 25:4, 25:19, 26:12, 27:3, 27:7, 27:21, 28:14, 28:22, 29:13, 31:3, 31:12, 31:25, 32:2, 33:6, 33:15, 33:18, 33:21, 34:2, 34:6, 34:8, 34:11, 35:3, 35:8, 35:11, 35:13, 36:15, 37:7, 37:13, 38:3, 38:18, 39:1, 39:12, 39:18, 39:25, 40:17, 41:17, 42:7, 42:16, 43:19, 45:3, 45:12, 46:5, 46:10, 46:17, 47:3, 49:7, 49:13, 52:2, 52:22, 53:2, 53:11, 53:17, 53:20, 54:24, 55:10, 56:2, 57:22, 58:2
**theme** [2] - 10:5, 10:6
**theory** [6] - 40:23, 41:13, 50:18, 51:11, 51:17, 51:24
**they've** [7] - 3:13, 6:9, 17:23, 30:16, 42:1, 42:23, 55:7
**thinking** [4] - 6:1, 19:23, 21:6, 44:15
**third** [3] - 16:10, 16:15, 32:3
**Third** [2] - 16:11, 16:12
**three** [4] - 5:3, 9:24, 21:25, 51:12
**throw** [1] - 14:21
**tied** [1] - 50:14
**timing** [1] - 50:19
**today** [11] - 3:13, 3:16, 19:24, 26:14, 26:15, 27:4, 41:20, 47:4, 47:5, 54:4, 56:13
**together** [1] - 50:14
**tonight** [1] - 7:22
**took** [1] - 51:12
**topic** [1] - 56:24
**total** [10] - 10:14, 12:17, 12:19, 12:20, 12:24, 13:13, 15:22, 17:5, 17:20, 20:21

**totally** [1] - 37:12
**totals** [1] - 12:8
**trade** [1] - 32:6
**trail** [1] - 9:1
**train** [2] - 56:19, 56:20, 58:2
**transcript** [2] - 59:11, 59:13
**TRANSCRIPT** [1] - 1:9
**treatise** [1] - 16:14
**treble** [4] - 5:4, 5:7, 8:18, 8:19
**trial** [7] - 15:9, 15:10, 15:11, 16:22, 16:23, 17:3, 21:7
**tried** [2] - 22:11, 23:9
**true** [4] - 8:5, 18:24, 35:1, 59:14
**truly** [3] - 7:18, 9:9, 18:11
**try** [1] - 29:8
**trying** [6] - 27:8, 37:19, 37:20, 45:12, 56:14, 57:25
**turn** [1] - 20:8
**turnage** [1] - 3:8
**TURNAGE** [1] - 1:21
**turning** [1] - 6:8
**two** [11] - 4:14, 9:3, 9:13, 19:1, 19:18, 32:5, 39:6, 49:15, 51:15, 56:3, 57:14
**type** [9] - 10:18, 23:22, 30:20, 34:20, 36:16, 36:17, 38:4, 44:12, 55:23
**typed** [1] - 59:12
**types** [8] - 5:19, 8:9, 25:14, 25:18, 26:4, 26:10, 26:16, 26:19
**typewritten** [1] - 59:14
**typically** [1] - 33:3

**U**

**U.S** [1] - 41:11
**U.S.M.J** [1] - 1:13
**ultimately** [1] - 17:22
**unable** [2] - 23:21, 52:21
**under** [6] - 20:16, 29:22, 37:22, 38:2, 43:18, 52:1
**underlying** [6] - 4:23, 5:14, 5:16, 5:21, 19:3, 24:13
**undermines** [2] - 10:5, 10:6
**underperformance** [1]

- 22:22
**underperforming** [2] - 28:9, 28:12
**understood** [3] - 6:2, 25:19, 35:6
**undisclosed** [1] - 9:10
**UNITED** [1] - 1:1
**universe** [1] - 44:23
**unlawfully** [1] - 32:4
**unless** [2] - 36:7, 42:4
**unreasonable** [1] - 20:19
**unrelated** [1] - 37:12
**up** [12] - 20:2, 21:14, 28:3, 28:10, 30:1, 31:1, 31:19, 40:11, 43:25, 50:14, 56:17, 57:16
**updates** [2] - 13:16, 13:20
**users** [1] - 38:24

**V**

**vacating** [1] - 57:19
**various** [1] - 26:2
**vast** [1] - 9:3
**viable** [1] - 40:23
**view** [3] - 30:22, 42:12, 57:23
**views** [1] - 43:11
**violated** [1] - 51:21
**visiting** [1] - 57:20
**vs** [4] - 1:5, 16:12, 41:11, 59:9

**W**

**W1** [4] - 22:14, 23:23, 50:23, 50:24
**waive** [7] - 54:6, 54:17, 55:2, 55:8, 55:11, 55:13, 55:21
**waiver** [3] - 7:10, 7:17, 55:23
**waiving** [1] - 54:6
**walker** [2] - 4:16, 6:5
**wants** [1] - 5:3
**warner** [1] - 59:4
**Warner** [1] - 59:21
**Watch** [2] - 38:9, 38:16, 38:24
**watch** [5] - 22:14, 36:21, 37:1, 37:6, 37:11, 37:12, 37:18, 43:15, 44:24, 45:1, 51:14, 51:22, 51:24
**watches** [2] - 44:21,

44:22
**watching** [1] - 51:15
**week** [1] - 54:20
**weeks** [1] - 56:3
**whole** [1] - 22:2
**willfully** [1] - 7:11
**willing** [2] - 11:2, 39:3
**willingness** [1] - 38:24
**WILMER** [1] - 1:19
**Wilmer** [1] - 3:6
**Wisconsin** [1] - 14:8
**withhold** [1] - 28:23
**withholding** [1] - 4:9
**world** [2] - 14:17, 14:19
**worried** [1] - 15:6
**worry** [1] - 52:7
**writes** [1] - 7:22

## X

**XYZ** [1] - 8:21

## Y

**years** [1] - 57:6
**yesterday** [1] - 55:16
**yourself** [1] - 32:16

# EXHIBIT B

1

```
        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE


APPLE, INC.,                 )
                             )
          Plaintiff,         )   C.A. No. 22-1377-MN-JLH
                             )             22-1378-MN-JLH
v.                           )
                             )
MASIMO CORPORATION,          )
et al.,                      )
                             )
          Defendant.         )



                  Friday, May 5, 2023
                  10:00 a.m.


                  844 King Street
                  Wilmington, Delaware



BEFORE:  THE HONORABLE JENNIFER L. HALL
         United States District Court Judge


APPEARANCES:

         POTTER, ANDERSON & CORROON, LLP
         BY:  DAVID ELLIS MOORE, ESQ.
         BY:  BINDU ANN GEORGE PALAPURA, ESQ.

                     -and-
```

2

APPEARANCES CONTINUED:

```
DESMARAIS LLP
BY:  JOHN DESMARAIS, ESQ.
BY:  PETER MAGIC, ESQ.
BY:  JORDAN MALZ, ESQ.
BY:  KERRI-ANN LIMBEEK, ESQ.

     -and-

WILMER HALE
BY:  JENNIFER MILICI, ESQ.
BY:  MARK FORD, ESQ.

     -and-

APPLE IN-HOUSE COUNSEL
BY:  NATALIE POUS, ESQ.
BY:  MEAGHAN THOMAS-KENNEDY, ESQ.

          Counsel for the Plaintiff


PHILLIPS, McLAUGHLIN & HALL, P.A.
BY:  JOHN C. PHILLIPS, JR., ESQ.

     -and-

KNOBBE MARTENS
BY:  STEVE JENSON, ESQ.
BY:  BRIAN C. HORNE, ESQ.
BY:  JARED C. BUNKER, ESQ.
BY:  BENJAMIN A. KATZENELLENBOGEN, ESQ.
BY:  STEPHEN LARSON, ESQ.
BY:  ADAM B. POWELL, ESQ.

          Counsel for the Defendant
```

20

21
22
23
24

3

1    THE COURT:  Good morning, counsel.

2    This is Jennifer Hall.  We're here on the line

3    for a scheduling conference.  This is Apple

4    versus Masimo and Sound United.  It's civil

5    action numbers 22-1377 and 22-1378.  May I have

6    appearances, please, for plaintiffs?

7         MR. MOORE:  Good morning, Your

8    Honor.  It's David Moore.

9         THE COURT:  Good morning, Mr.

10   Moore.  Do you have others with you?  You may

11   have cut out.

12        MR. MOORE:  Sorry about that.

13   Bindu Palapura is with me.  And our co-counsel

14   from Desmarais is on the line as well, John

15   Desmarais, Peter Magic, Jordan Malz and

16   Kerri-Ann Limbeek.  We also have counsel from

17   Wilmer Hale on the line, Jennifer Milici and

18   Mark Ford.  And I believe we also have in-house

19   counsel from Apple, Natalie Pous and Meaghan

20   Thomas-Kennedy on the line.

21        THE COURT:  Great.  Good morning

22   to all of you.  Do we have counsel for the

23   defendants on the line?

24        MR. PHILLIPS:  Good morning, Your

4

1    Honor.  This is Jack Phillips of Phillips,

2    McLaughlin & Hall and with me on the line are

3    Steve Jenson, Brian Horne, Jared Bunker, Ben

4    Katzenellenbogen, Stephen Larson and Adam Powell

5    of the Knobbe Martens firm.

6         THE COURT:  Good morning to all of

7    you.  So I thought that I would let you know

8    what my thoughts are and then we'll give

9    everybody a chance to ask questions at the end.

10   I anticipate we may need to get on another call,

11   but let me just tell you what I'm thinking.

12        I can tell you that we spent a

13   great deal of time looking at the docket and

14   seeing what's pending.  We have a good

15   understanding about what claims are at issue in

16   the two cases and what the parties want to do

17   with respect to the schedule.  I think we also

18   have a gut understanding about why they want to

19   do what they want to do.  So what I'm going to

20   outline for you takes into consideration the

21   parties' pleadings, which we've reviewed, the

22   pending motions to dismiss and strike, the

23   claims and the counterclaims and the defenses.

24   We've looked carefully at the competing proposed

5

1  schedules and we looked at all of the arguments
2  made in all of the scheduling related motions to
3  include the pending motions to expedite, to
4  consolidate, to sever and to stay and we've also
5  taken into account that it appears to us that
6  this is -- well, it doesn't just appear to us,
7  it's the case that it's not the only matter
8  between plaintiff and defendants and these cases
9  are part of a larger battle between the parties.
10  You all have many cases against each other
11  related to the products at issue and so any
12  arguments by one side or the other side to the
13  Court about why it would be burdensome to defend
14  against the other side's claims are taken by the
15  Court with a degree of skepticism.  And I also
16  think that there's no reason why the parties'
17  claims that they've chosen to bring against each
18  other in Delaware can't move as fast here as
19  they have in other forums as well.  I've also
20  taken into account that there is a reason to
21  think that some discovery relevant to this case
22  has already been had.  And the parties have
23  suggested that they are both amenable in
24  principle to cross these agreements that would

7

1  course, but for now everything is going forward
2  in discovery.
3         The cases and the claims are going
4  to proceed forward with the idea that we will
5  have a case management conference in January of
6  2024, at which time we will decide which claims
7  and defenses should proceed to trial.  And
8  should the Court determine that there are cases
9  that should proceed to trial, the Court is going
10  to be able to get you to trial within a month or
11  two of January 2024.  The exact date will be
12  decided at the case management conference in
13  January.
14         Should the parties desire to file
15  summary judgment motions, briefing on those
16  motions should be complete by the second week in
17  December.  If a party wishes to file more than
18  one summary judgment motion, what we're going to
19  do is incorporate a ranking procedure that's
20  consistent with the procedure that Judge
21  Connolly uses.  And I know your Delaware counsel
22  will be able to fill you in on that if you're
23  not familiar, but the general idea is that the
24  parties have to make clear the order in which

6

1  allow discovery between the cases presently
2  before the Court as well as including some of
3  the discovery that they've had in the Central
4  District of California case and the ITC case.
5         So having taken the totality of
6  these circumstances under consideration, in my
7  view there's really only one good way to proceed
8  that takes into account both sides' competing
9  interests in having their claims and defenses
10  heard both fairly and expeditiously as well as
11  the Court's and the parties' interests in
12  efficiency.  And so here's the broad outline of
13  the plan.
14         The cases are going to be
15  informally consolidated for pretrial
16  proceedings.  There will be one scheduling order
17  that will apply to both cases for pretrial
18  proceeding.  Subject to the Court's upcoming
19  ruling on the pending motions to dismiss and
20  strike, every claim and every defense and every
21  counterclaim is going to go forward in discovery
22  at this time.  As I mentioned in my oral order
23  yesterday, the Court will take up the motions to
24  dismiss and strike claims and defenses in due

8

1  they want their summary judgment motions heard.
2  So the first motion the party wishes the Court
3  to consider should be designated number one and
4  the second motion number two and so on.  And
5  then the Court will review those motions in
6  order.  And if the Court decides to deny a
7  motion filed by the parties, barring
8  exceptionable circumstances, the Court will not
9  review any further summary judgment motions by
10  that party.
11         Alternatively, if the parties want
12  to save some time on the schedule, they can, if
13  both sides agree, forego the opportunity to file
14  summary judgment motions as of right and instead
15  the Court will adopt a procedure under which the
16  parties can file short competing letters
17  requesting leave to file summary judgment.  If
18  the parties choose that option, those can be due
19  two weeks before the January 2024 case
20  management conference and we'll take them up at
21  that conference.
22         And as I said, the plan would be
23  to get you to trial within a month or two of
24  January 2024.  That trial may involve a formal

9

1  consolidation of certain claims from each of the
2  two actions or it may not.  We'll figure that
3  out in January.  The parties can argue at that
4  point in time about what should go forward and
5  the Court will need a joint letter no longer
6  than six pages, single-spaced, to be filed at
7  least 10 days before the January 2024 status
8  conference and the letter should indicate how
9  the parties think the case should proceed to
10  trial.
11        Based on what I said, I imagine
12  that you will all want to go back and meet and
13  confer about discovery limits and dates.
14        To the extent there is a need to
15  have a markman hearing, I'll need a joint brief
16  for that two weeks before whatever date you want
17  the markman hearing to be and I can accommodate
18  that.  I'll be able to get you a ruling on any
19  markman issues at the hearing or very shortly
20  thereafter, but if you don't have a ruling by
21  the time expert reports are due, the parties'
22  experts will need to address both sides'
23  competing claim constructions.
24        So with respect to the pending

10

1  motions we've got in the 1377 case, there's a
2  motion to expedite.  That is denied.  However, I
3  will say that Apple's request for a trial eight
4  months from the date of the scheduling order
5  comes pretty close to what the Court has just
6  offered on the phone today and my plan is to
7  keep the trial pretty close to eight months from
8  the day we're going to enter the scheduling
9  order.  With respect to, again, the 1377 and the
10  1378 cases, the motion to consolidate cases,
11  that's going to be denied, because we're not
12  going to have formal consolidation at this time.
13  The cases, however, will be informally
14  consolidated for scheduling and discovery and we
15  can re-raise at the case management conference
16  any arguments that the claims should be tried
17  together.
18        In 1378 we've got a motion to
19  sever certain of the counterclaims in that case.
20  That's denied without prejudice to re-raise at
21  the January 2024 case management conference.
22  And then we have also a motion to stay discovery
23  pending a resolution of a motion to dismiss and
24  that's denied.

11

1        I know what you all are probably
2  wondering, which is is Judge Noreika going to go
3  for this and the answer to that is yes.  I
4  actually have spoken with her about the pending
5  motions and she and I each independently came up
6  with the plan that I have outlined for you
7  today, which indicates to me that it's a good
8  plan and it's the right way to proceed.
9        So I don't know where we are with
10  the 26-day disclosures and the initial patent
11  disclosures.  At least based on the competing
12  proposed schedules that you all filed a couple
13  weeks ago, it looked to me like we were making
14  some progress, so hopefully those things can be
15  incorporated into whatever you all come up with,
16  but I'd like you all to have a proposed
17  scheduling order with any additional disputes
18  based on the plan that I've outlined set forth
19  in that and then if we need to get back on the
20  phone we can.  Hopefully we can get that revised
21  scheduling order within a week.
22        So does anyone have any questions
23  from plaintiff's side?
24        MR. DESMARAIS:  Hello, Your Honor.

12

1  This is John Desmarais for Apple.  Your plan
2  sounds like a good one and we have no questions
3  and we appreciate the Court's hard work to come
4  up with the plan.  So thank you.
5        THE COURT:  Great.  Thanks very
6  much.  Any questions from defendants?
7        MR. HORNE:  No, Your Honor.  This
8  is Brian Horne for defendants and I echo Mr.
9  Desmarais's sentiments.
10        THE COURT:  Fantastic.  Well,
11  let's get crackin' on these claims.  So we'll
12  look forward to getting a scheduling from you in
13  a week.  Thank you, everybody.  Bye bye.
14        (End at 10:15 a.m.)
15
16
17
18
19
20
21
22
23
24

1   State of Delaware)
            )
2   New Castle County)

3

4

5            CERTIFICATE OF REPORTER

6

7        I, Stacy M. Ingram, Certified Court Reporter
8   and Notary Public, do hereby certify that the
9   foregoing record, Pages 1 to 13 inclusive, is a true
10  and accurate transcript of my stenographic notes
11  taken on May 5, 2023, in the above-captioned matter.

12

13       IN WITNESS WHEREOF, I have hereunto set my
14  hand and seal this 5th day of May 2023, at
15  Wilmington.

16

17

18     _/s/ Stacy M. Ingram_
19      Stacy M. Ingram, CCR

20

21

22

23

24

            Hawkins Reporting Service
      855 Arthursville Road   Hartly, Delaware  19953
            (302) 658-6697  FAX (302) 658-8418

**/**

/s [1] - 13:18

**1**

1 [1] - 13:9
10 [1] - 9:7
10:00 [1] - 1:11
10:15 [1] - 12:14
13 [1] - 13:9
1377 [2] - 10:1, 10:9
1378 [2] - 10:10, 10:18

**2**

2023 [3] - 1:10, 13:11, 13:14
2024 [6] - 7:6, 7:11, 8:19, 8:24, 9:7, 10:21
22-1377 [1] - 3:5
22-1377-MN-JLH [1] - 1:4
22-1378 [1] - 3:5
22-1378-MN-JLH [1] - 1:5
26-day [1] - 11:10

**5**

5 [2] - 1:10, 13:11
5th [1] - 13:14

**8**

844 [1] - 1:12

**A**

a.m [2] - 1:11, 12:14
able [3] - 7:10, 7:22, 9:18
above-captioned [1] - 13:11
accommodate [1] - 9:17
account [3] - 5:5, 5:20, 6:8
accurate [1] - 13:10
action [1] - 3:5
actions [1] - 9:2
ADAM [1] - 2:18
Adam [1] - 4:4

additional [1] - 11:17
address [1] - 9:22
adopt [1] - 8:15
ago [1] - 11:13
agree [1] - 8:13
agreements [1] - 5:24
al [1] - 1:7
allow [1] - 6:1
alternatively [1] - 8:11
amenable [1] - 5:23
ANDERSON [1] - 1:20
Ann [1] - 3:16
ANN [2] - 1:21, 2:4
answer [1] - 11:3
anticipate [1] - 4:10
appear [1] - 5:6
APPEARANCES [2] - 1:19, 2:1
appearances [1] - 3:6
APPLE [2] - 1:3, 2:9
Apple [3] - 3:3, 3:19, 12:1
Apple's [1] - 10:3
apply [1] - 6:17
appreciate [1] - 12:3
argue [1] - 9:3
arguments [3] - 5:1, 5:12, 10:16

**B**

barring [1] - 8:7
based [3] - 9:11, 11:11, 11:18
battle [1] - 5:9
BEFORE [1] - 1:16
Ben [1] - 4:3
BENJAMIN [1] - 2:17
between [3] - 5:8, 5:9, 6:1
BINDU [1] - 1:21
Bindu [1] - 3:13
Brian [2] - 4:3, 12:8
BRIAN [1] - 2:16
brief [1] - 9:15
briefing [1] - 7:15
bring [1] - 5:17
broad [1] - 6:12
BUNKER [1] - 2:16
Bunker [1] - 4:3
burdensome [1] - 5:13
BY [17] - 1:20, 1:21, 2:2, 2:3, 2:3, 2:4, 2:6, 2:7, 2:9, 2:10, 2:13, 2:15, 2:16, 2:16, 2:17, 2:17,

2:18
bye [2] - 12:13

**C**

C.A [1] - 1:4
California [1] - 6:4
captioned [1] - 13:11
carefully [1] - 4:24
case [12] - 5:7, 5:21, 6:4, 7:5, 7:12, 8:19, 9:9, 10:1, 10:15, 10:19, 10:21
cases [11] - 4:16, 5:8, 5:10, 6:1, 6:14, 6:17, 7:3, 7:8, 10:10, 10:13
Castle [1] - 13:2
CCR [1] - 13:19
Central [2] - 6:3
certain [2] - 9:1, 10:19
CERTIFICATE [1] - 13:5
Certified [1] - 13:7
certify [1] - 13:8
chance [1] - 4:9
choose [1] - 8:18
chosen [1] - 5:17
circumstances [2] - 6:6, 8:8
civil [1] - 3:4
claim [2] - 6:20, 9:23
claims [11] - 4:15, 4:23, 5:14, 5:17, 6:9, 6:24, 7:3, 7:6, 9:1, 10:16, 12:11
clear [1] - 7:24
close [2] - 10:5, 10:7
co [1] - 3:13
co-counsel [1] - 3:13
competing [5] - 4:24, 6:8, 8:16, 9:23, 11:11
complete [1] - 7:16
confer [1] - 9:13
conference [8] - 3:3, 7:5, 7:12, 8:20, 8:21, 9:8, 10:15, 10:21
Connolly [1] - 7:21
consider [1] - 8:3
consideration [2] - 4:20, 6:6
consistent [1] - 7:20
consolidate [2] - 5:4, 10:10
consolidated [2] - 6:15, 10:14

consolidation [2] - 9:1, 10:12
constructions [1] - 9:23
CONTINUED [1] - 2:1
CORPORATION [1] - 1:6
CORROON [1] - 1:20
COUNSEL [1] - 2:9
Counsel [2] - 2:11, 2:19
counsel [6] - 3:1, 3:13, 3:16, 3:19, 3:22, 7:21
counterclaim [1] - 6:21
counterclaims [2] - 4:23, 10:19
County [1] - 13:2
couple [1] - 11:12
course [1] - 7:1
COURT [7] - 1:1, 3:1, 3:9, 3:21, 4:6, 12:5, 12:10
Court [15] - 1:16, 5:13, 5:15, 6:2, 6:23, 7:8, 7:9, 8:2, 8:5, 8:6, 8:8, 8:15, 9:5, 10:5, 13:7
Court's [1] - 6:11, 6:18, 12:3
crackin [1] - 12:11
cross [1] - 5:24
cut [1] - 3:11

**D**

date [3] - 7:11, 9:16, 10:4
dates [1] - 9:13
David [1] - 3:8
DAVID [1] - 1:20
days [1] - 9:7
deal [1] - 4:13
December [1] - 7:17
decide [1] - 7:6
decided [1] - 7:12
decides [1] - 8:6
defend [1] - 5:13
Defendant [1] - 1:8, 2:19
defendants [4] - 3:23, 5:8, 12:6, 12:8
defense [1] - 6:20
defenses [4] - 4:23, 6:9, 6:24, 7:7
degree [1] - 5:15
DELAWARE [1] - 1:1

Delaware [4] - 1:13, 5:18, 7:21, 13:1
denied [4] - 10:2, 10:11, 10:20, 10:24
deny [1] - 8:6
designated [1] - 8:3
desire [1] - 7:14
Desmarais [3] - 3:14, 3:15, 12:1
DESMARAIS [3] - 2:2, 2:2, 11:24
Desmarais's [1] - 12:9
determine [1] - 7:8
disclosures [2] - 11:10, 11:11
discovery [8] - 5:21, 6:1, 6:3, 6:21, 7:2, 9:13, 10:14, 10:22
dismiss [4] - 4:22, 6:19, 6:24, 10:23
disputes [1] - 11:17
DISTRICT [2] - 1:1, 1:1
District [2] - 1:16, 6:4
docket [1] - 4:13
due [3] - 6:24, 8:18, 9:21

**E**

echo [1] - 12:8
efficiency [1] - 6:12
eight [2] - 10:3, 10:7
ELLIS [1] - 1:20
End [1] - 12:14
end [1] - 4:9
enter [1] - 10:8
ESQ [17] - 1:20, 1:21, 2:2, 2:3, 2:3, 2:4, 2:6, 2:7, 2:9, 2:10, 2:13, 2:15, 2:16, 2:16, 2:17, 2:17, 2:18
et [1] - 1:7
exact [1] - 7:11
exceptionable [1] - 8:8
expedite [2] - 5:3, 10:2
expeditiously [1] - 6:10
expert [1] - 9:21
experts [1] - 9:22
extent [1] - 9:14

Hawkins Reporting Service
855 Arthursville Road    Hartly, Delaware   19953
(302) 658-6697    FAX (302) 658-8418
Page 1 of 1 of 3
5 of 7 sheets                                                                                        05/05/2023 11:29:50 AM

**F**

**fairly** [1] - 6:10
**familiar** [1] - 7:23
**Fantastic** [1] - 12:10
**fast** [1] - 5:18
**figure** [1] - 9:2
**file** [5] - 7:14, 7:17, 8:13, 8:16, 8:17
**filed** [3] - 8:7, 9:6, 11:12
**fill** [1] - 7:22
**firm** [1] - 4:5
**first** [1] - 8:2
**FOR** [1] - 1:1
**FORD** [1] - 2:7
**Ford** [1] - 3:18
**forego** [1] - 8:13
**foregoing** [1] - 13:9
**formal** [2] - 8:24, 10:12
**forth** [1] - 11:18
**forums** [1] - 5:19
**forward** [5] - 6:21, 7:1, 7:4, 9:4, 12:12
**Friday** [1] - 1:10

**G**

**general** [1] - 7:23
**GEORGE** [1] - 1:21
**great** [3] - 3:21, 4:13, 12:5
**gut** [1] - 4:18

**H**

**HALE** [1] - 2:6
**Hale** [1] - 3:17
**HALL** [2] - 1:16, 2:12
**Hall** [2] - 3:2, 4:2
**hand** [1] - 13:14
**hard** [1] - 12:3
**heard** [2] - 6:10, 8:1
**hearing** [3] - 9:15, 9:17, 9:19
**hello** [1] - 11:24
**hereby** [1] - 13:8
**hereunto** [1] - 13:13
**Honor** [4] - 3:8, 4:1, 11:24, 12:7
**HONORABLE** [1] - 1:16
**hopefully** [2] - 11:14, 11:20
**Horne** [2] - 4:3, 12:8

**HORNE** [2] - 2:16, 12:7
**house** [1] - 3:18
**HOUSE** [1] - 2:9

**I**

**idea** [2] - 7:4, 7:23
**imagine** [1] - 9:11
**IN** [3] - 1:1, 2:9, 13:13
**in-house** [1] - 3:18
**IN-HOUSE** [1] - 2:9
**INC** [1] - 1:3
**include** [1] - 5:3
**including** [1] - 6:2
**inclusive** [1] - 13:9
**incorporate** [1] - 7:19
**incorporated** [1] - 11:15
**independently** [1] - 11:5
**indicate** [1] - 9:8
**indicates** [1] - 11:7
**informally** [2] - 6:15, 10:13
**Ingram** [3] - 13:7, 13:18, 13:19
**initial** [1] - 11:10
**instead** [1] - 8:14
**interests** [2] - 6:9, 6:11
**involve** [1] - 8:24
**issue** [2] - 4:15, 5:11
**issues** [1] - 9:19
**ITC** [1] - 6:4

**J**

**Jack** [1] - 4:1
**January** [8] - 7:5, 7:11, 7:13, 8:19, 8:24, 9:3, 9:7, 10:21
**Jared** [1] - 4:3
**JARED** [1] - 2:16
**JENNIFER** [2] - 1:16, 2:6
**Jennifer** [2] - 3:2, 3:17
**Jenson** [1] - 4:3
**JENSON** [1] - 2:15
**JOHN** [2] - 2:2, 2:13
**John** [3] - 3:14, 12:1
**joint** [2] - 9:5, 9:15
**Jordan** [1] - 3:15
**JORDAN** [1] - 2:3
**JR** [1] - 2:13
**Judge** [3] - 1:16, 7:20, 11:2

**judgment** [6] - 7:15, 7:18, 8:1, 8:9, 8:14, 8:17

**K**

**KATZENELLENBOG EN** [1] - 2:17
**Katzenellenbogen** [1] - 4:4
**keep** [1] - 10:7
**Kennedy** [1] - 3:20
**KENNEDY** [1] - 2:10
**KERRI** [1] - 2:4
**Kerri** [1] - 3:16
**KERRI-ANN** [1] - 2:4
**Kerri-Ann** [1] - 3:16
**King** [1] - 1:12
**KNOBBE** [1] - 2:15
**Knobbe** [1] - 4:5

**L**

**larger** [1] - 5:9
**LARSON** [1] - 2:17
**Larson** [1] - 4:4
**least** [2] - 9:7, 11:11
**leave** [1] - 8:17
**letter** [2] - 9:5, 9:8
**letters** [1] - 8:16
**LIMBEEK** [1] - 2:4
**Limbeek** [1] - 4:5
**limits** [1] - 9:13
**line** [6] - 3:2, 3:14, 3:17, 3:20, 3:23, 4:2
**LLP** [2] - 1:20, 2:2
**look** [1] - 12:12
**looked** [3] - 4:24, 5:1, 11:13
**looking** [1] - 4:13

**M**

**MAGIC** [1] - 2:3
**Magic** [1] - 3:15
**Malz** [1] - 3:15
**MALZ** [1] - 2:3
**management** [5] - 7:5, 7:12, 8:20, 10:15, 10:21
**MARK** [1] - 2:7
**Mark** [1] - 3:18
**markman** [3] - 9:15, 9:17, 9:19
**MARTENS** [1] - 2:15
**Martens** [1] - 4:5

**MASIMO** [1] - 1:6
**Masimo** [1] - 3:4
**matter** [2] - 5:7, 13:11
**McLaughlin** [2] - 2:12, 4:2
**Meaghan** [1] - 3:19
**MEAGHAN** [1] - 2:10
**meet** [1] - 9:12
**mentioned** [1] - 6:22
**Milici** [1] - 3:17
**MILICI** [1] - 2:6
**month** [2] - 7:10, 8:23
**months** [2] - 10:4, 10:7
**Moore** [2] - 3:8, 3:10
**MOORE** [3] - 1:20, 3:7, 3:12
**morning** [6] - 3:1, 3:7, 3:9, 3:21, 3:24, 4:6
**motion** [9] - 7:18, 8:2, 8:4, 8:7, 10:2, 10:10, 10:18, 10:22, 10:23
**motions** [13] - 4:22, 5:2, 5:3, 6:19, 6:23, 7:15, 7:16, 8:1, 8:5, 8:9, 8:14, 10:1, 11:5
**move** [1] - 5:18
**MR** [5] - 3:7, 3:12, 3:24, 11:24, 12:7

**N**

**Natalie** [1] - 3:19
**NATALIE** [1] - 2:9
**need** [6] - 4:10, 9:5, 9:14, 9:15, 9:22, 11:19
**New** [1] - 13:2
**Noreika** [1] - 11:2
**Notary** [1] - 13:8
**notes** [1] - 13:10
**number** [2] - 8:3, 8:4
**numbers** [1] - 3:5

**O**

**OF** [2] - 1:1, 13:5
**offered** [1] - 10:6
**one** [6] - 5:12, 6:7, 6:16, 7:18, 8:3, 12:2
**opportunity** [1] - 8:13
**option** [1] - 8:18
**oral** [1] - 6:22
**order** [8] - 6:16, 6:22, 7:24, 8:6, 10:4, 10:9, 11:17, 11:21

**outline** [2] - 4:20, 6:12
**outlined** [1] - 11:6, 11:18

**P**

**P.A** [1] - 2:12
**Pages** [1] - 13:9
**pages** [1] - 9:6
**PALAPURA** [1] - 1:21
**Palapura** [1] - 3:13
**part** [1] - 5:9
**parties** [11] - 4:16, 5:9, 5:22, 7:14, 7:24, 8:7, 8:11, 8:16, 8:18, 9:3, 9:9
**parties'** [4] - 4:21, 5:16, 6:11, 9:21
**party** [3] - 7:17, 8:2, 8:10
**patent** [1] - 11:10
**pending** [7] - 4:14, 4:22, 5:3, 6:19, 9:24, 10:23, 11:4
**Peter** [1] - 3:15
**PETER** [1] - 2:3
**Phillips** [2] - 4:1
**PHILLIPS** [3] - 2:12, 2:13, 3:24
**phone** [2] - 10:6, 11:20
**Plaintiff** [2] - 1:4, 2:11
**plaintiff** [1] - 5:8
**plaintiff's** [1] - 11:23
**plaintiffs** [1] - 3:6
**plan** [8] - 6:13, 8:22, 10:6, 11:6, 11:8, 11:18, 12:1, 12:4
**pleadings** [1] - 4:21
**point** [1] - 9:4
**POTTER** [1] - 1:20
**Pous** [1] - 3:19
**POUS** [1] - 2:9
**Powell** [1] - 4:4
**POWELL** [1] - 2:18
**prejudice** [1] - 10:20
**presently** [1] - 6:1
**pretrial** [2] - 6:15, 6:17
**pretty** [2] - 10:5, 10:7
**principle** [1] - 5:24
**procedure** [3] - 7:19, 7:20, 8:15
**proceed** [6] - 6:7, 7:4, 7:7, 7:9, 9:9, 11:8
**proceeding** [1] - 6:18
**proceedings** [1] - 6:16

Hawkins Reporting Service
855 Arthursville Road    Hartly, Delaware   19953
(302) 658-6697   FAX (302) 658-8418
Page 2 to 2 of 5
05/05/2023 11:29:50 AM
6 of 7 sheets

| | | |
|---|---|---|
| **products** [1] - 5:11 | **shortly** [1] - 9:19 | **trial** [8] - 7:7, 7:9, 7:10, 8:23, 8:24, 9:10, 10:3, 10:7 |
| **progress** [1] - 11:14 | **side** [3] - 5:12, 11:23 | **tried** [1] - 10:16 |
| **proposed** [3] - 4:24, 11:12, 11:16 | **side's** [1] - 5:14 | **true** [1] - 13:9 |
| **Public** [1] - 13:8 | **sides** [1] - 8:13 | **two** [7] - 4:16, 7:11, 8:4, 8:19, 8:23, 9:2, 9:16 |
| | **sides'** [2] - 6:8, 9:22 | |
| **Q** | **single** [1] - 9:6 | |
| | **single-spaced** [1] - 9:6 | **U** |
| **questions** [4] - 4:9, 11:22, 12:2, 12:6 | **six** [1] - 9:6 | |
| | **skepticism** [1] - 5:15 | **under** [2] - 6:6, 8:15 |
| **R** | **sorry** [1] - 3:12 | **UNITED** [1] - 1:1 |
| | **Sound** [1] - 3:4 | **United** [2] - 1:16, 3:4 |
| **raise** [2] - 10:15, 10:20 | **sounds** [1] - 12:2 | **up** [5] - 6:23, 8:20, 11:5, 11:15, 12:4 |
| **ranking** [1] - 7:19 | **spaced** [1] - 9:6 | **upcoming** [1] - 6:18 |
| **re** [2] - 10:15, 10:20 | **spent** [1] - 4:12 | **uses** [1] - 7:21 |
| **re-raise** [2] - 10:15, 10:20 | **spoken** [1] - 11:4 | |
| **really** [1] - 6:7 | **Stacy** [3] - 13:7, 13:18, 13:19 | **V** |
| **reason** [2] - 5:16, 5:20 | **State** [1] - 13:1 | |
| **record** [1] - 13:9 | **STATES** [1] - 1:1 | **versus** [1] - 3:4 |
| **related** [2] - 5:2, 5:11 | **States** [1] - 1:16 | **view** [1] - 6:7 |
| **relevant** [1] - 5:21 | **status** [1] - 9:7 | |
| **REPORTER** [1] - 13:5 | **stay** [2] - 5:4, 10:22 | **W** |
| **Reporter** [1] - 13:7 | **stenographic** [1] - 13:10 | |
| **reports** [1] - 9:21 | **STEPHEN** [1] - 2:17 | **week** [3] - 7:16, 11:21, 12:13 |
| **request** [1] - 10:3 | **Stephen** [1] - 4:4 | **weeks** [3] - 8:19, 9:16, 11:13 |
| **requesting** [1] - 8:17 | **STEVE** [1] - 2:15 | **WHEREOF** [1] - 13:13 |
| **resolution** [1] - 10:23 | **Steve** [1] - 4:3 | **Wilmer** [1] - 3:17 |
| **respect** [3] - 4:17, 9:24, 10:9 | **Street** [1] - 1:12 | **WILMER** [1] - 2:6 |
| **review** [2] - 8:5, 8:9 | **strike** [3] - 4:22, 6:20, 6:24 | **Wilmington** [2] - 1:13, 13:15 |
| **reviewed** [1] - 4:21 | **subject** [1] - 6:18 | **wishes** [2] - 7:17, 8:2 |
| **revised** [1] - 11:20 | **suggested** [1] - 5:23 | **WITNESS** [1] - 13:13 |
| **ruling** [3] - 6:19, 9:18, 9:20 | **summary** [6] - 7:15, 7:18, 8:1, 8:9, 8:14, 8:17 | **wondering** [1] - 11:2 |
| | | |
| **S** | **T** | **Y** |
| | | |
| **save** [1] - 8:12 | **THE** [9] - 1:1, 1:1, 1:16, 3:1, 3:9, 3:21, 4:6, 12:5, 12:10 | **yesterday** [1] - 6:23 |
| **schedule** [2] - 4:17, 8:12 | **thereafter** [1] - 9:20 | |
| **schedules** [2] - 5:1, 11:12 | **they've** [2] - 5:17, 6:3 | |
| **scheduling** [9] - 3:3, 5:2, 6:16, 10:4, 10:8, 10:14, 11:17, 11:21, 12:12 | **thinking** [1] - 4:11 | |
| | **THOMAS** [1] - 2:10 | |
| **seal** [1] - 13:14 | **Thomas** [1] - 3:20 | |
| **second** [2] - 7:16, 8:4 | **THOMAS-KENNEDY** [1] - 2:10 | |
| **seeing** [1] - 4:14 | **Thomas-Kennedy** [1] - 3:20 | |
| **sentiments** [1] - 12:9 | **thoughts** [1] - 4:8 | |
| **set** [2] - 11:18, 13:13 | **today** [2] - 10:6, 11:7 | |
| **sever** [2] - 5:4, 10:19 | **together** [1] - 10:17 | |
| **short** [1] - 8:16 | **totality** [1] - 6:5 | |
| | **transcript** [1] - 13:10 | |

Hawkins Reporting Service
855 Arthursville Road    Hartly, Delaware   19953
(302) 658-6697    FAX (302) 658-8418

05/05/2023 11:29:50 AM